**IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | |
|---|---|
| IN RE BRISTOW GROUP INC. SECURITIES LITIGATION | Case No.: 4:19-cv-00509 (KPE) |

**<u>CONSOLIDATED AMENDED CLASS ACTION COMPLAINT</u>**

## TABLE OF CONTENTS

I.     NATURE OF THE ACTION ....................................................................................1

II.    JURISDICTION AND VENUE ...............................................................................5

III.   PARTIES ...............................................................................................................6

       A.    Lead Plaintiffs ...........................................................................................6

       B.    Defendants .................................................................................................6

       C.    Relevant Non-Parties .................................................................................8

IV.    FACTUAL BACKGROUND ALLEGATIONS .......................................................9

       A.    Bristow's Business, its Dependence on the Offshore Oil and Gas Industry,
             and the "STRIVE" Business Strategy Bristow Developed in Response to the
             Downturn in that Industry ...........................................................................9

       B.    As a Central Part of Bristow's STRIVE Strategy, Defendants Envisioned
             and Purported to Construct a "Liquidity Runway" to See Bristow Safely
             Through the Oil and Gas Downturn ...........................................................13

             1.    The Secured Debt Financings ...................................................15

             2.    The Collateral/Maintenance Covenants ....................................17

             3.    Bristow's Further Debt Financings, and their Cross-Default
                   Provisions ...............................................................................18

       C.    Bristow's Leased Helicopters and its Strategy and Efforts to Return Them ........20

       D.    Bristow's Attempted Acquisition of Columbia Helicopters ................................22

V.     DEFENDANTS' FALSE AND/OR MISLEADING STATEMENTS DURING
       THE CLASS PERIOD ...........................................................................................24

       A.    Overview ..................................................................................................24

       B.    Third Quarter Fiscal 2018 ........................................................................30

       C.    Year-End Fiscal 2018 ...............................................................................32

             1.    The Q4/Full Year Fiscal 2018 Press Release and Presentation ................32

             2.    The Fiscal 2018 Conference Call ..............................................37

             3.    The Fiscal 2018 Form 10-K ......................................................40

       D.    First Quarter Fiscal 2019 ..........................................................................54

             1.    The Q1 2019 Press Release and Presentation ...........................54

|     |     | 2.  | The Q1 2019 Conference Call ................................................. | 59 |

|     |     | 3.  | The Q1 2019 Form 10-Q.......................................................... | 60 |

|     | E.  | September 5, 2018: Barclays CEO Energy Power Conference ........................... | 66 |

|     | F.  | Second Quarter Fiscal 2019 ...................................................... | 70 |

|     |     | 1.  | The Q2 2019 Press Release and Presentation ............................. | 70 |

|     |     | 2.  | The Q2 2019 Conference Call ................................................. | 75 |

|     |     | 3.  | The Q2 2019 Form 10-Q.......................................................... | 76 |

| VI. | THE TRUTH EMERGES............................................................. | 80 |

|     | A.  | Bristow's February 11, 2019 Corrective Disclosures Reveal Bristow's Covenant Violations, Controls Failures, Debt Misclassifications and Potential Going Concern Risk .................................................. | 80 |

|     | B.  | Subsequent Disclosures, Revealing Further Fall-out from Defendants' Misconduct and Deepening Going Concern Risk, Further Sink Bristow's Share Price .............................................................. | 85 |

|     | C.  | Bristow's Bankruptcy ............................................................ | 96 |

|     | D.  | Bristow's June 19, 2019 Amended SEC Filings Admit the Falsity of, and Correct, Defendants' Class Period Representations ............................ | 97 |

|     |     | 1.  | The Amended SEC Filings and the Q3 2019 Form 10-Q......................... | 97 |

|     |     | 2.  | The Amended SEC Filings' Disjointed New/Alternative Explanations for Bristow's Reclassification of its Debts as Short-Term, and for Bristow's Going Concern Risk, Are Strong Evidence of Scienter .................................................. | 102 |

| VII. | MATERIALITY ...................................................................... | 105 |

| VIII. | LOSS CAUSATION................................................................... | 106 |

| IX. | ADDITIONAL FACTUAL ALLEGATIONS FURTHER SUPPORTING SCIENTER ...................................................................... | 109 |

|     | A.  | Bristow and Defendants Were Aware at All Times of the Collateral/Maintenance Covenants in the PK Air Debt, Macquarie Debt and Relevant Helicopter Leases.......................................... | 110 |

|     |     | 1.  | Defendant Miller Signed the PK Air Debt Agreement........................... | 111 |

|     |     | 2.  | Defendants' Public Statements Evidence Baliff's and Miller's Direct Involvement in Obtaining and Negotiating the Macquarie Debt and PK Air Debt, and their Detailed Awareness of the Status, Terms and Covenants of Those Debt Agreements .................................. | 111 |

3.    The Centrality of the Secured Debt Financings to Bristow and Defendants Further Supports Defendants' Scienter................................121

4.    Defendants Were Long Familiar with the PK Air Debt Counterparty and its Financing Terms/ Covenants........................................................122

B.    Defendants Were Aware of Bristow's Covenant Violations No Later than the Last Three Months of 2018 (Calendar Year)..................................123

C.    Bristow and Defendants Failed to Maintain Effective Internal Controls ............125

D.    The Delayed Closing and Ultimate Collapse of the Columbia Acquisition Further Support Scienter ....................................................................135

E.    Defendant Baliff's Expedited Departure Supports an Inference of Scienter ..............................................................................................143

X.    CLASS ACTION ALLEGATIONS .................................................................143

XI.    APPLICABILITY OF THE FRAUD-ON-THE-MARKET AND *AFFILIATED UTE* PRESUMPTIONS OF RELIANCE ................................145

XII.    NO SAFE HARBOR ......................................................................................147

XIII.    CAUSES OF ACTION ...................................................................................147

XIV.    PRAYER FOR RELIEF .................................................................................151

XV.    JURY TRIAL DEMANDED ...........................................................................151

**Glossary**

| Term | Meaning |
|---|---|
| Allman | Brian J. Allman, Bristow's Vice President and Chief Accounting Officer throughout the Class Period.  After the Class Period, on February 28, 2019, Allman succeeded Miller as Bristow's CFO |
| Amended Fiscal 2018 Form 10-K/A | Amended Bristow Form 10-K for the fiscal year ended March 31, 2018, filed with the SEC on June 19, 2019 |
| Amended Q1 2019 Form 10-Q/A | Amended Bristow Form 10-Q for the fiscal quarter ended June 30, 2018, filed with the SEC on June 19, 2019 |
| Amended Q2 2019 Form 10-Q/A | Amended Bristow Form 10-Q for the fiscal quarter ended September 30, 2018, filed with the SEC on June 19, 2019 |
| Amended SEC Filings | Amended Fiscal 2018 Form 10-K/A, Amended Q1 2019 Form 10-Q/A and Amended Q2 2019 Form 10-Q/A |
| Baliff | Jonathan E. Baliff, Bristow's CEO, and a member of Bristow's Board, throughout the Class Period (and Bristow's President at all relevant times until November 9, 2018) |
| Bankruptcy | Bristow's bankruptcy filing pursuant to Chapter 11 of the U.S. Bankruptcy Code, proceeding under the caption *In re Bristow Group Inc., et al.*, Case No. 19-32713 (DRJ) (Bankr. S.D. Tex.) |
| Class Period | The period from February 8, 2018 through February 11, 2019 |
| Collateral/Maintenance Covenants | Non-financial covenants in certain of Bristow's secured debt financings (the PK Air Debt and Macquarie Debt) and in certain of Bristow's helicopter leases (with Milestone Aviation Group) requiring, *inter alia*, that: (1) Bristow maintain, on each pledged/leased helicopter airframe, the specific pledged/leased engine(s) associated with that airframe under the relevant Secured Debt Financing agreement and/or lease; with the limited exception that (2) in the event a pledged/leased engine was removed for maintenance from a pledged/leased airframe and a non-pledged engine installed in its place (for example, a "loaner" engine provided by an original equipment manufacturer ("OEM") maintenance provider), the originally-pledged/leased engine (or another engine subject to the same pledge or lease) be returned and/or re-installed in the airframe within 180 days |
| Columbia | Columbia Helicopters, Inc., a helicopter services provider specializing in heavy-lift operations for military/defense customers, which Bristow agreed to acquire on or about November 9, 2018, but whose acquisition was terminated on or about February 11, 2019 |
| Columbia Acquisition | Bristow's proposed purchase of Columbia |

| Term | Meaning |
|---|---|
| Defendants | Baliff and Miller |
| Fiscal 2018 Form 10-K | Bristow Form 10-K for the fiscal year ended March 31, 2018, filed with the SEC on May 23, 2018 |
| Fiscal 2019 Forms 10-Q | Q1 2019 Form 10-Q and Q2 2019 Form 10-Q |
| Lombard Debt | Bristow's twin secured equipment term loans for an aggregate of $200 million from Lombard North Central Plc, a part of the Royal Bank of Scotland, which Bristow used in December 2016 and January 2017 to finance Bristow's purchase of eight (8) large helicopters required for use in connection with Bristow's U.K. SAR contract, secured by those eight helicopters and maturing in December 2023 and January 2024 |
| Macquarie Debt | Bristow's $200 million five-year secured equipment term loan from Macquarie Bank Limited, secured by 20 of Bristow's oil and gas helicopters and maturing in March 2022, which funded in March 2017 and which Bristow used to pay down its extant bank debt ($154.1 million of Bristow's term loan credit facility and $45.9 million of Bristow's term loan) |
| Miller | L. Don Miller, Bristow's CFO throughout the Class Period. After the Class Period, on February 28, 2019, Miller succeeded Baliff as Bristow's CEO and President |
| NYSE | New York Stock Exchange |
| Original SEC Filings | Fiscal 2018 Form 10-K, Q1 2019 Form 10-Q and Q2 2019 Form 10-Q |
| PK Air Debt | Bristow's ~$230 million in secured equipment term loans from PK Transportation Finance Ireland Limited, secured by 24 Bristow helicopters and maturing in July 2023, which funded in September 2017 and which Bristow used to pay down its extant bank debt (including $17.0 million of Bristow's term loan credit facility, $93.7 million of Bristow's term loan and $103.0 million Bristow's revolving credit facility) |
| Q1 2019 Form 10-Q | Bristow Form 10-Q for the fiscal quarter ended June 30, 2018, filed with the SEC on August 2, 2018 |
| Q2 2019 Form 10-Q | Bristow Form 10-Q for the fiscal quarter ended September 30, 2018, filed with the SEC on November 9, 2018 |
| Q3 2019 Form 10-Q | Bristow Form 10-Q for the fiscal quarter ended December 30, 2018, originally due to be filed with the SEC on or about February 6, 2019, but not filed then or on subsequent, delayed due dates including February 11, 2019 and April 15, 2019, and ultimately filed on June 19, 2019 |

| Term | Meaning |
| --- | --- |
| S&P 500 | The S&P 500 index |
| SEC | U.S. Securities and Exchange Commission |
| Secured Debt Financings | The Lombard Debt, Macquarie Debt and the PK Air Debt |
| STRIVE | Acronym for Defendants' stated business strategy for Bristow, with each letter standing for a specific prong of the strategy |

Court-appointed Lead Plaintiffs Andrew Abernathey, Jay Abernathey, Guy Abernathey and Meridian Investments, LLC ("Lead Plaintiffs"), by and through Lead Plaintiffs' attorneys, allege the following against Jonathan Baliff ("Baliff"), who served as Chief Executive Officer ("CEO") and President of non-party Bristow Group, Inc. ("Bristow" or the "Company") during the Class Period, and L. Don Miller ("Miller"), Bristow's Chief Financial Officer ("CFO") during the Class Period. Lead Plaintiffs' allegations concerning their transactions are based upon Lead Plaintiffs' personal knowledge. All other allegations are based upon Lead Plaintiffs' attorneys' investigation, which includes without limitation: (a) review and analysis of Bristow's regulatory filings with the U.S. Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and media reports issued and disseminated by Bristow and Defendants; and (c) review of other publicly available information concerning Bristow, including reports on Bristow authored by securities analysts and filings made by and/or concerning Bristow in Bristow's Bankruptcy.[1] Lead Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.    NATURE OF THE ACTION

1.    Lead Plaintiffs bring this action under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and SEC Rule 10b-5 promulgated under the Exchange Act, on behalf of Lead Plaintiffs and all similarly situated purchasers of Bristow common stock during the period between February 8, 2018 and February 12, 2019 (the "Class Period"). Lead Plaintiffs bring these claims against Defendants Jonathan Baliff and Don Miller, who were Bristow's two most senior officers during the Class Period and who are directly responsible for Bristow's false and materially misleading statements in its SEC Filings.

2.    Bristow, a Delaware corporation headquartered in Houston, Texas, is a provider of industrial aviation services, primarily through its fleet of approximately 400 rotary (helicopter) and fixed-wing aircraft. At all relevant times, shares of Bristow common stock traded on the New

---

[1] The "Bankruptcy" refers to *In re Bristow Group Inc.*, Case No. 19-32713 (DRJ) (Bankr. S.D. Tex.). All references to "Bankr. Dkt. No." are to the Bankruptcy docket.

York Stock Exchange ("NYSE") under the symbol "BRS." Bristow filed for bankruptcy protection on May 11, 2019.[2]

3.      Most of Bristow's business and revenues came from providing helicopter transportation services to the offshore oil and gas industry (*e.g.*, transporting personnel to and from offshore oil and gas production platforms) and from providing certain related fixed-wing transportation services (*e.g.*, flying personnel to locations close to such offshore platforms). *See* Section IV.A, *infra*. However, an oil industry downturn beginning in 2014 led to sharp declines in offshore oil and gas operations and spending. That decline in spending on offshore oil and gas operations directly (and negatively) affected Bristow by leading to substantial reductions in Bristow's contracts, flights, revenues, and pricing, and in turn, substantial helicopter fleet overcapacity, with Bristow bearing the cost (*i.e.*, idle aircraft that were not producing any revenues). *Id.*

4.      In response to the offshore oil and gas industry downturn, Defendants developed a business strategy to develop sufficient funding and liquidity to allow Bristow to operate through the oil and gas industry downturn. *See* Sections IV.A-B, *infra*.

5.      Defendants developed this liquidity between late 2016 and March 2018 through a series of three equipment-based financing agreements – the Secured Debt Financings, through which Bristow obtained more than $600 million in loans secured by approximately 52 Bristow aircraft (*see* Section IV.B.1, *infra*), as well as through notes offerings raising almost $500 million more (*see* Section IV.B.3, *infra*). Defendants used the funds raised from these new, secured financing agreements to pave a purported multi-year "liquidity runway" for Bristow by: (1) paying

---

[2] Pursuant to the "Order (i) Approving the Disclosure Statement, (ii) Confirming the Amended Joint Chapter 11 Plan of Reorganization of Bristow Group Inc. and Its Debtor Affiliates, as Further Modified and (iii) Granting Related Relief," only claims against Defendants were excluded from the third-party releases. *See* Bankr. Dkt. No. 822-1 at ¶40 ("solely with respect to securities class action claims that have been asserted against the previously named Individual Defendants (the 'Named Defendants') in the securities litigation styled: *In re Bristow Group Inc. Securities Litigation*, Case No. 19-cv-00509 (KPE), in the United States District Court for the Southern District of Texas, Houston Division ('Securities Litigation'), the term 'Releasing Parties' shall not include Persons or Entities that purchased or otherwise acquired Existing Interests between February 8, 2018 and February 12, 2019, inclusive, that are seeking to pursue remedies under the Securities Exchange Act of 1934.").

off Bristow's revolving and near-term bank debts so that Bristow would have no substantial debt payment obligations (other than interest expense) until 2022 and following years; and (2) covering Bristow's operating losses in the interim, until an upturn in the offshore oil and gas sector returned Bristow to profitability.

6.      But in addition to their financial terms, Bristow's new Secured Debt Financing agreements also included certain important non-financial covenants.  Bristow's new loans were secured by Bristow's helicopters, and the financing agreements for those loans included detailed provisions identifying which Bristow helicopters were pledged as collateral for each loan, specifying, *inter alia*, the serial numbers of their primary components: (a) the serial number of the helicopter airframe, (b) the serial number of the engine or engines installed in that airframe, and (c) the serial numbers of the rotor blades installed on the airframe.  The debt agreements provided that Bristow could not separate those specified components for longer than a certain period of time (usually 180 days) without permission from the lender.  So, for example, if Bristow had to remove an engine from the airframe on a pledged helicopter to perform maintenance on the engine (usually replacing it with a different engine in the interim), Bristow had to notify the lender and make sure that the pledged engine was reinstalled in the pledged airframe within 180 days.  These non-financial covenants are referred to in this complaint as the Collateral/Maintenance Covenants.

7.      These Collateral/Maintenance covenants served a critical function for Bristow's lenders: insuring the value of the collateral that secured Bristow's new Secured Debt Financings. First, the covenants ensured that if Bristow ever defaulted on its debts, the lenders would not foreclose on the helicopters pledged as collateral only to find that those helicopters now included replacement engines of lesser value than the engines pledged under the debt agreement (for example, because the replacement engines had significantly more flight hours than the pledged engines).  Second, the covenants ensured that each complete helicopter was only pledged as collateral for one secured financing agreement.  In other words, absent these non-financial covenants, Bristow's lenders risked, in the event of a foreclosure, finding that a helicopter pledged

as collateral for their loan included an engine pledged as collateral to a different lender.  Requiring matching of airframes and engines by serial number avoided that risk.

8.      Bristow's Secured Debt Financing agreements also included cross-default provisions.  Those cross-default provisions meant that if Bristow materially breached any one of its Secured Debt Financing agreements, Bristow would be in default of *all* of its Secured Debt Financing agreements, and thus *all* $1.4 billion of Bristow's supposedly long-term debt – the "liquidity runway" that was the centerpiece of the strategy that Defendants sold to Bristow's investors – would accelerate and become immediately due and payable.

9.      This classification of debt as long-term, as Bristow admitted at and after the close of the Class Period, was materially false and misleading.  *See* Section VI, *infra*.

10.     As Bristow explained only at and after the end of the Class Period, however, Bristow, due to an undisclosed material weakness in its internal controls, had operated throughout the Class Period – but unbeknownst to Plaintiffs and the Class – in violation of those material non-financial covenants contained in Bristow's Secured Debt Financings (and also in Bristow's helicopter lease agreements).  *See* Sections IV.B.2 and VI, *infra*.

11.     These undisclosed operational violations and weakness in internal controls had material financial consequences that, throughout the Class Period, remained hidden from and/or undisclosed to Plaintiffs and the Class.  *See* Section VI, *infra*.  Because violation of the Collateral/Maintenance Covenants constituted an event of default under the relevant agreements, Bristow's obligations under the relevant Secured Debt Financing and helicopter lease agreements were accelerated or subject to acceleration – *i.e*., to immediate and full payment.  Additionally, due to applicable cross-default provisions, Bristow's payment obligations under its note offerings were also subject to acceleration.  *See* Sections IV.B.3 and VI, *infra*.

12.     Consequently, throughout the Class Period but unbeknownst to Plaintiffs and the Class, effectively all $1.4 billion of Bristow's remaining debt repayment obligations under the Secured Debt Financings and the notes offerings – obligations which Defendants publicly represented as long-term obligations, and whose purported long-term nature constituted the

backbone of Bristow's "liquidity runway" – were actually *short-term* debt obligations.  *See* Section VI, *infra*.  Moreover, and finally, as Bristow's massive, $1.4 billion short-term debt burden overwhelmed Bristow's then-available liquidity of approximately $350 million, Bristow, contrary to Defendants' representations, did *not* have sufficient liquidity to fund operations and continue as a going concern, but was instead effectively *insolvent* and faced imminent, material going concern risk.  *Id*.  Indeed, approximately three months following the close of the Class Period, Bristow entered Chapter 11 bankruptcy.

13.     The revelation of these truths at and after the close of the Class Period caused immediate and material market revaluation of Bristow's prospects and worth, manifesting itself in the swift erasure of nearly 40% of Bristow's share price the very next day after the first of Bristow's corrective disclosures and more than 80% of Bristow's share price following Bristow's further corrective disclosures.  *See* Section VI, *infra*; *see also* Sections VII-VIII, *infra*.  Lead Plaintiffs and other Class members, who purchased Bristow shares during the Class Period, at prices artificially inflated by Defendants' material misrepresentations and omissions concerning Bristow, were damaged as a result.  *See* Section VIII, *infra*.

## II.     JURISDICTION AND VENUE

14.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

15.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and Section 27 of the Exchange Act (15 U.S.C. §78aa).

16.     Defendants are subject to personal jurisdiction in this Court.  15 U.S.C. § 78aa(a) provides for nationwide service of process over claims brought under the Exchange Act. Defendants are subject to general personal jurisdiction in this Court, because they both work in Harris County, Texas.  Further, Defendants are subject to specific personal jurisdiction because they worked for Bristow in Houston, Texas during the Class Period and because they made the

materially false and misleading statements, from which Plaintiffs' claims in this Action arise, in Houston, Texas.

17.      Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)).  Bristow is headquartered in this Judicial District, Defendants work and reside in this Judicial District, and substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District.

18.      In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the U.S. mail, interstate telephone communications, and the facilities of a national securities exchange.

## III.   PARTIES

### A.   Lead Plaintiffs

19.      Court-appointed Lead Plaintiffs Andrew Abernathey, Jay Abernathey, Guy Abernathey and Meridian Investments, LLC purchased Bristow common stock during the Class Period, as was detailed in Lead Plaintiffs' sworn certifications filed previously with the Court, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

### B.   Defendants

20.      **Defendant Jonathan E. Baliff ("Baliff")** served as Bristow's CEO from July 2014 until February 28, 2019, as Bristow's President from July 2014 until November 9, 2018, and as a member of Bristow's Board of Directors from July 2014 until February 28, 2019.  Baliff joined Bristow in October 2010 as Senior Vice President and CFO, and served in those positions until July 2014, when he was promoted to become Bristow's CEO and President.

21.      Baliff signed Bristow's Fiscal 2018 Form 10-K, and provided signed, sworn certifications accompanying Bristow's Fiscal 2018 Form 10-K, Q1 2019 Form 10-Q and Q2 2019 Form 10-Q, attesting to (1) the accuracy and adequacy of the information in those filings, and

(2) the adequacy and efficacy of Bristow's disclosure controls and internal controls over financial reporting.

22.     **Defendant L. Don Miller ("Miller")** served as Bristow's CFO throughout the Class Period.  After joining Bristow in 2010 and holding multiple leadership positions in the Company's Finance and Strategy divisions – including Vice President of Mergers, Acquisitions and Integration (from November 2014 until June 2015) and Vice President of Strategy and Structured Transactions (from 2010 until 2014) – Miller was promoted to the CFO position in August 2015.  Subsequent to the Class Period, and following Baliff's retirement, Miller was named Bristow's CEO and President, and appointed to Bristow's Board, effective February 28, 2019.  Prior to joining Bristow, Miller was the President and CEO for Enron North America Corp. and Enron Power Marketing, Inc. from 2001 to 2007 and Director – Finance and Vice President, Asset Marketing Group from 1998 to 2001.

23.     Miller signed Bristow's Fiscal 2018 Form 10-K, Q1 2019 Form 10-Q and Q2 2019 Form 10-Q, and provided signed, sworn certifications accompanying each of those filings attesting to (1) the accuracy and adequacy of the information in those filings, and (2) the adequacy and efficacy of Bristow's disclosure controls and internal controls over financial reporting.  Miller also signed the PK Air Debt agreement.

24.     Hereinafter, Defendants Baliff and Miller are collectively referred to as the "Defendants."  Defendants, because of their positions with the Company, possessed the power and authority to control the content of Bristow's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market.  Each Defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-public information available to them, each of these defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public and that the positive representations which were being made were then materially false and/or

misleading.  Defendants are liable for the false statements, pleaded herein, as those statements were each "group-published" information, the result of the collective actions of the Defendants.

C.    **Relevant Non-Parties**

25.    **Non-party Bristow Group Inc.** (previously defined as "Bristow" or the "Company") is incorporated in Delaware, with principal executive offices located at 2103 City West Blvd, 4th Floor, Houston, Texas 77042.  During the Class Period, Bristow stock traded on the New York Stock Exchange ("NYSE") under the ticker symbol "BRS."[3]  Bristow was originally named as a Defendant when this Action was first commenced.  However, Bristow and certain of its subsidiaries voluntarily entered into bankruptcy cases under Chapter 11 of United States Bankruptcy Code on May 11, 2019 (the "Bankruptcy").  Claims against Bristow were automatically stayed upon Bristow's filing of the Bankruptcy.  Bristow exited the Bankruptcy as a privately-held company, owned almost entirely by Bristow's noteholders and creditors and in remaining part by a Bristow management incentive compensation plan to be used to remunerate Defendant Miller, non-party Allman, and other Bristow executives.  Pursuant to the order confirming the Bankruptcy Plan, Lead Plaintiffs' claims against Bristow (and other potential parties beyond Defendants Baliff and Miller) were discharged and released.  *See* Bankr. Dkt. No. 825 at ¶¶40.  However, at trial, Plaintiffs expressly reserve the right to seek recovery under the full D&O Liability Insurance Policy coverage, including without limitation, whether Bristow would have otherwise been liable under Section 10(b) of the Exchange Act and Defendants are only found liable as Control Persons under Section 20(a) of the Exchange Act.  *Id.* at ¶41.

26.    **Non-party Brian J. Allman ("Allman")** served as Bristow's Vice President and Chief Accounting Officer ("CAO") throughout the Class Period.  After joining Bristow in 2006 as Director of Financial Reporting, Allman was promoted to the position of Corporate Controller in August 2007 and became Bristow's CAO in April 2009 (a position he held for the next ten years,

---

[3] Bristow shares were delisted from the NYSE on or about May 13, 2019 and thereafter traded under the ticker symbol "BRSWQ" on the over-the-counter ("OTC") market.

until February 2019). Subsequent to the Class Period, Allman was appointed as Bristow's Senior Vice President and CFO on February 28, 2019, succeeding Miller in those positions.

27.     Allman signed Bristow's Fiscal 2018 Form 10-K, Q1 2019 Form 10-Q and Q2 2019 Form 10-Q.

## IV.   FACTUAL BACKGROUND ALLEGATIONS

### A.   Bristow's Business, its Dependence on the Offshore Oil and Gas Industry, and the "STRIVE" Business Strategy Bristow Developed in Response to the Downturn in that Industry

28.     Bristow is a leading provider of what it terms "industrial aviation services," which it and its unconsolidated affiliates provide primarily through a fleet of small (4-8 passenger), medium (12-16 passenger) and large (16-25 passenger) helicopters, and to a lesser extent through fixed-wing aircraft that further support its helicopter operations. As of March 31, 2018, Bristow's aircraft fleet was composed of the following 405 owned and leased aircraft:

| | Owned | Leased | Held for Sale | Operated by Unconsolidated Affiliates | Total |
|---|---|---|---|---|---|
| **Helicopters** | | | | | |
| **Large Helicopters** | 66 | 57 | 0 | 12 | 135 |
| **Medium Helicopters** | 62 | 24 | 9 | 58 | 153 |
| **Small Helicopters** | 22 | 3 | 0 | 13 | 38 |
| **Total - Helicopters** | 150 | 84 | 9 | 83 | 326 |
| **Fixed Wing Aircraft** | | | | | |
| **Fixed Wing Aircraft** | 29 | 21 | 2 | 27 | 79 |
| **Total Aircraft** | | | | | |
| **Total – Aircraft** | 179 | 105 | 11 | 110 | 405 |

29.     The primary markets for such industrial aviation services, both generally and for Bristow in particular, are (1) companies engaged in offshore oil and gas exploration, development and production, which require helicopters to transport personnel (and to a lesser extent, time-sensitive equipment) to and from offshore production platforms and drilling rigs, and (2) governments and other entities (such as companies engaged in offshore oil exploration and

production) that require "search and rescue" ("SAR") services.  Additional markets for industrial aviation services include air medical, agricultural support, firefighting, military, police, corporate transportation, tourism and traffic monitoring.

30.     Bristow's revenues derive in near-entirety from the oil and gas and SAR markets. For example, in fiscal 2018, 68% of Bristow's revenues were generated from oil and gas operations, 17% from U.K. SAR operations, and 15% from Bristow's fixed-wing fleet, which Bristow operated in substantial part to support its oil and gas helicopter services (for example, by flying oil and gas personnel from population centers to helicopter departure points located closer to offshore production platforms).

31.     The oil and gas business environment experienced a significant downturn beginning in 2014.  As the price of Brent crude oil fell from above $100/barrel in July 2014 to below $30/barrel by February 2016, companies engaged in oil and gas exploration and production (1) increasingly shifted from the highly costly development of offshore oil and gas formations to development of onshore shale formations, and (2) were compelled to implement measures to reduce their operational and capital costs (such as rescaling, delaying or canceling planned offshore projects, and/or otherwise reducing the use of, or prices paid for, helicopter transportation services).  This directly and negatively impacted Bristow's operations (as well as those of other providers of helicopter transportation to the oil and gas industry) by, *inter alia*, reducing offshore oil and gas demand for and spending on helicopter transportation, reducing the pricing Bristow and its peers could charge for such helicopter transportation services, and leaving Bristow and its peers with aircraft overcapacity – *i.e.*, significant numbers of idle helicopters that cost Bristow substantial amounts to own or lease and maintain while not generating any revenue.

32.     In response to these developments, Defendants devised and implemented a responsive business strategy for Bristow that Defendants referred to by the acronym "STRIVE." Defendants set forth their STRIVE strategy in Bristow's SEC filings (*see, e.g*., Fiscal 2018 Form 10-K, at 35-36; Fiscal 2017 Form 10-K, at 35) and discussed it during each of their quarterly

conference calls with analysts and investors prior to and during the Class Period.  Defendants described the elements of their STRIVE business strategy as follows:

    a.   *__S__ustain Target Zero Safety Culture.*  Safety will always be our number one focus.  We continue to deliver Target Zero performance with regard to our air accidents . . .

    b.   *__T__rain and Develop our People*.  We continue to invest in employee training to ensure that we have the best workforce in the industry.  We believe that the skills, talent and dedication of our employees are our most important assets. . .

    c.   *__R__enew Commercial Strategy and Operational Excellence.*  We are in the process of renewing both our commercial strategy to improve revenue productivity across our global markets and our operational strategy to serve our clients safely, reliably and efficiently.  We believe that we need to renew these strategies in order to thrive in an economy that is undergoing long-term structural change.  Our new Europe and Americas hub structure discussed elsewhere in this Annual Report has allowed us to achieve reductions in general and administrative expenses down to approximately 12% of revenue.  Further, our hub structure allows us to take advantage of short-cycle work, which we define as short-term demand requests from our oil and gas clients for contracts measured in months rather than years.  Our ability to service this demand led to significant outperformance versus internal expectations across many of our regions during fiscal year 2018.

    d.   *__I__mprove Balance Sheet and Return on Capital.*  **We seek to continue to improve our balance sheet and liquidity and reduce our capital costs**, with a goal of reduced financing leverage (including lower levels of debt and leases), return to profitability and improvement of return on invested capital.  To achieve this we have historically practiced the principal of prudent balance sheet management and **have proactively managed our liquidity position with cash flows from operations, as well as external financings.  These external financings have included the use of operating leases** for a target of approximately 35% of our LACE [Large Aircraft Equipment].  The target recognizes that we will have variability above or below the target of approximately 5% of our LACE due to timing of leases, purchases, disposals and lease terminations.  As of March 31, 2018, commercial helicopters under operating leases accounted for 40% of our LACE.  See "Liquidity and Capital Resources — Financial Condition and Sources of Liquidity" included elsewhere in this Annual Report for further discussion of our capital structure and liquidity.

    e.   *__V__alue-Added Acquisitions and Divestitures.*  We intend to pursue value-added acquisitions that not just make us bigger but better; that generate cost efficiencies that position us to thrive in an economy that is undergoing long-term structural change.  We may also divest portions of our business or assets

to narrow our product lines and reduce our operational footprint to reduce leverage and improve return on capital.  We also intend to continue to utilize portfolio and fleet optimization.  Consistent with our ongoing process to rationalize and simplify our business and global aircraft fleet, we sold 11 aircraft for proceeds of $48.3 million during fiscal year 2018.  We currently have 11 aircraft held for sale and the average age of our fleet is approximately nine years.  Additionally, our critical short and long-term goal is to significantly reduce our aircraft rent expense.  During fiscal year 2018 and April 2018, we returned four Airbus H225s and six Sikorsky S-92s.  The reduction of aircraft rent expense from these lease returns is just beginning and is a fundamental plank of our ongoing strategy to return to profitability.

f.  *Execute on Bristow Transformation.*  Our new Europe and Americas hub structure has allowed for global alignment with faster local market response and increased cost efficiency.  Also, as discussed elsewhere in this Annual Report, we reached agreements with OEMs during fiscal year 2018 to achieve $136 million in recoveries.

*See id.*

33.    Four of STRIVE's six elements are both straightforward and of minimal relevance here.  The first two elements, respectively **S**afety and **T**raining, need no further explication.  The third element, termed "**R**enew Commercial Strategy and Operational Excellence," centered on operational efficiency, which in large part boiled down to cost cutting.[4]  The sixth element, termed "**E**xecute on Bristow Transformation," merely emphasized that Bristow should actually "execute on" the previous five elements.

34.    The fourth and fifth elements of STRIVE – "**I**mprove Balance Sheet and Return on Capital" and "**V**alue-Added Acquisitions and Divestitures" – are, respectively, of central and substantial relevance here, and are further detailed in Sections IV.B-D below.

---

[4] *See, e.g.*, Bristow June 8, 2017 press release titled "Bristow Announces Critical Strategic And Leadership Changes For A Competitive And Profitable Future."  Operational efficiencies and cost cutting subsumed under this element of Bristow's strategy, as described by Defendants during Bristow's conference calls with analysts and investors during fiscal 2018 and fiscal 2019, included *inter alia*, Bristow's switch to a two-hub structure to better serve customers (and cut costs), Bristow's June 2017 layoffs (directed in one substantial part toward middle management positions), and Bristow's effort to reduce general and administrative expenses to 12% or less of revenues.

**B.    As a Central Part of Bristow's STRIVE Strategy, Defendants Envisioned and Purported to Construct a "Liquidity Runway" to See Bristow Safely Through the Oil and Gas Downturn**

35.     The fourth STRIVE element – "*Improve Balance Sheet and Return on Capital*" – focused, as Defendants explained in Bristow's Forms 10-K, on "improv[ing] our balance sheet and liquidity."  *See* Section IV.A, *supra*.

36.     As summarized below, from fiscal 2017 (Bristow's fiscal year ends on March 31) onwards, Defendants devoted tremendous effort to doing just that, and sought to thoroughly transform Bristow's balance sheet and liquidity by raising more than $1.1 billion in funds through multiple equipment-backed financings (the Secured Debt Financings as detailed below) and offerings of longer-term notes.  Defendants used the cash raised thereby:

    a.   to extinguish in its entirety Bristow's revolving and near-term bank credit and loan facilities, in effect "pushing out" Bristow's debt payment obligations to fiscal 2022 and beyond (when the notes and Secured Debt Financings reached their stated maturities); and

    b.   to fund Bristow's continuing operating losses through the oil and gas downturn and as Bristow sought to transform itself via the other STRIVE strategy elements (such as cutting costs and engaging in value-added acquisitions and divestitures) into a profitable venture – which in turn would allow Bristow to refinance its debts as they began to come due in fiscal 2022 and following years.

37.     Defendants termed the cash raised through Secured Debt Financings and notes offerings, and the above-summarized multi-year grace period it purportedly provided Bristow to right ship and navigate safely through the oil and gas downturn, as Bristow's "liquidity runway."

38.     Defendants' public statements, both prospective and retrospective, indicate that fashioning this "liquidity runway" was one of Defendants' foremost preoccupations from (1) fiscal 2017, when Defendants identified liquidity as one of three central components to their fiscal year 2017 "action plan" and began conceptualizing how to build a liquidity runway, through (2) fiscal 2018, when Defendants actually built much of that runway, principally through the Secured Debt

13

Financings, and (3) into fiscal 2019, when Defendants completed the last of the Secured Debt Financings and the liquidity runway. *See also* Sections IX.A.2-3, *infra*.

39.     Defendants began conceptualizing the building of the liquidity runway at the outset of fiscal 2017 (ended June 30, 2016), when Defendants began suggesting to analysts and investors that Bristow's then-unencumbered fleet of helicopters, representing between roughly $1.5 billion and $2.0 billion in value, represented a substantial source for equipment-based financings.

