**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| IN RE BRISTOW GROUP INC. SECURITIES LITIGATION | Case No.: 4:19-cv-00509 (KPE) |

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................... ii

TABLE OF ABBREVIATIONS AND DEFINED TERMS ........................................................ vii

PRELIMINARY STATEMENT .............................................................................................. 1

NATURE AND STAGE OF PROCEEDING ............................................................................. 5

STATEMENT OF THE ISSUES .............................................................................................. 5

ARGUMENT ........................................................................................................................ 6

I.      Plaintiffs Plausibly Allege that Defendants Falsely Represented Bristow's Internal
        Controls, Secured Financing Agreements, and Liquidity ...................................... 6

        A.      Plaintiffs Sufficiently Allege that Defendants Falsely Understated Bristow's
                Short-Term Debts by $1.4 Billion ............................................................. 9

        B.      Plaintiffs Plausibly Allege that Defendants' Statements Touting Bristow's
                Secured Debt Agreements and Liquidity Profile Were Materially Misleading.... 11

II.     Defendants' Arguments that Certain Ancillary False Representations Mentioned in
        the CAC Were Immaterial Fails as a Matter of Law ........................................... 12

III.    The CAC Adequately Alleges Scienter ............................................................... 14

        A.      Plaintiffs Plausibly Allege Miller & Baliff's Actual Knowledge of the
                Terms of the Covenants ......................................................................... 15

        B.      Miller & Baliff Personally and Repeatedly Conducted the Same
                "Assessment" that Supposedly Ultimately Revealed Bristow's Control
                Deficiency ............................................................................................. 19

        C.      Plaintiffs' Allegations Provide Multiple Potential Motives for Fraud.................. 21

                1.      Defendants' Motive to Cover-up Bristow's Internal Control
                        Weaknesses ................................................................................ 21

                2.      Miller's False Explanation About the Reason the Columbia
                        Acquisition Fell Apart Is Strong Evidence of Scienter............................ 24

IV.     The CAC Adequately Alleges Control Person Liability.................................................. 25

CONCLUSION.................................................................................................................... 25

i

## TABLE OF AUTHORITIES

**Cases**                                                                                          **Page(s)**

*Abrams v. Baker Hughes Inc.*,
292 F.3d 424 (5th Cir. 2002) ................................................................................... 18

*In re Adams Golf, Inc. Sec. Litig.*,
381 F.3d 267 (3d Cir. 2004)..................................................................................... 11

*In re Akorn, Inc. Sec. Litig.*,
240 F. Supp. 3d 802 (N.D. Ill. 2017) ......................................................................... 7

*Alaska Elec. Pension Fund v. Pharmacia Corp.*,
554 F.3d 342 (3d Cir. 2009)....................................................................................... 7

*In re ArthroCare Corp. Sec. Litig.*,
726 F. Supp. 2d 696 (W.D. Tex. 2010)..................................................................... 11

*Bach v. Amedisys, Inc.*,
10-cv-395, 2016 WL 4443177 (M.D. La. Aug. 19, 2016)........................................ 17

*Barrie v. Intervoice-Brite, Inc.*,
397 F.3d 249 (5th Cir. 2005) ................................................................................. 8, 10

*Berson v. Applied Signal Tech., Inc.*,
527 F.3d 982 (9th Cir. 2008) ................................................................................... 20

*In re BISYS Sec. Litig.*,
397 F. Supp. 2d 430 (S.D.N.Y. 2005)........................................................................ 7

*In re BP p.l.c. Sec. Litig.*,
843 F. Supp. 2d 712 (S.D. Tex. 2012) ........................................... 8, 16, 17, 20, 21

*Brody v. Transitional Hosps. Corp.*,
280 F.3d 997 (9th Cir. 2002) ................................................................................... 11

*Carlton v. Cannon*,
184 F. Supp. 3d 428 (S.D. Tex. 2016) ..................................................................... 14

*Church of Scientology Flag Serv. Org., Inc. v. City of Clearwater*,
2 F.3d 1514 (11th Cir. 1993) ................................................................................... 11

*City of Philadelphia v. Fleming Cos., Inc.*,
264 F.3d 1245 (10th Cir. 2001) ............................................................................... 11

*City of Pontiac Gen. Emps' Ret. Sys. v. Dell Inc.*,
15-cv-374, 2016 WL 6075540 (W.D. Tex. Sept. 16, 2016) ................................. 8, 10

*Collmer v. U.S. Liquids, Inc.*,
268 F. Supp. 2d 718 (S.D. Tex. 2001) ..................................................................... 10

ii

*DeMarco v. DepoTech Corp.*,
  149 F. Supp. 2d 1212 (S.D. Cal. 2001)...................................................................... 10

*Dobina v. Weatherford Int'l Ltd.*,
  909 F. Supp. 2d 228 (S.D.N.Y. 2012)........................................................................ 20

*Dura Pharm., Inc. v. Broudo*,
  544 U.S. 336 (2005)...................................................................................................... 3

*Fin. Acquisition Partners LP v. Blackwell*,
  440 F.3d 278, (5th Cir. 2006) ............................................................................... 9, 10

*In re FirstEnergy Sec. Litig.*,
  316 F. Supp. 2d 581 (N.D. Ohio 2004)........................................................................ 7

*In re Fleming Companies Inc. Sec. & Derivative Litig.*,
  MDL 1530, 2004 WL 5278716 (E.D. Tex. June 16, 2004)........................................ 7

*In re Galena Biopharma, Inc. Sec. Litig.*,
  117 F. Supp. 3d 1145 (D. Or. 2015) .......................................................................... 25

*Gebhardt v. ConAgra Foods, Inc.*,
  335 F.3d 824 (8th Cir. 2003) ....................................................................................... 8

*Goldstein v. MCI WorldCom*,
  340 F.3d 238 (5th Cir. 2003) ..................................................................................... 23

*Hall v. Johnson & Johnson*,
  18-cv-1833, 2019 WL 7207491 (D.N.J. Dec. 27, 2019) ........................................... 17

*Huddleston v. Herman & MacLean*,
  640 F.2d 534 (5th Cir. 1981) ..................................................................................... 14

*Ind. Elec. Workers' Pension Trust Fund IBEW v. Shaw Group*,
  537 F.3d 527 (5th Cir. 2008) ..................................................................................... 14

*Kaltman v. Key Energy Servs., Inc.*,
  447 F. Supp. 2d 648 (W.D. Tex. 2006)........................................................................ 7

*KB Partners I, L.P. v. Pain Therapeutics, Inc.*,
  11-cv-1034, 2015 WL 7760201 (W.D. Tex. Dec. 1, 2015)....................................... 13

*In re Key Energy Servs., Inc. Sec. Litig.*,
  166 F. Supp. 3d 822 (S.D. Tex. 2016) ......................................................................... 7

*Kleinman v. Elan Corp., plc*,
  706 F.3d 145 (2d Cir. 2013)................................................................................... 7, 11

*Kurtzman v. Compaq Computer Corp.*,
  99-cv-1011, 2000 WL 34292632 (S.D. Tex. Dec. 12, 2000) .................................... 11

*Kurtzman v. Compaq Computer Corp.*,
99-cv-1011, 2002 WL 32442832 (S.D. Tex. March 30, 2002) ............................................... 18

*In re Landry's Seafood Rest., Inc.*,
99-cv-1948, 2001 WL 34115784 (S.D. Tex. Feb. 20, 2001)................................................. 10

*Lemmer v. Nu-Kote Holding, Inc.*,
98-cv-161, 2001 WL 1112577 (N.D. Tex. Sept. 6, 2001),
*aff'd,* 71 F. App'x 356 (5th Cir. 2003)...................................................................................... 23

*In re LendingClub Sec. Litig.*,
254 F. Supp. 3d 1107 (N.D. Cal. 2017) ..................................................................................... 19

*Lormand v. U.S. Unwired, Inc.*,
565 F.3d 228 (5th Cir. 2009) .................................................. 5, 6, 11, 12, 13, 14, 21

*Marcus v. J.C. Penney Co., Inc.*,
13-cv-736, 2015 WL 5766870 (E.D. Tex. Sept. 29, 2015).................................................... 14

*Matrixx Initiatives, Inc. v. Siracusano*,
562 U.S. 27 (2011)........................................................................................................................ 6

*In re MicroStrategy, Inc. Sec. Litig.*,
115 F. Supp. 2d 620 (E.D. Va. 2000) ....................................................................................... 25

*Mun. Emps.' Ret. Sys. of Mich. v. Pier 1 Imports, Inc.*,
935 F.3d 424 (5th Cir. 2019) .................................................................................................... 21

*Nathenson v. Zonagen Inc.*,
267 F.3d 400 (5th Cir. 2001) ..................................................................................................... 18

*In re Netsolve, Inc. Sec. Litig.*,
185 F. Supp. 2d 684 (W.D. Tex. 2001)................................................................................. 18, 21

*No. 84 Employer-Teamster Joint Council Pension Trust Fund v. Am. West Holding Corp.*,
320 F.3d 920 (9th Cir. 2003) ...................................................................................................... 7

*In re NTL, Inc. Sec. Litig.*,
347 F. Supp. 2d 15 (S.D.N.Y. 2004)......................................................................................... 20

*In re OCA, Inc. Sec. and Derivative Litig.*,
05-cv-2165, 2006 WL 3747560 (E.D. La. Dec. 14, 2006) ....................................................... 7

