UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION


SVETLANA KOKAREVA,                . 4:19-CV-00509
INDIVIDUALLY AND ON BEHALF OF  . HOUSTON, TEXAS
ALL OTHERS SIMILARLY              . MAY 22, 2020
SITUATED,                         . 10:57 A.M.
                                  .
      PLAINTIFFS,                 .
VS.                               .
                                  .
BRISTOW GROUP, INC., ET AL,       .
                                  .
      DEFENDANTS.                 .
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .


TRANSCRIPT OF TELEPHONE CONFERENCE
BEFORE THE HONORABLE KEITH P. ELLISON
UNITED STATES DISTRICT JUDGE


***APPEARANCES***


FOR THE PLAINTIFFS:

      Paul R. Bessette
      Jessica England
      Tyler Highful
      KING & SPALDING LLP
      500 West Second Street
      Suite 1800
      Austin, Texas  78701

*APPEARANCES - CONTINUED*


FOR THE MOVANT MERIDIAN INVESTMENTS LLC:


        Michael C. Kelso
        SUSMAN GODFREY LLP
        1000 Louisiana Street
        Suite 5100
        Houston, Texas   77002


(And other appearances as listed in docket sheet)


OFFICIAL COURT REPORTER:

        Mayra Malone, CSR, RMR, CRR
        U.S. Courthouse
        515 Rusk
        Room 8004
        Houston, Texas   77002
        713-250-5787



Proceedings recorded by mechanical stenography.   Transcript
produced by computer-aided transcription.

**PROCEEDINGS**

*(All participants appeared by telephone)*

THE COURT:  Just for my benefit, let's go through appearances of counsel one more time.

Appearing for the plaintiffs, please?

MR. KELSO:  Good morning, Your Honor.  This is Michael Kelso.  I'm an associate at Susman Godfrey, and I will be arguing for the plaintiffs.

THE COURT:  Welcome.

MR. KELSO:  Thank you, Your Honor.

THE COURT:  For defendants?

MR. BESSETTE:  Good morning, Your Honor.  Paul Bessette with King and Spalding on behalf of the defendants. With me are my colleagues Tyler Highful and Jessica England, but I will be making the argument.

THE COURT:  Mr. Bess-it?

MR. BESSETTE:  Yes, Your Honor.  Ba-sett.

THE COURT:  Bessette.  I'm sorry.  Welcome to all of you too.

Okay.  You can assume I have read the papers, and I'm going to keep you on speaker phone if you don't mind just so I can handle the papers more expeditiously.

It is defendants' motion, so I will let defendant go first.  You need not repeat what is in the papers.

MR. BESSETTE:  Thank you, Your Honor.

May it please the Court.  This case comes down to whether plaintiffs state a viable claim for securities fraud, and as we have noted, these allegations are legally flawed, both in terms of falsity and scienter --

THE COURT:  Mr. Bessette, I'm going to slow you down just a little bit.  We have got to keep up with every word, and I want to make sure the court reporter gets it.

MR. BESSETTE:  I apologize.

THE COURT:  Everybody does it.  I'm the worst offender.

MR. BESSETTE:  I will do my best, Your Honor.

The heart of the case is plaintiffs' claim that a material weakness that the company disclosed in its turnover controls over maintenance records triggered a material default in the debt covenants and caused a debt reclassification.

In our view, that is an unwarranted conclusion.  It is not a fact.  In fact, there are no facts to support that conclusion.  Plaintiffs do not and cannot plead that the disclosed material weakness actually resulted in a breach of the debt covenants that was not cured or waived and, thus, it did not trigger loan acceleration nor debt reclassification.

THE COURT:  But we need to take the allegations for these purposes as true.  Isn't the question whether, if those allegations are true, whether that comports with the PSLRA and the securities protocol?

Don't we need to assume that what they allege is true and whether their allegations, if true, survive the defenses available under securities jurisprudence?

MR. BESSETTE:  Yes, Your Honor.  That's exactly right. And our point is, conclusions aside, the factual support, the actual allegations of fact in the complaint actually show that the debt reclassification had nothing do with Bristow's failure to implement adequate internal controls over the tracking of helicopter parts which were pledged as collateral.

