# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

IN RE BRISTOW GROUP INC.
SECURITIES LITIGATION

Case No. 4:19-cv-00509 (KPE)

## LEAD PLAINTIFFS' MOTION & MEMORANDUM OF LAW FOR: (I) FINAL APPROVAL OF CLASS ACTION SETTLEMENT; (II) APPROVAL OF PLAN OF ALLOCATION; AND (III) CERTIFICATION OF SETTLEMENT CLASS

**SUSMAN GODFREY LLP**
Barry Barnett
Michael C. Kelso
1000 Louisiana, Suite 5100
Houston, TX 77002
Telephone: (713) 651-9366
bbarnett@susmangodfrey.com
mkelso@susmangodfrey.com

**KIRBY McINERNEY LLP**
Ira M. Press (admitted *pro hac vice*)
Thomas W. Elrod (admitted *pro hac vice*)
250 Park Avenue, Suite 820
New York, NY 10177
Telephone: (212) 371-6600
ipress@kmllp.com
telrod@kmllp.com

*Lead Counsel for Plaintiffs and the Settlement Class*

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ................................................................................ 1

PROCEDURAL HISTORY .................................................................................... 3

   I.     The Class Action ................................................................................. 3

   II.    The Bristow Bankruptcy Proceedings .......................................... 4

   III.   Settlement Negotiations ..................................................................... 6

   IV.  Preliminary Approval ....................................................................... 6

ISSUES PRESENTED .......................................................................................... 6

ARGUMENT ...................................................................................................... 7

   I.     Legal Standards Governing Approval of Class Action Settlements ............................. 7

   II.    The Proposed Settlement is Fair, Reasonable, and Adequate ........................................ 9

        A.    The Procedural Requirements are Satisfied ........................................................ 9

            1.    Plaintiffs and Lead Counsel Adequately Represented the Settlement Class ........................ 9

            2.    The Settlement Resulted from Extensive Arm's-Length Negotiations Between Experienced Counsel Under the Auspice of An Experienced Mediator ........................ 11

        B.    The Substantive Requirements are Satisfied ........................................................ 11

            1.    The Relief Provided for the Settlement Class Is Fair and Adequate Given the Complexity, Costs, Risks, and Delay of Trial and Appeal ........................ 12

            2.    The Stage of the Litigation and Available Discovery Support Final Approval ........................ 13

            3.    The Risk of Further Litigation Supports Final Approval ........................ 14

                a.    Risks to Proving Liability ........................ 14

                b.    Risks of Proving Loss Causation and Damages ........................ 16

            4.    The Range of Possible Recovery and Certainty of Damages Support Final Approval ........................ 17

i

        5.      Lead Counsel, Lead Plaintiff, and Settlement Class
Members Support Final Approval ............................................................. 18

        6.      The Remaining Rule 23(e)(2) Factors Are Also Met ............................... 20

               a.      The Proposed Method for Distribution Is Effective ..................... 20

               b.      Requests for Attorneys' Fees, Expense Reimbursement,
and Incentive Awards are Reasonable ........................................... 20

               c.      There Are No Other Agreements Besides Opt Outs ..................... 21

               d.      Settlement Class Members Are Treated Equitably ....................... 22

III.    Notice to the Settlement Class Satisfies Rule 23 and Due Process ............................ 22

IV.    The Plan of Allocation Satisfies Rule 23 and Due Process ......................................... 24

V.    The Settlement Class Should be Finally Certified ....................................................... 25

CONCLUSION ............................................................................................................................... 25

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Alaska Elec. Pension Fund v. Flowserve Corp.*,
   572 F.3d 221 (5th Cir. 2009) ................................................................12

*Ayers v. Thompson*,
   358 F.3d 356 (5th Cir. 2004) ................................................................12

*Billitteri v. Sec. Am., Inc.*,
   No. 09 Civ. 1568, 2011 WL 3586217 (N.D. Tex. Aug. 4, 2011) ...........17

*Buettgen v. Harless*,
   No. 09 Civ. 791, 2013 WL 12303143 (N.D. Tex. Nov. 13, 2013) .........17

*In re Cendant Corp. Litig.*,
   264 F.3d 201 (3d Cir. 2001) .................................................................17

*In re Chicken Antitrust Litig. Am. Poultry*,
   669 F.2d 228 (5th Cir. 1982) ................................................................24

*In re Chinese-Manufactured Drywall Prods. Liab. Litig.*,
   424 F. Supp. 3d 456 (E.D. La. 2020) .....................................................8

*Cotton v. Hinton*,
   559 F.2d 1326 (5th Cir. 1977) ................................................................7

*In re Deepwater Horizon*,
   739 F.3d 790 (5th Cir. 2014) ..................................................................7

*DeHoyos v. Allstate Corp.*,
   240 F.R.D. 269 (W.D. Tex. 2007) .........................................................19

*In re Dell Inc., Sec. Litig.*,
   No. 06 Civ. 726, 2010 WL 2371834 (W.D. Tex. June 11, 2010) ..........24

*Dura Pharm., Inc. v. Broudo*,
   544 U.S. 336 (2005) ..............................................................................17

*Erica P. John Fund, Inc. v. Halliburton Co.*,
   No. 02 Civ. 1152, 2018 WL 1942227 (N.D. Tex. Apr. 25, 2018) .........22

*Florida Trailer & Equip. Co. v. Deal*,
   284 F.2d 567 (5th Cir. 1960) ..................................................................9

*In re Heartland Payment Sys., Inc. Customer Data Sec. Breach Litig.*,
   851 F. Supp. 2d 1040 (S.D. Tex. 2012)..................................................................7, 10, 13, 23

*Klein v. O'Neal, Inc.*,
   705 F. Supp. 2d 632 (N.D. Tex. 2010)..................................................................12

*Marcus v. J.C. Penney Co., Inc.*,
   No. 13 Civ. 736, 2017 WL 6590976 (E.D. Tex. Dec. 18, 2017)...........................19

*McNary v. Am. Sav. & Loan Ass'n*,
   76 F.R.D. 644 (N.D. Tex. 1977).........................................................................8

*Miller v. Glob. Geophysical Servs., Inc.*,
   No. 14 Civ. 708, 2016 WL 11645372 (S.D. Tex. Jan. 14, 2016)...........................21

*Miller v. Republic Nat'l Life Ins. Co.*,
   559 F.2d 426 (5th Cir. 1977)............................................................................7

*Mullane v. Cent. Hanover Bank & Tr. Co.*,
   339 U.S. 306 (1950)........................................................................................23

*Murillo v. Tex. A&M Univ. Sys.*,
   921 F. Supp. 443 (S.D. Tex. 1996)...................................................................11

*Newby v. Enron Corp.*,
   394 F.3d 296 (5th Cir. 2004)............................................................................8

*N.Y. State Teachers' Ret. Sys. v. Gen. Motors Co.*,
   315 F.R.D. 226 (E.D. Mich. 2016)...................................................................22

*In re OCA, Inc. Sec. & Derivative Litig.*,
   No. 05 Civ. 2165, 2009 WL 512081 (E.D. La. Mar. 2, 2009)...................13, 16, 24

*In re Pac. Lumber Co.*,
   584 F.3d 229 (5th Cir. 2009)............................................................................5

*Reed v. Gen. Motors Corp.*,
   703 F.2d 170 (5th Cir. 1983)........................................................................8, 11