40.     During the two-and-a-half year period from the first quarter of fiscal 2017 through the second quarter of fiscal 2019, Defendants publicly discussed Bristow's liquidity runway at effectively every available opportunity: in every quarterly press release announcing Bristow's results of operations, in every quarterly earnings presentation provided to analysts and investors, in every quarterly conference call with analysts and investors, and in every analyst/investor conference where they presented on Bristow.[5]

41.     The Company's efforts to preserve and extend financial liquidity were well-received by investors during the Class Period.  For example, in a May 24, 2018 analyst report, James West (Evercore ESI), observed:

> **Enough Liquidity To Ride Out The Final Throes of The Downturn.**  ***Bristow, and in particular CFO Don Miller, has been relentlessly (and effectively) restructuring its balance sheet for the past ~18 months.  We imagine he's on a first-name basis with the security guards at numerous banks by now.***  Since November 2016, BRS has secured upwards of $1.1bn in aggregate financing through a series of transactions (at least 7) from myriad of lenders.  This comprehensive refinancing served to bolster liquidity and provide additional financial flexibility through the latter stages of the downturn (and subsequent

---

[5] While Defendants' Class Period statements are disclosed herein, *see* Section V, *infra*, Baliff and Miller accustomed investors to this liquidity enhancement strategy prior to the Class Period.  For example, during the February 3, 2017 Q3 2017 earnings call, Miller harped on the centrality of liquidity management to Bristow's strategic goals, noting, "I'll continue to kind of pound the table about this, but on a downturn – any kind of downturn, liquidity is at a premium and so the idea we've had and as you know it's been to address our near-term maturities, continue to kind of build liquidity through the system[.]"  Likewise, at the February 15, 2017 Credit Suisse Energy Summit, Baliff explained that this goal was shared throughout Bristow's senior ranks, "I mean, let me just not speak just for Don Miller.  I do want to speak for the SMT, our Senior Management Team . . . . So, I don't want you to think that all the work that we've done, we're going to sit on our laurels. We have cleared a runway of liquidity. . . ."

unknown) and catapult a previously looming maturity wall well into the next decade (first significant maturity not till CY22).

\*\*\*

***Bristow has done a commendable job reengineering its balance sheet and defraying capital commitments (and still has additional levers to pull).*** A material pickup in activity, and thus revenue, is now likely need for Bristow to start generating free cash flow and ultimately grow into its capital structure, in our view.

42.     Defendants' central focus on this liquidity runway was recently emphasized and confirmed by Allman, who, in a declaration submitted in the Bankruptcy, explained that Defendants viewed that runway as Bristow's single biggest "advantage" in confronting the industry-wide challenge posed by the oil and gas market downturn:

> Notwithstanding the challenges the Company faced, **the one advantage it had was that it had no pressing maturity wall of debt coming due, and had material unencumbered assets. The Company accordingly pursued a strategy of maximizing liquidity and financial flexibility through asset-level borrowings and secured equipment lease transactions.** Together with revenues from operations, **this additional liquidity allowed the Company to service debt, provided a runway to maintain operations through the downturn, and be poised to gain market share when the offshore oil and gas market recovered.** For example, on December 18, 2017, BGI issued the Convertible Notes and raised approximately $144 million and on March 6, 2018, BGI issued the Secured Notes and raised approximately $350 million.

*See* Declaration of Brian J. Allman in Support of the Debtors' First Day Motions, at ¶46, May 12, 2019 (Bankr. Dkt. No. 25).

### 1.     The Secured Debt Financings

43.     During fiscal 2017 and fiscal 2018, Defendants conducted a series of three equipment-based financings that raised as much as $630 million in funds and liquidity for Bristow, as set forth below:

     a.     **The Lombard Debt**.  On November 11, 2016, Bristow entered into twin secured equipment term loans for an aggregate of $200 million with Lombard North Central Plc, a part of the Royal Bank of Scotland, which Bristow used in December 2016 and January 2017 to finance Bristow's purchase of eight (8) large helicopters

required for use in connection with Bristow's U.K. SAR contract, and which loans were secured by those eight helicopters and matured in December 2023 and January 2024 (the "Lombard Debt"). *See, e.g*., Fiscal 2018 Form 10-K, at 105.

b. **The Macquarie Debt**.  On February 1, 2017, Bristow entered into a term loan credit agreement for a $200 million five-year secured equipment term loan with Macquarie Bank Limited, secured by 20 of Bristow's oil and gas helicopters and maturing in March 2022 (the "Macquarie Debt").  The Macquarie Debt funded on March 7, 2017, and Bristow used the $200 million to pay down its extant bank debt ($154.1 million of Bristow's term loan credit facility and $45.9 million of Bristow's term loan). *See, e.g*., Fiscal 2018 Form 10-K, at 105.

c. **The PK Air Debt**.  On July 17, 2017, Bristow entered into a term loan credit agreement with PK Airfinance S.à r.l. (as agent) and PK Transportation Finance Ireland Limited (as lender), which provided for an aggregate maximum commitment amount of $230 million consisting of up to 24 loans to Bristow, each of which was secured by a Bristow helicopter pledged as collateral and each of which matured in 70 months – *i.e*., July 2023 (the "PK Air Debt").  The PK Air Debt funded in September 2017, and Bristow used the ultimate $213.7 million that it obtained to pay down its extant bank debt (including $17.0 million of Bristow's term loan credit facility, $93.7 million of Bristow's term loan and $103.0 million of Bristow's revolving credit facility). *See, e.g*., Fiscal 2018 Form 10-K, at 62, 105.

44. The Lombard Debt, the Macquarie Debt, and the PK Air Debt are referred to herein as the "Secured Debt Financings."

45. The approximately 52 helicopters collateralizing the Secured Debt Financings – in each case consisting of (1) a particular airframe (the helicopter body), (2) one or more specific engine(s) accompanying that airframe, and (3) one or more set(s) of rotor blades – are specifically identified in the Secured Debt Financing credit agreements, and are set forth at Exhibit A hereto. Helicopter airframes were accompanied by multiple engines in order to allow the airframe to be in

near-continuous use even as engines underwent periodic maintenance: the engine requiring maintenance could be extracted from the airframe for the relevant work, and an alternate engine inserted into the airframe to allow the helicopter to resume flight operations.

## 2.   The Collateral/Maintenance Covenants

46.   The Secured Debt Financings contained certain covenants with which Bristow was obligated to comply.  In addition to including financial covenants, such as the delivery of timely financial statements that complied with generally accepted accounting principles ("GAAP"), the Secured Debt Financings included certain covenants concerning preservation of the specific collateral for those financings (*i.e.*, the relevant helicopter airframes, engines and rotor blades) and how maintenance on the airframes and engines would be performed.

47.   Among other things, certain maintenance covenants associated with the Macquarie Debt and the PK Air Debt (and certain of Bristow's helicopter leases as well) required Bristow:

   a.   to maintain, on each pledged/leased helicopter airframe, the specific pledged/leased engine(s) associated with that airframe under the relevant Secured Debt Financing agreement and/or lease; with the limited exception that

   b.   in the event a pledged/leased engine was removed for maintenance from a pledged/leased airframe by an engine maintenance provider (typically, the original equipment manufacturer, or "OEM") and a non-pledged engine installed in its place (for example, a "loaner" engine provided by the OEM), the originally-pledged/leased engine (or another engine subject to the same pledge or lease) be returned and/or re-installed in the airframe within 180 days.

48.   The above-specified maintenance covenants are referred to herein as the "Collateral/Maintenance Covenants."[6]

---

[6] Bristow first disclosed the existence of such Collateral/Maintenance Covenants, and that Bristow had operated in violation of them at all times since March 31, 2018, on February 11, 2019.  *See* Section VI.A, *infra*.  Although Bristow did not then or thereafter disclose which of its "secured financings and lease agreements" contained such Collateral/Maintenance Covenants (*see* Section

49.     These non-financial covenants performed two critical functions for Bristow's lenders.  First, the covenants ensured that if Bristow ever defaulted on its debts, and the lenders had to foreclose on the helicopters pledged as collateral, the lenders would not foreclose only to find that the helicopters they now owned included replacement engines of lesser value than the engines originally pledged under the debt agreement.  For example, without these non-financial covenants, a lender risked that if it foreclosed on a helicopter pledged as collateral, it might find that the helicopter now included an engine with a greater number of flight hours (and thus worth less money) than the engine installed in the helicopter at the time the secured financing agreement was signed.  Second, the covenants ensured that each complete helicopter was only pledged as collateral for one secured financing agreement.  In other words, absent these non-financial covenants, Bristow's lenders risked, in the event of a foreclosure, finding that a helicopter pledged as collateral for their loan now included an engine pledged as collateral to a different lender, to which that lender had a competing claim.  Requiring matching of airframes and engines by serial number avoided that risk.

### 3.      Bristow's Further Debt Financings, and their Cross-Default Provisions

50.     After raising more than $600 million of funds and liquidity through the Secured Debt Financings, which financed Bristow's remaining aircraft obligations under the U.K. SAR contract and allowed Bristow to effectively extinguish its extant bank debt, Defendants thereafter continued to build Bristow's liquidity runway and raise further liquidity through two notes

---

VI.B, *infra*), certain later Bristow disclosures, such as its April 15, 2019 disclosure that the financings which Bristow had violated ("[c]ertain of our credit facilities which are secured by pledges of aircraft") had "aggregate outstanding borrowings of $391.2 million at December 31, 2018" (*see* ¶187, *infra*) allowed Lead Plaintiffs the ability to determine the identity of those particular financings: specifically, the Macquarie Debt and the PK Air Debt, which had exactly that outstanding principal balance at exactly that time.  Likewise, while Bristow also never disclosed which of its helicopter leases contained such Collateral Maintenance covenants, Lead Plaintiffs believe that they too can be identified through reasonable deduction as Bristow's two helicopter leases with Milestone for 17 large helicopters.  *See* Section IX.A.4, *infra*.  Specifically, given that Bristow's counterparties on the PK Air Debt (PK Airfinance S.à r.l. and PK Transportation Finance Ireland Limited) were affiliates of Milestone, they were likely to employ the same or similar contracts featuring the same or similar terms and covenants.  *See Id*.

offerings totaling nearly $500 million and a further $75 million asset-backed lending facility, as set forth below:

    a.   On December 18, 2017, Bristow issued and sold $143.8 million of 4½% Convertible Senior Notes due June 2023, which were unsecured, and whose proceeds were used in substantial part to pay down Bristow's extant bank debt ($89.6 million of Bristow's term loan) and to hedge Bristow's conversion risks ($10.1 million). *See, e.g.*, Fiscal 2018 Form 10-K, at 103-04.

    b.   On March 6, 2018, Bristow issued and sold $350 million of 8.75% Senior Secured Notes due March 2023, which were secured, *inter alia*, by approximately 77 Bristow aircraft, and whose proceeds were used in part to repay Bristow's remaining bank debt under Bristow's term loan and Bristow's revolving credit facility, and in remaining larger part for general corporate purposes. *See, e.g.*, Fiscal 2018 Form 10-K, at 102-03.

    c.   On April 17, 2018, Bristow entered into a new asset-backed revolving credit facility providing for commitments of $75 million (which could be increased to $100 million), secured by certain Bristow accounts receivables and maturing in five years (the "ABL Facility"). *See, e.g.*, Fiscal 2018 Form 10-K, at 102.

51.    This nearly $500 million of additional notes offerings, together with the $630 million Secured Debt Financings and one prior debt offering (the October 2012 issuance of $450 million of 6¼% Senior Notes due October 15, 2022), brought Bristow's aggregate purported long-term debt at the Class Period inception to approximately $1.429 billion. *See, e.g.*, Fiscal 2018 Form 10-K, at 102.

52.    Consistent with customary financing provisions, each of Bristow's three above-identified notes offerings contained "cross-default" provisions. Those cross-default provisions meant that a default on any one of Bristow's debt agreements triggered defaults under Bristow's other debt agreements. *See, e.g.*, Fiscal 2018 Form 10-K, at 30.

### C.      Bristow's Leased Helicopters and its Strategy and Efforts to Return Them

53.      Of the 405 helicopters in Bristow's fleet as of March 31, 2018, 105 were leased, rather than owned, by Bristow.  *See* ¶28, *supra*.  However, as result of the oil and gas industry downturn, Bristow began to experience significant fleet *over*capacity, and had no customers for many of its helicopters.  *See* ¶¶30-31, *supra*.  This meant that Bristow was paying substantial amounts to rent, and further sums to house and maintain, leased helicopters that were idle and thus not generating any revenue.

54.      Therefore, and as Defendants explained in Bristow's SEC filings, earnings presentations and conference calls with analysts and investors, "a fundamental plank of our ongoing strategy to return to profitability" was to return as many leased helicopters as possible as soon as the leases would allow.  *See, e.g.*, Fiscal 2018 Form 10-K, at 36; Fiscal 2017 Form 10-K, at 35-36; *see also* Q3 2018 Conference Call Transcript (Bloomberg), at 7-8.[7]  The return of leased helicopters served double-duty in Bristow's STRIVE strategy, by:

a.   reducing Bristow's future cash obligations, and thereby improving Bristow's balance sheet by removing substantial liabilities (thereby responding to STRIVE's "*Improve Balance Sheet and Return on Capital*" element); and

b.   divesting unproductive assets and/or portions of its business (thereby responding to STRIVE's "*Value-Added Acquisitions and Divestitures*" element).

*See* Fiscal 2018 Form 10-K, at 35-36 (representing the return of leased helicopters as a furtherance of both STRIVE elements).

---

[7] In response to analyst questions, Defendant Baliff explained: "I don't view our return of aircraft as a negative.  It's a real positive. It reduces our fleet, it reduce – it has knock-on benefits to our direct costs. . . . [T]his is a real ability for us to bring down our cost structure and regain profitability much faster. It's what a company like ours thinks about when we entered the lease strategy, creating exit ramp to improve our – I mean, it's an essence like amortizing debt that we don't actually have to put any capital against. And that's a real positive.…"

55.     Beginning in fiscal 2017, Defendants, each quarter, emphasized the strategy and benefits of such leased helicopter returns, and often specified how many of which kinds of helicopters they expected to return in upcoming time periods (or had already returned), and quantified to some extent the resulting financial benefits.  *See, e.g.*, Q4 2017 Conference Call Transcript (Bloomberg), at 13;[8] Q1 2018 Conference Call Transcript (Bloomberg), at 2; Q3 2018 Conference Call Transcript (Bloomberg), at 7-8;[9] Q4 2018 Conference Call Transcript

---

[8] Where Defendants Miller and Baliff explained:

> Miller: I want to highlight as well we've got – lease returns is still an important part of the story. And we've got roughly 40% of our fleet today, around 71 leased aircraft. Our plan is this year to return another nine on top of the two that we teed up in Q4 of last year. And then as we move into FY 2019, another kind of 14 . . . that's an important element of this deleveraging through time and really reduction of cost, financial cost through time as well."

<div align="center">***</div>

> Baliff: And we do have an exit ramp out of this.  We don't talk about how 2019 and 2020 can improve.  But especially as you move into 2019 and 2020, you see significant lease returns.  And again, it still makes a very safe, reliable and efficient Bristow.  But it makes it a smaller Bristow and that's fine with us, right?  That is fine with us because we are looking to reduce leverage.  We're looking to be more profitable.  And so for us, as we strive to move Bristow in this new market dynamic, we think this is a key part of the investment thesis for you and for everybody.

[9] Where Defendant Miller explained:

> [J]ust to remind you, we have 27 225s and we lease 11 and own 16.  So the 225s is always been part of the return strategy.  We got four this year, three next year, zero the following year and the four, the last year that we can return.  So that's always been an important element of the flexibility, the optionality that we have.  And then as Jonathan highlighted, we got four 92s for this year and – we update – we didn't update as part of this pack.  And I think in one of the conferences in Q4 of last year, we provided an update of our lease roll-off, our lease cost.  And so in FY'19, we can actually return 13 helicopters, which again includes three 225s and the lion's share of S-92s.

(Bloomberg), at 2-3 and 7;[10] Q1 2019 Conference Call Transcript (Bloomberg), at 3-4;[11] Q2 2019 Conference Call Transcript (Bloomberg), at 3.

    **D.**    **Bristow's Attempted Acquisition of Columbia Helicopters**

    56.    The fifth of the six STRIVE elements – ***Value-Added Acquisitions and Divestitures*** – had, in addition to the negative aspect discussed immediately above (divesting unproductive assets or portions of Bristow's business), a further, positive aspect (namely, making

---

[10] Where Defendants Baliff and Miller explained:

> Baliff: So let me discuss these 2018 STRIVE successes with some comments on fiscal 2019 that Don will then expand upon. . .
>
> [P]ortfolio and fleet optimization. As our aircraft leases continue to roll off, we were able to lower our aircraft rent expense 11% throughout this fiscal year. Improving capital efficiency through the return of these aircrafts is critical to both improved profitability and improved debt-to-EBITDA as we currently expect to reduce rent expense even further in fiscal 2019 as we have the ability to return 21 leased aircraft during the year.
>
>     ***
>
> Miller: We returned eight leased aircraft in fiscal 2018 and have the ability to return an additional 21 aircraft during fiscal 2019 having already returned six through May. Of the returned aircraft, four were H225s, and we have the ability to return three more during the remainder of fiscal 2019, all of which will further reduce cash lease cost in fiscal 2020.

[11] Where Defendants Baliff and Miller explained:

> Baliff: This quarter, we've returned seven leased aircraft and Don will talk further about this, and we have the ability to return an additional 18 during the remainder of fiscal year 2019. We've updated our lease roll off schedule which can be found on slide 17 of this earnings presentation, and is important to understand as we go through the next number of years and improve our balance sheet through these lease returns.
>
>     ***
>
> Miller: During the first quarter of fiscal 2019, we returned seven leased helicopters to lessors. Total rent in the first quarter was $50.1 million flat with fourth quarter fiscal 2018, but is projected to trend lower through fiscal 2019 benefiting from our ability to return up to 18 leased helicopters during the remainder of this fiscal year, and in line with our full year total rent guidance range of $185 million to $195 million.

value-added acquisitions).  As Defendants explained, such acquisitions could make strategic sense and add value to Bristow where they could: (1) diversify Bristow away from its substantial dependence on offshore oil and gas operations, for example by acquiring helicopter companies focused on other end-markets (such as military, medical, agricultural support, firefighting, police, corporate transportation, tourism and traffic monitoring); and/or (2) help resolve Bristow's fleet overcapacity and idled helicopters by presenting Bristow with new customers and markets where its helicopters could be used.

57.     Defendants embarked on such a value-added acquisition strategy when, on November 9, 2018, Bristow announced that it had reached an agreement to acquire Columbia Helicopters, Inc. ("Columbia").  As Defendants explained at length in Bristow's November 9, 2018 press release, conference call and earnings presentation, Columbia – which specialized in heavy-lift operations for military/defense (which provided Columbia with nearly 70% of its revenues), firefighting, forestry, infrastructure and on-shore oil and gas customers – served end-markets that largely did <u>not</u> overlap with Bristow's.  Bristow's acquisition of Columbia (the "Columbia Acquisition") would thus not only diversify Bristow's operations and make it less dependent on the offshore oil and gas industry, but would simultaneously help resolve the problem of Bristow's helicopter fleet overcapacity by allowing Bristow to put idle helicopters to productive, revenue-generating use for Columbia's customers – and most particularly, for the U.S. government and Department of Defense, for which Columbia possessed a rare and difficult-to-obtain CARB ("Cargo Airlift Review Board") certification to provide aviation services.[12]  Conversely, Bristow could also seek to use Columbia's heavy-lift aircraft and capabilities in geographic areas that Bristow already supported and for existing customers, and likewise market Columbia's maintenance, repair and overhaul capabilities to Bristow customers.  *Id.*

---

[12] *See* Bristow's November 9, 2018 press release titled "Bristow Group to Combine with Columbia Helicopters in a $560 Million Transaction, Creating a Leading Global Diversified Industrial Aviation Solutions Company"; Bristow's November 9, 2018 earnings presentation for the second quarter of fiscal 2019, at 3, 9-25 and 28; and Q2 2019 Conference Call Transcript (Bloomberg), at 4-8.

58.     As discussed herein, to fund its proposed Columbia Acquisition, Bristow, in November and December 2018, marketed yet another notes offering and quickly succeeded in finding investors to purchase all $135 million of the contemplated notes.  *See* Section IX.D, *infra*. Bristow's ability to raise such additional long-term debt financing further demonstrated that the market credited Defendants' public representations concerning Bristow's solvency and purported liquidity runway (*see* Section V, *infra*).

59.     In sum and as represented by Defendants, the Columbia Acquisition offered Bristow a broader and more diversified customer and revenue base, the prospect of greater growth, and a resolution for Bristow's idled/unproductive helicopter assets.

60.     However, and as alleged in greater detail in Section IX.D, *infra*, although Bristow originally asserted that the Columbia acquisition would close quite quickly (before December 31, 2018), and although Bristow very quickly obtained the necessary consents and financing for the Columbia Acquisition in the weeks following its November 9, 2018 announcement, Bristow later disclosed on December 10, 2018 that it no longer expected the Columbia Acquisition to close in 2018 – providing neither explanation nor any alternative timeline – and provided no further updates until announcing, in conjunction with its February 11, 2019 corrective disclosures, that the Columbia Acquisition agreement had been terminated.  In fact, Bristow's control deficiency and violations of the Collateral/Maintenance Covenants would very likely have breached multiple representations, warranties, and covenants by Bristow in the Columbia stock purchase agreement. *See* Section IX.D, *infra*.

## V.     DEFENDANTS' FALSE AND/OR MISLEADING STATEMENTS DURING THE CLASS PERIOD

### A.     Overview

61.     During the Class Period, Defendants made certain representations that were materially false and/or misleading, presented chronologically and in detail at Sections V.B-F, *infra*.  Such representations can be analytically divided into four basic categories.

62.     **First**, Defendants made material misstatements concerning the adequacy and efficacy of Bristow's disclosure controls and internal controls over financial reporting, and the consequent accuracy of the figures reported in Bristow's financial statements. Such misstatements include those set forth in ¶¶110-13, 138-141, 170-71, *infra*.

63.     As Defendants admitted on and after February 11, 2019, Defendants' representations concerning these matters were materially false in light of Bristow's failure, at all times since at least March 31, 2018, to monitor compliance with the Secured Debt Financings' Collateral/Maintenance Covenants. *See* Sections VI.A-B, *infra*. As Defendants explained in such post-Class Period disclosures, this failure: (1) constituted a "material weakness" with respect to Bristow's internal controls over financial reporting; (2) rendered such controls, together with Bristow's disclosure controls, "ineffective;" and (3) meant that Defendants' prior Class Period statements concerning the efficacy and adequacy of Bristow's controls, and the accuracy of the figures reported in Bristow's financial statements, could "no longer be relied upon." *Id*. Ultimately, the Amended SEC Filings that Bristow filed on or about June 19, 2019 amended the Original SEC Filings to correct these misstatements, and disclosed the internal controls' material weakness and inefficacy. *See* Section VI.D.1, *infra*.

64.     **Second**, Defendants, in Bristow's financial reporting and financial statements, materially misstated Bristow's short-term debts and "current" liabilities throughout the Class Period and made related false and/or misleading statements concerning the timing of Bristow's debt repayment obligations.

65.     In the financial results Defendants reported for Bristow during the Class Period for year-end fiscal 2018, Q1 2019 and Q2 2019, and in the financial statements Defendants produced for such periods and included in Bristow's Original SEC Filings, Defendants originally reported that Bristow's short-term debts ranged from $50.8 million to $56.7 million, and total current liabilities ranged from $326.9 million to $334.6 million. *See* ¶¶83-84, 98-99, 117-18, 130-31,149-50, 162-63, *infra*.

66.     In fact, these originally-reported figures **understated Bristow's short-term debt and current liabilities by approximately $1.4 billion**, and were therefore materially incorrect. *See* Sections VI.A-D, *infra*.  As Bristow first began to explain on February 11, 2019, and in its subsequent disclosures, Bristow's violations of the Collateral/Maintenance Covenants constituted events of default under the Secured Debt Financings' credit agreements.  Those events of default in turn rendered Bristow's obligations under such agreements immediately due and payable, and also triggered cross-default provisions in Bristow's notes offerings, rendering Bristow's obligations thereunder also immediately due and payable.  *See* Sections VI.A-B, *infra*. Consequently, substantially all of the $1.4 billion of Bristow debts that Defendants had originally represented as "long-term" (namely, debts associated with the Secured Debt Financings and notes offerings) were in fact "short-term," current liabilities – as Bristow ultimately conceded as much in the Amended SEC Filings, which amended the short-term debt and current liability figures originally reported in the Original SEC Filings to reflect that, **for such periods**, they were in fact $1.4 billion more than originally reported – although Bristow attempted to offer a different and implausible explanation for its amendment in an effort to obscure its own culpability.  *See* Section VI.D, *infra*.

67.     These particular misstatements are summarized in the table below:

| Defendants' Class Period Understatements of Bristow's Short-Term Debt and Current Liabilities | | | | | |
|---|---|---|---|---|---|
| as of | Debt / Liability Line Item | as Originally Reported | Originally Reported In | Amended Amount | Amount Understated |
| 3/31/2018 | Short-Term Borrowings and Current Maturities of Long-Term Debt | $56,700,000 | Fiscal 2018 Form 10-K<br><br>Q4 2018 Press Release | $1,475,438,000 | $1,418,738,000 |
| | Total Current Liabilities | $362,897,000 | | $1,786,584,000 | $1,423,687,000 |
| 6/30/2018 | Short-Term Borrowings and Current Maturities of Long-Term Debt | $53,723,000 | Q1 2019 Form 10-Q<br><br>Q1 2019 Press Release | $1,453,423,000 | $1,399,700,000 |
| | Total Current Liabilities | $334,649,000 | | $1,739,298,000 | $1,404,649,000 |
| 9/30/2018 | Short-Term Borrowings and Current Maturities of Long-Term Debt | $50,798,000 | Q2 2019 Form 10-Q<br><br>Q2 2019 Press Release | $1,439,931,000 | $1,389,133,000 |
| | Total Current Liabilities | $329,217,000 | | $1,723,299,000 | $1,394,082,000 |

68.     Additionally, Defendants made further, related misstatements that, like the misstatements identified in ¶¶64-67 immediately above, falsely and/or misleadingly represented short-term debts as long-term ones.  Such misstatements include those set forth in ¶¶90-91, 100-01, 122-25, 136-37, 146-47, 156-57, *infra*.  For example, in the Original SEC Filings (*see* ¶¶100-01, 136-37, 168-69, *infra*) and in Defendants' quarterly earnings presentations (*see* ¶¶90-91, 124-25, 156-57, *infra*; *see also* ¶¶146-47, *infra*), Defendants included tables representing that Bristow's repayment obligations with respect to the Secured Debt Financings and notes offerings were long-term ones, coming due in 2022 and beyond, rather than short-term, immediately-payable current liabilities.  Such misstatements were materially false and/or misleading for the same reasons stated in ¶¶64-67, *supra*.  All such debts outstanding, which totaled approximately $1.4 billion, were in fact, as of Class Period inception, "short-term," current liabilities of Bristow – as Bristow ultimately conceded in the Amended SEC Filings (despite its baseless attempt to conceal the true

cause), which amended the debt and liability figures originally reported in the Original SEC Filings to reflect that, for such periods, effectively all of the approximately $1.4 billion in outstanding Secured Debt Financings and notes offerings debt, originally reported in the Original SEC Filings as long-term debt, were in fact, at all times during the Class Period, short-term debts and current liabilities of Bristow.  *See* Section VI.D, *infra*.

69.    **Third**, Defendants made material misstatements concerning Bristow's liquidity and fundamental financial condition.

70.    For example, in sections of the Original SEC Filings explicitly devoted to Bristow's liquidity and financial condition, Defendants represented: (1) that Bristow's liquidity was "sufficient to satisfy our operating needs, existing capital commitments and other contractual cash obligations;" and (2) that Bristow's fundamental financial condition was solid, by omission of any warning to the contrary such as disclosure of "going concern" risk.  *See* ¶¶104-05, 132-33, 164-65, *infra*.

71.    Likewise, in Bristow's quarterly earnings press releases, earnings presentations, and conference calls throughout the Class Period, Defendants made extensive representations concerning Bristow's ample liquidity, and the assurances such liquidity purportedly afforded with respect to Bristow's financial condition (*e.g.*, providing Bristow with a purported "liquidity runway").  *See* ¶¶85-86, 88-91, 93-96, 106-07, 119-20, 122-5, 127-28, 134-37, 144-47, 151-52, 154-57, 159-60, 166-67, *infra*.

72.    Defendants' representations concerning Bristow's liquidity and financial condition were materially false and/or misleading.  Those representations were materially misleading, because Bristow failed to also disclose that it lacked internal controls related to its compliance with non-financial covenants – creating a material risk that Bristow would violate those covenants and the supposedly long-term debt Bristow was touting to the public as its "liquidity runway" would become immediately due and payable.  Further, as was first revealed at and after the Class Period close, that risk had materialized during the Class Period: Bristow's violations of the Collateral/Maintenance Covenants during the Class Period rendered substantially all of Bristow's

debts under the Secured Debt Financings and notes offerings (approximately $1.4 billion), immediately due and payable, *see* Sections VI.A-B, *infra*, transforming such sums into short-term debts that were current liabilities of Bristow, *see id.* and Section VI.D, *infra*.  Consequently, Bristow's available liquidity during the Class Period (which, as originally reported, ranged from approximately $250 million to $360 million) was *insufficient* to meet the short-term debts (exceeding $1.4 billion) and current liabilities (exceeding $1.7 billion) that Bristow then actually faced, thereby posing a substantial risk to Bristow's fundamental financial condition and ability to continue as a going concern.  *See* Sections VI.A-D, *infra*.  Indeed, in the Amended SEC Filings, Bristow ultimately: (1) amended the short-term debt and current liability figures that Defendants initially reported in the Original SEC Filings, which had understated Bristow's short-term debt and current liabilities by approximately $1.4 billion; and (2) amended Defendants' prior representations concerning Bristow's liquidity and financial condition, by (a) removing representations asserting Bristow's purportedly "sufficient" liquidity, and (b) replacing them with new disclosures concerning the going concern risk that Bristow faced.  *See* Section VI.D, *infra*.

73.     Often, certain of Defendants' misstatements combined the interrelated matters discussed in "Second" (debt levels/timing) and "Third" (liquidity and fundamental financial condition).  *See, e.g.*, ¶¶90-91, 122-25.

74.     **Fourth** and lastly, Defendants, on numerous occasions, made representations concerning the Secured Debt Financings and/or their associated covenants.  *See, e.g.*, ¶¶102-03, 108-09, 134-35, 166-67.

75.     Although such representations were not false in and of themselves, they were rendered materially misleading by Defendants' omission to simultaneously disclose – when choosing to discuss these matters – that Bristow had violated the Secured Debt Financings' Collateral/Maintenance Covenants.

B.       **Third Quarter Fiscal 2018**

76.     The Class Period begins on February 8, 2018, when Bristow reported operational

and financial results for the third quarter of fiscal 2018 (ended December 30, 2017) in (1) a press

release titled "Bristow Group Reports Third Quarter Fiscal Year 2018 Results" (the "Q3 2018

Press Release"), also included as an exhibit to a Form 8-K filed with the SEC and signed by

Allman, and (2) a Form 10-Q filed with the SEC, signed by Miller and Allman (the "Q3 2018

Form 10-Q").  Additionally, at 10:00 a.m Eastern Time on the following day, February 9, 2018,

Defendants hosted a conference call with analysts and investors to further discuss Bristow's

operations, financial results of operations and financial condition (the "Q3 2018 Conference

Call"), in conjunction with which they authored and used a presentation titled "Third quarter FY18

earnings presentation" (the "Q3 2018 Presentation"), which they provided publicly via their

website and as an exhibit to a February 9, 2018 Form 8-K filed with the SEC and signed by Allman.

77.     In the above-specified documents and during the Q3 2018 Conference Call,

Defendants represented continued success in constructing Bristow's purported liquidity runway,

by virtue of having issued a convertible senior notes offering due 2023, that raised approximately

$143.8 million and led Defendants to raise their guidance for Bristow's liquidity.

78.     For example, in the Q3 2018 Press Release, Defendants represented:

**BUSINESS AND FINANCIAL HIGHLIGHTS**

. . .We had $505.4 million of total liquidity as of December 31, 2017, an increase
of $116 million or 30% in the December 2017 quarter; we are raising our liquidity
guidance as of March 31, 2018 to a range of $450 million to $480 million, an
increase of approximately $40 million over our November 2017 guidance,
primarily due to the issuance of $143.8 million of 4½% Convertible Senior Notes
due 2023, net of amounts used to pay down existing bank debt.

***

**LIQUIDITY AND FINANCIAL FLEXIBILITY**

Don Miller, Senior Vice President and Chief Financial Officer, commented, "Our
liquidity improved significantly by $116 million or 30% to $505.4 million at the
end of the December 2017 quarter primarily due to the recovery of OEM costs and
the issuance of $143.8 million of our convertible senior notes.  In addition, we paid

down $135.4 million of our bank term loans and ended the quarter with $400 million available under our revolver, before $12 million in letters of credit.  We are raising our liquidity guidance as of March 31, 2018 to a range of $450 million to $480 million. . .”

79.     Similarly, in the Q3 2018 Presentation, Defendants represented:

**We are delivering on our STRIVE priorities with a better than expected quarter and improved liquidity**

In the face of continued offshore market challenges, we have delivered on a majority of the critical goals that our FY18 STRIVE priorities represent. . .

\*\*\*

Solid execution of FY18 STRIVE priorities positions Bristow well in this market and led to the successful issuance of our $143.8M convertible notes which increased liquidity to $505M.

*See* Q3 2018 Presentation, at slide 9.

80.     Likewise, during the Q3 2018 Conference Call, Baliff emphasized that Bristow's additional notes offering not only allowed Bristow to further build out its liquidity runway, but evidenced the capital markets' belief in Bristow's ability to execute its STRIVE strategy turnaround:

. . . **Successful execution of our fiscal year '18 STRIVE priorities also had knock-on impacts, as we believe they were part of the success to access the capital markets this past December through the issuance of approximately $144 million in convertible senior notes, which significantly improved our liquidity runway**.  This was a success that few offshore service providers were able to accomplish last quarter given the challenging market conditions.  I'm incredibly proud of our entire organization for the commendable results and execution of these priorities, especially, in safety improvement. . .

*See* Q3 2018 Conference Call, Bloomberg transcript at 5.

81.     Defendants' above-detailed February 8-9, 2018 representations were materially misleading insofar as Bristow's disclosures of a purportedly favorable liquidity position following the Secured Debt Financings did not accurately portray the fragility of the liquidity runway and the internal control risks presented by obligations to comply with material non-financial covenants.

C.     **Year-End Fiscal 2018**

1.     **The Q4/Full Year Fiscal 2018 Press Release and Presentation**

82.     On May 23, 2018, Bristow issued a press release titled "Bristow Group Reports Fiscal Fourth Quarter and Full Fiscal Year 2018 Results" (the "Q4 2018 Press Release"), disclosing, *inter alia*, Bristow's financial results of operations and financial condition for the fourth quarter and full year of fiscal 2018 (ended March 31, 2018).  On the same date, Bristow filed a Form 8-K with the SEC, signed by Allman, attaching the Q4 2018 Press Release as an exhibit thereto.

83.     The Q4 2018 Press Release presented consolidated balance sheet financial statements for Bristow as of March 31, 2018, including, *inter alia*, the following amounts of (1) short-term borrowings and current maturities of long-term debt, and (2) total current liabilities:

| Liabilities | March 31, 2018 |
|---|---|
| Short-term borrowings and current maturities of long-term debt | $56,700,000 |
| Total current liabilities | $362,897,000 |

84.     These figures were materially false, for the reasons stated in ¶¶64-67, *supra*.  As later revealed through Bristow's February-April 2019 disclosures, Bristow's violations of the Collateral/Maintenance Covenants, ongoing since at least March 31, 2018, had the effect of accelerating Bristow's obligations under the Secured Debt Financings and notes offerings, transforming $1.4 billion of previously long-term debt into short-term debt and current liabilities. *See* Sections VI.A-B, *infra*; ¶¶64-67, *supra*.  As Bristow later admitted in its June 19, 2019 Amended SEC Filings (although Bristow attempted to conceal the true reason), Bristow's originally-reported short-term debt and current liabilities as of March 31, 2018 (*i.e.*, the figures set forth above) had been understated by more than $1.4 billion: Bristow's short-term debt was not $56.7 million as of March 31, 2018, but rather $1.475 billion; and Bristow's current liabilities were not $362.9 million, but rather $1.787 billion.  *See* Section VI.D, *infra*; ¶¶64-67, *infra*.

85.     In addition, the Q4 2018 Press Release contained representations concerning Bristow's purported financial condition and liquidity from Defendants Baliff and Miller, as set forth below:

> "The New Bristow was successful in executing our fiscal 2018 STRIVE priorities, including agreements to recover $136 million in OEM costs, reducing rent expense by returning aircraft to lessors, deferring approximately $190 million of capital expenditures, and **increasing financial flexibility by completing over $700 million in new low cost financings**," said Jonathan Baliff, President and Chief Executive Officer of Bristow Group.
>
> <div align="center">***</div>
>
> "I am honored to work with a team that delivered **notable successes for our clients and investors in fiscal 2018, especially in the areas of** safety on the field and **liquidity on the balance sheet**," said Jonathan Baliff.
>
> <div align="center">***</div>
>
> **LIQUIDITY AND FINANCIAL FLEXIBILITY**
>
> Our cash balance of $380 million as of March 31, 2018 reflects the net benefit from closing and funding the $350 million 8.75% five-year Senior Secured Notes and the repayment of our April 2019 bank maturities.
>
> **Don Miller, Senior Vice President and Chief Financial Officer, commented, "Fiscal year 2018 was a very successful year for Bristow as we materially improved our liquidity runway by repaying our 2019 bank maturities with the closing and funding of over $700 million in new low cost capital eliminating near term refinancing risk.  The success of these financings will allow us to continue to focus on increasing revenue, reducing costs, and improving returns on our assets**."