*Pension Fund Grp. v. Tempur-Pedic Int'l, Inc.*,
614 F. App'x 237 (6th Cir. 2015) .............................................................................................. 13

*In re Pfizer Inc. Sec. Litig.*,
584 F. Supp. 2d 621 (S.D.N.Y. 2008)....................................................................................... 10

*Plotkin v. IP Axess Inc.*,
    407 F.3d 690 (5th Cir. 2005) ................................................................................. 18, 21

*In re Quality Sys., Inc. Sec. Litig.*,
    865 F.3d 1130 (9th Cir. 2017) ....................................................................................... 17

*Ramirez v. Exxon Mobil Corp.*,
    334 F. Supp. 3d 832 (N.D. Tex. 2018) ........................................................ 10, 17, 20

*Rombach v. Chang*,
    355 F.3d 164 (2d Cir. 2004).......................................................................................... 14

*Rubinstein v. Collins*,
    20 F.3d 160 (5th Cir. 1994) .......................................................................................... 11

*SD3, LLC v. Black & Decker (U.S.) Inc.*,
    801 F.3d 412 (4th Cir. 2015) ........................................................................................ 25

*S.E.C. v. Guenthner*,
    395 F. Supp. 2d 835 (D. Neb. 2005).......................................................................... 10

*Semerenko v. Cendant Corp.*,
    223 F.3d 165, (3d Cir. 2000)......................................................................................... 10

*Shanawaz v. Intellipharmaceutics Int'l Inc.*,
    348 F. Supp. 3d 313 (S.D.N.Y. 2018)......................................................................... 17

*Southland Sec. Corp. v. INSpire Ins. Sols., Inc.*,
    365 F.3d 353 (5th Cir. 2004) ..................................................................................... 6, 14

*Starr v. Sony BMG Music Entm't*,
    592 F.3d 314 (2d Cir. 2010).......................................................................................... 25

*Stone v. Life Partners Holdings, Inc.*,
    26 F. Supp. 3d 575 (W.D. Tex. 2014).......................................................................... 14

*In re Superior Offshore Int'l Inc. Sec. Litig.*,
    08-cv-687, 2009 WL 82064 (S.D. Tex. Jan. 12, 2009)........................................... 6

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007)............................................................................................... 5, 6, 14

*United Food & Commercial Workers Union v. Chesapeake Energy Corp.*,
    09-cv-1114, 2013 WL 4494384 (W.D. Okla. Mar. 29, 2013),
    *aff'd sub nom. United Food & Commercial Workers Union Local 880 Pension Fund v.
    Chesapeake Energy Corp.*,
    774 F.3d 1229 (10th Cir. 2014),
    *as amended nunc pro tunc* (Nov. 12, 2014)............................................................ 8

*United States v. Turner,*
   05-cv-355, 2007 WL 1367597 (W.D. Wash. May 8, 2007) ................................................... 10

*United States v. Villarreal,*
   324 F.3d 319 (5th Cir. 2003) ............................................................................................. 25

*Washtenaw County Employees Ret. Sys. v. Avid Tech., Inc.,*
   28 F. Supp. 3d 93 (D. Mass. 2014) ..................................................................................... 19

*In re Westinghouse Sec. Litig.,*
   90 F.3d 696 (3rd Cir. 1996) ............................................................................................... 10

**Rules and Regulations**

17 C.F.R. § 240.12b-2 ............................................................................................................. 7

Fed. R. Civ. P. 15 .................................................................................................................... 25

## TABLE OF ABBREVIATIONS AND DEFINED TERMS[1]

| Term | Meaning |
| --- | --- |
| Amended 2018 10-K/A | Amended Bristow Form 10-K for the fiscal year ended March 31, 2018, filed with the SEC on June 19, 2019 |
| Baliff | Jonathan E. Baliff, Bristow's CEO, and a member of Bristow's Board, throughout the Class Period (and Bristow's President at all relevant times until November 9, 2018) |
| Bristow or the Company | Bristow Group, Inc. |
| CAC | The Consolidated Amended Class Action Complaint [ECF No. 34]. |
| CEO | Chief Executive Officer |
| CFO | Chief Financial Officer |
| Class Period | The period from February 8, 2018 through February 11, 2019 |
| Columbia | Columbia Helicopters, Inc., a helicopter services provider specializing in heavy-lift operations for military/defense customers, which Bristow agreed to acquire on or about November 9, 2018, but whose acquisition was terminated on or about February 11, 2019 |
| Columbia Acquisition | Bristow's proposed purchase of Columbia |
| Columbia SPA | The stock purchase agreement governing Bristow's proposed acquisition of Columbia |
| Covenants | The covenants in certain of Bristow's secured debt financings (the Lombard Debt. and Macquarie Debt, and PK Air Debt) and in certain of Bristow's helicopter leases (with Milestone Aviation Group) requiring, *inter alia*, that: (1) Bristow maintain, on each pledged/leased helicopter airframe, the specific pledged/leased engine(s) associated with that airframe under the relevant Secured Debt Financing agreement and/or lease; with the limited exception that (2) in the event a pledged/leased engine was removed for maintenance from a pledged/leased airframe and a non-pledged engine installed in its place (for example, a "loaner" engine provided by an original equipment manufacturer ("OEM") maintenance provider), the originally-pledged/leased engine (or another engine subject to the same pledge or lease) be returned and/or re-installed in the airframe within 180 days |
| Debt Financings | The Lombard Debt, Macquarie Debt and the PK Air Debt |

---

[1] Capitalized terms not otherwise defined in the "Table of Abbreviations and Defined Terms" or herein shall have the meanings ascribed to them in the CAC. "¶_" refers to paragraphs of the CAC.

| Term | Meaning |
| --- | --- |
| Def. Br. | Defendants' Motion to Dismiss Plaintiffs' Consolidated Amended Class Action Complaint [ECF No. 36]. |
| Defendants | Baliff and Miller |
| Ex. | Exhibit to the Declaration of Michael J. Biles in Support of Defendants' Motion to Dismiss Plaintiffs' Consolidated Amended Class Action Complaint |
| Exchange Act | The Securities Exchange Act of 1934 |
| Fiscal 2018 10-K | Bristow Form 10-K for the fiscal year ended March 31, 2018, filed with the SEC on May 23, 2018 |
| Fiscal 2019 10-K | Bristow Form 10-K for the fiscal year ended March 31, 2019, filed with the SEC on October 28, 2019 |
| GAAP | Generally Accepted Accounting Principle |
| Lombard Debt | Bristow's twin secured equipment term loans for an aggregate of $200 million from Lombard North Central Plc, a part of the Royal Bank of Scotland, which Bristow used in December 2016 and January 2017 to finance Bristow's purchase of eight (8) large helicopters required for use in connection with Bristow's U.K. SAR contract, secured by those eight helicopters and maturing in December 2023 and January 2024 |
| Macquarie Debt | Bristow's $200 million five-year secured equipment term loan from Macquarie Bank Limited, secured by 20 of Bristow's oil and gas helicopters and maturing in March 2022, which funded in March 2017 and which Bristow used to pay down its extant bank debt ($154.1 million of Bristow's term loan credit facility and $45.9 million of Bristow's term loan) |
| Miller | L. Don Miller, Bristow's CFO throughout the Class Period. After the Class Period, on February 28, 2019, Miller succeeded Baliff as Bristow's CEO and President |
| Original SEC Filings | Fiscal 2018 10-K, Q1 2019 10-Q, and Q2 2019 10-Q |
| PK Air Debt | Bristow's ~$230 million in secured equipment term loans from PK Transportation Finance Ireland Limited, secured by 24 Bristow helicopters and maturing in July 2023, which funded in September 2017 and which Bristow used to pay down its extant bank debt (including $17.0 million of Bristow's term loan credit facility, $93.7 million of Bristow's term loan and $103.0 million Bristow's revolving credit facility) |
| Plaintiffs | Court-appointed Lead Plaintiffs Andrew Abernathey, Jay Abernathey, Guy Abernathey and Meridian Investments, LLC |
| PSLRA | The Private Securities Litigation Reform Act of 1995 |

| Term | Meaning |
|---|---|
| Q1 2019 10-Q | Bristow Form 10-Q for the fiscal quarter ended June 30, 2018, filed with the SEC on August 2, 2018 |
| Q2 2019 10-Q | Bristow Form 10-Q for the fiscal quarter ended September 30, 2018, filed with the SEC on November 9, 2018 |
| Q1 2020 10-Q | Bristow Form 10-Q for the fiscal quarter ended June 30, 2019, filed with the SEC on December 27, 2019 |
| SEC | U.S. Securities and Exchange Commission |
| SOX | The Sarbanes–Oxley Act of 2002 |

**PRELIMINARY STATEMENT**

Defendants' motion is meritless and should be denied. It raises just one argument that relates to the CAC as a whole—a supposed lack of scienter—and that argument fails as a matter of law in the face of the well-pled allegations tying Defendants directly to the undisclosed material control deficiencies that lie at the heart of this case. The remainder of the motion consists of a grab-bag of erroneous falsity and materiality arguments that (at most) pick around the edges of the numerous misstatements alleged.