And the timeline is important, and the timeline comes right from the amended complaint's own allegations.  For example, at paragraph 177, the company's disclosure on February 11th of 2019, which is, by the way, the end of the class period, the company disclosed this material weakness in its monitoring compliance.  But, importantly, what it disclosed, which it was evaluating, was whether it should reclassify its debt, and it was evaluating what possible noncompliance was resulting from the failure to monitor compliance.  And, importantly, it also indicated in that same disclosure that it was evaluating whether it can obtain waivers from its lenders for any possible noncompliance, if necessary. So that's a very telling disclosure, but there is no conclusion of a default or noncompliance.  The company was informing the investors that it was evaluating what possible noncompliance and what possible impact on the financial statements would come

from that.  And, in fact, on the very same day, they disclosed to the FCC in a notice under 12b-25 that it needed additional time to make these evaluations and to evaluate any implications from the company's financial statements and any potential noncompliance with these nonfinancial covenants about the tracking of parts.  So it's clear as of the end of the class period, there is no breach.  There is an effort to see if the lenders would waive any noncompliance.

And eight days later, as disclosed in paragraph 182 of the complaint in a press release on the 19th of February, the company discloses that all issues related to the noncompliance with debt covenants from the material weakness were cured or waived by December 31 of 2018.  So these disclosures demonstrate that the material issues of potential noncompliance, the lenders -- the company either cured them or the lenders waived the noncompliance as to, I think, nine of the helicopters.  And all of this was a very small subset of the 385 helicopters that the company had in operation.  So those are plaintiffs' very own allegations.

But, importantly, on the 19th, Your Honor, what the company also warned investors about, which was their impression, is that it could be in breach or default if it couldn't deliver financial statements without a going concern limitation.  And, further, it warned investors that unless certain actions are taken, accounting rules may require the

company to reclassify certain debt value.

So it's clear as of February, there was no event of default that was not cured or waived.  The lenders did not accelerate the debt.  There was no reclassification required.

Later, then in April, the company warned in its amended filings that it was still working on that it ultimately didn't file until June, it may have included a going concern warning because of the prolonged downturn in the oil and gas market that was obviously impacting its liquidity.

And then we know that in May, on May 11th, the company did file bankruptcy, which was under the debt covenants a clear event of default.  So plaintiffs' own allegations when you look at the timeline, the material issues were cured or waived and were in the rearview mirror, and what the company was looking at was a very significant liquidity squeeze because of the oil and gas market and ultimate bankruptcy, which was an event of default, which ultimately triggered debt acceleration and ultimately the debt reclassification.  That's all in the public disclosures.

So the fact that the plaintiffs don't have factual support in their own complaint for the conclusion that the material weakness on helicopter part tracking caused the debt re-class, it is clear from the disclosures and their own allegations that it didn't.

THE COURT:  Okay.  Let's pause for a moment and get

Mr. Kelso's response.

MR. BESSETTE:  Yes, Your Honor.

MR. KELSO:  Good morning, Your Honor.

THE COURT:  Good morning.

MR. KELSO:  Michael Kelso for the plaintiff.

Everything Mr. Bessette just said, Your Honor, I think from the plaintiffs' perspective is immaterial to whether this motion to dismiss should be granted or not.  They are pleading two different false statements in Bristow's security files.  One is, yes, we do challenge their debt classification as false, and we also challenge Bristow's false representation that its internal controls were affected, when in reality defendants and Bristow admit that those controls suffered from a material weakness throughout the class period.  So those are two separate false statements.  Right?  One has to do with whether or not Bristow's debt was properly classified as long term or short term.  But the second is its false and actionable misrepresentations that its internal controls over financial reporting were effective, when in reality they weren't.

So I think the defendants are complaining about the concealment and then the disclosure of the risk with the materialization of that risk.  Even if the risk didn't materialize, and we dispute that, we are happy to get into what we believe are the numerous well-pleaded facts in the complaint that support the reasonable inference that the defendants'

classification of its debt was false.  But even if defendants are right on that point, and the risk didn't materialize, defendants' false representations about the risk by misrepresenting their internal controls as effective are still actionable under the security laws.