*Rodriguez v. Stage 3 Separation, LLC*,
   No. 14 Civ. 603, 2015 WL 12866212 (W.D. Tex. Dec. 23, 2015) .......................11

*Rubenstein v. Republic Nat'l Life Ins. Co.*,
   74 F.R.D. 337 (N.D. Tex. 1976).........................................................................8

*Schwartz v. TXU Corp.*,
    No. 02 Civ. 2243, 2005 WL 3148350 (N.D. Tex. Nov. 8, 2005)....................13, 18, 22, 24-25

*In re Seitel Sec. Litig.*,
    245 F.R.D. 263 (S.D. Tex. 2007).................................................................................9

*Vaughn v. Am. Honda Motor Co.*,
    627 F. Supp. 2d 738 (E.D. Tex. 2007)......................................................................22

*In re Vitro S.A.B. de C.V.*,
    701 F.3d 1031 (5th Cir. 2012)....................................................................................5

**Statutes and Rules**

15 U.S.C. § 78u-4(b)(4).................................................................................................17

Fed. R. Civ. P. 23(c)(2).................................................................................................23

Fed. R. Civ. P. 23(e)............................................................................................*passim*

**Other Authorities**

Fed. R. Civ. P. 23(e)(2) advisory committee's note to 2018 amendments................................7, 9

Manual for Complex Litigation, Fourth, §21.312.........................................................23

Court-appointed Lead Plaintiffs Andrew Abernathey, Jay Abernathey, Guy Abernathey, and Meridian Investments I, LLC (collectively, "Lead Plaintiffs" or "Plaintiffs"), on behalf of themselves and the Settlement Class, respectfully submit this Memorandum of Law in support of their motion ("Motion"), pursuant to Rule 23 of the Federal Rules of Civil Procedure, for final approval of the proposed Settlement in this Action (the "Settlement"), for approval of the proposed plan of allocation of the net proceeds of the Settlement (the "Plan of Allocation"), and to certify a class for settlement purposes.[1]

## PRELIMINARY STATEMENT

After more than two years of hard-fought litigation, Lead Plaintiffs, through their counsel, obtained a $6,250,000 cash payment settlement to be made for the benefit of the Settlement Class in exchange for the dismissal of all claims against Defendants Jonathan Baliff and L. Don Miller (collectively, "Defendants" or "Settling Persons" and, with the Lead Plaintiffs, the "Parties"). This is an excellent result for the Settlement Class. The Settlement provides a significant and certain recovery while avoiding the substantial risks of prosecuting this Action through class certification, discovery, summary judgment, trial, and subsequent appeals. Moreover, the Parties reached the Settlement only after arm's-length negotiations that included a full-day mediation session over Zoom before Jed D. Melnick, Esq. of JAMS, an experienced mediator of securities class actions and other complex litigation. While that session did not result in a settlement, the Parties subsequently accepted a mediator's proposal. ¶¶ 17, 50. On a *pro rata* basis, the Settlement

---

[1] All capitalized terms used herein that are not otherwise defined have the meanings ascribed to them in the Stipulation and Agreement of Settlement dated January 27, 2021 (the "Stipulation") (ECF No. 56-1), or the concurrently filed Joint Declaration of Barry Barnett and Thomas W. Elrod in Support of: (i) Lead Plaintiffs' Motion for Final Approval of Class Action Settlement, Approval of Plan of Allocation, and Certification of Settlement Class; and (ii) Lead Counsel's Motion for an Award of Attorneys' Fees, Reimbursement of Litigation Expenses, and Service Awards for Lead Plaintiffs (the "Joint Declaration" or "Joint Decl."). Unless otherwise noted, all citations herein to "¶" and "Ex." refer, respectively, to paragraphs in and exhibits to the Joint Declaration.

Amount, as a percentage of the Class's recoverable damages, is more than triple the median recovery percentage for settlements of similar securities class actions.[2]

Lead Counsel firmly believe this Settlement is an excellent recovery for the Class based on their investigation, past experience in litigating similar cases, the significant risk, expense, and uncertainty of continued litigation, and the serious disputes between the Parties concerning the merits of the case and damages. The substantial efforts of Lead Counsel and Lead Plaintiffs, and their well-developed understanding of the strengths and weaknesses of the Action, support final approval.

Class members agree. As of today, no Settlement Class Member has objected to the terms of the Settlement and only a single investor filed an exclusion request.[3] Additionally, this Court preliminarily approved the terms of the Settlement in an order dated February 5, 2021. *See* ECF No. 61 (the "Preliminary Approval Order"). Pursuant to the Preliminary Approval Order, the Claims Administrator published the Summary Notice in *Investor's Business Daily* and transmitted it over the *PR Newswire*. In addition, 13,563 copies of the Postcard Notice were timely delivered to potential Class members and nominees. *See* Section III, *infra*.

Lead Plaintiffs also seek final approval of the proposed Plan of Allocation as set forth in the Notice. *See* Section IV, *infra*. Lead Counsel developed the proposed Plan of Allocation based

---

[2] According to a Cornerstone Research report, the median recovery in the Fifth Circuit for the ten years from 2011-2020 was 4.3% of damages for securities class action cases brought under Section 10(b) of the Securities Exchange Act of 1934. *See* Ex. A (Laarni T. Bulan & Laura E. Simmons, *Securities Class Action Settlements 2020 Review and Analysis*, Cornerstone Research, 20 Appendix 5 (2021) ("Cornerstone Report"), https://www.cornerstone.com/Publications/Reports/Securities-Class-Action-Settlements-2020-Review-and-Analysis). *See also* Ex. B (Janeen McIntosh & Svetlana Starykh, *Recent Trends in Securities Class Action Litigation: 2020 Full-Year Review*, NERA Economic Consulting, 19 (Jan. 25, 2021) ("NERA Report"), https://www.nera.com/content/dam/nera/publications/2021/PUB_2020_Full-Year_Trends_012221.pdf (finding median settlement between 2012 and 2020 in securities cases with investor losses between $20 million and $50 million recovered 5.2% of investor losses)). Measured against these yardsticks, the Settlement, if approved, will compensate the Class for approximately 17.36% of its estimated damages, which is a substantial recovery.

[3] Lead Counsel will address any exclusions or objections received by the deadline of July 16, 2021 in their reply papers, which are due by July 30, 2021.

on their understanding of the claims asserted in this Action and based on damage analysis prepared by a consulting expert.  Pursuant to the Plan of Allocation, the Settlement Fund will be allocated among Settlement Class Members based on the Settlement Class Members' recoverable damages under applicable law.

For these reasons, and those set forth below and in the Joint Declaration, Lead Plaintiffs respectfully request that the Court grant final approval of the Settlement and the Plan of Allocation and grant final certification of the Settlement Class for settlement purposes.