86.     Defendants' above-identified representations in the Q4 2018 Press Release concerning Bristow's purportedly favorable liquidity position (including "increasing financial flexibility," "notable successes [] in the areas of [] liquidity on the balance sheet," and "eliminating near term refinancing risk") and Bristow's "liquidity runway" were materially false and/or misleading, for the reasons stated in ¶¶69-73, *infra*.  In fact, and as Bristow's disclosures later revealed, Bristow was then effectively insolvent: its short-term debts (which then exceeded $1.4 billion) and current liabilities (which then exceeded $1.7 billion) dwarfed Bristow's then-available

liquidity (approximately $380 million), thereby posing a substantial risk to Bristow's fundamental financial condition and ability to continue as a going concern. *See* Sections VI.A-D, *infra*. In light of the imbalance between Bristow's short-term debts/current liabilities and its available liquidity, Bristow did not in fact have a liquidity runway, but rather faced an imminent liquidity crash landing.

87.     On May 24, 2018, Bristow posted to its website a presentation titled "Fourth quarter FY18 earnings presentation" (the "Q4 2018 Presentation"), presenting – in connection with Bristow's Q4 2018 Conference Call – *inter alia*, Bristow's financial results of operations and financial condition for the fourth quarter and full year of fiscal 2018 (ended March 31, 2018). On the same date, Bristow filed a Form 8-K with the SEC, signed by Allman, attaching the Q4 2018 Presentation as an exhibit thereto.

88.     The Q4 2018 Presentation, in three of its first four substantive slides, reiterated the above-detailed May 23, 2018 representations from Defendants Baliff and Miller concerning Bristow's purported financial condition and liquidity, and repeatedly emphasized Bristow's purported liquidity runway:

| FY18 STRIVE achievements provide a strong foundation for continued success in FY19 | |
|---|---|
| **Cost efficiencies** | [OMITTED] |
| **Portfolio and fleet optimization** | [OMITTED] |
| **Revenue growth** | [OMITTED] |
| **Improved financial flexibility** | • **Over $700M in new capital raised in FY18 for a total of ~$1.2 billion since December FY17**<br>• **$380M of liquidity (all cash) as of March 31, 2018; eliminated near-term refinancing risk and all bank financial maintenance covenants** |

*See* Q4 2018 Presentation, at 5.

**FY19 begins with liquidity of $380 million due to successful financings in FY18**

Total Liquidity

- **Funded over ~$700M in new capital in FY 18; repaid and terminated 2019 bank maturities**

- **First senior note debt maturity is not until FY23**

- **Limited debt amortization of ~$50M per year over the next three years**

- New $75M asset-backed revolving credit facility closed April 2018, which is not included in March 31, 2018 liquidity

[CHART OMITTED]

*See* Q4 2018 Presentation, at 6.

**Our FY19 STRIVE priorities are focused on creating a sustainable and profitable Bristow**

- Macro and political trends are pushing oil prices higher with the benefits largely accruing to onshore operators.  Offshore continues to show signs of stability (at low levels) with projected FID increases and more short cycle work for service companies

- **Our strong liquidity and operational leverage positions us well to compete today, drive further efficiencies, and capture an upturn in the offshore market, when it emerges**

- As we move into fiscal year 2019, we will continue to transform our business to **create sustainability, defined as positive cash flow, reduced leverage and an ability to refinance FY23 maturities in absence of an offshore market recovery**.  FY19 priorities include: . . .

- Continued innovation and greater cost efficiencies are required as we move from sustainability to profitability

*See* Q4 2018 Presentation, at 8.

89.     Defendants' above-identified representations in the Q4 2018 Presentation concerning Bristow's purportedly favorable liquidity position following the Secured Debt Financings, and the liquidity runway they purportedly afforded to Bristow, were substantively

identical to the Defendants' representations in the Q4 2018 Press Release concerning these matters, and were materially false and/or misleading for the reasons stated in ¶86, *supra*.

90.     Defendants also included in the Q4 2018 Presentation a detailed table illustrating Bristow's purported liquidity runway, showing, *inter alia*, limited debt amortization obligations during fiscal 2019, 2020 and 2021, with various debt offerings and secured debt financings maturing and requiring substantial principal repayments in fiscal 2022 (the Macquarie Debt), fiscal 2023 (multiple notes offerings), and fiscal 2024 (the PK Air Debt and Lombard Debt):

| Debt repayments and amortization as of March 31, 2018 | | | | | | | |
|---|---|---|---|---|---|---|---|
| Debt repayments and amortization schedule | | | | | | | |
| ($ in millions) | Balance 3/31/18 | FY19 | FY20 | FY21 | FY22 | FY23 | FY24+ |
| 8.75% Secured Senior Notes | 350.0 | - | - | - | - | 350.0 | - |
| 4.5% Convertible Senior Notes | 143.8 | - | - | - | - | - | 143.8 |
| 6.25% Senior Unsecured Notes | 401.5 | - | - | - | - | 401.5 | - |
| Macquarie Debt | 185.0 | 14.0 | 14.0 | 14.0 | 143.0 | - | - |
| Lombard Debt | 211.1 | 13.6 | 13.6 | 13.6 | 13.6 | 13.6 | 143.1 |
| PK Air Debt | 230.0 | 18.0 | 19.1 | 20.3 | 21.7 | 23.0 | 127.9 |
| Eastern Airways Debt | 14.5 | 14.5 | - | - | - | - | - |
| Airnorth Debt | 13.8 | 2.7 | 2.9 | 2.4 | 2.5 | 2.6 | 0.7 |
| Other Debt | 4.0 | - | 1.7 | 2.0 | 0.3 | - | - |
| Total | $1,553.7 | $62.8 | $51.2 | $52.4 | $181.1 | $790.8 | $415.4 |

*See* Q4 2018 Presentation, at 35.

91.     Defendants' above representation of Bristow's debts and debt repayment timing – a detailed numeric representation of Bristow's purported liquidity runway, depicting very limited debt repayment obligations for fiscal 2019-2021/2022 – was, where highlighted above, materially false and/or misleading, for the reasons set forth in ¶¶64-68, 69-73 and 74-75, *supra*.  In fact, and as revealed through Bristow's later filings: (1) substantially all of the $1.4 billion of outstanding principal that Bristow was obliged to repay under the Secured Debt Financings and the notes offerings was *not* long-term debt payable 3-5 years in the future, as depicted in the above table,

but instead short-term debt and current liabilities of Bristow; and (2) consequently, rather than enjoying a liquidity runway, Bristow was facing an imminent liquidity crash landing.

### 2.      The Fiscal 2018 Conference Call

92.      On May 24, 2018 at approximately 10:00 a.m., Defendants held a conference call with analysts and investors to further discuss Bristow's operations, financial results of operations and financial condition for the fourth quarter of fiscal 2018 (the "Q4 2018 Conference Call").

93.      During the Q4 2018 Conference Call, Defendants Baliff and Miller, relying on and referring analysts and investors to the above-detailed pages of the Q4 2018 Presentation, reiterated the representations made therein concerning Bristow's purported financial condition and liquidity:

> BALIFF: Turn to slide 5.  During the fourth quarter and for the full fiscal year, we have successfully accomplished our fiscal 2018 STRIVE priorities.  **This page shows that the successes on this page and the previous page provide runway from fiscal 2018 survivability to fiscal 2019 sustainability and ultimately, a return to profitability**  So let me discuss these 2018 STRIVE successes with some comments on fiscal 2019 that Don will then expand upon. . .

> \*\*\*

> Lastly, I just want to touch on an important aspect of our business, not just our commercial successes which give us a lot of confidence in fiscal 2019, but **our strong liquidity position and increased runway over the next several years due to the successful actions taken in the second half of fiscal 2018.**

> **We have eliminated near-term financing risks and have over $350 million of cash on our balance sheet due to the excellent work of Don Miller and our finance and accounting teams, on top of which the operational teams helped contribute.**

> **I would like to highlight that that strong liquidity** coupled with our strong operating leverage helped shape our guidance for fiscal year 2019 . . .

> MILLER: Thank you, Jonathan.  As Jonathan mentioned, **we were successful in fiscal 2018 by setting a strong foundation for the future which gives us confidence as we execute in fiscal 2019.  And in line with the prior three fiscal years in spite of challenging conditions, we ended fiscal 2018 with $380 million in liquidity.**

> **Our fiscal 2018 in liquidity is a result of many financings and other positive actions taken over the past two years**, including $630 million of equipment financings, debt issuance of $144 million of convertible senior notes and our recent

$350 million five-year Senior Secured Notes offering. **Importantly, with a portion of these proceeds, we paid off and terminated our 2019 bank maturities, thereby, increased our liquidity runway with our first senior note maturity not until fiscal 2023 and with manageable annual debt amortization of approximately $50 million per year for the next three years**.

Additionally in April 2018, we further increased our liquidity with our new $75 million five-year ABL facility. This additional source of liquidity is not included in our March 31, 2018, liquidity balance of $380 million. The borrowing capacity under the ABL facility was approximately $25 million as of May 23, 2018. Please see slide 35 for a complete listing of our debt repayments and amortization schedule as of March 31, 2018.

**In addition to the financings, other fiscal 2018 liquidity-enhancing actions** included the deferral of approximately $190 million of aircraft CapEx into future periods and $136 million in OEM costs recoveries. We also successfully reduced total CapEx from fiscal 2017 to fiscal 2018 by $89 million or 66% and we continue to make further progress in fiscal 2019, which I'll touch upon on the next slide.

We also reduced G&A costs from fiscal 2017 to fiscal 2018 by approximately $10 million or 5%, excluding restructuring costs. G&A cost reductions continue to remain a focus and since fiscal 2015, we have reduced G&A costs by approximately $75 million. We returned eight leased aircraft in fiscal 2018 and have the ability to return an additional 21 aircraft during fiscal 2019 having already returned six through May. Of the returned aircraft, four were H225s, and we have the ability to return three more during the remainder of fiscal 2019, all of which will further reduce cash lease cost in fiscal 2020.

**Fiscal 2018 was clearly a culmination of several years of effective execution on a number of important fronts providing the required liquidity to allow us to remain focused on improving operational performance and increasing cash flow**. Note that on May 18, 2018, our cash balance was $362 million which is net of approximately $25 million of principal interest and redundancy costs paid since March 31, 2018.

*See* Q4 2018 Conference Call Transcript (Bloomberg), at 2-3.

94. Defendants' above-identified representations in the Q4 2018 Conference Call concerning Bristow's purportedly favorable liquidity position in light of the Secured Debt Financings (including "our strong liquidity position and increased runway over the next several years," the "eliminat[ion of] near-term financing risks," Bristow's "strong liquidity" and the "strong foundation" it afforded Bristow for the future) and Bristow's "liquidity runway" were materially false and/or misleading, for the reasons stated in ¶¶69-73, *supra*. In fact, and as revealed

through Bristow's later filings: Bristow was then effectively insolvent: its short-term debts (which then exceeded $1.4 billion) and current liabilities (which then exceeded $1.7 billion) dwarfed Bristow's then-available liquidity (approximately $380 million), thereby posing a substantial risk to Bristow's fundamental financial condition and ability to continue as a going concern.  *See* Sections VI.A-D, *infra*.  In light of the imbalance between Bristow's short-term debts/current liabilities and its available liquidity, Bristow did not in fact have a liquidity runway, but rather faced an imminent liquidity crash landing.

95.     In addition, in responding to analyst questions concerning evidence and/or timing of revenue growth from oil and gas operations, Defendant Baliff answered that although Bristow's current financial guidance did not contemplate an immediate return to oil and gas revenue growth, he was nevertheless certain oil and gas revenue growth would return and that Bristow's "liquidity window" would allow Bristow "to get there:"

> <A - Jonathan E. Baliff>: . . . [A]lways our May calls are a bit difficult for us in this downturn.  There's no doubt that we bottomed fourth quarter fiscal 2017, and we've done a great job getting our cost structure in line to be competitive and 2018 successes show that.  But what we're trying to tell the Street now is we have a lot of confidence that we can get a lot of these LACE rates moving.
>
> And especially in Africa, we're currently – we're looking at less utilized aircraft, either moving them out or keeping some of them in.  Either way, we're already seeing signs that we're putting those aircraft back to work.  At this stage of the game though, we feel it would be not balanced to give you guys a significant amount of upside revenue in a forecast and a marketplace that even at $70, $80 for offshore is still showing a level of gradual recovery and not significant rapid recovery in one year.
>
> **Do I have confidence that we'll be able to get there?  Absolutely.  And we have the liquidity window to be able to do that** and continue to work with OEM partners, continue to work with internal cost structure, even be that much more competitive.  But in the end, we've got to be balanced in what we show you guys in May, and that's what we've done. . .

*See* Q4 2018 Conference Call Transcript (Bloomberg), at 8.

96.     Defendant Baliff's assertion that Bristow had a sufficient "liquidity window" to see it through an oil and gas industry recovery years into the future was substantively identical to

Defendants' prior statements during the Fiscal 2018 Conference Call concerning Bristow's favorable liquidity position and liquidity runway (*see* ¶93, *supra*), and was materially false and misleading for the same reasons, as set forth in ¶94, *supra*.

### 3.     The Fiscal 2018 Form 10-K

97.     On or about May 23, 2018, Defendants filed a Form 10-K with the SEC for the fiscal year 2018, ended March 31, 2018 (the "Fiscal 2018 Form 10-K").  The Fiscal 2018 Form 10-K was signed by Baliff, Miller and Allman.

98.     The Fiscal 2018 Form 10-K contained consolidated balance sheet financial statements for Bristow as of March 31, 2018, which, *inter alia*, presented the following amounts of (1) short-term borrowings and current maturities of long-term debt, and (2) total current liabilities:

| Liabilities | March 31, 2018 |
|---|---|
| Short-term borrowings and current maturities of long-term debt | $56,700,000 |
| Total current liabilities | $362,897,000 |

*See* Fiscal 2018 Form 10-K, at 76, 102 and 135.

99.     These representations were materially false, for the reasons stated in ¶84, *supra*, and understated both Bristow's short-term debts and its current liabilities, as of March 31, 2018, by more than $1.4 billion.

100.     Relatedly and in greater detail, in the Fiscal 2018 Form 10-K's "Future Cash Requirements – Contractual Obligations, Commercial Commitments and Off Balance Sheet Arrangements" subsection, Defendants provided the following table presenting and summarizing Bristow's "significant contractual obligations and other commercial commitments [] as of March 31, 2018 and the future periods in which such obligations are expected to be settled in cash" and the "timing of principal and interest payments on outstanding borrowings as of March 31, 2018":

| | | **Payments Due by Period** | | | |
| | | **Fiscal Year ending March 31,** | | | |
| | **Total** | **2019** | **2020 - 2021** | **2022 - 2023** | **2024 and beyond** |
| | | | **(In thousands)** | | |
| Contractual obligations: | | | | | |
| Long-term debt and short-term borrowings: | | | | | |
| Principal | $1,533,742 | $62,808 | $103,617 | $971,897 | $415,420 |
| Interest | 454,425 | 96,458 | 185,582 | 163,767 | 8,618 |
| Aircraft operating leases | 366,210 | 158,763 | 164,805 | 37,966 | 4,676 |
| Other operating leases | 75,422 | 9,959 | 16,577 | 16,156 | 32,730 |
| Pension obligations | 59,537 | 17,985 | 35,660 | 5,892 | — |
| Aircraft purchase obligations | 483,397 | 19,912 | 171,281 | 175,518 | 116,686 |
| Other purchase obligations | 48,344 | 48,344 | — | — | — |
| Total contractual cash obligations | $3,041,077 | $414,229 | $677,522 | $1,371,196 | $578,130 |
| Other commercial commitments | | | | | |
| Letters of credit | $22,075 | $22,075 | $— | $— | $— |
| Contingent consideration | 3,068 | 3,068 | — | — | — |
| Total commercial commitments | $25,143 | $25,143 | $— | $— | $— |

*See* Fiscal 2018 Form 10-K, at 63; *see also id.* at 106 (similar information concerning annual debt maturities from 2019 onwards).

101.    The highlighted figures in the above table (1) presented in more condensed form the information presented at ¶90, *supra*, concerning the purported timing of Bristow's debt repayment obligations; and (2) were materially false and/or misleading for the same reasons, as set forth in ¶91, *supra*.  In fact, effectively all $1.4 billion of the principal repayments represented in the above table to be due in or after fiscal 2020 (principally, fiscal 2022-24) were in fact, as revealed through Bristow's later filings, short-term debts and current liabilities of Bristow due in fiscal 2019.

102.    In addition, the Fiscal 2018 Form 10-K included multiple representations concerning the Macquarie Debt and the PK Air Debt specifically.  *See* Fiscal 2018 Form 10-K, at 30, 39, 62, 64, 102, and 105.  The Fiscal 2018 Form 10-K specifically identified the Macquarie Debt and the PK Air Debt as part of Bristow's long-term debt (*see id.* at 102), quantified the

amount of Macquarie Debt and PK Air Debt outstanding as of March 31, 2018 (*see id.* at 64, 102), and provided detailed descriptions of these (and other) debt financings:

*Macquarie Debt* — On February 1, 2017, one of our wholly-owned subsidiaries entered into a term loan credit agreement for a $200 million five-year secured equipment term loan with Macquarie Bank Limited (the "Macquarie Debt"). In conjunction with closing and funding under such term loan, we have agreed to lease five helicopters for lease terms ranging from 60 to 63 months from Wells Fargo Bank Northwest, N.A., acting as owner trustee for Macquarie Aerospace Inc., an affiliate of Macquarie Bank Limited. The borrower's obligations under the credit agreement are guaranteed by the Company and secured by 20 oil and gas aircraft. The financing funded on March 7, 2017. Borrowings under the financing bear interest at an interest rate equal to the ICE Benchmark Administration Limited LIBOR (or the successor thereto) plus 5.35% per annum. The interest rate was 7.00% and 6.24% as of March 31, 2018 and 2017, respectively. The proceeds from the financing were used to repay $154.1 million of the Term Loan Credit Facility and $45.9 million of the Term Loan.

The credit agreement governing the Macquarie Debt includes covenants, including requirements to maintain, register and insure the respective aircraft secured thereunder, and restrictions on the respective borrower thereunder to incur additional liens on or sell the respective aircraft secured thereunder (except to the Company and its subsidiaries). The Macquarie Debt matures in March 2022.

*PK Air Debt* — On July 17, 2017, a wholly-owned subsidiary entered into a term loan credit agreement with PK AirFinance S.à r.l., as agent, and PK Transportation Finance Ireland Limited, as lender, and other lenders from time to time party thereto, which provided for commitments in an aggregate amount of up to $230 million to make up to 24 term loans, each of which was made in respect of an aircraft pledged as collateral for all of the term loans. The term loans are also secured by a pledge of all shares of the borrower and any other assets of the borrower and are guaranteed by the Company. The financing funded in two tranches in September 2017 and proceeds were used to repay $17.0 million of the Term Loan Credit Facility, $93.7 million of the Term Loan and $103.0 million of the Revolving Credit Facility.

Each term loan bears interest at an interest rate equal to, at the borrower's option, a floating rate of one-month LIBOR plus a margin of 5% per annum (the "Margin"), subject to certain costs of funds adjustments, determined two business days before the borrowing date of each term loan, or a fixed rate based on a notional interest rate swap of 12 30-day months in respect of such term loan with a floating rate of interest based on one-month LIBOR, plus the Margin. The weighted-average interest rate was 6.79% as of March 31, 2018.

The borrower is required to repay each term loan on an annuity basis, payable monthly in arrears starting on the seventh month following the date of the

borrowing of such term loan, with a final payment of 53% of the initial amount of such term loan due on the 70th month following the date of the borrowing of such term loan.

In connection with the PK AirFinance term loan credit agreement, the borrower guarantees certain of its direct parent's obligations under existing aircraft operating leases up to a capped amount.

*See* Fiscal 2018 Form 10-K, at 105; *see also id*. at 39.

103.    Defendants' representations concerning the Macquarie Debt and the PK Air Debt were materially misleading, for the reasons stated in ¶¶74-75, *supra*.  Defendants' mentions of the Macquarie Debt and the PK Air Debt (*see* Fiscal 2018 Form 10-K, at 30, 39, 62, 64, 102, and 105) were materially misleading because Defendants omitted simultaneous (or any) disclosure that Bristow had violated the Collateral/Maintenance Covenants associated with those very debts, and/or that the outstanding principal of such debt, as well as of Bristow's other Secured Debt Financings and notes offerings, was short-term debt that was immediately due and payable.  In addition, the Fiscal 2018 Form 10-K's identification of the Macquarie Debt and the PK Air Debt as long-term debt (*see id*. at 102) was materially false, for the same reason.

104.    In a subsection of the Fiscal 2018 Form 10-K concerning Bristow's "Financial Condition and Sources of Liquidity," Defendants represented that Bristow's current financial condition and liquidity – including current cash of $361.8 million, generated largely through Bristow's 2017-2018 wave of debt offerings and secured debt financings (including the Macquarie Debt and the PK Air Debt) – would suffice to satisfy Bristow's operating needs, and capital and contractual commitments, and to allow Bristow to continue to operate as a going concern. Specifically, Defendants stated, in relevant part:

**Financial Condition and Sources of Liquidity**

. . . We manage our liquidity through generation of cash from operations while assessing our funding needs on an ongoing basis.  Historically, while we have generated cash from operations, financing cash flows also have been a significant source of liquidity over the past several years. . .

*\*\*\**

43

> **We expect that our cash on deposit as of May 18, 2018 of approximately $361.8 million, proceeds from aircraft sales, and available borrowing capacity of $33.9 million under our ABL Facility described under "Executive Overview — Recent Events — ABL Facility", as well as any future financings (which may include additional equipment financings and capital market transactions), will be sufficient to satisfy our operating needs, existing capital commitments and other contractual cash obligations**. However, we may require capital in excess of the amount available from these sources and we may need to seek additional sources of liquidity, complete aircraft sales or defer capital expenditures in order to have sufficient liquidity to satisfy operating needs, existing capital commitments and other contractual obligations.

*See* Fiscal 2018 Form 10-K, at 64-65.

105.    Defendants' above-identified representations concerning Bristow's liquidity and financial condition were materially false and misleading, for the reasons stated at ¶¶69-72, *supra*. Those representations were materially misleading because Bristow failed to disclose that it lacked internal controls related to its compliance with non-financial covenants – creating a material risk that Bristow would violate those covenants, accelerate its debts, and extinguish its liquidity. Additionally, Bristow's representations were false because that risk had materialized – Bristow had violated those covenants – and thus Bristow was then effectively insolvent: its short-term debts (which then exceeded $1.4 billion) and current liabilities (which then exceeded $1.7 billion) dwarfed Bristow's then-available liquidity (approximately $380 million), thereby posing a substantial risk to Bristow's fundamental financial condition and ability to continue as a going concern.  *See* Sections VI.A-D, *infra*.  In light of the imbalance between Bristow's short-term debts/current liabilities and its available liquidity, Bristow did not in fact have a liquidity runway, but rather faced an imminent liquidity crash landing.

106.    Relatedly, in the Fiscal 2018 Form 10-K's "Risk Factors" section, Defendants made certain representations concerning potential risks arising from Bristow's level of indebtedness:

> **Risks Relating to Our Level of Indebtedness**
>
> *Our level of indebtedness could adversely affect our ability to obtain financing, impair our ability to fulfill our obligations under our indebtedness and limit our ability to adjust to changing market conditions*.

We have substantial debt and substantial debt service requirements.  As of March 31, 2018, we had approximately $1.5 billion of outstanding indebtedness, including long-term debt.  In addition, on April 17, 2018, two of our subsidiaries entered into a new asset-backed revolving credit facility (the "ABL Facility"), which provides for commitments in an aggregate amount of $75 million, with a portion allocated to each borrower subsidiary, subject to an availability block of $15 million and a borrowing base calculated by reference to eligible accounts receivable.  The maximum amount of the ABL Facility may be increased from time to time to a total of as much as $100 million, subject to the satisfaction of certain conditions, and any such increase would be allocated among the borrower subsidiaries.  Although certain of our debt agreements contain restrictions on the incurrence of additional indebtedness, these restrictions are subject to a number of qualifications and exceptions.

Our level of indebtedness may have important consequences to our business, including:

• impairing our ability to obtain additional financing in the future for working capital, capital expenditures, acquisitions or other general corporate purposes;

• requiring us to dedicate a substantial portion of our cash flow to the payment of principal and interest on our indebtedness, which reduces the availability of our cash flow to fund working capital, capital expenditures, acquisitions and other general corporate purposes or to repurchase our debt upon a change of control;

• subjecting us to the risk of increased sensitivity to interest rate increases on our indebtedness with variable interest rates, including future borrowings under our ABL Facility;

• increasing the possibility of an event of default under certain covenants contained in our debt agreements; and

• limiting our ability to adjust to rapidly changing market conditions, reducing our ability to withstand competitive pressures and making us more vulnerable to a downturn in general economic conditions or our business than our competitors with less debt.

If we are unable to generate sufficient cash flow from operations in the future to service our debt, we may be required to refinance all or a portion of our existing debt or obtain additional financing.  There is no assurance that any such refinancing could be possible or that any additional financing could be obtained.  Our inability to obtain such refinancing or financing could have a material adverse effect on us.

***To service our indebtedness and lease obligations we will continue to require a significant amount of cash, and our ability to generate cash depends on many factors beyond our control***.

Our ability to make scheduled payments of principal or interest with respect to our indebtedness and lease obligations will depend on our ability to generate cash and on our financial results.  Our ability to generate cash depends on the demand for our services, which is subject to levels of activity in offshore oil and gas exploration, development and production, general economic conditions, the ability of our affiliates to generate and distribute cash flows, and financial, competitive, regulatory and other factors affecting our operations, many of which are beyond our control.  **We cannot assure you that our operations will generate sufficient cash flow or that future borrowings will be available to us under our ABL Facility or otherwise in an amount sufficient to enable us to pay our indebtedness or lease obligations or to fund our other liquidity needs**.

*See* Fiscal 2018 Form 10-K, at 29-30.

107.    The above-detailed representations concerning the potential risks and/or difficulties that Bristow *could* face in satisfying its debt, lease and other operating obligations, including the *possibility* that Bristow's liquidity and/or financial condition *could* prove inadequate to fund such obligations, were rendered materially misleading by Defendants' failure to simultaneously disclose that **Bristow's liquidity and/or financial condition were in fact inadequate, as of March 31, 2018 and during all subsequent periods, to fund its obligations, and that consequently Bristow faced actual and imminent risk of inability to continue as a going concern** (as was later revealed through Bristow's corrective disclosures on and after February 11, 2019, including in "supplement[al]" risk factor disclosures that Bristow provided nearly one year later, on April 15, 2019).

108.    In the Fiscal 2018 Form 10-K's "Risk Factors" section, Defendants made certain representations concerning (1) the existence of covenants in Bristow's debt offerings, secured debt financings (including the Macquarie Debt and the PK Air Debt), and helicopter lease agreements; and (2) the potential consequences of breaching such covenants, including creditors' ability to declare all of Bristow's obligations under such offerings, financings and agreements immediately due and payable:

> *Covenants in our debt agreements may restrict the manner in which we can operate our business*.
>
> The indentures governing our 6¼% Senior Notes due 2022 (the "6¼% Senior Notes") and our 8.75% Senior Secured Notes due 2023 (the "8.75% Senior Secured

Notes") limit, among other things, our ability and the ability of our restricted subsidiaries to:

• borrow money or issue guarantees;

• pay dividends, redeem capital stock or make certain other restricted payments;

• incur liens to secure indebtedness;

• make certain investments; or

• sell certain assets;

• enter into transactions with our affiliates;

• merge with another person or sell substantially all our assets.

If we fail to comply with these and other covenants, we would be in default under our aggregate $200 million U.S. dollar equivalent loans from Lombard North Central Plc, a part of the Royal Bank of Scotland (the "Lombard Debt"), $200 million loan from the Macquarie Bank Limited (the "Macquarie Debt"), $230 million term loan credit agreement with PK AirFinance S.à r.l., as agent, and PK Transportation Finance Ireland Limited, as lender, and other lenders from time to time party thereto (the "PK Air Debt") and ABL Facility (together, our "Credit Facilities") and the indentures governing the 6¼% Senior Notes and the 8.75% Senior Secured Notes, and the principal and accrued interest on our outstanding indebtedness may become due and payable. **In addition, our Credit Facilities and other debt agreements contain, and our future debt agreements may contain, similar and additional affirmative and negative covenants**. Our Credit Facilities and the 8.75% Senior Secured Notes are secured by many of our assets (including most of our helicopters), and such assets may not be available to secure additional financings. As a result, our ability to respond to changes in business and economic conditions and to obtain additional financing, if needed, may be significantly restricted, and we may be prevented from engaging in transactions that might otherwise be considered beneficial to us.

**Our debt agreements, including our Credit Facilities and the indentures governing the 6¼% Senior Notes, the 8.75% Senior Secured Notes and the 4½% Convertible Senior Notes due 2023 (the "4½% Convertible Senior Notes"), also require us or certain of our subsidiaries, and our future credit facilities may require us or certain of our subsidiaries, to observe certain covenants. Our ability to observe certain of those covenants can be affected by events beyond our control, and we cannot assure you that we will be able to observe these covenants in the future. The breach of any of these covenants could result in a default under our other debt agreements. Upon the occurrence of an event of default under our Credit Facilities, any future credit facilities or the indentures governing the 6¼% Senior Notes, the 8.75% Senior Secured Notes and the 4½% Convertible Senior Notes, our creditors could**

**elect to declare some or all amounts outstanding thereunder, including accrued interest or other obligations, to be immediately due and payable. There can be no assurance that our assets would be sufficient to repay all of our indebtedness in full**.

The agreements governing certain of our indebtedness, including our Credit Facilities, the indentures governing the 6¼% Senior Notes, the 8.75% Senior Secured Notes and the 4½% Convertible Senior Notes contain cross-default provisions.  Under these provisions, a default under one agreement governing our indebtedness may constitute a default under our other debt agreements.

***Failure to comply with covenants contained in certain of our lease agreements could limit our ability to maintain our leased aircraft fleet and could adversely affect our business***.

We have a significant amount of fixed obligations related to operating leases, including aircraft leases.  **The terms of our aircraft lease agreements contain covenants that impose certain limitations on us.  Such lease agreements limit, among other things, our ability to utilize aircraft in certain jurisdictions and/or to sublease aircraft, and may contain restrictions upon a change of control.  A breach of lease covenants could result in an obligation to repay amounts outstanding under the lease, including rent.**  A breach of lease covenants with respect to the return of aircraft to our lessors could also result in an obligation to pay holdover rent beyond the scheduled lease expiration date for such aircraft and/or increased maintenance and repair costs.  If any such event occurs, we may not be able to pay all amounts due under the leases or to refinance such leases on terms satisfactory to us or at all, which could have a material adverse effect on our business, financial condition and results of operations.

*See* Fiscal 2018 Form 10-K, at 30-31.

109.    The above-detailed "Risk Factor" representations concerning the existence of covenants in Bristow's debt offerings, Secured Debt Financings and lease agreements, and the potential consequences of breaching such covenants, were materially misleading, for the reasons stated in ¶¶74-75, *supra*.  Defendants failed to disclose that Bristow lacked internal controls related to compliance with those covenants.  And Defendants presented the risk of covenant breaches as if they were theoretical, when in fact, as Bristow's corrective disclosures of February-April 2019 later revealed, they were actual.  *See* Section VI.A-B, *infra*.  Defendants' omission to simultaneously disclose, when choosing to discuss Bristow's debt covenants and the potential risks associated with violations of such covenants, that Bristow did not have adequate monitoring control processes in place related to the Collateral/Maintenance Covenants, rendered such "Risk

Factor" representations materially misleading.   Defendants' omission to simultaneously or anywhere disclose, when choosing to discuss Bristow's debt covenants and the potential risks associated with violations of such covenants, that Bristow **was actually in breach of the Collateral/Maintenance Covenants at all times from March 31, 2018 onwards**, rendered such "Risk Factor" representations materially misleading.   Bristow effectively so acknowledged in the "supplement[al]" risk factor disclosures that it later disclosed on April 15, 2019, which presented the same risks as actual.  *See* ¶187, *infra*.

110.    The "Controls and Procedures" section of the Fiscal 2018 Form 10-K stated the following:

**Item 9A. Controls and Procedures**

**EVALUATION OF DISCLOSURE CONTROLS AND PROCEDURES**

We carried out an evaluation, under the supervision of and with the participation of our management, including Jonathan E. Baliff, our Chief Executive Officer ("CEO"), and L. Don Miller, our Chief Financial Officer ("CFO"), of the effectiveness of the Company's disclosure controls and procedures (as defined in Rule 13a-15(e) of the Exchange Act) as of March 31, 2018.   Based on that evaluation, **our CEO and CFO concluded that such disclosure controls and procedures were effective to ensure that information required to be disclosed in our periodic reports filed under the Exchange Act is recorded, processed, summarized and reported within the time periods specified by the SEC's rules and forms and such information is accumulated and communicated to our management as appropriate to allow for timely decisions regarding required disclosure under the Exchange Act**.

**MANAGEMENT'S REPORT ON INTERNAL CONTROL OVER FINANCIAL REPORTING**

Our management is responsible for establishing and maintaining adequate internal control over our financial reporting, as such term is defined in Exchange Act Rule 13a-15(f).  The Company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with GAAP.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements.   Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become

inadequate because of changes in conditions or because the degree of compliance with policies or procedures may deteriorate.

Under the supervision and with the participation of our management, including our CEO and CFO, we conducted an assessment of the effectiveness of our internal control over financial reporting as of March 31, 2018.  The assessment was based on criteria established in the framework Internal Control – Integrated Framework, issued by the Committee of Sponsoring Organizations of the Treadway Commission in 2013.  Based on this assessment, **management concluded that our internal control over financial reporting was effective as of March 31, 2018**.

The effectiveness of the Company's internal control over financial reporting as of March 31, 2018 has been audited by KPMG LLP, an independent registered public accounting firm, as stated in its report included herein.

*See* Fiscal 2018 Form 10-K, at 144.

111.    The above-identified representations concerning the efficacy and adequacy of Bristow's disclosure controls and procedures, and Bristow's internal controls over financial reporting, were materially false, for the reasons set forth at ¶¶62-63, *supra*.  In fact, as Bristow later disclosed in the February-April 2019 corrective disclosures and in the June 2019 Amended SEC Filings: (1) as of March 31, 2018 and for all subsequent periods, Bristow did "not have adequate monitoring control processes in place related to non-financial covenants within certain of its secured financing and lease agreements," which rendered its disclosure controls and procedures "ineffective" for such periods; and (2) this constituted a "material weakness in internal controls over financial reporting," rendering such internal controls over financial reporting ineffective.  *See* Sections VI.A-B and VI.D, *infra*.  Further, as revealed by Bristow's later SEC filings, these representations were misleading insofar they did not disclose that Bristow's financial statements were not GAAP-compliant (i) because of the misclassification of short-term debt as long-term debt, and (ii) by failing to disclose that that there was substantial doubt about Bristow's ability to continue as a going concern.  *See* Section IX.D, *infra*.

112.    Attached as Exhibits 31.1 and 31.2 to the Fiscal 2018 Form 10-K were certifications from Defendants Baliff and Miller,[13] stating:

Certification of Chief Executive Officer [Chief Financial Officer]

Pursuant to Exchange Act Rule 13a-14(a) or 15d-14(a)

I, Jonathan E. Baliff [L. Don Miller], certify that:

1.  I have reviewed this Annual Report on Form 10-K of Bristow Group Inc.;

2.  Based on my knowledge, **this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report**;

3.  Based on my knowledge, **the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant** as of, and for, the periods presented in this report;

4.  The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    (a)  **Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared**;

    (b)  **Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles**;

---

[13] The certifications from Defendants Baliff and Miller were identical in all but their respective names and job titles, and are therefore presented here once rather than twice, with the differences in names and job titles displayed in brackets.  Similar presentation also applies for the similar certifications signed and filed by Defendants Baliff and Miller in connection with the Q1 2019 Form 10-Q (¶¶140-43, *infra*) and the Q2 2019 Form 10-Q (¶¶172-73, *infra*).

(c)  Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d)  Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.  **The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):**

(a)  **All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information**; and

(b)  Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Dated: May 23, 2018

/s/ Jonathan E. Baliff [L. Don Miller]
Jonathan E. Baliff [L. Don Miller]
President and Chief Executive Officer
[Senior Vice President and Chief Financial Officer]

113.    Defendants' representations in these certifications – concerning the accuracy and adequacy of the Fiscal 2018 Form 10-K, the financial statements therein, and their presentation of, *inter alia*, Bristow's financial condition; and concerning the effectiveness and adequacy of Bristow's disclosure controls and procedures and Bristow's internal controls over financial reporting – were materially false, for the reasons set forth in ¶¶62-63, 64-67 and 69-72, *supra*.

a.  As was later revealed through Bristow's February-April 2019 corrective disclosures and in the Amended SEC Filings, the Fiscal 2018 Form 10-K:

i.  contained untrue statements of material fact, including material understatement of Bristow's short-term debts and current liabilities, and

material misrepresentation of Bristow's liquidity as "sufficient" to fund Bristow's continued operations;

    ii.  omitted the material fact of Bristow's going concern risk; and

    iii.  consequently, did *not* fairly present in all material respects Bristow's financial condition.

    b.  As was also later revealed through Bristow's February-April 2019 corrective disclosures and in the Amended SEC Filings:

        i.  Bristow's disclosure controls and procedures did *not* ensure that material information relating to Bristow, such as violation of the Collateral/Maintenance Covenants, was made known;

        ii.  Bristow's disclosure controls and internal controls over financial reporting did *not* provide reasonable assurance regarding the reliability of Bristow's financial reporting and financial statements; and

        iii.  instead and at all times since March 31, 2018, Bristow's disclosure controls and internal controls over financial reporting were *ineffective*, and Bristow's internal controls over financial reporting exhibited material weakness.