The motion's weakness is unsurprising given the series of events that give rise to this case: Bristow's stock price plunged nearly 40% following the Company's admission on February 11, 2019 that it "did not have adequate monitoring control processes in place related to non-financial covenants" within the Debt Financings—secured debt agreements that were admittedly essential to Bristow's continued liquidity—and that this material control deficiency may have caused Bristow to violate those covenants and to default on those critical loans. ¶¶ 174-80. On the same day, Bristow also disclosed that the Columbia Acquisition had collapsed, and that Bristow would pay a $20 million termination fee that the struggling company could ill afford. ¶ 268. Bristow's stock continued its decline the following trading day, falling another 20%. ¶ 180. Less than three months later, Bristow had filed for bankruptcy. ¶ 189.

Bristow admits that during the Class Period it falsely assured investors that its internal controls over financial reporting were "effective." ¶¶ 110-15, 138-43, 170-73. In fact, however, no internal controls even existed to monitor Covenant compliance. ¶¶ 258, 260-61.

Defendants, Bristow's most senior executives, were the architects of Bristow's strategy for raising liquidity to survive the oil and gas downturn by borrowing against its largely-unencumbered helicopter fleet through a series of Debt Financings that would allow Bristow to

raise enough cash to operate until the oil and gas market improved or until Bristow could diversify its operations through mergers and acquisitions—a strategy Miller and Baliff personally and consistently touted to investors throughout the Class Period. ¶¶ 32, 34, 54, 56-57.

The Debt Financings were secured by specific Bristow helicopters identified by serial number in the agreements. ¶¶ 6, 49, 226(f)-(g), 254. The agreements required Bristow to keep those helicopters assembled with their correct, specifically-identified engines and other key components. ¶¶ 6, 49. The Covenants ensured the value of the collateral that secured the underlying loans by (i) making sure that helicopters did not include components pledged to multiple different lenders in the event of a foreclosure; and (ii) making sure that each complete helicopter was only pledged as collateral for one loan. *Id.*

Defendants were also admittedly responsible for Bristow's quarterly assessments of its internal controls. ¶¶ 249-53. Miller and Baliff repeatedly represented to investors throughout the Class Period that, as required by SOX, they had evaluated the effectiveness of Bristow's internal controls and determined that such controls were "designed … to provide reasonable assurance regarding the reliability of financial reporting" and were "effective." ¶¶ 110-15, 138-43, 170-73, 251-53. Bristow later admitted those representations were false—in reality, Bristow had no process in place to monitor its compliance with the Covenants in the loan agreements that accounted for nearly half of Bristow's outstanding long-term debt and that Defendants had repeatedly told investors were essential to Bristow's continued liquidity. ¶¶ 256-62.

Plaintiffs' securities-fraud claims center on those admitted misstatements, the revelation of which triggered a 60% plunge in Bristow's stock [¶¶ 180, 217-18][2] and propelled Bristow into a

---

[2] Defendants point out intra-class period stock price declines [Def. Br. at 5]. However, Plaintiffs' theory of liability (and damages) is cabined to losses arising from corrective disclosures occurring at the end of the Class Period. *See*

downward spiral that ended in bankruptcy less than three months later [¶¶ 212, 219].

In the face of the admitted falsity of Defendants' Class Period statements regarding Bristow's internal controls, the instant motion raises just one challenge to their actionability: a supposed lack of scienter.  Def. Br. at 9-16.  That argument is meritless.  *See* Section III, *infra*. Plaintiffs allege specific facts establishing that Miller and Baliff were extensively involved in negotiating the secured debt agreements and repeatedly touted those agreements (and their supposed impact on improving Bristow's liquidity) to investors, all while knowledgably answering investor questions about the agreements' specific status and terms.  *See* Section III.A-B, *infra*. Indeed, Defendant Miller demonstrated his intimate familiarity with the subject matter of the alleged omissions by personally telling analysts of the specific models of helicopters secured by Bristow's debt agreements, that the agreements identified those helicopters as collateral by "***serial numbers***" [¶¶ 6, 49, 226(f), 254], and assuring that Bristow was "***well within all of our covenants***[.]"  *See* ¶ 226(g).

Further, Plaintiffs cite specific, Class Period admissions that Defendants were personally involved in overseeing and participating in Bristow's quarterly assessments of its internal controls over financial reporting.  *See* ¶¶ 249-53, Section III.B, *infra*.  Bristow later admitted that that THE Company in fact had ***no*** process in place during the Class Period for monitoring its compliance with its loan agreements, including the secured debt agreements that accounted for nearly half of Bristow's long-term debt and that Miller and Baliff regularly marketed to investors as key to Bristow's liquidity—a fact which Plaintiffs plausibly allege Miller and Baliff's personally-conducted quarterly reviews of Bristow's financial controls would have revealed.  ¶¶ 256-60.

---

¶¶ 220-21; *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 346-47 (2005).  Tellingly, Defendants *do not* challenge the pleading of loss causation in their opening brief.

Plaintiffs' allegations suffice to raise a "cogent and compelling" inference of scienter.  Defendants do not even attempt to offer any explanation or theory as to why their earlier assessments of Bristow's internal controls failed to identify the material weakness to which Bristow ultimately admitted.

Defendants' motion also challenges the element of falsity, but only as to one alleged misstatement in the CAC: after the Class Period, Bristow amended its Class Period SEC filings to retroactively reclassify all $1.4 billion of its supposedly long-term debt as short-term.  Plaintiffs allege that this massive debt reclassification was triggered by Bristow's violation of the Covenants in its Debt Financings, violations Bristow admits occurred during the Class Period.  ¶¶ 176-80. Defendants argue instead that the reclassification was triggered by a "technical accounting rule" that required Bristow to reclassify its debt *during* the Class Period based on its disclosure of a "going concern" risk [Def. Br. at 8]—even though that disclosure only happened *after* the time period for which Bristow restated its debts.  ¶¶ 203-08.  Defendants' argument raises (at most) a fact dispute, and at the motion to dismiss stage, the Court must draw the reasonable inference in Plaintiffs' favor that Bristow's retroactive reclassification of its debts *during the Class Period* was the result of the covenant violations Bristow admits occurred *during the Class Period*—and not the Defendant-favoring—and space-time bending—inference that Bristow somehow relied on "technical accounting rule[s]" to reclassify its Class Period debt based on a disclosure that Bristow concedes only occurred after the Class Period ended.  *See* Section I.B, *infra*.

Finally, Defendants challenge as legally "immaterial" what they term "a category of alleged misstatements concerning 'Bristow's liquidity and financial condition'" that Defendants allege are either "corporate puffery" or "forward-looking" and privileged under the PSLRA safe-harbor.  Def. Br. at 21-23.  They identify just four.  All four, however, are concrete statements

about Bristow's loans or liquidity situation, and none are forward looking or were accompanied by meaningful cautionary language as required to trigger the PSLRA safe harbor. *See* Section II, *infra*. The Court should deny the motion to dismiss.

## NATURE AND STAGE OF PROCEEDING

This putative securities-fraud class action was filed on February 14, 2019, against Bristow Group Inc., then-Bristow CEO Jonathan Baliff, and current Bristow CEO (and former CFO) L. Don Miller. Bristow declared bankruptcy on May 11, 2019 [ECF No. 28], and the Court appointed the BRS Investor Group as Lead Plaintiffs on May 14, 2019 [ECF No. 29]. Per the Court's scheduling order [ECF No. 33], Lead Plaintiffs filed their Consolidated Amended Class Action Complaint against Miller and Baliff (the claims against Bristow were discharged in bankruptcy) on November 4, 2019 [ECF No. 34], and Miller and Baliff moved to dismiss the complaint under Fed. R. Civ. P. 12(b)(6) on January 3, 2020 [ECF No. 36]. Plaintiffs oppose that motion to dismiss.

## STATEMENT OF THE ISSUES

1.     Whether Defendants' Class Period statements concerning Bristow's (i) internal controls, (ii) short-term debts, (iii) liquidity and financial condition, and (iv) secured financing and lease agreements were materially false and misleading? Legal Standard: "When faced with a Rule 12(b)(6) motion to dismiss a § 10(b) action, courts must, as with any motion to dismiss for failure to plead a claim on which relief can be granted, accept all factual allegations in the complaint as true" and "must also draw all reasonable inferences in the plaintiff's favor." *Lormand v. U.S. Unwired, Inc.*, 565 F.3d 228, 232 (5th Cir. 2009).

2.     Whether four alleged misstatements in the CAC that made specific representations about Bristow's then-existing liquidity were immaterial "corporate puffery" or "forward-looking" statements? Legal Standard: Same as for (1).

3.     Whether the CAC raises a strong inference of Defendants' scienter? Legal Standard: "When the allegations are accepted as true and taken collectively, would a reasonable person deem the inference of scienter at least as strong as any opposing inference?" *Tellabs, Inc. v. Makor Issues & Rights*, 551 U.S. 308, 326 (2007).

4.     Should the Court dismiss Section 20(a) claims if it upholds Section 10(b) claims and Defendants raise no other argument for their dismissal? Legal Standard: Same as for (1).