And I should say, Your Honor, one additional point.  Whether or not the debt classification was technically true or not, which is Mr. Bessette's entire argument, he says it was properly classified as long term and the reclassification occurred because of the going concerns.

Even if that is true, we also challenge Bristow's debt classification and its repeated attempt to promote itself to investors based on its liquidity steps that were materially misleading without Bristow also disclosing that it lacked internal controls in place to track its compliance that the defendants themselves repeatedly told investors were critical for Bristow to survive.

THE COURT:  The stock market was tanking during much of this period.  Isn't that some indication that communication was made to the public as to all the many vulnerabilities that Bristow had?

MR. BESSETTE:  Your Honor, this is Paul Bessette.

THE COURT:  The question was for Mr. Kelso.

MR. BESSETTE:  Sorry about that.

MR. KELSO:  Your Honor, the stock market was slowing

down a lot during this period.  It certainly doesn't make defendants' liquidity situation not actionable.  I think, in fact, if anything Bristow --

THE COURT:  You are breaking up.  Let's start the last sentence again.

MR. KELSO:  Yes, Your Honor.

Bristow's representation during this period where the stock market was going down generally, it's more than materiality, its statements about liquidity, its statements about its debt classification and its statements about its internal controls.  Because what Bristow was trying to do was distinguish itself from other oilfield services companies by representing that it was in a better liquidity position because it was able to borrow against the helicopters -- these are the secured financing agreements that are at the center of this case -- in order to pay off its existing debt and defer its obligations until 2022 and 2023 when it hoped the oil market would rebound.

That's all sort of secondary, Your Honor, to the key point, which is the day Bristow revealed this control deficiency, or the day after I should say, Bristow's stock plunged 40 percent on trading volumes that was more than 17 times greater than normal.  Its stock fell another 35 percent the day after.  In just two days, Bristow's investors lost $66 million in stockholder value, and the defendants don't

even challenge materiality in their motion to dismiss with respect to the control deficiency or allegations about some of the factors.

Their materiality argument, Your Honor, only goes to -- they cite four paragraphs in our complaint that their materiality argument goes to.  So it is really, you know, beside the point for purposes of this argument.

THE COURT:  Okay.  Back to Mr. Bessette.

MR. BESSETTE:  Yes, Your Honor.  I think plaintiff is conflating several concepts.  First, they seem to be walking away from what was a fair reading of the amended complaint, which is the heart of their case, that the material weakness and the material controls caused the debt reclassification.  And I have shown through the timeline of their own allegations that that is not the case.  They haven't pled any well-pleaded facts to show that, so that is an unwarranted conclusion that this Court does not need to credit on a motion to dismiss.

In terms of the material weakness itself and the alleged falsity of the control and material weakness statements, yes, the restatement by definition shows that that was a false statement.  But, importantly, what they're glossing over is, where is the scienter?  There has to be, for a securities fraud claim, the element of scienter, the intent to deceive or defraud, and we haven't touched on any of that here, but we all know that GAAP violations alone, which is what this

is, is not enough for scienter for securities fraud.

THE COURT:  Well, that was one of the questions I had, but these kinds of alleged violations, aren't they the kind of things that the leadership of Bristow would have had to have been familiar with because of the obligation to file 10-Ks?

MR. BESSETTE:  Well, no, Your Honor.  Plaintiffs apparently are trying to allege that senior executives knew about the helicopter tracking mechanics from day one of the class period and were hiding this.  I mean, that's -- there is no evidence of that.  They have no confidential witness.  They have no internal documents.  They are essentially trying to say that the debt covenants were so essential to the company that that is a strong inference.  Well, there are legions of case law that says that is not enough, and we have cited that in the briefs.

They also try to say that the defendants were aware of the debt covenant violations before they were actually disclosed.  And, again, there is nothing there to hang their hat on.  They try to squeeze it into the rubric of the BP case, which we, I think, made very clear in our papers that the allegations here are nothing like the allegations that Your Honor dealt with in the BP case.