## PROCEDURAL HISTORY

### I.        The Class Action

On February 14, 2019, the first of the putative securities class actions was commenced in this Court against Bristow and the Individual Defendants.  *See Kokareva v. Bristow Group Inc.*, No. 4:19 Civ. 00509 (S.D. Tex. Mar. 21, 2019), ECF No. 1.[4]  On March 21, 2019, a second securities class action was filed against the same defendants.  *See Lilienfeld v. Bristow Group Inc.*, No. 4:19 Civ. 01064 (S.D. Tex. Mar. 21, 2019), ECF No. 1.  On May 14, 2019, the Court (i) consolidated the related actions; (ii) appointed Meridian Investments I, LLC and Messrs. Abernathey as Lead Plaintiffs; and (iii) appointed the law firms of Kirby McInerney LLP and Susman Godfrey LLP as Lead Counsel.  ¶ 24.  On November 4, 2019, Lead Plaintiffs filed a Consolidated Amended Class Action Complaint for violation of the Federal Securities Laws (the "CAC" or "Operative Complaint") against Defendants Miller and Baliff.  ECF No. 33.[5]  On

---

[4] For the convenience of the Court, Plaintiffs provide the Court with a brief summary of the Procedural History in this instant motion.  However, a more detailed description of the litigation's factual and procedural history in the District and Bankruptcy Court is set forth in the Joint Declaration.  *See* ¶¶ 21-47.

[5] Bristow was not named a Defendant following the Bankruptcy plan confirmation order.  ¶ 45.  Specifically, pursuant to the "Order (I) Approving the Disclosure Statement, (II) Confirming the Amended Joint Chapter 11 Plan of Reorganization of Bristow Group Inc. and Its Debtor Affiliates, as Further Modified and (III) Granting Related Relief[,]" only claims against Defendants were excluded from the third-party releases.  *See In re Bristow Group Inc.*, No. 19 BK 32713 (Bankr. S.D. Tex. Oct. 7, 2019) (hereinafter "Bankr."), Dkt. No. 822-1 at ¶40 ("solely with respect to securities class action claims that have been asserted against the previously named Individual Defendants (the

3

January 3, 2020, Miller and Baliff moved to dismiss the CAC.  On May 22, 2020, following opposition and reply briefing, the Court heard oral argument on Defendants' motion to dismiss, and denied it in full.  ¶ 30.

## II.      The Bristow Bankruptcy Proceedings

On May 11, 2019, the Company filed a voluntary petition for relief under Chapter 11 of the United States Bankruptcy Code in the United States Bankruptcy Court for the Southern District of Texas.  ¶ 23.  On or about August 1, 2019, Bristow proposed a bankruptcy plan (further amended on or about August 20, 2019) that would have released all claims against, *inter alia*, Bristow and Defendants Miller and Baliff.  *See* ¶ 40.  In other words, if approved, the proposed bankruptcy plan would have caused the termination of this Action, and it would have prevented any Settlement Class Member from bringing similar claims on their own.

On August 19, 2019, with the assistance of Bankruptcy Counsel, Lead Plaintiffs prepared and filed an objection to the August 1, 2019 Disclosure Statement for the Joint Chapter 11 Plan of Reorganization of Bristow Group Inc. and its Debtor Affiliates (the "Disclosure Statement"). Bankr. Dkt. No. 557 (the "Disclosure Statement Objection").  ¶ 41.  On September 23, 2019, Lead Plaintiffs filed an objection to the amended bankruptcy plan that provided for, *inter alia*, broad releases of Bristow's current and former directors and officers (as well as numerous other third parties).  Bankr. Dkt. No. 693 (the "Bankruptcy Plan Objection").  In these objections, Lead Plaintiffs argued that the Bankruptcy Court should deny confirmation of the Plan – as drafted – because it provided for broad releases of Bristow's current and former directors and officers (as

---

'Named Defendants') in the securities litigation styled: *In re Bristow Group Inc. Securities Litigation*, Case No. 19-cv-00509 (KPE), in the United States District Court for the Southern District of Texas, Houston Division ('Securities Litigation'), the term 'Releasing Parties' shall not include Persons or Entities that purchased or otherwise acquired Existing Interests between February 8, 2018 and February 12, 2019, inclusive, that are seeking to pursue remedies under the Securities Exchange Act of 1934 . . . .").

well as numerous other third parties). Specifically, Lead Plaintiffs argued that the Plan's Releases represented an attempt by Bristow to (1) extinguish the putative class's claims against the current and former Bristow officers named as defendants in the Securities Class Action, and (2) cut off access to the Directors' & Officers' Liability Insurance Bristow carried that provides a non-Debtor source of recovery for the stockholders Bristow allegedly defrauded – all without ever having to confront Lead Plaintiffs' claims on the merits. ¶ 43.

Lead Plaintiffs argued that the proposed third-party releases contravened controlling Fifth Circuit precedent insofar as the Fifth Circuit has "firmly pronounced its opposition to such releases[]" and held that "a non-consensual, non-debtor discharge would not be available in this circuit . . . ." *In re Vitro S.A.B. de C.V.*, 701 F.3d 1031, 1062, 1060 (5th Cir. 2012) (citation omitted). Lead Plaintiffs also argued that the Fifth Circuit has unambiguously held that its opinions "seem broadly to foreclose non-consensual non-debtor releases and permanent injunctions[,]" explaining that "[t]he fresh start § 524(e) provides to debtors is not intended to serve this purpose." *In re Pac. Lumber Co.*, 584 F.3d 229, 252, 252–53 (5th Cir. 2009). *Id.*

Following the contested Bankruptcy plan confirmation hearing, during which Lead Plaintiffs examined witnesses and prepared to argue the merits of their Bankruptcy Plan Objection, the Bankruptcy Court entered a negotiated order that modified Bristow's bankruptcy plan in a manner that preserved the claims in this Action. ¶¶ 44-45. *See* Bankr. Dkt. No. 693. Pursuant to the "Order (I) Approving the Disclosure Statement, (II) Confirming the Amended Joint Chapter 11 Plan of Reorganization of Bristow Group Inc. and Its Debtor Affiliates, as Further Modified and (III) Granting Related Relief[,]" the claims previously asserted against the Defendants in this Action were excluded from the bankruptcy releases of claims against past and present officers and directors of Bristow. *See* Bankr. Dkt. No. 825 at ¶ 40. The exclusion from the release was limited

to claims relating to the period between February 8, 2018 and February 12, 2019, inclusive (*i.e.*, the Class Period in this Action), and liability was restricted to amounts covered by available D&O Policy limits. *Id.*

## III.    Settlement Negotiations

In July of 2020, shortly after discovery commenced, the Parties agreed to enter into mediation. ¶ 32. On October 15, 2020, the Parties participated in a full-day virtual Zoom mediation session before Mr. Melnick, which did not successfully culminate into an agreement. *Id.* After continued negotiations with Mr. Melnick, the mediator recommended that the Parties resolve the Action for $6,250,000. On or about November 3, 2020, the Parties accepted the mediator's recommendation. *Id.* In addition, the Parties engaged in informal confirmatory discovery that provided further confirmation to Lead Counsel that the proposed Settlement was fair, reasonable, and adequate. Subsequently, the Parties negotiated the terms of the Settlement and memorialized them in the Stipulation. ¶¶ 34-35, 37.

## IV.    Preliminary Approval

On January 28, 2021, Lead Plaintiffs filed an unopposed motion for preliminary approval of the Settlement accompanied by the Stipulation with the attached exhibits. ECF Nos. 55 & 56. As mentioned in the Preliminary Statement, the Court entered its Preliminary Approval Order on February 5, 2021. In the order, the Court preliminarily approved the terms of the Settlement, certified the class, and approved the proposed form and methods of distributing Notice to the Settlement Class as described herein in Section III, *infra*.

**ISSUES PRESENTED**

Should the Court grant final approval of the proposed Settlement and the Plan of Allocation? Plaintiffs submit the Court should grant final approval of both.