*See* Sections VI.A-B and VI.D, *infra*.

114.    Attached as Exhibits 32.1 and 32.2 to the Fiscal 2018 Form 10-K were Sarbanes Oxley certifications from Defendants Baliff and Miller, stating:

CERTIFICATION PURSUANT TO 18 U.S.C. SECTION 1350, AS ADOPTED PURSUANT TO SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002

In connection with the Annual Report on Form 10-K of Bristow Group Inc. (the "Company") for the period ended March 31, 2018, as filed with the Securities and Exchange Commission as of the date hereof (the "Report"), I, Jonathan E. Baliff [L. Don Miller], President and Chief Executive Officer [Senior Vice President and Chief Financial Officer] of the Company, hereby certify, pursuant to 18 U.S.C. §1350, as adopted pursuant to §906 of the Sarbanes-Oxley Act of 2002, that:

(1)  the Report fully complies with the requirements of Section 13(a) or 15(d), as appropriate, of the Securities Exchange Act of 1934, as amended; and

(2) **the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company**.

/s/ Jonathan E. Baliff [L. Don Miller]
Name: Jonathan E. Baliff [L. Don Miller]
Title: President and Chief Executive Officer
[Senior Vice President and Chief Financial Officer]
Date: May 23, 2018

115.    Defendants' representations in these Sarbanes Oxley certifications were materially false, for the reasons set forth at ¶¶64-67 and 69-72, *supra*.  In fact, as was later revealed through Bristow's February-April 2019 corrective disclosures, and as Bristow later admitted in the June 2019 Amended SEC Filings, the Fiscal 2018 Form 10-K did *not* fairly present, in all material respects, Bristow's financial condition, but instead materially misrepresented: (1) Bristow's short-term debts and current liabilities (both of which were understated by approximately $1.4 billion); and (2) Bristow's liquidity and financial condition (misrepresenting the former as sufficient to fund Bristow's near-term operations and obligations, when in fact it was not; and misrepresenting the latter by omitting to make consequent and requisite going concern disclosures).  *See* Sections VI.A-B and VI.D, *infra*.

## D.    First Quarter Fiscal 2019

### 1.    The Q1 2019 Press Release and Presentation

116.    On August 2, 2018, Bristow issued a press release titled "Bristow Group Reports First Quarter Fiscal Year 2019 Results" (the "Q1 2019 Press Release"), disclosing, *inter alia*, Bristow's financial results of operations and financial condition for the first quarter of fiscal 2019 (ended June 30, 2018).  On the same date, Bristow filed a Form 8-K, signed by Allman, with the SEC attaching the Q1 2019 Press Release as an exhibit thereto.

117.    The Q1 2019 Press Release contained consolidated balance sheet financial statements for Bristow as of June 30, 2018, presenting, *inter alia*, the following amounts of (1) short-term borrowings and current maturities of long-term debt, and (2) total current liabilities:

| Liabilities | June 30, 2018 |
|---|---|
| Short-term borrowings and current maturities of long-term debt | $53,723,000 |
| Total current liabilities | $334,649,000 |

118.   These figures were materially false, for the reasons stated in ¶¶64-67, *supra*.  As was later revealed through Bristow's February-April 2019 disclosures, Bristow's violations of the Collateral/Maintenance Covenants, ongoing since at least March 31, 2018, had the effect of accelerating Bristow's obligations under the Secured Debt Financings and note offerings, transforming $1.4 billion of previously long-term debt into short-term debt and current liabilities. *See* Sections VI.A-B, *infra*; ¶¶64-67, *supra*.  As Bristow later admitted in its June 19, 2019 Amended SEC Filings (despite its attempt to conceal the true reason), Bristow's originally-reported short-term debt and current liabilities as of June 30, 2018 (*i.e.*, the figures set forth above) had been understated by approximately $1.4 billion: Bristow's short-term debt was not $53.7 million as of June 30, 2018, but rather $1.453 billion; and Bristow's current liabilities were not $334.6 million, but rather $1.740 billion.  *See* Section VI.D, *infra*; ¶¶64-67, *supra*.

119.   In addition, the Q1 2019 Press Release contained additional representations concerning Bristow's purported financial condition and liquidity from Defendants Baliff and Miller, as set forth below:

> . . . said Jonathan Baliff.  "**Bristow's previous refinancings have enhanced our liquidity profile and we are well-positioned to take advantage of the beginning of an offshore investment cycle** as seismic activity has increased and more exploration rigs are going to work."
>
> ***
>
> **LIQUIDITY AND FINANCIAL FLEXIBILITY**
>
> Don Miller, Senior Vice President and Chief Financial Officer, commented, "**On the heels of the success we had in fiscal 2018 in terms of improving our liquidity runway, we finished the June 2018 quarter with almost $350 million in liquidity** including the completion of our ABL facility in April.  We remain focused on revenue growth, cost reduction and improved returns, including the return of seven leased aircraft in the June quarter with the ability to return another 18 aircraft over the remainder of fiscal 2019."

120.    Defendants' above-identified representations in the Q1 2019 Press Release concerning Bristow's purportedly favorable liquidity position following the Secured Debt Financings (including that the Secured Debt Financings "enhanced our liquidity profile" and made Bristow "well-positioned" to return to profitability in an oil/gas recovery) and Bristow's "liquidity runway" were materially false and/or misleading, for the reasons stated in ¶¶69-73, *supra*.  In fact, and as was later revealed through Bristow's February-June SEC filings, Defendants later admitted, Bristow was then effectively insolvent: its short-term debts (which then exceeded $1.4 billion) and current liabilities (which then exceeded $1.7 billion) dwarfed Bristow's then-available liquidity (approximately $350 million), thereby posing a substantial risk to Bristow's fundamental financial condition and ability to continue as a going concern.  *See* Sections VI.A-D, *infra*.  In light of the imbalance between Bristow's short-term debts/current liabilities and its available liquidity, Bristow did not in fact have a "liquidity runway," but rather faced an imminent liquidity crash landing.

121.    On August 3, 2018, Bristow posted to its website a presentation titled "First quarter FY19 earnings presentation" (the "Q1 2019 Presentation"), presenting – in connection with Bristow's Q1 2019 Conference Call – *inter alia*, Bristow's financial results of operations and financial condition for the first quarter of fiscal 2019 (ended June 30, 2018).  On the same date, Bristow filed a Form 8-K with the SEC, signed by Allman, attaching the Q1 2019 Presentation as an exhibit thereto.

122.    The Q1 2019 Presentation, in its first substantive slide, reiterated the above-detailed August 2, 2018 representations from Defendants Baliff and Miller concerning Bristow's purported financial condition and liquidity:



| Our global footprint and strong liquidity profile position us well in an uneven recovery for offshore services | |
| --- | --- |
| **Revenue growth** | [OMITTED] |
| **Cost efficiencies** | [OMITTED] |
| **Improving returns on capital** | [OMITTED] |
| **Improved financial flexibility** | • **Successful FY18 refinancings lead to no financial maintenance covenants or near-term maturity risk**<br>• New $75 million Asset-Backed Revolving Credit Facility closed in April<br>• After principal and interest payments of ~$40 million, liquidity of ~$342 million as of June 30, 2018 |

*See* Q1 2019 Presentation, at 5.

123.    Defendants' above-identified representations in the Q1 2019 Presentation concerning Bristow's purportedly favorable liquidity position following the Secured Debt Financings, and the liquidity runway it purportedly afforded, were substantively identical to the Defendants' representations in the Q1 2019 Press Release concerning these matters (*see* ¶119, *supra*), and were materially false and/or misleading for the same reasons (as set forth in ¶120, *supra*).

124.    Defendants also included in the Q1 2019 Presentation a detailed table illustrating Bristow's purported liquidity runway, showing, *inter alia*, limited debt amortization obligations during fiscal 2019, 2020 and 2021, with various debt offerings and secured debt financings maturing and requiring substantial principal repayments in fiscal 2022 (the Macquarie Debt), fiscal 2023 (multiple notes offerings), and fiscal 2024 (the PK Air Debt):

| Debt repayments and amortization as of June 30, 2018 | | | | | | | |
|---|---|---|---|---|---|---|---|
| **Debt repayments and amortization schedule** | | | | | | | |
| ($ in millions) | **Balance 6/30/18** | **FY19** | **FY20** | **FY21** | **FY22** | **FY23** | **FY24+** |
| 8.75% Secured Senior Notes | 350.0 | - | - | - | - | 350.0 | - |
| 4.5% Convertible Senior Notes | 143.8 | - | - | - | - | - | 143.8 |
| 6.25% Senior Unsecured Notes | 401.5 | - | - | - | - | 401.5 | - |
| Macquarie Debt | 181.5 | 10.5 | 14.0 | 14.0 | 143.0 | - | - |
| Lombard Debt | 195.5 | 9.6 | 12.8 | 12.8 | 12.8 | 12.8 | 134.7 |
| PK Air Debt | 225.6 | 13.6 | 19.1 | 20.3 | 21.7 | 23.0 | 127.9 |
| Eastern Airways Debt | 11.6 | 11.6 | - | - | - | - | - |
| Airnorth Debt | 13.1 | 2.0 | 2.9 | 2.4 | 2.5 | 2.6 | 0.7 |
| Other Debt | 10.0 | 0.2 | 4.1 | 4.9 | 0.8 | - | - |
| Total | $1,532.6 | $47.4 | $52.9 | $54.5 | $180.8 | $790.0 | $407.0 |

*See* Q1 2019 Presentation, at 33.

125.   Defendants' above representation of Bristow's debts and debt repayment timing – a detailed numeric representation of Bristow's purported liquidity runway, depicting very limited debt repayment obligations for fiscal 2019-2021/2022 – was, where highlighted above, materially false and/or misleading, for the reasons set forth in ¶¶64-68, 69-73 and 74-75 *supra*.  In fact, and as was revealed through Bristow's later filings: (1) substantially all of the $1.4 billion of outstanding principal that Bristow was obliged to repay under the Secured Debt Financings and the notes offerings was *not* long-term debt payable 3-5 years in the future, as depicted in the above table, but instead short-term debt and current liabilities of Bristow; and (2) consequently, rather than enjoying a liquidity runway, Bristow was facing an imminent liquidity crash landing.  Those representations were also materially misleading, because Bristow failed to disclose its lack of internal controls related to compliance with the Collateral/Maintenance Covenants in the agreements providing its purported liquidity runway and the corresponding risk (which had in fact materialized) that Bristow would violate those covenants and that its debt would be accelerated.

### 2. The Q1 2019 Conference Call

126.     On August 3, 2018, at approximately 10:00 a.m., Defendants held a conference call with analysts and investors to further discuss Bristow's operations, financial results of operations and financial condition for the first quarter of fiscal 2019 (the "Q1 2019 Conference Call").

127.     During the Q1 2019 Conference Call, Defendants Baliff and Miller, relying on and referring analysts and investors to the above-detailed page of the Q1 2019 Presentation, reiterated the representations made therein concerning Bristow's purported financial condition and liquidity:

> BALIFF: Please turn to slide 5. . . **Fifth, improved financial flexibility in 2019. Don and his team made tremendous progress over the past 18 months with over $1.2 billion of financings. These are pretty low cost financings that extend our runway. I think it is important to note that these refinancings have also no financial maintenance covenants. And as we mentioned on our last call, I would like to highlight our solid liquidity profile along with our strong operating leverage, which makes us very well positioned to take advantage of the beginning of an offshore investment cycle** as we're seeing from our peers who were reporting increased seismic activity and more exploration rigs going to work and we're seeing that in areas like Nigeria and Gulf of Mexico.
>
>                              \*\*\*
>
> MILLER: **As you know, we continue to focus on maintaining a strong and appropriate liquidity position** and during the quarter closed on our $75 million five-year ABL facility, which adds additional liquidity to our June 30 cash balance of approximately $317 million, bringing **our total liquidity to almost $350 million at quarter-end. As of last Friday, July 27, our total liquidity stood at approximately $355 million** including cash on deposit of $321 million. And lastly to remind you, slide 33 has a complete listing of our debt repayments and amortization schedule as of June 30, 2018.

*See* Q1 2019 Conference Call Transcript (Bloomberg), at 2-4.

128.     Defendants' above-identified representations in the Q1 2019 Conference Call concerning Bristow's purportedly favorable liquidity position in light of the Secured Debt Financings (including Bristow's "improved financial flexibility" following the Secured Debt Financings that purportedly "extend[ed] our runway," Bristow's "solid liquidity profile" and "strong and appropriate liquidity position") and Bristow's "liquidity runway" were materially false and/or misleading, for the reasons stated in ¶¶69-73, *supra*. In fact, and as later revealed through Bristow's February-June filings, Bristow was then effectively insolvent: its short-term debts

(which then exceeded $1.4 billion) and current liabilities (which then exceeded $1.7 billion) dwarfed Bristow's then-available liquidity (approximately $350 million), thereby posing a substantial risk to Bristow's fundamental financial condition and ability to continue as a going concern.  *See* Sections VI.A-D, *infra*.  In light of the imbalance between Bristow's short-term debts/current liabilities and its available liquidity, Bristow did not in fact have a liquidity runway, but rather faced an imminent liquidity crash landing.  Those representations were also materially misleading, because Bristow failed to disclose its lack of internal controls related to compliance with the Collateral/Maintenance Covenants in the agreements providing its purported liquidity runway and the corresponding risk (which had in fact materialized) that Bristow would violate those covenants and that its debt would be accelerated.

### 3.     The Q1 2019 Form 10-Q

129.     On or about August 2, 2018, Defendants filed a Form 10-Q with the SEC for the first quarter of fiscal 2019, ended June 30, 2018 (the "Q1 2019 Form 10-Q").  The Q1 2019 Form 10-Q was signed by Defendant Miller.

130.     The Q1 2019 Form 10-Q contained consolidated balance sheet financial statements for Bristow as of June 30, 2018, which, *inter alia*, stated the following amounts of (1) short-term borrowings and current maturities of long-term debt, and (2) total current liabilities:

| Liabilities | June 30, 2018 |
|---|---|
| Short-term borrowings and current maturities of long-term debt | $53,723,000 |
| Total current liabilities | $334,649,000 |

*See* Q1 2019 Form 10-Q, at 3, 20 and 40.

131.     These representations were materially false, for the reasons stated in ¶¶117-18, *supra*, and understated both Bristow's short-term debts and its current liabilities, as of June 30, 2018, by approximately $1.4 billion.

132.     In the "Management Discussion and Analysis" section of the Q1 2019 Form 10-Q, the subsection concerning "Financial Condition and Sources of Liquidity" stated, in relevant part:

*Financial Condition and Sources of Liquidity*

We manage our liquidity through generation of cash from operations while assessing our funding needs on an ongoing basis.  Historically, while we have generated cash from operations, financing cash flows also have been a significant source of liquidity over the past several years. . .

<div align="center">***</div>

**We expect that our cash on deposit as of July 27, 2018 of approximately $320.7 million, proceeds from aircraft sales, and available borrowing capacity of $33.9 million under our ABL Facility described under "Executive Overview — Market Outlook — Recent Events — ABL Facility", as well as any future financings (which may include additional equipment financings and capital market transactions), will be sufficient to satisfy our operating needs, existing capital commitments and other contractual cash obligations**.  However, we may require capital in excess of the amount available from these sources and we may need to seek additional sources of liquidity, complete aircraft sales or defer capital expenditures in order to have sufficient liquidity to satisfy operating needs, existing capital commitments and other contractual obligations.

*See* Q1 2019 Form 10-Q, at 68.

133.    Defendants' above-identified representations concerning Bristow's liquidity and financial condition were materially false and misleading, for the reasons stated at ¶¶69-72, *supra*. In fact, and as was later revealed through Bristow's February-June SEC filings, Bristow was then effectively insolvent: its short-term debts (which then exceeded $1.4 billion) and current liabilities (which then exceeded $1.7 billion) dwarfed Bristow's then-available liquidity (approximately $350 million), thereby posing a substantial risk to Bristow's fundamental financial condition and ability to continue as a going concern.  *See* Sections VI.A-D, *infra*.  In light of the imbalance between Bristow's short-term debts/current liabilities and its available liquidity, Bristow did not in fact have a liquidity runway, but rather faced an imminent liquidity crash landing.  Defendants' representations were also materially misleading, because Bristow failed to disclose its lack of internal controls related to compliance with the Collateral/Maintenance Covenants in the agreements providing its purported liquidity runway and the corresponding risk (which had in fact materialized) that Bristow would violate those covenants and that its debt would be accelerated.

134.    Relatedly, Defendants asserted, in the Q1 2019 Form 10-Q's section titled "Market Outlook," that Bristow had "increased [its] financial flexibility" by completing the Secured Debt Financings and the notes offerings:

> Additionally, we have taken the following actions in an effort to address the downturn:
>
> • **We increased our financial flexibility by entering into new secured equipment financings** that resulted in aggregate proceeds of $630 million funded in fiscal years 2017 and 2018.  Additionally, in fiscal year 2018, we completed the sale of $143.8 million of the 4½% Convertible Senior Notes and $350 million of the 8.75% Senior Secured Notes. . .

*See* Q1 2019 Form 10-Q, at 51.

135.    The above assertion was materially misleading for the reasons set forth below and in ¶¶69-73 and 74-75, *supra*:

a.    In fact, and as revealed through Bristow's later filings, Bristow was then effectively insolvent: its short-term debts (which then exceeded $1.4 billion) and current liabilities (which then exceeded $1.7 billion) dwarfed Bristow's then-available liquidity (approximately $350 million), thereby posing a substantial risk to Bristow's fundamental financial condition and ability to continue as a going concern.  *See* Sections VI.A-D, *infra*.  In light of the imbalance between Bristow's short-term debts/current liabilities and its available liquidity, Bristow did not in fact have a liquidity runway, but rather faced an imminent liquidity crash landing.

b.    Additionally, Defendants' assertion concerning the purported liquidity boost the Secured Debt Financings provided to Bristow was materially misleading by Defendants' omission of simultaneous or any disclosure that Bristow lacked internal controls related to compliance with the Collateral/Maintenance Covenants and that Bristow had in fact violated the Collateral/Maintenance Covenants associated with those debts, and/or that the outstanding principal of such debt, as

well as of Bristow's other Secured Debt Financings and notes offerings, was short-term debt that was immediately due and payable.

136.     In the Q1 2019 Form 10-Q's "Future Cash Requirements – Contractual Obligations, Commercial Commitments and Off Balance Sheet Arrangements" subsection, Defendants provided the following table presenting and summarizing Bristow's "significant contractual obligations and other commercial commitments [] as of June 30, 2018, and the future periods in which such obligations are expected to be settled in cash," and the "timing of principal and interest payments on outstanding borrowings as of June 30, 2018:"

| | | Payments Due by Period | | | |
|---|---|---|---|---|---|
| | | Nine Months Ending March 31, 2019 | Fiscal Year ending March 31, | | |
| | Total | | 2020 - 2021 | 2022 - 2023 | 2024 and beyond |
| | | (In thousands) | | | |
| Contractual Obligations | | | | | |
| Long-term debt and short-term borrowings: | | | | | |
| Principal | $1,532,569 | $47,430 | $107,356 | $970,783 | $407,000 |
| Interest | 432,901 | 72,666 | 187,152 | 164,560 | 8,523 |
| Aircraft operating leases | 317,532 | 115,941 | 159,436 | 37,479 | 4,676 |
| Other operating leases | 71,487 | 7,090 | 16,487 | 15,827 | 32,083 |
| Pension Obligations | 51,673 | 12,566 | 33,562 | 5,545 | — |
| Aircraft Purchase Obligations | 459,792 | 19,792 | 162,602 | 166,624 | 110,774 |
| Other Purchase Obligations | 42,988 | 42,683 | 305 | — | — |
| Total contractual cash obligations | $2,908,942 | $318,168 | $666,900 | $1,360,818 | $563,056 |
| Other commercial commitments | | | | | |
| Letters of Credit | $22,017 | $22,017 | $— | $— | $— |
| Total commercial commitments | $22,017 | $22,017 | $— | $— | $— |

*See* Q1 2019 Form 10-Q, at 66-67.

137.    The highlighted figures in the above table (1) presented in more condensed form the information presented at ¶124, *supra*, concerning the purported timing of Bristow's debt repayment obligations; and (2) were materially false and/or misleading for the same reasons, as set forth in ¶125, *supra*.

138.    The "Controls and Procedures" section of the Q1 2019 Form 10-Q stated the following:

**Item 4. Controls and Procedures.**

**Evaluation of Disclosure Controls and Procedures**

We carried out an evaluation, under the supervision of and with the participation of our management, including Jonathan E. Baliff, our Chief Executive Officer ("CEO"), and L. Don Miller, our Chief Financial Officer ("CFO"), of the effectiveness of the Company's disclosure controls and procedures (as defined in Rule 13a-15(e) of the Exchange Act) as of June 30, 2018.  Based on that evaluation, **our CEO and CFO concluded that such disclosure controls and procedures were effective to ensure that information required to be disclosed in our periodic reports filed under the Exchange Act is recorded, processed, summarized and reported within the time periods specified by the Securities and Exchange Commission's rules and forms and such information is accumulated and communicated to our management as appropriate to allow for timely decisions regarding required disclosure under the Exchange Act**.

*See* Q1 2019 Form 10-Q, at 69.

139.    The above-identified representations concerning the efficacy and adequacy of Bristow's disclosure controls and procedures were materially false, for the reasons set forth at ¶¶62-63 and 111, *supra*.  In fact and as Bristow later admitted in its February-April 2019 corrective disclosures and in the June 2019 Amended SEC Filings: (1) Bristow, as of March 31, 2018 and for all subsequent periods, did "not have adequate monitoring control processes in place related to non-financial covenants within certain of its secured financing and lease agreements," which rendered its disclosure controls and procedures "ineffective" for such periods; and (2) this constituted a "material weakness in internal controls over financial reporting," rendering such internal controls over financial reporting ineffective.  *See* Sections VI.A-B and VI.D, *infra*.

140.     Attached as Exhibits 31.1 and 31.2 to the Q1 2019 Form 10-Q were certifications from Defendants Baliff and Miller, signed August 2, 2018, that were substantively identical to the certifications attached to the Fiscal 2018 Form 10-K, provided at ¶112, *supra*.

141.     Defendants' representations in these certifications – concerning the accuracy and adequacy of the Q1 2019 Form 10-Q, the financial statements therein, and their presentation of, *inter alia*, Bristow's financial condition; and concerning the effectiveness and adequacy of Bristow's disclosure controls and procedures and Bristow's internal controls over financial reporting – were materially false, for the reasons set forth in ¶¶113, *supra*.

a.   As later revealed through Bristow's February-April 2019 corrective disclosures and in the Amended SEC Filings, the Q1 2019 Form 10-Q:

i.   contained untrue statements of material fact, including material understatement of Bristow's short-term debts and current liabilities, and material misrepresentation of Bristow's liquidity as "sufficient" to fund Bristow's continued operations;

ii.   omitted the material fact of Bristow's going concern risk; and

iii.   consequently, did *not* fairly present in all material respects Bristow's financial condition; and

iv.   finally, did not disclose that Bristow violated GAAP (i) by the misclassification of short-term debt as long-term debt, and (ii) by failing to disclose that that there was substantial doubt about Bristow's ability to continue as a going concern.  *See* Section IX.D, *infra*.

b.   As Bristow also later admitted in its February-April 2019 corrective disclosures and in the Amended SEC Filings:

i.   Bristow's disclosure controls and procedures did *not* ensure that material information relating to Bristow, such as violation of the Collateral/Maintenance Covenants, was made known;

    ii.   Bristow's disclosure controls and internal controls over financial reporting did *not* provide reasonable assurance regarding the reliability of Bristow's financial reporting and financial statements;

    iii.   instead and at all times since March 31, 2018, Bristow's disclosure controls and internal controls over financial reporting were *ineffective*, and Bristow's internal controls over financial reporting exhibited material weakness.

*See* Sections VI.A-B and VI.D, *infra*.

142.    Attached as Exhibits 32.1 and 32.2 to the Q1 2019 Form 10-Q were Sarbanes Oxley certifications from Defendants Baliff and Miller, signed August 2, 2018, that were substantively identical to the certifications attached to the Fiscal 2018 Form 10-K, provided at ¶114, *supra*.

143.    Defendants' representations in these Sarbanes Oxley certifications were materially false, for the reasons set forth at ¶115, *supra*.  In fact, as later revealed through Bristow's February-April 2019 corrective disclosures and June 2019 Amended SEC Filings, the Q1 2019 Form 10-Q did *not* fairly present, in all material respects, Bristow's financial condition, but instead materially misrepresented: (1) Bristow's short-term debts and current liabilities (both of which were understated by approximately $1.4 billion); and (2) Bristow's liquidity and financial condition (misrepresenting the former as sufficient to fund Bristow's near-term operations and obligations, when in fact it was not; and misrepresenting the latter by omitting to make consequent and requisite going concern disclosures); (3) Bristow's internal controls and procedures for financial reporting (misrepresenting these controls as effective when in fact they were subject to a material weakness). *See* Sections VI.A-B and VI.D, *infra*.

**E.**    **September 5, 2018: Barclays CEO Energy Power Conference**

144.    On September 5, 2018, Defendants Baliff and Miller participated in an annual conference hosted by Barclays Capital, the Barclays CEO Energy-Power Conference, in which senior management of energy-sector companies presented to analysts and to institutional investors.

In connection with their remarks at the conference, Defendants Baliff and Miller used, and made available to analysts and investors, a presentation on Bristow's operations, financial results and financial condition (the "Barclays Conference Presentation"), which Bristow also posted on its investor relations website.[14]   The Barclays Conference Presentation featured prominent representations concerning Bristow's purported financial condition and liquidity:

| Our global footprint and strong liquidity profile position us well in an uneven recovery for offshore services | |
| --- | --- |
| Revenue growth | [OMITTED] |
| Cost efficiencies | [OMITTED] |
| Improving returns on capital | [OMITTED] |
| Improved financial flexibility | • **Successful FY18 refinancings lead to no financial maintenance covenants or near-term maturity risk**<br>• New $75 million Asset-Backed Revolving Credit Facility closed in April<br>• After principal and interest payments of ~$40 million, liquidity of ~$342 million as of June 30, 2018 |

*See* Barclays Conference Presentation, at 7.

[14] *See* Barclays Conference Presentation, *available at*: http://ir.bristowgroup.com/events/event-details/bristow-group-inc-barclays-ceo-energy-power-conference-3.

**Bristow has maintained strong liquidity throughout this historic oil and gas downturn**

**Total Liquidity**

- **Maintaining a prudent and safe level of liquidity continues to be a priority**
- **$352 million in total current liquidity including $324 million in cash**
- **Recent refinancings and capex deferrals/reductions provide improved liquidity runway**

[CHART OMITTED]

- Our new $75 million asset-backed revolving credit facility provides ability to increase liquidity as U.K. and Norway businesses improve

*See* Barclays Conference Presentation, at 11.

145.   Defendants' above-identified representations in the Barclays Conference Presentation concerning Bristow's purportedly favorable liquidity position following the Secured Debt Financings (including Bristow's "strong liquidity profile position," "improved financial flexibility" and purported elimination of "near-term maturity risk" following the Secured Debt Financings), and the "improved liquidity runway" they purportedly afforded, were materially false and/or misleading for the reasons stated in ¶¶69-73, *supra*.  In fact, and as revealed through Defendants later filings, Bristow was then effectively insolvent: its short-term debts (which then exceeded $1.4 billion) and current liabilities (which then exceeded $1.7 billion) dwarfed Bristow's then-available liquidity (approximately $350 million), thereby posing a substantial risk to Bristow's fundamental financial condition and ability to continue as a going concern.  *See* Sections VI.A-D, *infra*.  In light of the imbalance between Bristow's short-term debts/current liabilities and its available liquidity, Bristow did not in fact have a liquidity runway, but rather faced an imminent liquidity crash landing.  Moreover, Defendants' efforts to tout the supposed liquidity benefits of the Secured Debt Financings were materially misleading because Defendants failed to also

disclose that those Secured Debt Financings included material non-financial covenants and that Bristow had no effective control processes in place to monitor compliance with those covenants.

146.    Relatedly, in the Barclays Conference Presentation, Defendants again depicted in detail Bristow's purported liquidity runway, under which Bristow faced only minimal debt repayment obligations from fiscal 2019 through fiscal 2021/2022, and no significant debt repayment obligations until fiscal 2023:

| Debt repayments as of June 30, 2018 with limited amortization over next three years |
| --- |

- Debt amortization of only ~$50 million/year from FY19 to FY21
- FY22 Macquarie debt maturity is secured by aircraft with current FMV of ~$275 million
- No significant senior public debt maturities prior to FY23

| Debt repayments and amortization schedule | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| ($ in millions) | Balance 6/30/18 | FY19 | FY20 | FY21 | FY22 | FY23 | FY24+ |
| 8.75% Secured Senior Notes | 350.0 | - | - | - | - | 350.0 | - |
| 4.5% Convertible Senior Notes | 143.8 | - | - | - | - | - | 143.8 |
| 6.25% Senior Unsecured Notes | 401.5 | - | - | - | - | 401.5 | - |
| Macquarie Debt | 181.5 | 10.5 | 14.0 | 14.0 | 143.0 | - | - |
| Lombard Debt | 195.5 | 9.6 | 12.8 | 12.8 | 12.8 | 12.8 | 134.7 |
| PK Air Debt | 225.6 | 13.6 | 19.1 | 20.3 | 21.7 | 23.0 | 127.9 |
| Eastern Airways Debt | 11.6 | 11.6 | - | - | - | - | - |
| Airnorth Debt | 13.1 | 2.0 | 2.9 | 2.4 | 2.5 | 2.6 | 0.7 |
| Other Debt | 10.0 | 0.2 | 4.1 | 4.9 | 0.8 | - | - |
| Total | $1,532.6 | $47.4 | $52.9 | $54.5 | $180.8 | $790.0 | $407.0 |

*See* Barclays Conference Presentation, at 14.

147.    Defendants' above representation of Bristow's debts and debt repayment timing – a detailed numeric representation of Bristow's purported liquidity runway, depicting very limited debt repayment obligations for fiscal 2019-2021/2022 – was, where highlighted above, materially false and/or misleading, for the reasons set forth in ¶¶64-68, 69-73 and 74-75, *supra*.  In fact, and as revealed through Bristow's later filings: (1) substantially all of the $1.4 billion of outstanding principal that Bristow was obliged to repay under the Secured Debt Financings and the notes

offerings was *not* long-term debt payable 3-5 years in the future, as depicted in the above table, but instead short-term debt and current liabilities of Bristow; and (2) consequently, rather than enjoying a liquidity runway, Bristow was facing an imminent liquidity crash landing.  Defendants' representations were also materially misleading, because Bristow failed to disclose its lack of internal controls related to compliance with the Collateral/Maintenance Covenants in the agreements providing its purported liquidity runway and the corresponding risk (which had in fact materialized) that Bristow would violate those covenants and that its debt would be accelerated.

F.      **Second Quarter Fiscal 2019**

1.      **The Q2 2019 Press Release and Presentation**

148.    On November 9, 2018, Bristow issued a press release titled "Bristow Group Reports Second Quarter Fiscal Year 2019 Results" (the "Q2 2019 Press Release"), disclosing, *inter alia*, Bristow's financial results of operations and financial condition for the second quarter of fiscal 2019 (ended September 30, 2018).  On the same date, Bristow filed a Form 8-K with the SEC attaching the Q2 2019 Press Release as an exhibit thereto.

149.    The Q2 2019 Press Release contained consolidated balance sheet financial statements for Bristow as of September 30, 2018, presenting, *inter alia*, the following amounts of (1) short-term borrowings and current maturities of long-term debt, and (2) total current liabilities:

| Liabilities | September 30, 2018 |
|---|---|
| Short-term borrowings and current maturities of long-term debt | $50,798,000 |
| Total current liabilities | $329,217,000 |

150.    These figures were materially false, for the reasons stated in ¶¶64-67, *supra*.  As later revealed through Bristow's February-June 2019 disclosures, Bristow's violations of the Collateral/Maintenance Covenants, ongoing since at least March 31, 2018, had the effect of accelerating Bristow's obligations under the Secured Debt Financings and note offerings, transforming $1.4 billion of previously long-term debt into short-term debt and current liabilities. *See* Sections VI.A-B, *infra*; ¶¶64-67, *supra*.  As Bristow later admitted in its June 19, 2019

Amended SEC Filings (despite its attempts to conceal the true cause), Bristow's originally-reported short-term debt and current liabilities as of September 30, 2018 (*i.e.*, the figures set forth above) had been understated by approximately $1.4 billion: Bristow's short-term debt was not $50.8 million as of September 30, 2018, but rather $1.440 billion; and Bristow's current liabilities were not $329.2 million, but rather $1.723 billion. *See* Section VI.D, *infra*; ¶¶64-67, *supra*.

151. The Q2 2019 Press Release contained additional representations concerning Bristow's purported financial condition and liquidity from Defendant Miller, as set forth below:

**LIQUIDITY AND FINANCIAL FLEXIBILITY**

**Don Miller, Senior Vice President and Chief Financial Officer, commented, "Bristow's previous financings and capital management continue to provide us with the runway needed to take advantage of the beginning of a recovery cycle for offshore oil and gas** and the ability to capitalize on market opportunities like the transaction to acquire Columbia Helicopters. . ."

152. Defendant Miller's above-identified representations in the Q2 2019 Press Release concerning Bristow's purportedly favorable liquidity position and Bristow's liquidity "runway" following the Secured Debt Financings were materially false and/or misleading, for the reasons stated in ¶¶69-73, *supra*. In fact, and as revealed through Bristow's later filings, Bristow was then effectively insolvent: its short-term debts (which then exceeded $1.4 billion) and current liabilities (which then exceeded $1.7 billion) dwarfed Bristow's then available liquidity (approximately $320 million), thereby posing a substantial risk to Bristow's fundamental financial condition and ability to continue as a going concern. *See* Sections VI.A-D, *infra*. In light of the imbalance between Bristow's short-term debts/current liabilities and its available liquidity, Bristow did not in fact have a liquidity runway, but rather faced an imminent liquidity crash landing. Defendants' representations were also materially misleading, because Bristow failed to disclose its lack of internal controls related to compliance with the Collateral/Maintenance Covenants in the agreements providing its purported liquidity runway and the corresponding risk (which had in fact materialized) that Bristow would violate those covenants and that its debt would be accelerated.

153.    On November 9, 2018, Bristow posted to its website a presentation titled "Second quarter FY19 earnings presentation Bristow Group and Columbia Helicopters: Redefining Industrial Aviation and Financially Improving Bristow" (the "Q2 2019 Presentation"), presenting – in connection with Bristow's Q2 2019 Conference Call – *inter alia*, Bristow's financial results of operations and financial condition for the second quarter of fiscal 2019 (ended September 30, 2018).

154.    The Q2 2019 Presentation, in its first two substantive slides, reiterated the above-detailed November 9, 2018 representations from Defendant Miller concerning Bristow's purported financial condition and liquidity:



| Bristow's global footprint and strong liquidity profile is preserved during this uneven recovery for offshore services | |
| --- | --- |
| **Revenue growth** | [OMITTED] |
| **Cost efficiencies** | [OMITTED] |
| **Improving returns on capital** | [OMITTED] |
| **Improved financial flexibility** | • Successful second quarter FY19 recovery of working capital led to $17M of operating cash flow and positive free cash flow<br>• **Liquidity of ~$320M as of September 30, 2018 after principal and interest payments** |

*See* Q2 2019 Presentation, at 6.

**Bristow has maintained strong liquidity throughout this historic oil and gas downturn**

**Total Liquidity**

- **Maintaining a prudent and safe level of liquidity continues to be a priority**
- **$320 million in total current liquidity including $308 million in cash**
- **Refinancings and capex deferrals/reductions provide improved liquidity runway**

[CHART OMITTED]

- $75 million asset-backed revolving credit facility provides ability to increase liquidity as U.K. and Norway businesses improve

*See* Q2 2019 Presentation, at 7.

155.  Defendants' above-identified representations in the Q2 2019 Presentation concerning Bristow's purportedly favorable liquidity position and Bristow's liquidity "runway" following the Secured Debt Financings (including Bristow's "strong liquidity profile," "improved financial flexibility" and "improved liquidity runway" purportedly resulting from the Secured Debt Financings) were materially false and/or misleading, for the reasons stated in ¶¶69-73, *supra*.  In fact, and as revealed through Defendants' later disclosures, Bristow was then effectively insolvent: its short-term debts (which then exceeded $1.4 billion) and current liabilities (which then exceeded $1.7 billion) dwarfed Bristow's then-available liquidity (approximately $320 million), thereby posing a substantial risk to Bristow's fundamental financial condition and ability to continue as a going concern.  *See* Sections VI.A-D, *infra*.  In light of the imbalance between Bristow's short-term debts/current liabilities and its available liquidity, Bristow did not in fact have a liquidity runway, but rather faced an imminent liquidity crash landing.  Defendants' representations were also materially misleading, because Bristow failed to disclose its lack of internal controls related to compliance with the Collateral/Maintenance Covenants in the agreements providing its

purported liquidity runway and the corresponding risk (which had in fact materialized) that Bristow would violate those covenants and that its debt would be accelerated.