5

**ARGUMENT**

The CAC amply alleges each element for claims under Section 10(b) of the Exchange Act: (i) a false statement or omission of material fact in connection with the sale or purchase of a security; (ii) made with scienter; (iii) upon which the plaintiff relied; and (iv) that caused plaintiff's losses. *See Matrixx Initiatives, Inc. v. Siracusano*, 562 U.S. 27, 37-38 (2011); *Tellabs*, 551 U.S. at 308. The Court assesses each of these elements under "the usual contours of a Rule 12(b)(6)" analysis, except that the inference of scienter must be strong and the misleading statements must be pled with particularity, as required by the PSLRA. *Lormand*, 565 F.3d at 239; *see also In re Superior Offshore Int'l Inc. Sec. Litig.*, 08-cv-687, 2009 WL 82064, at *2 (S.D. Tex. Jan. 12, 2009) (Rule 12(b)(6) motions are "viewed with disfavor and [are] rarely granted.").

Here, Defendants only challenge one element—scienter—as to the CAC as a whole. Defendants also challenge certain particular allegedly fraudulent statements on the grounds of falsity and materiality, but those challenges only apply to those specific statements.

**I.      Plaintiffs Plausibly Allege that Defendants Falsely Represented Bristow's Internal Controls, Secured Financing Agreements, and Liquidity**

To allege falsity, the plaintiff must "specify the statements contended to be fraudulent, identify the speaker, state when and where the statements were made, and explain why the statements were fraudulent." *Southland Sec. Corp. v. INSpire Ins. Sols., Inc.*, 365 F.3d 353, 362 (5th Cir. 2004) (citations omitted). Plaintiffs adequately allege four categories of actionable misstatements, *i.e.*, those regarding Bristow's (i) internal controls, (ii) short-term debts, (iii) liquidity and financial condition, and (iv) secured financing and lease agreements.

At the outset, Defendants do not—as they cannot—dispute the falsity of their internal control statements. As the CAC alleges, Defendants touted the adequacy of the Company's internal controls, attesting, *inter alia*, that they were "designed … to provide reasonable assurance

6

regarding the reliability of financial reporting" and were "effective." ¶¶ 110-15, 138-43, 170-73, 251-53. Bristow has admitted those statements were false, and Defendants do not argue otherwise. Bristow actually had no controls in place whatsoever to monitor compliance with the Covenants of its Debt Financings, and that deficiency constituted a "material weakness" that rendered its internal controls "ineffective" during the Class Period. ¶¶ 256-62.

It is also clear that such admitted misstatements were material. Bristow admitted that the control deficiency rose to the level of a "material weakness,"[3] necessitating the restatement of its management reports on internal controls. ¶¶ 258-61, Ex. 16 at 4.[4] Shareholders also considered the disclosure of internal control weakness to be material, as evidenced by the fact that Bristow's stock price dropped by nearly 40% after Bristow disclosed its control deficiency on February 11, 2019 [¶ 180].[5] The acknowledgement of the weakness also triggered a spiral of adversity that impelled Bristow to amend the Original SEC Filings (which in turn required the Company to reclassify its debt under its secured financing and lease agreements from long-term to short-term) and led to Bristow's "going concern" warning and bankruptcy three months later. ¶¶ 176-89.

---

[3] *In re Key Energy Servs., Inc. Sec. Litig.*, 166 F. Supp. 3d 822, 868 (S.D. Tex. 2016) ("'Material weakness' in a company's internal controls is a term of art in accounting that means 'a deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the registrant's annual or interim financial statements will not be prevented or detected on a timely basis.'") (quoting 17 C.F.R. § 240.12b-2).

[4] *See In re Fleming Companies Inc. Sec. & Derivative Litig.*, MDL 1530, 2004 WL 5278716, at *25 (E.D. Tex. June 16, 2004) (a restatement "constitutes an admission that the information contained in the public filings is false"); *Kaltman v. Key Energy Servs., Inc.*, 447 F. Supp. 2d 648, 658 (W.D. Tex. 2006) (company's "announcement of the need to restate its earnings constitutes an admission that its public filings are false"); *In re Akorn, Inc. Sec. Litig.*, 240 F. Supp. 3d 802, 815 (N.D. Ill. 2017) (restatement evidences materiality as GAAP requires restatements "only when errors are material"); *In re FirstEnergy Sec. Litig.*, 316 F. Supp. 2d 581, 594 (N.D. Ohio 2004) (similar); *In re BISYS Sec. Litig.*, 397 F. Supp. 2d 430, 437 (S.D.N.Y. 2005) (similar); *In re OCA, Inc. Sec. and Derivative Litig.*, 05-cv-2165, 2006 WL 3747560, at *12 (E.D. La. Dec. 14, 2006) (similar).

[5] *See Kleinman v. Elan Corp., plc*, 706 F.3d 145, 155 (2d Cir. 2013) ("A drop in stock price . . . tends to establish materiality, *i.e.*, whether reasonable investors would consider the information to be significant or to have altered the total mix of information affecting their investment decisions.") (citation and internal quotation marks omitted); *see also Alaska Elec. Pension Fund v. Pharmacia Corp.*, 554 F.3d 342, 352 (3d Cir. 2009); *No. 84 Employer-Teamster Joint Council Pension Trust Fund v. Am. West Holding Corp.*, 320 F.3d 920, 935 (9th Cir. 2003).

7

Without disputing the materiality of the control weakness, Defendants attempt to downplay it by suggesting that the reclassification of the debt, which occurred after the Class Period, was ultimately caused by other factors.  *See* Def. Br. at 7-8; Section I.A, *infra*.  However, putting aside that this claim raises a factual dispute that cannot be resolved at the pleading stage,[6] materiality is "judged at the time of the alleged misrepresentation" and not on how events later unfolded.  *In re BP p.l.c. Sec. Litig.*, 843 F. Supp. 2d 712, 775 (S.D. Tex. 2012).  A defendant cannot rely on an *ex post* perspective to disprove materiality just as a plaintiff cannot rely on hindsight to establish it.[7] Here, Defendants do not dispute that the CAC sufficiently alleges that the control weakness was material *ex ante*.  Indeed, Bristow admitted to the *ex ante* materiality of the control weakness on February 11, 2019, when it stated that, due thereto, the Company was "evaluating" whether "[the weakness] resulted in a misstatement in the Company's financial statements[,]" including, specifically, whether "certain debt balances should be reclassified from long-term to short-term in those financial statements … and the resulting impact on the assessment of the Company's ability to continue as a going concern."  ¶¶ 177-78.

Critically, because Bristow admitted the material falsity of Defendants' Class Period internal control statements and Defendants' sole argument against the actionability of such statements (scienter) fails as a matter of law (*see* Section III, *infra*), Defendants' falsity and materiality arguments with respect to their other alleged misstatements potentially affect only the *scope* of the claims at issue.

---

[6] *See Barrie v. Intervoice-Brite, Inc.*, 397 F.3d 249, 257-58 (5th Cir. 2005) ("The strong-inference pleading standard does not license us to resolve disputed facts at this stage of the case.") (citation omitted); *City of Pontiac Gen. Emps' Ret. Sys. v. Dell Inc.*, 15-cv-374, 2016 WL 6075540, at *4 (W.D. Tex. Sept. 16, 2016) ("fact-based" arguments "are insufficient to support a motion to dismiss").

[7] *See generally Gebhardt v. ConAgra Foods, Inc.*, 335 F.3d 824, 830-31 (8th Cir. 2003); *United Food & Commercial Workers Union v. Chesapeake Energy Corp.*, 09-cv-1114, 2013 WL 4494384, at *9 (W.D. Okla. Mar. 29, 2013), *aff'd sub nom. United Food & Commercial Workers Union Local 880 Pension Fund v. Chesapeake Energy Corp.*, 774 F.3d 1229 (10th Cir. 2014), *as amended nunc pro tunc* (Nov. 12, 2014).

**A.     Plaintiffs Sufficiently Allege that Defendants Falsely Understated Bristow's Short-Term Debts by $1.4 Billion**

Plaintiffs adequately allege that Bristow falsely represented its short-term debt as $329.2 million when in reality, due to Bristow's violations of the Covenants in the Debt Financings, Bristow's short-term debts totaled $1.7 billion. ¶¶ 83-84, 98-99, 117-18, 130-31, 149-50, 162-63. Bristow amended its Original SEC Filings to retroactively revise its short-term debts—effectively admitting that Bristow's Class Period representations were false. *See* n. 4, *supra*; ¶¶ 195-96.

Defendants argue that Bristow's debt reclassification does not demonstrate that its Original SEC filings were false because the reclassification "only occurred because *a technical accounting rule* required a twelve-month look-forward period for a going concern analysis from the date of the amended filings." Def. Br. at 8 (emphasis added); *see also id.* at 17.  According to Defendants, "applicable accounting rules required the Company to make an updated assessment as of the filing date of this Amendment No. 1 [*i.e.*, June 19, 2019] of whether there are conditions and events, considered in the aggregate, that raise 'substantial doubt about the Company's ability to continue as a going concern . . . during the twelve months from the date of filing of this Amendment No. 1'" and that "Bristow's restated financials are not an admission that the original financials were false because the Company's going concern analysis was based on facts existing on June 19, 2019—not on facts existing when the original financials were filed." Def. Br. at 17-18.