And, frankly, also, on the February 19th disclosure, the company said that the assessment of noncompliance with debt covenants commenced when senior

management became aware that engines and airframes were not matched up. And we know that was in late 2018. There are no allegations in the complaint to suggest, let alone meet the strong inference test, that any of the individual defendants were aware before the company disclosed this. And the company was fully transparent when it disclosed its evaluation, its assessment, the fact that the lenders did not call a breach. They actually waived any potential non-covenant violations, so the company was out of the woods with the material weakness.

Now, if they are going to hang their hat now on the material and control issues, they have got to show that those statements, which, yes, were restated because the company did find a control deficiency and a material weakness, they have got to plead facts to show that those statements were made when they were made with actual knowledge of falsity. And there is nothing in here to suggest that senior executives -- because they were aware of the debt financing and aware of how important that was to the company -- were aware of the minutiae of tracking helicopter parts and the fact that the company didn't have adequate compliance on those issues. There is nothing that suggests that. Certainly, it doesn't meet the actual knowledge standard. So I would suggest that even if plaintiffs are right in that, yes, the restatement is an acknowledgment of the falsity of the internal controls, there is absolutely no scienter here whatsoever, which is necessary

for a securities fraud claim.

THE COURT: There's no question, that's true. I do think this case is very different from BP in that in the pre-explosion narrative, we were talking about an event that was cataclysmic in its effect that no one had apparently foreseen. BP is different.

This is an issue of the ongoing operations of the company and day-to-day development of the story. Nobody claims these things were absolutely unforeseeable the way the Deepwater Horizon explosion was.

Back to you, Mr. Kelso.

MR. KELSO: Defendants' argument on scienter here is just wrong as a matter of law. That is because Bristow's own admission in just taking them at face value directly established that the company knew about its control deficiency at the time it filed its 10-Q for the second quarter of 2019.

So here is Bristow's April 15th, 2019 8-K, which we cite at paragraphs 185 and 187 of the complaint. In that filing, Bristow tried to explain away its control deficiency by saying, quote: During the three months ended December 31, 2018, we determined that some loaner engines owned by the maintenance providers and installed on pledged or leased airplanes had been on those airplanes for more than 180 days after the removal of the original engines.

In taking Bristow at its words, Your Honor, they

learned of the breaches and revealed the control deficiency no later than, quote, the three months ended December 31, 2018. Bristow filed its Q2 2019 10-Q on November 9th, 2018, right in the middle of that three-month period ended December 31, 2018 when Bristol admits it had actual knowledge of its covenant violations.  Defendants told investors in that 10-Q that they had evaluated the internal controls and that those controls were effective, and defendants both signed Sarbanes-Oxley certifications to that effect.  And those allegations are at paragraphs 170 and 172 of our complaint.  That 10-Q also touted Bristow's liquidity situation based on the secured financing agreements, all of which included the collateral maintenance covenant.

At the very least, Your Honor, it was severely reckless for defendants to tell investors that Bristow's internal controls were effective in its November 9, 2018 10-Q and to promote the liquidity effect of its secured financing agreement, when Bristow by its own admission had actual knowledge of the filings of the collateral maintenance covenants in those contracts.  Those allegations, just standing alone, are sufficient to establish the cogent and compelling inference of scienter.  But even beyond that conclusive admission with respect to the November 10-Q, we allege four key sets of facts that we think taken collectively give rise to a strong inference of scienter.

First, we allege in paragraph 226F of the complaint that the defendants knew that the secured financing agreements specifically identified the helicopters that served as collateral by serial number.

We also allege that both defendants were deeply familiar with Bristow's secured financing agreements and promoted those agreements to investors.

At paragraph 226G of the complaint, we allege Miller specifically responded to an analyst question about the Macquarie secured financing agreement.

Quote:  Let me reiterate.  We're well within all of our covenants and we've been able to stay ahead of that and that's very important to our financial flexibility.

And as we allege in paragraph 51 of the complaint, Bristow's three secured financing agreements, all of which included the collateral maintenance covenant, accounted for $630 million of Bristow's $1.43 billion in long-term debt.  That's 44 percent.  And Defendant Bailiff promoted those financing agreements as a key part of Bristow's strategy to raise liquidity to survive the oil and gas downturn, and they repeatedly differentiated Bristow to investors from other oilfield services companies on marketing Bristow's ability to enter into secured debt covenants by borrowing against its largely unencumbered helicopter fleet.