**ARGUMENT**

**I.    Legal Standards Governing Approval of Class Action Settlements**

The Fifth Circuit has long recognized that there is a prevailing public policy in favor of settlement in class action lawsuits, especially in complex cases such as this one. *See, e.g.*, *In re Deepwater Horizon*, 739 F.3d 790, 807 (5th Cir. 2014) (citations omitted) ("'overriding public interest in favor of settlement' that we have recognized '[p]articularly in class action suits.'"), *cert. denied sub nom.*, *BP Expl. & Prod. Inc. v. Lake Eugenie Land & Dev., Inc.*, 574 U.S. 1054 (2014); *Cotton v. Hinton*, 559 F.2d 1326, 1331 (5th Cir. 1977) (finding that "[p]articularly in class action suits, there is an overriding public interest in favor of settlement" because class actions "have a well deserved reputation as being most complex."); *Miller v. Republic Nat'l Life Ins. Co.*, 559 F.2d 426, 428 (5th Cir. 1977) (settlements of class actions are "highly favored in the law and will be upheld whenever possible because they are a means of amicably resolving doubts and preventing lawsuits.").

Under Federal Rule of Civil Procedure 23(e), the Court should grant final approval of the Settlement if it finds that it is "fair, reasonable, and adequate . . . [.]" *See* Fed. R. Civ. P. 23(e)(2); *In re Heartland Payment Sys., Inc. Customer Data Sec. Breach Litig.*, 851 F. Supp. 2d 1040, 1063 (S.D. Tex. 2012). In analyzing this standard, courts consider a four-pronged test that determines if the proposed settlement is fair, reasonable, and adequate. According to the 2018 amendments to Rule 23, the first two of these prongs (Rule 23(e)(2)(A)-(B)) address the "procedural" fairness of the settlement, while the last two (Rule 23(e)(2)(C)-(D)) address the "substantive" fairness. *See* Fed. R. Civ. P. 23(e)(2) advisory committee's note to 2018 amendments. The prongs are as set forth below:

A.    the class representatives and class counsel have adequately represented the class;

B.    the propos[ed] [settlement] was negotiated at arm's length;

    C.    the relief provided for the class is adequate, taking into account:
        i. the costs, risks, and delay of trial and appeal;
        ii. the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;
        iii. the terms of any proposed award of attorneys' fees, including timing of payment; and
        iv. any agreement required to be identified under Rule 23(e)(3); and
    D.    the proposal treats class members equitably relative to each other.

Fed. R. Civ. P. 23(e)(2)(A)-(D).

When considering final approval, the dispositive question is whether the proposed settlement, "taken as a whole, is so unfair on its face as to preclude judicial approval." *McNary v. Am. Sav. & Loan Ass'n*, 76 F.R.D. 644, 649 (N.D. Tex. 1977); *Rubenstein v. Republic Nat'l Life Ins. Co.*, 74 F.R.D. 337, 347 (N.D. Tex. 1976). To assist in evaluating final approval and whether a settlement is fair, reasonable, and adequate, the Fifth Circuit has considered several factors as set forth below, otherwise known as the *Reed* factors:

(1) the existence of fraud or collusion behind the settlement; (2) the complexity, expense, and likely duration of the litigation; (3) the stage of the [litigation] and the amount of discovery completed; (4) the probability of plaintiffs' success on the merits; (5) the range of possible recovery [and certainty of damages]; and (6) the opinions of the class counsel, class representatives, and absent class members.

*Reed v. Gen. Motors Corp.*, 703 F.2d 170, 172 (5th Cir. 1983); *see also Newby v. Enron Corp.*, 394 F.3d 296, 301 (5th Cir. 2004).[6]

Here, the proposed Settlement satisfies all of the *Reed* factors as well as the Rule 23(e)(2) factors, and they weigh in favor of final approval as demonstrated below.

---

[6] Notably, the Rule 23(e)(2) factors are intended to complement the *Reed* factors rather than to "displace" them. *See In re Chinese-Manufactured Drywall Prods. Liab. Litig.*, 424 F. Supp. 3d 456, 485 (E.D. La. 2020) (stating the purpose of Rule 23(e)(2) is to provide guidance and not to displace circuit court factors).

## II.    The Proposed Settlement is Fair, Reasonable, and Adequate

### A.    The Procedural Requirements are Satisfied

The first two factors of Rule 23(e)(2)—*i.e.*, the adequacy of the class's representation, and whether the settlement was the product of arm's-length negotiations—"look[] to the conduct of the litigation and of the negotiations leading up to the proposed settlement."  Fed. R. Civ. P. 23(e)(2) Advisory Committee Note to 2018 Amendments.

#### 1.    Plaintiffs and Lead Counsel Adequately Represented the Settlement Class

Rule 23(e)(2)(A) requires the Court to consider whether "the class representatives and class counsel have adequately represented the class[.]"  Fed. R. Civ. P. 23(e)(2)(A).  In applying this standard, courts look to whether the compromise represents a "reasonable evaluation of the risks of litigation[]" in light of the parties' claims and defenses.  *Florida Trailer & Equip. Co. v. Deal*, 284 F.2d 567, 571 (5th Cir. 1960).  Here, Lead Plaintiffs are investors whose interests in obtaining the largest possible recovery in the Action are aligned with the other Settlement Class Members.  Lead Plaintiffs purchased Bristow common stock during the Settlement Class Period at prices that were allegedly artificially inflated by the same alleged public misrepresentations that affected the prices paid by all of the Settlement Class Members.

In addition, Lead Plaintiffs selected counsel who are highly experienced in litigating securities class action lawsuits.  *In re Seitel Sec. Litig.*, 245 F.R.D. 263, 273 (S.D. Tex. 2007) (Gilmore, J) (adequacy of the settlement was supported by counsel's experience and expertise in litigation).  Lead Counsel have adequately represented the Settlement Class by vigorously prosecuting the Action throughout the litigation, including in federal bankruptcy court.  Indeed, the Settlement was reached after Plaintiffs' Counsel among other things:  (i) conducted a detailed investigation into the alleged misconduct, which included, *inter alia*, a review and analysis of

9

Bristow's regulatory filings with the U.S. Securities and Exchange Commission, press releases, and media reports issued and disseminated by Bristow and Defendants, a review of other publicly available information regarding Bristow including securities analyst reports on Bristow and filings concerning Bristow in Bristow's bankruptcy, and discussion with accounting, market efficiency, and loss causation and damages experts (¶¶ 8, 51); (ii) drafted the Operative Complaint (¶¶ 8, 12, 28); (iii) engaged in adversarial motion practice in federal bankruptcy court in opposition to Bristow's proposed bankruptcy plan in order to preserve claims against the Settling Persons that would have otherwise been released (¶¶ 39-47); (iv) engaged in extensive briefing in connection with Defendants' motion to dismiss and successfully defeated it (¶ 29); (v) commenced fact discovery by serving discovery requests (¶ 33); (vi) drafted and exchanged a detailed mediation statement attaching supporting exhibits and addressing issues related to both liability and damages (¶ 32); (vii) engaged in an arm's-length  mediation  facilitated by Mr. Melnick as the mediator (*id.*); (viii) negotiated the terms of the proposed Settlement (¶¶ 34-35); (ix) formulated the Plan of Allocation based on expert analysis that treats Lead Plaintiffs and all other members of the proposed Settlement Class equitably and fairly (¶¶ 59-66); and (x) conducted confirmatory discovery by reviewing non-public Bristow documents and interviewing Bristow's former Chief Financial Officer (and later Chief Executive Officer), Defendant Miller (¶ 36).  *See also In re Heartland Payment Sys.*, 851 F. Supp. 2d at 1065 (finding that representation was adequate where counsel "possessed sufficient information to gauge the strengths and weaknesses of the claims and defenses[]").