156.     Defendants also included in the Q2 2019 Presentation a detailed table illustrating Bristow's purported liquidity runway, showing, *inter alia*, limited debt amortization obligations during fiscal 2019, 2020 and 2021, with various debt offerings and secured debt financings maturing and requiring substantial principal repayments in fiscal 2022 (the Macquarie Debt), fiscal 2023 (multiple notes offerings), and fiscal 2024 (the PK Air Debt and Lombard Debt):

| **Debt repayments and amortization as of September 30, 2018** | | | | | | | |
|---|---|---|---|---|---|---|---|
| **Debt repayments and amortization schedule** | | | | | | | |
| ($ in millions) | **Balance 9/30/18** | **FY19** | **FY20** | **FY21** | **FY22** | **FY23** | **FY24+** |
| 8.75% Secured Senior Notes | 350.0 | - | - | - | - | 350.0 | - |
| 4.5% Convertible Senior Notes | 143.8 | - | - | - | - | - | 143.8 |
| 6.25% Senior Unsecured Notes | 401.5 | - | - | - | - | 401.5 | - |
| Macquarie Debt | 178.0 | 7.0 | 14.0 | 14.0 | 143.0 | - | - |
| Lombard Debt | 189.9 | 6.3 | 12.7 | 12.6 | 12.7 | 12.6 | 133.0 |
| PK Air Debt | 221.2 | 9.1 | 19.1 | 20.4 | 21.7 | 23.0 | 127.9 |
| Eastern Airways Debt | 7.5 | 7.5 | - | - | - | - | - |
| Airnorth Debt | 12.4 | 1.4 | 2.8 | 2.4 | 2.5 | 2.6 | 0.7 |
| Other Debt | 9.9 | - | - | 4.1 | 0.9 | - | - |
| Total | $1,514.2 | $31.3 | $52.7 | $54.3 | $180.8 | $789.7 | $405.4 |

*See* Q2 2019 Presentation, at 56.

157.     Defendants' above representation of Bristow's debts and debt repayment timing – a detailed numeric representation of Bristow's purported liquidity runway, depicting very limited debt repayment obligations for fiscal 2019-2021/2022 – was, where highlighted above, materially false and/or misleading, for the reasons set forth in ¶¶64-68, 69-73 and 74-75, *supra*.  In fact, and as revealed through Bristow's later filings: (1) substantially all of the $1.4 billion of outstanding principal that Bristow was obliged to repay under the Secured Debt Financings and the notes offerings was *not* long-term debt payable 3-5 years in the future, as depicted in the above table,

but instead short-term debt and current liabilities of Bristow; and (2) consequently, rather than enjoying a liquidity runway, Bristow was facing an imminent liquidity crash landing.

### 2. The Q2 2019 Conference Call

158. On November 9, 2018, at approximately 8:00 a.m., Defendants held a conference call with analysts and investors to further discuss Bristow's operations, financial results of operations and financial condition for the second quarter of fiscal 2019, as well as the Columbia Acquisition (the "Q2 2019 Conference Call").

159. During the Q2 2019 Conference Call, Defendant Baliff, relying on and referring analysts and investors to the above-detailed pages of the Q2 2019 Presentation, reiterated the representations made therein concerning Bristow's purported financial condition and liquidity:

> BALIFF: Fifth and **looking at improved financial flexibility**: an important achievement of our quarter is that our operations delivered operating cash flow of $17 million this quarter, as well as $9.5 million of free cash flow. **I would also like to highlight that our solid liquidity profile, along with our strong operating leverage, makes us well-positioned to take advantage of the beginning of an offshore investment cycle as more rigs are going to work** in places like the U.S. Gulf of Mexico, North Sea, West Africa, as I talked about, and we're even beginning to see more rigs go to work in Brazil.
>
> **Please turn to slide 7. We've maintained a strong liquidity profile through this historic oil and gas downturn. Maintaining a prudent and safe level of liquidity continues to be a priority for us. As of quarter-end, we had $320 million in liquidity**, including $308 million in cash.
>
> **And as Don has talked about in the past, we have no bank covenants. We're, in essence, living off this excellent liquidity, allowing ourselves to be strategically flexible and really support the operations for our clients. Don will provide an update on this later in the presentation. Our refinancing and CapEx deferrals and eliminations and reductions provide us with more ample liquidity**.

*See* Q2 2019 Conference Call Transcript (Bloomberg), at 3.

160. Defendant Baliff's above-identified representations in the Q2 2019 Conference Call, singing the praises of Bristow's purportedly favorable liquidity position and liquidity runway (including "our solid liquidity profile," "strong liquidity profile," "excellent liquidity" and "ample liquidity"), were materially false and/or misleading, for the reasons stated in ¶¶69-72, *supra*. In

fact, and as Defendants later admitted, Bristow was then effectively insolvent: its short-term debts (which then exceeded $1.4 billion) and current liabilities (which then exceeded $1.7 billion) dwarfed Bristow's then-available liquidity (approximately $320 million), thereby posing a substantial risk to Bristow's fundamental financial condition and ability to continue as a going concern.  *See* Sections VI.A-D, *infra*.  In light of the imbalance between Bristow's short-term debts/current liabilities and its available liquidity, Bristow did not in fact have a liquidity runway, but rather faced an imminent liquidity crash landing.  Defendants' representations were also materially misleading, because Bristow failed to disclose its lack of internal controls related to compliance with the Collateral/Maintenance Covenants in the agreements providing its purported liquidity runway and the corresponding risk (which had in fact materialized) that Bristow would violate those covenants and that its debt would thus be accelerated.

### 3.    The Q2 2019 Form 10-Q

161.    On or about November 9, 2018, Defendants filed a Form 10-Q with the SEC for the second quarter of fiscal 2019, ended September 30, 2018 (the "Q2 2019 Form 10-Q").  The Q2 2019 Form 10-Q was signed by Miller and Allman.

162.    The Q2 2019 Form 10-Q contained consolidated balance sheet financial statements for Bristow as of September 30, 2018, which, *inter alia*, stated the following amounts of (1) short-term borrowings and current maturities of long-term debt, and (2) total current liabilities:

| Liabilities | September 30, 2018 |
| --- | --- |
| Short-term borrowings and current maturities of long-term debt | $50,798,000 |
| Total current liabilities | $329,217,000 |

*See* Q2 2019 Form 10-Q, at 3, 22 and 45.

163.    These representations were materially false, for the reasons stated in ¶¶149-50, *supra*, and understated both Bristow's short-term debts and its current liabilities, as of September 30, 2018, by approximately $1.4 billion.

164.    In the "Management Discussion and Analysis" section of the Q2 2019 Form 10-Q,

the subsection concerning "Financial Condition and Sources of Liquidity" stated, in relevant part:

### Financial Condition and Sources of Liquidity

The significant factors that affect our overall liquidity include cash from or used to fund operations, capital expenditure commitments, debt service, pension funding, adequacy of bank lines of credit and our ability to attract capital on satisfactory terms. . .

**We expect that our cash on deposit as of November 2, 2018 of approximately $258.9 million, proceeds from aircraft sales, and available borrowing capacity of $7.4 million under our ABL Facility described under "Executive Overview — Market Outlook — Recent Events — ABL Facility", as well as any future financings (which may include additional equipment financings and capital market transactions), will be sufficient to satisfy our operating needs, existing capital commitments and other contractual cash obligations.** However, we may require capital in excess of the amount available from these sources and we may need to seek additional sources of liquidity, complete aircraft sales or defer capital expenditures in order to have sufficient liquidity to satisfy operating needs, existing capital commitments and other contractual obligations.

*See* Q2 2019 Form 10-Q, at 83.

165.    Defendants' above-identified representations concerning Bristow's liquidity and financial condition were materially false and misleading, for the reasons stated at ¶¶69-72, *supra*. In fact, and as revealed through Defendants' later disclosures, Bristow was then effectively insolvent: its short-term debts (which then exceeded $1.4 billion) and current liabilities (which then exceeded $1.7 billion) dwarfed Bristow's then-available liquidity (approximately $320 million), thereby posing a substantial risk to Bristow's fundamental financial condition and ability to continue as a going concern. *See* Sections VI.A-D, *infra*. In light of the imbalance between Bristow's short-term debts/current liabilities and its available liquidity, Bristow did not in fact have a liquidity runway, but rather faced an imminent liquidity crash landing.

166.    Relatedly, Defendants asserted, in the Q2 2019 Form 10-Q's section titled "Market Outlook," that Bristow had "increased its financial flexibility" by completing the Secured Debt Financings and the notes offerings:

Additionally, we have taken the following actions in an effort to address the downturn:

***

• **We increased our financial flexibility by entering into new secured equipment financings** that resulted in aggregate proceeds of $630 million funded in fiscal years 2017 and 2018.  Additionally, in fiscal year 2018, we completed the sale of $143.8 million of the 4½% Convertible Senior Notes and $350 million of the 8.75% Senior Secured Notes. . .

*See* Q2 2019 Form 10-Q, at 58.

167.    The above-identified representation concerning the purported "increased []" financial flexibility" arising from the Secured Debt Financings was identical to the representation made in the prior 10-Q filing (the Q1 2019 Form 10-Q – *see* ¶134, *supra*), and was materially false and/or misleading for the same reasons (set forth at ¶135, *supra*).  Defendants' representations were also materially misleading because Bristow failed to disclose its lack of internal controls related to compliance with the Collateral/Maintenance Covenants in the Secured Debt Financing agreements supposedly providing that "increased financial flexibility" and the corresponding risk (which had in fact materialized) that Bristow would violate those covenants and that its debt would thus be accelerated.

168.    In the Q2 2019 Form 10-Q's "Future Cash Requirements – Contractual Obligations, Commercial Commitments and Off Balance Sheet Arrangements" subsection, Defendants provided the following table presenting and summarizing Bristow's "significant contractual obligations and other commercial commitments [] as of September 30, 2018, and the future periods in which such obligations are expected to be settled in cash," and the "timing of principal and interest payments on outstanding borrowings as of September  30, 2018:"

| | | Payments Due by Period | | | |
| | | Six Months Ending March 31, 2019 | Fiscal Year ending March 31, | | |
| | Total | | 2020 - 2021 | 2022 - 2023 | 2024 and beyond |
| | | | (In thousands) | | |
| Contractual obligations: | | | | | |
| Long-term debt and short-term borrowings | | | | | |
| Principal | $1,514,184 | $31,336 | $107,031 | $970,470 | $405,347 |
| Interest | 411,297 | 48,925 | 188,099 | 165,239 | 9,034 |
| Aircraft operating leases | 276,248 | 74,658 | 159,435 | 37,479 | 4,676 |
| Other operating leases | 69,382 | 4,780 | 16,540 | 15,863 | 32,199 |
| Pension obligations | 46,808 | 8,181 | 33,150 | 5,477 | — |
| Aircraft purchase obligations | 457,493 | 19,780 | 161,757 | 165,758 | 110,198 |
| Other purchase obligations | 37,698 | 37,698 | — | — | — |
| Total contractual cash obligations | $2,813,110 | $225,358 | $666,012 | $1,360,286 | $561,454 |
| Other commercial commitments | | | | | |
| Letters of credit | $13,512 | $11,556 | $1,956 | $— | $— |
| Total commercial commitments | $13,512 | $11,556 | $1,956 | $— | $— |

*See* Q2 2019 Form 10-Q, at 82.

169.   The highlighted figures in the above table (1) presented in more condensed form the information presented at ¶156, *supra*, concerning the purported timing of Bristow's debt repayment obligations; and (2) were materially false and/or misleading for the same reasons, as set forth in ¶157, *supra*.

170.   The "Controls and Procedures" section of the Q2 2019 Form 10-Q stated the following:

**Item 4. *Controls and Procedures.***

***Evaluation of Disclosure Controls and Procedures***

We carried out an evaluation, under the supervision of and with the participation of our management, including Jonathan E. Baliff, our Chief Executive Officer ("CEO"), and L. Don Miller, our Chief Financial Officer ("CFO"), of the effectiveness of the Company's disclosure controls and procedures (as defined in Rule 13a-15(e) of the Exchange Act) as of September 30, 2018.  Based on that evaluation, **our CEO and CFO concluded that such disclosure controls and**

**procedures were effective to ensure that information required to be disclosed in our periodic reports filed under the Exchange Act is recorded, processed, summarized and reported within the time periods specified by the Securities and Exchange Commission's rules and forms and such information is accumulated and communicated to our management as appropriate to allow for timely decisions regarding required disclosure under the Exchange Act**.

*See* Q2 2019 Form 10-Q, at 83-84.

171.   The above-identified representations concerning the efficacy and adequacy of Bristow's disclosure controls and procedures were materially false, for the reasons set forth at ¶¶62-63, *supra*.   In fact, and as Bristow later admitted in its February-April 2019 corrective disclosures and in the June 2019 Amended SEC Filings: (1) Bristow, as of March 31, 2018 and for all subsequent periods, did "not have adequate monitoring control processes in place related to non-financial covenants within certain of its secured financing and lease agreements," which rendered its disclosure controls and procedures "ineffective" for such periods; and (2) this constituted a "material weakness in internal controls over financial reporting," rendering such internal controls over financial reporting ineffective.   *See* Sections VI.A-B and VI.D, *infra*.

172.   Attached as Exhibits 31.1 and 31.2 to the Q2 2019 Form 10-Q were certifications from Defendants Baliff and Miller, dated November 9, 2018, that were: (1) identical in all but their date to the above-detailed certifications filed in connection with the Q1 2019 Form 10-Q (*see* ¶140, *supra*); and (2) materially false and/or misleading for the very same reasons (*see* ¶141, *supra*).

173.   Attached as Exhibits 32.1 and 32.2 to the Q2 2019 Form 10-Q were certifications from Defendants Baliff and Miller, dated November 9, 2018, that were: (1) identical in all but their date to the above-detailed certifications filed in connection with the Q1 2019 Form 10-Q (*see* ¶142, *supra*); and (2) materially false and/or misleading for the very same reasons (*see* ¶143, *supra*).

## VI.   THE TRUTH EMERGES

### A.   Bristow's February 11, 2019 Corrective Disclosures Reveal Bristow's Covenant Violations, Controls Failures, Debt Misclassifications and Potential Going Concern Risk

174.   According to a press release Bristow issued on January 14, 2019, Bristow had scheduled its public release of third quarter fiscal 2019 financial results (*i.e.*, for the quarter ended

December 31, 2018) for the afternoon of February 7, 2019, post-market close, and an associated conference call with analysts for 10:00 a.m. Eastern Time the following morning, February 8, 2019.

175.    However, on February 6, 2019, Bristow issued a press release at 5:11 p.m. Eastern Time titled "Bristow Group Reschedules Fiscal Year 2019 Third Quarter Earnings Release and Conference Call Schedule," delaying its scheduled release of fiscal 2019 Q3 financial results from February 7, 2019 (as originally scheduled) to the afternoon of February 11, 2019, post-market close, and rescheduling the associated conference call with analysts to follow on February 11, 2019 at 5:00 p.m. Eastern Time.  Typically, such disclosure delays are occasioned by the presence of material negative information of which the market was previously unaware, such as an earnings restatement or a large write-down and therefore signal to the market the potential presence of new, adverse information (and, here, the delay was in fact occasioned by just such news, as detailed below).  Consequently, on the next trading day (February 7, 2019), and in response to this disclosure delay, which led the market to expect impending adverse information, Bristow shares fell from their February 6, 2019 closing price of $3.24 per share to close at $2.71 per share (a one-day, 16.36% decline), on trading volume of 1,201,851 shares (more than 1.56 times greater than Bristow's average daily trading volume during the Class Period).

176.    On February 11, 2019, at 4:33 p.m. Eastern Time, Bristow issued a press release titled "Bristow Group Reports Preliminary Third Quarter Fiscal Year 2019 Results," disclosing, *inter alia*: (1) what Bristow termed "preliminary" financial results for the third quarter of fiscal 2019; (2) that Bristow would not file, as customary and expected, its Form 10-Q for Q3 2019 on the same day (*i.e.*, February 11, 2019), and had instead filed a Form 12b-25 notification of late filing with the SEC; (3) that Bristow was canceling its planned 5:00 p.m. conference call and would comment no further until it had filed the Form 10-Q; and (4) disclosing, as the underlying reason for (1)-(3) above, that:

        a.    Bristow's internal controls over financial reporting had suffered from a "material weakness" – stemming from inadequate "monitoring control processes [] related to

non-financial covenants within certain of [Bristow's] secured financing and lease agreements" – since March 31, 2018 (*i.e.*, year-end fiscal 2018), and were ineffective as of March 31, 2018 and for all subsequent quarterly periods through December 31, 2018 (*i.e.*, Q1, Q2 and Q3 of fiscal 2019); and

b.   such material weakness may have led to misstatements in Bristow's previously-issued financial statements for such periods (*i.e.*, year-end 2018, and the first and second quarters of fiscal 2019) including, specifically:

   i.   the classification of certain debt balances in those financial statements as long-term, rather than short-term, debt, and

   ii.   relatedly, Defendants' "assessment" and assertions of Bristow's "ability to continue as a going concern."

177.   In relevant part, Bristow's above-identified February 11, 2019 press release stated:

HOUSTON, Feb. 11, 2019 /PRNewswire/ -- Bristow Group Inc. (NYSE: BRS) today announced that it filed a Form 12b-25 notification of late filing with the Securities and Exchange Commission and released preliminary results for the three and nine months ended December 31, 2018.  The Company intends to hold its investor conference call to discuss its fiscal year 2019 third quarter after it has filed its Form 10-Q with the SEC, and will not be commenting until the Form 10-Q has been filed.

**Management has concluded that the Company did not have adequate monitoring control processes in place related to non-financial covenants within certain of its secured financing and lease agreements, and this control deficiency identified represents a "material weakness" in internal controls over financial reporting.  Accordingly, the Company's internal control over financial reporting was ineffective at March 31, 2018 and the reporting periods thereafter.  As such, both management's assessment and the report of KPMG on internal control over financial reporting as of March 31, 2018 should no longer be relied upon.  In addition, because of the material weakness described above, in February 2019, the Company's management has determined that the Company's disclosure controls and procedures were not effective at a reasonable assurance level as of March 31, 2018 and the reporting periods thereafter**.

**The Company is evaluating whether this material weakness in internal controls over financial reporting resulted in a misstatement in the Company's financial statements included in the Annual Report on Form 10-K for the fiscal**

**year ended March 31, 2018 and the impact on the financial statements of the Company as of December 31, 2018, including disclosures.  The Company is specifically evaluating whether certain debt balances should be reclassified from long-term to short-term in those financial statements, whether related waivers can be obtained from lenders, if necessary, and the resulting impact on the assessment of the Company's ability to continue as a going concern**.

Further discussion of the material weakness and any financial statement implications, including any related revisions to the Company's previously issued financial statements, if required, will be included in the Quarterly Report on Form 10-Q for the three months ended December 31, 2018 and in an amendment to the Annual Report on Form 10-K for the fiscal year ended March 31, 2018.

178.   Relatedly, in a Form 8-K filed the same day with the SEC and signed by Allman, which attached the above-identified February 11, 2019, press release as an exhibit, Bristow provided a similar, though slightly more-detailed, disclosure, including in relevant part:

**As part of management's assessment of the Company's internal controls over financial reporting as of December 31, 2018, a control deficiency was identified by the Company related to the Company's processes for monitoring compliance with certain non-financial covenants in certain of the Company's secured financing and lease agreements.**  Identification of control deficiencies regularly occurs in connection with the assessment or audit of internal controls over financial reporting.  Control deficiencies exist when the design or operation of a control does not allow management or employees, in the normal course of performing their assigned functions, to prevent or detect misstatements on a timely basis.  A control deficiency may constitute a "significant deficiency" or a "material weakness" as defined in applicable Securities and Exchange Commission ("SEC") rules.  A "significant deficiency" means a deficiency, or a combination of deficiencies, in internal control over financial reporting that is less severe than a material weakness, yet important enough to merit attention by those responsible for oversight of the registrant's financial reporting.  **A "material weakness" means a deficiency or a combination of deficiencies, in internal control over financial reporting such that there is a reasonable possibility that a material misstatement of the registrant's financial statements will not be prevented or detected on a timely basis.  However, not all control deficiencies rise to the level of a significant deficiency or a material weakness.**

**Management has concluded that the Company did not have adequate monitoring control processes in place related to nonfinancial covenants within certain of its secured financing and lease agreements, and this control deficiency identified represents a "material weakness" in internal controls over financial reporting.**  Accordingly, the Company's internal control over financial reporting was ineffective at March 31, 2018 and the reporting periods thereafter.  As such, both management's assessment and the report of KPMG on internal control over financial reporting as of March 31, 2018 should no longer be

relied upon.  In addition, because of the material weakness described above, in February 2019, the Company's management has determined that the Company's disclosure controls and procedures were not effective at a reasonable assurance level as of March 31, 2018 and the reporting periods thereafter.

The Company is evaluating whether this material weakness in internal controls over financial reporting resulted in a misstatement in the Company's financial statements included in the Annual Report on Form 10-K for the fiscal year ended March 31, 2018 and the impact on the financial statements of the Company as of December 31, 2018, including disclosures.  **The Company is specifically evaluating whether certain debt balances should be reclassified from long-term to short-term in those financial statements, whether related waivers can be obtained from lenders, if necessary, <u>and the resulting impact on the assessment of the Company's ability to continue as a going concern.</u>**

Further discussion of the material weakness and any financial statement implications, including any related revisions to the Company's previously issued financial statements, if required, will be included in the Quarterly Report on Form 10-Q for the three months ended December 31, 2018 and in an amendment to the Annual Report on Form 10-K for the fiscal year ended March 31, 2018.

As a result of matters disclosed above, the Company is unable to file its Quarterly Report on Form 10-Q for the three months ended December 31, 2018 within the prescribed time period without unreasonable effort or expense.  The Company has filed a Form 12b-25 Notification of Late Filing with the SEC, postponing the filing of its Quarterly Report on Form 10-Q for the three months ended December 31, 2018…

179.    Similarly, in its February 11, 2019 Form 12b-25 Notification of Late Filing with the SEC, signed by Defendant Miller and explaining Bristow's failure to file its expected Form 10-Q, Bristow further disclosed:

Bristow Group Inc. (the "Company") is unable to file its Quarterly Report on Form 10-Q for the three months ended December 31, 2018 (the "Form 10-Q") within the prescribed time period without unreasonable effort or expense.

As disclosed by the Company in Item 8.01 of its Current Report on Form 8-K furnished to the U.S. Securities and Exchange Commission on February 11, 2019, the Company is reviewing its historical processes for monitoring compliance with certain non-financial covenants in certain of the Company's secured financing and lease agreements to determine whether all accounting and financial reporting implications of such processes, covenants and any breaches of such covenants were appropriately considered.  **The Company has identified a material weakness in internal controls over financial reporting that it expects to report in the Form 10-Q related to the monitoring of compliance with certain non-financial covenants in certain of the Company's secured financing and lease**

**agreements.** Additional time is needed for the Company to compile and analyze supporting documentation in order to complete the Form 10-Q, and for management and the Company's independent registered public accounting firm to evaluate any implications for the Company's financial statements for the current period and prior periods related to such material weakness and any noncompliance with such non-financial covenants. Further discussion of the material weakness and any financial statement implications, including any related revisions to the Company's previously issued financial statements, will be included in the Form 10-Q and an amendment to the Form 10-K filed for the fiscal year ended March 31, 2018.

180. In response to Bristow's February 11, 2019 disclosures – which revealed for the first time: (1) the material weakness in Bristow's internal controls over financial reporting as of year-end fiscal 2018 (*i.e.*, March 30, 2018) and all following quarterly periods of fiscal 2019, (2) that this material weakness may have caused Bristow to violate covenants in certain of its debt financing and helicopter lease agreements, and (3) possible impacts of such covenant violations and controls weaknesses for Bristow's previously-issued financial statements for such periods, including misclassification of short-term debt as long-term debt and mis-assessment of Bristow's ability to continue as a going concern – Bristow's shares immediately lost more than 60% of their remaining value, falling $1.86 per share on February 12-13, 2019. Specifically, Bristow's shares:

a. fell on February 12, 2019, dropping $1.22 per share from their February 11, 2019 closing price of $3.06 per share to close on February 12, 2019 at $1.84 per share, on trading volume of 9,908,369 shares (more than 12.87 times greater than Bristow's average daily trading volume during the Class Period); and

b. continued their decline on February 13, 2019, dropping a further $0.64 per share to close on February 13, 2019 at $1.20 per share, on an even more elevated trading volume of 13,310,016 shares (more than 17.29 times higher than Bristow's average daily trading volume during the Class Period).

B. **Subsequent Disclosures, Revealing Further Fall-out from Defendants' Misconduct and Deepening Going Concern Risk, Further Sink Bristow's Share Price**

181. In the weeks and months following Bristow's February 11, 2019 corrective disclosures, Bristow provided additional disclosure and detail concerning the nature, extent and

impacts of its covenant violations, which constituted further materialization of the risks previously concealed through Defendants' misconduct.

182.    On February 19, 2019,  Bristow again failed to file its already-delayed Form 10-Q with the SEC for the third quarter of fiscal 2019, ended December 31, 2018 (the "Q3 2019 Form 10-Q"), and instead, in a press release titled "Bristow Provides Update on Status of Form 10-Q Filing," withdrew any timeline for filing the Q3 2019 Form 10-Q, and added further disclosure and detail concerning the nature and extent of Bristow's covenant violations, and their impacts to Bristow's financial statements and Bristow's ability to continue as a going concern.  Bristow's February 19, 2019 press release stated:

> HOUSTON, Feb. 19, 2019 /PRNewswire/ -- Bristow Group Inc. (NYSE: BRS) today announced that it continues to work towards filing its quarterly report on Form 10-Q for the period ended December 31, 2018 (the "Form 10-Q") as soon as possible.  The Company does not intend to comment further until the Form 10-Q has been filed.
>
> The Company is not yet able to file the Form 10-Q because additional time is required for the Company to complete a review of its existing processes and controls to ensure compliance with non-financial covenants within certain secured financing and helicopter lease agreements.  At this time, the Company is not aware of any non-compliance with the non-financial covenants in its secured financing and helicopter lease agreements that has not been waived or previously cured, other than non-compliance resulting from the failure to timely file the Form 10-Q.  The Company has not detected any indications of accounting irregularities or impropriety in this process.
>
> **The determination of the existence of a control deficiency related to these matters, which has been classified as a material weakness in the Company's internal controls over financial reporting, and the need to assess possible non-compliance with all non-financial covenants commenced when the Company's senior management became aware that certain pledged and leased helicopter engines were not matched to specific pledged or leased helicopter airframes or returned to such airframes within specified periods, as is required under certain of the secured financing and helicopter lease agreements.  The removal and replacement of engines and components from helicopters is part of the Company's normal ongoing maintenance activities; however, since certain of those helicopter engines and airframes are pledged to lenders or leased from lessors, the removal of a pledged or leased engine from a pledged or leased airframe can create issues of non-compliance with certain of the secured financing and helicopter lease agreements.  All issues related to this matter**

**were cured prior to December 31, 2018 for all but nine helicopter engines (relating to three agreements) where the pledged or leased engines were not returned to the pledged or leased airframes within specified periods due to delays with certain of the Company's maintenance service providers.** The Company has obtained waivers of such non-compliance under the applicable agreements related to such helicopter engines. The issues detected, which have all been cured or waived, involve a small subset of the approximately 385 helicopter engines that are subject to the Company's secured financings or helicopter leases.

The material weakness and the matters the Company is continuing to assess for their impact on the Company's balance sheet classification of debt balances and related disclosures are limited to possible non-compliance with non-financial covenants.

The completion of the foregoing assessment is required in order for the Company to develop a remediation plan related to the control deficiency in this area, and for the Company and its auditors to determine the Company's compliance with non-financial covenants under these agreements as of December 31, 2018 and in prior periods.

**As a result of these issues, unless certain actions are taken, accounting rules may require the Company to reclassify certain debt balances from long-term to short-term.** These actions may include obtaining waivers from the Company's secured equipment financing lenders and helicopter lessors for potential non-compliance with non-financial covenants that may have existed prior to December 31, 2018 or obtaining waivers for any specific instances of non-compliance with non-financial covenants that existed as of December 31, 2018.

The Company's failure to file the Form 10-Q timely would, if the Form 10-Q is not filed prior to the expiration of applicable grace periods, result in an event of default under certain of the Company's financing and lease agreements, unless waived or extended.

**The classification of certain debt balances as short-term as of December 31, 2018, or for prior periods, likely would result in the Company's determination that there is a requirement to include disclosure about the Company's ability to continue as a going concern in the Form 10-Q and applicable prior filings.** In order to avoid a breach of covenants in the Company's secured equipment financings that require delivery of annual audited financial statements without any going concern explanation or limitation, the Company would need to seek waivers from its secured equipment financing lenders if such going concern disclosure determination is made with respect to the Form 10-K previously filed for the fiscal year ended March 31, 2018.

Further discussion of the material weakness and any financial statement implications, including any related revisions to the Company's previously issued

financial statements, if required, will be included in the Form 10-Q and in amendments to prior filings, where required.

The Company expects to receive a notice from the New York Stock Exchange (the "NYSE") that it is not in compliance with Section 802.01E of the NYSE Listed Company Manual due to the delay in filing its quarterly report on Form 10-Q for the period ended December 31, 2018.  The NYSE routinely issues such notices in such situations.  The Company expects that it will regain compliance with the NYSE listing standards upon filing the Form 10-Q, and is working towards filing the Form 10-Q as soon as possible.

183.    On March 18, 2019, Bristow filed a Form 8-K, signed by Allman, disclosing, *inter alia*, agreements with certain of its creditors to provide Bristow with a grace period extending to April 15, 2019 for filing the Q3 2019 Form 10-Q originally due February 11, 2019.

184.    On April 15, 2019, Bristow, again, failed to file its already twice-delayed Q3 2019 Form 10-Q, and instead issued a further press release and 8-K, signed by Allman, disclosing, *inter alia*: (1) an extension of the grace period for such filing through June 19, 2019; (2) a heightened going concern risk (as indicated by Bristow's announcements that it was "exploring strategic alternatives to strengthen our balance sheet and to preserve and maximize the value of the Company while remaining committed to providing safe, reliable service to our customers" and that it had "engaged financial and legal advisors, including Alvarez & Marsal, Houlihan Lokey, Baker Botts L.L.P. and Wachtell, Lipton, Rosen & Katz, to assist us in, among other things, analyzing various strategic alternatives to address our liquidity and capital structure"); and (3) numerous and material risks that Defendants had omitted to disclose in Bristow's previously-issued Fiscal 2018 Form 10-K and Fiscal 2019 Forms 10-Q.

185.    Bristow's April 15, 2019 press release, titled "Bristow Provides Financial Update" and issued at 4:44 p.m. Eastern Time, disclosed the new deadline of June 19, 2019 for filing the delinquent Form 10-Q, and, by virtue of Bristow's announcement, that it had "retained financial and legal advisors," including prominent bankruptcy/restructuring service providers such as Alvarez & Marsal, "to explore strategic financial alternatives, with the objective of strengthening its long-term capital position," indicated that Bristow stood on the verge of bankruptcy:

HOUSTON, April 15, 2019 /PRNewswire/ -- Bristow Group Inc. (NYSE: BRS) ("Bristow" or the "Company") today is providing an update on its efforts to complete its financial reporting process for the quarter ended December 31, 2018 and to best position the Company for the future.  The Company has obtained waivers from certain lenders that extend the deadline under its agreements with those lenders for filing the Company's Form 10-Q for the quarter ended December 31, 2018 to June 19, 2019, subject to certain conditions.  **The Company has also retained financial and legal advisors to explore strategic financial alternatives, with the objective of strengthening its long-term capital position.**  In addition, the Company has determined it would be in the Company's best interest to exercise its contractual right to utilize a contractual grace period of up to 30 days and not make a $12.5 million interest payment on the 6.25% Senior Unsecured Notes maturing in 2022 (the "Senior Notes") as it continues to work on its overall financing arrangements.

Bristow President and Chief Executive Officer L. Don Miller stated, "Bristow is working diligently with its financial and legal advisors to best position the company for the future, both financially and operationally.  The steps we are announcing today will afford us additional time to continue our efforts to complete our financial reporting process and address our capital structure.  Most importantly, we are, as always, focused on continuity of service in a safe, reliable and professional manner for our valued employees, clients and passengers, as we continue to navigate a challenging market."

**Financial Reporting and Debt Covenant Waivers**

The Company has obtained waivers of its covenants with its secured equipment financing lenders and asset backed revolving credit facility ("ABL") lenders with respect to the timing of delivery of unaudited financial statements for the quarter ended December 31, 2018.  The waivers also include waivers of cross-default provisions arising from the decision to enter the 30-day grace period in connection with the Senior Notes.  The waivers have the effect of extending the Company's deadline under its agreements with the lenders to file its 10-Q for the quarter ended December 31, 2018 until June 19, 2019, subject to certain conditions, including securing customary forbearance agreements with certain other debtholders as detailed in the Company's 8-K filing today.

**Strategic Financial Alternatives Review and Liquidity Update**

**The Company has engaged Houlihan Lokey and Alvarez & Marsal as its financial advisors and Baker Botts L.L.P. and Wachtell, Lipton, Rosen & Katz as its legal advisors to assist the Company in analyzing various strategic financial alternatives to address its capital structure, including strategic and refinancing alternatives to restructure its indebtedness and other contractual obligations**.

There can be no assurance that this review will result in any particular outcome, or that the Company will succeed in obtaining the forbearance agreements referred to above.

As of April 12, 2019, the Company had approximately $202.1 million of liquidity, consisting of aggregate cash on hand and availability under its ABL facility.

As part of the strategic financial review process, Bristow has elected not to make an interest payment of approximately $12.5 million due April 15, 2019 on the Senior Notes.  Under the terms of the relevant indenture, the Company has a contractual grace period of up to 30 days during which it may elect to make the interest payment and cure any related default.  Bristow believes it is in its best interest to use the grace period to continue working with its advisors and creditors to review alternatives for improving its capital structure.

The Company does not intend to comment further on its financial results or performance until its Form 10-Q for the quarter ended December 31, 2018 has been filed with the SEC.

186.    Additionally, in a Form 8-K filed the same day (April 15, 2019), and attaching the April 15, 2019 press release as an exhibit, Bristow reiterated the above two disclosures (*i.e.*, a new deadline for completing the delinquent Form 10-Q, and the effective concession that Bristow was poised at the edge of bankruptcy) and added a third disclosure, which detailed the material risks that Defendants had previously omitted and concealed from the Fiscal 2018 Form 10-K and the Fiscal 2019 Forms 10-Q concerning (i) the Collateral/Maintenance Covenants, (ii) Bristow's violations of such covenants, (iii) the fact those violations "were defaults under the affected credit and lease agreements," (iv) the consequent impacts of such violations on Bristow's indebtedness, financial condition and ability to continue as a going concern, and (v) the material weakness in Bristow's internal controls over financial reporting that omitted, obscured and/or misrepresented those impacts in the Fiscal 2018 Form 10-K and the Fiscal 2019 Forms 10-Q.

187.    Specifically, the April 15 Form 8-K sought, retroactively and by declaratory fiat, to "supplement the risk factors" disclosed in the Fiscal 2018 Form 10-K and the Fiscal 2019 Forms 10-Q with the below-quoted, additional risk factors that had been materially omitted at the times such documents were originally filed:

*Risk Factor Update*

The following risk factors are provided to supplement the risk factors of the Company previously disclosed under the headings "Risks Relating to Our Business" and "Risks Relating to Our Level of Indebtedness" in the Annual Report on Form 10-K for the fiscal year ended March 31, 2018 (the "2018 Form 10-K") and the Quarterly Report on Form 10-Q for the quarter ended September 30, 2018. Capitalized terms not otherwise defined herein have the meanings ascribed to them in the 2018 Form 10-K.

***We may not be successful in complying with the covenants contained in our debt instruments and lease agreements, and any such failure to comply could result in defaults under such commitments.  If we are unable to obtain waivers of any such defaults, we could be required to repay our debt obligations or contractual commitments earlier than anticipated, and there is no assurance that we would have sufficient cash available to fund such payments***.

Certain of our credit facilities which are secured by pledges of aircraft with aggregate outstanding borrowings of $391.2 million at December 31, 2018, and certain of our aircraft leasing arrangements to which we are the lessee, contain covenants of a non-financial nature related to pledged aircraft, and our failure to comply with these covenants could result in events of default under our financing agreements, unless waived.  Each aircraft collateral pledge specifically identifies the airframes and engines of the aircraft pledged to its credit facility.  Similarly, each aircraft lease specifically identifies the airframes and engines covered by the lease.  The agreements contain a requirement to maintain certain collateralized engines on specific collateralized aircraft with limited exceptions for, among other things, the repair and maintenance of the aircraft engines.  From time to time, engines are removed and replaced on an airframe.  In some cases, these actions are subject to certain other limited exceptions permitted under the credit and lease agreements, so long as (a) a pledged or leased engine is replaced with another engine subject to the same transaction or, in some cases, any other engine, so long as such other engine is free and clear of liens other than certain permitted liens and (b) in the case of a "loaner" engine furnished by a maintenance provider temporarily replacing a pledged or leased engine, the "loaner" engine is replaced with an engine (which may be the original engine, post-maintenance) subject to the same transaction within 180 days after the removal of the original engine.