Defendants' unsupported attorney-argument as to what "technical accounting rules" require necessitates expert testimony that cannot be resolved at the motion to dismiss stage. *See Fin. Acquisition Partners LP v. Blackwell*, 440 F.3d 278, 285-86 (5th Cir. 2006) (affirming refusal to consider expert affidavit on 12(b)(6) motion because to do so would "require[] a court to 'confront a myriad of complex evidentiary issues not generally capable of resolution at the pleading stage'" and to "consider[] such opinions might require ruling on the expert's

9

qualifications" which "would be inappropriate at the pleading stage.") (*citing DeMarco v. DepoTech Corp.*, 149 F. Supp. 2d 1212, 1221 (S.D. Cal. 2001)).[8]

Indeed, Defendants' entire argument as to what caused the reclassification merely raises a fact dispute that must be resolved in Plaintiffs' favor at the motion to dismiss stage. *See Barrie v. Intervoice-Brite, Inc.*, 397 F.3d at 257-58; *Dell*, 2016 WL 6075540, at *4. For example, given that the control weakness violated terms of the Columbia SPA [¶¶ 266-76], and that agreement's termination was disclosed at the same time as the control weakness [¶ 268], "it is reasonable to conclude that the disclosure of the falsity of the alleged misrepresentations [relating to the control weakness] played a substantial factor in the termination of the merger agreement," *Semerenko v. Cendant Corp.*, 223 F.3d 165, 187 (3d Cir. 2000), contrary to Defendants' *post hoc* narrative. In that Defendants concede that the termination of the acquisition agreement was a factor that led to the debt reclassification, *see* Def. Br. at 7-8, the control weakness was thus a cause of the debt reclassification even if the covenant violations were all cured or waived and not a factor as Defendants contend.[9]

Further, Defendants' argument is legally irrelevant. Even if the original classification of

---

[8] *See Ramirez v. Exxon Mobil Corp.*, 334 F. Supp. 3d 832 (N.D. Tex. 2018) (refusing to consider expert declaration because "the Court would have to consider complex evidentiary issues that are inappropriate at the motion to dismiss stage") (citing *Blackwell,* 440 F.3d at 285-86); *Collmer v. U.S. Liquids, Inc.*, 268 F. Supp. 2d 718, 741 (S.D. Tex. 2001) ("whether the defendant's accounting practices were consistent with GAAP is a factual question that requires expert testimony"); *In re Landry's Seafood Rest., Inc.*, 99-cv-1948, 2001 WL 34115784, at *22 (S.D. Tex. Feb. 20, 2001) (same); *In re Westinghouse Sec. Litig.*, 90 F.3d 696, 709 n. 9 (3rd Cir. 1996) (same); *United States v. Turner*, 05-cv-355, 2007 WL 1367597, at *1 (W.D. Wash. May 8, 2007) (same); *S.E.C. v. Guenthner*, 395 F. Supp. 2d 835, 846 (D. Neb. 2005) (same); *In re Pfizer Inc. Sec. Litig.*, 584 F. Supp. 2d 621, 635-36 (S.D.N.Y. 2008) (same because "[a] motion to dismiss a complaint is not an appropriate vehicle for determination as to the weight of the evidence, expert or otherwise").

[9] Defendants suggest that the covenant violations were immaterial because they supposedly were all cured or waived prior to the end of the Class Period. Def. Br. at 13. This, however, misstates the chronology. In fact, it was not until February 19, 2019—a week after the conclusion of the Class Period—that Bristow claimed that all such violations were cured or waived. ¶ 182. Moreover, the Company admitted that nine such violations were still outstanding as of December 31, 2018, which was during the Class Period. *Id.*

Bristow's debts as short-term was somehow technically correct as Defendants claim, Miller and Baliff's representations were still materially misleading given their failure to disclose Bristow's material internal control deficiencies and resulting covenant violations. ¶¶ 259-63. *See Lormand*, 565 F.3d at 248 ("the disclosure required by the securities laws is measured not by literal truth, but by the ability of the statements to accurately inform rather than mislead prospective buyers").[10]

Defendants repeatedly touted Bristow's Secured Debt Agreements to investors as critical to Bristow's liquidity, [*e.g.*, ¶¶ 92-94, 126-128, 144-45, 158-60], and thus owed a duty to tell Bristow's investors that, in reality, Bristow lacked an effective process for monitoring compliance with the Covenants, which meant that Bristow was playing roulette with its liquidity every time a helicopter went in for maintenance. *See* ¶ 187 (alleging that Bristow's control-deficiency heightened the risk that Bristow "may not be successful in complying with the covenants contained in our debt instruments and lease agreements" and would have to "reclassify certain debt from long-term to short-term"). Defendants' failure to disclose this critical information made their representations materially misleading even if they were somehow technically true.[11]

### B.    Plaintiffs Plausibly Allege that Defendants' Statements Touting Bristow's Secured Debt Agreements and Liquidity Profile Were Materially Misleading

Defendants also argue that "Bristow's disclosures about its financial condition, liquidity and going concern risk" were not "materially misleading" because "Bristow disclosed its liquidity

---

[10] *See City of Philadelphia v. Fleming Cos., Inc.*, 264 F.3d 1245, 1267 (10th Cir. 2001) ("it is possible for securities fraud defendants to comply technically with SEC reporting requirements . . . and yet still be omitting information that is material and should therefore be disclosed"); *Kleinman v. Elan*, 706 F.3d at 153; *In re Adams Golf, Inc. Sec. Litig.*, 381 F.3d 267, 277-78 (3d Cir. 2004); *Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002); *Church of Scientology Flag Serv. Org., Inc. v. City of Clearwater*, 2 F.3d 1514, 1546 (11th Cir. 1993).

[11] *See Rubinstein v. Collins*, 20 F.3d 160, 170 (5th Cir. 1994) ("'a duty to speak the full truth arises when a defendant undertakes a duty to say anything'") (citation omitted); *Kurtzman v. Compaq Computer Corp.*, 99-cv-1011, 2000 WL 34292632, at *22 (S.D. Tex. Dec. 12, 2000) ("numerous times during the Class Period Defendants voluntarily chose to speak publicly and therefore had a duty to tell the whole truth"); *In re ArthroCare Corp. Sec. Litig.*, 726 F. Supp. 2d 696, 716 (W.D. Tex. 2010) (defendant "has a duty to tell the whole truth, and disclose 'material, firm-specific adverse facts that affect the validity or plausibility' of his statement") (citation omitted).

11

concerns as they arose." Def. Br. at 20. But that argument raises a classic fact dispute that must be resolved in *Plaintiffs'* favor at the motion to dismiss stage. *Lormand*, 565 F.3d at 232 ("When faced with a Rule 12(b)(6) motion to dismiss a § 10(b) action, courts must, as with any motion to dismiss for failure to plead a claim on which relief can be granted, accept all factual allegations in the complaint as true.").

Further, Defendants' argument misses the point: Miller and Baliff's repeated statements to investors touting Bristow's Debt Financings and the liquidity raised through them were materially misleading because Miller and Baliff failed to disclose Bristow's material control weaknesses that placed Bristow at significant risk (which in fact materialized) of violating the Covenants, defaulting on its debts, and eliminating the Company's liquidity. ¶¶ 11, 63, 139, 143, 171. Defendants only cite Bristow's post-Class Period statements, *i.e.*, on February 19 and April 15, 2019. Def. Br. at 19-21. This ***does not*** excuse the Class Period omissions of the control weakness and covenant violations that rendered Defendants' Class Period liquidity statements materially misleading. *Lormand*, 565 F.3d at 248-49 ("Once the defendants engaged in public discussions concerning the benefits of Type II affiliation and the no-deposit programs, they had a duty to disclose a 'mix of information' that is not misleading.").

## II. Defendants' Arguments that Certain Ancillary False Representations Mentioned in the CAC Were Immaterial Fails as a Matter of Law

Defendants challenge as "immaterial" "a category of alleged misstatements concerning 'Bristow's liquidity and financial condition,'" which they label as inactionable "corporate puffery," but they identify just two statements (out of the CAC's 303 paragraphs) that they claim qualify.[12]

---

[12] Specifically, Defendants challenge the following statements as puffery: (i) Baliff's representation to investors that "Bristow was successful in executing our fiscal 2018 STRIVE priorities, including . . . increasing financial flexibility

Defendants' argument fails as a matter of law because it ignores the numerous concrete and factual representations made in direct connection with those statements emphasizing Bristow's supposedly positive liquidity position to investors that were, in reality, materially misleading.[13] *See Lormand*, 565 F.3d at 249 n. 14 ("[w]e reject the defendants' [puffery] argument, because the plaintiff alleges concrete factual and material misrepresentations and omissions. . .").  Miller and Baliff's statements are not "corporate puffery"—they are specific factual assertions that were materially misleading because Defendants failed to disclose Bristow's control weakness and covenant violations that rendered Bristow's secured loans at heightened risk of (and, indeed, already subject to) acceleration.  ¶¶ 8, 11.

Likewise, Defendants argue that two related alleged misstatements are "forward-looking" and thus fall within the PSLRA Safe Harbor.  Def. Br. at 23.  Even if true, Defendants' argument affects only those two statements; Defendants do not dispute that the overwhelming majority of their alleged fraudulent statements were not "forward-looking" and thus are not even arguably subject to the safe harbor.  Nonetheless, Defendants' arguments as to those two statements are legally meritless.[14]  In fact, both statements are retrospective.[15]  Additionally, contrary to

---

by completing over $700 million in new low cost financings." [¶ 85]; and (ii) Baliff and Miller's statements in a Bristow investor presentation that "Our strong liquidity and operational leverage positions us well to compete today, drive further efficiencies, and capture an upturn in the offshore market, when it emerges[.]" [¶ 88]. *See* Def. Br. at 21-22.