The second allegation, or second set of facts

that we allege, give rise to the first inference of scienter here, Defendants Bailiff and Miller's personal involvement in Bristow's assessment of its internal controls.  For example, at paragraph 252 of the complaint, we cite Bristow's 2018 10-K, which said, quote:  Under the supervision and with the participation of our management, including our CEO and CFO, we conducted an assessment of the effectiveness of our internal controls over financial reporting as of March 31, 2018.  Bailiff and Miller both certified.  Quote:  Based on this assessment, management concluded that our internal controls and financial reporting was effective.

Bailiff and Miller similarly represented that they personally documented Bristow's internal controls in Bristow's 10-Qs for the first and second quarters of 2019.

The third set of facts, Your Honor, which sort of goes hand in hand with the second, and which when considered collectively gives rise to the compelling inference of scienter here, is the magnitude of Bristow's control deficiency.

Bristow's post last period disclosures revealed that Bristow, in fact, had no process in place to monitor compliance with its own covenants.

At paragraph 260, we cite Bristow's amended 2018 10-K which said, quote:  We will continue the implementation of our remedial plan by establishing a debt and lease compliance program.  Not improving, not strengthening, not reviving.  And

the serious magnitude of the deficiencies in Bristow's internal controls is reinforced by the fact that Bristow still had not revealed that control deficiency when it filed its 2019 10-K on October 28 of last year, and the numerous conditional and extensive steps Bristow was going to have to take to fix that control deficiency that go well beyond establishing the debt compliance statement that was outlined in its 10-Q.  That includes augmenting financial planning and analyst fees with individuals who have appropriate levels of knowledge, expertise and skills in the areas of non-financial debt covenant compliance, monitoring, forming a formal enterprise risk assessment committee responsible for defining and continually evaluating our enterprise risk assessment objectives.  That's at page 175 of Bristow's 2019 10-K.

And at page 106 of its most recent SEC report, its 10-Q, filed December 27, Bristow disclosed that it still suffered from the same control deficiency and still had not put those measures in place.

So contrary to the way defendants try to paint this in their reply brief and the way they are trying to paint it right now, this was not a quick fix.  This was a serious and deep control deficiency that Bristow and Defendant Miller still have not remediated.

And, Your Honor, on this point, I think the Dobina against Weatherford case out of the Southern District of

New York, which we cite at page 20, footnote 24 of our brief, is clearly on point.  In that case, Judge --

THE COURT REPORTER:  Excuse me, sir.  This is the court reporter.  You are cutting out again.

MR. KELSO:  I apologize.  I will start back a little bit.

THE COURT:  Spell the name of the case for the court reporter, please.

MR. KELSO:  Dobina, D-O-B-I-N-A, against Weatherford, W-E-A-T-H-E-R-F-O-R-D.  And it's cited at page 20, footnote 24 of our brief.  In that case, Your Honor, Judge Kaplan wrote, quote:  The certification statement Becnel -- that's B-E-C-N-E-L -- along with Duroc-Danner, D-U-R-O-C-D-A-N-N-E-R -- was responsible for establishing and maintaining those controls and designed or caused such controls to be designed under his supervision.  Moreover, Becnel participated in and supervised each of the company's quarterly evaluations of its internal controls.  Where a statement is made repeatedly regarding an issue of special -- of specific personal interest to the officers, the allegations will more readily give rise to the requisite strong inference of scienter.

The Court continues, and these are facts that I think parallel the disclosure in the 2019 statement to the United States.

In March 2011, the company admitted inadequate

staffing and technical expertise, ineffective review and approval practices, inadequate processes to effectively reconcile income tax accounts and inadequate controls over the preparation of quarterly tax provisions. Given Becnel's personal participation in designing and evaluating the internal controls, he presumably had extensive knowledge about precisely these matters. And the Court denied the motion.