Based on the foregoing, it is respectfully submitted that Lead Plaintiffs and Lead Counsel have adequately represented the Settlement Class.

2.    **The Settlement Resulted from Extensive Arm's-Length Negotiations Between Experienced Counsel Under the Auspice of An Experienced Mediator**

Rule 23(e)(2)(B) and the first *Reed* factor are readily satisfied where there is no "fraud or collusion behind the settlement[.]" *Reed*, 703 F.2d at 172. Courts have found indications of non-collusion in instances where parties reach a settlement with the aid of a neutral arbiter. *Murillo v. Tex. A&M Univ. Sys.*, 921 F. Supp. 443, 445 (S.D. Tex. 1996).

As discussed above (*see* Section III, *supra*), the Parties reached the Settlement after hard-fought arm's-length negotiations presided over by Mr. Melnick, an experienced and well-respected mediator. The Parties exchanged detailed mediation statements and supporting exhibits in connection with disputes, including liability and damages. ¶ 32. After a mediation session on October 15, 2020, counsel for the Parties engaged in further discussions and negotiations. *Id.* These continued negotiations resulted in a mediator's proposal that the Parties accepted. *Id.* Mr. Melnick's substantial involvement and support in negotiating the Settlement further corroborate the conclusion that the Settlement was achieved without collusion. *See Rodriguez v. Stage 3 Separation, LLC*, No. 14 Civ. 603, 2015 WL 12866212, at *3 (W.D. Tex. Dec. 23, 2015) (no collusion when "parties attest that they 'engaged in arm's-length and extended settlement negotiations, including a full-day mediation.'"). Moreover, the Parties conducted confirmatory discovery that allowed them to evaluate whether the proposed Settlement is fair, reasonable, and adequate. As a result, the Parties thoroughly investigated the claims and attained deep knowledge of the strengths and weaknesses of the case. These good-faith negotiations culminated in an excellent settlement recovery of $6,250,000 in cash.

B.    **The Substantive Requirements are Satisfied**

The "substantive" requirements for final approval test the adequacy of the relief provided for the Class and whether the proposal "treats class members equitably relative to each other."

Fed. R. Civ. P. 23(e)(2)(C)–(D).  Here, upon consideration of the substantial risks inherent in continuing litigation, the Settlement provides a highly favorable recovery for the Class.

### 1.    The Relief Provided for the Settlement Class Is Fair and Adequate Given the Complexity, Costs, Risks, and Delay of Trial and Appeal

The Court considers the second *Reed* factor by analyzing the complexity, expense, and likely duration of continued litigation.  "When the prospect of ongoing litigation threatens to impose high costs of time and money on the parties, the reasonableness of approving a mutually-agreeable settlement is strengthened."  *Klein v. O'Neal, Inc.*, 705 F. Supp. 2d 632, 651 (N.D. Tex. 2010) (citing *Ayers v. Thompson*, 358 F.3d 356, 369 (5th Cir. 2004)).  Here, representatives of the Defendants would vigorously defend and seek to refute Lead Plaintiffs' claims at the class certification stage, during factual and expert discovery, summary judgment, trial, and post-trial proceedings.  Particularly during trial, the proceedings could involve weeks of hot disputes in connection with financial matters, damages experts' calculations, and initiation of the lengthy *Daubert* motion practice.  Continued litigation would undoubtedly increase the costs, time, and complexity for the Settlement Class in light of the challenging nature of the class action lawsuit.  *See Alaska Elec. Pension Fund v. Flowserve Corp.*, 572 F.3d 221, 253 (5th Cir. 2009) ("securities class-action plaintiff must thread the eye of a needle made smaller and smaller over the years by judicial decree and congressional action[]").

While the motion to dismiss was denied, the Court stated that it was a "close call . . . ." ¶ 30 (*citing* MTD Transcript at 30:15-22 (ECF No. 53)).  Even if Lead Plaintiffs prevailed on a wider margin, there remain significant issues that could potentially arise as the Parties engage in extensive discovery, oppose the inevitable motion for summary judgment, and if successful in those efforts, prove liability at trial, including expert witness admissibility and risks to proving liability, causation, and damages that would be subject to a jury determination.  These claims

would take approximately a few weeks to try and would expend many resources. Moreover, the Settlement Class would likely have to wait longer to get recovery, to the extent that there would be any, if Defendants were to appeal any judgment. *See Schwartz v. TXU Corp.*, No. 02 Civ. 2243, 2005 WL 3148350, at *19 (N.D. Tex. Nov. 8, 2005) ("if Plaintiffs were to succeed at trial, they still could expect a vigorous appeal by Defendants and an accompanying delay in the receipt of any relief[]"). Moreover, Lead Counsel were litigating the case against one of the nation's most successful and respected law firms, King & Spalding LLP, whose attorneys have considerable experience in securities litigation.

Upon consideration of the substantial risks inherent in continuing litigation, the Settlement provides a highly favorable recovery for the Class. The Settlement will provide an immediate $6.25 million recovery for the Settlement Class without having to face the aforementioned risks in continued litigation. In addition, the proposed Plan of Allocation was designed to ensure that the Settlement Class Members received equitable treatment relative to their investment losses. *See* Section IV, *infra*.

### 2. The Stage of the Litigation and Available Discovery Support Final Approval

The third *Reed* factor weighs in favor of final approval. Under this factor, the court analyzes whether the parties had ample information at their disposal to make a reasoned judgment on the merits of the opposing arguments. *See In re Heartland Payment Sys.*, 851 F. Supp. 2d at 1064-65 (citing cases); *see also In re OCA, Inc. Sec. & Derivative Litig.*, No. 05 Civ. 2165, 2009 WL 512081, at *12 (E.D. La. Mar. 2, 2009) ("The question is . . . but whether the parties have obtained sufficient information about the strengths and weaknesses of their respective cases to make a reasoned judgment about the desirability of settling the case on the terms proposed or continuing to litigate it.").

As discussed above, the Parties achieved the Settlement after two years of hard-fought litigation in both trial and federal bankruptcy courts. ¶¶ 21-47. Plaintiffs conducted in-depth research into Bristow's securities filings over a multi-year period from before, during, and after the class period; studied market reports from investment advisors and other commercial analysts; reviewed Bristow earnings calls with shareholders; and carefully scrutinized Bristow's publicly filed contracts, including the agreements at the center of this case—Bristow's secured financing agreements containing the collateral—maintenance covenants, and Bristow's ill-fated acquisition agreement with Columbia Helicopters. Lead Counsel also engaged in confirmatory discovery, extensively briefed Defendants' motion to dismiss with success, and objected to the proposed bankruptcy plan in order to preserve claims against the Defendants that would have otherwise been released. Thus, at this stage of litigation, the Parties had ample information available to them to evaluate and make reasoned judgments about the desirability of settling the claims based on the strengths and weaknesses of their respective positions.

### 3.      The Risk of Further Litigation Supports Final Approval

The fourth *Reed* factor also weighs in favor of the final approval of the Settlement. While Lead Plaintiffs have strong evidence to support their claims and prove Defendants' liability, Lead Plaintiffs are also cognizant of the substantial risks in continuing litigation and during trial. In consideration of all the risks that Lead Plaintiffs would have been exposed to, *e.g.*, proving liability, loss causation, and damages, Lead Plaintiffs and their counsel determined that the Settlement was in the best interest of the Settlement Class.