During the three months ended December 31, 2018, we determined that some "loaner" engines owned by maintenance providers and installed on pledged or leased airframes have been on those airframes for more than 180 days after the removal of the original engines.  We are reliant upon third-party maintenance providers to complete maintenance work on these subject engines; however, these maintenance providers did not complete the required repair work within the 180-day period permitted by our affected credit and lease agreements for which the engine(s) can be separated from the assigned airframe(s) nor have the maintenance providers been able to provide a timetable for the ultimate completion of the repairs

on those engines.  These instances, while limited in number, were defaults under the affected credit and lease agreements.  In addition, certain other engines had been installed on pledged or leased airframes for periods longer than 180 days.  All issues related to this matter were cured prior to December 31, 2018 but for nine helicopter engines (relating to three agreements) where the pledged or leased engines were not returned to the pledged or leased airframes within specified periods due to delays with certain of our maintenance service providers.  We obtained waivers of such non-compliance under the applicable agreements related to such helicopter engines.  Due to maintenance provider delays and the resulting continuing non-compliance with certain provisions of our affected credit and lease agreements, we obtained waivers from the relevant lenders and lessors that extends the deadline for the replacement of "loaner" engines on the relevant airframes to the earlier of (i) the date that occurs 30 days after the receipt by the Company of the respective engine(s) at our facility where the relevant airframe is located at that time or (ii) February 10, 2020.  Under these waivers, upon receipt of the affected engine(s) from our maintenance providers, we will have 30 days in order to reaffix the engine(s) to the relevant airframe.

Our decision to enter the Senior Notes Grace Period is, and the failure to make other payments of interest when due may be, an event of default under certain of our financing agreements, unless waived.  Please see the discussion of the Waiver Letters with respect to the secured equipment financings and the ABL Facility described in this Current Report on Form 8-K for more information.

Certain of our financing agreements contain covenants that require us to deliver quarterly and annual financial information and other reports within specified time periods.  Our failure to file the Form 10-Q or other financial information or reports within the specified time periods under these financing agreements would result in an event of default under certain of our financing agreements, unless waived or extended.  In addition, we expect to amend our 2018 Form 10-K and our Forms 10-Q for the quarterly periods ended June 30, 2018 and September 30, 2018, and such amendments may include, among other things, disclosure of any material weakness referred to below and/or a restatement of the financial statements contained therein to reclassify certain debt from long-term to short-term and to replace the "Report of Independent Registered Public Accounting Firm" contained within the 2018 Form 10-K with a report that contains a going concern explanation or limitation. The failure to deliver an audit report with respect to our annual financial statements for the fiscal year ended March 31, 2018 without any going concern explanation or limitation will, and any purported misrepresentation which may have been deemed to have been contained in any of our restated financial statements contained in our 2018 Form 10-K and/or Quarterly Reports on Form 10-Q for the quarterly periods ended June 30, 2018 and September 30, 2018 and certificates related thereto may, constitute an event of default under certain of our financing agreements.  Our assessment of our ability to continue as a going concern is still ongoing.

Events of default under our secured financing and helicopter lease agreements, if not cured or waived, could require us to repay these obligations earlier than

anticipated if the applicable counterparties pursue remedies.  We may not have sufficient cash available at such time to fund such payments.

***We have identified a material weakness in our internal control over financial reporting, which could, if not remediated, adversely affect our ability to report our financial condition and results of operations in a timely and accurate manner, investor confidence in our company and the value of our common stock.***

Management has concluded that the Company did not have adequate monitoring control processes in place related to non-financial covenants within certain of its secured financing and lease agreements, and this control deficiency identified represents a "material weakness" in internal controls over financial reporting.  A "material weakness" is a deficiency, or a combination of deficiencies, in internal control over financial reporting such that there is a reasonable possibility that a material misstatement of the Company's annual or interim financial statements will not be prevented or detected on a timely basis.  As a result of such material weakness, our management concluded that our disclosure controls and procedures and internal control over financial reporting were not effective at a reasonable assurance level as of March 31, 2018 and the reporting periods thereafter.

**The determination of the existence of a control deficiency related to these matters, which has been classified as a material weakness in our internal controls over financial reporting, and the need to assess possible non-compliance with all non-financial covenants commenced when our senior management became aware that certain pledged and leased helicopter engines were not matched to specific pledged or leased helicopter airframes or returned to such airframes within specified periods, as required under certain of the secured financing and helicopter lease agreements.**  The removal and replacement of engines and components from helicopters is part of our normal ongoing maintenance activities; however, since certain of those helicopter engines and airframes are pledged to lenders or leased from lessors, the removal of a pledged or leased engine from a pledged or leased airframe can create issues of non-compliance with certain of the secured financing and helicopter lease agreements.  All issues related to this matter were cured prior to December 31, 2018 for all but nine helicopter engines (relating to three agreements) where the pledged or leased engines were not returned to the pledged or leased airframes within specified periods due to delays with certain of our maintenance service providers.  We have obtained waivers of such non-compliance under the applicable agreements related to such helicopter engines.  **We are in the process of remediating this material weakness, but our remediation efforts are not yet complete.  There can be no assurance as to when the remediation plan will be fully implemented or whether the remediation efforts will be successful.**

Until our remediation plan is fully implemented, our management will continue to devote time and attention to these efforts.  If we do not complete our remediation in a timely fashion, or at all, or if our remediation plans are inadequate, our future consolidated financial statements could contain errors that may be undetected.  The

existence of a material weakness in the effectiveness of our internal controls could also affect our ability to obtain financing or could increase the cost of any financing we obtain.  The identification of the material weakness could also cause investors to lose confidence in the reliability of our financial statements and could result in a decrease in the value of our common stock.

***We have engaged financial and legal advisors to assist us in, among other things, analyzing various strategic financial alternatives to address our liquidity and capital structure, including strategic financial alternatives to restructure our indebtedness.  We and certain of our subsidiaries may elect to implement such a transaction through Chapter 11 of the United States Bankruptcy Code ("Chapter 11") in order to obtain court approval of such transactions and to facilitate the stakeholder approvals necessary to implement such transactions***.

We have engaged financial and legal advisors to assist us in, among other things, analyzing various strategic financial alternatives to address our liquidity and capital structure, including strategic financial alternatives to restructure our indebtedness. Our liquidity consisting of cash on hand and availability under our ABL Facility as of April 12, 2019 was $202.1 million, an approximate 15% decrease from $236.9 million of liquidity as of December 31, 2018.  As part of this review of strategic financial alternatives, we have elected not to make the $12.5 million interest payment on the Senior Notes due April 15, 2019.  Such payment is subject to a 30-day grace period under the indenture governing the Senior Notes; however, such missed payment triggers cross-default provisions in certain of other indebtedness and lease agreements.  We have obtained conditional waivers of such default under the relevant indebtedness through June 19, 2019 and expect to continue to need to seek waivers of other defaults under certain of our indebtedness and lease agreements with respect to any breaches of such agreements as a result of the potential restatement of our 2018 Form 10-K and/or Quarterly Reports on Form 10-Q for the quarterly periods ended June 30, 2018 and September 30, 2018 and certificates related thereto.  Further, if we have not made the April 15, 2019 interest payment on the Senior Notes on or before the expiration of the Senior Notes Grace Period, in order for the payment default waivers from our secured equipment lenders and ABL lenders to continue in effect beyond May 15, 2019, we are required to obtain forbearance agreements from the requisite holders of each of the Senior Notes, Convertible Notes and Secured Notes by such date.  If we are unsuccessful in obtaining the necessary waivers or forbearance agreements, we may be required to repay some or all of our indebtedness on an accelerated schedule, and our cash may not be sufficient to meet such commitments as they may be accelerated.  We cannot assure you that any of our strategies will yield sufficient funds to meet our ongoing liquidity needs, including for payments of interest and principal on our debt in the future, which could cause us to default on our obligations.  We may sell certain of our assets and may receive less than the value at which those assets are carried on our consolidated financial statements.

**We and certain of our subsidiaries may elect to implement such a transaction through Chapter 11 in order to obtain court approval of such transactions and**

**to facilitate the stakeholder approvals necessary to implement such transactions, or it may otherwise become necessary for us to seek protection under Chapter 11.**  If a Chapter 11 proceeding is commenced, our management would be required to spend a significant amount of time and effort dealing with the proceeding, including managing the potential impact to our business and relationships.  We also need to ensure that during any Chapter 11 proceeding, we retain management and other key personnel necessary to the success and growth of our business.  In addition, during the period of time we are involved in a bankruptcy proceeding, our customers and suppliers might lose confidence in our ability to reorganize our business successfully and could seek to establish alternative commercial relationships, which may cause, among other things, our suppliers, vendors, counterparties and service providers to renegotiate the terms of our agreements, attempt to terminate their relationship with us or require financial assurances from us.  Although we remain committed to providing safe, reliable operations, customers may lose confidence in our ability to provide them the level of service they expect, resulting in a significant decline in our revenues, profitability and cash flow.

Additionally, all of our indebtedness is senior to the existing common stock in our capital structure.  As a result, we believe that the restructuring our indebtedness and the confirmation of a plan that has requisite stakeholder support under a Chapter 11 proceeding could cause the shares of our existing common stock to be canceled, resulting in a limited recovery, if any, for holders of our common stock, and would place holders of our common stock at significant risk of losing all of their investment in our shares.  Additionally, certain of our consolidated subsidiaries have a significant amount of secured indebtedness that is senior to our unsecured indebtedness.  As a result, we believe that the outcome of a Chapter 11 proceeding could result in a limited recovery, if any, for unsecured noteholders and certain other unsecured creditors.

***The consolidated financial statements to be included in our amended 2018 Form 10-K, our Quarterly Report on Form 10-Q for the quarter ended December 31, 2018 and our Annual Report on Form 10-K for the fiscal year ended March 31, 2019 may contain disclosures that express substantial doubt about our ability to continue as a going concern, indicating the possibility that we may not be able to operate in the future***.

The consolidated financial statements to be included in our amended 2018 Form 10-K, our Quarterly Report on Form 10-Q for the quarter ended December 31, 2018 and our Annual Report on Form 10-K for the fiscal year ended March 31, 2019 will be prepared on a going concern basis, which contemplates the realization of assets and the satisfaction of liabilities and other commitments in the normal course of business and will not include any adjustments that might result from uncertainty about our ability to continue as a going concern.  Such assumption may not be justified.  Our liquidity has been negatively impacted by the prolonged downturn in the offshore oil and gas market, our levels of indebtedness, lease and aircraft purchase commitments and certain other commercial contracts.  In addition, we

have substantial interest payment obligations related to our debt and substantial lease and aircraft purchase commitments over the next twelve months. If we are unable to execute transactions to improve our financial condition, we do not believe we will have sufficient liquidity to conduct our business operations based on existing conditions and estimates during the next twelve months. If we become insolvent, investors in our common stock may lose the entire value of their investment in our business. The inclusion of disclosures that express substantial doubt about our ability to continue as a going concern may negatively impact the trading price of our common stock and have an adverse impact on our relationship with third parties with whom we do business, including our customers, vendors and employees, and could make it challenging and difficult for us to raise additional debt or equity financing to the extent needed, on attractive terms or at all, all of which could have a material adverse impact on our business, financial condition and results of operations.

188. In response to Bristow's April 15, 2019 disclosures – which revealed Bristow to be on the edge of bankruptcy and as such, constituted a materialization of the risk previously concealed by Defendants' material misrepresentations and omissions during the Class Period – Bristow's shares fell on April 16, 2019, dropping $0.45 per share from their April 15, 2019 closing price of $1.07 per share to close on April 16, 2019 at $0.62 per share, on a trading volume of 25,281,016 shares (more than 32.84 times greater than Bristow's average daily trading volume during the Class Period).

## C. Bristow's Bankruptcy

189. On May 11, 2019, Bristow initiated the Bankruptcy and voluntarily filed for Chapter 11 bankruptcy protection in the United States Bankruptcy Court for the Southern District of Texas, under the caption *In re Bristow Group Inc., et al.*, Case No. 19-32713 (DRJ) (Bankr. S.D. Tex.). Bristow emerged from the Bankruptcy on October 31, 2019. On the first trading day after Bristow declared bankruptcy, the price of Bristow shares plummeted by 70% (*i.e.*, falling from $0.28 closing price on May 10, 2019 to close $0.08 on May 14, 2019) on a trading volume of 12,874,974 shares.

### D. Bristow's June 19, 2019 Amended SEC Filings Admit the Falsity of, and Correct, Defendants' Class Period Representations

#### 1. The Amended SEC Filings and the Q3 2019 Form 10-Q

190. On June 19, 2019, Bristow filed with the SEC: (1) an amended Fiscal 2018 Form 10-K/A, (2) an amended Q1 2019 Form 10-Q/A, and (3) an amended Q2 2019 Form 10-Q/A (the "Amended SEC Filings").

191. As detailed below, the Amended SEC Filings differed from, and corrected, the original filings (*i.e.*, the Fiscal 2018 Form 10-K, the Q1 2019 Form 10-Q and the Q2 2019 Form 10-Q) in the following four ways.[15]

192. First, the Amended SEC Filings revised the original filings' representations concerning Bristow's disclosure controls and procedures, and internal controls over financial reporting, to:

a. admit that at all times since March 31, 2018, including the original "as of" dates of each of the original filings (*i.e.*, March 31, 2018, June 30, 2018, and September 30, 2018), Bristow's "internal control over financial reporting was not effective", and

b. disclose a "material weakness in the Company's internal control over financial reporting" arising from Bristow's and Defendants' failures to (1) "appropriately consider the requirements under certain of our secured financing and lease agreements," (2) "monitor compliance with the underlying non-financial covenants," and (3) "appropriately consider the related financial reporting risks…"[16]

---

[15] *See* Amended Q1 2019 Form 10-Q/A at cover page's "Explanatory Note" (summarizing differences between original and amended filing); Amended Q2 2019 Form 10-Q/A at cover page's "Explanatory Note" (same); Amended Fiscal 2018 Form 10-K/A at 2-3 (same).

[16] *See* Amended Q1 2019 Form 10-Q/A at 68-70, and *see also id*. at cover page's "Explanatory Note"; Amended Q2 2019 Form 10-Q/A at 91-92, *id*. at cover page's "Explanatory Note"; amended Fiscal 2018 Form 10-K/A at 148-49, and *id*. at 2-3.

193.     The above-identified disclosures in the Amended SEC Filings constitute admissions that Defendants' prior Class Period representations concerning Bristow's disclosure controls and procedures, and internal controls over financial reporting (*see* ¶¶110-13, 138-41, 170-72, *supra*), were materially false and misleading.

194.     Second, the Amended SEC Filings revised the financial statements in each and all of the original filings "to reclassify substantially all debt balances from long-term to short-term,"[17] revealing the short-term debt originally reported in each of the Original SEC Filings to have been understated at all times by approximately $1.4 billion.  Specifically:

a.    whereas Defendants originally reported in Bristow's Fiscal 2018 Form 10-K $56,700,000 of short-term borrowings and current maturities of long-term debt and $362,897,000 of total current liabilities as of March 31, 2018, the Amended Fiscal 2018 Form 10-K/A revealed that, as of March 31, 2018, short-term borrowings and current maturities of long-term debt were in fact $1,475,438,000 and that total current liabilities were in fact $1,786,584,000; [18]

b.    whereas Defendants originally reported in Bristow's Q1 2019 Form 10-Q $53,723,000 of short-term borrowings and current maturities of long-term debt and $334,649,000 of total current liabilities as of June 30, 2018, the Amended Q1 2019 Form 10-Q/A revealed that, as of June 30, 2018, short-term borrowings and current maturities of long-term debt were in fact $1,453,423,000 and that total current liabilities were in fact $1,739,298,000; [19] and

---

[17] *See* Amended Q1 2019 Form 10-Q/A at cover page's "Explanatory Note" and at 3, 6, 21, 40, 68-69; Amended Q2 2019 Form 10-Q/A at cover page's "Explanatory Note" and at 10, 27, 88, 89 and 91; Amended Fiscal 2018 Form 10-K/A at 2-3, 63, 65, 80, 105 and 148.

[18] *Compare* (1) Fiscal 2018 Form 10-K, at 76, 102 and 135, and (2) Amended Fiscal 2018 Form 10-K/A at 77, 105, 139, and *id*. at 2.

[19] *Compare* (1) Q1 2019 Form 10-Q, at 3, 20 and 40, and (2) Amended Q1 2019 Form 10-Q/A at 3, 21, 40, and *id*. at cover page's "Explanatory Note."

c.  whereas Defendants originally reported in Bristow's Q2 2019 Form 10-Q $50,798,000 of short-term borrowings and current maturities of long-term debt and $329,217,000 of total current liabilities as of September 30, 2018, the Amended Q2 2019 Form 10-Q/A revealed that, as of September 30, 2018, short-term borrowings and current maturities of long-term debt were in fact $1,439,931,000 and that total current liabilities were in fact $1,723,299,000.[20]

195.   The following table summarizes the short-term debt and current liability figures as of March 31, 2018, June 30, 2018 and September 30, 2018, as originally reported by Defendants in the Original SEC Filings and as later revised in the Amended SEC Filings, as well as the amounts by which the originally-reported debt and liability figures were understated:

| | | | | | |
|---|---|---|---|---|---|
| | | | | | |

| Defendants' Class Period Understatements of Bristow's Short-Term Debt and Current Liabilities | | | | | |
|---|---|---|---|---|---|
| as of | Debt / Liability Line Item | as Originally Reported | Originally Reported In | Amended Amount | Amount Understated |
| 3/31/2018 | Short-Term Borrowings and Current Maturities of Long-Term Debt | $56,700,000 | Fiscal 2018 Form 10-K<br><br>Q4/Fiscal 2018 Press Release | $1,475,438,000 | $1,418,738,000 |
| | Total Current Liabilities | $362,897,000 | | $1,786,584,000 | $1,423,687,000 |
| 6/30/2018 | Short-Term Borrowings and Current Maturities of Long-Term Debt | $53,723,000 | Q1 2019 Form 10-Q<br><br>Q1 2019 Press Release | $1,453,423,000 | $1,399,700,000 |
| | Total Current Liabilities | $334,649,000 | | $1,739,298,000 | $1,404,649,000 |
| 9/30/2018 | Short-Term Borrowings and Current Maturities of Long-Term Debt | $50,798,000 | Q2 2019 Form 10-Q<br><br>Q2 2019 Press Release | $1,439,931,000 | $1,389,133,000 |
| | Total Current Liabilities | $329,217,000 | | $1,723,299,000 | $1,394,082,000 |

---

[20] *Compare* (1) Q2 2019 Form 10-Q, at 3, 22 and 45, and (2) Amended Q2 2019 Form 10-Q/A at 6, 27, 51, and *id*. at cover page's "Explanatory Note."

196.     Thus, the above-identified revised disclosures in the Amended SEC Filings concerning Bristow's short-term debt and current liabilities as of (1) March 30, 2018, (2) June 30, 2018 and (3) September 30, 2018, constitute an admission that the short-term debt and current liability figures previously reported by Defendants during the Class Period for such dates (*see* ¶¶83-84, 98-99, 117-18, 130-31, 149-50, 162-63, *supra*) were misclassified by approximately $1.4 billion – and therefore materially false.

197.     Third, the Amended SEC Filings revised the Original SEC Filings' representations concerning Bristow's "financial condition" and "liquidity" to (1) remove the original representations that Bristow had liquidity "sufficient to satisfy our operating needs, existing capital commitments and other contractual cash obligations," and (2) instead disclose "substantial doubt about the Company's ability to continue as a going concern." [21]

198.     Thus, the above-identified revised disclosures in the Amended SEC Filings concerning Bristow's financial condition, liquidity and going concern risk indicate (1) that Defendants' prior Class Period representations concerning Bristow's financial condition and liquidity (*see* ¶¶104-05, 132-33, 164-65, *supra*) were materially false and/or (2) that such representations were materially misleading because they represented Bristow's liquidity as sufficient and omitted to disclose the material fact of Bristow's going concern risk.

199.     In addition, the above-identified revised disclosures in the Amended SEC Filings concerning Bristow's financial condition, liquidity and going concern risk also indicate that Defendants' related Class Period representations concerning Bristow's liquidity and liquidity runway (*see, inter alia,* ¶¶85-86, 88-90, 90-91, 93-96, 106-07, 119-20, 122-25, 127-28, 134-37, 144-47, 151-52, 154-57, 159-60, 166-67, *supra*) were materially false and/or misleading.  All such representations were premised on treating $1.4 billion of Bristow's debt repayment obligations as

---

[21] *See* Amended Q1 2019 Form 10-Q/A at 68, and *id*. at cover page's "Explanatory Note" and at 21; Amended Q2 2019 Form 10-Q/A at 89, *id*. at cover page's "Explanatory Note" and at 27; Amended Fiscal 2018 Form 10-K/A at 64-65 and *id*. at 2, 105.  *See also* Fiscal 2018 Form 10-K, at 65, Q1 2019 Form 10-Q, at 68, and Q2 2019 Form 10-Q, at 83.

long-term debt, due far in the future, when in fact such obligations were at all times during the Class Period, (1) short-term, and (2) far in excess of Bristow's available liquidity.

200.    Fourth, as the Amended SEC Filings explained, the Amended SEC Filings contained new certifications from Allman and Miller, dated June 19, 2019, attesting to the adequacy of Bristow's internal controls over financial reporting (as of June 19, 2019) and to the accuracy of the information contained in the Amended SEC Filings.[22]

201.    Defendants' *prior* Class Period certifications, included and filed with the Original SEC Filings, attesting to the adequacy of Bristow's internal controls over financial reporting and to the accuracy of the information contained in the Original SEC Filings (*see* ¶¶112-15, 140-43, 172-73, *supra*), were materially false and/or misleading when issued.  First, as set forth at ¶¶176-82, 187, 192-93, *supra*, Defendants have admitted that Bristow's internal controls over financial reporting throughout the Class Period were ineffective and suffered from material weaknesses. Second, as set forth at ¶¶191-99, *supra*, the Original SEC Filings contained materially false information with respect to Bristow's internal controls, short-term debt and current liabilities, and financial condition and liquidity.

202.    In addition to the Amended SEC Filings, Bristow also provided on June 19, 2019 its long-delayed Q3 2019 Form 10-Q (which had been originally due on or about February 6, 2019, and then had been repeatedly delayed).  Bristow's disclosures in the Q3 2019 Form 10-Q, for the period ending December 30, 2018, were consistent with those made in the Amended SEC Filings for prior periods, in that:

      a. Bristow disclosed that, as of December 31, 2018, its disclosure controls were ineffective and that its internal controls over financial reporting suffered from material weaknesses (*see* Q3 2019 Form 10-Q, at 93-94, 99);

---

[22] *See* Amended Fiscal 2018 Form 10-K/A at 3 and exhibits 31.3, 31.4, 32.3 and 32.4; Amended Q1 2019 Form 10-Q/A at cover page's "Explanatory Note" and exhibits 31.3, 31.4, 32.3 and 32.4; Amended Q2 2019 Form 10-Q/A at cover page's "Explanatory Note" and exhibits 31.3, 31.4, 32.3 and 32.4.

b.  Bristow reported substantially all of its debt obligations, as of December 31, 2018, as short-term debt (*see* Q3 2019 Form 10-Q, at 3, 23, 25, 52); and

c.  Bristow disclosed going concern risk (*see* Q3 2019 Form 10-Q, at 91, 100; *see also id*. at 25, 65).

### 2.  The Amended SEC Filings' Disjointed New/Alternative Explanations for Bristow's Reclassification of its Debts as Short-Term, and for Bristow's Going Concern Risk, Are Strong Evidence of Scienter

203.  Bristow's Amended SEC Filings attempted to walk back Bristow's prior statements that it may have to reclassify approximately $1.4 billion of debt from long-term to short-term because of Bristow's violation of the Collateral/Maintenance Covenants.  But Bristow's new explanation for its debt reclassification in the Amended SEC Filings is logically and factually disjointed, and thus – rather than being in any way exculpatory – is inculpatory.[23]  Notably, this contrived alternative explanation emerged only after Bristow and Defendants were sued by investors for securities fraud in connection with the lawsuits consolidated in this Action.

204.  In Bristow's initial and prior explanations, made between February 11, 2019 and April 15, 2019 (*see* Section VI.A-B, *supra*), Bristow explained that it would likely be required to correct its SEC filings from March 31, 2018, onwards to reclassify approximately $1.4 billion of long-term debt as short-term debt and to disclose a going concern risk, and identified Bristow's prior violations of the Collateral/Maintenance Covenants as the principal cause.

205.  Bristow's Amended SEC Filings, however, attempted to provide a new/alternative explanation for its debt reclassification.  Critically, while Bristow still admitted that underlying covenant breaches occurred, it was suddenly claiming that its debt-reclassification did not have to do with those covenant breaches.  Under Bristow's new/alternative explanation, the precipitating

---

[23] *See* Amended Fiscal 2018 Form 10-K/A at 2-3; Amended Q1 2019 Form 10-Q/A at cover page's "Explanatory Note"; Amended Q2 2019 Form 10-Q/A at cover page's "Explanatory Note."  In each of the Amended SEC Filings, the explanation set forth at the initial "Explanatory Note" was subsequently and multiply repeated.  *See* Amended Fiscal 2018 Form 10-K/A at 65, 80, 105, 148; Amended Q1 2019 Form 10-Q/A at 6, 21, 68-70; and Amended Q2 2019 Form 10-Q/A at 10, 27, 89, 91-92.

factor for Bristow's debt reclassification was Bristow's recent and *forward-looking determination as of June 19, 2019* that Bristow's "liquidity outlook has recently changed" which now indicated that a going concern risk existed.[24]   According to Bristow, that purported "recent [] change" in outlook – namely, acknowledgment of going concern risk on a going-forwards basis as of June 2019 – then triggered technical defaults and cascading cross defaults under Bristow's Secured Debt Financings and other debt instruments, subjecting Bristow's obligations thereunder to acceleration, and leading Bristow to conclude that all of its long-term debt should be reclassified as short-term debt.  *Id.*

206.   However, the new alternative explanation provided in the Amended SEC Filings is logically and factually disjointed and does not actually explain the events and actions that it purports to for the following reasons:

a. Under Bristow's new/alternative explanation, the precipitating factor for Bristow's debt reclassification is Bristow's new, recent and *forward-looking determination as of June 19, 2019* that Bristow's "liquidity outlook has recently changed" and that going concern risk existed.[25]   That purported "recent [] change" in outlook – namely, acknowledgment of going concern risk on a going-forwards basis as of June 2019 – then triggered technical defaults and cascading cross defaults under Bristow's Secured Debt Financings and other debt instruments, subjecting Bristow's obligations thereunder to acceleration, and leading Bristow to conclude that all of its long-term debt should be reclassified as short-term debt.  *Id.*

b. This new/alternative explanation might adequately explain why Bristow should reclassify long-term debt to short-term *for periods beginning June 19, 2019*, given the "recent" change in Bristow's liquidity outlook.  However, for the reasons set

---

[24] *See* Amended Fiscal 2018 Form 10-K/A, at 2-3; Amended Q1 2019 Form 10-Q/A at cover page's "Explanatory Note"; Amended Q2 2019 Form 10-Q/A at cover page's "Explanatory Note."

[25] *See* Amended Fiscal 2018 Form 10-K/A, at 2-3; Amended Q1 2019 Form 10-Q/A at cover page's "Explanatory Note"; Amended Q2 2019 Form 10-Q/A at cover page's "Explanatory Note."

forth above, the material weaknesses and covenant violations existed throughout the Class Period.  And of course, Bristow faced going concern doubt on June 19, 2019.  After all, Bristow filed for bankruptcy more than a month earlier – largely as a result of a series of events that was set in motion in February when Bristow made the first in a series of disclosures about its covenant breaches, which could cause reclassification of $1.4 billion in debt from long-term to short-term.  As such, Bristow should have reclassified its long-term debt as short-term debt based on those factors and not the factors enumerated for the first time in the June 19, 2019 disclosures.

c.   In other words, if the change to Bristow's liquidity outlook that led Bristow to conclude that it faced (and should disclose) going concern risk was a "recent" change, then Bristow's going concern risk, and the technical/cross-defaults it occasioned, were likewise *recent* – in turn meaning that the acceleration of all of Bristow's long-term debt, and the need to reclassify such amounts as short-term debt, were also *recent*.   To the contrary, these concerns relating to "liquidity outlook" and "going concern" risk existed and were known throughout the Class Period.  The new/alternative explanation does not provide a rational, coherent basis for Bristow's reclassification of its long-term debts to short-term **as of March 31, 2018, June 30, 2018 or September 30, 2018 –** *i.e.*, periods long prior to Bristow's "recent" change in liquidity outlook, long-prior to any consequent determination of going concern risk, and thus long-prior to any consequent technical/cross defaults or acceleration of Bristow's debt obligations.

207.   In sum, the new alternative explanation in Bristow's Amended SEC Filings is, as an explanation, entirely disjointed, and therefore ultimately lacks credibility.  It provides no reasonable explanation for the *prior*-period debt reclassifications Bristow made in those very Amended SEC Filings.

208. The fact that Bristow offered a new/alternative explanation that failed to rationally explain Bristow's amendments to its debt reclassifications in the Amended SEC Filings is inculpatory. The new/alternative explanation propounded in the SEC Filings appears to have been fashioned to shield Defendants from legal liability to the greatest extent possible, by minimizing the extent to which the Amended SEC Filings indicate the falsity of the Original SEC Filings. The falsity of that attempted exculpatory explanation is evidence of Bristow's and Defendants' consciousness that Defendants were liable for making materially false statements in its Original SEC Filings.

## VII.   MATERIALITY

209. Defendants' false statements and/or omissions – concerning Bristow's covenant violations, controls failures, debt load and very viability as a going concern – were material.

210. The above-detailed market reactions to Bristow's February 11, 2019 and April 15, 2019 disclosures, evidencing immediate and severe devaluations to Bristow's share price on extremely high trading volumes (*see* ¶¶180 and 188, *supra*), provide clear, practical and objective evidence of materiality.

211. These sharp and immediate market reactions to Bristow's post-Class Period disclosures demonstrate the impact of:

    a.   disclosure of the risks concealed throughout the Class Period by Defendants' misconduct;

    b.   materialization of the risks concealed throughout the Class Period by Defendants' misconduct;

    c.   revelation and corrective disclosure of Defendants' misconduct; and

    d.   the market's assessment of the value of Bristow's stock in light of Defendants' corrective disclosures and of the materialization of the risks previously concealed by Defendants' misconduct.

212.    In addition, the materiality of Defendants' false statements is further demonstrated by:

    a.  Defendants' frequent mentions of and focus on, in Defendants' above-detailed quarterly disclosures, Bristow's purported liquidity runway;

    b.  analysts' frequent questions and focus, in Bristow's above-detailed quarterly conference calls with analysts and investors, on Bristow's "liquidity runway", both prospectively (when it was being conceptualized) and as it was being built;

    c.  the crucial role that Bristow's purported liquidity runway played for Bristow, serving not only as part of – but as the fundamental precondition for – Bristow's STRIVE strategy;

    d.  Defendants' admissions on and after February 11, 2019 that the weaknesses in its Bristow's internal controls were *material* ones, and Defendants' consequent admission that investors could no longer rely upon Bristow's Class Period financial statements; and

    e.  Bristow's collapse into the Bankruptcy following its corrective disclosures.

## VIII.  LOSS CAUSATION

213.    During the Class Period, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Bristow common stock throughout the Class Period, and operated as a fraud or deceit on Class Period purchasers of Bristow common stock, by, *inter alia*, (1) concealing and/or omitting to disclose Bristow's violations of the Collateral/Maintenance Covenants in certain of Bristow's Secured Debt Financings and helicopter leasing agreements; (2) misrepresenting as long-term debt in Bristow's financial statements and other public statements approximately $1.4 billion in immediately due obligations; (3) making materially false and misleading statements concerning Bristow's liquidity, liquidity runway and ability to continue as a going concern, all of which were rendered a nullity by Bristow's actual level of short-term and/or current obligations as detailed herein; and (4) misrepresenting the

efficacy and adequacy of Bristow's disclosure controls and internal controls over financial reporting, which in fact were ineffective and suffered from material weakness. Defendants' misstatements operated together to materially misrepresent Bristow's risk of insolvency, reported solvency, and fundamental financial condition.

214. Defendants' false and misleading statements had their intended effect, and throughout the initial 9 months of the Class Period – from February 8, 2018 through early November 2018 – helped to maintain Bristow's share price at inflated levels above $10.00 per share (and as high as $18.72 per share). Among other things, this inflated share price provided Bristow with additional, and *crucial*, currency – all the more important given Bristow's constrained liquidity – with which to attempt the Columbia Acquisition and thereby execute on a vital plank in Bristow's STRIVE business strategy.

215. Loss causation is demonstrated here by the swift and material price declines experienced by Bristow shares in response to Defendants' corrective disclosures.

216. On February 6, 2019, Bristow issued a press release at 5:11 p.m. Eastern Time titled "Bristow Group Reschedules Fiscal Year 2019 Third Quarter Earnings Release and Conference Call Schedule," delaying its scheduled release of fiscal 2019 Q3 financial results from February 7, 2019 (as originally scheduled) to the afternoon of February 11, 2019, post-market close, and rescheduling the associated conference call with analysts to follow on February 11, 2019 at 5:00 p.m. Eastern Time. Typically, such disclosure delays are occasioned by the presence of material negative information of which the market was previously unaware, such as an earnings restatement or a large write-down and therefore signal to the market the potential presence of new, adverse information (and, here, the delay was in fact occasioned by just such news, as detailed below). Consequently, on the next trading day (February 7, 2019), and in response to this disclosure delay, which led the market to expect impending adverse information, Bristow shares fell from their February 6, 2019 closing price of $3.24 per share to close at $2.71 per share (a one-day, 16.36% decline), on trading volume of 1,201,851 shares (more than 1.56 times greater than Bristow's average daily trading volume during the Class Period).

217.    On February 11, 2019, Bristow released its preliminary fiscal 2019 Q3 financial results following the initial delay.  As discussed above (*see* Section VI.A, *supra*), these disclosures revealed, *inter alia*, that throughout the Class Period: (i) Bristow had been operating in violation of the Collateral/Maintenance Covenants in the Secured Debt Financings and in certain of its helicopter lease agreements; (ii) Bristow's covenant violations rendered Bristow's repayment obligations under the Secured Debt Financings and note offerings, which Bristow had misrepresented in its financial statements and other public statements as long-term debt, immediately due and payable; and (iii) Bristow's purported lifeline – its liquidity runway – was in fact a nullity, as, in light of the covenant violations, Bristow's greater-than-reported short-term obligations greatly exceeded Bristow's available liquidity and potentially posed a material risk to Bristow's ability to continue as a going concern.

218.    On February 12, 2019, when Bristow shares sank from $3.06 to $1.84 per share (*i.e.*, a 39.9% decline) in response to Bristow's February 11, 2019 disclosures, the broader stock Standard & Poors 500 stock market index (the "S&P 500") **rose** substantially, from 2,709.80 to 2,744.73 (*i.e.*, a gain of 1.3%).  In addition, the volume of Bristow shares traded on February 12, 2019 (9,908,369) was approximately *12.87 times greater* than the Class Period average of approximately 769,840 shares.  Likewise, on February 13, 2019, when Bristow shares *continued* their fall and closed at $1.20 per share (*i.e.*, a 34.8% decline), the S&P 500 **rose again**, from 2,744.73 to 2,753.03 (a gain of 0.3%).  Further, the trading volume of Bristow shares increased to 13,310,016 shares, which was approximately *17.29 times greater* than the Class Period daily trading volume.  Accordingly, during the two-day period following Bristow's February 11, 2019 disclosures, Bristow shares *lost* 60.8% of their value (falling from $3.06 to $1.20), on substantially greater trading volume, even as the S&P 500 *gained* 1.6% (rising from 2,709.80 to 2,753.02).

219.    Even after their initial February 11, 2019 disclosures, Defendants continued to disclose additional information which revealed that risks previously concealed by Defendants' misconduct, such as the actual severity of the potential going concern risk that Bristow first disclosed on February 11, 2019, had further materialized.  For example, on April 16, 2019, when

Bristow shares sank from $1.07 to $0.62 per share (*i.e*., a 42.1% decline) on trading volume of 25,281,016 shares in response to Bristow's April 15, 2019 disclosures – which revealed Bristow to be on the edge of bankruptcy and as such constituted a materialization of the risk previously concealed by Defendants' material misrepresentations and omissions during the Class Period –the S&P 500 again **rose**, from 2,905.58 to 2,907.06.  Likewise, on the first trading day after Bristow declared bankruptcy, the price of Bristow shares plummeted by 70% (*i.e.*, falling from $0.28 closing price on May 10, 2019 to close $0.08 on May 14, 2019) on a trading volume of 12,874,974 shares.

220.    The declines in the price of Bristow common stock following the corrective disclosures were a direct result of the nature and extent of Defendants' fraudulent misrepresentations being revealed to the market.  The timing and magnitude of the price declines in Bristow common stock negate any inference that the loss suffered by Lead Plaintiffs and the other Class members was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to Defendants' fraudulent conduct.

221.    Consequently, the economic loss, *i.e.*, damages, suffered by Lead Plaintiffs and the other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate the price of Bristow common stock – and the subsequent deflation when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

## IX.    ADDITIONAL FACTUAL ALLEGATIONS FURTHER SUPPORTING SCIENTER

222.    Defendants acted with scienter by virtue of:

   a.    their awareness of, or reckless disregard for, the Collateral/Maintenance Covenants in Bristow's secured debt financings, including the PK Air Debt and the Macquarie Debt, and Bristow's helicopter lease agreements;

   b.    their awareness of, or reckless disregard for, the fact that Bristow operated in violation of the Collateral/Maintenance Covenants since at least March 31, 2018;

c.  their awareness of, or reckless disregard for, significant deficiencies and/or material weaknesses in Bristow's disclosure controls and procedures, and in Bristow's internal controls over financial reporting;

d.  their intentional and/or reckless issuance of materially false or misleading statements particularly with respect to:

    i.  the efficacy and adequacy of Bristow's disclosure controls and procedures, and of Bristow's internal controls over financial reporting;

    ii.  the nature, amount and timing of Bristow's debt obligations;

    iii.  the PK Air Debt and/or the Macquarie Debt, the covenants associated with those debts and helicopter lease agreements, and Bristow's violations of such covenants; and

    iv.  Bristow's financial condition, liquidity and ability to continue as a going concern; and

e.  their ultimate responsibility to ensure the accuracy of such statements and their reckless failure to do so.