[13] *See, e.g.*, ¶ 85 (Bristow "complet[ed] over $700 million in new low cost financings" and "materially improved our liquidity runway by repaying our 2019 bank maturities with the closing and funding of over $700 million in new low cost capital eliminating near term refinancing risk"); ¶ 88 (Bristow "eliminated near-term refinancing risk and all bank financial maintenance covenants","[f]unded over ~$700M in new capital in FY 18", and had "[l]imited debt amortization of ~$50M per year over the next three years").

[14] *KB Partners I, L.P. v. Pain Therapeutics, Inc.*, 11-cv-1034, 2015 WL 7760201, at *10 (W.D. Tex. Dec. 1, 2015) (whether a statement is forward-looking or retrospective "is governed by the nature of the statement" and not by the defendant's self-serving characterizations of it.).

[15] Defendants' representation that "[a]s we move into fiscal year 2019, we will ***continue*** to transform our business to create sustainability, defined as positive cash flow, reduced leverage and an ability to refinance FY23 maturities in absence of an offshore market recovery," [¶ 88] (emphasis added), is retrospective, because the word "continue" implied that the described activities had already occurred or were underway. *See Pension Fund Grp. v. Tempur-Pedic*

13

Defendants' arguments, neither of those two supposedly forward-looking statements was accompanied by "meaningful cautionary language," [Def. Br. at 23], as required to trigger the PSLRA's safe harbor.[16]  Defendants cite only generic and boilerplate Class Period risk disclosures issued by Bristow, [Def. Br. at 23-24], yet such disclosures were inadequate as a matter of law because they omitted the control weaknesses and covenant violations, which had already materialized.[17]  Bristow conceded the point by "supplementing" its Class Period cautionary statements two months after the Class Period through a Form 8-K to include, *inter alia*, disclosure of the previously omitted control weakness and covenant violations.  ¶¶ 187.

### III.        The CAC Adequately Alleges Scienter

"The required state of mind [for scienter] is an intent to deceive, manipulate, or defraud or severe recklessness."  *Lormand*, 565 F.3d at 251 (alteration in original) (quoting *Ind. Elec. Workers' Pension Trust Fund IBEW v. Shaw Group*, 537 F.3d 527, 533 (5th Cir. 2008)).  In conducting the "holistic" scienter inquiry, the Court must "accept all factual allegations in the complaint as true."  *Tellabs*, 551 U.S. at 322-23.  An inference of scienter is strong if the facts, taken as true, give rise to an inference of scienter that is "at least as compelling" as any inference that the defendant acted innocently.  *Tellabs*, 551 U.S. at 314. That inference, however, "need not

---

*Int'l, Inc.*, 614 F. App'x 237, 247 (6th Cir. 2015).  And Defendants' representation that "[f]iscal year 2018 was a very successful year for Bristow as we materially improved our liquidity runway by repaying our 2019 bank maturities with the closing and funding of over $700 million in new low cost capital eliminating near term refinancing risk" was also retrospective, as it consists of claims that Bristow had already constructed and "improved" its "runway" and thus had nothing to do with the future at all.  *See Carlton v. Cannon*, 184 F. Supp. 3d 428, 467-68 (S.D. Tex. 2016); *Stone v. Life Partners Holdings, Inc.*, 26 F. Supp. 3d 575, 597 (W.D. Tex. 2014).

[16] To be considered "meaningful," a cautionary statement must contain "substantive company-specific warnings based on a realistic description of the risks applicable to the particular circumstances, not merely a boilerplate litany of generally applicable risk factors."  *INSpire Ins. Sols., Inc.,* 365 F.3d at 372 (citation and internal quotation omitted).

[17] *See Marcus v. J.C. Penney Co., Inc.*, 13-cv-736, 2015 WL 5766870, at *3 (E.D. Tex. Sept. 29, 2015) ("When risks have already begun to materialize, it is no longer sufficient to generally warn of the possibility of these risks in the future.  When cautionary language is 'glossed over as a future risk . . . rather than the certain dangers that had already begun to materialize' then the warnings are no longer meaningful.") (quoting *Lormand*, 565 F.3d at 245); *see also Huddleston v. Herman & MacLean*, 640 F.2d 534, 544 (5th Cir. 1981); *Rombach v. Chang*, 355 F.3d 164, 173 (2d Cir. 2004).

be irrefutable, *i.e.*, of the 'smoking-gun' genre, or even the 'most plausible of competing inferences.'" *Id.* at 324 (citation omitted). The CAC's allegations—viewed collectively—give rise to a strong inference of scienter. Defendants' scienter arguments fail.

### A.    Plaintiffs Plausibly Allege Miller & Baliff's Actual Knowledge of the Terms of the Covenants

Plaintiffs have plausibly alleged a "strong inference of scienter" based on Miller and Baliff's demonstrated knowledge of the terms of Bristow's Secured Debt Agreements, which they repeatedly touted to investors as Bristow's "single highest strategic priority." ¶ 230.

First, Plaintiffs' allegations establish that Miller had actual knowledge of the exact helicopters used as collateral for Bristow's Debt Financings, ***and that those helicopters were specifically identified in the Debt Financings by their exact serial numbers***. ¶ 226(f).[18] In the very same investor call, Miller ***specifically assured investors: "We're well within all of our covenants and we've been able to stay ahead of that and that's very important to our financial flexibility."*** ¶ 226(g).

Miller's demonstrated familiarity with these Covenants is unsurprising, as Miller was centrally involved in "negotiating and securing Bristow's secured debt financings"—all of which include materially-identical Covenants, ¶ 46—and "Baliff and Miller were constantly aware of the

---

[18] During the February 7, 2017 conference call, Miller explained:

> <A - L. Don Miller>: …. Yeah, I would say broadly so. I mean, obviously, we move helicopters around the globe to meet various client needs. So, from time- to-time, one will come off contract and move to a different geography or whatever the case would be, but I mean what you're seeing is and ultimately this – ***when the credit agreements get filed or whatever, you'll see the fleet, but it's typically S-92s and AW139s and AW189s that are secured in these.*** So, those are really, particularly in this market, high demand.…
>
> <Q - Gregory Lewis [analyst, Credit Suisse]>: Okay. ***And are those specific aircrafts or is it – like is it a serial numbers or is it just. . .***
>
> <A - L. Don Miller>: ***Yeah, Greg, it's serial numbers. Yes, it's serial numbers.***

*Id.*

15

status and terms of those financing[]" agreements.  *See* ¶¶ 226(a)–(j), 227–29.

Further, Miller and Baliff consistently emphasized "obtaining and negotiating the Debt Financings and the liquidity runway" to Bristow investors as "***Defendants' single highest strategic priority***."  ¶ 230 (emphasis added).  Prior to and during the Class Period, Defendants consistently discussed Bristow's liquidity runway in quarterly press releases, in quarterly earnings presentations, in conferences calls, and at analyst/investor conferences.  ¶¶ 40, 230.  And Miller and Baliff repeatedly emphasized the critical importance of raising liquidity through secured debt agreements by borrowing against Bristow's then-unencumbered helicopter fleet.  *See* ¶ 226.  Indeed, Bristow's Debt Financings—all of which included the Covenants—accounted for more than 44% of Bristow's total outstanding debt.  *See* ¶ 51.

Defendants' repeated statements emphasizing the importance of the Debt Financings to Bristow's liquidity and demonstrating their detailed knowledge of the Debt Financings' terms give rise to a "cogent and compelling" inference of scienter.  This Court's decision in *In re BP p.l.c. Securities Litigation*, 843 F. Supp. 2d 712 (S.D. Tex. 2012), is directly on point.  In *BP*, the Court held that "Plaintiffs adequately allege scienter with respect to Hayward by pointing to Hayward's own admissions as to what his job as CEO entailed, including verbal commitments revealing that he took responsibility for BP's process safety efforts and was the key individual tracking that progress."  *Id.* at 782–83.  The Court further explained that "[t]hroughout his time as CEO, Hayward continued to tout BP's safety improvements, even stating in 2009 that he was 'so bored with saying 'safety, people, and performance,' but I have determined that I'm not going to say anything else.'"  *Id.* at 783.  The Court concluded "Hayward's own actions as the spokesperson and champion for BP's reform efforts weigh strongly in favor of the inference that Hayward paid special attention to BP's process safety efforts or, at the least, was reckless in not doing so while

16

continuing to publicly tout improvements." *Id.*

The same is true here.  Defendants repeatedly represented to investors that raising liquidity through secured equipment financing was Bristow's single highest strategic priority, represented that they were extensively involved in negotiating Bristow's Debt Financings, and demonstrated their deep knowledge of those agreements by regularly answering detailed analyst questions about the specifics of those agreements.  Indeed, Miller specifically identified the helicopters securing the agreements by "serial numbers" and expressly represented that Bristow was "well within all of our covenants."  ¶¶ 226(f)-(g).  Miller and Baliff's own actions "weigh strongly in favor of the inference that [they] paid special attention to" Bristow's compliance with its Secured Debt Agreements "or, at the least, w[ere] reckless in not doing so while continuing to publicly tout improvements" in Bristow's liquidity situation resulting from those agreements.  *See BP*, 843 F. Supp. 2d at 783; *Ramirez*, 334 F. Supp. 3d at 856 ("Pension Fund alleges Defendant Swiger held in-depth discussions in analyst meetings, in which he demonstrated his 'intimate awareness' of ExxonMobil's reserves, financial results, and investment and valuation process.").  In fact, courts routinely find a strong inference of scienter where an officer publicly claimed to be intimately familiar with the division or contract at issue.[19]

Defendants ignore those well-pled allegations and instead argue that "[w]hile some courts have held that executive familiarity with an issue can be inferred based on its importance to the company, no court has held that executives are severely reckless in failing to understand the

---

[19] *See, e.g.*, *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1145 (9th Cir. 2017) (inference of scienter supported by repeated public statements about sales pipeline and performance contradicting private awareness); *Bach v. Amedisys, Inc.*, 10-cv-395, 2016 WL 4443177, at *13 (M.D. La. Aug. 19, 2016) (inference of scienter supported by public statements of compliance); *Hall v. Johnson & Johnson*, 18-cv-1833, 2019 WL 7207491, at *23 (D.N.J. Dec. 27, 2019) (inference of scienter supported by public statement of product safety contrary to officers' private awareness); *Shanawaz v. Intellipharmaceutics Int'l Inc.*, 348 F. Supp. 3d 313, 325-26 (S.D.N.Y. 2018) (inference of scienter supported where defendants "publicly represent[ed] that [company's new drug application] in fact included other types of studies that it did not in fact contain").