Defendants did not address this argument at all in their reply brief. At a minimum, Your Honor, it is at least as compelling as any opposing inference to conclude that defendants considered the three secured financing agreements that accounted for 44 percent of the company's outstanding debt when they personally conducted an assessment for the effectiveness of Bristow's internal control over financial reporting and that they would have noticed that Bristow, in fact, had no such process whatsoever for monitoring its compliance with those agreements. And if they didn't do that, Your Honor, then they were severely reckless in representing to investors that Bristow's controls were effective.

Defendants do not make a single argument with regard to this issue in their reply brief. And that inference, I think, is bolstered here by Bristow's own self-serving explanation that it discovered its control deficiency in that very same evaluation of the company's internal control.

Here is Bristow's February 11, 2019 8-K. Quote:

As part of management's assessment of the company's internal controls over financial reporting, as of December 31, 2018, a control deficiency was identified by the company.  Again, it is at least as compelling as any opposing inference, including the defendants discovered that control deficiency when they conducted that exact same evaluation for the Bristow's 2018 10-K and 10-Qs for the first two quarters of 2019.  This is yet another argument defendants did not address at all in their reply.

And the last point I'd make on this.  This point is the fourth set of facts that we think supports a strong inference of scienter here, an inference at least as compelling as any opposing inference, that addresses Mr. Bessette's point that he just made where he said the company has been fully transparent.  That couldn't be further from the truth.

Defendants' indisputedly false attempts to conceal the real reasons the Colombia acquisition fell apart also supports an inference of scienter, particularly when considered with the other facts that we have alleged.

When Bristow and defendants repeatedly told investors that the Columbia acquisition was terminated by mutual agreement of the parties, and that narrative started on February 11 when they disclosed the Colombia transaction fell apart, the same day it still revealed its control deficiency.

And we explain in paragraph 269A of the

complaint, Bristow specifically used that mutual agreement of the parties' explanation to deflect blame from the collapse of the Colombia transaction from Bristow's control deficiency.

Bristow's and defendants' own explanation, Your Honor, simply can't be true because Bristow paid Columbia a $20 million termination fee under the stock purchase agreement. That agreement at Section 12.1, cited at paragraph 271 of the complaint, expressly provides for termination, by, quote, the parties upon their mutual written consent.

And under the contract's plain language, Section 12.3, which is quoted at paragraphs 272 and 273 of the complaint, if the SPA is terminated by consent, then neither party owes a contractual termination fee.

The only situation in which Bristow had a termination fee is if Bristow had breached the stock purchase agreement, and Bristow's control deficiency would have breached a number of the reps and warranties in that SPA.  We list them at paragraph 275 of the complaint.  They include things like delivering SEC filings that didn't include any untrue statements of material fact.  We know Bristow did that because its control deficiency was untrue, delivering financial statements that are GAAP compliant.  Again, Bristow's control deficiency means they had breached that rep and warranty.  And if they had done that, that would have forced Bristow to pay the termination fee.  We know Defendant Miller was not truthful

when he said in SEC filings that, quote:  The parties mutually agreed to terminate the purchase agreement.  And, instead, we know that Bristow breached the stock purchase agreement and almost certainly cured the control deficiency, if disclosed, the same day it told investors the Columbia transaction fell apart.

Defendant Miller's untrue statements about the Columbia transaction are evidence of consciousness of guilt that support an inference of scienter.

As the Fourth Circuit explained in the antitrust context in SD3 against Black & Decker, cited on page 25, footnote 28 of our brief, quote:  These alleged attempts by the manufacturer to hide their actions could suggest that the defendants knew their actions would attract antitrust scrutiny.  In other words, the alleged facts suggest consciousness of guilt.

And we cite a number of additional cases in our brief, Your Honor, applying the same principle in the securities fraud context.  This is yet another point defendants' reply doesn't address.

Considered collectively, those allegations, Your Honor, defendants' promotion of the secured financing agreement and their knowledge of the specific terms, their personal involvement in assessing Bristow's internal controls, the magnitude of the control deficiency they claim they didn't

notice and their false attempt to deflect blame for the failure of the Colombia transaction from Bristow's control deficiency and purported inference of scienter, that is at least as compelling as any I have ever seen.