### a.      Risks to Proving Liability

As is typically the case in securities class actions, Lead Plaintiffs faced formidable risks in reaching this stage of the proceedings and procuring an excellent recovery for the Settlement Class. Lead Plaintiffs alleged that Defendants violated §§10(b) and 20(a) of the Exchange Act by issuing

14

or omitting material misstatements regarding Bristow's internal controls, debt levels, liquidity, financial condition and prospects, and other non-financial covenants. As a result of this alleged misconduct, the share price of Bristow's stock was artificially inflated during the Settlement Class Period, thereby injuring the Settlement Class Members when the truth was revealed.

Although Lead Plaintiffs believe that they can successfully prove Defendants' liability, Lead Plaintiffs are also aware of the risks that they would encounter in the face of Defendants' vigorous defense against the allegations. Indeed, Defendants attempted to evade their admissions on issuing false statements regarding the adequacy of their internal controls during the motion to dismiss briefing stage. They argued that their filing for bankruptcy, rather than the internal control violations, caused them to reclassify their debt obligations. *See* ECF No. 36 at 18. Defendants have also argued that any non-compliance with the non-financial covenants was not a material breach and that Bristow cured or obtained waivers of any covenant violations. *See id.* at 19-20. Defendants also claim that Bristow worked transparently and quickly to resolve its non-compliance and internal control issues with its outside auditor. *See id.* at 6-8.

There were additional risks related to proving scienter. Defendants would have claimed that they did not have the fraudulent intent required in a securities fraud claim. Specifically, Defendants would likely argue that they justifiably believed that their contractual violations were immaterial technical breaches which were promptly cured and/or waived. Defendants would have produced witnesses and documents that favor their position. Although Lead Plaintiffs believe that they would be able to obtain sufficient evidence and successfully prove that Defendants had the intent to deceive or defraud, the uncertainty of jury reaction would pose as a significant barrier to recovery. In addition, Lead Plaintiffs' success would not be guaranteed, particularly in light of this Court's note that the motion to dismiss was a "close call . . . ." ¶ 30.

Further, Lead Plaintiffs would have faced additional challenges during class certification, completion of fact and expert discovery, at summary judgment, at trial, and during post-trial proceedings. Notably, Lead Plaintiffs would have the ongoing risk of maintaining class-action status through trial. *See OCA*, 2009 WL 512081, at *21 ("Fifth Circuit decisions on causation, pleading and proof at the class certification stage make PSLRA claims particularly difficult . . . ."). Given this backdrop, it is clear that the Defendants would aggressively support their allegations and defenses, and Lead Plaintiffs would be exposed to significant litigation risks.

Although Lead Plaintiffs would be able to assert meritorious counterarguments, prevailing on those claims would not be immediate and certain, unlike the recovery in the Settlement. As mentioned earlier, this Court narrowly denied the motion to dismiss, which further supports the desirability of the Settlement. As set forth above, Defendants would continue to bolster their position that they made no material misstatements, and/or assert that they did not have the requisite scienter. Thus, Lead Plaintiffs achieved a recovery that is well within the range of reasonableness without prolonging an uncertain and costly litigation against the Defendants.

### b.     Risks of Proving Loss Causation and Damages

Even if Lead Plaintiffs were successful in defeating summary judgment and establishing liability at trial, they would face significant obstacles in proving loss causation and damages. Defendants would use their own damages experts to argue that Lead Plaintiffs' investment losses were not attributable to Defendants' alleged misconduct, but to non-fraud related factors such as the market deterioration in the offshore oil and gas industry. As previewed in Defendants' motion to dismiss, Defendants would also argue that Bristow's stock price declines were caused by announcements that warned of dire consequences that may potentially result from cross-defaults, which were cured or waived thereafter. In other words, Defendants would argue that the stock price declines had nothing to do with Lead Plaintiffs' alleged fraud, and thus, any stock price

decline flowing therefrom would need to be disaggregated from this other confounding news. As plaintiffs in securities class actions bear the burden of proof, Lead Plaintiffs would face significant challenges to successfully convince the jury. *See Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 345-46 (2005) (citing 15 U.S.C. § 78u-4(b)(4)) (Plaintiffs bear the burden of proving "that the defendant's misrepresentations 'caused the loss for which the plaintiff seeks to recover.'"); *Buettgen v. Harless*, No. 09 Civ. 791, 2013 WL 12303143, at *8 (N.D. Tex. Nov. 13, 2013) (stating that "there is no way of predicting which interpretations, inferences or testimony a jury would accept[]").

Had the Action not settled, the dispute over damages would have devolved into a costly battle of experts. *See In re Cendant Corp. Litig.*, 264 F.3d 201, 239 (3d Cir. 2001). In such a scenario, Plaintiffs faced the very real risk that the jury would ultimately accept the opinions of defendants' experts over those of plaintiffs' experts. Given the challenges that Lead Plaintiffs would face at summary judgment, trial, and post-trial to establish liability, scienter, loss causation, and damages, the Settlement should be favored.

### 4.    The Range of Possible Recovery and Certainty of Damages Support Final Approval

The fifth *Reed* factor looks to whether the Settlement recovery is reasonable in consideration of the merits of plaintiff's claims. *See Billitteri v. Sec. Am., Inc.*, No. 09 Civ. 1568, 2011 WL 3586217, at *12 (N.D. Tex. Aug. 4, 2011) ("whether the terms of the settlement 'fall within *a reasonable range of recovery*, given the likelihood of the plaintiffs' success on the merits.'").

Here, the $6.25 million recovery is within the range of reasonableness upon consideration of the practical, legal, and factual risks inherent in continued litigation as detailed above. If Lead Plaintiffs overcame all of the obstacles discussed above and prevailed on proving liability and

17

damages, Lead Plaintiffs' damages expert estimates that the total maximum damages potentially available in this Action would be $36 million.[7]  Given the risks mentioned above, the $6.25 million recovery is well within the range of reasonableness.  The Settlement recovery represents 17.36% of the estimated maximum potential damages for the Settlement Class.  This recovery percentage compares very favorably with recovery percentages in settlements of similar securities class actions, according to data compiled by the Cornerstone Report and the NERA Report.  According to the Cornerstone Report, a 17.36% recovery is more than triple the median percentage recovery for securities fraud cases of this size, and more than 4 times the median percentage recovery for securities class actions in the Fifth Circuit.  *See* Ex. A (Bulan & Simmons, *supra* note 2, at 6 Figure 5 and 20 Appendix 5 (reporting median recoveries of approximately 5.3% of estimated damages in securities class actions alleging between $25-$74 million in damages and a median recovery of 4.3% overall in securities class actions in the Fifth Circuit)).  The NERA Report corroborates the Cornerstone Report by providing similar statistics.  *See* Ex. B (McIntosh & Starykh, *supra* note 2, at 19 (reporting median recoveries of approximately 5.2% of estimated damages in cases between $20-$50 million in damages)).