223.  Defendants acted knowingly or in such a deliberately reckless manner as to constitute a fraud upon Lead Plaintiffs and the Class.  Defendants knew or were deliberately reckless in disregarding the materially false or misleading nature of the information they caused to be disseminated to the investing public.  Defendants also knew or were deliberately reckless in disregarding that the material misrepresentations and omissions contained in the Company's public statements would adversely affect the integrity of the market for the Company's stock and would cause the price of Bristow shares to be artificially inflated.

**A.  Bristow and Defendants Were Aware at All Times of the Collateral/Maintenance Covenants in the PK Air Debt, Macquarie Debt and Relevant Helicopter Leases**

224.  Extensive facts, set forth below, indicate that Defendants were directly involved in negotiating the terms of the PK Air Debt and the Macquarie Debt, and had detailed knowledge

concerning the terms of those debt agreements, including their covenants such as the Collateral/Maintenance Covenants.  *See* Sections IX.A.1-2, *infra*.  Additional facts further indicate that Defendants' awareness of the Collateral/Maintenance Covenants in such agreements, as well as in Bristow's relevant helicopter leases, is reasonably presumed.  *See* Sections IX.A.3-4, *infra*.

### 1. Defendant Miller Signed the PK Air Debt Agreement

225.    Defendant Miller signed the July 17, 2017 PK Air Debt agreement between Bristow and the relevant PK Air entities (PK Transportation Finance Ireland Limited and PK Airfinance S.à r.l.).[26]  The PK Air Debt agreement included Collateral/Maintenance Covenants that were substantially similar to the Collateral/Maintenance Covenants in Bristow's other secured debt agreements.  And at $230 million, the PK Air Debt was the largest of Bristow's three Secured Debt Financing agreements and represented a critical component of the "liquidity runway" that was central to Bristow's STRIVE strategy.  Consequently, knowledge of the PK Air Debt agreement terms, including the Collateral/Maintenance Covenants, is directly attributable to Defendant Miller.

### 2. Defendants' Public Statements Evidence Baliff's and Miller's Direct Involvement in Obtaining and Negotiating the Macquarie Debt and PK Air Debt, and their Detailed Awareness of the Status, Terms and Covenants of Those Debt Agreements

226.    As Defendants' and Bristow's public statements make abundantly clear, Defendant Miller's central focus from Bristow' fiscal 2017 forwards – and one of Defendant Baliff's central foci during the same period – was obtaining debt financing to provide Bristow with its purported liquidity runway.  These public statements indicate that Defendant Miller spent a great deal of time negotiating and securing Bristow's secured debt financings, including the PK Air Debt and the Macquarie Debt, and that Defendants Miller and Baliff were constantly aware of the status and terms of those financings, including among other things the covenants those financings bore and the precise helicopters serving as security for those financings.  For example, and specifically:

---

[26] *See* the July 18, 2017 Bristow Form 8-K, attaching as Exhibit 10.1 thereto the PK Air Debt agreement, at Ex. 10.1 at p. 77.

a. During Bristow's August 5, 2016 conference call for the first quarter of fiscal 2017 (ended June 30, 2016) (the "Q1 2017 Conference Call"), Defendant Baliff identified three principal priorities for fiscal 2017, one of which was improving Bristow's liquidity through seeking equipment-backed financing agreements secured by Bristow's unencumbered aircraft fleet.[27]   When analysts pressed for greater detail, Defendant Baliff, while refusing to provide any specificity, affirmed that Bristow was "evaluating [financing] options" and affirmed (in the face of commentary to the contrary) that such options were in fact "very available to us," and Defendant Miller identified Bristow's focus and "goal" as "equipment-based financing" using Bristow's "$2 billion of effectively unencumbered assets, both PP&E [property, plant & equipment] and aircraft." [28]

b. During their September 7, 2016 presentation to analysts and investors on Bristow at the Barclays CEO Energy-Power Conference, Defendants Baliff and Miller again identified liquidity generation through aircraft-secured debt financing as one of Defendants' top-three priorities,[29] with Miller terming it "a very keen focus of ours" and explaining the opportunity to use Bristow's unencumbered aircraft fleet to generate liquidity through equipment-based financing.[30]

---

[27] *See* Q1 2017 Conference Call Transcript (Bloomberg), at 4, 7 ("But we have an FY 2017 action plan which is Bristow's strategy in this downturn to survive as the global sector leader with three elements: one, improved safety performance, not just safety compliance; two, aggressively right size our cost structure to continue to serve clients globally while also capturing revenue with our global presence; and three, prudently pursue opportunities, especially liquidity enhancements" and "multiple financing options [are] being evaluated including the sale leaseback market anchored by our mostly unsecured UK SAR assets and a global owned fleet with $2 billion estimated value, all this continues to be available."); *see also* Bristow August 5, 2016 earnings presentation ("Q1 2017 Presentation"), at slides 5, 10.

[28] *See* August 5, 2016 Bristow Conference Call Transcript (Bloomberg), at 7; *see also* Bristow August 5, 2016 earnings presentation, at slides 5, 10.

[29] *See* September 7, 2016 Barclays Conference Presentation Transcript (Bloomberg) at 4-6.

[30] *See id.* at 6-7.

c. In Bristow's November 4, 2016 conference call for the second quarter of fiscal 2017 (ended September 30, 2016) (the "Q2 2017 Conference Call"), Defendant Baliff explained that Bristow's plan to "generate additional liquidity" would rely in central part on seeking financing deals for Bristow's $1.5 billion in unencumbered aircraft, and that Bristow was pursuing such deals "with a sense of urgency."[31] Defendant Miller, in response to analyst questions concerning Bristow's debt, reiterated that "it's clearly a priority for the company and we're very focused on addressing it as quickly as we can."[32]  Additionally, in response to further questions asking for greater details concerning Bristow's progress in securing financing, Defendant Miller's answer, while providing no further detail, confirmed that Defendants Miller and Baliff were actively involved in attempting to obtain secured-debt financings backed by Bristow's aircraft.[33]

---

[31] See Q2 2017 Conference Call Transcript (Bloomberg), at 3; see also Bristow November 14, 2016 earnings presentation, at 6 (slide titled "~$1.5 billion of unencumbered aircraft assets provides significant value to bridge liquidity").

[32] See Q2 2017 Conference Call Transcript (Bloomberg), at 8-9.

[33] See Q2 2017 Conference Call Transcript (Bloomberg), at 10:

> <Q - Brandon B. Dobell [analyst, William Blair] >: . . And I guess referencing to slide six, have you guys been talking with, I guess, sources of capital around the secured financing options.  I know you've been talking to the banks kind of consistently.  But as you think about other options out there, there was early-stage talks, advanced talks, are you comfortable that the direction of those talks is going the way you'd like?  I guess, just some color around how you think about either timing, magnitude or optionality around some of those secured financing alternatives?
>
> <A - L. Don Miller>: Yeah.  Brandon, look, I think, it's a fair question and I know it's kind of top of mind as we look at addressing that $200 million term loan.  But I think I would leave it where we've been consistently for the last several months.  One, I think Jonathan actually kind of summarized it well in and around that we're still currently pursuing several refinancing options.  And I think, the fact is, we really do benefit by the fact that we entered this downturn with pretty much an unencumbered aircraft base.

d.   During his December 7, 2016 presentation to analysts and investors at the Capital
     One Securities Energy Conference, Defendant Miller explained that "our focus
     recently has been really focused on building liquidity," that Bristow had recently
     announced its first equipment financing agreement (the Lombard Debt), and that
     Bristow still had "roughly $1.3 billion to $1.4 billion of unencumbered aircraft that
     we can use potentially to help drive liquidity and term out our existing bank
     facilities by using that as part of an equipment financing package." [34]

e.   In Bristow's February 3, 2017 conference call for the third quarter of fiscal 2017
     (ended December 31, 2016) (the "Q3 2017 Conference Call"), Defendant Bailiff,
     commending the "hard work of our finance teams," announced "several positive
     announcements on the liquidity front," including (1) that the previously-announced
     $200 million Lombard Debt had fully funded, and (2) that Bristow had
     "successfully secured additional long-term credit facilities to increase our current
     liquidity by an additional $430 million," comprised of the $200 million Macquarie
     Debt, for which Bristow had just "finalized the credit agreement," and the $230
     million PK Air Debt, for which Bristow had "executed a commitment letter."[35]

---

So, $1.5 billion of assets, $300 million of SAR assets, as I've said many times
before, if the discussion is around anything, it's around advance rates more than
anything.  And it's neither a discussion around SAR than oil and gas, but even
around oil and gas that does in this market, S-92s, AW139, high demand assets,
long-term viability in our industry.  So, again, high demand assets with the potential
lenders.

[34] *See* Bristow presentation at Capital One Securities Energy Conference Presentation Transcript
(Bloomberg), at 4.

[35] *See* Q3 2017 Bristow Conference Call Transcript (Bloomberg), at 3; *see also* February 3, 2017
earnings presentation, at 5-7, 9 and 19 (noting, *inter alia*, that Bristow "improv[ed] our liquidity
runway by $630 million through: Funding of $200 million Lombard seven-year equipment
financings[;] Finalized credit agreement with Macquarie for $200 million secured equipment
financing[;] Executed commitment letter with Milestone / GE Capital Aviation Services for $230
million secured equipment financing").

When appreciative analysts noted that Defendant Miller must have been "very busy" and asked for more explanation of the financings and their timings, Defendant Miller heartily agreed (with Baliff's concurrence), and emphasized his appreciation for Bristow's counterparties on the Macquarie Debt and PK Air Debt, both of which included the Collateral/Maintenance Covenants at issue:

**<Q - William Cameron Schnier [analyst, Evercore]>: Got it.  And just one more for Don.  It seems like it's been a very busy month thus far for you.** I was hoping you could just sort of walk us through the rationale behind the two new financings and maybe why the timing was right for that?

**<A - L. Don Miller>: Hey.  Good morning, Cam.  No, you're right**.

<Q - William Cameron Schnier>: Good morning.

**<A - L. Don Miller>: It's been a busy – I know it's been a busy month** – busy 18 months as CFO in the middle of a tough downturn.  But now, we're really pleased and let me just take this chance as well to thank both GE and Macquarie.  I think this is really a validation of their support for both us and the industry.  We have a really great broad-based relationship with GE on the engine side, fixed-wing leasing, Milestone and now on the lending side.

And then, Macquarie, they're new to the credit, they're new to relationship.  We've looked for way to work them in the past.  And so, we're really excited to have them now as a partner both in the lending side and the leasing side.  So, the real – **I mean, Cam, you've heard me say it before and I'll continue to kind of pound the table about this, but on a downturn – any kind of downturn, liquidity is at a premium and so the idea we've had and as you know it's been to address our near-term maturities, continue to kind of build liquidity through the system primarily through terming out our bank debt, using that new capital to pay down the revolver and then, obviously**, address that near-term maturity of $200 million.

So, we still got some work to go to get both these finished up, but with the Macquarie, we signed a credit agreement, just like we did with Lombard.  We announced that and then well within 45 days to 60 days went through and got that finished up.  **But I mean the real focus again, sorry for the long-winded answer, is really to just improve liquidity, continue to term out bank debt and really give us the runway that we need** to balance our needs as this market begins to recovery as we look into really calendar 2018 and our fiscal-year 2019.  So, that's a real motivator here, but **you are right.  It's been a very busy month**.

<A - Jonathan E. Baliff>: I think the emphasis, Cam, also is that the Macquarie credit agreement and GE commitment letter, both those don't need the level of

government approvals that Lombard did.  So, much of that is based on just getting the work done with those partners, but they've been really excellent so far.[36]

    f.   In response to analyst questions during the Q3 2017 Conference Call held on February 3, 2017, many of which centered on Bristow's secured debt financing announcements, Defendant Miller demonstrated knowledge of the details of the financing agreements, including the exact helicopters that secured the financings, **and that such helicopters were specifically identified in the agreements by their exact serial numbers**:

<A - L. Don Miller>: Yeah, I mean, Greg, hi, this is Don.  Yeah, I would say broadly so.  I mean, obviously, we move helicopters around the globe to meet various client needs.  So, from time- to-time, one will come off contract and move to a different geography or whatever the case would be, **but I mean what you're seeing is and ultimately this – when the credit agreements get filed or whatever, you'll see the fleet, but it's typically S-92s and AW139s and AW189s that are secured in these**.  So, those are really, particularly in this market, high demand.  They're new high demand high spec oil and gas aircraft.  So...

**<Q - Gregory Lewis [analyst, Credit Suisse]>: Okay.  And are those specific aircrafts or is it – like is it a serial numbers or is it just...**

**<A - L. Don Miller>: Yeah, Greg, it's serial numbers.  Yes, it's serial numbers.**[37]

    g.   Similarly, Defendant Miller, answering analyst questions concerning the covenants in the secured-debt financing agreements easily and authoritatively, demonstrated his knowledge of and familiarity with the specific covenants in the PK Air Debt and Macquarie Debt, both of which included the Collateral/Maintenance Covenants at issue:

<Q - Daniel J. Burke  [analyst, Johnson Rice]>: . . . Don, I've tried to squint at the Macquarie 8-K and I guess, also looking ahead to the contemplated GE credit facility.  Just wanted to know – just want to see if you could give us a rough overview of the covenant package and clarify whether there is any cash flow-based covenants associated or contemplated with either of those facility?

---

[36] *See* Q3 2017 Conference Call Transcript (Bloomberg), at 7-8.

[37] *See* Q3 2017 Bristow Conference Call Transcript (Bloomberg), at 8.

<A - L. Don Miller>: Daniel hi, good morning.  Sorry you had to squint, but I guess, that is the lot there, but the answer is no, there is not.

<Q - Daniel J. Burke>: Okay.  Great.

<A - L. Don Miller>: Daniel, let me reiterate.  ***We're well within all of our covenants and we've been able to stay ahead of that and that's very important to our financial flexibility***.[38]

    h.   In Bristow's May 24, 2017 conference call for the fourth quarter and full year fiscal 2017 (ended March 31, 2017) (the "Fiscal 2017 Conference Call"), Defendants repeatedly emphasized their progress on generating liquidity,[39] and both Defendant Baliff and Defendant Miller provided further details on finalizing and securing the PK Air Debt that again demonstrated their involvement in obtaining and negotiating those financing agreements:

BALIFF: Please turn to slide 6.  One of the things that gives our management confidence in fiscal year 2018 are the successes on this page, which show what we did in fiscal year 2017. . .

Our fiscal 2017 ending liquidity of $357 million is a result of a string of successful actions during the year, all of which are inter-independent and include [] the raising of $400 million through low-cost financings secured by a subset of our UK SAR and oil and gas helicopters.

We also secured significant financial flexibility with the amending of our bank covenants, providing us ample headroom in fiscal year 2018 and beyond.  **We continue to work through the final details of this free cash financing as you see on this page, which is $230 million equipment financings.  We expect this to close no later than June 30, 2017.**  And on a pro forma basis, including the $230 million from GECAS before paying down debt, our liquidity would be nearly $600 million.

<p style="text-align:center">***</p>

MILLER: **We remain on track with our previously announced GECAS financing.**  The $230 million of funds received from the financing plus the benefit of $15 million of H225 lease deferrals funds the fiscal 2018 required debt

---

[38] *See* Q3 2017 2017 Bristow Conference Call Transcript (Bloomberg), at 12.

[39] *See* Fiscal 2017 Bristow Conference Call Transcript (Bloomberg), at 3-4, 7 and 10; *see also* May 24, 2017 earnings presentation, at 5-6, 9.

amortization and maturities of $135 million plus an additional $95 million payment for the amortizing bank term loan.  Please note that included in the $135 million of maturities is the remaining $45 million of the $200 million term loan that's due November 2017.[40]

i.   During Bristow's June 9, 2017 business update conference call with analysts and investors, Defendants Baliff and Miller reiterated that the PK Air Debt was due to close by June 30, 2017, and ably answered more specific analyst questions concerning the PK Air Debt:

<Q - Daniel J. Burke [analyst, Johnson Rice]>: Yeah.  Okay, got it.  And then – that's helpful.  And maybe just the semantics, given that change, do you expect to fund the GE deal by June 30?

<A - L. Don Miller>: I mean, that's our goal.  I mean, clearly, first, you got to close, and then you fund, but our goal is to close then fund, but – so, yes.

<A - Jonathan E. Baliff>: Yeah.  But getting the $40 million in the door, for us, it's a big improvement, it's to me, dollars.  It doesn't mean that we're not – we can do GECAS and this sale, absolutely at the same time.  But for us, we're focused on the sale, improving the liquidity.  GECAS is progressing well.  And so, for us, we can do both, and again, like I said, there are other assets.[41]

j.   Similarly, during Bristow's November 9, 2017 conference call for the second quarter of fiscal 2018 (ended September 30, 2017) (the "Q2 2018 Conference Call"), Defendants again emphasized their achievements in generating liquidity, with both Defendant Baliff and Defendant Miller providing additional details concerning the closing and funding of the PK Air Debt during the prior quarter.[42]

---

[40] *See* Fiscal 2017 Bristow Conference Call Transcript (Bloomberg), at 3-4.

[41] *See* June 9, 2017 Bristow Conference Call Transcript (Bloomberg), at 6-7.

[42] *See* Q2 2018 Bristow Conference Call Transcript (Bloomberg), at 2 (Baliff: "To be specific, our team kept our promises and made great strides in delivering significantly improved operational performance and liquidity via the $32.4 million second quarter EBTIDA, the $230 million GECAS financing. . ."), 3-4 (Miller: "We are increasing our March 31, 2018 ending liquidity guidance to a range of $410 million to $450 million, up from our guidance of $225 million to $265 million as we continue to deliver on our commitment to implement self-help initiatives to improve liquidity and financial flexibility.  Now, let's walk through the numbers.  Starting at the top, we ended Q1 fiscal 2018 with $293 million liquidity.  And during our second quarter fiscal 2018, our total liquidity increased by $96 million to $389 million.  This increase was primarily driven by positive

227.     Securities analysts that followed Bristow were well aware of Defendant Miller's direct involvement in seeking, negotiating and obtaining the Secured Debt Financings.   For example, at the February 15, 2017 Credit Suisse Energy Summit, where Defendant Baliff presented on Bristow and spent significant time explaining the $630 million "wall of liquidity" that Bristow had recently obtained via the Secured Debt Financings,[43] his host, Credit Suisse analyst Gregory Lewis, expressed regret at not having Don Miller also present so that he could "congratulate him on all the work he's done [] with the secured [] equipment financings:"

> <Q - Gregory Lewis>: Okay.   Great.   And then, **Jonathan, I mean, I wish Don was here so I could congratulate him on all the work he's done and with the [ph] secured (25:19) and equipment financings**.  As we start, I mean and realize that there's already been some progress in 2017, as we look out over the next 12-plus months, what is Bristow going to do – what are sort of the thoughts behind trying to position the balance sheet to really make it ready for not only the near term, but maybe the longer term.

> <A - Jonathan E. Baliff>: Sure.  **I mean, let me just not speak just for Don Miller. I do want to speak for the SMT, our Senior Management Team,** the Board of Directors.  This is a company that we are not happy with where our balance sheet is right now.  So, I don't want you to think that all the work that we've done, we're going to sit on our laurels.

> We have cleared a runway of liquidity. . . [W]hen investors were asking us, why aren't you doing something in September? We had a sense of urgency, we worked with our partners, and we're able to get what I think people believe is an optimal solution.  This has now opened up other markets to us, right? Other capital market

---

net financing activities of $92 million, which **includes $230 million from the GECAS financing, which closed and funded in September**, less $132 million of debt amortization and required repayments and approximately $8 million in letters of credit issued.").

[43] *See* February 15, 2017 Bristow presentation at the Credit Suisse Energy Summit Transcript (Bloomberg), at 3-4 ("Let's turn to the next slide.  Page 7.  This is what we call our wall of liquidity, right?... We've been able to reinforce liquidity and still be able to generate cash flow compared to many of our peers. And this wall of liquidity gives us a runway that allows us, if the market does return, then we can take advantage of this liquidity to expand.  If it doesn't happen, then we'll actually have a safety net as the downturn continues.  But this is significantly higher than what we have been disclosing in the past and it's because of the strong partnerships we have with GECAS, GE/Milestone which is our primary lessor and has most of our lease to helicopters, but also bringing in Macquarie and Lombard as excellent partners within their regions to support us as we go through this downturn and then eventual growth.").

solutions, there's still secured abilities on our balance sheet because we have unencumbered assets.

**And I would say also our banks are becoming pretty impressed that Don and this team were able to get this financing**. So, it makes it that much easier to work with our banks too. So, feel good about all the options we have. The key for us is to do that in a very measured way. But also not in a way that you guys think we're just going to sit back and relax and feel, hey, we're great with this type of leverage. We will address it. And we'll address it in the right way, the way we just addressed our liquidity in the right way. And I think that's the best way I can answer that question.[44]

228.   Notably, as Defendant Baliff's response revealed, while Defendant Baliff acknowledged that Bristow's ability to obtain the Secured Debt Financings was driven in the first instance by Defendant Miller ("I would also say our banks are becoming pretty impressed that Don and his team were able to get this financing."), Baliff also corrected his host by indicating that the responsibility was in fact broader and extended to Bristow's larger "Senior Management Team" ("I mean, let me just not speak just for Don Miller. I do want to speak for the SMT, our Senior Management Team . . ."). *Id*.

229.   Lastly, on September 5, 2018, when both Defendants Baliff and Miller attended the Barclays CEO Energy-Power Conference to present on Bristow, Defendant Miller provided some retrospective commentary looking back on his last three years as Bristow's CFO and on the Secured Debt Financings that occupied so much of his focus and time:

So by way of background, again, my name is Don Miller. I'm the CFO at Bristow. I've been here 8.5 years, I've been in this seat. I celebrated my third – I guess it was a celebration. I celebrated my third anniversary last month. So I've been here for the challenging times to say the least.

**But a couple of things about what we are focused and really what we've tried to do since I stepped into the seat and really realized we're going to the extent of the downturn** . . . [**T**]**he real focus has been on liquidity** because this downturn was evolving, things were lasting longer, it was getting deeper and deeper. We really realized that for me, when I think about sources and uses with my credit background and again some of the challenges I've been through in terms of prior employers, liquidity was really the lifeblood for the company.

---

[44] *See* February 15, 2017 Bristow presentation at the February 15, 2017 Credit Suisse Energy Summit Transcript (Bloomberg), at 7.

And that's – and this page with the passage of time really indicates how we've been able to sustain a very appropriate level liquidity. . .

But the real focus has been to give us the flexibility and make sure that we have the liquidity runway to get through the downturn.  And I'll walk you through some of the actions we've taken over the last two or three years, really dictated how we've done that. . .

And so that's really what happened at the end of last fiscal year when we went into the capital markets for what was I think our fifth or sixth financing over about a year and a half.  And so we really went from a liquidity base, it was made up of a revolving credit and cash to really all cash.  So that's why you see a lot of green there at $380 million. . .[45]

### 3.     The Centrality of the Secured Debt Financings to Bristow and Defendants Further Supports Defendants' Scienter

230.    Third, as the above-quoted representations (*see* ¶¶226-29, *supra*) make clear – and independent of the representations indicating Defendants' actual and direct involvement in obtaining and negotiating the Secured Debt Financings and Defendants' actual awareness of their terms and covenants – the Secured Debt Financings were so central to Bristow's business and strategy that Defendants' scienter with respect to them is reasonably presumed.  Defendants' public statements, prior to and throughout the Class Period, furnish an ample record demonstrating that, between calendar years 2016-2018, obtaining and negotiating the Secured Debt Financings and the liquidity runway was Defendants' single highest strategic priority.  *See* ¶¶226-29, *supra*; *see also* Sections IV.A-B, *supra*.

231.    In the event that Defendants were unaware of these facts, this ignorance constitutes acting in such a deliberately reckless manner as to constitute fraud and deceit upon Lead Plaintiffs and other Class members.  However, the most reasonable inference from the central role the Secured Debt Financings played in achieving Defendants' strategic objectives for Bristow is that the Defendants were aware of the Secured Debt Financings' contractual terms and covenants.

---

[45] *See* September 5, 2018 Barclays Conference Presentation Transcript (Bloomberg), at 5-6.

### 4. Defendants Were Long Familiar with the PK Air Debt Counterparty and its Financing Terms/ Covenants

232. Fourth, Bristow's counterparty in the PK Air Debt agreement was not new to Bristow, and did not present Bristow with new or unfamiliar terms or covenants. To the contrary, Bristow's counterparty, PK AirFinance, was an affiliate of the Milestone Aviation Group ("Milestone"), the helicopter leasing unit of GE Capital Aviation Services ("GECAS"),[46] which was not only the world's largest and leading helicopter lessor, but, as Defendant Baliff explained, Bristow's "primary lessor since 2012," and Bristow's "long-term partner."[47] Bristow's helicopter financing relationship with Milestone began in 2012, when Milestone agreed to purchase for approximately $130 million, and lease to Bristow, five large helicopters.[48] In 2014, after three

---

[46] GECAS acquired PK AirFinance in 2000, and Milestone in January 2015. As Defendants' own comments indicate (*see, e.g.*, n.47 immediately below), Defendants did not see meaningful distinctions between these three entities (GECAS, Milestone, PK AirFinance), and instead referred to them interchangeably.

[47] *See* Q3 2017 Conference Call Transcript (Bloomberg), at 3 ("[W]e have executed a commitment letter with our primary lessor and long-term partner, Milestone Capital which is now part of GE Capital Aviation Services under which we will borrow $230 million secured by another 20 oil and gas aircraft."); February 15, 2017 Bristow presentation at the Credit Suisse Energy Summit Transcript (Bloomberg), at 4 (in which Baliff noted the "wall of liquidity" generated by the Lombard Debt, Macquarie Debt and PK Air Debt, attributing it to "the strong partnerships we have with GECAS, GE/Milestone, which is our primary lessor and has most of our lease to helicopters. . .."). *See also* February 2, 2017 press release issued by Milestone Aviation Group Limited, titled "Milestone Aviation Provides $230 Million Secured Debt Facility to Bristow Group," in which Defendant Baliff further explained:

> Milestone has been our primary lessor since 2012, and this agreement is another example of the continued strength of their commitment to Bristow Group. . . . Throughout our relationship, they have worked creatively and flexibly to structure lease solutions best suited for our business, and with the backing of GE they now have the capability to support our business objectives by providing us with significant financial flexibility, as an important alternative to traditional banking capital.

[48] *See, e.g.*, February 12, 2012 press release issued by Milestone Aviation Group Limited, titled "Milestone Aviation Group Announces Helicopter Leasing Transaction with Bristow Group"; February 2, 2017 press release issued by Milestone Aviation Group Limited, titled "Milestone Aviation Provides $230 Million Secured Debt Facility to Bristow Group."

years of working with Bristow, Milestone agreed to lease another 12 large helicopters to Bristow in connection with Bristow's successful bid for the UK SAR contract.[49]

233.    These above-identified two helicopter lease agreements with Milestone, for 17 large helicopters in total, accounted by themselves for nearly 25% of Bristow's entire leased aircraft fleet,[50] and they were the specific helicopter leases whose Collateral/Maintenance Covenants Bristow violated.  *See* fn.6, *supra*.

234.    Given that Milestone was Bristow's largest helicopter lessor and financing counterparty even *prior* to entering into the PK Air Debt agreement in mid-2017, and given that Bristow had negotiated multiple helicopter financing/leasing agreements with Milestone since 2012, Defendants were well-acquainted with Milestone, and, more specifically, with Milestone's customary financing and leasing agreements, including the Collateral/Maintenance Covenants in all of those financing and leasing agreements.  Defendants' long-standing and material familiarity with Milestone and its helicopter financing/leasing terms and conditions is therefore yet further indication that Defendants were familiar with the Collateral/Maintenance Covenants associated with the PK Air Debt.  As such, Bristow and Defendants must have tracked the status of the airframes and engines that were subject to these covenants, and if they did not, such failure was highly reckless in light of Bristow's and Defendants' knowledge of the covenants and the potential consequences of the breaches.

**B.    Defendants Were Aware of Bristow's Covenant Violations No Later than the Last Three Months of 2018 (Calendar Year)**

235.    Even Bristow's own self-serving statements demonstrate that – at the latest – Bristow had actual knowledge of its non-compliance with the Collateral/Maintenance Covenants

---

[49] *See, e.g.*, November 11, 2014 Milestone press release titled "Milestone Aviation Group Finances Helicopters for Bristow Helicopters LTD UK SAR Fleet."

[50] As of March 31, 2018, Bristow' leased aircraft fleet amounted to 70 LACE (large aircraft equivalents), with the 17 large helicopters from the above two Milestone agreements constituting 17 LACE.  *See, e.g.*, Q4 2018 Presentation, at 18.

for months before it disclosed that non-compliance and the related control deficiency to the investing public on February 11, 2019.

236.   In its April 15, 2019 8-K, Bristow stated: "***During the three months ended December 31, 2018***, we determined that some 'loaner' engines owned by maintenance providers and installed on pledged or leased airframes have been on those airframes for more than 180 days after the removal of the original engines."  *See* ¶187, *supra*.

237.   Bristow also stated in a February 19, 2019 press release: "All issues related to this matter were cured prior to December 31, 2018 for all but nine helicopter engines (relating to three agreements) where the pledged or leased engines were not returned to the pledged or leased airframes within specified periods due to delays with certain of the Company's maintenance service providers.  The Company has obtained waivers of such non-compliance under the applicable agreements related to such helicopter engines."  *See* ¶182, *supra*.

238.   Thus, *even Bristow's own self-serving public statements indicate that at the latest Defendants were aware of Bristow's violations of the Collateral/Maintenance Covenants well before December 31, 2018*.  This was not a passive omission given the amount of work necessary for Bristow to cure violations of the Collateral/Maintenance Covenants (*e.g.*, tracking errant engines and returning them to their proper airframes) and obtain waivers for remaining unresolved violations – months before Bristow disclosed that issue to the investing public on February 11, 2019.

239.   Juxtaposing Bristow's subsequent admissions against the Company's Class Period disclosures underscores why these knowing non-disclosures supports a strong inference of scienter.  Specifically, in November 2018, Bristow disclosed that the Company intended to issue up to $150 million in new convertible debt in connection with the Columbia Helicopters acquisition and that the Company was otherwise in compliance with its existing financing arrangements.  During the November 9, 2018 earnings call, Baliff represented that Bristow had "excellent" and "ample" liquidity and Miller suggested that the Columbia acquisition would

"improve [Bristow's] liquidity profile."[51]  Yet, even accepting Bristow's own self-serving subsequent statements at face value, Bristow admits that at that time – or shortly thereafter – Defendants were already aware that the Company's liquidity runway was – at best – in substantial risk due to Bristow's lack of internal controls related to its Collateral/Maintenance Covenants in the financing agreements providing that liquidity runway, and – at worst – already cut off due to breaches of material covenants in existing financing arrangements.

### C.  Bristow and Defendants Failed to Maintain Effective Internal Controls

240.  Defendants failed to comply with their obligations imposed by the SEC to maintain books and records in sufficient detail to reflect the transactions of the Company and to prepare financial statements in accordance with GAAP.  Section 13(b)2 of the Exchange Act, entitled *Periodical and Other Reports*, states the following with respect to books and records and internal controls:

> Every issuer which has a class of securities registered pursuant to section 78/ of this title and every issuer which is required to file reports pursuant 78*o*(d) of this title shall:
>
> A.  make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer;
>
> B.  devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that–
>
> > i.  transactions are executed in accordance with management's general or specific authorization;
> >
> > ii.  transactions are recorded as necessary (I) to permit preparation of financial statements in conformity with generally accepted accounting principles or any other criteria applicable to such statements, and (II) to maintain accountability for assets;
> >
> > iii.  access to assets is permitted only in accordance with management's general or specific authorization; and

---

[51] *See* Q2 2019 Conference Call Transcript (Bloomberg), at 3, 9.

iv.    the recorded accountability for assets is compared with the existing assets at reasonable intervals and appropriate action is taken with respect to any differences[.]

241.    A good system of internal controls helps management achieve its objectives related to the effectiveness and efficiency of its operations, the reliability of its financial reporting, and compliance with applicable laws and regulations.  It is management's responsibility to develop and implement internal controls necessary to ensure that it maintains adequate books and records. This is made clear in SEC regulations and in a report prepared by the Committee of Sponsoring Organizations of the Treadway Commission ("COSO"), titled Internal Control – Integrated Framework (the "COSO Report").[52]

242.    The COSO Report defines internal control as a process that is "designed to provide reasonable assurance regarding the achievement of objectives" related to the effectiveness and efficiency of operations, the reliability of financial reporting, and compliance with applicable laws and regulations.  COSO Report, Executive Summary.  More broadly, a system of internal control also includes the actions taken by a company's board of directors, management at all levels, and employees in running the business.

243.    The COSO Report requires that financial statements prepared for external purposes be fairly presented in conformity with GAAP and regulatory requirements.  To prepare financial statements in conformity with GAAP, management's responsibility is acknowledged in a set of standards known as generally accepted auditing standards ("GAAS").  *Id.*  GAAS outlines the responsibilities of an auditor, but also explains that management is responsible for its own financial reporting:

> The financial statements are management's responsibility.   The auditor's responsibility is to express an opinion on the financial statements.  ***Management is responsible for adopting sound accounting policies and for establishing and***

---

[52] Generally accepted auditing standards codified in AU § 319, Consideration of Internal Control in a Financial Statement Audit, is based on the internal control framework described in the COSO Report. The COSO Report was issued in September 1992 as a four-volume set.  Additional modifications and updates of the framework have been issued with the most recent Integrated Framework being issued in 2013 as a three-volume set.

*maintaining internal control* that will, among other things, initiate, record, process, and report transactions (as well as events and conditions) consistent with management's assertions embodied in the financial statements.  The entity's transactions and the related assets, liabilities, and equity are within the direct knowledge and control of management.  The auditor's knowledge of these matters and internal control is limited to that acquired through the audit.  Thus, *the fair presentation of financial statements in conformity with generally accepted accounting principles is an implicit and integral part of management's responsibility*.

AU § 110.3.

244.    Borrowing from generally accepted auditing standards, the COSO Report defines fair presentation as the following:

- the accounting principles selected and applied have general acceptance;

- the accounting principles are appropriate in the circumstances;

- the financial statements are informative of matters that may affect their use, understanding and interpretation; and

- the financial statements reflect the underlying transactions and events in a manner that present the financial position, results of operations and cash flows stated within a range of acceptable limits, that is, limits that are reasonable and practical to attain in financial statements.[53]

245.    The COSO Report defines five components of an internal control framework that are needed to enable a business to achieve its objectives: (1) the control environment, (2) risk assessment, (3) control activities, (4) information and communications, and (5) monitoring.

246.    Bristow's management is responsible for establishing and maintaining adequate internal control over financial reporting as defined in Rule 13a-15(f) under the Exchange Act.  The Company's internal control over financial reporting is designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with GAAP.

---

[53] *See* COSO Report, Chapter 3; *see also* Statement on Auditing Standards No. 69, The Meaning of "Present Fairly in Conformity With Generally Accepted Accounting Principles" in the Independent Auditor's Report (New York: AICPA, 1992).

247.   The term "reliable" as used in the COSO Report requires that financial statements prepared for external purposes be fairly presented in conformity with GAAS and regulatory requirements.  Reliability of financial reporting applies to published financial statements, including interim and consolidated financial statements, and selected financial data, such as earnings releases, derived from these financial statements.

248.   Internal control over financial reporting, as defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act, is a process designed by, or under the supervision of, the CEO and CFO and is effected by the Board, management and other personnel to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external reporting purposes in accordance with GAAP.  Internal control over financial reporting includes those policies and procedures that:

     a.   pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the Company;

     b.   provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with U.S. GAAP, and that the receipts and expenditures of the Company are being made only in accordance with appropriate authorization of management and the board of directors; and

     c.   provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use or disposition of the Company's assets that could have a material effect on the financial statements.

249.   Everyone in an organization has responsibility for internal controls.  However, the CEO sets the "tone at the top" that affects integrity, ethics, and other factors of a positive control environment.  "In any organization, 'the buck stops' with the chief executive.  He or she has ultimate ownership responsibility for the internal control system. . . .  The influence of the CEO on an entire organization cannot be overstated."  COSO Report, Chapter 8, p. 84.  The chief executive fulfills this duty by providing leadership and direction to senior managers and reviewing the way they are controlling the business.

250.    The Addendum to the COSO Report makes it clear that the Company's chief financial officers – in this case, Miller and non-party Allman, who were the principal accounting and financial officers during the Class Period – play a critical role with respect to the internal control system.

251.    In the Fiscal 2018 Form 10-K and the intervening Fiscal 2019 Form 10-Qs, Bristow, through Defendants Baliff and Miller, stated that Bristow's controls over financial reporting were effective.  In addition, in the Fiscal 2018 Form 10-K, Bristow's management certified compliance with GAAP and the COSO framework in the original SEC filings.  2018 Form 10-K, at 144.  For the reasons herein, these representations were false.