17

complicated minutiae of individual non-financial loan covenants," and "[c]ourts have repeatedly held that 'a pleading of scienter may not rest on the inference that defendants must have been aware of the misstatement based on their positions within the company.'"  Def. Br. at 11 (quoting *Abrams v. Baker Hughes Inc.*, 292 F.3d 424, 432 (5th Cir. 2002)).  Nonsense.  Plaintiffs are not arguing that Defendants' "familiarity" with the terms of the Debt Financings can be inferred solely from the agreements' "importance to the company" or based on Defendants' "positions within the company."  Instead, Plaintiffs pled facts exhaustively demonstrating Miller and Baliff's ***admitted***, ***actual*** familiarity with those agreements and extensive efforts to promote those agreements (and the liquidity they raised) to Bristow investors.[20]

Moreover, the strong inference of scienter is also bolstered by the fact that Defendants, as senior officers of Bristow, are deemed to have knowledge of Bristow's core operations.  That is because "knowledge of core business matters can be inferred to the officers and directors of a company."  *Kurtzman v. Compaq Computer Corp.*, 99-cv-1011, 2002 WL 32442832, *11 (S.D. Tex. March 30, 2002) (citation omitted).  Indeed, material misstatements of a company's significant financial facts can bolster other allegations of knowledge or severe recklessness.  *See Plotkin v. IP Axess Inc.*, 407 F.3d 690, 699-700 (5th Cir. 2005) ("It is reasonable to assume, given the importance of these deals to the company, that Ipaxess would have familiarized itself with the financial condition of Lynxus/AGNI . . . .").[21]

---

[20] Additionally, referring to the Covenants as "minutiae" of Bristow's Secured Financing Agreements is as absurd as referring to a mortgage as "minutiae" of a home equity loan.

[21] *See also Nathenson v. Zonagen Inc.*, 267 F.3d 400, 425 (5th Cir. 2001) (scienter adequately pleaded where statements concerned a product that was "obviously important" and about which CEO had "ample opportunity to become familiar"); *In re Netsolve, Inc. Sec. Litig.*, 185 F. Supp. 2d 684, 697 (W.D. Tex. 2001) (declining sales to "primary customer" that "was the lifeblood of the company" "would have been 'so obvious that the defendant[s] must have been aware of it'") (citation omitted).

### B.   Miller & Baliff Personally and Repeatedly Conducted the Same "Assessment" that Supposedly Ultimately Revealed Bristow's Control Deficiency

Defendants' personal involvement in Bristow's quarterly assessments of its internal controls during the Class Period further supports a "cogent and compelling" inference of scienter. In every quarter during the Class Period, as required by SOX, Bristow conducted identical assessments of its internal controls "*under the supervision of and with the participation of* our management, including *Jonathan E. Baliff, our Chief Executive Officer ('CEO') and L. Don Miller, our Chief Financial Officer ('CFO')*." ¶ 252.[22] In every single securities filing during the Class Period, Defendants attested that they evaluated those controls and concluded that they were "designed … to provide reasonable assurance regarding the reliability of financial reporting" and "effective." ¶¶ 110-15, 138-43, 170-73, 251-53.

Those representations were false. Bristow had a material weakness in its internal controls over financial reporting each time it falsely told its investors those controls were "effective." That is itself evidence of scienter. *See Washtenaw County Employees Ret. Sys. v. Avid Tech., Inc.*, 28 F. Supp. 3d 93, 114 (D. Mass. 2014) ("systemic failure to maintain adequate internal controls" supported scienter).

More directly, Defendants' personal involvement in Bristow's assessments of its internal controls strongly supports an inference of scienter here. Bristow's own self-serving explanation for its February 11, 2019 corrective disclosure was that Bristow discovered its material weakness in its internal controls *through the very same* "assessment of the effectiveness of [its] internal control over financial reporting" that Baliff and Miller had previously admitted they repeatedly

---

[22] *See In re LendingClub Sec. Litig.*, 254 F. Supp. 3d 1107, 1122 (N.D. Cal. 2017) ("Internal controls over financial reporting fell squarely within [CFO's] oversight. And [company's] admission that material weaknesses . . . existed ... suggests it would be 'absurd' for CFO [] to have been blind to these weaknesses and improprieties when the company assured investors its controls performed adequately and effectively.") (emphasis omitted).

"participat[ed]" in and "supervis[ed]" throughout the Class Period.  ¶ 256.  Bristow stated: "In connection with the preparation of annual and quarterly financial statements, the Company's management is responsible for evaluating its disclosure controls and procedures. . . .  ***As part of management's assessment of the Company's internal controls over financial reporting as of December 31, 2018***, a control deficiency was identified by the Company related to the Company's processes for monitoring compliance with certain non-financial covenants in certain of the Company's secured financing and lease agreements."  *Id*.  Accordingly, a strong inference of scienter is also raised by Bristow's admission that it became aware of the Covenant violations as early as the three months ended December 31, 2018.  ¶ 187.[23]

Bristow's claim that it discovered its control deficiency through the exact same "assessment" that Miller and Baliff personally "supervised" and "participated in" every quarter during the Class Period make it "at least as strong as any opposing inference" to conclude that those prior assessments also revealed that same control deficiency that Bristow admits was present during each of Miller and Baliff's prior assessments.  *See BP*, 843 F. Supp. 2d at 783.[24]

That inference is strengthened by the post-Class Period admission that Bristow previously did not effectively monitor its compliance with the Covenants.  Bristow's Amended 2018 10-K/A (which addressed the control deficiency) stated Bristow "will continue the implementation of our remediation plan ***by establishing a debt and lease compliance program*** with the specific objective

---

[23] *See Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 984, 987-88 & n. 5 (9th Cir. 2008) (inferring scienter from knowledge of stop-work orders on contracts totaling tens of millions of dollars, which defendants admitted having knowledge of shortly after alleged misstatements were made); *In re NTL, Inc. Sec. Litig.*, 347 F. Supp. 2d 15, 33 (S.D.N.Y. 2004) ("The allegation of scienter is certainly sufficient for defendant Knapp, as he admitted his knowledge" that the company had become cash flow negative.).

[24] *See also Ramirez*, 334 F. Supp. 3d at 853 ("These specific allegations of receiving regular, detailed information on carbon related risks and proxy costs as members of the Management Committee provide more than mere conclusory allegations that Defendants Tillerson and Swinger must have had knowledge based on their executive positions within ExxonMobil."); *see also Dobina v. Weatherford Int'l Ltd.*, 909 F. Supp. 2d 228, 246 (S.D.N.Y. 2012) (inference of scienter supported by certification of and ongoing participation in internal control evaluations).

20

of creating a sustainable and executable compliance process that can be repeated on a recurring basis to ensure timely monitoring of compliance with covenants and provisions." ¶ 260. Not 'improving,' not 'revising,' not 'amending,' not 'strengthening'—"*establishing*."

If Defendants did not have actual knowledge of Bristow's lack of an effective "program" for assuring "debt and lease compliance" with the Secured Financing Agreements that were Bristow's "single highest strategic priority" when they falsely told investors that Bristow's internal controls were "effective," then their conduct was—at a minimum—"severe[ly] reckless[]." *Lormand*, 565 F.3d at 251 (citation omitted); *see BP*, 843 F. Supp. 2d at 784 (explaining "an egregious refusal to see the obvious, or to investigate the doubtful, may in some cases give rise to an inference of recklessness") (quoting *Plotkin*, 407 F.3d at 700).[25] Indeed, Defendants do not even attempt to offer any explanation or theory—cogent, compelling, or otherwise—as to why their earlier internal control assessments failed to identify the subject material weakness.

### C. Plaintiffs' Allegations Provide Multiple Potential Motives for Fraud

#### 1. Defendants' Motive to Cover-up Bristow's Internal Control Weaknesses

Defendants' argument for dismissal rests heavily on their supposed lack of a motive to defraud. As Defendants themselves admit, however, motive is "not essential" to allege scienter, Def. Br. at 13 n.10 (citing *Mun. Emps.' Ret. Sys. of Mich. v. Pier 1 Imports, Inc.*, 935 F.3d 424, 431 (5th Cir. 2019)), and Plaintiffs' well-pleaded allegations more than suffice to plead scienter with or without separate allegations of motive.