THE COURT:  Okay.  Thank you.

Mr. Bessette, anything further?

MR. BESSETTE:  Yes, Your Honor.

On the issue of scienter, first off, I think it is quite clear that there is absolutely no allegations of motive that pass muster, so plaintiffs, as we indicated in our brief, have to have detailed, specific facts showing actual knowledge of falsity.

And the litany of arguments I believe counsel just listed off, the hodgepodge that are in the amended complaint, all cover the same issue.  They don't touch Defendants Bailiff and Miller.  There are no internal documents, there are no confidential witnesses that say Mr. Bailiff or Mr. Miller was aware of the control deficiency problems.  And we know from Fifth Circuit law, unlike the Southern District of New York case that was cited by plaintiffs' counsel, the Weatherford International case, certifications, SOX certifications and internal control certifications, do not give rise to a strong inference of scienter.  So there has to be something personal and specific that an individual defendant saw or heard or read that shows

actual awareness of falsity.  And there is absolutely nothing here.

What counsel just went through is a lot of smoke, some of which is just confusing, none of which touches the individual defendants which shows the falsity of any statement they were aware of at the time those statements were made.

So, for example, just by way of distinguishing, in the Weatherford case, that case dealt with confidential witnesses that discussed the internal control deficiencies in the company.  And the defendants in that case, unlike this case, had personal involvement in designing the internal controls.

Here, what plaintiffs outline is that, yes, the company was in a declining oil and gas market and liquidity was key and so senior executives were certainly keenly aware of the debt covenants that they had -- or the debt agreements and the funding that they were able to get into the company to provide some liquidity runway, which they made statements about to investors, but that is a far cry from saying that they were aware of details of helicopter tracking parts, and those sorts of things, at their senior level.  There is just nothing there. And that is what the Fifth Circuit and the district courts require for scienter when the plaintiffs have a burden of showing actual knowledge.

THE COURT:  Let's talk about the break up of the

Colombia deal.  Wasn't that a misstatement, the failure to reference the $20 million break-up fee?

MR. BESSETTE:  Your Honor, I actually think the whole Colombia transaction is a red herring.  I mean, what was happening at the time the company announced the deal -- let me just make sure I have the timeline.  Announced November 9 and then some various announcements in mid- and late-November and then an announcement in December that they thought the deal would not close before the end of the year.  And then we, of course, have the February 11th announcement of the termination.

During that time, the company's stock had dropped about 77 percent from before the Colombia transaction was announced, and the stock was a key component of the deal.  So it became apparent in the declining market that the company -- also dealing now with the discovery of issues that affected its debt covenants, it probably wasn't the greatest time to do the Colombia deal.  Regardless of the supposition, all plaintiffs -- everything in the complaint is all supposition.  There are no facts behind.  It's all --

THE COURT:  I can't get around the fact that there was omission of the $20 million break-up fee.  Now, if that had been known, if it wasn't just a mutual parting of the ways, if that would have been known, wouldn't the investors have been on notice that they should inquire about the reason that Bristow had to pay the break-up fee and wouldn't that quite possibly

have led them to further knowledge about controls or lack of controls?

MR. BESSETTE:  Your Honor, the fee was disclosed.  The company disclosed it was paying a $20 million fee to walk away.  It walked away from the transaction, and it paid the $20 million fee and told investors that.

So, yeah, I agree with you that that is some notice that investors should wonder -- I mean, we can see why the stocks tanked 75 percent and so -- but how is that at all scienter to allege false statements about debt covenants, a debt reclassification or even the control deficiency, the material weakness that the company disclosed in February of '19?

THE COURT:  Let me go back to Mr. Kelso on that point.

MR. KELSO:  A few different points.  I'm going to start with the Colombia point because we have just sort of been talking about it.  Right?  It is relevant to the control deficiency point because the fact that Bristow gave a false reason for why the Colombia transaction broke up, right, supports the idea that they were trying to cover up the real deal.  I mean, otherwise, why lie about it?  And this has all to do with what -- exactly what defendants are trying to do today, which is minimize the seriousness of the control deficiency:  It was totally cured.  They got waivers.  It didn't cause the debt reclassification.  It didn't cause the

break up of the deal.