## 5.   Lead Counsel, Lead Plaintiff, and Settlement Class Members Support Final Approval

The final factor is the opinions of class counsel, class representatives, and absent class members, and all weigh in favor of final approval.  Upon an experienced trial counsel's extensive fact-finding and evaluation of the strengths of the case, courts typically defer to the counsel's judgment in class action litigation because counsel has the best perspective on the merits of the case.  *Schwartz*, 2005 WL 3148350, at *21 ("[W]here the parties have conducted an extensive

---

[7] This estimate is based on, *inter alia*, determining the per-share stock price reactions to the alleged corrective disclosures, and estimates of the number of shares that were acquired by class members during the class period that remained unsold following each alleged corrective disclosure.

Case 4:19-cv-00509   Document 64   Filed on 07/02/21 in TXSD   Page 25 of 33

investigation, engaged in significant fact-finding and Lead Counsel is experienced in class-action litigation, courts typically 'defer to the judgment of experienced trial counsel who has evaluated the strength of his case.'").[8]  Here, Lead Counsel strongly endorse the Settlement and believe that it achieved an excellent recovery for the Settlement Class while avoiding exposure to substantial litigation risks.  *See* ¶ 51.  While Lead Counsel did not engage in extensive formal discovery, they did conduct an exhaustive investigation and confirmatory discovery, interview Bristow's former CFO (and later CEO), successfully defeat counterarguments raised by equally-seasoned opposing counsel, consult with accounting and damages experts, and resolve this Action through careful deliberations with an experienced third-party mediator.  ¶ 49.

Lead Plaintiffs, who have monitored and tracked Lead Counsel's work throughout the Litigation, also endorses the approval of the Settlement.[9]  In addition, to date, the reaction of Settlement Class Members has been favorable, with no objections and only a single request for exclusion, which also strongly supports final approval.  As noted above, Lead Counsel will address any exclusions or objections received by the deadline of July 16, 2021 in their reply papers, which are due by July 30, 2021.

Accordingly, all *Reed* factors are objectively satisfied and weigh in favor of final approval of the Settlement.

---

[8] *See DeHoyos v. Allstate Corp.*, 240 F.R.D. 269, 292 (W.D. Tex. 2007) ("The endorsement of class counsel is entitled to deference, especially in light of class counsel's significant experience in complex civil litigation and their lengthy opportunity to evaluate the merits of the claims."); *Marcus v. J.C. Penney Co., Inc.*, No. 13 Civ. 736, 2017 WL 6590976, at *3 (E.D. Tex. Dec. 18, 2017) ("[s]ignificant weight is given to the opinion of class counsel" and "the court is not to substitute its own judgment for that of counsel[]").

[9] *See* Ex. D, Joint Declaration of Andrew Abernathey, Jay Abernathey, and Guy Abernathey in Support of Lead Plaintiffs' Motion for: (1) Final Approval of Class Action Settlement; (2) Approval of Plan of Allocation; (3) Award of Attorneys' Fees and Expenses; and (4) Award to Lead Plaintiffs Pursuant to 15 U.S.C. § 78u-4(a)(4).

### 6.     The Remaining Rule 23(e)(2) Factors Are Also Met

Under Rule 23(e)(2)(C), courts also must consider whether the relief provided for the class is adequate in light of "the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims[,]" "the terms of any proposed award of attorney's fees, including timing of payment[,][]" and "any agreement required to be identified under Rule 23(e)(3) . . . ." Fed. R. Civ. P. 23(e)(2)(C)(ii)-(iv). Each of these factors supports the Settlement's approval or is neutral; thus, they do not suggest any basis for concluding the Settlement is inadequate.

### a.     The Proposed Method for Distribution Is Effective

Lead Plaintiffs' proposed method for processing Class members' claims and distributing relief to eligible claimants is comprised of well-established, effective procedures and will efficiently distribute the Net Settlement Fund. *See* Section IV, *infra*. Lead Plaintiffs' proposed Plan of Allocation distributes the Net Settlement Fund to Class Members who submit timely and valid claim forms. *See* Angeion Decl., Ex. B at 9-10. The Court-appointed Claims Administrator ("Angeion") will then determine each Authorized Claimant's *pro rata* share based upon their respective recognized loss. This Plan of Allocation is an effective way of distributing the Settlement among a sizable Class, relative to their respective losses, while not giving preferential treatment to Lead Plaintiffs or any other Class Member. Therefore, the Plan of Allocation is an unbiased and effective method of allocating the Settlement Fund.

### b.     Requests for Attorneys' Fees, Expense Reimbursement, and Incentive Awards are Reasonable

Rule 23(e)(2)(C)(iii) addresses "the terms of any proposed award of attorney's fees, including timing of payment." As disclosed in the Notice, Lead Counsel will apply for attorneys' fees in the amount of 33% of the Settlement, plus reimbursement of reasonable expenses. Lead

20

Counsel has filed a motion for an award of attorneys' fees and litigation expenses concurrently herewith. As detailed therein, an attorneys' fee award of 33% of a Settlement is consistent with awards approved in comparable class actions, and is well-supported in light of the extensive work performed and the results obtained. This amount is consistent with other awards in securities class action cases in this Circuit. *See Miller v. Glob. Geophysical Servs., Inc.*, No. 14 Civ. 708, 2016 WL 11645372, at *1 (S.D. Tex. Jan. 14, 2016) (Gilmore, J.) (one-third of the settlement was a reasonable fee given the "time and labor required, the novelty and difficulty of the case, the skill required to prosecute the case, the experience and ability of the attorneys, awards in similar cases, the contingent nature of the representation and the result obtained for the Class[]"). Lead Counsel's motion also includes a request for payment of $60,618.84 in expenses incurred by Plaintiffs' Counsel, and $10,000 in aggregate service awards to the four Lead Plaintiffs.

Pursuant to the terms of the Stipulation, and as is standard in securities class actions, attorneys' fees and expenses will be paid upon any such award granted by the Court, and shall be reimbursed to the Settlement Fund if the award is reduced or reversed in any subsequent legal proceedings. Stipulation at ¶ 17. Critically, with respect to the Court's consideration of the reasonableness of the Settlement, is the fact that approval of attorneys' fees is entirely separate from approval of the Settlement, and neither Plaintiffs nor Lead Counsel may terminate the Settlement based on the Court's or any appellate court's ruling with respect to the ultimate award of attorneys' fees or expenses. *Id.*

### c.    There Are No Other Agreements Besides Opt Outs

Rule 23(e)(2)(C)(iv) requires the disclosure of any agreement made in connection with the proposed Settlement. As disclosed in the Stipulation (Stipulation at ¶ 36), and in the memorandum in support of Lead Plaintiffs' Preliminary Approval Motion (ECF No. 55 at 16-17), the Settling Parties have entered into a standard supplemental agreement which provides that if Settlement

Class Members opt out of the Settlement such that the number of shares of Bristow common stock represented by such opt outs equals or exceeds a certain amount, Settling Persons have the option to terminate the Settlement.   While identified in the Stipulation, the specific terms of the supplemental agreement are confidential.  The supplemental agreement is available for in-camera review at the Court's request.  *See*, *e.g.*, *Erica P. John Fund, Inc. v. Halliburton Co.*, No. 02 Civ. 1152, 2018 WL 1942227, at *5 (N.D. Tex. Apr. 25, 2018) (granting final approval of securities class action that included a supplemental confidential agreement permitting settlement termination in the event of exclusion requests by a certain portion of the class); *see also N.Y. State Teachers' Ret. Sys. v. Gen. Motors Co.*, 315 F.R.D. 226, 240 (E.D. Mich. 2016) ("The opt-out threshold 'is typically not disclosed . . . '").  Such an agreement is a standard provision in securities class actions and thereby should not negatively affect the Court's determination of whether the Settlement is fair, reasonable, and adequate.  Accordingly, all the remaining Rule 23(e)(2) factors are satisfied.