252.    In its Fiscal 2018 Form 10-K, Bristow stated that Miller and Baliff supervised and participated in an evaluation of Bristow's disclosure controls and financial reporting controls in early 2018.   Specifically, Bristow's 10-K stated: "We carried out an evaluation, under the supervision of and with the participation of our management, including Jonathan E. Baliff, our Chief Executive Officer ('CEO'), and L. Don Miller, our Chief Financial Officer ('CFO'), of the effectiveness of the Company's disclosure controls and procedures (as defined in Rule 13a-15(e) of the Exchange Act) as of March 31, 2018."   *Id.*   Bristow's 10-K continued: "Based on that evaluation, our CEO and CFO concluded that such disclosure controls and procedures were effective to ensure that information required to be disclosed in our periodic reports filed under the Exchange Act is recorded, processed, summarized and reported within the time periods specified by the SEC's rules and forms and such information is accumulated and communicated to our management as appropriate to allow for timely decisions regarding required disclosure under the Exchange Act."   *Id.*

253.    Bristow also stated in its Fiscal 2018 10-K that "[u]nder the supervision and with the participation of our management, including our CEO and CFO, we conducted an assessment of the effectiveness of our internal control over financial reporting as of March 31, 2018. The assessment was based on criteria established in the framework Internal Control – Integrated Framework, issued by the Committee of Sponsoring Organizations of the Treadway Commission

in 2013." *Id.*  Bristow represented: "Based on this assessment, management concluded that our internal control over financial reporting was effective as of March 31, 2018." *Id.*

254.    As described above (¶¶224-34, *supra*), Baliff and Miller both had detailed knowledge of the covenants in the Secured Debt Financing agreements.  Indeed, Miller signed the PK Air Debt agreement—which included the Collateral/Maintenance Covenants at issue—and later demonstrated his actual knowledge that the Secured Debt Financings were secured by helicopters down to the serial number. *See* ¶¶225 and 226(f), *supra*.

255.    Moreover, as explained above, those Secured Debt Financings were the critical component of the "liquidity runway" that was central to Defendants' STRIVE strategy for Bristow. Further, when combined with the Collateral/Maintenance Covenants in Bristow's helicopter lease agreements, more than 50% of Bristow's helicopter fleet (measured by value) was subject to Collateral/Maintenance Covenants.

256.    Further, Bristow's own self-serving explanation in its February 11, 2019, 8-K stated that Bristow discovered the material weakness in its internal controls in connection with the very same type of "assessment of the effectiveness of [its] internal control over financial reporting" that Baliff and Miller "supervis[ed]" in early 2018: "In connection with the preparation of annual and quarterly financial statements, the Company's management is responsible for evaluating its disclosure controls and procedures . . . . This evaluation includes an assessment of the Company's internal controls over financial reporting . . . . ***As part of management's assessment of the Company's internal controls over financial reporting as of December 31, 2018***, a control deficiency was identified by the Company related to the Company's processes for monitoring compliance with certain non-financial covenants in certain of the Company's secured financing and lease agreements."

257.    Accordingly, it is more probable than not that any "assessment of the effectiveness" of Bristow's internal controls over financial reporting would have investigated – and revealed – whether Bristow was in compliance with the Collateral/Maintenance Covenants in its Secured Debt Financing agreements and its helicopter lease agreements and whether Bristow had adequate

controls and procedures for monitoring compliance with those Collateral/Maintenance Covenants. Such an assessment thus would have revealed the lack of any such controls and procedures at Bristow.

258.     In addition, following the end of the Class Period, Bristow's management and advisors reevaluated the Company's internal control failings under the COSO framework, as described in the Amended Fiscal 2018 Form 10-K/A:

> Subsequent to the assessment made in connection with the Original Filing, **our management, including our CEO and CFO, with the oversight of our Board of Directors,** re-evaluated the effectiveness of the design and operation of our internal control over financial reporting as of March 31, 2018.  The assessment was based on criteria established by the Committee of Sponsoring Organizations of the Treadway Commission in 2013 in Internal Control — Integrated Framework.  In connection with this assessment, management identified the following deficiency that we considered a material weakness in the Company's internal control over financial reporting.  **We did not appropriately consider the requirements under certain of our secured financing and lease agreements and our obligation to monitor compliance with the underlying non-financial covenants.**  As such, we did not appropriately consider the related financial reporting risks and changes in our lending agreements resulting in not implementing controls to determine compliance with non-financial covenants in certain of our secured financing and lease agreements.

Amended Fiscal 2018 Form 10-K/A at 148.

259.     Specifically, Defendants Baliff and Miller failed to comply with SEC regulations and the requirements of COSO.  As described herein, there was a material weakness in the internal controls at Bristow that were necessary to prepare accurate financial statements and ensure compliance with regulatory filing requirements applicable to public companies.  A material weakness is defined by the SEC as "a deficiency, or combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the registrant's annual or interim financial statements will not be prevented or detected on a timely basis."  Bristow's internal control system failed to live up to the standards as set forth in the five elements of the internal control framework described above in ¶245.  During the Class Period,

Defendants failed to maintain an effective control environment that focused on achieving consistent application of accounting policies and procedures and strict adherence to GAAP.

260.    As part of the Amended Fiscal 2018 Form 10-K/A, Bristow committed to implementing a series of remediation measures to address the material weaknesses identified during the protracted internal investigation relating to the Class Period breakdown of internal controls:

**Remediation Plan**

Although certain procedures have been undertaken as a result of the material weakness, to assess compliance with non-financial covenants of certain of our secured equipment financing and lease agreements to remediate the material weakness, **we will continue the implementation of our remediation plan by establishing a debt and lease compliance program with the specific objective of creating a sustainable and executable compliance process that can be repeated on a recurring basis to ensure timely monitoring of compliance with covenants and provisions.**  We intend to implement such compliance program by executing the following:

- Development of a more complete reporting process to ensure information gathered or created by our separate control processes throughout the business are reported to the appropriate level of management with the responsibility for reporting on debt and lease agreement compliance.
- **Implementation of new or redesigned processes, where necessary, for compliance with collateral maintenance requirements under our debt and lease agreements, specifically, tracking the movement of collateral throughout our operations.**
- Establishment of procedures for reassessment of our debt and lease compliance program to ensure timely actions are taken when necessary.

We anticipate the actions to be taken, and resulting process improvements, will generally strengthen our internal controls over financial reporting, as well as our disclosure controls and procedures, and over time, will address the material weakness.  The material weakness will be considered remediated once these controls have operated for a sufficient period of time for management to conclude, through testing, that these controls are operating effectively

Amended Fiscal 2018 Form 10-K/A at 149.

261.    Despite Bristow's and Defendants' ongoing attempts to the mitigate the impact of the internal control breaches in subsequent disclosures, the breadth of the control remediation program underscores the depth and severity of the material breakdown in internal controls during the Class Period.  Accordingly, the Amended Fiscal 2018 Form 10-K/A contains specific

admissions that Bristow, and its senior management, did not maintain effective controls during the Class Period.  Further, in its Fiscal 2019 Form 10-K filed on October 28, 2019, Bristow conceded that remediation efforts remained ongoing and acknowledged that "[i]mplementation of new or redesigned processes, where necessary, for compliance with collateral maintenance requirements under our debt and lease agreements, specifically, tracking the movement of collateral throughout our operations," was required.  *See* Fiscal 2019 Form 10-K, at 176.  The Company also acknowledged that it was "evaluating the use of third-party compliance services providers to assist with the development of our reporting process."  To wit, Bristow admits that as a direct result of these internal control deficiencies the Company breached material non-financial covenants.  As detailed above, when these breaches were discovered, Bristow reclassified its long-term debt as short-term debt.  *See* Section VI, *supra*.  Beyond delayed financial reports and the "going concern" risk that Bristow was forced to disclose, this reclassification effectively repudiated the narrative of a well-developed "liquidity runway" and path towards recovery that Defendants Baliff and Miller repeatedly touted to investors during the Class Period.

262.    The reclassification and ongoing remediation efforts also confirmed that Bristow's Class Period financial statements were not compliant with GAAP.  This violated at least certain of the financing agreements which required the delivery of timely GAAP-compliant financial statements.  Specifically, Bristow violated GAAP by the misclassification of short-term debt/current liabilities as long-term.  *See* Accounting Standards Codification ("ASC") Section 210 Balance Sheet and Section 470 Debt.  Bristow violated GAAP by failing to disclose that there was substantial doubt about Bristow's ability to continue as a going concern.  *See* ASC Section 205-40 Presentation of Financial Statements - Going Concern.

263.    Moreover, while Defendants suggest in their February 19, 2019 disclosures that the breaches of the covenants were the result of third-party maintenance operations, their role in these failures is not excused.  First, COSO dictates that management's responsibility to maintain sound internal controls extends to outsourced service providers, such as outsourced OEM maintenance providers.  *See* COSO Principle 15 ("The organization communicates with external parties about

matters affecting the functioning of internal control.").  Second, the Company's admission that these issues were discovered, but not disclosed during the Class Period undermines the inference that Bristow management had not already been monitoring for compliance.  *See* Section VI, *supra*. Third, Bristow undoubtedly had the ability to track compliance with these material non-financial covenants as the Company developed and maintained software solutions that integrated the Company's finance, maintenance, operations functions.[54]

264.   Prior to the Class Period, Bristow implemented SAP enterprise software, in part, because "the majority of Bristow's large oil and gas customers and larger OEM suppliers [were] already using SAP software," which eased the Company's "concerns about the complexity of aviation maintenance operations."[55]  The Maintenance Repair and Overhaul ("MRO") software solution – iMRO - Bristow adopted also provided for "[i]mproved compliance [m]anagement" with "[r]eal time status reporting" and "[s]eamless data flow from engineering to planning to work execution[.]"[56]  In fact, Bristow served as a reference for the iMRO software based on experience using the software "to implement an end-to-end solution in SAP for all Maintenance and Engineering processes covering its extensive fleet of helicopters, using SAP IS-AD and iMRO functionalities."[57]  The implementation provided Bristow with, *inter alia*, "[r]eal time visibility of

---

[54] L. Bonneau, "How Global Operations Are Taking Off at Bristow Group: VP IT & CIO Steve Sidney Describes the Business's Digital Transformation Journey," Apr. 1, 2015, *available at*: https://sapinsider.wispubs.com/Assets/Case-Studies/2015/April/IP-how-global-operations-are-taking-off-at-Bristow-Group (last visited Nov. 2, 2019); *see also* Steve Sidney, VP of IT, CIO, Bristow, "Bristow Group Implements SAP Business Suite Software Powered by SAP HANA," Nov. 3, 2015: *available at*: https://www.sap.com/assetdetail/2016/11/7cead497-967c-0010-82c7-eda71af511fa.html (last visited Nov. 2, 2019) (describing at minutes 12-14 reasons for and adoption of SAP software integrating (i) finance and supply chain, (ii) fixed assets, (iii) contracts-to-cash; and (iv) configuration control and maintenance operations).

[55] *See* L. Bonneau, "How Global Operations Are Taking Off at Bristow Group: VP IT & CIO Steve Sidney Describes the Business's Digital Transformation Journey," n.54, *supra*.

[56] *See* "Digital Maintenance Powered By iMRO," HCL, at 5, PDF Brochure *available at*: https://www.hcltech.com/brochures/aerospace-and-defense/digital-maintenance-powered-imro (last visited Oct. 23, 2019).

[57] *Id.* at 12 (describing Reference #4 as "A global leader in providing helicopter transportation services to off-shore oil platforms. An operator of over 450 Helicopters across 20 aircraft types. Provides O&G Transportation, Search & Rescue and Medical Evacuation services in about 25 countries around the globe.").

material availability across current stock, repair stock with vendor and even future routine rotable maintenance events enabled by iMRO Sourcing Workbench," and "[a]ccurate [t]racking of Aircraft and Component Maintenance Cost and Repair History [with] [g]reater visibility of Aircraft/Component via Event based Reliability Reports." *Id.*

265.     Based on the foregoing, Bristow's attempt to pass off a self-described *material weakness* in its *own* internal control regime as the result of third-party errors is a meritless attempt to pass responsibility that squarely belonged with Bristow: Bristow was responsible for complying with the covenants in its financing agreements and for monitoring its third-party maintenance providers to ensure their work did not cause Bristow to breach those covenants, and Bristow was responsible for maintaining internal controls to monitor that compliance to identify, address, and disclose any non-compliance.  Indeed, Bristow's attempt to shift blame is belied by accounting standards – with which the Company and Defendants purported to comply – and contradicted by their description of corporate operations.  Rather, the most plausible inference is Bristow had the ability to track the compliance with terms of the material non-financial covenants in secured financing and lease agreement – but either knowingly or recklessly failed to do so during the Class Period.

## D.     The Delayed Closing and Ultimate Collapse of the Columbia Acquisition Further Support Scienter

266.     In its November 9, 2018 press release announcing the Columbia Acquisition, Bristow represented that the Columbia Acquisition was expected to close prior to December 31, 2018.  After announcing the Columbia Acquisition, Bristow thereafter and quickly: (i) secured consent for the acquisition from Bristow's Senior Secured Noteholders  (*see* Bristow November 13 and 21, 2018 press releases announcing, respectively, Bristow's solicitation and receipt of such consent); and (ii) secured financing for the Columbia Acquisition through an agreement to sell $135 million of convertible senior secured notes (*see* Bristow November 28, 2018 Form 8-K).  Moreover, Bristow later disclosed in its February 11, 2018, Press Release titled "Bristow Group Reports Preliminary Third Quarter Fiscal Year 2019 Results" that it incurred more than $7.2

million in transaction costs associated with the Columbia Acquisition in November and December 2018.

267.    Despite having secured consent and financing and spent millions in transaction costs, on December 10, 2018, Bristow filed a Form 8-K with the SEC that stated, *inter alia*, that Bristow "no longer expects to complete the [Columbia] Acquisition on or before December 31, 2018."

268.    Following the December 10, 2018 disclosure that the Columbia Acquisition closing would be delayed, no further disclosure was issued from Bristow until, on February 11, 2019, when Bristow issued twin press releases announcing (1) that the Columbia Acquisition, was terminated "by mutual agreement of the parties," with Bristow having to pay a $20 million termination fee to Columbia; and (2) that Bristow was in possible violation of covenants in certain of its secured financing and lease agreements, that Bristow had material weaknesses in its internal controls over financial reporting, and that Bristow's financial statements for periods on and after March 31, 2018 had possibly misreported Bristow's debts and ability to continue as a going concern. *See* Bristow's February 11, 2019 press releases titled "Bristow and Columbia Helicopters Terminate Proposed Transaction" and "Bristow Group Reports Preliminary Third Quarter Fiscal 2019 Results."

269.    Despite their statements that the Columbia Acquisition would have provided assets "highly complementary to Bristow's" that would "expand [Bristow's] addressable market opportunities globally" (Bristow Nov. 9, 2018 press release titled "Bristow Group To Combine With Columbia Helicopters In A $560 Million Transaction, Creating A Leading Global Diversified Industrial Aviation Solutions Company," ¶¶57-60 *supra*), Bristow has never offered any reasoned explanation for why the Columbia Acquisition fell through to the tune of a $20 million termination fee and $7.2 million in sunk costs:

       a.    Bristow's February 11, 2019, preliminary earning-results press release, which first announced the termination tersely, stated  that "its agreement to acquire Columbia was terminated by mutual agreement of the parties" (even though *Bristow*, not

Columbia, paid the $20 million termination fee) and explained the termination cryptically only by saying: "Bristow and Columbia concluded that it was not possible to combine the two companies at this time due to a number of developments that occurred following the entry into the agreement." Bristow did, however, attempt to divert blame from its internal-control failures: "The Company noted the termination of the Columbia transaction is unrelated to Bristow's 12b-25 extension and related accounting review."

b. Bristow's other February 11, 2019 press release, titled "Bristow and Columbia Helicopters Terminate Proposed Transaction," included the same limited explanation: "The decision to enter into a mutual termination of the purchase agreement was based on a number of developments following the entry of the agreement, which led both Bristow and Columbia to conclude it was not possible to combine the two companies at this time."

c. Bristow's February 12, 2019, 8-K disclosing the termination (signed by Miller) merely stated: "the Parties mutually agreed to terminate the Purchase Agreement" (again, even though *Bristow* paid the full $20 million termination fee).

d. Bristow's next mention of the Columbia transaction was in the Declaration of its CFO (Allman) in connection with Bristow's Bankruptcy filings. *See* Bankr. Dkt. No. 25. Despite Allman's statement that Bristow's objective in the bankruptcy was "to restructure with an eye toward an *inevitable consolidation in the market for helicopter services*," *id.* ¶48, Allman again offered no explanation for why Bristow did not consummate its acquisition of Columbia and its "highly complementary" business. Allman stated only: "The Company ultimately determined, however, that the Columbia transaction could not be consummated, and on February 11, 2019, the Company and Columbia mutually terminated the [Stock Purchase Agreement]." Bankr. Dkt. No. 25, ¶50. Just as with Bristow's prior statements, Allman's

declaration offered no explanation for why—if the termination had actually been "mutual[]"—Bristow footed the bill for the full $20 million termination fee.

e.  Bristow's Q3 2019 Form 10-Q filed on June 19, 2019, stated only that "our agreement to acquire Columbia Helicopters, Inc. ("Columbia") had been terminated by mutual agreement of the parties" and that Bristow "paid $20 million to Columbia" as a termination fee.  Q3 2019 Form 10-Q, at 17.

f.  Bristow's disclosure statement in its Bankruptcy proceedings again emphasized the need for Bristow to "restructure with an eye toward an inevitable consolidation in the market for helicopter services," and yet Bristow explained its termination of the already-consented-to-and-financed Columbia Acquisition—which Bristow's disclosure statement described as having been expected to provide "a more diversified fleet and market presence," a "broader customer base," "an increase in contracted, stable revenue," and "expanded opportunities in certain market segments, including defense, firefighting and forestry"—by saying only: "The Company ultimately determined, however, that the Columbia transaction could not be consummated, and on February 11, 2019, the Company and Columbia mutually terminated the [Stock Purchase Agreement]."  Bankr. Dkt. No. 590-1 at 40.

g.  Bristow's 2019 Fiscal Year Form 10-K filed on October 28, 2019, repeated its description from its earlier 10-Q and stated only that "our agreement to acquire Columbia Helicopters, Inc. (Columbia) had been terminated by mutual agreement of the parties" and that Bristow "paid $20 million to Columbia" as a termination fee.  Fiscal 2019 Form 10-K, at 105.

270.  But the fact that Bristow paid the $20 million termination fee – combined with the Columbia Stock Purchase Agreement's plain language – conclusively disproves Bristow's repeated representations that the parties "mutually agreed to terminate" the Columbia Acquisition. That is because the Columbia Stock Purchase Agreement *expressly provides* for termination by "[t]he Parties upon their mutual written consent" and under the agreement's plain language ***no***

*termination fee would have been due if the contract had actually been terminated by mutual agreement of the parties, as Bristow falsely represented*.

271.    Section 12.1 of the Columbia Stock Purchase Agreement provides that the contract can be terminated in four ways:

12.1 **Termination**. This Agreement may be terminated at any time before Closing only by:

(a) The Parties upon their mutual written consent.

(b) Purchaser by giving written notice to the Company at any time (i) (A) in the event the Company or a Shareholder has breached or failed to perform any covenant contained in this Agreement, which breach or failure to perform would result in a failure of a condition set forth in Section 9.1(b) or there exists a breach of any representation or warranty of the Company or the Shareholders, which breach would result in the failure of a condition set forth in Section 9.1(a) and (B) such breach or failure to perform cannot be cured or, if capable of being cured, is not cured within 30 days after Purchaser has notified the Company of the breach or failure to perform (or, if sooner, by the Termination Date) or (ii) if Closing has not occurred on or prior to the Termination Date (unless the failure of the Closing to occur results primarily from or is primarily caused by Purchaser breaching any obligation, representation, warranty or covenant contained in this Agreement).

(c) The Company by giving written notice to Purchaser at any time (i) (A) in the event Purchaser has breached or failed to perform any covenant contained in this Agreement, which breach or failure to perform would result in a failure of a condition set forth in Section 9.2(b) or there exists a breach of any representation or warranty of Purchaser, which breach would result in the failure of a condition set forth in Section 9.2(a) and (B) such breach or failure to perform cannot be cured, or, if capable of being cured, is not cured within 30 days after the Company has notified Purchaser of the breach or failure to perform (or, if sooner, by the Termination Date), or (ii) if Closing has not occurred on or prior to the Termination Date (unless the failure of the Closing to occur results primarily from or is primarily caused by the Company or any Shareholder breaching any obligation, representation, warranty or covenant contained in this Agreement).

(d) The Company or Purchaser by giving written notice to the other Party if an Order shall have been entered permanently restraining, enjoining or otherwise permanently prohibiting the consummation of the Transactions and such Order shall have become final and non-appealable; provided, that the party seeking to terminate this Agreement pursuant to this Section 12.1(d) shall have complied with its obligations under Sections 8.4 and 8.6.

272.    Section 12.3 of the Stock Purchase Agreement sets out the conditions under which Bristow has to pay the termination fee:

12.3 **Termination Fee**.

(a) If:

(i) (A) all conditions set forth in Section 9.1 have been satisfied or waived (other than (1) conditions that by their terms are to be satisfied, and are capable of being satisfied, at Closing if the Closing were to occur at the time of the relevant termination or (2) any condition that was not satisfied as a result of the breach of, or default under, this Agreement by Purchaser) and (B) the Shareholder Representative and the Company have irrevocably confirmed in writing that the Shareholders and the Company are ready, willing, and able to consummate the Closing; ***and***

(ii) (A) ***the Company has terminated this Agreement pursuant to Section 12.1(c)*** or (B) Purchaser has terminated this Agreement pursuant to Section 12.1(b) ***at a time when the Company had the right to terminate this Agreement pursuant to Section 12.1(c)***;

then, Purchaser will promptly, but in any event within two Business Days of the date of termination, pay $20,000,000 (the "Termination Fee") to the Company as directed in writing by the Company. For the avoidance of doubt, in no event shall Purchaser be required to pay the Termination Fee on more than one occasion and in no event shall Purchaser be required to pay the Termination Fee in the event the Closing is consummated.

273.    Thus, under the Stock Purchase Agreement's plain language, Bristow ***does not have to pay the $20 million termination fee*** if the agreement is terminated under Section 12.1(a) by mutual agreement of the parties.  Bristow ***only*** has to pay the $20 million termination fee if (i) Columbia has satisfied all its conditions precedent under the agreement (Section 9.1 sets out conditions Columbia must satisfy to trigger Bristow's obligations under the contract) and Columbia has "irrevocably confirmed in writing" that it is "ready, willing, and able to consummate the Closing;" and (ii) either (A) Columbia terminates under Section 12.1(c) because Bristow breached a covenant, representation, or warranty or (B) Bristow terminates under Section 12.1(b) at a time when Columbia had the right to terminate under 12.1(c), which would Bristow also would have had to have breached a covenant, representation, or warranty to trigger 12.1(c)'s right to

terminate (12.1(c)'s provision for termination if Closing had not occurred by the Termination Date is inapposite here, because that date was defined as April 9, 2019).

274.    In short, there is no way Miller's and Bristow's representation that the parties "mutually agreed" to terminate the Columbia Acquisition was true – if it were, Bristow would not have been obligated to pay the $20 million termination fee.  Bristow was **only** required to pay the termination fee if Bristow breached a covenant, representation, or warranty in the Columbia Stock Purchase Agreement.

275.    In contrast to Miller's patently untrue representation that the parties "mutually agreed" to terminate the Columbia Acquisition, Bristow's **control deficiency** and violations of the Collateral/Maintenance Covenants would very likely have breached at least the following representations, warranties, and covenants by Bristow in the Stock Purchase Agreement – giving Columbia the right to terminate for cause and triggering Bristow's obligation to pay the $20 million termination fee:

> 5.8 **Parent SEC Reports**. Accurate and complete copies of each report, registration statement, prospectus, schedule, form, statement, and definitive proxy statement that Parent has filed with the SEC in the 12-month period preceding the Execution Date (collectively, the "Parent SEC Reports") have been filed through the SEC EDGAR system. As of the time it was filed with the SEC by Parent: (a) each Parent SEC Report complied in all material respects with the applicable requirements of the Securities Act and the rules and regulations promulgated thereunder or the Exchange Act and the rules and regulations promulgated thereunder (as the case may be), and (b) none of the Parent SEC Reports contained any untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary in order to make the statements made therein, in light of the circumstances under which they were made, not misleading.
>
> * * *
>
> 5.11 **Financial Statements**. Parent's financial statements set forth in the Parent SEC Reports filed since March 31, 2018 (the "Parent Financial Statements") have been prepared in accordance with GAAP (except as may be indicated in any notes thereto). Each balance sheet in the Parent Financial Statements is accurate and complete in all material respects and fairly presents in all material respects the financial condition of Parent as of its respective date. Each statement of income and cash flows in the Parent Financial Statements is accurate and complete in all material respects and fairly presents in all material respects the results of operations

and cash flows, respectively, of the Parent for the periods covered thereby. Notwithstanding the foregoing, the interim Parent Financial Statements (i.e., Parent Financial Statement as of a period other than a fiscal year-end) are subject to customary year-end adjustments and lack footnotes. Parent maintains a system of internal account controls and procedures designed to record transactions as reasonably necessary to permit the preparation of its financial statements in conformity with GAAP.

5.12 **No Undisclosed Liabilities**. Parent has no Liabilities of the type required by GAAP to be reflected or reserved against in the Parent Financial Statements, except (a) as expressly reflected or reserved against in the Parent Financial Statements, and (b) for Liabilities incurred in the ordinary course of business since March 31, 2018.

\* \* \*

9.2 **Conditions to Obligations of the Shareholders and the Company**. The obligations of the Company and the Shareholders to consummate the Transactions are subject to the satisfaction or waiver by the Shareholder Representative and the Company of each of the following conditions at or before Closing:

(a) . . . The other representations and warranties of the Purchaser set forth in Article 5 must be true and correct, in each case as of the Execution Date and as of the Closing Date as though made on the Closing Date, except to the extent that any representation or warranty is limited by its terms to a specific date (in which case the representation and warranty need only be true and correct on the date so specified), except for any breach of or inaccuracy in any of those representations and warranties that would not reasonably be expected to, individually or in the aggregate, result in a Parent Material Adverse Effect (in each case, disregarding all references to "Parent Material Adverse Effect," "material," "in all material respects" and similar qualifications as to materiality set forth therein).

276.     The timeline set forth above and Bristow's patent misrepresentation that the parties "mutually agreed to terminate" the Columbia Acquisition further supports an inference of Defendants' scienter.  The still-unexplained termination of the Columbia Acquisition, announced on February 11, 2019, was directly connected to Bristow's disclosure, the same day, of long-standing covenant violations, controls weaknesses, and financial misstatements.  The unexplained delay in the Columbia Acquisition that Bristow disclosed on December 10, 2018 – notwithstanding Bristow having already secured both consent and financing for the Columbia Acquisition – and the Columbia Acquisition's unexplained termination are, most plausibly, likewise connected to

Bristow's covenant violations, controls weaknesses, and financial misstatements, and indicates Defendants' scienter concerning these matters as of no later than December 10, 2018 onwards. Moreover, the clear falsity of Miller's and Bristow's attempt to exculpate themselves from the consequences of Bristow's control-deficiency disclosure and violation of the Collateral/Maintenance Covenants by claiming the Columbia Acquisition was terminated by "mutual agreement" – rather than because of Columbia's discovery of Bristow's control deficiency or covenant violations – is strong evidence of Miller's and Bristow's consciousness of guilt.

### E.    Defendant Baliff's Expedited Departure Supports an Inference of Scienter

277.    Scienter is further supported by Jonathan Baliff's abrupt departure from Bristow. On November 8, 2018, the Company announced the upcoming retirement of Jonathan E. Baliff as CEO and Board Member.  Bristow disclosed that Baliff was focusing on integration planning for the Columbia Helicopters acquisition.  However, on February 11, 2019, Bristow also announced that Defendant Baliff had retired as the Company's CEO and resigned from its Board of Directors, effective February 28, 2019—in essence, Baliff was afforded two-weeks notice.  However, the most logical inference is that Baliff's "gradual exit" from Bristow was accelerated following the disclosure of internal control violations and the vaguely described termination of the Columbia Helicopters Acquisition.

## X.    CLASS ACTION ALLEGATIONS

278.    Lead Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and 23(b)(3) on behalf of a class consisting of all persons and entities that acquired the common stock of Bristow during the Class Period, seeking to pursue remedies under the Exchange Act (the "Class").  Excluded from the Class are Defendants; the officers and directors of the Company, at all relevant times; members of their immediate families and their legal representatives, heirs, successors, or assigns; and any entity in which any of the Defendants have or had a controlling interest.

279.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Bristow stock was actively traded on the New York Stock Exchange ("NYSE").  While the exact number of Class members is unknown to Lead Plaintiffs at this time and can only be ascertained through appropriate discovery, Lead Plaintiffs believe that there are hundreds or thousands of members in the proposed Class.  Millions of Bristow shares were traded publicly during the Class Period on the NYSE.  As of May 18, 2018, the Company had 35,649,881 shares outstanding, and during the Class Period, average daily trading volume in Bristow shares was approximately 769,840 shares per day.  Record owners and other members of the Class may be identified from records maintained by Bristow or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

280.    Lead Plaintiffs' claims are typical of the claims of Class members, who were all similarly affected by the Defendants' wrongful conduct and violations of federal securities laws complained of herein.  Further, Lead Plaintiffs will fairly and adequately protect the interests of Class members and have retained counsel competent and experienced in class and securities litigation.

281.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

a.    whether the federal securities laws were violated by Defendants' conduct alleged herein;

b.    whether statements made by Defendants to the investing public during the Class Period omitted or misrepresented material facts about Bristow's internal controls, debt levels, liquidity, financial condition and prospects, and/or viability as a going concern;

c.    whether Defendants acted with scienter; and

d.      to what extent Class members have sustained damages and the proper measure of

damages.

282.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy because joinder of all members is impracticable and because common issues of law and fact predominate over any individual issues.  Further, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for many of the Class members to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## XI.    APPLICABILITY OF THE FRAUD-ON-THE-MARKET AND *AFFILIATED UTE* PRESUMPTIONS OF RELIANCE

283.    The market for Bristow common stock was open, well-developed, and efficient at all relevant times.  As a result of Defendants' materially false or misleading statements and material omissions, the Company's stock traded at artificially inflated prices during the Class Period, and closed at a Class Period high of $18.72 per share on May 17, 2018.  Lead Plaintiffs and other members of the Class purchased or otherwise acquired the Company's shares relying on the integrity of the market price of such securities and on publicly available market information relating to Bristow, and have been damaged thereby.

284.    During the Class Period, the artificial inflation of the value of Bristow's shares was caused by the material misrepresentations and omissions alleged in this Complaint, thereby causing the damages sustained by Lead Plaintiffs and other Class members.  As alleged herein, during the Class Period, Defendants made or caused to be made a series of materially false or misleading statements about the Company's business, financial condition and prospects, causing the price of the Company's stock to be artificially inflated at all relevant times.  When the truth was disclosed, it drove down the value of the Company's stock, causing Lead Plaintiffs and other Class members that had purchased the stock at artificially inflated prices to be damaged as a result.

285.     At all relevant times, the market for Bristow stock was efficient for the following reasons, among others:

a.     Bristow's stock met the requirements for listing, and it was listed and actively traded, on the NYSE, a highly efficient market;

b.     Bristow had 35,649,881 shares of common stock outstanding (as of May 18, 2018) and, during the Class Period, an average daily trading volume of 769,840 shares per day;

c.     As a regulated issuer, Bristow filed periodic public reports with the SEC and the NYSE;

d.     Bristow regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

e.     Bristow was followed by securities analysts employed by brokerage firms, including, *inter alia*, (1) William Thompson, of Barclays Bank PLC (2) James West, of Evercore ISI, and (3) James Wicklund, of Credit Suisse Securities (USA) LLC, who wrote reports about the Company that were distributed to the sales force and certain customers of their respective brokerage firms and made publicly available.

286.     Based on the foregoing, during the Class Period, the market for Bristow stock promptly digested information regarding the Company from all publicly available sources and impounded such information into the price of Bristow stock.  This is further and concretely evidenced by the market reactions to Bristow's February 11, 2019 and April 15, 2019 announcements and disclosures.  *See* Sections VI.A-B and VIII, *supra*.  Under these circumstances, the market for Bristow stock was efficient during the Class Period and, therefore,

investors' purchases of Bristow stock at artificially inflated market prices give rise to a class-wide presumption of reliance under the fraud-on-the-market doctrine.

287.     In the alternative, the *Affiliated Ute* presumption of reliance applies to the extent that Defendants' statements during the Class Period involved omissions of material facts.

## XII.   NO SAFE HARBOR

288.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the statements alleged to be false or misleading herein that relate to then-existing facts and conditions, nor does it apply to any material omissions alleged herein.  To the extent that statements alleged to be false or misleading are characterized as forward-looking, the statutory safe harbor does not apply to such statements because they were not sufficiently identified as "forward-looking statements" when made, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statements, and Defendants had actual knowledge that the forward-looking statements were materially false or misleading at the time each such statement was made.

## XIII.   CAUSES OF ACTION

### FIRST COUNT
### Violation of Section 10(b) of The Exchange Act and
### Rule 10b-5 Promulgated Thereunder Against All Defendants

289.     Lead Plaintiffs repeat and reallege each and every allegation set forth above as if fully set forth herein.  This claim is asserted against all Defendants.

290.     During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Lead Plaintiffs and other Class members, as alleged herein; and (ii) cause Lead Plaintiffs and other members of the Class to purchase Bristow stock at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

291.    Defendants: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of Bristow's common stock in an effort to maintain artificially high market prices for Bristow's stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5.  All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

292.    Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Bristow's internal controls, debt levels, liquidity, financial condition and viability as a going concern, as specified herein.

293.    Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse nonpublic information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Bristow's financial condition and prospects, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements about Bristow and its financial condition and prospects, in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of Bristow stock during the Class Period.

294.    Each of Defendants' primary liability, and controlling person liability, arises from the following facts: (i) Defendants were high level executives and/or directors at the Company during the Class Period, and members of the Company's senior management team or had control thereof; (ii) each of these Defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of

these Defendants enjoyed significant personal contact and familiarity with the other Defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these Defendants was aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

295.    Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Bristow's financial condition and prospects from the investing public and supporting the artificially inflated price of its common stock.  As demonstrated by Defendants' misstatements throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

296.    As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of Bristow stock was artificially inflated during the Class Period.  In ignorance of the fact that market prices of the Company's shares of common stock were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the shares traded, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Lead Plaintiffs and the other members of the Class acquired Bristow stock during the Class Period at artificially high prices and were damaged thereby.

297.    At the time of said misrepresentations and/or omissions, Lead Plaintiffs and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Lead

Plaintiffs and the other members of the Class and the marketplace known the truth concerning Bristow's internal controls, debt levels, liquidity, financial condition and/or viability as a going concern, which were not disclosed by Defendants, Lead Plaintiffs and other members of the Class would not have purchased or otherwise acquired their Bristow stock, or, if they had acquired such shares during the Class Period, they would not have done so at the artificially inflated prices which they paid.

298.     By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

299.     As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's common stock during the Class Period.

## SECOND COUNT
### Violation of Section 20(a) of the Exchange Act
#### Against All Defendants

300.     Lead Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

301.     Defendants acted as controlling persons of Bristow within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false statements filed by the Company with the SEC and disseminated to the investing public, Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Lead Plaintiffs contend are false and misleading.  Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Lead Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

302.     In particular, each of the Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular actions giving rise to the securities violations as alleged herein, and exercised the same.

303.     As set forth above, each of the Defendants – and the Company although it was not named as a defendant in this Action due to the Bankruptcy – violated Section 10(b) and Rule 10b-5 by their acts and/or omissions as alleged in this Complaint.   By virtue of their positions as controlling persons of the Company, the Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

## XIV.  PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiffs pray for relief and judgment, as follows:

(a)     Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b)     Awarding compensatory damages in favor of Lead Plaintiffs and all other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)     Awarding Lead Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)     Such other and further relief as the Court may deem just and proper.

## XV.  JURY TRIAL DEMANDED

Lead Plaintiffs hereby demand a trial by jury.

Dated: November 4, 2019

**SUSMAN GODFREY LLP**

/s/ *Barry Barnett*

Barry Barnett
Texas Bar No. 01778700
S.D. Tex. Bar No. 02607
Attorney-in-Charge
SUSMAN GODFREY L.L.P.
1000 Louisiana, Suite 5100
Houston, TX 77002-5096
Telephone: (713) 651-9366
Facsimile: (713) 654-6666
bbarnett@susmangodfrey.com

Of Counsel:

Michael C. Kelso
Texas Bar No. 24092617
S.D. Tex. Bar No. 3394505
SUSMAN GODFREY L.L.P.
1000 Louisiana, Suite 5100
Houston, TX 77002-5096
Telephone: (713) 651-9366
Facsimile: (713) 654-6666
mkelso@susmangodfrey.com

Ira M. Press (admitted *pro hac vice*)
Thomas W. Elrod (admitted *pro hac vice*)
KIRBY McINERNEY LLP
250 Park Avenue, Suite 820
New York, NY 10177
Telephone: (212) 371-6600
Facsimile: (212) 751-2540
ipress@kmllp.com
telrod@kmllp.com

*Counsel for Lead Plaintiffs and the Proposed
Plaintiff Class*