Even so, the facts alleged in the CAC provide multiple motives for Defendants'

---

[25] *See also In re Netsolve Inc.*, 185 F. Supp. 2d at 697 ("If true, this alleged problem also would have been 'obvious' to persons in the defendants' positions, particularly in light of the alleged customer service internal report released at NetSolve in April 2000, and omitting this problem when discussing customer growth could have gone beyond mere negligence.") (internal citation omitted).

misrepresentations.  Defendants repeatedly emphasized to investors during the Class Period the critical importance to Bristow's survival of raising liquidity by borrowing against Bristow's unencumbered helicopter fleet to survive the downturn.  *See* Section III(A), *supra*.  It is reasonable to infer that Defendants knew Bristow's ability to access secured credit would be imparied if it disclosed to its investors—and thus also to its current and potential lenders—that it had a material control deficiency because it had no process in place to monitor compliance with the terms of its loan agreements.  *See* Section III(B), *supra*.  Indeed, that motive is reinforced by the severity of Bristow's problems.  Bristow's Fiscal 2019 10-K, filed just before Plaintiffs' CAC, disclosed that Bristow had not yet remediated its control deficiency months after it was disclosed [¶ 261], and Bristow's Q1 2020 10-Q, filed on December 27, 2019, admits that Bristow has *still* not corrected its control deficiency.  Q1 2020 10-Q at 106.

Further, during the Class Period, Defendants repeatedly emphasized the importance of "value-added acquisitions" to Bristow's ability to overcome the oil and gas downturn, by "diversify[ing] Bristow away from its substantial dependence on offshore oil and gas operations" and "help[ing] resolve Bristow's fleet overcapacity and idled helicopters by presenting Bristow with new customers and markets where its helicopters could be used."  ¶ 56.  It is reasonable to infer that disclosing a material control deficiency (which ultimately led to a 40% drop in Bristow's stock) and violations of its debt agreements would have made Bristow a much less attractive partner for such an acquisition.

That motive became concrete with the Columbia Acquisition (announced November 9, 2018), which was precisely the type of "value-added acquisition[]" Bristow told investors it needed to survive the downturn.  ¶¶ 31-32, 56.  Bristow described Columbia's assets as "highly complementary to Bristow's" and represented that the acquisition would "expand [Bristow's]

22

addressable market opportunities globally[.]"  ¶ 269.

Ensuring that the Columbia Acquisition closed motivated Defendants to conceal Bristow's lack of effective internal controls over its compliance with the Debt Financings that Defendants admitted were critical to Bristow's continued liquidity.  *Goldstein v. MCI WorldCom*, 340 F.3d 238, 250 (5th Cir. 2003) ("While WorldCom characteristically engaged in numerous mergers and reverse-mergers, there was little 'routine' about the Sprint merger.  Ebbers himself promoted the Sprint merger as a 'crucial event' for the future of WorldCom.").  *See also* n. 24, *supra.*

Notably, the Columbia Acquisition's consideration included a $67 million stock component.  *See* Columbia SPA, November 11, 2018 Bristow 8-K Ex. 2.1 art. 3.1(a), app'x 1.1 (definition of "Stock Consideration").[26]  The motive to inflate Bristow's stock price in order to consummate the Columbia Acquisition using Bristow's stock—and to avoid having to pay Columbia the $20 million termination fee—also supports a strong inference of scienter.[27]  Thus, if Bristow's stock price dropped precipitously (as it did when Bristow's control deficiency was ultimately disclosed), Columbia would have a powerful financial incentive to terminate the deal.

Any disclosure of Bristow's control deficiency would also give Columbia the right to terminate the acquisition: The Columbia SPA included representations that "none of [Bristow's] SEC Reports contained any untrue statement of a material fact or omitted to state a material fact. . . ."  ¶ 275.  Bristow's admissions of a material control deficiency meant that Bristow's representations to Columbia were false—and that Columbia had the right (as well as the incentive) to terminate the deal for cause and trigger the $20 million termination fee.

---

[26] While that stock component had to be made up with cash if Bristow's stock price dropped, that cash conversion was capped at approximately $5 million.  *See id.* (definition of "Additional Cash Amount").

[27] *See Lemmer v. Nu-Kote Holding, Inc.*, 98-cv-161, 2001 WL 1112577, at *11 (N.D. Tex. Sept. 6, 2001), *aff'd,* 71 F. App'x 356 (5th Cir. 2003) ("specific planned acquisitions using stock" support alleged motive to artificially inflate shares); *MCI WorldCom*, 340 F.3d at 242, 250 (need to close "crucial" merger provided  motive to inflate its financial results).

### 2.     Miller's False Explanation About the Reason the Columbia Acquisition Fell Apart Is Strong Evidence of Scienter

That is almost certainly exactly what happened (or is "at least as strong as any opposing inference"), and Bristow's demonstrably false attempts to hide the actual explanation for the termination of the Columbia Acquisition and divert culpability away from Bristow's control deficiency are strong evidence of Defendants' consciousness of guilt and thus of scienter.

Bristow announced the termination of the Columbia transaction *the same day* Bristow disclosed it "was in possible violation of covenants in certain of its secured financing and lease agreements" and "that Bristow had material weaknesses in its internal controls over financial reporting" throughout the Class Period.  ¶ 268.

Defendants represented that the Columbia Acquisition was terminated by "mutual agreement of the parties," *see* ¶¶ 268-69(g), and sought to deflect blame for the deal's collapse from Bristow's contemporaneously-disclosed control deficiency by claiming that "the termination of the Columbia transaction is unrelated to Bristow's 12b-25 extension and related accounting review."  ¶ 269(a).

Defendants' repeated explanations that the transaction was terminated by "mutual agreement of the parties" is false, because Bristow admits it paid Columbia the full $20 million termination fee.  *See* ¶ 268.  Yet, the Columbia SPA expressly provides for termination by "[t]he Parties upon their mutual written consent," ¶¶ 270-71 (quoting § 12.1(a) of the Columbia SPA), and under the plain language of the contract, *Bristow would not have owed the termination fee* if the agreement had actually been terminated by "mutual consent" of the parties, as Bristow has falsely claimed, ¶¶ 272-73 (quoting § 12.3 of the Columbia SPA).  By contrast, Bristow *did* have to pay the termination fee if Columbia terminated the transaction because Bristow breached one of its representations and warranties.  *See* ¶ 273.  Those representations included that "none of

24

[Bristow's] SEC Reports contained any untrue statement of a material fact,"[¶ 275], a representation Bristow **admitted was untrue** when it revealed its material control deficiency **the same day it announced** the Columbia transaction had fallen apart, *see* ¶¶ 176-80.

Defendants' implausible attempts to explain away the collapse of the Columbia Acquisition as having been terminated "by mutual agreement of the parties"—a false explanation expressly used to deflect blame from its contemporaneously-disclosed control deficiency and "related accounting review"—is strong evidence of consciousness of guilt that supports a "cogent and compelling" inference of scienter.[28]

## IV.    The CAC Adequately Alleges Control Person Liability

Defendants contest Plaintiffs' Section 20(a) claims only on the basis that the underlying Section 10(b) claim should be dismissed.  Def. Br. at 25.[29]

### CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss should be denied.

---

[28] *See United States v. Villarreal*, 324 F.3d 319, 325 (5th Cir. 2003) ("[A] defendant's exculpatory statements which are shown by other evidence to be false may give rise to an inference of consciousness of guilt."); *SD3, LLC v. Black & Decker (U.S.) Inc.*, 801 F.3d 412, 432 (4th Cir. 2015) ("These alleged attempts by the manufacturers to hide their actions could suggest that the defendants knew their actions 'would attract antitrust scrutiny;' in other words, the alleged facts suggest consciousness of guilt.") (quoting *Starr v. Sony BMG Music Entm't*, 592 F.3d 314, 324 (2d Cir. 2010)); *In re MicroStrategy, Inc. Sec. Litig.*, 115 F. Supp. 2d 620, 641 (E.D. Va. 2000) (inference of scienter supported where defendant "cited a different . . . reason for its need to restate its financials" in attempt to "conceal a conscious or reckless practice of violating GAAP and falsely reporting financial figures"); *In re Galena Biopharma, Inc. Sec. Litig.*, 117 F. Supp. 3d 1145, 1166 (D. Or. 2015) (inference of scienter supported by alleged cover-up).

[29] If the CAC is dismissed in whole or part, Plaintiffs respectfully seek leave to amend under Fed. R. Civ. P. 15.

Dated: February 18, 2020

**SUSMAN GODFREY LLP**

/s/ *Barry Barnett*
Barry Barnett
Michael C. Kelso
SUSMAN GODFREY L.L.P.
1000 Louisiana, Suite 5100
Houston, TX 77002-5096
(713) 651-9366
bbarnett@susmangodfrey.com
mkelso@susmangodfrey.com

Ira M. Press (admitted *pro hac vice*)
Mark A. Strauss (admitted *pro hac vice*)
Thomas W. Elrod (admitted *pro hac vice*)
KIRBY McINERNEY LLP
250 Park Avenue, Suite 820
New York, NY 10177
(212) 371-6600
ipress@kmllp.com
mstrauss@kmllp.com
telrod@kmllp.com

*Counsel for Lead Plaintiffs and the Proposed Plaintiff Class*

26