They are trying to minimize it, and they are caught red handed in the Colombia transaction.

Mr. Bessette saying disclosing the termination fee should have put investors on notice is dead wrong because that was disclosed the same day they revealed the control deficiency and the same press release.  So that shouldn't have put investors on notice that there were control deficiency problems.  The reason they lied about the Colombia transaction, Your Honor, is because they were trying to cover up the fact that it was caused by Bristow's breach of the covenant.

Now, Mr. Bessette says today that, no, it was because of stock drop.  The problem with that explanation, Your Honor, is under the terms of the Colombia acquisition agreement, the stock dropping was a great deal for Bristow in terms of the Colombia transaction.  That's because while there was a $67 million stock component, that stock component was capped at 17 percent.  I think it is 17.31 percent of the company's equity.  So the more the stock dropped -- oh, and by the way, if it dropped below a certain level, Bristow had to pay a make-up fee that was only $5 million.  So the fact that the stock price dropped and the amount of stock that they had to convey over was capped, plus a $5 million equity component, was a good deal for Bristow and a fine deal for Columbia.  In that case, Columbia had motive to terminate the transaction,

but not the right to do so.

The question is:  What gave them the right to terminate the transaction and force them to pay the termination fee?  That's the control deficiency.  And these occur on the exact same timeline, even under the defendants' own narrative.

The other point I will make is Mr. Bessette keeps saying we need to have internal documents or confidential witnesses saying that Miller and Bailiff specifically were aware of Bristow's control deficiency.  That is just wrong under the law.

The Supreme Court in Tellabs says the inference that the defendants acted with scienter need not be irrefutable, i.e., of the smoking-gun genre, or even the most plausible of competing inferences.

Mr. Bessette here is demanding smoking-gun evidence, but what we have is exactly what Tellabs says we need; a number of factual allegations that considered collectively give rise to a cogent and compelling inference of scienter.  And they can't get around that by trying to break these facts up, you know, that SOX disclosures aren't sufficient on their own.  Well, maybe, maybe not, although when you are dealing with a control deficiency, I think that's a different situation.  When you are talking of some underlying accounting problem, even if the SOX certifications weren't sufficient on their own, they certainly are when considered

alongside the facts of the magnitude of the control deficiency Bristow was dealing with and when you consider it with the facts the defendants were specifically aware of the terms of the secured financing agreement.  Now Mr. Bessette is trying to minimize the collateral maintenance covenants by calling them minutia and referring -- saying CEOs wouldn't be aware of the way the company tracks engines or doesn't track engine parts.  Well, the security agreements on these loan covenants, Your Honor, I think as we said in our brief, are about as much the minutia of these loan covenants as the deed of the trust is minutia of the mortgage on my house.  It's a key component of the agreement, and if you don't comply with it, it has serious consequences, as evidenced by exactly what happened to Bristow here.  They want to make a lot of --

THE COURT:  Thank you.  To both of you, I wish it were true that in every case I had advocacy of the quality we have heard this morning.  I think it's a close call, but for now, I'm going to deny the motion to dismiss, and I may well take another look at it later in the narrative of the case.  But for now, I think the facts -- the allegations are well pled and accepting those as true, I think the complaint satisfies the PSLRA and other securities laws.

Thank you very much.  Thank you.

MR. KELSO:  Thank you, Your Honor.

MR. BESSETTE:  Thank you.

(Court adjourned at 11:41 a.m.)

* * * *

I, Mayra Malone, CSR, CRR, RMR, certify that as a Federal Official Reporter for the Southern District of Texas, I have transcribed the telephone conference of the foregoing entitled case to the best of my ability; that any inaudible designations are because of audio interference that precluded me from understanding the words spoken; and that the foregoing typewritten matter contains a full, true and correct transcript of my understanding of the aforesaid proceedings as recorded, to the best of my skill and ability.

DATE: June 8, 2020

/s/ Mayra Malone

----------------------------------------
Mayra Malone, CSR, RMR, CRR
Official Court Reporter