### d.    Settlement Class Members Are Treated Equitably

The Plan of Allocation, discussed below in Section IV, *infra*, which is set out in the Notice, explains how the Settlement proceeds will be distributed among Authorized Claimants.  It provides formulas for calculating the recognized claim of each Settlement Class Member, based on each such person's purchases or acquisitions of Bristow common stock during the Settlement Class Period.   Lead Plaintiffs, like all other Settlement Class Members, will be subject to the same formulas for distribution of the Settlement as described in the Plan of Allocation.

### III.    Notice to the Settlement Class Satisfies Rule 23 and Due Process

In connection with a Settlement Class maintained under Rule 23(b)(3), class notice must meet the requirements of both Rule 23(c)(2) and Rule 23(e).  *See Vaughn v. Am. Honda Motor Co.*, 627 F. Supp. 2d 738, 744 (E.D. Tex. 2007), *stay granted*, *order amended sub nom. Vaughn v. Am. Honda Motor Co.*, 507 F.3d 295 (5th Cir. 2007); *Schwartz*, 2005 WL 3148350, at *10.  Rule

23(c)(2) requires "the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." Fed. R. Civ. P. 23(c)(2)(B). Rule 23(e) is less specific, requiring only that notice of the proposed settlement be given "in a reasonable manner to all class members who would be bound by the proposal . . . ." Fed. R. Civ. P. 23(e)(1)(B).

While "'[t]here are no rigid rules to determine whether a settlement notice satisfies constitutional or Rule 23(e) requirements . . . the settlement notice must fairly apprise the prospective members of the class of the terms of the proposed settlement and of the options that are open to them in connection with the proceedings.'" *In re Heartland Payment Sys.*, 851 F. Supp. 2d at 1060. "Rule 23(e)(1)(B) requires the court to 'direct notice in a reasonable manner to all class members who would be bound by a proposed settlement, voluntary dismissal, or compromise' . . . ." Manual for Complex Litigation, Fourth, §21.312 at 293 (citing Fed. R. Civ. P. 23(e)(1)(B)). To satisfy due process, notice to class members must be "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 314 (1950).

Here, in accordance with the Preliminary Approval Order, starting on March 8, 2021, the Claims Administrator mailed the Postcard Notice to potential Settlement Class Members and nominees. *See* ¶ 58. As of June 30, 2021, a total of 13,563 Postcard Notices have been mailed to potential Settlement Class Members and their nominees. *Id.* Moreover, the Summary Notice was published once in *Investor's Business Daily* on March 15, 2021 and issued once over PR Newswire on March 15, 2021. Angeion ¶ 11 & Exs. D and E thereto. The Settlement information, including downloadable copies of the Notice and Proof Claim and Release, was posted on a website

exclusively established for the Settlement: https://www.bristowsecuritiessettlement.com. *Id.* ¶ 12. The Notice contained a description of the Action and the Settlement, including the recovery amount, attorneys' fees, and proposed Plan of Allocation. Angeion, Ex. B. The notice program provided all the information required by the PSLRA and adequately meets the due process and Rules 23(c)(2) and (e) requirements for providing notice to the Settlement Class.[10]

## IV.      The Plan of Allocation Satisfies Rule 23 and Due Process

Courts must consider the Plan of Allocation under the same standard as the Settlement. The Plan of Allocation must be "fair, reasonable, and adequate[,]" and not be "the product of collusion between the parties." *In re Chicken Antitrust Litig. Am. Poultry*, 669 F.2d 228, 238 (5th Cir. 1982). The Court should grant final approval for the Plan of Allocation because it does not improperly yield to any segment of the Settlement Class by providing preferential treatment. *See, e.g.*, *OCA*, 2009 WL 512081, at *11 (granting final approval to plan of allocation that "does not give unfair or preferential treatment to the lead plaintiff or any segment of the class.").

Here, the Plan of Allocation was fully disclosed in the Notice, which is posted on the Settlement website. *See* Angeion, Ex. B at 9-10. The Plan of Allocation was based on expert damages calculations, and provides a framework to allocate the Settlement Fund fairly among the Settlement Class Members, with *pro rata* allocations based on Settlement Class Members' recoverable damages. *Id.*, Notice at 9-10; *see, e.g.*, *In re Dell Inc., Sec. Litig.*, No. 06 Civ. 726, 2010 WL 2371834, at *10 (W.D. Tex. June 11, 2010) (to be fair, reasonable, and adequate, "[t]he allocation formula 'need only have a reasonable, rational basis, particularly if recommended by experienced and competent counsel[] . . . .'"); *Schwartz*, 2005 WL 3148350, at *8 (granted

---

[10] After the Claims Administrator completes the claims administration process, Lead Counsel will file a distribution motion with the Court which will contain, *inter alia*, the number of Class Members who submitted valid claims.

approval of plan of allocation "formulated by Lead Counsel with assistance from its materiality and damages experts[]").

The Plan of Allocation equitably distributes the Settlement proceeds to the members of the Settlement Class who suffered damages as a proximate result of Defendants' alleged fraud.  The allocation is based on a number of factors including the number of class period-purchased Bristow shares held at the time of each alleged corrective disclosure, the stock price declines in reaction to each disclosure, the prices paid by class members to purchase those shares, and the prices received from any sales of those shares.  ¶¶ 59-66.  Settlement Class Members who purchased or otherwise acquired Bristow common stock and held it during any of the corrective disclosures will receive an appropriate recovery according to the recognized loss calculations.  *Id*.  Thus, the Plan of Allocation is fair, reasonable, and adequate and should be granted final approval.

## V.        The Settlement Class Should be Finally Certified

The Court previously granted preliminary certification to the Settlement Class under Rules 23(a) and (b)(3).  *See* Preliminary Approval Order ¶ 1.  Because nothing has occurred since then to cast doubt on the propriety of class certification for settlement purposes, and no objections have been received to date, the Court should grant final class certification.

## CONCLUSION

Based on the foregoing, Plaintiffs respectfully request that the Court enter the proposed Final Approval Order, granting:  (i) final approval of the Settlement, (ii) approval of the Plan of Allocation, and (iii) final certification of the Settlement Class for settlement purposes.

Dated: July 2, 2021                                  Respectfully submitted,

**SUSMAN GODFREY LLP**

/s/ *Barry Barnett*
Barry Barnett
Michael C. Kelso

25

1000 Louisiana, Suite 5100
Houston, TX 77002
Telephone: (713) 651-9366
bbarnett@susmangodfrey.com
mkelso@susmangodfrey.com

**KIRBY McINERNEY LLP**
Ira M. Press (admitted *pro hac vice*)
Thomas W. Elrod (admitted *pro hac vice*)
250 Park Avenue, Suite 820
New York, NY 10177
Telephone: (212) 371-6600
ipress@kmllp.com
telrod@kmllp.com

*Lead Counsel for Lead Plaintiffs
and the Settlement Class*

## CERTIFICATE OF SERVICE

I hereby certify that on July 2, 2021, all counsel of record who are deemed to have consented to electronic service are being served with a copy of this document via the Court's CM/ECF Filing System.

*/s/ Barry Barnett*
Barry Barnett
