# EXHIBIT I

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

IN RE BRISTOW GROUP INC.
SECURITIES LITIGATION

Case No. 4:19-cv-00509 (KPE)

**COMPENDIUM OF UNPUBLISHED CASES AND AUTHORITIES CITED IN LEAD
PLAINTIFFS' UNOPPOSED MOTIONS FOR: (I) FINAL APPROVAL OF CLASS
ACTION SETTLEMENT; (II) APPROVAL OF PLAN OF ALLOCATION; (III)
CERTIFICATION OF SETTLEMENT CLASS; (IV) ATTORNEYS' FEES; (V)
REIMBURSEMENT OF LITIGATION EXPENSES; AND (VI) SERVICE AWARDS
FOR LEAD PLAINTIFFS PURSUANT TO COURT PROCEDURE 6.B**

## Cases

*Al's Pals Pet Care v. Woodforest Nat'l Bank, NA*,
   No. 17 Civ. 3852, 2019 WL 387409 (S.D. Tex. Jan. 30, 2019).......................................Tab 1

*Anwar v. Fairfield Greenwich Ltd.*,
   No. 09 Civ. 118, 2012 WL 1981505 (S.D.N.Y. June 1, 2012)..........................................Tab 2

*In re AudioEye, Inc. Sec. Litig.*,
   No. 15 Civ. 163 (D. Ariz. Apr. 3, 2017), ECF No. 96-2...................................................Tab 3

*In re AudioEye, Inc. Sec. Litig.*,
   No. 15 Civ. 163 (D. Ariz. May 8, 2017), ECF No. 100.....................................................Tab 4

*In re BankAtlantic Bancorp, Inc. Sec. Litig.*,
   No. 07 Civ. 61542, 2011 WL 1585605 (S.D. Fla. Apr. 25, 2011)....................................Tab 5

*Barfuss v. DGSE Co. Inc.*,
   No. 12 Civ. 3664 (N.D. Tex. Sept. 16, 2013), ECF No. 52...............................................Tab 6

*Barfuss v. DGSE Co. Inc.*,
   No. 12 Civ. 3664 (N.D. Tex. Oct. 21, 2013), ECF No. 59.................................................Tab 7

*Billitteri v. Sec. Am., Inc.*,
   No. 09 Civ. 1568, 2011 WL 3585983 (N.D. Tex. Aug. 4, 2011)......................................Tab 8

*Billitteri v. Sec. Am., Inc.*,
   No. 09 Civ. 1568, 2011 WL 3586217 (N.D. Tex. Aug. 4, 2011)......................................Tab 9

*Braud v. Transport Serv. Co. of Ill.*,
   No. 05 Civ. 1898, 2010 WL 3283398 (E.D. La. Aug. 17, 2010)....................................Tab 10

*In re Bristow Group Inc.*,
   No. 19 BK 32713 (Bankr. S.D. Tex.)
   ECF No. 1 (May 11, 2019)...........................................................................................Tab 11-A
   ECF No. 498 (Aug. 1, 2019).........................................................................................Tab 11-B
   ECF No. 557 (Aug. 19, 2019).......................................................................................Tab 11-C
   ECF No. 574 (Aug. 20, 2019).......................................................................................Tab 11-D
   ECF No. 589-1 (Aug. 22, 2019)....................................................................................Tab 11-E
   ECF No. 693 (Sept. 23, 2019).......................................................................................Tab 11-F
   ECF No. 822-1 (Oct. 7, 2019).......................................................................................Tab 11-G
   ECF No. 825 (Oct. 8, 2019)..........................................................................................Tab 11-H

*Buettgen v. Harless*,
   No. 09 Civ. 791, 2013 WL 12303143 (N.D. Tex. Nov. 13, 2013)..................................Tab 12

*Campton v. Ignite Restaurant Group*,
    No. 12 Civ. 2196, 2015 WL 12766537 (S.D. Tex. June 5, 2015)...................................Tab 13

*Carlton v. Cannon*,
    No. 15 Civ. 00012 (S.D. Tex. June 7, 2017), ECF No. 158..............................................Tab 14

*City of Omaha Police & Fire Ret. Sys. v. LHC Grp.*,
    No. 12 Civ. 1609, 2015 WL 965696 (W.D. La. Mar. 3, 2015)........................................Tab 15

*Costas v. Ormat Techs. Inc.*,
    No. 18 Civ. 00271 (D. Nev. Jan. 21, 2021), ECF No. 104...............................................Tab 16

*In re Dell Inc., Sec. Litig.*,
    No. 06 Civ. 726, 2010 WL 2371834 (W.D. Tex. June 11, 2010)....................................Tab 17

*Destefano v. Zynga, Inc.*,
    No. 12 Civ. 4007, 2016 WL 537946 (N.D. Cal. Feb. 11, 2016)......................................Tab 18

*De Vito v. Liquid Holdings Grp., Inc.*,
    No. 15 Civ. 06969 (D.N.J. Jan. 10, 2020), ECF No. 283.................................................Tab 19

*DiGiacomo v. Plains All American Pipeline*,
    No. 99 Civ. 4137, 2001 WL 34633373 (S.D. Tex. Dec. 19, 2001).................................Tab 20

*In re Enron Corp. Sec., Derivative & ERISA Litig.*,
    No. 01 Civ. 3624, 2004 WL 1900294 (S.D. Tex. Aug. 5, 2004)....................................Tab 21

*Erica P. John Fund, Inc. v. Halliburton Co.*,
    No. 02 Civ. 1152, 2018 WL 1942227 (N.D. Tex. Apr. 25, 2018)...................................Tab 22

*Esposito v. Am. Renal Assocs. Holdings, Inc.*,
    No. 16 Civ. 11797 (D. Mass. May 10, 2018), ECF No. 103-3.........................................Tab 23

*Esposito v. Am. Renal Assocs. Holdings, Inc.*,
    No. 16 Civ. 11797 (D. Mass. June 15, 2018), ECF No. 106............................................Tab 24

*Evans ex rel. United Dev. Funding IV v. Greenlaw*,
    No. 16 Civ. 635, 2019 WL 7879735 (N.D. Tex. Feb. 27, 2019).....................................Tab 25

*In re Extreme Networks, Inc. Sec. Litig.*,
    No. 15 Civ. 4883 (N.D. Cal. May 9, 2019), ECF No. 174-4...........................................Tab 26

*In re Extreme Networks, Inc. Sec. Litig.*,
    No. 15 Civ. 4883, 2019 WL 3290770 (N.D. Cal. July 22, 2019)....................................Tab 27

*In re EZCORP, Inc. Sec. Litig.*,
　　No. 15 Civ. 608, 2019 WL 6649017 (W.D. Tex. Dec. 6, 2019)......................................Tab 28

*Faircloth v. Certified Fin. Inc.*,
　　No. 99 Civ. 3097, 2001 WL 527489 (E.D. La. May 16, 2001).......................................Tab 29

*Fitzpatrick v. Uni-Pixel, Inc.*,
　　No. 13 Civ. 01649 (S.D. Tex. Apr. 30, 2015), ECF No. 58.............................................Tab 30

*In re FLAG Telecom Holdings, Ltd. Sec. Litig.*,
　　No. 02 Civ. 3400, 2010 WL 4537550 (S.D.N.Y. Nov. 8, 2010)......................................Tab 31

*Fleisher v. Phoenix Life Ins. Co.*,
　　No. 11 Civ. 8405, 2015 WL 10847814 (S.D.N.Y. Sept. 9, 2015)...................................Tab 32

*In re Forterra Inc. Sec. Litig.*,
　　No. 18 Civ. 1957, 2020 WL 4727070 (N.D. Tex. Aug. 12, 2020)..................................Tab 33

*Friedman v. Penson Worldwide, Inc.*,
　　No. 11 Civ. 02098 (N.D Tex. Aug. 23, 2013), ECF No. 100..........................................Tab 34

*Garza v. Sporting Goods Props., Inc.*,
　　No. 93 Civ. 1082, 1996 WL 56247 (W.D. Tex. Feb. 6, 1996)........................................Tab 35

*Glock v. FTS Int'l, Inc.*,
　　No. 20 Civ. 3928 (S.D. Tex. Feb. 17, 2021), ECF No. 23-1...........................................Tab 36

*Glock v. FTS Int'l, Inc.*,
　　No. 20 Civ. 3928, 2021 WL 1422714 (S.D. Tex. Apr. 13, 2021)...................................Tab 37

*Gupta v. Power Sols. Int'l, Inc.*,
　　No. 16 Civ. 8253, 2019 WL 2135914 (N.D. Ill. May 13, 2019)......................................Tab 38

*Johnson v. City of New York*,
　　No. 08 Civ. 3673, 2010 WL 5818290 (E.D.N.Y. Dec. 13, 2010)...................................Tab 39

*Keippel v. Health Ins. Innovations, Inc.*,
　　No. 19 Civ. 00421 (M.D. Fla. Mar. 23, 2021), ECF No. 112..........................................Tab 40

*Lazan v. Quantum Corp.*,
　　No. 18 Civ. 923 (N.D. Cal. Oct. 10, 2019), ECF No. 63-8.............................................Tab 41

*Lazan v. Quantum Corp.*,
　　No. 18 Civ. 923 (N.D. Cal. Nov. 27, 2019), ECF No. 69................................................Tab 42

*Lee v. Active Power, Inc.*,
   No. 13 Civ. 00797 (W.D. Tex. May 15, 2015), ECF No. 65.............................Tab 43

*Li v. Aeterna Zentaris Inc.*,
   No. 14 Civ. 7081, 2021 WL 2220565 (D.N.J. June 1, 2021)...........................Tab 44

*Lilienfeld v. Bristow Group Inc.*,
   No. 19 Civ. 1064 (S.D. Tex. Mar. 21, 2019), ECF No. 1.................................Tab 45

*Marcus v. J.C. Penney Co., Inc.*,
   No. 13 Civ. 736, 2017 WL 6590976 (E.D. Tex. Dec. 18, 2017).......................Tab 46

*Marcus v. J.C. Penney Co., Inc.*,
   No. 13 Civ. 736, 2018 WL 307024 (E.D. Tex. Jan. 4, 2018)...........................Tab 47

*Miller v. Glob. Geophysical Services, Inc.*,
   No. 14 Civ. 708, 2016 WL 11645372 (S.D. Tex. Jan. 14, 2016)......................Tab 48

*In re OCA, Inc. Sec. & Derivative Litig.*,
   No. 05 Civ. 2165, 2009 WL 512081 (E.D. La. Mar. 2, 2009).........................Tab 49

*Parmelee v. Santander Consumer USA Holdings Inc.*,
   No. 16 Civ. 783, 2019 WL 2352837 (N.D. Tex. June 3, 2019)......................Tab 50

*Rodriguez v. Stage 3 Separation, LLC*,
   No. 14 Civ. 603, 2015 WL 12866212 (W.D. Tex. Dec. 23, 2015) ..................Tab 51

*Rougier v. Applied Optoelectronics, Inc.*,
   No. 17 Civ. 2399 (S.D. Tex. Oct. 20, 2020), ECF No. 150-5.........................Tab 52

*Roussel v. Brinker Int'l, Inc.*,
   No. 05 Civ. 3733, 2010 WL 1881898 (S.D. Tex. Jan. 13, 2010)....................Tab 53

*In re SCANA Corp. Sec. Litig.*,
   No. 17 Civ. 2616 (D.S.C. Apr. 23, 2020), ECF No. 229-6.............................Tab 54

*Schwartz v. TXU Corp.*,
   No. 02 Civ. 2243, 2005 WL 3148350 (N.D. Tex. Nov. 8, 2005)....................Tab 55

*Singh v. 21Vianet Grp., Inc.*,
   No. 14 Civ. 894, 2018 WL 6427721 (E.D. Tex. Dec. 7, 2018) ......................Tab 56

*Slipchenko v. Brunel Energy, Inc.*,
   No. 11 Civ. 1465, 2015 WL 338358 (S.D. Tex. Jan. 23, 2015).....................Tab 57

*In re Veeco Instruments Inc. Sec. Litig.*,
    No. 05 MDL 1695, 2007 WL 4115808 (S.D.N.Y. Nov. 7, 2007)....................................Tab 58

*In re: Weatherford Int'l PLC*,
    No. 19 BK 33694 (Bankr. S.D. Tex. Sept. 11, 2019), ECF No. 343................................Tab 59

*Woburn Ret. Sys. v. Salix Pharm., Ltd.*,
    No. 14 Civ. 8925 (S.D.N.Y. June 19, 2017), ECF No. 225-4..........................................Tab 60

*Woburn Ret. Sys. v. Salix Pharm., Ltd.*,
    No. 14 Civ. 8925, 2017 WL 3579892 (S.D.N.Y. Aug. 18, 2017)....................................Tab 61

**Other Authorities**

Fed. R. Civ. P. 23(e)(2) advisory committee's note to 2018 amendments.............................Tab 62

Manual for Complex Litigation, Fourth, §21.312....................................................................Tab 63

# TAB 1

Case 4:19-cv-00509   Document 65-9   Filed 07/02/21 in TXSD   Page 9 of 1452
Al's Pals Pet Care v. Woodforest National Bank, NA, Not Reported in Fed. Supp. (2019)
2019 WL 387409

2019 WL 387409
Only the Westlaw citation is currently available.
United States District Court,
S.D. Texas, Houston Division.

AL'S PALS PET CARE, et al., Plaintiffs,
v.
WOODFOREST NATIONAL
BANK, NA, et al., Defendants.

Civil Action No: 4:17-CV-3852
|
Signed 01/30/2019

**Attorneys and Law Firms**

E. Adam Webb, Webb Klase et al, Atlanta, GA, Matthew Klase, Webb, Klase & Lemnd, LLC, Atlanta, GA, Andrew K. Meade, Hawash Meade Gaston Neese & Cicack LLP, Houston, TX, for Plaintiffs.

Behnam Dayanim, C. Reade Jacob, Jr., Paul Hastings LLP, Washington, DC, Samuel Wollin Cooper, Paul Hastings LLP, Houston, TX, William K Whitner, Paul Hastings LLP, Atlanta, GA, for Defendants.

## FINAL ORDER AND JUDGMENT

Kenneth M. Hoyt, United States District Judge

 **\*1**  This matter is before the Court on the unopposed (1) Motion for Final Approval of Class Settlement [Dkt. No. 41] and (2) Motion for Attorneys' Fees, Expenses, and Service Awards [Dkt. No. 42] filed by Plaintiffs and class counsel. The Court has reviewed all of the filings and evidence related to the Settlement and received testimonial submissions and briefing on the motions. Having considered the written submissions, and after oral argument at a hearing on January 30, 2019, the Court hereby **GRANTS** the motions as follows:

## Background

1. Defendants provide payment processing services. Plaintiffs allege Defendant Merchants' Choice Processing Solutions and its affiliates made a regular practice of tricking merchants to do business with Defendants by "cold calls" that falsely insinuated the callers worked for the merchants' then-current payment processing companies. Plaintiffs also allege that Defendants overcharged them by imposing several types of fees that were not authorized by the applicable contracts.

2. The lawsuit seeks to recover the alleged overcharges on behalf of Plaintiffs and a national class of other merchants, asserting claims for fraudulent inducement, breach of contract, and unjust enrichment. *See* [Dkt. No. 1]. Defendants deny Plaintiffs' allegations and contend the claims have no merit.

3. Defendants moved to dismiss the complaint [Dkt. No. 21] and, in response, Plaintiffs filed an amended complaint [Dkt. No. 24]. The amended complaint added new allegations and integrated several more named Plaintiffs based on extensive investigation by Plaintiffs' counsel.

4. During the Rule 26(f) conference and via several follow up communications, the parties agreed to mediate the case. They agreed to exchange specified data and documents in advance to allow for informed discussions. At the parties' request, the Court stayed proceedings pending the mediation. *See* [Dkt. No. 30].

5. For the next several months, the parties worked to prepare for the mediation. They retained Hunter Hughes, a nationally-respected and experienced class action neutral. Defendants gathered and produced more than 8,000 pages of documents, aggregate revenue figures, and hundreds of thousands of lines of transaction and fee data for the named Plaintiffs and a sample of putative class members. The parties each retained a data expert to assist in the analysis of this information and exchanged reports with their conclusions. Substantial efforts were expended before the mediation to narrow the differences in the parties' positions and the experts' conclusions. The parties also exchanged lengthy pre-mediation briefing on the legal issues.

6. Although the mediation was unsuccessful, the parties continued to work. After several follow-up discussions with Mr. Hughes, a tentative class-wide agreement was reached. This deal was subsequently reduced to a binding Settlement Agreement and Release ("Settlement") [Dkt. No. 41-1], for which the parties sought preliminary approval on September 7, 2018 [Dkt. Nos. 38-39]. On September 18, 2018, the Court issued preliminary approval to the proposed Settlement and instructed that notice be distributed to the class. *See* Preliminary Approval Order [Dkt. No. 40].

WESTLAW   © 2021 Thomson Reuters. No claim to original U.S. Government Works.

Case 4:19-cv-00509    Document 65-9    Filed 07/02/21 in TXSD    Page 10 of 1452

Al's Pals Pet Care v. Woodforest National Bank, NA, Not Reported in Fed. Supp. (2019)

2019 WL 387409

**\*2** 7. Notice was then distributed to the class in accordance with the Preliminary Approval Order. The Motion for Final Approval of Class Settlement and Motion for Attorneys' Fees, Expenses, and Service Awards were filed by Plaintiffs on December 19, 2018. No objections to the Settlement were filed before the January 2, 2019 deadline.

### Settlement Terms

8. The Settlement establishes a settlement fund of $15 million, which will be used to pay cash benefits to class members, costs of notice and administration, attorneys' fees and expenses, and service awards. All class members are eligible to receive a cash payment. Current customers will automatically receive their payments, while former customers will receive a payment if they file a simple claim form.

9. The amount of the cash payments is calculated the same way for both current and former customers pursuant to the allocation formula attached as Exhibit 1 to the Settlement. If the total of the cash distributed to current customers, the cash amount claimed by former customers, costs of notice administration, attorneys' fees and expenses, and service awards is less than $11 million, then the difference between the total of all of those amounts and $11 million will be distributed *pro rata* to all class members, except for those former customers who have not submitted claims. If the total of all of those amounts is equal to or more than $11 million, any money remaining in the settlement fund after payment of all obligations will be returned to Defendants.

10. The Settlement also requires Defendants to amend their standard merchant application and terms and conditions to (a) require Defendants to give 30 days' advance notice prior to increasing or adding any fees, (b) waive any applicable early termination fee if a merchant terminates within 90 days of an increase in non-pass through fees, and (c) allow merchants to dispute errors or charges on statements within 90 days from receipt or availability of their statements. Defendants are also bound to undertake a review of their telemarketing practices and, based on the results of this review, to revise their training program for their independent sales offices/agents, as may be necessary to include instruction that independent sales offices/agents should not imply or insinuate to prospective merchants that they are affiliated with the merchant's current payment processing service provider.

11. In conjunction with the Settlement, the class will release Defendants from the claims that were or could have been raised in this case. Class members specifically retain all rights to challenge invoices sent by Defendants after September 18, 2018, the date of preliminary approval. In turn, Defendants will release class members from any potential liability for payment of Defendants' attorneys' fees and expenses incurred in defending this case.

### Class Notice

12. Based on the declarations of Cameron Azari [Dkt. Nos. 44 and 48], the Court finds that that class has been notified of the Settlement pursuant to the plan approved by the Court. The Court further finds that the notice program constituted the best practicable notice to the class under the circumstances and fully satisfies the requirements of due process, including Fed. R. Civ. P. 23(e)(1) and 28 U.S.C. § 1715. Accordingly, the Court has jurisdiction over all class members for purposes of the Settlement.

### Merit of Settlement

**\*3** 13. After consideration of the criteria set forth in Fed. R. Civ. P. 23(e)(2) as well as the Fifth Circuit's "*Reed* factors" [*see* *Union Asset Management Holding A.G. v. Dell, Inc.*, 669 F.3d 632, 639 (5th Cir. 2012) (citing *Reed v. General Motors Corp.*, 703 F.2d 170 (5th Cir. 1983) ], the Court finds that the Settlement is fair, reasonable, and adequate.

14. Based on the well-developed record, the Court finds that the class has received excellent representation from both Plaintiffs and class counsel; the Settlement was reached at arm's length without collusion or fraud; and the Settlement treats class members equitably relative to one another. The Court also finds that the relief provided by the Settlement is appropriate given (i) the complexity, expense, and likely duration of the litigation without the Settlement, (ii) the range of recovery if the case were to be tried, (iii) the large amount of informal discovery taken, (iv) the uncertain likelihood of Plaintiffs' success on the merits, (v) the factually-supported opinions of Plaintiffs, class counsel, Hunter Hughes, and John Zavitsanos, (vi) the well-reasoned methodologies of distributing relief to class members and processing claims,

Al's Pals Pet Care v. Woodforest National Bank, NA, Not Reported in Fed. Supp. (2019)
2019 WL 387409

and (vii) the fact that *zero* class members have objected to the Settlement.

15. The Court hereby finally approves in all respects the Settlement and finds that the Settlement's terms for allocating and distributing the settlement fund are in all respects fair, reasonable, and adequate, and are in the best interests of the class.

**Certification of Settlement Class**

16. The Court hereby certifies, for settlement purposes only, the following class:

> All merchants in the United States that contracted to receive payment processing services from or through Defendants and paid one or more of the Subject Fees from December 22, 2013 through the date of preliminary approval. [1]

Excluded from the class are Defendants; parents, subsidiaries, or affiliates of any Defendant; any entity in which any Defendant has a controlling interest; Defendants' counsel; the Court and any employees of the Court; and the legal representatives, heirs, successors, and assigns of any such excluded party. Also excluded are those who properly excluded themselves from the class. A list of those who properly excluded themselves is attached as Exhibit A.

17. The Court specifically determines that, for settlement purposes only, the class meets all the requirements of Federal Rule of Procedure Rule 23(a) and (b)(3), namely that the class is so numerous that joinder of all members is impractical; that there are common issues of law and fact; that the claims of the class representatives are typical of absent class members; that the class representatives and class counsel have and will fairly and adequately protect the interests of the class; that common issues predominate over any individual issues; and that a class action is the superior means of adjudicating the controversy.

**\*4** 18. Plaintiffs Al's Pals Pet Care, LLC, DeFabio Spine and Sports Rehab, LLC, Julie Rudiger, Inc., Mena Stone & Landscaping Supplies, LLC, Tulsa Art Center, LLC, Ban-A-Pest Extermination Co., Inc., Fleetwood Chiropractic & Rehabilitation, PC, and Bayley Products, Inc. have adequately represented the settlement class and are appointed as settlement class representatives.

19. E. Adam Webb and Matthew C. Klase of Webb, Klase & Lemond, LLC; and Andrew K. Meade, D. John Neese, Jr., and Leann Pinkerton of Meade & Neese, LLP have adequately represented the settlement class and are appointed as class counsel.

**Attorneys' Fees, Expenses, and Service Awards**

20. Attorneys' Fees. The Court hereby grants to class counsel a fee in the amount of $5,000,000, which the Court finds to be fully supported by the facts, the record, and the applicable law. This amount shall be paid from the settlement fund.

21. The requested attorneys' fee is justified under the percentage of the common fund methodology described in *Dell*. 669 F.3d at 644. The fee represents one-third of the $15 million settlement fund, which is an oft-awarded percentage in common fund class action settlements in this Circuit. *E.g., Wolfe v. Anchor Drilling Fluids USA Inc.,* 2015 WL 12778393, \*3 (S.D. Tex. Dec. 7, 2015) (Hoyt, J.) (awarding 40%); *Frost v. Oil States Energy Servs.,* 2015 WL 12780763, \*2 (S.D. Tex. Nov. 19, 2015) (one-third); *Campton v. Ignite Restaurant Group, Inc.,* 2015 WL 12766537, \*3 (S.D. Tex. June 5, 2015) (one-third); *Jenkins v. Trustmark Nat'l Bank,* 300 F.R.D. 291, 307 (S.D. Miss. 2014) (one-third); *In re Combustion, Inc.,* 968 F. Supp. 1116, 1139-40 (W.D. La. 1997) (36%); *Erica P. John Fund, Inc. v. Halliburton Co.,* 2018 WL 1942227, \*12-13 (N.D. Tex. Apr. 25, 2018) (one-third); *Fairway Med. Ctr., LLC v. McGowan Enterprises, Inc.,* 2018 WL 1479222, \*2-3 (E.D. La. Mar. 27, 2018) (one-third); *In re Pool Prods. Distribution Mkt. Antitrust Litig.,* 2015 WL 4528880, \*23 (E.D. La. July 27, 2015) (one-third); *Burford v. Cargill, Inc.,* 2012 WL 5471985, \*5 (W.D. La. Nov. 8, 2012) (awarding one-third and noting "a review of analogous precedent indicates that an award of one-third of the common fund is reasonable and typical").

22. The Court has confirmed the reasonableness of the requested fee through an analysis of "the *Johnson* factors."

Case 4:19-cv-00509 Document 65-9 Filed 07/02/21 in TXSD Page 12 of 1452

Al's Pals Pet Care v. Woodforest National Bank, NA, Not Reported in Fed. Supp. (2019)

2019 WL 387409

*Johnson v. Ga. Highway Express, Inc.,* 488 F.2d 714, 717-20 (5th Cir.1974), *overruled on other grounds, Blanchard v. Bergeron,* 489 U.S. 87 (1989). Specifically, (i) class counsel devoted substantial time and labor to prosecuting and settling this case; (ii) the case presented novel and difficult legal issues; (iii) class counsel possessed the necessary skill to effectively litigate this case; (iv) class counsel's representation of the class precluded them from taking other employment; (v) the requested one-third fee is reasonable, customary, and standard for contingency litigation in this District; (vi) the action was prosecuted entirely on a contingency fee basis and thus presented a serious risk of non-payment; (vii) the amount and nature of the Settlement is impressive given the facts and applicable law; (viii) class counsel are highly-experienced in class action cases and their efforts have been lauded by prior courts; (ix) this case was undesirable given the risk of non-recovery and economics involved in prosecuting class actions; (x) class counsel had no existing relationships with the Plaintiffs; (xi) the requested fee comports with awards in similar cases; and (xii) other relevant circumstances justifying the requested fee are present.

 **\*5**  23. The record also shows that the parties' agreement in the Settlement with regard to fees was not negotiated until after the other terms of the Settlement had been negotiated and was not the product of collusion or fraud. As a result, the parties' agreement as to the payment of fees is entitled to substantial weight. *Johnson,* 448 F.2d at 720 ("In cases of this kind, we encourage counsel on both sides to utilize their best efforts to understandingly, sympathetically, and professionally arrive at a settlement as to attorney's fees.").

24. Expenses. The Court hereby grants to class counsel the requested expense reimbursement of $27,340.50, which the Court finds to be fully supported by the Settlement, the facts, the record, and the applicable law. *E.g., Mills v. Electric Auto-Lite Co.,* 396 U.S. 375, 391-92 (1970). This amount shall be paid from the settlement fund.

25. Service Awards. The Settlement provides that each of the class representatives is to receive $10,000 for their service on behalf of the class. The Court finds that payment of these service awards is warranted and approved in this case in light of the class representatives' work on behalf of the class and the risk they took of being held responsible for paying Defendants' legal fees and expenses pursuant to provisions in their merchant agreements. *Altier v. Worley Catastrophe Response, LLC,* 2012 WL 161824, \*15 (E.D. La. Jan. 18, 2012) (quoting *Sullivan v. DB Inv., Inc.,* 667 F.3d 273, 333 n.65 (3rd Cir. 2011) ).

### Releases

26. Pursuant to, and as more fully described in Section XII of the Settlement, on the Effective Date, the Releasing Parties shall be deemed to have and, by operation of this Final Order and Judgment shall have, fully and irrevocably released and forever discharged the Released Parties from the claims identified in Paragraph 68 of the Settlement. The release does not affect any right of the Releasing Parties to contest for any reason any invoice sent by Defendants after September 18, 2018, the date of preliminary approval. In addition, on the Effective Date, Defendants shall be deemed to have and, by operation of this Final Order and Judgment shall have, fully and irrevocably discharged the Plaintiff Released Parties for payment of Defendants' attorneys' fees and expenses incurred in defending this action. The terms capitalized in this paragraph have the same meaning ascribed to them in the Settlement.

### Dismissal and Final Judgment

27. The Court hereby DISMISSES this action WITH PREJUDICE as against the named Plaintiffs, all members of the class, and Defendants. The parties shall bear their own costs except as provided by the Settlement.

28. No class representative or settlement class member, either directly, representatively, or in any other capacity (other than a settlement class member who validly and timely elected to be excluded from the settlement class), shall commence, continue, or prosecute any action or proceeding in any court or tribunal asserting any of the claims that have been released under the Settlement, and they are hereby permanently enjoined from so proceeding.

29. By reason of the Settlement, and there being no just reason for delay, the Court hereby **ENTERS FINAL JUDGMENT** in this matter, which the clerk of Court is **DIRECTED** to immediately enter.

30. Without affecting the finality of this judgment, the Court retains continuing and exclusive jurisdiction over all matters

2019 WL 387409

relating to the administration, consummation, enforcement, and interpretation of the Settlement and of this Final Order and Judgment, to protect and effectuate this Final Order and Judgment, and for any other necessary purpose. The class representatives, Defendants, and each member of the settlement class are hereby deemed to have irrevocably submitted to the exclusive jurisdiction of this Court, for the purpose of any suit, action, proceeding, or dispute arising out of or relating to the Settlement, including the exhibits thereto, and only for such purposes. Without limiting the generality of the foregoing, and without affecting the finality of this Final Order and Judgment, the Court retains exclusive jurisdiction over any such suit, action, or proceeding. Solely for purposes of such suit, action, or proceeding, to the fullest extent they may effectively do so under applicable law, the parties hereto are deemed to have irrecoverably waived and agreed not to assert, by way of motion, as a defense or otherwise, any claim or objection that they are not subject to the jurisdiction of this Court, or that this Court is, in any way, an improper venue or an inconvenient forum.

### Use of this Order

 **\*6** 31. That the parties have reached a Settlement and participated in proceedings related to the Settlement should not be (a) offered or received as evidence of a presumption, concession, or an admission by any party, (b) offered or received as evidence of a presumption, concession, or any admission of any liability, fault, wrongdoing, or other dereliction of duty; provided, however, that reference may be made to the Settlement as may be necessary to effectuate or enforce its provisions.

32. In the *event* that the Settlement does not become effective according to its terms, this Order and Final Judgment shall be rendered null and void as provided by the Settlement, shall be vacated, and all orders entered and releases delivered in connection with the Settlement shall be null and void to the extent provided by and in accordance with the Settlement.

### Conclusion

33. For the reasons set forth herein, the Court hereby (a) GRANTS final approval of the Settlement; (b) **CERTIFIES** the settlement class pursuant to  Fed. R. Civ. P. 23(b)(3) and (e); (c) finds the class notice satisfied the requirements of  Rule 23, due process, and all other legal requirements; (d) approves the requests for attorneys' fees of $5,000,000.00, expenses of $27,340.50, and service awards of $10,000 for each class representative; (e) **DISMISSES** this action **WITH PREJUDICE** as to all parties and the members of the class; and (f) **ENTERS** FINAL JUDGMENT. The parties and the settlement administrator are directed to carry out the Settlement according to its terms.

It is so **ORDERED**.

### Requests for Exclusions

| Document ID | Merchant Name | |
|---|---|---|
| 1 | 1 | MIKE MARKS PRO SHOP – Merchant ID# 434466761880 |
| 2 | 1 | MIKE MARKS PRO SHOP – Merchant ID#:444233855881 |
| 3 | 2 | MISS BEHAVEN |
| 4 | 3 | LOYAL ORDER OF MOOSE |

**All Citations**

Not Reported in Fed. Supp., 2019 WL 387409

## Footnotes

1 "Subject Fees" refers to the following categories of fees charged by Defendants: (1) annual fee, (2) batch header fee, (3) PCI program/compliance fee, (4) PCI non-compliance/non-validation fee, (5) gateway access fee, (6) Foundry/emerchant fee, (7) monthly minimum discount fee, (8) non-qualified fee, (9) discount rate, (10) other discount fee, or (11) paper statement fee.

**End of Document** © 2021 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 2

2012 WL 1981505

2012 WL 1981505
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Pasha ANWAR, et al., Plaintiffs,
v.
FAIRFIELD GREENWICH
LIMITED, et al., Defendants.
This Document Relates to:
Da Silva Ferreira v. EFG Capital
International Corp., et al., 11–CV–813(VM).

Master File No. 09–CV–118 (VM).
|
June 1, 2012.

*ORDER GRANTING PETITION FOR AN
AWARD OF ATTORNEYS' FEES AND
REIMBURSEMENT OF EXPENSES*

VICTOR MARRERO, District Judge.

 **\*1** The Court held a hearing on June 12, 2012 to consider Plaintiffs' Petition for an Award of Attorney's Fees and Reimbursement of Expenses (the "Petition"). [1] The Court, having heard the argument of Counsel and reviewed the Petition and its supporting materials and declarations [DE 254–259], finds as follows:

### I. Plaintiffs' Counsel's Requested Fee is Fair Under the Percentage–of–Recovery Method and the Second Circuit's *Goldberger* factors

Plaintiffs' Counsel's requested fee of $2,568,664.56, representing 33% of the Settlement Amount, as attorneys' fees in this Action, is fair under the percentage-of-recovery method and the factors described in *Goldberger v. Integrated Resources, Inc.,* 209 F.3d 43, 50 (2d Cir.2000). Those factors include the following: the (1) the time and labor expended by Plaintiffs' Counsel; (2) the magnitude and complexities of this Action; (3) the risk of continued litigation; (4) the quality of representation; (5) the requested fee in relation to the Settlement; and (6) public policy considerations. *Goldberger,* 209 F.3d at 50.

### A. The time and labor expended by Plaintiffs' Counsel

The Court finds that the first *Goldberger* factor is satisfied. Plaintiffs' Counsel expended 3,448.1 hours to litigate this Action. Plaintiffs' Counsel, among other things: (i) conducted an extensive factual investigation into the events and circumstances underlying this Action; (ii) researched the law regarding the claims brought against EFG Capital and EFG Bank f/k/a EFG Private Bank SA ("EFG Bank") and the potential defenses thereto; (iii) filed a complaint against EFG Capital and EFG Bank for breach of fiduciary duty, gross negligence, unjust enrichment, and violation of Florida's Deceptive and Unfair Trade Practices Act ("FDUPTA"); (iv) engaged in extensive discovery on the merits of the claims, including analysis of over 125,000 pages of document production in response to multiple requests for production, interrogatories, requests for admission (and responses thereto); (v) researched and drafted oppositions to both EFG Bank's Motion to Dismiss and EFG Capital's Motion to Dismiss; (vi) conducted certification discovery and drafted a motion for class certification; (vii) took the depositions of six present and former officers and employees of EFG Capital, including its President and Chairman of the Board; (vii) defended the deposition of Plaintiff Lorrene da Silva Ferreira; (viii) engaged in extensive settlement negotiations, including two days of mediation; (ix) prepared a comprehensive multimedia presentation in conjunction with the mediation sessions; and (x) negotiated and drafted all of the critical settlement documents, including the Memorandum of Settlement, the Settlement Stipulation, a proposed Preliminary Approval Order and the Notice. Accordingly, the time and labor expended by Plaintiffs' Counsel here support the requested fee.

### B. The magnitude and complexities of the litigation

 **\*2** With regard to the second *Goldberger* factor, the Court finds that this case was a highly complex class action involving numerous legal and factual issues surrounding EFG Capital's duty to its customers; whether the duty had been breached; whether EFG Capital was responsible for the losses; whether SLUSA would bar the Action; and whether class treatment of EFG Capital's customer claims was appropriate. Plaintiffs' Counsel was faced with an adversary that retained highly skilled counsel and aggressively defended the Action, thereby making the legal issues and factual discovery highly complex. The factual discovery included hundreds of hours spent by Plaintiffs' Counsel reviewing EFG Capital's records, days of depositions, litigation of Swiss bank

secrecy laws, and combating efforts of EFG to slow discovery and delay the trial.

### C. The risks of continued litigation

With regard to the third *Goldberger* factor, the Court finds that this Action posed significant risks, making the prospect of a favorable verdict for the Settling Class far from certain. Plaintiffs faced numerous legal challenges, including but not limited to the legal duties of EFG Capital to its customers, class certification, and EFG Capital's Motion to Dismiss on SLUSA grounds. As such, the Court finds that the risks of prosecuting this Action were substantial.

### D. The quality of representation

The result achieved and the quality of the services provided are also important factors to be considered in determining the amount of reasonable attorneys' fees under a percentage of the fee analysis. *See Goldberger,* 209 F.3d at 50. Despite the significant risk of no recovery in this Action, a substantial cash settlement, representing 16.7% of the Settling Class Members' net losses, was secured for the Settling Class as a result of the legal representation provided by Plaintiffs' Counsel.

Plaintiffs' Counsel has extensive experience and expertise in complex litigation proceedings and class actions throughout the United States, and were qualified to conduct this Action. Plaintiffs' Counsel aggressively prosecuted this Action, pursuing merits discovery expeditiously through a number of motions to compel; obtaining and maintaining a trial date; and fully briefing class certification issues. As a result, Plaintiffs' Counsel uncovered facts relating to EFG Capital's knowledge of "red flags" that went far deeper than what had been alleged in other Madoff-related cases.

The Court has also considered the quality and vigor of opposing counsel. *See In re Warner Communication Sec. Litig.,* 618 F.Supp. 735, 749 (S.D.N.Y.1985). Here, EFG Capital and EFG Bank were represented by experienced and aggressive counsel. The fact that Plaintiffs' Counsel achieved this Settlement for the Settling Class in the face of substantial legal opposition further evidences the quality of their work.

Therefore, the Court finds the quality of the representation in this Action supports the requested fee.

### E. The requested fee in relation to the Settlement

**\*3** With regard to the third *Goldberger* factor, the Court finds that the fee request of 33% of the Gross Settlement Fund is well within the percentage range that courts within the Second Circuit have awarded in other complex litigations. *See Becher v. Long Island Lighting Co.,* 64 F.Supp.2d 174, 182 (E.D.N.Y.1999) (one-third of $7.8 million is "well within the range accepted by courts in this circuit").

### F. Public policy considerations

The Supreme Court has recognized that absent a class action, small claimants individually may lack the economic resources to vigorously litigate their rights. *Eisen v. Carlisle & Jacqueline,* 417 U.S. 156, 161, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974). Attorneys who take on class action matters on a contingent fee basis, enabling litigants to pool their claims, provide a service to the judicial process. This Court finds that public policy therefore supports the award of the attorneys' fees requested.

### II. The requested fee is reasonable under the lodestar "crosscheck"

In addition to the *Goldberger* factors, this Court has considered as a "cross-check," whether the requested fee determined under the percentage approach is consistent with an award that would result under the lodestar/multiplier approach. *Wal–Mart Stores, Inc. v. Visa U.S.A., Inc.,* 396 F.3d 96, 123 (2d Cir.2005).

Here, Plaintiffs' Counsel in the aggregate expended 3,448.1 hours, resulting in total fees of $1,063,149.50, in this Action. [2] The lodestar multiplier—the requested $2,568,664.56 fee divided by Plaintiffs' Counsel lodestar—is 2.42. A multiplier of 2.42 is well within the range of lodestar multipliers approved by courts in the Second Circuit and further demonstrates the reasonableness of the requested fee. *See In re Sumitomo Copper Litig.,* 74 F.Supp.2d 393, 399 (S.D.N.Y.1999) (awarding a 27.5% fee and finding multipliers of 3 to 4.5 to be common).

### III. Plaintiffs' Counsel is Entitled Reimbursement of Expenses

The Court also finds that Plaintiffs' Counsel's request for reimbursement of $114,100.05 in litigation costs and expenses incurred in connection with the prosecution

Case 4:19-cv-00509   Document 65-9   Filed 07/02/21 in TXSD   Page 17 of 1452
Anwar v. Fairfield Greenwich Ltd., Not Reported in F.Supp.2d (2012)
2012 WL 1981505

of this Action is reasonable. Courts routinely note that counsel is entitled to reimbursement from the common fund for reasonable litigation expenses. *See* *Reichman v. Bonsignore, Brignati & Mazzotta, P.C.,* 818 F.2d 278, 283 (2d Cir.1987). Here, Plaintiffs' Counsel seek reimbursement for expenses such as mediation fees, expert witness fees, electronic legal research, photocopying, postage, and travel expenses, each of which is the type "the paying, arms' length market" reimburses attorneys. *See* *In re Global Crossing Sec. & ERISA Litig.,* 225 F.R.D. 436, 468 (S.D.N.Y.2004). As such, these expenses shall be reimbursed.

### IV. Plaintiffs' Request for an Incentive Award is Justified in Light of their Service to the Settling Class

The Court grants Plaintiffs' requests for an incentive award in the aggregate amount of $25,000 for their representation of the Settling Class. Courts consistently approve awards in class action lawsuits to compensate named plaintiffs for the services they provide and burdens they endure during litigation. *See* *Dornberger v. Metro. Life Ins. Co.,* 203 F.R.D. 118, 124 (S.D.N.Y.2001).

 **\*4**  Here, Plaintiffs are a mother and daughter residing in Uruguay. They acted on behalf of the entire Settling Class, and thereby subjected themselves to the jurisdiction of the U.S. Court system. They responded to discovery requests, including deposition. Moreover, Lorrene Da Silva Ferreira regularly communicated with Plaintiffs' Counsel concerning the prosecution of this Action, reviewed and commented on pleadings, consulted with Plaintiffs' Counsel regarding discovery, and traveled to the United States on multiple occasions for deposition and mediation. Plaintiffs performed an admirable duty, yet will share the recovery equally with the other EFG customers who did not lead this Settling Class or even participate in the prosecution of this Action. As such, an incentive award to the Plaintiffs is justified in light of Plaintiffs' devotion, on behalf of the Settling Class, to successfully prosecuting this Action and providing an overall benefit to the Settling Class.

NOW, THEREFORE, IT IS HEREBY ORDERED as follows:

1. The Court awards Plaintiffs' Counsel $2,568,664.56, representing 33% of the Settlement Amount, as attorneys' fees in this Action, to be paid from the Gross Settlement Fund;

2. The award of attorneys' fees shall be allocated among Plaintiffs' Counsel in a fashion which, in the opinion and sole discretion of Plaintiffs' Counsel, fairly compensates Plaintiffs' Counsel for their respective contributions to the prosecution of the Action;

3. The Court awards $114,100.05 as reimbursement for Plaintiffs' Counsel's expenses in this Action, to be paid from the Gross Settlement Fund; and

4. The Court awards an incentive award to Plaintiffs in the aggregate amount of $25,000 for their representation of the Settling Class, to be paid from the Gross Settlement Fund.

**All Citations**

Not Reported in F.Supp.2d, 2012 WL 1981505

---

**Footnotes**

1     Capitalized terms used herein have the meanings defined in the Stipulation of Settlement, dated January 19, 2012 (the "Stipulation") [DE 229–1].

2     In computing the lodestar, the hourly billing rate to be applied is the "market rate," *i.e.,* the hourly rate that is normally charged in the community where counsel practices. *See, e .g., In re Cont'l* *Ill. Sec. Litig.,* 962 F.2d 566, 568 (7th Cir.1992) ("[I]t is not the function of judges in fee litigation to determine the equivalent of the medieval just price. It is to determine what the lawyer would receive if he were selling his services in the market rather than being paid by court order.") (holding that district court committed legal error by placing "a ceiling of $175 on the hourly rates of all lawyers for the class, including lawyers whose regular billing rates were almost twice as high"). Here, Plaintiffs' Counsel has submitted evidence that the hourly

**Anwar v. Fairfield Greenwich Ltd., Not Reported in F.Supp.2d (2012)**

2012 WL 1981505

rates charged by Plaintiffs' Counsel are consistent with the hourly rates charged in South Florida for similar legal representation.

---

**End of Document**

© 2021 Thomson Reuters. No claim to original U.S. Government Works.

Case 4:19-cv-00509   Document 65-9   Filed 07/02/21 in TXSD   Page 18 of 1452

# TAB 3

# EXHIBIT B

KIRBY MCINERNEY LLP
1002.01 AUDIOEYE LODESTAR
FROM INCEPTION THROUGH MARCH 31, 2017

| Attorney | Hours | Rate | Total |
|---|---|---|---|
| Ira Press (Partner) | 309.00 | $985.00 | $ 304,365.00 |
| Mark Strauss (Partner) | 257.50 | $850.00 | 218,875.00 |
| Henry Telias (Of Counsel) | 84.25 | $800.00 | 67,400.00 |
| Karina Kosharskyy (Associate) | 54.75 | $575.00 | 31,481.25 |
| Beverly Tse Mirza (Associate) | 47.00 | $650.00 | 30,550.00 |
| Anna Linetskaya (Associate) | 91.75 | $325.00 | 29,818.75 |
| Robert Gralewski (Partner) | 3.00 | $810.00 | 2,430.00 |
| Thomas Elrod (Associate) | 2.50 | $625.00 | 1,562.50 |
| | 849.75 | | $ 686,482.50 |

**Senior Analysts**

| | Hours | Rate | Total |
|---|---|---|---|
| Elaine Mui | 69.25 | $400.00 | $ 27,700.00 |
| Jing Yin | 20.00 | $325.00 | 6,500.00 |
| Natasha Mighell | 11.75 | $275.00 | 3,231.25 |
| Wilona Karnadi | 1.00 | $250.00 | 250.00 |

**Paralegals/Clerks**

| | Hours | Rate | Total |
|---|---|---|---|
| Paralegals - 1st Year | 87.25 | $250.00 | $ 21,812.50 |
| Paralegals 2nd Year | 55.25 | $300.00 | 16,575.00 |
| Clerks | 8.25 | $125.00 | 1,031.25 |
| TOTAL LODESTAR | 1102.50 | | $ 763,582.50 |

# TAB 4

WO

UNITED STATES DISTRICT COURT
DISTRICT OF ARIZONA

----------------------------------------------------

IN RE AUDIOEYE, INC., SECURITIES
LITIGATION

CV-15-00163-TUC-DCB

**ORDER AND FINAL
JUDGMENT**

----------------------------------------------------

On the 8th day of May, 2017, a hearing having been held before this Court to determine: (1) whether the terms and conditions of the Stipulation of Settlement dated December 13, 2016 (the "Stipulation") are fair, reasonable and adequate for the settlement of all claims asserted by (i) Plaintiffs against (ii) Defendants AudioEye, Inc. ("AudioEye"), Nathaniel Bradley and Edward O'Donnell (collectively, "Defendants"), and (2) whether to approve the proposed Plan of Allocation as a fair and reasonable method to allocate the Net Settlement Fund among Settlement Class Members; and,

The Court having considered all matters submitted to it at the hearing and otherwise; and,

It appearing that the Notice substantially in the form approved by the Court in the Court's Order Preliminarily Approving Settlement and Providing For Notice

("Preliminary Approval Order") was mailed to all reasonably identifiable Settlement Class Members and otherwise made available on the Claims Administrator's website; and,

It appearing that the Summary Notice substantially in the form approved by the Court in the Preliminary Approval Order was published in accordance with that Order and the specifications of the Court;

**NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:**

1. Capitalized terms used herein have the meanings defined in the Stipulation.

2. The Court has jurisdiction over the subject matter of the Litigation, Lead Plaintiffs, all Settlement Class Members and the Settling Defendants.

3. For purposes of this Settlement, this is a class action on behalf of all persons who purchased or otherwise acquired any common stock of AudioEye during the period from May 14, 2014 through and including April 1, 2015, and who were allegedly damaged thereby (the "Settlement Class"). Excluded from the Settlement Class are Defendants, the officers and directors of AudioEye during the Class Period, members of their immediate families and their legal representatives, heirs, successors, or assigns, any entity in which Defendants have or had a controlling interest, and any persons who separately file an action against one or more of Defendants, based in whole or in part on any claim arising out of or relating to any of the alleged acts, omissions, misrepresentations, facts, events, matters, transactions, or occurrences referred to in the Litigation or otherwise alleged, asserted, or contended in the Litigation. Also excluded from the Settlement Class are those persons who filed valid and timely requests for exclusion in accordance with the Preliminary Approval Order.

4.      With respect to the Class, and for purposes of this Settlement only, the Court finds and concludes that the requirements of Federal Rules of Civil Procedure 23(a) and 23(b)(3) are satisfied as: (a) the Members of the Class are so numerous that joinder of all Class Members in the Litigation is impracticable; (b) there are questions of law and fact common to the Class that predominate over any individual questions; (c) the claims of the Lead Plaintiffs are typical of the claims of the Class; (d) the Lead Plaintiffs and Lead Plaintiffs' Counsel have fairly and adequately represented and protected the interests of all the Class Members; and (e) a class action is superior to other available methods for the fair and efficient adjudication of the controversy, considering: (i) the interests of the Members of the Class in individually controlling the prosecution of the separate actions, (ii) the extent and nature of any litigation concerning the controversy already commenced by Members of the Class, (iii) the desirability or undesirability of continuing the litigation of these claims in this particular forum, and (iv) the difficulties likely to be encountered in the management of the Litigation.  Accordingly, for settlement purposes only, the Class is certified, Lead Plaintiffs are appointed Class Representatives, and Lead Plaintiffs' Counsel are appointed Class Counsel

5.      The Court hereby finds that the forms and methods of notifying the Settlement Class of the Settlement and its terms and conditions met the requirements of due process and Rule 23 of the Federal Rules of Civil Procedure, Section 21D(a)(7) of the Exchange Act, 15 U.S.C. § 78u-4(a)(7), as amended by the Private Securities Litigation Reform Act of 1995; the Constitution of the United States (including the Due Process Clause); and any other applicable law, constituted the best notice practicable under the circumstances; and constituted due and sufficient notice to all persons and entities entitled thereto of these proceedings and the matters set forth herein, including the Settlement and Plan of Allocation, to all persons entitled to such notice.  No Settlement Class Member is relieved from

the terms of the Settlement, including the releases provided for therein, based upon the contention or proof that such Settlement Class Member failed to receive actual or adequate notice. A full opportunity has been offered to the Settlement Class Members to object to the proposed Settlement and to participate in the hearing thereon. The Court further finds that the notice provisions of the Class Action Fairness Act, 28 U.S.C. § 1715, were fully discharged. Thus, it is hereby determined that all members of the Settlement Class are bound by this Order and Final Judgment [except those persons listed on Exhibit A to this Order and Final Judgment].

6. The Settlement is approved as fair, reasonable and adequate, and in the best interests of the Plaintiffs. Lead Plaintiffs and Settling Defendants are directed to consummate the Settlement in accordance with the terms and provisions of the Stipulation.

7. The Litigation and the operative Consolidated Amended Complaint are hereby dismissed in their entirety, with prejudice, and without costs.

8. Upon the Effective Date, and as provided in the Stipulation, Lead Plaintiffs and each of the Settlement Class Members, on behalf of themselves, and each of their current, past and future trusts, estates, beneficiaries, heirs, joint tenants, tenants in common, executors, administrators, trustees, predecessors, successors, partners, spouses, parents, subsidiaries, affiliates, attorneys, consultants, experts, brokers, creditors, insurers, agents, representatives, and assigns, and any Person that any of them represents, shall and by operation of this Order and Final Judgment are hereby deemed to have fully, finally, and forever released, relinquished and discharged, and are forever enjoined from prosecuting, any and all of the Settled Claims and all claims arising out of, relating to, or in connection with the Settlement, the Litigation, and/or the resolution of the Litigation against the Released Parties, whether or not such Settlement Class

Member executes and delivers the Proof of Claim and Release form or shares in the Net Settlement Fund.

9. Upon the Effective Date, Defendants shall release and forever discharge each and every one of the Defendants' Claims, and by operation of this Order and Final Judgment shall be forever enjoined from prosecuting Defendants' Claims as against any of the Lead Plaintiffs, Settlement Class Members, or their attorneys, including but not limited to claims for malicious prosecution or sanctions.

10. The Plan of Allocation is approved as fair and reasonable, and Lead Plaintiffs' Counsel and the Claims Administrator are directed to administer the Stipulation and Plan of Allocation in accordance with its terms and provisions. Any modification or change in the Plan of Allocation that may hereafter be approved shall in no way disturb, affect or delay the finality of this Order and Final Judgment or the Releases provided thereunder, shall not disturb, affect or delay the Effective Date of the Settlement, and shall be considered separate from this Order and Final Judgment.

11. In accordance with 15 U.S.C. § 78u-4(f)(7) and all other applicable laws and regulations, any and all claims by any Person against any of the Settling Defendants and/or other Released Persons for contribution or indemnification arising out of or relating in any way to any Settled Claim, or where the alleged damage to the claimant is measured by reference to the claimant's liability to any of the Lead Plaintiffs and/or Settlement Class Members, are hereby permanently barred and discharged. Further:

a. All claims for contribution and indemnification, however denominated, based upon or arising under the federal securities laws, state law, foreign law or common law, in favor of any Person(s), against any of the Defendants and/or other Released Parties, with

respect to, arising out of, or relating in any way to the claims, allegations, transactions, and/or events that are the subject of the Litigation, and/or based upon liability for, or arising out of or relating in any way to the Settled Claims, are extinguished, discharged, barred, satisfied and/or otherwise unenforceable.

b. All Persons are hereby barred and permanently enjoined, to the fullest extent allowed by law, from asserting, instituting or prosecuting in any capacity, any claim, action or proceeding against any of the Defendants and/or other Released Parties for equitable, partial, comparative, or complete contribution, subrogation or indemnity, however denominated, based upon liability for, and/or arising out of or relating in any way to the Settled Claims, and the Court finds that all such claims are extinguished, discharged, satisfied and made unenforceable.

c. Notwithstanding the foregoing, nothing in the Stipulation or this Order and Final Judgment shall apply to, bar, release or otherwise affect any claim or right to indemnification by any present or former employee, officer or director of AudioEye, based on contractual indemnity, corporate by-laws, or Arizona law governing indemnification of employees, directors and officers (including a claimed right for advancement of fees and costs), or any claim by any present or former employee, officer or director of AudioEye for indemnity or contribution arising in or from any proceeding other than this Litigation, that the Person asserting such claim would otherwise be entitled to assert in the absence of the Stipulation and Settlement and the Court's Order and Final Judgment. Nor shall any of the foregoing apply to, bar, release or otherwise affect any rights or

Case 4:15-cv-00163-DCB Document 100 Filed 05/08/17 Page 7 of 9

claims by any of the Released Parties under any relevant insurance policies.

12. The Court finds that all parties and their counsel have complied with each requirement of Rule 11 of the Federal Rules of Civil Procedure as to all proceedings herein.

13. Neither this Order and Final Judgment, the Stipulation, nor any of the negotiations, documents or proceedings connected with them shall be:

a. described as, construed as, offered or received against any Defendant or any of the Released Parties as evidence of and/or construed as or deemed to be evidence of any presumption, concession or admission by any of them of the truth of any fact alleged by Plaintiffs in the Litigation, of the validity of any claim that was or could have been asserted in the Litigation, or of the deficiency of any defense that was or could have been asserted in the Litigation or in any other litigation, or of any liability, loss, damage, negligence, fault or wrongdoing whatsoever;

b. described as, construed as, offered or received against any Defendant or any of the Released Parties as evidence of and/or construed as or deemed to be evidence of any presumption, concession or admission by any of them that the consideration to be provided hereunder, or the proposed Plan of Allocation, represents the amount that could be or would have been awarded to Lead Plaintiffs or the Settlement Class Members after trial.

14. Exclusive and specific jurisdiction is hereby retained over Defendants, the Lead Plaintiffs, and the Settlement Class Members for all matters relating to the Settlement, including the administration, interpretation, effectuation or enforcement of the Stipulation or Settlement and this Order and Final Judgment,

and including any application for fees and expenses incurred in connection with administering and distributing the settlement proceeds to the Settlement Class Members.

15. Without further order of the Court, Settling Defendants and Lead Plaintiffs may agree to reasonable extensions of time to carry out any of the provisions of the Stipulation.

16. There is no just reason for delay in the entry of this Order and Final Judgment and immediate entry by the Clerk of the Court is directed pursuant to Rule 54(b) of the Federal Rules of Civil Procedure.

17. Lead Plaintiffs' Counsel are **HEREBY AWARDED** 33 1/3% (thirty-three and one-third percent) of the Gross Settlement Fund for their attorneys' fees, plus accrued interest, which sum the Court finds to be fair and reasonable. Lead Plaintiffs' Counsel are hereby **AWARDED $507, 825.00**, plus accrued interest, in reimbursement of litigation expenses of **$26,250.47**, which expenses the Courts finds to be have been reasonably incurred. The foregoing amounts shall be paid to Lead Plaintiffs' Counsel from the Gross Settlement Fund, **$1,525,000.00** in cash, subject to the terms, conditions, and obligations of the Stipulation, which terms, conditions, and obligations are incorporated herein. Lead Plaintiffs' Counsel may make payments of fees and expenses to counsel for other plaintiffs as Lead Plaintiffs' Counsel deems appropriate based on their relative contribution to the prosecution and resolution of the Action. Neither the Plan of Allocation submitted by Lead Plaintiffs' Counsel nor the portion of this Order and Final Judgment regarding the attorneys' fee and litigation expenses application including any modification or change in the award of attorneys' fees and litigation expenses that may hereafter be approved, shall in any way disturb or affect this Order and Final Judgment or the Releases provided hereunder and shall be considered separate from this Order and Final Judgment.

18. In the event that the Settlement does not become final and effective in accordance with the terms and conditions set forth in the Stipulation, then this Order and Final Judgment shall be rendered null and void and be vacated and the Settlement and all orders entered in connection therewith shall be rendered null and void (except as provided in paragraphs E.1-3., G, L.4-7., and M.14. in the Stipulation), and the parties shall be deemed to have reverted to their respective status prior to the execution of the Stipulation, and they shall proceed in all respects as if the Stipulation had not been executed and the related orders had not been entered, preserving in that event all of their respective claims and defenses in the Litigation, and shall revert to their respective positions in the Litigation.

19. The Escrow Agent shall maintain the Net Settlement Fund in accordance with the requirements set forth in the Stipulation. No Defendant, or any other Released Party, shall have any liability, obligation, or responsibility whatsoever for the administration of the Settlement or disbursement of the Net Settlement Fund. Lead Plaintiffs' Counsel, Lead Plaintiffs, the Escrow Agent, and the Claims Administrator shall have no liability to any Class Member with respect to any aspect of the administration of the Settlement Fund, including, but not limited to, the processing of Claim Forms and the distribution of the Net Settlement Fund to Class Members.

**IT IS FURTHER ORDERED** that the Motion for an Award of Attorneys' Fees and Reimbursement of Expenses (Doc. 95) and the Motion for Final Approval of the Settlement, Class Certification and Plan of Allocation (Doc. 94) are **GRANTED**. This is the Final Judgment of the Court. This action is closed.

Dated this 8th day of May, 2017.

_____
Honorable David C. Bury
United States District Judge

# TAB 5

2011 WL 1585605

⚠️  KeyCite Overruling Risk - Negative Treatment

Overruling Risk   Erica P. John Fund, Inc. v. Halliburton Co.,   U.S.,   June 6, 2011

2011 WL 1585605
Only the Westlaw citation is currently available.
United States District Court,
S.D. Florida.

In re BANKATLANTIC BANCORP,
INC. Securities Litigation.

No. 07–61542–CIV.
|
April 25, 2011.

**Attorneys and Law Firms**

David Reich Chase, David R. Chase PA Penthouse 2, Fort Lauderdale, FL, Jules Brody, Stull Stull & Brody, Mark S. Arisohn, Michael W. Stocker, Serena W. Hallowell, Jonathan Gardner, Mindy Dolgoff, Labaton Sucharow LLP, New York, NY, Julie Prag Vianale, Kenneth J. Vianale, Vianale & Vianale, Boca Raton, FL, Ronald D. Shindler, Fowler White Burnett, Adam Michael Schachter, Stearns Weaver Miller Weissler Alhadeff & Sitterson, Miami, FL, Benjamin J. Hinerfeld, Mark S. Danek, Matthew Mustokoff, Michelle M. Newcomer, Nichole T. Browning, Andrew L. Zivitz, Barroway Topaz Kessler Meltzer & Check LLP, Radnor, PA, Jonathan Louis Alpert, The Alpert Law Firm PA, Miami Beach, FL, for Plaintiffs.

Eugene E. Stearns, Adam Michael Schachter, Andrea Naomi Nathan, Cecilia Duran Simmons, Gordon Mcrae Mead, Jr., Richard Bryan Jackson, James A. White, Stearns Weaver Miller Weissler Alhadeff & Sitterson, Miami, FL, for Defendants.

*ORDER ON MOTION FOR JUDGMENT AS A MATTER OF LAW AND MOTION FOR NEW TRIAL*

URSULA UNGARO, District Judge.

**\*1** THIS CAUSE is before the Court upon Defendants' Motion for Judgment as a Matter of Law and Defendants' Motion for New Trial. (D.E. 666 & 669.) Plaintiffs filed Responses in Opposition to both Motions, and Defendants filed Replies in Support of both Motions. (D.E. 674–75, 677 & 679.) Both Motions are ripe for disposition.

THE COURT has considered the Motions and the pertinent portions of the record and is otherwise fully advised in the premises.

AS SET FORTH BELOW, the Court will GRANT Defendants' Motion for Judgment as a Matter of Law and will CONDITIONALLY DENY Defendants' Motion for New Trial. Defendants are entitled to judgment in their favor as to all of Plaintiffs' claims.

**I. Procedural Background**

Plaintiffs are the class of individuals who purchased the common stock of Defendant BankAtlantic Bancorp, Inc. (Bancorp) between November 9, 2005 and October 25, 2007 (the Class). [1]

Bancorp is the publicly traded parent company of BankAtlantic, a federally chartered bank offering consumer and commercial banking and lending services throughout Florida. The remaining Defendants are current and former officers and directors of Bancorp: (1) James A. White, the former Executive Vice President and Chief Financial Officer (CFO) of Bancorp and former CFO of BankAtlantic; (2) John E. Abdo, the Vice–Chairman of the Board of Directors for Bancorp and BankAtlantic; (3) Valerie C. Toalson, CFO of Bancorp and Executive Vice President and CFO of BankAtlantic; (4) Jarett Levan, the President of BankAtlantic, and from January 16, 2007, the President of Bancorp and the Chief Executive Officer (CEO) of BankAtlantic; and, (5) Alan Levan, the former Chairman of the Board and CEO of Bancorp and former Chairman of the Board and President and CEO of BankAtlantic.

Plaintiffs contend that Defendants misrepresented and concealed the true quality and consequent value of certain assets in BankAtlantic's loan portfolio in violation of the Securities Exchange Act of 1934 (the Exchange Act), 15 U.S.C. § 78a *et seq.,* and caused Plaintiffs to suffer a loss when the truth was revealed.

**A.** *Pleadings & Class Certification*
Plaintiffs filed their initial Complaint on October 29, 2007 and their Consolidated Amended Complaint on April

2011 WL 1585605

22, 2008. On December 12, 2008, the Court dismissed the Consolidated Amended Complaint without prejudice pursuant to Defendants' motion and Federal Rules of Civil Procedure 9(b) and 12(b)(6). On January 12, 2009, Plaintiffs filed their First Amended Consolidated Complaint. And on May 12, 2009, the Court denied Defendants' motion to dismiss the First Amended Consolidated Complaint.

In the First Amended Consolidated Complaint, Plaintiffs sought damages under §§ 10(b), 20(a), and 20A of the Exchange Act, 15 U.S.C. §§ 78j(b), 78t(a) & 78t–1. (D.E.80.)

In Count I, Plaintiffs alleged that, throughout the class period, Defendants knowingly made materially false and misleading statements, in violation of § 10(b) of the Exchange Act as implemented by Exchange Act Rule 10b–5, 17 C.F.R. § 240.10b–5, regarding the value of its loan portfolio. Plaintiffs' Rule 10b–5 claims fell into three broad categories: misrepresentations and non-disclosures of the poor or deteriorating credit quality of BankAtlantic's land loan portfolio; misrepresentations and non-disclosures of its poor underwriting practices; and misrepresentations and non-disclosures of the adequacy of its loan loss reserves and the accuracy of its financial statements. The claims were further divided into two separate periods of damage ending with respective stock-price declines on April 26, 2007 and October 26, 2007.

 **\*2**  In Count II, Plaintiffs alleged that the individual Defendants were control persons of Bancorp and as such were liable for its Rule 10b–5 violations under § 20(a) of the Exchange Act. And in Count III, Plaintiffs alleged that Defendants Abdo and Alan Levan profited from the sale of Bancorp stock while in the possession of material, non-public information in violation of § 20A of the Exchange Act.

On October 20, 2009, after Defendants stated their non-opposition to Plaintiffs' motion to certify, the Court certified the Class. [2] (D.E. 147 & 153.) At that time, the case had been pending for two years, the discovery deadline was May 21, 2010, and trial was scheduled to begin on August 16, 2010. (D.E.148.)

Nevertheless, on April 22, 2010, nine months after the deadline to amend the pleadings and less than a month before the close of discovery, Plaintiffs moved to amend their complaint. (D.E. 208 & 210.) Plaintiffs offered three reasons for the amendment: shortening the class period to begin on October 19, 2006; discontinuing the insider trading claims

under § 20A; and identifying additional public statements which all "relate[d] to Plaintiffs' original theory of liability, *i.e.,* fraudulent misrepresentations regarding the true risk of BankAtlantic's land loan portfolio." (D.E.210.) The Court denied the motion.

In denying the motion, the Court agreed with Defendants to the extent they argued that shortening the class period and abandoning the § 20A claims would unfairly deny them a final adjudication of those issues. Further, the Court was unconvinced the remaining amendments were necessary as Plaintiffs had argued the additional statements were substantively indistinguishable from the claims in the First Amended Consolidated Complaint and offered no authority supporting the proposition that identification of the additional statements was required to state a legally sufficient claim. Moreover, the Court observed that, if required, Federal Rule of Civil Procedure 15(b) would allow for amendment of the pleadings at trial to conform to the evidence; in that regard, the Court stated "Defendants have been put on notice of these additional misstatements and omissions." (D.E.242.) Accordingly, the case proceeded on the First Amended Consolidated Complaint.

### B. *Motions for Summary Judgment & to Exclude Expert Testimony*

In June 2010, the parties filed cross-motions for summary judgment. Defendants moved for summary judgment on all claims. And Plaintiffs moved for summary judgment only on the narrow issues of the falsity of four statements made by Alan Levan in a July 25, 2007 conference call. In its August 18, 2010 Omnibus Order, the Court granted Defendants' motion in part and Plaintiffs' partial motion in full. *In re BankAtlantic Bancorp, Inc. Sec. Litig.,* 2010 WL 6397500 (S.D.Fla. Aug.18, 2010.) In that order, the Court also granted in part Defendants' motion to exclude the proposed testimony of Plaintiffs' loss causation and damages expert, Candace Preston. *Id.*

 **\*3**  The order entitled Defendants to final summary judgment on the claims Plaintiffs previously attempted to abandon: the claims from the first year of the class period (pre-October 19, 2006) and the claims under § 20A of the Exchange Act. *Id.* The order also entitled Defendants to final summary judgment on claims arising from any statements regarding BankAtlantic's loan loss reserves and on claims of damages caused by Bancorp's October 29, 2007 stock-price decline. *Id.* Collectively, these rulings shortened the class period to October 19, 2006 through October 26, 2007, and finally

2011 WL 1585605

adjudicated the claims of insider trading and accounting fraud in Defendants' favor. *Id.*

As to the balance of Plaintiffs' claims, Defendants strongly emphasized Plaintiffs' failure to produce credible, reliable evidence regarding loss causation and damages.[3] To that end, Defendants also moved to exclude Preston's testimony. The Court granted the motion to exclude in part; what survived from Preston's testimony was, in the Court's view, sufficient to create a genuine issue of fact as to loss causation and damages.[4]

Finally, the order entitled Plaintiffs to summary judgment as to the narrow issue of the objective falsity of four statements made by Alan Levan during a July 25, 2007 earnings conference call. The four statements at issue concerned the extent to which Alan Levan perceived weakness in certain portions of its loan portfolio. Plaintiffs presented undisputed evidence that those statements were objectively false. And Defendants came forward with no evidence that raised a genuine issue of material fact as to the objective falsity of the statements; rather Defendants focused their argument on the immateriality of the statements and the applicability of the forward-looking safe harbor of § 27A of the Private Securities Litigation Reform Act (the Reform Act), 15 U.S.C. § 78u, neither of which were at issue in Plaintiffs' Motion. Accordingly, the Court granted summary judgment in Plaintiffs' favor on the narrow issue of objective falsity; the Court did not address the materiality of the statements, whether they were made with scienter, or whether they came within the protection of the safe harbor.

## C. *Pretrial & Trial*
Before trial the parties filed pre-trial stipulations, proposed jury instructions, and proposed verdict forms. In their joint pre-trial stipulation supplement,[5] each side framed the issues of fact to be litigated at trial. (D.E.473.) Plaintiffs framed the issues as the elements of a Rule 10b–5 claim as they related to each of twenty-nine alleged misstatements and the individual Defendants' controlling-person status under § 20(a) with respect to each of those statements. Plaintiffs identified the twenty-nine alleged misstatements in a document attached to the supplement as Exhibit A and titled "Misstatements and Omissions Alleged by Plaintiffs." It separately listed the twenty-nine statements and, for each statement, the date on which it was made, the document or conference call in which it was made, and the Defendants responsible for the statement.

**\*4** Defendants objected to Plaintiffs' framing of the issues, stating:

> Plaintiffs' statement of the issues to be tried reflected in their Exhibit A is entirely inconsistent with the issues framed by the Court as remaining to be tried in the Court's Omnibus Order, is outside the pleadings, and is inconsistent with what remains of Plaintiffs' damages expert's testimony.

(D.E.473.) Defendants sought to frame the issues around the assumptions of Plaintiffs' damages expert, Candace Preston, without reference to any particular misrepresentations.[6]

The Court held an initial pre-trial conference on September 10, 2010 in which the supplemental stipulation was briefly discussed. (D.E.483.) At the conference, Plaintiffs stated: "Our case is essentially 29 misstatements," and Defendants complained: "There's no complaint that says 29 instances." (D.E. 483, pp. 41 & 44.) The issue was raised again at a follow-up pre-trial conference on October 5, 2010. (D.E.518.) At that conference the Court attempted to understand Defendants' position on the twenty-nine statements and asked whether Defendants were highlighting a problem with new statements not contained in the First Amended Consolidated Complaint. Defendants made clear that they were not objecting to the twenty-nine statements because some were not in the pleadings, but because they did not conform to Preston's assumptions:

> It isn't a question whether they're new or old. There are some new ones. But that isn't really [our] point.
>
> Candace Preston, who's their damage expert, was asked to make certain factual assumptions. None of those statements were in her factual assumptions ....

(D.E.518, p. 15.) Defendants argued that Plaintiffs were precluded from proving their Rule 10b–5 claims based on any individual statement, but were instead required to prove the fraud generally articulated by Preston in her assumptions. Ultimately, the Court ruled that Plaintiffs could prove their Rule 10b–5 claims based on individual statements so long as the fraud proven by the individual statements fit with Preston's assumptions and overall opinion on loss causation

and damages. At bottom, an action under Rule 10b–5 requires that the defendant made some *statement* which is misleading or is rendered misleading by the omission of further information. *See, e.g.,* § 78u–4(b)(1); *Roeder v. Alpha Indus., Inc.,* 814 F.2d 26–7 (1st Cir.1987).

Trial began on October 12, 2010. (D.E. 528 & 531.) Plaintiffs rested their case on October 28, 2010, and Defendants moved for judgment as a matter of law. (Tr. 2747.) During oral argument on the motion, Defendants reiterated their position that "this is not a case about 29 separate factual statements. This is a case based on Candace Preston's broad-brush assumptions." (Tr. 2758.) The Court reserved ruling on the motion, but during the course of the arguments, Plaintiffs withdrew seven of the twenty-nine alleged misstatements. (Tr. 2776–77, 87, 99 & 2857.)

**\*5** Defendants next presented their evidence and rested their case on November 3, 2010. (Tr. 3638–39.) Because the Court and the parties had not completed drafting the jury instructions and verdict form, the Court instructed the Jury to return on a later date.

The ensuing charge conference was protracted due mainly to the Reform Act's requirements that the Jury allocate proportionate liability at the levels of primary and secondary liability depending upon its determinations of scienter with respect to each statement. Both parties had submitted proposed verdict forms, but neither adequately addressed the intricate demands of the Reform Act as they applied to this case—a numerous-statement, varying-defendant, Rule 10b–5 class action involving two separate damage periods atop which was layered a varying-defendant § 20(a) class action. Plaintiffs' proposed verdict form was structured around nineteen individual statements taken from the list of twenty-nine misstatements submitted as part of their pretrial stipulation. [7] (D.E.593.) It asked the Jury to determine: whether each statement was a material misrepresentation on the part of any Defendant to whom it was attributed; the amount of per-share price inflation caused by any misrepresentation on each day of the class period; and, the controlling person status of each Defendant under § 20(a) of the Exchange Act. Defendants' proposed verdict form contained no reference to any particular misstatement. (D.E.593.) Instead, it asked the Jury to determine, for each period of damage, whether Plaintiffs proved Candace Preston's assumptions and, if so, to determine the earliest date on which any misrepresentation was made and the extent of each Defendant's liability. Defendants' form also asked the

jury to determine, for each period, the amount of per-share price inflation caused by any misstatement, but not on a daily basis. [8]

On November 9, 2010, the Court finalized the jury instructions and verdict form. The final jury instructions were lengthy, but not remarkably complex. (D.E.635.) The final verdict form, on the other hand, was both lengthy and complex—it was 75 pages long and contained over 150 questions. (D.E.632.) In the final verdict form, the Court adopted some components of both parties' proposals. (D.E.599.) The form divided the case into two separate periods as proposed by Defendants. But with respect to each period, rather than ask the Jury to determine the existence of some general type of fraud as assumed by Plaintiffs' damages expert, the form listed, in chronological order, each of 112 of the alleged misstatements (from Plaintiffs' list of nineteen). For each statement the Jury was asked a series of special interrogatories relating to the allocation of primary (Rule 10b–5) and secondary (§ 20(a)) liability under the Reform Act. Lastly, with respect to damages, the Court adapted Defendants' proposal that damages, if any, be assessed from the earliest date a misrepresentation was found to have been made; the verdict form instructed the Jury to determine, for each period, the damages, if any, resulting from the first misrepresentation it found to have been made in violation of Rule 10b–5. [9]

**\*6** On November 10, 2010, the parties delivered their closing arguments, and the Jury began its deliberations. (D.E. 641 & 643.) After five days of deliberations, on November 18, 2010, the Jury returned a verdict mainly in Defendants' favor. (D.E.665.) The Jury found no liability as to any Defendant for the first period [10] and no liability as to Defendants Abdo, White and Jarrett Levan for the second. The Jury, however, found liability and damages as to Defendants Alan Levan and Bancorp for the second period; the Jury found that Statement 7, made by Alan Levan during the April 26, 2007 earnings conference call, violated § 10(b) and that the violation proximately caused damages of $2.41 per share. The Jury further found Statements 10, 13 through 17, and 19 to have been made in violation of § 10(b); all were attributed to Alan Levan (and Bancorp) except for Statement 19 which was attributed to Alan Levan and Toalson (and Bancorp).

The Jury's special findings as to Statement 7, however, were inconsistent with both the general finding of liability and each other. The Jury specially found that Alan Levan "acted knowingly with respect to that statement" but also found

that Alan Levan "acted in good faith and did not directly or indirectly induce the Section 10(b) violation" as a § 20(a) controlling person of Bancorp. The relevant portion of the verdict as to Statement 7 liability was as follows:

*Question 7(a):* With respect to Statement 7, do you find that Alan Levan (and therefore Bancorp) violated Section 10(b)?

Yes # No ___

*Question 7(b):* Do you find that Alan Levan acted knowingly with respect to that statement?

Yes # No ___

* * *

*Question 7(d):* For each Defendant for whom you answered "yes" in Question 7(e) [re Section 20(a) controlling person status], do you find that such Defendant acted in good faith and did not directly or indirectly induce the Section 10(b) violation?

Alan Levan: Yes # No ___

(D.E.665.) And the verdict as to damages was as follows:

*Question II(B):* What is the amount of damages per share proximately caused by the first Section 10(b) violation you found during the period from April 26, 2007 through October 26, 2007?

$*2.41* per share

(D.E.665.)

The Court recognized the inconsistency and addressed the issue with the parties before accepting the verdict. (Tr. 4348–49.) The Court suggested that the inconsistency was potentially irrelevant because the Jury also found Alan Levan and Bancorp liable for Statement 10—a statement from the same April 26, 2007 conference call—and because the damage finding reasonably could be applied to that statement. *Id.* The Court then stated its intention to accept and publish the verdict unless there was some objection. *Id.* No party objected, and the Court summoned the Jury. [11] *Id.* The Court published the verdict and discharged the Jury without either party requesting clarification from the Jury or otherwise objecting. (Tr. 4359–72.)

## II. Pending Judgment

**\*7** The parties agree on most of the judgment compelled by the verdict—all Defendants are entitled to judgment in their favor for the first period and Defendants Abdo, Jarett Levan, and White are entitled to judgment in their favor for the second. The parties dispute only the proper judgment regarding Defendants Bancorp, Alan Levan, and Toalson as to the second period.

The threshold issue is the effect of the inconsistent verdict as to Statement 7. For the reasons set forth below, the Court will disregard the liability finding for Statement 7 and attach the damages finding to the liability finding for Statement 10.

The resolution of verdict inconsistencies is governed by Federal Rule of Civil Procedure 49. Rule 49 separates verdict forms into two categories: special verdicts under Rule 49(a) and general verdicts, with or without special interrogatories, under Rule 49(b). The verdict form in this case is a general verdict form accompanied by special interrogatories under Rule 49(b). [12] *See Mason v. Ford Motor Co.,* 307 F.3d 1271, 1273–76 (11th Cir.2002). As explained above, while the Jury generally found Alan Levan (and Bancorp) violated § 10(b) as to Statement 7 and specially found that he did so knowingly, it also specially found that he acted in good faith as a controlling person as to the violation. The two special findings are inconsistent with each other, and the latter is inconsistent with the general finding. [13]

Rule 49(b)(4) addresses the resolution of such inconsistencies as follows:

*Answers Inconsistent with Each Other and the Verdict.* When the answers are inconsistent with each other and one or more is also inconsistent with the general verdict, judgment must not be entered; instead, the court must direct the jury to further consider its answers and verdict, or must order a new trial.

Under this rule, the Court and the parties have two options: further deliberation or new trial. But a party that raises no objection to the inconsistency under Rule 49(b) prior to the discharge of the jury waives the objection. *E.g., Austin–Westshore Constr. Co. v. Federated Dep't Stores,* 934 F.2d 1217, 1226 (11th Cir.1991). And if the objection is waived the district court is no longer constrained by the two options contained in Rule 49(b). [14] *Austin v. Paramount Parks, Inc.,*

2011 WL 1585605

195 F.3d 715, 726 (4th Cir.1999) *cited in* 9B Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2513 (3d ed.2008).

The parties waived the objection in this case, and so the Court is unconstrained by Rule 49(b)(4) in resolving the inconsistency. Constrained only by reason and equity, the Court finds that the most fair and reasonable resolution is what the Court suggested at trial before the parties waived their objection—the Court will disregard the Statement 7 liability finding and, subject to the remaining Rule 50(b) and Rule 59 challenges, construe the Jury's verdict as finding $2.41–per–share damages caused by Statement 10.

**\*8** This resolution is more fair than a new trial both because it is essentially what the parties agreed to and also because granting a new trial (and selecting and swearing a new jury) now, when all the parties had to do was ask that the Jury clarify the inconsistency, would unnecessarily protract the final resolution of this complex, lengthy, and expensive dispute. *See Coralluzzo v. Educ. Mgmt. Corp.,* 86 F.3d 185, 186 (11th Cir.1996) ("To allow a new trial after the objecting party failed to seek a proper remedy at the only time possible [*i.e.,* before the jury is discharged] would undermine the incentives for efficient trial procedure and would allow the possible misuse of Rule 49 procedures ... by parties anxious to implant a ground for appeal should the jury's opinion prove distasteful to them.") (modification in original). And this resolution is reasonable for the reasons explained at trial regarding the conceptualization of the verdict form and the similarities of Statements 7 and 10, including the fact that Alan Levan made both in the same conference call. [15]

Having resolved the inconsistency, much of the remaining dispute as to the second period is now moot, *e.g.,* the disagreements regarding Statement 7 and the absence of a damages finding attached to Statement 10. And much of the remaining issues will become moot as the discussion below ensues. The Court begins with a discussion of Defendants' Motion for Judgment as a Matter of Law and then addresses the Motion for New Trial. Any argument not addressed in this order is rejected by the Court.

### III. Motion for Judgment as a Matter of Law

Defendants make numerous arguments in support of their Motion for Judgment as a Matter of Law. Among other arguments, Defendants contend that Plaintiffs failed to put

forth sufficient evidence at trial to support any of the elements of a Rule 10b–5 claim as to Statement 10 (or any other statement) and that Statement 10 falls within the forward-looking safe harbor of the Reform Act. The Court focuses its discussion on whether the evidence supported a finding that Statement 10 was an actionable misrepresentation or omission and, if so, whether the evidence supported a finding of loss causation or damages as to Statement 10. And because the Court agrees that the evidence of loss causation or damages was insufficient as to Statement 10, it does not address Defendants' remaining arguments.

#### A. *Rule 50(b) Standard*

Rule 50(a) allows a party, prior to the submission of the case to the jury, to move for judgment in its favor on the basis "that a reasonable jury would not have a legally sufficient evidentiary basis to find for the [opposing] party on that issue." If the Court does not grant the motion under Rule 50(a), a party may renew the motion under Rule 50(b) after the jury has returned a verdict.

"Regardless of timing, ... a district court's proper analysis is squarely and narrowly focused on the sufficiency of evidence." *Chaney v. City of Orlando,* 483 F.3d 1221, 1227 (11th Cir.2007). "The question before the district court regarding a motion for judgment as a matter of law remains whether the evidence is 'legally sufficient to find for the party on that issue,' regardless of whether the district court's analysis is undertaken before or after submitting the case to the jury." *Id.* (citations omitted). Generally, "any renewal of a motion for judgment as a matter of law under Rule 50(b) must be based upon the same grounds as the original request for judgment as a matter of law made under Rule 50(a) at the close of evidence and prior to the case being submitted to the jury." *Doe v. Celebrity Cruises, Inc.,* 394 F.3d 891, 903 (11th Cir.2004).

**\*9** "[I]n entertaining a motion for judgment as a matter of law, the court should review all the evidence of record." *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 150, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000). "In so doing, however, the court must draw all reasonable inferences in favor of the nonmoving party, and it may *not* make credibility determinations or weigh the evidence." *Id.* (emphasis added). "Thus, although the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe." *Id.* at 151. "That is, the court should give credence to evidence favoring the non-movant as well as that evidence supporting the moving

2011 WL 1585605

party that is uncontradicted and unimpeached, at least to the extent that evidence comes from a disinterested witness." *Id.* (internal quotations omitted).

But "the non-movant must put forth more than a mere scintilla of evidence suggesting that reasonable minds could reach differing verdicts." *Nebula Glass Int'l, Inc. v. Reichhold, Inc.,* 454 F.3d 1203, 1210 (11th Cir.2006). "[T]he court should deny a motion for judgment as a matter of law if the plaintiff presents enough evidence to create a substantial conflict in the evidence on an essential element of the plaintiff's case." *Id.*

### B. *Section 10(b) & Rule 10b–5*
Section 10(b) of the Exchange Act makes it unlawful "to use or employ, in connection with the purchase or sale of any security ... any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe." § 78j(b). In turn, Rule 10b–5 makes it unlawful for any person "to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b–5(b).

Courts have long recognized the implicit private right of action created by § 10(b) and Rule 10b–5, "which resembles, but is not identical to, common-law tort actions for deceit and misrepresentation." *Dura Pharms., Inc. v. Broudo,* 544 U.S. 336, 341, 125 S.Ct. 1627, 161 L.Ed.2d 577 (2005) (citations omitted). For cases involving publicly traded securities and purchases or sales in a public securities markets, the elements of the action include: (1) *a material misrepresentation (or omission);* (2) *scienter, i.e.,* a wrongful state of mind; (3) *a connection with the purchase or sale of a security;* (4) *reliance,* often referred to in cases involving public securities markets (fraud-on-the-market cases) as "transaction causation;" (5) *economic loss;* and (6) *loss causation, i.e.,* a causal connection between the material misrepresentation and the loss. *Id.* at 341–42 (citations omitted).

### C. *Actionable Misrepresentation or Omission*
Like all banks, BankAtlantic's income is substantially dependent on its borrowers' ability to make loan interest payments. And internal information that its borrowers might likely default on their obligations is highly relevant to BankAtlantic's prospects for future income and the value of Bancorp's stock. Plaintiffs contend that, in late 2006 and early 2007, Defendants had significant indications that the land loan portion of its construction loan portfolio would experience widespread defaults and collateral devaluations, but fraudulently misrepresented or concealed the true extent of this risk from investors. The Court agrees that a jury could have found Statement 10 to have been an actionable concealment of that risk under Rule 10b–5. The following facts are taken from the evidence introduced at trial and viewed in the light most favorable to Plaintiffs.

**\*10** In 2006 and 2007, BankAtlantic's commercial real estate loan (CRE) portfolio, valued at $1.2 to $1.3 billion dollars, was a major portion of its total loan portfolio. Included within the CRE portfolio was a portfolio of "land loans" valued at $400 to $500 million. (Tr. 272 & 1051–52; DX 5.)

At that time, BankAtlantic had several policies for the approval and monitoring of its CRE loans, including the land loan portfolio. (Tr. 275.) First, BankAtlantic's Major Loan Committee had to approve the initial grant and any modifications to loans in excess of $5 million. [16] (Tr. 285.) Second, BankAtlantic monitored its loan portfolio through an internal loan-grading system in which loans were graded 1 through 13. [17] (PX 151.) Grades 1 through 7 were passing; grade 10 loans were "specially mentioned assets," which have "potential weaknesses that deserve management's close attention"; and, grade 11 loans were "substandard," meaning that the "asset is inadequately protected by the current sound worth and paying capacity of the obligor or the collateral pledged, if any." [18] (PX 151; Tr. 317–19.) Additionally, if BankAtlantic determined that a borrower most likely would not repay his loan according to the terms of the original agreement, that loan was deemed "non-accrual," regardless of the assigned grade. (Tr. 338.) Finally, BankAtlantic created a monthly report called the Loan Watch List to help management track significant potential problem loans. (Tr. 336.) The list included all loans risk-graded 10 or 11 and all non-accrual loans and was distributed monthly to BankAtlantic's senior management. (Tr. 329–30.)

By early 2007, Defendants began to take notice of negative performance trends within the land loan portfolio. From January through March 2007, the Major Loan Committee approved payment extensions and modifications for at least nine land loans. (PX 122, 217, 340, 341, 342, 343, 344, 348; Tr. 1171–72 & 1175; DX 15.) On March 14, 2007, Alan Levan sent an email to members of the committee, referencing "a parade of land loans coming in for extentions [*sic* ] recently." (PX 138.) He stated:

I'm not sure what the purpose of the extentions [*sic* ] are other than hoping that more time will solve their problems (and ours). Experience tells us that in these markets, it is better to force a resolution early rather than wait for the market to further deteriorate.... Later, with pressure from all the banks, the borrower will not be able to accommodate us.

* * *

I believe we are in for a long sustained problem in this sector.
(PX 138.) On March 20, 2007, Marcia Snyder, BankAtlantic's former chief of commercial real estate lending, sent an email to BankAtlantic's loan officers, noting that the Major Loan Committee had "significant concerns" about the land loan portfolio. (PX 124, Tr. 458–61.) Snyder informed the loan officers that the Bank would conduct a review of all the loans in the land loan portfolio.[19] (PX 124.)

**\*11** The Loan Watch List for March 31, 2007 indicated that two land loans aggregating $20.2 million were on non-accrual status and another $21.3 million loan was risk-grade 11. (PX 350; Tr. 342.) On April 7, 2007, seven additional land loans aggregating approximately $93.2 million were adjusted to grade 10 or 11 and added to subsequent Loan Watch Lists. (DX 15; PX 351 & 356; Tr. 343–47.) In response to concerns over land loans, in the first quarter of 2007, BankAtlantic created a special Land Loan Committee, which met twice monthly to monitor land loans. (Tr. 454.) In early April, Alan Levan authorized a "full legal review" of all the loans in the land loan portfolio, because of the possibility that the Bank would have "legal issues" with the entire portfolio. (Tr. 3563–64.)

As the deadline for filing the 2007 first-quarter financial results approached,[20] BankAtlantic began to distinguish between what came to be called the "builder land bank" or "BLB" loans and the remainder of the land loan portfolio. (Tr. 1071, 3390.) The BLB land loans were loans made to developers to acquire and develop parcels of land into finished lots; these borrowers, who had option contracts for the "take down" of the finished lots with large regional or national homebuilders, relied on the homebuilders to exercise the options on schedule in order to provide the borrowers with revenue to meet their loan obligations to BankAtlantic on a timely basis. (DX 6, p. 18.) The remaining, non-

BLB land loans were made to developers to acquire land, develop it into finished lots, and sometimes build residential developments, but did not involve option contracts with national homebuilders. (Tr. 357–59; DX 6, p. 18.)

The problems Defendants observed in the land loan portfolio were not limited to either the BLB or non-BLB land loans —they were spread throughout the portfolio: the Major Loan Committee had approved extensions for both BLB and non-BLB land loans (PX 122, 217, 340, 341, 342, 343, 344 & 348; DX 15; Tr. 1171–72 & 1175); Marcia Snyder did not distinguish the categories of land loans in her email (PX 124, Tr. 458–61); both BLB and non-BLB land loans had depleted interest reserves (Tr. 461–62, 1226–28 & 3563); the March 31, 2007 Loan Watch List included one non-accrual BLB land loan and one non-accrual non-BLB land loan (PX 350; Tr. 342.); and the April 7, 2007 Loan Watch List additions included three BLB land loans and four non-BLB land loans (DX 15; PX 356; Tr. 343–47).

On April 26, 2007, Bancorp filed its first quarter 2007 financial results in an 8–K press release, which reported that BankAtlantic earned $5.7 million net income for the quarter. (DX 4.) Bancorp also announced an increase in non-accrual loans of $19.6 million from the first quarter of 2006, which related to loans in its CRE loan portfolio. (DX 4.) The release warned:

> The current environment for residential land acquisition and development loans is a concern, particularly in Florida, and represents an area where we remain very cautious in our credit management. In view of market conditions, we anticipate we may experience further deterioration in the portfolio over the next several quarters as the market attempts to absorb an oversupply of available lot inventory.

**\*12** (DX 4.)

The same day, Bancorp held its first-quarter earnings conference call. (DX 5.) In preparing for the call, Alan Levan asked James White, the then-CFO, to focus his discussion only on the BLB land loans.[21] (PX 139; Tr. 1673–76 & 3565–

2011 WL 1585605

66.) And during the call, Alan Levan emphasized the risks of the BLB land loans to the exclusion of the remaining land loans. He discussed a $19.6 million increase in non-accrual loans, which he attributed to two loans in the "land banking portfolio," and described that portfolio as follows:

... those very simply are loans that we made to land developers, people that buy land in anticipation of selling that land to national developers, national or local developers. Generally at the time of borrowing, the borrower or developer had contracts with builders to buy a significant or a substantial portion of the property, which would have been used to pay down the loan in the normal course. As we all recognize, the housing market in the—nationally, but particularly in Florida, is suffering some economic distress. And the amount of deposits that homebuilders nationally in Florida that have walked away from these deposits is pretty high.

(DX 5, p. 4.) This was the first time Alan Levan or Bancorp publicly distinguished the BLB portfolio from the remainder of the land loan portfolio.[22] (Tr. 3328–29 & 3568; DX 5, p. 23.) Alan Levan noted that this "portfolio" consisted of $140 to $160 million in loans and explained that it was a subject of concern because the national homebuilders had "slowed their takedown of lots" and many of the borrowers were requesting extensions "to give the builders more time to ultimately take down the lots." (DX 5, pp. 5 & 24.)

Alan Levan also stated as to the remainder of the CRE portfolio: "The portfolios that are buying land for their own development, those are proceeding in the normal course. We're not really seeing any difference in that portfolio than we've seen in the billion-and-a-half dollar portfolio." (DX 5, p. 24.) And when an investment analyst asked Alan Levan a question regarding the composition of the land loan portfolio, the following exchange ensued:

[ANALYST]: Hi. So just to follow up on the last set of questions, is it right to infer that your construction portfolio apart from the land bank is about $250 million? Is that the right inference, the construction loan portfolio?

* * *

ALAN LEVAN: I think we—if we—we'd probably have to get back to you on that. By deduction, that would certainly seem likely. If it's a $400 million portfolio and $140 million

to $160 million is in this one, probably the rest of it is in some stage of development to our borrower. The answer to that is probably yes, but perhaps we can get back to you (unintelligible) ...

[ANALYST]: Okay, but that—I mean, that $400 million number that was referenced before would encompass all construction-related loans generally speaking?

**\*13** ALAN LEVAN: No, no, no. Other—I mean, the entire portfolio is $1.4 billion, $1.5 billion. So there's lots of construction in our portfolio. And Valerie noted today, she'll tell you as soon as I stop talking, we're—we'll have to tell you offline, there's a certain designation when we finance a land acquisition with the anticipation of a building going on that. It tends to get into this land portfolio. And it may recharacterize as we start to build, but lots of our portfolio is a construction portfolio that we're not in any way concerned about.

(DX 5, p. 29.) The last portion of the exchange is what Plaintiffs identified as Statement 10: "But lots of our portfolio is a construction portfolio that we're not in any way concerned about."

Given the context of the statement, a jury could have found that when Alan Levan professed a lack of concern as to "lots of our portfolio," he was essentially stating that he was only concerned with the BLB land loans and *not* with the entire land loan portfolio. Indeed, Plaintiffs argued to the Jury in closing that Statement 10 was misleading with respect to the non-BLB land loans *only.* (Tr. 4093–94.) And a jury also could have found that Alan Levan's professed lack of concern about the balance of the land loan portfolio was untrue.

But not every untrue statement is actionable under Rule 10b–5. Generally, a misstatement or omission is actionable under the Rule if it is of a definite factual nature. *See Va. Bankshares, Inc. v. Sandberg,* 501 U.S. 1083, 1095, 111 S.Ct. 2749, 115 L.Ed.2d 929 (1991). And, under certain circumstances, management statements couched as conclusory beliefs can be actionable. *Id.* "Such statements are factual in two senses: as statements that [managers] do hold the belief stated and as statements about the subject matter of the ... belief expressed." *Id.* at 1092. A statement of conclusory belief is actionable as a misrepresentation if a plaintiff demonstrates *both* the managers' disbelief and the falsity of the underlying facts. *Id.* at 1093–96.

In this case, the evidence supports a finding that Statement 10 is actionable. A jury could have found that Alan Levan was

2011 WL 1585605

in fact concerned about the entire land loan portfolio and that certain of the same justifications he identified as the basis of his concern for the BLB loans existed (and were concealed) with respect to the remainder of the land loan portfolio.

With respect to the first point, Plaintiffs presented evidence that Alan Levan internally expressed undifferentiated concern regarding the entire land loan portfolio prior to the conference call. As detailed above, in a March 2007 email, Alan Levan stated that the land loan portfolio was facing "a long sustained problem," and in another March 2007 email, Marcia Snyder stated that the Major Loan Committee had "significant concerns" about both the BLB and non-BLB land loans. (PX 138 & 124.) Further, by the time of the conference call, BankAtlantic had created a special Land Loan Committee to review and address concerns regarding the entire land loan portfolio—twenty-nine loans were under review, nearly half of which were non-BLB land loans. Based on this evidence a jury could have found that Alan Levan falsely professed a lack of concern about the remainder of the land loan portfolio.

 **\*14** With respect to the second point, the stated justification for his relative lack of concern was the distinction between the BLB and non-BLB land loans, namely the involvement of national homebuilders in the BLB loans. Alan Levan explained that the BLB loans were made to borrowers whose business model depended on the sale of lots to these national home builders. According to Alan Levan, because of a softening residential real estate market, these builders were not "taking down" lots from the borrowers as scheduled which, in turn, was causing the borrowers to request payment extensions and in a few instances causing the borrowers to miss payments, resulting in non-accrual classifications. Another distinction was that for some BLB loans, the equity component was comprised of a letter of credit from the national home builder as opposed to a cash deposit. In the conference call, Alan Levan claimed these characteristics were unique to the BLB loans.

Plaintiffs put forth evidence, however, that certain of these characteristics were not confined to the BLB loans and were present throughout the land loan portfolio. A jury could have found that, by the time of the conference call, one non-BLB land loan was also on non-accrual status—in fact, it could have found that one of the two non-accrual BLB loans Alan Levan identified during the conference call was actually a non-BLB land loan. And a jury could have found that eight of the nine land loan extensions and modifications the Major Loan Committee had approved by March 2007 were non-

BLB land loans. (PX 122, 217, 340, 341, 342, 343, 344, 348; Tr. 1171–72 & 1175; DX 15.) In short, a jury could have found Statement 10 to be an actionable concealment of the risk of substantial losses to the non-BLB land loans.

**D.** *Loss Causation & Damages*
Plaintiffs contend that they suffered an actual loss when the true level of risk concealed by Statement 10 (the risk of substantial losses to the non-BLB land loans) was revealed on October 25 and 26, 2007 and the price of Bancorp's stock fell by $2.93. The issue therefore is whether Plaintiffs put forth sufficient evidence that their damages, if any, were "caused" by the concealment of this risk.

On October 25, 2007, Bancorp announced its third quarter 2007 financial results in a press release filed as an 8–K on October 26, 2007. (DX 11.) Bancorp suffered a loss from continuing operations of $29.6 million or $0.52 per diluted share and BankAtlantic suffered a net loss for the quarter of $27.1 million. The press release stated that BankAtlantic's loss:

> was driven by increased loan loss provisions and impairments of real estate owned and held for sale. Other factors contributing to the decline included net interest margin compression and costs associated with opening new stores, offset in part by an increase in non-interest income.

(DX 11.)

Bancorp further announced that BankAtlantic's loan loss provision for the quarter was $48.9 million.[23] (DX 11.) The provision was required by an increase in non-performing loans; Bancorp specifically noted the placement of eleven commercial real estate loans on non-accrual status during the quarter. (DX 11, p. 2.) In the 8–K, Bancorp did not specify what amounts of the $48.9 million loan loss provision were attributable to specific, qualitative, or quantitative reserves, nor did it break down the provision across the various segments of its loan portfolio. However, for the first time, Bancorp detailed the deterioration across the entire land loan portfolio. The release stated:

**\*15** "The categories within this 'Commercial Residential' portfolio where we believe we have exposure to the declines in the real estate market are as follows:

- Builder land bank loans [BLB land loans]: This category of 13 loans aggregates $149.3 million, of which five loans totaling $81.1 million are non-accrual and an additional three loans totaling $28.7 million were considered classified assets at quarter-end.

- Land acquisition and development loans [non-BLB land loans]: This category of 37 loans aggregates $218.5 million, of which three loans totaling $13.2 million are non-accrual and an additional five loans totaling $19.7 million were considered classified assets at quarter end.

- Land acquisition, development and construction loans [non-BLB land loans]: This category of 24 loans aggregates $165.3 million, of which seven loans totaling $62.0 million are non-accrual and an additional four loans totaling $41.9 million were considered classified assets at quarter end.

(DX 11.) The "classified" loans Bancorp disclosed in this 8–K included those graded 10 and 11. (Tr. 714–16.) On October 26, 2007, Bancorp held its third quarter 2007 earnings conference call. (DX 12.) During the call, Alan Levan reiterated the results announced in the 8–K. Toalson noted that the loans placed on non-accrual status necessitated a specific reserve of $27.9 million and additional general reserves. *Id.* p. 12. She also noted that the value of BankAtlantic's real estate owned decreased by $6.7 million. *Id.* Coincidental with the announcement of third-quarter losses, Bancorp's stock price declined by $2.93 on October 26, 2007. (Tr. 2560.)

"Loss causation is the causal link between the alleged misconduct and the economic harm ultimately suffered by the plaintiff." *Lentell v. Merrill Lynch & Co.,* 396 F.3d 161, 172 (2d Cir.2005) (citation omitted). In order to prove loss causation in a fraud-on-the-market case, a plaintiff must show: (i) that the fraudulently concealed truth was revealed to the market and (ii) that the revelation caused, at least in substantial part, a decline in the market-price of the security. *See Dura,* 544 U.S. at 342–345; *Robbins v. Koger Props., Inc.,* 116 F.3d 1441, 1448–49 (11th Cir.1997). Based on the evidence at trial, a jury could have found the first part of the

showing to have been satisfied, but not the second. The Court discusses both below.

**(i)** *Revelation of the Fraud*
In this case, Plaintiffs contend that Alan Levan, when he made Statement 10, concealed the risk of losses to the entire land loan portfolio by misrepresenting that the risk of significant losses was limited to the BLB loans and that this concealed risk was revealed to the market on October 25 and 26, 2007 when it materialized in the form of significant losses throughout the land loan portfolio. The materialization-of-the-risk theory is not new. Although the Eleventh Circuit has not expressly recognized the theory,[24] numerous courts have recognized that a concealed risk can be revealed when the risk materializes. *See, e.g., Schleicher v. Wendt,* 618 F.3d 679, 683 (7th Cir.2010); *In re Vivendi Universal S.A. Sec. Litig.,* ——F.Supp.2d ——, 2011 WL 590915, ——35–36 (S.D.N.Y. Feb.17, 2011); *In re Scientific Atlanta Sec. Litig.,* ——F.Supp.2d ——, 2010 WL 4793386, ——24–26 (N.D.Ga. Nov.18, 2010). Its general purpose is to allow defrauded investors to prove loss causation and recover under Rule 10b–5 even where the defendant does not publicly correct his fraud, but instead the fraud is revealed through some other event. *See, e.g., Scientific Atlanta,* 2010 WL 4793386 at *26 (citing *Alaska Elec. Pension Fund v. Flowserve Grp.,* 572 F.3d 221, 230 (5th Cir.2009)). With this purpose in mind, the Court agrees with those decisions recognizing the theory and adopts it here.

**\*16** Further, the Court agrees that the evidence supports a finding that the disclosures on October 25 and 26, 2007 revealed that the risk of substantial losses was not limited to the BLB loans but existed throughout the entire land loan portfolio. In the 8–K, for instance, Bancorp announced that an almost equal amount of BLB and non-BLB land loans ($81.1 and $74.2 million, respectively) were in non-accrual and also that the majority of the classified land loans at the end of the third quarter were non-BLB land loans. A jury could have found that these announcements revealed information about the risk to the entire land loan portfolio that had been concealed by Alan Levan when he made Statement 10. *See Vivendi,* 2011 WL 590915 at *36.

**(ii)** *Price Decline Caused by the Revelation*
Plaintiffs next contend that the revelation of this risk was the sole cause of the $2.93 decline in Bancorp's stock price on October 26, 2007. Plaintiffs argue that the market-price of Bancorp's stock was artificially inflated by Alan Levan's

2011 WL 1585605

concealment of the risk to the non-BLB portion of the land loan portfolio and that when the concealed risk was revealed to the market, the market-price corrected and the inflation was removed. And it was the market's release of this inflation which Plaintiffs claim caused the price decline on October 26, 2007. Plaintiffs rely exclusively on the unrebutted trial testimony of their expert, Candace Preston, to establish that the price decline resulted from the revelation.

At trial, Preston testified to the results of an "event study" she used to analyze the cause of the October 26, 2007 price decline. Preston began her event study by identifying two stock indices she thought best represented the general market and banking industry—the S & P 500 Index and the NASDAQ Bank Index. (Tr. 2550.) Preston explained that she first looked to these indices because Bancorp itself used them as benchmarks for market and industry performance comparisons in its public filings. (Tr. 2550–54.) Preston then confirmed that these indices historically had a "statistical fit" with the market-price of Bancorp's stock. (Tr. 2551.) In other words, through statistical regression analysis Preston confirmed a correlation between the general market and industry indices and the market-price of Bancorp's stock. *Id.*

Using this model, Preston was able to identify, on a daily basis, movements in Bancorp's stock price which were "statistically significant" because they did not correlate with the performance of the general market and industry indices. (Tr. 2557.) According to Preston, this statistical significance was a strong indication that the movement in Bancorp's stock price was caused by some Bancorp-specific event or information and not general market or industry information. (Tr. 2557–59.) Further according to Preston, the $2.93 decline in Bancorp's stock price on October 26, 2007 was statistically significant and, when measured against the expected market-price movement as predicted by the indices, represented a "residual decline" of $3.15. *Id.* Thus, Preston concluded that the decline was attributable to Bancorp-specific information. [25]

 **\*17** Preston next discussed her opinion that the entire decline was caused by the October 25, and 26, 2007 announcement in the 8–K and conference call of new, negative information regarding the land loan portfolio. (Tr. 2595–96.) Preston noted that on October 25 and 26, 2007 Bancorp published an 8–K with its third-quarter results and held a teleconference regarding those results. (Tr. 2594.) Preston further identified Bancorp's announcement of a significant increase in non-accrual and classified assets across

the BLB and non-BLB portions of the land loan portfolio as the negative information to which the market reacted. [26] (Tr. 2595.) Preston explained that she reviewed over a hundred analyst reports, many of which identified the negative information about the land loan portfolio as a surprise. (Tr. 2599–608.) She referenced one analyst report which stated that, though some stress was expected, "a provision of this magnitude is, in our view, a surprise." (PX 632; Tr. 2600.) The analyst further noted that Bancorp's announcement that many of its land loans were classified assets suggested "the possibility of migration into nonaccruals in the coming quarter." (PX 632; Tr. 2601.) Another analyst report noted that the "pipeline of potential nonperforming loans implies more pain ahead." (PX 630; Tr. 2606.)

Preston acknowledged that Bancorp also announced other information that might have affected the stock price on October 26, 2007, including net interest margin compression, the curtailment of BankAtlantic's branch expansion, and changes in the performance of home equity loans; but she maintained that this other news did not contribute to the residual decline of Bancorp's stock price on October 26, 2007. (Tr. 2608–10.) Preston based this opinion on the analysts' overwhelming focus on the deterioration of the land loans; the fact that Bancorp attributed the net interest margin compression to challenges it faced in its land loan portfolio; and, the analysts' positive reaction to the curtailment of the branch expansion. *Id.*

Finally, Preston concluded that the $3.15 residual decline on October 26, 2007, which she opined was caused by the negative information regarding the land loan portfolio, represented the amount by which Bancorp's stock price was inflated, beginning on April 26, 2007, *i.e.,* "the amount that investors overpaid as a result of [the fraud]." (Tr. 2527 & 2620–22.) Preston also concluded that "the decline due to the release of inflation on October 26th was ... $3.15." (Tr. 2547–48.)

Defendants contend that neither Preston's testimony nor any other evidence is sufficient to support a finding of loss causation or damages. With respect to Preston's testimony, Defendants argue that Preston's underlying assumption of fraud relating to both the BLB and non-BLB land loans was rejected by the Jury's findings and, therefore, that the Jury could not have relied on her opinion. And even if a jury could have relied on her opinion, Defendants argue that it was insufficient to support a finding that the revelation of the fraudulently concealed risk caused the price decline because

2011 WL 1585605

Preston failed to disaggregate the non-fraud effects of other negative information, including information regarding the risk to the BLB loans which was already known to the market.

**\*18** These arguments are not new. Defendants consistently raised them since the filing of their motions for summary judgment and to exclude Preston's testimony. And the Court first discussed them in its Omnibus Order addressing those motions:

> With respect to the company-specific decline of $3.15 per share on October 26, 2007, Preston opines that 100% of the decline is attributable to information regarding the credit quality of the entire land loan portfolio. Essentially, Preston's opinion is that there was no other bad news to disaggregate from the information regarding the credit quality of the land loan portfolio and, therefore, that 100% of the residual decline is attributable to the negative land loan information.

> Defendants argue that this opinion is inadmissible because Preston fails to disaggregate the confounding, non-fraudulent factors from the October announcements. Specifically, Defendants contend that Preston failed to disaggregate the loss related to BLB loans, the loss related to the increase in general reserves, and the loss attributable to market forces.

> In her affidavit, Preston explains that her opinion does not purport to focus only on the non-BLB land loans, but instead the entire land loan portfolio: "Defendants claim that the allegations are somehow limited to [LAD] and [LADC] loans—at the exclusion of the BLB loans. I am advised by Counsel that this is incorrect." Accordingly, the Defendants' arguments regarding the failure to disaggregate the BLB loan information do not go to the reliability of Preston's opinion because Preston is explicitly offering an opinion on the residual decline attributable to information regarding the entire land loan portfolio, including the BLB loans.

*In re BankAtlantic,* 2010 WL 6397500 at \*17 (footnotes and citations omitted). The Court went on to note: "However, the Court will revisit this issue should it become apparent that Plaintiffs have put forth insufficient evidence to support a fraud claim relating to the BLB loans which extends past the April 2007 disclosures." *Id.* at \*17 n. 26.

The Court did revisit the issue at trial in connection with Defendants' motion for judgment as a matter of law, but

determined that as there was sufficient evidence in the record to support a finding of BLB fraud after April 2007, the Jury would have to decide the issue. (Tr. 3044.) But, again, the Court noted that it would reconsider the issue post-verdict if the Jury found no such BLB fraud:

> Now, in the end, though, I suspect that the Court is not going to be able to rule as a matter of law that there was BLB fraud after April 26th; that the jury is going to have to decide that.

> ... There is an issue down the road ... of what should the jury be told about its decision as to whether there was BLB fraud after April 26th and what to do if they find there is no BLB fraud after April 26th.

(Tr. 3045.)

As it turns out, the verdict hinges on Statement 10 which, under *Virginia Bankshares,* does not support a finding of BLB fraud, but only a finding that the risk to the *remainder* (*i.e.,* the non-BLB portion) of the land loan portfolio was fraudulently concealed. *See* 501 U.S. at 1092–94. The Jury effectively rejected Preston's assumption, and so her testimony is— at best—incomplete because she failed to disaggregate the effect of the earlier disclosed negative BLB information on Bancorp's stock price.

**\*19** As the Supreme Court noted in *Dura,* even if a defrauded plaintiff sells his shares at a lower price after the truth of the fraud is revealed to the market "that lower price may reflect, not the earlier misrepresentation, but changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions, or other events, which taken separately or together account for some or all of that lower price." 544 U.S. at 343. Accordingly, where a fraud is revealed contemporaneously with the announcement of other negative, but non-fraud-related information, plaintiffs bear the burden of disaggregating the effect of the unrelated negative information on the stock price. Simply, establishing that the price reacted in some statistically significant way "to the *entire bundle* of negative information ... suggests only market efficiency, not loss causation, for there is no evidence linking the *culpable* disclosure to the stock-price movement." *Oscar Private Equity Invs. v. Allegiance Telecom, Inc.,* 487 F.3d 261, 271 (5th Cir.2007) (emphasis in original).

In this case, there is no question that Bancorp announced a bundle of negative information on October 25 and 26, 2007,

some of it fraud-related and some of it not fraud-related. Preston herself testified that Bancorp announced negative information in addition to that regarding the land loans, but she claimed this information had no effect on the stock price. (Tr. 2609.) However, the negative information regarding the land loans was itself a bundle of information. For instance, in its October 25, 2007 8–K, Bancorp did not simply announce an increase in non-accrual and classified assets within the land loan portfolio, it announced the particular increases in each portion of the land loan portfolio. Preston freely admitted at trial that she did not attempt to disaggregate this bundle of negative land loan information because she assumed that it was all fraud related, *i.e.,* that the fraud related to the entire land loan portfolio, including the BLB loans. [27] (Tr. 2691.) Preston did qualify this admission by claiming that such a disaggregation could only have been conducted using information which was not publicly disclosed as of October 26, 2007—Preston claims that Bancorp did not publicly disclose the breakdown of the negative land loan information between BLB and non-BLB loans. (Tr. 2710–11.) This claim is simply untrue, and no jury could have found otherwise. Although there may have been some items of negative news which were not publicly broken down (*e.g.,* the $48.9 million loan loss provision), as explained above, the negative news to which Preston explicitly attributed the price decline in her direct testimony—*i.e.,* the three bullet points in the 8–K announcing the increase in non-accrual and classified assets-was publicly broken down, *in the 8–K,* into its BLB and non-BLB components.

Moreover, the fact that neither Bancorp nor any analysts precisely quantified the effects of the negative BLB loan information versus the negative non-BLB information did not relieve Plaintiffs of the burden to disaggregate—the very nature of the task presumes that the competing factors will not always lend themselves to a mathematically precise disaggregation analysis. *See Dura,* 544 U.S. at 343. And Preston testified at trial that she was capable of a disaggregation analysis where the competing factors were not quantified. With respect to the first period, Preston claimed she was able to disaggregate from the $0.55 residual price decline on April 26, 2007, the effect of non-fraudulent information even though "that wasn't quantified by anyone"—not Bancorp and not the analysts. (Tr. 2588.) For that period, Preston arrived at a "conservative" estimate of $0.37 per share after disaggregation. (Tr. 2582–93.) Preston offered no explanation why a similar analysis would not have been possible to disaggregate the effects of the negative BLB loan information on the October 26, 2007 price decline.

**\*20** Given that a jury could not have found Statement 10 to include BLB fraud and Preston's admitted failure to disaggregate the effect of the negative information regarding the BLB loans, the Court agrees with Defendants that a jury could not have relied on her opinion—at least not with respect to Statement 10. *See Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.,* 509 U.S. 209, 242, 113 S.Ct. 2578, 125 L.Ed.2d 168 (1993) ("When an expert opinion is not supported by sufficient facts to validate it in the eyes of the law, or when indisputable record facts contradict or otherwise render the opinion unreasonable, it cannot support a jury's verdict."). This is fatal to the Jury's verdict because there is no other evidence from which a jury could have found loss causation.

Without Preston's opinion, a jury would be left with no more than the text of the 8–K and the conference call—both jumbles of qualitative and quantitative financial information—and several independently admitted analyst reports which point to the negative information regarding the land loan portfolio as a whole as the most important news. (PX 630, 632 & 638.) This evidence, however, was insufficient to allow the Jury to conclude that the fraud-related (*i.e.,* non-BLB information) affected the stock price. *See, e.g., Oscar,* 487 F.3d at 270–71 (holding that evidence of "analyst commentary" is "little more than well-informed speculation" as to whether a price decline is attributable to one piece of negative information or another). "[A]nalyst speculation about materiality, while better informed than a layman, more closely resembles the latter." *Id.* at 271. Expert testimony may not be required to prove loss causation in every Rule 10b–5 case, but where a tangle of fraud and non-fraud factors affect a stock's price, it usually is—and this case is no exception. *See, e.g., Archdiocese of Milwaukee Supporting Fund, Inc. v. Haliburton Co.,* 597 F.3d 330, 341 (5th Cir.2010) ("This showing of loss causation is a 'rigorous process' and requires both expert testimony and analytical research or an event study that demonstrates a linkage between the *culpable* disclosure and the stock-price movement.") (citations omitted).

Further, even if a jury could have relied on Preston's opinion up to a point—the point where she opined that the entire decline was attributable to the negative land loan information—it could not have completed the analysis and disaggregated the effects of the BLB information on its own. As explained above, the negative land loan information was itself a *bundle* of negative news—some regarding the BLB loans, some

2011 WL 1585605

regarding the non-BLB loans, and some regarding both. Any attempt to attribute some price decline to one particular piece without expert testimony would also be impermissible speculation. *See id.* While it may be true that the negative land loan news was spread equally between the BLB and non-BLB portions, any inference that each had an equal effect on the stock price is only speculation. *See, e.g., Fener v. Operating Eng'rs Constr. Indus.,* 579 F.3d 401, 410 (5th Cir.2009) ("[F]raudulent practices could have resulted in 90% of the circulation decline, but if the stock price fell because the market was concerned with *only* the reason for the other 10%, loss causation could not be proven."). Accordingly, a jury could not have found loss causation with respect to Statement 10, and judgment as a matter of law will be entered for Defendants.

**\*21** In concluding that Plaintiffs failed to produce sufficient evidence from which the jury could find loss causation, this Court readily concedes that reasonable minds can differ on the nature and extent of a plaintiff's burden in proving loss causation in a fraud-on-the-market-case under Rule 10b–5.

In *Dura,* the Supreme Court rejected the Ninth Circuit's view that a securities plaintiff adequately pled and proved loss causation by proving that he purchased stock at an inflated price due to fraud and subsequently suffered a loss. While such a showing might show that the misrepresentation "touches upon" a later economic loss, it does not, according to Justice Breyer's opinion, adequately account for the "tangle of factors affecting stock price" such as "changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions, or other events" taken separately or together. *Dura,* 544 U.S. at 343. However, in describing the plaintiff's burden, Justice Breyer merely stated: "it should not prove burdensome for a plaintiff who has suffered an economic loss to provide a defendant with some indication of the economic loss and proximate cause that the plaintiff has in mind." *Id.* at 347. He further stated: "We need not, and do not, consider other proximate cause or loss-related questions." *Id.* at 346. Yet, the greater weight of authority as reflected in many of the circuit and district court opinions that have followed *Dura* and are cited herein, is that a securities-fraud plaintiff can satisfy his burden of proving loss causation only by producing the testimony of an expert who has completed a reliable multiple-regression analysis, event study, and financial analysis in order to quantify the extent to which the claimed losses are the result of the alleged fraud.

Whether *Dura* actually requires this level of statistical and econometric analysis to prove loss causation is, in the view of this Court, a debatable proposition, and notwithstanding the conclusion herein that Plaintiffs' proof of loss causation failed, this Court has endeavored to apply a less rigorous standard in its consideration of Candace Preston's testimony and any other evidence relevant to the issue presented at trial. The evidence, however, ultimately failed in this case because Preston, on whose testimony proof of loss causation hinged, wholly failed to consider that the Jury would reject the assumption—the assumption that she was asked by Plaintiffs' counsel to make—that the BLB fraud persisted after April 26, 2007. The Jury therefore was left to impermissibly speculate as to the relative market effects of the various pieces of qualitative and quantitative land loan data contained in the 8–K and conference call. *See, e.g., Oscar,* 487 F.3d at 271 ("[P]laintiffs must, in order to establish loss causation ..., offer some empirically based showing that the corrective disclosure was more than just present at the scene. And this burden cannot be discharged by opinion bereft of the analysis plaintiff's own expert conceded was necessary."); *In re Williams Sec. Litig.,* 558 F.3d 1142–43 (10th Cir.2009).

**\*22** Further, Preston's testimony, even if sufficient to support a finding of loss causation, was insufficient to support a finding of damages—an essential element of Plaintiffs' claim. *See Dura,* 544 U.S. at 342. Where a plaintiff proves loss causation by demonstrating that the disclosure of the fraud was a substantial contributing cause of his loss, to prove damages, a more rigorous showing is required, because by the express terms of the Exchange Act, a plaintiff's recovery is limited to "actual damages on account of the act complained of." *See* § 78bb(a). And as stated by the Eleventh Circuit in *Robbins v. Koger Properties:* "as long as the misrepresentation is one substantial cause of the investment's decline in value, other contributing forces will not bar recovery under the loss causation requirement. But in determining recoverable damages, these contributing forces must be isolated and removed. This is often done ... with the help of an expert witness." *Robbins,* 116 F.3d at 1447 n. 5; *accord Miller v. Asensio & Co., Inc.,* 364 F.3d 223 (4th Cir.2004) (requiring a more rigorous disaggregation analysis to prove damages than loss causation).

Preston's testimony on damages fails for the same reasons as it does with respect to loss causation; she fails to adequately isolate the damages caused by the fraud. Without Preston's testimony, Plaintiffs failed to produce sufficient evidence for the Jury to find both the fact of proximately caused

damage and the amount of proximately caused damage. *See In re Williams Sec. Litig.,* 496 F.Supp.2d 1195, 1276 (N.D.Okla.2007) (plaintiffs' failure to prove fact and amount of damages fatal to claims). Thus, even had Plaintiffs made a sufficient showing of loss causation, they did not produce sufficient evidence to support an award of damages in any amount.

### D. *Remaining Statements*

Having determined that the verdict, which rested on Statement 10, was not supported by the evidence at trial, the question arises as to what should be done with the remaining statements for which the Jury found liability but was not asked to assess damages.[28] The simple answer is that these findings cannot support any judgment for Plaintiffs because there is no finding of damages attached to them.[29] Accordingly, the Court will enter a final judgment for Defendants as to all claims and statements. However, because the Court anticipates that Plaintiffs will move for a new trial on damages as to these remaining statements, the Court will also address under Rule 50(b), the insufficiency of the evidence supporting the liability findings as to these statements.

As with Statement 10, these remaining statements do not fit with Preston's assumptions about the nature of the fraud. The result is a similar failure of proof regarding the causal relationship between the statements and any decline in the price of Bancorp's stock—*i.e.,* loss causation and damages.

Statements 13 through 17 are excerpts of comments made by Alan Levan during the July 25, 2007 second-quarter earnings conference call. (DX 8.) During the call, Alan Levan reiterated his concern for the BLB loans and his relative lack of concern for the remainder of the land loan portfolio.[30] *Id.*

**\*23** Thus, apart from the fact that these statements were made some three months after the April 26, 2007 conference call each of these statements, like Statement 10, is at best a fraudulent concealment of the risk to the non-BLB portion of the land loan portfolio. And like Statement 10, a jury could not have found them to be actionable misrepresentations or omissions regarding the BLB loans. Accordingly, Preston's opinion and the other evidence of loss causation and damages fails for the same reason: Preston's failure to disaggregate the non-fraudulent negative information related to the BLB loans from the bundle of negative information announced on October 25 and 26, 2007.

The sole remaining statement for which the Jury found liability, Statement 19, is different from the other misstatements submitted to the Jury. It is not taken from an earnings conference call but from the text of Bancorp's 2007 second quarter 10–Q, published on August 9, 2007. (DX 9.) It is also not a general statement about levels of risk or management concern regarding the land loan portfolio. Instead, it is a discrete statement about the amount of "Total Potential Problem Loans," *i.e.,* a statement that the amount of "Total Potential Problem Loans" amounted to $8.35 million.[31] *Id.* p. 23. At trial, Plaintiffs contended this figure was a fraudulent misrepresentation because one of its components, the amount of "Performing impaired loans" was greatly understated at $4.6 million. According to Plaintiffs, all of BankAtlantic's then-classified assets met the stated definition of performing impaired loans and should have been disclosed as such. The true amount of performing impaired loans, Plaintiffs argued, was tens of millions of dollars higher, as was revealed by the October 25 2007 8–K. (DX 9, p. 23; PX 151; Tr. 4107–08.)

Assuming this was an actionable misrepresentation, there is insufficient evidence to connect it to any decline in the price of BankAtlantic's stock. While it may be true that a jury could have found Statement 19 to be a misrepresentation of the amount of potential problem loans across the land loan portfolio, including the BLB portion, Preston offered no opinion on such a fraud. Preston's opinion was based on the assumption that Bancorp broadly misrepresented or concealed the risk of significant losses throughout the land loan portfolio *as of April 26, 2007,* not on the assumption that Bancorp concealed *only* the total amount of classified assets by failing to report them as "performing impaired loans" months later on August 9, 2007.[32] (D.E. 365 Ex. B, p. 6.)

As with the previous statements, the divergence between Statement 19 and Preston's assumption about the fraud is fatal to her disaggregation analysis. Without accurate assumptions as to the nature, scope and duration of the fraud, Preston had no way of distinguishing fraudulent information from non-fraudulent information, much less disaggregating their effects on the stock price.[33] In the end, the Jury is left to unreasonably speculate as to whether Preston's disaggregation opinion based on the assumed fraud is equally applicable to some other fraud. *See Brooke,* 509 U.S. at 242. The October 25, 2007 8–K for instance announced increases in classified assets, non-accrual assets, and loan loss reserves relating to the entire land loan portfolio, but Statement 19 concealed only the true amount of total potential problem

loans (or classified assets)—the total amount of non-accruals were separately disclosed in the 10–Q and was not found to have been false. *See* Table, *supra* note 31; (DX 9.) And Preston's opinion is silent as to why the increases in either the non-accrual assets or loan loss reserves did not require disaggregation.

**\*24** Moreover, even if Statement 19 could be construed as an actionable misrepresentation or concealment of the general risk to the entire land loan portfolio, it is hard to conceive how a jury could find it to be a *material* misrepresentation as to the BLB portion, considering Bancorp's numerous warnings of risk and concern regarding the BLB loans up to that point. [34] *See Basic Inc. v. Levinson,* 85 U.S. 224, 231 (1987). Thus, the original problem of Preston's failure to disaggregate the negative BLB information persists.

For the foregoing reasons, the Court will enter final judgment as a matter of law in favor of Defendants as to all claims and statements. [35]

## IV. Motion for New Trial

Along with their Motion for Judgment as a Matter of Law, in the alternative, Defendants move for a new trial pursuant to Federal Rule of Civil Procedure 59. Federal Rule of Civil Procedure 50(c) provides that, if the court grants a renewed motion for judgment as a matter of law, it must also conditionally rule on any motion for a new trial by determining whether a new trial should be granted if the judgment is later vacated or reversed. Accordingly, the Court addresses whether Defendants would be entitled to a new trial, should the judgment for Defendants be vacated or reversed. [36] For the reasons stated below, the undersigned finds that, should the Court of Appeals reverse the Court's determination that Plaintiffs failed to put forth sufficient evidence of loss causation, Defendants would not be entitled to a new trial.

The Court first addresses Defendants' arguments regarding evidentiary errors. The Court then discusses Defendants' argument that the Court failed to properly instruct the Jury on various points of law and to utilize their proposed verdict form. Finally, the Court discusses Defendants' argument that the Court's instruction on the falsity of Alan Levan's July 25, 2007 statements was prejudicial error.

## A. *Rule 59 Standard*

Rule 59 provides that "the court may, on motion, grant a new trial on all or some of the issues ... after a jury trial for any reason for which a new trial has heretofore been granted in an action at law in federal court." A party may seek a new trial by arguing that "the verdict is against the great weight of the evidence, that the damages are excessive, or that, for other reasons, the trial was not fair to the party moving; and may raise questions of law arising out of alleged substantial errors in admission or rejection of evidence or instructions to the jury." *Montgomery Ward & Co. v. Duncan,* 311 U.S. 243, 251, 61 S.Ct. 189, 85 L.Ed. 147 (1940); *Steger v. Gen. Elec. Co.,* 318 F.3d 1066, 1081 (11th Cir.2003). But under Federal Rule of Civil Procedure 61, the court must disregard all errors and defects that do not affect any party's substantial rights.

## B. *Evidentiary Errors*

Defendants argue that the Court made several evidentiary errors and that they are entitled to a new trial as a result. First, they argue that the exclusion of their proposed expert witnesses' testimony was erroneous. Second, Defendants argue that the Court improperly excluded testimony concerning disclosures made by other financial institutions. Finally, Defendants argue that the Court wrongly admitted various statements made in emails by a BankAtlantic employee, Perry Alexander.

**\*25** The admissibility of evidence is committed to the broad discretion of the trial court. *Walker v. NationsBank of Fla.,* 53 F.3d 1548, 1554 (11th Cir.1995). A new trial is not warranted due to evidentiary error unless the error substantially prejudiced the affected party. Fed R. Civ. P. 61; *Peat, Inc. v. Vanguard Research, Inc.,* 378 F.3d 1154, 1162 (11th Cir.2004).

### (i) *Exclusion of Proposed Expert Testimony*

Prior to trial, Plaintiffs moved to exclude the proposed testimony of Defendants' three independent expert witnesses: Stephen Morrell, Jack DeWitt, and Michael Keable. (D.E. 312, 315 & 321.) Upon careful consideration of the Motions, the Court excluded all of Morrell's and DeWitt's proposed testimony and the majority of Keable's proposed testimony. (D.E. 466, 479 & 460.) Defendants contend that the Court's rulings on these matters constitute prejudicial error warranting a new trial.

In the instant Motion for New Trial, Defendants largely reargue issues raised in their responses to Plaintiffs' motions to exclude. (D.E. 366, 369 & 367.) The Court considered and addressed those arguments in its prior rulings and incorporates those findings in the instant order. (*See* D.E. 466, 479 & 460.) Below, the Court addresses only those additional arguments raised in Defendants' Motion for New Trial related to the Court's exclusion of their proposed experts. [37]

### a. *Stephen Morrell*

Defendants argue that the exclusion of the proposed testimony of Stephen Morrell was erroneous and warrants a new trial. Defendants incorporate by reference the arguments from their Response to Plaintiffs' Motion to Exclude Morrell's testimony and further argue that the exclusion of Morrell's testimony affected their substantial rights, "because Morrell would have explained how the decline in Bancorp's stock price was driven by a depression in the Florida real estate market." (D.E.666, p. 25.)

The Court did not err in excluding Morrell's proposed testimony. In his report, Morrell offered two broad opinions: first, that the recession in Florida began earlier, lasted longer, and was more severe than that suffered in the rest of the nation; and second, that, few, if any, economists or analysts could have foreseen the depth and breadth of the recession in Florida while it was happening. (D.E. 313, Ex. A ¶¶ 1 & 16.) These opinions were based on Morrell's comparison of a variety of economic measures for Florida and the United States as a whole over dates ranging from 2006 through 2010.

The Court excluded Morrell's proposed testimony under Federal Rules of Evidence 401, 402, 702 and the standards provided by *Daubert v. Merrell Dow Pharms. Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). First, the Court found that Morrell failed to explain the connection between his opinions and the raw economic data cited in his report. (D.E. 466, pp. 5 & 7). Second, the Court found that Morrell's opinions would not assist the trier of fact in determining a fact in issue. (D.E. 466, pp. 6 & 8.) His data and the conclusory opinions derived therefrom related to the economic recession in Florida from 2006 through 2010. Such testimony was both too broad temporally to relate to the instant action and not sufficiently connected to the question of whether Defendants' alleged misrepresentations concerning BankAtlantic's land loans caused Bancorp's stock price to decline in 2007.

**\*26** Though Defendants argue that Morrell would have explained that Bancorp's share price decline was driven by the collapsing Florida real estate market, Morrell offered no opinion to that effect in his expert report. In fact, Morrell's expert report concerned itself with the Florida real estate market only in the most limited way. He stated that "[h]ousing markets in Florida are experiencing a depression versus a severe United States recession." (D.E. 313, Ex. A ¶ 13.) This opinion was apparently based on two measures: a comparison of the number of building permits for new housing units issued in Florida in 2005 and the number issued in 2009; and a comparison of housing price indices for the Miami and Tampa regions from 2006 through January 2010 against a nationwide index. *Id.* These data and Morrell's resultant opinion were not sufficiently connected to the facts in issue in this case to meaningfully assist the trier of fact. *See Boca Raton Comty. Hosp., Inc. v. Tenet Healthcare Corp.,* 582 F.3d 1227, 1233–34 (11th Cir.2009). The Court, thus, committed no error in excluding Morrell's proposed testimony.

### b. *Michael Keable*

Defendants argue that the exclusion of the proposed expert testimony of Michael Keable was erroneous and warrants a new trial. Defendants offered Keable as an expert on loss causation and damages to counter Preston's testimony. Prior to trial, the Court determined that the bulk of Keable's opinions were inadmissible because they were insufficiently supported or explained and were not helpful to the trier of fact in deciding a question in issue. (*See* D.E. 460.) However, the Court ruled that Keable could offer at trial his "opinion regarding the false sense of precision in Preston's calculation of a $0.37 residual decline on April 26, 2007 attributable to negative information regarding the BLB loans." (D.E.460, p. 8.) Nonetheless, Defendants elected not to call Keable to testify at trial.

In their Motion for New Trial, Defendants raise no new arguments regarding the admissibility of Keable's testimony but argue that the Court's rulings on Keable's testimony "affected Defendants' substantial rights by eliminating their most direct answer to Candace Preston's damages analysis and exposing them to the argument made in closing that Alan Levan could not provide testimony to rebut her analysis because he was not an independent, third party expert." (D.E.666, p. 27.) To the extent that Defendants' argument addresses parts of Keable's testimony previously deemed inadmissible, the Court incorporates its earlier rulings. And insofar as Defendants chose not to present Keable's admissible testimony, any prejudice they suffered as

a result is wholly self-inflicted and does not warrant a new trial.

### (2) *Evidence of Other Banks' Disclosures*

Defendants argue that the Court erroneously excluded evidence and testimony that "few, if any, of the institutions included in the NASDAQ Bank Index made the sort of disclosure that Plaintiffs claimed should have been made here." (D.E.666, p. 27.) Specifically, Defendants sought to introduce evidence that other banks did not disclose the number or amounts of loans on internal watch lists or those rated special mention or substandard. The Court previously articulated its reasons for excluding such testimony at some length, both from the bench and in a written order. (*See* Tr. 3631–33; D.E. 527.) The Court incorporates those rulings here.

**\*27** In sum, the Court excluded such evidence because of its limited probative value and its potential to confuse the Jury. Plaintiffs did not claim that Defendants had an independent duty to disclose loans on internal watch lists; rather, they contended that Bancorp intentionally misrepresented the true quality and performance of its land loans, as reflected in the volume of land loans downgraded to special mention or substandard risk grades. Accordingly, evidence of what other banks disclosed would be irrelevant in the absence of a full presentation to the Jury of the types of loans made by those banks, how the loans were performing, and what representations those banks made regarding those assets, which would have required no less than a trial within a trial regarding the practices of unrelated banking institutions. The Court rightly excluded such evidence in light of its potential to confuse and mislead the jury. *See* Fed.R.Evid. 401 & 403.

Moreover, the evidence and testimony Defendants sought to introduce on this subject was incompetent. Defendants failed to lay a proper foundation for the testimony of any BankAtlantic employee who could have testified to a "consensus" among financial institutions regarding disclosure requirements. (*See* D.E. 526–3 & 527.) And Defendants sought to introduce a letter concerning regulatory disclosure requirements issued years after the end of the class period. (*See* D.E. 474, pp. 15–16 & Tr. 3631–33.) The Court committed no error in excluding this evidence.

### (3) *Perry Alexander Emails*

Defendants argue that the Court erroneously allowed the introduction of statements contained in eight email exchanges sent by a BankAtlantic employee, Perry Alexander, and that the admission of such evidence warrants a new trial. Defendants contend that the statements were inadmissible hearsay and Plaintiffs did not meet their burden of showing that they fell within an exclusion or exception to the general rule against hearsay. [38]

Hearsay evidence is generally inadmissible, except as provided by the Federal Rules of Evidence. Fed.R.Evid. 802. Rule 801(d) excludes several categories of statements from the definition of hearsay. A statement is not hearsay if it is offered against a party and is a statement by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship. Fed.R.Evid. 801(d)(2)(D). Whether a statement falls under Rule 801(d)(2)(D) depends not on whether the statement was made in the scope of the declarant's agency or employment but on whether the statement concerns matters within the scope of the agency or employment. *Wilkinson v. Carnival Cruise Lines,* 920 F.2d 1560, 1565 (11th Cir.1991).

The statements in question were admissible against Bancorp as admissions by a party-opponent. Alexander's statements concerned the credit quality and performance of various land loans coming before BankAtlantic's Major Loan Committee for approval, review, or modification. Alexander was employed as a loan officer and market manager for BankAtlantic from 1995 through 2008 and served on the committee from the second quarter of 2004 through June 2007. (Tr. 1389–90, 1395 & 3525–26.) His position as a member of that committee required him to review the details of the loans that came before it for approval or modification. (Tr. 1396–1400.) Alexander's service on the committee covered the period when many of the land loans in question were first approved and the period when the committee approved extensions and term modifications of many of those loans. His contemporaneous comments on the performance of those land loans as well as the processes by which they were approved and reviewed, thus, concerned matters within the scope of his employment. *See Wilkinson,* 920 F.2d at 1565–66.

**\*28** Though Alexander was employed by BankAtlantic rather than Bancorp, the statements in the subject emails were nonetheless admissible against Bancorp. Statements made by employees of a subsidiary may be attributed to its corporate parent when the parent dominates the activities of the subsidiary. *Big Apple BMW, Inc. v. BMW of N. Am.,* 974 F.2d 1358, 1372 (3d Cir.1992). There was no dispute

before or during trial that BankAtlantic is the wholly owned subsidiary of Bancorp and that Bancorp is a holding company, the primary asset of which is BankAtlantic. (*See* DX 3, pp. 1 & 7–8.) And Plaintiffs laid a sufficient foundation for the Court to find that Bancorp dominates BankAtlantic's activities. [39] (D.E.358.)

Defendants contend that Alexander's emails include "profanity, slang, gossip, and every other indication of unreliability imaginable." (D.E.666, p. 29.) The admissibility of statements by party-opponents as non-hearsay under Rule 801(d)(2) is the product of the adversary system, rather than the satisfaction of the conditions of the hearsay rule, such as the reliability of the statement. Fed.R.Evid. 801(d)(2)(D) advisory committee's note. Thus, no guarantee of trustworthiness is required in the case of an admission. *Id.* That Alexander's out-of-court statements may have included profanity and slang does not affect their admissibility under Rule 801(d)(2)(D).

Defendants' arguments that the statements should have been excluded as irrelevant and unduly prejudicial also fail. Alexander's statements concerned the underwriting, credit quality, and deterioration of land loans in BankAtlantic's portfolio, matters relevant to the Jury's determination of whether the alleged misstatements constituted material misrepresentations. And though he used colorful and sometimes profane language in expressing his observations and opinions, his manner of expression did not render the statements unduly prejudicial or confusing to the Jury. *See* Fed.R.Evid. 403. In any event, the Court required the redaction of several of Alexander's email exchanges to prevent the introduction of irrelevant and prejudicial material. (*See* Tr. 1376–85.)

Finally, even were Alexander's statements improperly admitted, Defendants fail to demonstrate that they are entitled to a new trial on this basis. Plaintiffs presented sufficient evidence, independent of Alexander's emails, for the Jury to find Alan Levan (and therefore Bancorp) liable for violating Rule 10b–5 with respect to Statement 10. The introduction of Alexander's statements was, thus, not vital to Plaintiffs' case and any error in admitting the statements was harmless. *Cf. Wilkinson,* 920 F.3d at 1564.

**C.** *Jury Instructions*

Defendants argue that the Court's failure to give several of their requested jury instructions constituted prejudicial error warranting a new trial. Specifically, Defendants argue that the Court should have submitted to the Jury a special interrogatory regarding Preston's assumptions and that the Court improperly instructed the Jury on: causation in a collapsing market; corrective disclosure and length of inflation; disaggregation and damages; and, the claimed amount of damages.

**\*29** The failure of a court to give a requested instruction is error only if the requested instruction is correct, is not adequately covered by the charge given, and deals with a point so important that the failure to give the instruction seriously impaired the defendant's ability to present an effective defense. *See Adams v. Sewell,* 946 F.2d 757, 767 (11th Cir.1991). A litigant is entitled to have the jury instructed on its theory of the case, so long as there was competent evidence to support the theory and the instruction is properly requested. *Ad–Vantage Tel. Directory Consultants v. GTE Directories Corp.,* 849 F.2d 1336, 1349 (11th Cir.1987). However, the Court need not give the requested instruction in the exact language requested. *Id.*

If the jury charge, as a whole, correctly instructs the jury on the law, no reversible error has been committed, even if a portion of the charge is technically imperfect. *Miller v. Universal City Studios, Inc.,* 650 F.2d 1365, 1372 (5th Cir. Jul.23, 1981). So long as the instructions accurately reflect the law, the court has wide discretion as to the style and wording. *Bateman v. Mnemonics, Inc.,* 79 F.3d 1532, 1543 (11th Cir.1996).

(1) *Preston's Assumptions*

Defendants argue that the Court should have submitted to the Jury a question as to whether Plaintiffs proved by a preponderance of the evidence the factual assumptions on which Preston premised her testimony. Defendants provide no legal support for the proposition that a jury must ratify an expert's assumptions via special findings in order to consider that expert's testimony. [40]

(2) *Causation in a Collapsing Market*

Defendants contend that the Court's instruction to the jury on corrective disclosures and materialization of the risk failed to make clear that "Defendants' argument was that the collapsing Florida real estate market severed the causal link." (D.E.666, p. 10.) Defendants' proposed instruction read, in relevant part:

2011 WL 1585605

... if the loss coincides with a market-wide phenomenon causing comparable losses to other investors, the prospect that the Plaintiffs' loss was caused by the alleged fraud decreases. Plaintiffs must prove that its loss was caused by the alleged fraud as opposed to intervening events.

(D.E.627.) The Court did not give Defendants' proposed instruction, but its instruction on corrective disclosures and materialization of the risk stated the following:

> Defendants contend that the Plaintiffs' losses were solely due to deteriorating conditions in the Florida real estate market, about which investors were forewarned. Defendants do not have the burden of proving this contention by a preponderance of the evidence; rather, it is Plaintiffs' burden, as stated above, to prove that the corrective disclosures and/or materialization of concealed risks, and not other factors, were significant contributing causes of their damages.

(D.E.635, pp. 21–22.) The Court's instructions adequately covered the law and Defendants' argument on causation in a collapsing market. *See Adams,* 946 F.2d at 767.

(3) *Corrective Disclosure & Length of Inflation*
**\*30** Defendants contend that the Court's failure to give their requested instruction titled "Corrective Disclosure and Length of Inflation" warrants a new trial. Defendants' proposed instruction included the following:

> If you find by a preponderance of the evidence that an alleged misrepresentation or omission artificially inflated the price of BankAtlantic Bancorp stock, you will

also have to determine the length of time during which the inflation existed. To make this determination, you must decide the date on which information curing or correcting the alleged misrepresentation or omission was publicly announced or otherwise effectively disseminated to the market. Dissemination of the allegedly withheld or misrepresented information through a public announcement, a press release, or a press report will correct the previous misrepresentation or omission and terminate the period during which purchasers can seek to hold Defendants liable under the securities laws for the misrepresentation or omission. At that point, subsequent purchasers are charged with knowledge of the true state of affairs and the stock's market price is presumed to reflect its true value.

(D.E.593–1, p. 14.)

The legal principle embedded in Defendants' requested instruction was sufficiently covered in the Court's instruction on corrective disclosures and the materialization of the risk. The Court instructed the Jury, in relevant part, that "Plaintiffs must prove by a preponderance of the evidence that a corrective disclosure or materialization of the concealed risk revealed the truth concealed by the misrepresentation or omission to the market *for the first time.*" (D.E.635, p. 20) (emphasis added). The instruction further informed the jury that the alleged revelations of the truth occurred on April 25 and 26, 2007 and October 25 and 26, 2007. (D.E.635, pp. 20–21.)

The Court's instruction accurately and adequately advised the Jury that, if they found the Company revealed the truth concealed in the alleged misrepresentations prior to dates of the alleged revelations, they could not find that the misrepresentations caused the share price declines on April 26, 2007 and October 25, 2007. The Court, thus, committed no error in refusing to give the instruction in the language Defendants requested. *See Adams,* 946 F.2d at 767.

Case 4:19-cv-00509 Document 65-9 Filed 07/02/21 in TXSD Page 54 of 1452
In re BankAtlantic Bancorp, Inc., Not Reported in F.Supp.2d (2011)
2011 WL 1585605

**(4)** *Disaggregation & Damages*

Defendants argue that the Court failed to make clear in its instructions that the Jury "needed to disaggregate non-fraud factors from any supposed loss...." (D.E.666, p. 12.) During the charge conference, Defendants proposed the following instruction to be added "to the end of the Court's proposed instructions":

> Defendants contend that the stock price declines that occurred were not caused as a result of any alleged misrepresentations or omissions, but were, instead, caused by deteriorating conditions in the Florida real estate market about which investors were forewarned. Any award of damages must subtract from the price declines the losses caused by such factors, and Plaintiffs carry the burden of proof to eliminate from their damage claim losses cause by non-fraud factors.

**\*31** (D.E.628.)

The first sentence of Defendants' requested instruction pertains more specifically to loss causation than to damages. And, in fact, this sentence was included almost verbatim in the Court's instruction to the Jury on loss causation. (D.E.635, p. 21.) The second part of the requested instruction relates to damages. The Court's instruction to the Jury on damages read, in pertinent part:

> There may be factors other than the alleged fraudulent statements and/or omissions that affected Bancorp's stock price on any given day. For example, market or industry conditions or bad news disclosed by Bancorp that was unrelated to the alleged fraud could have affected Bancorp's stock price. Defendants are not liable for any share price decline resulting from those other non-fraud related events. Plaintiffs bear the burden of disaggregating (or separating out) any share price declines that were caused by non-fraud related events or establishing that the entire share price decline was caused by the alleged fraud.

> Plaintiffs claim that the alleged fraud caused damages in the amount of 37 cents per share on April 26, 2007. Plaintiffs

also claim that the alleged fraud caused damages in the amount of $2.93 per share on October 26, 2007.

> Defendants claim that Plaintiffs have failed to separate out price declines caused by market conditions, the conditions of the real estate market, and other conditions not related to the alleged fraud.

(D.E.635, pp. 23–24.)

In line with the Defendants' requested instruction and the applicable law, the Court explicitly instructed the Jury that Plaintiffs could only recover damages actually caused by the misrepresentations and not by non-fraud related events. The instruction also placed the burden squarely on Plaintiffs to disaggregate from Bancorp's share price decline on the days in question the effect of any non-fraud events. And the Court informed the Jury of Defendants' theory, namely that Plaintiffs failed to disaggregate from the price decline the effect of market conditions. The Court committed no error in substituting language substantially equivalent to Defendants' proposed instruction. *See Adams,* 946 F.2d at 767.

**(5)** *$2.93 Damage Instruction*

Defendants argue that the Court's instruction that the Plaintiffs were seeking $2.93 per share in damages warrants a new trial. [41] Defendants correctly point out that Plaintiffs' damages expert testified that, in her opinion, Bancorp stock was artificially inflated by $3.15 in the second part of the class period. Defendants contend that the Court's instruction on Plaintiffs' claimed damages, by not holding them to the $3.15 figure presented by Preston, relieved Plaintiffs of the burden of disaggregating non-fraud factors from their damages claim. Defendants argue that the $2.93 figure was based on speculation and conjecture and amounted to an unsupportable basis for a jury verdict.

The Court's instruction on Plaintiffs' damages claim was not error. The $2.93 instruction was merely a recognition that, under the Exchange Act, damages in a securities fraud case are limited to those actually caused by the misrepresentation. *See* § 78bb; *Robbins,* 116 F.3d at 1447 n. 5. Expectation damages are generally not available to a prevailing plaintiff. Though Bancorp's residual decline on October 26, 2007 was, according to Plaintiffs' expert, $3.15 per share, all of which was caused by the revelation of the alleged fraud, the actual decline was $2.93. (Tr. 2596.) Plaintiffs were thus limited to that amount of per-share damages. The Court's instruction as to the amount Plaintiffs claimed in damages was not error.

**D.** *Instruction on the Falsity of Alan Levan's Statements*

**\*32** Defendants argue that the Court committed prejudicial error by instructing the Jury on its pretrial ruling that four statements made by Alan Levan in the July 25, 2007 conference call were false. Defendants argue that the Court erred in its pretrial ruling, that the subject statements were protected by the Reform Act's safe harbor, and that the question of liability regarding those statements should not have been submitted to the Jury because Plaintiffs failed to prove scienter, loss causation and damages with respect to the statements. Accordingly, Defendants argue that the Court erred in instructing the Jury as to its finding and that such error warrants a new trial.

(1) *Summary Judgment: Falsity*

Defendants argue that the Court erred in granting Plaintiffs'

Motion for Partial Summary Judgment, and, accordingly, its instruction to the Jury on that ruling was prejudicial error. Prior to trial, Plaintiffs moved for partial summary judgment as to the falsity of four statements Alan Levan made during the July 25, 2007 earnings conference call discussing Bancorp's second-quarter 2007 financial results.[42] The exchange that produced those statements proceeded as follows:

[ANALYST]: [I]s the $135 million in the land loans that you guys are concerned about, are there other portfolios (unintelligible) focus you on the construction portfolio that you feel there might be some risk down the road as well.

ALAN LEVAN: **There are no asset classes that we are concerned about in the portfolio as an asset class.** You know, we've reported all of the delinquencies that we have, which actually I don't think there are any other than the ones that we've, you know, that we've just reported to you.

**So, the portfolio has always performed extremely well, continues to perform extremely well.** And that's not to say that, you know, from time to time there aren't some issues as there always have, even though we've never taken losses in that—we've not taken—I won't say ever taken any losses, because that's probably never going to be a correct statement, **but that portfolio has performed extremely well.**

**The one category that we just are focused on is this land loan builder portfolio because, you know, just from one day to the next, the entire homebuilding industry, you know, went into a state of flux and turmoil and is impacting that particular class. But to our knowledge and in—just thinking through, there are no particular asset classes that we're concerned about other than that one class.**

(D.E.338–20, pp. 22–23) (emphasis in original.) Plaintiffs argued that no genuine issue of fact existed as to the falsity of the four highlighted statements, and the Court granted summary judgment in their favor on that narrow issue.[43] (*See* D.E. 411.)

The Court did not err in granting summary judgment on this issue. As discussed above, to prevail on a Rule 10b–5 claim, a plaintiff must show that a statement was false or misleading. *Basic Inc.,* 485 U.S. at 238. For a statement to be an actionable misrepresentation, it must be of a definite factual nature. *See Va. Bankshares,* 501 U.S. at 1095. Statements of opinion or belief can be actionable misrepresentations if the plaintiff shows that the speaker falsely stated his belief and shows the factual justification for the statement to be false. *Id.* at 1092. Though Plaintiffs alleged that four separate statements by Alan Levan on July 25, 2007 were false, the Court examined the statements in two categories because of the near identity of the statements. Specifically, the Court assessed the falsity of Alan Levan's statements that the portfolio had always performed and continued to perform extremely well and his statements that he was not concerned with any class of assets in the construction loan portfolio other than the BLB loans.

**\*33** As to the first category, Plaintiffs presented undisputed evidence of the falsity of Alan Levan's statement that the land loans other than the BLB loans had been and were performing extremely well.[44] First, within BankAtlantic, Alan Levan had undisputedly expressed that the land loan portfolio as a whole, including the non-BLB loans, was not performing extremely well, thus demonstrating the falsity of his public assessment regarding their performance. (D.E.338–19.)

Moreover, Plaintiffs presented undisputed evidence of the falsity of the justification for Alan Levan's statements. His internal assessment of the poor performance of the BLB and non-BLB loans was based on the many requested extensions of those loans' maturity dates to the Major Loan Committee, indicating poor performance and possible repayment problems. (D.E.338–14, 15, 16, 17, 18, 83, 84,

2011 WL 1585605

104.) Also, by July 25, 2007, two non-BLB loans and one BLB loan were on non-accrual status; four more non-BLB and one more BLB loan had been downgraded to risk grade 11, indicating that the "asset [was] inadequately protected by the current sound worth and paying capacity of the obligor or collateral pledged"; and six more non-BLB and four more BLB loans had been downgraded to risk grade 10, indicating that they had "potential weaknesses.... If left uncorrected, these potential weaknesses may result in the deterioration of the repayment prospects for the asset...." (D.E. 338–27 & D.E. 338–2, p. 5669.) Defendants presented no evidence that raised a genuine issue of fact as to the whether the land loans in the portfolio apart from the BLB loans had been and were continuing to perform extremely well as of July 25, 2007.

As to the second category of statements, Plaintiffs presented undisputed evidence that Alan Levan's professed concern with the BLB portion of the construction portfolio, to the exclusion of the balance of the land loan portfolio, was false. First, they presented undisputed evidence that Alan Levan was concerned with the entire land loan portfolio, because he had expressed undifferentiated concern with the performance of the land loan portfolio in its entirety, including both BLB and non-BLB loans, prior to the July 25, 2007 conference call. (*See* D.E. 338–5 & 338–19.)

Plaintiffs also presented undisputed evidence of the falsity of the factual justification for such statements. Alan Levan stated during the conference call that his concern with the performance of the BLB loans was due to the effects of turmoil and flux in the homebuilding industry. (D.E.338– 20, p. 23.) However, turmoil in the homebuilding industry was having the same effect on all the loans in the land loan portfolio, as evidenced by the negative performance trends and deterioration identified above, which were spread throughout the BLB and non-BLB portions of the land loan portfolio.

In response, Defendants argued that the statements in issue were not material and that they were subject to the protections of the Reform Act's safe harbor, neither of which were in issue in Plaintiffs' motion. As to falsity, Defendants argued that the BLB loans were subject to higher levels of risk than the other land loans and that, months after the July 2007 statements, the BLB loans ultimately suffered greater losses than the non-BLB land loans. These arguments, and the evidence offered in support thereof, failed to meet and rebut Plaintiffs' arguments that the statements were false. That the BLB loans were, perhaps, exposed to greater risk than the non-BLB loans did

not raise a genuine issue of fact as to whether Alan Levan was, in fact, concerned with the poor performance of all the land loans. Likewise, the higher losses caused by the BLB loans in the third quarter of 2007 failed to raise a genuine issue of fact as to whether the non-BLB loans were performing poorly and causing concern as of July 2007.

**\*34** In their Motion for Reconsideration, Defendants argued that the four statements were statements of opinion and Plaintiffs, thus, should have and failed to adduce evidence that Alan Levan knew his statements were false. In denying the motion, the Court noted that Alan Levan's state of mind was not relevant to the inquiry, in that whether he acted with scienter was a separate inquiry left to the Jury. The Court also noted that, though the statements contained an evaluative component, they were not statements of pure opinion, but rather were tethered to objective factual justifications. Insofar as these were statements of belief, the falsity of his belief —though not his intent to deceive-was relevant to the falsity inquiry. *See Va. Bankshares,* 501 U.S. at 1092–96. And because, as discussed above, Plaintiffs had presented undisputed evidence to meet that requirement, in the form of emails by Alan Levan expressing his concern with the poor performance of the entire land loan portfolio, Defendants' argument did not warrant reconsideration.

For these reasons, as well as the additional reasons set forth in the Omnibus Order and Order on Reconsideration, the Court did not err in granting summary judgment to Plaintiffs on the narrow issue of the falsity of these statements. Plaintiffs were entitled to the benefit of the Court's ruling and an appropriate instruction to the Jury, as discussed below.

#### (2) *Safe Harbor*

Defendants argue that the four statements that were the subject of the Court's partial summary judgment for Plaintiffs were protected by the Reform Act's safe harbor and, thus should not have been submitted for the Jury's consideration. They further argue that, because the statements were immunized by the safe harbor, the Court's instruction on its partial summary judgment finding was unduly prejudicial.

Section 27A of the Reform Act provides a safe harbor from Rule 10b–5 liability for certain forward-looking statements. § 78u–5(c) (1). Corporations and individuals may avoid liability under Rule 10b–5 for forward-looking statements that are "accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-

looking statement." § 78u–5(c)(1)(A)(I). Forward-looking statements include projections of revenues, income, or other financial items; statements of the plans and objectives of management for future operations; statements of future economic performance; or, any statement of the assumptions underlying or relating to such statements. § 78u–5(i)(1).

Defendants argue that the statements in issue were forward-looking statements. They contend that Alan Levan's answer to the analyst's question was, on the whole, forward-looking, and all statements of historical fact included in his answer also fall within the safe harbor as "assumptions underlying forward-looking statements." (D.E.666, p. 19.) Defendants broadly assert that "[s]tatements that include both forward-looking and factual factors must be treated as forward-looking." *Id.*

 **\*35** Defendants' contention that the safe harbor applies to all statements which include both forward-looking and non-forward-looking components misinterprets the law in this circuit. In *Harris v. Ivax,* 182 F.3d 799 (11th Cir.1999), the Eleventh Circuit assessed the applicability of the safe harbor to a variety of allegedly false and misleading statements made by an issuing corporation. One of the allegedly misleading statements was a list of factors that the company stated "will influence [its] third quarter results." *Id.* at 805. The plaintiffs alleged that the list was misleading in that it did not include the possibility of a goodwill writedown, a circumstance which eventually came to pass and allegedly caused the company's stock price to plummet. The district court ruled that the list was entitled to the protection of the safe harbor.

The Eleventh Circuit affirmed the district court, holding that the list was a "mixed bag," including some sentences that were forward looking and some that were not, but concluding that the list, in its entirety, was to be treated as a forward-looking statement. *Id.* at 806. The court held that "when the factors underlying a projection or economic forecast include both assumptions and statements of known fact, and a plaintiff alleges that a material factor is missing, the entire list of factors is treated as a forward-looking statement." *Id.* at 807. The *Harris* court, however, made clear that its holding pertained only to alleged omissions of material risk factors. *Id.* (noting that "treating mixed lists as forward-looking may open a loophole for *misleading omissions*") (emphasis added). The court further clarified that, "of course, if any of the individual sentences describing known facts ... were allegedly false, we could easily conclude that the smaller, non-forward-looking statement falls outside the safe harbor." *Id.* at 806.

Plaintiffs allege that the statements in issue were affirmative misrepresentations, not that Alan Levan's answer to the analyst's question was, on the whole, misleading because it omitted a material piece of information. (*See* D.E. 237.) Accordingly, each allegedly false statement must be evaluated to determine whether it is forward looking. *See Harris,* 182 F.3d at 806.

None of the four statements in issue was forward looking. In two of the subject statements, Alan Levan stated that Bancorp was not concerned with any class of loans in the construction portfolio other than the BLB loans. (DX 8, pp. 20–21.) These statements are assertions regarding the absence of *known* risk in the balance of the construction portfolio apart from the BLB portion. Statements regarding the *known* risk of an investment based upon observed facts, the truth of which are discernable at the time they are made, are not forward looking though they touch upon the future. *See Harris,* 182 F.3d at 805–06. The concept of risk touches upon the future, but whether management *knows* of a certain risk at a given time is ascertainable at that time.

 **\*36** The other two statements concern the past and present performance of the construction portfolio; Alan Levan stated that the portfolio had always performed extremely well and "continues to perform extremely well." (DX 8, p. 20.) These statements, too, are expressions of observed facts, rather than assumptions or any kind of prediction. *See Harris,* 182 F.3d at 806. And the truth of these statements was also discernable at the time the they were made. Accordingly, these statements do not fall under the protection of the Reform Act's safe harbor.

### (3) *Scienter*

Defendants argue that Plaintiffs failed to satisfy their burden of proof as to whether Alan Levan acted with scienter in making the four statements in issue. Accordingly, these statements could not support a finding of liability and should not have been submitted to the Jury.

To prove scienter, a plaintiff must show that the defendant made the alleged misrepresentations with "a mental state embracing intent to deceive, manipulate or defraud." *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 193, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976). It is not enough for plaintiffs to prove that the defendant acted negligently. *Id.* at 214. A plaintiff must prove either that the defendant acted with the "intent to deceive, manipulate, or defraud," or that he acted with "severe

recklessness." *Bryant v. Avado Brands, Inc.,* 187 F.3d 1271, 1284 (11th Cir.1999). Severe recklessness is

> limited to those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that defendant must have been aware of it.

*Id.* at 1282 n. 18. Due to the difficulty of proving a defendant's state of mind in fraud cases, circumstantial evidence of scienter may be sufficient to support the inference that he acted with the requisite intent. *See Herman & MacLean v. Huddleston,* 459 U.S. 375, 391 n. 30, 103 S.Ct. 683, 74 L.Ed.2d 548 (1983).

Though Defendants contend that Plaintiffs "failed to satisfy their burden of showing scienter" with respect to these statements, that question was for the Jury to resolve, because Plaintiffs presented sufficient evidence to support a finding of scienter. For example, Plaintiffs presented evidence that Alan Levan was aware of the significant deterioration of the land loan portfolio—including the non-BLB loans—before the July 2007 conference call, but chose to disclose only the issues with the BLB segment of the portfolio. Alan Levan also acknowledged the importance of investor conference calls as an opportunity for analysts to get information directly from management. (Tr. 3312.) Defendants' contention that the Court's instruction on the falsity of the July 25, 2007 statements was in error because of a failure of proof as to scienter, thus, fails.

### (4) *Loss Causation and Damages*

**\*37** Defendants argue that Plaintiffs failed to present evidence linking Statements 13 through 16 to a loss. Because Plaintiffs failed to prove loss causation and damages with respect to these statements, they should not have been submitted for consideration to the Jury and the Court's instruction regarding their falsity was prejudicial error.

As discussed above, the Court finds that there was insufficient evidence to support the Jury's finding of loss causation and damages with respect to Statement 10. And though the Jury's damages finding was connected only with Statement 10, the Court further clarified that the loss causation problems with Statement 10 similarly afflict Statements 13 through 16. Thus, should the Court of Appeals reverse the Court's ruling on the sufficiency of the evidence of loss causation and damages as to Statement 10, the same conclusion would follow with respect to Statements 13 through 16. And, accordingly, Defendants would not be entitled to a new trial on this basis.

### (5) *Prejudice of Court's Instruction*

Defendants argue that the Court's instruction to the Jury on its partial summary judgment ruling for Plaintiffs prejudiced the Jury such that it could not independently assess other questions of liability. The Court disagrees.

First, the Court precluded disclosure of the pretrial ruling until closing argument. (Tr. 123–26.) Though Plaintiffs mentioned the Court's ruling in connection with the four subject statements, it was not a prominent feature of their closing argument and they made no argument or implication that the Jury should draw inferences as to any other issues from the ruling. (*See* Tr. 4061, 4102–04 & 4255.) Then, the Court read to the Jury, as part of its final instructions, a carefully constructed paragraph explaining the limited nature of the pretrial ruling. The instruction to the Jury on this point read:

> Prior to trial, the Court also made a narrow ruling that four statements made by Alan Levan during a July 25, 2007 conference call were objectively misleading or false. You must also accept that these statements were, in fact, misleading or false. However, the Court has not made any determination regarding whether those statements were material, whether they were made with scienter, or whether they caused Bancorp's share price to decline. The Plaintiffs still must prove, and you will need to decide, the remaining elements of their claims with respect to these statements.
>
> These statements are entries 13, 14, 15, and 16 on the Table that is attached to the Verdict Form.

(D.E.635, p. 30.)

There is no indication that Defendants suffered undue prejudice as a result of this instruction. The Court clearly instructed the Jury on the narrowness of its ruling, and

2011 WL 1585605

the Court presumes the Jury followed its instructions as to this and every other matter. *See Johnson v. Breeden, 280 F.3d 1308, 1319 (11th Cir.2002).* Indeed, the Jury's findings strongly indicate that this presumption is correct. For example, the Jury found no § 10(b) violation as to Statements 8, 9, and 18, all attributed to Alan Levan. (D.E.665.) So it cannot be said that the instruction prejudiced the Jury against Alan Levan. [45]

**\*38** Further, the Jury's findings regarding Statements 13 through 16 are essentially superfluous to the conditional judgment. As discussed above, the award of damages in the amount of $2.41 per share is tied to Statement 10. A finding of no § 10(b) violation as to Statements 13 through 16 would not have affected the conditional judgment. [46]

For the reasons stated above, in the event the Court's ruling on Defendants' Motion for Judgment as a Matter of Law is vacated or reversed, Defendants should not be entitled to a new trial.

### V. Conclusion

Accordingly, it is

ORDERED AND ADJUDGED that Defendants' Motion for Judgement as a Matter of Law (D.E.669) is GRANTED. The Court will separately enter its Final Judgment in accordance with this Order and the Jury's Verdict. It is further

ORDERED AND ADJUDGED that Defendants' Motion for a New Trial (D.E.666) is CONDITIONALLY DENIED. It is further

ORDERED AND ADJUDGED that all pending motions are DENIED AS MOOT. It is further

ORDERED AND ADJUDGED that, in order for the Court to undertake its mandatory review of the record to determine whether sanctions for abusive litigation are appropriate under Federal Rule of Civil Procedure 11, the parties shall file their respective motions for sanctions, if any, within ten days hereof. The opposing party shall respond within ten days thereafter. Any replies shall be filed no later than five days after the filing of a response.

DONE AND ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2011 WL 1585605

### Footnotes

1     On February 4, 2008, the Court appointed State–Boston Retirement System as the Lead Plaintiff. (D.E.45.) State–Boston is an institutional investor claiming to have purchased shares in Bancorp during the class period and to have suffered over $1.8 million in losses. (D.E.45.) On October 19, 2009, the Court named State–Boston and Erie County Employees Retirement System as Co–Class Representatives. (D.E.153.)

2     Defendants later reversed their position and moved to decertify the class at trial. (D.E.529.) The Court denied the motion. (D.E.694.)

3     Defendants also sought summary judgment based on the forward-lookingstatement safe harbor under § 27A of the Private Securities Litigation Reform Act, 15 U.S.C. § 78u–5. The Court denied that portion of the motion because "Defendants fail[ed] to identify any particular statement that falls within the protection of the safe harbor." (D.E.411.)

4     The order allowed Preston's expert opinions on the following: the importance of information regarding a bank's credit and borrower quality to its valuation; the company-specific price declines to Bancorp stock following its April and October 2007 press releases and conference calls; the amount of the April 26, 2007 residual decline attributable to the disclosure of previously undisclosed negative information on April 25 and 26, 2007, and her belief that the entire October 26, 2007 residual decline was attributable to the disclosure of previously undisclosed negative information regarding BankAtlantic's land loan portfolio. *In re BankAtlantic,* 2010 WL 6397500.

5    The parties' initial joint pre-trial stipulation failed to conform to the requirements of the Court's trial order, and on September 1, 2010, the Court ordered the parties to supplement the filing. (D.E.470.)

6    Preston, in her expert report, did not analyze or reference any specific fraudulent statements. Instead, Plaintiffs's counsel asked her to generally assume that Defendants misrepresented the true quality and value of the assets in BankAtlantic's commercial real estate portfolio, as follows:

    a. At least from the beginning of, and throughout the Class Period, Defendants knew or recklessly disregarded the true state of the land loan portion of BankAtlantic's commercial real estate ("CRE") portfolio.

    b. At least from the beginning of, and throughout the Class Period, Defendants were aware of, misrepresented and failed to disclose the credit quality of their borrowers and the quality of the land loans in the land loan portion of the CRE portfolio.

    c. During the Class Period Defendants provided the public with false and/or misleading information or omitted material information necessary to make other statements not misleading concerning the quality of the assets in the land loan portion of the company's CRE portfolio, the "conservative" nature of its underwriting, and the collateral supporting the loans.

    d. By November 29, 2006 Defendants should have disclosed that, contrary to their assertions that they were unaware of any upcoming credit quality trends or problems and that they were comfortable with their borrowers, they were seeing an increase in problem loans ....

    e. By April 26, 2007, Defendants should have disclosed that:

    I. contrary to their assertions that their land bank portfolio presented risks not present in other segments of their CRE portfolio, the problem and potential problem loans were, in actuality, distributed throughout the land loan portion of the CRE portfolio;

    ii. the number and dollar value of the land loan portion of the CRE problem loans on the loan watch list ("LWL") and the potential problem loans as of April 26, 2007; and

    iii the trends and concerns expressed by management as of the date, representative samples of which are detailed below.

    (D.E.365, Ex. B, pp. 5–6.) The Court discusses Preston's trial testimony and the consequence of her reliance on these general assumptions below in the discussion of the Motion for Judgment as a Matter of Law. *See infra* Part III.

7    Plaintiffs had effectively withdrawn an additional three statements of the original twenty-nine when they filed their proposed verdict form on November 1, 2010. (D.E.593.)

8    Defendants' proposed verdict form was unworkable because it failed to address the Reform Act's requirement that the jury make specific findings as to each Defendant's responsibility for each statement or omission. *See* 15 U.S.C. § 78u–4(f).

9    Defendants objected to the final verdict form in its entirety and in particular that no single alleged misstatement could support a damages finding given the assumptions on which Preston's opinion relied.

10   Although the Jury found that several of the Defendants made materially false statements during this period, the Jury found no damages. Plaintiffs conceded prior to the discharge of the Jury that a finding of no liability as to this first period was the only possible interpretation of the verdict. (Tr. 4369.)

11   The relevant exchange was as follows:

    THE COURT: [I]n terms of taking the verdict, there's only one place where I see that it's a little confusing. But I don't really think it matters. So that's on statement 7. So statement 7 is the April 26, #07 conference call. The next statement that they find to be associated with a 10(b) violation is from the same conference call. So the way the case was conceptualized was if they found a 10(b) violation, it would be the first 10(b) violation in the period that damages would relate to, or relate back to. So, both those statements, statement 7 and statement 10, are both from the April 26th conference call.

    The response to the questions, the series of questions that relate to 7, I think are difficult to reconcile, but, again, I don't think it matters in light of the fact that the jury found that the fraud entered the market on April 26th.

2011 WL 1585605

> * * *
>
> Okay. So, let's just bring the jury in. Unless there's something somebody wants me to do about this problem associated with the questions related to statement 7, my suggestion would be let's bring the jury in.
> [No objections]
> (Jury returns at 10:50 a.m.)
> (Tr. 4348–49.)

12 Defendants argue it is a special verdict form under Rule 49(a). The Court disagrees. The verdict form asked the jury to make conclusory findings which involved application of the law to the facts, such as whether "Alan Levan (and therefore Bancorp) violated Section 10(b)" and to respond to special interrogatories as required by the Reform Act. *See* § 78u–4(f)(3). Accordingly, the verdict form is appropriately characterized as a general verdict form accompanied by special interrogatories under Rule 49(b). *See Mason v. Ford Motor Co.,* 307 F.3d 1271, 1273–76 (11th Cir.2002).

13 There is no question the findings are inconsistent. The jury instructions required at least a finding of severe reckless disregard as to the falsity of the statement in order to find a § 10(b) violation. (D.E.635.) One cannot act either knowingly or with severe reckless disregard as to the falsity of a statement and at the same time act in good faith as a controlling person with respect to the same act.

14 If this was not the case, the rule of waiver would be meaningless and its goal of efficient trial procedure would not be achieved because the Court would be left with no option but new trial. *See Coralluzzo v. Educ. Mgmt. Corp.,* 86 F.3d 185, 186 (11th Cir.1996).

15 It is no impediment to this resolution that Statement 10 was not identified in the First Amended Consolidated Complaint. When Plaintiffs first submitted their list of twenty-nine statements as part of the pretrial stipulations, Defendants did note that some of the statements were not included in the First Amended Complaint. But when questioned further about their resistance to the twenty-nine statements, Defendants clarified that they were not concerned with the fact that statements were not pled, but that they were concerned about Preston's failure to reference any individual statement in her expert opinion. Most importantly, at no point did Defendants identify Statement 10 as a statement which was not pled or object to the inclusion of Statement 10 on the verdict form on that basis. Accordingly, regardless of whether or not the finding as to Statement 10 was sufficient to support a damages finding, it was at issue and properly submitted to the Jury. *See* Fed.R.Civ.P. 15(b)(2).

16 Alan Levan and Abdo were members of the Major Loan Committee, and Alan Levan's approval was required for each loan presented to the committee. (Tr. 285 & 3523.)

17 The loan's sponsoring officer assigns a grade to each loan at the time it is made. (PX 151; Tr. 319–20.) After closing, the loan officer or Chief Credit Officer may adjust a loan's grade to reflect changes to its level of risk. (PX 151; Tr. 321–22.)

18 BankAtlantic employees testified inconsistently at trial as to whether loans graded 10 and higher or loans graded 11 and higher were considered "classified" assets. (*See* Tr. 319, 335, 471–74 & 2924.)

19 As a result of that review, BankAtlantic determined that many of the land loans had depleted interest reserves which is an indication that the borrower will not be able to continue to pay down the loan. (Tr. 461–62, 1226–28 & 3563.)

20 Each quarter, Bancorp publishes its quarterly financial results. The results are first announced in an 8–K press release filed with the Securities and Exchange Commission and are then discussed in an investor conference call. (Tr. 3318.) Conference calls are open to public participation; investment analysts participate in these calls and ask questions of management regarding its quarterly results. (Tr. 3312.) Conference calls provide management an opportunity to speak to investors and analysts and provide more information than is available in the quarterly financial results. (Tr. 3312.) After the conference call, the Company files a 10–Q quarterly earnings report with the Commission. (Tr. 3318.)

21 In preparation for the first quarter 2007 conference call, Defendant Jim White, then Bancorp's Chief Financial Officer, had prepared to discuss concerns with entire land loan portfolio. (Tr. 1666–73.)

Coincidental with the announcement of the first quarter losses and the discussion of Bancorp's concerns with the BLB land loans, Bancorp's stock price declined $0.56 on April 26, 2007. (Tr. 2558.)

On May 10, 2007, Bancorp filed its 10–Q for the first quarter of 2007. The Company noted that the residential real estate market, both in Florida and nationally, "continued to deteriorate during the first quarter of 2007." (DX 6, p. 18.) The report identified the BLB portfolio as comprising $140 million of the $562 million "commercial real estate acquisition and development portfolio." (DX 6, p. 18.) With respect to the non-BLB loans in the portfolio, it stated:

> The loans ... in this category are generally secured by residential and commercial real estate which will be fully developed by the borrower or sold to third parties. These loans generally involve property with a longer investment and development horizon and are guaranteed by the borrower or individuals and/or secured by additional collateral such that it is expected that the borrower will have the ability to service the debt under current conditions for a longer period of time.

(DX 6, p. 18.)

BankAtlantic reserves funds for potential loan losses; the reserves are counted as losses against BankAtlantic's income in the quarter in which they are taken. (Tr. 2937.) Loan loss reserves include three components: specific reserves, qualitative reserves, and quantitative reserves. (Tr. 539–541.) Specific reserves are provisions for individual, large-balance loans. When BankAtlantic downgrades to a risk grade of 10 or 11 a loan whose balance exceeds a set amount, it may then determine that it is necessary to take a specific reserve for that loan. (Tr. 540–41.) BankAtlantic takes quantitative and qualitative reserves, when necessary, for groups of loans with similar characteristics. Quantitative reserves are determined based on the historic performance of the group of loans. (Tr. 539 & 2930.) Qualitative reserves are based on current and expected economic factors that may affect the repayment of a given group of loans. (Tr. 539–40 & 2931.) When BankAtlantic determines that it will not be able to collect all or a portion of a loan, it charges off that amount. (Tr. 2964–65.) If a specific reserve was previously taken for that loan, the reserved amount is applied to the charge off. (Tr. 2967–68.) If the specific reserve is insufficient to cover the charge off, the difference between the charge off and the reserve is counted as a loss against BankAtlantic's income. (Tr. 2967–68 & 3003–04.)

The Eleventh Circuit has acknowledged the concept of the materialization-of-the-risk theory, but has not explicitly adopted it. *See La Grasta v. First Union Sec., Inc.,* 358 F.3d 840, 851 (11th Cir.2004); *Huddleston,* 640 F.2d 534.

In reaching this conclusion, Preston also examined the trading volume of Bancorp stock, which, on October 26, 2007, soared above Bancorp's standard trading volume. (Tr. 2562.) Preston opined that this was further indication that Bancorp-specific information caused the $2.93 decline. *Id.*

Specifically, Preston identified the information contained in the "three bullet points" on "page 3" of the 8–K as the information regarding non-accruals and classified assets which caused the price decline. (Tr. 2594–95.)

In fact, on cross-examination, Preston testified that, without a finding supporting her assumption of continuing BLB fraud after April, her opinion was basically irrelevant:

> Q. And those, in fact, are the assumptions that if those are true, you then rendered your opinion based on those facts?
> A. That's correct.
> Q. And if those opinions [*spoken error* ] are not true, then your opinion on damages, I think you would agree, isn't of much moment?
> A. Correct. If there is no liability, the there are no damages.
> * * *
>
> Q. So in other words, if the jury finds that the company did adequately warn of the risk of the builder land bank portfolio then your opinion as to the damages in October is wrong, correct?
> A. The jury would not find liability, so they would not find damages.
> * * *

Q. So we are perfectly clear, if the jury finds no fraud with the BLB portfolio from April to October, then your entire opinion dies?

A. In [*sic*] the jury finds no fraud related to the assumptions I have made regarding the land bank portfolio ..., then they not will find liability and than there will be no damages.

(Tr. 2691, 2713.) Preston may have avoided answering with a clear "yes," but her own assessment of the opinion is clear—without a finding in support of her assumption, it was not of much moment.

In addition to Statement 10, the jury found that Statements 13 through 17 and 19, were made in violation of Rule 10b–5 by certain Defendants, including Bancorp, Alan Levan, and Toalson.

Plaintiffs argue that "while the jury [was] asked to determine the first statement from which damages flowed, it was understood that any finding of damages would be constant and extend to any subsequent actionable misstatements and omissions." (D.E.675, p. 26.) The Court disagrees. The verdict form *only* asked the Jury to attach damages to "the first Section 10(b) violation [they] found," and, consequently, the Jury only found the amount of damages caused by the first Section 10(b) violation. (D.E. 665; Tr. 3951, 62.) In fact, the initial draft of the verdict form instructed the Jury to skip the remaining statements once the first violation was found in each damage period. (Tr. 3934–35.) Plaintiffs requested that the Jury be asked to adjudicate each statement regardless of whether they found a prior violation in case the first violation the Jury found was disregarded on appeal or in a post-trial motion. *Id.* And the Court accommodated the request. Also, the record is clear that Defendants never agreed that the Jury's finding of damages as to the first violation would automatically shift to the next violation if the first failed. (The resolution of the inconsistency as to Statement 7, on the other hand, was a completely separate issue governed by Rule 49 and for which their was a waiver by both parties. *See* Part II *supra*.)

As with the third-quarter earnings conference call, the transcript of the entire second-quarter earnings conference call was admitted into evidence at trial. The following are the relevant portions of Alan Levan's comments, embracing Statements 13 through 17:

[ANALYST]: Basically what I'm trying to—ask you is the $135 million in the land loans that you are concerned about, are there other portfolios (unintelligible) focus you on the construction portfolio that you feel there might be some risk down the road as well.

ALAN LEVAN: There are no asset classes that we are concerned about in the portfolio as an asset class. You know, we've reported all of the delinquencies that we have, which actually I don't think there are any other than the ones that we've, you know, that we've just reported to you.

So the portfolio has always performed extremely well, continues to perform extremely well. And that's not to say that, you know, from time to time there aren't some issues as there always have, even though we've never taken losses in that—we've not taken—I won't say ever taken any losses, because that's probably never going to be a correct statement, but that portfolio has performed extremely well.

The one category that we just are focused on is this land loan builder portfolio because, you know, just from one day to the next, the entire homebuilding industry, you know, went into a state of flux and turmoil and is impacting that particular class. But to our knowledge and in—just in thinking through, there are no particular asset classes that we're concerned about other than that one class.

* * *

[ANALYST]: ... If I can just question you about the commercial portfolio for a second, for the construction portion of that, which I think you said was 63% of the portfolio, can you give us some sense of what the various delinquency buckets on that portion of the portfolio looks like at the end of June and how that's changed since the beginning of the year?

ALAN LEVAN: I could be wrong, but I think it's zero. I don't think we have any delinquency in that portfolio, in the entire portfolio.

* * *

Other than the non-accruals we've reported to you, there is, you know, there is no—there are no other delinquencies in that portfolio.

2011 WL 1585605

> And again, I'm—I could be—don't take it as an absolute, but I'm just telling you to date we have—we do not have any concern about the balance of the portfolio.
>
> * * *
>
> Brian, we've confirmed that—while we were talking, somebody checked and to our knowledge, at this moment we have no delinquencies in the balance of the portfolio ... in the commercial portfolio.
>
> (DX 8, pp. 20–21, 32–33.)

The amount was listed in the following table:

|  | June 30, 2007 |
|---|---|
| NON PERFORMING ASSETS | |
| Non-accrual: | |
| Tax Certificates | $ 711 |
| Loans | 21,806 |
| Total non-accrual | 22,517 |
| Repossessed Assets: | |
| Real estate owned | 23,886 |
| **Total nonperforming assets, net** | $ 46,403 |
| Allowances | |
| Allowances for loan losses | $ 54,754 |
| Allowances for tax certificate loses [*sic*] | 3,829 |
| **Total allowances** | $ 58,583 |
| **POTENTIAL PROBLEM LOANS** | |
| Contractually past due 90 days or more | $ 164 |
| Performing impaired loans | 4,596 |
| Restructured loans | 3,588 |
| TOTAL POTENTIAL PROBLEM LOANS | $ 8,348 |

> (DX 9, p. 23.)

Indeed, it should be of no surprise that Preston's assumptions do not fit with Statement 19 because Statement 19 was not plead in the First Consolidated Amended Complaint—the pleading Preston claimed to have reviewed in formulating her opinion. (D.E. 365 Ex B., p. 4.) Preston's expert report predated Plaintiffs' motion to amend the complaint to include fraudulent understatement of the total potential problem loans in the 2007 second quarter 10–Q. (D.E. 210 & 365 Ex. B.) The importance of this point should not be understated; Preston herself testified at trial when asked why she reviewed the legal complaint: "I've [*sic*] just had to review the complaint, see what the allegations were .... I had to make sure I understand what the allegations are so I don't and up saying, without any basis, oh, the whole decline is related to that." (Tr. 2545.)

Jeffrey Mindling, BankAtlantic's Chief Credit Officer, testified at trial that many of the loans that were risk-graded 11 were accounted for in the same table in the category "Allowance for loan losses." (Tr. 611–20.) This, then, is an example of the type of information that arguably should have been considered as part of the disaggregation analysis if liability flowed from Statement 19.

Bancorp continued to warn of the risk to the BLB loans in the 10–Q:

> Conditions in the residential real estate market nationally and in Florida in particular continued to deteriorate during the six months fo 2007.... The "builder land bank loan" segment, at approximately $135 million, consists of twelve land loans to borrowers who have or had option agreements with regional and/or national home builders. These loans were originally underwritten based on projected sales of the developed lots to the builders/option holders and timely repayment of the loans is primarily dependent upon the acquisition of the property pursuant to the options. If the lots are not acquired as originally anticipated, BankAtlantic anticipates that the borrower may not be in a position to service the loan with the likely result being an increase in nonperforming loans and loan losses in this category.
>
> (DX 9, p. 22.)

Under § 20(a) of the Exchange Act, every person who directly or indirectly controls any person liable for a § 10(b) violation shall also be liable jointly and severally to the same extent as such controlled person. Because

liability under § 20(a) is derivative upon liability under § 10(b), the failure to produce sufficient evidence to support a § 10(b) violation is necessarily fatal to a § 20(a) claim. *See Edward J. Goodman Life Income Trust v. Jabil Cir., Inc.,* 594 F.3d 783 (11th Cir.2010). Accordingly, because all Defendants are entitled to judgment as a matter of law in their favor on all Plaintiffs' claims under § 10(b) and Rule 10b–5, they are likewise entitled to judgment in their favor as to Plaintiffs' claims under § 20(a).

Specifically, the Court examines whether Defendants would be entitled to a new trial should the Court of Appeals reverse the Court's judgment for Defendants and hold that the evidence of loss causation was sufficient to support a finding of liability against Alan Levan and Bancorp with respect to Statement 10.

Because Defendants raise no new issues with respect to DeWitt's testimony, the Court incorporates by reference and relies on the rulings made and reasons provided in its Order on Motion to Exclude Expert Testimony of Jack DeWitt. (D.E.479.)

Defendants do not articulate their objections to specific emails in their Motion for New Trial nor do they specify the basis for their objection; rather, they incorporate by reference the arguments they raised in a pretrial Motion *In Limine* to exclude the emails of Alexander. In that Motion, Defendants argued that the emails were neither business records excepted from the hearsay rule under Federal Rule of Evidence 803(6) nor admissions by a party-opponent under Federal Rule of Evidence 803(d)(2)(D). (D.E.298.) The Court denied the Motion without prejudice, as it failed to indicate which of Alexander's emails were the subject of the Motion. (D.E.457.)

Though the statements in issue may only have been admissible against Bancorp and not against the individual Defendants, no Defendant requested a limiting instruction from the Court to that effect.

The only legal support Defendants cite in their Motion is *Brooke Grp.,* 509 U.S. 209, 113 S.Ct. 2578, 125 L.Ed.2d 168, which has no bearing on the issue.

The Court instructed the Jury in relevant part: "Plaintiffs claim that the alleged fraud caused damages in the amount of $2.93 per share on October 26, 2007." (D.E.635, p. 24.)

Plaintiffs' motion had an extremely narrow focus. They stated:

> As noted above, to establish Defendants' liability under Section 10(b) and Rule 10b–5, Plaintiffs must prove that Defendants issued: "(1) a misstatement or omission, (2) of a material fact, (3) made with scienter, (4) on which plaintiff relied, (5) that proximately caused his injury." *Ziemba v. Cascade Int'l, Inc.,* 256 F.3d 1194, 1202 (11th Cir.2002).... Plaintiffs seek partial summary judgment only as to the first element—falsity—of Levan's July 25, 2007 earnings call statements.
>
> (D.E.237.)

These four statements were listed as Statements 13 through 16 on the verdict form.

Defendants argued in their Motion for Reconsideration and again in their Motion for New Trial that when Alan Levan stated in the July 25, 2007 conference call that the other loans in the portfolio were "performing extremely well," he was actually using a banking term of art, referring to loans that are "performing" as opposed to "non-performing," which is akin to non-accrual status. (D.E. 471, p. 6; D.E. 666, pp. 20–21.) However, at summary judgment (and even in connection with their Motion for Reconsideration), Defendants presented no evidence in support of this argument, let alone evidence that raised a genuine issue of material fact.

In fact, as explained above, the Jury found for Defendants on the majority of the issues.

By the same token, there would be no prejudice to Defendants even if the Plaintiffs' Motion for Partial Summary Judgment was wrongly decided. Nevertheless, the ruling on Plaintiffs' Motion for Partial Summary Judgment was extremely narrow and, as set forth above, was warranted based on the parties' briefing of the motion and supporting evidence.

---

**End of Document**

© 2021 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 6

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | |
|---|---|
| GRANT BARFUSS, on behalf of himself and all others similarly situated,<br><br>Plaintiffs<br><br>v.<br><br>DGSE COMPANIES, INC.; L.S. SMITH, JOHN BENSON, AND WILLIAM OYSTER,<br>Defendants | No. 12 Civ. 3664 (JJB)<br>ECF Case |

## LEAD PLAINTIFF'S COUNSEL'S MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR AWARD OF ATTORNEYS' FEES AND REIMBURSEMENT OF EXPENSES

**KIRBY McINERNEY LLP**

Ira M. Press
  New York Attorney Registration No. 2319481
  ipress@kmllp.com (*admitted pro hac vice*)
Beverly T. Mirza
  California Attorney Registration No. 237240
  bmirza@kmllp.com (*not admitted in N.D. Tex.*)
Thomas W. Elrod
  New York Attorney Registration No. 4778916
  telrod@kmllp.com (*not admitted in N.D. Tex.*)
825 Third Avenue, 16th Floor
New York, NY  10022

*Lead Counsel for Lead Plaintiff and Class*

**GRUBER HURST JOHANSEN HAIL SHANK LLP**

Mark A. Shank
  Texas State Bar No. 18090800
  mshank@ghjhlaw.com
Greg P. McAllister
  Texas State Bar No. 24071191
  gmcallister@ghjhlaw.com
1445 Ross Avenue
Suite 2500
Dallas, TX 75202
Telephone:   (214) 855-6800
Facsimile: (214) 855-6808

*Liaison Counsel for Lead Plaintiff and Class*

**TABLE OF CONTENTS**

I. INTRODUCTION ................................................................................................ 1

II. LEAD COUNSEL ARE ENTITLED TO AN AWARD OF ATTORNEYS' FEES FROM THE COMMON FUND ...................................................................... 2

III. THE REQUESTED ATTORNEYS' FEES ARE REASONABLE UNDER EITHER THE PERCENTAGE-OF-THE-FUND METHOD OR THE LODESTAR METHOD ............ 3

    A. The Requested Attorneys' Fees are Reasonable Under the Percentage-of-the-Fund-Method.................................................................................................. 3

    B. The Requested Attorneys' Fees are Reasonable Under the Lodestar Method........ 4

IV. OTHER FACTORS CONSIDERED BY COURTS IN THE FIFTH CIRCUIT CONFIRM THAT THE REQUESTED FEE IS FAIR AND REASONABLE.................. 6

    A. The Weight of the *Johnson* Factors Support Lead Counsel's Request for Attorneys' Fees and Reimbursement of Expenses........................................... 7

        1. Substantial Time and Labor Was Involved and Lead Counsel Assumed Great Risk ...................................................................... 7

        2. The Questions Involved in Litigating the Instant Action Were Difficult .... 10

        3. Litigating the Instant Action Required Specialized Experience .................. 11

        4. At Times, Lead Counsel Was Precluded From Other Employment............ 11

        5. Lead Counsel's Request Is Similar to the Customary Fees In Similar Cases ................................................................................................ 12

        6. Lead Counsel Accepted the Instant Case on a Wholly Contingent Basis, With No Guarantee of any Recovery or Reimbursement of Expenses........ 12

        7. Circumstantial Time Limitations, Most Notably DGSE's Limited Insurance Coverage and Other Resources Available for Settlement Required Lead Counsel to Secure a Favorable Settlement ................................................. 14

        8. Lead Counsel Obtained an Excellent Result for the Class ......................... 14

        9. The Action Required Significant Skill of Experienced Counsel to Bring the Action to a Successful Conclusion .......................................................... 15

10.   The "Undesirability" of the Action Supports Lead Counsel's Request for Attorneys' Fees ................................................................................. 16

11.   Lead Counsel's Relationship With Lead Plaintiff Supports Lead Counsel's Request for Attorneys' Fees ......................................................... 17

12.   Lead Counsel's Relationship Request For Fees Is Consistent With Awards in Similar Cases ................................................................................. 17

13.   The Reaction of the Settlement Class Supports the Requested Fee ............. 18

B.   Lead Counsel's Expenses Are Reasonable and Should Be Reimbursed .............. 19

V.   CONCLUSION ................................................................................................. 19

## TABLE OF AUTHORITIES

**Cases**

*Anixter v. Home-State Prod. Co.*,
   77 F.3d 1215 (10th Cir. 1996) ........................................................................................ 13

*Bateman Eichler, Hill Richards, Inc. v. Berner*,
   472 U.S. 299 (1985) ......................................................................................................... 2

*Bell v. Fore Sys. Inc.*,
   No. 97 Civ. 1265, 2003 U.S. Dist. LEXIS 26676 (W.D. Pa. Dec. 22, 2003) ............................ 12

*Billitteri v. Sec. Am., Inc.*,
   No. 09 Civ. 01568, 2011 U.S. Dist. LEXIS 93907 (N.D. Tex. Aug. 4, 2011).................... 11, 16

*Blum v. Stenson*,
   465 U.S. 886 n.16 (1984) ................................................................................................. 3

*Boeing Co. v. Van Gemert*,
   444 U.S. 472 (1980) ......................................................................................................... 2

*Brantley v. Surles*,
   804 F.2d 31 (5th Circuit 1986) ....................................................................................... 7

*Burford v. Cargill, Inc.*,
   No. 05 Civ. 0283, 2012 U.S. Dist. Lexis 161232 (W.D. La. Nov. 8, 2012) ..................... 4, 17

*Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*,
   511 U.S. 164 (1994) ....................................................................................................... 13

*Di Giacomo v. Plains All Am. Pipeline*,
   No. 99 Civ. 422001, 2001 U.S. Dist. LEXIS 25532 (S.D. Tex. Sept. 18, 2001) ............. 2, 5, 16

*Fin. Acquisition Partners LP v. Blackwell*,
   440 F.3d 278 (5th Cir. 2006) ........................................................................................... 8

*Flaherty & Crumrine Preferred Income Fund Inc. v. TXU Corp.*,
   565 F.3d 200 (5th Cir. 2009) ......................................................................................... 10

*Fogarazzo v. Lehman Bros., Inc.*,
   No. 03 Civ. 5194, 2011 WL 671745 (S.D.N.Y. Feb. 23, 2011) ........................................ 6

*Friedman v. Penson Worldwide, Inc.*,
   No. 11 Civ. 2098 (N.D. Tex. Aug. 23, 2013)........................................................... 3, 5, 17

*Hicks v. Morgan Stanley*,
   No. 01 Civ. 10071 (RJH), 2005 U.S. Dist. LEXIS 24890 (S.D.N.Y. Oct. 19, 2005) ............ 2

*In re Acceptance Ins. Cos. Sec. Litig.*,
   423 F.3d 899 (8th Cir. 2005)............................................................................................ 8

*In re Apple Computer, Inc.*,
   127 F. App'x 296 (9th Cir. 2005)..................................................................................... 8

*In re BankAtlantic Bancorp, Inc. Sec. Litig.*,
   No. 07 Civ. 61542, 2011 WL 1585605 (S.D. Fla. Apr. 25, 2011) .................................... 13

*In re Cerner Corp. Sec. Litig.*,
   425 F.3d 1079 (8th Cir. 2005) ................................................................ 8

*In re Combustion, Inc.*,
   968 F. Supp. 1116 (W.D. La. 1997) ................................................... 3-4, 17

*In re Corel Corp. Inc. Sec. Litig.*,
   293 F. Supp. 2d 484, 495-97 (E.D. Pa. 2003) ........................................ 12

*In re Datatec Sys., Inc. Sec. Litig.*, No.
   04 Civ. 525, 2007 WL 4225828 (D. N.J. Nov. 28, 2007) .......................... 12

*In re Dell Inc., Sec. Litig.*,
   No. 06 Civ. 726, 2010 U.S. Dist. LEXIS 58281 (W.D. Tex. June 10, 2010) ...................... 5, 17

*In re Eng'g Animation Sec. Litig.*,
   203 F.R.D. 417 (S.D. Iowa 2001) ......................................................... 12

*In re Enron Corp. Sec. Deriv. & "ERISA" Litig.*,
   586 F. Supp. 2d 732 (S.D. Tex. 2008) ...................................................... 5

*In re Giant Interactive Grp. Inc. Sec. Litig.*,
   279 F.R.D. 151 (S.D.N.Y. 2011) ............................................................. 5

*In re Harrah's Entertainment*,
   No. 95 Civ. 3925, 1998 U.S. Dist. LEXIS 18774 (E.D. La. Nov. 24, 1998). .......................... 14

*In re Heartland Payment Sys., Inc. Customer Data Sec. Breach Litig.*,
   No. 06 Civ. 6128, 2012 U.S. Dist. LEXIS 108516 (S.D.N.Y. Aug. 1, 2012) ................. 5, 18-19

*In re IMAX Sec. Litig.*,
   851 F. Supp. 2d 1040 (S.D. Tex. 2012) ................................................... 5

*In re Lawler*,
   807 F.2d 1207 (5th Cir. 1987) ............................................................... 5

*In re Marsh & McLennan Cos., Inc. Sec. Litig.*,
   No. 04 Civ. 8144 (CM), 2009 U.S. Dist. LEXIS 120953 (S.D.N.Y. Dec. 23, 2009) ............... 13

*In re Merck & Co., Inc. Sec. Litig.*,
   432 F.3d 261 (3d Cir. 2005) ................................................................. 8

*In re OCA, Inc. Sec. & Derivative Litig.*,
   No. 05 Civ. 2165, 2009 U.S. Dist. LEXIS 19210 (E.D. La. Mar. 2, 2009) ........................ 10, 17

*In re PEC Solutions, Inc. Sec. Litig.*,
   418 F.3d 379 (4th Cir. 2005) ................................................................. 8

*In re Pilgrim's Pride Corp. Sec. Litig.*,
   No. 08 Civ. 419 (E.D. Tex. May 2, 2012) ................................................... 5

*In re Ravisent Techs., Inc. Sec. Litig.*,
   No. Civ. A. 00-cv-1014, 2005 WL 906361 (E.D. Pa. Apr. 18, 2005) .................................... 12

*In re Safety Components, Inc. Sec. Litig.*,
   166 F. Supp. 2d 72 (D.N.J. 2001) ......................................................... 12

*In re Telik, 33 Inc. Sec. Litig.*,
  576 F. Supp. 2d 570 (S.D.N.Y. 2008) ...................................................................... 3

*In re Unisys Corp. Sec. Litig.*,
  No. 99-5333, 2001 WL 1563721 (E.D. Pa. Dec. 6, 2001) ....................................... 12

*In re Veeco Instruments Secs. Litig.*,
  No. 05 MDL 01695, 2007 U.S. Dist. LEXIS 85629 (S.D.N.Y. Nov. 7, 2007)......................... 13

*Johnson v. Georgia Highway Express*,
  488 F.2d 714 (5th Cir. 1974)............................................................................ 6, 11

*Johnston v. Comerica Mortg.Grp.*,
  83 F.3d 241, 245-46 (8th Cir. 1996) ...................................................................... 18

*Key Equity Investors Inc. v. SEL-LEB Mktg, Inc.*,
  246 F. App'x 780 (3d Cir. 2007)............................................................................ 8

*Klein v. O'Neal, Inc.*,
  705 F. Supp. 2d 632 (N.D. Tex. 2010)..................................................................... 6

*Maher v. Zapata Corp.*,
  714 F.2d 436 (5th Cir.1983)............................................................................ 10, 17

*Missouri v. Jenkins*,
  491 U.S. 274 (1989) ...................................................................................... 5

*Newby v. Enron Corp. (In re Enron Corp. Sec.)*,
  586 F. Supp. 2d 732 (S.D. Tex. 2008) ............................................................ 4, 5, 17

*Prindle v. Lewis*,
  No. 10 Civ. 1217, 2011 U.S. Dist. LEXIS 103284, (N.D. Tex. Aug. 24, 2011)....................... 10

*Purser v. Coralli*,
  No. 11 Civ. 03295, 2012 U.S. Dist. LEXIS 166214 (N.D. Tex. Nov. 21, 2012)...................... 10

*Radosti v. Envision EMI, LLC*,
  760 F. Supp. 2d 73 (D.D.C. 2011) ...................................................................... 19

*Robbins v. Koger Props. Inc.*,
  116 F.3d 1441 (11th Cir. 1997)............................................................................ 13

*Schwartz v. TXU Corp.*
  No. 04 Civ. 2078, 2005 U.S. Dist. LEXIS 27077 (N.D. Tex. Nov. 8, 2005)......2, 8-9, 12-14, 16

*Serio v. Wachovia Sec.,*
  *LLC*, No. 06-4681, 2009 WL 900167 (D.N.J. Mar. 31, 2009)............................................. 12

*Sims v. Shearson Lehman Bros., Inc.*,
  [1993-1994 Transfer Binder] Fed. Sec. L. Rep. (CCH) (N.D. Tex. Nov. 29, 1993) ............ 4, 17

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007) ...................................................................................... 2

*Union Asset Mgmt. Holding A.G. v. Dell, Inc.*,
  669 F.3d 632 (5th Cir. 2012)............................................................................3-4, 6

*Walco Invs. Inc. v. Thenen*,
  975 F. Supp. 1468 (S.D. Fla. 1997)........................................................................ 15

*Winer Family Trust v. Queen*,
  503 F.3d 319 (3d Cir. 2007)..................................................................................... 8

**Other Authorities**

4 NEWBERG ON CLASS ACTIONS § 14:6 (4th ed. 2013) ...................................................... 18

MANUAL FOR COMPLEX LITIGATION § 14.121 (4th ed. 2013)........................................... 18

*Recent Trends in Securities Class Action Litigation: 2012 Mid-Year Review*,

  NERA (2012) .................................................................................................... 12-13

**Rules**

15 U.S.C. § 78u-4(a)(6) ...................................................................................................... 3

Rule 10b-5.......................................................................................................................... 10

Section 10(b)...................................................................................................................... 10

## I.    INTRODUCTION

Court-appointed Lead Plaintiff's Counsel, Kirby McInerney LLP ("Kirby McInerney" or "Lead Counsel"), having achieved a Settlement providing for recovery of $1.7 million in cash for the benefit of the Class, respectfully submits this memorandum of law in support of its motion pursuant to Federal Rules of Civil Procedure Rule 23(h) and Rule 54(d)(2) for an award of attorneys' fees and reimbursement of litigation expenses to be paid out of the Settlement Fund, including interest at the same rate as the Settlement Fund's rate.[1]

The Settlement would recover approximately 30% of the estimated $5.68 million that the Class could have been recovered had plaintiffs prevailed at trial against Defendants.  As a percentage of potential damages, the Settlement is multiples higher than the norm in securities class actions, thus securing an excellent result for Class Members.[2]  Lead Counsel submits that this exceptional result was achieved through the skill, tenacity, and effective advocacy of Lead Counsel.  Lead Counsel, respectfully seeks an award of attorneys' fees in the amount of 33% of

---

[1]  Lead Plaintiff is simultaneously submitting the Declaration of Ira M. Press in Support of Motion  for Final Approval of Class Action Settlement and Plan of Allocation and Motion for Award of Attorneys' Fees and Reimbursement of Expenses (the "Press Declaration" or "Press Decl.")  The designation "¶" or "¶¶" refers to paragraphs in the Press Declaration.  The Court is respectfully referred to the Press Declaration for a detailed description of the history of this Action; the nature of the claims asserted; the negotiations leading to the Settlement; the risks and uncertainties of continued litigation; and a description of the services Lead Counsel has provided for the benefit of the Class.  Unless otherwise noted, capitalized terms have the meanings set out in the Press Declaration and in the Stipulation and Agreement of Settlement dated July 3, 2013 (the "Stipulation" (ECF No. 48)).  As used herein, "Lead Counsel" refers to Lead Counsel and Liaison Counsel, Gruber Hurst Johansen Hail Shank LLP for Lead Plaintiff and proposed class.  "Non-lead plaintiff's counsel" refers to the Rosen Law Firm, counsel for plaintiff Grant Barfuss, which filed the operative complaint, but did not perform work under the direction of Lead Counsel, and the Rosen Law Firm's local counsel, the Payne Mitchell Law Group.

[2] According to a 2013 report by Cornerstone Research entitled "Securities Class Action Settlements: 2012 Review and Analysis" ("Cornerstone Report"), for all securities class actions settled in 2012, the median settlement recovered 17.3% of estimated damages. *See* Appendix, Ex. 8 (App. p. 107).  All references to "Appendix" refer to "Appendix to Memorandum of Law in Support of Motion for Final Approval of Class Action Settlement and Plan of Allocation; Memorandum of Law in Support of Motion for Award of Attorneys' Fees and Reimbursement of Expenses" filed concurrently herewith.

the Settlement Amount, or $561,000.00, plus any accrued interest, and reimbursement of $13,351.74 in litigation expenses actually incurred.[3]

## II. LEAD COUNSEL ARE ENTITLED TO AN AWARD OF ATTORNEYS' FEES FROM THE COMMON FUND

The Supreme Court has long recognized that a "litigant or a lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from the fund as a whole." *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980) (cited by *Schwartz v. TXU Corp.*, No. 04 Civ. 2078, 2005 U.S. Dist. LEXIS 27077 (N.D. Tex. Nov. 8, 2005)). The Supreme Court has also emphasized that private securities actions are "an essential supplement to criminal prosecutions and civil enforcement actions" brought by the United States Securities and Exchange Commission ("SEC"). *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007); *accord Bateman Eichler, Hill Richards, Inc. v. Berner*, 472 U.S. 299, 310 (1985) (private securities actions are "'a most effective weapon in the enforcement' of the securities laws and . . . 'a necessary supplement to [SEC] action'" (citation omitted)).

Compensating plaintiffs' counsel for the risks they take in bringing these actions is essential, because "[s]uch actions could not be sustained if plaintiffs' counsel were not to receive remuneration from the settlement fund for their efforts on behalf of the class." *Hicks v. Morgan Stanley*, No. 01 Civ. 10071 (RJH), 2005 U.S. Dist. LEXIS 24890, at *26 (S.D.N.Y. Oct. 19, 2005); *see also Di Giacomo v. Plains All Am. Pipeline*, No. 9 Civ. 4137, 2001 U.S. Dist. LEXIS 25532, at *32, (S.D. Tex. Dec. 18, 2001).

---

[3] Lead Counsel's request for fees and expenses includes the total hours and expenses incurred by Lead Counsel, Liaison Counsel, and non-Lead plaintiffs' counsel, the Rosen Law Firm and its local counsel, the Payne Mitchell Law Group (collectively defined herein as "Plaintiffs' Counsel").

III.   **THE REQUESTED ATTORNEYS' FEES ARE REASONABLE UNDER EITHER THE PERCENTAGE-OF-THE-FUND METHOD OR THE LODESTAR METHOD**

There are two methods for determining the reasonableness of the requested fee in a common fund class action: the percentage-of-the-fund method, and the lodestar method. Under either method, the requested fee here is fair and reasonable.

A.   **The Requested Attorneys' Fees Are Reasonable Under the Percentage-of-the-Fund Method**

The Supreme Court has endorsed the percentage-of-the-fund method, stating that "under the 'common fund doctrine'. . . a reasonable fee is based on a percentage of the fund bestowed on the class." *Blum v. Stenson*, 465 U.S. 886, 900 n.16 (1984). The Fifth Circuit has approved of the use of the percentage-of-the-fund method and recognized that such an approach was endorsed by the PSLRA. *Union Asset Mgmt. Holding A.G. v. Dell, Inc.*, 669 F.3d 632, 643 (5th Cir. 2012) (citing 15 U.S.C. § 78u-4(a)(6); *In re Telik, 33 Inc. Sec. Litig.*, 576 F. Supp. 2d 570, 586 (S.D.N.Y. 2008) ("Congress plainly contemplated that percentage-of-recovery would be the primary measure of attorneys' fees awards in federal securities class actions."). In fact, "the Fifth Circuit has never reversed a district court judge's decision to use the percentage method" or "preclude[d] its use." *Union Asset Mgmt.*, 669 F.3d at 644.

Under either the percentage-of-the-common-fund approach, Lead Counsel's fee request is fair and reasonable. There are numerous examples of cases where the Fifth Circuit has awarded attorneys' fees of more than 30% of a common fund. *See, e.g.*, *Friedman v. Penson Worldwide, Inc.*, No. 11 Civ. 2098 (N.D. Tex. Aug. 23, 2013) (awarding 33% fee award) Appendix, Ex. 17 (App. p. 205-06); *In re Combustion, Inc.*, 968 F. Supp. 1116, 1133 (W.D. La. 1997); *Sims v.*

3

*Shearson Lehman Bros., Inc.*, [1993-1994 Transfer Binder] Fed. Sec. L. Rep. (CCH) P 98,134, at 98,976 (N.D. Tex. Nov. 29, 1993.[4]

In sum, when considered on a percentage basis, the requested fee is in line with the fees commonly awarded in securities class actions involving settlements of similar magnitude.  The percentage method thus demonstrates the reasonableness of the requested fee.

### B.        The Requested Attorneys' Fees Are Reasonable Under the Lodestar Method

The Fifth Circuit also allows district courts to determine the reasonableness of a requested fee pursuant to the lodestar method.  *See Union Asset Mgmt.*, 669 F.3d at 644.  The lodestar method strongly demonstrates the reasonableness of the fee request, and "[t]here is a strong presumption that the lodestar is a reasonable fee."  *Newby v. Enron Corp. (In re Enron Corp. Sec.)*, 586 F. Supp. 2d 732, 755 (S.D. Tex. 2008).

Under the lodestar method, the Court: (i) determines counsel's lodestar by multiplying the number of hours each attorney spent on the case by each attorney's reasonable hourly rate; and (ii) adjusts that lodestar figure by applying a multiplier "to reflect litigation risk, the complexity of the issues, the contingent nature of the engagement, the skill of the attorneys, and other factors."  *Id.* at 751.  In securities class actions, fees representing multiples above the lodestar are regularly awarded to reflect the contingency fee risk and other relevant factors.

Here, Lead Counsel submits a total of 1,162.70 hours of attorney and other professional support time prosecuting the Action.[5]  Press Decl. ¶¶ 53, 67. Plaintiffs' Counsel total lodestar,

---

[4] *See also Burford v. Cargill, Inc.*, No. 05 Civ. 0283, 2012 U.S. Dist. Lexis 161232 at *6 (W.D. La. Nov. 8, 2012) (awarding attorneys' fee of one-third of settlement fund); *In re Combustion, Inc.*, 968 F. Supp. 1116, 1133 (W.D. La. 1997) (same).

[5] As set forth in detail in the Declaration of Ira M. Press in Support of (i) Motion for Final Approval of Class Action Settlement and Plan of Allocation and (ii) Lead Counsel's Motion for Award of Attorneys' Fees and Reimbursement of Expenses ("Press Decl."), this figure includes the total number of hours and lodestar submitted by Lead Counsel, Liaison Counsel, and non-Lead plaintiffs' counsel (i.e., the Rosen Law Firm, and its local counsel the Payne

4

derived by multiplying these hours by each firm's current hourly rates is[6] $605,551.50.  *See id*.

While courts frequently award class counsel multipliers on their lodestar, the requested fee here,

which amounts to $561,000 (without interest), is less than counsels' lodestar.  *Id*.

It is respectfully submitted that the requested fee is reasonable.  In fact, courts frequently

award class counsel fees that are several times their lodestar.  *See, e.g., Di Giacomo v. Plains All

Am. Pipeline*, No. 99 Civ. 4137, 2001 U.S. Dist. LEXIS 25532, at * 32, (S.D. Tex. Dec. 18,

2001) ("courts typically apply multipliers ranging from one to four"); *Friedman v. Penson

Worldwide, Inc.*, No. 11 Civ. 2098 (N.D. Tex. Aug. 23, 2013) (awarding lodestar multiplier of

1.7) Appendix, Ex. 17 (App. p. 205-06); *In re Dell Sec. Litig.*, 2010 U.S. Dist. LEXIS 58281; *In

re Enron Corp. Sec. Deriv. & "ERISA" Litig.*, 586 F. Supp. 2d 732, 803 (S.D. Tex. 2008) (noting

that "the requested lodestar is reasonable for this efficiently prosecuted case and a multiplier of

5.2 is warranted").

Moreover, courts have granted attorneys' fee requests of 33% of the settlement fund or

more, when that figure is below counsel's lodestar.  *See, e.g., In re IMAX Sec. Litig.*, No. 06 Civ.

6128, 2012 U.S. Dist. LEXIS 108516, at *2 (S.D.N.Y. Aug. 1, 2012) (awarding 33% fee of $12

million settlement fund although lead counsel had 43% discount to lodestar); *In re Pilgrim's

Pride Corp. Sec. Litig.*, No. 08 Civ. 419 (E.D. Tex. May 2, 2012) (awarding fees representing

34% of lodestar) Appendix, Ex. 18 (App. p. 209-16); *In re Giant Interactive Grp. Inc. Sec. Litig.*,

279 F.R.D. 151, 162, 165 (S.D.N.Y. 2011) (awarding 33% fee of $13 million settlement fund

Mitchell Law Group).  Lead Counsel have excluded from their lodestar all time spent working on the fee application, including work on this brief, and all work after September 11, 2013.  Press Decl. ¶54.

[6] The use of current rates to calculate the lodestar figure has been endorsed by the Supreme Court, the Fifth Circuit, and district courts. *See Missouri v. Jenkins*, 491 U.S. 274, 283-84 (1989) (endorsing "an appropriate adjustment for delay in payment" by applying "current" rate); *In re Lawler*,  807 F.2d 1207, 1212 (5th Cir. 1987) ("attorneys' fees may be calculated at the rate prevailing at the time of the application"); *Newby.*, 586 F. Supp. 2d at 779 ("counsel have properly used their current billing rates").

based on negative multiplier); *Fogarazzo v. Lehman Bros., Inc.*, No. 03 Civ. 5194, 2011 WL 671745, at *4 (S.D.N.Y. Feb. 23, 2011) (awarding 33-1/3% fee in $6.75 million settlement although lead counsel had negative lodestar multiplier).

The attorneys' fees requested will compensate counsel for work already performed in this case, and for work remaining to be performed, including making sure that the Settlement is fairly administered and implemented, preparing for and attending the final fairness hearing, and obtaining dismissal of the action. For these reasons and as further discussed below, Lead Counsel's motion for an award of attorneys' fees and reimbursement of expenses should be granted.

## IV.   OTHER FACTORS CONSIDERED BY COURTS IN THE FIFTH CIRCUIT CONFIRM THAT THE REQUESTED FEE IS FAIR AND REASONABLE

While the Fifth Circuit "join[s] the majority of circuits in allowing our district courts the flexibility to choose between the percentage and lodestar methods in common fund cases," district courts are still required to justify their analyses under the weight of the *Johnson* Factors. *Johnson v. Georgia Highway Express*, 488 F.2d 714, 717–20 (5th Cir. 1974). Further, courts in the Fifth Circuit have often used a "blended" or "hybrid" percentage method, which awards a reasonable percentage of the common fund and then uses the *Johnson* factors as a cross-check. *See, e.g.*, *Union Asset Mgmt.*, 669 F.3d at 644 (endorsing "the district courts' continued use of the percentage method cross-checked with the *Johnson* factors"); *Klein v. O'Neal, Inc.*, 705 F. Supp. 2d 632, 675 (N.D. Tex. 2010) (applying the blended percentage method "to avoid deciding whether to follow one method over the other"). Nevertheless, under either the percentage-of-the-common-fund or lodestar approach, the Settlement is fair and reasonable.

A.      **The Weight of the *Johnson* Factors Support Lead Counsel's Request for Attorneys' Fees and Reimbursement of Expenses**

Fifth Circuit courts evaluate requests for attorneys' fees and reimbursement of expenses under the *Johnson* Factors.  488 F.2d at 717–20.  The *Johnson* Factors include the following: 1) the time and labor required; 2) the novelty and difficulty of the questions; 3) the skill requisite to perform the legal service properly; 4) the preclusion of other employment by the attorney due to acceptance of the case; 5) the customary fee; 6) whether the fee is fixed or contingent; 7) time limitations imposed by the client or the circumstances; 8) the amount involved and the results obtained; 9) the experience, reputation, and ability of the attorneys; 10) the "undesirability" of the case; 11) the nature and length of the professional relationship with the client; and 12) awards in similar cases. *Id.* at 717–19.  The Fifth Circuit has permitted district courts to exercise discretion in applying these factors as required by each case's unique circumstances.  *See Brantley v. Surles*, 804 F.2d 31, 325-26 (5th Circuit 1986) ("Our concern is not that a complete litany be given, but that findings be complete enough to assume a review which can determine whether the court has used proper factual criteria in exercising its discretion to fix just compensation.")  As discussed below, each of the *Johnson* factors supports Lead Counsel's motion for an award of attorneys' fees and reimbursement of expenses.

1.      **Substantial Time and Labor Was Involved and Lead Counsel Assumed Great Risk**

Lead Counsel undertook the representation of Lead Plaintiff and the Class in this Action on a wholly contingent basis, investing substantial time and funds to prosecute this Action, without any guarantee of compensation or of recovering out-of-pocket expenses.  There is a real risk of no recovery in complex securities litigation cases such as this one.  In the past few years, circuit courts have routinely upheld dismissals of securities fraud cases and as a result, counsel who was prosecuting those cases received no compensation even after spending thousands of

7

hours.[7]  Indeed, "approximately 90% of Fifth Circuit PSLRA pleading decisions have upheld the dismissal of complaints." *Schwartz*, 2005 U.S. Dist. LEXIS 27077, at *103.

Lead Counsel diligently litigated this Action since November 2012, and to date, Lead Counsel, Liaison Counsel, the Rosen Law Firm, and the Rosen Law Firm's local counsel, the Payne Mitchell Law Group have a collective lodestar of approximately $605,551.50.  Press Decl. ¶¶ 53, 67.

In November 2012, Lead Plaintiff Hillel Hyman retained Lead Counsel after disclosures caused the value DGSE Companies, Inc.'s ("DGSE" or "the Company") common stock to plummet.   After preparing extensive briefing in connection with contested motions for appointment of lead plaintiff, the Court appointed Hyman as Lead Plaintiff and Kirby McInerney as Lead Counsel.  Press Decl. ¶ 17.

Following its appointment, Lead Counsel organized a team of attorneys, including the firm's chief forensic accountant, to begin gathering information in preparation for drafting an amended complaint. *Id.* at ¶¶ 17-18, 25, 51.  However, in light of the limited financial resources available to satisfy any judgment or settlement in this Action, Lead Counsel believed it would be in the best interest of the putative class if settlement negotiations were attempted before incurring the legal expenses associated with filing an amended complaint[8] and drafting motions to dismiss, as well as the related opposition briefs to those motions, not to mention discovery proceedings.

---

[7] *See, e.g.*, *Winer Family Trust v. Queen*, 503 F.3d 319 (3d Cir. 2007); *Key Equity Investors Inc. v. SEL-LEB Mktg, Inc.*, 246 F. App'x 780 (3d Cir. 2007); *Fin. Acquisition Partners LP v. Blackwell*, 440 F.3d 278 (5th Cir. 2006); *In re Merck & Co., Inc. Sec. Litig.*, 432 F.3d 261 (3d Cir. 2005); *In re Cerner Corp. Sec. Litig.*, 425 F.3d 1079 (8th Cir. 2005); *In re Apple Computer, Inc.*, 127 F. App'x 296 (9th Cir. 2005); *In re PEC Solutions, Inc. Sec. Litig.*,  418 F.3d 379 (4th Cir. 2005); *In re Acceptance Ins. Cos. Sec. Litig.*,  423 F.3d 899 (8th Cir. 2005).

[8] Prior to the mediation session, Lead Counsel undertook significant efforts to investigate the factual allegations and draft an amended complaint, which was scheduled to be filed by the Court-ordered deadline of May 24, 2013. *See* Press Decl. at ¶¶ 17-18, 25, 51.  ECF No. 40.

Counsel for all parties participated in the Court-ordered mediation conducted by Judge Stickney on May 13, 2013, just 11 days prior to the Court-ordered deadline for Lead Plaintiff to file the Amended Class Action Complaint.  (ECF Nos. 40-41).  As counsel could not assume that the May 13 mediation would result in a settlement, counsel had worked diligently investigating and drafting an amended complaint, so that the same could be filed on or before the May 24 deadline had a settlement not been reached.  Press Decl. at ¶¶ 17-18, 25, 51.  In connection with the mediation, counsel also prepared a mediation brief that set forth the factual and legal basis for the claims.

The parties failed to reach a settlement at the mediation.  However, shortly thereafter, Judge Stickney submitted a mediator's proposal for settlement of both actions to counsel.  Under the terms of the mediator's proposal, DGSE will pay $1.7 million to settle the claims in this Action.  *Id.* ¶ 19.  On May 20, 2013, Lead Plaintiff and Defendants formally agreed to the terms of the mediator's proposal for settlement.  (ECF No. 43).  On June 6, 2013, the parties filed a joint status report informing the Court of, *inter alia*, the status of the proposed Settlement.  (ECF No. 43).  On July 3, 2013, Lead Plaintiff moved for preliminary approval of the Settlement, certification of a settlement class and approval of the Settlement.  (ECF Nos. 45-46).  The Court granted this request on July 8, 2013.  (ECF No. 49).

Lead Counsel clearly managed the prosecution of this Action to achieve the best result for the Settlement Class in the most efficient manner.  "[S]uch efficiency and effectiveness should be rewarded . . . ." *Schwartz*, 2005 U.S. Dist. LEXIS 27077, at *95-96 (N.D. Tex. Nov. 8, 2005) (citations omitted).  Accordingly, this factor weighs in favor of Lead Counsel's request for attorneys' fees and reimbursement of expenses.

**2.    The Questions Involved in Litigating the Instant Action Were Difficult**

The Fifth Circuit has observed that securities litigation generally is "notoriously difficult and unpredictable." *Maher v. Zapata Corp.*, 714 F.2d 436, 455 (5th Cir.1983).   The Complaint alleges violations of Section 10(b), Rule 10b-5 and 20(a) of the Securities Exchange Act of 1934. Furthermore, Lead Counsel believes that the liability case against Defendants was relatively strong but not without risks.  As more fully discussed in the accompanying Settlement Brief and Press Declaration, *see* Settlement Brief at V.D and Press Decl. at ¶¶ 32-39, Lead Plaintiff and the Class faced substantial hurdles in proving Defendants' liability.  For example, Defendants likely would have raised serious challenges to Lead Plaintiff's proof regarding the elements of scienter under the Fifth Circuit's stringent severe recklessness standard.  *Id.* ¶¶33-36; *see, e.g., Flaherty & Crumrine Preferred Income Fund Inc. v. TXU Corp.*, 565 F.3d 200, 207-08 (5th Cir. 2009) (cited by *Purser v. Coralli*, No. 11 Civ. 03295, 2012 U.S. Dist. LEXIS 166214, at *8 (N.D. Tex. Nov. 21, 2012) and *Prindle v. Lewis*, No. 10 Civ. 1217, 2011 U.S. Dist. LEXIS 103284, at *3 (N.D. Tex. Aug. 24, 2011)).

Similarly, Defendants would also have argued that Lead Plaintiff would be unable to prove loss causation, or that damages that Lead Plaintiff alleged resulted from the fraud were substantially less than Lead Plaintiff maintains.  *See* Press Decl., ¶ 37.  Given the Fifth Circuit's relatively high bar for proving critical issues in this case, such as loss causation and scienter, uncertainty of recovery at trial was especially real in this case despite Plaintiff's Counsel's best efforts.  *See, e.g., In re OCA, Inc. Sec. & Derivative Litig.*, No. 05 Civ. 2165, 2009 U.S. Dist. LEXIS 19210, at *67-68 (E.D. La. Mar. 2, 2009) ("Moreover, Fifth Circuit decisions on causation, pleading and proof at the class certification stage make PSLRA claims particularly difficult in this circuit.").   Therefore, the complexity of this Action supports the request fee award.

10

### 3.   Litigating the Instant Action Required Specialized Experience

In addition to the legal challenges presented by securities litigation, this case involves complex accounting issues that required special experience to properly prosecute and obtain a favorable result for the members of the Settlement Class.  In addition to Lead Counsel's own experience litigating securities class actions, Lead Counsel relied upon its in-house chief forensic accountant to analyze the complex accounting relating to the DGSE financial restatement and accounting practices, and to provide Lead Counsel with a basis to allege scienter despite the fact DGSE had in part attributed the financial restatements to issues such as the improper setup of accounting software.  Press Decl.  ¶¶ 33-36.

Accordingly, Lead Counsel's efforts assisted in achieving the Settlement under difficult circumstances.  This factor weights in favor of Lead Counsel's request for attorney's fees and reimbursement of expenses.

### 4.   At Times, Lead Counsel Was Precluded From Other Employment

This *Johnson* factor considers whether the possibility of other employment was foreclosed because of conflicts of interest which occur from the representation, and the fact that time spent on a client's behalf cannot be devoted to other cases.  *Johnson*, 488 F.2d at 718. Although conflicts originating from this representation have not prevented Lead Counsel from working on other matters, there have been numerous instances where this Action has required the devotion of substantial amounts of time that foreclosed work on other matters.  *See, generally*, *Billitteri v. Sec. Am., Inc.*, No. 09 Civ. 01568-F, 2011 U.S. Dist. LEXIS 93907, at *37 (N.D. Tex. Aug. 4, 2011) ("the parties were forced to act on an extremely tight time schedule at certain points of this litigation, particularly in the months leading up to the submission of this settlement for approval").   Therefore, this factor weighs in favor of Lead Counsel's request for attorneys' fees and reimbursement of expenses.

11

### 5.   Lead Counsel's Request Is Similar to the Customary Fees In Similar Cases

Lead Counsel respectfully seeks an award of attorneys' fees in the amount of 33% of the Settlement Amount, or $561,000.00, plus any accrued interest.  According to a January 2013 NERA Consulting study, "[f]or settlements below $5 million, . . . median plaintiffs' attorneys' fees are 34.2% of the settlement."  *See* Renzo Comolli, Sukaina Klein, Ronald I. Miller and Svetlana Starykh, *Recent Trends in Securities Class Action Litigation: 2012 Full-Year Review*, NERA, at 34 (January 2013) ("NERA Report")  Appendix, Ex. 9 (App. p. 114).  This nationwide percentage comports with awards granted by Texas federal courts.  *Schwartz*, 2005 U.S. Dist. LEXIS 27077, at *101 ("[t]he vast majority of Texas federal courts and courts in this District have awarded fees of 25%-33% in securities class actions."  Thus, Lead Counsel's request for 33% of the Settlement Fund is similar to awards granted in other securities class action cases.[9] Therefore, this factor supports Lead Counsel's request for attorneys' fees.

### 6.   Lead Counsel Accepted the Instant Case on a Wholly Contingent Basis, With No Guarantee of any Recovery or Reimbursement of Expenses

Here, Lead Counsel undertook representation of Lead Plaintiff and the Class on a wholly contingent basis, investing substantial time and funds to prosecute this Action without any guarantee of compensation or of recovering out-of-pocket expenses, which total $13,351.74 Press Decl. at ¶¶ 49, 61, 70, 76.  Plaintiffs' counsel, including Lead Counsel, Liaison Counsel,

---

[9] *See, e.g. Serio v. Wachovia Sec., LLC*, No. 06-4681, 2009 WL 900167, at *10-12 (D.N.J. Mar. 31, 2009) (awarding 32% of $1,005,000 settlement fund); *In re Datatec Sys., Inc. Sec. Litig.*, No. 04 Civ. 525, 2007 WL 4225828, at *8 (D. N.J. Nov. 28, 2007) (awarding fee award of 30% of $750,000 settlement fund; noting that the fees were "within the range of privately negotiated contingent fees"); *In re Safety Components, Inc. Sec. Litig.*, 166 F. Supp. 2d 72, 102 (D.N.J. 2001) (33 1/3% of $ 4.5 million); *In re Ravisent Techs., Inc. Sec. Litig.*, No. Civ. A. 00-cv-1014, 2005 WL 906361, at *11, 15 (E.D. Pa. Apr. 18, 2005) (awarding 33-1/3% of $7 million settlement fund); *Bell v. Fore Sys. Inc.*, No. 97-1265, 2003 U.S. Dist. LEXIS 26676, at *11 (W.D. Pa. Dec. 22, 2003) (awarding 33-1/3% of $11,700,000 fund in securities class action); *In re Corel Corp. Inc. Sec. Litig.*, 293 F. Supp. 2d 484, 495-97 (E.D. Pa. 2003) (approving 33-1/3 % fee in a $7 million settlement and awarding attorneys' fees of $2.3 million); *In re Unisys Corp. Sec. Litig.*, No. 99-5333, 2001 WL 1563721 at *3 (E.D. Pa. Dec. 6, 2001) (awarding 33% of $5,750,000 settlement fund); *In re Eng'g Animation Sec. Litig.*, 203 F.R.D. 417, 423 (S.D. Iowa 2001) (33-1/3% of $ 7.5 million).

and non-lead plaintiffs' counsel including the Rosen Law Firm and its local counsel, the Payne Mitchelll Law Group, devoted 1,162.70 hours to the Action.[10] "In numerous class actions . . . plaintiffs' counsel have expended thousands of hours and advanced significant out-of-pocket expenses and received no remuneration whatsoever." *In re Marsh & McLennan Cos., Inc. Sec. Litig.*, No. 04 Civ. 8144 (CM), 2009 U.S. Dist. LEXIS 120953, at *54 (S.D.N.Y. Dec. 23, 2009).

There is a real risk of no recovery in complex securities litigation cases such as this one. Over the last four years, more than 45% of all securities class actions have been dismissed on motions to dismiss.[11] In the 5th Circuit, more than 90% of these dismissals have been upheld,[12] and when the cases went to trial, defendants were as likely as plaintiffs to prevail.[13] Moreover, "even a victory at trial does not guarantee recovery." *In re Veeco Instruments Secs. Litig.*, No. 05 MDL 01695, 2007 U.S. Dist. LEXIS 85629, *22 (S.D.N.Y. Nov. 7, 2007)[14]

Lead Counsel's expectation of any fee award or expense reimbursement has always been contingent upon the result achieved and the Court's discretion in making an award. This consideration supports an award of attorneys' fees and reimbursement of expenses.

---

[10] Lead Counsel's efforts do not end with approval of this Settlement. Indeed, Lead Counsel will continue to supervise the claims administration process in the coming months and, upon completion of such process, prepare and file a motion for distribution of the Net Settlement Fund to members of the Class.

[11] *See* NERA Report at 23, Appendix, Ex. 9 (App. p. 113).

[12] *Schwartz*, 2005 U.S. Dist. LEXIS 27077, at *103 ("approximately 90% of Fifth Circuit PSLRA pleading decisions have upheld the dismissal of complaints.") .

[13] *Id.* at 37.

[14] *See,also*, *In re BankAtlantic Bancorp, Inc. Sec. Litig.*, No. 07 Civ. 61542, 2011 WL 1585605, at *6, *20 (S.D. Fla. Apr. 25, 2011) (although the jury found that certain statements violated section 10(b) of the Exchange Act, the court entered judgment as a matter of law in favor of the defendants as to all claims and statements, on the ground that plaintiffs had failed to present evidence from which the jury could reasonably find loss causation); *See, e.g., Robbins v. Koger Props. Inc.*, 116 F.3d 1441, 1449 (11th Cir. 1997) (reversing $81 million judgment in plaintiffs' favor and entering judgment in favor of defendant); *Anixter v. Home-Stake Prod. Co.*, 77 F.3d 1215, 1233 (10th Cir. 1996) (overturning plaintiffs' verdict obtained after two decades of litigation and remanding for new trial in light of intervening Supreme Court decision in *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164 (1994)).

7. **Circumstantial Time Limitations, Most Notably DGSE's Limited Insurance Coverage and Other Resources Available for Settlement Required Lead Counsel to Secure a Favorable Settlement**

Prior to filing an amended complaint, the exigencies of the Defendants' limited insurance coverage and financial condition compelled the parties to enter into settlement negotiations, and they requested the Court's permission to have Judge Stickney serve as a mediator.  (ECF No. 37). Following a hard fought tripartite mediation involving the Derivative Plaintiffs, Judge Stickney's proposal became the basis for the Settlement.  Press Decl. ¶ 25.  Lead Counsel's actions resulted in a favorable resolution of the Action on behalf of Lead Plaintiff and absent Class Members, who may have recovered a substantially reduced or no recovery at all had the Action proceeded. Therefore, this factor further supports an award of attorneys' fees and reimbursement of expenses.

8. **Lead Counsel Obtained an Excellent Result for the Class**

Lead Counsel obtained a benefit of $1.7 million cash recovery for the Settlement Class. As set forth above, and in the Settlement Brief at V.E and in the Press Declaration at ¶¶ 3, 60-65, this is a significant benefit given the risks of litigation.  *Schwartz*, 2005 U.S. Dist. LEXIS 27077, at \*106 ("[b]y any measure, the settlement represents an excellent resolution of this Litigation, as it includes significant relief for the vast majority of damaged class members, including cash for those damaged shareholders who suffered out of pocket losses"). [15]   If the Action had continued, Lead Plaintiff would have faced substantial obstacles in proving scienter, demonstrating that the Class' losses were caused by Defendants' misconduct, and proving the amount of class-wide damages. Additionally, Defendants' limited insurance coverage and the Company's financial

---

[15] Courts recognize that overemphasizing "the amount [] of hours spent on a contingency fee case would penalize counsel for obtaining an early settlement and would distort the value of the attorneys' services."  *In re Harrah's Entertainment*, No. 95 Civ. 3925, 1998 U.S. Dist. LEXIS 18774, at \*15 (E.D. La. Nov. 24, 1998).

condition increased the likelihood that class members would have recovered no (or substantially reduced) damages had the litigation continued.

Despite the exigencies of these circumstances, the Settlement's $1.7 million cash recovery would enable Class Members to recover approximately 30% of class-wide damages of $5.68 million.   Press Decl., ¶ 42.[16]   Because the median securities class action settlement recovered 17.3% of potential class damages in 2012, the Settlement is well above the median. "Securities Class Action Settlements: 2012 Review and Analysis" ("Cornerstone Report")   *See* Appendix, Ex. 8 (App. p. 107).   These factors weigh heavily in favor of an award of attorneys' fees and reimbursement of expenses.

### 9. The Action Required Significant Skill of Experienced Counsel to Bring the Action to a Successful Conclusion

As noted above, litigation of securities class actions requires counsel highly trained in class action matters and in the specialized issues that federal securities cases present.   All of the lawyers representing the Class possess these attributes, making their participation in this matter a significant value-addition for the Class.   The skill of counsel must be commensurate with the novelty and complexity of the issues in the case, as well as the skill of the opposing counsel. *See Walco Invs. Inc. v. Thenen*, 975 F. Supp. 1468, 1472 (S.D. Fla. 1997) (explaining that "[g]iven the quality of defense counsel from prominent national law firms, the Court is not confident that attorneys of lesser aptitude could have achieved similar results").   Lead Counsel has extensive experience in complex litigation and, in particular, with securities litigation.   Lead Counsel's

---

[16] The 30% figure assumes that all eligible class members file claims to share in the settlement recovery. Historically, substantially fewer than 100% of eligible class members participate in securities class action settlements.  If that turns out to be the case here, those Class Members that file valid claims will receive more than 30% of their potential damages - - perhaps substantially more.

record and accomplishments, detailed in the firm resume, speaks for itself.  Appendix, Ex. 11 (App. pp. 120-152).

In assessing the quality of representation by Lead Counsel, the Court also should consider the quality of the opposition.  *Billitteri*, 2011 U.S. Dist. LEXIS 93907, at *36 (N.D. Tex. Aug. 4, 2011) (citing *Schwartz*, 2005 U.S. Dist. LEXIS 27077, at *100 (N.D. Tex. Nov. 8, 2005)) ("The ability of plaintiffs' counsel to obtain such a favorable settlement for the Class in the face of such formidable legal opposition confirms the superior quality of their representation.").  As noted above, Defendants are represented by extremely able and diligent attorneys who pursued their clients' interests with great skill, causing Lead Counsel to bring all its experience and ability to bear in opposition.  Counsel for Defendants, Thompson & Knight LLP and Fulbright & Jaworski LLP, are two of the most well-respected law firms in the country, have relevant expertise and experience in complex litigation, including actions brought under the PSLRA.  Press Decl. ¶ 59. That Lead Counsel negotiated such a favorable settlement when Defendants were represented by such high caliber legal advocates militates in favor of granting the requested award.

Lead Counsel strongly recommends this Settlement based on: (1) its extensive and broad based experience litigating and successfully resolving class action PSLRA cases; and (2) after diligently investigating the claims and fully exploring the claims and defenses during the mediation process and while negotiating a potential settlement.

### 10.   The "Undesirability" of the Action Supports Lead Counsel's Request for Attorneys' Fees

"Class Action cases that carry with them elevated risks, such as the present litigation and that also require lengthy investigation through informal discovery, not to mention a possibility of no recovery, certainly speaks to the undesirability of a case."  *Schwartz*, 2005 U.S. Dist. LEXIS 27077, at *103) (citing *Di Giacomo v. Plains All Am. Pipeline*, No. 99 Civ. 422001, 2001 U.S.

16

Dist. LEXIS 25532, at *35 (S.D. Tex. Sept. 18, 2001)).  Additionally, for the reasons discussed above, "securities litigation on the whole is 'notoriously difficult and unpredictable.'"  *In re Dell Inc., Sec. Litig.*, No. 06 Civ. 726, 2010 U.S. Dist. LEXIS 58281, at *23 (W.D. Tex. June 10, 2010) (quoting *Maher v. Zapata Corp.*, 714 F.2d 436, 455 (5th Cir. 1983)).  Lead Counsel assumed this case on a contingency fee basis, and pursued this Action despite the high risk of little or no recovery "in the absence of any deep pocket defendant."  *Newby*, 586 F. Supp. 2d at. 797.  Additionally, because Lead Counsel does not seek an increase in its fee award to account for these risks, this factor remains relevant.  *In re OCA*, 2009 U.S. Dist. LEXIS 19210, at *72.

**11.  Lead Counsel's Relationship With Lead Plaintiff Supports Lead Counsel's Request for Attorneys' Fees**

In this case, Lead Plaintiff lost a significant amount of money as a result of his investment losses in DGSE Common Stock. (ECF No. 12).  Lead Plaintiff retained Lead Counsel to move for appointment as Lead Plaintiff, monitored the litigation, and monitored Lead Counsel's conduct throughout the prosecution of the Action.  Lead Plaintiff, as a representative of the absent class of DGSE's investors, thus fulfilled his fiduciary duties to the Settlement Class.  He supports the Settlement as well as Lead Counsel's request for 33% of the Settlement Fund.  These facts weigh in favor of an award of attorneys' fees and reimbursement of expenses.

**12.  Lead Counsel's Relationship Request For Fees Is Consistent With Awards in Similar Cases**

Courts in the Fifth Circuit have often awarded fees of approximately one-third in common fund cases.  *See, e.g.*, *Friedman v. Penson Worldwide, Inc.*, No. 11 Civ. 2098 (N.D. Tex. Aug. 23, 2013); *Burford v. Cargill, Inc.*, No. 05 Civ. 0283, 2012 U.S. Dist. Lexis, at *6 (W.D. La. Nov. 8, 2012); *In re Combustion, Inc.*, 968 F. Supp. 1116, 1133 (W.D. La. 1997) (internal quotations omitted) (approving fees in the amount of one-third of the $27.5 million settlement fund); *Sims v. Shearson Lehman Bros., Inc.*, [1993-1994 Transfer Binder] Fed. Sec. L.

Rep. (CCH) P 98,134, at 98,976 (N.D. Tex. Nov. 29, 1993) (approving fee of 33-1/3% of $30 million settlement in securities case).

According to the Manual for Complex Litigation published by the Federal Justice Center, attorneys' fees awarded under the percentage method generally (that is, beyond just securities class actions) are between 25% and 30% of the common fund. MANUAL FOR COMPLEX LITIGATION § 14.121 (4th ed. 2013). Fees awarded in securities and antitrust common fund cases are typically between 25% and 33% of the settlement fund. 4 NEWBERG ON CLASS ACTIONS § 14:6 (4th ed. 2013). Courts in the Fifth Circuit and elsewhere have long recognized that, although attorneys' fees are paid directly to counsel, these fees are best understood as an aspect of the class' recovery. *Heartland,* 851 F. Supp. 2d, 1078 (citing *Johnston v. Comerica Mortg.Grp.*, 83 F.3d 241, 245-46 (8th Cir. 1996)). Considering these authorities, an award of attorneys' fees of 33% is consistent with other common fund cases and should be awarded here.

**13.    The Reaction of the Settlement Class Supports the Requested Fee**

Beginning on July 26, 2013, Notices were mailed to the Settlement Class informing them that Lead Counsel would seek an award of attorneys' fees not to exceed 33% of the Settlement Fund, and unreimbursed expenses not to exceed $15,000.  As of September 16, 2013, under the direction of Lead Counsel, the Claims Administrator has mailed more than 1,329 packets containing approved Notice and Claim forms to potential Members of the Settlement Class, published the Summary Notice of the Settlement in *Investor's Business Daily* on July 26, 2013, and transmitted the same over *Business Wire* also on July 26, 2013.  Appendix, Ex. 3 (App. p. 63).  To date, no objections to the amount of attorneys' fees and expenses set forth in the Notice have been received, and no Class Members have opted out of the Settlement Class.  While time to object to Lead Counsel's application for attorneys' fees and expenses does not expire until September 30, 2013, pursuant to the Court's scheduling order, Lead Counsel will submit a

response to all timely objections on October 14, 2013. These facts weigh heavily in favor of an award of attorneys' fees and reimbursement of expenses.

### B.    Lead Counsel's Expenses Are Reasonable and Should Be Reimbursed

Lead Counsel also requests reimbursement for the reasonable and necessary expenses which they advanced to prosecute this Action. Litigation expenses are routinely paid from common funds upon the successful conclusion of class actions. *Heartland Payment Sys.*, 851 F. Supp. 2d at 1089 (citing *Radosti v. Envision EMI, LLC*, 760 F. Supp. 2d 73, 79 (D.D.C. 2011)). Plaintiffs' Counsel seek reimbursement for expenses in the amount of $13,351.74 in litigation expenses. Press Decl. ¶¶ 70-75. The Notice informed Settlement Class Members that Lead Counsel would seek reimbursement of expenses of up to $15,000. The expenses are of the type typically billed by attorneys to paying clients in the marketplace, and include such costs as copying fees, computerized research, and travel in connection with this case, to assist Lead Counsel through this Action. *Id.* at ¶ 72.

As is the case with Lead Counsel's request for attorneys' fees, to date, no objections have been filed by any Class Members to Lead Counsel's request for reimbursement of litigation expenses. All of the expenses were reasonable and necessary for the successful prosecution of this case and should be approved.

### V.    CONCLUSION

For the reasons set forth above, Lead Counsel submits that this fee request is fair and reasonable. It satisfies the guidelines of *Johnson*, especially in light of the complicated nature of the case, and the time, effort, and skill required to litigate this Action and reach this Settlement. Accordingly, for the foregoing reasons, Lead Counsel respectfully request that this Court enter the proposed Judgment Approving Class Action Settlement awarding: (1) attorneys' fees of 33% of the Settlement Amount of $1,700,000 or $561,000.00, plus any accrued interest; and (2)

reimbursement of Plaintiffs' Counsel litigation expenses in the amount of $13,351.74, plus any

accrued interest.

DATED:   New York, New York
            September 16, 2013        Respectfully Submitted,


                                       **KIRBY McINERNEY LLP**


                                       By: _____/s/ Ira M. Press_____
                                          Ira M. Press, Esq.
                                             New York Attorney Registration No. 2319481
                                             ipress@kmllp.com (*admitted pro hac vice*)
                                          825 Third Avenue
                                          New York, New York 10022
                                          Telephone:  (212) 371-6600
                                          Facsimile:   (212) 751-2540

                                       *Counsel for Lead Plaintiff Hillel Hyman and the Class*

                                       **GRUBER HURST JOHANSEN HAIL SHANK, LLP**
                                          Mark A. Shank
                                             Texas State Bar No. 18090800
                                             mshank@ghjhlaw.com
                                          Greg P. McAllister
                                             Texas State Bar No. 24071191
                                             gmcallister@ghjhlaw.com
                                          1445 Ross Ave
                                          Suite 2500
                                          Dallas, TX 75202-2711
                                          Telephone: (214) 855-6800
                                          Facsimile: (214) 855-6808

                                       *Liaison Counsel for Lead Plaintiff Hillel Hyman and the
                                       Class*


                                             20

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of the foregoing document was forwarded to all counsel of record through the Court's ECF system on September 16, 2013.

*/s/ Ira M. Press*
Ira M. Press, Esq.

21

# TAB 7

Case 4:19-cv-00509-B Document 65-9 Filed 07/02/21 in TXSD Page 96 of 1452

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
**FILED**

**OCT 2 1 2013**

CLERK, U.S. DISTRICT COURT
By_____
Deputy

GRANT BARFUSS, on behalf of himself and all others similarly situated,
          Plaintiffs

v.

DGSE COMPANIES, INC.; L.S. SMITH, JOHN BENSON, AND WILLIAM OYSTER,
          Defendants

No. 12 Civ. 3664 (JJB)
ECF Case

## JUDGMENT APPROVING CLASS ACTION SETTLEMENT

WHEREAS, a class action is before this Court entitled *Grant Barfuss v. DGSE Companies, Inc.*, No. 12 Civ. 3664 (N.D. Tex.) (JJB) (the "Action"); and

WHEREAS, Hillel Hyman (or "Lead Plaintiff"), individually and on behalf of the Settlement Class (as hereinafter defined) and defendants DGSE Companies, Inc. ("DGSE"), L.S. Smith, John Benson and William Oyster (collectively, the "Defendants") have entered into a Stipulation and Agreement of Settlement dated July 3, 2013 (the "Stipulation") that sets forth the terms and conditions of the proposed settlement, which provides for a complete dismissal on the merits and with prejudice of the claims asserted in the Action against all the Defendants upon the terms and conditions set forth in the Stipulation, subject to the approval of this Court (the "Settlement"); and

WHEREAS, unless otherwise defined in this Judgment, the capitalized terms herein shall have the same meaning as they have in the Stipulation; and

WHEREAS, by Order dated July 8, 2013 (the "Preliminary Approval Order"), this Court (a) preliminarily approved the Settlement; (b) certified the Settlement Class for settlement purposes only; (c) ordered that notice of the proposed Settlement be provided to potential Settlement Class

Case 3:12-cv-03064-B Document 59 Filed 10/21/13 Page 2 of 14 PageID 1207

Members; (d) provided Settlement Class Members with the opportunity either to exclude themselves from the Settlement Class or to object to the proposed Settlement; and (e) scheduled a hearing regarding final approval of the Settlement; and

WHEREAS, Lead Counsel has conducted confirmatory discovery; and

WHEREAS, due and adequate notice has been given to the Settlement Class; and

WHEREAS, the Court conducted a hearing on October 21, 2013 (the "Settlement Hearing") to consider, among other things, (a) whether the terms and conditions of the Settlement are fair, reasonable and adequate, and in the best interest of Lead Plaintiff and the other Settlement Class Members, and should therefore be approved; (b) whether a judgment should be entered dismissing the Action with prejudice as against all the Defendants; (c) whether the proposed Plan of Allocation for the proceeds of the Settlement is fair and reasonable and should be approved; and (d) whether the motion by Lead Counsel for an award of attorneys' fees and reimbursement of Litigation Expenses should be approved; and

WHEREAS, the Court having reviewed and considered the Stipulation, all papers filed and proceedings held herein in connection with the Settlement, all oral and written comments received regarding the proposed Settlement, and the record in the Action, and good cause appearing therefor;

NOW THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED:

1. **Jurisdiction:** The Court has jurisdiction over the subject matter of the Action, and all matters relating to the Settlement, as well as personal jurisdiction over all of the Settling Parties and each of the Settlement Class Members.

2. **Incorporation of Settlement Documents:** This Judgment incorporates and makes a part hereof: (a) the Stipulation filed with the Court on July 3, 2013; and (b) the Notice and the Summary Notice, both of which were filed with the Court on July 3, 2013.

2

3.    **Settlement Class Certification:** The Court hereby affirms its determinations in the Preliminary Approval Order certifying, for the purposes of settlement only, the Action as a class action pursuant to Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of the following Settlement Class: (a) a class of all Persons who purchased, or otherwise acquired DGSE common stock from April 15, 2011 through and including April 17, 2012, inclusive, and were damaged thereby. Excluded from the Settlement Class are all Defendants in the Action and their respective current or former Section 16 Officers, directors, Immediate Family members, legal representatives, heirs, successors or assigns, and any entity in which any Defendant has or had a controlling interest. [Also excluded from the Settlement Class are the Persons who timely and validly requested exclusion from the Settlement Class in accordance with the requirements set forth in the Notice, as listed on Exhibit 1 hereto.] All persons who have not made their objections to the Settlement in the manner provided in the Notice are deemed to have waived any objections by appeal, collateral attack or otherwise.

4.    **Adequacy of Representation:** Pursuant to Rule 23 of the Federal Rules of Civil Procedure, and for the purposes of settlement only, the Court hereby affirms its determinations in the Preliminary Approval Order certifying Hillel Hyman as class representative on behalf of the Settlement Class and appointing Lead Counsel as lead counsel for the Settlement Class. Lead Plaintiffs and Lead Counsel have fully and adequately represented the Settlement Class, both in terms of litigating this Action and for purposes of entering into and implementing the Settlement, and meet the requirements of Rules 23(a)(4) and 23(g) of the Federal Rules of Civil Procedure, respectively.

5.    **Notice:** The Court finds that the dissemination of the Notice and the publication of the Summary Notice: (a) were implemented in accordance with the Preliminary Approval Order;

3

(b) constituted the best notice practicable under the circumstances; (c) constituted notice that was reasonably calculated, under the circumstances, to apprise Settlement Class Members (i) of the pendency of the Action, (ii) of the effect of the Settlement (including the Releases provided for therein), (iii) of Lead Counsel's motion for an award of attorneys' fees and reimbursement of Litigation Expenses, (iv) of their right to object to any aspect of the Settlement, the Plan of Allocation and/or Lead Counsel's motion for attorneys' fees and reimbursement of Litigation Expenses, (v) of their right to exclude themselves from the Settlement Class, and (vi) of their right to appear at the Settlement Hearing; (d) constituted due, adequate and sufficient notice to all Persons entitled to receive notice of the proposed Settlement; and (e) satisfied the requirements of Rule 23 of the Federal Rules of Civil Procedure, Section 21D(a)(7) of the Securities Exchange Act of 1934, 15 U.S.C. § 78u-4(a)(7) as amended by the Private Securities Litigation Reform Act, due process, the Rules of the Court and all other applicable law and rules.

6.      **Final Settlement Approval and Dismissal of Claims:**  Pursuant to, and in accordance with, Rule 23 of the Federal Rules of Civil Procedure, this Court hereby fully and finally approves the Settlement set forth in the Stipulation in all respects (including, without limitation, the Settlement Amount, the Releases provided for therein, including the release of the Released Claims as against the Released Defendant Persons, and the dismissal with prejudice of claims against the Defendants), and finds that the Settlement is, in all respects, fair, reasonable and adequate, and is in the best interests of Lead Plaintiffs and the other Settlement Class Members. The Settling Parties are directed to implement, perform and consummate the Settlement in accordance with the terms and provisions contained in the Stipulation.

7.      All of the claims asserted in the Action against all the Defendants by Lead Plaintiffs and the other Settlement Class Members are hereby fully, finally and forever compromised, settled,

released, resolved, relinquished, waived, discharged and dismissed, on the merits and with prejudice as of the Effective Date of the Settlement. The Settling Parties shall bear their own costs and expenses, except as otherwise expressly provided in the Stipulation.

8. **Binding Effect:** The terms of the Stipulation and of this Judgment shall be forever binding on the Defendants, Lead Plaintiffs and all other Settlement Class Members (regardless of whether or not any individual Settlement Class Member submits a Claim Form or seeks or obtains a distribution from the Net Settlement Fund), as well as their respective heirs, executors, administrators, predecessors, successors and assigns. All Persons who have failed to properly file timely and valid requests for exclusion from the Settlement Class in accordance with the requirements set forth in the Notice (exclusive of the persons and entities as listed on Exhibit 1 annexed hereto who submitted timely and valid exclusion requests), release and forever discharge the Releasees from all Released Claims as provided in the Stipulation.

9. **Releases:** The releases as set forth in Paragraphs 5 and 6 of the Stipulation, together with the definitions contained in Paragraph 1 of the Stipulation relating thereto, are expressly incorporated herein in all respects. Accordingly, this Court orders that:

(a) Without further action by anyone, and subject to Paragraph 10 below, upon the Effective Date, Lead Plaintiff and each of the other Settlement Class Members, on behalf of themselves, their heirs, executors, administrators, predecessors, successors, affiliates and assigns, shall be deemed to have, and by operation of law and of this Judgment shall have, fully, finally and forever compromised, settled, released, resolved, relinquished, waived, discharged and dismissed each and every Released Claim against the DGSE Defendants, John Benson, and all other Released Defendant Persons, and shall forever be enjoined from prosecuting any or all of the Released Claims against any Released Defendant Persons.

5

[This release shall not apply to any Person who has timely and validly requested exclusion from the Settlement Class in accordance with the requirements set forth in the Notice, as listed on Exhibit 1 hereto]; and

(b) Without further action by anyone, and subject to Paragraph 10 below, upon the Effective Date, each of the DGSE Defendants, John Benson, and each of the other Released Defendant Persons, on behalf of themselves, their heirs, executors, administrators, predecessors, successors, affiliates and assigns, shall be deemed to have, and by operation of law and of this Judgment shall have, fully, finally and forever compromised, settled, released, resolved, relinquished, waived, discharged and dismissed each and every of the Released Defendant Persons' Claims against all of the Plaintiff-Related Releasees and all claims and causes of action of every nature and description, whether known claims or Unknown Claims, whether arising under federal, state, common or foreign law, that arise out of or relate in any way to the institution, prosecution, or settlement of the claims against each of the DGSE Defendants, John Benson, and each of the Released Defendant Persons, and shall forever be enjoined from prosecuting any or all of the Released Defendant Persons' Claims against any of the Plaintiff-Related Releasees. [This release shall not apply to any Person who has timely and validly requested exclusion from the Settlement Class in accordance with the requirements set forth in the Notice, as listed on Exhibit 1 hereto].

10. Notwithstanding Subparagraphs 9(a) – (b), above, nothing in this Judgment shall bar any action by any of the Settling Parties to enforce or effectuate the terms of the Stipulation or this Judgment, nor shall this Judgment alter the rights between and among the DGSE Defendants or John Benson.

11. **Complete Bar Order:**

(a)    Any and all Persons are permanently barred, enjoined and restrained, to the fullest extent permitted by applicable law, from commencing, prosecuting or asserting any claim for indemnity or contribution against any Released Defendant Person (or any other claim against any Released Defendant Person where the alleged injury to such Person is that Person's actual or threatened liability to the Settlement Class or a Settlement Class Member in the Action), based upon, arising out of or related to the Released Claims, whether arising under state, federal or foreign law, as claims, cross-claims, counterclaims or third-party claims, whether asserted in the Action, in this Court, in any federal or state court, or in any other court, arbitration proceeding, administrative agency or other forum in the United States or elsewhere. However, with respect to any judgment that the Settlement Class or a Settlement Class Member may obtain against such Person based upon, arising out of or relating to any Released Claim belonging to the Settlement Class or a Settlement Class Member, that Person shall be entitled to a credit of the greater of (i) an amount that corresponds to the percentage of responsibility of the Released Defendant Persons for the loss to the Settlement Class or the Settlement Class Member or (ii) the amount paid by or on behalf of the DGSE Defendants to the Settlement Class or the Settlement Class Member for common damages;

(b)    Each and every Released Defendant Person is hereby permanently barred, enjoined and restrained, to the fullest extent permitted by applicable law, from commencing, prosecuting or asserting any claim for contribution as outlined in the PSLRA;

(c)    Nothing in this Complete Bar Order shall prevent a putative Settlement Class Member who validly requested an exclusion from the Settlement Class from pursuing any

7

Released Claim against any Released Defendant Person. If any putative Settlement Class Member who validly requests exclusion from the Settlement Class pursues any such Released Claim against any Released Defendant Person, nothing in this Complete Bar Order or in the Stipulation shall operate to preclude such Released Defendant Person from asserting any claim of any kind against such putative Settlement Class Member (or seeking contribution or indemnity from any Person, including any co-defendant in the Action, in respect of the claim of such putative Settlement Class Member who validly requests exclusion from the Settlement Class);

(d)     Notwithstanding anything to the contrary in this Complete Bar Order, in the event that any Person (for purposes of this provision, a "petitioner") commences against any of the Released Defendant Persons any action asserting a claim that is based upon, arises out of or relates to any Released Claim belonging to the Settlement Class or a Settlement Class Member, including, but not limited to, any claim that is based upon, arises out of or relates to the Action, or the transactions and occurrences referred to in the Class Action Complaint, and such claim is not barred by a court pursuant to this Complete Bar Order or is not otherwise barred by the Complete Bar Order, the Complete Bar Order shall not bar claims by that Released Defendant Person against (i) such petitioner; (ii) any Person who is or was controlled by, controlling or under common control with the petitioner, or whose assets or estate are or were controlled, represented or administered by the petitioner, or as to whose claims the petitioner has succeeded; and (iii) any Person that participated with any of the Persons described in items (i) and (ii) of this provision in connection with the conduct, transactions or occurrences that are the subject of the claim brought against the Released Defendant Person(s), or any Person that was involved in the issues and damages alleged by

the petitioner. Nothing in this paragraph shall be deemed to create a claim or cause of action against a petitioner or any other Person described in this paragraph.

12.     **Rule 11 Findings:** The Court finds and concludes that the Settling Parties and their respective counsel have complied in all respects with the requirements of Rule 11 of the Federal Rules of Civil Procedure in connection with the commencement, maintenance, prosecution, defense and settlement of the Action.

13.     **No Admissions:** Neither this Judgment nor the Stipulation or its negotiations or any proceedings connected with it:

(a)     shall be offered against DGSE Defendants, John Benson, or any of the Released Defendant Persons as evidence of, or construed as, or deemed to be evidence of any presumption, concession or admission by any of the Released Defendant Persons with respect to the truth of any fact alleged by Lead Plaintiff or the validity of any claim that was or could have been asserted or the deficiency of any defense that has been or could have been asserted in this Action or in any litigation, or of any liability, negligence, fault or other wrongdoing of any kind of any of the Released Defendant Persons;

(b)     shall be offered against DGSE Defendants, John Benson, or any of the Released Defendant Persons as evidence of a presumption, concession or admission of any fault, misrepresentation or omission with respect to any statement or written document approved or made by DGSE Defendants, John Benson, or any of the Released Defendant Persons, or by DGSE Defendants or any of the Released Defendant Persons against Lead Plaintiff or any other Settlement Class Members as evidence of any infirmity in the claims of Lead Plaintiff or the other Settlement Class Members;

9

(c)     shall be offered by Lead Plaintiff against DGSE Defendants, John Benson, or any of the Released Defendant Persons, or by DGSE Defendants or any of the Released Defendant Persons against the Lead Plaintiff or any other Settlement Class Members, as evidence of a presumption, concession or admission with respect to any liability, negligence, fault or wrongdoing of any kind, in any other civil, criminal or administrative action or proceeding, other than such proceedings as may be necessary to effectuate the provisions of the Stipulation; provided, however, that the DGSE Defendants, John Benson, any other Released Defendant Person, Lead Plaintiffs, the other Settlement Class Members and their respective counsel may refer to the Stipulation to effectuate the protections from liability granted thereunder or otherwise to enforce the terms of the Settlement;

(d)     shall be construed by any of the Settling Parties against DGSE Defendants, John Benson, or any of the Released Defendant Persons, Lead Plaintiffs or any other Settlement Class Members as an admission, concession or presumption that the consideration to be given under the Settlement represents the amount which could be or would have been recovered after trial; and

(e)     shall be construed by any of the Settling Parties against Lead Plaintiffs or any other Settlement Class Members as an admission, concession or presumption that any of their claims are without merit, that DGSE Defendants, John Benson, or any of the Released Defendant Persons had meritorious affirmative defenses, or that damages recoverable under the Class Action Complaint would not have exceeded the Settlement Amount.

14.     **Retention of Jurisdiction:** Without affecting the finality of this Judgment in any way, this Court retains continuing and exclusive jurisdiction over: (a) the Settling Parties for purposes of the administration, interpretation, implementation and enforcement of the Settlement;

10

(b) the disposition of the Settlement Fund; (c) any motion for an award of attorneys' fees and/or Litigation Expenses by Lead Counsel in the Action that will be paid from the Settlement Fund; (d) any motion to approve the Plan of Allocation; (e) any motion to approve the distribution of the Net Settlement Fund to Authorized Claimants; and (f) the Settlement Class Members for all matters relating to the Action.

15. **Plan of Allocation:** Pursuant to and in full compliance with Rule 23 of the Federal Rules of Civil Procedure, the Court finds and concludes that due and adequate notice was directed to all Persons who are Settlement Class Members advising them of the Plan of Allocation and of their right to object thereto, and a full and fair opportunity was given to all Persons who are Settlement Class Members to be heard with respect to the Plan of Allocation. The Court finds that the formula for the calculation of the claims of Authorized Claimants, which is set forth in the Notice sent to Settlement Class Members, provides a fair and reasonable basis upon which to allocate among Settlement Class Members the proceeds of the Net Settlement Fund established by the Stipulation, with due consideration having been given to administrative convenience and necessity. The Court hereby finds and concludes that the Plan of Allocation is approved as fair and reasonable, and Lead Counsel and the Claims Administrator are directed to administer the Stipulation and Plan of Allocation in accordance with their terms and provisions. Any modification or change in the Plan of Allocation that may hereafter be approved shall in no way disturb, affect or delay the finality of this Judgment or the Releases provided thereunder, shall not disturb, affect or delay the Effective Date of the Settlement, and shall be considered separate from this Judgment.

16. The DGSE Defendants, John Benson, and all other Released Defendant Persons, including their respective insurers, shall have no responsibility whatsoever for the administration of

11

the Settlement, and shall have no liability whatsoever to any Person, including, but not limited to, Lead Plaintiffs, the Settlement Class or Lead Counsel in connection with any such administration.

17. **Lead Counsel's Award of Attorneys' Fees and Reimbursement of Litigation Expenses:** Lead Counsel are hereby awarded **33** % of the Settlement Amount as and for their attorneys' fees, which sum the Court finds to be fair and reasonable. Lead Counsel are hereby awarded $ 13,351.74 in reimbursement of Litigation Expenses, which expenses the Court finds to have been reasonably incurred. The foregoing amounts shall be paid to Lead Counsel from the Settlement Fund. Lead Counsel may make payments of fees and expenses to counsel for other plaintiffs as Lead Counsel deems appropriate based on their relative contribution to the prosecution and resolution of the Action. Neither the Plan of Allocation submitted by Lead Counsel nor the portion of this Judgment regarding the attorneys' fee and Litigation Expense application, including any modification or change in the award of attorneys' fees and Litigation Expenses that may hereafter be approved, shall in any way disturb or affect this Judgment or the Releases provided hereunder and shall be considered separate from this Judgment.

18. **Modification of the Agreement of Settlement:** Without further approval from the Court, Lead Plaintiffs, the DGSE Defendants, and John Benson are hereby authorized to agree to and adopt such amendments or modifications of the Stipulation or any Exhibits attached thereto to effectuate the Settlement that: (i) are not materially inconsistent with this Judgment; and (ii) do not materially limit the rights of Settlement Class Members in connection with the Settlement. Without further order of the Court, Lead Plaintiff, the DGSE Defendants, and John Benson may agree to reasonable extensions of time to carry out any provisions of the Settlement.

19. **Termination:** If the Settlement is terminated as provided in the Stipulation or the Effective Date does not occur, then this Judgment (and any orders of the Court relating to the

Settlement) shall be vacated, rendered null and void and be of no further force or effect, to the extent provided for in the Stipulation.

20.    **_Entry of Final Judgment:_**   There is no just reason to delay the entry of this Judgment as a final judgment as against all the Defendants.  Accordingly, the Clerk of the Court is expressly directed to immediately enter this final judgment as against all the Defendants.  The Settling Parties are hereby directed to perform the terms of the Stipulation.  [The Court has duly considered each objection that was filed to the proposed Settlement, and each objection is hereby overruled.]

SO ORDERED this ____ day of _____ , 2013.

The Honorable Jane J. Boyle
United States District Judge

13

# Exhibit 1

[No Settlement Class Members filed timely requests to opt-out of the proposed Settlement by the September 30, 2013 deadline.]

# TAB 8

Billitteri v. Securities America, Inc., Not Reported in F.Supp.2d (2011)

2011 WL 3585983
Only the Westlaw citation is currently available.
United States District Court,
N.D. Texas,
Dallas Division.

BILLITTERI
v.
SECURITIES AMERICA, INC., et
al. (Provident Royalties Litigation)
This Document Relates to: All Actions
C. Richard Toomey, et al. v.
Securities America, Inc., et al.
In re Medical Capital Securities Litigation
This Document Relates to: McCoy,
SACV09–1084 DOC (RNBx) (C.D.Cal.).

Nos. 3:09–cv–01568–F, 3:10–cv–01833–F.
|
No. ML 10–2145 DOC (RNBx) (C.D.Cal.).
|
Limited transfer for settlement purposes
as Case No. 3:11–cv–00191–F (N.D.Tex.).
|
Aug. 4, 2011.

**ORDER GRANTING CLASS COUNSEL'S
MOTION FOR ATTORNEYS' FEES AND
REIMBURSEMENT OF EXPENSES**

ROYAL FURGESON, Senior District Judge.

**\*1** BEFORE THE COURT is a Motion for Attorneys' Fees and Reimbursement of Expenses filed by Class Counsel on June 14, 2011 (*Billitteri* Docket No. 443, *McCoy* Docket No. 271, *Toomey* Docket No. 112). Several individual class members have filed objections regarding the requested amount of attorneys' fees in this case. After considering Class Counsel's Motion and the objections of individual class members, it is ORDERED that Class Counsel's Motion is GRANTED. [1]

**I. Factual and Procedural Background**

These class actions arise out of alleged Ponzi schemes related to two entities known as Provident Royalties ("Provident") and Medical Capital Holdings ("Medical Capital"). Securities for these two entities were sold by a number of broker-dealers, including Securities America, Inc. ("Securities America"). Securities America Financial Corporation ("SAFC") is the parent company of Securities America, and Ameriprise, Inc. ("Ameriprise") is the parent company of SAFC.

Provident's purported business was the development of oil and gas properties, and the Provident securities were sold as preferred stock and partnership interests in a series of shale gas ventures. Provident securities issued by affiliates of Provident were sold by a number of broker-dealers, including Securities America, Inc. ("Securities America"). Securities America Financial Corporation ("SAFC") is the parent company of Securities America. Ameriprise, Inc. ("Ameriprise") is the parent company of SAFC. In total, Provident raised over $400 million from investors, and Securities America sold over $47 million of Provident securities to 543 investors. Securities America sold Provident securities by the use of Private Placement Memoranda ("PPMs"), which the Representative Plaintiffs contend contained untrue statements of material fact and omitted material facts about the Provident entities.

Medical Capital raised approximately $2.2 billion through the sale of promissory notes issued by affiliated special purpose corporations, which purportedly provided financing to health care providers by purchasing their accounts receivable and by making loans to them. Securities America sold $697 million worth of Medical Capital notes. Similar to the Provident allegations, the Representative Plaintiffs allege that the PPMs contained untrue statements and omitted material facts, which are similar to those used in the alleged Provident Ponzi scheme.

In 2009, an SEC investigation revealed that Provident and Medical Capital were in fact Ponzi schemes, and many investors lost the bulk of their investments in Provident and Medical Capital. Class members are investors who purchased Provident securities through a Securities America broker-dealer between 2006 and January 2009, when Provident suspended dividend payments, or investors who purchased Medical Capital securities through a Securities America broker-dealer between September 2003 and July 2009. Representative Plaintiffs filed suit against all three of these entities in an attempt to recover their investments, alleging violations of federal and state securities laws, negligence,

and breach of fiduciary duty. The *Billitteri* case, addressing the sale of Provident securities, was filed in the Northern District of Texas on August 24, 2009. The *Toomey* case, also addressing the sale of Provident securities, was originally filed on November 25, 2009, and was transferred from the District of Idaho to the Northern District of Texas on September 14, 2010. The *McCoy* case, which addressed the sale of Medical Capital Securities, was originally filed on September 18, 2009 in the Central District of California. The *McCoy* case was transferred to this Court on January 31, 2011 for the purposes of settlement negotiations.

**\*2** While these class actions have been pending, a number of investors who purchased Provident or Medical Capital Securities from Securities America have been pursuing arbitrations against Securities America under the auspices of the Financial Industry Regulatory Authority ("FINRA"). Thus, both the class actions and the individual arbitrations have been moving forward on parallel tracks.

The early stages of this litigation required substantial motion practice, including surviving a Motion to Dismiss that was ruled upon in July of 2010. On February 17, 2011, Class Plaintiffs filed a Motion for Preliminary Approval of Class Action Settlement (*Billitteri* Docket No. 199) with the Court, indicating that they had reached a settlement with Securities America and SAFC for approximately $52 million, which would have been distributed to investors. The terms of the settlement included petitioning the Court to utilize its power under the All Writs Act, 28 U.S.C. § 1651(a), to stay arbitrations that had been brought against Securities America and SAFC by individual class members. The settlement was alleged to be a proper "limited fund" settlement under

Federal Rule of Civil Procedure 23(b)(1)(B). The Court set a hearing for March 18, 2011, and allowed any class members whose arbitration was to be stayed by approval of the settlement to file objections with the Court.

Over the next several weeks, the Court was inundated with objections from various class members, banks involved in related litigation, and state securities regulators, all of whom objected to the settlement for various reasons. The individual class members argued primarily that the proposed settlement did not meet the requirements of a Rule 23(b)(1)(B) limited fund under the Supreme Court's decision in

*Ortiz v. Fibreboard Corporation,* 527 U.S. 815, 119 S.Ct. 2295, 144 L.Ed.2d 715 (1999), that the Court did not have the power to enjoin the arbitrations under the All Writs

Act, the Rules Enabling Act, and the Federal Arbitration Act, and that the settlement did not meet the requirements of Rule 23(a). At the hearing, after hearing arguments by class counsel and counsel for Securities America in support of the settlement, the Court heard arguments from numerous attorneys representing individual class members and groups of class members, many of whom had coordinated beforehand. At the conclusion of the hearing, the Court issued an Order from the bench denying the Motion for Preliminary Approval of the settlement on the grounds that the conditions of a limited fund did not exist. *See* Order, *Billitteri* Docket No. 390.

Thrust back to the drawing board, the parties, including counsel for Securities America and SAFC, counsel for Ameriprise, class counsel, and many attorneys for the objecting class members, participated in a mediation session in Chicago, Illinois the next week. After intense negotiations, the parties informed the Court that a settlement had been reached as to both members of the class and as to those class members who had opted to pursue arbitration. In relevant part, the proposed settlement amounts to $80 million to be distributed to members of a class of investors who had purchased Provident and Medical Capital securities through a Securities America broker-dealer and who had not opted to pursue their claims through arbitration. A separate settlement amounting to $70 million would distribute funds to members of a class of investors who had purchased Provident and Medical Capital securities through a Securities America broker-dealer and who had opted to participate in arbitration. The $80 million portion of the settlement was submitted to the Court for approval, and the Court has approved that settlement by separate order.

**\*3** In this Motion, class counsel request attorneys' fees in the amount of 25% of the $80 million settlement fund after the portion of the settlement fund payable to the Provident Royalties Liquidating Trust, which amounts to $6,818,187, is deducted. This request amounts to $18,295,453. Class counsel also request $300,000 in expenses and $60,000 in administrative costs.

## II. Request for Attorneys' Fees

"[A] litigant or lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from the fund as a whole." *Boeing Co. v. Van Gemert,* 442 U.S. 472, 478 (1980); *see*

also Fed.R.Civ.P. 23(h) ("In a certified class action, the court may award reasonable attorney's fees and nontaxable costs that are authorized by law or the parties' agreement."). "To fully discharge its duty to review and approve class action settlement agreements, a district court must assess the reasonableness of the attorneys' fees." *Strong v. BellSouth Telecomms., Inc.,* 137 F.3d 844, 849 (5th Cir.1998). The Court "must not cursorily approve the attorneys' fee provision of a class settlement or delegate that duty to the parties ." *Id.* at 850; *see also Piambino v. Bailey,* 610 F.2d 1306, 1328 (5th Cir.1980) (instructing district courts not to simply "ratify a pre-arranged compact" for attorneys' fees when approving a class action settlement). "Although exacting judicial review of fee applications may be burdensome, it is necessary to discharge the court's obligation to award fees that are reasonable and consistent with governing law." *In re High Sulfur Content Gasoline Prod. Liab. Litig.,* 517 F.3d 220, 228 (5th Cir.2008) (citation and quotation marks omitted).

### A. Method of Determining the Reasonableness of Requested Attorneys' Fees

The Fifth Circuit has never definitively endorsed a method for evaluating a fee request in a common fund class action, but most district courts within the Circuit utilize either a percentage-based method or a lodestar method in determining the reasonableness of a request for attorneys' fees. *See Klein v. O'Neal,* 705 F.Supp.2d 632, 673–74 (N.D.Tex.2010) (Fitzwater, J.) (discussing types of analyses for class action settlement attorneys' fees requests). Under the percentage method, the Court would appropriate a percentage of the settlement as a reasonable attorneys' fee. *See, e.g., Schwartz v. TXU Corp.,* No. 3:02–CV–2243–K (lead case), 2005 WL 3148350, at *11 (N.D.Tex. Nov.8, 2005) (Kinkeade, J.). "Under the lodestar method ..., the district court must first determine the reasonable number of hours expended on litigation and the reasonable hourly rates for the participating attorneys. The lodestar is computed by multiplying the number of hours reasonably expended by the reasonable hourly rate." *Strong,* 137 F.3d at 850 (citing *Forbush v. J.C. Penney Co.,* 98 F.3d 817, 821 (5th Cir.1996))

Regardless of the utilized method, the Court must check the resulting fee for reasonableness against the twelve factors set out in *Johnson v. Georgia Highway Express, Inc.,* 488 F.2d 714 (5th Cir.1974), *overruled on other grounds by Blanchard v. Bergeron,* 489 U.S. 87, 109 S.Ct. 939, 103 L.Ed.2d 67 (1989), which are commonly known as the *Johnson* factors. The 12 factors laid out by the *Johnson* court include: (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the skill requisite to perform the legal service properly; (4) the preclusion of other employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases. *Johnson,* 488 F.2d at 717–19. In the percentage analysis, the requested percentage would be weighed against the factors to determine its fairness, while in the lodestar analysis, the factors could be used to support an increase or decrease of the calculated lodestar amount.

**\*4** In *Klein,* Judge Fitzwater discussed the method to be used in a common fund attorneys' fees request such as the one seen in this case:

> Because of the lack of clarity, district courts have concluded that, though the Fifth Circuit has not explicitly accepted the percentage method, it does appear to be amenable to its use, so long as the *Johnson* framework is utilized to ensure that the fee awarded is reasonable. To account for the Fifth Circuit's preference for a *Johnson* analysis, numerous district courts in this Circuit have primarily applied a "blended" percentage method to determine a reasonable fee award. The "blended" method, sometimes referred to as the "hybrid" method, uses the percentage method to establish a benchmark fee and then checks this amount against a reasonableness test based on consideration of the *Johnson* factors. The benchmark percentage can be adjusted up or down on this basis. Such an approach respects the Fifth Circuit's preferences, given that

the circuit has affirmed a court's calculation of fees based on the percentage method when the court has also considered the *Johnson* factors, noting the judge's use of the percentage method merely demonstrated his preference as a matter of policy.

*Klein,* 705 F.Supp.2d at 674–75 (citations and quotation marks omitted).

The Court takes note of Judge Fitzwater's analysis, and is of the opinion that applying the percentage method is appropriate in this case, so long as the Court determines that the requested percentage is reasonable and that the percentage is supported through application of the *Johnson* factors. In fact, the Fifth Circuit affirmed a district court's use of the percentage method in such a way in regard a settlement of a securities class action. *Longden v. Sunderman,* 979 F.2d 1095, 1100 n. 11 (5th Cir.1992). Indeed, as Judge Kinkeade noted in *Schwartz,* the percentage method is frequently used by district courts in the Fifth Circuit in common fund cases such as this. *Schwartz,* 2005 WL 3148350 at *25 (listing cases); *Shaw v. Toshiba Am. Info. Sys., Inc.,* 91 F.Supp.2d 942, 966–67 (E.D.Tex.2000) (Heartfield, J.) (listing cases). However, while the Court considers the percentage method to be appropriate in this case, out of an abundance of caution, the Court will also evaluate the fee request under the lodestar method as well. *E.g.* *Shaw,* 91 F.Supp.2d at 968.

### B. Percentage/Johnson Factors Method

The Court considers the attorney fee request of 25% of the $80 million settlement fund in this case to be reasonable. Similar cases in this district have provided comparable awards of attorneys' fees; in fact, courts have approved higher attorney fee requests in settlements for a larger amount. *See Klein,* 705 F.Supp.2d at 675 (finding a fee request of 30% of a settlement fund of $90–$110 million to be "within the range of reasonableness for settlements of this size," "although on the high end"); *Schwartz,* 2005 WL 3148359 at *27 ("The requested fee award of 22.2% of the [$149.75 million] Settlement fund is consistent with and, in fact, significantly less than awards made in similar cases."). The amount requested by Class Counsel in this case is not just reasonable but restrained considering the complexity of this litigation and the enormous effort it took to reach this settlement. As Judge

Fitzwater noted, "[t]he *Manual for Complex Litigation* states that '[a]ttorney fees awarded under the percentage method are often between 25% and 30% of the fund." *Klein,* 705 F.Supp.2d at 675 (quoting Manual for Complex Litigation (Fourth) § 14.121 (2010)). An award of 25% would reflect the general pattern in this district and other district courts within the Fifth Circuit in awarding attorneys' fees based on the percentage method.

**\*5** Several class members, including Michael and Marja Selna, Thomas M. and Germaine I. Simon, Steve and Miriam Shapiro, and Kim Runkle and James Yonkers, have objected to the 25% request for attorneys' fees as exorbitant, and ask the Court to lower the percentage of attorneys' fees awarded from the settlement fund. While the Court is cognizant of the significant losses suffered by class members in this case and that this settlement, prior to attorneys' fees, will amount to a recovery of approximately 40 cents on the dollar for class members, the Court is not convinced that the 25% request is unreasonable. The attorneys in this case have performed diligent and effective work on behalf of the class throughout this litigation, and have produced a very effective result for the class members compared to the general recovery in such cases. The objections of the Selnas, the Simons, the Shapiros, Runkle, and Yonkers are therefore overruled.

The Court now evaluates the 25% attorney fee request by Class Counsel against the *Johnson* factors.

### 1. Time and Labor Required

The time and labor expended by counsel in these cases was substantial. The *Billitteri, McCoy,* and *Toomey* cases were all filed in 2009, and the cases went through several important steps before a settlement was reached. Class Counsel litigated this case through a Motion to Dismiss decided in July 2010, which required them to amend their pleadings, transferring the *Toomey* and *McCoy* cases to this docket, painstaking settlement negotiations that had to be accelerated as the assets of Securities America threatened to be depleted through individual awards and the costs of litigating claims against it, responding to dozens of objections to the first settlement proposal by intervening arbitration claimants, the rejection of an initial Rule 23(b)(1) (B) settlement proposal, intense negotiations that produced the Settlement Agreement before the Court, and the shepherding of this settlement through the approval process. The Court is thoroughly convinced that the effort expended in this case justifies the attorneys' fees contemplated by counsel's request. Such a result is

Billitteri v. Securities America, Inc., Not Reported in F.Supp.2d (2011)

particularly justified by the extraordinary quality of the work and advocacy before the Court by counsel in this case.

The Court has also been provided with a log of the hours expended by co-lead counsel, Girard Gibbs LLP and Zwerling, Schachter & Zwerling, LLP, and all other counsel who performed work on behalf of the class. *See* Pls.' App., *Billitteri* Docket No. 445, at 1. Girard Gibbs expended 7,513.11 hours on the Provident and Medical Capital litigation, and Zwerling, Schachter & Zwerling expended 8,168.60 hours on the Provident and Medical Capital litigation. Including the hours of other counsel used in this case, class counsel expended over 19,000 hours on this litigation. This magnitude of work strongly justifies the 25% requested award.

### 2. Novelty and Difficulty of the Questions

**\*6** The questions addressed by class counsel throughout the course of this litigation were difficult and in some cases entirely novel, requiring substantial research and briefing before the Court. Class counsel had the difficult task of demonstrating the liability of Securities America for violations of securities laws and Texas state law for misrepresentations within Private Placement Memoranda issued by Provident and Medical Capital, assertions that they were forced to re-plead after the Court criticized their pleadings in an Order issued in July of 2010. Beyond these issues, however, class counsel was faced with an extremely difficult legal argument associated with their attempt to gain approval of the first proposed settlement, including (1) whether the Court had the authority under the All Writs Act to permanently enjoin contractually guaranteed arbitrations in light of a proposed Rule 23(b)(1)(B) "limited fund" settlement, (2) whether a "limited fund" existed as to that proposed settlement, and (3) whether a class could be certified over the objections of dozens of class members whose arbitrations would be halted if that proposed settlement were approved. While the Court ultimately rejected that settlement proposal, many of these arguments, particularly as to the first two questions, were particularly novel and difficult. Furthermore, despite the rejection of that settlement proposal, the work performed by the parties at that stage led to the proposal that was ultimately approved by the Court.

Additionally, to achieve this settlement, class counsel was required to pursue extremely difficult and complex negotiations and tactical analysis, particularly in the wake of the rejection of the first settlement. Beyond mere legal issues, class counsel was required to undertake substantial practical considerations in achieving the contemplated resolution of this class action. The difficulty faced by class counsel is not to be understated, and substantially supports the requested award of attorneys' fees.

### 3. Skill Requisite to Perform the Legal Service Properly

Class counsel required substantial skill to effectively litigate this case. To demonstrate liability of Securities America, SAFC, and Ameriprise, class counsel had to tie the alleged wrongdoing of Provident to the broker-dealer and its parent company, which requires significant skill in legal analysis and advocacy. Class counsel also needed to manage the needs and expectations of a class of individuals spread throughout the country, many of whom had lost substantial portions of their life savings. These actions also required counsel to navigate additional complexities because of the multidistrict nature of this litigation. Additionally, as so much of the effort in this case came down to negotiation of a satisfactory settlement agreement, class counsel required strong tactical and negotiating skills to deal with opposing counsel as well as various other attorneys representing intervenors in this case.

**\*7** As the Fifth Circuit noted regarding this factor, "The trial judge's expertise gained from past experience as a lawyer and his observation from the bench of lawyers at work become highly important in this consideration." *Johnson,* 488 F.2d at 718. As the Court has consistently observed throughout this litigation, the work of the attorneys in this case has been diligent, effective, and of extremely good quality. This is especially important in terms of class counsel because of the extremely effective work of opposing counsel. *See Schwartz,* 2005 WL 3148350 at \*30 ("The ability of plaintiffs' counsel to obtain such a favorable settlement for the Class in the face of such formidable legal opposition confirms the superior quality of their representation."). The skill required here, and the very impressive quality of class counsel's work, certainly justifies the contemplated award.

### 4. Preclusion of Other Employment by Attorneys

Class counsel has informed the Court that this litigation precluded them from immediately attending to or taking on other cases, and the Court is inclined to agree with this assessment. For two years, the Court has overseen this litigation, including the transfer of two of these cases to this district, and is well aware of the magnitude of work and travel that was required to litigate this case. Indeed, the parties were forced to act on an extremely tight time schedule at

certain points of this litigation, particularly in the months leading up to the submission of this settlement for approval, in which the Court is convinced that their work on this litigation constituted their first and only priority. Accordingly, the Court is of the opinion that this factor supports the requested award of fees. *See* *Shaw,* 91 F.Supp.2d at 970 (holding this factor to support enhancement of a fee under a *Johnson* /lodestar analysis when the court was "thoroughly familiar with the time limitations, the trial schedule imposed, the extraordinary commitment of time and labor the case required, and with the inability of Class Counsel to attend to other matters or to take on new business while this case was in active litigation").

### 5. Customary Fee

The 25% fee request in this case reflects the customary fee awarded in this Circuit. As Judge Kinkeade wrote in *Schwartz,* "The vast majority of Texas federal courts and courts in this district have awarded fees of 25%–33% in securities class actions." *Schwartz,* 2005 WL 3148250 at *31. Accordingly, this factor supports approval of the requested fee award.

### 6. Whether the Fee is Fixed or Contingent

Class counsel have submitted sworn declarations informing the Court that these cases were taken on a contingent fee basis, and that counsel have not been compensated for their work on the case to this point. This is particularly relevant considering the difficulty presented by the facts and legal questions in this case and the very real risk of obtaining no recovery at all. *See Brown v. J.P. Turner & Co.,* No. 1:09–cv–2649–JEC, 2011 U.S. Dist. LEXIS 53118, at *14–*16, 2011 WL 1882522 (N.D.Ga. May 17, 2011) (Carnes, J.) (dismissing case arising from alleged Provident Ponzi scheme against broker-dealer for failing to meet pleading standards). Class counsel has incurred significant expenses and provided thousands of hours of diligent legal work on this case with the very real possibility of no recovery or a very limited recovery. The contingent nature of this litigation supports the requested 25% fee. *See Schwartz,* 2005 WL 3148250 at *32.

### 7. Time Limitations Imposed by the Client or the Circumstances

**\*8** This litigation included certain parts where time limitations prompted swift action within very limited periods. Indeed, certain parts of this case involved providing the Court with briefing or motions that were to seek injunctive relief

mere days before the beginning of an arbitration proceeding, requiring counsel to work within extremely limited periods of time. This factor thus supports the requested award.

### 8. Amount Involved and Results Obtained

This factor "is entitled to particular weight when, as in this case, the efforts of counsel were instrumental in realizing a substantial recovery on behalf of the class." *Schwartz,* 2005 WL 3148250 at *32 (citing *In re Terra–Drill P'ships Sec. Litig.,* 733 F.Supp. 1127, 1129 (S.D.Tex.1990) (Pollack, J.)). Indeed, the Supreme Court has identified "the degree of success obtained" as "the most critical factor" in determining an award of reasonable attorneys' fees. *Hensley v. Eckerhart,* 461 U.S. 424, 436, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983). According to counsel, the recovery in this case of $80 million is one of the largest recoveries in a securities class action in the history of the Northern District of Texas; in fact, when considering the companion $70 million settlement for claimants who have gone to arbitration against the settling Defendants, this is the largest securities class action settlement in terms of monetary relief ever reached in this district. The ultimate result reached in this case, which could not have been accomplished without the dedicated and effective work of class counsel, is an excellent resolution considering all of the circumstances faced in this case, and provides a substantial recovery to class members of $80 million out of around $200 million in losses. This factor strongly supports the attorneys' fees requested by class counsel.

### 9. Experience, Reputation, and Ability of the Attorneys

Class counsel in this case possess great competence and experience, and the result reached in this case perfectly exemplifies their abilities. The Court has been extremely impressed with the conduct, skill, and accomplishment of class counsel throughout this litigation. This factor strongly supports their request for a 25% award of attorneys' fees.

### 10. "Undesirability" of the Case

The fact that this case, which raised particularly difficult issues, risked no recovery whatsoever, and the claims against Securities America and SAFC, which are very thinly capitalized, risked a limited recovery even if success was obtained. There was no guarantee that control person liability of Ameriprise could be established, and the result obtained is particularly impressive considering the very tough road faced

by class counsel at the outset of this litigation. This factor therefore supports the 25% fee request.

### 11. Nature and Length of the Professional Relationship with the Client

Based on representations by counsel, there has been a strong and effective relationship between class counsel and the named Plaintiffs in these cases. While the Court does not attach much weight to this factor in this case, the Court is of the opinion that this factor would not prompt an alteration of the requested fees.

### 12. Awards in Similar Cases

**\*9** The requested reward of 25% falls well within the awards generally granted in such cases, and may even be on the lower end. This factor thus supports the requested fee award.

\* \* \*

In sum, eleven of the twelve *Johnson* factors support Plaintiff's request for 25% of the settlement fund as attorneys' fees, and one factor weighs neither in favor nor against the request. The percentage method, backed by the *Johnson* factors as preferred by the Fifth Circuit, therefore supports the granting of class counsel's requested fees.

### C. Lodestar/Johnson Factors Method

As numerous district courts have noted, the law of the Fifth Circuit as to the proper method to use in evaluating attorneys' fees as to a class action settlement is unsettled. *See, e.g., Klein,* 705 F.Supp.2d at 674 (discussing the "lack of clarity" of Fifth Circuit case law regarding the proper method to evaluate attorneys' fees in a class action settlement). Out of precaution, therefore, the Court shall also evaluate the fee request of $18,295,453 under the lodestar analysis.

"The lodestar is computed by multiplying the number of hours reasonably expended by the reasonable hourly rate." *Shaw,* 91 F.Supp.2d at 968 (citing *Forbush,* 98 F.3d at 821). "The district court may then adjust the lodestar upward or downward depending on the respective weighs of the twelve factors set forth in [*Johnson* ]." *Forbush,* 98 F.3d at 821.

As noted above, the Court considers the amount of time expended by class counsel and their affiliates on this litigation

to be more than reasonable. The total number of hours expended by relevant counsel in this case is 19,028.64. Pl.'s Fee App., *Billitteri* Docket No. 445, at 1. Based on Plaintiff's calculations, the average hourly rate in this litigation would have amounted to $487.63. The Court has the ability to "consider its own knowledge and experience concerning reasonable and proper fees and may form an independent judgment with or without the aid of witnesses as to value." *Campbell v. Green,* 112 F.2d 143, 144 (5th Cir.1940). Taking this into consideration, the Court considers an hourly rate of $487.63 to be reasonable for purposes of the lodestar calculation. *See Klein,* 705 F.Supp.2d at 680 (finding a $500 average hourly rate to be reasonable). Working from this figure, the lodestar calculation that the Court would work from would be $9,279,007.15. This amount is slightly over half of the requested amount of $18,295,453. Under a lodestar approach, the multiplier sought by class counsel would amount to 1.97.

As the Court has demonstrated in its analysis of the *Johnson* factors above, eleven of the twelve *Johnson* factors weighed in favor of class counsel's request, and as to the lodestar method, would act as justification for increasing the award to its current level, and perhaps even beyond the request already made. *See id.* (approving 2.5 multiplier based on *Johnson* analysis). Thus, under either method, the Court is convinced that the request for an award of attorneys' fees of $18,295,453 is reasonable and justified.

### III. Request for Expenses and Administrative Costs

**\*10** The Court now assesses class counsel's request for a reimbursement of $300,000 in expenses related to this litigation and $60,000 in administrative costs. Expenses and administrative costs expended by class counsel are recoverable from a common fund in a class action settlement. *Klein,* 705 F.Supp.2d at 682, *Schwartz,* 2005 WL 3148250 at \*34.

The Court has reviewed the information submitted regarding the request for expenses, which indicates that the actual amount of expenditures exceeded the amount requested here. These expenses included $197,571.26 by co-lead counsel Girard Gibbs, which included long distance and conference calls, copying, obtaining court and deposition transcripts, document production, expert fees, filing fees, research, lodging, mediator fees, messenger and overnight courier expenses, postage, process service, and travel expenses

(which were justifiably substantial considering the national scope of this litigation), among other expenses. *See* Pl.'s Fee App., *Billitteri* Docket No. 445, at 17. Co-lead counsel Zwerling, Schachter & Zwerling expended $114,862.72 for similar services. *Id.* at 78. These two firms alone amount to over $300,000, not including the expenses of other counsel, which amounted to $59,469.45. Having reviewed these figures, the Court is of the opinion that these expenses were "reasonably and necessarily incurred" in prosecuting this litigation and obtaining this settlement. *Schwartz,* 2005 WL 3148250 at *34. The expenses request of $300,000 is therefore approved.

Class counsel requests an award of $60,000 in administrative costs from the settlement fund. Class counsel has provided that "[t]hese funds will be devoted to paying the reasonable administrative costs for the costs attendant to the Class Notice already disseminated, responding to inquiries by members of the Settlement Classes, the distribution of the Settlement Fund, and compensating the settlement administrator." Pls.' Mot., *Billitteri* Docket No. 444, at 17. The Court finds this request to be reasonable and necessary to ensure dissemination of the settlement fund and the administration of this settlement, and therefore approves this request.

### Conclusion

For the reasons stated above, it is ORDERED that Class Counsel's Motion for Attorneys' Fees and Reimbursement of Expenses is GRANTED. Under a percentage-based or lodestar-based analysis, with both backed by the *Johnson* factors, the Court is of the opinion that the request for attorneys fees in this case is fair, just, and reasonable. Class counsel is awarded $18,295,453 in attorneys' fees, $300,000 in expenses, and $60,000 in administrative costs from the settlement fund.

IT IS SO ORDERED.

### All Citations

Not Reported in F.Supp.2d, 2011 WL 3585983

### Footnotes

1      This resolves *Billitteri* Docket No. 443, *McCoy* Docket No. 271 and *Toomey* Docket No. 112.

**End of Document** © 2021 Thomson Reuters. No claim to original U.S. Government Works.

 © 2021 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 9

2011 WL 3586217

2011 WL 3586217
Only the Westlaw citation is currently available.
United States District Court,
N.D. Texas,
Dallas Division.

BILLITTERI
v.
SECURITIES AMERICA, INC., et
al. (Provident Royalties Litigation).
This Document Relates to: All Actions.
C. Richard Toomey, et al. v.
Securities America, Inc., et al.
In re Medical Capital Securities Litigation.
This Document Relates to: McCoy,
SACV09–1084 DOC (RNBx) (C.D.Cal.).

Nos. 3:09–cv–01568–F, 3:10–cv–01833–F.
|
No. ML 10–2145 DOC (RNBx) (C.D.Cal.).
|
Limited transfer for settlement purposes
as Case No. 3:11–cv–00191–F (N.D.Tex.).
|
Aug. 4, 2011.

ORDER GRANTING PLAINTIFFS'
MOTION FOR FINAL APPROVAL OF
CLASS ACTION SETTLEMENT WITH
SECURITIES AMERICA, INC., SECURITIES
AMERICA FINANCIAL CORPORATION,
AND AMERIPRISE FINANCIAL, INC.

ROYA FURGESON, Senior District Judge.

 **\*1** BEFORE THE COURT are the above-captioned class actions' Representative Plaintiffs' Motion for Final Approval of Class Action Settlement with Securities America, Inc., Securities America Financial Corporation, and Ameriprise Financial, Inc., filed on June 14, 2011 (*Billitteri* Docket No. 447, *McCoy* Docket No. 275, *Toomey* Docket No. 116). Several individual class members and the Commissioner of the Office of Securities and Insurance of the State of Montana filed objections to the settlement. [1] After considering the Motion, the briefs and submissions to the Court, and the

objections, it is ORDERED that Plaintiffs' Motion for Final Approval of Class Action Settlement is GRANTED. [2]

### I. Factual Background and
### Terms of the Proposed Settlement

These class actions arise out of alleged Ponzi schemes related to two entities known as Provident Royalties, LLC ("Provident") and Medical Capital Holdings, Inc. ("Medical Capital"). Provident's purported business was the development of oil and gas properties, and the Provident securities were sold as preferred stock and partnership interests in a series of shale gas ventures. Provident securities issued by affiliates of Provident were sold by a number of broker-dealers, including Securities America, Inc. ("Securities America"). Securities America Financial Corporation ("SAFC") is the parent company of Securities America. Ameriprise, Inc. ("Ameriprise") is the parent company of SAFC. In total, Provident raised over $400 million from investors, and Securities America sold over $47 million of Provident securities to 543 investors. Securities America sold Provident securities by the use of Private Placement Memoranda ("PPMs"), which the Representative Plaintiffs contend contained untrue statements of material fact and omitted material facts about the Provident entities.

Medical Capital raised approximately $2.2 billion through the sale of promissory notes issued by affiliated special purpose corporations, which purportedly provided financing to health care providers by purchasing their accounts receivable and by making loans to them. Securities America sold $697 million worth of Medical Capital notes. Similar to the Provident allegations, the Representative Plaintiffs allege that the PPMs contained untrue statements and omitted material facts, which are similar to those used in the alleged Provident Ponzi scheme.

Class members are investors who purchased Provident securities through a Securities America broker-dealer between 2006 and January 2009, when Provident suspended dividend payments, or investors who purchased Medical Capital securities through a Securities America broker-dealer between September 2003 and July 2009.

In 2009, an SEC investigation revealed that Provident and Medical Capital were in fact Ponzi schemes, and many investors lost the bulk of their investments in Provident and Medical Capital. The several Representative Plaintiffs filed

WESTLAW   © 2021 Thomson Reuters. No claim to original U.S. Government Works.

2011 WL 3586217

suit against Securities America, SAFC, and Ameriprise in an attempt to recover their investments, alleging violations of federal and state securities laws, negligence, and breach of fiduciary duty. The *Billitteri* case, addressing the sale of Provident securities, was filed in the Northern District of Texas on August 24, 2009. The *Toomey* case, also addressing the sale of Provident securities, was originally filed on November 25, 2009, and was transferred from the District of Idaho to the Northern District of Texas on September 14, 2010. The *McCoy* case, which addressed the sale of Medical Capital Securities, was originally filed on September 18, 2009 in the Central District of California. The *McCoy* case was transferred to this Court on January 31, 2011 for the purposes of settlement negotiations.

**\*2** While these class actions have been pending, a number of investors who purchased Provident or Medical Capital securities from Securities America have been pursuing arbitrations against Securities America under the auspices of the Financial Industry Regulatory Authority ("FINRA"). Thus, both the class actions and the individual arbitrations have been moving forward on parallel tracks.

Initially, the parties to the class action proposed a settlement involving only Securities America and SAFC which would have distributed over $50 million to all investors in Provident and Medical Capital through Securities America and which was premised upon a "limited fund" theory under [Federal Rule of Civil Procedure 23(b)(1)(B)](). As part of their request for approval of the settlement, the parties asked the Court to enjoin investors' arbitrations against Securities America and SAFC. The Court rejected this proposed settlement in March of 2011. *See* Order Denying Motion for Preliminary Approval of Partial Class Action Settlement with Securities America, *Billitteri* Docket No. 390. Securities America, SAFC, and Ameriprise subsequently participated in a mediation held in Chicago, Illinois with counsel for classes of investors and individual investors who had commenced arbitration proceedings against Securities America. This mediation and subsequent negotiations produced a second proposed settlement, which involves multiple classes, including Provident investors, Medical Capital investors, and separate classes for those who had commenced arbitration.

The instant Motion asks the Court to issue an order finally approving the Settlement Agreement that was submitted to the Court in conjunction with the instant Motion filed on June 14, 2011. *See* Settlement Agreement, Pls.' App., *Billitteri* Docket No. 449–3, at 183–212. The proposed settlement

would establish an $80 million settlement fund from contributions of Securities America, SAFC, and Ameriprise to be distributed to members of the two Settlement Classes that would be established by the Settlement Agreement. The Provident Settlement Class would consist of "all Investors, their successors and assigns, who purchased Provident Securities from [Securities America] and were damaged thereby." *Id.* at 188. A number of investors in Provident have assigned their claims to Milo Segner, Jr., the Liquidating Trustee of the Provident Royalties Liquidating Trust established in June 2010 by the Bankruptcy Court; these investors are also covered by the Settlement Agreement. The Medical Capital Class would consist of "all Investors, their successors and assigns, who purchased Medical Capital Notes from [Securities America] and were damaged thereby." *Id.* at 186. There are approximately 2,158 total members of the proposed Settlement Classes, 30 of whom have opted out of the proposed settlement. According to counsel for Securities America, two of these opt-outs have not filed claims at this time, and the remaining 28 opt-outs have elected to pursue individual arbitrations.

**\*3** The settlement fund would be distributed to the members of the Provident Settlement Class and the Medical Capital Settlement Class on a *pro rata* basis, while funds to be distributed to Provident class members who had assigned their claims to the Provident Royalties Liquidating Trust would be distributed directly to the Trustee for distribution to those class members in accordance with the Bankruptcy Plan. Based on the information provided to the Court by the parties, this settlement would provide a recovery of approximately 40 cents on the dollar to class members, minus attorneys' fees, costs, and administrative expenses. The settlement will be funded through a special purpose loan by Ameriprise to Securities America. All claims by the class members against these three entities that are covered by the Settlement Agreement would be released, and the claims against these three entities in the *Billitteri, Toomey,* and *McCoy* class actions would be dismissed with prejudice, after severance orders are entered. Since the Court now approves this settlement by this Order, severance of the claims against the settling defendants at issue in the instant Motions is necessary before final judgment can be entered because the class action plaintiffs have similar claims against other defendants in these cases.

A separate proposed settlement would settle claims with investors in Provident and Medical Capital who had made their investments through Securities America broker-dealers

and who had commenced arbitration proceedings against Securities America, SAFC, or Ameriprise. These investors' claims will be settled through a separate fund in the amount of $70 million. Over 650 arbitration claimants are included in this separate settlement with Securities America, which does not require the approval of this Court in this Order.

The Representative Plaintiffs filed Motions for Preliminary Approval of this proposed settlement with Securities America, SAFC, and Ameriprise on April 18, 2011 (*Billitteri* Docket No. 424, *Toomey* Docket No. 104, *McCoy* Docket No. 260). The Court preliminarily approved the proposed settlement on May 5, 2011 (*Billitteri* Docket No. 435, *Toomey* Docket No. 109, *McCoy* Docket No. 266). Class members were subsequently given an opportunity to object to or comment upon the settlement. Notice of the settlement and opportunities to object to or opt out of the settlement was sent via first class mail to all members of the class. Several individual class members filed objections to the settlement, as well as the Office of the Commissioner of Securities and Insurance of the state of Montana, which is currently pursuing an action in Montana state court against Securities America. A fairness hearing was held on July 27, 2011.

## II. Analysis

The Court now moves to the analysis surrounding certification of a class under [Rule 23(a)](#) and [Rule 23(b)](#) [(3),](#) notice to the class under [Rule 23(c)](#) and [Rule 23(e),](#) and approval of a class action settlement under [Rule 23(e).](#) The Court shall also address the merits of any objections to the proposed settlement.

### A. Requirements of [Rule 23(a)](#)

**\*4** A district court has wide discretion in deciding whether or not to certify a proposed class. *[Jenkins v. Raymark Indus., Inc.,](#)* 782 F.2d 468, 471–72 (5th Cir.1986). However, that discretion is not unlimited; the Court must undertake a "rigorous analysis" to ensure that the requirements of [Rule 23(a)](#) are met. *[General Tel. Co. of Southwest v. Falcon,](#)* 457 U.S. 147, 161, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982). "[Rule 23(a)](#) requires that the proposed class representatives demonstrate numerosity, commonality, typicality, and adequacy of representation." *[Maldonado v.](#)*

*[Ochsner Clinic Found.,](#)* 493 F.3d 521, 523 (5th Cir.2007). The Court shall address each of these [Rule 23(a)](#) factors in turn.

### 1. Numerosity

Numerosity is satisfied when the proposed class is "so large that joinder of all members is impracticable." [Fed.R.Civ.P. 23(a)(1)](#); *[Mullen v. Treasure Chest Casino, LLC,](#)* 186 F.3d 620, 623 (5th Cir.1999) (citing *[Amchem Prods., Inc. v. Windsor,](#)* 521 U.S. 591, 613, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997)). It is clear that the Settlement Classes created by the proposed settlement sufficiently satisfy the numerosity requirement. The proposed Provident Settlement Class includes 178 investors, and the proposed Medical Capital Settlement Class includes 1,983 investors. A class of such a size is comparable or excessive of the sizes of other classes certified within this Circuit. *See, e.g.,* *[Mullen,](#)* 186 F.3d at 624 (noting that a class of 100 to 150 members satisfies the numerosity requirement). Furthermore, members of the Settlement Classes are geographically dispersed, decreasing the practicability of joinder into one action. *See* *[Zeldman v. J. Ray McDermott & Co.,](#)* 651 F.2d 1030, 1038 (5th Cir.1981) (noting the relevance to the numerosity requirement of "geographic dispersion" of the class).

### 2. Commonality

Commonality is met when "there are questions of law or fact common to the class." [Fed.R.Civ.P. 23(a)(2).](#) The test of commonality is "not demanding"; all that is required is that "there is one common question of law or fact." *[James v. City of Dallas,](#)* 254 F.3d 551, 570 (5th Cir.2001). "The interests and claims of the various plaintiffs need not be identical. Rather, the commonality test is met when there is 'at least one issue whose resolution will affect all or a significant number of the putative class members.' " *[Forbush v. J.C. Penney Co.,](#)* 994 F.2d 1101, 1006 (5th Cir.1993) (quoting *[Stewart v. Winter,](#)* 669 F.2d 328, 335 (5th Cir.1982)). Here, all of the members of the Settlement Classes invested in Provident or Medical Capital through Securities America, creating at least one major issue of fact in common with all class members. Furthermore, the claims of the class members are replete with common questions of law that class members would have to prove in pursuing their claims, including whether Securities America as a broker-dealer can be held liable for the misrepresentations in the PPMs, whether the

PPMs contained misrepresentations, and whether Ameriprise can be held liable as a control person of Securities America. Accordingly, the commonality requirement is met.

### 3. Typicality

**\*5** Typicality is satisfied when "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed.R.Civ.P. 23(a)(3). The test for typicality is "not demanding," and "focuses on the similarity between the named plaintiffs' legal and remedial theories and the theories of those whom they purport to represent." *Mullen,* 186 F.3d at 625; *Lightbourn v. County of El Paso, Tex.,* 118 F.3d 421, 426 (5th Cir.1997). "Typicality does not require a complete identity of claims. Rather, the critical inquiry is whether the class representative's claims have the same essential characteristics as those of the putative class. If the claims arise from a similar course of conduct and share the same legal theory, factual differences will not defeat typicality." *James,* 254 F.3d at 571 (quoting 5 JAMES WM. MOORE ET AL., MOORE'S FEDERAL PRACTICE ¶ 23.24[4] (3d ed.2000)). "The prerequisite in the settlement context requires 'proof that the interests of the class representatives and the class are commonly held for purposes of receiving similar or overlapping benefits from a settlement.' " *DeHoyos v. Allstate Corp.,* 240 F.R.D. 269, 281 (W.D.Tex.2007) (Biery, J.) (citation omitted).

The Representative Plaintiffs of the Provident Class and the Medical Capital Class assert claims that arise out of Securities America's sale of Provident and Medical Capital securities, and each class member's claims would involve proving the similar facts about Securities America's actions in selling those securities and making statements or omissions concerning those securities. *See Longen v. Sunderman,* 123 F.R.D. 547, 557 (N.D.Tex.1988) (Sanders, J.) ("The individual factual differences between the class representatives will not defeat class certification in this case where Plaintiffs have alleged a continuous course of conduct by defendants which is uniformly fraudulent and that they, as well as each member of the class, suffered a financial loss as a result of the ... scheme."). The Representative Plaintiffs have each brought claims that are typical of the members of the Settlement Classes. Accordingly, the Representative Plaintiffs' claims satisfy the typicality requirement.

### 4. Adequacy of Representation

"Rule 23(a)(4) is satisfied where: (1) the named plaintiffs' counsel will prosecute the action zealously and competently; (2) the named plaintiffs possess a sufficient level of knowledge about the litigation to be capable of taking an active role in and exerting control over the prosecution of the litigation; and (3) there are no conflicts of interest between the named plaintiffs and the absent class members." *Hamilton v. First Am. Title Ins. Co.,* 266 F.R.D. 153, 163–64 (N.D.Tex.2010) (Fish, J.) (citing *Feder v. Elec. Data Sys. Corp.,* 429 F.3d 125, 129 (5th Cir.2005)).

Based on the information provided to the Court and the Court's involvement with counsel in this case, the adequacy of representation requirement is satisfied as to the Settlement Agreement. First, class counsel in this case and other counsel involved in the representation of class members in this matter, all of whom possess substantial experience in class action litigation, have zealously pursued the claims of class members, and have produced a satisfactory result for class members that exceeds the typical amount of recovery in securities class action. Indeed, the Court has had the opportunity to closely monitor the work of counsel in this litigation, and the diligent efforts of class counsel and their fellow representatives of investors is strongly deserving of commendation. Second, the Representative Plaintiffs, through submitted statements and declarations, have provided to the Court sufficient indications that they will continue to take an active role in the prosecution of this class action to its conclusion. The Court's observations throughout this litigation have also established that the Representative Plaintiffs have and will exert control over the prosecution of the litigation. Finally, the Court is satisfied that no conflict of interest exists between counsel for the Representative Plaintiffs and absent class members. Here, considering the effort expended to achieve a substantial recovery, the Court is convinced that "all class members are asserting [the] common right [of] achieving a maximum potential recovery for the class"; accordingly, "the class interests are not antagonistic for representation purposes." *In re Corrugated Container Antitrust Litig.,* 643 F.2d 195, 208 (5th Cir.1981); *see also McNamara v. Bre–X Minerals Ltd.,* 214 F.R.D. 424, 428–29 (E.D.Tex.2002) (Folsom, J.) (finding that the adequacy of representation requirement was met when the named plaintiffs and class members all sought maximum recovery and where class counsel was skilled and experienced).

Case 4:19-cv-00509 Document 65-9 Filed 07/02/21 in TXSD Page 124 of 1452
Billitteri v. Securities America, Inc., Not Reported in F.Supp.2d (2011)
2011 WL 3586217

### B. Requirements of Rule 23(b)(3)

**\*6** "Before certifying a class under Rule 23(b)(3), a court must determine that 'questions of law or fact common to the members of the class predominate over any questions affecting only individual members and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.' " *Madison v. Chalmette Refining, L.C.C.,* 637 F.3d 551, 555 (5th Cir.2011). The Court will address each of these requirements in turn.

#### 1. Predominance

"The Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem,* 521 U.S. at 623. "In order to 'predominate,' common questions must constitute a significant part of the individual cases." *Jenkins,* 782 F.2d at 472. "The predominance inquiry is 'more demanding than the commonality requirement of Rule 23(a)' and requires courts 'to consider how a trial on the merits would be conducted if a class were certified.' " *Maldonado,* 493 F.3d at 525 (quoting *Bell Atl. Corp. v. AT & T Corp.,* 339 F.3d 294, 301, 302 (5th Cir.2003)). "Predominance is a test readily met in certain cases alleging consumer or securities fraud or violations of the antitrust laws." *Amchem,* 521 U.S. at 625. Regarding the predominance requirement, the Fifth Circuit recently wrote,

> Determining whether the plaintiffs can clear the predominance hurdle set by Rule 23(b)(3) requires district courts to consider how a trial on the merits would be conducted if a class were certified. This, in turn, entails identifying the substantive issues that will control the outcome, assessing which issues will predominate, and then determining whether the issues are common to the class, a process that ultimately prevents the class from degenerating into a series of individual trials.

*Madison,* 637 F.3d at 555.

The proposed settlement resolves class members' claims for violations of Section 33(A)(2) of the Texas Securities Act, Section 12(a)(2) of the federal Securities Act of 1933, negligence, and breach of fiduciary duty. Regarding the Texas Securities Act claims, Section 33(A)(2) provides that "[a]

person who sells a security ... by means of an untrue statement of a material fact or an omission to state a material fact necessary in order to make the statement made, in the light of the circumstances under which they are made, not misleading, is liable to the person buying the security from him .... " Tex.Rev.Civ. Stat. art. 581, § 33(A) (2). A defendant may avoid liability by proving that either (a) the buyer knew of the untruth or omission, or (b) the defendant did not know, and in the exercise of reasonable care could not have known, of the untruth or omission. *Id.* To prove the liability of SAFC or Ameriprise, a plaintiff must first establish Securities America's liability and then prove that Ameriprise or SAFC "directly or indirectly controls" Securities America. *Id.* at § 33(F)(1). To demonstrate that Ameriprise or SAFC is a control person, a plaintiff "must prove that the alleged controlling person (1) had actual power or influence over the controlled person, and (2) had the power to control or influence the specific transaction or activity that gave rise to the underlying violation." *Fernea v. Merrill Lynch Pierce Fenner & Smith, Inc.,* No. 03–09–00566–CV, 2011 WL 2769838, at \*15 (Tex.App.-Austin, July 12, 2011). A plaintiff would not have to prove the control person's culpable participation. *Barnes v. SWS Fin. Servs. Inc.,* 97 S.W.3d 759, 763 (Tex.App.-Dallas 2003, no pet.). Ameriprise or SAFC may avoid liability by "sustain[ing] the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of the existence of the facts by reason of which the liability is alleged to exist." *Id.*

**\*7** Section 12(a) (2) provides,

> Any person who ... offers or sells a security ..., by the use of any means or instruments of transportation or communication in interstate commerce or in the mails, by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading (the purchaser not knowing of such untruth or omission), and who shall not sustain the burden of proof that he

did not know, and in the exercise of reasonable care could not have known, of such untruth or omission, shall be liable, subject to subsection (b) of this section, to the person purchasing such security from him ....

15 U.S.C. § 771(a)(2). As with the Texas Securities Act claims, plaintiffs would have to demonstrate that SAFC or Ameriprise had power or control over Securities America. *G.A. Thompson & Co. v. Partridge,* 636 F.2d 945, 957–58 (5th Cir.1981).

The Court is convinced that there are sufficient common class-wide issues and questions that are prevalent throughout the cases of individual class members for these securities claims under federal and state law to satisfy the predominance requirement. All of the class members invested in either Provident or Medical Capital through Securities America, which utilized much of the same materials from Provident and Medical Capital entities. At trial, the class members would be faced with common questions of fact, such as the conduct of Securities America and the representations that the company and the Provident and Medical Capital entities made, that would apply to each of their claims. *See* *Eatmon v. Palisades Collection, LLC,* 2:08–CV–306–DF–CE, 2010 WL 1189571, at *8 (E.D.Tex. Mar.5, 2010) (Everingham, J.) (noting that it is proper to allow a class action where a defendant is alleged to have acted in the "same basic manner" towards an entire class) (quoting *Randolph v. Crown Asset Mgmt., LLC,* 254 F.R.D. 513, 520 (N.D.Ill.2008)). As Judge Sanders noted in *Longen,* "[t]he class action device is appropriate in securities fraud cases involving similar or identical misrepresentations, even if they are issued at different times." *Longen,* 123 F.R.D. at 553. This case involves misrepresentations or omissions made regarding the same investments and similar PPMs issued by those organizations. These identical or near-identical alleged misrepresentations or omissions "are not only significant but pivotal" to the class members' claims, *Mullen,* 186 F.3d at 626, and the analysis of each would be remarkably similar. *See In re Dell, Inc.,* No. A–06–CA–726–SS, 2010 WL 2371834, at *7 (W.D.Tex. June 11, 2010) (Sparks, J.) (holding predominance requirement to be met in approval of class action settlement when analysis of fraudulent misrepresentation or omission and other questions

would be similar for each class member). The centrality of these issues to the securities claims weighs heavily in favor of the settlement meeting the predominance requirement.

**\*8** The class members in this case also raise negligence and breach of fiduciary duty claims based upon state law. A cause of action for negligence arises when an actor breaches a legal duty and the breach proximately causes damages. *Columbia Med. Ctr. of Las Colinas, Inc. v. Hogue,* 271 S.W.3d 238, 246 (Tex.2008). Under Texas law, "[t]he elements of a breach of fiduciary duty claim are: (1) a fiduciary relationship between the plaintiff and the defendant; (2) the defendant must have breached his fiduciary duty to the plaintiff; and (3) the defendant's breach must result in injury to the plaintiff or benefit to the defendant." *Navigant Consulting, Inc. v. Wilkinson,* 508 F.3d 277, 283 (5th Cir.2007) (quoting *Jones v. Blume,* 196 S.W.3d 440, 447 (Tex.App.-Dallas 2006, pet. denied)). There are class-wide issues of whether there was a legal duty for negligence purposes on the part of Securities America, as well as whether a fiduciary relationship and duty existed between class members and Securities America.

The common issues and elements of the claims asserted by class members, the issues that must be proved to establish the liability of Securities America and Ameriprise, and the common questions that are raised by Securities America's and Ameriprise's defenses are all sufficient to establish predominance in this case. Furthermore, the amount of damages is relatively easily obtainable and distributable on a *pro rata* basis. In sum, the Court is convinced that this case would not "degenerat[e] into a series of individual trials," *Bell Atl.,* 339 F.3d at 302, that would render class treatment impossible. Sufficient common questions predominate over individual questions to satisfy the predominance requirement.

*2. Superiority*

Superiority under Rule 23(b)(3) is met when a class action "is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed.R.Civ.P. 23(b)(3). "[T]he superiority analysis requires an understanding of the relevant claims, defenses, facts, and substantive law presented in the case." *In re Wilborn,* 609 F.3d 748, 755 (5th Cir.2010) (citations and quotation marks omitted). Among the interests that the Court must consider are the interests of class members in individually controlling

Case 4:19-cv-00509 Document 65-9 Filed 07/02/21 in TXSD Page 126 of 1452
Billitteri v. Securities America, Inc., Not Reported in F.Supp.2d (2011)
2011 WL 3586217

the prosecution and defense of separate actions, the extent and nature of any litigation concerning the controversy already begun by or against class members, the desirability or undesirability of concentrating the litigation of the claims in the particular forum, and the likely difficulties in managing a class action. Fed.R.Civ.P. 23(b)(3). None of these factors militate against approval of the settlement. Approximately 30 class members have opted out of the class already and can pursue their own litigation or arbitration. A separate proposed settlement is currently being contemplated for any investors who have brought arbitration claims, ensuring that the class members' interests in controlling their own paths of litigation will not interfere with approval of this settlement.

**\*9** These cases were brought before this Court or transferred to this Court in the Northern District of Texas for the purposes of settlement negotiations that have succeeded, which increases the desirability of class action settlement treatment in this forum. There have been no difficulties raised by any parties as to the difficulty of managing the class action; in any case, when "[c]onfronted with a request for settlement-only class certification, a district court need not inquire whether the case, if tried, would present intractable management problems, ... for the proposal is that there be no trial." *Amchem,* 521 U.S. at 620. Accordingly, the Court is convinced that the superiority requirement is met in this case.

*C. Notice Requirements of Rule 23(c)(2)*

In relevant part, Rule 23(c)(2)(B) provides, "For any class certified under Rule 23(b)(3), the court must direct to class members the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." Rule 23(c)(2)(B) also requires such notice to provide to class members in plain, easily understood terms (i) the nature of the action; (ii) the definition of the class certified; (iii) the class claims, issues, or defenses; (iv) that a class member may enter an appearance through an attorney if the member so desires; (v) that the court will exclude from the class any member who requests exclusion; (vi) the time and manner for requesting exclusion; and (vii) the binding effect of a class judgment on members under Rule 23(c)(3). Rule 23(e)(2) requires Court "to direct notice in a reasonable manner to all class members who would be bound by the proposal."

Notice was provided of this proposed settlement to all class members, whose contact information was compiled by and received from the Medical Capital and Provident Receivers, by first class mail sent out on May 16, 2011. The Court has reviewed the notice and finds it to be in compliance with the provisions of Rule 23(c) and Rule 23(e). The nature of the action, the definitions of the Settlement Classes, and the claims, defenses, and issues were clearly provided. Class members were provided with the date of the fairness hearing and were given the opportunity to object to or exclude themselves from the settlement, which was described in clear terms. *See* Pls.' App., *Billitteri* Docket No. 449–3, at 242–51. The scope of the class and effect of the judgment were clearly explained to the recipients of the notice. Accordingly, the requirements of Rule 23(c) and Rule 23(e) as to notice are satisfied, and the Court finds that class members have been given reasonable notice. *In re Dell,* 2010 WL 2371834 at *5; *Schwartz v. TXU Corp.,* No. 3:02–CV–2243–K (lead case), 2005 WL 3148350, at *11 (N.D.Tex. Nov.8, 2005) (Kinkeade, J.).

Having viewed submissions by counsel as well, the Court also concludes that the requirements of the Class Action Fairness Act, 28 U.S.C. § 1715, have been met. Notice was sent to all relevant state and federal officials, several of whom submitted briefings throughout the course of this litigation, and one of whom objects to this settlement. *See* Decl. of Peter Carter, *Billitteri* Docket No. 467.

*D. Fairness, Reasonableness, and Adequacy of the Settlement*

**\*10** In regard to a proposed class action settlement, Rule 23(e)(2) provides, "If the proposal would bind class members, the court may approve it only after a hearing and on finding that it is fair, reasonable, and adequate." The Fifth Circuit has provided six factors for district courts to consider in determining if a settlement satisfies the "fair, reasonable, and adequate" standard:

> (1) evidence that the settlement was obtained by fraud or collusion; (2) the complexity, expense, and likely duration of the litigation; (3) the stage of the litigation and available discovery; (4) the probability of plaintiffs' prevailing on the merits;

2011 WL 3586217

(5) the range of possible recovery and certainty of damages; and (6) the opinions of class counsel, class representatives, and absent class members.

*Newby v. Enron Corp.,* 394 F.3d 296, 301 (5th Cir.2004); *Reed v. Gen. Motors Corp.,* 703 F.2d 170, 172 (5th Cir.1983). These factors are commonly referred to as the *Reed* factors, and the Court will address each of them in turn. The Court will also address any objections to the settlement in regard to the *Reed* factor that they relate to for the Court's consideration.

### 1. Evidence that the Settlement was Obtained by Fraud or Collusion

As for the first factor, there is no evidence that the settlement was obtained by fraud or collusion. On the contrary, this settlement was diligently negotiated after a long and hard-fought process that culminated in ultimately successful mediation in Chicago before retried United States District Judge James Rosenbaum. *See* *Quintanilla v. A & R Demolition Inc.,* No. H–04–1965, 2007 WL 5166849, at *4 (S.D.Tex. May 7, 2007) (Rosenthal, J.) (holding a class action settlement to be free of fraud or collusion when "[t]he settlement was reached through arms-length negotiations after a long, hard-fought mediation with a neutral"). The representations of the parties throughout this litigation have impressed upon the Court that this settlement was negotiated at arms' length and was free of any fraud or collusion that would cause the Court to reject the settlement under this factor. *DeHoyos,* 240 F.R.D. at 287. The proposed settlement does not favor any class member or group of class members, which also weighs against any evidence of fraud or collusion and in favor of approval. *Vaughn v. Am. Honda Motor Co.,* 627 F.Supp.2d 738, 748 (E.D.Tex.2007) (Ward, J.).

### 2. Complexity, Expense, and Likely Duration of the Litigation

The second factor addresses the complexity, expense, and likely duration of the litigation. The Court is of the opinion that this factor weighs in favor of approval of the settlement. There is no doubt that this litigation is particularly complex, as it implicates state and federal claims, class actions transferred from Idaho and California (with the latter being for the

limited purpose of attempted settlement), the implications of various investors taking their claims to arbitration, the involvement of the trustee of a Liquidating Trust created by the Bankruptcy Court, sprawling related litigation, and various other complicated aspects. Indeed, this case perhaps best demonstrates why "securities litigation on the whole is 'notoriously difficult and unpredictable.' " *In re Dell,* 2010 WL 2371834 at *7 (quoting *Maker v. Zapata Corp.,* 714 F.2d 436, 455 (5th Cir.1983)). As Judge Sparks remarked in *Dell,* "Securities claims are difficult to prove, and without agreeing to a settlement, Plaintiffs no doubt face unpredictable and significant delays and expense in prosecuting this case." *Dell,* 2010 WL 2371834 at *7. In the event of a trial, "they would face tall hurdles in establishing the elements of their claims in the district court and convincing the jury of liability and the amount of damages." *Id.* Plaintiffs in this case would have the further unenviable task of demonstrating Ameriprise's liability for Securities America's alleged wrongs, as well as surviving a motion to dismiss, motion for summary judgment, class certification, and an almost-certain appeal. *See* *DeHoyos,* 240 F.R.D. at 291–92 (holding that the complexity, expense, and likely duration factor to favor approval of the settlement when further proceedings would include class certification, dispositive motions, Rule 23(f) appeal, trial, and further appeals). The Court has little doubt that the amount of time it would take to recover on behalf of class members, many of whom invested substantial portions of their retirement investments in these alleged Ponzi schemes, would measure in years rather than the months contemplated by the parties at this stage. *See* *Schwartz,* 2005 WL 3148350 at *19 (weighing a potential "delay in the receipt of any relief" in favor of approving a proposed settlement). Considering the potential road ahead for the litigants, the second factor weighs strongly in favor of approving this settlement.

### 3. Stage of Litigation and Availability of Discovery

**\*11** The third consideration is the stage of litigation and availability of discovery. This litigation has been ongoing for approximately two years, and this is the second attempt at a settlement of claims involving the sale of Provident and Medical Capital securities involving Securities America. Settlement negotiations between the parties have been an ongoing proposition for months, and the parties and the Court are very aware of the magnitude of the case and the positions of the parties. Although there has not been a full range of discovery in this case, sufficient information has been

2011 WL 3586217

disseminated to give the Court and the parties an effective view of the important issues in this case. As raised by class counsel at the July 27, 2011 hearing, such documentation has been made available through the exchange of millions of pages of documents, depositions by class counsel of the key players in Provident's business, documentation obtained by the S .E.C.-appointed receiver that has been reviewed by the parties, and the availability of documents and analysis stemming from a recently-settled regulatory action by the state of Massachusetts against Securities America. In any case, "the lack of [formal discovery] does not compel the conclusion that insufficient discovery was conducted" for the purposes of settlement approval. *Cotton v. Hinton,* 559 F.2d 1326, 1332 (5th Cir.1977). At this stage, the Court and the parties "possess ample information with which to evaluate the merits of the competing positions." *Ayers v. Thompson,* 358 F.3d 356, 369 (5th Cir.2004). Accordingly, this factor favors approval of the settlement.

### 4. Probability of Success on the Merits

The Court now addresses the fourth factor of the probability of success on the merits, which the Fifth Circuit has identified as the "most important factor." *Parker v. Anderson,* 667 F.2d 1204, 1209 (5th Cir.1982). "A district court faced with a proposed settlement must compare its terms with the likely rewards the class would have received following a successful trial of this case." *Reed,* 703 F.2d at 172. Here, the Court is of the opinion that the potential result favors approval of the settlement. If the class action had proceeded to trial and the class was to prevail, recovery from either Securities America, which, as noted at a previous hearing, is perilously undercapitalized, would be extremely difficult. Recovery against Ameriprise, as the parent company of Securities America's parent company, SAFC, would be similarly difficult. Class members would have to prove not only that the statements contained within the Private Placement Memoranda ("PPM") issued by Provident or Medical Capital entities were false, but that Securities America knew or should have known of the untruths or omissions within the PPMs. Even if they were to succeed, the testimony of Securities America CFO Kelly Windorski at the March 18, 2011 preliminary approval hearing for a previous proposed settlement indicates that full recovery of a judgment from Securities America or SAFC would be nearly impossible due to the small amount of assets available; indeed, the previous proposed settlement contemplated a $21 million contribution from Securities America and SAFC on a Rule 23(b)(1)(B) "limited fund" theory (which the Court

ultimately rejected), and it is clear that the total amount of assets available from Securities America or SAFC are not sufficient to cover the full amount of all claims.

**\*12** Ameriprise's voluntary contribution of tens of millions of dollars to this settlement provides class members with an opportunity to recover a substantial portion of their losses when it would be difficult to even demonstrate Ameriprise's control person liability were this litigation to continue. Plaintiffs would have to demonstrate that Ameriprise, the parent company of SAFC, which is the parent company of Securities America, had actual power or influence over Securities America and its sales of Provident and Medical Capital securities. *G.A. Thompson & Co.,* 636 F.2d at 957–58; *Fernea,* 2011 WL 2769838 at \*15. While the Court does not presume to rule on Ameriprise's knowledge, influence, and ultimate liability, piercing the corporate veil in such a manner is a very difficult task. Furthermore, the costs of litigating this dispute with all three entities and the burdens that the class would have to overcome further include surviving renewed motions to dismiss and motions for summary judgment, obtaining class certification, convincing a jury at trial, and very likely overcoming an eventual appeal. The settlement contemplated here would avoid those costs and difficulties.

In further support of the difficulty of the road ahead for the class, class counsel directs the Court to a recent decision in a related case, *Brown v. J.P. Turner & Co.,* No. 1:09–cv–2649–JEC, 2011 U.S. Dist. LEXIS 53118, 2011 WL 1882522 (N.D.Ga. May 17, 2011) (Carnes, J.). *Brown* is similar to this case; it is a suit brought by Provident investors against a broker-dealer who sold them Provident securities, alleging claims for fraud, negligence, negligent misrepresentation, and violations of Georgia securities laws. The burdens faced by the plaintiffs in *Brown* are very similar to those that would be faced by the class in this case. Judge Carries recently granted a motion to dismiss that case, and raised grounds for the dismissal that the class in this case would also have to demonstrate, including whether the broker-dealers had a duty to verify the accuracy of the PPMs for negligence purposes, whether the misrepresentations were made by Provident rather than the broker-dealer in the case, and whether there was a legal duty on the part of a broker-dealer to perform due diligence on the Provident securities. *Id.* at \*14–\*16. The Court agrees with class counsel that *Brown* demonstrates the difficulty of the class's case; accordingly, a recovery of the amount contemplated by this settlement would amount to a

2011 WL 3586217

fair, reasonable, and adequate recovery for purposes of the fourth *Reed* factor.

*5. Range of Possible Recovery by the Class*

The fifth factor is the range of possible recovery by the class. This factor includes an inquiry into whether the terms of the settlement "fall within *a reasonable range of recovery,* given the likelihood of the plaintiffs' success on the merits." *Klein,* 705 F.Supp.2d at 656 (emphasis in original) (quoting *Turner v. Murphy Oil USA, Inc.,* 472 F.Supp.2d 830, 849–50 (E.D.La.2007)). Class counsel has presented a number of empirical studies and examples that show that this recovery of approximately 40 cents on the dollar for investors in a securities class action far exceeds the normal amount recovered in such suits. Indeed, this potential recovery compares very favorably to recoveries seen in other securities class actions in this district. Based on a review of the empirical evidence and the Court's own experience in this litigation, the Court is inclined to agree with class counsel's assertions. The previous proposed settlement, which only involved Securities America and SAFC, amounted to a recovery of mere pennies on the dollar; by contrast, this amounts to a significantly greater recovery for class members. Considering the proposed settlement amount and percentage of recovery for class members far exceeds the normal result of class action settlements, this factor weighs strongly in favor of settlement.

**\*13** "Under [the range of possible recovery] factor, 'a court should consider the views of objecting class members when their 'objections to the settlement agreement center on their view that the relief it provides is inadequate.' " *Klein,* 705 F.Supp.2d at 656 (quoting *Ayers,* 358 F.3d at 370). In assessing the potential range of recovery, the Court takes into account the risks involved in the litigation and the potential costs involved, and ultimately considers whether the settlement amount is fair and reasonable and falls within a reasonable range of recovery. *See id.* (citations omitted).

One of the objections to the settlement focuses on the inadequacy of this result compared to the recovery of Massachusetts Medical Capital investors. Kim Runkle and James Yonkers argue that forty cents on the dollar minus costs and attorneys' fees does not amount to a fair settlement, especially in light of Securities America's agreement with the state of Massachusetts to fully compensate Massachusetts Medical Capital investors. They ask the Court to reject the settlement and send the parties back into negotiations or

proceed with class certification litigation. While it is true that certain class members at this point will achieve a 100% recovery as opposed to a 40% recovery based solely upon the advocacy of Massachusetts securities regulators, the Court is not convinced that this is a reason to reject the entire settlement. These objections, while reasonable, do not take into account the full context of the process that produced this settlement and the circumstances that the class as a whole and the settling defendants face. The unique recovery of the Massachusetts investors arose out of the result to a completely separate litigation that occurred with no involvement of this Court and not in conjunction with the class represented in this case. In any case, the additional recovery for certain members of the class based on an entirely separate proceeding is no reason to reject a settlement that still provides a substantially favorable recovery to the remainder of the class. This objection is therefore overruled.

A second objection by Thomas and Germaine Simon argues that investors should be able to recover interest on their investments in addition to the principal. However, this addition would amount to a negligible additional recovery that is not a sufficient reason to reject the settlement before the Court. The Simons' objection does not take into account the breadth of the negotiations taken in this case to secure the substantial recovery for all class members that far exceeds previously contemplated amounts. The Court shall not reject this settlement because the settlement does not include a small additional amount based on interest; accordingly, the Simons' objection is overruled. Overall, the objections of four class members out of thousands whose claims will be resolved by this settlement do not preclude approval. *See Klein,* 705 F.Supp.2d at 650 ("That one class member of 369 has objected to the proposed settlement does not preclude the court from approving it.").

**\*14** The Court is also convinced that the business model of Securities America would make the reality of full recovery extraordinarily difficult, if not impossible, in the wake of a successful legal victory. As the Court has repeatedly observed throughout this litigation, the undercapitalized and underinsured nature of the business model used by Securities America would have ensured that, even if the plaintiffs were to secure a legal victory in this case, Securities America and SAFC would not possess nearly enough assets to provide a recovery of the amount necessary to fully compensate class members. Mr. Windorski's testimony and the scope of the previously-rejected settlement strongly support this assessment. The scope of this settlement, which has been

greatly magnified by Ameriprise's voluntary contribution to the settlement fund, is especially attractive considering the reality of the potential recovery in this case when taking the business model and assets of Securities America into account.

In light of these considerations, the fifth factor weighs in favor of approving the settlement.

### 6. Opinions of Class Counsel, Class Representatives, and Absent Class Members

The final factor is the opinions of class counsel, class representatives, and absent class members. As class counsel tends to be the most familiar with the intricacies of a class action lawsuit and settlement, "the trial court is entitled to rely upon the judgment of experienced counsel for the parties." *Cotton,* 559 F.2d at 1330; *see also Reed,* 703 F.2d at 175. Here, class counsel, other counsel affiliated with the class action and ultimate settlement result, the Liquidating Trustee of the Provident Royalties Liquidating Trust, and the Provident and Medical Capital Receivers have enthusiastically endorsed the proposed settlement as a substantial achievement and recovery for class members, and the Court is inclined to agree. All class representatives have also submitted affidavits in support of the settlement, further supporting approval. Only 30 of over 2,000 class members have opted out of this settlement. "The extremely small number of opt-outs suggests a favorable opinion by the absent class members." *Vaughn,* 627 F.Supp.2d at 748. Furthermore, a very small number of objections have been received, and the several of the objections from class members actually approve of the amount of the settlement, instead objecting to the amount of attorneys' fees requested by counsel.[3] One class member, Patricia MacDonald, wrote in support of the settlement. The opinion of the personnel involved in the litigation toward the proposed settlement has been overwhelmingly positive, and the Court considers all of the contributions to weigh heavily in favor of approving the settlement.

Accordingly, the Court is convinced that all of the prescribed factors for evaluating a class action settlement support approval of the settlement agreement before the Court.

### E. Objections by the Commissioner of Securities and Insurance of Montana

**\*15** The Office of the Commissioner of Securities and Insurance of the state of Montana, which is not a party to this litigation, has submitted a brief objecting to the settlement to the extent it impedes upon the power of Montana state regulators to bring actions against any settling defendant for violations of Montana state law. A civil action by the state of Montana is currently proceeding against Securities America. Montana does not appear to object to approval of the settlement itself, but only to the extent that it interferes with the ability of Montana state regulators to pursue actions against Securities America under the laws of the state of Montana.

While Montana does not specifically identify what language in the Settlement Agreement it objects to, the Court believes that its concerns focus on the following provisions in Part C:

> 3. Dismiss all Released Claims with prejudice and without costs to any Settling Party as against any other Settling Party, and adjudge that Releasees are released from any and all liability as to the Released Claims, such that *any and all Claims filed by, or on behalf of, or for the benefit of, or in the name of any Settlement Class Member(s) in any forum against Releasees are or shall be dismissed to the extent they assert the Released Claims;*

> 4. Bar and permanently enjoin Settlement Class Members, and *any other persons purporting to act in the name of or on behalf of, or for the benefit of any Settlement Class Members, from prosecuting, commencing or continuing any and all Released Claims which they had or have, against the Releasees in any forum;*

> \* \* \*

> 6. Bar and permanently enjoin Releasees, *and any other persons purporting to act in the name or on behalf of any Releasee,* from prosecuting, commencing or continuing against any Settlement Class Member any and all claims that they had or have based upon the matters set forth in paragraph VIII.C.5 above ...

Settlement Agreement, Pls.' App., *Billitteri* Docket No. 449–3, at 198–99 (emphasis added).

The proposed settlement presented to the Court for approval contemplates settling claims for restitution by investors in the class.[4] This settlement does not prevent a state such as Montana from bringing claims or charges against Securities America, SAFC, or Ameriprise for violating its laws or securities regulations. Should a state choose to bring such claims or charges, there is no impediment to the assessing

Case 4:19-cv-00509 Document 65-9 Filed 07/02/21 in TXSD Page 131 of 1452
**Billitteri v. Securities America, Inc., Not Reported in F.Supp.2d (2011)**
2011 WL 3586217

of fines, penalties, or injunctive relief against the settling Defendants. At this stage, the question of whether the state of Montana or any other state may pursue claims against Securities America or any other settling defendant for the purpose of recovering on behalf of class members is not presently before the Court, and the Court shall not reject

the settlement based upon this objection. *See* *Larson v. Sprint Nextel Corp.,* No. 07–5325, 2010 WL 234934, at *16 (D.N.J. Jan.15, 2010)* ("[T]o the extent that the State of Minnesota encourages the Court to declare that the release provision contained in the *Larson* Settlement Agreement does not prevent its right to pursue law enforcement action (and corresponding restitution claims) in Minnesota state court, such matters are not presently before this Court and, therefore, will not be addressed at this juncture.").

 **\*16** In *In re American Investors Life Insurance Co. Annuity Marketing & Sales Practices Litigation,* 263 F.R.D. 226 (E.D.Pa.2009), Judge McLaughlin faced similar objections to a settlement from the Attorneys General of two states. *Id.* at 241. Judge McLaughlin overruled these objections, writing,

> In terms of foreclosed claims or relief, the issue of whether a ... restitution remedy may be foreclosed is not currently before the Court. The defendants in this action are entitled to a release of all claims held by class members in exchange for providing the relief outlined in the settlement. The attorneys' general law enforcement powers are not claims the plaintiffs have, and as such, the plaintiffs do not release any of these claims.

*Id.* The Court is convinced that a similar result is mandated in this case. The question of whether Montana is foreclosed

from pursuing certain actions by this settlement is not before the Court, and it is unnecessary and inappropriate to reject the settlement based upon a controversy that the Court need not and should not consider at this stage. In any case, even if the Court were to find merit to Montana's objections, it lacks the authority to comply with its apparent request to alter or omit certain language within the settlement. *See* *DeHoyos,* 240 F.R.D. at 286 (noting that "the court cannot the terms of the proposed settlement; rather, the Court must approve or disapprove of the proposed settlement as a whole") (quoting *Garza v. Sporting Goods Props., Inc.,* No. SA–93–CA–108, 1996 WL 56247, at *11 (W.D.Tex. Feb.6, 1996) (Biery, J.)). Montana's objection to the proposed settlement is therefore overruled.

### Conclusion

"A proposed settlement need not obtain the largest conceivable recovery for the class to be worthy of approval; it must simply be fair and adequate considering all of the relevant circumstances." *Klein,* 705 F.Supp.2d at 649. Here, the Court is convinced that the proposed settlement before it provides a fair, reasonable, and adequate recovery for

class members, and meets all of the requirements of Rule 23. Accordingly, it is ORDERED that the Motion for Class Action Settlement with Securities America, Inc., Securities America Financial Corporation, and Ameriprise Financial, Inc. is GRANTED. After an order of severance is issued, the Court shall issue a separate order detailing the Settlement Agreement and providing for final judgment of the claims against Securities America, SAFC, and Ameriprise in the *Billitteri, Toomey,* and *McCoy* cases. The Court shall also address the issue of attorneys' fees in a separate order.

IT IS SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2011 WL 3586217

### Footnotes

1    Several class members filed objections to the amount of attorneys' fees requested without substantively objecting to the settlement itself. These objections will be addressed in a separate order.

**Billitteri v. Securities America, Inc., Not Reported in F.Supp.2d (2011)**

2011 WL 3586217

2    This resolves *Billitteri* Docket No. 447, *McCoy* Docket No. 275 and *Toomey* Docket No. 116.

3    As noted earlier, these objections shall be addressed in a separate order.

4    According to counsel for Securities America, there are six Provident investors who are residents of the state of Montana. Five have claims that are covered by this settlement, and one is an arbitration claimant whose claims are covered by the settlement addressing arbitration claims.

---

**End of Document**
© 2021 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 10

Braud v. Transport Service Co. of Illinois, Not Reported in F.Supp.2d (2010)

KeyCite Yellow Flag - Negative Treatment

Distinguished by [Gros v. New Orleans City,](#) E.D.La., August 8, 2014

2010 WL 3283398
Only the Westlaw citation is currently available.
United States District Court,
E.D. Louisiana.

Pamela BRAUD, et al.

v.

TRANSPORT SERVICE CO. OF ILLINOIS, et al.

Civil Action Nos. 05–1898,
05–1977, 05–5557, 06–0891.
|
Aug. 17, 2010.

**Attorneys and Law Firms**

[John Paul Massicot](#), [Frank A. Silvestri](#), [M. Damien Savoie](#),
Silvestri & Massicot, [John D. Sileo](#), [John D. Sileo](#), Attorney
at Law, [Kevin Lester Oufnac](#), Kahn Gauthier Swick, LLC,
Ramona Donisia Washington, Ramona D. Washington,
Attorney and Counselor at Law, [Lawrence D. Wiedemann](#),
Wiedemann & Wiedemann, [Joseph M. Bruno](#), [David Scott
Scalia](#), Bruno & Bruno, New Orleans, LA, [Gregory G.
Gremillion](#), Gaudry, Ranson, Higgins & Gremillion, LLC,
Gretna, LA, [Ron Anthony Austin](#), Austin & Associates, LLC,
Harvey, LA, for Pamela Braud, et al.

[J. Warren Gardner, Jr.](#), [Gregory Scott Lacour](#), Christovich
& Kearney, LLP, [Lance R. Rydberg](#), Duncan, Courington &
Rydberg, LLC, New Orleans, LA, for Transport Service Co.
of Illinois, et al.

**ORDER**

[DANIEL E. KNOWLES, III](#), United States Magistrate Judge.

**\*1** On June 16, 2010, the undersigned Magistrate Judge
conducted a fairness hearing on the proposed settlement in
this putative class action. Also before the Court are the
Motion for an Award of Common Benefit Attorneys' Fees,
Costs and Administrative Expenses; Approval of Incentive
Awards to Settlement Class Representatives; and an Award
of Common Benefit Fees and Costs for Plaintiffs' Settlement
Class Counsel [Doc. # 215] and the Intervening Plaintiffs'
Counsel's Motion for Attorney's Fees/Petition for Common

Benefit Fees [Doc. # 216]. Present at the oral hearing
were John Paul Massicot, Damien Savoie, David Scalia and
Gregory Gremillion on behalf of plaintiffs and consolidated
plaintiffs. Also present were J. Warren Gardner and Gregory
Scott LaCour on behalf of defendant Transport Services
Co. of Illinois and Magali Puente on behalf of defendant
Jerome Holmes. Also present were Pius Obioha on behalf
of the objectors and William Hall, the Court-appointed
Special Master. [1] Having reviewed the relevant pleadings and
memoranda, the case law, the parties' oral argument and any
objections to the settlement, the Court rules as follows.

**I. Background**

On August 30, 2004, Pamela Braud and certain other plaintiffs
("plaintiffs") filed a "Class Action Petition for Damages" in
Civil District Court for the Parish of Orleans. This lawsuit
arose out of a chemical spill that occurred on August 19,
2004 in the Algiers area of New Orleans, Louisiana. Plaintiffs
proposed a class that would consist of all persons who were
present and/or owned property in the affected vicinity of
General Meyer Boulevard and Huntlee Drive in Algiers,
Louisiana on August 19, 2004, "when a toxic, noxious and/
or hazardous substance [Monoethanolamine] was released
and/or leaked from the failed tanker" owned by defendant
Transport Service Co. of Illinois ("Transport") and driven by
its employee, Jerome Holmes. [Doc. # 1 at p. 7].

On April 8, 2005, plaintiffs amended their petition to name
as an additional defendant Ineos Americas, L.L.C. ("Ineos"),
which plaintiffs contended was the owner and co-shipper of
the chemical that allegedly spilled. Ineos was served with the
original and supplemental class action petition on April 19,
2005. On May 19, 2005, Ineos timely removed the action
to federal court, basing removal jurisdiction on the Class
Action Fairness Act of 2005 ("CAFA"). Plaintiffs are citizens
of Louisiana, and Ineos is a foreign corporation authorized
to do business in Louisiana. On June 17, 2005, plaintiffs
moved to remand to state court, and on July 12, 2005, they
filed a purported unopposed motion to dismiss Ineos. By
order entered December 9, 2005, the District Court remanded,
finding that CAFA did not apply because plaintiffs had filed
their initial complaint before CAFA's effective date, despite
the fact that Ineos was not named as a defendant until after
the effective date (February 18, 2005). Transport, pursuant to

[28 U.S.C. § 1453(c),](#) filed on December 16, 2005 a timely
application for leave to appeal, which the Fifth Circuit granted
on January 27, 2006.

**\*2** The issue on appeal (one of first impression) was whether an amendment of the complaint through the addition of a new defendant "commenced" a new suit for purposes of CAFA. Defendants urged the Fifth Circuit to employ the reasoning of *Knudsen v. Liberty Mutual Insurance Co.,* 411 F.3d 805, 807 (7th Cir.2005), and *Schillinger v. Union Pacific Railroad,* 425 F.3d 330 (7th Cir.2005), to hold that the post-CAFA amendment of a pre-CAFA complaint by adding a new defendant "commences" a new suit. Plaintiffs countered that (1) CAFA was not meant to be retroactive; (2) *Knudsen* was inapposite, and any language that would support appellants' position was "mere dicta;" (3) even applying *Knudsen* 's reasoning, no new suit would commence here, because the addition of Ineos "related back" to the original complaint; and (4) in any event, Ineos's dismissal after removal and before the ruling on the motion to remand ousted the court of subject matter jurisdiction.

The Fifth Circuit found in favor of Transport, reaching the conclusion that amendments that add a defendant "commence" the civil action as to the added party based on two considerations: (1) Because CAFA does not define "commencement" of an action, it is obvious that CAFA is not intended to replace caselaw deciding when a lawsuit is considered "commenced" as to a new defendant and "most courts examining post-CAFA pleading amendments in a suit pending pre-CAFA recognize that such amendments can commence a 'new' lawsuit and create federal removal jurisdiction;" and (2) the court agreed with the *Knudsen* court that the addition of a new defendant "opens a new window of removal" under 1446(b). *Braud v. Transp. Serv. Co. of Ill.,* 445 F.3d 801 (5th Cir.2006). The Fifth Circuit reversed the order of the district court and remanded the matter to the district court for further proceedings.

After remand, the parties consented to proceed before the undersigned. The case then proceeded to a bench trial on two major issues: (1) the third-party fault of the policemen and the fireman after arrival at the spill and (2) the liability of Transport (*i.e .,* whether Holmes was operating in the course and scope of his employment at the time of the accident). Plaintiffs prevailed on both issues. However, the Court later denied plaintiffs' motion for class certification.

The parties ultimately settled. On March 1, 2010, the Court entered a preliminary approval order that defined the settlement class, designated class counsel, preliminarily found the sum of $950,000.00 reasonable and adequate to compensate the class and scheduled the fairness hearing on June 16, 2010. The Court has now conducted the fairness hearing as to the terms of the class settlement and approves the settlement for the reasons that follow.

## II. Law

Federal Rule of Civil Procedure 23 governs the settlement of class actions. *See Henderson v. Eaton,* No. Civ. A. 01–0138, 2002 WL 31415728, \*2 (E.D.La.2002) (citing *Pearson v. Ecological Sci. Corp.,* 522 F.2d 171, 176–77 (5th Cir.1975)). A class action may not be dismissed or compromised without the district court's approval. *See* Fed.R.Civ.P. 23(e). Before a court approves a settlement, the court must find that the proposed settlement is "fair, reasonable, and adequate." Fed.R.Civ.P. 23(e)(1)(c); *see also Cope v. Duggins,* 203 F.Supp.2d 650, 652–53 (E.D.La.2002) (citing *Cotton v. Hinton,* 559 F.2d 1326, 1330 (5th Cir.1977)).

**\*3** The Court must "ensure that the settlement is in the interest of the class, does not unfairly impinge on the rights and interests of dissenters, and does not merely mantle oppression." *Reed v. Gen. Motors Corp.,* 703 F.2d 170, 172 (5th Cir.1983) (quoting *Pettway v. Am. Cast Iron Pipe Co.,* 576 F.2d 1157, 1214 (5th Cir.1978)). Because the parties' interests are aligned in favor of a settlement, the Court must take independent steps to ensure fairness in the absence of adversarial proceedings. *Reynolds v. Beneficial Nat'l Bank,* 288 F.3d 277, 279–80 (7th Cir.2002) (noting that the class action context "requires district judges to exercise the highest degree of vigilance in scrutinizing proposed settlements."); *see also* Manual for Complex Litigation ("MCL") (Fourth) § 21.61 (2004). The Court's duty of vigilance does not, however, authorize it to try the case in the settlement hearings. *Cotton,* 559 F.2d at 1330.

A court shall not approve a settlement unless it is fair, adequate, and reasonable. *Parker v. Anderson,* 667 F.2d 1204, 1209 (5th Cir.1982). In evaluating proposed settlements, a court should consider six factors:

> (1) whether the settlement was a product of fraud or collusion; (2) the complexity, expense, and likely

Braud v. Transport Service Co. of Illinois, Not Reported in F.Supp.2d (2010)

duration of the litigation; (3) the stage of the proceedings and the amount of discovery completed; (4) the factual and legal obstacles [to] prevailing on the merits; (5) the possible range of recovery and the certainty of damages; and (6) the respective opinions of the participants, including class counsel, class representative, and the absent class members.

*Id.* (citing *Pettway v. Am. Cast Iron Pipe Co.,* 576 F.2d 1157 (5th Cir.1978)). Absent a showing of fraud or collusion, "the most important factor is the probability of the plaintiffs' success on the merits." *Id.* The Court must therefore ensure that evidence from the class representatives and special master resolve the aforementioned factors. In considering these factors, there is a strong presumption in favor of finding the settlement fair. *See* *Cotton,* 559 F.2d at 1331 ("Particularly in class action suits, there is an overriding public interest in favor of settlement.") (citing *United States v. Allegheny–Ludlum Indus., Inc.,* 517 F.2d 826 (5th Cir.1975)).

### III. Analysis

#### A. Fairness of the Settlement

At the oral fairness hearing, the Court heard testimony from numerous witnesses. The first witness to take the stand was class representative Ibrahim Autamari, who owns a business in the geographical area of the toxic spill. Autamari testified that he lost business on the day of the spill because the civil authorities cordoned off the area of the spill. Autamari testified that he had discussed the settlement with class counsel, had read the settlement documents, had read the petition for counsels' fees and costs, had discussed the settlement with the other class representatives and believed the settlement to be fair and adequate to compensate the class.

**\*4** Annie Meredith and Vicki Duzac, two other class representatives, then testified. [2] Meredith is a resident of the affected area, and Duzac is an officer of the New Orleans Police Department who was one of the first responders to the scene. While their losses differed from Autamari's, both testified identically to Autamari concerning the settlement terms and agreement. During the testimony of Meredith, Pius

Obioha, attorney for certain objectors, withdrew his objection after questioning Meredith as to the amount of the settlement agreement. The objection will be discussed further below.

William Hall, the Court-appointed Special Master, then testified. Hall testified that he had received no properly-filed opt-outs from the class. He also testified that he had received timely-filed objections (withdrawn later, as noted above) but had not received proof of claims as to those objectors. Further testimony as to the reasonableness of the attorneys' fees will be discussed below.

The Court finds that the settlement amount of $950,000.00 is fair and adequate to compensate the class. Counsel notes that approximately 687 claim forms were submitted before the Court-ordered deadline. Of these, approximately 578 claims fall within the established geographic boundaries. Approximately 200 claim forms have been provided with proof of residency or presence in the boundary areas. The sum of $950,000.00—less the attorneys' fees, as will be discussed below—is adequate to compensate this number of plaintiffs for their damages.

No party testified that the settlement was a product of fraud and/or collusion. Indeed, the Court notes that the parties have actively pursued settlement for a long period of time. Neither was the objection based on any notion of fraud and/or collusion. This lawsuit has been pending for five years, and the parties have actively pursued settlement as a final resolution. Indeed, while the Court ultimately denied class certification, plaintiffs earlier prevailed on the two aforementioned liability issues after a bench trial. Further, it is undisputed that a spill occurred, and plaintiffs have a likely success on the merits. The length of time that this suit has been pending, and the possibility that plaintiffs may succeed on the merits weigh in favor of plaintiffs' receipt of a large settlement fund that totals approximately one million dollars. The Court places heavy emphasis on the respective opinions of the class representatives, class counsel and the Special Master, all of whom testified that they approve of the settlement and its amount. The Court has no evidence before it that this settlement is unfair or inadequate to compensate plaintiffs.

On May 19, 2010, counsel Pius Obioha filed an objection to the settlement in the record. The objection listed the names of the putative plaintiffs and the objection itself: "The class members believe the settlement amount is inadequate to fully compensate the entire class for damages sustained." [Doc. #

213 at p. 9]. On June 30, 2010, Ron Austin filed a similar objection. [Doc. # 225]. While Obioha withdrew his objection at the oral fairness hearing, it appears that he now renews the objection, given that he has filed a Memorandum in Support of Objection Filed on Behalf of Certain Plaintiffs' Class Members. [Doc. # 223].

 **\*5** In the memorandum, counsel argues that the deadline to file a proof of claim form was May 7, 2010, and the deadline to file an objection was May 19, 2010. Counsel argues that nowhere on the settlement's website —www.aotclassaction.com—does it indicate that plaintiffs needed to file a proof of claim form to remain a member of the class and to later object. Counsel also notes that the "Legal Notice of Class–Wide Settlement" stated "those Class Members who do not timely file a proof of claim ... are not entitled to participate in any settlement or judgment affecting the Class Plaintiffs." [Doc. # 223–4 at p. 6]. Counsel argues, however, that the Legal Notice, like the website, did not require that a proof of claim form be filed to object to the settlement. Lastly, counsel notes that Section VII(5) of the settlement agreement provides, "Except for those settlement class members who have opted out in accordance with this agreement, every settlement class member will conclusively be deemed a settlement class member for all purposes under this agreement." [Doc. # 223–5 at p. 13]. Counsel thus contends that the objecting putative class members are conclusively deemed class members under the settlement agreement itself because they never opted out of the settlement.

For the following reasons, the Court rejects all objections to the settlement. The text of Federal Rule of Civil Procedure 23 allows a class member to object to a proposed settlement. Fed.R.Civ.P. 23(e)(5). But only class members have standing to object to a settlement. *Feder v. Elec. Data Sys. Corp.,* 248 Fed. Appx. 579, 580, 2007 WL 2800135, \*1 (5th Cir. Sept.25, 2007). "Anyone else lacks the requisite proof of injury necessary to establish the 'irreducible minimum' of standing." *Id.* The issue here is whether the putative plaintiffs listed in Obioha's objection and those in Austin's objection have provided enough evidence to demonstrate that they are class members who have standing to object. It is putative plaintiffs' burden to demonstrate that they have standing. *Id.* at \*2 (citing *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 561, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)).

The period to file a proof of claim closed on May 7, 2010. There is no evidence in the record that putative plaintiffs filed timely proof of claim forms. Indeed, Obioha submitted proof of claims on behalf of the putative plaintiffs to the Court at the June 16, 2010 oral hearing, more than a month after the deadline. *Id.* It is axiomatic that one must file a proof of claim form to become a member of a class, especially in a suit such as this in which this Court denied class certification, and the only class is a class for settlement purposes. While Obioha argued at the oral hearing that he had timely mailed the proof of claim forms, the only evidence in the record of a mailing that this Court has seen is a certified letter envelope attached to putative plaintiffs' objections and dated May 19, 2010. [3]

 **\*6** Further, despite their unsupported assertions that they are members of the settlement class, there is no evidence in the record that putative plaintiffs reside in the geographical boundary of the class. While putative plaintiffs listed their addresses on the untimely-filed proof of claim forms, class counsel never had the opportunity to compare the forms to the geographical boundary in the settlement agreement to ensure that plaintiffs fall within the definition of the class. While counsel's argument that Section VII(5) of the settlement agreement "deems" them settlement class members is superficially appealing, counsel can not avoid the fact that a party must file a proof of claim form before one can become a member of a settlement class. The language in the settlement agreement cited by the objectors presupposes that the settlement class member has filed a proof of claim form and has already become a settlement class member. Indeed, one can not opt out of a class to which one is not already a member. The Court here did not certify a class, and thus the only way that a party could become a member of the class would have been to file a proof of claim in accordance with the directive of the legal notice and the settlement agreement. Putative plaintiffs simply have no standing to object. Accordingly, the Court rejects the objections and finds the settlement fair and adequate to compensate the settlement class members.

## B. Attorneys' Fees

### 1. Motion for an Award of Common Benefit Attorneys' Fees, Costs and Administrative Expenses; Approval of Incentive Awards to Settlement Class Representatives; and an Award of Common Benefit Fees and Costs for Plaintiffs' Settlement Class Counsel

Class counsel, Silvestri & Massicot, seeks an award of common-benefit attorneys' fees based on a "percentage of

the fund" method rather than the Lodestar method because a calculation of a fee award based on the lodestar method will exceed the 40 percent sought under the percentage method. Counsel also seeks the allocation of an incentive award to the class representatives.

After citing relevant and generic case law as to the calculation of attorneys' fees under the lodestar method, counsel argues that there is a trend in the courts to adopt the "percentage of the fund" calculation in common-fund suits. *In re Combustion, Inc.,* 968 F.Supp. 1116 (W.D.La.1997); *see Longden v. Sunderman,* 979 F.2d 1095 (5th Cir.1992); *In re Harrah's Entm't, Inc. Secs. Litig.,* No. Civ. A. 95–3925, 1998 WL 832574 (E.D.La.1998).

Counsel argues that customarily, the percentage fees range between 33.33% and 45%. Counsel suggest that 40% is a reasonable rate in this suit given the nature of the litigation, the inherent risks involved, the amount of work done, the results obtained and the twelve factors in *Johnson v. Georgia Highway Express,* 488 F.2d 714 (5th Cir.1974), *abrogated on other grounds by Blanchard v. Bergeron,* 489 U.S. 87, 109 S.Ct. 939, 103 L.Ed.2d 67 (1989). Counsel points to unpublished case law in this circuit in which the court has awarded a 40% fee. *Pedeaux v. Georgia Gulf Corp.,* Civ. A. No. 01–349 (M.D.La.), [Doc. # 97 at p. 4]; *In re Eunice Train Derailment,* Civ. A. No. 00–1267 (W.D.La.), [Doc. # 124 at p. 7]; *In re The Complaint of Ingram Barge Co.,* 187 F.R.D. 262 (M.D.La.1999), [Doc. # 4060 at p. 5].

**\*7** Counsel argues that the time, labor, novelty and skill involved in this suit support a fee award of 40%. Counsel reviewed plaintiffs' rights before filing suit, investigated the claim, filed the suit, engaged in discovery, including propounding written discovery and attending numerous depositions, and defended the earlier two liability issues at trial before this Court. Counsel appealed the remand order to the Fifth Circuit. In addition, counsel has successfully resolved this suit. Counsel notes that in their five-year involvement in this suit, they have expended approximately 1,380 hours of attorney time and 185 hours of paralegal time.

Counsel argues that while this suit did not preclude them from accepting other work, it did preclude counsel's firm from devoting more time to other suits. Counsel contends that their relationship with the class representatives has been a professional one. Counsel also notes that the possibility

of non-payment and the loss of costs expended on behalf of the putative class members have been present throughout the litigation. Counsel advanced significant costs in this suit. That counsel negotiated a $950,000.00 settlement also weighs in favor of the fee award, given that the chemical spill was actually a rather small, albeit dangerous, spill. Counsel also contends that their experience, reputation and ability support the fee award. Counsel maintains that because many attorneys did not view this suit as one with a large potential or easy return, the undesirability of the case also weighs in favor of a fee award.

Counsel also contends that Ibrahim Autamari, Vicki Duzac, Annie Meredith and the Rev. Samuel Meredith merit incentive awards of $7,000.00, $5,000.00, $2,500.00 and $2,500.00, respectively. The class representatives worked with experienced counsel to help prosecute the suit. The class representatives also helped confer a benefit on the entire class. Citing to case law from other courts, counsel argues that such incentive awards are common and consistent with other incentive awards.

Lastly, counsel asks the Court to reimburse the Court-appointed Special Master, the Disbursing Agent and the Escrow Agent on submission of their respective bills, which sums shall be paid from the aggregate settlement fund.

### 2. Intervening Plaintiffs' Counsel's Motion for Attorney's Fees/Petition for Common Benefit Fees

Gregory Gremillion moves for an award of common-benefit attorneys' fees. He argues that he seeks the fees expended only for the common benefit of the class, although he actually expended more time on the suit. Gremillion represents Vicki Sessler Duzac, a class representative, and Shinette Kelly, Gary Gremillion, John Duzac and Robert Italiano.

Gremillion originally filed suit on behalf of his clients in state court. Gremillion notes that he participated in numerous depositions in the suit, including those of all five of his clients. Gremillion seeks a fee award in the total amount of $4,425.00. This amount includes common-benefit time on his behalf of 20.1 hours at $200.00/hour. Gremillion also notes that his paralegal devoted 5.4 hours to the suit at a rate of $75.00/hour, for a total of $405.00.

### 3. The Fairness Hearing

**\*8** As noted above, at the fairness hearing, each class representative testified that he or she had read the petition for

fees and costs, had discussed the petition with the other class representatives and approved the petition. Irving Warshauer, Esq. then testified as an expert as to attorneys' fees in suits such as this one. Warshauer testified that he has been an attorney in Louisiana since 1976 and has been involved in numerous class-action suits. After class counsel tendered him as an expert as to attorneys' fees in class-action suits, the Court accepted him as an expert after no objection.

Warshauer stated that he had reviewed the petition for fees and costs and examined the entire and voluminous file of this suit at the office of Sylvestri & Massicot. He testified that the contents of the file corresponded to the work listed as performed in the petition. Warshauer's expert opinion is that a fee of 40 percent is fair and adequate given the amount of work performed in this suit. He then cited the Court to several cases—both state and federal—in which the courts had awarded a fee of 40 percent. Warshauer testified that the work that Sylvestri & Massicot performed was commensurate with work that he and other attorneys had performed in similar suits.

After discussing Gremillion's fee petition, no party objected to the petition. Finally, Laura Bass, a paralegal at Sylvestri & Massicot, testified. She has been a paralegal at Sylvestri & Massicot for eight years. She testified as to the work that the firm had performed. She also testified that she had handled the claims office at Sylvestri & Massicot and that she had helped to design the class-action settlement website.

### 4. Analysis

With regard to determining the reasonableness of the amount of attorneys fees, a " 'district court is not bound by the agreement of the parties." ' *Strong v. BellSouth Telecomms., Inc.,* 137 F.3d 844, 849 (5th Cir.1998) (quoting *Piambino v. Bailey,* 610 F.2d 1306, 1328 (5th Cir.1980); *Foster v. Boise–Cascade, Inc.,* 577 F.2d 335, 336 (5th Cir.1978)). "The court must scrutinize the agreed-to fees under the standards set forth in *Johnson v. Georgia Highway Express,* 488 F.2d 714 (5th Cir.1974), and not merely 'ratify a pre-arranged compact." ' *Strong,* 137 F.3d at 849 (quoting *Piambino,* 610 F.2d at 1328). "Even when the district court finds the settlement agreement to be untainted by collusion, fraud, and other irregularities, the court must thoroughly review the attorneys' fees agreed to by the parties in the proposed settlement agreement." *Id.* at 850.

### a. Calculating Fees in the Fifth Circuit

Typically, courts have applied two different methods for calculating attorney fees in class action lawsuits: the percentage fee method and the lodestar method. In the Fifth Circuit, the lodestar method is used to calculate reasonable attorneys fees, but that method has been somewhat "blended" with the percentage fee method and the twelve factors set forth in *Johnson. See In re Harrah's Entm't Inc. Secs. Litig.,* No. Civ. A. 95–3925, 1998 WL 832574, at *3 (E.D.La. Nov.25, 1998) (citing *In re Combustion, Inc.,* 968 F.Supp. 1116, 1135 (W.D.La.1997)). Moreover, numerous district courts in this circuit have simply applied the percentage fee method in common fund cases. *See Harrah's,* 1998 WL 832574, at *2 (citing *In re Catfish Antitrust Litig.,* 939 F.Supp. 493, 500 (N.D.Miss.1996); *In re Prudential–Bach Energy Income P'ships Secs. Litig.,* No. MDL 888, 1994 WL 150742, at *4 (E.D.La. Mar.7, 1994)); *see also Turner v. Murphy Oil USA, Inc.,* 422 F.Supp.2d 676 (E.D.La.2006) (applying percentage fee method to compute common benefit fees in class action); *Faircloth v. Certified Fin., Inc.,* No. Civ. A. 99–3097, 2001 WL 527489 (E.D.La. May 16, 2001) (same).

**\*9** The Fifth Circuit has held that "this circuit uses [the lodestar method] to assess attorneys' fees in class action suits." *Strong,* 137 F.3d at 850. As Judge Clement stated in *Harrah's,* however, "[d]espite the apparent advantages of the percentage fee method over the lodestar method in common fund cases, the law in the Fifth Circuit concerning which method should be applied is 'at best unclear." ' *Id.* (quoting *Combustion,* 968 F.Supp. at 1134). But while the lodestar method is still the proper method for calculating attorneys' fees in this jurisdiction, the Fifth Circuit has recognized the propriety of the percentage fee method in situations in which each member of a class has an "undisputed and mathematically ascertainable claim to part of [a] judgment." *Strong,* 137 F.3d at 852 (quoting *Boeing Co. v. Van Gemert,* 444 U.S. 472, 479, 100 S.Ct. 745, 62 L.Ed.2d 676 (1980)). Therefore, "[i]t seems that a district court in the Fifth Circuit may exercise discretion in determining whether to apply the percentage fee or lodestar method, as long as under either method the award is supported by the twelve *Johnson* factors. *Harrah's,* 1998 WL 832574, at *3 (citing *Combustion,* 968 F.Supp. at 1135). Under either the lodestar or percentage fee method, the Fifth Circuit

requires that the award be supported by the *Johnson* factors. *Combustion,* 968 F.Supp. at 1135.

In 1974, the Fifth Circuit articulated twelve factors to be examined in setting attorneys' fees. *Johnson.* 488 F.2d at 717. The *Johnson* factors are: (1) time and labor required; (2) novelty and difficulty of the issues; (3) skill required to perform the legal services properly; (4) preclusion of other employment; (5) customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) amount involved and results obtained; (9) experience, reputation, and ability of the attorneys; (10) undesirability of the case; (11) nature and length of professional relationship with the client; and (12) awards in similar cases. *Id.* at 717–19.

Here, the Court will apply the percentage fee method in accordance with the case law in this circuit and at the request of counsel. The Court does not find that application of the lodestar method would result in a more reasonable award of fees. Moreover, application of the lodestar method would be unduly burdensome. The lodestar method would require the Court to set reasonable rates for the attorneys of at least four different firms and to review extensive itemized billing records in order to determine whether the approximately 1,600 charged hours were reasonably expended.

### b. Benchmark Percentage

Many courts begin their fee analysis by determining the initial "benchmark" percentage, which they then adjust for the particular circumstances of the case. *See, e.g., Camden I Condominium Ass'n, Inc. v. Dunkel,* 946 F.2d 768, 774–75 (11th Cir.1991) (citing *Paul, Johnson, Alston & Hunt v. Graulty,* 886 F.2d 268, 272 (9th Cir.1989)); *In re Catfish Antitrust Litig.,* 939 F.Supp. at 501; see also Manual of Complex Litigation ("MCL") (4th) § 14.122. To determine the benchmark, the Court considers fee awards in similar cases, which the Court notes is the last of the Johnson factors. The Manual for Complex Litigation states that a fee of 25% of a common fund "represents a typical benchmark." MCL (4th) § 14.121. Further, data on fee awards in class action settlements is available in a recent study that compares two comprehensive class action data sets from 1993–2002. *See* Theodore Eisenberg and Geoffrey P. Miller, *Attorney Fees in Class Action Settlement: An Empirical Study,* 1 Journal of Empirical Legal Studies 27, 28 (2004). The data sets are (1) data based on published decisions from "all state and federal class actions with reported fee decisions between 1993 and 2002, inclusive, in which the fee and class recovery could be determined with reasonable confidence"; and (2) information reported on more than 600 common fund cases from 1993 to 2002 in Class Action Reports ("CARs"). *Id.* The study finds a "strong correlation between the fee amount and the client recovery." *Id.* at 52. The study further indicates that a scaling effect exists, for "[a]s client recovery increases, the fee percent decreases." *Id.* at 54. The authors of the study suggest that the results can assist courts in determining fee awards:

> **\*10** [B]ecause our study finds an overwhelming correlation between class recovery and attorney fees, the court can conduct a simple initial inquiry that looks only at these two variables in any case where the size of the class recovery can be estimated. The court need only compare the request in a given case with average awards in cases of similar magnitude. If the request is relatively close to average awards in cases with similar characteristics, the court may feel a degree of confidence in approving the award. If the request is significantly higher than amounts awarded in past cases, the court should inquire further.

*Id.* at 72. Eisenberg and Miller divided the cases into ten ranges of recovery (deciles) and then gave the mean and median fee percent, as well as the standard deviation for each fee percent. *Id.* at 73. The Court finds the study's data on the average percentage fee awarded in the recovery range comparable to this case useful in arriving at a benchmark percentage fee. *Id.*

The $950,000.00 recovery in this case falls within the less than 10% decile of client recovery, which includes recoveries of less than $1.4 million. *Id.* at 73. Based on the CARs data set, the mean fee percent for nonsecurities cases in this decile was 30.9%, with a standard deviation of 8.2%. *Id.* The data set generated from published decisions shows a mean fee percent for cases in this decile of 29.5%, with a standard deviation of 5.9%. *Id.*

Based on this data, the Court will use an initial benchmark of 30%, which is roughly the average of the mean fee percentages of the two data sets for settlements of this size. The 30% benchmark is only 5% over and above the "typical benchmark" cited by the Manual for Complex Litigation (Fourth) § 14.121. The Court also notes that this percentage is in line with the percentage fee awards in the majority of the opinions from this circuit that this Court has reviewed. *See, e.g., In re OCA, Inc. Secs. & Derivative Litig.,* Civ. A. No. 05–2165, 2009 WL 512081, *20 (E.D.La. Mar.2, 2009) (awarding a percentage fee award of 27% in securities case after reviewing Eisenberg and Miller); *In re Bayou Sorrel Class Action,* No. 6:04CV 1101, 2006 WL 3230771, *20 (W.D.La. Oct.31, 2006) (awarding percentage fee award of 27% toxic exposure suit after reviewing Eisenberg and Miller); *In re Educ. Testing Serv. Praxis Principles of Learning & Teaching: Grades 7–12 Litig.,* 447 F.Supp.2d 612630 (2006) (awarding percentage fee award of 25% in contract suit after reviewing Eisenberg and Miller); *Faircloth v. Certified Fin., Inc.,* No. Civ. A. 99–3097, 2001 WL 527489, *9 (E.D.La. May 16, 2001) (awarding a percentage fee award of 35% in unlawful debt suit); *Harrah's,* 1998 WL 832574, *4 (awarding percentage fee award of 25% in securities fraud suit). The Court will next determine whether the benchmark should be adjusted based on the particular circumstances of this case. In doing so, the Court will consider the other eleven *Johnson* factors.

### c. The *Johnson* Factors

### i. The Time and Labor Required

 **\*11**  The Court finds that the amount of time and labor required in this suit warrants an adjustment of the benchmark percentage. This case has been pending for almost five years, and the parties have devoted much time and effort to its resolution. The parties participated in intensive and voluminous discovery and many depositions, as well as motion practice, class certification and a bench trial on two underlying issues. The parties even pursued the remand under CAFA on appeal to the Fifth Circuit. Accordingly, the Court finds that consideration of this factor warrants an increase in the benchmark percentage.

### ii. The Novelty and Difficulty of the Question

This case involved factually and legally complex issues. The issue raised on appeal under CAFA was one of first impression in this circuit. While the Court notes that factually, the case appears not so difficult—indeed, that a spill occurred

has never been in dispute—the Court notes that some of the underlying issues have been difficult. At the bench trial, the parties briefed and submitted evidence on the vicarious liability of Transport and Transport's affirmative defense of third-party fault (*i.e.,* that the first responders over-reacted after arriving at the spill and calling for a 1/2–mile evacuation). Accordingly, the Court finds that consideration of this factor warrants an increase in the benchmark percentage.

### iii. The Skill Requisite to Perform the Legal Service

This factor is closely tied to the second factor. Whether counsel needed more skill than usual to perform the legal services necessarily turns on the novelty and difficulty of the issues that the suit presents. Accordingly, the Court finds that the consideration of this factor warrants an increase in the benchmark percentage.

### iv. The Preclusion of Other Employment

Counsel argues that this factor weighs in favor of an increase in the benchmark percentage. Counsel contends that while they did not turn away other cases, the work on this case prevented them from devoting more time to other cases and had a substantial impact on case turnover and firm income. Given the amount of work expended on this suit over the approximately five-year period, the Court finds that this factor also weighs in favor of an increase in the benchmark percentage.

### v. The Customary Fee

Counsel contends that the customary contingency fee awarded in lawsuits similar to the instant case is well known to range between 33.33% and 45%. Counsel notes that at times this award is even higher, should a case be appealed. Plaintiffs point to three cases—two out of the Middle District of Louisiana and one out of the Western District of Louisiana —in which the courts awarded a 40% fee award. *Pedeaux v. Georgia Gulf Corp.,* Civ. A. No. 01–349 (M .D.La.), [Doc. # 97 at p. 4]; *In re Eunice Train Derailment,* Civ. A. No. 00– 1267 (W.D.La.), [Doc. # 124 at p. 7]; *In re The Complaint of Ingram Barge Co.,* 187 F.R.D. 262 (M.D.La.1999), [Doc. # 4060] at p. 5].

 **\*12**  But plaintiffs point to no facts to suggest that these cases are either representative or comparable to this one. Nonetheless, "contested personal injury claims arising from chemical spills can be more time intense and complex than

straightforward contract claims." *In re Educ. Testing Serv. Praxis Principles of Learning & Teaching: Grades 7–12 Litig.,* 447 F.Supp.2d 512, 631 (E.D.La.2006). Indeed, the parties here hotly contested liability and even went to trial on the issue of third-party and employer liability. Discovery involved medical and scientific proof of liability, causation and damages. Accordingly, while the Court is reticent to rely on three lawsuits that contradict the Eisenberg and Miller report, the Court finds that this factor also warrants an increase in the benchmark percentage.

#### vi. Whether the Fee is Fixed or Contingent

Consideration of this factor is designed to "demonstrat[e] the attorney's fee expectations when he accepted the case." 🚩 *Johnson,* 488 F.2d at 718. The fee here was contingent on the success of the litigation. Counsel contends that the possibility of non-payment and the loss of costs advanced on behalf of the putative class have been present throughout this litigation. Notwithstanding, the Court finds that such risk exists in all litigation. Whether the fee was fixed or contingent bears on whether counsel is bound by a contract and perhaps limited to a certain percentage even before the Court's analysis. The Court finds that this factor weighs neither in favor nor against an increase or decrease in the benchmark percentage.

#### vii. Time Limitations Imposed by the Client

Under this factor, the Court is to give a premium for "priority work that delays the lawyer's other legal work." *Id.* As noted above, counsel contends that while they did not turn away other cases, the work on this case prevented them from devoting more time to other cases and had a substantial impact on case turnover and firm income. Accordingly, given the amount of work expended on this suit over the approximately five-year period, the Court finds that this factor also weighs in favor of an increase in the benchmark percentage.

#### viii. The Amount Involved and the Results Obtained

Counsel contends that the negotiation of the $950,000.00 settlement for a relatively limited chemical spill with a limited exposure area weighs in favor of an increase in the benchmark percentage. Counsel also argues that their resolution of this suit as a class—as opposed to many individual trials after the denial of class certification—warrants an increase. The Court finds that counsel has obtained a substantial settlement and also devised a plan for distribution of the fund and payment

of claims that is practical, streamlined and fair. This factor warrants an increase.

#### ix. The Experience, Reputation and Ability of the Attorneys

The Court is satisfied that the experience and reputation of the attorneys involved are of the highest order. In addition, the Court notes that the ability of class counsel, as evidenced by their performance in this case, is equally first-rate. However, the Court finds that the quality of counsel is already accounted for in the enhancement the Court grants for the quality of the result and that this factor warrants no further enhancement.

#### x. The "Undesirability" of the Case

**\*13** Class counsel asserts that this case was extremely undesirable, mostly based on the risk of non-recovery, the difficulties in following up with plaintiffs after Hurricane Katrina and the potential that hundreds of individual trials would become necessary. Counsel argues that many attorneys did not view the case as one of large potential or easy return. The Court finds that although this is not the type of unpopular case that might stigmatize the lawyer who takes it, *see id.* at 719, there are some aspects of this case that made it undesirable. The risk of non-recovery of damages was, of course, significant, and the Court notes that following up with the affected class members had to be difficult given that much of the geographical boundary at issue here flooded significantly after Hurricane Katrina. Further, the relatively small size of the individual claims made undertaking expensive litigation against a few well-financed corporate defendants on a contingent fee a not-very-attractive proposition. Class certification would have changed this dynamic, but, here, a class was not certified. Accordingly, the Court finds that the undesirability in this case warrants an increase in the fee award.

#### xi. The Nature and Length of the Professional Relationship

Counsel notes that their professional relationship with the class representatives has developed into a good one, built on mutual respect and the exchange of information and advice. Counsel contends that they have conferred a benefit on many of the settlement class members who would not have received one as their claims would not have merited the time and expense to pursue as individual cases. After hearing the testimony of the class representatives, the Court finds that the relationship between them and class counsel is a professional

one in which all class representatives were educated about the case and the settlement. Accordingly, this factor warrants an increase in the benchmark percentage.

Accordingly, after an application of the *Johnson* factors, the Court finds that an increase to a 37% benchmark percentage is appropriate under the facts and circumstances of this particular case. A sum of $351,500.00 of the $950,000 settlement agreement shall be set aside for the payment of class and all counsel.

In a supplemental memorandum, counsel asks that a fund in the amount of no more than $50,000.00 be set aside from the requested total fee award for the payment of the individual attorneys' fees for those attorneys with contingency contracts for settlement class members who receive an award. Class counsel asks that the individual attorneys be paid on a pro rata basis by the Special Master, subject to Court approval. The Court finds no adequate basis to grant this request at this time. The Court is reticent to grant such a request with absolutely no knowledge of what any of the individual attorneys may claim. Any disputes that may arise may be resolved by the Special Master, subject to final approval by the Court.

### d. Incentive Awards

 **\*14**  As noted above, counsel contends that Ibrahim Autamari, Vicki Duzac, Annie Meredith and the Reverend Samuel Meredith merit incentive awards of $7,000.00, $5,000.00, $2,500.00 and $2,500.00, respectively. Federal courts often approve incentive awards in class action lawsuits to compensate named plaintiffs for the services they provide and the burdens they shoulder during litigation. *See In re Catfish Antitrust Litig.,* 939 F.Supp. at 503–04. Here, these four class representatives were involved in initiating the litigation and were willing to be subjected to discovery and to submit to depositions on behalf of the class. The Court finds that there is an adequate basis to award the incentive payments to each of the Class Representatives. *See generally* National Association of Consumer Advocates, *Standards and Guidelines for Litigating and Settling Consumer Class Actions,* 176 F.R.D. 375, 387 (West 1998).

### e. Administrative Costs

Counsel also ask the Court to award reimbursement of administrative costs to the Court-appointed Special Master, Disbursing Agent and Escrow Agent after submission of their respective bills. The Court will consider these costs after submission of the bills to the Court.

In a supplemental memorandum, counsel asks the Court to award $1,650.00 to Irving Warshauer for his work as an expert with regard to the attorneys' fees. The sum of $1,650.00 represents 5.5 hours of work at $300.00/hour. Warshauer is an attorney with 34 years of experience and has litigated many class-action lawsuits. For such experience, the Court finds the rate of $300.00/hour to be reasonable. The Court is familiar with the local legal market and finds that the $300.00/hour rate is within the customary range for partner-level attorneys practicing law in the area. The Court has recently approved attorneys' fees above these requested rates in a securities class action. *See In re OCA, Inc., Secs. & Derivative Litig.,* Civ. A. No. 05–2165, 2009 WL 512081, at \*25 (E.D.La.2009) (finding that partner-level attorneys performing securities work customarily billed at a rate between $400 and $450 an hour and associates customarily billed at a rate between $200 and $250 an hour). An attorney employed as an expert on attorneys' fees may charge a similar rate.

The Court also finds Warshauer's hours to be reasonable. Warshauer reviewed the settlement documents and the pleadings, class counsel's entire file at the office of Sylvestri & Massicot, prepared for his testimony at the fairness hearing and testified at the fairness hearing. The Court finds that 5.5 hours to complete such work is reasonable. Accordingly, the Court will award Warshauer $1,650.00 in expert fees.

### f. Gremillion's Fee Petition

As noted above, Gremillion seeks a fee award in the total amount of $4,425.00. This amount includes common-benefit time on his behalf of 20.1 hours at $200.00/hour. Gremillion also notes that his paralegal devoted 5.4 hours to the suit at a rate of $75.00/hour, for a total of $405.00. Gremillion represents five plaintiffs in this suit, including one of the class representatives.

 **\*15**  The Court will employ the lodestar method to determine the amount of fees to which Gremillion is entitled out of the common fund. In assessing the reasonableness of attorneys' fees, the court must first determine the "lodestar" by multiplying the reasonable number of hours expended and the reasonable hourly rate for each participating attorney.

*See* Henley v. Eckerhart, 461 U.S. 424, 433, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983); Green v. Adm'rs of the Tulane Educ. Fund, 284 F.3d 642, 661 (5th Cir.2002); *Migis v. Pearle Vision, Inc.,* 135 F.2d 1041, 1047 (5th Cir.1998);

*La. Power & Light Co. v. Kellstrom,* 50 F.3d 319, 324 (5th Cir.1995). The fee applicant bears the burden of proof on this issue. *See* *Riley v. City of Jackson,* 99 F.3d 757, 760 (5th Cir.1996); *Kellstrom,* 50 F.3d at 324; *In re Smith,* 996 F.2d 973, 978 (5th Cir.1992).

Gremillion seeks an hourly rate of $200.00 for himself and $75.00 for his paralegal. Gremillion has approximately 30 years of experience. This Court has recently sanctioned similar hourly rates for attorneys with similar (or even fewer) years of experience. *See, e.g., Creecy v. Metro. Prop. & Cas. Ins., Co.,* 548 F.Supp.2d 279, 285 (E.D.La.2008) (Roby, M.J.) (sanctioning $175/hour for associate with five years experience and $200/hour for partner with 11 years experience); *Orrill v. Mortgage Elec. Registration Sys., Inc.,* Civ. A. No. 06–10012, 2009 WL 4861994, at *3 (E.D.La. Nov. 7, 2008)2009 WL 4861994, at *3 (E.D.La. Nov. 7, 2008) (Roby, M.J.) (sanctioning $150/hour for associate with four years experience and $200/hour for partner with 12 years experience).

The Court also finds that an hourly rate of $75.00 for a paralegal in this area is reasonable. *See, e.g., Thompson v. Connick,* No. 07–30443, 2008 WL 5265197, at *26–27 (5th Cir. Dec.19, 2008) (approving hourly rates of $67 to $112 for paralegals as "at the upper range of what was reasonable in the" Eastern District of Louisiana from 2003 to 2007); *Collins v. Sanderson Farms,* 568 F.Supp.2d 714, 728 (E.D.La.2008) (awarding $95/hour for paralegals); *Wells v. Regency Hosp. Co.,* No. 07–3775, 2008 WL 5273712, at *3 (E.D.La. Dec.15, 2008) (Roby, M.J.) (reviewing cases and finding that $115 per hour for paralegal work was excessive and awarding $64 per hour); *Combe v. Life Ins. Co.,* No. 06–8909, 2008 WL 544547, at *3 (E.D.La.Feb.27, 2008) (Livaudais, J.) (awarding$70 per hour for paralegal work).

Considering the prevailing market rates in the Greater New Orleans area, the Court finds that the aforesaid hourly rates are within the low end of the range of the market rate in this area and that said rates are reasonable.

The Court must next determine whether the number of hours that counsel expended on the litigation was reasonable. The burden of proving the reasonableness of the hours expended is on the fee applicant. *Mota v. Univ. of Tex. Houston Health Sci. Ctr.,* 261 F.3d 512, 528 (5th Cir.2001). As a general proposition, all time that is excessive, duplicative,

and/or unproductive should be excised from any award of attorney's fees. *Watkins v. Fordice,* 7 F.3d 453, 457 (5th Cir.1993). Attorneys must exercise "billing judgment" by "writing off unproductive, excessive, or redundant hours" when seeking fee awards. *Walker v. U.S. Dep't of Hous. & Urban Dev.,* 99 F.3d 761, 769 (5th Cir.1996). The fee seeker's attorneys "are charged with proving that they exercised billing judgment." *Id.* at 770. When billing judgment is lacking, the court *must* exclude from the lodestar calculation the hours that were not reasonably expended.

**\*16** This Court has reviewed line by line the billing statement submitted on behalf of Gremillion and finds the hours expended by counsel to be reasonable. The billing statement reflects that counsel prepared a petition for damages, attended no fewer than six depositions and participated in numerous telephone conferences during which the parties negotiated the settlement. Gremillion's paralegal prepared the proof of claim forms for his five clients and met with Gremillion and each individual client to discuss the proof of claim form. The Court's review of the billing statement satisfies it that defense counsel exercised billing judgment Accordingly, the Court finds that Gremillion is entitled to an attorney fee award of $4,425.00.

Generally, the Court must next consider whether the lodestar should be adjusted upward or downward, depending on the circumstances of the case and the factors set forth in *Johnson.* *See* *Green,* 284 F.3d at 661; *Cobb v. Miller,* 818 F.2d 1227, 1232 (5th Cir.1987). However, neither Gremillion nor any other party moves for an upward or downward adjustment here. The Court thus dispenses with any analysis under *Johnson.*

### IV. Conclusion

For the foregoing reasons,

**IT IS ORDERED** that the SETTLEMENT is APPROVED. This case is ADMINISTRATIVELY CLOSED, subject to the final approval of any petitions for fees of any individuals that may later be submitted in accordance with this Order.

**IT IS FURTHER ORDERED** that the Motion for an Award of Common Benefit Attorneys' Fees, Costs and Administrative Expenses; Approval of Incentive Awards to Settlement Class Representatives; and an Award of Common Benefit Fees and Costs for Plaintiffs' Settlement Class

Counsel [Doc. # 215] is GRANTED IN PART as outlined above.

**IT IS FURTHER ORDERED** that Intervening Plaintiffs' Counsel's Motion for Attorney's Fees/Petition for Common Benefit Fees [Doc. # 216 is GRANTED.

**All Citations**

Not Reported in F.Supp.2d, 2010 WL 3283398

## Footnotes

1       While other counsel was present, the Court lists only those directly involved in the federal-court suit.

2       The Reverend Samuel Meredith, the husband of Annie Meredith, was present in the courtroom. The parties stipulated that his testimony would be identical to that of his wife.

3       Austin did not file his objection until June 30, 2010, well after the May 19, 2010 deadline. Moreover, there is no evidence in the record that any of Austin's putative plaintiffs even filed untimely proof of claim forms.

**End of Document**                              © 2021 Thomson Reuters. No claim to original U.S. Government Works.

**WESTLAW** © 2021 Thomson Reuters. No claim to original U.S. Government Works.                              12

# TAB 11-A

**Fill in this information to identify the case:**

United States Bankruptcy Court for the:

_____ District of _____
(State)

Case number (*If known*): _____ Chapter _____

☐ Check if this is an
amended filing

Official Form 201

# Voluntary Petition for Non-Individuals Filing for Bankruptcy                04/19

If more space is needed, attach a separate sheet to this form. On the top of any additional pages, write the debtor's name and the case number (if known).  For more information, a separate document, *Instructions for Bankruptcy Forms for Non-Individuals,* is available.

**1. Debtor's name**

_____

**2. All other names debtor used in the last 8 years**

Include any assumed names, trade names, and *doing business as* names

_____
_____
_____
_____
_____

**3. Debtor's federal Employer Identification Number** (EIN)

___ ___ – ___ ___ ___ ___ ___ ___ ___

**4. Debtor's address**

| Principal place of business | Mailing address, if different from principal place of business |
|---|---|
| _____ | _____ |
| Number        Street | Number        Street |
| _____ | _____ |
| | P.O. Box |
| _____ | _____ |
| City            State     ZIP Code | City            State     ZIP Code |
| | **Location of principal assets, if different from principal place of business** |
| _____ | _____ |
| County | Number        Street |
| | _____ |
| | _____ |
| | City            State     ZIP Code |

**5. Debtor's website** (URL)

_____

**6. Type of debtor**

☐ Corporation (including Limited Liability Company (LLC) and Limited Liability Partnership (LLP))

☐ Partnership (excluding  LLP)

☐ Other. Specify: _____

Debtor _____    Case number (if known)_____
　　　　　　Name

| | |
|---|---|
| **7. Describe debtor's business** | **A.** *Check one:* |

❑ Health Care Business (as defined in 11 U.S.C. § 101(27A))

❑ Single Asset Real Estate (as defined in 11 U.S.C. § 101(51B))

❑ Railroad (as defined in 11 U.S.C. § 101(44))

❑ Stockbroker (as defined in 11 U.S.C. § 101(53A))

❑ Commodity Broker (as defined in 11 U.S.C. § 101(6))

❑ Clearing Bank (as defined in 11 U.S.C. § 781(3))

❑ None of the above

**B.** *Check all that apply:*

❑ Tax-exempt entity (as described in 26 U.S.C. § 501)

❑ Investment company, including hedge fund or pooled investment vehicle (as defined in 15 U.S.C. § 80a-3)

❑ Investment advisor (as defined in 15 U.S.C. § 80b-2(a)(11))

**C.** NAICS (North American Industry Classification System) 4-digit code that best describes debtor. See http://www.uscourts.gov/four-digit-national-association-naics-codes .

___ ___ ___ ___

**8. Under which chapter of the Bankruptcy Code is the debtor filing?**

*Check one:*

❑ Chapter 7

❑ Chapter 9

❑ Chapter 11. *Check all that apply*:

　　❑  Debtor's aggregate noncontingent liquidated debts (excluding debts owed to insiders or affiliates) are less than $2,725,625 (amount subject to adjustment on 4/01/22 and every 3 years after that).

　　❑  The debtor is a small business debtor as defined in 11 U.S.C. § 101(51D). If the debtor is a small business debtor, attach the most recent balance sheet, statement of operations, cash-flow statement, and federal income tax return or if all of these documents do not exist, follow the procedure in 11 U.S.C. § 1116(1)(B).

　　❑ A plan is being filed with this petition.

　　❑ Acceptances of the plan were solicited prepetition from one or more classes of creditors, in accordance with 11 U.S.C. § 1126(b).

　　❑ The debtor is required to file periodic reports (for example, 10K and 10Q) with the Securities and Exchange Commission according to § 13 or 15(d) of the Securities Exchange Act of 1934. File the *Attachment to Voluntary Petition for Non-Individuals Filing for Bankruptcy under Chapter 11* (Official Form 201A) with this form.

　　❑ The debtor is a shell company as defined in the Securities Exchange Act of 1934 Rule 12b-2.

❑ Chapter 12

**9. Were prior bankruptcy cases filed by or against the debtor within the last 8 years?**

If more than 2 cases, attach a separate list.

❑ No

❑ Yes.　District _____  When _____  Case number _____
　　　　　　　　　　　　　　　　　　　　　　　MM / DD / YYYY

　　　　　District _____  When _____  Case number _____
　　　　　　　　　　　　　　　　　　　　　　　MM / DD / YYYY

**10. Are any bankruptcy cases pending or being filed by a business partner or an affiliate of the debtor?**

List all cases. If more than 1, attach a separate list.

❑ No

❑ Yes.　Debtor _____  Relationship _____

　　　　　District _____  When _____
　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　MM / DD / YYYY

　　　　　Case number, if known _____

Official Form 201　　　　　　Voluntary Petition for Non-Individuals Filing for Bankruptcy　　　　　　page **2**

| Debtor | | Case number (if known) |
|---|---|---|
| | Name | |

**11. Why is the case filed in *this district*?**

*Check all that apply:*

❑ Debtor has had its domicile, principal place of business, or principal assets in this district for 180 days immediately preceding the date of this petition or for a longer part of such 180 days than in any other district.

❑ A bankruptcy case concerning debtor's affiliate, general partner, or partnership is pending in this district.

**12. Does the debtor own or have possession of any real property or personal property that needs immediate attention?**

❑ No

❑ Yes. Answer below for each property that needs immediate attention. Attach additional sheets if needed.

**Why does the property need immediate attention?** (*Check all that apply.*)

❑ It poses or is alleged to pose a threat of imminent and identifiable hazard to public health or safety.

What is the hazard? _____

❑ It needs to be physically secured or protected from the weather.

❑ It includes perishable goods or assets that could quickly deteriorate or lose value without attention (for example, livestock, seasonal goods, meat, dairy, produce, or securities-related assets or other options).

❑ Other _____

**Where is the property?** _____
Number          Street

_____

_____
City                                    State     ZIP Code

**Is the property insured?**

❑ No

❑ Yes. Insurance agency _____

Contact name _____

Phone _____

---

## Statistical and administrative information

**13. Debtor's estimation of available funds**

*Check one:*

❑ Funds will be available for distribution to unsecured creditors.

❑ After any administrative expenses are paid, no funds will be available for distribution to unsecured creditors.

**14. Estimated number of creditors**

❑ 1-49
❑ 50-99
❑ 100-199
❑ 200-999

❑ 1,000-5,000
❑ 5,001-10,000
❑ 10,001-25,000

❑ 25,001-50,000
❑ 50,001-100,000
❑ More than 100,000

**15. Estimated assets**

❑ $0-$50,000
❑ $50,001-$100,000
❑ $100,001-$500,000
❑ $500,001-$1 million

❑ $1,000,001-$10 million
❑ $10,000,001-$50 million
❑ $50,000,001-$100 million
❑ $100,000,001-$500 million

❑ $500,000,001-$1 billion
❑ $1,000,000,001-$10 billion
❑ $10,000,000,001-$50 billion
❑ More than $50 billion

---

| Debtor | | Case number *(if known)* |
|---|---|---|
| | Name | |

**16. Estimated liabilities**

❑ $0-$50,000  
❑ $50,001-$100,000  
❑ $100,001-$500,000  
❑ $500,001-$1 million  

❑ $1,000,001-$10 million  
❑ $10,000,001-$50 million  
❑ $50,000,001-$100 million  
❑ $100,000,001-$500 million  

❑ $500,000,001-$1 billion  
❑ $1,000,000,001-$10 billion  
❑ $10,000,000,001-$50 billion  
❑ More than $50 billion  

## Request for Relief, Declaration, and Signatures

**WARNING --** Bankruptcy fraud is a serious crime. Making a false statement in connection with a bankruptcy case can result in fines up to $500,000 or imprisonment for up to 20 years, or both. 18 U.S.C. §§ 152, 1341, 1519, and 3571.

**17. Declaration and signature of authorized representative of debtor**

■ The debtor requests relief in accordance with the chapter of title 11, United States Code, specified in this petition.

■ I have been authorized to file this petition on behalf of the debtor.

■ I have examined the information in this petition and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on _____  
MM / DD / YYYY

✗ _____         _____  
Signature of authorized representative of debtor              Printed name

Title _____

**18. Signature of attorney**

✗ _____      Date _____  
Signature of attorney for debtor                                       MM / DD / YYYY

_____  
Printed name

_____  
Firm name

_____  
Number          Street

_____         _____   _____  
City                                                                              State           ZIP Code

_____                    _____  
Contact phone                                                         Email address

_____   _____  
Bar number                                                                         State

## Schedule 1

<u>Location of Principal Assets (Consolidated)</u>

The debtors collectively own a diverse fleet of aircraft. As such, in the ordinary course of their business, certain assets of the debtors, including their aircraft, move between jurisdictions and are located in various domestic and international locations.

## Schedule 2

### Pending Bankruptcy Cases Filed by the Debtor and Affiliates of the Debtor

On the date hereof, each of the affiliated entities listed below filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code in the United States Bankruptcy Court for the Southern District of Texas. The Debtors have filed a motion requesting that the chapter 11 cases of these entities be consolidated for procedural purposes only and jointly administered pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure.

| Company |
|---|
| Bristow Group, Inc. |
| BHNA Holdings Inc. |
| Bristow Alaska Inc. |
| Bristow Helicopters Inc. |
| Bristow U.S. Leasing LLC |
| Bristow U.S. LLC |
| BriLog Leasing Ltd. (Cayman) |
| Bristow Equipment Leasing Ltd. (Cayman) |

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| BRISTOW GROUP INC., | ) | Case No. 19- |
| | ) | |
| Debtor. | ) | |
| | ) | |

**Attachment to Voluntary Petition for Non-Individuals Filing for
Bankruptcy under Chapter 11**

1.        If any of the debtor's securities are registered under Section 12 of the Securities Exchange Act of 1934, the SEC file number is        **001-31617**.

2.        The following financial data is the latest available information and refers to the debtor's condition on 9/30/2018 (10-Q filed on 11/9/18.  Note: Subject to restatement.)

| | | | |
|---|---|---|---|
| a. | Total assets | $2,860,804,000 | |
| b. | Total debts (including debts listed in 2.c., below) | $1,885,623,000 | |
| c. | Debt securities held by more than 500 holders: | None | Approximate number of holders: |

secured ☐     unsecured ☐     subordinated ☐     $_____     _____
secured ☐     unsecured ☐     subordinated ☐     $_____     _____
secured ☐     unsecured ☐     subordinated ☐     $_____     _____
secured ☐     unsecured ☐     subordinated ☐     $_____     _____
secured ☐     unsecured ☐     subordinated ☐     $_____     _____

d.        Number of shares of preferred stock        0_____        _____

e.        Number of shares common stock        **35,918,916**        _____

Comments, if any: Asset and Liability amounts are on a consolidated basis and include both Debtor and non-Debtor operations.   Common stock in 2(e) is number of shares issued and outstanding.

3.        Brief description of debtor's business:  Bristow Group Inc. provides industrial aviation and charter services to offshore energy companies in Europe, Africa, the Americas, and the Asian Pacific. The Company also provides search and rescue services for governmental agencies and the oil and gas industry.

4.        List the names of any person who directly or indirectly owns, controls, or holds, with power to vote, 5% or more of the voting securities of debtor:  Mackenzie Financial Corporation; Blackrock Fund Advisors; Fidelity Management & Research Company Dimensional Fund Advisors LP (U.S.); The Vanguard Group, Inc.

**Chapter 11 or Chapter 9 Cases: List of Creditors Who Have the 30 Largest Unsecured Claims and Are Not Insiders**

| | Name of creditor and complete mailing address, including zip code | Name, telephone number, and email address of creditor contact | Nature of the claim (for example, trade debts, bank loans, professional services, and government contracts) | Indicate if claim is contingent, unliquidated, or disputed | Amount of unsecured claim If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|---|---|
| | | | | | Total claim, if partially secured | Deduction for value of collateral or setoff | Unsecured claim |
| 1 | Wilmington Trust, National Association Indentured Trustee ATTN:: Peter Finkel Vice President 50 South Sixth Street, Suite 1290 Minneapolis, MN 55402 | Peter Finkel EMAIL - pfinkel@wilmingtontrust.com PHONE - 612-217-5624 FAX - 302-427-4919 | 6.25% Senior Notes | | | | $ 415,893,717 |
| 2 | Wilmington Trust, National Association Indentured Trustee ATTN: Peter Finkel Vice President 50 South Sixth Street, Suite 1290 Minneapolis, MN 55402 | Peter Finkel EMAIL - pfinkel@wilmingtontrust.com PHONE - 612-217-5624 FAX - 302-427-4919 | 4.5% Convertible Senior Notes | | | | $ 146,609,116 |
| 3 | Milestone Aviation Group ATTN: Clifford Work General Counsel Minerva House, 2nd Floor Simmonscourt Road Ballsbridge Dublin, Ireland | Clifford Work EMAIL - cwork@milestoneaviation.com PHONE - 353-1-216-5700 | Lease Claims and Leases | | | | $ 20,192,292 |
| 4 | Infosys Limited ATTN: Salil Parekh Chief Executive Officer Electronics City Hosur Road Bengaluru, 560100 India | Salil Parekh EMAIL - salil_parekh@infosys.com PHONE - 91-80-2852-0261 FAX - 91-80-2852 -0362 | Trade Payable | Unliquidated | | | $ 1,390,758 |
| 5 | Agustawestland ATTN: William Hunt President 3050 Red Lion Road Philadelphia, PA 19114 | William Hunt EMAIL - william.hunt@agustawestland.com PHONE - 215-281-1485 FAX - 215-268-9104 | Trade Payable | | | | $ 519,606 |
| 6 | VIH Aviation Group Ltd. ATTN: Ken Norie President 1962 Canso Road North Saanich, BC V8L 5B5 Canada | Ken Norie EMAIL - knorie@vih.com PHONE - 250-656-3987 | Leases | | | | $ 208,687 |
| 7 | Sikorsky Commercial Inc ATTN: Daniel C. Schultz President 6801 Rockledge Drive Bethesda, MD 20817 | Daniel C. Schultz EMAIL - daniel.c.schultz@lmco.com PHONE - 301-897-6000 | Trade Payable | | | | $ 187,754 |
| 8 | Pratt & Whitney Canada Corp ATTN: Maria Della Posta President 1000 Marie-Victorin Boulevard Longueuil, QC J4G 1A1 Canada | Maria Della Posta EMAIL - maria.della.posta@pwc.ca PHONE - 450-677-9411 | Trade Payable | | | | $ 185,924 |
| 9 | General Electric Company ATTN: H. Lawrence Culp Jr. Chief Executive Officer 41 Farnsworth Street Boston, MA 02210 | H. Lawrence Culp Jr. EMAIL - larry.culp@ge.com PHONE - 617-443-3000 | Trade Payable | | | | $ 172,193 |
| 10 | Infosys McCamish ATTN: Gordon Beckham President 6425 Powers Ferry Road Suite 300 Atlanta, GA 30339 | Gordon Beckham EMAIL - gbeckham@mccamish.com PHONE - 770-690-1500 FAX - 770-690-1800 | Trade Payable | Unliquidated | | | $ 159,897 |
| 11 | Speedcast Communications, Inc ATTN: Pierre-Jean Beylier Chief Executive Officer 4400 S. Sam Houston Pkwy East Houston, TX 77048 | Pierre-Jean Beylier EMAIL - pj@speedcast.com PHONE - 832-668-2300 | Trade Payable | | | | $ 146,180 |
| 12 | Helifleet 2013-01, LLC ATTN: Jeffrey G. Tougas General Counsel 181 Bay Street Suite 2830 Toronto, ON M5J 2T3 Canada | Jeffrey G. Tougas EMAIL - jtougas@ecncapitalcorp.com PHONE - 514-908-0759 FAX - 514-908-0991 | Leases | | | | $ 129,216 |
| 13 | Precision Heliparts ATTN: Keith Stringer Director of Sales 220 Burgess, Unit #2 Broussard, LA 70518 | Keith Stringer EMAIL - kstringer@precisionaviationgroup.com PHONE - 404-768-9090 FAX - 404-768-9006 | Trade Payable | | | | $ 106,999 |

| | Name of creditor and complete mailing address, including zip code | Name, telephone number, and email address of creditor contact | Nature of the claim (for example, trade debts, bank loans, professional services, and government contracts) | Indicate if claim is contingent, unliquidated, or disputed | Amount of unsecured claim. If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|---|---|
| | | | | | Total claim, if partially secured | Deduction for value of collateral or setoff | Unsecured claim |
| 14 | Waypoint Leasing ATTN: John Petkovic Chief Executive Officer Two Embarcadero Center Suite 200 San Francisco, CA 94111 | John Petkovic EMAIL - john.petkovic@macquarie.aero PHONE - 415-829-6800 | Leases | | | | $ 103,569 |
| 15 | Expeditors And Production Services ATTN: Todd Matte President 206 Magnate Drive Lafayette, LA 70508 | Todd Matte EMAIL - todd.matte@epsteam.com PHONE - 337-839-2735 | Trade Payable | | | | $ 87,425 |
| 16 | Hub Enterprises, Inc. ATTN: James H. "Chip" Romero President PO Box 3162 Lafayette, LA 70502 | James H. "Chip" Romero EMAIL - chip@hubenterprises.com PHONE - 800-873-0933 FAX - 800-436-4399 | Trade Payable | | | | $ 65,643 |
| 17 | GE Aircraft Engines ATTN: William Neth Manager, Customer Programs 1000 Western Avenue Lynn, MA 01919 | William Neth EMAIL - william.neth@ge.com PHONE - 781-594-9157 | Trade Payable | | | | $ 65,304 |
| 18 | Bell Helicopter Textron, Inc. ATTN: Michelle Flores Manager, Key Accounts 3255 Bell Flight Boulevard Fort Worth, TX 76118 | Michelle Flores EMAIL - mflores3@bellflight.com PHONE - 817-280-3926 FAX - 817-280-2321 | Trade Payable | | | | $ 57,960 |
| 19 | Standard Aero Limited ATTN: Russell Ford Chief Executive Officer 6710 N. Scottsdale Road Suite 250 Scottsdale, AZ 85253 | Russell Ford EMAIL - russell.ford@standardaero.com PHONE - 480-377-3100 FAX - 480-377-3105 | Trade Payable | | | | $ 50,827 |
| 20 | Open Text Corporation ATTN: Mark Barrenechea Chief Executive Officer 275 Frank Tompa Drive Waterloo, ON N2L 0A1 Canada | Mark Barrenechea EMAIL - mbarrenechea@opentext.com PHONE - 519-888-7111 FAX - 519-888-0677 | Trade Payable | Unliquidated | | | $ 46,943 |
| 21 | Capgemini America, Inc ATTN: Paul Hermelin Chief Executive Officer 1100 Empire Central Place Suite 200 Dallas, TX 75247 | Paul Hermelin EMAIL - paul.hermelin@capgemini.com PHONE - 214-253-6415 FAX - 973-337-2701 | Trade Payable | | | | $ 45,937 |
| 22 | Acme Truck Line, Inc. ATTN: Mike Coatney President 200 Westbank Expressway Gretna, LA 70053 | Mike Coatney EMAIL - mike.coatney@acmetruck.com PHONE - 504-368-2510 FAX - 888-345-2263 | Trade Payable | | | | $ 43,402 |
| 23 | Ideagen Gael Limited ATTN: Ben Dorks Chief Executive Officer Ergo House Mere Way Ruddington Fields Business Park Nottingham, NG11 6 JS United Kingdom | Ben Dorks EMAIL - ben.dorks@ideagen.com PHONE - 44-1355-593400 FAX - 44-1355-579191 | Trade Payable | Unliquidated | | | $ 42,312 |
| 24 | HRD Aero Systems ATTN: Tom Salamone President 25555 Avenue Stanford Valencia, CA 91355 | Tom Salamone EMAIL - tom.s@hrd-aerosystems.com PHONE - 877-473-2376 FAX - 661-295-0672 | Trade Payable | | | | $ 40,560 |
| 25 | Boeing Distribution Services Inc ATTN: Travis Sullivan Vice President 3760 W. 108th Street Miami, FL 33018 | Travis Sullivan EMAIL - travis.sullivan@boeing.com PHONE - 305-925-2600 FAX - 305-507-7191 | Trade Payable | | | | $ 40,497 |
| 26 | Helicomb International, Inc. ATTN: Bill Cole General Manager 1402 South 69th East Avenue Tulsa, OK 74112 | Bill Cole EMAIL - bcole@pccstructurals.com PHONE - 918-835-3999 FAX - 918-834-4451 | Trade Payable | | | | $ 35,818 |

| | Name of creditor and complete mailing address, including zip code | Name, telephone number, and email address of creditor contact | Nature of the claim (for example, trade debts, bank loans, professional services, and government contracts) | Indicate if claim is contingent, unliquidated, or disputed | Amount of unsecured claim If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|---|---|
| | | | | | Total claim, if partially secured | Deduction for value of collateral or setoff | Unsecured claim |
| 27 | Composite Technology Inc ATTN: Andy Warner Chief Financial Officer 1727 S. Main Street DFW Airport Dallas, TX 75261 | Andy Warner PHONE - 972-456-6900 FAX - 972-456-0162 | Trade Payable | | | | $ 34,825 |
| 28 | SAP America ATTN: DJ Paoni President of SAP North America 3999 West Chester Pike Newtown Square, PA 19073 | DJ Paoni EMAIL - dj.paoni@sap.com PHONE - 610-661-1000 FAX - 610-595-2187 | Trade Payable | | | | $ 34,376 |
| 29 | IHS Global Inc. ATTN: Susan Farrell Vice President 1300 Connecticut Avenue Suite 800 Washington, DC 20036 | Susan Farrell EMAIL - susan.farrell@ihsmarkit.com PHONE - 202-721-0337 FAX - 303-397-2599 | Trade Payable | | | | $ 33,579 |
| 30 | Ernst & Young LLP ATTN: Thierry Caruso Partner 1401 Mckinney Street Houston, TX 77010 | Thierry Caruso EMAIL - thierry.caruso@ey.com PHONE - 713-750-1392 | Trade Payable | Unliquidated | | | Undetermined |

**Fill in this information to identify the case and this filing:**

Debtor Name __Bristow Group Inc._____

United States Bankruptcy Court for the: __Southern_____ District of __Texas_____
                                                                    (State)

Case number (*If known*): _____

---

Official Form 202

# Declaration Under Penalty of Perjury for Non-Individual Debtors    12/15

**An individual who is authorized to act on behalf of a non-individual debtor, such as a corporation or partnership, must sign and submit this form for the schedules of assets and liabilities, any other document that requires a declaration that is not included in the document, and any amendments of those documents. This form must state the individual's position or relationship to the debtor, the identity of the document, and the date.  Bankruptcy Rules 1008 and 9011.**

**WARNING -- Bankruptcy fraud is a serious crime.  Making a false statement, concealing property, or obtaining money or property by fraud in connection with a bankruptcy case can result in fines up to $500,000 or imprisonment for up to 20 years, or both.  18 U.S.C. §§ 152, 1341, 1519, and 3571.**

## Declaration and signature

I am the president, another officer, or an authorized agent of the corporation; a member or an authorized agent of the partnership; or another individual serving as a representative of the debtor in this case.

I have examined the information in the documents checked below and I have a reasonable belief that the information is true and correct:

☐ *Schedule A/B: Assets–Real and Personal Property* (Official Form 206A/B)

☐ *Schedule D: Creditors Who Have Claims Secured by Property* (Official Form 206D)

☐ *Schedule E/F: Creditors Who Have Unsecured Claims* (Official Form 206E/F)

☐ *Schedule G: Executory Contracts and Unexpired Leases* (Official Form 206G)

☐ *Schedule H: Codebtors* (Official Form 206H)

☐ *Summary of Assets and Liabilities for Non-Individuals* (Official Form 206Sum)

☐ Amended *Schedule* ____

☒ *Chapter 11 or Chapter 9 Cases: List of Creditors Who Have the 20 Largest Unsecured Claims and Are Not Insiders* (Official Form 204)

☐ Other document that requires a declaration_____

I declare under penalty of perjury that the foregoing is true and correct.

Executed on __05/11/2019__          ✖ __/s/ Brian J. Allman_____
                                                     Signature of individual signing on behalf of debtor

                                                     __Brian J. Allman_____
                                                     Printed name

                                                     __Senior Vice President and Chief Financial Officer____
                                                     Position or relationship to debtor

---

Official Form 202                **Declaration Under Penalty of Perjury for Non-Individual Debtors**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| BRISTOW GROUP INC., | § | Case No. 19-_____ (___) |
| | § | |
| Debtor. | § | |

## STATEMENT OF CORPORATE OWNERSHIP

Pursuant to Rules 1007(a)(1) and 7007.1 of the Federal Rules of Bankruptcy Procedure, the undersigned authorized officer of the Debtor certifies that the following corporate entities/individuals own 10% or more of the Debtor's equity interest.

| Shareholder | Percentage of Total Shares |
|---|---|
| Mackenzie Financial Corporation | 18.33% (common stock) |
| BlackRock Fund Advisors | 13.08% (common stock) |

**Fill in this information to identify the case and this filing:**

Debtor Name ___Bristow Group Inc._____

United States Bankruptcy Court for the: ___Southern_____ District of ___Texas_____
                                                                                              (State)

Case number (*If known*): _____

---

Official Form 202

# Declaration Under Penalty of Perjury for Non-Individual Debtors          12/15

**An individual who is authorized to act on behalf of a non-individual debtor, such as a corporation or partnership, must sign and submit this form for the schedules of assets and liabilities, any other document that requires a declaration that is not included in the document, and any amendments of those documents. This form must state the individual's position or relationship to the debtor, the identity of the document, and the date. Bankruptcy Rules 1008 and 9011.**

**WARNING -- Bankruptcy fraud is a serious crime. Making a false statement, concealing property, or obtaining money or property by fraud in connection with a bankruptcy case can result in fines up to $500,000 or imprisonment for up to 20 years, or both. 18 U.S.C. §§ 152, 1341, 1519, and 3571.**

## Declaration and signature

I am the president, another officer, or an authorized agent of the corporation; a member or an authorized agent of the partnership; or another individual serving as a representative of the debtor in this case.

I have examined the information in the documents checked below and I have a reasonable belief that the information is true and correct:

❑ *Schedule A/B: Assets–Real and Personal Property* (Official Form 206A/B)

❑ *Schedule D: Creditors Who Have Claims Secured by Property* (Official Form 206D)

❑ *Schedule E/F: Creditors Who Have Unsecured Claims* (Official Form 206E/F)

❑ *Schedule G: Executory Contracts and Unexpired Leases* (Official Form 206G)

❑ *Schedule H: Codebtors* (Official Form 206H)

❑ *Summary of Assets and Liabilities for Non-Individuals* (Official Form 206Sum)

❑ Amended *Schedule* _____

❑ *Chapter 11 or Chapter 9 Cases: List of Creditors Who Have the 20 Largest Unsecured Claims and Are Not Insiders* (Official Form 204)

☒ Other document that requires a declaration__Statement of Corporate Ownership_____

I declare under penalty of perjury that the foregoing is true and correct.

Executed on  05/11/2019              ✘ /s/ Brian J. Allman_____
                                         Signature of individual signing on behalf of debtor


                                         Brian J. Allman_____
                                         Printed name

                                         Senior Vice President and Chief Financial Officer_____
                                         Position or relationship to debtor

---

Official Form 202              **Declaration Under Penalty of Perjury for Non-Individual Debtors**

## RESOLUTIONS
## OF
## BRISTOW GROUP INC.
## BHNA HOLDINGS INC.
## BRISTOW ALASKA INC.
## BRISTOW HELICOPTERS INC.
## BRISTOW U.S. LEASING LLC
## BRISTOW U.S. LLC

### May 10, 2019

### Restructuring of Bristow Group Inc.

**WHEREAS**, (i) all of the members of the board of directors, (ii) all of the managers or (iii) the other governing body, as the case may be (in each case, the "Governing Body"), of the entities specified above (except as otherwise defined herein, each such entity, individually, a "Company," which term shall, in respect of Bristow U.S. LLC and in respect of transactions to which BL Scotia LP is a party, include reference to Bristow U.S. LLC separately acting in its capacity as general partner of BL Scotia LP, a Scottish Limited Partnership), has had the opportunity to consult with management and has reviewed and discussed the materials presented by the management and the legal and financial advisors of such Company regarding the liabilities and liquidity of such Company, the strategic alternatives available to such Company and the impact of the foregoing on such Company's business;

**WHEREAS**, Bristow Group Inc., a Delaware corporation ("BGI"), and its subsidiaries (collectively, the "Group") have approximately $1.5 billion in senior indebtedness, which indebtedness is comprised of (i) $350 million aggregate principal amount of 8.75% Senior Secured Notes due 2023 (the "8.75% Senior Secured Notes") currently outstanding; (ii) $401.5 million aggregate principal amount of 6.25% Senior Notes due 2022 (the "6.25% Senior Notes") currently outstanding; (iii) $143.75 million aggregate principal amount of 4.50% Convertible Senior Notes due 2023 (the "4.50% Convertible Senior Notes") currently outstanding; (iv) two seven-year British pound sterling denominated secured equipment term loan facilities with Lombard North Central plc, as agent, providing for an aggregate $200 million U.S. dollar equivalent in loans, of which $183 million is currently outstanding; (v) a term loan credit agreement with Macquarie Bank Limited, as agent, providing for a $200 million, five-year secured equipment term loans, of which $171 million is currently outstanding; (vi) a term loan credit facility with PK AirFinance S.à r.l., as agent, providing for an aggregate amount of up to $230 million in term loans, of which $211 million is currently outstanding; and (vii) a senior secured asset-backed revolving credit facility with Barclays Bank PLC, as agent, providing commitments in an aggregate principal amount of up to $75 million, of which $15 million is currently outstanding, including letters of credit;

**WHEREAS**, given BGI's previously disclosed financial challenges and its constrained liquidity, over the course of the past several months, BGI has been engaged in discussions with (i) an ad hoc committee comprising various holders of the 8.75% Senior Secured Notes (the "Secured Notes Ad Hoc Committee") and (ii) an ad hoc committee

comprising various holders of the 6.25% Senior Notes and the 4.50% Convertible Senior Notes (together with the Secured Notes Ad Hoc Committee, the "Ad Hoc Committees") in an effort to restructure its indebtedness and recapitalize BGI, as well as considering other strategic alternatives;

WHEREAS, the Board of Directors of BGI (the "BGI Board") and the Governing Body of each Company, as relevant, has considered one or more alternatives or transactions to reorganize or restructure the indebtedness and capital structure of BGI and one or more of its subsidiaries, including, among other things, through (i) one or more Chapter 11 bankruptcy filings and foreign insolvency proceedings on behalf of BGI and one or more of its subsidiaries to facilitate the restructuring of their indebtedness, (ii) an out-of-court restructuring of their indebtedness, (iii) an asset or equity sale to improve the Group's liquidity or to facilitate a restructuring or repayment of the Group's indebtedness or (iv) other similar transactions (each, a "Possible Transaction" and, collectively, the "Possible Transactions");

WHEREAS, on or before the date hereof, the BGI Board approved and/or ratified the retention of the following financial and legal advisors (collectively, the "Company Advisors"), to assist each Company and the BGI Board in connection with the development and negotiation of any Possible Transactions:

(i)     Houlihan Lokey Capital, Inc. – financial advisor to each Company;
(ii)    Alvarez & Marsal – financial advisor to each Company;
(iii)   Baker Botts L.L.P. – bankruptcy counsel to each Company in connection with the applicable Insolvency Case (as defined herein);
(iv)    Wachtell, Lipton, Rosen & Katz – co-counsel to BGI in connection with the applicable Insolvency Cases; and
(v)     Prime Clerk – claims, noticing and solicitation agent for each Company in connection with its Chapter 11 case; and

WHEREAS, the Company Advisors have been engaged in ongoing discussions with the Ad Hoc Committees and other stakeholders in an effort to reach accord on a consensual Possible Transaction that would allow for a restructuring of the Group's indebtedness and capital structure that would be supported by all such parties, and has kept the BGI Board and the other Governing Bodies appropriately advised as to any material developments or changes with respect to such discussions;

WHEREAS, to the extent that agreement has not yet been reached on a Possible Transaction, the Governing Body of each Company expects that discussions concerning the same will continue;

WHEREAS, the Governing Body of each Company has determined, after consulting with the Company Advisors, that it is in the best interests of such Company and its constituencies that such Company avail itself of the protections afforded by Chapter 11 of the United States Bankruptcy Code, 11 U.S.C. § 101 et seq., (the "Bankruptcy Code") or an applicable foreign insolvency proceeding by making a voluntary filing to open an Insolvency Case;

2

**WHEREAS**, the Governing Body of each Company has reviewed, considered in detail and had the opportunity to ask questions about such Company's Insolvency Case and related Insolvency Filings (as defined herein);

**WHEREAS**, the Governing Body of each Company has determined that it is in the best interests of such Company, its creditors and other parties in interest that such Company enter into a restructuring support agreement (the "Restructuring Support Agreement") by and among each of the Companies, certain of their affiliates, certain consenting creditors and certain consenting parties substantially on the terms presented to each Governing Body on or in advance of the date hereof;

**WHEREAS**, the members of the Governing Body of each Company acknowledge and believe that the Restructuring Support Agreement is procedurally and substantively fair to the Companies as contemplated by applicable law or the bylaws, memorandum and articles of association, limited liability company agreement or similar document (in each case as amended or amended and restated to date) of each Company;

**WHEREAS**, BGI desires to enter into a Commitment Letter (together with the exhibits, schedules and annexes thereto, the "Commitment Letter") from affiliates of, or investment funds managed or advised by, BlackRock Financial Management, Inc., DW Partners, LP, Highbridge Capital Management, LLC, Oak Hill Advisors, L.P. and Whitebox Advisors LLC, and accepted and agreed to by BGI and Bristow Holdings Company Ltd. III ("BHC III" and, together with BGI, the "Borrowers"), which provides for, among other things, a debtor-in-possession credit facility for borrowings not to exceed $75,000,000 (the "Loan Facility"), on the terms and subject to the conditions more fully set forth in the Commitment Letter;

**WHEREAS**, in connection with the Loan Facility, BGI desires that BHC III enter into a Credit Agreement (the "Credit Agreement") with BGI and BHC III, as borrowers thereunder, the guarantors party thereto, a syndicate of lenders (the "Lenders") and an agent to be named therein, as administrative agent and as collateral agent (in such capacity, the "Agent");

**WHEREAS**, pursuant to the terms of the Commitment Letter, certain of BGI's subsidiaries, including each Company, are required (a) to guarantee the obligations of the Borrowers and the other guarantors under the Credit Agreement and the agreements, instruments and documents executed and delivered to the Agent or the Lenders in connection therewith (collectively, the "Obligations") and (b) to grant liens on and security interests in certain of their assets as security for the Obligations, the guarantees referenced in the foregoing clause (a) and certain other obligations (collectively, the "Secured Obligations");

**WHEREAS**, in order to provide for such guarantees and such liens, each Company may be required to execute and deliver a guarantee agreement and one or more security agreements, aircraft security agreements and pledge agreements in respect of the Credit Agreement (collectively, the "Loan Documents");

**WHEREAS**, the Governing Body of each Company has been advised of the material terms of the Commitment Letter, the Credit Agreement and the Loan Documents to be executed on the date on which the Loan Facility closes;

3

**WHEREAS**, each Company expects to derive, directly or indirectly, benefits from the Loan Facility and the extensions of credit thereunder, and the Governing Body of each Company deems it necessary and advisable and in the best interests of such Company for such Company to (i) guarantee the Obligations, (ii) grant liens on certain assets of such Company to secure the Secured Obligations, (iii) mortgage, charge or otherwise pledge its equity in one or more subsidiaries of such Company (as applicable) and (iv) execute and deliver the Credit Agreement and each of the Loan Documents to which it is a party (as applicable) and perform its obligations thereunder; and

**WHEREAS**, the Governing Body of each Company deems it advisable and in the best interests of such Company to authorize and empower any Authorized Person (as defined herein), for and on behalf of such Company, to negotiate, execute and deliver the Credit Agreement and the Loan Documents relating to the Loan Facility (as applicable) and such other agreements, instruments and documents to the Agent and the Lenders in the name of and on behalf of such Company.

### *Insolvency Proceeding Voluntary Filing*

**NOW, THEREFORE, BE IT RESOLVED**, that, with respect to each Company, its Governing Body, after consultation with such Company's management and the Company Advisors, has determined that it is desirable and in the best interests of such Company, its creditors and other parties in interest that a voluntary petition be filed by such Company in the United States Bankruptcy Court for the Southern District of Texas, Houston Division (the "Bankruptcy Court") seeking relief under the provision of Chapter 11 of the Bankruptcy Code and, if appropriate, to commence a voluntary insolvency proceeding in the jurisdiction of its organization or incorporation (as applicable); and

**FURTHER RESOLVED**, that, with respect to BGI, any one or more of the Chief Executive Officer and President, and any Vice President or more senior officer of BGI, and, with respect to each other Company, any of the directors, officers or managers, as applicable, of such Company (each, an "Authorized Person"), be, and each hereby is, authorized and empowered, with full power of delegation, to negotiate, execute, deliver, file with the Bankruptcy Court and any appropriate foreign court, and perform, in the name and on behalf of the applicable Company, and under its corporate seal or otherwise, all plans, petitions, schedules, statements, motions, lists, applications, pleadings, papers, affidavits, declarations, orders and other documents (collectively, the "Insolvency Filings") (with such changes therein and additions thereto as any such Authorized Person may deem necessary, appropriate or advisable, the execution and delivery of any of the Insolvency Filings by any such Authorized Person with any changes thereto to be conclusive evidence that any such Authorized Person deemed such changes to meet such standard); and

**FURTHER RESOLVED**, that, with respect to each Company, any Authorized Person be, and each hereby is, authorized and empowered, with full power of delegation, in the name and on behalf of such Company, to take and perform any and all further acts and deeds that such Authorized Person, in consultation with the Company Advisors, deems necessary, appropriate or advisable in connection with such Company's Chapter 11 case and, if appropriate, foreign insolvency proceeding (each, an "Insolvency Case") or the Insolvency Filings, including,

without limitation, (i) the payment of fees, expenses and taxes such Authorized Person deems necessary, appropriate or advisable and (ii) the negotiation, execution, delivery, performance and filing of any and all additional documents, schedules, statements, lists, papers, agreements, certificates and/or instruments (or any amendments or modifications thereto) in connection with, or in furtherance of, such Insolvency Case with a view to the successful prosecution of such Chapter 11 Case (such acts to be conclusive evidence that such Authorized Person deemed the same to meet such standard); and

### *Retention of Advisors*

**FURTHER RESOLVED**, that the firm of Houlihan Lokey Capital, Inc., located at 1001 Fannin Street #4650, Houston, Texas 77002, is hereby retained as financial advisor to each Company in its Insolvency Case, subject to Bankruptcy Court approval and, if appropriate, the approval of any other court; and

**FURTHER RESOLVED**, that the firm of Alvarez & Marsal, located at 700 Louisiana Street, Suite 3300, Houston, Texas 77002, is hereby retained as financial advisor to each Company in its Insolvency Case, subject to Bankruptcy Court approval and, if appropriate, the approval of any other court; and

**FURTHER RESOLVED**, that the law firm of Baker Botts L.L.P., located at 910 Louisiana Street, Houston, Texas 77002, is hereby retained as bankruptcy counsel to each Company in its Insolvency Case, subject to Bankruptcy Court approval and, if appropriate, the approval of any other court; and

**FURTHER RESOLVED**, that the law firm of Wachtell, Lipton, Rosen & Katz, located at 51 West 52nd Street, New York, New York 10019, is hereby retained as co- counsel to BGI in the applicable Insolvency Case, subject to Bankruptcy Court approval; and

**FURTHER RESOLVED**, that the firm of Prime Clerk, located at One Grand Central Place, 60 East 42nd Street, Suite 1440, New York, NY 10165, is hereby retained as claims, noticing and solicitation agent for each Company in its Insolvency Case, subject to Bankruptcy Court approval and, if appropriate, the approval of any other court; and

**FURTHER RESOLVED**, that, with respect to each Company, any Authorized Person be, and each hereby is, authorized and empowered, with full power of delegation, in the name and on behalf of such Company, to negotiate, execute, deliver, file and perform any agreement, document or certificate and to take and perform any and all further acts and deeds (including, without limitation, (i) the payment of any consideration and (ii) the payment of fees, expenses and taxes) that such Authorized Person deems necessary, appropriate or advisable in connection with such Company's Insolvency Case, including, without limitation, negotiating, executing, delivering and performing any and all documents, agreements, certificates and/or instruments (or any amendments or modifications thereto) in connection with the engagement of professionals contemplated by these resolutions, with a view to the successful prosecution of such Insolvency Case; and

5

### *Form 8-K Filing*

**FURTHER RESOLVED**, that in connection with the Insolvency Filings, the BGI Board authorizes the filing with the Securities and Exchange Commission of a Current Report on Form 8-K and press release, each substantially in the form previously provided to the BGI Board, but with such changes and additions as are required by law or as any Authorized Person, in the discretion of such Authorized Person, deems necessary, appropriate or advisable, and authorizes such other filings in connection therewith as are required by the Securities Exchange Act of 1934, as amended, and the rules and regulations promulgated thereunder; and

### *Restructuring Support Agreement*

**FURTHER RESOLVED**, that, with respect to each Company, any Authorized Person be and each hereby is, authorized and empowered, with full power of delegation, in the name and on behalf of such Company, to enter into the Restructuring Support Agreement; and

**FURTHER RESOLVED**, that, with respect to each Company, any Authorized Person be and each hereby is, authorized and empowered, with full power of delegation, in the name and on behalf of such Company, to enter into a restructuring transaction or series of restructuring transactions by which the Companies will restructure their debt obligations and other liabilities, including but not limited to the restructuring transactions as described in the Restructuring Support Agreement (collectively, the "Restructuring Transactions"); and

**FURTHER RESOLVED**, that, with respect to each Company, any Authorized Person be and each hereby is, authorized and empowered, with full power of delegation, in the name and on behalf of such Company, to take or cause to be taken any and all such other and further action, and to execute, acknowledge, deliver and file any and all such agreements, certificates, instruments and other documents in furtherance of the Restructuring Transactions to which such Company is or will be a party, including, but not limited to, the Restructuring Support Agreement (collectively, the "Restructuring Documents"), to incur and pay or cause to be paid all fees and expenses and engage such persons, in each case, in the form or substantially in the form thereof submitted to each Governing Body (with such changes therein and additions thereto as any such Authorized Person may deem necessary, appropriate or advisable, the execution and delivery of any of the Restructuring Documents by any such Authorized Person with any changes thereto to be conclusive evidence that any such Authorized Person deemed such changes to meet such standard); and

**FURTHER RESOLVED**, that, with respect to each Company, any Authorized Person be and each hereby is, authorized and empowered, with full power of delegation, in the name and on behalf of such Company, to take any and all actions to (a) obtain approval by the Bankruptcy Court or any other regulatory or governmental entity of the Restructuring Documents in connection with the Restructuring Transactions, and (b) obtain approval by the Bankruptcy Court or any other regulatory or governmental entity of any Restructuring Transactions; and

**FURTHER RESOLVED**, that, with respect to each Company, any Authorized Person be and each hereby is, authorized and empowered, with full power of delegation, in the

6

name and on behalf of such Company, to execute and deliver any documents or to do such other things which shall in such Authorized Person's sole judgment be necessary, appropriate or advisable to give effect to the foregoing resolutions, which determination shall be conclusively evidenced by such Authorized Person's execution and delivery thereof; and

### Debtor-in-Possession Loan Facility

**FURTHER RESOLVED**, that the execution and delivery of the Commitment Letter by each of the Borrowers and the performance of its obligations thereunder (a) are in the best interests of such Borrower, (b) are in furtherance of the proper purposes of such Borrower, (c) will benefit such Borrower and (d) are hereby approved and authorized in all respects; and

**FURTHER RESOLVED**, that the Governing Body of each Company hereby adopts and approves the form, terms and provisions of the proposed Loan Facility as set forth in the Commitment Letter;

**FURTHER RESOLVED**, that each Company is authorized to grant to the Agent (for the benefit of the Lenders and any other persons to which any Secured Obligations are owed) liens on and security interests in certain of its assets as security for the Secured Obligations, including a mortgage, charge or pledge (as applicable) of the equity of any subsidiaries of such Company (as applicable); and

**FURTHER RESOLVED**, that, with respect to each Company, any Authorized Person be and each hereby is, authorized and empowered, with full power of delegation, in the name and on behalf of such Company, to negotiate and prepare the form, terms and provisions of, and to execute and deliver, for and on behalf of such Company, the Credit Agreement, the Loan Documents and any and all such other agreements, documents, instruments, certificates and other transaction documents that any Authorized Person deems necessary, appropriate or advisable to consummate the transactions contemplated by the Credit Agreement and the Loan Documents (together with the Credit Agreement and the Loan Documents, the "Transaction Documents"), in such form as may be approved by the Authorized Person executing and delivering the same, such Authorized Person's execution or delivery thereof to be conclusive evidence of such approval thereof by such Authorized Person and the approval of the Governing Body of such Company; and

**FURTHER RESOLVED**, that, with respect to each Company, any Authorized Person be and each hereby is, authorized and empowered, with full power of delegation, in the name and on behalf of such Company, to do and perform such further acts and things, including, without limitation, the execution and delivery of any amendments, modifications, extensions, renewals or supplements to the Loan Documents and any other Transaction Documents (including, without limitation, supplemental or additional collateral documents encumbering or otherwise securing assets and properties of such Company acquired after the closing of the Loan Facility), as may be necessary or deemed appropriate by such Authorized Person in connection with any of the Transaction Documents and the transactions contemplated thereby or which may be necessary or appropriate to comply with or evidence compliance with the terms, conditions and provisions of any of the Transaction Documents, and that the performance or execution

7

thereof by such Authorized Person shall be conclusive evidence of the approval thereof by such Authorized Person and by the Governing Body of such Company; and

**FURTHER RESOLVED**, that the proposed fee arrangements and commitments under the Commitment Letter and any other fee letters or commitment papers executed in connection with the Loan Facility be, and they hereby are, adopted and approved, in all respects; and the execution and delivery thereof by any Authorized Person with respect to a Company, for and on behalf of such Company, are hereby ratified, and the performance of such Company's obligations thereunder, including the payment of fees and expenses required thereby, is hereby adopted and approved, in each case in all respects; and

## Miscellaneous

**FURTHER RESOLVED**, that to the extent any Company is a shareholder, member or other owner of another Company, the Governing Body of each such parent Company hereby authorizes and approves, in its capacity as a shareholder, member or other owner of each such subsidiary Company, (i) the Insolvency Cases, Insolvency Filings and Restructuring Transactions, (ii) the execution, delivery and performance of the Restructuring Documents and Transaction Documents to which each such subsidiary Company is a party, including, without limitation, any and all amendments, modifications, extension, renewals or supplements thereto, (iii) the amendment of the bylaws, operating agreement or equivalent governing document of each such subsidiary Company to provide that the shareholder, member or other ownership interest of the parent Company will not cease or terminate and will continue notwithstanding the bankruptcy of such shareholder, member or owner, and (iv) the performance of all acts and deeds in furtherance of the foregoing and these resolutions; and

**FURTHER RESOLVED**, that, in respect of Bristow U.S. LLC acting in its capacity as general partner of BL Scotia LP and in respect of transactions to which BL Scotia LP is a party as a Company, any reference to transactions being (a) in the best interests of such Company, (b) in furtherance of the proper purposes of such Company, or (c) for the benefit of such Company shall be interpreted as such transactions being in the best interests of, in furtherance of the proper purposes of, and for the benefit of BL Scotia LP, and also in accordance with the requirements of any applicable limited partnership agreement in respect of BL Scotia LP; and

**FURTHER RESOLVED**, that, with respect to each Company, any Authorized Person be, and each hereby is, authorized and empowered, with full power of delegation, in the name and on behalf of such Company, to take, cause to be taken, or perform any and all further acts or deeds, including, without limitation, (i) the negotiation of such additional agreements, amendments, modifications, supplements, reports, documents, instruments, applications, notes, certificates, mortgages or charges (including any equitable mortgage or charge over shares in any subsidiary) not now known but which may be required, (ii) the execution, delivery and filing (if applicable) of any of the foregoing in such form as any Authorized Person shall in such Authorized Person's absolute discretion and sole opinion approve and (iii) the payment of all fees, consent payments, taxes and other expenses as any such Authorized Person, in his or her sole discretion, may approve or deem necessary, appropriate or advisable to carry out the intent and accomplish the purposes of the foregoing resolutions and the transactions contemplated

8

thereby, all of such actions, executions, deliveries, filings and payments to be conclusive evidence of such approval or that such Authorized Person deemed the same to meet such standard; and

**FURTHER RESOLVED**, that any and all past or prior actions heretofore taken by any Authorized Person or any other officer, director or manager of any Company, in the name and on behalf of such Company, in furtherance of any or all of the preceding resolutions, including but not limited to, the signing of any agreements, resolutions, deeds, letters, notices, certificates, acknowledgements, receipts, authorizations, instructions, releases, waivers, proxies and other documents (whether of a like nature or not) and the payment of all and any related fees and expenses be, and the same hereby are, ratified, confirmed and approved in all respects; and

**FURTHER RESOLVED**, that the Secretary or Assistant Secretary of BGI is hereby authorized and empowered to certify that these resolutions have been duly adopted to such person or persons as the Secretary or Assistant Secretary deems entitled thereto, and to attest or witness the execution of the documents authorized by the foregoing resolutions, and to sign and affix each Company's seal to such documents as may be necessary, appropriate or advisable.

# TAB 11-B

**THIS PLAN IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT. THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE PLAN. ACCEPTANCE OR REJECTION MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN CONDITIONALLY APPROVED BY THE BANKRUPTCY COURT. THE INFORMATION IN THE PLAN IS SUBJECT TO CHANGE. THIS PLAN IS NOT AN OFFER TO SELL ANY SECURITIES AND IS NOT SOLICITING AN OFFER TO BUY ANY SECURITIES.**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| BRISTOW GROUP INC., *et al.*,[1] | ) | Case No. 19-32713 (DRJ) |
|  | ) |  |
| Debtors. | ) | Jointly Administered |
|  | ) |  |

**JOINT CHAPTER 11 PLAN OF REORGANIZATION OF**
**BRISTOW GROUP INC. AND ITS DEBTOR AFFILIATES**

James R. Prince, State Bar No. 00784791
Omar J. Alaniz, State Bar No. 24040402
Kevin Chiu, State Bar No. 24109723
**BAKER BOTTS L.L.P.**
2001 Ross Avenue, Suite 900
Dallas, Texas 75201-2980
Telephone: (214) 953-6500
Facsimile: (214) 953-6503
Email:   jim.prince@bakerbotts.com
         omar.alaniz@bakerbotts.com
         kevin.chiu@bakerbotts.com

-and-

Emanuel C. Grillo (*pro hac vice)*
Chris Newcomb (*pro hac vice*)
**BAKER BOTTS L.L.P.**
30 Rockefeller Plaza
New York, New York 10112-4498
Telephone: (212) 408-2500
Facsimile: (212) 408-2501
Email:   emanuel.grillo@bakerbotts.com
         chris.newcomb@bakerbotts.com

Richard G. Mason (*pro hac vice*)
Amy R. Wolf (*pro hac vice*)
**WACHTELL, LIPTON, ROSEN & KATZ**
51 West 52nd Street
New York, New York 10019
Telephone: (212) 403-1000
Facsimile: (212) 403-2000
Email:   rgmason@wlrk.com
         arwolf@wlrk.com

*Co-Counsel to the Debtors and Debtors in Possession*

Dated: August 1, 2019

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each debtor's federal tax identification number, are: Bristow Group Inc. (9819), BHNA Holdings Inc. (8862), Bristow Alaska Inc. (8121), Bristow Helicopters Inc. (8733), Bristow U.S. Leasing LLC (2451), Bristow U.S. LLC (2904), BriLog Leasing Ltd. (9764), and Bristow Equipment Leasing Ltd. (9303). The corporate headquarters and the mailing address for the Debtors listed above is 2103 City West Blvd., 4th Floor, Houston, Texas 77042.

**TABLE OF CONTENTS**

**Page**

INTRODUCTION ....................................................................................................................................4

**ARTICLE I. DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME, GOVERNING LAW, AND OTHER REFERENCES** .......................................................................4
    A.    *Defined Terms* ..................................................................................................................4
    B.    *Rules of Interpretation* ...................................................................................................21
    C.    *Computation of Time* ......................................................................................................22
    D.    *Governing Law* ..............................................................................................................22
    E.    *Reference to Monetary Figures* ......................................................................................22
    F.    *Reference to the Debtors or the Reorganized Debtors* ...................................................22
    G.    *Controlling Document* ....................................................................................................22

**ARTICLE II. ADMINISTRATIVE AND PRIORITY CLAIMS** ..........................................................22
    A.    *Administrative Claims* ....................................................................................................22
    B.    *Professional Fee Claims* ................................................................................................23
    C.    *Priority Tax Claims* ........................................................................................................23
    D.    *DIP Facility Claims* ........................................................................................................23
    E.    *Statutory Fees* .................................................................................................................24

**ARTICLE III. CLASSIFICATION, TREATMENT, AND VOTING OF CLAIMS AND INTERESTS** .........24
    A.    *Classification of Claims and Interests* ...........................................................................24
    B.    *Treatment of Classes of Claims and Interests* ...............................................................25
    C.    *Special Provision Governing Unimpaired Claims* .........................................................30
    D.    *Elimination of Vacant Classes* .......................................................................................30
    E.    *Voting Classes; Presumed Acceptance by Non-Voting Classes* .....................................30
    F.    *Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code* .................30
    G.    *Intercompany Interests* ..................................................................................................30
    H.    *Subordinated Claims and Interests* ...............................................................................31

**ARTICLE IV. PROVISIONS FOR IMPLEMENTATION OF THE PLAN** ............................................31
    A.    *General Settlement of Claims, Interests, and Causes of Action* .....................................31
    B.    *Restructuring Transactions* ............................................................................................31
    C.    *Employee and Retiree Benefits* .......................................................................................31
    D.    *Issuance and Distribution of New Stock* ........................................................................32
    E.    *Determination of Holder Citizenship* ............................................................................32
    F.    *Rights Offering* ..............................................................................................................32
    G.    *The Exit Facility, the Amended and Restated 2019 Term Loan Facility, the New PK Air Note and the New Macquarie Note* .................33
    H.    *Rights Offering Per Share Price* .....................................................................................34
    I.    *Management Incentive Plan* ...........................................................................................34
    J.    *Management of Reorganized Bristow* .............................................................................34
    K.    *Exemption from Registration Requirements* ...................................................................34
    L.    *Vesting of Assets* .............................................................................................................35
    M.    *Cancellation of Instruments, Certificates, and Other Documents* ..................................35
    N.    *Corporate Action* ...........................................................................................................36
    O.    *Corporate Existence* .......................................................................................................37
    P.    *New Organizational Documents* .....................................................................................37
    Q.    *Effectuating Documents; Further Transactions* .............................................................37
    R.    *Section 1146(a) Exemption* .............................................................................................37
    S.    *Directors and Officers* ....................................................................................................38
    T.    *Preservation of Causes of Action* ...................................................................................38

**TABLE OF CONTENTS (CONT'D)**

|  |  |  | **Page** |
|---|---|---|---|
| U. | *Indenture Trustee Expenses* | | 39 |
| V. | *Closing the Chapter 11 Cases* | | 39 |

**ARTICLE V. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES** .......**39**
| A. | *Assumption or Rejection of Executory Contracts and Unexpired Leases* | 39 |
| B. | *Claims Based on Rejection of Executory Contracts or Unexpired Leases* | 40 |
| C. | *Cure of Defaults for Assumed Executory Contracts and Unexpired Leases* | 40 |
| D. | *Indemnification* | 41 |
| E. | *Insurance Policies* | 41 |
| F. | *Employee Compensation and Benefits* | 42 |
| G. | *Contracts and Leases After the Petition Date* | 42 |
| H. | *Reservation of Rights* | 42 |
| I. | *Nonoccurrence of Effective Date* | 43 |

**ARTICLE VI. PROVISIONS GOVERNING DISTRIBUTIONS** .......**43**
| A. | *Distributions on Account of Claims and Interests Allowed as of the Effective Date* | 43 |
| B. | *Rights and Powers of the Distribution Agent* | 43 |
| C. | *Special Rules for Distributions to Holders of Disputed Claims* | 43 |
| D. | *Delivery of Distributions* | 44 |
| E. | *Compliance with Tax Requirements/Allocations* | 45 |
| F. | *Claims Paid or Payable by Third Parties* | 46 |
| G. | *Setoffs* | 46 |
| H. | *Indefeasible Distributions* | 47 |
| I. | *Allocation Between Principal and Accrued Interest* | 47 |

**ARTICLE VII. PROCEDURES FOR RESOLVING DISPUTED CLAIMS** .......**47**
| A. | *Allowance of Claims* | 47 |
| B. | *Claims Administration Responsibilities* | 47 |
| C. | *Estimation of Claims* | 47 |
| D. | *Adjustment to Claims Without Objection* | 48 |
| E. | *Time to File Objections to Claims* | 48 |
| F. | *Disallowance of Claims* | 48 |
| G. | *Amendments to Claims* | 48 |
| H. | *No Distributions Pending Allowance* | 48 |
| I. | *Distributions After Allowance* | 48 |
| J. | *Single Satisfaction of Claims* | 49 |

**ARTICLE VIII. DISCHARGE, RELEASE, INJUNCTION AND RELATED PROVISIONS** .......**49**
| A. | ***Discharge of Claims and Termination of Interests*** | 49 |
| B. | ***Releases by the Debtors*** | 49 |
| C. | ***Releases by Holders of Claims and Interests*** | 50 |
| D. | ***Exculpation*** | 51 |
| E. | ***Injunction*** | 52 |
| F. | *Protection Against Discriminatory Treatment* | 52 |
| G. | *Release of Liens* | 52 |
| H. | *Reimbursement or Contribution* | 53 |
| I. | *Recoupment* | 53 |
| J. | *Subordination Rights* | 53 |
| K. | *Reservation of Rights of the United States* | 53 |

**ARTICLE IX. EFFECT OF CONFIRMATION OF THE PLAN** .......**54**
| A. | *Jurisdiction and Venue* | 54 |
| B. | *Order Approving the Disclosure Statement* | 54 |
| C. | *Voting Report* | 54 |

**TABLE OF CONTENTS (CONT'D)**

**Page**

|   |   |   |   |
|---|---|---|---|
| D. | *Judicial Notice* | | 54 |
| E. | *Transmittal and Mailing of Materials; Notice* | | 55 |
| F. | *Solicitation* | | 55 |
| G. | *Burden of Proof* | | 55 |
| H. | *Bankruptcy Rule 3016(a) Compliance* | | 55 |
| I. | *Compliance with the Requirements of Section 1129 of the Bankruptcy Code* | | 55 |
| J. | *Securities Under the Plan* | | 60 |
| K. | *Releases and Discharges* | | 60 |
| L. | *Release and Retention of Causes of Action* | | 61 |
| M. | *Approval of Restructuring Support Agreement, Backstop Commitment Agreement and Other Restructuring Documents and Agreements* | | 61 |
| N. | *Confirmation Hearing Exhibits* | | 61 |
| O. | *Objections to Confirmation of the Plan* | | 61 |
| P. | *Retention of Jurisdiction* | | 61 |
| Q. | *Plan Supplement* | | 61 |

**ARTICLE X. CONDITIONS PRECEDENT TO THE EFFECTIVE DATE** ........................ **62**
| A. | *Conditions Precedent to the Effective Date* | | 62 |
| B. | *Waiver of Conditions* | | 63 |
| C. | *Effect of Non-Occurrence of Conditions to Consummation* | | 63 |
| D. | *Substantial Consummation* | | 63 |

**ARTICLE XI. MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN** ........... **63**
| A. | *Modification of Plan* | | 63 |
| B. | *Effect of Confirmation on Modifications* | | 63 |
| C. | *Revocation or Withdrawal of Plan* | | 63 |

**ARTICLE XII. RETENTION OF JURISDICTION** ........................................ **64**

**ARTICLE XIII. MISCELLANEOUS PROVISIONS** ...................................... **65**
| A. | *Immediate Binding Effect* | | 65 |
| B. | *Restructuring Documents* | | 65 |
| C. | *Additional Documents* | | 66 |
| D. | *Dissolution of the Statutory Committees* | | 66 |
| E. | *Payment of Statutory Fees* | | 66 |
| F. | *Payment of Transaction Expenses* | | 66 |
| G. | *Reservation of Rights* | | 66 |
| H. | *Successors and Assigns* | | 66 |
| I. | *Service of Documents* | | 67 |
| J. | *Term of Injunctions or Stays* | | 68 |
| K. | *Entire Agreement* | | 68 |
| L. | *Plan Supplement* | | 68 |
| M. | *Non-Severability* | | 68 |
| N. | *Votes Solicited in Good Faith* | | 69 |
| O. | *Waiver or Estoppel* | | 69 |

**INTRODUCTION**

Bristow Group Inc. and its affiliated debtors and debtors in possession in the above-captioned chapter 11 cases propose this joint chapter 11 plan of reorganization pursuant to chapter 11 of title 11 of the United States Code. Capitalized terms used herein and not otherwise defined shall have the meanings ascribed to such terms in Article I.A hereof. Although proposed jointly for administrative purposes, the Plan constitutes a separate plan for each of the foregoing entities and each of the foregoing entities is a proponent of the Plan within the meaning of section 1129 of the Bankruptcy Code. The Plan does not contemplate substantive consolidation of any of the Debtors. The classification of Claims and Interests set forth in Article III of the Plan should be deemed to apply separately to each Debtor, as applicable.

Reference is made to the accompanying *Disclosure Statement for the Joint Chapter 11 Plan of Reorganization of Bristow Group Inc. and Its Debtor Affiliates* for a discussion of the Debtors' history, business, properties and operations, valuation, projections, risk factors, a summary and analysis of the Plan and the transactions contemplated thereby, and certain related matters.

ALL HOLDERS OF CLAIMS AND INTERESTS, TO THE EXTENT APPLICABLE, ARE ENCOURAGED TO READ THIS PLAN AND THE DISCLOSURE STATEMENT IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THIS PLAN.

**ARTICLE I.**
**DEFINED TERMS, RULES OF INTERPRETATION,**
**COMPUTATION OF TIME, GOVERNING LAW, AND OTHER REFERENCES**

A.     *Defined Terms*

1.      "*1145 Eligible Holder*" means each Holder of a Claim (as of the Distribution Record Date) that is acquiring the 1145 Rights Offering Stock for its own account.

2.      "*1145 Rights Offering*" means the rights offering for shares of New Common Stock to be conducted in reliance upon the exemption from registration under the Securities Act provided in section 1145 of the Bankruptcy Code, in accordance with the 1145 Rights Offering Procedures.

3.      "*1145 Rights Offering Procedures*" means the procedures attached as an exhibit to the Conditional Disclosure Statement Order.[2]

4.      "*1145 Rights Offering Stock*" means the New Common Stock issued pursuant to the 1145 Rights Offering.

5.      "*1145 Subscription Rights*" means the rights to purchase 1145 Rights Offering Stock pursuant to the 1145 Rights Offering at a per share purchase price of $36.37.

6.      "*2019 Term Loan Amendment Fee*" means Cash in an aggregate amount of $562,500.

7.      "*2019 Term Loan Facility*" means that certain prepetition secured term loan facility due May 2022 in the aggregate principal amount of $75,000,000, provided pursuant to the 2019 Term Loan Facility Credit Agreement.

8.       "*2019 Term Loan Facility Agent*" means Ankura Trust Company, LLC solely in its capacity as administrative agent under the 2019 Term Loan Facility.

---

[2]     [Note: The 1145 Rights Offering Procedures and the 4(a)(2) Rights Offering Procedures shall be filed with the Court prior to the hearing on the entry of the Conditional Disclosure Statement Order, and such procedures shall contain additional information and detail regarding the Rights Offering.]

9.      "*2019 Term Loan Facility Claim*" means any Claim against any of the Debtors arising from or based upon the 2019 Term Loan Facility.

10.      "*2019 Term Loan Facility Credit Agreement*" means that certain Term Loan Credit Agreement dated as of May 10, 2019, as amended, modified or supplemented from time to time among Bristow Parent and its non-Debtor affiliate Bristow Holdings Company Ltd. III (Cayman Islands), as borrowers, the guarantors from time to time party thereto, certain Holders of Secured Notes, as lenders, and the 2019 Term Loan Facility Agent, as administrative agent and collateral agent.

11.      "*4(a)(2) Eligible Holder*" means each holder (as of the Distribution Record Date) of a Claim that is an "accredited investor" (as defined in Rule 501(a) under the Securities Act) or a "qualified institutional buyer" within the meaning of Rule 144A of the Securities Act and that is acquiring the 4(a)(2) Rights Offering Stock for its own account.

12.      "*4(a)(2) Rights Offering*" means the rights offering for New Common Stock and New Preferred Stock to be conducted in reliance upon the exemption from registration under the Securities Act provided in Section 4(a)(2) of the Securities Act and/or Regulation D promulgated thereunder, in accordance with the 4(a)(2) Rights Offering Procedures.

13.      "*4(a)(2) Rights Offering Procedures*" means the procedures attached as an exhibit to the Conditional Disclosure Statement Order.[3]

14.      "*4(a)(2) Rights Offering Stock*" means the New Common Stock and New Preferred Stock issued pursuant to the 4(a)(2) Rights Offering.

15.      "*4(a)(2) Subscription Rights*" means the rights to purchase 4(a)(2) Rights Offering Stock at a per share purchase price of $36.37.

16.      "*Administrative Claim*" means a Claim against any of the Debtors on or after the Petition Date and before the Effective Date for a cost or expense of administration of the Chapter 11 Cases entitled to priority under sections 503(b), 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including: (a) the actual and necessary costs and expenses incurred on or after the Petition Date until and including the Effective Date of preserving the Estates and operating the Debtors' businesses; (b) Allowed Professional Fee Claims; (c) Allowed DIP Facility Claims; (d) all fees and charges assessed against the Estates pursuant to section 1930 of chapter 123 of title 28 of the United States Code; and (e) the Backstop Commitment Fee and the Equitization Consent Fee (which, in the case of this clause (e), are each deemed to be an Allowed Administrative Claim pursuant to the Confirmation Order).

17.      "*Administrative Claims Bar Date*" means the deadline for Filing requests for payment of Administrative Claims, which: (a) with respect to Administrative Claims other than Professional Fee Claims, shall be 30 days after the Effective Date; and (b) with respect to Professional Fee Claims, shall be 45 days after the Effective Date.

18.      "*Affiliate*" has the meaning set forth in section 101(2) of the Bankruptcy Code. With respect to any Person that is not a Debtor, the term "Affiliate" shall apply to such Person as if the Person were a Debtor.

19.      "*Allowed*" means, with respect to any Claim against any of the Debtors, except as otherwise provided herein: (a) a Claim that is evidenced by a Proof of Claim Filed by the Claims Bar Date (or such other date as agreed by the Debtors pursuant to the Bar Date Order) or a request for payment of an Administrative Claim Filed by the Administrative Claims Bar Date, as applicable (or for which Claim under the Plan, the Bankruptcy Code, or pursuant to a Final Order, a Proof of Claim or request for payment of Administrative Claim is not or shall not be required to be Filed); (b) a Claim that is listed in the Schedules as not contingent, not unliquidated, and not Disputed,

---

[3]      [Note: The 1145 Rights Offering Procedures and the 4(a)(2) Rights Offering Procedures shall be filed with the Court prior to the hearing on the entry of the Conditional Disclosure Statement, and such procedures shall contain additional information and detail regarding the Rights Offering.]

and for which no contrary or superseding Proof of Claim, as applicable, has been timely Filed; or (c) a Claim allowed pursuant to the Plan or a Final Order; *provided*, that with respect to a Claim described in clauses (a) and (b) above, such Claim shall be considered Allowed only if and to the extent that with respect to such Claim no objection to the allowance thereof is interposed within the applicable period of time fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Court, or such an objection is so interposed and the Claim has been Allowed by a Final Order. Any Claim that has been or is hereafter listed in the Schedules as contingent, unliquidated, or disputed, and for which no contrary or superseding Proof of Claim is or has been timely Filed, or that is not or has not been Allowed by a Final Order, is not considered Allowed and shall be expunged without further action by the Debtors and without further notice to any party or action, approval, or order of the Bankruptcy Court. Notwithstanding anything to the contrary herein, no Claim of any Entity subject to section 502(d) of the Bankruptcy Code shall be deemed Allowed unless and until such Entity pays in full the amount that it owes the applicable Debtor or Reorganized Debtor, as applicable. For the avoidance of doubt, a Proof of Claim Filed after the Claims Bar Date or a request for payment of an Administrative Claim Filed after the Administrative Claims Bar Date, as applicable, shall not be Allowed for any purposes whatsoever absent entry of a Final Order allowing such late-Filed Claim. "*Allow*" and "*Allowing*" shall have correlative meanings.

20. "*Amended and Restated 2019 Term Loan Credit Agreement*" means an amended and restated version of the 2019 Term Loan Credit Agreement to be entered into by the applicable Debtors, if the Debtors do not enter into the Exit Facility on or prior to the Effective Date, in any case secured by a first lien on substantially all assets of the Reorganized Debtors and their non-Debtor Affiliates (subject to customary and other agreed exclusions), with the same maturity and interest rate as set forth in the 2019 Term Loan Credit Agreement, and with amendments only to the prepayment, financial, reporting and other affirmative and negative covenants in the 2019 Term Loan Credit Agreement, which shall be subject to the consent rights of the Required RSA Parties on the terms set forth in the Restructuring Support Agreement.

21. "*Amended and Restated 2019 Term Loan Facility*" means the secured credit facility that Reorganized Bristow Parent and certain other Reorganized Debtors will enter into on the Effective Date in accordance with the Amended and Restated 2019 Term Loan Credit Agreement, if the Debtors do not enter into the Exit Facility on or prior to the Effective Date.

22. "*Amended and Restated 2019 Term Loan Facility Agent*" means the entity identified in the Plan Supplement as administrative and collateral agent under the Amended and Restated 2019 Term Loan Credit Agreement, solely in its capacity as such.

23. "*Amended and Restated 2019 Term Loan Facility Lenders*" means those certain lenders from time to time party to the Amended and Restated 2019 Term Loan Credit Agreement, solely in their capacity as such.

24. "*Amended and Restated 2019 Term Loan Documents*" means, collectively, the Amended and Restated 2019 Term Loan Credit Agreement and any and all other agreements, documents, and instruments delivered or entered into in connection therewith, including any guarantee agreements, pledge and collateral agreements, intercreditor agreements, and other security documents, which shall be subject to the consent rights of the Required RSA Parties on the terms set forth in the Restructuring Support Agreement.

25. "*Backstop Commitment Agreement*" means that certain backstop commitment agreement, entered into and dated as of July 24, 2019, pursuant to which the Backstop Commitment Parties have agreed to backstop the Rights Offering, as may be amended or modified from time to time in accordance with the terms thereof and the Restructuring Support Agreement and which shall be subject to the consent rights of the Required RSA Parties on the terms set forth in the Restructuring Support Agreement.

26. "*Backstop Commitment Fee*" has the meaning ascribed to such term in the Backstop Commitment Agreement, and shall be equal to 5.83% of the New Stock on a fully-diluted basis (except for the New Stock to be issued pursuant to the Management Incentive Plan).

27. "*Backstop Commitment Parties*" means at any time and from time to time, the parties that have committed to backstop the Rights Offering and are signatories to the Backstop Commitment Agreement, solely in their capacities as such, to the extent provided in the Backstop Commitment Agreement.

28. "*Bankruptcy Code*" means title 11 of the United States Code, 11 U.S.C. §§ 101–1532, as amended from time to time.

29. "*Bankruptcy Court*" means the United States Bankruptcy Court for the Southern District of Texas, Houston Division or such other court having jurisdiction over the Chapter 11 Cases, including, to the extent of the withdrawal of reference under 28 U.S.C. § 157 and/or the General Order of the District Court pursuant to section 151 of title 28 of the United States Code, the United States District Court for the Southern District of Texas.

30. "*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure promulgated under section 2075 of title 28 of the United States Code, and the general, local, and chambers rules of the Bankruptcy Court.

31. "*Bar Date Order*" means the *Order (I) Setting Bar Dates for Filing Proofs of Claim, Including Requests for Payment under Section 503(b)(9), (II) Establishing Amended Schedules Bar Date and Rejection Damages Bar Date, (III) Approving the Form of and Manner for Filing Proofs of Claim, Including Section 503(b)(9) Requests and (IV) Approving Notice of Bar Dates* [Docket No. 392] (as amended, modified, or supplemented from time to time in accordance with the terms thereof).

32. "*Bristow Parent*" means Bristow Group Inc.

33. "*Business Day*" means a day, other than a Saturday, Sunday, or "legal holiday" (as defined in Bankruptcy Rule 9006(a)).

34. "*Cash*" means the legal tender of the United States of America or the equivalent thereof, including bank deposits and checks.

35. "*Causes of Action*" means any and all claims, controversies, actions, proceedings, controversies, reimbursement claims, contribution claims, recoupment rights, interests, debts, third-party claims, indemnity claims, damages, remedies, causes of action, demands, rights, suits, obligations, liabilities, accounts, judgments, defenses, affirmative defenses, offsets, powers, privileges, licenses, franchises, avoidance actions, counterclaims and cross-claims, of any kind or character whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, asserted or unasserted, direct or indirect, assertible directly or derivatively, choate or inchoate, reduced to judgment or otherwise, secured or unsecured, whether arising before, on, or after the Petition Date, in tort, law, equity, or otherwise pursuant to any theory of law. Causes of Action also include: (a) all rights of setoff, counterclaim, or recoupment and claims on contracts or for breaches of duties imposed by law or equity; (b) the right to object to or otherwise contest Claims or Interests; (c) claims pursuant to sections 362, 510, 542, 543, 544 through 550, or 553 of the Bankruptcy Code; (d) such claims and defenses as fraud, mistake, duress, and usury and any other defenses set forth in section 558 of the Bankruptcy Code; and (e) any claim for fraudulent transfer or similar claim pursuant to any state or foreign law.

36. "*Certificate*" means any instrument evidencing a Claim or an Interest.

37. "*Chapter 11 Cases*" means, when used with reference to a particular Debtor, the case pending for that Debtor under chapter 11 of the Bankruptcy Code in the Bankruptcy Court, and when used with reference to all the Debtors, the procedurally consolidated and jointly administered chapter 11 cases pending for the Debtors in the Bankruptcy Court.

38. "*Citizenship Certification*" means a certification regarding the citizenship of a holder in the form approved by the Conditional Disclosure Statement Order or such other form that may be acceptable to the Debtors.

39. "*Claim*" has the meaning set forth in section 101(5) of the Bankruptcy Code.

40. "*Claims Bar Date*" means the applicable deadline by which Proofs of Claim must be Filed, as established by: (a) the Bar Date Order; (b) a Final Order of the Bankruptcy Court; or (c) the Plan.

41.      "*Claims Register*" means the official register of Claims maintained by the Solicitation Agent or the clerk of the Bankruptcy Court.

42.      "*Class*" means a category of Holders of Claims or Interests pursuant to section 1122(a) of the Bankruptcy Code.

43.      "*Collateral*" means any property or interest in property of the Estate of any Debtor subject to a Lien, charge, or other encumbrance to secure the payment or performance of a Claim, which Lien, charge, or other encumbrance is not subject to a Final Order ordering the remedy of avoidance of any such Lien, charge, or other encumbrance under the Bankruptcy Code.

44.      "*Compensation and Benefits Programs*" means all employment and severance agreements and policies, and all employment, compensation, and benefit plans, policies, workers' compensation programs, savings plans, retirement plans, deferred compensation plans, supplemental executive retirement plans, healthcare plans, disability plans, severance benefit plans, incentive and retention plans, programs and payments, life and accidental death and dismemberment insurance plans, and programs of the Debtors, and all amendments and modifications thereto, applicable to the Debtors' and their Affiliates' employees, former employees, retirees, and non-employee directors and the employees, former employees and retirees of their subsidiaries.

45.      "*Conditional Disclosure Statement Order*" means the order, which shall be subject to the consent rights of the Required RSA Parties on the terms set forth in the Restructuring Support Agreement, entered by the Bankruptcy Court conditionally approving the Disclosure Statement and the Solicitation Materials, and allowing solicitation of the Plan to commence, entered on [●], 2019 [Docket No. [●]], (as amended, modified, or supplemented from time to time in accordance with the terms thereof).

46.      "*Confirmation*" means the entry of the Confirmation Order on the docket of the Chapter 11 Cases.

47.      "*Confirmation Date*" means the date on which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Cases within the meaning of Bankruptcy Rules 5003 and 9021.

48.      "*Confirmation Hearing*" means the hearing held by the Bankruptcy Court to (a) consider Confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code and (b) consider final approval of the Disclosure Statement, the Solicitation Materials, the Restructuring Support Agreement, and the Backstop Commitment Agreement.

49.      "*Confirmation Order*" means the order of the Bankruptcy Court, the form and substance of which shall be subject to the consent rights of the Required RSA Parties on the terms set forth in the Restructuring Support Agreement, confirming the Plan pursuant to section 1129 of the Bankruptcy Code and providing final approval of the Disclosure Statement, the Solicitation Materials, the Restructuring Support Agreement, and the Backstop Commitment Agreement.

50.      "*Consummation*" or "*Consummated*" means the occurrence of the Effective Date.

51.      "*Convertible Notes*" means the 4.50% Convertible Senior Notes due 2023, issued in an original principal amount of approximately $143,750,000 pursuant to the Convertible Notes Indenture.

52.      "*Convertible Notes Indenture*" means that certain indenture, dated as of December 18, 2017, as amended, modified or supplemented from time to time, for the Convertible Notes, among Bristow Parent, as issuer, the Guarantor Subsidiaries, as guarantors, and the Convertible Notes Indenture Trustee, as trustee.

53.      "*Convertible Notes Indenture Trustee*" means Delaware Trust Company, and any successor thereto, solely in its capacity as successor trustee under the Convertible Notes Indenture.

54. "*Creditors' Committee*" means the official committee of unsecured creditors appointed in the Chapter 11 Cases pursuant to the *Notice of Appointment of Committee of Unsecured Creditors* [Docket No. 179], as may be reconstituted from time to time.

55. "*Cure Costs*" means all amounts, including an amount of $0.00, required to cure any monetary defaults under any Executory Contract or Unexpired Lease (or such lesser amount as may be agreed upon by the parties to such Executory Contract or Unexpired Lease) that is to be assumed by the Debtors pursuant to sections 365 or 1123 of the Bankruptcy Code.

56. "*Cure Notice*" means any notice that sets forth the proposed Cure Costs under any Executory Contract or Unexpired Lease at the time such contract or lease is assumed by the applicable Debtors under the Plan, which notice shall include (a) procedures for objecting to proposed assumptions or assignments of the applicable Executory Contracts and/or Unexpired Leases, (b) the Cure Costs proposed to be paid in connection therewith, and (c) procedures for resolution by the Bankruptcy Court of any related dispute.

57. "*D&O Liability Insurance Policies*" means all insurance policies (including any "tail policy") of any of the Debtors for current or former directors', managers', officers', and/or employees' liability.

58. "*Debtors*" means, collectively, Bristow Group Inc., BHNA Holdings Inc., Bristow Alaska Inc., Bristow Helicopters Inc., Bristow U.S. Leasing LLC, Bristow U.S. LLC, BriLog Leasing Ltd., and Bristow Equipment Leasing Ltd.

59. "*DIP Facility*" means that certain $150,000,000 senior secured term loan credit facility provided pursuant to the DIP Facility Credit Agreement.

60. "*DIP Facility Agent*" means Ankura Trust Company, LLC, or any successor thereto, solely in its capacity as administrative agent and collateral agent under the DIP Facility Credit Agreement.

61. "*DIP Facility Claim*" means any Claim, including for any Equitization Consent Fee if applicable, held by any of the DIP Facility Lenders or the DIP Facility Agent arising under or related to the DIP Facility Credit Agreement.

62. "*DIP Facility Credit Agreement*" means that certain Superpriority Secured Debtor-In-Possession Credit Agreement, dated as of August [●], 2019, by and among Bristow Parent, as parent borrower, Bristow Holdings Company Ltd. III, as co-borrower, each of the other Debtors and non-Debtor Affiliates, as guarantors, each of the lenders from time to time party thereto, and the DIP Facility Agent, which shall be subject to the consent rights of the Required RSA Parties on the terms set forth in the Restructuring Support Agreement.

63. "*DIP Facility Lenders*" means those certain lenders from time to time party to the DIP Facility Credit Agreement, solely in their capacity as such.

64. "*DIP Order*" means the *Order (A) Authorizing the Debtors to Obtain Postpetition Financing, (B) Authorizing the Debtors to Continue to Use Cash Collateral, (C) Granting Liens and Providing Superpriority Administrative Expense Status, (D) Modifying the Automatic Stay, and (E) Granting Related Relief* [Docket No. [●]] (as amended, modified, or supplemented from time to time in accordance with the terms thereof), which shall be subject to the consent rights of the Required RSA Parties on the terms set forth in the Restructuring Support Agreement.

65. "*Disclosure Statement*" means the disclosure statement for the Plan, including all exhibits and schedules thereto, which shall be subject to the consent rights of the Required RSA Parties on the terms set forth in the Restructuring Support Agreement.

66. "*Disputed*" means, as to any Claim or Interest (or any portion thereof), a Claim or Interest: (a) that is not Allowed; (b) that is not disallowed by the Plan, the Bankruptcy Code, or a Final Order, as applicable; (c) as to which a dispute is being adjudicated by a court of competent jurisdiction in accordance with non-bankruptcy law; (d)

as to which a timely objection or request for estimation has been Filed and not withdrawn; or (e) with respect to which a party in interest has Filed a Proof of Claim or otherwise made a written request to a Debtor for payment, without any further notice to or action, order, or approval of the Bankruptcy Court.

67. "*Distribution Agent*" means, as applicable, the Reorganized Debtors or any Entity the Reorganized Debtors select (with the consent of the Required RSA Parties) to make or to facilitate distributions in accordance with the Plan.

68. "*Distribution Date*" means, except as otherwise set forth herein and except distributions to holders of public securities, the date or dates determined by the Debtors or the Reorganized Debtors (in consultation with the Required RSA Parties), on or after the Effective Date, upon which the Distribution Agent shall make distributions to Holders of Allowed Claims and Interests entitled to receive distributions under the Plan.

69. "*Distribution Record Date*" means, other than with respect to those Secured Notes or Unsecured Notes deposited with DTC, the record date for purposes of determining which Holders of Allowed Claims against or Allowed Interests in the Debtors are eligible to receive distributions under the Plan, which date shall be the Confirmation Date, or such other date as is agreed to by the Debtors and the Required RSA Parties, or designated in a Final Order. The Distribution Record Date shall not apply to any Secured Notes or Unsecured Notes deposited with DTC, the Holders of which shall receive a distribution in accordance with the customary procedures of DTC.

70. "*DTC*" means The Depository Trust Company.

71. "*Effective Date*" means the date that is the first Business Day after the Confirmation Date on which all conditions precedent to the occurrence of the Effective Date set forth in Article X.A of the Plan have been satisfied or waived in accordance with Article X.B of the Plan, and the Plan is deemed effective by the Debtors and the Required RSA Parties.

72. "*Eligible Holder*" means a Holder that is a 4(a)(2) Eligible Holder and/or a 1145 Eligible Holder as of the Distribution Record Date.

73. "*Entity*" has the meaning set forth in section 101(15) of the Bankruptcy Code.

74. "*Equitization Allocation New Stock*" means 22.68% of the New Stock on a fully-diluted basis (except for the New Stock to be issued pursuant to the Management Incentive Plan), which shall be distributed to the Holders of DIP Facility Claims as set forth in Article II.D of the Plan.

75. "*Equitization Consent Fee*" means 2.27% of the New Stock on a fully-diluted basis (except for the New Stock to be issued pursuant to the Management Incentive Plan), which shall be distributed to the Holders of DIP Facility Claims as set forth in Article II.D of the Plan.

76. "*Estate*" means, as to each Debtor, the estate created for the Debtor pursuant to section 541 of the Bankruptcy Code upon the commencement of the applicable Debtor's Chapter 11 Case.

77. "*Exculpated Parties*" means, collectively, and in each case in its capacity as such: (a) the Debtors and the Reorganized Debtors; (b) the DIP Facility Agent; (c) the DIP Facility Lenders; (d) the Backstop Commitment Parties; (e) the Holders of 2019 Term Loan Facility Claims; (f) the 2019 Term Loan Facility Agent; (g) the Supporting Noteholders; (h) the Indenture Trustees; (i) with respect to each of the foregoing entities in clauses (a) through (h), each such Entity's current and former predecessors, successors, Affiliates (regardless of whether such interests are held directly or indirectly), subsidiaries, direct and indirect equity holders, funds, portfolio companies, and management companies; and (j) with respect to each of the foregoing Entities in clauses (a) through (h), each of their respective current and former directors, officers, members, employees, partners, managers, independent contractors, agents, representatives, principals, professionals, consultants, financial advisors, attorneys, accountants, investment bankers, and other professional advisors, each in their capacity as such; *provided that* no current or former Holder of Existing Interests, each in their capacity as such, is an Exculpated Party unless such Holder is also a Supporting Noteholder or current director, officer, or employee of a Debtor or an Affiliate of a Debtor.

78. "*Executory Contract*" means a contract or lease to which one or more of the Debtors is a party that is subject to assumption or rejection under section 365 or 1123 of the Bankruptcy Code.

79. "*Existing Interests*" means the Interests in Bristow Parent.

80. "*Exit Facility*" means the secured credit facility that Reorganized Bristow Parent and/or certain other Reorganized Debtors will enter into on the Effective Date in accordance with the Exit Facility Credit Agreement, if the Debtors elect to enter into the Exit Facility instead of entering into the Amended and Restated 2019 Term Loan Credit Agreement.

81. "*Exit Facility Agent*" means the entity identified in the Plan Supplement as administrative and collateral agent under the Exit Facility Credit Agreement, solely in its capacity as such.

82. "*Exit Facility Credit Agreement*" means the agreement governing the Exit Facility, if any, which shall be subject to the consent rights of the Required RSA Parties on the terms set forth in the Restructuring Support Agreement.

83. "*Exit Facility Documents*" means, collectively, the Exit Facility Credit Agreement and any and all other agreements, documents, and instruments delivered or entered into in connection therewith, including any guarantee agreements, pledge and collateral agreements, intercreditor agreements, and other security documents, which shall be subject to the consent rights of the Required RSA Parties on the terms set forth in the Restructuring Support Agreement.

84. "*Exit Facility Lenders*" means those certain lenders from time to time party to the Exit Facility Credit Agreement, solely in their capacity as such.

85. "*Federal Judgment Rate*" means the federal judgment rate in effect pursuant to 28 U.S.C. § 1961 as of the Petition Date, compounded annually.

86. "*File*," "*Filed*," and "*Filing*" means file, filed, or filing in the Chapter 11 Cases with the Bankruptcy Court.

87. "*Final Cash Collateral Order*" means the *Final Order (A) Authorizing the Debtors to Use Cash Collateral, (B) Granting Adequate Protection to the Prepetition Consenting Secured Parties, (C) Modifying the Automatic Stay and (D) Granting Related Relief* [Docket No. 312], (as amended, modified, or supplemented from time to time in accordance with the terms thereof), which shall be subject to the consent rights of the Required RSA Parties on the terms set forth in the Restructuring Support Agreement.

88. "*Final Decree*" means the decree contemplated under Bankruptcy Rule 3022.

89. "*Final Order*" means an order or judgment of the Bankruptcy Court or other court of competent jurisdiction with respect to the relevant subject matter that has not been reversed, stayed, modified, or amended, and as to which the time to appeal or seek certiorari has expired and no appeal or petition for certiorari has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been or may be Filed has been resolved by the highest court to which the order or judgment could be appealed or from which certiorari could be sought or the new trial, reargument, or rehearing shall have been denied, resulted in no modification of such order, or has otherwise been dismissed with prejudice.

90. "*General Unsecured Claim*" means any Claim against any of the Debtors that is not Secured and is not: (a) an Administrative Claim; (b) a Professional Fee Claim; (c) a Priority Tax Claim; (d) an Other Priority Claim; (e) an Unsecured Notes Claim; (f) a Trade Claim; (g) an Intercompany Claim; or (h) a Section 510(b) Claim.

91. "*Governance Term Sheet*" means the term sheet attached to the Restructuring Term Sheet as **Exhibit 4**, which shall be subject to the consent rights of the Required RSA Parties on the terms set forth in the Restructuring Support Agreement.

92.     "*Governmental Unit*" has the meaning set forth in section 101(27) of the Bankruptcy Code.

93.     "*Guarantor Subsidiaries*" means, collectively, Bristow Helicopters Inc., BHNA Holdings, Inc., Bristow U.S. Leasing LLC, Bristow Alaska Inc. and Bristow U.S. LLC.

94.     "*GUC Distribution Cash Amount*" means an aggregate amount of Cash in an amount to be determined as set forth in the Restructuring Term Sheet, which is to be distributed Pro Rata to all Holders of General Unsecured Claims that either (a) timely make the GUC Rights Offering Election or (b) are not a 4(a)(2) Eligible Holder.

95.     "*GUC Rights Offering Election*" means the election to be made by each holder of a General Unsecured Claim to receive the treatment under the Plan set forth in Article III.B.12.b.ii instead of the treatment under the Plan set forth in Article III.B.12.b.i, with such election being described in greater detail in the Rights Offering Procedures.

96.     "*GUC Subscription Rights*" means the non-certificated rights to be distributed to each Holder of a General Unsecured Claim that will enable each Holder thereof to purchase its Pro Rata share of the Unsecured Rights Offering Stock, pursuant to the terms of the Rights Offering Procedures and the Backstop Commitment Agreement.

97.     "*Holder*" means an Entity holding a Claim or Interest, as applicable.

98.     "*Impaired*" means, with respect to any Class of Claims or Interests, a Class of Claims or Interests that is impaired within the meaning of section 1124 of the Bankruptcy Code.

99.     "*Indemnification Obligations*" means each of the Debtors' indemnification provisions in place whether in the Debtors' bylaws, certificates of incorporation, other formation documents, board resolutions, management or indemnification agreements, employment contracts, or otherwise, for the current and former directors, officers, managers, employees, attorneys, other professionals, and agents of the Debtors and such current and former directors', officers', and managers' respective Affiliates.

100.     "*Indenture Trustee Expenses*" means the reasonable and documented compensation, fees, expenses, disbursements, and claims for indemnity, subrogation, and contribution incurred or owed to the Indenture Trustees, whether prior to or after the Petition Date but in all cases before the Effective Date, in each case under the Indentures.

101.     "*Indenture Trustees*" means, collectively the Secured Notes Indenture Trustee, the Senior Notes Indenture Trustee, and the Convertible Notes Indenture Trustee.

102.     "*Indentures*" means, collectively, the Secured Notes Indenture, the Senior Notes Indenture, and the Convertible Notes Indenture.

103.     "*Initial Amended RSA*" means that certain Amended and Restated Restructuring Support Agreement dated as of June 27, 2019 that the Restructuring Support Agreement amends, restates and replaces in its entirety.

104.     "*Initial MIP Amount*" means 4.0% of the New Stock on a fully diluted basis (of which 4.0%, 60% thereof shall be in grants of restricted units and 40% shall be in options).

105.     "*Intercompany Claim*" means any Claim held by a Debtor against another Debtor.

106.     "*Intercompany Interest*" means, other than an Interest in Bristow Parent, an Interest in one Debtor held by another Debtor.

107.     "*Interest*" means any equity security (as defined in section 101(16) of the Bankruptcy Code) in any Debtor, including options, warrants, rights, restricted stock unit or other securities or agreements to acquire the common stock, preferred stock, limited liability company interests, or other equity, ownership or profits interests of

12

any Debtor (whether or not arising under or in connection with any employment agreement, separation agreement or employee incentive plan or program of a Debtor as of the Petition Date).

108. "*Interim Compensation Order*" means the *Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses for Chapter 11 Case Professionals* [Docket No. 393] (as amended, modified, or supplemented from time to time in accordance with the terms thereof).

109. "*Key Employee Incentive Plan and Retention Payments Order*" means the *Order Authorizing and Approving Key Employee Incentive Plans and Non-Insider Retention Payments* [Docket No. [●]] (as amended, modified, or supplemented from time to time in accordance with the terms thereof).

110. "*Lien*" has the meaning set forth in section 101(37) of the Bankruptcy Code.

111. "*Lombard (BALL) Term Loan*" means that certain prepetition pound sterling funded secured loan facility dated as of November 11, 2016, in the original principal amount of $90,000,000 U.S. dollar equivalent, among Bristow Aircraft Leasing Limited, as borrower, Lombard North Central PLC, as lender, and Bristow Parent and Bristow U.S. Leasing LLC, as guarantors.

112. "*Lombard (BALL) Term Loan Credit Agreement*" means the credit agreement governing the Lombard (BALL) Term Loan, dated as of November 11, 2016, among Bristow Aircraft Leasing Limited, as borrower, Lombard North Central PLC, as lender, and Bristow Parent and Bristow U.S. Leasing LLC, as guarantors.

113. "*Lombard (BALL) Term Loan Guarantee*" means the guarantees by Bristow Parent and Bristow U.S. Leasing LLC of the obligations under Lombard (BALL) Term Loan or the Lombard (BALL) Term Loan Credit Agreement.

114. "*Lombard (BALL) Term Loan Guarantee Claim*" means any Claim against Bristow Parent or Bristow U.S. Leasing LLC arising from or based upon the Lombard (BALL) Term Loan Guarantee.

115. "*Lombard (BULL) Term Loan*" means that certain prepetition pound sterling funded secured loan facility dated as of November 11, 2016, in the original principal amount of $110,000,000 U.S. dollar equivalent, among Bristow U.S. Leasing LLC, as borrower, Lombard North Central PLC, as lender, and Bristow Parent, as guarantor

116. "*Lombard (BULL) Term Loan Claim*" means any Claim against any of the Debtors arising from or based upon the Lombard (BULL) Term Loan, the Lombard (BULL) Term Loan Guarantee or the Lombard (BULL) Term Loan Credit Agreement.

117. "*Lombard (BULL) Term Loan Credit Agreement*" means the credit agreement governing the Lombard (BULL) Term Loan, dated as of November 11, 2016, among Bristow U.S. Leasing LLC, as borrower, Lombard North Central PLC, as lender, and Bristow Parent, as guarantor.

118. "*Lombard (BULL) Term Loan Guarantee*" means the guarantee by Bristow Parent of the obligations under Lombard (BULL) Term Loan or the Lombard (BULL) Term Loan Credit Agreement.

119. "*Macquarie Term Loan Credit Facility*" means that certain prepetition term loan facility dated as of February 1, 2017, in the original principal amount of $200,000,000, among Bristow U.S. LLC, as borrower, Macquarie Bank Limited, as administrative agent, and Bristow Parent, as guarantor.

120. "*Macquarie Term Loan Credit Facility Claim*" means any claim against any Debtor arising from or based upon the Macquarie Term Loan Credit Facility.

121. "*Management Incentive Plan*" means a post-Effective Date management incentive plan for certain participating employees of the Reorganized Debtors and Affiliates to be established and implemented in accordance with Article IV.I of the Plan, which shall provide for the terms and conditions under which the MIP Pool may be

13

allowed and distributed to certain participating employees of the Reorganized Debtors and Affiliates and shall be in accordance with the Restructuring Term Sheet.

122.    "*MCA*" means the Maritime & Coastguard Agency, an executive agency of the United Kingdom.

123.    "*MCA and Other Customer Guarantee Claims*" means the MCA Guarantee Claims and the Other Customer Guarantee Claims.

124.    "*MCA Guarantee*" means the guarantee by Bristow Parent of the obligations of Bristow Helicopters Limited and its Affiliates under the UK SAR Contract.

125.    "*MCA Guarantee Claims*" means any Claim against Bristow Parent arising from or based upon the MCA Guarantee.

126.    "*MIP Pool*" means a pool of stock-based awards, in the form of options, appreciation rights, restricted stock units, restricted stock, or similar awards, as applicable, representing at least 5% but no more than 10% of the aggregate amount of New Stock, determined on a fully diluted and fully distributed basis (with the ratio of New Common Stock to New Preferred Stock to be the same as the ratio of all New Common Stock to all New Preferred Stock held by the average Backstop Commitment Party), which shall be reserved for distribution to certain participating employees of the Reorganized Debtors or Affiliates pursuant to the Management Incentive Plan and shall be in accordance with the Restructuring Term Sheet.

127.    "*New Common Stock*" means the common stock of Reorganized Bristow Parent, which shall be subject to the consent rights of the Required RSA Parties on the terms set forth in the Restructuring Support Agreement.

128.    "*New Common Stock Agreement*" means the definitive documentation governing the terms and conditions of the New Common Stock, which shall be subject to the consent rights of the Required RSA Parties on the terms set forth in the Restructuring Support Agreement.

129.    "*New Macquarie Note*" means a new note to be issued on the Effective Date by Bristow U.S. LLC, which note shall be secured by the same Collateral that secures the Macquarie Term Loan Credit Facility immediately prior to the Effective Date, with the other terms of the note to satisfy the requirements of section 1129(b) of the Bankruptcy Code, as determined by the Bankruptcy Court.

130.    "*New Organizational Documents*" means the form of the certificates or articles of incorporation, bylaws, or such other applicable formation documents, of each of the Reorganized Debtors, which shall be subject to the consent rights of the Required RSA Parties on the terms set forth in the Restructuring Support Agreement.

131.    "*New PK Air Note*" means a new note to be issued on the Effective Date by Bristow Equipment Leasing Ltd., which note shall be secured by the same Collateral that secures the PK Air Credit Facility immediately prior to the Effective Date, with the other terms of the note to satisfy the requirements of section 1129(b) of the Bankruptcy Code, as determined by the Bankruptcy Court.

132.    "*New Preferred Stock*" means the preferred stock of Reorganized Bristow Parent, which shall have the terms and conditions set forth in the New Preferred Stock Term Sheet, which shall be subject to the consent rights of the Required RSA Parties on the terms set forth in the Restructuring Support Agreement.

133.    "*New Preferred Stock Agreement*" means the definitive documentation governing the terms and conditions of the New Preferred Stock, which shall be subject to the consent rights of the Required RSA Parties on the terms set forth in the Restructuring Support Agreement.

134.    "*New Preferred Stock Term Sheet*" means the term sheet attached to the Restructuring Term Sheet as **Exhibit 3**.

14

135. "*New Shareholders' Agreement*" means the shareholders' agreement governing the rights of the Holders of New Common Stock and/or New Preferred Stock on and after the Effective Date, which shareholders' agreement shall be consistent with the Governance Term Sheet and subject to the consent rights of the Required RSA Parties on the terms set forth in the Restructuring Support Agreement.

136. "*New Stock*" means, collectively, the New Common Stock and the New Preferred Stock.

137. "*Non-U.S. Citizen*" means a Holder of an Allowed Unsecured Notes Claim or General Unsecured Claim that is not determined to be a U.S. Citizen under the procedure set forth in Article IV.E of this Plan.

138. "*Original DIP Commitment Letter*" means that certain commitment letter, dated as of May 10, 2019, by and among Bristow Parent, Bristow Holdings Company Ltd. III and each of the institutions identified on Schedule 1 thereto, as the same may have been amended, supplemented or otherwise modified.

139. "*Original RSA*" has the meaning ascribed to such term in the Restructuring Support Agreement.

140. "*Other Customer Contract*" means any revenue-generating customer contract of one or more of the Debtors' non-debtor Affiliates that is set forth in the Schedule of Other Customer Contracts.

141. "*Other Customer Guarantee*" means any guarantee by any of the Debtors of the obligations of one or more of its Affiliates under an Other Customer Contract.

142. "*Other Customer Guarantee Claim*" means any Claim against any of the Debtors arising from or based upon an Other Customer Guarantee.

143. "*Other Priority Claim*" means any Claim other than an Administrative Claim or a Priority Tax Claim entitled to priority in right of payment under section 507(a) of the Bankruptcy Code.

144. "*Other Secured Claim*" means any Secured Claim against any of the Debtors, other than a Secured Notes Claim, a 2019 Term Loan Facility Claim, or a Secured Equipment Financing Facilities Claim.

145. "*Person*" has the meaning set forth in section 101(41) of the Bankruptcy Code.

146. "*Petition Date*" means May 11, 2019, the date on which the Debtors commenced the Chapter 11 Cases.

147. "*PK Air Credit Facility*" means that certain prepetition term loan facility dated as of July 17, 2017 in the original principal amount of $230,000,000 across 24 term loans, among Bristow Equipment Leasing Ltd., as borrower, PK AirFinance S.à r.l., as agent, PK Transportation Finance Ireland Limited, as lender, and other lenders from time to time thereto.

148. "*PK Air Credit Facility Claim*" means any claim against any Debtor arising from or based upon the PK Air Credit Facility.

149. "*Plan*" means this joint chapter 11 plan (as it may be amended or supplemented from time to time, including all exhibits, schedules, supplements, appendices, annexes and attachments hereto), which shall be subject to the consent rights of the Required RSA Parties on the terms set forth in the Restructuring Support Agreement.

150. "*Plan Supplement*" means the compilation of documents and forms of documents, schedules, and exhibits to the Plan, to be Filed by the Debtors no later than 7 days before the Voting Deadline, or such later date as may be approved by the Bankruptcy Court on notice to parties in interest, and additional documents Filed with the Bankruptcy Court prior to the Effective Date as amendments to the Plan Supplement, including: (a) the material New Organizational Documents; (b) the Exit Facility Credit Agreement and material related documents, if applicable; (c) the Amended and Restated 2019 Term Loan Credit Agreement and material related documents, if applicable, and the identity of the Amended and Restated 2019 Term Loan Facility Agent; (d) the schedule of Retained Causes of

15

Action; (e) a disclosure of the members of the Reorganized Bristow Parent Board and their compensation; (f) the Schedule of Assumed Executory Contracts and Unexpired Leases; (g) the Schedule of Rejected Executory Contracts and Unexpired Leases; (h) the Restructuring Transactions Exhibit, if needed; (i) the form of the Management Incentive Plan; (j) the New Shareholders' Agreement; (k) the Schedule of Other Customer Contracts; (l) the New Preferred Stock Agreement; (m) the New Common Stock Agreement; (n) the terms of the New Macquarie Note; and (o) the terms of the New PK Air Note, which shall in each case be subject to the consent rights of the Required RSA Parties on the terms set forth in the Restructuring Support Agreement. The Debtors shall have the right to amend the documents contained in, and exhibits to, the Plan Supplement through the Effective Date, subject to the terms of the Plan, the Restructuring Support Agreement and the Backstop Commitment Agreement, including the consent rights of the Required RSA Parties.

151. *"Priority Tax Claim"* means any Claim of a Governmental Unit against any of the Debtors of the kind specified in section 507(a)(8) of the Bankruptcy Code.

152. *"Pro Rata"* means the proportion that an Allowed Claim or Allowed Interest in a particular Class bears to the aggregate amount of the Allowed Claims or Allowed Interests in that respective Class, or the proportion of the Allowed Claims or Allowed Interests in a particular Class and other Classes entitled to share in the same recovery as such Allowed Claim or Allowed Interests under the Plan.

153. *"Professional"* means an Entity employed in the Chapter 11 Cases pursuant to a Bankruptcy Court order in accordance with sections 327, 363, or 1103 of the Bankruptcy Code and to be compensated for services rendered before or on the Effective Date, pursuant to sections 327, 328, 329, 330, or 331 of the Bankruptcy Code.

154. *"Professional Fee Amount"* means the aggregate amount of Professional Fee Claims and other unpaid fees and expenses that Professionals estimate they have incurred or will incur in rendering services to the Debtors prior to and as of the Confirmation Date, which estimates Professionals shall deliver to the Debtors as set forth in Article II.B of the Plan.

155. *"Professional Fee Claim"* means any Administrative Claim for the compensation of Professionals and the reimbursement of expenses incurred by such Professionals through and including the Confirmation Date to the extent such fees and expenses have not been paid pursuant to an order of the Bankruptcy Court. To the extent the Bankruptcy Court denies or reduces by a Final Order any amount of a Professional's requested fees and expenses, then the amount by which such fees or expenses are reduced or denied shall reduce the applicable Professional Fee Claim.

156. *"Professional Fee Escrow Account"* means an account funded by the Debtors with Cash on the Effective Date in an amount equal to the total estimated amount of the Professional Fee Amount as set forth in Article II.B of the Plan.

157. *"Proof of Claim"* means a proof of Claim Filed against any of the Debtors in the Chapter 11 Cases by the applicable Claims Bar Date.

158. *"Reinstate,"* *"Reinstated,"* or *"Reinstatement"* means, with respect to Claims or Interests, that the Claim or Interest shall be rendered Unimpaired in accordance with section 1124 of the Bankruptcy Code.

159. *"Related Party"* means, collectively, current and former directors, managers, officers, shareholders, equity holders (regardless of whether such interests are held directly or indirectly), affiliated investment funds or investment vehicles, predecessors, participants, successors, assigns (whether by operation of law or otherwise), subsidiaries, current, former, and future affiliates, associated entities, managed entities, accounts or funds, partners, limited partners, general partners, principals, members, management companies, fund advisors, fiduciaries, trustees, employees, agents (including any Distribution Agent), advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, other representatives, and other professionals, representatives, advisors, predecessors, successors, and assigns, each solely in their capacities as such, solely in their capacity as such, and such entities' respective heirs, executors, estates, servants and nominees.

160. "*Released Parties*" means, collectively, and in each case in its capacity as such: (a) the Debtors; (b) the Reorganized Debtors; (c) the DIP Facility Agent; (d) the DIP Facility Lenders; (e) the Backstop Commitment Parties; (f) the Holders of 2019 Term Loan Facility Claims; (g) the 2019 Term Loan Facility Agent; (h) the Amended and Restated 2019 Term Loan Facility Lenders; (i) the Amended and Restated 2019 Term Loan Facility Agent; (j) the Supporting Noteholders; (k) the Indenture Trustees; (l) the Exit Facility Lenders; (m) the Exit Facility Agent; (n) each current and former Affiliate of each Entity in clause (a) through (m); and (o) each Related Party of each Entity in clause (a) through (n); *provided that* any holder of a Claim or Interest that (x) validly opts out of the releases contained in the Plan or (y) files an objection to the releases contained in the Plan shall not be a "Released Party."

161. "*Releasing Parties*" means, collectively, and in each case in its capacity as such: (a) the Debtors; (b) the Reorganized Debtors; (c) the DIP Facility Agent; (d) the DIP Facility Lenders; (e) the Backstop Commitment Parties; (f) the Holders of 2019 Term Loan Facility Claims; (g) the 2019 Term Loan Facility Agent; (h) the Amended and Restated 2019 Term Loan Facility Lenders; (i) the Amended and Restated 2019 Term Loan Facility Agent; (j) the Supporting Noteholders; (k) the Indenture Trustees; (l) the Exit Facility Lenders; (m) the Exit Facility Agent; (n) all Holders of Claims; (o) all Holders of Interests; (p) each current and former Affiliate of each Entity in clause (a) through (o); and (q) each Related Party of each Entity in clause (a) through (p); *provided that* any holder of a Claim or Interest that (x) validly opts out of the releases contained in the Plan or (y) files an objection to the releases contained in the Plan shall not be a "Releasing Party."

162. "*Reorganized Bristow Parent*" means Bristow Parent, as reorganized pursuant to and under the Plan, on and after the Effective Date, or any successor or assign thereto.

163. "*Reorganized Bristow Parent Board*" means the board of directors of Reorganized Bristow Parent on and after the Effective Date.

164. "*Reorganized Debtors*" means the Debtors, as reorganized pursuant to and under the Restructuring Transactions, on and after the Effective Date, or any successors or assigns thereto.

165. "*Required Backstop Parties*" has the meaning ascribed to such term in the Restructuring Support Agreement.

166. "*Required DIP Lenders*" has the meaning ascribed to such term in the Restructuring Support Agreement.

167. "*Required RSA Parties*" means, with respect to any document, order, agreement or as otherwise used in this Plan, the applicable parties holding the applicable consent rights under the Restructuring Support Agreement (including section 2.02 thereof).

168. "*Required Secured Parties*" has the meaning ascribed to such term in the Restructuring Term Sheet.

169. "*Restructuring Documents*" has the meaning ascribed to such term in the Restructuring Support Agreement. For the avoidance of doubt, Restructuring Documents shall include the Final Cash Collateral Order, the Disclosure Statement, the other solicitation materials with respect to the Plan, the Conditional Disclosure Statement Order, the Plan, each document included in the Plan Supplement, the Backstop Commitment Agreement, the Confirmation Order, the DIP Facility Credit Agreement, the DIP Order, the Exit Facility Credit Agreement, the Amended and Restated 2019 Term Loan Credit Agreement, the New PK Air Note, the New Macquarie Note, the New Organizational Documents, the Management Incentive Plan and the Rights Offering Procedures. Each of the Restructuring Documents shall comport with the terms of the Restructuring Support Agreement, including the applicable consent rights thereunder (including section 2.02 thereof).

170. "*Restructuring Support Agreement*" means that certain Second Amended and Restated Restructuring Support Agreement, entered into and dated as of July 24, 2019, by and among the Debtors and the Supporting Noteholders, including all exhibits, schedules and other attachments thereto, as such agreement may be amended from time to time in accordance with the terms thereof and which shall only be amended in accordance with the terms thereof, a copy of which is attached to the Disclosure Statement as **Exhibit A**.

17

171.    "*Restructuring Term Sheet*" means the term sheet attached as <u>Exhibit A</u> to the Restructuring Support Agreement including all exhibits, schedules and other attachments thereto.

172.    "*Restructuring Transactions*" mean those mergers, amalgamations, consolidations, arrangements, continuances, restructurings, transfers, conversions, dispositions, liquidations, dissolutions, or other corporate transactions that the Debtors and the Required RSA Parties reasonably determine to be necessary to implement the Plan.

173.    "*Restructuring Transactions Exhibit*" means an exhibit, which may be included as needed in the Plan Supplement, that sets forth the steps to be carried out to effectuate the Restructuring Transactions on and after the Effective Date.

174.    "*Retained Causes of Action*" means those Causes of Action that shall vest in the Reorganized Debtors on the Effective Date, which, for the avoidance of doubt, shall not include any of the Causes of Action that are settled, released or exculpated under the Plan.  For the avoidance of doubt, and notwithstanding anything to the contrary under the Plan, any and all Causes of Action that the Debtors may hold against Columbia Helicopters, Inc. and its affiliates shall be Retained Causes of Action.

175.    "*Rights Offering*" means, collectively, the 1145 Rights Offering and the 4(a)(2) Rights Offering, each of which shall be conducted in accordance with the Backstop Commitment Agreement, the Restructuring Support Agreement, and the applicable Rights Offering Procedures.

176.    "*Rights Offering Offerees*" means, collectively, (i) the Holders of Secured Notes Claims, (ii) the Holders of Unsecured Notes Claims, and (iii) the Holders of General Unsecured Claims that timely make the GUC Rights Offering Election.

177.    "*Rights Offering Participants*" means, collectively, the Rights Offering Offerees that duly subscribe for New Stock in accordance with the Rights Offering Procedures.

178.    "*Rights Offering Procedures*" means, collectively, the 1145 Rights Offering Procedures and the 4(a)(2) Rights Offering Procedures, each of which shall be subject to the consent rights of the Required RSA Parties on the terms set forth in the Restructuring Support Agreement.

179.    "*Rights Offering Stock*" means, collectively, the 1145 Rights Offering Stock and the 4(a)(2) Rights Offering Stock to be purchased by the Rights Offering Participants pursuant to the Rights Offering, which shall be equal to 58.22% of the New Stock on a fully-diluted basis (except for the New Stock to be issued pursuant to the Management Incentive Plan) and shall be payable 8.175% in New Preferred Stock and 91.825% in New Common Stock, subject to adjustment as set forth in the Backstop Commitment Agreement.  For the avoidance of doubt, the term "Rights Offering Stock" does not include the New Common Stock or New Preferred Stock issued on account of the Backstop Commitment Fee.

180.    "*Schedule of Assumed Executory Contracts and Unexpired Leases*" means the schedule (including any modifications or amendments thereto) of certain Executory Contracts and Unexpired Leases to be assumed by the Debtors pursuant to the Plan, which shall be subject to the consent rights of the Required RSA Parties on the terms set forth in the Restructuring Support Agreement.

181.    "*Schedule of Other Customer Contracts*" means the schedule (including any modifications or amendments thereto), if any, identifying the Other Customer Contracts.

182.    "*Schedule of Rejected Executory Contracts and Unexpired Leases*" means the schedule (including any amendments or modifications thereto), if any, of certain Executory Contracts and Unexpired Leases to be rejected by the Debtors pursuant to the Plan.

183.    "*Schedules*" means, collectively, the schedules of assets and liabilities and statements of financial affairs Filed by the Debtors pursuant to section 521 of the Bankruptcy Code.

18

184.    "*SEC*" means the Securities and Exchange Commission.

185.    "*Section 510(b) Claim*" means any claim against any of the Debtors subject to subordination under section 510(b) of the Bankruptcy Code.

186.    "*Secured*" or "*Secured Claim*" means, when referring to a Claim against any of the Debtors, a Claim that is: (a) secured by a lien on property in which any of the Debtors has an interest, which lien is valid, perfected, and enforceable pursuant to applicable law or by reason of a Bankruptcy Court order, or that is subject to a valid right of setoff pursuant to section 553 of the Bankruptcy Code, to the extent of the value of the creditor's interest in the Debtors' interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code; or (b) Allowed pursuant to the Plan, or separate order of the Bankruptcy Court, as a secured claim.

187.    "*Secured Equipment Financing Facilities Claim*" means any Claim against any of the Debtors arising from or based upon the Secured Equipment Financing Facilities.

188.    "*Secured Noteholder Subscription Rights*" means the non-certificated rights to be distributed to each Holder of Secured Notes that will enable each Holder thereof to purchase its Pro Rata share of the Secured Rights Offering Stock, pursuant to the terms of the Rights Offering Procedures and the Backstop Commitment Agreement.

189.    "*Secured Notes*" means the 8.75% Senior Secured Notes due 2023, issued in an original principal amount of $350,000,000 pursuant to the Secured Notes Indenture.

190.    "*Secured Notes Ad Hoc Group*" has the meaning ascribed to such term in the Restructuring Support Agreement.

191.    "*Secured Notes Claim*" means any Claim against any of the Debtors arising from or based upon the Secured Notes or the Secured Notes Indenture.

192.    "*Secured Notes Indenture*" means that certain indenture, dated as of March 6, 2018, as amended, modified or supplemented from time to time, for the Secured Notes, among Bristow Parent, as issuer, the Guarantor Subsidiaries, as guarantors, and the Secured Notes Indenture Trustee, as trustee.

193.    "*Secured Notes Indenture Trustee*" means U.S. Bank National Association, and any successor thereto, solely in its capacity as trustee under the Secured Notes Indenture.

194.    "*Secured Rights Offering Stock*" means the amount of the New Stock distributed pursuant to the Rights Offering in exchange for $37.5 million.

195.    "*Securities Act*" means the Securities Act of 1933, 15 U.S.C. §§ 77a–77aa, together with the rules and regulations promulgated thereunder, as amended from time to time, or any similar federal, state, or local law.

196.    "*Security*" has the meaning set forth in section 2(a)(1) of the Securities Act.  "*Securities*" shall have a correlative meaning.

197.    "*Senior Notes*" means the 6.25% Senior Notes due 2022, issued in an original principal amount of $450,000,000 pursuant to the Senior Notes Indenture.

198.    "*Senior Notes Indenture*" means that certain indenture, dated as of October 12, 2012, as amended, modified or supplemented from time to time, for the Senior Notes, among Bristow Parent, as issuer, the Guarantor Subsidiaries, as guarantors, and the Senior Notes Indenture Trustee, as trustee.

199.    "*Senior Notes Indenture Trustee*" means Wilmington Trust, National Association, and any successor thereto, solely in its capacity as trustee under the Senior Notes Indenture.

200.    "*Servicer*" means an agent or other authorized representative of Holders of Claims or Interests.

201.    "*Solicitation Agent*" means Prime Clerk LLC, the notice, claims, and solicitation agent retained by the Debtors in the Chapter 11 Cases.

202.    "*Solicitation Materials*" means, collectively, the solicitation materials with respect to the Plan.

203.    "*Subscription Rights*" means, collectively, the 1145 Subscription Rights and the 4(a)(2) Subscription Rights.

204.    "*Supporting Noteholders*" has the meaning ascribed to such term in the Restructuring Support Agreement.

205.    "*Supporting Secured Noteholders*" has the meaning ascribed to such term in the Restructuring Support Agreement.

206.    "*Supporting Unsecured Noteholders*" has the meaning ascribed to such term in the Restructuring Support Agreement.

207.    "*Trade Claim*" means any Claim held by an ordinary course trade vendor of the Debtors against any of the Debtors on account of ordinary course goods and/or services provided to any of the Debtors, including any due but unpaid director fees as of the Petition Date; *provided* that the Debtors may require in their discretion that such trade vendors agree to continue to provide goods or services to the Reorganized Debtors on customary credit terms after the Effective Date (and for the avoidance of doubt, those trade vendors that do not agree to continue to provide goods and services on customary credit terms (to the extent required by the Debtors) shall have their Claims treated as General Unsecured Claims).  For the avoidance of doubt, Trade Claims shall not include any Claim arising from or based upon (1) rejection of any Executory Contract or Unexpired Lease, (2) the Debtors' prepetition return of any aircraft or any prepetition agreement or settlement with respect to any aircraft lease obligations, (3) any agreement or arrangement with any former insider (as of the Petition Date) of any Debtor or (4) any obligation in respect of deferred compensation plans for any participant that is not a current employee on the Effective Date.

208.    "*Transaction Expenses*" has the meaning ascribed to such term in the Restructuring Support Agreement.

209.    "*UK SAR Contract*" means that certain contract between Bristow Helicopters Limited and MCA for the provision of search and rescue services in the United Kingdom on behalf of Her Majesty's Coastguard.

210.    "*Unclaimed Distribution*" means any distribution under the Plan on account of an Allowed Claim to a Holder that has not:  (a) accepted a particular distribution or, in the case of distributions made by check, negotiated such check; (b) given notice to the Reorganized Debtors of an intent to accept a particular distribution; (c) responded to the Debtors' or Reorganized Debtors' requests for information necessary to facilitate a particular distribution; or (d) taken any other action necessary to facilitate such distribution.

211.    "*Unexpired Lease*" means a lease of nonresidential real property to which one or more of the Debtors is a party to that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

212.    "*Unimpaired*" means, with respect to a Class of Claims or Interests, a Class of Claims or Interests that is not impaired within the meaning of section 1124 of the Bankruptcy Code.

213.    "*Unsecured Equity Pool*" means New Common Stock in an amount equal to 11% of all New Stock on a fully-diluted basis (except for the New Stock to be issued pursuant to the Management Incentive Plan),

214.    "*Unsecured Noteholder Subscription Rights*" means the non-certificated rights to be distributed to each Holder of Unsecured Notes that will enable each Holder thereof to purchase its Pro Rata share of the Unsecured

Rights Offering Stock, pursuant to the terms of the Rights Offering Procedures and the Backstop Commitment Agreement.

215. "*Unsecured Notes*" means, collectively, the Senior Notes and the Convertible Notes.

216. "*Unsecured Notes Ad Hoc Group*" has the meaning ascribed to such term in the Restructuring Support Agreement.

217. "*Unsecured Notes Claim*" means any Claim against any of the Debtors arising from or based upon the Senior Notes, the Senior Notes Indenture, the Convertible Notes, or the Convertible Notes Indenture.

218. "*Unsecured Rights Offering Stock*" means the amount of the New Stock distributed pursuant to the Rights Offering in exchange for $347.5 million.

219. "*Unsubscribed Shares*" has the meaning ascribed to such term in the Backstop Commitment Agreement.

220. "*U.S. Trustee*" means the Office of the United States Trustee for the Southern District of Texas.

221. "*Voting Classes*" has the meaning ascribed to such term in the Conditional Disclosure Statement Order.

222. "*Voting Report*" means the report certifying the methodology for the tabulation of votes and result of voting under the Plan.

B. *Rules of Interpretation*

For purposes herein: (1) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (2) unless otherwise specified, any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions; (3) unless otherwise specified, any reference herein to an existing document, schedule, or exhibit, shall mean such document, schedule, or exhibit, as it may have been or may be amended, modified, or supplemented; (4) unless otherwise specified, all references herein to "Articles" and "Sections" are references to Articles and Sections, respectively, hereof or hereto; (5) the words "herein," "hereof," and "hereto" refer to the Plan in its entirety rather than to any particular portion of the Plan; (6) captions and headings to Articles and Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan; (7) unless otherwise specified herein, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (8) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to such term in the Bankruptcy Code or the Bankruptcy Rules, as applicable; (9) references to docket numbers of documents Filed in the Chapter 11 Cases are references to the docket numbers under the Bankruptcy Court's CM/ECF system; (10) all references to statutes, regulations, orders, rules of courts, and the like shall mean as amended from time to time, and as applicable to the Chapter 11 Cases, unless otherwise stated; (11) references to "shareholders," "directors," and/or "officers" shall also include "members" and/or "managers," as applicable, as such terms are defined under the applicable state limited liability company laws; (12) the words "include" and "including" and variations thereof shall not be deemed to be terms of limitation, and shall be deemed to be followed by the words "without limitation," and (13) any immaterial effectuating provisions may be interpreted by the Debtors or the Reorganized Debtors in such a manner that is consistent with the overall purpose and intent of the Plan and without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity; *provided* that no effectuating provision shall be immaterial or deemed immaterial if it has any substantive legal or economic effect on any Person.

C.    *Computation of Time*

Unless otherwise specifically stated herein, the provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein.  If the date on which a transaction may occur pursuant to the Plan shall occur on a day that is not a Business Day, then such transaction shall instead occur on the next succeeding Business Day.  Any action to be taken on the Effective Date may be taken on or soon as reasonably practicable after the Effective Date.

D.    *Governing Law*

Except to the extent a rule of law or procedure is supplied by federal law (including the Bankruptcy Code or Bankruptcy Rules), and subject to the provisions of any contract, lease, instrument, release, indenture, or other agreement or document entered into expressly in connection herewith, the rights and obligations arising hereunder shall be governed by, and construed and enforced in accordance with, the laws of the State of New York, without giving effect to conflict of laws principles.

E.    *Reference to Monetary Figures*

All references in the Plan to monetary figures refer to currency of the United States of America, unless otherwise expressly provided.

F.    *Reference to the Debtors or the Reorganized Debtors*

Except as otherwise specifically provided in the Plan to the contrary, references in the Plan to the Debtors or to the Reorganized Debtors mean the Debtors and the Reorganized Debtors, as applicable, to the extent the context requires.

G.    *Controlling Document*

In the event of an inconsistency between the Plan and the Disclosure Statement, the terms of the Plan shall control in all respects.  In the event of an inconsistency between the Plan and any document included in the Plan Supplement, the applicable Plan Supplement document shall control.  In the event of an inconsistency between the Confirmation Order and any of the Plan, the Disclosure Statement, or the Plan Supplement, the Confirmation Order shall control.

## ARTICLE II.
## ADMINISTRATIVE AND PRIORITY CLAIMS

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, Professional Fee Claims, Priority Tax Claims, DIP Facility Claims and Other Priority Claims have not been classified and thus are excluded from the Classes of Claims and Interests set forth in Article III of the Plan.

A.    *Administrative Claims*

Except with respect to the Professional Fee Claims, DIP Facility Claims and Claims for fees and expenses pursuant to section 1930 of chapter 123 of title 28 of the United States Code, and except to the extent that a Holder of an Allowed Administrative Claim and the Debtor against which such Allowed Administrative Claim is asserted agree to less favorable treatment for such Holder, or such Holder has been paid by any Debtor on account of such Allowed Administrative Claim prior to the Effective Date, each Holder of such an Allowed Administrative Claim will receive in full and final satisfaction of its Allowed Administrative Claim an amount of Cash equal to the amount of such Allowed Administrative Claim in accordance with the following:  (1) if an Administrative Claim is Allowed on or prior to the Effective Date, on the Effective Date or as soon as reasonably practicable thereafter (or, if not then due, when such Allowed Administrative Claim is due or as soon as reasonably practicable thereafter); (2) if such Administrative Claim is not Allowed as of the Effective Date, no later than 30 days after the date on which an order Allowing such Administrative Claim becomes a Final Order, or as soon as reasonably practicable thereafter; (3) if

such Allowed Administrative Claim is based on liabilities incurred by the Debtors in the ordinary course of their business after the Petition Date, in accordance with the terms and conditions of the particular transaction giving rise to such Allowed Administrative Claim without any further action by the Holders of such Allowed Administrative Claim; (4) at such time and upon such terms as may be agreed upon by such Holder and the Debtors or the Reorganized Debtors, as applicable; or (5) at such time and upon such terms as set forth in an order of the Bankruptcy Court.

Holders of Administrative Claims that are required to File and serve a request for payment of such Administrative Claims that do not File and serve such a request by the Administrative Claims Bar Date shall be forever barred, stopped, and enjoined from asserting such Administrative Claims against the Debtors or the Reorganized Debtors, and such Administrative Claims shall be deemed compromised, settled, and released as of the Effective Date. For the avoidance of doubt, Holders of DIP Facility Claims shall not be required to File or serve any request for payment of such DIP Facility Claims.

B.      *Professional Fee Claims*

All final requests for payment of Professional Fee Claims for services rendered and reimbursement of expenses incurred during the period from the Petition Date through the Confirmation Date must be Filed with the Bankruptcy Court no later than 45 days after the Effective Date. The Bankruptcy Court shall determine the Allowed amounts of such Professional Fee Claims after notice and a hearing in accordance with the Bankruptcy Code, the Bankruptcy Rules, and any procedures established by the Bankruptcy Court. The Reorganized Debtors shall pay Professional Fee Claims in Cash in the amount the Bankruptcy Court allows, including from the Professional Fee Escrow Account, which the Reorganized Debtors will establish in trust for the Professionals and fund with Cash equal to the Professional Fee Amount on the Effective Date. Professionals shall deliver to the Debtors their estimates for purposes of the Reorganized Debtors computing the Professional Fee Amount no later than 10 Business Days following the Confirmation Date. For the avoidance of doubt, no such estimate shall be deemed to limit the amount of the fees and expenses that are the subject of a Professional's final request for payment of Professional Fee Claims Filed with the Bankruptcy Court. If a Professional does not provide an estimate, the Debtors may estimate the unpaid and unbilled fees and expenses of such Professional. No funds in the Professional Fee Escrow Account shall be property of the Estates, and the Professional Fee Escrow Account shall be maintained in trust solely for the benefit of Holders of Professional Fee Claims. Any funds remaining in the Professional Fee Escrow Account after all Allowed Professional Fee Claims have been paid shall be promptly turned over to the Reorganized Debtors.

From and after the Confirmation Date, any requirement that Professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Reorganized Debtors may employ and pay any Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

C.      *Priority Tax Claims*

Except to the extent that a Holder of an Allowed Priority Tax Claim and the Debtor (with the consent of the Required RSA Parties, not to be unreasonably withheld) against which such Allowed Priority Tax Claim is asserted agree to a less favorable treatment for such Holder, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Priority Tax Claim, each Holder of such Allowed Priority Tax Claim shall be treated in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code and, for the avoidance of doubt, Holders of Allowed Priority Tax Claims will receive interest on such Allowed Priority Tax Claims after the Effective Date in accordance with sections 511 and 1129(a)(9)(C) of the Bankruptcy Code.

D.      *DIP Facility Claims*

As of the Effective Date, the DIP Facility Claims shall be Allowed and deemed to be Allowed Claims in the full amount outstanding under the DIP Facility Credit Agreement and the DIP Order, including all principal, accrued and unpaid interest, and all accrued and unpaid fees, expenses, and noncontingent indemnity payable under the DIP Facility Credit Agreement or the DIP Order. Except to the extent that a Holder of an Allowed DIP Facility Claim agrees to a less favorable treatment, in full and final satisfaction, compromise, settlement, release, and discharge of, and in exchange for, each Allowed DIP Facility Claim, each such Holder shall receive its Pro Rata share of (i) payment in full in Cash of any accrued and unpaid interest, fees and expenses, (ii) the Equitization Consent Fee, payable at the

election of each Holder of a DIP Facility Claim in New Common Stock or New Preferred Stock, and (iii) the Equitization Allocation New Stock, which shall be payable 8.175% in New Preferred Stock and 91.825% in New Common Stock, subject to adjustment as set forth in the Backstop Commitment Agreement.  Upon receiving the treatment set forth in this paragraph, on the Effective Date, all Liens and security interests granted to secure the DIP Facility Claims shall be automatically terminated and of no further force and effect without any further notice to or action, order, or approval of the Bankruptcy Court or any other Entity.

E.      *Statutory Fees*

All fees due and payable pursuant to section 1930 of title 28 of the United States Code prior to the Effective Date shall be timely paid by the Debtors.  On and after the Effective Date, the Reorganized Debtors shall timely pay any and all such fees when due and payable, and shall File with the Bankruptcy Court quarterly reports in a form reasonably acceptable to the U.S. Trustee.  Each Debtor shall remain obligated to pay such quarterly fees to the U.S. Trustee until the earliest of that particular Debtor's case being closed, dismissed, or converted to a case under chapter 7 of the Bankruptcy Code.

**ARTICLE III.**
**CLASSIFICATION, TREATMENT, AND VOTING OF CLAIMS AND INTERESTS**

A.      *Classification of Claims and Interests*

The Plan constitutes a separate plan proposed by each Debtor within the meaning of section 1121 of the Bankruptcy Code.  Except for the Claims addressed in Article II of the Plan, all Claims and Interests are classified in the Classes set forth below for all purposes, including voting, Confirmation, and distribution pursuant to the Plan, all in accordance with sections 1122 and 1123(a)(1) of the Bankruptcy Code.  A Claim or an Interest is classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest qualifies within the description of such other Classes.  A Claim or an Interest also is classified in a particular Class for the purpose of receiving distributions under the Plan only to the extent that such Claim or Interest is an Allowed Claim or Existing Interest in that Class and has not been paid, released, or otherwise satisfied or disallowed by Final Order prior to the Effective Date.  Unless otherwise indicated, each Holder of an Allowed Claim or Interest, as applicable, shall receive such treatment on the Effective Date (or, if payment is not then due, in accordance with its terms in the ordinary course of business) or as soon as reasonably practicable thereafter, the timing of which shall be subject to the reasonable discretion of the Reorganized Debtors and the consent of the Required RSA Parties (not to be unreasonably withheld). For all purposes under the Plan, each Class will contain sub-Classes for each of the Debtors, as applicable; *provided*, that any Class that does not contain any Allowed Claims or Existing Interests with respect to a particular Debtor will be treated in accordance with Article III.D below.

Below is a chart assigning each Class a number for purposes of identifying each separate Class.

| Class | Claim or Interest | Status | Voting Rights |
|---|---|---|---|
| 1 | Other Secured Claims | Unimpaired | Deemed to Accept |
| 2 | Other Priority Claims | Unimpaired | Deemed to Accept |
| 3 | 2019 Term Loan Facility | Impaired | Entitled to Vote |
| 4 | Secured Notes Claims | Impaired | Entitled to Vote |
| 5 | Lombard (BULL) Term Loan Claims | Unimpaired | Deemed to Accept |
| 6 | PK Air Credit Facility Claims | Impaired | Entitled to Vote |
| 7 | Macquarie Term Loan Credit Facility Claims | Impaired | Entitled to Vote |
| 8 | Unsecured Notes Claims | Impaired | Entitled to Vote |

24

| Class | Claim or Interest | Status | Voting Rights |
|-------|-------------------|--------|---------------|
| 9 | Lombard (BALL) Term Loan Guarantee Claims | Unimpaired | Deemed to Accept |
| 10 | MCA and Other Customer Guarantee Claims | Unimpaired | Deemed to Accept |
| 11 | Trade Claims | Unimpaired | Deemed to Accept |
| 12 | General Unsecured Claims | Impaired | Entitled to Vote |
| 13 | Intercompany Claims | Unimpaired, or Impaired | Deemed to Accept, or Presumed to Reject |
| 14 | Intercompany Interests | Unimpaired, or Impaired | Deemed to Accept, or Presumed to Reject |
| 15 | Existing Interests | Impaired | Presumed to Reject |
| 16 | Section 510(b) Claims | Impaired | Presumed to Reject |

B.    *Treatment of Classes of Claims and Interests*

1.    <u>Class 1 — Other Secured Claims</u>

a.    *Classification*:  Class 1 consists of all Other Secured Claims.

b.    *Treatment*:  Each Holder of an Allowed Other Secured Claim shall receive, in full and final satisfaction of such Allowed Other Secured Claim, at the option of the applicable Debtor (with the consent of the Required RSA Parties, not to be unreasonably withheld), either:

i.    payment in full in Cash;

ii.    delivery of the Collateral securing any such Allowed Other Secured Claim;

iii.    Reinstatement of such Other Secured Claim, notwithstanding any contractual provision or applicable non-bankruptcy law that entitles the holder of such claim to demand or to receive payment prior to the stated maturity of such Allowed Other Secured Claim from and after the occurrence of default; or

iv.    such other treatment rendering such Other Secured Claim Unimpaired.

c.    *Voting*:  Class 1 is Unimpaired.  Holders of Allowed Other Secured Claims in Class 1 are conclusively deemed to have accepted the Plan under section 1126(f) of the Bankruptcy Code.  Holders of Allowed Other Secured Claims in Class 1 are not entitled to vote to accept or reject the Plan.

2.    <u>Class 2 — Other Priority Claims</u>

a.    *Classification*:  Class 2 consists of all Other Priority Claims.

b.    *Treatment*:  Each Holder of an Allowed Other Priority Claim shall receive, in full and final satisfaction of such Allowed Other Priority Claim, at the option of the applicable Debtors (with the consent of the Required RSA Parties, not to be unreasonably withheld), either:

25

      i.        Cash in an amount equal to such Allowed Other Priority Claim; or

      ii.      such other treatment rendering such Other Priority Claim Unimpaired.

c.    *Voting*: Class 2 is Unimpaired. Holders of Allowed Other Priority Claims in Class 2 are conclusively deemed to have accepted the Plan under section 1126(f) of the Bankruptcy Code. Holders of Allowed Other Priority Claims in Class 2 are not entitled to vote to accept or reject the Plan.

3.    Class 3 — 2019 Term Loan Facility Claims

a.    *Classification*: Class 3 consists of all 2019 Term Loan Facility Claims.

b.    *Treatment*: As of the Effective Date, the 2019 Term Loan Facility Claims shall be Allowed and deemed to be Allowed Claims in the full amount outstanding under the 2019 Term Loan Facility Credit Agreement, the DIP Order and the Final Cash Collateral Order, including all principal, accrued and unpaid interest, and all accrued and unpaid fees, expenses, and noncontingent indemnity payable under the 2019 Term Loan Facility Credit Agreement, the DIP Order and the Final Cash Collateral Order. In full and final satisfaction of each Allowed 2019 Term Loan Facility Claim, each Holder of an Allowed 2019 Term Loan Facility Claim shall either:

      i.      if the Debtors enter into the Exit Facility on or prior to the Effective Date, receive payment in full in Cash, or

      ii.      if the Debtors do not enter into the Exit Facility on or prior to the Effective Date, (x) have its Allowed 2019 Term Loan Facility Claim be Reinstated and governed by the Amended and Restated 2019 Term Loan Credit Agreement, and (y) receive its Pro Rata share of the 2019 Term Loan Amendment Fee.

c.    *Voting*: Class 3 is Impaired. Holders of Allowed 2019 Term Loan Facility Claims in Class 3 are entitled to vote to accept or reject the Plan.

4.    Class 4 — Secured Notes Claims

a.    *Classification*: Class 4 consists of all Secured Notes Claims.

b.    *Treatment*: As of the Effective Date, the Secured Notes Claims shall be Allowed and deemed to be Allowed Claims in the full amount outstanding under the Secured Notes Indenture, the DIP Order and the Final Cash Collateral Order, including all principal, accrued and unpaid interest, and all accrued and unpaid fees, expenses, and noncontingent indemnity payable under the Secured Notes Indenture, the DIP Order and the Final Cash Collateral Order. In full and final satisfaction of each Secured Notes Claim, each Holder of an Allowed Secured Notes Claim shall receive (i) payment in full in Cash of any accrued and unpaid prepetition and postpetition interest at the non-default contract rate (except to the extent otherwise paid as adequate protection pursuant to the Final Cash Collateral Order and not recharacterized or otherwise avoided, but ***not*** including any make-whole or prepayment premium), (ii) after giving effect to the immediately preceding clause (i), Cash in an amount equal to 97% of the outstanding amount of such Allowed Secured Notes Claim ***and*** (iii) such Holder's Pro Rata share of the Secured Noteholder Subscription Rights.

c.    *Voting*: Class 4 is Impaired. Holders of Allowed Secured Notes Claims in Class 4 are entitled to vote to accept or reject the Plan.

26

5. Class 5 — Lombard (BULL) Term Loan Claims

 a. *Classification*:  Class 5 consists of all Lombard (BULL) Term Loan Claims.

 b. *Treatment*:  In full and final satisfaction of each Lombard (BULL) Term Loan Claim, all Allowed Lombard (BULL) Term Loan Claims shall be Reinstated.

 c. *Voting*: Class 5 is Unimpaired.  Holders of Allowed Lombard (BULL) Term Loan Claims in Class 5 are conclusively deemed to have accepted the Plan under section 1126(f) of the Bankruptcy Code.   Holders of Allowed Lombard (BULL) Term Loan Claims in Class 5 are not entitled to vote to accept or reject the Plan.

6. Class 6 — PK Air Credit Facility Claims

 a. *Classification*:  Class 6 consists of all PK Air Credit Facility Claims.

 b. *Treatment*:  In full and final satisfaction of all Allowed PK Air Credit Facility Claims, each Holder of an Allowed PK Air Credit Facility Claim shall receive its Pro Rata share of the New PK Air Note.

 c. *Voting*:  Class 6 is Impaired.  Holders of Allowed PK Air Credit Facility Claims in Class 6 are entitled to vote to accept or reject the Plan.

7. Class 7 — Macquarie Term Loan Credit Facility Claims

 a. *Classification*:  Class 7 consists of all Macquarie Term Loan Credit Facility Claims.

 b. *Treatment*:  In full and final satisfaction of all Allowed Macquarie Term Loan Credit Facility Claims, each Holder of an Allowed Macquarie Term Loan Credit Facility Claim shall receive its Pro Rata share of the New Macquarie Note.

 c. *Voting*:  Class 7 is Impaired.  Holders of Allowed Macquarie Term Loan Credit Facility Claims in Class 7 are entitled to vote to accept or reject the Plan.

8. Class 8 — Unsecured Notes Claims

 a. *Classification*:  Class 8 consists of all Unsecured Notes Claims.

 b. *Treatment*: Each holder of an Allowed Unsecured Notes Claim shall receive, in full and final satisfaction of all Allowed Unsecured Notes Claims:

  iii. if such Holder is a 4(a)(2) Eligible Holder, its Pro Rata share (calculated as the Pro Rata share of all Allowed Unsecured Notes Claims and all Allowed General Unsecured Claims that do not make the GUC Rights Offering Election (including the failure to timely return an election notice)) of (x) the Unsecured Equity Pool and (y) the Unsecured Noteholder Subscription Rights;[4] or

  iv. if such Holder is not a 4(a)(2) Eligible Holder, its Pro Rata share of the GUC Distribution Cash Amount.

---

[4] [Note: Treatment of Unsecured Notes Claims may be subject to modification prior to solicitation to the extent necessary to comply with applicable regulatory requirements, including with respect to any limitations on foreign ownership of the New Common Stock, and such modifications shall be deemed to be consistent with the terms of the Restructuring Support Agreement and the Backstop Commitment Agreement.]

c. *Voting*: Class 8 is Impaired. Holders of Allowed Unsecured Notes Claims in Class 8 are entitled to vote to accept or reject the Plan.

9. Class 9 – Lombard (BALL) Term Loan Guarantee Claims

a. *Classification*: Class 9 consists of all Lombard Guarantee Claims.

b. *Treatment*: In full and final satisfaction of each Lombard (BALL) Term Loan Guarantee Claim, all Allowed Lombard (BALL) Term Loan Guarantee Claims shall be Reinstated.

c. *Voting*: Class 9 is Unimpaired. Holders of Allowed Lombard (BALL) Term Loan Guarantee Claims in Class 9 are conclusively deemed to have accepted the Plan under section 1126(f) of the Bankruptcy Code. Holders of Lombard (BALL) Term Loan Guarantee Claims in Class 9 are not entitled to vote to accept or reject the Plan.

10. Class 10 – MCA and Other Customer Guarantee Claims

a. *Classification*: Class 10 consists of all MCA and Other Customer Guarantee Claims.

b. *Treatment*: In full and final satisfaction of each MCA and Other Customer Guarantee Claim, all Allowed MCA and Other Customer Guarantee Claims shall be Reinstated.

c. *Voting*: Class 10 is Unimpaired. Holders of Allowed MCA and Other Customer Guarantee Claims in Class 10 are conclusively deemed to have accepted the Plan under section 1126(f) of the Bankruptcy Code. Holders of Allowed MCA and Other Customer Guarantee Claims in Class 10 are not entitled to vote to accept or reject the Plan.

11. Class 11 — Trade Claims

a. *Classification*: Class 11 consists of all Trade Claims.

b. *Treatment*: Each Holder of an Allowed Trade Claim shall receive, in full and final satisfaction of such Allowed Trade Claim, payment in full of such Allowed General Unsecured Claim on the Effective Date or otherwise in the ordinary course of the Debtors' business.

c. *Voting*: Class 11 is Unimpaired. Holders of Allowed General Unsecured Claims in Class 11 are conclusively deemed to have accepted the Plan under section 1126(f) of the Bankruptcy Code. Holders of Allowed General Unsecured Claims in Class 11 are not entitled to vote to accept or reject the Plan.

12. Class 12 — General Unsecured Claims

a. *Classification*: Class 12 consists of all General Unsecured Claims.

b. *Treatment*: Each Holder of a General Unsecured Claim shall receive, in full and final satisfaction of such Allowed General Unsecured Claim:

i. if such Holder does not timely make the GUC Rights Offering Election and is a 4(a)(2) Eligible Holder, its Pro Rata share (calculated as the Pro Rata share of all Allowed Unsecured Notes Claims and all Allowed General Unsecured Claims that do not make the GUC Rights Offering Election (including the failure to timely

28

return an election notice)) of (x) the Unsecured Equity Pool and (y) the GUC Subscription Rights[5]; or

    ii.    if such Holder does timely make the GUC Rights Offering Election or is not a 4(a)(2) Eligible Holder, its Pro Rata share of the GUC Distribution Cash Amount.

c.    *Voting*: Class 12 is Impaired. Holders of Allowed General Unsecured Claims in Class 12 are entitled to vote to accept or reject the Plan.

13.    <u>Class 13 — Intercompany Claims</u>

a.    *Classification*: Class 13 consists of all Intercompany Claims.

b.    *Treatment*: Unless otherwise provided for under the Plan, Intercompany Claims shall, at the election of the Required RSA Parties, be Reinstated, compromised, or cancelled.

c.    *Voting*: Class 13 is either Unimpaired, in which case the Holders of Allowed Intercompany Claims in Class 13 are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code, or Impaired and not receiving any distribution under the Plan, in which case the Holders of such Allowed Intercompany Claims in Class 13 are presumed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, each Holder of an Allowed Intercompany Claim in Class 13 will not be entitled to vote to accept or reject the Plan.

14.    <u>Class 14 — Intercompany Interests</u>

a.    *Classification*: Class 14 consists of all Intercompany Interests.

b.    *Treatment*: Unless otherwise provided for under the Plan, Intercompany Claims shall, at the election of the Required RSA Parties, be Reinstated solely to maintain the Debtors' corporate structure, compromised, or cancelled.

c.    *Voting*: Class 14 is either Unimpaired, in which case the Holders of Allowed Intercompany Interests in Class 14 are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code, or Impaired and not receiving any distribution under the Plan, in which case the Holders of such Allowed Intercompany Interests in Class 14 are presumed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, each Holder of an Allowed Intercompany Claim in Class 14 will not be entitled to vote to accept or reject the Plan.

15.    <u>Class 15 — Existing Interests</u>

a.    *Classification*: Class 15 consists of all Existing Interests.

b.    *Treatment*: Each Existing Interest shall be cancelled, released, and expunged and shall be of no further force and effect. Each Holder of an Existing Interest shall not receive any distribution on account of such Existing Interest.

c.    *Voting*: Class 15 is Impaired and not receiving any distribution under the Plan. Holders of Existing Interests in Class 15 are presumed to have rejected the Plan pursuant to section

---

[5]    [Note: Treatment of General Unsecured Claims may be subject to modification prior to solicitation to the extent necessary to comply with applicable regulatory requirements, including with respect to any limitations on foreign ownership of the New Common Stock, and such modifications shall be deemed to be consistent with the terms of the Restructuring Support Agreement and the Backstop Commitment Agreement.]

1126(g) of the Bankruptcy Code. Therefore, such Holders are not entitled to vote to accept or reject the Plan.

16. Class 16 — Section 510(b) Claims.

a. *Classification*: Class 16 consists of all Section 510(b) Claims.

b. *Treatment*: Section 510(b) Claims will be canceled, released, and extinguished as of the Effective Date, and will be of no further force or effect, and each Holder of a Section 510(b) Claim will not receive any distribution on account of such Section 510(b) Claim.

c. *Voting*: Class 16 is Impaired and not receiving any distribution under the Plan. Holders of Section 510(b) Claims in Class 16 are presumed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, such Holders are not entitled to vote to accept or reject the Plan.

C. *Special Provision Governing Unimpaired Claims*

Except as otherwise provided in the Plan, nothing under the Plan shall affect the Debtors' or the Reorganized Debtors' rights regarding any Unimpaired Claim, including all rights regarding legal and equitable defenses to, or setoffs or recoupments against, any such Unimpaired Claim.

D. *Elimination of Vacant Classes*

Any Class of Claims or Interests that does not have a Holder of an Allowed Claim or Allowed Interest, or a Claim or Interest temporarily Allowed by the Bankruptcy Court as of the date of the Confirmation Hearing, shall be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

E. *Voting Classes; Presumed Acceptance by Non-Voting Classes*

If a Class contains Claims eligible to vote on the Plan and no Holder of Claims eligible to vote in such Class votes to accept or reject the Plan, the Plan shall be presumed accepted by the Holders of such Claims in such Class.

F. *Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code*

Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of Confirmation by acceptance of the Plan by at least one Impaired Class of Claims. The Debtors shall seek Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class(es) of Claims or Interests. The Debtors reserve the right to modify the Plan in accordance with Article XI of the Plan to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification, including by modifying the treatment applicable to a Class of Claims or Interests to render such Class of Claims or Interests Unimpaired to the extent permitted by the Restructuring Support Agreement, the Backstop Commitment Agreement, the Bankruptcy Code and the Bankruptcy Rules.

G. *Intercompany Interests*

To the extent Reinstated under the Plan, the Intercompany Interests shall be Reinstated for the ultimate benefit of the Holders of Claims that receive New Common Stock and New Preferred Stock under the Plan, and the Intercompany Interests shall receive no recovery or distribution. For the avoidance of doubt, to the extent Reinstated pursuant to the Plan, on and after the Effective Date, all Intercompany Interests shall be owned by the same Reorganized Debtor that corresponds with the Debtor that owned such Intercompany Interests prior to the Effective Date (subject to any modifications in the Restructuring Transactions Exhibit).

H.    *Subordinated Claims and Interests*

The allowance, classification, and treatment of all Allowed Claims and Allowed Interests and their respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise.  Pursuant to section 510 of the Bankruptcy Code, the Debtors or Reorganized Debtors, as applicable, reserve the right to re-classify any Allowed Claim or Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

## ARTICLE IV.
## PROVISIONS FOR IMPLEMENTATION OF THE PLAN

A.    *General Settlement of Claims, Interests, and Causes of Action*

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, upon the Effective Date, the provisions of the Plan shall constitute a good faith compromise and settlement of all Claims, Interests, Causes of Action, and controversies released, settled, compromised, discharged, satisfied, or otherwise resolved pursuant to the Plan.  The Plan shall be deemed a motion, proposed by the Debtors and joined by the Required RSA Parties to approve the good-faith compromise and settlement of all Claims, Interests, Causes of Action, and controversies pursuant to Bankruptcy Rule 9019, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise and settlement of all such Claims, Interests, Causes of Action, and controversies, as well as a finding by the Bankruptcy Court that such compromise and settlement is in the best interests of the Debtors, their Estates, and Holders of Claims and Interests and is fair, equitable, reasonable, and in the best interests of the Debtors and their Estates.

B.    *Restructuring Transactions*

On the Effective Date or as soon as reasonably practicable thereafter, the Reorganized Debtors shall consummate the Restructuring Transactions and take all actions reasonably acceptable to the Required RSA Parties as may be necessary or appropriate to effectuate the Restructuring Transactions, including:  (1) the execution and delivery of any appropriate agreements or other documents of merger, consolidation, restructuring, conversion, disposition, transfer, formation, organization, dissolution, or liquidation containing terms that are consistent with the terms of the Plan and the Restructuring Support Agreement, and that satisfy the requirements of applicable law and any other terms to which the applicable Entities may agree, including the documents comprising the Plan Supplement and the New Organizational Documents; (2) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan and the Restructuring Support Agreement and having other terms for which the applicable Entities may agree; (3) the execution, delivery and filing, if applicable, of appropriate certificates or articles of incorporation, formation, reincorporation, merger, consolidation, conversion, or dissolution pursuant to applicable state law, including any applicable New Organizational Documents; (4) such other transactions that are required to effectuate the Restructuring Transactions; and (5) all other actions that the applicable Entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law.

C.    *Employee and Retiree Benefits*

Unless otherwise provided herein, and subject to Article V hereof, all employee wages and Compensation and Benefits Programs in place as of the Effective Date with the Debtors shall be assumed by the Reorganized Debtors and shall remain in place as of the Effective Date, and the Reorganized Debtors will continue to honor such agreements, arrangements, programs, and plans.  For the avoidance of doubt, pursuant to section 1129(a)(13) of the Bankruptcy Code, from and after the Effective Date, all retiree benefits (as such term is defined in section 1114 of the Bankruptcy Code), if any, shall continue to be paid in accordance with applicable law.

D.        *Issuance and Distribution of New Stock*[6]

All Existing Interests shall be cancelled on the Effective Date and Reorganized Bristow Parent shall issue the New Stock to Holders of Claims and Interests entitled to receive New Stock pursuant to the Plan, the Rights Offering, the DIP Order, or the Backstop Commitment Agreement (including the Backstop Commitment Fee and the Equitization Consent Fee), in each case in the proportions set forth in the Restructuring Support Agreement.  The issuance of New Common Stock and the New Preferred Stock shall be duly authorized without the need for any further corporate action and without any further action by the Debtors or the Reorganized Debtors or by Holders of any Claims or Interests, as applicable.  All New Common Stock and the New Preferred Stock issued under the Plan shall be duly authorized, validly issued, fully paid, and non-assessable.  All distributions of New Common Stock shall be made in accordance with all applicable regulatory requirements, including with respect to any limitations on foreign ownership of the New Common Stock.  Accordingly, in no event will Non-U.S. Citizens be entitled to own in the aggregate more than twenty-four and nine-tenths percent (24.9%) of the total number of outstanding shares of New Common Stock and New Preferred Stock.

On the Effective Date, Reorganized Bristow Parent and all Holders of the New Common Stock and/or New Preferred Stock then outstanding shall be deemed to be parties to the New Shareholders' Agreement, substantially in the form contained in the Plan Supplement, without the need for execution by any such Holder.  On the Effective Date, the New Shareholders' Agreement shall be binding on the Reorganized Debtors and all parties receiving, and all Holders of, the New Common Stock and/or the New Preferred Stock.

E.        *Determination of Holder Citizenship*

If a Holder of an Allowed Class 8 Unsecured Notes Claim or Class 12 General Unsecured Claim furnishes a Citizenship Certification to the Debtors on or before the Distribution Record Date and, after review, the Debtors, in their reasonable discretion, accept such Citizenship Certification as reasonable proof to establish that such Holder is a U.S. Citizen, such Holder will receive New Common Stock and New Preferred Stock representing all of such holder's Pro Rata share of the New Common Stock Distribution as of the Effective Date; *provided, however,* that if such Holder is a Non-U.S. Citizen, or if the Holder fails to furnish a Citizenship Certification to the Debtors on or before the Distribution Record Date, or if the Citizenship Certification of such Holder has not been accepted or has been rejected by the Debtors in their reasonable discretion on or before the date that is 5 Business Days after the Distribution Record Date, such Holder will be treated as a Non-U.S. Citizen for all purposes hereunder and under the Plan.  In connection with the Debtors' review of any Citizenship Certification, the Debtors will have the right to require the Holder furnishing the Citizenship Certification to provide the Debtors with such documentation and other information as they may reasonably request as proof confirming that the holder is a U.S. Citizen.  The Debtors will treat all such documentation and information provided by a Holder as confidential; *provided, that*, the Debtors will share such information with the Creditors' Committee on a confidential basis and will work cooperatively with the Creditors' Committee with respect to citizenship issues.

F.        *Rights Offering*

The Debtors or Reorganized Debtors, as applicable, shall allocate the Subscription Rights for the Rights Offering to the Rights Offering Offerees as set forth in the Plan and the Rights Offering Procedures.  Pursuant to the Backstop Commitment Agreement, the Rights Offering Procedures, and the Plan, the Rights Offering shall be open to all Rights Offering Participants.

Upon exercise of the Subscription Rights by the Rights Offering Participants pursuant to the terms of the Backstop Commitment Agreement, the Rights Offering Procedures, and the Plan, the Reorganized Debtors shall be authorized to issue the New Stock in accordance with the Plan, the Backstop Commitment Agreement, and the Rights Offering Procedures.

---

[6]        [Note: The Plan shall be revised prior to solicitation to include the use of warrants to the extent necessary to ensure that the Reorganized Debtors are in compliance with the requirements of 49 U.S.C. § 40102(a), and such revisions shall be deemed to be consistent with the terms of the Restructuring Support Agreement and the Backstop Commitment Agreement.]

Pursuant to the Backstop Commitment Agreement, the Backstop Commitment Parties shall purchase any Rights Offering Stock not subscribed to by Rights Offering Participants as set forth in the Backstop Commitment Agreement. On the Effective Date, the rights and obligations of the Debtors under the Backstop Commitment Agreement shall vest in the Reorganized Debtors.

The Rights Offering will be comprised of the 1145 Rights Offering and the 4(a)(2) Rights Offering. The Rights Offering will be conducted on a Pro Rata basis in reliance upon one or more exemptions from registration under the Securities Act, which will include the exemption provided in section 1145 of the Bankruptcy Code to the fullest extent available and, to the extent such exemption is not available (and with respect to the New Common Stock, only in the proportion required to preserve the availability of such exemption under section 1145 of the Bankruptcy Code), the exemption from registration set forth in Section 4(a)(2) of the Securities Act and/or Regulation D promulgated thereunder or another available exemption from registration under the Securities Act.

In addition, on the Distribution Date, New Stock in an amount equal to the Backstop Commitment Fee shall be distributed to the Backstop Commitment Parties under and as set forth in the Backstop Commitment Agreement.

G. *The Exit Facility, the Amended and Restated 2019 Term Loan Facility, the New PK Air Note and the New Macquarie Note*

On the Effective Date, the applicable Reorganized Debtors shall enter into (a) either the Exit Facility Documents or the Amended and Restated 2019 Term Loan Documents, as applicable, and (b) the New PK Air Note and the New Macquarie Note, including any documents required in connection with the creation or perfection of Liens in connection therewith. The Confirmation Order shall include approval of (a) either (i) the Exit Facility and the Exit Facility Documents or (ii) the Amended and Restated 2019 Term Loan Facility and the Amended and Restated 2019 Term Loan Documents, as applicable and (b) the New PK Air Note and the New Macquarie Note, all transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred and fees paid by the Reorganized Debtors in connection therewith, authorization of the Reorganized Debtors to enter into, execute, and perform under (a) either the Exit Facility Documents or the Amended and Restated 2019 Term Loan Documents, as applicable, and (b) the New PK Air Note and the New Macquarie Note, and all related documents and agreements to the extent a party thereto, and authorization for the Reorganized Debtors to create or perfect the Liens in connection therewith.

(a) Either the Exit Facility Documents or the Amended and Restated 2019 Term Loan Documents, as applicable, and (b) the New PK Air Note and the New Macquarie Note, shall constitute legal, valid, binding, and authorized obligations of the Reorganized Debtors, enforceable in accordance with their terms. The financial accommodations to be extended pursuant to either (a) the Exit Facility Documents or the Amended and Restated 2019 Term Loan Documents, as applicable, and (b) the New PK Air Note and the New Macquarie Note, are being extended, and shall be deemed to have been extended, in good faith, for legitimate business purposes, are reasonable, shall not be subject to any Claims, Causes of Action, avoidance, reduction, recharacterization, subordination (whether contractual or otherwise), cross claim, disallowance, impairment, objection, or challenges under any applicable law or regulation by any Person for any purposes whatsoever, and shall not constitute preferential transfers, fraudulent transfers, obligations, or conveyances, or other voidable transfers or obligations under the Bankruptcy Code or any other applicable non-bankruptcy law.

The lenders under the Exit Facility or the Amended and Restated 2019 Term Loan Facility, as applicable, and the New PK Air Note and the New Macquarie Note, shall have valid, binding, and enforceable Liens on the Collateral (or other property identified as "Collateral" therein) specified in, and to the extent required by, the Exit Facility Documents or the Amended and Restated 2019 Term Loan Documents, as applicable, the New PK Air Note and the New Macquarie Note, as applicable. To the extent granted, the guarantees, mortgages, pledges, Liens and other security interests granted pursuant to either the Exit Facility Documents or the Amended and Restated 2019 Term Loan Documents, as applicable, are granted in good faith as an inducement to the lenders under either the Exit Facility or the Amended and Restated 2019 Term Loan Facility, as applicable, to extend credit thereunder and shall be deemed not to constitute a fraudulent conveyance or fraudulent transfer, shall not otherwise be subject to avoidance, recharacterization, or subordination (whether contractual or otherwise) for any purposes whatsoever, and the priorities of any such Liens and security interests shall be as set forth in the relevant Exit Facility Documents or the Amended and Restated 2019 Term Loan Documents, as applicable. The Reorganized Debtors and the persons and entities

granted such Liens are authorized to make all filings and recordings, and to obtain all governmental approvals and consents necessary to establish and perfect such Liens under the provisions of the applicable state, provincial, federal, or other law (whether domestic or foreign) that would be applicable in the absence of the Plan and the Confirmation Order, and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such Liens to third parties.

H.      *Rights Offering Per Share Price*

        All issuances of New Stock pursuant to the Rights Offering and the Backstop Commitment Agreement (except for the Shares of New Stock issued as payment of the Backstop Commitment Fee) shall be issued at a per share purchase price of $36.37. All New Stock issued in satisfaction of the Backstop Commitment Fee or the Equitization Consent Fee shall be issued at an assumed per share purchase price of $36.37.

I.      *Management Incentive Plan*

        On the Effective Date, the Initial MIP Amount shall be implemented and effective as part of the Management Incentive Plan on terms and conditions agreed to by the compensation committee of Bristow Parent, the Required Supporting Secured Noteholders, the Required Supporting Unsecured Noteholders and the Required Backstop Parties. Additionally, following the Effective Date, the Reorganized Bristow Parent Board shall determine the terms and conditions of the Management Incentive Plan in excess of the Initial MIP Amount, which, in the aggregate and inclusive of the Initial MIP Amount, shall be between 5.0% and 10.0% of the New Stock on a fully diluted basis (with the ratio of such New Common Stock and New Preferred Stock to be the same as the ratio of all New Common Stock to New Preferred Stock held by the average Backstop Commitment Party as set forth in the Restructuring Support Agreement).

J.      *Management of Reorganized Bristow*

        The Debtors' current management team shall remain in their current positions after consummation of the Restructuring Transactions, and shall enter into new employment agreements in connection with the Restructuring Transactions on terms and conditions that are reasonably acceptable to the Debtors and the Required RSA Parties.

K.      *Exemption from Registration Requirements*

        The offering, issuance, and distribution of any Securities pursuant to the Plan, including the New Stock, will be exempt from the registration requirements of section 5 of the Securities Act or any similar federal, state, or local law in reliance on (1) with respect to the New Common Stock in connection with the 1145 Rights Offering, section 1145 of the Bankruptcy Code or, only to the extent such exemption under section 1145 of the Bankruptcy Code is not available, any other available exemption from registration under the Securities Act, (2) with respect to the New Common Stock and New Preferred Stock issued in connection with the 4(a)(2) Rights Offering, section (4)(a)(2) of the Securities Act or Regulation D promulgated thereunder and (3) with respect to the New Common Stock and New Preferred Stock issued on account of (x) the Backstop Commitment Fee, (y) Equitization Allocation New Common Stock and Equitization Allocation New Preferred Stock, and (z) the Equitization Consent Fee, section 1145 of the Bankruptcy Code.

        Pursuant to section 1145 of the Bankruptcy Code, the New Common Stock and New Preferred Stock issued under the Plan may be sold without registration under the Securities Act by the recipients thereof, subject to: (1) only with respect to the New Common Stock issued in connection with the 1145 Rights Offering, or the New Stock issued on account of the Backstop Commitment Fee, the Equitization Allocation New Common Stock and Equitization Allocation New Preferred Stock, and the Equitization Consent Fee, the provisions of section 1145(b)(1) of the Bankruptcy Code relating to the definition of an underwriter in section 2(a)(11) of the Securities Act and compliance with any applicable state or foreign securities laws, if any, and the rules and regulations of the SEC, if any, applicable at the time of any future transfer of such Securities or instruments; (2) only with respect to the New Common Stock and New Preferred Stock issued in connection with the 4(a)(2) Rights Offering, section 4(a)(2) of the Securities Act or Regulation D promulgated thereunder, the requirements of the applicable provisions of Rule 144 or Rule 144A or any other registration exemption under the Securities Act; (3) any other applicable regulatory approval; and (4) the

transfer restrictions set forth in the New Organizational Documents, if any.  All shares of New Common Stock and New Preferred Stock issued on account of (x) the Backstop Commitment Fee, (y) the Equitization Allocation New Common Stock and Equitization Allocation New Preferred Stock, and (z) the Equitization Consent Fee, will be issued without registration under the Securities Act or any similar federal, state, or local law in reliance on section 1145 of the Bankruptcy Code.  All Unsubscribed Shares of New Common Stock and New Preferred Stock issued to the Backstop Commitment Parties pursuant to the Backstop Commitment Agreement (other than shares of New Common Stock and New Preferred Stock issued on account of the Backstop Commitment Fee) will be issued without registration under the Securities Act or any similar federal, state, or local law in reliance on section 4(a)(2) of the Securities Act or Regulation D promulgated thereunder.

Persons who purchase the New Common Stock or the New Preferred Stock pursuant to the exemption from registration set forth in section 4(a)(2) of the Securities Act or Regulation D promulgated thereunder will hold "restricted securities."  Resales of such restricted securities would not be exempted by section 1145 of the Bankruptcy Code from registration under the Securities Act or other applicable law.  Holders of restricted securities would, however, be permitted to resell New Common Stock or New Preferred Stock without registration if they are able to comply with the applicable provisions of Rule 144 or Rule 144A or any other registration exemption under the Securities Act, or if such securities are registered with the Securities and Exchange Commission.

If the ownership of the New Common Stock or the New Preferred Stock is reflected through the facilities of DTC, neither the Debtors, the Reorganized Debtors, nor any other Person shall be required to provide any further evidence other than the Plan or the Confirmation Order with respect to the treatment of the New Common Stock and the New Preferred Stock under applicable securities laws.

DTC shall be required to accept and conclusively rely upon the Plan or Confirmation Order in lieu of a legal opinion regarding whether the New Common Stock and/or the New Preferred Stock are exempt from registration and/or eligible for DTC book-entry delivery, settlement, and depository services.

Notwithstanding anything to the contrary in the Plan, no entity (including, for the avoidance of doubt, DTC) shall be entitled to require a legal opinion regarding the validity of any transaction contemplated by the Plan, including, for the avoidance of doubt, whether the New Common Stock or the New Preferred Stock are exempt from registration and/or eligible for DTC book-entry delivery, settlement, and depository services.

L.      *Vesting of Assets*

Except as otherwise provided in the Plan or in any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement, on the Effective Date, all property in each Debtor's Estate, all Causes of Action, and any property acquired by each of the Debtors under the Plan shall vest in each respective Reorganized Debtor, free and clear of all Liens, Claims, charges, or other encumbrances.  On and after the Effective Date, except as otherwise provided in the Plan, each Reorganized Debtor may operate its business and may use, acquire, or dispose of property and pursue, compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

M.      *Cancellation of Instruments, Certificates, and Other Documents*

Except as otherwise provided in the Plan or any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement, on the Effective Date, all notes, instruments, Certificates, and other documents evidencing Claims or Interests, including the Indentures, if the Debtors enter into the Exit Facility, the 2019 Term Loan Facility, and any other credit agreements and indentures, shall be terminated and canceled and the obligations of the Debtors thereunder or in any way related thereto shall be deemed satisfied in full and discharged.  In addition to the foregoing, the Indentures and the 2019 Term Loan Credit Agreement shall survive the occurrence of the Effective Date and shall continue in effect solely to the extent necessary to: (i) allow a disbursing agent, the 2019 Term Loan Facility Agent or the Indenture Trustees to make distributions under the Plan to the Holders of Secured Notes Claims, Unsecured Notes Claims and 2019 Term Loan Facility Claims, as applicable; (ii) allow the Debtors, the Reorganized Debtors,  the Indenture Trustees and the 2019 Term Loan Facility Agent to make post-Effective Date distributions or take such other action pursuant to the Plan on account of Allowed Secured Notes Claims, Allowed Unsecured Notes Claims and Allowed 2019 Term Loan Facility Claims, as applicable, and to otherwise exercise their

rights and discharge their obligations relating to the interests of the Holders of such Claims in accordance with the Plan; (iii) allow the Indenture Trustees and the 2019 Term Loan Facility Agent to maintain or assert any rights it may have against the distributions to Holders of Secured Notes Claims, Unsecured Notes Claims and 2019 Term Loan Facility Claims, as applicable pursuant to the terms of the Indentures or 2019 Term Loan Facility Credit Agreement, as applicable; *provided* that except as expressly provided in this Section IV.M, nothing in this Section IV.M shall affect the discharge of Claims pursuant to the Bankruptcy Code, the Confirmation Order or the Plan or result in any liability or expense to the Reorganized Debtors; (iv) permit the Indenture Trustees and the 2019 Term Loan Facility Agent to assert their respective charging liens; and (v) allow the Indenture Trustees and the 2019 Term Loan Facility Agent to maintain any right of indemnification, contribution, subrogation or any other claim or entitlement they may have under the applicable Indentures and 2019 Term Loan Facility Credit Agreement.

Notwithstanding anything to the contrary contained in the Plan, on or after the Effective Date, all duties and responsibilities of the 2019 Term Loan Facility Agent arising under or related to the 2019 Term Loan Facility Credit Agreement shall be discharged except to the extent required in order to effectuate the Plan. For the avoidance of doubt and notwithstanding the foregoing, nothing contained in the Plan shall in any way limit or affect the standing of the 2019 Term Loan Facility Agent to appear and be heard in the Chapter 11 Cases on and after the Effective Date. The 2019 Term Loan Facility Agent shall be entitled in reimbursement of reasonable and documented fees and expenses (including reasonable and documented fees and expenses of its professionals) incurred in connection with the matters set forth in this Section IV.M.

If the record holder of the Secured Notes or Unsecured Notes is DTC or its nominee or another securities depository or custodian thereof, and such Secured Notes or Unsecured Notes are represented by a global security held by or on behalf of DTC or such other securities depository or custodian, then each such Holder of the Secured Notes or Unsecured Notes shall be deemed to have surrendered such Holder's note, debenture or other evidence of indebtedness upon surrender of such global security by DTC or such other securities depository or custodian thereof.

N.      *Corporate Action*

On and after the Effective Date, all actions contemplated by the Plan are and shall be deemed authorized and approved by the Bankruptcy Court in all respects without any further corporate or equity holder action, including, as applicable: (1) the adoption, execution, and/or filing of the New Organizational Documents and the New Shareholders' Agreement; (2) the selection of the directors, managers, and officers for the Reorganized Debtors, including the appointment of the Reorganized Bristow Parent Board; (3) the authorization, issuance, entry into and distribution, as applicable, of the Exit Facility, the Amended and Restated 2019 Term Loan Facility, the New PK Air Note and the New Macquarie Note, the New Common Stock and the New Preferred Stock and the execution, delivery, and filing of any documents pertaining thereto, as applicable; (4) the rejection, assumption, or assumption and assignment, as applicable, of Executory Contracts and Unexpired Leases; (5) the formation of any Entities pursuant to the Restructuring Transactions; (6) the implementation of the Restructuring Transactions, including any transaction contemplated by the Restructuring Transactions Exhibit; (7) the adoption of the Management Incentive Plan by the Reorganized Bristow Parent Board; and (8) all other actions contemplated by the Plan (whether to occur before, on, or after the Effective Date). Upon the Effective Date, all matters provided for in the Plan involving the corporate structure of the Reorganized Debtors, and any corporate, partnership, limited liability company, or other governance action required by the Debtors or the Reorganized Debtors in connection with the Plan shall be deemed to have occurred and shall be in effect, without any requirement of further corporate or other action by any Security holders, members, directors, or officers of the Debtors or Reorganized Debtors, as applicable.

On or before the Effective Date, as applicable, the appropriate directors and officers of the Debtors or the Reorganized Debtors shall be (or shall be deemed to have been) authorized and (as applicable) directed to issue, execute, and deliver the agreements, documents, Securities, and instruments contemplated by the Plan (or necessary or desirable to effectuate the Restructuring Transactions) in the name of and on behalf of the Reorganized Debtors, including and any and all other agreements, documents, Securities, and instruments relating to the foregoing, to the extent not previously authorized by the Bankruptcy Court. The authorizations and approvals contemplated by this Article IV.N shall be effective notwithstanding any requirements under non-bankruptcy law.

O.   *Corporate Existence*

Except as otherwise provided in the Plan or any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement, on the Effective Date, each Debtor shall continue to exist after the Effective Date as a separate corporation, limited liability company, partnership, or other form of entity, as the case may be, with all the powers of a corporation, limited liability company, partnership, or other form of entity, as the case may be, pursuant to the applicable law in the jurisdiction in which each applicable Debtor is incorporated or formed and pursuant to the respective certificate of incorporation and by-laws (or other analogous formation documents) in effect before the Effective Date, except to the extent such certificate of incorporation or bylaws (or other analogous formation, constituent or governance documents) is amended by the Plan or otherwise, and to the extent any such document is amended, such document is deemed to be amended pursuant to the Plan and requires no further action or approval (other than any requisite filings required under applicable state or federal law).  Notwithstanding the foregoing, the Debtors reserve the right to modify the Debtors' corporate structure as of the Effective Date, including by merger or liquidation of any Reorganized Debtor or otherwise.

P.   *New Organizational Documents*

On the Effective Date, or as soon thereafter as is reasonably practicable, the Reorganized Debtors' certificates of incorporation and bylaws (and other formation and constituent documents relating to limited liability companies) shall be amended or amended and restated, as applicable, as may be required to be consistent with the provisions of the Plan, the Restructuring Support Agreement (including the Governance Term Sheet) the New Organizational Documents, as applicable, and the Bankruptcy Code.  To the extent required under the Plan or applicable nonbankruptcy law, the Reorganized Debtors will file their respective New Organizational Documents with the applicable Secretaries of State and/or other applicable authorities in their respective states, provinces, or countries of incorporation in accordance with the corporate laws of the respective states, provinces, or countries of incorporation. The New Organizational Documents shall, among other things: (1) authorize the issuance of the New Common Stock and the New Preferred Stock; and (2) pursuant to and only to the extent required by section 1123(a)(6) of the Bankruptcy Code, include a provision prohibiting the issuance of non-voting equity Securities.  After the Effective Date, each Reorganized Debtor may amend and restate its certificate of incorporation and other formation and constituent documents as permitted by the laws of its respective jurisdiction of formation and the terms of the New Organizational Documents.  It is currently expected that the Reorganized Debtors' organizational documents will be amended immediately following Confirmation to incorporate provisions that preclude foreign control and prevent foreign ownership of the Reorganized Debtors from exceeding specified limitations required by U.S. federal law governing air carriers.  These amendments will involve safeguards to ensure that at no time will the Reorganized Debtors (including Reorganized Bristow Parent) be out of compliance with the foreign ownership limitations contained in such laws.

Q.   *Effectuating Documents; Further Transactions*

On and after the Effective Date, the Reorganized Debtors and the officers and members of the boards of directors and managers (or other relevant governing body) thereof, including the Reorganized Bristow Parent Board, shall be authorized to and may issue, execute, deliver, file, or record such contracts, Securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan, including the New PK Air Note, the New Macquarie Note, the Exit Facility Credit Agreement and the Amended and Restated 2019 Term Loan Credit Agreement, as applicable, and the Securities issued pursuant to the Plan in the name of and on behalf of the Reorganized Debtors, without the need for any approvals, authorizations, or consents except for those expressly required under the Plan.

R.   *Section 1146(a) Exemption*

To the fullest extent permitted by section 1146(a) of the Bankruptcy Code, any transfers (whether from a Debtor to a Reorganized Debtor or to any other Person) of property under the Plan (including the Restructuring Transactions) or pursuant to: (1) the issuance, distribution, transfer, or exchange of any debt, equity Security, or other interest in the Debtors or the Reorganized Debtors; (2) the creation, modification, consolidation, termination, refinancing, and/or recording of any mortgage, deed of trust, or other security interest, or the securing of additional indebtedness by such or other means; (3) the making, assignment, or recording of any lease or sublease; (4) the grant

of Collateral (or other property identified as "Collateral" therein) as security for the New PK Air Note, the New Macquarie Note, the Exit Facility or the Amended and Restated 2019 Term Loan Credit Agreement, as applicable; or (5) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan (including the Restructuring Transactions), shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forego the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee, or governmental assessment. All filing or recording officers (or any other Person with authority over any of the foregoing), wherever located and by whomever appointed, shall comply with the requirements of section 1146(a) of the Bankruptcy Code, shall forego the collection of any such tax or governmental assessment, and shall accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

S.      *Directors and Officers*

As of the Effective Date, the term of the current members of the boards of directors of the Debtors shall expire, and the initial boards of directors, including the Reorganized Bristow Parent Board, as well as the officers of each of the Reorganized Debtors, shall be appointed in accordance with the New Organizational Documents and other constituent documents of each Reorganized Debtor. As set forth in the Restructuring Support Agreement (including the Governance Term Sheet), the initial Reorganized Bristow Parent Board shall consist of 7 directors, with the directors of the Reorganized Bristow Parent Board being appointed consistent with the Governance Term Sheet and the New Organizational Documents. The Reorganized Debtors will comply with the requirements set forth in 49 U.S.C. § 40102(a) with respect to the citizenship of its officers, directors and senior management team.

Pursuant to section 1129(a)(5) of the Bankruptcy Code, the Debtors will, to the extent reasonably practicable, disclose in advance of the Confirmation Hearing the identity and affiliations of any Person proposed to serve on the Reorganized Bristow Parent Board, as well as those Persons that will serve as officers of the Reorganized Debtors. To the extent any such director or officer is an "insider" under the Bankruptcy Code, the nature of any compensation to be paid to such director or officer will also be disclosed. Provisions regarding the removal, appointment, and replacement of members of the Reorganized Bristow Parent Board will be disclosed in the New Organizational Documents.

T.      *Preservation of Causes of Action*

Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan, including pursuant to Article VIII of the Plan or a Final Order, in accordance with section 1123(b) of the Bankruptcy Code, such Causes of Action shall be Retained Causes of Action, whether arising before or after the Petition Date, including any actions specifically enumerated in the Plan Supplement, and the Reorganized Debtors' rights to commence, prosecute, or settle such Retained Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date. **No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against them as any indication that the Debtors or the Reorganized Debtors will not pursue any and all available Causes of Action against them. The Debtors and the Reorganized Debtors expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided herein.** Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan, including pursuant to Article VIII of the Plan or a Final Order, the Reorganized Debtors expressly reserve all Causes of Action, for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation. For the avoidance of doubt, in no instance will any Cause of Action preserved pursuant to this Article IV.T include any claim or Cause of Action with respect to, or against, a Released Party that is released under Article VIII of the Plan.

In accordance with section 1123(b)(3) of the Bankruptcy Code, any Causes of Action preserved pursuant to the first paragraph of this Article IV.T that a Debtor may hold against any Entity shall vest in the Reorganized Debtors. The applicable Reorganized Debtor, through its authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action. The Reorganized Debtors shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action, or to decline to do any of the foregoing, without the consent or approval of any third party or any further notice to or action, order, or approval of the Bankruptcy Court.

U.      *Indenture Trustee Expenses*

On the Effective Date, the Debtors or Reorganized Debtors shall distribute Cash to the Indenture Trustees in an amount equal to the Indenture Trustee Expenses; underline{provided}, that the Indenture Trustees shall provide the Debtors with the invoices for which they seek payment no later than five (5) days prior to the Effective Date. If the Debtors dispute any Indenture Trustee Expenses, the Debtors shall (i) pay the undisputed portion of the Indenture Trustee Expenses and (ii) notify the Indenture Trustees with respect to any disputed portion of the Indenture Trustee Expenses within five (5) days after presentation of the invoices by the Indenture Trustees.

V.      *Closing the Chapter 11 Cases*

On and after the Effective Date, the Debtors or Reorganized Debtors shall be permitted to close all of the Chapter 11 Cases of the Debtors except for the Chapter 11 Case of Bristow Parent and any other Debtor identified in the Restructuring Transactions Exhibit as having its Chapter 11 Case remain open following the Effective Date, and all contested matters relating to any of the Debtors, including objections to Claims, shall be administered and heard in the Chapter 11 Case of Bristow Parent, irrespective of whether such Claim(s) were Filed against a Debtor whose Chapter 11 Case was closed.

When all Disputed Claims have become Allowed or disallowed and all distributions have been made in accordance with the Plan, the Reorganized Debtors shall seek authority to close any remaining Chapter 11 Cases in accordance with the Bankruptcy Code and the Bankruptcy Rules.

**ARTICLE V.**
**TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES**

A.      *Assumption or Rejection of Executory Contracts and Unexpired Leases*

On the Effective Date, each Executory Contract and Unexpired Lease shall be deemed assumed pursuant to section 365 of the Bankruptcy Code, without the need for any further notice to or action, order, or approval of the Bankruptcy Court, unless such Executory Contract or Unexpired Lease is listed on the Schedule of Rejected Executory Contracts and Unexpired Leases, if any. The assumption of Executory Contracts and Unexpired Leases hereunder may include the assignment of certain of such contracts to Affiliates. The Confirmation Order will constitute an order of the Bankruptcy Court approving the above-described assumptions, rejections, and assumptions and assignments. For the avoidance of doubt and notwithstanding anything to the contrary herein, the Backstop Commitment Agreement and Restructuring Support Agreement shall be assumed on the Effective Date, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's authorization for the Debtors to enter into the Backstop Commitment Agreement and Restructuring Support Agreement and perform any and all obligations of the Debtors thereunder.

Except as otherwise provided herein or agreed to by the Debtors and the applicable counterparty, each assumed Executory Contract or Unexpired Lease shall include all modifications, amendments, supplements, restatements, or other agreements related thereto, and all rights related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests. Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease or the validity, priority, or amount of any Claims that may arise in connection therewith. To the extent applicable, no change of control (or similar provision) will be deemed to occur under any such Executory Contract or Unexpired Lease.

If certain, but not all, of a contract counterparty's Executory Contracts and/or Unexpired Leases are assumed pursuant to the Plan, the Confirmation Order shall be a determination that such counterparty's Executory Contracts and/or Unexpired Leases that are being rejected pursuant to the Plan are severable agreements that are not integrated with those Executory Contracts and/or Unexpired Leases that are being assumed pursuant to the Plan. Parties seeking to contest this finding with respect to their Executory Contracts and/or Unexpired Leases must file a timely objection to the Plan on the grounds that their agreements are integrated and not severable, and any such dispute shall be resolved by the Bankruptcy Court at the Confirmation Hearing (to the extent not resolved by the parties prior to the Confirmation Hearing).

B.      *Claims Based on Rejection of Executory Contracts or Unexpired Leases*

Counterparties to Executory Contracts or Unexpired Leases listed on the Schedule of Rejected Executory Contracts and Unexpired Leases, if any, shall be served with a notice of rejection of Executory Contracts and Unexpired Leases with the Plan Supplement. Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts and Unexpired Leases, if any, must be Filed with the Bankruptcy Court within 30 days after the date of the order of the Bankruptcy Court approving such rejection. Any Claims arising from the rejection of an Executory Contract or Unexpired Lease that are not Filed within such time will be automatically disallowed, forever barred from assertion, and shall not be enforceable against, as applicable, the Debtors, the Reorganized Debtors, the Estates, or property of the foregoing parties, without the need for any objection by the Debtors or Reorganized Debtors, as applicable, or further notice to, or action, order, or approval of the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully satisfied, released, and discharged, notwithstanding anything in a Proof of Claim to the contrary. Claims arising from the rejection of the Debtors' Executory Contracts and Unexpired Leases shall be classified as General Unsecured Claims and shall be treated in accordance with Article III of the Plan.

C.      *Cure of Defaults for Assumed Executory Contracts and Unexpired Leases*

On the Effective Date or as soon as reasonably practicable thereafter, the Debtors or the Reorganized Debtors, as applicable, shall pay all Cure Costs relating to Executory Contracts and Unexpired Leases that are being assumed under the Plan. Unless otherwise agreed upon in writing by the parties to the applicable Executory Contract or Unexpired Lease, all requests for payment of Cure Costs that differ from the amounts paid or proposed to be paid by the Debtors or the Reorganized Debtors to a counterparty must be Filed with the Solicitation Agent on or before 14 days after receiving the applicable Cure Notice. Any such request that is not timely Filed shall be disallowed and forever barred, estopped, and enjoined from assertion, and shall not be enforceable against any Debtor or Reorganized Debtor, without the need for any objection by the Debtors or Reorganized Debtors or any other party in interest or any further notice to or action, order, or approval of the Bankruptcy Court. Any Cure Costs shall be deemed fully satisfied, released, and discharged upon payment by the Debtors or the Reorganized Debtors of the applicable Cure Costs; *provided*, *however*, that nothing herein shall prevent the Reorganized Debtors from paying any Cure Costs despite the failure of the relevant counterparty to file such request for payment of such Cure Costs. The Reorganized Debtors also may settle any Cure Costs (with the reasonable consent of the Required RSA Parties) without any further notice to or action, order, or approval of the Bankruptcy Court. In addition, any objection to the assumption of an Executory Contract or Unexpired Lease under the Plan must be Filed with the Bankruptcy Court on or before the Confirmation Hearing. Any such objection will be scheduled to be heard by the Bankruptcy Court at the Confirmation Hearing or at the Debtors' or Reorganized Debtors', as applicable, first scheduled omnibus hearing for which such objection is timely Filed. Any counterparty to an Executory Contract or Unexpired Lease that fails to timely object to the proposed assumption of any Executory Contract or Unexpired Lease will be deemed to have consented to such assumption.

If there is any dispute regarding any Cure Costs, the ability of the Reorganized Debtors or any assignee to provide "adequate assurance of future performance" within the meaning of section 365 of the Bankruptcy Code, or any other matter pertaining to assumption, then payment of any Cure Costs shall occur as soon as reasonably practicable after entry of a Final Order resolving such dispute, approving such assumption (and, if applicable, assignment), or as may be agreed upon by the Debtors or the Reorganized Debtors, as applicable, and the counterparty to the Executory Contract or Unexpired Lease. The Debtors and Reorganized Debtors, as applicable, reserve the right at any time to move to reject any Executory Contract or Unexpired Lease based upon the existence of any such unresolved dispute. If the Bankruptcy Court determines that the Allowed Cure Cost with respect to any Executory Contract or Unexpired Lease is greater than the amount set forth in the applicable Cure Notice, the Debtors (with the

reasonable consent of the Required RSA Parties) shall have the right to add such Executory Contract or Unexpired Lease to the Schedule of Rejected Executory Contracts and Unexpired Leases, in which case such Executory Contract or Unexpired Lease will be deemed rejected as of the Effective Date subject to the applicable counterparty's right to object to such rejection.

Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise and full payment of any applicable Cure Costs pursuant to this Article V.C shall result in the full release and satisfaction of any Cures, Claims, or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time prior to the effective date of assumption. **Any and all Proofs of Claim based upon Executory Contracts or Unexpired Leases that have been assumed in the Chapter 11 Cases, including pursuant to the Confirmation Order, and for which any Cure Costs have been fully paid pursuant to this Article V.C, shall be deemed disallowed and expunged as of the Effective Date without the need for any objection thereto or any further notice to or action, order, or approval of the Bankruptcy Court.**

D.      *Indemnification*

On and as of the Effective Date, the Indemnification Obligations will be assumed, irrevocable with respect to any claims relating to acts or omissions occurring at or prior to the Effective Date, and will survive the effectiveness of the Plan, and the New Organizational Documents will provide for the indemnification, defense, reimbursement, exculpation, and/or limitation of liability of, and advancement of fees and expenses to the Debtors' and the Reorganized Debtors' directors, officers, employees, or agents that were employed by, or serving on the board of directors (or similar governing body) of, any of the Debtors as of the Petition Date, to the fullest extent permitted by law and at least to the same extent as the organizational documents of each of the respective Debtors on the Petition Date, against any Claims or Causes of Action whether direct or derivative, liquidated or unliquidated, fixed or contingent, disputed or undisputed, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, and, notwithstanding anything in the Plan to the contrary, none of the Reorganized Debtors will amend and/or restate the New Organizational Documents before or after the Effective Date to terminate or adversely affect any of the Reorganized Debtors' obligations to provide such indemnification rights or such directors', officers', employees', or agents' indemnification rights with respect to any claims relating to acts or omissions occurring at or prior to the Effective Date.

E.      *Insurance Policies*

Notwithstanding anything in the Plan to the contrary, all of the Debtors' insurance policies and any agreements, documents, or instruments relating thereto, are treated as and deemed to be Executory Contracts under the Plan. On the Effective Date, pursuant to section 365(a) of the Bankruptcy Code, the Debtors shall be deemed to have assumed all insurance policies and any agreements, documents, and instruments related thereto, including all D&O Liability Insurance Policies (including tail coverage liability insurance). Entry of the Confirmation Order will constitute the Bankruptcy Court's approval of the Reorganized Debtors' assumption of all such insurance policies, including the D&O Liability Insurance Policies. Notwithstanding anything to the contrary contained in the Plan, Confirmation of the Plan shall not discharge, impair, or otherwise modify any indemnity obligations assumed by the foregoing assumption of insurance policies, including the D&O Liability Insurance Policies, and each such indemnity obligation will be deemed and treated as an Executory Contract that has been assumed by the Reorganized Debtors under the Plan as to which no Proof of Claim or Claim for Cure Costs need be Filed, and shall survive the Effective Date.

On or before the Effective Date, the Debtors shall purchase and maintain tail coverage under the D&O Liability Insurance Policies for the six-year period following the Effective Date on terms no less favorable than under, and with an aggregate limit of liability no less than the aggregate limit of liability under, the existing D&O Liability Insurance Policies. In addition to such tail coverage, the D&O Liability Insurance Policies shall remain in place in the ordinary course during the Chapter 11 Cases.

F.     *Employee Compensation and Benefits*

    1.     <u>Compensation and Benefits Programs</u>

Subject to the provisions of the Plan, all Compensation and Benefits Programs shall be treated as Executory Contracts under the Plan and deemed assumed on the Effective Date pursuant to the provisions of sections 365 and 1123 of the Bankruptcy Code, except for:

    (a)  all employee equity or equity-based incentive plans, and any provisions set forth in the Compensation and Benefits Programs that provide for rights to acquire Interests in any of the Debtors;

    (b)  any Compensation and Benefits Programs that, as of the entry of the Confirmation Order, have been specifically waived by the beneficiaries of any employee benefit plan or contract;

    (c)  any agreement or arrangement between a Debtor and a former insider as of the Petition Date; and

    (d)  any deferred compensation plan for any participant that is not a current employee on the Effective Date; and

    (e)  Compensation and Benefits Programs that have been rejected pursuant to an order of the Bankruptcy Court or is listed on the Schedule of Rejected Executory Contracts and Unexpired Leases.

Any assumption of Compensation and Benefits Programs pursuant to the terms herein shall not be deemed to trigger any applicable change of control, immediate vesting, termination, or similar provisions therein. No counterparty shall have rights under a Compensation and Benefits Programs assumed pursuant to the Plan other than those applicable immediately prior to such assumption.

    2.     <u>Workers' Compensation Programs.</u>

As of the Effective Date, except as set forth in the Plan Supplement, the Debtors and the Reorganized Debtors shall continue to honor their obligations under: (a) all applicable workers' compensation laws in states in which the Reorganized Debtors operate; and (b) the Debtors' written contracts, agreements, agreements of indemnity, self-insured workers' compensation bonds, policies, programs, and plans for workers' compensation and workers' compensation insurance. All Proofs of Claim on account of workers' compensation shall be deemed withdrawn automatically and without any further notice to or action, order, or approval of the Bankruptcy Court; *provided that* nothing in the Plan shall limit, diminish, or otherwise alter the Debtors' or Reorganized Debtors' defenses, Causes of Action, or other rights under applicable non-bankruptcy law with respect to any such contracts, agreements, policies, programs, and plans; *provided further* that nothing herein shall be deemed to impose any obligations on the Debtors in addition to what is provided for under applicable state law.

G.     *Contracts and Leases After the Petition Date*

Contracts and leases entered into after the Petition Date by any Debtor, including any Executory Contracts and Unexpired Leases assumed under section 365 of the Bankruptcy Code, will be performed by the applicable Debtor or Reorganized Debtor liable thereunder in the ordinary course of its business. Such contracts and leases that are not rejected under the Plan shall survive and remain unaffected by entry of the Confirmation Order.

H.     *Reservation of Rights*

Nothing contained in the Plan or the Plan Supplement shall constitute an admission by the Debtors or any other party that any contract or lease is in fact an Executory Contract or Unexpired Lease or that any Debtor or Reorganized Debtor has any liability thereunder. If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption, the Debtors or the Reorganized Debtors, as applicable, shall have 45 days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease.

I.       *Nonoccurrence of Effective Date*

In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code.

## ARTICLE VI.
## PROVISIONS GOVERNING DISTRIBUTIONS

A.       *Distributions on Account of Claims and Interests Allowed as of the Effective Date*

Except as otherwise provided herein, in a Final Order, or as otherwise agreed to by the Debtors (or the Reorganized Debtors) and the Holder of the applicable Claim or Interest, on the first Distribution Date, the Distribution Agent shall make initial distributions under the Plan on account of Claims and Interests Allowed on or before the Effective Date; *provided*, *however*, that (1) Allowed Administrative Claims with respect to liabilities incurred by the Debtors in the ordinary course of business shall be paid or performed in the ordinary course of business in accordance with the terms and conditions of any controlling agreements, course of dealing, course of business, or industry practice, and (2) Allowed Priority Tax Claims shall be paid in accordance with Article II.C.  To the extent any Allowed Priority Tax Claim is not due and owing on the Effective Date, such Claim shall be paid in full in Cash in accordance with the terms of any agreement between the Debtors and the Holder of such Claim or as may be due and payable under applicable non-bankruptcy law or in the ordinary course of business.  A Distribution Date shall occur no more frequently than once in every 90-day period after the Effective Date, as necessary, in the Reorganized Debtors' sole discretion.

B.       *Rights and Powers of the Distribution Agent*

1.       Powers of Distribution Agent

The Distribution Agent shall be empowered to:  (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan; (b) make all distributions contemplated hereby; (c) employ professionals to represent it with respect to its responsibilities; and (d) exercise such other powers as may be vested in the Distribution Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Distribution Agent to be necessary and proper to implement the provisions hereof.

2.       Expenses Incurred On or After the Effective Date

Except as otherwise ordered by the Bankruptcy Court, the amount of any reasonable fees and expenses incurred by the Distribution Agent on or after the Effective Date (including taxes) and any reasonable compensation and expense reimbursement claims (including reasonable attorney fees and expenses) made by the Distribution Agent shall be paid in Cash by the Reorganized Debtors.

C.       *Special Rules for Distributions to Holders of Disputed Claims*

Except as otherwise agreed by the relevant parties:  no partial payments and no partial distributions shall be made with respect to a Disputed Claim until all such disputes in connection with such Disputed Claim have been resolved by settlement or Final Order.  Any dividends or other distributions arising from property distributed to Holders of Allowed Claims in a Class and paid to such Holders under the Plan shall also be paid, in the applicable amounts, to any Holder of a Disputed Claim in such Class that becomes an Allowed Claim after the date or dates that such dividends or other distributions were earlier paid to Holders of Allowed Claims in such Class.

Any fund established to hold consideration to be received under the Plan pending resolution of Disputed Claims shall be treated as a "disputed ownership fund" pursuant to Treasury Regulation section 1.468B-9.  Any such fund shall, therefore, be subject to entity-level taxation.  For the avoidance of doubt, any New Stock shall not be issued to such fund; rather, Reorganized Bristow Parent shall retain sufficient authorized, but unissued, New Stock and issue them directly to Holders of Claims following the resolution of Disputed Claims.

D.  *Delivery of Distributions*

1.  <u>Record Date for Distributions</u>

Except as provided herein, on the Distribution Record Date, the Claims Register shall be closed and the Debtors, the Reorganized Debtors, or any other party responsible for making distributions under the Plan shall be authorized and entitled to recognize only those record Holders listed on the Claims Register or any other transfer register for each Class of Claims as maintained by the Debtors or their agents, each of which shall be deemed closed as of the close of business on the Distribution Record Date, and there shall be no further changes in the record Holders of the applicable Claims.  In addition, with respect to payment of any Cure Costs or disputes over any Cure Costs, neither the Debtors nor the Distribution Agent shall have any obligation to recognize or deal with any party other than the non-Debtor party to the applicable Executory Contract or Unexpired Lease as of the Effective Date, even if such non-Debtor party has thereafter sold, assigned, or otherwise transferred its Claim for Cure Costs.  The Distribution Record Date shall not apply to Secured Notes and Unsecured Notes deposited with DTC, the Holders of which shall receive distributions in accordance with the customary procedures of DTC

2.  <u>Distribution Process</u>

The Distribution Agent shall make all distributions required under the Plan, except that with respect to distributions to Holders of Allowed Claims governed by a separate agreement, shall exercise commercially reasonable efforts to implement appropriate mechanics governing such distributions in accordance with the Plan and the terms of the relevant governing agreement.  Except as otherwise provided herein, and notwithstanding any authority to the contrary, distributions to Holders of Allowed Claims and Allowed Interests, including Claims and Interests that become Allowed after the Effective Date, shall be made to Holders of record or their respective designees as of the Distribution Record Date:  (a) to the address of such Holder or designee as set forth in the applicable register (or if the appropriate notice has been provided pursuant to the governing agreement in writing, on or before the date that is 10 calendar days before the Effective Date, of a change of address or an identification of designee, to the changed address or to such designee, as applicable); or (b) in accordance with Federal Rule of Civil Procedure 4, as modified and made applicable by Bankruptcy Rule 7004, if no address exists in the applicable register, no Proof of Claim has been Filed, and the Distribution Agent has not received a written notice of a change of address on or before the date that is 10 calendar days before the Effective Date.  The Debtors, the Reorganized Debtors, and the Distribution Agent, as applicable, shall not incur any liability whatsoever on account of any distributions under the Plan.  Except as otherwise provided in the Plan, Holders of Claims and Holders of Interests shall not be entitled to interest, dividends, or accruals on the distributions provided for in the Plan, regardless of whether such distributions are delivered on or at any time after the Effective Date.

3.  <u>Foreign Currency Exchange Rate</u>

Except as otherwise provided in a Bankruptcy Court order, as of the Effective Date, any Claim asserted in currency other than U.S. dollars shall be automatically deemed converted to the equivalent U.S. dollar value using the exchange rate for the applicable currency as published in *The Wall Street Journal, National Edition*, on the Effective Date.

4.  <u>Fractional, Undeliverable, and Unclaimed Distributions</u>

a.  *Fractional Distributions*.  Whenever any distribution of fractional shares of New Common Stock or New Preferred Stock would otherwise be required pursuant to the Plan, the actual distribution shall reflect a rounding of such fraction to the nearest interest or share or dollar, as applicable, with half interests of shares, or any amount equal to $0.50, or less being rounded down.  The total number of authorized shares of New Stock to be distributed pursuant to the Plan shall be adjusted as necessary to account for the foregoing rounding.

b.  *Undeliverable Distributions*.  If any distribution to a Holder of an Allowed Claim is returned to the Distribution Agent as undeliverable, no further distributions shall be made to such Holder unless and until the Distribution Agent is notified in writing of such

Holder's then-current address or other necessary information for delivery, at which time all currently due missed distributions shall be made to such Holder on the next Distribution Date. Undeliverable distributions shall remain in the possession of the Reorganized Debtors until such time as a distribution becomes deliverable, or such distribution reverts to the Reorganized Debtors or is canceled pursuant to Article VI.D.4.c of the Plan, and shall not be supplemented with any interest, dividends, or other accruals of any kind.

    c.    *Reversion*. Any distribution under the Plan that is an Unclaimed Distribution for a period of 6 months after distribution shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code and such Unclaimed Distribution shall revest in the applicable Reorganized Debtor and, to the extent such Unclaimed Distribution is comprised of New Common Stock or New Preferred Stock, each shall be transferred to the Backstop Commitment Parties on a Pro Rata basis. Upon such revesting, the Claim of the Holder or its successors with respect to such property shall be canceled, discharged, and forever barred notwithstanding any applicable federal or state escheat, abandoned, or unclaimed property laws, or any provisions in any document governing the distribution that is an Unclaimed Distribution, to the contrary.

    5.    <u>Minimum; *De Minimis* Distributions</u>

No Cash payment of less than $100 shall be made to a Holder of an Allowed Claim on account of such Allowed Claim.

    6.    <u>Surrender of Canceled Instruments or Securities</u>

On the Effective Date, each Holder of a Certificate shall be deemed to have surrendered such Certificate to the Distribution Agent or a Servicer (to the extent the relevant Claim is governed by an agreement and administered by a Servicer). Such Certificate shall be canceled solely with respect to the Debtors, and such cancelation shall not alter the obligations or rights of any non-Debtor third parties vis-à-vis one another with respect to such Certificate. Notwithstanding the foregoing paragraph, this Article VI.D.6 shall not apply to any Claims and Interests that are Reinstated pursuant to the terms of the Plan.

E.    *Compliance with Tax Requirements/Allocations*

In connection with the Plan, to the extent applicable, the Distribution Agent shall request distributees to provide appropriate documentation that may be required for an exemption from withholding or reporting, and shall comply with all tax withholding and reporting requirements imposed on it by any Governmental Unit, and all distributions pursuant to the Plan shall be subject to such withholding and reporting requirements unless an exception applies. Notwithstanding any provision in the Plan to the contrary, the Distribution Agent shall take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, or withholding distributions pending receipt of information necessary to facilitate such distributions. The Reorganized Debtors and the Distribution Agent reserves the right to allocate all distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support, and other spousal awards, liens, and encumbrances. All Persons holding Claims shall be required to provide any information necessary to effect information reporting and the withholding of such taxes. Notwithstanding any other provision of the Plan to the contrary, each Holder of an Allowed Claim shall have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any Governmental Unit, including income, withholding, and other tax obligations, on account of such distribution.

F.   *Claims Paid or Payable by Third Parties*

1.   Claims Paid by Third Parties

A Claim shall be correspondingly reduced, and the applicable portion of such Claim shall be disallowed without an objection to such Claim having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the Holder of such Claim receives a payment on account of such Claim from a party that is not a Debtor or Reorganized Debtor; *provided* that the Debtors shall provide 21 calendar days' notice to the Holder prior to any disallowance of such Claim during which period the Holder may object to such disallowance, and if the parties cannot reach an agreed resolution, the matter shall be decided by the Bankruptcy Court. Subject to the last sentence of this paragraph, to the extent a Holder of a Claim receives a distribution on account of such Claim and receives payment from a party that is not a Debtor or a Reorganized Debtor on account of such Claim, such Holder shall, within 14 calendar days of receipt thereof, repay or return the distribution to the Reorganized Debtors to the extent the Holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such distribution under the Plan. The failure of such Holder to timely repay or return such distribution shall result in the Holder owing the Reorganized Debtors annualized interest at the Federal Judgment Rate on such amount owed for each Business Day after the 14-day grace period specified above until the amount is repaid.

2.   Claims Payable by Insurance Carriers

No distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' insurance policies until the Holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy. To the extent that one or more of the Debtors' insurers agrees to satisfy in full or in part a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such insurers' agreement, the applicable portion of such Claim may be expunged without a Claim objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court; *provided* that the Debtors shall provide 21 calendar days' notice to the Holder of such Claim prior to any disallowance of such Claim during which period the Holder may object to such disallowance, and if the parties cannot reach an agreed resolution, the matter shall be decided by the Bankruptcy Court.

3.   Applicability of Insurance Policies

Except as otherwise provided in the Plan, distributions to Holders of Allowed Claims shall be in accordance with the provisions of any applicable insurance policy. Notwithstanding anything to the contrary contained herein (including Article VIII of the Plan), nothing contained in the Plan shall constitute or be deemed a release, settlement, satisfaction, compromise, or waiver of any Cause of Action that the Debtors or any other Entity may hold against any other Entity, including insurers, under any policies of insurance or applicable indemnity, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

G.   *Setoffs*

Except as otherwise expressly provided for herein, each Reorganized Debtor, pursuant to the Bankruptcy Code (including section 553 of the Bankruptcy Code), applicable non-bankruptcy law, or as may be agreed to by the Holder of a Claim, may (but shall not be required to) set off against any Allowed Claim and the distributions to be made pursuant to the Plan on account of such Allowed Claim (before any distribution is made on account of such Allowed Claim), any claims, rights, and Causes of Action of any nature that such Debtor or Reorganized Debtor, as applicable, may hold against the Holder of such Allowed Claim, to the extent such claims, rights, or Causes of Action against such Holder have not been otherwise compromised or settled on or prior to the Effective Date (whether pursuant to the Plan or otherwise); *provided*, *however*, that neither the failure to effect such a setoff nor the allowance of any Claim pursuant to the Plan shall constitute a waiver or release by such Reorganized Debtor of any such claims, rights, and Causes of Action that such Reorganized Debtor may possess against such Holder. In no event shall any Holder of Claims be entitled to set off any such Claim against any claim, right, or Cause of Action of the Debtor or Reorganized Debtor (as applicable), unless such Holder has Filed a motion with the Bankruptcy Court requesting the authority to perform such setoff on or before the Confirmation Date, and notwithstanding any indication in any Proof

of Claim or otherwise that such Holder asserts, has, or intends to preserve any right of setoff pursuant to section 553 of the Bankruptcy Code or otherwise.

H.     *Indefeasible Distributions*

Any and all distributions made under the Plan shall be indefeasible and not subject to clawback.

I.     *Allocation Between Principal and Accrued Interest*

Distributions in respect of Allowed Claims shall be allocated first to the principal amount of such Claims (as determined for U.S. federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Allowed Claims, to any portion of such Claims for accrued but unpaid interest.

## ARTICLE VII.
## PROCEDURES FOR RESOLVING DISPUTED CLAIMS

A.     *Allowance of Claims*

After the Effective Date, each of the Reorganized Debtors shall have and retain any and all rights and defenses the applicable Debtor had with respect to any Claim immediately before the Effective Date. Except as expressly provided in the Plan or in any order entered in the Chapter 11 Cases before the Effective Date (including the Confirmation Order), no Claim shall become an Allowed Claim unless and until such Claim is deemed Allowed under the Plan or the Bankruptcy Code, or the Bankruptcy Court has entered a Final Order, including the Confirmation Order (when it becomes a Final Order), in the Chapter 11 Cases allowing such Claim.

B.     *Claims Administration Responsibilities*

Except as otherwise specifically provided in the Plan and notwithstanding any requirements that may be imposed pursuant to Bankruptcy Rule 9019, after the Effective Date, the Reorganized Debtors shall have the sole authority to: (1) File and prosecute objections to Claims; (2) settle, compromise, withdraw, litigate to judgment, or otherwise resolve objections to any and all Claims (with the reasonable consent of the Required RSA Parties), regardless of whether such Claims are in a Class or otherwise; (3) settle, compromise, or resolve any Disputed Claim (with the reasonable consent of the Required RSA Parties) without any further notice to or action, order, or approval by the Bankruptcy Court; and (4) administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court.  On and after the Effective Date, the Reorganized Debtors will use commercially reasonable efforts to advance the claims resolution process through estimation or otherwise.

C.     *Estimation of Claims*

Before, on, or after the Effective Date, the Debtors or the Reorganized Debtors, as applicable, may (but are not required to) at any time request that the Bankruptcy Court estimate any Claim pursuant to applicable law, including pursuant to section 502(c) of the Bankruptcy Code and/or Bankruptcy Rule 3012 for any reason, regardless of whether any party previously has objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction to estimate any such Claim, including during the litigation of any objection to any Claim or during the pendency of any appeal relating to such objection.  Notwithstanding any provision to the contrary in the Plan, a Claim that has been expunged from the Claims Register, but that either is subject to appeal or has not been the subject of a Final Order, shall be deemed to be estimated at zero dollars, unless otherwise ordered by the Bankruptcy Court.  In the event that the Bankruptcy Court estimates any Claim, such estimated amount shall constitute a maximum limitation on such Claim for all purposes under the Plan (including for purposes of distributions and discharge) and may be used as evidence in any supplemental proceedings, and the Debtors or Reorganized Debtors may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim.  Notwithstanding section 502(j) of the Bankruptcy Code, in no event shall any Holder of a Claim that has been estimated pursuant to section 502(c) of the Bankruptcy Code or otherwise be entitled to seek reconsideration of such estimation unless such Holder has Filed a motion requesting the right to seek such reconsideration on or before seven

(7) days after the date on which such Claim is estimated. Each of the foregoing Claims and objection, estimation, and resolution procedures are cumulative and not exclusive of one another. Claims may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.

D.  *Adjustment to Claims Without Objection*

Any Claim that has been paid or satisfied, or any Claim that has been amended or superseded, may be adjusted or expunged on the Claims Register by the Debtors or the Reorganized Debtors without an objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

E.  *Time to File Objections to Claims*

Any objections to Claims shall be Filed on or before the later of (1) 180 days after the Effective Date and (2) such other period of limitation as may be specifically fixed by the Bankruptcy Court upon a motion by the Debtors or the Reorganized Debtors.

F.  *Disallowance of Claims*

Any Claims held by Entities from which property is recoverable under sections 542, 543, 550, or 553 of the Bankruptcy Code or that is a transferee of a transfer avoidable under sections 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code, shall not be Allowed or deemed Allowed, and Holders of such Claims may not receive any distributions on account of such Claims until such time as such Causes of Action against that Entity have been settled or a Bankruptcy Court order with respect thereto has been entered and all sums due, if any, to the Debtors by that Entity have been turned over or paid to the Debtors or the Reorganized Debtors. All Proofs of Claim Filed on account of an Indemnification Obligation shall be deemed satisfied and expunged from the Claims Register as of the Effective Date to the extent such Indemnification Obligation is assumed (or honored or reaffirmed, as the case may be) pursuant to the Plan, without any further notice to or action, order, or approval of the Bankruptcy Court.

**Except as otherwise provided herein or as agreed to by the Debtors or the Reorganized Debtors, any and all Proofs of Claim Filed after the Claims Bar Date shall be deemed disallowed and expunged as of the Effective Date without any further notice to or action, order, or approval of the Bankruptcy Court, and Holders of such Claims may not receive any distributions on account of such Claims, unless such late Proof of Claim has been deemed timely Filed by a Final Order.**

G.  *Amendments to Claims*

On or after the Effective Date, a Claim may not be Filed or amended without the prior authorization of the Bankruptcy Court or the Reorganized Debtors, and any such new or amended Claim Filed shall be deemed disallowed in full and expunged without any further notice to or action, order, or approval of the Bankruptcy Court to the maximum extent provided by applicable law.

H.  *No Distributions Pending Allowance*

If an objection to a Claim or portion thereof is Filed, no payment or distribution provided under the Plan shall be made on account of such Claim or portion thereof unless and until such Disputed Claim becomes an Allowed Claim, unless otherwise determined by the Reorganized Debtors.

I.  *Distributions After Allowance*

To the extent that a Disputed Claim ultimately becomes an Allowed Claim, distributions shall be made to the Holder of such Allowed Claim in accordance with the provisions of the Plan. As soon as reasonably practicable after the date that the order or judgment of the Bankruptcy Court allowing any Disputed Claim becomes a Final Order, the Reorganized Debtors shall provide to the Holder of such Claim the distribution to which such Holder is entitled under the Plan as of the Effective Date, less any previous distribution (if any) that was made on account of the undisputed

portion of such Claim, without any interest, dividends, or accruals to be paid on account of such Claim unless required under applicable bankruptcy law or as otherwise provided herein.

J.      *Single Satisfaction of Claims*

Holders of Allowed Claims may assert such Claims against the Debtors obligated with respect to such Claims, and such Claims shall be entitled to share in the recovery provided for the applicable Class of Claims against the Debtors based upon the full Allowed amount of such Claims. Notwithstanding the foregoing, in no case shall the aggregate value of all property received or retained under the Plan on account of any Allowed Claim exceed 100 percent of the underlying Allowed Claim (including applicable interest, if any such interest is Allowed).

### ARTICLE VIII.
### DISCHARGE, RELEASE, INJUNCTION AND RELATED PROVISIONS

A.      ***Discharge of Claims and Termination of Interests***

**Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan or in any contract, instrument, or other agreement or document created pursuant to the Plan, the distributions, rights, and treatment that are provided in the Plan shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of Claims (including any Intercompany Claims resolved or compromised after the Effective Date by the Reorganized Debtors), Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and Interests in, the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any liability (including withdrawal liability) to the extent such Claims or Interests relate to services performed by employees of the Debtors before the Effective Date and that arise from a termination of employment, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not: (1) a Proof of Claim based upon such debt or right is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code; (2) a Claim or Interest based upon such debt, right, or Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (3) the Holder of such a Claim or Interest has accepted the Plan. Any default or "event of default" by the Debtors or Affiliates with respect to any Claim or Interest that existed immediately before or on account of the Filing of the Chapter 11 Cases shall be deemed cured (and no longer continuing) as of the Effective Date. The Confirmation Order shall be a judicial determination of the discharge of all Claims and Interests subject to the Effective Date occurring.**

B.      ***Releases by the Debtors***

**Pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, on and after the Effective Date, each Released Party is deemed fully, conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by the Debtors, the Reorganized Debtors, their Estates, and any person seeking to exercise the rights of the Estates, including any successors to the Debtors or any Estates representative appointed or selected pursuant to section 1123(b)(3) of the Bankruptcy Code from any and all Causes of Action, including any derivative claims asserted on behalf of the Debtors, that the Debtors, the Reorganized Debtors, or their Estates, including any successors to the Debtors or any Estates representative appointed or selected pursuant to section 1123(b)(3) of the Bankruptcy Code, would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or Interest, or that any Holder of any Claim or Interest could have asserted on behalf of the Debtors, based on or relating to, or in any manner arising from, in whole or in part:**

**1.      the Debtors, the business or contractual arrangement between the Debtors and any Released Party, any Securities issued by the Debtors and the ownership thereof, the Debtors' in- or out-of-court restructuring efforts, the 2019 Term Loan Facility, the Compensation and Benefit Programs, intercompany**

transactions, or the formulation, preparation, dissemination, negotiation, or Filing of the Restructuring Support Agreement, the Plan, the Disclosure Statement or the Rights Offering Procedures;

2. any Restructuring Transaction, contract, instrument, release, or other agreement or document (including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Restructuring Support Agreement, the Original RSA, the Original DIP Commitment Letter, the Initial Amended RSA, the Disclosure Statement, or the Plan, including the Rights Offering, the Backstop Commitment Agreement, the DIP Facility, the Exit Facility or the Amended and Restated 2019 Term Loan Facility;

3. the Chapter 11 Cases, the Disclosure Statement, the Plan, the Filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the solicitation of votes with respect to the Plan, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan or the Rights Offering, or the distribution of property under the Plan or any other related agreement with respect to the foregoing; or

4. any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date, including all avoidance actions or other relief obtained by the Debtors in the Chapter 11 Cases.

Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (i) any claims related to any act or omission that is determined in a Final Order to have constituted willful misconduct, gross negligence, or actual fraud, (ii) the rights of any party under any employment agreement or plan, (iii) any post-Effective Date obligations of any party or Entity under the Plan, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, (iv) the rights of Holders of Allowed Claims to receive distributions under the Plan or (v) any Cause of Action the Debtors may have against Columbia Helicopters, Inc.

Entry of the Confirmation Order will constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the foregoing release, which includes by reference each of the related provisions and definitions contained herein, and further, will constitute the Bankruptcy Court's finding that the foregoing release is: (i) in exchange for the good and valuable consideration provided by the Released Parties; (ii) a good faith settlement and compromise of the Claims released; (iii) in the best interest of the Debtors and their Estates; (iv) fair, equitable, and reasonable; and (v) given and made after due notice and opportunity for hearing.

C.      *Releases by Holders of Claims and Interests*

As of the Effective Date, except as otherwise provided herein, each Releasing Party is deemed to have fully, conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged each Debtor, Reorganized Debtor, and Released Party from any and all Causes of Action, including any derivative claims asserted on behalf of the Debtors, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part:

1. the Debtors, the business or contractual arrangement between the Debtors and any Releasing Party, any Securities issued by the Debtors and the ownership thereof, the Debtors' in- or out-of-court restructuring efforts, the 2019 Term Loan Facility, the Compensation and Benefit Programs, intercompany transactions, or the formulation, preparation, dissemination, negotiation, or Filing of the Restructuring Support Agreement, the Plan, the Disclosure Statement or the Rights Offering Procedures;

2. any Restructuring Transaction, contract, instrument, release, or other agreement or document (including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the

50

Restructuring Support Agreement, the Original RSA, the Original DIP Commitment Letter, the Initial Amended RSA, the Disclosure Statement, or the Plan, including the Rights Offering, the Backstop Commitment Agreement, the DIP Facility, the Exit Facility or the Amended and Restated 2019 Term Loan Facility;

      3.      the Chapter 11 Cases, the Disclosure Statement, the Plan, the Filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the solicitation of votes with respect to the Plan, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan or the Rights Offering, or the distribution of property under the Plan or any other related agreement with respect to the foregoing; or

      4.      any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date, including all avoidance actions or other relief obtained by the Debtors in the Chapter 11 Cases.

Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (i) any claims related to any act or omission that is determined in a Final Order to have constituted willful misconduct, gross negligence, or actual fraud, (ii) any post-Effective Date obligations of any party or Entity under the Plan, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, or (iii) the rights of Holders of Allowed Claims to receive distributions under the Plan.

Entry of the Confirmation Order will constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the foregoing release, which includes by reference each of the related provisions and definitions contained herein, and further, will constitute the Bankruptcy Court's finding that the foregoing release is: (i) in exchange for the good and valuable consideration provided by the Released Parties; (ii) a good faith settlement and compromise of the Claims released; (iii) in the best interest of the Debtors and their Estates; (iv) fair, equitable, and reasonable; and (v) given and made after due notice and opportunity for hearing.

D.    *Exculpation*

Except as otherwise specifically provided in the Plan, no Exculpated Party shall have or incur, and each Exculpated Party is hereby released and exculpated from any Cause of Action for any claim related to any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, Filing, or termination of the Restructuring Support Agreement and related prepetition transactions (including the 2019 Term Loan Facility Credit Agreement), the Original RSA, the Original DIP Commitment Letter, the Initial Amended RSA, the Disclosure Statement, the Plan, the Rights Offering, the Rights Offering Procedures, the Backstop Commitment Agreement, the DIP Facility, the Exit Facility, the Amended and Restated 2019 Term Loan Facility, or any Restructuring Transaction, contract, instrument, release or other agreement or document created or entered into in connection with the Disclosure Statement or the Plan, the Filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance of Securities pursuant to the Plan or the Rights Offering, or the distribution of property under the Plan or any other related agreement with respect to the foregoing, except for claims related to any act or omission that is determined in a Final Order to have constituted actual fraud, willful misconduct, or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan. The Exculpated Parties have, and upon completion of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of, and distribution of, consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

E.       *Injunction*

**Except as otherwise expressly provided in the Plan or for obligations or distributions issued or required to be paid pursuant to the Plan or the Confirmation Order, all Entities that have held, hold, or may hold Claims or Interests that have been released pursuant to the Plan, shall be discharged pursuant to the Plan, or are subject to exculpation pursuant to the Plan, are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Reorganized Debtors, or the Released Parties or the Exculpated Parties:  (i) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests; (ii) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such Claims or Interests; (iii) creating, perfecting, or enforcing any lien or encumbrance of any kind against such Entities or the property or the estates of such Entities on account of or in connection with or with respect to any such Claims or Interests; (iv) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such Claims or Interests unless such Entity has timely asserted such setoff right in a document Filed with the Bankruptcy Court explicitly preserving such setoff, and notwithstanding an indication of a claim or interest or otherwise that such Entity asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (v) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests released or settled pursuant to the Plan.**

F.       *Protection Against Discriminatory Treatment*

In accordance with section 525 of the Bankruptcy Code, and consistent with Article VI of the United States Constitution, no Governmental Unit shall discriminate against any Reorganized Debtor, or any Entity with which a Reorganized Debtor has been or is associated, solely because such Reorganized Debtor was a Debtor under chapter 11, may have been insolvent before the commencement of the Chapter 11 Cases (or during the Chapter 11 Cases but before such Debtor was granted or denied a discharge), or has not paid a debt that is dischargeable in the Chapter 11 Cases.

G.       *Release of Liens*

Except as otherwise specifically provided in the Plan, the Exit Facility Credit Agreement or the Amended and Restated 2019 Term Loan Credit Agreement, as applicable, the New PK Air Note, the New Macquarie Note or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released and discharged, and all of the right, title, and interest of any holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Reorganized Debtors and their successors and assigns, in each case, without any further approval or order of the Bankruptcy Court and without any action or Filing being required to be made by the Debtors or the Reorganized Debtors, or any other Holder of a Secured Claim.  In addition, at the sole expense of the Debtors or the Reorganized Debtors, the Holders of Secured Claims shall execute and deliver all documents reasonably requested by the Debtors, Reorganized Debtors or administrative agent for the Exit Facility to evidence the release of such mortgages, deeds of trust, Liens, pledges, and other security interests and shall authorize the Reorganized Debtors and their designees to file UCC-3 termination statements and other release documentation (to the extent applicable) with respect thereto.  Notwithstanding the foregoing paragraph, this Article VIII.G shall not apply to any Secured Claims that are Reinstated pursuant to the terms of this Plan.

H.      *Reimbursement or Contribution*

If the Bankruptcy Court disallows a Claim for reimbursement or contribution of an Entity pursuant to section 502(e)(1)(B) of the Bankruptcy Code, then to the extent that such Claim is contingent as of the Effective Date, such Claim shall be forever disallowed notwithstanding section 502(j) of the Bankruptcy Code, unless prior to the Effective Date (1) such Claim has been adjudicated as non-contingent, or (2) the relevant Holder of a Claim has Filed a non-contingent Proof of Claim on account of such Claim and a Final Order has been entered determining such Claim as no longer contingent.

I.      *Recoupment*

In no event shall any Holder of a Claim be entitled to recoup such Claim against any claim, right, or Cause of Action of the Debtors or the Reorganized Debtors, as applicable, unless such Holder actually has performed such recoupment and provided notice thereof in writing to the Debtors on or before the Confirmation Date, notwithstanding any indication in any Proof of Claim or otherwise that such Holder asserts, has, or intends to preserve any right of recoupment.

J.      *Subordination Rights*

Any distributions under the Plan to Holders of Allowed Claims shall be received and retained free from any obligations to hold or transfer the same to any other Holder and shall not be subject to levy, garnishment, attachment, or other legal process by any Holder by reason of claimed contractual subordination rights.  On the Effective Date, any such subordination rights shall be deemed waived, and the Confirmation Order shall constitute an injunction enjoining any Entity from enforcing or attempting to enforce any contractual, legal, or equitable subordination rights to property distributed under the Plan, in each case other than as provided in the Plan; *provided*, that any such subordination rights shall be preserved in the event the Confirmation Order is vacated, the Effective Date does not occur in accordance with the terms hereunder or the Plan is revoked or withdrawn.

K.      *Reservation of Rights of the United States*

As to the United States of America, its agencies, departments, or agents (collectively, the "United States"), nothing in the Plan, the Plan Supplement, or the Confirmation Order shall expand the scope of discharge, release, or injunction to which the Debtors or Reorganized Debtors are entitled under the Bankruptcy Code, if any.  The discharge, release, and injunction provisions contained in the Plan, the Plan Supplement, and the Confirmation Order are not intended and shall not be construed to bar the United States from, subsequent to the Confirmation Order, pursuing any actions, including but not limited to any police or regulatory action, against anyone.

Notwithstanding anything contained in the Plan, the Plan Supplement, or the Confirmation Order to the contrary, nothing in the Plan, the Plan Supplement, or the Confirmation Order shall discharge, release, impair, or otherwise preclude: (a) any liability to the United States that is a "claim" within the meaning of section 101(5) of the Bankruptcy Code, irrespective of whether the claim arose on, after, or before the Confirmation Date; (b) any liability to the United States that is not a "claim" within the meaning of section 101(5) of the Bankruptcy Code; (c) any valid right of setoff or recoupment of the United States against any of the Debtors or Reorganized Debtors; or (d) any liability of the Debtors or Reorganized Debtors under police or regulatory statutes or regulations to any Governmental Unit (as defined by section 101(27) of the Bankruptcy Code) as the owner, lessor, lessee, or operator of property that such entity owns, operates, or leases on, before, and/or after the Confirmation Date. Nor shall anything in the Confirmation Order, the Plan, or the Plan Supplement: (a) enjoin or otherwise bar the United States and/or any Governmental Unit from asserting or enforcing, outside the Bankruptcy Court, any liability described in this paragraph, (b) divest any court, commission, or tribunal of jurisdiction from resolving any matters relating to the liabilities and/or claims set forth in this paragraph, or (c) confer in the Bankruptcy Court jurisdiction over any matter as to which it would not have jurisdiction under the Bankruptcy Code.

Moreover, nothing in the Confirmation Order, the Plan, or the Plan Supplement shall release or exculpate any non-Debtor, including any Released Parties and/or Exculpated Parties, from any liability to the United States, including but not limited to any liabilities arising under the Internal Revenue Code, the environmental laws, or the

criminal laws against the Released Parties and/or Exculpated Parties, nor shall anything in the Confirmation Order, the Plan, or the Plan Supplement enjoin the United States from bringing any claim, suit, action, or other proceeding against the Released Parties and/or Exculpated Parties for any liability whatsoever.

Nothing contained in the Plan, the Plan Supplement, or the Confirmation Order shall be deemed to determine the tax liability of any person or entity, including but not limited to the Debtors and the Reorganized Debtors, nor shall the Plan, the Plan Supplement, or the Confirmation Order be deemed to have determined the federal tax treatment of any item, distribution, or entity, including the federal tax consequences of the Plan, nor shall anything in the Plan, the Plan Supplement, or the Confirmation Order be deemed to have conferred jurisdiction upon the Bankruptcy Court to make determinations as to federal tax liability and federal tax treatment except as provided under 11 U.S.C. § 505.

## ARTICLE IX.
## EFFECT OF CONFIRMATION OF THE PLAN

Upon entry of the Confirmation Order, the Bankruptcy Court shall be deemed to have made and issued on the Confirmation Date, pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014, the following findings of fact and conclusions of law as though made after due deliberation and upon the record at the Confirmation Hearing.  Upon entry of the Confirmation Order, any and all findings of fact in the Plan shall constitute findings of fact even if they are stated as conclusions of law, and any and all conclusions of law in the Plan shall constitute conclusions of law even if they are stated as findings of fact.

A. *Jurisdiction and Venue*

On the Petition Date, the Debtors commenced the Chapter 11 Cases by filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code.  The Debtors were and are qualified to be debtors under section 109 of the Bankruptcy Code.  Venue in the Southern District of Texas was proper as of the Petition Date and continues to be proper.  Confirmation of the Plan is a core proceeding under 28 U.S.C. § 157(b)(2).  The Bankruptcy Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1334 and the Bankruptcy Court has exclusive jurisdiction to determine whether the Plan complies with the applicable provisions of the Bankruptcy Code and should be confirmed.

B. *Order Approving the Disclosure Statement*

On [●], 2019, the Bankruptcy Court entered the Conditional Disclosure Statement Order which, among other things, (a) conditionally approved the Disclosure Statement as containing adequate information within the meaning of section 1125 of the Bankruptcy Code and Bankruptcy Rule 3017 and (b) conditionally approved certain procedures and documents for soliciting and tabulating votes with respect to the Plan.

C. *Voting Report*

Prior to the Confirmation Hearing, the Solicitation Agent filed the Voting Report.  All procedures used to distribute solicitation materials to the applicable Holders of Claims and Interests and to tabulate the ballots were fair and conducted in accordance with the Conditional Disclosure Statement Order, the Bankruptcy Code, the Bankruptcy Rules, and all other applicable rules, laws, and regulations.  Pursuant to sections 1124 and 1126 of the Bankruptcy Code, at least one Impaired Class entitled to vote on the Plan has voted to accept the Plan.

D. *Judicial Notice*

The Bankruptcy Court takes judicial notice of the docket of the Chapter 11 Cases maintained by the clerk of the Bankruptcy Court and/or its duly appointed agent, including all pleadings and other documents Filed, all orders entered, and all evidence and arguments made, proffered, or adduced at the hearings held before the Bankruptcy Court during the pendency of the Chapter 11 Cases (including the Confirmation Hearing).  Resolutions of any objections to Confirmation explained on the record at the Confirmation Hearing are hereby incorporated by reference.  All entries

on the docket of the Chapter 11 Cases shall constitute the record before the Bankruptcy Court for purposes of the Confirmation Hearing.

E.      *Transmittal and Mailing of Materials; Notice*

Due, adequate, and sufficient notice of the Disclosure Statement, the Plan, the Plan Supplement, the Confirmation Hearing, and the release and exculpation provisions set forth in Article VIII of the Plan, along with all deadlines for voting on or objecting to the Plan, has been given to (1) all known Holders of Claims and Interests; (2) parties that requested notice in accordance with Bankruptcy Rule 2002; (3) all parties to Unexpired Leases and Executory Contracts, and (4) all taxing authorities listed on the Schedules or in the Claims Register, in compliance with Bankruptcy Rules 2002(b), 3017, 3019, and 3020(b), the Conditional Disclosure Statement Order, and such transmittal and service were appropriate, adequate, and sufficient. Adequate and sufficient notice of the Confirmation Hearing and other dates, deadlines, and hearings described in the Conditional Disclosure Statement Order was given in compliance with the Bankruptcy Rules and such order, and no other or further notice is or shall be required.

F.      *Solicitation*

Votes for acceptance and rejection of the Plan were solicited in good faith and complied with sections 1125 and 1126 of the Bankruptcy Code, Bankruptcy Rules 3017, 3018, and 3019, the Conditional Disclosure Statement Order, all other applicable provisions of the Bankruptcy Code and all other applicable rules, laws, and regulations. The Debtors and their respective directors, managers, officers, employees, agents, affiliates, representatives, attorneys, and advisors, as applicable, have solicited votes on the Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code and the Conditional Disclosure Statement Order and are entitled to the protections afforded by section 1125(e) of the Bankruptcy Code and the exculpation provisions set forth in Article VIII of the Plan. The Debtors and the Released Parties solicited acceptance of the Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code and they participated in good faith, and in compliance with the applicable provisions of the Bankruptcy Code in the offer, issuance, sale, or purchase of New Stock and any debt securities that were offered or sold under the Plan and, pursuant to section 1125(e) of the Bankruptcy Code, and no Released Party is or shall be liable on account of such solicitation for violation of any applicable law, rule, or regulation governing solicitation of acceptance of a chapter 11 plan or the offer, issuance, sale, or purchase of such debt securities.

G.      *Burden of Proof*

The Debtors, as proponents of the Plan, have satisfied their burden of proving the elements of sections 1129(a) and 1129(b) of the Bankruptcy Code by a preponderance of the evidence, which is the applicable evidentiary standard. The Debtors have satisfied the elements of section 1129(a) and 1129(b) of the Bankruptcy Code by clear and convincing evidence.

H.      *Bankruptcy Rule 3016(a) Compliance*

The Plan is dated and identifies the proponents thereof, thereby satisfying Bankruptcy Rule 3016(a).

I.      *Compliance with the Requirements of Section 1129 of the Bankruptcy Code*

The plan complies with all requirements of section 1129 of the Bankruptcy Code as follows:

1.      Section 1129(a)(1)–Compliance of the Plan with Applicable Provisions of the Bankruptcy Code

The Plan complies with all applicable provisions of the Bankruptcy Code as required by section 1129(a)(1) of the Bankruptcy Code, including sections 1121, 1122, 1123, and 1125 of the Bankruptcy Code.

a.      Standing

Each of the Debtors has standing to file a plan and the Debtors, therefore, have satisfied section 1121 of the Bankruptcy Code.

b.      Proper Classification

Pursuant to sections 1122(a) and 1123(a)(1) of the Bankruptcy Code, Article III of the Plan designates Classes of Claims and Interests, other than Administrative Claims, Professional Fee Claims, DIP Facility Claims, and Priority Tax Claims, which are not required to be classified.  As required by section 1122(a) of the Bankruptcy Code, each Class of Claims and Interests contains only Claims or Interests that are substantially similar to the other Claims or Interests within that Class.

c.      Specification of Unimpaired Classes

Pursuant to section 1123(a)(2) of the Bankruptcy Code, Article III of the Plan specifies all Classes of Claims and Interests that are not Impaired.

d.      Specification of Treatment of Impaired Classes

Pursuant to section 1123(a)(3) of the Bankruptcy Code, Article III of the Plan specifies the treatment of all Classes of Claims and Interests that are Impaired.

e.      No Discrimination

Pursuant to section 1123(a)(4) of the Bankruptcy Code, Article III of the Plan provides the same treatment for each Claim or Interest within a particular Class, as the case may be, unless the Holder of a particular Claim or Interest has agreed to less favorable treatment with respect to such Claim or Interest, as applicable.

f.      Plan Implementation

Pursuant to section 1123(a)(5) of the Bankruptcy Code, the Plan provides adequate and proper means for the Plan's implementation.  Immediately upon the Effective Date, sufficient Cash and other consideration provided under the Plan will be available to make all payments required to be made on the Effective Date pursuant to the terms of the Plan.  Moreover, Article IV and various other provisions of the Plan specifically provide adequate means for the Plan's implementation.

g.      Voting Power of Equity Securities; Selection of Officer, Director, or Trustee under the Plan

The New Organizational Documents comply with sections 1123(a)(6) and 1123(a)(7) of the Bankruptcy Code.

h.      Impairment/Unimpairment of Classes of Claims and Equity Interests

Pursuant to section 1123(b)(1) of the Bankruptcy Code, (i) Class 1 (Other Secured Claims), Class 2 (Other Priority Claims), Class 5 (Lombard (BULL) Term Loan Claims), Class 9 (Lombard (BALL) Term Loan Guarantee Claims), Class 10 (MCA and Other Customer Guarantee Claims) and Class 11 (Trade Claims) are Unimpaired under the Plan, (ii) Class 3 (2019 Term Loan Facility Claims), Class 4 (Secured Notes Claims), Class 6 (PK Air Credit Facility Claims), Class 7 (Macquarie Term Loan Credit Facility Claims), Class 8 (Unsecured Notes Claims), Class 12 (General Unsecured Claims), Class 15 (Existing Interests), and Class 16 (Section 510(b) Claims) are Impaired under the Plan, and (iii) Class 13 (Intercompany Claims) and Class 14 (Intercompany Interests) are either Unimpaired or Impaired under the Plan at the election of the Required RSA Parties.

i.      Assumption and Rejection of Executory Contracts and Unexpired Leases

In accordance with section 1123(b)(2) of the Bankruptcy Code, pursuant to Article V of the Plan, on the Effective Date, each Executory Contract and Unexpired Lease shall be deemed assumed unless such Executory Contract or Unexpired Lease is listed on the Schedule of Rejected Executory Contracts and Unexpired Leases, if any.  The assumption of Executory Contracts and Unexpired Leases hereunder may include the assignment of certain of such contracts to Affiliates.  The Debtors' assumption and assignment of the Executory Contracts and Unexpired

56

Leases listed on the Schedule of Assumed Executory Contracts and Unexpired Leases pursuant to Article V of the Plan governing assumption and rejection of executory contracts and unexpired leases satisfies the requirements of section 365(b) of the Bankruptcy Code and, accordingly, the requirements of section 1123(b) of the Bankruptcy Code.

The Debtors have exercised reasonable business judgment in determining whether to reject, assume, or assume and assign each of their Executory Contracts and Unexpired Leases under the terms of the Plan.  Each pre- or post-Confirmation rejection, assumption, or assumption and assignment of an Executory Contract or Unexpired Lease pursuant to Article V of the Plan will be legal, valid and binding upon the applicable Debtor and all other parties to such Executory Contract or Unexpired Lease, as applicable, all to the same extent as if such rejection, assumption, or assumption and assignment had been effectuated pursuant to an appropriate order of the Court entered before the Confirmation Date under section 365 of the Bankruptcy Code. Each of the Executory Contracts and Unexpired Leases to be rejected, assumed, or assumed and assigned is deemed to be an executory contract or an unexpired lease, as applicable.

### j.      Settlement of Claims and Causes of Action

All of the settlements and compromises pursuant to and in connection with the Plan or incorporated by reference into the Plan comply with the requirements of section 1123(b)(3) of the Bankruptcy Code and Bankruptcy Rule 9019.

Pursuant to Bankruptcy Rule 9019 and section 363 of the Bankruptcy Code and in consideration for the distributions and other benefits provided under the Plan, any and all compromise and settlement provisions of the Plan constitute good-faith compromises, are in the best interests of the Debtors, the Estates, and all Holders of Claims and Interests, and are fair, equitable, and reasonable.

Specifically, the settlements and compromises pursuant to and in connection with the Plan are substantively fair based on the following factors: (a) the balance between the litigation's possibility of success and the settlement's future benefits; (b) the likelihood of complex and protracted litigation and risk and difficulty of collecting on the judgment; (c) the proportion of creditors and parties in interest that support the settlement; (d) the competency of counsel reviewing the settlement; the nature and breadth of releases to be obtained by officers and directors; and (f) the extent to which the settlement is the product of arm's-length bargaining.

### k.      Cure of Defaults

Article V of the Plan provides for the satisfaction of default claims associated with each Executory Contract and Unexpired Lease to be assumed in accordance with section 365(b)(1) of the Bankruptcy Code.  The Cure Costs identified in the Schedule of Assumed Executory Contracts and Unexpired Leases and any amendments thereto, as applicable, represent the amount, if any, that the Debtors propose to pay in full and complete satisfaction of such default claims.  Any disputed cure amounts will be determined in accordance with the procedures set forth in Article V of the Plan, and applicable bankruptcy and nonbankruptcy law.  As such, the Plan provides that the Debtors will cure, or provide adequate assurance that the Debtors will promptly cure, defaults with Executory Contracts and Unexpired Leases in compliance with section 365(b)(1) of the Bankruptcy Code.  Thus, the Plan complies with section 1123(d) of the Bankruptcy Code.

### l.      Other Appropriate Provisions

The Plan's other provisions are appropriate and consistent with the applicable provisions of the Bankruptcy Code, including provisions for (i) distributions to holders of Claims and Interests, (ii) objections to Claims, (iii) procedures for resolving disputed, contingent, and unliquidated claims, (iv) cure amounts, procedures governing cure disputes, and (vi) indemnification obligations.

2. Section 1129(a)(2)–Compliance of Plan Proponents with Applicable Provisions of the Bankruptcy Code

The Debtors, as proponents of the Plan, have complied with all applicable provisions of the Bankruptcy Code as required by section 1129(a)(2) of the Bankruptcy Code, including sections 1125 and 1126 of the Bankruptcy Code and Bankruptcy Rules 3017, 3018, and 3019. In particular, the Debtors are proper debtors under section 109 of the Bankruptcy Code and proper proponents of the Plan under section 1121(a) of the Bankruptcy Code. Furthermore, the solicitation of acceptances or rejections of the Plan was (i) pursuant to the Conditional Disclosure Statement Order; (ii) in compliance with all applicable laws, rules, and regulations governing the adequacy of disclosure in connection with such solicitation; and (iii) solicited after disclosure to Holders of Claims or Interests of adequate information as defined in section 1125(a) of the Bankruptcy Code. Accordingly, the Debtors and their respective directors, officers, employees, agents, affiliates, and Professionals have acted in "good faith" within the meaning of section 1125(e) of the Bankruptcy Code.

3. Section 1129(a)(3)–Proposal of Plan in Good Faith

The Debtors have proposed the Plan in good faith and not by any means forbidden by law based on the totality of the circumstances surrounding the filing of the Chapter 11 Cases, the Plan itself, and the process leading to its formulation. The Chapter 11 Cases were filed, and the Plan was proposed, with the legitimate purpose of allowing the Debtors to reorganize.

4. Section 1129(a)(4)–Bankruptcy Court Approval of Certain Payments as Reasonable

Pursuant to section 1129(a)(4) of the Bankruptcy Code, the payments to be made for services or for costs in connection with the Chapter 11 Cases or the Plan are approved. The fees and expenses incurred by Professionals retained by the Debtors or the Creditors' Committee shall be payable according to the orders approving such Professionals' retentions, the Interim Compensation Order, other applicable Bankruptcy Court orders, or as otherwise provided in the Plan.

5. Section 1129(a)(5)–Disclosure of Identity of Proposed Management, Compensation of Insiders, and Consistency of Management Proposals with the Interests of Creditors and Public Policy

Pursuant to section 1129(a)(5) of the Bankruptcy Code, information concerning the individuals proposed to serve on the Reorganized Bristow Parent Board and each such individual's compensation upon Consummation of the Plan has been fully disclosed (in the Plan Supplement) to the extent available, and the appointment to, or continuance in, such office of such person is consistent with the interests of Holders of Claims and Interests and with public policy.

6. Section 1129(a)(6)–Approval of Rate Changes

Section 1129(a)(6) of the Bankruptcy Code is not applicable because the Plan does not provide for rate changes by any of the Debtors.

7. Section 1129(a)(7)–Best Interests of Creditors and Interest Holders

The liquidation analysis included in the Disclosure Statement, and the other evidence related thereto that was proffered or adduced at or prior to, or in affidavits in connection with, the Confirmation Hearing, is reasonable. The methodology used and assumptions made in such liquidation analysis, as supplemented by the evidence proffered or adduced at or prior to, or in affidavits filed in connection with, the Confirmation Hearing, are reasonable. With respect to each Impaired Class, each Holder of an Allowed Claim or Interest in such Class has accepted the Plan or will receive under the Plan on account of such Claim or Interest property of a value, as of the Effective Date, that is not less than the amount such Holder would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code.

8.      Section 1129(a)(8)–Conclusive Presumption of Acceptance by Unimpaired Classes; Acceptance of the Plan by Each Impaired Class

Certain Classes of Claims and Interests are Unimpaired and are deemed conclusively to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. In addition, at least one Impaired Class that was entitled to vote has voted to accept the Plan. Because the Plan provides that the certain Classes of Claims and Interests will be Impaired and because no distributions shall be made to Holders in such Classes, such Holders are deemed conclusively to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code and, therefore, are not entitled to vote to accept or reject the Plan.

9.      Section 1129(a)(9)–Treatment of Claims Entitled to Priority Pursuant to Section 507(a) of the Bankruptcy Code

The treatment of Administrative Claims, Professional Fee Claims, DIP Facility Claims, Other Priority Claims, and Priority Tax Claims under Article II of the Plan satisfies the requirements of section 1129(a)(9) of the Bankruptcy Code.

10.      Section 1129(a)(10)–Acceptance by at Least One Impaired Class

At least one Impaired Class has voted to accept the Plan. Accordingly, section 1129(a)(10) of the Bankruptcy Code is satisfied.

11.      Section 1129(a)(11)–Feasibility of the Plan

The Plan satisfies section 1129(a)(11) of the Bankruptcy Code. Based upon the evidence proffered or adduced at, or prior to, or in affidavits filed in connection with, the Confirmation Hearing, the Plan is feasible and Confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtors or any successor to the Debtors under the Plan, except as such liquidation is proposed in the Plan. Furthermore, the Debtors will have adequate assets to satisfy their respective obligations under the Plan.

12.      Section 1129(a)(12)–Payment of Bankruptcy Fees

Article II.E of the Plan provides for the payment of all fees payable under 28 U.S.C. § 1930(a) in accordance with section 1129(a)(12) of the Bankruptcy Code.

13.      Section 1129(a)(13)–Retiree Benefits

The Plan provides for the treatment of all retiree benefits in accordance with section 1129(a)(13) of the Bankruptcy Code.

14.      Section 1129(a)(14)–Domestic Support Obligations

The Debtors are not required by a judicial or administrative order, or by statute, to pay any domestic support obligations, and therefore, section 1129(a)(14) of the Bankruptcy Code is inapplicable in these Chapter 11 Cases.

15.      Section 1129(a)(15)–The Debtors Are Not Individuals

The Debtors are not individuals, and therefore, section 1129(a)(15) of the Bankruptcy Code is inapplicable in these Chapter 11 Cases.

16.      Section 1129(a)(16)–No Applicable Nonbankruptcy Law Regarding Transfers

Each of the Debtors that is a corporation is a moneyed, business, or commercial corporation or trust, and therefore, section 1129(a)(16) of the Bankruptcy Code is inapplicable in these Chapter 11 Cases.

17.     Section 1129(b)–Confirmation of Plan Over Rejection of Impaired Classes

The Plan satisfies the requirements of section 1129(b) of the Bankruptcy Code with respect to the Classes presumed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code or that have actually rejected the Plan (if any).  To determine whether a plan is "fair and equitable" with respect to a class of claims, section 1129(b)(2)(B)(ii) of the Bankruptcy Code provides in pertinent part that "the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or interest any property."  To determine whether a plan is "fair and equitable" with respect to a class of interests,  section 1129(b)(2)(C)(ii) of the Bankruptcy Code provides that "the holder of any interest that is junior to the interests of such class will not receive or retain under the plan on account of such junior interest any property."  There are no classes junior to the deemed (or actual) rejecting classes of claims or interests that will receive any distribution under the Plan. The Plan, therefore, satisfies the requirements of section 1129(b) of the Bankruptcy Code.

18.     Section 1129(c)–Confirmation of Only One Plan With Respect to the Debtors

The Plan is the only plan that has been filed in these Chapter 11 Cases with respect to the Debtors. Accordingly, the Plan satisfies the requirements of section 1129(c) of the Bankruptcy Code.

19.     Section 1129(d)–Principal Purpose Not Avoidance of Taxes

The principal purpose of the Plan is not the avoidance of taxes or the avoidance of the application of section 5 of the Securities Act.  Accordingly, the Plan satisfies the requirements of section 1129(d) of the Bankruptcy Code.

20.     Section 1129(e)–Small Business Case

Section 1129(e) is inapplicable because these Chapter 11 Cases do not qualify as small business cases thereunder.

J.     *Securities Under the Plan*

Pursuant to the Plan, and without further corporate or other action, the New Stock and any debt issued or assumed by the Reorganized Debtors will be issued on the Effective Date subject to the terms of the Plan.

K.     *Releases and Discharges*

The releases and discharges of Claims and Causes of Action described in the Plan, including releases by the Debtors and by Holders of Claims, constitute good faith compromises and settlements of the matters covered thereby. Such compromises and settlements are made in exchange for consideration and are in the best interest of Holders of Claims, are fair, equitable, reasonable, and are integral elements of the resolution of the Chapter 11 Cases in accordance with the Plan. Each of the discharge, release, indemnification, and exculpation provisions set forth in the Plan: (a) is within the jurisdiction of the Court under 28 U.S.C. §§ 1334(a), 1334(b), and 1334(d); (b) is an essential means of implementing the Plan pursuant to section 1123(a)(6) of the Bankruptcy Code; (c) is an integral element of the transactions incorporated into the Plan; (d) confers material benefit on, and is in the best interests of, the Debtors, their estates, and their creditors; (e) is important to the overall objectives of the Plan to finally resolve all Claims among or against the parties in interest in the Chapter 11 Cases with respect to the Debtors; (f) is consistent with sections 105, 1123, 1129, and all other applicable provisions of the Bankruptcy Code; (g) given and made after due notice and opportunity for hearing; and (h), without limiting the foregoing, with respect to the releases and injunctions in Article VIII of the Plan, are (i) essential elements of the Restructuring Transactions and Plan, terms and conditions without which the Supporting Noteholders would not have entered into the Restructuring Support Agreement, (iii) narrowly tailored, and (iv) in consideration of the substantial financial contribution of the Supporting Noteholders, the Backstop Commitment Parties, and the other Rights Offering Participants under the Plan.  Furthermore, the injunction set forth in Article VIII is an essential component of the Plan, the fruit of long-term negotiations and achieved by the exchange of good and valuable consideration that will enable unsecured creditors to realize distributions in the Chapter 11 Cases.

L. *Release and Retention of Causes of Action*

It is in the best interests of Holders of Claims and Interests that the provisions in Article VIII of the Plan be approved.

M. *Approval of Restructuring Support Agreement, Backstop Commitment Agreement and Other Restructuring Documents and Agreements*

All documents and agreements necessary to implement the Plan, including the Restructuring Support Agreement, the Backstop Commitment Agreement and the other Restructuring Documents are essential elements of the Plan, are necessary to consummate the Plan and the Restructuring Transaction, and entry into and consummation of the transactions contemplated by each such document and agreement is in the best interests of the Debtors, the Estates, and Holders of Claims and Interests. The Debtors have exercised reasonable business judgment in determining which agreements to enter into and have provided sufficient and adequate notice of such documents and agreements. The terms and conditions of such documents and agreements have been negotiated in good faith, at arm's-length, are fair and reasonable, and are hereby reaffirmed and approved, and subject to the occurrence of the Effective Date and execution and delivery in accordance with their respective terms, shall be in full force and effect and valid, binding, and enforceable in accordance with their respective terms, without the need for any further notice to or action, order, or approval of the Bankruptcy Court, or other action under applicable law, regulation, or rule.

N. *Confirmation Hearing Exhibits*

All of the exhibits presented at the Confirmation Hearing have been properly received into evidence and are a part of the record before the Bankruptcy Court.

O. *Objections to Confirmation of the Plan*

Any and all objections to Confirmation have been withdrawn, settled, overruled, or otherwise resolved.

P. *Retention of Jurisdiction*

The Bankruptcy Court may properly retain jurisdiction over the matters set forth in Article XII of the Plan and section 1142 of the Bankruptcy Code.

Q. *Plan Supplement*

The Debtors filed the Plan Supplement, which includes the following documents: (a) the material New Organizational Documents; (b) the Exit Facility Credit Agreement and material related documents, if applicable; (c) the Amended and Restated 2019 Term Loan Credit Agreement and material related documents, if applicable, and the identity of the Amended and Restated 2019 Term Loan Facility Agent; (d) the schedule of Retained Causes of Action; (e) a disclosure of the members of the Reorganized Bristow Parent Board and their compensation; (f) the Schedule of Assumed Executory Contracts and Unexpired Leases; (g) the Schedule of Rejected Executory Contracts and Unexpired Leases; (h) the Restructuring Transactions Exhibit, if needed; (i) the form of the Management Incentive Plan; (j) the New Shareholders' Agreement; (k) the Schedule of Other Customer Contracts; (l) the New Preferred Stock Agreement; (m) the New Common Stock Agreement; (n) the terms of the New Macquarie Note; and (o) the terms of the New PK Air Note. All such documents comply with the terms of the Plan, and the filing and notice of such documents was adequate, proper and in accordance with the Conditional Disclosure Statement Order, the Bankruptcy Code, and the Bankruptcy Rules.

**ARTICLE X.**
**CONDITIONS PRECEDENT TO THE EFFECTIVE DATE**

A.      *Conditions Precedent to the Effective Date*

It shall be a condition to the Effective Date that the following conditions shall have been satisfied or waived pursuant to Article X.B of the Plan:

1.      The Bankruptcy Court shall have entered the Confirmation Order in form and substance consistent in all respects with the Restructuring Support Agreement and otherwise in form and substance acceptable to the Debtors and the Required RSA Parties, and the Confirmation Order shall be a Final Order;

2.      The DIP Order shall have been entered and no event of default shall have occurred and be continuing thereunder.

3.      Each of the Plan, the Restructuring Documents, and all documents contained in any supplement to the Plan, including the Plan Supplement and any exhibits, schedules, amendments, modifications or supplements thereto, shall have been executed and/or filed, in form and substance consistent in all respects with the Restructuring Support Agreement and otherwise comply with the applicable consent rights (if any) set forth in this Plan for such documents and shall not have been modified in a manner inconsistent with the Restructuring Support Agreement;

4.      Either (i) the Exit Facility Documents shall have been duly executed and delivered by all of the Entities that are parties thereto and all conditions precedent (other than any conditions related to the occurrence of the Effective Date) to the effectiveness of the Exit Facility shall have been satisfied or duly waived in writing or (ii) the Amended and Restated 2019 Term Loan Credit Agreement has been executed and is in full force and effect;

5.      The New PK Air Note and New Macquarie Note shall have been duly executed and delivered by all of the Entities that are parties thereto.

6.      The Backstop Commitment Agreement and the Restructuring Support Agreement shall have been approved by entry of an order by the Bankruptcy Court and shall remain in full force and effect, all conditions shall have been satisfied thereunder, and there shall be no breach that would give rise to a right to terminate the Backstop Commitment Agreement or the Restructuring Support Agreement for which notice has been given in accordance with the terms thereof (including by the requisite parties thereunder), or such notice could have been given to the extent such notice is not permitted due to the commencement of the Chapter 11 Cases and the related automatic stay;

7.      No court of competent jurisdiction or other competent governmental or regulatory authority shall have issued a final and non-appealable order making illegal or otherwise restricting, preventing or prohibiting, in any material respect, the consummation of the Plan, the Restructuring Support Agreement or any of the Restructuring Documents or Restructuring Transactions contemplated thereby;

8.      The Debtors shall have obtained all material authorizations, consents, regulatory approvals, rulings, or documents that are necessary to implement and effectuate the Restructuring Transactions;

9.      The Debtors shall have paid all Transaction Expenses then known or submitted to the Debtors;

10.     All Allowed Professional Fee Claims shall have been paid in full or amounts sufficient to pay such Allowed Professional Fee Claims after the Effective Date shall have been placed in the Professional Fee Escrow Account pending approval of the Professional Fee Claims by the Bankruptcy Court; and

11.     The Debtors shall have implemented the Restructuring Transactions in a manner consistent in all respects with the Restructuring Support Agreement (subject to the consent rights set forth therein).

B.      *Waiver of Conditions*

The conditions to the Effective Date of the Plan set forth in Article X of the Plan may only be waived with the consent of the Debtors and the Required RSA Parties (such consents not to be unreasonably withheld) without notice, leave, or order of the Bankruptcy Court or any formal action other than proceedings to confirm or consummate the Plan.

C.      *Effect of Non-Occurrence of Conditions to Consummation*

If the Effective Date does not occur on or before the termination of the Restructuring Support Agreement or the Backstop Commitment Agreement, the Plan shall be null and void in all respects and nothing contained in the Plan or the Disclosure Statement shall:  (1) constitute a waiver or release of any Claims, Interests, or Causes of Action by any Entity; (2) prejudice in any manner the rights of any Debtor or any other Entity; or (3) constitute an admission, acknowledgment, offer, or undertaking of any sort by any Debtor or any other Entity; *provided*, that all provisions of the Restructuring Support Agreement or the Backstop Commitment Agreement that survive termination thereof shall remain in effect in accordance with the terms thereof.

D.      *Substantial Consummation*

"Substantial consummation" of the Plan, as defined in section 1101(2) of the Bankruptcy Code, shall be deemed to occur on the Effective Date.

## ARTICLE XI.
## MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN

A.      *Modification of Plan*

Effective as of the date hereof and subject to the consent of the Required RSA Parties:  (1) the Debtors reserve the right, in accordance with the Bankruptcy Code and the Bankruptcy Rules, to amend or modify the Plan before the entry of the Confirmation Order consistent with the terms set forth herein, and, as appropriate, not resolicit votes on such modified Plan; and (2) after the entry of the Confirmation Order, the Debtors or the Reorganized Debtors, as applicable, may, upon order of the Bankruptcy Court, amend or modify the Plan, in accordance with section 1127(b) of the Bankruptcy Code and Bankruptcy Rule 3019, remedy any defect or omission, or reconcile any inconsistency in the Plan in such manner as may be necessary to carry out the purpose and intent of the Plan consistent with the terms set forth herein.

B.      *Effect of Confirmation on Modifications*

Entry of the Confirmation Order shall constitute approval of all modifications to the Plan occurring after the solicitation of votes thereon pursuant to section 1127(a) of the Bankruptcy Code and a finding that such modifications to the Plan do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

C.      *Revocation or Withdrawal of Plan*

Subject to the terms of the Restructuring Support Agreement, the Debtors reserve the right to revoke or withdraw the Plan with respect to any or all Debtors before the Confirmation Date and to File subsequent chapter 11 plans.  If the Debtors revoke or withdraw the Plan, or if Confirmation or the Effective Date does not occur, then:  (1) the Plan will be null and void in all respects; (2) any settlement or compromise embodied in the Plan, assumption or rejection of Executory Contracts or Unexpired Leases effectuated by the Plan, and any document or agreement executed pursuant hereto will be null and void in all respects; and (3) nothing contained in the Plan shall (a) constitute a waiver or release of any Claims, Interests, or Causes of Action by any Entity, (b) prejudice in any manner the rights of any Debtor or any other Entity, or (c) constitute an admission, acknowledgement, offer, or undertaking of any sort by any Debtor or any other Entity.

63

# ARTICLE XII.
## RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of, or related to, the Chapter 11 Cases and the Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code, including jurisdiction to:

1. allow, disallow, determine, liquidate, classify, estimate, or establish the priority, Secured or unsecured status, or amount of any Claim against a Debtor, including the resolution of any request for payment of any Claim and the resolution of any and all objections to the Secured or unsecured status, priority, amount, or allowance of Claims;

2. decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or the Plan;

3. resolve any matters related to Executory Contracts or Unexpired Leases, including: (a) the assumption or assumption and assignment of any Executory Contract or Unexpired Lease to which a Debtor is party or with respect to which a Debtor may be liable and to hear, determine, and, if necessary, liquidate, any Cure Costs or Claims arising therefrom, including pursuant to section 365 of the Bankruptcy Code; (b) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed; and (c) any dispute regarding whether a contract or lease is or was executory or expired;

4. ensure that distributions to Holders of Allowed Claims and Allowed Interests are accomplished pursuant to the provisions of the Plan and adjudicate any and all disputes arising from or relating to distributions under the Plan;

5. adjudicate, decide, or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters, and grant or deny any applications involving a Debtor that may be pending on the Effective Date;

6. enter and implement such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of (a) contracts, instruments, releases, indentures, and other agreements or documents approved by a Final Order in the Chapter 11 Cases, and (b) the Plan, the Confirmation Order, and contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan;

7. enforce any order for the sale of property pursuant to sections 363, 1123, or 1146(a) of the Bankruptcy Code;

8. grant any consensual request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code;

9. issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Entity with Consummation or enforcement of the Plan;

10. hear, determine, and resolve any cases, matters, controversies, suits, disputes, or Causes of Action in connection with or in any way related to the Chapter 11 Cases, including: (a) with respect to the repayment or return of distributions and the recovery of additional amounts owed by the Holder of a Claim for amounts not timely repaid pursuant to Article VI.F.1 of the Plan; (b) with respect to the releases, injunctions, and other provisions contained in Article VIII of the Plan, including entry of such orders as may be necessary or appropriate to implement such releases, injunctions, and other provisions; (c) that may arise in connection with the Consummation, interpretation, implementation, or enforcement of the Plan, the Confirmation Order, and contracts, instruments, releases, and other agreements or documents created in connection with the Plan; or (d) related to section 1141 of the Bankruptcy Code;

11.  enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

12.  consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

13.  hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

14.  enter an order or Final Decree concluding or closing the Chapter 11 Cases;

15.  enforce all orders previously entered by the Bankruptcy Court;

16.  hear and determine disputes involving any matter related to the implementation of the Plan, *provided*, *however*, that upon the closing of the Exit Facility (or, if applicable, the execution of the Amended and Restated 2019 Term Loan Credit Agreement) and execution of the New Organizational Documents, disputes with respect to the Exit Facility and the New Organizational Documents that are not related to the Plan shall otherwise be governed by the jurisdictional, forum selection or dispute resolution clause contained in such document; and

17.  hear any other matter not inconsistent with the Bankruptcy Code.

Notwithstanding the foregoing, the Bankruptcy Court retains jurisdiction, but not exclusive jurisdiction, to determine whether environmental liabilities asserted by any Governmental Unit are discharged or otherwise barred by the Confirmation Order or the Plan, or the Bankruptcy Code.  As of the Effective Date, notwithstanding anything in this Article XII to the contrary, the Exit Facility (or, if applicable, the execution of the Amended and Restated 2019 Term Loan Credit Agreement), the New PK Air Note, the New Macquarie Note, and the New Organizational Documents shall be governed by the jurisdictional provisions contained therein.

## ARTICLE XIII.
## MISCELLANEOUS PROVISIONS

A.  *Immediate Binding Effect*

Subject to Article X.A hereof, and notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan and the Plan Supplement shall be immediately effective and enforceable and deemed binding upon the Debtors, the Reorganized Debtors, and any and all Holders of Claims or Interests (irrespective of whether such Holders of Claims or Interests are deemed to have accepted the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, discharges, and injunctions described in the Plan, each Entity acquiring property under the Plan, and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtors.  All Claims and debts shall be as fixed, adjusted, or compromised, as applicable, pursuant to the Plan regardless of whether any Holder of a Claim or debt has voted on the Plan.

B.  *Restructuring Documents*

All Restructuring Documents, including the Final Cash Collateral Order, the Disclosure Statement, the other solicitation materials with respect to the Plan, the Conditional Disclosure Statement Order, the Plan, each document included in the Plan Supplement, the Backstop Commitment Agreement, the Confirmation Order, the DIP Facility Credit Agreement, the DIP Order, the Exit Facility Credit Agreement, the Amended and Restated 2019 Term Loan Credit Agreement, the New Organizational Documents, the Management Incentive Plan and the Rights Offering Procedures, shall be subject to the consent rights of the Required RSA Parties on the terms set forth in the Restructuring Support Agreement.

C. *Additional Documents*

On or before the Effective Date, and subject to the terms of the Restructuring Support Agreement and the Backstop Commitment Agreement, the Debtors may File with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan. The Debtors or the Reorganized Debtors, as applicable, and all Holders of Claims receiving distributions pursuant to the Plan and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

D. *Dissolution of the Statutory Committees*

On the Effective Date, the Creditors' Committee and any other statutory committee appointed in the Chapter 11 Cases shall dissolve automatically and the members thereof shall be released and discharged from all rights, duties, responsibilities, and liabilities arising from, or related to, the Chapter 11 Cases and under the Bankruptcy Code, except for the limited purpose of prosecuting requests for payment of Professional Fee Claims for services rendered and reimbursement of expenses incurred prior to the Effective Date by the Creditors' Committee and its Professionals. The Debtors shall no longer be responsible for paying any fees or expenses incurred by the members of or advisors to the Creditors' Committee or any other statutory committee after the Effective Date.  Upon the dissolution of the Creditors' Committee and any other statutory committee, the members of such committees and their respective professionals will cease to have any duty, obligation or role arising from or related to the Chapter 11 Cases and shall be released and discharged from all rights and duties from or related to the Chapter 11 Cases.

E. *Payment of Statutory Fees*

All fees payable pursuant to 28 U.S.C. § 1930(a) prior to the Effective Date shall be paid by the Debtors.  On and after the Effective Date, the Reorganized Debtors shall pay any and all such fees when due and payable, and shall File with the Bankruptcy Court quarterly reports in a form reasonably acceptable to the U.S. Trustee.  Each Debtor and Reorganized Debtor shall remain obligated to pay quarterly fees to the U.S. Trustee until the earliest of that particular Debtor's or Reorganized Debtor's case being closed, dismissed, or converted to a case under chapter 7 of the Bankruptcy Code.

F. *Payment of Transaction Expenses*

The Debtors and Reorganized Debtors, as applicable, will, on the Effective Date (or, to the extent not known or submitted to the Debtors for payment as of the Effective Date, promptly following receipt of an invoice therefor, whether incurred before or after the Effective Date) and to the extent invoiced in accordance with the terms of the applicable engagement letter (and, for the avoidance of doubt, no invoices shall be required to include itemized time detail), pay the Transaction Expenses (whether accrued prepetition or postpetition and to the extent not otherwise paid during the Chapter 11 Cases), without the need for application by any such parties to the Bankruptcy Court, and without notice and a hearing pursuant to section 1129(a)(4) of the Bankruptcy Code or otherwise.

G. *Reservation of Rights*

The Plan shall have no force or effect unless the Bankruptcy Court shall enter the Confirmation Order.  None of the Filing of the Plan, any statement or provision contained in the Plan, or the taking of any action by any Debtor with respect to the Plan, the Disclosure Statement, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of any Debtor with respect to the Holders of Claims or Interests prior to the Effective Date.

H. *Successors and Assigns*

The rights, benefits, and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, Affiliate, officer, director, agent, representative, attorney, beneficiaries, or guardian, if any, of each Entity.

I.      *Service of Documents*

After the Effective Date, any pleading, notice, or other document required by the Plan to be served on or delivered to the Reorganized Debtors shall be served on:

**Reorganized Debtors**

**Bristow Group Inc.**
2103 City West Blvd., 4th Floor
Houston, Texas 77042
Attn:     Victoria Lazar

with copies to:

**Counsel to Debtors**

**Baker Botts L.L.P.**
2001 Ross Avenue, Suite 900
Dallas, Texas 75201-2980
Attn:     James R. Prince
          Omar J. Alaniz
          Kevin Chiu

-and-

**Baker Botts L.L.P.**
30 Rockefeller Plaza
New York, New York 10112-4498
Attn:     Emanuel C. Grillo
          Chris Newcomb

-and-

**Wachtell, Lipton, Rosen & Katz**
51 West 52nd Street
New York, New York 10019
Attn:     Richard G. Mason
          Amy R. Wolf

**Counsel to the Secured Notes Ad Hoc Group**

**Davis Polk & Wardwell LLP**
450 Lexington Avenue
New York, New York 10017
Attn:     Damian S. Schaible
(damian.schaible@davispolk.com)
          Natasha Tsiouris
(natasha.tsiouris@davispolk.com)

**Counsel to the Unsecured Notes Ad Hoc Group**

**Kirkland & Ellis LLP**
601 Lexington Avenue
New York, New York 10022
Attn:    Joshua A. Sussberg
(joshua.sussberg@kirkland.com)
           Brian E. Schwartz
(brian.schwartz@kirkland.com)

-and-

Kirkland & Ellis LLP
300 North LaSalle
Chicago, Illinois 60654
Attn:    Gregory F. Pesce
(gregory.pesce@kirkland.com)

J.    *Term of Injunctions or Stays*

**Unless otherwise provided herein or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases (pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court) and existing on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order) shall remain in full force and effect until the Effective Date. All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.**

K.    *Entire Agreement*

Except as otherwise indicated, the Plan supersedes all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

L.    *Plan Supplement*

All exhibits and documents included in the Plan Supplement are incorporated into and are a part of the Plan as if set forth in full in the Plan. After any of such documents included in the Plan Supplement are Filed, copies of such documents shall be made available upon written request to the Debtors' counsel at the address above or by downloading such exhibits and documents from the Solicitation Agent's website at https://cases.primeclerk.com/Bristow or the Bankruptcy Court's website at https://www.pacer.gov/.

M.    *Non-Severability*

If, prior to Confirmation, the Bankruptcy Court holds any term or provision of the Plan to be invalid, void, or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is: (1) valid and enforceable pursuant to its terms; (2) integral to the Plan and may not be deleted or modified without the consent of the Debtors or the Required RSA Parties; and (3) non-severable and mutually dependent.

N.      *Votes Solicited in Good Faith*

Upon entry of the Confirmation Order, the Debtors will be deemed to have solicited votes on the Plan in good faith and in compliance with the Bankruptcy Code, and pursuant to section 1125(e) of the Bankruptcy Code, the Debtors and each of the Supporting Noteholders and each of their respective Affiliates, agents, representatives, members, principals, equity holders (regardless of whether such interests are held directly or indirectly), officers, directors, managers, employees, advisors, and attorneys will be deemed to have participated in good faith and in compliance with the Bankruptcy Code in the offer, issuance, sale, and purchase of Securities offered and sold under the Plan, and, therefore, neither any of such parties or individuals or the Reorganized Debtors will have any liability for the violation of any applicable law, rule, or regulation governing the solicitation of votes on the Plan or the offer, issuance, sale, or purchase of the Securities offered and sold under the Plan.

O.      *Waiver or Estoppel*

Each Holder of a Claim or an Interest shall be deemed to have waived any right to assert any argument, including the right to argue that its Claim or Interest should be Allowed in a certain amount, in a certain priority, Secured or not subordinated by virtue of an agreement made with the Debtors or their counsel, or any other Entity, if such agreement was not disclosed in the Plan, the Disclosure Statement, the Restructuring Support Agreement, or papers Filed with the Bankruptcy Court prior to the Confirmation Date.

[*remainder of page intentionally left blank*]

Dated:  August 1, 2019

BRISTOW GROUP INC.
on behalf of itself and all other Debtors

By: */s/ Brian J. Allman*
Name:  Brian J. Allman
Title:  Senior Vice President and Chief Financial Officer

# TAB 11-C

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| **BRISTOW GROUP INC.,** *et al.,* | § | **CASE NO. 19-32713 (DRJ)** |
| | § | **(CHAPTER 11)** |
| **DEBTORS.** | § | **(Jointly Administered)** |

### BRS INVESTOR GROUP OBJECTION TO DISCLOSURE STATEMENT
**[This instrument relates to ECF No. 499]**

TO THE HONORABLE DAVID R. JONES, CHIEF U.S. BANKRUPTCY JUDGE:

Meridian Investments I, LLC, Andrew Abernathey, Jay Abernathey, and Guy Abernathey

(collectively, the "***BRS Investor Group***") as Lead Plaintiff, and as holders of Existing Interests in

Bristow Group Inc. (the "***Debtors***"), file this Objection (the "***Objection***") to the August 1, 2019

Disclosure Statement for the Joint Chapter 11 Plan of Reorganization of Bristow Group, Inc. and

its Debtor Affiliates (the "***Disclosure Statement***").

### SUMMARY OF OBJECTION[1]

The Disclosure Statement fails to meet the requirements of § 1125(a) of title 11 of the U.S.

Code (the "***Bankruptcy Code***") because it: (i) omits any disclosure concerning the securities fraud

class action commenced by investors in Bristow common stock and led by the BRS Investor Group

against the Debtors and non-Debtor officers (current and former) of the Debtors for violations of

the securities laws (defined herein as the "***Securities Litigation***"); (ii) omits material information

concerning the preservation of the rights of the Securities Litigation Class to collect proceeds from

the Directors & Officers ("***D&O***") Liability Insurance Policies procured by the Debtors for the

benefit of themselves and their directors and officers should liability be established against any of

---

[1] Unless otherwise stated herein, all undefined capitalized terms used in this Objection shall have the meanings ascribed to them in the Disclosure Statement and Plan. Additionally, certain undefined capitalized terms appearing in the Summary of Objection are defined later in the Objection.

the defendants in the Securities Litigation;[2] (iii) fails to provide any disclosure or explanation of the valuation of the Debtors' business enterprise for purposes of the extinguishment of Existing Interests and Section 510(b) Claims; and (iv) fails to address the preservation of Potentially Relevant Books and Records pertaining to the Securities Litigation.

In addition, the Disclosure Statement should not be approved because it describes a plan that should not be confirmed with the third-party non-debtor releases barred by the Bankruptcy Code and Fifth Circuit law. The Plan[3] described in the Disclosure Statement is facially unconfirmable because it provides for broad releases of numerous categories of persons and entities who are non-Debtors, which would bind the holders of Existing Interests and Section 510(b) Claims, without making any distributions to such parties under the Plan.

The Fifth Circuit has "firmly pronounced its opposition to such releases" and held that "a non-consensual, non-debtor discharge would not be available in this circuit." *In re Vitro S.A.B. de CV*, 701 F.3d 1031, 1060 (5th Cir. 2012). And the Fifth Circuit has further explained that its opinions "seem broadly to foreclose non-consensual non-debtor releases and permanent injunctions," holding that "[t]he fresh start § 524(e) provides to debtors is not intended to serve this purpose." *In re Pac. Lumber Co.*, 584 F.3d 229, 252–53 (5th Cir. 2009).

The Plan releases are directly contrary to that binding, Fifth Circuit precedent. Indeed, the Releases are particularly offensive to the BRS Investor Group as Lead Plaintiff for the Securities Litigation Class in light of their claims against non-Debtor officers and directors in the Securities Litigation. To make matters worse, while the Plan's discharge provisions would bar enforcement

---

[2] The Debtors appear to have ten (10) primary and excess D&O Liability Insurance Policies, totaling $100 million of coverage, with policy periods that include the filing of the Securities Litigation. *See, e.g.*, ECF No. 14-1 (schedule of Debtors' D&O Liability Insurance Policies). Counsel for the BRS Investor Group requested that Defendants in the Securities Litigation produce copies of these policies to assess the impact of this bankruptcy proceeding on the coverage. To date, Defendants have declined to produce the policies.

[3] Joint Chapter 11 Plan of Reorganization of Bristow Group Inc. and its Debtor Affiliates (ECF No. 498) (the "***Plan***").

of claims against the Debtors in the Securities Litigation, the Plan Releases by Holders of Claims and Equity Interests (the "**Releases**") and Injunction appear to bar the Debtors from being named as nominal parties for the limited purpose of establishing liability in the Securities Litigation, thus enabling the Securities Litigation Class to recover proceeds of the D&O Liability Insurance Policies.

As currently drafted, the Releases under the Plan may well provide the insurers under the D&O Liability Insurance Policies with an unintended, and undeserved, defense to coverage for the very types of claims that have been asserted in the Securities Litigation. Fifth Circuit law directly prohibits such a result.

To try to evade that binding Fifth Circuit precedent, the Debtors attempt to smuggle in their broad releases under the veneer of "consent" through a construct in the Plan providing that the Releases would be effective unless the "Releasing Parties" take affirmative steps to opt out of providing the Releases. That attempt fails as a matter of law for three independent reasons. First, bankruptcy courts generally apply state contract law principles in determining whether a plan's procedures are sufficient to establish consent to third-party releases. Texas law is clear that "silence and inaction will not be construed as an assent to an offer," precluding as a matter of law the Debtors' attempt to use a failure to opt out to establish consent to the Releases. *Texas Ass'n Gov't Risk Mgmt. Pool v. Matagorda County*, 52 S.W.3d 128, 132 (Tex. 2000) (quoting 2 *Williston on Contracts* § 6:49 (4th ed. 1991)).

Second, as to holders of Existing Interests and Section 510(b) Claims, the Debtors attempt to establish "consent" to the Releases fails as a matter of law because the Releases are not supported by consideration. Under the Plan, holders of Existing Interests and Section 510(b) Claims receive no distribution, have their claims discharged, and receive no interest in the Reorganized Debtors.

**OBJECTION TO DISCLOSURE STATEMENT**                                    **PAGE 3 OF 22**

Finally, the Debtors' attempt to establish "consent" to the releases fails for the independent reason that holders of Existing Interests and Section 510(b) Claims are deemed to have rejected the Plan, because their interests and claims will be extinguished, and they are entitled to no distribution. The Debtors' attempt to establish "consent" through Existing Interests and Section 510(b) Claims holders' failure to respond in an election in which they are not even entitled to vote is nowhere close to sufficient to establish "consent" to releases that the Fifth Circuit has repeatedly held the Debtors have no legal authority to force on the holders of Existing Interests and Section 510(b) Claims.

In sum, the Releases contained in the Plan are fatally flawed and the Court should deny approval of the Disclosure Statement absent further disclosure and structural changes to the Releases to preserve the rights of opt-out parties (individually or collectively) to proceed against non-Debtor defendants, including officers and directors of the Debtors, and collect non-bankruptcy estate proceeds under the D&O Liability Insurance Policies of the Debtors should liability be established.

As set forth in further detail below, in order to correct the manifest defects of the Plan, the BRS Investor Group has proposed language for the Debtors to incorporate into the Plan, Disclosure Statement, and confirmation order as a means to address these Objections.

## BACKGROUND

1.      The BRS Investor Group has been appointed to serve as Lead Plaintiff in a suit that is brought as a proposed class action on behalf of all purchasers of Bristow securities during the period between February 8, 2018 and February 12, 2019, inclusive ("***Securities Litigation Class***"),[4] pursuant to 15 U.S.C. §78u-4(a)(3)(B) in the securities class action case styled: *In re*

---

[4] Any reference in this Objection to the Class Period or the Complaint or any allegations therein is for informational purposes only, is qualified in its entirety by the actual allegations in the Complaint (as may be amended from time to time), and is made without prejudice to any rights, claims, arguments, and counterarguments of Lead Plaintiff and/or

OBJECTION TO DISCLOSURE STATEMENT                                                        PAGE 4 OF 22

*Bristow Group Inc. Securities Litigation*, Case No. 19-cv-00509 (KPE), in the United States District Court for the Southern District of Texas, Houston Division ("***Securities Litigation***"). The Securities Litigation is subject to the Private Securities Litigation Reform Act of 1995 ("***PSLRA***").

2. The claims of the Lead Plaintiff and the Securities Litigation Class members arise from the purchase or acquisition of securities of Bristow Group Inc. between February 8, 2018 and February 12, 2019 (the "***Class Period***") as set forth in the Class Action Complaint for Violations of the Federal Securities Laws (Jury Trial Demanded) (the "***Complaint***") filed on February 14, 2019. Defendants named in the Complaint include Bristow Group Inc., Jonathan E. Baliff (Debtors' former chief executive officer), and L. Don Miller (Debtors' current chief executive officer and former chief financial officer).

3. On May 17, 2019, District Judge Keith Ellison entered an Order for Consolidation of Actions, Appointment of Lead Plaintiff, and Approval of Selection of Lead Counsel, appointing BRS Investor Group as Lead Plaintiff and approving Kirby McInerney LLP and Susman Godfrey L.L.P. as Lead Counsel.

4. On July 22, 2019, the parties to the Securities Litigation filed a proposed scheduling stipulation with the District Court requesting the entry of an order setting forth deadlines to file an amended complaint and motion to dismiss briefing.

5. On July 29, 2019, the BRS Investor Group, as Lead Plaintiff in the Securities Litigation filed a conditional proof of claim (Claim Registry No. 15), for itself and the Securities Litigation Class members pursuant to Rule 7023 of Fed. R. Bank. P., in an unliquidated amount,

---

the Proposed Class in the Securities Litigation, including but not limited to the rights to amend the Complaint from time to time and to modify the definitions of the Proposed Class and/or the Class Period.

OBJECTION TO DISCLOSURE STATEMENT                                                                PAGE 5 OF 22

subject to certification of a class as provided under the PSLRA, or, if warranted following relief from the PSLRA automatic stay, through a class certification process in the Bankruptcy Court.[5]

## OBJECTION

### I.     The Disclosure Statement does not contain "Adequate Information"

6.      The Disclosure Statement should not be approved because it fails to provide adequate information.   Section 1125(b) of the Bankruptcy Code requires that a disclosure statement contain adequate information.  "Adequate Information" is defined as "information of a kind, and in sufficient detail . . . [so as to enable] a hypothetical investor of the relevant class to make an informed judgment about the plan."  11 U.S.C. § 1125(a); *In re Metrocraft Publ'g Servs., Inc.*, 39 B.R. 567, 567-69 (Bankr. N.D. Ga. 1984) (listing numerous factors courts may consider in determining whether a disclosure statement provides adequate information).

7.      The purpose of a disclosure statement for a chapter 11 plan "is to provide 'adequate information' to creditors to enable them to decide whether to accept or reject the proposed plan." *In re Feretti*, 128 B.R. 16, 18 (Bankr. D.N.H. 1991) (citations omitted).  Although courts assess adequacy on a case-by-case basis, a disclosure statement must contain "simple and clear language delineating the consequences of the proposed plan on [creditors'] claims and the possible . . . alternatives so that [creditors] can intelligently accept or reject the Plan."  *In re Copy Crafters Quickprint*, Inc., 92 B.R. 973, 981 (Bankr. N.D.N.Y. 1988); *see also In re Texas Extrusion Corp.*, 844 F.2d 1142,  1157 (5th Cir. 1988).  In essence, a disclosure statement "must clearly and

---

[5] Given that Class 16 of the Plan does not provide for any distribution to the holders of Section 510(b) Claims, such as the claims of the BRS Investor Group and the Securities Litigation Class members, the BRS Investor Group does not believe certification of the Securities Litigation Class in the Chapter 11 Cases for allowance and distribution purposes (the standard reason for certification pursuant to Bankruptcy Rule 7023) is necessary.  However, the BRS Investor Group, for itself and the Securities Litigation Class members, reserves the right to move, on an expedited basis if necessary, for certification of the Securities Litigation Class for the limited purpose of enabling the BRS Investor Group, for itself and the Securities Litigation Class members, to opt out of the Releases in the event the Court determines that separate certification of the Securities Litigation Class as a Certified Class is necessary for that purpose.

succinctly inform the average . . . creditor what it is going to get, when it is going to get it, and what contingencies there are to getting its distribution." *Ferretti*, 128 B.R. at 19. In its current form, the Disclosure Statement does not contain adequate information for Proposed Lead Plaintiffs to evaluate the Plan, and thus the Disclosure Statement should not be approved.

8.      Courts also will not approve disclosure statements that describe plans that are "so fatally flawed that confirmation is impossible." *In re U.S. Brass Corp.*, 194 B.R. 420, 422 (Bankr. E.D. Tex. 1996). Because, as discussed more fully below, the Plan cannot be confirmed in its current form, it would be counterproductive to conditionally approve the Disclosure Statement and authorize the Debtors to expend estate resources soliciting votes on an unconfirmable Plan.

**A.      The Disclosure Statement omits any information concerning the Securities Litigation or the preservation of recoveries under D&O Liability Policies**

9.      The Disclosure Statement reflects a Plan treatment that will extinguish Existing Interests (Class 15) and Section 510(b) Claims (Class 16). While the Disclosure Statement makes bold pronouncements relating to the restructuring arrangement struck with the commercial lenders, Article VII, N (page 45) of the Disclosure Statement provides sparse reference to pending litigation, with no discussion of the Securities Litigation. While the Debtors have struck a grand bargain to emerge from bankruptcy under a plan that makes no distribution to holders of Existing Interests and Section 510(b) Claims, such actions do not excuse the Debtors from disclosing "adequate information."

10.      Adequate information under the circumstances of these cases necessarily requires a discussion of the claims and causes of action asserted against the Debtors and their current and former officers and directors in the Securities Litigation. Adequate information further requires the Debtors to provide the justification for non-debtor officers and directors to receive a release

when there will be no consideration paid to the holders of Existing Interests and Section 510(b) Claims.

11. The Disclosure Statement also omits material information concerning the preservation of the rights of opt-outs or non-"Releasing Parties" (individually or collectively in the case of the Securities Litigation Class members) to collect proceeds from the D&O Liability Insurance Policies of the Debtors should liability be established. While the Disclosure Statement makes reference to the assumption of its D&O Liability Insurance Policies (page 25), the disclosure is wholly insufficient concerning the ability of any opt-out party that may prevail from being able to recover proceeds from the D&O Liability Insurance Policies, which are not property of the Chapter 11 bankruptcy estates.[6]

12. Article VIII, C of the Plan, "Releases by Holders of Claims and Interests" states:

As of the Effective Date, except as otherwise provided herein, ***each Releasing Party is deemed to have fully, conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged each Debtor***, Reorganized Debtor, and Released Party from any and all Causes of Action, including any derivative claims asserted on behalf of the Debtors, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part:

1. ***the Debtors, the business or contractual arrangement between the Debtors and any Releasing Party, any Securities issued by the Debtors and the ownership thereof***, . . .

(emphasis added).

13. To the extent that language could be construed as providing the Debtors with releases separate from and in addition to the discharge that will be received upon confirmation of the Plan, the Disclosure Statement should not be approved because it is legally deficient. The

---

[6] *Houston v. Edgeworth (In re Edgeworth)*, 993 F.2d 51, 55-56 (5th Cir. 1993) (holding that proceeds of liability insurance policies typically do not become property of the bankruptcy estate; *Homsy v. Floyd (In re Vitek, Inc.)*, 51 F.3d 530, 534-35 (5th Cir. 1995).

**OBJECTION TO DISCLOSURE STATEMENT**

additional "releases" of the Debtors may have the unintended effect of jeopardizing the ability of the Lead Plaintiff and the Securities Litigation Class members to establish liability against both the Debtors as purely nominal parties and against non-Debtor officer and director defendants for purposes of collecting under the D&O Liability Insurance Policies, including under "Side C" entity coverage provisions.[7]

14.     The Fifth Circuit has forcefully denounced such a result as "fundamentally wrong," holding "[t]he 'fresh-start' policy is not intended to provide a method by which an insurer can escape its obligations based simply on the financial misfortunes of the insured." *In re Coho Res. Inc.*, 345 F.3d 338, 343 (5th Cir. 2003) (quoting *In re Edgeworth*, 993 F.2d 51, 54 (5th Cir. 1993; then *In re Jet Fla. Sys.*, 883 F.2d 970, 975 (11th Cir. 1989)).

15.     Further, the Disclosure Statement does not explain whether these or any other insurance policies cover the claims asserted in the Securities Litigation, and if so, how the Plan would permit Lead Plaintiffs or the Securities Litigation Class to access coverage under such policies for the Class Claims to the extent of available insurance coverage, which would have no impact on the Debtors' estates.  This omission is particularly glaring in light of Article VI.F.2 (page 46) of the Plan, which provides that no distributions will be made on account of allowed claims covered by the Debtors' D&O Liability Insurance Policies until the holders thereof exhaust all remedies with respect to such insurance policies.  However, the Disclosure Statement does not explain how Lead Plaintiff and the Securities Litigation Class can comply with that mandate.  The Disclosure Statement must provide such information.

---

[7] *See* Jason S. Brookner & Lydia R. Webb, *Ain't No Easy Answers: D&O Insurance Proceeds in Bankruptcy*, 26 Norton Journal of Bankruptcy Law & Practice 4 (2017) (describing Side A, Side B, and Side C coverage under typical D&O liability insurance policies).

OBJECTION TO DISCLOSURE STATEMENT                                              PAGE 9 OF 22

16.     To correct these defects, the Plan must expressly exclude the BRS Investor Group and the Securities Litigation Class, and their claims against the non-debtor defendants in the Securities Litigation, from the Releases and Injunction.  Absent such revisions, the Disclosure Statement should not be approved.  To that end, the BRS Investor Group suggests that the following language should be included in the Plan, Disclosure Statement, and confirmation order to clarify that the BRS Investor Group and Securities Litigation Class members are not deemed to be "Releasing Parties" as follows:

> Neither the BRS Investor Group nor the Securities Litigation Class (both individually or collectively) in the securities class action styled:  *In re Bristow Group Inc. Securities Litigation*, Case No. 19-cv-00509 (KPE), in the United States District Court for the Southern District of Texas, Houston Division, shall be "Releasing Parties" under the Plan.

In addition, for the avoidance of any doubt, the definition of "Released Parties" should clarify that the non-Debtor defendants in the Securities Litigation, in their capacity as such, are not "Released Parties," as follows:

> None of the non-Debtor defendants in the securities class action styled:  *In re Bristow Group Inc. Securities Litigation*, Case No. 19-cv-00509 (KPE), in the United States District Court for the Southern District of Texas, Houston Division, shall constitute "Released Parties" under the Plan.

In addition, Article VIII C of the Plan should expressly include the following:

> Notwithstanding anything to the contrary in this Plan or the Confirmation Order, nothing herein or therein does, shall, or may be construed to release, enjoin or otherwise adversely impact the claims and causes of action asserted against any non-Debtor defendants in the securities class action styled:  *In re Bristow Group Inc. Securities Litigation*, Case No. 19-cv-00509 (KPE), in the United States District Court for the Southern District of Texas, Houston Division.

Finally, for the avoidance of any doubt concerning the releases of the Debtors, Article VIII C of the Plan should expressly indicate the following:

> Notwithstanding anything to the contrary in this Plan or the Confirmation Order, nothing herein or therein does, shall, or may be construed to release, the Debtors or bar the assertion of claims against them as nominal defendants in the securities class

action styled: *In re Bristow Group Inc. Securities Litigation*, Case No. 19-cv-00509 (KPE), in the United States District Court for the Southern District of Texas, Houston Division, for purposes of preserving and enforcing rights to coverage under and recovery of the proceeds of the D&O Liability Insurance Policies.[8]

**B.** **The Disclosure Statement does not explain how Lead Plaintiffs and the Securities Litigation Class will be able to pursue the Class Claims against the Debtor Defendant to the extent of available insurance coverage**

17. As discussed above, the Disclosure Statement does not disclose whether the claims of Lead Plaintiff and the Proposed Class against Bristow will be preserved to the extent of available insurance coverage. This treatment implies that Lead Plaintiffs and the Securities Litigation Class will not be able to continue to litigate the Class Claims against the Debtor Defendant through the Securities Litigation. As such, the Plan Injunction appears to bar Lead Plaintiffs and the Proposed Class from doing so, and neither the Plan nor the Disclosure Statement describes any mechanism for Lead Plaintiffs and the Securities Litigation Class to pursue their Class Claims against the Debtor Defendant to access available insurance and liquidate their claims for purposes of pro rata distributions of insurance proceeds. The following language should be added to the end of paragraph E, Article V (page 41) of the Plan:

> Nothing in this Plan or Confirmation Order shall (a) constitute a finding or stipulation that any proceeds of any of the D&O Liability Insurance Policies are property of the Estate; (b) modify or supersede any provision (including but not limited to any priority of payments provision) of any of the D&O Liability Insurance Policies, or (c) otherwise preclude the Lead Plaintiff and the Securities Litigation Class in the Securities Litigation, or any party entitled to coverage under the D&O Liability Insurance Policies, from seeking and obtaining coverage thereunder.

---

[8] *See Edgeworth*, 993 F.2d at 56 (holding that §524 did not bar plaintiffs from pursuing lawsuit after discharge "so that they can recover against policy proceeds"); *Coho Res.*, 345 F.3d at 343 ("courts are in 'near unanimous agreement' that §524(e) 'permits a creditor to bring, and proceed in, an action nominally directed against a discharged debtor for the sole purpose of proving liability on its part as a prerequisite to recovering from its insurer.'").

**C.     The Disclosure Statement omits any discussion of the enterprise value of the Debtors**

18.     As set forth in greater detail in the Objection of the Ad Hoc Committee of Equity Security Holders to the Disclosure Statement, the Disclosure Statement fails to provide any disclosure or explanation of the valuation of the Debtors' business enterprise for purposes of the extinguishment of Existing Interests and Section 510(b) Claims.  The BRS Investor Group adopts the Objections urged by the Ad Hoc Equity Committee to the adequacy of the Disclosure Statement.

**D.     The Disclosure Statement does not disclose whether or how the Debtors intend to preserve evidence potentially relevant to the Securities Litigation after the Effective Date of the Plan**

19.     Fact discovery in the Securities Litigation has not commenced and has been temporarily stayed under the PSLRA.  As the issuer of securities that are the subject of the Securities Litigation and given their involvement in the facts and circumstances alleged therein, the Debtors undoubtedly have books, records, electronically stored information, and other evidence potentially relevant to the Securities Litigation in their possession, custody, and/or control.

20.     Section 78u-4 of the PSLRA mandates that

> Any party to the action with actual notice of the allegations contained in the complaint shall treat all documents, data compilations (including electronically recorded or stored data), and tangible objects that are in the custody or control of such person and that are relevant to the allegations, as if they were the subject of a continuing request for production of documents from an opposing party under the Federal Rules of Civil Procedure.

15 U.S.C. § 78u-4(b)(3)(C)(i).  This mandatory requirement is subject to "sanction for willful violation."  15 U.S.C. § 78u-4(b)(3)(C)(ii).  The Debtors are presently parties to the Securities Litigation and thus remain subject to the PSLRA's document preservation mandate.  Continuing preservation of the Debtors' books, records, electronically stored information, and other items of

evidence that are potentially relevant to the Securities Litigation post-confirmation is critical to avoid prejudice to the BRS Investor Group and Securities Litigation Class members. However, the Plan does not contain, and the Disclosure Statement does not describe any requirement that the Debtors take any action to preserve potentially relevant evidence, nor does the Disclosure Statement contain any explanation of what, if any measures, the Debtors intend to implement to ensure such evidence is retained and preserved through the completion of the Securities Litigation.

21. Inclusion of the following provision in the Plan, along with a corresponding disclosure in the Disclosure Statement, would resolve the BRS Investor Group's concerns with respect to the post-confirmation preservation of evidence that is potentially relevant to the Securities Litigation:

> Until the entry of a final and non-appealable order or judgment or settlement with respect to all defendants now or hereafter named in the securities class action styled: *In re Bristow Group Inc. Securities Litigation*, Case No. 19-cv-00509 (KPE), in the United States District Court for the Southern District of Texas, Houston Division, the Debtors, and any transferee or custodian of the Debtors' books, records, documents, files, electronic data (in whatever format, including native format), or any tangible object or other item of evidence relevant or potentially relevant to the Securities Litigation, wherever stored (collectively, the "***Potentially Relevant Books and Records***"), shall preserve and maintain Potentially Relevant Books and Records as if they were the subject of a continuing request for production of documents from an opposing party under the Federal Rules of Civil Procedure, and shall not destroy, abandon, transfer, or otherwise render unavailable such Potentially Relevant Books and Records.

22. Considering the foregoing deficiencies, the Disclosure Statement cannot be approved without appropriate amendments and supplementation. However, notwithstanding the foregoing, the Disclosure Statement indicates flaws in the Plan that are fatal to confirmation and warrant denial of the Disclosure Statement.

## II. The Disclosure Statement Describes a Plan that is Unconfirmable on its Face

23. Even in those cases where a disclosure statement fairly and accurately describes the plan, objection can properly be made at the disclosure statement stage if the plan is defective. "As

serious violations of the Bankruptcy Code by a [plan proponent] can and should result in denial of confirmation of a plan . . . a disclosure statement pertaining to an unconfirmable plan is a futile undertaking and an improvident expenditure of judicial resources." *In re Greate Bay Hotel & Casino, Inc.*, 251 B.R. 213, 237 (Bankr. D.N.J. 2000); *In re American Capital Equip., LLC*, 688 F.3d 145, 153-54 (3d Cir. 2012); s*ee also, U.S. Brass Corp.*, 194 B.R. at 422.

24. Section 105 of the Bankruptcy Code permits the Court to control its own docket and decline to approve a disclosure statement when the plan it supports may not be confirmable. *American Capital Equipment,* 688 F.3d at 154. A plan is patently unconfirmable when "confirmation defects cannot be overcome by creditor voting" andthe confirmation defects relate to "matters upon which all material facts are not in dispute or have been fully developed at the disclosure statement hearing." *Id*. at 154-55. The BRS Investor Group submits that the Plan is patently unconfirmable because the Releases are impermissible.

**A. The Releases Are Impermissible Under § 524(e) of the Bankruptcy Code and Fifth Circuit Law**

25. Section 524(e) of the Bankruptcy Code provides that the "discharge of a debt of the debtor does not affect the liability of any other entity on, or the property of any other entity for, such debt." The Releases include non-debtors, including the officers and directors named as defendants in the Securities Litigation.

26. The Fifth Circuit has "firmly pronounced its opposition to such releases" and held that "a non-consensual, non-debtor discharge would not be available in this circuit." *Vitro S.A.B. de CV*, 701 F.3d at 1060. And the Court has expressly ruled that its opinions "seem broadly to foreclose non-consensual non-debtor releases and permanent injunctions," holding that "[t]he fresh start § 524(e) provides to debtors is not intended to serve this purpose." *Pac. Lumber Co.*, 584 F.3d at 252 (striking down all non-debtor releases in plan except those releasing members of

the unsecured creditors' committee because "its members are the only disinterested volunteers" to be released.)[9]

27.     Applying *Pacific Lumber*, the United States District Court for the Northern District of Texas held that the bankruptcy court's approval of non-debtor releases, a permanent injunction, and exculpation provisions was "clear error." *See Dropbox, Inc. v. Thru, Inc., et al. (In re Thru, Inc.)*, 2018 WL 5113124, *23 (N.D. Tex. 2018).  The debtor's plan in *Thru* released the debtor, "its officers, directors, and various other personnel from liability, except for acts or omissions made in bad faith 'in connection with or related to formulating, negotiation, implementing, confirming or consummating' the plan, disclosure statement or any plan document." *Id*. at *22. The District Court reversed "the bankruptcy court's decision concerning the plan's injunction and exculpation provisions, and [remanded the] case to the bankruptcy court with instructions to strike aspects [of the plan paragraphs] concerning improper releases of non- debtor third parties." *Id*. at *23.

28.     Simply put, binding Fifth Circuit precedent squarely prohibits the Debtors from forcing releases of claims against non-debtors on creditors or equity holders.  *Vitro S.A.B. de CV*, 701 F.3d at 1061 ("This conclusion was consistent with prior rulings from this circuit that 'seem broadly to foreclose non-consensual non-debtor releases and permanent injunctions.'" (quoting *Pac. Lumber Co.*, 584 F.3d at 252)).

---

[9] *See also Solidus Networks, Inc. v. Excel Innovations, Inc. (In re Excel Innovations, Inc.)*, 502 F.3d 1086, 1095 (9th Cir. 2007) (holding that the maximum injunctive relief that a bankruptcy court can grant a non-debtor third party is through the confirmation of the debtor's plan of reorganization); *Abel v. Landsing Diversified Props.-II (In re W. Real Estate Fund, Inc.)*, 922 F.2d 592, 601-02 (10th Cir. 1990) (holding that injunctions in favor of non-debtor third parties cannot last past the confirmation of the debtor's plan); *Am. Hardwoods, Inc. v. Deutsche Credit Corp. (In re Am. Hardwoods, Inc.)*, 885 F.2d 621, 624-27 (9th Cir. 1989) (holding that bankruptcy courts lack the power to issue injunctions that outlast plan confirmation).

**B.      The Releases Are Nonconsensual**

29.      The Debtors attempt to evade that binding Fifth Circuit precedent, by attempting to establish that the Releasing Parties here have "consented" to the releases.  That attempt fails as a matter of law.

30.      The Fifth Circuit's opinions broadly prohibit nonconsensual third-party releases, and the Fifth Circuit has not explained what is required to establish that a release is "consensual." The Fifth Circuit has, however, treated a claimant as nonconsenting because, besides not voting for the plan, she directly challenged it before it became final.  *See, e.g., Pac. Lumber Co.*, 584 F.3d at 236-39.   Likewise, bankruptcy courts within the Fifth Circuit have considered a release "consensual" with respect to a creditor who affirmatively votes in favor of the plan and receives consideration in exchange for a third-party release integral to the plan.  *See, e.g., In re Bigler LP*, 442 B.R. 537, 546 (Bankr. S.D. Tex. 2010); *In re Wool Growers Cent. Storage Co.*, 371 B.R. 768, 775-76 (Bankr. N.D. Tex. 2007) ("Consensual nondebtor releases that are specific in language, integral to the plan, a condition of the settlement, and given for consideration do not violate section 524(e).").

31.      Here, the Debtors cannot establish "consent" to the Releases by holders of Existing Interests and Section 510(b) Claims (including the BRS Investor Group and the Securities Litigation Class) by deeming the holders of Existing Interests and Section 510(b) Claims to be "Releasing Parties" unless they opt out.  That attempt fails as a matter of law for three independent reasons.

32.      *First*, a release where parties are required to take affirmative action in order not to give a release is not a consensual release.   "Courts generally apply contract principles in deciding whether a creditor consents to a third-party release."  *In re SunEdison, Inc.*, 576 B.R. 453, 458 (Bankr. S.D.N.Y. 2017).

33.     Texas law is clear that "silence and inaction will not be construed as an assent to an offer," precluding as a matter of law any argument by Bristow that a failure to opt-out or object to the plan somehow operates as consent or agreement to the releases.  *Texas Ass'n Gov't Risk Mgmt. Pool*, 52 S.W.3d at 132 (quoting 2 *Williston on Contracts* § 6:49 (4th ed. 1991)).

34.     "[A]s a matter of law, when a party is unilaterally informed of [a contract term], 'mere failure to object within a reasonable time . . . , without more, could not establish an agreement between the parties.'" *In re Couture Hotel Corp.*, 554 B.R. 369, 381 (Bankr. N.D. Tex. 2016) (quoting *Triton Oil and Gas Corp. v. Marine Contractors and Supply, Inc.*, 664 S.W.2d 443, 445 (Tex. 1982)). "'[A] meeting of the minds is an essential element of an implied-in-fact contract.'" *Id.* (quoting *Excess Underwriters at Lloyd's, London v. Frank's Casing Crew & Rental Tools, Inc.*, 246 S.W.3d 42, 49 (Tex. 2008)).

35.     In *SunEdison,* the court applied New York contract law, noting that an offeror cannot transform an offeree's silence into acceptance when the offeree does not intend to accept the offer.  *Id.*  The only exceptions to this rule are (a) when the silence is misleading, (b) when silence as consent is supported by the parties' ongoing course of conduct, or (c) when the offeree accepts the benefits of the offer despite reasonable opportunity to reject and understand that the offeror expects compensation.  *Id.* at 458-59.

36.     In *SunEdison*, the debtors argued that the warning in the disclosure statement and on the ballots regarding the potential effect of silence gave rise to a duty to speak, and the nonvoting creditors' failure to object to the plan or to otherwise reject the plan should be deemed their consent to the release.  *SunEdison*, 576 B.R. at 460.  The *SunEdison* court rejected this argument because the debtors failed to show that the nonvoting creditors' silence was misleading or that the nonvoting creditors silence signified their intention to consent to the release, finding that silence could easily be attributable to other causes.  *Id.*  The debtors did not contend that an

**OBJECTION TO DISCLOSURE STATEMENT**                                                    **PAGE 17 OF 22**

ongoing course of conduct between themselves and the nonvoting creditors gave rise to a duty to speak. *Id*.

37.     "Charging all inactive creditors with full knowledge of the scope and implications of the proposed third-party releases and implying a 'consent' to the third-party releases based on the creditors' inaction, is simply not realistic or fair and would stretch the meaning of 'consent' beyond the breaking point." *In re Chassix Holdings, Inc.*, 533 B.R. 64, 81 (Bankr. S.D.N.Y. 2015). The *SunEdison* court concluded that the "Non-Voting Releasors did not consent to the Release." *SunEdison*, 576 B.R. at 461.

38.     The holding in *SunEdison* is particularly applicable in these cases insofar as the holders of Equity Interests and Section 510(b) claims will not be solicited to accept or reject the Plan. Yet, they will nevertheless be required to opt out to preserve their rights notwithstanding the fact that they will receive no distributions under the Plan in satisfaction and exchange of their interests or claims, all the while the non-debtor defendants will receive a release. *Pacific Lumber* and its progeny do not support treating the current Releases and opt-out as consensual, especially given that there is no consideration or channeling of resources to deal with the extinguished claims and interests.

39.     Bankruptcy Judge Mullin reached a similar conclusion in finding similar opt-out provisions to be non-consensual, ordering that such provisions be eliminated from the debtor's plan. *In re Mac Churchill, Inc.*, Case No. 18-41988-MXM-11, United States Bankruptcy Court, Northern District of Texas, Fort Worth Division (June 4, 2019). In sustaining the United States Trustee's confirmation objection relating to third party releases, Judge Mullin found that inaction in connection with an opt-out release set forth on a plan ballot is insufficient to constitute affirmative action on the part of the non-voting creditor to form the requisite consent. "The courts

generally do agree that you have to have an affirmative opt-out and that silence really shouldn't be deemed consent." *See* Mac Churchill Tr. at 14, ln. 1 to 3.

40.     Judge Mullin distinguished *dicta* from a recent opinion of Chief Judge Rosenthal from the Southern District of Texas, *Cole v. Nabors Corp. Servs., Inc. (In re CJ Holding Co.)*, No. H-18-3250, 2019 U.S. Dist. LEXIS 21199 (S.D. Tex. Feb. 8, 2019) ("*CJ Holdings*"), noting that the facts of that case were distinct from those before him.  In *CJ Holdings*, the challenge to the opt-out release came "a couple of" years post-confirmation, rather than at the time of confirmation. Likewise, the creditor in *CJ Holdings* challenged an order enforcing a confirmation order, long past the time to appeal the confirmation order, rather than challenging whether the court should have confirmed the plan with an opt-out release in the first place.

41.     Thus, the Debtors' attempt to establish "consent" to the Releases based on a mere failure to opt out fails under Texas law.

42.     *Second*, even if inaction could be considered "consent" (it cannot), such an inference would be particularly inappropriate under the terms of the Plan here.  That is because holders of Existing Interests and Section 510(b) Claims are not entitled to vote on the Plan.  Both Existing Interests (Class 15) and Section 510(b) Claims (Class 16) are "cancelled, released, and expunged" and "shall be of no further force and effect," and holders of such interests and claims will "not receive any distribution" under the Plan.  Plan at 29–30.  Because holders of Existing Interests and Section 510(b) Claims are "[i]mpaired and not receiving any distribution under the Plan," they "are presumed to have rejected the plan pursuant to Section 1126(g) of the Bankruptcy Code. *Id.* "Therefore, such holders **are not entitled to vote to accept or reject the Plan**." *Id.*

43.     Thus, the Debtors are attempting to base their argument for "consent" to the Releases based on a failure to "opt out" by holders of Existing Interests and Section 510(b) Claims

in a solicitation *in which they are not even entitled to vote*. The Debtors' attempt to establish consent under such procedures is wholly deficient.

44.     *Third*, the Debtors cannot establish "consent" to the Releases by holders of Existing Interests or Section 510(b) Claims, because the Releases are not supported by consideration. Under Texas law, "[a] contract without consideration is unenforceable." *Marx v. FDP, LP*, 474 S.W.3d 368, 378 (Tex. App.—San Antonio 2015, pet. denied).

45.     Here, holders of Existing Interests and Section 510(b) Claims (including the BRS Investor Group and the Securities Litigation Class) are not entitled to any distributions under the Plan and receive no interest in the Reorganized Debtors. Thus, the Releases are unenforceable as a matter of law because they are not supported by consideration. *See Bigler*, 442 B.R. at 547 (striking releases in a plan except for claims "that are property of the Estate in consideration for funding of the Plan by Amegy"); *Wool Growers*, 371 B.R. at 776 ("Consensual nondebtor releases that are specific in language, integral to the plan, a condition of the settlement, *and given for consideration* do not violate section 524(e)." (emphasis added)).

46.     Indeed, the lack of consideration for the Releases in the Plan also reinforces the impropriety of inferring consent to the Releases based on inaction here: Why would any reasonable, fully informed holder of Existing Interests or Section 510(b) claims ever voluntarily relinquish its independent, direct claims against non-debtor defendants in exchange for absolutely nothing? The clear answer is that they would not.

47.     Absent the ameliorating language proffered by the BRS Investor Group, the Court should require that the Releases in the Plan be modified or removed so that they comply with Section 524(e) of the Bankruptcy Code and Fifth Circuit authority and decline to approve the Disclosure Statement until such modifications are made.

## RESERVATION OF RIGHTS

48.     Neither the filing of this Objection nor anything contained herein are intended to limit, prejudice, or otherwise impact any rights of BRS Investor Group or the Proposed Class in connection with the filing, solicitation, or confirmation of the Plan (or any other plan) or approval of the Disclosure Statement and Solicitation Procedures.  The BRS Investor Group, on behalf of itself and the Securities Litigation Class, hereby reserves all such rights, including but not limited to the rights to (a) object on any and all grounds to (i) approval of the Disclosure Statement and solicitation procedures for the Plan and (ii) confirmation of the Plan, on any basis, including but not limited to the fact that this Court lacks constitutional adjudicatory authority pursuant to *Stern v. Marshall*, 564 U.S. 462 (2011) and its progeny to approve a release of the claims of the BRS Investor Group and the Securities Class against non-debtor defendants, (b) take any other action permitted or required under the Bankruptcy Code and other applicable law, on behalf of itself and the Securities Litigation Class, and (c) seek, on behalf of itself and the Securities Litigation Class, any other relief in connection with the foregoing.

49.     **For the avoidance of doubt, the BRS Investor Group, for itself and the Securities Litigation Class, DO NOT CONSENT, AND EXPRESSLY OBJECT, to (a) the Releases contained in the Plan in favor of non-Debtor officer and director defendants in the Securities Litigation, and (b) the Bankruptcy Court's entry of any final order or judgment that this Court lacks jurisdiction or statutory and/or constitutional adjudicatory authority to enter without the affirmative and knowing consent of all parties affected thereby.**

## PRAYER

For the foregoing reasons, the BRS Investor Group respectfully requests this Court to sustain this Objection, deny approval of the Disclosure Statement, and grant the BRS Investor Group such other and further relief to which it may be justly entitled, both at law and in equity.

DATED: August 19, 2019

Respectfully submitted,

**JOSEPH G. EPSTEIN PLLC**
24 Greenway Plaza, Suite 970
Houston, Texas 77046
(713) 222-8400 (Telephone)
(713) 621-0046 (Facsimile)
joe@epsteintexaslaw.com


By:     _/s/ Joseph G. Epstein_____
          Joseph G. Epstein
          Texas Bar No. 06639320
          S.D. Tex. No. 11733


-and-

Ira M. Press
Thomas W. Elrod
**KIRBY MCINERNEY LLP**
250 Park Avenue, Suite 820
New York, NY 10177
(212) 371-6600 (Telephone)
(212) 751-2540 (Facsimile)
ipress@kmllp.com
telrod@kmllp.com


-and-

Michael C. Kelso, Texas Bar No. 24092617
Barry Barnett, Texas Bar No. 01778700
**SUSMAN GODFREY LLP**
1000 Louisiana, Suite 5100
Houston, TX  77002
(713) 651-9366 (Telephone)
(713) 654-6666 (Facsimile)
mkelso@susmangodfrey.com
bbarnett@susmangodfrey.com

***Attorneys for the BRS Investor Group***

## Certificate of Service

I hereby certify that on August 19, 2019, a true and correct copy of the foregoing document was electronically mailed to the parties that are registered or otherwise entitled to receive electronic notices in this case pursuant to the Electronic Filing Procedures in this District.

          _/s/ Joseph G. Epstein_____
          One of Counsel

# TAB 11-D

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| BRISTOW GROUP INC., *et al.*,[1] | ) | Case No. 19-32713 (DRJ) |
|  | ) |  |
| Debtors. | ) |  |
|  | ) | Jointly Administered |
|  | ) |  |

**NOTICE OF FILING OF AMENDED JOINT CHAPTER 11 PLAN OF**
**REORGANIZATION OF BRISTOW GROUP INC. AND ITS DEBTOR AFFILIATES**
**[DOCKET NO. 498]**

**PLEASE TAKE NOTICE** that on August 1, 2019, the above captioned debtors and debtors in possession (collectively, the "Debtors"), filed the *Joint Chapter 11 Plan of Reorganization of Bristow Group Inc. and Its Debtor Affiliates* [Docket No. 498] (the "Original Plan") with the United States Bankruptcy Court for the Southern District of Texas (the "Court").

**PLEASE TAKE FURTHER NOTICE** that the Debtors hereby file an *Amended Joint Chapter 11 Plan of Reorganization of Bristow Group Inc. and Its Debtor Affiliates* (the "Amended Plan"), attached hereto as **Exhibit A**.

**PLEASE TAKE FURTHER NOTICE** that attached hereto as **Exhibit B** is a comparison of the Original Plan and the Amended Plan.

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each debtor's federal tax identification number, are: Bristow Group Inc. (9819), BHNA Holdings Inc. (8862), Bristow Alaska Inc. (8121), Bristow Helicopters Inc. (8733), Bristow U.S. Leasing LLC (2451), Bristow U.S. LLC (2904), BriLog Leasing Ltd. (9764), and Bristow Equipment Leasing Ltd. (9303). The corporate headquarters and the mailing address for the Debtors listed above is 2103 City West Blvd., 4th Floor, Houston, Texas 77042.

PLEASE TAKE FURTHER NOTICE that the Debtors reserve the right to materially alter, amend, or modify the Amended Plan, *provided that* the Debtors will file a revised version of the Amended Plan if such document is altered, amended, or modified in any material respect.

PLEASE TAKE FURTHER NOTICE that copies of all documents filed in these chapter 11 cases are available free of charge by visiting https://cases.primeclerk.com/Bristow or by calling (844) 627-6967. You may also obtain copies of any pleadings by visiting the Court's website at https://ecf.txsb.uscourts.gov in accordance with the procedures and fees set forth therein.

[*remainder of page intentionally left blank*]

New York New York
Dated: August 20, 2019

Respectfully submitted,

**BAKER BOTTS L.L.P.**

*/s/ Chris Newcomb*
James R. Prince, State Bar No. 00784791
Omar J. Alaniz, State Bar No. 24040402
Kevin Chiu, State Bar No. 24109723
**BAKER BOTTS L.L.P.**
2001 Ross Avenue, Suite 900
Dallas, Texas 75201-2980
Telephone: (214) 953-6500
Facsimile: (214) 953-6503
Email: jim.prince@bakerbotts.com
        omar.alaniz@bakerbotts.com
        kevin.chiu@bakerbotts.com




-and-

Emanuel C. Grillo,
(*pro hac vice*)
Chris Newcomb.
(*pro hac vice*)
**BAKER BOTTS L.L.P.**
30 Rockefeller Plaza
New York, New York 10112-4498
Telephone: (212) 408-2500
Facsimile: (212) 408-2501
Email: emanuel.grillo@bakerbotts.com
        chris.newcomb@bakerbotts.com


*Co-Counsel to the Debtors and Debtors in Possession*

**WACHTELL, LIPTON, ROSEN & KATZ**


Richard G. Mason
(*pro hac vice*)
Amy R. Wolf
(*pro hac vice*)
**WACHTELL, LIPTON, ROSEN & KATZ**
51 West 52nd Street
New York, New York 10019
Telephone: (212) 403-1000
Facsimile: (212) 403-2000




Email: rgmason@wlrk.com
        arwolf@wlrk.com

*Co-Counsel to the Debtors and Debtors in Possession*

# TAB 11-E

**Exhibit A**

Amended Plan

**THIS PLAN IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT. THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE PLAN. ACCEPTANCE OR REJECTION MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN CONDITIONALLY APPROVED BY THE BANKRUPTCY COURT. THE INFORMATION IN THE PLAN IS SUBJECT TO CHANGE. THIS PLAN IS NOT AN OFFER TO SELL ANY SECURITIES AND IS NOT SOLICITING AN OFFER TO BUY ANY SECURITIES.**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| BRISTOW GROUP INC., *et al.*,[1] | ) | Case No. 19-32713 (DRJ) |
|  | ) |  |
| Debtors. | ) | Jointly Administered |
|  | ) |  |

**AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION OF**
**BRISTOW GROUP INC. AND ITS DEBTOR AFFILIATES, AS MODIFIED**

James R. Prince, State Bar No. 00784791
Omar J. Alaniz, State Bar No. 24040402
Kevin Chiu, State Bar No. 24109723
**BAKER BOTTS L.L.P.**
2001 Ross Avenue, Suite 900
Dallas, Texas 75201-2980
Telephone: (214) 953-6500
Facsimile: (214) 953-6503
Email:   jim.prince@bakerbotts.com
    omar.alaniz@bakerbotts.com
    kevin.chiu@bakerbotts.com

-and-

Emanuel C. Grillo (*pro hac vice)*
Chris Newcomb (*pro hac vice*)
**BAKER BOTTS L.L.P.**
30 Rockefeller Plaza
New York, New York  10112-4498
Telephone: (212) 408-2500
Facsimile: (212) 408-2501
Email:   emanuel.grillo@bakerbotts.com
    chris.newcomb@bakerbotts.com

Richard G. Mason (*pro hac vice*)
Amy R. Wolf (*pro hac vice*)
**WACHTELL, LIPTON, ROSEN & KATZ**
51 West 52nd Street
New York, New York 10019
Telephone: (212) 403-1000
Facsimile: (212) 403-2000
Email:   rgmason@wlrk.com
    arwolf@wlrk.com

*Co-Counsel to the Debtors and Debtors in Possession*

Dated: August 22, 2019

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each debtor's federal tax identification number, are: Bristow Group Inc. (9819), BHNA Holdings Inc. (8862), Bristow Alaska Inc. (8121), Bristow Helicopters Inc. (8733), Bristow U.S. Leasing LLC (2451), Bristow U.S. LLC (2904), BriLog Leasing Ltd. (9764), and Bristow Equipment Leasing Ltd. (9303). The corporate headquarters and the mailing address for the Debtors listed above is 2103 City West Blvd., 4th Floor, Houston, Texas 77042.

**TABLE OF CONTENTS**

**Page**

INTRODUCTION .................................................................................................................................4

**ARTICLE I. DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME, GOVERNING LAW, AND OTHER REFERENCES**.............................................................4
    A.    *Defined Terms* ........................................................................................................4
    B.    *Rules of Interpretation* .........................................................................................23
    C.    *Computation of Time*...........................................................................................24
    D.    *Governing Law*....................................................................................................24
    E.    *Reference to Monetary Figures*...........................................................................24
    F.    *Reference to the Debtors or the Reorganized Debtors*........................................24
    G.    *Controlling Document*.........................................................................................24

**ARTICLE II. ADMINISTRATIVE AND PRIORITY CLAIMS**.........................................................24
    A.    *Administrative Claims*.........................................................................................24
    B.    *Professional Fee Claims* ......................................................................................25
    C.    *Priority Tax Claims*.............................................................................................25
    D.    *DIP Facility Claims* ............................................................................................26
    E.    *Statutory Fees* .....................................................................................................26

**ARTICLE III. CLASSIFICATION, TREATMENT, AND VOTING OF CLAIMS AND INTERESTS**.........26
    A.    *Classification of Claims and Interests* ................................................................26
    B.    *Treatment of Classes of Claims and Interests* .....................................................27
    C.    *Special Provision Governing Unimpaired Claims* ..............................................34
    D.    *Elimination of Vacant Classes* ............................................................................34
    E.    *Voting Classes; Presumed Acceptance by Non-Voting Classes*...........................34
    F.    *Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code*.................34
    G.    *Intercompany Interests*........................................................................................34
    H.    *Substantive Consolidation; GUC Cash Distribution Amount* ..............................34
    I.    *Subordinated Claims and Interests* .....................................................................34

**ARTICLE IV. PROVISIONS FOR IMPLEMENTATION OF THE PLAN**............................................35
    A.    *General Settlement of Claims, Interests, and Causes of Action* ..........................35
    B.    *Restructuring Transactions*..................................................................................35
    C.    *Employee and Retiree Benefits*............................................................................35
    D.    *Issuance and Distribution of New Stock* .............................................................35
    E.    *Determination of Holder Citizenship* ..................................................................36
    F.    *Rights Offering* ...................................................................................................36
    G.    *The Exit Facility, the Amended and Restated 2019 Term Loan Facility and the Amended PK Air Loan Documents* ..................................................37
    H.    *Rights Offering Per Share Price* ..........................................................................38
    I.    *Management Incentive Plan*.................................................................................38
    J.    *Management of Reorganized Bristow* ..................................................................38
    K.    *Exemption from Registration Requirements*........................................................38
    L.    *Vesting of Assets* .................................................................................................39
    M.    *Cancellation of Instruments, Certificates, and Other Documents*.......................39
    N.    *Corporate Action* ...............................................................................................40
    O.    *Corporate Existence*............................................................................................41
    P.    *New Organizational Documents* ..........................................................................41
    Q.    *Effectuating Documents; Further Transactions*...................................................41
    R.    *Section 1146(a) Exemption* .................................................................................42
    S.    *Directors and Officers* ........................................................................................42

**TABLE OF CONTENTS (CONT'D)**

| | | | Page |
|---|---|---|---|
| T. | *Preservation of Causes of Action* | | 42 |
| U. | *Milestone Settlement* | | 43 |
| V. | *Indenture Trustee Expenses* | | 43 |
| W. | *Closing the Chapter 11 Cases* | | 44 |
| **ARTICLE V. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES** | | | **44** |
| A. | *Assumption or Rejection of Executory Contracts and Unexpired Leases* | | 44 |
| B. | *Claims Based on Rejection of Executory Contracts or Unexpired Leases* | | 44 |
| C. | *Cure of Defaults for Assumed Executory Contracts and Unexpired Leases* | | 45 |
| D. | *Indemnification* | | 46 |
| E. | *Insurance Policies* | | 46 |
| F. | *Employee Compensation and Benefits* | | 46 |
| G. | *Contracts and Leases After the Petition Date* | | 47 |
| H. | *Reservation of Rights* | | 47 |
| I. | *Nonoccurrence of Effective Date* | | 47 |
| **ARTICLE VI. PROVISIONS GOVERNING DISTRIBUTIONS** | | | **48** |
| A. | *Distributions on Account of Claims and Interests Allowed as of the Effective Date* | | 48 |
| B. | *Rights and Powers of the Distribution Agent* | | 48 |
| C. | *Special Rules for Distributions to Holders of Disputed Claims* | | 48 |
| D. | *Delivery of Distributions* | | 49 |
| E. | *Compliance with Tax Requirements/Allocations* | | 50 |
| F. | *Claims Paid or Payable by Third Parties* | | 51 |
| G. | *Setoffs* | | 51 |
| H. | *Indefeasible Distributions* | | 52 |
| I. | *Allocation Between Principal and Accrued Interest* | | 52 |
| **ARTICLE VII. PROCEDURES FOR RESOLVING DISPUTED CLAIMS** | | | **52** |
| A. | *Allowance of Claims* | | 52 |
| B. | *Claims Administration Responsibilities* | | 52 |
| C. | *Estimation of Claims* | | 52 |
| D. | *Disputed Claims Reserve* | | 53 |
| E. | *Adjustment to Claims Without Objection* | | 53 |
| F. | *Time to File Objections to Claims* | | 54 |
| G. | *Disallowance of Claims* | | 54 |
| H. | *Amendments to Claims* | | 54 |
| I. | *No Distributions Pending Allowance* | | 54 |
| J. | *Distributions After Allowance* | | 54 |
| K. | *Single Satisfaction of Claims* | | 55 |
| L. | *Claims Consultation Rights* | | 55 |
| **ARTICLE VIII. DISCHARGE, RELEASE, INJUNCTION AND RELATED PROVISIONS** | | | **55** |
| A. | ***Discharge of Claims and Termination of Interests*** | | 55 |
| B. | ***Releases by the Debtors*** | | 55 |
| C. | ***Releases by Holders of Claims and Interests*** | | 56 |
| D. | ***Exculpation*** | | 57 |
| E. | ***Injunction*** | | 58 |
| F. | *Protection Against Discriminatory Treatment* | | 58 |
| G. | *Release of Liens* | | 58 |
| H. | *Reimbursement or Contribution* | | 59 |
| I. | *Recoupment* | | 59 |
| J. | *Subordination Rights* | | 59 |
| K. | *Reservation of Rights of the United States* | | 59 |

**TABLE OF CONTENTS (CONT'D)**

<u>**Page**</u>

**ARTICLE IX. EFFECT OF CONFIRMATION OF THE PLAN** ........................................................ 60
    A.    *Jurisdiction and Venue* ........................................................................................ 60
    B.    *Order Approving the Disclosure Statement* ........................................................ 60
    C.    *Voting Report* ...................................................................................................... 60
    D.    *Judicial Notice* .................................................................................................... 61
    E.    *Transmittal and Mailing of Materials; Notice* ................................................... 61
    F.    *Solicitation* .......................................................................................................... 61
    G.    *Burden of Proof* ................................................................................................... 61
    H.    *Bankruptcy Rule 3016(a) Compliance* ............................................................... 61
    I.    *Compliance with the Requirements of Section 1129 of the Bankruptcy Code* .............................. 61
    J.    *Securities Under the Plan* ................................................................................... 66
    K.    *Releases and Discharges* .................................................................................... 66
    L.    *Release and Retention of Causes of Action* ....................................................... 67
    M.    *Approval of Restructuring Support Agreement, Backstop Commitment Agreement and Other Restructuring Documents and Agreements* ................................................ 67
    N.    *Confirmation Hearing Exhibits* ........................................................................... 67
    O.    *Objections to Confirmation of the Plan* .............................................................. 67
    P.    *Retention of Jurisdiction* ..................................................................................... 67
    Q.    *Plan Supplement* .................................................................................................. 67

**ARTICLE X. CONDITIONS PRECEDENT TO THE EFFECTIVE DATE** ....................................... 68
    A.    *Conditions Precedent to the Effective Date* ....................................................... 68
    B.    *Waiver of Conditions* ........................................................................................... 69
    C.    *Effect of Non-Occurrence of Conditions to Consummation* ............................... 69
    D.    *Substantial Consummation* .................................................................................. 69

**ARTICLE XI. MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN** ............................ 69
    A.    *Modification of Plan* ............................................................................................ 69
    B.    *Effect of Confirmation on Modifications* ............................................................ 69
    C.    *Revocation or Withdrawal of Plan* ...................................................................... 69

**ARTICLE XII. RETENTION OF JURISDICTION** .......................................................................... 70

**ARTICLE XIII. MISCELLANEOUS PROVISIONS** ......................................................................... 71
    A.    *Immediate Binding Effect* ................................................................................... 71
    B.    *Restructuring Documents* .................................................................................... 71
    C.    *Additional Documents* ......................................................................................... 72
    D.    *Dissolution of the Statutory Committees* ............................................................ 72
    E.    *Payment of Statutory Fees* ................................................................................... 72
    F.    *Payment of Transaction Expenses* ....................................................................... 72
    G.    *Reservation of Rights* .......................................................................................... 72
    H.    *Successors and Assigns* ....................................................................................... 73
    I.    *Service of Documents* .......................................................................................... 73
    J.    *Term of Injunctions or Stays* ............................................................................... 74
    K.    *Entire Agreement* ................................................................................................. 74
    L.    *Plan Supplement* .................................................................................................. 74
    M.    *Non-Severability* .................................................................................................. 75
    N.    *Votes Solicited in Good Faith* ............................................................................. 75
    O.    *Waiver or Estoppel* .............................................................................................. 75

**INTRODUCTION**

Bristow Group Inc. and its affiliated debtors and debtors in possession in the above-captioned chapter 11 cases propose this joint chapter 11 plan of reorganization pursuant to chapter 11 of title 11 of the United States Code. Capitalized terms used herein and not otherwise defined shall have the meanings ascribed to such terms in Article I.A hereof. Although proposed jointly for administrative purposes, the Plan constitutes a separate plan for each of the foregoing entities and each of the foregoing entities is a proponent of the Plan within the meaning of section 1129 of the Bankruptcy Code. The Plan does not contemplate substantive consolidation for any of the Debtors; *provided that* the Debtors and the Reorganized Debtors, as applicable, shall consolidate Allowed Claims into one Estate for purposes of distributions for Classes 8 and 12. The classification of Claims and Interests set forth in Article III of the Plan should be deemed to apply separately to each Debtor, as applicable.

Reference is made to the accompanying *Amended Disclosure Statement for the Amended Joint Chapter 11 Plan of Reorganization of Bristow Group Inc. and Its Debtor Affiliates, As Modified* for a discussion of the Debtors' history, business, properties and operations, valuation, projections, risk factors, a summary and analysis of the Plan and the transactions contemplated thereby, and certain related matters.

ALL HOLDERS OF CLAIMS AND INTERESTS, TO THE EXTENT APPLICABLE, ARE ENCOURAGED TO READ THIS PLAN AND THE DISCLOSURE STATEMENT IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THIS PLAN.

**ARTICLE I.**
**DEFINED TERMS, RULES OF INTERPRETATION,**
**COMPUTATION OF TIME, GOVERNING LAW, AND OTHER REFERENCES**

A.      *Defined Terms*

1.      "*1145 Eligible Holder*" means each Holder of a Claim (as of the Distribution Record Date) that is acquiring the 1145 Rights Offering Stock for its own account.

2.      "*1145 Rights Offering*" means the rights offering for shares of New Common Stock to be conducted in reliance upon the exemption from registration under the Securities Act provided in section 1145 of the Bankruptcy Code, in accordance with the 1145 Rights Offering Procedures.

3.      "*1145 Rights Offering and Unsecured Cash Out Election Procedures*" means the procedures (and any forms and notices attendant thereto) governing the 1145 Rights Offering and the Unsecured Cash Out Election that are attached as an exhibit to the Conditional Disclosure Statement Order.

4.      "*1145 Rights Offering Stock*" means the New Common Stock issued pursuant to the 1145 Rights Offering.

5.      "*1145 Subscription Rights*" means the rights to purchase 1145 Rights Offering Stock pursuant to the 1145 Rights Offering at a per share purchase price of $36.37.

6.      "*2019 Term Loan Amendment Fee*" means Cash in an aggregate amount of $562,500.

7.      "*2019 Term Loan Facility*" means that certain prepetition secured term loan facility due May 2022 in the aggregate principal amount of $75,000,000, provided pursuant to the 2019 Term Loan Facility Credit Agreement.

8.      "*2019 Term Loan Facility Agent*" means Ankura Trust Company, LLC, solely in its capacities as administrative agent and collateral agent under the 2019 Term Loan Facility.

9.      "*2019 Term Loan Facility Claim*" means any Claim against any of the Debtors arising from or based upon the 2019 Term Loan Facility.

10.  "*2019 Term Loan Facility Credit Agreement*" means that certain Term Loan Credit Agreement dated as of May 10, 2019, as amended, modified or supplemented from time to time among Bristow Parent and its non-Debtor affiliate Bristow Holdings Company Ltd. III (Cayman Islands), as borrowers, the guarantors from time to time party thereto, certain Holders of Secured Notes, as lenders, and the 2019 Term Loan Facility Agent, as administrative agent and collateral agent.

11.  "*4(a)(2) Eligible Holder*" means each Holder of a Claim (as of the Distribution Record Date) that is an "accredited investor" (as defined in Rule 501(a) under the Securities Act) or a "qualified institutional buyer" (within the meaning of Rule 144A of the Securities Act) and that is acquiring the 4(a)(2) Rights Offering Stock for its own account.

12.  "*4(a)(2) Rights Offering*" means the rights offering for New Common Stock and New Preferred Stock to be conducted in reliance upon the exemption from registration under the Securities Act provided in Section 4(a)(2) of the Securities Act and/or Regulation D promulgated thereunder, in accordance with the 4(a)(2) Rights Offering Procedures.

13.  "*4(a)(2) Rights Offering Procedures*" means the procedures (and any forms and notices attendant thereto) governing the 4(a)(2) Rights Offering that are attached as an exhibit to the Conditional Disclosure Statement Order.

14.  "*4(a)(2) Rights Offering Stock*" means the New Common Stock and New Preferred Stock issued pursuant to the 4(a)(2) Rights Offering.

15.  "*4(a)(2) Subscription Rights*" means the rights to purchase 4(a)(2) Rights Offering Stock pursuant to the 4(a)(2) Rights Offering at a per share purchase price of $36.37.

16.  "*Administrative Claim*" means a Claim against any of the Debtors arising on or after the Petition Date and before the Effective Date for a cost or expense of administration of the Chapter 11 Cases entitled to priority under sections 503(b), 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including:  (a) the actual and necessary costs and expenses incurred on or after the Petition Date until and including the Effective Date of preserving the Estates and operating the Debtors' businesses; (b) Allowed Professional Fee Claims; (c) Allowed DIP Facility Claims; (d) all fees and charges assessed against the Estates pursuant to section 1930 of chapter 123 of title 28 of the United States Code; and (e) the Backstop Commitment Fee and the Equitization Consent Fee (which, in the case of this clause (e), are each deemed to be an Allowed Administrative Claim pursuant to the Confirmation Order).

17.  "*Administrative Claims Bar Date*" means the deadline for Filing requests for payment of Administrative Claims, which: (a) with respect to Administrative Claims other than Professional Fee Claims, shall be 30 days after the Effective Date; and (b) with respect to Professional Fee Claims, shall be 45 days after the Effective Date.

18.  "*Affiliate*" has the meaning set forth in section 101(2) of the Bankruptcy Code.  With respect to any Person that is not a Debtor, the term "Affiliate" shall apply to such Person as if the Person were a Debtor.

19.  "*Allowed*" means, with respect to any Claim against any of the Debtors, except as otherwise provided herein: (a) a Claim that is evidenced by a Proof of Claim Filed by the Claims Bar Date (or such other date as agreed by the Debtors pursuant to the Bar Date Order) or a request for payment of an Administrative Claim Filed by the Administrative Claims Bar Date, as applicable (or for which Claim under the Plan, the Bankruptcy Code, or pursuant to a Final Order, a Proof of Claim or request for payment of Administrative Claim is not or shall not be required to be Filed); (b) a Claim that is listed in the Schedules as not contingent, not unliquidated, and not Disputed, and for which no contrary or superseding Proof of Claim, as applicable, has been timely Filed; or (c) a Claim allowed pursuant to the Plan or a Final Order; *provided*, that with respect to a Claim described in clauses (a) and (b) above, such Claim shall be considered Allowed only if and to the extent that with respect to such Claim no objection to the allowance thereof is interposed within the applicable period of time fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Court, or such an objection is so interposed and the Claim has been Allowed by a Final Order.  Any Claim that has been or is hereafter listed in the Schedules as contingent, unliquidated, or disputed,

5

and for which no contrary or superseding Proof of Claim is or has been timely Filed, or that is not or has not been Allowed by a Final Order, is not considered Allowed and shall be expunged without further action by the Debtors and without further notice to any party or action, approval, or order of the Bankruptcy Court. Notwithstanding anything to the contrary herein, no Claim of any Entity subject to section 502(d) of the Bankruptcy Code shall be deemed Allowed unless and until such Entity pays in full the amount that it owes the applicable Debtor or Reorganized Debtor, as applicable. For the avoidance of doubt, a Proof of Claim Filed after the Claims Bar Date or a request for payment of an Administrative Claim Filed after the Administrative Claims Bar Date, as applicable, shall not be Allowed for any purposes whatsoever absent entry of a Final Order allowing such late-Filed Claim. "*Allow*" and "*Allowing*" shall have correlative meanings.

20. "*Amended and Restated 2019 Term Loan Credit Agreement*" means an amended and restated version of the 2019 Term Loan Credit Agreement to be entered into by the applicable Debtors, if the Debtors do not enter into the Exit Facility on or prior to the Effective Date, in any case secured by a first lien on substantially all assets of the Reorganized Debtors and their non-Debtor Affiliates (subject to customary and other agreed exclusions), with the same maturity and interest rate as set forth in the 2019 Term Loan Credit Agreement, and with amendments only to the prepayment, financial, reporting and other affirmative and negative covenants in the 2019 Term Loan Credit Agreement, which shall be subject to the consent rights of the Required RSA Parties on the terms set forth in the Restructuring Support Agreement.

21. "*Amended and Restated 2019 Term Loan Facility*" means the secured credit facility that Reorganized Bristow Parent and certain other Reorganized Debtors will enter into on the Effective Date in accordance with the Amended and Restated 2019 Term Loan Credit Agreement, if the Debtors do not enter into the Exit Facility on or prior to the Effective Date.

22. "*Amended and Restated 2019 Term Loan Facility Agent*" means the entity identified in the Plan Supplement as administrative and collateral agent under the Amended and Restated 2019 Term Loan Credit Agreement, solely in its capacity as such.

23. "*Amended and Restated 2019 Term Loan Facility Lenders*" means those certain lenders from time to time party to the Amended and Restated 2019 Term Loan Credit Agreement, solely in their capacity as such.

24. "*Amended and Restated 2019 Term Loan Documents*" means, collectively, the Amended and Restated 2019 Term Loan Credit Agreement and any and all other agreements, documents, and instruments delivered or entered into in connection therewith, including any guarantee agreements, pledge and collateral agreements, intercreditor agreements, and other security documents, which shall be subject to the consent rights of the Required RSA Parties on the terms set forth in the Restructuring Support Agreement.

25. "*Amended PK Air Credit Facility Agreement*" means the amended PK Air Facility Credit Agreement, as amended in a manner consistent with the Milestone Settlement.

26. "*Amended PK Air Loan Documents* " means the amended PK Air Loan Documents, as amended in a manner consistent with the Milestone Settlement.

27. "*Avoidance Actions*" means any and all avoidance, recovery, subordination, or other Claims and Causes of Actions that may be brought by or on behalf of the Debtors or their Estates or other authorized parties in interest under the Bankruptcy Code or applicable non-bankruptcy law, including actions or remedies under chapter 5 of the Bankruptcy Code or under similar or related state or federal statutes and common law.

28. "*Backstop Commitment Agreement*" means that certain backstop commitment agreement, entered into and dated as of July 24, 2019, pursuant to which the Backstop Commitment Parties have agreed to backstop the Rights Offering, as may be amended or modified from time to time in accordance with the terms thereof and the Restructuring Support Agreement, and which shall be subject to the consent rights of the Required RSA Parties on the terms set forth in the Restructuring Support Agreement.

29.     "*Backstop Commitment Fee*" has the meaning ascribed to such term in the Backstop Commitment Agreement, and shall be equal to 5.83% of the New Stock on a fully-diluted basis (except for the New Stock to be issued pursuant to the Management Incentive Plan).

30.     "*Backstop Commitment Parties*" means at any time and from time to time, the parties that have committed to backstop the Rights Offering and are signatories to the Backstop Commitment Agreement, solely in their capacities as such, to the extent provided in the Backstop Commitment Agreement.

31.     "*Bankruptcy Code*" means title 11 of the United States Code, 11 U.S.C. §§ 101–1532, as amended from time to time.

32.     "*Bankruptcy Court*" means the United States Bankruptcy Court for the Southern District of Texas, Houston Division or such other court having jurisdiction over the Chapter 11 Cases, including, to the extent of the withdrawal of reference under 28 U.S.C. § 157 and/or the General Order of the District Court pursuant to section 151 of title 28 of the United States Code, the United States District Court for the Southern District of Texas.

33.     "*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure promulgated under section 2075 of title 28 of the United States Code, and the general, local, and chambers rules of the Bankruptcy Court.

34.     "*Bar Date Order*" means the *Order (I) Setting Bar Dates for Filing Proofs of Claim, Including Requests for Payment under Section 503(b)(9), (II) Establishing Amended Schedules Bar Date and Rejection Damages Bar Date, (III) Approving the Form of and Manner for Filing Proofs of Claim, Including Section 503(b)(9) Requests and (IV) Approving Notice of Bar Dates* [Docket No. 392] (as amended, modified, or supplemented from time to time in accordance with the terms thereof).

35.     "*Bristow Parent*" means Bristow Group Inc.

36.     "*Business Day*" means a day, other than a Saturday, Sunday, or "legal holiday" (as defined in Bankruptcy Rule 9006(a)).

37.     "*Cash*" means the legal tender of the United States of America or the equivalent thereof, including bank deposits and checks.

38.     "*Causes of Action*" means any and all claims, controversies, actions, proceedings, controversies, reimbursement claims, contribution claims, recoupment rights, interests, debts, third-party claims, indemnity claims, damages, remedies, causes of action, demands, rights, suits, obligations, liabilities, accounts, judgments, defenses, affirmative defenses, offsets, powers, privileges, licenses, franchises, Avoidance Actions, counterclaims and cross-claims, of any kind or character whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, asserted or unasserted, direct or indirect, assertible directly or derivatively, choate or inchoate, reduced to judgment or otherwise, secured or unsecured, whether arising before, on, or after the Petition Date, in tort, law, equity, or otherwise pursuant to any theory of law.  Causes of Action also include:  (a) all rights of setoff, counterclaim, or recoupment and claims on contracts or for breaches of duties imposed by law or equity; (b) the right to object to or otherwise contest Claims or Interests; (c) claims pursuant to sections 362, 510, 542, 543, 544 through 550, or 553 of the Bankruptcy Code; (d) such claims and defenses as fraud, mistake, duress, and usury and any other defenses set forth in section 558 of the Bankruptcy Code; and (e) any claim for fraudulent transfer or similar claim pursuant to any state or foreign law.

39.     "*Certificate*" means any instrument evidencing a Claim or an Interest.

40.     "*Chapter 11 Cases*" means, when used with reference to a particular Debtor, the case pending for that Debtor under chapter 11 of the Bankruptcy Code in the Bankruptcy Court, and when used with reference to all the Debtors, the procedurally consolidated and jointly administered chapter 11 cases pending for the Debtors in the Bankruptcy Court.

41.     "*Citizenship Certification*" means a certification regarding the citizenship of a Holder of a General Unsecured Claim, Unsecured Notes Claim, or Secured Notes Claim, in the form approved by the Conditional Disclosure Statement Order or such other form that may be acceptable to the Debtors.

42.     "*Claim*" has the meaning set forth in section 101(5) of the Bankruptcy Code.

43.     "*Claims Bar Date*" means the applicable deadline by which Proofs of Claim must be Filed, as established by: (a) the Bar Date Order; (b) a Final Order of the Bankruptcy Court; or (c) the Plan.

44.     "*Claims Register*" means the official register of Claims maintained by the Solicitation Agent or the clerk of the Bankruptcy Court.

45.     "*Class*" means a category of Holders of Claims or Interests pursuant to section 1122(a) of the Bankruptcy Code.

46.     "*Collateral*" means any property or interest in property of the Estate of any Debtor subject to a Lien, charge, or other encumbrance to secure the payment or performance of a Claim, which Lien, charge, or other encumbrance is not subject to a Final Order ordering the remedy of avoidance of any such Lien, charge, or other encumbrance under the Bankruptcy Code.

47.     "*Committee Consent Right*" means the consent and consultation rights of the Creditors' Committee as set forth in the Committee Joinder.

48.     "*Committee Joinder*" means the joinder by the Creditors' Committee dated August 19, 2019 to the Restructuring Support Agreement.

49.     "*Compensation and Benefits Programs*" means all employment and severance agreements and policies, and all employment, compensation, and benefit plans, policies, workers' compensation programs, savings plans, retirement plans, deferred compensation plans, supplemental executive retirement plans, healthcare plans, disability plans, severance benefit plans, incentive and retention plans, programs and payments, life and accidental death and dismemberment insurance plans, and programs of the Debtors, and all amendments and modifications thereto, applicable to the Debtors' and their Affiliates' employees, former employees, retirees, and non-employee directors and the employees, former employees and retirees of their subsidiaries.

50.     "*Conditional Disclosure Statement Order*" means the order (and all exhibits thereto), which shall be subject to the consent rights of the Required RSA Parties on the terms set forth in the Restructuring Support Agreement, entered by the Bankruptcy Court conditionally approving the Disclosure Statement and the Solicitation Materials, and allowing solicitation of the Plan to commence, entered on [August 22], 2019 [Docket No. [●]], (as amended, modified, or supplemented from time to time in accordance with the terms thereof).

51.     "*Confirmation*" means the entry of the Confirmation Order on the docket of the Chapter 11 Cases.

52.     "*Confirmation Date*" means the date on which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Cases within the meaning of Bankruptcy Rules 5003 and 9021.

53.     "*Confirmation Hearing*" means the hearing held by the Bankruptcy Court to (a) consider Confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code and (b) consider final approval of the Disclosure Statement, the Solicitation Materials, the Restructuring Support Agreement, and the Backstop Commitment Agreement.

54.     "*Confirmation Order*" means the order of the Bankruptcy Court, the form and substance of which shall be subject to the consent rights of the Required RSA Parties on the terms set forth in the Restructuring Support Agreement, and subject to the Committee Consent Right, and, with respect to issues that affect the Milestone Parties, be in form and substance reasonably acceptable to the Milestone Parties, confirming the Plan pursuant to section 1129

8

of the Bankruptcy Code and providing final approval of the Disclosure Statement, the Solicitation Materials, the Restructuring Support Agreement, and the Backstop Commitment Agreement.

55.    "*Consummation*" or "*Consummated*" means the occurrence of the Effective Date.

56.    "*Convertible Notes*" means the 4.50% Convertible Senior Notes due 2023, issued in an original principal amount of approximately $143,750,000 pursuant to the Convertible Notes Indenture.

57.    "*Convertible Notes Indenture*" means that certain indenture, dated as of December 18, 2017, as amended, modified or supplemented from time to time, for the Convertible Notes, among Bristow Parent, as issuer, the Guarantor Subsidiaries, as guarantors, and the Convertible Notes Indenture Trustee, as trustee.

58.    "*Convertible Notes Indenture Trustee*" means Delaware Trust Company, and any successor thereto, solely in its capacity as successor trustee under the Convertible Notes Indenture.

59.    "*Creditors' Committee*" means the official committee of unsecured creditors appointed in the Chapter 11 Cases pursuant to the *Notice of Appointment of Committee of Unsecured Creditors* [Docket No. 179], as may be reconstituted from time to time.

60.    "*Cure Costs*" means all amounts, including an amount of $0.00, required to cure any monetary defaults under any Executory Contract or Unexpired Lease (or such lesser amount as may be agreed upon by the parties to such Executory Contract or Unexpired Lease) that is to be assumed by the Debtors pursuant to sections 365 or 1123 of the Bankruptcy Code.

61.    "*Cure Notice*" means any notice that sets forth the proposed Cure Costs under any Executory Contract or Unexpired Lease at the time such contract or lease is assumed by the applicable Debtors under the Plan, which notice shall include (a) procedures for objecting to proposed assumptions or assignments of the applicable Executory Contracts and/or Unexpired Leases, (b) the Cure Costs proposed to be paid in connection therewith, and (c) procedures for resolution by the Bankruptcy Court of any related dispute.

62.    "*D&O Liability Insurance Policies*" means all insurance policies (including any "tail policy") of any of the Debtors for current or former directors', managers', officers', and/or employees' liability.

63.    "*Debtors*" means, collectively, Bristow Group Inc., BHNA Holdings Inc., Bristow Alaska Inc., Bristow Helicopters Inc., Bristow U.S. Leasing LLC, Bristow U.S. LLC, BriLog Leasing Ltd., and Bristow Equipment Leasing Ltd.

64.    "*DIP Facility*" means that certain $150,000,000 senior secured term loan credit facility provided pursuant to the DIP Facility Credit Agreement.

65.    "*DIP Facility Agent*" means Ankura Trust Company, LLC, or any successor thereto, solely in its capacity as administrative agent and collateral agent under the DIP Facility Credit Agreement.

66.    "*DIP Facility Claim*" means any Claim, including for any Equitization Consent Fee if applicable, held by any of the DIP Facility Lenders or the DIP Facility Agent arising under or related to the DIP Facility Credit Agreement.

67.    "*DIP Facility Credit Agreement*" means that certain Superpriority Secured Debtor-In-Possession Credit Agreement, which is attached as Exhibit A to the DIP Order, which shall be subject to the consent rights of the Required RSA Parties on the terms set forth in the Restructuring Support Agreement.

68.    "*DIP Facility Lenders*" means those certain lenders from time to time party to the DIP Facility Credit Agreement, solely in their capacity as such.

69. "*DIP Order*" means the *Order (A) Authorizing the Debtors to Obtain Postpetition Financing, (B) Authorizing the Debtors to Continue to Use Cash Collateral, (C) Granting Liens and Providing Superpriority Administrative Expense Status, (D) Modifying the Automatic Stay, and (E) Granting Related Relief* [Docket No. [●]] (as amended, modified, or supplemented from time to time in accordance with the terms thereof), which shall be subject to the consent rights of the Required RSA Parties on the terms set forth in the Restructuring Support Agreement.

70. "*Disclosure Statement*" means the disclosure statement for the Plan, including all exhibits and schedules thereto, which shall be subject to the consent rights of the Required RSA Parties on the terms set forth in the Restructuring Support Agreement.

71. "*Disputed*" means, as to any Claim or Interest (or any portion thereof), a Claim or Interest: (a) that is not Allowed; (b) that is not disallowed by the Plan, the Bankruptcy Code, or a Final Order, as applicable; (c) as to which a dispute is being adjudicated by a court of competent jurisdiction in accordance with non-bankruptcy law; (d) as to which a timely objection or request for estimation has been Filed and not withdrawn; or (e) with respect to which a party in interest has Filed a Proof of Claim or otherwise made a written request to a Debtor for payment, without any further notice to or action, order, or approval of the Bankruptcy Court.

72. "*Distribution Agent*" means, as applicable, the Reorganized Debtors or any Entity the Reorganized Debtors select (with the consent of the Required RSA Parties) to make or to facilitate distributions in accordance with the Plan.

73. "*Distribution Date*" means, except as otherwise set forth herein and except distributions to holders of public securities, the date or dates determined by the Debtors or the Reorganized Debtors (in consultation with the Required RSA Parties), on or after the Effective Date, upon which the Distribution Agent shall make distributions to Holders of Allowed Claims and Interests entitled to receive distributions under the Plan.

74. "*Distribution Record Date*" means, other than with respect to those Secured Notes or Unsecured Notes deposited with DTC, the record date for purposes of determining which Holders of Allowed Claims against or Allowed Interests in the Debtors are eligible to receive distributions under the Plan, which date shall be the Confirmation Date, or such other date as is agreed to by the Debtors and the Required RSA Parties, or designated in a Final Order. The Distribution Record Date shall not apply to any Secured Notes or Unsecured Notes deposited with DTC, the Holders of which shall receive a distribution in accordance with the customary procedures of DTC.

75. "*DTC*" means The Depository Trust Company.

76. "*Effective Date*" means the date that is the first Business Day after the Confirmation Date on which all conditions precedent to the occurrence of the Effective Date set forth in Article X.A of the Plan have been satisfied or waived in accordance with Article X.B of the Plan, and the Plan is deemed effective by the Debtors and the Required RSA Parties.

77. "*Eligible Holder*" means a Holder that is a 4(a)(2) Eligible Holder and/or a 1145 Eligible Holder, in each case, as of the Distribution Record Date.

78. "*Entity*" has the meaning set forth in section 101(15) of the Bankruptcy Code.

79. "*Equitization Allocation New Stock*" means 22.68% of the New Stock on a fully-diluted basis (except for the New Stock to be issued pursuant to the Management Incentive Plan), which shall be distributed to the Holders of DIP Facility Claims as set forth in Article II.D of the Plan.

80. "*Equitization Consent Fee*" means 2.27% of the New Stock on a fully-diluted basis (except for the New Stock to be issued pursuant to the Management Incentive Plan), which shall be distributed to the Holders of DIP Facility Claims as set forth in Article II.D of the Plan.

10

81. "*Estate*" means, as to each Debtor, the estate created for the Debtor pursuant to section 541 of the Bankruptcy Code upon the commencement of the applicable Debtor's Chapter 11 Case.

82. "*Exculpated Parties*" means, collectively, and in each case in its capacity as such: (a) the Debtors and the Reorganized Debtors; (b) the DIP Facility Agent; (c) the DIP Facility Lenders; (d) the Backstop Commitment Parties; (e) the Holders of 2019 Term Loan Facility Claims; (f) the 2019 Term Loan Facility Agent; (g) the Supporting Noteholders; (h) the Indenture Trustees; (i) the Milestone Parties; (j) the Creditors' Committee and each of its current and former members; (k) with respect to each of the foregoing entities in clauses (a) through (j), each such Entity's current and former predecessors, successors, Affiliates (regardless of whether such interests are held directly or indirectly), subsidiaries, direct and indirect equity holders, funds, portfolio companies, and management companies; and (l) with respect to each of the foregoing Entities in clauses (a) through (k), each of their respective current and former directors, officers, members, employees, partners, managers, independent contractors, agents, representatives, principals, professionals, consultants, financial advisors, attorneys, accountants, investment bankers, and other professional advisors, each in their capacity as such; *provided that* no current or former Holder of Existing Interests, each in their capacity as such, is an Exculpated Party unless such Holder is also a Supporting Noteholder or current director, officer or employee of a Debtor or an Affiliate of a Debtor.

83. "*Executory Contract*" means a contract or lease to which one or more of the Debtors is a party that is subject to assumption or rejection under section 365 or 1123 of the Bankruptcy Code.

84. "*Existing Interests*" means the Interests in Bristow Parent.

85. "*Exit Facility*" means the secured credit facility that Reorganized Bristow Parent and/or certain other Reorganized Debtors will enter into on the Effective Date in accordance with the Exit Facility Credit Agreement, if the Debtors elect to enter into the Exit Facility instead of entering into the Amended and Restated 2019 Term Loan Credit Agreement.

86. "*Exit Facility Agent*" means the entity identified in the Plan Supplement as administrative and collateral agent under the Exit Facility Credit Agreement, solely in its capacity as such.

87. "*Exit Facility Credit Agreement*" means the agreement governing the Exit Facility, if any, which shall be subject to the consent rights of the Required RSA Parties on the terms set forth in the Restructuring Support Agreement.

88. "*Exit Facility Documents*" means, collectively, the Exit Facility Credit Agreement and any and all other agreements, documents, and instruments delivered or entered into in connection therewith, including any guarantee agreements, pledge and collateral agreements, intercreditor agreements, and other security documents, which shall be subject to the consent rights of the Required RSA Parties on the terms set forth in the Restructuring Support Agreement.

89. "*Exit Facility Lenders*" means those certain lenders from time to time party to the Exit Facility Credit Agreement, solely in their capacity as such.

90. "*Exit Facility Term Sheet*" means a term sheet describing the material terms of the Exit Facility Credit Agreement, if any, which shall be subject to the consent rights of the Required RSA Parties on the terms set forth in the Restructuring Support Agreement.

91. "*Federal Judgment Rate*" means the federal judgment rate in effect pursuant to 28 U.S.C. § 1961 as of the Petition Date, compounded annually.

92. "*File*," "*Filed*," and "*Filing*" means file, filed, or filing in the Chapter 11 Cases with the Bankruptcy Court.

93. "*Final Cash Collateral Order*" means the *Final Order (A) Authorizing the Debtors to Use Cash Collateral, (B) Granting Adequate Protection to the Prepetition Consenting Secured Parties, (C) Modifying the*

11

*Automatic Stay and (D) Granting Related Relief* [Docket No. 312], (as amended, modified, or supplemented from time to time in accordance with the terms thereof), which shall be subject to the consent rights of the Required RSA Parties on the terms set forth in the Restructuring Support Agreement.

94. "*Final Decree*" means the decree contemplated under Bankruptcy Rule 3022.

95. "*Final Order*" means an order or judgment of the Bankruptcy Court or other court of competent jurisdiction with respect to the relevant subject matter that has not been reversed, stayed, modified, or amended, and as to which the time to appeal or seek certiorari has expired and no appeal or petition for certiorari has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been or may be Filed has been resolved by the highest court to which the order or judgment could be appealed or from which certiorari could be sought or the new trial, reargument, or rehearing shall have been denied, resulted in no modification of such order, or has otherwise been dismissed with prejudice.

96. "*General Unsecured Claim*" means any Claim against any of the Debtors that is not Secured and is not: (a) an Administrative Claim; (b) a Professional Fee Claim; (c) a Priority Tax Claim; (d) an Other Priority Claim; (e) an Unsecured Notes Claim; (f) a Trade Claim; (g) an Intercompany Claim; or (h) a Section 510(b) Claim.

97. "*Governance Term Sheet*" means the term sheet attached to the Restructuring Term Sheet as **Exhibit 4**, which shall be subject to the consent rights of the Required RSA Parties on the terms set forth in the Restructuring Support Agreement.

98. "*Governmental Unit*" has the meaning set forth in section 101(27) of the Bankruptcy Code.

99. "*Guarantor Subsidiaries*" means, collectively, Bristow Helicopters Inc., BHNA Holdings, Inc., Bristow U.S. Leasing LLC, Bristow Alaska Inc. and Bristow U.S. LLC.

100. "*GUC Distribution Cash Amount*" means an aggregate amount of Cash in an amount of $6.75 million, subject to increase to the extent of any portion of the Unsecured 4(a)(2) Distribution Cash Amount that is not distributed to eligible holders of Unsecured Notes Claims and General Unsecured Claims in accordance with the Plan.

101. "*HeliFleet Stipulation*" means the *Stipulation and Agreed Order Between the Debtors and HeliFleet 2013-01, LLC Regarding (I) Settlement of Claims and (II) Related Matters* [Docket No. [●]].

102. "*Holder*" means an Entity holding a Claim or Interest, as applicable.

103. "*Impaired*" means, with respect to any Class of Claims or Interests, a Class of Claims or Interests that is impaired within the meaning of section 1124 of the Bankruptcy Code.

104. "*Indemnification Obligations*" means each of the Debtors' indemnification provisions in place, whether in the Debtors' bylaws, certificates of incorporation, other formation documents, board resolutions, management or indemnification agreements, employment contracts, or otherwise, for the current and former directors, officers, managers, employees, attorneys, other professionals, and agents of the Debtors and such current and former directors', officers', and managers' respective Affiliates.

105. "*Indenture Trustee Expenses*" means the reasonable and documented compensation, fees, out-of-pocket expenses, disbursements, and claims for indemnity, subrogation, and contribution incurred or owed to the Indenture Trustees, including, without limitation, reasonable and documented attorneys' fees, expenses and disbursements, whether prior to or after the Petition Date but in all cases before the Effective Date, in each case under the Indentures.

106. "*Indenture Trustees*" means, collectively the Secured Notes Indenture Trustee, the Senior Notes Indenture Trustee, and the Convertible Notes Indenture Trustee.

12

107. "*Indentures*" means, collectively, the Secured Notes Indenture, the Senior Notes Indenture, and the Convertible Notes Indenture.

108. "*Initial Amended RSA*" means that certain Amended and Restated Restructuring Support Agreement dated as of June 27, 2019 that the Restructuring Support Agreement amends, restates and replaces in its entirety.

109. "*Initial MIP Amount*" means 4.0% of the New Stock on a fully diluted basis (of which 4.0%, 60% thereof shall be in grants of restricted units and 40% shall be in options).

110. "*Intercompany Claim*" means any Claim held by a Debtor against another Debtor.

111. "*Intercompany Interest*" means, other than an Interest in Bristow Parent, an Interest in one Debtor held by another Debtor.

112. "*Interest*" means any equity security (as defined in section 101(16) of the Bankruptcy Code) in any Debtor, including options, warrants, rights, restricted stock unit or other securities or agreements to acquire the common stock, preferred stock, limited liability company interests, or other equity, ownership or profits interests of any Debtor (whether or not arising under or in connection with any employment agreement, separation agreement or employee incentive plan or program of a Debtor as of the Petition Date).

113. "*Interim Compensation Order*" means the *Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses for Chapter 11 Case Professionals* [Docket No. 393] (as amended, modified, or supplemented from time to time in accordance with the terms thereof).

114. "*Key Employee Incentive Plan and Retention Payments Order*" means the *Order Authorizing and Approving Key Employee Incentive Plans and Non-Insider Retention Payments* [Docket No. [●]] (as amended, modified, or supplemented from time to time in accordance with the terms thereof).

115. "*Lien*" has the meaning set forth in section 101(37) of the Bankruptcy Code.

116. "*Lombard (BALL) Term Loan*" means that certain prepetition pound sterling funded secured loan facility dated as of November 11, 2016, in the original principal amount of $90,000,000 U.S. dollar equivalent, among Bristow Aircraft Leasing Limited, as borrower, Lombard North Central PLC, as lender, and Bristow Parent and Bristow U.S. Leasing LLC, as guarantors.

117. "*Lombard (BALL) Term Loan Credit Agreement*" means the credit agreement governing the Lombard (BALL) Term Loan, dated as of November 11, 2016, among Bristow Aircraft Leasing Limited, as borrower, Lombard North Central PLC, as lender, and Bristow Parent and Bristow U.S. Leasing LLC, as guarantors.

118. "*Lombard (BALL) Term Loan Guarantee*" means the guarantees by Bristow Parent and Bristow U.S. Leasing LLC of the obligations under Lombard (BALL) Term Loan or the Lombard (BALL) Term Loan Credit Agreement.

119. "*Lombard (BALL) Term Loan Guarantee Claim*" means any Claim against Bristow Parent or Bristow U.S. Leasing LLC arising from or based upon the Lombard (BALL) Term Loan Guarantee.

120. "*Lombard (BULL) Term Loan*" means that certain prepetition pound sterling funded secured loan facility dated as of November 11, 2016, in the original principal amount of $110,000,000 U.S. dollar equivalent, among Bristow U.S. Leasing LLC, as borrower, Lombard North Central PLC, as lender, and Bristow Parent, as guarantor.

121. "*Lombard (BULL) Term Loan Claim*" means any Claim against any of the Debtors arising from or based upon the Lombard (BULL) Term Loan, the Lombard (BULL) Term Loan Guarantee or the Lombard (BULL) Term Loan Credit Agreement.

13

122.    "*Lombard (BULL) Term Loan Credit Agreement*" means the credit agreement governing the Lombard (BULL) Term Loan, dated as of November 11, 2016, among Bristow U.S. Leasing LLC, as borrower, Lombard North Central PLC, as lender, and Bristow Parent, as guarantor.

123.    "*Lombard (BULL) Term Loan Guarantee*" means the guarantee by Bristow Parent of the obligations under Lombard (BULL) Term Loan or the Lombard (BULL) Term Loan Credit Agreement.

124.     "*Macquarie Term Loan Credit Facility*" means that certain prepetition term loan facility dated as of February 1, 2017, in the original principal amount of $200,000,000, among Bristow U.S. LLC, as borrower, Macquarie Bank Limited, as administrative agent, and Bristow Parent, as guarantor.

125.    "*Macquarie Term Loan Credit Facility Claim*" means any claim against any Debtor arising from or based upon the Macquarie Term Loan Credit Facility or the Macquarie Term Loan Guarantee.

126.    "*Macquarie Term Loan Guarantee*" means the guarantee by Bristow Parent of the obligations under the Macquarie Term Loan Credit Facility.

127.    "*MAG Lease Documents*" means the leases, agreements and documents defined as "MAG Lease Documents" in the PK Air Credit Facility.

128.    "*MAG Lease Obligations*" means the obligations under the MAG Lease Documents.

129.    "*MAG Lease Obligation Claims*" means the claims against BriLog Leasing Ltd.,  Bristow Equipment Leasing Ltd.,  Bristow U.S. Leasing LLC, Bristow Parent or any other Debtor arising from or based upon the MAG Lease Documents.

130.    "*Management Incentive Plan*" means a post-Effective Date management incentive plan for certain participating employees of the Reorganized Debtors and Affiliates to be established and implemented in accordance with Article IV.I of the Plan, which shall provide for the terms and conditions under which the MIP Pool may be allowed and distributed to certain participating employees of the Reorganized Debtors and Affiliates and shall be in accordance with the Restructuring Term Sheet.

131.    "*MCA*" means the Maritime & Coastguard Agency, an executive agency of the United Kingdom.

132.    "*MCA and Other Customer Guarantee Claims*" means the MCA Guarantee Claims and the Other Customer Guarantee Claims.

133.    "*MCA Guarantee*" means the guarantee by Bristow Parent of the obligations of Bristow Helicopters Limited and its Affiliates under the UK SAR Contract.

134.    "*MCA Guarantee Claims*" means any Claim against Bristow Parent arising from or based upon the MCA Guarantee.

135.    "*Milestone Parties*" means, collectively, The Milestone Aviation Group Limited, PK Air, the "MAG Parties" as defined in the PK Air Credit Facility, GE Aviation, and their respective affiliates, including certain lessor trusts.

136.    "*Milestone Settlement*" means the settlement between the Debtors and the Milestone Parties that provides for, among other things, the assumption pursuant to section 365 of the Bankruptcy Code of the MAG Lease Documents, amendment of the PK Air Credit Facility, the Allowance of Claims of the Milestone Parties and the reimbursement of certain professional fees, all as set forth in the motion pursuant to Bankruptcy Rule 9019 seeking approval of such settlement.

137.    "*Milestone Settlement Order*" means the order entered by the Bankruptcy Court approving the Milestone Settlement, the form and substance of which shall be acceptable to the Milestone Parties and the Required

14

RSA Parties on the terms set forth in the Restructuring Support Agreement. The Debtors and the Milestone Parties have an agreement in principle which will be memorialized in a term sheet and submitted to the Bankruptcy Court for approval in a motion pursuant to Bankruptcy Rule 9019. If the Bankruptcy Court fails to approve the Milestone Settlement and enter the Milestone Settlement Order on or before September 18, 2019 (or such later date as may be agreed to in writing by each of the Debtors, the Milestone Parties and the Required RSA Parties), the Debtors and the Milestone Parties will revert to their respective rights under the MAG Lease Documents, the PK Air Loan Documents and applicable law and the Milestone Parties shall be able to object to the Plan and Disclosure Statement on any grounds and otherwise exercise any rights and remedies available to them under the MAG Lease Documents, the PK Air Loan Documents, the Bankruptcy Code and Convention on International Interests In Mobile Equipment and the Protocol to the Convention on International Interests in Mobile Equipment on Matters Specific to Aircraft Equipment.

138. "*MIP Pool*" means a pool of stock-based awards, in the form of options, appreciation rights, restricted stock units, restricted stock, or similar awards, as applicable, representing at least 5% but no more than 10% of the aggregate amount of New Stock, determined on a fully diluted and fully distributed basis (with the ratio of New Common Stock to New Preferred Stock to be the same as the ratio of all New Common Stock to all New Preferred Stock held by the average Backstop Commitment Party), which shall be reserved for distribution to certain participating employees of the Reorganized Debtors or Affiliates pursuant to the Management Incentive Plan and shall be in accordance with the Restructuring Term Sheet.

139. "*New Common Stock*" means the common stock of Reorganized Bristow Parent, which shall be subject to the consent rights of the Required RSA Parties on the terms set forth in the Restructuring Support Agreement.

140. "*New Common Stock Agreement*" means the definitive documentation governing the terms and conditions of the New Common Stock, which shall be subject to the consent rights of the Required RSA Parties on the terms set forth in the Restructuring Support Agreement.

141. "*New Organizational Documents*" means the form of the certificates or articles of incorporation, bylaws, or such other applicable formation documents, of each of the Reorganized Debtors, which shall be subject to the consent rights of the Required RSA Parties on the terms set forth in the Restructuring Support Agreement.

142. "*New Preferred Stock*" means the preferred stock of Reorganized Bristow Parent, which shall have the terms and conditions set forth in the New Preferred Stock Term Sheet, which shall be subject to the consent rights of the Required RSA Parties on the terms set forth in the Restructuring Support Agreement.

143. "*New Preferred Stock Agreement*" means the definitive documentation governing the terms and conditions of the New Preferred Stock, which shall be subject to the consent rights of the Required RSA Parties on the terms set forth in the Restructuring Support Agreement.

144. "*New Preferred Stock Term Sheet*" means the term sheet attached to the Restructuring Term Sheet as **Exhibit 3**.

145. "*New Shareholders' Agreement*" means the shareholders' agreement governing the rights of the Holders of New Stock on and after the Effective Date, which shareholders' agreement shall be consistent with the Governance Term Sheet, shall include reasonable and customary minority protection rights, and shall be subject to the consent rights of the Required RSA Parties on the terms set forth in the Restructuring Support Agreement, and the Debtors and the Required Backstop Parties shall consult with the Creditors' Committee regarding the terms of such shareholders' agreement. Notwithstanding anything to the contrary in the Governance Term Sheet, the New Shareholders' Agreement shall provide that the Reorganized Debtors shall provide all holders of the New Stock with quarterly, unaudited financial statements, as well as management discussion and analysis materials regarding the financial condition and results of operations for the Reorganized Debtors with respect to such financial statements, subject to execution of standard confidentiality agreements with the Reorganized Debtors.

146. "*New Stock*" means, collectively, the New Common Stock and the New Preferred Stock. For the avoidance of doubt, to the extent necessary to ensure that the Reorganized Debtors are in compliance with the

requirements of 49 U.S.C. § 40102(a)(15)(C), the Reorganized Debtors (subject to any consent rights set forth in the Restructuring Support Agreement) may issue New Warrants (in lieu of New Stock) to any Entity (other than a Backstop Party or a recipient from the MIP Pool) that is a Non-U.S. Citizen that would otherwise receive New Stock pursuant to the Plan.

147. "*New Warrants*" means warrants for the New Stock, which shall be issued by the Reorganized Debtors in order to ensure compliance with the requirements of 49 U.S.C. § 40102(a)(15)(C), with the terms of such warrants to be governed by the New Warrant Agreement.

148. "*New Warrant Agreement*" means the agreement governing the terms of the New Warrants, which shall be subject to the consent rights of the Required RSA Parties on the terms set forth in the Restructuring Support Agreement.

149. "*Non-U.S. Citizen*" means a Holder of an Allowed Unsecured Notes Claim, General Unsecured Claim, or Secured Notes Claim that is not determined to be a U.S. Citizen under the procedure set forth in Article IV.E of this Plan.

150. "*Original DIP Commitment Letter*" means that certain commitment letter, dated as of May 10, 2019, by and among Bristow Parent, Bristow Holdings Company Ltd. III and each of the institutions identified on Schedule 1 thereto, as the same may have been amended, supplemented or otherwise modified.

151. "*Original RSA*" has the meaning ascribed to such term in the Restructuring Support Agreement.

152. "*Other Customer Contract*" means any revenue-generating customer contract of one or more of the Debtors' non-debtor Affiliates that is set forth in the Schedule of Other Customer Contracts.

153. "*Other Customer Guarantee*" means any guarantee by any of the Debtors of the obligations of one or more of its Affiliates under an Other Customer Contract.

154. "*Other Customer Guarantee Claim*" means any Claim against any of the Debtors arising from or based upon an Other Customer Guarantee.

155. "*Other Priority Claim*" means any Claim other than an Administrative Claim or a Priority Tax Claim entitled to priority in right of payment under section 507(a) of the Bankruptcy Code.

156. "*Other Secured Claim*" means any Secured Claim against any of the Debtors, other than a Secured Notes Claim, a 2019 Term Loan Facility Claim, a Lombard (BULL) Term Loan Claim, a Macquarie Term Loan Credit Facility Claim, or a PK Air Credit Facility Claim.

157. "*Person*" has the meaning set forth in section 101(41) of the Bankruptcy Code.

158. "*Petition Date*" means May 11, 2019, the date on which the Debtors commenced the Chapter 11 Cases.

159. "*PK Air*" means PK AirFinance S.à r.l, as agent, security trustee and MAG Agent under the PK Air Credit Facility.

160. "*PK Air Credit Facility*" means that certain prepetition credit agreement dated as of July 17, 2017 in the original principal amount of $230,000,000 across 24 term loans, among Bristow Equipment Leasing Ltd., as borrower, PK Air, as agent, PK Transportation Finance Ireland Limited, as lender, and other lenders from time to time thereto.

161. "*PK Air Credit Facility Claim*" means any claim against BriLog Leasing Ltd., Bristow Equipment Leasing Ltd., Bristow U.S. Leasing LLC, Bristow Parent or any other Debtor arising from or based upon the PK Air Loan Documents.

16

162. "*PK Air Credit Facility Guarantee*" means the guarantee by Bristow Parent of the obligations under the PK Air Loan Documents.

163. "*PK Air Loan Documents*" means, collectively, the PK Air Credit Facility, the PK Air Credit Facility Guarantee, related promissory notes, and all other agreements, documents, and instruments delivered or entered into in connection therewith, including any guarantee agreements, pledge and collateral agreements, aircraft mortgages, intercreditor agreements, security documents and other "Loan Documents" as defined in the PK Air Credit Facility.

164. "*Plan*" means this joint chapter 11 plan (as it may be amended or supplemented from time to time, including all exhibits, schedules, supplements, appendices, annexes and attachments hereto), which shall be subject to the consent rights of the Required RSA Parties on the terms set forth in the Restructuring Support Agreement.

165. "*Plan Supplement*" means the compilation of documents and forms of documents, schedules, and exhibits to the Plan, to be Filed by the Debtors no later than 7 days before the Voting Deadline, or such later date as may be approved by the Bankruptcy Court on notice to parties in interest (as such documents may be amended prior to the Effective Date by Filing such amended documents), including: (a) the material New Organizational Documents; (b) the Exit Facility Term Sheet, if applicable; (c) the Amended and Restated 2019 Term Loan Credit Agreement and material related documents, if applicable, and the identity of the Amended and Restated 2019 Term Loan Facility Agent; (d) the schedule of Retained Causes of Action; (e) a disclosure of the members of the Reorganized Bristow Parent Board and their compensation; (f) the Schedule of Assumed Executory Contracts and Unexpired Leases; (g) the Schedule of Rejected Executory Contracts and Unexpired Leases; (h) the Restructuring Transactions Exhibit, if needed; (i) a description of the material terms of the Management Incentive Plan; (j) the New Shareholders' Agreement; (k) the Schedule of Other Customer Contracts; (l) the New Preferred Stock Agreement; (m) the New Common Stock Agreement; (n) the terms of the Amended PK Air Credit Facility Agreement (to the extent not disclosed in the motion seeking approval of the Milestone Settlement); and (o) to the extent necessary in order to ensure compliance with 49 U.S.C. § 40102(a), the New Warrant Agreement, which shall in each case be subject to the consent rights of the Required RSA Parties on the terms set forth in the Restructuring Support Agreement. The Debtors and the Required RSA Parties shall consult with the Creditors' Committee regarding the Plan Supplement documents, and the Plan Supplement documents shall be subject to the Committee Consent Right. The Debtors shall have the right to amend the documents contained in, and exhibits to, the Plan Supplement through the Effective Date, subject to the terms of the Plan, the Restructuring Support Agreement and the Backstop Commitment Agreement, including the consent rights of the Required RSA Parties.

166. "*Priority Tax Claim*" means any Claim of a Governmental Unit against any of the Debtors of the kind specified in section 507(a)(8) of the Bankruptcy Code.

167. "*Pro Rata*" means the proportion that an Allowed Claim or Allowed Interest in a particular Class bears to the aggregate amount of the Allowed Claims or Allowed Interests in that respective Class, or the proportion of the Allowed Claims or Allowed Interests in a particular Class and other Classes entitled to share in the same recovery as such Allowed Claim or Allowed Interests under the Plan.

168. "*Professional*" means an Entity employed in the Chapter 11 Cases pursuant to a Bankruptcy Court order in accordance with sections 327, 363, or 1103 of the Bankruptcy Code and to be compensated for services rendered before or on the Effective Date, pursuant to sections 327, 328, 329, 330, or 331 of the Bankruptcy Code.

169. "*Professional Fee Amount*" means the aggregate amount of Professional Fee Claims and other unpaid fees and expenses that Professionals estimate they have incurred or will incur in rendering services to the Debtors prior to and as of the Confirmation Date, which estimates Professionals shall deliver to the Debtors as set forth in Article II.B of the Plan.

170. "*Professional Fee Claim*" means any Administrative Claim for the compensation of Professionals and the reimbursement of expenses incurred by such Professionals through and including the Confirmation Date to the extent such fees and expenses have not been paid pursuant to an order of the Bankruptcy Court. To the extent the Bankruptcy Court denies or reduces by a Final Order any amount of a Professional's requested fees and expenses, then the amount by which such fees or expenses are reduced or denied shall reduce the applicable Professional Fee Claim.

171.     "*Professional Fee Escrow Account*" means an account funded by the Debtors with Cash on the Effective Date in an amount equal to the total estimated amount of the Professional Fee Amount as set forth in Article II.B of the Plan.

172.     "*Proof of Claim*" means a proof of Claim Filed against any of the Debtors in the Chapter 11 Cases by the applicable Claims Bar Date.

173.     "*Reinstate*," "*Reinstated*," or "*Reinstatement*" means, with respect to Claims or Interests, that the Claim or Interest shall be rendered Unimpaired in accordance with section 1124 of the Bankruptcy Code.

174.     "*Related Party*" means, collectively, current and former directors, managers, officers, shareholders, equity holders (regardless of whether such interests are held directly or indirectly), affiliated investment funds or investment vehicles, predecessors, participants, successors, assigns (whether by operation of law or otherwise), subsidiaries, current, former, and future affiliates, associated entities, managed entities, accounts or funds, partners, limited partners, general partners, principals, members, management companies, fund advisors, fiduciaries, trustees, employees, agents (including any Distribution Agent), advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, other representatives, and other professionals, representatives, advisors, predecessors, successors, and assigns, each solely in their capacities as such, solely in their capacity as such, and such entities' respective heirs, executors, estates, servants and nominees.

175.     "*Released Parties*" means, collectively, and in each case in its capacity as such: (a) the Debtors; (b) the Reorganized Debtors; (c) the DIP Facility Agent; (d) the DIP Facility Lenders; (e) the Backstop Commitment Parties; (f) the Holders of 2019 Term Loan Facility Claims; (g) the 2019 Term Loan Facility Agent; (h) the Amended and Restated 2019 Term Loan Facility Lenders; (i) the Amended and Restated 2019 Term Loan Facility Agent; (j) the Supporting Noteholders; (k) the Indenture Trustees; (l) the Exit Facility Lenders; (m) the Exit Facility Agent; (n) the Milestone Parties; (o) the Creditors' Committee and each of its current and former members; (p) each current and former Affiliate of each Entity in clause (a) through (o); and (q) each Related Party of each Entity in clause (a) through (p); *provided that* any holder of a Claim or Interest that (x) validly opts out of the releases contained in the Plan or (y) files an objection to the releases contained in the Plan shall not be a "Released Party."

176.     "*Releasing Parties*" means, collectively, and in each case in its capacity as such: (a) the Debtors; (b) the Reorganized Debtors; (c) the DIP Facility Agent; (d) the DIP Facility Lenders; (e) the Backstop Commitment Parties; (f) the Holders of 2019 Term Loan Facility Claims; (g) the 2019 Term Loan Facility Agent; (h) the Amended and Restated 2019 Term Loan Facility Lenders; (i) the Amended and Restated 2019 Term Loan Facility Agent; (j) the Supporting Noteholders; (k) the Indenture Trustees; (l) the Exit Facility Lenders; (m) the Exit Facility Agent; (n) all Holders of Claims; (o) all Holders of Interests; (p) the Milestone Parties; (q) the Creditors' Committee and each of its current and former members; (r) each current and former Affiliate of each Entity in clause (a) through (q); and (s) each Related Party of each Entity in clause (a) through (r); *provided that* any holder of a Claim or Interest that (x) validly opts out of the releases contained in the Plan or (y) files an objection to the releases contained in the Plan shall not be a "Releasing Party"; *provided*, *further*, that for the avoidance of doubt, no Holder of a Claim that is party to or has otherwise signed the Restructuring Support Agreement may opt out of the releases.

177.     "*Reorganized Bristow Parent*" means Bristow Parent, as reorganized pursuant to and under the Plan, on and after the Effective Date, or any successor or assign thereto.

178.      "*Reorganized Bristow Parent Board*" means the board of directors of Reorganized Bristow Parent on and after the Effective Date.

179.     "*Reorganized Debtors*" means the Debtors, as reorganized pursuant to and under the Restructuring Transactions, on and after the Effective Date, or any successors or assigns thereto.

180.     "*Required Backstop Parties*" has the meaning ascribed to such term in the Restructuring Support Agreement.

181. "*Required DIP Lenders*" has the meaning ascribed to such term in the Restructuring Support Agreement.

182. "*Required RSA Parties*" means, with respect to any document, order, agreement or as otherwise used in this Plan, the applicable parties holding the applicable consent rights under the Restructuring Support Agreement (including section 2.02 thereof).

183. "*Restructuring Documents*" has the meaning ascribed to such term in the Restructuring Support Agreement. For the avoidance of doubt, Restructuring Documents shall include the Final Cash Collateral Order, the Disclosure Statement, the other solicitation materials with respect to the Plan, the Conditional Disclosure Statement Order, the Plan, each document included in the Plan Supplement, the Backstop Commitment Agreement, the Confirmation Order, the DIP Facility Credit Agreement, the DIP Order, the Exit Facility Credit Agreement, the Amended and Restated 2019 Term Loan Credit Agreement, the Amended PK Air Credit Facility Agreement, the New Organizational Documents, the Management Incentive Plan and the Rights Offering Procedures. Each of the Restructuring Documents shall comport with the terms of the Restructuring Support Agreement, including the applicable consent rights thereunder (including section 2.02 thereof). The Debtors and the Required RSA Parties shall consult with the Creditors' Committee regarding the Restructuring Documents, and the Restructuring Documents shall be subject to the Committee Consent Right.

184. "*Restructuring Support Agreement*" means that certain Second Amended and Restated Restructuring Support Agreement, entered into and dated as of July 24, 2019, by and among the Debtors and the Supporting Noteholders, including all exhibits, schedules and other attachments thereto, as such agreement may be amended from time to time in accordance with the terms thereof including pursuant to the Committee Joinder and which shall only be amended in accordance with the terms thereof, a copy of which is attached to the Disclosure Statement as **Exhibit B**.

185. "*Restructuring Term Sheet*" means the term sheet attached as **Exhibit A** to the Restructuring Support Agreement including all exhibits, schedules and other attachments thereto.

186. "*Restructuring Transactions*" mean those mergers, amalgamations, consolidations, arrangements, continuances, restructurings, transfers, conversions, dispositions, liquidations, dissolutions, or other corporate transactions that the Debtors and the Required RSA Parties reasonably determine to be necessary to implement the Plan.

187. "*Restructuring Transactions Exhibit*" means an exhibit, which may be included as needed in the Plan Supplement, that sets forth the steps to be carried out to effectuate the Restructuring Transactions on and after the Effective Date.

188. "*Retained Causes of Action*" means those Causes of Action that shall vest in the Reorganized Debtors on the Effective Date, which, for the avoidance of doubt, shall not include any of the Causes of Action that are settled, released or exculpated under the Plan. For the avoidance of doubt, and notwithstanding anything to the contrary under the Plan, any and all Causes of Action that the Debtors may hold against Columbia Helicopters, Inc. and its Related Parties shall be Retained Causes of Action.

189. "*Rights Offering*" means, collectively, the 1145 Rights Offering and the 4(a)(2) Rights Offering, each of which shall be conducted in accordance with the Backstop Commitment Agreement, the Restructuring Support Agreement, and the applicable Rights Offering Procedures.

190. "*Rights Offering Offerees*" means, collectively, (i) the Holders of Secured Notes Claims, (ii) the Holders of Unsecured Notes Claims that are Eligible 4(a)(2) Holders, (iii) the Holders of Unsecured Notes Claims that are **not** Eligible 4(a)(2) Holders and do **not** timely make the Unsecured Cash Out Election, and (iv) the Holders of General Unsecured Claims that do **not** timely make the Unsecured Cash Out Election.

191. "*Rights Offering Participants*" means, collectively, the Rights Offering Offerees that duly subscribe for New Stock in accordance with the Rights Offering Procedures.

19

192. "*Rights Offering and Cash Out Procedures*" means, collectively, the 1145 Rights Offering and Cash Out Election Procedures and the 4(a)(2) Rights Offering Procedures, as applicable, each of which shall be subject to (i) the consent rights of the Required RSA Parties on the terms set forth in the Restructuring Support Agreement, and (ii) the Committee Consent Rights.

193. *Rights Offering Procedures*" means, collectively, the 1145 Rights Offering and Cash Out Election Procedures and the 4(a)(2) Rights Offering Procedures, as applicable, each of which shall be subject to (i) the consent rights of the Required RSA Parties on the terms set forth in the Restructuring Support Agreement, and (ii) the Committee Consent Rights.

194. "*Rights Offering Stock*" means, collectively, the 1145 Rights Offering Stock and the 4(a)(2) Rights Offering Stock to be purchased by the Rights Offering Participants pursuant to the Rights Offering, which shall be equal to 58.22% of the New Stock on a fully-diluted basis (except for the New Stock to be issued pursuant to the Management Incentive Plan) and shall be payable 8.175% in New Preferred Stock and 91.825% in New Common Stock, subject to adjustment as set forth in the Backstop Commitment Agreement. For the avoidance of doubt, the term "Rights Offering Stock" does not include the New Common Stock or New Preferred Stock issued on account of the Backstop Commitment Fee.

195. "*Schedule of Assumed Executory Contracts and Unexpired Leases*" means the schedule (including any modifications or amendments thereto) of certain Executory Contracts and Unexpired Leases to be assumed by the Debtors pursuant to the Plan, which shall be subject to the consent rights of the Required RSA Parties on the terms set forth in the Restructuring Support Agreement.

196. "*Schedule of Other Customer Contracts*" means the schedule (including any modifications or amendments thereto), if any, identifying the Other Customer Contracts.

197. "*Schedule of Rejected Executory Contracts and Unexpired Leases*" means the schedule (including any amendments or modifications thereto), if any, of certain Executory Contracts and Unexpired Leases to be rejected by the Debtors pursuant to the Plan.

198. "*Schedules*" means, collectively, the schedules of assets and liabilities and statements of financial affairs Filed by the Debtors pursuant to section 521 of the Bankruptcy Code.

199. "*SEC*" means the Securities and Exchange Commission.

200. "*Section 510(b) Claim*" means any claim against any of the Debtors that is subject to subordination under section 510(b) of the Bankruptcy Code.

201. "*Secured*" or "*Secured Claim*" means, when referring to a Claim against any of the Debtors, a Claim that is: (a) secured by a lien on property in which any of the Debtors has an interest, which lien is valid, perfected, and enforceable pursuant to applicable law or by reason of a Bankruptcy Court order, or that is subject to a valid right of setoff pursuant to section 553 of the Bankruptcy Code, to the extent of the value of the creditor's interest in the Debtors' interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code; or (b) Allowed pursuant to the Plan, or separate order of the Bankruptcy Court, as a secured claim.

202. "*Secured Noteholder Subscription Rights*" means the non-certificated rights to be distributed to each Holder of Secured Notes that will enable each Holder thereof to purchase its Pro Rata share of the Secured Rights Offering Stock, pursuant to the terms of the Rights Offering Procedures and the Backstop Commitment Agreement.

203. "*Secured Notes*" means the 8.75% Senior Secured Notes due 2023, issued in an original principal amount of $350,000,000 pursuant to the Secured Notes Indenture.

204. "*Secured Notes Ad Hoc Group*" has the meaning ascribed to such term in the Restructuring Support Agreement.

20

205. "*Secured Notes Claim*" means any Claim against any of the Debtors arising from or based upon the Secured Notes or the Secured Notes Indenture.

206. "*Secured Notes Indenture*" means that certain indenture, dated as of March 6, 2018, as amended, modified or supplemented from time to time, for the Secured Notes, among Bristow Parent, as issuer, the Guarantor Subsidiaries, as guarantors, and the Secured Notes Indenture Trustee, as trustee.

207. "*Secured Notes Indenture Trustee*" means U.S. Bank National Association, and any successor thereto, solely in its capacity as trustee under the Secured Notes Indenture.

208. "*Secured Rights Offering Stock*" means the amount of the New Stock distributed pursuant to the Rights Offering in exchange for $37.5 million.

209. "*Securities Act*" means the Securities Act of 1933, 15 U.S.C. §§ 77a–77aa, together with the rules and regulations promulgated thereunder, as amended from time to time, or any similar federal, state, or local law.

210. "*Security*" has the meaning set forth in section 2(a)(1) of the Securities Act. "*Securities*" shall have a correlative meaning.

211. "*Senior Notes*" means the 6.25% Senior Notes due 2022, issued in an original principal amount of $450,000,000 pursuant to the Senior Notes Indenture.

212. "*Senior Notes Indenture*" means that certain indenture, dated as of October 12, 2012, as amended, modified or supplemented from time to time, for the Senior Notes, among Bristow Parent, as issuer, the Guarantor Subsidiaries, as guarantors, and the Senior Notes Indenture Trustee, as trustee.

213. "*Senior Notes Indenture Trustee*" means Wilmington Trust, National Association, and any successor thereto, solely in its capacity as trustee under the Senior Notes Indenture.

214. "*Servicer*" means an agent or other authorized representative of Holders of Claims or Interests.

215. "*Solicitation Agent*" means Prime Clerk LLC, the notice, claims, and solicitation agent retained by the Debtors in the Chapter 11 Cases.

216. "*Solicitation Materials*" means, collectively, the solicitation materials with respect to the Plan.

217. "*Subscription Rights*" means, collectively, the 1145 Subscription Rights and the 4(a)(2) Subscription Rights.

218. "*Supporting Noteholders*" has the meaning ascribed to such term in the Restructuring Support Agreement.

219. "*Supporting Secured Noteholders*" has the meaning ascribed to such term in the Restructuring Support Agreement.

220. "*Supporting Unsecured Noteholders*" has the meaning ascribed to such term in the Restructuring Support Agreement.

221. "*Trade Claim*" means any Claim held by an ordinary course trade vendor of the Debtors against any of the Debtors on account of ordinary course goods and/or services provided to any of the Debtors, including any due but unpaid director fees as of the Petition Date. For the avoidance of doubt, Trade Claims shall not include any Claim arising from or based upon (1) rejection of any Executory Contract or Unexpired Lease, (2) the Debtors' prepetition return of any aircraft or any prepetition agreement or settlement with respect to any aircraft lease obligations, (3) any agreement or arrangement with any former insider (as of the Petition Date) of any Debtor or

(4) any obligation in respect of deferred compensation plans for any participant that is not a current employee on the Effective Date.

222.    "*Transaction Expenses*" has the meaning ascribed to such term in the Restructuring Support Agreement.

223.    "*UK ABL Credit Facility*" means that certain asset based credit facility pursuant to the ABL Facilities Agreement, dated April 17, 2018, among Bristow Norway AS and Bristow Helicopters Limited, as borrowers, Barclays Bank PLC and Credit Suisse AG, Cayman Island Branch, as arrangers and bookrunners, Barclays Bank PLC as agent, issuing bank, security agent and swingline lender, and the several branches, other financial institutions and other lenders from time to time party thereto and Bristow Parent, as guarantor.

224.    "*UK ABL Credit Facility Guarantee*" means the guarantee by Bristow Parent of the obligations of Bristow Norway AS and Bristow Helicopters Limited under the UK ABL Credit Facility.

225.    "*UK ABL Credit Facility Guarantee Claim*" means any Claim against Bristow Parent arising from or based upon the UK ABL Credit Facility Guarantee.

226.    "*UK SAR Contract*" means that certain contract between Bristow Helicopters Limited and MCA for the provision of search and rescue services in the United Kingdom on behalf of Her Majesty's Coastguard.

227.    "*Unclaimed Distribution*" means any distribution under the Plan on account of an Allowed Claim to a Holder that has not: (a) accepted a particular distribution or, in the case of distributions made by check, negotiated such check; (b) given notice to the Reorganized Debtors of an intent to accept a particular distribution; (c) responded to the Debtors' or Reorganized Debtors' requests for information necessary to facilitate a particular distribution; or (d) taken any other action necessary to facilitate such distribution.

228.    "*Unexpired Lease*" means a lease of nonresidential real property to which one or more of the Debtors is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

229.    "*Unimpaired*" means, with respect to a Class of Claims or Interests, a Class of Claims or Interests that is not impaired within the meaning of section 1124 of the Bankruptcy Code.

230.    "*Unsecured 1145 Rights Offering Stock*" means the amount of the Unsecured Rights Offering Stock that is also 1145 Rights Offering Stock.

231.    "*Unsecured 1145 Subscription Rights*" means the non-certificated rights to be distributed to each Holder of an Unsecured Notes Claim or General Unsecured Claim, in each case, that has not timely made the Unsecured Cash Out Election, that will enable each Holder thereof to purchase its Pro Rata share of the Unsecured 1145 Rights Offering Stock, pursuant to the terms of the Rights Offering Procedures and the Backstop Commitment Agreement.

232.    "*Unsecured 4(a)(2) Distribution Cash Amount*" means Cash in an amount of up to $250,000, *provided that* after all distributions of such amount have been completed as set forth in the Plan, any portion remaining shall be added to the GUC Distribution Cash Amount.

233.    "*Unsecured 4(a)(2) Rights Offering Stock*" means the amount of the Unsecured Rights Offering Stock that is also 4(a)(2) Rights Offering Stock.

234.    "*Unsecured 4(a)(2) Subscription Rights*" means the non-certificated rights to be distributed to each 4(a)(2) Eligible Holder of an Unsecured Notes Claim or General Unsecured Claim that has not timely made the Unsecured Cash Out Election, that will enable each Holder thereof to purchase its Pro Rata share of the Unsecured 4(a)(2) Rights Offering Stock, pursuant to the terms of the Rights Offering Procedures and the Backstop Commitment Agreement.

235.    "*Unsecured Cash Out Election*" means the election to be made by (a) each holder of an General Unsecured Claim to receive the treatment under the Plan set forth in Article III.B.12.b.i.y or Article III.B.12.b.ii.y instead of the treatment under the Plan set forth in Article III.B.12.b.i.x or Article III.B.12.b.ii.x, as applicable, and (b) each holder of an Unsecured Notes Claim that is not a 4(a)(2) Eligible Holder to receive the treatment under the Plan set forth in Article III.B.8.b.ii.y instead of the treatment under the Plan set forth in Article III.B.8.b.ii.x, with such election being described in greater detail in the 1145 Rights Offering and Unsecured Cash Out Election Procedures.

236.    "*Unsecured Equity Pool*" means New Common Stock in an amount equal to 11% of all New Stock on a fully-diluted basis (except for the New Stock to be issued pursuant to the Management Incentive Plan).

237.    "*Unsecured Notes*" means, collectively, the Senior Notes and the Convertible Notes.

238.    "*Unsecured Notes Ad Hoc Group*" has the meaning ascribed to such term in the Restructuring Support Agreement.

239.    "*Unsecured Notes Claim*" means any Claim against any of the Debtors arising from or based upon the Senior Notes, the Senior Notes Indenture, the Convertible Notes, or the Convertible Notes Indenture.

240.    "*Unsecured Notes Indenture Trustees*" means collectively, the Senior Notes Indenture Trustee and the Convertible Notes Indenture Trustee.

241.    "*Unsecured Rights Offering Stock*" means the amount of the New Stock distributed pursuant to the Rights Offering in exchange for $347.5 million.

242.    "*Unsubscribed Shares*" has the meaning ascribed to such term in the Backstop Commitment Agreement.

243.    "*U.S. Trustee*" means the Office of the United States Trustee for the Southern District of Texas.

244.    "*Voting Classes*" has the meaning ascribed to such term in the Conditional Disclosure Statement Order.

245.    "*Voting Report*" means the report certifying the methodology for the tabulation of votes and result of voting under the Plan.

B.      *Rules of Interpretation*

For purposes herein:  (1) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (2) unless otherwise specified, any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions; (3) unless otherwise specified, any reference herein to an existing document, schedule, or exhibit, shall mean such document, schedule, or exhibit, as it may have been or may be amended, modified, or supplemented; (4) unless otherwise specified, all references herein to "Articles" and "Sections" are references to Articles and Sections, respectively, hereof or hereto; (5) the words "herein," "hereof," and "hereto" refer to the Plan in its entirety rather than to any particular portion of the Plan; (6) captions and headings to Articles and Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan; (7) unless otherwise specified herein, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (8) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to such term in the Bankruptcy Code or the Bankruptcy Rules, as applicable; (9) references to docket numbers of documents Filed in the Chapter 11 Cases are references to the docket numbers under the Bankruptcy Court's CM/ECF system; (10) all references to statutes, regulations, orders, rules of courts, and the like shall mean as amended from time to time, and as applicable to the Chapter 11 Cases, unless otherwise stated; (11) references to "shareholders," "directors," and/or "officers" shall also include "members"

23

and/or "managers," as applicable, as such terms are defined under the applicable state limited liability company laws; (12) the words "include" and "including" and variations thereof shall not be deemed to be terms of limitation, and shall be deemed to be followed by the words "without limitation"; and (13) any immaterial effectuating provisions may be interpreted by the Debtors or the Reorganized Debtors in such a manner that is consistent with the overall purpose and intent of the Plan and without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity; *provided that* no effectuating provision shall be immaterial or deemed immaterial if it has any substantive legal or economic effect on any Person.

C.      *Computation of Time*

Unless otherwise specifically stated herein, the provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein. If the date on which a transaction may occur pursuant to the Plan shall occur on a day that is not a Business Day, then such transaction shall instead occur on the next succeeding Business Day. Any action to be taken on the Effective Date may be taken on or soon as reasonably practicable after the Effective Date.

D.      *Governing Law*

Except to the extent a rule of law or procedure is supplied by federal law (including the Bankruptcy Code or Bankruptcy Rules), and subject to the provisions of any contract, lease, instrument, release, indenture, or other agreement or document entered into expressly in connection herewith, the rights and obligations arising hereunder shall be governed by, and construed and enforced in accordance with, the laws of the State of New York, without giving effect to conflict of laws principles.

E.      *Reference to Monetary Figures*

All references in the Plan to monetary figures refer to currency of the United States of America, unless otherwise expressly provided.

F.      *Reference to the Debtors or the Reorganized Debtors*

Except as otherwise specifically provided in the Plan to the contrary, references in the Plan to the Debtors or to the Reorganized Debtors mean the Debtors and the Reorganized Debtors, as applicable, to the extent the context requires.

G.      *Controlling Document*

In the event of an inconsistency between the Plan and the Disclosure Statement, the terms of the Plan shall control in all respects. In the event of an inconsistency between the Plan and any document included in the Plan Supplement, the applicable Plan Supplement document shall control. In the event of an inconsistency between the Confirmation Order and any of the Plan, the Disclosure Statement, or the Plan Supplement, the Confirmation Order shall control.

## ARTICLE II.
## ADMINISTRATIVE AND PRIORITY CLAIMS

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, Professional Fee Claims, Priority Tax Claims, DIP Facility Claims and Other Priority Claims have not been classified and thus are excluded from the Classes of Claims and Interests set forth in Article III of the Plan.

A.      *Administrative Claims*

Except with respect to the Professional Fee Claims, DIP Facility Claims and Claims for fees and expenses pursuant to section 1930 of chapter 123 of title 28 of the United States Code, and except to the extent that a Holder of an Allowed Administrative Claim and the Debtor (with the consent of the Required RSA Parties, not to be

24

unreasonably withheld) against which such Allowed Administrative Claim is asserted agree to less favorable treatment for such Holder, or such Holder has been paid by any Debtor on account of such Allowed Administrative Claim prior to the Effective Date, each Holder of such an Allowed Administrative Claim will receive in full and final satisfaction of its Allowed Administrative Claim an amount of Cash equal to the amount of such Allowed Administrative Claim in accordance with the following: (1) if an Administrative Claim is Allowed on or prior to the Effective Date, on the Effective Date or as soon as reasonably practicable thereafter (or, if not then due, when such Allowed Administrative Claim is due or as soon as reasonably practicable thereafter); (2) if such Administrative Claim is not Allowed as of the Effective Date, no later than 30 days after the date on which the Reorganized Debtors Allow such Allowed Administrative Claim or the date on which an order Allowing such Administrative Claim becomes a Final Order, or as soon as reasonably practicable thereafter, as applicable; (3) if such Allowed Administrative Claim is based on liabilities incurred by the Debtors in the ordinary course of their business after the Petition Date, in accordance with the terms and conditions of the particular transaction giving rise to such Allowed Administrative Claim without any further action by the Holder of such Allowed Administrative Claim; (4) at such time and upon such terms as may be agreed upon by such Holder and the Debtors or the Reorganized Debtors, as applicable; or (5) at such time and upon such terms as set forth in an order of the Bankruptcy Court.

Holders of Administrative Claims that are required to File and serve a request for payment of such Administrative Claims by the Administrative Claims Bar Date that do not File and serve such a request by the Administrative Claims Bar Date shall be forever barred, stopped, and enjoined from asserting such Administrative Claims against the Debtors or the Reorganized Debtors, and such Administrative Claims shall be deemed compromised, settled, and released as of the Effective Date. For the avoidance of doubt, Holders of DIP Facility Claims shall not be required to File or serve any request for payment of such DIP Facility Claims.

B.      *Professional Fee Claims*

Notwithstanding anything to the contrary herein, all final requests for payment of Professional Fee Claims for services rendered and reimbursement of expenses incurred during the period from the Petition Date through the Confirmation Date must be Filed with the Bankruptcy Court no later than 45 days after the Effective Date. The Bankruptcy Court shall determine the Allowed amounts of such Professional Fee Claims after notice and a hearing in accordance with the Bankruptcy Code, the Bankruptcy Rules, and any procedures established by the Bankruptcy Court. The Reorganized Debtors shall pay Professional Fee Claims in Cash in the amount the Bankruptcy Court Allows, including from the Professional Fee Escrow Account, which the Reorganized Debtors will establish in trust for the Professionals and fund with Cash equal to the Professional Fee Amount on the Effective Date. Professionals shall deliver to the Debtors their estimates for purposes of the Reorganized Debtors computing the Professional Fee Amount no later than 10 Business Days following the Confirmation Date. For the avoidance of doubt, no such estimate shall be deemed to limit the amount of the fees and expenses that are the subject of a Professional's final request for payment of Professional Fee Claims Filed with the Bankruptcy Court. If a Professional does not provide an estimate, the Debtors may estimate the unpaid and unbilled fees and expenses of such Professional. No funds in the Professional Fee Escrow Account shall be property of the Estates, and the Professional Fee Escrow Account shall be maintained in trust solely for the benefit of Holders of Professional Fee Claims. Any funds remaining in the Professional Fee Escrow Account after all Allowed Professional Fee Claims have been paid shall be promptly turned over to the Reorganized Debtors.

From and after the Confirmation Date, any requirement that Professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Reorganized Debtors may employ and pay any Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court. The reasonable and documented fees and expenses incurred by the Professionals to the Creditors' Committee after the Confirmation Date until the complete dissolution of the Creditors' Committee for all purposes in accordance with Article XIII.D will be paid by the Debtors or the Reorganized Debtors, as applicable, in the ordinary course of business (and not later than 30 days after submission of invoices).

C.      *Priority Tax Claims*

Except to the extent that a Holder of an Allowed Priority Tax Claim and the Debtor (with the consent of the Required RSA Parties, not to be unreasonably withheld) against which such Allowed Priority Tax Claim is asserted

agree to a less favorable treatment for such Holder, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Priority Tax Claim, each Holder of such Allowed Priority Tax Claim shall be treated in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code and, for the avoidance of doubt, Holders of Allowed Priority Tax Claims will receive interest on such Allowed Priority Tax Claims after the Effective Date in accordance with sections 511 and 1129(a)(9)(C) of the Bankruptcy Code.

D.      *DIP Facility Claims*

As of the Effective Date, the DIP Facility Claims shall be Allowed and deemed to be Allowed Claims in the full amount outstanding under the DIP Facility Credit Agreement and the DIP Order, including all principal, accrued and unpaid interest, and all accrued and unpaid fees, expenses, and noncontingent indemnity payable under the DIP Facility Credit Agreement or the DIP Order.  Except to the extent that a Holder of an Allowed DIP Facility Claim agrees to a less favorable treatment, in full and final satisfaction, compromise, settlement, release, and discharge of, and in exchange for, each Allowed DIP Facility Claim, each such Holder shall receive its Pro Rata share of (i) payment in full in Cash of any accrued and unpaid interest, fees and expenses, (ii) the Equitization Consent Fee, payable at the election of each Holder of a DIP Facility Claim in New Common Stock or New Preferred Stock, and (iii) the Equitization Allocation New Stock, of which 8.175% shall be payable in New Preferred Stock and 91.825% shall be payable in New Common Stock, subject to adjustment as set forth in the Backstop Commitment Agreement.  Upon receiving the treatment set forth in this paragraph, on the Effective Date, all Liens and security interests granted to secure the DIP Facility Claims shall be automatically terminated and of no further force and effect without any further notice to or action, order, or approval of the Bankruptcy Court or any other Entity.

E.      *Statutory Fees*

All fees due and payable pursuant to section 1930 of title 28 of the United States Code prior to the Effective Date shall be timely paid by the Debtors.  On and after the Effective Date, the Reorganized Debtors shall timely pay any and all such fees when due and payable, and shall File with the Bankruptcy Court quarterly reports in a form reasonably acceptable to the U.S. Trustee.  Each Debtor shall remain obligated to pay such quarterly fees to the U.S. Trustee until the earliest of that particular Debtor's case being closed, dismissed, or converted to a case under chapter 7 of the Bankruptcy Code.

**ARTICLE III.**
**CLASSIFICATION, TREATMENT, AND VOTING OF CLAIMS AND INTERESTS**

A.      *Classification of Claims and Interests*

The Plan constitutes a separate plan proposed by each Debtor within the meaning of section 1121 of the Bankruptcy Code; *provided that* the Debtors and the Reorganized Debtors, as applicable, shall consolidate Allowed Claims into one Estate for purposes of distributions for Classes 8 and 12.  Except for the Claims addressed in Article II of the Plan, all Claims and Interests are classified in the Classes set forth below for all purposes, including voting, Confirmation, and distribution pursuant to the Plan, all in accordance with sections 1122 and 1123(a)(1) of the Bankruptcy Code.  A Claim or an Interest is classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest qualifies within the description of such other Classes.  A Claim or an Interest also is classified in a particular Class for the purpose of receiving distributions under the Plan only to the extent that such Claim or Interest is an Allowed Claim or Existing Interest in that Class and has not been paid, released, or otherwise satisfied or disallowed by Final Order prior to the Effective Date.  Unless otherwise indicated, each Holder of an Allowed Claim or Interest, as applicable, shall receive such treatment on the Effective Date (or, if payment is not then due, in accordance with its terms in the ordinary course of business) or as soon as reasonably practicable thereafter, the timing of which shall be subject to the reasonable discretion of the Reorganized Debtors and the consent of the Required RSA Parties (not to be unreasonably withheld). For all purposes under the Plan, each Class will contain sub-Classes

26

for each of the Debtors, as applicable; *provided*, that any Class that does not contain any Allowed Claims or Existing Interests with respect to a particular Debtor will be treated in accordance with Article III.D below.

Below is a chart assigning each Class a number for purposes of identifying each separate Class.

| Class | Claim or Interest | Status | Voting Rights |
|---|---|---|---|
| 1 | Other Secured Claims | Unimpaired | Deemed to Accept |
| 2 | Other Priority Claims | Unimpaired | Deemed to Accept |
| 3 | 2019 Term Loan Facility | Impaired | Entitled to Vote |
| 4 | Secured Notes Claims | Impaired | Entitled to Vote |
| 5 | Lombard (BULL) Term Loan Claims | Unimpaired | Deemed to Accept |
| 6 | PK Air Credit Facility Claims and MAG Lease Obligation Claims | Impaired | Entitled to Vote |
| 7 | Macquarie Term Loan Credit Facility Claims | Unimpaired | Deemed to Accept |
| 8 | Unsecured Notes Claims | Impaired | Entitled to Vote |
| 9 | Lombard (BALL) Term Loan Guarantee Claims and UK ABL Credit Facility Guarantee Claims | Unimpaired | Deemed to Accept |
| 10 | MCA and Other Customer Guarantee Claims | Unimpaired | Deemed to Accept |
| 11 | Trade Claims | Unimpaired | Deemed to Accept |
| 12 | General Unsecured Claims | Impaired | Entitled to Vote |
| 13 | Intercompany Claims | Unimpaired, or Impaired | Deemed to Accept, or Presumed to Reject |
| 14 | Intercompany Interests | Unimpaired, or Impaired | Deemed to Accept, or Presumed to Reject |
| 15 | Existing Interests | Impaired | Presumed to Reject |
| 16 | Section 510(b) Claims | Impaired | Presumed to Reject |

B.      *Treatment of Classes of Claims and Interests*

      1.      Class 1 — Other Secured Claims

            a.      *Classification*:  Class 1 consists of all Other Secured Claims.

            b.      *Treatment*:  Each Holder of an Allowed Other Secured Claim shall receive, in full and final satisfaction of such Allowed Other Secured Claim, at the option of the applicable Debtor (with the consent of the Required RSA Parties, not to be unreasonably withheld), either:

                i.      payment in full in Cash;

                ii.      delivery of the Collateral securing any such Allowed Other Secured Claim;

      iii.    Reinstatement of such Allowed Other Secured Claim, notwithstanding any contractual provision or applicable non-bankruptcy law that entitles the holder of such claim to demand or to receive payment prior to the stated maturity of such Allowed Other Secured Claim from and after the occurrence of default; or

      iv.    such other treatment rendering such Allowed Other Secured Claim Unimpaired.

c.    *Voting*: Class 1 is Unimpaired. Holders of Allowed Other Secured Claims in Class 1 are conclusively deemed to have accepted the Plan under section 1126(f) of the Bankruptcy Code. Holders of Allowed Other Secured Claims in Class 1 are not entitled to vote to accept or reject the Plan.

2.    Class 2 — Other Priority Claims

a.    *Classification*: Class 2 consists of all Other Priority Claims.

b.    *Treatment*: Each Holder of an Allowed Other Priority Claim shall receive, in full and final satisfaction of such Allowed Other Priority Claim, at the option of the applicable Debtors (with the consent of the Required RSA Parties, not to be unreasonably withheld), either:

      i.    Cash in an amount equal to such Allowed Other Priority Claim; or

      ii.    such other treatment rendering such Allowed Other Priority Claim Unimpaired.

c.    *Voting*: Class 2 is Unimpaired. Holders of Allowed Other Priority Claims in Class 2 are conclusively deemed to have accepted the Plan under section 1126(f) of the Bankruptcy Code. Holders of Allowed Other Priority Claims in Class 2 are not entitled to vote to accept or reject the Plan.

3.    Class 3 — 2019 Term Loan Facility Claims

a.    *Classification*: Class 3 consists of all 2019 Term Loan Facility Claims.

b.    *Treatment*: As of the Effective Date, the 2019 Term Loan Facility Claims shall be Allowed and deemed to be Allowed Claims in the full amount outstanding under the 2019 Term Loan Facility Credit Agreement, the DIP Order and the Final Cash Collateral Order, including all principal, accrued and unpaid interest, and all accrued and unpaid fees, expenses, and noncontingent indemnity payable under the 2019 Term Loan Facility Credit Agreement, the DIP Order and the Final Cash Collateral Order. In full and final satisfaction of each Allowed 2019 Term Loan Facility Claim, each Holder of an Allowed 2019 Term Loan Facility Claim shall either:

      i.    if the Debtors enter into the Exit Facility on or prior to the Effective Date, receive payment in full in Cash; or

      ii.    if the Debtors do not enter into the Exit Facility on or prior to the Effective Date, (x) have its Allowed 2019 Term Loan Facility Claim Reinstated and governed by the Amended and Restated 2019 Term Loan Credit Agreement, and (y) receive its Pro Rata share of the 2019 Term Loan Amendment Fee.

c.    *Voting*: Class 3 is Impaired. Holders of Allowed 2019 Term Loan Facility Claims in Class 3 are entitled to vote to accept or reject the Plan.

28

4.    <u>Class 4 — Secured Notes Claims</u>

    a.    *Classification*: Class 4 consists of all Secured Notes Claims.

    b.    *Treatment*: As of the Effective Date, the Secured Notes Claims shall be Allowed and deemed to be Allowed Claims in the full amount outstanding under the Secured Notes Indenture, the DIP Order and the Final Cash Collateral Order, including all principal, accrued and unpaid interest, and all accrued and unpaid fees, expenses, and noncontingent indemnity payable under the Secured Notes Indenture, the DIP Order and the Final Cash Collateral Order. In full and final satisfaction of each Secured Notes Claim, each Holder of an Allowed Secured Notes Claim shall receive (i) payment in full in Cash of any accrued and unpaid prepetition and postpetition interest at the non-default contract rate (except to the extent otherwise paid as adequate protection pursuant to the Final Cash Collateral Order and not recharacterized or otherwise avoided, but ***not*** including any make-whole or prepayment premium), (ii) after giving effect to the immediately preceding clause (i), Cash in an amount equal to 97% of the outstanding amount of such Allowed Secured Notes Claim ***and*** (iii) such Holder's Pro Rata share of the Secured Noteholder Subscription Rights.

    c.    *Voting*: Class 4 is Impaired. Holders of Allowed Secured Notes Claims in Class 4 are entitled to vote to accept or reject the Plan.

5.    <u>Class 5 — Lombard (BULL) Term Loan Claims</u>

    a.    *Classification*: Class 5 consists of all Lombard (BULL) Term Loan Claims.

    b.    *Treatment*: In full and final satisfaction of each Lombard (BULL) Term Loan Claim, all Allowed Lombard (BULL) Term Loan Claims shall be Reinstated.

    c.    *Voting*: Class 5 is Unimpaired. Holders of Allowed Lombard (BULL) Term Loan Claims in Class 5 are conclusively deemed to have accepted the Plan under section 1126(f) of the Bankruptcy Code. Holders of Allowed Lombard (BULL) Term Loan Claims in Class 5 are not entitled to vote to accept or reject the Plan.

6.    <u>Class 6 — PK Air Credit Facility Claims and MAG Lease Obligation Claims</u>

    a.    *Classification*: Class 6 consists of all PK Air Credit Facility Claims and MAG Lease Obligation Claims.

    b.    *Treatment*: As of the date of entry of the Milestone Settlement Order, the PK Air Credit Facility Claims and the MAG Lease Obligation Claims shall be Allowed in full and reinstated as and to the extent set forth in the Milestone Settlement Order. The Allowed PK Credit Facility Claims and MAG Lease Obligation Claims shall be satisfied in accordance with the Milestone Settlement Order, and Allowed PK Air Credit Facility Claims and MAG Lease Obligation Claims, the PK Air Facility Loan Documents shall be amended and the MAG Lease Documents shall be assumed and cured pursuant to, and in accordance with, and to the extent provided for in, the Milestone Settlement and the Milestone Settlement Order, and such PK Air Facility Loan Documents and MAG Lease Documents shall be reinstated and vest with, and be binding on, the Reorganized Debtors as and to the extent set forth in the Milestone Settlement Order. The Milestone Parties and PK Air shall retain all security interests, guarantees and share charges that secure the PK Air Credit Facility Claims and MAG Lease Obligation Claims as and to the extent set forth in the Milestone Settlement Order.

29

c. *Voting*: Class 6 is Impaired. Holders of PK Air Credit Facility Claims and MAG Lease Obligation Claims in Class 6 are entitled to vote to accept or reject the Plan.

7. Class 7 — Macquarie Term Loan Credit Facility Claims

a. *Classification*: Class 7 consists of all Macquarie Term Loan Credit Facility Claims.

b. *Treatment*: In full and final satisfaction of all Allowed Macquarie Term Loan Credit Facility Claims, such Allowed Macquarie Term Loan Credit Facility Claims shall be Reinstated, or shall receive such other treatment as may be agreed upon by such Holders, the Debtors, and the Required Backstop Parties.

c. *Voting*: Class 7 is Unimpaired. Holders of Allowed Macquarie Term Loan Credit Facility Claims in Class 7 are conclusively deemed to have accepted the Plan under section 1126(f) of the Bankruptcy Code. Holders of Allowed Macquarie Term Loan Credit Facility Claims in Class 7 are not entitled to vote to accept or reject the Plan.

8. Class 8 — Unsecured Notes Claims

a. *Classification*: Class 8 consists of all Unsecured Notes Claims.

b. *Treatment*: Each holder of an Allowed Unsecured Notes Claim shall receive, in full and final satisfaction of all Allowed Unsecured Notes Claims:

i. if such Holder **is** a 4(a)(2) Eligible Holder, its Pro Rata[2] share of (x) the Unsecured Equity Pool, (y) the Unsecured 1145 Subscription Rights, and (z) the Unsecured 4(a)(2) Subscription Rights; or

ii. if such Holder is **not** a 4(a)(2) Eligible Holder, either:

(x) if such Holder **does not** timely make the Unsecured Cash Out Election (including the failure to timely return an election notice), its Pro Rata[3] share of (A) the Unsecured Equity Pool, (B) *solely if such Holder fully exercises its Unsecured 1145 Subscription Rights*, the Unsecured 4(a)(2) Distribution Cash Amount (up to a maximum of 7.6% of such Holder's Unsecured Notes Claims), and (C) the Unsecured 1145 Subscription Rights; or

---

[2] For the treatment set forth in this Section III.B.8.i, the Pro Rata amounts shall be calculated as follows: for the treatment set forth in (x) and (y), the Pro Rata amounts shall be calculated as the Pro Rata share of all Allowed Unsecured Notes Claims and all Allowed General Unsecured Claims, in each case, that do not make the Unsecured Cash Out Election (including the failure to timely return an election notice), and for the treatment set forth in (z), the Pro Rata amount shall be calculated as the Pro Rata share of all Allowed Unsecured Notes Claims and all Allowed General Unsecured Claims, in each case, that are held by 4(a)(2) Eligible Holders and that do not make the Unsecured Cash Out Election (including the failure to return an election notice).

[3] For the treatment set forth in this Section III.B.8.b.ii.x, the Pro Rata amounts shall be calculated as follows: for the treatment set forth in (A) and (C), the Pro Rata amount shall be calculated as the Pro Rata share of all Allowed Unsecured Notes Claims and all Allowed General Unsecured Claims, in each case, that do not make the Unsecured Cash Out Election (including the failure to timely return an election notice); and for the treatment set forth in (B), the Pro Rata amount shall be calculated as the Pro Rata share of all Allowed Unsecured Notes Claims and all Allowed General Unsecured Claims, in each case, that are not held by 4(a)(2) Eligible Holders and that do not make the Unsecured Cash Out Election (including the failure to timely return an election notice).

30

(y) if such Holder **does** timely make the Unsecured Cash Out Election, its Pro Rata[4] share of the GUC Distribution Cash Amount.

    c.    *Voting*: Class 8 is Impaired. Holders of Allowed Unsecured Notes Claims in Class 8 are entitled to vote to accept or reject the Plan.

9.    Class 9 – Lombard (BALL) Term Loan Guarantee Claims and UK ABL Credit Facility Guarantee Claims

    a.    *Classification*: Class 9 consists of all Lombard Guarantee Claims and UK ABL Facility Guarantee Claims.

    b.    *Treatment*: In full and final satisfaction of each Lombard (BALL) Term Loan Guarantee Claim and UK ABL Credit Facility Guarantee Claim, all Allowed Lombard (BALL) Term Loan Guarantee Claims and Allowed UK ABL Credit Facility Guarantee Claims shall be Reinstated.

    c.    *Voting*: Class 9 is Unimpaired. Holders of Allowed Lombard (BALL) Term Loan Guarantee Claims and Allowed UK ABL Credit Facility Guarantee Claims in Class 9 are conclusively deemed to have accepted the Plan under section 1126(f) of the Bankruptcy Code. Holders of Lombard (BALL) Term Loan Guarantee Claims and UK ABL Credit Facility Guarantee Claims in Class 9 are not entitled to vote to accept or reject the Plan.

10.    Class 10 – MCA and Other Customer Guarantee Claims

    a.    *Classification*: Class 10 consists of all MCA and Other Customer Guarantee Claims.

    b.    *Treatment*: In full and final satisfaction of each MCA and Other Customer Guarantee Claim, all Allowed MCA and Other Customer Guarantee Claims shall be Reinstated.

    c.    *Voting*: Class 10 is Unimpaired. Holders of Allowed MCA and Other Customer Guarantee Claims in Class 10 are conclusively deemed to have accepted the Plan under section 1126(f) of the Bankruptcy Code. Holders of Allowed MCA and Other Customer Guarantee Claims in Class 10 are not entitled to vote to accept or reject the Plan.

11.    Class 11 — Trade Claims

    a.    *Classification*: Class 11 consists of all Trade Claims.

    b.    *Treatment*: Each Holder of an Allowed Trade Claim shall receive, in full and final satisfaction of such Allowed Trade Claim, payment in full of such Allowed General Unsecured Claim on the Effective Date or otherwise in the ordinary course of the Debtors' business.

    c.    *Voting*: Class 11 is Unimpaired. Holders of Allowed General Unsecured Claims in Class 11 are conclusively deemed to have accepted the Plan under section 1126(f) of the Bankruptcy Code. Holders of Allowed General Unsecured Claims in Class 11 are not entitled to vote to accept or reject the Plan.

---

[4] For the treatment set forth in this Section III.B.ii.y, the Pro Rata amounts shall be calculated as the Pro Rata share of all Allowed Unsecured Notes Claims held by Holders that are not a 4(a)(2) Eligible Holder and Allowed General Unsecured Claims, and, in each case, that timely make the Unsecured Cash Out Election.

31

12.    Class 12 — General Unsecured Claims

    a.    *Classification*:  Class 12 consists of all General Unsecured Claims.

    b.    *Treatment*:  Each Holder of a General Unsecured Claim shall receive, in full and final satisfaction of such Allowed General Unsecured Claim:

        i.    if such Holder **is** a 4(a)(2) Eligible Holder, either:

        (x) if such Holder **does not** timely make the Unsecured Cash Out Election, its Pro Rata[5] share of (A) the Unsecured Equity Pool (B) the Unsecured 1145 Subscription Rights, and (C) the Unsecured 4(a)(2) Subscription Rights; or

        (y) if such Holder **does** timely make the Unsecured Cash Out Election, its Pro Rata[6] share of the GUC Distribution Cash Amount.

        ii.    if such Holder is **not** a 4(a)(2) Eligible Holder, either:

        (x) if such Holder **does not** timely make the Unsecured Cash Out Election, its Pro Rata[7] share of (A) the Unsecured Equity Pool, (B) *solely if such Holder fully exercises its Unsecured 1145 Subscription Rights*, the Unsecured 4(a)(2) Distribution Cash Amount (up to a maximum of 7.6% of such Holder's General Unsecured Claims), and (C) the Unsecured 1145 Subscription Rights; or

        (y) if such Holder **does** timely make the Unsecured Cash Out Election, its Pro Rata[8] share of the GUC Distribution Cash Amount.

    c.    *Voting*:  Class 12 is Impaired.  Holders of Allowed General Unsecured Claims in Class 12 are entitled to vote to accept or reject the Plan.

---

[5]    For the treatment set forth in this Section III.B.12.b.i.x, the Pro Rata amounts shall be calculated as follows: for the treatment set forth in (A) and (B), the Pro Rata amount shall be calculated as the Pro Rata share of all Allowed Unsecured Notes Claims and all Allowed General Unsecured Claims, in each case, that do not make the Unsecured Cash Out Election (including the failure to timely return an election notice), and for the treatment set forth in (C), the Pro Rata amount shall be calculated as the Pro Rata share of all Allowed Unsecured Notes Claims and all Allowed General Unsecured Claims, in each case that are held by 4(a)(2) Eligible Holders and that do not make the Unsecured Cash Out Election (including the failure to timely return an election notice).

[6]    For the treatment set forth in this Section III.B.12.b.i.y, the Pro Rata amounts shall be calculated as the Pro Rata share of all Allowed Unsecured Notes Claims held by Holders that are not a 4(a)(2) Eligible Holder and Allowed General Unsecured Claims, in each case, that timely make the Unsecured Cash Out Election.

[7]    For the treatment set forth in this Section III.B.12.b.ii.x, the Pro Rata amounts shall be calculated as follows:  for the treatment set forth in (A) and (C), the Pro Rata amount shall be calculated as the Pro Rata share of all Allowed Unsecured Notes Claims and all Allowed General Unsecured Claims, in each case, that do not make the Unsecured Cash Out Election (including the failure to timely return an election notice); and for the treatment set forth in (B), the Pro Rata amount shall be calculated as the Pro Rata share of all Allowed Unsecured Notes Claims and all Allowed General Unsecured Claims, in each case, that are not held by 4(a)(2) Eligible Holders and that do not make the Unsecured Cash Out Election (including the failure to timely return an election notice).

[8]    For the treatment set forth in this Section III.B.12.b.ii.y, the Pro Rata amounts shall be calculated as the Pro Rata share of all Allowed Unsecured Notes Claims held by Holders that are not a 4(a)(2)Eligible Holder and all Allowed General Unsecured Claims and, in each case, that timely make the Unsecured Cash Out Election.

13. Class 13 — Intercompany Claims

    a. *Classification*: Class 13 consists of all Intercompany Claims.

    b. *Treatment*: Unless otherwise provided for under the Plan, Intercompany Claims shall, at the election of the Required RSA Parties, be Reinstated, compromised, or cancelled.

    c. *Voting*: Class 13 is either Unimpaired, in which case the Holders of Allowed Intercompany Claims in Class 13 are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code, or Impaired and not receiving any distribution under the Plan, in which case the Holders of such Allowed Intercompany Claims in Class 13 are presumed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, each Holder of an Allowed Intercompany Claim in Class 13 will not be entitled to vote to accept or reject the Plan.

14. Class 14 — Intercompany Interests

    a. *Classification*: Class 14 consists of all Intercompany Interests.

    b. *Treatment*: Unless otherwise provided for under the Plan, Intercompany Claims shall, at the election of the Required RSA Parties, be Reinstated solely to maintain the Debtors' corporate structure, compromised, or cancelled.

    c. *Voting*: Class 14 is either Unimpaired, in which case the Holders of Allowed Intercompany Interests in Class 14 are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code, or Impaired and not receiving any distribution under the Plan, in which case the Holders of such Allowed Intercompany Interests in Class 14 are presumed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, each Holder of an Allowed Intercompany Interest in Class 14 will not be entitled to vote to accept or reject the Plan.

15. Class 15 — Existing Interests

    a. *Classification*: Class 15 consists of all Existing Interests.

    b. *Treatment*: Each Existing Interest shall be cancelled, released, and expunged and shall be of no further force and effect. Each Holder of an Existing Interest shall not receive any distribution on account of such Existing Interest.

    c. *Voting*: Class 15 is Impaired and not receiving any distribution under the Plan. Holders of Existing Interests in Class 15 are presumed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, such Holders are not entitled to vote to accept or reject the Plan.

16. Class 16 — Section 510(b) Claims.

    a. *Classification*: Class 16 consists of all Section 510(b) Claims.

    b. *Treatment*: Section 510(b) Claims will be canceled, released, and extinguished as of the Effective Date, and will be of no further force or effect, and each Holder of a Section 510(b) Claim will not receive any distribution on account of such Section 510(b) Claim.

    c. *Voting*: Class 16 is Impaired and not receiving any distribution under the Plan. Holders of Section 510(b) Claims in Class 16 are presumed to have rejected the Plan pursuant to

section 1126(g) of the Bankruptcy Code. Therefore, such Holders are not entitled to vote to accept or reject the Plan.

C.     *Special Provision Governing Unimpaired Claims*

Except as otherwise provided in the Plan, nothing under the Plan shall affect the Debtors' or the Reorganized Debtors' rights regarding any Unimpaired Claim, including all rights regarding legal and equitable defenses to, or setoffs or recoupments against, any such Unimpaired Claim.

D.     *Elimination of Vacant Classes*

Any Class of Claims or Interests that does not have a Holder of an Allowed Claim or Allowed Interest, or a Claim or Interest temporarily Allowed by the Bankruptcy Court as of the date of the Confirmation Hearing, shall be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

E.     *Voting Classes; Presumed Acceptance by Non-Voting Classes*

If a Class contains Claims eligible to vote on the Plan and no Holder of Claims eligible to vote in such Class votes to accept or reject the Plan, the Plan shall be presumed accepted by the Holders of such Claims in such Class.

F.     *Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code*

Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of Confirmation by acceptance of the Plan by at least one Impaired Class of Claims. The Debtors shall seek Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class(es) of Claims or Interests. The Debtors reserve the right to modify the Plan in accordance with Article XI of the Plan to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification, including by modifying the treatment applicable to a Class of Claims or Interests to render such Class of Claims or Interests Unimpaired to the extent permitted by the Restructuring Support Agreement, the Backstop Commitment Agreement, the Bankruptcy Code and the Bankruptcy Rules.

G.     *Intercompany Interests*

To the extent Reinstated under the Plan, the Intercompany Interests shall be Reinstated for the ultimate benefit of the Holders of Claims that receive New Common Stock and New Preferred Stock under the Plan, and the Intercompany Interests shall receive no recovery or distribution. For the avoidance of doubt, to the extent Reinstated pursuant to the Plan, on and after the Effective Date, all Intercompany Interests shall be owned by the same Reorganized Debtor that corresponds with the Debtor that owned such Intercompany Interests prior to the Effective Date (subject to any modifications in the Restructuring Transactions Exhibit).

H.     *Substantive Consolidation; GUC Cash Distribution Amount*

The Plan is being proposed as a joint plan of reorganization of the Debtors for administrative purposes only and constitutes a separate chapter 11 plan of reorganization for each Debtor. The Plan is not premised upon the substantive consolidation of the Debtors with respect to the Classes of Claims or Interests set forth in the Plan; *provided that* the Debtors and the Reorganized Debtors, as applicable, shall consolidate Allowed Claims into one Estate for purposes of distributions for Classes 8 and 12.

I.     *Subordinated Claims and Interests*

The allowance, classification, and treatment of all Allowed Claims and Allowed Interests and their respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code,

34

or otherwise. Pursuant to section 510 of the Bankruptcy Code, the Debtors or Reorganized Debtors, as applicable, reserve the right to re-classify any Allowed Claim or Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

## ARTICLE IV.
## PROVISIONS FOR IMPLEMENTATION OF THE PLAN

A. *General Settlement of Claims, Interests, and Causes of Action*

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, upon the Effective Date, the provisions of the Plan shall constitute a good faith compromise and settlement of all Claims, Interests, Causes of Action, and controversies released, settled, compromised, discharged, satisfied, or otherwise resolved pursuant to the Plan. The Plan shall be deemed a motion, proposed by the Debtors and joined by the Supporting Noteholders and the Creditors' Committee to approve the good-faith compromise and settlement of all Claims, Interests, Causes of Action, and controversies pursuant to Bankruptcy Rule 9019, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise and settlement of all such Claims, Interests, Causes of Action, and controversies, as well as a finding by the Bankruptcy Court that such compromise and settlement is in the best interests of the Debtors, their Estates, and Holders of Claims and Interests and is fair, equitable, reasonable, and in the best interests of the Debtors and their Estates.

B. *Restructuring Transactions*

On the Effective Date or as soon as reasonably practicable thereafter, the Reorganized Debtors shall consummate the Restructuring Transactions and take all actions reasonably acceptable to the Required RSA Parties as may be necessary or appropriate to effectuate the Restructuring Transactions, including: (1) the execution and delivery of any appropriate agreements or other documents of merger, consolidation, restructuring, conversion, disposition, transfer, formation, organization, dissolution, or liquidation containing terms that are consistent with the terms of the Plan and the Restructuring Support Agreement, and that satisfy the requirements of applicable law and any other terms to which the applicable Entities may agree, including the documents comprising the Plan Supplement and the New Organizational Documents; (2) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan and the Restructuring Support Agreement and having other terms for which the applicable Entities may agree; (3) the execution, delivery and filing, if applicable, of appropriate certificates or articles of incorporation, formation, reincorporation, merger, consolidation, conversion, or dissolution pursuant to applicable state law, including any applicable New Organizational Documents; (4) such other transactions that are required to effectuate the Restructuring Transactions; and (5) all other actions that the applicable Entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law.

C. *Employee and Retiree Benefits*

Unless otherwise provided herein, and subject to Article V hereof, all employee wages and Compensation and Benefits Programs in place as of the Effective Date with the Debtors shall be assumed by the Reorganized Debtors and shall remain in place as of the Effective Date, and the Reorganized Debtors will continue to honor such agreements, arrangements, programs, and plans. For the avoidance of doubt, pursuant to section 1129(a)(13) of the Bankruptcy Code, from and after the Effective Date, all retiree benefits (as such term is defined in section 1114 of the Bankruptcy Code), if any, shall continue to be paid in accordance with applicable law.

D. *Issuance and Distribution of New Stock*

All Existing Interests shall be cancelled on the Effective Date and Reorganized Bristow Parent shall issue the New Stock to Holders of Claims and Interests entitled to receive New Stock pursuant to the Plan, the Rights Offering, the DIP Order, or the Backstop Commitment Agreement (including the Backstop Commitment Fee and the Equitization Consent Fee), in each case in the proportions set forth in the Plan and the Restructuring Support Agreement. The issuance of New Stock shall be duly authorized without the need for any further corporate action and without any further action by the Debtors or the Reorganized Debtors or by Holders of any Claims or Interests, as

35

applicable. All New Stock issued under the Plan shall be duly authorized, validly issued, fully paid, and non-assessable. All distributions of New Stock shall be made in accordance with all applicable regulatory requirements, including with respect to any limitations on foreign ownership of the New Stock. Accordingly, in no event will Non-U.S. Citizens be entitled to own in the aggregate more than twenty-four and nine-tenths percent (24.9%) of the total number of outstanding shares of New Stock.

On the Effective Date, Reorganized Bristow Parent and all Holders of the New Stock then outstanding shall be deemed to be parties to the New Shareholders' Agreement, substantially in the form contained in the Plan Supplement, without the need for execution by any such Holder. On the Effective Date, the New Shareholders' Agreement shall be binding on the Reorganized Debtors and all parties receiving, and all Holders of, the New Stock.

E.      *Determination of Holder Citizenship*

The Debtors or the Required Backstop Parties may require that a Holder of an Unsecured Notes Claim, General Unsecured Claim, or Secured Notes Claim demonstrate that it is a U.S. Citizen to the extent necessary to ensure that the Reorganized Debtors are in compliance with the requirements of 49 U.S.C. § 40102(a)(15)(C). If a Holder of an Unsecured Notes Claim, General Unsecured Claim, or Secured Notes Claim furnishes a Citizenship Certification (or other evidence that such Holder is a U.S. Citizen) to the Debtors or the Required Backstop Parties on or before the Distribution Record Date and, after review, the Debtors and the Required Backstop Parties, in their reasonable discretion, accept such Citizenship Certification (or other evidence) as reasonable proof to establish that such Holder is a U.S. Citizen, such Holder will receive New Stock representing all of such holder's entitlement to the New Stock under the Plan and the Backstop Commitment Agreement; *provided, however,* that if such Holder is a Non-U.S. Citizen, or if the Holder fails to furnish a Citizenship Certification to the Debtors on or before the Distribution Record Date, or if the Citizenship Certification of such Holder has not been accepted or has been rejected by the Debtors or the Required Backstop Parties in their reasonable discretion on or before the date that is 10 Business Days after the Distribution Record Date, such Holder will be treated as a Non-U.S. Citizen for all purposes hereunder and under the Plan; *provided*, the issuance of any New Warrants (in lieu of New Stock) to any Holder that is a Non-U.S. Citizen shall be subject to any consent rights set forth in the Restructuring Support Agreement. In connection with the Debtors' review of any Citizenship Certification, the Debtors or the Required Backstop Parties will have the right to require the Holder furnishing the Citizenship Certification to provide the Debtors with such documentation and other information as they may reasonably request as proof confirming that the holder is a U.S. Citizen. The Debtors and the Required Backstop Parties will treat all such documentation and information provided by a Holder as confidential; *provided, that*, the Debtors and the Required Backstop Parties will share such information with the Creditors' Committee on a confidential basis and will work cooperatively with the Creditors' Committee with respect to citizenship issues.

F.      *Rights Offering*

The Debtors or Reorganized Debtors, as applicable, shall allocate the Subscription Rights for the Rights Offering to the Rights Offering Offerees as set forth in the Plan and the Rights Offering Procedures. Pursuant to the Backstop Commitment Agreement, the Rights Offering Procedures, and the Plan, the Rights Offering shall be open to all Rights Offering Participants.

Upon exercise of the Subscription Rights by the Rights Offering Participants pursuant to the terms of the Backstop Commitment Agreement, the Rights Offering Procedures, and the Plan, the Reorganized Debtors shall be authorized to issue the New Stock in accordance with the Plan, the Backstop Commitment Agreement, and the Rights Offering Procedures.

Pursuant to the Backstop Commitment Agreement, the Backstop Commitment Parties shall purchase any Rights Offering Stock not subscribed to by Rights Offering Participants as set forth in the Backstop Commitment Agreement. On the Effective Date, the rights and obligations of the Debtors under the Backstop Commitment Agreement shall vest in the Reorganized Debtors.

The Rights Offering will be comprised of the 1145 Rights Offering and the 4(a)(2) Rights Offering. The Rights Offering will be conducted on a Pro Rata basis in reliance upon one or more exemptions from registration under the Securities Act, which will include the exemption provided in section 1145 of the Bankruptcy Code to the

fullest extent available and, to the extent such exemption is not available (and with respect to the New Common Stock, only in the proportion required to preserve the availability of such exemption under section 1145 of the Bankruptcy Code), the exemption from registration set forth in Section 4(a)(2) of the Securities Act and/or Regulation D promulgated thereunder or another available exemption from registration under the Securities Act.

In addition, on the Distribution Date, New Stock in an amount equal to the Backstop Commitment Fee shall be distributed to the Backstop Commitment Parties under and as set forth in the Backstop Commitment Agreement.

G. *The Exit Facility, the Amended and Restated 2019 Term Loan Facility and the Amended PK Air Loan Documents*

On the Effective Date, the applicable Reorganized Debtors shall enter into (a) either the Exit Facility Documents or the Amended and Restated 2019 Term Loan Documents, as applicable, and (b) unless the Milestone Settlement Order provides otherwise, the Amended PK Air Loan Documents, including any documents required in connection with the creation or perfection of Liens in connection therewith. The Confirmation Order shall include approval of (a) either (i) the Exit Facility and the Exit Facility Documents or (ii) the Amended and Restated 2019 Term Loan Facility and the Amended and Restated 2019 Term Loan Documents, as applicable and (b) the Amended PK Air Loan Documents, all transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred and fees paid by the Reorganized Debtors in connection therewith, authorization of the Reorganized Debtors to enter into, execute, and perform under (a) either the Exit Facility Documents or the Amended and Restated 2019 Term Loan Documents, as applicable, and (b) the Amended PK Air Loan Documents, and all related documents and agreements to the extent a party thereto, and authorization for the Reorganized Debtors to create or perfect the Liens in connection therewith.

(a) Either the Exit Facility Documents or the Amended and Restated 2019 Term Loan Documents, as applicable, and (b) the Amended PK Air Loan Documents, shall constitute legal, valid, binding, and authorized obligations of the Reorganized Debtors, enforceable in accordance with their terms. The financial accommodations to be extended pursuant to either (a) the Exit Facility Documents or the Amended and Restated 2019 Term Loan Documents, as applicable, and (b) the Amended PK Air Credit Facility, are being extended, and shall be deemed to have been extended, in good faith, for legitimate business purposes, are reasonable, shall not be subject to any Claims, Causes of Action, avoidance, reduction, recharacterization, subordination (whether contractual or otherwise), cross claim, disallowance, impairment, objection, or challenges under any applicable law or regulation by any Person for any purposes whatsoever, and shall not constitute preferential transfers, fraudulent transfers, obligations, or conveyances, or other voidable transfers or obligations under the Bankruptcy Code or any other applicable non-bankruptcy law.

The lenders under the Exit Facility or the Amended and Restated 2019 Term Loan Facility, as applicable, and the Amended PK Air Credit Facility, shall have valid, binding, and enforceable Liens on the Collateral (or other property identified as "Collateral" therein) specified in, and to the extent required by, the Exit Facility Documents or the Amended and Restated 2019 Term Loan Documents, as applicable, and the Amended PK Air Credit Facility Agreement, as applicable. To the extent granted, the guarantees, mortgages, pledges, Liens and other security interests granted pursuant to either the Exit Facility Documents or the Amended and Restated 2019 Term Loan Documents, as applicable, are granted in good faith as an inducement to the lenders under either the Exit Facility or the Amended and Restated 2019 Term Loan Facility, as applicable, to extend credit thereunder and shall be deemed not to constitute a fraudulent conveyance or fraudulent transfer, shall not otherwise be subject to avoidance, recharacterization, or subordination (whether contractual or otherwise) for any purposes whatsoever, and the priorities of any such Liens and security interests shall be as set forth in the relevant Exit Facility Documents or the Amended and Restated 2019 Term Loan Documents, as applicable. The Reorganized Debtors and the persons and entities granted such Liens are authorized to make all filings and recordings, and to obtain all governmental approvals and consents necessary to establish and perfect such Liens under the provisions of the applicable state, provincial, federal, or other law (whether domestic or foreign) that would be applicable in the absence of the Plan and the Confirmation Order, and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such Liens to third parties.

H.      *Rights Offering Per Share Price*

All issuances of New Stock pursuant to the Rights Offerings, Backstop Commitment Agreement, DIP Credit Agreement and DIP Order shall be issued at a per share purchase price of $36.37 (for the avoidance of doubt, with respect to the Backstop Commitment Fee, the Equitization Allocation New Stock, or the Equitization Consent Fee, such purchase price is an implied price and no new purchase shall occur).

I.      *Management Incentive Plan*

On the Effective Date, the Initial MIP Amount shall be implemented and effective as part of the Management Incentive Plan on terms and conditions agreed to by the compensation committee of Bristow Parent, the Required Supporting Secured Noteholders, the Required Supporting Unsecured Noteholders and the Required Backstop Parties. Additionally, following the Effective Date, the Reorganized Bristow Parent Board shall determine the terms and conditions of the Management Incentive Plan in excess of the Initial MIP Amount, which, in the aggregate and inclusive of the Initial MIP Amount, shall be between 5.0% and 10.0% of the New Stock on a fully diluted basis (with the ratio of such New Common Stock and New Preferred Stock to be the same as the ratio of all New Common Stock to New Preferred Stock held by the average Backstop Commitment Party as set forth in the Restructuring Support Agreement).

J.      *Management of Reorganized Bristow*

The Debtors' current management team shall remain in their current positions after consummation of the Restructuring Transactions, and the Debtors shall either (a) enter into new employment agreements with their current management team in connection with the Restructuring Transactions, or (b) assume the Management Severance Benefits Plan, dated June 4, 2014 as amended and restated May 1, 2019, and as further amended to provide that Tier 1, 2 and 3 employees execute Participation Agreements imposing non-competition obligations on severance, good reason rights and a minimum term, and further that in each case, such agreements shall be on terms and conditions that are reasonably acceptable to the Debtors and the Required RSA Parties.

K.      *Exemption from Registration Requirements*

The offering, issuance, and distribution of any Securities pursuant to the Plan, including the New Stock, will be exempt from the registration requirements of section 5 of the Securities Act or any similar federal, state, or local law in reliance on (1) with respect to the New Common Stock issued as part of the Unsecured Common Equity Pool, or in connection with the 1145 Rights Offering, section 1145 of the Bankruptcy Code or, only to the extent such exemption under section 1145 of the Bankruptcy Code is not available, any other available exemption from registration under the Securities Act, (2) with respect to the New Common Stock and New Preferred Stock issued in connection with the 4(a)(2) Rights Offering, section (4)(a)(2) of the Securities Act or Regulation D promulgated thereunder and (3) with respect to the New Common Stock and New Preferred Stock issued on account of (x) the Backstop Commitment Fee, (y) Equitization Allocation New Common Stock and Equitization Allocation New Preferred Stock, and (z) the Equitization Consent Fee, section 1145 of the Bankruptcy Code.

Pursuant to section 1145 of the Bankruptcy Code, the New Common Stock and New Preferred Stock issued under the Plan may be sold without registration under the Securities Act by the recipients thereof, subject to: (1) only with respect to the New Common Stock issued as part of the Unsecured Common Equity Pool, or in connection with the 1145 Rights Offering, or the New Stock issued on account of the Backstop Commitment Fee, the Equitization Allocation New Common Stock, the Equitization Allocation New Preferred Stock, and the Equitization Consent Fee, the provisions of section 1145(b)(1) of the Bankruptcy Code relating to the definition of an underwriter in section 2(a)(11) of the Securities Act and compliance with any applicable state or foreign securities laws, if any, and the rules and regulations of the SEC, if any, applicable at the time of any future transfer of such Securities or instruments; (2) only with respect to the New Common Stock and New Preferred Stock issued in connection with the 4(a)(2) Rights Offering, section 4(a)(2) of the Securities Act or Regulation D promulgated thereunder, the requirements of the applicable provisions of Rule 144 or Rule 144A or any other registration exemption under the Securities Act; (3) any other applicable regulatory approval; and (4) the transfer restrictions set forth in the New Shareholders' Agreement and the New Organizational Documents, if any. All shares of New Common Stock and New Preferred Stock issued on account of (x) the Backstop Commitment Fee, (y) the Equitization Allocation New Common Stock and Equitization

38

Allocation New Preferred Stock, and (z) the Equitization Consent Fee, will be issued without registration under the Securities Act or any similar federal, state, or local law in reliance on section 1145 of the Bankruptcy Code. All Unsubscribed Shares of New Common Stock and New Preferred Stock issued to the Backstop Commitment Parties pursuant to the Backstop Commitment Agreement (other than shares of New Common Stock and New Preferred Stock issued on account of the Backstop Commitment Fee) will be issued without registration under the Securities Act or any similar federal, state, or local law in reliance on section 4(a)(2) of the Securities Act or Regulation D promulgated thereunder.

Persons who purchase the New Common Stock or the New Preferred Stock pursuant to the exemption from registration set forth in section 4(a)(2) of the Securities Act or Regulation D promulgated thereunder will hold "restricted securities." Resales of such restricted securities would not be exempted by section 1145 of the Bankruptcy Code from registration under the Securities Act or other applicable law. Holders of restricted securities would, however, be permitted to resell New Common Stock or New Preferred Stock without registration if they are able to comply with the applicable provisions of Rule 144 or Rule 144A or any other registration exemption under the Securities Act, or if such securities are registered with the Securities and Exchange Commission.

The New Common Stock issued as part of the Unsecured Common Equity Pool and the 1145 Rights Offering Stock shall be reflected through the facilities of DTC, and neither the Debtors, the Reorganized Debtors, nor any other Person shall be required to provide any further evidence other than the Plan or the Confirmation Order with respect to the treatment of such New Common Stock under applicable securities laws.

DTC shall be required to accept and conclusively rely upon the Plan or Confirmation Order in lieu of a legal opinion regarding whether the New Common Stock issued as part of the Unsecured Common Equity Pool or the 1145 Rights Offering Stock are exempt from registration and/or eligible for DTC book-entry delivery, settlement, and depository services.

Notwithstanding anything to the contrary in the Plan, no entity (including, for the avoidance of doubt, DTC) shall be entitled to require a legal opinion regarding the validity of any transaction contemplated by the Plan, including, for the avoidance of doubt, whether New Common Stock issued as part of the Unsecured Common Equity Pool or the 1145 Rights Offering Stock are exempt from registration and/or eligible for DTC book-entry delivery, settlement, and depository services.

L.      *Vesting of Assets*

Except as otherwise provided in the Plan or in any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement, on the Effective Date, all property in each Debtor's Estate, all Causes of Action, and any property acquired by each of the Debtors under the Plan shall vest in each respective Reorganized Debtor, free and clear of all Liens, Claims, charges, or other encumbrances. On and after the Effective Date, except as otherwise provided in the Plan, each Reorganized Debtor may operate its business and may use, acquire, or dispose of property and pursue, compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

M.      *Cancellation of Instruments, Certificates, and Other Documents*

Except as otherwise provided in the Plan or any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement, on the Effective Date, (a) all notes, instruments, Certificates, and other documents evidencing Claims or Interests, including the Indentures, (b) if the Debtors enter into the Exit Facility, the 2019 Term Loan Credit Agreement, and (c) any other credit agreements and indentures, shall be terminated and canceled and the obligations of the Debtors thereunder or in any way related thereto shall be deemed satisfied in full and discharged and the Indenture Trustees shall be released from all duties thereunder without any need for further action or approval by the Bankruptcy Court or any Holder or other person. In addition to the foregoing, the Indentures and the 2019 Term Loan Credit Agreement shall survive the occurrence of the Effective Date and shall continue in effect solely to the extent necessary to: (i) allow a disbursing agent, the 2019 Term Loan Facility Agent or the Indenture Trustees to make distributions under the Plan to the Holders of Secured Notes Claims, Unsecured Notes Claims and 2019 Term Loan Facility Claims, as applicable; (ii) allow the Debtors, the Reorganized Debtors, the Indenture Trustees and the 2019 Term Loan Facility Agent to make post-Effective Date distributions or take such other action pursuant to the

Plan on account of Allowed Secured Notes Claims, Allowed Unsecured Notes Claims and Allowed 2019 Term Loan Facility Claims, as applicable, and to otherwise exercise their rights and discharge their obligations relating to the interests of the Holders of such Claims in accordance with the Plan; (iii) allow the Indenture Trustees and the 2019 Term Loan Facility Agent to enforce their rights, claims and interests vis-à-vis any parties other than the Debtors; (iv) allow the Indenture Trustees and the 2019 Term Loan Facility Agent to maintain or assert any rights it may have against the distributions to Holders of Secured Notes Claims, Unsecured Notes Claims and 2019 Term Loan Facility Claims, as applicable pursuant to the terms of the Indentures or 2019 Term Loan Facility Credit Agreement, as applicable, for the payment of outstanding fees, expenses and indemnification obligations arising under (and due pursuant to the terms of) the Indentures; *provided that* except as expressly provided in this Section IV.M, nothing in this Section IV.M shall affect the discharge of Claims pursuant to the Bankruptcy Code, the Confirmation Order or the Plan or result in any liability or expense to the Reorganized Debtors; (v) permit the Indenture Trustees and the 2019 Term Loan Facility Agent to assert their respective charging liens; (vi) permit the Indenture Trustees and the 2019 Term Loan Facility Agent to appear in the Chapter 11 Cases; and (vii) allow the Indenture Trustees and the 2019 Term Loan Facility Agent to maintain any right of indemnification, contribution, subrogation or any other claim or entitlement they may have under the applicable Indentures and 2019 Term Loan Facility Credit Agreement. Except for the foregoing with respect to such other rights of the Indenture Trustees that survive the Indentures, the Indenture Trustees and their respective agents shall be relieved of all further duties and responsibilities related to the Indentures and the Plan.

Notwithstanding anything to the contrary contained in the Plan, on or after the Effective Date, all duties and responsibilities of the 2019 Term Loan Facility Agent arising under or related to the 2019 Term Loan Facility Credit Agreement shall be discharged except to the extent required in order to effectuate the Plan. For the avoidance of doubt and notwithstanding the foregoing, nothing contained in the Plan shall in any way limit or affect the standing of the 2019 Term Loan Facility Agent to appear and be heard in the Chapter 11 Cases on and after the Effective Date. The 2019 Term Loan Facility Agent shall be entitled to reimbursement of reasonable and documented fees and expenses (including reasonable and documented fees and expenses of its professionals) incurred in connection with the matters set forth in this Section IV.M.

If the record holder of the Secured Notes or Unsecured Notes is DTC or its nominee or another securities depository or custodian thereof, and such Secured Notes or Unsecured Notes are represented by a global security held by or on behalf of DTC or such other securities depository or custodian, then each such Holder of the Secured Notes or Unsecured Notes shall be deemed to have surrendered such Holder's note, debenture or other evidence of indebtedness upon surrender of such global security by DTC or such other securities depository or custodian thereof.

N.      *Corporate Action*

On and after the Effective Date, all actions contemplated by the Plan are and shall be deemed authorized and approved by the Bankruptcy Court in all respects without any further corporate or equity holder action, including, as applicable: (1) the adoption, execution, and/or filing of the New Organizational Documents and the New Shareholders' Agreement; (2) the selection of the directors, managers, and officers for the Reorganized Debtors, including the appointment of the Reorganized Bristow Parent Board; (3) the authorization, issuance, entry into and distribution, as applicable, of the Exit Facility, the Amended and Restated 2019 Term Loan Facility, the Amended PK Air Credit Facility Agreement, the New Common Stock and the New Preferred Stock and the execution, delivery, and filing of any documents pertaining thereto, as applicable; (4) the rejection, assumption, or assumption and assignment, as applicable, of Executory Contracts and Unexpired Leases; (5) the formation of any Entities pursuant to the Restructuring Transactions; (6) the implementation of the Restructuring Transactions, including any transaction contemplated by the Restructuring Transactions Exhibit; (7) the adoption of the Management Incentive Plan by the Reorganized Bristow Parent Board; and (8) all other actions contemplated by the Plan (whether to occur before, on, or after the Effective Date). Upon the Effective Date, all matters provided for in the Plan involving the corporate structure of the Reorganized Debtors, and any corporate, partnership, limited liability company, or other governance action required by the Debtors or the Reorganized Debtors in connection with the Plan shall be deemed to have occurred and shall be in effect, without any requirement of further corporate or other action by any Security holders, members, directors, or officers of the Debtors or Reorganized Debtors, as applicable.

On or before the Effective Date, as applicable, the appropriate directors and officers of the Debtors or the Reorganized Debtors shall be (or shall be deemed to have been) authorized and (as applicable) directed to issue,

40

execute, and deliver the agreements, documents, Securities, and instruments contemplated by the Plan (or necessary or desirable to effectuate the Restructuring Transactions) in the name of and on behalf of the Reorganized Debtors, including and any and all other agreements, documents, Securities, and instruments relating to the foregoing, to the extent not previously authorized by the Bankruptcy Court. The authorizations and approvals contemplated by this Article IV.N shall be effective notwithstanding any requirements under non-bankruptcy law.

O.    *Corporate Existence*

Except as otherwise provided in the Plan or any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement, on the Effective Date, each Debtor shall continue to exist after the Effective Date as a separate corporation, limited liability company, partnership, or other form of entity, as the case may be, with all the powers of a corporation, limited liability company, partnership, or other form of entity, as the case may be, pursuant to the applicable law in the jurisdiction in which each applicable Debtor is incorporated or formed and pursuant to the respective certificate of incorporation and by-laws (or other analogous formation documents) in effect before the Effective Date, except to the extent such certificate of incorporation or bylaws (or other analogous formation, constituent or governance documents) is amended by the Plan or otherwise, and to the extent any such document is amended, such document is deemed to be amended pursuant to the Plan and requires no further action or approval (other than any requisite filings required under applicable state or federal law). Notwithstanding the foregoing, the Debtors reserve the right to modify the Debtors' corporate structure as of the Effective Date, including by merger or liquidation of any Reorganized Debtor or otherwise.

P.    *New Organizational Documents*

On the Effective Date, or as soon thereafter as is reasonably practicable, the Reorganized Debtors' certificates of incorporation and bylaws (and other formation and constituent documents relating to limited liability companies) shall be amended or amended and restated, as applicable, as may be required to be consistent with the provisions of the Plan, the Restructuring Support Agreement (including the Governance Term Sheet) the New Organizational Documents, as applicable, and the Bankruptcy Code. To the extent required under the Plan or applicable nonbankruptcy law, the Reorganized Debtors will file their respective New Organizational Documents with the applicable Secretaries of State and/or other applicable authorities in their respective states, provinces, or countries of incorporation in accordance with the corporate laws of the respective states, provinces, or countries of incorporation. The New Organizational Documents shall, among other things: (1) authorize the issuance of the New Common Stock and the New Preferred Stock; and (2) pursuant to and only to the extent required by section 1123(a)(6) of the Bankruptcy Code, include a provision prohibiting the issuance of non-voting equity Securities. After the Effective Date, each Reorganized Debtor may amend and restate its certificate of incorporation and other formation and constituent documents as permitted by the laws of its respective jurisdiction of formation and the terms of the New Organizational Documents. It is currently expected that the Reorganized Debtors' organizational documents will be amended immediately following Confirmation to incorporate provisions that preclude foreign control and prevent foreign ownership of the Reorganized Debtors from exceeding specified limitations required by U.S. federal law governing air carriers. These amendments will involve safeguards to ensure that at no time will the Reorganized Debtors (including Reorganized Bristow Parent) be out of compliance with the foreign ownership limitations contained in such laws.

Q.    *Effectuating Documents; Further Transactions*

On and after the Effective Date, the Reorganized Debtors and the officers and members of the boards of directors and managers (or other relevant governing body) thereof, including the Reorganized Bristow Parent Board, shall be authorized to and may issue, execute, deliver, file, or record such contracts, Securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan, including the Amended PK Air Credit Facility Agreement, the Exit Facility Credit Agreement and the Amended and Restated 2019 Term Loan Credit Agreement, as applicable, and the Securities issued pursuant to the Plan in the name of and on behalf of the Reorganized Debtors, without the need for any approvals, authorizations, or consents except for those expressly required under the Plan.

41

R.    *Section 1146(a) Exemption*

To the fullest extent permitted by section 1146(a) of the Bankruptcy Code, any transfers (whether from a Debtor to a Reorganized Debtor or to any other Person) of property under the Plan (including the Restructuring Transactions) or pursuant to: (1) the issuance, distribution, transfer, or exchange of any debt, equity Security, or other interest in the Debtors or the Reorganized Debtors; (2) the creation, modification, consolidation, termination, refinancing, and/or recording of any mortgage, deed of trust, or other security interest, or the securing of additional indebtedness by such or other means; (3) the making, assignment, or recording of any lease or sublease; (4) the grant of Collateral (or other property identified as "Collateral" therein) as security for the Amended PK Air Credit Facility Agreement, the Exit Facility or the Amended and Restated 2019 Term Loan Credit Agreement, as applicable; or (5) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan (including the Restructuring Transactions), shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forego the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee, or governmental assessment. All filing or recording officers (or any other Person with authority over any of the foregoing), wherever located and by whomever appointed, shall comply with the requirements of section 1146(a) of the Bankruptcy Code, shall forego the collection of any such tax or governmental assessment, and shall accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

S.    *Directors and Officers*

As of the Effective Date, the term of the current members of the boards of directors of the Debtors shall expire, and the initial boards of directors, including the Reorganized Bristow Parent Board, as well as the officers of each of the Reorganized Debtors, shall be appointed in accordance with the New Organizational Documents and other constituent documents of each Reorganized Debtor. As set forth in the Restructuring Support Agreement (including the Governance Term Sheet), the initial Reorganized Bristow Parent Board shall consist of 7 directors, with the directors of the Reorganized Bristow Parent Board being appointed consistent with the Governance Term Sheet and the New Organizational Documents. The Reorganized Debtors will comply with the requirements set forth in 49 U.S.C. § 40102(a)(15)(C) with respect to the citizenship of its officers, directors and senior management team.

The New Organizational Documents and the New Shareholders' Agreement shall provide that any independent director appointed to the Reorganized Bristow Parent Board shall be unaffiliated with any person that has designation rights for the Reorganized Bristow Parent Board.

Pursuant to section 1129(a)(5) of the Bankruptcy Code, the Debtors will, to the extent reasonably practicable, disclose in advance of the Confirmation Hearing the identity and affiliations of any Person proposed to serve on the Reorganized Bristow Parent Board, as well as those Persons that will serve as officers of the Reorganized Debtors. To the extent any such director or officer is an "insider" under the Bankruptcy Code, the nature of any compensation to be paid to such director or officer will also be disclosed. Provisions regarding the removal, appointment, and replacement of members of the Reorganized Bristow Parent Board will be disclosed in the New Organizational Documents.

T.    *Preservation of Causes of Action*

Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan, including pursuant to Article VIII of the Plan or a Final Order, in accordance with section 1123(b) of the Bankruptcy Code, such Causes of Action shall be Retained Causes of Action, whether arising before or after the Petition Date, including any actions specifically enumerated in the Plan Supplement, and the Reorganized Debtors' rights to commence, prosecute, or settle such Retained Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date. **No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against them as any**

42

**indication that the Debtors or the Reorganized Debtors will not pursue any and all available Causes of Action against them. The Debtors and the Reorganized Debtors expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided herein.** Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan, including pursuant to Article VIII of the Plan or a Final Order, the Reorganized Debtors expressly reserve all Causes of Action, for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation. For the avoidance of doubt, in no instance will any Cause of Action preserved pursuant to this Article IV.T include any claim or Cause of Action with respect to, or against, a Released Party that is released under Article VIII of the Plan.

In accordance with section 1123(b)(3) of the Bankruptcy Code, any Causes of Action preserved pursuant to the first paragraph of this Article IV.T that a Debtor may hold against any Entity shall vest in the Reorganized Debtors. The applicable Reorganized Debtor, through its authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action. The Reorganized Debtors shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action, or to decline to do any of the foregoing, without the consent or approval of any third party or any further notice to or action, order, or approval of the Bankruptcy Court.

U.      *Milestone Settlement*

The terms of the Milestone Settlement are fully incorporated into the Plan by reference, and the Debtors and the Milestone Parties shall abide by the terms of the Milestone Settlement Order, including the payment by the Debtors, no later than the Effective Date, of the reasonable and documented professional fees of the Milestone Parties as set forth in the Milestone Settlement Order. To the extent of a conflict between this Plan and the Milestone Settlement Order, the Milestone Settlement Order will control.

V.      *Indenture Trustee Expenses*

On the Effective Date, and without any further notice to or action, order or approval of the Bankruptcy Court, the Debtors or Reorganized Debtors shall distribute Cash to the Indenture Trustees in an amount equal to the Indenture Trustee Expenses without a reduction to recoveries to Holders of the Secured Notes Claims or Unsecured Notes Claims; *provided that* the Indenture Trustees shall provide the Debtors with the invoices (subject to redaction to preserve attorney-client privilege) for which they seek payment no later than fifteen (15) days prior to the Effective Date. If the Debtors dispute any Indenture Trustee Expenses, the Debtors shall (i) pay the undisputed portion of the Indenture Trustee Expenses, (ii) notify the Indenture Trustees with respect to any disputed portion of the Indenture Trustee Expenses within ten (10) days after presentation of the invoices by the Indenture Trustees, and (iii) escrow the amount of any disputed portion of the Indenture Trustee Expenses pending any resolution. Upon such notification, the applicable Indenture Trustee may submit such dispute for resolution by the Bankruptcy Court. For the avoidance of doubt, nothing herein affects the Indenture Trustees' rights to exercise their respective charging liens pursuant to the terms of the applicable Indentures.

To the extent the Indenture Trustees provide services or incur costs or expenses, including professional fees, related to or in connection with the Plan, the Confirmation Order or the Indentures after the Effective Date, such Indenture Trustee shall be entitled to receive from the Reorganized Debtors, without further Bankruptcy Court approval, reasonable compensation for such services and reimbursement of reasonable out-of-pocket expenses incurred with such services. The payment of such compensation and expenses will be made promptly or as otherwise agreed to by the applicable Indenture Trustee and the Reorganized Debtors.

The payment of the applicable Unsecured Notes Indenture Trustee and the Convertible Notes Indenture Trustee as set forth in the applicable indenture or bond agreement shall be considered a distribution on account of Unsecured Notes Claims.

W.      *Closing the Chapter 11 Cases*

On and after the Effective Date, the Debtors or Reorganized Debtors shall be permitted to close all of the Chapter 11 Cases of the Debtors except for the Chapter 11 Case of Bristow Parent and any other Debtor identified in the Restructuring Transactions Exhibit as having its Chapter 11 Case remain open following the Effective Date, and all contested matters relating to any of the Debtors, including objections to Claims, shall be administered and heard in the Chapter 11 Case of Bristow Parent, irrespective of whether such Claim(s) were Filed against a Debtor whose Chapter 11 Case was closed.

When all Disputed Claims have become Allowed or disallowed and all distributions have been made in accordance with the Plan, the Reorganized Debtors shall seek authority to close any remaining Chapter 11 Cases in accordance with the Bankruptcy Code and the Bankruptcy Rules.

## ARTICLE V.
## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

A.      *Assumption or Rejection of Executory Contracts and Unexpired Leases*

Unless otherwise assumed or rejected pursuant to an order of the Bankruptcy Court (including the Milestone Settlement Order) entered prior to the Effective Date, on the Effective Date, each Executory Contract and Unexpired Lease shall be deemed assumed pursuant to section 365 of the Bankruptcy Code, without the need for any further notice to or action, order, or approval of the Bankruptcy Court, unless such Executory Contract or Unexpired Lease is listed on the Schedule of Rejected Executory Contracts and Unexpired Leases, if any. The assumption of Executory Contracts and Unexpired Leases hereunder may include the assignment of certain of such contracts to Affiliates. The Confirmation Order will constitute an order of the Bankruptcy Court approving the above-described assumptions, rejections, and assumptions and assignments. For the avoidance of doubt and notwithstanding anything to the contrary herein, the Backstop Commitment Agreement and Restructuring Support Agreement shall be assumed on the Effective Date, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's authorization for the Debtors to enter into the Backstop Commitment Agreement and Restructuring Support Agreement as of the Confirmation Date and perform any and all obligations of the Debtors thereunder.

Except as otherwise provided herein or agreed to by the Debtors and the applicable counterparty, each assumed Executory Contract or Unexpired Lease shall include all modifications, amendments, supplements, restatements, or other agreements related thereto, and all rights related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests. Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease or the validity, priority, or amount of any Claims that may arise in connection therewith. To the extent applicable, no change of control (or similar provision) will be deemed to occur under any such Executory Contract or Unexpired Lease.

If certain, but not all, of a contract counterparty's Executory Contracts and/or Unexpired Leases are assumed pursuant to the Plan, the Confirmation Order shall be a determination that such counterparty's Executory Contracts and/or Unexpired Leases that are being rejected pursuant to the Plan are severable agreements that are not integrated with those Executory Contracts and/or Unexpired Leases that are being assumed pursuant to the Plan. Parties seeking to contest this finding with respect to their Executory Contracts and/or Unexpired Leases must file a timely objection to the Plan on the grounds that their agreements are integrated and not severable, and any such dispute shall be resolved by the Bankruptcy Court at the Confirmation Hearing (to the extent not resolved by the parties prior to the Confirmation Hearing).

B.      *Claims Based on Rejection of Executory Contracts or Unexpired Leases*

Counterparties to Executory Contracts or Unexpired Leases listed on the Schedule of Rejected Executory Contracts and Unexpired Leases, if any, shall be served with a notice of rejection of Executory Contracts and Unexpired Leases with the Plan Supplement. Proofs of Claim with respect to Claims arising from the rejection of

Executory Contracts and Unexpired Leases, if any, must be Filed with the Bankruptcy Court within 30 days after the date of the order of the Bankruptcy Court approving such rejection. Any Claims arising from the rejection of an Executory Contract or Unexpired Lease that are not Filed within such time will be automatically disallowed, forever barred from assertion, and shall not be enforceable against, as applicable, the Debtors, the Reorganized Debtors, the Estates, or property of the foregoing parties, without the need for any objection by the Debtors or Reorganized Debtors, as applicable, or further notice to, or action, order, or approval of the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully satisfied, released, and discharged, notwithstanding anything in a Proof of Claim to the contrary. Claims arising from the rejection of the Debtors' Executory Contracts and Unexpired Leases shall be classified as General Unsecured Claims and shall be treated in accordance with Article III of the Plan.

C.      *Cure of Defaults for Assumed Executory Contracts and Unexpired Leases*

On the Effective Date or as soon as reasonably practicable thereafter, the Debtors or the Reorganized Debtors, as applicable, shall pay all Cure Costs relating to Executory Contracts and Unexpired Leases that are being assumed under the Plan. Unless otherwise agreed upon in writing by the parties to the applicable Executory Contract or Unexpired Lease, all requests for payment of Cure Costs that differ from the amounts paid or proposed to be paid by the Debtors or the Reorganized Debtors to a counterparty must be Filed with the Solicitation Agent on or before 14 days after receiving the applicable Cure Notice. Any such request that is not timely Filed shall be disallowed and forever barred, estopped, and enjoined from assertion, and shall not be enforceable against any Debtor or Reorganized Debtor, without the need for any objection by the Debtors or Reorganized Debtors or any other party in interest or any further notice to or action, order, or approval of the Bankruptcy Court. Any Cure Costs shall be deemed fully satisfied, released, and discharged upon payment by the Debtors or the Reorganized Debtors of the applicable Cure Costs; *provided*, *however*, that nothing herein shall prevent the Reorganized Debtors from paying any Cure Costs despite the failure of the relevant counterparty to file such request for payment of such Cure Costs. The Reorganized Debtors also may settle any Cure Costs (with the reasonable consent of the Required RSA Parties, and unless the Creditors' Committee is dissolved, after satisfying the Committee Consent Right) without any further notice to or action, order, or approval of the Bankruptcy Court. In addition, any objection to the assumption of an Executory Contract or Unexpired Lease under the Plan must be Filed with the Bankruptcy Court on or before the Confirmation Hearing. Any such objection will be scheduled to be heard by the Bankruptcy Court at the Confirmation Hearing or at the Debtors' or Reorganized Debtors', as applicable, first scheduled omnibus hearing for which such objection is timely Filed. Any counterparty to an Executory Contract or Unexpired Lease that fails to timely object to the proposed assumption of any Executory Contract or Unexpired Lease will be deemed to have consented to such assumption.

If there is any dispute regarding any Cure Costs, the ability of the Reorganized Debtors or any assignee to provide "adequate assurance of future performance" within the meaning of section 365 of the Bankruptcy Code, or any other matter pertaining to assumption, then payment of any Cure Costs shall occur as soon as reasonably practicable after entry of a Final Order resolving such dispute, approving such assumption (and, if applicable, assignment), or as may be agreed upon by the Debtors or the Reorganized Debtors, as applicable, and the counterparty to the Executory Contract or Unexpired Lease. The Debtors and Reorganized Debtors, as applicable, reserve the right at any time to move to reject any Executory Contract or Unexpired Lease based upon the existence of any such unresolved dispute. If the Bankruptcy Court determines that the Allowed Cure Cost with respect to any Executory Contract or Unexpired Lease is greater than the amount set forth in the applicable Cure Notice, the Debtors (with the reasonable consent of the Required RSA Parties, and unless the Creditors' Committee is dissolved, after satisfying the Committee Consent Right) shall have the right to add such Executory Contract or Unexpired Lease to the Schedule of Rejected Executory Contracts and Unexpired Leases, in which case such Executory Contract or Unexpired Lease will be deemed rejected as of the Effective Date subject to the applicable counterparty's right to object to such rejection.

Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise and full payment of any applicable Cure Costs pursuant to this Article V.C shall result in the full release and satisfaction of any Cures, Claims, or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time prior to the effective date of assumption. **Any and all Proofs of Claim based upon Executory Contracts or Unexpired Leases that have been assumed in the Chapter 11 Cases, including pursuant to the Confirmation Order, and for which any Cure Costs have been fully paid pursuant to**

45

**this <u>Article V.C</u>, shall be deemed disallowed and expunged as of the Effective Date without the need for any objection thereto or any further notice to or action, order, or approval of the Bankruptcy Court.**

D.    *Indemnification*

On and as of the Effective Date, the Indemnification Obligations will be assumed, irrevocable with respect to any claims relating to acts or omissions occurring at or prior to the Effective Date, and will survive the effectiveness of the Plan, and the New Organizational Documents will provide for the indemnification, defense, reimbursement, exculpation, and/or limitation of liability of, and advancement of fees and expenses to the Debtors' and the Reorganized Debtors' directors, officers, employees, or agents that were employed by, or serving on the board of directors (or similar governing body) of, any of the Debtors as of the Petition Date and/or at any time in the period between the Petition Date and the Effective Date, to the fullest extent permitted by law and at least to the same extent as the organizational documents of each of the respective Debtors on the Petition Date or the applicable period between the Petition Date and the Effective Date, against any Claims or Causes of Action whether direct or derivative, liquidated or unliquidated, fixed or contingent, disputed or undisputed, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, and, notwithstanding anything in the Plan to the contrary, none of the Reorganized Debtors will amend and/or restate the New Organizational Documents before or after the Effective Date to terminate or adversely affect any of the Reorganized Debtors' obligations to provide such indemnification rights or such directors', officers', employees', or agents' indemnification rights with respect to any claims relating to acts or omissions occurring at or prior to the Effective Date.

E.    *Insurance Policies*

Notwithstanding anything in the Plan to the contrary, all of the Debtors' insurance policies and any agreements, documents, or instruments relating thereto, are treated as and deemed to be Executory Contracts under the Plan. On the Effective Date, pursuant to section 365(a) of the Bankruptcy Code, the Debtors shall be deemed to have assumed all insurance policies and any agreements, documents, and instruments related thereto, including all D&O Liability Insurance Policies (including tail coverage liability insurance). Entry of the Confirmation Order will constitute the Bankruptcy Court's approval of the Reorganized Debtors' assumption of all such insurance policies, including the D&O Liability Insurance Policies. Notwithstanding anything to the contrary contained in the Plan, Confirmation of the Plan shall not discharge, impair, or otherwise modify any indemnity obligations assumed by the foregoing assumption of insurance policies, including the D&O Liability Insurance Policies, and each such indemnity obligation will be deemed and treated as an Executory Contract that has been assumed by the Reorganized Debtors under the Plan as to which no Proof of Claim or Claim for Cure Costs need be Filed, and shall survive the Effective Date.

On or before the Effective Date, the Debtors shall purchase and maintain tail coverage under the D&O Liability Insurance Policies for the six-year period following the Effective Date on terms no less favorable than under, and with an aggregate limit of liability no less than the aggregate limit of liability under, the existing D&O Liability Insurance Policies. In addition to such tail coverage, the D&O Liability Insurance Policies shall remain in place in the ordinary course during the Chapter 11 Cases.

F.    *Employee Compensation and Benefits*

1.    <u>Compensation and Benefits Programs</u>

Subject to the provisions of the Plan, all Compensation and Benefits Programs shall be treated as Executory Contracts under the Plan and deemed assumed on the Effective Date pursuant to the provisions of sections 365 and 1123 of the Bankruptcy Code, except for:

(a) all employee equity or equity-based incentive plans, and any provisions set forth in the Compensation and Benefits Programs that provide for rights to acquire Interests in any of the Debtors;

(b) any Compensation and Benefits Programs that, as of the entry of the Confirmation Order, have been specifically waived by the beneficiaries of any employee benefit plan or contract;

(c) any agreement or arrangement between a Debtor and a former insider as of the Petition Date;

(d) any deferred compensation plan for any participant that is not a current employee on the Effective Date; and

(e) Compensation and Benefits Programs that have been rejected pursuant to an order of the Bankruptcy Court or is listed on the Schedule of Rejected Executory Contracts and Unexpired Leases.

Any assumption of Compensation and Benefits Programs pursuant to the terms herein shall not be deemed to trigger any applicable change of control, immediate vesting, termination, or similar provisions therein. No counterparty shall have rights under a Compensation and Benefits Programs assumed pursuant to the Plan other than those applicable immediately prior to such assumption.

2. Workers' Compensation Programs.

As of the Effective Date, except as set forth in the Plan Supplement, the Debtors and the Reorganized Debtors shall continue to honor their obligations under: (a) all applicable workers' compensation laws in states in which the Reorganized Debtors operate; and (b) the Debtors' written contracts, agreements, agreements of indemnity, self-insured workers' compensation bonds, policies, programs, and plans for workers' compensation and workers' compensation insurance. All Proofs of Claim on account of workers' compensation shall be deemed withdrawn automatically and without any further notice to or action, order, or approval of the Bankruptcy Court; *provided that* nothing in the Plan shall limit, diminish, or otherwise alter the Debtors' or Reorganized Debtors' defenses, Causes of Action, or other rights under applicable non-bankruptcy law with respect to any such contracts, agreements, policies, programs, and plans; *provided further* that nothing herein shall be deemed to impose any obligations on the Debtors in addition to what is provided for under applicable state law.

G. *Contracts and Leases After the Petition Date*

Contracts and leases entered into after the Petition Date by any Debtor, including any Executory Contracts and Unexpired Leases assumed under section 365 of the Bankruptcy Code, will be performed by the applicable Debtor or Reorganized Debtor liable thereunder in the ordinary course of its business. Such contracts and leases that are not rejected under the Plan shall survive and remain unaffected by entry of the Confirmation Order.

H. *Reservation of Rights*

Nothing contained in the Plan or the Plan Supplement shall constitute an admission by the Debtors or any other party that any contract or lease is in fact an Executory Contract or Unexpired Lease or that any Debtor or Reorganized Debtor has any liability thereunder. If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption, the Debtors or the Reorganized Debtors, as applicable, shall have 45 days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease.

I. *Nonoccurrence of Effective Date*

In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code.

## ARTICLE VI.
## PROVISIONS GOVERNING DISTRIBUTIONS

A.      *Distributions on Account of Claims and Interests Allowed as of the Effective Date*

Except as otherwise provided herein, in a Final Order, or as otherwise agreed to by the Debtors (or the Reorganized Debtors) and the Holder of the applicable Claim or Interest, on the first Distribution Date, the Distribution Agent shall make initial distributions under the Plan on account of Claims and Interests Allowed on or before the Effective Date; *provided*, *however*, that (1) Allowed Administrative Claims with respect to liabilities incurred by the Debtors in the ordinary course of business shall be paid or performed in the ordinary course of business in accordance with the terms and conditions of any controlling agreements, course of dealing, course of business, or industry practice, and (2) Allowed Priority Tax Claims shall be paid in accordance with Article II.C.  To the extent any Allowed Priority Tax Claim is not due and owing on the Effective Date, such Claim shall be paid in full in Cash in accordance with the terms of any agreement between the Debtors and the Holder of such Claim or as may be due and payable under applicable non-bankruptcy law or in the ordinary course of business.  A Distribution Date shall occur no more frequently than once in every 90-day period after the Effective Date, as necessary, in the Reorganized Debtors' sole discretion.

B.      *Rights and Powers of the Distribution Agent*

1.      Powers of Distribution Agent

The Distribution Agent shall be empowered to:  (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan; (b) make all distributions contemplated hereby; (c) employ professionals to represent it with respect to its responsibilities; and (d) exercise such other powers as may be vested in the Distribution Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Distribution Agent to be necessary and proper to implement the provisions hereof.

2.      Expenses Incurred On or After the Effective Date

Except as otherwise ordered by the Bankruptcy Court, the amount of any reasonable fees and expenses incurred by the Distribution Agent on or after the Effective Date (including taxes) and any reasonable compensation and expense reimbursement claims (including reasonable attorney fees and expenses) made by the Distribution Agent shall be paid in Cash by the Reorganized Debtors.

C.      *Special Rules for Distributions to Holders of Disputed Claims*

Except as otherwise agreed by the relevant parties:  no partial payments and no partial distributions shall be made with respect to a Disputed Claim until all such disputes in connection with such Disputed Claim have been resolved by settlement or Final Order.  Any dividends or other distributions arising from property distributed to Holders of Allowed Claims in a Class and paid to such Holders under the Plan shall also be paid, in the applicable amounts, to any Holder of a Disputed Claim in such Class that becomes an Allowed Claim after the date or dates that such dividends or other distributions were earlier paid to Holders of Allowed Claims in such Class.

Any fund established to hold consideration to be received under the Plan pending resolution of Disputed Claims shall be treated as a "disputed ownership fund" pursuant to Treasury Regulation section 1.468B-9.  Any such fund shall, therefore, be subject to entity-level taxation.  For the avoidance of doubt, any New Stock shall not be issued to such fund; rather, Reorganized Bristow Parent shall retain sufficient authorized, but unissued, New Stock and issue them directly to Holders of Claims following the resolution of Disputed Claims.

48

D.   *Delivery of Distributions*

     1.     <u>Record Date for Distributions</u>

Except as provided herein, on the Distribution Record Date, the Claims Register shall be closed and the Debtors, the Reorganized Debtors, or any other party responsible for making distributions under the Plan shall be authorized and entitled to recognize only those record Holders listed on the Claims Register or any other transfer register for each Class of Claims as maintained by the Debtors or their agents, each of which shall be deemed closed as of the close of business on the Distribution Record Date, and there shall be no further changes in the record Holders of the applicable Claims. In addition, with respect to payment of any Cure Costs or disputes over any Cure Costs, neither the Debtors nor the Distribution Agent shall have any obligation to recognize or deal with any party other than the non-Debtor party to the applicable Executory Contract or Unexpired Lease as of the Effective Date, even if such non-Debtor party has thereafter sold, assigned, or otherwise transferred its Claim for Cure Costs. The Distribution Record Date shall not apply to Secured Notes and Unsecured Notes deposited with DTC, the Holders of which shall receive distributions in accordance with the customary procedures of DTC.

     2.     <u>Distribution Process</u>

The Distribution Agent shall make all distributions required under the Plan, except that with respect to distributions to Holders of Allowed Claims governed by a separate agreement, shall exercise commercially reasonable efforts to implement appropriate mechanics governing such distributions in accordance with the Plan and the terms of the relevant governing agreement. Except as otherwise provided herein, and notwithstanding any authority to the contrary, distributions to Holders of Allowed Claims and Allowed Interests, including Claims and Interests that become Allowed after the Effective Date, shall be made to Holders of record or their respective designees as of the Distribution Record Date: (a) to the address of such Holder or designee as set forth in the applicable register (or if the appropriate notice has been provided pursuant to the governing agreement in writing, on or before the date that is 10 calendar days before the Effective Date, of a change of address or an identification of designee, to the changed address or to such designee, as applicable); or (b) in accordance with Federal Rule of Civil Procedure 4, as modified and made applicable by Bankruptcy Rule 7004, if no address exists in the applicable register, no Proof of Claim has been Filed, and the Distribution Agent has not received a written notice of a change of address on or before the date that is 10 calendar days before the Effective Date. The Debtors, the Reorganized Debtors, and the Distribution Agent, as applicable, shall not incur any liability whatsoever on account of any distributions under the Plan. Except as otherwise provided in the Plan, Holders of Claims and Holders of Interests shall not be entitled to interest, dividends, or accruals on the distributions provided for in the Plan, regardless of whether such distributions are delivered on or at any time after the Effective Date.

     3.     <u>Delivery of Distributions to Holders of Unsecured Notes Claims</u>

Except as otherwise provided in the Plan or reasonably requested by the applicable Unsecured Notes Indenture Trustee, all distributions to Holders of Unsecured Notes Claims shall be made to and deemed completed when received by the applicable Unsecured Notes Indenture Trustee; provided, however, that at such Unsecured Notes Indenture Trustee's written election, the applicable distributions shall not be distributed to Holders of Unsecured Notes Claims in the name of the Unsecured Notes Indenture Trustee. Upon such written election, the Unsecured Notes Indenture Trustee shall hold or direct such distributions for the benefit of Holders of Unsecured Notes Claims, and the Unsecured Notes Indenture Trustees shall arrange to deliver such distributions to or on behalf of such Holders, subject to the Unsecured Notes Indenture Trustee's charging liens. The payment of the applicable Unsecured Notes Indenture Trustee and the Convertible Notes Indenture Trustee as set forth in the applicable indenture or bond agreement shall be considered a distribution on account of Unsecured Notes Claims. If an Unsecured Notes Indenture Trustee is unable to make such distributions or consents to the Distribution Agent making such distributions in writing, the Distribution Agent, with the cooperation of such Unsecured Notes Indenture Trustee, shall make such distributions to the extent practicable to do so (provided that until such distributions are made, the applicable charging liens shall attach to the property to be distributed in the same manner as if such distributions were made through the applicable Unsecured Notes Indenture Trustee).

4.      Foreign Currency Exchange Rate

Except as otherwise provided in a Bankruptcy Court order, as of the Effective Date, any Claim asserted in currency other than U.S. dollars shall be automatically deemed converted to the equivalent U.S. dollar value using the exchange rate for the applicable currency as published in *The Wall Street Journal, National Edition*, on the Effective Date.

5.      Fractional, Undeliverable, and Unclaimed Distributions

a.      *Fractional Distributions*.  Whenever any distribution of fractional shares of New Common Stock or New Preferred Stock would otherwise be required pursuant to the Plan, the actual distribution shall reflect a rounding of such fraction to the nearest interest or share or dollar, as applicable, with half interests of shares, or any amount equal to $0.50, or less being rounded down.  The total number of authorized shares of New Stock to be distributed pursuant to the Plan shall be adjusted as necessary to account for the foregoing rounding.

b.      *Undeliverable Distributions*.  If any distribution to a Holder of an Allowed Claim is returned to the Distribution Agent as undeliverable, no further distributions shall be made to such Holder unless and until the Distribution Agent is notified in writing of such Holder's then-current address or other necessary information for delivery, at which time all currently due missed distributions shall be made to such Holder on the next Distribution Date.  Undeliverable distributions shall remain in the possession of the Reorganized Debtors until such time as a distribution becomes deliverable, or such distribution reverts to the Reorganized Debtors or is canceled pursuant to Article VI.D.5.c of the Plan, and shall not be supplemented with any interest, dividends, or other accruals of any kind.

c.      *Reversion*.  Any distribution under the Plan that is an Unclaimed Distribution for a period of 6 months after distribution shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code and such Unclaimed Distribution shall revest in the applicable Reorganized Debtor and, to the extent such Unclaimed Distribution is comprised of New Common Stock or New Preferred Stock, each shall be transferred to the Backstop Commitment Parties on a Pro Rata basis.  Upon such revesting, the Claim of the Holder or its successors with respect to such property shall be canceled, discharged, and forever barred notwithstanding any applicable federal or state escheat, abandoned, or unclaimed property laws, or any provisions in any document governing the distribution that is an Unclaimed Distribution, to the contrary.

6.      Minimum; *De Minimis* Distributions

No Cash payment of less than $50 shall be made to a Holder of an Allowed Claim on account of such Allowed Claim.

7.      Surrender of Canceled Instruments or Securities

On the Effective Date, each Holder of a Certificate shall be deemed to have surrendered such Certificate to the Distribution Agent or a Servicer (to the extent the relevant Claim is governed by an agreement and administered by a Servicer).  Such Certificate shall be canceled solely with respect to the Debtors, and such cancelation shall not alter the obligations or rights of any non-Debtor third parties vis-à-vis one another with respect to such Certificate.  Notwithstanding the foregoing paragraph, this Article VI.D.6 shall not apply to any Claims and Interests that are Reinstated pursuant to the terms of the Plan.

E.      *Compliance with Tax Requirements/Allocations*

In connection with the Plan, to the extent applicable, the Distribution Agent shall request distributees to provide appropriate documentation that may be required for an exemption from withholding or reporting, and shall

50

comply with all tax withholding and reporting requirements imposed on it by any Governmental Unit, and all distributions pursuant to the Plan shall be subject to such withholding and reporting requirements unless an exception applies.  Notwithstanding any provision in the Plan to the contrary, the Distribution Agent shall take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, or withholding distributions pending receipt of information necessary to facilitate such distributions.  The Reorganized Debtors and the Distribution Agent reserves the right to allocate all distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support, and other spousal awards, liens, and encumbrances. All Persons holding Claims shall be required to provide any information necessary to effect information reporting and the withholding of such taxes.  Notwithstanding any other provision of the Plan to the contrary, each Holder of an Allowed Claim shall have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any Governmental Unit, including income, withholding, and other tax obligations, on account of such distribution.

F.      *Claims Paid or Payable by Third Parties*

1.      Claims Paid by Third Parties

Subject to the last sentence of this paragraph, to the extent a Holder of a Claim receives a distribution on account of such Claim and receives payment from a party that is not a Debtor or a Reorganized Debtor on account of such Claim, such Holder shall, within 14 calendar days of receipt thereof, repay or return the distribution to the Reorganized Debtors to the extent the Holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such distribution under the Plan.  The failure of such Holder to timely repay or return such distribution shall result in the Holder owing the Reorganized Debtors annualized interest at the Federal Judgment Rate on such amount owed for each Business Day after the 14-day grace period specified above until the amount is repaid.

2.      Claims Payable by Insurance Carriers

No distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' insurance policies until the Holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy.  To the extent that one or more of the Debtors' insurers agrees to satisfy in full or in part a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such insurers' agreement, the applicable portion of such Claim may be expunged without a Claim objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court; *provided that* the Debtors shall provide 21 calendar days' notice to the Holder of such Claim prior to any disallowance of such Claim during which period the Holder may object to such disallowance, and if the parties cannot reach an agreed resolution, the matter shall be decided by the Bankruptcy Court.

3.      Applicability of Insurance Policies

Except as otherwise provided in the Plan, distributions to Holders of Allowed Claims shall be in accordance with the provisions of any applicable insurance policy.  Notwithstanding anything to the contrary contained herein (including Article VIII of the Plan), nothing contained in the Plan shall constitute or be deemed a release, settlement, satisfaction, compromise, or waiver of any Cause of Action that the Debtors or any other Entity may hold against any other Entity, including insurers, under any policies of insurance or applicable indemnity, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

G.      *Setoffs*

Except as otherwise expressly provided for herein, each Reorganized Debtor, pursuant to the Bankruptcy Code (including section 553 of the Bankruptcy Code), applicable non-bankruptcy law, or as may be agreed to by the Holder of a Claim, may (but shall not be required to) set off against any Allowed Claim and the distributions to be made pursuant to the Plan on account of such Allowed Claim (before any distribution is made on account of such

Allowed Claim), any claims, rights, and Causes of Action of any nature that such Debtor or Reorganized Debtor, as applicable, may hold against the Holder of such Allowed Claim, to the extent such claims, rights, or Causes of Action against such Holder have not been otherwise compromised or settled on or prior to the Effective Date (whether pursuant to the Plan or otherwise); *provided*, *however*, that neither the failure to effect such a setoff nor the allowance of any Claim pursuant to the Plan shall constitute a waiver or release by such Reorganized Debtor of any such claims, rights, and Causes of Action that such Reorganized Debtor may possess against such Holder. In no event shall any Holder of Claims be entitled to set off any such Claim against any claim, right, or Cause of Action of the Debtor or Reorganized Debtor (as applicable), unless such Holder has Filed a motion with the Bankruptcy Court requesting the authority to perform such setoff on or before the Confirmation Date, and notwithstanding any indication in any Proof of Claim or otherwise that such Holder asserts, has, or intends to preserve any right of setoff pursuant to section 553 of the Bankruptcy Code or otherwise.

H.      *Indefeasible Distributions*

Any and all distributions made under the Plan shall be indefeasible and not subject to clawback.

I.      *Allocation Between Principal and Accrued Interest*

Distributions in respect of Allowed Claims shall be allocated first to the principal amount of such Claims (as determined for U.S. federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Allowed Claims, to any portion of such Claims for accrued but unpaid interest.

## ARTICLE VII.
## PROCEDURES FOR RESOLVING DISPUTED CLAIMS

A.      *Allowance of Claims*

After the Effective Date, each of the Reorganized Debtors shall have and retain any and all rights and defenses the applicable Debtor had with respect to any Claim immediately before the Effective Date. Except as expressly provided in the Plan or in any order entered in the Chapter 11 Cases before the Effective Date (including the Confirmation Order), no Claim shall become an Allowed Claim unless and until such Claim is deemed Allowed under the Plan or the Bankruptcy Code, or the Bankruptcy Court has entered a Final Order, including the Confirmation Order (when it becomes a Final Order), in the Chapter 11 Cases allowing such Claim.

B.      *Claims Administration Responsibilities*

Except as otherwise specifically provided in the Plan and notwithstanding any requirements that may be imposed pursuant to Bankruptcy Rule 9019, after the Effective Date, the Reorganized Debtors shall have the sole authority to: (1) File and prosecute objections to Claims; (2) settle, compromise, withdraw, litigate to judgment, or otherwise resolve objections to any and all Claims (with the reasonable consent of the Required RSA Parties), regardless of whether such Claims are in a Class or otherwise; (3) settle, compromise, or resolve any Disputed Claim (with the reasonable consent of the Required RSA Parties) without any further notice to or action, order, or approval by the Bankruptcy Court; and (4) administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court. On and after the Effective Date, the Reorganized Debtors will use commercially reasonable efforts to advance the claims resolution process through estimation or otherwise, subject to the provisions of Article VII.K of the Plan. After the Effective Date, the Reorganized Debtors shall resolve Disputed Claims in accordance with the Debtors' fiduciary duties and pursuant to the terms of the Plan.

C.      *Estimation of Claims*

Before, on, or after the Effective Date, the Debtors or the Reorganized Debtors, as applicable, may (but are not required to) at any time request that the Bankruptcy Court estimate any Claim pursuant to applicable law, including pursuant to section 502(c) of the Bankruptcy Code and/or Bankruptcy Rule 3012 for any reason, regardless of whether any party previously has objected to such Claim or whether the Bankruptcy Court has ruled on any such objection,

and the Bankruptcy Court shall retain jurisdiction to estimate any such Claim, including during the litigation of any objection to any Claim or during the pendency of any appeal relating to such objection. Notwithstanding any provision to the contrary in the Plan, a Claim that has been expunged from the Claims Register, but that either is subject to appeal or has not been the subject of a Final Order, shall be deemed to be estimated at zero dollars, unless otherwise ordered by the Bankruptcy Court. In the event that the Bankruptcy Court estimates any Claim and does not provide otherwise, such estimated amount shall constitute a maximum limitation on such Claim for all purposes under the Plan (including for purposes of distributions and discharge) and may be used as evidence in any supplemental proceedings, and the Debtors or Reorganized Debtors may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim. Notwithstanding section 502(j) of the Bankruptcy Code, in no event shall any Holder of a Claim that has been estimated pursuant to section 502(c) of the Bankruptcy Code or otherwise be entitled to seek reconsideration of such estimation unless such Holder has Filed a motion requesting the right to seek such reconsideration on or before seven (7) days after the date on which such Claim is estimated. Each of the foregoing Claims and objection, estimation, and resolution procedures are cumulative and not exclusive of one another. Claims may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.

D.    *Disputed Claims Reserve*

On or before the Effective Date, the Reorganized Debtors shall establish one or more reserves of Cash and/or New Common Stock for those General Unsecured Claims that are Disputed Claims as of the Distribution Record Date (for the avoidance of doubt, deducting such amounts from the Unsecured Equity Pool, GUC Distribution Cash Amount, and Unsecured 4(a)(2) Distribution Cash Amount), which reserves shall be administered by the Reorganized Debtors or the Distribution Agent, as applicable. After the Effective Date, the Reorganized Debtors or the Distribution Agent shall hold such Cash and/or New Common Stock in such reserve(s) in trust for the benefit of the Holders of General Unsecured Claims that are Disputed Claims as of the Distribution Record Date, that are ultimately determined to be Allowed after the Distribution Record Date. The Reorganized Debtors or the Distribution Agent shall distribute such amounts (net of any expenses, including any taxes relating thereto), as provided herein, as such Claims are resolved by a Final Order or agreed to by settlement, and such amounts will be distributable on account of such Claims as such amounts would have been distributable had such Claims been Allowed Claims as of the Effective Date under Article III of the Plan solely to the extent of the amounts available in the applicable reserve(s); *provided*, *however*, that for the avoidance of doubt, and as set forth in the Rights Offering Procedures, there shall not be any reserve of any Unsecured 4(a)(2) Subscription Rights or Unsecured 1145 Subscription Rights, and any Holder of a General Unsecured Claim that is a Disputed Claim as of the Distribution Record Date shall not be entitled to receive or exercise any Unsecured 4(a)(2) Subscription Rights or Unsecured 1145 Subscription Rights.

Upon a Disputed Claim becoming disallowed by a Final Order, (a) the applicable amount of Cash that was in the disputed claims reserve on account of such Disputed Claim shall be distributed by the Reorganized Debtors to the applicable Holders of Claims that would have received such Cash pursuant to the Plan if such Disputed Claim did not exist as of the Distribution Record Date, with the Reorganized Debtors making such distributions of any such released Cash no less frequently than every three months following the Effective Date and (b) the applicable amount of New Common Stock that was in the disputed claims reserve on account of such Disputed Claim shall be cancelled by the Reorganized Debtors.

Any assets held in a disputed claims reserve shall be subject to the tax rules that apply to "disputed ownership funds" under 26 C.F.R. 1.468B–9. As such, such assets will be subject to entity-level taxation, and the Reorganized Debtors shall be required to comply with the relevant rules.

E.    *Adjustment to Claims Without Objection*

Any Claim that has been paid or satisfied, or any Claim that has been amended or superseded, may be adjusted or expunged on the Claims Register by the Debtors or the Reorganized Debtors without an objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

F.      *Time to File Objections to Claims*

Any objections to Claims shall be Filed on or before the later of (1) 180 days after the Effective Date and (2) such other period of limitation as may be specifically fixed by the Bankruptcy Court upon a motion by the Debtors or the Reorganized Debtors.

G.      *Disallowance of Claims*

Any Claims held by Entities from which property is recoverable under sections 542, 543, 550, or 553 of the Bankruptcy Code or that is a transferee of a transfer avoidable under sections 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code, shall not be Allowed or deemed Allowed, and Holders of such Claims may not receive any distributions on account of such Claims until such time as such Causes of Action against that Entity have been settled or a Bankruptcy Court order with respect thereto has been entered and all sums due, if any, to the Debtors by that Entity have been turned over or paid to the Debtors or the Reorganized Debtors. All Proofs of Claim Filed on account of an Indemnification Obligation shall be deemed satisfied and expunged from the Claims Register as of the Effective Date to the extent such Indemnification Obligation is assumed (or honored or reaffirmed, as the case may be) pursuant to the Plan, without any further notice to or action, order, or approval of the Bankruptcy Court. Notwithstanding anything to the contrary in this Plan, any Holder of an Allowed Claim under section 502(h) of the Bankruptcy Code arising from an Avoidance Action shall, in lieu of any distribution to Holders of Allowed General Unsecured Claims, solely receive Cash from the proceeds of such Avoidance Action in an amount reasonably equivalent to the percentage recovery received by Holders of General Unsecured Claims based on the enterprise value of the Debtors for purposes of Confirmation; *provided that* the Reorganized Debtors may elect in their sole discretion (and without any further approval from the Court) to instead have such amount of Cash set off against the recovery from the applicable Avoidance Action.

**Except as otherwise provided herein or as agreed to by the Debtors or the Reorganized Debtors, any and all Proofs of Claim Filed after the Claims Bar Date shall be deemed disallowed and expunged as of the Effective Date without any further notice to or action, order, or approval of the Bankruptcy Court, and Holders of such Claims may not receive any distributions on account of such Claims, unless such late Proof of Claim has been deemed timely Filed by a Final Order.**

H.      *Amendments to Claims*

On or after the Effective Date, a Claim may not be Filed or amended without the prior authorization of the Bankruptcy Court or the Reorganized Debtors, and any such new or amended Claim Filed shall be deemed disallowed in full and expunged without any further notice to or action, order, or approval of the Bankruptcy Court to the maximum extent provided by applicable law.

I.      *No Distributions Pending Allowance*

If an objection to a Claim or portion thereof is Filed, no payment or distribution provided under the Plan shall be made on account of such Claim or portion thereof unless and until such Disputed Claim becomes an Allowed Claim, unless otherwise determined by the Reorganized Debtors.

J.      *Distributions After Allowance*

To the extent that a Disputed Claim ultimately becomes an Allowed Claim, distributions shall be made to the Holder of such Allowed Claim in accordance with the provisions of the Plan. As soon as reasonably practicable after the date that the order or judgment of the Bankruptcy Court allowing any Disputed Claim becomes a Final Order, the Reorganized Debtors shall provide to the Holder of such Claim the distribution to which such Holder is entitled under the Plan as of the Effective Date, less any previous distribution (if any) that was made on account of the undisputed portion of such Claim, without any interest, dividends, or accruals to be paid on account of such Claim unless required under applicable bankruptcy law or as otherwise provided herein.

K.     *Single Satisfaction of Claims*

Holders of Allowed Claims may assert such Claims against the Debtors obligated with respect to such Claims, and such Claims shall be entitled to share in the recovery provided for the applicable Class of Claims against the Debtors based upon the full Allowed amount of such Claims. Notwithstanding the foregoing, in no case shall the aggregate value of all property received or retained under the Plan on account of any Allowed Claim exceed 100 percent of the underlying Allowed Claim (including applicable interest, if any such interest is Allowed).

L.     *Claims Consultation Rights*

The Debtors or the Reorganized Debtors, as applicable, shall consult with the Creditors' Committee with regard to the allowance of any claims participating in the GUC Distribution Cash Amount prior to the Effective Date.

## ARTICLE VIII.
## DISCHARGE, RELEASE, INJUNCTION AND RELATED PROVISIONS

A.     *Discharge of Claims and Termination of Interests*

**Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan or in any contract, instrument, or other agreement or document created pursuant to the Plan, the distributions, rights, and treatment that are provided in the Plan shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of Claims (including any Intercompany Claims resolved or compromised after the Effective Date by the Reorganized Debtors), Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and Interests in, the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any liability (including withdrawal liability) to the extent such Claims or Interests relate to services performed by employees of the Debtors before the Effective Date and that arise from a termination of employment, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not: (1) a Proof of Claim based upon such debt or right is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code; (2) a Claim or Interest based upon such debt, right, or Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (3) the Holder of such a Claim or Interest has accepted the Plan. Any default or "event of default" by the Debtors or Affiliates with respect to any Claim or Interest that existed immediately before or on account of the Filing of the Chapter 11 Cases shall be deemed cured (and no longer continuing) as of the Effective Date. The Confirmation Order shall be a judicial determination of the discharge of all Claims and Interests subject to the Effective Date occurring.**

B.     *Releases by the Debtors*

**Pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, on and after the Effective Date, each Released Party is deemed fully, conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by the Debtors, the Reorganized Debtors, their Estates, and any person seeking to exercise the rights of the Estates, including any successors to the Debtors or any Estates representative appointed or selected pursuant to section 1123(b)(3) of the Bankruptcy Code from any and all Causes of Action, including any derivative claims asserted on behalf of the Debtors, that the Debtors, the Reorganized Debtors, or their Estates, including any successors to the Debtors or any Estates representative appointed or selected pursuant to section 1123(b)(3) of the Bankruptcy Code, would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or Interest, or that any Holder of any Claim or Interest could have asserted on behalf of the Debtors, based on or relating to, or in any manner arising from, in whole or in part:**

55

1.   the Debtors, the business or contractual arrangement between the Debtors and any Released Party, any Securities issued by the Debtors and the ownership thereof, the Debtors' in- or out-of-court restructuring efforts, the 2019 Term Loan Facility, the Compensation and Benefit Programs, intercompany transactions, or the formulation, preparation, dissemination, negotiation, or Filing of the Restructuring Support Agreement, the Plan, the Disclosure Statement, Rights Offering Procedures, or any other Restructuring Documents;

2.   any Restructuring Transaction, contract, instrument, release, or other agreement or document (including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Restructuring Support Agreement, the Original RSA, the Original DIP Commitment Letter, the Initial Amended RSA, the Disclosure Statement, or the Plan, including the Rights Offering, the Backstop Commitment Agreement, the DIP Facility, the Exit Facility, the Amended and Restated 2019 Term Loan Facility, or any other Restructuring Documents;

3.   the Chapter 11 Cases, the Disclosure Statement, the Plan, the Filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the solicitation of votes with respect to the Plan, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan or the Rights Offering, or the distribution of property under the Plan or any other related agreement with respect to the foregoing; or

4.   any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date, including all Avoidance Actions or other relief obtained by the Debtors in the Chapter 11 Cases.

Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (i) any claims related to any act or omission that is determined in a Final Order to have constituted willful misconduct, gross negligence, or actual fraud, (ii) the rights of any current employee of the Debtors under any employment agreement or plan, (iii) the rights of the Debtors with respect to any confidentiality provisions or covenants restricting competition in favor of the Debtors under any employment agreement with a current or former employee of the Debtors, (iv) any post-Effective Date obligations of any party or Entity under the Plan, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, (v) the rights of Holders of Allowed Claims to receive distributions under the Plan, (vi) any Cause of Action the Debtors may have against Columbia Helicopters, Inc. and its Related Parties, or (vii) any Cause of Action the Debtors may have against any of their former officers or directors as of the Petition Date in respect of payments made and referenced under any separation, retirement, consulting agreement, employment agreement or plan.

Entry of the Confirmation Order will constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the foregoing release, which includes by reference each of the related provisions and definitions contained herein, and further, will constitute the Bankruptcy Court's finding that the foregoing release is: (i) in exchange for the good and valuable consideration provided by the Released Parties; (ii) a good faith settlement and compromise of the Claims released; (iii) in the best interest of the Debtors and their Estates; (iv) fair, equitable, and reasonable; and (v) given and made after due notice and opportunity for hearing.

C.  *Releases by Holders of Claims and Interests*

As of the Effective Date, except as otherwise provided herein, each Releasing Party is deemed to have fully, conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged each Debtor, Reorganized Debtor, and Released Party from any and all Causes of Action, including any derivative claims asserted on behalf of the Debtors, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part:

56

1.      the Debtors, the business or contractual arrangement between the Debtors and any Releasing Party, any Securities issued by the Debtors and the ownership thereof, the Debtors' in- or out-of-court restructuring efforts, the 2019 Term Loan Facility, the Compensation and Benefit Programs, intercompany transactions, or the formulation, preparation, dissemination, negotiation, or Filing of the Restructuring Support Agreement, the Plan, the Disclosure Statement, Rights Offering Procedures, or any other Restructuring Documents;

2.      any Restructuring Transaction, contract, instrument, release, or other agreement or document (including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Restructuring Support Agreement, the Original RSA, the Original DIP Commitment Letter, the Initial Amended RSA, the Disclosure Statement, or the Plan, including the Rights Offering, the Backstop Commitment Agreement, the DIP Facility, the Exit Facility, the Amended and Restated 2019 Term Loan Facility, or any other Restructuring Documents;

3.      the Chapter 11 Cases, the Disclosure Statement, the Plan, the Filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the solicitation of votes with respect to the Plan, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan or the Rights Offering, or the distribution of property under the Plan or any other related agreement with respect to the foregoing; or

4.      any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date, including all Avoidance Actions or other relief obtained by the Debtors in the Chapter 11 Cases.

Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (i) any claims related to any act or omission that is determined in a Final Order to have constituted willful misconduct, gross negligence, or actual fraud, (ii) the rights of any current employee of the Debtors under any employment agreement or plan, (iii) the rights of the Debtors with respect to any confidentiality provisions or covenants restricting competition in favor of the Debtors under any employment agreement with a current or former employee of the Debtors, (iv) any post-Effective Date obligations of any party or Entity under the Plan, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, (v) the rights of Holders of Allowed Claims to receive distributions under the Plan, (vi) any Cause of Action the Debtors may have against Columbia Helicopters, Inc. and its Related Parties, or (vii) any Cause of Action the Debtors may have against any of their former officers or directors as of the Petition Date in respect of payments made and referenced under any separation, retirement, consulting agreement, employment agreement or plan.

Entry of the Confirmation Order will constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the foregoing release, which includes by reference each of the related provisions and definitions contained herein, and further, will constitute the Bankruptcy Court's finding that the foregoing release is: (i) in exchange for the good and valuable consideration provided by the Released Parties; (ii) a good faith settlement and compromise of the Claims released; (iii) in the best interest of the Debtors and their Estates; (iv) fair, equitable, and reasonable; and (v) given and made after due notice and opportunity for hearing.

D.      *Exculpation*

Except as otherwise specifically provided in the Plan, no Exculpated Party shall have or incur, and each Exculpated Party is hereby released and exculpated from any Cause of Action for any claim related to any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, Filing, or termination of the Restructuring Support Agreement and related prepetition transactions (including the 2019 Term Loan Facility Credit Agreement), the Original RSA, the Original DIP Commitment Letter, the Initial Amended RSA, the Disclosure Statement, the Plan, the Rights Offering, the Rights Offering Procedures, the Backstop Commitment Agreement, the DIP Facility, the Exit

**Facility, the Amended and Restated 2019 Term Loan Facility, any other Restructuring Documents, or any Restructuring Transaction, contract, instrument, release or other agreement or document created or entered into in connection with the Disclosure Statement or the Plan, the Filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance of Securities pursuant to the Plan or the Rights Offering, or the distribution of property under the Plan or any other related agreement with respect to the foregoing, except for claims related to any act or omission that is determined in a Final Order to have constituted actual fraud, willful misconduct, or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan. The Exculpated Parties have, and upon completion of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of, and distribution of, consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.**

E.    *Injunction*

**Except as otherwise expressly provided in the Plan or for obligations or distributions issued or required to be paid pursuant to the Plan or the Confirmation Order, all Entities that have held, hold, or may hold Claims or Interests that have been released pursuant to the Plan, discharged pursuant to the Plan, or are subject to exculpation pursuant to the Plan, are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Reorganized Debtors, or the Released Parties or the Exculpated Parties: (i) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests; (ii) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such Claims or Interests; (iii) creating, perfecting, or enforcing any lien or encumbrance of any kind against such Entities or the property or the estates of such Entities on account of or in connection with or with respect to any such Claims or Interests; (iv) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such Claims or Interests unless such Entity has timely asserted such setoff right in a document Filed with the Bankruptcy Court explicitly preserving such setoff, and notwithstanding an indication of a claim or interest or otherwise that such Entity asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (v) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests released or settled pursuant to the Plan.**

F.    *Protection Against Discriminatory Treatment*

In accordance with section 525 of the Bankruptcy Code, and consistent with Article VI of the United States Constitution, no Governmental Unit shall discriminate against any Reorganized Debtor, or any Entity with which a Reorganized Debtor has been or is associated, solely because such Reorganized Debtor was a Debtor under chapter 11, may have been insolvent before the commencement of the Chapter 11 Cases (or during the Chapter 11 Cases but before such Debtor was granted or denied a discharge), or has not paid a debt that is dischargeable in the Chapter 11 Cases.

G.    *Release of Liens*

Except as otherwise specifically provided in the Plan,, the Milestone Settlement Agreement, the Exit Facility Credit Agreement or the Amended and Restated 2019 Term Loan Credit Agreement, as applicable, the Amended PK Air Credit Facility Agreement or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released and discharged, and all of the right, title, and interest of any holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Reorganized Debtors and their successors and assigns, in

58

each case, without any further approval or order of the Bankruptcy Court and without any action or Filing being required to be made by the Debtors or the Reorganized Debtors, or any other Holder of a Secured Claim. In addition, at the sole expense of the Debtors or the Reorganized Debtors, the Holders of Secured Claims shall execute and deliver all documents reasonably requested by the Debtors, Reorganized Debtors or administrative agent for the Exit Facility to evidence the release of such mortgages, deeds of trust, Liens, pledges, and other security interests and shall authorize the Reorganized Debtors and their designees to file UCC-3 termination statements and other release documentation (to the extent applicable) with respect thereto. Notwithstanding the foregoing paragraph, this Article VIII.G shall not apply to any Secured Claims that are Reinstated pursuant to the terms of this Plan.

H.    *Reimbursement or Contribution*

If the Bankruptcy Court disallows a Claim for reimbursement or contribution of an Entity pursuant to section 502(e)(1)(B) of the Bankruptcy Code, then to the extent that such Claim is contingent as of the Effective Date, such Claim shall be forever disallowed notwithstanding section 502(j) of the Bankruptcy Code, unless prior to the Effective Date (1) such Claim has been adjudicated as non-contingent, or (2) the relevant Holder of a Claim has Filed a non-contingent Proof of Claim on account of such Claim and a Final Order has been entered determining such Claim as no longer contingent.

I.    *Recoupment*

In no event shall any Holder of a Claim be entitled to recoup such Claim against any claim, right, or Cause of Action of the Debtors or the Reorganized Debtors, as applicable, unless such Holder actually has performed such recoupment and provided notice thereof in writing to the Debtors on or before the Confirmation Date, notwithstanding any indication in any Proof of Claim or otherwise that such Holder asserts, has, or intends to preserve any right of recoupment.

J.    *Subordination Rights*

Any distributions under the Plan to Holders of Allowed Claims shall be received and retained free from any obligations to hold or transfer the same to any other Holder and shall not be subject to levy, garnishment, attachment, or other legal process by any Holder by reason of claimed contractual subordination rights. On the Effective Date, any such subordination rights shall be deemed waived, and the Confirmation Order shall constitute an injunction enjoining any Entity from enforcing or attempting to enforce any contractual, legal, or equitable subordination rights to property distributed under the Plan, in each case other than as provided in the Plan; *provided*, that any such subordination rights shall be preserved in the event the Confirmation Order is vacated, the Effective Date does not occur in accordance with the terms hereunder or the Plan is revoked or withdrawn.

K.    *Reservation of Rights of the United States*

As to the United States of America, its agencies, departments, or agents (collectively, the "United States"), nothing in the Plan, the Plan Supplement, or the Confirmation Order shall expand the scope of discharge, release, or injunction to which the Debtors or Reorganized Debtors are entitled under the Bankruptcy Code, if any. The discharge, release, and injunction provisions contained in the Plan, the Plan Supplement, and the Confirmation Order are not intended and shall not be construed to bar the United States from, subsequent to the Confirmation Order, pursuing any actions, including but not limited to any police or regulatory action, against anyone.

Notwithstanding anything contained in the Plan, the Plan Supplement, or the Confirmation Order to the contrary, nothing in the Plan, the Plan Supplement, or the Confirmation Order shall discharge, release, impair, or otherwise preclude: (a) any liability to the United States that is a "claim" within the meaning of section 101(5) of the Bankruptcy Code, irrespective of whether the claim arose on, after, or before the Confirmation Date; (b) any liability to the United States that is not a "claim" within the meaning of section 101(5) of the Bankruptcy Code; (c) any valid right of setoff or recoupment of the United States against any of the Debtors or Reorganized Debtors; or (d) any liability of the Debtors or Reorganized Debtors under police or regulatory statutes or regulations to any Governmental Unit (as defined by section 101(27) of the Bankruptcy Code) as the owner, lessor, lessee, or operator of property that such entity owns, operates, or leases on, before, and/or after the Confirmation Date. Nor shall anything in the

59

Confirmation Order, the Plan, or the Plan Supplement: (a) enjoin or otherwise bar the United States and/or any Governmental Unit from asserting or enforcing, outside the Bankruptcy Court, any liability described in this paragraph, (b) divest any court, commission, or tribunal of jurisdiction from resolving any matters relating to the liabilities and/or claims set forth in this paragraph, or (c) confer in the Bankruptcy Court jurisdiction over any matter as to which it would not have jurisdiction under the Bankruptcy Code.

Moreover, nothing in the Confirmation Order, the Plan, or the Plan Supplement shall release or exculpate any non-Debtor, including any Released Parties and/or Exculpated Parties, from any liability to the United States, including but not limited to any liabilities arising under the Internal Revenue Code, the environmental laws, or the criminal laws against the Released Parties and/or Exculpated Parties, nor shall anything in the Confirmation Order, the Plan, or the Plan Supplement enjoin the United States from bringing any claim, suit, action, or other proceeding against the Released Parties and/or Exculpated Parties for any liability whatsoever.

Nothing contained in the Plan, the Plan Supplement, or the Confirmation Order shall be deemed to determine the tax liability of any person or entity, including but not limited to the Debtors and the Reorganized Debtors, nor shall the Plan, the Plan Supplement, or the Confirmation Order be deemed to have determined the federal tax treatment of any item, distribution, or entity, including the federal tax consequences of the Plan, nor shall anything in the Plan, the Plan Supplement, or the Confirmation Order be deemed to have conferred jurisdiction upon the Bankruptcy Court to make determinations as to federal tax liability and federal tax treatment except as provided under 11 U.S.C. § 505.

## ARTICLE IX.
## EFFECT OF CONFIRMATION OF THE PLAN

Upon entry of the Confirmation Order, the Bankruptcy Court shall be deemed to have made and issued on the Confirmation Date, pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014, the following findings of fact and conclusions of law as though made after due deliberation and upon the record at the Confirmation Hearing. Upon entry of the Confirmation Order, any and all findings of fact in the Plan shall constitute findings of fact even if they are stated as conclusions of law, and any and all conclusions of law in the Plan shall constitute conclusions of law even if they are stated as findings of fact.

A. *Jurisdiction and Venue*

On the Petition Date, the Debtors commenced the Chapter 11 Cases by filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code. The Debtors were and are qualified to be debtors under section 109 of the Bankruptcy Code. Venue in the Southern District of Texas was proper as of the Petition Date and continues to be proper. Confirmation of the Plan is a core proceeding under 28 U.S.C. § 157(b)(2). The Bankruptcy Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1334 and the Bankruptcy Court has exclusive jurisdiction to determine whether the Plan complies with the applicable provisions of the Bankruptcy Code and should be confirmed.

B. *Order Approving the Disclosure Statement*

On [●], 2019, the Bankruptcy Court entered the Conditional Disclosure Statement Order, which, among other things, (a) conditionally approved the Disclosure Statement as containing adequate information within the meaning of section 1125 of the Bankruptcy Code and Bankruptcy Rule 3017 and (b) conditionally approved certain procedures and documents for soliciting and tabulating votes with respect to the Plan.

C. *Voting Report*

Prior to the Confirmation Hearing, the Solicitation Agent filed the Voting Report. All procedures used to distribute solicitation materials to the applicable Holders of Claims and Interests and to tabulate the ballots were fair and conducted in accordance with the Conditional Disclosure Statement Order, the Bankruptcy Code, the Bankruptcy

Rules, and all other applicable rules, laws, and regulations. Pursuant to sections 1124 and 1126 of the Bankruptcy Code, at least one Impaired Class entitled to vote on the Plan has voted to accept the Plan.

D.     *Judicial Notice*

The Bankruptcy Court takes judicial notice of the docket of the Chapter 11 Cases maintained by the clerk of the Bankruptcy Court and/or its duly appointed agent, including all pleadings and other documents Filed, all orders entered, and all evidence and arguments made, proffered, or adduced at the hearings held before the Bankruptcy Court during the pendency of the Chapter 11 Cases (including the Confirmation Hearing). Resolutions of any objections to Confirmation explained on the record at the Confirmation Hearing are hereby incorporated by reference. All entries on the docket of the Chapter 11 Cases shall constitute the record before the Bankruptcy Court for purposes of the Confirmation Hearing.

E.     *Transmittal and Mailing of Materials; Notice*

Due, adequate, and sufficient notice of the Disclosure Statement, the Plan, the Plan Supplement, the Confirmation Hearing, and the release and exculpation provisions set forth in Article VIII of the Plan, along with all deadlines for voting on or objecting to the Plan, has been given to (1) all known Holders of Claims and Interests, (2) parties that requested notice in accordance with Bankruptcy Rule 2002, (3) all parties to Unexpired Leases and Executory Contracts, and (4) all taxing authorities listed on the Schedules or in the Claims Register, in compliance with Bankruptcy Rules 2002(b), 3017, 3019, and 3020(b), the Conditional Disclosure Statement Order, and such transmittal and service were appropriate, adequate, and sufficient. Adequate and sufficient notice of the Confirmation Hearing and other dates, deadlines, and hearings described in the Conditional Disclosure Statement Order was given in compliance with the Bankruptcy Rules and such order, and no other or further notice is or shall be required.

F.     *Solicitation*

Votes for acceptance and rejection of the Plan were solicited in good faith and complied with sections 1125 and 1126 of the Bankruptcy Code, Bankruptcy Rules 3017, 3018, and 3019, the Conditional Disclosure Statement Order, all other applicable provisions of the Bankruptcy Code and all other applicable rules, laws, and regulations. The Debtors and their respective directors, managers, officers, employees, agents, affiliates, representatives, attorneys, and advisors, as applicable, have solicited votes on the Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code and the Conditional Disclosure Statement Order and are entitled to the protections afforded by section 1125(e) of the Bankruptcy Code and the exculpation provisions set forth in Article VIII of the Plan. The Debtors and the Released Parties solicited acceptance of the Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code and they participated in good faith, and in compliance with the applicable provisions of the Bankruptcy Code in the offer, issuance, sale, or purchase of New Stock and any debt securities that were offered or sold under the Plan and, pursuant to section 1125(e) of the Bankruptcy Code, and no Released Party is or shall be liable on account of such solicitation for violation of any applicable law, rule, or regulation governing solicitation of acceptance of a chapter 11 plan or the offer, issuance, sale, or purchase of such debt securities.

G.     *Burden of Proof*

The Debtors, as proponents of the Plan, have satisfied their burden of proving the elements of sections 1129(a) and 1129(b) of the Bankruptcy Code by a preponderance of the evidence, which is the applicable evidentiary standard. The Debtors have satisfied the elements of section 1129(a) and 1129(b) of the Bankruptcy Code by clear and convincing evidence.

H.     *Bankruptcy Rule 3016(a) Compliance*

The Plan is dated and identifies the proponents thereof, thereby satisfying Bankruptcy Rule 3016(a).

I.     *Compliance with the Requirements of Section 1129 of the Bankruptcy Code*

The plan complies with all requirements of section 1129 of the Bankruptcy Code as follows:

1. <u>Section 1129(a)(1)–Compliance of the Plan with Applicable Provisions of the Bankruptcy Code</u>

The Plan complies with all applicable provisions of the Bankruptcy Code as required by section 1129(a)(1) of the Bankruptcy Code, including sections 1121, 1122, 1123, and 1125 of the Bankruptcy Code.

a. Standing

Each of the Debtors has standing to file a plan and the Debtors, therefore, have satisfied section 1121 of the Bankruptcy Code.

b. Proper Classification

Pursuant to sections 1122(a) and 1123(a)(1) of the Bankruptcy Code, Article III of the Plan designates Classes of Claims and Interests, other than Administrative Claims, Professional Fee Claims, DIP Facility Claims, and Priority Tax Claims, which are not required to be classified. As required by section 1122(a) of the Bankruptcy Code, each Class of Claims and Interests contains only Claims or Interests that are substantially similar to the other Claims or Interests within that Class.

c. Specification of Unimpaired Classes

Pursuant to section 1123(a)(2) of the Bankruptcy Code, Article III of the Plan specifies all Classes of Claims and Interests that are not Impaired.

d. Specification of Treatment of Impaired Classes

Pursuant to section 1123(a)(3) of the Bankruptcy Code, Article III of the Plan specifies the treatment of all Classes of Claims and Interests that are Impaired.

e. No Discrimination

Pursuant to section 1123(a)(4) of the Bankruptcy Code, Article III of the Plan provides the same treatment for each Claim or Interest within a particular Class, as the case may be, unless the Holder of a particular Claim or Interest has agreed to less favorable treatment with respect to such Claim or Interest, as applicable.

f. Plan Implementation

Pursuant to section 1123(a)(5) of the Bankruptcy Code, the Plan provides adequate and proper means for the Plan's implementation. Immediately upon the Effective Date, sufficient Cash and other consideration provided under the Plan will be available to make all payments required to be made on the Effective Date pursuant to the terms of the Plan. Moreover, Article IV and various other provisions of the Plan specifically provide adequate means for the Plan's implementation.

g. Voting Power of Equity Securities; Selection of Officer, Director, or Trustee under the Plan

The New Organizational Documents comply with sections 1123(a)(6) and 1123(a)(7) of the Bankruptcy Code.

h. Impairment/Unimpairment of Classes of Claims and Equity Interests

Pursuant to section 1123(b)(1) of the Bankruptcy Code, (i) Class 1 (Other Secured Claims), Class 2 (Other Priority Claims), Class 5 (Lombard (BULL) Term Loan Claims), Class 7 (Macquarie Term Loan Credit Facility Claims), Class 9 (Lombard (BALL) Term Loan Guarantee Claims and UK ABL Credit Facility), Class 10 (MCA and Other Customer Guarantee Claims) and Class 11 (Trade Claims) are Unimpaired under the Plan, (ii) Class 3 (2019 Term Loan Facility Claims), Class 4 (Secured Notes Claims), Class 6 (PK Air Credit Facility Claims and MAG Lease Obligation Claims), Class 8 (Unsecured Notes Claims), Class 12 (General Unsecured Claims), Class 15 (Existing

Interests), and Class 16 (Section 510(b) Claims) are Impaired under the Plan, and (iii) Class 13 (Intercompany Claims) and Class 14 (Intercompany Interests) are either Unimpaired or Impaired under the Plan at the election of the Required RSA Parties.

i.      Assumption and Rejection of Executory Contracts and Unexpired Leases

In accordance with section 1123(b)(2) of the Bankruptcy Code, pursuant to Article V of the Plan, on the Effective Date, each Executory Contract and Unexpired Lease shall be deemed assumed unless such Executory Contract or Unexpired Lease is listed on the Schedule of Rejected Executory Contracts and Unexpired Leases, if any. The assumption of Executory Contracts and Unexpired Leases hereunder may include the assignment of certain of such contracts to Affiliates. The Debtors' assumption and assignment of the Executory Contracts and Unexpired Leases listed on the Schedule of Assumed Executory Contracts and Unexpired Leases pursuant to Article V of the Plan governing assumption and rejection of executory contracts and unexpired leases satisfies the requirements of section 365(b) of the Bankruptcy Code and, accordingly, the requirements of section 1123(b) of the Bankruptcy Code.

The Debtors have exercised reasonable business judgment in determining whether to reject, assume, or assume and assign each of their Executory Contracts and Unexpired Leases under the terms of the Plan. Each pre- or post-Confirmation rejection, assumption, or assumption and assignment of an Executory Contract or Unexpired Lease pursuant to Article V of the Plan will be legal, valid and binding upon the applicable Debtor and all other parties to such Executory Contract or Unexpired Lease, as applicable, all to the same extent as if such rejection, assumption, or assumption and assignment had been effectuated pursuant to an appropriate order of the Court entered before the Confirmation Date under section 365 of the Bankruptcy Code. Each of the Executory Contracts and Unexpired Leases to be rejected, assumed, or assumed and assigned is deemed to be an executory contract or an unexpired lease, as applicable.

j.      Settlement of Claims and Causes of Action

All of the settlements and compromises pursuant to and in connection with the Plan or incorporated by reference into the Plan comply with the requirements of section 1123(b)(3) of the Bankruptcy Code and Bankruptcy Rule 9019.

Pursuant to Bankruptcy Rule 9019 and section 363 of the Bankruptcy Code and in consideration for the distributions and other benefits provided under the Plan, any and all compromise and settlement provisions of the Plan constitute good-faith compromises, are in the best interests of the Debtors, the Estates, and all Holders of Claims and Interests, and are fair, equitable, and reasonable.

Specifically, the settlements and compromises pursuant to and in connection with the Plan are substantively fair based on the following factors: (a) the balance between the litigation's possibility of success and the settlement's future benefits; (b) the likelihood of complex and protracted litigation and risk and difficulty of collecting on the judgment; (c) the proportion of creditors and parties in interest that support the settlement; (d) the competency of counsel reviewing the settlement; the nature and breadth of releases to be obtained by officers and directors; and (e) the extent to which the settlement is the product of arm's-length bargaining.

k.      Cure of Defaults

Article V of the Plan provides for the satisfaction of default claims associated with each Executory Contract and Unexpired Lease to be assumed in accordance with section 365(b)(1) of the Bankruptcy Code. The Cure Costs identified in the Schedule of Assumed Executory Contracts and Unexpired Leases and any amendments thereto, as applicable, represent the amount, if any, that the Debtors propose to pay in full and complete satisfaction of such default claims. Any disputed cure amounts will be determined in accordance with the procedures set forth in Article V of the Plan, and applicable bankruptcy and nonbankruptcy law. As such, the Plan provides that the Debtors will cure, or provide adequate assurance that the Debtors will promptly cure, defaults with Executory Contracts and Unexpired Leases in compliance with section 365(b)(1) of the Bankruptcy Code. Thus, the Plan complies with section 1123(d) of the Bankruptcy Code.

l.    Other Appropriate Provisions

The Plan's other provisions are appropriate and consistent with the applicable provisions of the Bankruptcy Code, including provisions for (i) distributions to holders of Claims and Interests, (ii) objections to Claims, (iii) procedures for resolving disputed, contingent, and unliquidated claims, (iv) cure amounts, procedures governing cure disputes, and (v) indemnification obligations.

2.    Section 1129(a)(2)–Compliance of Plan Proponents with Applicable Provisions of the Bankruptcy Code

The Debtors, as proponents of the Plan, have complied with all applicable provisions of the Bankruptcy Code as required by section 1129(a)(2) of the Bankruptcy Code, including sections 1125 and 1126 of the Bankruptcy Code and Bankruptcy Rules 3017, 3018, and 3019. In particular, the Debtors are proper debtors under section 109 of the Bankruptcy Code and proper proponents of the Plan under section 1121(a) of the Bankruptcy Code. Furthermore, the solicitation of acceptances or rejections of the Plan was (i) pursuant to the Conditional Disclosure Statement Order; (ii) in compliance with all applicable laws, rules, and regulations governing the adequacy of disclosure in connection with such solicitation; and (iii) solicited after disclosure to Holders of Claims or Interests of adequate information as defined in section 1125(a) of the Bankruptcy Code. Accordingly, the Debtors and their respective directors, officers, employees, agents, affiliates, and Professionals have acted in "good faith" within the meaning of section 1125(e) of the Bankruptcy Code.

3.    Section 1129(a)(3)–Proposal of Plan in Good Faith

The Debtors have proposed the Plan in good faith and not by any means forbidden by law based on the totality of the circumstances surrounding the filing of the Chapter 11 Cases, the Plan itself, and the process leading to its formulation. The Chapter 11 Cases were filed, and the Plan was proposed, with the legitimate purpose of allowing the Debtors to reorganize.

4.    Section 1129(a)(4)–Bankruptcy Court Approval of Certain Payments as Reasonable

Pursuant to section 1129(a)(4) of the Bankruptcy Code, the payments to be made for services or for costs in connection with the Chapter 11 Cases or the Plan are approved. The fees and expenses incurred by Professionals retained by the Debtors or the Creditors' Committee shall be payable according to the orders approving such Professionals' retentions, the Interim Compensation Order, other applicable Bankruptcy Court orders, or as otherwise provided in the Plan.

5.    Section 1129(a)(5)–Disclosure of Identity of Proposed Management, Compensation of Insiders, and Consistency of Management Proposals with the Interests of Creditors and Public Policy

Pursuant to section 1129(a)(5) of the Bankruptcy Code, information concerning the individuals proposed to serve on the Reorganized Bristow Parent Board and each such individual's compensation upon Consummation of the Plan has been fully disclosed (in the Plan Supplement) to the extent available, and the appointment to, or continuance in, such office of such person is consistent with the interests of Holders of Claims and Interests and with public policy.

6.    Section 1129(a)(6)–Approval of Rate Changes

Section 1129(a)(6) of the Bankruptcy Code is not applicable because the Plan does not provide for rate changes by any of the Debtors.

7.    Section 1129(a)(7)–Best Interests of Creditors and Interest Holders

The liquidation analysis included in the Disclosure Statement, and the other evidence related thereto that was proffered or adduced at or prior to, or in affidavits in connection with, the Confirmation Hearing, is reasonable. The methodology used and assumptions made in such liquidation analysis, as supplemented by the evidence proffered or adduced at or prior to, or in affidavits filed in connection with, the Confirmation Hearing, are reasonable. With respect

64

to each Impaired Class, each Holder of an Allowed Claim or Interest in such Class has accepted the Plan or will receive under the Plan on account of such Claim or Interest property of a value, as of the Effective Date, that is not less than the amount such Holder would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code.

8.      Section 1129(a)(8)–Conclusive Presumption of Acceptance by Unimpaired Classes; Acceptance of the Plan by Each Impaired Class

Certain Classes of Claims and Interests are Unimpaired and are deemed conclusively to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. In addition, at least one Impaired Class that was entitled to vote has voted to accept the Plan. Because the Plan provides that the certain Classes of Claims and Interests will be Impaired and because no distributions shall be made to Holders in such Classes, such Holders are deemed conclusively to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code and, therefore, are not entitled to vote to accept or reject the Plan.

9.      Section 1129(a)(9)–Treatment of Claims Entitled to Priority Pursuant to Section 507(a) of the Bankruptcy Code

The treatment of Administrative Claims, Professional Fee Claims, DIP Facility Claims, Other Priority Claims, and Priority Tax Claims under Article II of the Plan satisfies the requirements of section 1129(a)(9) of the Bankruptcy Code.

10.      Section 1129(a)(10)–Acceptance by at Least One Impaired Class

At least one Impaired Class has voted to accept the Plan. Accordingly, section 1129(a)(10) of the Bankruptcy Code is satisfied.

11.      Section 1129(a)(11)–Feasibility of the Plan

The Plan satisfies section 1129(a)(11) of the Bankruptcy Code. Based upon the evidence proffered or adduced at, or prior to, or in affidavits filed in connection with, the Confirmation Hearing, the Plan is feasible and Confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtors or any successor to the Debtors under the Plan, except as such liquidation is proposed in the Plan. Furthermore, the Debtors will have adequate assets to satisfy their respective obligations under the Plan.

12.      Section 1129(a)(12)–Payment of Bankruptcy Fees

Article II.E of the Plan provides for the payment of all fees payable under 28 U.S.C. § 1930(a) in accordance with section 1129(a)(12) of the Bankruptcy Code.

13.      Section 1129(a)(13)–Retiree Benefits

The Plan provides for the treatment of all retiree benefits in accordance with section 1129(a)(13) of the Bankruptcy Code.

14.      Section 1129(a)(14)–Domestic Support Obligations

The Debtors are not required by a judicial or administrative order, or by statute, to pay any domestic support obligations, and therefore, section 1129(a)(14) of the Bankruptcy Code is inapplicable in these Chapter 11 Cases.

15.      Section 1129(a)(15)–The Debtors Are Not Individuals

The Debtors are not individuals, and therefore, section 1129(a)(15) of the Bankruptcy Code is inapplicable in these Chapter 11 Cases.

16.      <u>Section 1129(a)(16)–No Applicable Nonbankruptcy Law Regarding Transfers</u>

Each of the Debtors that is a corporation is a moneyed, business, or commercial corporation or trust, and therefore, section 1129(a)(16) of the Bankruptcy Code is inapplicable in these Chapter 11 Cases.

17.      <u>Section 1129(b)–Confirmation of Plan Over Rejection of Impaired Classes</u>

The Plan satisfies the requirements of section 1129(b) of the Bankruptcy Code with respect to the Classes presumed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code or that have actually rejected the Plan (if any). To determine whether a plan is "fair and equitable" with respect to a class of claims, section 1129(b)(2)(B)(ii) of the Bankruptcy Code provides in pertinent part that "the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or interest any property." To determine whether a plan is "fair and equitable" with respect to a class of interests, section 1129(b)(2)(C)(ii) of the Bankruptcy Code provides that "the holder of any interest that is junior to the interests of such class will not receive or retain under the plan on account of such junior interest any property." There are no classes junior to the deemed (or actual) rejecting classes of claims or interests that will receive any distribution under the Plan. The Plan, therefore, satisfies the requirements of section 1129(b) of the Bankruptcy Code.

18.      <u>Section 1129(c)–Confirmation of Only One Plan With Respect to the Debtors</u>

The Plan is the only plan that has been filed in these Chapter 11 Cases with respect to the Debtors. Accordingly, the Plan satisfies the requirements of section 1129(c) of the Bankruptcy Code.

19.      <u>Section 1129(d)–Principal Purpose Not Avoidance of Taxes</u>

The principal purpose of the Plan is not the avoidance of taxes or the avoidance of the application of section 5 of the Securities Act. Accordingly, the Plan satisfies the requirements of section 1129(d) of the Bankruptcy Code.

20.      <u>Section 1129(e)–Small Business Case</u>

Section 1129(e) is inapplicable because these Chapter 11 Cases do not qualify as small business cases thereunder.

J.      *Securities Under the Plan*

Pursuant to the Plan, and without further corporate or other action, the New Stock and any debt issued or assumed by the Reorganized Debtors will be issued or entered into, as applicable, on the Effective Date subject to the terms of the Plan.

K.      *Releases and Discharges*

The releases and discharges of Claims and Causes of Action described in the Plan, including releases by the Debtors and by Holders of Claims and Interests, constitute good faith compromises and settlements of the matters covered thereby. Such compromises and settlements are made in exchange for consideration and are in the best interest of Holders of Claims and Interests, are fair, equitable, reasonable, and are integral elements of the resolution of the Chapter 11 Cases in accordance with the Plan. Each of the discharge, release, indemnification, and exculpation provisions set forth in the Plan: (a) is within the jurisdiction of the Court under 28 U.S.C. §§ 1334(a), 1334(b), and 1334(d); (b) is an essential means of implementing the Plan pursuant to section 1123(a)(6) of the Bankruptcy Code; (c) is an integral element of the transactions incorporated into the Plan; (d) confers material benefit on, and is in the best interests of, the Debtors, their estates, and their creditors; (e) is important to the overall objectives of the Plan to finally resolve all Claims and Interests among or against the parties in interest in the Chapter 11 Cases with respect to the Debtors; (f) is consistent with sections 105, 1123, 1129, and all other applicable provisions of the Bankruptcy Code; (g) given and made after due notice and opportunity for hearing; and (h), without limiting the foregoing, with respect to the releases and injunctions in Article VIII of the Plan, are (i) essential elements of the Restructuring Transactions and Plan, terms and conditions without which the Supporting Noteholders would not have entered into

66

the Restructuring Support Agreement, (ii) narrowly tailored, and (iii) in consideration of the substantial financial contribution of the Supporting Noteholders, the Backstop Commitment Parties, and the other Rights Offering Participants under the Plan. Furthermore, the injunction set forth in Article VIII is an essential component of the Plan, the fruit of long-term negotiations and achieved by the exchange of good and valuable consideration that will enable unsecured creditors to realize distributions in the Chapter 11 Cases.

L.      *Release and Retention of Causes of Action*

It is in the best interests of Holders of Claims and Interests that the provisions in Article VIII of the Plan be approved.

M.      *Approval of Restructuring Support Agreement, Backstop Commitment Agreement and Other Restructuring Documents and Agreements*

All documents and agreements necessary to implement the Plan, including the Restructuring Support Agreement, the Backstop Commitment Agreement and the other Restructuring Documents are essential elements of the Plan, are necessary to consummate the Plan and the Restructuring Transaction, and entry into and consummation of the transactions contemplated by each such document and agreement is in the best interests of the Debtors, the Estates, and Holders of Claims and Interests. The Debtors have exercised reasonable business judgment in determining which agreements to enter into and have provided sufficient and adequate notice of such documents and agreements. The terms and conditions of such documents and agreements have been negotiated in good faith, at arm's-length, are fair and reasonable, and are hereby reaffirmed and approved, and subject to the occurrence of the Effective Date and execution and delivery in accordance with their respective terms, shall be in full force and effect and valid, binding, and enforceable in accordance with their respective terms, without the need for any further notice to or action, order, or approval of the Bankruptcy Court, or other action under applicable law, regulation, or rule.

N.      *Confirmation Hearing Exhibits*

All of the exhibits presented at the Confirmation Hearing have been properly received into evidence and are a part of the record before the Bankruptcy Court.

O.      *Objections to Confirmation of the Plan*

Any and all objections to Confirmation have been withdrawn, settled, overruled, or otherwise resolved.

P.      *Retention of Jurisdiction*

The Bankruptcy Court may properly retain jurisdiction over the matters set forth in Article XII of the Plan and section 1142 of the Bankruptcy Code.

Q.      *Plan Supplement*

The Debtors filed the Plan Supplement, which includes the following documents: (a) the material New Organizational Documents; (b) the Exit Facility Term Sheet, if applicable; (c) the Amended and Restated 2019 Term Loan Credit Agreement and material related documents, if applicable, and the identity of the Amended and Restated 2019 Term Loan Facility Agent; (d) the schedule of Retained Causes of Action; (e) a disclosure of the members of the Reorganized Bristow Parent Board and their compensation; (f) the Schedule of Assumed Executory Contracts and Unexpired Leases; (g) the Schedule of Rejected Executory Contracts and Unexpired Leases; (h) the Restructuring Transactions Exhibit, if needed; (i) a description of the material terms of the Management Incentive Plan; (j) the New Shareholders' Agreement; (k) the Schedule of Other Customer Contracts; (l) the New Preferred Stock Agreement; (m) the New Common Stock Agreement; (n) the terms of the Amended PK Air Credit Facility Agreement (to the extent not set forth in the motion seeking approval of the Milestone Settlement); and (o) to the extent necessary in order to ensure compliance with 49 U.S.C. § 40102(a)(15)(C), the New Warrant Agreement. All such documents comply with the terms of the Plan, and the filing and notice of such documents was adequate, proper and in accordance with the Conditional Disclosure Statement Order, the Bankruptcy Code, and the Bankruptcy Rules.

67

**ARTICLE X.**
**CONDITIONS PRECEDENT TO THE EFFECTIVE DATE**

A.      *Conditions Precedent to the Effective Date*

It shall be a condition to the Effective Date that the following conditions shall have been satisfied or waived pursuant to Article X.B of the Plan:

1.      The Bankruptcy Court shall have entered the Confirmation Order in form and substance consistent in all respects with the Restructuring Support Agreement and otherwise in form and substance acceptable to the Debtors and the Required RSA Parties and, with respect to issues that affect the Milestone Parties, in form and substance reasonably acceptable to the Milestone Parties, and the Confirmation Order shall have become a Final Order;

2.      The DIP Order shall have been entered and no event of default shall have occurred and be continuing thereunder.

3.      Each of the Plan, the Restructuring Documents, and all documents contained in any supplement to the Plan, including the Plan Supplement and any exhibits, schedules, amendments, modifications or supplements thereto, shall have been executed and/or filed, in form and substance consistent in all respects with the Restructuring Support Agreement and otherwise comply with the applicable consent rights (if any) set forth in this Plan for such documents and shall not have been modified in a manner inconsistent with the Restructuring Support Agreement;

4.      Either (i) the Exit Facility Documents shall have been duly executed and delivered by all of the Entities that are parties thereto and all conditions precedent (other than any conditions related to the occurrence of the Effective Date) to the effectiveness of the Exit Facility shall have been satisfied or duly waived in writing or (ii) the Amended and Restated 2019 Term Loan Credit Agreement has been executed and is in full force and effect;

5.      The Bankruptcy Court shall have entered the Milestone Settlement Order, such order shall have become a Final Order, and the parties to the Milestone Settlement shall have complied with their obligations thereunder arising through the Effective Date (including the payment by the Debtors, no later than the Effective Date, of the reasonable and documented fees and expenses of its professionals).

6.      The Bankruptcy Court shall have entered the HeliFleet Stipulation, which shall have become a Final Order.

7.      The Backstop Commitment Agreement and the Restructuring Support Agreement shall have been approved by entry of an order by the Bankruptcy Court and shall remain in full force and effect, all conditions shall have been satisfied thereunder, and there shall be no breach that would give rise to a right to terminate the Backstop Commitment Agreement or the Restructuring Support Agreement for which notice has been given in accordance with the terms thereof (including by the requisite parties thereunder), or such notice could have been given to the extent such notice is not permitted due to the commencement of the Chapter 11 Cases and the related automatic stay;

8.      No court of competent jurisdiction or other competent governmental or regulatory authority shall have issued a final and non-appealable order making illegal or otherwise restricting, preventing or prohibiting, in any material respect, the consummation of the Plan, the Restructuring Support Agreement or any of the Restructuring Documents or Restructuring Transactions contemplated thereby;

9.      The Debtors shall have obtained all material authorizations, consents, regulatory approvals, rulings, or documents that are necessary to implement and effectuate the Restructuring Transactions;

10.     The Debtors shall have paid all Transaction Expenses then known or submitted to the Debtors;

11.     The Debtors shall have paid all reasonable and documented fees and expenses incurred and unpaid as of the Effective Date of each of the members of the Creditors' Committee, including up to $20,000 for the reasonable and documented fees of Infosys Limited, in its capacity as a member of the Creditors' Committee;

68

12.	All Allowed Professional Fee Claims shall have been paid in full or amounts sufficient to pay such Allowed Professional Fee Claims after the Effective Date shall have been placed in the Professional Fee Escrow Account pending approval of the Professional Fee Claims by the Bankruptcy Court; and

13.	The Debtors shall have implemented the Restructuring Transactions in a manner consistent in all respects with the Restructuring Support Agreement (subject to the consent rights set forth therein).

B.	*Waiver of Conditions*

The conditions to the Effective Date of the Plan set forth in Article X of the Plan may only be waived with the consent of the Debtors and the Required RSA Parties (such consents not to be unreasonably withheld) without notice, leave, or order of the Bankruptcy Court or any formal action other than proceedings to confirm or consummate the Plan.

C.	*Effect of Non-Occurrence of Conditions to Consummation*

If the Effective Date does not occur on or before the termination of the Restructuring Support Agreement or the Backstop Commitment Agreement, the Plan shall be null and void in all respects and nothing contained in the Plan or the Disclosure Statement shall: (1) constitute a waiver or release of any Claims, Interests, or Causes of Action by any Entity; (2) prejudice in any manner the rights of any Debtor or any other Entity; or (3) constitute an admission, acknowledgment, offer, or undertaking of any sort by any Debtor or any other Entity; *provided*, that all provisions of the Restructuring Support Agreement or the Backstop Commitment Agreement that survive termination thereof shall remain in effect in accordance with the terms thereof.

D.	*Substantial Consummation*

"Substantial consummation" of the Plan, as defined in section 1101(2) of the Bankruptcy Code, shall be deemed to occur on the Effective Date.

## ARTICLE XI.
## MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN

A.	*Modification of Plan*

Effective as of the date hereof and subject to the consent of the Required RSA Parties and the Committee Consent Right: (1) the Debtors reserve the right, in accordance with the Bankruptcy Code and the Bankruptcy Rules, to amend or modify the Plan before the entry of the Confirmation Order consistent with the terms set forth herein, and, as appropriate, not resolicit votes on such modified Plan; and (2) after the entry of the Confirmation Order, the Debtors or the Reorganized Debtors, as applicable, may, upon order of the Bankruptcy Court, amend or modify the Plan, in accordance with section 1127(b) of the Bankruptcy Code and Bankruptcy Rule 3019, remedy any defect or omission, or reconcile any inconsistency in the Plan in such manner as may be necessary to carry out the purpose and intent of the Plan consistent with the terms set forth herein.

B.	*Effect of Confirmation on Modifications*

Entry of the Confirmation Order shall constitute approval of all modifications to the Plan occurring after the solicitation of votes thereon pursuant to section 1127(a) of the Bankruptcy Code and a finding that such modifications to the Plan do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

C.	*Revocation or Withdrawal of Plan*

Subject to the terms of the Restructuring Support Agreement, the Debtors reserve the right to revoke or withdraw the Plan with respect to any or all Debtors before the Confirmation Date and to File subsequent chapter 11 plans. If the Debtors revoke or withdraw the Plan, or if Confirmation or the Effective Date does not occur, then: (1) the Plan will be null and void in all respects; (2) any settlement or compromise embodied in the Plan, assumption or

rejection of Executory Contracts or Unexpired Leases effectuated by the Plan, and any document or agreement executed pursuant hereto will be null and void in all respects; and (3) nothing contained in the Plan shall (a) constitute a waiver or release of any Claims, Interests, or Causes of Action by any Entity, (b) prejudice in any manner the rights of any Debtor or any other Entity, or (c) constitute an admission, acknowledgement, offer, or undertaking of any sort by any Debtor or any other Entity.

## ARTICLE XII.
## RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of, or related to, the Chapter 11 Cases and the Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code, including jurisdiction to:

1. allow, disallow, determine, liquidate, classify, estimate, or establish the priority, Secured or unsecured status, or amount of any Claim against a Debtor, including the resolution of any request for payment of any Claim and the resolution of any and all objections to the Secured or unsecured status, priority, amount, or allowance of Claims;

2. decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or the Plan;

3. resolve any matters related to Executory Contracts or Unexpired Leases, including: (a) the assumption or assumption and assignment of any Executory Contract or Unexpired Lease to which a Debtor is party or with respect to which a Debtor may be liable and to hear, determine, and, if necessary, liquidate, any Cure Costs or Claims arising therefrom, including pursuant to section 365 of the Bankruptcy Code; (b) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed; and (c) any dispute regarding whether a contract or lease is or was executory or expired;

4. ensure that distributions to Holders of Allowed Claims and Allowed Interests are accomplished pursuant to the provisions of the Plan and adjudicate any and all disputes arising from or relating to distributions under the Plan;

5. adjudicate, decide, or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters, and grant or deny any applications involving a Debtor that may be pending on the Effective Date;

6. enter and implement such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of (a) contracts, instruments, releases, indentures, and other agreements or documents approved by a Final Order in the Chapter 11 Cases, and (b) the Plan, the Confirmation Order, and contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan;

7. enforce any order for the sale of property pursuant to sections 363, 1123, or 1146(a) of the Bankruptcy Code;

8. grant any consensual request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code;

9. issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Entity with Consummation or enforcement of the Plan;

10. hear, determine, and resolve any cases, matters, controversies, suits, disputes, or Causes of Action in connection with or in any way related to the Chapter 11 Cases, including: (a) with respect to the repayment or return of distributions and the recovery of additional amounts owed by the Holder of a Claim for amounts not timely repaid pursuant to Article VI.F.1 of the Plan; (b) with respect to the releases, injunctions, and other provisions

contained in Article VIII of the Plan, including entry of such orders as may be necessary or appropriate to implement such releases, injunctions, and other provisions; (c) that may arise in connection with the Consummation, interpretation, implementation, or enforcement of the Plan, the Confirmation Order, and contracts, instruments, releases, and other agreements or documents created in connection with the Plan; or (d) related to section 1141 of the Bankruptcy Code;

11.     enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

12.     consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

13.     hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

14.     enter an order or Final Decree concluding or closing the Chapter 11 Cases;

15.     enforce all orders previously entered by the Bankruptcy Court;

16.     hear and determine disputes involving any matter related to the implementation of the Plan, *provided*, *however*, that upon the closing of the Exit Facility (or, if applicable, the execution of the Amended and Restated 2019 Term Loan Credit Agreement) and execution of the New Organizational Documents, disputes with respect to the Exit Facility and the New Organizational Documents that are not related to the Plan shall otherwise be governed by the jurisdictional, forum selection or dispute resolution clause contained in such document; and

17.     hear any other matter not inconsistent with the Bankruptcy Code.

Notwithstanding the foregoing, the Bankruptcy Court retains jurisdiction, but not exclusive jurisdiction, to determine whether environmental liabilities asserted by any Governmental Unit are discharged or otherwise barred by the Confirmation Order or the Plan, or the Bankruptcy Code.  As of the Effective Date, notwithstanding anything in this Article XII to the contrary, the Exit Facility (or, if applicable, the execution of the Amended and Restated 2019 Term Loan Credit Agreement), the Amended PK Air Credit Facility Agreement and the New Organizational Documents shall be governed by the jurisdictional provisions contained therein.

## ARTICLE XIII.
## MISCELLANEOUS PROVISIONS

A.      *Immediate Binding Effect*

Subject to Article X.A hereof, and notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan and the Plan Supplement shall be immediately effective and enforceable and deemed binding upon the Debtors, the Reorganized Debtors, and any and all Holders of Claims or Interests (irrespective of whether such Holders of Claims or Interests have accepted or are deemed to have accepted the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, discharges, and injunctions described in the Plan, each Entity acquiring property under the Plan, and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtors.  All Claims and debts shall be as fixed, adjusted, or compromised, as applicable, pursuant to the Plan regardless of whether any Holder of a Claim or debt has voted on the Plan.

B.      *Restructuring Documents*

All Restructuring Documents, including the Final Cash Collateral Order, the Disclosure Statement, the other solicitation materials with respect to the Plan, the Conditional Disclosure Statement Order, the Plan, each document included in the Plan Supplement, the Backstop Commitment Agreement, the Confirmation Order, the DIP Facility Credit Agreement, the DIP Order, the Exit Facility Credit Agreement, the Amended and Restated 2019 Term Loan

71

Credit Agreement, the New Organizational Documents, the Management Incentive Plan and the Rights Offering Procedures, shall be subject to the consent rights of the Required RSA Parties on the terms set forth in the Restructuring Support Agreement, and subject to the Committee Consent Right.

C.     *Additional Documents*

On or before the Effective Date, and subject to the terms of the Restructuring Support Agreement and the Backstop Commitment Agreement, the Debtors may File with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan. The Debtors or the Reorganized Debtors, as applicable, and all Holders of Claims receiving distributions pursuant to the Plan and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

D.     *Dissolution of the Statutory Committees*

On the Effective Date, the Creditors' Committee and any other statutory committee appointed in the Chapter 11 Cases shall dissolve automatically and the members thereof shall be released and discharged from all rights, duties, responsibilities, and liabilities arising from, or related to, the Chapter 11 Cases and under the Bankruptcy Code, except for the purposes of (a) prosecuting requests for payment of Professional Fee Claims for services rendered and reimbursement of expenses incurred prior to the Effective Date by the Creditors' Committee and its Professionals, (b) participating in any adversary proceeding commenced on or before the Effective Date in which the Creditors' Committee (or any member thereof in its capacity as such) is named, and (c) participating in any appeals of the Confirmation Order. The Debtors shall no longer be responsible for paying any fees or expenses incurred by the members of or advisors to the Creditors' Committee or any other statutory committee after the Effective Date except for those purposes set forth in the preceding sentence. Upon the dissolution of the Creditors' Committee and any other statutory committee, the members of such committees and their respective professionals will cease to have any duty, obligation or role arising from or related to the Chapter 11 Cases and shall be released and discharged from all rights and duties from or related to the Chapter 11 Cases.

E.     *Payment of Statutory Fees*

All fees payable pursuant to 28 U.S.C. § 1930(a) prior to the Effective Date shall be paid by the Debtors.  On and after the Effective Date, the Reorganized Debtors shall pay any and all such fees when due and payable, and shall File with the Bankruptcy Court quarterly reports in a form reasonably acceptable to the U.S. Trustee.  Each Debtor and Reorganized Debtor shall remain obligated to pay quarterly fees to the U.S. Trustee until the earliest of that particular Debtor's or Reorganized Debtor's case being closed, dismissed, or converted to a case under chapter 7 of the Bankruptcy Code.

F.     *Payment of Transaction Expenses*

The Debtors and Reorganized Debtors, as applicable, will, on the Effective Date (or, to the extent not known or submitted to the Debtors for payment as of the Effective Date, promptly following receipt of an invoice therefor, whether incurred before or after the Effective Date) and to the extent invoiced in accordance with the terms of the applicable engagement letter (and, for the avoidance of doubt, no invoices shall be required to include itemized time detail), pay the Transaction Expenses (whether accrued prepetition or postpetition and to the extent not otherwise paid during the Chapter 11 Cases), without the need for application by any such parties to the Bankruptcy Court, and without notice and a hearing pursuant to section 1129(a)(4) of the Bankruptcy Code or otherwise.

G.     *Reservation of Rights*

The Plan shall have no force or effect unless the Bankruptcy Court shall enter the Confirmation Order.  None of the Filing of the Plan, any statement or provision contained in the Plan, or the taking of any action by any Debtor with respect to the Plan, the Disclosure Statement, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of any Debtor with respect to the Holders of Claims or Interests prior to the Effective Date.

H. *Successors and Assigns*

The rights, benefits, and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, Affiliate, officer, director, agent, representative, attorney, beneficiaries, or guardian, if any, of each Entity.

I. *Service of Documents*

After the Effective Date, any pleading, notice, or other document required by the Plan to be served on or delivered to the Reorganized Debtors shall be served on:

| | |
|---|---|
| **Reorganized Debtors** | **Bristow Group Inc.**<br>2103 City West Blvd., 4th Floor<br>Houston, Texas 77042<br>Attn: Victoria Lazar<br><br>with copies to: |
| **Counsel to Debtors** | **Baker Botts L.L.P.**<br>2001 Ross Avenue, Suite 900<br>Dallas, Texas 75201-2980<br>Attn: James R. Prince<br>Omar J. Alaniz<br>Kevin Chiu<br><br>-and-<br><br>**Baker Botts L.L.P.**<br>30 Rockefeller Plaza<br>New York, New York 10112-4498<br>Attn: Emanuel C. Grillo<br>Chris Newcomb<br><br>-and-<br><br>**Wachtell, Lipton, Rosen & Katz**<br>51 West 52nd Street<br>New York, New York 10019<br>Attn: Richard G. Mason<br>Amy R. Wolf |
| **Counsel to the Secured Notes Ad Hoc Group** | **Davis Polk & Wardwell LLP**<br>450 Lexington Avenue<br>New York, New York 10017<br>Attn: Damian S. Schaible<br>(damian.schaible@davispolk.com)<br>Natasha Tsiouris<br>(natasha.tsiouris@davispolk.com) |

| | |
|---|---|
| **Counsel to the Unsecured Notes Ad Hoc Group** | **Kirkland & Ellis LLP**<br>601 Lexington Avenue<br>New York, New York 10022<br>Attn:  Joshua A. Sussberg<br>(joshua.sussberg@kirkland.com)<br>      Brian E. Schartz<br>(brian.schartz@kirkland.com)<br><br>-and-<br><br>Kirkland & Ellis LLP<br>300 North LaSalle<br>Chicago, Illinois 60654<br>Attn:  Gregory F. Pesce<br>(gregory.pesce@kirkland.com) |
| **Counsel to the Creditors' Committee** | **Kramer Levin Naftalis & Frankel LLP**<br>1177 Avenue of the Americas<br>New York, New York 10036<br>Attn:  Douglas H. Mannal<br>(dmannal@kramerlevin.com)<br>      Anupama Yerramalli<br>(ayerramalli@kramerlevin.com) |

J.      *Term of Injunctions or Stays*

**Unless otherwise provided herein or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases (pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court) and existing on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order) shall remain in full force and effect until the Effective Date.  All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.**

K.      *Entire Agreement*

Except as otherwise indicated, the Plan supersedes all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

L.      *Plan Supplement*

All exhibits and documents included in the Plan Supplement are incorporated into and are a part of the Plan as if set forth in full in the Plan.  After any of such documents included in the Plan Supplement are Filed, copies of such documents shall be made available upon written request to the Debtors' counsel at the address above or by downloading such exhibits and documents from the Solicitation Agent's website at https://cases.primeclerk.com/Bristow or the Bankruptcy Court's website at https://www.pacer.gov/.

M.       *Non-Severability*

If, prior to Confirmation, the Bankruptcy Court holds any term or provision of the Plan to be invalid, void, or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is:  (1) valid and enforceable pursuant to its terms; (2) integral to the Plan and may not be deleted or modified without the consent of the Debtors, the Required RSA Parties, and without satisfying the Committee Consent Right; and (3) non-severable and mutually dependent.

N.       *Votes Solicited in Good Faith*

Upon entry of the Confirmation Order, the Debtors will be deemed to have solicited votes on the Plan in good faith and in compliance with the Bankruptcy Code, and pursuant to section 1125(e) of the Bankruptcy Code, the Debtors and each of the Supporting Noteholders and each of their respective Affiliates, agents, representatives, members, principals, equity holders (regardless of whether such interests are held directly or indirectly), officers, directors, managers, employees, advisors, and attorneys will be deemed to have participated in good faith and in compliance with the Bankruptcy Code in the offer, issuance, sale, and purchase of Securities offered and sold under the Plan, and, therefore, neither any of such parties or individuals or the Reorganized Debtors will have any liability for the violation of any applicable law, rule, or regulation governing the solicitation of votes on the Plan or the offer, issuance, sale, or purchase of the Securities offered and sold under the Plan.

O.       *Waiver or Estoppel*

Each Holder of a Claim or an Interest shall be deemed to have waived any right to assert any argument, including the right to argue that its Claim or Interest should be Allowed in a certain amount, in a certain priority, Secured or not subordinated by virtue of an agreement made with the Debtors or their counsel, or any other Entity, if such agreement was not disclosed in the Plan, the Disclosure Statement, the Restructuring Support Agreement, or papers Filed with the Bankruptcy Court prior to the Confirmation Date.

Dated:  August 22, 2019

BRISTOW GROUP INC.
on behalf of itself and all other Debtors


By: */s/ Brian J. Allman*
Name:  Brian J. Allman
Title:  Senior Vice President and Chief Financial Officer

# TAB 11-F

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| **BRISTOW GROUP INC.,** *et al.,* | § | **CASE NO. 19-32713 (DRJ)** |
| | § | **(CHAPTER 11)** |
| DEBTORS. | § | (Jointly Administered) |
| | § | |

### BRS INVESTOR GROUP OBJECTION AND RESERVATION OF RIGHTS TO AMENDED JOINT CHAPTER 11 PLAN FOR DEBTORS
**[This instrument relates to ECF No. 589]**

TO THE HONORABLE DAVID R. JONES, CHIEF U.S. BANKRUPTCY JUDGE:

Meridian Investments I, LLC, Andrew Abernathey, Jay Abernathey, and Guy Abernathey (collectively, the "**BRS Investor Group**") as Lead Plaintiff, and as holders of Existing Interests in Bristow Group Inc. ("**Bristow**" or the "**Debtors**"), file this Objection (the "**Objection**") to the Amended Joint Chapter 11 Plan of Reorganization of Bristow Group Inc. and Its Affiliated Debtors Affiliates, As Modified (the "**Plan**").

### SUMMARY OF OBJECTION[1]

The Court should deny confirmation of the Plan because it provides for broad releases of Bristow's current and former directors and officers (as well as numerous other third-parties).  The problem with the Releases is simple:  none of the current and former directors and officers have filed for relief under the Bankruptcy Code and thus none are entitled to a discharge of any claims against them under the Bankruptcy Code.  The Fifth Circuit has been clear on this point and has "firmly pronounced its opposition to such releases" and held that "a non-consensual, non-debtor discharge would not be available in this circuit."  *In re Vitro S.A.B. de CV*, 701 F.3d 1031, 1060

---

[1] Unless otherwise stated herein, all undefined capitalized terms used in this Objection shall have the meanings ascribed to them in the Plan and Disclosure Statement.  Additionally, certain undefined capitalized terms appearing in the Summary of Objection are defined later in the Objection.

(5th Cir. 2012). The Fifth Circuit has unambiguously held that its opinions "seem broadly to foreclose non-consensual non-debtor releases and permanent injunctions," explaining that "[t]he fresh start § 524(e) provides to debtors is not intended to serve this purpose." *In re Pac. Lumber Co.*, 584 F.3d 229, 252–53 (5th Cir. 2009).

The Releases in Bristow's Plan are directly contrary to that binding Fifth Circuit precedent. Nor is the impact of the impermissible third-party Releases in Bristow's Plan here hypothetical. Bristow and two of its current and former officers are currently defendants in a pending securities class action before Judge Ellison in the United States District Court for the Southern District of Texas (the "***Securities Class Action***"). The BRS Investor Group is the Lead Plaintiff for the putative class of the holders of Existing Interests and Section 510(b) Claims. The Plan's Releases represent a calculated attempt by Bristow—in direct violation of binding Fifth Circuit precedent— to (1) extinguish the putative class's claims against the current and former Bristow officers named as defendants in the Securities Class Action, and (2) cut off access to the $100 million in Directors' & Officers' Liability Insurance Bristow carries that likely covers Bristow's liability as a nominal defendant in the Securities Class Action and provides a non-Debtor source of recovery for the stockholders Bristow allegedly defrauded—all without ever having to confront the BRS Investor Group's claims on the merits. The Fifth Circuit has been clear that the Bankruptcy Code does not provide for such a result.

To overcome binding Fifth Circuit precedent, the Debtors attempt to manufacture "consent" to their impermissible Releases through a construct in the Plan providing that the Releases are effective unless the "Releasing Parties" take affirmative steps to opt-out of them.

But Bristow's argument is legally meritless. That is so for four independent reasons. In the first place, Texas law is clear that "silence and inaction will not be construed as an assent to an offer." *Texas Ass'n Gov't Risk Mgmt. Pool v. Matagorda County*, 52 S.W.3d 128, 132 (Tex. 2000)

(quoting 2 *Williston on Contracts* § 6:49 (4th ed. 1991)).  Thus, the Debtors' argument that by merely failing to respond to the Debtors' notice—Bristow's stockholders somehow released their claims not only against Bristow itself—but also against its current and former directors and officers fails as a matter of law.

Second, the Plan's impermissible third-party Releases are not supported by consideration and are thus legally ineffective as to Bristow stockholders (*i.e.*, holders of Existing Interests and Section 510(b) Claims, in the Plan's terminology).  Under the Plan, holders of Existing Interests and Section 510(b) Claims have their current claims and interests completely discharged, receive no distribution under the Plan, and receive no equity in the Reorganized Debtor.  Accordingly, Bristow's attempt to enforce its legally invalid third-party Releases against its stockholders fails, because the Releases are not supported by consideration.

Third, the Debtors' attempt to create "consent" to the Releases fails for the independent reason that holders of Existing Interests and Section 510(b) Claims are deemed to have rejected the Plan, because their interests and claims will be extinguished, and they are entitled to no distribution.  The Debtors' attempt to establish "consent" through Existing Interests and Section 510(b) Claims holders' failure to respond in an election in which they are not even entitled to vote does not establish "consent" to releases that the Fifth Circuit has repeatedly held the Debtors have no legal authority to force on the holders of Existing Interests and Section 510(b) Claims.[2]

Fourth, even if a lack of a response to the Debtors' opt-out forms were sufficient for the Court to infer consent (it is not) and even if the Releases were supported by consideration (which they are not), Bristow's argument would still fail as a matter of law—at least as to the claims in

---

[2] This Court's confirmation order in *Weatherford Int'l Plc*, Case No. 19-33694, United States Bankruptcy Court for the Southern District of Texas (ECF 343 Sept. 11, 2019), does not address the legal grounds for consent as these issues were not raised by GAMCO.

the Securities Class Action—because the notice sent to Bristow stockholders did not provide adequate notice that Bristow stockholders were releasing specific, already-asserted claims in pending litigation by not returning the opt-out form. *See* ECF 599 at 115–121. By merely including the broad, legalistic language from the Release provisions of the Plan in the notice sent to stockholders—without also informing the stockholders that they would be releasing their right to receive payment from currently-pending claims already asserted against Bristow and other parties covered by the releases—the opt-out forms failed to give adequate notice that by not opting out, stockholders were releasing their claims covered by the Securities Class Action, and the Releases are thus ineffective as to those claims.

In sum, the Releases contained in the Plan are fatally flawed and the Court should reject the opt-out sophistry urged by the Debtors as a means to bind the BRS Investor Group and others when no consideration is being provided for the Releases and inadequate disclosure and notice was provided by the Debtors to the holders of Existing Interests and Section 510(b) Claims. Absent the Debtors' incorporating language proposed by the BRS Investor Group into the Plan and Confirmation Order as a means to address these Objections, the Court should deny confirmation of the Plan.

## BACKGROUND

1. The BRS Investor Group has been appointed to serve as Lead Plaintiff in a suit that is brought as a proposed class action on behalf of all purchasers of Bristow securities during the period between February 8, 2018 and February 12, 2019, inclusive ("***Securities Litigation Class***"),[3] pursuant to 15 U.S.C. § 78u-4(a)(3)(B) in the securities class action case styled: *In re*

---

[3] Any reference in this Objection to the Class Period or the Complaint or any allegations therein is for informational purposes only, is qualified in its entirety by the actual allegations in the Complaint (as may be amended from time to time), and is made without prejudice to any rights, claims, arguments, and counterarguments of Lead Plaintiff and/or the Proposed Class in the Securities Litigation, including but not limited to the rights to amend the Complaint from time to time and to modify the definitions of the Proposed Class and/or the Class Period.

*Bristow Group Inc. Securities Litigation*, Case No. 19-cv-00509 (KPE), in the United States District Court for the Southern District of Texas, Houston Division ("***Securities Litigation***"). The Securities Litigation is subject to the Private Securities Litigation Reform Act of 1995 ("***PSLRA***").

2. The claims of the Lead Plaintiff and the Securities Litigation Class members arise from the purchase or acquisition of securities of Bristow Group Inc. between February 8, 2018 and February 12, 2019 (the "***Class Period***") as set forth in the Class Action Complaint for Violations of the Federal Securities Laws (Jury Trial Demanded) (the "***Complaint***") filed on February 14, 2019. Defendants named in the Complaint include Bristow Group Inc., Jonathan E. Baliff (Debtors' former Chief Executive Officer), and L. Don Miller (Debtors' current Chief Executive Officer and former Chief Financial Officer).

3. On May 17, 2019, District Judge Keith Ellison entered an Order for Consolidation of Actions, Appointment of Lead Plaintiff, and Approval of Selection of Lead Counsel, appointing BRS Investor Group as Lead Plaintiff and approving Kirby McInerney LLP and Susman Godfrey L.L.P. as Lead Counsel.

4. On July 29, 2019, the BRS Investor Group, as Lead Plaintiff in the Securities Litigation filed a conditional proof of claim (Claim Registry No. 15), for itself and the Securities Litigation Class members pursuant to Rule 7023 of Fed. R. Bank. P., in an unliquidated amount, subject to certification of a class as provided under the PSLRA, or, if warranted following relief from the PSLRA automatic stay, through a class certification process in the Bankruptcy Court.

5. On September 5, 2019, the District Court entered its Order providing for the Lead Plaintiff to file a Consolidated Class Action Complaint sixty (60) calendar days after the entry of the Order and for Defendants Jonathan E. Baliff and L. Don Miller to answer, move, or otherwise respond to the Consolidated Class Action Complaint sixty (60) calendar days after it is filed. The

Order applies to the non-Debtor Defendants, the very parties for which the Debtors seek to obtain forbidden Releases.

**OBJECTION**

**I.     The Releases Are Forbidden Under Section 524(e) And Fifth Circuit Law**

6.      The Plan should not be confirmed because it has not "been proposed in good faith and not by any means forbidden by law" as required by Section 1129(a)(3) of the Bankruptcy Code.

7.      Section 524(e) of the Bankruptcy Code provides that the "discharge of a debt of the debtor does not affect the liability of any other entity on, or the property of any other entity for, such debt." In spite of that clear statutory language, however, the Releases in Bristow's Plan here purport to release claims against non-Debtors, including the claims against the officers and directors (Baliff and Miller) alleged in the Securities Litigation.

8.      Those third-party Releases in the Plan are prohibited under binding Fifth Circuit precedent. The Fifth Circuit has "firmly pronounced its opposition to such releases" and unambiguously held that "a non-consensual, non-debtor discharge would not be available in this circuit." *Vitro S.A.B.*, 701 F.3d at 1060. The Fifth Circuit has further held that its opinions "seem broadly to foreclose non-consensual non-debtor releases and permanent injunctions," and has rejected the notion that a bankruptcy plan can be used as a mechanism to release or discharge liabilities of persons or entities who are not actually bankrupt, explaining "[t]he fresh start § 524(e) provides to debtors is not intended to serve this purpose." *Pac. Lumber Co.*, 584 F.3d at 252 (striking down all non-debtor releases in plan except those releasing members of the unsecured creditors' committee because "its members are the only disinterested volunteers" to be released.).[4]

---

[4] *See also Solidus Networks, Inc. v. Excel Innovations, Inc.* (*In re Excel Innovations, Inc.*), 502 F.3d 1086, 1095 (9th Cir. 2007) (holding that the maximum injunctive relief that a bankruptcy court can grant a non-debtor third party is

9.      Accordingly, district courts in this circuit have routinely applied Fifth Circuit precedent to strike improper third-party releases in proposed Chapter 11 plans.  For example, the United States District Court for the Northern District of Texas held in *Dropbox, Inc. v. Thru, Inc., et al. (In re Thru, Inc.)*, that the bankruptcy court's approval of non-debtor releases, a permanent injunction, and exculpation provisions was "clear error."  2018 U.S. Dist. LEXIS 179769, 2018 WL 5113124, *23 (N.D. Tex. Oct. 19, 2018).  The original plan in *Thru* erroneously approved by the bankruptcy court improperly released the debtor, "its officers, directors, and various other personnel from liability, except for acts or omissions made in bad faith 'in connection with or related to formulating, negotiation, implementing, confirming or consummating' the plan, disclosure statement or any plan document."  *Id.* at *22.  The District Court reversed "the bankruptcy court's decision concerning the plan's injunction and exculpation provisions, and [remanded the] case to the bankruptcy court with instructions to strike aspects [of the plan paragraphs] concerning improper releases of non-debtor third parties."[5]

10.      The Releases are also invalid to the extent they purport to affect the right to recover against third-parties (including insurance companies) based on discharged claims against the Debtors.  The Fifth Circuit has held: "[I]t makes no sense to allow an insurer to escape coverage for injuries cause by its insured merely because the insured receives a bankruptcy discharge."  *In re Edgeworth*, 993 F.2d 51, 54 (5th Cir. 1993).  The Fifth Circuit continued, "[t]he 'fresh-start' policy is not intended to provide a method by which an insurer can escape its obligations based simply on the financial misfortunates of the insured" and explained that "[s]uch a result would be

---

through the confirmation of the debtor's plan of reorganization); *Abel v. Landsing Diversified Props.-II (In re W. Real Estate Fund, Inc.)*, 922 F.2d 592, 601-02 (10th Cir. 1990) (holding that injunctions in favor of non-debtor third parties cannot last past the confirmation of the debtor's plan); *Am. Hardwoods, Inc. v. Deutsche Credit Corp. (In re Am. Hardwoods, Inc.)*, 885 F.2d 621, 624-27 (9th Cir. 1989) (holding that bankruptcy courts lack the power to issue injunctions that outlast plan confirmation).

[5] *Id.* at *23.

**OBJECTION TO DEBTORS' PLAN**

fundamentally wrong." *Id.* The Fifth Circuit has thus held that, "as long as the costs of defense are borne by the insurer and there is no execution on judgment against the debtor personally, section 524(a) will not bar a suit against the discharged debtor as the nominal defendant." *Id.* Accordingly, to the extent the Releases are construed to provide any relief to Bristow beyond the discharge provided by § 524(a) of the Bankruptcy Code, the Releases are invalid.

11. The Fifth Circuit has been clear: A debtor cannot use the Bankruptcy Code to obtain a release of claims against third parties. Debtors receive the discharge provided by Section 524 and that is all. *Vitro S.A.B.*, 701 F.3d at 1061 ("This conclusion was consistent with prior rulings from this circuit that 'seem broadly to foreclose non-consensual non-debtor releases and permanent injunctions.'" (quoting *Pac. Lumber Co.*, 584 F.3d at 252)).

## II. Bristow Cannot Evade Binding Fifth Circuit Precedent By Attempting To Construe The Releases As "Consensual"

12. The Debtors seek to evade binding Fifth Circuit precedent, by attempting to establish that the Releasing Parties here have "consented" to the releases. That attempt fails as a matter of law.

13. The Fifth Circuit's opinions broadly prohibit nonconsensual third-party releases, and the Fifth Circuit has not explained what is required to establish that a release is "consensual." Some bankruptcy courts within the Fifth Circuit, however, have considered a release "consensual" when a creditor (a) affirmatively votes in favor of the plan and (b) receives consideration in exchange for a third-party release that is (c) integral to the plan. *See, e.g., In re Bigler LP*, 442 B.R. 537, 546 (Bankr. S.D. Tex. 2010); *In re Wool Growers Cent. Storage Co.*, 371 B.R. 768, 775-76 (Bankr. N.D. Tex. 2007) ("Consensual nondebtor releases that are specific in language, integral to the plan, a condition of the settlement, and given for consideration do not violate section 524(e).").

14.     Here, the third-party Releases in Bristow's Plan fail to meet those requirements—and thus the Plan cannot be confirmed as a matter of law—with respect to holders of Existing Interests and Section 510(b) Claims (including the BRS Investor Group and the Securities Litigation Class).  Bristow has attempted to establish "consent" to the Releases by holders of Existing Interests and Section 510(b) Claims through an opt-out process.  Bristow mailed forms to holders of Existing Interests and Section 510(b) Claims and argues that any holder of an Existing Interest or Section 501(b) Claim who does not return an executed form affirmatively opting out of the Releases is deemed to have consented to them.

15.     Bristow's argument that the Releases are "consensual" is legally meritless for four independent reasons.

### A.     Bristow's Contention That Inaction Indicates Consent To The Releases Is Legally Baseless

16.     *First*, merely not opting-out of a proposed release is legally insufficient to establish "consent" to the release.  "Courts generally apply contract principles in deciding whether a creditor consents to a third-party release."  *In re SunEdison, Inc.*, 576 B.R. 453, 458 (Bankr. S.D.N.Y. 2017).

17.     Texas law is clear that "silence and inaction will not be construed as an assent to an offer," precluding as a matter of law any argument by Bristow that a failure to opt-out or object to the plan somehow operates as consent or agreement to the releases.  *See Texas Ass'n Gov't Risk Mgmt. Pool*, 52 S.W.3d at 132.

18.     Accordingly, "as a matter of law, when a party is unilaterally informed of [a contract term], 'mere failure to object within a reasonable time . . . , without more, could not establish an agreement between the parties.'"  *In re Couture Hotel Corp.*, 554 B.R. 369, 381 (Bankr. N.D. Tex. 2016) (quoting *Triton Oil and Gas Corp. v. Marine Contractors and Supply,*

*Inc.*, 664 S.W.2d 443, 445 (Tex. 1982)). "'[A] meeting of the minds is an essential element of an implied-in-fact contract.'" *Id.* (quoting *Excess Underwriters at Lloyd's, London v. Frank's Casing Crew & Rental Tools, Inc.*, 246 S.W.3d 42, 49 (Tex. 2008)).

19.     Bankruptcy courts in other jurisdictions have followed this approach and held that a mere non-response to an opt-out form is legally insufficient to establish consent to a third-party release.  For example, in *SunEdison,* the Court applied New York contract law, noting that an offeror cannot transform an offeree's silence into acceptance when the offeree does not intend to accept the offer.  *SunEdison*, 576 B.R. at 458–59.  The Court noted that under New York law, the only exceptions to this rule are (a) when the silence is misleading, (b) when silence as consent is supported by the parties' ongoing course of conduct, or (c) when the offeree accepts the benefits of the offer despite reasonable opportunity to reject and understand that the offeror expects compensation.  *Id.*

20.     In *SunEdison*, the debtors argued that the warning in the disclosure statement and on the ballots regarding the potential effect of silence gave rise to a duty to speak, and the nonvoting creditors' failure to object to the plan or to otherwise reject the plan should be deemed their consent to the release.  The *SunEdison* court rejected this argument because the debtors failed to show that the nonvoting creditors' silence was misleading or that the nonvoting creditors silence signified their intention to consent to the release, finding that silence could easily be attributable to other causes.  *Id.* at 460.[6]  The *SunEdison* court thus concluded that the "Non-Voting Releasors did not consent to the Release."  *Id.* at 461.

21.     Other bankruptcy courts agree.  For example, the Court in *In re Chassix Holdings, Inc.*, held that "[c]harging all inactive creditors with full knowledge of the scope and implications

---

[6] The debtors did not contend that an ongoing course of conduct between themselves and the nonvoting creditors gave rise to a duty to speak. *Id.* at 460.

of the proposed third-party releases and implying a 'consent' to the third-party releases based on the creditors' inaction, is simply not realistic or fair and would stretch the meaning of 'consent' beyond the breaking point." *In re Chassix Holdings, Inc.*, 533 B.R. 64, 81 (Bankr. S.D.N.Y. 2015).

22.    Bankruptcy Judge Mullin reached a similar conclusion in finding similar opt-out provisions to be non-consensual, ordering that such provisions be eliminated from the debtor's plan. *In re Mac Churchill, Inc.*, Case No. 18-41988-MXM-11 (N.D. Tex. June 4, 2019). Sustaining the United States Trustee's confirmation objection relating to third party releases, Judge Mullin found that inaction in connection with an opt-out release set forth on a plan ballot is insufficient to constitute affirmative action on the part of the non-voting creditor to form the requisite consent.  "The courts generally do agree that you have to have an affirmative opt-out and that silence really shouldn't be deemed consent." *See Mac Churchill* Tr. at 14, ln. 1 to 3.

23.    Judge Mullin distinguished *dicta* from a recent opinion of Chief Judge Rosenthal from the Southern District of Texas, *Cole v. Nabors Corp. Servs., Inc. (In re CJ Holding Co.)*, C.A. No. H-18-3250, 2019 U.S. Dist. LEXIS 21199 (S.D. Tex. Feb. 8, 2019) ("**CJ Holdings**"), noting that the facts of that case were distinct from those before him.  In *CJ Holdings*, the challenge to the opt-out release came "a couple of" years post-confirmation, rather than at the time of confirmation.  Likewise, the creditor in *CJ Holdings* challenged an order enforcing a confirmation order, long past the time to appeal the confirmation order, rather than challenging whether the court should have confirmed the plan with an opt-out release in the first place.

24.    Texas law is clear that Bristow cannot establish consent to the third-party Releases in the Plan based merely on the fact that an interest holder did not affirmatively opt-out of the Releases.  Indeed, that is doubly true as to holders of Existing Interests and Section 510(b) Claims, because they were not solicited to accept or reject the Plan and received no distributions under the Plan.  There is simply no basis to infer that not affirmatively submitting an opt-out form indicates

"consent" to the Releases in the Plan under those circumstances, instead of being attributable to other considerations:  Why would a Bristow stockholder—whose interests are fully impaired and extinguished under the Plan, who is not even entitled to vote on the Plan, and who receives nothing under the Plan—ever elect to give up or release anything of value?  They plainly would not, and the Court should reject Bristow's baseless attempt to infer that Bristow's stockholders "consented" to give up something (their Section 510(b) Claims against Bristow's insurers and its current and former officers) in exchange for nothing.  Such a holding would "stretch the meaning of 'consent' beyond the breaking point."  *Chassix*, 533 B.R. at 81.

### B. Inferring Consent Is Particularly Inappropriate Here, Because Bristow Stockholders Were Not Entitled To Vote On The Plan

25.     *Second*, even if inaction could be considered "consent" (it cannot), such an inference would be particularly inappropriate under the terms of the Plan.  That is because holders of Existing Interests and Section 510(b) Claims were not entitled to vote on the Plan.  Both Existing Interests (Class 15) and Section 510(b) Claims (Class 16) are "cancelled, released, and expunged" and "shall be of no further force and effect," and holders of such interests and claims will "not receive any distribution" under the Plan.  Plan at 29–30.  Because holders of Existing Interests and Section 510(b) Claims are "[i]mpaired and not receiving any distribution under the Plan," they "are presumed to have rejected the plan pursuant to Section 1126(g) of the Bankruptcy Code.  *Id.* "Therefore, such holders ***are not entitled to vote to accept or reject the Plan***."  *Id.*

26.     Thus, the Debtors are attempting to base their argument for "consent" to the Releases on a failure to "opt-out" by holders of Existing Interests and Section 510(b) Claims in a solicitation ***in which they are not even entitled to vote***.  The Debtors' attempt to establish consent under such procedures is wholly deficient.

**C.** **The Releases Are Invalid Because They Are Not Supported By Consideration**

27. *Third*, the Debtors cannot establish "consent" to the Releases by holders of Existing Interests or Section 510(b) Claims, because the Releases are not supported by consideration. Under Texas law, "[a] contract without consideration is unenforceable." *Marx v. FDP, LP*, 474 S.W.3d 368, 378 (Tex. App.—San Antonio 2015, pet. denied).

28. Here, holders of Existing Interests and Section 510(b) Claims (including the BRS Investor Group and the Securities Litigation Class) have their current interests fully discharged under the Plan, they are not entitled to any distributions, and they receive no interest in the Reorganized Debtors. Put simply, they receive absolutely nothing in exchange for (supposedly) releasing their claims against the Debtor and the third-parties covered by the Releases. Thus, the Releases are unenforceable as a matter of law because they are not supported by consideration. *See Bigler*, 442 B.R. at 547 (striking releases in a plan except for claims "that are property of the Estate in consideration for funding of the Plan by Amegy"); *Wool Growers*, 371 B.R. at 776 ("Consensual nondebtor releases that are specific in language, integral to the plan, a condition of the settlement, *and given for consideration* do not violate section 524(e)." (emphasis added)).

29. Indeed, as noted above, the lack of consideration for the Releases in the Plan also reinforces the impropriety of inferring consent to the Releases based on inaction here: It is highly implausible that any reasonable, fully informed holder of Existing Interests or Section 510(b) claims would ever voluntarily relinquish its independent, direct claims against non-debtor defendants in exchange for nothing.

**D.** **The Debtors' Failure To Provide Disclosure Or Give Proper Notice Of The Claims Being Released**

30. *Fourth*, even assuming the Court could infer consent to the Releases based on inaction and that the releases were supported by consideration (neither is true), the Releases are

still invalid as to the Securities Class Action because the opt-out form failed to inform Bristow stockholders that the claims in the Securities Class Action were being released.  For example, in the class action context, courts hold that in order to comply with due process and the Federal Rules of Civil Procedure, a notice to potential class members of a settlement must provide "a succinct description of the substance of the action and the parties' positions." *See In re Vitamin C Antitrust Litig.*, 2012 U.S. Dist. LEXIS 152275, 2012 WL 5289514, at *8 (E.D.N.Y. Oct. 23, 2012) (citing *In re Payment Interchange Fee & Merch. Discount Antitrust Litig.*, 2008 WL 115104 (E.D.N.Y. Jan. 8, 2008)).

31.     Bristow failed to provide that information here or make any disclosure whatsoever of the Securities Class Action despite the objections raised by the BRS Investor Group to the Disclosure Statement.  *See* ECF 557.  Instead, Bristow's opt-out form merely included the language of the Releases from the Plan but failed to inform Bristow stockholders that failing to opt-out could affect their right to recover based on already-asserted claims in currently-pending litigation.  *See* ECF 599 at 115–121.  In other words, Bristow failed to adequately provide disclosure or notice to Bristow stockholders that by failing to opt out of the Releases they were potentially releasing—not just undefined, unasserted, hypothetical claims (that may or may not exist) in hypothetical, future litigation—but their right to recover based on presently asserted claims in already-filed, currently-pending litigation against Bristow and its current and former CEO in an existing class action lawsuit.

32.     Hence, even if the Court were to hold the Releases are valid generally (they are not), the Court should exclude the claims of putative class members in the Securities Class Action from the scope of the releases.

33.     Absent the ameliorating language proffered by the BRS Investor Group set forth below, the Court should require that the Releases in the Plan be modified or removed so that they

comply with Section 524(e) of the Bankruptcy Code and Fifth Circuit authority and deny confirmation of the Plan.

### III.    The Plan And Confirmation Order Should Include The Following Language

34.    To overcome the manifest defects, the Plan and Confirmation Order must expressly exclude the BRS Investor Group and the Securities Litigation Class, and their claims against the non-Debtor defendants in the Securities Litigation, from the Releases and Injunction. To that end, the BRS Investor Group suggests that the following language should be included in the Plan and Confirmation Order to clarify that the BRS Investor Group and Securities Litigation Class members are not deemed to be "Releasing Parties" as follows:

> **Neither the BRS Investor Group nor the Securities Litigation Class (both individually or collectively) in the Securities Litigation shall be "Releasing Parties" under the Plan.**

In addition, for the avoidance of any doubt, the definition of "Released Parties" should clarify that the non-Debtor defendants in the Securities Litigation, in their capacity as such, are not "Released Parties," as follows:

> **None of the non-Debtor defendants in the Securities Litigation shall constitute "Released Parties" under the Plan.**

In addition, Article VIII C of the Plan should expressly include the following:

> **Notwithstanding anything to the contrary in this Plan or the Confirmation Order, nothing herein or therein does, shall, or may be construed to release, enjoin or otherwise adversely impact the claims and causes of action asserted against any non-Debtor defendants in the Securities Litigation**.

In addition, for the avoidance of any doubt concerning the releases of the Debtors, Article VIII C of the Plan should expressly indicate the following:

> **Notwithstanding anything to the contrary in this Plan or the Confirmation Order, nothing herein or therein does, shall, or may be construed to release, the Debtors or bar the assertion of claims against the Debtors solely as nominal defendants in the Securities Litigation for the purposes of preserving and**

**enforcing rights to coverage under and recovery of the proceeds of the D&O Liability Insurance Policies.**[7]

35.     Finally, the Plan Injunction would bar Lead Plaintiffs and the Proposed Class from doing so, and neither the Plan nor the Disclosure Statement describes any mechanism for Lead Plaintiffs and the Securities Litigation Class to pursue their Class Claims against the Debtor Defendant to access available insurance and liquidate their claims for purposes of pro rata distributions of insurance proceeds.   The following language should be added to the end of paragraph E, Article V of the Plan:

> **Nothing in this Plan or Confirmation Order shall (a) constitute a finding or stipulation that any proceeds of any of the D&O Liability Insurance Policies are property of the Estate; (b) modify or supersede any provision (including but not limited to any priority of payments provision) of any of the D&O Liability Insurance Policies, or (c) otherwise preclude the Securities Litigation Lead Plaintiff and the Securities Litigation Class in the Securities Litigation, or any party entitled to coverage under the D&O Liability Insurance Policies from seeking recovery under any such D&O Liability Insurance Policy in accordance with the terms thereof.**

**IV.     The Plan Must Require The Debtors To Preserve Potentially Relevant Evidence Until The conclusion Of The Securities Action.**

36.     Fact discovery in the Securities Litigation has not commenced and has been temporarily stayed under the PSLRA.   As the issuer of securities that are the subject of the Securities Litigation and given their involvement in the facts and circumstances alleged therein, the Debtors undoubtedly have books, records, electronically stored information, and other evidence potentially relevant to the Securities Litigation in their possession, custody, and/or control.

37.     Section 78u-4 of the PSLRA mandates that

---

[7] *See Edgeworth*, 993 F.2d at 56 (holding that §524 did not bar plaintiffs from pursuing lawsuit after discharge "so that they can recover against policy proceeds"); *In re Coho Res.*, 345 F.3d 338, 343(5th Cir. 2003) ("courts are in 'near unanimous agreement' that §524(e) 'permits a creditor to bring, and proceed in, an action nominally directed against a discharged debtor for the sole purpose of proving liability on its part as a prerequisite to recovering from its insurer.'").

Any party to the action with actual notice of the allegations contained in the complaint shall treat all documents, data compilations (including electronically recorded or stored data), and tangible objects that are in the custody or control of such person and that are relevant to the allegations, as if they were the subject of a continuing request for production of documents from an opposing party under the Federal Rules of Civil Procedure.

15 U.S.C. § 78u-4(b)(3)(C)(i). This mandatory requirement is subject to "sanction for willful violation." 15 U.S.C. § 78u-4(b)(3)(C)(ii). The Debtors are presently parties to the Securities Litigation and thus remain subject to the PSLRA's document preservation mandate. Continuing preservation of the Debtors' books, records, electronically stored information, and other items of evidence that are potentially relevant to the Securities Litigation post-confirmation is critical to avoid prejudice to the BRS Investor Group and Securities Litigation Class members. However, the Plan does not contain any explanation of what, if any measures, the Debtors intend to implement to ensure such evidence is retained and preserved through the completion of the Securities Litigation.

38. Inclusion of the following provision in the Plan would resolve the BRS Investor Group's concerns with respect to the post-confirmation preservation of evidence that is potentially relevant to the Securities Litigation:

Until the entry of a final and non-appealable order or judgment or settlement with respect to all defendants now or hereafter named in the securities class action styled: *In re Bristow Group Inc. Securities Litigation*, Case No. 19-cv-00509 (KPE), in the United States District Court for the Southern District of Texas, Houston Division, the Debtors, and any transferee or custodian of the Debtors' books, records, documents, files, electronic data (in whatever format, including native format), or any tangible object or other item of evidence relevant or potentially relevant to the Securities Litigation, wherever stored (collectively, the "***Potentially Relevant Books and Records***"), shall preserve and maintain Potentially Relevant Books and Records as if they were the subject of a continuing request for production of documents from an opposing party under the Federal Rules of Civil Procedure, and shall not destroy, abandon, transfer, or otherwise render unavailable such Potentially Relevant Books and Records.

## RESERVATION OF RIGHTS

39. **For the avoidance of doubt, the BRS Investor Group, for itself and the Securities Litigation Class, DO NOT CONSENT, AND EXPRESSLY OBJECT, to (a) the Releases contained in the Plan in favor of non-Debtor officer and director defendants (Baliff and Miller) in the Securities Litigation, and (b) the Bankruptcy Court's entry of any final order or judgment that this Court lacks jurisdiction or statutory and/or constitutional adjudicatory authority to enter without the affirmative and knowing consent of all parties affected thereby.**

## PRAYER

For the foregoing reasons, the BRS Investor Group respectfully requests this Court to sustain this Objection, deny confirmation of the Plan, and grant the BRS Investor Group such other and further relief to which it may be justly entitled, both at law and in equity.

DATED: September 23, 2019

Respectfully submitted,

**JOSEPH G. EPSTEIN PLLC**
24 Greenway Plaza, Suite 970
Houston, Texas 77046
(713) 222-8400 (Telephone)
(713) 621-0046 (Facsimile)
joe@epsteintexaslaw.com


By: _____*/s/ Joseph G. Epstein*_____
          Joseph G. Epstein
          Texas Bar No. 06639320
          S.D. Tex. No. 11733


-and-

Ira M. Press
Thomas W. Elrod
**KIRBY MCINERNEY LLP**
250 Park Avenue, Suite 820
New York, NY 10177
(212) 371-6600 (Telephone)
(212) 751-2540 (Facsimile)
ipress@kmllp.com
telrod@kmllp.com


-and-

Michael C. Kelso, Texas Bar No. 24092617
Barry Barnett, Texas Bar No. 01778700
**SUSMAN GODFREY LLP**
1000 Louisiana, Suite 5100
Houston, TX  77002
(713) 651-9366 (Telephone)
(713) 654-6666 (Facsimile)
mkelso@susmangodfrey.com
bbarnett@susmangodfrey.com

***Attorneys for the BRS Investor Group***


### Certificate of Service

I hereby certify that on September 23, 2019, a true and correct copy of the foregoing document was electronically mailed to the parties that are registered or otherwise entitled to receive electronic notices in this case pursuant to the Electronic Filing Procedures in this District and to the persons and parties listed on the Master Service List.

          _____*/s/ Joseph G. Epstein*_____
          One of Counsel

# TAB 11-G

**Exhibit A**

Revised Proposed Confirmation Order

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| BRISTOW GROUP INC., *et al.*,[1] | ) Case No. 19-32713 (DRJ) |
| | ) |
| Debtors. | ) (Jointly Administered) |
| | ) |

**ORDER (I) APPROVING THE DISCLOSURE
STATEMENT, (II) CONFIRMING THE AMENDED JOINT CHAPTER 11
PLAN OF REORGANIZATION OF BRISTOW GROUP INC. AND ITS DEBTOR
AFFILIATES, AS FURTHER MODIFIED AND (III) GRANTING RELATED RELIEF**

The above-captioned debtors and debtors in possession (collectively, the "Debtors")

having: [2]

    a.   commenced, on May 11, 2019 (the "Petition Date"), these Chapter 11 Cases by filing voluntary petitions for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code");

    b.   filed,[3] on the Petition Date, the *Declaration of Brian J. Allman in Support of the Debtors' First Day Motions* [Docket No. 25] (the "First Day Declaration"), detailing the facts and circumstances of the Debtors' Chapter 11 Cases;

    c.   operated their businesses and managed their properties during these Chapter 11 Cases as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code;

    d.   entered into that certain Restructuring Support Agreement, dated as of May 10, 2019 (as amended and restated on June 27, 2019 and July 24, 2019 and amended on August 22, 2019, and as further modified, supplemented, or otherwise amended from time to time in accordance with its terms, the "Restructuring Support

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each debtor's federal tax identification number, are: Bristow Group Inc. (9819), BHNA Holdings Inc. (8862), Bristow Alaska Inc. (8121), Bristow Helicopters Inc. (8733), Bristow U.S. Leasing LLC (2451), Bristow U.S. LLC (2904), BriLog Leasing Ltd. (9764), and Bristow Equipment Leasing Ltd. (9303). The corporate headquarters and the mailing address for the Debtors listed above is 2103 City West Blvd., 4th Floor, Houston, Texas 77042.

[2] Capitalized terms used but not otherwise defined herein have the meanings given to them in the Plan (as defined below). The rules of interpretation set forth in Article I.B of the Plan apply to the Confirmation Order.

[3] Unless otherwise indicated, use of the term "filed" herein refers also to the service of the applicable document filed on the docket in these chapter 11 cases, as applicable.

Agreement") to which that certain Backstop Commitment Agreement, dated as of July 24, 2019 is attached as Exhibit 2 of Exhibit A thereto (as modified, supplemented, or otherwise amended from time to time in accordance with its terms, the "Backstop Commitment Agreement"), which sets forth the terms of a consensual financial restructuring of the Debtors and a new equity capital investment pursuant to the Rights Offering;

e. filed, on August 1, 2019, the *Joint Chapter 11 Plan of Reorganization of Bristow Group Inc. and Its Debtor Affiliates* [Docket No. 498] and the *Disclosure Statement for the Joint Chapter 11 Plan of Reorganization of Bristow Group Inc. and Its Debtor Affiliates* [Docket No. 499];

f. filed, on August 8, 2019, the *Debtors' Emergency Motion for Entry of an Order (I) Conditionally Approving the Adequacy of the Disclosure Statement, (II) Approving the Solicitation and Notice Procedures with Respect to Confirmation of the Plan, (III) Approving the Form of Various Ballots and Notices in Connection Therewith, (IV) Approving the Rights Offering Procedures, and (V) Approving the Scheduling of Certain Dates in Connection with Confirmation of the Plan* [Docket No. 520] (the "Conditional Disclosure Statement Motion");

g. filed, on August 20, 2019, the *Amended Joint Chapter 11 Plan of Reorganization of Bristow Group Inc. and Its Debtor Affiliates* [Docket No. 574] and the *Amended Disclosure Statement for the Amended Joint Chapter 11 Plan of Reorganization of Bristow Group Inc. and Its Debtor Affiliates* [Docket No. 575] (the "Amended Disclosure Statement");

h. filed on August 22, 2019, the *Amended Joint Chapter 11 Plan of Reorganization of Bristow Group Inc. and Its Debtor Affiliates, as Modified* [Docket No. 589] (as amended, amended and restated or otherwise modified from time to time, including by the Modified Plan (as defined below), the "Plan") and the *Amended Disclosure Statement for the Amended Joint Chapter 11 Plan of Reorganization of Bristow Group Inc. and Its Debtor Affiliates, as Modified* [Docket No. 590] (with the exhibits thereto filed with the Amended Disclosure Statement, the "Disclosure Statement");

i. served, on or about August 26, 2019, the *Notice of (A) Deadline to Cast Votes to Accept or Reject Amended Joint Chapter 11 Plan for the Debtors, as Modified, (B) Combined Hearing to Consider Approval of the Disclosure Statement Related Thereto, (C) Deadline to Object to Confirmation, and (D) Related Matters and Procedures* (the "Combined Hearing Notice"), which contained notice of the date and time set for the hearing to consider approval of the Disclosure Statement and confirmation of the Plan (the "Combined Hearing"), and the deadline for filing objections to the Plan and the Disclosure Statement, on all creditors and equity holders of the Debtors, as evidenced by the Solicitation Affidavit (defined below), consistent with the Conditional Disclosure Statement Order (defined below);

j. published, on August 29, 2019, in *The Wall Street Journal (National Edition)* and the *Houston Chronicle*, as evidenced by the Publication Affidavit (defined below), the Combined Hearing Notice, consistent with the Conditional Disclosure Statement Order;

2

k.  distributed for solicitation, on or about August 29, 2019, (i) the Disclosure Statement, as conditionally approved by the Court; (ii) the Solicitation Procedures Order; (iii) the Solicitation Procedures; (iv) the Combined Hearing Notice; (v) the ballots for each Voting Class (defined below); (vi) a pre-addressed, postage pre-paid reply envelope; and (vii) cover letters from the Debtors and Creditors' Committee (collectively, the "Solicitation Package") to all known holders of Claims as of August 21, 2019 in Class 3 (2019 Term Loan Facility Claims), Class 4 (Secured Notes Claims), Class 6 (PK Air Credit Facility Claims and MAG Lease Obligation Claims), Class 8 (Unsecured Notes Claims), and Class 12 (General Unsecured Claims), which are entitled to vote to accept or reject the Plan, as evidenced by the Solicitation Affidavit, consistent with the order granting the Conditional Disclosure Statement Order;

l.  distributed, on or about August 29, 2019, (i) to all known holders of Claims as of August 21, 2019 in Class 1 (Other Secured Claims), Class 2 (Other Priority Claims), Class 5 (Lombard (BULL) Term Loan Claims), Class 9 (Lombard (BALL) Term Loan Guarantee Claims and UK ABL Credit Facility Guaranty Claims), Class 10 (MCA and Other Customer Claims) and Class 11 (Trade Claims), which are deemed to accept the Plan and not entitled to vote to accept or reject the Plan, a *Non-Voting Status Notice with Respect to Unimpaired Classes Presumed to Accept the Amended Joint Chapter 11 Plan of Reorganization of Bristow Group Inc. and Its Affiliate Debtors, as Modified* (the "Deemed to Accept Notice"), and (ii) to all known holders of Claims or Interests as of August 21, 2019 in Class 15 (Existing Interests) and Class 16 (Section 510(b) Claims), which are deemed to reject the Plan and not entitled to vote to accept or reject the Plan, the *Non-Voting Status Notice with Respect to Impaired Classes Presumed to Reject the Amended Joint Chapter 11 Plan of Reorganization of Bristow Group Inc. and Its Affiliate Debtors, as Modified* (the "Deemed to Reject Notice"), which included a Third Party Release Opt Out Form to permit holders of Class 15 Claims or Class 16 Interests to opt out of the Third Party Releases (defined below) (the "Opt Out Form"), as evidenced by the Solicitation Affidavit, consistent with the order granting the Conditional Disclosure Statement Order;

m.  filed, on August 30, 2019, the *Debtors' Emergency Motion to Approve Term Sheet with PK Airfinance S.À.R.L. and Milestone Aviation Group Limited* [Docket No. 611] (the "Milestone 9019 Motion") seeking approval of the Milestone Settlement;

n.  filed, on September 9, 2019, the *Notice of Filing of Assumed Executory Contract and Unexpired Lease Schedule* [Docket No. 632] (as subsequently amended on September 30, 2019 [Docket No. 741], the "Assumption Schedule") and the *Notice of Filing of Rejected Executory Contract and Unexpired Lease Schedule* [Docket No. 633] (the "Rejection Schedule") and served, on September 9, 2019, notices on the contract counterparties listed in the Assumption Schedule and the Rejection Schedule, informing such counterparties of the assumption or rejection, as applicable, of their contracts (the "Contract Notices"), as evidenced by the Contract Notice Affidavit (defined below), consistent with the Conditional Disclosure Statement Order;

3

o. filed, on September 10, 2019, the *Affidavit of Publication* (the "<u>Publication Affidavit</u>") and the *Affidavit of Service of Solicitation Materials* [Docket No. 634] ("<u>Solicitation Affidavit</u>") and, on September 26, 2019, the Corrected Affidavit of Service with respect to the Contract Notices [Docket No. 721] (the "<u>Contract Notice Affidavit</u>" and together with the Publication Affidavit and the Solicitation Affidavit, the "<u>Affidavits</u>")

p. filed, on September 16, 2019, the *Plan Supplement for the Amended Joint Chapter 11 Plan of Reorganization of Bristow Group Inc. and Its Debtor Affiliates, as Modified* [Docket No. 656] (the "<u>First Plan Supplement</u>");

q. filed, on September 28, 2019, the *Debtors' Emergency Motion to Approve Term Sheet with Macquarie Leasing LLC and Macquarie Rotocraft Holdings LLC* [Docket No. 731] seeking approval of a settlement (the "<u>Macquarie Settlement</u>") with Macquarie Leasing LLC and Macquarie Rotocraft Holdings LLC (collectively, "<u>Macquarie</u>") pursuant to which, among other things, the Debtors and Macquarie would amend the Macquarie Term Loan Credit Facility (as so amended, the "<u>Amended Macquarie Term Loan Credit Facility</u>");

r. filed, on September 30, 2019, the *Declaration of James Daloia of Prime Clerk LLC Regarding the Solicitation of Votes and Tabulation of Ballots Cast on the Amended Joint Chapter 11 Plan of Reorganization of Bristow Group Inc. and Its Debtor Affiliates, as Modified* [Docket No. 739], which detailed the results of the Plan voting process (the "<u>Voting Declaration</u>" and, together with the First Day Declaration, the "<u>Declarations</u>");

s. filed, on September 30, 2019, the *Amended Joint Chapter 11 Plan of Reorganization of Bristow Group Inc. and Its Debtor Affiliates, as <u>Further Modified</u>* [Docket No. 742].

t. filed, on September 30, 2019, the *Debtors': (I) Memorandum of Law in Support of (A) Approving Adequacy of Debtors' Disclosure Statement, and (B) Confirmation of Amended Joint Chapter 11 Plan of Reorganization of Bristow Group Inc. and its Debtor Affiliates, as Modified; (II) Reply to Objections with Respect to the Plan and Disclosure Statement and (III) Opposition to Motion to Appoint Equity Committee)* [Docket No. 744] (the "<u>Confirmation Brief</u>");

u. filed, on September 30, 2019, the *Declaration of Joseph J. Sciametta in Support of an Order Approving the Debtors' Disclosure Statement for and Confirming the Debtors' Joint Chapter 11 Plan* [Docket No. 781] (the "<u>Sciametta Declaration</u>" and, together with the First Day Declaration and the Voting Declaration, the "<u>Declarations</u>");

v. filed, on October 2, 2019, the *Amended Plan Supplement for the Amended Joint Chapter 11 Plan of Reorganization of Bristow Group Inc. and Its Debtor Affiliates, as Modified* [Docket No. 782] (the "<u>Amended Plan Supplement</u>" and, together with the First Plan Supplement, as modified, amended, or supplemented from time to time, the "<u>Plan Supplement</u>", which, for purposes of the Plan and this Confirmation Order, is included in the definition of the "Plan"); and

4

w.  filed, on October 2, 2019, the Stipulated Findings of Fact for Combined Disclosure Statement and Confirmation Hearing [Docket No. 784] (the "Stipulated Facts").

The Court having:

a.  entered, on August 26, 2019, the *Order (i) Conditionally Approving the Adequacy of the Disclosure Statement, (ii) Approving the Solicitation and Notice Procedures with Respect to Confirmation of the Plan, (iii) Approving the Form of Various Ballots and Notices in Connection Therewith, (iv) Approving the Rights Offering Procedures, and (v) Approving the Scheduling of Certain Dates in Connection with Confirmation of the Plan* [Docket No. 599] (the "Conditional Disclosure Statement Order");

b.  entered, on September 23, 2019, that *Order Granting Debtors' Motion to Approve Term Sheet with PK Airfinance S.À.R.L. and Milestone Aviation Group Limited* [Docket No. 698] (the "Milestone Settlement Order");

c.  set September 23, 2019, at 4:00 p.m. (prevailing Central Time) as the deadline for voting on the Plan (the "Voting Deadline") and deadline for filing objections to confirmation of the Plan (the "Objection Deadline");

d.  set October 3, 2019 at 1:00 p.m. (prevailing Central Time), as the date and time for the Combined Hearing, pursuant to Bankruptcy Rules 3017 and 3018 and sections 1126, 1128, and 1129 of the Bankruptcy Code, as set forth in the Conditional Disclosure Statement Order, the time for which was subsequently changed to 9:00 a.m. (prevailing Central Time) on the same date;

e.  reviewed the Plan, the Disclosure Statement, the Plan Supplement, the Confirmation Brief, the Declarations, the Voting Declaration, the Combined Hearing Notice, the Affidavits, and all filed pleadings, exhibits, statements, and comments regarding approval of the Disclosure Statement and Confirmation, including all objections, statements, and reservations of rights;

f.  held the Combined Hearing;

g.  heard the statements and arguments made by counsel in respect of approval of the Disclosure Statement and Confirmation and having considered the record of these Chapter 11 Cases and taken judicial notice of all papers and pleadings filed in the Chapter 11 Cases; and

h.  considered all oral representations, testimony, documents, filings, and other evidence regarding approval of the Disclosure Statement and Confirmation.

NOW, THEREFORE, after due deliberation thereon and good cause appearing therefor,

the Court hereby makes and issues the following findings of fact, and conclusions of law:

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

IT IS DETERMINED, FOUND, ADJUDGED, DECREED AND ORDERED THAT:

A.      **Findings of Fact**.  The findings of fact and conclusions of law set forth herein, in the Plan, including specifically in Article IX of the Plan, in the Stipulated Facts and in the record of the Combined Hearing constitute the Court's findings of fact and conclusions of law under Rule 52 of the Federal Rules of Civil Procedure, as made applicable herein by Bankruptcy Rules 7052 and 9014.  To the extent any of the following conclusions of law constitute findings of fact, or vice versa, they are adopted as such.

B.      **Jurisdiction, Venue, and Core Proceeding**.  The Court has jurisdiction over these Chapter 11 Cases pursuant to section 1334 of title 28 of the United States Code.  The Court has exclusive jurisdiction to determine whether the Disclosure Statement and the Plan comply with the applicable provisions of the Bankruptcy Code and should be approved and confirmed, respectively.  Venue is proper in this district pursuant to sections 1408 and 1409 of title 28 of the United States Code.  Approval of the Disclosure Statement and Confirmation of the Plan are core proceedings within the meaning of section 157(b)(2) of title 28 of the United States Code.

C.      **Disclosure Statement**.  The Disclosure Statement contains (a) sufficient information of a kind necessary to satisfy the disclosure requirements of all applicable nonbankruptcy laws, rules, and regulations, including the Securities Act, (b) "adequate information" (as such term is defined in section 1125(a) of the Bankruptcy Code and used in section 1126(b)(2) of the Bankruptcy Code) with respect to the Debtors, the Plan, and the transactions contemplated therein and (c) specific descriptions of releases and injunctions related thereto in accordance with Bankruptcy Rule 3016(c).  The filing of the Disclosure Statement with the Clerk of the Court satisfied Bankruptcy Rule 3016(b).

6

D. **Ballots.** The Classes entitled to vote on the Plan (collectively, the "Voting Classes") are set forth below:

| Class | Designation |
|---|---|
| 3 | 2019 Term Loan Facility Claims |
| 4 | Secured Notes Claims |
| 6 | PK Air Credit Facility Claims and MAG Lease Obligation Claims |
| 7 | Macquarie Term Loan Credit Facility Claims |
| 8 | Unsecured Notes Claims |
| 12 | General Unsecured Claims |

As set forth and approved in the Solicitation Procedures Order, the ballots the Debtors used to solicit votes to accept or reject the Plan from holders in the Voting Classes adequately addressed the particular needs of these Chapter 11 Cases and were appropriate for holders in the Voting Classes to vote to accept or reject the Plan.

E. **Notice.** As evidenced by the Affidavits and the Voting Declaration, all parties required to be given notice of the Combined Hearing (including the deadline for filing and serving objections to approval of the Disclosure Statement and confirmation of the Plan) have been given due, proper, adequate, timely, and sufficient notice of the Combined Hearing in accordance with the Solicitation Procedures Order and in compliance with the Bankruptcy Code, the Bankruptcy Rules, the Local Rules and all other applicable non-bankruptcy rules, laws, and regulations and such parties have had an opportunity to appear and be heard with respect thereto.

F. **Solicitation.** As described in and evidenced by the Affidavits and the Voting Declaration, transmittal and service of the Solicitation Materials (collectively, the "Solicitation") were timely, adequate, appropriate, and sufficient under the circumstances. The Solicitation (i) was conducted in good faith and (ii) complied with the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, the Solicitation and Scheduling Order, and all other applicable non-bankruptcy rules, laws, and regulations applicable to the Solicitation.

7

G.      **Vote Tabulation.**  As described in the Voting Declaration, the holders of Claims in the Class 3 (2019 Term Loan Facility Claims), Class 4 (Secured Notes Claims), Class 6 (PK Air Credit Facility Claims and MAG Lease Obligations Claims), Class 8 (Unsecured Notes Claims) and Class 12 (General Unsecured Claims) are Impaired under the Plan and have voted to accept the Plan in the numbers and amounts required by section 1126 of the Bankruptcy Code.  All procedures used to tabulate the Ballots were fair, reasonable, and conducted in accordance with the applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, the Solicitation Procedures Order, and all other applicable non-bankruptcy rules, laws, and regulations.  Additionally, Class 7 (Macquarie Term Loan Credit Facility Claims) is Impaired under the Plan and the Macquarie Parties, through the Macquarie Settlement, have voted to accept the Plan.

H.      **Service of Opt Out Form**.   The process described in the Voting Declaration and the Solicitation Affidavit that the Debtors and Prime Clerk followed to identify the relevant parties on which to serve the Opt Out Form and to distribute the Opt Out Form (i) is consistent with the industry standard for the identification and dissemination of such materials on holders of public securities, and (ii) was reasonably calculated to ensure that each of Holders of Interests in Class 15 and Claims in Class 16 was informed of its ability to opt out of the Third Party Releases and the consequences for failing to timely do so.

I.      **Modifications to Plan**.  Pursuant to section 1127 of the Bankruptcy Code, the modifications to the Plan set forth in the Modified Plan or in this Confirmation Order constitute technical or clarifying changes, changes with respect to particular Claims by agreement with holders of such Claims, or modifications that do not otherwise materially and adversely affect or change the treatment of any other Claim under the Plan.  Notice of these modifications was

8

adequate and appropriate under the facts and circumstances of the Chapter 11 Cases. In accordance with Bankruptcy Rule 3019, these modifications do not require additional disclosure under section 1125 of the Bankruptcy Code or the resolicitation of votes under section 1126 of the Bankruptcy Code, and they do not require that holders of Claims or Interests be afforded an opportunity to change previously cast acceptances or rejections of the Plan. Accordingly, the Plan is properly before this Court and all votes cast with respect to the Plan prior to such modification shall be binding and shall apply with respect to the Plan.

J.      **Releases, Exculpation, Injunction, and Preservation of Claims and Causes of Action**.  Article VIII.B of the Plan describes certain releases granted by the Debtors, the Reorganized Debtors and the Estates (the "Debtor Releases").  Such releases are a necessary and integral element of the Plan, and are fair, reasonable, and in the best interests of the Debtors, the Estates, and holders of Claims and Interests.  The Debtor Releases are:  (a) in exchange for the good and valuable consideration provided by the Released Parties; (b) a good-faith settlement and compromise of the Claims released by Article VIII.B of the Plan; (c) given, and made, after due notice and opportunity for hearing; (d) appropriately tailored under the facts and circumstances of the Chapter 11 Cases; and (e) a bar to any of the Debtors, the Reorganized Debtors and the Estates asserting any Claim or Cause of Action released by the Debtor Releases.

K.      Article VIII.C of the Plan describes certain releases (the "Third-Party Releases") granted by the Releasing Parties of the Released Parties which include:  (a) the Debtors; (b) the Reorganized Debtors; (c) the DIP Facility Agent; (d) the DIP Facility Lenders; (e) the Backstop Commitment Parties; (f) the Holders of 2019 Term Loan Facility Claims; (g) the 2019 Term Loan Facility Agent; (h) the Amended and Restated 2019 Term Loan Facility Lenders; (i) the Amended and Restated 2019 Term Loan Facility Agent; (j) the Supporting Noteholders; (k) the Indenture

9

Trustees; (l) the Exit Facility Lenders; (m) the Exit Facility Agent; (n) the Milestone Parties; (o) the Creditors' Committee and each of its current and former members and the parties related to any of the foregoing as more fully set forth in Article I.A.175 of the Plan.

L.      The Third-Party Releases are consensual with respect to the Releasing Parties and such parties were provided notice of the chapter 11 proceedings, the Plan, the deadline to object to confirmation of the Plan, and received the Combined Hearing Notice and were properly informed that the Holders of Claims against or Interests in the Debtors that did not (a) check the "opt out" box on the applicable Ballot or opt out form attached to the Deemed to Reject Notice, returned in advance of the Voting Deadline, or (b) object to their inclusion as a Releasing Party on or before the Objection Deadline would be deemed to have consented to the release of all Claims and Causes of Action against the Debtors and the Released Parties as set forth in Article VIII.C. The Combined Hearing Notice was additionally published in *The Wall Street Journal (National Edition)* and *the Houston Chronicle* on August 29, 2019.  The release provisions of the Plan were conspicuous, emphasized with boldface type in the Plan, the Disclosure Statement, the Ballots, the Combined Hearing Notice, the Deemed to Accept Notice and the Deemed to Reject Notice. Importantly, the inclusion of the parties to the Restructuring Support Agreement and the Milestone Parties in the Third-Party Releases was a material inducement for their participation, negotiation and ultimate resolution of Claims through the Restructuring Support Agreement, the Milestone Settlement and Plan, as applicable.

M.      The Third Party Releases are: (a) in exchange for the good and valuable consideration provided by the Released Parties; (b) a good-faith settlement and compromise of the Claims and Causes of Action released by the Third-Party Releases; (c) materially beneficial to, and in the best interests of, the Debtors, their Estates, and their stakeholders, and is important to

the overall objectives of the Plan to finally resolve certain Claims among or against certain parties in interest in these Chapter 11 Cases; (d) fair, equitable, and reasonable; (e) given and made after due notice and opportunity for hearing; (f) a bar to any of the Releasing Parties asserting any Claim or Cause of Action released by the Third Party Release against any of the Released Parties; and (g) consistent with sections 105, 524, 1123, 1129, and 1141 and other applicable provisions of the Bankruptcy Code.

N.     The exculpation, described in Article VIII.D of the Plan (the "Exculpation"), is appropriate under applicable law because it was proposed in good faith, was formulated following extensive good-faith, arm's-length negotiations with key constituents, and is appropriately limited in scope. Without limiting anything in the Exculpation, each Exculpated Party has participated in good faith in these Chapter 11 Cases and is appropriately released and exculpated from any obligation, Cause of Action, or liability for any act taken or omitted to be taken in connection with, or arising from or relating in any way to, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, Filing, or termination of the Restructuring Support Agreement and related prepetition transactions (including the 2019 Term Loan Facility Credit Agreement), the Original RSA, the Original DIP Commitment Letter, the Initial Amended RSA, the Disclosure Statement, the Plan, the Rights Offering, the Rights Offering Procedures, the Backstop Commitment Agreement, the DIP Facility, the Exit Facility, the Amended and Restated 2019 Term Loan Facility, any other Restructuring Documents, or any Restructuring Transaction, contract, instrument, release or other agreement or document created or entered into in connection with the Disclosure Statement or the Plan, the Filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the

11

issuance of Securities pursuant to the Plan or the Rights Offering, or the distribution of property under the Plan or any other related agreement with respect to the foregoing.

O.     The injunction provisions set forth in Article VIII.E of the Plan are necessary to implement, preserve, and enforce the Debtors' discharge, the Debtor Releases, the Third-Party Releases, and the Exculpation, and are narrowly tailored to achieve this purpose.

P.     Article IV.T of the Plan provides that the Reorganized Debtors will retain, and may assert, all rights to commence and pursue, as appropriate, any and all Causes of Action except for Causes of Action that have been expressly waived, relinquished, exculpated released, compromised or settled by the Plan, whether arising before or after the Petition Date in accordance with section 1123(b)(3)(B) of the Bankruptcy Code.  The provisions regarding the preservation of Causes of Action in the Plan are appropriate, fair, equitable, and reasonable, and are in the best interests of the Debtors, the Estates, and holders of Claims and Interests.

Q.     The release and discharge of all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates described in Article VIII.G of the Plan (the "Lien Release"), except as otherwise expressly provided in the Plan and this Confirmation Order, is necessary to implement the Plan.  The provisions of the Lien Release are appropriate, fair, equitable, and reasonable and are in the best interests of the Debtors, the Estates, and holders of Claims and Interests.

R.     **Management Incentive Plan**.  The Plan provides for the allocation of New Stock to the Management Incentive Plan.  The Debtors disclosed the terms of the Management Incentive Plan in Exhibit I of the Plan Supplement.  The Court finds that allocation of the New Stock to the Management Incentive Plan is fair and reasonable and is appropriate to align the incentives of participants with the goals of Reorganized Bristow Parent.

S.      **Rights Offering**.  The Debtors solicited subscriptions to the Rights Offering in good faith pursuant to the Rights Offering Procedures set forth in the Solicitation Procedures Order, applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, the Local Rules and any applicable non-bankruptcy laws, rules or regulations, and the Rights Offering Procedures are fair, equitable, and reasonable and provide for the Rights Offering to be conducted in a manner that is in the best interests of the Debtors, the Estates and holders of Claims and Interests.

T.      **Valuation.**  The evidence with respect to the valuation analysis of the Debtors introduced at the Combined Hearing and in the Declarations provides the basis for and supports the distributions and recoveries of Holders of Claims and Interests under the Plan, and is reasonable, persuasive and credible, and uses reasonable and appropriate methodologies and assumptions.  Based on all of the evidence presented by the Debtors and other parties both prior to and at the Combined Hearing, the enterprise value of the Debtors pursuant to the Plan does not exceed \$1.25 billion.  Given such enterprise value of the Debtors, pursuant to the applicable provisions of the Bankruptcy Code and Bankruptcy Rules, the Plan's treatment of Existing Interests is appropriate and reasonable, and Holders of Existing Interests are not entitled to receive any distribution under the Plan.

U.      **Cram Down Requirements**.  Classes 1, 2, 5, 9, 10 and 11 constitute Unimpaired Classes, each of which is conclusively presumed to have accepted the Plan in accordance with section 1126(f) of the Bankruptcy Code.  Each of the Voting Classes, Classes 3, 4, 6, 7, 8 and 12, has voted to accept the Plan.  Holders of Existing Interests in Class 15 and Section 510(b) Claims in Class 16 were not solicited and are deemed to have rejected the Plan because the enterprise value of the Debtors is less than the aggregate amount of Claims against the Debtors.  Additionally, Holders of Intercompany Claims in Class 13 and Intercompany Interests in Class 14 (together with

Class 13, Class 15 and Class 16, the "Deemed Rejecting Classes") are conclusively presumed to accept or deemed to reject the Plan and, accordingly, were not solicited. Accordingly, notwithstanding the foregoing, the Plan is confirmable despite the failure to satisfy section 1129(a)(8) because, as set forth below, it satisfies sections 1129(a)(10) and 1129(b) of the Bankruptcy Code.

V. The Plan satisfies the requirements of section 1129(a)(10) of the Bankruptcy Code. As evidenced by the Voting Declaration, each Voting Class voted to accept the Plan by more than the requisite numbers and amounts of Claims, determined without including any acceptance of the Plan by any insider (as that term is defined in section 101(31) of the Bankruptcy Code), specified under the Bankruptcy Code.

W. The Plan also satisfies the requirements of section 1129(b) of the Bankruptcy Code. Notwithstanding the fact that each Deemed Rejecting Class has been, or may be, deemed to reject the Plan, the Plan may be confirmed pursuant to section 1129(b)(l) of the Bankruptcy Code. First, all of the requirements of section 1129(a) of the Bankruptcy Code other than section 1129(a)(8) have been met. Second, the Plan is fair and equitable with respect to each Deemed Rejecting Class. The Plan has been proposed in good faith, is reasonable and meets the requirements that no Holder of any Claim or Interest that is junior to each Deemed Rejecting Class will receive or retain any property under the Plan on account of such junior Claim or Interest, and no Holder of a Claim or Interest in a Class senior to such Class is receiving more than 100% of the amount of its Claim on account of such Claim. Accordingly, the Plan is fair and equitable towards all Holders of Claims and Interests in the Deemed Rejecting Classes. Third, the Plan does not discriminate unfairly because similarly situated creditors will receive substantially similar treatment on account

14

of their Claims and Interests irrespective of Class. The Plan may therefore be confirmed despite the fact that not all Impaired Classes have voted to accept the Plan.

X.     **Good Faith**. The Debtors have proposed the Plan in good faith and not by any means forbidden by law. In so determining based on the evidence presented to this Court, including the Declarations, the Plan, the Disclosure Statement and the other motions and pleadings filed and the testimony elicited at the Combined Hearing, the Court has examined the totality of the circumstances surrounding the filing of these Chapter 11 Cases, the Plan itself, the Restructuring Support Agreement, the process leading to Confirmation, including the overwhelming support of holders of Claims in the Voting Classes for the Plan, and the transactions to be implemented pursuant thereto. These Chapter 11 Cases were filed, and the Plan was proposed, with the legitimate purpose of allowing the Debtors to reorganize and emerge from bankruptcy with a capital and organizational structure that will allow them to conduct their businesses and satisfy their obligations with sufficient liquidity and capital resources. The Plan is the product of good faith, arm's length negotiations by and among the Debtors, the parties to the Restructuring Support Agreement and the Creditors' Committee, among others.

Y.     **Satisfaction of Confirmation.** Based on the foregoing and the findings contained in Article IX of the Plan, the Debtors, as proponents of the Plan, have met their burden of proving by a preponderance of the evidence, which is the applicable evidentiary standard for Confirmation, that the Plan satisfied all applicable elements of sections 1129(a) and 1129(b) of the Bankruptcy Code required for Confirmation.

15

## ORDER

IT IS HEREBY ORDERED THAT:

### I.  Approval of the Disclosure Statement

1.      The Disclosure Statement and the Solicitation Materials are approved on a final basis pursuant to section 1125 of the Bankruptcy Code.  Any and all remaining objections or reservations of rights with respect to the Disclosure Statement that have not been withdrawn or resolved as of the entry of this Confirmation Order are hereby overruled in their entirety on the merits.

### II.  Confirmation of the Plan

2.      The Plan is confirmed pursuant to section 1129 of the Bankruptcy Code.

3.      Any and all objections to the Plan that have not been withdrawn or resolved on the merits as of the entry of this Confirmation Order are hereby overruled in their entirety on the merits.

4.      The documents contained in the Plan Supplement are integral to the Plan and are approved by the Court and the Debtors and the Reorganized Debtors (as applicable) are authorized to take all actions required under the Plan and the Plan Supplement documents to effectuate the Plan, the Plan Supplement and the Restructuring Transactions, including, for the avoidance of doubt, the issuance of any new equity interests as contemplated by the Plan.

5.      The terms of the Plan, the Plan Supplement, the Milestone Settlement Order and the exhibits thereto are incorporated herein by reference, and are an integral part of this Confirmation Order.  The terms of the Plan, the Plan Supplement, the Milestone Settlement Order, all exhibits thereto, and all other relevant and necessary documents shall be effective and binding as of the Effective Date on all parties in interest, including the Debtors, the Reorganized Debtors and all holders of Claims and Interests.  The failure to specifically include or refer to any particular

16

article, section, or provision of the Plan, the Plan Supplement, the Milestone Settlement Order or any related document in this Confirmation Order does not diminish or impair the effectiveness or enforceability of such article, section, or provision.

6.      The compromises and settlements set forth in the Plan are approved, and will be effective immediately and binding on all parties in interest on the Effective Date.

7.      The Debtors shall cause to be served a notice of the entry of this Confirmation Order and occurrence of the Effective Date, substantially in form attached hereto as **Exhibit B** (the "Confirmation Notice"), upon (a) all parties listed in the creditor matrix maintained by Prime Clerk LLC and (b) such additional persons and entities as deemed appropriate by the Debtors, no later than five (5) business days after the Effective Date.  The Debtors shall cause the Confirmation Notice to be published in the *Wall Street Journal* and the *Houston Chronicle* within seven (7) business days after the Effective Date.

## III.   Releases by the Debtors

8.      The following release by the Debtors in Section VIII.B of the Plan is approved:

> Pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, on and after the Effective Date, each Released Party is deemed fully, conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by the Debtors, the Reorganized Debtors, their Estates, and any person seeking to exercise the rights of the Estates, including any successors to the Debtors or any Estates representative appointed or selected pursuant to section 1123(b)(3) of the Bankruptcy Code from any and all Causes of Action, including any derivative claims asserted on behalf of the Debtors, that the Debtors, the Reorganized Debtors, or their Estates, including any successors to the Debtors or any Estates representative appointed or selected pursuant to section 1123(b)(3) of the Bankruptcy Code, would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or Interest, or that any Holder of any Claim or Interest could have asserted on behalf of the Debtors, based on or relating to, or in any manner arising from, in whole or in part:
>
> 1.      the Debtors, the business or contractual arrangement between the Debtors and any Released Party, any Securities issued by the Debtors and the ownership thereof, the Debtors' in- or out-of-court restructuring efforts, the 2019

17

Term Loan Facility, the Compensation and Benefit Programs, intercompany transactions, or the formulation, preparation, dissemination, negotiation, or Filing of the Restructuring Support Agreement, the Plan, the Disclosure Statement, Rights Offering Procedures, or any other Restructuring Documents;

2. any Restructuring Transaction, contract, instrument, release, or other agreement or document (including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or this Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Restructuring Support Agreement, the Original RSA, the Original DIP Commitment Letter, the Initial Amended RSA, the Disclosure Statement, or the Plan, including the Rights Offering, the Backstop Commitment Agreement, the DIP Facility, the Exit Facility, the Amended and Restated 2019 Term Loan Facility, or any other Restructuring Documents;

3. the Chapter 11 Cases, the Disclosure Statement, the Plan, the Filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the solicitation of votes with respect to the Plan, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan or the Rights Offering, or the distribution of property under the Plan or any other related agreement with respect to the foregoing; or

4. any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date, including all Avoidance Actions or other relief obtained by the Debtors in the Chapter 11 Cases.

Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (i) any claims related to any act or omission that is determined in a Final Order to have constituted willful misconduct, gross negligence, or actual fraud, (ii) the rights of any current employee of the Debtors under any employment agreement or plan, (iii) the rights of the Debtors with respect to any confidentiality provisions or covenants restricting competition in favor of the Debtors under any employment agreement with a current or former employee of the Debtors, (iv) any post-Effective Date obligations of any party or Entity under the Plan, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, (v) the rights of Holders of Allowed Claims to receive distributions under the Plan, (vi) any Cause of Action the Debtors may have against Columbia Helicopters, Inc. and its Related Parties, or (vii) any Cause of Action the Debtors may have against any of their former officers or directors as of the Petition Date in respect of payments made and referenced under any separation, retirement, consulting agreement, employment agreement or plan.

Entry of this Confirmation Order constitutes the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the foregoing release, which includes by reference each of the related provisions and definitions contained herein, and further, constitutes the Bankruptcy Court's finding that the foregoing release is: (i) in exchange for the good and valuable consideration provided by the Released Parties; (ii) a good faith settlement and compromise of the Claims released; (iii) in the best interest of the Debtors and their Estates; (iv) fair, equitable, and reasonable; and (v) given and made after due notice and opportunity for hearing.

## IV. Releases by Holders of Claims and Interests.

9. The following release by Holders of Claims and Interests in Section VIII.C of the Plan is approved:

As of the Effective Date, except as otherwise provided herein, each Releasing Party is deemed to have fully, conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged each Debtor, Reorganized Debtor, and Released Party from any and all Causes of Action, including any derivative claims asserted on behalf of the Debtors, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part:

1. the Debtors, the business or contractual arrangement between the Debtors and any Releasing Party, any Securities issued by the Debtors and the ownership thereof, the Debtors' in- or out-of-court restructuring efforts, the 2019 Term Loan Facility, the Compensation and Benefit Programs, intercompany transactions, or the formulation, preparation, dissemination, negotiation, or Filing of the Restructuring Support Agreement, the Plan, the Disclosure Statement, Rights Offering Procedures, or any other Restructuring Documents;

2. any Restructuring Transaction, contract, instrument, release, or other agreement or document (including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or this Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Restructuring Support Agreement, the Original RSA, the Original DIP Commitment Letter, the Initial Amended RSA, the Disclosure Statement, or the Plan, including the Rights Offering, the Backstop Commitment Agreement, the DIP Facility, the Exit Facility, the Amended and Restated 2019 Term Loan Facility, or any other Restructuring Documents;

3. the Chapter 11 Cases, the Disclosure Statement, the Plan, the Filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the solicitation of votes with respect to the Plan, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan or the Rights Offering, or the

19

distribution of property under the Plan or any other related agreement with respect to the foregoing; or

       4.      any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date, including all Avoidance Actions or other relief obtained by the Debtors in the Chapter 11 Cases.

Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (i) any claims related to any act or omission that is determined in a Final Order to have constituted willful misconduct, gross negligence, or actual fraud, (ii) the rights of any current employee of the Debtors under any employment agreement or plan, (iii) the rights of the Debtors with respect to any confidentiality provisions or covenants restricting competition in favor of the Debtors under any employment agreement with a current or former employee of the Debtors, (iv) any post-Effective Date obligations of any party or Entity under the Plan, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, (v) the rights of Holders of Allowed Claims to receive distributions under the Plan, (vi) any Cause of Action the Debtors may have against Columbia Helicopters, Inc. and its Related Parties, or (vii) any Cause of Action the Debtors may have against any of their former officers or directors as of the Petition Date in respect of payments made and referenced under any separation, retirement, consulting agreement, employment agreement or plan.

Entry of this Confirmation Order constitutes the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the foregoing release, which includes by reference each of the related provisions and definitions contained herein, and further, constitutes the Bankruptcy Court's finding that the foregoing release is: (i) in exchange for the good and valuable consideration provided by the Released Parties; (ii) a good faith settlement and compromise of the Claims released; (iii) in the best interest of the Debtors and their Estates; (iv) fair, equitable, and reasonable; and (v) given and made after due notice and opportunity for hearing.

## V.    Exculpation.

10.    The following exculpation of the Exculpated Parties in Section VIII.D of the Plan is approved:

Except as otherwise specifically provided in the Plan, no Exculpated Party shall have or incur, and each Exculpated Party is hereby released and exculpated from any Cause of Action for any claim related to any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, Filing, or termination of the Restructuring Support Agreement and related prepetition transactions (including the 2019 Term Loan Facility Credit Agreement), the Original RSA, the Original

20

DIP Commitment Letter, the Initial Amended RSA, the Disclosure Statement, the Plan, the Rights Offering, the Rights Offering Procedures, the Backstop Commitment Agreement, the DIP Facility, the Exit Facility, the Amended and Restated 2019 Term Loan Facility, any other Restructuring Documents, or any Restructuring Transaction, contract, instrument, release or other agreement or document created or entered into in connection with the Disclosure Statement or the Plan, the Filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance of Securities pursuant to the Plan or the Rights Offering, or the distribution of property under the Plan or any other related agreement with respect to the foregoing, except for claims related to any act or omission that is determined in a Final Order to have constituted actual fraud, willful misconduct, or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan. The Exculpated Parties have, and upon completion of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of, and distribution of, consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

## VI. Injunction.

11. The following injunction in Section VIII.E of the Plan is approved:

Except as otherwise expressly provided in the Plan or for obligations or distributions issued or required to be paid pursuant to the Plan or this Confirmation Order, all Entities that have held, hold, or may hold Claims or Interests that have been released pursuant to the Plan, discharged pursuant to the Plan, or are subject to exculpation pursuant to the Plan, are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Reorganized Debtors, or the Released Parties or the Exculpated Parties: (i) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests; (ii) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such Claims or Interests; (iii) creating, perfecting, or enforcing any lien or encumbrance of any kind against such Entities or the property or the estates of such Entities on account of or in connection with or with respect to any such Claims or Interests; (iv) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such Claims or Interests unless such Entity has timely asserted such setoff right in a document Filed with the Bankruptcy Court explicitly preserving such setoff, and notwithstanding an indication of a claim or interest or otherwise that such Entity

21

asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (v) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests released or settled pursuant to the Plan.

**VII.    Implementation of Other Necessary Documents and Agreements**

12.    The Debtors and the Reorganized Debtors, as applicable, are authorized, without further notice to, or action, order or approval of this Court or any other Person, to execute and deliver all agreements, documents, instruments and certificates relating to such documents and agreements and to perform their obligations thereunder, including, without limitation, to pay all fees, costs and expenses thereunder in accordance with the Plan. The terms and conditions of such documents and agreements are reaffirmed or approved, as applicable, and shall, upon completion of documentation and execution, be valid, binding and enforceable.

**VIII.   Plan Distributions**

13.    The Debtors are authorized to make all Plan Distributions pursuant to the terms of the Plan and to pay any other applicable fees and expenses approved by any other order of this Bankruptcy Court.

**IX.    Rights Offering**

14.    On the Effective Date, Reorganized Bristow Parent shall consummate the Rights Offering in accordance with the Rights Offering Procedures set forth in the Solicitation Procedures Order and the Plan.

**X.    No Action Required**

15.    Under section 1142(b) of the Bankruptcy Code and applicable nonbankruptcy law, including section 303 of the General Corporation Law of the State of Delaware and any comparable provision of the business organization laws of any other jurisdiction, as applicable, no action of the directors, partners, managers, members, stockholders or equity holders of the Debtors

22

or the Reorganized Debtors, as applicable, is required to authorize the Debtors and the Reorganized Debtors, as applicable, to enter into, execute, deliver, file, adopt, amend, restate, consummate, or effectuate, as the case may be, the Plan and any contract, instrument, or other document to be executed, delivered, adopted, or amended in connection with the implementation of the Plan and following the Effective Date, each of the Restructuring Documents, including the New Organizational Documents, will be a legal, valid, and binding obligation of the Debtors or Reorganized Debtors, as applicable, enforceable against the Debtors and the Reorganized Debtors in accordance with the respective terms thereof.

16. Subject to the terms of the RSA and the Backstop Commitment Agreement, the Debtors are also authorized from and after the date hereof to negotiate, execute, issue, deliver, implement, file, or record any contract, instrument, release, or other agreement or document or take any action necessary or appropriate to implement the transactions contemplated by the Plan, including those set forth in the Restructuring Transactions Exhibit attached as Exhibit L to the Plan Supplement, including, among other things, any merger, transfer, liquidation, or consolidation of any of the Debtors or their non-Debtor subsidiaries or their assets.

17. This Confirmation Order shall constitute all authority, approvals, and consents required, if any, by the laws, rules, and regulations of all states and any other governmental authority or any contract to which any of the Debtors are party with respect to the implementation or consummation of the Plan and any documents, instruments, or agreements, and any amendments or modifications thereto, and any other acts and transactions referred to in or contemplated by the Plan, the Plan Supplement, the Disclosure Statement, and any documents, instruments, securities, or agreements provided for therein, and any amendments or modifications thereto.

## XI. Cancellation of Instruments and Release of Liens

18.    Except as otherwise provided in the Plan, the Milestone Settlement Order or any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement, on the Effective Date, (a) all notes, instruments, Certificates, and other documents evidencing Claims or Interests, including the Indentures, (b) if the Debtors enter into the Exit Facility, the 2019 Term Loan Credit Agreement, and (c) any other credit agreements and indentures, shall be terminated and canceled and the obligations of the Debtors thereunder or in any way related thereto shall be deemed satisfied in full and discharged and, subject to Article IV.M of the Plan, the Indenture Trustees and, if applicable, 2019 Term Loan Facility Agent shall be released from all duties thereunder without any need for further action or approval by the Bankruptcy Court or any Holder or other person, *provided that* the Indentures and, if applicable, the 2019 Term Loan Credit Agreement shall survived the occurrence of the Effective date and continue in effect solely to the extent set forth in Article IV.M of the Plan.

## XII. Release of Liens

19.    Except as otherwise specifically provided in the Plan, the Milestone Settlement Order, the Exit Facility Credit Agreement or the Amended and Restated 2019 Term Loan Credit Agreement, as applicable, the Amended PK Air Credit Facility Agreement or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, and except with respect to Secured Claims that are Reinstated pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released and discharged, and all of the right, title, and interest of any holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall

24

revert to the Reorganized Debtors and their successors and assigns, in each case, without any further approval or order of the Bankruptcy Court and without any action or filing being required to be made by the Debtors or the Reorganized Debtors, or any other Holder of a Secured Claim. In addition, at the sole expense of the Debtors or the Reorganized Debtors, the Holders of Secured Claims shall execute and deliver all documents reasonably requested by the Debtors, Reorganized Debtors or administrative agent for the Exit Facility to evidence the release of such mortgages, deeds of trust, Liens, pledges, and other security interests and shall authorize the Reorganized Debtors and their designees to file UCC-3 termination statements and other release documentation (to the extent applicable) with respect thereto.

## XIII.    Exemption from Registration

20.    The offering, issuance, and distribution of any Securities pursuant to the Plan, including the New Stock, shall be exempt from the registration requirements of section 5 of the Securities Act or any similar federal, state, or local law in reliance on (1) with respect to the New Common Stock issued as part of the Unsecured Common Equity Pool, or in connection with the 1145 Rights Offering, section 1145 of the Bankruptcy Code or, only to the extent such exemption under section 1145 of the Bankruptcy Code is not available, any other available exemption from registration under the Securities Act, (2) with respect to the New Common Stock and New Preferred Stock issued in connection with the 4(a)(2) Rights Offering, and all Unsubscribed Shares of New Common Stock and New Preferred Stock issued to the Backstop Commitment Parties pursuant to the Backstop Commitment Agreement (other than shares of New Common Stock and New Preferred Stock issued on account of the Backstop Commitment Fee), section (4)(a)(2) of the Securities Act or Regulation D promulgated thereunder and (3) with respect to the New Common Stock and New Preferred Stock issued on account of (x) the Backstop Commitment Fee, (y)

25

Equitization Allocation New Common Stock and Equitization Allocation New Preferred Stock, and (z) the Equitization Consent Fee, section 1145 of the Bankruptcy Code.

21.　　Pursuant to section 1145 of the Bankruptcy Code, the New Common Stock issued under the Plan as part of the Unsecured Common Equity Pool, or in connection with the 1145 Rights Offering, or the New Stock issued on account of the Backstop Commitment Fee, the Equitization Allocation New Common Stock, the Equitization Allocation New Preferred Stock, and the Equitization Consent Fee, may be sold without registration under the Securities Act by the recipients thereof, subject to: (1) the provisions of section 1145(b)(1) of the Bankruptcy Code relating to the definition of an underwriter in section 2(a)(11) of the Securities Act and compliance with any applicable state or foreign securities laws, if any, and the rules and regulations of the SEC, if any, applicable at the time of any future transfer of such Securities or instruments; (2) any other applicable regulatory approval; and (3) the transfer restrictions set forth in the New Shareholders' Agreement and the New Organizational Documents, if any.  All shares of New Common Stock and New Preferred Stock issued on account of (x) the Backstop Commitment Fee, (y) the Equitization Allocation New Common Stock and Equitization Allocation New Preferred Stock, and (z) the Equitization Consent Fee, will be issued without registration under the Securities Act or any similar federal, state, or local law in reliance on section 1145 of the Bankruptcy Code. All New Common Stock and New Preferred Stock issued in connection with the 4(a)(2) Rights Offering, and all Unsubscribed Shares of New Common Stock and New Preferred Stock issued to the Backstop Commitment Parties pursuant to the Backstop Commitment Agreement (other than shares of New Common Stock and New Preferred Stock issued on account of the Backstop Commitment Fee), will be issued without registration under the Securities Act or any similar

26

federal, state, or local law in reliance on section 4(a)(2) of the Securities Act or Regulation D promulgated thereunder.

22. Persons who purchase the New Common Stock or the New Preferred Stock pursuant to the exemption from registration set forth in section 4(a)(2) of the Securities Act or Regulation D promulgated thereunder will hold "restricted securities." Resales of such restricted securities would not be exempted by section 1145 of the Bankruptcy Code from registration under the Securities Act or other applicable law. Holders of restricted securities would, however, be permitted to resell New Common Stock or New Preferred Stock without registration if they are able to comply with the applicable provisions of Rule 144 or Rule 144A or any other exemption from registration under the Securities Act, or if such securities are registered with the Securities and Exchange Commission.

## XIV. Enforceability of Plan

23. Pursuant to sections 1123(a) and 1142(a) of the Bankruptcy Code, upon the Effective Date, the provisions of this Confirmation Order and the Plan shall apply and be binding and enforceable notwithstanding any otherwise applicable nonbankruptcy law.

## XV. Reservation of Rights of the United States

24. As to the United States of America, its agencies, departments, or agents (collectively, the "United States"), notwithstanding anything to the contrary in this Confirmation Order, the Plan, the Plan Supplement or the Disclosure Statement, as to the United States, nothing in the Confirmation Order, Plan, or Disclosure Statement shall: (1) affect or impair the rights of the United States to assert setoff and recoupment and such rights (and the Debtors' defenses and any corresponding setoff and recoupment rights of the Debtors) are expressly preserved; (2) affect or impair the exercise of the United States' police and regulatory powers against the Debtors, the Reorganized Debtors, or any non-Debtor; (3) be construed as a compromise or settlement of any

27

claim, liability, suit, cause of action, or interest of the United States; (4) release, enjoin, or discharge any non-Debtor from any claim, liability, suit, or cause of action of the United States nor shall anything in the Confirmation Order, the Plan, the Plan Supplement or the Disclosure Statement enjoin the United States from bringing any claim, suit, cause of action, or other proceeding against any non-Debtor for any liability whatsoever; or (5) shall affect or impair any rights or causes of action that the United States has or may have against any surety under any Customs or other bond pursuant to applicable non-bankruptcy law, nor shall anything in the Confirmation Order, the Plan, the Plan Supplement or the Disclosure Statement preclude or prohibit the ability of the United States to make demand on, be paid by, or otherwise pursue any surety that is jointly and severally liable for any debt owed to the United States; provided that nothing in this paragraph shall affect in any way any release by the Debtors, Reorganized Debtors, their Estates, any person exercising the rights of the Estates, or any successor to the Estates of the Released Parties provided for in Article VIII.B of the Plan.

25. No provision in the Plan or this Confirmation Order relieves the Debtors or the reorganized Debtors from their obligation to comply with the Communications Act of 1934, as amended, and the rules, regulations and orders promulgated thereunder by the Federal Communications Commission ("FCC"). No transfer of any FCC license or authorization held by the Debtors or transfer of control of the Debtors, or transfer of control of a FCC licensee controlled by the Debtors shall take place prior to the issuance of FCC regulatory approval for such transfer pursuant to applicable FCC regulations. The FCC's rights and powers to take any action pursuant to its regulatory authority including, but not limited to, imposing any regulatory conditions on any of the above described transfers, are fully preserved, and nothing herein shall proscribe or constrain the FCC's exercise of such power or authority.

### XVI.  Louisiana Department of Revenue

26.  A failure by any Debtor or Reorganized Debtor to make a payment due under the Plan or pay any tax due for any post-Confirmation tax period to the Louisiana Department of Revenue ("LDR") shall be an "Event of Default".  LDR will give the Debtor written notice of the Event of Default ("Notice of Default") at the address listed on the Debtor's most recent filed tax return, with a copy to the Debtors' counsel, provided however, that the failure to declare an Event of Default at the time of occurrence not constitute a waiver by LDR of its right to declare that the Debtor is in default.  If the Debtor fails to cure the default within twenty (20) days after receipt of Notice of Default, LDR may (a) enforce the entire amount of its Claim; (b) exercise any and all rights and remedies allowed under state law or any other applicable non-bankruptcy law; and/or (c) seek such relief as my be available from a court of applicable jurisdiction.  Any Allowed Administrative Claims of LDR not timely paid in accordance with applicable law shall include interest at the applicable statutory rate of the State of Louisiana.  Notwithstanding anything in the Plan or the Confirmation Order to the contrary, (i) LDR's setoff rights, if any, are preserved, (ii) the Plan does not release any third party non-Debtor entity for any liability owed to LDR with respect to Sales or Withholding Taxes imposed pursuant to La. R.S. 47:1561:1.

27.  For the avoidance of doubt, pursuant to section 503(b)(1)(D), LDR is not required to file a request for the payment of an expense described in sections 503(b)(1)(B) or (C) as a condition of its being an Allowed Administrative Expense Claim.  Additionally, for the avoidance of doubt, notwithstanding anything in the Plan or the Confirmation Order to the contrary, on and after the Effective Date, LDR is permitted to amend a previously timely filed proof of claim to the extent it relates back to such previously filed proof of claim.  The Reorganized Debtors' rights to dispute any such amendment are preserved.

28.     Notwithstanding anything in the Plan to the contrary, the Bankruptcy Court's retention of jurisdiction with respect to LDR's prepetition claim(s) shall be limited to (i) resolving the amount of and all other matters with respect to any tax claim arising prior to Confirmation, and (ii) enforcing any discharge provision of the Plan.  Subject to section 505 of the Bankruptcy Code, the Bankruptcy Court retains exclusive jurisdiction to address all matters pertaining to any LDR Claim arising prior to Confirmation.

## XVII.  Management Incentive Plan

29.     Reorganized Bristow Parent is authorized to implement the Management Incentive Plan to the extent provided for in the Plan.

## XVIII. Exit Facility and Amended Debt Facilities

30.     The Reorganized Debtors are hereby authorized to enter into, on the Effective Date, and take such actions as necessary or desirable to perform under either of the Exit Facility and the Amended and Restated 2019 Term Loan Facility and, in each case, all documents or agreements related thereto, including the payment or reimbursement of any fees, indemnities and expenses under or pursuant to any such documents and agreements in connection therewith.  In addition, to the extent not entered into by the Debtors prior to the Effective Date, the Reorganized Debtors are hereby authorized to enter into the Amended PK Air Loan Documents and the amendments to the Macquarie Term Loan Documents provided for in the Macquarie Settlement (the "Amended Macquarie Term Loan Credit Facility"), all transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred and fees paid by the Reorganized Debtors in connection therewith.

31.     The Debtors shall continue and complete the Exit Facility marketing process in accordance with the terms of the Plan and the Restructuring Support Agreement.  In the event that the Exit Facility marketing process is not successfully completed, the Debtors shall provide for the

treatment of the 2019 Term Loan Facility Claims in accordance with Article III.B.3.b.ii of the Plan, provided that any Amended and Reinstated 2019 Term Loan Credit Agreement shall be acceptable to the "Required Lenders" (as defined in the 2019 Term Loan Facility), the Required Supporting Secured Noteholders (as defined in the Restructuring Support Agreement) and the Required Backstop Parties (as defined in the Restructuring Support Agreement) and shall be subject to the Committee Consent Right.

32. The lenders under the Exit Facility or the Amended and Restated 2019 Term Loan Facility, as applicable, the Amended PK Air Credit Facility Agreement and the Amended Macquarie Term Loan Documents, shall have valid, binding, and enforceable Liens on the Collateral (or other property identified as "Collateral" therein) specified in, and to the extent required by, the Exit Facility Documents or the Amended and Restated 2019 Term Loan Documents, as applicable, the Amended PK Air Loan Documents and the Amended Macquarie Term Loan Documents, as applicable, *provided that* no such Liens shall apply to those certain certificates of deposit assigned to Hancock Whitney Bank designated as CD# 707747 which secures Letter of Credit #7348399 in the amount of $195,000.00; CD# 707748 which secures Letter of Credit #5512899 in the amount of $235,000.00; CD# 707749 which secures Letter of Credit #3874799 in the amount of $250,000.00; and CD# 727158 which secures its card account, whose last four digits are #2374 in the amount of $112,000.00, as well as CD# 727161 which secures its card account, whose last four digits are #6554 in the amount of $70,000.00.

33. To the extent granted, the guarantees, mortgages, pledges, Liens and other security interests granted pursuant to either the Exit Facility Documents or the Amended and Restated 2019 Term Loan Documents, as applicable, the Amended PK Air Loan Documents and the Amended Macquarie Loan Documents are granted in good faith as an inducement to the lenders under either

the Exit Facility or the Amended and Restated 2019 Term Loan Facility, as applicable, the Amended PK Air Loan Documents and the Amended Macquarie Term Loan Documents to extend credit thereunder and shall be deemed not to constitute a fraudulent conveyance or fraudulent transfer, shall not otherwise be subject to avoidance, recharacterization, or subordination (whether contractual or otherwise) for any purposes whatsoever, and the priorities of any such Liens and security interests shall be as set forth in the relevant Exit Facility Documents or the Amended and Restated 2019 Term Loan Documents, as applicable, the Amended PK Air Loan Documents and the Amended Macquarie Term Loan Credit Facility. The Reorganized Debtors and the persons and entities granted such Liens are authorized to make all filings and recordings, and to obtain all governmental approvals and consents necessary to establish and perfect such Liens under the provisions of the applicable state, provincial, federal, or other law (whether domestic or foreign) that would be applicable in the absence of the Plan and this Confirmation Order, and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such Liens to third parties.

## XIX. Executory Contracts and Unexpired Leases

34. Unless otherwise assumed or rejected pursuant to an order of the Court (including the Milestone Settlement Order and the Macquarie Settlement Order) entered prior to the Effective Date, on the Effective Date, each Executory Contract and Unexpired Lease shall be deemed assumed pursuant to section 365 of the Bankruptcy Code, unless such Executory Contract or Unexpired Lease is listed on the Schedule of Rejected Executory Contracts and Unexpired Leases. The assumption of Executory Contracts and Unexpired Leases may include the assignment of certain of such contracts to Affiliates.

35. All of the Debtors' insurance policies and any agreements, documents, or instruments relating thereto, including the D&O Liability Insurance Policies, are treated as and

32

deemed to be Executory Contracts under the Plan, and shall also be deemed assumed as of the Effective Date.  Notwithstanding any other provisions of the Plan or the Confirmation Order, with respect to their insurance policies, the Debtors are authorized to: (i) pay all insurance obligations in connection with their insurance, (ii) maintain and administer their insurance policies and honor and pay all claims, including but not limited to deductible amounts and self-insured retention amounts, and other costs and expenses related thereto, whether arising prior to or after the Petition Date and (iii) pay any undisputed prepetition amounts that are later determined to be due and owing as a result of an audit, including any additional fees and costs imposed as a result of any audit.

36.     To the extent the Debtors assume the Debtors' self-funded employee health benefits plan ("Health Plan") and that certain Master Services Agreement No. MSA-476690 dated January 1, 2010 (the "Master Services Agreement"), through which Aetna Life Insurance Company ("Aetna") administers the Health Plan, Aetna's rights are hereby reserved to recover from the Debtors and Reorganized Debtors all amounts that become due to Aetna in the ordinary course under the Health Plan and the Master Services Agreement.  This reservation includes without limitation, Aetna's right to recover from the Debtors and Reorganized Debtors all amounts under the Health Plan and/or the Master Services Agreement which have been accrued but not yet submitted to or processed by Aetna, without regard to whether the dates of service for such benefits were prior to or after the Effective Date.

37.     The Backstop Commitment Agreement and the Restructuring Support Agreement, which are hereby approved on a final basis, shall also be assumed on the Effective Date.

38.     Contracts and leases entered into after the Petition Date by any Debtor, including any Executory Contracts and Unexpired Leases assumed under section 365 of the Bankruptcy Code, shall survive and remain unaffected.

33

39.     If certain, but not all, of a contract counterparty's Executory Contracts and/or Unexpired Leases are assumed pursuant to the Plan, such counterparty's Executory Contracts and/or Unexpired Leases that are being rejected pursuant to the Plan are deemed severable agreements that are not integrated with those Executory Contracts and/or Unexpired Leases that are being assumed pursuant to the Plan.

**XX.     BRS Investor Group**

40.     For purposes of the third-party release set forth in Article VIII.C and solely with respect to securities class action claims that have been asserted against the previously named Individual Defendants (the "Named Defendants") in the securities litigation styled: *In re Bristow Group Inc. Securities Litigation*, Case No. 19-cv-00509 (KPE), in the United States District Court for the Southern District of Texas, Houston Division ("Securities Litigation"), the term "Releasing Parties" shall not include Persons or Entities that purchased or otherwise acquired Existing Interests between February 8, 2018 and February 12, 2019, inclusive, that are seeking to pursue remedies under the Securities Exchange Act of 1934  (collectively, the "Securities Class Members"), provided that (i) any recovery, if any, under or payment of proceeds of or settlement in such action or on account of such Claims is limited solely to amounts recoverable under the D&O Liability Insurance Policies, (ii) the Securities Class Members shall be deemed to have waived any portion of any judgment that would (a) otherwise have to be satisfied by (x) an unexhausted self-insured retention or deductible payable by the Debtors or (y) the Named Defendants personally or their assets, or (b) otherwise not be covered by the D&O Liability Insurance Policies, (iii) the Securities Class Members shall not seek, and shall not be entitled to, any recovery from the Debtors, the Estates, the Reorganized Debtors and/or the assets of any of the foregoing other than the D&O Liability Insurance Policies; (iv) nothing in this paragraph shall affect the Debtors' release of the Named Defendants pursuant to Article VIII.B of the Plan, it being

34

understood that the Securities Class Members shall be enjoined from asserting or prosecuting any derivative claim by or on behalf of the Debtors or the Reorganized Debtors, and (v) all proofs of claim filed by the Securities Class Members or their counsel, including without limitation Proof of Claim No. 107, filed in the name "BRS Investor Group, as Lead Plaintiff in the Consolidated Action (as set forth in the Addendum)" are hereby deemed withdrawn with prejudice except as provided for in this first sentence of this paragraph. For the avoidance of doubt, all claims and defenses of the Debtors, the Reorganized Debtors, the Named Defendants and the insurers under the D&O Liability Insurance Policies are preserved and the inclusion of this paragraph in the Confirmation Order is not a determination of any claim or issue in the Securities Litigation. For the further avoidance of doubt, nothing in this paragraph shall give rise to or provide a basis for the Named Defendants to assert a general unsecured claim against any of the Debtors in the Chapter 11 Cases.

41. Nothing in the Plan or Confirmation Order shall (a) constitute a finding or stipulation that any proceeds of any of the D&O Liability Insurance Policies are property of the Estate, (b) modify or supersede any provision (including but not limited to any priority of payments provision) of any of the D&O Liability Insurance Policies, or (c) otherwise preclude any Person entitled to coverage under the D&O Liability Insurance Policies from seeking recovery under or payment of proceeds of any such D&O Liability Insurance Policy in accordance with the terms thereof.

## XXI. Miscellaneous

42. After the Effective Date, the Debtors or Reorganized Debtors, as applicable, shall have no obligation to file with the Court or serve on any parties reports that the Debtors or Reorganized Debtors, as applicable, were obligated to file under the Bankruptcy Code or a Court order, including monthly operating reports (even for those periods for which a monthly operating

report was not filed before the Effective Date), ordinary course professional reports, reports to any parties otherwise required under the "first" and "second" day orders entered in these Chapter 11 Case, including the Final Cash Collateral Order and the DIP Order, and monthly or quarterly reports for Professionals; provided, however, that the Debtors or Reorganized Debtors, as applicable, will comply with the U.S. Trustee's quarterly reporting requirements.

43. On the Effective Date (or, to the extent not known or submitted to the Debtors for payment as of the Effective Date, promptly following receipt of an invoice therefor, whether incurred before or after the Effective Date) and to the extent invoiced in accordance with the terms of applicable engagement letter (and, for the avoidance of doubt, no invoices be required to include itemized time detail), the Debtors or the Reorganized Debtors, as applicable, shall pay all Transaction Expenses not previously paid pursuant to an order of the Bankruptcy Court in accordance with the Article XIII.F of the Plan.

44. Except as otherwise set forth herein, this Court retains jurisdiction over all matters arising out of or related to these Chapter 11 Cases and the Plan, including the matters set forth in Article XI of the Plan.

45. Notwithstanding the possible applicability of Bankruptcy Rules 6004(g), 7062, 9014, or otherwise, the terms and conditions of this Confirmation Order shall be effective and enforceable immediately upon its entry. Each term and provision of the Plan, and the transactions related thereto as it heretofore may have been altered or interpreted by the Court is: (a) valid and enforceable pursuant to its terms; (b) integral to the Plan and may not be deleted or modified except as provided by the Plan or this Confirmation Order; and (c) nonseverable and mutually dependent.

46. Subject to the terms of the Plan, the Restructuring Support Agreement, and the Backstop Commitment Agreement, respectively, the Debtors are hereby authorized to amend or

37

modify the Plan at any time prior to the substantial consummation of the Plan, but only in accordance with section 1127 of the Bankruptcy Code and Article X.A of the Plan, without further order of this Court.

47.    Notwithstanding Bankruptcy Rule 3020(e), the terms and conditions of this Confirmation Order will be effective and enforceable immediately upon its entry.

Houston, Texas
Date: _____, 2019

_____
DAVID R. JONES
UNITED STATES BANKRUPTCY JUDGE

**<u>Exhibit A</u>**

**Plan**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| BRISTOW GROUP INC., *et al.*,[1] | ) | Case No. 19-32713 (DRJ) |
|  | ) |  |
| Debtors. | ) | Jointly Administered |
|  | ) |  |

**AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION OF**
**BRISTOW GROUP INC. AND ITS DEBTOR AFFILIATES, AS <u>FURTHER</u> MODIFIED**

James R. Prince, State Bar No. 00784791
Omar J. Alaniz, State Bar No. 24040402
Kevin Chiu, State Bar No. 24109723
**BAKER BOTTS L.L.P.**
2001 Ross Avenue, Suite 900
Dallas, Texas 75201-2980
Telephone: (214) 953-6500
Facsimile: (214) 953-6503
Email:     jim.prince@bakerbotts.com
                omar.alaniz@bakerbotts.com
                kevin.chiu@bakerbotts.com

-and-

Emanuel C. Grillo (*pro hac vice)*
Chris Newcomb (*pro hac vice*)
**BAKER BOTTS L.L.P.**
30 Rockefeller Plaza
New York, New York   10112-4498
Telephone: (212) 408-2500
Facsimile: (212) 408-2501
Email:     emanuel.grillo@bakerbotts.com
                chris.newcomb@bakerbotts.com

Richard G. Mason (*pro hac vice*)
Amy R. Wolf (*pro hac vice*)
**WACHTELL, LIPTON, ROSEN & KATZ**
51 West 52nd Street
New York, New York 10019
Telephone: (212) 403-1000
Facsimile: (212) 403-2000
Email:     rgmason@wlrk.com
                arwolf@wlrk.com

*Co-Counsel to the Debtors and Debtors in Possession*

Dated: September 30, 2019

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each debtor's federal tax identification number, are: Bristow Group Inc. (9819), BHNA Holdings Inc. (8862), Bristow Alaska Inc. (8121), Bristow Helicopters Inc. (8733), Bristow U.S. Leasing LLC (2451), Bristow U.S. LLC (2904), BriLog Leasing Ltd. (9764), and Bristow Equipment Leasing Ltd. (9303). The corporate headquarters and the mailing address for the Debtors listed above is 2103 City West Blvd., 4th Floor, Houston, Texas 77042.

**TABLE OF CONTENTS**

**Page**

INTRODUCTION ...................................................................................................................................4

**ARTICLE I. DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME, GOVERNING LAW, AND OTHER REFERENCES** ........................................................................4
    A.    *Defined Terms* ........................................................................................................4
    B.    *Rules of Interpretation* ........................................................................................24
    C.    *Computation of Time*..........................................................................................24
    D.    *Governing Law*....................................................................................................24
    E.    *Reference to Monetary Figures* ...........................................................................24
    F.    *Reference to the Debtors or the Reorganized Debtors*.........................................24
    G.    *Controlling Document*.........................................................................................25

**ARTICLE II. ADMINISTRATIVE AND PRIORITY CLAIMS**.........................................................25
    A.    *Administrative Claims*.........................................................................................25
    B.    *Professional Fee Claims* ......................................................................................25
    C.    *Priority Tax Claims*.............................................................................................26
    D.    *DIP Facility Claims* ............................................................................................26
    E.    *Statutory Fees* .....................................................................................................26

**ARTICLE III. CLASSIFICATION, TREATMENT, AND VOTING OF CLAIMS AND INTERESTS**.........27
    A.    *Classification of Claims and Interests* ................................................................27
    B.    *Treatment of Classes of Claims and Interests* .....................................................28
    C.    *Special Provision Governing Unimpaired Claims* ...............................................34
    D.    *Elimination of Vacant Classes* ...........................................................................34
    E.    *Voting Classes; Presumed Acceptance by Non-Voting Classes* ...........................34
    F.    *Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code* .................34
    G.    *Intercompany Interests*........................................................................................34
    H.    *Substantive Consolidation; GUC Cash Distribution Amount* ..............................35
    I.    *Subordinated Claims and Interests* .....................................................................35

**ARTICLE IV. PROVISIONS FOR IMPLEMENTATION OF THE PLAN**........................................35
    A.    *General Settlement of Claims, Interests, and Causes of Action* ...........................35
    B.    *Restructuring Transactions*..................................................................................35
    C.    *Employee and Retiree Benefits*............................................................................36
    D.    *Issuance and Distribution of New Stock* .............................................................36
    E.    *Determination of Holder Citizenship* ..................................................................36
    F.    *Rights Offering* ...................................................................................................37
    G.    *The Exit Facility, the Amended and Restated 2019 Term Loan Facility and the Amended PK Air Loan Documents* ...................................................................37
    H.    *Rights Offering Per Share Price* .........................................................................38
    I.    *Management Incentive Plan*.................................................................................38
    J.    *Management of Reorganized Bristow* ..................................................................38
    K.    *Exemption from Registration Requirements*........................................................38
    L.    *Vesting of Assets* .................................................................................................40
    M.    *Cancellation of Instruments, Certificates, and Other Documents*........................40
    N.    *Corporate Action* ...............................................................................................41
    O.    *Corporate Existence*............................................................................................41
    P.    *New Organizational Documents* ..........................................................................41
    Q.    *Effectuating Documents; Further Transactions*...................................................42
    R.    *Section 1146(a) Exemption* ................................................................................42
    S.    *Directors and Officers* ........................................................................................42

**TABLE OF CONTENTS (CONT'D)**

**Page**

T.    *Preservation of Causes of Action* .................................................................................43
U.    *Milestone Settlement* .................................................................................................43
V.    *Macquarie Settlement* ...............................................................................................43
W.   *Indenture Trustee Expenses* ......................................................................................44
X.    *Closing the Chapter 11 Cases* ..................................................................................44

**ARTICLE V. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES ......................44**
A.    *Assumption or Rejection of Executory Contracts and Unexpired Leases* ................44
B.    *Claims Based on Rejection of Executory Contracts or Unexpired Leases* ...............45
C.    *Cure of Defaults for Assumed Executory Contracts and Unexpired Leases* ...........45
D.    *Indemnification* ........................................................................................................46
E.    *Insurance Policies* ....................................................................................................46
F.    *Employee Compensation and Benefits* .....................................................................47
G.    *Contracts and Leases After the Petition Date* .........................................................48
H.    *Reservation of Rights* ................................................................................................48
I.    *Nonoccurrence of Effective Date* .............................................................................48

**ARTICLE VI. PROVISIONS GOVERNING DISTRIBUTIONS ........................................................48**
A.    *Distributions on Account of Claims and Interests Allowed as of the Effective Date*........48
B.    *Rights and Powers of the Distribution Agent* ..........................................................48
C.    *Special Rules for Distributions to Holders of Disputed Claims* ..............................49
D.    *Delivery of Distributions* ..........................................................................................49
E.    *Compliance with Tax Requirements/Allocations* .....................................................51
F.    *Claims Paid or Payable by Third Parties* ...............................................................51
G.    *Setoffs* .......................................................................................................................52
H.    *Indefeasible Distributions* ........................................................................................52
I.    *Allocation Between Principal and Accrued Interest* ................................................52

**ARTICLE VII. PROCEDURES FOR RESOLVING DISPUTED CLAIMS....................................52**
A.    *Allowance of Claims* .................................................................................................52
B.    *Claims Administration Responsibilities* ..................................................................53
C.    *Estimation of Claims* ................................................................................................53
D.    *Disputed Claims Reserve* ..........................................................................................53
E.    *Adjustment to Claims Without Objection* .................................................................54
F.    *Time to File Objections to Claims* ............................................................................54
G.    *Disallowance of Claims* ...........................................................................................54
H.    *Amendments to Claims* .............................................................................................55
I.    *No Distributions Pending Allowance* .......................................................................55
J.    *Distributions After Allowance* ..................................................................................55
K.    *Single Satisfaction of Claims* ...................................................................................55
L.    *Claims Consultation Rights* ......................................................................................55

**ARTICLE VIII. DISCHARGE, RELEASE, INJUNCTION AND RELATED PROVISIONS ........................55**
A.    ***Discharge of Claims and Termination of Interests*** .................................................55
B.    ***Releases by the Debtors*** ..........................................................................................56
C.    ***Releases by Holders of Claims and Interests*** .........................................................57
D.    ***Exculpation*** ..........................................................................................................58
E.    ***Injunction*** .............................................................................................................58
F.    *Protection Against Discriminatory Treatment* .........................................................59
G.    *Release of Liens* .......................................................................................................59
H.    *Reimbursement or Contribution*...............................................................................59
I.    *Recoupment*...............................................................................................................59
J.    *Subordination Rights*................................................................................................59
K.    *Reservation of Rights of the United States* ...............................................................60

**TABLE OF CONTENTS (CONT'D)**

**Page**

**ARTICLE IX. EFFECT OF CONFIRMATION OF THE PLAN** .......................................................................**60**
    A.    *Jurisdiction and Venue*.................................................................................60
    B.    *Order Approving the Disclosure Statement* .................................................61
    C.    *Voting Report* ..............................................................................................61
    D.    *Judicial Notice* ............................................................................................61
    E.    *Transmittal and Mailing of Materials; Notice* ...........................................61
    F.    *Solicitation* ..................................................................................................61
    G.    *Burden of Proof*...........................................................................................62
    H.    *Bankruptcy Rule 3016(a) Compliance* .........................................................62
    I.    *Compliance with the Requirements of Section 1129 of the Bankruptcy Code* ...............................62
    J.    *Securities Under the Plan* ...........................................................................67
    K.    *Releases and Discharges* .............................................................................67
    L.    *Release and Retention of Causes of Action*..................................................67
    M.    *Approval of Restructuring Support Agreement, Backstop Commitment Agreement and Other Restructuring Documents and Agreements*..............................67
    N.    *Confirmation Hearing Exhibits* ...................................................................67
    O.    *Objections to Confirmation of the Plan* .......................................................68
    P.    *Retention of Jurisdiction* .............................................................................68
    Q.    *Plan Supplement* .........................................................................................68

**ARTICLE X. CONDITIONS PRECEDENT TO THE EFFECTIVE DATE** ........................................**68**
    A.    *Conditions Precedent to the Effective Date* .................................................68
    B.    *Waiver of Conditions* ..................................................................................69
    C.    *Effect of Non-Occurrence of Conditions to Consummation* .........................69
    D.    *Substantial Consummation* .........................................................................69

**ARTICLE XI. MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN** ...........................**70**
    A.    *Modification of Plan* ...................................................................................70
    B.    *Effect of Confirmation on Modifications*......................................................70
    C.    *Revocation or Withdrawal of Plan*...............................................................70

**ARTICLE XII. RETENTION OF JURISDICTION**........................................................................**70**

**ARTICLE XIII. MISCELLANEOUS PROVISIONS**.......................................................................**72**
    A.    *Immediate Binding Effect*............................................................................72
    B.    *Restructuring Documents*.............................................................................72
    C.    *Additional Documents*.................................................................................72
    D.    *Dissolution of the Statutory Committees* ......................................................72
    E.    *Payment of Statutory Fees* ...........................................................................73
    F.    *Payment of Transaction Expenses* ................................................................73
    G.    *Reservation of Rights* ..................................................................................73
    H.    *Successors and Assigns* ...............................................................................73
    I.    *Service of Documents*..................................................................................73
    J.    *Term of Injunctions or Stays* .......................................................................75
    K.    *Entire Agreement* ........................................................................................75
    L.    *Plan Supplement* .........................................................................................75
    M.    *Non-Severability* .........................................................................................75
    N.    *Votes Solicited in Good Faith* ......................................................................75
    O.    *Waiver or Estoppel*......................................................................................76

**INTRODUCTION**

Bristow Group Inc. and its affiliated debtors and debtors in possession in the above-captioned chapter 11 cases propose this joint chapter 11 plan of reorganization pursuant to chapter 11 of title 11 of the United States Code. Capitalized terms used herein and not otherwise defined shall have the meanings ascribed to such terms in Article I.A hereof. Although proposed jointly for administrative purposes, the Plan constitutes a separate plan for each of the foregoing entities and each of the foregoing entities is a proponent of the Plan within the meaning of section 1129 of the Bankruptcy Code. The Plan does not contemplate substantive consolidation for any of the Debtors; *provided that* the Debtors and the Reorganized Debtors, as applicable, shall consolidate Allowed Claims into one Estate for purposes of distributions for Classes 8 and 12. The classification of Claims and Interests set forth in Article III of the Plan should be deemed to apply separately to each Debtor, as applicable.

Reference is made to the accompanying *Amended Disclosure Statement for the Amended Joint Chapter 11 Plan of Reorganization of Bristow Group Inc. and Its Debtor Affiliates, As Modified* for a discussion of the Debtors' history, business, properties and operations, valuation, projections, risk factors, a summary and analysis of the Plan and the transactions contemplated thereby, and certain related matters.

ALL HOLDERS OF CLAIMS AND INTERESTS, TO THE EXTENT APPLICABLE, ARE ENCOURAGED TO READ THIS PLAN AND THE DISCLOSURE STATEMENT IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THIS PLAN.

**ARTICLE I.**
**DEFINED TERMS, RULES OF INTERPRETATION,**
**COMPUTATION OF TIME, GOVERNING LAW, AND OTHER REFERENCES**

A.     *Defined Terms*

1.     "*1145 Eligible Holder*" means each Holder of a Claim (as of the Distribution Record Date) that is acquiring the 1145 Rights Offering Stock for its own account.

2.     "*1145 Rights Offering*" means the rights offering for shares of New Common Stock to be conducted in reliance upon the exemption from registration under the Securities Act provided in section 1145 of the Bankruptcy Code, in accordance with the 1145 Rights Offering Procedures.

3.     "*1145 Rights Offering and Unsecured Cash Out Election Procedures*" means the procedures (and any forms and notices attendant thereto) governing the 1145 Rights Offering and the Unsecured Cash Out Election that are attached as an exhibit to the Conditional Disclosure Statement Order.

4.     "*1145 Rights Offering Stock*" means the New Common Stock issued pursuant to the 1145 Rights Offering.

5.     "*1145 Subscription Rights*" means the rights to purchase 1145 Rights Offering Stock pursuant to the 1145 Rights Offering at a per share purchase price of $36.37.

6.     "*2019 Term Loan Amendment Fee*" means Cash in an aggregate amount of $562,500.

7.     "*2019 Term Loan Facility*" means that certain prepetition secured term loan facility due May 2022 in the aggregate principal amount of $75,000,000, provided pursuant to the 2019 Term Loan Facility Credit Agreement.

8.     "*2019 Term Loan Facility Agent*" means Ankura Trust Company, LLC, solely in its capacities as administrative agent and collateral agent under the 2019 Term Loan Facility.

9.     "*2019 Term Loan Facility Claim*" means any Claim against any of the Debtors arising from or based upon the 2019 Term Loan Facility.

10. "*2019 Term Loan Facility Credit Agreement*" means that certain Term Loan Credit Agreement dated as of May 10, 2019, as amended, modified or supplemented from time to time among Bristow Parent and its non-Debtor affiliate Bristow Holdings Company Ltd. III (Cayman Islands), as borrowers, the guarantors from time to time party thereto, certain Holders of Secured Notes, as lenders, and the 2019 Term Loan Facility Agent, as administrative agent and collateral agent.

11. "*4(a)(2) Eligible Holder*" means each Holder of a Claim (as of the Distribution Record Date) that is an "accredited investor" (as defined in Rule 501(a) under the Securities Act) or a "qualified institutional buyer" (within the meaning of Rule 144A of the Securities Act) and that is acquiring the 4(a)(2) Rights Offering Stock for its own account.

12. "*4(a)(2) Rights Offering*" means the rights offering for New Common Stock and New Preferred Stock to be conducted in reliance upon the exemption from registration under the Securities Act provided in Section 4(a)(2) of the Securities Act and/or Regulation D promulgated thereunder, in accordance with the 4(a)(2) Rights Offering Procedures.

13. "*4(a)(2) Rights Offering Procedures*" means the procedures (and any forms and notices attendant thereto) governing the 4(a)(2) Rights Offering that are attached as an exhibit to the Conditional Disclosure Statement Order.

14. "*4(a)(2) Rights Offering Stock*" means the New Common Stock and New Preferred Stock issued pursuant to the 4(a)(2) Rights Offering.

15. "*4(a)(2) Subscription Rights*" means the rights to purchase 4(a)(2) Rights Offering Stock pursuant to the 4(a)(2) Rights Offering at a per share purchase price of $36.37.

16. "*Administrative Claim*" means a Claim against any of the Debtors arising on or after the Petition Date and before the Effective Date for a cost or expense of administration of the Chapter 11 Cases entitled to priority under sections 503(b), 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including: (a) the actual and necessary costs and expenses incurred on or after the Petition Date until and including the Effective Date of preserving the Estates and operating the Debtors' businesses; (b) Allowed Professional Fee Claims; (c) Allowed DIP Facility Claims; (d) all fees and charges assessed against the Estates pursuant to section 1930 of chapter 123 of title 28 of the United States Code; and (e) the Backstop Commitment Fee and the Equitization Consent Fee (which, in the case of this clause (e), are each deemed to be an Allowed Administrative Claim pursuant to the Confirmation Order).

17. "*Administrative Claims Bar Date*" means the deadline for Filing requests for payment of Administrative Claims, which: (a) with respect to Administrative Claims other than Professional Fee Claims, shall be 30 days after the Effective Date; and (b) with respect to Professional Fee Claims, shall be 45 days after the Effective Date.

18. "*Affiliate*" has the meaning set forth in section 101(2) of the Bankruptcy Code. With respect to any Person that is not a Debtor, the term "Affiliate" shall apply to such Person as if the Person were a Debtor.

19. "*Allowed*" means, with respect to any Claim against any of the Debtors, except as otherwise provided herein: (a) a Claim that is evidenced by a Proof of Claim Filed by the Claims Bar Date (or such other date as agreed by the Debtors pursuant to the Bar Date Order) or a request for payment of an Administrative Claim Filed by the Administrative Claims Bar Date, as applicable (or for which Claim under the Plan, the Bankruptcy Code, or pursuant to a Final Order, a Proof of Claim or request for payment of Administrative Claim is not or shall not be required to be Filed); (b) a Claim that is listed in the Schedules as not contingent, not unliquidated, and not Disputed, and for which no contrary or superseding Proof of Claim, as applicable, has been timely Filed; or (c) a Claim allowed pursuant to the Plan or a Final Order; *provided*, that with respect to a Claim described in clauses (a) and (b) above, such Claim shall be considered Allowed only if and to the extent that with respect to such Claim no objection to the allowance thereof is interposed within the applicable period of time fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Court, or such an objection is so interposed and the Claim has been Allowed by a Final Order. Any Claim that has been or is hereafter listed in the Schedules as contingent, unliquidated, or disputed,

5

and for which no contrary or superseding Proof of Claim is or has been timely Filed, or that is not or has not been Allowed by a Final Order, is not considered Allowed and shall be expunged without further action by the Debtors and without further notice to any party or action, approval, or order of the Bankruptcy Court. Notwithstanding anything to the contrary herein, no Claim of any Entity subject to section 502(d) of the Bankruptcy Code shall be deemed Allowed unless and until such Entity pays in full the amount that it owes the applicable Debtor or Reorganized Debtor, as applicable. For the avoidance of doubt, a Proof of Claim Filed after the Claims Bar Date or a request for payment of an Administrative Claim Filed after the Administrative Claims Bar Date, as applicable, shall not be Allowed for any purposes whatsoever absent entry of a Final Order allowing such late-Filed Claim. "*Allow*" and "*Allowing*" shall have correlative meanings.

20. "*Amended and Restated 2019 Term Loan Credit Agreement*" means an amended and restated version of the 2019 Term Loan Credit Agreement to be entered into by the applicable Debtors, if the Debtors do not enter into the Exit Facility on or prior to the Effective Date, in any case secured by a first lien on substantially all assets of the Reorganized Debtors and their non-Debtor Affiliates (subject to customary and other agreed exclusions), with the same maturity and interest rate as set forth in the 2019 Term Loan Credit Agreement, and with amendments only to the prepayment, financial, reporting and other affirmative and negative covenants in the 2019 Term Loan Credit Agreement, which shall be subject to the consent rights of the Required RSA Parties on the terms set forth in the Restructuring Support Agreement.

21. "*Amended and Restated 2019 Term Loan Facility*" means the secured credit facility that Reorganized Bristow Parent and certain other Reorganized Debtors will enter into on the Effective Date in accordance with the Amended and Restated 2019 Term Loan Credit Agreement, if the Debtors do not enter into the Exit Facility on or prior to the Effective Date.

22. "*Amended and Restated 2019 Term Loan Facility Agent*" means the entity identified in the Plan Supplement as administrative and collateral agent under the Amended and Restated 2019 Term Loan Credit Agreement, solely in its capacity as such.

23. "*Amended and Restated 2019 Term Loan Facility Lenders*" means those certain lenders from time to time party to the Amended and Restated 2019 Term Loan Credit Agreement, solely in their capacity as such.

24. "*Amended and Restated 2019 Term Loan Documents*" means, collectively, the Amended and Restated 2019 Term Loan Credit Agreement and any and all other agreements, documents, and instruments delivered or entered into in connection therewith, including any guarantee agreements, pledge and collateral agreements, intercreditor agreements, and other security documents, which shall be subject to the consent rights of the Required RSA Parties on the terms set forth in the Restructuring Support Agreement.

25. "*Amended PK Air Credit Facility Agreement*" means the amended PK Air Facility Credit Agreement, as amended in a manner consistent with the Milestone Settlement.

26. "*Amended PK Air Loan Documents*" means the amended PK Air Loan Documents, as amended in a manner consistent with the Milestone Settlement.

27. "*Avoidance Actions*" means any and all avoidance, recovery, subordination, or other Claims and Causes of Actions that may be brought by or on behalf of the Debtors or their Estates or other authorized parties in interest under the Bankruptcy Code or applicable non-bankruptcy law, including actions or remedies under chapter 5 of the Bankruptcy Code or under similar or related state or federal statutes and common law.

28. "*Backstop Commitment Agreement*" means that certain backstop commitment agreement, entered into and dated as of July 24, 2019, pursuant to which the Backstop Commitment Parties have agreed to backstop the Rights Offering, as may be amended or modified from time to time in accordance with the terms thereof and the Restructuring Support Agreement, and which shall be subject to the consent rights of the Required RSA Parties on the terms set forth in the Restructuring Support Agreement.

6

29. "*Backstop Commitment Fee*" has the meaning ascribed to such term in the Backstop Commitment Agreement, and shall be equal to 5.83% of the New Stock on a fully-diluted basis (except for the New Stock to be issued pursuant to the Management Incentive Plan).

30. "*Backstop Commitment Parties*" means at any time and from time to time, the parties that have committed to backstop the Rights Offering and are signatories to the Backstop Commitment Agreement, solely in their capacities as such, to the extent provided in the Backstop Commitment Agreement.

31. "*Bankruptcy Code*" means title 11 of the United States Code, 11 U.S.C. §§ 101–1532, as amended from time to time.

32. "*Bankruptcy Court*" means the United States Bankruptcy Court for the Southern District of Texas, Houston Division or such other court having jurisdiction over the Chapter 11 Cases, including, to the extent of the withdrawal of reference under 28 U.S.C. § 157 and/or the General Order of the District Court pursuant to section 151 of title 28 of the United States Code, the United States District Court for the Southern District of Texas.

33. "*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure promulgated under section 2075 of title 28 of the United States Code, and the general, local, and chambers rules of the Bankruptcy Court.

34. "*Bar Date Order*" means the *Order (I) Setting Bar Dates for Filing Proofs of Claim, Including Requests for Payment under Section 503(b)(9), (II) Establishing Amended Schedules Bar Date and Rejection Damages Bar Date, (III) Approving the Form of and Manner for Filing Proofs of Claim, Including Section 503(b)(9) Requests and (IV) Approving Notice of Bar Dates* [Docket No. 392] (as amended, modified, or supplemented from time to time in accordance with the terms thereof).

35. "*Bristow Parent*" means Bristow Group Inc.

36. "*Business Day*" means a day, other than a Saturday, Sunday, or "legal holiday" (as defined in Bankruptcy Rule 9006(a)).

37. "*Cash*" means the legal tender of the United States of America or the equivalent thereof, including bank deposits and checks.

38. "*Causes of Action*" means any and all claims, controversies, actions, proceedings, controversies, reimbursement claims, contribution claims, recoupment rights, interests, debts, third-party claims, indemnity claims, damages, remedies, causes of action, demands, rights, suits, obligations, liabilities, accounts, judgments, defenses, affirmative defenses, offsets, powers, privileges, licenses, franchises, Avoidance Actions, counterclaims and cross-claims, of any kind or character whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, asserted or unasserted, direct or indirect, assertible directly or derivatively, choate or inchoate, reduced to judgment or otherwise, secured or unsecured, whether arising before, on, or after the Petition Date, in tort, law, equity, or otherwise pursuant to any theory of law. Causes of Action also include: (a) all rights of setoff, counterclaim, or recoupment and claims on contracts or for breaches of duties imposed by law or equity; (b) the right to object to or otherwise contest Claims or Interests; (c) claims pursuant to sections 362, 510, 542, 543, 544 through 550, or 553 of the Bankruptcy Code; (d) such claims and defenses as fraud, mistake, duress, and usury and any other defenses set forth in section 558 of the Bankruptcy Code; and (e) any claim for fraudulent transfer or similar claim pursuant to any state or foreign law.

39. "*Certificate*" means any instrument evidencing a Claim or an Interest.

40. "*Chapter 11 Cases*" means, when used with reference to a particular Debtor, the case pending for that Debtor under chapter 11 of the Bankruptcy Code in the Bankruptcy Court, and when used with reference to all the Debtors, the procedurally consolidated and jointly administered chapter 11 cases pending for the Debtors in the Bankruptcy Court.

41.     "*Citizenship Certification*" means a certification regarding the citizenship of a Holder of a General Unsecured Claim, Unsecured Notes Claim, or Secured Notes Claim, in the form approved by the Conditional Disclosure Statement Order or such other form that may be acceptable to the Debtors.

42.     "*Claim*" has the meaning set forth in section 101(5) of the Bankruptcy Code.

43.     "*Claims Bar Date*" means the applicable deadline by which Proofs of Claim must be Filed, as established by: (a) the Bar Date Order; (b) a Final Order of the Bankruptcy Court; or (c) the Plan.

44.     "*Claims Register*" means the official register of Claims maintained by the Solicitation Agent or the clerk of the Bankruptcy Court.

45.     "*Class*" means a category of Holders of Claims or Interests pursuant to section 1122(a) of the Bankruptcy Code.

46.     "*Collateral*" means any property or interest in property of the Estate of any Debtor subject to a Lien, charge, or other encumbrance to secure the payment or performance of a Claim, which Lien, charge, or other encumbrance is not subject to a Final Order ordering the remedy of avoidance of any such Lien, charge, or other encumbrance under the Bankruptcy Code.

47.     "*Committee Consent Right*" means the consent and consultation rights of the Creditors' Committee as set forth in the Committee Joinder.

48.     "*Committee Joinder*" means the joinder by the Creditors' Committee dated August 19, 2019 to the Restructuring Support Agreement.

49.     "*Compensation and Benefits Programs*" means all employment and severance agreements and policies, and all employment, compensation, and benefit plans, policies, workers' compensation programs, savings plans, retirement plans, deferred compensation plans, supplemental executive retirement plans, healthcare plans, disability plans, severance benefit plans, incentive and retention plans, programs and payments, life and accidental death and dismemberment insurance plans, and programs of the Debtors, and all amendments and modifications thereto, applicable to the Debtors' and their Affiliates' employees, former employees, retirees, and non-employee directors and the employees, former employees and retirees of their subsidiaries.

50.     "*Conditional Disclosure Statement Order*" means the order (and all exhibits thereto), which shall be subject to the consent rights of the Required RSA Parties on the terms set forth in the Restructuring Support Agreement, entered by the Bankruptcy Court conditionally approving the Disclosure Statement and the Solicitation Materials, and allowing solicitation of the Plan to commence, entered on August 26, 2019 [Docket No. 599], (as amended, modified, or supplemented from time to time in accordance with the terms thereof).

51.     "*Confirmation*" means the entry of the Confirmation Order on the docket of the Chapter 11 Cases.

52.     "*Confirmation Date*" means the date on which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Cases within the meaning of Bankruptcy Rules 5003 and 9021.

53.     "*Confirmation Hearing*" means the hearing held by the Bankruptcy Court to (a) consider Confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code and (b) consider final approval of the Disclosure Statement, the Solicitation Materials, the Restructuring Support Agreement, and the Backstop Commitment Agreement.

54.     "*Confirmation Order*" means the order of the Bankruptcy Court, the form and substance of which shall be subject to the consent rights of the Required RSA Parties on the terms set forth in the Restructuring Support Agreement, and subject to the Committee Consent Right, and, with respect to issues that affect the Milestone Parties, be in form and substance reasonably acceptable to the Milestone Parties, confirming the Plan pursuant to section 1129

8

of the Bankruptcy Code and providing final approval of the Disclosure Statement, the Solicitation Materials, the Restructuring Support Agreement, and the Backstop Commitment Agreement.

55.      "*Consummation*" or "*Consummated*" means the occurrence of the Effective Date.

56.      "*Convertible Notes*" means the 4.50% Convertible Senior Notes due 2023, issued in an original principal amount of approximately $143,750,000 pursuant to the Convertible Notes Indenture.

57.      "*Convertible Notes Indenture*" means that certain indenture, dated as of December 18, 2017, as amended, modified or supplemented from time to time, for the Convertible Notes, among Bristow Parent, as issuer, the Guarantor Subsidiaries, as guarantors, and the Convertible Notes Indenture Trustee, as trustee.

58.      "*Convertible Notes Indenture Trustee*" means Delaware Trust Company, and any successor thereto, solely in its capacity as successor trustee under the Convertible Notes Indenture.

59.      "*Creditors' Committee*" means the official committee of unsecured creditors appointed in the Chapter 11 Cases pursuant to the *Notice of Appointment of Committee of Unsecured Creditors* [Docket No. 179], as may be reconstituted from time to time.

60.      "*Cure Costs*" means all amounts, including an amount of $0.00, required to cure any monetary defaults under any Executory Contract or Unexpired Lease (or such lesser amount as may be agreed upon by the parties to such Executory Contract or Unexpired Lease) that is to be assumed by the Debtors pursuant to sections 365 or 1123 of the Bankruptcy Code.

61.      "*Cure Notice*" means any notice that sets forth the proposed Cure Costs under any Executory Contract or Unexpired Lease at the time such contract or lease is assumed by the applicable Debtors under the Plan, which notice shall include (a) procedures for objecting to proposed assumptions or assignments of the applicable Executory Contracts and/or Unexpired Leases, (b) the Cure Costs proposed to be paid in connection therewith, and (c) procedures for resolution by the Bankruptcy Court of any related dispute.

62.      "*D&O Liability Insurance Policies*" means all insurance policies (including any "tail policy") of any of the Debtors for current or former directors', managers', officers', and/or employees' liability.

63.      "*Debtors*" means, collectively, Bristow Group Inc., BHNA Holdings Inc., Bristow Alaska Inc., Bristow Helicopters Inc., Bristow U.S. Leasing LLC, Bristow U.S. LLC, BriLog Leasing Ltd., and Bristow Equipment Leasing Ltd.

64.      "*DIP Facility*" means that certain $150,000,000 senior secured term loan credit facility provided pursuant to the DIP Facility Credit Agreement.

65.      "*DIP Facility Agent*" means Ankura Trust Company, LLC, or any successor thereto, solely in its capacity as administrative agent and collateral agent under the DIP Facility Credit Agreement.

66.      "*DIP Facility Claim*" means any Claim, including for any Equitization Consent Fee if applicable, held by any of the DIP Facility Lenders or the DIP Facility Agent arising under or related to the DIP Facility Credit Agreement.

67.      "*DIP Facility Credit Agreement*" means that certain Superpriority Secured Debtor-In-Possession Credit Agreement, which is attached as Exhibit A to the DIP Order, which shall be subject to the consent rights of the Required RSA Parties on the terms set forth in the Restructuring Support Agreement.

68.      "*DIP Facility Lenders*" means those certain lenders from time to time party to the DIP Facility Credit Agreement, solely in their capacity as such.

69. "*DIP Order*" means the *Order (A) Authorizing the Debtors to Obtain Postpetition Financing, (B) Authorizing the Debtors to Continue to Use Cash Collateral, (C) Granting Liens and Providing Superpriority Administrative Expense Status, (D) Modifying the Automatic Stay, and (E) Granting Related Relief* [Docket No. 582] (as amended, modified, or supplemented from time to time in accordance with the terms thereof), which shall be subject to the consent rights of the Required RSA Parties on the terms set forth in the Restructuring Support Agreement.

70. "*Disclosure Statement*" means the disclosure statement for the Plan, including all exhibits and schedules thereto, which shall be subject to the consent rights of the Required RSA Parties on the terms set forth in the Restructuring Support Agreement.

71. "*Disputed*" means, as to any Claim or Interest (or any portion thereof), a Claim or Interest: (a) that is not Allowed; (b) that is not disallowed by the Plan, the Bankruptcy Code, or a Final Order, as applicable; (c) as to which a dispute is being adjudicated by a court of competent jurisdiction in accordance with non-bankruptcy law; (d) as to which a timely objection or request for estimation has been Filed and not withdrawn; or (e) with respect to which a party in interest has Filed a Proof of Claim or otherwise made a written request to a Debtor for payment, without any further notice to or action, order, or approval of the Bankruptcy Court.

72. "*Distribution Agent*" means, as applicable, the Reorganized Debtors or any Entity the Reorganized Debtors select (with the consent of the Required RSA Parties) to make or to facilitate distributions in accordance with the Plan.

73. "*Distribution Date*" means, except as otherwise set forth herein and except distributions to holders of public securities, the date or dates determined by the Debtors or the Reorganized Debtors (in consultation with the Required RSA Parties), on or after the Effective Date, upon which the Distribution Agent shall make distributions to Holders of Allowed Claims and Interests entitled to receive distributions under the Plan.

74. "*Distribution Record Date*" means, other than with respect to those Secured Notes or Unsecured Notes deposited with DTC, the record date for purposes of determining which Holders of Allowed Claims against or Allowed Interests in the Debtors are eligible to receive distributions under the Plan, which date shall be the Confirmation Date, or such other date as is agreed to by the Debtors and the Required RSA Parties, or designated in a Final Order. The Distribution Record Date shall not apply to any Secured Notes or Unsecured Notes deposited with DTC, the Holders of which shall receive a distribution in accordance with the customary procedures of DTC.

75. "*DTC*" means The Depository Trust Company.

76. "*Effective Date*" means the date that is the first Business Day after the Confirmation Date on which all conditions precedent to the occurrence of the Effective Date set forth in Article X.A of the Plan have been satisfied or waived in accordance with Article X.B of the Plan, and the Plan is deemed effective by the Debtors and the Required RSA Parties.

77. "*Eligible Holder*" means a Holder that is a 4(a)(2) Eligible Holder and/or a 1145 Eligible Holder, in each case, as of the Distribution Record Date.

78. "*Entity*" has the meaning set forth in section 101(15) of the Bankruptcy Code.

79. "*Equitization Allocation New Stock*" means 22.68% of the New Stock on a fully-diluted basis (except for the New Stock to be issued pursuant to the Management Incentive Plan), which shall be distributed to the Holders of DIP Facility Claims as set forth in Article II.D of the Plan.

80. "*Equitization Consent Fee*" means 2.27% of the New Stock on a fully-diluted basis (except for the New Stock to be issued pursuant to the Management Incentive Plan), which shall be distributed to the Holders of DIP Facility Claims as set forth in Article II.D of the Plan.

81. "*Estate*" means, as to each Debtor, the estate created for the Debtor pursuant to section 541 of the Bankruptcy Code upon the commencement of the applicable Debtor's Chapter 11 Case.

82. "*Exculpated Parties*" means, collectively, and in each case in its capacity as such:  (a) the Debtors and the Reorganized Debtors; (b) the DIP Facility Agent; (c) the DIP Facility Lenders; (d) the Backstop Commitment Parties; (e) the Holders of 2019 Term Loan Facility Claims; (f) the 2019 Term Loan Facility Agent; (g) the Supporting Noteholders; (h) the Indenture Trustees; (i) the Milestone Parties; (j) the Creditors' Committee and each of its current and former members; (k) with respect to each of the foregoing entities in clauses (a) through (j), each such Entity's current and former predecessors, successors, Affiliates (regardless of whether such interests are held directly or indirectly), subsidiaries, direct and indirect equity holders, funds, portfolio companies, and management companies; and (l) with respect to each of the foregoing Entities in clauses (a) through (k), each of their respective current and former directors, officers, members, employees, partners, managers, independent contractors, agents, representatives, principals, professionals, consultants, financial advisors, attorneys, accountants, investment bankers, and other professional advisors, each in their capacity as such; *provided that* no current or former Holder of Existing Interests, each in their capacity as such, is an Exculpated Party unless such Holder is also a Supporting Noteholder or current director, officer or employee of a Debtor or an Affiliate of a Debtor.

83. "*Executory Contract*" means a contract or lease to which one or more of the Debtors is a party that is subject to assumption or rejection under section 365 or 1123 of the Bankruptcy Code.

84. "*Existing Interests*" means the Interests in Bristow Parent.

85. "*Exit Facility*" means the secured credit facility that Reorganized Bristow Parent and/or certain other Reorganized Debtors will enter into on the Effective Date in accordance with the Exit Facility Credit Agreement, if the Debtors elect to enter into the Exit Facility instead of entering into the Amended and Restated 2019 Term Loan Credit Agreement.

86. "*Exit Facility Agent*" means the entity identified in the Plan Supplement as administrative and collateral agent under the Exit Facility Credit Agreement, solely in its capacity as such.

87. "*Exit Facility Credit Agreement*" means the agreement governing the Exit Facility, if any, which shall be subject to the consent rights of the Required RSA Parties on the terms set forth in the Restructuring Support Agreement.

88. "*Exit Facility Documents*" means, collectively, the Exit Facility Credit Agreement and any and all other agreements, documents, and instruments delivered or entered into in connection therewith, including any guarantee agreements, pledge and collateral agreements, intercreditor agreements, and other security documents, which shall be subject to the consent rights of the Required RSA Parties on the terms set forth in the Restructuring Support Agreement.

89. "*Exit Facility Lenders*" means those certain lenders from time to time party to the Exit Facility Credit Agreement, solely in their capacity as such.

90. "*Exit Facility Term Sheet*" means a term sheet describing the material terms of the Exit Facility Credit Agreement, if any, which shall be subject to the consent rights of the Required RSA Parties on the terms set forth in the Restructuring Support Agreement.

91. "*Federal Judgment Rate*" means the federal judgment rate in effect pursuant to 28 U.S.C. § 1961 as of the Petition Date, compounded annually.

92. "*File*," "*Filed*," and "*Filing*" means file, filed, or filing in the Chapter 11 Cases with the Bankruptcy Court.

93. "*Final Cash Collateral Order*" means the *Final Order (A) Authorizing the Debtors to Use Cash Collateral, (B) Granting Adequate Protection to the Prepetition Consenting Secured Parties, (C) Modifying the*

11

*Automatic Stay and (D) Granting Related Relief* [Docket No. 312], (as amended, modified, or supplemented from time to time in accordance with the terms thereof), which shall be subject to the consent rights of the Required RSA Parties on the terms set forth in the Restructuring Support Agreement.

94. "*Final Decree*" means the decree contemplated under Bankruptcy Rule 3022.

95. "*Final Order*" means an order or judgment of the Bankruptcy Court or other court of competent jurisdiction with respect to the relevant subject matter that has not been reversed, stayed, modified, or amended, and as to which the time to appeal or seek certiorari has expired and no appeal or petition for certiorari has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been or may be Filed has been resolved by the highest court to which the order or judgment could be appealed or from which certiorari could be sought or the new trial, reargument, or rehearing shall have been denied, resulted in no modification of such order, or has otherwise been dismissed with prejudice.

96. "*General Unsecured Claim*" means any Claim against any of the Debtors that is not Secured and is not: (a) an Administrative Claim; (b) a Professional Fee Claim; (c) a Priority Tax Claim; (d) an Other Priority Claim; (e) an Unsecured Notes Claim; (f) a Trade Claim; (g) an Intercompany Claim; or (h) a Section 510(b) Claim.

97. "*Governance Term Sheet*" means the term sheet attached to the Restructuring Term Sheet as **Exhibit 4**, which shall be subject to the consent rights of the Required RSA Parties on the terms set forth in the Restructuring Support Agreement.

98. "*Governmental Unit*" has the meaning set forth in section 101(27) of the Bankruptcy Code.

99. "*Guarantor Subsidiaries*" means, collectively, Bristow Helicopters Inc., BHNA Holdings, Inc., Bristow U.S. Leasing LLC, Bristow Alaska Inc. and Bristow U.S. LLC.

100. "*GUC Distribution Cash Amount*" means an aggregate amount of Cash in an amount of $6.75 million, subject to increase to the extent of any portion of the Unsecured 4(a)(2) Distribution Cash Amount that is not distributed to eligible holders of Unsecured Notes Claims and General Unsecured Claims in accordance with the Plan.

101. "*HeliFleet Stipulation*" means the *Stipulation and Agreed Order Between the Debtors and HeliFleet 2013-01, LLC Regarding (I) Settlement of Claims and (II) Related Matters* [Docket No. [●]].

102. "*Holder*" means an Entity holding a Claim or Interest, as applicable.

103. "*Impaired*" means, with respect to any Class of Claims or Interests, a Class of Claims or Interests that is impaired within the meaning of section 1124 of the Bankruptcy Code.

104. "*Indemnification Obligations*" means each of the Debtors' indemnification provisions in place, whether in the Debtors' bylaws, certificates of incorporation, other formation documents, board resolutions, management or indemnification agreements, employment contracts, or otherwise, for the current and former directors, officers, managers, employees, attorneys, other professionals, and agents of the Debtors and such current and former directors', officers', and managers' respective Affiliates.

105. "*Indenture Trustee Expenses*" means the reasonable and documented compensation, fees, out-of-pocket expenses, disbursements, and claims for indemnity, subrogation, and contribution incurred or owed to the Indenture Trustees, including, without limitation, reasonable and documented attorneys' fees, expenses and disbursements, whether prior to or after the Petition Date but in all cases before the Effective Date, in each case under the Indentures.

106. "*Indenture Trustees*" means, collectively the Secured Notes Indenture Trustee, the Senior Notes Indenture Trustee, and the Convertible Notes Indenture Trustee.

12

107.    "*Indentures*" means, collectively, the Secured Notes Indenture, the Senior Notes Indenture, and the Convertible Notes Indenture.

108.    "*Initial Amended RSA*" means that certain Amended and Restated Restructuring Support Agreement dated as of June 27, 2019 that the Restructuring Support Agreement amends, restates and replaces in its entirety.

109.    "*Initial MIP Amount*" means 4.0% of the New Stock on a fully diluted basis (of which 4.0%, 60% thereof shall be in grants of restricted units and 40% shall be in options).

110.    "*Intercompany Claim*" means any Claim held by a Debtor against another Debtor.

111.    "*Intercompany Interest*" means, other than an Interest in Bristow Parent, an Interest in one Debtor held by another Debtor.

112.    "*Interest*" means any equity security (as defined in section 101(16) of the Bankruptcy Code) in any Debtor, including options, warrants, rights, restricted stock unit or other securities or agreements to acquire the common stock, preferred stock, limited liability company interests, or other equity, ownership or profits interests of any Debtor (whether or not arising under or in connection with any employment agreement, separation agreement or employee incentive plan or program of a Debtor as of the Petition Date).

113.    "*Interim Compensation Order*" means the *Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses for Chapter 11 Case Professionals* [Docket No. 393] (as amended, modified, or supplemented from time to time in accordance with the terms thereof).

114.    "*Key Employee Incentive Plan and Retention Payments Order*" means the *Order Authorizing and Approving Key Employee Incentive Plans and Non-Insider Retention Payments* [Docket No. 588] (as amended, modified, or supplemented from time to time in accordance with the terms thereof).

115.    "*Lien*" has the meaning set forth in section 101(37) of the Bankruptcy Code.

116.    "*Lombard (BALL) Term Loan*" means that certain prepetition pound sterling funded secured loan facility dated as of November 11, 2016, in the original principal amount of $90,000,000 U.S. dollar equivalent, among Bristow Aircraft Leasing Limited, as borrower, Lombard North Central PLC, as lender, and Bristow Parent and Bristow U.S. Leasing LLC, as guarantors.

117.    "*Lombard (BALL) Term Loan Credit Agreement*" means the credit agreement governing the Lombard (BALL) Term Loan, dated as of November 11, 2016, among Bristow Aircraft Leasing Limited, as borrower, Lombard North Central PLC, as lender, and Bristow Parent and Bristow U.S. Leasing LLC, as guarantors.

118.    "*Lombard (BALL) Term Loan Guarantee*" means the guarantees by Bristow Parent and Bristow U.S. Leasing LLC of the obligations under Lombard (BALL) Term Loan or the Lombard (BALL) Term Loan Credit Agreement.

119.    "*Lombard (BALL) Term Loan Guarantee Claim*" means any Claim against Bristow Parent or Bristow U.S. Leasing LLC arising from or based upon the Lombard (BALL) Term Loan Guarantee.

120.    "*Lombard (BULL) Term Loan*" means that certain prepetition pound sterling funded secured loan facility dated as of November 11, 2016, in the original principal amount of $110,000,000 U.S. dollar equivalent, among Bristow U.S. Leasing LLC, as borrower, Lombard North Central PLC, as lender, and Bristow Parent, as guarantor.

121.    "*Lombard (BULL) Term Loan Claim*" means any Claim against any of the Debtors arising from or based upon the Lombard (BULL) Term Loan, the Lombard (BULL) Term Loan Guarantee or the Lombard (BULL) Term Loan Credit Agreement.

122. "*Lombard (BULL) Term Loan Credit Agreement*" means the credit agreement governing the Lombard (BULL) Term Loan, dated as of November 11, 2016, among Bristow U.S. Leasing LLC, as borrower, Lombard North Central PLC, as lender, and Bristow Parent, as guarantor.

123. "*Lombard (BULL) Term Loan Guarantee*" means the guarantee by Bristow Parent of the obligations under Lombard (BULL) Term Loan or the Lombard (BULL) Term Loan Credit Agreement.

124. "*Macquarie Parties*" means, collectively, Macquarie Bank Limited, Macquarie Leasing LLC and Macquarie Rotorcraft Leasing Holdings Limited and certain related owner trustees and affiliates.

125. "*Macquarie Settlement*" means the settlement between the Debtors and the Macquarie Parties that provides for, among other things, the assumption pursuant to section 365 of the Bankruptcy Code of certain leases between the Debtors and the Macquarie Parties, amendment of the Macquarie Term Loan Credit Facility and the Macquarie Term Loan Documents, the Allowance of certain Claims of the Macquarie Parties and the reimbursement of certain professional fees, all as set forth in the motion pursuant to Bankruptcy Rule 9019 seeking approval of such settlement.

126. "*Macquarie Settlement Order*" means the order entered by the Bankruptcy Court approving the Macquarie Settlement.

127. "*Macquarie Term Loan Credit Facility*" means that certain prepetition term loan facility dated as of February 1, 2017, in the original principal amount of $200,000,000, among Bristow U.S. LLC, as borrower, Macquarie Bank Limited, as administrative agent, and Bristow Parent, as guarantor.

128. "*Macquarie Term Loan Credit Facility Claim*" means any claim against any Debtor arising from or based upon the Macquarie Term Loan Credit Facility or the Macquarie Term Loan Guarantee.

129. "*Macquarie Term Loan Documents*" means the Macquarie Term Loan Credit Facility and all other "Loan Documents" as defined in the Macquarie Term Loan Credit Facility.

130. "*Macquarie Term Loan Guarantee*" means the guarantee by Bristow Parent of the obligations under the Macquarie Term Loan Credit Facility.

131. "*MAG Lease Documents*" means the leases, agreements and documents defined as "MAG Lease Documents" in the PK Air Credit Facility.

132. "*MAG Lease Obligations*" means the obligations under the MAG Lease Documents.

133. "*MAG Lease Obligation Claims*" means the claims against BriLog Leasing Ltd., Bristow Equipment Leasing Ltd., Bristow U.S. Leasing LLC, Bristow Parent or any other Debtor arising from or based upon the MAG Lease Documents.

134. "*Management Incentive Plan*" means a post-Effective Date management incentive plan for certain participating employees of the Reorganized Debtors and Affiliates to be established and implemented in accordance with Article IV.I of the Plan, which shall provide for the terms and conditions under which the MIP Pool may be allowed and distributed to certain participating employees of the Reorganized Debtors and Affiliates and shall be in accordance with the Restructuring Term Sheet.

135. "*MCA*" means the Maritime & Coastguard Agency, an executive agency of the United Kingdom.

136. "*MCA and Other Customer Guarantee Claims*" means the MCA Guarantee Claims and the Other Customer Guarantee Claims.

137. "*MCA Guarantee*" means the guarantee by Bristow Parent of the obligations of Bristow Helicopters Limited and its Affiliates under the UK SAR Contract.

14

138. "*MCA Guarantee Claims*" means any Claim against Bristow Parent arising from or based upon the MCA Guarantee.

139. "*Milestone Parties*" means, collectively, The Milestone Aviation Group Limited, PK Air, the "MAG Parties" as defined in the PK Air Credit Facility, GE Aviation, and their respective affiliates, including certain lessor trusts.

140. "*Milestone Settlement*" means the settlement between the Debtors and the Milestone Parties that provides for, among other things, the assumption pursuant to section 365 of the Bankruptcy Code of the MAG Lease Documents, amendment of the PK Air Credit Facility, the Allowance of Claims of the Milestone Parties and the reimbursement of certain professional fees, all as set forth in the motion pursuant to Bankruptcy Rule 9019 seeking approval of such settlement.

141. "*Milestone Settlement Order*" means the order entered by the Bankruptcy Court approving the Milestone Settlement, the form and substance of which shall be acceptable to the Milestone Parties and the Required RSA Parties on the terms set forth in the Restructuring Support Agreement. The Debtors and the Milestone Parties have an agreement in principle which will be memorialized in a term sheet and submitted to the Bankruptcy Court for approval in a motion pursuant to Bankruptcy Rule 9019. If the Bankruptcy Court fails to approve the Milestone Settlement and enter the Milestone Settlement Order on or before September 18, 2019 (or such later date as may be agreed to in writing by each of the Debtors, the Milestone Parties and the Required RSA Parties), the Debtors and the Milestone Parties will revert to their respective rights under the MAG Lease Documents, the PK Air Loan Documents and applicable law and the Milestone Parties shall be able to object to the Plan and Disclosure Statement on any grounds and otherwise exercise any rights and remedies available to them under the MAG Lease Documents, the PK Air Loan Documents, the Bankruptcy Code and Convention on International Interests In Mobile Equipment and the Protocol to the Convention on International Interests in Mobile Equipment on Matters Specific to Aircraft Equipment.

142. "*MIP Pool*" means a pool of stock-based awards, in the form of options, appreciation rights, restricted stock units, restricted stock, or similar awards, as applicable, representing at least 5% but no more than 10% of the aggregate amount of New Stock, determined on a fully diluted and fully distributed basis (with the ratio of New Common Stock to New Preferred Stock to be the same as the ratio of all New Common Stock to all New Preferred Stock held by the average Backstop Commitment Party), which shall be reserved for distribution to certain participating employees of the Reorganized Debtors or Affiliates pursuant to the Management Incentive Plan and shall be in accordance with the Restructuring Term Sheet.

143. "*New Common Stock*" means the common stock of Reorganized Bristow Parent, which shall be subject to the consent rights of the Required RSA Parties on the terms set forth in the Restructuring Support Agreement.

144. "*New Common Stock Agreement*" means the definitive documentation governing the terms and conditions of the New Common Stock, which shall be subject to the consent rights of the Required RSA Parties on the terms set forth in the Restructuring Support Agreement.

145. "*New Organizational Documents*" means the form of the certificates or articles of incorporation, bylaws, or such other applicable formation documents, of each of the Reorganized Debtors, which shall be subject to the consent rights of the Required RSA Parties on the terms set forth in the Restructuring Support Agreement.

146. "*New Preferred Stock*" means the preferred stock of Reorganized Bristow Parent, which shall have the terms and conditions set forth in the New Preferred Stock Term Sheet, which shall be subject to the consent rights of the Required RSA Parties on the terms set forth in the Restructuring Support Agreement.

147. "*New Preferred Stock Agreement*" means the definitive documentation governing the terms and conditions of the New Preferred Stock, which shall be subject to the consent rights of the Required RSA Parties on the terms set forth in the Restructuring Support Agreement.

148.    "*New Preferred Stock Term Sheet*" means the term sheet attached to the Restructuring Term Sheet as **Exhibit 3**.

149.    "*New Shareholders' Agreement*" means the shareholders' agreement governing the rights of the Holders of New Stock on and after the Effective Date, which shareholders' agreement shall be consistent with the Governance Term Sheet, shall include reasonable and customary minority protection rights, and shall be subject to the consent rights of the Required RSA Parties on the terms set forth in the Restructuring Support Agreement, and the Debtors and the Required Backstop Parties shall consult with the Creditors' Committee regarding the terms of such shareholders' agreement. Notwithstanding anything to the contrary in the Governance Term Sheet, the New Shareholders' Agreement shall provide that the Reorganized Debtors shall provide all holders of the New Stock with quarterly, unaudited financial statements, as well as management discussion and analysis materials regarding the financial condition and results of operations for the Reorganized Debtors with respect to such financial statements, subject to execution of standard confidentiality agreements with the Reorganized Debtors.

150.    "*New Stock*" means, collectively, the New Common Stock and the New Preferred Stock. For the avoidance of doubt, to the extent necessary to ensure that the Reorganized Debtors are in compliance with the requirements of 49 U.S.C. § 40102(a)(15)(C), the Reorganized Debtors (subject to any consent rights set forth in the Restructuring Support Agreement) may issue New Warrants (in lieu of New Stock) to any Entity (other than a Backstop Party or a recipient from the MIP Pool) that is a Non-U.S. Citizen that would otherwise receive New Stock pursuant to the Plan.

151.    "*New Warrants*" means warrants for the New Stock, which shall be issued by the Reorganized Debtors in order to ensure compliance with the requirements of 49 U.S.C. § 40102(a)(15)(C), with the terms of such warrants to be governed by the New Warrant Agreement.

152.    "*New Warrant Agreement*" means the agreement governing the terms of the New Warrants, which shall be subject to the consent rights of the Required RSA Parties on the terms set forth in the Restructuring Support Agreement.

153.    "*Non-U.S. Citizen*" means a Holder of an Allowed Unsecured Notes Claim, General Unsecured Claim, or Secured Notes Claim that is not determined to be a U.S. Citizen under the procedure set forth in Article IV.E of this Plan.

154.    "*Original DIP Commitment Letter*" means that certain commitment letter, dated as of May 10, 2019, by and among Bristow Parent, Bristow Holdings Company Ltd. III and each of the institutions identified on Schedule 1 thereto, as the same may have been amended, supplemented or otherwise modified.

155.    "*Original RSA*" has the meaning ascribed to such term in the Restructuring Support Agreement.

156.    "*Other Customer Contract*" means any revenue-generating customer contract of one or more of the Debtors' non-debtor Affiliates that is set forth in the Schedule of Other Customer Contracts.

157.    "*Other Customer Guarantee*" means any guarantee by any of the Debtors of the obligations of one or more of its Affiliates under an Other Customer Contract.

158.    "*Other Customer Guarantee Claim*" means any Claim against any of the Debtors arising from or based upon an Other Customer Guarantee.

159.    "*Other Priority Claim*" means any Claim other than an Administrative Claim or a Priority Tax Claim entitled to priority in right of payment under section 507(a) of the Bankruptcy Code.

160.    "*Other Secured Claim*" means any Secured Claim against any of the Debtors, other than a Secured Notes Claim, a 2019 Term Loan Facility Claim, a Lombard (BULL) Term Loan Claim, a Macquarie Term Loan Credit Facility Claim, or a PK Air Credit Facility Claim.

16

161. "*Person*" has the meaning set forth in section 101(41) of the Bankruptcy Code.

162. "*Petition Date*" means May 11, 2019, the date on which the Debtors commenced the Chapter 11 Cases.

163. "*PK Air*" means PK AirFinance S.à r.l, as agent, security trustee and MAG Agent under the PK Air Credit Facility.

164. "*PK Air Credit Facility*" means that certain prepetition credit agreement dated as of July 17, 2017 in the original principal amount of $230,000,000 across 24 term loans, among Bristow Equipment Leasing Ltd., as borrower, PK Air, as agent, PK Transportation Finance Ireland Limited, as lender, and other lenders from time to time thereto.

165. "*PK Air Credit Facility Claim*" means any claim against BriLog Leasing Ltd., Bristow Equipment Leasing Ltd., Bristow U.S. Leasing LLC, Bristow Parent or any other Debtor arising from or based upon the PK Air Loan Documents.

166. "*PK Air Credit Facility Guarantee*" means the guarantee by Bristow Parent of the obligations under the PK Air Loan Documents.

167. "*PK Air Loan Documents*" means, collectively, the PK Air Credit Facility, the PK Air Credit Facility Guarantee, related promissory notes, and all other agreements, documents, and instruments delivered or entered into in connection therewith, including any guarantee agreements, pledge and collateral agreements, aircraft mortgages, intercreditor agreements, security documents and other "Loan Documents" as defined in the PK Air Credit Facility.

168. "*Plan*" means this joint chapter 11 plan (as it may be amended or supplemented from time to time, including all exhibits, schedules, supplements, appendices, annexes and attachments hereto), which shall be subject to the consent rights of the Required RSA Parties on the terms set forth in the Restructuring Support Agreement.

169. "*Plan Supplement*" means the compilation of documents and forms of documents, schedules, and exhibits to the Plan, to be Filed by the Debtors no later than 7 days before the Voting Deadline, or such later date as may be approved by the Bankruptcy Court on notice to parties in interest (as such documents may be amended prior to the Effective Date by Filing such amended documents), including: (a) the material New Organizational Documents; (b) the Exit Facility Term Sheet, if applicable; (c) the Amended and Restated 2019 Term Loan Credit Agreement and material related documents, if applicable, and the identity of the Amended and Restated 2019 Term Loan Facility Agent; (d) the schedule of Retained Causes of Action; (e) a disclosure of the members of the Reorganized Bristow Parent Board and their compensation; (f) the Schedule of Assumed Executory Contracts and Unexpired Leases; (g) the Schedule of Rejected Executory Contracts and Unexpired Leases; (h) the Restructuring Transactions Exhibit, if needed; (i) a description of the material terms of the Management Incentive Plan; (j) the New Shareholders' Agreement; (k) the Schedule of Other Customer Contracts; (l) the New Preferred Stock Agreement; (m) the New Common Stock Agreement; (n) the terms of the Amended PK Air Credit Facility Agreement (to the extent not disclosed in the motion seeking approval of the Milestone Settlement); and (o) to the extent necessary in order to ensure compliance with 49 U.S.C. § 40102(a), the New Warrant Agreement, which shall in each case be subject to the consent rights of the Required RSA Parties on the terms set forth in the Restructuring Support Agreement. The Debtors and the Required RSA Parties shall consult with the Creditors' Committee regarding the Plan Supplement documents, and the Plan Supplement documents shall be subject to the Committee Consent Right. The Debtors shall have the right to amend the documents contained in, and exhibits to, the Plan Supplement through the Effective Date, subject to the terms of the Plan, the Restructuring Support Agreement and the Backstop Commitment Agreement, including the consent rights of the Required RSA Parties.

170. "*Priority Tax Claim*" means any Claim of a Governmental Unit against any of the Debtors of the kind specified in section 507(a)(8) of the Bankruptcy Code.

171. "*Pro Rata*" means the proportion that an Allowed Claim or Allowed Interest in a particular Class bears to the aggregate amount of the Allowed Claims or Allowed Interests in that respective Class, or the proportion

of the Allowed Claims or Allowed Interests in a particular Class and other Classes entitled to share in the same recovery as such Allowed Claim or Allowed Interests under the Plan.

172. "*Professional*" means an Entity employed in the Chapter 11 Cases pursuant to a Bankruptcy Court order in accordance with sections 327, 363, or 1103 of the Bankruptcy Code and to be compensated for services rendered before or on the Effective Date, pursuant to sections 327, 328, 329, 330, or 331 of the Bankruptcy Code.

173. "*Professional Fee Amount*" means the aggregate amount of Professional Fee Claims and other unpaid fees and expenses that Professionals estimate they have incurred or will incur in rendering services to the Debtors prior to and as of the Confirmation Date, which estimates Professionals shall deliver to the Debtors as set forth in Article II.B of the Plan.

174. "*Professional Fee Claim*" means any Administrative Claim for the compensation of Professionals and the reimbursement of expenses incurred by such Professionals through and including the Confirmation Date to the extent such fees and expenses have not been paid pursuant to an order of the Bankruptcy Court. To the extent the Bankruptcy Court denies or reduces by a Final Order any amount of a Professional's requested fees and expenses, then the amount by which such fees or expenses are reduced or denied shall reduce the applicable Professional Fee Claim.

175. "*Professional Fee Escrow Account*" means an account funded by the Debtors with Cash on the Effective Date in an amount equal to the total estimated amount of the Professional Fee Amount as set forth in Article II.B of the Plan.

176. "*Proof of Claim*" means a proof of Claim Filed against any of the Debtors in the Chapter 11 Cases by the applicable Claims Bar Date.

177. "*Reinstate*," "*Reinstated*," or "*Reinstatement*" means, with respect to Claims or Interests, that the Claim or Interest shall be rendered Unimpaired in accordance with section 1124 of the Bankruptcy Code.

178. "*Related Party*" means, collectively, current and former directors, managers, officers, shareholders, equity holders (regardless of whether such interests are held directly or indirectly), affiliated investment funds or investment vehicles, predecessors, participants, successors, assigns (whether by operation of law or otherwise), subsidiaries, current, former, and future affiliates, associated entities, managed entities, accounts or funds, partners, limited partners, general partners, principals, members, management companies, fund advisors, fiduciaries, trustees, employees, agents (including any Distribution Agent), advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, other representatives, and other professionals, representatives, advisors, predecessors, successors, and assigns, each solely in their capacities as such, solely in their capacity as such, and such entities' respective heirs, executors, estates, servants and nominees.

179. "*Released Parties*" means, collectively, and in each case in its capacity as such: (a) the Debtors; (b) the Reorganized Debtors; (c) the DIP Facility Agent; (d) the DIP Facility Lenders; (e) the Backstop Commitment Parties; (f) the Holders of 2019 Term Loan Facility Claims; (g) the 2019 Term Loan Facility Agent; (h) the Amended and Restated 2019 Term Loan Facility Lenders; (i) the Amended and Restated 2019 Term Loan Facility Agent; (j) the Supporting Noteholders; (k) the Indenture Trustees; (l) the Exit Facility Lenders; (m) the Exit Facility Agent; (n) the Milestone Parties; (o) the Creditors' Committee and each of its current and former members; (p) each current and former Affiliate of each Entity in clause (a) through (o); and (q) each Related Party of each Entity in clause (a) through (p); *provided that* any holder of a Claim or Interest that (x) validly opts out of the releases contained in the Plan or (y) files an objection to the releases contained in the Plan shall not be a "Released Party."

180. "*Releasing Parties*" means, collectively, and in each case in its capacity as such: (a) the Debtors; (b) the Reorganized Debtors; (c) the DIP Facility Agent; (d) the DIP Facility Lenders; (e) the Backstop Commitment Parties; (f) the Holders of 2019 Term Loan Facility Claims; (g) the 2019 Term Loan Facility Agent; (h) the Amended and Restated 2019 Term Loan Facility Lenders; (i) the Amended and Restated 2019 Term Loan Facility Agent; (j) the Supporting Noteholders; (k) the Indenture Trustees; (l) the Exit Facility Lenders; (m) the Exit Facility Agent; (n) all Holders of Claims; (o) all Holders of Interests; (p) the Milestone Parties; (q) the Creditors' Committee and each of its

current and former members; (r) each current and former Affiliate of each Entity in clause (a) through (q); and (s) each Related Party of each Entity in clause (a) through (r); *provided that* any holder of a Claim or Interest that (x) validly opts out of the releases contained in the Plan or (y) files an objection to the releases contained in the Plan shall not be a "Releasing Party"; *provided*, *further*, that for the avoidance of doubt, no Holder of a Claim that is party to or has otherwise signed the Restructuring Support Agreement may opt out of the releases.

181.    "*Reorganized Bristow Parent*" means Bristow Parent, as reorganized pursuant to and under the Plan, on and after the Effective Date, or any successor or assign thereto.

182.    "*Reorganized Bristow Parent Board*" means the board of directors of Reorganized Bristow Parent on and after the Effective Date.

183.    "*Reorganized Debtors*" means the Debtors, as reorganized pursuant to and under the Restructuring Transactions, on and after the Effective Date, or any successors or assigns thereto.

184.    "*Required Backstop Parties*" has the meaning ascribed to such term in the Restructuring Support Agreement.

185.    "*Required DIP Lenders*" has the meaning ascribed to such term in the Restructuring Support Agreement.

186.    "*Required RSA Parties*" means, with respect to any document, order, agreement or as otherwise used in this Plan, the applicable parties holding the applicable consent rights under the Restructuring Support Agreement (including section 2.02 thereof).

187.    "*Restructuring Documents*" has the meaning ascribed to such term in the Restructuring Support Agreement.  For the avoidance of doubt, Restructuring Documents shall include the Final Cash Collateral Order, the Disclosure Statement, the other solicitation materials with respect to the Plan, the Conditional Disclosure Statement Order, the Plan, each document included in the Plan Supplement, the Backstop Commitment Agreement, the Confirmation Order, the DIP Facility Credit Agreement, the DIP Order, the Exit Facility Credit Agreement, the Amended and Restated 2019 Term Loan Credit Agreement,  the Amended PK Air Credit Facility Agreement, the New Organizational Documents, the Management Incentive Plan and the Rights Offering Procedures.  Each of the Restructuring Documents shall comport with the terms of the Restructuring Support Agreement, including the applicable consent rights thereunder (including section 2.02 thereof).  The Debtors and the Required RSA Parties shall consult with the Creditors' Committee regarding the Restructuring Documents, and the Restructuring Documents shall be subject to the Committee Consent Right.

188.    "*Restructuring Support Agreement*" means that certain Second Amended and Restated Restructuring Support Agreement, entered into and dated as of July 24, 2019, by and among the Debtors and the Supporting Noteholders, including all exhibits, schedules and other attachments thereto, as such agreement may be amended from time to time in accordance with the terms thereof including pursuant to the Committee Joinder and which shall only be amended in accordance with the terms thereof, a copy of which is attached to the Disclosure Statement as **Exhibit B**.

189.    "*Restructuring Term Sheet*" means the term sheet attached as **Exhibit A** to the Restructuring Support Agreement including all exhibits, schedules and other attachments thereto.

190.    "*Restructuring Transactions*" mean those mergers, amalgamations, consolidations, arrangements, continuances, restructurings, transfers, conversions, dispositions, liquidations, dissolutions, or other corporate transactions that the Debtors and the Required RSA Parties reasonably determine to be necessary to implement the Plan.

191.    "*Restructuring Transactions Exhibit*" means an exhibit, which may be included as needed in the Plan Supplement, that sets forth the steps to be carried out to effectuate the Restructuring Transactions on and after the Effective Date.

192. "*Retained Causes of Action*" means those Causes of Action that shall vest in the Reorganized Debtors on the Effective Date, which, for the avoidance of doubt, shall not include any of the Causes of Action that are settled, released or exculpated under the Plan. For the avoidance of doubt, and notwithstanding anything to the contrary under the Plan, any and all Causes of Action that the Debtors may hold against Columbia Helicopters, Inc. and its Related Parties shall be Retained Causes of Action.

193. "*Rights Offering*" means, collectively, the 1145 Rights Offering and the 4(a)(2) Rights Offering, each of which shall be conducted in accordance with the Backstop Commitment Agreement, the Restructuring Support Agreement, and the applicable Rights Offering Procedures.

194. "*Rights Offering Offerees*" means, collectively, (i) the Holders of Secured Notes Claims, (ii) the Holders of Unsecured Notes Claims that are Eligible 4(a)(2) Holders, (iii) the Holders of Unsecured Notes Claims that are **not** Eligible 4(a)(2) Holders and do **not** timely make the Unsecured Cash Out Election, and (iv) the Holders of General Unsecured Claims that do **not** timely make the Unsecured Cash Out Election.

195. "*Rights Offering Participants*" means, collectively, the Rights Offering Offerees that duly subscribe for New Stock in accordance with the Rights Offering Procedures.

196. "*Rights Offering and Cash Out Procedures*" means, collectively, the 1145 Rights Offering and Cash Out Election Procedures and the 4(a)(2) Rights Offering Procedures, as applicable, each of which shall be subject to (i) the consent rights of the Required RSA Parties on the terms set forth in the Restructuring Support Agreement, and (ii) the Committee Consent Rights.

197. *Rights Offering Procedures*" means, collectively, the 1145 Rights Offering and Cash Out Election Procedures and the 4(a)(2) Rights Offering Procedures, as applicable, each of which shall be subject to (i) the consent rights of the Required RSA Parties on the terms set forth in the Restructuring Support Agreement, and (ii) the Committee Consent Rights.

198. "*Rights Offering Stock*" means, collectively, the 1145 Rights Offering Stock and the 4(a)(2) Rights Offering Stock to be purchased by the Rights Offering Participants pursuant to the Rights Offering, which shall be equal to 58.22% of the New Stock on a fully-diluted basis (except for the New Stock to be issued pursuant to the Management Incentive Plan) and shall be payable 8.175% in New Preferred Stock and 91.825% in New Common Stock, subject to adjustment as set forth in the Backstop Commitment Agreement. For the avoidance of doubt, the term "Rights Offering Stock" does not include the New Common Stock or New Preferred Stock issued on account of the Backstop Commitment Fee.

199. "*Schedule of Assumed Executory Contracts and Unexpired Leases*" means the schedule (including any modifications or amendments thereto) of certain Executory Contracts and Unexpired Leases to be assumed by the Debtors pursuant to the Plan, which shall be subject to the consent rights of the Required RSA Parties on the terms set forth in the Restructuring Support Agreement.

200. "*Schedule of Other Customer Contracts*" means the schedule (including any modifications or amendments thereto), if any, identifying the Other Customer Contracts.

201. "*Schedule of Rejected Executory Contracts and Unexpired Leases*" means the schedule (including any amendments or modifications thereto), if any, of certain Executory Contracts and Unexpired Leases to be rejected by the Debtors pursuant to the Plan.

202. "*Schedules*" means, collectively, the schedules of assets and liabilities and statements of financial affairs Filed by the Debtors pursuant to section 521 of the Bankruptcy Code.

203. "*SEC*" means the Securities and Exchange Commission.

204. "*Section 510(b) Claim*" means any claim against any of the Debtors that is subject to subordination under section 510(b) of the Bankruptcy Code.

20

205.    "*Secured*" or "*Secured Claim*" means, when referring to a Claim against any of the Debtors, a Claim that is: (a) secured by a lien on property in which any of the Debtors has an interest, which lien is valid, perfected, and enforceable pursuant to applicable law or by reason of a Bankruptcy Court order, or that is subject to a valid right of setoff pursuant to section 553 of the Bankruptcy Code, to the extent of the value of the creditor's interest in the Debtors' interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code; or (b) Allowed pursuant to the Plan, or separate order of the Bankruptcy Court, as a secured claim.

206.    "*Secured Noteholder Subscription Rights*" means the non-certificated rights to be distributed to each Holder of Secured Notes that will enable each Holder thereof to purchase its Pro Rata share of the Secured Rights Offering Stock, pursuant to the terms of the Rights Offering Procedures and the Backstop Commitment Agreement.

207.    "*Secured Notes*" means the 8.75% Senior Secured Notes due 2023, issued in an original principal amount of $350,000,000 pursuant to the Secured Notes Indenture.

208.    "*Secured Notes Ad Hoc Group*" has the meaning ascribed to such term in the Restructuring Support Agreement.

209.    "*Secured Notes Claim*" means any Claim against any of the Debtors arising from or based upon the Secured Notes or the Secured Notes Indenture.

210.    "*Secured Notes Indenture*" means that certain indenture, dated as of March 6, 2018, as amended, modified or supplemented from time to time, for the Secured Notes, among Bristow Parent, as issuer, the Guarantor Subsidiaries, as guarantors, and the Secured Notes Indenture Trustee, as trustee.

211.    "*Secured Notes Indenture Trustee*" means U.S. Bank National Association, and any successor thereto, solely in its capacity as trustee under the Secured Notes Indenture.

212.    "*Secured Rights Offering Stock*" means the amount of the New Stock distributed pursuant to the Rights Offering in exchange for $37.5 million.

213.    "*Securities Act*" means the Securities Act of 1933, 15 U.S.C. §§ 77a–77aa, together with the rules and regulations promulgated thereunder, as amended from time to time, or any similar federal, state, or local law.

214.    "*Security*" has the meaning set forth in section 2(a)(1) of the Securities Act. "*Securities*" shall have a correlative meaning.

215.    "*Senior Notes*" means the 6.25% Senior Notes due 2022, issued in an original principal amount of $450,000,000 pursuant to the Senior Notes Indenture.

216.    "*Senior Notes Indenture*" means that certain indenture, dated as of October 12, 2012, as amended, modified or supplemented from time to time, for the Senior Notes, among Bristow Parent, as issuer, the Guarantor Subsidiaries, as guarantors, and the Senior Notes Indenture Trustee, as trustee.

217.    "*Senior Notes Indenture Trustee*" means Wilmington Trust, National Association, and any successor thereto, solely in its capacity as trustee under the Senior Notes Indenture.

218.    "*Servicer*" means an agent or other authorized representative of Holders of Claims or Interests.

219.    "*Solicitation Agent*" means Prime Clerk LLC, the notice, claims, and solicitation agent retained by the Debtors in the Chapter 11 Cases.

220.    "*Solicitation Materials*" means, collectively, the solicitation materials with respect to the Plan.

21

221.    "*Subscription Rights*" means, collectively, the 1145 Subscription Rights and the 4(a)(2) Subscription Rights.

222.    "*Supporting Noteholders*" has the meaning ascribed to such term in the Restructuring Support Agreement.

223.    "*Supporting Secured Noteholders*" has the meaning ascribed to such term in the Restructuring Support Agreement.

224.    "*Supporting Unsecured Noteholders*" has the meaning ascribed to such term in the Restructuring Support Agreement.

225.    "*Trade Claim*" means any Claim held by an ordinary course trade vendor of the Debtors against any of the Debtors on account of ordinary course goods and/or services provided to any of the Debtors, including any due but unpaid director fees as of the Petition Date. For the avoidance of doubt, Trade Claims shall not include any Claim arising from or based upon (1) rejection of any Executory Contract or Unexpired Lease, (2) the Debtors' prepetition return of any aircraft or any prepetition agreement or settlement with respect to any aircraft lease obligations, (3) any agreement or arrangement with any former insider (as of the Petition Date) of any Debtor or (4) any obligation in respect of deferred compensation plans for any participant that is not a current employee on the Effective Date.

226.    "*Transaction Expenses*" has the meaning ascribed to such term in the Restructuring Support Agreement.

227.    "*UK ABL Credit Facility*" means that certain asset based credit facility pursuant to the ABL Facilities Agreement, dated April 17, 2018, among Bristow Norway AS and Bristow Helicopters Limited, as borrowers, Barclays Bank PLC and Credit Suisse AG, Cayman Island Branch, as arrangers and bookrunners, Barclays Bank PLC as agent, issuing bank, security agent and swingline lender, and the several branches, other financial institutions and other lenders from time to time party thereto and Bristow Parent, as guarantor.

228.    "*UK ABL Credit Facility Guarantee*" means the guarantee by Bristow Parent of the obligations of Bristow Norway AS and Bristow Helicopters Limited under the UK ABL Credit Facility.

229.    "*UK ABL Credit Facility Guarantee Claim*" means any Claim against Bristow Parent arising from or based upon the UK ABL Credit Facility Guarantee.

230.    "*UK SAR Contract*" means that certain contract between Bristow Helicopters Limited and MCA for the provision of search and rescue services in the United Kingdom on behalf of Her Majesty's Coastguard.

231.    "*Unclaimed Distribution*" means any distribution under the Plan on account of an Allowed Claim to a Holder that has not: (a) accepted a particular distribution or, in the case of distributions made by check, negotiated such check; (b) given notice to the Reorganized Debtors of an intent to accept a particular distribution; (c) responded to the Debtors' or Reorganized Debtors' requests for information necessary to facilitate a particular distribution; or (d) taken any other action necessary to facilitate such distribution.

232.    "*Unexpired Lease*" means a lease of nonresidential real property to which one or more of the Debtors is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

233.    "*Unimpaired*" means, with respect to a Class of Claims or Interests, a Class of Claims or Interests that is not impaired within the meaning of section 1124 of the Bankruptcy Code.

234.    "*Unsecured 1145 Rights Offering Stock*" means the amount of the Unsecured Rights Offering Stock that is also 1145 Rights Offering Stock.

22

235.     "*Unsecured 1145 Subscription Rights*" means the non-certificated rights to be distributed to each Holder of an Unsecured Notes Claim or General Unsecured Claim, in each case, that has not timely made the Unsecured Cash Out Election, that will enable each Holder thereof to purchase its Pro Rata share of the Unsecured 1145 Rights Offering Stock, pursuant to the terms of the Rights Offering Procedures and the Backstop Commitment Agreement.

236.     "*Unsecured 4(a)(2) Distribution Cash Amount*" means Cash in an amount of up to $250,000, *provided that* after all distributions of such amount have been completed as set forth in the Plan, any portion remaining shall be added to the GUC Distribution Cash Amount.

237.     "*Unsecured 4(a)(2) Rights Offering Stock*" means the amount of the Unsecured Rights Offering Stock that is also 4(a)(2) Rights Offering Stock.

238.     "*Unsecured 4(a)(2) Subscription Rights*" means the non-certificated rights to be distributed to each 4(a)(2) Eligible Holder of an Unsecured Notes Claim or General Unsecured Claim that has not timely made the Unsecured Cash Out Election, that will enable each Holder thereof to purchase its Pro Rata share of the Unsecured 4(a)(2) Rights Offering Stock, pursuant to the terms of the Rights Offering Procedures and the Backstop Commitment Agreement.

239.     "*Unsecured Cash Out Election*" means the election to be made by (a) each holder of an General Unsecured Claim to receive the treatment under the Plan set forth in Article III.B.12.b.i.y or Article III.B.12.b.ii.y instead of the treatment under the Plan set forth in Article III.B.12.b.i.x or Article III.B.12.b.ii.x, as applicable, and (b) each holder of an Unsecured Notes Claim that is not a 4(a)(2) Eligible Holder to receive the treatment under the Plan set forth in Article III.B.8.b.ii.y instead of the treatment under the Plan set forth in Article III.B.8.b.ii.x, with such election being described in greater detail in the 1145 Rights Offering and Unsecured Cash Out Election Procedures.

240.     "*Unsecured Equity Pool*" means New Common Stock in an amount equal to 11% of all New Stock on a fully-diluted basis (except for the New Stock to be issued pursuant to the Management Incentive Plan).

241.     "*Unsecured Notes*" means, collectively, the Senior Notes and the Convertible Notes.

242.     "*Unsecured Notes Ad Hoc Group*" has the meaning ascribed to such term in the Restructuring Support Agreement.

243.     "*Unsecured Notes Claim*" means any Claim against any of the Debtors arising from or based upon the Senior Notes, the Senior Notes Indenture, the Convertible Notes, or the Convertible Notes Indenture.

244.     "*Unsecured Notes Indenture Trustees*" means collectively, the Senior Notes Indenture Trustee and the Convertible Notes Indenture Trustee.

245.     "*Unsecured Rights Offering Stock*" means the amount of the New Stock distributed pursuant to the Rights Offering in exchange for $347.5 million.

246.     "*Unsubscribed Shares*" has the meaning ascribed to such term in the Backstop Commitment Agreement.

247.     "*U.S. Trustee*" means the Office of the United States Trustee for the Southern District of Texas.

248.     "*Voting Classes*" has the meaning ascribed to such term in the Conditional Disclosure Statement Order.

249.     "*Voting Report*" means the report certifying the methodology for the tabulation of votes and result of voting under the Plan.

23

B.      *Rules of Interpretation*

For purposes herein:  (1) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (2) unless otherwise specified, any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions; (3) unless otherwise specified, any reference herein to an existing document, schedule, or exhibit, shall mean such document, schedule, or exhibit, as it may have been or may be amended, modified, or supplemented; (4) unless otherwise specified, all references herein to "Articles" and "Sections" are references to Articles and Sections, respectively, hereof or hereto; (5) the words "herein," "hereof," and "hereto" refer to the Plan in its entirety rather than to any particular portion of the Plan; (6) captions and headings to Articles and Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan; (7) unless otherwise specified herein, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (8) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to such term in the Bankruptcy Code or the Bankruptcy Rules, as applicable; (9) references to docket numbers of documents Filed in the Chapter 11 Cases are references to the docket numbers under the Bankruptcy Court's CM/ECF system; (10) all references to statutes, regulations, orders, rules of courts, and the like shall mean as amended from time to time, and as applicable to the Chapter 11 Cases, unless otherwise stated; (11) references to "shareholders," "directors," and/or "officers" shall also include "members" and/or "managers," as applicable, as such terms are defined under the applicable state limited liability company laws; (12) the words "include" and "including" and variations thereof shall not be deemed to be terms of limitation, and shall be deemed to be followed by the words "without limitation"; and (13) any immaterial effectuating provisions may be interpreted by the Debtors or the Reorganized Debtors in such a manner that is consistent with the overall purpose and intent of the Plan and without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity; *provided that* no effectuating provision shall be immaterial or deemed immaterial if it has any substantive legal or economic effect on any Person.

C.      *Computation of Time*

Unless otherwise specifically stated herein, the provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein.  If the date on which a transaction may occur pursuant to the Plan shall occur on a day that is not a Business Day, then such transaction shall instead occur on the next succeeding Business Day.  Any action to be taken on the Effective Date may be taken on or soon as reasonably practicable after the Effective Date.

D.      *Governing Law*

Except to the extent a rule of law or procedure is supplied by federal law (including the Bankruptcy Code or Bankruptcy Rules), and subject to the provisions of any contract, lease, instrument, release, indenture, or other agreement or document entered into expressly in connection herewith, the rights and obligations arising hereunder shall be governed by, and construed and enforced in accordance with, the laws of the State of New York, without giving effect to conflict of laws principles.

E.      *Reference to Monetary Figures*

All references in the Plan to monetary figures refer to currency of the United States of America, unless otherwise expressly provided.

F.      *Reference to the Debtors or the Reorganized Debtors*

Except as otherwise specifically provided in the Plan to the contrary, references in the Plan to the Debtors or to the Reorganized Debtors mean the Debtors and the Reorganized Debtors, as applicable, to the extent the context requires.

24

G.    *Controlling Document*

In the event of an inconsistency between the Plan and the Disclosure Statement, the terms of the Plan shall control in all respects. In the event of an inconsistency between the Plan and any document included in the Plan Supplement, the applicable Plan Supplement document shall control. In the event of an inconsistency between the Confirmation Order and any of the Plan, the Disclosure Statement, or the Plan Supplement, the Confirmation Order shall control.

# ARTICLE II.
# ADMINISTRATIVE AND PRIORITY CLAIMS

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, Professional Fee Claims, Priority Tax Claims, DIP Facility Claims and Other Priority Claims have not been classified and thus are excluded from the Classes of Claims and Interests set forth in Article III of the Plan.

A.    *Administrative Claims*

Except with respect to the Professional Fee Claims, DIP Facility Claims and Claims for fees and expenses pursuant to section 1930 of chapter 123 of title 28 of the United States Code, and except to the extent that a Holder of an Allowed Administrative Claim and the Debtor (with the consent of the Required RSA Parties, not to be unreasonably withheld) against which such Allowed Administrative Claim is asserted agree to less favorable treatment for such Holder, or such Holder has been paid by any Debtor on account of such Allowed Administrative Claim prior to the Effective Date, each Holder of such an Allowed Administrative Claim will receive in full and final satisfaction of its Allowed Administrative Claim an amount of Cash equal to the amount of such Allowed Administrative Claim in accordance with the following: (1) if an Administrative Claim is Allowed on or prior to the Effective Date, on the Effective Date or as soon as reasonably practicable thereafter (or, if not then due, when such Allowed Administrative Claim is due or as soon as reasonably practicable thereafter); (2) if such Administrative Claim is not Allowed as of the Effective Date, no later than 30 days after the date on which the Reorganized Debtors Allow such Allowed Administrative Claim or the date on which an order Allowing such Administrative Claim becomes a Final Order, or as soon as reasonably practicable thereafter, as applicable; (3) if such Allowed Administrative Claim is based on liabilities incurred by the Debtors in the ordinary course of their business after the Petition Date, in accordance with the terms and conditions of the particular transaction giving rise to such Allowed Administrative Claim without any further action by the Holder of such Allowed Administrative Claim; (4) at such time and upon such terms as may be agreed upon by such Holder and the Debtors or the Reorganized Debtors, as applicable; or (5) at such time and upon such terms as set forth in an order of the Bankruptcy Court.

Holders of Administrative Claims that are required to File and serve a request for payment of such Administrative Claims by the Administrative Claims Bar Date that do not File and serve such a request by the Administrative Claims Bar Date shall be forever barred, stopped, and enjoined from asserting such Administrative Claims against the Debtors or the Reorganized Debtors, and such Administrative Claims shall be deemed compromised, settled, and released as of the Effective Date. For the avoidance of doubt, Holders of DIP Facility Claims shall not be required to File or serve any request for payment of such DIP Facility Claims.

B.    *Professional Fee Claims*

Notwithstanding anything to the contrary herein, all final requests for payment of Professional Fee Claims for services rendered and reimbursement of expenses incurred during the period from the Petition Date through the Confirmation Date must be Filed with the Bankruptcy Court no later than 45 days after the Effective Date. The Bankruptcy Court shall determine the Allowed amounts of such Professional Fee Claims after notice and a hearing in accordance with the Bankruptcy Code, the Bankruptcy Rules, and any procedures established by the Bankruptcy Court. The Reorganized Debtors shall pay Professional Fee Claims in Cash in the amount the Bankruptcy Court Allows, including from the Professional Fee Escrow Account, which the Reorganized Debtors will establish in trust for the Professionals and fund with Cash equal to the Professional Fee Amount on the Effective Date. Professionals shall deliver to the Debtors their estimates for purposes of the Reorganized Debtors computing the Professional Fee Amount no later than 10 Business Days following the Confirmation Date. For the avoidance of doubt, no such estimate shall be deemed to limit the amount of the fees and expenses that are the subject of a Professional's final request for

25

payment of Professional Fee Claims Filed with the Bankruptcy Court. If a Professional does not provide an estimate, the Debtors may estimate the unpaid and unbilled fees and expenses of such Professional. No funds in the Professional Fee Escrow Account shall be property of the Estates, and the Professional Fee Escrow Account shall be maintained in trust solely for the benefit of Holders of Professional Fee Claims. Any funds remaining in the Professional Fee Escrow Account after all Allowed Professional Fee Claims have been paid shall be promptly turned over to the Reorganized Debtors.

From and after the Confirmation Date, any requirement that Professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Reorganized Debtors may employ and pay any Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court. The reasonable and documented fees and expenses incurred by the Professionals to the Creditors' Committee after the Confirmation Date until the complete dissolution of the Creditors' Committee for all purposes in accordance with Article XIII.D will be paid by the Debtors or the Reorganized Debtors, as applicable, in the ordinary course of business (and not later than 30 days after submission of invoices).

C.      *Priority Tax Claims*

Except to the extent that a Holder of an Allowed Priority Tax Claim and the Debtor (with the consent of the Required RSA Parties, not to be unreasonably withheld) against which such Allowed Priority Tax Claim is asserted agree to a less favorable treatment for such Holder, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Priority Tax Claim, each Holder of such Allowed Priority Tax Claim shall be treated in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code and, for the avoidance of doubt, Holders of Allowed Priority Tax Claims will receive interest on such Allowed Priority Tax Claims after the Effective Date in accordance with sections 511 and 1129(a)(9)(C) of the Bankruptcy Code.

D.      *DIP Facility Claims*

As of the Effective Date, the DIP Facility Claims shall be Allowed and deemed to be Allowed Claims in the full amount outstanding under the DIP Facility Credit Agreement and the DIP Order, including all principal, accrued and unpaid interest, and all accrued and unpaid fees, expenses, and noncontingent indemnity payable under the DIP Facility Credit Agreement or the DIP Order. Except to the extent that a Holder of an Allowed DIP Facility Claim agrees to a less favorable treatment, in full and final satisfaction, compromise, settlement, release, and discharge of, and in exchange for, each Allowed DIP Facility Claim, each such Holder shall receive its Pro Rata share of (i) payment in full in Cash of any accrued and unpaid interest, fees and expenses, (ii) the Equitization Consent Fee, payable at the election of each Holder of a DIP Facility Claim in New Common Stock or New Preferred Stock, and (iii) the Equitization Allocation New Stock, of which 8.175% shall be payable in New Preferred Stock and 91.825% shall be payable in New Common Stock, subject to adjustment as set forth in the Backstop Commitment Agreement. Upon receiving the treatment set forth in this paragraph, on the Effective Date, all Liens and security interests granted to secure the DIP Facility Claims shall be automatically terminated and of no further force and effect without any further notice to or action, order, or approval of the Bankruptcy Court or any other Entity.

E.      *Statutory Fees*

All fees due and payable pursuant to section 1930 of title 28 of the United States Code prior to the Effective Date shall be timely paid by the Debtors. On and after the Effective Date, the Reorganized Debtors shall timely pay any and all such fees when due and payable, and shall File with the Bankruptcy Court quarterly reports in a form reasonably acceptable to the U.S. Trustee. Each Debtor shall remain obligated to pay such quarterly fees to the U.S. Trustee until the earliest of that particular Debtor's case being closed, dismissed, or converted to a case under chapter 7 of the Bankruptcy Code.

**ARTICLE III.**
**CLASSIFICATION, TREATMENT, AND VOTING OF CLAIMS AND INTERESTS**

A.    *Classification of Claims and Interests*

The Plan constitutes a separate plan proposed by each Debtor within the meaning of section 1121 of the Bankruptcy Code; *provided that* the Debtors and the Reorganized Debtors, as applicable, shall consolidate Allowed Claims into one Estate for purposes of distributions for Classes 8 and 12. Except for the Claims addressed in Article II of the Plan, all Claims and Interests are classified in the Classes set forth below for all purposes, including voting, Confirmation, and distribution pursuant to the Plan, all in accordance with sections 1122 and 1123(a)(1) of the Bankruptcy Code. A Claim or an Interest is classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest qualifies within the description of such other Classes. A Claim or an Interest also is classified in a particular Class for the purpose of receiving distributions under the Plan only to the extent that such Claim or Interest is an Allowed Claim or Existing Interest in that Class and has not been paid, released, or otherwise satisfied or disallowed by Final Order prior to the Effective Date. Unless otherwise indicated, each Holder of an Allowed Claim or Interest, as applicable, shall receive such treatment on the Effective Date (or, if payment is not then due, in accordance with its terms in the ordinary course of business) or as soon as reasonably practicable thereafter, the timing of which shall be subject to the reasonable discretion of the Reorganized Debtors and the consent of the Required RSA Parties (not to be unreasonably withheld). For all purposes under the Plan, each Class will contain sub-Classes for each of the Debtors, as applicable; *provided*, that any Class that does not contain any Allowed Claims or Existing Interests with respect to a particular Debtor will be treated in accordance with Article III.D below.

Below is a chart assigning each Class a number for purposes of identifying each separate Class.

| Class | Claim or Interest | Status | Voting Rights |
|-------|-------------------|--------|---------------|
| 1 | Other Secured Claims | Unimpaired | Deemed to Accept |
| 2 | Other Priority Claims | Unimpaired | Deemed to Accept |
| 3 | 2019 Term Loan Facility | Impaired | Entitled to Vote |
| 4 | Secured Notes Claims | Impaired | Entitled to Vote |
| 5 | Lombard (BULL) Term Loan Claims | Unimpaired | Deemed to Accept |
| 6 | PK Air Credit Facility Claims and MAG Lease Obligation Claims | Impaired | Entitled to Vote |
| 7 | Macquarie Term Loan Credit Facility Claims | Impaired | Entitled to Vote |
| 8 | Unsecured Notes Claims | Impaired | Entitled to Vote |
| 9 | Lombard (BALL) Term Loan Guarantee Claims and UK ABL Credit Facility Guarantee Claims | Unimpaired | Deemed to Accept |
| 10 | MCA and Other Customer Guarantee Claims | Unimpaired | Deemed to Accept |
| 11 | Trade Claims | Unimpaired | Deemed to Accept |
| 12 | General Unsecured Claims | Impaired | Entitled to Vote |
| 13 | Intercompany Claims | Unimpaired, or Impaired | Deemed to Accept, or Presumed to Reject |

27

| Class | Claim or Interest | Status | Voting Rights |
|---|---|---|---|
| 14 | Intercompany Interests | Unimpaired, or Impaired | Deemed to Accept, or Presumed to Reject |
| 15 | Existing Interests | Impaired | Presumed to Reject |
| 16 | Section 510(b) Claims | Impaired | Presumed to Reject |

B.       *Treatment of Classes of Claims and Interests*

1.       Class 1 — Other Secured Claims

a.       *Classification*:  Class 1 consists of all Other Secured Claims.

b.       *Treatment*:  Each Holder of an Allowed Other Secured Claim shall receive, in full and final satisfaction of such Allowed Other Secured Claim, at the option of the applicable Debtor (with the consent of the Required RSA Parties, not to be unreasonably withheld), either:

   i.       payment in full in Cash;

   ii.      delivery of the Collateral securing any such Allowed Other Secured Claim;

   iii.     Reinstatement of such Allowed Other Secured Claim, notwithstanding any contractual provision or applicable non-bankruptcy law that entitles the holder of such claim to demand or to receive payment prior to the stated maturity of such Allowed Other Secured Claim from and after the occurrence of default; or

   iv.      such other treatment rendering such Allowed Other Secured Claim Unimpaired.

c.       *Voting*:  Class 1 is Unimpaired.  Holders of Allowed Other Secured Claims in Class 1 are conclusively deemed to have accepted the Plan under section 1126(f) of the Bankruptcy Code.  Holders of Allowed Other Secured Claims in Class 1 are not entitled to vote to accept or reject the Plan.

2.       Class 2 — Other Priority Claims

a.       *Classification*:  Class 2 consists of all Other Priority Claims.

b.       *Treatment*:  Each Holder of an Allowed Other Priority Claim shall receive, in full and final satisfaction of such Allowed Other Priority Claim, at the option of the applicable Debtors (with the consent of the Required RSA Parties, not to be unreasonably withheld), either:

   i.       Cash in an amount equal to such Allowed Other Priority Claim; or

   ii.      such other treatment rendering such Allowed Other Priority Claim Unimpaired.

c.       *Voting*:  Class 2 is Unimpaired.  Holders of Allowed Other Priority Claims in Class 2 are conclusively deemed to have accepted the Plan under section 1126(f) of the Bankruptcy Code.  Holders of Allowed Other Priority Claims in Class 2 are not entitled to vote to accept or reject the Plan.

3.       Class 3 — 2019 Term Loan Facility Claims

a.       *Classification*:  Class 3 consists of all 2019 Term Loan Facility Claims.

28

b. *Treatment*: As of the Effective Date, the 2019 Term Loan Facility Claims shall be Allowed and deemed to be Allowed Claims in the full amount outstanding under the 2019 Term Loan Facility Credit Agreement, the DIP Order and the Final Cash Collateral Order, including all principal, accrued and unpaid interest, and all accrued and unpaid fees, expenses, and noncontingent indemnity payable under the 2019 Term Loan Facility Credit Agreement, the DIP Order and the Final Cash Collateral Order. In full and final satisfaction of each Allowed 2019 Term Loan Facility Claim, each Holder of an Allowed 2019 Term Loan Facility Claim shall either:

    i. if the Debtors enter into the Exit Facility on or prior to the Effective Date, receive payment in full in Cash; or

    ii. if the Debtors do not enter into the Exit Facility on or prior to the Effective Date, (x) have its Allowed 2019 Term Loan Facility Claim Reinstated and governed by the Amended and Restated 2019 Term Loan Credit Agreement, and (y) receive its Pro Rata share of the 2019 Term Loan Amendment Fee.

c. *Voting*: Class 3 is Impaired. Holders of Allowed 2019 Term Loan Facility Claims in Class 3 are entitled to vote to accept or reject the Plan.

4. Class 4 — Secured Notes Claims

a. *Classification*: Class 4 consists of all Secured Notes Claims.

b. *Treatment*: As of the Effective Date, the Secured Notes Claims shall be Allowed and deemed to be Allowed Claims in the full amount outstanding under the Secured Notes Indenture, the DIP Order and the Final Cash Collateral Order, including all principal, accrued and unpaid interest, and all accrued and unpaid fees, expenses, and noncontingent indemnity payable under the Secured Notes Indenture, the DIP Order and the Final Cash Collateral Order. In full and final satisfaction of each Secured Notes Claim, each Holder of an Allowed Secured Notes Claim shall receive (i) payment in full in Cash of any accrued and unpaid prepetition and postpetition interest at the non-default contract rate (except to the extent otherwise paid as adequate protection pursuant to the Final Cash Collateral Order and not recharacterized or otherwise avoided, but *not* including any make-whole or prepayment premium), (ii) after giving effect to the immediately preceding clause (i), Cash in an amount equal to 97% of the outstanding amount of such Allowed Secured Notes Claim *and* (iii) such Holder's Pro Rata share of the Secured Noteholder Subscription Rights.

c. *Voting*: Class 4 is Impaired. Holders of Allowed Secured Notes Claims in Class 4 are entitled to vote to accept or reject the Plan.

5. Class 5 — Lombard (BULL) Term Loan Claims

a. *Classification*: Class 5 consists of all Lombard (BULL) Term Loan Claims.

b. *Treatment*: In full and final satisfaction of each Lombard (BULL) Term Loan Claim, all Allowed Lombard (BULL) Term Loan Claims shall be Reinstated.

c. *Voting*: Class 5 is Unimpaired. Holders of Allowed Lombard (BULL) Term Loan Claims in Class 5 are conclusively deemed to have accepted the Plan under section 1126(f) of the Bankruptcy Code. Holders of Allowed Lombard (BULL) Term Loan Claims in Class 5 are not entitled to vote to accept or reject the Plan.

6.  Class 6 — PK Air Credit Facility Claims and MAG Lease Obligation Claims

    a.    *Classification*:  Class 6 consists of all PK Air Credit Facility Claims and MAG Lease Obligation Claims.

    b.    *Treatment*:  As of the date of entry of the Milestone Settlement Order, the PK Air Credit Facility Claims and the MAG Lease Obligation Claims shall be Allowed in full and reinstated as and to the extent set forth in the Milestone Settlement Order.  The Allowed PK Credit Facility Claims and MAG Lease Obligation Claims shall be satisfied in accordance with the Milestone Settlement Order, and Allowed PK Air Credit Facility Claims and MAG Lease Obligation Claims, the PK Air Facility Loan Documents shall be amended and the MAG Lease Documents shall be assumed and cured pursuant to, and in accordance with, and to the extent provided for in, the Milestone Settlement and the Milestone Settlement Order, and such PK Air Facility Loan Documents and MAG Lease Documents shall be reinstated and vest with, and be binding on, the Reorganized Debtors as and to the extent set forth in the Milestone Settlement Order.  The Milestone Parties and PK Air shall retain all security interests, guarantees and share charges that secure the PK Air Credit Facility Claims and MAG Lease Obligation Claims as and to the extent set forth in the Milestone Settlement Order.

    c.    *Voting*:  Class 6 is Impaired.  Holders of PK Air Credit Facility Claims and MAG Lease Obligation Claims in Class 6 are entitled to vote to accept or reject the Plan.

7.  Class 7 — Macquarie Term Loan Credit Facility Claims

    a.    *Classification*:  Class 7 consists of all Macquarie Term Loan Credit Facility Claims.

    b.    *Treatment*:  In full and final satisfaction of all Allowed Macquarie Term Loan Credit Facility Claims, such Allowed Macquarie Term Loan Credit Facility Claims shall be Reinstated, or shall receive such other treatment as may be agreed upon by such Holders, the Debtors, and the Required Backstop Parties.  The Macquarie Term Loan Credit Facility and the other Macquarie Term Loan Documents shall be amended in accordance with, and to the extent provided for in, the Macquarie Settlement Order and shall be reinstated and vest with, and be binding on, the Reorganized Debtors as and to the extent set forth in the Macquarie Settlement Order.

    c.    *Voting*:  Class 7 is Impaired.  Holders of Allowed Macquarie Term Loan Credit Facility Claims in Class 7 are entitled to vote to accept or reject the Plan.

8.  Class 8 — Unsecured Notes Claims

    a.    *Classification*:  Class 8 consists of all Unsecured Notes Claims.

    b.    *Treatment*: Each holder of an Allowed Unsecured Notes Claim shall receive, in full and final satisfaction of all Allowed Unsecured Notes Claims:

        i.    if such Holder **is** a 4(a)(2) Eligible Holder, its Pro Rata[2] share of (x) the Unsecured Equity Pool, (y) the Unsecured 1145 Subscription Rights, and (z) the Unsecured 4(a)(2) Subscription Rights; or

---

[2]    For the treatment set forth in this Section III.B.8.i, the Pro Rata amounts shall be calculated as follows: for the treatment set forth in (x) and (y), the Pro Rata amounts shall be calculated as the Pro Rata share of all Allowed Unsecured Notes Claims and all Allowed General Unsecured Claims, in each case, that do not make the Unsecured Cash Out Election (including the failure to timely return an election notice), and for the treatment set forth in (z), the Pro Rata amount shall be calculated as the Pro Rata share of all Allowed Unsecured Notes Claims and all Allowed General Unsecured Claims, in each case, that are held

ii. if such Holder is **not** a 4(a)(2) Eligible Holder, either:

(x) if such Holder **does not** timely make the Unsecured Cash Out Election (including the failure to timely return an election notice), its Pro Rata[3] share of (A) the Unsecured Equity Pool, (B) *solely if such Holder fully exercises its Unsecured 1145 Subscription Rights*, the Unsecured 4(a)(2) Distribution Cash Amount (up to a maximum of 7.6% of such Holder's Unsecured Notes Claims), and (C) the Unsecured 1145 Subscription Rights; or

(y) if such Holder **does** timely make the Unsecured Cash Out Election, its Pro Rata[4] share of the GUC Distribution Cash Amount.

c. *Voting*: Class 8 is Impaired. Holders of Allowed Unsecured Notes Claims in Class 8 are entitled to vote to accept or reject the Plan.

9. Class 9 – Lombard (BALL) Term Loan Guarantee Claims and UK ABL Credit Facility Guarantee Claims

a. *Classification*: Class 9 consists of all Lombard Guarantee Claims and UK ABL Facility Guarantee Claims.

b. *Treatment*: In full and final satisfaction of each Lombard (BALL) Term Loan Guarantee Claim and UK ABL Credit Facility Guarantee Claim, all Allowed Lombard (BALL) Term Loan Guarantee Claims and Allowed UK ABL Credit Facility Guarantee Claims shall be Reinstated.

c. *Voting*: Class 9 is Unimpaired. Holders of Allowed Lombard (BALL) Term Loan Guarantee Claims and Allowed UK ABL Credit Facility Guarantee Claims in Class 9 are conclusively deemed to have accepted the Plan under section 1126(f) of the Bankruptcy Code. Holders of Lombard (BALL) Term Loan Guarantee Claims and UK ABL Credit Facility Guarantee Claims in Class 9 are not entitled to vote to accept or reject the Plan.

10. Class 10 – MCA and Other Customer Guarantee Claims

a. *Classification*: Class 10 consists of all MCA and Other Customer Guarantee Claims.

b. *Treatment*: In full and final satisfaction of each MCA and Other Customer Guarantee Claim, all Allowed MCA and Other Customer Guarantee Claims shall be Reinstated.

c. *Voting*: Class 10 is Unimpaired. Holders of Allowed MCA and Other Customer Guarantee Claims in Class 10 are conclusively deemed to have accepted the Plan under section

---

by 4(a)(2) Eligible Holders and that do not make the Unsecured Cash Out Election (including the failure to return an election notice).

3 For the treatment set forth in this Section III.B.8.b.ii.x, the Pro Rata amounts shall be calculated as follows: for the treatment set forth in (A) and (C), the Pro Rata amount shall be calculated as the Pro Rata share of all Allowed Unsecured Notes Claims and all Allowed General Unsecured Claims, in each case, that do not make the Unsecured Cash Out Election (including the failure to timely return an election notice); and for the treatment set forth in (B), the Pro Rata amount shall be calculated as the Pro Rata share of all Allowed Unsecured Notes Claims and all Allowed General Unsecured Claims, in each case, that are not held by 4(a)(2) Eligible Holders and that do not make the Unsecured Cash Out Election (including the failure to timely return an election notice).

4 For the treatment set forth in this Section III.B.ii.y, the Pro Rata amounts shall be calculated as the Pro Rata share of all Allowed Unsecured Notes Claims held by Holders that are not a 4(a)(2) Eligible Holder and Allowed General Unsecured Claims, and, in each case, that timely make the Unsecured Cash Out Election.

31

1126(f) of the Bankruptcy Code. Holders of Allowed MCA and Other Customer Guarantee Claims in Class 10 are not entitled to vote to accept or reject the Plan.

11. Class 11 — Trade Claims

    a. *Classification*: Class 11 consists of all Trade Claims.

    b. *Treatment*: Each Holder of an Allowed Trade Claim shall receive, in full and final satisfaction of such Allowed Trade Claim, payment in full of such Allowed General Unsecured Claim on the Effective Date or otherwise in the ordinary course of the Debtors' business.

    c. *Voting*: Class 11 is Unimpaired. Holders of Allowed General Unsecured Claims in Class 11 are conclusively deemed to have accepted the Plan under section 1126(f) of the Bankruptcy Code. Holders of Allowed General Unsecured Claims in Class 11 are not entitled to vote to accept or reject the Plan.

12. Class 12 — General Unsecured Claims

    a. *Classification*: Class 12 consists of all General Unsecured Claims.

    b. *Treatment*: Each Holder of a General Unsecured Claim shall receive, in full and final satisfaction of such Allowed General Unsecured Claim:

        i. if such Holder **is** a 4(a)(2) Eligible Holder, either:

          (x) if such Holder **does not** timely make the Unsecured Cash Out Election, its Pro Rata[5] share of (A) the Unsecured Equity Pool (B) the Unsecured 1145 Subscription Rights, and (C) the Unsecured 4(a)(2) Subscription Rights; or

          (y) if such Holder **does** timely make the Unsecured Cash Out Election, its Pro Rata[6] share of the GUC Distribution Cash Amount.

        ii. if such Holder is **not** a 4(a)(2) Eligible Holder, either:

          (x) if such Holder **does not** timely make the Unsecured Cash Out Election, its Pro Rata[7] share of (A) the Unsecured Equity Pool, (B) *solely if such Holder fully exercises its Unsecured 1145 Subscription Rights*, the Unsecured 4(a)(2)

---

[5] For the treatment set forth in this <u>Section III.B.12.b.i.x</u>, the Pro Rata amounts shall be calculated as follows: for the treatment set forth in (A) and (B), the Pro Rata amount shall be calculated as the Pro Rata share of all Allowed Unsecured Notes Claims and all Allowed General Unsecured Claims, in each case, that do not make the Unsecured Cash Out Election (including the failure to timely return an election notice), and for the treatment set forth in (C), the Pro Rata amount shall be calculated as the Pro Rata share of all Allowed Unsecured Notes Claims and all Allowed General Unsecured Claims, in each case that are held by 4(a)(2) Eligible Holders and that do not make the Unsecured Cash Out Election (including the failure to timely return an election notice).

[6] For the treatment set forth in this <u>Section III.B.12.b.i.y</u>, the Pro Rata amounts shall be calculated as the Pro Rata share of all Allowed Unsecured Notes Claims held by Holders that are not a 4(a)(2) Eligible Holder and Allowed General Unsecured Claims, in each case, that timely make the Unsecured Cash Out Election.

[7] For the treatment set forth in this <u>Section III.B.12.b.ii.x</u>, the Pro Rata amounts shall be calculated as follows: for the treatment set forth in (A) and (C), the Pro Rata amount shall be calculated as the Pro Rata share of all Allowed Unsecured Notes Claims and all Allowed General Unsecured Claims, in each case, that do not make the Unsecured Cash Out Election (including the failure to timely return an election notice); and for the treatment set forth in (B), the Pro Rata amount shall be calculated as the Pro Rata share of all Allowed Unsecured Notes Claims and all Allowed General Unsecured Claims, in each case, that are not held by 4(a)(2) Eligible Holders and that do not make the Unsecured Cash Out Election (including the failure to timely return an election notice).

Distribution Cash Amount (up to a maximum of 7.6% of such Holder's General Unsecured Claims), and (C) the Unsecured 1145 Subscription Rights; or

(y) if such Holder **does** timely make the Unsecured Cash Out Election, its Pro Rata[8] share of the GUC Distribution Cash Amount.

c. *Voting*: Class 12 is Impaired. Holders of Allowed General Unsecured Claims in Class 12 are entitled to vote to accept or reject the Plan.

13. Class 13 — Intercompany Claims

a. *Classification*: Class 13 consists of all Intercompany Claims.

b. *Treatment*: Unless otherwise provided for under the Plan, Intercompany Claims shall, at the election of the Required RSA Parties, be Reinstated, compromised, or cancelled.

c. *Voting*: Class 13 is either Unimpaired, in which case the Holders of Allowed Intercompany Claims in Class 13 are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code, or Impaired and not receiving any distribution under the Plan, in which case the Holders of such Allowed Intercompany Claims in Class 13 are presumed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, each Holder of an Allowed Intercompany Claim in Class 13 will not be entitled to vote to accept or reject the Plan.

14. Class 14 — Intercompany Interests

a. *Classification*: Class 14 consists of all Intercompany Interests.

b. *Treatment*: Unless otherwise provided for under the Plan, Intercompany Claims shall, at the election of the Required RSA Parties, be Reinstated solely to maintain the Debtors' corporate structure, compromised, or cancelled.

c. *Voting*: Class 14 is either Unimpaired, in which case the Holders of Allowed Intercompany Interests in Class 14 are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code, or Impaired and not receiving any distribution under the Plan, in which case the Holders of such Allowed Intercompany Interests in Class 14 are presumed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, each Holder of an Allowed Intercompany Interest in Class 14 will not be entitled to vote to accept or reject the Plan.

15. Class 15 — Existing Interests

a. *Classification*: Class 15 consists of all Existing Interests.

b. *Treatment*: Each Existing Interest shall be cancelled, released, and expunged and shall be of no further force and effect. Each Holder of an Existing Interest shall not receive any distribution on account of such Existing Interest.

c. *Voting*: Class 15 is Impaired and not receiving any distribution under the Plan. Holders of Existing Interests in Class 15 are presumed to have rejected the Plan pursuant to section

---

8 For the treatment set forth in this Section III.B.12.b.ii.y, the Pro Rata amounts shall be calculated as the Pro Rata share of all Allowed Unsecured Notes Claims held by Holders that are not a 4(a)(2)Eligible Holder and all Allowed General Unsecured Claims and, in each case, that timely make the Unsecured Cash Out Election.

1126(g) of the Bankruptcy Code. Therefore, such Holders are not entitled to vote to accept or reject the Plan.

16.    Class 16 — Section 510(b) Claims.

    a.    *Classification*:  Class 16 consists of all Section 510(b) Claims.

    b.    *Treatment*:  Section 510(b) Claims will be canceled, released, and extinguished as of the Effective Date, and will be of no further force or effect, and each Holder of a Section 510(b) Claim will not receive any distribution on account of such Section 510(b) Claim.

    c.    *Voting*:  Class 16 is Impaired and not receiving any distribution under the Plan.  Holders of Section 510(b) Claims in Class 16 are presumed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, such Holders are not entitled to vote to accept or reject the Plan.

C.    *Special Provision Governing Unimpaired Claims*

Except as otherwise provided in the Plan, nothing under the Plan shall affect the Debtors' or the Reorganized Debtors' rights regarding any Unimpaired Claim, including all rights regarding legal and equitable defenses to, or setoffs or recoupments against, any such Unimpaired Claim.

D.    *Elimination of Vacant Classes*

Any Class of Claims or Interests that does not have a Holder of an Allowed Claim or Allowed Interest, or a Claim or Interest temporarily Allowed by the Bankruptcy Court as of the date of the Confirmation Hearing, shall be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

E.    *Voting Classes; Presumed Acceptance by Non-Voting Classes*

If a Class contains Claims eligible to vote on the Plan and no Holder of Claims eligible to vote in such Class votes to accept or reject the Plan, the Plan shall be presumed accepted by the Holders of such Claims in such Class.

F.    *Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code*

Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of Confirmation by acceptance of the Plan by at least one Impaired Class of Claims.  The Debtors shall seek Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class(es) of Claims or Interests.  The Debtors reserve the right to modify the Plan in accordance with Article XI of the Plan to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification, including by modifying the treatment applicable to a Class of Claims or Interests to render such Class of Claims or Interests Unimpaired to the extent permitted by the Restructuring Support Agreement, the Backstop Commitment Agreement, the Bankruptcy Code and the Bankruptcy Rules.

G.    *Intercompany Interests*

To the extent Reinstated under the Plan, the Intercompany Interests shall be Reinstated for the ultimate benefit of the Holders of Claims that receive New Common Stock and New Preferred Stock under the Plan, and the Intercompany Interests shall receive no recovery or distribution.  For the avoidance of doubt, to the extent Reinstated pursuant to the Plan, on and after the Effective Date, all Intercompany Interests shall be owned by the same Reorganized Debtor that corresponds with the Debtor that owned such Intercompany Interests prior to the Effective Date (subject to any modifications in the Restructuring Transactions Exhibit).

34

H.    *Substantive Consolidation; GUC Cash Distribution Amount*

The Plan is being proposed as a joint plan of reorganization of the Debtors for administrative purposes only and constitutes a separate chapter 11 plan of reorganization for each Debtor. The Plan is not premised upon the substantive consolidation of the Debtors with respect to the Classes of Claims or Interests set forth in the Plan; *provided that* the Debtors and the Reorganized Debtors, as applicable, shall consolidate Allowed Claims into one Estate for purposes of distributions for Classes 8 and 12.

I.    *Subordinated Claims and Interests*

The allowance, classification, and treatment of all Allowed Claims and Allowed Interests and their respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise. Pursuant to section 510 of the Bankruptcy Code, the Debtors or Reorganized Debtors, as applicable, reserve the right to re-classify any Allowed Claim or Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

## ARTICLE IV.
## PROVISIONS FOR IMPLEMENTATION OF THE PLAN

A.    *General Settlement of Claims, Interests, and Causes of Action*

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, upon the Effective Date, the provisions of the Plan shall constitute a good faith compromise and settlement of all Claims, Interests, Causes of Action, and controversies released, settled, compromised, discharged, satisfied, or otherwise resolved pursuant to the Plan. The Plan shall be deemed a motion, proposed by the Debtors and joined by the Supporting Noteholders and the Creditors' Committee to approve the good-faith compromise and settlement of all Claims, Interests, Causes of Action, and controversies pursuant to Bankruptcy Rule 9019, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise and settlement of all such Claims, Interests, Causes of Action, and controversies, as well as a finding by the Bankruptcy Court that such compromise and settlement is in the best interests of the Debtors, their Estates, and Holders of Claims and Interests and is fair, equitable, reasonable, and in the best interests of the Debtors and their Estates.

B.    *Restructuring Transactions*

On the Effective Date or as soon as reasonably practicable thereafter, the Reorganized Debtors shall consummate the Restructuring Transactions and take all actions reasonably acceptable to the Required RSA Parties as may be necessary or appropriate to effectuate the Restructuring Transactions, including: (1) the execution and delivery of any appropriate agreements or other documents of merger, consolidation, restructuring, conversion, disposition, transfer, formation, organization, dissolution, or liquidation containing terms that are consistent with the terms of the Plan and the Restructuring Support Agreement, and that satisfy the requirements of applicable law and any other terms to which the applicable Entities may agree, including the documents comprising the Plan Supplement and the New Organizational Documents; (2) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan and the Restructuring Support Agreement and having other terms for which the applicable Entities may agree; (3) the execution, delivery and filing, if applicable, of appropriate certificates or articles of incorporation, formation, reincorporation, merger, consolidation, conversion, or dissolution pursuant to applicable state law, including any applicable New Organizational Documents; (4) such other transactions that are required to effectuate the Restructuring Transactions; and (5) all other actions that the applicable Entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law.

35

C.       *Employee and Retiree Benefits*

Unless otherwise provided herein, and subject to <u>Article V</u> hereof, all employee wages and Compensation and Benefits Programs in place as of the Effective Date with the Debtors shall be assumed by the Reorganized Debtors and shall remain in place as of the Effective Date, and the Reorganized Debtors will continue to honor such agreements, arrangements, programs, and plans.  For the avoidance of doubt, pursuant to section 1129(a)(13) of the Bankruptcy Code, from and after the Effective Date, all retiree benefits (as such term is defined in section 1114 of the Bankruptcy Code), if any, shall continue to be paid in accordance with applicable law.

D.       *Issuance and Distribution of New Stock*

All Existing Interests shall be cancelled on the Effective Date and Reorganized Bristow Parent shall issue the New Stock to Holders of Claims and Interests entitled to receive New Stock pursuant to the Plan, the Rights Offering, the DIP Order, or the Backstop Commitment Agreement (including the Backstop Commitment Fee and the Equitization Consent Fee), in each case in the proportions set forth in the Plan and the Restructuring Support Agreement.  The issuance of New Stock shall be duly authorized without the need for any further corporate action and without any further action by the Debtors or the Reorganized Debtors or by Holders of any Claims or Interests, as applicable.  All New Stock issued under the Plan shall be duly authorized, validly issued, fully paid, and non-assessable.  All distributions of New Stock shall be made in accordance with all applicable regulatory requirements, including with respect to any limitations on foreign ownership of the New Stock.  Accordingly, in no event will Non-U.S. Citizens be entitled to own in the aggregate more than twenty-four and nine-tenths percent (24.9%) of the total number of outstanding shares of New Stock.

On the Effective Date, Reorganized Bristow Parent and all Holders of the New Stock then outstanding shall be deemed to be parties to the New Shareholders' Agreement, substantially in the form contained in the Plan Supplement, without the need for execution by any such Holder.  On the Effective Date, the New Shareholders' Agreement shall be binding on the Reorganized Debtors and all parties receiving, and all Holders of, the New Stock.

E.       *Determination of Holder Citizenship*

The Debtors or the Required Backstop Parties may require that a Holder of an Unsecured Notes Claim, General Unsecured Claim, or Secured Notes Claim demonstrate that it is a U.S. Citizen to the extent necessary to ensure that the Reorganized Debtors are in compliance with the requirements of 49 U.S.C. § 40102(a)(15)(C).  If a Holder of an Unsecured Notes Claim, General Unsecured Claim, or Secured Notes Claim furnishes a Citizenship Certification (or other evidence that such Holder is a U.S. Citizen) to the Debtors or the Required Backstop Parties on or before the Distribution Record Date and, after review, the Debtors and the Required Backstop Parties, in their reasonable discretion, accept such Citizenship Certification (or other evidence) as reasonable proof to establish that such Holder is a U.S. Citizen, such Holder will receive New Stock representing all of such holder's entitlement to the New Stock under the Plan and the Backstop Commitment Agreement; *provided, however,* that if such Holder is a Non-U.S. Citizen, or if the Holder fails to furnish a Citizenship Certification to the Debtors on or before the Distribution Record Date, or if the Citizenship Certification of such Holder has not been accepted or has been rejected by the Debtors or the Required Backstop Parties in their reasonable discretion on or before the date that is 10 Business Days after the Distribution Record Date, such Holder will be treated as a Non-U.S. Citizen for all purposes hereunder and under the Plan; *provided*, the issuance of any New Warrants (in lieu of New Stock) to any Holder that is a Non-U.S. Citizen shall be subject to any consent rights set forth in the Restructuring Support Agreement.  In connection with the Debtors' review of any Citizenship Certification, the Debtors or the Required Backstop Parties will have the right to require the Holder furnishing the Citizenship Certification to provide the Debtors with such documentation and other information as they may reasonably request as proof confirming that the holder is a U.S. Citizen.  The Debtors and the Required Backstop Parties will treat all such documentation and information provided by a Holder as confidential; *provided, that*, the Debtors and the Required Backstop Parties will share such information with the

36

Creditors' Committee on a confidential basis and will work cooperatively with the Creditors' Committee with respect to citizenship issues.

F.     *Rights Offering*

The Debtors or Reorganized Debtors, as applicable, shall allocate the Subscription Rights for the Rights Offering to the Rights Offering Offerees as set forth in the Plan and the Rights Offering Procedures. Pursuant to the Backstop Commitment Agreement, the Rights Offering Procedures, and the Plan, the Rights Offering shall be open to all Rights Offering Participants.

Upon exercise of the Subscription Rights by the Rights Offering Participants pursuant to the terms of the Backstop Commitment Agreement, the Rights Offering Procedures, and the Plan, the Reorganized Debtors shall be authorized to issue the New Stock in accordance with the Plan, the Backstop Commitment Agreement, and the Rights Offering Procedures.

Pursuant to the Backstop Commitment Agreement, the Backstop Commitment Parties shall purchase any Rights Offering Stock not subscribed to by Rights Offering Participants as set forth in the Backstop Commitment Agreement. On the Effective Date, the rights and obligations of the Debtors under the Backstop Commitment Agreement shall vest in the Reorganized Debtors.

The Rights Offering will be comprised of the 1145 Rights Offering and the 4(a)(2) Rights Offering. The Rights Offering will be conducted on a Pro Rata basis in reliance upon one or more exemptions from registration under the Securities Act, which will include the exemption provided in section 1145 of the Bankruptcy Code to the fullest extent available and, to the extent such exemption is not available (and with respect to the New Common Stock, only in the proportion required to preserve the availability of such exemption under section 1145 of the Bankruptcy Code), the exemption from registration set forth in Section 4(a)(2) of the Securities Act and/or Regulation D promulgated thereunder or another available exemption from registration under the Securities Act.

In addition, on the Distribution Date, New Stock in an amount equal to the Backstop Commitment Fee shall be distributed to the Backstop Commitment Parties under and as set forth in the Backstop Commitment Agreement.

G.     *The Exit Facility, the Amended and Restated 2019 Term Loan Facility and the Amended PK Air Loan Documents*

On the Effective Date, the applicable Reorganized Debtors shall enter into (a) either the Exit Facility Documents or the Amended and Restated 2019 Term Loan Documents, as applicable, and (b) unless the Milestone Settlement Order provides otherwise, the Amended PK Air Loan Documents, including any documents required in connection with the creation or perfection of Liens in connection therewith. The Confirmation Order shall include approval of (a) either (i) the Exit Facility and the Exit Facility Documents or (ii) the Amended and Restated 2019 Term Loan Facility and the Amended and Restated 2019 Term Loan Documents, as applicable and (b) the Amended PK Air Loan Documents, all transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred and fees paid by the Reorganized Debtors in connection therewith, authorization of the Reorganized Debtors to enter into, execute, and perform under (a) either the Exit Facility Documents or the Amended and Restated 2019 Term Loan Documents, as applicable, and (b) the Amended PK Air Loan Documents, and all related documents and agreements to the extent a party thereto, and authorization for the Reorganized Debtors to create or perfect the Liens in connection therewith.

(a) Either the Exit Facility Documents or the Amended and Restated 2019 Term Loan Documents, as applicable, and (b) the Amended PK Air Loan Documents, shall constitute legal, valid, binding, and authorized obligations of the Reorganized Debtors, enforceable in accordance with their terms. The financial accommodations to be extended pursuant to either (a) the Exit Facility Documents or the Amended and Restated 2019 Term Loan Documents, as applicable, and (b) the Amended PK Air Credit Facility, are being extended, and shall be deemed to have been extended, in good faith, for legitimate business purposes, are reasonable, shall not be subject to any Claims, Causes of Action, avoidance, reduction, recharacterization, subordination (whether contractual or otherwise), cross claim, disallowance, impairment, objection, or challenges under any applicable law or regulation by any Person for

37

any purposes whatsoever, and shall not constitute preferential transfers, fraudulent transfers, obligations, or conveyances, or other voidable transfers or obligations under the Bankruptcy Code or any other applicable non-bankruptcy law.

The lenders under the Exit Facility or the Amended and Restated 2019 Term Loan Facility, as applicable, and the Amended PK Air Credit Facility, shall have valid, binding, and enforceable Liens on the Collateral (or other property identified as "Collateral" therein) specified in, and to the extent required by, the Exit Facility Documents or the Amended and Restated 2019 Term Loan Documents, as applicable, and the Amended PK Air Credit Facility Agreement, as applicable. To the extent granted, the guarantees, mortgages, pledges, Liens and other security interests granted pursuant to either the Exit Facility Documents or the Amended and Restated 2019 Term Loan Documents, as applicable, are granted in good faith as an inducement to the lenders under either the Exit Facility or the Amended and Restated 2019 Term Loan Facility, as applicable, to extend credit thereunder and shall be deemed not to constitute a fraudulent conveyance or fraudulent transfer, shall not otherwise be subject to avoidance, recharacterization, or subordination (whether contractual or otherwise) for any purposes whatsoever, and the priorities of any such Liens and security interests shall be as set forth in the relevant Exit Facility Documents or the Amended and Restated 2019 Term Loan Documents, as applicable. The Reorganized Debtors and the persons and entities granted such Liens are authorized to make all filings and recordings, and to obtain all governmental approvals and consents necessary to establish and perfect such Liens under the provisions of the applicable state, provincial, federal, or other law (whether domestic or foreign) that would be applicable in the absence of the Plan and the Confirmation Order, and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such Liens to third parties.

H.      *Rights Offering Per Share Price*

All issuances of New Stock pursuant to the Rights Offerings, Backstop Commitment Agreement, DIP Credit Agreement and DIP Order shall be issued at a per share purchase price of $36.37 (for the avoidance of doubt, with respect to the Backstop Commitment Fee, the Equitization Allocation New Stock, or the Equitization Consent Fee, such purchase price is an implied price and no new purchase shall occur).

I.      *Management Incentive Plan*

On the Effective Date, the Initial MIP Amount shall be implemented and effective as part of the Management Incentive Plan on terms and conditions agreed to by the compensation committee of Bristow Parent, the Required Supporting Secured Noteholders, the Required Supporting Unsecured Noteholders and the Required Backstop Parties. Additionally, following the Effective Date, the Reorganized Bristow Parent Board shall determine the terms and conditions of the Management Incentive Plan in excess of the Initial MIP Amount, which, in the aggregate and inclusive of the Initial MIP Amount, shall be between 5.0% and 10.0% of the New Stock on a fully diluted basis (with the ratio of such New Common Stock and New Preferred Stock to be the same as the ratio of all New Common Stock to New Preferred Stock held by the average Backstop Commitment Party as set forth in the Restructuring Support Agreement).

J.      *Management of Reorganized Bristow*

The Debtors' current management team shall remain in their current positions after consummation of the Restructuring Transactions, and the Debtors shall either (a) enter into new employment agreements with their current management team in connection with the Restructuring Transactions, or (b) assume the Management Severance Benefits Plan, dated June 4, 2014 as amended and restated May 1, 2019, and as further amended to provide that Tier 1, 2 and 3 employees execute Participation Agreements imposing non-competition obligations on severance, good reason rights and a minimum term, and further that in each case, such agreements shall be on terms and conditions that are reasonably acceptable to the Debtors and the Required RSA Parties.

K.      *Exemption from Registration Requirements*

The offering, issuance, and distribution of any Securities pursuant to the Plan, including the New Stock, will be exempt from the registration requirements of section 5 of the Securities Act or any similar federal, state, or local

38

law in reliance on (1) with respect to the New Common Stock issued as part of the Unsecured Common Equity Pool, or in connection with the 1145 Rights Offering, section 1145 of the Bankruptcy Code or, only to the extent such exemption under section 1145 of the Bankruptcy Code is not available, any other available exemption from registration under the Securities Act, (2) with respect to the New Common Stock and New Preferred Stock issued in connection with the 4(a)(2) Rights Offering, section (4)(a)(2) of the Securities Act or Regulation D promulgated thereunder and (3) with respect to the New Common Stock and New Preferred Stock issued on account of (x) the Backstop Commitment Fee, (y) Equitization Allocation New Common Stock and Equitization Allocation New Preferred Stock, and (z) the Equitization Consent Fee, section 1145 of the Bankruptcy Code.

Pursuant to section 1145 of the Bankruptcy Code, the New Common Stock and New Preferred Stock issued under the Plan may be sold without registration under the Securities Act by the recipients thereof, subject to: (1) only with respect to the New Common Stock issued as part of the Unsecured Common Equity Pool, or in connection with the 1145 Rights Offering, or the New Stock issued on account of the Backstop Commitment Fee, the Equitization Allocation New Common Stock, the Equitization Allocation New Preferred Stock, and the Equitization Consent Fee, the provisions of section 1145(b)(1) of the Bankruptcy Code relating to the definition of an underwriter in section 2(a)(11) of the Securities Act and compliance with any applicable state or foreign securities laws, if any, and the rules and regulations of the SEC, if any, applicable at the time of any future transfer of such Securities or instruments; (2) only with respect to the New Common Stock and New Preferred Stock issued in connection with the 4(a)(2) Rights Offering, section 4(a)(2) of the Securities Act or Regulation D promulgated thereunder, the requirements of the applicable provisions of Rule 144 or Rule 144A or any other registration exemption under the Securities Act; (3) any other applicable regulatory approval; and (4) the transfer restrictions set forth in the New Shareholders' Agreement and the New Organizational Documents, if any. All shares of New Common Stock and New Preferred Stock issued on account of (x) the Backstop Commitment Fee, (y) the Equitization Allocation New Common Stock and Equitization Allocation New Preferred Stock, and (z) the Equitization Consent Fee, will be issued without registration under the Securities Act or any similar federal, state, or local law in reliance on section 1145 of the Bankruptcy Code. All Unsubscribed Shares of New Common Stock and New Preferred Stock issued to the Backstop Commitment Parties pursuant to the Backstop Commitment Agreement (other than shares of New Common Stock and New Preferred Stock issued on account of the Backstop Commitment Fee) will be issued without registration under the Securities Act or any similar federal, state, or local law in reliance on section 4(a)(2) of the Securities Act or Regulation D promulgated thereunder.

Persons who purchase the New Common Stock or the New Preferred Stock pursuant to the exemption from registration set forth in section 4(a)(2) of the Securities Act or Regulation D promulgated thereunder will hold "restricted securities." Resales of such restricted securities would not be exempted by section 1145 of the Bankruptcy Code from registration under the Securities Act or other applicable law. Holders of restricted securities would, however, be permitted to resell New Common Stock or New Preferred Stock without registration if they are able to comply with the applicable provisions of Rule 144 or Rule 144A or any other registration exemption under the Securities Act, or if such securities are registered with the Securities and Exchange Commission.

The New Common Stock issued as part of the Unsecured Common Equity Pool and the 1145 Rights Offering Stock shall be reflected through the facilities of DTC, and neither the Debtors, the Reorganized Debtors, nor any other Person shall be required to provide any further evidence other than the Plan or the Confirmation Order with respect to the treatment of such New Common Stock under applicable securities laws.

DTC shall be required to accept and conclusively rely upon the Plan or Confirmation Order in lieu of a legal opinion regarding whether the New Common Stock issued as part of the Unsecured Common Equity Pool or the 1145 Rights Offering Stock are exempt from registration and/or eligible for DTC book-entry delivery, settlement, and depository services.

Notwithstanding anything to the contrary in the Plan, no entity (including, for the avoidance of doubt, DTC) shall be entitled to require a legal opinion regarding the validity of any transaction contemplated by the Plan, including, for the avoidance of doubt, whether New Common Stock issued as part of the Unsecured Common Equity Pool or the 1145 Rights Offering Stock are exempt from registration and/or eligible for DTC book-entry delivery, settlement, and depository services.

L.       *Vesting of Assets*

Except as otherwise provided in the Plan or in any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement, on the Effective Date, all property in each Debtor's Estate, all Causes of Action, and any property acquired by each of the Debtors under the Plan shall vest in each respective Reorganized Debtor, free and clear of all Liens, Claims, charges, or other encumbrances.  On and after the Effective Date, except as otherwise provided in the Plan, each Reorganized Debtor may operate its business and may use, acquire, or dispose of property and pursue, compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

M.       *Cancellation of Instruments, Certificates, and Other Documents*

Except as otherwise provided in the Plan or any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement, on the Effective Date, (a) all notes, instruments, Certificates, and other documents evidencing Claims or Interests, including the Indentures, (b) if the Debtors enter into the Exit Facility, the 2019 Term Loan Credit Agreement, and (c) any other credit agreements and indentures, shall be terminated and canceled and the obligations of the Debtors thereunder or in any way related thereto shall be deemed satisfied in full and discharged and the Indenture Trustees shall be released from all duties thereunder without any need for further action or approval by the Bankruptcy Court or any Holder or other person.  In addition to the foregoing, the Indentures and the 2019 Term Loan Credit Agreement shall survive the occurrence of the Effective Date and shall continue in effect solely to the extent necessary to: (i) allow a disbursing agent, the 2019 Term Loan Facility Agent or the Indenture Trustees to make distributions under the Plan to the Holders of Secured Notes Claims, Unsecured Notes Claims and 2019 Term Loan Facility Claims, as applicable; (ii) allow the Debtors, the Reorganized Debtors,  the Indenture Trustees and the 2019 Term Loan Facility Agent to make post-Effective Date distributions or take such other action pursuant to the Plan on account of Allowed Secured Notes Claims, Allowed Unsecured Notes Claims and Allowed 2019 Term Loan Facility Claims, as applicable, and to otherwise exercise their rights and discharge their obligations relating to the interests of the Holders of such Claims in accordance with the Plan; (iii) allow the Indenture Trustees and the 2019 Term Loan Facility Agent to enforce their rights, claims and interests vis-à-vis any parties other than the Debtors; (iv) allow the Indenture Trustees and the 2019 Term Loan Facility Agent to maintain or assert any rights it may have against the distributions to Holders of Secured Notes Claims, Unsecured Notes Claims and 2019 Term Loan Facility Claims, as applicable pursuant to the terms of the Indentures or 2019 Term Loan Facility Credit Agreement, as applicable, for the payment of outstanding fees, expenses and indemnification obligations arising under (and due pursuant to the terms of) the Indentures; *provided that* except as expressly provided in this Section IV.M, nothing in this Section IV.M shall affect the discharge of Claims pursuant to the Bankruptcy Code, the Confirmation Order or the Plan or result in any liability or expense to the Reorganized Debtors; (v) permit the Indenture Trustees and the 2019 Term Loan Facility Agent to assert their respective charging liens; (vi) permit the Indenture Trustees and the 2019 Term Loan Facility Agent to appear in the Chapter 11 Cases; and (vii) allow the Indenture Trustees and the 2019 Term Loan Facility Agent to maintain any right of indemnification, contribution, subrogation or any other claim or entitlement they may have under the applicable Indentures and 2019 Term Loan Facility Credit Agreement.  Except for the foregoing with respect to such other rights of the Indenture Trustees that survive the Indentures, the Indenture Trustees and their respective agents shall be relieved of all further duties and responsibilities related to the Indentures and the Plan.

Notwithstanding anything to the contrary contained in the Plan, on or after the Effective Date, all duties and responsibilities of the 2019 Term Loan Facility Agent arising under or related to the 2019 Term Loan Facility Credit Agreement shall be discharged except to the extent required in order to effectuate the Plan.  For the avoidance of doubt and notwithstanding the foregoing, nothing contained in the Plan shall in any way limit or affect the standing of the 2019 Term Loan Facility Agent to appear and be heard in the Chapter 11 Cases on and after the Effective Date.  The 2019 Term Loan Facility Agent shall be entitled to reimbursement of reasonable and documented fees and expenses (including reasonable and documented fees and expenses of its professionals) incurred in connection with the matters set forth in this Section IV.M.

If the record holder of the Secured Notes or Unsecured Notes is DTC or its nominee or another securities depository or custodian thereof, and such Secured Notes or Unsecured Notes are represented by a global security held by or on behalf of DTC or such other securities depository or custodian, then each such Holder of the Secured Notes

40

or Unsecured Notes shall be deemed to have surrendered such Holder's note, debenture or other evidence of indebtedness upon surrender of such global security by DTC or such other securities depository or custodian thereof.

N.      *Corporate Action*

On and after the Effective Date, all actions contemplated by the Plan are and shall be deemed authorized and approved by the Bankruptcy Court in all respects without any further corporate or equity holder action, including, as applicable:  (1) the adoption, execution, and/or filing of the New Organizational Documents and the New Shareholders' Agreement; (2) the selection of the directors, managers, and officers for the Reorganized Debtors, including the appointment of the Reorganized Bristow Parent Board; (3) the authorization, issuance, entry into and distribution, as applicable, of the Exit Facility, the Amended and Restated 2019 Term Loan Facility, the Amended PK Air Credit Facility Agreement, the New Common Stock and the New Preferred Stock and the execution, delivery, and filing of any documents pertaining thereto, as applicable; (4) the rejection, assumption, or assumption and assignment, as applicable, of Executory Contracts and Unexpired Leases; (5) the formation of any Entities pursuant to the Restructuring Transactions; (6) the implementation of the Restructuring Transactions, including any transaction contemplated by the Restructuring Transactions Exhibit;  (7) the adoption of the Management Incentive Plan by the Reorganized Bristow Parent Board; and (8) all other actions contemplated by the Plan (whether to occur before, on, or after the Effective Date).  Upon the Effective Date, all matters provided for in the Plan involving the corporate structure of the Reorganized Debtors, and any corporate, partnership, limited liability company, or other governance action required by the Debtors or the Reorganized Debtors in connection with the Plan shall be deemed to have occurred and shall be in effect, without any requirement of further corporate or other action by any Security holders, members, directors, or officers of the Debtors or Reorganized Debtors, as applicable.

On or before the Effective Date, as applicable, the appropriate directors and officers of the Debtors or the Reorganized Debtors shall be (or shall be deemed to have been) authorized and (as applicable) directed to issue, execute, and deliver the agreements, documents, Securities, and instruments contemplated by the Plan (or necessary or desirable to effectuate the Restructuring Transactions) in the name of and on behalf of the Reorganized Debtors, including and any and all other agreements, documents, Securities, and instruments relating to the foregoing, to the extent not previously authorized by the Bankruptcy Court.  The authorizations and approvals contemplated by this Article IV.N shall be effective notwithstanding any requirements under non-bankruptcy law.

O.      *Corporate Existence*

Except as otherwise provided in the Plan or any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement, on the Effective Date, each Debtor shall continue to exist after the Effective Date as a separate corporation, limited liability company, partnership, or other form of entity, as the case may be, with all the powers of a corporation, limited liability company, partnership, or other form of entity, as the case may be, pursuant to the applicable law in the jurisdiction in which each applicable Debtor is incorporated or formed and pursuant to the respective certificate of incorporation and by-laws (or other analogous formation documents) in effect before the Effective Date, except to the extent such certificate of incorporation or bylaws (or other analogous formation, constituent or governance documents) is amended by the Plan or otherwise, and to the extent any such document is amended, such document is deemed to be amended pursuant to the Plan and requires no further action or approval (other than any requisite filings required under applicable state or federal law).  Notwithstanding the foregoing, the Debtors reserve the right to modify the Debtors' corporate structure as of the Effective Date, including by merger or liquidation of any Reorganized Debtor or otherwise.

P.      *New Organizational Documents*

On the Effective Date, or as soon thereafter as is reasonably practicable, the Reorganized Debtors' certificates of incorporation and bylaws (and other formation and constituent documents relating to limited liability companies) shall be amended or amended and restated, as applicable, as may be required to be consistent with the provisions of the Plan, the Restructuring Support Agreement (including the Governance Term Sheet) the New Organizational Documents, as applicable, and the Bankruptcy Code.  To the extent required under the Plan or applicable nonbankruptcy law, the Reorganized Debtors will file their respective New Organizational Documents with the applicable Secretaries of State and/or other applicable authorities in their respective states, provinces, or countries of incorporation in accordance with the corporate laws of the respective states, provinces, or countries of incorporation.

41

The New Organizational Documents shall, among other things: (1) authorize the issuance of the New Common Stock and the New Preferred Stock; and (2) pursuant to and only to the extent required by section 1123(a)(6) of the Bankruptcy Code, include a provision prohibiting the issuance of non-voting equity Securities. After the Effective Date, each Reorganized Debtor may amend and restate its certificate of incorporation and other formation and constituent documents as permitted by the laws of its respective jurisdiction of formation and the terms of the New Organizational Documents. It is currently expected that the Reorganized Debtors' organizational documents will be amended immediately following Confirmation to incorporate provisions that preclude foreign control and prevent foreign ownership of the Reorganized Debtors from exceeding specified limitations required by U.S. federal law governing air carriers. These amendments will involve safeguards to ensure that at no time will the Reorganized Debtors (including Reorganized Bristow Parent) be out of compliance with the foreign ownership limitations contained in such laws.

Q. *Effectuating Documents; Further Transactions*

On and after the Effective Date, the Reorganized Debtors and the officers and members of the boards of directors and managers (or other relevant governing body) thereof, including the Reorganized Bristow Parent Board, shall be authorized to and may issue, execute, deliver, file, or record such contracts, Securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan, including the Amended PK Air Credit Facility Agreement, the Exit Facility Credit Agreement and the Amended and Restated 2019 Term Loan Credit Agreement, as applicable, and the Securities issued pursuant to the Plan in the name of and on behalf of the Reorganized Debtors, without the need for any approvals, authorizations, or consents except for those expressly required under the Plan.

R. *Section 1146(a) Exemption*

To the fullest extent permitted by section 1146(a) of the Bankruptcy Code, any transfers (whether from a Debtor to a Reorganized Debtor or to any other Person) of property under the Plan (including the Restructuring Transactions) or pursuant to: (1) the issuance, distribution, transfer, or exchange of any debt, equity Security, or other interest in the Debtors or the Reorganized Debtors; (2) the creation, modification, consolidation, termination, refinancing, and/or recording of any mortgage, deed of trust, or other security interest, or the securing of additional indebtedness by such or other means; (3) the making, assignment, or recording of any lease or sublease; (4) the grant of Collateral (or other property identified as "Collateral" therein) as security for the Amended PK Air Credit Facility Agreement, the Exit Facility or the Amended and Restated 2019 Term Loan Credit Agreement, as applicable; or (5) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan (including the Restructuring Transactions), shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forego the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee, or governmental assessment. All filing or recording officers (or any other Person with authority over any of the foregoing), wherever located and by whomever appointed, shall comply with the requirements of section 1146(a) of the Bankruptcy Code, shall forego the collection of any such tax or governmental assessment, and shall accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

S. *Directors and Officers*

As of the Effective Date, the term of the current members of the boards of directors of the Debtors shall expire, and the initial boards of directors, including the Reorganized Bristow Parent Board, as well as the officers of each of the Reorganized Debtors, shall be appointed in accordance with the New Organizational Documents and other constituent documents of each Reorganized Debtor. As set forth in the Restructuring Support Agreement (including the Governance Term Sheet), the initial Reorganized Bristow Parent Board shall consist of 7 directors, with the directors of the Reorganized Bristow Parent Board being appointed consistent with the Governance Term Sheet and

42

the New Organizational Documents. The Reorganized Debtors will comply with the requirements set forth in 49 U.S.C. § 40102(a)(15)(C) with respect to the citizenship of its officers, directors and senior management team.

The New Organizational Documents and the New Shareholders' Agreement shall provide that any independent director appointed to the Reorganized Bristow Parent Board shall be unaffiliated with any person that has designation rights for the Reorganized Bristow Parent Board.

Pursuant to section 1129(a)(5) of the Bankruptcy Code, the Debtors will, to the extent reasonably practicable, disclose in advance of the Confirmation Hearing the identity and affiliations of any Person proposed to serve on the Reorganized Bristow Parent Board, as well as those Persons that will serve as officers of the Reorganized Debtors. To the extent any such director or officer is an "insider" under the Bankruptcy Code, the nature of any compensation to be paid to such director or officer will also be disclosed. Provisions regarding the removal, appointment, and replacement of members of the Reorganized Bristow Parent Board will be disclosed in the New Organizational Documents.

T.      *Preservation of Causes of Action*

Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan, including pursuant to Article VIII of the Plan or a Final Order, in accordance with section 1123(b) of the Bankruptcy Code, such Causes of Action shall be Retained Causes of Action, whether arising before or after the Petition Date, including any actions specifically enumerated in the Plan Supplement, and the Reorganized Debtors' rights to commence, prosecute, or settle such Retained Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date. **No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against them as any indication that the Debtors or the Reorganized Debtors will not pursue any and all available Causes of Action against them. The Debtors and the Reorganized Debtors expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided herein.** Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan, including pursuant to Article VIII of the Plan or a Final Order, the Reorganized Debtors expressly reserve all Causes of Action, for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation. For the avoidance of doubt, in no instance will any Cause of Action preserved pursuant to this Article IV.T include any claim or Cause of Action with respect to, or against, a Released Party that is released under Article VIII of the Plan.

In accordance with section 1123(b)(3) of the Bankruptcy Code, any Causes of Action preserved pursuant to the first paragraph of this Article IV.T that a Debtor may hold against any Entity shall vest in the Reorganized Debtors. The applicable Reorganized Debtor, through its authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action. The Reorganized Debtors shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action, or to decline to do any of the foregoing, without the consent or approval of any third party or any further notice to or action, order, or approval of the Bankruptcy Court.

U.      *Milestone Settlement*

The terms of the Milestone Settlement are fully incorporated into the Plan by reference, and the Debtors and the Milestone Parties shall abide by the terms of the Milestone Settlement Order, including the payment by the Debtors, no later than the Effective Date, of the reasonable and documented professional fees of the Milestone Parties as set forth in the Milestone Settlement Order. To the extent of a conflict between this Plan and the Milestone Settlement Order, the Milestone Settlement Order will control.

V.      *Macquarie Settlement*

The terms of the Macquarie Settlement are fully incorporated into the Plan by reference, and the Debtors and the Macquarie Parties shall abide by the terms of the Macquarie Settlement Order, including the payment by the

43

Debtors of the reasonable and documented professional fees of the Macquarie Parties as and to the extent set forth in the Macquarie Settlement Order. To the extent of a conflict between this Plan and the Macquarie Settlement Order, the Macquarie Settlement Order will control.

W.      *Indenture Trustee Expenses*

On the Effective Date, and without any further notice to or action, order or approval of the Bankruptcy Court, the Debtors or Reorganized Debtors shall distribute Cash to the Indenture Trustees in an amount equal to the Indenture Trustee Expenses without a reduction to recoveries to Holders of the Secured Notes Claims or Unsecured Notes Claims; *provided that* the Indenture Trustees shall provide the Debtors with the invoices (subject to redaction to preserve attorney-client privilege) for which they seek payment no later than fifteen (15) days prior to the Effective Date. If the Debtors dispute any Indenture Trustee Expenses, the Debtors shall (i) pay the undisputed portion of the Indenture Trustee Expenses, (ii) notify the Indenture Trustees with respect to any disputed portion of the Indenture Trustee Expenses within ten (10) days after presentation of the invoices by the Indenture Trustees, and (iii) escrow the amount of any disputed portion of the Indenture Trustee Expenses pending any resolution. Upon such notification, the applicable Indenture Trustee may submit such dispute for resolution by the Bankruptcy Court. For the avoidance of doubt, nothing herein affects the Indenture Trustees' rights to exercise their respective charging liens pursuant to the terms of the applicable Indentures.

To the extent the Indenture Trustees provide services or incur costs or expenses, including professional fees, related to or in connection with the Plan, the Confirmation Order or the Indentures after the Effective Date, such Indenture Trustee shall be entitled to receive from the Reorganized Debtors, without further Bankruptcy Court approval, reasonable compensation for such services and reimbursement of reasonable out-of-pocket expenses incurred with such services. The payment of such compensation and expenses will be made promptly or as otherwise agreed to by the applicable Indenture Trustee and the Reorganized Debtors.

The payment of the applicable Unsecured Notes Indenture Trustee and the Convertible Notes Indenture Trustee as set forth in the applicable indenture or bond agreement shall be considered a distribution on account of Unsecured Notes Claims.

X.      *Closing the Chapter 11 Cases*

On and after the Effective Date, the Debtors or Reorganized Debtors shall be permitted to close all of the Chapter 11 Cases of the Debtors except for the Chapter 11 Case of Bristow Parent and any other Debtor identified in the Restructuring Transactions Exhibit as having its Chapter 11 Case remain open following the Effective Date, and all contested matters relating to any of the Debtors, including objections to Claims, shall be administered and heard in the Chapter 11 Case of Bristow Parent, irrespective of whether such Claim(s) were Filed against a Debtor whose Chapter 11 Case was closed.

When all Disputed Claims have become Allowed or disallowed and all distributions have been made in accordance with the Plan, the Reorganized Debtors shall seek authority to close any remaining Chapter 11 Cases in accordance with the Bankruptcy Code and the Bankruptcy Rules.

## ARTICLE V.
### TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

A.      *Assumption or Rejection of Executory Contracts and Unexpired Leases*

Unless otherwise assumed or rejected pursuant to an order of the Bankruptcy Court (including the Milestone Settlement Order and the Macquarie Settlement Order) entered prior to the Effective Date, on the Effective Date, each Executory Contract and Unexpired Lease shall be deemed assumed pursuant to section 365 of the Bankruptcy Code, without the need for any further notice to or action, order, or approval of the Bankruptcy Court, unless such Executory Contract or Unexpired Lease is listed on the Schedule of Rejected Executory Contracts and Unexpired Leases, if any. The assumption of Executory Contracts and Unexpired Leases hereunder may include the assignment of certain of such contracts to Affiliates. The Confirmation Order will constitute an order of the Bankruptcy Court approving the

44

above-described assumptions, rejections, and assumptions and assignments. For the avoidance of doubt and notwithstanding anything to the contrary herein, the Backstop Commitment Agreement and Restructuring Support Agreement shall be assumed on the Effective Date, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's authorization for the Debtors to enter into the Backstop Commitment Agreement and Restructuring Support Agreement as of the Confirmation Date and perform any and all obligations of the Debtors thereunder.

Except as otherwise provided herein or agreed to by the Debtors and the applicable counterparty, each assumed Executory Contract or Unexpired Lease shall include all modifications, amendments, supplements, restatements, or other agreements related thereto, and all rights related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests. Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease or the validity, priority, or amount of any Claims that may arise in connection therewith. To the extent applicable, no change of control (or similar provision) will be deemed to occur under any such Executory Contract or Unexpired Lease.

If certain, but not all, of a contract counterparty's Executory Contracts and/or Unexpired Leases are assumed pursuant to the Plan, the Confirmation Order shall be a determination that such counterparty's Executory Contracts and/or Unexpired Leases that are being rejected pursuant to the Plan are severable agreements that are not integrated with those Executory Contracts and/or Unexpired Leases that are being assumed pursuant to the Plan. Parties seeking to contest this finding with respect to their Executory Contracts and/or Unexpired Leases must file a timely objection to the Plan on the grounds that their agreements are integrated and not severable, and any such dispute shall be resolved by the Bankruptcy Court at the Confirmation Hearing (to the extent not resolved by the parties prior to the Confirmation Hearing).

B.      *Claims Based on Rejection of Executory Contracts or Unexpired Leases*

Counterparties to Executory Contracts or Unexpired Leases listed on the Schedule of Rejected Executory Contracts and Unexpired Leases, if any, shall be served with a notice of rejection of Executory Contracts and Unexpired Leases with the Plan Supplement. Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts and Unexpired Leases, if any, must be Filed with the Bankruptcy Court within 30 days after the date of the order of the Bankruptcy Court approving such rejection. Any Claims arising from the rejection of an Executory Contract or Unexpired Lease that are not Filed within such time will be automatically disallowed, forever barred from assertion, and shall not be enforceable against, as applicable, the Debtors, the Reorganized Debtors, the Estates, or property of the foregoing parties, without the need for any objection by the Debtors or Reorganized Debtors, as applicable, or further notice to, or action, order, or approval of the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully satisfied, released, and discharged, notwithstanding anything in a Proof of Claim to the contrary. Claims arising from the rejection of the Debtors' Executory Contracts and Unexpired Leases shall be classified as General Unsecured Claims and shall be treated in accordance with Article III of the Plan.

C.      *Cure of Defaults for Assumed Executory Contracts and Unexpired Leases*

On the Effective Date or as soon as reasonably practicable thereafter, the Debtors or the Reorganized Debtors, as applicable, shall pay all Cure Costs relating to Executory Contracts and Unexpired Leases that are being assumed under the Plan. Unless otherwise agreed upon in writing by the parties to the applicable Executory Contract or Unexpired Lease, all requests for payment of Cure Costs that differ from the amounts paid or proposed to be paid by the Debtors or the Reorganized Debtors to a counterparty must be Filed with the Solicitation Agent on or before 14 days after receiving the applicable Cure Notice. Any such request that is not timely Filed shall be disallowed and forever barred, estopped, and enjoined from assertion, and shall not be enforceable against any Debtor or Reorganized Debtor, without the need for any objection by the Debtors or Reorganized Debtors or any other party in interest or any further notice to or action, order, or approval of the Bankruptcy Court. Any Cure Costs shall be deemed fully satisfied, released, and discharged upon payment by the Debtors or the Reorganized Debtors of the applicable Cure Costs; *provided*, *however*, that nothing herein shall prevent the Reorganized Debtors from paying any Cure Costs despite the failure of the relevant counterparty to file such request for payment of such Cure Costs. The Reorganized Debtors

45

also may settle any Cure Costs (with the reasonable consent of the Required RSA Parties, and unless the Creditors' Committee is dissolved, after satisfying the Committee Consent Right) without any further notice to or action, order, or approval of the Bankruptcy Court. In addition, any objection to the assumption of an Executory Contract or Unexpired Lease under the Plan must be Filed with the Bankruptcy Court on or before the Confirmation Hearing. Any such objection will be scheduled to be heard by the Bankruptcy Court at the Confirmation Hearing or at the Debtors' or Reorganized Debtors', as applicable, first scheduled omnibus hearing for which such objection is timely Filed. Any counterparty to an Executory Contract or Unexpired Lease that fails to timely object to the proposed assumption of any Executory Contract or Unexpired Lease will be deemed to have consented to such assumption.

If there is any dispute regarding any Cure Costs, the ability of the Reorganized Debtors or any assignee to provide "adequate assurance of future performance" within the meaning of section 365 of the Bankruptcy Code, or any other matter pertaining to assumption, then payment of any Cure Costs shall occur as soon as reasonably practicable after entry of a Final Order resolving such dispute, approving such assumption (and, if applicable, assignment), or as may be agreed upon by the Debtors or the Reorganized Debtors, as applicable, and the counterparty to the Executory Contract or Unexpired Lease. The Debtors and Reorganized Debtors, as applicable, reserve the right at any time to move to reject any Executory Contract or Unexpired Lease based upon the existence of any such unresolved dispute. If the Bankruptcy Court determines that the Allowed Cure Cost with respect to any Executory Contract or Unexpired Lease is greater than the amount set forth in the applicable Cure Notice, the Debtors (with the reasonable consent of the Required RSA Parties, and unless the Creditors' Committee is dissolved, after satisfying the Committee Consent Right) shall have the right to add such Executory Contract or Unexpired Lease to the Schedule of Rejected Executory Contracts and Unexpired Leases, in which case such Executory Contract or Unexpired Lease will be deemed rejected as of the Effective Date subject to the applicable counterparty's right to object to such rejection.

Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise and full payment of any applicable Cure Costs pursuant to this Article V.C shall result in the full release and satisfaction of any Cures, Claims, or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time prior to the effective date of assumption. **Any and all Proofs of Claim based upon Executory Contracts or Unexpired Leases that have been assumed in the Chapter 11 Cases, including pursuant to the Confirmation Order, and for which any Cure Costs have been fully paid pursuant to this Article V.C, shall be deemed disallowed and expunged as of the Effective Date without the need for any objection thereto or any further notice to or action, order, or approval of the Bankruptcy Court.**

D.  *Indemnification*

On and as of the Effective Date, the Indemnification Obligations will be assumed, irrevocable with respect to any claims relating to acts or omissions occurring at or prior to the Effective Date, and will survive the effectiveness of the Plan, and the New Organizational Documents will provide for the indemnification, defense, reimbursement, exculpation, and/or limitation of liability of, and advancement of fees and expenses to the Debtors' and the Reorganized Debtors' directors, officers, employees, or agents that were employed by, or serving on the board of directors (or similar governing body) of, any of the Debtors as of the Petition Date and/or at any time in the period between the Petition Date and the Effective Date, to the fullest extent permitted by law and at least to the same extent as the organizational documents of each of the respective Debtors on the Petition Date or the applicable period between the Petition Date and the Effective Date, against any Claims or Causes of Action whether direct or derivative, liquidated or unliquidated, fixed or contingent, disputed or undisputed, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, and, notwithstanding anything in the Plan to the contrary, none of the Reorganized Debtors will amend and/or restate the New Organizational Documents before or after the Effective Date to terminate or adversely affect any of the Reorganized Debtors' obligations to provide such indemnification rights or such directors', officers', employees', or agents' indemnification rights with respect to any claims relating to acts or omissions occurring at or prior to the Effective Date.

E.  *Insurance Policies*

Notwithstanding anything in the Plan to the contrary, all of the Debtors' insurance policies and any agreements, documents, or instruments relating thereto, are treated as and deemed to be Executory Contracts under the Plan. On the Effective Date, pursuant to section 365(a) of the Bankruptcy Code, the Debtors shall be deemed to

46

have assumed all insurance policies and any agreements, documents, and instruments related thereto, including all D&O Liability Insurance Policies (including tail coverage liability insurance). Entry of the Confirmation Order will constitute the Bankruptcy Court's approval of the Reorganized Debtors' assumption of all such insurance policies, including the D&O Liability Insurance Policies. Notwithstanding anything to the contrary contained in the Plan, Confirmation of the Plan shall not discharge, impair, or otherwise modify any indemnity obligations assumed by the foregoing assumption of insurance policies, including the D&O Liability Insurance Policies, and each such indemnity obligation will be deemed and treated as an Executory Contract that has been assumed by the Reorganized Debtors under the Plan as to which no Proof of Claim or Claim for Cure Costs need be Filed, and shall survive the Effective Date.

On or before the Effective Date, the Debtors shall purchase and maintain tail coverage under the D&O Liability Insurance Policies for the six-year period following the Effective Date on terms no less favorable than under, and with an aggregate limit of liability no less than the aggregate limit of liability under, the existing D&O Liability Insurance Policies. In addition to such tail coverage, the D&O Liability Insurance Policies shall remain in place in the ordinary course during the Chapter 11 Cases.

F.      *Employee Compensation and Benefits*

  1.      Compensation and Benefits Programs

Subject to the provisions of the Plan, all Compensation and Benefits Programs shall be treated as Executory Contracts under the Plan and deemed assumed on the Effective Date pursuant to the provisions of sections 365 and 1123 of the Bankruptcy Code, except for:

  (a)  all employee equity or equity-based incentive plans, and any provisions set forth in the Compensation and Benefits Programs that provide for rights to acquire Interests in any of the Debtors;

  (b)  any Compensation and Benefits Programs that, as of the entry of the Confirmation Order, have been specifically waived by the beneficiaries of any employee benefit plan or contract;

  (c)  any agreement or arrangement between a Debtor and a former insider as of the Petition Date;

  (d)  any deferred compensation plan for any participant that is not a current employee on the Effective Date; and

  (e)  Compensation and Benefits Programs that have been rejected pursuant to an order of the Bankruptcy Court or is listed on the Schedule of Rejected Executory Contracts and Unexpired Leases.

Any assumption of Compensation and Benefits Programs pursuant to the terms herein shall not be deemed to trigger any applicable change of control, immediate vesting, termination, or similar provisions therein. No counterparty shall have rights under a Compensation and Benefits Programs assumed pursuant to the Plan other than those applicable immediately prior to such assumption.

  2.      Workers' Compensation Programs.

As of the Effective Date, except as set forth in the Plan Supplement, the Debtors and the Reorganized Debtors shall continue to honor their obligations under: (a) all applicable workers' compensation laws in states in which the Reorganized Debtors operate; and (b) the Debtors' written contracts, agreements, agreements of indemnity, self-insured workers' compensation bonds, policies, programs, and plans for workers' compensation and workers' compensation insurance. All Proofs of Claim on account of workers' compensation shall be deemed withdrawn automatically and without any further notice to or action, order, or approval of the Bankruptcy Court; *provided that* nothing in the Plan shall limit, diminish, or otherwise alter the Debtors' or Reorganized Debtors' defenses, Causes of Action, or other rights under applicable non-bankruptcy law with respect to any such contracts, agreements, policies,

programs, and plans; *provided further* that nothing herein shall be deemed to impose any obligations on the Debtors in addition to what is provided for under applicable state law.

G.       *Contracts and Leases After the Petition Date*

Contracts and leases entered into after the Petition Date by any Debtor, including any Executory Contracts and Unexpired Leases assumed under section 365 of the Bankruptcy Code, will be performed by the applicable Debtor or Reorganized Debtor liable thereunder in the ordinary course of its business.  Such contracts and leases that are not rejected under the Plan shall survive and remain unaffected by entry of the Confirmation Order.

H.       *Reservation of Rights*

Nothing contained in the Plan or the Plan Supplement shall constitute an admission by the Debtors or any other party that any contract or lease is in fact an Executory Contract or Unexpired Lease or that any Debtor or Reorganized Debtor has any liability thereunder.  If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption, the Debtors or the Reorganized Debtors, as applicable, shall have 45 days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease.

I.       *Nonoccurrence of Effective Date*

In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code.

## ARTICLE VI.
## PROVISIONS GOVERNING DISTRIBUTIONS

A.       *Distributions on Account of Claims and Interests Allowed as of the Effective Date*

Except as otherwise provided herein, in a Final Order, or as otherwise agreed to by the Debtors (or the Reorganized Debtors) and the Holder of the applicable Claim or Interest, on the first Distribution Date, the Distribution Agent shall make initial distributions under the Plan on account of Claims and Interests Allowed on or before the Effective Date; *provided*, *however*, that (1) Allowed Administrative Claims with respect to liabilities incurred by the Debtors in the ordinary course of business shall be paid or performed in the ordinary course of business in accordance with the terms and conditions of any controlling agreements, course of dealing, course of business, or industry practice, and (2) Allowed Priority Tax Claims shall be paid in accordance with Article II.C.  To the extent any Allowed Priority Tax Claim is not due and owing on the Effective Date, such Claim shall be paid in full in Cash in accordance with the terms of any agreement between the Debtors and the Holder of such Claim or as may be due and payable under applicable non-bankruptcy law or in the ordinary course of business.  A Distribution Date shall occur no more frequently than once in every 90-day period after the Effective Date, as necessary, in the Reorganized Debtors' sole discretion.

B.       *Rights and Powers of the Distribution Agent*

1.       Powers of Distribution Agent

The Distribution Agent shall be empowered to:  (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan; (b) make all distributions contemplated hereby; (c) employ professionals to represent it with respect to its responsibilities; and (d) exercise such other powers as may be vested in the Distribution Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Distribution Agent to be necessary and proper to implement the provisions hereof.

2.        <u>Expenses Incurred On or After the Effective Date</u>

Except as otherwise ordered by the Bankruptcy Court, the amount of any reasonable fees and expenses incurred by the Distribution Agent on or after the Effective Date (including taxes) and any reasonable compensation and expense reimbursement claims (including reasonable attorney fees and expenses) made by the Distribution Agent shall be paid in Cash by the Reorganized Debtors.

C.        *Special Rules for Distributions to Holders of Disputed Claims*

Except as otherwise agreed by the relevant parties: no partial payments and no partial distributions shall be made with respect to a Disputed Claim until all such disputes in connection with such Disputed Claim have been resolved by settlement or Final Order. Any dividends or other distributions arising from property distributed to Holders of Allowed Claims in a Class and paid to such Holders under the Plan shall also be paid, in the applicable amounts, to any Holder of a Disputed Claim in such Class that becomes an Allowed Claim after the date or dates that such dividends or other distributions were earlier paid to Holders of Allowed Claims in such Class.

Any fund established to hold consideration to be received under the Plan pending resolution of Disputed Claims shall be treated as a "disputed ownership fund" pursuant to Treasury Regulation section 1.468B-9. Any such fund shall, therefore, be subject to entity-level taxation. For the avoidance of doubt, any New Stock shall not be issued to such fund; rather, Reorganized Bristow Parent shall retain sufficient authorized, but unissued, New Stock and issue them directly to Holders of Claims following the resolution of Disputed Claims.

D.        *Delivery of Distributions*

1.        <u>Record Date for Distributions</u>

Except as provided herein, on the Distribution Record Date, the Claims Register shall be closed and the Debtors, the Reorganized Debtors, or any other party responsible for making distributions under the Plan shall be authorized and entitled to recognize only those record Holders listed on the Claims Register or any other transfer register for each Class of Claims as maintained by the Debtors or their agents, each of which shall be deemed closed as of the close of business on the Distribution Record Date, and there shall be no further changes in the record Holders of the applicable Claims. In addition, with respect to payment of any Cure Costs or disputes over any Cure Costs, neither the Debtors nor the Distribution Agent shall have any obligation to recognize or deal with any party other than the non-Debtor party to the applicable Executory Contract or Unexpired Lease as of the Effective Date, even if such non-Debtor party has thereafter sold, assigned, or otherwise transferred its Claim for Cure Costs. The Distribution Record Date shall not apply to Secured Notes and Unsecured Notes deposited with DTC, the Holders of which shall receive distributions in accordance with the customary procedures of DTC.

2.        <u>Distribution Process</u>

The Distribution Agent shall make all distributions required under the Plan, except that with respect to distributions to Holders of Allowed Claims governed by a separate agreement, shall exercise commercially reasonable efforts to implement appropriate mechanics governing such distributions in accordance with the Plan and the terms of the relevant governing agreement. Except as otherwise provided herein, and notwithstanding any authority to the contrary, distributions to Holders of Allowed Claims and Allowed Interests, including Claims and Interests that become Allowed after the Effective Date, shall be made to Holders of record or their respective designees as of the Distribution Record Date: (a) to the address of such Holder or designee as set forth in the applicable register (or if the appropriate notice has been provided pursuant to the governing agreement in writing, on or before the date that is 10 calendar days before the Effective Date, of a change of address or an identification of designee, to the changed address or to such designee, as applicable); or (b) in accordance with Federal Rule of Civil Procedure 4, as modified and made applicable by Bankruptcy Rule 7004, if no address exists in the applicable register, no Proof of Claim has been Filed, and the Distribution Agent has not received a written notice of a change of address on or before the date that is 10 calendar days before the Effective Date. The Debtors, the Reorganized Debtors, and the Distribution Agent, as applicable, shall not incur any liability whatsoever on account of any distributions under the Plan. Except as otherwise provided in the Plan, Holders of Claims and Holders of Interests shall not be entitled to interest, dividends,

49

or accruals on the distributions provided for in the Plan, regardless of whether such distributions are delivered on or at any time after the Effective Date.

3.      Delivery of Distributions to Holders of Unsecured Notes Claims

Except as otherwise provided in the Plan or reasonably requested by the applicable Unsecured Notes Indenture Trustee, all distributions to Holders of Unsecured Notes Claims shall be made to and deemed completed when received by the applicable Unsecured Notes Indenture Trustee; provided, however, that at such Unsecured Notes Indenture Trustee's written election, the applicable distributions shall not be distributed to Holders of Unsecured Notes Claims in the name of the Unsecured Notes Indenture Trustee. Upon such written election, the Unsecured Notes Indenture Trustee shall hold or direct such distributions for the benefit of Holders of Unsecured Notes Claims, and the Unsecured Notes Indenture Trustees shall arrange to deliver such distributions to or on behalf of such Holders, subject to the Unsecured Notes Indenture Trustee's charging liens. The payment of the applicable Unsecured Notes Indenture Trustee and the Convertible Notes Indenture Trustee as set forth in the applicable indenture or bond agreement shall be considered a distribution on account of Unsecured Notes Claims. If an Unsecured Notes Indenture Trustee is unable to make such distributions or consents to the Distribution Agent making such distributions in writing, the Distribution Agent, with the cooperation of such Unsecured Notes Indenture Trustee, shall make such distributions to the extent practicable to do so (provided that until such distributions are made, the applicable charging liens shall attach to the property to be distributed in the same manner as if such distributions were made through the applicable Unsecured Notes Indenture Trustee).

4.      Foreign Currency Exchange Rate

Except as otherwise provided in a Bankruptcy Court order, as of the Effective Date, any Claim asserted in currency other than U.S. dollars shall be automatically deemed converted to the equivalent U.S. dollar value using the exchange rate for the applicable currency as published in *The Wall Street Journal, National Edition*, on the Effective Date.

5.      Fractional, Undeliverable, and Unclaimed Distributions

a.      *Fractional Distributions.* Whenever any distribution of fractional shares of New Common Stock or New Preferred Stock would otherwise be required pursuant to the Plan, the actual distribution shall reflect a rounding of such fraction to the nearest interest or share or dollar, as applicable, with half interests of shares, or any amount equal to $0.50, or less being rounded down. The total number of authorized shares of New Stock to be distributed pursuant to the Plan shall be adjusted as necessary to account for the foregoing rounding.

b.      *Undeliverable Distributions.* If any distribution to a Holder of an Allowed Claim is returned to the Distribution Agent as undeliverable, no further distributions shall be made to such Holder unless and until the Distribution Agent is notified in writing of such Holder's then-current address or other necessary information for delivery, at which time all currently due missed distributions shall be made to such Holder on the next Distribution Date. Undeliverable distributions shall remain in the possession of the Reorganized Debtors until such time as a distribution becomes deliverable, or such distribution reverts to the Reorganized Debtors or is canceled pursuant to Article VI.D.5.c of the Plan, and shall not be supplemented with any interest, dividends, or other accruals of any kind.

c.      *Reversion.* Any distribution under the Plan that is an Unclaimed Distribution for a period of 6 months after distribution shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code and such Unclaimed Distribution shall revest in the applicable Reorganized Debtor and, to the extent such Unclaimed Distribution is comprised of New Common Stock or New Preferred Stock, each shall be transferred to the Backstop Commitment Parties on a Pro Rata basis. Upon such revesting, the Claim of the Holder or its successors with respect to such property shall be canceled, discharged, and forever barred notwithstanding any applicable federal or state escheat, abandoned, or unclaimed

50

property laws, or any provisions in any document governing the distribution that is an Unclaimed Distribution, to the contrary.

6. Minimum; *De Minimis* Distributions

No Cash payment of less than $50 shall be made to a Holder of an Allowed Claim on account of such Allowed Claim.

7. Surrender of Canceled Instruments or Securities

On the Effective Date, each Holder of a Certificate shall be deemed to have surrendered such Certificate to the Distribution Agent or a Servicer (to the extent the relevant Claim is governed by an agreement and administered by a Servicer). Such Certificate shall be canceled solely with respect to the Debtors, and such cancelation shall not alter the obligations or rights of any non-Debtor third parties vis-à-vis one another with respect to such Certificate. Notwithstanding the foregoing paragraph, this Article VI.D.6 shall not apply to any Claims and Interests that are Reinstated pursuant to the terms of the Plan.

E. *Compliance with Tax Requirements/Allocations*

In connection with the Plan, to the extent applicable, the Distribution Agent shall request distributees to provide appropriate documentation that may be required for an exemption from withholding or reporting, and shall comply with all tax withholding and reporting requirements imposed on it by any Governmental Unit, and all distributions pursuant to the Plan shall be subject to such withholding and reporting requirements unless an exception applies. Notwithstanding any provision in the Plan to the contrary, the Distribution Agent shall take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, or withholding distributions pending receipt of information necessary to facilitate such distributions. The Reorganized Debtors and the Distribution Agent reserves the right to allocate all distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support, and other spousal awards, liens, and encumbrances. All Persons holding Claims shall be required to provide any information necessary to effect information reporting and the withholding of such taxes. Notwithstanding any other provision of the Plan to the contrary, each Holder of an Allowed Claim shall have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any Governmental Unit, including income, withholding, and other tax obligations, on account of such distribution.

F. *Claims Paid or Payable by Third Parties*

1. Claims Paid by Third Parties

Subject to the last sentence of this paragraph, to the extent a Holder of a Claim receives a distribution on account of such Claim and receives payment from a party that is not a Debtor or a Reorganized Debtor on account of such Claim, such Holder shall, within 14 calendar days of receipt thereof, repay or return the distribution to the Reorganized Debtors to the extent the Holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such distribution under the Plan. The failure of such Holder to timely repay or return such distribution shall result in the Holder owing the Reorganized Debtors annualized interest at the Federal Judgment Rate on such amount owed for each Business Day after the 14-day grace period specified above until the amount is repaid.

2. Claims Payable by Insurance Carriers

No distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' insurance policies until the Holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy. To the extent that one or more of the Debtors' insurers agrees to satisfy in full or in part a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such insurers' agreement, the applicable portion of such Claim may be expunged without a Claim objection having to be Filed and

without any further notice to or action, order, or approval of the Bankruptcy Court; *provided that* the Debtors shall provide 21 calendar days' notice to the Holder of such Claim prior to any disallowance of such Claim during which period the Holder may object to such disallowance, and if the parties cannot reach an agreed resolution, the matter shall be decided by the Bankruptcy Court.

        3.        Applicability of Insurance Policies

Except as otherwise provided in the Plan, distributions to Holders of Allowed Claims shall be in accordance with the provisions of any applicable insurance policy. Notwithstanding anything to the contrary contained herein (including Article VIII of the Plan), nothing contained in the Plan shall constitute or be deemed a release, settlement, satisfaction, compromise, or waiver of any Cause of Action that the Debtors or any other Entity may hold against any other Entity, including insurers, under any policies of insurance or applicable indemnity, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

G.      *Setoffs*

Except as otherwise expressly provided for herein, each Reorganized Debtor, pursuant to the Bankruptcy Code (including section 553 of the Bankruptcy Code), applicable non-bankruptcy law, or as may be agreed to by the Holder of a Claim, may (but shall not be required to) set off against any Allowed Claim and the distributions to be made pursuant to the Plan on account of such Allowed Claim (before any distribution is made on account of such Allowed Claim), any claims, rights, and Causes of Action of any nature that such Debtor or Reorganized Debtor, as applicable, may hold against the Holder of such Allowed Claim, to the extent such claims, rights, or Causes of Action against such Holder have not been otherwise compromised or settled on or prior to the Effective Date (whether pursuant to the Plan or otherwise); *provided*, *however*, that neither the failure to effect such a setoff nor the allowance of any Claim pursuant to the Plan shall constitute a waiver or release by such Reorganized Debtor of any such claims, rights, and Causes of Action that such Reorganized Debtor may possess against such Holder. In no event shall any Holder of Claims be entitled to set off any such Claim against any claim, right, or Cause of Action of the Debtor or Reorganized Debtor (as applicable), unless such Holder has Filed a motion with the Bankruptcy Court requesting the authority to perform such setoff on or before the Confirmation Date, and notwithstanding any indication in any Proof of Claim or otherwise that such Holder asserts, has, or intends to preserve any right of setoff pursuant to section 553 of the Bankruptcy Code or otherwise.

H.      *Indefeasible Distributions*

Any and all distributions made under the Plan shall be indefeasible and not subject to clawback.

I.      *Allocation Between Principal and Accrued Interest*

Distributions in respect of Allowed Claims shall be allocated first to the principal amount of such Claims (as determined for U.S. federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Allowed Claims, to any portion of such Claims for accrued but unpaid interest.

**ARTICLE VII.**
**PROCEDURES FOR RESOLVING DISPUTED CLAIMS**

A.      *Allowance of Claims*

After the Effective Date, each of the Reorganized Debtors shall have and retain any and all rights and defenses the applicable Debtor had with respect to any Claim immediately before the Effective Date. Except as expressly provided in the Plan or in any order entered in the Chapter 11 Cases before the Effective Date (including the Confirmation Order), no Claim shall become an Allowed Claim unless and until such Claim is deemed Allowed under the Plan or the Bankruptcy Code, or the Bankruptcy Court has entered a Final Order, including the Confirmation Order (when it becomes a Final Order), in the Chapter 11 Cases allowing such Claim.

52

B.      *Claims Administration Responsibilities*

Except as otherwise specifically provided in the Plan and notwithstanding any requirements that may be imposed pursuant to Bankruptcy Rule 9019, after the Effective Date, the Reorganized Debtors shall have the sole authority to: (1) File and prosecute objections to Claims; (2) settle, compromise, withdraw, litigate to judgment, or otherwise resolve objections to any and all Claims (with the reasonable consent of the Required RSA Parties), regardless of whether such Claims are in a Class or otherwise; (3) settle, compromise, or resolve any Disputed Claim (with the reasonable consent of the Required RSA Parties) without any further notice to or action, order, or approval by the Bankruptcy Court; and (4) administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court.  On and after the Effective Date, the Reorganized Debtors will use commercially reasonable efforts to advance the claims resolution process through estimation or otherwise, subject to the provisions of Article VII.K of the Plan.  After the Effective Date, the Reorganized Debtors shall resolve Disputed Claims in accordance with the Debtors' fiduciary duties and pursuant to the terms of the Plan.

C.      *Estimation of Claims*

Before, on, or after the Effective Date, the Debtors or the Reorganized Debtors, as applicable, may (but are not required to) at any time request that the Bankruptcy Court estimate any Claim pursuant to applicable law, including pursuant to section 502(c) of the Bankruptcy Code and/or Bankruptcy Rule 3012 for any reason, regardless of whether any party previously has objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction to estimate any such Claim, including during the litigation of any objection to any Claim or during the pendency of any appeal relating to such objection.  Notwithstanding any provision to the contrary in the Plan, a Claim that has been expunged from the Claims Register, but that either is subject to appeal or has not been the subject of a Final Order, shall be deemed to be estimated at zero dollars, unless otherwise ordered by the Bankruptcy Court.  In the event that the Bankruptcy Court estimates any Claim and does not provide otherwise, such estimated amount shall constitute a maximum limitation on such Claim for all purposes under the Plan (including for purposes of distributions and discharge) and may be used as evidence in any supplemental proceedings, and the Debtors or Reorganized Debtors may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim.  Notwithstanding section 502(j) of the Bankruptcy Code, in no event shall any Holder of a Claim that has been estimated pursuant to section 502(c) of the Bankruptcy Code or otherwise be entitled to seek reconsideration of such estimation unless such Holder has Filed a motion requesting the right to seek such reconsideration on or before seven (7) days after the date on which such Claim is estimated.  Each of the foregoing Claims and objection, estimation, and resolution procedures are cumulative and not exclusive of one another.  Claims may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.

D.      *Disputed Claims Reserve*

On or before the Effective Date, the Reorganized Debtors shall establish one or more reserves of Cash and/or New Common Stock for those General Unsecured Claims that are Disputed Claims as of the Distribution Record Date (for the avoidance of doubt, deducting such amounts from the Unsecured Equity Pool, GUC Distribution Cash Amount, and Unsecured 4(a)(2) Distribution Cash Amount), which reserves shall be administered by the Reorganized Debtors or the Distribution Agent, as applicable.  After the Effective Date, the Reorganized Debtors or the Distribution Agent shall hold such Cash and/or New Common Stock in such reserve(s) in trust for the benefit of the Holders of General Unsecured Claims that are Disputed Claims as of the Distribution Record Date, that are ultimately determined to be Allowed after the Distribution Record Date.  The Reorganized Debtors or the Distribution Agent shall distribute such amounts (net of any expenses, including any taxes relating thereto), as provided herein, as such Claims are resolved by a Final Order or agreed to by settlement, and such amounts will be distributable on account of such Claims as such amounts would have been distributable had such Claims been Allowed Claims as of the Effective Date under Article III of the Plan solely to the extent of the amounts available in the applicable reserve(s); *provided*, *however*, that for the avoidance of doubt, and as set forth in the Rights Offering Procedures, there shall not be any reserve of any Unsecured 4(a)(2) Subscription Rights or Unsecured 1145 Subscription Rights, and any Holder of a General

Unsecured Claim that is a Disputed Claim as of the Distribution Record Date shall not be entitled to receive or exercise any Unsecured 4(a)(2) Subscription Rights or Unsecured 1145 Subscription Rights.

Upon a Disputed Claim becoming disallowed by a Final Order, (a) the applicable amount of Cash that was in the disputed claims reserve on account of such Disputed Claim shall be distributed by the Reorganized Debtors to the applicable Holders of Claims that would have received such Cash pursuant to the Plan if such Disputed Claim did not exist as of the Distribution Record Date, with the Reorganized Debtors making such distributions of any such released Cash no less frequently than every three months following the Effective Date and (b) the applicable amount of New Common Stock that was in the disputed claims reserve on account of such Disputed Claim shall be cancelled by the Reorganized Debtors.

Any assets held in a disputed claims reserve shall be subject to the tax rules that apply to "disputed ownership funds" under 26 C.F.R. 1.468B–9. As such, such assets will be subject to entity-level taxation, and the Reorganized Debtors shall be required to comply with the relevant rules.

E.     *Adjustment to Claims Without Objection*

Any Claim that has been paid or satisfied, or any Claim that has been amended or superseded, may be adjusted or expunged on the Claims Register by the Debtors or the Reorganized Debtors without an objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

F.     *Time to File Objections to Claims*

Any objections to Claims shall be Filed on or before the later of (1) 180 days after the Effective Date and (2) such other period of limitation as may be specifically fixed by the Bankruptcy Court upon a motion by the Debtors or the Reorganized Debtors.

G.     *Disallowance of Claims*

Any Claims held by Entities from which property is recoverable under sections 542, 543, 550, or 553 of the Bankruptcy Code or that is a transferee of a transfer avoidable under sections 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code, shall not be Allowed or deemed Allowed, and Holders of such Claims may not receive any distributions on account of such Claims until such time as such Causes of Action against that Entity have been settled or a Bankruptcy Court order with respect thereto has been entered and all sums due, if any, to the Debtors by that Entity have been turned over or paid to the Debtors or the Reorganized Debtors. All Proofs of Claim Filed on account of an Indemnification Obligation shall be deemed satisfied and expunged from the Claims Register as of the Effective Date to the extent such Indemnification Obligation is assumed (or honored or reaffirmed, as the case may be) pursuant to the Plan, without any further notice to or action, order, or approval of the Bankruptcy Court. Notwithstanding anything to the contrary in this Plan, any Holder of an Allowed Claim under section 502(h) of the Bankruptcy Code arising from an Avoidance Action shall, in lieu of any distribution to Holders of Allowed General Unsecured Claims, solely receive Cash from the proceeds of such Avoidance Action in an amount reasonably equivalent to the percentage recovery received by Holders of General Unsecured Claims based on the enterprise value of the Debtors for purposes of Confirmation; *provided that* the Reorganized Debtors may elect in their sole discretion (and without any further approval from the Court) to instead have such amount of Cash set off against the recovery from the applicable Avoidance Action.

**Except as otherwise provided herein or as agreed to by the Debtors or the Reorganized Debtors, any and all Proofs of Claim Filed after the Claims Bar Date shall be deemed disallowed and expunged as of the Effective Date without any further notice to or action, order, or approval of the Bankruptcy Court, and Holders of such Claims may not receive any distributions on account of such Claims, unless such late Proof of Claim has been deemed timely Filed by a Final Order.**

54

H.      *Amendments to Claims*

On or after the Effective Date, a Claim may not be Filed or amended without the prior authorization of the Bankruptcy Court or the Reorganized Debtors, and any such new or amended Claim Filed shall be deemed disallowed in full and expunged without any further notice to or action, order, or approval of the Bankruptcy Court to the maximum extent provided by applicable law.

I.      *No Distributions Pending Allowance*

If an objection to a Claim or portion thereof is Filed, no payment or distribution provided under the Plan shall be made on account of such Claim or portion thereof unless and until such Disputed Claim becomes an Allowed Claim, unless otherwise determined by the Reorganized Debtors.

J.      *Distributions After Allowance*

To the extent that a Disputed Claim ultimately becomes an Allowed Claim, distributions shall be made to the Holder of such Allowed Claim in accordance with the provisions of the Plan. As soon as reasonably practicable after the date that the order or judgment of the Bankruptcy Court allowing any Disputed Claim becomes a Final Order, the Reorganized Debtors shall provide to the Holder of such Claim the distribution to which such Holder is entitled under the Plan as of the Effective Date, less any previous distribution (if any) that was made on account of the undisputed portion of such Claim, without any interest, dividends, or accruals to be paid on account of such Claim unless required under applicable bankruptcy law or as otherwise provided herein.

K.      *Single Satisfaction of Claims*

Holders of Allowed Claims may assert such Claims against the Debtors obligated with respect to such Claims, and such Claims shall be entitled to share in the recovery provided for the applicable Class of Claims against the Debtors based upon the full Allowed amount of such Claims. Notwithstanding the foregoing, in no case shall the aggregate value of all property received or retained under the Plan on account of any Allowed Claim exceed 100 percent of the underlying Allowed Claim (including applicable interest, if any such interest is Allowed).

L.      *Claims Consultation Rights*

The Debtors or the Reorganized Debtors, as applicable, shall consult with the Creditors' Committee with regard to the allowance of any claims participating in the GUC Distribution Cash Amount prior to the Effective Date.

## ARTICLE VIII.
## DISCHARGE, RELEASE, INJUNCTION AND RELATED PROVISIONS

A.      *Discharge of Claims and Termination of Interests*

**Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan or in any contract, instrument, or other agreement or document created pursuant to the Plan, the distributions, rights, and treatment that are provided in the Plan shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of Claims (including any Intercompany Claims resolved or compromised after the Effective Date by the Reorganized Debtors), Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and Interests in, the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any liability (including withdrawal liability) to the extent such Claims or Interests relate to services performed by employees of the Debtors before the Effective Date and that arise from a termination of employment, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in**

55

sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not: (1) a Proof of Claim based upon such debt or right is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code; (2) a Claim or Interest based upon such debt, right, or Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (3) the Holder of such a Claim or Interest has accepted the Plan. Any default or "event of default" by the Debtors or Affiliates with respect to any Claim or Interest that existed immediately before or on account of the Filing of the Chapter 11 Cases shall be deemed cured (and no longer continuing) as of the Effective Date. The Confirmation Order shall be a judicial determination of the discharge of all Claims and Interests subject to the Effective Date occurring.

B.    *Releases by the Debtors*

Pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, on and after the Effective Date, each Released Party is deemed fully, conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by the Debtors, the Reorganized Debtors, their Estates, and any person seeking to exercise the rights of the Estates, including any successors to the Debtors or any Estates representative appointed or selected pursuant to section 1123(b)(3) of the Bankruptcy Code from any and all Causes of Action, including any derivative claims asserted on behalf of the Debtors, that the Debtors, the Reorganized Debtors, or their Estates, including any successors to the Debtors or any Estates representative appointed or selected pursuant to section 1123(b)(3) of the Bankruptcy Code, would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or Interest, or that any Holder of any Claim or Interest could have asserted on behalf of the Debtors, based on or relating to, or in any manner arising from, in whole or in part:

1.    the Debtors, the business or contractual arrangement between the Debtors and any Released Party, any Securities issued by the Debtors and the ownership thereof, the Debtors' in- or out-of-court restructuring efforts, the 2019 Term Loan Facility, the Compensation and Benefit Programs, intercompany transactions, or the formulation, preparation, dissemination, negotiation, or Filing of the Restructuring Support Agreement, the Plan, the Disclosure Statement, Rights Offering Procedures, or any other Restructuring Documents;

2.    any Restructuring Transaction, contract, instrument, release, or other agreement or document (including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Restructuring Support Agreement, the Original RSA, the Original DIP Commitment Letter, the Initial Amended RSA, the Disclosure Statement, or the Plan, including the Rights Offering, the Backstop Commitment Agreement, the DIP Facility, the Exit Facility, the Amended and Restated 2019 Term Loan Facility, or any other Restructuring Documents;

3.    the Chapter 11 Cases, the Disclosure Statement, the Plan, the Filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the solicitation of votes with respect to the Plan, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan or the Rights Offering, or the distribution of property under the Plan or any other related agreement with respect to the foregoing; or

4.    any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date, including all Avoidance Actions or other relief obtained by the Debtors in the Chapter 11 Cases.

Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (i) any claims related to any act or omission that is determined in a Final Order to have constituted willful misconduct, gross negligence, or actual fraud, (ii) the rights of any current employee of the Debtors under any employment agreement or plan, (iii) the rights of the Debtors with respect to any confidentiality provisions or covenants restricting competition in favor of the Debtors under any employment agreement with a current or former employee of the Debtors, (iv) any post-Effective Date obligations of any party or Entity under the Plan, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the

Plan Supplement) executed to implement the Plan, (v) the rights of Holders of Allowed Claims to receive distributions under the Plan, (vi) any Cause of Action the Debtors may have against Columbia Helicopters, Inc. and its Related Parties, or (vii) any Cause of Action the Debtors may have against any of their former officers or directors as of the Petition Date in respect of payments made and referenced under any separation, retirement, consulting agreement, employment agreement or plan.

Entry of the Confirmation Order will constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the foregoing release, which includes by reference each of the related provisions and definitions contained herein, and further, will constitute the Bankruptcy Court's finding that the foregoing release is: (i) in exchange for the good and valuable consideration provided by the Released Parties; (ii) a good faith settlement and compromise of the Claims released; (iii) in the best interest of the Debtors and their Estates; (iv) fair, equitable, and reasonable; and (v) given and made after due notice and opportunity for hearing.

C.      *Releases by Holders of Claims and Interests*

As of the Effective Date, except as otherwise provided herein, each Releasing Party is deemed to have fully, conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged each Debtor, Reorganized Debtor, and Released Party from any and all Causes of Action, including any derivative claims asserted on behalf of the Debtors, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part:

1.      the Debtors, the business or contractual arrangement between the Debtors and any Releasing Party, any Securities issued by the Debtors and the ownership thereof, the Debtors' in- or out-of-court restructuring efforts, the 2019 Term Loan Facility, the Compensation and Benefit Programs, intercompany transactions, or the formulation, preparation, dissemination, negotiation, or Filing of the Restructuring Support Agreement, the Plan, the Disclosure Statement, Rights Offering Procedures, or any other Restructuring Documents;

2.      any Restructuring Transaction, contract, instrument, release, or other agreement or document (including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Restructuring Support Agreement, the Original RSA, the Original DIP Commitment Letter, the Initial Amended RSA, the Disclosure Statement, or the Plan, including the Rights Offering, the Backstop Commitment Agreement, the DIP Facility, the Exit Facility, the Amended and Restated 2019 Term Loan Facility, or any other Restructuring Documents;

3.      the Chapter 11 Cases, the Disclosure Statement, the Plan, the Filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the solicitation of votes with respect to the Plan, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan or the Rights Offering, or the distribution of property under the Plan or any other related agreement with respect to the foregoing; or

4.      any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date, including all Avoidance Actions or other relief obtained by the Debtors in the Chapter 11 Cases.

Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (i) any claims related to any act or omission that is determined in a Final Order to have constituted willful misconduct, gross negligence, or actual fraud, (ii) the rights of any current employee of the Debtors under any employment agreement or plan, (iii) the rights of the Debtors with respect to any confidentiality provisions or covenants restricting competition in favor of the Debtors under any employment agreement with a current or former employee of the Debtors, (iv) any post-Effective Date obligations of any party or Entity under the Plan, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, (v) the rights of Holders of Allowed Claims to receive

distributions under the Plan, (vi) any Cause of Action the Debtors may have against Columbia Helicopters, Inc. and its Related Parties, or (vii) any Cause of Action the Debtors may have against any of their former officers or directors as of the Petition Date in respect of payments made and referenced under any separation, retirement, consulting agreement, employment agreement or plan.

Entry of the Confirmation Order will constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the foregoing release, which includes by reference each of the related provisions and definitions contained herein, and further, will constitute the Bankruptcy Court's finding that the foregoing release is: (i) in exchange for the good and valuable consideration provided by the Released Parties; (ii) a good faith settlement and compromise of the Claims released; (iii) in the best interest of the Debtors and their Estates; (iv) fair, equitable, and reasonable; and (v) given and made after due notice and opportunity for hearing.

D.      *Exculpation*

Except as otherwise specifically provided in the Plan, no Exculpated Party shall have or incur, and each Exculpated Party is hereby released and exculpated from any Cause of Action for any claim related to any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, Filing, or termination of the Restructuring Support Agreement and related prepetition transactions (including the 2019 Term Loan Facility Credit Agreement), the Original RSA, the Original DIP Commitment Letter, the Initial Amended RSA, the Disclosure Statement, the Plan, the Rights Offering, the Rights Offering Procedures, the Backstop Commitment Agreement, the DIP Facility, the Exit Facility, the Amended and Restated 2019 Term Loan Facility, any other Restructuring Documents, or any Restructuring Transaction, contract, instrument, release or other agreement or document created or entered into in connection with the Disclosure Statement or the Plan, the Filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance of Securities pursuant to the Plan or the Rights Offering, or the distribution of property under the Plan or any other related agreement with respect to the foregoing, except for claims related to any act or omission that is determined in a Final Order to have constituted actual fraud, willful misconduct, or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan. The Exculpated Parties have, and upon completion of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of, and distribution of, consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

E.      *Injunction*

Except as otherwise expressly provided in the Plan or for obligations or distributions issued or required to be paid pursuant to the Plan or the Confirmation Order, all Entities that have held, hold, or may hold Claims or Interests that have been released pursuant to the Plan, discharged pursuant to the Plan, or are subject to exculpation pursuant to the Plan, are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Reorganized Debtors, or the Released Parties or the Exculpated Parties: (i) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests; (ii) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such Claims or Interests; (iii) creating, perfecting, or enforcing any lien or encumbrance of any kind against such Entities or the property or the estates of such Entities on account of or in connection with or with respect to any such Claims or Interests; (iv) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such Claims or Interests unless such Entity has timely asserted such setoff right in a document Filed with the Bankruptcy Court explicitly preserving such setoff, and notwithstanding an indication of a claim or interest or otherwise that such Entity asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (v) commencing or continuing in any manner any action or other proceeding of any kind on

**account of or in connection with or with respect to any such Claims or Interests released or settled pursuant to the Plan.**

F.  *Protection Against Discriminatory Treatment*

In accordance with section 525 of the Bankruptcy Code, and consistent with Article VI of the United States Constitution, no Governmental Unit shall discriminate against any Reorganized Debtor, or any Entity with which a Reorganized Debtor has been or is associated, solely because such Reorganized Debtor was a Debtor under chapter 11, may have been insolvent before the commencement of the Chapter 11 Cases (or during the Chapter 11 Cases but before such Debtor was granted or denied a discharge), or has not paid a debt that is dischargeable in the Chapter 11 Cases.

G.  *Release of Liens*

Except as otherwise specifically provided in the Plan,, the Milestone Settlement, the Exit Facility Credit Agreement or the Amended and Restated 2019 Term Loan Credit Agreement, as applicable, the Amended PK Air Credit Facility Agreement or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released and discharged, and all of the right, title, and interest of any holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Reorganized Debtors and their successors and assigns, in each case, without any further approval or order of the Bankruptcy Court and without any action or Filing being required to be made by the Debtors or the Reorganized Debtors, or any other Holder of a Secured Claim. In addition, at the sole expense of the Debtors or the Reorganized Debtors, the Holders of Secured Claims shall execute and deliver all documents reasonably requested by the Debtors, Reorganized Debtors or administrative agent for the Exit Facility to evidence the release of such mortgages, deeds of trust, Liens, pledges, and other security interests and shall authorize the Reorganized Debtors and their designees to file UCC-3 termination statements and other release documentation (to the extent applicable) with respect thereto. Notwithstanding the foregoing paragraph, this Article VIII.G shall not apply to any Secured Claims that are Reinstated pursuant to the terms of this Plan.

H.  *Reimbursement or Contribution*

If the Bankruptcy Court disallows a Claim for reimbursement or contribution of an Entity pursuant to section 502(e)(1)(B) of the Bankruptcy Code, then to the extent that such Claim is contingent as of the Effective Date, such Claim shall be forever disallowed notwithstanding section 502(j) of the Bankruptcy Code, unless prior to the Effective Date (1) such Claim has been adjudicated as non-contingent, or (2) the relevant Holder of a Claim has Filed a non-contingent Proof of Claim on account of such Claim and a Final Order has been entered determining such Claim as no longer contingent.

I.  *Recoupment*

In no event shall any Holder of a Claim be entitled to recoup such Claim against any claim, right, or Cause of Action of the Debtors or the Reorganized Debtors, as applicable, unless such Holder actually has performed such recoupment and provided notice thereof in writing to the Debtors on or before the Confirmation Date, notwithstanding any indication in any Proof of Claim or otherwise that such Holder asserts, has, or intends to preserve any right of recoupment.

J.  *Subordination Rights*

Any distributions under the Plan to Holders of Allowed Claims shall be received and retained free from any obligations to hold or transfer the same to any other Holder and shall not be subject to levy, garnishment, attachment, or other legal process by any Holder by reason of claimed contractual subordination rights. On the Effective Date, any such subordination rights shall be deemed waived, and the Confirmation Order shall constitute an injunction enjoining any Entity from enforcing or attempting to enforce any contractual, legal, or equitable subordination rights

to property distributed under the Plan, in each case other than as provided in the Plan; *provided*, that any such subordination rights shall be preserved in the event the Confirmation Order is vacated, the Effective Date does not occur in accordance with the terms hereunder or the Plan is revoked or withdrawn.

K.      *Reservation of Rights of the United States*

As to the United States of America, its agencies, departments, or agents (collectively, the "United States"), nothing in the Plan, the Plan Supplement, or the Confirmation Order shall expand the scope of discharge, release, or injunction to which the Debtors or Reorganized Debtors are entitled under the Bankruptcy Code, if any. The discharge, release, and injunction provisions contained in the Plan, the Plan Supplement, and the Confirmation Order are not intended and shall not be construed to bar the United States from, subsequent to the Confirmation Order, pursuing any actions, including but not limited to any police or regulatory action, against anyone.

Notwithstanding anything contained in the Plan or the Plan Supplement to the contrary, nothing in the Plan or the Plan Supplement shall discharge, release, impair, or otherwise preclude: (a) any liability to the United States that is not a "claim" within the meaning of section 101(5) of the Bankruptcy Code; (b) any valid right of setoff or recoupment of the United States against any of the Debtors or Reorganized Debtors; or (c) the exercise of the United States' police and regulatory powers against the Debtors, the Reorganized Debtors, or any non-Debtor. Nor shall anything in the Confirmation Order, the Plan, or the Plan Supplement: (a) enjoin or otherwise bar the United States and/or any Governmental Unit from asserting or enforcing, outside the Bankruptcy Court, any liability described in this paragraph, (b) divest any court, commission, or tribunal of jurisdiction from resolving any matters relating to the liabilities and/or claims set forth in this paragraph, or (c) confer in the Bankruptcy Court jurisdiction over any matter as to which it would not have jurisdiction under the Bankruptcy Code.

Moreover, nothing in the Confirmation Order, the Plan, or the Plan Supplement shall release or exculpate any non-Debtor, including any Released Parties and/or Exculpated Parties, from any liability to the United States, including but not limited to any liabilities arising under the Internal Revenue Code, the environmental laws, or the criminal laws against the Released Parties and/or Exculpated Parties, nor shall anything in the Confirmation Order, the Plan, or the Plan Supplement enjoin the United States from bringing any claim, suit, action, or other proceeding against the Released Parties and/or Exculpated Parties for any liability whatsoever; *provided that* nothing in this paragraph shall affect in any way any release by the Debtors, the Reorganized Debtors, their Estates, any person exercising the rights of the Estates, or any successor to the Estates of the Released Parties provided for in Article VIII.B of the Plan.

Nothing contained in the Plan, the Plan Supplement, or the Confirmation Order shall be deemed to determine the tax liability of any person or entity, including but not limited to the Debtors and the Reorganized Debtors, nor shall the Plan, the Plan Supplement, or the Confirmation Order be deemed to have determined the federal tax treatment of any item, distribution, or entity, including the federal tax consequences of the Plan, nor shall anything in the Plan, the Plan Supplement, or the Confirmation Order be deemed to have conferred jurisdiction upon the Bankruptcy Court to make determinations as to federal tax liability and federal tax treatment except as provided under 11 U.S.C. § 505.

## ARTICLE IX.
## EFFECT OF CONFIRMATION OF THE PLAN

Upon entry of the Confirmation Order, the Bankruptcy Court shall be deemed to have made and issued on the Confirmation Date, pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014, the following findings of fact and conclusions of law as though made after due deliberation and upon the record at the Confirmation Hearing. Upon entry of the Confirmation Order, any and all findings of fact in the Plan shall constitute findings of fact even if they are stated as conclusions of law, and any and all conclusions of law in the Plan shall constitute conclusions of law even if they are stated as findings of fact.

A.      *Jurisdiction and Venue*

On the Petition Date, the Debtors commenced the Chapter 11 Cases by filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code. The Debtors were and are qualified to be debtors under section 109 of the

60

Bankruptcy Code. Venue in the Southern District of Texas was proper as of the Petition Date and continues to be proper. Confirmation of the Plan is a core proceeding under 28 U.S.C. § 157(b)(2). The Bankruptcy Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1334 and the Bankruptcy Court has exclusive jurisdiction to determine whether the Plan complies with the applicable provisions of the Bankruptcy Code and should be confirmed.

B.      *Order Approving the Disclosure Statement*

On August 26, 2019, the Bankruptcy Court entered the Conditional Disclosure Statement Order, which, among other things, (a) conditionally approved the Disclosure Statement as containing adequate information within the meaning of section 1125 of the Bankruptcy Code and Bankruptcy Rule 3017 and (b) conditionally approved certain procedures and documents for soliciting and tabulating votes with respect to the Plan.

C.      *Voting Report*

Prior to the Confirmation Hearing, the Solicitation Agent filed the Voting Report. All procedures used to distribute solicitation materials to the applicable Holders of Claims and Interests and to tabulate the ballots were fair and conducted in accordance with the Conditional Disclosure Statement Order, the Bankruptcy Code, the Bankruptcy Rules, and all other applicable rules, laws, and regulations. Pursuant to sections 1124 and 1126 of the Bankruptcy Code, at least one Impaired Class entitled to vote on the Plan has voted to accept the Plan.

D.      *Judicial Notice*

The Bankruptcy Court takes judicial notice of the docket of the Chapter 11 Cases maintained by the clerk of the Bankruptcy Court and/or its duly appointed agent, including all pleadings and other documents Filed, all orders entered, and all evidence and arguments made, proffered, or adduced at the hearings held before the Bankruptcy Court during the pendency of the Chapter 11 Cases (including the Confirmation Hearing). Resolutions of any objections to Confirmation explained on the record at the Confirmation Hearing are hereby incorporated by reference. All entries on the docket of the Chapter 11 Cases shall constitute the record before the Bankruptcy Court for purposes of the Confirmation Hearing.

E.      *Transmittal and Mailing of Materials; Notice*

Due, adequate, and sufficient notice of the Disclosure Statement, the Plan, the Plan Supplement, the Confirmation Hearing, and the release and exculpation provisions set forth in Article VIII of the Plan, along with all deadlines for voting on or objecting to the Plan, has been given to (1) all known Holders of Claims and Interests, (2) parties that requested notice in accordance with Bankruptcy Rule 2002, (3) all parties to Unexpired Leases and Executory Contracts, and (4) all taxing authorities listed on the Schedules or in the Claims Register, in compliance with Bankruptcy Rules 2002(b), 3017, 3019, and 3020(b), the Conditional Disclosure Statement Order, and such transmittal and service were appropriate, adequate, and sufficient. Adequate and sufficient notice of the Confirmation Hearing and other dates, deadlines, and hearings described in the Conditional Disclosure Statement Order was given in compliance with the Bankruptcy Rules and such order, and no other or further notice is or shall be required.

F.      *Solicitation*

Votes for acceptance and rejection of the Plan were solicited in good faith and complied with sections 1125 and 1126 of the Bankruptcy Code, Bankruptcy Rules 3017, 3018, and 3019, the Conditional Disclosure Statement Order, all other applicable provisions of the Bankruptcy Code and all other applicable rules, laws, and regulations. The Debtors and their respective directors, managers, officers, employees, agents, affiliates, representatives, attorneys, and advisors, as applicable, have solicited votes on the Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code and the Conditional Disclosure Statement Order and are entitled to the protections afforded by section 1125(e) of the Bankruptcy Code and the exculpation provisions set forth in Article VIII of the Plan. The Debtors and the Released Parties solicited acceptance of the Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code and they participated in good faith, and in compliance with the applicable provisions of the Bankruptcy Code in the offer, issuance, sale, or purchase of New Stock and any debt

61

securities that were offered or sold under the Plan and, pursuant to section 1125(e) of the Bankruptcy Code, and no Released Party is or shall be liable on account of such solicitation for violation of any applicable law, rule, or regulation governing solicitation of acceptance of a chapter 11 plan or the offer, issuance, sale, or purchase of such debt securities.

### G. *Burden of Proof*

The Debtors, as proponents of the Plan, have satisfied their burden of proving the elements of sections 1129(a) and 1129(b) of the Bankruptcy Code by a preponderance of the evidence, which is the applicable evidentiary standard. The Debtors have satisfied the elements of section 1129(a) and 1129(b) of the Bankruptcy Code by clear and convincing evidence.

### H. *Bankruptcy Rule 3016(a) Compliance*

The Plan is dated and identifies the proponents thereof, thereby satisfying Bankruptcy Rule 3016(a).

### I. *Compliance with the Requirements of Section 1129 of the Bankruptcy Code*

The plan complies with all requirements of section 1129 of the Bankruptcy Code as follows:

1. Section 1129(a)(1)–Compliance of the Plan with Applicable Provisions of the Bankruptcy Code

The Plan complies with all applicable provisions of the Bankruptcy Code as required by section 1129(a)(1) of the Bankruptcy Code, including sections 1121, 1122, 1123, and 1125 of the Bankruptcy Code.

a. Standing

Each of the Debtors has standing to file a plan and the Debtors, therefore, have satisfied section 1121 of the Bankruptcy Code.

b. Proper Classification

Pursuant to sections 1122(a) and 1123(a)(1) of the Bankruptcy Code, Article III of the Plan designates Classes of Claims and Interests, other than Administrative Claims, Professional Fee Claims, DIP Facility Claims, and Priority Tax Claims, which are not required to be classified. As required by section 1122(a) of the Bankruptcy Code, each Class of Claims and Interests contains only Claims or Interests that are substantially similar to the other Claims or Interests within that Class.

c. Specification of Unimpaired Classes

Pursuant to section 1123(a)(2) of the Bankruptcy Code, Article III of the Plan specifies all Classes of Claims and Interests that are not Impaired.

d. Specification of Treatment of Impaired Classes

Pursuant to section 1123(a)(3) of the Bankruptcy Code, Article III of the Plan specifies the treatment of all Classes of Claims and Interests that are Impaired.

e. No Discrimination

Pursuant to section 1123(a)(4) of the Bankruptcy Code, Article III of the Plan provides the same treatment for each Claim or Interest within a particular Class, as the case may be, unless the Holder of a particular Claim or Interest has agreed to less favorable treatment with respect to such Claim or Interest, as applicable.

f.      Plan Implementation

Pursuant to section 1123(a)(5) of the Bankruptcy Code, the Plan provides adequate and proper means for the Plan's implementation. Immediately upon the Effective Date, sufficient Cash and other consideration provided under the Plan will be available to make all payments required to be made on the Effective Date pursuant to the terms of the Plan. Moreover, Article IV and various other provisions of the Plan specifically provide adequate means for the Plan's implementation.

g.      Voting Power of Equity Securities; Selection of Officer, Director, or Trustee under the Plan

The New Organizational Documents comply with sections 1123(a)(6) and 1123(a)(7) of the Bankruptcy Code.

h.      Impairment/Unimpairment of Classes of Claims and Equity Interests

Pursuant to section 1123(b)(1) of the Bankruptcy Code, (i) Class 1 (Other Secured Claims), Class 2 (Other Priority Claims), Class 5 (Lombard (BULL) Term Loan Claims), Class 7 (Macquarie Term Loan Credit Facility Claims), Class 9 (Lombard (BALL) Term Loan Guarantee Claims and UK ABL Credit Facility), Class 10 (MCA and Other Customer Guarantee Claims) and Class 11 (Trade Claims) are Unimpaired under the Plan, (ii) Class 3 (2019 Term Loan Facility Claims), Class 4 (Secured Notes Claims), Class 6 (PK Air Credit Facility Claims and MAG Lease Obligation Claims), Class 8 (Unsecured Notes Claims), Class 12 (General Unsecured Claims), Class 15 (Existing Interests), and Class 16 (Section 510(b) Claims) are Impaired under the Plan, and (iii) Class 13 (Intercompany Claims) and Class 14 (Intercompany Interests) are either Unimpaired or Impaired under the Plan at the election of the Required RSA Parties.

i.      Assumption and Rejection of Executory Contracts and Unexpired Leases

In accordance with section 1123(b)(2) of the Bankruptcy Code, pursuant to Article V of the Plan, on the Effective Date, each Executory Contract and Unexpired Lease shall be deemed assumed unless such Executory Contract or Unexpired Lease is listed on the Schedule of Rejected Executory Contracts and Unexpired Leases, if any. The assumption of Executory Contracts and Unexpired Leases hereunder may include the assignment of certain of such contracts to Affiliates. The Debtors' assumption and assignment of the Executory Contracts and Unexpired Leases listed on the Schedule of Assumed Executory Contracts and Unexpired Leases pursuant to Article V of the Plan governing assumption and rejection of executory contracts and unexpired leases satisfies the requirements of section 365(b) of the Bankruptcy Code and, accordingly, the requirements of section 1123(b) of the Bankruptcy Code.

The Debtors have exercised reasonable business judgment in determining whether to reject, assume, or assume and assign each of their Executory Contracts and Unexpired Leases under the terms of the Plan. Each pre- or post-Confirmation rejection, assumption, or assumption and assignment of an Executory Contract or Unexpired Lease pursuant to Article V of the Plan will be legal, valid and binding upon the applicable Debtor and all other parties to such Executory Contract or Unexpired Lease, as applicable, all to the same extent as if such rejection, assumption, or assumption and assignment had been effectuated pursuant to an appropriate order of the Court entered before the Confirmation Date under section 365 of the Bankruptcy Code. Each of the Executory Contracts and Unexpired Leases to be rejected, assumed, or assumed and assigned is deemed to be an executory contract or an unexpired lease, as applicable.

j.      Settlement of Claims and Causes of Action

All of the settlements and compromises pursuant to and in connection with the Plan or incorporated by reference into the Plan comply with the requirements of section 1123(b)(3) of the Bankruptcy Code and Bankruptcy Rule 9019.

Pursuant to Bankruptcy Rule 9019 and section 363 of the Bankruptcy Code and in consideration for the distributions and other benefits provided under the Plan, any and all compromise and settlement provisions of the Plan

constitute good-faith compromises, are in the best interests of the Debtors, the Estates, and all Holders of Claims and Interests, and are fair, equitable, and reasonable.

Specifically, the settlements and compromises pursuant to and in connection with the Plan are substantively fair based on the following factors: (a) the balance between the litigation's possibility of success and the settlement's future benefits; (b) the likelihood of complex and protracted litigation and risk and difficulty of collecting on the judgment; (c) the proportion of creditors and parties in interest that support the settlement; (d) the competency of counsel reviewing the settlement; the nature and breadth of releases to be obtained by officers and directors; and (e) the extent to which the settlement is the product of arm's-length bargaining.

k.      Cure of Defaults

Article V of the Plan provides for the satisfaction of default claims associated with each Executory Contract and Unexpired Lease to be assumed in accordance with section 365(b)(1) of the Bankruptcy Code. The Cure Costs identified in the Schedule of Assumed Executory Contracts and Unexpired Leases and any amendments thereto, as applicable, represent the amount, if any, that the Debtors propose to pay in full and complete satisfaction of such default claims. Any disputed cure amounts will be determined in accordance with the procedures set forth in Article V of the Plan, and applicable bankruptcy and nonbankruptcy law. As such, the Plan provides that the Debtors will cure, or provide adequate assurance that the Debtors will promptly cure, defaults with Executory Contracts and Unexpired Leases in compliance with section 365(b)(1) of the Bankruptcy Code. Thus, the Plan complies with section 1123(d) of the Bankruptcy Code.

l.      Other Appropriate Provisions

The Plan's other provisions are appropriate and consistent with the applicable provisions of the Bankruptcy Code, including provisions for (i) distributions to holders of Claims and Interests, (ii) objections to Claims, (iii) procedures for resolving disputed, contingent, and unliquidated claims, (iv) cure amounts, procedures governing cure disputes, and (v) indemnification obligations.

2.      Section 1129(a)(2)–Compliance of Plan Proponents with Applicable Provisions of the Bankruptcy Code

The Debtors, as proponents of the Plan, have complied with all applicable provisions of the Bankruptcy Code as required by section 1129(a)(2) of the Bankruptcy Code, including sections 1125 and 1126 of the Bankruptcy Code and Bankruptcy Rules 3017, 3018, and 3019. In particular, the Debtors are proper debtors under section 109 of the Bankruptcy Code and proper proponents of the Plan under section 1121(a) of the Bankruptcy Code. Furthermore, the solicitation of acceptances or rejections of the Plan was (i) pursuant to the Conditional Disclosure Statement Order; (ii) in compliance with all applicable laws, rules, and regulations governing the adequacy of disclosure in connection with such solicitation; and (iii) solicited after disclosure to Holders of Claims or Interests of adequate information as defined in section 1125(a) of the Bankruptcy Code. Accordingly, the Debtors and their respective directors, officers, employees, agents, affiliates, and Professionals have acted in "good faith" within the meaning of section 1125(e) of the Bankruptcy Code.

3.      Section 1129(a)(3)–Proposal of Plan in Good Faith

The Debtors have proposed the Plan in good faith and not by any means forbidden by law based on the totality of the circumstances surrounding the filing of the Chapter 11 Cases, the Plan itself, and the process leading to its formulation. The Chapter 11 Cases were filed, and the Plan was proposed, with the legitimate purpose of allowing the Debtors to reorganize.

4.      Section 1129(a)(4)–Bankruptcy Court Approval of Certain Payments as Reasonable

Pursuant to section 1129(a)(4) of the Bankruptcy Code, the payments to be made for services or for costs in connection with the Chapter 11 Cases or the Plan are approved. The fees and expenses incurred by Professionals retained by the Debtors or the Creditors' Committee shall be payable according to the orders approving such

Professionals' retentions, the Interim Compensation Order, other applicable Bankruptcy Court orders, or as otherwise provided in the Plan.

5.     Section 1129(a)(5)–Disclosure of Identity of Proposed Management, Compensation of Insiders, and Consistency of Management Proposals with the Interests of Creditors and Public Policy

Pursuant to section 1129(a)(5) of the Bankruptcy Code, information concerning the individuals proposed to serve on the Reorganized Bristow Parent Board and each such individual's compensation upon Consummation of the Plan has been fully disclosed (in the Plan Supplement) to the extent available, and the appointment to, or continuance in, such office of such person is consistent with the interests of Holders of Claims and Interests and with public policy.

6.     Section 1129(a)(6)–Approval of Rate Changes

Section 1129(a)(6) of the Bankruptcy Code is not applicable because the Plan does not provide for rate changes by any of the Debtors.

7.     Section 1129(a)(7)–Best Interests of Creditors and Interest Holders

The liquidation analysis included in the Disclosure Statement, and the other evidence related thereto that was proffered or adduced at or prior to, or in affidavits in connection with, the Confirmation Hearing, is reasonable. The methodology used and assumptions made in such liquidation analysis, as supplemented by the evidence proffered or adduced at or prior to, or in affidavits filed in connection with, the Confirmation Hearing, are reasonable. With respect to each Impaired Class, each Holder of an Allowed Claim or Interest in such Class has accepted the Plan or will receive under the Plan on account of such Claim or Interest property of a value, as of the Effective Date, that is not less than the amount such Holder would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code.

8.     Section 1129(a)(8)–Conclusive Presumption of Acceptance by Unimpaired Classes; Acceptance of the Plan by Each Impaired Class

Certain Classes of Claims and Interests are Unimpaired and are deemed conclusively to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. In addition, at least one Impaired Class that was entitled to vote has voted to accept the Plan. Because the Plan provides that the certain Classes of Claims and Interests will be Impaired and because no distributions shall be made to Holders in such Classes, such Holders are deemed conclusively to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code and, therefore, are not entitled to vote to accept or reject the Plan.

9.     Section 1129(a)(9)–Treatment of Claims Entitled to Priority Pursuant to Section 507(a) of the Bankruptcy Code

The treatment of Administrative Claims, Professional Fee Claims, DIP Facility Claims, Other Priority Claims, and Priority Tax Claims under Article II of the Plan satisfies the requirements of section 1129(a)(9) of the Bankruptcy Code.

10.     Section 1129(a)(10)–Acceptance by at Least One Impaired Class

At least one Impaired Class has voted to accept the Plan. Accordingly, section 1129(a)(10) of the Bankruptcy Code is satisfied.

11.     Section 1129(a)(11)–Feasibility of the Plan

The Plan satisfies section 1129(a)(11) of the Bankruptcy Code. Based upon the evidence proffered or adduced at, or prior to, or in affidavits filed in connection with, the Confirmation Hearing, the Plan is feasible and Confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtors or any successor to the Debtors under the Plan, except as such liquidation is proposed in the Plan. Furthermore, the Debtors will have adequate assets to satisfy their respective obligations under the Plan.

12. Section 1129(a)(12)–Payment of Bankruptcy Fees

Article II.E of the Plan provides for the payment of all fees payable under 28 U.S.C. § 1930(a) in accordance with section 1129(a)(12) of the Bankruptcy Code.

13. Section 1129(a)(13)–Retiree Benefits

The Plan provides for the treatment of all retiree benefits in accordance with section 1129(a)(13) of the Bankruptcy Code.

14. Section 1129(a)(14)–Domestic Support Obligations

The Debtors are not required by a judicial or administrative order, or by statute, to pay any domestic support obligations, and therefore, section 1129(a)(14) of the Bankruptcy Code is inapplicable in these Chapter 11 Cases.

15. Section 1129(a)(15)–The Debtors Are Not Individuals

The Debtors are not individuals, and therefore, section 1129(a)(15) of the Bankruptcy Code is inapplicable in these Chapter 11 Cases.

16. Section 1129(a)(16)–No Applicable Nonbankruptcy Law Regarding Transfers

Each of the Debtors that is a corporation is a moneyed, business, or commercial corporation or trust, and therefore, section 1129(a)(16) of the Bankruptcy Code is inapplicable in these Chapter 11 Cases.

17. Section 1129(b)–Confirmation of Plan Over Rejection of Impaired Classes

The Plan satisfies the requirements of section 1129(b) of the Bankruptcy Code with respect to the Classes presumed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code or that have actually rejected the Plan (if any). To determine whether a plan is "fair and equitable" with respect to a class of claims, section 1129(b)(2)(B)(ii) of the Bankruptcy Code provides in pertinent part that "the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or interest any property." To determine whether a plan is "fair and equitable" with respect to a class of interests, section 1129(b)(2)(C)(ii) of the Bankruptcy Code provides that "the holder of any interest that is junior to the interests of such class will not receive or retain under the plan on account of such junior interest any property." There are no classes junior to the deemed (or actual) rejecting classes of claims or interests that will receive any distribution under the Plan. The Plan, therefore, satisfies the requirements of section 1129(b) of the Bankruptcy Code.

18. Section 1129(c)–Confirmation of Only One Plan With Respect to the Debtors

The Plan is the only plan that has been filed in these Chapter 11 Cases with respect to the Debtors. Accordingly, the Plan satisfies the requirements of section 1129(c) of the Bankruptcy Code.

19. Section 1129(d)–Principal Purpose Not Avoidance of Taxes

The principal purpose of the Plan is not the avoidance of taxes or the avoidance of the application of section 5 of the Securities Act. Accordingly, the Plan satisfies the requirements of section 1129(d) of the Bankruptcy Code.

20. Section 1129(e)–Small Business Case

Section 1129(e) is inapplicable because these Chapter 11 Cases do not qualify as small business cases thereunder.

J.      *Securities Under the Plan*

Pursuant to the Plan, and without further corporate or other action, the New Stock and any debt issued or assumed by the Reorganized Debtors will be issued or entered into, as applicable, on the Effective Date subject to the terms of the Plan.

K.      *Releases and Discharges*

The releases and discharges of Claims and Causes of Action described in the Plan, including releases by the Debtors and by Holders of Claims and Interests, constitute good faith compromises and settlements of the matters covered thereby. Such compromises and settlements are made in exchange for consideration and are in the best interest of Holders of Claims and Interests, are fair, equitable, reasonable, and are integral elements of the resolution of the Chapter 11 Cases in accordance with the Plan. Each of the discharge, release, indemnification, and exculpation provisions set forth in the Plan: (a) is within the jurisdiction of the Court under 28 U.S.C. §§ 1334(a), 1334(b), and 1334(d); (b) is an essential means of implementing the Plan pursuant to section 1123(a)(6) of the Bankruptcy Code; (c) is an integral element of the transactions incorporated into the Plan; (d) confers material benefit on, and is in the best interests of, the Debtors, their estates, and their creditors; (e) is important to the overall objectives of the Plan to finally resolve all Claims and Interests among or against the parties in interest in the Chapter 11 Cases with respect to the Debtors; (f) is consistent with sections 105, 1123, 1129, and all other applicable provisions of the Bankruptcy Code; (g) given and made after due notice and opportunity for hearing; and (h), without limiting the foregoing, with respect to the releases and injunctions in Article VIII of the Plan, are (i) essential elements of the Restructuring Transactions and Plan, terms and conditions without which the Supporting Noteholders would not have entered into the Restructuring Support Agreement, (ii) narrowly tailored, and (iii) in consideration of the substantial financial contribution of the Supporting Noteholders, the Backstop Commitment Parties, and the other Rights Offering Participants under the Plan. Furthermore, the injunction set forth in Article VIII is an essential component of the Plan, the fruit of long-term negotiations and achieved by the exchange of good and valuable consideration that will enable unsecured creditors to realize distributions in the Chapter 11 Cases.

L.      *Release and Retention of Causes of Action*

It is in the best interests of Holders of Claims and Interests that the provisions in Article VIII of the Plan be approved.

M.      *Approval of Restructuring Support Agreement, Backstop Commitment Agreement and Other Restructuring Documents and Agreements*

All documents and agreements necessary to implement the Plan, including the Restructuring Support Agreement, the Backstop Commitment Agreement and the other Restructuring Documents are essential elements of the Plan, are necessary to consummate the Plan and the Restructuring Transaction, and entry into and consummation of the transactions contemplated by each such document and agreement is in the best interests of the Debtors, the Estates, and Holders of Claims and Interests. The Debtors have exercised reasonable business judgment in determining which agreements to enter into and have provided sufficient and adequate notice of such documents and agreements. The terms and conditions of such documents and agreements have been negotiated in good faith, at arm's-length, are fair and reasonable, and are hereby reaffirmed and approved, and subject to the occurrence of the Effective Date and execution and delivery in accordance with their respective terms, shall be in full force and effect and valid, binding, and enforceable in accordance with their respective terms, without the need for any further notice to or action, order, or approval of the Bankruptcy Court, or other action under applicable law, regulation, or rule.

N.      *Confirmation Hearing Exhibits*

All of the exhibits presented at the Confirmation Hearing have been properly received into evidence and are a part of the record before the Bankruptcy Court.

O.     *Objections to Confirmation of the Plan*

Any and all objections to Confirmation have been withdrawn, settled, overruled, or otherwise resolved.

P.     *Retention of Jurisdiction*

The Bankruptcy Court may properly retain jurisdiction over the matters set forth in Article XII of the Plan and section 1142 of the Bankruptcy Code.

Q.     *Plan Supplement*

The Debtors filed the Plan Supplement, which includes the following documents: (a) the material New Organizational Documents; (b) the Exit Facility Term Sheet, if applicable; (c) the Amended and Restated 2019 Term Loan Credit Agreement and material related documents, if applicable, and the identity of the Amended and Restated 2019 Term Loan Facility Agent; (d) the schedule of Retained Causes of Action; (e) a disclosure of the members of the Reorganized Bristow Parent Board and their compensation; (f) the Schedule of Assumed Executory Contracts and Unexpired Leases; (g) the Schedule of Rejected Executory Contracts and Unexpired Leases; (h) the Restructuring Transactions Exhibit, if needed; (i) a description of the material terms of the Management Incentive Plan; (j) the New Shareholders' Agreement; (k) the Schedule of Other Customer Contracts; (l) the New Preferred Stock Agreement; (m) the New Common Stock Agreement; (n) the terms of the Amended PK Air Credit Facility Agreement (to the extent not set forth in the motion seeking approval of the Milestone Settlement); and (o) to the extent necessary in order to ensure compliance with 49 U.S.C. § 40102(a)(15)(C), the New Warrant Agreement. All such documents comply with the terms of the Plan, and the filing and notice of such documents was adequate, proper and in accordance with the Conditional Disclosure Statement Order, the Bankruptcy Code, and the Bankruptcy Rules.

## ARTICLE X.
## CONDITIONS PRECEDENT TO THE EFFECTIVE DATE

A.     *Conditions Precedent to the Effective Date*

It shall be a condition to the Effective Date that the following conditions shall have been satisfied or waived pursuant to Article X.B of the Plan:

1.     The Bankruptcy Court shall have entered the Confirmation Order in form and substance consistent in all respects with the Restructuring Support Agreement and otherwise in form and substance acceptable to the Debtors and the Required RSA Parties and, with respect to issues that affect the Milestone Parties, in form and substance reasonably acceptable to the Milestone Parties, and the Confirmation Order shall have become a Final Order;

2.     The DIP Order shall have been entered and no event of default shall have occurred and be continuing thereunder.

3.     Each of the Plan, the Restructuring Documents, and all documents contained in any supplement to the Plan, including the Plan Supplement and any exhibits, schedules, amendments, modifications or supplements thereto, shall have been executed and/or filed, in form and substance consistent in all respects with the Restructuring Support Agreement and otherwise comply with the applicable consent rights (if any) set forth in this Plan for such documents and shall not have been modified in a manner inconsistent with the Restructuring Support Agreement;

4.     Either (i) the Exit Facility Documents shall have been duly executed and delivered by all of the Entities that are parties thereto and all conditions precedent (other than any conditions related to the occurrence of the Effective Date) to the effectiveness of the Exit Facility shall have been satisfied or duly waived in writing or (ii) the Amended and Restated 2019 Term Loan Credit Agreement has been executed and is in full force and effect;

5.     The Bankruptcy Court shall have entered the Milestone Settlement Order, such order shall have become a Final Order, and the parties to the Milestone Settlement shall have complied with their obligations

68

thereunder arising through the Effective Date (including the payment by the Debtors, no later than the Effective Date, of the reasonable and documented fees and expenses of its professionals).

6. The Bankruptcy Court shall have entered the HeliFleet Stipulation, which shall have become a Final Order.

7. The Backstop Commitment Agreement and the Restructuring Support Agreement shall have been approved by entry of an order by the Bankruptcy Court and shall remain in full force and effect, all conditions shall have been satisfied thereunder, and there shall be no breach that would give rise to a right to terminate the Backstop Commitment Agreement or the Restructuring Support Agreement for which notice has been given in accordance with the terms thereof (including by the requisite parties thereunder), or such notice could have been given to the extent such notice is not permitted due to the commencement of the Chapter 11 Cases and the related automatic stay;

8. No court of competent jurisdiction or other competent governmental or regulatory authority shall have issued a final and non-appealable order making illegal or otherwise restricting, preventing or prohibiting, in any material respect, the consummation of the Plan, the Restructuring Support Agreement or any of the Restructuring Documents or Restructuring Transactions contemplated thereby;

9. The Debtors shall have obtained all material authorizations, consents, regulatory approvals, rulings, or documents that are necessary to implement and effectuate the Restructuring Transactions;

10. The Debtors shall have paid all Transaction Expenses then known or submitted to the Debtors;

11. The Debtors shall have paid all reasonable and documented fees and expenses incurred and unpaid as of the Effective Date of each of the members of the Creditors' Committee, including up to $20,000 for the reasonable and documented fees of Infosys Limited, in its capacity as a member of the Creditors' Committee;

12. All Allowed Professional Fee Claims shall have been paid in full or amounts sufficient to pay such Allowed Professional Fee Claims after the Effective Date shall have been placed in the Professional Fee Escrow Account pending approval of the Professional Fee Claims by the Bankruptcy Court; and

13. The Debtors shall have implemented the Restructuring Transactions in a manner consistent in all respects with the Restructuring Support Agreement (subject to the consent rights set forth therein).

B. *Waiver of Conditions*

The conditions to the Effective Date of the Plan set forth in Article X of the Plan may only be waived with the consent of the Debtors and the Required RSA Parties (such consents not to be unreasonably withheld) without notice, leave, or order of the Bankruptcy Court or any formal action other than proceedings to confirm or consummate the Plan.

C. *Effect of Non-Occurrence of Conditions to Consummation*

If the Effective Date does not occur on or before the termination of the Restructuring Support Agreement or the Backstop Commitment Agreement, the Plan shall be null and void in all respects and nothing contained in the Plan or the Disclosure Statement shall: (1) constitute a waiver or release of any Claims, Interests, or Causes of Action by any Entity; (2) prejudice in any manner the rights of any Debtor or any other Entity; or (3) constitute an admission, acknowledgment, offer, or undertaking of any sort by any Debtor or any other Entity; *provided*, that all provisions of the Restructuring Support Agreement or the Backstop Commitment Agreement that survive termination thereof shall remain in effect in accordance with the terms thereof.

D. *Substantial Consummation*

"Substantial consummation" of the Plan, as defined in section 1101(2) of the Bankruptcy Code, shall be deemed to occur on the Effective Date.

## ARTICLE XI.
## MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN

A.      *Modification of Plan*

Effective as of the date hereof and subject to the consent of the Required RSA Parties and the Committee Consent Right:  (1) the Debtors reserve the right, in accordance with the Bankruptcy Code and the Bankruptcy Rules, to amend or modify the Plan before the entry of the Confirmation Order consistent with the terms set forth herein, and, as appropriate, not resolicit votes on such modified Plan; and (2) after the entry of the Confirmation Order, the Debtors or the Reorganized Debtors, as applicable, may, upon order of the Bankruptcy Court, amend or modify the Plan, in accordance with section 1127(b) of the Bankruptcy Code and Bankruptcy Rule 3019, remedy any defect or omission, or reconcile any inconsistency in the Plan in such manner as may be necessary to carry out the purpose and intent of the Plan consistent with the terms set forth herein.

B.      *Effect of Confirmation on Modifications*

Entry of the Confirmation Order shall constitute approval of all modifications to the Plan occurring after the solicitation of votes thereon pursuant to section 1127(a) of the Bankruptcy Code and a finding that such modifications to the Plan do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

C.      *Revocation or Withdrawal of Plan*

Subject to the terms of the Restructuring Support Agreement, the Debtors reserve the right to revoke or withdraw the Plan with respect to any or all Debtors before the Confirmation Date and to File subsequent chapter 11 plans.  If the Debtors revoke or withdraw the Plan, or if Confirmation or the Effective Date does not occur, then:  (1) the Plan will be null and void in all respects; (2) any settlement or compromise embodied in the Plan, assumption or rejection of Executory Contracts or Unexpired Leases effectuated by the Plan, and any document or agreement executed pursuant hereto will be null and void in all respects; and (3) nothing contained in the Plan shall (a) constitute a waiver or release of any Claims, Interests, or Causes of Action by any Entity, (b) prejudice in any manner the rights of any Debtor or any other Entity, or (c) constitute an admission, acknowledgement, offer, or undertaking of any sort by any Debtor or any other Entity.

## ARTICLE XII.
## RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of, or related to, the Chapter 11 Cases and the Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code, including jurisdiction to:

1.      allow, disallow, determine, liquidate, classify, estimate, or establish the priority, Secured or unsecured status, or amount of any Claim against a Debtor, including the resolution of any request for payment of any Claim and the resolution of any and all objections to the Secured or unsecured status, priority, amount, or allowance of Claims;

2.      decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or the Plan;

3.      resolve any matters related to Executory Contracts or Unexpired Leases, including:  (a) the assumption or assumption and assignment of any Executory Contract or Unexpired Lease to which a Debtor is party or with respect to which a Debtor may be liable and to hear, determine, and, if necessary, liquidate, any Cure Costs or Claims arising therefrom, including pursuant to section 365 of the Bankruptcy Code; (b) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed; and (c) any dispute regarding whether a contract or lease is or was executory or expired;

70

4.  ensure that distributions to Holders of Allowed Claims and Allowed Interests are accomplished pursuant to the provisions of the Plan and adjudicate any and all disputes arising from or relating to distributions under the Plan;

5.  adjudicate, decide, or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters, and grant or deny any applications involving a Debtor that may be pending on the Effective Date;

6.  enter and implement such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of (a) contracts, instruments, releases, indentures, and other agreements or documents approved by a Final Order in the Chapter 11 Cases, and (b) the Plan, the Confirmation Order, and contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan;

7.  enforce any order for the sale of property pursuant to sections 363, 1123, or 1146(a) of the Bankruptcy Code;

8.  grant any consensual request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code;

9.  issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Entity with Consummation or enforcement of the Plan;

10.  hear, determine, and resolve any cases, matters, controversies, suits, disputes, or Causes of Action in connection with or in any way related to the Chapter 11 Cases, including: (a) with respect to the repayment or return of distributions and the recovery of additional amounts owed by the Holder of a Claim for amounts not timely repaid pursuant to Article VI.F.1 of the Plan; (b) with respect to the releases, injunctions, and other provisions contained in Article VIII of the Plan, including entry of such orders as may be necessary or appropriate to implement such releases, injunctions, and other provisions; (c) that may arise in connection with the Consummation, interpretation, implementation, or enforcement of the Plan, the Confirmation Order, and contracts, instruments, releases, and other agreements or documents created in connection with the Plan; or (d) related to section 1141 of the Bankruptcy Code;

11.  enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

12.  consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

13.  hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

14.  enter an order or Final Decree concluding or closing the Chapter 11 Cases;

15.  enforce all orders previously entered by the Bankruptcy Court;

16.  hear and determine disputes involving any matter related to the implementation of the Plan, *provided*, *however*, that upon the closing of the Exit Facility (or, if applicable, the execution of the Amended and Restated 2019 Term Loan Credit Agreement) and execution of the New Organizational Documents, disputes with respect to the Exit Facility and the New Organizational Documents that are not related to the Plan shall otherwise be governed by the jurisdictional, forum selection or dispute resolution clause contained in such document; and

17.  hear any other matter not inconsistent with the Bankruptcy Code.

Notwithstanding the foregoing, the Bankruptcy Court retains jurisdiction, but not exclusive jurisdiction, to determine whether environmental liabilities asserted by any Governmental Unit are discharged or otherwise barred by

71

the Confirmation Order or the Plan, or the Bankruptcy Code. As of the Effective Date, notwithstanding anything in this Article XII to the contrary, the Exit Facility (or, if applicable, the execution of the Amended and Restated 2019 Term Loan Credit Agreement), the Amended PK Air Credit Facility Agreement and the New Organizational Documents shall be governed by the jurisdictional provisions contained therein.

### ARTICLE XIII.
### MISCELLANEOUS PROVISIONS

A.  *Immediate Binding Effect*

Subject to Article X.A hereof, and notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan and the Plan Supplement shall be immediately effective and enforceable and deemed binding upon the Debtors, the Reorganized Debtors, and any and all Holders of Claims or Interests (irrespective of whether such Holders of Claims or Interests have accepted or are deemed to have accepted the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, discharges, and injunctions described in the Plan, each Entity acquiring property under the Plan, and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtors. All Claims and debts shall be as fixed, adjusted, or compromised, as applicable, pursuant to the Plan regardless of whether any Holder of a Claim or debt has voted on the Plan.

B.  *Restructuring Documents*

All Restructuring Documents, including the Final Cash Collateral Order, the Disclosure Statement, the other solicitation materials with respect to the Plan, the Conditional Disclosure Statement Order, the Plan, each document included in the Plan Supplement, the Backstop Commitment Agreement, the Confirmation Order, the DIP Facility Credit Agreement, the DIP Order, the Exit Facility Credit Agreement, the Amended and Restated 2019 Term Loan Credit Agreement, the New Organizational Documents, the Management Incentive Plan and the Rights Offering Procedures, shall be subject to the consent rights of the Required RSA Parties on the terms set forth in the Restructuring Support Agreement, and subject to the Committee Consent Right.

C.  *Additional Documents*

On or before the Effective Date, and subject to the terms of the Restructuring Support Agreement and the Backstop Commitment Agreement, the Debtors may File with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan. The Debtors or the Reorganized Debtors, as applicable, and all Holders of Claims receiving distributions pursuant to the Plan and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

D.  *Dissolution of the Statutory Committees*

On the Effective Date, the Creditors' Committee and any other statutory committee appointed in the Chapter 11 Cases shall dissolve automatically and the members thereof shall be released and discharged from all rights, duties, responsibilities, and liabilities arising from, or related to, the Chapter 11 Cases and under the Bankruptcy Code, except for the purposes of (a) prosecuting requests for payment of Professional Fee Claims for services rendered and reimbursement of expenses incurred prior to the Effective Date by the Creditors' Committee and its Professionals, (b) participating in any adversary proceeding commenced on or before the Effective Date in which the Creditors' Committee (or any member thereof in its capacity as such) is named, and (c) participating in any appeals of the Confirmation Order. The Debtors shall no longer be responsible for paying any fees or expenses incurred by the members of or advisors to the Creditors' Committee or any other statutory committee after the Effective Date except for those purposes set forth in the preceding sentence. Upon the dissolution of the Creditors' Committee and any other statutory committee, the members of such committees and their respective professionals will cease to have any duty, obligation or role arising from or related to the Chapter 11 Cases and shall be released and discharged from all rights and duties from or related to the Chapter 11 Cases.

E.      *Payment of Statutory Fees*

All fees payable pursuant to 28 U.S.C. § 1930(a) prior to the Effective Date shall be paid by the Debtors.  On and after the Effective Date, the Reorganized Debtors shall pay any and all such fees when due and payable, and shall File with the Bankruptcy Court quarterly reports in a form reasonably acceptable to the U.S. Trustee.  Each Debtor and Reorganized Debtor shall remain obligated to pay quarterly fees to the U.S. Trustee until the earliest of that particular Debtor's or Reorganized Debtor's case being closed, dismissed, or converted to a case under chapter 7 of the Bankruptcy Code.

F.      *Payment of Transaction Expenses*

The Debtors and Reorganized Debtors, as applicable, will, on the Effective Date (or, to the extent not known or submitted to the Debtors for payment as of the Effective Date, promptly following receipt of an invoice therefor, whether incurred before or after the Effective Date) and to the extent invoiced in accordance with the terms of the applicable engagement letter (and, for the avoidance of doubt, no invoices shall be required to include itemized time detail), pay the Transaction Expenses (whether accrued prepetition or postpetition and to the extent not otherwise paid during the Chapter 11 Cases), without the need for application by any such parties to the Bankruptcy Court, and without notice and a hearing pursuant to section 1129(a)(4) of the Bankruptcy Code or otherwise.

G.      *Reservation of Rights*

The Plan shall have no force or effect unless the Bankruptcy Court shall enter the Confirmation Order.  None of the Filing of the Plan, any statement or provision contained in the Plan, or the taking of any action by any Debtor with respect to the Plan, the Disclosure Statement, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of any Debtor with respect to the Holders of Claims or Interests prior to the Effective Date.

H.      *Successors and Assigns*

The rights, benefits, and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, Affiliate, officer, director, agent, representative, attorney, beneficiaries, or guardian, if any, of each Entity.

I.      *Service of Documents*

After the Effective Date, any pleading, notice, or other document required by the Plan to be served on or delivered to the Reorganized Debtors shall be served on:

| **Reorganized Debtors** | **Bristow Group Inc.** |
| --- | --- |
| | 2103 City West Blvd., 4th Floor |
| | Houston, Texas 77042 |
| | Attn:    Victoria Lazar |
| | |
| | with copies to: |

73

**Counsel to Debtors**

**Baker Botts L.L.P.**
2001 Ross Avenue, Suite 900
Dallas, Texas 75201-2980
Attn:    James R. Prince
          Omar J. Alaniz
          Kevin Chiu

-and-

**Baker Botts L.L.P.**
30 Rockefeller Plaza
New York, New York 10112-4498
Attn:    Emanuel C. Grillo
          Chris Newcomb

-and-

**Wachtell, Lipton, Rosen & Katz**
51 West 52nd Street
New York, New York 10019
Attn:    Richard G. Mason
          Amy R. Wolf

**Counsel to the Secured Notes Ad Hoc Group**

**Davis Polk & Wardwell LLP**
450 Lexington Avenue
New York, New York 10017
Attn:    Damian S. Schaible
(damian.schaible@davispolk.com)
          Natasha Tsiouris
(natasha.tsiouris@davispolk.com)

**Counsel to the Unsecured Notes Ad Hoc Group**

**Kirkland & Ellis LLP**
601 Lexington Avenue
New York, New York 10022
Attn:    Joshua A. Sussberg
(joshua.sussberg@kirkland.com)
          Brian E. Schartz
(brian.schartz@kirkland.com)

-and-

Kirkland & Ellis LLP
300 North LaSalle
Chicago, Illinois 60654
Attn:    Gregory F. Pesce
(gregory.pesce@kirkland.com)

74

**Counsel to the Creditors' Committee**          **Kramer Levin Naftalis & Frankel LLP**
1177 Avenue of the Americas
New York, New York 10036
Attn:  Douglas H. Mannal
(dmannal@kramerlevin.com)
    Anupama Yerramalli
(ayerramalli@kramerlevin.com)

J.      *Term of Injunctions or Stays*

**Unless otherwise provided herein or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases (pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court) and existing on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order) shall remain in full force and effect until the Effective Date. All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.**

K.      *Entire Agreement*

Except as otherwise indicated, the Plan supersedes all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

L.      *Plan Supplement*

All exhibits and documents included in the Plan Supplement are incorporated into and are a part of the Plan as if set forth in full in the Plan. After any of such documents included in the Plan Supplement are Filed, copies of such documents shall be made available upon written request to the Debtors' counsel at the address above or by downloading such exhibits and documents from the Solicitation Agent's website at https://cases.primeclerk.com/Bristow or the Bankruptcy Court's website at https://www.pacer.gov/.

M.      *Non-Severability*

If, prior to Confirmation, the Bankruptcy Court holds any term or provision of the Plan to be invalid, void, or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is: (1) valid and enforceable pursuant to its terms; (2) integral to the Plan and may not be deleted or modified without the consent of the Debtors, the Required RSA Parties, and without satisfying the Committee Consent Right; and (3) non-severable and mutually dependent.

N.      *Votes Solicited in Good Faith*

Upon entry of the Confirmation Order, the Debtors will be deemed to have solicited votes on the Plan in good faith and in compliance with the Bankruptcy Code, and pursuant to section 1125(e) of the Bankruptcy Code, the Debtors and each of the Supporting Noteholders and each of their respective Affiliates, agents, representatives, members, principals, equity holders (regardless of whether such interests are held directly or indirectly), officers, directors, managers, employees, advisors, and attorneys will be deemed to have participated in good faith and in compliance with the Bankruptcy Code in the offer, issuance, sale, and purchase of Securities offered and sold under

the Plan, and, therefore, neither any of such parties or individuals or the Reorganized Debtors will have any liability for the violation of any applicable law, rule, or regulation governing the solicitation of votes on the Plan or the offer, issuance, sale, or purchase of the Securities offered and sold under the Plan.

O.      *Waiver or Estoppel*

Each Holder of a Claim or an Interest shall be deemed to have waived any right to assert any argument, including the right to argue that its Claim or Interest should be Allowed in a certain amount, in a certain priority, Secured or not subordinated by virtue of an agreement made with the Debtors or their counsel, or any other Entity, if such agreement was not disclosed in the Plan, the Disclosure Statement, the Restructuring Support Agreement, or papers Filed with the Bankruptcy Court prior to the Confirmation Date.

[*Remainder of page intentionally left blank*]

Dated:  September 30, 2019                     BRISTOW GROUP INC.
                                               on behalf of itself and all other Debtors


                                               By: */s/ Brian J. Allman*
                                               Name:  Brian J. Allman
                                               Title:  Senior Vice President and Chief Financial Officer

77

**<u>Exhibit B</u>**

**Confirmation Notice**

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| BRISTOW GROUP INC., *et al.*,[1] | ) | Case No. 19-32713 (DRJ) |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) |  |

## NOTICE OF (A) ENTRY OF CONFIRMATION ORDER (I) APPROVING THE DISCLOSURE STATEMENT, (II) CONFIRMING THE AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION OF BRISTOW GROUP INC. AND ITS DEBTOR AFFILIATES, AS FURTHER MODIFIED, AND (III) GRANTING RELATED RELIEF; AND (B) OCCURRENCE OF EFFECTIVE DATE

**TO ALL CREDITORS, INTEREST HOLDERS, AND OTHER PARTIES IN INTEREST:**

**PLEASE TAKE NOTICE** that on [●], 2019, the United States Bankruptcy Court for the Southern District of Texas (the "Bankruptcy Court"), entered an order [Docket No. [●]] (the "Confirmation Order") approving the *Amended Disclosure Statement for the Amended Joint Chapter 11 Plan of Reorganization of Bristow Group Inc. And Its Debtor Affiliates, as Modified* [Docket No. 590] and confirming the *Amended Joint Chapter 11 Plan of Reorganization of Bristow Group Inc. And Its Debtor Affiliates, as Further Modified* [Docket No. 742] (with all supplements and exhibits thereto, the "Plan"),[2] attached as **Exhibit A** to the Confirmation Order.

**PLEASE TAKE FURTHER NOTICE** that the Effective Date of the Plan occurred on [●], 2019.

**PLEASE TAKE FURTHER NOTICE** that pursuant to Article V.B of the Plan, Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, if any, must be Filed with the Bankruptcy Court within 30 days after the date of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such rejection. **Any Claims arising from the rejection of an Executory Contract or Unexpired Lease that are not Filed within such time will be automatically disallowed, forever barred from assertion, and shall not be enforceable against, as applicable, the Debtors, the Reorganized Debtors,**

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each debtor's federal tax identification number, are: Bristow Group Inc. (9819), BHNA Holdings Inc. (8862), Bristow Alaska Inc. (8121), Bristow Helicopters Inc. (8733), Bristow U.S. Leasing LLC (2451), Bristow U.S. LLC (2904), BriLog Leasing Ltd. (9764), and Bristow Equipment Leasing Ltd. (9303). The corporate headquarters and the mailing address for the Debtors listed above is 2103 City West Blvd., 4th Floor, Houston, Texas 77042.

[2] Capitalized terms not otherwise defined herein have the meanings ascribed to them in the Plan or the Confirmation Order, as applicable.

**the Estates, or property of the foregoing parties, without the need for any objection by the Debtors or Reorganized Debtors, as applicable, or further notice to, or action, order, or approval of the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully satisfied, released, and discharged, notwithstanding anything in a Proof of Claim to the contrary.**

**PLEASE TAKE FURTHER NOTICE** that, except with respect to Administrative Claims that are Professional Fee Claims or as otherwise set forth in the Plan, requests for payment of an Allowed Administrative Claim other than requests for payment of Administrative Claims arising in the ordinary course of business must be Filed with the Bankruptcy Court no later than 30 days after the Effective Date (the "<u>Administrative Claims Bar Date</u>"). **HOLDERS OF ADMINISTRATIVE CLAIMS THAT ARE REQUIRED TO FILE AND SERVE A REQUEST FOR PAYMENT OF SUCH ADMINISTRATIVE CLAIMS BY THE ADMINISTRATIVE CLAIMS BAR DATE THAT DO NOT FILE AND SERVE SUCH A REQUEST BY THE ADMINISTRATIVE CLAIMS BAR DATE SHALL BE FOREVER BARRED, ESTOPPED, AND ENJOINED FROM ASSERTING SUCH ADMINISTRATIVE CLAIMS AGAINST THE DEBTORS OR THE REORGANIZED DEBTORS, AND SUCH ADMINISTRATIVE CLAIMS SHALL BE DEEMED COMPROMISED, SETTLED, AND RELEASED AS OF THE EFFECTIVE DATE. FOR THE AVOIDANCE OF DOUBT, HOLDERS OF DIP FACILITY CLAIMS SHALL NOT BE REQUIRED TO FILE OR SERVE ANY REQUEST FOR PAYMENT OF SUCH DIP FACILITY CLAIMS.**

**PLEASE TAKE FURTHER NOTICE** that, unless otherwise ordered by the Bankruptcy Court, all final requests for payment of Professional Fee Claims must be Filed with the Bankruptcy Court no later than 45 days after the Effective Date.

**PLEASE TAKE FURTHER NOTICE** that the terms of the Plan, the Plan Supplement, and the Confirmation Order shall be immediately effective and enforceable and deemed binding upon the Debtors or the Reorganized Debtors, as applicable, and any and all Holders of Claims or Interests (regardless of whether such Claims or Interests are deemed to have accepted or rejected the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, and injunctions described in the Plan, each Entity acquiring property under the Plan, the Confirmation Order and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtors.

**PLEASE TAKE FURTHER NOTICE** that the Plan, the Plan Supplement, the Confirmation Order, and copies of all documents Filed in these Chapter 11 Cases are available free of charge by visiting https://cases.primeclerk.com/Bristow or by calling the Debtors' restructuring hotline at (844) 627-6967. You may also obtain copies of any pleadings filed in these Chapter 11 Cases for a fee via PACER at: http://www.nysb.uscourts.gov.

Houston, Texas
Dated: [__], 2019

Respectfully submitted,

| | |
|---|---|
| **BAKER BOTTS L.L.P.** | **WACHTELL, LIPTON, ROSEN & KATZ** |

*/s/ Draft*

James R. Prince, State Bar No. 00784791          Richard G. Mason (*pro hac vice*)
Omar J. Alaniz, State Bar No. 24040402            Amy R. Wolf (*pro hac vice*)
Kevin Chiu, State Bar No. 24109723                 **WACHTELL, LIPTON, ROSEN & KATZ**
**BAKER BOTTS L.L.P.**                                        51 West 52nd Street
2001 Ross Avenue, Suite 900                            New York, New York 10019
Dallas, Texas 75201-2980                                  Telephone: (212) 403-1000
Telephone: (214) 953-6500                               Facsimile: (212) 403-2000
Facsimile: (214) 953-6503                                Email: rgmason@wlrk.com
Email: jim.prince@bakerbotts.com                               arwolf@wlrk.com
        omar.alaniz@bakerbotts.com
        kevin.chiu@bakerbotts.com

                                                                   *Proposed Co-Counsel to the Debtors and*
                                                                   *Debtors in Possession*

-and-

Emanuel C. Grillo (*pro hac vice)*
Chris Newcomb (*pro hac vice*)
**BAKER BOTTS L.L.P.**
30 Rockefeller Plaza
New York, New York 10112-4498
Telephone: (212) 408-2500
Facsimile: (212) 408-2501
Email: emanuel.grillo@bakerbotts.com
        chris.newcomb@bakerbotts.com

*Proposed Co-Counsel to the Debtors and*
*Debtors in Possession*

---

**IF YOU HAVE ANY QUESTIONS ABOUT THIS NOTICE, PLEASE
CONTACT PRIME CLERK LLC BY CALLING (844) 627-6967.**

---

3

# TAB 11-H

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| BRISTOW GROUP INC., *et al.*,[1] | ) | Case No. 19-32713 (DRJ) |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) |  |

**ORDER (I) APPROVING THE DISCLOSURE**
**STATEMENT, (II) CONFIRMING THE AMENDED JOINT CHAPTER 11**
**PLAN OF REORGANIZATION OF BRISTOW GROUP INC. AND ITS DEBTOR**
**AFFILIATES, AS FURTHER MODIFIED AND (III) GRANTING RELATED RELIEF**

The above-captioned debtors and debtors in possession (collectively, the "Debtors")

having: [2]

    a.  commenced, on May 11, 2019 (the "Petition Date"), these Chapter 11 Cases by filing voluntary petitions for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code");

    b.  filed,[3] on the Petition Date, the *Declaration of Brian J. Allman in Support of the Debtors' First Day Motions* [Docket No. 25] (the "First Day Declaration"), detailing the facts and circumstances of the Debtors' Chapter 11 Cases;

    c.  operated their businesses and managed their properties during these Chapter 11 Cases as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code;

    d.  entered into that certain Restructuring Support Agreement, dated as of May 10, 2019 (as amended and restated on June 27, 2019 and July 24, 2019 and amended on August 22, 2019, and as further modified, supplemented, or otherwise amended from time to time in accordance with its terms, the "Restructuring Support

---

[1]  The Debtors in these chapter 11 cases, along with the last four digits of each debtor's federal tax identification number, are: Bristow Group Inc. (9819), BHNA Holdings Inc. (8862), Bristow Alaska Inc. (8121), Bristow Helicopters Inc. (8733), Bristow U.S. Leasing LLC (2451), Bristow U.S. LLC (2904), BriLog Leasing Ltd. (9764), and Bristow Equipment Leasing Ltd. (9303). The corporate headquarters and the mailing address for the Debtors listed above is 2103 City West Blvd., 4th Floor, Houston, Texas 77042.

[2]  Capitalized terms used but not otherwise defined herein have the meanings given to them in the Plan (as defined below). The rules of interpretation set forth in Article I.B of the Plan apply to the Confirmation Order.

[3]  Unless otherwise indicated, use of the term "filed" herein refers also to the service of the applicable document filed on the docket in these chapter 11 cases, as applicable.

Agreement") to which that certain Backstop Commitment Agreement, dated as of July 24, 2019 is attached as Exhibit 2 of Exhibit A thereto (as modified, supplemented, or otherwise amended from time to time in accordance with its terms, the "Backstop Commitment Agreement"), which sets forth the terms of a consensual financial restructuring of the Debtors and a new equity capital investment pursuant to the Rights Offering;

e.  filed, on August 1, 2019, the *Joint Chapter 11 Plan of Reorganization of Bristow Group Inc. and Its Debtor Affiliates* [Docket No. 498] and the *Disclosure Statement for the Joint Chapter 11 Plan of Reorganization of Bristow Group Inc. and Its Debtor Affiliates* [Docket No. 499];

f.  filed, on August 8, 2019, the *Debtors' Emergency Motion for Entry of an Order (I) Conditionally Approving the Adequacy of the Disclosure Statement, (II) Approving the Solicitation and Notice Procedures with Respect to Confirmation of the Plan, (III) Approving the Form of Various Ballots and Notices in Connection Therewith, (IV) Approving the Rights Offering Procedures, and (V) Approving the Scheduling of Certain Dates in Connection with Confirmation of the Plan* [Docket No. 520] (the "Conditional Disclosure Statement Motion");

g.  filed, on August 20, 2019, the *Amended Joint Chapter 11 Plan of Reorganization of Bristow Group Inc. and Its Debtor Affiliates* [Docket No. 574] and the *Amended Disclosure Statement for the Amended Joint Chapter 11 Plan of Reorganization of Bristow Group Inc. and Its Debtor Affiliates* [Docket No. 575] (the "Amended Disclosure Statement");

h.  filed on August 22, 2019, the *Amended Joint Chapter 11 Plan of Reorganization of Bristow Group Inc. and Its Debtor Affiliates, as Modified* [Docket No. 589] (as amended, amended and restated or otherwise modified from time to time, including by the Modified Plan (as defined below), the "Plan") and the *Amended Disclosure Statement for the Amended Joint Chapter 11 Plan of Reorganization of Bristow Group Inc. and Its Debtor Affiliates, as Modified* [Docket No. 590] (with the exhibits thereto filed with the Amended Disclosure Statement, the "Disclosure Statement");

i.  served, on or about August 26, 2019, the *Notice of (A) Deadline to Cast Votes to Accept or Reject Amended Joint Chapter 11 Plan for the Debtors, as Modified, (B) Combined Hearing to Consider Approval of the Disclosure Statement Related Thereto, (C) Deadline to Object to Confirmation, and (D) Related Matters and Procedures* (the "Combined Hearing Notice"), which contained notice of the date and time set for the hearing to consider approval of the Disclosure Statement and confirmation of the Plan (the "Combined Hearing"), and the deadline for filing objections to the Plan and the Disclosure Statement, on all creditors and equity holders of the Debtors, as evidenced by the Solicitation Affidavit (defined below), consistent with the Conditional Disclosure Statement Order (defined below);

j.  published, on August 29, 2019, in *The Wall Street Journal (National Edition)* and the *Houston Chronicle*, as evidenced by the Publication Affidavit (defined below), the Combined Hearing Notice, consistent with the Conditional Disclosure Statement Order;

2

k. distributed for solicitation, on or about August 29, 2019, (i) the Disclosure Statement, as conditionally approved by the Court; (ii) the Solicitation Procedures Order; (iii) the Solicitation Procedures; (iv) the Combined Hearing Notice; (v) the ballots for each Voting Class (defined below); (vi) a pre-addressed, postage pre-paid reply envelope; and (vii) cover letters from the Debtors and Creditors' Committee (collectively, the "Solicitation Package") to all known holders of Claims as of August 21, 2019 in Class 3 (2019 Term Loan Facility Claims), Class 4 (Secured Notes Claims), Class 6 (PK Air Credit Facility Claims and MAG Lease Obligation Claims), Class 8 (Unsecured Notes Claims), and Class 12 (General Unsecured Claims), which are entitled to vote to accept or reject the Plan, as evidenced by the Solicitation Affidavit, consistent with the order granting the Conditional Disclosure Statement Order;

l. distributed, on or about August 29, 2019, (i) to all known holders of Claims as of August 21, 2019 in Class 1 (Other Secured Claims), Class 2 (Other Priority Claims), Class 5 (Lombard (BULL) Term Loan Claims), Class 9 (Lombard (BALL) Term Loan Guarantee Claims and UK ABL Credit Facility Guaranty Claims), Class 10 (MCA and Other Customer Claims) and Class 11 (Trade Claims), which are deemed to accept the Plan and not entitled to vote to accept or reject the Plan, a *Non-Voting Status Notice with Respect to Unimpaired Classes Presumed to Accept the Amended Joint Chapter 11 Plan of Reorganization of Bristow Group Inc. and Its Affiliate Debtors, as Modified* (the "Deemed to Accept Notice"), and (ii) to all known holders of Claims or Interests as of August 21, 2019 in Class 15 (Existing Interests) and Class 16 (Section 510(b) Claims), which are deemed to reject the Plan and not entitled to vote to accept or reject the Plan, the *Non-Voting Status Notice with Respect to Impaired Classes Presumed to Reject the Amended Joint Chapter 11 Plan of Reorganization of Bristow Group Inc. and Its Affiliate Debtors, as Modified* (the "Deemed to Reject Notice"), which included a Third Party Release Opt Out Form to permit holders of Class 15 Claims or Class 16 Interests to opt out of the Third Party Releases (defined below) (the "Opt Out Form"), as evidenced by the Solicitation Affidavit, consistent with the order granting the Conditional Disclosure Statement Order;

m. filed, on August 30, 2019, the *Debtors' Emergency Motion to Approve Term Sheet with PK Airfinance S.À.R.L. and Milestone Aviation Group Limited* [Docket No. 611] (the "Milestone 9019 Motion") seeking approval of the Milestone Settlement;

n. filed, on September 9, 2019, the *Notice of Filing of Assumed Executory Contract and Unexpired Lease Schedule* [Docket No. 632] (as subsequently amended on September 30, 2019 [Docket No. 741], the "Assumption Schedule") and the *Notice of Filing of Rejected Executory Contract and Unexpired Lease Schedule* [Docket No. 633] (the "Rejection Schedule") and served, on September 9, 2019, notices on the contract counterparties listed in the Assumption Schedule and the Rejection Schedule, informing such counterparties of the assumption or rejection, as applicable, of their contracts (the "Contract Notices"), as evidenced by the Contract Notice Affidavit (defined below), consistent with the Conditional Disclosure Statement Order;

o. filed, on September 10, 2019, the *Affidavit of Publication* (the "Publication Affidavit") and the *Affidavit of Service of Solicitation Materials* [Docket No. 634] ("Solicitation Affidavit") and, on September 26, 2019, the Corrected Affidavit of Service with respect to the Contract Notices [Docket No. 721] (the "Contract Notice Affidavit" and together with the Publication Affidavit and the Solicitation Affidavit, the "Affidavits")

p. filed, on September 16, 2019, the *Plan Supplement for the Amended Joint Chapter 11 Plan of Reorganization of Bristow Group Inc. and Its Debtor Affiliates, as Modified* [Docket No. 656] (the "First Plan Supplement");

q. filed, on September 28, 2019, the *Debtors' Emergency Motion to Approve Term Sheet with Macquarie Leasing LLC and Macquarie Rotocraft Holdings LLC* [Docket No. 731] seeking approval of a settlement (the "Macquarie Settlement") with Macquarie Leasing LLC and Macquarie Rotocraft Holdings LLC (collectively, "Macquarie") pursuant to which, among other things, the Debtors and Macquarie would amend the Macquarie Term Loan Credit Facility (as so amended, the "Amended Macquarie Term Loan Credit Facility");

r. filed, on September 30, 2019, the *Declaration of James Daloia of Prime Clerk LLC Regarding the Solicitation of Votes and Tabulation of Ballots Cast on the Amended Joint Chapter 11 Plan of Reorganization of Bristow Group Inc. and Its Debtor Affiliates, as Modified* [Docket No. 739], which detailed the results of the Plan voting process (the "Voting Declaration" and, together with the First Day Declaration, the "Declarations");

s. filed, on September 30, 2019, the *Amended Joint Chapter 11 Plan of Reorganization of Bristow Group Inc. and Its Debtor Affiliates, as Further Modified* [Docket No. 742].

t. filed, on September 30, 2019, the *Debtors': (I) Memorandum of Law in Support of (A) Approving Adequacy of Debtors' Disclosure Statement, and (B) Confirmation of Amended Joint Chapter 11 Plan of Reorganization of Bristow Group Inc. and its Debtor Affiliates, as Modified; (II) Reply to Objections with Respect to the Plan and Disclosure Statement and (III) Opposition to Motion to Appoint Equity Committee)* [Docket No. 744] (the "Confirmation Brief");

u. filed, on September 30, 2019, the *Declaration of Joseph J. Sciametta in Support of an Order Approving the Debtors' Disclosure Statement for and Confirming the Debtors' Joint Chapter 11 Plan* [Docket No. 781] (the "Sciametta Declaration" and, together with the First Day Declaration and the Voting Declaration, the "Declarations");

v. filed, on October 2, 2019, the *Amended Plan Supplement for the Amended Joint Chapter 11 Plan of Reorganization of Bristow Group Inc. and Its Debtor Affiliates, as Modified* [Docket No. 782] (the "Amended Plan Supplement" and, together with the First Plan Supplement, as modified, amended, or supplemented from time to time, the "Plan Supplement", which, for purposes of the Plan and this Confirmation Order, is included in the definition of the "Plan"); and

4

w. filed, on October 2, 2019, the Stipulated Findings of Fact for Combined Disclosure Statement and Confirmation Hearing [Docket No. 784] (the "Stipulated Facts").

The Court having:

a. entered, on August 26, 2019, the *Order (i) Conditionally Approving the Adequacy of the Disclosure Statement, (ii) Approving the Solicitation and Notice Procedures with Respect to Confirmation of the Plan, (iii) Approving the Form of Various Ballots and Notices in Connection Therewith, (iv) Approving the Rights Offering Procedures, and (v) Approving the Scheduling of Certain Dates in Connection with Confirmation of the Plan* [Docket No. 599] (the "Conditional Disclosure Statement Order");

b. entered, on September 23, 2019, that *Order Granting Debtors' Motion to Approve Term Sheet with PK Airfinance S.À.R.L. and Milestone Aviation Group Limited* [Docket No. 698] (the "Milestone Settlement Order");

c. set September 23, 2019, at 4:00 p.m. (prevailing Central Time) as the deadline for voting on the Plan (the "Voting Deadline") and deadline for filing objections to confirmation of the Plan (the "Objection Deadline");

d. set October 3, 2019 at 1:00 p.m. (prevailing Central Time), as the date and time for the Combined Hearing, pursuant to Bankruptcy Rules 3017 and 3018 and sections 1126, 1128, and 1129 of the Bankruptcy Code, as set forth in the Conditional Disclosure Statement Order, the time for which was subsequently changed to 9:00 a.m. (prevailing Central Time) on the same date;

e. reviewed the Plan, the Disclosure Statement, the Plan Supplement, the Confirmation Brief, the Declarations, the Voting Declaration, the Combined Hearing Notice, the Affidavits, and all filed pleadings, exhibits, statements, and comments regarding approval of the Disclosure Statement and Confirmation, including all objections, statements, and reservations of rights;

f. held the Combined Hearing;

g. heard the statements and arguments made by counsel in respect of approval of the Disclosure Statement and Confirmation and having considered the record of these Chapter 11 Cases and taken judicial notice of all papers and pleadings filed in the Chapter 11 Cases; and

h. considered all oral representations, testimony, documents, filings, and other evidence regarding approval of the Disclosure Statement and Confirmation.

NOW, THEREFORE, after due deliberation thereon and good cause appearing therefor,

the Court hereby makes and issues the following findings of fact, and conclusions of law:

5

## **FINDINGS OF FACT AND CONCLUSIONS OF LAW**

IT IS DETERMINED, FOUND, ADJUDGED, DECREED AND ORDERED THAT:

A. **Findings of Fact**. The findings of fact and conclusions of law set forth herein, in the Plan, including specifically in Article IX of the Plan, in the Stipulated Facts and in the record of the Combined Hearing constitute the Court's findings of fact and conclusions of law under Rule 52 of the Federal Rules of Civil Procedure, as made applicable herein by Bankruptcy Rules 7052 and 9014. To the extent any of the following conclusions of law constitute findings of fact, or vice versa, they are adopted as such.

B. **Jurisdiction, Venue, and Core Proceeding**. The Court has jurisdiction over these Chapter 11 Cases pursuant to section 1334 of title 28 of the United States Code. The Court has exclusive jurisdiction to determine whether the Disclosure Statement and the Plan comply with the applicable provisions of the Bankruptcy Code and should be approved and confirmed, respectively. Venue is proper in this district pursuant to sections 1408 and 1409 of title 28 of the United States Code. Approval of the Disclosure Statement and Confirmation of the Plan are core proceedings within the meaning of section 157(b)(2) of title 28 of the United States Code.

C. **Disclosure Statement**. The Disclosure Statement contains (a) sufficient information of a kind necessary to satisfy the disclosure requirements of all applicable nonbankruptcy laws, rules, and regulations, including the Securities Act, (b) "adequate information" (as such term is defined in section 1125(a) of the Bankruptcy Code and used in section 1126(b)(2) of the Bankruptcy Code) with respect to the Debtors, the Plan, and the transactions contemplated therein and (c) specific descriptions of releases and injunctions related thereto in accordance with Bankruptcy Rule 3016(c). The filing of the Disclosure Statement with the Clerk of the Court satisfied Bankruptcy Rule 3016(b).

6

D. **Ballots.** The Classes entitled to vote on the Plan (collectively, the "Voting Classes") are set forth below:

| Class | Designation |
|-------|-------------|
| 3 | 2019 Term Loan Facility Claims |
| 4 | Secured Notes Claims |
| 6 | PK Air Credit Facility Claims and MAG Lease Obligation Claims |
| 7 | Macquarie Term Loan Credit Facility Claims |
| 8 | Unsecured Notes Claims |
| 12 | General Unsecured Claims |

As set forth and approved in the Solicitation Procedures Order, the ballots the Debtors used to solicit votes to accept or reject the Plan from holders in the Voting Classes adequately addressed the particular needs of these Chapter 11 Cases and were appropriate for holders in the Voting Classes to vote to accept or reject the Plan.

E. **Notice.** As evidenced by the Affidavits and the Voting Declaration, all parties required to be given notice of the Combined Hearing (including the deadline for filing and serving objections to approval of the Disclosure Statement and confirmation of the Plan) have been given due, proper, adequate, timely, and sufficient notice of the Combined Hearing in accordance with the Solicitation Procedures Order and in compliance with the Bankruptcy Code, the Bankruptcy Rules, the Local Rules and all other applicable non-bankruptcy rules, laws, and regulations and such parties have had an opportunity to appear and be heard with respect thereto.

F. **Solicitation.** As described in and evidenced by the Affidavits and the Voting Declaration, transmittal and service of the Solicitation Materials (collectively, the "Solicitation") were timely, adequate, appropriate, and sufficient under the circumstances. The Solicitation (i) was conducted in good faith and (ii) complied with the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, the Solicitation and Scheduling Order, and all other applicable non-bankruptcy rules, laws, and regulations applicable to the Solicitation.

7

G.  **Vote Tabulation.**  As described in the Voting Declaration, the holders of Claims in the Class 3 (2019 Term Loan Facility Claims), Class 4 (Secured Notes Claims), Class 6 (PK Air Credit Facility Claims and MAG Lease Obligations Claims), Class 8 (Unsecured Notes Claims) and Class 12 (General Unsecured Claims) are Impaired under the Plan and have voted to accept the Plan in the numbers and amounts required by section 1126 of the Bankruptcy Code.  All procedures used to tabulate the Ballots were fair, reasonable, and conducted in accordance with the applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, the Solicitation Procedures Order, and all other applicable non-bankruptcy rules, laws, and regulations.  Additionally, Class 7 (Macquarie Term Loan Credit Facility Claims) is Impaired under the Plan and the Macquarie Parties, through the Macquarie Settlement, have voted to accept the Plan.

H.  **Service of Opt Out Form**.  The process described in the Voting Declaration and the Solicitation Affidavit that the Debtors and Prime Clerk followed to identify the relevant parties on which to serve the Opt Out Form and to distribute the Opt Out Form (i) is consistent with the industry standard for the identification and dissemination of such materials on holders of public securities, and (ii) was reasonably calculated to ensure that each of Holders of Interests in Class 15 and Claims in Class 16 was informed of its ability to opt out of the Third Party Releases and the consequences for failing to timely do so.

I.  **Modifications to Plan**.  Pursuant to section 1127 of the Bankruptcy Code, the modifications to the Plan set forth in the Modified Plan or in this Confirmation Order constitute technical or clarifying changes, changes with respect to particular Claims by agreement with holders of such Claims, or modifications that do not otherwise materially and adversely affect or change the treatment of any other Claim under the Plan.  Notice of these modifications was

8

adequate and appropriate under the facts and circumstances of the Chapter 11 Cases. In accordance with Bankruptcy Rule 3019, these modifications do not require additional disclosure under section 1125 of the Bankruptcy Code or the resolicitation of votes under section 1126 of the Bankruptcy Code, and they do not require that holders of Claims or Interests be afforded an opportunity to change previously cast acceptances or rejections of the Plan. Accordingly, the Plan is properly before this Court and all votes cast with respect to the Plan prior to such modification shall be binding and shall apply with respect to the Plan.

J.     **Releases, Exculpation, Injunction, and Preservation of Claims and Causes of Action**. Article VIII.B of the Plan describes certain releases granted by the Debtors, the Reorganized Debtors and the Estates (the "Debtor Releases"). Such releases are a necessary and integral element of the Plan, and are fair, reasonable, and in the best interests of the Debtors, the Estates, and holders of Claims and Interests. The Debtor Releases are: (a) in exchange for the good and valuable consideration provided by the Released Parties; (b) a good-faith settlement and compromise of the Claims released by Article VIII.B of the Plan; (c) given, and made, after due notice and opportunity for hearing; (d) appropriately tailored under the facts and circumstances of the Chapter 11 Cases; and (e) a bar to any of the Debtors, the Reorganized Debtors and the Estates asserting any Claim or Cause of Action released by the Debtor Releases.

K.     Article VIII.C of the Plan describes certain releases (the "Third-Party Releases") granted by the Releasing Parties of the Released Parties which include: (a) the Debtors; (b) the Reorganized Debtors; (c) the DIP Facility Agent; (d) the DIP Facility Lenders; (e) the Backstop Commitment Parties; (f) the Holders of 2019 Term Loan Facility Claims; (g) the 2019 Term Loan Facility Agent; (h) the Amended and Restated 2019 Term Loan Facility Lenders; (i) the Amended and Restated 2019 Term Loan Facility Agent; (j) the Supporting Noteholders; (k) the Indenture

9

Trustees; (l) the Exit Facility Lenders; (m) the Exit Facility Agent; (n) the Milestone Parties; (o) the Creditors' Committee and each of its current and former members and the parties related to any of the foregoing as more fully set forth in Article I.A.175 of the Plan.

L.      The Third-Party Releases are consensual with respect to the Releasing Parties and such parties were provided notice of the chapter 11 proceedings, the Plan, the deadline to object to confirmation of the Plan, and received the Combined Hearing Notice and were properly informed that the Holders of Claims against or Interests in the Debtors that did not (a) check the "opt out" box on the applicable Ballot or opt out form attached to the Deemed to Reject Notice, returned in advance of the Voting Deadline, or (b) object to their inclusion as a Releasing Party on or before the Objection Deadline would be deemed to have consented to the release of all Claims and Causes of Action against the Debtors and the Released Parties as set forth in Article VIII.C. The Combined Hearing Notice was additionally published in *The Wall Street Journal (National Edition)* and *the Houston Chronicle* on August 29, 2019.   The release provisions of the Plan were conspicuous, emphasized with boldface type in the Plan, the Disclosure Statement, the Ballots, the Combined Hearing Notice, the Deemed to Accept Notice and the Deemed to Reject Notice. Importantly, the inclusion of the parties to the Restructuring Support Agreement and the Milestone Parties in the Third-Party Releases was a material inducement for their participation, negotiation and ultimate resolution of Claims through the Restructuring Support Agreement, the Milestone Settlement and Plan, as applicable.

M.      The Third Party Releases are: (a) in exchange for the good and valuable consideration provided by the Released Parties; (b) a good-faith settlement and compromise of the Claims and Causes of Action released by the Third-Party Releases; (c) materially beneficial to, and in the best interests of, the Debtors, their Estates, and their stakeholders, and is important to

10

the overall objectives of the Plan to finally resolve certain Claims among or against certain parties in interest in these Chapter 11 Cases; (d) fair, equitable, and reasonable; (e) given and made after due notice and opportunity for hearing; (f) a bar to any of the Releasing Parties asserting any Claim or Cause of Action released by the Third Party Release against any of the Released Parties; and (g) consistent with sections 105, 524, 1123, 1129, and 1141 and other applicable provisions of the Bankruptcy Code.

N.     The exculpation, described in Article VIII.D of the Plan (the "Exculpation"), is appropriate under applicable law because it was proposed in good faith, was formulated following extensive good-faith, arm's-length negotiations with key constituents, and is appropriately limited in scope. Without limiting anything in the Exculpation, each Exculpated Party has participated in good faith in these Chapter 11 Cases and is appropriately released and exculpated from any obligation, Cause of Action, or liability for any act taken or omitted to be taken in connection with, or arising from or relating in any way to, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, Filing, or termination of the Restructuring Support Agreement and related prepetition transactions (including the 2019 Term Loan Facility Credit Agreement), the Original RSA, the Original DIP Commitment Letter, the Initial Amended RSA, the Disclosure Statement, the Plan, the Rights Offering, the Rights Offering Procedures, the Backstop Commitment Agreement, the DIP Facility, the Exit Facility, the Amended and Restated 2019 Term Loan Facility, any other Restructuring Documents, or any Restructuring Transaction, contract, instrument, release or other agreement or document created or entered into in connection with the Disclosure Statement or the Plan, the Filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the

issuance of Securities pursuant to the Plan or the Rights Offering, or the distribution of property under the Plan or any other related agreement with respect to the foregoing.

O.     The injunction provisions set forth in Article VIII.E of the Plan are necessary to implement, preserve, and enforce the Debtors' discharge, the Debtor Releases, the Third-Party Releases, and the Exculpation, and are narrowly tailored to achieve this purpose.

P.      Article IV.T of the Plan provides that the Reorganized Debtors will retain, and may assert, all rights to commence and pursue, as appropriate, any and all Causes of Action except for Causes of Action that have been expressly waived, relinquished, exculpated released, compromised or settled by the Plan, whether arising before or after the Petition Date in accordance with section 1123(b)(3)(B) of the Bankruptcy Code.  The provisions regarding the preservation of Causes of Action in the Plan are appropriate, fair, equitable, and reasonable, and are in the best interests of the Debtors, the Estates, and holders of Claims and Interests.

Q.     The release and discharge of all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates described in Article VIII.G of the Plan (the "Lien Release"), except as otherwise expressly provided in the Plan and this Confirmation Order, is necessary to implement the Plan.  The provisions of the Lien Release are appropriate, fair, equitable, and reasonable and are in the best interests of the Debtors, the Estates, and holders of Claims and Interests.

R.     **Management Incentive Plan**.  The Plan provides for the allocation of New Stock to the Management Incentive Plan.  The Debtors disclosed the terms of the Management Incentive Plan in Exhibit I of the Plan Supplement.  The Court finds that allocation of the New Stock to the Management Incentive Plan is fair and reasonable and is appropriate to align the incentives of participants with the goals of Reorganized Bristow Parent.

12

S.     **Rights Offering**.  The Debtors solicited subscriptions to the Rights Offering in good faith pursuant to the Rights Offering Procedures set forth in the Solicitation Procedures Order, applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, the Local Rules and any applicable non-bankruptcy laws, rules or regulations, and the Rights Offering Procedures are fair, equitable, and reasonable and provide for the Rights Offering to be conducted in a manner that is in the best interests of the Debtors, the Estates and holders of Claims and Interests.

T.     **Valuation.**  The evidence with respect to the valuation analysis of the Debtors introduced at the Combined Hearing and in the Declarations provides the basis for and supports the distributions and recoveries of Holders of Claims and Interests under the Plan, and is reasonable, persuasive and credible, and uses reasonable and appropriate methodologies and assumptions.  Based on all of the evidence presented by the Debtors and other parties both prior to and at the Combined Hearing, the enterprise value of the Debtors pursuant to the Plan does not exceed $1.25 billion.  Given such enterprise value of the Debtors, pursuant to the applicable provisions of the Bankruptcy Code and Bankruptcy Rules, the Plan's treatment of Existing Interests is appropriate and reasonable, and Holders of Existing Interests are not entitled to receive any distribution under the Plan.

U.     **Cram Down Requirements**.  Classes 1, 2, 5, 9, 10 and 11 constitute Unimpaired Classes, each of which is conclusively presumed to have accepted the Plan in accordance with section 1126(f) of the Bankruptcy Code.  Each of the Voting Classes, Classes 3, 4, 6, 7, 8 and 12, has voted to accept the Plan.  Holders of Existing Interests in Class 15 and Section 510(b) Claims in Class 16 were not solicited and are deemed to have rejected the Plan because the enterprise value of the Debtors is less than the aggregate amount of Claims against the Debtors.  Additionally, Holders of Intercompany Claims in Class 13 and Intercompany Interests in Class 14 (together with

13

Class 13, Class 15 and Class 16, the "Deemed Rejecting Classes") are conclusively presumed to accept or deemed to reject the Plan and, accordingly, were not solicited. Accordingly, notwithstanding the foregoing, the Plan is confirmable despite the failure to satisfy section 1129(a)(8) because, as set forth below, it satisfies sections 1129(a)(10) and 1129(b) of the Bankruptcy Code.

V. The Plan satisfies the requirements of section 1129(a)(10) of the Bankruptcy Code. As evidenced by the Voting Declaration, each Voting Class voted to accept the Plan by more than the requisite numbers and amounts of Claims, determined without including any acceptance of the Plan by any insider (as that term is defined in section 101(31) of the Bankruptcy Code), specified under the Bankruptcy Code.

W. The Plan also satisfies the requirements of section 1129(b) of the Bankruptcy Code. Notwithstanding the fact that each Deemed Rejecting Class has been, or may be, deemed to reject the Plan, the Plan may be confirmed pursuant to section 1129(b)(l) of the Bankruptcy Code. First, all of the requirements of section 1129(a) of the Bankruptcy Code other than section 1129(a)(8) have been met. Second, the Plan is fair and equitable with respect to each Deemed Rejecting Class. The Plan has been proposed in good faith, is reasonable and meets the requirements that no Holder of any Claim or Interest that is junior to each Deemed Rejecting Class will receive or retain any property under the Plan on account of such junior Claim or Interest, and no Holder of a Claim or Interest in a Class senior to such Class is receiving more than 100% of the amount of its Claim on account of such Claim. Accordingly, the Plan is fair and equitable towards all Holders of Claims and Interests in the Deemed Rejecting Classes. Third, the Plan does not discriminate unfairly because similarly situated creditors will receive substantially similar treatment on account

14

of their Claims and Interests irrespective of Class.  The Plan may therefore be confirmed despite the fact that not all Impaired Classes have voted to accept the Plan.

X.      **Good Faith**.  The Debtors have proposed the Plan in good faith and not by any means forbidden by law.  In so determining based on the evidence presented to this Court, including the Declarations, the Plan, the Disclosure Statement and the other motions and pleadings filed and the testimony elicited at the Combined Hearing, the Court has examined the totality of the circumstances surrounding the filing of these Chapter 11 Cases, the Plan itself, the Restructuring Support Agreement, the process leading to Confirmation, including the overwhelming support of holders of Claims in the Voting Classes for the Plan, and the transactions to be implemented pursuant thereto.  These Chapter 11 Cases were filed, and the Plan was proposed, with the legitimate purpose of allowing the Debtors to reorganize and emerge from bankruptcy with a capital and organizational structure that will allow them to conduct their businesses and satisfy their obligations with sufficient liquidity and capital resources.  The Plan is the product of good faith, arm's length negotiations by and among the Debtors, the parties to the Restructuring Support Agreement and the Creditors' Committee, among others.

Y.      **Satisfaction of Confirmation.**  Based on the foregoing and the findings contained in Article IX of the Plan, the Debtors, as proponents of the Plan, have met their burden of proving by a preponderance of the evidence, which is the applicable evidentiary standard for Confirmation, that the Plan satisfied all applicable elements of sections 1129(a) and 1129(b) of the Bankruptcy Code required for Confirmation.

**ORDER**

IT IS HEREBY ORDERED THAT:

**I.     Approval of the Disclosure Statement**

1.     The Disclosure Statement and the Solicitation Materials are approved on a final basis pursuant to section 1125 of the Bankruptcy Code.  Any and all remaining objections or reservations of rights with respect to the Disclosure Statement that have not been withdrawn or resolved as of the entry of this Confirmation Order are hereby overruled in their entirety on the merits.

**II.    Confirmation of the Plan**

2.     The Plan is confirmed pursuant to section 1129 of the Bankruptcy Code.

3.     Any and all objections to the Plan that have not been withdrawn or resolved on the merits as of the entry of this Confirmation Order are hereby overruled in their entirety on the merits.

4.     The documents contained in the Plan Supplement are integral to the Plan and are approved by the Court and the Debtors and the Reorganized Debtors (as applicable) are authorized to take all actions required under the Plan and the Plan Supplement documents to effectuate the Plan, the Plan Supplement and the Restructuring Transactions, including, for the avoidance of doubt, the issuance of any new equity interests as contemplated by the Plan.

5.     The terms of the Plan, the Plan Supplement, the Milestone Settlement Order and the exhibits thereto are incorporated herein by reference, and are an integral part of this Confirmation Order.  The terms of the Plan, the Plan Supplement, the Milestone Settlement Order, all exhibits thereto, and all other relevant and necessary documents shall be effective and binding as of the Effective Date on all parties in interest, including the Debtors, the Reorganized Debtors and all holders of Claims and Interests.  The failure to specifically include or refer to any particular

16

article, section, or provision of the Plan, the Plan Supplement, the Milestone Settlement Order or any related document in this Confirmation Order does not diminish or impair the effectiveness or enforceability of such article, section, or provision.

6. The compromises and settlements set forth in the Plan are approved, and will be effective immediately and binding on all parties in interest on the Effective Date.

7. The Debtors shall cause to be served a notice of the entry of this Confirmation Order and occurrence of the Effective Date, substantially in form attached hereto as **Exhibit B** (the "Confirmation Notice"), upon (a) all parties listed in the creditor matrix maintained by Prime Clerk LLC and (b) such additional persons and entities as deemed appropriate by the Debtors, no later than five (5) business days after the Effective Date. The Debtors shall cause the Confirmation Notice to be published in the *Wall Street Journal* and the *Houston Chronicle* within seven (7) business days after the Effective Date.

### III. Releases by the Debtors

8. The following release by the Debtors in Section VIII.B of the Plan is approved:

> Pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, on and after the Effective Date, each Released Party is deemed fully, conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by the Debtors, the Reorganized Debtors, their Estates, and any person seeking to exercise the rights of the Estates, including any successors to the Debtors or any Estates representative appointed or selected pursuant to section 1123(b)(3) of the Bankruptcy Code from any and all Causes of Action, including any derivative claims asserted on behalf of the Debtors, that the Debtors, the Reorganized Debtors, or their Estates, including any successors to the Debtors or any Estates representative appointed or selected pursuant to section 1123(b)(3) of the Bankruptcy Code, would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or Interest, or that any Holder of any Claim or Interest could have asserted on behalf of the Debtors, based on or relating to, or in any manner arising from, in whole or in part:
>
> > 1. the Debtors, the business or contractual arrangement between the Debtors and any Released Party, any Securities issued by the Debtors and the ownership thereof, the Debtors' in- or out-of-court restructuring efforts, the 2019

17

Term Loan Facility, the Compensation and Benefit Programs, intercompany transactions, or the formulation, preparation, dissemination, negotiation, or Filing of the Restructuring Support Agreement, the Plan, the Disclosure Statement, Rights Offering Procedures, or any other Restructuring Documents;

2.  any Restructuring Transaction, contract, instrument, release, or other agreement or document (including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or this Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Restructuring Support Agreement, the Original RSA, the Original DIP Commitment Letter, the Initial Amended RSA, the Disclosure Statement, or the Plan, including the Rights Offering, the Backstop Commitment Agreement, the DIP Facility, the Exit Facility, the Amended and Restated 2019 Term Loan Facility, or any other Restructuring Documents;

3.  the Chapter 11 Cases, the Disclosure Statement, the Plan, the Filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the solicitation of votes with respect to the Plan, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan or the Rights Offering, or the distribution of property under the Plan or any other related agreement with respect to the foregoing; or

4.  any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date, including all Avoidance Actions or other relief obtained by the Debtors in the Chapter 11 Cases.

Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (i) any claims related to any act or omission that is determined in a Final Order to have constituted willful misconduct, gross negligence, or actual fraud, (ii) the rights of any current employee of the Debtors under any employment agreement or plan, (iii) the rights of the Debtors with respect to any confidentiality provisions or covenants restricting competition in favor of the Debtors under any employment agreement with a current or former employee of the Debtors, (iv) any post-Effective Date obligations of any party or Entity under the Plan, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, (v) the rights of Holders of Allowed Claims to receive distributions under the Plan, (vi) any Cause of Action the Debtors may have against Columbia Helicopters, Inc. and its Related Parties, or (vii) any Cause of Action the Debtors may have against any of their former officers or directors as of the Petition Date in respect of payments made and referenced under any separation, retirement, consulting agreement, employment agreement or plan.

Entry of this Confirmation Order constitutes the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the foregoing release, which includes by reference each of the related provisions and definitions contained herein, and further, constitutes the Bankruptcy Court's finding that the foregoing release is: (i) in exchange for the good and valuable consideration provided by the Released Parties; (ii) a good faith settlement and compromise of the Claims released; (iii) in the best interest of the Debtors and their Estates; (iv) fair, equitable, and reasonable; and (v) given and made after due notice and opportunity for hearing.

## IV. Releases by Holders of Claims and Interests.

9. The following release by Holders of Claims and Interests in Section VIII.C of the Plan is approved:

As of the Effective Date, except as otherwise provided herein, each Releasing Party is deemed to have fully, conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged each Debtor, Reorganized Debtor, and Released Party from any and all Causes of Action, including any derivative claims asserted on behalf of the Debtors, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part:

1. the Debtors, the business or contractual arrangement between the Debtors and any Releasing Party, any Securities issued by the Debtors and the ownership thereof, the Debtors' in- or out-of-court restructuring efforts, the 2019 Term Loan Facility, the Compensation and Benefit Programs, intercompany transactions, or the formulation, preparation, dissemination, negotiation, or Filing of the Restructuring Support Agreement, the Plan, the Disclosure Statement, Rights Offering Procedures, or any other Restructuring Documents;

2. any Restructuring Transaction, contract, instrument, release, or other agreement or document (including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or this Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Restructuring Support Agreement, the Original RSA, the Original DIP Commitment Letter, the Initial Amended RSA, the Disclosure Statement, or the Plan, including the Rights Offering, the Backstop Commitment Agreement, the DIP Facility, the Exit Facility, the Amended and Restated 2019 Term Loan Facility, or any other Restructuring Documents;

3. the Chapter 11 Cases, the Disclosure Statement, the Plan, the Filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the solicitation of votes with respect to the Plan, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan or the Rights Offering, or the

19

distribution of property under the Plan or any other related agreement with respect to the foregoing; or

4. any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date, including all Avoidance Actions or other relief obtained by the Debtors in the Chapter 11 Cases.

Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (i) any claims related to any act or omission that is determined in a Final Order to have constituted willful misconduct, gross negligence, or actual fraud, (ii) the rights of any current employee of the Debtors under any employment agreement or plan, (iii) the rights of the Debtors with respect to any confidentiality provisions or covenants restricting competition in favor of the Debtors under any employment agreement with a current or former employee of the Debtors, (iv) any post-Effective Date obligations of any party or Entity under the Plan, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, (v) the rights of Holders of Allowed Claims to receive distributions under the Plan, (vi) any Cause of Action the Debtors may have against Columbia Helicopters, Inc. and its Related Parties, or (vii) any Cause of Action the Debtors may have against any of their former officers or directors as of the Petition Date in respect of payments made and referenced under any separation, retirement, consulting agreement, employment agreement or plan.

Entry of this Confirmation Order constitutes the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the foregoing release, which includes by reference each of the related provisions and definitions contained herein, and further, constitutes the Bankruptcy Court's finding that the foregoing release is: (i) in exchange for the good and valuable consideration provided by the Released Parties; (ii) a good faith settlement and compromise of the Claims released; (iii) in the best interest of the Debtors and their Estates; (iv) fair, equitable, and reasonable; and (v) given and made after due notice and opportunity for hearing.

## V. Exculpation.

10. The following exculpation of the Exculpated Parties in Section VIII.D of the Plan is approved:

Except as otherwise specifically provided in the Plan, no Exculpated Party shall have or incur, and each Exculpated Party is hereby released and exculpated from any Cause of Action for any claim related to any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, Filing, or termination of the Restructuring Support Agreement and related prepetition transactions (including the 2019 Term Loan Facility Credit Agreement), the Original RSA, the Original

20

DIP Commitment Letter, the Initial Amended RSA, the Disclosure Statement, the Plan, the Rights Offering, the Rights Offering Procedures, the Backstop Commitment Agreement, the DIP Facility, the Exit Facility, the Amended and Restated 2019 Term Loan Facility, any other Restructuring Documents, or any Restructuring Transaction, contract, instrument, release or other agreement or document created or entered into in connection with the Disclosure Statement or the Plan, the Filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance of Securities pursuant to the Plan or the Rights Offering, or the distribution of property under the Plan or any other related agreement with respect to the foregoing, except for claims related to any act or omission that is determined in a Final Order to have constituted actual fraud, willful misconduct, or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan. The Exculpated Parties have, and upon completion of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of, and distribution of, consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

## VI. Injunction.

11. The following injunction in Section VIII.E of the Plan is approved:

Except as otherwise expressly provided in the Plan or for obligations or distributions issued or required to be paid pursuant to the Plan or this Confirmation Order, all Entities that have held, hold, or may hold Claims or Interests that have been released pursuant to the Plan, discharged pursuant to the Plan, or are subject to exculpation pursuant to the Plan, are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Reorganized Debtors, or the Released Parties or the Exculpated Parties: (i) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests; (ii) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such Claims or Interests; (iii) creating, perfecting, or enforcing any lien or encumbrance of any kind against such Entities or the property or the estates of such Entities on account of or in connection with or with respect to any such Claims or Interests; (iv) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such Claims or Interests unless such Entity has timely asserted such setoff right in a document Filed with the Bankruptcy Court explicitly preserving such setoff, and notwithstanding an indication of a claim or interest or otherwise that such Entity

21

asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (v) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests released or settled pursuant to the Plan.

**VII.   Implementation of Other Necessary Documents and Agreements**

12.     The Debtors and the Reorganized Debtors, as applicable, are authorized, without further notice to, or action, order or approval of this Court or any other Person, to execute and deliver all agreements, documents, instruments and certificates relating to such documents and agreements and to perform their obligations thereunder, including, without limitation, to pay all fees, costs and expenses thereunder in accordance with the Plan.  The terms and conditions of such documents and agreements are reaffirmed or approved, as applicable, and shall, upon completion of documentation and execution, be valid, binding and enforceable.

**VIII.  Plan Distributions**

13.     The Debtors are authorized to make all Plan Distributions pursuant to the terms of the Plan and to pay any other applicable fees and expenses approved by any other order of this Bankruptcy Court.

**IX.    Rights Offering**

14.     On the Effective Date, Reorganized Bristow Parent shall consummate the Rights Offering in accordance with the Rights Offering Procedures set forth in the Solicitation Procedures Order and the Plan.

**X.     No Action Required**

15.     Under section 1142(b) of the Bankruptcy Code and applicable nonbankruptcy law, including section 303 of the General Corporation Law of the State of Delaware and any comparable provision of the business organization laws of any other jurisdiction, as applicable, no action of the directors, partners, managers, members, stockholders or equity holders of the Debtors

or the Reorganized Debtors, as applicable, is required to authorize the Debtors and the Reorganized Debtors, as applicable, to enter into, execute, deliver, file, adopt, amend, restate, consummate, or effectuate, as the case may be, the Plan and any contract, instrument, or other document to be executed, delivered, adopted, or amended in connection with the implementation of the Plan and following the Effective Date, each of the Restructuring Documents, including the New Organizational Documents, will be a legal, valid, and binding obligation of the Debtors or Reorganized Debtors, as applicable, enforceable against the Debtors and the Reorganized Debtors in accordance with the respective terms thereof.

16. Subject to the terms of the RSA and the Backstop Commitment Agreement, the Debtors are also authorized from and after the date hereof to negotiate, execute, issue, deliver, implement, file, or record any contract, instrument, release, or other agreement or document or take any action necessary or appropriate to implement the transactions contemplated by the Plan, including those set forth in the Restructuring Transactions Exhibit attached as Exhibit L to the Plan Supplement, including, among other things, any merger, transfer, liquidation, or consolidation of any of the Debtors or their non-Debtor subsidiaries or their assets.

17. This Confirmation Order shall constitute all authority, approvals, and consents required, if any, by the laws, rules, and regulations of all states and any other governmental authority or any contract to which any of the Debtors are party with respect to the implementation or consummation of the Plan and any documents, instruments, or agreements, and any amendments or modifications thereto, and any other acts and transactions referred to in or contemplated by the Plan, the Plan Supplement, the Disclosure Statement, and any documents, instruments, securities, or agreements provided for therein, and any amendments or modifications thereto.

## XI.  Cancellation of Instruments and Release of Liens

18.  Except as otherwise provided in the Plan, the Milestone Settlement Order or any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement, on the Effective Date, (a) all notes, instruments, Certificates, and other documents evidencing Claims or Interests, including the Indentures, (b) if the Debtors enter into the Exit Facility, the 2019 Term Loan Credit Agreement, and (c) any other credit agreements and indentures, shall be terminated and canceled and the obligations of the Debtors thereunder or in any way related thereto shall be deemed satisfied in full and discharged and, subject to Article IV.M of the Plan, the Indenture Trustees and, if applicable, 2019 Term Loan Facility Agent shall be released from all duties thereunder without any need for further action or approval by the Bankruptcy Court or any Holder or other person, *provided that* the Indentures and, if applicable, the 2019 Term Loan Credit Agreement shall survived the occurrence of the Effective date and continue in effect solely to the extent set forth in Article IV.M of the Plan.

## XII.  Release of Liens

19.  Except as otherwise specifically provided in the Plan, the Milestone Settlement Order, the Exit Facility Credit Agreement or the Amended and Restated 2019 Term Loan Credit Agreement, as applicable, the Amended PK Air Credit Facility Agreement or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, and except with respect to Secured Claims that are Reinstated pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released and discharged, and all of the right, title, and interest of any holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall

24

revert to the Reorganized Debtors and their successors and assigns, in each case, without any further approval or order of the Bankruptcy Court and without any action or filing being required to be made by the Debtors or the Reorganized Debtors, or any other Holder of a Secured Claim. In addition, at the sole expense of the Debtors or the Reorganized Debtors, the Holders of Secured Claims shall execute and deliver all documents reasonably requested by the Debtors, Reorganized Debtors or administrative agent for the Exit Facility to evidence the release of such mortgages, deeds of trust, Liens, pledges, and other security interests and shall authorize the Reorganized Debtors and their designees to file UCC-3 termination statements and other release documentation (to the extent applicable) with respect thereto.

## XIII. Exemption from Registration

20. The offering, issuance, and distribution of any Securities pursuant to the Plan, including the New Stock, shall be exempt from the registration requirements of section 5 of the Securities Act or any similar federal, state, or local law in reliance on (1) with respect to the New Common Stock issued as part of the Unsecured Common Equity Pool, or in connection with the 1145 Rights Offering, section 1145 of the Bankruptcy Code or, only to the extent such exemption under section 1145 of the Bankruptcy Code is not available, any other available exemption from registration under the Securities Act, (2) with respect to the New Common Stock and New Preferred Stock issued in connection with the 4(a)(2) Rights Offering, and all Unsubscribed Shares of New Common Stock and New Preferred Stock issued to the Backstop Commitment Parties pursuant to the Backstop Commitment Agreement (other than shares of New Common Stock and New Preferred Stock issued on account of the Backstop Commitment Fee), section (4)(a)(2) of the Securities Act or Regulation D promulgated thereunder and (3) with respect to the New Common Stock and New Preferred Stock issued on account of (x) the Backstop Commitment Fee, (y)

Equitization Allocation New Common Stock and Equitization Allocation New Preferred Stock, and (z) the Equitization Consent Fee, section 1145 of the Bankruptcy Code.

21. Pursuant to section 1145 of the Bankruptcy Code, the New Common Stock issued under the Plan as part of the Unsecured Common Equity Pool, or in connection with the 1145 Rights Offering, or the New Stock issued on account of the Backstop Commitment Fee, the Equitization Allocation New Common Stock, the Equitization Allocation New Preferred Stock, and the Equitization Consent Fee, may be sold without registration under the Securities Act by the recipients thereof, subject to: (1) the provisions of section 1145(b)(1) of the Bankruptcy Code relating to the definition of an underwriter in section 2(a)(11) of the Securities Act and compliance with any applicable state or foreign securities laws, if any, and the rules and regulations of the SEC, if any, applicable at the time of any future transfer of such Securities or instruments; (2) any other applicable regulatory approval; and (3) the transfer restrictions set forth in the New Shareholders' Agreement and the New Organizational Documents, if any. All shares of New Common Stock and New Preferred Stock issued on account of (x) the Backstop Commitment Fee, (y) the Equitization Allocation New Common Stock and Equitization Allocation New Preferred Stock, and (z) the Equitization Consent Fee, will be issued without registration under the Securities Act or any similar federal, state, or local law in reliance on section 1145 of the Bankruptcy Code. All New Common Stock and New Preferred Stock issued in connection with the 4(a)(2) Rights Offering, and all Unsubscribed Shares of New Common Stock and New Preferred Stock issued to the Backstop Commitment Parties pursuant to the Backstop Commitment Agreement (other than shares of New Common Stock and New Preferred Stock issued on account of the Backstop Commitment Fee), will be issued without registration under the Securities Act or any similar

26

federal, state, or local law in reliance on section 4(a)(2) of the Securities Act or Regulation D promulgated thereunder.

22.     Persons who purchase the New Common Stock or the New Preferred Stock pursuant to the exemption from registration set forth in section 4(a)(2) of the Securities Act or Regulation D promulgated thereunder will hold "restricted securities."  Resales of such restricted securities would not be exempted by section 1145 of the Bankruptcy Code from registration under the Securities Act or other applicable law.  Holders of restricted securities would, however, be permitted to resell New Common Stock or New Preferred Stock without registration if they are able to comply with the applicable provisions of Rule 144 or Rule 144A or any other exemption from registration under the Securities Act, or if such securities are registered with the Securities and Exchange Commission.

## XIV.    Enforceability of Plan

23.     Pursuant to sections 1123(a) and 1142(a) of the Bankruptcy Code, upon the Effective Date, the provisions of this Confirmation Order and the Plan shall apply and be binding and enforceable notwithstanding any otherwise applicable nonbankruptcy law.

## XV.    Reservation of Rights of the United States

24.     As to the United States of America, its agencies, departments, or agents (collectively, the "United States"), notwithstanding anything to the contrary in this Confirmation Order, the Plan, the Plan Supplement or the Disclosure Statement, as to the United States, nothing in the Confirmation Order, Plan, or Disclosure Statement shall:  (1) affect or impair the rights of the United States to assert setoff and recoupment and such rights (and the Debtors' defenses and any corresponding setoff and recoupment rights of the Debtors) are expressly preserved; (2) affect or impair the exercise of the United States' police and regulatory powers against the Debtors, the Reorganized Debtors, or any non-Debtor; (3) be construed as a compromise or settlement of any

claim, liability, suit, cause of action, or interest of the United States; (4) release, enjoin, or discharge any non-Debtor from any claim, liability, suit, or cause of action of the United States nor shall anything in the Confirmation Order, the Plan, the Plan Supplement or the Disclosure Statement enjoin the United States from bringing any claim, suit, cause of action, or other proceeding against any non-Debtor for any liability whatsoever; or (5) shall affect or impair any rights or causes of action that the United States has or may have against any surety under any Customs or other bond pursuant to applicable non-bankruptcy law, nor shall anything in the Confirmation Order, the Plan, the Plan Supplement or the Disclosure Statement preclude or prohibit the ability of the United States to make demand on, be paid by, or otherwise pursue any surety that is jointly and severally liable for any debt owed to the United States; provided that nothing in this paragraph shall affect in any way any release by the Debtors, Reorganized Debtors, their Estates, any person exercising the rights of the Estates, or any successor to the Estates of the Released Parties provided for in Article VIII.B of the Plan.

25.     No provision in the Plan or this Confirmation Order relieves the Debtors or the reorganized Debtors from their obligation to comply with the Communications Act of 1934, as amended, and the rules, regulations and orders promulgated thereunder by the Federal Communications Commission ("FCC"). No transfer of any FCC license or authorization held by the Debtors or transfer of control of the Debtors, or transfer of control of a FCC licensee controlled by the Debtors shall take place prior to the issuance of FCC regulatory approval for such transfer pursuant to applicable FCC regulations. The FCC's rights and powers to take any action pursuant to its regulatory authority including, but not limited to, imposing any regulatory conditions on any of the above described transfers, are fully preserved, and nothing herein shall proscribe or constrain the FCC's exercise of such power or authority.

**XVI. Louisiana Department of Revenue**

26.     A failure by any Debtor or Reorganized Debtor to make a payment due under the Plan or pay any tax due for any post-Confirmation tax period to the Louisiana Department of Revenue ("LDR") shall be an "Event of Default".  LDR will give the Debtor written notice of the Event of Default ("Notice of Default") at the address listed on the Debtor's most recent filed tax return, with a copy to the Debtors' counsel, provided however, that the failure to declare an Event of Default at the time of occurrence not constitute a waiver by LDR of its right to declare that the Debtor is in default.  If the Debtor fails to cure the default within twenty (20) days after receipt of Notice of Default, LDR may (a) enforce the entire amount of its Claim; (b) exercise any and all rights and remedies allowed under state law or any other applicable non-bankruptcy law; and/or (c) seek such relief as my be available from a court of applicable jurisdiction.  Any Allowed Administrative Claims of LDR not timely paid in accordance with applicable law shall include interest at the applicable statutory rate of the State of Louisiana.  Notwithstanding anything in the Plan or the Confirmation Order to the contrary, (i) LDR's setoff rights, if any, are preserved, (ii) the Plan does not release any third party non-Debtor entity for any liability owed to LDR with respect to Sales or Withholding Taxes imposed pursuant to La. R.S. 47:1561:1.

27.     For the avoidance of doubt, pursuant to section 503(b)(1)(D), LDR is not required to file a request for the payment of an expense described in sections 503(b)(1)(B) or (C) as a condition of its being an Allowed Administrative Expense Claim.  Additionally, for the avoidance of doubt, notwithstanding anything in the Plan or the Confirmation Order to the contrary, on and after the Effective Date, LDR is permitted to amend a previously timely filed proof of claim to the extent it relates back to such previously filed proof of claim.  The Reorganized Debtors' rights to dispute any such amendment are preserved.

28.     Notwithstanding anything in the Plan to the contrary, the Bankruptcy Court's retention of jurisdiction with respect to LDR's prepetition claim(s) shall be limited to (i) resolving the amount of and all other matters with respect to any tax claim arising prior to Confirmation, and (ii) enforcing any discharge provision of the Plan.  Subject to section 505 of the Bankruptcy Code, the Bankruptcy Court retains exclusive jurisdiction to address all matters pertaining to any LDR Claim arising prior to Confirmation.

## XVII.  Management Incentive Plan

29.     Reorganized Bristow Parent is authorized to implement the Management Incentive Plan to the extent provided for in the Plan.

## XVIII. Exit Facility and Amended Debt Facilities

30.     The Reorganized Debtors are hereby authorized to enter into, on the Effective Date, and take such actions as necessary or desirable to perform under either of the Exit Facility and the Amended and Restated 2019 Term Loan Facility and, in each case, all documents or agreements related thereto, including the payment or reimbursement of any fees, indemnities and expenses under or pursuant to any such documents and agreements in connection therewith.  In addition, to the extent not entered into by the Debtors prior to the Effective Date, the Reorganized Debtors are hereby authorized to enter into the Amended PK Air Loan Documents and the amendments to the Macquarie Term Loan Documents provided for in the Macquarie Settlement (the "Amended Macquarie Term Loan Credit Facility"), all transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred and fees paid by the Reorganized Debtors in connection therewith.

31.     The Debtors shall continue and complete the Exit Facility marketing process in accordance with the terms of the Plan and the Restructuring Support Agreement.  In the event that the Exit Facility marketing process is not successfully completed, the Debtors shall provide for the

30

treatment of the 2019 Term Loan Facility Claims in accordance with Article III.B.3.b.ii of the Plan, provided that any Amended and Reinstated 2019 Term Loan Credit Agreement shall be acceptable to the "Required Lenders" (as defined in the 2019 Term Loan Facility), the Required Supporting Secured Noteholders (as defined in the Restructuring Support Agreement) and the Required Backstop Parties (as defined in the Restructuring Support Agreement) and shall be subject to the Committee Consent Right.

32. The lenders under the Exit Facility or the Amended and Restated 2019 Term Loan Facility, as applicable, the Amended PK Air Credit Facility Agreement and the Amended Macquarie Term Loan Documents, shall have valid, binding, and enforceable Liens on the Collateral (or other property identified as "Collateral" therein) specified in, and to the extent required by, the Exit Facility Documents or the Amended and Restated 2019 Term Loan Documents, as applicable, the Amended PK Air Loan Documents and the Amended Macquarie Term Loan Documents, as applicable, *provided that* no such Liens shall apply to those certain certificates of deposit assigned to Hancock Whitney Bank designated as CD# 707747 which secures Letter of Credit #7348399 in the amount of $195,000.00; CD# 707748 which secures Letter of Credit #5512899 in the amount of $235,000.00; CD# 707749 which secures Letter of Credit #3874799 in the amount of $250,000.00; and CD# 727158 which secures its card account, whose last four digits are #2374 in the amount of $112,000.00, as well as CD# 727161 which secures its card account, whose last four digits are #6554 in the amount of $70,000.00.

33. To the extent granted, the guarantees, mortgages, pledges, Liens and other security interests granted pursuant to either the Exit Facility Documents or the Amended and Restated 2019 Term Loan Documents, as applicable, the Amended PK Air Loan Documents and the Amended Macquarie Loan Documents are granted in good faith as an inducement to the lenders under either

31

the Exit Facility or the Amended and Restated 2019 Term Loan Facility, as applicable, the Amended PK Air Loan Documents and the Amended Macquarie Term Loan Documents to extend credit thereunder and shall be deemed not to constitute a fraudulent conveyance or fraudulent transfer, shall not otherwise be subject to avoidance, recharacterization, or subordination (whether contractual or otherwise) for any purposes whatsoever, and the priorities of any such Liens and security interests shall be as set forth in the relevant Exit Facility Documents or the Amended and Restated 2019 Term Loan Documents, as applicable, the Amended PK Air Loan Documents and the Amended Macquarie Term Loan Credit Facility. The Reorganized Debtors and the persons and entities granted such Liens are authorized to make all filings and recordings, and to obtain all governmental approvals and consents necessary to establish and perfect such Liens under the provisions of the applicable state, provincial, federal, or other law (whether domestic or foreign) that would be applicable in the absence of the Plan and this Confirmation Order, and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such Liens to third parties.

## XIX.   Executory Contracts and Unexpired Leases

34.     Unless otherwise assumed or rejected pursuant to an order of the Court (including the Milestone Settlement Order and the Macquarie Settlement Order) entered prior to the Effective Date, on the Effective Date, each Executory Contract and Unexpired Lease shall be deemed assumed pursuant to section 365 of the Bankruptcy Code, unless such Executory Contract or Unexpired Lease is listed on the Schedule of Rejected Executory Contracts and Unexpired Leases. The assumption of Executory Contracts and Unexpired Leases may include the assignment of certain of such contracts to Affiliates.

35.     All of the Debtors' insurance policies and any agreements, documents, or instruments relating thereto, including the D&O Liability Insurance Policies, are treated as and

32

deemed to be Executory Contracts under the Plan, and shall also be deemed assumed as of the Effective Date. Notwithstanding any other provisions of the Plan or the Confirmation Order, with respect to their insurance policies, the Debtors are authorized to: (i) pay all insurance obligations in connection with their insurance, (ii) maintain and administer their insurance policies and honor and pay all claims, including but not limited to deductible amounts and self-insured retention amounts, and other costs and expenses related thereto, whether arising prior to or after the Petition Date and (iii) pay any undisputed prepetition amounts that are later determined to be due and owing as a result of an audit, including any additional fees and costs imposed as a result of any audit.

36. To the extent the Debtors assume the Debtors' self-funded employee health benefits plan ("Health Plan") and that certain Master Services Agreement No. MSA-476690 dated January 1, 2010 (the "Master Services Agreement"), through which Aetna Life Insurance Company ("Aetna") administers the Health Plan, Aetna's rights are hereby reserved to recover from the Debtors and Reorganized Debtors all amounts that become due to Aetna in the ordinary course under the Health Plan and the Master Services Agreement. This reservation includes without limitation, Aetna's right to recover from the Debtors and Reorganized Debtors all amounts under the Health Plan and/or the Master Services Agreement which have been accrued but not yet submitted to or processed by Aetna, without regard to whether the dates of service for such benefits were prior to or after the Effective Date.

37. The Backstop Commitment Agreement and the Restructuring Support Agreement, which are hereby approved on a final basis, shall also be assumed on the Effective Date.

38. Contracts and leases entered into after the Petition Date by any Debtor, including any Executory Contracts and Unexpired Leases assumed under section 365 of the Bankruptcy Code, shall survive and remain unaffected.

33

39.     If certain, but not all, of a contract counterparty's Executory Contracts and/or Unexpired Leases are assumed pursuant to the Plan, such counterparty's Executory Contracts and/or Unexpired Leases that are being rejected pursuant to the Plan are deemed severable agreements that are not integrated with those Executory Contracts and/or Unexpired Leases that are being assumed pursuant to the Plan.

## XX.    BRS Investor Group

40.     For purposes of the third-party release set forth in Article VIII.C and solely with respect to securities class action claims that have been asserted against the previously named Individual Defendants (the "Named Defendants") in the securities litigation styled: *In re Bristow Group Inc. Securities Litigation*, Case No. 19-cv-00509 (KPE), in the United States District Court for the Southern District of Texas, Houston Division ("Securities Litigation"), the term "Releasing Parties" shall not include Persons or Entities that purchased or otherwise acquired Existing Interests between February 8, 2018 and February 12, 2019, inclusive, that are seeking to pursue remedies under the Securities Exchange Act of 1934 (collectively, the "Securities Class Members"), provided that (i) any recovery, if any, under or payment of proceeds of or settlement in such action or on account of such Claims is limited solely to amounts recoverable under the D&O Liability Insurance Policies, (ii) the Securities Class Members shall be deemed to have waived any portion of any judgment that would (a) otherwise have to be satisfied by (x) an unexhausted self-insured retention or deductible payable by the Debtors or (y) the Named Defendants personally or their assets, or (b) otherwise not be covered by the D&O Liability Insurance Policies, (iii) the Securities Class Members shall not seek, and shall not be entitled to, any recovery from the Debtors, the Estates, the Reorganized Debtors and/or the assets of any of the foregoing other than the D&O Liability Insurance Policies; (iv) nothing in this paragraph shall affect the Debtors' release of the Named Defendants pursuant to Article VIII.B of the Plan, it being

34

understood that the Securities Class Members shall be enjoined from asserting or prosecuting any derivative claim by or on behalf of the Debtors or the Reorganized Debtors, and (v) all proofs of claim filed by the Securities Class Members or their counsel, including without limitation Proof of Claim No. 107, filed in the name "BRS Investor Group, as Lead Plaintiff in the Consolidated Action (as set forth in the Addendum)" are hereby deemed withdrawn with prejudice except as provided for in this first sentence of this paragraph. For the avoidance of doubt, all claims and defenses of the Debtors, the Reorganized Debtors, the Named Defendants and the insurers under the D&O Liability Insurance Policies are preserved and the inclusion of this paragraph in the Confirmation Order is not a determination of any claim or issue in the Securities Litigation. For the further avoidance of doubt, nothing in this paragraph shall give rise to or provide a basis for the Named Defendants to assert a general unsecured claim against any of the Debtors in the Chapter 11 Cases.

41. Nothing in the Plan or Confirmation Order shall (a) constitute a finding or stipulation that any proceeds of any of the D&O Liability Insurance Policies are property of the Estate, (b) modify or supersede any provision (including but not limited to any priority of payments provision) of any of the D&O Liability Insurance Policies, or (c) otherwise preclude any Person entitled to coverage under the D&O Liability Insurance Policies from seeking recovery under or payment of proceeds of any such D&O Liability Insurance Policy in accordance with the terms thereof.

### XXI. Miscellaneous

42. After the Effective Date, the Debtors or Reorganized Debtors, as applicable, shall have no obligation to file with the Court or serve on any parties reports that the Debtors or Reorganized Debtors, as applicable, were obligated to file under the Bankruptcy Code or a Court order, including monthly operating reports (even for those periods for which a monthly operating

report was not filed before the Effective Date), ordinary course professional reports, reports to any parties otherwise required under the "first" and "second" day orders entered in these Chapter 11 Case, including the Final Cash Collateral Order and the DIP Order, and monthly or quarterly reports for Professionals; provided, however, that the Debtors or Reorganized Debtors, as applicable, will comply with the U.S. Trustee's quarterly reporting requirements.

43. On the Effective Date (or, to the extent not known or submitted to the Debtors for payment as of the Effective Date, promptly following receipt of an invoice therefor, whether incurred before or after the Effective Date) and to the extent invoiced in accordance with the terms of applicable engagement letter (and, for the avoidance of doubt, no invoices be required to include itemized time detail), the Debtors or the Reorganized Debtors, as applicable, shall pay all Transaction Expenses not previously paid pursuant to an order of the Bankruptcy Court in accordance with the Article XIII.F of the Plan.

44. Except as otherwise set forth herein, this Court retains jurisdiction over all matters arising out of or related to these Chapter 11 Cases and the Plan, including the matters set forth in Article XI of the Plan.

45. Notwithstanding the possible applicability of Bankruptcy Rules 6004(g), 7062, 9014, or otherwise, the terms and conditions of this Confirmation Order shall be effective and enforceable immediately upon its entry. Each term and provision of the Plan, and the transactions related thereto as it heretofore may have been altered or interpreted by the Court is: (a) valid and enforceable pursuant to its terms; (b) integral to the Plan and may not be deleted or modified except as provided by the Plan or this Confirmation Order; and (c) nonseverable and mutually dependent.

46. Subject to the terms of the Plan, the Restructuring Support Agreement, and the Backstop Commitment Agreement, respectively, the Debtors are hereby authorized to amend or

37

modify the Plan at any time prior to the substantial consummation of the Plan, but only in accordance with section 1127 of the Bankruptcy Code and Article X.A of the Plan, without further order of this Court.

47. Notwithstanding Bankruptcy Rule 3020(e), the terms and conditions of this Confirmation Order will be effective and enforceable immediately upon its entry.

**Signed: October 08, 2019**

**DAVID R. JONES**
**UNITED STATES BANKRUPTCY JUDGE**

37

**Exhibit A**

**Plan**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| BRISTOW GROUP INC., *et al.*,[1] | ) | Case No. 19-32713 (DRJ) |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |

**AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION OF**
**BRISTOW GROUP INC. AND ITS DEBTOR AFFILIATES, AS <u>FURTHER</u> MODIFIED**

James R. Prince, State Bar No. 00784791
Omar J. Alaniz, State Bar No. 24040402
Kevin Chiu, State Bar No. 24109723
**BAKER BOTTS L.L.P.**
2001 Ross Avenue, Suite 900
Dallas, Texas 75201-2980
Telephone:  (214) 953-6500
Facsimile:  (214) 953-6503
Email:    jim.prince@bakerbotts.com
       omar.alaniz@bakerbotts.com
       kevin.chiu@bakerbotts.com

-and-

Emanuel C. Grillo (*pro hac vice)*
Chris Newcomb (*pro hac vice*)
**BAKER BOTTS L.L.P.**
30 Rockefeller Plaza
New York, New York   10112-4498
Telephone:  (212) 408-2500
Facsimile:  (212) 408-2501
Email:    emanuel.grillo@bakerbotts.com
       chris.newcomb@bakerbotts.com

Richard G. Mason (*pro hac vice*)
Amy R. Wolf (*pro hac vice*)
**WACHTELL, LIPTON, ROSEN & KATZ**
51 West 52nd Street
New York, New York 10019
Telephone:  (212) 403-1000
Facsimile:  (212) 403-2000
Email:    rgmason@wlrk.com
       arwolf@wlrk.com

*Co-Counsel to the Debtors and Debtors in Possession*

Dated:  September 30, 2019

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each debtor's federal tax identification number, are: Bristow Group Inc. (9819), BHNA Holdings Inc. (8862), Bristow Alaska Inc. (8121), Bristow Helicopters Inc. (8733), Bristow U.S. Leasing LLC (2451), Bristow U.S. LLC (2904), BriLog Leasing Ltd. (9764), and Bristow Equipment Leasing Ltd. (9303). The corporate headquarters and the mailing address for the Debtors listed above is 2103 City West Blvd., 4th Floor, Houston, Texas 77042.

**TABLE OF CONTENTS**

**Page**

INTRODUCTION ................................................................................................................................4

ARTICLE I. DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME, GOVERNING LAW, AND OTHER REFERENCES ................................................................4
    A.    *Defined Terms* ..............................................................................................................4
    B.    *Rules of Interpretation* ..............................................................................................24
    C.    *Computation of Time* ................................................................................................24
    D.    *Governing Law* ..........................................................................................................24
    E.    *Reference to Monetary Figures* .................................................................................24
    F.    *Reference to the Debtors or the Reorganized Debtors* ...............................................24
    G.    *Controlling Document* ...............................................................................................25

ARTICLE II. ADMINISTRATIVE AND PRIORITY CLAIMS ........................................................25
    A.    *Administrative Claims* ...............................................................................................25
    B.    *Professional Fee Claims* ............................................................................................25
    C.    *Priority Tax Claims* ...................................................................................................26
    D.    *DIP Facility Claims* ...................................................................................................26
    E.    *Statutory Fees* ............................................................................................................26

ARTICLE III. CLASSIFICATION, TREATMENT, AND VOTING OF CLAIMS AND INTERESTS .........27
    A.    *Classification of Claims and Interests* ......................................................................27
    B.    *Treatment of Classes of Claims and Interests* ...........................................................28
    C.    *Special Provision Governing Unimpaired Claims* .....................................................34
    D.    *Elimination of Vacant Classes* ..................................................................................34
    E.    *Voting Classes; Presumed Acceptance by Non-Voting Classes* ..................................34
    F.    *Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code* .................34
    G.    *Intercompany Interests* ..............................................................................................34
    H.    *Substantive Consolidation; GUC Cash Distribution Amount* ....................................35
    I.    *Subordinated Claims and Interests* ...........................................................................35

ARTICLE IV. PROVISIONS FOR IMPLEMENTATION OF THE PLAN .........................................35
    A.    *General Settlement of Claims, Interests, and Causes of Action* .................................35
    B.    *Restructuring Transactions* ........................................................................................35
    C.    *Employee and Retiree Benefits* ..................................................................................36
    D.    *Issuance and Distribution of New Stock* ....................................................................36
    E.    *Determination of Holder Citizenship* ........................................................................36
    F.    *Rights Offering* ..........................................................................................................37
    G.    *The Exit Facility, the Amended and Restated 2019 Term Loan Facility and the Amended PK Air Loan Documents* .............................................................................37
    H.    *Rights Offering Per Share Price* ................................................................................38
    I.    *Management Incentive Plan* .......................................................................................38
    J.    *Management of Reorganized Bristow* ........................................................................38
    K.    *Exemption from Registration Requirements* ..............................................................38
    L.    *Vesting of Assets* ........................................................................................................40
    M.    *Cancellation of Instruments, Certificates, and Other Documents* .............................40
    N.    *Corporate Action* ......................................................................................................41
    O.    *Corporate Existence* ..................................................................................................41
    P.    *New Organizational Documents* ................................................................................41
    Q.    *Effectuating Documents; Further Transactions* ........................................................42
    R.    *Section 1146(a) Exemption* ........................................................................................42
    S.    *Directors and Officers* ..............................................................................................42

<strong>Page</strong>

| | | |
|---|---|---|
| T. | *Preservation of Causes of Action* | 43 |
| U. | *Milestone Settlement* | 43 |
| V. | *Macquarie Settlement* | 43 |
| W. | *Indenture Trustee Expenses* | 44 |
| X. | *Closing the Chapter 11 Cases* | 44 |

**ARTICLE V. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES** ......**44**

| | | |
|---|---|---|
| A. | *Assumption or Rejection of Executory Contracts and Unexpired Leases* | 44 |
| B. | *Claims Based on Rejection of Executory Contracts or Unexpired Leases* | 45 |
| C. | *Cure of Defaults for Assumed Executory Contracts and Unexpired Leases* | 45 |
| D. | *Indemnification* | 46 |
| E. | *Insurance Policies* | 46 |
| F. | *Employee Compensation and Benefits* | 47 |
| G. | *Contracts and Leases After the Petition Date* | 48 |
| H. | *Reservation of Rights* | 48 |
| I. | *Nonoccurrence of Effective Date* | 48 |

**ARTICLE VI. PROVISIONS GOVERNING DISTRIBUTIONS** .......**48**

| | | |
|---|---|---|
| A. | *Distributions on Account of Claims and Interests Allowed as of the Effective Date* | 48 |
| B. | *Rights and Powers of the Distribution Agent* | 48 |
| C. | *Special Rules for Distributions to Holders of Disputed Claims* | 49 |
| D. | *Delivery of Distributions* | 49 |
| E. | *Compliance with Tax Requirements/Allocations* | 51 |
| F. | *Claims Paid or Payable by Third Parties* | 51 |
| G. | *Setoffs* | 52 |
| H. | *Indefeasible Distributions* | 52 |
| I. | *Allocation Between Principal and Accrued Interest* | 52 |

**ARTICLE VII. PROCEDURES FOR RESOLVING DISPUTED CLAIMS** .......**52**

| | | |
|---|---|---|
| A. | *Allowance of Claims* | 52 |
| B. | *Claims Administration Responsibilities* | 53 |
| C. | *Estimation of Claims* | 53 |
| D. | *Disputed Claims Reserve* | 53 |
| E. | *Adjustment to Claims Without Objection* | 54 |
| F. | *Time to File Objections to Claims* | 54 |
| G. | *Disallowance of Claims* | 54 |
| H. | *Amendments to Claims* | 55 |
| I. | *No Distributions Pending Allowance* | 55 |
| J. | *Distributions After Allowance* | 55 |
| K. | *Single Satisfaction of Claims* | 55 |
| L. | *Claims Consultation Rights* | 55 |

**ARTICLE VIII. DISCHARGE, RELEASE, INJUNCTION AND RELATED PROVISIONS** .......**55**

| | | |
|---|---|---|
| A. | ***Discharge of Claims and Termination of Interests*** | 55 |
| B. | ***Releases by the Debtors*** | 56 |
| C. | ***Releases by Holders of Claims and Interests*** | 57 |
| D. | ***Exculpation*** | 58 |
| E. | ***Injunction*** | 58 |
| F. | *Protection Against Discriminatory Treatment* | 59 |
| G. | *Release of Liens* | 59 |
| H. | *Reimbursement or Contribution* | 59 |
| I. | *Recoupment* | 59 |
| J. | *Subordination Rights* | 59 |
| K. | *Reservation of Rights of the United States* | 60 |

**TABLE OF CONTENTS (CONT'D)**

**Page**

**ARTICLE IX. EFFECT OF CONFIRMATION OF THE PLAN** ........................................................ 60
    A.      *Jurisdiction and Venue* ........................................................ 60
    B.      *Order Approving the Disclosure Statement* ........................................................ 61
    C.      *Voting Report* ........................................................ 61
    D.      *Judicial Notice* ........................................................ 61
    E.      *Transmittal and Mailing of Materials; Notice* ........................................................ 61
    F.      *Solicitation* ........................................................ 61
    G.      *Burden of Proof* ........................................................ 62
    H.      *Bankruptcy Rule 3016(a) Compliance* ........................................................ 62
    I.      *Compliance with the Requirements of Section 1129 of the Bankruptcy Code* ........................................................ 62
    J.      *Securities Under the Plan* ........................................................ 67
    K.      *Releases and Discharges* ........................................................ 67
    L.      *Release and Retention of Causes of Action* ........................................................ 67
    M.      *Approval of Restructuring Support Agreement, Backstop Commitment Agreement and Other Restructuring Documents and Agreements* ........................................................ 67
    N.      *Confirmation Hearing Exhibits* ........................................................ 67
    O.      *Objections to Confirmation of the Plan* ........................................................ 68
    P.      *Retention of Jurisdiction* ........................................................ 68
    Q.      *Plan Supplement* ........................................................ 68

**ARTICLE X. CONDITIONS PRECEDENT TO THE EFFECTIVE DATE** ........................................................ 68
    A.      *Conditions Precedent to the Effective Date* ........................................................ 68
    B.      *Waiver of Conditions* ........................................................ 69
    C.      *Effect of Non-Occurrence of Conditions to Consummation* ........................................................ 69
    D.      *Substantial Consummation* ........................................................ 69

**ARTICLE XI. MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN** ........................................................ 70
    A.      *Modification of Plan* ........................................................ 70
    B.      *Effect of Confirmation on Modifications* ........................................................ 70
    C.      *Revocation or Withdrawal of Plan* ........................................................ 70

**ARTICLE XII. RETENTION OF JURISDICTION** ........................................................ 70

**ARTICLE XIII. MISCELLANEOUS PROVISIONS** ........................................................ 72
    A.      *Immediate Binding Effect* ........................................................ 72
    B.      *Restructuring Documents* ........................................................ 72
    C.      *Additional Documents* ........................................................ 72
    D.      *Dissolution of the Statutory Committees* ........................................................ 72
    E.      *Payment of Statutory Fees* ........................................................ 73
    F.      *Payment of Transaction Expenses* ........................................................ 73
    G.      *Reservation of Rights* ........................................................ 73
    H.      *Successors and Assigns* ........................................................ 73
    I.      *Service of Documents* ........................................................ 73
    J.      *Term of Injunctions or Stays* ........................................................ 75
    K.      *Entire Agreement* ........................................................ 75
    L.      *Plan Supplement* ........................................................ 75
    M.      *Non-Severability* ........................................................ 75
    N.      *Votes Solicited in Good Faith* ........................................................ 75
    O.      *Waiver or Estoppel* ........................................................ 76

**INTRODUCTION**

Bristow Group Inc. and its affiliated debtors and debtors in possession in the above-captioned chapter 11 cases propose this joint chapter 11 plan of reorganization pursuant to chapter 11 of title 11 of the United States Code. Capitalized terms used herein and not otherwise defined shall have the meanings ascribed to such terms in Article I.A hereof. Although proposed jointly for administrative purposes, the Plan constitutes a separate plan for each of the foregoing entities and each of the foregoing entities is a proponent of the Plan within the meaning of section 1129 of the Bankruptcy Code. The Plan does not contemplate substantive consolidation for any of the Debtors; *provided that* the Debtors and the Reorganized Debtors, as applicable, shall consolidate Allowed Claims into one Estate for purposes of distributions for Classes 8 and 12. The classification of Claims and Interests set forth in Article III of the Plan should be deemed to apply separately to each Debtor, as applicable.

Reference is made to the accompanying *Amended Disclosure Statement for the Amended Joint Chapter 11 Plan of Reorganization of Bristow Group Inc. and Its Debtor Affiliates, As Modified* for a discussion of the Debtors' history, business, properties and operations, valuation, projections, risk factors, a summary and analysis of the Plan and the transactions contemplated thereby, and certain related matters.

ALL HOLDERS OF CLAIMS AND INTERESTS, TO THE EXTENT APPLICABLE, ARE ENCOURAGED TO READ THIS PLAN AND THE DISCLOSURE STATEMENT IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THIS PLAN.

**ARTICLE I.**
**DEFINED TERMS, RULES OF INTERPRETATION,**
**COMPUTATION OF TIME, GOVERNING LAW, AND OTHER REFERENCES**

A.      *Defined Terms*

1.      "*1145 Eligible Holder*" means each Holder of a Claim (as of the Distribution Record Date) that is acquiring the 1145 Rights Offering Stock for its own account.

2.      "*1145 Rights Offering*" means the rights offering for shares of New Common Stock to be conducted in reliance upon the exemption from registration under the Securities Act provided in section 1145 of the Bankruptcy Code, in accordance with the 1145 Rights Offering Procedures.

3.      "*1145 Rights Offering and Unsecured Cash Out Election Procedures*" means the procedures (and any forms and notices attendant thereto) governing the 1145 Rights Offering and the Unsecured Cash Out Election that are attached as an exhibit to the Conditional Disclosure Statement Order.

4.      "*1145 Rights Offering Stock*" means the New Common Stock issued pursuant to the 1145 Rights Offering.

5.      "*1145 Subscription Rights*" means the rights to purchase 1145 Rights Offering Stock pursuant to the 1145 Rights Offering at a per share purchase price of $36.37.

6.      "*2019 Term Loan Amendment Fee*" means Cash in an aggregate amount of $562,500.

7.      "*2019 Term Loan Facility*" means that certain prepetition secured term loan facility due May 2022 in the aggregate principal amount of $75,000,000, provided pursuant to the 2019 Term Loan Facility Credit Agreement.

8.      "*2019 Term Loan Facility Agent*" means Ankura Trust Company, LLC, solely in its capacities as administrative agent and collateral agent under the 2019 Term Loan Facility.

9.      "*2019 Term Loan Facility Claim*" means any Claim against any of the Debtors arising from or based upon the 2019 Term Loan Facility.

10.     "*2019 Term Loan Facility Credit Agreement*" means that certain Term Loan Credit Agreement dated as of May 10, 2019, as amended, modified or supplemented from time to time among Bristow Parent and its non-Debtor affiliate Bristow Holdings Company Ltd. III (Cayman Islands), as borrowers, the guarantors from time to time party thereto, certain Holders of Secured Notes, as lenders, and the 2019 Term Loan Facility Agent, as administrative agent and collateral agent.

11.     "*4(a)(2) Eligible Holder*" means each Holder of a Claim (as of the Distribution Record Date) that is an "accredited investor" (as defined in Rule 501(a) under the Securities Act) or a "qualified institutional buyer" (within the meaning of Rule 144A of the Securities Act) and that is acquiring the 4(a)(2) Rights Offering Stock for its own account.

12.     "*4(a)(2) Rights Offering*" means the rights offering for New Common Stock and New Preferred Stock to be conducted in reliance upon the exemption from registration under the Securities Act provided in Section 4(a)(2) of the Securities Act and/or Regulation D promulgated thereunder, in accordance with the 4(a)(2) Rights Offering Procedures.

13.     "*4(a)(2) Rights Offering Procedures*" means the procedures (and any forms and notices attendant thereto) governing the 4(a)(2) Rights Offering that are attached as an exhibit to the Conditional Disclosure Statement Order.

14.     "*4(a)(2) Rights Offering Stock*" means the New Common Stock and New Preferred Stock issued pursuant to the 4(a)(2) Rights Offering.

15.     "*4(a)(2) Subscription Rights*" means the rights to purchase 4(a)(2) Rights Offering Stock pursuant to the 4(a)(2) Rights Offering at a per share purchase price of $36.37.

16.     "*Administrative Claim*" means a Claim against any of the Debtors arising on or after the Petition Date and before the Effective Date for a cost or expense of administration of the Chapter 11 Cases entitled to priority under sections 503(b), 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including:  (a) the actual and necessary costs and expenses incurred on or after the Petition Date until and including the Effective Date of preserving the Estates and operating the Debtors' businesses; (b) Allowed Professional Fee Claims; (c) Allowed DIP Facility Claims; (d) all fees and charges assessed against the Estates pursuant to section 1930 of chapter 123 of title 28 of the United States Code; and (e) the Backstop Commitment Fee and the Equitization Consent Fee (which, in the case of this clause (e), are each deemed to be an Allowed Administrative Claim pursuant to the Confirmation Order).

17.     "*Administrative Claims Bar Date*" means the deadline for Filing requests for payment of Administrative Claims, which: (a) with respect to Administrative Claims other than Professional Fee Claims, shall be 30 days after the Effective Date; and (b) with respect to Professional Fee Claims, shall be 45 days after the Effective Date.

18.     "*Affiliate*" has the meaning set forth in section 101(2) of the Bankruptcy Code.  With respect to any Person that is not a Debtor, the term "Affiliate" shall apply to such Person as if the Person were a Debtor.

19.     "*Allowed*" means, with respect to any Claim against any of the Debtors, except as otherwise provided herein: (a) a Claim that is evidenced by a Proof of Claim Filed by the Claims Bar Date (or such other date as agreed by the Debtors pursuant to the Bar Date Order) or a request for payment of an Administrative Claim Filed by the Administrative Claims Bar Date, as applicable (or for which Claim under the Plan, the Bankruptcy Code, or pursuant to a Final Order, a Proof of Claim or request for payment of Administrative Claim is not or shall not be required to be Filed); (b) a Claim that is listed in the Schedules as not contingent, not unliquidated, and not Disputed, and for which no contrary or superseding Proof of Claim, as applicable, has been timely Filed; or (c) a Claim allowed pursuant to the Plan or a Final Order; *provided*, that with respect to a Claim described in clauses (a) and (b) above, such Claim shall be considered Allowed only if and to the extent that with respect to such Claim no objection to the allowance thereof is interposed within the applicable period of time fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Court, or such an objection is so interposed and the Claim has been Allowed by a Final Order.  Any Claim that has been or is hereafter listed in the Schedules as contingent, unliquidated, or disputed,

5

and for which no contrary or superseding Proof of Claim is or has been timely Filed, or that is not or has not been Allowed by a Final Order, is not considered Allowed and shall be expunged without further action by the Debtors and without further notice to any party or action, approval, or order of the Bankruptcy Court. Notwithstanding anything to the contrary herein, no Claim of any Entity subject to section 502(d) of the Bankruptcy Code shall be deemed Allowed unless and until such Entity pays in full the amount that it owes the applicable Debtor or Reorganized Debtor, as applicable. For the avoidance of doubt, a Proof of Claim Filed after the Claims Bar Date or a request for payment of an Administrative Claim Filed after the Administrative Claims Bar Date, as applicable, shall not be Allowed for any purposes whatsoever absent entry of a Final Order allowing such late-Filed Claim. "*Allow*" and "*Allowing*" shall have correlative meanings.

20. "*Amended and Restated 2019 Term Loan Credit Agreement*" means an amended and restated version of the 2019 Term Loan Credit Agreement to be entered into by the applicable Debtors, if the Debtors do not enter into the Exit Facility on or prior to the Effective Date, in any case secured by a first lien on substantially all assets of the Reorganized Debtors and their non-Debtor Affiliates (subject to customary and other agreed exclusions), with the same maturity and interest rate as set forth in the 2019 Term Loan Credit Agreement, and with amendments only to the prepayment, financial, reporting and other affirmative and negative covenants in the 2019 Term Loan Credit Agreement, which shall be subject to the consent rights of the Required RSA Parties on the terms set forth in the Restructuring Support Agreement.

21. "*Amended and Restated 2019 Term Loan Facility*" means the secured credit facility that Reorganized Bristow Parent and certain other Reorganized Debtors will enter into on the Effective Date in accordance with the Amended and Restated 2019 Term Loan Credit Agreement, if the Debtors do not enter into the Exit Facility on or prior to the Effective Date.

22. "*Amended and Restated 2019 Term Loan Facility Agent*" means the entity identified in the Plan Supplement as administrative and collateral agent under the Amended and Restated 2019 Term Loan Credit Agreement, solely in its capacity as such.

23. "*Amended and Restated 2019 Term Loan Facility Lenders*" means those certain lenders from time to time party to the Amended and Restated 2019 Term Loan Credit Agreement, solely in their capacity as such.

24. "*Amended and Restated 2019 Term Loan Documents*" means, collectively, the Amended and Restated 2019 Term Loan Credit Agreement and any and all other agreements, documents, and instruments delivered or entered into in connection therewith, including any guarantee agreements, pledge and collateral agreements, intercreditor agreements, and other security documents, which shall be subject to the consent rights of the Required RSA Parties on the terms set forth in the Restructuring Support Agreement.

25. "*Amended PK Air Credit Facility Agreement*" means the amended PK Air Facility Credit Agreement, as amended in a manner consistent with the Milestone Settlement.

26. "*Amended PK Air Loan Documents* " means the amended PK Air Loan Documents, as amended in a manner consistent with the Milestone Settlement.

27. "*Avoidance Actions*" means any and all avoidance, recovery, subordination, or other Claims and Causes of Actions that may be brought by or on behalf of the Debtors or their Estates or other authorized parties in interest under the Bankruptcy Code or applicable non-bankruptcy law, including actions or remedies under chapter 5 of the Bankruptcy Code or under similar or related state or federal statutes and common law.

28. "*Backstop Commitment Agreement*" means that certain backstop commitment agreement, entered into and dated as of July 24, 2019, pursuant to which the Backstop Commitment Parties have agreed to backstop the Rights Offering, as may be amended or modified from time to time in accordance with the terms thereof and the Restructuring Support Agreement, and which shall be subject to the consent rights of the Required RSA Parties on the terms set forth in the Restructuring Support Agreement.

6

29.     "*Backstop Commitment Fee*" has the meaning ascribed to such term in the Backstop Commitment Agreement, and shall be equal to 5.83% of the New Stock on a fully-diluted basis (except for the New Stock to be issued pursuant to the Management Incentive Plan).

30.     "*Backstop Commitment Parties*" means at any time and from time to time, the parties that have committed to backstop the Rights Offering and are signatories to the Backstop Commitment Agreement, solely in their capacities as such, to the extent provided in the Backstop Commitment Agreement.

31.     "*Bankruptcy Code*" means title 11 of the United States Code, 11 U.S.C. §§ 101–1532, as amended from time to time.

32.     "*Bankruptcy Court*" means the United States Bankruptcy Court for the Southern District of Texas, Houston Division or such other court having jurisdiction over the Chapter 11 Cases, including, to the extent of the withdrawal of reference under 28 U.S.C. § 157 and/or the General Order of the District Court pursuant to section 151 of title 28 of the United States Code, the United States District Court for the Southern District of Texas.

33.     "*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure promulgated under section 2075 of title 28 of the United States Code, and the general, local, and chambers rules of the Bankruptcy Court.

34.     "*Bar Date Order*" means the *Order (I) Setting Bar Dates for Filing Proofs of Claim, Including Requests for Payment under Section 503(b)(9), (II) Establishing Amended Schedules Bar Date and Rejection Damages Bar Date, (III) Approving the Form of and Manner for Filing Proofs of Claim, Including Section 503(b)(9) Requests and (IV) Approving Notice of Bar Dates* [Docket No. 392] (as amended, modified, or supplemented from time to time in accordance with the terms thereof).

35.     "*Bristow Parent*" means Bristow Group Inc.

36.     "*Business Day*" means a day, other than a Saturday, Sunday, or "legal holiday" (as defined in Bankruptcy Rule 9006(a)).

37.     "*Cash*" means the legal tender of the United States of America or the equivalent thereof, including bank deposits and checks.

38.     "*Causes of Action*" means any and all claims, controversies, actions, proceedings, controversies, reimbursement claims, contribution claims, recoupment rights, interests, debts, third-party claims, indemnity claims, damages, remedies, causes of action, demands, rights, suits, obligations, liabilities, accounts, judgments, defenses, affirmative defenses, offsets, powers, privileges, licenses, franchises, Avoidance Actions, counterclaims and cross-claims, of any kind or character whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, asserted or unasserted, direct or indirect, assertible directly or derivatively, choate or inchoate, reduced to judgment or otherwise, secured or unsecured, whether arising before, on, or after the Petition Date, in tort, law, equity, or otherwise pursuant to any theory of law. Causes of Action also include: (a) all rights of setoff, counterclaim, or recoupment and claims on contracts or for breaches of duties imposed by law or equity; (b) the right to object to or otherwise contest Claims or Interests; (c) claims pursuant to sections 362, 510, 542, 543, 544 through 550, or 553 of the Bankruptcy Code; (d) such claims and defenses as fraud, mistake, duress, and usury and any other defenses set forth in section 558 of the Bankruptcy Code; and (e) any claim for fraudulent transfer or similar claim pursuant to any state or foreign law.

39.     "*Certificate*" means any instrument evidencing a Claim or an Interest.

40.     "*Chapter 11 Cases*" means, when used with reference to a particular Debtor, the case pending for that Debtor under chapter 11 of the Bankruptcy Code in the Bankruptcy Court, and when used with reference to all the Debtors, the procedurally consolidated and jointly administered chapter 11 cases pending for the Debtors in the Bankruptcy Court.

41. "*Citizenship Certification*" means a certification regarding the citizenship of a Holder of a General Unsecured Claim, Unsecured Notes Claim, or Secured Notes Claim, in the form approved by the Conditional Disclosure Statement Order or such other form that may be acceptable to the Debtors.

42. "*Claim*" has the meaning set forth in section 101(5) of the Bankruptcy Code.

43. "*Claims Bar Date*" means the applicable deadline by which Proofs of Claim must be Filed, as established by: (a) the Bar Date Order; (b) a Final Order of the Bankruptcy Court; or (c) the Plan.

44. "*Claims Register*" means the official register of Claims maintained by the Solicitation Agent or the clerk of the Bankruptcy Court.

45. "*Class*" means a category of Holders of Claims or Interests pursuant to section 1122(a) of the Bankruptcy Code.

46. "*Collateral*" means any property or interest in property of the Estate of any Debtor subject to a Lien, charge, or other encumbrance to secure the payment or performance of a Claim, which Lien, charge, or other encumbrance is not subject to a Final Order ordering the remedy of avoidance of any such Lien, charge, or other encumbrance under the Bankruptcy Code.

47. "*Committee Consent Right*" means the consent and consultation rights of the Creditors' Committee as set forth in the Committee Joinder.

48. "*Committee Joinder*" means the joinder by the Creditors' Committee dated August 19, 2019 to the Restructuring Support Agreement.

49. "*Compensation and Benefits Programs*" means all employment and severance agreements and policies, and all employment, compensation, and benefit plans, policies, workers' compensation programs, savings plans, retirement plans, deferred compensation plans, supplemental executive retirement plans, healthcare plans, disability plans, severance benefit plans, incentive and retention plans, programs and payments, life and accidental death and dismemberment insurance plans, and programs of the Debtors, and all amendments and modifications thereto, applicable to the Debtors' and their Affiliates' employees, former employees, retirees, and non-employee directors and the employees, former employees and retirees of their subsidiaries.

50. "*Conditional Disclosure Statement Order*" means the order (and all exhibits thereto), which shall be subject to the consent rights of the Required RSA Parties on the terms set forth in the Restructuring Support Agreement, entered by the Bankruptcy Court conditionally approving the Disclosure Statement and the Solicitation Materials, and allowing solicitation of the Plan to commence, entered on August 26, 2019 [Docket No. 599], (as amended, modified, or supplemented from time to time in accordance with the terms thereof).

51. "*Confirmation*" means the entry of the Confirmation Order on the docket of the Chapter 11 Cases.

52. "*Confirmation Date*" means the date on which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Cases within the meaning of Bankruptcy Rules 5003 and 9021.

53. "*Confirmation Hearing*" means the hearing held by the Bankruptcy Court to (a) consider Confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code and (b) consider final approval of the Disclosure Statement, the Solicitation Materials, the Restructuring Support Agreement, and the Backstop Commitment Agreement.

54. "*Confirmation Order*" means the order of the Bankruptcy Court, the form and substance of which shall be subject to the consent rights of the Required RSA Parties on the terms set forth in the Restructuring Support Agreement, and subject to the Committee Consent Right, and, with respect to issues that affect the Milestone Parties, be in form and substance reasonably acceptable to the Milestone Parties, confirming the Plan pursuant to section 1129

of the Bankruptcy Code and providing final approval of the Disclosure Statement, the Solicitation Materials, the Restructuring Support Agreement, and the Backstop Commitment Agreement.

55.    "*Consummation*" or "*Consummated*" means the occurrence of the Effective Date.

56.    "*Convertible Notes*" means the 4.50% Convertible Senior Notes due 2023, issued in an original principal amount of approximately $143,750,000 pursuant to the Convertible Notes Indenture.

57.    "*Convertible Notes Indenture*" means that certain indenture, dated as of December 18, 2017, as amended, modified or supplemented from time to time, for the Convertible Notes, among Bristow Parent, as issuer, the Guarantor Subsidiaries, as guarantors, and the Convertible Notes Indenture Trustee, as trustee.

58.    "*Convertible Notes Indenture Trustee*" means Delaware Trust Company, and any successor thereto, solely in its capacity as successor trustee under the Convertible Notes Indenture.

59.    "*Creditors' Committee*" means the official committee of unsecured creditors appointed in the Chapter 11 Cases pursuant to the *Notice of Appointment of Committee of Unsecured Creditors* [Docket No. 179], as may be reconstituted from time to time.

60.    "*Cure Costs*" means all amounts, including an amount of $0.00, required to cure any monetary defaults under any Executory Contract or Unexpired Lease (or such lesser amount as may be agreed upon by the parties to such Executory Contract or Unexpired Lease) that is to be assumed by the Debtors pursuant to sections 365 or 1123 of the Bankruptcy Code.

61.    "*Cure Notice*" means any notice that sets forth the proposed Cure Costs under any Executory Contract or Unexpired Lease at the time such contract or lease is assumed by the applicable Debtors under the Plan, which notice shall include (a) procedures for objecting to proposed assumptions or assignments of the applicable Executory Contracts and/or Unexpired Leases, (b) the Cure Costs proposed to be paid in connection therewith, and (c) procedures for resolution by the Bankruptcy Court of any related dispute.

62.    "*D&O Liability Insurance Policies*" means all insurance policies (including any "tail policy") of any of the Debtors for current or former directors', managers', officers', and/or employees' liability.

63.    "*Debtors*" means, collectively, Bristow Group Inc., BHNA Holdings Inc., Bristow Alaska Inc., Bristow Helicopters Inc., Bristow U.S. Leasing LLC, Bristow U.S. LLC, BriLog Leasing Ltd., and Bristow Equipment Leasing Ltd.

64.    "*DIP Facility*" means that certain $150,000,000 senior secured term loan credit facility provided pursuant to the DIP Facility Credit Agreement.

65.    "*DIP Facility Agent*" means Ankura Trust Company, LLC, or any successor thereto, solely in its capacity as administrative agent and collateral agent under the DIP Facility Credit Agreement.

66.    "*DIP Facility Claim*" means any Claim, including for any Equitization Consent Fee if applicable, held by any of the DIP Facility Lenders or the DIP Facility Agent arising under or related to the DIP Facility Credit Agreement.

67.    "*DIP Facility Credit Agreement*" means that certain Superpriority Secured Debtor-In-Possession Credit Agreement, which is attached as Exhibit A to the DIP Order, which shall be subject to the consent rights of the Required RSA Parties on the terms set forth in the Restructuring Support Agreement.

68.    "*DIP Facility Lenders*" means those certain lenders from time to time party to the DIP Facility Credit Agreement, solely in their capacity as such.

69. "*DIP Order*" means the *Order (A) Authorizing the Debtors to Obtain Postpetition Financing, (B) Authorizing the Debtors to Continue to Use Cash Collateral, (C) Granting Liens and Providing Superpriority Administrative Expense Status, (D) Modifying the Automatic Stay, and (E) Granting Related Relief* [Docket No. 582] (as amended, modified, or supplemented from time to time in accordance with the terms thereof), which shall be subject to the consent rights of the Required RSA Parties on the terms set forth in the Restructuring Support Agreement.

70. "*Disclosure Statement*" means the disclosure statement for the Plan, including all exhibits and schedules thereto, which shall be subject to the consent rights of the Required RSA Parties on the terms set forth in the Restructuring Support Agreement.

71. "*Disputed*" means, as to any Claim or Interest (or any portion thereof), a Claim or Interest: (a) that is not Allowed; (b) that is not disallowed by the Plan, the Bankruptcy Code, or a Final Order, as applicable; (c) as to which a dispute is being adjudicated by a court of competent jurisdiction in accordance with non-bankruptcy law; (d) as to which a timely objection or request for estimation has been Filed and not withdrawn; or (e) with respect to which a party in interest has Filed a Proof of Claim or otherwise made a written request to a Debtor for payment, without any further notice to or action, order, or approval of the Bankruptcy Court.

72. "*Distribution Agent*" means, as applicable, the Reorganized Debtors or any Entity the Reorganized Debtors select (with the consent of the Required RSA Parties) to make or to facilitate distributions in accordance with the Plan.

73. "*Distribution Date*" means, except as otherwise set forth herein and except distributions to holders of public securities, the date or dates determined by the Debtors or the Reorganized Debtors (in consultation with the Required RSA Parties), on or after the Effective Date, upon which the Distribution Agent shall make distributions to Holders of Allowed Claims and Interests entitled to receive distributions under the Plan.

74. "*Distribution Record Date*" means, other than with respect to those Secured Notes or Unsecured Notes deposited with DTC, the record date for purposes of determining which Holders of Allowed Claims against or Allowed Interests in the Debtors are eligible to receive distributions under the Plan, which date shall be the Confirmation Date, or such other date as is agreed to by the Debtors and the Required RSA Parties, or designated in a Final Order. The Distribution Record Date shall not apply to any Secured Notes or Unsecured Notes deposited with DTC, the Holders of which shall receive a distribution in accordance with the customary procedures of DTC.

75. "*DTC*" means The Depository Trust Company.

76. "*Effective Date*" means the date that is the first Business Day after the Confirmation Date on which all conditions precedent to the occurrence of the Effective Date set forth in Article X.A of the Plan have been satisfied or waived in accordance with Article X.B of the Plan, and the Plan is deemed effective by the Debtors and the Required RSA Parties.

77. "*Eligible Holder*" means a Holder that is a 4(a)(2) Eligible Holder and/or a 1145 Eligible Holder, in each case, as of the Distribution Record Date.

78. "*Entity*" has the meaning set forth in section 101(15) of the Bankruptcy Code.

79. "*Equitization Allocation New Stock*" means 22.68% of the New Stock on a fully-diluted basis (except for the New Stock to be issued pursuant to the Management Incentive Plan), which shall be distributed to the Holders of DIP Facility Claims as set forth in Article II.D of the Plan.

80. "*Equitization Consent Fee*" means 2.27% of the New Stock on a fully-diluted basis (except for the New Stock to be issued pursuant to the Management Incentive Plan), which shall be distributed to the Holders of DIP Facility Claims as set forth in Article II.D of the Plan.

10

81. "*Estate*" means, as to each Debtor, the estate created for the Debtor pursuant to section 541 of the Bankruptcy Code upon the commencement of the applicable Debtor's Chapter 11 Case.

82. "*Exculpated Parties*" means, collectively, and in each case in its capacity as such: (a) the Debtors and the Reorganized Debtors; (b) the DIP Facility Agent; (c) the DIP Facility Lenders; (d) the Backstop Commitment Parties; (e) the Holders of 2019 Term Loan Facility Claims; (f) the 2019 Term Loan Facility Agent; (g) the Supporting Noteholders; (h) the Indenture Trustees; (i) the Milestone Parties; (j) the Creditors' Committee and each of its current and former members; (k) with respect to each of the foregoing entities in clauses (a) through (j), each such Entity's current and former predecessors, successors, Affiliates (regardless of whether such interests are held directly or indirectly), subsidiaries, direct and indirect equity holders, funds, portfolio companies, and management companies; and (l) with respect to each of the foregoing Entities in clauses (a) through (k), each of their respective current and former directors, officers, members, employees, partners, managers, independent contractors, agents, representatives, principals, professionals, consultants, financial advisors, attorneys, accountants, investment bankers, and other professional advisors, each in their capacity as such; *provided that* no current or former Holder of Existing Interests, each in their capacity as such, is an Exculpated Party unless such Holder is also a Supporting Noteholder or current director, officer or employee of a Debtor or an Affiliate of a Debtor.

83. "*Executory Contract*" means a contract or lease to which one or more of the Debtors is a party that is subject to assumption or rejection under section 365 or 1123 of the Bankruptcy Code.

84. "*Existing Interests*" means the Interests in Bristow Parent.

85. "*Exit Facility*" means the secured credit facility that Reorganized Bristow Parent and/or certain other Reorganized Debtors will enter into on the Effective Date in accordance with the Exit Facility Credit Agreement, if the Debtors elect to enter into the Exit Facility instead of entering into the Amended and Restated 2019 Term Loan Credit Agreement.

86. "*Exit Facility Agent*" means the entity identified in the Plan Supplement as administrative and collateral agent under the Exit Facility Credit Agreement, solely in its capacity as such.

87. "*Exit Facility Credit Agreement*" means the agreement governing the Exit Facility, if any, which shall be subject to the consent rights of the Required RSA Parties on the terms set forth in the Restructuring Support Agreement.

88. "*Exit Facility Documents*" means, collectively, the Exit Facility Credit Agreement and any and all other agreements, documents, and instruments delivered or entered into in connection therewith, including any guarantee agreements, pledge and collateral agreements, intercreditor agreements, and other security documents, which shall be subject to the consent rights of the Required RSA Parties on the terms set forth in the Restructuring Support Agreement.

89. "*Exit Facility Lenders*" means those certain lenders from time to time party to the Exit Facility Credit Agreement, solely in their capacity as such.

90. "*Exit Facility Term Sheet*" means a term sheet describing the material terms of the Exit Facility Credit Agreement, if any, which shall be subject to the consent rights of the Required RSA Parties on the terms set forth in the Restructuring Support Agreement.

91. "*Federal Judgment Rate*" means the federal judgment rate in effect pursuant to 28 U.S.C. § 1961 as of the Petition Date, compounded annually.

92. "*File*," "*Filed*," and "*Filing*" means file, filed, or filing in the Chapter 11 Cases with the Bankruptcy Court.

93. "*Final Cash Collateral Order*" means the *Final Order (A) Authorizing the Debtors to Use Cash Collateral, (B) Granting Adequate Protection to the Prepetition Consenting Secured Parties, (C) Modifying the*

*Automatic Stay and (D) Granting Related Relief* [Docket No. 312], (as amended, modified, or supplemented from time to time in accordance with the terms thereof), which shall be subject to the consent rights of the Required RSA Parties on the terms set forth in the Restructuring Support Agreement.

94.    "*Final Decree*" means the decree contemplated under Bankruptcy Rule 3022.

95.    "*Final Order*" means an order or judgment of the Bankruptcy Court or other court of competent jurisdiction with respect to the relevant subject matter that has not been reversed, stayed, modified, or amended, and as to which the time to appeal or seek certiorari has expired and no appeal or petition for certiorari has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been or may be Filed has been resolved by the highest court to which the order or judgment could be appealed or from which certiorari could be sought or the new trial, reargument, or rehearing shall have been denied, resulted in no modification of such order, or has otherwise been dismissed with prejudice.

96.    "*General Unsecured Claim*" means any Claim against any of the Debtors that is not Secured and is not: (a) an Administrative Claim; (b) a Professional Fee Claim; (c) a Priority Tax Claim; (d) an Other Priority Claim; (e) an Unsecured Notes Claim; (f) a Trade Claim; (g) an Intercompany Claim; or (h) a Section 510(b) Claim.

97.    "*Governance Term Sheet*" means the term sheet attached to the Restructuring Term Sheet as **Exhibit 4**, which shall be subject to the consent rights of the Required RSA Parties on the terms set forth in the Restructuring Support Agreement.

98.    "*Governmental Unit*" has the meaning set forth in section 101(27) of the Bankruptcy Code.

99.    "*Guarantor Subsidiaries*" means, collectively, Bristow Helicopters Inc., BHNA Holdings, Inc., Bristow U.S. Leasing LLC, Bristow Alaska Inc. and Bristow U.S. LLC.

100.    "*GUC Distribution Cash Amount*" means an aggregate amount of Cash in an amount of $6.75 million, subject to increase to the extent of any portion of the Unsecured 4(a)(2) Distribution Cash Amount that is not distributed to eligible holders of Unsecured Notes Claims and General Unsecured Claims in accordance with the Plan.

101.    "*HeliFleet Stipulation*" means the *Stipulation and Agreed Order Between the Debtors and HeliFleet 2013-01, LLC Regarding (I) Settlement of Claims and (II) Related Matters* [Docket No. [●]].

102.    "*Holder*" means an Entity holding a Claim or Interest, as applicable.

103.    "*Impaired*" means, with respect to any Class of Claims or Interests, a Class of Claims or Interests that is impaired within the meaning of section 1124 of the Bankruptcy Code.

104.    "*Indemnification Obligations*" means each of the Debtors' indemnification provisions in place, whether in the Debtors' bylaws, certificates of incorporation, other formation documents, board resolutions, management or indemnification agreements, employment contracts, or otherwise, for the current and former directors, officers, managers, employees, attorneys, other professionals, and agents of the Debtors and such current and former directors', officers', and managers' respective Affiliates.

105.    "*Indenture Trustee Expenses*" means the reasonable and documented compensation, fees, out-of-pocket expenses, disbursements, and claims for indemnity, subrogation, and contribution incurred or owed to the Indenture Trustees, including, without limitation, reasonable and documented attorneys' fees, expenses and disbursements, whether prior to or after the Petition Date but in all cases before the Effective Date, in each case under the Indentures.

106.    "*Indenture Trustees*" means, collectively the Secured Notes Indenture Trustee, the Senior Notes Indenture Trustee, and the Convertible Notes Indenture Trustee.

12

107. "*Indentures*" means, collectively, the Secured Notes Indenture, the Senior Notes Indenture, and the Convertible Notes Indenture.

108. "*Initial Amended RSA*" means that certain Amended and Restated Restructuring Support Agreement dated as of June 27, 2019 that the Restructuring Support Agreement amends, restates and replaces in its entirety.

109. "*Initial MIP Amount*" means 4.0% of the New Stock on a fully diluted basis (of which 4.0%, 60% thereof shall be in grants of restricted units and 40% shall be in options).

110. "*Intercompany Claim*" means any Claim held by a Debtor against another Debtor.

111. "*Intercompany Interest*" means, other than an Interest in Bristow Parent, an Interest in one Debtor held by another Debtor.

112. "*Interest*" means any equity security (as defined in section 101(16) of the Bankruptcy Code) in any Debtor, including options, warrants, rights, restricted stock unit or other securities or agreements to acquire the common stock, preferred stock, limited liability company interests, or other equity, ownership or profits interests of any Debtor (whether or not arising under or in connection with any employment agreement, separation agreement or employee incentive plan or program of a Debtor as of the Petition Date).

113. "*Interim Compensation Order*" means the *Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses for Chapter 11 Case Professionals* [Docket No. 393] (as amended, modified, or supplemented from time to time in accordance with the terms thereof).

114. "*Key Employee Incentive Plan and Retention Payments Order*" means the *Order Authorizing and Approving Key Employee Incentive Plans and Non-Insider Retention Payments* [Docket No. 588] (as amended, modified, or supplemented from time to time in accordance with the terms thereof).

115. "*Lien*" has the meaning set forth in section 101(37) of the Bankruptcy Code.

116. "*Lombard (BALL) Term Loan*" means that certain prepetition pound sterling funded secured loan facility dated as of November 11, 2016, in the original principal amount of $90,000,000 U.S. dollar equivalent, among Bristow Aircraft Leasing Limited, as borrower, Lombard North Central PLC, as lender, and Bristow Parent and Bristow U.S. Leasing LLC, as guarantors.

117. "*Lombard (BALL) Term Loan Credit Agreement*" means the credit agreement governing the Lombard (BALL) Term Loan, dated as of November 11, 2016, among Bristow Aircraft Leasing Limited, as borrower, Lombard North Central PLC, as lender, and Bristow Parent and Bristow U.S. Leasing LLC, as guarantors.

118. "*Lombard (BALL) Term Loan Guarantee*" means the guarantees by Bristow Parent and Bristow U.S. Leasing LLC of the obligations under Lombard (BALL) Term Loan or the Lombard (BALL) Term Loan Credit Agreement.

119. "*Lombard (BALL) Term Loan Guarantee Claim*" means any Claim against Bristow Parent or Bristow U.S. Leasing LLC arising from or based upon the Lombard (BALL) Term Loan Guarantee.

120. "*Lombard (BULL) Term Loan*" means that certain prepetition pound sterling funded secured loan facility dated as of November 11, 2016, in the original principal amount of $110,000,000 U.S. dollar equivalent, among Bristow U.S. Leasing LLC, as borrower, Lombard North Central PLC, as lender, and Bristow Parent, as guarantor.

121. "*Lombard (BULL) Term Loan Claim*" means any Claim against any of the Debtors arising from or based upon the Lombard (BULL) Term Loan, the Lombard (BULL) Term Loan Guarantee or the Lombard (BULL) Term Loan Credit Agreement.

13

122. "*Lombard (BULL) Term Loan Credit Agreement*" means the credit agreement governing the Lombard (BULL) Term Loan, dated as of November 11, 2016, among Bristow U.S. Leasing LLC, as borrower, Lombard North Central PLC, as lender, and Bristow Parent, as guarantor.

123. "*Lombard (BULL) Term Loan Guarantee*" means the guarantee by Bristow Parent of the obligations under Lombard (BULL) Term Loan or the Lombard (BULL) Term Loan Credit Agreement.

124. "*Macquarie Parties*" means, collectively, Macquarie Bank Limited, Macquarie Leasing LLC and Macquarie Rotorcraft Leasing Holdings Limited and certain related owner trustees and affiliates.

125. "*Macquarie Settlement*" means the settlement between the Debtors and the Macquarie Parties that provides for, among other things, the assumption pursuant to section 365 of the Bankruptcy Code of certain leases between the Debtors and the Macquarie Parties, amendment of the Macquarie Term Loan Credit Facility and the Macquarie Term Loan Documents, the Allowance of certain Claims of the Macquarie Parties and the reimbursement of certain professional fees, all as set forth in the motion pursuant to Bankruptcy Rule 9019 seeking approval of such settlement.

126. "*Macquarie Settlement Order*" means the order entered by the Bankruptcy Court approving the Macquarie Settlement.

127. "*Macquarie Term Loan Credit Facility*" means that certain prepetition term loan facility dated as of February 1, 2017, in the original principal amount of $200,000,000, among Bristow U.S. LLC, as borrower, Macquarie Bank Limited, as administrative agent, and Bristow Parent, as guarantor.

128. "*Macquarie Term Loan Credit Facility Claim*" means any claim against any Debtor arising from or based upon the Macquarie Term Loan Credit Facility or the Macquarie Term Loan Guarantee.

129. "*Macquarie Term Loan Documents*" means the Macquarie Term Loan Credit Facility and all other "Loan Documents" as defined in the Macquarie Term Loan Credit Facility.

130. "*Macquarie Term Loan Guarantee*" means the guarantee by Bristow Parent of the obligations under the Macquarie Term Loan Credit Facility.

131. "*MAG Lease Documents*" means the leases, agreements and documents defined as "MAG Lease Documents" in the PK Air Credit Facility.

132. "*MAG Lease Obligations*" means the obligations under the MAG Lease Documents.

133. "*MAG Lease Obligation Claims*" means the claims against BriLog Leasing Ltd., Bristow Equipment Leasing Ltd., Bristow U.S. Leasing LLC, Bristow Parent or any other Debtor arising from or based upon the MAG Lease Documents.

134. "*Management Incentive Plan*" means a post-Effective Date management incentive plan for certain participating employees of the Reorganized Debtors and Affiliates to be established and implemented in accordance with Article IV.I of the Plan, which shall provide for the terms and conditions under which the MIP Pool may be allowed and distributed to certain participating employees of the Reorganized Debtors and Affiliates and shall be in accordance with the Restructuring Term Sheet.

135. "*MCA*" means the Maritime & Coastguard Agency, an executive agency of the United Kingdom.

136. "*MCA and Other Customer Guarantee Claims*" means the MCA Guarantee Claims and the Other Customer Guarantee Claims.

137. "*MCA Guarantee*" means the guarantee by Bristow Parent of the obligations of Bristow Helicopters Limited and its Affiliates under the UK SAR Contract.

138.     "*MCA Guarantee Claims*" means any Claim against Bristow Parent arising from or based upon the MCA Guarantee.

139.     "*Milestone Parties*" means, collectively, The Milestone Aviation Group Limited, PK Air, the "MAG Parties" as defined in the PK Air Credit Facility, GE Aviation, and their respective affiliates, including certain lessor trusts.

140.     "*Milestone Settlement*" means the settlement between the Debtors and the Milestone Parties that provides for, among other things, the assumption pursuant to section 365 of the Bankruptcy Code of the MAG Lease Documents, amendment of the PK Air Credit Facility, the Allowance of Claims of the Milestone Parties and the reimbursement of certain professional fees, all as set forth in the motion pursuant to Bankruptcy Rule 9019 seeking approval of such settlement.

141.     "*Milestone Settlement Order*" means the order entered by the Bankruptcy Court approving the Milestone Settlement, the form and substance of which shall be acceptable to the Milestone Parties and the Required RSA Parties on the terms set forth in the Restructuring Support Agreement.  The Debtors and the Milestone Parties have an agreement in principle which will be memorialized in a term sheet and submitted to the Bankruptcy Court for approval in a motion pursuant to Bankruptcy Rule 9019.  If the Bankruptcy Court fails to approve the Milestone Settlement and enter the Milestone Settlement Order on or before September 18, 2019 (or such later date as may be agreed to in writing by each of the Debtors, the Milestone Parties and the Required RSA Parties), the Debtors and the Milestone Parties will revert to their respective rights under the MAG Lease Documents, the PK Air Loan Documents and applicable law and the Milestone Parties shall be able to object to the Plan and Disclosure Statement on any grounds and otherwise exercise any rights and remedies available to them under  the MAG Lease Documents, the PK Air Loan Documents, the Bankruptcy Code and Convention on International Interests In Mobile Equipment and the Protocol to the Convention on International Interests in Mobile Equipment on Matters Specific to Aircraft Equipment.

142.     "*MIP Pool*" means a pool of stock-based awards, in the form of options, appreciation rights, restricted stock units, restricted stock, or similar awards, as applicable, representing at least 5% but no more than 10% of the aggregate amount of New Stock, determined on a fully diluted and fully distributed basis (with the ratio of New Common Stock to New Preferred Stock to be the same as the ratio of all New Common Stock to all New Preferred Stock held by the average Backstop Commitment Party), which shall be reserved for distribution to certain participating employees of the Reorganized Debtors or Affiliates pursuant to the Management Incentive Plan and shall be in accordance with the Restructuring Term Sheet.

143.     "*New Common Stock*" means the common stock of Reorganized Bristow Parent, which shall be subject to the consent rights of the Required RSA Parties on the terms set forth in the Restructuring Support Agreement.

144.     "*New Common Stock Agreement*" means the definitive documentation governing the terms and conditions of the New Common Stock, which shall be subject to the consent rights of the Required RSA Parties on the terms set forth in the Restructuring Support Agreement.

145.     "*New Organizational Documents*" means the form of the certificates or articles of incorporation, bylaws, or such other applicable formation documents, of each of the Reorganized Debtors, which shall be subject to the consent rights of the Required RSA Parties on the terms set forth in the Restructuring Support Agreement.

146.     "*New Preferred Stock*" means the preferred stock of Reorganized Bristow Parent, which shall have the terms and conditions set forth in the New Preferred Stock Term Sheet, which shall be subject to the consent rights of the Required RSA Parties on the terms set forth in the Restructuring Support Agreement.

147.     "*New Preferred Stock Agreement*" means the definitive documentation governing the terms and conditions of the New Preferred Stock, which shall be subject to the consent rights of the Required RSA Parties on the terms set forth in the Restructuring Support Agreement.

148.    "*New Preferred Stock Term Sheet*" means the term sheet attached to the Restructuring Term Sheet as **Exhibit 3**.

149.    "*New Shareholders' Agreement*" means the shareholders' agreement governing the rights of the Holders of New Stock on and after the Effective Date, which shareholders' agreement shall be consistent with the Governance Term Sheet, shall include reasonable and customary minority protection rights, and shall be subject to the consent rights of the Required RSA Parties on the terms set forth in the Restructuring Support Agreement, and the Debtors and the Required Backstop Parties shall consult with the Creditors' Committee regarding the terms of such shareholders' agreement.  Notwithstanding anything to the contrary in the Governance Term Sheet, the New Shareholders' Agreement shall provide that the Reorganized Debtors shall provide all holders of the New Stock with quarterly, unaudited financial statements, as well as management discussion and analysis materials regarding the financial condition and results of operations for the Reorganized Debtors with respect to such financial statements, subject to execution of standard confidentiality agreements with the Reorganized Debtors.

150.    "*New Stock*" means, collectively, the New Common Stock and the New Preferred Stock.  For the avoidance of doubt, to the extent necessary to ensure that the Reorganized Debtors are in compliance with the requirements of 49 U.S.C. § 40102(a)(15)(C), the Reorganized Debtors (subject to any consent rights set forth in the Restructuring Support Agreement) may issue New Warrants (in lieu of New Stock) to any Entity (other than a Backstop Party or a recipient from the MIP Pool) that is a Non-U.S. Citizen that would otherwise receive New Stock pursuant to the Plan.

151.    "*New Warrants*" means warrants for the New Stock, which shall be issued by the Reorganized Debtors in order to ensure compliance with the requirements of 49 U.S.C. § 40102(a)(15)(C), with the terms of such warrants to be governed by the New Warrant Agreement.

152.    "*New Warrant Agreement*" means the agreement governing the terms of the New Warrants, which shall be subject to the consent rights of the Required RSA Parties on the terms set forth in the Restructuring Support Agreement.

153.    "*Non-U.S. Citizen*" means a Holder of an Allowed Unsecured Notes Claim, General Unsecured Claim, or Secured Notes Claim that is not determined to be a U.S. Citizen under the procedure set forth in Article IV.E of this Plan.

154.    "*Original DIP Commitment Letter*" means that certain commitment letter, dated as of May 10, 2019, by and among Bristow Parent, Bristow Holdings Company Ltd. III and each of the institutions identified on Schedule 1 thereto, as the same may have been amended, supplemented or otherwise modified.

155.    "*Original RSA*" has the meaning ascribed to such term in the Restructuring Support Agreement.

156.    "*Other Customer Contract*" means any revenue-generating customer contract of one or more of the Debtors' non-debtor Affiliates that is set forth in the Schedule of Other Customer Contracts.

157.    "*Other Customer Guarantee*" means any guarantee by any of the Debtors of the obligations of one or more of its Affiliates under an Other Customer Contract.

158.    "*Other Customer Guarantee Claim*" means any Claim against any of the Debtors arising from or based upon an Other Customer Guarantee.

159.    "*Other Priority Claim*" means any Claim other than an Administrative Claim or a Priority Tax Claim entitled to priority in right of payment under section 507(a) of the Bankruptcy Code.

160.    "*Other Secured Claim*" means any Secured Claim against any of the Debtors, other than a Secured Notes Claim, a 2019 Term Loan Facility Claim, a Lombard (BULL) Term Loan Claim, a Macquarie Term Loan Credit Facility Claim, or a PK Air Credit Facility Claim.

16

161.    "*Person*" has the meaning set forth in section 101(41) of the Bankruptcy Code.

162.    "*Petition Date*" means May 11, 2019, the date on which the Debtors commenced the Chapter 11 Cases.

163.    "*PK Air*" means PK AirFinance S.à r.l, as agent, security trustee and MAG Agent under the PK Air Credit Facility.

164.    "*PK Air Credit Facility*" means that certain prepetition credit agreement dated as of July 17, 2017 in the original principal amount of $230,000,000 across 24 term loans, among Bristow Equipment Leasing Ltd., as borrower, PK Air, as agent, PK Transportation Finance Ireland Limited, as lender, and other lenders from time to time thereto.

165.    "*PK Air Credit Facility Claim*" means any claim against BriLog Leasing Ltd.,  Bristow Equipment Leasing Ltd.,  Bristow U.S. Leasing LLC, Bristow Parent or any other Debtor arising from or based upon the PK Air Loan Documents.

166.    "*PK Air Credit Facility Guarantee*" means the guarantee by Bristow Parent of the obligations under the PK Air Loan Documents.

167.    "*PK Air Loan Documents*" means, collectively, the PK Air Credit Facility, the PK Air Credit Facility Guarantee, related promissory notes, and all other agreements, documents, and instruments delivered or entered into in connection therewith, including any guarantee agreements, pledge and collateral agreements, aircraft mortgages, intercreditor agreements, security documents and other "Loan Documents" as defined in the PK Air Credit Facility.

168.    "*Plan*" means this joint chapter 11 plan (as it may be amended or supplemented from time to time, including all exhibits, schedules, supplements, appendices, annexes and attachments hereto), which shall be subject to the consent rights of the Required RSA Parties on the terms set forth in the Restructuring Support Agreement.

169.    "*Plan Supplement*" means the compilation of documents and forms of documents, schedules, and exhibits to the Plan, to be Filed by the Debtors no later than 7 days before the Voting Deadline, or such later date as may be approved by the Bankruptcy Court on notice to parties in interest (as such documents may be amended prior to the Effective Date by Filing such amended documents), including: (a) the material New Organizational Documents; (b) the Exit Facility Term Sheet, if applicable; (c) the Amended and Restated 2019 Term Loan Credit Agreement and material related documents, if applicable, and the identity of the Amended and Restated 2019 Term Loan Facility Agent; (d) the schedule of Retained Causes of Action; (e) a disclosure of the members of the Reorganized Bristow Parent Board and their compensation; (f) the Schedule of Assumed Executory Contracts and Unexpired Leases; (g) the Schedule of Rejected Executory Contracts and Unexpired Leases; (h) the Restructuring Transactions Exhibit, if needed; (i) a description of the material terms of the Management Incentive Plan; (j) the New Shareholders' Agreement; (k) the Schedule of Other Customer Contracts; (l) the New Preferred Stock Agreement; (m) the New Common Stock Agreement; (n) the terms of the Amended PK Air Credit Facility Agreement (to the extent not disclosed in the motion seeking approval of the Milestone Settlement); and (o) to the extent necessary in order to ensure compliance with 49 U.S.C. § 40102(a), the New Warrant Agreement, which shall in each case be subject to the consent rights of the Required RSA Parties on the terms set forth in the Restructuring Support Agreement.  The Debtors and the Required RSA Parties shall consult with the Creditors' Committee regarding the Plan Supplement documents, and the Plan Supplement documents shall be subject to the Committee Consent Right.  The Debtors shall have the right to amend the documents contained in, and exhibits to, the Plan Supplement through the Effective Date, subject to the terms of the Plan, the Restructuring Support Agreement and the Backstop Commitment Agreement, including the consent rights of the Required RSA Parties.

170.    "*Priority Tax Claim*" means any Claim of a Governmental Unit against any of the Debtors of the kind specified in section 507(a)(8) of the Bankruptcy Code.

171.    "*Pro Rata*" means the proportion that an Allowed Claim or Allowed Interest in a particular Class bears to the aggregate amount of the Allowed Claims or Allowed Interests in that respective Class, or the proportion

of the Allowed Claims or Allowed Interests in a particular Class and other Classes entitled to share in the same recovery as such Allowed Claim or Allowed Interests under the Plan.

172.    "*Professional*" means an Entity employed in the Chapter 11 Cases pursuant to a Bankruptcy Court order in accordance with sections 327, 363, or 1103 of the Bankruptcy Code and to be compensated for services rendered before or on the Effective Date, pursuant to sections 327, 328, 329, 330, or 331 of the Bankruptcy Code.

173.    "*Professional Fee Amount*" means the aggregate amount of Professional Fee Claims and other unpaid fees and expenses that Professionals estimate they have incurred or will incur in rendering services to the Debtors prior to and as of the Confirmation Date, which estimates Professionals shall deliver to the Debtors as set forth in Article II.B of the Plan.

174.    "*Professional Fee Claim*" means any Administrative Claim for the compensation of Professionals and the reimbursement of expenses incurred by such Professionals through and including the Confirmation Date to the extent such fees and expenses have not been paid pursuant to an order of the Bankruptcy Court.  To the extent the Bankruptcy Court denies or reduces by a Final Order any amount of a Professional's requested fees and expenses, then the amount by which such fees or expenses are reduced or denied shall reduce the applicable Professional Fee Claim.

175.    "*Professional Fee Escrow Account*" means an account funded by the Debtors with Cash on the Effective Date in an amount equal to the total estimated amount of the Professional Fee Amount as set forth in Article II.B of the Plan.

176.    "*Proof of Claim*" means a proof of Claim Filed against any of the Debtors in the Chapter 11 Cases by the applicable Claims Bar Date.

177.    "*Reinstate*," "*Reinstated*," or "*Reinstatement*" means, with respect to Claims or Interests, that the Claim or Interest shall be rendered Unimpaired in accordance with section 1124 of the Bankruptcy Code.

178.    "*Related Party*" means, collectively, current and former directors, managers, officers, shareholders, equity holders (regardless of whether such interests are held directly or indirectly), affiliated investment funds or investment vehicles, predecessors, participants, successors, assigns (whether by operation of law or otherwise), subsidiaries, current, former, and future affiliates, associated entities, managed entities, accounts or funds, partners, limited partners, general partners, principals, members, management companies, fund advisors, fiduciaries, trustees, employees, agents (including any Distribution Agent), advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, other representatives, and other professionals, representatives, advisors, predecessors, successors, and assigns, each solely in their capacities as such, solely in their capacity as such, and such entities' respective heirs, executors, estates, servants and nominees.

179.    "*Released Parties*" means, collectively, and in each case in its capacity as such: (a) the Debtors; (b) the Reorganized Debtors; (c) the DIP Facility Agent; (d) the DIP Facility Lenders; (e) the Backstop Commitment Parties; (f) the Holders of 2019 Term Loan Facility Claims; (g) the 2019 Term Loan Facility Agent; (h) the Amended and Restated 2019 Term Loan Facility Lenders; (i) the Amended and Restated 2019 Term Loan Facility Agent; (j) the Supporting Noteholders; (k) the Indenture Trustees; (l) the Exit Facility Lenders; (m) the Exit Facility Agent; (n) the Milestone Parties; (o) the Creditors' Committee and each of its current and former members; (p) each current and former Affiliate of each Entity in clause (a) through (o); and (q) each Related Party of each Entity in clause (a) through (p); *provided that* any holder of a Claim or Interest that (x) validly opts out of the releases contained in the Plan or (y) files an objection to the releases contained in the Plan shall not be a "Released Party."

180.    "*Releasing Parties*" means, collectively, and in each case in its capacity as such: (a) the Debtors; (b) the Reorganized Debtors; (c) the DIP Facility Agent; (d) the DIP Facility Lenders; (e) the Backstop Commitment Parties; (f) the Holders of 2019 Term Loan Facility Claims; (g) the 2019 Term Loan Facility Agent; (h) the Amended and Restated 2019 Term Loan Facility Lenders; (i) the Amended and Restated 2019 Term Loan Facility Agent; (j) the Supporting Noteholders; (k) the Indenture Trustees; (l) the Exit Facility Lenders; (m) the Exit Facility Agent; (n) all Holders of Claims; (o) all Holders of Interests; (p) the Milestone Parties; (q) the Creditors' Committee and each of its

current and former members; (r) each current and former Affiliate of each Entity in clause (a) through (q); and (s) each Related Party of each Entity in clause (a) through (r); *provided that* any holder of a Claim or Interest that (x) validly opts out of the releases contained in the Plan or (y) files an objection to the releases contained in the Plan shall not be a "Releasing Party"; *provided*, *further*, that for the avoidance of doubt, no Holder of a Claim that is party to or has otherwise signed the Restructuring Support Agreement may opt out of the releases.

181. "*Reorganized Bristow Parent*" means Bristow Parent, as reorganized pursuant to and under the Plan, on and after the Effective Date, or any successor or assign thereto.

182. "*Reorganized Bristow Parent Board*" means the board of directors of Reorganized Bristow Parent on and after the Effective Date.

183. "*Reorganized Debtors*" means the Debtors, as reorganized pursuant to and under the Restructuring Transactions, on and after the Effective Date, or any successors or assigns thereto.

184. "*Required Backstop Parties*" has the meaning ascribed to such term in the Restructuring Support Agreement.

185. "*Required DIP Lenders*" has the meaning ascribed to such term in the Restructuring Support Agreement.

186. "*Required RSA Parties*" means, with respect to any document, order, agreement or as otherwise used in this Plan, the applicable parties holding the applicable consent rights under the Restructuring Support Agreement (including section 2.02 thereof).

187. "*Restructuring Documents*" has the meaning ascribed to such term in the Restructuring Support Agreement. For the avoidance of doubt, Restructuring Documents shall include the Final Cash Collateral Order, the Disclosure Statement, the other solicitation materials with respect to the Plan, the Conditional Disclosure Statement Order, the Plan, each document included in the Plan Supplement, the Backstop Commitment Agreement, the Confirmation Order, the DIP Facility Credit Agreement, the DIP Order, the Exit Facility Credit Agreement, the Amended and Restated 2019 Term Loan Credit Agreement, the Amended PK Air Credit Facility Agreement, the New Organizational Documents, the Management Incentive Plan and the Rights Offering Procedures. Each of the Restructuring Documents shall comport with the terms of the Restructuring Support Agreement, including the applicable consent rights thereunder (including section 2.02 thereof). The Debtors and the Required RSA Parties shall consult with the Creditors' Committee regarding the Restructuring Documents, and the Restructuring Documents shall be subject to the Committee Consent Right.

188. "*Restructuring Support Agreement*" means that certain Second Amended and Restated Restructuring Support Agreement, entered into and dated as of July 24, 2019, by and among the Debtors and the Supporting Noteholders, including all exhibits, schedules and other attachments thereto, as such agreement may be amended from time to time in accordance with the terms thereof including pursuant to the Committee Joinder and which shall only be amended in accordance with the terms thereof, a copy of which is attached to the Disclosure Statement as **Exhibit B**.

189. "*Restructuring Term Sheet*" means the term sheet attached as **Exhibit A** to the Restructuring Support Agreement including all exhibits, schedules and other attachments thereto.

190. "*Restructuring Transactions*" mean those mergers, amalgamations, consolidations, arrangements, continuances, restructurings, transfers, conversions, dispositions, liquidations, dissolutions, or other corporate transactions that the Debtors and the Required RSA Parties reasonably determine to be necessary to implement the Plan.

191. "*Restructuring Transactions Exhibit*" means an exhibit, which may be included as needed in the Plan Supplement, that sets forth the steps to be carried out to effectuate the Restructuring Transactions on and after the Effective Date.

192.     "*Retained Causes of Action*" means those Causes of Action that shall vest in the Reorganized Debtors on the Effective Date, which, for the avoidance of doubt, shall not include any of the Causes of Action that are settled, released or exculpated under the Plan.  For the avoidance of doubt, and notwithstanding anything to the contrary under the Plan, any and all Causes of Action that the Debtors may hold against Columbia Helicopters, Inc. and its Related Parties shall be Retained Causes of Action.

193.     "*Rights Offering*" means, collectively, the 1145 Rights Offering and the 4(a)(2) Rights Offering, each of which shall be conducted in accordance with the Backstop Commitment Agreement, the Restructuring Support Agreement, and the applicable Rights Offering Procedures.

194.     "*Rights Offering Offerees*" means, collectively, (i) the Holders of Secured Notes Claims, (ii) the Holders of Unsecured Notes Claims that are Eligible 4(a)(2) Holders, (iii) the Holders of Unsecured Notes Claims that are **not** Eligible 4(a)(2) Holders and do **not** timely make the Unsecured Cash Out Election, and (iv) the Holders of General Unsecured Claims that do **not** timely make the Unsecured Cash Out Election.

195.     "*Rights Offering Participants*" means, collectively, the Rights Offering Offerees that duly subscribe for New Stock in accordance with the Rights Offering Procedures.

196.     "*Rights Offering and Cash Out Procedures*" means, collectively, the 1145 Rights Offering and Cash Out Election Procedures and the 4(a)(2) Rights Offering Procedures*,* as applicable, each of which shall be subject to (i) the consent rights of the Required RSA Parties on the terms set forth in the Restructuring Support Agreement, and (ii) the Committee Consent Rights.

197.     *Rights Offering Procedures*" means, collectively, the 1145 Rights Offering and Cash Out Election Procedures and the 4(a)(2) Rights Offering Procedures*,* as applicable, each of which shall be subject to (i) the consent rights of the Required RSA Parties on the terms set forth in the Restructuring Support Agreement, and (ii) the Committee Consent Rights.

198.     "*Rights Offering Stock*" means, collectively, the 1145 Rights Offering Stock and the 4(a)(2) Rights Offering Stock to be purchased by the Rights Offering Participants pursuant to the Rights Offering, which shall be equal to 58.22% of the New Stock on a fully-diluted basis (except for the New Stock to be issued pursuant to the Management Incentive Plan) and shall be payable 8.175% in New Preferred Stock and 91.825% in New Common Stock, subject to adjustment as set forth in the Backstop Commitment Agreement.  For the avoidance of doubt, the term "Rights Offering Stock" does not include the New Common Stock or New Preferred Stock issued on account of the Backstop Commitment Fee.

199.     "*Schedule of Assumed Executory Contracts and Unexpired Leases*" means the schedule (including any modifications or amendments thereto) of certain Executory Contracts and Unexpired Leases to be assumed by the Debtors pursuant to the Plan, which shall be subject to the consent rights of the Required RSA Parties on the terms set forth in the Restructuring Support Agreement.

200.     "*Schedule of Other Customer Contracts*" means the schedule (including any modifications or amendments thereto), if any, identifying the Other Customer Contracts.

201.     "*Schedule of Rejected Executory Contracts and Unexpired Leases*" means the schedule (including any amendments or modifications thereto), if any, of certain Executory Contracts and Unexpired Leases to be rejected by the Debtors pursuant to the Plan.

202.     "*Schedules*" means, collectively, the schedules of assets and liabilities and statements of financial affairs Filed by the Debtors pursuant to section 521 of the Bankruptcy Code.

203.     "*SEC*" means the Securities and Exchange Commission.

204.     "*Section 510(b) Claim*" means any claim against any of the Debtors that is subject to subordination under section 510(b) of the Bankruptcy Code.

205.    "*Secured*" or "*Secured Claim*" means, when referring to a Claim against any of the Debtors, a Claim that is: (a) secured by a lien on property in which any of the Debtors has an interest, which lien is valid, perfected, and enforceable pursuant to applicable law or by reason of a Bankruptcy Court order, or that is subject to a valid right of setoff pursuant to section 553 of the Bankruptcy Code, to the extent of the value of the creditor's interest in the Debtors' interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code; or (b) Allowed pursuant to the Plan, or separate order of the Bankruptcy Court, as a secured claim.

206.    "*Secured Noteholder Subscription Rights*" means the non-certificated rights to be distributed to each Holder of Secured Notes that will enable each Holder thereof to purchase its Pro Rata share of the Secured Rights Offering Stock, pursuant to the terms of the Rights Offering Procedures and the Backstop Commitment Agreement.

207.    "*Secured Notes*" means the 8.75% Senior Secured Notes due 2023, issued in an original principal amount of $350,000,000 pursuant to the Secured Notes Indenture.

208.    "*Secured Notes Ad Hoc Group*" has the meaning ascribed to such term in the Restructuring Support Agreement.

209.    "*Secured Notes Claim*" means any Claim against any of the Debtors arising from or based upon the Secured Notes or the Secured Notes Indenture.

210.    "*Secured Notes Indenture*" means that certain indenture, dated as of March 6, 2018, as amended, modified or supplemented from time to time, for the Secured Notes, among Bristow Parent, as issuer, the Guarantor Subsidiaries, as guarantors, and the Secured Notes Indenture Trustee, as trustee.

211.    "*Secured Notes Indenture Trustee*" means U.S. Bank National Association, and any successor thereto, solely in its capacity as trustee under the Secured Notes Indenture.

212.    "*Secured Rights Offering Stock*" means the amount of the New Stock distributed pursuant to the Rights Offering in exchange for $37.5 million.

213.    "*Securities Act*" means the Securities Act of 1933, 15 U.S.C. §§ 77a–77aa, together with the rules and regulations promulgated thereunder, as amended from time to time, or any similar federal, state, or local law.

214.    "*Security*" has the meaning set forth in section 2(a)(1) of the Securities Act. "*Securities*" shall have a correlative meaning.

215.    "*Senior Notes*" means the 6.25% Senior Notes due 2022, issued in an original principal amount of $450,000,000 pursuant to the Senior Notes Indenture.

216.    "*Senior Notes Indenture*" means that certain indenture, dated as of October 12, 2012, as amended, modified or supplemented from time to time, for the Senior Notes, among Bristow Parent, as issuer, the Guarantor Subsidiaries, as guarantors, and the Senior Notes Indenture Trustee, as trustee.

217.    "*Senior Notes Indenture Trustee*" means Wilmington Trust, National Association, and any successor thereto, solely in its capacity as trustee under the Senior Notes Indenture.

218.    "*Servicer*" means an agent or other authorized representative of Holders of Claims or Interests.

219.    "*Solicitation Agent*" means Prime Clerk LLC, the notice, claims, and solicitation agent retained by the Debtors in the Chapter 11 Cases.

220.    "*Solicitation Materials*" means, collectively, the solicitation materials with respect to the Plan.

221. "*Subscription Rights*" means, collectively, the 1145 Subscription Rights and the 4(a)(2) Subscription Rights.

222. "*Supporting Noteholders*" has the meaning ascribed to such term in the Restructuring Support Agreement.

223. "*Supporting Secured Noteholders*" has the meaning ascribed to such term in the Restructuring Support Agreement.

224. "*Supporting Unsecured Noteholders*" has the meaning ascribed to such term in the Restructuring Support Agreement.

225. "*Trade Claim*" means any Claim held by an ordinary course trade vendor of the Debtors against any of the Debtors on account of ordinary course goods and/or services provided to any of the Debtors, including any due but unpaid director fees as of the Petition Date. For the avoidance of doubt, Trade Claims shall not include any Claim arising from or based upon (1) rejection of any Executory Contract or Unexpired Lease, (2) the Debtors' prepetition return of any aircraft or any prepetition agreement or settlement with respect to any aircraft lease obligations, (3) any agreement or arrangement with any former insider (as of the Petition Date) of any Debtor or (4) any obligation in respect of deferred compensation plans for any participant that is not a current employee on the Effective Date.

226. "*Transaction Expenses*" has the meaning ascribed to such term in the Restructuring Support Agreement.

227. "*UK ABL Credit Facility*" means that certain asset based credit facility pursuant to the ABL Facilities Agreement, dated April 17, 2018, among Bristow Norway AS and Bristow Helicopters Limited, as borrowers, Barclays Bank PLC and Credit Suisse AG, Cayman Island Branch, as arrangers and bookrunners, Barclays Bank PLC as agent, issuing bank, security agent and swingline lender, and the several branches, other financial institutions and other lenders from time to time party thereto and Bristow Parent, as guarantor.

228. "*UK ABL Credit Facility Guarantee*" means the guarantee by Bristow Parent of the obligations of Bristow Norway AS and Bristow Helicopters Limited under the UK ABL Credit Facility.

229. "*UK ABL Credit Facility Guarantee Claim*" means any Claim against Bristow Parent arising from or based upon the UK ABL Credit Facility Guarantee.

230. "*UK SAR Contract*" means that certain contract between Bristow Helicopters Limited and MCA for the provision of search and rescue services in the United Kingdom on behalf of Her Majesty's Coastguard.

231. "*Unclaimed Distribution*" means any distribution under the Plan on account of an Allowed Claim to a Holder that has not: (a) accepted a particular distribution or, in the case of distributions made by check, negotiated such check; (b) given notice to the Reorganized Debtors of an intent to accept a particular distribution; (c) responded to the Debtors' or Reorganized Debtors' requests for information necessary to facilitate a particular distribution; or (d) taken any other action necessary to facilitate such distribution.

232. "*Unexpired Lease*" means a lease of nonresidential real property to which one or more of the Debtors is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

233. "*Unimpaired*" means, with respect to a Class of Claims or Interests, a Class of Claims or Interests that is not impaired within the meaning of section 1124 of the Bankruptcy Code.

234. "*Unsecured 1145 Rights Offering Stock*" means the amount of the Unsecured Rights Offering Stock that is also 1145 Rights Offering Stock.

235. "*Unsecured 1145 Subscription Rights*" means the non-certificated rights to be distributed to each Holder of an Unsecured Notes Claim or General Unsecured Claim, in each case, that has not timely made the Unsecured Cash Out Election, that will enable each Holder thereof to purchase its Pro Rata share of the Unsecured 1145 Rights Offering Stock, pursuant to the terms of the Rights Offering Procedures and the Backstop Commitment Agreement.

236. "*Unsecured 4(a)(2) Distribution Cash Amount*" means Cash in an amount of up to $250,000, *provided that* after all distributions of such amount have been completed as set forth in the Plan, any portion remaining shall be added to the GUC Distribution Cash Amount.

237. "*Unsecured 4(a)(2) Rights Offering Stock*" means the amount of the Unsecured Rights Offering Stock that is also 4(a)(2) Rights Offering Stock.

238. "*Unsecured 4(a)(2) Subscription Rights*" means the non-certificated rights to be distributed to each 4(a)(2) Eligible Holder of an Unsecured Notes Claim or General Unsecured Claim that has not timely made the Unsecured Cash Out Election, that will enable each Holder thereof to purchase its Pro Rata share of the Unsecured 4(a)(2) Rights Offering Stock, pursuant to the terms of the Rights Offering Procedures and the Backstop Commitment Agreement.

239. "*Unsecured Cash Out Election*" means the election to be made by (a) each holder of an General Unsecured Claim to receive the treatment under the Plan set forth in Article III.B.12.b.i.y or Article III.B.12.b.ii.y instead of the treatment under the Plan set forth in Article III.B.12.b.i.x or Article III.B.12.b.ii.x, as applicable, and (b) each holder of an Unsecured Notes Claim that is not a 4(a)(2) Eligible Holder to receive the treatment under the Plan set forth in Article III.B.8.b.ii.y instead of the treatment under the Plan set forth in Article III.B.8.b.ii.x, with such election being described in greater detail in the 1145 Rights Offering and Unsecured Cash Out Election Procedures.

240. "*Unsecured Equity Pool*" means New Common Stock in an amount equal to 11% of all New Stock on a fully-diluted basis (except for the New Stock to be issued pursuant to the Management Incentive Plan).

241. "*Unsecured Notes*" means, collectively, the Senior Notes and the Convertible Notes.

242. "*Unsecured Notes Ad Hoc Group*" has the meaning ascribed to such term in the Restructuring Support Agreement.

243. "*Unsecured Notes Claim*" means any Claim against any of the Debtors arising from or based upon the Senior Notes, the Senior Notes Indenture, the Convertible Notes, or the Convertible Notes Indenture.

244. "*Unsecured Notes Indenture Trustees*" means collectively, the Senior Notes Indenture Trustee and the Convertible Notes Indenture Trustee.

245. "*Unsecured Rights Offering Stock*" means the amount of the New Stock distributed pursuant to the Rights Offering in exchange for $347.5 million.

246. "*Unsubscribed Shares*" has the meaning ascribed to such term in the Backstop Commitment Agreement.

247. "*U.S. Trustee*" means the Office of the United States Trustee for the Southern District of Texas.

248. "*Voting Classes*" has the meaning ascribed to such term in the Conditional Disclosure Statement Order.

249. "*Voting Report*" means the report certifying the methodology for the tabulation of votes and result of voting under the Plan.

B.      *Rules of Interpretation*

For purposes herein:  (1) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (2) unless otherwise specified, any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions; (3) unless otherwise specified, any reference herein to an existing document, schedule, or exhibit, shall mean such document, schedule, or exhibit, as it may have been or may be amended, modified, or supplemented; (4) unless otherwise specified, all references herein to "Articles" and "Sections" are references to Articles and Sections, respectively, hereof or hereto; (5) the words "herein," "hereof," and "hereto" refer to the Plan in its entirety rather than to any particular portion of the Plan; (6) captions and headings to Articles and Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan; (7) unless otherwise specified herein, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (8) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to such term in the Bankruptcy Code or the Bankruptcy Rules, as applicable; (9) references to docket numbers of documents Filed in the Chapter 11 Cases are references to the docket numbers under the Bankruptcy Court's CM/ECF system; (10) all references to statutes, regulations, orders, rules of courts, and the like shall mean as amended from time to time, and as applicable to the Chapter 11 Cases, unless otherwise stated; (11) references to "shareholders," "directors," and/or "officers" shall also include "members" and/or "managers," as applicable, as such terms are defined under the applicable state limited liability company laws; (12) the words "include" and "including" and variations thereof shall not be deemed to be terms of limitation, and shall be deemed to be followed by the words "without limitation"; and (13) any immaterial effectuating provisions may be interpreted by the Debtors or the Reorganized Debtors in such a manner that is consistent with the overall purpose and intent of the Plan and without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity; *provided that* no effectuating provision shall be immaterial or deemed immaterial if it has any substantive legal or economic effect on any Person.

C.      *Computation of Time*

Unless otherwise specifically stated herein, the provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein.  If the date on which a transaction may occur pursuant to the Plan shall occur on a day that is not a Business Day, then such transaction shall instead occur on the next succeeding Business Day.  Any action to be taken on the Effective Date may be taken on or soon as reasonably practicable after the Effective Date.

D.      *Governing Law*

Except to the extent a rule of law or procedure is supplied by federal law (including the Bankruptcy Code or Bankruptcy Rules), and subject to the provisions of any contract, lease, instrument, release, indenture, or other agreement or document entered into expressly in connection herewith, the rights and obligations arising hereunder shall be governed by, and construed and enforced in accordance with, the laws of the State of New York, without giving effect to conflict of laws principles.

E.      *Reference to Monetary Figures*

All references in the Plan to monetary figures refer to currency of the United States of America, unless otherwise expressly provided.

F.      *Reference to the Debtors or the Reorganized Debtors*

Except as otherwise specifically provided in the Plan to the contrary, references in the Plan to the Debtors or to the Reorganized Debtors mean the Debtors and the Reorganized Debtors, as applicable, to the extent the context requires.

24

G.      *Controlling Document*

In the event of an inconsistency between the Plan and the Disclosure Statement, the terms of the Plan shall control in all respects. In the event of an inconsistency between the Plan and any document included in the Plan Supplement, the applicable Plan Supplement document shall control. In the event of an inconsistency between the Confirmation Order and any of the Plan, the Disclosure Statement, or the Plan Supplement, the Confirmation Order shall control.

## ARTICLE II.
## ADMINISTRATIVE AND PRIORITY CLAIMS

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, Professional Fee Claims, Priority Tax Claims, DIP Facility Claims and Other Priority Claims have not been classified and thus are excluded from the Classes of Claims and Interests set forth in Article III of the Plan.

A.      *Administrative Claims*

Except with respect to the Professional Fee Claims, DIP Facility Claims and Claims for fees and expenses pursuant to section 1930 of chapter 123 of title 28 of the United States Code, and except to the extent that a Holder of an Allowed Administrative Claim and the Debtor (with the consent of the Required RSA Parties, not to be unreasonably withheld) against which such Allowed Administrative Claim is asserted agree to less favorable treatment for such Holder, or such Holder has been paid by any Debtor on account of such Allowed Administrative Claim prior to the Effective Date, each Holder of such an Allowed Administrative Claim will receive in full and final satisfaction of its Allowed Administrative Claim an amount of Cash equal to the amount of such Allowed Administrative Claim in accordance with the following: (1) if an Administrative Claim is Allowed on or prior to the Effective Date, on the Effective Date or as soon as reasonably practicable thereafter (or, if not then due, when such Allowed Administrative Claim is due or as soon as reasonably practicable thereafter); (2) if such Administrative Claim is not Allowed as of the Effective Date, no later than 30 days after the date on which the Reorganized Debtors Allow such Allowed Administrative Claim or the date on which an order Allowing such Administrative Claim becomes a Final Order, or as soon as reasonably practicable thereafter, as applicable; (3) if such Allowed Administrative Claim is based on liabilities incurred by the Debtors in the ordinary course of their business after the Petition Date, in accordance with the terms and conditions of the particular transaction giving rise to such Allowed Administrative Claim without any further action by the Holder of such Allowed Administrative Claim; (4) at such time and upon such terms as may be agreed upon by such Holder and the Debtors or the Reorganized Debtors, as applicable; or (5) at such time and upon such terms as set forth in an order of the Bankruptcy Court.

Holders of Administrative Claims that are required to File and serve a request for payment of such Administrative Claims by the Administrative Claims Bar Date that do not File and serve such a request by the Administrative Claims Bar Date shall be forever barred, stopped, and enjoined from asserting such Administrative Claims against the Debtors or the Reorganized Debtors, and such Administrative Claims shall be deemed compromised, settled, and released as of the Effective Date. For the avoidance of doubt, Holders of DIP Facility Claims shall not be required to File or serve any request for payment of such DIP Facility Claims.

B.      *Professional Fee Claims*

Notwithstanding anything to the contrary herein, all final requests for payment of Professional Fee Claims for services rendered and reimbursement of expenses incurred during the period from the Petition Date through the Confirmation Date must be Filed with the Bankruptcy Court no later than 45 days after the Effective Date. The Bankruptcy Court shall determine the Allowed amounts of such Professional Fee Claims after notice and a hearing in accordance with the Bankruptcy Code, the Bankruptcy Rules, and any procedures established by the Bankruptcy Court. The Reorganized Debtors shall pay Professional Fee Claims in Cash in the amount the Bankruptcy Court Allows, including from the Professional Fee Escrow Account, which the Reorganized Debtors will establish in trust for the Professionals and fund with Cash equal to the Professional Fee Amount on the Effective Date. Professionals shall deliver to the Debtors their estimates for purposes of the Reorganized Debtors computing the Professional Fee Amount no later than 10 Business Days following the Confirmation Date. For the avoidance of doubt, no such estimate shall be deemed to limit the amount of the fees and expenses that are the subject of a Professional's final request for

25

payment of Professional Fee Claims Filed with the Bankruptcy Court. If a Professional does not provide an estimate, the Debtors may estimate the unpaid and unbilled fees and expenses of such Professional. No funds in the Professional Fee Escrow Account shall be property of the Estates, and the Professional Fee Escrow Account shall be maintained in trust solely for the benefit of Holders of Professional Fee Claims. Any funds remaining in the Professional Fee Escrow Account after all Allowed Professional Fee Claims have been paid shall be promptly turned over to the Reorganized Debtors.

From and after the Confirmation Date, any requirement that Professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Reorganized Debtors may employ and pay any Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court. The reasonable and documented fees and expenses incurred by the Professionals to the Creditors' Committee after the Confirmation Date until the complete dissolution of the Creditors' Committee for all purposes in accordance with Article XIII.D will be paid by the Debtors or the Reorganized Debtors, as applicable, in the ordinary course of business (and not later than 30 days after submission of invoices).

C.      *Priority Tax Claims*

Except to the extent that a Holder of an Allowed Priority Tax Claim and the Debtor (with the consent of the Required RSA Parties, not to be unreasonably withheld) against which such Allowed Priority Tax Claim is asserted agree to a less favorable treatment for such Holder, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Priority Tax Claim, each Holder of such Allowed Priority Tax Claim shall be treated in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code and, for the avoidance of doubt, Holders of Allowed Priority Tax Claims will receive interest on such Allowed Priority Tax Claims after the Effective Date in accordance with sections 511 and 1129(a)(9)(C) of the Bankruptcy Code.

D.      *DIP Facility Claims*

As of the Effective Date, the DIP Facility Claims shall be Allowed and deemed to be Allowed Claims in the full amount outstanding under the DIP Facility Credit Agreement and the DIP Order, including all principal, accrued and unpaid interest, and all accrued and unpaid fees, expenses, and noncontingent indemnity payable under the DIP Facility Credit Agreement or the DIP Order. Except to the extent that a Holder of an Allowed DIP Facility Claim agrees to a less favorable treatment, in full and final satisfaction, compromise, settlement, release, and discharge of, and in exchange for, each Allowed DIP Facility Claim, each such Holder shall receive its Pro Rata share of (i) payment in full in Cash of any accrued and unpaid interest, fees and expenses, (ii) the Equitization Consent Fee, payable at the election of each Holder of a DIP Facility Claim in New Common Stock or New Preferred Stock, and (iii) the Equitization Allocation New Stock, of which 8.175% shall be payable in New Preferred Stock and 91.825% shall be payable in New Common Stock, subject to adjustment as set forth in the Backstop Commitment Agreement. Upon receiving the treatment set forth in this paragraph, on the Effective Date, all Liens and security interests granted to secure the DIP Facility Claims shall be automatically terminated and of no further force and effect without any further notice to or action, order, or approval of the Bankruptcy Court or any other Entity.

E.      *Statutory Fees*

All fees due and payable pursuant to section 1930 of title 28 of the United States Code prior to the Effective Date shall be timely paid by the Debtors. On and after the Effective Date, the Reorganized Debtors shall timely pay any and all such fees when due and payable, and shall File with the Bankruptcy Court quarterly reports in a form reasonably acceptable to the U.S. Trustee. Each Debtor shall remain obligated to pay such quarterly fees to the U.S. Trustee until the earliest of that particular Debtor's case being closed, dismissed, or converted to a case under chapter 7 of the Bankruptcy Code.

**ARTICLE III.**
**CLASSIFICATION, TREATMENT, AND VOTING OF CLAIMS AND INTERESTS**

A.      *Classification of Claims and Interests*

The Plan constitutes a separate plan proposed by each Debtor within the meaning of section 1121 of the Bankruptcy Code; *provided that* the Debtors and the Reorganized Debtors, as applicable, shall consolidate Allowed Claims into one Estate for purposes of distributions for Classes 8 and 12. Except for the Claims addressed in Article II of the Plan, all Claims and Interests are classified in the Classes set forth below for all purposes, including voting, Confirmation, and distribution pursuant to the Plan, all in accordance with sections 1122 and 1123(a)(1) of the Bankruptcy Code. A Claim or an Interest is classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest qualifies within the description of such other Classes. A Claim or an Interest also is classified in a particular Class for the purpose of receiving distributions under the Plan only to the extent that such Claim or Interest is an Allowed Claim or Existing Interest in that Class and has not been paid, released, or otherwise satisfied or disallowed by Final Order prior to the Effective Date. Unless otherwise indicated, each Holder of an Allowed Claim or Interest, as applicable, shall receive such treatment on the Effective Date (or, if payment is not then due, in accordance with its terms in the ordinary course of business) or as soon as reasonably practicable thereafter, the timing of which shall be subject to the reasonable discretion of the Reorganized Debtors and the consent of the Required RSA Parties (not to be unreasonably withheld). For all purposes under the Plan, each Class will contain sub-Classes for each of the Debtors, as applicable; *provided*, that any Class that does not contain any Allowed Claims or Existing Interests with respect to a particular Debtor will be treated in accordance with Article III.D below.

Below is a chart assigning each Class a number for purposes of identifying each separate Class.

| Class | Claim or Interest | Status | Voting Rights |
|---|---|---|---|
| 1 | Other Secured Claims | Unimpaired | Deemed to Accept |
| 2 | Other Priority Claims | Unimpaired | Deemed to Accept |
| 3 | 2019 Term Loan Facility | Impaired | Entitled to Vote |
| 4 | Secured Notes Claims | Impaired | Entitled to Vote |
| 5 | Lombard (BULL) Term Loan Claims | Unimpaired | Deemed to Accept |
| 6 | PK Air Credit Facility Claims and MAG Lease Obligation Claims | Impaired | Entitled to Vote |
| 7 | Macquarie Term Loan Credit Facility Claims | Impaired | Entitled to Vote |
| 8 | Unsecured Notes Claims | Impaired | Entitled to Vote |
| 9 | Lombard (BALL) Term Loan Guarantee Claims and UK ABL Credit Facility Guarantee Claims | Unimpaired | Deemed to Accept |
| 10 | MCA and Other Customer Guarantee Claims | Unimpaired | Deemed to Accept |
| 11 | Trade Claims | Unimpaired | Deemed to Accept |
| 12 | General Unsecured Claims | Impaired | Entitled to Vote |
| 13 | Intercompany Claims | Unimpaired, or Impaired | Deemed to Accept, or Presumed to Reject |

27

| Class | Claim or Interest | Status | Voting Rights |
|-------|-------------------|--------|---------------|
| 14 | Intercompany Interests | Unimpaired, or Impaired | Deemed to Accept, or Presumed to Reject |
| 15 | Existing Interests | Impaired | Presumed to Reject |
| 16 | Section 510(b) Claims | Impaired | Presumed to Reject |

B.  *Treatment of Classes of Claims and Interests*

1. Class 1 — Other Secured Claims

   a. *Classification*: Class 1 consists of all Other Secured Claims.

   b. *Treatment*: Each Holder of an Allowed Other Secured Claim shall receive, in full and final satisfaction of such Allowed Other Secured Claim, at the option of the applicable Debtor (with the consent of the Required RSA Parties, not to be unreasonably withheld), either:

      i. payment in full in Cash;

      ii. delivery of the Collateral securing any such Allowed Other Secured Claim;

      iii. Reinstatement of such Allowed Other Secured Claim, notwithstanding any contractual provision or applicable non-bankruptcy law that entitles the holder of such claim to demand or to receive payment prior to the stated maturity of such Allowed Other Secured Claim from and after the occurrence of default; or

      iv. such other treatment rendering such Allowed Other Secured Claim Unimpaired.

   c. *Voting*: Class 1 is Unimpaired. Holders of Allowed Other Secured Claims in Class 1 are conclusively deemed to have accepted the Plan under section 1126(f) of the Bankruptcy Code. Holders of Allowed Other Secured Claims in Class 1 are not entitled to vote to accept or reject the Plan.

2. Class 2 — Other Priority Claims

   a. *Classification*: Class 2 consists of all Other Priority Claims.

   b. *Treatment*: Each Holder of an Allowed Other Priority Claim shall receive, in full and final satisfaction of such Allowed Other Priority Claim, at the option of the applicable Debtors (with the consent of the Required RSA Parties, not to be unreasonably withheld), either:

      i. Cash in an amount equal to such Allowed Other Priority Claim; or

      ii. such other treatment rendering such Allowed Other Priority Claim Unimpaired.

   c. *Voting*: Class 2 is Unimpaired. Holders of Allowed Other Priority Claims in Class 2 are conclusively deemed to have accepted the Plan under section 1126(f) of the Bankruptcy Code. Holders of Allowed Other Priority Claims in Class 2 are not entitled to vote to accept or reject the Plan.

3. Class 3 — 2019 Term Loan Facility Claims

   a. *Classification*: Class 3 consists of all 2019 Term Loan Facility Claims.

28

b. *Treatment*: As of the Effective Date, the 2019 Term Loan Facility Claims shall be Allowed and deemed to be Allowed Claims in the full amount outstanding under the 2019 Term Loan Facility Credit Agreement, the DIP Order and the Final Cash Collateral Order, including all principal, accrued and unpaid interest, and all accrued and unpaid fees, expenses, and noncontingent indemnity payable under the 2019 Term Loan Facility Credit Agreement, the DIP Order and the Final Cash Collateral Order. In full and final satisfaction of each Allowed 2019 Term Loan Facility Claim, each Holder of an Allowed 2019 Term Loan Facility Claim shall either:

    i. if the Debtors enter into the Exit Facility on or prior to the Effective Date, receive payment in full in Cash; or

    ii. if the Debtors do not enter into the Exit Facility on or prior to the Effective Date, (x) have its Allowed 2019 Term Loan Facility Claim Reinstated and governed by the Amended and Restated 2019 Term Loan Credit Agreement, and (y) receive its Pro Rata share of the 2019 Term Loan Amendment Fee.

c. *Voting*: Class 3 is Impaired. Holders of Allowed 2019 Term Loan Facility Claims in Class 3 are entitled to vote to accept or reject the Plan.

4. <u>Class 4 — Secured Notes Claims</u>

a. *Classification*: Class 4 consists of all Secured Notes Claims.

b. *Treatment*: As of the Effective Date, the Secured Notes Claims shall be Allowed and deemed to be Allowed Claims in the full amount outstanding under the Secured Notes Indenture, the DIP Order and the Final Cash Collateral Order, including all principal, accrued and unpaid interest, and all accrued and unpaid fees, expenses, and noncontingent indemnity payable under the Secured Notes Indenture, the DIP Order and the Final Cash Collateral Order. In full and final satisfaction of each Secured Notes Claim, each Holder of an Allowed Secured Notes Claim shall receive (i) payment in full in Cash of any accrued and unpaid prepetition and postpetition interest at the non-default contract rate (except to the extent otherwise paid as adequate protection pursuant to the Final Cash Collateral Order and not recharacterized or otherwise avoided, but ***not*** including any make-whole or prepayment premium), (ii) after giving effect to the immediately preceding clause (i), Cash in an amount equal to 97% of the outstanding amount of such Allowed Secured Notes Claim ***and*** (iii) such Holder's Pro Rata share of the Secured Noteholder Subscription Rights.

c. *Voting*: Class 4 is Impaired. Holders of Allowed Secured Notes Claims in Class 4 are entitled to vote to accept or reject the Plan.

5. <u>Class 5 — Lombard (BULL) Term Loan Claims</u>

a. *Classification*: Class 5 consists of all Lombard (BULL) Term Loan Claims.

b. *Treatment*: In full and final satisfaction of each Lombard (BULL) Term Loan Claim, all Allowed Lombard (BULL) Term Loan Claims shall be Reinstated.

c. *Voting*: Class 5 is Unimpaired. Holders of Allowed Lombard (BULL) Term Loan Claims in Class 5 are conclusively deemed to have accepted the Plan under section 1126(f) of the Bankruptcy Code. Holders of Allowed Lombard (BULL) Term Loan Claims in Class 5 are not entitled to vote to accept or reject the Plan.

29

6.    Class 6 — PK Air Credit Facility Claims and MAG Lease Obligation Claims

   a.    *Classification*:  Class 6 consists of all PK Air Credit Facility Claims and MAG Lease Obligation Claims.

   b.    *Treatment*:  As of the date of entry of the Milestone Settlement Order, the PK Air Credit Facility Claims and the MAG Lease Obligation Claims shall be Allowed in full and reinstated as and to the extent set forth in the Milestone Settlement Order.  The Allowed PK Credit Facility Claims and MAG Lease Obligation Claims shall be satisfied in accordance with the Milestone Settlement Order, and Allowed PK Air Credit Facility Claims and MAG Lease Obligation Claims, the PK Air Facility Loan Documents shall be amended and the MAG Lease Documents shall be assumed and cured pursuant to, and in accordance with, and to the extent provided for in, the Milestone Settlement and the Milestone Settlement Order, and such PK Air Facility Loan Documents and MAG Lease Documents shall be reinstated and vest with, and be binding on, the Reorganized Debtors as and to the extent set forth in the Milestone Settlement Order.  The Milestone Parties and PK Air shall retain all security interests, guarantees and share charges that secure the PK Air Credit Facility Claims and MAG Lease Obligation Claims as and to the extent set forth in the Milestone Settlement Order.

   c.    *Voting*:  Class 6 is Impaired.  Holders of PK Air Credit Facility Claims and MAG Lease Obligation Claims in Class 6 are entitled to vote to accept or reject the Plan.

7.    Class 7 — Macquarie Term Loan Credit Facility Claims

   a.    *Classification*:  Class 7 consists of all Macquarie Term Loan Credit Facility Claims.

   b.    *Treatment*:  In full and final satisfaction of all Allowed Macquarie Term Loan Credit Facility Claims, such Allowed Macquarie Term Loan Credit Facility Claims shall be Reinstated, or shall receive such other treatment as may be agreed upon by such Holders, the Debtors, and the Required Backstop Parties.  The Macquarie Term Loan Credit Facility and the other Macquarie Term Loan Documents shall be amended in accordance with, and to the extent provided for in, the Macquarie Settlement Order and shall be reinstated and vest with, and be binding on, the Reorganized Debtors as and to the extent set forth in the Macquarie Settlement Order.

   c.    *Voting*:  Class 7 is Impaired.  Holders of Allowed Macquarie Term Loan Credit Facility Claims in Class 7 are entitled to vote to accept or reject the Plan.

8.    Class 8 — Unsecured Notes Claims

   a.    *Classification*:  Class 8 consists of all Unsecured Notes Claims.

   b.    *Treatment*: Each holder of an Allowed Unsecured Notes Claim shall receive, in full and final satisfaction of all Allowed Unsecured Notes Claims:

      i.    if such Holder **is** a 4(a)(2) Eligible Holder, its Pro Rata[2] share of (x) the Unsecured Equity Pool, (y) the Unsecured 1145 Subscription Rights, and (z) the Unsecured 4(a)(2) Subscription Rights; or

---

[2]    For the treatment set forth in this Section III.B.8.i, the Pro Rata amounts shall be calculated as follows: for the treatment set forth in (x) and (y), the Pro Rata amounts shall be calculated as the Pro Rata share of all Allowed Unsecured Notes Claims and all Allowed General Unsecured Claims, in each case, that do not make the Unsecured Cash Out Election (including the failure to timely return an election notice), and for the treatment set forth in (z), the Pro Rata amount shall be calculated as the Pro Rata share of all Allowed Unsecured Notes Claims and all Allowed General Unsecured Claims, in each case, that are held

30

      ii.      if such Holder is **not** a 4(a)(2) Eligible Holder, either:

      (x) if such Holder **does not** timely make the Unsecured Cash Out Election (including the failure to timely return an election notice), its Pro Rata[3] share of (A) the Unsecured Equity Pool, (B) *solely if such Holder fully exercises its Unsecured 1145 Subscription Rights*, the Unsecured 4(a)(2) Distribution Cash Amount (up to a maximum of 7.6% of such Holder's Unsecured Notes Claims), and (C) the Unsecured 1145 Subscription Rights; or

      (y) if such Holder **does** timely make the Unsecured Cash Out Election, its Pro Rata[4] share of the GUC Distribution Cash Amount.

    c.    *Voting*: Class 8 is Impaired. Holders of Allowed Unsecured Notes Claims in Class 8 are entitled to vote to accept or reject the Plan.

9.    <u>Class 9 – Lombard (BALL) Term Loan Guarantee Claims and UK ABL Credit Facility Guarantee Claims</u>

    a.    *Classification*: Class 9 consists of all Lombard Guarantee Claims and UK ABL Facility Guarantee Claims.

    b.    *Treatment*: In full and final satisfaction of each Lombard (BALL) Term Loan Guarantee Claim and UK ABL Credit Facility Guarantee Claim, all Allowed Lombard (BALL) Term Loan Guarantee Claims and Allowed UK ABL Credit Facility Guarantee Claims shall be Reinstated.

    c.    *Voting*: Class 9 is Unimpaired. Holders of Allowed Lombard (BALL) Term Loan Guarantee Claims and Allowed UK ABL Credit Facility Guarantee Claims in Class 9 are conclusively deemed to have accepted the Plan under section 1126(f) of the Bankruptcy Code. Holders of Lombard (BALL) Term Loan Guarantee Claims and UK ABL Credit Facility Guarantee Claims in Class 9 are not entitled to vote to accept or reject the Plan.

10.    <u>Class 10 – MCA and Other Customer Guarantee Claims</u>

    a.    *Classification*: Class 10 consists of all MCA and Other Customer Guarantee Claims.

    b.    *Treatment*: In full and final satisfaction of each MCA and Other Customer Guarantee Claim, all Allowed MCA and Other Customer Guarantee Claims shall be Reinstated.

    c.    *Voting*: Class 10 is Unimpaired. Holders of Allowed MCA and Other Customer Guarantee Claims in Class 10 are conclusively deemed to have accepted the Plan under section

---

by 4(a)(2) Eligible Holders and that do not make the Unsecured Cash Out Election (including the failure to return an election notice).

[3] For the treatment set forth in this <u>Section III.B.8.b.ii.x</u>, the Pro Rata amounts shall be calculated as follows: for the treatment set forth in (A) and (C), the Pro Rata amount shall be calculated as the Pro Rata share of all Allowed Unsecured Notes Claims and all Allowed General Unsecured Claims, in each case, that do not make the Unsecured Cash Out Election (including the failure to timely return an election notice); and for the treatment set forth in (B), the Pro Rata amount shall be calculated as the Pro Rata share of all Allowed Unsecured Notes Claims and all Allowed General Unsecured Claims, in each case, that are not held by 4(a)(2) Eligible Holders and that do not make the Unsecured Cash Out Election (including the failure to timely return an election notice).

[4] For the treatment set forth in this <u>Section III.B.ii.y</u>, the Pro Rata amounts shall be calculated as the Pro Rata share of all Allowed Unsecured Notes Claims held by Holders that are not a 4(a)(2) Eligible Holder and Allowed General Unsecured Claims, and, in each case, that timely make the Unsecured Cash Out Election.

31

1126(f) of the Bankruptcy Code. Holders of Allowed MCA and Other Customer Guarantee Claims in Class 10 are not entitled to vote to accept or reject the Plan.

11. <u>Class 11 — Trade Claims</u>

    a.    *Classification*: Class 11 consists of all Trade Claims.

    b.    *Treatment*: Each Holder of an Allowed Trade Claim shall receive, in full and final satisfaction of such Allowed Trade Claim, payment in full of such Allowed General Unsecured Claim on the Effective Date or otherwise in the ordinary course of the Debtors' business.

    c.    *Voting*: Class 11 is Unimpaired. Holders of Allowed General Unsecured Claims in Class 11 are conclusively deemed to have accepted the Plan under section 1126(f) of the Bankruptcy Code. Holders of Allowed General Unsecured Claims in Class 11 are not entitled to vote to accept or reject the Plan.

12. <u>Class 12 — General Unsecured Claims</u>

    a.    *Classification*: Class 12 consists of all General Unsecured Claims.

    b.    *Treatment*: Each Holder of a General Unsecured Claim shall receive, in full and final satisfaction of such Allowed General Unsecured Claim:

        i.    if such Holder **is** a 4(a)(2) Eligible Holder, either:

        (x) if such Holder **does not** timely make the Unsecured Cash Out Election, its Pro Rata[5] share of (A) the Unsecured Equity Pool (B) the Unsecured 1145 Subscription Rights, and (C) the Unsecured 4(a)(2) Subscription Rights; or

        (y) if such Holder **does** timely make the Unsecured Cash Out Election, its Pro Rata[6] share of the GUC Distribution Cash Amount.

        ii.    if such Holder is **not** a 4(a)(2) Eligible Holder, either:

        (x) if such Holder **does not** timely make the Unsecured Cash Out Election, its Pro Rata[7] share of (A) the Unsecured Equity Pool, (B) ***solely if such Holder fully exercises its Unsecured 1145 Subscription Rights***, the Unsecured 4(a)(2)

---

[5]   For the treatment set forth in this <u>Section III.B.12.b.i.x</u>, the Pro Rata amounts shall be calculated as follows: for the treatment set forth in (A) and (B), the Pro Rata amount shall be calculated as the Pro Rata share of all Allowed Unsecured Notes Claims and all Allowed General Unsecured Claims, in each case, that do not make the Unsecured Cash Out Election (including the failure to timely return an election notice), and for the treatment set forth in (C), the Pro Rata amount shall be calculated as the Pro Rata share of all Allowed Unsecured Notes Claims and all Allowed General Unsecured Claims, in each case that are held by 4(a)(2) Eligible Holders and that do not make the Unsecured Cash Out Election (including the failure to timely return an election notice).

[6]   For the treatment set forth in this <u>Section III.B.12.b.i.y</u>, the Pro Rata amounts shall be calculated as the Pro Rata share of all Allowed Unsecured Notes Claims held by Holders that are not a 4(a)(2) Eligible Holder and Allowed General Unsecured Claims, in each case, that timely make the Unsecured Cash Out Election.

[7]   For the treatment set forth in this <u>Section III.B.12.b.ii.x</u>, the Pro Rata amounts shall be calculated as follows: for the treatment set forth in (A) and (C), the Pro Rata amount shall be calculated as the Pro Rata share of all Allowed Unsecured Notes Claims and all Allowed General Unsecured Claims, in each case, that do not make the Unsecured Cash Out Election (including the failure to timely return an election notice); and for the treatment set forth in (B), the Pro Rata amount shall be calculated as the Pro Rata share of all Allowed Unsecured Notes Claims and all Allowed General Unsecured Claims, in each case, that are not held by 4(a)(2) Eligible Holders and that do not make the Unsecured Cash Out Election (including the failure to timely return an election notice).

Distribution Cash Amount (up to a maximum of 7.6% of such Holder's General Unsecured Claims), and (C) the Unsecured 1145 Subscription Rights; or

(y) if such Holder **does** timely make the Unsecured Cash Out Election, its Pro Rata[8] share of the GUC Distribution Cash Amount.

c.   *Voting*: Class 12 is Impaired.  Holders of Allowed General Unsecured Claims in Class 12 are entitled to vote to accept or reject the Plan.

13.   Class 13 — Intercompany Claims

a.   *Classification*:  Class 13 consists of all Intercompany Claims.

b.   *Treatment*:  Unless otherwise provided for under the Plan, Intercompany Claims shall, at the election of the Required RSA Parties, be Reinstated, compromised, or cancelled.

c.   *Voting*: Class 13 is either Unimpaired, in which case the Holders of Allowed Intercompany Claims in Class 13 are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code, or Impaired and not receiving any distribution under the Plan, in which case the Holders of such Allowed Intercompany Claims in Class 13 are presumed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, each Holder of an Allowed Intercompany Claim in Class 13 will not be entitled to vote to accept or reject the Plan.

14.   Class 14 — Intercompany Interests

a.   *Classification*:  Class 14 consists of all Intercompany Interests.

b.   *Treatment*:  Unless otherwise provided for under the Plan, Intercompany Claims shall, at the election of the Required RSA Parties, be Reinstated solely to maintain the Debtors' corporate structure, compromised, or cancelled.

c.   *Voting*: Class 14 is either Unimpaired, in which case the Holders of Allowed Intercompany Interests in Class 14 are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code, or Impaired and not receiving any distribution under the Plan, in which case the Holders of such Allowed Intercompany Interests in Class 14 are presumed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, each Holder of an Allowed Intercompany Interest in Class 14 will not be entitled to vote to accept or reject the Plan.

15.   Class 15 — Existing Interests

a.   *Classification*: Class 15 consists of all Existing Interests.

b.   *Treatment*:  Each Existing Interest shall be cancelled, released, and expunged and shall be of no further force and effect.  Each Holder of an Existing Interest shall not receive any distribution on account of such Existing Interest.

c.   *Voting*: Class 15 is Impaired and not receiving any distribution under the Plan.  Holders of Existing Interests in Class 15 are presumed to have rejected the Plan pursuant to section

---

[8]   For the treatment set forth in this Section III.B.12.b.ii.y, the Pro Rata amounts shall be calculated as the Pro Rata share of all Allowed Unsecured Notes Claims held by Holders that are not a 4(a)(2)Eligible Holder and all Allowed General Unsecured Claims and, in each case, that timely make the Unsecured Cash Out Election.

1126(g) of the Bankruptcy Code. Therefore, such Holders are not entitled to vote to accept or reject the Plan.

16. Class 16 — Section 510(b) Claims.

    a. *Classification*: Class 16 consists of all Section 510(b) Claims.

    b. *Treatment*: Section 510(b) Claims will be canceled, released, and extinguished as of the Effective Date, and will be of no further force or effect, and each Holder of a Section 510(b) Claim will not receive any distribution on account of such Section 510(b) Claim.

    c. *Voting*: Class 16 is Impaired and not receiving any distribution under the Plan. Holders of Section 510(b) Claims in Class 16 are presumed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, such Holders are not entitled to vote to accept or reject the Plan.

C. *Special Provision Governing Unimpaired Claims*

Except as otherwise provided in the Plan, nothing under the Plan shall affect the Debtors' or the Reorganized Debtors' rights regarding any Unimpaired Claim, including all rights regarding legal and equitable defenses to, or setoffs or recoupments against, any such Unimpaired Claim.

D. *Elimination of Vacant Classes*

Any Class of Claims or Interests that does not have a Holder of an Allowed Claim or Allowed Interest, or a Claim or Interest temporarily Allowed by the Bankruptcy Court as of the date of the Confirmation Hearing, shall be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

E. *Voting Classes; Presumed Acceptance by Non-Voting Classes*

If a Class contains Claims eligible to vote on the Plan and no Holder of Claims eligible to vote in such Class votes to accept or reject the Plan, the Plan shall be presumed accepted by the Holders of such Claims in such Class.

F. *Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code*

Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of Confirmation by acceptance of the Plan by at least one Impaired Class of Claims. The Debtors shall seek Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class(es) of Claims or Interests. The Debtors reserve the right to modify the Plan in accordance with Article XI of the Plan to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification, including by modifying the treatment applicable to a Class of Claims or Interests to render such Class of Claims or Interests Unimpaired to the extent permitted by the Restructuring Support Agreement, the Backstop Commitment Agreement, the Bankruptcy Code and the Bankruptcy Rules.

G. *Intercompany Interests*

To the extent Reinstated under the Plan, the Intercompany Interests shall be Reinstated for the ultimate benefit of the Holders of Claims that receive New Common Stock and New Preferred Stock under the Plan, and the Intercompany Interests shall receive no recovery or distribution. For the avoidance of doubt, to the extent Reinstated pursuant to the Plan, on and after the Effective Date, all Intercompany Interests shall be owned by the same Reorganized Debtor that corresponds with the Debtor that owned such Intercompany Interests prior to the Effective Date (subject to any modifications in the Restructuring Transactions Exhibit).

H.      *Substantive Consolidation; GUC Cash Distribution Amount*

The Plan is being proposed as a joint plan of reorganization of the Debtors for administrative purposes only and constitutes a separate chapter 11 plan of reorganization for each Debtor. The Plan is not premised upon the substantive consolidation of the Debtors with respect to the Classes of Claims or Interests set forth in the Plan; *provided that* the Debtors and the Reorganized Debtors, as applicable, shall consolidate Allowed Claims into one Estate for purposes of distributions for Classes 8 and 12.

I.      *Subordinated Claims and Interests*

The allowance, classification, and treatment of all Allowed Claims and Allowed Interests and their respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise. Pursuant to section 510 of the Bankruptcy Code, the Debtors or Reorganized Debtors, as applicable, reserve the right to re-classify any Allowed Claim or Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

## ARTICLE IV.
### PROVISIONS FOR IMPLEMENTATION OF THE PLAN

A.      *General Settlement of Claims, Interests, and Causes of Action*

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, upon the Effective Date, the provisions of the Plan shall constitute a good faith compromise and settlement of all Claims, Interests, Causes of Action, and controversies released, settled, compromised, discharged, satisfied, or otherwise resolved pursuant to the Plan. The Plan shall be deemed a motion, proposed by the Debtors and joined by the Supporting Noteholders and the Creditors' Committee to approve the good-faith compromise and settlement of all Claims, Interests, Causes of Action, and controversies pursuant to Bankruptcy Rule 9019, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise and settlement of all such Claims, Interests, Causes of Action, and controversies, as well as a finding by the Bankruptcy Court that such compromise and settlement is in the best interests of the Debtors, their Estates, and Holders of Claims and Interests and is fair, equitable, reasonable, and in the best interests of the Debtors and their Estates.

B.      *Restructuring Transactions*

On the Effective Date or as soon as reasonably practicable thereafter, the Reorganized Debtors shall consummate the Restructuring Transactions and take all actions reasonably acceptable to the Required RSA Parties as may be necessary or appropriate to effectuate the Restructuring Transactions, including: (1) the execution and delivery of any appropriate agreements or other documents of merger, consolidation, restructuring, conversion, disposition, transfer, formation, organization, dissolution, or liquidation containing terms that are consistent with the terms of the Plan and the Restructuring Support Agreement, and that satisfy the requirements of applicable law and any other terms to which the applicable Entities may agree, including the documents comprising the Plan Supplement and the New Organizational Documents; (2) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan and the Restructuring Support Agreement and having other terms for which the applicable Entities may agree; (3) the execution, delivery and filing, if applicable, of appropriate certificates or articles of incorporation, formation, reincorporation, merger, consolidation, conversion, or dissolution pursuant to applicable state law, including any applicable New Organizational Documents; (4) such other transactions that are required to effectuate the Restructuring Transactions; and (5) all other actions that the applicable Entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law.

## C. *Employee and Retiree Benefits*

Unless otherwise provided herein, and subject to Article V hereof, all employee wages and Compensation and Benefits Programs in place as of the Effective Date with the Debtors shall be assumed by the Reorganized Debtors and shall remain in place as of the Effective Date, and the Reorganized Debtors will continue to honor such agreements, arrangements, programs, and plans.  For the avoidance of doubt, pursuant to section 1129(a)(13) of the Bankruptcy Code, from and after the Effective Date, all retiree benefits (as such term is defined in section 1114 of the Bankruptcy Code), if any, shall continue to be paid in accordance with applicable law.

## D. *Issuance and Distribution of New Stock*

All Existing Interests shall be cancelled on the Effective Date and Reorganized Bristow Parent shall issue the New Stock to Holders of Claims and Interests entitled to receive New Stock pursuant to the Plan, the Rights Offering, the DIP Order, or the Backstop Commitment Agreement (including the Backstop Commitment Fee and the Equitization Consent Fee), in each case in the proportions set forth in the Plan and the Restructuring Support Agreement.  The issuance of New Stock shall be duly authorized without the need for any further corporate action and without any further action by the Debtors or the Reorganized Debtors or by Holders of any Claims or Interests, as applicable.  All New Stock issued under the Plan shall be duly authorized, validly issued, fully paid, and non-assessable.  All distributions of New Stock shall be made in accordance with all applicable regulatory requirements, including with respect to any limitations on foreign ownership of the New Stock.  Accordingly, in no event will Non-U.S. Citizens be entitled to own in the aggregate more than twenty-four and nine-tenths percent (24.9%) of the total number of outstanding shares of New Stock.

On the Effective Date, Reorganized Bristow Parent and all Holders of the New Stock then outstanding shall be deemed to be parties to the New Shareholders' Agreement, substantially in the form contained in the Plan Supplement, without the need for execution by any such Holder.  On the Effective Date, the New Shareholders' Agreement shall be binding on the Reorganized Debtors and all parties receiving, and all Holders of, the New Stock.

## E. *Determination of Holder Citizenship*

The Debtors or the Required Backstop Parties may require that a Holder of an Unsecured Notes Claim, General Unsecured Claim, or Secured Notes Claim demonstrate that it is a U.S. Citizen to the extent necessary to ensure that the Reorganized Debtors are in compliance with the requirements of 49 U.S.C. § 40102(a)(15)(C).  If a Holder of an Unsecured Notes Claim, General Unsecured Claim, or Secured Notes Claim furnishes a Citizenship Certification (or other evidence that such Holder is a U.S. Citizen) to the Debtors or the Required Backstop Parties on or before the Distribution Record Date and, after review, the Debtors and the Required Backstop Parties, in their reasonable discretion, accept such Citizenship Certification (or other evidence) as reasonable proof to establish that such Holder is a U.S. Citizen, such Holder will receive New Stock representing all of such holder's entitlement to the New Stock under the Plan and the Backstop Commitment Agreement; *provided, however,* that if such Holder is a Non-U.S. Citizen, or if the Holder fails to furnish a Citizenship Certification to the Debtors on or before the Distribution Record Date, or if the Citizenship Certification of such Holder has not been accepted or has been rejected by the Debtors or the Required Backstop Parties in their reasonable discretion on or before the date that is 10 Business Days after the Distribution Record Date, such Holder will be treated as a Non-U.S. Citizen for all purposes hereunder and under the Plan; *provided,* the issuance of any New Warrants (in lieu of New Stock) to any Holder that is a Non-U.S. Citizen shall be subject to any consent rights set forth in the Restructuring Support Agreement.  In connection with the Debtors' review of any Citizenship Certification, the Debtors or the Required Backstop Parties will have the right to require the Holder furnishing the Citizenship Certification to provide the Debtors with such documentation and other information as they may reasonably request as proof confirming that the holder is a U.S. Citizen.  The Debtors and the Required Backstop Parties will treat all such documentation and information provided by a Holder as confidential; *provided, that,* the Debtors and the Required Backstop Parties will share such information with the

Creditors' Committee on a confidential basis and will work cooperatively with the Creditors' Committee with respect to citizenship issues.

F.      *Rights Offering*

The Debtors or Reorganized Debtors, as applicable, shall allocate the Subscription Rights for the Rights Offering to the Rights Offering Offerees as set forth in the Plan and the Rights Offering Procedures.  Pursuant to the Backstop Commitment Agreement, the Rights Offering Procedures, and the Plan, the Rights Offering shall be open to all Rights Offering Participants.

Upon exercise of the Subscription Rights by the Rights Offering Participants pursuant to the terms of the Backstop Commitment Agreement, the Rights Offering Procedures, and the Plan, the Reorganized Debtors shall be authorized to issue the New Stock in accordance with the Plan, the Backstop Commitment Agreement, and the Rights Offering Procedures.

Pursuant to the Backstop Commitment Agreement, the Backstop Commitment Parties shall purchase any Rights Offering Stock not subscribed to by Rights Offering Participants as set forth in the Backstop Commitment Agreement.  On the Effective Date, the rights and obligations of the Debtors under the Backstop Commitment Agreement shall vest in the Reorganized Debtors.

The Rights Offering will be comprised of the 1145 Rights Offering and the 4(a)(2) Rights Offering.  The Rights Offering will be conducted on a Pro Rata basis in reliance upon one or more exemptions from registration under the Securities Act, which will include the exemption provided in section 1145 of the Bankruptcy Code to the fullest extent available and, to the extent such exemption is not available (and with respect to the New Common Stock, only in the proportion required to preserve the availability of such exemption under section 1145 of the Bankruptcy Code), the exemption from registration set forth in Section 4(a)(2) of the Securities Act and/or Regulation D promulgated thereunder or another available exemption from registration under the Securities Act.

In addition, on the Distribution Date, New Stock in an amount equal to the Backstop Commitment Fee shall be distributed to the Backstop Commitment Parties under and as set forth in the Backstop Commitment Agreement.

G.      *The Exit Facility, the Amended and Restated 2019 Term Loan Facility and the Amended PK Air Loan Documents*

On the Effective Date, the applicable Reorganized Debtors shall enter into (a) either the Exit Facility Documents or the Amended and Restated 2019 Term Loan Documents, as applicable, and (b) unless the Milestone Settlement Order provides otherwise, the Amended PK Air Loan Documents, including any documents required in connection with the creation or perfection of Liens in connection therewith.  The Confirmation Order shall include approval of (a) either (i) the Exit Facility and the Exit Facility Documents or (ii) the Amended and Restated 2019 Term Loan Facility and the Amended and Restated 2019 Term Loan Documents, as applicable and (b) the Amended PK Air Loan Documents, all transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred and fees paid by the Reorganized Debtors in connection therewith, authorization of the Reorganized Debtors to enter into, execute, and perform under (a) either the Exit Facility Documents or the Amended and Restated 2019 Term Loan Documents, as applicable, and (b) the Amended PK Air Loan Documents, and all related documents and agreements to the extent a party thereto, and authorization for the Reorganized Debtors to create or perfect the Liens in connection therewith.

(a) Either the Exit Facility Documents or the Amended and Restated 2019 Term Loan Documents, as applicable, and (b) the Amended PK Air Loan Documents, shall constitute legal, valid, binding, and authorized obligations of the Reorganized Debtors, enforceable in accordance with their terms.  The financial accommodations to be extended pursuant to either (a) the Exit Facility Documents or the Amended and Restated 2019 Term Loan Documents, as applicable, and (b) the Amended PK Air Credit Facility, are being extended, and shall be deemed to have been extended, in good faith, for legitimate business purposes, are reasonable, shall not be subject to any Claims, Causes of Action, avoidance, reduction, recharacterization, subordination (whether contractual or otherwise), cross claim, disallowance, impairment, objection, or challenges under any applicable law or regulation by any Person for

37

any purposes whatsoever, and shall not constitute preferential transfers, fraudulent transfers, obligations, or conveyances, or other voidable transfers or obligations under the Bankruptcy Code or any other applicable non-bankruptcy law.

The lenders under the Exit Facility or the Amended and Restated 2019 Term Loan Facility, as applicable, and the Amended PK Air Credit Facility, shall have valid, binding, and enforceable Liens on the Collateral (or other property identified as "Collateral" therein) specified in, and to the extent required by, the Exit Facility Documents or the Amended and Restated 2019 Term Loan Documents, as applicable, and the Amended PK Air Credit Facility Agreement, as applicable. To the extent granted, the guarantees, mortgages, pledges, Liens and other security interests granted pursuant to either the Exit Facility Documents or the Amended and Restated 2019 Term Loan Documents, as applicable, are granted in good faith as an inducement to the lenders under either the Exit Facility or the Amended and Restated 2019 Term Loan Facility, as applicable, to extend credit thereunder and shall be deemed not to constitute a fraudulent conveyance or fraudulent transfer, shall not otherwise be subject to avoidance, recharacterization, or subordination (whether contractual or otherwise) for any purposes whatsoever, and the priorities of any such Liens and security interests shall be as set forth in the relevant Exit Facility Documents or the Amended and Restated 2019 Term Loan Documents, as applicable. The Reorganized Debtors and the persons and entities granted such Liens are authorized to make all filings and recordings, and to obtain all governmental approvals and consents necessary to establish and perfect such Liens under the provisions of the applicable state, provincial, federal, or other law (whether domestic or foreign) that would be applicable in the absence of the Plan and the Confirmation Order, and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such Liens to third parties.

H.      *Rights Offering Per Share Price*

All issuances of New Stock pursuant to the Rights Offerings, Backstop Commitment Agreement, DIP Credit Agreement and DIP Order shall be issued at a per share purchase price of $36.37 (for the avoidance of doubt, with respect to the Backstop Commitment Fee, the Equitization Allocation New Stock, or the Equitization Consent Fee, such purchase price is an implied price and no new purchase shall occur).

I.      *Management Incentive Plan*

On the Effective Date, the Initial MIP Amount shall be implemented and effective as part of the Management Incentive Plan on terms and conditions agreed to by the compensation committee of Bristow Parent, the Required Supporting Secured Noteholders, the Required Supporting Unsecured Noteholders and the Required Backstop Parties. Additionally, following the Effective Date, the Reorganized Bristow Parent Board shall determine the terms and conditions of the Management Incentive Plan in excess of the Initial MIP Amount, which, in the aggregate and inclusive of the Initial MIP Amount, shall be between 5.0% and 10.0% of the New Stock on a fully diluted basis (with the ratio of such New Common Stock and New Preferred Stock to be the same as the ratio of all New Common Stock to New Preferred Stock held by the average Backstop Commitment Party as set forth in the Restructuring Support Agreement).

J.      *Management of Reorganized Bristow*

The Debtors' current management team shall remain in their current positions after consummation of the Restructuring Transactions, and the Debtors shall either (a) enter into new employment agreements with their current management team in connection with the Restructuring Transactions, or (b) assume the Management Severance Benefits Plan, dated June 4, 2014 as amended and restated May 1, 2019, and as further amended to provide that Tier 1, 2 and 3 employees execute Participation Agreements imposing non-competition obligations on severance, good reason rights and a minimum term, and further that in each case, such agreements shall be on terms and conditions that are reasonably acceptable to the Debtors and the Required RSA Parties.

K.      *Exemption from Registration Requirements*

The offering, issuance, and distribution of any Securities pursuant to the Plan, including the New Stock, will be exempt from the registration requirements of section 5 of the Securities Act or any similar federal, state, or local

law in reliance on (1) with respect to the New Common Stock issued as part of the Unsecured Common Equity Pool, or in connection with the 1145 Rights Offering, section 1145 of the Bankruptcy Code or, only to the extent such exemption under section 1145 of the Bankruptcy Code is not available, any other available exemption from registration under the Securities Act, (2) with respect to the New Common Stock and New Preferred Stock issued in connection with the 4(a)(2) Rights Offering, section (4)(a)(2) of the Securities Act or Regulation D promulgated thereunder and (3) with respect to the New Common Stock and New Preferred Stock issued on account of (x) the Backstop Commitment Fee, (y) Equitization Allocation New Common Stock and Equitization Allocation New Preferred Stock, and (z) the Equitization Consent Fee, section 1145 of the Bankruptcy Code.

Pursuant to section 1145 of the Bankruptcy Code, the New Common Stock and New Preferred Stock issued under the Plan may be sold without registration under the Securities Act by the recipients thereof, subject to: (1) only with respect to the New Common Stock issued as part of the Unsecured Common Equity Pool, or in connection with the 1145 Rights Offering, or the New Stock issued on account of the Backstop Commitment Fee, the Equitization Allocation New Common Stock, the Equitization Allocation New Preferred Stock, and the Equitization Consent Fee, the provisions of section 1145(b)(1) of the Bankruptcy Code relating to the definition of an underwriter in section 2(a)(11) of the Securities Act and compliance with any applicable state or foreign securities laws, if any, and the rules and regulations of the SEC, if any, applicable at the time of any future transfer of such Securities or instruments; (2) only with respect to the New Common Stock and New Preferred Stock issued in connection with the 4(a)(2) Rights Offering, section 4(a)(2) of the Securities Act or Regulation D promulgated thereunder, the requirements of the applicable provisions of Rule 144 or Rule 144A or any other registration exemption under the Securities Act; (3) any other applicable regulatory approval; and (4) the transfer restrictions set forth in the New Shareholders' Agreement and the New Organizational Documents, if any. All shares of New Common Stock and New Preferred Stock issued on account of (x) the Backstop Commitment Fee, (y) the Equitization Allocation New Common Stock and Equitization Allocation New Preferred Stock, and (z) the Equitization Consent Fee, will be issued without registration under the Securities Act or any similar federal, state, or local law in reliance on section 1145 of the Bankruptcy Code. All Unsubscribed Shares of New Common Stock and New Preferred Stock issued to the Backstop Commitment Parties pursuant to the Backstop Commitment Agreement (other than shares of New Common Stock and New Preferred Stock issued on account of the Backstop Commitment Fee) will be issued without registration under the Securities Act or any similar federal, state, or local law in reliance on section 4(a)(2) of the Securities Act or Regulation D promulgated thereunder.

Persons who purchase the New Common Stock or the New Preferred Stock pursuant to the exemption from registration set forth in section 4(a)(2) of the Securities Act or Regulation D promulgated thereunder will hold "restricted securities." Resales of such restricted securities would not be exempted by section 1145 of the Bankruptcy Code from registration under the Securities Act or other applicable law. Holders of restricted securities would, however, be permitted to resell New Common Stock or New Preferred Stock without registration if they are able to comply with the applicable provisions of Rule 144 or Rule 144A or any other registration exemption under the Securities Act, or if such securities are registered with the Securities and Exchange Commission.

The New Common Stock issued as part of the Unsecured Common Equity Pool and the 1145 Rights Offering Stock shall be reflected through the facilities of DTC, and neither the Debtors, the Reorganized Debtors, nor any other Person shall be required to provide any further evidence other than the Plan or the Confirmation Order with respect to the treatment of such New Common Stock under applicable securities laws.

DTC shall be required to accept and conclusively rely upon the Plan or Confirmation Order in lieu of a legal opinion regarding whether the New Common Stock issued as part of the Unsecured Common Equity Pool or the 1145 Rights Offering Stock are exempt from registration and/or eligible for DTC book-entry delivery, settlement, and depository services.

Notwithstanding anything to the contrary in the Plan, no entity (including, for the avoidance of doubt, DTC) shall be entitled to require a legal opinion regarding the validity of any transaction contemplated by the Plan, including, for the avoidance of doubt, whether New Common Stock issued as part of the Unsecured Common Equity Pool or the 1145 Rights Offering Stock are exempt from registration and/or eligible for DTC book-entry delivery, settlement, and depository services.

L.       *Vesting of Assets*

Except as otherwise provided in the Plan or in any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement, on the Effective Date, all property in each Debtor's Estate, all Causes of Action, and any property acquired by each of the Debtors under the Plan shall vest in each respective Reorganized Debtor, free and clear of all Liens, Claims, charges, or other encumbrances.  On and after the Effective Date, except as otherwise provided in the Plan, each Reorganized Debtor may operate its business and may use, acquire, or dispose of property and pursue, compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

M.       *Cancellation of Instruments, Certificates, and Other Documents*

Except as otherwise provided in the Plan or any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement, on the Effective Date, (a) all notes, instruments, Certificates, and other documents evidencing Claims or Interests, including the Indentures, (b) if the Debtors enter into the Exit Facility, the 2019 Term Loan Credit Agreement, and (c) any other credit agreements and indentures, shall be terminated and canceled and the obligations of the Debtors thereunder or in any way related thereto shall be deemed satisfied in full and discharged and the Indenture Trustees shall be released from all duties thereunder without any need for further action or approval by the Bankruptcy Court or any Holder or other person.  In addition to the foregoing, the Indentures and the 2019 Term Loan Credit Agreement shall survive the occurrence of the Effective Date and shall continue in effect solely to the extent necessary to: (i) allow a disbursing agent, the 2019 Term Loan Facility Agent or the Indenture Trustees to make distributions under the Plan to the Holders of Secured Notes Claims, Unsecured Notes Claims and 2019 Term Loan Facility Claims, as applicable; (ii) allow the Debtors, the Reorganized Debtors,  the Indenture Trustees and the 2019 Term Loan Facility Agent to make post-Effective Date distributions or take such other action pursuant to the Plan on account of Allowed Secured Notes Claims, Allowed Unsecured Notes Claims and Allowed 2019 Term Loan Facility Claims, as applicable, and to otherwise exercise their rights and discharge their obligations relating to the interests of the Holders of such Claims in accordance with the Plan; (iii) allow the Indenture Trustees and the 2019 Term Loan Facility Agent to enforce their rights, claims and interests vis-à-vis any parties other than the Debtors; (iv) allow the Indenture Trustees and the 2019 Term Loan Facility Agent to maintain or assert any rights it may have against the distributions to Holders of Secured Notes Claims, Unsecured Notes Claims and 2019 Term Loan Facility Claims, as applicable pursuant to the terms of the Indentures or 2019 Term Loan Facility Credit Agreement, as applicable, for the payment of outstanding fees, expenses and indemnification obligations arising under (and due pursuant to the terms of) the Indentures; *provided that* except as expressly provided in this Section IV.M, nothing in this Section IV.M shall affect the discharge of Claims pursuant to the Bankruptcy Code, the Confirmation Order or the Plan or result in any liability or expense to the Reorganized Debtors; (v) permit the Indenture Trustees and the 2019 Term Loan Facility Agent to assert their respective charging liens; (vi) permit the Indenture Trustees and the 2019 Term Loan Facility Agent to appear in the Chapter 11 Cases; and (vii) allow the Indenture Trustees and the 2019 Term Loan Facility Agent to maintain any right of indemnification, contribution, subrogation or any other claim or entitlement they may have under the applicable Indentures and 2019 Term Loan Facility Credit Agreement.  Except for the foregoing with respect to such other rights of the Indenture Trustees that survive the Indentures, the Indenture Trustees and their respective agents shall be relieved of all further duties and responsibilities related to the Indentures and the Plan.

Notwithstanding anything to the contrary contained in the Plan, on or after the Effective Date, all duties and responsibilities of the 2019 Term Loan Facility Agent arising under or related to the 2019 Term Loan Facility Credit Agreement shall be discharged except to the extent required in order to effectuate the Plan.  For the avoidance of doubt and notwithstanding the foregoing, nothing contained in the Plan shall in any way limit or affect the standing of the 2019 Term Loan Facility Agent to appear and be heard in the Chapter 11 Cases on and after the Effective Date.  The 2019 Term Loan Facility Agent shall be entitled to reimbursement of reasonable and documented fees and expenses (including reasonable and documented fees and expenses of its professionals) incurred in connection with the matters set forth in this Section IV.M.

If the record holder of the Secured Notes or Unsecured Notes is DTC or its nominee or another securities depository or custodian thereof, and such Secured Notes or Unsecured Notes are represented by a global security held by or on behalf of DTC or such other securities depository or custodian, then each such Holder of the Secured Notes

or Unsecured Notes shall be deemed to have surrendered such Holder's note, debenture or other evidence of indebtedness upon surrender of such global security by DTC or such other securities depository or custodian thereof.

N.     *Corporate Action*

On and after the Effective Date, all actions contemplated by the Plan are and shall be deemed authorized and approved by the Bankruptcy Court in all respects without any further corporate or equity holder action, including, as applicable:  (1) the adoption, execution, and/or filing of the New Organizational Documents and the New Shareholders' Agreement; (2) the selection of the directors, managers, and officers for the Reorganized Debtors, including the appointment of the Reorganized Bristow Parent Board; (3) the authorization, issuance, entry into and distribution, as applicable, of the Exit Facility, the Amended and Restated 2019 Term Loan Facility, the Amended PK Air Credit Facility Agreement, the New Common Stock and the New Preferred Stock and the execution, delivery, and filing of any documents pertaining thereto, as applicable; (4) the rejection, assumption, or assumption and assignment, as applicable, of Executory Contracts and Unexpired Leases; (5) the formation of any Entities pursuant to the Restructuring Transactions; (6) the implementation of the Restructuring Transactions, including any transaction contemplated by the Restructuring Transactions Exhibit; (7) the adoption of the Management Incentive Plan by the Reorganized Bristow Parent Board; and (8) all other actions contemplated by the Plan (whether to occur before, on, or after the Effective Date).  Upon the Effective Date, all matters provided for in the Plan involving the corporate structure of the Reorganized Debtors, and any corporate, partnership, limited liability company, or other governance action required by the Debtors or the Reorganized Debtors in connection with the Plan shall be deemed to have occurred and shall be in effect, without any requirement of further corporate or other action by any Security holders, members, directors, or officers of the Debtors or Reorganized Debtors, as applicable.

On or before the Effective Date, as applicable, the appropriate directors and officers of the Debtors or the Reorganized Debtors shall be (or shall be deemed to have been) authorized and (as applicable) directed to issue, execute, and deliver the agreements, documents, Securities, and instruments contemplated by the Plan (or necessary or desirable to effectuate the Restructuring Transactions) in the name of and on behalf of the Reorganized Debtors, including and any and all other agreements, documents, Securities, and instruments relating to the foregoing, to the extent not previously authorized by the Bankruptcy Court.  The authorizations and approvals contemplated by this Article IV.N shall be effective notwithstanding any requirements under non-bankruptcy law.

O.     *Corporate Existence*

Except as otherwise provided in the Plan or any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement, on the Effective Date, each Debtor shall continue to exist after the Effective Date as a separate corporation, limited liability company, partnership, or other form of entity, as the case may be, with all the powers of a corporation, limited liability company, partnership, or other form of entity, as the case may be, pursuant to the applicable law in the jurisdiction in which each applicable Debtor is incorporated or formed and pursuant to the respective certificate of incorporation and by-laws (or other analogous formation documents) in effect before the Effective Date, except to the extent such certificate of incorporation or bylaws (or other analogous formation, constituent or governance documents) is amended by the Plan or otherwise, and to the extent any such document is amended, such document is deemed to be amended pursuant to the Plan and requires no further action or approval (other than any requisite filings required under applicable state or federal law).  Notwithstanding the foregoing, the Debtors reserve the right to modify the Debtors' corporate structure as of the Effective Date, including by merger or liquidation of any Reorganized Debtor or otherwise.

P.     *New Organizational Documents*

On the Effective Date, or as soon thereafter as is reasonably practicable, the Reorganized Debtors' certificates of incorporation and bylaws (and other formation and constituent documents relating to limited liability companies) shall be amended or amended and restated, as applicable, as may be required to be consistent with the provisions of the Plan, the Restructuring Support Agreement (including the Governance Term Sheet) the New Organizational Documents, as applicable, and the Bankruptcy Code.  To the extent required under the Plan or applicable nonbankruptcy law, the Reorganized Debtors will file their respective New Organizational Documents with the applicable Secretaries of State and/or other applicable authorities in their respective states, provinces, or countries of incorporation in accordance with the corporate laws of the respective states, provinces, or countries of incorporation.

41

The New Organizational Documents shall, among other things: (1) authorize the issuance of the New Common Stock and the New Preferred Stock; and (2) pursuant to and only to the extent required by section 1123(a)(6) of the Bankruptcy Code, include a provision prohibiting the issuance of non-voting equity Securities. After the Effective Date, each Reorganized Debtor may amend and restate its certificate of incorporation and other formation and constituent documents as permitted by the laws of its respective jurisdiction of formation and the terms of the New Organizational Documents. It is currently expected that the Reorganized Debtors' organizational documents will be amended immediately following Confirmation to incorporate provisions that preclude foreign control and prevent foreign ownership of the Reorganized Debtors from exceeding specified limitations required by U.S. federal law governing air carriers. These amendments will involve safeguards to ensure that at no time will the Reorganized Debtors (including Reorganized Bristow Parent) be out of compliance with the foreign ownership limitations contained in such laws.

Q. *Effectuating Documents; Further Transactions*

On and after the Effective Date, the Reorganized Debtors and the officers and members of the boards of directors and managers (or other relevant governing body) thereof, including the Reorganized Bristow Parent Board, shall be authorized to and may issue, execute, deliver, file, or record such contracts, Securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan, including the Amended PK Air Credit Facility Agreement, the Exit Facility Credit Agreement and the Amended and Restated 2019 Term Loan Credit Agreement, as applicable, and the Securities issued pursuant to the Plan in the name of and on behalf of the Reorganized Debtors, without the need for any approvals, authorizations, or consents except for those expressly required under the Plan.

R. *Section 1146(a) Exemption*

To the fullest extent permitted by section 1146(a) of the Bankruptcy Code, any transfers (whether from a Debtor to a Reorganized Debtor or to any other Person) of property under the Plan (including the Restructuring Transactions) or pursuant to: (1) the issuance, distribution, transfer, or exchange of any debt, equity Security, or other interest in the Debtors or the Reorganized Debtors; (2) the creation, modification, consolidation, termination, refinancing, and/or recording of any mortgage, deed of trust, or other security interest, or the securing of additional indebtedness by such or other means; (3) the making, assignment, or recording of any lease or sublease; (4) the grant of Collateral (or other property identified as "Collateral" therein) as security for the Amended PK Air Credit Facility Agreement, the Exit Facility or the Amended and Restated 2019 Term Loan Credit Agreement, as applicable; or (5) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan (including the Restructuring Transactions), shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forego the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee, or governmental assessment. All filing or recording officers (or any other Person with authority over any of the foregoing), wherever located and by whomever appointed, shall comply with the requirements of section 1146(a) of the Bankruptcy Code, shall forego the collection of any such tax or governmental assessment, and shall accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

S. *Directors and Officers*

As of the Effective Date, the term of the current members of the boards of directors of the Debtors shall expire, and the initial boards of directors, including the Reorganized Bristow Parent Board, as well as the officers of each of the Reorganized Debtors, shall be appointed in accordance with the New Organizational Documents and other constituent documents of each Reorganized Debtor. As set forth in the Restructuring Support Agreement (including the Governance Term Sheet), the initial Reorganized Bristow Parent Board shall consist of 7 directors, with the directors of the Reorganized Bristow Parent Board being appointed consistent with the Governance Term Sheet and

the New Organizational Documents.  The Reorganized Debtors will comply with the requirements set forth in 49 U.S.C. § 40102(a)(15)(C) with respect to the citizenship of its officers, directors and senior management team.

The New Organizational Documents and the New Shareholders' Agreement shall provide that any independent director appointed to the Reorganized Bristow Parent Board shall be unaffiliated with any person that has designation rights for the Reorganized Bristow Parent Board.

Pursuant to section 1129(a)(5) of the Bankruptcy Code, the Debtors will, to the extent reasonably practicable, disclose in advance of the Confirmation Hearing the identity and affiliations of any Person proposed to serve on the Reorganized Bristow Parent Board, as well as those Persons that will serve as officers of the Reorganized Debtors. To the extent any such director or officer is an "insider" under the Bankruptcy Code, the nature of any compensation to be paid to such director or officer will also be disclosed.  Provisions regarding the removal, appointment, and replacement of members of the Reorganized Bristow Parent Board will be disclosed in the New Organizational Documents.

T.        *Preservation of Causes of Action*

Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan, including pursuant to Article VIII of the Plan or a Final Order, in accordance with section 1123(b) of the Bankruptcy Code, such Causes of Action shall be Retained Causes of Action, whether arising before or after the Petition Date, including any actions specifically enumerated in the Plan Supplement, and the Reorganized Debtors' rights to commence, prosecute, or settle such Retained Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date. **No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against them as any indication that the Debtors or the Reorganized Debtors will not pursue any and all available Causes of Action against them.  The Debtors and the Reorganized Debtors expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided herein.** Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan, including pursuant to Article VIII of the Plan or a Final Order, the Reorganized Debtors expressly reserve all Causes of Action, for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.  For the avoidance of doubt, in no instance will any Cause of Action preserved pursuant to this Article IV.T include any claim or Cause of Action with respect to, or against, a Released Party that is released under Article VIII of the Plan.

In accordance with section 1123(b)(3) of the Bankruptcy Code, any Causes of Action preserved pursuant to the first paragraph of this Article IV.T that a Debtor may hold against any Entity shall vest in the Reorganized Debtors. The applicable Reorganized Debtor, through its authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action.  The Reorganized Debtors shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action, or to decline to do any of the foregoing, without the consent or approval of any third party or any further notice to or action, order, or approval of the Bankruptcy Court.

U.        *Milestone Settlement*

The terms of the Milestone Settlement are fully incorporated into the Plan by reference, and the Debtors and the Milestone Parties shall abide by the terms of the Milestone Settlement Order, including the payment by the Debtors, no later than the Effective Date, of the reasonable and documented professional fees of the Milestone Parties as set forth in the Milestone Settlement Order.  To the extent of a conflict between this Plan and the Milestone Settlement Order, the Milestone Settlement Order will control.

V.        *Macquarie Settlement*

The terms of the Macquarie Settlement are fully incorporated into the Plan by reference, and the Debtors and the Macquarie Parties shall abide by the terms of the Macquarie Settlement Order, including the payment by the

Debtors of the reasonable and documented professional fees of the Macquarie Parties as and to the extent set forth in the Macquarie Settlement Order. To the extent of a conflict between this Plan and the Macquarie Settlement Order, the Macquarie Settlement Order will control.

W.      *Indenture Trustee Expenses*

On the Effective Date, and without any further notice to or action, order or approval of the Bankruptcy Court, the Debtors or Reorganized Debtors shall distribute Cash to the Indenture Trustees in an amount equal to the Indenture Trustee Expenses without a reduction to recoveries to Holders of the Secured Notes Claims or Unsecured Notes Claims; *provided that* the Indenture Trustees shall provide the Debtors with the invoices (subject to redaction to preserve attorney-client privilege) for which they seek payment no later than fifteen (15) days prior to the Effective Date. If the Debtors dispute any Indenture Trustee Expenses, the Debtors shall (i) pay the undisputed portion of the Indenture Trustee Expenses, (ii) notify the Indenture Trustees with respect to any disputed portion of the Indenture Trustee Expenses within ten (10) days after presentation of the invoices by the Indenture Trustees, and (iii) escrow the amount of any disputed portion of the Indenture Trustee Expenses pending any resolution. Upon such notification, the applicable Indenture Trustee may submit such dispute for resolution by the Bankruptcy Court. For the avoidance of doubt, nothing herein affects the Indenture Trustees' rights to exercise their respective charging liens pursuant to the terms of the applicable Indentures.

To the extent the Indenture Trustees provide services or incur costs or expenses, including professional fees, related to or in connection with the Plan, the Confirmation Order or the Indentures after the Effective Date, such Indenture Trustee shall be entitled to receive from the Reorganized Debtors, without further Bankruptcy Court approval, reasonable compensation for such services and reimbursement of reasonable out-of-pocket expenses incurred with such services. The payment of such compensation and expenses will be made promptly or as otherwise agreed to by the applicable Indenture Trustee and the Reorganized Debtors.

The payment of the applicable Unsecured Notes Indenture Trustee and the Convertible Notes Indenture Trustee as set forth in the applicable indenture or bond agreement shall be considered a distribution on account of Unsecured Notes Claims.

X.      *Closing the Chapter 11 Cases*

On and after the Effective Date, the Debtors or Reorganized Debtors shall be permitted to close all of the Chapter 11 Cases of the Debtors except for the Chapter 11 Case of Bristow Parent and any other Debtor identified in the Restructuring Transactions Exhibit as having its Chapter 11 Case remain open following the Effective Date, and all contested matters relating to any of the Debtors, including objections to Claims, shall be administered and heard in the Chapter 11 Case of Bristow Parent, irrespective of whether such Claim(s) were Filed against a Debtor whose Chapter 11 Case was closed.

When all Disputed Claims have become Allowed or disallowed and all distributions have been made in accordance with the Plan, the Reorganized Debtors shall seek authority to close any remaining Chapter 11 Cases in accordance with the Bankruptcy Code and the Bankruptcy Rules.

## ARTICLE V.
## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

A.      *Assumption or Rejection of Executory Contracts and Unexpired Leases*

Unless otherwise assumed or rejected pursuant to an order of the Bankruptcy Court (including the Milestone Settlement Order and the Macquarie Settlement Order) entered prior to the Effective Date, on the Effective Date, each Executory Contract and Unexpired Lease shall be deemed assumed pursuant to section 365 of the Bankruptcy Code, without the need for any further notice to or action, order, or approval of the Bankruptcy Court, unless such Executory Contract or Unexpired Lease is listed on the Schedule of Rejected Executory Contracts and Unexpired Leases, if any. The assumption of Executory Contracts and Unexpired Leases hereunder may include the assignment of certain of such contracts to Affiliates. The Confirmation Order will constitute an order of the Bankruptcy Court approving the

above-described assumptions, rejections, and assumptions and assignments. For the avoidance of doubt and notwithstanding anything to the contrary herein, the Backstop Commitment Agreement and Restructuring Support Agreement shall be assumed on the Effective Date, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's authorization for the Debtors to enter into the Backstop Commitment Agreement and Restructuring Support Agreement as of the Confirmation Date and perform any and all obligations of the Debtors thereunder.

Except as otherwise provided herein or agreed to by the Debtors and the applicable counterparty, each assumed Executory Contract or Unexpired Lease shall include all modifications, amendments, supplements, restatements, or other agreements related thereto, and all rights related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests. Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease or the validity, priority, or amount of any Claims that may arise in connection therewith. To the extent applicable, no change of control (or similar provision) will be deemed to occur under any such Executory Contract or Unexpired Lease.

If certain, but not all, of a contract counterparty's Executory Contracts and/or Unexpired Leases are assumed pursuant to the Plan, the Confirmation Order shall be a determination that such counterparty's Executory Contracts and/or Unexpired Leases that are being rejected pursuant to the Plan are severable agreements that are not integrated with those Executory Contracts and/or Unexpired Leases that are being assumed pursuant to the Plan. Parties seeking to contest this finding with respect to their Executory Contracts and/or Unexpired Leases must file a timely objection to the Plan on the grounds that their agreements are integrated and not severable, and any such dispute shall be resolved by the Bankruptcy Court at the Confirmation Hearing (to the extent not resolved by the parties prior to the Confirmation Hearing).

B.      *Claims Based on Rejection of Executory Contracts or Unexpired Leases*

Counterparties to Executory Contracts or Unexpired Leases listed on the Schedule of Rejected Executory Contracts and Unexpired Leases, if any, shall be served with a notice of rejection of Executory Contracts and Unexpired Leases with the Plan Supplement. Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts and Unexpired Leases, if any, must be Filed with the Bankruptcy Court within 30 days after the date of the order of the Bankruptcy Court approving such rejection. Any Claims arising from the rejection of an Executory Contract or Unexpired Lease that are not Filed within such time will be automatically disallowed, forever barred from assertion, and shall not be enforceable against, as applicable, the Debtors, the Reorganized Debtors, the Estates, or property of the foregoing parties, without the need for any objection by the Debtors or Reorganized Debtors, as applicable, or further notice to, or action, order, or approval of the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully satisfied, released, and discharged, notwithstanding anything in a Proof of Claim to the contrary. Claims arising from the rejection of the Debtors' Executory Contracts and Unexpired Leases shall be classified as General Unsecured Claims and shall be treated in accordance with Article III of the Plan.

C.      *Cure of Defaults for Assumed Executory Contracts and Unexpired Leases*

On the Effective Date or as soon as reasonably practicable thereafter, the Debtors or the Reorganized Debtors, as applicable, shall pay all Cure Costs relating to Executory Contracts and Unexpired Leases that are being assumed under the Plan. Unless otherwise agreed upon in writing by the parties to the applicable Executory Contract or Unexpired Lease, all requests for payment of Cure Costs that differ from the amounts paid or proposed to be paid by the Debtors or the Reorganized Debtors to a counterparty must be Filed with the Solicitation Agent on or before 14 days after receiving the applicable Cure Notice. Any such request that is not timely Filed shall be disallowed and forever barred, estopped, and enjoined from assertion, and shall not be enforceable against any Debtor or Reorganized Debtor, without the need for any objection by the Debtors or Reorganized Debtors or any other party in interest or any further notice to or action, order, or approval of the Bankruptcy Court. Any Cure Costs shall be deemed fully satisfied, released, and discharged upon payment by the Debtors or the Reorganized Debtors of the applicable Cure Costs; *provided*, *however*, that nothing herein shall prevent the Reorganized Debtors from paying any Cure Costs despite the failure of the relevant counterparty to file such request for payment of such Cure Costs. The Reorganized Debtors

also may settle any Cure Costs (with the reasonable consent of the Required RSA Parties, and unless the Creditors' Committee is dissolved, after satisfying the Committee Consent Right) without any further notice to or action, order, or approval of the Bankruptcy Court. In addition, any objection to the assumption of an Executory Contract or Unexpired Lease under the Plan must be Filed with the Bankruptcy Court on or before the Confirmation Hearing. Any such objection will be scheduled to be heard by the Bankruptcy Court at the Confirmation Hearing or at the Debtors' or Reorganized Debtors', as applicable, first scheduled omnibus hearing for which such objection is timely Filed. Any counterparty to an Executory Contract or Unexpired Lease that fails to timely object to the proposed assumption of any Executory Contract or Unexpired Lease will be deemed to have consented to such assumption.

If there is any dispute regarding any Cure Costs, the ability of the Reorganized Debtors or any assignee to provide "adequate assurance of future performance" within the meaning of section 365 of the Bankruptcy Code, or any other matter pertaining to assumption, then payment of any Cure Costs shall occur as soon as reasonably practicable after entry of a Final Order resolving such dispute, approving such assumption (and, if applicable, assignment), or as may be agreed upon by the Debtors or the Reorganized Debtors, as applicable, and the counterparty to the Executory Contract or Unexpired Lease. The Debtors and Reorganized Debtors, as applicable, reserve the right at any time to move to reject any Executory Contract or Unexpired Lease based upon the existence of any such unresolved dispute. If the Bankruptcy Court determines that the Allowed Cure Cost with respect to any Executory Contract or Unexpired Lease is greater than the amount set forth in the applicable Cure Notice, the Debtors (with the reasonable consent of the Required RSA Parties, and unless the Creditors' Committee is dissolved, after satisfying the Committee Consent Right) shall have the right to add such Executory Contract or Unexpired Lease to the Schedule of Rejected Executory Contracts and Unexpired Leases, in which case such Executory Contract or Unexpired Lease will be deemed rejected as of the Effective Date subject to the applicable counterparty's right to object to such rejection.

Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise and full payment of any applicable Cure Costs pursuant to this Article V.C shall result in the full release and satisfaction of any Cures, Claims, or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time prior to the effective date of assumption. **Any and all Proofs of Claim based upon Executory Contracts or Unexpired Leases that have been assumed in the Chapter 11 Cases, including pursuant to the Confirmation Order, and for which any Cure Costs have been fully paid pursuant to this Article V.C, shall be deemed disallowed and expunged as of the Effective Date without the need for any objection thereto or any further notice to or action, order, or approval of the Bankruptcy Court.**

D.     *Indemnification*

On and as of the Effective Date, the Indemnification Obligations will be assumed, irrevocable with respect to any claims relating to acts or omissions occurring at or prior to the Effective Date, and will survive the effectiveness of the Plan, and the New Organizational Documents will provide for the indemnification, defense, reimbursement, exculpation, and/or limitation of liability of, and advancement of fees and expenses to the Debtors' and the Reorganized Debtors' directors, officers, employees, or agents that were employed by, or serving on the board of directors (or similar governing body) of, any of the Debtors as of the Petition Date and/or at any time in the period between the Petition Date and the Effective Date, to the fullest extent permitted by law and at least to the same extent as the organizational documents of each of the respective Debtors on the Petition Date or the applicable period between the Petition Date and the Effective Date, against any Claims or Causes of Action whether direct or derivative, liquidated or unliquidated, fixed or contingent, disputed or undisputed, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, and, notwithstanding anything in the Plan to the contrary, none of the Reorganized Debtors will amend and/or restate the New Organizational Documents before or after the Effective Date to terminate or adversely affect any of the Reorganized Debtors' obligations to provide such indemnification rights or such directors', officers', employees', or agents' indemnification rights with respect to any claims relating to acts or omissions occurring at or prior to the Effective Date.

E.     *Insurance Policies*

Notwithstanding anything in the Plan to the contrary, all of the Debtors' insurance policies and any agreements, documents, or instruments relating thereto, are treated as and deemed to be Executory Contracts under the Plan. On the Effective Date, pursuant to section 365(a) of the Bankruptcy Code, the Debtors shall be deemed to

46

have assumed all insurance policies and any agreements, documents, and instruments related thereto, including all D&O Liability Insurance Policies (including tail coverage liability insurance). Entry of the Confirmation Order will constitute the Bankruptcy Court's approval of the Reorganized Debtors' assumption of all such insurance policies, including the D&O Liability Insurance Policies. Notwithstanding anything to the contrary contained in the Plan, Confirmation of the Plan shall not discharge, impair, or otherwise modify any indemnity obligations assumed by the foregoing assumption of insurance policies, including the D&O Liability Insurance Policies, and each such indemnity obligation will be deemed and treated as an Executory Contract that has been assumed by the Reorganized Debtors under the Plan as to which no Proof of Claim or Claim for Cure Costs need be Filed, and shall survive the Effective Date.

On or before the Effective Date, the Debtors shall purchase and maintain tail coverage under the D&O Liability Insurance Policies for the six-year period following the Effective Date on terms no less favorable than under, and with an aggregate limit of liability no less than the aggregate limit of liability under, the existing D&O Liability Insurance Policies. In addition to such tail coverage, the D&O Liability Insurance Policies shall remain in place in the ordinary course during the Chapter 11 Cases.

F.      *Employee Compensation and Benefits*

1.      Compensation and Benefits Programs

Subject to the provisions of the Plan, all Compensation and Benefits Programs shall be treated as Executory Contracts under the Plan and deemed assumed on the Effective Date pursuant to the provisions of sections 365 and 1123 of the Bankruptcy Code, except for:

(a)  all employee equity or equity-based incentive plans, and any provisions set forth in the Compensation and Benefits Programs that provide for rights to acquire Interests in any of the Debtors;

(b)  any Compensation and Benefits Programs that, as of the entry of the Confirmation Order, have been specifically waived by the beneficiaries of any employee benefit plan or contract;

(c)  any agreement or arrangement between a Debtor and a former insider as of the Petition Date;

(d)  any deferred compensation plan for any participant that is not a current employee on the Effective Date; and

(e)  Compensation and Benefits Programs that have been rejected pursuant to an order of the Bankruptcy Court or is listed on the Schedule of Rejected Executory Contracts and Unexpired Leases.

Any assumption of Compensation and Benefits Programs pursuant to the terms herein shall not be deemed to trigger any applicable change of control, immediate vesting, termination, or similar provisions therein. No counterparty shall have rights under a Compensation and Benefits Programs assumed pursuant to the Plan other than those applicable immediately prior to such assumption.

2.      Workers' Compensation Programs.

As of the Effective Date, except as set forth in the Plan Supplement, the Debtors and the Reorganized Debtors shall continue to honor their obligations under: (a) all applicable workers' compensation laws in states in which the Reorganized Debtors operate; and (b) the Debtors' written contracts, agreements, agreements of indemnity, self-insured workers' compensation bonds, policies, programs, and plans for workers' compensation and workers' compensation insurance. All Proofs of Claim on account of workers' compensation shall be deemed withdrawn automatically and without any further notice to or action, order, or approval of the Bankruptcy Court; *provided that* nothing in the Plan shall limit, diminish, or otherwise alter the Debtors' or Reorganized Debtors' defenses, Causes of Action, or other rights under applicable non-bankruptcy law with respect to any such contracts, agreements, policies,

programs, and plans; *provided further* that nothing herein shall be deemed to impose any obligations on the Debtors in addition to what is provided for under applicable state law.

G.      *Contracts and Leases After the Petition Date*

Contracts and leases entered into after the Petition Date by any Debtor, including any Executory Contracts and Unexpired Leases assumed under section 365 of the Bankruptcy Code, will be performed by the applicable Debtor or Reorganized Debtor liable thereunder in the ordinary course of its business. Such contracts and leases that are not rejected under the Plan shall survive and remain unaffected by entry of the Confirmation Order.

H.      *Reservation of Rights*

Nothing contained in the Plan or the Plan Supplement shall constitute an admission by the Debtors or any other party that any contract or lease is in fact an Executory Contract or Unexpired Lease or that any Debtor or Reorganized Debtor has any liability thereunder. If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption, the Debtors or the Reorganized Debtors, as applicable, shall have 45 days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease.

I.      *Nonoccurrence of Effective Date*

In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code.

## ARTICLE VI.
## PROVISIONS GOVERNING DISTRIBUTIONS

A.      *Distributions on Account of Claims and Interests Allowed as of the Effective Date*

Except as otherwise provided herein, in a Final Order, or as otherwise agreed to by the Debtors (or the Reorganized Debtors) and the Holder of the applicable Claim or Interest, on the first Distribution Date, the Distribution Agent shall make initial distributions under the Plan on account of Claims and Interests Allowed on or before the Effective Date; *provided, however*, that (1) Allowed Administrative Claims with respect to liabilities incurred by the Debtors in the ordinary course of business shall be paid or performed in the ordinary course of business in accordance with the terms and conditions of any controlling agreements, course of dealing, course of business, or industry practice, and (2) Allowed Priority Tax Claims shall be paid in accordance with Article II.C. To the extent any Allowed Priority Tax Claim is not due and owing on the Effective Date, such Claim shall be paid in full in Cash in accordance with the terms of any agreement between the Debtors and the Holder of such Claim or as may be due and payable under applicable non-bankruptcy law or in the ordinary course of business. A Distribution Date shall occur no more frequently than once in every 90-day period after the Effective Date, as necessary, in the Reorganized Debtors' sole discretion.

B.      *Rights and Powers of the Distribution Agent*

1.      Powers of Distribution Agent

The Distribution Agent shall be empowered to: (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan; (b) make all distributions contemplated hereby; (c) employ professionals to represent it with respect to its responsibilities; and (d) exercise such other powers as may be vested in the Distribution Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Distribution Agent to be necessary and proper to implement the provisions hereof.

2.      Expenses Incurred On or After the Effective Date

Except as otherwise ordered by the Bankruptcy Court, the amount of any reasonable fees and expenses incurred by the Distribution Agent on or after the Effective Date (including taxes) and any reasonable compensation and expense reimbursement claims (including reasonable attorney fees and expenses) made by the Distribution Agent shall be paid in Cash by the Reorganized Debtors.

C.      *Special Rules for Distributions to Holders of Disputed Claims*

Except as otherwise agreed by the relevant parties:  no partial payments and no partial distributions shall be made with respect to a Disputed Claim until all such disputes in connection with such Disputed Claim have been resolved by settlement or Final Order.  Any dividends or other distributions arising from property distributed to Holders of Allowed Claims in a Class and paid to such Holders under the Plan shall also be paid, in the applicable amounts, to any Holder of a Disputed Claim in such Class that becomes an Allowed Claim after the date or dates that such dividends or other distributions were earlier paid to Holders of Allowed Claims in such Class.

Any fund established to hold consideration to be received under the Plan pending resolution of Disputed Claims shall be treated as a "disputed ownership fund" pursuant to Treasury Regulation section 1.468B-9.  Any such fund shall, therefore, be subject to entity-level taxation.  For the avoidance of doubt, any New Stock shall not be issued to such fund; rather, Reorganized Bristow Parent shall retain sufficient authorized, but unissued, New Stock and issue them directly to Holders of Claims following the resolution of Disputed Claims.

D.      *Delivery of Distributions*

1.      Record Date for Distributions

Except as provided herein, on the Distribution Record Date, the Claims Register shall be closed and the Debtors, the Reorganized Debtors, or any other party responsible for making distributions under the Plan shall be authorized and entitled to recognize only those record Holders listed on the Claims Register or any other transfer register for each Class of Claims as maintained by the Debtors or their agents, each of which shall be deemed closed as of the close of business on the Distribution Record Date, and there shall be no further changes in the record Holders of the applicable Claims.  In addition, with respect to payment of any Cure Costs or disputes over any Cure Costs, neither the Debtors nor the Distribution Agent shall have any obligation to recognize or deal with any party other than the non-Debtor party to the applicable Executory Contract or Unexpired Lease as of the Effective Date, even if such non-Debtor party has thereafter sold, assigned, or otherwise transferred its Claim for Cure Costs.  The Distribution Record Date shall not apply to Secured Notes and Unsecured Notes deposited with DTC, the Holders of which shall receive distributions in accordance with the customary procedures of DTC.

2.      Distribution Process

The Distribution Agent shall make all distributions required under the Plan, except that with respect to distributions to Holders of Allowed Claims governed by a separate agreement, shall exercise commercially reasonable efforts to implement appropriate mechanics governing such distributions in accordance with the Plan and the terms of the relevant governing agreement.  Except as otherwise provided herein, and notwithstanding any authority to the contrary, distributions to Holders of Allowed Claims and Allowed Interests, including Claims and Interests that become Allowed after the Effective Date, shall be made to Holders of record or their respective designees as of the Distribution Record Date:  (a) to the address of such Holder or designee as set forth in the applicable register (or if the appropriate notice has been provided pursuant to the governing agreement in writing, on or before the date that is 10 calendar days before the Effective Date, of a change of address or an identification of designee, to the changed address or to such designee, as applicable); or (b) in accordance with Federal Rule of Civil Procedure 4, as modified and made applicable by Bankruptcy Rule 7004, if no address exists in the applicable register, no Proof of Claim has been Filed, and the Distribution Agent has not received a written notice of a change of address on or before the date that is 10 calendar days before the Effective Date.  The Debtors, the Reorganized Debtors, and the Distribution Agent, as applicable, shall not incur any liability whatsoever on account of any distributions under the Plan.  Except as otherwise provided in the Plan, Holders of Claims and Holders of Interests shall not be entitled to interest, dividends,

or accruals on the distributions provided for in the Plan, regardless of whether such distributions are delivered on or at any time after the Effective Date.

        3.        Delivery of Distributions to Holders of Unsecured Notes Claims

Except as otherwise provided in the Plan or reasonably requested by the applicable Unsecured Notes Indenture Trustee, all distributions to Holders of Unsecured Notes Claims shall be made to and deemed completed when received by the applicable Unsecured Notes Indenture Trustee; provided, however, that at such Unsecured Notes Indenture Trustee's written election, the applicable distributions shall not be distributed to Holders of Unsecured Notes Claims in the name of the Unsecured Notes Indenture Trustee. Upon such written election, the Unsecured Notes Indenture Trustee shall hold or direct such distributions for the benefit of Holders of Unsecured Notes Claims, and the Unsecured Notes Indenture Trustees shall arrange to deliver such distributions to or on behalf of such Holders, subject to the Unsecured Notes Indenture Trustee's charging liens. The payment of the applicable Unsecured Notes Indenture Trustee and the Convertible Notes Indenture Trustee as set forth in the applicable indenture or bond agreement shall be considered a distribution on account of Unsecured Notes Claims. If an Unsecured Notes Indenture Trustee is unable to make such distributions or consents to the Distribution Agent making such distributions in writing, the Distribution Agent, with the cooperation of such Unsecured Notes Indenture Trustee, shall make such distributions to the extent practicable to do so (provided that until such distributions are made, the applicable charging liens shall attach to the property to be distributed in the same manner as if such distributions were made through the applicable Unsecured Notes Indenture Trustee).

        4.        Foreign Currency Exchange Rate

Except as otherwise provided in a Bankruptcy Court order, as of the Effective Date, any Claim asserted in currency other than U.S. dollars shall be automatically deemed converted to the equivalent U.S. dollar value using the exchange rate for the applicable currency as published in *The Wall Street Journal, National Edition*, on the Effective Date.

        5.        Fractional, Undeliverable, and Unclaimed Distributions

        a.    *Fractional Distributions.* Whenever any distribution of fractional shares of New Common Stock or New Preferred Stock would otherwise be required pursuant to the Plan, the actual distribution shall reflect a rounding of such fraction to the nearest interest or share or dollar, as applicable, with half interests of shares, or any amount equal to $0.50, or less being rounded down. The total number of authorized shares of New Stock to be distributed pursuant to the Plan shall be adjusted as necessary to account for the foregoing rounding.

        b.    *Undeliverable Distributions.* If any distribution to a Holder of an Allowed Claim is returned to the Distribution Agent as undeliverable, no further distributions shall be made to such Holder unless and until the Distribution Agent is notified in writing of such Holder's then-current address or other necessary information for delivery, at which time all currently due missed distributions shall be made to such Holder on the next Distribution Date. Undeliverable distributions shall remain in the possession of the Reorganized Debtors until such time as a distribution becomes deliverable, or such distribution reverts to the Reorganized Debtors or is canceled pursuant to Article VI.D.5.c of the Plan, and shall not be supplemented with any interest, dividends, or other accruals of any kind.

        c.    *Reversion.* Any distribution under the Plan that is an Unclaimed Distribution for a period of 6 months after distribution shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code and such Unclaimed Distribution shall revest in the applicable Reorganized Debtor and, to the extent such Unclaimed Distribution is comprised of New Common Stock or New Preferred Stock, each shall be transferred to the Backstop Commitment Parties on a Pro Rata basis. Upon such revesting, the Claim of the Holder or its successors with respect to such property shall be canceled, discharged, and forever barred notwithstanding any applicable federal or state escheat, abandoned, or unclaimed

50

property laws, or any provisions in any document governing the distribution that is an Unclaimed Distribution, to the contrary.

     6.     Minimum; *De Minimis* Distributions

No Cash payment of less than $50 shall be made to a Holder of an Allowed Claim on account of such Allowed Claim.

     7.     Surrender of Canceled Instruments or Securities

On the Effective Date, each Holder of a Certificate shall be deemed to have surrendered such Certificate to the Distribution Agent or a Servicer (to the extent the relevant Claim is governed by an agreement and administered by a Servicer). Such Certificate shall be canceled solely with respect to the Debtors, and such cancelation shall not alter the obligations or rights of any non-Debtor third parties vis-à-vis one another with respect to such Certificate. Notwithstanding the foregoing paragraph, this Article VI.D.6 shall not apply to any Claims and Interests that are Reinstated pursuant to the terms of the Plan.

E.     *Compliance with Tax Requirements/Allocations*

In connection with the Plan, to the extent applicable, the Distribution Agent shall request distributees to provide appropriate documentation that may be required for an exemption from withholding or reporting, and shall comply with all tax withholding and reporting requirements imposed on it by any Governmental Unit, and all distributions pursuant to the Plan shall be subject to such withholding and reporting requirements unless an exception applies. Notwithstanding any provision in the Plan to the contrary, the Distribution Agent shall take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, or withholding distributions pending receipt of information necessary to facilitate such distributions. The Reorganized Debtors and the Distribution Agent reserves the right to allocate all distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support, and other spousal awards, liens, and encumbrances. All Persons holding Claims shall be required to provide any information necessary to effect information reporting and the withholding of such taxes. Notwithstanding any other provision of the Plan to the contrary, each Holder of an Allowed Claim shall have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any Governmental Unit, including income, withholding, and other tax obligations, on account of such distribution.

F.     *Claims Paid or Payable by Third Parties*

     1.     Claims Paid by Third Parties

Subject to the last sentence of this paragraph, to the extent a Holder of a Claim receives a distribution on account of such Claim and receives payment from a party that is not a Debtor or a Reorganized Debtor on account of such Claim, such Holder shall, within 14 calendar days of receipt thereof, repay or return the distribution to the Reorganized Debtors to the extent the Holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such distribution under the Plan. The failure of such Holder to timely repay or return such distribution shall result in the Holder owing the Reorganized Debtors annualized interest at the Federal Judgment Rate on such amount owed for each Business Day after the 14-day grace period specified above until the amount is repaid.

     2.     Claims Payable by Insurance Carriers

No distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' insurance policies until the Holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy. To the extent that one or more of the Debtors' insurers agrees to satisfy in full or in part a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such insurers' agreement, the applicable portion of such Claim may be expunged without a Claim objection having to be Filed and

51

without any further notice to or action, order, or approval of the Bankruptcy Court; *provided that* the Debtors shall provide 21 calendar days' notice to the Holder of such Claim prior to any disallowance of such Claim during which period the Holder may object to such disallowance, and if the parties cannot reach an agreed resolution, the matter shall be decided by the Bankruptcy Court.

### 3. Applicability of Insurance Policies

Except as otherwise provided in the Plan, distributions to Holders of Allowed Claims shall be in accordance with the provisions of any applicable insurance policy. Notwithstanding anything to the contrary contained herein (including Article VIII of the Plan), nothing contained in the Plan shall constitute or be deemed a release, settlement, satisfaction, compromise, or waiver of any Cause of Action that the Debtors or any other Entity may hold against any other Entity, including insurers, under any policies of insurance or applicable indemnity, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

### G. *Setoffs*

Except as otherwise expressly provided for herein, each Reorganized Debtor, pursuant to the Bankruptcy Code (including section 553 of the Bankruptcy Code), applicable non-bankruptcy law, or as may be agreed to by the Holder of a Claim, may (but shall not be required to) set off against any Allowed Claim and the distributions to be made pursuant to the Plan on account of such Allowed Claim (before any distribution is made on account of such Allowed Claim), any claims, rights, and Causes of Action of any nature that such Debtor or Reorganized Debtor, as applicable, may hold against the Holder of such Allowed Claim, to the extent such claims, rights, or Causes of Action against such Holder have not been otherwise compromised or settled on or prior to the Effective Date (whether pursuant to the Plan or otherwise); *provided*, *however*, that neither the failure to effect such a setoff nor the allowance of any Claim pursuant to the Plan shall constitute a waiver or release by such Reorganized Debtor of any such claims, rights, and Causes of Action that such Reorganized Debtor may possess against such Holder. In no event shall any Holder of Claims be entitled to set off any such Claim against any claim, right, or Cause of Action of the Debtor or Reorganized Debtor (as applicable), unless such Holder has Filed a motion with the Bankruptcy Court requesting the authority to perform such setoff on or before the Confirmation Date, and notwithstanding any indication in any Proof of Claim or otherwise that such Holder asserts, has, or intends to preserve any right of setoff pursuant to section 553 of the Bankruptcy Code or otherwise.

### H. *Indefeasible Distributions*

Any and all distributions made under the Plan shall be indefeasible and not subject to clawback.

### I. *Allocation Between Principal and Accrued Interest*

Distributions in respect of Allowed Claims shall be allocated first to the principal amount of such Claims (as determined for U.S. federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Allowed Claims, to any portion of such Claims for accrued but unpaid interest.

## ARTICLE VII.
## PROCEDURES FOR RESOLVING DISPUTED CLAIMS

### A. *Allowance of Claims*

After the Effective Date, each of the Reorganized Debtors shall have and retain any and all rights and defenses the applicable Debtor had with respect to any Claim immediately before the Effective Date. Except as expressly provided in the Plan or in any order entered in the Chapter 11 Cases before the Effective Date (including the Confirmation Order), no Claim shall become an Allowed Claim unless and until such Claim is deemed Allowed under the Plan or the Bankruptcy Code, or the Bankruptcy Court has entered a Final Order, including the Confirmation Order (when it becomes a Final Order), in the Chapter 11 Cases allowing such Claim.

B.      *Claims Administration Responsibilities*

Except as otherwise specifically provided in the Plan and notwithstanding any requirements that may be imposed pursuant to Bankruptcy Rule 9019, after the Effective Date, the Reorganized Debtors shall have the sole authority to: (1) File and prosecute objections to Claims; (2) settle, compromise, withdraw, litigate to judgment, or otherwise resolve objections to any and all Claims (with the reasonable consent of the Required RSA Parties), regardless of whether such Claims are in a Class or otherwise; (3) settle, compromise, or resolve any Disputed Claim (with the reasonable consent of the Required RSA Parties) without any further notice to or action, order, or approval by the Bankruptcy Court; and (4) administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court.  On and after the Effective Date, the Reorganized Debtors will use commercially reasonable efforts to advance the claims resolution process through estimation or otherwise, subject to the provisions of Article VII.K of the Plan.  After the Effective Date, the Reorganized Debtors shall resolve Disputed Claims in accordance with the Debtors' fiduciary duties and pursuant to the terms of the Plan.

C.      *Estimation of Claims*

Before, on, or after the Effective Date, the Debtors or the Reorganized Debtors, as applicable, may (but are not required to) at any time request that the Bankruptcy Court estimate any Claim pursuant to applicable law, including pursuant to section 502(c) of the Bankruptcy Code and/or Bankruptcy Rule 3012 for any reason, regardless of whether any party previously has objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction to estimate any such Claim, including during the litigation of any objection to any Claim or during the pendency of any appeal relating to such objection.  Notwithstanding any provision to the contrary in the Plan, a Claim that has been expunged from the Claims Register, but that either is subject to appeal or has not been the subject of a Final Order, shall be deemed to be estimated at zero dollars, unless otherwise ordered by the Bankruptcy Court.  In the event that the Bankruptcy Court estimates any Claim and does not provide otherwise, such estimated amount shall constitute a maximum limitation on such Claim for all purposes under the Plan (including for purposes of distributions and discharge) and may be used as evidence in any supplemental proceedings, and the Debtors or Reorganized Debtors may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim.  Notwithstanding section 502(j) of the Bankruptcy Code, in no event shall any Holder of a Claim that has been estimated pursuant to section 502(c) of the Bankruptcy Code or otherwise be entitled to seek reconsideration of such estimation unless such Holder has Filed a motion requesting the right to seek such reconsideration on or before seven (7) days after the date on which such Claim is estimated.  Each of the foregoing Claims and objection, estimation, and resolution procedures are cumulative and not exclusive of one another.  Claims may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.

D.      *Disputed Claims Reserve*

On or before the Effective Date, the Reorganized Debtors shall establish one or more reserves of Cash and/or New Common Stock for those General Unsecured Claims that are Disputed Claims as of the Distribution Record Date (for the avoidance of doubt, deducting such amounts from the Unsecured Equity Pool, GUC Distribution Cash Amount, and Unsecured 4(a)(2) Distribution Cash Amount), which reserves shall be administered by the Reorganized Debtors or the Distribution Agent, as applicable.  After the Effective Date, the Reorganized Debtors or the Distribution Agent shall hold such Cash and/or New Common Stock in such reserve(s) in trust for the benefit of the Holders of General Unsecured Claims that are Disputed Claims as of the Distribution Record Date, that are ultimately determined to be Allowed after the Distribution Record Date.  The Reorganized Debtors or the Distribution Agent shall distribute such amounts (net of any expenses, including any taxes relating thereto), as provided herein, as such Claims are resolved by a Final Order or agreed to by settlement, and such amounts will be distributable on account of such Claims as such amounts would have been distributable had such Claims been Allowed Claims as of the Effective Date under Article III of the Plan solely to the extent of the amounts available in the applicable reserve(s); *provided*, *however*, that for the avoidance of doubt, and as set forth in the Rights Offering Procedures, there shall not be any reserve of any Unsecured 4(a)(2) Subscription Rights or Unsecured 1145 Subscription Rights, and any Holder of a General

Unsecured Claim that is a Disputed Claim as of the Distribution Record Date shall not be entitled to receive or exercise any Unsecured 4(a)(2) Subscription Rights or Unsecured 1145 Subscription Rights.

Upon a Disputed Claim becoming disallowed by a Final Order, (a) the applicable amount of Cash that was in the disputed claims reserve on account of such Disputed Claim shall be distributed by the Reorganized Debtors to the applicable Holders of Claims that would have received such Cash pursuant to the Plan if such Disputed Claim did not exist as of the Distribution Record Date, with the Reorganized Debtors making such distributions of any such released Cash no less frequently than every three months following the Effective Date and (b) the applicable amount of New Common Stock that was in the disputed claims reserve on account of such Disputed Claim shall be cancelled by the Reorganized Debtors.

Any assets held in a disputed claims reserve shall be subject to the tax rules that apply to "disputed ownership funds" under 26 C.F.R. 1.468B–9. As such, such assets will be subject to entity-level taxation, and the Reorganized Debtors shall be required to comply with the relevant rules.

E.      *Adjustment to Claims Without Objection*

Any Claim that has been paid or satisfied, or any Claim that has been amended or superseded, may be adjusted or expunged on the Claims Register by the Debtors or the Reorganized Debtors without an objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

F.      *Time to File Objections to Claims*

Any objections to Claims shall be Filed on or before the later of (1) 180 days after the Effective Date and (2) such other period of limitation as may be specifically fixed by the Bankruptcy Court upon a motion by the Debtors or the Reorganized Debtors.

G.      *Disallowance of Claims*

Any Claims held by Entities from which property is recoverable under sections 542, 543, 550, or 553 of the Bankruptcy Code or that is a transferee of a transfer avoidable under sections 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code, shall not be Allowed or deemed Allowed, and Holders of such Claims may not receive any distributions on account of such Claims until such time as such Causes of Action against that Entity have been settled or a Bankruptcy Court order with respect thereto has been entered and all sums due, if any, to the Debtors by that Entity have been turned over or paid to the Debtors or the Reorganized Debtors. All Proofs of Claim Filed on account of an Indemnification Obligation shall be deemed satisfied and expunged from the Claims Register as of the Effective Date to the extent such Indemnification Obligation is assumed (or honored or reaffirmed, as the case may be) pursuant to the Plan, without any further notice to or action, order, or approval of the Bankruptcy Court. Notwithstanding anything to the contrary in this Plan, any Holder of an Allowed Claim under section 502(h) of the Bankruptcy Code arising from an Avoidance Action shall, in lieu of any distribution to Holders of Allowed General Unsecured Claims, solely receive Cash from the proceeds of such Avoidance Action in an amount reasonably equivalent to the percentage recovery received by Holders of General Unsecured Claims based on the enterprise value of the Debtors for purposes of Confirmation; *provided that* the Reorganized Debtors may elect in their sole discretion (and without any further approval from the Court) to instead have such amount of Cash set off against the recovery from the applicable Avoidance Action.

**Except as otherwise provided herein or as agreed to by the Debtors or the Reorganized Debtors, any and all Proofs of Claim Filed after the Claims Bar Date shall be deemed disallowed and expunged as of the Effective Date without any further notice to or action, order, or approval of the Bankruptcy Court, and Holders of such Claims may not receive any distributions on account of such Claims, unless such late Proof of Claim has been deemed timely Filed by a Final Order.**

H. *Amendments to Claims*

On or after the Effective Date, a Claim may not be Filed or amended without the prior authorization of the Bankruptcy Court or the Reorganized Debtors, and any such new or amended Claim Filed shall be deemed disallowed in full and expunged without any further notice to or action, order, or approval of the Bankruptcy Court to the maximum extent provided by applicable law.

I. *No Distributions Pending Allowance*

If an objection to a Claim or portion thereof is Filed, no payment or distribution provided under the Plan shall be made on account of such Claim or portion thereof unless and until such Disputed Claim becomes an Allowed Claim, unless otherwise determined by the Reorganized Debtors.

J. *Distributions After Allowance*

To the extent that a Disputed Claim ultimately becomes an Allowed Claim, distributions shall be made to the Holder of such Allowed Claim in accordance with the provisions of the Plan. As soon as reasonably practicable after the date that the order or judgment of the Bankruptcy Court allowing any Disputed Claim becomes a Final Order, the Reorganized Debtors shall provide to the Holder of such Claim the distribution to which such Holder is entitled under the Plan as of the Effective Date, less any previous distribution (if any) that was made on account of the undisputed portion of such Claim, without any interest, dividends, or accruals to be paid on account of such Claim unless required under applicable bankruptcy law or as otherwise provided herein.

K. *Single Satisfaction of Claims*

Holders of Allowed Claims may assert such Claims against the Debtors obligated with respect to such Claims, and such Claims shall be entitled to share in the recovery provided for the applicable Class of Claims against the Debtors based upon the full Allowed amount of such Claims.  Notwithstanding the foregoing, in no case shall the aggregate value of all property received or retained under the Plan on account of any Allowed Claim exceed 100 percent of the underlying Allowed Claim (including applicable interest, if any such interest is Allowed).

L. *Claims Consultation Rights*

The Debtors or the Reorganized Debtors, as applicable, shall consult with the Creditors' Committee with regard to the allowance of any claims participating in the GUC Distribution Cash Amount prior to the Effective Date.

## ARTICLE VIII.
## DISCHARGE, RELEASE, INJUNCTION AND RELATED PROVISIONS

A. *Discharge of Claims and Termination of Interests*

**Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan or in any contract, instrument, or other agreement or document created pursuant to the Plan, the distributions, rights, and treatment that are provided in the Plan shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of Claims (including any Intercompany Claims resolved or compromised after the Effective Date by the Reorganized Debtors), Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and Interests in, the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any liability (including withdrawal liability) to the extent such Claims or Interests relate to services performed by employees of the Debtors before the Effective Date and that arise from a termination of employment, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in**

55

sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not: (1) a Proof of Claim based upon such debt or right is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code; (2) a Claim or Interest based upon such debt, right, or Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (3) the Holder of such a Claim or Interest has accepted the Plan. Any default or "event of default" by the Debtors or Affiliates with respect to any Claim or Interest that existed immediately before or on account of the Filing of the Chapter 11 Cases shall be deemed cured (and no longer continuing) as of the Effective Date. The Confirmation Order shall be a judicial determination of the discharge of all Claims and Interests subject to the Effective Date occurring.

B.      *Releases by the Debtors*

Pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, on and after the Effective Date, each Released Party is deemed fully, conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by the Debtors, the Reorganized Debtors, their Estates, and any person seeking to exercise the rights of the Estates, including any successors to the Debtors or any Estates representative appointed or selected pursuant to section 1123(b)(3) of the Bankruptcy Code from any and all Causes of Action, including any derivative claims asserted on behalf of the Debtors, that the Debtors, the Reorganized Debtors, or their Estates, including any successors to the Debtors or any Estates representative appointed or selected pursuant to section 1123(b)(3) of the Bankruptcy Code, would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or Interest, or that any Holder of any Claim or Interest could have asserted on behalf of the Debtors, based on or relating to, or in any manner arising from, in whole or in part:

1.      the Debtors, the business or contractual arrangement between the Debtors and any Released Party, any Securities issued by the Debtors and the ownership thereof, the Debtors' in- or out-of-court restructuring efforts, the 2019 Term Loan Facility, the Compensation and Benefit Programs, intercompany transactions, or the formulation, preparation, dissemination, negotiation, or Filing of the Restructuring Support Agreement, the Plan, the Disclosure Statement, Rights Offering Procedures, or any other Restructuring Documents;

2.      any Restructuring Transaction, contract, instrument, release, or other agreement or document (including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Restructuring Support Agreement, the Original RSA, the Original DIP Commitment Letter, the Initial Amended RSA, the Disclosure Statement, or the Plan, including the Rights Offering, the Backstop Commitment Agreement, the DIP Facility, the Exit Facility, the Amended and Restated 2019 Term Loan Facility, or any other Restructuring Documents;

3.      the Chapter 11 Cases, the Disclosure Statement, the Plan, the Filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the solicitation of votes with respect to the Plan, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan or the Rights Offering, or the distribution of property under the Plan or any other related agreement with respect to the foregoing; or

4.      any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date, including all Avoidance Actions or other relief obtained by the Debtors in the Chapter 11 Cases.

Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (i) any claims related to any act or omission that is determined in a Final Order to have constituted willful misconduct, gross negligence, or actual fraud, (ii) the rights of any current employee of the Debtors under any employment agreement or plan, (iii) the rights of the Debtors with respect to any confidentiality provisions or covenants restricting competition in favor of the Debtors under any employment agreement with a current or former employee of the Debtors, (iv) any post-Effective Date obligations of any party or Entity under the Plan, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the

Plan Supplement) executed to implement the Plan, (v) the rights of Holders of Allowed Claims to receive distributions under the Plan, (vi) any Cause of Action the Debtors may have against Columbia Helicopters, Inc. and its Related Parties, or (vii) any Cause of Action the Debtors may have against any of their former officers or directors as of the Petition Date in respect of payments made and referenced under any separation, retirement, consulting agreement, employment agreement or plan.

Entry of the Confirmation Order will constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the foregoing release, which includes by reference each of the related provisions and definitions contained herein, and further, will constitute the Bankruptcy Court's finding that the foregoing release is: (i) in exchange for the good and valuable consideration provided by the Released Parties; (ii) a good faith settlement and compromise of the Claims released; (iii) in the best interest of the Debtors and their Estates; (iv) fair, equitable, and reasonable; and (v) given and made after due notice and opportunity for hearing.

C.      *Releases by Holders of Claims and Interests*

As of the Effective Date, except as otherwise provided herein, each Releasing Party is deemed to have fully, conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged each Debtor, Reorganized Debtor, and Released Party from any and all Causes of Action, including any derivative claims asserted on behalf of the Debtors, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part:

1.      the Debtors, the business or contractual arrangement between the Debtors and any Releasing Party, any Securities issued by the Debtors and the ownership thereof, the Debtors' in- or out-of-court restructuring efforts, the 2019 Term Loan Facility, the Compensation and Benefit Programs, intercompany transactions, or the formulation, preparation, dissemination, negotiation, or Filing of the Restructuring Support Agreement, the Plan, the Disclosure Statement, Rights Offering Procedures, or any other Restructuring Documents;

2.      any Restructuring Transaction, contract, instrument, release, or other agreement or document (including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Restructuring Support Agreement, the Original RSA, the Original DIP Commitment Letter, the Initial Amended RSA, the Disclosure Statement, or the Plan, including the Rights Offering, the Backstop Commitment Agreement, the DIP Facility, the Exit Facility, the Amended and Restated 2019 Term Loan Facility, or any other Restructuring Documents;

3.      the Chapter 11 Cases, the Disclosure Statement, the Plan, the Filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the solicitation of votes with respect to the Plan, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan or the Rights Offering, or the distribution of property under the Plan or any other related agreement with respect to the foregoing; or

4.      any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date, including all Avoidance Actions or other relief obtained by the Debtors in the Chapter 11 Cases.

Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (i) any claims related to any act or omission that is determined in a Final Order to have constituted willful misconduct, gross negligence, or actual fraud, (ii) the rights of any current employee of the Debtors under any employment agreement or plan, (iii) the rights of the Debtors with respect to any confidentiality provisions or covenants restricting competition in favor of the Debtors under any employment agreement with a current or former employee of the Debtors, (iv) any post-Effective Date obligations of any party or Entity under the Plan, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, (v) the rights of Holders of Allowed Claims to receive

distributions under the Plan, (vi) any Cause of Action the Debtors may have against Columbia Helicopters, Inc. and its Related Parties, or (vii) any Cause of Action the Debtors may have against any of their former officers or directors as of the Petition Date in respect of payments made and referenced under any separation, retirement, consulting agreement, employment agreement or plan.

Entry of the Confirmation Order will constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the foregoing release, which includes by reference each of the related provisions and definitions contained herein, and further, will constitute the Bankruptcy Court's finding that the foregoing release is: (i) in exchange for the good and valuable consideration provided by the Released Parties; (ii) a good faith settlement and compromise of the Claims released; (iii) in the best interest of the Debtors and their Estates; (iv) fair, equitable, and reasonable; and (v) given and made after due notice and opportunity for hearing.

D.    *Exculpation*

Except as otherwise specifically provided in the Plan, no Exculpated Party shall have or incur, and each Exculpated Party is hereby released and exculpated from any Cause of Action for any claim related to any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, Filing, or termination of the Restructuring Support Agreement and related prepetition transactions (including the 2019 Term Loan Facility Credit Agreement), the Original RSA, the Original DIP Commitment Letter, the Initial Amended RSA, the Disclosure Statement, the Plan, the Rights Offering, the Rights Offering Procedures, the Backstop Commitment Agreement, the DIP Facility, the Exit Facility, the Amended and Restated 2019 Term Loan Facility, any other Restructuring Documents, or any Restructuring Transaction, contract, instrument, release or other agreement or document created or entered into in connection with the Disclosure Statement or the Plan, the Filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance of Securities pursuant to the Plan or the Rights Offering, or the distribution of property under the Plan or any other related agreement with respect to the foregoing, except for claims related to any act or omission that is determined in a Final Order to have constituted actual fraud, willful misconduct, or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.  The Exculpated Parties have, and upon completion of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of, and distribution of, consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

E.    *Injunction*

Except as otherwise expressly provided in the Plan or for obligations or distributions issued or required to be paid pursuant to the Plan or the Confirmation Order, all Entities that have held, hold, or may hold Claims or Interests that have been released pursuant to the Plan, discharged pursuant to the Plan, or are subject to exculpation pursuant to the Plan, are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Reorganized Debtors, or the Released Parties or the Exculpated Parties: (i) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests; (ii) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such Claims or Interests; (iii) creating, perfecting, or enforcing any lien or encumbrance of any kind against such Entities or the property or the estates of such Entities on account of or in connection with or with respect to any such Claims or Interests; (iv) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such Claims or Interests unless such Entity has timely asserted such setoff right in a document Filed with the Bankruptcy Court explicitly preserving such setoff, and notwithstanding an indication of a claim or interest or otherwise that such Entity asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (v) commencing or continuing in any manner any action or other proceeding of any kind on

**account of or in connection with or with respect to any such Claims or Interests released or settled pursuant to the Plan.**

F.      *Protection Against Discriminatory Treatment*

In accordance with section 525 of the Bankruptcy Code, and consistent with Article VI of the United States Constitution, no Governmental Unit shall discriminate against any Reorganized Debtor, or any Entity with which a Reorganized Debtor has been or is associated, solely because such Reorganized Debtor was a Debtor under chapter 11, may have been insolvent before the commencement of the Chapter 11 Cases (or during the Chapter 11 Cases but before such Debtor was granted or denied a discharge), or has not paid a debt that is dischargeable in the Chapter 11 Cases.

G.      *Release of Liens*

Except as otherwise specifically provided in the Plan,, the Milestone Settlement, the Exit Facility Credit Agreement or the Amended and Restated 2019 Term Loan Credit Agreement, as applicable, the Amended PK Air Credit Facility Agreement or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released and discharged, and all of the right, title, and interest of any holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Reorganized Debtors and their successors and assigns, in each case, without any further approval or order of the Bankruptcy Court and without any action or Filing being required to be made by the Debtors or the Reorganized Debtors, or any other Holder of a Secured Claim.  In addition, at the sole expense of the Debtors or the Reorganized Debtors, the Holders of Secured Claims shall execute and deliver all documents reasonably requested by the Debtors, Reorganized Debtors or administrative agent for the Exit Facility to evidence the release of such mortgages, deeds of trust, Liens, pledges, and other security interests and shall authorize the Reorganized Debtors and their designees to file UCC-3 termination statements and other release documentation (to the extent applicable) with respect thereto.  Notwithstanding the foregoing paragraph, this Article VIII.G shall not apply to any Secured Claims that are Reinstated pursuant to the terms of this Plan.

H.      *Reimbursement or Contribution*

If the Bankruptcy Court disallows a Claim for reimbursement or contribution of an Entity pursuant to section 502(e)(1)(B) of the Bankruptcy Code, then to the extent that such Claim is contingent as of the Effective Date, such Claim shall be forever disallowed notwithstanding section 502(j) of the Bankruptcy Code, unless prior to the Effective Date (1) such Claim has been adjudicated as non-contingent, or (2) the relevant Holder of a Claim has Filed a non-contingent Proof of Claim on account of such Claim and a Final Order has been entered determining such Claim as no longer contingent.

I.      *Recoupment*

In no event shall any Holder of a Claim be entitled to recoup such Claim against any claim, right, or Cause of Action of the Debtors or the Reorganized Debtors, as applicable, unless such Holder actually has performed such recoupment and provided notice thereof in writing to the Debtors on or before the Confirmation Date, notwithstanding any indication in any Proof of Claim or otherwise that such Holder asserts, has, or intends to preserve any right of recoupment.

J.      *Subordination Rights*

Any distributions under the Plan to Holders of Allowed Claims shall be received and retained free from any obligations to hold or transfer the same to any other Holder and shall not be subject to levy, garnishment, attachment, or other legal process by any Holder by reason of claimed contractual subordination rights.  On the Effective Date, any such subordination rights shall be deemed waived, and the Confirmation Order shall constitute an injunction enjoining any Entity from enforcing or attempting to enforce any contractual, legal, or equitable subordination rights

59

to property distributed under the Plan, in each case other than as provided in the Plan; *provided*, that any such subordination rights shall be preserved in the event the Confirmation Order is vacated, the Effective Date does not occur in accordance with the terms hereunder or the Plan is revoked or withdrawn.

K.      *Reservation of Rights of the United States*

As to the United States of America, its agencies, departments, or agents (collectively, the "United States"), nothing in the Plan, the Plan Supplement, or the Confirmation Order shall expand the scope of discharge, release, or injunction to which the Debtors or Reorganized Debtors are entitled under the Bankruptcy Code, if any. The discharge, release, and injunction provisions contained in the Plan, the Plan Supplement, and the Confirmation Order are not intended and shall not be construed to bar the United States from, subsequent to the Confirmation Order, pursuing any actions, including but not limited to any police or regulatory action, against anyone.

Notwithstanding anything contained in the Plan or the Plan Supplement to the contrary, nothing in the Plan or the Plan Supplement shall discharge, release, impair, or otherwise preclude: (a) any liability to the United States that is not a "claim" within the meaning of section 101(5) of the Bankruptcy Code; (b) any valid right of setoff or recoupment of the United States against any of the Debtors or Reorganized Debtors; or (c) the exercise of the United States' police and regulatory powers against the Debtors, the Reorganized Debtors, or any non-Debtor. Nor shall anything in the Confirmation Order, the Plan, or the Plan Supplement: (a) enjoin or otherwise bar the United States and/or any Governmental Unit from asserting or enforcing, outside the Bankruptcy Court, any liability described in this paragraph, (b) divest any court, commission, or tribunal of jurisdiction from resolving any matters relating to the liabilities and/or claims set forth in this paragraph, or (c) confer in the Bankruptcy Court jurisdiction over any matter as to which it would not have jurisdiction under the Bankruptcy Code.

Moreover, nothing in the Confirmation Order, the Plan, or the Plan Supplement shall release or exculpate any non-Debtor, including any Released Parties and/or Exculpated Parties, from any liability to the United States, including but not limited to any liabilities arising under the Internal Revenue Code, the environmental laws, or the criminal laws against the Released Parties and/or Exculpated Parties, nor shall anything in the Confirmation Order, the Plan, or the Plan Supplement enjoin the United States from bringing any claim, suit, action, or other proceeding against the Released Parties and/or Exculpated Parties for any liability whatsoever; *provided that* nothing in this paragraph shall affect in any way any release by the Debtors, the Reorganized Debtors, their Estates, any person exercising the rights of the Estates, or any successor to the Estates of the Released Parties provided for in Article VIII.B of the Plan.

Nothing contained in the Plan, the Plan Supplement, or the Confirmation Order shall be deemed to determine the tax liability of any person or entity, including but not limited to the Debtors and the Reorganized Debtors, nor shall the Plan, the Plan Supplement, or the Confirmation Order be deemed to have determined the federal tax treatment of any item, distribution, or entity, including the federal tax consequences of the Plan, nor shall anything in the Plan, the Plan Supplement, or the Confirmation Order be deemed to have conferred jurisdiction upon the Bankruptcy Court to make determinations as to federal tax liability and federal tax treatment except as provided under 11 U.S.C. § 505.

## ARTICLE IX.
## EFFECT OF CONFIRMATION OF THE PLAN

Upon entry of the Confirmation Order, the Bankruptcy Court shall be deemed to have made and issued on the Confirmation Date, pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014, the following findings of fact and conclusions of law as though made after due deliberation and upon the record at the Confirmation Hearing. Upon entry of the Confirmation Order, any and all findings of fact in the Plan shall constitute findings of fact even if they are stated as conclusions of law, and any and all conclusions of law in the Plan shall constitute conclusions of law even if they are stated as findings of fact.

A.      *Jurisdiction and Venue*

On the Petition Date, the Debtors commenced the Chapter 11 Cases by filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code. The Debtors were and are qualified to be debtors under section 109 of the

Bankruptcy Code. Venue in the Southern District of Texas was proper as of the Petition Date and continues to be proper. Confirmation of the Plan is a core proceeding under 28 U.S.C. § 157(b)(2). The Bankruptcy Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1334 and the Bankruptcy Court has exclusive jurisdiction to determine whether the Plan complies with the applicable provisions of the Bankruptcy Code and should be confirmed.

B.        *Order Approving the Disclosure Statement*

On August 26, 2019, the Bankruptcy Court entered the Conditional Disclosure Statement Order, which, among other things, (a) conditionally approved the Disclosure Statement as containing adequate information within the meaning of section 1125 of the Bankruptcy Code and Bankruptcy Rule 3017 and (b) conditionally approved certain procedures and documents for soliciting and tabulating votes with respect to the Plan.

C.        *Voting Report*

Prior to the Confirmation Hearing, the Solicitation Agent filed the Voting Report. All procedures used to distribute solicitation materials to the applicable Holders of Claims and Interests and to tabulate the ballots were fair and conducted in accordance with the Conditional Disclosure Statement Order, the Bankruptcy Code, the Bankruptcy Rules, and all other applicable rules, laws, and regulations. Pursuant to sections 1124 and 1126 of the Bankruptcy Code, at least one Impaired Class entitled to vote on the Plan has voted to accept the Plan.

D.        *Judicial Notice*

The Bankruptcy Court takes judicial notice of the docket of the Chapter 11 Cases maintained by the clerk of the Bankruptcy Court and/or its duly appointed agent, including all pleadings and other documents Filed, all orders entered, and all evidence and arguments made, proffered, or adduced at the hearings held before the Bankruptcy Court during the pendency of the Chapter 11 Cases (including the Confirmation Hearing). Resolutions of any objections to Confirmation explained on the record at the Confirmation Hearing are hereby incorporated by reference. All entries on the docket of the Chapter 11 Cases shall constitute the record before the Bankruptcy Court for purposes of the Confirmation Hearing.

E.        *Transmittal and Mailing of Materials; Notice*

Due, adequate, and sufficient notice of the Disclosure Statement, the Plan, the Plan Supplement, the Confirmation Hearing, and the release and exculpation provisions set forth in Article VIII of the Plan, along with all deadlines for voting on or objecting to the Plan, has been given to (1) all known Holders of Claims and Interests, (2) parties that requested notice in accordance with Bankruptcy Rule 2002, (3) all parties to Unexpired Leases and Executory Contracts, and (4) all taxing authorities listed on the Schedules or in the Claims Register, in compliance with Bankruptcy Rules 2002(b), 3017, 3019, and 3020(b), the Conditional Disclosure Statement Order, and such transmittal and service were appropriate, adequate, and sufficient. Adequate and sufficient notice of the Confirmation Hearing and other dates, deadlines, and hearings described in the Conditional Disclosure Statement Order was given in compliance with the Bankruptcy Rules and such order, and no other or further notice is or shall be required.

F.        *Solicitation*

Votes for acceptance and rejection of the Plan were solicited in good faith and complied with sections 1125 and 1126 of the Bankruptcy Code, Bankruptcy Rules 3017, 3018, and 3019, the Conditional Disclosure Statement Order, all other applicable provisions of the Bankruptcy Code and all other applicable rules, laws, and regulations. The Debtors and their respective directors, managers, officers, employees, agents, affiliates, representatives, attorneys, and advisors, as applicable, have solicited votes on the Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code and the Conditional Disclosure Statement Order and are entitled to the protections afforded by section 1125(e) of the Bankruptcy Code and the exculpation provisions set forth in Article VIII of the Plan. The Debtors and the Released Parties solicited acceptance of the Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code and they participated in good faith, and in compliance with the applicable provisions of the Bankruptcy Code in the offer, issuance, sale, or purchase of New Stock and any debt

61

securities that were offered or sold under the Plan and, pursuant to section 1125(e) of the Bankruptcy Code, and no Released Party is or shall be liable on account of such solicitation for violation of any applicable law, rule, or regulation governing solicitation of acceptance of a chapter 11 plan or the offer, issuance, sale, or purchase of such debt securities.

G.    *Burden of Proof*

The Debtors, as proponents of the Plan, have satisfied their burden of proving the elements of sections 1129(a) and 1129(b) of the Bankruptcy Code by a preponderance of the evidence, which is the applicable evidentiary standard. The Debtors have satisfied the elements of section 1129(a) and 1129(b) of the Bankruptcy Code by clear and convincing evidence.

H.    *Bankruptcy Rule 3016(a) Compliance*

The Plan is dated and identifies the proponents thereof, thereby satisfying Bankruptcy Rule 3016(a).

I.    *Compliance with the Requirements of Section 1129 of the Bankruptcy Code*

The plan complies with all requirements of section 1129 of the Bankruptcy Code as follows:

1.    <u>Section 1129(a)(1)–Compliance of the Plan with Applicable Provisions of the Bankruptcy Code</u>

The Plan complies with all applicable provisions of the Bankruptcy Code as required by section 1129(a)(1) of the Bankruptcy Code, including sections 1121, 1122, 1123, and 1125 of the Bankruptcy Code.

a.    Standing

Each of the Debtors has standing to file a plan and the Debtors, therefore, have satisfied section 1121 of the Bankruptcy Code.

b.    Proper Classification

Pursuant to sections 1122(a) and 1123(a)(1) of the Bankruptcy Code, Article III of the Plan designates Classes of Claims and Interests, other than Administrative Claims, Professional Fee Claims, DIP Facility Claims, and Priority Tax Claims, which are not required to be classified. As required by section 1122(a) of the Bankruptcy Code, each Class of Claims and Interests contains only Claims or Interests that are substantially similar to the other Claims or Interests within that Class.

c.    Specification of Unimpaired Classes

Pursuant to section 1123(a)(2) of the Bankruptcy Code, Article III of the Plan specifies all Classes of Claims and Interests that are not Impaired.

d.    Specification of Treatment of Impaired Classes

Pursuant to section 1123(a)(3) of the Bankruptcy Code, Article III of the Plan specifies the treatment of all Classes of Claims and Interests that are Impaired.

e.    No Discrimination

Pursuant to section 1123(a)(4) of the Bankruptcy Code, Article III of the Plan provides the same treatment for each Claim or Interest within a particular Class, as the case may be, unless the Holder of a particular Claim or Interest has agreed to less favorable treatment with respect to such Claim or Interest, as applicable.

f.       Plan Implementation

Pursuant to section 1123(a)(5) of the Bankruptcy Code, the Plan provides adequate and proper means for the Plan's implementation. Immediately upon the Effective Date, sufficient Cash and other consideration provided under the Plan will be available to make all payments required to be made on the Effective Date pursuant to the terms of the Plan. Moreover, Article IV and various other provisions of the Plan specifically provide adequate means for the Plan's implementation.

g.       Voting Power of Equity Securities; Selection of Officer, Director, or Trustee under the Plan

The New Organizational Documents comply with sections 1123(a)(6) and 1123(a)(7) of the Bankruptcy Code.

h.       Impairment/Unimpairment of Classes of Claims and Equity Interests

Pursuant to section 1123(b)(1) of the Bankruptcy Code, (i) Class 1 (Other Secured Claims), Class 2 (Other Priority Claims), Class 5 (Lombard (BULL) Term Loan Claims), Class 7 (Macquarie Term Loan Credit Facility Claims), Class 9 (Lombard (BALL) Term Loan Guarantee Claims and UK ABL Credit Facility), Class 10 (MCA and Other Customer Guarantee Claims) and Class 11 (Trade Claims) are Unimpaired under the Plan, (ii) Class 3 (2019 Term Loan Facility Claims), Class 4 (Secured Notes Claims), Class 6 (PK Air Credit Facility Claims and MAG Lease Obligation Claims), Class 8 (Unsecured Notes Claims), Class 12 (General Unsecured Claims), Class 15 (Existing Interests), and Class 16 (Section 510(b) Claims) are Impaired under the Plan, and (iii) Class 13 (Intercompany Claims) and Class 14 (Intercompany Interests) are either Unimpaired or Impaired under the Plan at the election of the Required RSA Parties.

i.       Assumption and Rejection of Executory Contracts and Unexpired Leases

In accordance with section 1123(b)(2) of the Bankruptcy Code, pursuant to Article V of the Plan, on the Effective Date, each Executory Contract and Unexpired Lease shall be deemed assumed unless such Executory Contract or Unexpired Lease is listed on the Schedule of Rejected Executory Contracts and Unexpired Leases, if any. The assumption of Executory Contracts and Unexpired Leases hereunder may include the assignment of certain of such contracts to Affiliates. The Debtors' assumption and assignment of the Executory Contracts and Unexpired Leases listed on the Schedule of Assumed Executory Contracts and Unexpired Leases pursuant to Article V of the Plan governing assumption and rejection of executory contracts and unexpired leases satisfies the requirements of section 365(b) of the Bankruptcy Code and, accordingly, the requirements of section 1123(b) of the Bankruptcy Code.

The Debtors have exercised reasonable business judgment in determining whether to reject, assume, or assume and assign each of their Executory Contracts and Unexpired Leases under the terms of the Plan. Each pre- or post-Confirmation rejection, assumption, or assumption and assignment of an Executory Contract or Unexpired Lease pursuant to Article V of the Plan will be legal, valid and binding upon the applicable Debtor and all other parties to such Executory Contract or Unexpired Lease, as applicable, all to the same extent as if such rejection, assumption, or assumption and assignment had been effectuated pursuant to an appropriate order of the Court entered before the Confirmation Date under section 365 of the Bankruptcy Code. Each of the Executory Contracts and Unexpired Leases to be rejected, assumed, or assumed and assigned is deemed to be an executory contract or an unexpired lease, as applicable.

j.       Settlement of Claims and Causes of Action

All of the settlements and compromises pursuant to and in connection with the Plan or incorporated by reference into the Plan comply with the requirements of section 1123(b)(3) of the Bankruptcy Code and Bankruptcy Rule 9019.

Pursuant to Bankruptcy Rule 9019 and section 363 of the Bankruptcy Code and in consideration for the distributions and other benefits provided under the Plan, any and all compromise and settlement provisions of the Plan

63

constitute good-faith compromises, are in the best interests of the Debtors, the Estates, and all Holders of Claims and Interests, and are fair, equitable, and reasonable.

Specifically, the settlements and compromises pursuant to and in connection with the Plan are substantively fair based on the following factors: (a) the balance between the litigation's possibility of success and the settlement's future benefits; (b) the likelihood of complex and protracted litigation and risk and difficulty of collecting on the judgment; (c) the proportion of creditors and parties in interest that support the settlement; (d) the competency of counsel reviewing the settlement; the nature and breadth of releases to be obtained by officers and directors; and (e) the extent to which the settlement is the product of arm's-length bargaining.

### k.      Cure of Defaults

Article V of the Plan provides for the satisfaction of default claims associated with each Executory Contract and Unexpired Lease to be assumed in accordance with section 365(b)(1) of the Bankruptcy Code. The Cure Costs identified in the Schedule of Assumed Executory Contracts and Unexpired Leases and any amendments thereto, as applicable, represent the amount, if any, that the Debtors propose to pay in full and complete satisfaction of such default claims. Any disputed cure amounts will be determined in accordance with the procedures set forth in Article V of the Plan, and applicable bankruptcy and nonbankruptcy law. As such, the Plan provides that the Debtors will cure, or provide adequate assurance that the Debtors will promptly cure, defaults with Executory Contracts and Unexpired Leases in compliance with section 365(b)(1) of the Bankruptcy Code. Thus, the Plan complies with section 1123(d) of the Bankruptcy Code.

### l.      Other Appropriate Provisions

The Plan's other provisions are appropriate and consistent with the applicable provisions of the Bankruptcy Code, including provisions for (i) distributions to holders of Claims and Interests, (ii) objections to Claims, (iii) procedures for resolving disputed, contingent, and unliquidated claims, (iv) cure amounts, procedures governing cure disputes, and (v) indemnification obligations.

### 2.      Section 1129(a)(2)–Compliance of Plan Proponents with Applicable Provisions of the Bankruptcy Code

The Debtors, as proponents of the Plan, have complied with all applicable provisions of the Bankruptcy Code as required by section 1129(a)(2) of the Bankruptcy Code, including sections 1125 and 1126 of the Bankruptcy Code and Bankruptcy Rules 3017, 3018, and 3019. In particular, the Debtors are proper debtors under section 109 of the Bankruptcy Code and proper proponents of the Plan under section 1121(a) of the Bankruptcy Code. Furthermore, the solicitation of acceptances or rejections of the Plan was (i) pursuant to the Conditional Disclosure Statement Order; (ii) in compliance with all applicable laws, rules, and regulations governing the adequacy of disclosure in connection with such solicitation; and (iii) solicited after disclosure to Holders of Claims or Interests of adequate information as defined in section 1125(a) of the Bankruptcy Code. Accordingly, the Debtors and their respective directors, officers, employees, agents, affiliates, and Professionals have acted in "good faith" within the meaning of section 1125(e) of the Bankruptcy Code.

### 3.      Section 1129(a)(3)–Proposal of Plan in Good Faith

The Debtors have proposed the Plan in good faith and not by any means forbidden by law based on the totality of the circumstances surrounding the filing of the Chapter 11 Cases, the Plan itself, and the process leading to its formulation. The Chapter 11 Cases were filed, and the Plan was proposed, with the legitimate purpose of allowing the Debtors to reorganize.

### 4.      Section 1129(a)(4)–Bankruptcy Court Approval of Certain Payments as Reasonable

Pursuant to section 1129(a)(4) of the Bankruptcy Code, the payments to be made for services or for costs in connection with the Chapter 11 Cases or the Plan are approved. The fees and expenses incurred by Professionals retained by the Debtors or the Creditors' Committee shall be payable according to the orders approving such

Professionals' retentions, the Interim Compensation Order, other applicable Bankruptcy Court orders, or as otherwise provided in the Plan.

> 5. Section 1129(a)(5)–Disclosure of Identity of Proposed Management, Compensation of Insiders, and Consistency of Management Proposals with the Interests of Creditors and Public Policy

Pursuant to section 1129(a)(5) of the Bankruptcy Code, information concerning the individuals proposed to serve on the Reorganized Bristow Parent Board and each such individual's compensation upon Consummation of the Plan has been fully disclosed (in the Plan Supplement) to the extent available, and the appointment to, or continuance in, such office of such person is consistent with the interests of Holders of Claims and Interests and with public policy.

> 6. Section 1129(a)(6)–Approval of Rate Changes

Section 1129(a)(6) of the Bankruptcy Code is not applicable because the Plan does not provide for rate changes by any of the Debtors.

> 7. Section 1129(a)(7)–Best Interests of Creditors and Interest Holders

The liquidation analysis included in the Disclosure Statement, and the other evidence related thereto that was proffered or adduced at or prior to, or in affidavits in connection with, the Confirmation Hearing, is reasonable. The methodology used and assumptions made in such liquidation analysis, as supplemented by the evidence proffered or adduced at or prior to, or in affidavits filed in connection with, the Confirmation Hearing, are reasonable. With respect to each Impaired Class, each Holder of an Allowed Claim or Interest in such Class has accepted the Plan or will receive under the Plan on account of such Claim or Interest property of a value, as of the Effective Date, that is not less than the amount such Holder would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code.

> 8. Section 1129(a)(8)–Conclusive Presumption of Acceptance by Unimpaired Classes; Acceptance of the Plan by Each Impaired Class

Certain Classes of Claims and Interests are Unimpaired and are deemed conclusively to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. In addition, at least one Impaired Class that was entitled to vote has voted to accept the Plan. Because the Plan provides that the certain Classes of Claims and Interests will be Impaired and because no distributions shall be made to Holders in such Classes, such Holders are deemed conclusively to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code and, therefore, are not entitled to vote to accept or reject the Plan.

> 9. Section 1129(a)(9)–Treatment of Claims Entitled to Priority Pursuant to Section 507(a) of the Bankruptcy Code

The treatment of Administrative Claims, Professional Fee Claims, DIP Facility Claims, Other Priority Claims, and Priority Tax Claims under Article II of the Plan satisfies the requirements of section 1129(a)(9) of the Bankruptcy Code.

> 10. Section 1129(a)(10)–Acceptance by at Least One Impaired Class

At least one Impaired Class has voted to accept the Plan. Accordingly, section 1129(a)(10) of the Bankruptcy Code is satisfied.

> 11. Section 1129(a)(11)–Feasibility of the Plan

The Plan satisfies section 1129(a)(11) of the Bankruptcy Code. Based upon the evidence proffered or adduced at, or prior to, or in affidavits filed in connection with, the Confirmation Hearing, the Plan is feasible and Confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtors or any successor to the Debtors under the Plan, except as such liquidation is proposed in the Plan. Furthermore, the Debtors will have adequate assets to satisfy their respective obligations under the Plan.

65

12.     Section 1129(a)(12)–Payment of Bankruptcy Fees

Article II.E of the Plan provides for the payment of all fees payable under 28 U.S.C. § 1930(a) in accordance with section 1129(a)(12) of the Bankruptcy Code.

13.     Section 1129(a)(13)–Retiree Benefits

The Plan provides for the treatment of all retiree benefits in accordance with section 1129(a)(13) of the Bankruptcy Code.

14.     Section 1129(a)(14)–Domestic Support Obligations

The Debtors are not required by a judicial or administrative order, or by statute, to pay any domestic support obligations, and therefore, section 1129(a)(14) of the Bankruptcy Code is inapplicable in these Chapter 11 Cases.

15.     Section 1129(a)(15)–The Debtors Are Not Individuals

The Debtors are not individuals, and therefore, section 1129(a)(15) of the Bankruptcy Code is inapplicable in these Chapter 11 Cases.

16.     Section 1129(a)(16)–No Applicable Nonbankruptcy Law Regarding Transfers

Each of the Debtors that is a corporation is a moneyed, business, or commercial corporation or trust, and therefore, section 1129(a)(16) of the Bankruptcy Code is inapplicable in these Chapter 11 Cases.

17.     Section 1129(b)–Confirmation of Plan Over Rejection of Impaired Classes

The Plan satisfies the requirements of section 1129(b) of the Bankruptcy Code with respect to the Classes presumed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code or that have actually rejected the Plan (if any).  To determine whether a plan is "fair and equitable" with respect to a class of claims, section 1129(b)(2)(B)(ii) of the Bankruptcy Code provides in pertinent part that "the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or interest any property."  To determine whether a plan is "fair and equitable" with respect to a class of interests,  section 1129(b)(2)(C)(ii) of the Bankruptcy Code provides that "the holder of any interest that is junior to the interests of such class will not receive or retain under the plan on account of such junior interest any property."  There are no classes junior to the deemed (or actual) rejecting classes of claims or interests that will receive any distribution under the Plan.  The Plan, therefore, satisfies the requirements of section 1129(b) of the Bankruptcy Code.

18.     Section 1129(c)–Confirmation of Only One Plan With Respect to the Debtors

The Plan is the only plan that has been filed in these Chapter 11 Cases with respect to the Debtors.  Accordingly, the Plan satisfies the requirements of section 1129(c) of the Bankruptcy Code.

19.     Section 1129(d)–Principal Purpose Not Avoidance of Taxes

The principal purpose of the Plan is not the avoidance of taxes or the avoidance of the application of section 5 of the Securities Act.  Accordingly, the Plan satisfies the requirements of section 1129(d) of the Bankruptcy Code.

20.     Section 1129(e)–Small Business Case

Section 1129(e) is inapplicable because these Chapter 11 Cases do not qualify as small business cases thereunder.

J.      *Securities Under the Plan*

Pursuant to the Plan, and without further corporate or other action, the New Stock and any debt issued or assumed by the Reorganized Debtors will be issued or entered into, as applicable, on the Effective Date subject to the terms of the Plan.

K.      *Releases and Discharges*

The releases and discharges of Claims and Causes of Action described in the Plan, including releases by the Debtors and by Holders of Claims and Interests, constitute good faith compromises and settlements of the matters covered thereby. Such compromises and settlements are made in exchange for consideration and are in the best interest of Holders of Claims and Interests, are fair, equitable, reasonable, and are integral elements of the resolution of the Chapter 11 Cases in accordance with the Plan. Each of the discharge, release, indemnification, and exculpation provisions set forth in the Plan: (a) is within the jurisdiction of the Court under 28 U.S.C. §§ 1334(a), 1334(b), and 1334(d); (b) is an essential means of implementing the Plan pursuant to section 1123(a)(6) of the Bankruptcy Code; (c) is an integral element of the transactions incorporated into the Plan; (d) confers material benefit on, and is in the best interests of, the Debtors, their estates, and their creditors; (e) is important to the overall objectives of the Plan to finally resolve all Claims and Interests among or against the parties in interest in the Chapter 11 Cases with respect to the Debtors; (f) is consistent with sections 105, 1123, 1129, and all other applicable provisions of the Bankruptcy Code; (g) given and made after due notice and opportunity for hearing; and (h), without limiting the foregoing, with respect to the releases and injunctions in Article VIII of the Plan, are (i) essential elements of the Restructuring Transactions and Plan, terms and conditions without which the Supporting Noteholders would not have entered into the Restructuring Support Agreement, (ii) narrowly tailored, and (iii) in consideration of the substantial financial contribution of the Supporting Noteholders, the Backstop Commitment Parties, and the other Rights Offering Participants under the Plan.  Furthermore, the injunction set forth in Article VIII is an essential component of the Plan, the fruit of long-term negotiations and achieved by the exchange of good and valuable consideration that will enable unsecured creditors to realize distributions in the Chapter 11 Cases.

L.      *Release and Retention of Causes of Action*

It is in the best interests of Holders of Claims and Interests that the provisions in Article VIII of the Plan be approved.

M.      *Approval of Restructuring Support Agreement, Backstop Commitment Agreement and Other Restructuring Documents and Agreements*

All documents and agreements necessary to implement the Plan, including the Restructuring Support Agreement, the Backstop Commitment Agreement and the other Restructuring Documents are essential elements of the Plan, are necessary to consummate the Plan and the Restructuring Transaction, and entry into and consummation of the transactions contemplated by each such document and agreement is in the best interests of the Debtors, the Estates, and Holders of Claims and Interests.  The Debtors have exercised reasonable business judgment in determining which agreements to enter into and have provided sufficient and adequate notice of such documents and agreements.  The terms and conditions of such documents and agreements have been negotiated in good faith, at arm's-length, are fair and reasonable, and are hereby reaffirmed and approved, and subject to the occurrence of the Effective Date and execution and delivery in accordance with their respective terms, shall be in full force and effect and valid, binding, and enforceable in accordance with their respective terms, without the need for any further notice to or action, order, or approval of the Bankruptcy Court, or other action under applicable law, regulation, or rule.

N.      *Confirmation Hearing Exhibits*

All of the exhibits presented at the Confirmation Hearing have been properly received into evidence and are a part of the record before the Bankruptcy Court.

O.    *Objections to Confirmation of the Plan*

Any and all objections to Confirmation have been withdrawn, settled, overruled, or otherwise resolved.

P.    *Retention of Jurisdiction*

The Bankruptcy Court may properly retain jurisdiction over the matters set forth in Article XII of the Plan and section 1142 of the Bankruptcy Code.

Q.    *Plan Supplement*

The Debtors filed the Plan Supplement, which includes the following documents: (a) the material New Organizational Documents; (b) the Exit Facility Term Sheet, if applicable; (c) the Amended and Restated 2019 Term Loan Credit Agreement and material related documents, if applicable, and the identity of the Amended and Restated 2019 Term Loan Facility Agent; (d) the schedule of Retained Causes of Action; (e) a disclosure of the members of the Reorganized Bristow Parent Board and their compensation; (f) the Schedule of Assumed Executory Contracts and Unexpired Leases; (g) the Schedule of Rejected Executory Contracts and Unexpired Leases; (h) the Restructuring Transactions Exhibit, if needed; (i) a description of the material terms of the Management Incentive Plan; (j) the New Shareholders' Agreement; (k) the Schedule of Other Customer Contracts; (l) the New Preferred Stock Agreement; (m) the New Common Stock Agreement; (n) the terms of the Amended PK Air Credit Facility Agreement (to the extent not set forth in the motion seeking approval of the Milestone Settlement); and (o) to the extent necessary in order to ensure compliance with 49 U.S.C. § 40102(a)(15)(C), the New Warrant Agreement.  All such documents comply with the terms of the Plan, and the filing and notice of such documents was adequate, proper and in accordance with the Conditional Disclosure Statement Order, the Bankruptcy Code, and the Bankruptcy Rules.

## ARTICLE X.
## CONDITIONS PRECEDENT TO THE EFFECTIVE DATE

A.    *Conditions Precedent to the Effective Date*

It shall be a condition to the Effective Date that the following conditions shall have been satisfied or waived pursuant to Article X.B of the Plan:

1.    The Bankruptcy Court shall have entered the Confirmation Order in form and substance consistent in all respects with the Restructuring Support Agreement and otherwise in form and substance acceptable to the Debtors and the Required RSA Parties and, with respect to issues that affect the Milestone Parties, in form and substance reasonably acceptable to the Milestone Parties, and the Confirmation Order shall have become a Final Order;

2.    The DIP Order shall have been entered and no event of default shall have occurred and be continuing thereunder.

3.    Each of the Plan, the Restructuring Documents, and all documents contained in any supplement to the Plan, including the Plan Supplement and any exhibits, schedules, amendments, modifications or supplements thereto, shall have been executed and/or filed, in form and substance consistent in all respects with the Restructuring Support Agreement and otherwise comply with the applicable consent rights (if any) set forth in this Plan for such documents and shall not have been modified in a manner inconsistent with the Restructuring Support Agreement;

4.    Either (i) the Exit Facility Documents shall have been duly executed and delivered by all of the Entities that are parties thereto and all conditions precedent (other than any conditions related to the occurrence of the Effective Date) to the effectiveness of the Exit Facility shall have been satisfied or duly waived in writing or (ii) the Amended and Restated 2019 Term Loan Credit Agreement has been executed and is in full force and effect;

5.    The Bankruptcy Court shall have entered the Milestone Settlement Order, such order shall have become a Final Order, and the parties to the Milestone Settlement shall have complied with their obligations

68

thereunder arising through the Effective Date (including the payment by the Debtors, no later than the Effective Date, of the reasonable and documented fees and expenses of its professionals).

6.    The Bankruptcy Court shall have entered the HeliFleet Stipulation, which shall have become a Final Order.

7.    The Backstop Commitment Agreement and the Restructuring Support Agreement shall have been approved by entry of an order by the Bankruptcy Court and shall remain in full force and effect, all conditions shall have been satisfied thereunder, and there shall be no breach that would give rise to a right to terminate the Backstop Commitment Agreement or the Restructuring Support Agreement for which notice has been given in accordance with the terms thereof (including by the requisite parties thereunder), or such notice could have been given to the extent such notice is not permitted due to the commencement of the Chapter 11 Cases and the related automatic stay;

8.    No court of competent jurisdiction or other competent governmental or regulatory authority shall have issued a final and non-appealable order making illegal or otherwise restricting, preventing or prohibiting, in any material respect, the consummation of the Plan, the Restructuring Support Agreement or any of the Restructuring Documents or Restructuring Transactions contemplated thereby;

9.    The Debtors shall have obtained all material authorizations, consents, regulatory approvals, rulings, or documents that are necessary to implement and effectuate the Restructuring Transactions;

10.   The Debtors shall have paid all Transaction Expenses then known or submitted to the Debtors;

11.   The Debtors shall have paid all reasonable and documented fees and expenses incurred and unpaid as of the Effective Date of each of the members of the Creditors' Committee, including up to $20,000 for the reasonable and documented fees of Infosys Limited, in its capacity as a member of the Creditors' Committee;

12.   All Allowed Professional Fee Claims shall have been paid in full or amounts sufficient to pay such Allowed Professional Fee Claims after the Effective Date shall have been placed in the Professional Fee Escrow Account pending approval of the Professional Fee Claims by the Bankruptcy Court; and

13.   The Debtors shall have implemented the Restructuring Transactions in a manner consistent in all respects with the Restructuring Support Agreement (subject to the consent rights set forth therein).

B.    *Waiver of Conditions*

The conditions to the Effective Date of the Plan set forth in Article X of the Plan may only be waived with the consent of the Debtors and the Required RSA Parties (such consents not to be unreasonably withheld) without notice, leave, or order of the Bankruptcy Court or any formal action other than proceedings to confirm or consummate the Plan.

C.    *Effect of Non-Occurrence of Conditions to Consummation*

If the Effective Date does not occur on or before the termination of the Restructuring Support Agreement or the Backstop Commitment Agreement, the Plan shall be null and void in all respects and nothing contained in the Plan or the Disclosure Statement shall:  (1) constitute a waiver or release of any Claims, Interests, or Causes of Action by any Entity; (2) prejudice in any manner the rights of any Debtor or any other Entity; or (3) constitute an admission, acknowledgment, offer, or undertaking of any sort by any Debtor or any other Entity; *provided*, that all provisions of the Restructuring Support Agreement or the Backstop Commitment Agreement that survive termination thereof shall remain in effect in accordance with the terms thereof.

D.    *Substantial Consummation*

"Substantial consummation" of the Plan, as defined in section 1101(2) of the Bankruptcy Code, shall be deemed to occur on the Effective Date.

## ARTICLE XI.
## MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN

A.  *Modification of Plan*

Effective as of the date hereof and subject to the consent of the Required RSA Parties and the Committee Consent Right:  (1) the Debtors reserve the right, in accordance with the Bankruptcy Code and the Bankruptcy Rules, to amend or modify the Plan before the entry of the Confirmation Order consistent with the terms set forth herein, and, as appropriate, not resolicit votes on such modified Plan; and (2) after the entry of the Confirmation Order, the Debtors or the Reorganized Debtors, as applicable, may, upon order of the Bankruptcy Court, amend or modify the Plan, in accordance with section 1127(b) of the Bankruptcy Code and Bankruptcy Rule 3019, remedy any defect or omission, or reconcile any inconsistency in the Plan in such manner as may be necessary to carry out the purpose and intent of the Plan consistent with the terms set forth herein.

B.  *Effect of Confirmation on Modifications*

Entry of the Confirmation Order shall constitute approval of all modifications to the Plan occurring after the solicitation of votes thereon pursuant to section 1127(a) of the Bankruptcy Code and a finding that such modifications to the Plan do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

C.  *Revocation or Withdrawal of Plan*

Subject to the terms of the Restructuring Support Agreement, the Debtors reserve the right to revoke or withdraw the Plan with respect to any or all Debtors before the Confirmation Date and to File subsequent chapter 11 plans.  If the Debtors revoke or withdraw the Plan, or if Confirmation or the Effective Date does not occur, then:  (1) the Plan will be null and void in all respects; (2) any settlement or compromise embodied in the Plan, assumption or rejection of Executory Contracts or Unexpired Leases effectuated by the Plan, and any document or agreement executed pursuant hereto will be null and void in all respects; and (3) nothing contained in the Plan shall (a) constitute a waiver or release of any Claims, Interests, or Causes of Action by any Entity, (b) prejudice in any manner the rights of any Debtor or any other Entity, or (c) constitute an admission, acknowledgement, offer, or undertaking of any sort by any Debtor or any other Entity.

## ARTICLE XII.
## RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of, or related to, the Chapter 11 Cases and the Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code, including jurisdiction to:

1.  allow, disallow, determine, liquidate, classify, estimate, or establish the priority, Secured or unsecured status, or amount of any Claim against a Debtor, including the resolution of any request for payment of any Claim and the resolution of any and all objections to the Secured or unsecured status, priority, amount, or allowance of Claims;

2.  decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or the Plan;

3.  resolve any matters related to Executory Contracts or Unexpired Leases, including:  (a) the assumption or assumption and assignment of any Executory Contract or Unexpired Lease to which a Debtor is party or with respect to which a Debtor may be liable and to hear, determine, and, if necessary, liquidate, any Cure Costs or Claims arising therefrom, including pursuant to section 365 of the Bankruptcy Code; (b) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed; and (c) any dispute regarding whether a contract or lease is or was executory or expired;

70

4.      ensure that distributions to Holders of Allowed Claims and Allowed Interests are accomplished pursuant to the provisions of the Plan and adjudicate any and all disputes arising from or relating to distributions under the Plan;

5.      adjudicate, decide, or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters, and grant or deny any applications involving a Debtor that may be pending on the Effective Date;

6.      enter and implement such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of (a) contracts, instruments, releases, indentures, and other agreements or documents approved by a Final Order in the Chapter 11 Cases, and (b) the Plan, the Confirmation Order, and contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan;

7.      enforce any order for the sale of property pursuant to sections 363, 1123, or 1146(a) of the Bankruptcy Code;

8.      grant any consensual request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code;

9.      issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Entity with Consummation or enforcement of the Plan;

10.      hear, determine, and resolve any cases, matters, controversies, suits, disputes, or Causes of Action in connection with or in any way related to the Chapter 11 Cases, including:  (a) with respect to the repayment or return of distributions and the recovery of additional amounts owed by the Holder of a Claim for amounts not timely repaid pursuant to Article VI.F.1 of the Plan; (b) with respect to the releases, injunctions, and other provisions contained in Article VIII of the Plan, including entry of such orders as may be necessary or appropriate to implement such releases, injunctions, and other provisions; (c) that may arise in connection with the Consummation, interpretation, implementation, or enforcement of the Plan, the Confirmation Order, and contracts, instruments, releases, and other agreements or documents created in connection with the Plan; or (d) related to section 1141 of the Bankruptcy Code;

11.      enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

12.      consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

13.      hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

14.      enter an order or Final Decree concluding or closing the Chapter 11 Cases;

15.      enforce all orders previously entered by the Bankruptcy Court;

16.      hear and determine disputes involving any matter related to the implementation of the Plan, *provided*, *however*, that upon the closing of the Exit Facility (or, if applicable, the execution of the Amended and Restated 2019 Term Loan Credit Agreement) and execution of the New Organizational Documents, disputes with respect to the Exit Facility and the New Organizational Documents that are not related to the Plan shall otherwise be governed by the jurisdictional, forum selection or dispute resolution clause contained in such document; and

17.      hear any other matter not inconsistent with the Bankruptcy Code.

Notwithstanding the foregoing, the Bankruptcy Court retains jurisdiction, but not exclusive jurisdiction, to determine whether environmental liabilities asserted by any Governmental Unit are discharged or otherwise barred by

the Confirmation Order or the Plan, or the Bankruptcy Code. As of the Effective Date, notwithstanding anything in this Article XII to the contrary, the Exit Facility (or, if applicable, the execution of the Amended and Restated 2019 Term Loan Credit Agreement), the Amended PK Air Credit Facility Agreement and the New Organizational Documents shall be governed by the jurisdictional provisions contained therein.

## ARTICLE XIII.
## MISCELLANEOUS PROVISIONS

### A. *Immediate Binding Effect*

Subject to Article X.A hereof, and notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan and the Plan Supplement shall be immediately effective and enforceable and deemed binding upon the Debtors, the Reorganized Debtors, and any and all Holders of Claims or Interests (irrespective of whether such Holders of Claims or Interests have accepted or are deemed to have accepted the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, discharges, and injunctions described in the Plan, each Entity acquiring property under the Plan, and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtors. All Claims and debts shall be as fixed, adjusted, or compromised, as applicable, pursuant to the Plan regardless of whether any Holder of a Claim or debt has voted on the Plan.

### B. *Restructuring Documents*

All Restructuring Documents, including the Final Cash Collateral Order, the Disclosure Statement, the other solicitation materials with respect to the Plan, the Conditional Disclosure Statement Order, the Plan, each document included in the Plan Supplement, the Backstop Commitment Agreement, the Confirmation Order, the DIP Facility Credit Agreement, the DIP Order, the Exit Facility Credit Agreement, the Amended and Restated 2019 Term Loan Credit Agreement, the New Organizational Documents, the Management Incentive Plan and the Rights Offering Procedures, shall be subject to the consent rights of the Required RSA Parties on the terms set forth in the Restructuring Support Agreement, and subject to the Committee Consent Right.

### C. *Additional Documents*

On or before the Effective Date, and subject to the terms of the Restructuring Support Agreement and the Backstop Commitment Agreement, the Debtors may File with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan. The Debtors or the Reorganized Debtors, as applicable, and all Holders of Claims receiving distributions pursuant to the Plan and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

### D. *Dissolution of the Statutory Committees*

On the Effective Date, the Creditors' Committee and any other statutory committee appointed in the Chapter 11 Cases shall dissolve automatically and the members thereof shall be released and discharged from all rights, duties, responsibilities, and liabilities arising from, or related to, the Chapter 11 Cases and under the Bankruptcy Code, except for the purposes of (a) prosecuting requests for payment of Professional Fee Claims for services rendered and reimbursement of expenses incurred prior to the Effective Date by the Creditors' Committee and its Professionals, (b) participating in any adversary proceeding commenced on or before the Effective Date in which the Creditors' Committee (or any member thereof in its capacity as such) is named, and (c) participating in any appeals of the Confirmation Order. The Debtors shall no longer be responsible for paying any fees or expenses incurred by the members of or advisors to the Creditors' Committee or any other statutory committee after the Effective Date except for those purposes set forth in the preceding sentence. Upon the dissolution of the Creditors' Committee and any other statutory committee, the members of such committees and their respective professionals will cease to have any duty, obligation or role arising from or related to the Chapter 11 Cases and shall be released and discharged from all rights and duties from or related to the Chapter 11 Cases.

E.     *Payment of Statutory Fees*

All fees payable pursuant to 28 U.S.C. § 1930(a) prior to the Effective Date shall be paid by the Debtors.  On and after the Effective Date, the Reorganized Debtors shall pay any and all such fees when due and payable, and shall File with the Bankruptcy Court quarterly reports in a form reasonably acceptable to the U.S. Trustee.  Each Debtor and Reorganized Debtor shall remain obligated to pay quarterly fees to the U.S. Trustee until the earliest of that particular Debtor's or Reorganized Debtor's case being closed, dismissed, or converted to a case under chapter 7 of the Bankruptcy Code.

F.     *Payment of Transaction Expenses*

The Debtors and Reorganized Debtors, as applicable, will, on the Effective Date (or, to the extent not known or submitted to the Debtors for payment as of the Effective Date, promptly following receipt of an invoice therefor, whether incurred before or after the Effective Date) and to the extent invoiced in accordance with the terms of the applicable engagement letter (and, for the avoidance of doubt, no invoices shall be required to include itemized time detail), pay the Transaction Expenses (whether accrued prepetition or postpetition and to the extent not otherwise paid during the Chapter 11 Cases), without the need for application by any such parties to the Bankruptcy Court, and without notice and a hearing pursuant to section 1129(a)(4) of the Bankruptcy Code or otherwise.

G.     *Reservation of Rights*

The Plan shall have no force or effect unless the Bankruptcy Court shall enter the Confirmation Order.  None of the Filing of the Plan, any statement or provision contained in the Plan, or the taking of any action by any Debtor with respect to the Plan, the Disclosure Statement, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of any Debtor with respect to the Holders of Claims or Interests prior to the Effective Date.

H.     *Successors and Assigns*

The rights, benefits, and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, Affiliate, officer, director, agent, representative, attorney, beneficiaries, or guardian, if any, of each Entity.

I.     *Service of Documents*

After the Effective Date, any pleading, notice, or other document required by the Plan to be served on or delivered to the Reorganized Debtors shall be served on:

| **Reorganized Debtors** | **Bristow Group Inc.** |
| --- | --- |
| | 2103 City West Blvd., 4th Floor |
| | Houston, Texas 77042 |
| | Attn:    Victoria Lazar |
| | |
| | with copies to: |

73

| | |
|---|---|
| **Counsel to Debtors** | **Baker Botts L.L.P.**<br>2001 Ross Avenue, Suite 900<br>Dallas, Texas 75201-2980<br>Attn:   James R. Prince<br>          Omar J. Alaniz<br>          Kevin Chiu<br><br>-and-<br><br>**Baker Botts L.L.P.**<br>30 Rockefeller Plaza<br>New York, New York 10112-4498<br>Attn:   Emanuel C. Grillo<br>          Chris Newcomb<br><br>-and-<br><br>**Wachtell, Lipton, Rosen & Katz**<br>51 West 52nd Street<br>New York, New York 10019<br>Attn:   Richard G. Mason<br>          Amy R. Wolf |
| **Counsel to the Secured Notes Ad Hoc Group** | **Davis Polk & Wardwell LLP**<br>450 Lexington Avenue<br>New York, New York 10017<br>Attn:   Damian S. Schaible<br>(damian.schaible@davispolk.com)<br>          Natasha Tsiouris<br>(natasha.tsiouris@davispolk.com) |
| **Counsel to the Unsecured Notes Ad Hoc Group** | **Kirkland & Ellis LLP**<br>601 Lexington Avenue<br>New York, New York 10022<br>Attn:   Joshua A. Sussberg<br>(joshua.sussberg@kirkland.com)<br>          Brian E. Schartz<br>(brian.schartz@kirkland.com)<br><br>-and-<br><br>Kirkland & Ellis LLP<br>300 North LaSalle<br>Chicago, Illinois 60654<br>Attn:   Gregory F. Pesce<br>(gregory.pesce@kirkland.com) |

**Counsel to the Creditors' Committee**      **Kramer Levin Naftalis & Frankel LLP**
1177 Avenue of the Americas
New York, New York 10036
Attn:   Douglas H. Mannal
(dmannal@kramerlevin.com)
        Anupama Yerramalli
(ayerramalli@kramerlevin.com)

J.      *Term of Injunctions or Stays*

**Unless otherwise provided herein or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases (pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court) and existing on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order) shall remain in full force and effect until the Effective Date. All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.**

K.      *Entire Agreement*

Except as otherwise indicated, the Plan supersedes all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

L.      *Plan Supplement*

All exhibits and documents included in the Plan Supplement are incorporated into and are a part of the Plan as if set forth in full in the Plan. After any of such documents included in the Plan Supplement are Filed, copies of such documents shall be made available upon written request to the Debtors' counsel at the address above or by downloading such exhibits and documents from the Solicitation Agent's website at https://cases.primeclerk.com/Bristow or the Bankruptcy Court's website at https://www.pacer.gov/.

M.      *Non-Severability*

If, prior to Confirmation, the Bankruptcy Court holds any term or provision of the Plan to be invalid, void, or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is: (1) valid and enforceable pursuant to its terms; (2) integral to the Plan and may not be deleted or modified without the consent of the Debtors, the Required RSA Parties, and without satisfying the Committee Consent Right; and (3) non-severable and mutually dependent.

N.      *Votes Solicited in Good Faith*

Upon entry of the Confirmation Order, the Debtors will be deemed to have solicited votes on the Plan in good faith and in compliance with the Bankruptcy Code, and pursuant to section 1125(e) of the Bankruptcy Code, the Debtors and each of the Supporting Noteholders and each of their respective Affiliates, agents, representatives, members, principals, equity holders (regardless of whether such interests are held directly or indirectly), officers, directors, managers, employees, advisors, and attorneys will be deemed to have participated in good faith and in compliance with the Bankruptcy Code in the offer, issuance, sale, and purchase of Securities offered and sold under

76

the Plan, and, therefore, neither any of such parties or individuals or the Reorganized Debtors will have any liability for the violation of any applicable law, rule, or regulation governing the solicitation of votes on the Plan or the offer, issuance, sale, or purchase of the Securities offered and sold under the Plan.

O.      *Waiver or Estoppel*

Each Holder of a Claim or an Interest shall be deemed to have waived any right to assert any argument, including the right to argue that its Claim or Interest should be Allowed in a certain amount, in a certain priority, Secured or not subordinated by virtue of an agreement made with the Debtors or their counsel, or any other Entity, if such agreement was not disclosed in the Plan, the Disclosure Statement, the Restructuring Support Agreement, or papers Filed with the Bankruptcy Court prior to the Confirmation Date.

[*Remainder of page intentionally left blank*]

Dated:  September 30, 2019

BRISTOW GROUP INC.
on behalf of itself and all other Debtors


By: */s/ Brian J. Allman*
Name:  Brian J. Allman
Title:  Senior Vice President and Chief Financial Officer

**Exhibit B**

**Confirmation Notice**

# UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| BRISTOW GROUP INC., *et al.*,[1] | ) | Case No. 19-32713 (DRJ) |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) |  |

**NOTICE OF (A) ENTRY OF CONFIRMATION ORDER (I) APPROVING THE DISCLOSURE STATEMENT, (II) CONFIRMING THE AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION OF BRISTOW GROUP INC. AND ITS DEBTOR AFFILIATES, AS FURTHER MODIFIED, AND (III) GRANTING RELATED RELIEF; AND (B) OCCURRENCE OF EFFECTIVE DATE**

**TO ALL CREDITORS, INTEREST HOLDERS, AND OTHER PARTIES IN INTEREST:**

**PLEASE TAKE NOTICE** that on [●], 2019, the United States Bankruptcy Court for the Southern District of Texas (the "Bankruptcy Court"), entered an order [Docket No. [●]] (the "Confirmation Order") approving the *Amended Disclosure Statement for the Amended Joint Chapter 11 Plan of Reorganization of Bristow Group Inc. And Its Debtor Affiliates, as Modified* [Docket No. 590] and confirming the *Amended Joint Chapter 11 Plan of Reorganization of Bristow Group Inc. And Its Debtor Affiliates, as Further Modified* [Docket No. 742] (with all supplements and exhibits thereto, the "Plan"),[2] attached as **Exhibit A** to the Confirmation Order.

**PLEASE TAKE FURTHER NOTICE** that the Effective Date of the Plan occurred on [●], 2019.

**PLEASE TAKE FURTHER NOTICE** that pursuant to Article V.B of the Plan, Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, if any, must be Filed with the Bankruptcy Court within 30 days after the date of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such rejection. **Any Claims arising from the rejection of an Executory Contract or Unexpired Lease that are not Filed within such time will be automatically disallowed, forever barred from assertion, and shall not be enforceable against, as applicable, the Debtors, the Reorganized Debtors,**

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each debtor's federal tax identification number, are: Bristow Group Inc. (9819), BHNA Holdings Inc. (8862), Bristow Alaska Inc. (8121), Bristow Helicopters Inc. (8733), Bristow U.S. Leasing LLC (2451), Bristow U.S. LLC (2904), BriLog Leasing Ltd. (9764), and Bristow Equipment Leasing Ltd. (9303). The corporate headquarters and the mailing address for the Debtors listed above is 2103 City West Blvd., 4th Floor, Houston, Texas 77042.

[2] Capitalized terms not otherwise defined herein have the meanings ascribed to them in the Plan or the Confirmation Order, as applicable.

**the Estates, or property of the foregoing parties, without the need for any objection by the Debtors or Reorganized Debtors, as applicable, or further notice to, or action, order, or approval of the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully satisfied, released, and discharged, notwithstanding anything in a Proof of Claim to the contrary.**

**PLEASE TAKE FURTHER NOTICE** that, except with respect to Administrative Claims that are Professional Fee Claims or as otherwise set forth in the Plan, requests for payment of an Allowed Administrative Claim other than requests for payment of Administrative Claims arising in the ordinary course of business must be Filed with the Bankruptcy Court no later than 30 days after the Effective Date (the "Administrative Claims Bar Date"). **HOLDERS OF ADMINISTRATIVE CLAIMS THAT ARE REQUIRED TO FILE AND SERVE A REQUEST FOR PAYMENT OF SUCH ADMINISTRATIVE CLAIMS BY THE ADMINISTRATIVE CLAIMS BAR DATE THAT DO NOT FILE AND SERVE SUCH A REQUEST BY THE ADMINISTRATIVE CLAIMS BAR DATE SHALL BE FOREVER BARRED, ESTOPPED, AND ENJOINED FROM ASSERTING SUCH ADMINISTRATIVE CLAIMS AGAINST THE DEBTORS OR THE REORGANIZED DEBTORS, AND SUCH ADMINISTRATIVE CLAIMS SHALL BE DEEMED COMPROMISED, SETTLED, AND RELEASED AS OF THE EFFECTIVE DATE. FOR THE AVOIDANCE OF DOUBT, HOLDERS OF DIP FACILITY CLAIMS SHALL NOT BE REQUIRED TO FILE OR SERVE ANY REQUEST FOR PAYMENT OF SUCH DIP FACILITY CLAIMS.**

**PLEASE TAKE FURTHER NOTICE** that, unless otherwise ordered by the Bankruptcy Court, all final requests for payment of Professional Fee Claims must be Filed with the Bankruptcy Court no later than 45 days after the Effective Date.

**PLEASE TAKE FURTHER NOTICE** that the terms of the Plan, the Plan Supplement, and the Confirmation Order shall be immediately effective and enforceable and deemed binding upon the Debtors or the Reorganized Debtors, as applicable, and any and all Holders of Claims or Interests (regardless of whether such Claims or Interests are deemed to have accepted or rejected the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, and injunctions described in the Plan, each Entity acquiring property under the Plan, the Confirmation Order and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtors.

**PLEASE TAKE FURTHER NOTICE** that the Plan, the Plan Supplement, the Confirmation Order, and copies of all documents Filed in these Chapter 11 Cases are available free of charge by visiting https://cases.primeclerk.com/Bristow or by calling the Debtors' restructuring hotline at (844) 627-6967. You may also obtain copies of any pleadings filed in these Chapter 11 Cases for a fee via PACER at: http://www.nysb.uscourts.gov.

Houston, Texas
Dated: [__], 2019

Respectfully submitted,

**BAKER BOTTS L.L.P.**

*/s/ Draft*

James R. Prince, State Bar No. 00784791
Omar J. Alaniz, State Bar No. 24040402
Kevin Chiu, State Bar No. 24109723
**BAKER BOTTS L.L.P.**
2001 Ross Avenue, Suite 900
Dallas, Texas 75201-2980
Telephone: (214) 953-6500
Facsimile: (214) 953-6503
Email: jim.prince@bakerbotts.com
        omar.alaniz@bakerbotts.com
        kevin.chiu@bakerbotts.com

-and-

Emanuel C. Grillo (*pro hac vice)*
Chris Newcomb (*pro hac vice*)
**BAKER BOTTS L.L.P.**
30 Rockefeller Plaza
New York, New York   10112-4498
Telephone: (212) 408-2500
Facsimile: (212) 408-2501
Email: emanuel.grillo@bakerbotts.com
        chris.newcomb@bakerbotts.com

*Proposed Co-Counsel to the Debtors and
Debtors in Possession*

**WACHTELL, LIPTON, ROSEN & KATZ**

Richard G. Mason (*pro hac vice*)
Amy R. Wolf (*pro hac vice)*
**WACHTELL, LIPTON, ROSEN & KATZ**
51 West 52nd Street
New York, New York 10019
Telephone: (212) 403-1000
Facsimile: (212) 403-2000
Email: rgmason@wlrk.com
        arwolf@wlrk.com

*Proposed Co-Counsel to the Debtors and
Debtors in Possession*

**IF YOU HAVE ANY QUESTIONS ABOUT THIS NOTICE, PLEASE
CONTACT PRIME CLERK LLC BY CALLING (844) 627-6967.**

# TAB 12

2013 WL 12303143

2013 WL 12303143
Only the Westlaw citation is currently available.
United States District Court,
N.D. Texas, Dallas Division.

Jan BUETTGEN, on Behalf of Himself and
All Others Similarly Situated, Plaintiff,
v.
Katherine J. HARLESS, et al., Defendants.

Civil Action No. 3:09-cv-00791-K
|
Consolidated with Nos. 3:09-cv-00938-
K, 3:09-cv-1049-K, 3:09-cv-1552-K
|
Signed 11/13/2013

**Attorneys and Law Firms**

Jamie Jean McKey, Kendall Law Group LLP, Roger L. Mandel, Lackey Hershman LLP, Dallas, TX, Debra J. Wyman, Robbins Geller Rudman & Dowd LLP, San Diego, CA, Thomas E. Bilek, The Bilek Law Firm LLP, Houston, TX, Thomas J. McKenna, Gainey McKenna & Egleston, New York, NY, for Plaintiff.

Dee J. Kelly, Jr., Marcus G. Mungioli, Kelly Hart & Hallman, Fort Worth, TX, Andrew G. Horne, Eric F. Leon, Jay P. Lefkowitz, Kristin Sheffield, Matthew F. Dexter, Kirkland & Ellis LLP, New York, NY, Harriet Ellan Miers, Seth Michael Roberts, Locke Lord Bissell & Liddell LLP, Dallas, TX, for Defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

ED KINKEADE, UNITED STATES DISTRICT JUDGE

**\*1** I. BACKGROUND ... ——
A. Materials Considered by the Court ... ——

B. History of Litigation ... ——

C. The Parties and Their Counsel ... ——

D. Plaintiffs' Allegations ... ——

E. Defendants' Response ... ——

F. Class Certification ... ——

G. The Settlement ... ——

H. The Preliminary Approval Order ... ——

I. The Fairness Hearing ... ——

II. THE TERMS OF THE SETTLEMENT ... ——
A. The Settlement Fund. ... ——

  1. Expenses to Be Deducted from the Settlement Fund ... ——

  2. The Plan of Distribution ... ——

B. Release Bar Orders ... ——

III. JURISDICTION ... ——
A. Subject Matter Jurisdiction ... ——

B. Personal Jurisdiction ... ——

IV. THE CLASS NOTICE SATISFIES ALL APPLICABLE REQUIREMENTS ... ——
A. Notice to Class Members ... ——

V. FAIRNESS OF THE SETTLEMENT ... ——
A. The Lack of Fraud or Collusion Behind the Settlement ... ——

B. The Complexity, Expense, and Likely Duration of the Litigation ... ——

C. The Stage of the Proceedings and the Amount of Discovery Completed ... ——

D. The Probability of Plaintiffs' Success on the Merits ... ——

E. The Range of Possible Recovery ... ——

F. The Opinions of Lead Counsel, Class Representatives, and Absent Class Members ... ——

VI. FAIRNESS OF THE PLAN OF DISTRIBUTION ... ——

Buettgen v. Harless, Not Reported in Fed. Supp. (2013)

2013 WL 12303143

VII. ATTORNEY'S FEES AND EXPENSES SOUGHT BY LEAD COUNSEL ... ——
A. Attorney's Fees Sought by Lead Counsel ... ——

B. Lead Counsel's Requested Fee Is Consistent with Fee Awards in Comparable Cases from this District ... ——

C. The Requested Fee Is Consistent with Contingent Fee Arrangements Negotiated in Non-Class Litigation ... ——

D. The Reasonableness of Lead Counsel's Fee Request Is Confirmed Under the *Johnson* Factors ... ——

   1. Time and Labor Required ... ——

   2. Novelty and Difficulty of the Issues ... ——

   3. Skill Required: the Experience, Reputation, and Ability of the Attorneys ... ——

   4. Preclusion of Other Employment ... ——

   5. The Customary Fee and Awards in Similar Cases ... ——

   6. Whether the Fee Is Fixed or Contingent ... ——

   7. Time Limitations Imposed by the Client or the Circumstances ... ——

   8. The Amount Involved and the Results Obtained ... ——

   9. The "Undesirability" of the Case ... ——

   10. Time Limitations Imposed by the Client or the Circumstances and the Nature and Length of the Professional Relationship with the Client ... ——

E. Expenses Sought by Lead Counsel ... ——

F. Plaintiff's Request for an Award ... ——

VIII. CONCLUSION ... ——
Plaintiffs and Defendants have submitted for approval a proposed settlement of this class action that is memorialized in a Settlement Agreement ("Stipulation"), dated June 7, 2013. For the reasons set out below, the Court has determined that the settlement is fair, reasonable and adequate, and should be approved. The Court makes the following findings of fact and conclusions of law. It has issued a Final Judgment and Order of Dismissal with Prejudice, approving the settlement and dismissing the complaint in this action with prejudice.

## I. BACKGROUND

### A. Materials Considered by the Court

**\*2** In coming to its decision, this Court has considered the written memoranda submitted by the parties and all other Class Members, as well as oral arguments made by the parties and other Class Members in connection with the settlement. As discussed below, the parties have fully briefed the request for approval, and they have supported the request with numerous declarations or affidavits of fact, including from expert witnesses and the Court appointed Lead Plaintiff. Also, both Lead Counsel and counsel for Defendants made oral presentations at the November 12, 2013 Settlement Hearing.

### B. History of Litigation

On April 30, 2009, a class action lawsuit was filed against five of Idearc's top former executives (collectively, the "Defendants") alleging violations of the federal securities laws, namely §§ 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"). This lawsuit was styled *Buettgen v. Harless, et al.*, Civil Action No. 3:09-cv-0791-K. Dkt. No. 1.

On July 1, 2009, the Court issued an Order of Consolidation that consolidated Civil Action No. 3:09-CV-0938-K, that was initiated on May 21, 2009, with and into Civil Action No. 3:09-CV-0791-K. Dkt. No. 6. Later, on September 30, 2009, the Court, by its own motion, ordered that *Jones v. Jones*, Civil Action No. 3:09-CV-1552-K, also be consolidated into *Buettgen v. Harless, et al.*, Civil Action No. 3:09-CV-0791-K. Dkt. No. 30.

In July 2009, various class members filed motions and memoranda in support thereof for the appointment of lead plaintiffs and the approval of lead plaintiffs' choice of counsel. During July and August 2009, opposition and reply memoranda were filed in connection therein.

On November 9, 2009, the Court issued a Memorandum Opinion and Order granting Kentucky State District Council of Carpenters Pension Trust Fund's motion to be appointed Lead Plaintiff and approving its selection of Coughlin Stoia

Case 4:19-cv-00509   Document 65-9   Filed 07/02/21 in TXSD   Page 613 of 1452

Buettgen v. Harless, Not Reported in Fed. Supp. (2013)
2013 WL 12303143

Geller Rudman & Robbins LLP (n/k/a Robbins Geller Rudman & Dowd LLP) as Lead Counsel and Kendall Law Group, LLP as Liaison Counsel. Dkt. No. 31.

On February 11, 2010, Lead Plaintiff filed the Consolidated Class Action Complaint for Violations of Federal Securities Laws (the "Complaint") against defendants Katherine J. Harless, Scott W. Klein, Andrew Coticchio, Samuel "Dee" Jones, and Frank P. Gatto. Dkt. No. 55. The Complaint alleged a Class Period of August 9, 2007 through October 30, 2008, and detailed Defendants' alleged violations of §§ 10(b) and 20(a) of the Exchange Act and Rule 10b-5 promulgated thereunder during that time.

On April 12, 2010, Defendants filed a Motion to Dismiss the Complaint. Dkt. No. 60. On May 27, 2010, Lead Plaintiff opposed. And on June 24, 2010, Defendants filed their reply memoranda. Thereafter, on August 11, 2010, the Court issued an Order: (1) denying Defendants' Motion to Dismiss the Complaint in its entirety; and (2) denying Lead Plaintiff's Motion to Strike or, in the Alternative, to Convert Defendants' Motion to Dismiss into a Motion for Summary Judgment. Dkt. No. 82.

Defendants filed their Answer to the Complaint on September 2, 2010. Dkt. No. 85.

On November 1, 2010, Plaintiffs filed their Motion for Class Certification, seeking the Court's certification of a class comprised of all persons who purchased the publicly-traded securities of Idearc during the Class Period of August 9, 2007 through October 30, 2008, and who were damaged thereby. Dkt. No. 94. Plaintiffs' Motion for Class Certification also requested the Court appoint both Lead Plaintiff and Mr. Kenneth Werring, an individual shareholder, as Class Representatives. On January 14, 2011, Defendants filed an Opposition to Plaintiffs' Motion for Class Certification. Dkt. No. 101. On February 25, 2011, Plaintiffs filed a reply. Thereafter, on May 19, 2011, the Court issued a Memorandum Opinion and Order granting Plaintiffs' Motion for Class Certification and appointing Lead Plaintiff and Mr. Werring as Class Representatives. Dkt. No. 113. Defendants petitioned the Fifth Circuit for leave to appeal, but on June 27, 2011, Defendants' petition was denied. Dkt. No. 134.

 **\*3**  From August 2010, when the Court denied Defendants' Motion to Dismiss, until the close of discovery on August 10, 2012, the parties pursued discovery in this case. The parties exchanged numerous sets of document requests and interrogatories, subpoenaed over 30 third parties, and took or defended nearly 30 depositions of the parties, other Idearc employees and third party fact witnesses.

In addition to fact discovery, the parties exchanged multiple reports by and took or defended the depositions of four experts. On October 31, 2012, Plaintiffs moved to exclude the testimony of Defendants' experts and Defendants moved to exclude the testimony of one of Plaintiffs' experts. Dkt. Nos. 170, 172, 176. In November and December 2012, the parties exchanged opposition briefs and replies in support of their respective motions. Dkt. Nos. 181, 183, 185, 187-88, 190. On March 11, 2013, the Court denied the parties' motions to exclude. Dkt. No. 210.

On September 24, 2012, Defendants filed their motion for summary judgment. Dkt. No. 159. Defendants argued in support of their motion, *inter alia*, that Plaintiffs could not meet their burden of proving scienter or loss causation. On October 15, 2012, Plaintiffs opposed. Dkt. No. 162. And on October 30, 2012, Defendants filed a reply. Dkt. Nos. 168-169. After a hearing on the motion on February 11, 2013, on February 20, 2013, the Court entered an order denying in full Defendants' motion for summary judgment.

### C. The Parties and Their Counsel

**Class Representatives.** Lead Plaintiff Kentucky State District Council of Carpenters Pension Trust Fund and Kenneth Werring were appointed Class Representatives in this case. Each purchased Idearc securities during the Class Period.

**Lead Counsel.** Class Representatives and the Class are represented by several experienced law firms, including Robbins Geller Rudman & Dowd LLP, Robbins Arroyo LLP, Glancy Binkow & Goldberg LLP and Kendall Law Group, LLP. Lead Counsel are knowledgeable about, and experienced in, federal securities fraud class actions.

**Defendants.** The Complaint named as defendants Idearc CEOs Katherine J. Harless and Scott W. Klein, CFOs Andrew Coticchio and Samuel "Dee" Jones, and Interim CEO Frank P. Gatto. Because Idearc had filed for bankruptcy on March 31, 2009, it was not named as a defendant in the Complaint.

**Defendants' Counsel.** Defendants are represented by Kirkland & Ellis LLP and Locke Lord LLP. These firms and the lawyers involved in this case have extensive experience in the defense of complex securities class action litigation.

**Buettgen v. Harless, Not Reported in Fed. Supp. (2013)**

2013 WL 12303143

Case 4:19-cv-00509   Document 65-9   Filed 07/02/21 in TXSD   Page 614 of 1452

### D. Plaintiffs' Allegations

The Complaint alleged a Class Period of August 9, 2007 through October 30, 2008, and detailed Defendants' alleged violations of §§ 10(b) and 20(a) of the Exchange Act and Rule 10b-5 promulgated thereunder by the Securities and Exchange Commission ("SEC") by participating in an allegedly fraudulent scheme to misrepresent to investors Idearc's true financial condition. Plaintiffs allege that Defendants understated Idearc's bad debt expense and allowance for doubtful accounts in light of the known and significant loosening of the Company's credit and collection policies to generate revenue in the near-term. Plaintiffs further allege Defendants misrepresented Idearc's ability to remain liquid—and thus avoid bankruptcy—for a specified period of time. Plaintiffs claimed that Defendants' allegedly false and misleading statements and material omissions caused the Company's stock price to be artificially inflated. When the truth finally reached the market, Idearc's stock price experienced significant declines, damaging Plaintiffs and Class Members.

### E. Defendants' Response

**\*4** Defendants expressly deny any wrongdoing or liability in connection with any facts or claims that have been or could have been alleged in connection with this litigation. Defendants contend that they have substantial legal and factual defenses to Plaintiffs' claims and belief that they ultimately would have prevailed on the claims at trial. Specifically, Defendants argued that some of Plaintiffs' alleged misstatements were mere "puffery" and that others were forward looking and thus protected from liability. Defendants were also prepared to argue that any misstatement concerning Idearc's bad debt expense was immaterial when compared to Idearc's overall business. In addition, Defendants were also prepared to put forth evidence negating Plaintiffs' allegations of Defendants' scienter. Specifically, Defendants argued that the calculations for Idearc's bad debt expense originated in Idearc's accounting department and thus Defendants, as high level executives, were not a part of, nor aware of those calculations. In addition, Defendants were prepared to present evidence that they had relied on the approval of E&Y.

Defendants have represented to the Court that they nevertheless consider it desirable for the class action to be settled and dismissed to avoid the substantial burden, expense, and uncertainties that would be involved in protracted litigation, and to settle the Released Claims against them.

### F. Class Certification

As discussed above, on May 19, 2011, the Court certified a class comprised of all persons who purchased the publicly-traded securities of Idearc during the Class Period of August 9, 2007 through October 30, 2008, and who were damaged thereby. Dkt. No. 113. Excluded from the Class are the Defendants and members of their immediate families, any entity in which a defendant has a controlling interest, and the legal representatives, heirs, successors or assigns of any such excluded party.

### G. The Settlement

During this litigation, the parties participated in four mediation sessions with three different mediators. Only the last of these mediations was directly successful in bringing about the settlement. The first mediation was held in Boca Raton, Florida with mediator Judge Nicholas H. Politan (Ret.) on November 17, 2011. The second mediation was held in San Francisco, California with mediator Judge James S. Ware (Ret.) on January 23, 2013. The third mediation was held in Dallas, Texas with Magistrate Judge Paul D. Stickney on February 11, 2013, after the parties argued Defendants' motion for summary judgment before the Court.

On March 18, 2013, the parties returned in front of Magistrate Judge Stickney for a fourth mediation in Dallas, Texas. Lead Counsel and Plaintiffs attended the mediation and negotiated in good faith in an effort to settle the case. The case did not settle during the mediation. However, after the mediation, Judge Stickney made a mediator's proposal that the case should settle for $33.75 million. Each side was given time to consider and decide whether to accept the mediator's proposed settlement. The mediator's proposal was accepted.

On June 10, 2013, the parties submitted the signed Stipulation governing the settlement dated June 7, 2013. Dkt. No. 220. The proposed settlement provides, among other things, that Defendants would make a cash settlement payment of $33,750,000.00.

### H. The Preliminary Approval Order

On June 28, 2013, this Court, based upon its review of the Stipulation and the parties' joint application, entered an order which, among other things: (i) preliminarily approved

**Buettgen v. Harless, Not Reported in Fed. Supp. (2013)**

2013 WL 12303143

the settlement; and (ii) found that the proposed forms and methods of notice met all the requirements of the Federal Rules of Civil Procedure, the PSLRA, and due process ("Preliminary Approval Order"). The Court scheduled a final hearing on the fairness of the proposed settlement for November 12, 2013.

As discussed in more detail below, consistent with the Court's June 28, 2013 order and subsequent amended orders dated July 2, 2013 and August 14, 2013, the parties provided notice of the proposed settlement to Class Members. The Court approved a class action claims administrator, Gilardi & Co. LLC ("Gilardi"), which arranged for the mailing of individual notices. Gilardi also had the notice published in the national edition of *Investor's Business Daily* and once over *Business Wire.*

### I. The Fairness Hearing

**\*5** The parties filed submissions in support of the settlement on September 16, 2013. These submissions were accompanied by numerous declarations. Plaintiffs presented declarations from: (1) Debra J. Wyman, class counsel, in support of final approval of the settlement and an award of attorneys' fees and expenses and Plaintiff's expenses; (2) Debra J. Wyman, Lionel Z. Glancy, Thomas J. McKenna, Craig W. Smith, and Joe Kendall (separately) in support of applications for an award of attorneys' fees and expenses; (3) Kenneth F. Werring, class representative, in support of final approval of the settlement and an award of attorneys' fees and expenses; (4) David Tharp, of Lead Plaintiff Kentucky State District Council of Carpenters Pension Trust Fund, in support of final approval of the settlement and an award of attorneys' fees and expenses; and (5) Carole K. Sylvester, of Gilardi, concerning the dissemination and publication of notice to potential Class Members.

The Court held a hearing regarding the fairness, reasonableness and adequacy of the proposed settlement on November 12, 2013.

Both Lead Counsel and defense counsel made presentations in support of the settlement at the November 12, 2013 hearing. Parties objecting to the settlement made presentations as well.

### II. THE TERMS OF THE SETTLEMENT

The proposed settlement provides the Class with a substantial monetary recovery, which will be allocated among Class Members on the basis of their particular claims.

#### A. The Settlement Fund

Pursuant to the terms of the Stipulation, the Defendants paid a total of Thirty-Three Million Seven Hundred and Fifty Thousand Dollars ($33,750,000) into a settlement fund from which relief will be provided to Class Members (the "Settlement Fund").

#### 1. Expenses to Be Deducted from the Settlement Fund

The Stipulation provides that notice and administration expenses, Lead Counsel's fees and expenses, and tax expenses (if any) will be paid from the Settlement Fund. The balance of the fund after payment of those amounts will be distributed to Class Members ("Net Settlement Fund").

The terms of the Stipulation provided that Lead Counsel could apply to the Court for an award of attorneys' fees and expenses. Lead Counsel committed in the Notice mailed to Class Members that they will seek an award of fees of 30% of the Settlement Fund. Plaintiffs and Lead Counsel have also applied for an award of litigation expenses in an amount equal to $1,680,094.10.

#### 2. The Plan of Distribution

The Stipulation provides that eligible Class Members who submit valid and timely proof of claim forms will receive distributions from the balance of the Settlement Fund in the form of cash. Those distributions are to be calculated pursuant to the Plan of Distribution prepared by Lead Counsel. Neither the Defendants nor their counsel have had any role in, or responsibility for, the Plan of Distribution.

Pursuant to the Plan of Distribution, the Net Settlement Fund will be distributed to eligible Class Members who submit valid, timely Proof of Claim and Release forms ("Authorized Claimants"). The Plan of Distribution clearly identifies the circumstances by which Authorized Claimants may participate in the distribution of the Net Settlement Fund.

For purposes of determining the amount an Authorized Claimant may recover under the Plan of Distribution, Lead Counsel have consulted with their damages consultant.

### B. Release Bar Orders

In consideration of the comprehensive relief described above, the Stipulation contemplates that this Court will enter an Order approving the settlement that incorporates a release.

## III. JURISDICTION

### A. Subject Matter Jurisdiction

This Court has federal question jurisdiction pursuant to § 27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. §§ 1331 and 1337(a).

### B. Personal Jurisdiction

This Court has in personam jurisdiction over Lead Plaintiffs and Class Members. The Court plainly may exercise personal jurisdiction over Class Members from Texas and over objectors as a result of their filing objections with this Court. And the Court has properly obtained personal jurisdiction over other out-of-state Class Members by giving them proper notice and a chance to opt out or to be heard. *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 811-12, 105 S.Ct. 2965, 86 L.Ed.2d 628 (1985); *Calagaz v. Calhoon*, 309 F.2d 248 (5th Cir. 1962); *Robins v. Cli-Claque Co.*, No. 3:02-CV-1339-M, 2003 WL 21804883, at *5, 2003 U.S. Dist. LEXIS 13695, at *15 (N.D. Tex. Aug. 5, 2003).

**\*6** The Court therefore finds that all Class Members who did not request exclusion from the Class are subject to this Court's personal jurisdiction. *See Shutts*, 472 U.S. at 812-13, 105 S.Ct. 2965.

## IV. THE CLASS NOTICE SATISFIES ALL APPLICABLE REQUIREMENTS

### A. Notice to Class Members

Beginning on July 15, 2013, Gilardi mailed 594,779 Claim Packages to potential Class Members, nominees and filers. Gilardi also established a toll-free number to accommodate potential Class Member inquiries and posted copies of the Notice, the Proof of Claim, and the Stipulation and Order Regarding Class Notice Procedures to Gilardi's website on July 15, 2013.

Beginning on August 21, 2013, Gilardi mailed 753,578 copies of the Court-approved Postcard to reasonably identifiable Class Members and in response to requests from potential Class Members, brokers and/or nominees. In addition, Gilardi has sent a total of 24,888 Amended Notices and Modified Claim Forms to potential Class Members, nominees and filers. Overall, Gilardi has mailed 773,169 original and amended Notices and Claim Forms.

Consistent with the Court's Preliminary Approval Order, the Notice included the text of the proposed Plan of Distribution and a Proof of Claim and Release form, which included instructions and requirements for filing a Proof of Claim. The Notice also included a general description of the dismissal, release and bar order provisions of the Stipulation.

In addition to mailing individual notices, Gilardi arranged to have the Court approved Summary Notice run in the national edition of *Investor's Business Daily* and over *Business Wire* on July 5, 2013.

The Postcard, the Amended Notice, the Modified Claim Form, and the Amended and Second Amended Orders Preliminarily Approving Settlement and Providing for Notice were also posted to Gilardi's website.

## V. FAIRNESS OF THE SETTLEMENT

The following factors have been cited as the pertinent criteria for evaluating the fairness of a proposed settlement in the Fifth Circuit: "(1) the existence of fraud or collusion behind the settlement; (2) the complexity, expense, and likely duration of the litigation; (3) the stage of the proceedings and the amount of discovery completed; (4) the probability of plaintiffs' success on the merits; (5) the range of possible recovery; and (6) the opinions of the class counsel, class representatives, and absent class members." *Reed v. GMC*, 703 F.2d 170, 172 (5th Cir. 1983).

### A. The Lack of Fraud or Collusion Behind the Settlement

The lack of fraud or collusion supports the fairness of the settlement. This settlement was the result of arm's-length negotiations between the parties. Furthermore, this case has been vigorously litigated by both parties from start to finish. It was not until after the parties' fourth mediation session, after summary judgment and *Daubert* motions were denied and trial was weeks away, that the parties accepted the mediator's proposal and were able to come to an agreement to settle. The parties' hard fought litigation efforts and numerous settlement attempts demonstrate the lack of collusion behind this settlement.

### B. The Complexity, Expense, and Likely Duration of the Litigation

**\*7**  An analysis of the complexity, expense, and likely duration of further litigation, supports the Court's approval of the settlement.

But for the settlement, Plaintiffs would have continued preparing for trial. In an action of this complexity, the costs associated with trial, including preparation and the inevitable post-trial appeals—would be very high. Continuing the litigation would also have depleted insurance proceeds that were available to fund a settlement or satisfy a judgment in this action.

Moreover, one can easily conclude that this action, if taken to trial, would require an additional year, or possibly more, to conclude, necessitating many hours of counsel's and the Court's time and resources. Any subsequent appeals could easily double or triple this time. In short, years might pass before the Class would receive a recovery, if any.

Thus, this factor also supports approval of the settlement.

### C. The Stage of the Proceedings and the Amount of Discovery Completed

"There is no precise formula for what constitutes sufficient evidence to enable the court to analyze intelligently the contested questions of fact. It is clear that the court need not possess evidence to decide the merits of the issue, because the compromise is proposed in order to avoid further litigation." 4 Alba Conte & Herbert B. Newberg, *Newberg on Class Actions* § 11.45, at 127 (4th ed. 2002); *see also In re OCA, Inc. Sec. & Derivative Litig.*, No. 05-2165 Section R(3), 2009 WL 512081, at \*12, 2009 U.S. Dist. LEXIS 19210, at \*39-\*40 (E.D. La. Mar. 2, 2009) ("The question is not whether the parties have completed a particular amount of discovery, but whether the parties have obtained sufficient information about the strengths and weaknesses of their respective cases to make a reasoned judgment about the desirability of settling the case on the terms proposed or continuing to litigate it."). Further, the trial court "may legitimately presume that counsel's judgment [that it has the information necessary to evaluate a settlement] is reliable." *In re Corrugated Container Antitrust Litig.*, 643 F.2d 195, 211 (5th Cir. 1981).

The extent of discovery completed and the stage of the proceedings also weighs in favor of the settlement. By the time the settlement was reached, Lead Counsel had sufficient knowledge and understanding of the merits of the claims alleged in the action and the defenses that would be asserted by Defendants to determine that the settlement confers a substantial benefit upon the Class. Lead Counsel obtained this knowledge through investigating and researching the facts and issues required to draft the initial and amended complaints; opposing the Motion to Dismiss, briefing class certification, litigating the class certification issue on appeal; reviewing and analyzing millions of pages of documents produced by Defendants and third parties during the course of discovery; preparing for and/or conducting dozens of depositions; conferring with consultants and forensic accountants; working with experts, taking and defending expert depositions; briefing summary judgment motions and motions to exclude expert testimony; communicating with former Idearc employees with knowledge of Plaintiffs' allegations; drafting a detailed mediation statement; and preparing detailed presentations for use at mediation and oral argument. Lead Counsel then used the information to participate in arm's-length settlement negotiations with Defendants, including formal mediation with the assistance of experienced mediators, all of who are current or retired federal judges. The knowledge and insight gained by Lead Counsel during the four years this case has been pending provided more than sufficient information to evaluate the strengths and weaknesses of the Class's claims and Defendants' defenses.

### D. The Probability of Plaintiffs' Success on the Merits

**\*8**  Plaintiffs also faced numerous risks if they had continued to pursue the litigation. While Lead Counsel believed Plaintiffs would have prevailed on the merits at trial, Defendants were just as adamant that Plaintiffs would not have. There was a very real risk that Plaintiffs would not have convinced a jury that the alleged misrepresentations and omissions were materially false or misleading when made or that damages related to them.

For instance, while Plaintiffs firmly believed that the documentary and testimonial evidence they intended to offer at trial fully supported their claims, there is no way of predicting which interpretations, inferences or testimony a jury would accept. Further, Defendants have adamantly denied any culpability throughout the litigation and were prepared to mount aggressive defenses that could potentially

bar a class recovery. If the jury sided with Defendants on their defenses, the Class could recover nothing.

For instance, Defendants were prepared to aggressively argue and present supporting evidence at trial that the alleged misstatements were not actionable. Specifically, Defendants argued that some of Plaintiffs' alleged misstatements were mere "puffery" and that others were forward looking and thus protected from liability. While Plaintiffs disputed these contentions, if Defendants succeeded in these arguments, many of the alleged misstatements may have been excluded from the case.

Defendants were also prepared to argue that any misstatement concerning Idearc's bad debt expense was immaterial when compared to Idearc's overall business. Should this argument have succeeded, Plaintiffs would have been unable to prove that the Defendants made material false and misleading statements, a required element of Plaintiffs' claim. The settlement avoids the risk that these matters might have been viewed by the Court or jury as favorable to Defendants.

In addition, Defendants were also prepared to put forth evidence negating Plaintiffs' allegations of Defendants' scienter. Specifically, Defendants argued that the calculations for Idearc's bad debt expense originated in Idearc's accounting department and thus Defendants, as high level executives, were not a part of, nor aware of those calculations. In addition, Defendants were prepared to present evidence that they had relied on the approval of E&Y. Should Defendants' arguments have succeeded, Plaintiffs may have been unable to prove scienter. All of these issues of proof as to liability posed substantial risks to recovery at trial.

Moreover, absent settlement, Plaintiffs and the Class also faced the risk that the fact finder might have viewed the accounting issues in this case as overly technical and complex, thereby misunderstanding or dismissing the facts forming the basis of Plaintiffs' accounting claims.

Even if Plaintiffs succeeded in proving liability, a major risk going forward related to loss causation. Because the determination of loss causation and damages is a complicated process requiring expert testimony, these is a risk that the loss causation assessments of the parties' experts at trial would vary substantially, reducing this defense to a "battle of experts." One cannot predict which expert's testimony or methodology a jury would find reliable. If the jury agreed

with Defendants, Plaintiffs would have had their damages significantly reduced or their claims fail as a matter of law.

Finally, even though the Court certified a Class in this action despite the Fifth Circuit's prior requirement of proof of loss causation, Plaintiffs nevertheless faced the risk that the Court could subsequently decertify the Class. The settlement avoids any further disputes prior to trial relating to maintaining the certified Class.

**\*9** As noted above, the proposed settlement provides that each eligible Class Member who files a valid Proof of Claim will receive, within a relatively short period of time following approval and final disposition of the case, a distribution from the Net Settlement Fund consistent with Lead Counsel's Plan of Distribution. That certainty of recovery clearly outweighs Plaintiffs' uncertain prospects of success through continued litigation. This factor therefore favors approval of the settlement.

### E. The Range of Possible Recovery

The amount offered in settlement was an important consideration in Plaintiffs' and Lead Counsel's decision to settle this action. While Plaintiffs estimate damages over $220 million in this case, Defendants contended that the Class suffered no actionable damages from the alleged misstatements and omissions.

Here, the settlement provides $33.75 million in cash in exchange for the release of all claims against Defendants. Therefore, without exposing the Class to the risks of potential litigation as described above, Lead Counsel obtained a substantial portion of the Class's theoretical damages.

Plaintiffs and the Class faced a significant risk relating to loss causation and that the jury or the Court might conclude there were no damages flowing from the alleged misrepresentations, and this risk has been avoided as a result of the settlement. Lead Counsel was aware that if Plaintiffs' theory of loss causation and damages were to fail before a jury, the Class's opportunity for recovery would be significantly diminished, if not eliminated.

### F. The Opinions of Lead Counsel, Class Representatives, and Absent Class Members

The experience and views of counsel also weigh in favor of this Court's approval of the settlement. Lead Counsel is an experienced plaintiffs' class action firm. In addition, as set

forth above, Lead Counsel is very knowledgeable regarding all the circumstances at issue. Lead Counsel has vigorously prosecuted this action against the Defendants for four years, and, in light of the risks involved in further litigation, believes that the settlement is in the best interests of the Class.

The reaction of the Class to the settlement has been supportive. In response to the notice procedures, only two Class Members have objected to the settlement.

## VI. FAIRNESS OF THE PLAN OF DISTRIBUTION

The standard for approving a plan of distribution is the same as the standard for approving the settlement: the plan must be "fair, adequate, and reasonable" and must not be " 'the product of collusion between the parties.' " *In re Chicken Antitrust Litig.*, 669 F.2d 228, 238 (5th Cir. 1981) (citation omitted). This analysis is to be "informed by the strong judicial policy favoring settlements as well as the realization that compromise is the essence of settlement." *Id.* In addition, an allocation or distribution formula need only have a reasonable basis, particularly if recommended by experienced class counsel. *Taft v. Ackermans*, No. 02 Civ. 7951 (PKL), 2007 WL 414493, at *9, 2007 U.S. Dist. LEXIS 9144, at *27 (S.D.N.Y. Jan. 31, 2007).

Lead Counsel prepared the Plan of Distribution after careful consideration and analysis, and without reference to any particular trading patterns of any of the Plaintiffs.

The Plan of Distribution was also fully disclosed in the Notice, the Amended Notice and on Lead Counsel's and the Claims Administrator's website. Overall, if the total claims for all Authorized Claimants exceed the Net Settlement Fund, each Authorized Claimant's share of the Net Settlement Fund will be determined based upon the percentage that his, her or its claim bears to the total of the claims for all Authorized Claimants. Wyman Decl., ¶¶ 141-144. *See In re Merrill Lynch & Co., Inc.*, No. 02 MDL 1484 (JFK), 2007 WL 313474, at *12, 2007 U.S. Dist. LEXIS 9450, at *39 (S.D.N.Y. Feb. 1, 2007) ("A plan of allocation that calls for the pro rata distribution of settlement proceeds on the basis of investment loss is reasonable."); *see also In re Broadcom Corp. Sec. Litig.*, No. SACV 01-275 DT (MLGx), 2005 WL 8152913, at *4–5, 2005 U.S. Dist. LEXIS 41976, at *17 (C.D. Cal. Sept. 12, 2005) (approving plan of distribution where the allocation was pro rata across the class).

**\*10** For all of the reasons set out above, the Court finds that the Plan of Distribution proposed by Plaintiffs in this case is fair, reasonable and adequate.

## VII. ATTORNEY'S FEES AND EXPENSES SOUGHT BY LEAD COUNSEL

### A. Attorney's Fees Sought by Lead Counsel

Lead Counsel seek an award of attorneys' fees of 30% of the Settlement Fund.

Lead Counsel for the Class is entitled to a fee paid out of the common fund created for the benefit of the Class. *See* *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478-79, 100 S.Ct. 745, 62 L.Ed.2d 676 (1980) (Supreme Court has consistently recognized the common fund doctrine to permit attorneys who obtain a recovery for a class to be compensated from the benefits achieved as a result of their efforts).

As other district courts within this Circuit have noted, "since *Blum* was decided [in 1984], there has been no Fifth Circuit decision that would preclude this Court from employing the percentage of the fund approach endorsed in *Blum* and the circuit and district court decisions that followed and applied *Blum*." *In re Prudential-Bache Energy Income P'ships Sec. Litig.*, MDL No. 888, 1994 WL 150742, at *4–5, 1994 U.S. Dist. LEXIS 4786, at *11-*12 (E.D. La. Apr. 13, 1994) ("*Prudential I*"); *see also* *Shaw v. Toshiba Am. Info. Sys.*, 91 F.Supp.2d 942, 967 n.15 (E.D. Tex. 2000) ("the Fifth Circuit has **never** ... reversed a district court judge's decision to award a fee as a percentage") (emphasis in original); *Longden v. Sunderman*, 979 F.2d 1095, 1100 n.11 (5th Cir. 1992) (affirming district court's percentage fee award in securities class action). Accordingly, numerous district courts within the Fifth Circuit have applied the percentage-of-recovery method in awarding fees. For example, the published opinions in *In re Catfish Antitrust Litig.*, 939 F.Supp. 493, 500 (N.D. Miss. 1996), and *Shaw*, 91 F.Supp.2d at 966-67, list numerous class action cases as examples. Indeed, as this Court has noted in *Schwartz v. TXU Corp.*, No. 3:02-CV-2243-K, 2005 WL 3148350, at *26, 2005 U.S. Dist. LEXIS 27077, at *84 (N.D. Tex. Nov. 8, 2005), "there is a strong consensus in favor of awarding attorneys' fees in common fund cases as a percentage of the recovery."

Case 4:19-cv-00509 Document 65-9 Filed 07/02/21 in TXSD Page 620 of 1452
Buettgen v. Harless, Not Reported in Fed. Supp. (2013)
2013 WL 12303143

## B. Lead Counsel's Requested Fee Is Consistent with Fee Awards in Comparable Cases from this District

The requested fee award of 30% of the Settlement Fund is consistent with awards made in similar cases. *See, e.g.*, *Shaw*, 91 F.Supp.2d at 972 ("based on the opinions of other courts and the available studies of class action attorneys' fees awards ... this Court concludes that attorneys' fees in the range from twenty-five percent (25%) to [33-1/3%] have been routinely awarded in class actions"). In fact, district courts in this Circuit, including this one, have repeatedly awarded fees of 30% or more of the total recovery under the percentage-of-the-recovery method in securities class actions. *See Crowell v. Mannatech, Inc.*, No. 3:07-cv-00238-K, slip op. (N.D. Tex. Mar. 10, 2009) (awarding 30% of settlement fund) (Kinkeade, J.) (Compendium at 12); *Brody v. Zix Corp.*, No. 3-04-CV-1931-K, slip op. (N.D. Tex. June 16, 2008) (awarding 33-1/3% of settlement fund) (Kinkeade, J.) (Compendium at 3). Dkt. No. 237.

## C. The Requested Fee Is Consistent with Contingent Fee Arrangements Negotiated in Non-Class Litigation

**\*11** The percentage method is also consistent with, and is intended to mirror, the private marketplace for negotiated contingent fee arrangements. *Kirchoff v. Flynn*, 786 F.2d 320, 324 (7th Cir. 1986) ("When the 'prevailing' method of compensating lawyers for 'similar services' is the contingent fee, then the contingent fee *is* the 'market rate.' ") (emphasis in original). In non-class litigation, 33-1/3% contingency fees are typical. As Justices Brennan and Marshall observed in their concurring opinion in *Blum*: "In tort suits, an attorney might receive one-third of whatever amount the plaintiff recovers. In those cases, therefore, the fee is directly proportional to the recovery." *Blum v. Stenson*, 465 U.S. 886, 903, 104 S.Ct. 1541, 79 L.Ed.2d 891 \*(1984). *See also In re Prudential-Bache Energy Income P'ships Sec. Litig.*, MDL No. 888, 1994 WL 202394, at \*2, 1994 U.S. Dist. LEXIS 6621, at \*4 (E.D. La. May 18, 1994) ("*Prudential II*") ("Were this not a class action, attorney's fees would range between 30% and 40%, the percentages commonly contracted for in contingency cases.").

## D. The Reasonableness of Lead Counsel's Fee Request Is Confirmed Under the *Johnson* Factors

Application of the *Johnson* factors also confirms that the requested fee is fair and reasonable. Some district courts within the Fifth Circuit have applied a hybrid approach in analyzing the fairness and reasonableness of requested fees, using the percentage method to set an initial percentage fee, and then adjusting that fee up or down based on the previously noted *Johnson* factors. *See In re Harrah's Entm't, Inc.*, No. 95-3925 SECTION "N", 1998 WL 832574, at \*7, 1998 U.S. Dist. LEXIS 18774, at \*20-\*21 (E.D. La. Nov. 25, 1998); *see also Shaw*, 91 F.Supp.2d at 967-68.

An analysis of the *Johnson* factors demonstrates that an award of 30% of the Settlement Fund is reasonable in this case. The *Johnson* factors are as follows: (1) time and labor required; (2) novelty and difficulty of the issues; (3) skill required to perform the legal services properly; (4) preclusion of other employment; (5) customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) amount involved and results obtained; (9) experience, reputation, and ability of the attorneys; (10) undesirability of the case; (11) nature and length of professional relationship with the client; and (12) awards in similar cases. *Johnson v. Ga. Highway Express, Inc.*, 488 F.2d 714, 717-19 (5th Cir. 1974). The relevance of each of the *Johnson* factors will vary in any particular case, and, rather than requiring a rigid application of each factor, the Fifth Circuit has left it to the lower court's discretion to apply those factors in view of the circumstances of a particular case. *Brantley v. Surles*, 804 F.2d 321, 325-26 (5th Cir. 1986).

### 1. Time and Labor Required

Plaintiffs' Counsel have devoted a substantial amount of time and effort vigorously prosecuting this case. In turn, Defendants have fiercely fought this case for four years, and at virtually every stage of the litigation, Plaintiffs' Counsel have successfully responded to these defense strategies and tactics, while aggressively building Plaintiffs' case on the merits.

Plaintiffs' Counsel's substantial amount of time and effort expended in successfully prosecuting this case is also reflected in their lodestar, which amounts to over 33,000 hours of professional and paraprofessional time spent on this case.

Case 4:19-cv-00509 Document 65-9 Filed 07/02/21 in TXSD Page 621 of 1452

Buettgen v. Harless, Not Reported in Fed. Supp. (2013)
2013 WL 12303143

### 2. Novelty and Difficulty of the Issues

The prosecution of this case has been complex, involving repeated rounds of briefing complicated issues of law regarding the adequacy of the pleadings and class certification, difficult and time consuming factual discovery (including grueling party and non-party depositions), expensive work with expert witnesses, and summary judgment and *Daubert* motions. Moreover, at the time the Class was certified, Fifth Circuit precedent required evidentiary proof of loss causation—the toughest standard in the nation. Lead Counsel obtained certification of the Class, something that was very rarely achieved under the governing law.

### 3. Skill Required: the Experience, Reputation, and Ability of the Attorneys

**\*12** The third and the ninth *Johnson* factors, the skill required and the experience, reputation, and ability of the attorneys also support the requested fee award. Here, Lead Counsel performed their work diligently, skillfully and achieved a substantial recovery for the Class. Lead Counsel have many years of experience in complex federal civil litigation, particularly the litigation of securities and other class actions.

Lead Counsel's experience in the field also allowed them to obtain significant investigative materials in spite of the PSLRA's barriers to formal discovery, identify the complex issues involved in this case, and formulate strategies to successfully prosecute it effectively. *See TXU Corp.*, 2005 WL 3148350, at \*30, 2005 U.S. Dist. LEXIS 27077, at \*99 ("Plaintiffs' counsel demonstrated that notwithstanding the barriers erected by the PSLRA, they would develop evidence to support a convincing case."). But for Lead Counsel's efforts, the Class's claims might have been dismissed at the pleading or summary judgment stage. Instead, Lead Counsel were able to secure a settlement of $33.75 million, representing a very good result for the Class.

The quality of opposing counsel is also important in evaluating the quality of services rendered by Lead Counsel. *See, e.g.*, *In re Aetna Inc. Sec. Litig.*, No. 1219, 2001 WL 20928, at \*14–15, 2001 U.S. Dist. LEXIS 68, at \*45-\*46 (E.D. Pa. Jan. 4, 2001); *In re Ikon Office Solutions, Inc.*, 194 F.R.D. 166, 195 (E.D. Pa. 2000). The defense attorneys in this case are aggressive, experienced, and highly skilled. Kirkland & Ellis LLP and Locke Lord are both excellent defense firms. In particular, Harriet Miers is recognized nationally as an excellent and persuasive litigator. *See TXU Corp.*, 2005 WL 3148350, at \*30, 2005 U.S. Dist. LEXIS 27077, at \*100 (finding that skill factor supported the fee award because, *inter alia*, opposing counsel were "highly experienced lawyers from prominent and well-respected law firms"). The ability of Lead Counsel to develop their case and negotiate this excellent settlement in the face of this formidable opposition confirms the quality of Plaintiffs' representation.

### 4. Preclusion of Other Employment

The time spent by Lead Counsel on this case was at the expense of time that counsel could have devoted to other matters. Accordingly, to the extent applicable, this factor supports the requested percentage.

### 5. The Customary Fee and Awards in Similar Cases

As demonstrated above, a 30% fee is consistent with fee percentages that have been repeatedly awarded by courts in this Circuit and District as well as numerous other similar cases throughout the country.

### 6. Whether the Fee Is Fixed or Contingent

The contingent nature of the fee and the financial burden carried by Lead Counsel warrants the Court's approval of the requested attorneys' fees. Lead Counsel have litigated the action on a wholly contingent basis, and borne all the risk of this action—the risks of surviving a motion to dismiss, opposing a dispositive motion, obtaining class certification, proving liability, addressing Defendants' arguments on loss causation and damages, prevailing in the "battle of the experts," litigating the action through trial and possible appeals—expending many hours of work, at great expense, and never being paid. From the outset, Lead Counsel understood that they were embarking on a complex, expensive, and lengthy litigation with no guarantee of ever being compensated for the enormous investment of time and money the case would require. In undertaking that

Buettgen v. Harless, Not Reported in Fed. Supp. (2013)
2013 WL 12303143

responsibility, Lead Counsel were obligated to assure that sufficient attorney, expert, and paraprofessional resources were dedicated to the prosecution of the action and that funds were available to compensate staff and to pay for the considerable expenses which a case such as this entails. Further, because of the nature of a contingent practice where cases are predominantly "big cases" lasting several years, not only do contingent litigation firms have to pay regular overhead, but they also must advance the expenses of the litigation.

**\*13** In addition to advancing litigation expenses and paying overhead, Lead Counsel faced the possibility they would receive no attorneys' fees. It is incorrect to presume that a law firm handling complex contingent litigation always wins. In fact, tens of thousands of hours have been expended in losing efforts, and the factor labeled by the courts as "the risks of litigation" is not an empty phrase.

In addition to the time value of money and the deferred compensation, Lead Counsel have borne the substantial risk that they might not achieve success in this case and would therefore be paid nothing for their substantial efforts to obtain a recovery for the Class.

In numerous cases, plaintiffs' counsel in contingent cases such as this, have expended thousands of hours only to receive no compensation. Moreover, there have been many hard-fought lawsuits where, because of (i) the discovery of facts unknown when the case was commenced; (ii) changes in the law while the case was pending; or (iii) decisions of judges or juries following a trial on the merits, the excellent professional efforts of members of the plaintiffs' bar produced no fee for counsel. Losses such as these are exceedingly expensive. Further, changes in the law through legislation or judicial decree can be catastrophic, frequently affecting many of contingent-fee counsel's pending cases. Thus, there existed a demonstrable risk that Lead Counsel would invest substantial efforts and receive nothing.

### 7. Time Limitations Imposed by the Client or the Circumstances

This factor does not pertain to this case and is thus neutral.

### 8. The Amount Involved and the Results Obtained

The benefit conferred to the class and the result achieved is an important factor in setting a fair fee. *See, e.g., In re* *Terra-Drill P'ships Sec. Litig.*, 733 F.Supp. 1127, 1128 (S.D. Tex. 1990) (noting that the *Johnson* factors emphasize "the results obtained"). The settlement constitutes a fair, reasonable, and adequate recovery under any circumstances, which may not ultimately be matched, at the conclusion of lengthy and costly litigation several years down the road. When this recovery is viewed against the difficulties Plaintiffs would face proving liability and damages, and carrying their burdens at trial, this Court should find that it would have been very difficult for Plaintiffs to obtain a greater recovery. *In re "Agent Orange" Prod. Liab. Litig.*, 611 F.Supp. 1396, 1405 (E.D.N.Y. 1985) ("[M]uch of the value of a settlement lies in the ability to make funds available promptly."), *aff'd in part and rev'd in part on other grounds*, 818 F.2d 179 (2d Cir. 1987).

In fact, the settlement obtained represents a recovery of approximately 15% of the Class's alleged maximum recoverable damages. *See* Wyman Decl., ¶¶ 167-169. This recovery is substantially greater than the average recovery in securities fraud cases. *See* Ellen M. Ryan, Laura E. Simmons, *Securities Class Action Settlements 2012 Review and Analysis*, at 8 (Cornerstone Research 2013) (in 2012, the median settlement amount, as a percentage of estimated damages, was 1.8%).

### 9. The "Undesirability" of the Case

The tenth *Johnson* factor, undesirability of the case, also supports the fee requested here. Securities cases have generally been recognized as "undesirable" due to the financial burden on counsel and the time demands of litigating class actions of this size and complexity. *Garza v. Sporting Goods Props.*, No. SA-93-CA-1082, 1996 WL 56247, at \*33, 1996 U.S. Dist. LEXIS 2009, at \*118 (W.D. Tex. Feb. 6, 1996) (factors such as financial burden on counsel and time demands of litigating class action of this size and complexity have caused cases to be considered "undesirable").

### 10. Time Limitations Imposed by the Client or the Circumstances and the Nature and Length of the Professional Relationship with the Client

**Buettgen v. Harless, Not Reported in Fed. Supp. (2013)**

2013 WL 12303143

---

**\*14** These factors do not pertain to this case and are thus neutral.

### E. Expenses Sought by Lead Counsel

Lead Counsel also request expenses of $1,680,094.10 in connection with the prosecution of the action on behalf of the Class, plus interest on such amount at the same rate as earned by the Settlement Fund.

The expenses incurred by Lead Counsel include in-house and private investigators, in-house damage consultants, expert fees, mediation fees, travel, photocopying of documents, on-line research, messenger service, postage, express mail and next day delivery, long distance and facsimile expenses, database maintenance for the nearly 3 million pages of documents produced by various parties, transportation, meals, and other incidental expenses directly related to the prosecution of this action.

The Court finds that these expenses were reasonably and necessarily incurred in prosecuting this action and achieving the proposed settlement. The expenses should therefore be awarded.

### F. Plaintiff's Request for an Award

Plaintiff Werring requests an award of $5,000 to compensate him for the time and expenses incurred in representing the Class in this action.

Reimbursement of such expenses should be allowed because it "encourages participation of plaintiffs in the active supervision of their counsel." *Varljen v. H.J. Meyers & Co.,* No. 97 CIV. 6742 (DLC), 2000 WL 1683656, at \*6, 2000 U.S. Dist. LEXIS 16205, at \*14 n.2 (S.D.N.Y. Nov. 8, 2000). Moreover, courts "routinely award such costs and expenses both to reimburse the named plaintiffs for expenses incurred through their involvement with the action and lost wages, as well as to provide an incentive for such plaintiffs to remain involved in the litigation and to incur such expenses in the first place." *Hicks v. Morgan Stanley & Co.,* No. 01 Civ. 10071 (RJH), 2005 WL 2757792, at \*10, 2005 U.S. Dist. LEXIS 24890, at \*30 (S.D.N.Y. Oct. 24, 2005). Plaintiff Werring was actively involved in the litigation and is deserving of the requested amount.

### VIII. CONCLUSION

This settlement is comprehensive in scope, is fair and even-handed in its application and is of substantial monetary and non-monetary value to the Class. The Court therefore approves the settlement as fair, reasonable and adequate. The Court also finds reasonable and awards to Lead Counsel the negotiated attorneys' fee of 30% of the Settlement Fund, the expense amount requested, plus interest, and an award to Plaintiff Werring.

IT IS SO ORDERED.

### All Citations

Not Reported in Fed. Supp., 2013 WL 12303143

---

**End of Document**

© 2021 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 13

2015 WL 12766537

2015 WL 12766537
Only the Westlaw citation is currently available.
United States District Court,
S.D. Texas, Houston Division.

Chaz CAMPTON, Individually and on Behalf
of All Others Similarly Situated, Plaintiffs
v.
IGNITE RESTAURANT GROUP,
INC., et. al., Defendants

Civil Action No. 4:12–2196
|
Signed 06/05/2015

**Attorneys and Law Firms**

Heather Davis, Payne Mitchell Law Group, Dallas, TX,
Kevin Koon-Pon Chan, Laurence M. Rosen, Phillip Kim, The
Rosen Law Firm, P.A., New York, NY, R. Dean Gresham,
Gresham PC, Dallas, TX, for Plaintiffs.

Stephen Burton Crain, Tony Lee Visage, Bracewell Giuliani
LLP, Houston, TX, Scott Lemond, Houston, TX, Shireen A.
Barday, Yosef J Riemer, Kirkland Ellis, LLP, New York, NY,
Joseph L. Motto, Robert Y. Sperling, Winston & Strawn LLP,
Chicago, IL, Walter Moreau Berger, Winston & Strawn LLP,
Houston, TX, for Defendants.

## ORDER

VANESSA D. GILMORE, UNITED STATES DISTRICT
JUDGE

 **\*1** On the 5th day of June, 2015, a hearing having been
held before this Court to determine: (1) whether the terms and
conditions of the Stipulation and Agreement of Settlement
dated January 23, 2013 (the "Stipulation") are fair, reasonable
and adequate for the settlement of all claims asserted by (i)
the Settlement Class against (ii) Defendants Ignite Restaurant
Group, Inc. ("Ignite" or the "Company"), Raymong A.
Blanchette, III, Jeffrey L. Rager, and Edward W. Engel,
Credit Suisse Securities (USC) LLC, Robert W. Baird &
Co. Inc., Piper JAffray & Co., KeyBanc Capital Markets
Inc., Lazard Capital Markets LLC, and Raymond James &
Associates, Inc. (collectively, the "Settling Defendants"); (2)
whether to approve the proposed Plan of Allocation as a
fair and reasonable method to allocate the Net Settlement

Fund among Class Members; and (3) whether attorney's fees,
reimbursement of expenses, and compensatory award to Lead
Plaintiffs are fair and reasonable; and

The Court having considered all matters submitted to it at the
hearing and otherwise; and

It appearing that the Notice substantially in the form approved
by the Court in the Court's Order Preliminary Approval of
Settlement ("Preliminary Approval Order") was mailed to all
reasonable identifiable Class Members; and

It appearing that the Summary Notice substantially in the
form approved by the Court in the Preliminary Approval
Order was published in accordance with that Order and the
specifications of the Court;

NOW, THEREFORE, IT IS HEREBY ORDERED,
ADJUDGED AND DECREED THAT:

1. All capitalized terms used herein have the same meanings
as set forth and defined in the Stipulation.

2. The Court has jurisdiction over the subject matter of the
Litigation, Lead Plaintiffs, all Settlement Class Members and
the Settling Defendants.

3. The Court hereby finally finds, for purposes of the
Settlement only, that the prerequisites for a class action under

 Rules 23 (a) and (b)(3) of the Federal Rules of Civil
Procedure have been satisfied in that: (1) the number of
Settlement Class Members is so numerous that joinder of all
members of the Settlement Class is impracticable; (b) there
are questions of law and fact common to the Settlement Class
Members; (c) the claims of the Lead Plaintiffs are typical
of the claims of the Settlement Class they seek to represent;
(d) the Lead Plaintiffs will fairly and adequately represent
the interests of the Settlement Class; € the questions of law
and fact common to the members of the Settlement Class
predominate over any questions affecting only individual
members of the Settlement Class; and (f) a class action is
superior to other available methods for the fair and efficient
adjudication of the Litigation.

4. Accordingly, the Court hereby finally certifies this action
as a class action for purposes of the Settlement only,
pursuant to  Rule 23(a) and (b)(3) of the Federal Rules
of Civil Procedure, on behalf of all persons who purchased

or otherwise acquired the common stock of the Company pursuant and/or traceable to Ignite's Registration Statement or Ignite's Prospectus issued in connection with the Company's IPO during the Class Period, and we allegedly damaged thereby. Excluded from the Settlement Class are Defendants, the present and former officers and directors of the Company and any subsidiary thereof, "Whiney Entities" (Defined as J.H. Whitney VI. L.P., and J.H. Whitney Capital Partners LLC, JCS Holdings, LLC), members of the immediate family of each of the Defendants or the Whitney Entities, any person, firm, trust, corporation, officer, director or other individual or entity in which any Defendant or Whitney Entity has a controlling interest or which is related to or affiliated with any of the Defendants or the Whitney Entities, and the legal representatives, agents, affiliates, heirs, successors-in-interest or assigns of any such excluded party. Also excluded from the Settlement Class are the following persons listed in Exhibit A hereto that validly excluded themselves in accordance with the Preliminary Approval Order.

**\*2** 5. The Court hereby finds that the forms and methods of notifying the Settlement Class of the Settlement and its terms and conditions met the requirements of due process and

Rule 23 of the Federal Rules of Civil Procedure, Section 21D(a)(7) of the Exchange Act, 15 U.S.C. § 78u–4(a)(7), as amended by the Private Securities Litigation Reform Act of 1995; constituted the best notice practicable under the circumstances; and constituted due and sufficient notice to all persons and entities entitled thereto of these proceedings and the matters set forth herein, including the Settlement and Plan of Allocation, to all persons entitled to such notice. No Settlement Class Member is relieved from the terms of the Settlement, including the releases provided for therein, based upon the contention or proof that such Settlement Class Members failed to receive actual or adequate notice. A full opportunity has been offered to the Settlement Class Members to object to the proposed Settlement and to participate in the hearing thereon. The Court further finds that the notice provisions of the Class Action Fairness Act, 28 U.S.C. § 1715, were fully discharged. Thus, it is hereby determined that all members of the Settlement Class are bound by this Order and Final Judgment except those persons listed on Exhibit A to this Order and Final Judgment.

6. Pursuant to Federal Rule of Civil Procedure 23, the Court hereby approves the Settlement set forth in the Stipulation and finds that said Settlement is, in all respects,

fair, reasonable and adequate, and in the best interests of the Settlement Class.

7. Pursuant to Federal Rule of Civil Procedure 23, the Court finds that the Stipulation and Settlement are fair, reasonable, and adequate to each of the Settling Parties, and that the Stipulation and Settlement are hereby finally approved in all respects, and the Settling Parties are hereby directed to perform its terms.

8. Accordingly, the Court authorizes and directs implementation of all the terms and provisions of the Stipulation, as well as the terms and provisions hereof. The Court hereby dismisses, as to Defendants, the Litigation and all Settled Claims of the Settlement Class with prejudice, without costs to either side.

9. Upon the Effective Date, and as provided in the Stipulation, Lead Plaintiffs and the Settlement Class Members, on behalf of themselves, their current and former heirs, executors, administrators, successors, attorneys, legal representatives, and assigns, and any person they represents, shall be deemed to have, and by operation of this Order and Final Judgment shall have, generally and fully release and forever relinquished and discharged all Settled Claims (including, without limitation, Unknown Claims) and any and all claims arising out of, relating to, or in connection with the Settlement, the Litigation, or the resolution of the Litigation against the Released Parties, whether or not such Settlement Class Member executes and delivers the Proof of Claim and Release.

10. Upon the Effective Date, Lead Plaintiffs and each of the Settlement Class Members, and anyone acting or purporting to act for any of the them, are hereby permanently and forever enjoined from prosecuting, attempting to prosecute, or assisting others in the prosecution of the Settled Claims (including, without limitation, Unknown Claims) and any and all claims arising out of, relating to, or in connection with the Settlement, the Litigation, or the resolution of the Litigation against the Released Parties, whether or not such Settlement Class Member executes and delivers the Proof of Claim and Release.

11. Each of the Settling Defendants, including any and all of their respective successors in interest or assigns, hereby releases and forever discharges, and shall forever be enjoined form prosecuting, any and all Settled Defendants' Claims against the Lead Plaintiffs, any of the Settlement Class

Case 4:19-cv-00509 Document 65-9 Filed 07/02/21 in TXSD Page 627 of 1452

Campton v. Ignite Restaurant Group, Inc., Not Reported in Fed. Supp. (2015)
2015 WL 12766537

Members and any of their counsel, including Lead Plaintiffs' Counsel for the Settlement Class and any counsel working under Lead Plaintiffs' Counsel's direction.

12. The Court hereby finds that the proposed Plan of Allocation is a fair and reasonable method to allocate the Net Settlement Fund among Settlement Class Members/

13. The Court finds that all parties and their counsel have complied with each requirement of Rule 11 of the Federal Rules of Civil Procedure as to all proceedings herein.

**\*3** 14. Neither this Order and Final Judgment, the Stipulation, the Settlement contained therein, nor any of the negotiations, documents or proceedings connected with them shall be:

(a) deemed to be or may be used as an admission of, or evidence of, the validity of any Settled Claim, or of any wrongdoing or liability of the Release Parties;

(b) deemed to be or may be used as an admission of, or evidence of, any fault or omission of any of the Released Parties;

(c) construed against the Settling Defendants or against the Lead Plaintiffs or the Settlement Class as an admission or concession that the consideration to be given hereunder represents the amount which could be or would have been recovered after trial; of

(d) construed as, or received in evidence as, an admission, concession or presumption against the Settlement Class or any of them, that any of their claims are without merit or that damages recoverable under the Complaint would not have exceeded the Gross Settlement Fund.

15. The released Parties may file the Stipulation and/or this Order and Final Judgment in any action that may be brought against them in order to support a defense or counterclaim based on principles of *res judicata*, collateral estoppel, release, good faith settlement, judgment bar or reduction or any other theory of claim preclusion or issue preclusion or similar defense or counterclaim.

16. Without affecting the finality of this Order and Final Judgment in any way, this Court hereby retains continuing exclusive jurisdiction over the Settling Defendants and the Settlement Class Members for all matters relating to the Litigation, including:

(a) the administration, interpretation, effectuation or enforcement of the Stipulation or Settlement and this Order and Final Judgment;

(b) implementation of this Settlement and any award or distribution of the Net Settlement Fund, including interest earned thereon; and

(c) disposition of the Net Settlement Fund.

17. Without further order of the Court, the Settling Defendants and Lead Plaintiffs may agree to reasonable extensions of time to carry out any provisions of the Stipulation.

18. The Court GRANTS Lead Counsel's request for attorneys' fees in the cash amount of one-third of the Settlement Fund ($600,000 in cash), as well as reimbursement of reasonable and necessary expenses incurred in the prosecution of the Action in the amount of $304,009.77, together with the interest earned thereon for the same time period and at the rate earned by the Settlement Fund until paid. Said fees shall be allocated among Plaintiffs' Counsel in a manner which, in their good-faith judgment, reflects each counsel's contribution to the institution, prosecution and resolution of the Action. The Court finds that the amount of fees awarded is fair and reasonable in light of the time and labor required, the novelty and difficulty of the case, the skill required to prosecute the case, the experience and ability of the attorneys, awards in similar cases, the contingent nature of the representation and the result obtained for the Class.

**\*4** 19. The Court hereby GRANTS Lead Plaintiffs' reimbursement of their reasonable costs and expenses (including lost wages) directly related to their representation of the Settlement Class in the total amount of $4,000.

**All Citations**

Not Reported in Fed. Supp., 2015 WL 12766537

---

# TAB 14

United States District Court
Southern District of Texas

**ENTERED**

June 07, 2017

David J. Bradley, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

|  |  |
|---|---|
| DAVE CARLTON, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> FRED CANNON, *et al.*, <br><br> Defendants. | No.: 4:15-cv-00012 <br><br> CLASS ACTION <br><br><br> Chief Judge Lee H. Rosenthal |

## [PROPOSED] ORDER GRANTING ATTORNEYS' FEES, REIMBURSEMENT OF EXPENSES, AND COMPENSATORY AWARD TO LEAD PLAINTIFFS

Having considered the moving papers on Lead Plaintiffs' Motion for Award of Attorneys' Fees, Reimbursement of Expenses, and Compensatory Award to Lead Plaintiffs and all other matters presented to this Court, and good cause appearing therefore:

IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:

1.    The Court GRANTS Plaintiffs' Counsel's[1] request for attorneys' fees in the cash amount of one-third of the Settlement Fund ($1,500,000). The Court finds that the amount of fees awarded is fair and reasonable in light of the time and labor required, the novelty and difficulty of the case, the skill required to prosecute the case, the experience and ability of the attorneys, awards in similar cases, the contingent nature of the representation and the result obtained for the Class. The fee award shall be distributed to Plaintiffs' Counsel according to the following schedule: $375,000 may be disbursed to Plaintiffs' Counsel from the entire fee award (representing 25%) immediately after the Effective Date. After the Court enters an order

---

[1] "Plaintiffs' Counsel" includes Lead Counsel The Rosen Law Firm, P.A. and Levi & Korsinsky LLP, as well as Liaison Counsel Gascoyne & Bullion, P.C. and additional liaison counsel Gresham P.C.

1

Case 4:19-cv-00508 Document 65-8 Filed on 07/02/21 in TXSD Page 630 of 1452
Case 4:15-cv-00012 Document 158 Filed in TXSD on 06/07/17 Page 2 of 2
Case 4:15-cv-00012 Document 157-1 Filed in TXSD on 06/05/17 Page 2 of 2

authorizing the initial distribution of the Settlement Fund to the Authorized Claimants, $562,000 may be distributed to Plaintiffs' Counsel from the entire fee award (representing 37.5%) at the same time as the initial distribution is made to Authorized Claimants. Upon the completion of the distribution of the entire Settlement Fund payable to Authorized Claimants, the remaining $562,000 from the entire fee award (representing 37.5%) may be distributed to Plaintiffs' Counsel. Said fees shall be allocated among Plaintiffs' Counsel in a manner which, in their good-faith judgment, reflects each counsel's contribution to the institution, prosecution and resolution of the Action.

2.     The Court GRANTS Plaintiffs' Counsel's request for reimbursement of reasonable and necessary expenses incurred in the prosecution of the Actions in the amount of $177,695.18 together with the interest earned thereon for the same time period and at the rate earned by the Settlement Fund until paid. The amount of $177,695.18 in reimbursement for expenses may be distributed to Plaintiffs' Counsel immediately after the Effective Date.

3.     The Court hereby GRANTS Lead Plaintiffs' reimbursement of their reasonable costs and expenses (including lost wages) directly related to their representation of the Settlement Class in the total amount of $15,000 or $7,500 each.

SO ORDERED:

Dated: June 2 , 2017

_____
HON. LEE H. ROSENTHAL
UNITED STATES DISTRICT JUDGE

2

# TAB 15

2015 WL 965696, Fed. Sec. L. Rep. P 98,390

2015 WL 965696
United States District Court,
W.D. Louisiana.

CITY OF OMAHA POLICE &
FIRE RETIREMENT SYSTEM
v.
LHC GROUP, et al.

Civil No. 6:12–1609.
|
Signed March 2, 2015.
|
Filed March 3, 2015.

**Attorneys and Law Firms**

Anne L. Box, John T. Jasnoch, Scott & Scott, San Diego, CA, Andrew Allen Lemmon, Irma L. Netting, Lemmon Law Firm, Hahnville, LA, Deborah Clark–Weintraub, Donald A. Broggi, Joseph P. Guglielmo, Scott & Scott, New York, NY, for City of Omaha Police & Fire Retirement System.

Carmen M. Rodriguez, Gary J. Russo, Jones Walker, Lafayette, LA, Elizabeth Gingold Greenman, John A. Jordak, Alston & Bird, Atlanta, GA, for LHC Group, et al.

## JUDGMENT

JAMES T. TRIMBLE, JR., District Judge.

 **\*1** This matter was referred to United States Magistrate Judge C. Michael Hill for Report and Recommendation. After an independent review of the record, and noting the absence of any objections, this Court concludes that the Report and Recommendation of the Magistrate Judge is correct and adopts the findings and conclusions therein as its own.

Accordingly, IT IS THEREFORE ORDERED, ADJUDGED AND DECREED that Lead Plaintiff's Motion for Award of Attorneys' Fees and Reimbursement of Litigation Costs and Expenses filed by City of Omaha Police and Fire Retirement System [rec. doc. 80] is GRANTED, and that 30% of the settlement fund ($2,355,000) is awarded for attorneys' fees, that $163,228.52 in expenses is awarded and $5,000 is awarded as compensation to Lead Plaintiff, for a total of $2,523,228.52.

## REPORT AND RECOMMENDATION

C. MICHAEL HILL, United States Magistrate Judge.

Pending before the undersigned is Lead Plaintiff's Motion for Award of Attorneys' Fees and Reimbursement of Litigation Costs and Expenses filed by City of Omaha Police and Fire Retirement System ("Lead Plaintiff"), on October 21, 2014. [rec. doc. 80]. No opposition has been filed. [1]

On December 11, 2014, the undersigned held a hearing [rec. doc. 83] on Lead Plaintiff's Motion for Final Approval of Class Action Settlement and Plan of Allocation of Settlement Proceeds filed on October 21, 2014 [rec. doc. 79], and the Motion for Award of Attorneys' Fees [rec. doc. 80]. At that hearing, the parties agreed to settle this action in the amount of $7,850,000.00 in cash. The attorneys for the class sought fees in the amount of 33 1/3% of the Settlement Fund ($2,614,050) and reimbursement of litigation expenses in the amount of $163,228.52, as well as a compensatory award of $5,000.00 to the Lead Plaintiff as reimbursement for the costs and expenses incurred as a direct result of its representation of the Class. [2] Defendants, LHC Group, Inc. ("LHC") and Keith G. Myers ("Myers"), agreed to the settlement amount. Additionally, defendants indicated that they had no opposition to the motion or the fees, costs and expenses requested.

By Report and Recommendation issued contemporaneously herewith, the undersigned has recommended that Judge Trimble approve the settlement.

For the following reasons, the undersigned recommends that attorney fees of 30% of the settlement amount ($2,355,000) be awarded, plus $163,228.52 for expenses, plus a compensatory award of $5,000 to Lead Plaintiff, for a total of $2,523,228.52.

## Background

The background for this litigation is set forth in the Report and Recommendation on Lead Plaintiff's Motion for Final Approval of Class Action Settlement and Plan of Allocation of Settlement Proceeds, issued contemporaneously herewith.

City of Omaha Police & Fire Retirement System v. LHC Group, Not Reported in...
2015 WL 965696, Fed. Sec. L. Rep. P 98,390

### *Law and Analysis*

### GUIDELINES FOR ATTORNEYS' FEES AND EXPENSES CALCULATION

Lead Plaintiff seeks costs and attorney's fees against defendants pursuant to the Settlement Agreement. [rec. docs. 72, 79].

 **\*2**  Under the "American Rule," "the prevailing litigant is ordinarily not entitled to collect a reasonable attorneys' fee from the loser." *Pennsylvania v. Delaware Valley Citizens' Council for Clean Air,* 478 U.S. 546, 561, 106 S.Ct. 3088, 3096, 92 L.Ed.2d 439 (1986) (*quoting Alyeska Pipeline Serice. Co. v.* *Wilderness Society,* 421 U.S. 240, 247, 95 S.Ct. 1612, 1616, 44 L.Ed.2d 141 (1975)). However, the United States Supreme Court "has recognized consistently that a litigant or a lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from the fund as a whole." *Boeing Co. v. Van Gemert,* 444 U.S. 472, 478, 100 S.Ct. 745, 749, 62 L.Ed.2d 676 (1980). The Fifth Circuit has acknowledged that the "common benefit" or "common fund" equitable doctrine allows for the assessment of attorneys' fees against a common fund created by the attorneys' efforts. *Barton v. Drummond Co.,* 636 F.2d 978, 982 (5th Cir.1981).

 Rule 23 of the Federal Rules of Civil Procedure was amended in 2003 to formally recognize the equitable power of the court to set common benefit fees in the class action using the following language: "In a certified class action, the court may award reasonable attorneys' fees and nontaxable costs that are authorized by law or by the parties' agreement." Fed.R.Civ.P. 23(h).

In common fund cases, courts typically use one of two methods for calculating attorneys' fees: (1) the percentage method, in which the court awards fees as a reasonable percentage of the common fund; or (2) the lodestar method, in which the court computes fees by multiplying the number of hours reasonably expended on the litigation by a reasonable hourly rate and, in its discretion, applying an upward or downward multiplier. *Union Asset Mgmt. v. Dell, Inc.,* 669 F.3d 632, 642–643 (5th Cir.2012); *Buford v. Cargill, Inc.,* 2012 WL 5471985, at *1 (W.D.La. Nov. 8, 2012) (Hicks, J).

Under the percentage method, the Court is first required to determine the actual monetary value conferred to the class members by the settlement. *Buford,* 2012 WL 5471985, at * 1 (*citing In re Heartland Payment Systems, Inc. Customer Data Sec. Breach Litigation,* 851 F.Supp.2d 1040, 1075 (S.D.Tex.2012)). The Court then sets the benchmark percentage to be applied to this value. *Id.; In re Heartland,* 851 F.Supp.2d at 1075. After setting the benchmark, the Court applies the *Johnson* [3] factors to determine whether a positive or negative adjustment of the benchmark is warranted. *Id.*

Under the lodestar method, determination of reasonable attorney's fees involves a two-step procedure. *Louisiana Power & Light Co. v.. Kellstrom,* 50 F.3d 319, 324 (5th Cir.1995) ((*citing* *Hensley v. Eckerhart,* 461 U.S. 424, 433, 103 S.Ct. 1933, 1939, 76 L.Ed.2d 40, 51 (1983)). Initially, the district court must determine the reasonable number of hours expended on the litigation and the reasonable hourly rates for the participating lawyers. *Id.* Then, the district court must multiply the reasonable hours by the reasonable hourly rates. *Id.* The product of this multiplication is the lodestar, which the district court then either accepts or adjusts upward or downward, depending on the circumstances of the case, after assessing the dozen factors set forth in *Johnson.* *Wegner v. Standard Insurance Company,* 129 F.3d 814, 822 (5th Cir.1997).

 **\*3**  The Fifth Circuit has endorsed the district courts' use of the percentage method cross-checked with the factors set out in *Johnson,* specifically stating:

> We join the majority of circuits in allowing our district courts the flexibility to choose between the percentage and lodestar methods in common fund cases, with their analyses under either approach informed by the *Johnson* considerations.

*Dell,* 669 F.3d at 644.

District courts in this Circuit regularly use the "blended percentage method" or "hybrid percentage method" with

City of Omaha Police & Fire Retirement System v. LHC Group, Not Reported in...
2015 WL 965696, Fed. Sec. L. Rep. P 98,390

a *Johnson* reasonableness check. 🚩*Dell,* 669 F.3d at 643 (*citing Klein v. O'Neal, Inc.,* 705 F.Supp.2d 632, 674–75 (N.D.Tex.2010) (collecting cases); *Jenkins v. Trustmark Nat. Bank,* 300 F.R.D. 291, 307 (S.D.Miss.2014); *Bethea v. Sprint Communications Co. L.P.,* 2013 WL 228094, at *3 (S.D.Miss. Jan. 18, 2013); *Burford,* 2012 WL 5471985, at *1; 🚩⚠️*In re Enron Corp. Securities, Derivative & ERISA Litigation,* 586 F.Supp.2d 732, 751 (S.D.Tex.2008); 🚩*Turner v. Murphy Oil USA, Inc.,* 472 F.Supp.2d 830, 860 (E.D.La.2007) (Fallon, J); 🚩*Batchelder v. Kerr–McGee Corp.,* 246 F.Supp.2d 525, 531 (N.D.Miss.2003); *In re Catfish Antitrust Litigation,* 939 F.Supp. 493, 501 (N.D.Miss.1996)); *In re Bayou Sorrel Class Action,* 2006 WL 3230771, at *3–4 (W.D.La. Oct. 31, 2006) (Haik, J); 🚩*In re Educational Testing Service Praxis Principles of Learning & Teaching: Grades 7–12 Litig.,* 447 F.Supp.2d 612, 628–629 (E.D.La.2006) (Vance, J); 🚩*In re Combustion, Inc.,* 968 F.Supp. 1116, 1135 (W.D. La 1997) (Haik, J).

In keeping with this Fifth Circuit precedent, the undersigned finds that the blended percentage approach is the appropriate method for calculating reasonable attorneys' fees in this case. 🚩*Turner,* 472 F.Supp.2d at 860–61. Accordingly, the Court will first determine the valuation of the benefit received by the class and then select an initial benchmark percentage. *Id.* The Court will then determine whether the benchmark should be adjusted based on the application of the *Johnson* factors to the particular circumstances of this case. *Id.* Finally, the Court will conduct a rough lodestar analysis to cross-check the reasonableness of the percentage fee award. *Id.*

### Analysis

The focus first turns to the facts and issues presented in the Motion for Award of Attorneys' Fees and Reimbursement of Litigation Costs and Expenses. Lead Plaintiff's counsel ("Lead Counsel") seek an award of attorneys' fees in the amount of 33 1/3% of the Settlement Fund and reimbursement of litigation expenses in the amount of $163,228.52. Counsel also seeks a compensatory award of $5,000.00 to the Lead Plaintiff as reimbursement for the costs and expenses incurred as a direct result of its representation of the Class. [rec. doc. 80, p. 1]. In support of this request, Lead Counsel submitted the Declaration of Deborah Clark–Weintraub in Support of Award of Attorneys' Fees and Expenses ("Weintraub

Declaration"); Declaration of Daryl Scott in Support of Scott +Scott Attorneys at Law LLP's Application for Award of Attorneys' Fees and Reimbursement of Expenses ("Scott Declaration"); Declaration of Andrew Lemmon in Support of the Lemmon Law Firm's Application for Award of Attorneys' Fees and Reimbursement Expenses ("Lemmon Declaration"), and Declaration of Lead Plaintiff City of Omaha Police and Fire Retirement System in Support of Final Approval of Settlement and Application for Reimbursement of Costs and Expenses ("Lead Plaintiff Declaration").

### Percentage Calculation

**\*4** In its motion, Lead Counsel requests an award of attorneys' fees in the amount of 33 1/3% of the amount of the Settlement Fund. The monetary value of the settlement is $7,850,000 in cash, plus interest earned from August 18, 2014, the date the settlement funds are/were deposited into the escrow account. [rec. doc. 80, p. 5].

No general rule can be articulated on what is a reasonable percentage of a common fund. *Jenkins,* 300 F.R.D. at 307 (*citing Bethea,* 2013 WL 228094, at *3). Nonetheless, awards commonly fall between a lower end of 20% and an upper end of 50%. *Id.* (*citing Smith v. Tower Loan of Miss., Inc.,* 216 F.R.D. 338, 368 (S.D.Miss.2003)); *In re Catfish,* 939 F.Supp. at 501 (adopting 25% benchmark); *In re Shell Oil Refinery,* 155 F.R.D. 552, 573 (E.D.La.1993) (noting most common fund fee awards range between 20% and 30%); 🚩*Camden I Condo. Assoc., Inc. v. Dunkle,* 946 F.2d 768, 774 (11th Cir.1991) ( "[t]he majority of common fund fee awards fall between 20% and 30% of the fund.").

In *Jenkins,* the court recently approved an award of one third (33.33%) of the $4,000,000 settlement fund. *Id.* at 306. It is not unusual for district courts in the Fifth Circuit to award percentages of approximately one third. *Jenkins,* 300 F.R.D. at 307 (*citing Collins v. Sanderson Farms, Inc.,* 568 F.Supp.2d 714, 729 (E.D.La.2008) (Berrigan, J)).

While the Court recognizes that a 33 1/3% contingency is common in this geographic area, and further recognizes that a 33 1/3% contingency has been approved in other common fund cases, the Court finds that a 30% fee is reasonable in this case.

### Johnson Factors

City of Omaha Police & Fire Retirement System v. LHC Group, Not Reported in...
2015 WL 965696, Fed. Sec. L. Rep. P 98,390

In order to ensure the reasonableness of the percentage applied, many circuits which apply the percentage method still make application of the lodestar factors enunciated in *Johnson. Batchelder, 246 F.Supp.2d at 531*. While all of the *Johnson* factors are not necessarily relevant under a percentage fee approach, courts have found that those factors are the most proper standard with which to weigh the reasonableness of a fee award. *Id .; Bethea, 2013 WL 228094, at \*4*. A district court's *Johnson* analysis need not be meticulously detailed: "If the district court has articulated and clearly applied the criteria ... [the Fifth Circuit] will not require the trial court's findings to be so excruciatingly explicit in this area of minutiae that decisions of fee awards consume more paper than did the cases from which they arose." *Kellstrom, 50 F.3d at 331* (quoting *Blanchard v. Bergeron, 893 F.2d 87, 89 (5th Cir.1990)*).

The twelve *Johnson* factors are:

  (1) the time and labor required;

  (2) the novelty and difficulty of the questions;

  (3) the skill requisite to perform the legal service properly;

  (4) the preclusion of other employment by the attorney due to acceptance of the case;

  (5) the customary fee;

  (6) whether the fee is fixed or contingent;

  **\*5** (7) time limitations imposed by the client or the circumstances;

  (8) the amount involved and the results obtained;

  (9) the experience, reputation, and ability of the attorneys;

  (10) the "undesirability" of the case;

  (11) the nature and length of the professional relationship with the client,

  and

  (12) awards in similar cases.

*Johnson, 488 F.2d at 717–719*.

Even though the *Johnson* factors must be addressed to ensure that the resulting fee is reasonable, not every factor need be necessarily considered. *Batchelder, 246 F.Supp.2d at 531–32* (citing *Uselton v. Commercial Lovelace Motor Freight, Inc., 9 F.3d 849, 854 (10th Cir.1993)* ("rarely are all the *Johnson* factors applicable; this is particularly so in a common fund situation.")). Based upon an application and analysis of these factors, the court can make any adjustments necessary to the benchmark percentage rate in order to ensure that a reasonable amount is awarded. *Id.*

A listing of the factors and analysis of each factor as it applies in this case follow.

*(1) Time and labor involved*
This lawsuit was filed on June 13, 2012, and litigated for approximately two and a half years. During the course of the litigation, Lead Counsel conducted a detailed investigation of potential claims against LHC and Myers; filed a motion for appointment of Lead Plaintiff and Lead Counsel; oversaw investigative interviews of numerous witnesses; prepared a detailed amended complaint; filed a 27–page opposition to defendants' 34–page motion to dismiss; opposed defendants' interlocutory appeal; filed a motion to compel; drafted Freedom of Information Act requests to the Securities and Exchange Commission ("SEC") and the Office of Inspector General, Department of Health and Human Services; prepared initial disclosures and propounded requests for production of documents upon defendants; received and reviewed over 137,000 pages of documents produced by defendants and the SEC; responded to defendants' requests for production and interrogatories; engaged in multiple telephone conferences regarding the scope of discovery; consulted with experts and consultants in the fields of economics and damages; filed a motion for preliminary approval of class settlement; prepared two detailed mediation briefs; attended a full-day mediation and had numerous follow-up communications with the mediator; spent weeks negotiating the settlement terms; filed a motion for final approval of settlement, and participated in several status conferences with the Court. [Weintraub Declaration, p. 2]. As of the date of filing the instant motion, Lead Counsel had spent approximately 2,141.2 hours litigating this case. [Scott Declaration, ¶ 5; Lemmon Declaration, ¶ 5].

The undersigned observes that all counsel have done a substantial amount of work in this case. However, because this matter was resolved prior to summary judgment and trial, this saved the parties time and expense. The undersigned finds that the amount of work in this case is accurately

2015 WL 965696, Fed. Sec. L. Rep. P 98,390

reflected in the nature of an award based upon percentage of recovery; therefore, this factor does not significantly affect the reasonableness of the award. *Batchelder,* 246 F.Supp.2d at 532. Accordingly, I find that this factor does not warrant an adjustment to the benchmark.

### (2)*Novelty and Difficulty of the Issues* [4]

**\*6** The Amended Complaint asserts claims for securities fraud under §§ 10(b), 20(a) and 20A of the Securities and Exchange Act of 1934 and Rule 10b–5, 17 C.F.R. § 240.10b–5, which is a highly technical and complicated area of the law. The Fifth Circuit recognizes that shareholder derivative actions are "notoriously difficult and unpredictable." *Maher v. Zapata Corp.,* 714 F.2d 436, 455 (5th Cir.1983) (*citing Schimmel v. Goldman,* 57 F.R.D. 481, 487 (S.D.N.Y.1973). In fact, Fifth Circuit decisions on causation, pleading and proof at the class certification stage make Private Securities Litigation Reform Act ("PSLRA") [5] claims particularly difficult to prosecute in this circuit. *In re OCA,* 2009 WL 512081, at \*21.

Given the inherent difficulty involved in securities class actions and the special difficulty of bringing those cases in the Fifth Circuit, the Court finds that consideration of this factor warrants a substantial fee. The difficulty and complexity of securities class action litigation in this Circuit has led the undersigned to recommend a fee of 30%.

### (3)*The skill required to Perform the Legal Services Properly*

The firm resume of Lead Counsel indicates that Scott+Scott has significant expertise in complex securities litigation involving stock fraud. [Scott Declaration, Exhibit A]. This skill was demonstrated through the numerous pleadings filed in this case, particularly in opposing defendants' highly detailed Motion to Dismiss. Lead Counsel also acknowledges that defendants "were represented by highly experienced lawyers from prominent and well-respected law firms." [rec. doc. 81, p. 13]. *See Walco Investments, Inc. v. Thenen,* 975 F.Supp.1468, 1472 (S.D.Fla.1997) ("[g]iven the quality of defense counsel from prominent national law firms, the Court is not confident that attorneys of lesser aptitude could have achieved similar results"); *Billitteri v. Securities America, Inc.,* 2011 WL 3585983, \*7 (N.D.Tex. Aug. 4, 2011) ("[B]ecause of the extremely effective work of opposing

counsel.... The skill required here ... certainly justifies the contemplated award").

In light of the quality of all counsel's work product and conduct before this Court, I find that consideration of this factor justifies a substantial fee award. Again, the Court has given great weight to this factor in recommending an award of a 30% fee.

### (4)*Preclusion of other employment*

This factor "involves the dual consideration of otherwise available business which is foreclosed because of conflicts of interest which occur from the representation, and the fact that once the employment is undertaken the attorney is not free to use the time spent on the client's behalf for other purposes."

*Burford,* 2012 WL 5471985, at \*3 (*quoting Johnson,* 488 F.2d at 718)). The undersigned observes that Lead Counsel has spent approximately 2,141.2 hours litigating this case over a two-and-a-half-year period. [Scott Declaration, ¶ 5; Lemmon Declaration, ¶ 5]. Given the significant amount of time devoted to this case, Lead Counsel was probably precluded from working on other matters.

**\*7** However, a number of attorneys worked on this case, and the hours are not itemized to show any delays in the lawyers' other legal work. *In re Educ. Testing Serv.,* 447 F.Supp.2d at 632 (*citing Johnson,* 488 F.2d at 718). Further, the Fifth Circuit has held that preclusion of other employment is generally subsumed in the lodestar calculation. *Shipes v. Trinity Industries,* 987 F.2d 311, 321–322 (5th Cir.1993); *Heidtman v. County of El Paso,* 171 F.3d 1038, 1043 (5th Cir.1999). Thus, this factor does not support an enhancement of the lodestar.

### (5)*Customary fee*

The customary fee for similar work in the community should be considered, as "it is open knowledge that various types of legal work command differing scales of compensation."

*Buford,* 2012 WL 5471985, at \*3 (*quoting Johnson,* 488 F.2d at 718)). In the Western District of Louisiana, the customary contingency fee for representation of plaintiffs "ranges from 33 1/3% to 50% of the gross award plus costs for cases requiring the institution and prosecution of litigation." *Id.* (*quoting In re Bayou Sorrel Class Action,* 2006 WL 3230771, \*5 (W.D.La. Oct. 31, 2006)). [6] Thus, this

2015 WL 965696, Fed. Sec. L. Rep. P 98,390

factor supports approval of the 30% fee which, in this case, constitutes a substantial award. *Id.*

**(6) Fixed or contingent fee**

"The fee quoted to the client or the percentage of the recovery agreed to is helpful in demonstrating the attorney's fee expectations when he accepted the case." [7] *Burford,* 2012 WL 5471985, at \*4 (*quoting* 🚩 *Johnson,* 488 F.2d at 718). Here, Lead Counsel undertook this complex securities class action on a contingent fee basis, assuming a significant risk of nonpayment. *Jenkins,* 300 F.R.D. at 309. In recognizing the contingent risk of nonpayment in class action cases, courts have found that class counsel ought to be compensated ... for risk of loss or nonpayment assumed by carrying through with the case. 🚩 *Turner,* 472 F.Supp.2d at 859–860 (*citing* 🚩 *In re Combustion,* 968 F.Supp. at 1132. Because this fee award is comparable to a reasonable contingency fee award, I find that consideration of this factor does not justify an increase to the fee award. 🚩 *In re Educ. Testing Serv.,* 447 F.Supp.2d at 631.

**(7) Time limitations**

Lead Counsel states that this factor does not pertain to this case. [8] [rec. doc. 80, p. 15].

**(8) The Time Involved and the Results Obtained** [9]

The most critical factor in determining the reasonableness of a fee award is the degree of success obtained. *Slipchenko v. Brunel Energy, Inc.,* 2015 WL 338358, at \*21 (S.D. Texas Jan. 23, 2015) (*citing Heartland Payment Systems, Inc. Customer Data Sec. Breach Litigation,* 851 F.Supp.2d 1040, 1085 (S.D.Tex.2012)). Approximately two and a half years after the complaint was filed, the parties were able to settle this matter. Under the proposed settlement, the Class will receive $7,850,000, plus interest in exchange for the release of all claims against defendants. Based on preliminary damage studies prepared by Lead Plaintiff's expert on causation and damages, this equates to approximately 7.4%–10.3% of estimated provable damages. [rec. doc. 80, p. 15]. The typical recovery in most class actions generally is three-to-six cents on the dollar. 🚩⚠️*In re Enron Corp. Sec., Derivative & ERISA Litig.,* 586 F.Supp.2d 732, 804 (S.D.Tex.2008).

**\*8** The undersigned finds that a high degree of success has been obtained in this matter. *Burford,* 2012 WL 5471985, at \*4. However, trial was not required. Counsel agreed to

a 33 1/3% contingency which would have included trial. Accordingly, the Court concludes that a small percentage reduction from the agreed upon percentage is appropriate.

**(9) The Experience, Reputation and Ability of Counsel** [10]

The declarations filed in the record provide evidence of the experience, reputation, and ability of Class Counsel. [rec. doc. 80, Weintraub, Scott and Lemmon Declarations]. Additionally, the Court notes that all of the attorneys have performed in an exemplary manner in this complex securities fraud litigation. However, this factor is accounted for in the contingency percentage recommended by the Court.

**(10) The Undesirability of the Case**

Cases may be deemed "undesirable" when "the defendant is a large corporation with substantial resources, financial and otherwise, for a vigorous defense; and the legal and factual issues presented risks to recovery absent settlement." *Burford,* 2012 WL 5471985, at \*5 (*citing Heartland Payment Systems,* 851 F.Supp.2d at 1085).

Here, LHC is a large corporation with substantial resources, as indicated by the fact that it hired the large and well-established Louisiana law firm Jones Walker and the Atlanta Georgia law firm Alston & Bird to defend it in this case. Additionally, this complex securities litigation presented risks that required investigation and informal discovery to uncover and analyze, as well as risk of no recovery. *Di Giacomo v. Plains All American Pipeline,* 2001 WL 34633373, at \*12 (S.D. Texas Dec. 19, 2001). These factors speak directly to the undesirability of the case. However, the Court finds that the percentage fee recommended adequately addresses this factor.

**(11) The nature and length of the professional relationship with the client**

Lead Counsel has represented Lead Plaintiff since at least 2009. [Weintraub Declaration, ¶ 22]. The Declaration of James Sklenar, Chairman of Omaha Police and Fire ("Lead Plaintiff Declaration"), indicates that he has been in regular contact with Lead Counsel and estimates that he and other board members have spent approximately 38.5 hours participating in the litigation activities. [Lead Plaintiff Declaration, ¶¶ 4, 8]. In a case such as this, where counsel has been quickly responsive to class members who needed explanations, assistance, and assurances, the eleventh factor

2015 WL 965696, Fed. Sec. L. Rep. P 98,390

weighs in favor of a substantial award. *Burford,* 2001 WL 5471985, at \*52001 WL 5471985, at \*5 (*citing In re Bayou Sorrel,* 2006 WL 3230771, at \*6). However, I find the fee adequately compensates for this factor.

### (12) Awards in similar cases

As indicated above, the customary contingency fee in the Western District of Louisiana for representation of plaintiffs in class actions "ranges from 33 1/3% to 50% of the gross award plus costs for cases requiring the institution and prosecution of litigation." *Id.* (*quoting In re Bayou Sorrel Class Action,* 2006 WL 3230771, \*5)). Thus, an award of 30% of the common fund is reasonable and typical and does not justify an enhancement of the award. *Id.*

**\*9** In conclusion, two of the *Johnson* factors merit an increase in the fee award: the novelty and difficulty of the issues and the undesirability of the case. The undersigned finds that these factors support the fee award of 30% of the settlement fund. A much stronger showing on the *Johnson* factors would have been necessary to justify a higher fee.

*See In re Educ. Testing Serv.,* 447 F.Supp.2d at 632 (class counsel awarded 29% of the requested 40% of the settlement fund where two of the *Johnson* factors were met).

#### *Lodestar Cross–Check*

In the final step, the Court conducts a rough lodestar analysis to cross-check the reasonableness of the percentage fee award. *Turner,* 472 F.Supp.2d at 861. The lodestar analysis is not undertaken to calculate a specific fee, but only to provide a rough cross-check on the reasonableness of the fee arrived at by the percentage method. *Id.*

Lead Counsel reportedly expended approximately 2,141.2 hours, at hourly rates of up to $775 per hour for the attorneys at Scott+Scott in New York, and $625 per hour for the attorneys at the Lemmon firm in New Orleans. The resulting lodestar for the services performed is $1,225,920.50.

To determine reasonable rates, a court considers the attorneys' regular rates as well as prevailing rates in the community. *Kellstrom,* 50 F.3d at 328. The "relevant community" for the purpose of awarding attorney fees is the judicial district in which the litigation occurred. *Talen's Marine & Fuel, L.L.C.*

*v. Con Dive, LLC,* 2011 WL 1595274, \*3 (W.D.La. Apr. 21, 2011) (Hanna, J).

The undersigned is unaware of any local law firms (in the Lafayette Louisiana geographic area) who handle this type of litigation routinely, so there are no firms in this area which can be used for realistic comparison. The undersigned has checked rates in metropolitan areas in the south and southwest for attorneys involved in securities class actions. Given the undersigned's knowledge of the legal market in complex securities class actions, I find that the rates charged by Lead Counsel, while on the high end, are within the reasonable range. *See In re Enron,* 586 F.Supp.2d at 780 (noting that fees ranging from $400−$795 per hour for partners and $210−$460 per hour for associates were in accord with prevailing market rates for big firms in Houston/Dallas Texas). Using these hours and rates, the undersigned calculates a lodestar baseline of $1,225,920.50, which matches Lead Plaintiff's calculations. [Scott Declaration, pp. 1–2; Lemmon Declaration, p. 1].

The purpose of a lodestar cross-check of the results of a percentage fee award is to avoid windfall fees, that is, to "ensure that the percentage approach does not lead to a fee that represents an extraordinary lodestar multiple." *In re Enron,* 586 F.Supp.2d at 751–752 (*citing In re Cendant Corp. Sec. Litig.* ("*Cendant I*"), 264 F.3d 201, 285 (3d Cir.2001); *In re Cendant Corp. Sec. Litig.* ("*Cendant II*"), 404 F.3d 173, 188 (3d Cir.2005)). A cross-check is performed by dividing the proposed fee award by the lodestar calculation, resulting in the lodestar multiplier. *Id.* (*citing In re AT & T Corp.,* 455 F.3d 160, 164 (3d Cir.2006)).

**\*10** The multiplier represents the risk of the litigation, the complexity of the issues, the contingent nature of the engagement, the skill of the attorneys, and other factors. *Id.* (*citing In re Global Crossing Sec. & ERISA Litig.,* 225 F.R.D. 436, 468 (S.D.N.Y.)). The "risk multiplier" is not considered separately in the Fifth Circuit but included with the *Johnson* factor evaluation. *In re Combustion,* 968 F.Supp. at 1135 (*citing Longden v. Sunderman,* 979 F.2d 1095, 1099 (5th Cir.1992); *In re Shell Oil Refinery,* 155 F.R.D. at 572 (discussion of risk incorporated in the "undesirability of the case.")).

City of Omaha Police & Fire Retirement System v. LHC Group, Not Reported in...
2015 WL 965696, Fed. Sec. L. Rep. P 98,390

Since the multiplier can then be "adjusted to account for particular circumstances, such as the quality of representation, the benefit obtained for the class, the complexity and novelty of the issues presented, and the risks involved, if the court considers the multiplier too great, it should reduce the award." *In re Enron,* 586 F.Supp.2d at 751–752 (*citing In re Global Crossing* at 164 & n. 4). It can also upwardly adjust the multiplier in rare and exceptional cases where such a modification is justified by specific evidence in the record and detailed findings by the court. *Id.* The multiplier need not fall within any predefined range, provided that the district court analysis justifies the award. *Id* . (*citing In re Rite Aid Corp. Securities Litigation,* 396 F.3d 294, 307 (3rd Cir.2005)).

The Court may consider multipliers used in comparable cases. *Id.* (*citing Rite Aid,* 396 F.3d at 307 n. 17). Multipliers ranging from one to four frequently are awarded in common fund cases when the lodestar method is applied. *In re Combustion, Inc.,* 968 F.Supp. at 1133–34 (*citing In re Shell Oil Refinery,* 155 F.R.D. 552, 573 (E.D.La.1993) (applying risk multiplier of 3 to 3.5) (and cases cited at note 55)). A large common fund award may warrant an even larger multiplier. *Id.* (*citing In re Beverly Hills Fire Litigation,* 639 F.Supp. 915 (E.D.Ky.1986) (multiplier of 5 for lead counsel for contingency and superior trial skills in personal injury class action)).

The Court must adjust the lodestar by the *Johnson* factors to determine an appropriate multiplier. Here, dividing the proposed fee award by the lodestar calculation results in a lodestar multiplier of 1.92 which is on the lower end of approved multipliers. *In re Combustion, Inc.* The Court finds that a multiplier of 1.92 falls within the range applied in this district and Circuit. This multiplier adequately accounts for the novelty and difficulty of the issues, the results obtained and the undesirability of the case.

The Court recommends an attorney fee award of 30% of the settlement fund or $2,355,000. This fairness of this fee award is further confirmed by the lodestar calculation.

### Compensatory Award

Federal courts often approve incentive awards in class action lawsuits to compensate named plaintiffs for the services they provide and burdens they shoulder during litigation. *In re Educ. Testing Serv.,* 447 F.Supp.2d at 633–34 (*citing*

*In re Catfish,* 939 F.Supp. at 503–04)). Here, the class representatives were involved in initiating the litigation, and were willing to incur costs and expenses and be subjected to discovery on behalf of the class. *Id.* The Court finds that there is an adequate basis to award a compensatory award to Lead Plaintiff in the amount of $5,000, and so recommends.

### Expenses

**\*11** Finally, the request for costs and expenses totaling $163,228.52 in costs and expenses must be addressed.

An attorney who has created a common fund for the benefit of the class is entitled to reimbursement of reasonable litigation expenses from that fund. *In re Ikon Office Solutions, Inc., Sec. Litig.,* 194 F.R.D. 166, 192 (E.D.Pa.2000). Counsel for a class action is entitled to reimbursement of expenses that were adequately documented and reasonably and appropriately incurred in the prosecution of the class action. *In re Safety Components, Inc. Sec. Litig.,* 166 F.Supp.2d 72, 108 (D.N.J.2001).

Lead Counsel requests an award of $163,228.52 in expenses. In support of the award, Lead Counsel has submitted declaration itemizing the expenses. [Scott Declaration, p. 2; Lemmon Declaration, p. 2]. These include the following categories: postage and courier; document production and electronic database set up and maintenance; expert fees; filing, witness and other fees; mediation; on-line research; photocopies; press releases; staff overtime; telephone, facsimile and data, and travel (meals, hotels and transportation). Courts have permitted recovery of similar expenses. *See Jenkins,* 300 F.R.D. at 310–11 (approving reimbursement of $181,213.18 in litigation expenses for expert fees, travel costs and administrative expenses including filing fees, PACER charges, copies, postage, delivery fees and similar expenses); *In re Remeron End–Payor Antitrust Litig.,* 2005 WL 2230314, at *32 (D.N.J. Sept. 13, 2005) (approving reimbursement of litigation expenses including substantial fees for experts; substantial costs associated with creating and maintaining an electronic document database; travel and lodging expenses; copying costs, and the costs of deposition transcripts).

The Court has reviewed the itemized expenses and finds that the asserted expenses are reasonable. Accordingly, the undersigned finds that the full amount of the expenses should be awarded in addition to the percentage fee. *See In re OCA, Inc.,* 2009 WL 512081, at *26 (class counsel awarded full

Case 4:19-cv-00509 Document 65-9 Filed 07/02/21 in TXSD Page 640 of 1452

City of Omaha Police & Fire Retirement System v. LHC Group, Not Reported in...
2015 WL 965696, Fed. Sec. L. Rep. P 98,390

amount of $179,466.05 in expenses in addition to percentage fee of $1,852,500).

Defendants have not objected to the amount of expenses incurred. Accordingly, I recommend that the Court award the full amount of $163,228.52 in costs and expenses.

### *CONCLUSION*

For the foregoing reasons, it is recommended that 30% of the settlement fund ($2,355,000) be awarded for attorneys' fees, that $163,228.52 in expenses be awarded and $5,000 be awarded as compensation to Lead Plaintiff, for a total of $2,523,228.52.

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and F.R.Civ.Proc .72(b), parties aggrieved by this recommendation have fourteen (14) days from service of this Report and Recommendation to file specific, written objections with the Clerk of Court. A party may respond to another party's objections within fourteen (14) days after being served with a copy thereof. Counsel are directed to furnish a courtesy copy of any objections or responses to the District Judge at the time of filing.

**\*12 FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FACTUAL FINDINGS AND/OR THE PROPOSED LEGAL CONCLUSIONS REFLECTED IN THIS REPORT AND RECOMMENDATION WITHIN FOURTEEN (14) DAYS FOLLOWING THE DATE OF ITS SERVICE, OR WITHIN THE TIME FRAME AUTHORIZED BY FED.R.CIV.P. 6(b), SHALL BAR AN AGGRIEVED PARTY FROM ATTACKING THE FACTUAL FINDINGS OR THE LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT COURT, EXCEPT UPON GROUNDS OF PLAIN ERROR.** *DOUGLASS V. UNITED SERVICES AUTOMOBILE ASSOCIATION,* **79 F.3D 1415 (5TH CIR.1996).**

### All Citations

Not Reported in F.Supp.3d, 2015 WL 965696, Fed. Sec. L. Rep. P 98,390

### Footnotes

1       LR 7.5W provides that opposition shall be filed within 21 days after service of the motion.
2       The "Class" consists of all persons who purchased or otherwise acquired LHC common stock between July 30, 2008 and October 26, 2011, excluding defendants, directors and officers of LHC and their families and affiliates. [rec. doc. 72, Stipulation, ¶ 1.4]
3       *Johnson v. Georgia Highway Express, Inc.,* 488 F.2d 714 (5th Cir.1974), *abrogated on other grounds by Blanchard v. Bergeron,* 489 U.S. 87, 109 S.Ct. 939, 103 L.Ed.2d 67 (1989)
4       In *Walker v. U.S. Dept. of Housing and Urban Development,* 99 F.3d 761, 772 (5th Cir.1996), the Fifth Circuit noted that the Supreme Court has limited greatly the use of the second, third, eighth, and ninth *Johnson* factors.
5       In securities class actions, the notice must satisfy the disclosure requirements of the Private Securities Litigation Reform Act (PSLRA). *In re OCA, Inc. Securities & Derivative Litig.,* 2009 WL 512081, at \*7 (E.D.La. March 2, 2009) (Vance, J).
6       The Court's own experience in contingency fee cases indicates that, currently, most contingency fees in this geographic area are in the 33 1/3% to 40% range.
7       In *Walker,* 99 F.3d at 772, the Fifth Circuit noted that the Supreme Court has barred any use of the sixth factor. *See City of Burlington v. Dague,* 505 U.S. 557, 567, 112 S.Ct. 2638, 2643, 120 L.Ed.2d 449 (1992); *Shipes,* 987 F.2d at 320.

**City of Omaha Police & Fire Retirement System v. LHC Group, Not Reported in...**

2015 WL 965696, Fed. Sec. L. Rep. P 98,390

8　　The seventh factor is subsumed in the number of hours reasonably expended. 🚩*Walker,* 99 F.3d at 772.

9　　The Supreme Court has greatly limited the use of this factor. 🚩*Walker,* 99 F.3d at 771.

10　　The Supreme Court has greatly limited the use of this factor. 🚩*Walker,* 99 F.3d at 771.

---

**End of Document**

© 2021 Thomson Reuters. No claim to original U.S. Government Works.

City of Omaha Police & Fire Retirement System v. LHC Group, Not Reported in...

2015 WL 965696, Fed. Sec. L. Rep. P 98,390

---

# TAB 16

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEVADA**

MAC COSTAS, Individually and on Behalf of All Others Similarly Situated,

                              Plaintiffs,

                     v.

ORMAT TECHNOLOGIES, INC., ISAAC ANGEL, and DORON BLACHAR,

                              Defendants.

No. 3:18-cv-00271-RCJ-WGC

Hon. Robert C. Jones

**ORDER AND FINAL JUDGMENT**

On the 11th day of January, 2021, a hearing having been held before this Court to determine: (1) whether the terms and conditions of the Stipulation and Agreement of Settlement and Release dated June 8, 2020 (the "Stipulation") are fair, reasonable, and adequate for the settlement of all claims asserted by the Settlement Class against Ormat Technologies, Inc. ("Ormat" or the "Company"), Isaac Angel, and Doron Blachar (the "Individual Defendants," and together with Ormat, the "Defendants");[1] (2) whether to approve the proposed Plan of Allocation as a fair and reasonable method to allocate the Net Settlement Fund among Settlement Class Members; (3) whether judgment should be entered dismissing the Action with prejudice; (4) whether to approve the proposed Plan of Allocation as a fair and reasonable method to allocate the Net Settlement Fund among Settlement Class Members; (5) whether and in what amount to award Lead Counsel fees and reimbursement of expenses; and (6) whether and in what amount to award a service fee to Lead Plaintiff;

The Court having considered all matters submitted to it at the hearing and otherwise; and

It appearing that the Notice substantially in the form approved by the Court in the Order Preliminarily Approving Settlement (Dkt. No. 88) ("Preliminary Approval Order") was mailed to all reasonably identifiable Settlement Class Members; and

---

[1] The Class Representative, on behalf of itself and the Settlement Class, and Defendants are collectively referred to as the "Parties."

It appearing that the Publication Notice substantially in the form approved by the Court in the Preliminary Approval Order was published in accordance with the Court's specifications;

**NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:**

1. Unless indicated otherwise, all capitalized terms used herein have the same meanings as set forth and defined in the Stipulation.

2. The Court has jurisdiction over the subject matter of this action (the "Action"), Class Representative, all Settlement Class Members, and the Defendants, including all Settlement Class Members who did not timely file a request for exclusion from the Settlement Class by the relevant deadline pursuant to the Preliminary Approval Order.

3. The Court finally certifies the Class, defined as: "All Persons, including those resident in Israel, that purchased or acquired shares of Ormat, either on the New York Stock Exchange ("NYSE"), or on the Tel Aviv Stock Exchange ("TASE"), or both the NYSE and TASE between August 3, 2017 and May 15, 2018, both dates inclusive. Excluded from the Class are the named Defendants to this action, and immediate family members of any Defendant; the legal representatives, heirs, successors, or assigns of any Defendant; and any entity in which any Defendant has a controlling interest."

4. This Court finds that, for the purposes of effectuating this Settlement, (i) the Class Members are so numerous that joinder of all Class Members in the Action is impracticable, (ii) there are questions of law or fact common to all Class Members, (iii) the claims of the Class Representative are typical of the claims of the Class, (iv) the Class Representative and Class Counsel have fairly and adequately protected and represented the interests of all Class Members and (v) a class action is superior to other available methods for fair and efficient adjudication of the controversy.

5. The Court hereby finds that the forms and methods of notifying the Settlement Class of the Settlement and its terms and conditions: met the requirements of due process, Rule 23 of the Federal Rules of Civil Procedure, and 15 U.S.C. § 78u-4(a)(7) (added to the Exchange Act by the Private Securities Litigation Reform Act of 1995); constituted the best notice practicable under the circumstances; and constituted due and sufficient notice to all persons and entities entitled thereto of these proceedings and the matters set forth herein, including the Settlement and Plan of Allocation. No Settlement Class Member is relieved from the terms of the Settlement, including the releases provided

for therein, based upon the contention or proof that such Settlement Class Member failed to receive actual or adequate notice. A full opportunity has been offered to the Settlement Class Members to object to the proposed Settlement and to participate in the hearing thereon. The Court further finds that the notice provisions of the Class Action Fairness Act, 28 U.S.C. § 1715, were fully discharged and that the statutory waiting period has elapsed. Thus, it is hereby determined that all members of the Settlement Class are bound by this Order and Final Judgment except those listed on Exhibit A hereto.

6. The Settlement is approved as fair, reasonable, adequate, and in the best interests of the Settlement Class. The Court further finds that there was no collusion, that the Settlement set forth in the Stipulation is the result of arm's-length negotiations between experienced, competent counsel representing the interests of the Settlement Class Members and the Defendants, and that the record is sufficiently developed and complete to have enabled the Class Representative and the Defendants to have adequately evaluated and considered their positions. Class Representative and Defendants are directed to consummate the Settlement in accordance with the terms and provisions of the Stipulation.

7. The Court herby finds that the proposed Plan of Allocation is a fair and reasonable method to allocate the Net Settlement Fund among Settlement Class Members, and Lead Counsel and the Claims Administrator are directed to administer the Plan of Allocation in accordance with its terms and the terms of the Stipulation.

8. Except with respect to individual claims by persons who have validly and timely requested exclusion from the Settlement Class, all of the claims asserted in the Amended Complaint or the Action against the Defendants are hereby dismissed with prejudice, without costs as to the Parties, except as awarded under the Settlement Fund and approved by the Court.

9. Each of the Releasing Parties are hereby deemed to have fully, finally, and forever waived, released, relinquished and discharged each and every one of the Released Claims, including Unknown Claims, against each and every one of the Released Parties, whether or not the Class Member executes and delivers the Proof of Claim, and whether or not such Class Member shares in the Settlement Fund. Except however, the Settlement shall not release any claims in the action captioned *In re Ormat Tech., Derivative Litig.*, No. 18-cv-439-RCJ-WGC (D. Nev. Sept. 11, 2018).

10. Each of the Releasing Parties are hereby forever barred and enjoined from commencing,

[PROPOSED] ORDER AND FINAL JUDGMENT

prosecuting, or assisting in the commencement or prosecution of, any claim arising from the purchase or sale of Ormat securities during the Class Period. Each of the Releasing Parties is further permanently and forever barred and enjoined from filing, commencing, instituting, prosecuting or maintaining, either directly, indirectly, representatively, or in any other capacity, in this Court, or in any other court of law or equity, administrative forum, or arbitration tribunal, any claim, counterclaim, cross-claim, third-party claim or other actions based upon, relating to, or arising out of any of the Released Claims and/or the transactions and occurrences referred to in the Complaint, or in any other pleadings filed in this Action against any of the Released Parties, whether such claims are legal or equitable, known or unknown, foreseen or unforeseen, matured or unmatured, accrued or unaccrued, or are asserted under federal, foreign, state, local or common law.

11. This order shall bar all future claims for contribution arising out of the action—**(i)** by any person against Ormat, Isaac Angel or Doron Blachar; and **(ii)** by Ormat, Isaac Angel or Doron Blachar against any person, other than a person whose liability has been extinguished by the settlement.

12. The Court finds that all parties and their counsel have complied with each requirement of Fed. R. Civ. P. 11 as to all proceedings herein.

13. Lead Counsel is awarded attorneys' fees in the amount of $1,191,389.12, Plaintiffs' Counsel (consisting of Lead Counsel and Liaison Counsel, the Muehlbauer Law Office, Ltd.) is awarded expenses in the amount of $117,928.31, and Israeli Counsel Aiden, Tirosh & Co. is awarded expenses in the amount of $57,904.32, plus any applicable interest to such amounts, such as amounts to be paid out of the Settlement Fund immediately following entry of this Order. Lead Counsel shall thereafter be solely responsible for allocating the attorneys' fees and expenses among other counsel in the manner in which Lead Counsel in good faith believe reflects the contributions of such counsel to the initiation, prosecution, and resolution of the Action.

14. Lead Plaintiff is awarded $15,000, as a compensatory award for its service to the class and for reasonable costs and expenses directly relating to the representation of the Settlement Class as provided in 15 U.S.C. §78u-4(a)(4), such amounts to be paid from the Settlement Fund upon the Effective Date of the Settlement.

15. Neither this Order and Final Judgment, the Preliminary Approval Order, the Stipulation

(including the exhibits thereto), the Term Sheet dated March 23, 2020 ("Term Sheet"), nor any of the negotiations, documents or proceedings connected with them shall be argued to be or offered or received:

    a.   against any of the Released Parties as evidence of, or construed as evidence of, any presumption, concession, or admission by any of the Released Parties with respect to the truth of any fact alleged by the Plaintiffs in the Amended Complaint or the Action, or the validity of any claim that has been or could have been asserted against any of the Defendants in the Amended Complaint or the Action, or the deficiency of any defense that has been or could have been asserted in the Action, or of any wrongdoing or liability by any of the Defendants, or any liability, fault, misrepresentation, or omission with respect to any statement or written document approved or made by any of the Defendants;

    b.   against the Plaintiffs or any Settlement Class Member or Lead Counsel as evidence of, or construed as evidence of, any infirmity of the claims alleged by the Plaintiffs in the Amended Complaint or the Action or of any lack of merit to the claims or the Amended Complaint or the Action or of any bad faith, dilatory motive, or inadequate prosecution of the claims or the Amended Complaint or the Action;

    c.   against any of the Defendants, the Plaintiffs, or any Settlement Class Member, or their respective legal counsel, as evidence of, or construed as evidence of, any presumption, concession, or admission by any of the Defendants, the Plaintiffs, or any Settlement Class Member, or their respective legal counsel, with respect to any liability, negligence, fault, or wrongdoing as against any of the Defendants, the Plaintiffs, or any Settlement Class Member, or their respective legal counsel, in any other civil, criminal, or administrative action or proceeding, other than such actions or proceedings as may be necessary to effectuate the provisions of this Stipulation, provided, however, that if this Stipulation is approved by the Court, the Defendants, the Plaintiffs, and any Settlement Class Member, or their respective legal counsel, may refer to it to effectuate the liability protection and releases granted them

hereunder;

d.  against any of the Defendants as evidence of, or construed as evidence of, any presumption, concession, or admission by any of them that the Settlement Consideration represents the amount which could or would have been received after trial of the Action against them;

e.  against the Plaintiffs or any Settlement Class Member as evidence of, or construed as evidence of, any presumption, concession, or admission by any of the Plaintiffs or any Settlement Class Member that any of their claims are without merit, or that any defenses asserted by the Defendants have any merit, or that damages recoverable in the Action would not have exceeded the Settlement Fund; or

f.  as evidence of, or construed as evidence of, any presumption, concession, or admission that the modifications to the class definitions as ordered in the Preliminary Approval Order are appropriate in this Action, except for purposes of this Settlement.

16.  Notwithstanding the foregoing Paragraph 15, the Settling Parties and other Released Parties may file or refer to this Order and Final Judgment, the Stipulation, Preliminary Approval Order, and/or any Claim Form: (a) to effectuate the liability protections granted hereunder or thereunder, including without limitation, to support a defense or counterclaim based on principles of *res judicata*, collateral estoppel, release, good-faith settlement, judgment bar or reduction, or any theory of claim preclusion or issue preclusion or similar defense or counterclaim; (b) to obtain a judgment reduction under applicable law; (c) to enforce any applicable insurance policies and any agreements relating thereto; or (d) to enforce the terms of the Stipulation and/or this Order and Final Judgment.

17.  Exclusive jurisdiction is hereby retained over the Settling Parties for all matters relating to the Action, including the administration, interpretation, effectuation or enforcement of the Stipulation, or Settlement and this Order and Final Judgment, and including any application for fees and expenses incurred in connection with administering and distributing the Settlement proceeds to the Settlement Class Members.

18.  Without further order of the Court, the Settling Parties may agree to reasonable

[PROPOSED] ORDER AND FINAL JUDGMENT

extensions of time to carry out any of the provisions in the Stipulation.

19. There is no just reason for delay in the entry of this Order and Final Judgment and immediate entry by the Clerk of the Court is directed pursuant to Fed. R. Civ. P. 54(b).

20. Any order approving or modifying the Plan of Allocation, Class Counsel's application or award of attorneys' fees and expenses, or Class Representative's application or award for reimbursement of costs and expenses, shall be separate from, and shall not in any way disturb or affect, the finality of this Judgment, the Stipulation, or the Settlement contained therein, nor any act performed or document executed pursuant to or in furtherance of the Stipulation or the Settlement.

21. In the event that the Settlement does not become Final and effective in accordance with the terms and conditions set forth in the Stipulation, then this Judgment shall be vacated, rendered null and void and be of no further force and effect, except as otherwise provided by the Stipulation, and this Judgment shall be without prejudice to the rights of the Settling Parties, and the Settling Parties shall be deemed to have reverted *nunc pro tunc* to their respective status prior to the execution of the Term Sheet, and the Settling Parties shall proceed in all respects as if the Term Sheet and the Stipulation had not been executed and the related orders had not been entered, without prejudice in any way from the negotiation, fact, or terms of the Settlement, and preserving all of their respective claims and defenses in the Action, and shall revert to their respective positions in the Action. In such circumstances, the parties shall thereafter work together to arrive at a mutually agreeable schedule for resuming litigation of the Action.

22. In the event the Judgment does not become Final or the Settlement is terminated in accordance with the terms and conditions set forth in the Stipulation, within ten (10) business days of entry of the order rendering the Settlement and Judgment non-Final or notice of the Settlement being terminated, all monies then held in the Escrow Account, including interest, shall be returned to the Defendants or their insurers. Lead Counsel shall return any fees or award previously distributed in connection with the Settlement.

23. The Court's orders entered during this Action relating to the confidentiality of information shall survive this Settlement.

**SO ORDERED** in the District of Nevada on January 21, 2021.

[PROPOSED] ORDER AND FINAL JUDGMENT

ROBERT C. JONES

UNITED STATES DISTRICT JUDGE

[PROPOSED] ORDER AND FINAL JUDGMENT

# TAB 17

2010 WL 2371834
United States District Court,
W.D. Texas,
Austin Division.

In re DELL INC., Securities Litigation.

No. A–06–CA–726–SS.
|
June 11, 2010.

**Attorneys and Law Firms**

Darren J. Robbins, Robbins Geller Rudman & Dowd LLP, Mary K. Blasy, Ramzi Abadou, Stacey Kaplan, William S. Lerach, Lerach Coughlin Stoia Geller Rudman & Robbins LLP, San Diego, CA, Don L. Davis, Byrd Davis Furman, Larry F. York, McGinnis, Lochridge & Kilgore, LLP, Dirk M. Jordan, Paul L. Smith, Robyn Pozza Dollar, Paul L. Smith & Associates, Mary F. Keller, Winstead PC, Joseph F. Brophy, Hohmann, Taube & Summers, LLP, Austin, TX, Joe Kendall, Willie C. Briscoe, The Briscoe Law Firm, Hamilton Lindley, Kendall Law Group, LLP, Dallas, TX, Christopher L. Nelson, Darren J. Check, David Kessler, Katharine M. Ryan, Sean M. Handler, Sharan Nirmul, Barroway Topaz Kessler Meltzer & Check, LLP, Stuart L. Berman, Schiffrin Barroway Topaz & Kessler, LLP, Radnor, PA, Geoffrey C. Jarvis, Naumon A. Amjed, Grant & Eisenhofer, P.A., Wilmington, DE, Jay W. Eisenhofer, Jonathan Margolis, Grant & Eisenhofer P.A., Christopher A. Seeger, Michael Farkas, Stephen A. Weiss, Seeger Weiss LLP, Daniel P. Chiplock, Robert G. Eisler, Steven E. Fineman, Lieff, Cabraser, Heimann & Bernstein LLP, New York, NY, Bruce W. Leppla, Richard M. Heimann, Lieff, Cabraser, Heimann & Bernstein LLP, Patrick J. Coughlin, Lerach Coughlin Stoia Geller, San Francisco, CA, Roger L. Mandel, Attorney at Law, Willie C. Briscoe, The Briscoe Law Firm, Dallas, TX, Gregory E. Keller, Martin D. Chitwood, Meryl W. Roper, Michael R. Peacock, Nikole M. Davenport, Robert W. Killorin, Chitwood Harley Harnes LLP, Atlanta, GA, Chad A. Carder, Jeffrey W. Golan, Leonard Barrack, Mark R. Rosen, Barrack, Rodos & Bacine, Philadelphia, PA, Gregg S. Levin, Joseph F. Rice, Motley Rice LLC, Lance C. Oliver, Ronald L. Motley, Motley Rice LLC, Mount Pleasant, SC, William H. Narwold, Motley Rice LLC Law Firm, Hartford, CT, G. Paul Howes, Lerach Coughlin Stoia Geller Rudman & Robbins LLP, Houston, TX, James M. Hughes, for Plaintiff.

Brian Strother Greig, Peter Andrew Stokes, Fulbright & Jaworski, LLP, Lin Hughes, McGinnis, Lochridge & Kilgore LLP, Patton G. Lochridge, Austin, TX, Greg L. Weselka, Michael L. Davitt, Patricia J. Villareal, Thomas R. Jackson, Jones Day, Dallas, TX, John L. Latham, Alston & Bird LLP, Atlanta, GA, Gina Caruso, Michael P. Carroll, Michael S. Flynn, Davis, Polk & Wardwell, Meir Feder, Jones Day, New York, NY, for Defendant.

Mark E. Wilson, Michael L. Brooks, Kerns, Frost & Pearlman, LLC, Chicago, IL, for Movant.

*ORDER*

SAM SPARKS, District Judge.

**\*1** BE IT REMEMBERED on May 21, 2010, the Court held a hearing in the above-styled cause, and the parties appeared through counsel. Before the Court were Union Asset Management Holding AG ("Lead Plaintiff")'s Unopposed Motion for Settlement [# 224] and memorandum in support thereof [# 225]; Lead Plaintiff's Motion for Certification of the Settlement Class and Final Approval of the Settlement Plan of Allocation [# 242], Lead Plaintiff's response in support [# 264]; Lead Plaintiff's Motion for Attorneys' Fees [# 243], Lead Plaintiff's response in support [# 264]; Joann F. Brook's Motion to Intervene [# 251]; the Motion to Appear Pro Hac Vice by Mark E. Wilson [# 252]; and objections to the foregoing filed by Jeannine T. Morris, Edward H. Sonn, Andrew J. Applegate, Amelia P. Klingler, William R. Klingler, Geneva E. Wright, Oscar P. Fitzgerald, Neil R. Scheier, Travis Cox, George Sibley, Brian F. Murphy Rev Trust, The Raymond M. Murphy Rev Trust, Althans M. Katherine, Jerry Sachs, Kathy Kowalchuk, Joann F. Brooks, Osman Pekin, P. William Bercik, Steven G. Schuleman, St. Stephen, Inc., and Smokestack Lightning Limited. Having considered the foregoing motions, responses, replies, and objections, the case file as a whole, the relevant law, and the representations of counsel at the hearing, the Court enters the following opinion and order.

**Background**

This is a securities fraud class action brought on behalf of all investors who purchased common stock in Dell, Inc. ("Dell") between May 16, 2002 and September 8, 2006 (the "Class Period"). Plaintiffs allege violations under Sections

2010 WL 2371834, Fed. Sec. L. Rep. P 95,771

10(b) and 20(a) of the Securities Exchange Act of 1934, as amended by the PSLRA, 15 U.S.C. §§ 78u–4, and Rule 10b–5 promulgated thereunder. This Court consolidated various similar actions on February 28, 2007, and chose Union Asset Management Holding AG ("Lead Plaintiff") as the lead plaintiff of the consolidated action on April 9, 2007. Plaintiffs filed their Consolidated Amended Complaint [# 164] on January 11, 2008 against Dell; Michael Dell, Dell's founder and Chairman; Kevin Rollins, Dell's former President and Chief Executive Officer; James Schneider, Dell's former Chief Financial Officer, and PricewaterhouseCoopers ("PwC"), Dell's outside auditor.

In general, Plaintiffs allege the Defendants fraudulently and materially inflated reported revenues during the Class Period by $463 million, and engaged in erroneous accounting by accelerating and overstating revenue, mismanaging various accruals and reserves, and manipulating warranty liabilities. Pls.' Am. Compl. at ¶¶ 96, 101, 103–42. Secondly, Plaintiffs allege Defendants disseminated false and misleading information to the public attributing Dell's success to its unique business model and other things, but never to accounting fraud. Because of the fraud—which Plaintiffs allege was "unwound" beginning in 2005 with the announcement of disappointing earnings statements—Dell's share price dropped 45.3% between August 11, 2005 and September 8, 2006. Plaintiffs allege this drop represented "the unwinding of Dell's fraudulent scheme" and represented a total loss to shareholders of $45.7 billion. *Id.* at ¶ 767. Finally, Plaintiffs allege the Individual Defendants took advantage of the inflated stock prices during the Class Period to cash in some of their stock and stock option grants, and earn tremendous bonuses. *See, e.g. id.* at ¶ 666. Plaintiffs also allege PwC, Dell's longtime auditor, consistently approved the now-restated financial statements as prepared in accordance with GAAP and their audits as prepared in accordance with GAAS, although they were not. *Id.* at ¶¶ 19, 267. These opinions from PwC, Plaintiffs allege, were materially false and misleading as well. *Id.* at ¶ 243.

**\*2** On October 7, 2008, this Court issued an order granting Defendants' and PwC's motions to dismiss Plaintiffs' Amended Complaint, finding Plaintiffs had failed to adequately plead a strong inference of scienter as to Defendants or PwC, and had failed to adequately plead loss causation. Following the dismissal, Lead Plaintiff filed a notice of appeal with the Fifth Circuit Court of Appeals on November 3, 2008.

On November 29, 2009, Lead Plaintiff and the Dell Defendants entered into a stipulation of settlement, and on December 22, 2009, this Court entered an order preliminarily certifying the Settlement Class, approving the Stipulation and Notice, and setting a final approval hearing. That hearing took place on May 21, 2010.

### Analysis

**I. Lead Plaintiff's Unopposed Motion for Settlement [# 224] and memorandum in support [# 225], and Lead Plaintiff's Motion for Certification of the Settlement Class and Final Approval of the Settlement Plan of Allocation [# 242]**

**A. Certification of the Settlement Class**

The proposed settlement class in the present case consists of "all persons who purchased or otherwise acquired the common stock of Dell Inc., directly or beneficially, between May 16, 2002 and September 8, 2006, inclusive, and who were damaged thereby." Rice Decl. at ¶ 7. The Settlement Class excludes "[p]ersons who timely and validly request exclusion from the Settlement Class pursuant to the Notice; Defendants; [PwC]; the officers and directors of Dell Inc. and [PwC] during the Settlement Class Period; members of their immediate families and legal representatives, heirs, successors, or assigns, and any entity in which Defendants or [PwC] have or had a controlling interest during the Settlement Class Period." *Id.* at ¶ 8.

The certification requirements of Federal Rule of Civil Procedure 23 generally apply with full force even when certification is solely for settlement purposes. *See Amchem Prods. Inc. v. Windsor,* 521 U.S. 591, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997); *DeHoyos v. Allstate Corp.,* 240 F.R.D. 269 (W.D.Tex.2007) (citing *Garza v. Sporting Goods Properties, Inc.,* 1996 WL 56247 at \*3 (W.D.Tex.1996)). Of course, in the settlement context the district court need not consider "whether the case, if tried, would present intractable management problems, for the proposal is that there be no trial"; however, the court's consideration of the other factors in Rule 23 is of "vital importance," and demands "undiluted, even heightened" attention in the settlement context, as the court will lack a later opportunity to make adjustments to the class. *Amchen Prods., Inc.,* 521 U.S. at

620. The familiar Rule 23 requirements are numerosity, commonality, typicality, and adequacy of representation.

**Numerosity.** The numerosity requirement is met when "joinder of all members is impracticable." FED. R. CIV. P. 23(a)(1). In this case, it would of course be highly difficult to join all the members of the proposed settlement class, which includes all persons who purchased or otherwise acquired the common stock of Dell within a span of almost four and a half years. For this reason, the Fifth Circuit has held the numerosity requirement is "generally assumed to have been met in class action suits involving nationally traded securities." Zeidman v. J. Ray McDermott & Co., Inc., 651 F.2d 1030, 1039 (5th Cir.1981). No objector disputes whether the numerosity requirement is met in the present case, and the Court finds the requirement is plainly satisfied.

**\*3 Commonality.** The commonality requirement mandates there be at least one factual or legal issue which is common to all or substantially all of the class members. FED. R. CIV. P. 23(a) (2), Lightbourn v. County of El Paso, 118 F.3d 421, 426 (5th Cir.1997). The threshold of commonality is not high; it is met when there is at least one issue whose resolution will affect all or a significant number of the putative class members. Forbush v. J.C. Penney Co., 994 F.2d 1101, 1106 (5th Cir.1993). In this case, the settlement class members' claims all arise out of the same set of operative facts and are based on common legal theories: that Defendants' misrepresentations violated federal securities law, Dell's public statements were false and misleading, Defendants knew their statements were false when they made them, the price of Dell's common stock was artificially inflated during the Class Period as a result of the fraud, and certain Dell stockholders sustained damages as a result. Thus, factual or legal issues common to all the settlement class members are without doubt present in this case.

It should be noted, because at least one objector raises the point, the proposed settlement class consists of "all persons who purchased or otherwise acquired the common stock of Dell Inc., directly or beneficially, between May 16, 2002 and September 8, 2006, inclusive, *and who were damaged thereby."* Rice Decl. at ¶ 7 (emphasis added). One objector argues the last clause of this definition is too imprecise, and will essentially require a mini-trial to determine whether each potential class member was damaged. However, the fact some claims may require some individualized analysis is not fatal

to commonality. James v. City of Dallas, 254 F.3d, 551, 570 (5th Cir.2001). In this case, whether each potential class member was damaged is likely to be an objective question which can be decided definitively based on evidence of his or her Dell stock holdings during the Class Period. The Fifth Circuit has approved at least one securities class action settlement with a class definition almost identical to that in this case. See Feder v. Elec. Data Sys. Corp., 429 F.3d 125, 129 (5th Cir.2005) (approving a class definition which included "[a]ll persons and entities who purchased or otherwise acquired the securities of [the Company] [during the Class Period], and who were damaged thereby.").

Furthermore, at least one district court has considered an almost identical argument (made, in fact, by the same objector who advances the argument in the present case) and rejected it. See In re Initial Public Offering Secs. Litig., 671 F.Supp.2d 467, 492–94 (S.D.N.Y.2009) (*"IPO"* ). In *IPO,* the objector argued the inclusion of the phrase "who were damaged" in the class definition was not adequately precise or objective, would require a mini-trial to determine whether a potential class member qualified for the class, and would require the court to address the issue of liability. Id. at 492–93. The district court found this argument "ha[d] no merit," as the phrase simply identified those who would have had standing to bring suit. Id. at 493. The district court also reasoned that because an investor is damaged solely by losing money, a "quick look at trading cards would show whether [a potential class member] had lost money on its investments" and been damaged. Id. Finally, the court found the settlement plan of allocation—not the district court—would determine the amount of damages to which a class member was ultimately entitled. Id.

**\*4** This Court agrees with the commonsense reasoning set forth in *IPO,* and finds it persuasive the Fifth Circuit has specifically affirmed a class definition with the phrase "and who were damaged thereby." Feder, 429 F.3d at 129. Based on the foregoing, the Court finds the commonality requirement is met in the present case.

**Typicality.** Like commonality, the test for typicality is not demanding—it "focuses on the similarity between the named plaintiffs' legal and remedial theories and the theories of those whom they purport to represent." Mullen v. Treasure Chest Casino LLC, 186 F.3d 620, 625 (5th Cir.1999). Typicality

is satisfied when the named plaintiffs' claims for relief arise from the same common nucleus of operative facts as the claims of absent class members. *Id.* In this case, all the Class Members' claims arise from the same underlying facts, and rest on the same legal arguments (basically, that Defendants' conduct violated federal securities laws); thus, Lead Plaintiff's claims are effectively indistinguishable from the rest of the Class Members' claims, and the Court finds typicality is met with respect to the proposed Settlement Class.

**Adequacy of Representation.** To meet the requirement for adequacy of representation, plaintiffs must show (1) the zeal and competence of the representative party's counsel and (2) the willingness and ability of the representative party to take an active role in and control the litigation and to protect the interests of absentees. *Stirman v. Exxon Corp.,* 280 F.3d 554, 563 (5th Cir.2002). The relatively protracted period of litigation in this case makes the adequacy determination simple; the proposed class representatives have actively participated in litigation and settlement negotiations and have demonstrated the ability to ably represent the class's interests. Class counsel is experienced, and there has been no assertion of incompetency by any potential member of the settlement class in this case. This requirement is satisfied.

**Superiority and Predominance.** Finally, in addition to satisfying the Rule 23(a) requirements, Plaintiffs must satisfy at least one sub-section of Federal Rule of Civil Procedure 23(b) in order to certify a class. *Regents of Univ. of Cali. v. Credit Suisse First Boston (USA),* 482 F.3d 372, 295 (5th Cir.2007). Plaintiffs assert their claims satisfy Rule 23(b)(3) in that "the questions of law or fact common to class members predominate over any questions affecting only individual members, and ... a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." FED. R. CIV. P. 23(b)(3).

The predominance inquiry requires the questions of law or fact common to the members of the class "predominate over any questions affecting only individual members." *Unger v. Amedisys Inc.,* 401 F.3d 316, 320 (5th Cir.2005). The superiority analysis is "fact-specific and will vary depending on the circumstances of any given case"; it requires simply that a "class action is superior to other available methods for the fair and efficient adjudication of the controversy." FED. R. CIV. P. 23(b)(3); *Robertson v. Monsanto*

*Co.,* 287 Fed. App'x. 354, 361 (5th Cir.2008). Both the superiority and predominance requirements are met in this case. As for superiority, a class action is undoubtedly the best available method of litigating the case. Litigating each shareholder's claim against Defendants individually would be a massive waste of judicial resources, as the vast majority of the issues of law and fact in this case—the fraudulent misrepresentations or omissions in question, the scienter of the Defendants, the loss causation, etc.—are common to all the class members. Most of the class members would have absolutely no incentive to litigate their claims outside the purview of a class action, as their losses are relatively small and the hurdles to bringing a suit in the context of the PSLRA are relatively high. As for predominance, the parties have not identified a single issue affecting only an individual member of the class (save damages); all the liability issues in this case are common questions of law or fact. Thus, a class action is undoubtedly superior to other available methods for fairly and efficiently adjudicating this controversy, and the Court finds the proposed Settlement Class meets all the requirements of Rule 23.

**\*5** Therefore, certification of the proposed settlement class is appropriate in this case, and Lead Plaintiff's motion for certification of the settlement class is hereby GRANTED.

### B. Final Approval of the Settlement Agreement

#### *(1) Terms of the Agreement*

The Settlement Agreement entered into between Lead Plaintiff and the Dell Defendants provides for a payment of $40 million in cash into a Net Settlement Fund by the Dell Defendants. Def.'s Mot. Approval, Ex. A ("Rice Decl."). All settlement class members have until May 11, 2010 to file a valid proof of claim substantiating their purchase of Dell common stock during the Class Period and their resulting damages. *Id.* at ¶ 47. Lead Plaintiff estimates about 3.34 billion shares of Dell stock were damaged during the Class Period, and thus the estimated recovery per damaged share—before deduction of attorneys' fees and expenses—is about one cent per share. *Id.* at ¶ 48. This estimated recovery, of course, assumes 100% of the class members with recoverable damages will actually make a claim. *Id.*

The Settlement Agreement further states class members who make a valid claim will receive a distribution from the Net Settlement Fund, subject to a $10.00 *de minimis* requirement. *Id.* at ¶ 49. If the Net Settlement Fund has sufficient funds,

each claimant will receive an amount equal to the total of their net loss; however, in the more likely scenario that the Net Settlement Fund is not sufficient, each claimant will receive his or her *pro rata* share of the Fund. *Id.* The initial distribution will be made after all the claims are processed; if there are any funds remaining in the Net Settlement Fund six months after the initial distribution, there will be a second distribution, and additional distributions will continue in six-month intervals until Lead Plaintiff determines the distributions are "no longer cost-effective." *Id.* at ¶¶ 49–50.

### (2) Notice Issued

A district court has discretion to approve a class-action settlement under Rule 23(e) provided, among other things, the parties establish that all interested parties have been given reasonable notice of the settlement and its terms. FED. R. CIV. P. 23(e)(1)(B). In this case, it is undisputed Lead Plaintiff provided two forms of notice of the proposed Settlement Agreement to potential class members: (1) a full 8–page notice to all identifiable class members sent to their last known address; and (2) a summary notice published in *The Investors Daily* and *The New York Times.* As of April 2010, Lead Plaintiff had mailed 1.7 million notice packets to potential settlement class members. Lead Plaintiff also posted the notice packets online at www.dellsecuritieslitigation.com, and posted a phone number for potential class members to call if they had questions concerning the settlement.

The notice itself adequately describes both the key facts of the suit, the monetary distribution of the settlement, and the procedure for objecting to the settlement. In fact, not a single objector has raised a complaint about the form or content of the notice itself, and the Court—after a thorough review of the notice—likewise finds no cause for objection. The notice satisfies the requirements of Rule 23, and the Court therefore finds the potential class members have been given reasonable notice of the Settlement Agreement and its terms.

*See, e.g.* *Schwartz v. TXU Corp.,* 2005 U.S. Dist. LEXIS 27077, 2005 WL 3148350 (N.D.Tex. Nov. 8, 2005) (citing *Miller v. Republic Nat'l Life Ins. Co.,* 559 F.2d 426, 429–30 (5th Cir.1977)).

### (3) Fair, Adequate, and Reasonable Settlement

**\*6** A district court has discretion to approve a class-action settlement under Rule 23(e) if the settlement is fair, adequate, and reasonable. *Ayers v. Thompson,* 358 F.3d 356,

368 (5th Cir.2004) (citing *Parker v. Anderson,* 667 F.2d 1204, 1209 (5th Cir.1982)). The district court's "exercise of discretion is to be tested by inquiries that ensure that the settlement is in the interest of the class, does not unfairly impinge on the rights and interests of dissenters, and does not merely mantle oppression." *Ayers,* 385 F.3d at 368 (quoting *Reed v. General Motors Corp.,* 703 F.2d 170, 172 (5th Cir.1983)). In assessing whether the settlement is reasonable, the Fifth Circuit has set forth six key points, or "*Reed* factors," which should be considered. These factors are:

(1) the existence of fraud or collusion behind the settlement;

(2) the probability of plaintiffs' success on the merits;

(3) the range of possible recovery;

(4) the complexity, expense and likely duration of the litigation;

(5) the stage of the proceedings and the amount of discovery completed; and

(6) the opinions of class counsel, class representatives, and absent class members.

*Reed,* 703 F.2d at 172 (citing *Parker,* 667 F.2d at 1209). The Court will consider the *Reed* factors in turn.

First, there has been no suggestion the settlement was collusive; the case has been extensively and vigorously litigated up to this point. As for the second factor (Plaintiffs' likelihood of success on the merits), it is low. As set forth in Lead Plaintiff's motion for final approval, the Fifth Circuit's historic rate of reversal for Rule 12(b)(6) dismissals of securities class action suits is not high; in 2005, one district court found "about 90% of this Circuit's reported PSLRA decisions involving the adequacy of pleadings in securities fraud cases have upheld their dismissal." *Schwartz v. TXU Corp.,* 2005 WL 3148350 at *32 (N.D.Tex.2005). Plaintiffs' case—which was dismissed by this Court and was on appeal in the Fifth Circuit awaiting a ruling when the parties agreed to settle the case—was no doubt in dire straits, with Lead Plaintiff facing a significant risk the class members would recover nothing at all.

As for the third *Reed* factor, the range of possible recovery in this case is wide: if the Court's dismissal were upheld on appeal, Plaintiffs would recover nothing. On the other end of the spectrum, Lead Plaintiff's counsel at the final approval

hearing represented their damages "could have run into the billions" had everything gone in favor of Plaintiffs, although he represented $120 million would be a more realistic forecast of Plaintiffs' possible damages. Similarly, Plaintiffs' Amended Complaint alleged the drop in Dell's stock caused by Defendants represented a total loss to shareholders of $45.7 billion. Am. Compl. at ¶ 767. Of course, this forecast was significantly dimmed by the fact Plaintiffs' Amended Complaint was dismissed in the district court. Thus, based solely on the procedural posture of this case, $40 million appears to be well within the reasonable range of recovery. [1]

**\*7** Turning to the fourth factor, the legal issues involved in this case are complex; securities litigation on the whole is "notoriously difficult and unpredictable." *Maher v. Zapata Corp. ., 714 F.2d 436, 455 (5th Cir.1983).* Thus, the complexity, expense, and likely duration of the suit weighs in favor of approval of the settlement. Securities claims are difficult to prove, and without agreeing to a settlement, Plaintiffs no doubt face unpredictable and significant delays and expense in prosecuting this case. As counsel recognized at the hearing, and as is discussed *infra,* even if Plaintiffs managed to prevail on appeal, they would face tall hurdles in establishing the elements of their claims in the district court and convincing the jury of liability and the amount of damages.

Next, Lead Plaintiff claims the fourth *Reed* factor—the "stage of the proceedings and the amount of discovery completed"—weighs most strongly in favor of approval of this settlement, as Defendants have already won a dismissal of the lawsuit in the district court (a ruling for which the probability of reversal is low, as discussed above), and thus there is a significant chance Plaintiffs will recover nothing at all if the case continues. In considering this *Reed* factor, the Court must evaluate whether "the parties and the district court possess ample information with which to evaluate the merits of the competing positions." *Ayers,* 358 F.3d at 369.

The Court disagrees with Lead Plaintiff's argument this factor weighs most strongly in favor of settlement. Lead Counsel admitted at the hearing no formal discovery has yet been conducted in this case, not even a single deposition. Lead Counsel claims Plaintiffs are not entitled to discovery under the PSLRA given the fact their claims have been dismissed, and because they are under a statutory stay of discovery during the pendency of the appeal. But notwithstanding the reasons for the lack of discovery—which the Court assumes are valid—there is no mistaking the fact this settlement was

essentially made in the dark, with very little information about the possibility of proving Plaintiffs' claims at trial. Thus, Lead Counsel is unable to value this case except by comparing it to settlements in other securities class actions-a metric which must satisfy, as it is the only one available, but one which fails completely to take into account the individual claims of this case and their likelihood of being proven. The Court can readily ascertain that the settlement in this case is a relatively good one for a securities class action in the procedural posture of this case; however, the Court finds itself groping in the dark to determine whether it is a very good settlement based on the merits of the claims at issue in this particular case. It is entirely unclear which, if any, of Plaintiffs' allegations were likely capable of being proven at trial and what the real value of the claims—from $45.7 billion to zero—is.

**\*8** It is somewhat troubling to approve a settlement for claims which remain so shrouded in mystery. However, Lead Counsel's point that it was barred from discovery by the PSLRA and a statutory stay is well taken, and Lead Counsel further represents it has investigated Plaintiffs' claims as diligently as possible outside the context of traditional discovery by, for instance, hiring private investigators and experts on GAAP, loss causation, and damages. Thus, the Court finds the parties were informed about the merits of their respective positions, and the settlement can be approved as reasonable even without formal discovery having been conducted. [2] The Court relies on the representations of counsel for both sides that they have "achieved the desired quantum of information necessary to achieve a settlement," *see, e.g. Cotton v. Hinton,* 559 F.2d 1326, 1332 (5th Cir.1977), and finds the fourth *Reed* factor weighs in favor of approval, if only slightly.

Finally, Lead Plaintiff and Lead Counsel strongly agree a class settlement is in the interest of all concerned, as it will achieve finality and avoid appellate litigation. Out of 1.7 million class notices sent to potential settlement class members, only 21 have so far filed objections in this Court —about 0.001% of the total potential class members. This is a minuscule number of complaints, especially considering the fact the Court has had no objections indicating the notice packets were mailed late, the response time was inadequate, or the procedures for filing objections were not well-explained. Thus, it appears the potential class members have been given every chance to object, but the large majority have simply chosen not to. Furthermore, Lead Plaintiff represents as of March 29, 2010, only 68 potential class members had requested exclusion from the Settlement Class.

WESTLAW © 2021 Thomson Reuters. No claim to original U.S. Government Works.

The Court notes there was one objection voiced by almost every objector who appeared at the hearing: an objection to the *de minimis* provision of the Settlement Agreement, which limits recovery of damages to those class members whose potential recovery amount is ten dollars or more. Lead Counsel argues the *de minimis* requirement is necessary and justified because the likely cost of processing these smaller claims outweighs the actual recovery to the Settlement Class Members. Rice Decl. at ¶ 60. Many courts have recognized *de minimus* thresholds for payable claims are beneficial to the class as a whole, since they save the settlement fund from being depleted by the administrative costs associated with claims unlikely to exceed those costs. *In re Gilat Satellite Networks, Ltd.,* 2007 WL 1191048 at *9 (E.D.N.Y.2007) (citing *In re Global Crossing Secs. & ERISA Litig.,* 225 F.R.D. 436, 463 (S.D.N.Y.2004)). In *Global Crossing,* the district court approved a ten dollar *de minimis* threshold and noted "[c]lass counsel are entitled to use their discretion to conclude that, at some point, the need to avoid excessive expense to the class as a whole outweighs the minimal loss to the claimants who are not receiving their *de minimis* amounts of relief." 225 F.R.D. at 463. On this rationale, courts have frequently approved such thresholds, often at ten dollars. *In re Gilat Sat. Networks,* 2007 WL 1191048 at *9.

 **\*9** In the present case, the ten dollar *de minimis* provision was the portion of the Plan of Allocation which inspired the most vociferous objections, mostly on the part of individual shareholders who felt the institutional shareholders in the class were benefitting at their expense. *See, e.g.* Docket Nos. 235, 238, 240, 255, 256. Lead Counsel admitted at the hearing it is impossible to know (before the claims are received and processed) how many shareholders will get nothing because of the *de minimis* provision; in fact, it may be a majority of the class members. [3] In response to the objections regarding the *de minimis* provision, Lead Counsel suggested at the hearing that the Court might remove the *de minimis* provision and put in place a different provision to keep the administration costs manageable, such as a provision limiting each claimant to one check, negotiable only within some set period of time. Such a provision would allow all class members to recover at least some portion of their damages, but would conserve the Settlement Fund by not requiring the administrators to re-issue and re-mail checks long after they have been sent.

Thus, in the interests of allowing each shareholder to recover at least some portion of their damages and of addressing the concerns of those who appeared at the hearing, and because Lead Counsel expressed equal satisfaction with this solution, the Court finds the *de minimis* provision of the Settlement Plan of Allocation should be eliminated, and replaced with a provision limiting each claimant to one check negotiable within 60 days. This solution is reasonable to preserve the Settlement Fund from excessive and unnecessary expenses, which is in the overall interest of the class as a whole. [4]

The rest of the objections the Court received can be generally summarized as follows: (1) the requested attorneys' fees are too high, *see* Docket Nos. 233, 235, 236, 237, 238, 240, 245, 246, 247, 248, 250, 256, 2611; (2) the settlement amount is too low, and is disproportionally low compared with the attorneys' fees, *see* Docket Nos. 236, 237, 246, 247, 253, 255; (3) the settlement impermissibly favors a small group of class members (the institutional investors) over the vast majority of the class, for which the probable recovery is not worth the trouble to submit a claim, *see* Docket No. 255; (4) there was no securities fraud on the part of Defendants, and therefore the complaint was properly dismissed in the first place, *see* Docket No. 254; (4) the settlement punishes current shareholders of Dell in order to benefit the settlement class, *see* Docket Nos. 250, 254; (5) securities class action suits in general are unfair extortion, and this settlement will only encourage them, *see* Docket Nos. 233, 234, 254, 255; and (7) the Plan of Allocation makes no distinction between institutional and individual investors, although the losses could not have been as damaging to institutional investors because they presumably affected a smaller percentage of their total holdings, *see* Docket No. 253.

 **\*10** As for the objections concerning attorneys' fees, they are addressed in the second half of this order. Otherwise, the objections have little impact on the Court's determination. For instance, any objection the $40 million recovery is too low does not take into account the procedural posture of the case and the steep and perilous path Plaintiffs would have had to climb (even in the event of a reversal) to get any recovery. The class members might very well have received nothing had this litigation continued. The other objections— that institutional investors will benefit more than individual investors because of their larger holdings, that securities class actions are extortion and should be eliminated, that there was no securities fraud on the part of Defendants in the first place, or that current shareholders are being punished to the benefit of the class members—are either meritless or are outside the purview of this Court's review. For instance, it is true those with larger holdings (such as

institutional investors) sustained greater monetary damages and will recover proportionately under the Plan of Allocation, but this fact cannot (and should not) change the Plan of Allocation. It is absolutely necessary to any just allocation that those who have lost the most also stand to gain the most. Likewise, whether securities class actions are fundamentally wrong is another objection which the Court has no power to address; it is an objection which must be raised with Congress, not the Court. And whether there was in fact any securities fraud on the part of the Dell Defendants or whether Dell's current shareholders are unfairly losing money into the pockets of the class members are questions for which Dell is responsible, not the Court. Dell and its counsel must certainly have considered these issues carefully before Defendants agreed to and recommended this settlement for the Court's approval. This Court's role in approving this settlement is primarily to safeguard the interests of the absent class members, not the interests of the Defendants or even of Dell's current shareholders, as the Defendants (including Dell) were represented by competent counsel at the settlement negotiations. *See, e.g. In re Syncor ERISA Litig.,* 516 F.3d 1095, 1100 (9th Cir.2008) ("The purpose of Rule 23(e) is to protect the unnamed members of the class from unjust or unfair settlements affecting their rights."). The lawyers for Dell are fiduciaries for the company—and, by extension, the existing shareholders of the company. They acted in their capacity as fiduciaries in recommending this settlement and, because they are officers of the Court, the Court shall rely on their representations.

Therefore, based on all the foregoing, the Court accepts the recommendation of counsel for all parties and finds the Plan of Allocation is fair, reasonable, and adequate, and is not the product of collusion between the parties. The allocation formula "need only have a reasonable, rational basis, particularly if recommended by 'experienced and competent' class counsel," *In re Am. Bank Note Holographics, Inc.,* 127 F.Supp.2d 418, 429–30 (S.D.N.Y.2001), and the Plan of Allocation in this case is reasonable, rational, and recommended by competent counsel. The Plan calculates each class member's total recognized losses and allocates recovery based on the class member's purchases and sales relative to the alleged corrective disclosures, which is consistent with the allegations in the Amended Complaint. Each class member will receive his or her *pro rata* share of the total funds based on the calculation of his or her recognized losses. This approach is a reasonable one, and is consistent with the Plaintiffs' allegations throughout this case.

**\*11** In sum, the Court finds the Settlement Plan of Allocation is fair, reasonable, and adequate, and should be approved. Lead Plaintiff's Unopposed Motion for Settlement [# 224] and Lead Plaintiff's Motion for Certification of the Settlement Class and Final Approval of the Settlement Plan of Allocation [# 242] are therefore GRANTED, subject to the change outlined above with respect to the *de minimis* provision of the Plan.

Before turning to attorneys' fees, the Court takes a moment to note that although the Settlement Plan is indeed reasonable and fair—and is actually probably *more* than fair to the class members, who stood in very real danger of receiving absolutely nothing—it is also a good example of how deficient our present securities class action laws are. This Court joins in the chorus for further equitable reform of our present securities law. Congress has recognized the class-action vehicle for litigation involving nationally-traded securities has been sorely abused, and has injured the entire United States economy. *See Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit,* 547 U.S. 71, 81, 126 S.Ct. 1503, 164 L.Ed.2d 179 (2006) (citing H.R. Conf. Rep. No. 104–369, p. 31 (1995)). "[M]anipulation by class action lawyers of the clients whom they purportedly represent" has long been rampant, and these abuses result in extortionate settlements with no substantial benefit to anyone but the lawyers. *Id.* The damaged shareholders in this lawsuit stand to gain, based on the lawyers' best approximations, about one cent per damaged share. The lawyers, however, seek (under their agreement with their carefully-selected client) 25% of the total recovery plus expenses: roughly $10.5 million dollars. It is clear from these numbers who exactly had an incentive to bring this case, and who is the ultimate victor. It is neither the Plaintiffs nor the Defendants, but the lawyers.

## II. Lead Plaintiff's Motion for Attorneys' Fees and Expenses [# 243]

As indicated above, Lead Plaintiff (joined by Lead Counsel and the other attorneys in this case) requests the Court approve attorneys' fees in the amount of 25% of the Settlement Fund, or $10 million plus interest, and expenses in the amount of $450,000. *See* Pl.'s Mot. Atty.'s Fees [# 243] at 1. Lead Plaintiff represents this amount is consistent with the terms of its retainer agreement with Lead Counsel (the "Retainer Agreement"). *Id.* at 2.

### A. Attorneys' Fees

Pursuant to Federal Rule of Civil Procedure 23(e), the Court must independently analyze the reasonableness of the attorneys' fees proposed in the settlement agreement. *See Strong v. BellSouth Telecomm., Inc.,* 137 F.3d 844, 849–50 (5th Cir.1998). The Supreme Court "has recognized consistently that a litigant or a lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from the fund as a whole." *Boeing Co. v. Van Gemert,* 444 U.S. 472, 478, 100 S.Ct. 745, 62 L.Ed.2d 676 (1980). Thus, in common fund cases the attorneys' fees are taken out of the total recovery, lessening the ultimate award for the individual class members. *In re Enron Corp. Sec., Derivs. & ERISA Litig.,* 586 F.Supp.2d 732, 745 n. 10 (S.D.Tex.2008). Because of this arrangement—in which the plaintiffs' loss is the attorneys' gain—the Court must carefully scrutinize the fee award in common fund cases such as this one, as the interests of the attorneys directly conflict with those of the class. *Id.* at 745.

#### *(1) Method of Calculating Fees*

**\*12** In common fund cases, courts typically utilize one of two methods of calculating attorneys' fees: (1) the percentage method, under which the court awards fees as a reasonable percentage of the common fund; or (2) the lodestar method, under which the court awards fees by multiplying the number of reasonable hours expended by a reasonable hourly rate and applying a lodestar multiplier. *In re OCA, Inc. Secs. & Deriv. Litig.,* 2009 WL 512081 at *17 (E.D.La.2009) (citing *In re Enron,* 586 F.Supp.2d at 745–46). The Fifth Circuit has not expressly adopted the percentage method over the lodestar method for common fund lawsuits; "[t]he law of the Fifth Circuit as to which of the two methods should be employed ... is at best unclear." *In re Combustion, Inc.,* 968 F.Supp. 1116, 1134 (W.D.La.1997). But, as other courts have noted, "[t]he vast majority of Courts of Appeals have approved or mandated the use of the percentage method" in common fund cases, and the method has been specifically approved by the Supreme Court. *In re OCA,* 2009 WL 512081 at *17. In fact, the Manual for Complex Litigation identifies the Fifth Circuit as the *only* circuit that has yet to explicitly adopt the percentage method in common fund cases. *Klein v. O'Neal, Inc.,* 2010 WL 1435161 at *34 (N.D.Tex. April 9, 2010) (citing *Manual for Complex Litigation (Fourth)*

§ 14.121 (2010)). Numerous district courts in this circuit have used the percentage method in common fund cases,[5] generally concluding "though the Fifth Circuit has not explicitly accepted the percentage method, it does appear to be amenable to its use, so long as the *Johnson* framework is utilized to ensure that the fee awarded is reasonable." *See, e.g.,* *Turner v. Murphy Oil USA, Inc.,* 472 F.Supp.2d 830, 843 (E.D.La.2007) (citations omitted).

The rationale behind this widespread (and increasing) use of the percentage method to calculate attorneys' fees in securities class action cases is because the method is considered "particularly appropriate" to the PSLRA. *In re OCA,* 2009 WL 512081 at *19. The PSLRA explicitly contemplates the use of the percentage method to calculate attorneys' fees in securities actions (although it does not prohibit the lodestar method), stating "[t]otal attorneys' fees and expenses awarded by the court to counsel for the plaintiff class shall not exceed a reasonable *percentage* of the amount of any damages and prejudgment interest actually paid to the class." 15 U.S.C.A. § 78u–4(a)(6) (emphasis added). Furthermore, a group of "prominent judges and practitioners" studied the issue and identified a number of flaws in the lodestar method which make it less appropriate for these types of cases, including: (1) increasing the workload of the judicial system; (2) lack of objectivity; (3) a sense of mathematical precision unwarranted in terms of the realities of the practice of law; (4) ease of manipulation by judges who prefer to calculate the fees in terms of percentages of the settlement fund; (5) encouraging duplicative and unjustified work; (6) discouraging early settlement; (7) not providing judges with enough flexibility to award or deter lawyers so that desirable objectives, such as early settlement, will be fostered; (8) providing relatively less monetary reward to the public interest bar; and (9) confusion and unpredictability in administration. *Di Giacomo v. Plains All Am. Pipeline,* 2001 WL 34633373 at *6 (S.D.Tex.2001) (citing *Task Force Report,* 108 F.R.D. 237, 246–49 (1986)). The benefits of the percentage fee method include "readily ascertainable fee amounts that align the interests of class counsel with those of the class members." *Id.*

**\*13** Therefore, based on all the foregoing, and because it was the method chosen by Lead Plaintiff and Lead Counsel in their Retainer Agreement (discussed *infra* ), the Court finds the percentage method is appropriate for this case, as long as the Court utilizes the familiar *Johnson* framework to ensure the fee awarded is reasonable.[6]

### (2) Percentage of the Fund Method

Since the passage of the PSLRA, many courts have held a fee request submitted pursuant to a retainer agreement entered into by a properly-selected lead plaintiff and a properly-selected lead counsel is "entitled to deference, given the lead plaintiff's role in selecting counsel under the PSLRA." *See* *In re Enron,* 586 F.Supp.2d at 749; *In re Cendant Corp. Litig.,* 264 F.3d 201, 282 (3d Cir.2001). For instance, in *In re Worldcom, Inc.,* the district court recognized "when class counsel in a securities lawsuit have negotiated an arm's-length agreement with a sophisticated lead plaintiff possessing a large stake in the litigation, and when that lead plaintiff endorses the application following close supervision of the litigation, the court should give the terms of that agreement great weight." 388 F.Supp.2d 319, 356 (S.D.N.Y.2005).

In the present case, Lead Counsel requests 25% of the Settlement Fund in attorneys' fees (a total of $10 million), and claims this fee amount was negotiated at arms length with the Lead Plaintiff and is thus entitled to a strong presumption of reasonableness. The Retainer Agreement between Lead Plaintiff and Lead Counsel in fact provides for a fee in the range of 18% to 25% of the total recovery, with the precise percentage to be set by Lead Plaintiff and Lead Counsel based on the amount of "discovery and work done to date." *See* Pl.'s Mot. Final Approval, Ex. II (copy of the Nov. 7, 2006 Retainer Agreement). Lead Plaintiff has filed an affidavit stating Lead Counsel's fee request of 25% is "fair and reasonable," in light of the fact Lead Counsel has "vigorously prosecuted this litigation[.]" *See id.,* Ex. XII.

Lead Counsel argues a fee of 25% is not excessive. Courts have indeed recognized "[a]ttorney fees awarded under the percentage method are often between 25% and 30% of the fund." *See, e.g., Klein,* 2010 WL 1435161 at *35; *In re OCA,* 2009 WL 512081 at *19 (citing 4 NEWBERG ON CLASS ACTIONS § 14.6 (4th ed.) (finding, in the context of securities suits, "common fee awards generally fall within the 20 to 33 percent range."). The Manual for Complex Litigation states a fee of 25% of a common fund "represents a typical benchmark," MANUAL FOR COMPLEX LITIGATION (FOURTH) § 14 .121 (2010), and the Ninth Circuit has adopted a benchmark of 25% in all common fund cases. *See* *Staton v. Boeing Co.,* 327 F.3d 938, 968 (9th Cir.2003). However, "[i]n order to prevent windfalls to attorneys, the percentage of attorneys' fees awarded typically decreases as the settlement award increases in size." *Id.* And although

benchmarks may be helpful indicators of the reasonableness of the percentage used in a class action, many courts have recognized, because of the wide variety of percentages that have been approved, "a district court may not rely on a formulaic application of the appropriate range in awarding fees but must consider the relevant circumstances of the particular case." *In re Cendant PRIDES Litig.,* 243 F.3d 722, 736 (3d Cir.2001).

**\*14** In the present case, the Court agrees the Retainer Agreement, setting a fee range of 18% to 25%, was entered into by a properly-selected, sophisticated Lead Plaintiff and properly-selected Lead Counsel, and the terms of the Agreement are therefore entitled to a presumption of reasonableness. The requested fee appears to be within the range of reasonable fees in this and other circuits, although fee percentages do tend to decrease in inverse proportion to the total amount of a class recovery. *See, e.g.* *In re Lease Oil Antitrust Litig.,* 186 F.R.D. 403, 444 (S.D.Tex.1999) (citing cases). The Court also notes although the objections from the Settlement Class are relatively few, the majority of those who did object voiced vociferous complaints about the amount of attorneys' fees, especially in comparison to the potential recovery of the class members themselves.

In light of these considerations, the Court will take a hybrid approach, and proceed to examine the requested 25% fee in light of the *Johnson* factors to determine whether a deviation from the requested percentage is appropriate and to test the overall reasonableness of the fee. *Schwartz v. TXU Corp.,* 2005 WL 3148350 at *28 (N.D.Tex.2005) (finding "[s]ome district courts within the Fifth Circuit have applied a hybrid approach in analyzing the fairness and reasonableness of requested fees. These courts have used the percentage method to set an initial percentage fee, and then reviewed that fee based on the '*Johnson* factors.' "). As other courts have done, this Court will analyze each relevant *Johnson* factor separately and will then consider what deviation from the benchmark percentage, if any, is warranted based on all the factors considered together. *See, e.g., Harrah's,* 1998 WL 832574.

### (3) The Johnson Factors

The *Johnson* factors are intended to ensure "a reasonable fee ." *Johnson v. Georgia Highway Express, Inc.,* 488 F.2d 714, 720 (5th Cir.1974). The twelve factors are (1) the time and labor required; (2) the novelty and difficulty of

the issues; (3) the skill required to perform the legal service adequately; (4) the preclusion of other employment by the attorney because he accepted this case; (5) the customary fee for similar work in the community; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the undesirability of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases. *Id.* at 717–19. While the *Johnson* factors must be addressed, "rarely are all the *Johnson* factors applicable; this is particularly so in a common fund situation." *Di Giacomo,* 2001 WL 34633373 at *9 (citing *Uselton v. Comm'l. Lovelace Motor Freight, Inc.,* 9 F.3d 849, 854 (10th Cir.1993)).

**\*15 (1) Time and Labor Required.** At the time of filing the request for attorneys' fees, class counsel claimed to have spent 8,386.36 documented hours prosecuting this case on behalf of the class. See Pl.'s Mot. Final Approval, Ex. VII. Professor Lynn Baker, Lead Plaintiff's expert witness on fee arrangements in complex litigation, testified at the final settlement approval hearing that the requested percentage fee is consistent with the "lodestar cross-check" she conducted. A "lodestar" is generally calculated by multiplying the number of hours reasonably expended on the litigation by an appropriate hourly rate in the community for such work. *Shipes v. Trinity Industries,* 987 F.2d 311, 319–20 (5th Cir.1993). Ms. Baker stated she reviewed time records submitted by the attorneys, and using those time records and the attorneys' reported rates she calculated a total lodestar fee of $3,564,203.00. She also testified it is appropriate to apply a risk multiplier of approximately 2.5 in this case because of the substantial risk involved in taking the case on a contingent fee basis. [7] Thus the total lodestar fee, as calculated by Ms. Baker, is $8,910,507.50.

Based on the foregoing, the Courts finds the first *Johnson* factor, for time and labor required, weighs in favor of a reduced percentage fee. The lodestar fee testified to by Ms. Baker is an extremely generous one for multiple reasons. First, it assumes the legitimacy of every hour reported by Lead Counsel, although generally the party seeking attorneys' fees bears the burden of presenting adequately documented time records to prove the number of hours for which compensation is requested is reasonable. *Hensley v. Eckerhart,* 461 U.S. 424, 437, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983). The

court should exclude from the lodestar fee calculation any hours it finds were not "reasonably expended"—in other words, "all time that is excessive, duplicative, or inadequately documented." *Id.* at 434. As the Supreme Court has explained, "[c]ases may be overstaffed, and the skill and experience of lawyers vary widely"; thus, the application should show the attorneys have exercised "billing judgment," or a good faith effort to document their time and write off any excessive, duplicative, or inadequately documented hours. *Id.*

Ms. Baker testified she spent a total of thirty minutes reviewing the time records of the attorneys in this case. This Court, which has conducted many lodestar analyses, knows there is no way to adequately examine billing records—particularly in a case with as many lawyers as this one—in such a short amount of time. The assumption which must be drawn is that Ms. Baker simply assumed there was not a single hour in the billing records which was excessive, duplicative, or inadequately documented, as she did not reduce class counsel's documented hours by a single hour. [8] Furthermore, Ms. Baker assumed the propriety of a blended rate of $425, which included attorneys who charged hourly rates as high as $900 per hour. Ms. Baker did not testify whether she believed this is an appropriate hourly rate in the community for such work, but the Court finds it very difficult to believe it is. In a 2006 report, the State Bar found the average hourly rate for lawyers with over 25 years of experience to be just $258 per hour. *See* STATE BAR OF TEXAS, *Hourly Rates in 2005 Report* (Sept. 21, 2006). A substantial number of the hours claimed by Plaintiffs are billed at over three times that rate. In short, the lodestar fee calculated by Ms. Baker is the most lavish lodestar which could possibly be accepted by any district court conducting a lodestar analysis in this case. Nonetheless, Ms. Baker's lodestar fee is still over $1 million less than Lead Counsel's requested percentage fee. Thus, the Court finds the time and labor required to prosecute this case justify a decrease in the benchmark, to a percentage at the low end of the range agreed upon in the Retainer Agreement.

**\*16 (2) Novelty and difficulty of the issues.** Securities actions are generally large and complex cases involving difficult financial and accounting issues. *In re OCA,* 2009 WL 512081 at *21. "Moreover, Fifth Circuit decisions on causation, pleading and proof at the class certification stage make PSLRA claims particularly difficult in [the Fifth C]ircuit." *Id.* (citing *In re Enron,* 586 F.Supp.2d at 788). For example, unlike many other circuits, the Fifth Circuit has rejected the group pleading doctrine. *See, e.g. Southland*

*Sec. Corp. v. INSpire Ins. Solutions, Inc.,* 365 F.3d 353, 363–65 (5th Cir.2004) (holding the group pleading doctrine "cannot withstand the PSLRA's specific requirement that the untrue statement or omissions be set forth with particularity as to each defendant" and "conflicts with the scienter requirement"). Furthermore, with respect to the loss causation element, the Fifth Circuit has decided the plaintiff bears the burden at the class certification stage of demonstrating by a preponderance of all admissible evidence the stock price actually moved because of the defendants' alleged misrepresentation or corrective disclosure. *See, e.g.,* 🚩 *Oscar Private Equity Investments v. Allegiance Telecom, Inc.,* 487 F.3d 261, 269, 264–66 (5th Cir.2007) (citing 🟡 *Greenberg v. Crossroads Sys., Inc.,* 364 F.3d 657, 663, 665–66 (5th Cir.2004) ("to trigger the presumption [of reliance] plaintiffs must demonstrate that ... the cause of the decline in price is due to the revelation of the truth and not the release of unrelated negative information [.]"). This requirement would undoubtedly have posed a substantial hurdle in this particular case.

Thus, it is clear this case carried significant risk and difficulty. However, the difficulty of pleading and proving a claim under the PSLRA is something Lead Counsel was well aware of when taking this case. None of the legal issues outlined above are particularly novel. Although Lead Counsel trumpets the difficulty of proving this case at trial, it wisely does not argue the case would have required any groundbreaking legal analysis. Therefore, because the legal issues are somewhat difficult but not novel, and because Lead Counsel was wholly aware of the challenging aspects of this case at the time it fought to be Lead Counsel and negotiated its fees in the Retainer Agreement, the Court finds this factor is neutral and warrants neither an increase nor a decrease in the benchmark.

**(3) Skill required to perform the legal service adequately.** As noted by the Court in *Di Giacomo,* this factor is evidenced where "counsel performed diligently and skillfully, achieving a speedy and fair settlement, distinguished by the use of informal discovery and cooperative investigation to provide the information necessary to analyze the case and reach a resolution." 2001 2001 WL 34633373 at * 12. "The trial judge's expertise gained from past experience as a lawyer and his observation from the bench of lawyers at work become highly important in this consideration." 🚩 *Johnson,* 488 F.2d at 718.

*17 Because Plaintiffs were not successful in overcoming the motions to dismiss, nor were they successful on appeal (as it was never concluded), the only demonstrable success Lead Counsel has had is in settling this case. This Court found the Amended Complaint drafted by Lead Counsel did not meet the requirements of the PSLRA or Rule 9(b) for either of the major elements of its claims. Because of this Court's dismissal of the Amended Complaint, this case was in a far more precarious position at the time it was settled than it would have been in if the Plaintiffs had prevailed at the motion to dismiss stage. Thus, although the settlement may well be a reasonable one considering the current procedural posture of the case, the Court cannot ignore the fact Plaintiffs would have had much more leverage in the settlement had Lead Counsel drafted a complaint sufficient to survive the motions to dismiss. Because of the dismissal, no formal discovery was ever conducted in this case, and therefore Lead Counsel did not engage in that costly and time-consuming process (although it did engage in various types of informal discovery).

In short, the Court finds the legal services rendered in this case required considerably less skill and time than the average securities class action. Although Lead Counsel was successful in obtaining a speedy and fair settlement after its case was dismissed, it did not adequately plead its claims in the first place.[9] Furthermore, although Lead Counsel did investigate its claims through informal discovery and negotiate a fair settlement, it never engaged in any type of formal discovery, which would have allowed it to investigate those claims more aggressively, and could not produce any evidence for the Court to evaluate, in any meaningful manner, the reasonableness of the settlement. Thus, the Court finds this factor also merits a decrease in the percentage fee.

**(4) Preclusion of other employment by the attorney.** Lead Counsel alleges in its motion for attorneys' fees it "has been precluded from accepting other matters as a result of the substantial time and resources devoted to" this case. Pl.'s Mot. Atty.'s Fees at 13. However there is no evidence, such as an affidavit, cited to support this claim. There is no doubt the attorneys did pass up other work in order to prosecute this case, but the Court cannot assume that legal work would have been more lucrative than this case without any evidence so indicating. This factor is neutral.

**(5) The customary fee for similar work; awards in similar cases .** The Court discussed, *supra,* the typical fees in securities cases involving comparable awards. Because the

benchmark percentage is about average for cases of this kind, the Court finds this factor does not warrant an adjustment. *See In re OCA,* 2009 WL 512081 at *21.

**(6) Whether the fee is fixed or contingent.** Consideration of this factor is designed to "demonstrat[e] the attorney's fee expectations when he accepted the case." 🚩*Johnson,* 488 F.2d at 718. In the present case, Lead Counsel prosecuted this case on a contingency basis and advanced costs. There was a real risk of no recovery, and significant uncertainty as to the recovery amount, if any. This risk should rightly be considered in the award of attorneys' fees, and for this reason the Court adjusted the lodestar fee by a multiplier of 2.5 in its discussion of the first factor, *supra.* The Court also notes, however, this case was brought against a corporation with deep pockets and every incentive to quickly settle. The market price for accepting this risk, as evidenced by the Retainer Agreement, was 18 to 25% of the total recovery. Lead Counsel made a high-risk investment which will have paid off very handsomely if it is awarded a fee in this agreed-upon range. The Court finds no adjustment of the benchmark is required on the basis of this factor.

**\*18 (7) Time limitations; nature and length of attorney-client relationship.** Lead Counsel recognizes these factors are inapplicable to this case, and are therefore neutral.

**(8) Amount involved and the results obtained.** The United States Supreme Court and the Fifth Circuit have held "the most critical factor in determining the reasonableness of a fee award is the degree of success obtained." 🚩⚠️*In re Enron,* 586 F.Supp.2d at 796 (citing 🚩*Farrar v. Hobby,* 506 U.S. 103, 114, 113 S.Ct. 566, 121 L.Ed.2d 494 (1992); 🚩 *Migis v. Pearle Vision, Inc.,* 135 F.3d 1041, 1047 (5th Cir.1998)). Lead Counsel argues it obtained a "particularly good result" in this case by settling early in the proceedings, prior to obtaining discovery. As discussed at length, *supra,* the settlement obtained appears to be a reasonable and rational one, considering the procedural posture of this case and the likelihood of no recovery had it continued. However, it is impossible to know whether the settlement is a "particularly good" or "laudable" recovery for the class, as Lead Counsel claims, because no discovery was ever conducted in this case, and no evidence was ever presented in the record for the Court to make any intelligent determination on the subject. Although Lead Plaintiff touts statistics about average settlement amounts in other securities class actions and the Fifth Circuit's low rate of reversal for dismissals under the

PSLRA, these are simply general statistics, which do not take into account the individual aspects of this particular case. The statistics are admittedly the only metric available to measure the reasonableness of the settlement, as no discovery was done, and the statistics do indicate the settlement is reasonable (and better for the class than the likely alternative); however, the statistics do not prove the settlement is in any way extraordinary. The Court is simply without means to evaluate whether the amount of the settlement was the best possible result, or even near it. One thing is sure: had Lead Counsel succeeded at either the trial or the appellate level, Plaintiffs would have had substantially more leverage in settling their claims.

Therefore, although the Court may safely assume the settlement is reasonable and rational, it will not assume the settlement is exceptional. Aside from the settlement, the results achieved by Lead Counsel in the litigation were undeniably poor. Because counsel obtained no notable results in trial or on appeal, but did achieve what appears to be a reasonable settlement based on the dire procedural posture of the case, the Court finds this prong justifies a slight decrease in the benchmark percentage.

**(9) Experience, reputation, and ability of the attorneys.**

The Court does not question the legal ability, experience, reputation, or resources of Lead Counsel. Counsel performed diligently and skillfully with respect to the settlement negotiations, and managed to achieve a relatively speedy settlement, and one which was a welcome alternative to awaiting a decision on appeal and, in the best case scenario, attempting to convince a jury of its claims. As the Court recognized in a previous order appointing Lead Counsel, the firm "appears to have extensive experience in securities class action litigation."

**\*19 (10) Undesirability of the case.** Class action cases often carry with them elevated risks, a requirement of lengthy investigation through informal discovery, and a possibility of no recovery, all of which speak to the undesirability of such a case. *Di Giacomo,* 2001 WL 34633373 at *12. However, as the court recognized in *Di Giacomo,* the quality and number of attorneys who file suit (and fight for their client to be the lead plaintiff) in a case such as this is also an indication such cases are usually highly desirable. In this case, the Court well remembers the number and prominence of the attorneys who battled for the privilege of having their client assume the role of lead plaintiff. Lead Counsel won this battle, and thus

its claims about the supposed undesirability of this case ring somewhat hollow. Nonetheless, because there is risk inherent in a contingent fee case of any kind, the Court finds this factor is neutral, and supports a fee percentage within the agreed-upon range.

### (4) Conclusion

Having analyzed the fee award under the *Johnson* factors, the Court finds they collectively warrant a downward adjustment of the fee award to 18% of the total recovery. The fee is within the range of agreed-upon fees in Lead Counsel's Retainer Agreement with its own carefully-selected client, and is therefore presumptively reasonable. This fee will compensate counsel liberally, but will also protect the interests of the members of the settlement class to the greatest possible degree. Having carefully scrutinized the fee award in light of the applicable law and the Court's experience with this litigation as a whole, the Court hereby awards attorneys' fees in the amount $7,200,000.00 (SEVEN MILLION TWO HUNDRED THOUSAND DOLLARS AND NO CENTS), or 18% of the Net Settlement Fund. [10]

### B. Expenses

Lead counsel also requests $450,000 for reasonable expenses incurred in the prosecution of the litigation. Lead Counsel has submitted copies of documentation for well over $450,000 in reasonable expenses during the course of the litigation. The documentation, it should be noted, is a colossal tower of receipts for expenses such as printing, copying, experts, online research, "other professionals," travel, postage, process service, office supplies, telephone, and fax charges. The Court has no specific information or evidence which would allow it to possibly determine which of these expenses were actually reasonable and necessary to this litigation. However, because the total of the expenses far exceeds $450,000, and because the documentation is supported by the affidavits of counsel, who are officers of the Court, the Court will accept the figure of $450,000 as a reasonable amount. The Court hereby awards Lead Counsel and Liaison Counsel reasonable costs and expenses in the amount of $450,000 (FOUR HUNDRED AND FIFTY THOUSAND DOLLARS AND NO CENTS), which expenses shall be paid to Plaintiffs' Lead Counsel from the Settlement Fund with interest, from the date such Settlement Fund was funded to the date of payment, at the same net rate the Settlement Fund earns.

### III. Dr. Schuleman's Motions and Objections

**\*20** Dr. Steven Schuleman appeared at the final settlement approval hearing as an objector, and his counsel addressed the Court multiple times at the hearing. Since the Settlement Hearing, Dr. Schuleman has filed four motions: a Motion to Permit the Filing of Claim [# 276], a Motion for Continuation of Fairness Hearing [# 277], a Motion to Amend Class Notice [# 278], and a Motion to Appoint Additional Class Counsel [# 276]. However, none of these motions or objections were timely filed. The notice sent to the potential class members in this case clearly indicates on the first page that all objections must be filed with the Court by April 10, 2010. Because the date of the final approval hearing was continued, the Court actually accepted objections all the way up until the date of the hearing, on May 21, 2010. At the hearing, the Court the considered the objections of those who appeared (including Dr. Schuleman, who was represented by counsel), and directed all parties who wished to comment further on any issues to do so on or before June 4, 2010, the final deadline. Dr. Schuleman did not file any of his motions or comments until June 7, 2010. Because this litigation simply has to end at some point, and because Dr. Schuleman has had more than ample time to inform the Court of his position on the settlement at issue (and has in fact done so repeatedly, both in writing and orally), Dr. Schuleman's motions and objections are DISMISSED as time-barred.

### Conclusion

In accordance with the foregoing,

IT IS ORDERED that Union Asset Management Holding AG's Unopposed Motion for Settlement [# 224] is GRANTED.

IT IS FURTHER ORDERED that Union Asset Management Holding AG's Motion for Certification of the Settlement Class and Final Approval of the Settlement Plan of Allocation [# 242] is GRANTED in part, subject to the *de minimis* provision being stricken from the Plan of Allocation and replaced by a provision limiting each claimant to one check, negotiable within 60 days.

IT IS FURTHER ORDERED that Union Asset Management Holding AG's Motion for Attorneys' Fees [# 243] is GRANTED IN PART, in accordance with the foregoing order.

2010 WL 2371834, Fed. Sec. L. Rep. P 95,771

IT IS FURTHER ORDERED that Plaintiffs' Lead Counsel and Liaison Counsel are hereby awarded 18% (EIGHTEEN PERCENT) of the Settlement Fund, or $7,200,000.00 (SEVEN MILLION TWO HUNDRED THOUSAND DOLLARS AND NO CENTS), in fees, plus interest, which sum the Court finds to be fair and reasonable. The award of attorneys' fees shall be allocated by Lead Counsel and Liaison Counsel among all of Plaintiffs' counsel who prosecuted this litigation in a manner consistent with their respective contributions.

IT IS FURTHER ORDERED that Plaintiffs' Lead Counsel and Liaison Counsel are hereby awarded reasonable costs and expenses in the amount of $450,000 (FOUR HUNDRED AND FIFTY THOUSAND DOLLARS AND NO CENTS), which expenses shall be paid to Plaintiffs' Lead Counsel from the Settlement Fund with interest, from the date such Settlement Fund was funded to the date of payment, at the same net rate the Settlement Fund earns.

**\*21** IT IS FURTHER ORDERED that Joann F. Brook's Motion to Intervene [# 251] is DENIED.

IT IS FURTHER ORDERED that the Motion to Appear Pro Hac Vice by Mark E. Wilson [# 252] is DISMISSED as moot.

IT IS FINALLY ORDERED that the Motion to Permit the Filing of Claim [# 276], Motion for Continuation of Fairness Hearing [# 277], Motion to Amend Class Notice [# 278], and Motion to Appoint Additional Class Counsel [# 279] filed by Steven Schuleman are DISMISSED as time-barred.

**All Citations**

Not Reported in F.Supp.2d, 2010 WL 2371834, Fed. Sec. L. Rep. P 95,771

## Footnotes

1    Plaintiff's expert witness, Professor Lynn Baker, testified the $40 million settlement is "an extraordinary result" given the posture of this case.

2    The Fifth Circuit has held a lack of formal discovery "does not compel the conclusion that insufficient discovery was conducted; instead, "[t]he scope of the discovery to be conducted in each case rests with the sound discretion of the trial judge." *Cotton v. Hinton,* 559 F.2d 1326, 1332–33 (5th Cir.1977). In fact, the *Cotton* court noted discovery often wastes the time of the court, the parties, and the attorneys, adds unnecessarily to the financial burden of investigation, and is used to harass the opposing party, such that informal discovery is "desired." *Id.* at 1332.

3    By the Court's calculations, a class member would have had to own approximately 1,200 shares to survive the *de minimis* provision and recover $10.01.

4    It should also be noted the new provision eliminates a conflict of interest from the settlement which troubled the Court at the hearing. Class counsel, as fiduciaries of the interests of the class, argued for the inclusion of the *de minimis* provision; however, the *de minimis* provision would have undoubtedly wiped out the recovery of a portion of the class members, and class counsel admitted to having ***no idea*** how many of its clients the provision would affect. If the provision affected the majority of the class, class counsel would have found themselves in the awkward ethical position of having advocated what was to the detriment of the majority of the class, their clients. The new provision adopted by the Court eliminates this ethical conflict.

5    *See, e.g., In re Enron,* 586 F.Supp.2d at 751; *In re OCA,* 2009 WL 512081 at \* 19–20 (collecting cases); *Klein v. O'Neal, Inc.,* 2010 WL 1435161 at \*34 (N.D.Tex. April 9, 2010) (collecting cases). It should be noted these courts and other circuit courts often perform a cross-check on the percentage method, as discussed *infra. See, e.g. Gunter v. Ridgewood Energy Corp.,* 223 F.3d 190 (3d Cir.2000); *In re OCA,* 2009 WL 512081 at \*23.

**In re Dell Inc., Not Reported in F.Supp.2d (2010)**
2010 WL 2371834, Fed. Sec. L. Rep. P 95,771

6       The *Johnson* factors are (1) required time and labor; (2) issues' novelty and complexity; (3) the skill required to properly litigate them; (4) whether the attorney had to refuse other work to litigate the case; (5) the attorney's customary fee; (6) whether the fee is fixed or contingent; (7) whether the client or case circumstances imposed any time constraints; (8) the amount involved and results obtained; (9) the experience, reputation, and ability of the attorneys; (10) whether the case was "undesirable;" (11) the type of attorney-client relationship and whether it was long-standing; and (12) awards made in similar cases. *Johnson v. Georgia Highway Express, Inc.,* 488 F.2d 714 (5th Cir.1974).

7       In using the lodestar method, courts typically apply "multipliers" ranging from one to four. *Di Giacomo,* 2001 WL 34633373 at *11 (collecting cases). In contingency fee cases, a multiplier reflects the possibility of no recovery. *Id.*

8       Neither did the Court attempt to determine from the voluminous billing records submitted in this case which hours were reasonably expended and which were not, primarily because the undersigned does not have weeks or months to devote himself solely to the question of attorneys' fees in this single case.

9       For instance, in *Schwarz* the district court considered this prong of the *Johnson* framework and remarked "[b]ut for [counsel]'s diligent and tenacious efforts, all of the Class's claims could have been dismissed with prejudice at the pleading stage." 2005 WL 3148350 at *30. In this case, the claims **were** dismissed with prejudice at the pleading stage, and therefore Lead Counsel deserves less accolades for its diligence and tenacity.

10      Let it be known this is a payment at the rate of $858.64 **per hour.** No lawyer in the country would turn down compensation at this rate.

---

**End of Document**                                              © 2021 Thomson Reuters. No claim to original U.S. Government Works.

---

# TAB 18

2016 WL 537946, Fed. Sec. L. Rep. P 99,022

2016 WL 537946
United States District Court, N.D. California.

Mark H. DESTEFANO, et al., Plaintiffs,
v.
ZYNGA, INC., et al., Defendants.

Case No. 12-cv-04007-JSC
|
Signed 02/11/2016

**Attorneys and Law Firms**

Shawn A. Williams, Robbins Geller Rudman & Dowd LLP, San Francisco, CA, Darren Jay Robbins, David Conrad Walton, Robbins Geller Rudman & Dowd LLP, San Diego, CA, for Plaintiffs.

**ORDER GRANTING MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT AND MOTION FOR ATTORNEYS' FEES**

Re: Dkt. Nos. 215, 216

JACQUELINE SCOTT CORLEY, United States Magistrate Judge

**\*1** Lead Plaintiff David Fee ("Lead Plaintiff") brings this pre-certification securities class action against Defendants Zynga Inc. ("Zynga" or the "Company"), Mark Pincus, David M. Wehner, and John Schappert (the "Individual Defendants," and collectively, "Defendants"), alleging that Defendants artificially inflated Zynga's stock price by misleading investors about Zynga's core business metrics and engaging in insider trading in violation of the federal securities laws. On October 27, 2015, the Court issued an Order granting Lead Plaintiff's unopposed Motion for Preliminary Approval of Class Action Settlement. *In re Zynga Inc. Secs. Litig.*, No. 12-cv-4007-JSC, 2015 WL 6471171, at *1 (N.D. Cal. Oct. 27, 2015).

Now pending before the Court is Lead Plaintiff's motion for final approval of a class action settlement (Dkt. No. 215),[1] and Lead Counsel's motion for attorneys' fees and reimbursement of litigation costs (Dkt. No. 216). Defendants do not oppose the motions. There are no objections from any Class Members. The Court held a final fairness hearing on February 11, 2016.

**BACKGROUND**

**A. Factual Background**

This is a securities class action on behalf of all persons who purchased or otherwise acquired the common stock of Zynga during the relevant class period, defined below. Zynga develops, markets and operates online social game services that generate revenue primarily through in-game sale of virtual currency and goods to users, monitored mainly through a financial metric called "bookings." (Dkt. No. 155 ¶ 3.) In the lead up to its December 15, 2011 initial public offering ("IPO"), the Individual Defendants and other corporate insiders had access to real-time data showing declines in user numbers, user spending, and bookings. Just three months after the IPO, and despite an IPO restriction that barred them from selling for a certain time period, aware of the Company's poor financial condition the Individual Defendants and some officers sold their shares for hundreds of millions of dollars in a Secondary Offering on April 3, 2012. (*Id.* ¶¶ 7-8.) Just three months later, on July 25, 2012, Zynga disclosed its poor financial results to the public. (*Id.* ¶ 10.) The officers' actions allowed them to shift the Company's revenue losses from the first quarter to the second quarter of 2012, thereby artificially inflating the price of Zynga shares during the first quarter. (*Id.* ¶¶ 11-12.) As part of their effort to artificially inflate the price of Zynga stock, Defendants issued a series of false and misleading statements regarding Zynga's bookings, game pipeline, Facebook changes, and 2012 guidance, all while the Company's finances were actually deteriorating. (*See id.* ¶¶ 13-21.) By the time the truth about the Company's financial status was actually disclosed, Zynga's stock price had fallen 37% in a single day. (*Id.* ¶ 23.)

**B. Procedural History**

**\*2** Beginning on June 30, 2012, twelve class actions were filed in this Court against Zynga and certain of its directors and officers, as well as certain underwriters that served in connection with the Company's IPO and secondary offering of personally held shares ("Secondary Offering").[2] By Stipulation and Order of September 26, 2012, the district court consolidated seven related class actions then pending in this District into this single class action entitled *In re Zynga Inc. Securities Litigation*, Lead Case No. 12-cv-4007-JSW.[3] (Dkt. No. 30; *see also* Dkt. No. 206 ¶ 2.) On October 23, 2012,

Case 4:19-cv-00509 Document 65-9 Filed 07/02/21 in TXSD Page 670 of 1452

Destefano v. Zynga, Inc., Not Reported in Fed. Supp. (2016)

2016 WL 537946, Fed. Sec. L. Rep. P 99,022

the Court related an additional five actions into this class action.[4] (Dkt. No. 92; *see also* Dkt. No. 206 ¶ 2.) On January 23, 2013, the district court appointed David Fee as Lead Plaintiff for the putative class pursuant to Section 21D(a)(3)(B) of the Securities Exchange Act of 1934 ("Exchange Act") as amended by the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u-4(a)(3)(B), and Section 27D(a)(3)(B) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. § 77z-1(a)(3)(B), and approved the law firms of Berman DeValerio and Newman Ferrara LLP as Lead Counsel in this class action.

On April 3, 2013, after extensive investigation by Lead Counsel, Lead Plaintiff and named plaintiff Joy Arjoon-Singh filed a Consolidated Complaint alleging claims under the Exchange Act and the Securities Act on behalf of all persons who purchased Zynga common stock between December 15, 2011 and July 25, 2012, inclusive. (Dkt. No. 125; *see also* Dkt. No. 206 ¶ 3.) The Consolidated Complaint asserted (1) claims under Section 20 of the Exchange Act against the Officer Defendants; (2) claims under Section 11 of the Securities Act against the Director Defendants and Underwriter Defendants; (3) claims under Section 12(a)(2) of the Securities Act against Zynga and the Underwriter Defendants; and (4) claims under Section 15 of the Securities Act against the Officer Defendants and Director Defendants. (See generally Dkt. No. 125.) The district court granted Defendants' motion to dismiss the entire Consolidated Complaint with leave to amend. (Dkt. No. 152; *see also* Dkt. No. 206 ¶ 3.)

After further investigation, Lead Plaintiff filed the First Amended Complaint ("FAC"), which is the operative pleading in this action. (Dkt. No. 155; *see also* Dkt. No. 206 ¶ 4.) The two-count FAC brings causes of action only under the Exchange Act. Plaintiff no longer brings claims against the Underwriter Defendants; instead, only Zynga and certain officers and directors are named as defendants. The first cause of action alleges that Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 by making materially false statements that operated as a fraud and deceit upon Lead Plaintiff and the other class members in connection with their purchases of Zynga common stock. The second cause of action is a control-person liability claim against the Individual Defendants under Section 10(a) of the Exchange Act. In the FAC, Lead Plaintiff elected not to replead claims for shares purchased between December 14, 2011 and July 25, 2012 (the "Earlier Period") and instead shortened the relevant time period to only five months, running from February 14, 2012 to July 25, 2012 (the "FAC Class Period"). (*See* Dkt. No.

210; *Compare* Dkt. No. 125 at 5, *with* Dkt. No. 155 ¶ 2.) Lead Plaintiff made this tactical decision for three reasons: (1) Zynga's first statement about its 2012 guidance was not made until February 14, 2012, so there were no claims based on that guidance until that date; (2) the allegations about the changes to Facebook games solely pertain to the later period; and (3) the allegations regarding statements about bookings declines are more compelling later in 2012, since trends in declining sales would be more defined later in the quarter. (Dkt. No. 210 at 3; *see also* Dkt. No. 155 ¶¶ 85, 131.)

**\*3** Defendants moved to dismiss the FAC, and the Court determined that Lead Plaintiff had adequately alleged all claims—including those based on declining bookings, the Facebook issue, and the 2012 guidance—except those as to Defendants' statements regarding Zynga's game pipeline, which the Court concluded were inactionable business puffery. (Dkt. No. 176; *see also* Dkt. No. 206 ¶ 5.) The Court then denied Defendants' motion for reconsideration of their motion to dismiss. (Dkt. No. 183; *see also* Dkt. No. 206 ¶ 5.) Thus, the FAC is the operative pleading in this action.

The district court held a case management conference on June 12, 2015. (Dkt. No. 187; *see also* Dkt. No. 206 ¶ 8.) Prior to the conference, the parties had agreed to participate in a mediation session. (Dkt. No. 186.) By the parties' consent, the action was then reassigned to the undersigned magistrate judge for all further proceedings. (Dkt. Nos. 190, 193.) In August 2015, the parties reached a settlement. Following a hearing on October 8, 2015, the parties filed an Amended Stipulation of Settlement and Revised Class Notice to address concerns that the Court raised.[5] (Dkt. Nos. 210, 212-1.) The Court granted the parties' motion for preliminary approval of settlement on October 27, 2015. 2015 WL 6471171, at \*1.

In accordance with the order granting preliminary approval, Lead Plaintiff filed a motion for final approval and Lead Counsel filed a motion for attorneys' fees and reimbursement of litigation expenses on December 11, 2015. (Dkt. Nos. 215, 216.) The Court and counsel received a single objection: the Isaacson-Weaver Family Trust filed a "preliminary objection" to the Settlement Agreement and notice of intent to appear at the final fairness hearing, but later withdrew the objection stating that it no longer wished to challenge the Settlement or Plan of Allocation as unreasonable, and instead submitted a request for exclusion from the Settlement Class, acknowledging that this meant they had no standing to challenge the Settlement. (Dkt. Nos. 220, 225.) *See also*

*In re Equity Funding Corp. of Am. Sec. Litig.*, 603 F.2d

Case 4:19-cv-00509 Document 65-9 Filed 07/02/21 in TXSD Page 671 of 1452
Destefano v. Zynga, Inc., Not Reported in Fed. Supp. (2016)
2016 WL 537946, Fed. Sec. L. Rep. P 99,022

1353, 1360-61 (9th Cir. 1979) (noting that one who is not a class member potentially bound by a settlement "lacks standing to object"). Due to unexpected delays during the Notice period—specifically, significant delays from certain institutional brokers in providing the claims administrator with names and addresses of Zynga stock's beneficial owners—the claims administrator mailed Notice Packets to certain potential Settlement Class Members with insufficient time to respond. (*See* Dkt. No. 224 at 2-3.) Accordingly, the Court extended the deadline for those Settlement Class Members impacted by the delay to request exclusion or to object to the Settlement, Lead Plaintiff's deadline to respond to objections and submit a final reply brief in support of final approval, and the final approval hearing itself. (Dkt. No. 224 at 4.) Ultimately, objections and exclusion requests were due on January 12, 2016 for the bulk of the Settlement Class Members and on January 29, 2016 for those Settlement Class Members affected by the brokers-associated delayed notice. By the date of the final fairness hearing, there have been no objections filed and 32 requests for exclusion. (Dkt. No. 228 ¶¶ 8-9.)

## SETTLEMENT TERMS [6]

**\*4** On August 4, 2015, the parties participated in intensive, arm's-length settlement negotiations under the supervision of experienced mediator, Hon. Edward A. Infante (Ret.) of JAMS. (Dkt. No. 206 ¶¶ 9-10.) At the negotiations, the parties had the benefit of having already exchanged extensive analyses of the legal and factual issues—including the falsity of Defendants' statements, scienter, and loss causation—in connection with their briefing on the motions to dismiss. (*Id.* ¶ 12.) The parties had already served discovery requests and exchanged initial disclosures, and Lead Plaintiff had responded to Defendants' Requests for Admission and Interrogatories. (Dkt. No 206 ¶ 7.) At the conclusion of the August 4 mediation, the parties reached an agreement on all material terms, including the amount of the settlement. (*Id.* ¶ 13.) Thereafter, the parties engaged in further negotiations and ultimately entered the Settlement Agreement before the Court, as amended following the hearing. (*See* Dkt. No. 212-1.) The key provisions are as follows.

In short, the Settlement Agreement provides for a Settlement Fund of $23 million with interest earned until entry of final approval. (Dkt. No. 212-1 ¶¶ 4.1, 4.3.) Reduced from that fund are (1) attorneys' fees up to 25% of the fund, or $5,750,000; (2) actual litigation costs of up to $276,000; and

(3) claims administration expenses up to $900,000. (Dkt. No. 212-1 at 61; Dkt. No. 206 6.) The remaining funds are then distributed to Settlement Class Members who do not opt out of the class. (Dkt. No. 212-1 ¶ 5.2.) The Settlement Class is defined as "all Persons who purchased or otherwise acquired Zynga's common stock during the Class Settlement Period[,]" except those who opt out. (*Id.* ¶ 1-34.) Settlement Class Members will receive a *pro rata* share of the fund based on the Plan of Allocation, which sets forth a different formula for calculating Recognized Loss depending on when the shares were purchased. Specifically,

For each share of Zynga common stock purchased between December 15, 2011 and the close of trading on February 14, 2012, inclusive, and:

a) Sold prior to the close of trading on July 25, 2012, the Recognized Loss is zero ($0.00).

b) Sold at a loss after the close of trading on July 25, 2012 through and including the close of trading on October 23, 2012, the Recognized Loss shall be the lesser of 1) $0.12 per share; or 2) the difference between the purchase price per share and the sale price per share.

c) Held as of the close of trading on October 23, 2012, the Recognized Loss shall be the lesser of $0.12 per share; or the difference between the purchase price per share and $3.18 per share.

For each share of Zynga common stock purchased between February 14, 2012 (including the after-hours market on February 14, 2012) and the close of trading on July 25, 2012, inclusive, and:

a) Sold prior to the close of trading on July 25, 2012, the Recognized Loss is zero ($0.00).

b) Sold at a loss after the close of trading on July 25, 2012 through and including the close of trading on October 23, 2012, the Recognized Loss shall be the lesser of 1) $1.14 per share; or 2) the difference between the purchase price per share and the sale price per share.

c) Held as of the close of trading on October 23, 2012, the Recognized Loss shall be the lesser of $1.14 per share; or the difference between the purchase price per share and $3.18 per share.

(Dkt. No. 212-1 at 65-66.)

Destefano v. Zynga, Inc., Not Reported in Fed. Supp. (2016)

2016 WL 537946, Fed. Sec. L. Rep. P 99,022

Lead Plaintiff estimates that the average distribution will be $0.15 per share before deduction of fees and expenses if all Settlement Class Members participate. (Dkt. No. 206 ¶ 17.) However, no Settlement Class Member will be issued a check for a Recognized Loss of less than $10.00 due to the expenses associated with administering the claims. (Dkt. No. 212-1 at 64.) Any funds remaining after distribution to Settlement Class Members will be donated to a charitable organization selected by Lead Plaintiff and subject to Court approval. (*Id.* ¶ 4.4.) None of the Settlement Fund will revert to Defendants. In exchange for their participation, Settlement Class Members will release all claims asserted in this action or that could have been asserted in this action or that arise out of the same facts or purchases, except for claims relating to enforcement of the Settlement Agreement and claims alleged in a number of derivative actions filed on Zynga's behalf now pending in other courts. (*Id.* ¶ 1.30.)

## DISCUSSION

**\*5** Judicial policy strongly favors settlement of class actions. *Class Plaintiffs v. City of Seattle*, 955 F.2d 1268, 1276 (9th Cir. 1992). "To vindicate the settlement of such serious claims, however, judges have the responsibility of ensuring fairness to all members of the class presented for certification." *Staton v. Boeing Co.*, 327 F.3d 938, 952 (9th Cir. 2003). Where the "parties reach a settlement agreement prior to class certification, courts must peruse the proposed compromise to ratify both the propriety of the certification and the fairness of the settlement." *Id.* In the first stage of the process, the court preliminarily approves the settlement pending a final fairness hearing, temporarily certifies a settlement class, and authorizes notice to the class. *See Villegas v. J.P. Morgan Chase & Co.*, No. CV 09-00261 SBA (EMC), 2012 WL 5878390, at \*5 (N.D. Cal. Nov. 21, 2012). "At the [final] fairness hearing...after notice is given to putative class members, the court entertains any of their objections to (1) the treatment of the litigation as a class action and/or (2) the terms of the settlement." *Ontiveros v. Zamora*, 303 F.R.D. 356, 363 (E.D. Cal. 2014) (citing *Diaz v. Trust Territory of Pac. Islands*, 876 F.2d 1401, 1408 (9th Cir. 1989)). Following the final fairness hearing, the Court must reach a final determination as to whether the parties should be allowed to settle the class action pursuant to their agreed upon terms. *See id.*; *Nat'l Rural Telecomm'cns Corp. v. DIRECTV, Inc.*, 221 F.R.D. 523, 535 (C.D. Cal. 2004).

## I. Final Approval of the Settlement Agreement

### A. Final Class Certification of the Settlement Class

#### 1. *Rule 23(a) Requirements*

Class actions must meet the following requirements prior to certification:

> 1) the class is so numerous that joinder of all members is impracticable; 2) there are questions of law or fact common to the class; 3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and 4) the representative parties will fairly and adequacy protect the interests of the class.

Fed. R. Civ. P. 23(a). These requirements are known as numerosity, commonality, typicality, and adequacy of representation, respectively. *Leyva v. Medline Indus. Inc.*, 716 F.3d 510, 512 (9th Cir. 2013). The Court must determine that Lead Plaintiff has satisfied his burden to demonstrate that the proposed class satisfies each element of Rule 23. These requirements "demand undiluted, even heightened, attention in the settlement context...for a court asked to certify a settlement class will lack the opportunity, present when a case is litigated, to adjust the class, informed by the proceedings as they unfold." *Amchem Prods. Inc. v. Windsor*, 521 U.S. 591, 620 (1997) (citations and footnote omitted).

The Court previously found that the putative class satisfied the numerosity, commonality, typicality, and adequacy of representation requirements of Rule 23(a). *Zynga*, 2015 WL 6471171, at \*6-7. The Court is unaware of any changes that would alter its analysis, and the parties did not indicate either in their papers or at the fairness hearing that any such developments had occurred. Nor has any Settlement Class Member objected to class treatment on the grounds that the Settlement Class lacks any of the Rule 23(a) requirements. Thus, all four of Rule 23(a)'s requirements have been met.

Case 4:19-cv-00509 Document 65-9 Filed 07/02/21 in TXSD Page 673 of 1452

**Destefano v. Zynga, Inc., Not Reported in Fed. Supp. (2016)**
2016 WL 537946, Fed. Sec. L. Rep. P 99,022

#### 2. *Rule 23(b) Requirements*

In addition to meeting the requirements of Rule 23(a), a potential class must also meet one of the conditions outlined in Rule 23(b)—of relevance here, the condition that "the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). In evaluating the proposed class, "pertinent" matters include:

> (A) the class members' interests in individually controlling the prosecution or defense of separate actions;
>
> (B) the extent and nature of any litigations concerning the controversy already begun by or against class members;
>
> **\*6** (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
>
> (D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3). Again, the Court previously found that both prerequisites of Rule 23(b)(3) were satisfied. *Zynga*, 2015 WL 6471171, at \*7. The Court is unaware of any changes that would alter its analysis, and the parties did not indicate either in their papers or at the fairness hearing that any such developments had occurred. There were no objections from Class Members, let alone objections that raised any issue with the predominance of common questions or superiority of class action treatment.

#### 3. *Rule 23(c)(2) Notice Requirements*

Finally, if the Court certifies a class under Rule 23(b)(3), it "must direct to class members the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." Fed. R. Civ. P. 23(c)(2)(B). Rule 23(c)(2) governs both the form and content of a proposed notice. *See Ravens v. Iftikar*, 174 F.R.D. 651, 658 (N.D. Cal. 1997) (citation omitted). The notice must be "reasonably certain to inform the absent members of the plaintiff class," but Rule 23 does not require actual notice. *Silber v. Mabon*, 18 F.3d 1449, 1454 (9th Cir. 1994) (citation omitted).

As the Settlement Agreement provides, the claims administrator, Epiq Systems, Inc. ("Epiq"), complied with the Court-approved notice plan. On November 3, 2015, Epiq caused the Summary Notice to be published in *Investor's Business Daily*. (Dkt. No. 217-1 ¶ 14.) Epiq also complied with the mailing requirements. Specifically, Epiq mailed the Notice Packet on November 3, 2015 to three categories of recipients: (1) the list of 439 known Zynga stock holders that Defendants provided; (2) brokerage firms, banks, institutions, and other third-party nominees ("brokers"), along with a request that the brokers either send a copy of the Notice Packet to the beneficial owner of the stock within 10 days or provide to Epiq the names and addresses of the beneficial owners within 10 days after receipt of the Notice Packet; and Epiq's own internal list of 1,625 of the largest and most common banks, brokers, and other nominees. (*Id.* ¶¶ 5-13.) In total, Epiq mailed 2,064 Notice Packets on the Notice Date. (*Id.* ¶ 10.) After that mailing, Epiq also mailed, emailed, or called the 53 potential Settlement Class Members who had contacted Lead Counsel and requested information about the Settlement prior to the Notice Date. (*Id.* ¶ 11.) Ultimately, after receiving contact information from brokers, Epiq mailed a total of 235,580 Notice Packets to potential Class Members. (Dkt. No. 228 ¶¶ 3-4.)

However, a number of brokers did not comply with Epiq's request to provide names of the beneficial owners or forward the Notice Packet to the beneficial owners in a timely manner. (*See* Dkt. No. 224 at 3.) A number of institutional brokers did not provide Epiq with names and addresses until mid-to-late December; Epiq mailed the Notice Packet to these 58,037 names and addresses within a matter of days, and no later than January 5, 2016. (*See id.*) But some brokers did not provide the names and addresses until after that date.

**\*7** Specifically, on January 6, 2016, National Financial provided 4 additional names and addresses; Epiq mailed the Notice Packet to them on January 11, 2016. Fidelity provided an additional 3,701 names and addresses on January 8, 2016; Epiq mailed the Notice Packet to them on January 12, 2016—the deadline for objections. (*See id.*) Given the parties' concessions that these delays meant that "certain Settlement Class Members may not have received their Notice Packets with sufficient time to respond" (*id.* at 4), the Court extended the deadline for those affected Settlement Class

**Destefano v. Zynga, Inc., Not Reported in Fed. Supp. (2016)**

2016 WL 537946, Fed. Sec. L. Rep. P 99,022

Members to respond by over two weeks, to January 29, 2016. (Dkt. No. 224 at 7.) Notice of the extension was posted on the settlement website that Epiq maintains; the change in deadline was set off in bold font in a bright red text box at the top of the website's homepage and all other pages. *See* www.zyngasecuritieslitigation.com (last visited Feb. 5, 2016). (*See also* Dkt. No. 228 ¶ 6.) Epiq also updated its phone and email responses to reflect the extended deadlines. (*Id.* ¶ 7.) While a new Notice Packet was not mailed to the Settlement Class Members notifying them of the change, the Notice Packet states in all capital letters that the final approval hearing date may change, and directs Settlement Class Members to check the settlement website and Court's PACER docket to remain apprised of the appropriate timing. (Dkt. No. 217-1 at 19.) The manner of notice need not be perfect. *In re TD Ameritrade Account Holder Litig.*, Nos. C 07-2852 SBA, C 07-4903 SBA, 2011 WL 4079226, at *10 (N.D. Cal. Sept. 13, 2011) ("[T]here is no requirement that notice be perfect."); *Browning v. Yahoo! Inc.*, No. C04-01463 HRL, 2007 WL 4105971, at *6 (N.D. Cal. No. 16, 2007); *see also In re Online DVD-Rental Antitrust Litig.*, 779 F.3d 934, 947 (9th Cir. 2015) ("The notice in this case was not perfect, but the court did not abuse its discretion in approving the notice plan and ultimately approving the settlement."). Under the circumstances presented, the Court is satisfied that this system of providing notice was reasonably calculated to provide notice to Settlement Class Members and was the best form of notice available under the circumstances.

Likewise, the content of the Notice Packet is sufficient: it clearly identifies the options available to putative Settlement Class Members: do nothing; object to the terms of the settlement and/or amount of attorneys' fees; or opt out—and also thoroughly explained the nature and mechanics of the Settlement Agreement. (Dkt. No. 217-1 at 10-29.)

While the Isaacson-Weaver Family Trust withdrew its objection and, having done so, concedes that it now lacks standing to challenge the Notice Packet or any other aspect of the Settlement Agreement, because there have been some complications relating to notice, the Court addresses the concerns raised in the withdrawn objection here. The Isaacson-Weaver Family Trust objected on the grounds that the notice procedure did not give it sufficient time to respond or object, and thus failed to comport with due process. But given that the response deadline was extended, this objection is overruled. The Isaacson-Weaver Family Trust next faulted the first page of the Notice Packet, titled "Overview of

the Settlement," which indicates that each Settlement Class Member will receive a *pro rata* share of the Settlement Fund based on the price per share depending on the time of purchase. (*Id.* at 10.) The Isaacson-Weaver Family Trust appeared to concede that this description is correct, and instead contended that the overview is wanting because it does not notify Settlement Class Members that those beneficial owners whose Recognized Loss under the formula is less than $10.00 will not receive a distribution. (Dkt. No. 220 at 4.) But the summary explicitly directs the reader to read the rest of the Notice Packet carefully. (Dkt. No. 217-1 at 11.) In its description of the Plan of Allocation, the Notice Packet clearly and unequivocally states in bold, set-off language that "[n]o distribution to Authorized Claimants who would receive less than $10.00 will be made because of the administrative expenses of processing and mailing such checks" and that such Authorized Claimants are nevertheless bound by the terms of the Settlement. (*Id.* at 21.) That this statement was not included in the overall summary does not render the Notice Packet unfair, unreasonable, or inadequate.

The same is true of the Isaacson-Weaver Family Trust's challenge of the Notice Packet's description of the attorneys' fees that Lead Counsel seeks. As the objector correctly noted, the law requires a notice to set forth "the amount of fees and costs that will be sought (including the amount of such fees and costs determined on an average per share basis), and a brief explanation supporting the fees and costs sought." 15 U.S.C. §§ 77z-1(a)(7)(C), 78u-4(7)(C). Such information shall be clearly summarized on the cover page of any notice to a party of any proposed or final settlement agreement. *See id.* §§ 77z-1(a)(7), 78u-4(7). The overview on the first page of the Notice Packet does just that, notifying the Settlement Class that Lead Counsel will seek:

> **\*8** 25% of the Settlement Fund, or approximately $5,750,000.00, and litigation expenses of up to $276,000.00 incurred in investigating the facts, litigating the case and negotiating the Settlement. These payments, if approved, will come out of the $23 million Settlement Fund, and are estimated to be an average of $0.04 per damaged share[.]

Destefano v. Zynga, Inc., Not Reported in Fed. Supp. (2016)

2016 WL 537946, Fed. Sec. L. Rep. P 99,022

(Dkt. No. 217-1 at 10.) The Isaacson-Weaver Family Trust contended that there is "no explanation supporting the fees and costs sought" (Dkt. No. 220 at 4), but the summary does provide a brief explanation: investigation, litigation, and negotiation efforts. Moreover, while the Isaacson-Weaver Family Trust argued that the Notice is insufficient because the overview does not include an "indication of the attorneys' lodestar...let alone of the fact that counsel seek a substantial enhancement of the lodestar" (*id.*), they did not cite any authority holding that information is required to be in the notice, and the Court has found none. Thus, contrary to the Isaacson-Weaver Family Trust's argument that the Notice Packet is "clearly deficient," the Court concludes that the content of the Notice Packet is sufficient to satisfy Rule 23(c)(2)(B). *See Churchill Vill., L.L.C. v. Gen. Elec.*, 361 F.3d 566, 575 (9th Cir. 2004) ("Notice is satisfactory if it generally describes the terms of the settlement in sufficient detail to alert those with adverse viewpoints to investigate and to come forward and be heard.") (internal quotation marks and citation omitted).

The Court is therefore satisfied that the form and content of the Notice Packet was adequate, and thus that the notice given in this case was reasonably calculated to provide notice to Settlement Class Members and was the best form of notice available under the circumstances.

### B. Approval of the Settlement

Having determined that class treatment is warranted, the Court now addresses whether the terms of the parties' settlement appears fair, adequate, and reasonable under Rule 23(e). In making this determination, a court typically considers the following factors initially set forth in *Churchill Village, L.L.C. v. General Electric*, 361 F.3d 566 (9th Cir. 2004): "(1) the strength of the plaintiff's case; (2) the risk, expense, complexity, and likely duration of further litigation; (3) the risk of maintaining class action status throughout the trial; (4) the amount offered in settlement; (5) the extent of discovery completed and the stage of the proceedings; (6) the experience and views of counsel; (7) the presence of a government participant; and (8) the reaction of the class members to the proposed settlement." *Id.* at 575. The Court need not consider all of these factors, or may consider others. *In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 942 (9th Cir. 2011) ("The factors in a

court's fairness assessment will naturally vary from case to case[.]").

But in *Bluetooth*, the Ninth Circuit explained that when "a settlement agreement is negotiated *prior* to formal class certification, consideration of these eight...factors alone" is insufficient. *Id.* at 946 (emphasis in original). In these cases, courts must show not only a comprehensive analysis of the above factors, but also that the settlement did not result from collusion among the parties. *Id.* at 947. Because collusion "may not always be evident on the face of a settlement,...courts [ ] must be particularly vigilant not only for explicit collusion, but also for more subtle signs that class counsel have allowed pursuit of their own self-interests and that of certain class members to infect the negotiations." *Id.* The court identified three such signs:

**\*9** (1) when class counsel receives a disproportionate distribution of the settlement, or when the class receives no monetary distribution but counsel is amply awarded[;]

(2) when the parties negotiate a "clear sailing" arrangement providing for the payment of attorneys' fees separate and apart from class funds without objection by the defendant which carries the potential of enabling a defendant to pay class counsel excessive fees and costs in exchange for counsel accepting an unfair settlement on behalf of the class[;] and

(3) when the parties arrange for fees not awarded to revert to defendants rather than to be added to the class fund.

*Id.* (internal quotation marks and citations omitted). For the reasons stated below, a review of these factors indicates that on balance this Settlement is fair, adequate, and reasonable.

### 1. *The Strength of Plaintiff's Case and the Risk, Expense, Complexity, and Likely Duration of Further Litigation*

The first relevant factor is the risk of continuing litigation, including the strengths and weaknesses of Lead Plaintiff's case on the merits, balanced against the certainty and immediacy of recovery from the Settlement. *See Dunleavy v. Nadler (In re Mego Fin. Corp. Sec. Litig.)*, 213 F.3d 454, 458 (9th Cir. 2000); *Rieckborn v. Velti PLC*, No. 13-cv-3889-WHO, 2015 WL 468329, at *4 (N.D. Cal. Feb. 3, 2015) (citations omitted). Although this action reached settlement before the Court had occasion to consider the claims' merits,

**Destefano v. Zynga, Inc., Not Reported in Fed. Supp. (2016)**

2016 WL 537946, Fed. Sec. L. Rep. P 99,022

the Court need not reach an ultimate conclusion about the merits of the dispute now, "for it is the very uncertainty of outcome in litigation and avoidance of wasteful and expensive litigation that induce consensual settlements." *Officers for Justice v. Civ. Serv. Comm'n of City & Cnty. of San Francisco*, 688 F.2d 615, 625 (9th Cir. 1982) (citations omitted). To that end, there is no "particular formula by which th[e] outcome must be tested." *Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 965 (9th Cir. 2009); *Garner v. State Farm Mut. Auto. Ins. Co.*, No. CV 08 1365 CW (EMC), 2010 WL 1687832, at *9 (N.D. Cal. Apr. 22, 2010). Instead, the Court's assessment of the likelihood of success is "nothing more than an amalgam of delicate balancing, gross approximations and rough justice." *Rodriguez*, 563 F.3d at 965 (internal quotation marks and citation omitted). "In reality, parties, counsel, mediators, and district judges naturally arrive at a reasonable range for settlement by considering the likelihood of a plaintiffs' or defense verdict, the potential recovery, and the chances of obtaining it, discounted to a present value." *Id.* "In most situations, unless the settlement is clearly inadequate, its acceptance and approval are preferable to lengthy and expensive litigation with uncertain results." *DIRECTV, Inc.*, 221 F.R.D. at 526 (quotation marks and citation omitted).

Here, Lead Plaintiff contends that his Section 10(b) claims have significant merit, but he acknowledges a number of risks and uncertainties should he proceed towards summary and judgment and trial. (Dkt. No. 215 at 13-17.) Defendants have vigorously denied liability throughout this litigation. Defendants' position is that (1) none of the challenged statements was false or misleading when made; (2) Lead Plaintiff's scienter allegations fail for a number of reasons; and (4) Lead Plaintiff will be unable to demonstrate loss causation because the July 2012 disclosures were not related to the alleged fraud but to previously disclosed risks. (Dkt. No. 217 ¶¶ 35, 64-65.) Indeed, a court in this District recently noted that in "any securities litigation case, it [is] difficult for [plaintiff] to prove loss causation and damages at trial." *In re Celera Corp. Sec. Litig.*, No. 5:10-CV-02604-EJD, 2015 WL 1482303, at *5 (N.D. Cal. Mar. 31, 2015).

**\*10** As for the statements at issue here, while Lead Plaintiff believes he can prove they were false and misleading when made, he nevertheless faces a number of challenges relating to each statement. For example, Defendants argue that the alleged misrepresentations about Zynga's guidance are protected by the statutory safe-harbor for forward-looking

statements. (*Id.* ¶ 64.) Lead Plaintiff concedes that forward-looking statements can be particularly difficult to prove (Dkt. No. 215 at 15), as they require proof that the speaker actually did not believe the statement, had no reasonable basis to believe the statement, or is aware of undisclosed facts tending to disprove the statement's accuracy. *See* *Provenz v. Miller*, 102 F.3d 1478, 1487 (9th Cir. 1996) (citation omitted); *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387-88 (9th Cir. 2010) (affirming grant of summary judgment for defendants where plaintiffs alleged that defendants violated Section 10(b) by, among other things, issuing a quarterly forecast that lacked a reasonable basis and making intra-quarter statements without knowledge of facts tending to seriously undermine those statements). Further, proving the alleged misrepresentations about Facebook platform changes requires establishing when Defendants learned of the changes and whether and when they learned that the changes would impact Zynga's business. (Dkt. No. 217 ¶ 64.) Lead Plaintiff contends that this will be particularly hard to prove given that Defendant Wehner is now a senior executive at Facebook, having become its Vice President shortly after the Settlement Class Period and having recently become its Chief Financial Officer. (*Id.*) Lead Plaintiff maintains that the bookings-related statements will likewise be difficult to prove as they require evidence of when Defendants observed the trends and at what point the trends should have been disclosed. (*Id.*) Moreover, as to all of the alleged misrepresentations, some typical hallmarks of scienter in securities fraud cases, such as a restatement, SEC action or investigation, or criminal action or investigation are absent here. (*Id.* ¶ 66.) Lead Plaintiff thus believes that he can prove that these statements were false when made, but acknowledges that doing so will be difficult.

In addition to scienter, loss causation might have been particularly difficult for Lead Plaintiff to prove, as Defendants would have argued that Lead Plaintiff's expert could not apportion losses to Defendants' misstatements as opposed to other events and information available on the market, including information about Zynga's game pipeline, which the Court found inactionable as a matter of law as well as unexpected declines in second quarter results, delays in the launch of new games, and poor performance of one particular game. (*Id.* ¶ 67; *see also* Dkt. No. 152.) Given these challenges, Lead Plaintiff would likely face a summary judgment motion before given the opportunity to prove his claims at trial. Indeed, at the June 12, 2015 Case Management Conference, the court entertained allowing Defendants to file an early motion for partial summary judgment after limited

discovery into Zynga's reported record financial results, including bookings. (Dkt. No. 217 ¶ 40.) Thus, the availability of multiple stages of summary judgment briefing even before trial would present a significant hurdle to recovery for Lead Plaintiff.

Lead Plaintiff identifies still other risks associated with continued litigation notwithstanding his confidence in the success of his claims. For example, Lead Counsel notes that the parties entered this Settlement Agreement when over a year remained until the close of discovery. (*Id.* ¶ 70; *see also* Dkt. No. 187.) Thus, the parties faced costly discovery. Similarly, Lead Counsel anticipated having to invest substantial labor and expenses briefing class certification, motions for summary judgment, pre-trial and evidentiary motions, and possible appeals. (Dkt. No. 217 ¶¶ 69-70, 119.) A trial would also be costly. (*Id.*) Thus, continuing litigation would not only be costly—representing expenses that would take away from any ultimate classwide recovery—but would also delay resolution and recovery for Settlement Class Members. And even before Lead Plaintiff were able to reach these challenges to establishing liability, he would also have the hurdle of class certification which, as discussed below, would be contested. In short, setting aside certification, although Lead Plaintiff believes in the strength of his claims, he still faces a number of problems in proving his case on the merits which indicate that further litigation is likely to be costly and time-intensive, with no guarantee of a more beneficial outcome for Class Members as a result.

Against all of this, the Settlement Agreement, which offers an immediate and certain award for a large number of potential Class Members, appears a much better option. Accordingly, it is reasonable for Lead Plaintiff to decide that the guarantee of an immediate recovery outweighs the uncertainties of pursuing a possibly more favorable outcome by continuing to litigate. These factors therefore weigh in favor of approval.

### 2. *The Risk of Maintaining Class Action Status Throughout Trial*

 **\*11**  In considering the third factor, the Court looks to the risk of maintaining class certification if the litigation were to proceed. First, the Settlement Class includes Class Members whose claims are no longer part of the operative complaint— that is, Class Members who purchased their shares of Zynga stock during the "Earlier Period" (between December 15, 2011 and the close of trading on February 14, 2012) who

would not be part of any class subject to a fully litigated, contested motion for class certification because Lead Plaintiff did not include their claims in the operative complaint and instead the claims are limited to shares purchased during the FAC Period (between February 14, 2012 and the close of trading on July 26, 2012). Thus, certification for the purposes of settlement is broader than the certification Lead Plaintiff could hope to achieve were litigation to continue. As a result, the scope of recovery is broader with the Settlement Agreement than it would be otherwise. This factor therefore weighs in favor of approving the Settlement.

### 3. *The Amount Offered in Settlement*

The fourth fairness factor, the amount of recovery offered, also favors final approval of the Settlement. This factor "is generally considered the most important, because the critical component of any settlement is the amount of relief obtained by the class." *Bayat v. Bank of the W.*, No. C-13-2376 EMC, 2015 WL 1744342, at \*4 (N.D. Cal. Apr. 15, 2015) (citation omitted). Because "the interests of class members and class counsel nearly always diverge, courts must remain alert to the possibility that some class counsel may urge a class settlement at a low figure or on a less-than-optimal basis in exchange for red-carpet treatment on fees." *In re HP Inkjet Printer Litig.*, 716 F.3d 1173, 1178 (9th Cir. 2013) (internal quotation marks, citation, and footnote omitted).

When considering the fairness and adequacy of the amount offered in settlement, it "is the complete package taken as a whole, rather than the individual component parts, that must be examined for overall fairness." *DIRECTV*, 221 F.R.D. at 527 (citation omitted); *see also* *Rodriguez*, 563 F.3d at 965 (noting that assessing the fairness, adequacy, and reasonableness of the amount offered in settlement is not a matter of applying a "particular formula"). "[I]t is well-settled law that a proposed settlement may be acceptable even though it amounts to only a fraction of the potential recovery that might be available to the class members at trial." *DIRECTV*, 221 F.R.D. at 527 (citations omitted).

The Court previously concluded that the amount of the settlement was within the range of possible approval. *Zynga*, 2015 WL 6471171, at \*11. The Court again finds that the $23 million offered in settlement is reasonable. Lead Plaintiff's damages expert estimates that the Settlement Amount represents approximately 14 percent of likely

**Destefano v. Zynga, Inc., Not Reported in Fed. Supp. (2016)**

2016 WL 537946, Fed. Sec. L. Rep. P 99,022

recoverable aggregate damages at trial (Dkt. No. 217 ¶ 63), which would be a total of $164 million. According to Lead Plaintiff's damages expert, after deductions for attorneys' fees and costs and administration costs, the payout to the Settlement Class will be approximately 9.5 percent of those likely recoverable damages. (*Id.*) This is well within the range of percentages approved in other securities-fraud related actions in this District. *See, e.g., Celera Corp.,* 2015 WL 7351449, at *6 (granting final approval on a settlement fund of $24,750,000, which represented 17 percent of the plaintiff's total estimated damages with a per-share recovery of $1.02); *In re Omnivision Techs., Inc.,* 559 F. Supp. 2d 1036, 1042 (N.D. Cal. 2008) (granting final approval of a settlement fund of $13.75 million where the gross class recovery was 9 percent of maximum potential recovery, which totaled 6 percent after deductions for attorneys' fees and costs).

In addition, Lead Plaintiff cited, and the Court reviewed, a recent report prepared by Cornerstone Research, which indicates that in securities class action cases between 2013 and 2015, settlements involved a median recovery of 2.2 percent of estimated damages. *See* Laarni T. Bulan et al., *Securities Class Action Settlements: 2014 Review & Analysis,* Cornerstone Research, at 8 (2015). [7] This was an increase from prior years: the median recovery was 2.1 percent in 2011 and 1.8 percent in 2012. *Id.* The median settlement as a percentage of estimated damages in the Ninth Circuit hovered around at 2.4 percent from 2005 through 2014. *Id.* at 22. The portion of the Settlement Fund to be distributed to Class Members here is nearly four times greater than these amounts, which further suggests the Settlement's reasonableness. Turning to the recovery for each individual investor, the per-share recovery amounts to a distribution of $0.15 per damaged share purchased in the entire Settlement Class Period, compared to $1.14 per share if Lead Plaintiff were to prevail at trial. (Dkt. No. 206 ¶ 17.) After deductions, the per-share recovery is estimated to be $0.11 per damaged share during the entire Settlement Class Period, or 9.6 percent of the estimated per-share recovery at trial. (*See id.* ¶ 16.) Thus, the per-share recovery falls squarely within the settlement amounts approved in other securities class action cases. *See, e.g., Celera,* 2015 WL 7351449, at *6; *Omnivision,* 559 F. Supp. 2d at 1042.

**\*12** The per-share recovery is quite different if the numbers for the Earlier Period and the FAC Class Period are separated. Specifically, the per-share recovery amounts to an average distribution of $0.01551 per damaged share purchased in the Earlier Period, and $0.15506 per damaged share purchased in the FAC Class Period. (Dkt. No. 217-1 at 10.) However, courts have approved settlements that offer less recovery for claims deemed weaker and, thus, less likely to prevail. *See Vinh Nguyen v. Radient Pharms. Corp.,* No. 11-cv-00406, 2014 WL 1802293, at *5 (C.D. Cal. May 6, 2014) (noting that a "settlement in a securities class action case" can "sensibly make[ ] interclass distinctions based upon," among other things, "the relative strengths and weaknesses of class members' individual claims and the timing of purchases of the securities at issue") (quotation marks and citation omitted); *see, e.g., In re Patriot Am. Hospitality Inc. Sec. Litig.,* No. MDL C-00-1300 VRW et al., 2005 WL 3801594, at *4 (N.D. Cal. Nov. 30, 2005) (granting final approval of a securities class action settlement that provided for different recovery depending on when class members purchased and sold their stock shares). For the reasons discussed in the Court's Order granting preliminary approval of the Settlement, so it is here. *See Zynga,* 2015 WL 6471171, at *12.

The Isaacson-Weaver Family Trust's withdrawn objection to the amount of the Settlement Fund does not change the Court's conclusion. The Isaacson-Weaver Family Trust argued that the "total settlement fund as a percentage of the losses suffered by the class is trifling, suggesting a settlement for nuisance value not founded upon the actual scale of the damages from the alleged misconduct." (Dkt. No. 220 at 7.) But Section 10(b) securities fraud damages do not include an investor's *total* loss. Instead, a plaintiff is entitled to recover only those damages he proves were caused by the fraud, not by other market conditions. *See Dura Pharms, Inc. v. Broudo,* 544 U.S. 336, 342 (2005). In accordance with that principle, the total Settlement Fund here (along with the Plan of Allocation discussed in detail below) was determined in consultation with a damages expert who examined market conditions to create a formula that estimates the portion of economic loss attributable to the fraud alleged.

In sum, while the percentage may seem small compared to the potential maximum investor loss identified, which totals $164 million, Lead Plaintiff's willingness to accept a smaller certain award rather than attempt to seek full recovery but risk getting nothing is reasonable in light of the risk, expense, complexity, and likely duration attached to the litigation of these claims. This factor, too, weighs in favor of approval.

2016 WL 537946, Fed. Sec. L. Rep. P 99,022

#### 4. *The Extent of Discovery Completed*

In the context of class action settlements, as long as the parties have sufficient information to make an informed decision about settlement, "formal discovery is not a necessary ticket to the bargaining table[.]" *Linney v. Cellular Alaska P'ship, 151 F.3d 1234, 1239 (9th Cir. 1998)* (quotation marks and citation omitted). Rather, the court focuses on whether "the parties carefully investigated the claims before reaching a resolution." *Ontiveros, 303 F.R.D. at 371* (citation omitted).

The extent of discovery completed and stage of the proceeding supports settlement here. By the time the parties reached the Settlement, litigation had proceeded to a point in which both parties had "a clear view of the strengths and weaknesses of their cases." *In re Portal Software, Inc. Sec. Litig., No. C-03-5138 VRW, 2007 WL 4171201, at *4 (N.D. Cal. Nov. 26, 2007)* (quotation marks and citation omitted). The Settlement reflects three and a half years of completed work, including pre-filing investigation, which included review and analysis of Zynga's SEC filings, earnings calls, and other public statements, analysis reports, and media coverage, as well as interviews with confidential witnesses; drafting the complaint; opposing two rounds of Defendants' motions to dismiss and a motion for reconsideration; working with damages, gaming, and accounting consultants; propounding and responding to some discovery; and preparing for and participating in mediation, which involved drafting a detailed mediation statement after reviewing Zynga's confidential, internal financial documents. (Dkt. No. 217 ¶¶ 5-7, 24, 30, 53-55, 117.) The Settlement also followed a full-day mediation with an experienced mediator and follow-up private negotiations between the parties. (*Id.* ¶ 48.) On this record, the Court is persuaded that Lead Plaintiff has conducted sufficient discovery to make an informed decision regarding the adequacy of the Settlement. *See In re Immune Response Sec. Litig., 497 F. Supp. 2d 1166, 1174 (S.D. Cal. 2007)* (finding this factor weighed in favor of approval where the parties had conducted informal discovery and investigation into the matters alleged and had litigated defendants' motions to dismiss).

#### 5. *The Experience and Views of Counsel*

**\*13** Parties "represented by competent counsel are better positioned than courts to produce a settlement that fairly reflects each party's expected outcome in litigation[.]" *Rodriguez, 563 F.3d at 967* (quotation marks and citation omitted). "A district court is entitled to give consideration to the opinion of competent counsel that the settlement is fair, reasonable, and adequate." *Ching v. Siemens Indus., Inc., No. 11-cv-04838-MEJ, 2014 WL 2926210, at *5 (N.D. Cal. June 27, 2014)* (internal quotation marks, citation, and modifications omitted).

The experience and views of counsel also weigh in favor of approving the Settlement. Lead Counsel and counsel for Defendants have substantial experience in securities class actions and other complex class action litigation. (Dkt. No. 217 ¶¶ 126-128.) In particular, Lead Counsel from both Berman DeValerio and Newman Ferrara have litigated numerous class action securities cases and have worked on numerous mediations and settlements, including in this District. (*See id.* ¶¶ 126-127.) Lead Counsel recommend the Settlement and attest that it is a strong result given the substantial risks in continuing the action. (*See, e.g.*, Dt. No. 217 ¶ 62.) The Court is not aware of any evidence to contradict this assertion. Accordingly, Lead Counsel's endorsement weighs in favor of approving the Settlement. *See, e.g., Omnivision, 559 F. Supp. 2d at 1043* (finding class counsel's recommendation in favor of settlement presumptively reasonable, as counsel demonstrated knowledge about the case and securities litigation in general).

#### 6. *The Presence of a Government Participant*

Although no government entity is a party to this action, the United States Attorney General, as well as the Attorneys General for the relevant states, were notified of the settlement pursuant to the notice provision of the Class Action Fairness Act ("CAFA"), *28 U.S.C. § 1715* on October 7, 2015. (Dkt. No. 217 ¶ 82.) "Although CAFA does not create an affirmative duty for either state or federal officials to take any action in response to a class action settlement, CAFA presumes that, once put on notice, state or federal officials will raise any concerns that they may have during the normal course of the class action settlement procedures." *Garner, 2010 WL 1687832, at *14* (internal quotation marks and citation omitted).

### 7. *The Reaction of Class Members to the Proposed Settlement*

The number of class members who object to a proposed settlement is a factor to be considered. 🔖 *Mandujano v. Basic Vegetable Prods., Inc.*, 541 F.2d 832, 837 (9th Cir. 1976). "[T]he absence of a large number of objections to a proposed class action settlement raises a strong presumption that the terms of a proposed class settlement are favorable to the class members." 🔖 *Omnivision*, 559 F. Supp. 2d at 1043 (quotation marks and citation omitted). Put another way, a "court may appropriately infer that a class action settlement is fair, adequate, and reasonable when few class members object to it." *Larsen v. Trader Joe's Co.*, No. 11-cv-05188-WHO, 2014 WL 3404531, at *5 (N.D. Cal. July 11, 2014) (internal quotation marks and citation omitted); *see also* 🚩 *Hanlon*, 150 F.3d at 1027 ("[T]he fact that the overwhelming majority of the class willingly approved the offer and stayed in the class presents at least some objective positive commentary as to its fairness.").

Here, there is no exact number of Settlement Class Members identified, but Lead Counsel notes that there were millions of Zynga common stock shares sold, so there are "likely thousands" of class members. (Dkt. No. 205 at 21.) The Claims Administrator mailed the Notice Packet to 235,580 potential Settlement Class Members. (*See* Dkt. No. 228 ¶¶ 3-4.) Notice was also published in the national edition of *Investor's Business Daily*. (*Id.* ¶ 14.) Epiq also set up a website, www.zyngasecuritieslitigation.com, which allowed visitors to view the Settlement Agreement, Notice Packet, and Plan of Distribution, and a telephone line for questions. After receiving notice of the proposed settlement, the Settlement Class has largely expressed approval: the Claims Administrator has received 24,574 Proofs of Claim from potential Settlement Class Members, and there have been no objections.[8] (Dkt. No. 228 ¶¶ 9-10.) By any standard, the lack of objection of the Class Members favors approval of the Settlement. *See, e.g.*, 🔖 *Churchill Vill.*, 361 F.3d at 577 (affirming settlement with 45 objections out of 90,000 notices sent); 🚩 *Rodriguez v. W. Publ'g Corp.*, No. CV05-3222 R, 2007 WL 2827379, at *10 (C.D. Cal. Sept. 10, 2007) (affirming settlement of 54 objections out of 376,000 notices).

**\*14** In addition, a low number of exclusions representing a small fraction of shares in the public float also supports the reasonableness of a securities class action settlement. *See, e.g.*, 🔖 *Chun-Hoon v. McKee Foods Corp.*, 716 F. Supp. 2d 848, 852 (N.D. Cal. 2010) (noting that where there were no objections and 16 opt-outs representing 4.86 percent of the class "strongly supports settlement"); *In re AIG, Inc. Sec. Litig.*, No. 04 Civ. 8141 DAB, 2010 WL 5060697, at *2 (S.D.N.Y. Dec. 2, 2010) (concluding that where there were only 105 requests for exclusion, and only 61 that were valid and timely, out of 2 million notice packets sent, the reaction of the class is positive and favors settlement). Here, as of the final fairness hearing, the Claims Administrator had received 32 requests for exclusion. (Dkt. No. 228 ¶ 8.) None of the 32 exclusion requests were from large, institutional investors. (*Id.*) Of those, 16 of the requests did not indicate the number of shares purchased during the Settlement Class Period, as required.[9] (*Id.*) The 16 remaining exclusion requests that did include the number of shares purchased represent a total of 34,852 shares. (*Id.*) This represents only .0176 percent of the total number of shares in the hands of public investors during the Settlement Class Period. (Dkt. No. 227 ¶ 5.) Thus, the small number of exclusions representing a very small portion of the total shares at issue further supports settlement. *See* 🔖 *Chun-Hoon*, 716 F. Supp. 2d at 852; *AIG*, 2010 WL 5060697, at *2. For each of these reasons, the reaction of the class strongly supports final approval of the Settlement Agreement.

### 8. *Absence of Collusion*

The first *Bluetooth* factor weighs against a finding of collusion. Lead Counsel moves for an award of $5,750,000 in fees, or 25 percent of the Settlement Fund. (Dkt. No. 216 at 8.) In addition, Lead Counsel requests an award of $189,427.69 in expenses and up to $900,000 in administration expenses. (Dkt. No. 212-1 at 61; Dkt. No. 226 at 15; Dkt. No. 206 ¶ 19.) Subtracting these amounts from the Settlement Fund, the Class will be left with at least $16,160,572.31 —nearly three times more than either Lead Counsel or the Claims Administrator stands to receive. That the class payout is far more than double the fees sought weighs against a finding of collusion. *See, e.g.*, *Rieckborn*, 2015 WL 468329, at *8 (finding no collusion where the estimated class payout of $6,405,530.33 was more than double plaintiff's counsel's requested $219,469.67 award); *Larsen*, 2014 WL 3404531, at *8 (finding no collusion where the estimated class payout of $1,906,884.85 was more than double plaintiffs' counsel's requested $950,000.00 award). The second *Bluetooth* factor

2016 WL 537946, Fed. Sec. L. Rep. P 99,022

also weighs against such a finding, because the Settlement Agreement does not contain a clear sailing provision. As to the third factor, the Settlement Agreement provides that unclaimed or undistributed funds, after a possible second round of redistribution, will go to a *cy pres* beneficiary unaffiliated with either party and subject to later court approval. (Dkt. No. 212-1 ¶¶ 4.4.) Under no circumstances does the Settlement Agreement provide for unclaimed funds to revert to Defendants.

The absence of any *Bluetooth* factor suggests that the Settlement Agreement did not result from, and was not influenced by, collusion. And indeed, aside from the absence of any *Bluetooth* factor, the Settlement adequately satisfies Class Members' claims, which is reflected at least in part by the complete absence of objections to the Settlement. Further, the Court finds no evidence of explicit collusion here, where after considerable motion practice the parties engaged in settlement negotiations overseen by an experienced neutral mediator before reaching this Settlement Agreement. Considering the scope of the litigation and nature of the negotiations at issue here, the Court is satisfied that the Settlement Agreement is the product of successful arms-length negotiations.

### 9. *Plan of Allocation*

"Approval of a plan of allocation of settlement proceeds in a class action...is governed by the same standards of review applicable to the settlement as a whole: the plan must be fair, reasonable and adequate. It is reasonable to allocate the settlement funds to class members based on the extent of their injuries or the strength of their claims on the merits."

*Omnivision*, 559 F. Supp. 2d at 1045 (internal quotation marks and citations omitted); *see also In re Oracle Sec. Litig.*, No. 90-cv-00931-VRW, 1994 WL 502054, at *1 (N.D. Cal. June 18, 1994) ("A plan of allocation that reimburses class members based on the extent of their injuries is generally reasonable.") (citation omitted). Courts "recognize that an allocation formula need only have a reasonable, rational basis, particularly if recommended by experienced and competent counsel." *Vinh Nguyen*, 2014 WL 1802293, at *5 (internal quotation marks and citation omitted).

 **\*15** The Plan of Allocation that Lead Plaintiff proposes here meets those criteria. The Settlement Class includes anyone who bought shares of Zynga common stock during the Settlement Class Period but divides the class into two distinct groups: (1) individuals who purchased shares during the Earlier Period, which was before many of the misstatements alleged, whose claims were not included in the FAC; and (2) individuals who purchased shares during the FAC Class Period.

The Plan of Allocation sets forth a formula for calculating recognized loss for shares purchased in each period. Lead Plaintiff contends that the Plan of Allocation was prepared in consultation with experts and will result in fair and equitable distribution. (Dkt. No. 217 ¶¶ 103-104.) Lead Plaintiff's damages consultant analyzed movements in the price of Zynga common stock after the alleged disclosures on July 25, 2012 and assessed the portion of the price drop allegedly attributable to the fraud. (Dkt. No. 217 ¶ 85.) For shares purchased in both time periods, the recognized loss is zero for Class Members who sold their shares before the Settlement Class Period closed—*i.e.*, while the stock price was still benefitting from Zynga's alleged misrepresentations, and there will be no distributions to any Authorized Claimant (a Class Member who submits a timely Claim Form) whose recognized loss is less than $10.00. (*Id.* ¶ 92.) Lead Counsel aver that they concluded that claims for shares purchased during the Earlier Period are significantly weaker for several reasons, including:

> (a) the 2012 guidance was first issued on February 14, 2012 [the beginning of the FAC Class Period]; (b) the allegations regarding the Facebook platform changes solely pertain to the [FAC Class Period]; (c) the allegations that Defendants were aware of declining trends in bookings were stronger during the [FAC Class Period]; and (d) the Court had dismissed the allegations regarding Zynga's game pipeline [which applied to both periods] as inactionable as a matter of law.

(*Id.* ¶ 86.) With those principles in mind, Lead Counsel and the damages consultant concluded that the shares purchased during the Earlier Period were entitled to a significantly lower price per damaged share. (*See id.* ¶¶ 90-91.) According to Lead Plaintiff's damages consultant, only a small number

2016 WL 537946, Fed. Sec. L. Rep. P 99,022

of shares purchased during the Earlier Period are damaged, because Zynga stock was heavily traded during the Earlier Period resulting in stock that was bought and sold before the disclosures—*i.e.*, no recognized loss caused by the fraud. (*Id.* ¶ 107.)

Courts have approved similar distribution plans. *See, e.g.*, *Rieckborn*, 2015 WL 468329, at \*10; *Portal Software*, 2007 WL 4171201, at \*5-6. Indeed, "governing law recognizes that shareholders are damaged differently according to when they purchased and sold their shares in relation to the corrective disclosures." *Rieckborn*, 2015 WL 468329, at \*10 (citations omitted); *see also* *Vinh Nguyen*, 2014 WL 1802293, at \*5. Thus, it is reasonable here to craft a distribution plan based on this principle. For example, in *Rieckborn*, addressing several class members' objections to a distribution plan in a securities class action, the court noted that "[i]t is certainly possible that a fair and reasonable distribution plan could be created that would award a greater recovery" to purchasers from the time period awarded lesser recovery, "[b]ut plaintiffs have provided an explanation of their chosen allocation that is reasonable and that corresponds to the allegations in the [complaint]." 2015 WL 468329, at \*10. So it is here.

**\*16** \* \* \*

In sum, the *Churchill* fairness factors support approval, the *Bluetooth* factors do not indicate collusion, and the Plan of Allocation is fair, reasonable, and adequate. The Court is therefore satisfied that the Settlement was not the result of collusion between the parties and instead is the product of arms-length negotiations between experienced and professional counsel. There are no objections to address. For each of these reasons, the Settlement Agreement passes muster under Rule 23(e) and final approval is appropriate. The Court will therefore GRANT Lead Plaintiff's motion for final approval and will enter the Proposed Judgment submitted by Lead Plaintiff.

## II. Attorneys' Fee Award

Next, the Court must determine whether the requested attorneys' fees and litigation expenses and the claims administrator costs are fair and reasonable. Lead Counsel seeks an award of $5,750,000 in attorneys' fees, or 25 percent of the $23 million Settlement Fund, as well as $189,427.69 in

litigation expenses. For the reasons set forth below, the Court GRANTS the requests in full.

### A. Attorneys' Fee Award

When a negotiated class action settlement includes an award of attorneys' fees, the fee award must be evaluated in the overall context of the settlement. *Knisley v. Network Assocs.*, 312 F.3d 1123, 126 (9th Cir. 2002). At the same time, the court has "an independent obligation to ensure that the award, like the settlement itself, is reasonable, even if the parties have already agreed to an amount." *Bluetooth*, 654 F.3d at 941 (citations omitted); *see also* *Zucker v. Occidental Petroleum Corp.*, 192 F.3d 1323, 1328-29 (9th Cir. 1999) ("[T]he district court must exercise its inherent authority to assure that the amount and mode of payment of attorneys' fees are fair and proper.") (footnote omitted).

The Ninth Circuit has approved two methods of determining attorneys' fees in cases where, as here, the amount of the attorneys' fee award is taken from the common fund set aside for the entire settlement: the "percentage of the fund" method and the "lodestar" method. *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1047 (9th Cir. 2002) (citation omitted). The district court retains discretion in common fund cases to choose either method. *Id.* Under either approach, "[r]easonableness is the goal, and mechanical or formulaic application of either method, where it yields an unreasonable result, can be an abuse of discretion." *Fischel v. Equitable Life Assurance Soc'y of the U.S.*, 307 F.3d 997, 1007 (9th Cir. 2002) (quotation marks and citation omitted).

Under the percentage of the fund method, the court may award class counsel a given percentage of the common fund recovered for the class. *Id.* "The percentage method is particularly appropriate in common fund cases where 'the benefit to the class is easily quantified.' " *Ontiveros*, 303 F.R.D. at 372 (quoting *Bluetooth*, 654 F.3d at 942). In common fund cases in the Ninth Circuit, the "benchmark" award is 25 percent of the recovery obtained, with 20-30 percent as the usual range. *See* *Vizcaino*, 290 F.3d at 1047; *see also* *Rieckborn*, 2015 WL 468329, at \*21 ("A fee award of 25 percent of the common fund is the benchmark identified by the Ninth Circuit and is squarely within the range of awards generally approved by district courts in this circuit.") (citation omitted). Because this case involves a common settlement

2016 WL 537946, Fed. Sec. L. Rep. P 99,022

fund with an easily quantifiable benefit to the Class, the Court will primarily determine attorneys' fees using the percentage method but will incorporate a lodestar cross-check to ensure the reasonableness of the award. *See id.*; *see, e.g., Nwabueze v. AT&T, Inc.*, No. C 09-01529 SI, 2014 WL 324262, at \*3 (N.D. Cal. Jan. 29, 2014); *Ontiveros*, 303 F.R.D. at 372 (adopting a common fund percentage model to determine attorneys' fees but using the lodestar method to cross-check the amount).

### 1. *Percentage of the Fund*

 **\*17**  In assessing whether the percentage requested is fair and reasonable, courts generally consider the following factors: (1) the results achieved; (2) the risk of litigation; (3) the skill required and the quality of work performed; (4) the contingent nature of the fee and the financial burden; and (5) the awards made in similar cases. *Online DVD-Rental*, 779 F.3d at 954-55 (citation omitted); *see also Vizcaino*, 290 F.3d at 1047.

Here, Lead Counsel requests an award of attorneys' fees which amounts to 25 percent of the total settlement value, or $5,750,000. This request is consistent with the Settlement Agreement, which does not provide a maximum amount of attorneys' fees that counsel may seek, and with the Notice, which indicates that Lead Counsel will request a 25 percent award. (Dkt. No. 212-1 ¶¶ 7.1; *id.* at 61.) Lead Counsel contends that this request is presumptively reasonable, as it is consistent with the Ninth Circuit's 25 percent benchmark, and fair and reasonable given the *Vizcaino* factors.

Indeed, the circumstances of this case support the 25 percent of the Settlement Fund that Lead Counsel requests. The overall result and benefit to the class from the litigation is the most important factor in granting a fee award. *See Omnivision*, 559 F. Supp. 2d at 1046 (citing *In re Heritage Bond Litig.*, No. 02-ML-1475 DT et al., 2005 WL 1594403, at \*8 (C.D. Cal. June 10, 2005)). As discussed above, the result achieved for the Class—especially at this early stage—is favorable considering the potential vulnerabilities of Lead Plaintiff's case.

As to the second factor, as discussed above, the risks associated with this case were substantial given the challenges of obtaining class certification and establishing the falsity of the misrepresentations and loss causation. Lead Counsel

submits that the risks were particular high here because (1) there was no government investigation or accounting restatement—ordinarily, hallmarks of securities fraud that might suggest a case has merit—and (2) following Zynga's disclosures, Zynga's stock value plummeted, and Lead Counsel understood this to mean there would always be an issue as to collectability of any judgment achieved. (Dkt. No. 217 ¶¶ 66, 133.) The Court agrees.

The third factor, the skill required and quality of work performed, likewise supports the 25 percent benchmark award. The "prosecution and management of a complex national class action requires unique legal skills and abilities." *Omnivision*, 559 F. Supp. 2d at 1047 (internal quotation marks and citation omitted). "This is particularly true in securities cases because the Private Securities Litigation Reform Act makes it much more difficult for securities plaintiffs to get past a motion to dismiss." *Id.* (citation omitted). Here, Lead Counsel engaged in significant pre-filing investigation, shepherded this case past two motions to dismiss and a motion for reconsideration, and reached a settlement quickly before expending resources that would otherwise have gone to the Class after further litigation. Lead Counsel is highly experienced in class actions, including securities class actions. (Dkt. No. 217 ¶¶ 126-127; Dkt. No. 217-2 ¶ 2 & Ex. 1; Dkt. No. 217-3 ¶ 3 & Ex. 1.) The quality of opposing counsel is also relevant to the quality and skill that class counsel provided, *see Barbosa v. Cargill Meat Solutions Corp.*, 297 F.R.D. 431, 449 (E.D. Cal. 2013); *see also Wing v. Asarco*, 114 F.3d 986, 989 (9th Cir. 1997) (affirming fee award and noting that the court's evaluation of class counsel's work considered "the quality of opposition counsel and [defendant's] record of success in this type of litigation"), and here, Defendants were represented by a law firm ranked as a national leader in securities litigation. (Dkt. No. 217 ¶¶ 129-131.) For each of these reasons, the skill required and quality of work performed supports the fee award sought.

 **\*18**  With respect to the contingent nature of the litigation—the fourth factor—courts tend to find above-market-value fee awards more appropriate in this context given the need to encourage counsel to take on contingency-fee cases for plaintiffs who otherwise could not afford to pay hourly fees. *See, e.g., In re Wash. Public Power Supply Sys. Sec. Litig.*, 19 F.3d 1291, 1299 (9th Cir. 1994). This is especially true where, as here, class counsel has significant experience in the particular type of litigation at issue; indeed, in such

2016 WL 537946, Fed. Sec. L. Rep. P 99,022

contexts, courts have awarded an even higher 33 percent fee award. *See, e.g.*, *Heritage*, 2005 WL 1594403, at \*19 (awarding attorneys' fees equal to 33 percent of the common settlement fund based in part on the effort, skill, and experience of class counsel and collecting cases regarding the same). Moreover, when counsel takes on a contingency fee case and the litigation is protracted, the risk of non-payment after years of litigation justifies a significant fee award. *See id.* So it is here, where Lead Counsel have litigated this case since 2012 and, to date, have incurred at least $189,427.69 in out-of-pocket expenses and over $3 million in time worked on the matter all with the possibility of little to no recovery, as described above. (*See* Dkt. No. 216 at 21.) Thus, that Lead Counsel here have significant experience in this field and took on this matter on a contingent basis further indicates that the 25 percent benchmark fee request is reasonable.

As to the fifth factor and awards in similar cases, several other courts—including courts in this District—have concluded that a 25 percent award was appropriate in complex securities class actions. *See, e.g.*, *Rieckborn*, 2015 WL 468329, at \*21. Indeed, in many securities class actions, the award has exceeded the 25 percent benchmark. *See, e.g.*, *Mego Fin. Corp.*, 213 F.3d at 463 (affirming a 33.33 percent of the fund fee award); *In re Pac. Enters. Sec. Litig.*, 47 F.3d 373, 379 (affirming a 33 percent of the fund fee award); *Omnivision*, 559 F. Supp. 2d at 1047 (approving a 28 percent fee award); *In re Nuvelo, Inc. Sec. Litig.*, No. C 07-04056 CRB, 2011 WL 2650592, at \*3 (approving a 30 percent fee); *In re CV Therapeutics, Inc. Sec. Litig.*, No. C 03-3709 SI, 2007 WL 1033478, at \*1 (N.D. Cal. Apr. 4, 2007) (approving a 30 percent fee); *Vinh Nguyen*, 2014 WL 1802293, at \*3 (approving a 28 percent fee). Lead Counsel also cites a study published by National Economic Research Associates ("NERA") Economic Consulting, which found that for nationwide settlements between $10 million and $25 million, the median attorneys' fee award for the period January 1996 to December 2014 was 30.0 percent and for the most recent two-year period from January 2012 to December 2014, the median award was 27.5 percent of the common fund. *See* Dr. Renzo Comolli et al., *Recent Trends in Securities Class Action Litigation: 2014 Full-Year Review*, at 34 (Jan. 20, 2015).[10] The cases from the Ninth Circuit and this District and the NERA study suggest that the 25 percent benchmark fee award here on the $23 million settlement is fair and reasonable.

Finally, the lack of objection by any Class Members also supports the 25 percent fee award. *See Omnivision*, 449 F. Supp. 2d at 1048 (finding factor favored approval where no objections to fee were raised in response to 57,630 copies of the notice being sent).

### 2. *Lodestar Cross-Check*

The Ninth Circuit encourages district courts "to guard against an unreasonable result" by cross-checking attorneys' fees calculations against a second method. *In re Bluetooth*, 654 F.3d at 944; *see also* *Vizcaino*, 290 F.3d at 1050 ("[W]hile the primary basis of the fee award remains the percentage method, the lodestar may provide a useful perspective on the reasonableness of a given percentage award.") (footnote omitted). "The 'lodestar' is calculated by multiplying the number of hours...reasonably expended on the litigation by a reasonable hourly rate." *Morales v. City of San Rafael*, 96 F.3d 359, 363 (9th Cir. 1996) (citation omitted). "Once the court has fixed the lodestar, it may increase or decrease that amount by applying a positive or negative multiplier to take into account a variety of other factors, including the quality of the representation, the novelty and complexity of the issues, the results obtained, and the contingent risk presented." *Thayer v. Wells Fargo Bank, N.A.*, 92 Cal. App. 4th 819, 833 (2001) (citation omitted).

### a. Reasonable Rate

 **\*19** "In determining a reasonable hourly rate, the district court should be guided by the rate prevailing in the community for similar work performed by attorneys of comparable skill, experience, and reputation." *Chalmers v. City of Los Angeles*, 796 F.2d 1205, 1210-11 (9th Cir. 1986) (citation omitted), *amended on other grounds by* 808 F.2d 1373 (9th Cir. 1987). The relevant community for the purposes of determining the prevailing market rate is generally the "forum in which the district court sits." *Camacho v. Bridgeport Fin., Inc.*, 523 F.3d 973, 979 (9th Cir. 2008) (citation omitted). In addition to affidavits from the fee applicant himself, other evidence of prevailing market rates may include affidavits from other area attorneys or examples of rates awarded to counsel in previous cases. *See*

Destefano v. Zynga, Inc., Not Reported in Fed. Supp. (2016)

2016 WL 537946, Fed. Sec. L. Rep. P 99,022

*Cotton v. City of Eureka*, 889 F. Supp. 2d 1154, 1167 (N.D. Cal. 2012) (citation omitted).

Here, Lead Counsel submitted declarations setting forth the hourly rates for all of the attorneys, paralegals, and other staff from the two law firms who contributed to this litigation. (Dkt. No. 217-2 ¶ 4 & Ex. 2 (showing rates ranging from $300 to 615 for forensic accountants, financial analysts, investors, and paralegals to $390 to 875 for attorneys); Dkt. No.217-3 ¶ 7 (showing rates ranging from $185 to 850 for attorneys).) Lead Counsel aver that the rates charged in this case are fair and reasonable (Dkt. No. 217 ¶ 124; Dkt. No. 217-2 ¶¶ 4-9; Dkt. No. 217-3 ¶¶ 6-12), and are the regular rates that each firm generally charges for both contingency and hourly-fee cases (Dkt. No. 217-2 ¶ 6; Dkt. No. 217-3 ¶ 10). The rates are in line with those prevailing in the community, as courts in this District have approved similar or higher billing rates for attorneys and paralegals. (*See* Dkt. No. 216 at 26 (collecting cases).) As part of their attorneys' fee award, Lead Counsel here also seek an award covering the cost of financial analysts and related professionals, which courts have also found compensable as part of the fee award. *See, e.g.*, *B-K Lighting, Inc. v. Vision3 Lighting*, No. CV 06-02825 MMM (PLAx), 2009 WL 3838264, at *12 (C.D. Cal. Nov. 16, 2009), *vacated on other grounds by* 2010 WL 2653274 (Fed. Cir. 2010) (approving award of fees for a financial analyst on counsel's staff).

Lead Counsel's attorneys' fee request also includes cost for on-staff investigators. Investigators' work is more often deemed compensable as litigation costs rather than as part of the attorneys' fee award. *See, e.g.*, *Bay Area Painters & Tapers Pension Trust Fund v. Golden Vas Printing*, No. C-10-02934 CW (DMR), 2011 WL 6119161, at *8 (N.D. Cal. Nov. 7, 2011); *Symantec Corp. v. Logical Plus, Inc.*, No. C 06-7963 SI, 2010 WL 3504850, at *1 (N.D. Cal. Sept. 7, 2010); *In re Daou Sys., Inc. Sec. Litig.*, No. 98-CV-1537-L(AJB), 2008 WL 2899726, at *1 (S.D. Cal. July 24, 2008). In those cases, however, the attorneys hired outside investigators. Here, in contrast, the investigators were on Lead Counsel's staff, so it makes sense to include their wages in the attorneys' fee calculation. Lead Counsel is also requesting reimbursement for $30,340.50 in investigator fees (Dkt. No. 217 ¶ 146), which gave the Court pause as to whether duplicative investigation costs were being sought. However, Lead Counsel aver that their experienced in-house investigators began the investigation, but given its scope, which involved searching for hundreds of witnesses and interviewing dozens, Lead Counsel decided to retain an outside investigative firm to assist the internal team. (*Id.* ¶ 149.) Given this explanation, the Court will include in the attorneys' fees award compensation for Lead Counsel's in-house investigators, and separately will reimburse costs for hiring the outside firm.

**\*20** The Court therefore concludes that the requested attorneys' rates, and rates of associated staff, are reasonable.

b. Reasonable Hours

As to the number of hours billed, they must equal the number of hours that can reasonably be billed to a private client. *Gonzalez v. City of Maywood*, 729 F.3d 1196, 1202 (9th Cir. 2013). Thus, the court should only award fees based on "the number of hours reasonably expended on the litigation" and should exclude "hours that are excessive, redundant, or otherwise unnecessary[.]" *Hensley v. Eckerhart*, 461 U.S. 424, 433-34 (1983). "There is no precise rule or formula for making these determinations[,]" and the court "necessarily has discretion in making this equitable judgment." *Id.* at 436-37.

Here, Lead Counsel's time records from both Berman DeValerio and Newman Ferrara reflect more than 5,580.05 hours of work performed on this case.[11] (Dkt. No. 217 ¶ 118.) While the case had not yet proceeded to motions for summary judgment, significant work was still done on this case: Lead Counsel has shown that in prosecuting Lead Plaintiff's claims, they conducted an extensive investigation into the underlying facts, which including interviews with a number of confidential witnesses, examination of complex financial records, and education about the gaming market; thoroughly researched relevant law; prepared and filed the complaint, and then later, the 114-page consolidated complaint; defended two motions to dismiss and a motion for reconsideration; analyzed Defendants' financial condition; prepared a detailed mediation statement; consulted with experts regarding loss causation and damages; participated in the day-long mediation session with Judge Infante; and continued thereafter to negotiate with Defendants to reach this Settlement. (Dkt. No. 217 ¶¶ 6-7.) Given the amount of work done, the Court concludes that the number of hours expended was reasonable. While two law firms both contributed to the work done, Lead Counsel aver that they coordinated efforts between the two firms to avoid duplication of efforts and

Case 4:19-cv-00509 Document 65-9 Filed 07/02/21 in TXSD Page 686 of 1452

**Destefano v. Zynga, Inc., Not Reported in Fed. Supp. (2016)**

2016 WL 537946, Fed. Sec. L. Rep. P 99,022

delegated tasks to lower-level attorneys where appropriate, to keep costs down. (*Id.* ¶¶ 120-121.) In light of the volume and scope of work done and counsel's efforts to avoid duplicitous work, the Court concludes that the number of hours Lead Plaintiff worked on this matter could reasonably be billed to a private, hourly-fee client and therefore are compensable. *Gonzalez*, 729 F.3d 1196, 1202

### c. Lodestar Calculation

**\*21** Lead Counsel therefore dedicated a combined total of 5,580.05 litigating this case, for which they accrued $3,347,319.25 in attorneys' fees based on their hourly rates. (*Id.* ¶ 118.) After determining the lodestar, the Court divides the total fees sought by the lodestar to arrive at the multiplier. *See* *Hopkins v. Stryker Sales Corp.*, No. 11-CV-02786-LHK, 2013 WL 496358, at \*4 (N.D. Cal. Feb. 6, 2013) (citation omitted). "The purpose of this multiplier is to account for the risk Class Counsel assumes when they take on a contingent-fee cases." *Id.* (citation omitted). If the multiplier falls within an acceptable range, it further supports the conclusion that the fees sought are, in fact, reasonable. *Id.* In determining whether a multiplier is reasonable, courts consider a number of factors similar to those considered when determining the appropriate percentage of the fund, including:

> (1) the time and labor required, (2) the novelty and difficulty of the questions involved, (3) the skill requisite to perform the legal service properly, (4) the preclusion of other employment by the attorney due to acceptance of the case, (5) the customary fee, (6) whether the fee is fixed or contingent, (7) time limitations imposed by the client or the circumstances, (8) the amount involved and the results obtained, a(9) the experience, reputation, and ability of the attorneys, (10) the "undesirability" of the case, (11) the nature and length of the professional relationship with the client, and (12) awards in similar cases.

*Id.* (citations omitted). "Multipliers of 1 to 4 are commonly found to be appropriate in complex class action cases." *Id.* (citation omitted); *see also* *Vizcaino*, 290 F.3d at 1051 (affirming application of a 3.65 multiplier based on complexity of case and risks involved, among others); *see also* *Van Vranken v. Atl. Richfield Co.*, 901 F. Supp. 294, 298 (N.D. Cal. 1995) ("Multipliers in the 3-4 range are common in lodestar awards for lengthy and complex class action litigation.") (citation omitted). In securities class actions in particular, courts have applied multipliers ranging from 1.25 up to 4. *See, e.g.*, *Rieckborn*, 2015 WL 468329, at \*22 (approving a 25 percent fee that constituted a 1.25 multiplier); *Omnivision*, 559 F. Supp. 2d at 1048 (approving a 28 percent fee that constitute a 1.33 multiplier); *see also* *Portal Software*, 2007 WL 4171201, at \*16 (noting that a negative multiplier on a lodestar cross-check is an "unusual situation").

Here, based on the lodestar amount of $3,347,319.25, if the Court were to grant Lead Counsel's request for a 25 percent award, the multiplier would be 1.7. In light of the results of this action, the contingent nature of Lead Counsel's fee arrangement, the complexity of this case and the risks involved in litigating it, the skill and experience required to do so properly, and the typical range of multipliers in securities class actions, the Court concludes that the 1.7 multiplier—towards the lower end of the Ninth Circuit's scale —is reasonable. *See* *Vizcaino*, 290 F.3d at 1051 n.6. This is especially true given that the percentage sought is at the presumptively reasonable benchmark amount in this Circuit.

### 3. *Withdrawn Objections to the Attorneys' Fee Request*

The Isaacson-Weaver Family Trust's withdrawn objection to this fee request is unavailing. First, the Isaacson-Weaver Family Trust objected on the grounds that the PSLRA requires courts to make a finding regarding counsel's compliance with Federal Rule of Civil Procedure 11 before granting a fee award as part of the statute's fee-shifting scheme. (Dkt. No. 220 at 7.) Rule 11(b) requires an attorney who is presenting to the court a pleading or motion, to certify to the best of the person's knowledge, information, and belief, after an inquiry reasonable under the circumstances, that it is not being presented for an improper purpose; that the legal contentions are warranted by existing law or a nonfrivolous argument for new law; that the factual contentions have, or likely will have,

Case 4:19-cv-00509    Document 65-9    Filed 07/02/21 in TXSD    Page 687 of 1452

Destefano v. Zynga, Inc., Not Reported in Fed. Supp. (2016)
2016 WL 537946, Fed. Sec. L. Rep. P 99,022

evidentiary support; and that denials of factual contentions are warranted or reasonable. Fed. R. Civ. P. 11(b). In any private action arising under the PSLRA, courts are required to make Rule 11 findings "upon final adjudication of the action." 15 U.S.C. § 78u-41(c)(1). [12] Section 78u-4(c)(2) requires the court to impose mandatory sanctions for any Rule 11(b) violation, and the presumptive sanction is attorneys' fees and litigation expenses. *Id.* § 78u-4(c)(3). The goal of these provisions, entitled "Sanctions for Abusive Litigation," is to "reduce significantly the filing of meritless securities lawsuits[.]" *Great Dynasty Int'l Fin. Holdings Ltd. v. Haiting Li*, No. C-13-1734-EMC, 2014 WL 3381416, at *4 (N.D. Cal. July 10, 2014) (quotation marks and citation omitted). During the course of this action, the parties and their attorneys have at all times complied with Rule 11(b)'s requirements. For all of the reasons described above, far from "abusive litigation," which Section 78u-41(c)(1)'s inquiry is meant to combat, Lead Plaintiff had a legal basis for bringing this action.

**\*22**  *  *  *

Given that Lead Counsel seeks the benchmark percentage of the fund, and the lodestar calculation with a reasonable multiplier confirms the amount sought, the requested attorneys' fees are reasonable. The Court will therefore award Lead Counsel the $5,750,000 it seeks.

### B. Reimbursement of Litigation Expenses

Lead Counsel also seeks to recover $189,427.69 in litigation expenses, including copying, court costs, computer research, delivery fees, expert and investigator fees, mediation, telephone, and travel costs. [13] (Dkt. No. 217 ¶ 146.) "There is no doubt that an attorney who has created a common fund for the benefit of the class is entitled to reimbursement of reasonable litigation expenses from that fund." *Ontiveros*, 303 F.R.D. at 375 (quotation marks and citations omitted). To that end, courts throughout the Ninth Circuit regularly award litigation costs and expenses — including photocopying, printing, postage, court costs, research on online databases, experts and consultants, and reasonable travel expenses—in securities class actions, as attorneys routinely bill private clients for such expenses in non-contingent litigation. *See* *Harris v. Marhoefer*, 24 F.3d 16, 19 (9th Cir. 1994) (noting that a prevailing plaintiff may be entitled to costs including, among other things, "postage, investigator, copying costs, hotel bills, meals,"

and messenger services); *see, e.g.*, *Rieckborn*, 2015 WL 468329, at *22 (approving $219,469.67 in expenses after nearly two years of litigation); *Omnivision*, 559 F. Supp. 2d at 1048 (approving $560,489.90 in costs after three years of litigation).

The Notice informed Class Members that Class Counsel would seek up to $276,000 in litigation expenses. (Dkt. No. 217 ¶ 158; Dkt. No. 217-1 at 10.) No Class Member objected to this figure. Given that Lead Counsel requests reimbursement of costs that are reasonable, regularly billed to clients in hourly fee cases, routinely awarded in contingency fee cases, and substantially below the maximum amount stated in the Notice, Lead Counsel is entitled to recover $189,427.69 in litigation expenses.

### C. Administration Costs [14]

The Settlement Agreement also allocated up to $900,000 in settlement administration costs, which includes fees and expenses incurred by the claims administrator in connection providing notice to the Settlement Class and administering the claims process. (Dkt. No. 212-1 ¶¶ 1.26, 5.2; Dkt. No. 217-1 at 18.) The parties selected Epiq as the claims administrator and its duties included: preparing and disseminating the Class Notice, publishing Class Notice in *Investor's Business Daily*, operating and maintaining a toll-free phone number for the Settlement with interactive voice recording; establishing and maintaining a website on which users can request a copy of the Notice Packet; managing requests for exclusion; and reporting on proofs of claim. (Dkt. No. 217-1 ¶¶ 4-24.) The Notice informed Class Members that up to $900,000 of administration costs would be deducted from the Settlement Fund, and no Class Members objected. Neither the motion for final approval nor the attorneys' fees motion indicated the total administration costs to date, but as of the final fairness hearing, Lead Counsel represented that the cost of settlement administration to date have been approximately $350,000, and Lead Counsel still estimates the total cost will near $900,000. Courts regularly award administrative costs associated with providing notice to the class. *See, e.g.*, *Bellinghausen v. Tractor Supply Co.*, 306 F.R.D. 245, 266 (N.D. Cal. 2015). The Court therefore concludes that Epiq's costs were reasonable incurred for the benefit of the class and approves the full amount to be deducted from the total Settlement Fund.

Case 4:19-cv-00509 Document 65-9 Filed 07/02/21 in TXSD Page 688 of 1452

Destefano v. Zynga, Inc., Not Reported in Fed. Supp. (2016)

2016 WL 537946, Fed. Sec. L. Rep. P 99,022

## CONCLUSION

**\*23** For the reasons described above, the Court GRANTS Lead Plaintiff's motion for final approval of the parties' Settlement Agreement. The Court concludes that the parties and their counsel have at all times complied with Rule 11. In addition, the Court GRANTS Lead Counsel's motion for attorneys' fees and costs and awards Lead Counsel $5,750,000 in attorneys' fees and $189,427.69 in litigation costs. The Court will enter the Proposed Judgment that Lead Counsel submitted.

The Clerk is directed to close this case.

This Order disposes of Docket Nos. 215 and 216.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2016 WL 537946, Fed. Sec. L. Rep. P 99,022

## Footnotes

1 Record citations are to material in the Electronic Case File ("ECF"); pinpoint citations are to the ECF-generated page numbers at the top of the documents.

2 *DeStefano v. Zynga Inc.*, Case No. 12-cv-4007-JSW; *Campus v. Zynga Inc.*, No. 12-cv-4048-JSW; *Diemand v. ZyngaInc.*, No. 12-cv-4059-JSW; *Phillips v. Zynga Inc.*, No. 12-cv-4064-JSC;*Walker v. Zynga Inc.*, No. 12-cv-4066-JSW; *Gaines v. Zynga Inc.*, No. 12-cv-4133-SBA; *Moayyad v. Zynga Inc.*, No. 12-cv-4250-JSW; *Draper v.Zynga Inc.*, No. 12-v-4017-RS; *Yan v. Zynga Inc.*, No. 12-cv-4360-LHK;*Choukri v. Zynga Inc.*, No. 12-cv-4629-CRB; *Westley v. Zynga Inc.*, No. 12-cv-4833-LHK; *Reyes v. Zynga Inc.*, No. 12-cv-5065-CRB.

3 Specifically, the Court consolidated civil actions numbered 12-cv-4007-JSW, 12-cv-4048-JSW, 12-cv-4059-JSW, 12-cv-4064-JSW, 12-cv-4066-JSW, 12-cv-4133-SBA, and 12-cv-4250-JSW.

4 These cases related civil actions numbered 12-cv-4017-RS, 12-cv-4360-LHK, 12-cv-4629-CRB, 12-cv-4833-LHK, and 12-cv-5065-CRB with the consolidated action.

5 In this Order, the Court refers to the Amended Stipulation of Settlement and Revised Class Notice as the Settlement Agreement and Class Notice, respectively.

6 A more thorough description of the background of this case, the settlement negotiations, and the terms of the Settlement Agreement can be found in the Preliminary Approval Order, which the Court incorporates here in full. *See Zynga*, 2015 WL 6471171, at *2-5.

7 *Available at* https://www.cornerstone.com/GetAttachment/701f936e-ab1d-425b-8304-8a3e063abae8/Securities-Class-Action-Settlements-2014-Review-and-Analysis.pdf (last visited Feb. 9, 2016).

8 Again, the Court received one preliminary objection that has since been withdrawn and, given the entity's request for exclusion, it lacks standing to object anyway. (Dkt. Nos. 220, 225.)

9 At oral argument, Lead Counsel confirmed the parties' agreement that the putative Class Members whose exclusion requests failed to include the number of shares purchased were nevertheless deemed excluded from the Settlement Class.

10 *Available at http://www.nera.com/content/dam/nera/publications/2015/Full_Year_Trends_2014_0115.pdf* (last visited Feb. 5, 2016).

11 Lead Counsel submitted summaries of hours worked. (*See* Dkt. No. 217 ¶¶ 112, 118, 122-124; Dkt. No. 217-2 at 59; Dkt. No. 217-3 ¶ 4.) The Court may rely on these summaries, as actual billing records are unnecessary in the context of assessing the lodestar cross-check. *See Covillo v. Specialtys Café*, No. C-11-00594 DMR, 2014 WL 954516, at *6 (N.D. Cal. May. 6, 2014) ("The lodestar cross-check calculation need entail neither mathematical precision nor bean counting...[courts] may rely on summaries submitted by the attorneys and need not review actual billing records.") (alterations in original) (quoting *In re Rite Aid Corp. Sec. Litig.*, 396 F.3d 294, 206-07 (3d Cir. 2005)).

**Destefano v. Zynga, Inc., Not Reported in Fed. Supp. (2016)**

2016 WL 537946, Fed. Sec. L. Rep. P 99,022

12 Section 78u-41(c)(1) provides that "[i]n any private action arising under this chapter, upon final adjudication of the action, the court shall include in the record specific findings regarding compliance by each part and each attorney representing any party with each requirement of Rule 11(b) of the Federal Rules of Civil Procedure as to any complaint, responsive pleading, or dispositive motion.

13 In their motion for final approval, Lead Counsel initially requested $184,681.29 in expenses, but noted that the request did not include future expenses relating to final approval, include preparing a reply brief, additional expenses from consulting with their damages expert, and travel expenses for the final fairness hearing. (Dkt. No. 217 ¶ 155.) In their reply brief, Lead Counsel represented that their expenses then totaled $189,427.69, and provided to the Court an accounting of the additional expenses incurred since the attorneys' fees motion was filed. (Dkt. No. 226 at 15; Dkt. No. 227 ¶ 4.) Accordingly, the Court uses the updated expenses amount.

14 Though not part of Lead Counsel's motion for attorneys' fees and costs, the Court reviews the request for administration costs here.

---

**End of Document**

© 2021 Thomson Reuters. No claim to original U.S. Government Works.

---

# TAB 19

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| ROBERT DE VITO, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>LIQUID HOLDINGS GROUP, INC., BRIAN M. STORMS, KENNETH D. SHIFRIN, RICHARD SCHAEFFER, BRAIN FERDINAND, and SANDLER O'NEILL & PARTNERS, L.P.,<br><br>Defendants. | Civ. No.: 15-6969 (KM) (JBC) |

## ~~[PROPOSED]~~ ORDER AWARDING ATTORNEYS' FEES AND EXPENSES

WHEREAS, this matter came on for hearing on January 10, 2020 (the "Settlement Hearing") on Co-Lead Counsel's motion for an award of attorneys' fees and payment of litigation expenses, including the Lead Plaintiffs' requests for awards pursuant to the Private Securities Litigation Reform Act of 1995 (the "PSLRA"). The Court having considered all matters submitted to it at the Settlement Hearing and otherwise; and it appearing that Notice of the Settlement Hearing substantially in the form approved by the Court was mailed to all Settlement Class Members who could be identified with reasonable effort, and that a Summary Notice of the hearing substantially in the form approved by the Court was published in *Investor's Business Daily* and transmitted over *PR Newswire* pursuant to the specifications of the Court; and the Court having considered and determined the fairness and reasonableness of the award of attorneys' fees and litigation expenses requested,

**NOW, THEREFORE, after due deliberation, IT IS ORDERED, ADJUDGED AND DECREED that:**

1. This Order incorporates by reference the definitions in the Stipulation and Agreement of Settlement filed with the Court on October 29, 2019 (the "Stipulation"), and all capitalized terms not otherwise defined herein shall have the same meanings as set forth in the Stipulation.

2. The Court has jurisdiction to enter this Order and over the subject matter of the Action and all parties to the Action, including all Settlement Class Members.

3. Notice of Co-Lead Counsel's motion for an award of attorneys' fees and payment of litigation expenses was given to all Settlement Class Members who could be identified with reasonable effort. The form and method of notifying the Settlement Class of the motion for an award of attorneys' fees and payment of litigation expenses satisfied the notice requirements of Rule 23 of the Federal Rules of Civil Procedure, the United States Constitution (including the Due Process Clause), and Section 21D(a)(7) of the Securities Exchange Act of 1934, 15 U.S.C. § 78u-4(a)(7), as amended by the PSLRA; constituted the best notice practicable under the circumstances; and constituted due, adequate, and sufficient notice to all Persons entitled thereto.

4. There have been no objections to Co-Lead Counsel's request for attorneys' fees or litigation expenses, or the Lead Plaintiffs' requests for an incentive award pursuant to the PSLRA.

5. Co-Lead Counsel are hereby awarded attorneys' fees in the amount of one-third of the Settlement Fund and $62,635.99 in payment of Co-Lead Counsel's litigation expenses (which fees and expenses shall be paid from the Settlement Fund), which sums the Court finds to be fair and reasonable. Co-Lead Counsel shall allocate the attorneys' fees awarded amongst Co-Lead Counsel in a manner which

2

they, in good faith, believe reflects the contributions of such counsel to the institution, prosecution, and settlement of the Action.

6. In making this award of attorneys' fees and expenses to be paid from the Settlement Fund, the Court has considered and found that:

(a) The Settlement has created a fund of $4,062,500 in cash that has been funded into escrow pursuant to the terms of the Stipulation, and that numerous Settlement Class Members who submit acceptable Claim Forms will benefit from the Settlement that occurred because of the efforts of Co-Lead Counsel;

(b) More than 8,300 copies of the Notice have been mailed to potential members of the Settlement Class and there have been no objections to the fee or expense request;

(c) The fee sought by Co-Lead Counsel has been reviewed and approved as reasonable by the Lead Plaintiffs, investors that oversaw the prosecution and resolution of the Action;

(d) Co-Lead Counsel have conducted the litigation and achieved the Settlement with skill, perseverance, and diligent advocacy;

(e) The Action raised several complex issues and had been litigated for more than four years, and continued litigation would have been extensive and lengthy;

(f) Had Co-Lead Counsel not achieved the Settlement, there was a significant risk that Lead Plaintiffs and the other Settlement Class Members may have recovered less or nothing from Defendants, and Co-Lead Counsel would have received no fees;

(g) Co-Lead Counsel devoted more than 2,450 hours, with a lodestar value of $1,488,328.75, to achieve the Settlement; and

(h)     The amount of attorneys' fees awarded, and litigation expenses to be paid, from the Settlement Fund are fair and reasonable and consistent with awards in similar cases.

7.      Lead Plaintiff Michael Sanders is hereby awarded $1,950 from the Settlement Fund as reimbursement for his reasonable costs and expenses directly related to his representation of the Settlement Class.

8.      Lead Plaintiff Sidney R. Berger is hereby awarded $5,000 from the Settlement Fund as reimbursement for his reasonable costs and expenses directly related to his representation of the Settlement Class.

9.      Any appeal or any challenge affecting this Court's approval of any attorneys' fees and expense application shall in no way disturb or affect the finality of the Judgment.

10.     Exclusive jurisdiction is hereby retained over the parties and the Settlement Class Members for all matters relating to this Action, including the administration, interpretation, effectuation, or enforcement of the Stipulation and this Order.

11.     In the event that the Settlement is terminated, or the Effective Date of the Settlement otherwise fails to occur, this Order shall be rendered null and void to the extent provided by the Stipulation.

[Intentionally left blank]

4

12. There is no just reason for delay in the entry of this Order, and immediate entry by the Clerk of the Court is expressly directed.

DATED this $\underline{10th}$ day of $\underline{January}$ , 2020

BY THE COURT:

THE HONORABLE KEVIN MCNULTY
UNITED STATES DISTRICT JUDGE

# TAB 20

2001 WL 34633373

2001 WL 34633373
Only the Westlaw citation is currently available.
United States District Court,
S.D. Texas.

Pasquale DI GIACOMO, et al., Plaintiffs
v.
PLAINS ALL AMERICAN
PIPELINE, et al., Defendants
Bill KOPLOVITZ, et al., Plaintiffs
v.
PLAINS RESOURCES, INC., et al., Defendants

No. Civ.A.H-99-4137, Civ.A.H-99-4212.
|
Dec. 19, 2001.

MEMORANDUM AND OPINION

ROSENTHAL, J.

**\*1** The parties in these related securities class actions reached agreements to settle and have applied for an award of attorney fees and reimbursement of expenses. This court held a hearing on the application for fees and requested supplemental information as to the work performed by the law firms seeking fees and expenses. That information was provided. No objections to the settlement or fees have been filed. Based on the record, the evidence, the arguments of counsel, and the applicable law, this court analyzes the settlement and resolves the request for fees and expenses, as set out below.

I. Background

Plains All American Pipeline, L.P. (PAAP) was a publicly traded Delaware limited partnership formed in 1998 to acquire and operate certain crude oil business and assets of Plains Resources, Inc. (PRI). Plains All American, Inc., a wholly-owned subsidiary of PRI, was PAAP's general partner. PRI explores, acquires, develops, and exploits crude oil and natural gas properties, and, through its operation of PAAP, is involved in marketing, transporting, terminalling, and storing crude oil. PRI owned a majority of the PAAP units.

PAAP made an Initial Public Offering in November 1998 and a Secondary Offering in October 1999. On November 26,

1999, PAAP announced a loss of over $160 million due to previously undisclosed oil trades. As a result, PAAP would likely restate its financial results for the first three quarters of 1999 to report losses approximating $100 million. The price of PAAP Units and the price of PRI common stock dropped precipitously following the disclosure. On March 30, 2000, PAAP released the restatement of its previously reported financial results for 1998 and 1999. The restatement recognized approximately $7.1 million in trading losses for 1998 and $166.4 million for 1999. Net income for 1998 was reduced by $2.4 million; for the first quarter of 1999, by $21.4 million; for the second quarter of 1999, by $21.2 million; and for the third quarter of 1999, by $72.2 million. PRI's financial results were also, and similarly, restated.

On or after November 29, 1999, twenty separate class actions were filed on behalf of individuals who purchased the limited partnership units of PAAP and/or the common stock and options of PRI during specific periods. The suits initially named as defendants PAAP, PRI, and individuals who served as officers and/or directors. Several of the officers served dual roles as officers of both PRI and PAAP.

Consolidated and amended class actions complaints were filed in both the *DiGiacomo* and *Koplovitz* actions. The *DiGiacomo* complaint alleged class actions claims on behalf of all persons who purchased the common limited partnership units of PAAP from November 18, 1998 to November 26, 1999. The *Koplovitz* complaint alleged class actions claims on behalf of all persons who purchased the common stock or call options of PRI from October 29, 1998 to November 26, 1999.

**\*2** Investigation and discovery conducted before and after the suits were filed revealed a number of highly speculative crude oil contracts entered into by a single trader. Those transactions featured a large number of positions kept "open" for extended periods. Investigation and discovery was conducted into the internal controls at PAAP and PRI for monitoring traders and trades and for setting and enforcing limits on those trades. That work focused on the extent to which the losses resulted from the individual trader's deliberate steps to bypass the controls and conceal the nature and extent of his trades; from the inadequacy of the controls or their application; or from other factors unrelated to the trading losses.

In the Consolidated and Amended Class Complaint filed in the *DiGiacomo* case, the named plaintiff alleged violations of sections 11 and 15 of the Securities Act of 1933, [15

Di Giacomo v. Plains All American Pipeline, Not Reported in F.Supp.2d (2001)
2001 WL 34633373

U.S.C. §§ 77k and 77o, and sections 10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b) and 78t(a), and the rules and regulations promulgated thereunder. In the *Koplovitz* complaint, the named plaintiff alleged violations under sections 10(b) and 20(a) of the 1934 Act and the implementing rules and regulations. The *DiGiacomo* complaint alleged materially false and misleading statements and omissions in the Registration Statements and Prospectuses issued in connection with PAAP's IPO and Secondary Offering, in violation of section 11 of the 1933 Act. The complaint alleged that in the November 17, 1998 IPO Prospectus and the October 1, 1999 Secondary Offering Prospectus, defendants specifically stated that PAAP did not take positions in its oil trades that were intended to speculate on oil price changes; did not engage in speculative futures trading that could expose the Partnership to indeterminable losses; and was able to monitor trading. The Prospectuses included financial results that failed to represent the risks and losses from the speculative oil trading that PAAP was actually engaging in through traders whose activities were not understood or stopped. The Prospectuses included statements as to PAAP's earnings and profits in the first three quarters of 1999 that, as a result of the liabilities resulting from its trading activities, were without reasonable basis.

Both the *DiGiacomo* and *Koplovitz* complaints alleged that the defendants knowingly or recklessly released materially false and misleading information to the investing public, in violation of section 10(b) of the 1934 Act and rule 10b-5. In *DiGiacomo,* the plaintiffs alleged that the class period extended from November 17, 1998, the date the IPO issued, through November 26, 1999. In *Koplovitz,* the plaintiffs alleged a class period from October 29, 1998, the date that PRI announced its financial results for the third quarter ending September 30, 1998, through November 26, 1999. In both suits, plaintiffs alleged that because defendants disseminated materially false and misleading information, the prices of the PAAP Units and PRI common stock and call options were artificially inflated throughout the class periods. As to the individual defendants, plaintiffs in both cases alleged that certain of these defendants engaged in the scheme to conceal the oil trading losses in order to prevent price declines in the PAAP Units and the PRI shares.

**\*3** On April 27, 2000, this court appointed lead plaintiffs to pursue the claims on behalf of purchasers of PAAP Units, and approved the Plains All American Lead Plaintiffs' Group's selection of Berger & Montague, P.C., Milberg

Weiss Bershad Hynes & Lerach LLP, Kaplan Kilsheimer & Fox and Bernstein Liebhard & Lifshitz LLP as Plaintiffs' Executive Committee; Berger & Montague, P.C., and Milberg Weiss Bershad Hynes & Lerach LLP as Co-Chairman of the Executive Committee; and Greenberg Peden P.C. as Plaintiffs' Liaison Counsel pursuant to section 21D(a)(3)(B)(v) of the Exchange Act. This court also granted the motion of the Plains Resources Plaintiffs' Group to be appointed lead plaintiffs to pursue claims on behalf of purchasers of PRI common stock and options, and approved Cauley & Geller, Bowman & Coates, LLP as lead counsel and Whittington, Von Sternberger, Emerson & Wilsher, LLP as plaintiffs' liaison counsel.

During the investigation and discovery, the parties did not take depositions. However, the plaintiffs propounded extensive document requests. The requests included documents relating to the crude oil contracts that plaintiffs contended led to the losses that, in turn, caused the restatements of revenue and income. The requests also included PAAP's internal documents relating to its controls over such trading activities. The documents included the statements made to the SEC and NASDAQ/AMEX relating to the trading losses and restated revenue and income. The informal discovery included interviews with certain of the individual defendants concerning trading activity, internal controls in place to monitor the traders and trades, and the extent to which the internal controls had been implemented and enforced. Counsel for plaintiffs retained experts in accounting to determine the extent to which the financial statements violated generally accepted accounting principles and contained false and misleading statements. Counsel for both sides also retained experts in accounting and damages to determine the extent to which damages could be proven in light of subsequent increases in the price of PAAP stock after the end of the class periods.

The parties engaged in extensive arms-length settlement negotiations. Prolonged and repeated discussions involved detailed presentations on both liability and damages issues. The disputed issues included the following:

1. As to the section 11 claim involving the PAAP Units, the plaintiffs faced uncertainty as to the effect on damages from the fact that within a relatively short time after PAAP and PRI disclosed the trading losses, the price of the units rebounded dramatically.

Di Giacomo v. Plains All American Pipeline, Not Reported in F.Supp.2d (2001)

2001 WL 34633373

2. As to liability with respect to the claims under sections 10(b) and 20(a) of the 1934 Act and rule 10b-5, plaintiffs' investigation revealed facts that would complicate proof of scienter. Specifically, the investigation and informal discovery revealed that PAAP did have in place a system of internal controls and reporting requirements to monitor traders; a particular trader had deliberately and deceitfully bypassed those controls to conceal his transactions; as a result, defendants would be able to present evidence that they did not know that this trader was engaging in certain types of transactions; and defendants did not know the extent to which those transactions were speculative. Such evidence presented plaintiffs with difficulties in proving the element of scienter and would have assisted defendants in asserting a good faith defense to claims of control person liability.

**\*4** After extensive negotiations, the parties entered into a settlement agreement resolving all claims. The proposed settlement consisted of $24.1 million in cash in the *DiGiacomo* case, a recovery of approximately 48 percent of the likely provable damages. The *Koplovitz* action was settled for $5.4 million in cash, a recovery of approximately 39 percent of the most likely provable damages. The difference in part reflected that as to the claims based on the PAAP Units, proof of scienter was not required. The settlement funds have been earning interest at the six-month T-Bill rate since October 1, 2000.

Following a hearing, this court provisionally certified a settlement class in the *DiGiacomo* action, consisting of all persons who did not request exclusion by February 15, 2001 who purchased PAAP Units during the class period, and in the *Koplovitz* action, consisting of all persons who did not request exclusion by February 15, 2001 who purchased PRI common stock and call options during the class period. Class Notice was initially mailed to over 595 class members and nominees in the *DiGiacomo* case, which amounted to the distribution of notice to a total of 19,335 prospective class members. Summary notice was also provided by industry publication. Ten class members requested exclusion, representing approximately .03 percent of the PAAP Units in the class. In the *Koplovitz* case, class notice was mailed to 431 class members and nominees, amounting to distribution of notice to a total of 2,051 prospective class members. One class member opted out, representing approximately .09 percent of the shares in the class. No objections were filed.

The parties submitted, and the court preliminarily approved, a plan for computing class members' claims and distributing the

settlement proceeds in accordance with timely proofs of claim submitted by class members. This court conducted a fairness hearing to determine whether to approve the proposed settlement. *See* FED.R.CIV.P. 23(e). After considering the testimony at the hearing, the lengthy memoranda and exhibits submitted prior to the hearing, the failure of any class member to file objections to the proposed settlement, and the virtual absence of requests for exclusion from the classes, this court concluded that the proposed settlement is fair to the class members. The case presented significant risks of no recovery, or of limited recovery, based on the difficulties in proving scienter and in establishing damages. The litigation would have been prolonged, with extensive motions practice and inevitable appeals. Given the uncertainty of success in litigation, or success but involving a recovery of a small amount of the damages sought, and the certainty of prolonged litigation absent settlement, the $29.5 million cash settlement amount, achieved in approximately one and one-half years, was a fair, reasonable, and adequate settlement.

*See In re Lease Oil Antitrust Litig.,* 186 F.R.D. 403, 431 (S.D.Tex.1999)(stating that when considering a proposed settlement, a district court should consider the follow six factors: "(1) the assurance that there is no fraud or collusion behind the settlement; (2) the state of the proceedings and the amount of discovery completed; (3) the probability of plaintiff's success on the merits; (4) the range of possible recovery; (5) the complexity, expense, and likely duration of the litigation; and (6) the opinions of the class counsel, class representatives, and absent class members")(quoting *Reed v. General Motors Corp.,* 703 F.2d 170, 172 (5th Cir.1983)).

**\*5** This court took the issue of attorney fees under submission and requested additional information from the attorneys. Counsel have submitted additional information as to the number of hours, hourly rates, and work performed by the numerous different law firms representing plaintiffs. The attorneys have also submitted information based on the completed claims administration. The total amount of valid claims submitted in *DiGiacomo* is $12,784,165.80, and, in *Koplovitz,* $3,738,970.00. As a result, this court has the assurance of knowing that awarding the amount of fees requested will still provide class members who have submitted claims the full amount, or more, of their allowable claims.

Counsel requested this court to rule on the issue of attorney fees and to issue the final orders releasing the funds. Plaintiffs' counsel argue for attorney fees of thirty percent of the total

recovery, plus expenses of $187,667.57 (in *DiGiacomo* ) and $19,838.63 (in *Koplovitz* ), plus interest.

## II. Analysis

### A. The Method for Determining Attorney Fees

Most courts use the percentage of the fund method in awarding fees in common fund class actions. *See, e.g.,* Camden I Condominium Assoc., Inc. v. Dunkle, 946 F.2d 768, 774 (11th Cir.1991)("Henceforth in this circuit, attorneys' fees awarded from a common fund shall be based upon a reasonable percentage of the fund established for the benefit of the class"); Swedish Hospital Corp. v. Shalala, 1 F.3d 1261 (D.C.Cir.1993)(holding that in common fund class actions, percentage of the fund method is the only permissible method of award of attorney fees). The Supreme Court has indicated that the percentage fee method is a proper method of calculating attorney fees in a common fund case. *See* Blum v. Stenson, 465 U.S. 886, 900 n. 16, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984); Boeing Co. v. Van Gemert, 444 U.S. 472, 478, 100 S.Ct. 745, 62 L.Ed.2d 676 (1980) ("[A] lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from the fund as a whole.").

Other courts use the lodestar approach, which requires the court to compute the "lodestar" by multiplying the number of hours reasonably expended by the reasonable hourly rate. Strong v. Bellsouth Telecommunications, Inc., 137 F.3d 844, 850 (5th Cir.1998). The court may then apply a multiplier to the lodestar, adjusting the lodestar either up or down. *Id*. The Fifth Circuit has stated that "this circuit uses [the lodestar method] to assess attorneys' fees in class action suits." Strong, 137 F.3d at 850. Clearly, however, the Fifth Circuit recognizes the propriety of the percentage fee method where each member of a class has an "undisputed and mathematically ascertainable claim to part of [a] judgment." *See* id. at 852 (quoting Boeing, 444 U.S. at 479, 100 S.Ct. at 748). A district court in the Fifth Circuit has discretion in determining whether to apply the percentage fee or lodestar method. *See* In re Combustion, Inc., 968 F.Supp. 1116, 1135 (W.D.La.1997).

 **\*6** Numerous district courts in the Fifth Circuit have applied the percentage fee method to common fund cases.

*See, e.g.,* Faircloth v.. Certified Finance, Inc., 2001 WL 527489 at \*9 (E.D.La. May 16, 2001) (calculating fees under both percentage fee method and lodestar method); Shaw v. Toshiba America Info. Sys., Inc., 91 F.Supp.2d 942 (E.D.Tex.2000); In re Lease Oil Antitrust Litig. (No. II), 186 F.R.D. 403 (S.D.Tex.1999)(applying percentage fee method with lodestar cross-check); In re Harrah's Entertainment, Inc., 1998 WL 832574 at \*4 (E.D.La. Nov.25, 1998); Combustion, 968 F.Supp. at 1135;In re Catfish Antitrust Litig., 939 F.Supp. 493, 500 (N.D.Miss.1996); In re Prudential-Bache Energy Income Partnership Sec. Litig., No. 888, 1994 WL 150742 at \*4 (E.D.La. Apr.13, 1994).

In a 1985 Third Circuit Task Force Report, prominent judges and practitioners explained why attorney fee awards in common fund cases should be based on the percentage fee method. Task Force Report, 108 F.R.D. 237, 254-59 (1986). The Report identified a number of deficiencies with the lodestar method, including: (1) increasing the workload of the judicial system; (2) lack of objectivity; (3) a sense of mathematical precision unwarranted in terms of the realities of the practice of law; (4) ease of manipulation by judges who prefer to calculate the fees in terms of percentages of the settlement fund; (5) encouraging duplicative and unjustified work; (6) discouraging early settlement; (7) not providing judges with enough flexibility to award or deter lawyers so that desirable objectives, such as early settlement, will be fostered; (8) providing relatively less monetary reward to the public interest bar; and (9) confusion and unpredictability in administration. Task Force Report, 108 F.R.D. at 246-49. A 2001 Third Circuit Task Force, examining class counsel selection methods based on ex ante fee determinations, has issued a draft report, again concluding that attorney fee awards in common fund cases should be based on the percentage of fund, rather than lodestar, approach:

> The 1985 Task Force Report made a compelling case for rejecting the lodestar in common fund cases. We see nothing that has changed in the interim to diminish the power of the arguments made in 1985. The lodestar remains difficult and burdensome to apply, and it positively encourages counsel to run up the bill, expending hours that are of no benefit to the class. Moreover, use the lodestar may result

Di Giacomo v. Plains All American Pipeline, Not Reported in F.Supp.2d (2001)

2001 WL 34633373

in undercompensation of talented attorneys. Experienced practitioners know that a highly qualified and dedicated attorney may do more for a class in an hour than another attorney could do in ten. The lodestar can end up prejudicing lawyers who are more effective with a lesser expenditure of time.

Draft Task Force Report, p. 105. The benefits of the percentage fee method include readily ascertainable fee amounts that align the interests of class counsel with those of the class members. *See* *In re Cendant Corp. Prides Litig.,* 243 F.3d 722 (3d Cir.2001); *see also Rawlings v. Prudential-Bache Properties, Inc.,* 9 F.3d 513, 516 (6th Cir.1993); *Shalala,* 1 F.3d at 1267-71.

**\*7** Despite the apparent advantages of the percentage fee method over the lodestar method in common fund cases, the law in the Fifth Circuit concerning which method should be applied is "at best unclear." *Combustion,* 968 F.Supp. at 1134. District courts in the Fifth Circuit have exercised discretion in determining which method to use. *Id.* at 1135. In 1974, the Fifth Circuit articulated twelve factors to be examined in setting attorney fees. *Johnson v. Georgia Highway Express, Inc.,* 488 F.2d 714, (5th Cir .1974). The *Johnson* factors are: (1) time and labor required; (2) novelty and difficulty of the issues; (3) skill required to perform the legal services properly; (4) preclusion of other employment; (5) customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) amount involved and results obtained; (9) experience, reputation, and ability of the attorneys; (10) undesirability of the case; (11) nature and length of professional relationship with the client; and (12) awards in similar cases. *Id.* at 717-19. Under either method, the Fifth Circuit requires that the award be supported by the *Johnson* factors. *Combustion,* 968 F.Supp. at 1135.

Some courts have attempted to obtain the benefits of both methods by applying the percentage of the fund method and using the lodestar as a cross-check to ensure that the percentage awarded does not create an unreasonably high fee. *See* *In re Cendant Corp. Litig.,* 264 F.3d 201 (3d Cir.2001).

The goal of such an application is "to ensure that the proposed fee award does not result in counsel being paid a rate vastly in excess of what any lawyer could reasonably charge per hour, thus avoiding a 'windfall' to lead counsel." *Id.* at 285. The Tenth Circuit has expressed a preference for the percentage of the fund method, but looks at the *Johnson* factors to determine which percentage to apply in a given case. *Gottlieb v.. Barry,* 43 F.3d 474, 483 (10th Cir.1994)(citing *Uselton v. Commercial Lovelace Motor Freight, Inc.,* 9 F.3d 849, 853 (10th Cir .1993)). In using a lodestar approach as a cross-check when awarding a percentage of the fund, a court often uses a summary of the hours expended by counsel at various stages, with less detailed breakdown than a straightforward application of the lodestar method as the primary basis for determining the appropriate fee. Such a cross-check enables the court to make a more reliable judgment as to whether the percentage appears too high or low, given the time required by the case. *In re Prudential Ins. Co. of Am. Sales Practices Litig.,* 148 F.3d 283, 340-41 (3d Cir.1998)(cited in *In re Cendant Corp. Litig.,* 264 F.3d at 284-85).

In this case, counsel have requested the court to apply the percentage fee method and award thirty percent of the class fund in both classes. This court requested, and counsel provided, a summary of the hours, work, and hourly rates for the lawyers who will benefit from the fees awarded. Based on these documents and the entire record, this court will use the percentage of the fund method, accompanied by a "lodestar cross-check." This approach is based on the conclusion that application of the lodestar method by itself is unlikely to result in a more reasonable award of fees; would be unduly burdensome; would require the court to set reasonable rates for the attorneys of a large number of different firms and to review extensive itemized billing records in order to determine whether the 4,709 hours reflected in the summary records submitted were reasonably expended.

**\*8** The method of analysis selected requires a determination of the percentage to be applied. Counsel urges that thirty percent is a recognized "benchmark." The status of any percentage as a "benchmark" has recently been the subject of increased scrutiny from both the bench and in the academy. That critical analysis must be balanced by a recognition of the reasonable expectations of counsel, formed when the cases were filed, developed, and settled.

B. Setting a Percentage

Counsel argue for the recognition and application of a thirty percent benchmark for the $24.1 million fund in the *DiGiacomo* case and the $5.4 million fund in the *Koplovitz* case, for a total of $8.85 million. A number of cases recognize a benchmark of between twenty and thirty percent in common fund cases. The Ninth Circuit has adopted a benchmark of twenty-five percent in common fund cases. *Torrisi v. Tucson Elec. Power Co.,* 8 F.3d 1370, 1376 (9th Cir.1993). *See also Catfish,* 939 F.Supp. at 501, 503 (adopting a 25 percent benchmark). A number of common fund fee awards in post-PLSRA cases fall between twenty and thirty percent. *See, e.g., Gwozdzinnsky v. Sandler Assoc.,* 159 F.3d 1346 (2d Cir. Mar.13, 1998)(unpublished table opinion)(affirming award of twenty-five percent in $2 million securities settlement); *In re Ikon Office Solutions, Inc. Sec. Litig.,* 194 F.R.D. 166 (E.D.Pa.2000)(awarding thirty percent in $111 million securities fraud settlement); *Kurzweil v. Philip Morris Co.,* 1999 WL 1076105 (S.D.N.Y. Nov.30, 1999)(awarding thirty percent in $123.8 million securities fraud settlement); *Fournier v. PFS Investments, Inc.,* 997 F.Supp. 828, 832 (E.D.Mich.1998)(awarding twenty percent in $7.5 million securities fraud settlement); *see also* Docket Entry No. 80 at 15-16 (listing unpublished opinions awarding twenty to thirty percent in post-PLSRA securities cases).

Recent study has cast doubt on the assumption that fees awarded in percentage of common fund cases generally adhere to a twenty-five to thirty percent "benchmark." Particularly in extremely large recovery cases, percentage recoveries have often been well below twenty-five percent. *See, e.g., In re Cendant Corp. Prides Litig.,* 243 F.3d at 737 (listing twelve cases in which fees were a smaller percentage of the settlement); *Goldberger v. Integrated Resources, Inc.,* 209 F.3d 43, 52 (2d Cir.2000)(affirming fee award of 4 percent of the class recovery and rejecting counsel's objections to the fee as a substantial departure from the 25 percent "benchmark" in the profession); *In re Dreyfus Aggressive Growth Mutual Fund Litig.,* 2001 WL 709262 at *4 (S.D.N.Y. June 22, 2001) (finding 30 percent of a common fund award "at the far end" of reasonableness for securities class actions, and awarding fees amounting to 15 percent of the fund); *In re Fine Host Corp. Sec. Litig.,* 2000 WL 33116538 (S.D.N.Y. Nov. 8, 2000) (awarding fees amounting to 17.5 percent of the class recovery). In *Goldberger,* the Second Circuit observed that the asserted 25

percent "benchmark" reflected a contingency risk that was unlikely to be present in every securities fraud class action and held that a 25 percent fee would be unreasonably high in that case, given the absence of a significant risk of nonrecovery. 209 F.3d at 51-52.

**\*9** Courts determining what benchmark to use in a particular case, in circuits that formally adopt the percentage of fund method, examine a number of different factors, including: (1) the size of the fund created and the number of persons benefitted; (2) the presence or absence of substantial objections by members of the class to the settlement terms and/or fees requested by counsel; (3) the skill and efficiency of the attorneys involved; (4) the complexity and duration of the litigation; (5) the risk of nonpayment; (6) the amount of time devoted to the case by plaintiffs' counsel; and (7) awards in similar cases. *See Gunter v. Ridgewood Energy Corp.,* 223 F.3d 190, 195 n. 1 (3d Cir.2000).

In this case, the fund consists of $24.1 million for the PAAP Unit purchasers class and $5.4 million for the PRI common stock purchasers class. The nature of the classes makes it possible to say, with assurance, that all those harmed who have filed claims will benefit. There are no objections and virtually no requests for exclusion from the settlement class. The work of the attorneys has largely been out of court, but the speed and quality of the results required both efficiency and effectiveness. The litigation presented complex issues of scienter and causation as to the section 10(b) and section 20 claims and complex issues as to damages with respect to the section 11 claims. The litigation was filed in November 1999 and settled approximately one and one-half years later, a swift resolution for such cases. There is no evident risk of nonpayment. Although it is difficult to gauge the similarity of other securities cases in aspects relevant to the fees sought and awarded, it appears that the size of the common fund in this case is similar to cases in which fees range from twenty to thirty percent.

Thirty percent is the award the attorneys appeared to contemplate at the time they accepted this case and worked it to a relatively swift, efficient, and successful settlement. *See In re Synthroid Marketing Litig.,* 264 F.3d 712, 718-19 (7th Cir.2001)(discussing "market-based approach" to attorney fees). The claims administration is complete, allowing this court the advantage of knowing that even if the court awards thirty percent of the common fund as fees, the class members with allowable claims will recover the full amount of the

Di Giacomo v. Plains All American Pipeline, Not Reported in F.Supp.2d (2001)

2001 WL 34633373

allowable claims, net of attorney fees and expenses. In light of all these factors, this court agrees that thirty percent is a percentage that will produce a reasonable fee. This court applies the *Johnson* factors as a lodestar cross-check.

C. Application of the *Johnson* Factors

The *Johnson* factors are intended to provide the court supervising the settlement and fee with information to determine that the award is reasonable. 🚩 *Johnson,* 488 F.2d at 720. While the *Johnson* factors must be addressed, "rarely are all the *Johnson* factors applicable; this is particularly so in a common fund situation." 🚩 *Uselton v. Commercial Lovelace Motor Freight, Inc.,* 9 F.3d 849, 854 (10th Cir.1993). This court examines the reasonableness of an award of thirty percent in light of each of the applicable *Johnson* factors.

*1. Time and Labor Required*

**\*10** Counsel have submitted summaries of their billing records, representing approximately 4,709.60 hours of work by attorneys in a number of firms. Two of those firms accounted for almost one-half of the hours spent: Milberg Weiss Bershad Hynes & Lerach LLP and Berger & Montague, P.C., the co-chairs of the Plaintiffs' Counsel's Executive Committee. Their work is described as assuming the primary responsibility for research and preparation of the complaint and consolidated complaint; coordinating and directly participating in the witness interviews, document productions, and other informal discovery; negotiating and analyzing the terms of the settlement; and drafting the pleadings, motions, and documents necessary to achieve the settlement, including the plan of allocation and application for approval. Three other firms, Cauley Geller Bowman & Coates, LLP, Kaplan, Kilsheimer & Fox LLP, and Bernstein Liebhard & Lifshitz, account for another quarter of the hours expended on this litigation. Their work included researching and drafting initial complaints; searching for the lead plaintiff under the PSLRA; involvement in discovery; participating in key interviews; and coordinating communications with class members. The time expended by the other firms ranged from a low of five hours to approximately one hundred and forty-one hours. The primary work of many of these firms consisted of the initial investigation and filing complaints that were later consolidated, responding to shareholder communications, and reviewing and monitoring subsequent pleadings and documents. The coordination appears to have minimized duplicative involvement in the informal discovery and document production. The hourly rates for attorneys range from a high of $615.00 per hour to a low of $200.00 per hour for an associate lawyer. The law firms made extensive use of legal assistants, whose hourly rates ranged from $50.00 to $150.00. The average hourly rate amounts to $354.75; combined with the total number of hours of 4,709.60, the lodestar is $1,670,730.60. An award of thirty percent under the lodestar method would require a multiplier of approximately 5.3.

This court will not conduct a detailed analysis of charged hours and hourly rates. To do so would undermine the utility of the percentage fee method. However, this court does note that the hours spent and the average hourly rates are reasonable in light of the circumstances of this case and the results achieved for plaintiffs. Plaintiffs' counsel did not have the benefit of a public investigation or prior litigation and had to rely on their own diligent investigation to build a successful case. Both sides were represented by well known law firms with sophisticated lawyers, and their rates reflect the specialized nature of this type of litigation. Legal obstacles to recovery were significant. Plaintiffs' counsel pursued an aggressive and efficient strategy that culminated in a substantial recovery in a short period of time, saving plaintiffs large sums of money and avoiding the considerable risk and delays of litigation. This court finds that the time and labor expended was reasonably required for the results achieved in this case.

**\*11** In using the lodestar method, courts typically apply multipliers ranging from one to four. *Faircloth,* 2001 WL 527489 at \*7; *In re Harrah's Entertainment, Inc.,* 1998 WL 832574 at \*5; 🚩 *Combustion,* 968 F.Supp. at 1133 (collecting cases). The multiplier can, of course, far exceed that number; counsel have provided a number of examples of such awards. (Docket Entry No. 80, p. 24). This court finds that 5.3 is an acceptable multiplier in light of the particular facts of this case, discussed more fully below.

In contingency fee cases, a multiplier reflects the possibility of no recovery. Because counsel prosecuted this action on a contingent fee basis, this court appropriately focuses on the extent of the risk and the results obtained. An undue emphasis on the number of hours spent on a contingency fee case would penalize counsel for obtaining an early settlement and could distort the value of the attorneys' services. *See In re Harrah's Entertainment, Inc.,* 1998 WL 832574 at \*5. The applicable *Johnson* factors support the size of the award in this case.

*2. Novelty and Difficulty of the Issues*

This case raised significant risks as to liability on the section 10(b) and 🚩 section 20 claims under the Exchange Act. There was significant dispute as to the extent of the defendants' knowledge that one trader was making unauthorized, speculative transactions. Defendants had established measures to prevent the type of trades that led to the losses in this case. The trades violated company policy. Defendants presented information showing that the trades escaped detection because the trader deliberately concealed his activities and intentionally circumvented the controls the company had implemented. There was no insider trading by the individual defendants, removing a basis for proving that these defendants had the requisite scienter during the class period. Proof of scienter under section 10(b) and rule 10b-5 raised significant legal issues and factual complexity, increasing the risk of no recovery as to such claims.

Plaintiffs also sued the individual defendants as controlling persons under section 20 of the Exchange Act. Proof as to such claims was complicated because controlling person liability is subject to a defense of good faith. *Cf.* 🚩 *Dennis v. General Imaging, Inc.,* 918 F.2d 496, 509 (5th Cir.1990); 🚩⚠️ *Paul F. Newton & Co. v. Texas Commerce Bank,* 630 F.2d 1111, 1119 (5th Cir.1980). The factual basis of the individual defendants' good faith defense raised many of the same issues as the proof of scienter under section 10 and rule 10b-5.

The section 10 and 🚩 section 20 claims under the Exchange Act, and the section 11 claims under the Securities Act of 1933, also raised significant damages and causation issues. Within approximately one year following the disclosure of the trading losses, the unit price rebounded and erased the decline that followed the disclosure and restatement of the financials. Defendants were prepared to present expert testimony that because of this fact, and because there were other factors unrelated to defendants' conduct that influenced the price during the class period, class members who bought and sold during the class period were not damaged by defendants' conduct. Although the section 11 claims required no proof of scienter, 🚩 *Herman & MacLean v. Huddleston,* 459 U.S. 375, 382, 103 S.Ct. 683, 74 L.Ed.2d 548 (1983), defendants had significant factual and legal grounds on which to base expert testimony that no damages could be recovered. The rule 10b-5 and 🚩 section 20 claims not only required proof

of scienter, with the risks that entailed in this case, but also included uncertainty as to proving causation and damages.

**\*12** As a result, this case had significant risks of no recovery or limited recovery. The risks not only support the fairness and adequacy of the settlement that was reached, but also support the use of thirty percent as the basis for a fee award and, in lodestar terms, support a 5.3 multiplier.

*3. Undesirability of the Case*

From the outset, this case was desirable; the quality and number of the firms filing suit shortly after the loss disclosure testifies to that fact. However, the case also carried risks that required investigation and informal discovery to uncover and analyze. There was risk of no recovery. This factor of uncertainty merits an increase in the percentage and, under the lodestar method, speaks directly to the justification for the multiplier.

*4. Skill Required to Perform the Legal Services Properly; Experience, and Ability of the Attorneys Involved*

This court does not question the legal skill, ability, experience, and resources of plaintiffs' attorneys. Counsel performed diligently and skillfully, achieving a speedy and fair settlement, distinguished by the use of informal discovery and cooperative investigation to provide the information necessary to analyze the case and reach a resolution. These factors, considered together with the time and labor required, support the percentage and the lodestar multiplier.

*5. Preclusion of Other Employment*

Plaintiffs' attorneys do not specifically allege any preclusion of other employment due to acceptance of this case. This factor does not influence the fee calculation.

*6. Customary Fee; Whether Fee is Fixed or Contingent; Amount Involved and Results Obtained; Awards in Similar Cases*

Although there is a wide range in common fund fee awards, a majority of common fund fee awards in cases that, like this case, involve large settlements but do not involve the issues raised by "mega" class action settlement amounts, fall between twenty and thirty percent. Plaintiffs' attorneys prosecuted this case on a contingency basis and advanced costs. There was a real risk of no recovery, and significant uncertainty as to the recovery amounts. In one and one-half

Di Giacomo v. Plains All American Pipeline, Not Reported in F.Supp.2d (2001)
2001 WL 34633373

years, plaintiffs' attorneys achieved a recovery valued at a total of $29.5 million, in cash, for both classes. The claims file reveals that all allowable claims will be satisfied even after providing the requested fees and reimbursing expenses of $187,667.57 in the *DiGiacomo* case and $19,838.63 in the *Koplovitz* case. The settlement is paid in cash. The settlement allocation has been approved. The fact that this settlement consists of cash, and that the allocation and distribution plan provides assurance that all allowable claims will be fully satisfied, provides significant support for the fee award sought.

*7. Time Limitations Imposed by the Client or the Circumstances; Nature and Length of the Professional Relationship with the Clients*

Plaintiffs' attorneys do not address any time limitations imposed by the clients or the circumstances. Nor do plaintiffs' attorneys discuss the nature and length of their professional relationship with the clients. These factors are inapplicable.

### D. Expenses

**\*13** No party has objected to the amount of the expenses. Having reviewed the declarations and memoranda submitted in support, this court finds that the asserted costs are reasonable and awards the full amount of expenses in addition to the percentage fee. *See Faircloth,* 2001 WL 527489 at *12 (awarding costs in addition to the percentage fee); *In re Harrah's Entertainment, Inc.,* 1998 WL 832574 at *7 (same); *Catfish,* 939 F.Supp. at 503 (same).

### E. Interest

Plaintiffs' attorneys request interest on fees and expenses. No party has objected to an award of interest. The court awards interest on fees and expenses in the amount actually earned since October 1, 2000.

### F. Final Calculation

Having considered all the *Johnson* factors, together with the court's award of substantial expenses in addition to the attorney fees, the court determines that a fee should be awarded based on thirty percent of the class settlement fund. In making this award, this court recognizes the results achieved in this case for the class members and the skill of counsel in negotiating a speedy and fair settlement. The other *Johnson* factors either support the size of the fee awarded or are inapplicable. This court therefore awards total attorney fees in the amount of $7,230,000.00 and expenses of $187,667.57 in the *DiGiacomo* case and attorney fees in the amount of $1,620,000.00 and expenses of $19,838.63 in the *Koplovitz* case, with the interest actually earned on the fees and expenses for the same period and at the same rate as that earned on the settlement fund.

**All Citations**

Not Reported in F.Supp.2d, 2001 WL 34633373

---

**End of Document**

© 2021 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 21

In re Enron Corp. Securities, Derivative & "ERISA" Litigation, Not Reported in...
2004 WL 1900294

Case 4:19-cv-00509    Document 65-9    Filed 07/02/21 in TXSD    Page 707 of 1452

2004 WL 1900294
Only the Westlaw citation is currently available.
United States District Court,
S.D. Texas, Houston Division.

In re ENRON CORPORATION SECURITIES,
DERIVATIVE & "ERISA LITIGATION
Mark NEWBY, et al., Plaintiffs
v.
ENRON CORPORATION, et al., Defendants
THE REGENTS OF THE UNIVERSITY OF
CALIFORNIA, et al., Individually and On Behalf
of All Others Similarly Situated, Plaintiffs,
v.
Kenneth L. LAY, et al., Defendants.

No. MDL 1446, Civ.A. H–01–3624.
|
Aug. 5, 2004.

**Attorneys and Law Firms**

Eric D. Green, Resolutions LLC, Boston, MA, Kevin T. Duffy, New York, NY, William C. Conner, White Plains, NY, Richard J. Zook, Cunningham Darlow et al, Roger B. Greenberg, Schwartz Junell et al, Houston, TX, for Plaintiffs.

David Alan Solomon, Jordan W. Siev, Anderson Kill et al, Jeffrey Lewis Glatzer, Anderson Kill Olick PC, New York, NY, Lawrence W. Schonbrun, Attorney at Law, Berkeley, CA, Stephen D. Susman, Kenneth S. Marks, Susman Godfrey LLP, Scott David Lassetter, John B. Strasburger, Weil Gotshal & Manges, Houston, TX, for Defendants.

*MEMORANDUM AND ORDER AWARDING*
*LEAD PLAINTIFF'S COUNSEL PARTIAL*
*REIMBURSEMENT OF EXPENSES*

HARMON, J.

**\*1** Pending before the Court in the above referenced cause with supporting declarations is Lead Counsel's application for partial reimbursement of expenses (instrument # 1847), originally in the amount of $4,841,820.56 [1] for Lead Counsel and, for firms working with Milberg Weiss Bershad Hynes & Lerach LLP ("Milberg Weiss"), $128,129.58, $28 for Genovese Joblove & Battista PA ("GJB"), [2] $28,093.26

for Guneo Waldman & Gilbert, LLP, [3] and $10,521.99 for Schwartz, Junell, Greenberg & Oathout, LLP ("SJGO"), for a total of $5,008,565.39. These funds are to be paid from the $15 million Expense Fund [4] (approved # 1835) established pursuant to the Stipulation of Partial Settlement (approved # 1834), dated August 29, 2002, between Representative Plaintiffs and certain Arthur Andersen entities (Andersen Worldwide Societe Cooperative, Arthur Andersen (United Kingdom), Arthur Andersen–Brazil, and Andersen Co. (India)). Lead Plaintiff represents that before the application for partial reimbursement was originally filed, Lead Plaintiff the Regents reviewed the repayment requests and approved them; such oversight by the Regents is intended to be another procedural safeguard for the class.

On May 3, 2004 Lead Counsel filed a Notice of Change of Firm Affiliation (# 2119) and is now a partner in Lerach Coughlin Stoia & Robins LLP ("Lerach Coughlin"). # 2289. A written agreement between Milberg Weiss and Lerach Coughlin will govern the partial reimbursement of any fees from the Expense Fund, but for purposes of Lead Plaintiff's application, its revised proposed order awards such reimbursement to Lerach Coughlin. *Id.* However, to conform to the pleadings here, the Court will refer to Movant as Milberg Weiss.

Lead Counsel has arranged its expenditures in categories and requests reimbursement in the following amounts for the following expenses, which it deems "reasonable and necessary" and "of the type typically billed by attorneys to paying clients in the marketplace" (# 1847 at 2). [5] First Milberg Weiss seeks reimbursement of $1,696,097.74 for Experts', Consultants', and Investigators' fees, broken down as follows: (a) $808,573.57 for financial consultants that aided it in drafting allegations and in discovery relating to the financial institution defendants; (b) $58,241.05 for computer consultants employed after this Court ordered Arthur Andersen, which was alleged to have destroyed or deleted physical and electronic files, to make its expert available to Lead Counsel's expert to preserve what documents it could and identify what had been destroyed; (c) $731,308.04 for investigators identifying, locating, and interviewing witnesses; (d) $20,212.00 for accounting consultants to review Enron's accounting and auditing; (e) $11,200.00 for consultants that aided Milberg Weiss in developing allegations about defendant law firms' duties and obligations; (f) $11,200.00 for energy consultants to help Milberg Weiss understand the dynamics and practices of the energy industry; and (g) $55,363.08 for *Newby'* s

Case 4:19-cv-00509 Document 65-9 Filed 07/02/21 in TXSD Page 708 of 1452

In re Enron Corp. Securities, Derivative & "ERISA" Litigation, Not Reported in...
2004 WL 1900294

share of the court-ordered mediation. As for class action notices, Lead Plaintiff's counsel applies for reimbursement for $3,581.00 expended in complying with the PSLRA's notice requirements, 15 U.S.C. § 78u–4(a)(3)(A)(i). In addition, it requests repayment of $78,826.55 for filing and witness fees; $354,534.90 for computerized legal research, which amount represents actual charges of the vendors; $866,156.76 for meals, hotels, and transportation; $65,419.43 for overnight delivery of pleadings prior to establishment of the website service and for communications with clients, delivery of documents for depositions, etc.; $1,489,483.53 for actual, out-of-house costs for photocopying; $57,566.34 for telephone and telecopier expenses; $164,798.29 for court reporter services; and $64,356.03 for miscellaneous items, specifically $7,860.70 for various publications and $56,495.33 for computer equipment for its Houston-based Enron trial office. *See* # 1848, Declaration of Helen J. Hodges in support of partial reimbursement of expenses to Milberg Weiss.

 **\*2** The law firms that have aided Milberg Weiss in prosecuting this litigation have also broken down their smaller reimbursement requests into similar categories. # 1847 at 7–8; # 1849,[6] 1850,[7] 1851.[8]

Only Milberg Weiss' reimbursement requests have been challenged by Plaintiff class member Brian Dabrowski through his attorney, Lawrence W. Schonbrun, although the Court has reviewed all of the requests and supplemental documentation. Furthermore, the objections were not directed to the amounts in the partial reimbursement application, but to the fact that there was no underlying documentation to support or gauge the expenditures.

After objections were lodged regarding the lack of evidentiary support in the record for the reimbursement requests, e.g., invoices, logs, bills, cancelled checks, etc., this Court noted its obligation to protect the class members and the common fund by careful scrutiny, especially relating to two concerns voiced about the Stipulation during the fairness hearing: (1) the unspecified amount of attorney's fees to be requested in the future by counsel and (2) the possibility that monies reimbursed from the Expense Fund for expenses might be used to pay for expenses incurred by others not part of the class. The instant application for partial reimbursement does not include attorney's fees. In response to the objections, but also to protect Lead Counsel from having to reveal privileged work product in this on-going litigation, the Court ordered

Lead Counsel to submit the documentation to support its requests under seal for *in camera* inspection by the Court.

Milberg Weiss has provided a lengthy printout of the firm's "Enron: Expense Report from Inception through June 30, 2003," composed of individually itemized and dated expenses generated by the firm's accounting record-keeping system, based on different source documents including individual invoices, travel-related expense reports, internally-generated reports of in-house expenses, etc. In a letter accompanying the new submission, Lead Plaintiff states that it has discovered that it claimed $18,259.04 too much in transportation expenses and, after deducting that amount, it now seeks a reduced total reimbursement of $4,823,561.52. The Cuneo Law Group has provided an "Account Quick Report" as of May 27, 2003, itemizing each expense for Enron with date and amount; GJB has provided similar materials; and SJGO has provided copies of invoices and receipts as well as a computer-generated itemized list like the others. The Court has since examined these documents.

This case involves a common fund and expenditures are justified by the common fund doctrine established in *Boeing Co. v. Van Gemert,* 444 U.S. 472, 478, 100 S.Ct. 745, 62 L.Ed.2d 676 (1980):

> This Court has recognized consistently that a litigant or lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorneys' fee from the fund as a whole. Jurisdiction over the fund involved in the litigation allows a court to prevent ... inequity by assessing attorney's fees against the entire fund, thus spreading fees proportionately among those who benefitted by the suit.

 **\*3** *Id.*

The rationale for allowing attorneys compensation for expenses and fees from a common fund "is that unless the costs of litigation are spread to the beneficiaries of the fund, they will be unjustly enriched by the attorney's efforts." *Swedish Hosp. Corp. v. Shalala,* 1 F.3d 1261,

Case 4:19-cv-00509 Document 65-9 Filed 07/02/21 in TXSD Page 709 of 1452

In re Enron Corp. Securities, Derivative & ""ERISA" Litigation, Not Reported in...
2004 WL 1900294

1265 (D.C.Cir.1993); *Manual for Complex Litigation (Third)* § 14.12 at 186–87 (2004) ("The common-fund exception to the American Rule is grounded in the equitable powers of the courts under the doctrines of quantum meruit and unjust enrichment. The exception applies where a common fund has been created by the efforts of a plaintiff's attorney and rests on the principle that 'persons who benefit of a lawsuit without contributing to its costs are unjustly enriched at the successful litigant's expense [footnotes omitted]."); *Acosta v. Master Maintenance,* 192 F.Supp.2d 577, 582 (M.D.La.2001) ("[T]he common fund doctrine rests on the perception that persons who obtain the benefit of a lawsuit without contributing to its cost are unjustly enriched at the successful litigant's expense."), *aff'd,* 69 Fed. Appx. 659, No. 02–30655, 1003 WL 21356040 (5th Cir. May 29, 2003)1003 WL 21356040 (5th Cir. May 29, 2003).

Moreover, as expressed by the district court in *Acosta v. Master Maintenance,* 192 F.Supp.2d 577, 581–82 (M.D.La.2001), *aff'd,* 69 Fed. Appx. 659, No. 02–30655, 1003 WL 21356040 (5th Cir. May 29, 2003)1003 WL 21356040 (5th Cir. May 29, 2003):

> "When a common fund is available, attorneys for the successful parties may petition for a portion of the fund as compensations for their efforts. Once an attorney files such a petition, his role changes from one of fiduciary for his clients to that of a claimant against the fund created for the clients' benefit. Defendants, having made their contribution to the settlement, are uninterested in the distribution, so (as in this case) they typically do not offer any opposition to the fee petition. It is therefore incumbent upon the trial court to become the fiduciary for the fund's beneficiaries and to act with 'moderation and a jealous regard to the rights of those who are interested in the fund' in determining what is a reasonable fee to be paid to class counsel for their efforts in settling the litigation and creating the fund." ... The same reasoning applies to the application for costs in the present case .... [citations omitted]

*Id., quoting Purdy v. Security Savings & Loan Assoc.,* 727 F.Supp. 1366, 1268 (E.D.Wis.1989). Thus counsel should maintain their records so as to be able to "explain the expenditures at the time they were incurred." *Acosta,* 192 F.Supp.2d at 583.

The Court does not question the nature (categories) of all of the requested expense reimbursements and agrees that these kinds of expenditures are necessary costs, "of the type typically billed by attorneys to paying clients in the marketplace" or obviously justified in light of the size, geographical spread, and complexity of this litigation with frequently "cutting-edge" legal issues. With respect to all categories except the travel expenses (including hotels and airfare) for which Milberg Weiss seeks reimbursement, the amounts sought in each category appear to the Court to be reasonable in light of the circumstances, and the Court finds that those expenditures were for the common benefit of all the plaintiffs, including payments for experts, investigative expenses, court costs, photocopying, postage, accounting costs, court reporter services, etc. *See generally Acosta v. Master Maintenance,* 192 F.Supp.2d 577.

**\*4** Nevertheless, the Court is disturbed by request for reimbursement of some of Milberg Weiss' expenditures on hotel rooms and airfare, which appear not only luxurious, but extravagant, and should not have to be born by the plaintiff class through the Expense Fund. Certain members of Milberg Weiss have standardly traveled first or business class and stayed in very expensive hotels. Even within these parameters, however, certain items are "buried" within the columns of itemized expenses, and there is no explanation by Lead Plaintiff for the extraordinary amounts or how they are related to the litigation. For example, several times members of the firm have chartered private jets; the Court finds no reason why the Expense Fund should subsidize such travel. For instance, on January 26, 2003 Mr. Lerach chartered a jet for $6,563.78; on May 16, 2003 he chartered another for $12,355.50; and on June 6, 2003, he chartered another for $6,258.67. There are numerous planes from Houston, the major hub of Continental Airlines and host to numerous others to major east and west coast cities every day; there should be no reason why firm members need to pay exorbitant plane fares. This Court questions a number of such items. For example, on May 17, 2002 one woman paid $3,469 to fly on American Airlines from J.F.K. airport in New York to San Diego and back to Newark. On June 11, 2002 three first class tickets were purchased on Elite Jet for $9,223.50. On May 22, 2003 one attorney paid $1,059.50 to fly from San Diego to Dallas, and then $1,061.00 to fly back the next day. The Court believes that counsel have a responsibility to find reasonable airfares or to fund the extra costs themselves.

Similarly there are some extravagant hotel bills for which Milberg Weiss seeks reimbursement. The most noticeable is a $25,584.33 tab for a night at the Ritz Carlton in Laguna Niguel. Mr. Lerach has a documented preference for $1000 plus per night hotel rooms. Other examples of

In re Enron Corp. Securities, Derivative & "ERISA" Litigation, Not Reported in...

2004 WL 1900294

Case 4:19-cv-00509   Document 65-9   Filed 07/02/21 in TXSD   Page 710 of 1452

excessive reimbursement requests include hotel stays by Darnell Donahue ($1,315.87), Rick Nelson ($899.46) and Christine Sanders ($1451.88) on December 2, 2001.

These extravagant sums are unreasonable, unnecessary, and clearly not for the benefit of all the plaintiffs. If members of the firm choose to stay in high-end lodgings or purchase extraordinarily expensive airplanes, it should be at their expense, not that of the expense fund. For these reasons the Court is reducing the amount of reimbursement for "Meals, Hotel and Transportation by 20%, or $169,579.54, from $847,897.72 to $678,318.18. [9] Moreover it admonishes Lead Counsel that it will require for future requests for reimbursement in this category not only a record of the cost, but an explanation if it appears excessive.

4. The awarded expenses shall be paid immediately after the date this Order is executed, subject to the terms, conditions and obligations of the Stipulation, which terms, conditions and obligations are incorporated herein.

Accordingly, for the reasons indicated herein, it is hereby ORDERED, ADJUDGED, AND DECREED that

1. All of the capitalized terms used herein shall have the same meanings as set forth in the Stipulation of Partial Settlement dated as of August 29, 2002 ("Stipulation").

*5 2. This Court has jurisdiction over the subject matter of this application and all matters relating thereto, including all Members of the Settlement Class.

3. The Court hereby awards the following counsel firms partial reimbursement of litigation expenses in the amounts shown:

a.   Lerach Coughlin Stoia & Robbins LLP.......................... $4,653,982.00

b.   Genovese Joblove & Battista PA................................. $128,129.58

c.   Cuneo Waldman & Filbert, LLP.................................. $28,093.26

d.   Schwartz, Junell, Greenberg & Oathout, LLP.............. $10,521.99

IT IS SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2004 WL 1900294

## Footnotes

1   As will be explained, Lead Plaintiff subsequently reduced this amount by $18,259.04, to $4,823,561.52.

2   The declaration of Craig P. Riders of GJB (# 1847) recites that the firm aided Milberg Weiss "regarding matters in the Enron bankruptcy proceeding and the potential impact of the bankruptcy proceedings on the litigation pending before the Court."

3   Cuneo Waldman & Gilbert, LLP is the successor firm to The Cuneo Law Group, PC. According to the declaration of Jonathan W. Cuneo (# 1851), in addition to aiding in drafting pleadings and portions of the opposition to motions to dismiss, the "firm was involved in the passage of the Private Securities Litigation Reform Act of 1995" and has "special expertise in Congressional developments that led to the passage of that Act." The firm also "monitored all Congressional hearings dealing with Enron" and obtained all materials relevant to them that have been released.

4   Pursuant to the Stipulation, the Fund was allocated as follows: 80.5% is allocated to *Newby* and to *Washington State Investment Board* (H–02–3401) actions; and 19.5% to the *Tittle* action.

Case 4:19-cv-00509 Document 65-9 Filed 07/02/21 in TXSD Page 711 of 1452

In re Enron Corp. Securities, Derivative & "ERISA" Litigation, Not Reported in...
2004 WL 1900294

5     Citing *Harris v. Marhoefer,* 24 F.3d 16, 19 (9 th Cir.1994), and *In re Media Vision Technology Sec. Litig.,* 913 F.Supp. 1362, 1366 (N.D.Cal.1996).

6     # 1849, the declaration of Roger Greenberg of SJGO seeks compensation for $600 of expenses for filing, service or process and witness fees; $927 for transcripts of case proceedings from a court reporter; $6,647.38 for courthouse messenger and overnight delivery services (Federal Express and UPS); $318.02 for computerized legal research; $52.43 for court record searches; $226.38 for travel expenses; $566.29 for outside copy services; $931.20 for telephone and facsimile charges; and $253.28 for postage, mainly before the website was established.

7     # 1850, Reiders' declaration for GJB, seeks repayment of the following expenses incurred by the firm: $69,500.87 for travel expenses; $3,218.27 for photocopies; $4,113.41 for telephone and facsimile charges; $3,860.40 for Messenger and Federal Express costs; $195.20 for postage; $525 for filing, witness and other fees; $1,259.54 for court reporter services; $5,660.22 for computerized legal research; and $39,796.67 for the document depository.

8     Cuneo on behalf of Cuneo Waldman & Gilbert, LLP declares his firm has expended $8,665.96 for travel; $8,682.46 for photocopies; $463.84 for telephone and facsimile; $8,906.55 for messenger and Federal Express services; $43.17 for computerized legal research; $0 .68 for postage; and $1,330.60 for miscellaneous costs.

9     The Court has reached the figure it will award by taking 20% (or $169,579.54) of Lead Plaintiff's reduced request for this category, $847,897.72, and subtracting that amount from Lead Plaintiff's total reimbursement request, $4,823,561.52, to obtain the amount the Court approves, $4,653,982.00.

**End of Document**

© 2021 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 22

Case 4:19-cv-00509    Document 65-9    Filed 07/02/21 in TXSD    Page 713 of 1452
Erica P. John Fund, Inc. v. Halliburton Company, Not Reported in Fed. Supp. (2018)
2018 WL 1942227

2018 WL 1942227
Only the Westlaw citation is currently available.
United States District Court,
N.D. Texas, Dallas Division.

The ERICA P. JOHN FUND, INC., et al., on Behalf
of Itself and All Others Similarly Situated, Plaintiffs,
v.
HALLIBURTON COMPANY
and David J. Lesar, Defendants.

Civil Action No. 3:02-cv-1152-M
|
Signed 04/25/2018

**Attorneys and Law Firms**

Marc R. Stanley, Martin Woodward, Stanley Law Group, E. Lawrence Vincent, Burns Charest LLP, Roger L. Mandel, Roger L. Mandel, P.C., William B. Federman, Federman & Sherwood, Robert M. Thornton, Theodore Carl Anderson, III, Kilgore & Kilgore PLLC, Willie Briscoe, The Briscoe Law Firm, Dallas, TX, Nadeem Faruqi, Faruqi & Faruqi, Kim E. Miller, Kahn Swick & Foti LLC, Michael A. Swick, Law Offices of Michael A. Swick, Gregory M. Nespole, Wolf Haldenstein Adler Freeman & Herz, Jules Brody, Patrick Slyne, Stull Stull & Brody, New York, NY, Darren J. Check, Kay E. Sickles, Marc I. Willner, Richard S. Schiffrin, Schiffrin Barroway Topaz & Kessler LLP, Stuart L. Berman, Barroway Topaz Kessler Meltzer & Check, LLP, Radnor, PA, John G. Emerson, Jr., Emerson Scott LLP, Houston, TX, David Boies, Boies Schiller & Flexner, Armonk, NY, Arthur L. Shingler, III, Scott + Scott, William S. Lerach, Lerach Coughlin Stoia Geller Rudman & Robbins, San Diego, CA, Caryl L. Boies, David Paul Nelson, Lauren Louis, Sashi Bach Boruchow, Carl E. Goldfarb, Justin D. Fitzdam, Boies Schiller & Flexner LLP, Fort Lauderdale, FL, David R. Scott, Scott+Scott Attorneys at Law LLP, Colchester, CT, Edmund W. Searby, Mark V. Jackowski, Scott Scott LLP, Chagrin Falls, OH, Geoffrey M. Johnson, Scottscott, Attorneys at Law, LLP, Cleveland Heights, OH, J. Ryan Lopatka, Lewis Kahn, Michael R. Robinson, Kahn Swick & Foti LLC, Madisonville, LA, Neil Rothstein, Truth in Corporate Justice, West Hollywood, CA, for Plaintiffs.

Jessica B. Pulliam, Charles David Strecker, John Benjamin Lawrence, Thomas E. O'Brien, Baker Botts LLP, Benjamin T. Pendroff, Barnes & Thornburg, Dallas, TX, David D. Sterling, Baker Botts LLP, Houston, TX, for Defendants.

**MEMORANDUM OPINION AND ORDER**

BARBARA M. G. LYNN, CHIEF JUDGE

**\*1** On February 21, 2017, the Erica P. John Fund, Inc. ("EPJF"), Lead Plaintiff in this securities class action case, filed a Stipulation of Settlement, (ECF No. 794), and a Motion for Preliminary Approval of Class Action Settlement, (ECF No. 795). The Court granted preliminary approval. (ECF No. 805).

EPJF then filed the Motion for Final Approval of Class Action Settlement and Plan of Allocation. (ECF No. 818). Class Counsel—Boies Schiller Flexner LLP ("BSF"), Kahn Swick & Foti, LLC ("KSF"), and Lawrence "Larry" Vincent—filed the Motion for Award of Attorneys' Fees and Reimbursement of Litigation Expenses. (ECF No. 820). Several other firms have also moved for fees and expenses, namely Federman & Sherwood, (ECF No. 812), Kilgore & Kilgore, PLLC (ECF No. 815), and Robbins Geller Rudman & Dowd LLP, (ECF No. 817). Robbins Geller Rudman & Dowd has since withdrawn its request for fees and instead seeks only expenses. (ECF No. 823).

On July 31, 2017, the Court held a final fairness hearing regarding the Motion for Final Approval and heard argument on the fee and expense motions. For the reasons stated below and on the record, the Motion for Final Approval of Class Action Settlement and Plan of Allocation is **GRANTED**; Class Counsel's Motion for Award of Attorneys' Fees and Reimbursement of Litigation Expenses is **GRANTED**; Federman & Sherwood's Motion for Attorney Fees and Reimbursement of Expenses is **GRANTED IN PART** and **DENIED IN PART**; Kilgore & Kilgore's Motion for Award of Attorneys' Fees and Expenses is **GRANTED IN PART** and **DENIED IN PART**; and Robbins Geller Rudman & Dowd's Motion for Award of Expenses is **GRANTED**.

**I. Factual and Procedural Background**

**a. Background of the Case**

> Erica P. John Fund, Inc. (EPJ Fund), is the lead plaintiff in a putative class action against Halliburton and one of its executives

Erica P. John Fund, Inc. v. Halliburton Company, Not Reported in Fed. Supp. (2018)

2018 WL 1942227

(collectively Halliburton) alleging violations of section 10(b) of the Securities Exchange Act of 1934, and Securities and Exchange Commission Rule 10b–5. According to EPJ Fund, between June 3, 1999, and December 7, 2001, Halliburton made a series of misrepresentations regarding its potential liability in asbestos litigation, its expected revenue from certain construction contracts, and the anticipated benefits of its merger with another company—all in an attempt to inflate the price of its stock. Halliburton subsequently made a number of corrective disclosures, which, EPJ Fund contends, caused the company's stock price to drop and investors to lose money.

*Halliburton Co. v. Erica P. John Fund, Inc.*, 134 S. Ct. 2398, 2405–08 (2014) (*Halliburton I*). Numerous complaints alleging misrepresentations by Halliburton were filed in 2002 and consolidated into this action. (ECF No. 22). Four lead plaintiffs were appointed, including the Archdiocese of Milwaukee Supporting Fund, Inc. ("AMSF"), the precursor in name to EPJF. (*Id.* at 22). Schiffrin & Barroway, LLP ("S&B") was appointed as lead counsel, and Federman & Sherwood ("F&S") and The Emerson Firm were appointed co-liaison counsel. (*Id.*)

**\*2** On May 10, 2004, all lead plaintiffs except for AMSF moved for preliminary approval of settlement, asserting that all claims had been settled for $6 million. (ECF No. 94). AMSF opposed the settlement, arguing that it had not been included in settlement discussions and that the proposed figure was insufficient. AMSF further moved to have S&B removed as lead counsel. Following a final fairness hearing, the Court denied approval and held that there was insufficient proof that the proposed settlement was fair, reasonable, and adequate. (ECF No. 133 at 16). On October 7, 2004, Kilgore & Kilgore, PLLC ("K&K") was appointed local counsel for AMSF. (ECF No. 149). On May 3, 2005, S&B was removed as lead counsel. (ECF No. 195). AMSF became the sole remaining lead plaintiff in the action, and at its request and with the Court's approval, Scott+Scott, LLP and Lerach Coughlin Stoia Geller Rudman & Robbins LLP were appointed co-lead counsel. (*Id.*)

In February of 2007, Scott+Scott and Lerach Coughlin Stoia Geller Rudman & Robbins were relieved of their duties as lead counsel and were replaced by BSF. (ECF No. 308). AMSF subsequently changed its name to the "Erica P. John Fund, Inc." (ECF No. 472). At the class certification stage, the case was subject to multiple appeals, and the Supreme Court granted certiorari twice to resolve various issues. *See* *Halliburton I*, 563 U.S. 804 (2011); *Halliburton Co. v. Erica P. John Fund, Inc.*, 134 S. Ct. 2398 (2014) (*Halliburton II*). The following excerpt from *Halliburton II* provides a concise summary of the procedural history and legal issues raised during this stage:

EPJ Fund moved to certify a class comprising all investors who purchased Halliburton common stock during the class period.... [E]xcept for one difficulty, the court would have also concluded that the class satisfied the requirement of Rule 23(b)(3) that "the questions of law or fact common to class members predominate over any questions affecting only individual members." The difficulty was that Circuit precedent required securities fraud plaintiffs to prove "loss causation"—a causal connection between the defendants' alleged misrepresentations and the plaintiffs' economic losses—in order to invoke Basic's presumption of reliance and obtain class certification. Because EPJ Fund had not demonstrated such a connection for any of Halliburton's alleged misrepresentations, the District Court refused to certify the proposed class. The United States Court of Appeals for the Fifth Circuit affirmed the denial of class certification on the same ground. *Archdiocese of Milwaukee Supporting Fund, Inc. v. Halliburton Co.*, 597 F.3d 330 (2010).

We granted certiorari and vacated the judgment, finding nothing in "Basic or its logic" to justify the Fifth Circuit's requirement that securities fraud plaintiffs prove loss causation at the class certification stage in order to invoke Basic's presumption of reliance. *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. ——, ——, 131 S.Ct. 2179, 2185–2186, 180 L.Ed.2d 24 (2011) (*Halliburton I*). "Loss causation," we explained, "addresses a matter different from whether an investor relied on a misrepresentation, presumptively or otherwise, when buying or selling a stock." We remanded the case for the lower courts to consider "any further arguments against class certification" that Halliburton had preserved.

On remand, Halliburton argued that class certification was inappropriate because the evidence it had earlier

WESTLAW    © 2021 Thomson Reuters. No claim to original U.S. Government Works.

Case 4:19-cv-00509   Document 65-9   Filed 07/02/21 in TXSD   Page 715 of 1452
Erica P. John Fund, Inc. v. Halliburton Company, Not Reported in Fed. Supp. (2018)
2018 WL 1942227

introduced to disprove loss causation also showed that none of its alleged misrepresentations had actually affected its stock price.... The District Court declined to consider Halliburton's argument, holding that the Basic presumption applied and certifying the class under Rule 23(b)(3).

The Fifth Circuit affirmed. 718 F.3d 423 (2013). The court found that Halliburton had preserved its price impact argument, but to no avail. *Id.,* at 435–436. While acknowledging that "Halliburton's price impact evidence could be used at the trial on the merits to refute the presumption of reliance," *id.,* at 433, the court held that Halliburton could not use such evidence for that purpose at the class certification *2407 stage, *id.,* at 435. "[P]rice impact evidence," the court explained, "does not bear on the question of common question predominance [under Rule 23(b)(3) ], and is thus appropriately considered only on the merits after the class has been certified." *Ibid.* We once again granted certiorari, this time to resolve a conflict among the Circuits over whether securities fraud defendants may attempt to rebut the Basic presumption at the class certification stage with evidence of a lack of price impact.

**\*3** *Halliburton II*, 134 S. Ct. at 2405–08. In *Halliburton II*, the Supreme Court held that Halliburton could introduce evidence of a lack of price impact at the class certification stage to show the absence of predominance. *Id.* at 2414–17. The Supreme Court again vacated the judgment of the Fifth Circuit and remanded the case to this Court for further proceedings. *Id.* at 2417. After briefing and oral argument addressing *Halliburton II*, this Court certified the class. (ECF No. 601). After Defendants took another appeal to the Fifth Circuit, EPJF filed the Stipulation of Settlement. (ECF No. 794).

### b. Summary of the Settlement

The Stipulation of Settlement is between EPJF, on behalf of itself and each of the class members, and Defendants Halliburton Company and David Lesar. (ECF No. 794). Plaintiffs are agreeing to release all claims based on the purchase or acquisition of common stock during the Class Period, which is defined as between August 16, 1999, and December 7, 2001, inclusive. The Parties agreed to settle the case for $100,000,000.00 subject to the Court's approval. The Stipulation of Settlement does not include claims stemming

from purchases of stock between December 8, 2001, and July 22, 2002, which are part of the *Magruder* putative class action. *See Magruder v. Halliburton Co.*, No. 3:05-cv-1156-M (N.D. Tex.). These claims are expressly not released.

### II. Motion for Final Approval of Class Action Settlement

Under Rule 23(e), a court must review any "settlement, voluntary dismissal, or compromise" of the "claims, issues, or defenses of a certified class." FED. R. CIV. P. 23(e). Rule 23(e) establishes certain procedures in considering a proposed settlement, each of which will be considered in turn:

(1) The court must direct notice in a reasonable manner to all class members who would be bound by the proposal.

(2) If the proposal would bind class members, the court may approve it only after a hearing and on finding that it is fair, reasonable, and adequate.

(3) The parties seeking approval must file a statement identifying any agreement made in connection with the proposal.

(4) If the class action was previously certified under Rule 23(b)(3), the court may refuse to approve a settlement unless it affords a new opportunity to request exclusion to individual class members who had an earlier opportunity to request exclusion but did not do so.

(5) Any class member may object to the proposal if it requires court approval under this subdivision (e); the objection may be withdrawn only with the court's approval.

*Id.*

### a. Notice Must Be Directed in a Reasonable Manner to All Class Members

Notice of the settlement was reasonable, provided ample due process, [1] and satisfied the requirements for settlement notices set out in the Private Securities Litigation Act ("PSLA"). [2] Notice was disseminated through the procedures provided in the Court's Preliminary Approval Order. (ECF No. 805). In the Motion for Final Approval, Class Counsel stated that by April 14, 2017, 42,194 copies of the notice had been mailed to potential class members identified through Halliburton's transfer agent records and their nominees, and as of June 28, 2017, an additional 67,008 copies had been

2018 WL 1942227

sent. (ECF No. 818 at 21). Notice was published in *Investor's Business Daily* and disseminated on PR Newswire. (*Id.*) The Claims Administrator maintained a toll-free phone number and a website providing additional information; as of April 27, 2017, the Claims Administrator had received 56 calls and 174 hits on the website. (*Id.*) In terms of timing, the class members had 87 days between the initial mailing of the notice on April 14, 2017, and the deadline to request exclusion from the class, which was on July 16, 2017. *See* *DeJulius v. New Eng. Health Care Emps. Pension Fund*, 429 F.3d 935, 946 (10th Cir. 2005) (notice program upheld as providing sufficient due process even though 70.7% of the class members received fewer than thirty-two days' notice); *Silber v. Mabon*, 18 F.3d 1449, 1452, 1454 (9th Cir. 1994) (due process requirement and Rule 23 satisfied when settlement notices were sent out forty days before the opt-out deadline). Furthermore, the fairness hearing was scheduled more than 75 days after the notice date. *See* *Schwartz v. TXU Corp.*, 2005 WL 3148350, at *11 (N.D. Tex. Nov. 8, 2005) (stating that a gap of 62 days between when notice was first sent out and the fairness hearing was adequate). Except for the lead plaintiff in *Magruder*, the Court received no objections to the settlement, and only one objection to the fees sought.

### b. The Proposed Settlement Must be Fair, Reasonable, and Adequate

**\*4** Courts evaluate the *Reed* factors to determine whether a proposed class action settlement is fair, reasonable, and adequate. *See* *Reed v. General Motors Corp.*, 703 F.2d 170 (5th Cir. 1983). The *Reed* factors are: (1) evidence that the settlement was obtained by fraud or collusion; (2) the complexity, expense, and likely duration of the litigation; (3) the stage of the litigation and available discovery; (4) the probability of plaintiffs prevailing on the merits; (5) the range of possible recovery and certainty of damages; and (6) the opinions of class counsel, class representatives, and absent class members. *Newby v. Enron Corp.*, 394 F.3d 296, 301 (5th Cir. 2004). In light of the *Reed* factors, the proposed settlement is fair, reasonable, and adequate.

### i. Evidence that the Settlement Was Obtained by Fraud or Collusion

Nothing in the record indicates that the current settlement was the result of secret negotiations or improper collusion. No parties (other than the lead plaintiff in *Magruder*) have objected, and those objections do not assert any fraud or collusion. Furthermore, the settlement was obtained through formal mediation before former U.S. District Judge Layn R. Phillips, which strongly suggests that the settlement was not the result of improper dealings. *See* *In re Bluetooth Headset Products Liability Litig.*, 654 F.3d 935, 948 (9th Cir. 2011) (noting that the "presence of a neutral mediator" is a factor "weighing in favor of a finding of non-collusiveness").

### ii. The Complexity, Expense, and Likely Duration of the Litigation

Having been heard twice by the Supreme Court and multiple times by the Fifth Circuit, and having lasted more than fifteen years, this case is indisputably complex and of lengthy duration.

### iii. Stage of the Litigation and Available Discovery

The litigation was set for trial, subject to the last appeal. The parties have produced over 1.3 million documents and have taken 28 fact depositions. The appendices to the cross-motions for summary judgment exceeded 9,400 pages.

"A presumption of fairness, adequacy, and reasonableness may attach to a class settlement reached in arm's-length negotiations between experienced, capable counsel after meaningful discovery." *In re Heartland Payment Sys., Inc.*, 851 F. Supp. 2d 1040, 1063 (S.D. Tex. 2012) (internal quotation marks omitted). Here, the parties have engaged in substantial and meaningful discovery, and thus the parties were fully aware of the complete facts and the strengths and weaknesses of their respective positions.

### iv. The Probability of Plaintiffs Prevailing on the Merits

EPJF succeeded in certifying the class on the December 7, 2001, disclosure and had a not insignificant probability of prevailing on the merits. However, there remained a substantial risk for all parties in proceeding to trial.

#### v. Range of Possible Recovery and Certainty of Damages

In the Motion for Final Approval, EPJF states that the "$100,000,000 all cash recovery constitutes approximately 11.8% of the maximum recoverable damages for the Class (approximately $848 million, as determined in consultation with Lead Plaintiff's damages expert)." (ECF No. 818 at 14). However, EPJF also points out that Defendants had strong arguments that the alleged misrepresentations were not wholly actionable, which would have limited "the maximum recoverable damages to as low as $233 million according to Lead Plaintiff's damages expert." [3] (*Id.* at 14-15). Under this lower recovery, the $100 million settlement would constitute 42.9% of the maximum recoverable damages for the class.

**\*5** The focus of this factor is whether the settlement falls within the range of reasonableness. The Court is not to try the case via the fairness hearing because "the very purpose of the compromise is to avoid the delay and expense of such a trial." *Reed*, 703 F.2d at 172. In ascertaining whether a settlement falls "within the range of possible approval," courts will compare the settlement amount to the relief the class could expect to recover at trial, i.e., the strength of the plaintiff's case. *See, e.g.*, *In re Nat'l Football League Platers' Concussion Injury Litig.*, 961 F. Supp. 2d 708, 714 (E.D. Pa. 2014) ("To determine whether a settlement falls 'within the range of possible approval,' a court must 'consider plaintiffs' expected recovery balanced against the value of the settlement offer.' "). "The fact that a proposed settlement may only amount to a fraction of the potential recovery does not, in and of itself, mean that the proposed settlement is grossly inadequate and should be disapproved." *Parker v. Anderson*, 667 F.2d 1204, 1210 n.6 (5th Cir. 1982) (citing *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 455 (2d Cir. 1974) ).

Here, the recovery is 11.8% to 42.9% of the maximum possible recovery, depending on the conservativeness of the figures set forth by EPJF. As final approval is frequently given to settlements even when "the settlement amount is a very small fraction of the damages amount projected by the Plaintiffs," this recovery is reasonable in light of the possible damages. *See In re Enron Corp. Sec., Derivative, & ERISA Litig.*, 228 F.R.D. 451, 566 (S.D. Tex. 2005). Even the "low" estimate, 11.8%, is a fairly sizeable recovery compared to other approved securities class action settlements. *See, e.g.*, *In re Initial Public Offering Sec. Litig.*, 671 F. Supp. 2d 467, 483 (S.D.N.Y. 2009) (approving a settlement representing two percent of aggregated expected recovery). Furthermore, the amount to be recovered is more than fifteen times what the Court rejected in 2004, when it found a $6 million settlement not fair, reasonable, or adequate.

#### vi. Opinions of Class Counsel, Class Representatives, and Absent Class Members

Class Counsel and Lead Plaintiff all agree to the settlement. *See also* *Cotton v. Hinton*, 559 F.2d 1326, 1330 (5th Cir. 1977) ("[T]he trial judge, absent fraud, collusion, or the like, should be hesitant to substitute its own judgment for that of counsel."). After notice to the class was given, the only person objecting to the Settlement is Magruder, who is not a member of the class. "Receipt of few or no objections can be viewed as indicative of the adequacy of the settlement." *In re Enron Corp.*, 228 F.R.D. at 567 (internal quotation marks omitted).

#### c. The Parties Seeking Approval Must File a Statement Identifying Any Agreement Made in Connection with the Proposal

Rule 23(e) requires "[t]he parties seeking approval [to] file a statement identifying any agreement made in connection with the proposal." FED. R. CIV. P. 23(e)(3). This requirement does not only concern disclosure of the basic settlement terms; "[i]t aims instead at related undertakings that, although seemingly separate, may have influenced the terms of the settlement by trading away possible advantages for the class in return for advantages for others." *Id.* Committee Notes (2003). "The spirit of [ Rule 23(e)(3) ] is to compel identification of any agreement or understanding," written or oral, "that might have affected the interests of class members by altering what they may be receiving or foregoing." *Slipchenko v. Brunel Energy, Inc.*, 2015 WL 338358, at \*6 (S.D. Tex. Jan. 23, 2015) (quoting MANUAL FOR COMPLEX LITIGATION (FOURTH) § 21.631 (2004) ).

The parties have satisfied this requirement by filing the Stipulation of Settlement, which publicly discloses the terms of the agreement between EPJF and Defendants made in connection with the settlement. The Stipulation also describes a "supplemental confidential agreement" between the parties, which "gives Halliburton the right, but not the obligation, to terminate the settlement in the event that a certain portion of

Case 4:19-cv-00509 Document 65-9 Filed 07/02/21 in TXSD Page 718 of 1452

Erica P. John Fund, Inc. v. Halliburton Company, Not Reported in Fed. Supp. (2018)

2018 WL 1942227

the Class delivers timely and valid requests for exclusion from the Class." (ECF No. 794 at 36-37).

#### d. An Additional Opt-Out Opportunity

**\*6** Rule 23(e)(4) provides that "[i]f the class action was previously certified under Rule 23(b)(3), the court may refuse to approve a settlement unless it affords a new opportunity to request exclusion to individual class members who had an earlier opportunity to request exclusion but did not do so." Rule 23(e)(4) "comes into play when the opt-out opportunity expired before the members received notice of a proposed settlement." Slipchenko, 2015 WL 338358, at \*7. This factor is inapplicable here. The members of the class received notice of the Settlement well before the opt-out opportunity expired. [4]

#### e. Class Member Objections

Class members must be provided an opportunity to object to the proposed settlement. FED. R. CIV. P. 23(e). The notice sent to the class here informed them of their right to object and outlined the process for doing so. To date, there have been a total of two objections filed to any aspect of the settlement: one by Patricia Magruder, the lead plaintiff in the *Magruder* class action, to the settlement itself, (ECF No. 810), and one by Channa Weeratunge in a one-page objection to Class Counsel's Motion for Award, (ECF No. 808). As discussed later below, the Court holds that the fee award sought by Class Counsel is reasonable.

Magruder objects to the proposed settlement as being (1) unfair to the shareholders, and (b) an "unlawful infringement on the right of the Magruder Class Claims." (ECF No. 810 at 1). Magruder argues that the release provided for in the Stipulation of Settlement is too broad, arguing that EPJF has "abandoned all other claims, and those [abandoned] claims are the subject of the Magruder Action." (*Id.* at 4).

Magruder's objection is **OVERRULED**. Because she is not a member of the class in this case, she lacks standing to object to the settlement. An objector who does not prove her membership in the class lacks standing to object to a settlement reached in a securities class action. *See Feder v. Electronic Data Systems Corp.*, 248 Fed.Appx. 579, 580 (5th Cir. 2007) ("[O]nly class members have an interest in the settlement funds, and therefore only class members

have standing to object to a settlement."); *see also In re Deepwater Horizon*, 739 F.3d 790, 809 (5th Cir. 2014) (holding that the district court did not abuse its discretion in deeming objectors who did not substantiate their membership in the class to have waived and forfeited their objections to settlement); *Shaw v. Toshiba Am. Info. Sys.*, 91 F. Supp. 2d 942, 974–75 (E.D. Tex. 2000) (noting that an objector who failed to substantiate his membership in the class did not have "proper standing" to object to class action settlement).

Magruder, as the party seeking to establish jurisdiction, bears the burden of proving standing. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). The Stipulation of Settlement defines the class as "all Persons (including, as to all such Persons, their beneficiaries) who purchased or otherwise acquired common stock of Halliburton Company between August 16, 1999 and December 7, 2001." [5] (ECF No. 794 at 3). Magruder purchased her shares on December 10, 2001. [6] (ECF No. 810 at 2). Magruder provides no other evidence showing that she is a member of the Class and cites to no other authority to suggest that non-class members have standing to object to a proposed settlement.

**\*7** Instead, Magruder states that she "derives her status to object to this current settlement from (1) being an original objector to the *[earlier]* settlement and (2) as an intervenor who is now Lead Class Plaintiff in the Magruder Class Action." (ECF No. 810 at 3). The fact that Magruder is the lead plaintiff in another class action is irrelevant for determining standing to object to the proposed settlement in this class action. Furthermore, Magruder cites to no authority that being an objector in the earlier $6 million settlement gives standing for her to object now, after her case was severed from this action by the Court's June 3, 2005, Order. (ECF No. 207). Magruder's case became a distinct, independent action upon severance, and she did not retain membership in this class. *See also Allied Elevator, Inc. v. E. Tex. State Bank of Buna*, 965 F.2d 34, 36 (5th Cir. 1992) ("Severance under Rule 21 creates two separate actions or suits where previously there was but one. Where a single claim is severed out of a suit, it proceeds as a discrete, independent action, and a court may render a final, appealable judgment in either one of the resulting two actions notwithstanding the continued existence of unresolved claims in the other.").

Case 4:19-cv-00509    Document 65-9    Filed 07/02/21 in TXSD    Page 719 of 1452

Erica P. John Fund, Inc. v. Halliburton Company, Not Reported in Fed. Supp. (2018)
2018 WL 1942227

### III. Class Counsel's Motion for Award of Attorneys' Fees and Reimbursement of Litigation Expenses

Class Counsel applies for attorney's fees in the total combined amount of $33,333,333.33, or one-third of the Settlement Fund, plus interest. The request for one-third of the Fund is intended as an award to BSF, KSF, and Lawrence "Larry" Vincent, who "served as local counsel to BSF and later KSF in this action." (ECF No. 820 at 4). Class Counsel indicates that the award will be divided among Class Counsel as follows:

> BSF and KSF have agreed, after paying Mr. Vincent at his lodestar, with the same negative multiplier as Class counsel is seeking, to share remaining fees on a 65/35% basis with BSF receiving 65% of the fees and KSF 35%.

(*Id.* at 4 n.1). In addition, Class Counsel seeks reimbursement for $5,969,540.84 in expenses, plus interest. (*Id.* at 3). Class Counsel also asks for a $100,000 compensation award, plus interest, to Lead Plaintiff. (*Id.*)

Class Counsel argues that the requested fees are reasonable under either the "percentage of the fund" method or the "lodestar" method for calculating fees. In their Reply to the Motion for Award, Class Counsel advocates using a "scaled back lodestar analysis" as a "cross-check" to the percentage method as "a rough gauge of the reasonableness of the proposed fees." (ECF No. 831 at 5–6). Class Counsel points to other district courts in the Fifth Circuit that have accepted fee awards calculated under the percentage method in light of the *Johnson* factors and have then used the lodestar method as a rough means of checking their work. (*Id.* at 5). Class Counsel states that the requested award equates to a "negative multiplier of 0.77 of Class Counsel's lodestar," and thus argues that the requested award is also reasonable under the lodestar method. (ECF No. 820 at 3).

Broadly, Class Counsel argues that they are entitled to this fee for several reasons, including: overcoming the initial denial of class certification in *Halliburton I*, successfully overcoming efforts to eliminate the fraud-on-the-market presumption in *Halliburton II*, serving more than 60 third-party subpoenas, filing eight motions to compel, reviewing more than 1.3 million pages of documents, taking or defending 40 fact depositions, and taking or defending 11 expert depositions. (ECF No. 820 at 2). Class Counsel also describes the settlement as an "exceptional result," which was the result of many years of hard work. (*Id.*)

#### a. Legal Standard

The use of a common fund to pay attorney's fees in class action settlements is well established. *See* [Boeing Co. v. Van Gemert, 444 U.S. 472, 478 (1980)](#) ("[T]his Court has recognized consistently that a litigant or a lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from the fund as a whole."). Courts typically use one of two methods for calculating attorney's fees in common fund cases: (1) the percentage method, in which the court awards fees as a reasonable percentage of the common fund, or (2) the lodestar method, in which the court computes fees by multiplying the number of hours reasonably expended on the litigation by a reasonable hourly rate and, in its discretion, applying an upward or downward multiplier. [Union Asset Mgmt. Holding A.G. v. Dell, Inc., 669 F.3d 632, 642–435 (5th Cir. 2012)](#).

**\*8** Regardless of whether the court uses the percentage method or the lodestar method, it must consider the *Johnson* factors in calculating attorney's fees. The *Johnson* factors are (1) the time and labor required; (2) the novelty and difficulty of the legal issues; (3) the skill required to perform the legal service properly; (4) the preclusion of other employment by the attorney as a result of taking the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or other circumstances; (8) the monetary amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) whether the case is undesirable; (11) the nature and duration of the professional relationship with the client; and (12) awards in similar cases. [Johnson v. Ga. Highway Exp., Inc., 488 F.2d 714, 718 (5th Cir. 1974)](#), *overruled on other grounds by* [Blanchard v. Bergeron, 489 U.S. 87, 90 (1989)](#).

The PSLA expressly contemplates the percentage method, providing that "[t]otal attorneys' fees and expenses awarded by the court to counsel for the plaintiff class shall not exceed a reasonable percentage of the amount of any damages and prejudgment interest actually paid to the class." [15 U.S.C. § 78u–4(a)(6)](#); *see also* [Union Asset Mgmt., 669 F.3d at 644–](#)

Case 4:19-cv-00509 Document 65-9 Filed 07/02/21 in TXSD Page 720 of 1452

Erica P. John Fund, Inc. v. Halliburton Company, Not Reported in Fed. Supp. (2018)
2018 WL 1942227

45 (affirming an 18% fee award in a PSLA case, so long as the *Johnson* framework for assessing the reasonableness of a fee award is used). The statute does not define "reasonable percentage," but the Motion for Final Approval cites to numerous courts in the Fifth Circuit that have approved applications for fee awards of 33⅓% in class actions. *See, e.g.*, *In re Olicom Sec. Litig.*, No. 94-0511 (N.D. Tex. Aug. 30, 1996); *Sims v. Shearson Lehman Bros., Inc.*, Fed. Sec. L. Rep. (CCH) ¶ 98, 134, at 98,976 (N.D. Tex. Nov. 29, 1993)*Sims v. Shearson Lehman Bros., Inc.*, Fed. Sec. L. Rep. (CCH) ¶ 98, 134, at 98,976 (N.D. Tex. Nov. 29, 1993).

If the lodestar method is used, the lodestar is calculated by multiplying the number of hours that an attorney reasonably spent on the case by an appropriate hourly rate, which is the market rate in the community for this work. *See* *Smith & Fuller, P.A. v. Cooper Tire & Rubber Co.*, 685 F.3d 486, 490 (5th Cir. 2012). The party seeking reimbursement of attorney's fees bears the burden of establishing the number of hours expended by presenting adequate time records as evidence. *See* *Watkins v. Fordice*, 7 F.3d 453, 457 (5th Cir. 1993). The court should use this time as a benchmark and then exclude any time that is excessive, duplicative, unnecessary, or inadequately documented. *See id.* The hours remaining are those reasonably expended, and there is a strong presumption of the reasonableness of the lodestar amount. *See* *Perdue v. Kenny A.*, 559 U.S. 542, 552 (2010); *Saizan v. Delta Concrete Prods. Co.*, 448 F.3d 795, 800 (5th Cir. 2006).

"A reasonable hourly rate is the prevailing market rate in the relevant legal community for similar services by lawyers of reasonably comparable skills, experience, and reputation." *Norman v. Hous. Auth. of City of Montgomery*, 836 F.2d 1292, 1299 (11th Cir. 1988) (citing *Blum v. Stenson*, 465 U.S. 886, 895–96 n.11 (1984) ). The relevant legal community is the community in which the district court sits. *See* *Tollett v. City of Kemah*, 285 F.3d 357, 368 (5th Cir. 2002). The burden is on the movant to "produce satisfactory evidence— in addition to the attorney's own affidavits—that the requested rates are in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation." *Blum*, 465 U.S. at 896 n.11. After calculating the lodestar, the Court may either (1) accept the lodestar figure or (2) decrease or enhance it based on the circumstances of the case, taking into account the *Johnson* factors.

"[D]istrict courts in [the Fifth Circuit] regularly use the percentage method blended with a *Johnson* reasonableness check." *Union Asset Mgmt.*, 669 F.3d at 643 (endorsing the use of the percentage method, so long as it is cross-checked with "a meticulous *Johnson* analysis"); [7] *see also In Re: Oil Spill*, 2016 WL 6215974, at *19 (E.D. La. Oct. 25, 2016) ("[T]he loadstar [sic] cross-check is a streamlined process, avoiding the detailed analysis that goes into a traditional lodestar examination."). Courts often then apply a lodestar calculation as a cross-check of the percentage method. *See City of Omaha Police & Fire Ret. Sys. v. LHC Grp.*, 2015 WL 965696, at *4 (W.D. La. Mar. 3, 2015) (conducting "a rough lodestar analysis to cross-check the reasonableness of the percentage fee award"); *In re Vioxx Prod. Liab. Litig.*, 2013 WL 5295707, at *3 (E.D. La. Sept. 18, 2013) ("The lodestar analysis is not undertaken to calculate a specific fee, but only to provide a broad cross check on the reasonableness of the fee arrived at by the percentage method"). The lodestar cross-check is usually applied "to avoid windfall fees, i.e., to ensure that the percentage approach does not lead to a fee that represents an extraordinary lodestar multiple." *Payment Sys., Inc. Customer Data Sec. Breach Litig.*, 851 F. Supp. 2d 1040, 1086 (S.D. Tex. 2012).

**\*9** Furthermore, courts using a lodestar as a cross-check to the percentage method have relaxed the degree of scrutiny applied to counsel's billing records. *See, e.g.*, *In re Heartland Payment Sys.*, 851 F. Supp. 2d at 1086–87 ("Those circuits approving the lodestar cross-check have made it clear that district courts need not scrutinize counsel's billing records with the thoroughness required were the lodestar method applied by itself.... In this case, the court has reviewed the fees-and-costs reports that counsel submitted and has examined many of the pages thoroughly. It has not taken the extraordinary amount of time needed, however, for a thorough examination of all the time and billing records that counsel generated for purposes of a standalone lodestar analysis.").

Class Counsel argues that the proposed settlement is reasonable under both the percentage method and the lodestar method. Based on the Fifth Circuit's precedent, the Court believes that proceeding with the percentage method analyzed under the *Johnson* factors will be sufficient for analyzing fees. The Court will also perform a simplified lodestar analysis as a cross-check.

### a. Percentage Method

Case 4:19-cv-00509 Document 65-9 Filed 07/02/21 in TXSD Page 721 of 1452

Erica P. John Fund, Inc. v. Halliburton Company, Not Reported in Fed. Supp. (2018)

2018 WL 1942227

Class Counsel argues that the percentage of the fund that they request for their award of attorney's fees—one-third of the fund, or 33⅓%—is within the range of percentage fees awarded in the Fifth Circuit in other complex cases.

"The Manual for Complex Litigation states that '[a]ttorney fees awarded under the percentage method are often between 25% and 30% of the fund.' " *Klein v. O'Neal, Inc.*, 705 F. Supp. 2d 632, 675 (N.D. Tex. 2010) (quoting MANUAL FOR COMPLEX LITIGATION (FOURTH) § 14.121 (2010)); *Schwartz*, 2005 WL 3148350, at *27 ("The requested fee award of 22.2% of the Settlement Fund is consistent with and, in fact, significantly less than awards made in similar cases."). However, numerous courts in this Circuit have awarded fees in the 30% to 36% range. [8] "If the request is relatively close to the average awards in cases with similar characteristics, the court may feel a degree of confidence in approving the award." *Klein*, 705 F. Supp. 2d at 675.

**\*10** Here, the 33⅓% requested is slightly above the fee range suggested by the Manual for Complex Litigation, but it is not necessarily excessive for that reason alone. The fee request is further analyzed in the context of the *Johnson* factors to see whether it is fair, reasonable, and adequate.

### b. *Johnson* Factors

"The court must scrutinize the agreed-to fees under the standards set forth in [*Johnson*], and not merely ratify a pre-arranged compact." *Strong v. BellSouth Telecomm., Inc.*, 137 F.3d 844, 849 (5th Cir. 1988). The court's analysis under *Johnson* must not be merely conclusory, but must establish grounds for the court's decision on each of the relevant factors. *Klein*, 705 F. Supp. 2d at 676; *but see In re High Sulfur*, 517 F.3d 220, 228–29 (5th Cir. 2008) ("If the district court has articulated and clearly applied the correct criteria, we will not require the trial court's findings to be so excruciatingly explicit in this area of minutiae that decisions of fee awards consume more paper than did the cases from which they arose."). However, "[e]ven though it is apparent that the Johnson factors must be addressed to ensure that the resulting fee is reasonable, not every factor need be necessarily considered." *In re Combustion, Inc.*, 968 F. Supp. 1116, 1135 (W.D. La. 1997).

#### i. Factor 1: The Time and Labor Required

This case is over fifteen years old. There are over 800 filings on the docket. The docket indicates that there have been at least 17 hearings. There were three appeals to the Fifth Circuit, and two to the Supreme Court. The Court concludes that this case has required an enormous amount of time and labor.

BSF was appointed Class Counsel on February 23, 2007. (ECF No. 308). In the joint declaration of Carl Goldfarb and Kim Miller, Class Counsel describes the efforts put forth to prosecute Lead Plaintiff's claims over the many years that this case has been pending. (ECF No. 819 at App.01–131). Class Counsel states that it has dedicated over 67,399.7 hours to the prosecution and resolution of the claims against Defendants. (*Id.* at App.64). The joint declaration also describes how Class Counsel "overcame various legal and factual hurdles, including two trips to the U.S. Supreme Court related to class certification, the completion of extensive fact and expert discovery, including at least 40 fact depositions (4 of which were two-day depositions), 11 expert depositions, the review of over 1.3 million pages of documents, and summary judgment and *Daubert* briefing." (*Id.* at App.63).

#### ii. Factor 2: The Novelty and Difficulty of the Legal Issues

Class Counsel is correct that the multiple trips to the Supreme Court, and in particular the Supreme Court's reversal of Fifth Circuit precedent in *Halliburton I*, demonstrate the novelty and difficulty of the legal issues in this case:

> Class Counsel had to challenge and ultimately reverse the Fifth Circuit's now discredited precedent holding that plaintiffs had to establish loss causation by a preponderance of the evidence at class certification in order to invoke the fraud-on-the-market presumption. Even after doing so, because of the evolving case law, Class Counsel had to face novel legal questions regarding when and how the fraud-on-the-market presumption could be rebutted, what type of

Case 4:19-cv-00509  Document 65-9  Filed 07/02/21 in TXSD  Page 722 of 1452

Erica P. John Fund, Inc. v. Halliburton Company, Not Reported in Fed. Supp. (2018)

2018 WL 1942227

evidence or argument could be used to rebut the presumption at class certification, the quantum of evidence necessary to do so, and even what weight to accord the presumption during the analysis. The fact that the Supreme Court agreed to hear this case twice, and the Fifth Circuit agreed to hear it three times is one indication of the novelty and difficulty of the issues presented, and weighs in favor of granting Class Counsel's fee request.

**\*11**  (ECF No. 820 at 13–14).

### iii. Factors 3 and 9: The Skill Required to Perform the Legal Service Properly and the Experience, Reputation, and Ability of the Attorneys

In its briefing, Class Counsel lumps in Factor 3, "the skill required to perform the legal service properly," with Factor 9, the "experience, reputation, and ability of the attorneys." (ECF No. 820 at 15). Class Counsel argues that this case required expertise at the trial, appellate, and Supreme Court levels. Furthermore, Class Counsel describes how much of the trial preparation—in particular, discovery and the dispositive motion preparation—occurred at the same time as the issues being heard on appeal. Class Counsel points to David Boies's "decades of experience in complex litigation" and KSF's specialized skills as securities class action litigators. (*Id.* at 16 ("Currently KSF is lead or co-counsel in ten securities putative class action litigations, including a number of high profile actions.") ).

Class Counsel also points to the "quality of the opposition faced by Class Counsel" as a relevant factor in assessing their performance. *See* *Schwartz, 2005 WL 3148350, at \*30* ("The ability of Plaintiff's Counsel to obtain such a favorable settlement for the Class in the face of such formidable legal opposition confirms the superior quality of their representation."). The Court agrees that, in this case, that was a substantial factor due to the very high quality of defense counsel's work.

### iv. Factor 4: The Preclusion of Other Employment by the Attorney as a Result of Taking the Case

Class Counsel "spent over 67,399 hours prosecuting the Action, with the bulk of that work taking place between February of 2007 and December 2016. Those hours were time that Class Counsel's attorneys could not devote to other matters." (ECF No. 820 at 17). The Court agrees that such a level of work would inevitably preclude other representations.

### v. Factor 5: The Customary Fee

Class Counsel points to similar fees awarded in prior, comparable cases. The Court believes that this is one of the *Johnson* factors that does not necessarily need to be considered in this case, because cases like these do not have "customary fees." *See* *In re Combustion, Inc., 968 F. Supp. at 1135* ("Even though it is apparent that the Johnson factors must be addressed to ensure that the resulting fee is reasonable, not every factor need be necessarily considered.").

### vi. Factor 6: Whether the Fee Is Fixed or Contingent

Class Counsel prosecuted this case on a fully contingent basis, and accordingly, this factor supports the requested fee. The contingent nature of Class Counsel's fee is also significant considering that at numerous points this case stood on shaky ground, such as when the Court denied class certification and was affirmed in doing so by the Fifth Circuit.

### vii. Factor 7: Time Limitations Imposed by the Client or Other Circumstances

This factor does not apply in this case because there is no indication that Lead Plaintiff imposed any time limits in the prosecution of this case.

### viii. Factor 8: The Monetary Amount Involved and the Results Obtained

**\*12** The Fifth Circuit has called this factor the "most critical" factor. *See* *Migis v. Pearle Vision, Inc.*, 135 F.3d 1041, 1047 (5th Cir. 1998) (degree of success is "most critical [*Johnson*] factor") (quoting *Farrar v. Hobby*, 506 U.S. 103, 114 (1992) ).

According to Lead Plaintiff's damages expert, if Plaintiffs prevailed at trial, the maximum amount of damages estimated was $848 million, and the minimum was $233 million. A settlement of $100 million reflects a reasonable recovery based on the estimated damages figures that the class could have hoped to recover at trial, and as discussed above, the current settlement is more than fifteen times larger than the earlier settlement that the Court rejected.

### ix. Factor 10: Whether the Case Is Undesirable

Class Counsel points to BSF being the third lead counsel in this case as evidence of the undesirability of the case, as well as the uphill battle Class Counsel and Lead Plaintiff faced in continuing to prosecute this case after the Court denied class certification in 2008. Additionally, the "risk of non-recovery" and "undertaking expensive litigation against ... well-financed corporate defendants on a contingent fee" has been held to make a case undesirable, warranting a higher fee. *Braud v. Transport Serv. Co.*, 2010 WL 3283398, at \*13 (E.D. La. Aug. 17, 2010).

### x. Factor 11: The Nature and Duration of the Professional Relationship with the Client

BSF was appointed counsel for Lead Plaintiff on February 23, 2007, and thus has been Class Counsel for more than a decade. Considering that Class Counsel was replaced twice before BSF was appointed, the longevity of BSF's appointment indicates that the professional relationship with Lead Plaintiff was positive.

### xi. Factor 12: Awards in Similar Cases

The 33⅓% requested by Class Counsel is within the range of typical awards, and is not the highest fee awarded in securities class action cases. *See* *In re Combustion,* Inc., 968 F. Supp. at 1156 (approving fee of 36% of $127 million settlement)*;*

*see also In re Olicom Sec. Litig.*, No. 3:94–CV–0511–D (N.D. Tex. Aug. 30, 1996) (approving 33⅓% fee); *Belman, et al. v. Warrington, et al.*, No. H–91–3767 (S.D. Tex. Nov. 16, 1993) (approving fees representing 33% of the settlement fund in securities case); *Sims v. Shearson Lehman Bros., Inc.*, Fed. Sec. L. Rep. (CCH) ¶ 98, 134, at 98,976 (N.D. Tex. Nov. 29, 1993)*Sims v. Shearson Lehman Bros., Inc.*, Fed. Sec. L. Rep. (CCH) ¶ 98, 134, at 98,976 (N.D. Tex. Nov. 29, 1993) (approving fee of 33⅓% of $30 million settlement in securities case).

### xii. Conclusion

After considering all of the *Johnson* factors, the Court concludes that the percentage requested by Class Counsel is reasonable and fair. Compared to other common fund cases in this Circuit, Class Counsel is not asking for an unusually large or high fee. Furthermore, there are significant considerations that further justify the fee, such as the dogged perseverance Class Counsel showed in this case, such as eventually convincing the Supreme Court to overturn adverse Fifth Circuit precedent. Other than Channa Weeratunge's objection, which is **OVERRULED**, there were no objections from class members to the fee award. Although the lack of objections is not a *Johnson* factor, the Court finds it relevant in considering the reasonableness and fairness of the award.

### c. Lodestar Method

**\*13** A court is to apply a lodestar calculation as a cross-check of the percentage method. Under this method, the court takes the recorded hours worked by the attorneys and multiplies them by a reasonable hourly rate. *See, e.g.*, *Forbush v. J.C. Penney Co.*, 98 F.3d 817, 821 (5th Cir. 1996). The resulting lodestar amount may then be adjusted upward or downward depending on the court's application of the *Johnson* factors. *See id.*

BSF presents evidence that it has spent 42,489.70 hours of attorney and other professional time prosecuting this action since February 23, 2007. (ECF No. 819 at App.133-34). Based on current rates,[9] BSF assert that its lodestar is equal to $26,738,490.50. (*Id.*) KSF asserts that it has been involved as "Special Counsel to Lead Plaintiff" since 2009. (*Id.* at App.137). KSF asserts that the firm has spent 24,910 hours prosecuting this action, resulting in a total lodestar amount of $16,385,469.50. (*Id.* at App.137-38)

Case 4:19-cv-00509 Document 65-9 Filed 07/02/21 in TXSD Page 724 of 1452

Erica P. John Fund, Inc. v. Halliburton Company, Not Reported in Fed. Supp. (2018)
2018 WL 1942227

Lawrence Vincent states that he began working with Lead Plaintiff in 2006, specifically to investigate the removal of then-lead class counsel William Lerach. (ECF No. 819 at App.142). After BSF was appointed lead counsel, Vincent states that he assisted primarily in appellate briefing and serving as local counsel. Vincent asserts that he has performed 321.8 hours of work in connection with the prosecution of the case and that the hourly rate he charges in comparable and non-contingent matters is $600, which results in his lodestar of $193,080. (*Id.* at App.140).

The total lodestar for Class Counsel (BSF, KSF, and Vincent) is $43,317,040.00, representing 67,721.5 hours of work. [10] The Court has examined the contemporaneous billing records submitted by Class Counsel and find them reasonable. The requested fee of $33,333,333.33 is less than the lodestar; specifically, Class Counsel is asking for 77% of their lodestar. [11] Because there is a strong presumption that the lodestar represents a reasonable fee, *City of Burlington v. Dague*, 505 U.S. 557, 562 (1992), the fact that Class Counsel seeks an award less than the lodestar supports finding that the fee award is reasonable.

### d. Expenses

Class Counsel also seeks reimbursement of its reasonable expenses in the amount of $5,969,540.84, plus interest. (ECF No. 820 at 24). In the Motion for Preliminary Approval and in the Notice, Class Counsel indicated that it would seek a maximum of $7,500,000.00 in expenses, and thus the requested reimbursement is below the noticed expenses cap. (ECF No. 795 at 16). Class Counsel has provided a 472-page appendix detailing the expenses for which it seeks reimbursement. (ECF No. 834).

**\*14** "Expenses and administrative costs expended by class counsel are recoverable from a common fund in a class action settlement." *Billitteri v. Sec. Am., Inc.*, 2011 WL 3585983, at \*10 (N.D. Tex. Aug. 4, 2011). In *Schwartz*, Judge Kinkeade reimbursed expenses that were "reasonably and necessarily incurred in prosecuting this action and achieving the proposed Settlement." 2005 WL 3148350, at \*34. These expenses included consulting expert fees, transportation, meals and lodging, in-house and outsourced photocopying, research, court reporting fees and deposition transcripts, overnight courier services, postage, and other services. *Id.*

The joint declaration of Carl Goldfarb and Kim Miller, of BSF and KSF, respectively, describes why, and for what, the expenses were incurred. (ECF No. 819 at App.070–72). A significant amount—64% of the requested expenses, or $3,818,406.07—was spent on experts and consultants, which Class Counsel claims were necessary to establish the basic elements of Lead Plaintiff's claims, and thus were necessary in the prosecution of this case. Other large expenditures include document maintenance necessary to process and maintain the 1.3 million documents in this case (11% of total); legal research (7% of total); and mediation fees, which were shared with Defendants (0.6% of total). Overall, the expenses were reasonable and necessary for successful prosecution of this case, and there have been no objections to the amount requested. Accordingly, the expenses are reimbursed.

### e. $100,000 Award for Lead Plaintiff

Class Counsel seeks a $100,000 award for Lead Plaintiff as compensation for the time it dedicated in supervising this action. (ECF No. 820 at 3). Lead Plaintiff provides a declaration from the CEO of EPJF, Paula John, detailing the involvement of the Lead Plaintiff in this action, including discussing strategy, reviewing pleadings, participating in discovery, being deposed, and attending mediation. (ECF No. 819 at App.150–57). Paula John and EPJF's CFO, Patrick Byrne, argue that the time spent on this case precluded them from working on other matters. (*Id.* at App.155).

Representative parties may be awarded "reasonable costs and expenses (including lost wages)" relating to the representation of the class:

> The share of any final judgment or of any settlement that is awarded to a representative party serving on behalf of a class shall be equal, on a per share basis, to the portion of the final judgment or settlement awarded to all other members of the class. *Nothing in this paragraph shall be construed to limit the award of reasonable costs and expenses (including lost wages) directly relating to the representation of the class to any representative party serving on behalf of the class.*

2018 WL 1942227

15 U.S.C. § 77z-1(4) (emphasis added).

As stated at the July 31, 2017, hearing, the request for the $100,000 award for Lead Plaintiff is granted**.** Without the hard and diligent work of Lead Plaintiff over fifteen years, this recovery would not have been possible. The requested fee is reasonable based on the value of the time of Lead Plaintiff, and no one has objected to this award.

### f. Scott+Scott Expenses

Scott+Scott does not file a separate motion for its expenses. However, Class Counsel "has included in its application the request by [Scott+Scott] for reimbursement of $300,652.90." (ECF No. 820 at 25). In support, Class Counsel attaches Scott+Scott's expense report, (ECF No. 834), and the declaration of Geoffery Johnson, (ECF No. 819 at App.178-82).

The expenses requested by Scott+Scott are reasonable, and there have been no objections to the amount requested. A significant amount—55% of the requested expenses, or $163,933.33—was spent on experts, consultants, and investigators—which Mr. Johnson claims was necessary to contact confidential witnesses and to prepare confidential witness memoranda used to support allegations in the complaint—and thus was reasonably necessary in the successful prosecution of this case. *See also* *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 308 (2007) (allowing scienter to be inferred from confidential sources). Accordingly, the expenses are reimbursed.

## IV. F&S's Motion for Award of Attorney Fees and Reimbursement of Expenses

### a. Fees

 **\*15** For their work as original co-liaison counsel on behalf of the class, F&S seeks an award of attorney's fees in the amount of its actual lodestar, without a multiplier or interest, of $200,703.75. (ECF No. 812 at 1). F&S began serving as local counsel to original lead counsel, S&B, on December 6, 2002. (ECF No. 22). On February 10, 2005, following the failed $6 million settlement, S&B moved to withdraw as lead counsel. (ECF No. 160). On May 3, 2005, the Court appointed EPJF as the sole Lead Plaintiff and appointed Scott+Scott and Lerach Coughlin Stoia Geller Rudman & Robbins as lead counsel. (ECF No. 195). F&S's involvement as counsel ceased at this time.

Lead Plaintiff opposes F&S's request for fees. (ECF No. 825). As a preliminary matter, deference is given to Lead Plaintiff's determination that non-lead counsel is not entitled to fees. The Third Circuit recognizes "that a presumption of correctness should ... be accorded to the lead plaintiff's decision that a non-lead counsel's work, not made pursuant to an agreement between lead counsel and lead plaintiff, is not entitled to fees to be paid out of the common fund." *In re Cendant Corp. Litig.*, 404 F.3d 173, 199 (3d Cir. 2005). In *In re Enron*, Judge Harmon noted that she "does not believe that the Fifth Circuit would go so far as to accord a presumption of correctness, but would certainly give the Lead Plaintiff's determination considerable weight" in assessing whether fees should be denied to non-lead counsel. [12] 586 F. Supp. 2d at 765. The Fifth Circuit does not appear to have commented on the amount of deference to be accorded.

The Court finds persuasive Lead Plaintiff's opposition to F&S receiving fees and note additionally that F&S has not articulated any substantial or independent benefit conferred to the Class. *In re Enron Corp.*, 2008 WL 2566929, at \*3 ("If an attorney creates a substantial benefit for the class in this period ... then he or she will be entitled to compensation."). If anything, F&S's efforts in supporting the failed settlement delayed the progression of the case and threatened potential recovery. A significant portion of F&S's requested fees are related to the proffered $6 million settlement, which was rejected, in part, because counsel failed to include all of the lead plaintiffs in settlement negotiations and failed to disclose material details to them. (ECF No. 133 at 12-13). Further, F&S requests fees attending a hearing on August 25, 2003, on EPJF's Motion to Show Cause as to whether S&B violated its fiduciary duties to the class. If F&S was there in a supportive capacity to S&B, it was in support of arguments made against EPJF's Motion and, therefore, arguments made against the Class. *Cf. In re Enron*, 2008 WL 2566929, at \*3 ("[An attorney] whose efforts create, discover, increase or preserve a fund to which others also have a claim, is entitled to recover from the fund the costs of his litigation including [fees]."). F&S also improperly requests fees in preparing a fee application in connection with the rejected $6 million settlement. [13] *See Hadden v. Standard Supply & Hardware Co.*, 1997 WL 403239, at \*3 (E.D. La. July 17, 1997) ("[W]ork relating to attorneys' fees applications is not compensable from a common fund and that the time spent working on attorneys' fees applications and research regarding attorneys' fees should not be included in the lodestar

Erica P. John Fund, Inc. v. Halliburton Company, Not Reported in Fed. Supp. (2018)
2018 WL 1942227

amount."). The record overall indicates that F&S performed administrative services that did not benefit the class. *See also In re Adelphia Communs. Corp. Sec. & Derivative Litig.*, 2008 U.S. Dist. LEXIS 67220 at *15-16, 2008 WL 4128702 (S.D.N.Y. Sep. 3, 2008) ("[T]he filing of a complaint, without more, is not fee-worthy" unless the filing attorneys "alone discover grounds for a suit, based on their own investigation rather than on public reports" or lay out "factual research or legal theories that lead counsel did not discover, and upon which lead counsel later rely.").

**\*16** Because F&S did not provide a substantial or independent benefit to the Class and acted contrary to the wishes of at least the current Lead Plaintiff, who opposes its fee application, its requested fee award is denied.

#### b. Expenses

F&S seeks reimbursement of out of pocket expenses in the amount of $10,922.05, without interest. (ECF No. 812 at 1). "Lead Plaintiff does not oppose reimbursement of [F&S's] expenses reasonably incurred in connection with the prosecution of the litigation." (ECF No 825 at 5).

F&S provides detailed expense sheets in support of its request. (ECF No. 814-1 at 39). However, some of the expenses appear to have been expended in support of the failed $6 million settlement. One entry for May 29, 2004, describes a $1,772.80 expense labeled "Copies-stipulation and settlement." (*Id.* at 37). Based on the docket sheet, the stipulation to the failed $6 million settlement was filed on May 10, 2004, and thus it appears that F&S seeks to be reimbursed for making copies of the earlier settlement which, if it had succeeded, would have dramatically reduced the class's recovery. F&S also requests reimbursement for expenses related to attending a hearing on August 25, 2003, on EPJF's Motion to Show Cause as to whether S&B violated its fiduciary duties to the class, which, as discussed, was detrimental to the class. Accordingly, the Court determines that the following expenses were not reasonably and necessarily incurred in prosecuting this action and in achieving the proposed settlement:

| Date | Expense | Amount |
| --- | --- | --- |
| August 25, 2003 | Car Rental | $47.84 |
| August 25, 2003 | Meals | $36.50 |
| August 25, 2003 | Parking | $6.50 |
| May 29, 2004 | Copies-stipulation and settlement | $1,772.90 |
| May 29, 2004 | Postage-stipulation and settlement | $64.80 |
| | Total: | $1,928.54 |

The remainder of the claimed expenses of $8,993.51 is reimbursed.

### V. K&K's Motion for Award of Attorneys' Fees and Expenses

#### a. Fees

K&K seeks $132,600.20 in fees for its work performed as local counsel for AMSF. (ECF No. 815). K&K's involvement as counsel ceased when Scott+Scott and Lerach Coughlin Stoia Geller Rudman & Robbins were relieved of their duties as lead counsel, and were replaced by BSF. (ECF No. 308). Lead Plaintiff opposes K&K's request for fees. (ECF No. 825).

Unlike F&S, K&K was more actively involved in the litigation of this case, particularly in its opposition to the failed settlement. K&K participated in "strategy regarding opposition to the Settlement, briefing on the opposition, and the preparation for ... the hearing on the opposition." (ECF No. 815 at 3). Its work benefited the class by ultimately contributing to the current settlement. K&K also assisted in drafting the third and fourth consolidated class action complaints, briefs on the motions to dismiss, traveling to California for strategy and discovery meetings, and traveling to Houston for mediation. *Id.* Notably, Defendants' Motion to Dismiss the third consolidated class action complaint was denied, in part, based on the relation-back doctrine, the arguments for which were "developed and briefed by

Case 4:19-cv-00509 Document 65-9 Filed 07/02/21 in TXSD Page 727 of 1452
Erica P. John Fund, Inc. v. Halliburton Company, Not Reported in Fed. Supp. (2018)
2018 WL 1942227

K&K." (Anderson Aff. ¶ 9, ECF No. 815-1). Despite Lead Plaintiff's opposition, the Court finds that K&K has provided substantial or independent benefit to the class. Moreover, the Court has examined the contemporaneous billing records and find them reasonable. Accordingly, and for the reasons similar to the ones discussed in awarding fees to Class Counsel, the Court awards attorney's fees to K&K.

**\*17** However, the Court makes two modifications to the fee award. The total lodestar requested by K&K is $132,600.20, representing 305 hours of work. The lodestar is based on current billing rates. (ECF No. 815 at 6 & n.4). The lodestar must be calculated using historical rates, as opposed to current rates. It is true that "[t]he prevailing rate, unless other factors dictate, is the current rate that is paid to attorneys even though the litigation spans a number of years." *See Pruett v. Harris Cty. Bail Bond Bd.*, 593 F. Supp. 2d 944, 946 (S.D. Tex. 2008). One such factor that militates against using the current rate is when counsel seeks fees based mostly on work performed during the early stages of litigation. *See Rodriguez v. Barrita, Inc.*, 53 F. Supp. 3d 1268, 1280 (N.D. Cal. 2014) (reducing fee award from current (2014) rate because "overwhelming majority of [counsel's] time spent in this case (approximately 93%) occurred in 2013 and earlier"). K&K stopped all work on this case on February 23, 2007, more than 10 years before it submitted its request for fees. While the rate provided by K&K may reasonably reflects the value of its services today, using that rate causes an unwarranted increase in the overall fee award. Based on the record, the fee request, adjusted for historical rates, is $118,391.88. (*See* ECF No. 826 at ¶ 3c). Second, circumstances warrant an additional downward adjustment of K&K's lodestar. K&K should not be entitled to receive proportionally more attorney's fees than Class Counsel; the Court thus applies a 0.77 multiplier, the same multiplier applied to Class Counsel's lodestar. Accordingly, K&K is awarded $91,161.75 in attorney's fees.

#### b. Expenses

K&K asks for $7,380.87 in expenses, plus interest, and provides a detailed expense report. (ECF No. 815 at 12). As with F&S, "Lead Plaintiff does not oppose reimbursement of [K&K's] expenses reasonably incurred in connection with the prosecution of the litigation." (ECF No. 820 at 5). After reviewing the expense report provided by K&K, the Court finds that the expenses were reasonable and necessary for successful prosecution of this case. Accordingly, the expenses are reimbursed.

### VI. RGRD's Motion for Award of Expenses

RGRD served as co-lead counsel from May 3, 2005, through February 23, 2007. RGRD initially moved for fees and expenses; however, RGRD has since withdrawn its request for an award of attorney's fees, and instead seeks only reimbursement of expenses. (ECF No. 823).

RGRD seeks reimbursement for $112,513.85 in expenses. (ECF No. 817 at 6). RGRD submits exhibits detailing its expenses, separated by category. (ECF No. 817-1 at 6-7). There are no objections to RGRD's request for expenses. After reviewing the evidence provided by RGRD, the Court finds that the expenses were reasonable and necessary for successful prosecution of this case. Accordingly, the expenses are reimbursed.

### VII. Conclusion

For the reasons stated below and on the record, the Motion for Final Approval of Class Action Settlement is **GRANTED**. Class Counsel's Motion for Award of Attorneys' Fees and Reimbursement of Litigation Expenses is **GRANTED**. Class Counsel is awarded $33,333,333.33 in attorney's fees, plus interest accrued thereon. [14] Class Counsel is reimbursed $5,969,540.84 for expenses, plus interest accrued thereon. Lead Plaintiff is awarded $100,000, plus interest accrued thereon. Scott+Scott is reimbursed $300,652.90 for expenses, plus interest accrued thereon.

Federman & Sherwood's Motion for Attorney Fees and Reimbursement of Expenses is **GRANTED IN PART** and **DENIED IN PART**. F&S's is reimbursed $8,993.51 for expenses. Kilgore & Kilgore's Motion for Award of Attorneys' Fees and Expenses is **GRANTED IN PART** and **DENIED IN PART**. K&K is awarded $91,161.75 in attorney's fees, plus interest accrued thereon. K&K is reimbursed $7,380.87 for expenses, plus interest accrued thereon. Robbins Geller Rudman & Dowd's Motion for Award of Expenses is **GRANTED**. RGRD is reimbursed $112,513.85 for expenses, plus interest accrued thereon.

### **SO ORDERED.**

### **All Citations**

Not Reported in Fed. Supp., 2018 WL 1942227

Case 4:19-cv-00509  Document 65-9  Filed 07/02/21 in TXSD  Page 728 of 1452
Erica P. John Fund, Inc. v. Halliburton Company, Not Reported in Fed. Supp. (2018)
2018 WL 1942227

## Footnotes

1    "There are no rigid rules to determine whether a settlement notice satisfies constitutional or Rule 23(e) requirements[.]" *Wal–Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 114 (2d Cir. 2005). Instead, "a settlement notice need only satisfy the broad reasonableness standards imposed by due process." *In re Katrina Canal Breaches Litig.*, 628 F.3d 185, 197 (5th Cir. 2010) (internal quotation marks omitted). Due process is satisfied if the notice provides class members with the "information reasonably necessary for them to make a decision whether to object to the settlement." *Id.*; *see also* *Wal–Mart Stores*, 396 F.3d at 114 (explaining that "the settlement notice must fairly apprise the prospective members of the class of the terms of the proposed settlement and of the options that are open to them in connection with the proceedings"). However, due process does not require actual notice to each party intended to be bound by the adjudication of a representative action. *Mullane v. Cent. Hanover Bank & Trust. Co.*, 339 U.S. 306, 313–14 (1950) ("A construction of the Due Process Clause which would place impossible or impracticable obstacles in the way could not be justified."); *In re Integra Realty Res., Inc.*, 262 F.3d 1089, 1110–11 (10th Cir. 2001) (holding Rule 23 and due process requisites satisfied where the record indicated that only seventy-seven percent of class members actually received notice of the settlement).

2    The PSLA requires that notices of settlement must state: (A) the amount of the settlement proposed to be distributed to the parties to the action, determined in the aggregate and on an average per share basis; (B) if the parties do not agree on the average amount of damages per share that would be recoverable if the plaintiff prevailed on each claim alleged under this chapter (as is the case here), a statement from each settling party concerning the issue or issues on which the parties disagree; (C) if any of the settling parties or their counsel intend to apply to the court for an award of attorneys' fees or costs from any fund established as part of the settlement, a statement indicating which parties or counsel intend to make such an application, the amount of fees and costs that will be sought (including the amount of such fees and costs determined on an average per share basis), and a brief explanation supporting the fees and costs sought; (D) the name, telephone number, and address of one or more representatives of counsel for the plaintiff class who will be reasonably available to answer questions from class members concerning any matter contained in any notice of settlement published or otherwise disseminated to the class; (E) a brief statement explaining the reasons why the parties are proposing the settlement; (F) such other information as may be required by the court. 15 U.S.C. § 78u-4(a)(7)(A)–(F).

3    At the final settlement hearing, Lead Plaintiff's damages expert provided testimony on how these estimated recoveries were calculated.

4    The deadline to submit requests for exclusion from the class was July 10, 2017. (ECF No. 805 at 7).

5    In response to the Court's March 21, 2017, Order, (ECF No. 802), EPJF and Halliburton updated the definition of "Released Claim" to remove any ambiguity about whether the release covered Magruder's claims. (*See* ECF No 804).

6    "Patricia A. Magruder purchased 200 shares of Halliburton stock on December 10, 2001 at a price of $13.97 per share through her online account at CSFB Direct. December 10, 2001 (a Monday) was the first trading day after December 7, 2001 (a Friday). She continues to hold those shares to this date." (ECF No. 810 at 2).

7    "To be clear, we endorse the district courts' continued use of the percentage method cross-checked with the *Johnson* factors. We join the majority of circuits in allowing our district courts the flexibility to choose between the percentage and lodestar methods in common fund cases, with their analyses under either approach informed by the *Johnson* considerations." *Union Asset Mgmt.*, 669 F.3d at 644.

8    *See Hoeck v. Compusa, Inc. et al.*, No. 3:98–CV–0998–M (N.D. Tex. Oct. 14, 2003) (Lynn, C.J.) (approving 30% fee); *In re Firstplus Fin. Group, Inc. Sec. Litig., Master File*, No. 3:98–CV–2551–M (N.D. Tex. Oct. 14, 2003) (Lynn, C.J.) (approving 30% fee in securities class action); *Southland Secs. Corp. v. INSpire Ins.*

Case 4:19-cv-00509 Document 65-9 Filed 07/02/21 in TXSD Page 729 of 1452

Erica P. John Fund, Inc. v. Halliburton Company, Not Reported in Fed. Supp. (2018)

2018 WL 1942227

*Solutions, Inc.*, No. 4:00–CV–355-Y (N.D. Tex. Mar. 9, 2005) (Means, J.) (approving 30% fee in securities class action); *Scheiner v. i2 Techs., Inc., et al.*, No. 3:01–CV–418–H (N.D. Tex. Oct. 1, 2004) (Sanders, J.) (approving fee of 25% of $80 million settlement in securities class action); *Warstadt v. Hastings Entm't, Inc., et al.*, No. 2:00–CV–089–J (N.D. Tex. Mar. 10, 2003) (Robinson, J.) (approving 30% fee in securities class action); *Silver v. UICI, et al.*, No. 3:99-CV-2860–L (N.D. Tex. Mar 3, 2003) (Lindsay, J.) (approving 30% fee in securities class action); *In re Unistar Fin. Serv. Corp. Sec. Litig.*, No. 3:99–CV–1857–D (N.D. Tex. Aug. 17, 2001) (Fitzwater, J.) (approving 30% fee in a securities class action); *Kisilenko v. STB Sys., Inc.*, No. 3:99–CV–2872–M (N.D. Tex. Nov. 3, 2000) (Lynn, C.J.) (approving 30% fee in a securities class action); *In re Landry's Seafood Rests., Inc. Sec. Litig.*, No. H–99–1948 (S.D. Tex. Jun. 13, 2002) (Harmon, J.) (approving 30% fee in securities class action); *In re Intellicall Sec. Litig.*, No. 3:91–CV–0730–P (N.D. Tex. Sept. 22, 1993) (Solis, J.) (approving 30% fee in a securities class action); *Robertson, et al. v. Strassner, et al.*, No. H–98–0364 (S.D. Tex. Jan. 5, 2000) (Atlas, J.) (approving 30% fee in securities class action);

*In re Combustion, Inc.*, 968 F. Supp. 1116, 1156 (W.D. La. 1997) (Haik, J.) (approving fee of 36% of $127 million settlement); *Neibert, et al. v. Monarch Dental Corp., et al.*, No. 3:99–CV–762–X (N.D. Tex. Jun. 19, 2000) (Kendall, J.) (approving 30% fee); *In re Olicom Sec. Litig.*, No. 3:94–CV–0511–D (N.D. Tex. Aug. 30, 1996) (Fitzwater, J.) (approving 33–1/3% fee); *Belman, et al. v. Warrington, et al.*, No. H–91–3767 (S.D. Tex. Nov. 16, 1993) (Hoyt, J.) (approving 33% fee); *Sims v. Shearson Lehman Bros., Inc.*, Fed. Sec. L. Rep. (CCH) ¶ 98, 134, at 98,976 (N.D. Tex. Nov. 29, 1993)*Sims v. Shearson Lehman Bros., Inc.,* Fed. Sec. L. Rep. (CCH) ¶ 98, 134, at 98,976 (N.D. Tex. Nov. 29, 1993) (Kendall, J.) (approving fee of 33–1/3% of $30 million settlement in securities case); *In re ProNet, Inc.1933 Act Sec. Litig.*, No. 3:96–CV–1795–P (N.D. Tex. Nov. 19, 1997) (Solis, J.) (awarding 30% fee); *In re Granada P'ships Sec. Litig.*, No. H–90–0214 (S.D. Tex. Oct. 19, 1992) (Harmon, J.) (approving 30% fee); *Orzel v. Gilliam, et al.*, No. 3:90–CV–0044–G (N.D. Tex. May 16, 1995) (Fish, J.) (approving 30% fee in securities case); *Courtney, et al. v. Am. Airlines, Inc., et al.*, No. 4:97–CV–668–A (N.D. Tex. Sept. 3, 1999) (McBryde, J.) (approving 30% fee); *Transamerican Ref. Corp. v. Dravo Corp.*, No. H–88–789 (S.D. Tex. Nov. 16, 1992) (Black, J.) (approving 30% fee); *Plains*, 2001 U.S. Dist. LEXIS 25532 (Rosenthal, J.) (approving 30% fee in securities class action). These cases were compiled by Judge Kinkeade in *Schwartz*, 2005 WL 3148350, at \*27.

Both BSF and KSF state that each firm's lodestar was compiled using 2017 hourly rates for individuals still at each respective firm, and for individuals no longer at the firm, by using their last hourly rates. (ECF No. 819 at App.133).

The Motion for Award states that Class Counsel "spent a total of more than 67,399" hours, which is the total number of hours worked by BSF and KSF, excluding Vincent's hours. (ECF No. 820 at 8). Similarly, the Motion for Award states that Class Counsel's total lodestar is $43,123,960.00, which is the total lodestar of BSF and KSF, excluding Vincent's individual lodestar. (*Id.*)

The inclusion or exclusion of Vincent's hours in the total lodestar does not dramatically change the 0.77 multiplier. If Vincent's time is included in the lodestar, the requested fee is 0.7695 of the lodestar (i.e., $33,333,333.33 / $43,317,040). If Vincent's time is excluded from the lodestar, the requested fee is 0.7729 (i.e., $33,333,333.33 / $43,123,960).

In an earlier opinion, Judge Harmon adopted the Third Circuit's test for identifying when the presumption of correctness, or "the weight that might be accorded the decision of a properly selected and effective Lead Plaintiff by the Fifth Circuit," can be overcome. 2008 WL 2566929, at \*5 (S.D. Tex. June 24, 2008). Specifically, Judge Harmon stated that a lead plaintiff's opposition to non-lead counsel receiving fees could be overcome if non-lead counsel could show (1) that the lead plaintiff had failed in its fiduciary representation of the class, or (2) that the denial of fees was erroneous because non-lead counsel "can and do specifically identify the benefits they independently provided to the class that would not have been provided by the services of lead counsel." *Id.* (citing *Cendant*, 404 F.3d at 199–200).

For example, 3.25 hours on August 11, 2004, for "Work for motion for approval of fees." (ECF No. 814-1 at 21).

**Erica P. John Fund, Inc. v. Halliburton Company, Not Reported in Fed. Supp. (2018)**

2018 WL 1942227

14    Interest here refers only to the proportionate share of interest accrued by the Settlement Fund while held in escrow. (ECF No. 794 at 32).

---

**End of Document**                              © 2021 Thomson Reuters. No claim to original U.S. Government Works.

TAB 23

# EXHIBIT C

**KIRBY MCINERNEY LLP**

**American Renal Associates - Lodestar Report**
**From Inception through May 9, 2018**

| Attorneys | Hours | Rate | Total |
|---|---|---|---|
| Andrew McNeela (P) | 408.50 | $900 | $367,650.00 |
| Ira Press (P) | 211.00 | $985 | $207,835.00 |
| Beverly Tse-Mirza (OC) | 48.25 | $650 | $31,362.50 |
| Angela Farren (A) | 17.00 | $350 | $5,950.00 |
| | | | |
| **Total Attorney** | **684.75** | | **$612,797.50** |
| **Analyst** | | | |
| Elaine Mui (SAN) | 76.75 | $450 | $34,537.50 |
| Natasha Mighell (AN) | 36.00 | $275 | $9,900.00 |
| Nicholas Topousis (AN) | 1.00 | $275 | $275.00 |
| **Paralegals/Admin Clerk** | | | |
| Justin Somelofske (SPL) | 3.00 | $300 | $900.00 |
| Malavika Krishnan (PL) | 96.25 | $250 | $24,062.50 |
| Chloe Chung (PL) | 34.50 | $250 | $8,625.00 |
| Miriam Bial (PL) | 15.75 | $250 | $3,937.50 |
| Sarah Lynch (PL) | 11.00 | $250 | $2,750.00 |
| Wendy Li (PL) | 8.25 | $250 | $2,062.50 |
| Ricardo Wright (AC) | 22.00 | $125 | $2,750.00 |
| | | | |
| **TOTAL LODESTAR** | **989.25** | | **$702,597.50** |

(P) - Partner
(OC) - Of Counsel
(A) - Associate
(SAN) - Senior Analyst
(AN) - Analyst
(SPL) - Senior Paralegal
(PL) - Paralegal
(AC) Admin Clerk

**KIRBY MCINERNEY LLP**

**American Renal Associates - Expenses**
**From Inception through May 9, 2018**

| Description | Amount |
|---|---:|
| Investigative Services | $23,170.85 |
| Mediation | $9,450.00 |
| Computer Research (Westlaw, Pacer, Lexis) | $4,475.37 |
| Publications | $577.50 |
| Filing Fees | $200.00 |
| Federal Express | $40.45 |
|  |  |
| **TOTAL** | **$37,914.17** |

# TAB 24

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| MARY ESPOSITO, Individually and on Behalf of All Other Persons Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>AMERICAN RENAL ASSOCIATES HOLDINGS, INC., JOSEPH A. CARLUCCI, JONATHAN L. WILCOX, SYED T. KAMAL, JONATHAN J. McDONOUGH, CENTERBRIDGE CAPITAL PARTNERS L.P., MERRILL LYNCH, PIERCE, FENNER, & SMITH, INC., BARCLAYS CAPITAL INC., GOLDMAN, SACHS & CO., WELLS FARGO SECURITIES, LLC, SUNTRUST ROBINSON HUMPHREY, and LEERINK PARTNERS LLC,<br><br>Defendants. | Civil Action No. 16 Civ. 11797 (ADB)<br><br>**CLASS ACTION** |

## <u>ORDER AND FINAL JUDGMENT</u>

**WHEREAS**, the Parties to the above-described class action (the "Action") entered into the Stipulation of Settlement dated as of January 30, 2018 (the "Stipulation"); and

**WHEREAS**, the Court appointed Errol Rudman and Rudman Partners, L.P. ("Lead Plaintiffs") as class representatives, and Kirby McInerney LLP as Lead Plaintiffs' Counsel; and

**WHEREAS**, solely for purposes of settlement, the Parties have agreed to the certification of a Settlement Class defined as, collectively, the following: (a) all Persons that purchased or otherwise acquired ARAH securities between April 20, 2016 and August 18, 2016, inclusive, including (b) all Persons that purchased or otherwise acquired ARAH securities pursuant or traceable to ARAH's Form S-1/A, as amended, and the Form 424B Prospectus (together, the

"Registration Statement") filed in connection with the Company's April 20, 2016 offering, but excluding Defendants, their spouses, and anyone (other than a tenant or employee) sharing the household of any Defendant, and any Persons who submit a valid and timely request for exclusion pursuant to the Notice; and

WHEREAS, on February 8, 2018, the Court entered the Order Preliminarily Approving Class Action Settlement and Providing for Notice and Settlement Hearing ("Preliminary Approval Order"), which, *inter alia*:  (i) preliminarily approved the settlement; (ii) approved the forms and manner of notice of the Action and settlement to members of the Settlement Class ("Settlement Class Members"); (iii) directed that appropriate notice of the Action and settlement be given to the Settlement Class; and (iv) set a hearing date to consider final approval of the settlement; and

WHEREAS, notice of the settlement was provided to Settlement Class Members in accordance with the Court's Preliminary Approval Order, including by individual mailed notice to all Settlement Class Members who could be reasonably identified and by publication of a summary notice in *The Wall Street Journal,* or, if significantly less expensive, *The Financial Times* or *Investor's Business Daily*, and over a national newswire service; and

WHEREAS, notice of the settlement was mailed to federal officials and state officials as described in 28 U.S.C. §1715; and

WHEREAS, on June 14, 2018, at 2:00 p.m., at the United States District Court for the District of Massachusetts, 1 Courthouse Way, Boston, Massachusetts, 02210, the Court held a hearing to determine whether the settlement was fair, reasonable, and adequate to the Settlement Class ("Settlement Hearing"); and

WHEREAS, based on the foregoing, having considered the papers filed and proceedings held in connection with the settlement, having considered all of the other files, records, and proceedings in the Action, and being otherwise fully advised; and

WHEREAS, unless otherwise defined herein, all capitalized words contained herein shall have the same meanings as they have in the Stipulation;

**THE COURT HEREBY FINDS AND CONCLUDES** that:

A. This Court has jurisdiction over the subject matter of the Action and over all Parties to the Action, including all Settlement Class Members.

B. This Order incorporates the definitions in the Stipulation, and all terms used in this Order have the same meanings as set forth in the Stipulation, unless otherwise defined herein.

C. The Notice and Summary Notice given to the Settlement Class in accordance with the Preliminary Approval Order was the best notice practicable under the circumstances of this Action, and constituted due and sufficient notice of the proceedings and matters set forth therein, including of the settlement, to all Persons entitled to notice. The notices fully satisfied the requirements of due process, 15 U.S.C. §§ 77z-1(a)(7) and §78u-4(a)(7), as amended by the Private Securities Litigation Reform Act of 1995, Rule 23 of the Federal Rules of Civil Procedure, and all other applicable law and rules.

D. The notice to federal officials and state officials, as given, complied with 28 U.S.C. §1715.

E. The settlement set forth in the Stipulation (i) is in all respects fair, reasonable, and adequate to the Settlement Class, (ii) was the product of informed, arms'-length negotiations among competent, able counsel, before a nationally known, professional mediator, and (iii) was

- 3 -

made based upon a record that is sufficiently developed and complete to have enabled the Lead

Plaintiffs and Defendants to adequately evaluate and consider their positions.

F.      Lead Plaintiffs have fairly and adequately represented the interests of the

Settlement Class Members in connection with the settlement.

G.      The Persons who have timely and validly requested exclusion from the Settlement

Class are identified in Exhibit 1 attached hereto ("Excluded Persons").

H.      Lead Plaintiffs and the Settlement Class Members, and all and each of them, are

hereby bound by the terms of the settlement set forth in the Stipulation.

I.      During the course of the Action, all Parties and their respective counsel appearing

herein have complied with their obligations under Rule 11(b) of the Federal Rules of Civil

Procedure.

**NOW, THEREFORE, IT IS HEREBY ORDERED AND ADJUDGED** that:

1.      Pursuant to Federal Rule of Civil Procedure 23, the Court hereby (i) certifies, for

settlement purposes only, the Settlement Class, and (ii) approves the settlement set forth in the

Stipulation as fair, reasonable and adequate to the Settlement Class.  Accordingly, for settlement

purposes, the Court authorizes and directs implementation of all terms and provisions of the

Stipulation.

2.      All Parties to this Action, and all Settlement Class Members, are bound by the

settlement as set forth in the Stipulation and this Order.  Excluded Persons identified in Exhibit 1

are no longer parties to this Action, and are not bound by the Stipulation or the settlement.

3.      Judgment shall be, and hereby is, entered dismissing the Action with prejudice, on

the merits, and without taxation of costs in favor of or against any Party.

4.    Lead Plaintiffs and all Settlement Class Members are hereby conclusively deemed to have fully, finally, and forever compromised, settled, released, resolved, relinquished, waived, and discharged ARAH, Joseph A. Carlucci, Jonathan L. Wilcox, Syed T. Kamal, Jonathan J. McDonough, Centerbridge Capital Partners, L.P., Merrill Lynch, Pierce, Fenner & Smith Incorporated, Barclays Capital Inc., Goldman Sachs & Co. LLC (formerly known as Goldman, Sachs & Co.), Wells Fargo Securities, LLC, SunTrust Robinson Humphrey, Inc., and Leerink Partners LLC., all and each of them, and all and each of their respective past and present parent, subsidiary, and affiliated corporations and entities, the predecessors and successors and assigns in interest of any of them, associates (all as defined in SEC Rule 12b-2 promulgated pursuant to the Securities Exchange Act of 1934), and all and each of their respective past and present officers, directors, employees, managers, members, agents, affiliates, partners, representatives, spouses, heirs, executors, trustees, administrators, and insurers (including the Insurer), and legal or other representatives; and the predecessors, successors, heirs, executors, administrators, advisors, and assigns of each of the foregoing (all of them are the "Released Parties"), with respect to any and all manner of claims, including any Unknown Claims, debts, demands, rights, interests, actions, suits, causes of action, cross-claims, counter-claims, charges, judgments, obligations, setoffs, or liabilities for any obligations of any kind whatsoever (however denominated), whether class, individual or otherwise in nature, for fees, costs, penalties, damages whenever incurred, and liabilities of any nature whatsoever (including, without limitation, direct or indirect claims or demands for rescission, damages, interest, attorneys' fees, and any other costs, expenses or liabilities whatsoever, including joint and several), whether based on federal, state, local, statutory or common law, in equity, or on any other law, rule, regulation, ordinance, contract, or the law of any foreign jurisdiction, whether fixed or

- 5 -

contingent, known or unknown, liquidated or unliquidated, suspected or unsuspected, asserted or unasserted, matured or unmatured, which Settlement Class Members or any of them, whether directly, representatively, derivatively, or in any other capacity, now have, ever had, or ever will have against Released Parties, arising from or relating in any way to, directly or indirectly, (1) the purchase, sale, or other acquisition or disposition, or holding, of ARAH securities during the Settlement Class Period, and/or (2) any conduct alleged in the Action or that could have been alleged in the Action against any of Defendants or the other Released Parties.

5.      Lead Plaintiffs and all Settlement Class Members are hereby barred and permanently enjoined from commencing, instituting, prosecuting, continuing to prosecute, soliciting, encouraging, or participating in the prosecution of any action or proceeding in any court of law or equity, arbitration tribunal, administrative forum, or other forum of any kind, asserting any of the Released Claims.

6.      This Court hereby approves the Plan of Allocation as set forth in the Full Notice as fair and equitable, and overrules all objections to the Plan of Allocation, if any, in their entirety.  The Court directs Lead Plaintiffs' Counsel and the Claims Administrator to proceed with the processing of Claim Forms and the administration of the settlement pursuant to the terms of the Plan of Allocation and, upon completion of the claims processing procedure, to present to this Court a proposed final distribution order for the distribution of the Net Settlement Fund to eligible Settlement Class Members, as provided in the Stipulation and Plan of Allocation.

7.      This Court hereby awards Lead Plaintiffs' Counsel reimbursement of their out-of-pocket expenses in the amount of $37,914.17, and attorneys' fees equal to 33% of the Settlement Fund, with interest to accrue on all such amounts at the same rate and for the same

- 6 -

periods as accrued by the Settlement Fund from the date of this Final Judgment to the date of

actual payment of said attorneys' fees and expenses to Lead Plaintiffs' Counsel as provided in

the Stipulation. The foregoing amounts shall be paid to Lead Plaintiffs' Counsel from the

Settlement Fund pursuant to the terms of the Stipulation. The Court finds the amount of

attorneys' fees awarded herein to be fair and reasonable based on: (a) the work performed and

costs incurred by Lead Plaintiffs' Counsel; (b) the complexity of the case; (c) the risks

undertaken by Lead Plaintiffs' Counsel and the contingent nature of their employment; (d) the

quality of the work performed by Lead Plaintiff's Counsel in this Action and their standing and

experience in prosecuting similar class action securities litigation; (e) awards to successful

plaintiffs' counsel in other, similar litigation; (f) the benefits achieved for Settlement Class

Members through the settlement; and (g) the absence of a significant number of objections from

Settlement Class Members to the application for an award of attorneys' fees or reimbursement of

expenses to Lead Plaintiffs' Counsel. The Court also finds that the requested reimbursement of

expenses is proper and that the expenses incurred by Lead Plaintiffs' Counsel were reasonable

and necessary in the prosecution of this Action on behalf of Settlement Class Members. Lead

Plaintiffs are also awarded the sum of $5,000 each, as reasonable costs and expenses directly

relating to the representation of the Settlement Class as provided in 15 U.S.C. §§ 77z- 1(a)(4)

and 78u-4(a)(4), such amounts to be paid from the Settlement Fund.

8. Lead Plaintiffs' Counsel may apply, from time to time, for any fees and/or

expenses incurred by them solely in connection with the administration of the Settlement Fund

and distribution of the Net Settlement Fund to Settlement Class Members.

9. All payments of attorneys' fees and reimbursement of expenses to Lead Plaintiffs'

Counsel in the Action shall be made from the Settlement Fund, and the Released Parties shall

have no liability or responsibility for the payment of any of Lead Plaintiffs' Counsel's attorneys' fees or expenses.

10. Except as otherwise expressly provided herein, the Stipulation and settlement, whether or not consummated, and any proceedings taken pursuant to it:

a. shall not be offered or received against any of Defendants for any purpose, including without limitation as evidence of, or construed as or deemed to be evidence of, any presumption, concession or admission by any of Defendants with respect to the truth of any fact alleged by Lead Plaintiffs, the validity of any claim that had been or could have been asserted against any of Defendants in the Action or in any proceeding, or the lack of merit of any defense that had been or could have been asserted to such claim, or of any liability, negligence, fault or wrongdoing of Defendants;

b. shall not be offered or received against any of Defendants for any purpose, including without limitation as evidence of a presumption, concession or admission of any fault, misrepresentation or omission with respect to any statement or written document approved or made by any Defendant;

c. shall not be offered or received against any of Defendants for any purpose, including without limitation as evidence of a presumption, concession or admission with respect to any liability, negligence, fault or wrongdoing, or in any way referred to for any other reason as against any of Defendants, in any other civil, criminal or administrative action or proceeding; and/or

d. shall not be construed against any of Defendants for any purpose, including without limitation as a presumption, concession or admission that the consideration to be given hereunder represents the amount that could be or would have been recovered after trial.

11.     The Court hereby retains and reserves jurisdiction over: (a) implementation of this settlement and any distributions from the Settlement Fund; (b) disposition of the Settlement Fund; (c) hearing and determining applications for attorneys' fees, interest, and expenses in the Action; (d) the Action, until the Effective Date; (e) all Parties, for the purpose of enforcing and administering the Stipulation and the terms set forth therein; and (f) any other matters solely related to the distribution of the proceeds of the settlement.

12.     In the event that this judgment does not become Final in accordance with ¶ IV(A)(13) of the Stipulation, and the Effective Date in accordance with ¶ IV(I)(1) of the Stipulation does not occur, then the judgment shall be rendered null and void to the extent provided by and in accordance with the Stipulation, and this Order shall be vacated. In such event, all orders entered and releases delivered in connection with the settlement, including without limitation any orders certifying the Settlement Class, shall be null and void, except to the extent provided by and in accordance with the Stipulation. In such event, the Parties shall return to their positions as of November 28, 2017.

13.     The Escrow Agent shall maintain the Settlement Fund in accordance with the requirements set forth in the Stipulation. No Defendant, or any other of the Released Parties, shall have any liability, obligation, or responsibility whatsoever for the administration of the Settlement Fund or disbursement of the Net Settlement Fund. Lead Plaintiffs' Counsel, Lead Plaintiffs, the Escrow Agent, and the Claims Administrator shall have no liability to any Settlement Class Member with respect to any aspect of the administration of the Settlement Fund, including, but not limited to, the processing of Claim Forms and the distribution of the Net Settlement Fund to the Settlement Class Members consistent with the Plan of Allocation.

14.     This Court's ruling on the Plan of Allocation and Lead Plaintiffs' Counsel's motion for attorneys' fees and/or reimbursement of expenses shall not disturb or affect this Order or the finality of this Order.  More specifically, neither appellate review nor modification of the Plan of Allocation set forth in the Full Notice, nor any action in regard to the motion by Lead Plaintiffs' Counsel for attorneys' fees and/or reimbursement of expenses and the award of costs and expenses, shall affect the finality of any other portion of this Final Judgment Order, nor delay the Effective Date of the Stipulation, and each shall be considered separate for the purposes of appellate review of this Final Judgment Order.

15.     Without further approval from the Court, Lead Plaintiffs' Counsel and Defendants' Counsel are hereby authorized to agree to and adopt such amendments or modifications of the Stipulation or any exhibits attached thereto to effectuate the settlement that: (i) are not materially inconsistent with this Final Judgment Order; and (ii) do not materially limit the rights of Settlement Class Members in connection with the settlement.  Without further order of the Court, the Parties may agree to reasonable extensions of time to carry out any of the provisions of the Stipulation.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Date:   June 15, 2018.
        Boston, Massachusetts


                                        /s/ Allison D. Burroughs
                                        ALLISON D. BURROUGHS
                                        United States District Judge

# TAB 25

**Evans on behalf of United Development Funding IV v. Greenlaw, Slip Copy (2019)**

2019 WL 7879735

2019 WL 7879735
Only the Westlaw citation is currently available.
United States District Court,
N.D. Texas, Dallas Division.

Richard EVANS, derivatively ON BEHALF OF
UNITED DEVELOPMENT FUNDING IV, Plaintiff,
v.
Hollis M. GREENLAW, et al., Defendants,
and
United Development Funding
IV, Nominal Defendant.
Adam Baxter and David Ostlund,
derivatively on behalf of United
Development Funding IV, Plaintiffs,
v.
Hollis M. Greenlaw, et al., Defendants,
and
United Development Funding
IV, Nominal Defendant.

Case No. 3:16-cv-0635-M, Case No. 3:17-cv-2433-M
|
Signed 02/27/2019

**Attorneys and Law Firms**

Brian P. Lauten, Brian Lauten, P.C., Michael P. Lyons, Deans
& Lyons LLP, Dallas, TX, Adam Apton, Pro Hac Vice,
Nicholas Porritt, Levi & Korsinsky LLP, Washington, DC, for
Plaintiff.

Michael P. Gibson, Camille M. Knight, Burleson Pate &
Gibson LLP, Dallas, TX, for Defendant Hollis M. Greenlaw.

Barrett R. Howell, Brandon N. McCarthy, Katten Muchin
Rosenman, John R. Hardin, K&L Gates LLP, Dallas, TX,
John Rotunno, Pro Hac Vice, Joseph Wylie, II, Pro Hac
Vice, Matthew Alvis, Pro Hac Vice, Paul J. Walsen, K&L
Gates LLP, Chicago, IL, for Defendants Philip K. Marshall, J.
Heath Malone, Steven J. Finkle, UMTH General Services LP,
UMTH Land Development LP, United Development Funding
IV.

Paul Edward Coggins, Kiprian E. Mendrygal, Locke Lord
LLP, Dallas, TX, for Defendant John R. Ray.

Ralph Ritch Roberts, III, Law Offices of R. Ritch Roberts,
Michael John Uhl, Fitzpatrick Jacks Smith & Uhl, Dallas, TX,
for Defendant Todd Etter.

**ORDER**

BARBARA M.G. LYNN, CHIEF JUDGE

**\*1** Before the Court are Plaintiff Evans' Motion for an
Award of Attorneys' Fees and Reimbursement of Expenses
(ECF No. 56 in Case No. 3:16-cv-0635), and Plaintiffs Baxter
and Ostlund's Motion for Attorneys' Fees, Reimbursement of
Expenses and Payment of a Service Award (ECF No. 71 in
Case No. 3:16-cv-0635 and ECF No. 23 in Case No. 3:17-
cv-2433). For the following reasons, Plaintiff Evans' Motion
is GRANTED, and Plaintiffs Baxter and Ostlund's Motion is
DENIED.

**I. Background**

Shareholders of United Development Funding IV ("UDF
IV") brought two derivative actions on behalf of UDF IV
against UDF IV's officers, its directors, other interested
parties, and various entities that were involved in UDF IV's
alleged fraudulent Ponzi scheme. Plaintiff Evans' case is
captioned *Evans v. Greenlaw et al.*, 3:16-cv-00635-M, and
Plaintiffs Baxter and Ostlund's case is captioned *Baxter et al.
v. Greenlaw et al.*, 3:17-cv-02433-M. On December 21, 2017,
the parties in *Evans* entered into a Stipulation of Settlement.
(*See* ECF No. 53). The Stipulation provides that,

> [C]ertain of the Individual Defendants will cause one
> million five hundred thousand dollars ($1,500,000) to
> be paid under the applicable policy of insurance to
> be deposited into an escrow account for purposes of
> effecting the settlement contemplated by this Stipulation
> (the 'Settlement Fund'). A portion of the Settlement Fund
> shall be used to pay any attorneys' fees awarded to Plaintiff
> (including, if any, any incentive award), implement the
> corporate governance measures set forth herein and/or
> for other corporate purposes including the payment or
> partial payment of any award, judgment or settlement in
> connection with the UDF Class Action Litigation.

> [...]

> Plaintiff's counsel shall apply to the Court for an award of
> attorneys' fees and reimbursement of expenses to be paid
> from the Settlement Fund. Defendants shall not oppose

Plaintiff's application for such fee and expense award provided that Plaintiff does not seek an amount in excess of six hundred fifty thousand dollars ($650,000).

(ECF No. 53 ¶¶ 1.1, 3.1). No one objected to the *Evans* settlement. (ECF No. 57 ¶ 19; ECF No. 68 at 5). On May 14, 2018, the Court entered an Order granting final approval of the *Evans* settlement, and granting Plaintiff Evans' request for an incentive award of $2,500. (ECF No. 68). The Court deferred its determination of attorneys' fees until the Court approved UDF IV's class action settlement in *Hay v. Greenlaw, et al.*, No. 4:16-cv-00188-M, and *In re United Development Funding IV Securities Litigation*, No. 3:15-cv-04030-M. (*Id.* at 11). On February 21, 2019, the Court entered an Order approving the class action settlement.

Evans' counsel request $650,000 in attorneys' fees. (ECF No. 56 at 2–3; ECF No. 75 at 6). Baxter and Ostlund's counsel do not dispute the total amount of fees sought by Evans' counsel. (ECF No. 66 at 11:20–12:6). Instead, Baxter and Ostlund's counsel argue that they should receive a portion of the award based on the contributions they made toward the *Evans* settlement. (ECF No. 72 at 10–17).

## II. Legal Standard

**\*2** Because this derivative action is a diversity case, the determination of the fee award is governed by state law. *See Schilling v. Belcher*, 582 F.2d 995, 1003 (5th Cir. 1978). In Maryland—where UDF IV is organized—attorneys' fees may be recovered in a successful derivative action under the "common fund" doctrine. *See Boland v. Boland*, 423 Md. 296, 31 A.3d 529, 542 (Md. 2011) (citing *Hess Const. Co. v. Bd. of Educ. of Prince George's Cty.*, 341 Md. 155, 669 A.2d 1352, 1358 (Md. 1996)) (observing that the common fund theory, allowing reasonable recovery of fees for a successful plaintiff, is allowed "where a stockholder's derivative action benefitted all of the shareholders"). The application of the common fund doctrine in an individual case lies "within the discretion of the trial judge." *Bontempo v. Lare*, 217 Md. App. 81, 135, 90 A.3d 559 (Md. App. 2014), *aff'd*, 444 Md. 344, 119 A.3d 791 (Md. 2015).

Attorneys' fees awarded under the common fund doctrine may be calculated using a percentage method, the lodestar method, or a combination of both. *Garcia v. Foulger Pratt Dev., Inc.*, 155 Md.App. 634, 845 A.2d 16, 34 (Md. Ct. Spec. App. 2003). Evans' counsel and Baxter and Ostlund's

counsel both assert that the lodestar method is appropriate. The Court agrees. *See Whitaker v. Navy Fed. Credit Union*, 09CV2288, 2010 WL 3928616, at \*5 (D. Md. Oct. 4, 2010) (determining that lodestar analysis was appropriate where "the members are not actually receiving a monetary payment").

Under the lodestar method, a court's award of reasonable attorneys' fees is the product of the reasonable hours expended multiplied by a reasonable hourly rate. *Xiao–Yue Gu v. Hughes STX Corp.*, 127 F.Supp.2d 751, 764 (D. Md. 2001); *Monmouth Meadows Homeowners Ass'n., Inc. v. Hamilton*, 416 Md. 325, 333, 7 A.3d 1 (Md. 2010). In assessing the reasonableness of the hours and rate claimed, Maryland courts consider the following twelve factors elucidated in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (1974) and adopted by the Fourth Circuit in *Barber v. Kimbrell's, Inc.*, 577 F.2d 216, 226 n. 28 (4th Cir. 1978): (1) the time and labor required; (2) the novelty and difficulty of the issues; (3) the skill required to perform the legal service adequately; (4) the preclusion of other employment by the attorney due to the case; (5) the customary fee for similar work in the community; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the undesirability of the case; (11) the nature and length of the professional relationship with the client; and (12) the awards in similar cases. *Id.*

## III. Analysis

### A. Evans' Counsel's Requested Attorneys' Fees are Reasonable Under the *Johnson* Factors.

Evans' counsel provide evidence that they worked a total of 342.05 hours for a lodestar amount of $212,294. (ECF Nos. 75-2 at 2, 75-3 at 1). Evans' counsel request a multiplier of slightly more than 3x for a total of $650,000 in fees.

#### 1. Factor 1: Time and Labor Required

Evans' counsel spent the majority of their 342.05 hours of time (1) interviewing Timothy McCormick, independent counsel for the Audit Committee of UDF IV; (2) reviewing 170,000 pages of UDF IV documents; and (3) mediating and negotiating the *Evans* settlement. (*See* ECF No. 75 at 3)

(stating that Evans' counsel spent 27% of their time engaging in fact discovery, 20% of their time conducting legal research, and 15% of their time negotiating the *Evans* settlement). Evans' counsel's billing records show that when this case was stayed between May 18, 2016, and September 22, 2017, negotiations with Defendants continued. (ECF No. 75-2 at 4–5). The Court concludes that this case required significant time and labor and that this supports a finding that the requested fees are reasonable.

### 2. Factor 2: The Novelty and Difficulty of the Issues

**\*3**  Shareholder derivative cases are notoriously complex to litigate. *See* *In re Pac. Enters. Sec. Litig.*, 47 F.3d 373, 378 (9th Cir. 1995); *Cohn v. Nelson*, 375 F. Supp. 2d 844, 852 (E.D. Mo. 2005) ("Settlements of shareholder derivative actions are particularly favored because such litigation 'is notoriously difficult and unpredictable.' "). This case was especially complex because of the complicated relationships between UDF IV and its related-entities. The Court finds that the issues presented in *Evans* are complex and required a high level of legal skill. This support a finding that the requested fees are reasonable.

### 3. Factors Three and Nine: The Skill Required to Perform the Legal Service Adequately and the Experience, Reputation, and Ability of the Attorneys

Evans' counsel have a high level of skill and expertise with respect to shareholder derivative suits. (*See* ECF No. 75 at 4). Further, the standing of opposing counsel should be weighed in determining the fee, because such standing reflects the challenge faced by Evans' counsel and "confirms the superior quality of their representation." *Schwartz v. TXU Corp.*, No. 3:02-cv-2243-K, 2005 WL 3148350, at \*10 (N.D. Tex. Nov. 8, 2005). Defendants were represented by highly-qualified lawyers and negotiations with them required skill and expertise. (ECF No. 75 at 4–5). The Court finds that factors three and nine support approval of the requested fee.

### 4. Factor Four: The Preclusion of Other Employment

The Court finds that Evans' counsel's 342.05 hours of work inevitably precluded other representations and that this weighs in favor of approval. *See* *Burford v. Cargill, Inc.*, CIV.A. 05-0283, 2012 WL 5471985, at \*3 (W.D. La. Nov. 8, 2012) ("The affidavits of Class Counsel prove that while this case did not preclude them from accepting other work, they were often times precluded from working on other cases due

to the demands of the instant matter.... This factor weighs in favor of a substantial fee award.").

### 5. Factors Five and Twelve: The Customary Fee for Similar Work in the Community and Awards in Similar Cases

With a lodestar of $212,294, and a requested attorneys' fee award of $650,000, the requested fee is 3.06 times greater than the lodestar amount. Evans' counsel direct the Court to other common fund securities cases where the fees awarded were similar multipliers of the lodestar amount. *See* *In re Enron Corp. Securities, Derivative & ERISA Litig.*, 586 F. Supp. 2d 732, 752 (S.D. Tex. 2008) (noting that "the Ninth Circuit performed a survey of multipliers and found 'a range of 0.6–19.6, with most (20 of 24, or 83%) from 1.0 to 4.0 and a bare majority (13 of 24, or 54%) in the 1.5–3.0 range' ") (quoting *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1051 n.6 (9th Cir. 2002)); *OneBeacon Ins. Co. v. T. Wade Welch & Assocs.*, No. H-11-3061, 2015 WL 5021954, at \*13-14, 2015 U.S. Dist. LEXIS 111500 at \*37 (S.D. Tex. Aug. 24, 2015) (awarding 3.0x multiplier in insurance coverage action); *City of Omaha Police & Fire Ret. Sys. v. LHC Grp.*, No. 6:12-1609, 2015 WL 965696, at \*10, 2015 U.S. Dist. LEXIS 26053, at \*22 (W.D. La. Mar. 03, 2015) ("Multipliers ranging from one to four frequently are awarded in common fund cases when the lodestar method is applied."). Based on these cases, and the Court's observation of other, similar cases, the Court finds that the requested fee is within the range of normal fee awards in actions of this type.

### 6. Factor Six: Whether the Fee is Fixed or Contingent

Here, the requested fee is contingent. Courts have recognized that a court should consider the risk inherent in taking a case on contingency in determining whether the amount of fees is appropriate. *See* *Turner v. Murphy Oil USA, Inc.*, 472 F. Supp. 2d 830, 859–60 (E.D. La. 2007) ("Recognizing the 'contingent risk of nonpayment' in [class action] cases, courts have found that class counsel ought to be compensated ... for risk of loss or nonpayment assumed by carrying through with the case."). The Court finds that the risk assumed by Evans' counsel in performing their work on contingency weighs in favor of approving the requested fees.

### 7. Factor Seven: Time Limitations Imposed by the Client or the Circumstances

2019 WL 7879735

**\*4** Evans' counsel argue that the fact that they filed the Evans Complaint soon after the FBI's raid on UDF IV's corporate headquarters demonstrates Evans' counsel's "commitment to the case." (ECF No. 75 at 6). Because Evans' counsel were not required to file the Complaint immediately after the raid, the Court finds that this factor weighs neither in favor nor against the requested fee award.

### 8. Factor Eight: The Amount Involved and the Results Obtained

The Fifth Circuit has called this factor the "most critical" factor. *See* 🚩 *Migis v. Pearle Vision*, Inc., 135 F.3d 1041, 1047 (5th Cir. 1998). Evans' counsel explain that discovery produced evidence suggesting that a report written by Hayman Capital Management, L.P. that accused UDF IV of operating a Ponzi-like scheme and over-leveraging itself to certain borrowers, among other things, was not entirely accurate. (ECF No. 75 at 7). Evans' counsel states that UDF IV continues to deny any wrongdoing and is pursuing Hayman Capital for defamation. Despite this question of Defendants' liability, Evans' counsel were still able to secure the *Evans* settlement. The *Evans* settlement also provides UDF IV with $1.5 million from its liability insurer to be used for corporate governance reform, related settlements, and attorneys' fees. The Court finds that this factor supports approval of the requested fee.

### 9. Factor Ten: The Undesirability of the Case

Evans' counsel concede that this case was "not especially desirable or undesirable." (ECF No. 75 at 8). The Court finds that this factor weighs neither in favor nor against the requested fee award.

### 10. Factor Eleven: Nature and Length of the Professional Relationship with Clients

Given that Evans' counsel do not have a long-term relationship, outside of this action, with their client, this factor does not weigh strongly for or against awarding the requested fees.

For the reasons stated above, all of the applicable 🚩 *Johnson* factors are neutral or weigh in favor of awarding the requested

fees, and the Court thus approves the requested fees of Evans' counsel.

### B. Allocation of Attorneys' Fees to Baxter and Ostlund's Counsel

Baxter and Ostlund's counsel claim that they deserve a portion of the fee award because they contributed to the *Evans* settlement. Baxter and Ostlund's counsel argue that "the Court should award the firms' respective out-of-pocket expenses off the top of the settlement, and then allocate the remaining attorneys' fees award among counsel based on the firms' respective lodestar amounts." (ECF No. 72 at 22).

Based on the pleadings and argument at the hearing on February 15, 2019, the Court finds that Baxter and Ostlund's counsel's alleged contributions did not confer a benefit on UDF IV or its shareholders, other than Baxter and Ostlund. *See* 🚩 *Boland*, 31 A.3d at 542 (allowing for reasonable attorneys' fees "where a stockholder's derivative action benefitted all of the shareholders") (internal citation omitted). The Court is not persuaded that Evans did not have standing and that the settlement achieved would not have been obtained without Baxter and Ostlund's separate suit. Therefore, Baxter and Ostlund's counsel are not entitled to any portion of the fee award of $650,000. For the same reasons, the Court denies Plaintiffs Baxter and Ostlund's requests for incentive awards.

Accordingly,

IT IS ORDERED that Plaintiff Evans' Motion for an Award of Attorneys' Fees and Reimbursement of Expenses (ECF No. 56 in Case No. 3:16-cv-0635) is GRANTED, and Plaintiffs Baxter and Ostlund's Motion for Attorneys' Fees, Reimbursement of Expenses and Payment of a Service Award (ECF No. 71 in Case No. 3:16-cv-0635 and ECF No. 23 in Case No. 3:17-cv-2433) is DENIED.

**\*5** SO ORDERED.

### All Citations

Slip Copy, 2019 WL 7879735

---

**End of Document**

© 2021 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 26

# Exhibit 4

**LABATON SUCHAROW LLP**
Carol C. Villegas (*pro hac vice*)
Alec T. Coquin (*pro hac vice*)
140 Broadway
New York, NY 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477
Email: cvillegas@labaton.com
        acoquin@labaton.com

*Attorneys for Lead Plaintiff and Lead Counsel
for the Class*

**BERMAN TABACCO**
Nicole Lavallee (SBN 165755)
A. Chowning Poppler (SBN 272870)
44 Montgomery Street, Ste. 650
San Francisco, CA 94104
Telephone: (415) 433-3200
Facsimile: (415) 433-6382
Email: nlavallee@bermantabacco.com
        cpoppler@bermantabacco.com

*Liaison Counsel for the Class*

### UNITED STATES DISTRICT COURT

### NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

| | |
|---|---|
| In re EXTREME NETWORKS, INC.<br>SECURITIES LITIGATION<br><br>This Document Relates to:<br><br>All Actions. | ) Master File No. 5:15-cv-04883-BLF-SVK<br>)<br>) **DECLARATION OF NICOLE**<br>) **LAVALLEE FILED ON BEHALF OF**<br>) **BERMAN TABACCO IN SUPPORT OF**<br>) **APPLICATION FOR AWARD OF**<br>) **ATTORNEYS' FEES AND EXPENSES**<br>)<br>)<br>) Date:  June 20, 2019  1:30 p.m.<br>) Dept.:  Courtroom 4, 5th Floor<br>) Judge:  Hon. Beth Labson Freeman<br>)<br>)<br>) |

CASE NO. 5:15-CV-04883-BLF-SVK
DECLARATION OF NICOLE LAVALLEE FILED ON BEHALF OF BERMAN TABACCO IN SUPPORT OF
APPLICATION FOR AWARD OF ATTORNEYS' FEES AND EXPENSES

I, NICOLE LAVALLEE, declare as follows under penalty of perjury, pursuant to 28 U.S.C. § 1746:

1. I am the managing partner of the San Francisco office of Berman Tabacco. I submit this declaration in support of Lead Counsel's motion for an award of attorneys' fees and payment of expenses, on behalf of all Plaintiffs' Counsel who contributed to the prosecution of the claims in the above-captioned action (the "Action"), from inception through April 15, 2019 (the "Time Period"). I have personal knowledge of the facts set forth herein and, if called upon, could and would testify thereto.

2. My firm, which served as Liaison Counsel in the Action, advised Lead Counsel Labaton Sucharow LLP on various matters throughout the litigation, which are described in detail in the Declaration of Carol C. Villegas in Support of Lead Plaintiff's Motion for Final Approval of Class Action Settlement and Plan of Allocation and Lead Counsel's Motion for an Award of Attorneys' Fees and Payment of Expenses, submitted herewith.

3. The information in this declaration regarding my firm's time and expenses is taken from time and expense reports and supporting documentation prepared and/or maintained by the firm in the ordinary course of business. These reports were reviewed by me, in connection with the preparation of this declaration. As a result of this review, reductions were made to time in the exercise of billing judgment. As a result of this review and the adjustments made, I believe that the time reflected in the firm's lodestar calculation and the expenses for which payment is sought as set forth in this declaration are reasonable in amount and were necessary for the effective and efficient prosecution and resolution of the litigation. In addition, I believe that the expenses are all of a type that would normally be charged to a fee-paying client in the private legal marketplace.

4. After the reductions referred to above, the schedule attached hereto as Exhibit A is a summary indicating the amount of time spent by the attorneys and professional support staff members of my firm who were involved in the prosecution of the Action and the lodestar calculation based on my firm's current rates. For personnel who are no longer employed by my

CASE NO. 5:15-CV-04883-BLF-SVK
DECLARATION OF NICOLE LAVALLEE FILED ON BEHALF OF BERMAN TABACCO IN SUPPORT
OF APPLICATION FOR AWARD OF ATTORNEYS' FEES AND EXPENSES            1

firm, the lodestar calculation is based upon the rates for such personnel in his or her final year of employment by my firm. The schedule was prepared from daily time records regularly prepared and maintained by my firm, which are available at the request of the Court. Time expended in preparing this application for fees and payment of expenses has not been included in this request.

5. The hourly rates for the attorneys and professional support staff of my firm included in Exhibit A are their usual and customary rates.

6. The total number of hours expended on this litigation by my firm during the Time Period is 123.10 hours. The total lodestar for my firm for those hours is $70,142.00.

7. Attached as Exhibit B is a task-based summary of the work performed by the attorneys and professional staff members who performed services in this Action.

8. My firm's lodestar figures are based upon the firm's hourly rates, which rates do not include charges for expense items. Expense items are recorded separately and are not duplicated in my firm's hourly rates.

9. As detailed in Exhibit C, my firm has incurred a total of $2,552.13 in expenses and charges in connection with the prosecution of the litigation. These expenses and charges are summarized by category in Exhibit C.

10. The following is additional information regarding certain of my firm's expenses:

(a) Filing, Witness and Other Fees: $915.00. These expenses have been paid to courts in connection with *pro hac vice* motions.

(b) Work-Related Transportation, Hotels & Meals: $95.30. In connection with the prosecution of this case, the firm has paid for work-related transportation expenses, meals and travel expenses related to, among other things, attending court conferences and hearings.

(c) Court Hearing and Deposition Reporting: $276.25. These expenses have been paid to court reporters in connection with transcripts of court hearings or to court reporting services, in connection with the depositions taken in the Action.

(d)　　Online Legal and Factual Research: $47.41. The firm conducted research using databases maintained by vendors such as PACER, Bloomberg and Westlaw. These databases were used to obtain access to financial information, factual information, and to conduct legal research. This expense represents the expense incurred by my firm for use of these services in connection with this litigation. The charges for these vendors vary depending upon the type of services requested.

11.　　The expenses pertaining to the Action are reflected on the books and records of my firm. These books and records are prepared from expense vouchers, check records and other source materials and are an accurate record of the expenses.

12.　　With respect to the standing of my firm, attached hereto as Exhibit D is a biography of my firm, as well as biographies of the firm's attorneys who worked on this litigation and who are currently employed by the firm.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 3rd day of May, 2019, at San Francisco.

_____
NICOLE LAVALLEE

# Exhibit A

# EXHIBIT A

## *IN RE EXTREME NETWORKS, INC. SEC. LITIG.*

### Berman Tabacco

### Inception through April 15, 2019

| *NAME* | | *HOURS* | *RATE* | *LODESTAR* |
|---|---|---|---|---|
| Beaulieu, Karen | FA | 1.00 | $395.00 | $395.00 |
| Becker, Kathy | PL | 20.70 | $370.00 | $7,659.00 |
| Giblin, Wendy (former) | OC | 14.30 | $615.00 | $8,794.50 |
| Lavallee, Nicole | P | 19.50 | $920.00 | $17,940.00 |
| Poppler, Chowning | A | 63.30 | $525.00 | $33,232.50 |
| Scarsciotti, Jeannine | FA | .80 | $505.00 | $404.00 |
| Soboleva, Yelena | PL | 2.20 | $225.00 | $495.00 |
| Tabacco, Joseph | P | 1.30 | $940.00 | $1,222.00 |
| **TOTAL** | | **123.10** | | **$70,142.00** |

Partner          (P)          Financial Analyst     (FA)

Of Counsel     (OC)         Investigator             (I)

Associate       (A)          Paralegal                (PL)

CASE NO. 5:15-CV-04883-BLF-SVK
DECLARATION OF NICOLE LAVALLEE FILED ON BEHALF OF BERMAN TABACCO IN SUPPORT OF
APPLICATION FOR AWARD OF ATTORNEYS' FEES AND EXPENSES

# Exhibit B

**EXHIBIT B**

*IN RE EXTREME NETWORKS INC. SEC. LITIG.*

**Berman Tabacco**

**Inception through April 15, 2019**

Categories:

| | |
|---|---|
| (1) Factual Investigation | (6) Court Appearances |
| (2) Pleadings | (7) Experts/Consultants |
| (3) Discovery | (8) Settlement |
| (4) Case Management | (9) Litigation Strategy/Analysis |
| (5) Motions and Legal Research | |

| Name | Status | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | Total Hours | Rate | Total Lodestar |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Beaulieu, Karen | FA | 1.00 | | | | | | | | | 1.00 | $395.00 | $395.00 |
| Becker, Kathy | PL | 1.80 | 18.30 | | | | | | 0.60 | | 20.70 | $370.00 | $7,659.00 |
| Giblin, Wendy | OC | 14.30 | | | | | | | | | 14.30 | $615.00 | $8,794.50 |
| Lavallee, Nicole | P | 1.90 | 4.10 | | | | 5.50 | | 6.50 | 1.50 | 19.50 | $920.00 | $17,940.00 |
| Poppler, Chowning | A | 0.10 | 26.70 | | | | 33.00 | | 1.50 | 2.00 | 63.30 | $525.00 | $33,232.50 |
| Scarsciotti, Jeannine | FA | 0.80 | | | | | | | | | 0.80 | $505.00 | $404.00 |
| Soboleva, Yelena | PL | 0.30 | 1.90 | | | | | | | | 2.20 | $225.00 | $495.00 |
| Tabacco, Joseph | P | | | | | | | | 1.30 | | 1.30 | $940.00 | $1,222.00 |
| **TOTAL:** | | 20.20 | 51.00 | 0.00 | 0.00 | 0.00 | 38.50 | 0.00 | 9.90 | 3.50 | 123.10 | | $70,142.00 |

| | |
|---|---|
| Partner (P) | Financial Analyst (FA) |
| Of Counsel (OC) | Investigator (I) |
| Associate (A) | Paralegal (PL) |

# Exhibit C

**EXHIBIT C**

*IN RE EXTREME NETWORKS, INC. SEC. LITIG.*

**Berman Tabacco**

**Inception through April 15, 2019**

| CATEGORY | AMOUNT |
|---|---|
| Filing, Witness and Other Fees | $915.00 |
| Work-Related Transportation, Hotels & Meals | $95.30 |
| Long-Distance Telephone, Facsimile and Conference Calling | $0.00 |
| Messenger, Overnight Delivery | $697.85 |
| Court Hearing and Deposition Reporting | $276.25 |
| Experts/Consultants | $0.00 |
| Duplicating | $520.32 |
| Online Legal and Factual Research | $47.41 |
| Litigation Support | $0.00 |
| Research Materials | $0.00 |
| *TOTAL* | $2,552.13 |

CASE NO. 5:15-CV-04883-BLF-SVK
DECLARATION OF NICOLE LAVALLEE FILED ON BEHALF OF BERMAN TABACCO IN SUPPORT OF
APPLICATION FOR AWARD OF ATTORNEYS' FEES AND EXPENSES

**Exhibit D**

**EXHIBIT D**

*IN RE EXTREME NETWORKS, INC. SEC. LITIG.*

**Berman Tabacco**


FIRM RESUME


CASE NO. 5:15-CV-04883-BLF-SVK
DECLARATION OF NICOLE LAVALLEE FILED ON BEHALF OF BERMAN TABACCO IN SUPPORT OF
APPLICATION FOR AWARD OF ATTORNEYS' FEES AND EXPENSES



## THE FIRM

Berman Tabacco is a national law firm with 35 attorneys located in offices in Boston and San Francisco. Since its founding in 1982, the firm has devoted its practice to complex litigation, primarily representing plaintiffs seeking redress under U.S. federal and state securities and antitrust laws.

Over the past three-and-a-half decades, Berman Tabacco's attorneys have prosecuted hundreds of class actions, recovering billions of dollars on behalf of the firm's clients and the classes they represented. In addition to financial recoveries, the firm has achieved significant changes in corporate governance and business practices of defendant companies. Indeed, the firm appears as among the firms with the most settlements on the list of the top 100 largest securities class actions in SCAS' published report, *Top 100 U.S. Class Action Settlements of All Time (as of 12/31/2017).* According to ISS Securities Class Action Services' "Top 50 for 2015" report, Berman Tabacco was one of only six firms that recovered more than half-a-billion dollars for investors in 2015.[1] SCAS similarly ranked the firm among the few that obtained over half-a-billion in settlements in 2004 and 2009, and ranked the firm 3rd in terms of settlement averages for class actions in 2009, 2010 and 4th in 2004 (SCAS ceased rankings according to settlement sizes in 2012). The firm currently holds leadership positions in securities and antitrust cases around the country.

Berman Tabacco is rated AV Preeminent® by *Martindale-Hubbell®*. *Benchmark Litigation* ranked the firm as a "Top Ten Plaintiffs' Firm" for its work "on behalf of individuals and institutions who have suffered financial harm due to violations of securities or antitrust laws" in its 2017 10th Anniversary edition, as well as a "Top Plaintiffs" firm in its 2018 and 2019 editions (only seven firms were so named). *Benchmark Litigation* also ranked the firm as "Highly Recommended" in 2019 – the eighth time the firm has received that distinction.[2] *The Legal 500* also ranked the firm as "recommended" in securities litigation in its 2017 and 2018 U.S. editions (as well as ranking seven of the firm's attorneys in the same category each year). Additionally, *Chambers USA* nationwide edition recognized the firm in the Securities Litigation – Mainly Plaintiff category in 2017 and 2018. In addition, the firm was recently recognized in litigation – antitrust by *U.S. News – Best Lawyers* in its *Best Law Firms* (2019 ed.). Berman Tabacco's lawyers are frequently singled out for favorable comments by our clients, presiding judges and opposing counsel. For examples, please see:

## SECURITIES PRACTICE

Berman Tabacco has more than 37 years of experience in securities litigation and has represented public pension funds and other institutional investors in this area since 1998. As reported by Cornerstone Research, the firm has successfully prosecuted some of the most significant shareholder class action

---

[1] ISS's report "lists the top 50 plaintiffs' law firms ranked by the total dollar value of the final class action settlements occurring in 2015 in which the law firm served as lead or co-lead counsel." ISS Securities Class Action Services, *Top 50 for 2015* (May 2016)*.

[2] *See* https://www.benchmarklitigation.com/firms/berman-tabacco/f-195.



lawsuits.[3]  Indeed, the firm appears as among the firms with the most settlements on the list of the top 100 largest securities class actions in SCAS' published report, *Top 100 U.S. Class Action Settlements of All Time (as of 12/31/2017)*.  According to the most recent ISS Securities Class Action Services "Top 50 for 2015" report, Berman Tabacco was one of only six firms that recovered more than half-a-billion dollars for investors in 2015.[4]  SCAS similarly ranked the firm among the few that obtained over half-a-billion in settlements in 2004 and 2009, and ranked the firm 3rd in terms of settlement averages for class actions in 2009, 2010 and 4th in 2004 (SCAS ceased rankings according to settlement sizes in 2012).

Specifically, the firm has been appointed lead or co-lead counsel in more than 100 actions, recovering billions of dollars on behalf of defrauded investors and the classes they represent under the Private Securities Litigation Reform Act of 1995 ("PSLRA").  The firm has an extremely rigorous case-evaluation process and highly experienced litigation attorneys.  Its dismissal rate for cases brought under the PSLRA is less than half the overall dismissal rate for such cases according to one authoritative study.[5]

Berman Tabacco serves as monitoring, evaluation and/or litigation counsel to nearly 100 institutional investors, including statewide public employee retirement systems in more than 17 states, 15 public funds with more than $50 billion in assets, six of the 10 largest public pension plans in the country and 12 of the largest 20.[6]  For many institutional investors, the firm's services include electronically monitoring the client's portfolio for losses due to securities fraud in U.S. securities cases.

The firm provides portfolio monitoring, case evaluation and litigation services to its institutional clients, including the litigation of class and individual claims pursuant to U.S. federal and state securities laws, as well as derivative cases pursuant to state law.  The firm also offers institutional investors legal services in other areas, including (a) representing institutional investors in general commercial litigation; (b) representing institutional investors in their capacity as defendants in constructive fraudulent transfer cases; (c) negotiating resolution of disputes with money managers and custodians; and (d) pursuing shareholder rights, such as books and records demands and merger and acquisition cases.

---

[3] Cornerstone Research, *Securities Class Action Filings: 2011 Year in Review* (2012), at p. 23, *available at* http://securities.stanford.edu/research-reports/1996-2011/Cornerstone-Research-Securities-Class-Action-Filings-2011-YIR.pdf.

[4] ISS's report "lists the top 50 plaintiffs' law firms ranked by the total dollar value of the final class action settlements occurring in 2015 in which the law firm served as lead or co-lead counsel."  ISS Securities Class Action Services, *Top 50 for 2015* (May 2, 2016).

[5]  Firm data reflects dismissal rates through present.  Overall dismissal rates come from *Securities Class Action Filings: 2017 Year in Review*, p. 15 (Cornerstone Research 2017), https://www.cornerstone.com/Publications/Reports/Securities-Class-Action-Filings-2017-YIR.

[6] Based on an May 2018 query of the Standard & Poor's Money Market Directories, www.mmdwebaccess.com, whereby public pension funds were ranked according to defined benefit assets under management.  Actual valuation dates vary.



Firm Resume

## RESULTS

## SECURITIES SETTLEMENTS

Examples of the firm's settlements include:

*Carlson v. Xerox Corp.*, No. 00-cv-1621 (D. Conn.). Representing the Louisiana State Employees' Retirement System as co-lead counsel, Berman Tabacco negotiated a $750 million settlement to resolve claims of securities fraud against Xerox, certain top officers and its auditor KPMG LLP. When it received final court approval in January 2009, the recovery was the 10th largest securities class action settlement of all time. The judge praised plaintiffs' counsel for obtaining "a very large settlement" despite vigorous opposition in a case complicated by an alleged fraud that "involved multiple accounting standards that touched on numerous aspects of a multinational corporation's business, implicated operating units around the world, and spanned five annual reporting periods. … [and] the rudiments of the accounting principles at issue in the case were complex, as were numerous other aspects of the case. … The class received high-quality legal representation and obtained a very large settlement in the face of vigorous opposition by highly experienced and skilled defense counsel."

*In re IndyMac Mortgage-Backed Litigation*, No. 09-cv-4583 (S.D.N.Y.). Representing the Wyoming State Treasurer's Office and the Wyoming Retirement System as lead plaintiffs, Berman Tabacco achieved settlements totaling $346 million in a case regarding the securitization and sale of mortgage-backed securities ("MBS") by IndyMac Bank and related entities. In February 2015, the court approved a $340 million settlement with six underwriters of IndyMac MBS offerings, adding to a previous $6 million partial settlement and making the total recovery one of the largest MBS class action settlements to date. This settlement is extraordinary, not only because of its size but also because $340 million of the settlement amount was paid entirely by underwriters who had due diligence defenses. In most other MBS cases, by contrast, plaintiffs were able to recover the settlement fund monies from the issuing entities, who are held to a strict liability standard for which there is no due diligence defense. (The issuer in this action, IndyMac Bank, is no longer in existence.)

*In re Bristol-Myers Squibb Securities Litigation*, No. 02-cv-2251 (S.D.N.Y.). Berman Tabacco represented the Fresno County Employees' Retirement Association and Louisiana State Employees' Retirement System as co-lead plaintiffs and negotiated a settlement of $300 million in July 2004. At that time, the settlement was the largest by a drug company in a U.S. securities fraud case.

*In re The Bear Stearns Cos. Inc. Securities, Derivative and ERISA Litigation*, Master File No. 08-MDL No. 1963/08 Civ. 2793 (S.D.N.Y). Berman Tabacco acted as co-lead counsel for court-appointed lead plaintiff the State of Michigan Retirement Systems in this case arising from investment losses suffered in the Bear Stearns Companies' 2008 collapse. The firm negotiated $294.9 million in settlements, comprised of $275 million from Bear Stearns and $19.9 million from auditor Deloitte & Touche LLP. The settlement received final approval November 9, 2012. At the time, the settlement for $294.9 million represented one of the 40 largest securities class action settlements under the PSLRA. This is particularly significant in light of the fact that no government entity had pursued actions or claims against Bear Stearns or its former officers and directors related to the same conduct complained of in the firm's action.

3



*In re El Paso Securities Litigation*, No. H-02-2717 (S.D. Tex.). Representing the Oklahoma Firefighters Pension and Retirement System as co-lead plaintiff, Berman Tabacco helped negotiate a settlement totaling $285 million, including $12 million from auditors PricewaterhouseCoopers. The court granted final approval of the settlement in March 2007.

*California Public Employees' Retirement System v. Moody's Corp.*, No. CGC-09-490241 (Cal. Super. Ct. San Francisco Cty.). As lead counsel representing the California Public Employees' Retirement System (CalPERS), the firm negotiated a combined $255 million settlement with the credit rating agencies Moody's and Standard & Poor's to settle CalPERS' claim that "Aaa" ratings on three structured investment vehicles were negligent misrepresentations under California law. In addition to obtaining a substantial recovery for investment losses, this case was groundbreaking in that (a) the settlements rank as the largest known recoveries from Moody's and S&P in a private lawsuit for civil damages, and (b) it resulted in a published appellate court opinion finding that rating agencies can, in certain circumstances, be liable for negligent misrepresentations under California law for their ratings of privately-placed securities.

*In re Centennial Technologies Securities Litigation*, No. 97-cv-10304 (D. Mass.). Berman Tabacco served as sole lead counsel in a class action involving a massive accounting scandal that shot down the company's high-flying stock. Berman Tabacco negotiated a settlement that permitted a turnaround of the company and provided a substantial recovery for class members. The firm negotiated changes in corporate practice, including strengthening internal financial controls and obtaining 37% of the company's stock for the class. The firm also recovered $20 million from Coopers & Lybrand, Centennial's auditor at the time. In addition, the firm recovered $2.1 million from defendants Jay Alix & Associates and Lawrence J. Ramaekers for a total recovery of more than $35 million for the class. The firm subsequently obtained a $207 million judgment against former Centennial CEO Emanuel Pinez.

*In re Digital Lightwave Securities Litigation*, No. 98-152-cv-T-24C (M.D. Fla.). As co-lead counsel, Berman Tabacco negotiated a settlement that included changing company management and strengthening the company's internal financial controls. The class received 1.8 million shares of freely tradable common stock that traded at just below $4 per share when the court approved the settlement. At the time the shares were distributed to the members of the class, the stock traded at approximately $100 per share and class members received more than 200% of their losses after the payment of attorneys' fees and expenses. The total value of the settlement, at the time of distribution, was almost $200 million.

*In re Lernout & Hauspie Securities Litigation*, No. 00-11589 (D. Mass.), and *Quaak v. Dexia, S.A.*, No. 03-11566 (D. Mass.). In December 2004, as co-lead counsel, Berman Tabacco negotiated what was then the third-largest settlement ever paid by accounting firms in a securities class action – a $115 million agreement with the U.S. and Belgian affiliates of KPMG International. The case stemmed from KPMG's work for Lernout & Hauspie Speech Products, a software company driven into bankruptcy by a massive fraud. In March 2005, the firm reached an additional settlement worth $5.27 million with certain of Lernout & Hauspie's former top officers and directors. In the related *Quaak* case, the firm negotiated a $60 million settlement with Dexia Bank Belgium to settle claims stemming from the bank's alleged role in the fraudulent scheme at Lernout & Hauspie. The court granted final approval of the Dexia settlement in June 2007, bringing the total settlement value to more than $180 million.



*In re BP PLC Securities Litigation*, No. 10-md-2185 (S.D. Tex.). The firm was co-lead counsel representing co-lead plaintiff Ohio Public Employees Retirement System. Lead plaintiffs reached a $175 million settlement to resolve claims brought on behalf of a class of investors who purchased BP's American Depositary Shares ("ADS") between April 26, 2010 and May 28, 2010. The action alleged that BP and two of its former officers made false and misleading statements regarding the severity of the Gulf of Mexico oil spill. More specifically, plaintiffs alleged that BP misrepresented that its best estimate of the oil spill flow rate was from 1,000 to 5,000 barrels of oil per day, when internal BP estimates showed substantially higher potential flow rates. On February 13, 2017, the court granted final approval of the settlement, ending more than six years of hard fought litigation that included extensive fact and expert discovery, multiple rounds of briefing on defendants' motions to dismiss, two rounds of briefing on class certification, a successful defense of BP's appeal of the district court's class certification decision and briefing on cross-motions for summary judgment. This settlement reportedly represents one of only four mega securities class action settlements (settlements of $100 million or more) in 2017. *See Securities Class Action Settlements—2017 Review and Analysis*, p. 4 (Cornerstone Research 2018), https://www.cornerstone.com/Publications/Reports/Securities-Class-Action-Settlements-2017-Review-and-Analysis. It was also listed as the highest valued settlement during the first half of 2017 by ISS Securities Class Action Services. *See* ISS Securities Class Action Services, *Top 100 U.S. Class Action Settlements of All Time as of Dec. 31, 2017* (2018), p. 2, *available at* https://www.bermantabacco.com/wp-content/uploads/2018/03/SCAS-Top-100-Settlements-of-All-Time-2017-12-31.pdf.

*In re Fannie Mae 2008 Securities Litigation*, No. 08-cv-7831 (S.D.N.Y.). As co-lead counsel representing the Massachusetts Pension Reserves Investment Management Board, a co-lead plaintiff for the common stock class, Berman Tabacco helped negotiate a $170 million settlement with Fannie Mae. To achieve the settlement, which was approved in March 2015, plaintiffs had to overcome the challenges posed by the federal government's placement of Fannie Mae into conservatorship and by the Second Circuit's upholding of dismissal of similar claims against Freddie Mac, Fannie Mae's sibling Government-Sponsored Enterprise.

*In re Symbol Technologies, Inc. Securities Litigation*, No. 2:02-cv-01383 (E.D.N.Y.). Berman Tabacco represented the Louisiana Municipal Police Employees' Retirement System as co-lead plaintiff, obtaining a $139 million partial settlement in June 2004. Subsequently, Symbol's former auditor, Deloitte & Touche LLP, agreed to pay $24 million, bringing the total settlement to $163 million. The court granted final approval in September 2006.

*In re Prison Realty Securities Litigation*, No. 3:99-cv-0452 (M.D. Tenn.) (*In re Old CCA Securities Litigation*, No. 3:99-cv-0458). The firm represented the former shareholders of Corrections Corporation of America, which merged with another company to form Prison Realty Trust, Inc. The action charged that the registration statement issued in connection with the merger contained untrue statements. Overcoming arguments that the class' claims of securities fraud were released in prior litigation involving the merger, the firm successfully defeated the motions to dismiss. It subsequently negotiated a global settlement of approximately $120 million in cash and stock for this case and other related litigation.

*Oracle Cases*, Coordination Proceeding, Special Title (Rule 1550(b)) No. 4180 (Cal. Super. Ct. San Mateo Cty.). In this coordinated derivative action, Oracle Corporation shareholders alleged that the company's Chief Executive Officer, Lawrence J. Ellison, profited from illegal insider trading. Acting as co-lead counsel, the firm reached a settlement, pursuant to which Mr. Ellison would personally make charitable donations of



$100 million over five years in Oracle's name to an institution or charity approved by the company and pay $22 million in attorneys' fees and expenses associated with the prosecution of the case. The innovative agreement, approved by a judge in December 2005, benefited Oracle through increased goodwill and brand recognition, while minimizing concerns that would have been raised by a payment from Mr. Ellison to the company, given his significant ownership stake. The lawsuit resulted in important changes to Oracle's internal trading policies that decrease the chances that an insider will be able to trade in possession of material, non-public information.

*In re International Rectifier Securities Litigation*, No. 07-cv-2544 (C.D. Cal.). As co-lead counsel representing the Massachusetts Laborers' Pension Fund, the firm negotiated a $90 million settlement with International Rectifier Corporation and certain top officers and directors. The case alleged that the company engaged in numerous accounting improprieties to inflate its financial results. The court granted final approval of the settlement in February 2010. At the settlement approval hearing, the Honorable John F. Walter, the presiding judge, praised counsel, stating: "I think the work by the lawyers – all the lawyers in this case – was excellent. … In this case, the papers were excellent. So it makes our job easier and, quite frankly, more interesting when I have lawyers with the skill of the lawyers that are present in the courtroom today who have worked on this case … the motion practice in this case was, quite frankly, very intellectually challenging and well done. … I've presided over this consolidated action since its commencement and have nothing but the highest respect for the professionalism of the attorneys involved in this case. … The fact that plaintiffs' counsel were able to successfully prosecute this action against such formidable opponents is an impressive feat."

*In re State Street Bank & Trust Co. ERISA Litigation*, No. 07-cv-8488 (S.D.N.Y.). The firm acted as co-lead counsel in this consolidated class action case, which alleged that defendant State Street Bank and Trust Company and its affiliate, State Street Global Advisors, Inc., (collectively, "State Street") breached their fiduciary duties under the Employee Retirement Income Security Act of 1974 ("ERISA") by failing to prudently manage the assets of ERISA plans invested in State Street fixed income funds during 2007. After well over a year of litigation, during which Berman Tabacco and its co-counsel reviewed approximately 13 million pages of documents and took more than 30 depositions, the parties negotiated an all-cash $89.75 million settlement, which received final approval in 2010.

*In re Philip Services Corp. Securities Litigation*, No. 98-cv-0835 (S.D.N.Y). As co-lead counsel, Berman Tabacco negotiated settlements totaling $79.75 million with the bankrupt company's former auditors, top officers, directors and underwriters. The case alleged that Philip Services and its top officers and directors made false and misleading statements regarding the company's publicly reported revenues, earnings, assets and liabilities. The district court initially dismissed the claims on grounds of *forum non conveniens*, but the firm successfully obtained a reversal by the United States Court of Appeals for the Second Circuit. The court granted final approval of the settlements in March 2007.

*In re Reliant Securities Litigation*, No. 02-cv-1810 (S.D. Tex.). As lead counsel representing the Louisiana Municipal Police Employees' Retirement System, the firm negotiated a $75 million cash settlement from the company and Deloitte & Touche LLP. The settlement received final approval in January 2006.

*In re KLA-Tencor Corp. Securities Litigation*, No. 06-cv-04065 (N.D. Cal.). Representing co-lead plaintiff Louisiana Municipal Police Employees' Retirement System, Berman Tabacco negotiated a $65 million



agreement to settle claims that KLA-Tencor illegally backdated stock option grants, issued false and misleading statements regarding grants to key executives and inflated the company's financial results by understating expenses associated with the backdated options. The court granted final approval of the settlement in 2008. At the conclusion of the case, Judge Charles R. Breyer praised plaintiffs' counsel for "working very hard" in exchange for an "extraordinarily reasonable" fee, stating: "I appreciate the fact that you've done an outstanding job, and you've been entirely reasonable in what you've done. Congratulations for working very hard on this."

*City of Brockton Retirement System v. Avon Products Inc.*, No. 11-cv-04665 (S.D.N.Y.). As a member of the executive committee representing named plaintiffs City of Brockton Retirement System and Louisiana Municipal Police Employees' Retirement System, the firm negotiated a $62 million settlement. The action alleged that Avon Products, Inc. violated federal securities laws by failing to disclose to investors the size and scope of the Company's violations of the Foreign Corrupt Practices Act of 1977 ("FCPA"). In response to Avon's piecemeal disclosures over the course of more than a year, which ultimately revealed the true extent of the FCPA violations, the company's stock lost nearly 20% of its pre-disclosure value. This case was one of the very few successful securities cases premised on FCPA violations.

*Ehrenreich v. Witter*, No. 95-cv-6637 (S.D. Fla.). The firm was co-lead counsel in this case involving Sensormatic Electronics Corp., which resulted in a settlement of $53.5 million. When it as approved in 1998, the settlement was one of the largest class action settlements in the state of Florida.

*In re Thomas & Betts Securities Litigation*, No. 2:00-cv-2127 (W.D. Tenn.). The firm served as co-lead counsel in this class action, which settled for more than $51 million in 2004. Plaintiffs had accused the company and other defendants of issuing false and misleading financial statements for 1996, 1997, 1998, 1999 and the first two quarters of 2000.

*In re Enterasys Networks, Inc. Securities Litigation*, No. C-02-071-M (D.N.H.). Berman Tabacco acted as sole lead counsel in a case against Enterasys Networks, Inc., in which the Los Angeles County Employees Retirement Association was lead plaintiff. The company settled in October 2003 for $17 million in cash, stock valued at $33 million and major corporate governance improvements that opened the computer networking company to greater public scrutiny. Changes included requiring the company to back a proposal to eliminate its staggered board of directors, allowing certain large shareholders to propose candidates to the board and expanding the company's annual proxy disclosures. The settlement received final court approval in December 2003.

*Giarraputo v. UNUMProvident Corp.*, No. 2:99-cv-00301 (D. Me.). As a member of the executive committee representing plaintiffs, Berman Tabacco secured a $45 million settlement in a lawsuit stemming from the 1999 merger that created UNUMProvident. Shareholders of both predecessor companies accused the insurer of misleading the public about its business condition before the merger. The settlement received final approval in June 2002.

*In re General Electric Co. Securities Litigation*, No. 09 Civ. 1951 (S.D.N.Y.). The firm serves as Lead Counsel on behalf of the State Universities Retirement System of Illinois in a lawsuit against General Electric Co. and certain of its officers. A settlement in the amount of $40 million was reached with all the parties. The court approved the settlement on September 6, 2013.



*In re UCAR International, Inc. Securities Litigation*, No. 98-cv-0600 (D. Conn.). The firm represented the Florida State Board of Administration as the lead plaintiff in a securities claim arising from an accounting restatement. The case settled for $40 million cash and the requirement that UCAR appoint an independent director to its board of directors. The settlement was approved in 2000.

*In re American Home Mortgage Securities Litigation*, No. 07-MD-1898 (E.D.N.Y.). As co-lead counsel representing the Oklahoma Police Pension & Retirement System, the firm negotiated a $37.25 million settlement – including $4.75 million from auditors Deloitte & Touche and $8.5 million from underwriters – despite the difficulties American Home's bankruptcy posed to asset recovery. The plaintiffs contended that American Home had failed to write down the value of certain loans in its portfolio, which declined substantially in value as the credit markets unraveled. The settlement received final approval in 2010 and was distributed in 2011.

*In re Avant, Securities Litigation*, No. 96-cv-20132 (N.D. Cal.). Avant!, a software company, was charged with securities fraud in connection with its alleged theft of a competitor's software code, which Avant! incorporated into its flagship software product. Serving as lead counsel, the firm recovered $35 million for the class. The recovery resulted in eligible class claimants receiving almost 50% of their losses after attorneys' fees and expenses.

*In re SmartForce PLC d/b/a SkillSoft Securities Litigation*, No. 02-cv-544 (D.N.H.). Representing the Teachers' Retirement System of Louisiana as co-lead plaintiff, Berman Tabacco negotiated a $30.5 million partial settlement with SkillSoft. Subsequently, the firm also negotiated an $8 million cash settlement with Ernst & Young Chartered Accountants and Ernst & Young LLP, SkillSoft's auditors at the time. The settlements received final approval in September 2004 and November 2005, respectively.

*In re Sykes Enterprises, Inc. Securities Litigation*, No. 8:00-cv-212-T-26F (M.D. Fla.). The firm represented the Florida State Board of Administration as co-lead plaintiff. Sykes Enterprises was accused of using improper means to match the company's earnings with Wall Street's expectations. The firm negotiated a $30 million settlement.

*In re Valence Securities Litigation*, No. 95-cv-20459 (N.D. Cal.). Berman Tabacco served as co-lead counsel in this action against a Silicon Valley-based company for overstating its performance and the development of an allegedly revolutionary battery technology. After the Ninth Circuit reversed the district court's decision to grant summary judgment in favor of defendants, the case settled for $30 million in Valence common stock.

*In re Sybase II, Securities Litigation*, No. 98-cv-0252-CAL (N.D. Cal.). Sybase was charged with inflating its quarterly financial results by improperly recognizing revenue at its wholly owned subsidiary in Japan. Acting as co-lead counsel, the firm obtained a $28.5 million settlement.

*In re Force Protection Inc. Securities Litigation*, No. 08-cv-845 (D.S.C.). As co-lead counsel representing the Laborers' Annuity and Benefit System of Chicago, the firm negotiated a $24 million settlement in a securities class action against armored vehicle manufacturer Force Protection, Inc. The settlement addressed the claims of shareholders who accused the company and its top officers of making false and



misleading statements regarding financial results, failing to maintain effective internal controls over financial reporting and failing to comply with government contracting standards.

*In re Zynga Inc. Securities Litigation*, No. 12-cv-04007 (N.D. Cal.). As co-lead counsel, the firm negotiated a $23 million recovery to settle claims against the company and certain of its officers. The case alleged that the company and its highest-level officers falsely touted accelerated bookings and aggressive growth through 2012, while concealing crucial information that Zynga was experiencing significant declines in bookings for its games and upcoming Facebook platform changes that would negatively impact Zynga's bookings. Then, while Zynga's stock was trading at near a class-period high, defendants obtained an early release from the IPO lock-up on their shares to enable them and a few other insiders to reap over $593 million in proceeds in a secondary offering of personally held shares. The secondary offering was timed just three months before Zynga announced its dismal Q2 2012 earnings at the end of the class period, which caused Zynga's stock to plummet. The court granted final approval of the settlement in February 2016.

*In re ICG Communications Inc. Securities Litigation*, No. 00-cv-1864 (D. Colo.). As co-lead counsel representing the Strategic Marketing Analysis Fund, the firm negotiated an $18 million settlement with ICG Communications Inc. The case alleged that ICG executives misled investors and misrepresented growth, revenues and network capabilities. The court granted final approval of the settlement in January 2007.

*In re Critical Path, Inc. Securities Litigation*, No. 01-cv-0551 (N.D. Cal.). The firm negotiated a $17.5 million recovery to settle claims of accounting improprieties at a California software development company. Representing the Florida State Board of Administration, the firm was able to obtain this recovery despite difficulties arising from the fact that Critical Path teetered on the edge of bankruptcy. The settlement was approved in June 2002.

*In re Sunrise Senior Living, Inc. Securities Litigation*, No. 07-cv-00102 (D.D.C.). A federal judge granted final approval of a $13.5 million settlement between Oklahoma Firefighters Pension and Retirement System, represented by Berman Tabacco, and Sunrise Senior Living Inc.

*Hallet v. Li & Fung, Ltd.*, No. 95-cv-08917 (S.D.N.Y.). Cyrk Inc. was charged with misrepresenting its financial results and failing to disclose that its largest customer was ending its relationship with the company. In 1998, Berman Tabacco successfully recovered more than $13 million for defrauded investors.

*In re Warnaco Group, Inc. Securities Litigation*, No. 00-cv-6266 (S.D.N.Y.). Representing the Fresno County Employees' Retirement Association as co-lead plaintiff, the firm negotiated a $12.85 million settlement with several current and former top officers of the company.

*Gelfer v. Pegasystems, Inc.*, No. 98-cv-12527 (D. Mass.). As co-lead counsel, Berman Tabacco negotiated a settlement valued at $12.5 million, $4.5 million in cash and $7.5 million in shares of the company's stock or cash, at the company's option.

*Sand Point Partners, L.P. v. Pediatrix Medical Group, Inc.*, No. 99-cv-6181 (S.D. Fla.). Berman Tabacco represented the Florida State Board of Administration, which was appointed co-lead plaintiff along with several other public pension funds. The complaint accused Pediatrix of Medicaid billing fraud, claiming that



the company illegally increased revenue and profit margins by improperly coding treatment rendered. The case settled for $12 million on the eve of trial in 2002.

*In re Molten Metal Technology Inc. Securities Litigation*, No. 1:97-cv-10325 (D. Mass.), and *Axler v. Scientific Ecology Group, Inc.*, No. 1:98-cv-10161 (D. Mass.). As co-lead counsel, Berman Tabacco played a key role in settling the actions after Molten Metal and several affiliates filed a petition for bankruptcy reorganization in Massachusetts. The individual defendants and the insurance carriers in Molten Metal agreed to settle for $11.91 million. After the bankruptcy, a trustee objected to the use of insurance proceeds for the settlement. The parties agreed to pay the trustee $1.325 million of the Molten Metal settlement. The parties also agreed to settle claims against Scientific Ecology Group for $1.25 million, giving Molten Metal's investors $11.835 million.

*In re CHS Electronics, Inc. Securities Litigation*, No. 99-8186-CIV (S.D. Fla.). The firm helped obtain an $11.5 million settlement for co-lead plaintiff Warburg, Dillon, Read, LLC (now UBS Warburg).

*In re Summit Technology Securities Litigation*, No. 96-cv-11589 (D. Mass.). Berman Tabacco, as co-lead counsel, negotiated a $10 million settlement for the benefit of the class.

*In re Exide Corp. Securities Litigation*, No. 98-cv-60061 (E.D. Mich.). Exide was charged with having altered its inventory accounting system to artificially inflate profits by reselling used, outdated or unsuitable batteries as new ones. As co-lead counsel for the class, Berman Tabacco recovered more than $10 million in cash for class members.

*In re Fidelity/Micron Securities Litigation*, No. 95-cv-12676 (D. Mass.). The firm recovered $10 million in cash for Micron investors after a Fidelity Fund manager touted Micron while secretly selling the stock.

*In re Par Pharmaceutical Securities Litigation*, No. 06-cv-03226 (D.N.J.). As counsel for court-appointed plaintiff, the Louisiana Municipal Police Employees' Retirement System, Berman Tabacco obtained an $8.1 million settlement from the company and its former CEO and CFO, which the court approved in January 2013. The case alleged that the company had misled investors about its accounting practices, including overstatement of revenues.

*In re Interspeed, Inc. Securities Litigation*, No. 00-cv-12090-EFH (D. Mass.). Berman Tabacco served as co-lead counsel and negotiated a $7.5 million settlement on behalf of the class. The settlement was reached in an early stage of the proceedings, largely as a result of the financial condition of Interspeed and the need to salvage a recovery from its available assets and insurance.

*In re Abercrombie & Fitch Co. Securities Litigation*, No. M21-83 (S.D.N.Y). As a member of the executive committee in this case, the firm recovered more than $6 million on behalf of investors. The case alleged that the clothing company misled investors with respect to declining sales, which affected the company's financial condition. The court granted final approval of the settlement in January 2007.

*In re Digital Domain Media Group, Inc. Securities Litigation*, No. 12-14333-CIV (S.D. Fla.). As co-lead counsel, Berman Tabacco obtained a $5.5 million settlement on behalf investors of Digital Domain Media



Group, Inc. that was approved by the both bankruptcy court and the Southern District of Florida. The lead plaintiffs alleged that DDMG, a digital production company that was forced to file for bankruptcy in September 2012, less than 10 months after its initial public offering ("IPO"), misled investors in documents filed with the U.S. Securities and Exchange Commission as part of the IPO and in other statements made throughout the class period. Among other things, the lawsuit alleged that the defendants misled the public about DDMG's ability to raise capital and fund its operations, falsely reassuring investors about the company's ability to meet operating expenses while it "burned" cash at a rate that threatened its viability. In fact, according to a September 18, 2012 article in the Palm Beach Post, DDMG had difficulties meeting payroll as far back as 2010. According to the same article, then-Chairman and CEO John C. Textor "himself predicted a 'train wreck' in an email to an investor in early 2010."

*In re WorldCom, Inc. Securities Litigation*, No. 02-cv-3288 (S.D.N.Y.).  As counsel to court-appointed bondholder representatives, the County of Fresno, California and the Fresno County Employees' Retirement Association, Berman Tabacco helped a team of lawyers representing the lead plaintiff, the New York State Common Retirement Fund, obtain settlements worth more than $6.13 billion.

## ANTITRUST PRACTICE

Berman Tabacco has a national reputation for our work prosecuting antitrust class actions involving price-fixing, market allocation agreements, patent misuse, monopolization and group boycotts among other types of anticompetitive conduct.  Representing clients ranging from Fortune 500 companies and public pension funds to individual consumers, the experienced senior attorneys in our Antitrust Practice Group have engineered substantial settlements and changed business practices of defendant companies, recovering more than $1 billion for our clients overall.

Berman Tabacco has played a major role in the prosecution of numerous landmark antitrust cases.  For example, the firm was lead counsel in the Toys "R" Us litigation, which developed the antitrust laws with respect to "hub and spoke" conspiracies and resulted in a $56 million settlement.  Berman Tabacco brought the first action centered on so-called "reverse payments" between a brand name drug maker and a generic drug maker, resulting in an $80 million settlement from the drug makers, which had been accused of keeping a generic version of their blood pressure medication off the market.

The firm's victories for victims of antitrust violations have come at the trial court level and also through landmark appellate court victories, which have contributed to shaping private enforcement of antitrust law. For example, in the Cardizem CD case, Berman Tabacco was co-lead counsel representing health insurer Aetna in an antitrust class action and obtained a pioneering ruling in the federal court of appeals regarding the "reverse payment" by a generic drug manufacturer to the brand name drug manufacturer.  In a first of its kind ruling, the appellate court held that the brand name drug manufacturer's payment of $40 million per year to the generic company for the generic to delay bringing its competing drug to market was a *per se* unlawful market allocation agreement. Today that victory still shapes the ongoing antitrust battle over competition in the pharmaceutical market.

In the firm's case against diamond giant De Beers, the Third Circuit, sitting *en banc*, vacated an earlier panel decision and upheld the certification of a nationwide settlement class, removing the last obstacle to



final approval of a historic $295 million settlement. The Third Circuit's important decision provides a roadmap for obtaining settlement class certification in complex, nationwide class actions involving laws of numerous states.

In 2016, the firm won reversal of a grant of summary judgment for defendant automakers in a group boycott-conspiracy case involving the export of new motor vehicles from Canada to the U.S. The California Court of Appeal found that plaintiffs had presented evidence of "patently anticompetitive conduct" with evidence gathered in the pre-trial phase, which was powerful enough to go to a jury. The ruling is a rare example of an appellate court analyzing and reversing a trial court's evidentiary rulings to find evidence of a conspiracy.

Today the firm currently represents clients in significant antitrust class actions around the country, including actively representing major public pension funds in prosecuting price-fixing in the financial derivatives and commodities markets in the Euribor, Yen LIBOR and Canadian Dollar Offered Rate actions and the Foreign Currency Exchange Rate action.

While the majority of antitrust cases settle, our attorneys have experience taking antitrust class actions to trial. Because we represent only plaintiffs in antitrust matters, we do not have the conflicts of interest of other national law firms that represent both plaintiffs and defendants. Our experience also allows us to counsel medium and larger-sized corporations considering whether to participate as a class member or opt-out and pursue an individual strategy.

## RESULTS

## ANTITRUST SETTLEMENTS

Over the past two-and-a-half decades, Berman Tabacco has actively prosecuted scores of complex antitrust cases that led to substantial settlements for its clients. These include:

*In re NASDAQ Market-Makers Antitrust Litigation*, No. 94-cv-3996 (S.D.N.Y). The firm played a significant role in one of the largest antitrust settlements on record in a case that involved alleged price-fixing by more than 30 NASDAQ Market-Makers on about 6,000 NASDAQ-listed stocks over a four-year period. The settlement was valued at nearly $1 billion.

*In re Foreign Currency Conversion Fee Antitrust Litigation*, MDL No. 1409 (S.D.N.Y.). Berman Tabacco, as head of discovery against defendant Citigroup Inc., played a key role in reaching a $336 million settlement. The agreement settled claims that the defendants, which include the VISA, MasterCard and Diners Club networks and other leading bank members of the VISA and MasterCard networks, violated federal and state antitrust laws in connection with fees charged to U.S. cardholders for transactions effected in foreign currencies.

*In re DRAM Antitrust Litigation*, No. M:02-cv-01486 (N.D. Cal.). As liaison counsel, the firm actively participated in this multidistrict litigation, which ultimately resulted in significant settlements with some of the world's leading manufacturers of Dynamic Random Access Memory (DRAM) chips. The defendant chip-



makers allegedly conspired to fix prices of the DRAM memory chips sold in the United States during the class period. The negotiated settlements totaled nearly $326 million.

*Sullivan v. DB Investments, Inc.*, No. 04-02819 (D.N.J.). Berman Tabacco represented a class of diamond resellers, such as diamond jewelry stores, in this case alleging that the De Beers group of companies unlawfully monopolized the worldwide supply of diamonds in a scheme to overcharge resellers and consumers. In May 2008, a federal judge approved the settlement, which included a cash payment to class members of $295 million, an agreement by De Beers to submit to the jurisdiction of the United States court to enforce the terms of the settlement and a comprehensive injunction limiting De Beers' ability to restrict the worldwide supply of diamonds in the future. This case is significant not only because of the large cash recovery but also because previous efforts to obtain jurisdiction over De Beers in both private and government actions had failed. On August 27, 2010, the United States Court of Appeals for the Third Circuit agreed to hear arguments over whether to uphold the district court's certification of the settlement class. By agreeing to schedule an *en banc* appeal before the full court, the Third Circuit vacated a July 13, 2010 ruling by a three-judge panel of the appeals court that, in a 2-to-1 decision, had ordered a remand of the case back to the district court, which may have required substantial adjustments to the original settlement. On February 23, 2011, the Third Circuit, sitting *en banc*, again heard oral argument from the parties. On December 20, 2011, the *en banc* Third Circuit handed down its decision affirming the district court in all respects.

*In re Lithium Ion Batteries Antitrust Litigation*, No. 13-md-2420-YGR (N.D. Cal.). As co-lead class counsel for Direct Purchaser Plaintiffs ("DPPs") in this this multidistrict antitrust litigation, the firm achieved settlements totaling $139.3 million. The litigation arose from an alleged worldwide conspiracy to fix prices of lithium-ion rechargeable batteries ("LiBs"). LiBs are components of LiB camcorders, digital cameras, and laptop computers. The alleged conspiracy involved some of the largest companies in the world—Sony, Samsung SDI, Panasonic, Sanyo, LG Chem, Toshiba, Hitachi Maxell, and NEC Corp. The lawsuit alleges that defendants participated in a conspiracy to fix the prices of LiBs, which affected the prices paid for the batteries and certain products in which the batteries are used. Plaintiffs successfully defeated multiple motions to dismiss involving complex issues of antitrust standing and the pleading of conspiracy allegations. Berman Tabacco and the team negotiated multiple settlements totaling $139.3 million. The court granted final approval on May 16, 2018.

*In re Sorbates Direct Purchaser Antitrust Litigation*, No. C 98-4886 CAL (N.D. Cal.). The firm served as lead counsel alleging that six manufacturers of Sorbates, a food preservative, violated antitrust laws through participation in a worldwide conspiracy to fix prices and allocations to customers in the United States. The firm negotiated a partial settlement of $82 million with four of the defendants in 2000. Following intensive pretrial litigation, the firm achieved a further $14.5 million settlement with the two remaining defendants, Japanese manufacturers, in 2002. The total settlement achieved for the class was $96.5 million.

*In re Disposable Contact Lens Antitrust Litigation*, MDL No. 1030 (M.D. Fla.). The firm acted as co-lead counsel and chief trial counsel. Representing both a national class and the State of Florida, the firm helped secure settlements from defendants Bausch & Lomb and the American Optometric Association before trial and from Johnson & Johnson after five weeks of trial. The settlements were valued at more than $92 million and also included significant injunctive relief to make disposable contact lenses available at more discount outlets and more competitive prices.



*In re Cardizem CD Antitrust Litigation*, No. 99-01278 (E.D. Mich.). In another case involving generic drug competition, Berman Tabacco, as co-lead counsel, helped secure an $80 million settlement from French-German drug maker Aventis Pharmaceuticals and the Andrx Corporation of Florida. The payment to consumers, state agencies and insurance companies settled claims that the companies conspired to prevent the marketing of a less expensive generic version of the blood pressure medication Cardizem CD. The state attorneys general of New York and Michigan joined the case in support of the class. The firm achieved a significant appellate victory in a first of its kind ruling that the brand name drugmaker's payment of $40 million per year for the generic company to delay bringing its generic version of blood-pressure medication Cardizem CD to market constituted an agreement not to compete that is a *per se* violation of the antitrust laws.

*In re Toys "R" Us Antitrust Litigation*, MDL No. 1211 (E.D.N.Y.). The California office negotiated a $56 million settlement to answer claims that the retailer violated laws by colluding to cut off or limit supplies of popular toys to stores that sold the products at lower prices. The case developed the antitrust laws with respect to a "hub and spoke" conspiracy, where a downstream power seller coerces upstream manufacturers to the detriment of consumers. One component of the settlement required Toys "R" Us to donate $36 million worth of toys to needy children throughout the United States over a three-year period.

*In re Reformulated Gasoline (RFG) Antitrust and Patent Litigation*, MDL No. 05-1671 (C.D. Cal.). Berman Tabacco, as co-lead counsel, negotiated a $48 million settlement with Union Oil Company and Unocal. The agreement settled claims that the defendants manipulated the California gas market for summertime reformulated gasoline and increased prices for consumers. The noteworthy settlement delivered to consumers a combination of clean air benefits and funding for alternative fuel research.

*In re Abbott Laboratories Norvir Antitrust Litigation*, Nos. 04-1511, 04-4203 (N.D. Cal.). Berman Tabacco acted as co-lead counsel in a case on behalf of indirect purchasers alleging that the defendant pharmaceutical company engaged in an illegal leveraged monopoly in the sale of its AIDS boosting drug known as Norvir (or Ritanovir). Plaintiffs were successful through summary judgment, including the invalidation of two key patents based on prior art, but were reversed on appeal in the Ninth Circuit as to the leveraged monopoly theory. The case settled for $10 million, which was distributed net of fees and costs on a *cy pres* basis to 10 different AIDS research and charity organizations throughout the United States.

*Automotive Refinishing Paint Antitrust*, J.C.C.P. No. 4199 (Cal. Super. Ct.). In this class action, indirect purchaser-plaintiffs brought suit in California State Court against five manufacturers of automotive refinishing coatings and chemicals alleging that they violated California law by unlawfully conspiring to fix paint prices. Settlements were reached with all defendants totaling $9.4 million, 55% of which was allocated among an End-User Class consisting of consumers and distributed on a *cy pres*, or charitable, basis to thirty-nine court-approved organizations throughout California, and the remaining 45% of which was distributed directly to a Refinishing Class consisting principally of auto-body shops located throughout California.

**BERMAN | TABACCO**                                                    Firm Resume

## LEADERSHIP ROLES

The firm currently acts as lead or co-lead counsel in high-profile securities and antitrust class actions and also represents investors in individual actions, ERISA cases and derivative cases.

The following is a representative list of active class action cases in which the firm serves as lead or co-lead counsel or as executive committee member.

> *In re Aqua Metals, Inc. Securities Litigation*, No. 4:17-CV-07142-HSG (N.D. Cal.). Co-lead counsel for court-appointed lead plaintiff Plymouth County Retirement Association.

> *In re Apple Processor Litigation*, No. 18-cv-00147-EJD (N.D. Cal.). Co-lead counsel for a proposed nationwide class of purchasers of Apple devices, such as iPhones, iPads, and Apple TVs.

> *Fire & Police Pension Assoc. of Colorado. v. Bank of Montreal, et al.*, No. 1:18-CV-00342 (S.D.N.Y.). Member of two-firm Executive Committee.

> *In re Facebook, Inc. Shareholder Derivative Privacy Litigation*, No. 4:18-cv-01792-HSG (N.D. Cal.). Liaison Counsel for plaintiffs and member of Plaintiffs' Executive Committee.

> *Okla. Firefighters Pension & Ret. Sys. v. Chew, et al.*, No. 4:18-cv-04698-KAW (N.D. Cal.). Counsel for Oklahoma Firefighters Pension and Retirement System in derivative action against PG&E's Board of Director related to the catastrophic 2017 wildfires in Northern California.

> *In re EpiPen ERISA Litigation*, No. 17-CV-1884 (PAM/SER) (D. Minn.). Co-lead counsel for class.

> *San Antonio Fire & Police Pension Fund v. AmerisourceBergen Corp.*, C.A. No. 2018-0551 (Del. Ch.). Counsel for San Antonio Fire & Police Pension Fund in books and records action.

> *Solomon v. American Web Loan, Inc.*, et al., No. 4:17-CV-145 (E.D. VA.). Co-Lead counsel for class.

> *Gingras v. Rosette*, No. 5:15-CV-00101-GWC (D. VT.), and *Gingras v. Victory Park Capital Advisors, LLC, et al.*, No. 5:17-CV-233 (D. VT.). Co-lead counsel for plaintiffs.

> *Granger v. Great Plains Lending, LLC, et al.*, No. 1:18-cv-00112 (M.D.N.C.) Co-lead counsel for plaintiffs.

> *In re UnitedHealth Section 220 Litigation*, C.A. No. 0681-TMR (Del. Ch.). Co-lead counsel representing plaintiff Amalgamated Bank.

> *Massachusetts Laborers' Pension Fund v. Wells Fargo & Co., et al.*, C.A. No. 12997-VCG (Del. Ch. Ct.). Counsel for Massachusetts Laborers' Pension Fund and the Employees' Retirement System of the City of Providence in action under Section 220 of the Delaware General Corporation Law in order to evaluate whether the facts support a derivative suit on behalf of Wells Fargo against its officers and directors for breaches of their fiduciary duties.

> *Ohio Public Employees Retirement System v. BP America, Inc.*, No. 12-cv-01837 (S.D. Tex.).

15



Counsel for plaintiffs in individual action.

> *Sullivan v. Barclays PLC,* No. 13-cv-2811 (S.D.N.Y.). Counsel for plaintiffs and represents California State Teachers' Retirement System.

> *Laydon v. Mizuho Bank, Ltd.*, No. 1:12-cv-03419 (GBD) (S.D.N.Y.), and *Sonterra Capital Master Fund, Ltd. v. UBS AG*, No. 1:15-cv-05844 (GBD) (S.D.N.Y). Counsel for plaintiffs and represents California State Teachers' Retirement System and Oklahoma Police Pension and Retirement System.

> *Carlin v. DairyAmerica, Inc.*, No. 09-cv-00430 (E.D. Cal.). Member of the Interim Executive Committee and Liaison Counsel.

## TRIAL EXPERIENCE

The firm has significant experience taking class actions to trial. Over the years, Berman Tabacco's attorneys have tried cases against pharmaceutical companies in courtrooms in New York and Boston, a railroad conglomerate in Delaware, one of the nation's largest trustee banks in Philadelphia, a major food retailer in St. Louis and the top officers of a failed New England bank.

The firm has been involved in more trials than most of the firms in the plaintiffs' class action bar. Our partners' trial experience includes:

> *MAZ Partners, LP v. Bruce A. Shear, et al.*, No. 1:11-cv-11049-PBS (D. Mass.). After two-week trial in 2017 in this breach of fiduciary class action, jury verdict for plaintiffs but no damage award. Following post-trial briefing, court exercised its equitable power and ordered $3 million award by defendant.

> *Conway v. Licata*, No. 13-12193 (D. Mass.). 2015 jury verdict for defendants (firm's client) after two-week trial on the vast majority of counts, awarding the plaintiffs a mere fraction of the damages sought. Jury also returned a verdict for defendants on one of their counterclaims.

> *In re MetLife Demutualization Litigation*, No. 00-Civ-2258 (E.D.N.Y.). This case settled for $50 million after the jury was empaneled.

> *White v. Heartland High-Yield Municipal Bond Fund*, No. 00-C-1388 (E.D. Wis.). firm attorneys conducted three weeks of a jury trial against final defendant, PwC, before a settlement was reached for $8.25 million. The total settlement amount was $23.25 million.

> *In re Disposable Contact Lens Antitrust Litigation*, MDL No. 1030 (M.D. Fla.). Settled for $60 million with defendant Johnson & Johnson after five weeks of trial.

> *Gutman v. Howard Savings Bank*, No. 2:90-cv-02397 (D.N.J.). Jury verdict for plaintiffs after three weeks of trial in individual action. The firm also obtained a landmark opinion allowing investors to pursue common law fraud claims arising out of their decision to retain securities as opposed to purchasing new shares. *See Gutman v. Howard Savings Bank*, 748 F. Supp. 254 (D.N.J. 1990).



> *Hurley v. Federal Deposit Insurance Corp.*, No. 88-cv-940 (D. Mass.). Bench verdict for plaintiffs.

> *Levine v. Fenster*, No. 2-cv-895131 (D.N.J.). Plaintiffs' verdict of $3 million following four-week trial.

> *In re Equitec Securities Litigation*, No. 90-cv-2064 (N.D. Cal.). Parties reached a $35 million settlement at the close of evidence following five-month trial.

> *In re ICN/Viratek Securities Litigation*, No. 87-cv-4296 (S.D.N.Y.). Hung jury with 8-1 vote in favor of plaintiffs; the case eventually settled for over $14.5 million.

> *In re Biogen Securities Litigation*, No. 94-cv-12177 (D. Mass.). Verdict for defendants.

> *Upp v. Mellon*, No. 91-5219 (E.D. Pa.). In this bench trial, tried through verdict in 1992, the court found for a class of trust beneficiaries in a suit against the trustee bank and ordered disgorgement of fees. The Third Circuit later reversed based on lack of jurisdiction.



## OUR ATTORNEYS

### *Partners*

## NICOLE LAVALLEE

Nicole Lavallee, the managing partner of the firm's San Francisco office and member of the firm's executive committee, focuses her practice on securities and derivative litigation.  She is an integral member of the firm's New Case Investigations Team, which oversees the firm's portfolio monitoring program and investigates potential securities law violations to determine whether a case meets the firm's exacting standards.  She also advises clients on foreign litigation.

Since the enactment of the PSLRA, Ms. Lavallee has prosecuted numerous high-profile securities fraud cases for the firm.  Most recently, she was one of the lead attorneys overseeing the *IndyMac Mortgage-Backed Securities Litigation*, which settled for $346 million – one of the largest private MBS recoveries on record and the largest of any case where the issuer bank was in bankruptcy.  She was the lead partner handling the day-to-day prosecution of numerous other cases, where she handled or oversaw case investigation and factual development and briefing (including appeal briefing), conducted depositions, argued key motions (including motions to dismiss, motions for summary judgment and/or discovery motions), and participated in settlement negotiations.

Examples receiving favorable judicial commentary include: (i) *In re KLA-Tencor Corp. Securities Litigation*, No. C06-04065 (N.D. Cal.), an options-backdating class action, representing co-lead plaintiff the Louisiana Municipal Police Employees' Retirement System, which settled for $65 million; (ii) *In re International Rectifier Securities Litigation*, No. 07-cv-02544 (C.D. Cal.), on behalf of the co-lead plaintiff Massachusetts Laborers' Pension Fund, alleging manipulation of the company's financial results, which settled for $90 million in 2009; (iii) *Oracle Cases*, Coordination Proceeding, Special Title (Rule 1550(b)), No. JCCP 4180 (Cal. Super. Ct. San Mateo Cty.), a derivative case alleging that Lawrence Ellison engaged in illicit insider trading, and which settled weeks before trial when Mr. Ellison agreed to make $100 million in charitable donations in Oracle's name; and (iv) opt-out actions on behalf of State of Michigan Retirement System and Fresno County Employees' Retirement Association against Countrywide Financial Corp. (*State Treasurer of The State of Michigan v. Countrywide Financial Corp.*, No. CV-11-00809 (C.D. Cal.) and *Fresno County Employees Retirement Association v. Countrywide Financial Corp.*, No. CV-11-00811 (C.D. Cal.)).  She also played a key role in trial preparation for the *In re GenesisIntermedia, Inc. Securities Litigation*, No. CV 01-9024 (N.D. Cal.), class action.  She also acted as local counsel in a number of cases where she played a significant role such as *State of Oregon v. McKesson HBOC, Inc.*, Master File No. 307619 (Cal. Super. Ct. San Francisco Cty.), an individual opt out action brought on behalf of the retirement systems for Colorado, Utah and Minnesota, which settled very favorably.  Most recently, she oversaw the prosecution of *In re Zynga, Inc. Securities Litigation*, No. 12-cv-04007 (N.D. Cal.), which settled for $23 million in February 2016.

Currently, Ms. Lavallee is the lead partner at Berman Tabacco on *In re Aqua Metals, Inc. Securities Litigation*, No. 4:17-CV-07142-HSG (N.D. Cal.), in which the Firm is co-lead counsel representing court-appointed lead plaintiff Plymouth County Retirement Association.  The action alleges that defendants Aqua Metals, Inc. and company executives falsely misled investors about the status of its implementation of and



operations of its AquaRefining technology, which the company claimed had the potential to revolutionize lead recycling and make lead-acid batteries the only truly sustainable battery technology. She also oversees *San Antonio Fire & Police Pension Fund v. AmerisourceBergen Corp.*, C.A. No. 2018-0551 (Del. Ch.), an action pursuant to 8 Del. C. § 220 on behalf of the San Antonio Fire & Police Pension Fund against AmerisourceBergen Corp. to compel the company to provide certain of its books and records. The primary purpose of this books and records request is to ascertain whether Amerisource's directors breached their fiduciary duties in connection with its subsidiary's alleged illegal scheme to produce and market unapproved prefilled syringes ("PFS") in violation of federal and state laws. In 2017, Amerisource entered a guilty plea related to the alleged illegal PFS scheme and has paid more than $875 million in penalties and fines to settle related civil and criminal claims. She is also a lead partner on *Oklahoma Firefighters Pension & Retirement System v. Chew, et al.*, No. 18-cv-04698 (N.D. Cal.), a derivative action alleging the officers and directors of PG&E Corporation abdicated their fiduciary duties to oversee the company's safety and risk functions and thereby failed to ensure that PG&E's electrical power and distribution lines complied with state regulations and other safety protocols designed to prevent power and distribution lines from sparking wildfires in California. This lack of oversight allegedly caused a series of catastrophic wildfires that ravaged areas of Northern California beginning in October 2017.

Ms. Lavallee has an AV Preeminent® rating from *Martindale-Hubbell*® and was named a Super Lawyer in 2017 and 2018 by *Northern California Super Lawyers Magazine*. She was also recognized as a *Recommended Attorney in Securities Litigation* by *The Legal 500* in 2017 and 2018. She was also designated a *Local Litigation Star* by *Benchmark Litigation* in 2019. She has authored numerous articles and lectured on securities litigation. She was also included in *San Francisco Magazine's Top Women Attorneys in Northern California* in 2017-2018. She is also co-chair for the 2016 Cross-Border Litigation Forum, a gathering of the most senior legal practitioners in U.S./Canada cross-border litigation (was also on the Steering Committee for the 2012 and 2014 forums). Ms. Lavallee is admitted to practice in California (1993), all federal courts in the Ninth Circuit and the Ninth Circuit of the U.S. Courts of Appeals.

## JOSEPH J. TABACCO, JR.

Joseph J. Tabacco, Jr., the founding member of Berman Tabacco's San Francisco office, actively litigates antitrust, securities fraud, commercial high tech and intellectual property matters.

Prior to 1981, Mr. Tabacco served as senior trial attorney for the U.S. Department of Justice, Antitrust Division in both the Central District of California and the Southern District of New York. In that capacity, he had major responsibility for several criminal and civil matters, including the antitrust trial of *United States v. IBM*. Since entering private practice in the early 1980s, Mr. Tabacco has served as trial or lead counsel in numerous antitrust and securities cases and has been involved in all aspects of state and federal litigation. In private practice, Mr. Tabacco has also tried a number of securities cases, each of which resolved successfully at various points during or after trial, including *In re MetLife Demutualization Litigation* (settled after jury empaneled), *Gutman v. Howard Savings Bank* (plaintiffs' verdict after six-week trial), *In re Equitec Securities Litigation* (settled after six months of trial) and *In re Ramtek Securities Litigation*.

Mr. Tabacco was one of the firm's lead attorneys representing the Wyoming State Treasurer and Wyoming Retirement System in the *In re IndyMac Mortgage-Backed Securities Litigation* in which the firm achieved settlements totaling $346 million. He also oversaw *California Public Employees' Retirement System v.*



*Moody's Corp.*, No. CGC-09-490241 (Cal. Super. Ct. San Francisco Cty.), the pioneering case that held credit rating agencies (Standard & Poor's and Moody's) financially responsible for their negligence in rating structured investment vehicles. After settling with both McGraw Hill Companies and Moody's, California Public Employees' Retirement System' total recovery for the case was $255 million. Over the decades, Mr. Tabacco has prosecuted numerous securities fraud and antitrust cases against both domestic and international companies. In additional, he has engaged in depositions and discovery outside the U.S., including most recently in England in *CalPERS v. Moody's Corp.*

Mr. Tabacco recently oversaw *In re Lithium Ion Batteries Antitrust Litigation*, No. 13-md-2420-YGR (N.D. Cal.), which achieved settlements in the total amount of $139.3 million for a class of direct purchasers of lithium-ion rechargeable batteries (final approval on the last three settlements was granted on May 16, 2018). The lawsuit alleged that defendants, including LG, Panasonic, Sony, Hitachi, and Samsung, participated in a conspiracy to fix the prices of lithium ion rechargeable batteries, which affected the prices paid for the batteries and certain products in which the batteries are used and which the defendants sell.

Since 2008, Mr. Tabacco has served as an independent member of the Board of Directors of Overstock.com, a publicly-traded company internet retailer. He is Chair of the Board's Corporate Governance Committee and also serves as a member of the Board's Audit and Compensation Committees. He also frequently lectures and authors articles on securities and antitrust law issues and is a member of the Advisory Board of the Institute for Consumer Antitrust Studies at Loyola University Chicago School of Law and the Advisory Board of the Center for Law, Economics & Finance at the George Washington School of Law. Mr. Tabacco is also a former teaching fellow of the Attorney General's Advocacy Institute in Washington, D.C., and has served on the faculty of ALI-ABA on programs about U.S.-Canadian business litigation and trial of complex securities cases.

For 12 consecutive years, he has been among the top U.S. securities litigators ranked by *Chambers USA* and is also AV Preeminent® rated by *Martindale-Hubbell®*. Mr. Tabacco has been featured by the *Daily Journal* as one of California's top 30 securities litigators, a group chosen from both the plaintiff and defense bars, and as one of the *Top Plaintiffs Lawyers in California in 2017*. He was also recognized by *Who's Who Legal: Competition*, most recently in 2018 – a designation he has received for the past 5 years since the creation of the publication's Plaintiffs section. Additionally, for 15 consecutive years, Mr. Tabacco has been named a Super Lawyer by *Northern California Super Lawyers Magazine*, which features the top 5% of attorneys in the region. He was ranked as a *Recommended Attorney in Securities Litigation* by *The Legal 500* in 2017 and 2018 and was ranked by *Benchmark Litigation* as a Local Litigation Star in 2017 and 2018 and as a *Benchmark California Star* in 2019. He was recognized by *Best Lawyers®* for Litigation-Antitrust (2018 and 2019) and for Litigation-Securities (2019). Mr. Tabacco was also singled out by a top defense attorney for exemplifying "the finest tradition of the trial bar." In 2018, *Chambers USA* hailed Mr. Tabacco as "a well-known plaintiff-side securities litigator with a very strong profile among peers [, who] achieves impressive results in class actions involving issues such as the securitization of mortgaged-backed securities and manipulation of exchange rates." *Chambers* highlighted a client's praise for Joe: "'His legal knowledge and skills are at the highest level. His combined intelligence and experience results in well-reasoned and thoughtful arguments to further our case.'"

Mr. Tabacco has been admitted to practice law in the states of California, Massachusetts, New York and the District of Columbia (currently inactive).



### *Associates*

## A. CHOWNING POPPLER

Chowning Poppler focuses her practice on antitrust and securities litigation.  Prior to joining the firm in 2015, she worked as a litigation associate at a San Francisco law firm where she represented plaintiffs in employment-related individual and class action matters in state and federal court.  Ms. Poppler started her legal career at a plaintiffs' firm in San Diego which specializes in securities and consumer class actions.

While in law school, Ms. Poppler interned at the Public Integrity Bureau of the State of New York Office of the Attorney General where she investigated alleged corruption and fraud in local governments.  Ms. Poppler served on her law school's Pro Bono Legal Advocates board where she oversaw and coordinated volunteers for the unlawful detainer law clinic.  She was also a member of the *San Diego International Law Journal*.

Northern California *Super Lawyers Magazine* named Ms. Poppler a "Rising Star" in 2017 and 2018.  She was also included in *San Francisco Magazine's Top Women Attorneys in Northern California* in 2017-2018.  She has served as an Executive Board Member on the ACLU – North Peninsula Chapter Board since 2012.  She is admitted to practice law in the State of California and the U.S. District Courts for the Northern, Central and Eastern Districts of California.

### OFFICES

| **MASSACHUSETTS** | **CALIFORNIA** |
|---|---|
| One Liberty Square | 44 Montgomery Street, Suite 650 |
| Boston, MA 02109 | San Francisco, CA 94104 |
| Phone: (617) 542-8300 | Phone: (415) 433-3200 |
| Fax: (617) 542-1194 | Fax: (415) 433-6382 |

### ###

# TAB 27

2019 WL 3290770
Only the Westlaw citation is currently available.
United States District Court, N.D. California,
San Jose Division.

IN RE EXTREME NETWORKS,
INC. SECURITIES LITIGATION

Case No. 15-cv-04883-BLF
|
Signed 07/22/2019

ORDER GRANTING LEAD PLAINTIFF'S
MOTION FOR FINAL APPROVAL OF CLASS
ACTION SETTLEMENT AND PLAN OF
ALLOCATION; GRANTING LEAD COUNSEL'S
MOTION FOR AN AWARD OF ATTORNEYS'
FEES AND PAYMENT OF EXPENSES

[Re: ECF 172, 173]

BETH LABSON FREEMAN, United States District Judge

**\*1** On June 27, 2019, the Court heard (1) Lead Plaintiff's Motion for Final Approval of Class Action Settlement and Plan of Allocation (Appr. Mot., ECF 172), and (2) Lead Counsel's Motion for an Award of Attorneys' Fees and Payment of Expenses (Fees Mot., ECF 173). For the reasons discussed below and those stated on the record at the hearing on the motions, the motions are GRANTED.

## I. BACKGROUND

### A. Facts

This is a putative class action for securities fraud brought against Extreme Networks, Inc. ("Extreme") and its officers Charles W. Berger, John T. Kurtzweil, and Kenneth B. Arola ("Individual Defendants") (collectively with Extreme, "Defendants"). Founded in 1966, Extreme is a Delaware corporation with its principal offices in San Jose, California. *See* First Am. Compl. ("FAC") ¶ 2, 32, ECF 105. Extreme develops and sells network infrastructure equipment such as wired and wireless devices for accessing the Internet, as well as related software. *Id.* ¶ 2. The Individual Defendants were officers and directors of Extreme during the time relevant to this litigation. Defendant Charles W. Berger was Extreme's President and Chief Executive Officer ("CEO") and a member

of Extreme's Board of Directors from April 2013 until April 19, 2015. *Id.* ¶ 34. Defendant John T. Kurtzweil was Extreme's Chief Financial Officer ("CFO") and Senior Vice President from June 29, 2012 until June 1, 2014. *Id.* ¶ 35. From June 2, 2014 until September 30, 2014, Kurtzweil served as Special Assistant to the CEO. *Id.* Defendant Kenneth B. Arola was the Company's CFO and Senior Vice President from June 2, 2014 through May 2016. *Id.* ¶ 36.

The First Amended Complaint ("FAC") alleges that Defendants misrepresented to investors the success of Extreme's post-acquisition integration with its former competitor, Enterasys Networks, Inc. ("Enterasys"), as well as developments in Extreme's "key partnership" with Lenovo Group Ltd. ("Lenovo"). *See, e.g.*, *id.* ¶¶ 1–18. Defendants' positive representations to investors about the resulting "synergies" from the Enterasys integration and benefits of the Lenovo partnership—including a commitment that cost savings from these arrangements would lead to double-digit revenue growth and a 10% operating margin by June 2015—caused Extreme's stock price to rise. *Id.* ¶¶ 17–19. Extreme's stock price then dropped when Extreme reported disappointing financial results at various points between February 2014 and the end of the Class Period on April 9, 2015. *Id.* ¶¶ 20–22.

Relying on six confidential witnesses ("CWs"), Lead Plaintiff Arkansas Teacher Retirement System ("ATRS" or "Lead Plaintiff") alleged that Defendants knew or recklessly disregarded material adverse facts regarding the lack of any integration plan for the Enterasys merger, which was not "on track" or "complete" as represented. *Id.* ¶ 13. ATRS also pointed to accounts from CWs that the Lenovo partnership was largely unproductive, in direct contrast to Defendants' representations to the market. *Id.* ¶ 17. According to ATRS, Defendants' false statements caused Extreme's stock to trade at artificially inflated prices between September 12, 2013, and April 9, 2015 (the "Class Period"), reaching a high of $8.14 per share on January 23, 2014. *Id.* ¶ 19. ATRS alleges that four partial corrective disclosures by Defendants announcing revenue shortfalls, guidance misses, and turnovers of Extreme executives, caused the stock price to plummet as the undisclosed risks relating to Enterasys integration and Lenovo partnership materialized. *Id.* ¶ 20–22.

**\*2** Defendants have agreed to pay $7,000,000 in cash, to secure a settlement of the claims in the Action and related claims that could have been brought ("Released Claims").

Case 4:19-cv-00509   Document 65-9   Filed 07/02/21 in TXSD   Page 788 of 1452

In re Extreme Networks, Inc. Securities Litigation, Not Reported in Fed. Supp. (2019)
2019 WL 3290770

## B. Procedural History

This litigation has a long history of nearly four years. In October of 2015, two securities class action complaints were filed on behalf of individuals who invested in Extreme during the relevant time period. [1] On December 1, 2015, the Court granted the parties' stipulation to consolidate the two actions. ECF 18. On June 28, 2016, the Court appointed ATRS as Lead Plaintiff, Labaton Sucharow LLP as Lead Counsel, and Berman DeValerio [2] as Liaison Counsel to represent the putative class. ECF 75.

On September 26, 2016, ATRS filed a Consolidated Class Action Complaint on behalf of all investors who purchased the publicly traded common stock of Extreme and/or exchange-traded options on such common stock during the Class Period. *See* Consol. Compl. ¶ 1, ECF 87. Prior to filing the Consolidated Complaint, Lead Counsel conducted extensive factual investigation, including reviewing SEC documents, press releases, and other publicly available information, as well as reviewing research reports issued by financial analysts and other public data. Villegas Decl. ISO Final Appr. ("Villegas Decl.") ¶ 17, ECF 174. Lead Counsel also interviewed former employees of Extreme and other persons with relevant knowledge and consulted with an economics expert for loss causation and damages. *Id.* The Consolidated Complaint asserted two causes of action, based on the facts described above: (1) violation of § 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 against all Defendants; and (2) violation of § 20(a) of the Securities Exchange Act of 1934 against the Individual Defendants for liability as control persons of Extreme. *See generally* Consol. Compl.

On November 10, 2016, Defendants moved to dismiss the Consolidated Complaint. *See* ECF 89. On April 17, 2017, the Court granted Defendants' motion with leave to amend because ATRS had failed to adequately plead that Defendants made any false or misleading statements and that they did so with scienter. *See* ECF 102 at 42. On May 29, 2017, ATRS filed its First Amended Complaint, asserting the same two causes of action for securities violations against the same Defendants, focusing their amended factual allegations on statements that the Court had indicated were actionable. *See generally* FAC. Prior to filing the FAC, ATRS contacted 148 former employees of Extreme and interviewed 24 of those employees. Villegas Decl. ¶ 25. ATRS also consulted with an expert in the field of executive compensation. *Id.* On July 10, 2017, Defendants filed a motion to dismiss the FAC. *See* ECF

107. On March 21, 2018, the Court granted in part and denied in part Defendants' motion to dismiss, finding that ATRS stated a claim under Section 10(b) and Rule 10b-5 against all Defendants except Kurtzweil and that ATRS stated a claim under Section 20(a) against the Individual Defendants. On June 21, 2018, more than one and a half years after the Consolidated Complaint was filed and over two and a half years after the lawsuit's inception, Defendants answered the FAC. *See* ECF 145.

**\*3** The parties then engaged in some discovery, including numerous requests for production and interrogatories and their responses, as well as depositions. Lead Plaintiff served eighty-seven requests for the production of documents on Defendants on April 30, 2018. Villegas Decl. ¶ 33. Defendants served responses and objections to Lead Plaintiff's document requests on June 14, 2018. *Id.* The parties exchanged initial disclosures on May 21, 2018. *Id.* And the parties met and conferred extensively regarding the production of electronically stored information and a protective order governing the disclosures in the action. *Id.* ¶ 34.

Concurrently with discovery, the parties engaged in mediation and settlement discussions. On July 18, 2018, the parties attended an in-person mediation with Robert A. Meyer, Esq. ("Mr. Meyer"), an experienced mediator. *Id.* ¶¶ 35–36. The initial mediation was preceded by the exchange of mediation statements and Defendants' production of approximately 1,270 pages of documents, including Board of Director minutes and presentations, which Lead Counsel reviewed. *Id.* ¶¶ 36–37. Following rigorous arm's length negotiations led by Mr. Meyer, the parties accepted a mediator's proposal on August 17, 2018. *Id.* ¶ 38. On September 26, 2018, the parties entered into a settlement term sheet, and on November 30, 2018, ATRS filed the finalized settlement agreement in support of its motion seeking preliminary approval of the settlement. *See* ECF 155, 156-1.

## C. Settlement Agreement, Allocation Plan, and Notice Plan

On March 13, 2019, the Court granted ATRS's motion for preliminary approval of class action settlement and approved the forms of notice to the Settlement Class. *See* ECF 167. The class includes "all persons and entities that purchased or otherwise acquired the publicly traded common stock and exchange-traded call options, and/or sold put options, of Extreme Networks, Inc. during the period from September 12, 2013 through April 9, 2015, inclusive, and who were damaged

Case 4:19-cv-00509   Document 65-9   Filed 07/02/21 in TXSD   Page 789 of 1452

In re Extreme Networks, Inc. Securities Litigation, Not Reported in Fed. Supp. (2019)
2019 WL 3290770

thereby." *See* ECF 156-1 ("Agreement") at 10 ¶ hh. Under the Settlement Agreement, Extreme has agreed to provide a settlement fund in the amount of $7 million. *See* Agreement at 10 ¶ gg, 13 ¶ 6. Of the $7 million, the Settlement Class will receive what remains after subtracting the cost of any attorney's fees and expenses, notice and administration costs, Lead Plaintiff's service awards, and applicable taxes (the "Net Settlement Fund"). Villegas Decl. ¶ 62; Agreement ¶ 26. The Net Settlement Fund will be distributed among claimants on a *pro rata* basis based on "Recognized Loss" formulas tied to claimants' potential damages and developed by ATRS's expert. Settlement Agreement ¶¶ 22–26; Villegas Decl. ¶ 63; ECF 167 ¶¶ 48–57. Each claimant's calculated recognized loss will be compared to the aggregate recognized loss of all claimants to determine that claimant's *pro rata* share of the settlement fund. Villegas Decl. ¶ 64. Because the Court dismissed claims prior to February 5, 2014, but the class covers individuals who purchased shares prior to that date, those individuals' claims will be calculated using 20% of the alleged artificial inflation of the share prices. *Id.* ¶ 63.

The Court preliminarily approved, and the Settlement Administrator ("KCC") and the parties complied with, the following notice process: KCC obtained the names and addresses of potential settlement class members from listings provided by Extreme's transfer agent and from banks, brokers, and other nominees. Villegas Decl. ¶ 42; Villegas Decl., Ex. 2 ¶¶ 1–7, ECF 174-2. KCC sent by first-class mail notice packets (containing the notice and claim form) to settlement class members and potential nominees (third-party purchasers who may have purchased shares on behalf of potential claimants). Villegas Decl. ¶ 42; Villegas Decl., Ex. 2 ¶¶ 4–7. As of June 4, 2019, KCC had mailed 27,972 notice packets. Suppl. Decl. of Lance Cavallo ¶ 2, ECF 177. The summary notice was also published in *Investor's Business Daily* and disseminated over *PR Newswire.* Villegas Decl. ¶ 43. KCC also created and maintained a settlement website. Villegas Decl., Ex. 2 ¶ 10.

**\*4** The Agreement (and approved notice plan) contemplates a process for direct payments to the class members. First, class members needed to submit by June 6, 2019 a simple claim form for their shares purchased during the class period. Villegas Decl. ¶ 61; ECF 167. The direct mail and website notices informed members of the opportunity to opt out through a simple form. Requests for exclusions or objections needed to be filed by May 23, 2019. Villegas Decl. ¶ 45; ECF 167. Once KCC has processed submitted claims and provided claimants with an opportunity to cure

deficiencies or challenge rejection determinations, payment distributions will be made to eligible claimants through PayPal (for all payments below $10.00 and for payments between $10.00 and $100.00 for those who elect this option), or by check. Villegas Decl. ¶ 65. At least six months after the initial distribution of the funds, any funds remaining will be redistributed to those who have previously cashed their checks. *Id.* This process will be repeated until the remaining sum is no longer economically feasible to distribute. At that time, Lead Counsel will request with the Court that the unclaimed balance be distributed to a *Cy Pres* Recipient: Consumer Federation of America ("CFA"). *Id.* CFA is a national non-profit consumer advocacy organization for investor protection; it has been approved as a *Cy pres* beneficiary in several securities cases in California. *Id.* ¶ 66.

As of June 4, 2019, 1,244 valid claims had been submitted, representing over 66,777,000 shares of common stock purchased during the class period. Villegas Decl., Ex. 2 ¶¶ 5–6. Of those claims, 888 were filed by or on behalf of institutions and 356 claims were submitted by or on behalf of individuals. *Id.* ¶ 5.

On June 20, 2019, the Court held a hearing on the motions. Counsel represented on the record at the hearing that a total of 3,845 claims had been received, constituting a response rate of approximately 14 percent. Counsel also represented that of these claims, over 3,000 had been filed by or on behalf of institutions and approximately 400 by or on behalf of individuals. The deadline to submit claims had passed, but Counsel was continuing to accept claims through an informal grace period. At the hearing, this Court ordered Lead Counsel to post by June 21, 2019 a firm grace period termination date of June 28, 2019 on the website maintained by KCC, and to accept only claims filed before that date as determined by postmark and email timestamp. Only two requests for exclusion were received by June 20, 2019, one of which was deemed invalid for failing to provide the requisite information and neglecting to cure the deficiency when notified by KCC that the exclusion request was invalid. Villegas Decl., Ex. 2 ¶ 3. There were no objectors before the deadline and no objectors appeared at the hearing. *Id.* Counsel represented on the record at the hearing that initial distribution was expected to commence in December 2019. The Court indicated on the record that both motions would be granted. On the day of the hearing, the Court issued an order approving the Plan of Allocation. ECF 180.

Case 4:19-cv-00509 Document 65-9 Filed 07/02/21 in TXSD Page 790 of 1452
In re Extreme Networks, Inc. Securities Litigation, Not Reported in Fed. Supp. (2019)
2019 WL 3290770

## II. MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT

In order to grant final approval of the class action settlement, the Court must determine that (1) the class meets the requirements for certification under Federal Rule of Civil Procedure 23, and (2) the settlement reached on behalf of the class is fair, reasonable, and adequate. *See Staton v. Boeing Co.*, 327 F.3d 938, 952 (9th Cir. 2003) ("Especially in the context of a case in which the parties reach a settlement agreement prior to class certification, courts must peruse the proposed compromise to ratify both the propriety of the certification and the fairness of the settlement.").

### A. The Class Meets the Requirements for Certification under Rule 23

A class action is maintainable only if it meets the four requirements of Rule 23(a):

(1) the class is so numerous that joinder of all members is impracticable;

(2) there are questions of law or fact common to the class;

(3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and

(4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a). In a settlement-only certification context, the "specifications of the Rule—those designed to protect absentees by blocking unwarranted or overbroad class definitions—demand undiluted, even heightened, attention." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 620 (1997).

**\*5** In addition to satisfying the Rule 23(a) requirements, "parties seeking class certification must show that the action is maintainable under Rule 23(b)(1), (2), or (3)." *Id.* at 614. Plaintiffs seek certification under Rule 23(b)(3), which requires that (1) "questions of law or fact common to class members predominate over any questions affecting only individual members" and (2) "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

The Court concluded that these requirements were satisfied when it granted preliminary approval of the class action settlement. *See* ECF 167. The Court is not aware of any new facts which would alter that conclusion. However, the Court reviews the Rule 23 requirements again briefly, as follows.

Turning first to the Rule 23(a) prerequisites, the Court has no difficulty concluding that because the class contains thousands of members (3,845 claims filed as of the June 20, 2019 hearing), joinder of all class members would be impracticable. The commonality requirement is met because the key issues in the case are the same for all class members, including, for example, whether Defendants misrepresented material facts or omitted material facts for publicly traded stocks in violation of the law and whether these alleged actions artificially inflated the stock price. *See* Villegas Decl. ¶ 31. ATRS's claims are typical of those of the class, as it advances the same claims, shares identical legal theories, and allegedly experienced losses from Extreme's misrepresentations. *See Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998) (typicality requires only that the claims of the class representatives be "reasonably co-extensive with those of absent class members"). Finally, to determine ATRS's adequacy, the Court "must resolve two questions: (1) do the named plaintiffs and their counsel have any conflicts of interest with other class members and (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?" *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 985 (9th Cir. 2011) (internal quotation marks and citation omitted). The Court has no reservations regarding the abilities of Class Counsel or their zeal in representing the class, and the record discloses no conflict of interest which would preclude ATRS from acting as class representative. *See* Villegas Decl. ¶¶ 4, 16, 101.

With respect to Rule 23(b)(3), the "predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem*, 521 U.S. at 623. The common questions in this case which would be subject to common proof include whether Defendants misrepresented material facts or omitted material facts for publicly traded stocks in violation of the law, whether Defendants had a duty to disclose alleged material omissions or acted with scienter, and whether the market price of Extreme's common stock during the class period was artificially inflated due to the alleged material omissions and/or misrepresentations. Villegas Decl. ¶ 31; *see generally*

Case 4:19-cv-00509 Document 65-9 Filed 07/02/21 in TXSD Page 791 of 1452

In re Extreme Networks, Inc. Securities Litigation, Not Reported in Fed. Supp. (2019)
2019 WL 3290770

ECF 130. These questions predominate. Moreover, given this commonality, and the number of potential class members, the Court concludes that a class action is a superior mechanism for adjudicating the claims at issue.

Accordingly, the Court concludes that the requirements of Rule 23 are met and that certification of the class for settlement purposes is appropriate. Plaintiff Arkansas Teacher Retirement System is hereby appointed as class representative and Labaton Sucharow LLP is appointed class counsel.

### B. The Settlement is Fundamentally Fair, Adequate, and Reasonable

**\*6** Federal Rule of Civil Procedure 23(e) "requires the district court to determine whether a proposed settlement is fundamentally fair, adequate, and reasonable." *Hanlon, 150 F.3d at 1026*. In the Ninth Circuit, courts use a multi-factor balancing test to analyze whether a given settlement is fair, adequate and reasonable. That test includes the following factors:

> the strength of the plaintiffs' case; the risk, expense, complexity, and likely duration of further litigation; the risk of maintaining class action status throughout the trial; the amount offered in settlement; the extent of discovery completed and the stage of the proceedings; the experience and views of counsel; the presence of a governmental participant; and the reaction of the class members to the proposed settlement.

*Id.* at 1026–27; *see also* *Lane v. Facebook, Inc.*, 696 F.3d 811, 819 (9th Cir. 2012) (discussing *Hanlon* factors).

Recent amendments to Rule 23 require the district court to consider a similar list of factors before approving a settlement, including whether:

(A) the class representatives and class counsel have adequately represented the class;

(B) the proposal was negotiated at arm's length;

(C) the relief provided for the class is adequate, taking into account:

(i) the costs, risks, and delay of trial and appeal;

(ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;

(iii) the terms of any proposed award of attorney's fees, including timing of payment; and

(iv) any agreement required to be identified under Rule 23(e)(3);

(D) the proposal treats class members equitably relative to each other.

Fed. R. Civ. P. 23(e)(2).

In the Advisory Committee notes to the amendment, the Advisory Committee states that "[c]ourts have generated lists of factors to shed light" on whether a proposed class-action settlement is "fair, reasonable, and adequate." Advisory Committee Notes to 2018 Amendments, Fed. R. Civ. P. 23(e)(2) ("2018 R23 Advisory Notes"). The notes of the Advisory Committee explain that the enumerated, specific factors added to Rule 23(e)(2) are not intended to "displace" any factors currently used by the courts, but instead aim to focus the court and attorneys on "the core concerns of procedure and substance that should guide the decision whether to approve the proposal." *Id.*; *cf.* *United States v. Vonn,* 535 U.S. 55, 64 n.6 (2002) ("[T]he Advisory Committee Notes provide a reliable source of insight into the meaning of a rule...."). Accordingly, the Court applies the framework set forth in Rule 23 with guidance from the Ninth Circuit's precedent, bearing in mind the Advisory Committee's instruction not to let "[t]he sheer number of factors" distract the Court and parties from the "central concerns" underlying Rule 23(e)(2).

Because this settlement occurs before formal class certification, the Court must also ensure that the class settlement is not the "product of collusion among the negotiating parties." *In re Bluetooth Headset Prods. Liab. Litig.*, 654 F. 3d 935, 946–47 (9th Cir. 2011).

Case 4:19-cv-00509 Document 65-9 Filed 07/02/21 in TXSD Page 792 of 1452

In re Extreme Networks, Inc. Securities Litigation, Not Reported in Fed. Supp. (2019)

2019 WL 3290770

## 1. Adequacy of Notice

"Adequate notice is critical to court approval of a class settlement under Rule 23(e). *Hanlon,* 150 F.3d at 1025. For the Court to approve a settlement, "[t]he class must be notified of a proposed settlement in a manner that does not systematically leave any group without notice." *Officers for Justice v. Civil Serv. Comm'n of City & County of San Francisco,* 688 F.2d 615, 624 (9th Cir. 1982) (citation omitted).

**\*7** The Court previously approved the parties' proposed notice procedures. *See* ECF 167. In the motion for final approval, ATRS states that it followed this approved notice plan. Appr. Mot. at 3. After determining the best way to contact potential members of the class, KCC mailed almost 28,000 notice packets to potential class members and nominees. Cavallo Suppl. Decl. ¶ 3. The notice informed the class members of all key aspects of the Settlement, hearings, and the process for objections. *Id.* In addition, the Court-approved summary notice was published in *Investor's Business Daily*, transmitted over *PR Newswire*, and posted on the dedicated website. Villegas Decl. ¶ 103; Villegas Decl., Ex. 2 ¶ 10. Class counsel represented at the hearing that this notice process resulted in approximately 14% of the potential class submitting claims. This response rate is substantial.

In light of these actions and the Court's prior order granting preliminary approval, the Court finds that the parties have provided sufficient notice to the class members. *See Lundell v. Dell, Inc.,* Case No. 05-3970 JWRS, 2006 WL 3507938, at \*1 (N.D. Cal. Dec. 5, 2006) (holding that notice via email and first class mail constituted the "best practicable notice" and satisfied due process requirements).

## 2. Rule 23(e)/*Hanlon* Factors

Turning to the Rule 23(e) factors, the Court first considers whether "the class representatives and class counsel have adequately represented the class" and whether "the proposal was negotiated at arm's length." Fed. R. Civ. P. 23(e)(2)(A)–(B). These considerations overlap with certain *Hanlon* factors, such as the non-collusive nature of negotiations, the extent of discovery completed, and the stage of proceedings. *See Hanlon,* 150 F.3d at 1026.

As discussed above when certifying the class, the Court finds that both Lead Plaintiff and Class Counsel have adequately represented the class. In its Preliminary Approval Order, the Court found no evidence of a conflict between class representatives or counsel and the rest of the class. ECF 167 ¶ 3. No contrary evidence has emerged. Similarly, the Court found that counsel has vigorously prosecuted this action through dispositive motion practice, extensive initial discovery, and formal mediation. *See* Villegas Decl. ¶¶ 3–39, 90–91. Counsel possessed sufficient information to make an informed decision about the settlement, and its preliminary approval motion included information regarding settlement outcomes of similar cases, further indicating that counsel had adequate information from which to negotiate the settlement. *See* 2018 R23 Advisory Notes. The Court finds that counsel has continued to represent the class diligently by complying with the notice plan and settlement procedures. *See* Villegas Decl. ¶¶ 40–45. ATRS likewise actively participated in the prosecution of this case, including reviewing filings and discovery, and attending and participating in settlement negotiations. *See* ECF 174-1. Thus, the Court finds the adequacy of representation weighs in favor of approval.

The Settlement was also the product of arm's length negotiations through mediation sessions and follow-up communications supervised by an experienced mediator. Villegas Decl. ¶¶ 35–36. Pursuant to Ninth Circuit precedent, the Court must examine the Settlement for additional indicia of collusion that would undermine a *prima facie* arm's length negotiation. Because the Settlement was reached prior to class certification, there is "greater potential for a breach of fiduciary duty owed the class during settlement," and the Court must examine the risk of collusion with "an even higher level of scrutiny for evidence of collusion or other conflicts of interest." *In re Bluetooth,* 654 F.3d at 946. Signs of collusion may include (a) disproportionate distributions of settlement funds to counsel; (b) negotiation of attorney's fees separate from the class fund (a "clear sailing" provision); or (c) an arrangement for funds not awarded to revert to the defendants. *Id.* If multiple indicia of implicit collusion are present, the district court has a heightened obligation to assure that fees are not unreasonably high. *Id.* (quoting *Staton,* 327 F.3d at 965).

Case 4:19-cv-00509 Document 65-9 Filed 07/02/21 in TXSD Page 793 of 1452

In re Extreme Networks, Inc. Securities Litigation, Not Reported in Fed. Supp. (2019)

2019 WL 3290770

**\*8** There is no evidence that the parties colluded here. Counsel's fee request is proportionate to the settlement fund, there is no clear sailing provision, and no funds revert to Defendants. *See generally* Agreement. Further, the Court finds that the requested fees are in fact reasonable, to be discussed in greater detail below. This factor weighs in favor of approval.

Rules 23(e)(2)(C)–(D) specify factors for conducting a "substantive" review of the proposed settlement. The Court discusses each of the enumerated factors in turn.

### a. Strength of Plaintiffs' Case and Risk of Continuing Litigation

In assessing "the costs, risks, and delay of trial and appeal," Fed R. Civ. P. 23(e)(2)(C)(i), courts in the Ninth Circuit evaluate "the strength of the plaintiffs' case; the risk, expense, complexity, and likely duration of further litigation; [and] the risk of maintaining class action status throughout the trial." *Hanlon*, 150 F.3d at 1026. The Court finds that ATRS faced significant obstacles in this case, including needing to survive multiple motions to dismiss that raised important and complicated issues. The class would have faced similar risks at trial. As set forth in ATRS's motion, these obstacles included challenges to the material falsity of each alleged misstatement, class certification challenges, loss causation and damages challenges, and the risks inherent in a "battle of the experts" of complex economic theories in a jury trial. Appr. Mot. at 6–14. Throughout the litigation and mediation, Defendants raised many substantive, potentially meritorious defenses to the claims; indeed, the Court narrowed the claims significantly through the motions to dismiss phase. *See* Villegas Decl. ¶¶ 46–60. Securities actions in particular are often long, hard-fought, complicated, and extremely difficult to win.

The Court finds this factor weighs in favor of approval.

### b. Effectiveness of Distribution Method, Terms of Attorney's Fees, and Supplemental Agreements

The Court must likewise consider "the effectiveness of [the] proposed method of distributing relief to the class." Fed. R. Civ. P. 23(e)(2)(C)(ii). The Court has already approved the Plan of Allocation and has determined that it is reasonable and effective. ECF 180. The "terms of [the] proposed award of attorney's fees," Fed. R. Civ. P. 23(e)(2)(C)(iii), are reasonable as discussed below. There are no supplemental agreements. This factor weighs in favor of approval.

### c. Equitable Treatment of Class Members

Rule 23 also requires consideration of whether "the proposal treats class members equitably relative to each other." Fed. R. Civ. P. 23(e)(2)(C)(i). Consistent with this instruction, the Court considers whether the proposal "improperly grant[s] preferential treatment to class representatives or segments of the class." *In re Tableware Antitrust Litig.*, 484 F. Supp. 2d 1078, 1079 (N.D. Cal. 2007) (citation omitted). Under the Agreement, class members who have submitted timely claims will receive payments on a *pro rata* basis based on the value of their original claim and the number of claims filed. Villegas Decl. ¶¶ 63–66. In granting preliminary approval, the Court found that this proposed allocation did not constitute improper preferential treatment. ECF 180. The Court adheres to its view that the allocation plan is equitable. Moreover, the service award ATRS seeks is reasonable and does not constitute inequitable treatment of class members. *See Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 958–59 (9th Cir. 2009). This factor weighs in favor of approval.

### d. Settlement Amount

**\*9** "The relief that the settlement is expected to provide to class members is a central concern," though it is not enumerated among the factors of Rule 23(e). 2018 R23 Advisory Notes. Thus, the Court considers "the amount offered in the settlement." *Hanlon,* 150 F.3d at 1026. Crucial to the determination of adequacy is the ratio of "plaintiffs' expected recovery balanced against the value of the settlement offer." *In re Tableware,* 484 F. Supp. 2d at 1080. However, "[i]t is well-settled law that a cash settlement amounting to only a fraction of the potential recovery does not per se render the settlement inadequate or unfair." *Officers for Justice,* 688 F.2d at 628.

Case 4:19-cv-00509   Document 65-9   Filed 07/02/21 in TXSD   Page 794 of 1452

In re Extreme Networks, Inc. Securities Litigation, Not Reported in Fed. Supp. (2019)
2019 WL 3290770

Here, the $7 million fund represents a substantial recovery for the class. Experts have calculated that the maximum potential damages in this action is $74 million to $140 million, with a recovery as low as $13 million to $36 million if Defendants' disaggregation arguments had succeeded. *See* Villegas Decl. ¶ 5. The gross settlement amount thus represents a recovery of between 5% and 9.5% of non-disaggregated damages and between 19% to 54% if disaggregated arguments are credited. *Id.* Other courts have found similar recoveries to be fair and reasonable. *See, e.g.,* *In re Omnivision Techs.*, 559 F. Supp. 2d 1036, 1042 (N.D. Cal. 2007); *Int'l Bhd. of Elec. Workers Local 697 Pension Fund v. Int'l Game Tech., Inc.*, No. 3:09-cv-00419-MMD, 2012 WL 5199742, at *3 (D. Nev. Oct. 19, 2012) (finding 3.5% recovery to be within "the median recovery in securities class actions settled in the last few years").

Accordingly, the amount of the settlement also weighs in favor of approval.

### e. Counsel's Experience

The Court also considers "the experience and views of counsel." *Hanlon,* 150 F. 3d at 1026. Labaton Sucharow has extensive experience representing plaintiffs in securities and financial class action lawsuits. *See generally* Villegas Decl., Ex. 3, ECF 174-3. That such experienced counsel advocate in favor of the settlement weighs in favor of approval.

### C. Objections

"[T]he absence of a large number of objections to a proposed class action settlement raises a strong presumption that the terms of a proposed class settlement action are favorable to the class members." *Omnivision,* 559 F. Supp. 2d at 1043 (citation omitted). Here, Class Counsel and the Court received zero objections. Cavallo Suppl. Decl. ¶ 3. Many potential class members are sophisticated institutional investors; the lack of objections from such institutions indicates that the settlement is fair and reasonable. *See* *In re Citigroup Inc. Sec. Litig.*, 965 F. Supp. 2d 369, 382 (S.D.N.Y. 2013); *In re Linerboard Antitrust Litig.,* 321 F. Supp. 2d 619, 629 (E.D. Pa. 2004). Likewise, there were only two requests for exclusion, one of which KCC deemed invalid. *See id.* ¶ 3. This positive response from the class confirms that the settlement is fair and reasonable.

\* \* \*

Balancing the relevant factors, the Court finds the settlement fair and reasonable under Rule 23(e) and *Hanlon*.

### D. CONCLUSION

For the foregoing reasons, and after considering the record as a whole, the Court finds that notice of the proposed settlement was adequate, the settlement was not the result of collusion, and the settlement is fair, adequate, and reasonable.

Lead Plaintiff's Motion for Final Approval of Class Action Settlement and Plan of Allocation is GRANTED.

## III. MOTION FOR AN AWARD OF ATTORNEYS' FEES AND PAYMENT OF EXPENSES

ATRS seeks an award of attorneys' fees totaling $1.75 million, reimbursement of litigation costs and expenses in the amount of $167,200, and a service award of $2,180.80 for ATRS. The Court also considers the reasonableness of the Settlement Administrator's requested costs.

### A. Attorneys' Fees and Expenses

#### 1. Legal Standard

**\*10** "While attorneys' fees and costs may be awarded in a certified class action where so authorized by law or the parties' agreement, Fed. R. Civ. P. 23(h), courts have an independent obligation to ensure that the award, like the settlement itself, is reasonable, even if the parties have already agreed to an amount." *In re Bluetooth,* 654 F.3d at 941. "Where a settlement produces a common fund for the benefit of the entire class," as here, "courts have discretion to employ either the lodestar method or the percentage-of-recovery method" to determine the reasonableness of attorneys' fees. *Id.* at 942.

Under the percentage-of-recovery method, the attorneys are awarded fees in the amount of a percentage of the common fund recovered for the class. *Id.* Courts applying this method "typically calculate 25% of the fund as the benchmark for a reasonable fee award, providing adequate explanation in the record of any special circumstances justifying a

Case 4:19-cv-00509 Document 65-9 Filed 07/02/21 in TXSD Page 795 of 1452
In re Extreme Networks, Inc. Securities Litigation, Not Reported in Fed. Supp. (2019)
2019 WL 3290770

departure." *Id.* (internal quotation marks omitted). However, "[t]he benchmark percentage should be adjusted, or replaced by a lodestar calculation, when special circumstances indicate that the percentage recovery would be either too small or too large in light of the hours devoted to the case or other relevant factors." *Six (6) Mexican Workers v. Arizona Citrus Growers*, 904 F.3d 1301, 1311 (9th Cir. 2011). Relevant factors to a determination of the percentage ultimately awarded include "(1) the results achieved; (2) the risk of litigation; (3) the skill required and quality of work; (4) the contingent nature of the fee and the financial burden carried by the plaintiffs; and (5) awards made in similar cases." *Tarlecki v. bebe Stores, Inc.*, No. C 05-1777 MHP, 2009 WL 3720872, at \*4 (N.D. Cal. Nov. 3, 2009).

Under the lodestar method, attorneys' fees are "calculated by multiplying the number of hours the prevailing party reasonably expended on the litigation (as supported by adequate documentation) by a reasonable hourly rate for the region and for the experience of the lawyer." *In re Bluetooth*, 654 F.3d at 941. This amount may be increased or decreased by a multiplier that reflects factors such as "the quality of representation, the benefit obtained for the class, the complexity and novelty of the issues presented, and the risk of nonpayment." *Id.* at 942.

In common fund cases, a lodestar calculation may provide a cross-check on the reasonableness of a percentage award. *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1050 (9th Cir. 2002). Where the attorneys' investment in the case "is minimal, as in the case of an early settlement, the lodestar calculation may convince a court that a lower percentage is reasonable." *Id.* "Similarly, the lodestar calculation can be helpful in suggesting a higher percentage when litigation has been protracted." *Id.* Thus even when the primary basis of the fee award is the percentage method, "the lodestar may provide a useful perspective on the reasonableness of a given percentage award." *Id.* "The lodestar cross-check calculation need entail neither mathematical precision nor bean counting.... [Courts] may rely on summaries submitted by the attorneys and need not review actual billing records." *Covillo v. Specialtys Cafe*, No. C-11-00594-DMR, 2014 WL 954516, at \*6 (N.D. Cal. Mar. 6, 2014) (internal quotation marks and citation omitted).

An attorney is also entitled to "recover as part of the award of attorney's fees those out-of-pocket expenses that would normally be charged to a fee paying client." *Harris v. Marhoefer*, 24 F.3d 16, 19 (9th Cir. 1994) (internal quotation marks and citation omitted).

### 2. Discussion

**\*11** ATRS seeks an award of attorneys' fees totaling $1.75 million, which represents 25% of the $7 million gross Settlement Fund, as well as litigation expenses and costs in the amount of $167,200. *See* Fees Mot at 1.

Addressing expenses first, the Court does not hesitate to approve an award in the requested amount of $167,200. Class Counsel have submitted an itemized list of expenses by category of expense incurred through April 15, 2019, totaling $164,647.87, excluding Settlement Administration fees. *See* ECF 174-3, Ex. C. The Court has reviewed the list and finds the expenses to be reasonable.

The Court likewise is satisfied that the request for attorneys' fees is reasonable. Using the percentage-of-recovery method, the Court starts at the 25% benchmark. *See In re Bluetooth*, 654 F.3d at 942. ATRS requests 25%, given the exceptional results achieved, the risks of the litigation, the fine quality of Class Counsel's work, and the contingent nature of the fee. Courts have awarded comparable percentages in similar cases. *See* Villegas Decl.; *Destefano v. Zynga, Inc.*, No. 12-cv-04007-JSC, 2016 WL 537946, at \*23 (N.D. Cal. Feb. 11, 2016) (25%); *Omnivision*, 559 F. Supp. 2d at 1049 (28%). As of April 15, 2019, Labaton Sucharow expended 5,778.7 hours litigating this action. Villegas Decl., Ex. 3 ¶ 6 & Ex. A. A lodestar cross-check confirms the reasonableness of the requested fees, which amounts to a 0.53 multiplier of the lodestar in the amount of $3,260,714.50. *Id.* Courts have found that "[m]ultipliers of 1 to 4 are commonly found to be appropriate in common fund cases." *Aboudi v. T-Mobile USA, Inc.*, No. 12-CV-2169-BTM, 2015 WL 4923602, at \*7 (S.D. Cal. Aug. 18, 2015); *see also Petersen v. CJ Am., Inc.*, No. 14-CV-2570-DMS, 2016 WL 5719823, at \*1 (S.D. Cal. Sept. 30, 2016) (awarding 1.12 multiplier and recognizing that "the majority of fee awards in the district courts in the Ninth Circuit are 1.5 to 3 times higher than lodestar"). Thus, a multiplier below 1.0 is below the range typically awarded by courts and is presumptively reasonable.

In re Extreme Networks, Inc. Securities Litigation, Not Reported in Fed. Supp. (2019)

2019 WL 3290770

Lead Plaintiff's motion for attorneys' fees and expenses is GRANTED. ATRS is awarded expenses in the amount of $167,200 and attorneys' fees in the amount of $1.75 million.

## B. Incentive Award

Lead Plaintiff ATRS requests an incentive award in the amount of $2,180.80. The Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u-4(a)(4), limits a class representative's recovery to an amount "equal, on a per share basis, to the portion of the final judgment or settlement awarded to all other members of the class," but also provides that "[n]othing in this paragraph shall be construed to limit the award of reasonable costs and expenses (including lost wages) directly relating to the representation of the class to any representative party serving on behalf of a class." Incentive awards "are discretionary ... and are intended to compensate class representatives for work done on behalf of the class, to make up for financial or reputational risk undertaken in bringing the action, and, sometimes, to recognize their willingness to act as a private attorney general." Rodriguez, 563 F.3d at 958–59 (internal citation omitted).

"Incentive awards typically range from $2,000 to $10,000." Bellinghausen v. Tractor Supply Co., 306 F.R.D. 245, 267 (N.D. Cal. 2015). Service awards as high as $5,000 are presumptively reasonable in this judicial district. See, e.g., Camberis v. Ocwen Loan Serv. LLC, Case No. 14-cv-02970-EMC2015 WL 7995534, at *3 (N.D. Cal. Dec. 7, 2015). ATRS's participation in this case was substantial and was essential to obtaining the considerable monetary recovery which will be enjoyed by each class member. See Villegas Decl., Ex. 1 ¶¶ 8–11. Two representatives of ATRS expended 25 hours supervising and participating in the litigation and their requested award is directly tied to their normal hourly rates. Id. ¶¶ 10–11. Given the amount of time and assistance ATRS put into the case and the success of the recovery, an incentive award in the amount of $2,180.80 is proportional to the class members' recoveries. See Hayes v. MagnaChip Semiconductor Corp., No.14-cv-01160-JST, 2016 WL 6902856 at *10 (N.D. Cal. Nov. 21, 2016) (noting that $5,000 incentive awards are presumptively reasonable in the 9th Circuit); In re Am. Apparel S'holder Litig., No. CV 10-06352 MMM, 2014 WL 10212865, at *34 (C.D. Cal. July 28, 2014) (awarding an incentive award of $6,600 in a securities class action).

**\*12** The Court concludes that the requested $2,180.80 incentive award is appropriate in this case.

## C. Settlement Administrator Costs

The Court also holds that it is appropriate to award KCC its costs. In its preliminary approval order, the Court held that Lead Counsel may pay KCC its costs in an amount not to exceed $500,000. See ECF 167 ¶ 20. To date, ATRS has not submitted evidence regarding the total final costs requested by KCC. Given the somewhat complex nature of the allocation plan, the Court approves the awarding of costs to KCC in an amount not to exceed $500,000 subject to ATRS submitting an accounting of such costs with a request that the Court approve the final amount. ATRS shall submit such a request by administrative motion **within 14 days of KCC's final accounting**. If KCC does not reach this cap, the excess funds shall be distributed to the class claimants according to the provisions of the Agreement if practicable or distributed through *Cy Pres*.

## IV. ORDER

For the reasons discussed above,

(1) Lead Plaintiff's Motion for Final Approval of Class Action Settlement and Plan of Allocation is GRANTED; and

(2) Lead Counsel's Motion for an Award of Attorneys' Fees and Payment of Expenses is GRANTED. ATRS is awarded attorneys' fees in the amount of $1.75 million, costs and expenses in the amount of $167,200, and a service award in the amount of $2,180.80.

(3) The Settlement Administrator costs are APPROVED in an amount not to exceed $500,000.

Without affecting the finality of this Order and accompanying Judgment in any way, the Court retains jurisdiction over (1) implementation and enforcement of the Settlement Agreement until each and every act agreed to be performed by the parties pursuant to the Settlement Agreement has been performed; (2) any other actions necessary to conclude the Settlement and to administer, effectuate, interpret, and monitor compliance with the provisions of the Settlement Agreement; and (3) all parties to this action and Settlement class members for the purpose of implementing and enforcing the Settlement Agreement. Within 21 days after the distribution of the settlement funds and payment of attorneys' fees, the parties shall file a Post-Distribution Accounting in

Case 4:19-cv-00509   Document 65-9   Filed 07/02/21 in TXSD   Page 797 of 1452

In re Extreme Networks, Inc. Securities Litigation, Not Reported in Fed. Supp. (2019)
2019 WL 3290770

accordance with this District's Procedural Guidance for Class Action Settlements. The parties must seek approval from the Court for any *Cy Pres* distributions.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2019 WL 3290770

## Footnotes

1    *See Hong v. Extreme Networks, Inc., et al.*, No. 5:15-cv-04883-BLF, Compl., ECF 1 (Oct. 23, 2015); and *Kasprzak v. Extreme Networks, Inc., et al.*, No. 5:15-cv-04975-BLF, Compl., ECF 1 (Oct. 29, 2015).

2    Berman DeValerio has since been renamed Berman Tabacco.

**End of Document**                                        © 2021 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 28

2019 WL 6649017
Only the Westlaw citation is currently available.
United States District Court, W.D. Texas.

IN RE EZCORP, INC. SECURITIES LITIGATION

Master File No. 1:15-CV-00608-SS
|
Signed 12/06/2019

**ORDER AWARDING ATTORNEYS' FEES AND REIMBURSEMENT OF LITIGATION EXPENSES**

The Honorable Sam Sparks, United States District Judge

 **\*1**  This matter came on for hearing on December 6, 2019 (the "Settlement Hearing") on Lead Counsel's motion for an award of attorneys' fees and reimbursement of Litigation Expenses. The Court having considered all matters submitted to it at the Settlement Hearing and otherwise; and it appearing that notice of the Settlement Hearing substantially in the form approved by the Court was mailed to all Settlement Class Members who or which could be identified with reasonable effort, and that a summary notice of the hearing substantially in the form approved by the Court was published in *Investor's Business Daily* and was transmitted over the *PR Newswire* pursuant to the specifications of the Court; and the Court having considered and determined the fairness and reasonableness of the award of attorneys' fees and Litigation Expenses requested,

NOW, THEREFORE, IT IS HEREBY ORDERED THAT:

1. This Order incorporates by reference the definitions in the Stipulation and Agreement of Settlement dated July 18, 2019 (the "Stipulation," ECF No. 137-1) and all capitalized terms not otherwise defined herein shall have the same meanings as set forth in the Stipulation.

2. The Court has jurisdiction to enter this Order and over the subject matter of the Action and all parties to the Action, including all Settlement Class Members.

3. Notice of Lead Counsel's motion for an award of attorneys' fees and reimbursement of Litigation Expenses was given to all Settlement Class Members who could be identified with reasonable effort. The form and method of notifying the Settlement Class of the motion for an award of attorneys'

fees and expenses satisfied the requirements of Rule 23 of the Federal Rules of Civil Procedure, the Private Securities Litigation Reform Act of 1995 (15 U.S.C. § 78u-4(a)(7)), due process, and all other applicable law and rules, constituted the best notice practicable under the circumstances, and constituted due and sufficient notice to all persons and entities entitled thereto.

4. Lead Counsel are hereby awarded attorneys' fees in the amount of 33% of the Settlement Fund and $258,570.95 reimbursement of Plaintiff's Counsel's litigation expenses (which fees and expenses shall be paid from the Settlement Fund), which sums the Court finds to be fair and reasonable. Lead Counsel shall allocate the attorneys' fees awarded amongst Plaintiff's Counsel in a manner which it, in good faith, believes reflects the contributions of such counsel to the institution, prosecution and settlement of the Action.

5. In making this award of attorneys' fees and reimbursement of expenses to be paid from the Settlement Fund, the Court has considered and found that:

(a) The Settlement has created a fund of $4.875 million in cash that has been funded into escrow pursuant to the terms of the Stipulation, and that numerous Settlement Class Members who submit acceptable Claim Forms will benefit from the Settlement that occurred because of the efforts of Lead Counsel;

(b) Copies of the Postcard Notice were mailed to over 13,700 potential Settlement Class Members and nominees stating that Lead Counsel would apply for attorneys' fees and expenses, notice and administration costs and taxes;

 **\*2**  (c) The Notice posted on the Settlement Website informed potential Settlement Class Members and nominees that Lead Counsel would apply for attorneys' fees and expenses in an amount not exceed 33 ⅓% of the Settlement Fund and reimbursement of Litigation Expenses in an amount not to exceed $300,000. There were no objections to the requested attorneys' fees and expenses;

(d) Lead Counsel has conducted the litigation and achieved the Settlement with skill, perseverance and diligent advocacy;

(e) The Action raised a number of complex issues;

(f) Had Lead Counsel not achieved the Settlement there would remain a significant risk that Lead Plaintiff and the

other members of the Settlement Class may have recovered less or nothing from Defendants;

(g) Plaintiff's Counsel devoted over 4,676 hours, with a lodestar value of approximately $2,892,252 to achieve the Settlement; and

(h) The amount of attorneys' fees awarded and expenses to be reimbursed from the Settlement Fund are fair and reasonable and consistent with awards in similar cases.

6. Lead Plaintiff John Rooney is hereby awarded $7,500 from the Settlement Fund as reimbursement for his reasonable costs directly related to his representation of the Settlement Class.

7. Any appeal or any challenge affecting this Court's approval regarding any attorneys' fees and expense application shall in no way disturb or affect the finality of the Judgment.

8. Exclusive jurisdiction is hereby retained over the parties and the Settlement Class Members for all matters relating to this Action, including the administration, interpretation, effectuation or enforcement of the Stipulation and this Order.

9. In the event that the Settlement is terminated or the Effective Date of the Settlement otherwise fails to occur, this Order shall be rendered null and void to the extent provided by the Stipulation.

10. There is no just reason for delay in the entry of this Order, and immediate entry by the Clerk of the Court is expressly directed.

**All Citations**

Slip Copy, 2019 WL 6649017

---

**End of Document**

© 2021 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 29

2001 WL 527489

2001 WL 527489
Only the Westlaw citation is currently available.
United States District Court, E.D. Louisiana.

Patricia FAIRCLOTH, individually and
on behalf of all others similarly situated

v.

CERTIFIED FINANCE INC., Robert S. Cunard,
Jr., individually and in his capacity as an officer
of Certified Finance, Inc., Tommy L. Easterling,
individually and in his capacity as an officer of
Certified Finance, Inc., National Fire Insurance
Company of Hartford, and XYZ Insurance Company

No. Civ.A. 99–3097.
|
May 16, 2001.

**Opinion**

PORTEOUS, J.

**\*1** Before this Court are two motions filed in the above-captioned action: (1) Motion for Final Approval of Settlement Agreement, filed by the Named Plaintiff, Patricia Faircloth, individually and on behalf of the Plaintiff Class; and (2) Motion for an Award of a Reasonable Attorneys' Fee and Reimbursement for Costs Expended, filed on behalf of Class Counsel. These Motions came for hearing on May 9, 2001, with oral argument. The Court, having heard the arguments of the parties and having studied the legal memoranda and exhibits, the record, and the applicable law, is fully advised on the premises and ready to rule.

*ORDER AND REASONS*

I. BACKGROUND:

Certified Finance, Inc. ("Certified Finance") is a finance company that engages in the practice of extending loans to persons with pending personal injury litigation. If an attorney representing a consumer made a referral to Certified Finance, that attorney was often required to execute a guaranty in favor of Certified Finance, thereby ensuring payment to Certified Finance in the event that the underlying personal injury litigation did not result in a favorable outcome for the consumer.

On October 12, 1999, the Plaintiff, Patricia Faircloth, filed suit against Certified Finance, Inc., and two of its officers, Robert S. Cunard, Jr. and Tommy L. Easterling, alleging that certain loans for which she is indebted to the Defendant, Certified Finance, Inc., are unenforceable. Specifically, the Plaintiff alleged that the Defendant engaged in "loan flipping" that resulted in the imposition of interest charges substantially greater than the maximum interest rate allowed under both federal and state law. Accordingly, Faircloth claimed that the aforementioned loans are "unlawful debt" as defined in both 18 U.S.C. § 1961(6) and La. R.S. 9:3501 *et seq.* The plaintiff sought money damages and other relief with respect to the interest computations of Certified Finance, but did not dispute the principal amounts due under the terms of the notes.

On October 4, 2000, this Court entered an Order certifying this litigation as a class action pursuant to Rule 23(b)(3) of the Federal Rules of Civil Procedure. This Court defined the Class as all persons or entities who are obligated on a consumer loan or pre-computed consumer credit transaction, as that term is defined by La. R.S. 9:3516(14) and 9:3516(25), respectively, from Certified Finance, Inc., and which loan transaction calls for a payment within ten years from the date of the filing of the Complaint. The Defendants appealed this Court's Order of Class Certification to the Fifth Circuit Court of Appeals, which denied the Defendants permission to appeal.

Certified Finance, Easterling, and Cunard have denied and continue to deny any wrongdoing and/or liability in connection with all persons and entities that executed loan obligations in favor of Certified Finance. Certified Finance filed a counterclaim against the Named Plaintiff, seeking to recover sums allegedly owed to Certified Finance in connect with Faircloth's loan transactions with Certified Finance, along with interest, attorneys' fees, and costs. Additionally, Certified Finance, Easterling, and Cunard filed a third party demand against National Fire Insurance Company of Hartford ("Hartford"), seeking indemnity and defense costs in connection with its Commercial General Liability insurance policy. Hartford agreed to undertake a defense of Certified Finance, Easterling, and Cunard, but it has reserved its rights to contest coverage under the policy with respect to the Plaintiffs' claims.

**\*2** After lengthy negotiations and with the aid and guidance of Magistrate Lance M. Affrick, the Named Plaintiff, on behalf of herself and the Plaintiff Class, and the Defendants

reached a settlement agreement in the above-captioned matter. On April 11, 2001, the Plaintiffs filed with this Court a true and correct copy of the Settlement Agreement, as well as a Motion for Preliminary Approval of the Settlement Agreement. This Court, after thoroughly reviewing the Proposed Settlement Agreement, preliminarily approved said agreement on April 12, 2001. This Court directed that Notice of the Proposed Settlement of Class Action be sent to the Plaintiff Class. On that same date, Class Counsel mailed Notice to the class plaintiffs. The Notice of the Proposed Settlement of Class Action instructed class members to submit any objections to the proposed settlement to this Court no later than May 1, 2001. Additionally, this Court scheduled a Settlement Hearing for May 9, 2001, at which time this Court would consider the fairness, reasonableness, and adequacy of the proposed settlement agreement.

## II. LAW AND ANALYSIS:

A. Plaintiffs' Motion for Final Approval of Settlement Agreement:

After lengthy negotiations, aided by the guidance of Magistrate Lance M. Affrick, the Plaintiffs and Defendants have reached a settlement agreement in the above-captioned matter. While the Defendants have denied, and continue to deny, any liability with respect to the Plaintiffs' claims, they do not oppose final approval of the settlement agreement. In fact, the Defendants have joined in the motion seeking final approval of said settlement agreement.

Pursuant to Rule 23 of the Federal Rules of Civil Procedure, "[a] class action may not be dismissed or compromised without the approval of the court." Fed.R.Civ.P. 23(e). Three conditions must be satisfied before a court can approve a proposed settlement. First, notice of the settlement must be sent to all members of the class in accordance with the manner directed by the court. See Fed.R.Civ.P. 23(e); Roper v. Consurve, Inc., 578 F.2d 1106, 1110 (5th Cir.1978). Second, the court must determine that "the settlement is fair, adequate and reasonable and is not the product of collusion between the parties." In re Beef Industry Antitrust Litigation, 607 F.2d 167, 179 (5th Cir.1979) (citing Cotton v. Hinton, 559 F.2d 1326, 1330 (5th Cir.1977)). Third, the Court must "make an independent and thorough inquiry into the reasonableness of the attorneys' fees proposed in the settlement agreement." Bryant v. Universal Services, Inc., No. Civ. A. 99–2944, 2000 WL 680258, at *1 (E.D.La. May 24, 2000) (Vance, J.) (citing Strong v. BellSouth Telecomms. Inc., 137 F.3d 844, 849–50 (5th Cir.1998)).

*1. The Notice Requirement:*

Rule 23(e) of the Federal Rules of Civil Procedure requires that prior notice of a class settlement be given to all class members. See Fed.R.Civ.P. 23(e). This notice must provide the class members with information sufficient to consider the terms of the proposed settlement and determine whether or not to object to the proposed settlement. See In re Shell Oil Refinery, 155 F.R.D. 552, 557 (E.D.La.1993) (citing Newberg on Class Actions, § 11.30 (3 rd ed.1992)). In the present case, this Court directed that Notice of Proposed Settlement of Class Action be sent to all class members in an Order dated April 12, 2001. Notice was sent via first class mail to the most current known address of each class member on April 12, 2001. The Notice informed the class members of the terms of the proposed settlement agreement, the date and location of the fairness hearing, the pendency of Class Counsel's motion for an award of attorneys' fees and reimbursement of costs, and the procedure for objecting to any of the terms contained in the agreement. In addition to mailing notice to the individual class members, on April 15, 2001, a Summary Notice appeared in the *Times Picayune* and the *Baton Rouge Advocate,* two newspapers of general circulation in the New Orleans and Baton Rouge areas.

**\*3** This Court finds that such a manner of notifying the class members of the proposed settlement comports with this Court's Order, due process, and Rule 23 of the Federal Rules of Civil Procedure. See In re Beef Industry Antitrust Litigation, 607 F.2d at 179. The Notice sent to the class members and published in the two newspapers contained the information necessary for the class members to evaluate the proposed settlement, as well as the proper procedure for objecting to the proposed settlement. Accordingly, the Notice requirement of Rule 23(e) has been satisfied in the present case. See Fed.R.Civ.P. 23(e); *see also In re Shell Oil Refinery,* 155 F.R.D. at 558.

*2. The Fairness, Adequacy, and Reasonableness of the Proposed Settlement:*

Faircloth v. Certified Finance Inc., Not Reported in F.Supp.2d (2001)

2001 WL 527489

In order to approve a settlement agreement in a class action lawsuit, the court must find that "the settlement is fair, adequate and reasonable and is not the product of collusion between the parties." *In re Beef Industry Antitrust Litigation,* 607 F.2d at 179 (citing *Cotton,* 559 F.2d at 1330). With regard to the inquiry into the fairness of the proposed settlement agreement, the court's goal is to "ensure that the settlement is in the interest of the class, does not unfairly impinge on the rights and interest of dissenters, and does not merely mantle oppression." ' *Reed v. General Motors Corp.,* 703 F.2d 170, 172 (5th Cir.1983) (quoting *Pettway v. American Cast Iron Pipe Co.,* 576 F.2d 1157, 1214 (5th Cir.1978)). The Fifth Circuit has established six factors for courts to consider in assessing the fairness, adequacy, and reasonableness of a proposed settlement agreement. Those factors are:

> (1) the existence of fraud or collusion behind the settlement; (2) the complexity, expense, and likely duration of the litigation; (3) the stage of the proceedings and the amount of discovery completed; (4) the probability of plaintiffs' success on the merits; (5) the range of possible recovery; and (6) the opinions of the class counsel, class representatives, and absent class members.

*Reed,* 703 F.2d at 172 (citing *Parker v. Anderson,* 667 F.2d 1204, 1209 (5th Cir.1982)); *see also,* *In re Corrugated Container Antitrust Litigation,* 643 F.2d 195, 217 (5th Cir.1981).

"The hallmark of *Rule 23* is the flexibility it affords to the courts to utilize the class device in a particular case to best serve the ends of justice for the affected parties and to promote judicial efficiencies." *In re Beef Industry Antitrust Litigation,* 607 F.2d at 177 (citing 3 Newberg, Class Actions § 5570c at 476). Therefore, in weighing the aforementioned factors, it is important note that there is a strong presumption in favor of finding a settlement fair. *See* *Neff v. VIA Metropolitan Transit Auth.,* 179 F.R.D. 185,

208 (W.D.Tex.1998) (citing *Ahearn v. Fibreboard Corp.,* 162 F.R.D. 505, 527 (E.D.Tex.1995)); *see also,* *Cotton,* 559 F.2d at 1331.

*a. Existence of Fraud and Collusion*

**\*4** First, the Court must determine whether or not the proposed settlement is the result of fraud or collusion between the parties. *See Reed,* 703 F.2d at 172. However, there is typically an initial presumption that a proposed settlement is fair and reasonable when it is the result of arms length negotiations. *See* 2 Newberg on Class Actions, § 11.40 at 451 (2nd ed.1985). In the present case, counsel for all parties represented to this Court at the fairness hearing that the proposed settlement agreement is the result of lengthy and contentious negotiations. All of the attorneys involved in the case remained zealous advocates, vigorously representing their clients' interests throughout the entire litigation process, including the settlement negotiations. The settlement negotiations were closely monitored by Magistrate Judge Lance M. Affrick, who notified this court that negotiations remained at arms length throughout the entire settlement process. Accordingly, this Court finds that there is no indication that the settlement agreement is the product of fraud or collusion.

*b. Complexity, Expense, and Likely Duration of the Litigation:*

There is no dispute that the present case is an extraordinarily complex RICO class action involving multiple defendants. Not only are the RICO statutes extremely intricate and technical, but the underlying loan transactions in this case involve complex interest calculations and sophisticated financial theories. In fact, the law and underlying financial transactions involved are so complex that trial in the above-captioned matter was estimated to last at least two weeks. Furthermore, this case has been punctuated with a contentious motion practice on behalf of virtually all parties involved and has spawned thousands of pages of pleadings and document production. This matter has gone on for nearly two years and would undoubtedly continue on a protracted litigation path absent approval of the proposed settlement agreement.

Given the already active motion practice spawned by this litigation and the fact that the parties have already appealed

2001 WL 527489

a ruling of this Court to the Fifth Circuit Court of Appeals, it is likely that the parties would continue on a lengthy path of litigation whereby a great amount of judicial resources would be expended. This Court finds that should this complex litigation continue on towards trial, it is most likely that the case would last several more years and cost this Court and the parties involved an enormous amount of money. Such a determination weighs in favor of approving the proposed settlement.

### c. Stage of the Proceedings and the Amount of Discovery Completed:

At the time that the parties reached the settlement agreement, the above-captioned matter was in its second year of litigation. As stated above, a lengthy motions practice preceded the proposed settlement, in which the parties challenged every aspect of each others' claims and defenses. While not completed at the time of settlement, the parties had already engaged in detailed discovery, including taking lengthy depositions. The motions filed on behalf of both the Plaintiffs and the Defendants indicate that all parties involved had developed an in-depth understanding of the case at hand. The Court is satisfied that the parties have premised their decision to settle this case on substantial research conducted regarding their respective positions. The Court finds that this factor weighs in favor of approving the settlement.

### d. Probability of the Plaintiffs' Success on the Merits and the Range of Possible Recovery:

**\*5** In evaluating the likelihood of success on the merits, the court "must not try the case in the settlement hearings because '[t]he very purpose of the compromise is to avoid the delay and expense of such a trial." ' *Reed,* 703 F.2d at 172 (quoting *Young v. Katz,* 447 F.2d 431, 433 (5th Cir.1971)). Instead, the court must simply compare the terms of the settlement "with the likely rewards the class would have received following a successful trial of the case." *Reed,* 703 F.2d at 172 (citing *Cotton,* 559 F.2d at 1330). In the present case, Counsel for the Plaintiff Class is highly confident that the class would prevail on the merits against Certified Finance and its directors. However, the Defendants are equally as confident that they would prevail on their defenses. Furthermore, Hartford, the Defendants' insurer, appears equally confident of prevailing on its coverage

defense. The Plaintiffs argue that given such a situation, "even assuming the Plaintiff Class prevailed at trial on all theories, the likelihood of collection on a large judgment against Certified Finance might be called into question without its insurance coverage." Memorandum in Support of Plaintiffs' Motion for Final Approval of Settlement Agreement, page 16. The Plaintiffs argue that the proposed settlement provides the class with immediate, tangible benefits without further delay or uncertainty as to their ability to actually recover from the Defendants.

While the Plaintiff Class could arguably receive a greater award of damages at trial should it succeed on the merits, the litigation risks in the area of insurance coverage, not to mention the added costs of litigation and the increased possibility of being unable to collect from the Defendants on a judgment after lengthy and expensive litigation, all weigh in favor of settlement. Counsel for the Defendants represented to this Court at the fairness hearing that the amount of damages awarded pursuant to the settlement agreement is greater than what the Defendants believe the Plaintiffs would receive at trial. Defense counsel explained that while the Defendants continue to deny liability, they found the significant risk involved in going forward to trial in this matter warranted settling the case at this time rather than incurring further litigation expenses.

After comparing the significance of immediate recovery by way of settlement with the mere possibility of success on the merits and relief in the future following lengthy and expensive litigation, this Court is of the opinion that the settlement agreement should be approved. Under the settlement agreement, the class members will receive immediate cash benefits, as well as credits to their outstanding loan balances in some cases, without future delay. While it can be argued that the class members would receive greater benefits at trial, " '[i]t has been held proper to take the bird in the hand instead of a prospective flock in the bush." ' *In re Shell Oil Refinery,* 155 F.R.D. at 560 ((quoting *Oppenlander v. Standard Oil Co.,* 64 F.R.D. 597, 624 (D.Colo.1974)) (quoting *State of West Virginia v. Chas. Pfizer & Co.,* 314 F.Supp. 710, 743 (S.D.N.Y.1970)).

### e. Opinions of Class Counsel, Class Representative, & Absent Class Members:

**\*6** In the present case, the settling parties believe that the settlement is an appropriate and fair end to contentious, time

consuming litigation. Counsel for all parties represented at the fairness hearing that they are all of the opinion that the proposed settlement is fair, adequate, and reasonable under the circumstances. The Court agrees, for the class members will receive actual benefits pursuant to the settlement agreement in exchange for a dismissal of all claims with prejudice. Furthermore, the Court finds it significant that out of a class of 560 plaintiffs, no class member challenged the adequacy or reasonableness of the proposed settlement at the fairness hearing. The Court finds that this factor also weighs in favor of approval of the proposed settlement. Therefore, for the foregoing reasons, this Court finds that the proposed settlement is fair, adequate, and reasonable. Accordingly, Plaintiffs' Motion for Final Approval of Settlement Agreement shall be GRANTED.

C. Class Counsel's Motion for An Award of a Reasonable Attorneys' Fee and Reimbursement for Costs Expended:

The second motion before this Court is Class Counsel's Motion for an Award of Reasonable Attorneys' Fees and Reimbursement for Costs Expended. This Motion requires the court to "make an independent and thorough inquiry into the reasonableness of the attorneys' fees proposed in the settlement agreement." *Bryant,* 2000 WL 680258, at *1 (citing *Strong,* 137 F.3d at 849–50). In the present motion, Class Counsel seeks an award of attorneys fees in the amount of 35% of the common settlement fund, or approximately $560,000.00, plus 35% of any interest accrued thereon, plus reimbursement for actual costs expended to date in the amount of $11,469.74. [1]

With regard to determining the reasonableness of the amount of attorneys fees, a " 'district court is not bound by the agreement of the parties." ' *Strong,* 137 F.3d at 849 (quoting *Piambino v. Bailey,* 610 F.2d 1306, 1328 (5th Cir.1980); *Foster v. Boise–Cascade, Inc.,* 577 F.2d 335, 336 (5th Cir.1978)). "The court must scrutinize the agreed-to fees under the standards set forth in *Johnson v. Georgia Highway Express,* 488 F.2d 714 (5th Cir.1974), and not merely 'ratify a pre-arranged compact." ' *Strong,* 137 F.3d at 849 (quoting *Piambino,* 610 F.2d at 1328). "Even when the district court finds the settlement agreement to be untainted by collusion, fraud, and other irregularities, the court must thoroughly review the attorneys' fees agreed to by

the parties in the proposed settlement agreement." *Strong,* 137 F.3d at 850.

*1. Calculating Attorneys Fees in the Fifth Circuit:*
Typically, courts have applied two different methods for calculating attorney fees in class action lawsuits: the percentage fee method and the lodestar method. In the Fifth Circuit, the lodestar method is used to calculate reasonable attorneys fees, but that method has been somewhat "blended" with the percentage fee method and the twelve factors set forth in *Johnson. See In re Harrah's Entertainment Inc. Securities Litigation,* No. Civ. A. 95–3925, 1998 WL 832574, at *3 (E.D.La. Nov. 25, 1998) (citing *In re Combustion, Inc.,* 968 F.Supp. 1116, 1135 (W.D.La.1997)). Moreover, numerous district courts in this circuit have simply applied the percentage fee method in common fund cases. *See Harrah's,* 1998 WL 832574, at *2 (citing *In re Catfish Antitrust Litigation,* 939 F.Supp. 493, 500 (N.D.Miss.1996); *In re Prudential–Bach Energy Income Partnerships Securities Litigation,* 1994 WL 150742, at *4 (E.D.La. March 7, 1994)).

**\*7** While the lodestar method is still the proper method for calculating attorneys fees in this jurisdiction, the Fifth Circuit has recognized the propriety of the percentage fee method in situations in which each member of a class has an "undisputed and mathematically ascertainable claim to part of [a] judgment." *Strong,* 137 F.3d at 852 (quoting *Boeing Co. v. Van Gemert,* 444 U.S. 472, 479, 100 S.Ct.745, 748, 62 L.Ed.2d 676 (1980)). Therefore, "[i]t seems that a district court in the Fifth Circuit may exercise discretion in determining whether to apply the percentage fee or lodestar method, as long as under either method the award is supported by the twelve *Johnson* factors. *Harrah's,* 1998 WL 832574, at *3 (citing *Combustion,* 968 F.Supp. at 1135). As Judge Clement stated in *Harrah's,* "[d]espite the apparent advantages of the percentage fee method over the lodestar method in common fund cases, the law in the Fifth Circuit concerning which method should be applied is 'at best unclear." ' *Id.* (quoting *Combustion,* 968 F.Supp. at 1134). Therefore, out of an abundance of caution, this Court will apply both methods to the facts at hand and compare the results before rendering its decision as to amount of attorneys' fees that would be fair, just, and reasonable.

**Faircloth v. Certified Finance Inc., Not Reported in F.Supp.2d (2001)**

2001 WL 527489

Under the percentage fee method, the district court simply awards a percentage of the total settlement fund to class counsel. *See Prudential–Bach,* 1994 WL 150742, at [*] 3. However, under the lodestar method, "the district court must first determine the reasonable number of hours expended on litigation and the reasonable hourly rates for the participating attorneys." *Strong,* 137 F.3d at 850 (citing F*orbush,* 98 F.3d at 821). "The lodestar is computed by multiplying the number of hours reasonably expended by the reasonable hourly rate." *Id.* After reviewing the twelve *Johnson* factors, "the court may then apply a multiplier to the lodestar, adjusting the lodestar either upward or downward." *Id.* "However, '[t]he lodestar may be adjusted according to a *Johnson* factor only if that factor is not already taken into account by the lodestar." ' *Id.* (quoting *Transamerican Natural Gas Corp. v. Zapata Partnership, Ltd. (In re Fender),* 12 F.3d 480, 487 (5th Cir.1994)).

"[M]ultipliers ranging from one to four frequently are awarded in common fund cases when the lodestar method is applied." *Id.* (citing *Combustion,* 968 F.Supp. at 1133 (citations omitted)). Such multipliers are "necessary to reflect the possibility of no recovery." *Id.* The Third Circuit Task Force on Court-awarded Attorneys' Fees set forth four factors that enhance a multiplier. Those factors are: (1) the risk of losing; (2) the result obtained; (3) the delay in obtaining attorneys' fees; and (4) the petitioning attorneys' contribution to a prompt or delayed resolution of the action. *See* 108 F.R.D. 237, 264 (Oct. 8, 1985).

**\*8** In determining whether or not to apply a multiplier to the lodestar, the district court must also consider the following twelve factors set forth in *Johnson:*

> (1) the time and labor required, (2) the novelty and difficulty of the issues, (3) the skill required to perform the legal services properly, (4) the preclusion of other employment, (5) the customary fee, (6) whether the fee is fixed or contingent, (7) time limitations imposed by the client or the circumstances, (8) the amount involved and the results obtained, (9) the experience, reputation, and ability of the attorneys, (10) the undesirability of the case, (11) the nature and length

of the professional relationship with the client, and (12) awards in similar cases.

*Johnson,* 488 F.2d at 717–19.

Wile the Fifth Circuit requires that the award of attorneys fees be supported by the *Johnson* factors, rarely are all of the *Johnson* factors applicable to a particular case. *See Harrah's,* 1998 WL 832574, at [*] 3–4 (citations omitted). Therefore, this Court will only address those *Johnson* factors that it deems applicable in this particular case.

*2. Class Counsel's Requested Award of Attorney Fees:*

In the present case, Class Counsel has submitted a Motion for an Award of a Reasonable Attorneys' Fee and Reimbursement for Costs Expended in which he requests an attorneys fee of thirty five percent (35%) of the common settlement fund. Class Counsel asserts that such a method of computing attorneys fees is appropriate in a common fund case such as the above-captioned matter because "each member of the plaintiff class has an undisputed and mathematically ascertainable claim to the common settlement fund." Memorandum in Support of Motion for an Award of a Reasonable Attorneys' Fee and Reimbursement for Costs Expended, page 8. Furthermore, Class Counsel argues that such a percentage of the common fund comports with fees awarded in similar common fund cases. *See id.* at 9. Accordingly, Class Counsel seeks attorney fees of $560,000.00, 35% of the estimated $1,600,000 settlement fund. Furthermore, Class Counsel seeks 35% of any interest accrued on the cash portion of the settlement fund deposited with Hibernia National Bank. *See id.* at 10.

In support of such an award of attorneys fees, Class Counsel calculated an award of attorneys fees using the lodestar method and compared that figure with the 35% of the fund figure requested above. In calculating attorneys fees using the lodestar method, Class Counsel applied the *Johnson* factors to the case at hand, most of which he claims support the application of an enhanced multiplier in the calculation of the award of attorney fees. *See id.* at 17–18. Class Counsel asserts that these factors support the application of an enhanced multiplier of 3.5 in this case. If that multiplier is applied to a suggested lodestar fee of $204,455.00, it yields a suggested fee of $715,000.00, a sum well above the requested fee of $560,000.00. Therefore, Class Counsel argues that the

2001 WL 527489

requested fee of $560,000.00 is surely reasonable under the circumstances.

### 3. The Court's Evaluation of the Requested Award of Attorneys Fees:

**\*9** In the present case, Class Counsel requests attorneys fees in the amount of 35% of the settlement fund, which results in an award of $560,000.00 in attorneys fees. However, that figure is based on an estimated value of the settlement fund. The actual value of the settlement fund in this case is $ 1,534,321.06; therefore, 35% of the settlement fund is actually $537,012.37, not $560,000.00. This Court will use the actual value of the settlement fund in determining the reasonableness of attorneys fees in the present case, rather than the estimated value of the fund. Accordingly, this Court views Class Counsel's request for 35% of the settlement fund to be a request for $537,012.37 in attorneys' fees.

#### a. The Percentage of the Common Fund Analysis:

In evaluating the reasonableness of the attorneys fees calculated using the percentage method, the Court must first determine the reasonableness range of fees in similar cases. After a lengthy discussion of the various bases for calculating attorneys fees in common fund class action lawsuits, the United States District Court for the Eastern District of Texas recently concluded that "based on the opinions of other courts and the available studies of class action attorneys' fee awards (such as the NERA study), this Court concludes that attorneys' fees in the range from twenty-five percent (25%) to thirty-three and thirty-four one-hundredths percent (33.34%) have been routinely awarded in class actions." *Shaw v. Toshiba America Information Systems, Inc.,* 91 F.Supp.2d 942, 972 (E.D.Tex.2000). That court further stated that "[e]mpirical studies show that, regardless whether the percentage method or the lodestar method is used, fee awards in class actions average around one-third of the recovery." *Id.*

In the present case, the actual value of the settlement fund is $1,534, 321.06. Given the guiding principles described above, this Court determines that 33.34% is an appropriate and reasonable percentage for application of the percentage method in this case. Therefore, under the percentage method theory of calculating attorneys fees, the fair, just, and reasonable amount of attorneys fees would be $511,542.64 in the present case if a percentage of 33.34% were used to calculate the award.

While the majority of attorneys' fees awarded pursuant to the percentage method range between twenty-five and thirty-three and one-third percent of the common fund, Class Counsel argues that the fee percentage should be higher than 33.34% in this case. *See* Memorandum in Support of the Motion for an Award of a Reasonable Attorneys' Fee and Reimbursement for Costs, page 10. Class Counsel argues that "where the recovery is more modest, the fee percentage tends to be higher on a proportionate basis because of the larger ratio of hours to the amount of recovery." *Id.* (citing *In re Shell Oil Refinery,* 155 F.R.D. at 573 (citing Newberg on Class Actions, § 14.03.)) Accordingly, Class Counsel argues in favor of awarding attorneys' fees in the amount of 35% of the settlement value, or $537,012.37.

#### b. The Lodestar Method of Calculating Attorney Fees:

**\*10** In calculating the lodestar method, this Court must first multiply the number of hours reasonably expended by Class Counsel by a reasonable hourly rate. Class Counsel submits that a total of 817.82 hours were expended in the prosecution of the above-captioned matter. Specifically, Mr. Herman spent a total of 684.82 hours in the prosecution of this matter, Mr. Castaing spent 44.5 hours in the prosecution of this matter, and Mr. Lilly spent 88.5 hours in the prosecution of this matter. *See* Memorandum in Support of the Motion for an Award of a Reasonable Attorneys' Fee and Reimbursement for Costs, page 12 and Exhibits A–1 through A–3. Class Counsel submits that the prevailing hourly rate for contingency legal work in this jurisdiction ranges from $225.00 to $300.00. *See id.* at 13. After reviewing decisions of other courts in this jurisdiction, this Court is of the opinion that $225.00 is a reasonable hourly rate for contingency work in the Eastern District of Louisiana.[2] When that rate is multiplied by the number of hours expended by Class Counsel in prosecuting the instant matter, it yields a lodestar of $184,009.50, prior to the imposition of a multiplier. Should the Court accept as reasonable Class Counsel's requested award of attorneys' fees in the amount of $537,012.37, that would require the application of a multiplier of approximately three under the lodestar method.

#### 1. The Application of the Johnson Factors:

With regard to the applicability of a multiplier, this Court finds that the *Johnson* factors weigh in favor of applying a multiplier to the lodestar in the present case. First, as discussed above, this case required a substantial amount of time and labor to prosecute. The time records of Class Counsel reveal a reasonable number of hours expended for

2001 WL 527489

the benefit of the Class. This Court finds that the number of hours billed is neither excessive or duplicative. [3] However, this Court finds it unnecessary and unwarranted to focus too narrowly on the number of hours billed or the hourly rate in contingency fee cases. As explained by the court in *Harrah's,* "[b]ecause counsel prosecuted this action on a contingent fee basis, the Court would rather focus on results obtained. *Harrah's,* 1998 WL 832574, at [*] 5. "To overly emphasize the amounts of hours spent on a contingency fee case would penalize counsel for obtaining an early settlement and would distort the value of the attorneys' services." *Id.* Nevertheless, this Court finds that the time and labor required of Class Counsel in this complicated RICO action weigh in favor of applying an enhanced multiplier.

Second, as mentioned above, there is no dispute that the present case is an extraordinarily complex RICO class action involving multiple defendants. Not only are the RICO statutes extremely intricate and technical, but the underlying loan transactions in this case involve complex interest calculations and sophisticated financial theories. Furthermore, a RICO cause of action super-imposed upon the procedural hurdles of Rule 23 of the Federal Rules of Civil Procedure unquestionably presents formidable challenges to any litigant. Therefore, this Court finds that the novel and difficult issues present in this RICO case warrant the application of an enhanced multiplier.

**\*11** Third, this Court finds that the skill required to perform the legal services in this action also weigh in favor of applying a multiplier to the lodestar in this case. The complexities of the RICO issues alone required substantial skill and expertise on the part of Class Counsel, but this case also involved sophisticated financial theories and complex interest calculations. Class Counsel was required to gain a firm understanding of these theories and calculations in order to adequately prosecute the above-captioned action. Class Counsel represented to this Court that "Mr. Herman undertook significant effort to mathematically reconstruct Ms. Faircloth's loan transaction, in order to articulate and demonstrate liability." Memorandum in Support of the Motion for an Award of a Reasonable Attorneys' Fee and Reimbursement for Costs, page 15. This Court finds that such considerations weigh in favor of the application of a multiplier.

Fourth, the Court finds persuasive Class Counsel's representation that prosecuting this action precluded lead

counsel from handling other matters on behalf of other clients. *See* Memorandum in Support of the Motion for an Award of a Reasonable Attorneys' Fee and Reimbursement for Costs, page 15. Given that Mr. Herman alone spent almost 700 hours over the past two years in the prosecution of this action, the Court finds that this factor warrants an enhancement of the multiplier in this case.

Fifth, this Court finds significant the amount involved in the current action and the results obtained through settlement. The United States Supreme Court and the Fifth Circuit have consistently maintained that this eighth *Johnson* factor is "the most critical factor in determining the reasonableness of a fee award." *Shaw,* 91 F.Supp.2d at 971 (citations omitted). As discussed above, the settlement agreement reached on behalf of the class plaintiffs provides the class members with tangible benefits. The class members will receive actual cash in proportion to the amount of interest paid above the legal rate, as well as credits to their loan balances in some instances. After considering the formidable defenses mounted to the claims of the class members and the actual benefits conferred upon the class members through the settlement, this Court finds that this eighth *Johnson* factor warrants the application of an enhanced multiplier.

Sixth, this Court finds that the experience, reputation, and ability of Class Counsel also warrant an enhancement of the multiplier in this case. The attorneys involved are all highly accomplished lawyers with significant experience prosecuting complex commercial actions such as the present case. Furthermore, Class Counsel possessed substantial experience in the prosecution of RICO actions, as well as other class action lawsuits.

Seventh, this Court finds that the undesirability of the case warrants an enhancement of the multiplier in this case. The dispute regarding insurance coverage between Certified Finance and Hartford made the possibility of recovery speculative. If Hartford was successful at trial in demonstrating a lack of insurance coverage, then the possibility of the plaintiff class recovering a judgment from Certified Finance alone would be remote. The risk of being unable to collect from Certified Finance made this case somewhat undesirable and warrants the application of a multiplier in this case.

**\*12** Finally, after considering the pertinent *Johnson* factors in the present case, this Court is of the opinion that the majority of those factors weigh in favor of applying a

**Faircloth v. Certified Finance Inc., Not Reported in F.Supp.2d (2001)**

2001 WL 527489

multiplier in the present case. Furthermore, after considering the factors set forth by the Third Circuit Task Force, this Court is of the opinion that an enhanced multiplier is warranted. Specifically, this Court finds significant Class Counsel's ability to obtain a favorable settlement on behalf of the plaintiff class within two years of filing this complex lawsuit. Therefore, this Court is of the opinion that a multiplier of three is warranted in the present case.

III. CONCLUSION:

As sated above, this Court determined that $225.00 is a reasonable hourly rate for contingency work in this jurisdiction. When that rate is multiplied by the number of hours expended by Class Counsel in prosecuting the instant matter, it yields a lodestar of $184,009.50, prior to the imposition of a multiplier. If a multiplier of three is applied to the lodestar figure, it yields attorneys' fees of $552,028.50. Class Counsel has requested an award of attorneys' fees in the amount of 35% of the settlement value, or $537,012.37. That figure is within the range of fees independently calculated by this Court under both the percentage fund method and the lodestar method. Therefore, this Court finds that Class Counsel's request for attorneys' fees in the amount of 35% of the settlement value is fair, adequate, and reasonable.

Additionally, Class Counsel requests reimbursement for costs expended in the prosecution of this action. Class Counsel submitted records reflecting actual costs of $11,469.74 in connection with the prosecution of this case. Furthermore,

Class Counsel has certified to this Court that those costs are true and accurate. Therefore, this Court shall award Class Counsel $11,469.74 for the reimbursement of costs.

Accordingly,

IT IS ORDERED that Plaintiffs' Motion for Final Approval of Settlement Agreement be, and the same is hereby, GRANTED.

IT IS FURTHER ORDERED that Class Counsel's Motion for an Award of a Reasonable Attorneys' Fee and Reimbursement for Costs Expended be, and the same is hereby, GRANTED.

IT IS FURTHER ORDERED that Class Counsel be awarded attorneys' fees in the amount of $537,012.37, 35% of the actual settlement value.

IT IS FURTHER ORDERED that Class Counsel be awarded 35% of any interest accrued on the cash portion of the settlement on deposit with Hibernia National Bank.

IT IS FURTHER ORDERED that Class Counsel be awarded $11,469.74 for the reimbursement of costs expended in the prosecution of this action.

**All Citations**

Not Reported in F.Supp.2d, 2001 WL 527489

---

**Footnotes**

1    In the present case, a member of the Plaintiff Class submitted a letter to the court objecting to Class Counsel's proposed award of attorney fees on the grounds that the cases cited by Class Counsel reveal no award of attorney fees greater than 26% of the common fund. His objection is primarily based on a "cost to return" theory, noting that Class Counsel spent approximately $11,000, but seek a return of greater than $500,000 in fees. While said objection was not submitted in proper form as directed by the Notice of Fairness Hearing sent to class members, this Court will implicitly address this objection through its independent calculation of reasonable attorneys' fees whereby it will consider the percentages awarded to counsel in past class action lawsuits in evaluating the propriety and reasonableness of Class Counsel's requested fee in this case.

2    The hourly rate applied to the hours reasonably expended must reflect the prevailing market rate in this legal community for similar services provided by attorneys of comparable skill, experience, and reputation. *See In re Shell Oil Refinery,* 155 F.R.D. at 570 (citing *Blum v. Stenson,* 465 U.S. 886, 895–96 n. 11, 104 S.Ct. 1541, 1547 n. 11, 79 L.Ed.2d 891 (1984)). While the Court may review testimony regarding the prevailing rate in the pertinent legal market, the Court may also " 'consider its own knowledge and expertise concerning

2001 WL 527489

reasonable and proper fees and may form an independent judgment." ' *Id.* (quoting *Norman v. Housing Authority of City of Montgomery,* 836 F.2d 1292, 1303 (11th Cir.1988)).

3    While this Court performed the lodestar calculation in which it multiplied the number of hours expended prosecuting the above-captioned action by a reasonable rate for legal services by lawyers of comparable skill, experience, and reputation, this Court will refrain from conducting a detailed analysis of charged hours and hourly rates because "[t]o do so would undermine the utility of the percentage fee method" advanced by Class Counsel. *See Harrah's,* 1998 WL 832574, at [*]5.

---

**End of Document**          © 2021 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 30

**EXHIBIT B**

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## (HOUSTON DIVISION)

| | |
|---|---|
| CHARLES J. FITZPATRICK, Individually and On Behalf of All Others Similarly Situated, <br><br> Plaintiffs, <br><br> v. <br><br> UNI-PIXEL, INC., REED J. KILLION and JEFFREY W. TOMZ, <br><br> Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) |

**Case No. 4:13-cv-01649**
**Hon. Sim Lake**

**Hearing Date:** April 30, 2015
**Hearing Time:** 2:00 p.m.
**Courtroom:** 9B

## [PROPOSED] ORDER AND FINAL JUDGMENT

On the 30th day of April, 2015, a hearing having been held before this Court to determine: (1) whether the terms and conditions of the Stipulation and Agreement of Settlement dated December 19, 2014 (the "Stipulation") are fair, reasonable and adequate for the settlement of all claims asserted by the Settlement Class against Uni-Pixel, Inc., Reed J. Killion and Jeffrey W. Tomz (collectively the "Settling Defendants" or "Defendants"); and (2) whether to approve the proposed Plan of Allocation as a fair and reasonable method to allocate the Net Settlement Fund among Settlement Class Members; and the Court having considered all matters submitted to it at the hearing and otherwise; and

It appearing that the Notice substantially in the form approved by the Court in the Court's Order Preliminarily Approving Settlement and Providing For Notice ("Preliminary Approval Order") (Dkt. No. 47) was mailed to all reasonably identifiable Settlement Class Members; and

It appearing that the Summary Notice substantially in the form approved by the Court in the Preliminary Approval Order was published in accordance with that Order and the specifications of the Court;

**NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:**

1.      Unless indicated otherwise, all capitalized terms used herein have the same meanings as set forth and defined in the Stipulation and in the Notice.

2.      The Court has jurisdiction over the subject matter of the Action, Lead Plaintiffs, all Settlement Class Members and the Defendants.

3.      The District Court finds that the prerequisites for a class action under Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure have been satisfied in that: (a) the number of Settlement Class Members is so numerous that joinder of all members thereof is impracticable; (b) there are questions of law and fact common to the Settlement Class; (c) the claims of the

{00163961;1 }                                      1

Lead Plaintiffs are typical of the claims of the Settlement Class they seek to represent; (d) Lead Plaintiffs fairly and adequately represent the interests of the Settlement Class; (e) the questions of law and fact common to the members of the Settlement Class predominate over any questions affecting only individual members of the Settlement Class; and (f) a class action is superior to other available methods for the fair and efficient adjudication of this Litigation. The Settlement Class is being certified for settlement purposes only.

4.     Pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure, the Court hereby certifies the claims in this action against the Settling Defendants. The Court certifies as the Settlement Class all persons or entities who purchased or otherwise acquired Uni-Pixel common stock during the period from December 7, 2012, through and including May 31, 2013, and were damaged thereby. Excluded from the Settlement Class are:

a.     Defendants;

b.     Officers and/or directors of Uni-Pixel;

c.     All current and former partners or accounting personnel of the Defendants that were employed by the Defendants during the Class Period;

d.     All such excluded persons' immediate families, legal representatives, heirs, predecessors, successors, and assigns, and any entity in which any excluded person has or had a controlling interest;

e.     Any persons who have separately filed proceedings against one or more of Defendants, based in whole or in part on any claim arising out of or relating to any of the alleged acts, omissions, misrepresentations, facts, events, matters, transactions, or occurrences referred to in the Class Action or otherwise alleged, asserted, or contended in the Class Action; and

{00163961;1 }                                    2

f. ~~Those persons who file valid and timely requests for exclusion in accordance with the Preliminary Approval Order, a list of whom is attached to this Order~~ as ~~Exhibit A~~.

5.      Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Lead Plaintiffs are certified as the class representatives (or "Class Plaintiffs") and Lead Counsel previously selected by Lead Plaintiffs and appointed by the Court is hereby appointed as Lead Counsel for the Settlement Class (or "Class Counsel").

6.      The Court hereby finds that the forms and methods of notifying the Settlement Class of the Settlement and its terms and conditions: met the requirements of due process, Rule 23 of the Federal Rules of Civil Procedure, and 15 U.S.C. § 78u-4(a)(7) (added to the Exchange Act by the Private Securities Litigation Reform Act of 1995); constituted the best notice practicable under the circumstances; and constituted due and sufficient notice to all persons and entities entitled thereto of these proceedings and the matters set forth herein, including the Settlement and Plan of Allocation, to all persons entitled to such notice. No Settlement Class Member is relieved from the terms of the Settlement, including the releases provided for therein, based upon the contention or proof that such Settlement Class Member failed to receive actual or adequate notice. A full opportunity has been offered to the Settlement Class Members to object to the proposed Settlement and to participate in the hearing thereon. The Court further finds that the notice provisions of the Class Action Fairness Act, 28 U.S.C. § 1715, were fully discharged and that the statutory waiting period has elapsed. Thus, it is hereby determined that all members of the Settlement Class are bound by this Order and Final Judgment except those persons listed on Exhibit A to this Order and Final Judgment.

7.      The Settlement is approved as fair, reasonable and adequate, and in the best

interests of the Settlement Class. Lead Plaintiffs and Settling Defendants are directed to consummate the Settlement in accordance with the terms and provisions of the Stipulation. Upon the satisfaction of these conditions precedent:

a. The Action and the Amended Complaint ~~will be~~ *is hereby* dismissed with prejudice, and without costs, as to the Settling Defendants;

b. Lead Plaintiffs and the Settlement Class Members, on behalf of themselves, their current and former heirs, executors, administrators, successors, attorneys, legal representatives, and assigns, will be deemed to have released and forever discharged the Settling Defendants' Released Parties from any and all Released Plaintiffs' Claims. Lead Plaintiffs and the Settlement Class Members, and anyone acting or purporting to act for any of them, and will be permanently and forever enjoined from prosecuting, attempting to prosecute, or assisting others in the prosecution of the Released Plaintiffs' Claims against the Settling Defendants' Released Parties;

c. The Settling Defendants and their Released Parties, including any and all of their respective successors in interest or assigns, will be deemed to have released and forever discharged any and all Settling Defendants' Claims against the Lead Plaintiffs, any of the Settlement Class Members and any of their counsel, including Class Counsel and any counsel working under Class Counsel's direction.

8. The Court hereby finds that the proposed Plan of Allocation is a fair and reasonable method to allocate the Net Settlement Fund among Settlement Class Members.

9. Neither this Order and Final Judgment, the Stipulation, nor any of the

negotiations, documents or proceedings connected with them shall be:

a.  referred to or used against the Released Parties, or any of them, as evidence of wrongdoing by anyone;

b.  construed against the Released Parties, or any of them, as an admission or concession that the consideration to be given hereunder represents the amount which could be or would have been recovered after trial;

c.  construed as, or received in evidence as, an admission, concession or presumption against the Settlement Class or any of them, that any of their claims are without merit or that damages recoverable under the Complaint would not have exceeded the Settlement; or

d.  used or construed as an admission of any fault, liability or wrongdoing by any person or entity, or offered or received in evidence as an admission, concession, presumption or inference against any of the Released Parties in any proceeding other than such proceedings as may be necessary to consummate or enforce the Stipulation.

10.  The Court retains jurisdiction for matters relating to the Settlement.

11.  Without further order of the Court, Lead Plaintiffs and the Settling Defendants may agree to reasonable extensions of time to carry out any of the provisions of the Stipulation.

~~12.  There is no just reason for delay in the entry of this Order and Final Judgment and immediate entry by the Clerk of the Court is directed pursuant to Rule 54(b) of the Federal Rules of Civil Procedure.~~

13.  Pursuant to Section 21D(c)(1) of the Private Securities Litigation Reform Act of 1995, this Court hereby finds that each Party and its respective counsel has complied with each

requirement of Rule 11(b) of the Federal Rules of Civil Procedure as to all pleadings and motions related to the Released Plaintiffs' Claims, and that insofar as it relates to the Released Plaintiffs' Claims, the Action was not brought for any improper purpose and is not unwarranted by existing law or legally frivolous.

14.    Pursuant to Section 3(a)(10) of the Securities Act of 1933, as amended, the Settlement Stock is exempt from registration.

15.    The Court GRANTS Co-Lead Counsel's request for attorneys' fees in the cash amount of $ 783,333 .⁰⁰    and    one-third   ∆   of the Settlement Stock as well as reimbursement of reasonable and necessary expenses incurred in the prosecution of the Action in the amount of $ 40,162 ⁰⁵  , together with the interest earned thereon for the same time period and at the rate earned by the Settlement Fund until paid.  Said fees shall be allocated among Plaintiffs' Counsel in a manner which, in their good-faith judgment, reflects each counsel's contribution to the institution, prosecution and resolution of the Action.  The Court finds that the amount of fees awarded is fair and reasonable in light of the time and labor required, the novelty and difficulty of the case, the skill required to prosecute the case, the experience and ability of the attorneys, awards in similar cases, the contingent nature of the representation and the result obtained for the Class

16.    The Court hereby GRANTS Lead Plaintiffs' reimbursement of their reasonable costs and expenses (including lost wages) directly related to his representation of the Settlement Class in the amount of $ 1500 .⁰⁰ each.

17.    Any order approving or modifying the Plan of Allocation, Co-Lead Counsel's application or award of attorneys' fees and expenses, or Lead Plaintiff's application or award for

{00163961;1 }                                                    6

reimbursement of costs and expenses, shall not disturb or affect the finality of this Judgment, the Stipulation, or the Settlement contained therein, nor any act performed or document executed pursuant to or in furtherance of the Stipulation or the Settlement.

18.     In the event that the Settlement does not become final and effective in accordance with the terms and conditions set forth in the Stipulation, then this Order and Final Judgment shall be rendered null and void and be vacated and the Settlement and all orders entered in connection therewith shall be rendered null and void, and the parties shall be deemed to have reverted to their respective status prior to the execution of this Stipulation, and they shall proceed in all respects as if the Stipulation had not been executed (except as set forth in the Stipulation itself) and the related orders had not been entered, preserving in that event all of their respective claims and defenses in the Action, and shall revert to their respective positions in the Action.

SO ORDERED:

Dated: __April  30__, 201 5


_____
HON. SIM LAKE
UNITED STATES DISTRICT JUDGE

# TAB 31

2010 WL 4537550

🚩  KeyCite Yellow Flag - Negative Treatment

Distinguished by   Parker Hannifin Corp. v. North Sound Properties,
S.D.N.Y.,   July 12, 2013

2010 WL 4537550
Only the Westlaw citation is currently available.

**This decision was reviewed by West editorial
staff and not assigned editorial enhancements.**

United States District Court,
S.D. New York.

In re FLAG TELECOM HOLDINGS,
LTD. SECURITIES LITIGATION.
This Document Relates to: All Actions.

Master File No. 02–CV–3400 (CM)(PED).
|
Nov. 8, 2010.

**DECISION AND ORDER APPROVING THE
SETTLEMENT, CERTIFYING THE CLASS FOR
SETTLEMENT PURPOSES, APPROVING THE
PLAN OF ALLOCATION OF THE SETTLEMENT
FUND, AND AWARDING ATTORNEYS' FEES**

McMahon, District Judge.

**\*1** Pursuant to 🚩 Rule 23(e) of the Federal Rules of
Civil Procedure, Lead Plaintiffs and Class Representatives
Peter T. Loftin and Joseph Coughlin (collectively, "Lead
Plaintiffs" or the "Class Representatives") have moved
for an order granting: (1) final approval of the proposed
settlement of this action (the "Action") against Citigroup
Global Markets, Inc. ("CGMI") and seven former officers and
directors (the "Individual Defendants") [1] of FLAG Telecom
Holdings, Limited ("FLAG") [2] (collectively, with CGMI,
"Defendants") for $24.4 million in cash; (2) final approval of
the proposed Plan of Allocation of the settlement proceeds;
(3) an award of attorneys' fees and reimbursement of counsels'
expenses incurred in connection with the prosecution and
settlement of the Action; and (4) an award to Lead Plaintiffs
for their services in prosecuting the Action. The motion is not
opposed by defendants.

## I. PRELIMINARY STATEMENT

This Settlement is the culmination of more than eight years
of intense, complex and unremitting litigation. The claims
and defenses, which center on allegations of materially false
statements made by Defendants in a scheme to artificially
inflate the value of FLAG'S common stock, were sharply
disputed and aggressively litigated by all parties. Despite the
long pendency of this case, it would be a mistake to presume
that the pace of the litigation was, at any time, "leisurely." A
detailed chronology of the case, attached as Exhibit A to the
moving Declaration of Brad N. Friedman, demonstrates that
significant activity occurred throughout the entire eight year
period. The major judicial proceedings which—included two
motions to dismiss, a motion for judgment on the pleadings,
a motion for partial summary judgment, numerous discovery
motions, a petition for a Writ of Mandamus, class certification
and the appeal of class certification to the Second Circuit,
as well as significant litigation in the District Court for
the District of Columbia and in the High Court of Justice
in England—represent just a small fraction of the nearly-
constant activity in the case.

Discovery and discovery-related disputes required massive
time and effort: Plaintiffs reviewed more than 2.4 million
pages of documents produced by Defendants; analyzed
privilege logs with more than 9,000 entries; issued document
requests by subpoena or Hague Request to over fifty (50)
non-parties, including companies in France and England, and
received nearly 300,000 pages of documents in response;
and conducted sixteen (16) fact depositions, including seven
taken in Europe pursuant to Hague Convention requests.
Each of three proposed Class Representatives, as well as
Plaintiffs' expert, were deposed by the Defendants. Frequent
and protracted discovery disputes resulted in hundreds of
letters and emails among the parties, and multiple written
opinions from multiple jurisdictions in the U.S., and in
London.

Settlement negotiations in this case were extraordinarily
complicated due, among other reasons, to a Directors and
Officers Insurance policy involving twenty-two insurance
carriers on eight separate layers of coverage. Negotiations
were further complicated by parallel litigation, [3] which
also had to be settled for the Individual Defendants to
achieve total peace. The Settlement eventually was achieved
with the assistance of the Honorable Daniel Weinstein, a
retired California Superior Court Judge, after three full-day
mediation sessions that were preceded by extensive written

submissions from the parties on both liability and damage issues. Along the way, Plaintiffs also mediated a division of any recovery with the *Rahl* plaintiffs, in a mediation overseen by the Honorable Nicholas H. Politan, a retired Judge from the U.S. District Court for the District of New Jersey. Ultimately, all parties, including the *Rahl* plaintiffs, agreed to Judge Weinstein's "Mediator's Proposal."

**\*2** Even the drafting of the settlement documents was fiercely contested. From the time the Mediator's Proposal was signed by all parties on November 6, 2009, it took more than seven months, scores of emails, and multiple written submissions to and binding rulings by the mediator, for the parties to agree on the terms of the Stipulation and Agreement of Settlement and other settlement documents.

Members of the Class appear to agree with Lead Counsel's conclusion that the proposed Settlement is fair, reasonable and adequate and that the requested fee is fair and reasonable. Pursuant to the Court's Preliminary Order, as of August 31, 2010, over 43,450 copies of the Notice have been mailed to Class Members or their nominees. (Fishbein Aff., ¶ 8.) In addition, a Summary Notice was published in the national editions of The Wall Street Journal and over the National Circuit of *Business Wire* on July 21, 2010. (Andrejkovics Aff., ¶ 2.) The Notice informed potential Class Members of their right to object or request exclusion from the Class by September 22, 2010. No one has filed an objection to any aspect of the Settlement, including counsel's request for attorneys' fees and reimbursement of expenses, and no member of the Class has requested exclusion from the Class.

## II. FACTUAL BACKGROUND%

At all times relevant to this Action, FLAG functioned as a global telecommunications network and services provider, offering a range of products and services to international telecommunications carriers, application service providers and Internet service providers. FLAG offered its shares to the general public in an initial public offering ("IPO") that commenced on February 11, 2000 and closed on February 16, 2000, during which FLAG sold 27,963,980 common shares at $24.00 per share and pre-IPO shareholders sold 8,436,320 shares at that price for total net proceeds to the company of approximately $634.6 million.

FLAG stated in its IPO Prospectus, which was incorporated into the Registration Statement filed with the SEC, that its goal was to become "the leading global carriers' carrier by offering a wide range of cost-effective capacity use

options and wholesale products and services across our global network." To further that goal, FLAG was constructing the FLAG Atlantic cable system (the "FA–1 system"), a 50/50 joint venture with GTS TransAtlantic Carrier Services Ltd. ("GTS"), which would connect London and Paris to New York and have a potential capacity of fifteen times the maximum of the most advanced cable system in service on the Atlantic at that time. FLAG'S IPO prospectus stated, among other things, that FLAG intended to finance the construction of the FA–1 system with $600 million in bank financing and presale capacity commitments in excess of $750 million. [4]

Plaintiffs allege that, in FLAG's IPO Prospectus and, indeed, throughout the Class Period, the market was misled about the source and nature of FLAG's presales relating to the FA–1 system, the demand for FLAG's telecommunications bandwidth, the value of FLAG's assets, and FLAG's profitability. Plaintiffs claim that FLAG's IPO Prospectus was misleading and omissive because, among other things, a substantial portion of the supposed $750 million in presales were "at cost"—including $200 million to FLAG'S co-venture partner, GTS. Plaintiffs allege that these "at cost" sales were mere financing facilities rather than true presales and, therefore, were not true indicators of profit or demand on the FA–1 system. Plaintiffs also allege that the motivating factor behind the "at cost" presales was to satisfy bank covenants so that FLAG could obtain financing to build the FA–1 system. Plaintiffs claim that, in turn, the motivating factor for FLAG's construction of the FA–1 system was to create a positive story and, therefore, favorable conditions for an IPO of FLAG's common stock, notwithstanding the failure of FLAG's previously existing cable system and FLAG management's substantial doubts about FLAG and FA–1's future prospects.

**\*3** Plaintiffs also contend that certain Defendants (1) artificially and fraudulently inflated FLAG's reported revenues and EBITDA during fiscal years 2000 and 2001 by causing FLAG to enter into reciprocal "swap" sales with its competitors (such as Qwest and Global Crossing), which did not need the capacity, and then immediately booking the revenue from those sales while amortizing the cost over time; (2) failed to record a substantial impairment of FLAG'S long-lived assets in a timely fashion; and (3) made false and misleading statements about the demand in the marketplace for FLAG'S products and services between April 24, 2001 and November 6, 2001.

Plaintiffs' claims arise under Sections 11, 12(a)(2) and 15 of the Securities Act of 1933 (the "'33 Act claims") and Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 and Rule 10b–5 promulgated thereunder (the "'34 Act claims").

Defendants contend that Plaintiffs' allegations are untrue and without any factual support and that Defendants made no false or misleading or omissive statements.

Two years after the IPO, on February 13, 2002, FLAG announced that "approximately 14% of GAAP revenues for the full year 2001 was associated with reciprocal transactions entered into with other telecommunications companies and service providers" and that FLAG anticipated that, if business conditions did not improve, the company would run out of cash sometime in 2003 unless it was able to obtain cash from another source. Following this announcement, the market price of FLAG common stock, which had traded as high as $41 per share during the Class Period, declined by 46% from its February 12, 2002 closing price, to a closing price of $0.36 per share on February 13, 2002, on trading volume more than 10 times its daily average.

### III. HISTORY OF THE LITIGATION

#### A. *Plaintiffs' Investigation, the Initial Complaint, and the Appointment of Lead Counsel*

Beginning in early 2002, Plaintiffs conducted extensive legal and factual investigations into the facts ultimately alleged in the initial complaint. This investigation and research included, *inter alia:* collecting and analyzing FLAG'S financial statements and other public statements; assembling and reviewing a comprehensive collection of analyst reports, SEC filings and major financial news service reports on FLAG and the telecom industry from a variety of sources; consulting with Lead Counsels' in-house forensic accounting experts and analyzing the relevant provisions of GAAP and related commentary; and extensively researching the applicable law.

As a direct result of Plaintiffs' investigatory efforts, the initial complaint on behalf of plaintiff Peter T. Loftin was filed on May 1, 2002. On October 18, 2002, the Honorable William C. Conner consolidated several related actions under the caption above and appointed Mr. Loftin as Lead Plaintiff and Milberg LLP, f/k/a Milberg Weiss Bershad Hynes & Lerach LLP ("Milberg"), as Lead Counsel.

**\*4** Plaintiffs thereafter began work on a Consolidated Amended Complaint. Lead Counsel's in-house investigative unit, working with outside investigators both in the United States and in England, identified, located and interviewed more than thirty potential witnesses, six of whom became confidential sources who provided information set forth in the Complaint, In addition, Plaintiffs retained and consulted extensively with damages expert Dr. Scott Hakala. Plaintiffs filed a Consolidated Amended Complaint on March 20, 2003.

Lead Plaintiff and eventual Class Representative Peter Loftin played a central role during this period, devoting many days to assisting the research and development of Plaintiffs' claims. Mr. Loftin, who lost more than $24 million on his FLAG investment, was particularly instrumental in shaping Plaintiffs' claims against former defendant Verizon Communications, Inc. ("Verizon") and even contributed draft allegations for the complaint.

On November 19, 2003, J. Andrew Rahl, as Trustee of the Flag Litigation Trust (the "Trustee"), filed the *Rahl* action in State Court in New York against some of the same defendants as this Action, and others. The *Rahl* Defendants removed that action to this Court, where it was assigned to Judge Conner as a related case. Plaintiffs' Lead Counsel and Trustee's counsel in *Rahl* thereafter entered into an informal joint prosecution agreement.

#### B. *The Amended and Second Amended Complaint and the Motions to Dismiss the Second Amended Complaint*

Plaintiffs filed a 76–page, 226–paragraph Corrected Consolidated Amended Complaint on April 15, 2003, which three different sets of law firms (Shearman & Sterling for the Individual Defendants and former defendant FLAG; Milbank Tweed for CGMI; and Kirkland & Ellis for Verizon) moved and filed separate briefs against. Plaintiffs filed a Second Consolidated Amended Complaint (the "2CAC") that made a technical correction to the name of the defendant FLAG entity (from FTGL to FLAG), on December 1, 2003, and the prior briefing was deemed directed towards that pleading. In their various briefs, the then-defendants argued that (1) the challenged statements in the Registration Statement were neither false nor misleading; (2) Plaintiffs failed to allege facts to establish that the Defendants knew, but failed to disclose, information they had a legal duty to disclose; (3) the challenged statements regarding market demand and bandwidth pricing made during the Class Period were neither false nor misleading; and (4) the allegations of GAAP violations relating to allegedly improper swap transactions

and the failure to timely write down assets were inaccurate and/or insufficiently specific and/or vitiated by the fact that the challenged transactions had been reviewed by outside auditors.

In a forty-three page decision issued on February 25, 2004, the Court dismissed the 2CAC without prejudice. [5]

### C. *The Third Amended Complaint and the Motions to Dismiss That Complaint*

**\*5** Pursuant to the Court's Order, Plaintiffs then filed a 109–page, 299–paragraph Third Consolidated Amended Complaint ("3CAC"), on April 14, 2004. In response to the Court's concerns expressed in its February 25, 2004 decision about standing under Section 12(a) (2) of the ′33 Act, in addition to Peter T. Loftin, the 3CAC included as an additional plaintiff Norman H. Hunter, who purchased 200 FLAG shares in FLAG'S IPO. Mr. Hunter sold those shares prior to the end of the Class Period. Joseph Coughlin, who purchased shares traceable to the IPO in February 2000 and additional shares in February 2001, and who held his shares throughout the Class Period, moved to intervene as an additional plaintiff and proposed class representative on February 11, 2005.

The 3CAC contained a plethora of new facts to support Plaintiffs' claims. On June 23, 2004, the Individual Defendants and FLAG moved to dismiss the 3CAC, renewing their claims regarding the inadequacy of Plaintiffs' allegations of misleading statements and omissions and, in addition, asserting that Hunter's claims were time-barred because of his late entry into the case. Verizon and CGMI, separately, moved to dismiss as well.

After extensive briefing, the Court issued a sixty-five page decision on January 12, 2005, denying in part and granting in part the motions to dismiss. [6] The Court held that Plaintiffs had not pled facts demonstrating that the statements regarding demand in FLAG's prospectus were false as of the time of the IPO; however, the Court held that Plaintiffs *had* "alleged facts sufficient to demonstrate that the Prospectus contained a material misstatement or omission in connection with the Alcatel Sales Agreement," an agreement by which FLAG had (allegedly) fraudulently inflated the amount of its FA–1 presales. [7] The Court also held that the 3CAC included allegations sufficient to sustain Plaintiffs' claims regarding: (1) improper accounting related to FLAG's swap transactions; (2) FLAG'S failure to write down the value of its assets in a timely manner; and (3) misstatements concerning demand

and the optimistic outlook for FA–1 made by Bande and McCormack between April 1, 2001 and the end of the Class Period. The Court also held that the allegations in the 3CAC raised the requisite strong inference of *scienter* required for the ′34 Act claims against Bande, McCormack and Bautista, but not Evans.

The Court upheld Plaintiffs' claims that FLAG'S financial results issued between June 23, 2000 and February 13, 2002 were materially false or misleading when issued because FLAG had entered into improper swap transactions to artificially inflate its revenues. In this regard, the Court specifically cited supporting statements Lead Counsel had obtained from confidential sources developed during its investigation. The Court further held that Hunter's claims had been tolled by the filing of Plaintiffs' May 2002 complaint and, thus, were timely raised in the 3CAC.

**\*6** Plaintiffs' ′33 Act claims against defendants Bautista and Evans were dismissed because they had not signed the Registration Statement and, despite "a host of new allegations" in the 3CAC regarding Verizon's alleged status as a control person of FLAG and use of FLAG as a corporate piggy bank, the Court again dismissed Plaintiffs' claims against Verizon. [8] Plaintiffs' claims against FLAG and Evans were dismissed with prejudice and the claims against Verizon were dismissed without prejudice. The motions to dismiss by Bande, McCormack, Rubin, Petri, McQuaid, Seskin, Suan, and Salomon Smith Barney, Inc. n/k/a CGMI, were denied.

### D. *Motion for Judgment on the Pleadings*
On June 23, 2005, CGMI moved to dismiss Plaintiffs' Securities Act claims pursuant to Rule 12(c) of the Federal Rules of Civil Procedure, based on an affirmative defense of negative causation. CGMI also asserted that Plaintiffs' claims were barred by the statute of limitations. On January 23, 2006, the Court denied Defendants' motion in its entirety, holding that (1) Defendants had failed to establish "that the decline [in FLAG'S stock price] was not due, at least in part, to the alleged misrepresentations concerning pre-sales in Flag's Prospectus" and (2) that the new allegations in the 3CAC arose from the same conduct charged in the May 2002 complaint and were, therefore, not time-barred. [9]

### E. *Motion for Class Certification*
On February 11, 2005, Plaintiffs moved to certify a class and also moved to have Joseph Coughlin, who purchased

Case 4:19-cv-00509    Document 65-9    Filed 07/02/21 in TXSD    Page 826 of 1452
In re Flag Telecom Holdings, Ltd. Securities Litigation, Not Reported in F.Supp.2d (2010)
2010 WL 4537550

shares traceable to the IPO in February 2000 and additional shares in February 2001, intervene as an additional plaintiff and proposed Class Representative. Defendants aggressively opposed this motion, filing a fifty-page brief and a declaration with more than 1,850 pages of exhibits.

Defendants also challenged the adequacy of the named Plaintiffs to represent the class, claiming that the Plaintiffs were insufficiently engaged in the management of the case and, in particular, were not sufficiently concerned with the then-pending indictment of Lead Counsel and its potential consequences, although Defendants themselves said they did "not [challenge] the competence or adequacy" of Lead Counsel. [10]

Plaintiffs responded with a twenty-page reply brief refuting Defendants' contentions, accompanied by a sworn Declaration from one of Plaintiffs' previously confidential sources (FLAG's former Vice President of Sales for North America); a sworn Declaration from damages expert Dr. Scott Hakala (eighty-five pages with exhibits); and a sworn Declaration of Lead Counsel (491 pages with exhibits). Defendants submitted a 256–page sur-reply (including exhibits). Plaintiffs filed a twenty-five page response to Defendants' sur-reply. On September 4, 2007, the District Court issued a fifty-page decision granting Plaintiffs' motion for class certification. The Court included in-and-out traders in the class because, "in light of Hakala's affidavit ... it is conceivable" that the in-and-out purchasers may be able to prove loss causation based on events prior to the end of the Class Period. [11] The Court appointed Peter T. Loftin, Norman H. Hunter, and Joseph Coughlin as the Class Representatives, and appointed Milberg as Class Counsel.

### F. *Discovery and Discovery Disputes*

**\*7** Discovery in this case was, itself, a multi-front war with battles frequently occurring simultaneously on two continents. Defendants opposed or objected to nearly every discovery request. Productions were often delayed, at least in part because documents, and especially critical accounting documents, were resident on difficult-to-access computer systems owned by overseas non-party FTGL. Disputes over discovery were frequently the subject of letters to the Court, resulting in numerous court appearances, multiple written Court decisions, a petition (by the Individual Defendants) for a Writ of Mandamus to the Court of Appeals, and thousands of pages of briefs and correspondence among the parties.

Plaintiffs have, since 2005, obtained approximately 2,391,600 pages of documents from the Individual Defendants, including approximately 2,381,800 pages of documents from FTGL that were produced by Defendant McCormack pursuant to an unusual court Order. In addition, Plaintiffs ultimately received 39,425 pages of accounting documents generated from FTGL's accounting system under an agreement with the Individual Defendants pursuant to which a third-party vendor generated reports and Plaintiffs (with the *Rahl* Trustee) paid one-half of the costs. Plaintiffs also obtained 37,725 pages of documents from CGMI and another 268,500 pages of documents from more than fifty (50) non-parties to whom Plaintiffs issued subpoenas and/or the Court issued Hague Convention requests in England and France.

Plaintiffs deposed sixteen witnesses, six of whom were deposed overseas pursuant to Requests for International Judicial Assistance Pursuant to the Hague Convention. At the time of the Settlement, eight additional Hague Convention requests had been issued by the Court and more overseas depositions had been scheduled.

In connection with class certification, the proposed Class Representatives, including Norman Hunter, were deposed and produced over 4,000 pages of documents. Defendants also deposed and obtained documents from Plaintiffs' damages expert, Dr. Scott Hakala.

At the time of the Settlement, Plaintiffs had issued Plaintiffs' Notice of Deposition to CGMI pursuant to Fed.R.Civ.P. 30(b) (6); Plaintiffs' Second Set of Supplemental Interrogatories to CGMI and Request for Production of Documents; and Plaintiffs' Corrected First Set of Requests for Admission to CGMI.

The parties to this Action and the *Rahl* litigation entered into a number of stipulations governing the conduct of discovery. While these stipulations greatly enhanced the efficiency of discovery for all parties, and permitted the plaintiffs in the two litigations each to access the discovery obtained by the other, the process of negotiating and drafting the stipulations was complex and extremely time-consuming.

It is totally unnecessary to recount here the massive amount of discovery litigation (and concomitant sanctions litigation) in which the parties engaged once discovery finally commenced (due to the PSLRA stay, discovery did not begin until 2005!). Suffice it to say that the parties are still unable to read each others' descriptions of their many discovery battles without

having war break out anew. Nothing between the parties came easily.

**\*8** Plaintiffs' efforts to obtain discovery from non-parties also required huge investments of time and effort. As mentioned above, Plaintiffs issued subpoenas and/or the Court issued Hague Convention requests to more than fifty (50) non-parties. Several of those parties resisted discovery, necessitating collateral litigation. There was litigation between plaintiffs and the law firm of Gibson, Dunn & Crutcher, which previously represented FLAG in certain matters and which received a subpoena to produce documents in this case. Multiple hearings relating to discovery in this matter were held by the High Court of Justice in London, which required Plaintiffs to retain a Barrister in addition to their Solicitor. There were also interlocutory appeals relating to third party discovery in the Second Circuit.

### G. *The Motions for Summary Judgment and the Operative Complaint*

On June 25, 2007, in response to the Individual Defendants' request for permission to file a motion for partial summary judgment dismissing Plaintiffs' ′33 Act claims in their entirety, Plaintiffs moved for leave to amend the 3CAC to further detail their ′33 Act claims. That motion was granted. Plaintiffs filed the Fourth Consolidated Amended Complaint on October 15, 2007. The final and operative complaint, the Corrected Fourth Consolidated Amended Complaint (the "Complaint"), was filed on January 10, 2008 .[12]

After the completion of further discovery targeted specifically at the more detailed ′33 Act allegations, on May 13, 2008, both sets of remaining Defendants (the Individual Defendants and CGMI) filed a motion pursuant to Rule 56 of the Federal Rules of Civil Procedure seeking summary judgment on Plaintiffs' ′33 Act claims. Defendants asserted in their motion that the Registration Statement was not false or misleading because:

(i) FLAG had approximately $774 million in FA–1 presales at the time of the IPO and, therefore, the challenged statement at issue—that FLAG had "presales in excess of $750 million"—was true;

(ii) the challenged statement could not have misled potential investors about market demand because the statement was in a section of the Registration Statement dealing with financing, not demand;

(iii) even if a reasonable investor could have understood the challenged statements to be about demand for capacity on the FA–1 system, cautionary language in the Registration Statement about future demand for FLAG'S products was sufficient to make the Registration Statement on the whole not misleading; and

(iv) the specific presales transactions challenged by Plaintiffs were legitimate and the relevant terms of the transactions were disclosed in the Registration Statement.

Collectively, the briefing on this motion included over 175 pages of legal memoranda and over 3,300 pages of declarations and appendices.

On March 23, 2009, the Court issued a twenty-three page opinion denying Defendants' motion in its entirety.[13]

### H. *The Rule 23(f) Appeal of Class Certification*

**\*9** On September 19, 2007, Defendants each filed a petition pursuant to Rule 23(f) of the Federal Rules of Civil Procedure seeking interlocutory review of the Court's class certification decision. The Second Circuit granted Defendants' Rule 23(f) petitions on December 12, 2007.

On July 22, 2009, the Second Circuit affirmed virtually all of the Court's class certification Order, rejecting all but one of the Defendants' arguments. However, the Second Circuit agreed with Defendants that "as a matter of law" there was insufficient evidence of loss causation prior to the last day of the Class Period for in-and-out traders to remain in the Class. The Court of Appeals therefore vacated the Court's class certification Order with respect to those Class Members who sold their FLAG common stock prior to February 13, 2002, and ruled that Norman H. Hunter, who sold all of his shares before the end of the Class Period, could not serve as a Class Representative. Unfortunately for Plaintiffs, this decision dramatically reduced the total potential recovery in this case, from more than $360 million to approximately $14.2 million.[14]

On August 5, 2009, Plaintiffs filed a petition pursuant to Rules 35 and 40 of the Federal Rules of Appellate Procedure seeking rehearing of the appeal and/or rehearing *en banc.* By Order dated October 6, 2009, the Second Circuit Court of Appeals

denied Plaintiffs' petition for rehearing and/or rehearing *en banc.*

### I. *Judge Conner's Death and the September 2009 Status Conference*

In early July 2009, the parties learned that the Judge who had so ably presided over this matter since its inception, Judge Conner, had died. Shortly thereafter the case was re-assigned, and on August 7, 2009, the parties were advised that the Court would hold a status conference on September 17, 2009. At that status conference, the Court informed the parties that it would not be overly sympathetic to resolving prior to trial yet another defense motion for partial summary judgment, this time on the ′34 Act claims, because a trial was already a near certainty in light of the denial of the motion for summary judgment on the ′33 Act claims. The Court also informed the parties that it thought the motion for rehearing in the Second Circuit (which was then pending) was unlikely to be granted, and that if it was in fact denied, the Court would not be sympathetic to a renewed motion, based on additional evidence, to certify a class of in-and-out traders. The Court set a schedule to complete discovery and advised the parties that it expected the case to be resolved—whether by settlement or trial—within the year.

### IV. HISTORY OF THE SETTLEMENT NEGOTIATIONS

In a case of this complexity and magnitude, one expects to encounter certain obstacles to settlement. In this case, settlement negotiations were exponentially more complicated than usual due to the Byzantine structure of the Directors and Officers ("D & O") Insurance policy covering the Individual Defendants, disputes between the two sets of defendants and among the insurance carriers and the Defendants, and the existence of the parallel *Rahl* action.

**\*10** The $250 million D & O policy is comprised of one primary and seven excess coverage layers, with multiple carriers sharing each layer. For example, the second excess layer includes five carriers. In all, there are 22 different carriers, with several appearing in more than one layer.[15] According to the terms of the policy, the carriers in any particular layer are not obligated to make any payment unless and until all the coverage layers below are exhausted. This coverage structure results in a situation where any carrier that would be required to pay into a possible settlement can effectively veto the settlement even though that veto may expose carriers on higher layers to greatly increased liability;

and, unless the vetoing carrier itself appears on a higher layer, it has no incentive to accept the settlement. Further complicating the situation, certain carriers in the insurance tower, at various times, threatened to and/or did disclaim coverage of the ′33 Act claims[16] and/or coverage of CGMI.

The parties' long-running dispute over loss causation also posed a very significant obstacle to settlement. In addition to raising the issue in their motions to dismiss, motion for judgment on the pleadings, summary judgment motion, opposition to class certification and in their appeal of the class certification decision, Defendants continually asserted causation as a defense throughout the settlement negotiations, maintaining that damages were only a small fraction of those claimed by Plaintiffs.

### A. *Judge Weinstein Presides Over the First Mediation Session Between Plaintiffs and the Individual Defendants*

On October 17, 2007, Plaintiffs' Lead Counsel (with the assistance of Mr. Loftin's personal in-house counsel), counsel for the Individual Defendants (with the assistance of defendant McCormack), and counsel for several of the insurance carriers, conducted a full-day mediation session before retired California Superior Court Judge Daniel Weinstein of JAMS.[17] Formal written mediation statements were submitted by both sides in advance of the mediation. At the Mediator's request, both sides also submitted a supplemental mediation statement on the issue of loss causation. At the beginning of the mediation counsel for both sides, as well as Mr. McCormack, made oral presentations. At the conclusion of the session Plaintiffs made a settlement demand to which the Individual Defendants did not respond, and the mediation ended without success.

### B. *Periodic Efforts Continue Over the Next Year and a Half*

Although formal mediation did not resume until June 2009, Judge Weinstein periodically kept in contact with both sides, and even occasionally met in person with several of the insurance carriers to discuss this case—including at least once for breakfast in the summer of 2008. However, Lead Counsel refused to attend any further meetings absent a commitment that such a meeting would result in a meaningful response to the outstanding settlement. As the insurance carriers would not make such a commitment, no meeting occurred.

**\*11** In addition, Lead Counsel exchanged a few telephone calls with counsel for CGMI, to see whether CGMI had any interest in discussing settlement. Counsel for CGMI had no interest at that time in mediation, but was willing to consider a direct negotiation if the parties were in the same financial ballpark. It quickly became clear that the parties were not in the same ballpark, and so no such negotiations occurred.

#### C. *Judge Weinstein Presides Over the Second Mediation Session Between Plaintiffs and the Individual Defendants*

By Spring 2009, the insurance carriers finally agreed to make a meaningful response to Lead Counsel's outstanding settlement demand, and on June 2, 2009, Plaintiffs' Lead Counsel (again with the assistance of Mr. Loftin's in-house counsel), counsel for the Individual Defendants, and counsel for several of the insurance carriers (including counsel for certain additional insurance carriers who had not attended the prior mediation session), renewed their mediation efforts before Judge Weinstein. By this time, the primary insurance layer was entirely or almost entirely exhausted by defense costs. Once again, however, the mediation was unsuccessful.

#### D. *Judge Politan Presides Over a Mediation Session Between Plaintiffs and the Plaintiff in Rahl*

Lead Counsel and plaintiff's counsel in *Rahl* agreed that, for a variety of reasons, it would make sense if the plaintiffs in the two competing actions could agree (subject to the later approval by this Court now being sought) upon an allocation between them of any recovery in both cases. Accordingly, on June 24, 2009, Plaintiffs' Lead Counsel and counsel for the Trustee in *Rahl* conducted a full-day mediation session before retired United States District Court Judge Nicholas H. Politan, to see whether these two sets of plaintiffs could agree upon a division between them of any future recovery. This mediation resulted in an agreement that the Class would receive 70% of any recovery from the Individual Defendants, plus 100% of any recovery from CGMI. Certain document production issues were also mediated and resolved as between the Trustee and the Class.

In retrospect, the importance of this agreement cannot be overstated. At the time—June 2009—the Second Circuit had not yet issued its ruling on loss causation. Had Lead Plaintiffs won the loss causation issue in the Circuit (as Lead Counsel reasonably believed they would) the 70–30 split with *Rahl* might well have turned out to be a mildly bad deal, or at least a neutral deal, for the Class. *However,* by "hedging"

against the possibility of a bad result in the Circuit, Plaintiffs ultimately were able to achieve *more* than a full recovery in their negotiations with the Defendants. This agreement also removed a significant complication in connection with achieving a global settlement.

#### E. *Judge Weinstein Presides Over a Third Mediation Session. This Time Among the Plaintiffs in Both Cases, the Individual Defendants, and CGMI*

**\*12** The mediation before Judge Weinstein finally convened for the third time on October 29, 2009, this time with the addition of counsel for the Trustee, as well as counsel for CGMI, who learned about the planned mediation shortly before-hand and requested (and was granted) permission to attend. The parties did not reach agreement during this session. However, this session did eventually result in a "Mediator's Proposal" that was accepted by all parties on November 6, 2009. As a result of this proposal, and Plaintiffs' earlier agreement with the Trustee, Plaintiffs have agreed to settle this action for 70% of the $34 million in cash being paid on the Individual Defendants' behalf to settle this action and *Rahl,* plus $600,000 in cash being paid by CGMI (all of which is going to the Class in this Action). The total settlement consideration to the Class in this Action is $24.4 million.

#### F. *"Litigation" Ensues Before Judge Weinstein Over the Terms of the Final Settlement Agreement*

Even the signing of the Mediator's Proposal did not end the legal battle. Over a period of more than seven months after the Mediator's Proposal was signed, the parties exchanged multiple drafts of the Stipulation and Agreement of Settlement, Notice of Pendency and other documents, but were not able to resolve all outstanding issues. Fortunately, however, as part of the Mediator's Proposal to which all parties agreed, Judge Weinstein retained "binding authority" to resolve any disputes in connection with finalizing the settlement papers.

In February and March 2010, numerous issues were submitted to Judge Weinstein for decision pursuant this binding authority, and multiple responses and replies were submitted by Plaintiffs and the Individual Defendants. Additional disputes, as between the insurance carriers and the Individual Defendants, were also submitted to Judge Weinstein for resolution, thereby causing further delay. The Stipulation and Agreement of Settlement was finally executed on June 21, 2010.

## V. THE ISSUANCE OF NOTICE AND THE REACTION OF THE CLASS TO THE PROPOSED SETTLEMENT

Subsequent to the Settlement, Lead Plaintiffs retained a claims administrator on behalf of the Class (the "Claims Administrator"). The Claims Administrator was chosen after a competitive bidding process and extensive negotiations thereafter to significantly reduce third party costs, such as broker nominee charges typically incurred during securities class action settlement administrations.

After the parties submitted documentation requesting preliminary approval of the Settlement, this Court entered an Order on June 23, 2010, preliminarily approving the Settlement embodied in the Stipulation (the "Preliminary Approval Order"). The Preliminary Approval Order: (1) approved a form of Notice; (2) approved the form of publication notice; (3) ordered that any Class members wishing to exclude themselves from the Class do so by letters postmarked no later than September 22, 2010; (4) ordered that any Class members wishing to object to the Settlement file their papers by September 22, 2010; and (5) ordered a fairness hearing to take place at 2 p.m. on October 29, 2010. The Court also approved the Claims Administrator in the Preliminary Approval Order.

 **\*13** In accordance with the Preliminary Approval Order, on July 16, 2010, Lead Counsel caused the Notice to be mailed to all Class members who could be identified from FLAG'S stock transfer records and through the efforts of the Claims Administrator. As of August 31, 2010, a total of over 43,450 Notices were sent to potential Class members. (Fishbein Aff., ¶ 8.) Additionally, and also pursuant to the Preliminary Approval Order, on July 21, 2010, a Summary Notice was published in the national editions of The Wall Street Journal and over the National Circuit of *Business Wire.* (Andrejkovics Aff., ¶ 2.)

The Notice provided a detailed description of: (1) the Action; (2) the nature of the claims; (3) the history of the litigation; (4) the potential outcome if this Action were to proceed to trial; (5) the terms of the proposed settlement and the Plan of Allocation, including the manner in which the Settlement Fund would be divided among the Class; (6) the process and deadline for filing objections, requests for exclusion and claim forms; (7) the date, time, and place of the Court's hearing to determine the fairness of the Settlement; (8) the right of Class members to be heard at the hearing; and (9) the claims to be released. The Notice also informed the Class that

Lead Plaintiffs would apply for: (1) reimbursement of their expenses in the approximate amount of two million dollars, plus an award of attorneys' fees in the amount of 30% of the remaining balance of the Gross Settlement Fund after reimbursement of these expenses and payment of any PSLRA awards to the Lead Plaintiffs; and (b) awards to the Lead Plaintiffs for their services in prosecuting the Action in the amounts of $100,000 for Lead Plaintiff Peter T. Loftin and $5,000 for Lead Plaintiff Joseph Coughlin.

Both the Notice and Summary Notice are available on the Internet on the websites of Lead Counsel and the Claims Administrator and at the website flagtelecomsecuritiessettlement.com. To date, Lead Plaintiffs have paid $66,714.44 out of the Settlement Fund to cover the costs related to Settlement notice and administration.

Pursuant to the terms of the Notice and the Court's preliminary approval Order of June 23, 2010, Class Members have until September 22, 2010 to opt-out of or object to this Settlement pursuant to 🚩 Fed.R.Civ.P. 23. No Class Members have exercised their right to opt out and no Class Members have objected to the proposed Settlement.

## VI. THE COURT GRANTS FINAL APPROVAL TO THE PROPOSED SETTLEMENT

### A. *The Standard for Evaluating Class Action Settlements*

The standard for reviewing a proposed class action settlement is whether the settlement is "fair, reasonable and adequate." *In re EVCI Career Colleges Holding Corp. Sec. Litig.,* Nos. 05 Civ. 10240(CM) *et. al.,* 2007 WL 2230177, at \*3 (S.D.N.Y. July 27, 2001) (*citing Maywalt v. Parker & Parsley Petroleum Co.,* 67 F.3d 1027, 1079 (2d. Cir.1995)). "A proposed class action settlement enjoys a strong presumption that it is fair, reasonable and adequate if, as is the case here, it was the product of arm's-length negotiations conducted by capable counsel, well-experienced in class action litigation arising under the federal securities laws." *EVCI,* 2007 WL 2230177, at \*4 (*citing In re Sumitomo Copper Litis.,* 189 F.R.D. 274, 280 (S.D.N.Y.1999)); 🚩 *New York & Maryland v. Nintendo of Am.,* 775 F.Supp. 676, 680–81 (S.D.N.Y.1991)); *accord* 🚩 *Wal–Mart Stores, Inc. v. Visa U.S.A., Inc.,* 396 F.3d 96, 116 (2d Cir.2005), *cert. denied,* 544 U.S. 1044, 125 S.Ct. 2277, 161 L.Ed.2d 1080 (2005). "There is a 'strong judicial policy in favor of settlements, particularly in the class action

context.' " *In re Telik, Inc. Sec. Litig.,* 576 F.Supp.2d 570, 575 (S.D.N.Y.2008) (*quoting In re Paine Webber Ltd. P'ships Litig.,* 147 F.3d 132, 138 (2d Cir.1998)). Moreover, " 'great weight' is accorded to the recommendations of counsel, who are most closely acquainted with the facts of the underlying litigation." *Maley v. Del Global Techs. Corp.,* 186 F.Supp.2d 358, 366 (S.D.N.Y.2002) (internal quotation and citation omitted).

**\*14** The presumption in favor of the negotiated settlement in this case is strengthened by the fact that settlement was reached in an extended mediation supervised by Judge Weinstein. *See In re Telik,* 576 F.Supp.2d at 576 ("Judge Weinstein's role in the settlement negotiations strongly supports a finding that they were conducted at arm's-length and without collusion."); *In re Elan Sec. Litig.,* 385 F.Supp.2d 363, 369 (S.D.N.Y.2005) ("[T]he Court has no reason to question that the Settlement was the product of extended 'arm's length' negotiations, including, among other things, the two-day settlement conference before Judge Politan."); *In re Interpublic Sec. Litig.,* Nos. 02 Civ. 6527(DLC), 03 Civ. 1194(DLC), 2004 WL 2397190, at \*7 (S.D.N.Y. Oct. 26, 2004) (negotiations were arm's-length where, among other things, parties met with magistrate judge and document discovery was complete).

All parties were represented throughout the Settlement negotiations by able counsel experienced in class action and securities litigation: Plaintiffs by Brad N. Friedman of Milberg, LLP; CGMI by Douglas Henkin of Milbank, Tweed, Hadley and McCloy; and the Individual Defendants by Jerome Fortinsky of Shearman & Sterling. The Trustee was represented by Grant & Eisenhofer. *See In re Global Crossing Sec. & ERISA Litig.,* 225 F.R.D. 436, 461 (S.D.N.Y.2004) ("Both sides have been represented well.... Counsel for plaintiffs, the Settling Defendants, and STB possessed the requisite expertise to negotiate a fair settlement."); *In re NASDAQ Market–Makers Antitrust Litig.,* 187 F.R.D. 466, 474 (S.D.N.Y.1998) (approving settlement where "[t]he process by which the parties reached the Proposed Settlements was arm's-length and hard fought by skilled advocates").

In sum, the Settlement was negotiated at arm's-length by sophisticated counsel before an experienced mediator, and after the completion of significant discovery. These facts establish that the process leading to the Settlement was fair

to absent Class Members. The Court should therefore accord the strongest presumption of fairness to the Settlement in this case.

**B. *The Settlement Is Fair, Reasonable and Adequate and in the Best Interests of the Class***

Courts in this Circuit evaluate the fairness, adequacy and reasonableness of a class action settlement according to the "*Grinnell* factors:"

> (1) the complexity, expense and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through the trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; [and] (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of the litigation.

**\*15** *City of Detroit v. Grinnell Corp.,* 495 F.2d 448, 463 (2d Cir.1974); *see also County of Suffolk v. Long Island Lighting Co.,* 907 F.2d 1295, 1323–24 (2d Cir.1990); *In re Sumitomo,* 189 F.R.D. at 281. "In finding that a settlement is fair, not every factor must weigh in favor of settlement, 'rather the court should consider the totality of these factors in light of the particular circumstances.' " *In re Global Crossing,* 225 F.R.D. at 456 (*quoting Thompson v. Metropolitan Life Ins. Co.,* 216 F.R.D. 55, 61 (S.D.N.Y.2003)).

**i. Continued Litigation Would Be Complex and Consume Substantial Judicial and Private Resources**

The complexity, expense and possible duration of this litigation weigh in favor of settlement. "[I]n evaluating the settlement of a securities class action, federal courts, including this Court, 'have long recognized that such

litigation is notably difficult and notoriously uncertain.' " *Sumitomo,* 189 F.R.D. at 281 (*quoting In re Michael Milken and Assoc. Sec. Litig.,* 150 F.R.D. 46, 53 (S.D.N.Y.1993)). Indeed, the courts recognize that "[s]ecurities class actions are generally complex and expensive to prosecute." *In re Gilat Satellite Networks, Ltd.,* No. CV–02–1510, 2007 WL 1191048, at \*10 (E.D.N.Y. Apr. 19, 2007). Thus, "[c]lass action suits readily lend themselves to compromise because of the difficulties of proof, the uncertainties of the outcome, and the typical length of the litigation." *In re Luxottica Group S.p .A. Litig.,* 233 F.R.D. 306, 310 (E.D.N.Y.2006) (citations omitted).

Although Plaintiffs have conducted significant fact discovery, the costs and duration of completing fact discovery, conducting expert discovery, additional motion practice, trial preparation, the trial itself, post-trial motions, and any appeals would be substantial. At the time this proposed Settlement was reached, six additional overseas depositions were scheduled. In total, at least twelve additional depositions would have been conducted by Plaintiffs in preparation for trial. Expert discovery would be particularly expensive and time-consuming as both sides would require the services of experts in the telecommunications industry in addition to accounting and damages experts.

Finally, whatever the outcome of any eventual trial, which would likely require several months and involve the introduction of hundreds (if not thousands) of exhibits, vigorously contested motions and significant expenses, it is virtually certain that appeals would be taken from any verdict. All of the foregoing would delay the ability of the Class to recover for years assuming, of course, that Plaintiffs would ultimately be successful in proving their claims. Settlement at this juncture unequivocally results in a substantial and tangible present recovery for the Class, without any attendant risk of delay, or of continued litigation through, for example, summary judgment on the '34 Act claims, a protracted trial, and post-trial proceedings. *See Hicks v. Stanley,* No. 01 Civ. 10071(RJH), 2005 WL 2757792, at \*6 (S.D.N.Y. Oct.19, 2005) ("Further litigation would necessarily involve further costs; justice may be best served with a fair settlement today as opposed to an uncertain future settlement or trial of the action.").

### ii. The Reaction of the Class to the Proposed Settlement Has Been Overwhelmingly Positive

**\*16** The reaction of the Class to the Settlement is a significant factor—perhaps the most significant factor to be weighed in considering its adequacy. *In re Veeco Instruments Secs. Litig.* (*"Veeco I"* ), No. 05 MDL 0165(CM), 2007 WL 4115809, at \*7 (S.D.N.Y. Nov.7, 2007); *see also Maley,* 186 F.Supp.2d at 362; *In re American Bank Note Holographics, Inc., Sec. Litig.,* 127 F.Supp.2d 418, 425 (S.D.N.Y.2001).

The Class's reaction to the Settlement in this case is overwhelmingly positive. More than 43,450 Notices were mailed to Class Members or their nominees. To date, no Class Members have exercised their right to opt out and no Class Members have objected to the proposed Settlement. This is an exceptionally strong indication of the fairness of the Settlement. *See Strougo v. Bassini,* 258 F.Supp.2d 254, 258 (S.D.N.Y.2003) (*citing In re SmithKline Beckman Corp. Sec. Litig.,* 751 F.Supp. 525, 530 (E.D.Pa.1990) ("Both the utter absence of objections and the nominal number of shareholders who have exercised their right to opt out ... militate strongly in favor of approval of the settlement."). The absence of objections to the Settlement supports the inference that it is fair, reasonable and adequate. *See Maley,* 186 F.Supp.2d at 374.

### iii. Settlement Was Reached at an Advanced Stage of Litigation After Significant Discovery and Extensive Consultation with a Damages Expert

The advanced stage of this litigation and the extensive amount of discovery completed militate in favor of approval of the Settlement. As detailed above, the parties have been vigorously litigating this case for more than eight years, through multiple motions to dismiss, a motion for judgment on the pleadings, discovery and countless discovery motions, a class certification motion, a motion for partial summary judgment, and an interlocutory appeal of the Court's class certification Order. Plaintiffs have reviewed more than 2.5 million pages of documents and taken 16 depositions. Defendants have deposed each of the Class Representatives plus plaintiff Norman Hunter and Plaintiffs' damages expert. The parties conducted multiple full-day mediation sessions before Judge Weinstein (plus Plaintiffs' and the Trustee's mediation before Judge Politan) and exchanged extensive mediation statements on both liability and damages. Throughout all phases of the litigation, Lead Counsel has consulted with and received the advice of Dr. Scott Hakala, a recognized expert on the subject of damages in securities cases.

2010 WL 4537550

Thus, the parties reached an agreement to settle the litigation at a point when they had a well-informed understanding of the legal and factual issues surrounding the case. Having sufficient information to properly evaluate the strengths and weaknesses of their case, Lead Counsel were able to settle the litigation on terms highly favorable to the Class without the substantial risk, uncertainty, and delay of continued litigation. *See Veeco I,* 2007 WL 4115809, at *8 ("It is evident that Plaintiffs have a clear view of the strengths and weaknesses of their case and of the adequacy of the Settlement.") (internal quotations omitted) (*citing Meijer, Inc. v. 3M,* Civil Action No. 04–5871, 2006 WL 2382718, at *14 (E.D.Pa. Aug.14, 2006) (Parties had "an adequate appreciation of the merits" of case at time settlement negotiated where Class Counsel, *inter alia,* reviewed hundreds of thousands of pages of documents and depositions and consulted extensively with economic expert; and parties engaged in mediation, including exchange of mediation statements regarding merits of respective positions in order to inform and facilitate negotiations.)).

### iv. Establishing Liability, Particularly with Respect to Defendants' *Scienter,* Involves Significant Risks

**\*17** While Plaintiffs maintain that their claims against Defendants are valid, they would face significant legal challenges if this case were to continue, and there is a real risk that they would ultimately fail to establish liability. "Courts routinely recognize that securities class actions present hurdles to proving liability that are difficult for plaintiffs to clear." *In re Top Tankers, Inc., Sec. Litig.,* No. 06 Civ. 13761(CM), 2008 WL 2944620, at *4 (S.D.N.Y. July 31, 2008); *see In re AOL Time Warner, Inc. Sec. & ERISA Litig.,* No. MDL 1500, 02 Civ. 5575(SWK), 2006 WL 903236, at *4 (S.D.N.Y. Apr. 6, 2006) ("The difficulty of establishing liability is a common risk of securities litigation."); *In re Indep. Energy Holdings PLC Sec. Litig.,* No. 00 Civ. 6689(SAS), 2003 WL 22244676, at *3 (S.D.N.Y. Sept.29, 2003) (noting difficulty of proving *scienter* ); *see also Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* 551 U.S. 308, 321–22, 127 S.Ct. 2499, 168 L.Ed.2d 179 (2007).

In their various motions, answers to the Complaint, and during the multiple mediation sessions, the Individual Defendants have asserted that:

- the disclosures in FLAG's registration statement regarding presales were accurate and not misleading;

- the Individual Defendants' Class Period statements regarding demand were true and not misleading;

- all of FLAG's accounting for capacity sales during the Class Period was accurate and in accordance with GAAP;

- the allegedly improper "swap" transactions were legitimate business transactions and were properly accounted for;

- FLAG was not required to report an impairment during the Class Period; and

- Plaintiffs could not prove causation and damages.

Defendant CGMI has asserted numerous additional defenses, including negative causation and that it conducted sufficient due diligence. Had this case not settled, Defendants could be expected to gather additional evidence for each of these defenses and to assert them in a motion for summary judgment and/or at trial and, if necessary, on appeal.

The Individual Defendants have also claimed that Plaintiffs face insurmountable hurdles in proving *scienter* against the three remaining Individual Defendants on Plaintiffs' ′34 Act claims. Plaintiffs believe they would ultimately prevail on this issue but acknowledge that proving *scienter* in this case would be particularly challenging in light of the following: (1) there is no evidence that any of the ′34 Act Defendants exercised options on or sold FLAG stock during the Class Period; (2) the ′34 Act Defendants claim to have relied in good faith on the advice of multiple sets of accountants who approved the relevant accounting decisions; and (3) the ′34 Act Defendants claim their alleged misstatements were supported by contemporaneous documents and reports that, in and of themselves, negate any inference of *scienter.*

Moreover, at trial, Plaintiffs would face the additional risks posed by conflicting evidence and testimony. Since many witnesses likely would be aligned with Defendants and, as a result, would be hostile to Plaintiffs' case, Plaintiffs would be required to rely primarily on documents and expert witnesses to establish their case. The risk of establishing liability would be exacerbated by the risks inherent in all shareholder litigation, such as the unpredictability of a lengthy and complex jury trial, the risks that witnesses would suddenly become unavailable or jurors could react to the evidence in unforeseen ways, and the risks that the jury would find that Defendants reasonably believed in the propriety of their

actions at the time and, consequently, Plaintiffs failed to prove *scienter.*

### v. Establishing Recoverable Damages, Particularly with Respect to Loss Causation, Also Involves Significant Risks

**\*18**  Plaintiffs also faced significant risk in proving causation and the amount of damages.

> In order to prove loss causation and damages, Lead Plaintiff would be required to prove that Defendants' alleged false and misleading statements and omissions of material fact inflated the price of [defendant's] common stock during the Class Period, and that upon the Company's disclosure of such misinformation, the price of [defendant's] common stock dropped and damaged Lead Plaintiff and the Class. Lead Plaintiff would also be required to prove the amount of artificial inflation in the price of [defendant's] common stock.

*In re Top Tankers,* 2008 WL 2944620, at \*5. Plaintiffs anticipate that, in the absence of settlement, Defendants would move for summary judgment on the ′34 Act claims at the close of discovery, renewing the multiple arguments made in their motions to dismiss and for judgment on the pleadings.

The most significant risk to Plaintiffs' claim for damages was actually realized in this case, when the Second Circuit held, as a matter of law, that there was insufficient evidence on which in-and-out traders could establish the element of loss causation. As previously noted, this decision probably caused a very significant reduction in Plaintiffs' recoverable damages, from over $360 million to approximately $14.2 million. Although Plaintiffs initially considered a motion asking that the District Court reformulate the Class to include at least some of the individuals excluded by the Second Circuit's decision, the likelihood of success on such a motion was slim, and the Court so advised the parties during the September 17, 2009 status conference.

With regard to the damages remaining viable in the case, Defendants likely would contend that actual damages, if indeed there were any at all, were far less than even $14.2 million. First, Defendants would claim that any losses suffered by the Class during the Class period were caused not by the acts of the Individual Defendants but, rather, by the general stock market decline and, in particular, the collapse of the telecommunications market. Second, Defendants would argue that the decline in FLAG'S stock price following its announcement on February 13, 2002 resulted primarily from statements indicating that the company might not be able to continue operations in 2003, not from the "corrective disclosures" related to the fraud alleged by Plaintiffs. Finally, even if Plaintiffs prevailed on issues of liability and damage causation, Defendants would likely present an expert to testify that the proper calculation of damages would result in a recovery of only minimal damages at most.

Even in a less challenging case, "[c]alculation of damages is a 'complicated and uncertain process, typically involving conflicting expert opinion' about the difference between the purchase price and the stock's 'true' value absent the alleged fraud." *Global Crossing,* 225 F.R.D. at 459 (*quoting Mayley,* 186 F.Supp.2d at 365). Undoubtedly, in this action, establishing the amount of damages at trial would have resulted in a "battle of experts." The jury's verdict with respect to damages would thus depend on its reaction to the complex testimony of experts, a reaction that is inherently uncertain and unpredictable. *See EVCI Career College,* 2007 WL 2230177, at \*8 (*citing In re PaineWebber Ltd. P'ships Litig.,* 171 F.R.D. 104, 129 (S.D.N.Y.1997), *aff'd,* 117 F.3d 721 (2d Cir.1997) (noting unpredictability of outcome of battle of damage experts)).

**\*19**  Thus, the very substantial challenges facing Plaintiffs in their attempts to prove liability, loss causation and damages weigh heavily in favor of approval of the proposed Settlement.

### vi. The Risk of Maintaining a Class Action Through Trial Also Weighs in Favor of Approval

In addition to the risks of establishing liability and damages, the nature of the Second Circuit's decision was such that there remained a risk of maintaining class status through trial. From the beginning of the case, Defendants strongly contested class certification on various grounds. It is likely that, after the conclusion of expert discovery, Defendants would renew their argument that conflicts among class members relating

to liability and damages make class treatment improper or, alternatively, require the certification of subclasses. The Second Circuit, while upholding the certification of a single class including both ′33 Act and ′34 Act plaintiffs, cautioned:

> [W]e do not suggest that the issue described by Defendants does not deserve the careful and continued attention of the district court, but merely that it does not inevitably lead at the present time to the decertification of the class. As the lower court recognized, if Plaintiffs are able to prove loss causation with respect to both the ′33 and ′34 Act claims, then it will be necessary for a jury "to determine the extent of harm caused by each [misstatement], and it is here that the interests of class members could diverge." We are confident in the lower court's wisdom and ability to utilize the available case management tools to see that all members of the class are protected, including but not limited to the authority to alter or amend the class certification order pursuant to Rule 23(c)(1)(C), to certify subclasses pursuant to Rule 23(c)(5), and the authority under Rule 23(d) to issue orders ensuring "the fair and efficient conduct of the action."

*In re Flag Telecom Holdings, Ltd. Sec. Litig.,* 574 F.3d 29, 37 (2d Cir.2009) (internal citations omitted) (*citing In re Flag,* 245 F.R.D. at 160). Thus, there remained in this case the very real risk of decertification or modification of the class at a later stage of the proceedings. *See In re NASDAQ Market–Makers Antitrust Litig.,* 187 F.R.D. 466, 476–77 (S.D.N.Y.1998) (decertification can occur if management problems arise during litigation; decertification or reversal of certification would deprive class of any recovery).

### vii. The Ability of the Defendants to Withstand a Greater Judgment

If Plaintiffs somehow were successful in undoing the implications of the Second Circuit's loss causation ruling, then the ′34 Act Defendants would lack sufficient insurance, and presumably would lack sufficient resources, to pay a judgment in the full amount of the claimed damages. CGMI recently needed a well-publicized infusion of taxpayer dollars just to survive. In any event, "the mere ability to withstand a greater judgment does not suggest the settlement is unfair." *AOL Time Warner,* 2006 WL 903236, at *42, This is particularly true where, as here, the settlement appears to exceed the recoverable damages, in light of the Second Circuit's ruling.

### viii. The Settlement is Reasonable When Viewed in Light of the Best Possible Recovery and the Risks of Continued Litigation

**\*20** The last two substantive factors courts consider are the range of reasonableness of the settlement funds in light of (1) the best possible recovery and (2) litigation risks. In analyzing these last two factors, the issue for the Court is not whether the Settlement represents the "best possible recovery," but how the Settlement relates to the strengths and weaknesses of the case. The Court "consider[s] and weigh[s] the nature of the claim, the possible defenses, the situation of the parties, and the exercise of business judgment in determining whether the proposed settlement is reasonable." *Grinnell,* 495 F.2d at 462. Courts agree that the determination of a "reasonable" settlement "is not susceptible of a mathematical equation yielding a particularized sum." *PaineWebber,* 171 F.R.D. at 130 (*quoting Milken,* 150 F.R.D. at 66). Instead, "in any case there is a range of reasonableness with respect to a settlement." *Newman v. Stein,* 464 F.2d 689, 693 (2d Cir.1972); *see Indep. Energy,* 2003 WL 22244676, at *4.

Under the proposed Settlement, the Class will receive $24.4 million, well in excess of the $14.2 million estimated by Plaintiffs' expert to be the potential damages in light of the Second Circuit ruling excluding in-and-out traders from the Class. More aggressive methods of calculation could result in damages ranging from approximately $25 million to approximately $120 million .[18] Even under the most favorable, $120 million scenario, the proposed settlement amounts to over 20% of the potential damages, well within the "range of reasonableness." *See In re Merrill Lynch Research Rep. Sec. Litig.,* Nos. 02 MDL 1484(JFK), 02 Civ. 3176(JFK), 02 Civ. 7854(JFK), 02 Civ. 10021(JFK), 2007 WL 313474, at *10 (S.D.N.Y. Feb. 1, 2007) (settlement representing 6.25% of estimated damages found to be "at the higher end of the range of reasonableness of recovery in class action securities litigations"); *In re PaineWebber,* 171 F.R.D., at 132 (recovery between 7% and 20% is "well within the range of reasonableness"); *see also In re Telik,* 576 F.Supp.2d at 580 (settlement representing 25% of recoverable damages is "well above that in most securities class actions"); *Veeco I,* 2007 WL 4115809, at *11 (settlement representing 23.2% of possible recovery is "squarely within the range of reasonableness") (internal quotations omitted).

2010 WL 4537550

By all measures, the proposed Settlement compares favorably with settlements reached in other securities class actions in recent years. According to objective data recently published by Cornerstone Research, the $24.4 million recovery here is more than three times the median settlement ($7.4 million) in class actions reported during the period 1996 through 2008 and three times the median settlement ($8.0 million) reported for 2009 settlements. The median settlement in class actions securities cases was 2.9% of estimated damages for the period 2002 through 2008 and 2.3% of estimated damages in 2009. In cases with estimated damages of less than $50 million, the median settlement was 11.4% of estimated damages for the period 2002 through 2008 and 12% of estimated damages in 2009. Here, the settlement amount represents 170% of the potential damages (with damages of $14.2 million), and 20% of the maximum potential damages under the most aggressive possible approach (with damages of $120 million).

**\*21** In light of these circumstances and all of the delay and uncertainty that would be inherent in continued litigation, the Settlement falls well within the range of possible recovery considered fair, reasonable and adequate.

## VII. THE PLAN OF ALLOCATION IS FAIR AND REASONABLE

A Plan of Allocation is fair and reasonable as long as it has a "reasonable, rational basis." *Maley,* 186 F.Supp.2d at 367. Courts recognize that "the adequacy of an allocation plan turns on whether counsel has properly apprised itself of the merits of all claims, and whether the proposed apportionment is fair and reasonable in light of that information." PaineWebber, 171 F.R.D. at 133. An allocation formula need only have a reasonable and rational basis, particularly if recommended by experienced and competent counsel. Counsel's conclusion here that the Plan of Allocation is fair and reasonable is therefore entitled to great weight. *American Bank Note,* 127 F.Supp.2d at 430 (approving allocation plan and according counsel's opinion "considerable weight" because there were "detailed assessments of the strengths and weaknesses of the claims asserted, the applicable damages, and the likelihood of recovery").

The Plan of Allocation proposed herein has been prepared by Plaintiffs' Lead Counsel utilizing their Damages Expert's report and data concerning causation and damages. The Plan reflects the proposition that the price of FLAG common stock was artificially inflated from the beginning of the

'33 Act Class Period on February 11, 2000, and at the beginning of the '34 Act Class Period on March 6, 2000, and through February 12, 2002, but that much of the artificial inflation was suddenly eliminated on February 13, 2002 when FLAG made disclosures that at least partially corrected its prior misstatements, and that any remaining artificial inflation was eliminated by April 11, 2002. The Plan reflects the requirements for establishing damages promulgated by

*Dura Pharmaceuticals, Inc. v. Broudo,* 544 U.S. 336, 125 S.Ct. 1627, 161 L.Ed.2d 577 (2005), and complies with the requirements of the PSLRA.

The Plan of Allocation separately allocates the Net Individual Defendants' Settlement Fund differently than the CGMI Settlement Fund, based on the fact that CGMI was only alleged to be liable under the Securities Act for the IPO, while the Individual Defendants were alleged to be liable under both the Securities Act for the IPO and under Section 10(b) of the Exchange Act for the Class Period.

The Plan provides for the distribution of the Net Individual Defendants' Settlement Fund to all Class Members on a *pro rata* basis based on a formula that takes into account the alleged artificial inflation paid on the shares of FLAG stock purchased during the entire period February 11, 2000 through February 12, 2002, that were still held at the close of trading on February 12, 2002.

The Plan separately provides for the distribution of the Net CGMI Settlement Fund to all IPO Class Members on a *pro rata* basis based on a formula that takes into account the alleged artificial inflation paid on shares of FLAG stock purchased during the IPO period February 11, 2000 through May 10, 2000, that were still held at the close of trading on February 12, 2002.

**\*22** The Plan's formula subtracts the Asserted Value of the shares on the day of purchase from the purchase price actually paid to calculate the amount of artificial inflation allegedly paid, and either uses that, or a maximum of $5.08 per share, the amount by which the corrective disclosure reduced the alleged inflation, to give the Claimant a "Recognized Claim" from those shares. If the shares were sold after February 12, 2002 for more than their Asserted Value, then the amount received in excess of the Asserted Value can reduce the Recognized Claim. The Net Individual Defendants' Settlement Fund will be distributed *pro rata* to Class Members who submit acceptable Proofs of Claim ("Authorized Claimants") based on their particular

Case 4:19-cv-00509   Document 65-9   Filed 07/02/21 in TXSD   Page 837 of 1452
In re Flag Telecom Holdings, Ltd. Securities Litigation, Not Reported in F.Supp.2d (2010)
2010 WL 4537550

Recognized Claim as compared to the total of all Class Members' Recognized Claims. The Net CMGI Settlement Fund will be distributed *pro rata* to Authorized Claimants based on their particular IPO Recognized Claim as compared to the total of all IPO Class Members' Recognized Claims.

The Plan of Allocation is set forth in full in the Settlement Notice, and there have been no objections to the Plan.

Accordingly, the court concludes that the Plan of Allocation provides a fair and reasonable method for allocating the Net Settlement Funds among Class Members based on their relative compensable losses, and should be approved.

## VIII. LEAD COUNSEL'S REQUEST FOR FEES AND EXPENSES IS FAIR AND REASONABLE

Lead Counsel, having achieved recovery of $24.4 million in what appears to be a case worth substantially less, seek reimbursement of expenses in the amount of $1,910,420.76, plus an award of attorneys' fees in the amount of 30% of the *remaining* balance of the Settlement Fund *after* reimbursement of these expenses and payment of any PSLRA awards to the Class Representatives; *i.e.,* Lead Counsel seek a fee award that is 30% of the Settlement Fund "net" of expenses and awards to the Class Representatives. On the more traditional "gross" basis, this would amount to an award of only approximately 27.5%. In dollar terms this amount—approximately $6,715,374, plus a *pro rata* share of the accrued interest—is less than 32% of Lead Counsel's approximately $21,000,000 of lodestar in this case.

The $24.4 million Settlement obtained for the benefit of the Class is the result of literally tens of thousands of hours spent by Lead Counsel and the skill and perseverance of Lead Counsel in litigating this Action. It represents a remarkable result for the Class in a complex case that posed a great many obstacles to recovery. Lead Counsel's considerable expenditure of time and resources on a difficult and protracted case, where Lead Counsel ultimately obtained a superior result in light of the size of the Class and the amount of recoverable damages, justifies the requested fee.

Lead Counsel devoted over 45,500 hours to the prosecution of this case over more than eight years. Lead Counsel prosecuted the Action on an entirely contingent-fee basis. The significant outlay of cash and personnel resources by Lead Counsel has been completely at risk. Given the uncertainties inherent in securities class actions generally and the difficulties in this particular case, there was a significant possibility that Lead

Counsel would recover nothing for their substantial efforts. They are in any event recovering only a portion of their outlay.

**\*23** Courts in this District and throughout the nation, recognizing the risks and effort generally expended by counsel to obtain favorable results, have not hesitated to award 30% of the "gross" recovery, or more, in complicated securities fraud cases such as this. Furthermore, the Settlement amount here far exceeds the national medians —in straight dollar terms and as a percentage of the recovery compared to the total alleged damages—for class action securities settlements after the passage of the PSLRA.

The reaction of the Class (or, rather, the lack of reaction of the Class) to the proposed fee award supports Lead Counsel's request. The support of the Class is not surprising, for even after payment of expenses of $1,910,420.76, PSLRA awards to Loftin of $100,000 and to Coughlin of $5,000, and Lead Counsel's requested fee of 30% of the remainder, the net payment to the Class—approximately $15,669,205, plus interest—still would be more than 100% of a $14.2 million damage figure.

### A. *Lead Counsel Are Awarded Fees from the Common Fund Created as a Result of the Settlement*

Courts have long recognized that " 'attorneys who create a common fund to be shared by a class are entitled to an award of fees and expenses from that fund as compensation for their work.' " *Veeco I,* 2007 WL 4115809, at \*2 (*quoting American Bank Note,* 127 F.Supp.2d at 430); *see* *Boeing Co. v. Van Gemert,* 444 U.S. 472, 100 S.Ct. 745, 62 L.Ed.2d 676 (1980). The purpose of the common fund doctrine is to fairly and adequately compensate class counsel for services rendered and to prevent the unjust enrichment of persons who benefit from a lawsuit without shouldering its costs. *Mills v. Electric Auto–Lite Co.,* 396 U.S. 375, 392, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970). Moreover, awards of attorneys' fees from a common fund "serve to encourage skilled counsel to represent those who seek redress for damages inflicted on entire classes of persons, and to discourage future misconduct of a similar nature." *In re Telik,* 576 F.Supp.2d at 585. Accordingly, Lead Counsel are entitled to an award of attorneys' fees and expenses from the Settlement Fund.

Courts traditionally have used two methods to calculate attorneys' fees in common fund cases: the percentage method, which awards attorneys' fees as a percentage of the common

fund created for the benefit of the class; and the lodestar/ multiplier or "presumptively reasonable fee" approach, which multiplies the number of hours expended by counsel by the hourly rate normally charged for similar work by attorneys of comparable skill and experience, and enhances the resulting lodestar figure by an appropriate multiplier to reflect litigation risk, the complexity of the issues, the contingent nature of the engagement, the skill of the attorneys, and other factors. *Savoie v. Merchants Bank,* 166 F.3d 456, 460 (2d Cir.1999). The Second Circuit has held that both the percentage and lodestar/multiplier methods are available to district courts in awarding attorneys' fees in common fund cases. *Goldberger v. Integrated Res., Inc.,* 209 F.3d 43, 50 (2d Cir.2000). However, as has often and emphatically been noted, the percentage of recovery methodology is considered the "most efficient and logical means" for calculating attorneys' fees. *In re Telik,* 576 F.Supp.2d at 584.

**\*24** Under either method—percentage or lodestar/multiplier —the fees awarded in common fund cases must be "reasonable" under the circumstances. *Goldberger,* 209 F.3d at 47; *In re Fine Host Corp. Sec. Litig.,* No. MDL 1241, 3:97–CV–2619 JCH, 2000 WL 33116538, at *4 (D.Conn. Nov.8, 2000). The Second Circuit has instructed that, in the exercise of their discretion,

> [D]istrict courts should continue to be guided by the traditional criteria in determining a reasonable common fund fee, including: "(1) the time and labor expended by counsel; (2) the magnitude and complexities of the litigation; (3) the risk of the litigation .... (4) the quality of representation; (5) the requested fee in relation to the settlement; and (6) public policy considerations."

*Goldberger,* 209 F.3d at 50 (*quoting In re Union Carbide Corp. Consumer Prod. Bus. Sec. Litig.,* 724 F.Supp. 160, 163 (S.D.N.Y.1989)).

The fee requested in this case—30% of the "net" Settlement Fund (approximately 27.5% of the "gross" Settlement Fund) is reasonable in light of the extensive efforts and risks faced over the course of nearly eight years of litigation and is well within the range of fees awarded (even on "gross" settlements) by courts in this Circuit. *See, e.g., In re Bisys Sec. Litig.,* No. 04 Civ. 3840(JSR), 2007 WL 2049726, at * 2 (S.D.N.Y. July 16, 2007) (30% of $65.87 million settlement); *In re Priceline.com, Inc Sec. Litig.,* No. 3:00–

CV–1884(AVC), 2007 WL 2115592, at *4–5 (D.Conn.2007) (30% of $80 million settlement); *Hicks v. Stanley,* No. 01 Civ. 10071(RJH), 2005 WL 2757792, at *9 (S.D.N.Y. Oct.24, 2005) (30% of $10 million settlement); *In re Warnaco Group. Inc. Sec. Litig.,* No. 00 Civ. 6266(LMM), 2004 WL 1574690, at *3 (S.D.N.Y. July 13, 2004) (30% of $12.85 million settlement); *Kurzweil v. Phillip Morris Co., Inc.,* Nos. 94 Civ. 2373(MBM), 94 Civ. 2546(BMB), 1999 WL 1076105, at *1 (S.D.N.Y. Nov. 30, 1999) (30% of $123 million settlement).

Indeed, as this Court wrote in *In re Veeco Instruments* (*"Veeco II"* ), there are numerous other common fund cases in this District alone where fees were awarded in the amount of 33 1/3% of the gross settlement fund. *Veeco Instruments Inc. Sec. Litig.,* No. 05 MDL 01695(CM), 2007 WL 4115808, at *4 n. 5 (S.D.N.Y. Nov.7, 2007) (*"Veeco II"* ) (collecting cases). [19]

Likewise, courts in other circuits around the country commonly award attorneys' fees equal to or higher than the compensation requested here. "Awards of 30% or more of a settlement fund are not uncommon in § 10(b) common fund cases such as this." *Ressler v. Jacobson,* 149 F.R.D. 651, 655 (M.D.Fla.1992); *see also In re Rite Aid Corp. Sec. Litig.,* 146 F.Supp.2d 706, 735 (E.D.Pa.2001) (noting that in a study of 287 settlements ranging from less than $1 million to $50 million, "the median turns out to be one-third"). As this Court observed in *In re Telik* (awarding attorneys' fees of 25% of the settlement amount):

> **\*25** The requested fee is also less than the fee awards in many cases such as this throughout the rest of the country. *See, e.g., In re Ravisent Techs., Inc. Sec. Litig.,* 2005 WL 906361, at *15 (E.D.Pa. Apr.18, 2005) (awarding attorneys' fees of one-third of $7 million settlement); *In re Corel Corp. Inc. Sec. Litig.,* 293 F.Supp.2d 484, 497 (E.D.Pa.2003) ("[T]he 33 1/3% fee request in this complex case is within the reasonable range."); *Faircloth v. Certified Fin. Inc.,* 2001 WL 527489, at *12 (E.D.La. May 16, 2001) (awarding attorneys' fees of 35% of settlement plus interest and reimbursement of expenses).

*In re Telik,* 576 F.Supp.2d at 587 (additional citations omitted). [20]

The Second Circuit "encourages" an analysis of counsel's lodestar "as a 'cross check' on the reasonableness of the

requested percentage." *Goldberger,* 209 F.3d at 50; EVCI, 2007 WL 2230177, at * 17. Where the lodestar is used as a cross-check, "the hours documented by counsel need not be exhaustively scrutinized by the district court." *Goldberger, 209 F.3d at 50.*

A lodestar analysis begins with the calculation of the lodestar, which is "comprised of the amount of hours devoted by counsel multiplied by the normal, non-contingent hourly billing rate of counsel." *In re Prudential Sec. Inc. Ltd. Pshps, Litig.,* 985 F.Supp. 410, 414 (S.D.N.Y.1997), Here, Lead Counsel devoted over 45,500 hours to this matter and their lodestar was $20,955,697.50. (Milberg Decl., ¶ 6 and Exh. A.) [21] Lead Counsel's efforts are described in detail *supra,* and in the accompanying Friedman Declaration. Lead Counsel is also overseeing all aspects of the settlement process, a responsibility that will continue into the coming months.

Lead Counsel are highly experienced in prosecuting complex securities class action cases. (Milberg Decl., Exh. D.) Consequently, Lead Counsel "were presumably able to perform the various tasks necessary to advance Plaintiffs' and the Class's interests in a more efficient manner than would have counsel with a lesser degree of specialization in the field." *In re Telik,* 576 F.Supp.2d at 588–89 (*citing Teachers Ret. Sys. of La. v. A.C.L.N ., Ltd.,* No. 01–CV–11814(MP), 2004 WL 1087261, at *6 (S.D.N.Y. May 14, 2004) (noting that the skill and prior experience of counsel in the specialized field of shareholder securities litigation is relevant in determining fair compensation)).

Finally, in evaluating the reasonableness of the hours expended on this case, it is critical to note that until the Second Circuit decision on July 22, 2009—that is, for more than seven years of the pendency of this case—the estimated amount of damages available to the Class was between $362 million and $465.5 million.

In a lodestar analysis, the appropriate hourly rates are " 'those [rates] prevailing in the community for similar services of lawyers of reasonably comparable skill, experience and reputation.' " *Cruz v. Local Union No. 3 of the IBEW,* 34 F.3d 1148, 1159 (2d Cir.1994) (*quoting Blum v. Stenson,* 465 U.S. 886, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984)); *see also Luciano v. Olsten Corp.,* 109 F.3d 111, 115–16 (2d

Cir.1997); *Veeco II,* 2007 WL 4115808, at *9. In complex securities class actions in this Circuit and around the country, courts have repeatedly found rates similar to those charged by Lead Counsel here to be reasonable; indeed, the American Lawyer recently reported that the *median* billing rate for partners at many leading law firms exceeds $900/hour. [22] The median rates for the firms representing defendants in this case were reported to be $950/hour for Shearman & Sterling and $900/hour for Milbank, Tweed, Hadley & McCloy. And, of course, we know that counsel for the Individual Defendants, Shearman & Sterling, who were paid currently and on a risk-free basis, long ago exhausted the entirety of a $20 million primary layer of insurance on defense costs.

**\*26** "Under the lodestar method, a positive multiplier is typically applied to the lodestar in recognition of the risk of the litigation, the complexity of the issues, the contingent nature of the engagement, the skill of the attorneys, and other factors." *In re Marsh & McLennan Cos., Inc. Sec. Litig.,* No. 04 Civ. 8144(CM), 2009 WL 5178546, at *20 (S.D.N.Y. Dec.23, 2009) (*citing Goldberger,* 209 F.3d at 47); *Savoie v. Merchants Bank,* 166 F.3d 456, 460 (2d Cir.1999). "In contingent litigation, lodestar multiples of over 4 are routinely awarded by courts, including this Court." *In re Telik,* 576 F.Supp.2d at 590 (a multiplier of 4 .65 was "well within the range awarded by courts in this Circuit and courts throughout the country") (*citing Maley,* 186 F.Supp.2d at 369). In this case, the percentage fee requested represents a fractional multiplier of less than 0.32 times the lodestar. Thus, even though Lead Counsel here assumed very substantial risk in prosecuting this case and achieved an excellent result considering all the circumstances, they will nevertheless recoup far less than their lodestar.

Lead Counsel's request for a percentage fee representing a significant discount from their lodestar provides additional support for the reasonableness of the fee request. *See In re Initial Pub. Offering Sec. Litig.,* 671 F.Supp.2d 467, 515 (S.D.N.Y.2009) (awarding fees of 33 1/3%, noting that even in a mega-fund case, there is "no real danger of overcompensation" where the award represents a fractional multiplier to the lodestar); *Veeco II,* 2007 WL 4115808, at *10 ("Not only is Plaintiffs' Counsel not receiving a premium on their lodestar to compensate them for the contingent risk factor, their fee request amounts to a deep discount from their lodestar. Thus, the lodestar 'cross-check' unquestionably

supports a percentage fee award of 30%."); In re Blech Sec. Litig., Nos. 94 CIV. 7696(RWS), 95 CIV. 6422(RWS), 2000 WL 661680, at *5 (S.D.N.Y. May 19, 2000) (awarding lead counsel 30% of the settlement, and confirming that the award was reasonable because it represented a fractional multiplier of lead counsel's lodestar).

Finally, the Second Circuit has stated that whether the Court uses the percentage method or the lodestar approach, it should continue to consider the following traditional criteria: (1) the time and labor expended by counsel; (2) the risks of the litigation; (3) the magnitude and complexity of the litigation; (4) the requested fee in relation to the settlement; (5) the quality of representation; and (6) public policy considerations. Goldberger, 209 F.3d at 50. An analysis of these factors demonstrates that the requested fee is reasonable.

Lead Counsel has devoted over 45,500 hours to the prosecution and settlement of this case. (Milberg Decl., ¶ 6 and Exh. A.) As detailed *supra* and in the accompanying Friedman Declaration, these efforts were reasonable and necessary to the effective prosecution of this Action.

**\*27** The reasonableness of the requested fee is also supported by an evaluation of the risks undertaken by Lead Counsel in prosecuting this Action. The Second Circuit has recognized that "despite the most vigorous and competent of efforts, success is never guaranteed." Grinnell, 495 F.2d at 471. Securities class actions such as this are "notably difficult and notoriously uncertain." In re Sumitomo, 189 F.R.D. at 281.

Lead Counsel undertook this Action on a wholly contingent basis, investing substantial amounts of time and money to prosecute this litigation with no guarantee of compensation or even the recovery of out-of-pocket expenses. Unlike counsel for Defendants, who are paid substantial hourly rates and reimbursed for their expenses on a regular basis, Lead Counsel have not been compensated for any time or expenses since this case began more than eight years ago. Courts in the Second Circuit have recognized that the risk associated with a case undertaken on a contingent fee basis is an important factor in determining an appropriate fee award. *See, e.g.,* American Bank Note, 127 F.Supp.2d at 433 (concluding it is "appropriate to take this [contingent-fee] risk into account in determining the appropriate fee to award"); *In re Prudential,* 985 F.Supp.2d at 417 ("Numerous courts have recognized that the attorney's contingent fee risk is an important factor in determining the fee award.").

Lead Counsel prosecuted this action essentially by itself against teams of defense lawyers from two large and well-funded firms—Shearman & Sterling and Milbank, Tweed, Hadley & McCloy—plus other substantial defense firms who represented earlier defendants (*e.g.,* Kirkland & Ellis on behalf of Verizon) and/or who appeared in connection with discovery disputes (*e.g.,* Gibson Dunn, appearing *pro se* ).

Moreover, there was no prior governmental action against FLAG on which Lead Counsel could "piggy back." The burden and the risk here were borne solely by Lead Counsel. As this Court wrote in *Veeco II:*

> Indeed, the risk of non-payment in complex cases, such as this one, is very real. There are numerous class actions in which counsel expended thousands of hours and yet received no remuneration whatsoever despite their diligence and expertise. There is no guarantee of reaching trial, and even a victory at trial does not guarantee recovery. As the Court stated in *Warner:* "Even a victory at trial is not a guarantee of ultimate success.... An appeal could seriously and adversely affect the scope of an ultimate recovery, if not the recovery itself." 618 F.Supp. at 747–48.

2007 WL 4115808, at *6 (*quoting In re Warner Commc'n Sec. Litig.,* 618 F.Supp. 735, 747–48 (S.D.N.Y.1985)).

The risks involved in this case were compounded by the complexity of the issues. Lead Counsel faced enormous obstacles in proving the liability of the Defendants. Assuming these hurdles could be overcome, Lead Counsel still faced the burden of proving both the extent of the Class's damages and that those damages were caused by Defendants' conduct, a "complicated and uncertain" process at best. Global Crossing, 225 F.R.D. at 459. Moreover, the risk of this case for Lead Counsel increased as a result of developments in the law during the course of this litigation, especially in the areas of loss causation and class certification.

**\*28** Much of the risk borne by Lead Counsel here was realized when the Second Circuit held that in-and-out traders should be excluded from the Class, because there was no loss causation prior to the end of the Class Period (thus also arguably limiting the remaining Class's damages). As a result of this decision, the maximum potential damages available to

the Class arguably were reduced from more than $362 million to potentially as little as $14.2 million.

Notwithstanding the foregoing significant risks of continued litigation, Lead Counsel zealously represented the Class and secured for them a sizable recovery—indeed, a recovery greater than what may have been the maximum potential recoverable damages. The risks associated with this litigation clearly support the reasonableness of Lead Counsel's fee request.

As discussed above, the proposed fee—30% of the "net" Settlement amount—is well within the range of fees awarded by courts in this Circuit and other circuits in securities class actions. Thus, this factor weighs in favor of the reasonableness of the requested fee.

The quality of the representation and the standing of Lead Counsel are important factors that also support the reasonableness of the requested fee. Lead Counsel have immense experience in complex federal civil litigation, particularly the litigation of securities and other class actions and have received significant recognition for their work. Lead Counsel's experience allowed them to identify the complex issues involved in this case and formulate appropriate and effective litigation strategies. Lead Counsel aggressively prosecuted this Action for roughly eight years and ultimately obtained an extraordinary recovery for the Class.

The skill and sophistication of Lead Counsel's representation in this case enabled Plaintiffs to prevail in battle after battle, critical motion after critical motion, including, most notably, the motions to dismiss, the motion for judgment on the pleadings, countless discovery motions, the motion for class certification (in which Plaintiffs also won every issue on appeal other than loss causation), and the partial summary judgment motion. But nowhere was the skill of Lead Counsel more dramatically displayed than in the mediation and negotiation with the *Rahl* Trustee and the subsequent mediation with the Defendants, which led to the Plaintiffs obtaining FLAG's privileged documents from FTGL, and ultimately to the Plaintiffs receiving 70% of the total recovery from the Individual Defendants in both cases.

Furthermore, the Settlement was obtained in the face of extremely aggressive opposition from the Defendants, represented by the pre-eminent defense firms of Shearman & Sterling and Milbank, Tweed, Hadley & McCloy. The quality of the opposition should be taken into consideration

in assessing the quality of Lead Counsel's performance. *See, e.g., Teachers Ret. Sys.,* 2004 WL 1087261, at *20; *Maley., 186 F.Supp.2d at 373.*

**\*29** Courts in the Second Circuit have held that "[p]ublic policy concerns favor the award of reasonable attorneys' fees in class action securities litigation." *In re Merrill Lynch Tyco,* 249 F.R.D. 124, 141–42 (S.D.N.Y.2008) ( " 'In order to attract well qualified plaintiffs' counsel who are able to take a case to trial, and who defendants understand are able and willing to do so, it is necessary to provide appropriate financial incentives.' ") (quoting *In re Worldcom, Inc. Sec. Litig.,* 388 F.Supp.2d 319, 359 (S.D.N.Y.2005)). Moreover, "public policy supports granting attorneys fees that are sufficient to encourage plaintiffs' counsel to bring securities class actions that supplement the efforts of the SEC." *In re Bristol–Myers,* 361 F.Supp.2d 229, 236 (S.D.N.Y.2005); *see also Maley,* 186 F.Supp.2d at 373 ("In considering an award of attorney's fees, the public policy of vigorously enforcing the federal securities laws must be considered."); *In re Visa Check/Master Money Antitrust Litig.,* 297 F.Supp.2d 503, 524 (E.D.N.Y.2003) ("The fees awarded must be reasonable, but they must also serve as an inducement for lawyers to make similar efforts in the future."), *aff'd sub nom. Wal–Mart Stores, Inc. v. Visa U.S.A. Inc.,* 396 F.3d 96 (2d Cir.2005).

If this important public policy is to be carried out, the courts should award fees which will adequately compensate Lead Counsel for the value of their efforts, taking into account the enormous risks they undertook. In this case, Lead Counsel seeks a fee that is significantly less than its accrued lodestar. As such, public policy considerations favor granting the fee request.

Finally, numerous courts have noted that the lack of objection from members of the class is one of the most important factors in determining the reasonableness of a requested fee. *Maley,* 186 F.Supp.2d at 374 ("The reaction by members of the Class is entitled to great weight by the Court."); *Ressler,* 149 F.R.D. at 656 (lack of objections is "strong evidence" of the reasonableness of the fee request); *In re Prudential Sec. Inc. Ltd. P'ships Litig.,* 912 F.Supp. 97, 103 (S.D.N.Y.1996) (court determined that an "isolated expression of opinion" should be considered "in the context of thousands of class members who have not expressed

themselves similarly"), *aff'd, Toland v. Prudential Sec. P'ship Litig.,* 107 F.3d 3 (2d Cir.1996).

Over 43,450 Notices have been mailed to potential Class Members and a Summary Notice was also published in *The Wall Street Journal* . (Fishbein Aff., ¶ 8; Andrejkovics Aff., ¶ 2.) The Notice mailed to Class Members stated that Lead Counsel would seek reimbursement of expenses in the approximate amount of $2 million, plus an award of attorneys' fees in the amount of 30% of the remaining balance of the Gross Settlement Fund after reimbursement of these expenses and payment of any PSLRA awards to the Lead Plaintiffs. Notably, not one Class Member has objected to this request. The overwhelmingly positive response to date by the Class attests to the approval of the Class with respect to both the Settlement and the fee and expense application.

## IX. THE REQUEST FOR REIMBURSEMENT OF EXPENSES IS REASONABLE AND APPROPRIATE

 **\*30**  It is well accepted that counsel who create a common fund are entitled to the reimbursement of expenses that they advanced to a class. *See, e.g., Teachers' Ret. Sys.,* 2004 WL 1087261, at \*6; *American Bank Note,* 127 F.Supp.2d at 430. " 'Courts in the Second Circuit normally grant expense requests in common fund cases as a matter of course.' " *EVCI,* 2007 WL 2230177, at \* 18 (*quoting In re McDonnell Douglas Equip. Lease Fee Litig.,* 842 F.Supp. 733, 746 (S.D.N.Y.1994)). Courts have awarded such expenses so long as counsel's documentation of them is "adequate." *NASDAQ Market–Makers,* 187 F.R.D. at 489.

In the Milberg and Finkelstein Declarations, counsel have detailed and documented the $1,910,420.76 in expenses that they incurred in connection with this action.[23] These expenses are of the type that law firms typically bill to their clients, including photocopying of documents, mediation fees, court filing fees, deposition transcripts, fees for foreign counsel, on-line research, creation of a document database, messenger service, postage and next day delivery, long distance and facsimile expenses, transportation, travel, and other expenses directly related to the prosecution of this Action. All of these expenses are customary and necessary expenses for a complex securities action, and were necessary for Lead Counsel to successfully prosecute this case.

In addition, Lead Counsel retained accounting, damages and other experts. These experts assisted Lead Counsel in the factual investigation and analysis in connection with the amended complaints and during merits discovery, and also assisted Lead Counsel in preparing their submissions for mediation and a potential trial. This Court and others have reimbursed such expert witness fees where "[t]he expenses incurred were essential to the successful prosecution and resolution of [the] Action." *Veeco II,* 2007 WL 4115808, at \*11 (quoting EVCI, 2007 WL 2230177, at \*18.)

Finally, the expenses for which reimbursement is sought amount to less than the expense figure of $2 million referred to in the Notice, to which no objection was filed.

Accordingly, Lead Counsel's request for reimbursement of these expenses is granted.

## X. LEAD PLAINTIFFS ARE ENTITLED TO AN AWARD PURSUANT TO 15 U.S .C. § 78U–4(A)(4)

Under the PSLRA, the Court may award "reasonable costs and expenses (including lost wages) directly relating to the representation of the class to any representative party serving on behalf of a class." 15 U.S.C. § 78u–4(a)(4). *See also Hicks,* 2005 WL 2757792, at \*10. Lead Plaintiffs devoted substantial amounts of their time to the oversight of, and participation in, the litigation on behalf of the Class. (*See* Loftin Declaration at ¶¶ 6–17; Coughlin Declaration at ¶¶ 5–9.)

As Judge Conner wrote in his decision granting class certification, the Lead Plaintiffs "all received and reviewed the pleadings, consulted with [Lead Counsel] on various issues relevant to the lawsuit, produced documents and participated in depositions. Loftin, for example, is intimately familiar with the claims and was uniquely involved in the drafting of the Complaint, particularly with respect to the decision to initially name Verizon as a defendant.... And Coughlin, during his deposition, cogently explained the underlying basis for the litigation."[24]

 **\*31**  The Settlement Notice advised Class Members that application "will also be made for reimbursement to the Lead Plaintiffs for an amount not to exceed $100,000 for Lead Plaintiff Peter T. Loftin and for an amount not to exceed $5,000 for Lead Plaintiff Joseph Coughlin."[25]

No objections to these requests have been filed. They are granted.

Mr. Loftin, who lost over $24 million in FLAG stock, has been actively involved in this litigation since its inception in 2002.[26] As set forth in the Loftin Declaration, he reviewed and authorized the various complaints, as well as countless other pleadings, and, incredibly, even assisted in researching and drafting significant parts of the complaint. He consulted regularly with counsel, and insisted on Lead Counsel visiting him at his home in Florida for a full-day in-person briefing. He also traveled from Miami to New York for his deposition, which lasted a full day, as well as a preparation session the day before. He also produced over 4,000 pages of documents from his and his business's files. And, of course, he also sent his in-house counsel to attend several of the mediation sessions in person. In total, Mr. Loftin estimates that he has spent more than four hundred hours on this litigation over the eight years it has been pending. (Loftin Decl., ¶ 17.)

Mr. Coughlin responded to Lead Counsel's statutory lead plaintiff notice at the beginning of the case, but because his loss was much smaller than Mr. Loftin's, he did not seek to intervene as an additional Lead Plaintiff and Class Representative until February 2005, in response to threats from the Defendants that they would challenge Mr. Loftin as a Class Representative in light of his prior work for BTI.[27] Because he became involved significantly later in the case, Mr. Coughlin spent much less time on this matter than did Mr. Loftin, but he still spent a meaningful amount of time.

In addition to reviewing the complaint and other pleadings and communicating with Lead Counsel, Mr. Coughlin collected his documents for production to the Defendants, and travelled from Florida to New York to sit for a half-day deposition, and also spent time preparing for his deposition the night before. In total, Mr. Coughlin estimates that he has spent approximately twenty hours on this litigation, including travel time. Coughlin Decl., ¶ 9.

**XI. CONCLUSION**

For the reasons set forth above, the Court grants the motion for an order granting: (1) final approval of the proposed Settlement; (2) final approval of the proposed Plan of Allocation for the settlement proceeds; (3) reimbursement of $1,910,420.76 for expenses incurred in connection with the prosecution and settlement of the Action and attorneys' fees in the amount of 30% of the remaining balance of the Settlement Fund after reimbursement of these expenses and payment of any PSLRA awards to the Lead Plaintiffs; and (4) awards to Lead Plaintiffs for their services in prosecuting the Action in the amounts of $100,000 for Lead Plaintiff Peter T. Loftin and $5,000 for Lead Plaintiff Joseph Coughlin.

**All Citations**

Not Reported in F.Supp.2d, 2010 WL 4537550

**Footnotes**

1    The seven individual defendants are Andres Bande, Edward McCormack, Edward McQuaid, Philip Seskin, Daniel Petri, Dr. Lim Lek Suan and Larry Bautista.

2    Former Defendant/non-party FLAG filed a Chapter 11 bankruptcy petition on April 12, 2002. FLAG emerged from its Chapter 11 proceeding on October 9, 2002, with FLAG Telecom Group Limited ("FTGL") becoming its successor. In late 2003, FTGL was purchased by Reliance Gateway Net Limited, a subsidiary of Reliance Communications Limited.

3    *Rahl v. Bande,* C.A. No. 04–CV–1019 (CM)(PED) (*"Rahl"*).

4    In telecom industry parlance, "presales" are capacity sales made on a system prior to the date the system is put into service.

5    *In re Flag Telecom Holdings, Ltd. Sec. Litig.,* 308 F.Supp.2d 249 (S.D.N.Y.2004).

6    *In re Flag Telecom Holdings, Ltd. Sec. Litig.,* 352 F.Supp.2d 429 (S.D.N.Y.2005).

7    *Id.* at 451.

8    *Id.* at 457.

9    *In re Flag Telecom Holdings, Ltd. Sec. Litig.,* 411 F.Supp.2d 377 (S.D.N.Y.2006).

Case 4:19-cv-00509 Document 65-9 Filed 07/02/21 in TXSD Page 844 of 1452
In re Flag Telecom Holdings, Ltd. Securities Litigation, Not Reported in F.Supp.2d (2010)
2010 WL 4537550

10 Defendants' Joint Memorandum of Law In Opposition to Plaintiffs' Motion for Class Certification, at 22 n. 65.

11 *Id.* at 167.

12 The Correction removed vestigal references to Verizon as a defendant.

13 🚩 *In re Flag Telecom Holdings, Ltd. Sec. Litig.,* 618 F.Supp.2d 311 (S.D.N.Y.2009).

14 Prior to the Second Circuit's decision, Plaintiffs' damage expert, Dr. Scott Hakala, calculated that the potential damages in this case were in the range of $362.3 million to $465.5 million, depending on whether one used the economic loss method or the investment loss method of calculating damages, and whether the date of the first significant corrective disclosure is considered to be April 2, 2001 or June 18, 2001.

15 The first layer is $20 million (two carriers share 50/50); the second layer is $30 million after the first $20 million is exhausted (two carriers share 50/50); the third layer is $50 million after the prior $50 million is exhausted (five carriers have 20% each); the fourth layer is $50 million after the prior $100 million is exhausted (one carrier has 82.16%, plus two others); the fifth layer is $25 million after the prior $150 million is exhausted (one is 40% and three others are 20% each); and the sixth through eighth layers are $25 million each (each is a different single carrier).

16 Astoundingly, certain excess insurance policies in the tower did not "follow form."

17 CGMI and plaintiff's counsel in *Rahl* were not part of the initial mediation efforts.

18 To achieve these results, Class Members (those who held their shares throughout the Class Period) would have to prove loss causation prior to the end of the Class Period notwithstanding the Second Circuit's holding that "as a matter of law" there is insufficient evidence of such loss causation. In addition, to obtain the most favorable damages scenario ($120 million), Plaintiffs would need to argue that the Court should calculate damages based on the "constant percentage inflation" method, not the "constant dollar" method—*i.e.,* that artificial inflation (and, consequently, damages) should be measured by the *percentage* by which FLAG'S stock price dropped when corrective information was revealed to the market, not simply by the *dollar amount* by which FLAG's price dropped upon the disclosure of corrective information. While Plaintiffs believe that each of these approaches for calculating legally compensable damages is economically sound, and while valid legal and factual arguments exist in support of each of these approaches, such approaches are not universally accepted and have not been accepted by all courts. *See, e.g.,* 🚩 *In re Williams Sec. Litig.,* 496 F.Supp.2d 1195, 1270 (N.D.Okla.2007) (rejecting the "constant percentage inflation" method), *aff'd,* 🚩 558 F.3d 1144 (10th Cir.2009).

19 *See also In re Blech Sec. Litig.,* 2002 WL 31720381, at * 1 (S.D.N.Y. Dec.4, 2002) (33.3%); 🚩 *In re APAC Teleservice, Inc. Sec. Litig.,* 1999 WL 1052004, at *1 (S.D.N.Y. Nov.19, 1999) (33 1/3% of $21 million settlement); *Becher v. Long Island Lighting Co.,* 64 F.Supp.2d 174, 182 (E.D.N.Y.1999) (one-third fee, plus expenses, is "well within the range accepted by courts in this circuit"); 🚩 *In re Medical X–Ray Film Antitrust Litig.,* 1998 WL 661515, at *2 (E.D.N.Y. Aug.7, 1998) (awarding 33 1/3% of $39.36 million after concluding such an award is "well within the range accepted by courts in this circuit").

20 *See also In re Managed Care Litig.,* 2003 WL 22850070, at *2 (S.D.Fla. Oct.24, 2003) (awarding 35.5%).

21 In addition, Finkelstein Thompson devoted 46.9 hours to this matter on a fully contingent basis, and their lodestar was $17,590.00, in connection with Lead Counsels' efforts to compel the production of documents from Gibson, Dunn & Crutcher. (Finkelstein Decl. ¶¶ 2, 5 and Exh. 1.) All other law firms that assisted Lead Counsel were foreign firms that may not legally be paid contingently, or, in one instance, an American bankruptcy firm that would not work contingently, and so these fees and expenses were advanced by Lead Counsel and are being treated by Lead Counsel as an expense to Lead Counsel. (Milberg Decl., Exhs. B and C.)

22 *Bankruptcy Billing,* The American Lawyer, February 2010, at 44–45.

23 Of the total expenses set forth in text, only a relatively small amount—$1,165.83—were incurred by Finkelstein Thompson.

24 🚩⚠️ *In re Flag Telecom,* 245 F.R.D. at 160–63.

25    Settlement Notice, at 2.

26    Mr. Loftin founded and was, for many years, the Chairman and CEO of a domestic long distance phone company named BTI. Today he owns Casa Casuarina, an upscale South Beach, Florida hotel and event location in the former Versace Mansion. Over the course of the Class Period, especially the summer of 2000, he purchased a total of 1,700,000 FLAG shares at various prices, primarily in the range of $15.50 per share. He sold 297,300 of these shares in early April 2001, at prices ranging from approximately $2.72 to $4.02 per share, and held the remainder until FLAG filed for bankruptcy.

27    Mr. Coughlin served in the Air Force from 1958 to 1962, and then spent six years with the CIA in cryptographic communications, at times posted overseas in classified locations; both positions required a security clearance. He then spent six years as a facilities analyst at IBM. Prior to retiring he spent 20 years as a court reporter. Mr. Coughlin purchased 250 shares traceable to the IPO at prices just under $31.25 per share on February 23, 2000, and purchased an additional 100 shares on July 3, 2001 for $5.17 per share. He held these shares until FLAG filed for bankruptcy.

---

**End of Document**

© 2021 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 32

Case 4:19-cv-00509 Document 65-9 Filed 07/02/21 in TXSD Page 847 of 1452

Fleisher v. Phoenix Life Insurance Company, Not Reported in Fed. Supp. (2015)

2015 WL 10847814

📁 KeyCite Yellow Flag - Negative Treatment

Distinguished by In re Tremont Securities Law, State Law and Insurance Litigation, S.D.N.Y., February 11, 2019

2015 WL 10847814
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Martin FLEISHER, as Trustee of the Michael Moss Irrevocable Life Insurance Trust II and Jonathan Berck, as Trustee of the John L. Loeb, Jr. Insurance Trust, on Behalf of Themselves and All Others Similarly Situated, Plaintiff,
v.
PHOENIX LIFE INSURANCE COMPANY, Defendant.
SPRR LLC, on behalf of itself and all others similarly situated, Plaintiff,
v.
PHL Variable Insurance Co., Defendant.

Civil Action Nos. 11-cv-8405 (CM), 14-cv-8714 (CM)
|
Signed September 9, 2015

**Attorneys and Law Firms**

Frances Sarah Lewis, Steven Gerald Sklaver, Susman Godfrey L.L.P., Los Angeles, CA, Jacob W. Buchdahl, Seth D. Ard, Shawn J. Rabin, Susman Godfrey LLP, Rebecca Sol Tinio, U.S. Attorney's Office, New York, NY, for Plaintiff.

David T. McDowell, Thomas F.A. Hetherington, Hutson Brit Smelley, Jarrett Earl Ganer, Edison, McDowell & Hetherington, LLP, Houston, TX, Brian Patrick Perryman, Jason H. Gould, Kristen Reilly, Waldemar J. Pflepsen, Carlton Fields Jorden Burt, P.A., Washington, DC, Jacob R. Hathorn, Stephen J. Jorden, Robert David Helfand, Carlton Fields Jorden Burt, PA, Simsbury, CT, Patrick J. Feeley, Dorsey & Whitney LLP, New York, NY, Raul Antonio Cuervo, Carlton Fields Jorden Burt, P.A, Miami, FL, for Defendant.

**DECISION AND ORDER APPROVING CLASS ACTION SETTLEMENT AND APPROVING MOTION FOR ATTORNEYS' FEES**

McMahon, United States District Judge

**\*1** After three-plus years of hard-fought litigation and one year of arm's-length negotiations conducted with the assistance of a highly experienced mediator, Plaintiffs have agreed to settle this complex insurance class action after securing an excellent result for the Class. The Settlement was reached on the eve of trial, after class certification and decertification briefing and rulings, voluminous cross-motions for summary judgment and rulings, and the submission of the Joint Preliminary Trial Report, exhibit and witness lists, objections, and deposition designations, voir dire questions, and proposed jury instructions. Preliminary approval of the Settlement was granted on June 3, 2015, and Notice to the Class was mailed on June 17, 2015. Not a single objection to the Settlement has been filed. Only three requests for exclusion were made by anyone not affiliated with the pending *U.S. Bank* actions, which were not settled along with the Fleisher and TIGR actions.

The Settlement gives the Class an outstanding recovery. When the monetary and nonmonetary benefits are combined, the Class will receive over $130 million in total value. This includes over $40.5 million in cash payments by Phoenix. Checks will be mailed directly to all Class members with no need to submit claim forms. No funds will revert to Defendants.

The non-monetary benefits also provide very substantial benefits to the Class. First, Phoenix has agreed to waive any further challenges to the validity of the Class Policies on the grounds of misrepresentations in the application or a lack of insurable interest, permanently giving up the "stranger-originated life insurance" or "STOLI" defense. Phoenix's agreement to end all STOLI challenges represented by these lawsuits, despite having an industry-high rate of resisting payment of claims, will ensure that, upon the occurrence of a maturity event, hundreds of millions in death benefits otherwise owed to members of the Class will be paid. Second, Phoenix has agreed not to impose any additional COI increases through December 31, 2020, even if otherwise permitted by the express language of the policies. Plaintiffs' expert, Ann Juliano from Demeter Investments Ltd., an independent consultant for large, institutional life settlement investors globally, has opined that the net present value of the STOLI and fraud defense waiver and five-year COI freeze creates an additional $94.3 million in value to the Class.

2015 WL 10847814

These are exceptional results for the Class in this hotly-contested litigation.

In November 2011, Plaintiffs filed suited asserting that Phoenix's COI rate increases on certain PAUL policies in April 2010 and November 2011 were made in violation of the policy terms. Phoenix disputed these allegations and challenged Plaintiffs on the sufficiency of the allegations of the complaint, energetically litigating class certification, discovery, liability, and damages at every turn. The summary judgment briefing and the parties' Preliminary Joint Pretrial Report previewed the many difficult and complex issues that remained for trial, including disputed questions of fact about Phoenix's pricing assumptions and applicable actuarial standards of practice. Class Counsel achieved this Settlement only after undertaking significant labor in prosecuting this litigation and investing substantial sums, all entirely at their risk if they did not prevail, including: obtaining and analyzing more than 1.2 million pages of documents, working with liability and damages experts, briefing numerous motions, and taking and defending twenty depositions. The arm's-length settlement negotiations were also extensive: the parties along with counsel attended three in-person mediation sessions with Professor Eric Green, a highly experienced and very well-regarded mediator.

**\*2** The positive reaction to the Settlement by the Class also confirms that the terms are fair, adequate, and reasonable. The deadline to object or request exclusion from the Class has passed, and *not a single Class member objected,* and this is a Class that contains many large and sophisticated investors who are all owners of million dollar-plus life insurance policies. Furthermore, after removing the opt-outs affiliated with the *U.S. Bank* actions, only three other Class members requested exclusion—less than 2% of the Class.

For each of the foregoing reasons and additional reasons provided for below, the court grants final approval to the settlement.

### FACTUAL AND PROCEDURAL BACKGROUND

**A.** *The Class Action Litigation*

In 2010 and 2011, Phoenix announced that it was raising COI rates on more than a thousand life insurance policies it had previously issued. On November 18, 2011, Plaintiffs challenged both rate hikes in a class action brought against Phoenix Life Insurance Company ("*Fleisher* Action"), Case

No. 11–cv–8405–CM. The complaint alleged four claims for relief: breach of contract, breach of the implied covenant of good faith and fair dealing, violation of New York General Business Law § 349, and declaratory judgment. On May 2, 2012, the Court dismissed three of these four claims for relief, but denied the motion to dismiss Plaintiffs' breach of contract claim. Dkt. 29.

Merits discovery began in December 2011. *See* Dkt. 43 at 1. Plaintiffs filed two, important motions to compel in November 2012, which were granted by Magistrate Judge Francis and confirmed by this Court, despite heavy opposition and reconsideration requested by Phoenix. Dkt. 72 & 77; Dkt. 93, 101, 112–13, 115, 117, 123–24, 140. During discovery, Class Counsel analyzed over a million pages of documents, including complicated actuarial tables, took and defended over 20 days of depositions of 17 witnesses, and subpoenaed Defendants' reinsurers and actuarial and financial advisors. Declaration of Steven G. Sklaver in support of Plaintiffs' Motion for Final Approval of Class Action Settlement, filed Aug. 19, 2015, ("Sklaver Decl.") ¶¶ 5–6. Class Counsel also defended the depositions of Mr. Fleisher and Mr. Berck, named Plaintiffs, as well as Plaintiffs' actuarial expert, Larry N. Stem, and Plaintiffs' economist, Robert Mills, among others. *Id.*

On January 11, 2013, Plaintiffs moved to certify the 2010 and 2011 classes. Dkt. 81. The Court initially certified both classes. Dkt. 135. The Court subsequently decertified the 2010 class, but denied two motions to decertify the 2011 class. On December 6, 2013, both parties filed motions for summary judgment, supported by extensive expert reports, exhibits and declarations. Dkt. 184, 190. The Court denied Plaintiffs' motion and granted Phoenix's motion in part. Dkt. 235. The Court also denied a second motion to dismiss and a motion for partial summary judgment of Mr. Berck's claim. Dkt. 231. On March 13, 2015, the parties filed a Preliminary Joint Pre-trial Report totaling over a 100 pages on the liability phase alone. Dkt. 262. The parties also proposed jury instructions, verdict forms, and voir dire questions. Dkt. 263, 265. On April 7, 2015, the parties filed 10 motions *in limine.* Dkt. 268, 273. The Settlement was reached in principle the morning of the pre-trial conference while those motions were pending.

On October 31, 2014, Plaintiff SPRR, LLC, also represented by Class Counsel, filed a complaint against PHL Variable Insurance Company challenging the same 2011 COI increase on behalf of a putative national class and alleging a breach of contract claim ("*SPRR* Action"), Case No. 14–cv–8714–CM.

Case 4:19-cv-00509     Document 65-9     Filed 07/02/21 in TXSD     Page 849 of 1452

Fleisher v. Phoenix Life Insurance Company, Not Reported in Fed. Supp. (2015)
2015 WL 10847814

Because discovery overlapped with the *Fleisher* Action, and the same issues and counsel for plaintiff and defendant were involved, the parties agreed that discovery in the *Fleisher* Action was deemed to be produced in the *SPRR* Action. After making their initial discovery requests, the parties continued several deadlines until after the conclusion of the *Fleisher* Action. *SPRR* Dkt. 30. The *SPRR* Action was reassigned to this Court on April 30, 2015. *See* Notice of Case Reassignment, *SPRR* Action, Dkt. Entry 4/30/15.

### B. *Settlement Negotiations and Terms*

 **\*3** The Settlement was reached only after the parties conducted extensive, arm's-length negotiations with the assistance of an experienced, nationally known mediator. Professor Eric D. Green is the co-founder of Resolutions LLC. Declaration of Professor Eric Green in support of Plaintiffs' Motion for Preliminary Approval ("Green Decl."), filed May 29, 2015, Dkt. 300, ¶ 2. Prof. Green was a member of the faculty of Boston University School of Law where he taught mediation for thirty years, co-founded JAMS/Endispute, was a co-author of Dispute Resolution, which was the first legal textbook on ADR, and has successfully mediated many high stakes cases, including complex class actions and the *United States v. Microsoft* antitrust case. *Id.*

The mediation process began in April 2014 and lasted over a year. Sklaver Decl. 9–10; Green Decl. ¶¶ 7–11. On April 1, May 9, and June 25, 2014, the parties participated in three, full-day, in-person mediation sessions with Prof. Green at his offices in Boston, which were preceded by mediation briefing. Sklaver Decl. ¶¶ 10–12; Green Decl. ¶¶ 7–9. All three sessions were attended by counsel for Phoenix, Class Counsel, as well as Mr. Fleisher. Sklaver Decl. ¶ 10; Green Decl. ¶¶ 6–9. The terms of the Settlement were also negotiated in extensive teleconference and email discussions. Sklaver Decl. 12. A Memorandum of Understanding ("MOU") was negotiated in-person at Susman Godfrey's offices in New York City, with the assistance of Prof. Green who participated by telephone. Sklaver Decl. ¶ 11; Green Decl. ¶ 11. Thereafter, the long-form Stipulation of Settlement was exchanged, edited, drafted, and heavily negotiated and ultimately agreed to and signed on May 29, 2015. Sklaver Decl. ¶ 7, 11.

Prof. Green believes that the proposed Settlement is fair and reasonable, and is a highly successful result for the Class. Green Decl. ¶ 6, 15. Class Counsel was well informed of the strengths and weaknesses of the parties' claims and defenses, and the negotiations were hard-fought and non-collusive. Sklaver Decl. ¶¶ 12, 14–16; Green Decl. ¶ 12–15.

The Settlement was also made in light of the results of an all-day mock jury trial conducted by Class Counsel in advance of trial. Sklaver Decl. ¶ 5.

### 1. Monetary and Non–Monetary Relief to Class Members

The Settlement provides the following substantial benefits to the Class members:

- *Cash Payment of $40,759,820.88* – Not *Claims Made.* This includes $34,759,820.88 [1] in cash (minus fees and expenses) for the benefit of Class members that will be automatically distributed *without* requiring them to submit proofs of claim, plus Phoenix's agreement to separately pay the first $6 million in attorneys' fees awarded by the Court.

- *COI Freeze valued at $61 million.* A total and complete COI freeze through December 31, 2020. Thus, even if Phoenix has a change in expectations that would otherwise permit a COI rate increase under the policies, Phoenix will not increase COI rates for more than five years.

- *Policy Validity and STOLI Waiver valued at $33.3 million.* Phoenix has agreed not to challenge the validity and enforceability of any eligible policies owned by participating Class members on the grounds of lack of an insurable interest or misrepresentations in the application. [2]

Sklaver Decl. ¶ 8; Declaration of Robert Mills, filed Aug. 19, 2015 ("Mills Decl.") ¶ 7; Declaration of Ann Juliano, filed Aug. 19, 2015, ("Juliano Decl.") ¶ 14 & Ex. A (Report).

The Settlement defines the Class as:

> "Class" or "Settlement Class" means the Owners of PAUL Policies for which Phoenix sent notice that the Policy was subject to the 2010 Adjustment or 2011 Adjustment (the "Class Policies").

2015 WL 10847814

Preliminary Approval Order, Dkt. 303, ¶ 5. Excluded from the Class are (1) any officers, directors, or employees of any Defendant; the affiliates, legal representatives, attorneys, successors, or assigns of any Defendant; attorneys, successors, or assigns of any Defendant; Class Counsel and their employees; and any judge, justice, or judicial official presiding over the Actions and the staff and immediate family of any such judge, justice, or judicial official; (2) Owners of Policies that received a decrease in their COI rates or whose COI rates were unchanged as part of the 2011 Adjustment; (3) Owners of confidentially identified Policies for which Phoenix covenants that a prior settlement bars claims; and (4) Owners of two designated Policies that are the subject of pre-existing litigation. *Id.* at ¶ 6.

### 2. Release of COI–Related Claims against Defendants

 **\*4**  In exchange for the consideration provided, Plaintiffs and Class members will release any and all claims, causes of action, debts, liabilities, damages, restitution, equitable, legal and administrative relief, known and unknown, at law or in equity, whether brought directly or indirectly, including any further claim to recovery or relief as a result of actions by any state or federal government agencies, arising out of or relating to any and all matters concerning the COI rates and COI charges assessed in the past or in the future by Defendants as a result of the 2010 or 2011 COI rate adjustments as stated in the Stipulation of Settlement.

### 3. Attorney's Fees, Costs, and Class Representative Incentive Awards

The Settlement recognizes that Class Counsel may seek attorneys' fees and reimbursement of costs and expenses incurred in the prosecution of these actions, subject to approval of the Court. The Notice informed Class Members that Class Counsel may seek fees up to one-third of the cash portion of the settlement plus $6 million that Phoenix agreed to pay over and above the benefits provided to class in cash and other relief, which would have equaled $17.5 million. *See* Declaration of Scott Exley of Rust Consulting, filed July 7, 2014, Dkt. 307 ("Exley Decl."), Ex. A ("Notice") ¶ 18. In a concurrently filed motion, Class Counsel seeks payment of a total of $13.5 million in attorney's fees, representing 9.9% of the overall Settlement value or 22% of the cash fund plus Phoenix's agreement to separately pay the first $6

million in fees awarded. Class Counsel also seek $902,564.49 in unreimbursed expenses necessarily incurred in connection with the prosecution of this action, plus future such expenses, and incentive awards of up to $25,000 for Mr. Fleisher and $5,000 for the two other named Plaintiffs. No Class member objected to these terms, which were all described in the Notice to the Class. *Id.*

### 4. Distribution Plan

The Distribution Plan, as also set forth in the Notice, allocates funds to Class members on a *pro rata* basis. The cash payment will be allocated as follows: (1) $2 million will be distributed to those whose policies lapsed after receiving notice of a COI increase but before ever paying an overcharge, and (2) the remaining funds, after reduction for Court approved fees, costs, and incentive awards, will be distributed among those who paid a COI overcharge. Eligible lapsed policyholders will be paid in proportion to the premiums each paid before termination. Eligible COI overcharge policyholders will be paid in proportion to their share of the COI overcharges paid through March 2015. After expiration of the deadline for any returned or uncashed check, an escheatment process will follow consistent with applicable law.

### C. *Preliminary Approval and Notice to the Class*

On June 3, 2015, the Court entered an order conditionally certifying the Settlement Class, naming Susman Godfrey as counsel for the Settlement Class, naming Plaintiffs as representatives of the Class, and preliminarily approving the settlement with Defendants. Dkt. 303 at 2–3, 8, 9. The Court also appointed Rust Consulting to serve as the Settlement Administrator, approved the proposed Notice Program, and set a final approval hearing for September 9, 2015. *Id.* at ¶¶ 10, 12, 20. On June 8, 2015, the Court proposed certain amendments to the Notice. Dkt. 304. The Court approved Plaintiffs' proposed revisions, Dkt. 306, and the Notice was mailed to the last known address of all known potential Class Members on July 17, 2015. *See* Exley Decl. ¶ 7.

### I. *DISCUSSION*

The settlement of complex litigation is strongly favored. The Second Circuit is "mindful of the strong judicial policy in favor of settlements, particularly in the class action context. The compromise of complex litigation is encouraged by the courts and favored by public policy." *Wal–Mart Stores,*

Fleisher v. Phoenix Life Insurance Company, Not Reported in Fed. Supp. (2015)

2015 WL 10847814

*Inc. v. Visa U.S.A., Inc.,* 396 F.3d 96, 116–17 (2d Cir.2005) ("*Wal–Mart*") (internal quotation marks and citation omitted);

*In re Prudential Sec. Inc. Ltd. P'ships Litig.,* 163 F.R.D. 200, 209 (S.D.N.Y.1995) ("It is well established that there is an overriding public interest in settling and quieting litigation, and this is particularly true in class actions."). The approval of a class action settlement is a matter of discretion for the trial court. *See Maywalt v. Parker & Parsley Petroleum Co.,* 67 F.3d 1072, 1079 (2d Cir.1995). "In exercising this discretion, courts should give proper deference to the private consensual decision of the parties." *Clark v. Ecolab, Inc.,* Nos. 07 Civ. 8623, 04 Civ. 4488, 06 Civ. 5672(PAC), 2009 WL 6615729, at *3 (S.D.N.Y. Nov. 27, 2009) (internal quotation marks omitted). "In evaluating the settlement, the Court should keep in mind the unique ability of class and defense counsel to assess the potential risks and rewards of litigation...." *Id.* (internal quotation marks omitted).

**\*5** A court may approve a class settlement if it is "fair, adequate, and reasonable, and not a product of collusion." *In re Air Cargo Shipping Servs. Antitrust Litig.,* No. 06–MD–1775 (JG) (VVP), 2012 WL 3138596, at *4 (E.D.N.Y. Aug. 2, 2012) (quoting *Joel A. v. Giuliani,* 218 F.3d 132, 138 (2d Cir.2000)). This evaluation requires the court to consider "both the settlement's terms and the negotiating process leading to settlement." *Wal–Mart,* 396 F.3d at 116. For the negotiating process, "So long as the integrity of the arm's length negotiation process is preserved ... a strong initial presumption of fairness attaches to the proposed settlement." *In re PaineWebber Ltd. P'ships Litig.,* 171 F.R.D. 104, 125 (S.D.N.Y.1997), *aff'd,* 117 F.3d 721 (2d Cir.1997). For approval of the settlement's terms, recognizing that a settlement represents an exercise of judgment by the negotiating parties, the Second Circuit has cautioned that although a court should not give "rubber stamp approval" to a proposed settlement, it must "stop short of the detailed and thorough investigation that it would undertake if it were actually trying the case." *Detroit v. Grinnell Corp.,* 495 F.2d 448, 462 (2d Cir.1974); *see also In re Veeco Instruments Inc. Sec. Litig.,* No. 05 MDL 01695(CM), 2007 WL 4115809, at *5 (S.D.N.Y. Nov. 7, 2007). In assessing a settlement, then, the court should neither substitute its judgment for that of the parties who negotiated the settlement nor conduct a mini-trial on the action's merits. *Weinberger v. Kendrick,* 698 F.2d 61, 74 (2d Cir.1983).

In addition to a presumption of fairness that attaches to a settlement reached as a result of arm's-length negotiations, the Second Circuit has identified nine factors for a court to consider in making a Rule 23(e) fairness determination:

> (1) the complexity, expense and likely duration of the litigation ...; (2) the reaction of the class to the settlement ...; (3) the stage of the proceedings and the amount of discovery completed ...; (4) the risks of establishing liability ...; (5) the risks of establishing damages ...; (6) the risks of maintaining the class action through the trial ...; (7) the ability of the defendants to withstand a greater judgment ...; (8) the range of reasonableness of the settlement fund in light of the best possible recovery ...; [and] (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation....

*Grinnell,* 495 F.2d at 463. In applying these factors, "not every factor must weigh in favor of the settlement, but rather the court should consider the totality of these factors in light of the particular circumstances." *In re Telik, Inc. Sec. Litig.,* 576 F.Supp.2d 570, 575 (S.D.N.Y.2008) (internal quotation marks omitted).

### A. *The Proposed Class Action Settlement is Procedurally Fair*

The Settlement is entitled to an initial presumption of fairness and adequacy because it was reached by experienced, fully-informed counsel after extensive arm's-length negotiations. *See Shapiro v. JPMorgan Chase & Co.,* Nos. 11 Civ. 8831(CM)(MHD), 11 Civ. 7961(CM), 2014 WL 1224666, at *7 (S.D.N.Y. Mar. 24, 2014). Counsel on both sides are well-versed in the prosecution of contract and insurance litigation (including life settlement litigation), and the Settlement was reached just before trial. *See* Green Decl. ¶¶ 10–12. The negotiations spanned a year and included three mediation sessions in Boston, as well as numerous telephone calls, emails, and in-person meetings. Sklaver Decl. ¶¶ 10–12;

Green Decl. ¶¶ 7–11. The discussions culminated in a signed MOU the day of the pre-trial hearing. This occurred only after Class Counsel had conducted a full day of jury testing, reviewed millions of pages of documents with the assistance of experts, conducted a substantial number of depositions, and briefed or opposed—mostly successfully—motions to dismiss, motions to compel, class certification, summary judgment, and motions *in limine.*

It is the opinion of Class Counsel, Class Plaintiffs, and an experienced mediator that this settlement is fair, reasonable, and adequate. Sklaver Decl. ¶¶ 7, 14; Green Decl. ¶ 6, 15. Courts give counsel's opinion considerable weight because they are closest to the facts and risks associated with the litigation. *In re Hi–Crush Partners L.P. Sec. Litig.,* No. 12–cv–8557–CM, 2014 WL 7323417, at *5 (S.D.N.Y. Dec. 19, 2014) ("[Counsel's] opinion is entitled to great weight." (quotation marks and citations omitted)); *see also PaineWebber,* 171 F.R.D. at 125. The extensive participation of an experienced mediator also "reinforces that the Settlement Agreement is non-collusive." *Johnson v. Brennan,* 10–cv–4712–CM, 2011 WL 1872405, at *1 (S.D.N.Y. May 17, 2011); *In re Flag Telecom Holdings, Ltd. Sec. Litig.,* No. 02–CV–3400 (CM)(PED), 2010 WL 4537550, at *14 (S.D.N.Y. Nov. 8, 2010) ("[The] presumption in favor of the negotiated settlement in this case is strengthened by the fact that settlement was reached in an extended mediation"); *see also D'Amato v. Deutsche Bank,* 236 F.3d 78, 85 (2d Cir.2001) ("[A] mediator[ ] ... helps to ensure that the proceedings were free of collusion and undue pressure.").

 **\*6** All of the above facts establish that the Settlement is procedurally fair. *See McReynolds v. Richards–Cantave,* 588 F.3d 790, 803 (2d Cir.2009) (There is a "presumption of fairness, reasonableness, and adequacy as to the settlement where a class settlement is reached in arm's-length negotiations between experienced, capable counsel after meaningful discovery" (alteration and internal quotation marks omitted)).

**B. *The Proposed Class Action Settlement Is Substantively Fair:* Grinnell Factors**

Evaluation of this settlement under the *Grinnell* factors supports final approval.

**1. Complexity, Expense, and Likely Duration of the Litigation (*Grinnell* Factor 1)**

The first factor, which addresses "the complexity, expense and likely duration of the litigation," strongly supports approval. *Grinnell,* 495 F.2d at 463. The litigation was indisputably complex. The complaint alleged the breach of an insurance contract, the resolution of which would require conflicting testimony by experts as to actuarial standards, the original and revised pricing assumptions used by Phoenix for the PAUL insurance products at issue, and what it means to "recoup past losses" or "discriminate unfairly" within a "class" of insured. These complex claims were bitterly fought, as Defendants developed defenses to liability, damages, and class certification, and offered their own expert opinions on actuarial issues for the key questions. The court has issued opinions of great length of complexity in connection with motions to dismiss and for summary judgment.

The Settlement also ends future litigation and uncertainty. Even if the Class could recover a judgment at trial and survive any decertification challenges, post-verdict and appellate litigation would likely have lasted for years. *See Strougo v. Bassini,* 258 F.Supp.2d 254, 261 (S.D.N.Y.2003) ("[t]he potential for this litigation to result in great expense and to continue for a long time suggest that settlement is in the best interests of the Class"); *Prudential,* 163 F.R.D. at 210 ("[I]t may be preferable to take the bird in the hand instead of the prospective flock in the bush." (internal quotation marks omitted)); *In re Sony SXRD Rear Projection Television Class Action Litig.,* No. 06 Civ. 5173(RPP), 2008 WL 1956267, at *6 (S.D.N.Y. May 1, 2008) ("the complexity, expense and likely duration of the litigation going forward weigh in favor of approval of the Settlement.... Not only would Plaintiffs spend substantial sums in litigating this case through trial and appeals, it could be years before class members saw any recovery, if at all."). Thus, this factor weighs strongly in favor of approval of the Settlement.

**2. Reaction of the Class to Settlement (*Grinnell* Factor 2)**

The second factor, the "reaction of the class to the settlement," strongly supports approval. *Grinnell,* 495 F.2d at 463; *see, e.g., In re FLAG Telecom,* 2010 WL 4537550, at *16.

Fleisher v. Phoenix Life Insurance Company, Not Reported in Fed. Supp. (2015)
2015 WL 10847814

Specifically, ' "the absence of objections may itself be taken as evidencing the fairness of a settlement.' " *PaineWebber,* 171 F.R.D. at 126 (citation omitted); *see also In re Luxottica Grp. S.p.A. Sec. Litig.,* 233 F.R.D. 306, 311–12 (E.D.N.Y.2006). This Court has noted that the reaction of the class to a settlement "is considered perhaps 'the most significant factor to be weighed in considering its adequacy.' " *Veeco,* 2007 WL 4115809, at *7 (citation omitted).

**\*7** Here, pursuant to the Preliminary Approval Order, a total of 758 copies of the Notice were mailed to potential Class Members. Dkt. 303 (Preliminary Approval Order); Exley Decl. ¶ 7. The Notice was also made available on a public website, and Class Members were provided a dedicated P.O. Box and toll-free hotline with live support to contact the Settlement Administrator. *Id.* at ¶ 4. After the initial mailing of 758 Notices to the last known addresses of Class members, Rust continued to investigate and update addresses. Declaration of Joel Botzet in support of Plaintiff s Motion for Final Approval of Class Action Settlement, filed Aug. 19, 2015 ("Botzet Decl.") ¶ 5. Before and after mailing, Rust undertook thorough efforts to update the mailing list using the National Change of Address Database. *Id* at ¶ 2, 5. The Settlement has also attracted national media attention and was disclosed in Phoenix's filings with the SEC. *See* Sklaver Decl. ¶ 13.

Class members were given until July 17, 2015, to object to or exclude themselves from the Settlement. Notice 14, 19 Notice 14, 19. That deadline passed and not a single objection was received. Botzet Decl. ¶ 6. As expected, U.S. Bank acting as securities intermediary for Lima Acquisition LP, which has brought its own litigation against Phoenix scheduled to go to trial in September, excluded itself from the Class, as did five entities affiliated with Lima. *Id.* at ¶ 8; *see U.S. Bank Nat'l Assoc., as securities intermediary for Lima Acquisition LP v. PHL Variable Insurance Co.,* Case No. 12–CV–6811(CM); *U.S. Bank Nat'l Assoc., as securities intermediary v. PHL Variable Insurance Co.,* Case No. 13–CV–1580(CM). Aside from the Lima-affiliated entities, only three other Class members requested exclusion from the Class, representing a total of 26 Class policies. These 3 Class members own a combined 26 policies representing only 1.5% of the total Class of policies in the Settlement. Botzet Decl. ¶¶ 8–9.

Tiger Capital LLC, a sophisticated investor which owns a significant number of Class Policies and also pursued litigation against Phoenix that was set for trial in July 2015, settled its litigation and remained a member of the Class. *See Tiger Capital LLC v. PHL Variable Ins. Co.,* Case No. 12–cv–2939(CM), Dkt. 156 (announcing "settlement in principle of all claims in this case that includes Tiger Capital, LLC's participation in the nationwide class settlement pending for Court approval in [the *Fleisher* and *SPRR* Actions").

The overwhelming response of Class members is in favor of the Settlement, as evidenced by the complete lack of any objections and only three requests for exclusion by Class members other than those who have already opted out by filing the *U.S. Bank* Action, which will be tried later this month. *Cf. Grant v. Bethlehem Steel Corp.,* 823 F.2d 20, 24 (2d Cir.1987) (approving class settlement where 45 of the 126 class members, or approximately 36%, expressed opposition to the settlement). This factor, too, strongly weighs in favor of approval.

### 3. Stage of the Proceedings and Amount of Discovery Completed (*Grinnell* Factor 3)

The third *Grinnell* factor, which addresses "the stage of the proceedings and the amount of discovery completed," also strongly supports approval of the Settlement. *Grinnell,* 495 F.2d at 463. When courts "look [ ] to the stage of the proceedings and the amount of discovery completed" under the third *Grinnell* factor, they "focus[ ] on whether the plaintiffs obtained sufficient information through discovery to properly evaluate their case and to assess the adequacy of any settlement proposal." *In re Advanced Battery Techs., Inc. Sec. Litig.,* No. 11 Civ. 2279(CM), 2014 WL 1243799, at *6 (S.D.N.Y. Mar. 24, 2014) (internal quotation marks omitted); *see also Visa,* 396 F.3d at 118.

At the time of Settlement—the morning of the pre-trial conference—trial was a mere 45 days away. Fact and expert discovery were both extensive (and had long since closed):

**\*8** • Plaintiffs served 80 document requests and, with expert assistance, Class Counsel analyzed over 1.2 million pages of documents produced by Defendants that exceeded nine gigabytes of native files alone (over 100 gigabytes when considering TIFFs), took and defended over 20 days of depositions of 17 witnesses, and issued numerous third-party subpoenas to Defendants' reinsurers and actuarial and financial advisors. Sklaver Decl. ¶ 5.

Case 4:19-cv-00509  Document 65-9  Filed 07/02/21 in TXSD  Page 854 of 1452

Fleisher v. Phoenix Life Insurance Company, Not Reported in Fed. Supp. (2015)
2015 WL 10847814

- Plaintiffs Fleisher and Berck were both deposed during full day depositions. *Id.*

- Plaintiffs successfully obtained class certification for the 2011 COI increase in the *Fleisher* Action, extensively briefed the central legal issues on motions for summary judgment, and consulted with experts to develop a liability and damages model, both in support of their motion for class certification and for trial. Those experts included:

  - Larry N. Stem, a Fellow of the Society of Actuaries and a Member of the American Academy of Actuaries, who has worked in the insurance industry for over forty years and who has designed, developed, and priced many universal life products for life insurance companies, including drafting policy forms; and

  - Robert Mills, an economist and Director at Micronomics, Inc., who has more than sixteen years of economic research and consulting experience and the calculation of economic damages.

- Class Counsel and their experts also reviewed and analyzed the expert analysis Defendants submitted. Defendants retained Douglas French, who submitted a total of 146 pages of expert reports and declarations, including extensive quantitative analysis. Plaintiffs' experts assessed these reports and provided responses to them. Id.

- Plaintiffs also participated in three separate in-person mediation sessions conducted by a highly experienced and respected mediator, supported by additional lengthy briefing, and conducted numerous settlement negotiations with Defendants. *Id.*

- The parties submitted a voluminous pre-trial order with hundreds of exhibits, and briefed over ten motions *in limine. Id.*

In sum, Class Counsel had the benefit of extensive discovery and expert analysis with which to make an intelligent, informed appraisal of the strengths and weaknesses of the Class's claims and Defendants' defenses, and the likelihood of obtaining a larger recovery for the Class if this litigation continued. Sklaver Decl. ¶¶ 15–16; see In re Bear Stearns Cos. Secs., Derivative, & ERISA Litig., 909 F.Supp.2d 259, 267 (S.D.N.Y.2012) (parties had requisite knowledge to "gauge the strengths and weaknesses of their claims and the

adequacy of settlement" where they "conducted extensive investigations, obtained and reviewed millions of pages of documents, and briefed and litigated a number of significant legal issues"). To be blunt, on only one other occasion has this court seen a case that settled after such full and thorough preparation. Class counsel could not possibly have been more knowledgeable about the strengths and weaknesses of their case.

### 4. Risk of Establishing Liability, Damages, and in Maintaining the Class Action Through the Trial (*Grinnell* Factors 4, 5, & 6)

The fourth, fifth and sixth *Grinnell* factors, which address "the risks of establishing liability," "the risks of establishing damages," and "the risks of maintaining the class action through the trial," also strongly support approval of the Settlement. *Grinnell,* 495 F.2d at 463. In assessing factors 4, 5 and 6, which are often considered together, the Court is not required to decide the merits of the case, resolve unsettled legal questions, or to "foresee with absolute certainty the outcome of the case." *Shapiro,* 2014 WL 1224666, at *10. "[R]ather, the Court need only assess the risks of litigation against the certainty of recovery under the proposed settlement." *In re Global Crossing Secs. And ERISA Litig.,* 225 F.R.D. 436, 459 (S.D.N.Y.2004). In assessing the risks, courts recognize that "the complexity of Plaintiff's claims *ipso facto* creates uncertainty." *In re Currency Conversion Fee Antitrust Litig.,* 263 F.R.D. 110, 123 (S.D.N.Y.2009). While Plaintiffs and Class Counsel believe that they would prevail in their claims asserted against Defendants, they also recognize the risks and uncertainties inherent in pursuing the action through class certification, summary judgment, trial and appeals.

#### a. *Risks to Establishing Liability*

 **\*9** Plaintiffs believe their position on liability is strong, but accept that there are complex issues that pose risk. The Court is well aware of the challenges that Plaintiffs would face at trial. Defendants laid out their contentions for the liability phase of the trial in 38 detailed paragraphs of the pre-trial order. Dkt. 262, 89–126. For example, Plaintiffs allege that actuarial standards of practice define a "class" of policies for purposes of determining and re-determining rates at issuance, and that Phoenix breached the policies by

Case 4:19-cv-00509 Document 65-9 Filed 07/02/21 in TXSD Page 855 of 1452

Fleisher v. Phoenix Life Insurance Company, Not Reported in Fed. Supp. (2015)
2015 WL 10847814

changing which policies constituted a "class" and by making changes that unfairly discriminated within a class. Defendants contested these allegations, offering its own actuarial expert who was going to testify that Phoenix was permitted to re-determine which policies comprised a "class" at the time of the COI rate increases. It is unclear how a jury would decide these disputed issues at trial. *See* West Virginia v. Chas. Pfizer & Co., 314 F.Supp. 710, 743–44 (S.D.N.Y.1970), *aff'd,* 440 F.2d 1079 (2d Cir.1971) ("[N]o matter how confident one may be of the outcome of litigation, such confidence is often misplaced."); *In re Baldwin–United Corp.,* 105 F.R.D. 475, 482 (S.D.N.Y.1984) (comparing advantages of immediate cash payments with risks involved in long and uncertain litigation).

### b. *Risks to Establishing Damages*

Even if Plaintiffs won the liability phase, Plaintiffs also faced risks in establishing damages during the separate damages phase of trial. The Settlement removes substantial uncertainties about Plaintiffs' chances of success or potential decertification. *Charron v. Wiener,* 731 F.3d 241, 249 (2d Cir.2013) ("[T]he litigation risks attendant to these possibilities [like decertification] weighed heavily in favor of the fairness of a settlement."). Plaintiffs' submitted a comprehensive damages expert report by Robert Mills, whom Phoenix deposed. Phoenix rebutted Plaintiffs' testimony in its own expert reports, in opposing class certification and in Phoenix's subsequent motions for decertification. Dkt. 97, 159, 172. Defendants have vigorously contested Mr. Mills's conclusions in quantifying the alleged overcharges and also the Plaintiffs' legal grounds for recovering past premiums for policies that lapsed after the COI increases were announced but before paying an overcharge. *See, e.g.,* Dkts. 97, 159, 172. The prospect of a battle at trial and establishing recovery for all Class members without decertification adds substantial risk to Plaintiffs' claims. *See* In re NASDAQ Market–Makers Antitrust Litig., 187 F.R.D. 465, 476 (S.D.N.Y.1998) (observing that "[d]amages at trial would inevitably involve a battle of the experts" and noting that it is "difficult to predict with any certainty which testimony would be credited") (internal quotation marks omitted); *In re FLAG Telecom,* 2010 WL 4537550, at *18 ("The jury's verdict ... would ... depend on its reaction to the complex testimony of experts, a reaction that is inherently uncertain and unpredictable.").

### c. *Risks on Appeal.*

Even if Plaintiffs succeed at trial, Defendants are certain to file post-trial motions and, if necessary, an appeal. The appeal of the complex insurance and actuarial issues in this case is likely to be lengthy and expensive, and there is no assurance that Plaintiffs would prevail. *See* In re Michael Milken & Assocs. Secs. Litig., 150 F.R.D. 57, 65 (S.D.N.Y.1993) (noting that "[i]t must also be recognized that victory even at the trial stage is not a guarantee of ultimate success" and citing a case where a multimillion dollar judgment was reversed). There is also a huge appellate risk for Phoenix: if an appellate court overturned this court's determination that "changed investment expectations" (assuming those expectations did indeed change), which may properly be considered in setting new COI rates, includes changes in the amount of money to be invested (which is not Plaintiffs' position at all), Phoenix's entire defense would crumble.

### 5. Ability of Defendants to Withstand a Greater Judgment (*Grinnell* Factor 7)

The seventh *Grinnell* factor addresses the defendants' ability to withstand a greater judgment. Even if Phoenix could withstand a greater judgment, "this factor, standing alone, does not suggest that the settlement is unfair." *D'Amato,* 236 F.3d at 86. Indeed, "a defendant is not required to empty its coffers before a settlement can be found adequate." *Sony,* 2008 WL 1956267, at *8 (internal quotation marks omitted). The mere fact that a defendant "is able to pay more than it offers in settlement does not, standing alone, indicate the settlement is unreasonable or inadequate." *Global Crossing,* 225 F.R.D. at 460.

### 6. Range of Reasonableness of the Settlement Funds in Light of the Best Possible Recovery and All the Attendant Risks of Litigation (*Grinnell* Factors 8 and 9)

**\*10** The final two *Grinnell* factors, "the range of reasonableness of the settlement fund in light of the best possible recovery" and "the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation," also strongly support approval of the Settlement. *Grinnell,* 495 F.2d at 463. Courts typically

Case 4:19-cv-00509 Document 65-9 Filed 07/02/21 in TXSD Page 856 of 1452

Fleisher v. Phoenix Life Insurance Company, Not Reported in Fed. Supp. (2015)
2015 WL 10847814

combine their analysis of the final two *Grinnell* factors. *See* [🚩](#) *[Global Crossing,](#)* 225 F.R.D. at 460. In analyzing these two factors, a reviewing court "consider[s] and weigh[s] the nature of the claim, the possible defenses, the situation of the parties, and the exercise of business judgment in determining whether the proposed settlement is reasonable." [🚩](#) *[Grinnell,](#)* 495 F.2d at 462. "The determination of whether a settlement amount is reasonable does not involve the use of a mathematical equation yielding a particularized sum." [🚩](#) *[Massiah v. MetroPlus Health Plan, Inc.,](#)* No. 11–cv–05669 (BMC), 2012 WL 5874655, at \*5 (E.D.N.Y. Nov. 20, 2012). Rather, "there is a range of reasonableness with respect to a settlement—a range which recognizes the uncertainties of law and fact in any particular case and the concomitant risks and costs necessarily inherent in taking any litigation to completion." [🚩](#) *[Visa,](#)* 396 F.3d at 119. Moreover, the settlement amount must be judged "not in comparison with the possible recovery in the best of all possible worlds, but rather in light of the strengths and weaknesses of plaintiffs' case." *[Shapiro,](#)* 2014 WL 1224666, at \*11. The overall value of the settlement comprises monetary as well as non-monetary relief. *See, e.g.,* [🚩](#) *[Velez v. Novartis Pharm. Corp.,](#)* No. 04 CIV 09194 CM, 2010 WL 4877852, at \*8, \*18 (S.D.N.Y. Nov. 30, 2010) (both monetary and non-monetary relief considered in calculating value of settlement).

Here, the overall Settlement value exceeds $130 million, including substantial monetary as well as non-monetary benefits. Subject to Court approval, Phoenix will be paying $40,759,820.88 in cash, which includes $34,759,820.88 for distribution to Class members along with Phoenix's agreement to separately pay the first $6 million in attorneys' fees awarded for, amongst other things, the substantial non-monetary relief obtained for the Class. *See, e.g., [In re](#) [Excess Value Ins. Coverage Litig.,](#)* 598 F.Supp.2d 380, 386–87 (S.D.N.Y.2005) (holding value of settlement includes the value of any legal fees paid by defendants); [🚩](#) *[Johnston v. Comerica Mortg. Corp.,](#)* 83 F.3d 241, 245–46 (8th Cir.1996) ("The award to the class and the agreement on attorney fees represent a package deal. Even if the fees are paid directly to the attorneys, those fees are still best viewed as an aspect of the class' recovery."). The $34,759,820.88 amounts to 68.5% of the Plaintiffs' overcharge damages through March 2015. Mills Decl. ¶ 7.

The non-monetary relief provided by the Settlement is also substantial and has an estimated value of over $93.4 million.

Juliano Decl. ¶ 14 & Ex. A (Report) at 1. First, Phoenix has agreed never to contest the validity and enforceability of Class Policies on the grounds of lack of an insurable interest or misrepresentations in the application for such policies. And second, Phoenix has agreed to implement a total and complete COI freeze through December 31, 2020. Plaintiffs' expert, Ann Juliano of Demeter Capital, who has over 10 years of experience in analyzing the buying and selling of life insurance policies on the secondary market, including Phoenix policies, has evaluated both of these guarantees by Phoenix. Juliano Decl. 6–9. For the validity guarantee, Ms. Juliano analyzed the historical challenge rate by Phoenix to the validity of these Class policies, as well as Phoenix's likelihood of success based on historical industry data. *Id.,* Ex. A, Section 2.2. Based on the ownership make-up of the Class Policies, life expectancy estimates for each policy generated to assess the longevity expectations of the policies, and lapse assumptions and future premiums owed for the Class Policies based on historical data from Phoenix, Ms. Juliano estimates that Phoenix's commitment not challenge the Class Policies upon the occurrence of a maturity event saves Class members an estimated $33.3 million in claims payments that Phoenix otherwise would have recovered. *Id.*

With respect to the COI freeze, Ms. Juliano analyzed Phoenix's previous COI rate adjustments and calculated the likelihood of a future COI increase in the next five years—the period of the freeze—and the impact Phoenix's guarantee not to adjust rates would have on the value of the life insurance policies in question on the secondary market. Ms. Juliano's analysis concludes that the promise of a COI freeze adds another $61 million in value to the Settlement. *Id.,* Ex. A, Section 2.1.

 **\*11** The combination of monetary and non-monetary benefits is a sizable recovery in light of the total projected damages and the risks of litigation. In fact, this is one of the most remunerative settlements this court has ever been asked to approve. Even considering just the cash component, the settlement is well within the permitted range on final approval. *See* [🚩](#) *[Grinnell Corp.,](#)* 495 F.2d at 455 & n. 2 (in theory, even a recovery of only a fraction of one percent of the overall damages could be a reasonable and fair settlement); [🚩](#) *[In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.,](#)* 986 F.Supp.2d 207, 229 (E.D.N.Y.2013) (granting final approval to antitrust class action settlement representing approximately 2.5% of the highest damages estimate as "within the range of reasonableness in light of the

Fleisher v. Phoenix Life Insurance Company, Not Reported in Fed. Supp. (2015)

2015 WL 10847814

best possible recovery and in light of all the attendant risks of litigation"); *In re Air Cargo Shipping Servs. Antitrust Litig.,* Case No. 06–MD–1775, 2009 WL 3077396, at *9 (E.D.N.Y. Sept. 25, 2009) (approving settlement in price-fixing class action representing approximately 10.5% of the surcharges incurred by class members during the class period); *In re Med. X–Ray Film Antitrust Litig.,* CV–93–5904, 1998 WL 661515, *5–6 (E.D.N.Y. Aug. 7, 1998) (granting final approval to antitrust class action settlement representing approximately 17% of the estimated best possible recovery).

The Settlement is even more significant given the considerable risks involved in the litigation as set forth above. Plaintiffs and Class Counsel carefully and thoroughly analyzed these risks when negotiating the present Settlement. The proposed Settlement is a favorable result for the Settlement Class in light of the range of possible recoveries and the risks of continued litigation. *Massiah,* 2012 WL 5874655, at *5 ("[W]hen a settlement assures immediate payment of substantial amounts to class members, even if it means sacrificing speculative payment of a hypothetically larger amount years down the road, settlement is reasonable under this factor.") (internal quotation marks omitted).

In short, all the Grinnell factors are satisfied.

The settlement is approved.

### C. *The Notice Program Satisfied Rule 23 and Due Process*

Due process and the Federal Rules require that the class receive adequate notice of a class action settlement. *See Wal–Mart,* 396 F.3d at 114. The standard for the adequacy of a settlement notice in a class action "is measured by reasonableness." *Id.* at 113 (citing *Soberal–Perez v. Heckler,* 717 F.2d 36, 43 (2d Cir.1983); Fed.R.Civ.P. 23(e)). As the Second Circuit has held, "[t]here are no rigid rules to determine whether a settlement notice to the class satisfies constitutional or Rule 23(e) requirements; the settlement notice must fairly apprise the prospective members of the class of the terms of the proposed settlement and of the options that are open to them in connection with the proceedings." *Wal–Mart,* 396 F.3d at 113–14 (internal quotation marks omitted). The notice sent to the class must be "the best notice practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." *Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, 617 (1997).

Here, the robust Notice Program, which included mailing individual Notices to the last known address of all Class members, more than meets the requirements of due process, Rule 23, and the notice standards articulated by the Second Circuit. Pursuant to the Preliminary Approval Order, Rust Consulting individually mailed the Notice to Class members via First–Class mail. Exley Decl. ¶¶ 6–7; Botzet Decl. ¶¶ 3, 5. Rust conducted skip tracing for any Notices returned as undelivered, and Class Counsel and Phoenix assisted in investigating additional approaches where the mailing was returned, such as contacting the servicer for the policies to acquire updated information. Botzet Decl. ¶ 5. Through these methods, Rust was able to reduce the total number of undelivered Notices to under fifty. *Id.* Rust also made the Notice publicly available on a website, and maintained a call center for Class members with questions. Exley Decl. ¶¶ 3–5.

**\*12** The Notice communicated in plain language the essential elements of the Settlement and the options available to Class Members in connection with the settlement. Exley Decl., Ex. A. The Notice describes the litigation, summarizes the Settlement's terms and benefits, describes the manner of allocating the cash payments among eligible Class members, quotes the releases verbatim, discloses the request for Court approval of attorneys' fees, expenses, and named plaintiff incentive awards, and explains the deadline and procedure for filing objections to the Settlement as well as opting out of the cash settlement class. *Id.* Additionally, the Notice prominently notifies class members how they can obtain more information from Class Counsel or the Settlement Administrator though a toll-free number, a website, and traditional channels including mail and telephone. *Id.* These features of the Notice all demonstrate due process and that the federal rules have been satisfied. *See Wal–Mart,* 396 F.3d at 114 (quoting *Newberg* § 11.53, at 167) ("Notice is 'adequate if it may be understood by the average class member.' ").

### D. *The Distribution Plan is Fair and Reasonable*

A distribution plan is fair and reasonable as long as it has a "reasonable, rational basis." *Maley v. Del Global Techs. Corp.,* 186 F.Supp.2d 358, 367 (S.D.N.Y.2002). Courts recognize that "the adequacy of an allocation plan turns on whether counsel has properly apprised itself of the merits of all claims, and whether the proposed apportionment is fair

Case 4:19-cv-00509    Document 65-9    Filed 07/02/21 in TXSD    Page 858 of 1452

Fleisher v. Phoenix Life Insurance Company, Not Reported in Fed. Supp. (2015)

2015 WL 10847814

and reasonable in light of that information," not mathematical precision. *PaineWebber,* 171 F.R.D. at 133. The cash payment will be allocated *pro rata* as follows, which was fully explained in the Notice: (1) $2 million will be distributed to those whose policies lapsed after receiving notice of a COI increase but before ever paying an overcharge, and (2) the remaining funds, after reduction for fees, costs, incentive awards, will be distributed among those who paid a COI overcharge. Exley Decl. Ex. A, at 5. Eligible lapsed policyholders will be paid in proportion to the premiums each paid before termination, relative to the premiums paid by all such policyholders. Eligible COI overcharge policyholders will be paid in proportion to their share of the overall COI overcharges paid by Class members through March 2015. *Id.* For uncashed or returned checks, after the time to request reissuance for any lost checks expires, an escheatment process will follow consistent with applicable state law.

This type of distribution, where funds are distributed on a *pro rata* basis, has frequently been determined to be fair, adequate, and reasonable. *See In re Vitamins Antitrust Litig.,* No. 99–CV–197, 2000 WL 1737867 at *6 (D.D.C. Mar. 31, 2000) ("Settlement distributions, such as this one, that apportions funds according to the relative amount of damages suffered by class members, have repeatedly been deemed fair and reasonable."); *In re Lloyds' Am. Trust Fund Litig.,* No. 96–CV–1262, 2002 WL 31663577 at *19 (S.D.N.Y. Nov. 26, 2002) ("*pro rata* allocations provided in the Stipulation are not only reasonable and rational, but appear to the fairest method of allocating the settlement benefits."); *PaineWebber,* 171 F.R.D. at 135 (approving pro rata distribution). Counsel's conclusion that the distribution plan is fair, adequate, and reasonable, Prelim. Sklaver Decl. ¶ 14, is entitled to great weight. *See In re Am. Bank Note Holographies, Inc.* 127 F.Supp.2d 418, 429–30 (S.D.N.Y.2001) (approving allocation plan and according counsel's opinion "considerable weight"). Furthermore, no Class member has objected to this straightforward and equitable allocation.

Accordingly, the distribution plan is fair and reasonable, and is approved.

### E. *The Motion for Approval of Counsel's Fee Request is Granted*

Court-appointed Class Counsel Susman Godfrey L.L.P. ("SG" or "Class Counsel"), having recovered $134 million in total relief for the benefit of the Class, has applied for an award of attorneys' fees in the amount of $13.5 million,

which is 9.9% of the gross settlement benefit (or using a less-accepted and more conservative methodology, 1/3 of the cash component of the settlement viewed in isolation). The proposed figure is well within the range approved by courts in this Circuit. *See Velez v. Novartis Pharm. Corp.,* No. 04 CIV 09194 CM, 2010 WL 4877852, at *21 (S.D.N.Y. Nov. 30, 2010) ("The federal courts have established that a standard fee in complex class action cases like this one, where plaintiffs' counsel have achieved a good recovery for the class, ranges from 20 to 50 percent of the **gross settlement benefit,"** which includes the value of both monetary and nonmonetary relief, and "[d]istrict courts in the Second Circuit routinely award attorneys' fees that are 30 percent or greater."). [3] Here, the requested award is warranted by the outstanding results achieved for the Class through the efforts of Class Counsel, and the enormous risks taken and overcome in litigation brought entirely on a contingency fee basis.

**\*13** The Settlement was achieved as a result of the tenacious prosecution of the case by Class Counsel. As this Court is well aware, the litigation was hard-fought. Class Counsel briefed (or opposed) motions to dismiss, motions for class certification and decertification, several motions to compel, took and defended a large number of depositions, including the depositions of senior current and former employees of Phoenix and its actuarial advisors, assisted in the preparation of four detailed expert reports on liability and damages in addition to other expert submissions, reviewed more than 1.2 million pages of documents produced in discovery, filed and responded to motions for and against summary judgment, prepared and filed a 100+ page Joint Preliminary Trial Report, briefed ten motions *in limine,* prepared exhibit and witness lists, submitted jury instructions, and proposed voir dire questions—all after significant jury testing was conducted in an all-day mock trial. The Settlement was reached on the eve of trial, and only after protracted, arm's-length settlement negotiations, including three full-day mediations in Boston facilitated by Professor Eric D. Green, an experienced and highly respected mediator.

Class Counsel faced and overcame substantial risks to achieve this settlement. Class Counsel invested over ***$3.6 million in time and money*** into this case, with the real possibility of getting nothing in return. Class Counsel undertook this litigation on a wholly contingent basis, with no assurance either of payment or of recouping expenses. On damages, Defendants vigorously contested the conclusions of Plaintiffs' damages expert in quantifying the alleged overcharges and also the Plaintiffs' legal grounds for recovering past premiums

Case 4:19-cv-00509    Document 65-9    Filed 07/02/21 in TXSD    Page 859 of 1452

Fleisher v. Phoenix Life Insurance Company, Not Reported in Fed. Supp. (2015)

2015 WL 10847814

for policies that immediately lapsed after the COI increases were announced. Finally, class certification was a hotly disputed issue, and the Court noted that it would entertain motions to decertify after trial. Dkt. 230 (Jan. 31, 2014 Order) at 3 ("Only if Fleisher and his class prevail on [liability] will I even begin to consider the argument that this group of people can prove damages on a class-wide basis. I admit that I am skeptical of that argument – I said that last August – but I will approach the issue with an open mind ..."). Notwithstanding these issues and many more, SG achieved a settlement value of $134 million that will provide Class members with outstanding relief.

The Class was advised in the Notice that Class Counsel could apply for fees equal to one-third of the cash portion of the settlement plus $6 million that Phoenix agreed to pay over and above the benefits provided to the Class in cash and other relief, which would have equaled $17.5 million. Declaration of Scott Exley re: Notification and Settlement Administrative Services, filed July 7, 2015, Dkt. 307 ("Exley Decl."), Ex. A (the "Notice") ¶ 18. No Class member objected to a fee award in that amount. This is particularly significant where, as here, the Class contains many large and sophisticated investors. *See* Dkt. 97 (Phoenix's Opp. to Class Cert.) at 16 ("the putative class members are all owners of million dollar-plus life insurance policies capable of paying large premiums, including many sophisticated life settlement investors or their nominees."); *In re Telik, Inc. Sec. Litig.,* 576 F.Supp.2d 570, 594 (S.D.N.Y.2008) ("That only one objection to the fee request was received is powerful evidence that the requested fee is fair and reasonable"). In addition, the non-cash benefits of a COI freeze and a STOLI and fraud waiver have an easily quantifiable value and do not depend on any redemption rates. An application for $17.5 million as provided for in the Notice would be fair and reasonable in light of all the circumstances.

Despite these facts, Class Counsel has determined to only apply for a fee equal to $13.5 million, and amount which equals less than 10% of the gross settlement benefit (including the value of the nonmonetary benefits), or $6 million that Phoenix has agreed to separately pay plus 22% of the cash fund, or 33–1/3% of the cash portion of the settlement considered in isolation from the other components of the Settlement. The $13.5 million applied for would be reasonable under governing standards even if there had never been a non-cash component of the Settlement's benefits. If this application is approved, the Class will end up with 78% of the cash fund because $6 million of the fees are being separately paid by Phoenix.

**\*14** For each of these reasons, SG respectfully moves this Court for an award of attorneys' fees of $13,500,000. SG also seeks reimbursement for $902,564.49 in litigation expenses and incentive awards for the named Plaintiffs to compensate them for their time and efforts in bringing this case to a successful resolution.

### *1. Class Counsel is Entitled to Fees From the Common Fund*

The Supreme Court has long recognized that a lawyer who obtains a recovery "for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from the fund as a whole." *Boeing Co. v. Van Gemert,* 444 U.S. 472, 478 (1980). "The court's authority to reimburse the parties stems from the fact that the class action [device] is a creature of equity and the allowance of attorney-related costs is considered part of the historic equity power of the federal courts." 7B Charles A. Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure: Civil 2d § 1803, at 493–94 (2d ed.1986). The purposes of the doctrine are to fairly and adequately compensate class counsel for services rendered; to ensure that all class members contribute equally towards the costs associated with litigation pursued on their behalf; and to encourage skilled counsel to represent those who seek redress for injury inflicted on an entire class and thereby discourage future misconduct of a similar nature. *See City of Providence v. Aeropostale, Inc.,* No. 11 Civ. 7132(CM), 2014 WL 1883494, at \*10–\*11 (S.D.N.Y. May 9, 2014) (citing *Goldberger v. Integrated Res.,* 209 F.3d 43, 47 (2d Cir.2000) and *Hicks v. Morgan Stanley,* No. 01 Civ. 10071, 2005 WL 2757792, at \*9 (S.D.N.Y. Oct. 24, 2005)); *accord Maley v. Del Global Techs. Corp.,* 186 F.Supp.2d 358, 369 (S.D.N.Y.2002). As this Court has previously observed, "Courts in this Circuit have consistently adhered to these teachings." *City of Providence,* 2014 WL 1883494, at \*11.

### *2. Percentage Method*

Under the percentage method, the "court sets some percentage of the recovery as a fee." *Goldberger,* 209 F.3d at 47. While Courts may award attorneys' fees under either the "lodestar" method or the "percentage of the recovery" method, "[t]he

Fleisher v. Phoenix Life Insurance Company, Not Reported in Fed. Supp. (2015)

2015 WL 10847814

trend in this Circuit is toward the percentage method." *Wal–Mart Stores, Inc. v. Visa U.S.A., Inc.,* 396 F.3d 96, 121 (2d Cir. 2005) (quotations and citation omitted). The percentage method is preferable because it "directly aligns the interests of the class and its counsel and provides a powerful incentive for the efficient prosecution and early resolution of litigation." *Id.* (quotations omitted). [4] "[T]he percentage method continues to be the trend of district courts in this Circuit and has been adopted in the vast majority of circuits." *In re Marsh & McLennan Cos., Inc. Sec. Litig.,* No. 04 Civ. 8144(CM), 2009 WL 5178546, at * 14 (S.D.N.Y. Dec. 23, 2009); *accord City of Providence,* 2014 WL 1883494(CM), at *11 ("The trend among district courts in the Second Circuit is to award fees using the percentage method."); *In re Telik, Inc. Sec. Litig.,* 576 F.Supp.2d 570, 586 & n.7 (S.D.N.Y.2008) ("[T]here is a strong consensus—both in this Circuit and across the country—in favor of awarding attorneys' fees in common fund cases as a percentage of the recovery."). [5]

**\*15** Here, Class Counsel is seeking a $13.5 million fee, which represents *less than 10% of the overall settlement value*, including monetary and non-monetary benefits. As set forth in the Final Approval Memorandum supporting declarations and accompanying expert report, financial analysts with expertise in longevity markets who work with large, institutional investors to acquire life settlements value the nonmonetary relief provided in the Settlement at $94.3 million. The overall cash payment by Phoenix is $40,759,820.88, consisting of a $34,759,820.88 payment from which distributions to the Class will be made (net fees and costs) and a separate payment for the first $6 million in fees awarded. [6] The overall cash payment made available for the benefit of the Class, prior to the opt-out reduction, was $48.5 million. The gross settlement value, combining the monetary and nonmonetary benefits, is approximately $134 million after removing opt-outs, or $142 million when the entire benefits made available to the Class are considered.

In calculating the overall settlement value for purposes of the "percentage of the recovery" approach, Courts include the value of both the monetary and non-monetary benefits conferred on the Class. *See Velez,* 2010 WL 4877852, at *8, *18 (approving settlement that was "21.8 percent of the *total relief* available through the settlement," which included "both nonmonetary and monetary relief valued at up to $175 million"). Leading authorities agree, [7] as do

courts in this Circuit and nationwide. [8] The Federal Judicial Center provides an example of when it is appropriate to base a percentage fee on the value of injunctive relief through objective criteria: "an injunction against an overcharge may be valued at the amount of the overcharge multiplied by the number of people likely to be exposed to the overcharge in the near future." [9] In this case, the valuation of the COI freeze follows a similar formula.

**\*16** In *Velez,* this Court explained that, in addition to monetary relief, the Settlement provided equitable relief that would improve Novartis' employment practices in order to ensure that its sales force was treated fairly. *Id.* at *1. This Court valued this programmatic relief at "at least $22.5 million." *Id.* at *15. In granting the requested $38.125 million fee, this Court compared the fee to the "gross value of the settlement," which combined the values of the monetary relief, the nonmonetary benefits and the money earmarked for attorneys' fees:

> The Settlement Agreement provides that, subject to Court approval, Class Counsel will receive $38,125 million in attorneys' fees—which equals 21.8 percent of the $175 million **total gross value of the settlement,** including the attorneys' fee provision ...

> Based on the "percentage of the fund" approach for evaluating class action fees, the amount of attorneys' fees in question is compared to the overall settlement value, including any portion earmarked for said fees. Here, the requested fees represent approximately 21.8 **percent of the total relief** available through the settlement. Even if calculated in **the more conservative and less-accepted methodology of percent against monetary fund** (rather than overall value), the requested fees represent approximately 25 percent of the monetary relief available through settlement. As such, the fee falls well within the mainstream of percentage of awards granted by courts in the Second Circuit in class suits of similar size and complexity—and is less, percentage-wise, than many.

*Id.* at *18. Here, the requested fee represents less than 10% of the total gross value of the Settlement, which is *far below* the mainstream of percentage awards in this Circuit. Even if calculated in "the more conservative and less-accepted methodology of percent against monetary fund (rather than overall value)," *id.,* the requested fees represent just 22% of the cash fund that is available for distribution to the Class plus Phoenix's separate $6 million payment (or 27.8% of the $48.5

Case 4:19-cv-00509 Document 65-9 Filed 07/02/21 in TXSD Page 861 of 1452

Fleisher v. Phoenix Life Insurance Company, Not Reported in Fed. Supp. (2015)
2015 WL 10847814

million made available for the benefit of the class, [10] or one-third of the entire remaining cash portion of the settlement—all of which falls well within the mainstream of percentage of awarded granted by courts in this Circuit).

Courts in this district regularly approve percentage-based awards that far exceed the 10% requested here. *See, e.g., Novartis,* 2010 WL 4877852, at *8 (approving $38 million in fees that were approximately 22 percent of the total settlement value and 25 percent of monetary award); *Central States S.E. and S.W. Areas Health and Welfare Fund v. Merck–Medco Managed Care, L.L.C.,* 504 F.3d 229 (2d Cir.2007) (affirming 30% award of a $42.5 million settlement). That is true in cases with similar or higher fee requests as this one. [11]

**\*17** This Court recently approved a much higher (33%) award in a case that, like this one, was litigated to the brink of trial, after extensive and hard-fought discovery. *See City of Providence v. Aeropostale, Inc.,* No. 11 Civ. 7132(CM), Oral Arg. Tr. (Dkt 68, May 15, 2014) at 4 ("[T]his is the rare case where I have no problem with a 33 percent fee ... because this case has actually been litigated. This is not a case where ... there was a relatively quick settlement followed by confirmatory discovery. This was a case where you all were way, way down the pike in the litigation before Judge Weinstein came in and knocked your heads together and got you to settle it."). [12] In the circumstances, the fee request is entirely reasonable.

Finally, the requested fee is far less than the 45% that Sussman Godfrey would obtain on the open market under its standard contingency fee arrangement in which expenses are advanced. *See* Declaration of Steven G. Sklaver in support of Final Approval, filed Aug. 19, 2015 ("Sklaver Decl.") ¶ 17. This fact is highly relevant to determining the appropriateness of the award because the Court's ultimate task is to "approximate the reasonable fee that a competitive market would bear." *Johnson v. City of New York,* No. 08–cv–3673 (KAM)(LB), 2010 WL 5818290, at *4 (E.D.N.Y. Dec. 13, 2010) (citing *McDaniel v. County of Schenectady,* 595 F.3d 411, 420 (2d Cir.2010)); *see also McDaniel,* 595 F.3d at 422 (district court's focus should be "on mimicking a market"); *see also In re Lloyd's Am. Trust Fund Litig.,* No. 96–cv–1262 (RWS), 2002 WL 31663577, at *26 (S.D.N.Y. Nov. 26, 2002) ("[T]he percentage approach most closely approximates the manner in which private litigants

compensate their attorneys in the **marketplace contingency fee model.**").

All this is predicated on the non-cash portion of the settlement's having considerable value—and it does. But even if no specific monetary value were attributed to the injunctive relief, the fee request would still be fair and reasonable under the percentage approach. The substantial injunctive relief is a major factor in favor of the fee request, even if no specific monetary value is assigned to it. [13]

### 3. Lodestar "Crosscheck"

The Second Circuit also permits courts to utilize a lodestar "crosscheck" to further test the reasonableness of a percentage-based fee. *See Goldberger,* 209 F.3d at 50. The "lodestar" is calculated by multiplying the number of hours expended on the litigation by each particular attorney or paraprofessional by their current hourly rate, and totaling the amounts for all timekeepers. Additionally, "[u]nder the lodestar method of fee computation, a multiplier is typically applied to the lodestar." *In re Global Crossing Sec. & ERISA Litig.,* 225 F.R.D. 436, 468 (S.D.N.Y.2004). "The multiplier represents the risk of the litigation, the complexity of the issues, the contingent nature of the engagement, the skill of the attorneys, and other factors." *Id.* (citing *Goldberger,* 209 F.3d at 47); *see also In re Flag Telecom Holdings, Ltd. Secs. Litig.,* Case No. 02–cv–3400(CM), 2010 WL 4537550, at *25–26 (S.D.N.Y. Nov. 8, 2010). Where the lodestar is used as a cross-check, "the hours documented by counsel need not be exhaustively scrutinized by the district court." *Goldberger,* 209 F.3d at 50.

**\*18** In these entirely contingent actions, as of August 6, 2015, Class Counsel collectively spent over 6,500 hours, representing a lodestar of $2,770,410, and advanced $902,564.49 in expenses, in investigating, prosecuting and ultimately settling these claims over a multi-year period. *See* Sklaver Decl. ¶¶ 8–21. This lodestar is calculated at current hourly rates, which has been endorsed repeatedly by the Supreme Court, the Second Circuit and district courts within the Second Circuit as a means of accounting for the delay in payment inherent in class actions and for inflation. [14] Based on the requested fee ($13,500,000), class counsel's aggregate lodestar yields a "crosscheck" multiplier of 4.87. This is well

Case 4:19-cv-00509  Document 65-9  Filed 07/02/21 in TXSD  Page 862 of 1452

Fleisher v. Phoenix Life Insurance Company, Not Reported in Fed. Supp. (2015)

2015 WL 10847814

within the range of crosscheck multipliers awarded in this circuit.

"Courts regularly award lodestar multipliers from 2 to 6 times lodestar" in this Circuit, 🚩 *Morris v. Affinity Health Plan, Inc.,* 859 F.Supp.2d 611, 623–24 (S.D.N.Y.2012), and have been known to award lodestar multipliers significantly greater than the 4.87 multiplier sought here. *See e.g.,* 🚩 *Maley,* 186 F.Supp.2d at 369 (awarding percentage method with cross-check lodestar multiplier of 4.65, which was "well within the range awarded by courts in this Circuit and courts throughout the country," and citing cases with a 7.7 multiplier and 5.5 multiplier); *see also* 🚩 *In re Telik, Inc. Sec. Litig.,* 576 F.Supp.2d 570, 590 (S.D.N.Y.2008) ("In contingent litigation, lodestar multiples of over 4 are routinely awarded by courts, including this Court" (citing *Maley* )); *In re EVCI Career Colleges Holding Corp. Sec. Litig.,* No. 05 Civ. 10240(CM), 2007 WL 2230177, at *17 n.7 (S.D.N.Y. July 27, 2007)* ("Lodestar multipliers of nearly 5 have been deemed 'common' by courts in this District.").The multiplier is on the higher end, but that is entirely appropriate, given the fact that counsel were ready to go to trial when they settled.

Class Counsel's hourly rates are reasonable. The rates for Class Counsel who billed meaningful time to this case (ranging from $225 to $675 per hour) are comparable to peer plaintiffs and defense-side law firms litigating matters of similar magnitude. *See* Sklaver Deck 18–20; *see* 🚩 *In re Hi– Crush Partners L.P. Sec. Litig.,* No. 12 Civ. 8557(CM), 2014 WL 7323417, at *14 (S.D.N.Y. Dec. 19, 2014) ("The rates billed by Lead Counsel (ranging from $425 to $825 per hour) for attorneys, are comparable to peer plaintiffs and defense-side law firms litigating matters of similar magnitude."). [15]

### 4. The *Goldberger* Factors Support the Requested Fee Award

**\*19** Under either the percentage method or the lodestar multiplier approach, the *Goldberger* factors' ultimately determine the reasonableness of a common fund fee," 🚩 *Wal–Mart,* 396 F.3d at 121. The *Goldberger* factors, which the Court weighs in its discretion, are:

> (1) the time and labor expended by counsel; (2) the magnitude and

complexities of the litigation; (3) the risk of the litigation ...; (4) the quality of representation; (5) the requested fee in relation to the settlement; and (6) public policy considerations.

🚩 *Goldberger,* 209 F.3d at 50 (citation omitted). Each of these factors confirms that the requested fee is reasonable on a percentage basis.

### (i) Time And Labor Expended By Counsel (*Goldberger* Factor 1)

The first *Goldberger* factor, which addresses the "the time and labor expended by counsel," strongly supports approval of the requested fee. Class Counsel spent over 6,500 hours prosecuting this case and, as discussed above, the lodestar multiplier is well within the range approved by Courts in this Circuit. The substantial time devoted to this litigation over three and a half years reflects the intensive effort Class Counsel exerted to bring this case to a favorable resolution, and was reasonable. Class Counsel among other things:

- Conducted an initial investigation of this case to develop the theories and facts that formed the basis of the allegations in the complaint, and responded to and, with for the claims that gave rise to the settlement, defeated Defendants' two complex motions to dismiss, filed years apart. Dkt. 29; Dkt. 231.

- Filed two important motions to compel in November 2012, which were granted and reaffirmed, despite heavy opposition and re-litigation by Phoenix. Dkt. 72 & 77; Dkt. 93, 101, 112–13, 115, 117, 123–24, 140.

- Completed fact discovery:

  - Served 80 document requests and, with expert assistance, analyzed over 1.2 million pages of documents produced by Defendants that exceeded 9 gigabytes of native files. Class Counsel also issued numerous third-party subpoenas to Defendants' reinsurers and actuarial and financial advisors (some of which required litigation to compel production). Sklaver Decl. ¶ 5.

- Assisted in gathering and reviewing the production of 3,632 documents by Class Plaintiffs. *Id.*

Case 4:19-cv-00509    Document 65-9    Filed 07/02/21 in TXSD    Page 863 of 1452

Fleisher v. Phoenix Life Insurance Company, Not Reported in Fed. Supp. (2015)

2015 WL 10847814

- Took and defended over 20 days of depositions of 17 witnesses, including senior executives of Phoenix. Plaintiffs Fleisher and Berck were both deposed during full day depositions. *Id.*

- Obtained class certification for the 2011 COI increase in the *Fleisher* Action, supported by two expert reports, and defeated two motions to decertify the 2011 class. Dkt. 81, 135, 149, 230.

- Briefed motions for summary judgment filed by both parties, supported by extensive expert reports, exhibits and declarations, and defeated Phoenix's motion in the part that gave rise to this settlement. Dkt. 184, 190, 235.

- Conducted all-day jury testing in advance of trial before 24 mock jurors, divided into 3 panels of 8 for deliberations. Sklaver Decl. ¶ 5.

- Filed a joint pre-trial order totaling over a 100 pages on the liability phase alone. Dkt. 262. The parties also proposed jury instructions, verdict forms and voir dire questions. Dkt. 263, 265.

**\*20** • Filed or opposed 10 motions *in limine.* Dkt. 268, 273.

- Attended three full day, in-person mediation sessions in Boston conducted by a highly experienced mediator, preceded by mediation briefing. Sklaver Decl. ¶ 5; Green Decl. 7–9. All sessions were attended by counsel for Phoenix, counsel for Plaintiffs, as well as Mr. Fleisher. The terms of the Settlement were also negotiated in extensive teleconference and email discussions. Sklaver Decl. ¶ 5. A memorandum of understanding was negotiated in-person at Susman Godfrey's offices in New York City. Sklaver Decl. ¶ 5.

- Obtained the excellent result for the class, as described in the Final Approval Memorandum and supporting papers.

In sum, Class Counsel committed substantial time and resources to achieve an excellent recovery in this case. The time and lodestar figures will increase as counsel prepare for final-approval proceedings, handle claims administration issues, and continue to respond to class member inquiries.

#### (ii) Magnitude and Complexity of the Litigation (*Goldberger* Factor 2)

The second *Goldberger* factor, which addresses "the magnitude and complexities of the litigation," also strongly supports approval of the requested fee. The litigation was indisputably complex, as attested by the parties' extensive discovery and pre-trial order and the summary judgment records. *See City of Providence,* 2014 WL 1883494, at \*16 (the "magnitude and complexity" of litigation supported award when counsel analyzed "1.3 million documents," "prepared for and took 12 fact depositions of executives of the Company," and "prepared an extensive motion for class certification").

The complaint alleged the breach of an insurance contract, the resolution of which would require conflicting testimony by experts as to actuarial standards of practice, the original and revised pricing assumptions used by Phoenix for the PAUL insurance products at issue, and what it means to "recoup past losses" or discriminate unfairly "within a class of insured." These complex claims were bitterly fought, as Defendants developed defenses to liability, damages, and class certification, and offered their own expert opinions on actuarial issues for the key questions. If the litigation had not been settled, Class Counsel would have faced additional obstacles as Defendants continued to mount a vigorous defense, including a trial that would require substantial fact and expert testimony, and certain appeals thereafter.

#### (iii) The Risk of the Litigation (*Goldberger* Factor 3)

The third *Goldberger* factor, which addresses the "risk of the litigation," also strongly supports approval of the requested fee. The Second Circuit has identified "the risk of success as 'perhaps the foremost' factor to be considered in determining [a reasonable fee award]." *Goldberger,* 209 F.3d at 54 (citation omitted); *see also In re Telik, Inc. Sec. Litig.,* 576 F.Supp.2d 570, 592 (S.D.N.Y.2008) ("Courts have repeatedly recognized that 'the risk of the litigation' is a pivotal factor in assessing the appropriate attorneys' fees to award to plaintiffs' counsel in class actions."). Class Counsel confronted and overcame myriad risks in reaching the Settlement. Those litigation risks are discussed extensively above.

Case 4:19-cv-00509 Document 65-9 Filed 07/02/21 in TXSD Page 864 of 1452

Fleisher v. Phoenix Life Insurance Company, Not Reported in Fed. Supp. (2015)

2015 WL 10847814

**\*21** In addition, "The Second Circuit has recognized that the risk associated with a case undertaken on a contingent basis is an important factor in determining an appropriate fee award." *City of Providence,* 2014 WL 1883494, at \*14. As the Second Circuit has observed:

> No one expects a lawyer whose compensation is contingent upon his success to charge, when successful, as little as he would charge a client who in advance had agreed to pay for his services, regardless of success. Nor, particularly in complicated cases producing large recoveries, is it just to make a fee depend solely on the reasonable amount of time expended.

*Detroit v. Grinnell Corp.,* 495 F.2d 448, 470 (2d Cir.1974). [16] Unlike counsel for the Defendants, who are paid hourly rates and reimbursed for their expenses on a regular basis, Sussman Godfrey has not been compensated for any of its time (above 6,500 hours) with a lodestar value of over $2.7 million, or for any of its more than $900,000 in litigation expenses incurred since the case commenced in November 2011. Moreover, the firm would not have been compensated for its time or expenses at all had it been unsuccessful in this litigation. *See City of Detroit v. Grinnell Corp.,* 495 F.2d 448, 471 (2d Cir.1974) ("[D]espite the most vigorous and competent of efforts, success is never guaranteed."); *Marsh & McLennan,* 2009 WL 5178546, at \*18 ("In numerous class actions ... plaintiffs' counsel have expended thousands of hours and advanced significant out-of-pocket expenses and received no remuneration whatsoever." (citing examples of cases dismissed)). The risk of no recovery in complex cases of this type is real, and is heightened when Class Counsel opt to fight up to the eve of trial, in order to achieve the very best result for the class, rather than reaching a less attractive settlement early in the litigation.

### (iv) The Quality of the Representation (*Goldberger* Factor 4)

The fourth *Goldberger* factor, which addresses the "the quality of representation," also supports approval of the requested fee. Courts have consistently recognized that the result achieved is a major factor to be considered in making a fee award and in assessing the quality of the representation. *See, e.g.,* *Hensley v. Eckerhart,* 461 U.S. 424, 436 (1983). Class counsel respectfully submits that the Settlement— which creates an overall value of $134 million— achieved in face of complex litigation and the real risk from the outset that the case could be dismissed and/or the class not certified, evidences the quality of Class Counsel's representation.

**\*22** Regarding the skills of Class Counsel, the Court previously appointed Sussman Godfrey as Class Counsel because the firm met all the requirements of Rule 23(g). [17] Susman Godfrey has significant experience with insurance litigation and class actions, including settlements thereof. *See* Sklaver Decl. ¶ 3. The lawyers working for the Class have substantial experience prosecuting large-scale class actions and life settlement litigation. *Id.* The work that Class Counsel has performed in litigating and settling this case, and the substantial resources they have committed to prosecuting the case, demonstrates their commitment to the Class and to representing the Class's interests. *See Morris,* 859 F.Supp.2d at 622. They also, frankly, did very good work.

"The quality of opposing counsel is also important in evaluating the quality of Lead Counsel's work." *City of Providence,* 2014 WL 1883494, at \*17. [18] Defendants are represented by skilled and highly regarded counsel from prestigious firms with well-deserved reputations for vigorous advocacy in the defense of complex civil cases. In sum, all of the customary metrics indicative of high quality of representation weigh in favor of the requested fee.

### v. Requested Fee In Relation to the Settlements (*Goldberger* Factor 5)

The fifth *Goldberger* factor, which addresses "the requested fee in relation to the settlement," also strongly supports approval of the requested fee. In *Costco,* the court held that "the fact that the requested fee is comparable to fees that courts have found reasonable ... weighs in favor of the fee's reasonableness." *Dupler v. Costco Wholesale Corp.,* 705 F.Supp.2d 231, 244 (E.D.N.Y.2010). As discussed above, the proposed award is well within the range of fees awarded by courts under the percentage method.

Case 4:19-cv-00509    Document 65-9    Filed 07/02/21 in TXSD    Page 865 of 1452

Fleisher v. Phoenix Life Insurance Company, Not Reported in Fed. Supp. (2015)
2015 WL 10847814

### vi. Public Policy Considerations (*Goldberger* Factor 6)2

Finally, the sixth *Goldberger* factor, which addresses "public policy considerations," supports approval of the request fee. Public policy considerations strongly favor incentivizing skilled private attorneys to undertake this type of litigation, especially since the action is on behalf of small claimants who lack the financial incentive to obtain a recovery on their own behalf. *See In re WorldCom, Inc. Sec. Litig.,* 388 F.Supp.2d 319, 359 (S.D.N.Y.2005) ("[T]o attract well-qualified plaintiffs' counsel who are able to take a case to trial, and who defendants understand are able and willing to do so, it is necessary to provide appropriate financial incentives"); *Hicks v. Stanley,* No. 01 Civ. 10071(RJH), 2005 WL 2757792, at *9 (S.D.N.Y. Oct. 24, 2005) (" 'To make certain that the public is represented by talented and experienced trial counsel, the remuneration should be both fair and rewarding' " (citation omitted)).

### 5. The Class's Reaction to the Fee Request

**\*23** In addition to the criteria set forth in *Goldberger,* courts in the Second Circuit consider the reaction of the Class to the fee request in deciding how large a fee to award. *See In re Telik, Inc. Sec. Litig.,* 576 F.Supp.2d 570, 594 (S.D.N.Y.2008) ("That only one objection to the fee request was received is powerful evidence that the requested fee is fair and reasonable"); *In re Veeco Instruments Inc. Secs. Litig.,* Case No. 05–MDL–01695(CM), 2007 WL 4115808, at * 10 (S.D.N.Y. Nov. 7, 2007); *Maley,* 186 F.Supp.2d at 374 374 (when no one objected to fee request, finding that the "overwhelmingly positive" reaction by members of the Class "is entitled to great weight by the Court"); *see also In re Rite Aid Corp. Sec. Litig.,* 396 F.3d 294, 305 (3d Cir.2005) ("The class's reaction to the fee request supports approval of the requested fees"). The Notice provided that Counsel may seek "an award for attorneys' fees of $6 million for, among other things, the non-monetary benefits conferred, to be paid for by Phoenix and not from the Settlement Fund, and up to one-third of the Settlement Fund after any reduction for Class members who opt-out," which amounts to $17,586,606.96 (= $6 million plus $11,586,606.96, *i.e.,* a third of $34,759,820.88). Notice ¶ 18. Class members, including many large and sophisticated businesses, were given until July 17, 2015, to object or exclude themselves from the Settlement. *Id.* That deadline passed and not a single objection was received. Declaration of Joel Botzet re: Notification, Requests for Exclusion and Settlement Administration Services, filed Aug. 19, 2015 ("Botzet Decl.") ¶ 7. Furthermore, aside from the Lima-affiliated entities, only three other Class members requested exclusion from the Class, representing a total of 26 Class policies. These 3 Class members own a combined 26 policies representing only 1.5% of the total Class of policies in the Settlement. *Id.* 8–9. "When a class is comprised of sophisticated business entities that can be expected to oppose any request for attorney fees they find unreasonable, the lack of objections 'indicates the appropriateness of the [fee] request.' " *In re Remeron Direct Purchaser Antitrust Litig.,* No. Civ. 03–0085 FSH, 2005 WL 3008808, at *13 n.1 (D.N.J. Nov. 9, 2005) (awarding fee of 33.3% of $75 mm settlement).

### F. *Counsel's Motion for Reimbursement of Expenses is Granted*

Class Counsel also requests reimbursement in the amount of $902,564.49 for out-ofpocket expenses reasonably and necessarily incurred in connection with the prosecution of this Action. "Courts routinely note that counsel is entitled to reimbursement from the common fund for reasonable litigation expenses." *Anwar v. Fairfield Greenwich Ltd.,* Case No. 09–cv–118(VM), 2012 WL 1981505, at *3 (S.D.N.Y. June 1, 2012) (citing *Reichman v. Bonsignore, Brignati & Mazzotta, P.C.,* 818 F.2d 278, 283 (2d Cir.1987)). [19]

The expenses advanced in this litigation are described in the papers filed in support of this application. *See* Sklaver Decl. ¶ 21. These expenses were reasonable and necessary in this litigation, and have been expended for the direct benefit of the Class. *See Id.* They are the type of expenses typically billed by attorneys to paying clients in the marketplace and include such costs as fees paid to experts, mediation fees, notice costs, computerized research, document production and storage, court fees, reporting services, and travel in connection with this litigation. *See Anwar,* 2012 WL 1981505, at *3 (reimbursing expenses such as "mediation fees, expert witness fees, electronic legal research, photocopying, postage, and travel expenses, each of which is the type 'the paying, arms' length market' reimburses attorneys" (quoting *In re Global Crossing Sec. & ERISA Litig.,* 225 F.R.D. 436, 468 (S.D.N.Y.2004))). The fact that Class Counsel was willing to expend their own money, where reimbursement was entirely contingent on the success of this litigation, is perhaps the best indicator that the expenditures were reasonable

Case 4:19-cv-00509   Document 65-9   Filed 07/02/21 in TXSD   Page 866 of 1452

Fleisher v. Phoenix Life Insurance Company, Not Reported in Fed. Supp. (2015)
2015 WL 10847814

and necessary. *See, e.g.,* In re Visa Check/Mastermoney Antitrust Litig., 297 F.Supp.2d 503, 525 (E.D.N.Y.2003) (noting that it is common practice to grant expense request and awarding $18.7 million in expenses where the "lion's share of these expenses reflects the cost of experts and consultants, litigation and trial support services, document imaging and copying, deposition costs, on-line legal research, and travel expenses."). [20]

### G. *The Motion for Incentive Fees is Granted*

**\*24** Finally, Class Counsel seeks an incentive award of $25,000 for named plaintiff Marty Fleisher and $5,000 for named Plaintiffs Jonathan Berk and SPRR, as stated in the Notice. No Class member objected to this award. Courts "routinely award such costs and expenses to both reimburse named plaintiffs for expenses incurred through their involvement with the action and lost wages, as well as provide an incentive for such plaintiffs to remain involved in the litigation and incur such expenses in the first place." *Morgan Stanley,* 2005 WL 2757792, at *10. [21]

This is not a case where the named plaintiffs had little or no involvement. Martin Fleisher, for example, spent at least 88 hours actively fulfilling his obligations as a Class representative, complying with all demands placed upon him during the prosecution and Settlement of this Action, and providing valuable assistance to Class Counsel for over three years. *See* Declaration of Marty Fleisher in support of Final Approval, filed Aug. 19, 2015, ¶ 13. Mr. Fleisher is a highly sophisticated named plaintiff, whose knowledge of the insurance industry and the pricing of life insurance products proved continually invaluable in this case.

The discovery obligations imposed on Mr. Fleisher were significant, including the Defendant taking a full day deposition of Mr. Fleisher, and a separate deposition of one of his analysts. *See* Fleisher Decl. ¶ 13. Mr. Fleisher reviewed pleadings and motions, reviewed other court filings, communicated regularly with Class Counsel, and was continuously involved in the litigation process. *See id.* Finally, showing his dedication to this case, Mr. Fleisher, who resides and works in New York, personally travelled to Boston to attend all three mediations in person. Mr. Fleisher is a graduate of NYU School of Law and his typical billable rate ranges from between $550 at the low end and $715 at the high end, and the opportunity cost alone for his time spent on this case well exceeds $25,000. *Id.* at ¶ 6, 13.

The contributions of the other two class members were less than Mr. Fleisher but still meaningful and set forth in the accompanying Sklaver declaration, and warrant $5,000 incentive and time award. *See Sklaver Decl.* ¶ 23.

### *CONCLUSION*

The motions at Docket # # 308 and 315 in No. 11–cv–8405 and Docket # # 42 and 49 in No. 14–cv–08714 are granted in their entirety. The Clerk of the Court is directed to remove those motions from the court's list of open motions, and to close the file in these matters.

**All Citations**

Not Reported in Fed. Supp., 2015 WL 10847814

### Footnotes

1    The Settlement provided for the reduction of a $42.5 million cash fund based on opt-outs, calculated using the proportional amount of COI overcharges paid by the opt-outs compared to the rest of the Class.

2    Phoenix's frequent assertion of STOLI challenges on multi-million dollar universal life policies is well documented in litigation filed across the country. *See* Sklaver Decl. ¶ 26 (listing cases); *Wall Street Journal,* "Vulture Investor Battles for Death–Bet Payouts," April 19, 2012, ("Phoenix has denied tens of millions of dollars in investors' claims for death benefits, its regulatory filings show. In 2008, its peak year for challenges, it reported seven claims in dispute, totaling $50 million, or 7.6% of the face amount of claims that it received that year. The industry average is less than 1%. It has been involved in dozens of lawsuits asking courts to void policies.... But Phoenix has continued to bring lawsuits.").

3    All capitalized terms shall have the meaning set forth in the Stipulation of Settlement, Dkt. 299–2.

WESTLAW   © 2021 Thomson Reuters. No claim to original U.S. Government Works.

2015 WL 10847814

4    The Second Circuit has also explained the disadvantages of the lodestar method: "In contrast, the lodestar [method] creates an unanticipated disincentive to early settlements, tempts lawyers to run up their hours, and compels district courts to engage in a gimlet-eyed review of line-item fee audits." *Id.* (citations and alterations removed).

5    *See also In re Beacon Assocs. Litig.,* No. 09 Civ. 3907(CM), 2013 WL 2450960, at *5 (S.D.N.Y. May 9, 2013) ("The trend in this Circuit has been toward the use of a percentage of recovery as the preferred method of calculating the award for class counsel in common fund cases, reserving the traditional 'lodestar' calculation as a method of testing the fairness of a proposed settlement"); *In re IMAX Sec. Litig.,* No. 06 Civ. 6128, 2012 WL 3133476, at *5 (S.D.N.Y. Aug. 1, 2012) (same); *Fogarazzo v. Lehman Bros., Inc.,* No. 03 Civ. 5194, 2011 WL 671745, at *2 (S.D.N.Y. Feb. 23, 2011) (same); *In re Comverse Tech., Inc. Sec. Litig.,* No. 06 Civ. 1825, 2010 WL 2653354, at *2 (E.D.N.Y. June 24, 2010) (same); *In re Initial Pub. Offering Sec. Litig.,* 671 F.Supp.2d 467, 480 (S.D.N.Y.2009) (same).

6    In calculating the value of the monetary benefit, Courts include any amounts earmarked for attorneys' fees. *See id. See Velez,* 2010 WL 4877852, at *18 ("Based on the 'percentage of the fund' approach for evaluating class action fees, the amount of attorneys' fees in question is compared to the overall settlement value, **including any portion earmarked for said fees.").**

7    Federal Judicial Center, Managing Class Action Litigation: A Pocket Guide for Judges, 3d. Ed., 35 (2010) ("Courts use two methods to calculate fees for cases in which the settlement is susceptible to an objective evaluation. **The primary method is based on a percentage of the actual value to the class of any settlement fund plus the actual value of any nonmonetary relief.");** Principles of the Law of Aggregate Litigation, **The** American Law Institute, Mar 1, 2010, § 3.13 ("[A] percentage-of-the-fund approach should be the method utilized in most common-fund cases, with the percentage being based on both the monetary and nonmonetary **value** of the judgment or settlement.").

8    *See Sheppard v. Consol. Edison Co. of New York,* No. 94–CV–0403(JG), 2002 WL 2003206, at *7 (E.D.N.Y. Aug. 1, 2002) (approving fee petition where fee was measured as a percentage of the "total settlement," which included $6.745 million in monetary relief and "an estimated $5 million in non-monetary, injunctive relief); *In re Auction Houses Antitrust Litig.,* No. 00 CIV. 0648(LAK), 2001 WL 170792, at *10, *17 (S.D.N.Y. Feb. 22, 2001) *aff'd,* 42 F. App'x 511 (2d Cir.2002) (approving fee measured as a "percentage of the recovery," which was valued at $512 million based on cash payments and nonmonetary discount certificates; the court noted that valuing the certificates, through expert testimony, was relevant to "fixing the amount of lead counsel's fee, which is fixed as a percentage of the gross recovery"); *McCoy v. Health Net, Inc.,* 569 F.Supp.2d 448 (D.N.J.2008) (awarding fee of $69.7 million, which represents "28% of the $249 million value of the common fund **plus the parties' lowest estimated value of the injunctive relief"** of $28 million and noting: "The value of the injunctive relief here is a highly relevant circumstance in determining what percentage of the common fund class counsel should receive as attorneys' fees."); *cf. Blessing v. Sirius XM Radio Inc.,* 507 F. App'x 1, 4 (2d Cir.2012) (district court properly determined that settlement was fair based in part on its valuation of the "nonmonetary antitrust" benefits, principally a "price freeze").

9    A Pocket Guide for Judges, 3d. Ed., 34–35 (2010).

10   The Second Circuit has held that "[t]he entire Fund, and not some portion thereof, is created through the efforts of counsel at the instigation of the entire class. An allocation of fees by percentage should therefore be awarded on the basis of the total funds made available whether claimed or not." *Masters v. Wilhelmina Model Agency, Inc.,* 473 F.3d 423, 437 (2d Cir.2007). District courts in the Second Circuit agree that the entire-fund rule applies even if some portion of the unclaimed fund reverts to defendants. *See, e.g., In re Nigeria Charter Flights Litig.,* No. 04–CV–304, 2011 WL 7945548, at *5 (E.D.N.Y. Aug. 25, 2011) *report and recommendation adopted,* No. 04–CV–304, 2012 WL 1886352 (E.D.N.Y. May 23, 2012); *Aros v. United*

Case 4:19-cv-00509 Document 65-9 Filed 07/02/21 in TXSD Page 868 of 1452

Fleisher v. Phoenix Life Insurance Company, Not Reported in Fed. Supp. (2015)

2015 WL 10847814

*Rentals, Inc.,* No. 3.10–CV–73 JCH, 2012 WL 3060470, at \*5 (D.Conn. July 26, 2012); *Bozak v. FedEx Ground Package Sys.,* Inc., No. 3:11–CV–00738–RNC, 2014 WL 3778211, at \*6 (D.Conn. July 31, 2014). Here, the entire fund, prior to the opt-out, is \$42.5 million, plus the \$6 million earmarked for attorneys' fees. That is one proper benchmark for the monetary portion of the fund.

11    *See, e.g., City of Providence,* 2014 WL 1883494, at \*20 (awarding 33% of \$15 million settlement recovery); *In re Sadia S.A. Sec. Litig.,* No. 08 Civ. 9528(SAS), 2011 WL 6825235, at \*3 (S.D.N.Y. Dec. 28, 2011) (awarding 30% of \$27 million settlement recovery); *In re Marsh ERISA Litig.,* 265 F.R.D. 128, 135 (S.D.N.Y.2010) (1/3 of \$35 million); *In re Initial Pub. Offering Sec. Litig.,* 671 F.Supp.2d 467, 516 (S.D.N.Y.2009) (awarding 33.3% fee of \$510 million net settlement recovery); *In re Priceline.com, Inc. Sec. Litig.,* 2007 WL 2115592, at \*5 (D.Conn. July 20, 2007) (awarding 30% of \$80 million settlement recovery); *Maley v. Del Global Tech. Corp.,* 186 F.Supp.2d 358, 370 (S.D.N.Y.2002) (awarding 1/3 of \$11.5 million recovery); *see also In re Oxford Health Plans, Inc. Sec. Litig.,* No. MDL–1222 (CLB) slip op. at 7 (S.D.N.Y. June 12, 2003) (awarding 28% of \$300 million settlement recovery).

12    *See also In re Payment Card Interchange Fee Lit.,* 991 F.Supp.2d 437, 446 (E.D.N.Y.2014) (award of \$554.8 million was appropriate partly because "this case settled only after many years of hard-fought litigation. Privately negotiated fees in complex cases ... often include a higher fee for cases that proceed past a motion to dismiss, discovery, summary judgment, or other benchmarks").

13    *See, e g., In re Payment Card Interchange Fee Lit.,* 991 F.Supp.2d 437, 446 (E.D.N.Y.2014) (awarding although it is impossible to know with certainty the ultimate value of the injunctive relief, it may very likely exceed the value of the monetary relief in the long run. The injunctive relief is therefore a "relevant circumstance," to say the least (citation omitted); *In re Visa Check/Mastermoney Antitrust Litig.,* 297 F.Supp.2d 503, 524–25 (E.D.N.Y.2003) *aff'd* 396 F.3d 96 (2d Cir.2005) (awarding \$220 million fee and explaining: "the Settlements are so large, particularly considering the injunctive relief, that even the exorbitant fee I award seems small in comparison ... I agree that the substantial injunctive relief here should inform my decision on awarding fees, and it has"); *see also Torres v. Gristede's Operating Corp.,* 519 Fed.Appx. 1, 5 (2d Cir.2013) (where fee award was analogized to a common fund percentage award, fee was justified in part by "injunctive and other non-monetary relief").

14    *See, e.g., Missouri v. Jenkins,* 491 U.S. 274, 283–84 (1989) (endorsing "an appropriate adjustment for delay in payment" by applying "current" rate); *Gierlinger v. Gleason,* 160 F.3d 858, 882 (2d Cir.1998) (rates "should be 'current rather than historic' ") (citation and internal quotations omitted); *LeBlanc–Sternberg v. Fletcher,* 143 F.3d 748, 764 (2d Cir.1998) (current rates "should be applied in order to compensate for the delay in payment"); *In re Union Carbide Corp. Consumer Prods. Bus. Sec. Litig.,* 724 F.Supp. 160, 163 (S.D.N.Y.1989) (citation omitted) (Using current rates helps "compensate for the delay in receiving compensation, inflationary losses, and the loss of interest.").

15    Courts compare hourly rates with those prevailing in the community. *See Luciano v. Olsten Corp.,* 109 F.3d 111, 115 (2d Cir.1997) ("[t]he lodestar figure should be in line with those [rates] prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation") (internal quotations omitted). One source commonly used by courts in this Circuit to assess prevailing rates in this District is the National Law Journal Survey. *See, e.g., Williamsburg Fair Hous. Comm. v. N.Y. City Hous. Auth.,* No. 76 Civ. 2125, 2005 U.S. Dist. LEXIS 5200, at \*35 (S.D.N.Y. Apr. 4, 2005) (observing that "a recent billing survey made by the National Law Journal shows that senior partners in New York City charge as much as \$ 750 per hour and junior partners charge as much as \$ 490 per hour"). Current median rates are often above \$500 in New York. *See* Jones, Leigh, *The best still charge the most: For high-end legal work, firms remain in the driver's seat over hourly rates.* The National Law Journal (Online) (Dec. 17.2012) at \*2 ("Not surprisingly,

Case 4:19-cv-00509 Document 65-9 Filed 07/02/21 in TXSD Page 869 of 1452
Fleisher v. Phoenix Life Insurance Company, Not Reported in Fed. Supp. (2015)
2015 WL 10847814

the biggest firms in the biggest markets generally had the highest rates. Several firms that have their largest offices in New York and Washington had median rates above $500, according the NLJ survey."). The National Law Journal survey for 2012 shows that partners at New York firms charge between $330 to $1200 and associates range between $215 to $760. *See* Sklaver Decl. Ex. 1 (2012 National Law Journal survey).

16    *See also In re Dreyfus Aggressive Growth Mut. Fund Litig.,* No. 98 CV 4318 HB, 2001 WL 709262, at *6 (S.D.NY. June 22, 2001) ("Contingency risk is the principal, though not exclusive factor, courts should consider in their determination of attorneys' fees."); *Flag Telecom,* 2010 WL 4537550, at *27 ("Courts in the Second Circuit have recognized that the risk associated with a case undertaken on a contingent fee basis is an important factor in determining an appropriate fee award."); *In re Am. Bank Note Holographies,* 127 F.Supp.2d 418, 433 (S.D.N.Y.2001) (it is "appropriate to take this [contingent-fee] risk into account in determining the appropriate fee to award").

17    *See Morris,* 859 F.Supp.2d at 621–22 (noting that Rule 23(g)) requires the court to consider "the work counsel has done in identifying or investigating potential claims in the action, ... counsel's experience in handling class actions, other complex litigation, and claims of the type asserted in the action, ... counsel's knowledge of the applicable law, and ... the resources counsel will commit to representing the class") (internal quotation marks omitted).

18    *See also Anwar,* 2012 WL 1981505, at *2 (considering "the quality and vigor of opposing counsel"); *Marsh & McLennan,* 2009 WL 5178546, at *19 (reasonableness of fee was supported by fact that defendants "were represented by first-rate attorneys who vigorously contested Lead Plaintiffs' claims and allegations"); *In re Marsh ERISA Litig.,* 265 F.R.D. 128, 148 (S.D.N.Y.2010) ("The high quality of defense counsel opposing Plaintiffs' efforts further proves the caliber of representation that was necessary to achieve the Settlement.").

19    See *also In re Arakis Energy Corp. Sec. Litig.,* No. 95cv3431(ARR), 2001 WL 1590512, at *17 n.12 (E.D.N.Y. Oct. 31, 2001) ("Courts in the Second Circuit normally grant expense requests in common fund cases as a matter of course."); *In re Vitamins Antitrust Litig.,* No. 99–197(TFH), MDL No. 1285, 2001 WL 34312839, at *13 (D.D.C. July 16, 2001) ("[A]n attorney who has created a common fund for the benefit of the class is entitled to reimbursement of ... reasonable litigation expenses from that fund.... Courts have routinely awarded expenses for which counsel would normally directly bill their clients.").

20    The Settlement, and the preliminary approval order, also provides that Notice and Administrative Costs shall be paid from the Settlement Fund as they become due. Settlement ¶¶ IV.E, VIII; Prel. Appr. Order, 11–cv–8405, Dkt. 303 ¶ 10. Class Counsel seeks the Court's approval to continue making those payments as they become due. Current amounts are set forth in the Declaration.

21    *See also Anwar,* 2012 WL 1981505, at *3 ("Courts consistently approve awards in class action lawsuits to compensate named plaintiffs for the services they provide and burdens they endure during litigation."); *Varljen v. H.J. Meyers & Co.,* No. 97 CIV 6742(DLC), 2000 WL 1683656, at *4 (S.D.N.Y. Nov. 8, 2000) (reimbursement of such expenses should be allowed because it "encourages participation of plaintiffs in the active supervision of their counsel").

---

**End of Document** © 2021 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 33

2020 WL 4727070
Only the Westlaw citation is currently available.
United States District Court,
N.D. Texas, Dallas Division.

IN RE FORTERRA INC. SECURITIES LITIGATION

Civil Action No. 3:18-CV-01957-X
|
Signed 08/12/2020

## ORDER AWARDING ATTORNEYS' FEES AND REIMBURSEMENT OF LITIGATION EXPENSES

BRANTLEY STARR, UNITED STATES DISTRICT JUDGE

**\*1** This matter came on for hearing on July 28, 2020 (Settlement Hearing) on Lead Counsel's motion for an award of attorneys' fees and reimbursement of Litigation Expenses. The Court having considered all matters submitted to it at the Settlement Hearing and otherwise; and it appearing that notice of the Settlement Hearing substantially in the form approved by the Court was mailed to all Settlement Class Members who or which could be identified with reasonable effort, and that a summary notice of the hearing substantially in the form approved by the Court was published in *Investor's Business Daily* and was transmitted over the *PR Newswire* pursuant to the specifications of the Court; and the Court having considered and determined the fairness and reasonableness of the award of attorneys' fees and Litigation Expenses requested,

NOW, THEREFORE, IT IS HEREBY ORDERED THAT:

1. This Order incorporates by reference the definitions in the Stipulation and Agreement of Settlement dated November 4, 2019 (ECF No. 123-1) (Stipulation) and all capitalized terms not otherwise defined herein shall have the same meanings as set forth in the Stipulation.

2. The Court has jurisdiction to enter this Order and over the subject matter of the Action and all parties to the Action, including all Settlement Class Members.

3. Notice of Lead Counsel's motion for an award of attorneys' fees and reimbursement of Litigation Expenses was given to all Settlement Class Members who could be identified

with reasonable effort. The form and method of notifying the Settlement Class of the motion for an award of attorneys' fees and expenses satisfied the requirements of Rule 23 of the Federal Rules of Civil Procedure, the Private Securities Litigation Reform Act of 1995 (15 U.S.C. § 77z-1), due process, and all other applicable law and rules, constituted the best notice practicable under the circumstances, and constituted due and sufficient notice to all persons and entities entitled thereto.

4. Lead Counsel are hereby awarded attorneys' fees in the amount of 33⅓% of the Settlement Fund and $60,504.95 in reimbursement of Lead Counsel's litigation expenses (which fees and expenses shall be paid from the Settlement Fund), which sums the Court finds to be fair and reasonable. Lead Counsel shall allocate the attorneys' fees awarded amongst Plaintiffs' Counsel in a manner which they, in good faith, believes reflects the contributions of such counsel to the institution, prosecution and settlement of the Action.

5. In making this award of attorneys' fees and reimbursement of expenses to be paid from the Settlement Fund, the Court has considered and found that:

(a) The Settlement has created a fund of $5,500,000 in cash that has been funded into escrow pursuant to the terms of the Stipulation, and that numerous Settlement Class Members who submit acceptable Claim Forms will benefit from the Settlement that occurred because of the efforts of Plaintiffs' Counsel;

(b) Copies of the Postcard Notice were mailed to over 19,600 potential Settlement Class Members and nominees stating that Lead Counsel would apply for attorneys' fees in an amount not exceed 33⅓% of the Settlement Fund and reimbursement of Litigation Expenses in an amount not to exceed $100,000. There were no objections to the requested attorneys' fees and expenses;

**\*2** (c) Plaintiffs' Counsel have conducted the litigation and achieved the Settlement with skill, perseverance and diligent advocacy;

(d) The Action raised a number of complex issues;

(e) Had Plaintiffs' Counsel not achieved the Settlement there would remain a significant risk that Plaintiffs and the other members of the Settlement Class may have recovered less or nothing from Defendants;

(f) Plaintiff's Counsel devoted 1,225.6 hours, with a lodestar value of approximately $848,138.75 to achieve the Settlement; and

(g) The amount of attorneys' fees awarded and expenses to be reimbursed from the Settlement Fund are fair and reasonable and consistent with awards in similar cases.

6. Lead Plaintiff Wladislaw Maciuga is hereby awarded $10,000 from the Settlement Fund as reimbursement for his reasonable costs and expenses directly related to his representation of the Settlement Class.

7. Additional named Plaintiff Supanin Disayawathana is hereby awarded $5,000 from the Settlement Fund as reimbursement for his reasonable costs and expenses directly related to his representation of the Settlement Class.

8. Any appeal or any challenge affecting this Court's approval regarding any attorneys' fees and expense application shall in no way disturb or affect the finality of the Judgment.

9. Exclusive jurisdiction is hereby retained over the parties and the Settlement Class Members for all matters relating to this Action, including the administration, interpretation, effectuation or enforcement of the Stipulation and this Order.

10. In the event that the Settlement is terminated or the Effective Date of the Settlement otherwise fails to occur, this Order shall be rendered null and void to the extent provided by the Stipulation.

11. There is no just reason for delay in the entry of this Order, and immediate entry by the Clerk of the Court is expressly directed.

**IT IS SO ORDERED** this 12th day of August 2020.

**All Citations**

Slip Copy, 2020 WL 4727070

---

**End of Document**

© 2021 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 34

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| REID FRIEDMAN, on behalf of himself and all others similarly situated, | § § § § | |
| Plaintiff, | § § § | |
| v. | § § § | Civil Action No. 3:11-cv-02098-O |
| PENSON WORLDWIDE, INC. et al., | § § § | |
| Defendants. | § § § § | |

**ORDER GRANTING CO-LEAD COUNSEL'S MOTION FOR AWARD OF
ATTORNEYS' FEES AND REIMBURSEMENT OF EXPENSES**

Before the Court is Co-Lead Counsel's Application for an Award of Attorneys' Fees and Reimbursement of Expenses (ECF No. 87). Upon consideration of all papers submitted thereon; notice of the request having been given to the potential members of the Settlement Class; the Court having held a hearing on August 23, 2013, at which all persons who received notice had the opportunity to present their views; and, the Court being fully apprised of the relevant facts and circumstances;

Based on the record before the Court as well as the presentation of Co-Lead Counsel to the Court at the August 23, 2013 hearing, pursuant to Rule 23(h)(3) of the Federal Rules of Civil Procedure, the Court finds the following factors support the conclusion that Co-Lead Counsel's request for attorneys' fees is fair and reasonable under the circumstances of this case:

    a.    the substantial time and labor involved;

    b.    the magnitude and complexities of the litigation;

    c.    the quality of the representation;

Case 3:11-cv-02058-O Document 100 Filed 08/23/13 Page 2 of 2 PageID 4975

     d.     the customary fee in similar cases and for similar work;

     e.     the risks associated with the litigation;

     f.     the considerable time limitations associated with the litigation;

     g.     the results achieved for the Settlement Class;

     h.     the skills, reputation, ability, and experience of counsel;

     i.     the undesirability of the case; and

     j.     the amount of the requested fee in relation to the settlement.

The Court further finds that Plaintiff's Counsel's litigation expenses were reasonably incurred in the prosecution of this case.

Therefore, it is hereby **ORDERED, ADJUDGED, and DECREED** as follows:

1.     The Court hereby grants an award of attorneys' fees to be paid from the Settlement Fund, equal to 33⅓% ($2,166,540) of the settlement fund ("Settlement Fund").

2.     This fee award shall be allocated among counsel by Co-Lead Counsel, Kaplan Fox & Kilsheimer LLP ("Kaplan Fox") and Schneider Wallace Cottrell Brayton Konecky LLP ("Schneider Wallace"), in a manner which Kaplan Fox and Schneider Wallace determine, in good faith, reflects the contributions of counsel to the prosecution of this litigation and the recovery obtained on behalf of the Settlement Class.

3.     The Court hereby grants Co-Lead Counsel's application for reimbursement of litigation expenses in the amount of $252,160.20 to be paid from the Settlement Fund. The Court finds that these expenses were reasonably incurred in the prosecution of this litigation.

     **SO ORDERED** on this **23rd day** of **August, 2013.**

2

Reed O'Connor
**UNITED STATES DISTRICT JUDGE**

# TAB 35

Case 4:19-cv-00509 Document 65-9 Filed 07/02/21 in TXSD Page 877 of 1452

Garza v. Sporting Goods Properties, Inc., Not Reported in F.Supp. (1996)

1996 WL 56247

1996 WL 56247
Only the Westlaw citation is currently available.
United States District Court, W.D. Texas.

Leonel GARZA, Jr., Rodolfo Vega, Ronald Ressman, Michael P. O'Neill, Christopher Gill, Laura Gill, Greg DeWinne, Tom France, William H. Mitchell, Huey Johnson, and Tyler Johnson, And Additional Plaintiffs Listed on Exhibit "A" to the Complaint, Individually and on Behalf of Others Similarly Situated, as a Class Action, Plaintiffs,

v.

SPORTING GOODS PROPERTIES, INC., formerly known as Remington Arms Company, Inc.; DuPont Chemical and Energy Operations, Inc.; E.I. DuPont de Nemours & Co., Inc.; and Remington Arms Company, Inc., formerly known as RACI Acquisition Corporation, Defendants.

No. CIV. A. SA–93–CA–108.
|
Feb. 6, 1996.

ORDER APPROVING CLASS ACTION SETTLEMENT AND DISMISSING ACTION WITH PREJUDICE

[BIERY](), District Judge.

**\*1** Exemplifying the idea that peaceable resolution of disputes is not an exact science but is the essence of the art of compromise, a suggested agreement to bring closure to this controversy has been considered by the Court. This case was removed to federal court on December 20, 1993, and has been preceded by fifteen years of related litigation. The parties, through their counsel, have engaged in tens of thousands of hours of legal work, investigation, analysis, and mediation. Resulting from this effort is a joint motion by the named plaintiffs and defendants Sporting Goods Properties, Inc., formerly known as Remington Arms Company, inc. ("SGPI"); DuPont Chemical and Energy Operation, Inc. ("DuPont: Chemical"); E.I. du Pont de Nemours and Company, ("DuPont"); (collectively, the "DuPont Defendants"); and Remington Arms Company, Inc., formerly known as RACI Acquisition Corporation ("Remington"); (collectively, the "Defendants") for approval of a proposed settlement (the "Settlement") pertaining to a settlement class (the "Settlement Class") consisting of:

all persons or entities in the United States, or its possessions and territories including the District of Columbia and the Commonwealth of Puerto Rico, who now or hereafter own one or more Remington 12–gauge shotguns, of Models 870, 1100, 11–87, 3200 and Sportsman Models 58, 12A and 12P, manufactured after 1960 (the "Shotguns") with barrels made of a steel known as American Iron and Steel Institute C–1140 modified steel "1140M Steel"), and who have not opted out pursuant to this Court's order of August 31, 1995 and *excluding, however,* any entity in which any Defendant has a controlling interest, and the officers, directors, affiliates, legal representatives, heirs, successors, subsidiaries, distributors, resellers and/or assigns of any such controlled entity, or of any Defendant. This exclusion shall not apply to (a) non-officer and/or non-director employees of Defendants as to guns personally owned by them, *or* (b) Defendants' resellers or distributors (or the employees thereof) as to guns owned by them for personal use (rather than for resale or business promotional purposes), *and* who, if otherwise eligible, would be Settlement Class Members;

which was conditionally certified by order of this Court dated

August 31, 1995, under [rules 23(a), (b)(3) and (e) of the Federal Rules of Civil Procedure](), solely for the purpose of settlement. The compromise and settlement agreement was reached by the parties and their counsel with the assistance of the Honorable Fred Shannon, a former Texas and United States District Judge. All parties, counsel, and Judge Shannon have represented to the Court their unanimous opinion the proposed settlement is fair, adequate, and reasonable.

**Garza v. Sporting Goods Properties, Inc., Not Reported in F.Supp. (1996)**

1996 WL 56247

This joint motion for final approval of the settlement was briefed, supported by affidavits, testimony and documents in the record, and was the subject of an extensive hearing (the "Settlement Hearing") on December 29, 1995. Recognizing that no settlement will please all the people all the time, and based on these submissions and the Court's Findings of Fact and Conclusions of Law Regarding Fairness of Class Action Settlement rendered below, the Settlement is APPROVED.

## I. CERTIFICATION OF CLASS/JURISDICTION

### A. JURISDICTION

**\*2** Prior to reaching a proposed settlement, the parties to this litigation fought many battles. The first concerned this Court's jurisdiction. Defendants timely removed the case to federal court based on diversity of citizenship. Defendants acknowledged the plaintiffs attempted to plead actual damages per plaintiff below the $50,000 jurisdictional amount but claimed the compensatory and punitive damages plus attorney's fees sought exceeded $50,000. In their motion to remand, plaintiffs quoted the language of their original petition which prayed for a sum not to exceed $50,000 for each plaintiff. These issues were further briefed for the Court [1] by defendants' response to the motion to remand, plaintiffs' supplemental brief, and defendants' response to plaintiffs, supplemental brief. No action on these pending motions was taken. At a status conference held by Magistrate Judge Nowak on September 7, 1994, the plaintiffs agreed to withdraw their motion because of concern that a remand at this time might impede or hinder ongoing settlement negotiations.

In an effort to ensure federal court jurisdiction, plaintiffs filed a motion for leave to file a first amended complaint which was granted on November 14, 1994. In that complaint, plaintiffs stated:

> [t] his case is brought as a class action on behalf of all persons in the United States who own or use Remington shotguns but have not yet been injured by an unobstructed barrel burst, pursuant to the Lanham Act, 15 U.S.C. § 1125, the Magnuson–Moss Act, 15 U.S.C. § 2310 (with respect

to the named individual Plaintiffs' claims), state consumer protection and warranty statutes, and the common law of fraud, malice, negligence, gross negligence, and strict liability.

In addition, plaintiffs stated the amount in controversy exceeds $50,000.

Jurisdiction was discussed at this Court's first conference with the parties held on June 26, 1995. The Court noted that if the action was being brought under the Magnuson–Moss Act as a class action, the number of named plaintiffs needed to be one hundred. Defendants remained firm that diversity of citizenship was the basis for jurisdiction. In plaintiffs' third amended complaint, section 2130(d)(3)(C) of the Magnuson–Moss Act was satisfied as 100 plaintiffs were named. In addition, plaintiffs claim the aggregate amount in controversy exceeds $50,000 exclusive of interest and costs, and the citizenship of all named plaintiffs is diverse from the citizenship of all the defendants. The parties now agree that class members' punitive damages claims may be aggregated in order to determine the jurisdictional amount in controversy. Thus, the Court is now satisfied it has jurisdiction based on diversity of citizenship, federal claims or both. [2]

### B. CLASS CERTIFICATION

Another controversy between the parties prior to settlement concerned class certification. Although the original petition filed in state court and all subsequent amended complaints filed in federal court were on behalf of named plaintiffs and "on Behalf of Others Similarly Situated, as a Class Action," no formal motion for class certification was filed pursuant to Western District of Texas Local Rule CV–23 until June 14, 1995. [3] Prior to this Court's determination of the issue, the parties reached the proposed settlement, and the defendants agreed to class certification for settlement purposes only. [4] On August 20, 1995, plaintiffs and defendants jointly moved for an order from this Court conditionally certifying the settlement class which was granted. Despite the conditional class certification, however, one circuit has held that "courts employing settlement classes must still make findings that the class complies with Rule 23(a) and the appropriate parts of Rule 23(b) 11 and the failure to do so is "a plain

Garza v. Sporting Goods Properties, Inc., Not Reported in F.Supp. (1996)

1996 WL 56247

error of law, and hence an abuse of discretion, requiring the certification be set aside." *In re General Motors Corp. Pick-up Truck Fuel Tank Prods. Liab. Litig.,* 55 F.3d 768, 800 (3rd Cir.1995). Therefore, this Court will examine the class action prerequisites.

### 1. *Rule 23(a) Prerequisites*

**\*3** In deciding whether to certify a class, a district court is given wide discretion. *Jenkins v. Raymark Indus., Inc.,* 782 F.2d 468, 471–72 (5th Cir.1986). "A class may be certified if all four prerequisites of Rule 23(a) of the Federal Rules of Civil Procedure are met and one or more of the provisions of Rule 23(b) is satisfied." *Ahearn v. Fibreboard Corp.,* 162 F.R.D. 505, 523 (E.D.Tex.1995). Rule 23(a) provides as follows:

> One or more members of a class action may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or.defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed.R.Civ.P. 23(a) Although these requirements apply to all federal class actions, the application is varied. Some courts approve settlements and certify settlement classes under a more relaxed standard which allows the class to be certified in the context of settlement but leaves doubt as to certification for litigation purposes. *Ahearn,* 162 F.R.D. at 523. Other courts do not allow the standard to be relaxed simply because the class is being certified in the context of a settlement. *In Re General Motors Corp. Pick–Up Truck Fuel Tank Prods. Liab. Litig.,* 55 F.3d 768, 799 (3rd Cir.1995) Defendants maintain this class should be certified for purposes of settlement but could not meet the requirements for certification for purposes of litigation. *See In re Beef Indus. Antitrust Litig.,* 607 F.2d 167, 178 (5th Cir.1979), *cert. denied,* 452 U.S. 905 (1981) (altogether proper and consistent for court to certify class for settlement purposes while it might have had more difficulty reaching determination in different context). Although the last word from the Fifth Circuit Court of Appeals indicates a class may be certified for settlement purposes when doubt exists as to certification for litigation purposes, one United States District Court in Tyler, Texas has taken the approach that the rule 23(a) requirements are "no different in the settlement context than in the litigation context." *Ahearn,* 162 F.R.D. at 523. *Ahearn* and *In re General Motors Corp. Pick–Up Truck Fuel Tank Prods. Liab. Litig.* lead this Court to agree the rule 23(a) requirements must be applied equally to settlement classes and litigation classes.

> a. *Numerosity* The numerosity requirement of rule 23(a) is obviously satisfied because the proposed class involves the owners of approximately 8.5 million shotguns, and the owners are spread geographically across the United States. As set forth in rule 23(a)(1), the numerosity prerequisite is met when "joinder of all parties is impracticable." Given the number of potential class members and geographical dispersion of same, the joinder of all parties is indeed impractical.

### b. *Commonality*

**\*4** The commonality requirement of rule 23(a) requires there be at least one factual or legal issue which is common to all or substantially all of the class members. *Jenkins v. Raymark Indus., Inc.,* 782 F.2d 468, 472 (5th Cir.1986) Thus, "[t]he commonality test is met when there is 'at least one issue whose resolution will affect all or a significant number of the putative class members.' " *Forbush v. J.C. Penney Co., Inc.,* 994 F.2d 1101, 1106 (5th Cir.1993). "The threshold of 'commonality' is not high." *Jenkins,* 782 F.2d at 472. As long as class members are allegedly affected by a defendant's general policy, here the 1140 modified steel, and the general policy is the crux or focus of the litigation, the commonality prerequisite is satisfied. *Bowling v. Pfizer, Inc.,* 143 F.R.D. 141, 158 (S.D.Ohio 1992), *appeal dism'd without opinion,*

1996 WL 56247

995 F.2d 1066 (6th Cir.1993). [5] The common issues concern the use of 1140 modified steel in the types of Remington shotgun barrels owned by the members of the class and whether the class members were adequately warned by the defendants as to barrel bursts or failures in barrels made with 1140 modified steel. [6]

### c. *Typicality*

The typicality requirement does not focus as much on the relative strengths of the cases of the named and unnamed plaintiffs as it does on the "similarity of the legal and remedial theories behind their claims." *Jenkins v. Raymark Indus., Inc.,* 782 F.2d 468, 472 (5th Cir.1986) This prerequisite in the settlement context requires "proof that the interests of the class representatives and the class are commonly held for purposes of receiving similar or overlapping benefits from a settlement." *Ahearn,* 162 F.R.D. at 524 (quoting 2 NEWBERG ON CLASS ACTIONS § 11.28, at 11–58). Plaintiffs do not assert claims unique to themselves. All of the class members' claims arise simply out of the ownership of certain model Remington shotguns with barrels made from 1140 modified steel. All persons sustaining personal injuries from a barrel burst are excluded from the class. Thus, the legal and remedial theories asserted by the class representatives are typical of the class itself.

### d. *Adequacy of Representation*

Rule 23(a)(4) requires the class representatives and their counsel to "fairly and adequately protect the interests of the class." To meet this requirement, two elements must be satisfied: (1) concerns regarding the qualifications of counsel and (2) concerns regarding "the relationship between the interests of the Class representatives and the interests of other class members. *Ahearn,* 162 F.R.D. at 524 (quoting *Jenkins v. Raymark Indus., Inc.* 109 F.R.D). 269, 273 (E.D.Tex.1985)R.D). 269, 273 (E.D.Tex.1985), *aff'd,* 782 F.2d 468 (5th Cir.1986)). The Court must be sure there is an absence of conflict and be assured vigorous prosecution. 1 NEWBERG ON CLASS ACTIONS § 3.22, at 3–126.

### *Qualifications of Counsel*

Class counsel in this case are highly skilled, competent, and experienced trial lawyers. For example, James L. Branton is licensed in Texas and in federal court, is board certified in personal injury and civil trial law and has extensive experience and training in the field of products liability; likewise, Oliver S. Heard, Jr. is also an experienced trial lawyer licensed in Texas and in federal court; Robert Mullendore and William Watt are Montana counsel and provide experience in prosecuting class actions and administering class action settlements; and Jon D. Robinson brings inimitable experience concerning Remington 12–gauge shotguns. Mr. Robinson has successfully litigated numerous individual personal injury cases involving Remington shotgun barrel bursts and has been engaged for seventeen years in the metallurgical and legal investigation of 1140 modified steel barrel failures. In reviewing the curriculum vitaes of counsel and observing their competence, skill, and expertise before this Court, the Court is satisfied class counsel has adequately represented the class.

### *Class Representatives*

**\*5** The Court also holds the class representatives have adequately represented the class. All of the named plaintiffs own at least one model of the Remington shotguns at issue; they own various models of the shotguns at issue and have owned the guns for varying lengths of time ranging from 1968 through 1994. As stated at the fairness hearing, all claims are warranty claims without physical injury. The fact the physical injury claims have been excluded from the class reinforces that the general nature of all claims by the plaintiffs are very similar to that of all absent class members. As set out in *Ahearn,* 162 F.R.D. at 525, "[c]lass representatives satisfy the adequacy requirement unless they have "an insufficient stake in the outcome or interest antagonistic to the unnamed members." Moreover, as long as "all class members are united in asserting a common right, such as achieving the maximum possible recovery for the class, the class interests are not antagonistic for representation purposes." *In re Corrugated Container Antitrust Litig.,* 643 F.2d 195, 208 (5th Cir.1981). The Court cannot find any antagonistic interests between class members and unnamed members. Plaintiffs, through counsel, fought to obtain the best possible recovery

Case 4:19-cv-00509   Document 65-9   Filed 07/02/21 in TXSD   Page 881 of 1452

Garza v. Sporting Goods Properties, Inc., Not Reported in F.Supp. (1996)

1996 WL 56247

to the point where defendants stated they would go to trial rather than make any further concessions benefitting the class. Thus, the class representatives have met the primary standard for determining the adequacy of their representation. *See Gonzales v. Cassidy,* 474 F.2d 67, 75 (5th Cir.1973) (when class representative, through counsel, vigorously and tenaciously protects interests of class, primary standard for determining adequacy of class representative met).

### 2. *The Applicable Provision of* Rule 23(b)

As previously noted, in addition to complying with the prerequisites of rule 23(a), a putative class action must also satisfy at least one subsection of rule 23(b). These parties seek certification under rule 23(b)(3) requiring the court to find:

> that questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. The matters pertinent to the findings include: (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action.

Fed R. Civ. P. 23(b)(3)

Although never argued before the Court due to procedural circumstances previously described, plaintiffs have alleged the common issues central to this case predominate over

individual issues and include: the existence of defect, the defendants' knowledge of the defect, the failure to warn, fraudulent concealment, and misrepresentations. Defendants on the other hand agree the class can be certified for settlement purposes because the Fifth Circuit has recognized the criteria of rule 23 can be satisfied in the context of settlement even though it could not be satisfied if the case were litigated. *In re Beef Indus. Antitrust Litig.,* 607 F.2d 167, 174 (5th Cir.1979), *cert. denied,* 452 U.S. 905 (1981). Defendants believe predominance of common legal and factual issues and the case manageability would be critical concerns if this case were certified for litigation purposes. However, if the settlement is fair and adequate, the complexity and manageability of the case is of no concern because there is no litigation to manage and the class can be properly certified.

**\*6** The Court concludes the class is properly certified.

### II. FACTUAL BACKGROUND

On November 24, 1993, suit was filed by the plaintiffs in the 45th Judicial District Court of Bexar County, Texas, against Remington Arms Company, Inc. and E. 1. DuPont de Nemours & Co., Inc. [7] It was filed as a class action on behalf of current and future owners and users of Remington 12–gauge shotguns manufactured since 1960 with barrels made of 1140M Steel. [8] On December 2, 1993, defendants removed the case to federal court based on diversity of citizenship pursuant to 28 U.S.C. §§ 1332, 1441. The removal was not without opposition however as plaintiffs filed their motion to remand on January 7, 1994. As previously discussed, the jurisdictional issue was eventually resolved, and this Court was found to have jurisdiction.

Plaintiffs' allegations are that the shotguns are defective and their barrels are susceptible to bursting because they are made from 1140M steel, and that the barrel bursts can occur during normal usage and cause damage to the guns and in some cases, serious personal injury. The record reflects that on average, approximately 115 barrel failures occur each year and an estimated 2,500 to 3,000 failures have occurred over the last thirty years. The claims against each of the defendants are based on negligence, gross negligence, breaches of warranty, malice, fraud, strict products liability, fraudulent transfer, and violations of state and federal consumer protection and deceptive trade practice statutes. Plaintiffs allege damages

1996 WL 56247

based on lost value and lost use of the shotguns, the cost of replacing the defective barrels, exemplary damages, costs, and attorney's fees. In addition, plaintiffs are seeking equitable and monetary relief. The monetary relief requested is $1.5 billion in compensatory and $300 million in exemplary damages as well as other damages. The equitable relief sought is an order from the Court requiring the defendants to: (1) issue warnings to the proposed class regarding the danger of barrel bursts; (2) cease manufacture of 12–gauge shotguns with 1140M steel barrels; and (3) adjust warranty claims by making replacement barrels available to the proposed class.

The record reflects this case has been pending for over two years. During that time, the Court was made aware of the discovery being conducted and the progress of negotiations. The progression of events was as follows:

On July 1, 1994, the parties filed their first discovery status reports. According to the reports, the depositions of the six named plaintiffs had been taken and settlement negotiations had been initiated and were continuing. Plaintiffs' report indicated the parties had been involved in extensive settlement discussions and had agreed in good faith to attempt to resolve the class action within sixty days, subject to the Court's approval. Thereafter, the parties were ordered to appear on September 7, 1994, before United States Magistrate Judge Nancy Stein Nowak to discuss the current status of settlement negotiations. At this hearing, plaintiffs agreed to withdraw their motion to remand, and the Court granted an extension of scheduling order deadlines. Following the extension of deadlines, plaintiffs filed their first amended complaint.

 **\*7**  The next status report, a joint report, was filed by the parties on November 9, 1994. The parties advised the Court they were continuing settlement negotiations and had reached a "Memorandum of Understanding on the primary issues." The memorandum of understanding was preliminary and not binding unless and until a full settlement agreement was reached and approved by the Court. The preliminary letter of understanding identified the following components for a prospective future settlement; (1) a change to a new barrel steel for the Model 870, 1100 and 11–87 shotguns to be approved by plaintiffs, attorneys; (2) a notice campaign; and (3) a barrel exchange program offering reduced-price replacement barrels. Because of the serious settlement negotiations, the parties asked that all current scheduling deadlines be extended an additional 120 days. The Court granted this request.

A second joint status report was filed by the parties on February 22, 1995. Again, the parties reported significant progress towards resolution of the case, but several key issues remained open to discussion. The parties also informed the Court that defendants had provided plaintiffs, counsel with draft documents concerning potential settlement terms and several joint conferences had been convened in addition to the separate conferences held by plaintiffs and defendants respectively to discuss potential settlement. The report related plaintiff's counsel had spent several days in Phoenix, Arizona reviewing thousands of pages of documents voluntarily produced by defendants in order to expedite the negotiations process, and defendants had made available to plaintiffs results of certain product testing so plaintiffs' expert might conduct his own tests. [9] The parties represented that significant progress had been made since the previous joint status report.

On April 11, 1995, the parties filed a joint motion again seeking extension of existing deadlines and requesting a status conference before the Court. The conference proposed to enable the parties to inform the Court fully of the activities occurring the past few months and apprising the Court of the planned future activities. Considerable disagreement had developed on a number of issues, primarily the optimal method of distributing the benefit achieved by any settlement to the members of the class. other major points of contention concerned the logistics and administrative costs of the proposed discount barrel program and the price at which these barrels would be offered. The Court granted the request for conference and set it for May 11, 1995, so the personal representatives of the defendants could appear at the conference. At this stage of the litigation, the case was still referred to the magistrate judge but was being monitored by the district court as well. The scheduling of yet another status conference prompted the district court to enter the following order:

> This case is one of the oldest cases on this Court's docket. The Court has been advised of the good faith settlement negotiations which have been taking place among the parties and is aware of yet another status conference set for May 11, 1995.

>  **\*8**  The parties and counsel are advised that the time has come to fish or cut bait. Consequently, the parties and counsel need to put forth their last and best offers in the hope of reaching a resolution of this dispute without the time and expense of discovery and trial. If settlement, at

Garza v. Sporting Goods Properties, Inc., Not Reported in F.Supp. (1996)

1996 WL 56247

least in principle, is not announced at the May 11 status conference, the parties and counsel need to be prepared to engage in an accelerated discovery schedule and be prepared for trial in September, 1995.

The status conference was held, and the case was set for trial to begin September 25, 1995. Following the conference, this Court entered an order appointing former Texas and United States District Judge Fred Shannon to serve as a mediator and setting a premediation conference for June 26. Prior to the mediation date, plaintiffs filed a motion for leave of court to file a motion for certification of a class action under rules 23(b)(2) and 23(b)(3) of the Federal Rules of Civil Procedure. Defendants opposed this motion contending the motion was not made in accordance with the time limitations set forth in the Western District of Texas Local Rule CV–23.

At the premediation conference, the parties discussed the various issues concerning jurisdiction and recent class certification motion. [10] Following the conference, the parties began the mediation process which resulted in three series of meetings between the parties and lasting approximately eight total days. According to the mediator, the first meeting allowed the parties to voice their respective viewpoints and the evidence to be produced by each side. The mediator testified he acted as a sounding board on various issues as he discussed the matter with each side. This first meeting lasted approximately three days. After that, the mediator stayed in contact with the parties, and a second and third meeting were held. These face-to-face meetings were spread over a three month time period with telephone conversations between the parties taking place in the interim. Throughout this negotiation period, the issue remained open as to whether the September trial would consist only of the named plaintiffs or whether the case would proceed as a class action.

As the negotiations continued between the parties, the Court monitored the status of the case. On July 25, 1995, the parties met with the Court to discuss the status of the case. The defendants represented that a 90 to 95% settlement had been achieved, but issues concerning whether governmental entities would be included in the class and the right of defendants to cancel settlement if too many persons opted out of the settlement remained. The parties were told to advise the Court by August 16 whether a settlement had been reached.

On August 21, 1995, the parties filed their joint motion for preliminary class certification and preliminary approval of the settlement agreement as embodied in the Stipulation of

Settlement, and for approval of the forms and manner of notice to be given to the settlement class to inform them of the settlement and the fairness hearing. The Court granted this motion on August 24, 1995. The settlement terms were set forth as follows:

**\*9** 1. *Change in Barrel Steel.* Remington has selected a steel other than 1140M Steel for use in barrels of Model 870, 1100 and 11–87 12–gauge shotguns, and, since June 1995, has made these models with barrels of this new steel, which can withstand higher pressures. (The other Shotguns were discontinued in the 1980's and before.) Plaintiffs have agreed with Remington's selection of this new steel, and Remington has agreed not to use 1140M Steel for the barrels of these models, or 12–gauge shotguns derivative of Models 870, 1100 or 11–87, in the future. The Settling Parties agree that this product change and undertaking represent partial implementation of the equitable relief sought by Plaintiffs in the Action.

Model 870, 1100 and 11–87 12–gauge shotguns represent by far the bulk of Remington shotguns sold. Although such sales are subject to numerous factors, Remington does not anticipate any significant deterioration in its shotgun market share in the near term, and anticipates that approximately 60 percent of new Model 870, 1100 or 11–87 shotguns sold will be purchased by present owners of Remington shotguns, the majority of whom are Potential Class Members.

2. *Settlement Cost Amount.* Defendants will pay the total sum of $31.5 million in settlement of the Action (the "Settlement Cost Amount"), out of which amount will be paid (a) the Payment Pool (that is, all monies to be distributed to Participating Class Members after payment of costs set forth in (b)—(d); (b) all Class Counsel Fees and Expenses as approved by the Court; (c) reasonable compensation for any time expended by Plaintiffs in connection with this Action, as approved by the court; and (d) up to $1.375 million of Administrative costs, the balance of which will be borne by Defendants.

3. *Settlement Payments.* The Payment Pool shall be distributed to Participating Class Members as follows:

(a) If the Settlement is approved, the Distribution Notice will be published, as provided in the Settlement Administration Plan, informing Settlement Class Members of the procedures to follow in order to claim Settlement Payments.

1996 WL 56247

(b) Settlement Payments will be made to those Settlement Class members who presently own one or more Shotguns and who timely submit the Distribution Notice signed pursuant to 28 U.S.C. § 1746, supply certain proof of ownership of such shotgun(s) (including, but not limited to, the serial and model number(s) of those guns); and state that they understand that as a condition to cashing the Settlement Payment check, they will be required to read, and agree to follow, the instructions to be provided in the Safety Bulletin accompanying the check.

(c) The payments will be distributed according to the following point system, based on the age and model number of each Settlement Class Members' Shotgun(s). [11]

(d) Each Participating Class Member shall be entitled to a Settlement Payment based on the number of points accumulated for each Shotgun the Class Member owns. The value of a point shall be determined by dividing the total points of Participating Class Members into the Payment Pool.

**\*10** (e) Settlement Class Members (including those who do not own a Shotgun until after the Effective Date of this Settlement) shall have until the time set forth in the Settlement Administration Plan to sign up for a Settlement Payment. The failure of any Settlement Class Member to timely file for a Settlement Payment shall not in any way vitiate, or in any other way affect, the release of such non-Participating Class Member of his or her claims to the full extent provided in this Stipulation.

(f) Defendants shall tabulate and validate Participating Class Members claims as they are received, by determining if the information submitted by claimants is (1) complete, (2) timely provided, (3) consistent with Defendants, sales and manufacturing records and (4) consistent with valid information submitted by other claimants. During the period for submitting claims, Defendants shall provide the Court, and copy Class Counsel, with monthly summaries of claim tabulations. Within 60 calendar days after the close of the claims submission period, and with notice to Class Counsel, Defendants shall submit to the Court for its approval a final distribution list for payment of claims. Such report shall contain a list of all claims which, after reasonable opportunity having been provided to the

claimant for resubmission of validating information, have been determined to be invalid and not subject to payment. All Settlement Payment checks shall be mailed no later than ten (10) business days after Court approval of the final distribution list, unless the Court instructs otherwise. No person or entity shall be permitted to charge a fee of any kind to any person or entity for submitting or assisting in submitting a Participating Class Member's claim for a Settlement Payment.

4. *Shotgun Safety Bulletin.* Remington will provide a Shotgun Safety Bulletin regarding the risks of shotgun barrel bursts, as well as other safe shotgun handling practices, with every Settlement Payment made to Participating Class Members.

5. *Release by Plaintiff, the Settlement Class and Defendants.* As consideration for the Settlement, upon entry of the Court's Final order and Judgment, the Action will be dismissed with prejudice on the merits, and the Court will further bar and enjoin the prosecution of, any and all claims to be released (the "Release"). Defendants and Defendants, present and former officers, directors, agents, consultants, attorneys, accountants, insurers, reinsurers, personal representatives, distributors, resellers, spouses, issues, heirs, executors, successors, assigns, parent corporations subsidiaries, divisions and affiliates trusts, or entities controlled by them, and all other persons and entities whether herein named or not (the "Released Parties") shall be released from any claims, causes of action, damages, and liabilities of any kind, nature and character whatsoever in law, equity, or otherwise, known or unknown, suspected or unsuspected, that now exist, may come to exist, or heretofore existed, arising out of, related to, connected with, or based in whole or in part on the use of 1140M Steel (including, without limitation, claims relating to the design and/or manufacture of barrels, the selection of 1140M Steel and the adequacy of warnings provided) in the barrels of Shotguns owned, used or possessed by Settlement Class Members, or on the matters set forth in the Action; and any and all other claims and causes of action that have been or could be asserted in this or any other forum by reason of, or that relate in any way to, any of these matters; *provided, however,* that any Bodily Injury Claims that Settlement Class Members have, have had, or may have shall not be released; and *further provided* that this Release shall become null and void and of no force or effect if this Court, or any court with proper jurisdiction over an

Case 4:19-cv-00509 Document 65-9 Filed 07/02/21 in TXSD Page 885 of 1452

Garza v. Sporting Goods Properties, Inc., Not Reported in F.Supp. (1996)

1996 WL 56247

appeal from the Order, shall determine, after reasonable notice and an opportunity for the parties to be heard, that the Settlement shall not become Final in accordance with its terms, or if the Effective Date does not occur for any reason.

**\*11** Two days after receipt of the motion and stipulation, the parties appeared again before the Court. At this conference the parties informed the Court that the law enforcement agencies would be members of the class, notice in the major publications would be published by September 1, general interest publications would contain the notice by October 15, and special interest publications would include the notice by mid to late November. Class members would have until December 15 to opt out of the settlement, and defendants would have until December 28 to decide whether the opt outs were excessive. The date for the Fairness Hearing was set for December 29, 1995.

One final status conference was held before the Fairness Hearing. On December 5, 1995, the parties appeared before the Court to report on the public notification process, the number of opt-outs received, and the Fairness Hearing agenda. The Court was advised that tens of millions of people had been reached by the notices in the various publications. In addition, approximately 260,000 long form notices had been sent to owners of shotguns who had provided warranty cards to Remington and an additional 15,000 to 16,000 notices were sent to people who had read the notice or had heard of the class action and who either wrote or called in for the information. By this date, approximately 5,000 letters had been received, only 52 of which expressed objections to the settlement. Opt outs received by this time numbered 137 with some of the people opting out because they had no problems with their guns. The defendants also reported that approximately 1,300 notices were sent to gun clubs and to state firearms educators asking them to post or publish the short form notice. The conference concluded with plaintiffs and defendants expressing firm belief in their respective positions but recognizing a fact finder could go either way—one of the motivating factors in reaching the compromise. Both sides indicated their readiness and desire to proceed to the December 29, 1995 Fairness Hearing and final settlement.

### III. STANDARD OF REVIEW

### A. SETTLEMENT OF CLASS ACTION

Rule 23 (e) of the Federal Rules of Civil Procedure provides no standard by which a court is to consider the settlement of a class action. Rather, the rule states:

> A class action shall not be dismissed or compromised without the approval of the court, and notice of the proposed dismissal or compromise shall be given to all members of the class in such manner as the court directs.

"Decisional law, however, provides us with a general measuring rod for considering settlements:

In determining whether to approve a proposed settlement, the cardinal rule is that the District Court must find that the settlement is fair, adequate and reasonable.

Approval of the settlement under this standard is not to be upset unless 'the trial court clearly abused its discretion.' " *In re Corrugated Container Antitrust Litig.,* 643 F.2d 195, 207 (5th Cir.1981). The general rule applicable to the court's exercise of its discretion in deciding the fairness of a proposed class action is that the court must "ensure that the settlement is in the interest of the class, does not unfairly impinge on the rights and interests of dissenters, and does not merely mantle oppression." *In re Shell Oil Refinery,* 155 F.R.D. 552, 559 (E.D.La.1993). In addition, the court acts "as a fiduciary who must serve as a guardian of the rights of absent class members." *Grunin v. International House of Pancakes,* 513 F.2d 114, 123 (8th Cir.), *cert. denied,* 423 U.S. 864 (1975); *Morales v. Turman,* 569 F.Supp. 332, 337 (E.D.Tex.1983). However, the court cannot modify the terms of the proposed settlement; rather, the court must approve or disapprove of the proposed settlement as a whole. *Ahearn v. Fibreboard Corn.,* 162 F.R.D. 505, 527 (E.D.Tex.1995) There is a strong presumption in favor of finding the settlement fair. *Id.* The proposed settlement is not required to "achieve some hypothetical standard constructed by imagining every benefit that might someday be obtained in contested litigation." *Id.* at 527–28. Compromise is the essence of settlement, and the court may rely on the judgment of experienced counsel for the parties. *Id.* at 528.

Garza v. Sporting Goods Properties, Inc., Not Reported in F.Supp. (1996)

1996 WL 56247

**\*12** In assessing whether a settlement is "fair, adequate and reasonable," the Fifth Circuit has stated six key points or *Reed* factors should be considered. These factors are:

1. the existence of fraud or collusion behind the settlement;

2. the complexity, expense, and likely duration of the litigation;

3. the state of the proceedings and the amount of discovery completed;

4. the probability of plaintiffs' success on the merits;

5. the range of possible recovery; and

6. the opinions of the class counsel, class representatives, and absent class members.

*Reed v. General Motors Corp.,* 703 F.2d 170, 172 (5th Cir.1983) *see* *Ahearn v. Fibreboard Corp.,* 162 F.R.D. 505, 528 (E.D.Tex.1995) (court used these factors in assessing the fairness of the settlement). In applying these factors, the Fifth Circuit has admonished courts to be mindful of the "overriding public interest in favor of settlement" in class action suits. *Cotton v. Hinton,* 559 F.2d 1326, 1331 (5th Cir.1977).

### B. THE REED FACTORS

#### 1. *The Existence of Fraud or Collusion*

#### *Behind the Settlement*

Having held several conferences with all parties, the Court finds no evidence of any fraud or collusion behind the settlement but finds the settlement was the result of hard fought, arm's length negotiations. [12] In addition to experienced plaintiffs, counsel, defendants are expertly represented by: Anne E. Cohen of Debevoise & Plimpton, Fred S. Souk of Crowell & Moring, Howard P. Newton of Matthews & Branscomb, Charles L. Smith of Groce, Locke & Hebdon, Michael L. Clarke, Senior Counsel for E.I. DuPont de Nemours and Company, and Andrew T. O'Neill, Office of General Counsel for Remington Arms Company, Inc. Undisputedly, all parties are vigorously represented. Although settlement negotiations began at an early stage in the case, it took over a year to resolve the issues. The

assistance of a court-appointed mediator was needed to reach the settlement presented. At the Fairness Hearing, the Court heard from the mediator. Judge Shannon stated he had serious questions as to whether the case could be settled when he first became involved in the case. [13] He declared that, "[t]he divergence in the viewpoints expressed by each of the parties was made known clearly and strenuously early on, so as we approached the matter I had serious doubt about whether the case could be resolved." Judge Shannon then explained to the Court the mediation was a continuing process spanning over a three month period with three series of face-to-face meetings and telephone conferences during the interim periods between the parties on a daily basis. The mediator described his role during the first meeting as follows:

> [T]he parties made known their respective viewpoints about the case, made known, basically, the evidence to be produced by each side. Then we split up into two warring camps, so to speak, and I then became a shuttle diplomat between the two. I became, really, a sounding board for each side, listening to their point of view and then reflecting back to them ways or means that might be used to come to a compromise.

**\*13** Judge Shannon concluded that "indeed, the agreement before [the Court] was made at arm's length, it is free of collusion between the parties." Finding no evidence to the contrary, the Court finds the settlement free of fraud or collusion.

#### 2. *The Complexity, Expense, and Likely*

#### *Duration of the Litigation*

Having previously reviewed the history of this litigation, there is no doubt this case is procedurally and substantively complex. Were the case to proceed to trial, the timeliness issue concerning class certification would become a major battleground before the Court could even consider the various issues concerning the merits of the case and the incorporation of products liability/warranty laws from all fifty states.

Garza v. Sporting Goods Properties, Inc., Not Reported in F.Supp. (1996)

1996 WL 56247

Moreover, the most conservative estimate of the Court's time needed for trial is six to eight weeks. Given this Court's criminal docket, it is uncertain when the parties could expect a trial without interruption. Not only would the lengthy trial consume court resources, but the case would also be subjected to lengthy appeals. One court put this perspective on the issue:

> [t]he Court should consider the vagaries of litigation and compare the significance of immediate recovery by way of the compromise to the mere possibility of relief in the future, after protracted and expensive litigation. In this respect, '[i]t has been held proper to take the bird in the hand instead of a prospective flock in the bush.'

*In re Shell Oil Refinery,* 155 F.R.D. 552, 560 (E.D.La.1993)(quoting *Oppenlander v. Standard Oil Co.,* 64 F.R.D. 597, 624 (D.Colo.1974)). The Court is satisfied this factor is met.

### 3. *The Stage of the Proceedings and the Amount of Discovery Completed*

The extent of discovery needed in order for the parties to have sufficient information to make an informed and reasoned evaluation of the settlement and for the Court to be able to determine the fairness and adequacy of the compromise is left to the discretion of the Court. *See Cotton v. Hinton,* 559 F.2d 1332–33 (5th Cir.1977). Sufficiency of information does not depend on the amount of formal discovery that has been taken because other sources of information may be available to show that the settlement may be approved even when little or no formal discovery has been completed. [14] *Id.* Additionally, a court may consider information available to the parties which was developed in prior or related proceedings. *See Ahearn v. Fibreboard Corp.,* 162 F.R.D). 505, 528 (E.D.Tex.1995)R.D). 505, 528 (E.D.Tex.1995)(factual and legal issues identified and developed through extensive litigation; class counsel thoroughly familiar with asbestos litigation in general).

Here, formal discovery in relation to the class action was conducted and the exchange of informal discovery was quite extensive. Since the fall of 1994, class counsel has received approximately 200,000 pages of potentially relevant documents as well as proprietary information on production, marketing, and cost data. In addition, each side has met with the opposing side's expert metallurgical witnesses.

Moreover, class counsel has a wealth of information gained from litigating personal injury cases involving Remington shotguns. In particular, ion Robinson has been researching and litigating this issue for the past seventeen years. Unquestionably, the parties have adequate information from which to decide whether to settle the case, and the Court has ample information from which to decide if the settlement is fair, adequate and reasonable.

### 4. *The Probability of Plaintiffs' Success on the Merits*

**\*14**  Once the issue of possible fraud or collusion behind the settlement is removed, the next most important factor in deciding the fairness, adequateness, and reasonableness of the settlement is the likelihood of plaintiffs, success on the merits if the case were to proceed to trial. *Parker v. Anderson,* 667 F.2d 1204, 1209 (5th Cir.1982). In making this determination, the court must compare the terms of the settlement with the "likely rewards the class would have received following a successful trial of the case." *Reed v. General Motors Corp.,* 703 F.2d 170, 172 (5th Cir.1983). However, the court is not to decide the issues or try the case via the fairness hearing because, "[t]he very purpose of the compromise is to avoid the delay and expense of such a trial." *Id.* (quoting *Young v. Katz,* 447 F.2d 431, 433 (5th Cir.1971)).

Although each side still vigorously believes it will prevail if the case proceeds to trial, both sides recognize the uncertainty of litigation. At the Fairness Hearing, class counsel discussed the strengths and weaknesses of their case and apprised the Court of some of the factors which were taken into consideration in their determination that the settlement was fair and reasonable. Among the factors were: (1) because production began in 1960, statutes of limitation could drastically limit the potential relief to only about fifteen percent of the barrels now included in the settlement class, easily limiting the class to a million two hundred barrels provided the Court certified the class; (2) the "overwhelming" complications which could be caused by the application of laws of the fifty states if the case were tried as a national class action; (3) the impossibility of replacing, in less than an estimated ten to twelve years, all of the 1140M barrels sold by Remington; (4) the reduced measure of damages because of depreciation in value cf many of the older or well-used barrels which have not failed and the fact that most of these have not failed; (5) notwithstanding 2,500 to 3,000 barrel failures, the plaintiffs' inability to demonstrate in laboratory tests that a 12–gauge Remington barrel will burst catastrophically at

**Garza v. Sporting Goods Properties, Inc., Not Reported in F.Supp. (1996)**

1996 WL 56247

standard pressures; (6) the substantial cost of trial where the result is always uncertain; (7) the consideration that a trial and subsequent appeal could be limited to a few Texas gun owners and no relief for gun owners in any other part of the country; and (8) although significant in gross numbers, the statistically small number of barrel failures compared to the large number of barrels manufactured with the 1140 modified steel. [15]

Defendants presented to the Court their perspective on the case and maintained plaintiffs would be faced with substantive obstacles if the case were tried; the most significant obstacle being the defendants, substantive legal and factual defenses to plaintiffs' defect allegations. Defendants claim plaintiffs face the additional obstacles of: (1) demonstrating on a fifty-state basis that causes of action exist for products that have not actually failed and are unlikely to do so; (2) whether the equitable remedies sought, i.e. the cessation of the use of 1140M steel, the issuance of warnings, and the provision of reduced-price replacement barrels, could be the subject of injunctive relief; (3) the potential difficulty in meeting class certification requirements; (4) statute of limitations problems; and (5) state law differences concerning recovery of economic loss, implied warranty claims, punitive damages, mental anguish claims, and injunctive relief.

**\*15** Keeping in mind the Court is not to try the case or decide the issues, the Court finds sufficient risk to each side that the outcome of continued litigation is unpredictable and the substantial risk to each side as to the ultimate outcome strongly favors settlement.

As presented at the Fairness Hearing, litigating the existence of a defect in the shotguns will be a hard-fought battle of well-qualified experts. Plaintiffs' proof would consist of three primary components: the past history of bursts to provide proof of a problem; the opinions of their metallurgical experts, including Dr. David W. Levinson, Adjunct Professor of Metallurgy, Department of Material Science and Engineering, University of Arizona, to explain the history of failures, and the ballistics and reloading investigation conducted by Jon Robinson which indicates it is all but impossible to overload accidentally a 12–gauge shell as claimed by the defendants. Of course, defendants claim their proof counters that of the plaintiffs. The defendants' primary expert is Dr. Gary Fowler, a registered professional metallurgical engineer and head of Fowler, Inc., a professional engineering consulting firm specializing in metallurgical issues. Dr. Fowler received his B.S. and M.S. in Materials Science and Engineering from the University of California, Los Angeles as well as his

Ph.D in Metallurgy and Metals Processing. Dr. Fowler has done extensive cyclic hydraulic pressuring of various guns in unchanged and damaged conditions. His conclusion is the guns are not defective, and they do not burst through normal use. Moreover, defendants would establish that plaintiffs have not been able to make the guns fail in a controlled setting; statistically, a small percentage of chamber bursts occur each year, raising questions about misuse and over-pressure ammunition causing these failures. Defendants have also indicated they would move to exclude the testimony of plaintiffs' expert, Dr. David Levinson, as being "unscientific and unreliable 'expert' testimony."

In addition to the battle of experts as to defect, there is a potential manageability problem associated with maintaining the case as a nationwide class action in a litigation context. The claims brought involve substantive law of all states and territories of the United States. Although there is conflicting case law, the Court finds there is some uncertainty as to whether this case could be litigated as a nationwide class action. *Compare* *Feinstein v. Firestone Tire & Rubber Co.,* 535 F.Supp. 595, 602(S.:). N.Y.1982) (no claim under implied warranty of merchantability on tires where no failures experienced by plaintiffs) *with* *Bowling V. Pfizer, Inc.,* 143 F.R.D. 141, 148 (S.D.Ohio 1992), *appeal dism'd without opinion,* 995 F.2d 1066 (6th Cir.1993) (class action for negligence, strict liability, negligent misrepresentation, fraudulent misrepresentation allowed to proceed for plaintiffs with properly functioning heart valves).

**\*16** Another area of uncertainty involves the ability of plaintiffs to obtain the equitable relief sought if they prevail on the defect issue and class certification. In their third amended complaint, plaintiffs asked for equitable relief as follows:

1. issuance by Defendants of an adequate warning to class members of the danger of barrel bursts;

2. cessation of the manufacture by any of the Defendants of shotgun barrels using AISI C–1140 modified steel; and

3. adjustment of class members, warranty claims by making non-defective replacement barrels available to class members on terms that will promote and encourage such replacements.

An important part of the settlement includes defendants' agreement to change the steel and to issue warnings. Should the case proceed to trial, however, this Court may or may not

Garza v. Sporting Goods Properties, Inc., Not Reported in F.Supp. (1996)

1996 WL 56247

have the power to grant the requested relief. *See* *Walsh v. Ford Motor Co.,* 130 F.R.D. 260, 266 (D.D.C.1990), *appeal dism'd,* 945 F.2d 1188 (D.C.Cir.1991) (plaintiffs agreed court powerless to order injunctive relief against defendant in states where vertical privity requirements defeat plaintiffs' claims). *But see* *In re General Motors Corp. Pick–Up Truck Fuel Tank Prods. Liab. Litig.,* 55 F.3d 768, 811 n. 30 (3rd. Cir.1995)(although some courts express doubt about ordering recall by injunction, not conclusive court lacks power, matter warrants further consideration).

Although nonsubstantive, another potential barrier for plaintiffs is statutes of limitations defenses. This action includes shotguns manufactured since 1960 and purchased as long as thirty-six years ago. In most states, warranty claims are governed by a four-year limitations period pursuant to the applicable Uniform Commercial Code. Thus, many of the claims may no longer be viable. Moreover, some states have statutes of repose that also may preclude owners' claims. As a result, the possibility exists that many of the claims would be time-barred. The Court also recognizes that class certification is also a possible nonsubstantive barrier.

Given the instances of barrel failures with 1140 modified steel, approximately 115 per year and approximately 2,500 to 3,000 occurring over the past thirty years, the obstacles confronting the plaintiffs, and the battle of the experts which will take place at trial, the Court finds this case presents sufficient risk to each side. Even if the plaintiffs were to continue with the litigation and prevail at trial, and even if the damages awarded were in excess of the amount of the settlement obtained, there is no doubt lengthy appeals would follow as would enormous costs and expenses. All these factors, i.e. the litigation risks concerning proof of defect, the cost of continued litigation, and the possible limits to plaintiffs, recovery, support a compromise in this matter and the Court's approval of that compromise.

5. *The Range of Possible Recovery*

in determining whether the settlement is reasonable in light of the range of possible recovery factor, the Court is to "determine the value of the settlement in light of the potential for recovery." *In re Shell Oil Refinery,* 155 F.R.D. 552, 563 (E.D.La.1993). This analysis requires the Court to "establish the range of possible damages that could be recovered at trial, and, then, by evaluating the likelihood of prevailing

at trial and other relevant factors, [16] determine whether the settlement is pegged at a point in the range that is fair to the plaintiff settlors." *In re Corrugated Container Antitrust Litig* 643 F.2d 195, 213 (5th Cir.1981), *cert. denied,* 456 U.S. 998 & 1012 (1982).

**\*17** As in *Maher v. Zapata Corp.,* 714 F.2d 436, 460 (5th Cir.1993), the proponents of settlement here did not provide this Court with an "express estimate of the range of possible monetary recovery should plaintiffs prevail at trial." The Court, however, was provided with arguments from each side concerning their respective positions on the merits of the asserted claims, the risks associated with continued litigation, and the advantages to and value of the settlement. Based on the Court's experience, it is estimated the range of "possible" damages to be from $75 to $100 million. This figure is based on the likelihood that only approximately fifteen percent of all shotguns manufactured would be able to survive a statute of limitations defense. This figure does not, however, take into account that a national class may not be able to be certified, the evidence presented by the defendants as to the defect issue, and the possibility that this Court legally would not be able to award damages to class members for a product which has not failed. As in most cases tried to a jury, the recovery can range from zero to several million dollars. Moreover, the recovery sought in this case is not purely monetary.

In addition to monetary compensation sought in the plaintiffs' third amended complaint, the plaintiffs also sought equitable relief in the form of warnings to be issued to class members, a change in the steel used by Remington in future production of shotguns, and an adjustment of class members' warranty claims by making non-defective replacement barrels available to class members on terms that will promote and encourage replacements. *See* *Cotton v. Hinton,* 559 F.2d 1326, 1330 (5th Cir.1977) (relief sought in complaint may be helpful to establish benchmark by which to compare settlement terms). In procuring the settlement, class counsel was able to achieve a change in steel, warnings to be issued to all class members who participate in the settlement, and a fund of $31.5 million —the most amount of money defendants were willing to pay to avoid trial. As pointed out by the defendants, plaintiffs asked only for a discount on replacement barrels and did not ask for all guns to be recalled. Defendants argue the discount on replacement barrels is duplicative of the request for monetary relief on the warranty claim.

Garza v. Sporting Goods Properties, Inc., Not Reported in F.Supp. (1996)

1996 WL 56247

In addition to hearing arguments from counsel at the Fairness Hearing, the Court also heard testimony from an economic expert, Dr. Rostam M. Kavoussi, on the economic valuation of the proposed settlement. Dr. Kavoussi prepared an analysis of the economic benefits to the plaintiffs as a result of the settlement, and the goal of his study was to quantify these benefits.

In order to make the analysis, Dr. Kavoussi had to make certain assumptions and use certain data. He first obtained from the defendants the total number of Remington shotguns that had been produced and sold between 1960 and 1994 —8,185,229. He was also told that approximately 92.6% of the 8,185,229 shotguns were sold to people residing in the United States. Dr. Kavoussi made an assumption as to how many guns sold from 1960 to 1994 were still in use or operational. According to his testimony, Dr. Kavoussi used the most conservative figure—96 percent. [17] For his analysis, Dr. Kavoussi also had to know how much it would cost people to replace their defective barrels if Remington had not changed the steel in the new guns. He based his price on a sporting guns catalog, and the average retail cost was estimated to be $169.73 per barrel. Dr. Kavoussi assumed gun sales over the next thirty years would stay at approximately 1,018,000 per year of which Remington's share of the market is 37%. Of the 37% market, 80% of all shotguns sold in t-.e United States are assumed to be 12–gauge shotguns. Dr. Kavoussi had to make an assumption about how many of the guns with the new steel barrels would be purchased by class members. He estimated that 60% of all 12–gauge shotguns sold by Remington are sold to people who already own shotguns. Further, because the 60% represented 12–gauge shotguns purchased by people who own shotguns of all gauges, he had to know what percentage of the people who buy 12–gauge shotguns already own 12–gauge shotguns. He multiplied the 80% times the 60% to arrive at a 48% figure— 48% of people who buy 12–gauge Remington shotguns will have owned one or more 12–gauge Remington shotguns in the class. The final number for the analysis was the number of shotguns which are replaced every year. According to Dr. Kavoussi's testimony, he used the high number of 2.4% to be extremely conservative.

 **\*18** Dr. Kavoussi also calculated the benefit of the barrel steel replacement. Based on Mr. Robinson's 17 years of experience, Dr. Kavoussi was told that an average of 115 incidents or bursts of some sort occur each year. Of the 115 incidents, 100 result in minor property damage with no personal injury; 9.5 result in minor injuries—lacerations,

contusions and so forth; 5 are serious injuries—fractures, scars, lost digits; and 0.5, i.e. one every two years, result in catastrophic injuries—loss of an eye, loss of a thumb, etc. Mr. Robinson also supplied a cost for each of the above categories. For property damage the estimated cost per incident is $500; minor injuries cost $50,000 per incident; serious injuries cost $500,000 per incident; and catastrophic injuries cost $1,000,000 per incident. Dr. Kavoussi also made the assumption that a 50% reduction in injury will result because of the notification campaign and the availability of replacement barrels. Further, because of the discontinuance of the 1140M steel in all new shotguns, it was assumed that a 90% reduction in injuries would result. Though it is impossible to value the prevention of death or blindness, clearly such social benefit obtained by the settlement is important.

Based on all of the above data and the monetary recovery of $31.5 million to be realized by the settlement, Dr. Kavoussi's estimate of the economic benefit for class members totalled $415.3 million over the next 30 years. [18] Dr. Kavoussi also estimated the total benefit of the settlement to all owners of Remington shotguns in the United States totalled $1,070.5 million over the next 30 years. [19] Dr. Kavoussi then broke down the total economic benefit to the class into percentages and determined the value of change in barrel steel was 85.8% of the total benefit, the monetary recovery was 7.6% of the total benefit, and the value of injury prevention was 6.6% of the total benefit. Dr. Kavoussi also calculated the amount of potential recovery per gun if 100,000 claims are made against a fund of $16.625 million. The amount per point is calculated to be $55.66 with the minimum recovery being two points and the maximum recovery being six points. [20] Dr. Kavoussi acknowledged that it is very difficult to estimate exactly how many class members will file claims. Of the nine class actions he reviewed, the number of responses/claims ranged from one percent to thirty-five percent. He testified that generally, there is an inverse correlation between the size of the class and the responses received. In this case, he noted that many of the shotguns, sixty-one percent, were sold before 1980 and therefore, "there are all kinds of things that could have happened [to these guns] between then and now; guns being lost, or all kinds of other things." This is one factor that would mitigate against having a very high response rate.

All parties have agreed the settlement is reasonable and the mediator has concurred in that analysis. of course, this Court recognizes the recovery range of a jury verdict could be more or less depending upon how the jury perceives the

**Garza v. Sporting Goods Properties, Inc., Not Reported in F.Supp. (1996)**

1996 WL 56247

evidence and the costs and expenses incurred in continuing the litigation to trial. *In re Shell Oil Refinery,* 255 F.R.D. 552, 565 (E.D.La.1993). The calculation of the possible range of recovery cannot be mathematically precise. *Id.* This Court finds that based on the evidence heard and its experience in conducting trials, the amount of the proposed settlement is within the range of possible recovery.[21]

### 6. *The Opinions of Class Counsel, Class Representatives, and Absent Class Members*

#### a. *Opinions of Class Counsel and Class Representatives*

**\*19** As noted, the settlement was presented to the Court after long, hard-fought negotiations between the parties; both sides endorse the settlement.[22] In reviewing the opinions of counsel, the Court is to bear in mind that counsel for each side possess the unique ability to "assess the potential risks and rewards of litigation, and a presumption of correctness is said to attach to a class settlement reached in arms length negotiations between experienced, capable counsel after meaningful discovery." *Lelsz v. Kavanagh,* 783 F.Supp. 286, 297 (N.D.Tex.1991) (quoting MANUAL FOR COMPLES LITIGATION § 30.41) As to the class representatives, the Court received no objections from the seven individuals designated as class representatives nor from the other 105 named plaintiffs.[23] The settlement was also supported by the mediator, Judge Fred Shannon, and two members from the Montana Wildlife Federation, Stan Frasier and Tony Jewett, who filed affidavits supporting the settlement. In addition, support for the settlement was received from an institutional owner, the Texas Department of Public Safety. In a letter dated December 14, 1995, and admitted as Plaintiffs, Exhibit 32 at the Fairness Hearing, the Department stated it owns 2507 Remington Shotguns which meet the class criteria. The Department indicated it did not intend to appear at the Fairness Hearing but expressed its desire to be included in the settlement.

#### b. *Opinions of Absent Class Members*

In addition to the opinions of class counsel and class representatives, the Court is also to consider the opinions of absent class members. In doing so, the Court should carefully weigh the number and nature of objections while keeping in mind the settlement can be fair even if a large number of class members oppose it. *Reed v. General Motors Corp.,* 703 F.2d 170, 174 (5th Cir.1983). The Court should also recognize that "a low level of vociferous objection is not necessarily synonymous with jubilant support[,]" but great support for the settlement can certainly be a factor favoring approval. *In re Corrugated Container Antitrust Litig.,* 643 F.2d 195, 217–18 (5th Cir.1981); *see Cotton v. Hinton,* 559 F.2d 1326, 1331 (5th Cir.1977) (in assessing fairness of proposed settlement, number of objectors is factor to consider but not controlling). The number of objectors should be considered carefully. *Reed,* 703 F.2d at 174.

The defendants, in an effort to identify and apprise as many class members of the settlement as reasonably possible, financed a massive notification campaign.[24] Although the published Notice specifically told potential class members they need not do anything to be included in the class, approximately 1,000 members responded in writing and asked to be made a part of the settlement as of December 15, 1995. As of December 27, 1995, 355 class members, owning between 515 and 550 guns, asked to be excluded. Of those 313 individual shotgun owners who requested exclusion from the class in compliance with the terms of the Court's order, 236 stated no explanation for their decision to opt out, 52 stated they believed the lawsuit to be groundless and/or defendants should not be required to do anything as the reason for exclusion, and 25 criticized the settlement as inadequate. Exclusion notices were also received from 40 individual owners who did not comply with the Court's order because they failed to include the serial numbers of their guns in their notices. Of the total 355 exclusion notices received, 18 criticized class counsel's fees. Sauk County, Wisconsin and the Iowa Department of Corrections were the two institutional owners who filed exclusion requests. Sauk County owns 37 shotguns and the Iowa Department of Corrections has not yet provided the quantity or serial numbers of their shotguns. In total, 6,500 to 7,000 pieces of correspondence from class members were received by the date specified in the notice. Of this amount, only 146 individuals and two institutions filed formal objections or formal critical comments regarding the settlement. Eleven of these objections filed by individuals were incomplete. of the remaining 123 formal objections, 109 individuals found the settlement provided inadequate relief for class members, 33 objected to the fee request, and 17 opposed the lawsuit as groundless or unnecessary. Of course, some letters contained a combination of these objections.

Case 4:19-cv-00509    Document 65-9    Filed 07/02/21 in TXSD    Page 892 of 1452

Garza v. Sporting Goods Properties, Inc., Not Reported in F.Supp. (1996)

1996 WL 56247

**\*20**  In criticizing the adequacy of the settlement, two basic arguments were presented:

1. The settlement should provide for replacement barrels, or the cost for replacement barrels, or the cost of a new shotgun.

2. The point system should be adjusted to account for Class Members who own more than one barrel for each gun, and to take into account that some shotguns are more valuable than others either because (1) they originally sold for more money, (2) they were particularly well cared for, or (3) they were sold as collectors models and have therefore been maintained in an unfired condition.

In addition to these complaints, some members, although not objecting to the settlement, expressed concern about whether they should continue to use their shotguns.

As testified to by class counsel at the Fairness Hearing, negotiations were strenuous concerning a replacement program for all barrels with the hope that Remington would be able and willing to replace all barrels with the new high strength barrels. However, as negotiations continued, class counsel realized that replacement of all barrels was not feasible or necessary.[25] class counsel became aware that Remington lacked the necessary production capacity to make a barrel exchange program possible. Moreover, class counsel became aware that barrel inspection might identify most of the barrels likely to fail.[26] As a result, class counsel agreed to a fund of money to help publicize the danger of barrel bursts and to compensate class members who wanted to participate.[27]

Perhaps in a perfect world, replacement of all barrels would and could be the result. However, as the Fifth Circuit has recognized, "inherent in compromise is a yielding of absolutes and an abandoning of high hopes." *Cotton, 559 F.2d at 1330*. The Court is aware of the concern some class members hold as a result of the notice, and their motivation in seeking replacement in lieu of compensation is certainly sincere. Although plaintiffs' expert has put forth various theories as to the "probable" cause of the barrel bursts, plaintiffs admit they have been unable to recreate a barrel burst in a laboratory setting at the standard shell pressures. Defendants' expert, Dr. Fowler, has concluded to a reasonable degree of scientific certainty that these shotgun barrels are fit for their ordinary and intended use and are

not defective or an unreasonably dangerous product. Dr. Fowler's opinion is that the 1140M steel barrels will not fail by bursting when subjected to normal shotshell pressures no matter how many times such pressures are exerted. According to Dr. Fowler, the barrels, even with intentionally-induced cracks, will withstand repeated discharge at normal shotshell pressures without bursting. With such conflicting opinions, it is reasonable that a compromise was reached.

The Court has reviewed all the data. Even if the settlement were not approved, the case proceeded to trial, and the defect was proved, it is uncertain the replacement remedy sought by objectors could be provided by this Court. Moreover, plaintiffs' expert, Dr. Levinson has recognized that:

> **\*21**  [t]he cost of replacing every 1140 modified steel barrel with a low sulfur barrel may not be justified considering the small percentage of barrels which burst and produce injuries.... If all new barrels are made of low sulfur steel; existing owners are adequately warned about the past history of failures, injuries and risk of future failures; and if all interested owners are advised to visually inspect their barrels for ill-fitting choke tubes, uneven barrel thickness, a loose rib, signs of cracks, bulges or other damage in the barrels, I believe most injury-producing failures can be eliminated.

In addition, actual replacement of all barrels was never requested in any of the complaints filed. The most requested in any complaint was a discount on replacement barrels to encourage replacement. As presented, the settlement provides for the notice requested and a monetary fund of cash for class members to be used as the member chooses. Based on all these factors, the Court finds the settlement is not inadequate, unreasonable, or unfair to the class.

Formal objections to the point system were also received. Most of the comments concerned the failure of the system to give credit to the owners for each additional barrel they own. A few found the point system unable to account for all the variables which may be considered in determining the value of a shotgun.

Garza v. Sporting Goods Properties, Inc., Not Reported in F.Supp. (1996)

1996 WL 56247

According to the affidavit of William A. Wohl, Sr., the Senior Manager of Media Relations and Public Affairs at Remington Arms Company, Inc., of the nearly 10 million Remington 12–gauge barrels manufactured with 1140M steel, approximately 900,000 were sold as parts—that is extra barrels for use on existing guns. A total of 560 class members have claimed ownership of multiple barrels and a number have objected to the settlement for this reason. Again, in a perfect world, the point system would have taken the extra barrels into account. However, except for the markings on these extra barrels which indicate the approximate time of production and the Remington personnel who performed certain inspections, the markings are not immediately apparent and cannot definitely distinguish one barrel from another. If recovery were to be based on multiple barrel ownership, a potential for abuse and fraudulent claims exists. Remington shotguns, on the other hand, have a serial number imprinted on the receiver, and the validity of the claim cannot be disputed. Thus, settlement based on shotgun ownership is the most practical and efficient method.

Another criticism of the point system is its failure fully to recognize differences in shotgun values. As provided, the point system takes into account factors considered to be most significant in determining value: age and original value. The various other factors such as the initial purchase price, the particular model, whether the shotgun has been used or kept unfired, and other gun features such as barrel style, length, ribbing, stock, trim, and weight would again result in an imprecise method susceptible to fraudulent claims. If all of these factors were considered, each gun would have to be appraised on a case-by-case, subjective basis. Thus, the point system as devised is the most appropriate and objective method for valuation.

 *22  In addition to those objectors who questioned the adequacy of the settlement, seventeen individuals objected to the settlement because they viewed the suit as groundless or unnecessary. Fifty-two exclusions from the class were received on that same ground. objections/opt outs in this category ranged from claims of "class action abuse," firm belief in the quality of their shotguns, and concern that suits like this is what caused American manufacturers to move to foreign soil. More likely than not, these correspondents are not aware of the 2,500 to 3,000 known instances of barrel failures. At the Fairness Hearing, the defendants expressed their gratitude for these types of letters of support, but expressed their desire for Court approval of the settlement.

The Court also received and reviewed the Notice of Objection and of Intention to Appear Through Counsel at Fairness Hearing to Object to Proposed Settlement and Award of Attorney's Fees by class member Elizabeth Pretzer and the Declaration of Lawrence W. Schonbrun in Support of Class Member (Elizabeth Pretzer) objections to Proposed Settlement and Award of Attorney's Fees. According to Mr. Schonbrun's Declaration, his area of legal concentration "is law firm billing practices, with a special interest in the prevention of excessive attorneys' fee awards in class litigation." Mr. Schonbrun has appeared on behalf of class members in numerous class actions and has been successful in challenging various fee applications. In cases in which he has appeared and filed objections, he has secured procedural safeguards to benefit class members and has secured "fee and expense reduction to the benefit of class members of *over $17.2 million* below the initial maximum fees, costs and expenses requested by class counsel."

Despite his notice, Mr. Schonbrun did not appear at the Fairness Hearing. Class counsel reported at the Hearing they had spoken with Mr. Schonbrun by telephone the previous day and after he had been provided with a copy of the fee application, brief in support of the application, and all the attached affidavits. Class counsel reportedly asked Mr. Schonbrun what his position was now that he had reviewed the fee application, brief, and affidavits, and if he still was objecting. According to class counsel, Mr. Schonbrun's words were, "At this time, I do not intend to appear and object." Mr. Schonbrun did ask class counsel to consider an agreement concerning the residue. He asked if the parties would agree that "whatever residue is left in the settlement fund after distribution, such as checks that don't get cashed and things of that nature, would you agree to notify all the people who objected and appeared so they can have some input as to what is done with that residue?" Class counsel stated to Mr. Schonbrun they had no objection. Class counsel Oliver Heard then asked the Court to include Mr. Schonbrun's request in the agreement if they could make such an agreement with counsel for Remington and DuPont. Counsel for defendants have informed the Court, by letter dated January 30, 1996, they agree "notice shall be given to those who filed objections in connection with the settlement of any proceeding that may be held regarding residuary moneys (if any) in the settlement fund after distribution is completed."

Garza v. Sporting Goods Properties, Inc., Not Reported in F.Supp. (1996)

1996 WL 56247

c. *Opinions of Objectors/Intervenors at Fairness Hearing*

**\*23** In addition to receiving Mr. Schonbrun's notice to appear, the Court also heard from two objectors who attended the Fairness Hearing, Mr. Ralph Lopez and Ms. Sarah B. Vandenbraak. Mr. Lopez filed his motion to intervene as a class member and his notice of intention to appear and object to class counsel's fee application on December 15, 1995. No objection was voiced by Mr. Lopez concerning the proposed settlement; indeed Mr. Lopez commented, "it's a splendid settlement." Ms. Vandenbraak appeared on behalf of the Commonwealth of Pennsylvania, Department of Corrections and the Pennsylvania State Police. These institutions filed their notice of their intention to appear and object to the proposed class action on December 18, 1995, and their motion to intervene on December 28, 1995. The Department of Corrections and the State Police objected to the adequacy of the settlement and to the amount of attorneys, fees. By Memorandum dated December 31, 1995, and transmitted by facsimile to all parties, the Court notified the parties the motions to intervene would be granted.

The Commonwealth of Pennsylvania, Department of Corrections and Pennsylvania State Police (hereinafter "Pennsylvania") object: to the proposed settlement because it does "not assure that Plaintiffs will receive either safe shotguns or a sufficient award to replace shotguns which are defective." Pennsylvania estimates it owns approximately 1,800 shotguns subject to this litigation, and the estimated cost of replacing these guns will exceed $500,000. If the full amount of attorneys' fees and costs are awarded out of the settlement fund, the amount available to compensate members of the class will be reduced to $18 million. Moreover, there is no way to determine how many potential members of the class will participate in the settlement and therefore, impossible for Pennsylvania to determine whether it will receive sufficient funds to replace the shotguns it owns.

Pennsylvania believes the fact that it cannot determine whether it will be able to replace the shotguns it owns is particularly important because its employees use these shotguns in their law enforcement work. In instances of prison disturbances, attempted escapes, and other law enforcement activities, these shotguns may be their employee's last line of defense. Pennsylvania believes it is likely they will want to replace their shotguns. Thus, the practical value of the settlement hinges entirely on whether the settlement will provide adequate funds to replace their shotguns.

From the comments made by Pennsylvania at the Fairness Hearing, it appears they would either like an iron-clad guarantee the barrels are safe or to receive the full cost to replace all of their 1800 guns. [28] The Court observed Pennsylvania could have opted out but did not, and Pennsylvania wanted to recover the benefit but did not want to shoulder the burden and expense of going forward with its own litigation. By its very nature, no compromise and settlement can be 100% satisfactory to all parties. A "just result is often no more than an arbitrary point between competing notions of reasonableness." *In re Corrucrated Container Antitrust Litig.,* 659 F.2d 1322, 1325 (5th Cir.1981). Although some class members have made this same request for full replacement, there are many obstacles preventing same. Moreover, the evidence is conflicting as to whether the barrels are defective—thus the compromise between the parties. [29] In gauging the reasonableness of a settlement, the Court must look to the potential result if the case were to be litigated, taking into consideration the substantive and procedural obstacles which plaintiffs would otherwise face. Pennsylvania has not shown how it would leap these hurdles.

**\*24** Pennsylvania also believes class counsel has "severely overestimated" the benefit of the settlement to the class. Although plaintiffs' economist estimated the value of the settlement at approximately $350 million, taking into consideration the change in barrel steel, Pennsylvania asserts "that is not a benefit conferred on the class *as a result of the settlement"* Pennsylvania claims this benefit is nothing more than class members being given the option to purchase new shotguns, and the class will have that option regardless of the settlement. Moreover, class members will have to spend $700 million dollars in purchasing new shotguns to achieve the dollar benefit.

Likewise, Pennsylvania also claims the evaluation of the proposed limitation on future injuries as a result of the settlement is overestimated. According to Pennsylvania, this benefit is achieved only if class members purchase new barrels, and the replacement cost of a new barrel is approximately $169. Therefore, if every shotgun owner files a claim, the class members will receive only $2 from the settlement fund in exchange for this benefit. Such a minimal economic recovery cannot be considered an adequate settlement on behalf of the class members.

**Garza v. Sporting Goods Properties, Inc., Not Reported in F.Supp. (1996)**

1996 WL 56247

Contrary to Pennsylvania's position, the change in barrel steel is a major achievement by the plaintiffs as is the settlement proviso requiring the distribution of safe gun-handling materials with all settlement checks. Although true that class members must purchase new Remington shotguns in order to obtain the benefit of the new barrel steel, historical purchase patterns prove this money would have been spent by class members anyway for replacement shotguns whether of 1140 steel or the new steel. In fact, Pennsylvania has regularly purchased new Remington shotguns in the past. If Pennsylvania continues with its historical purchasing pattern, it too will benefit from the change in steel accomplished by the settlement. Likewise, Pennsylvania, like all other class members, will benefit from reduced injuries whether or not they purchase new barrels. Reduction in injury is a result not only of the change of barrel steel but also from the notice of the potential problems to class members and safe gun-handling practice materials which will be distributed. The Court finds, therefore, these objections without merit.

Pennsylvania also requests the Court disapprove the settlement and consider certifying a subclass consisting of law enforcement agencies. Because the named class representatives are sportsmen, Pennsylvania claims the interests of the law enforcement agencies are not adequately represented. Pennsylvania asserts the sportsmen representatives do not possess the same interests or suffer the same injury as law enforcement agencies do. These agencies may be exposed to certain liabilities the sportsmen or recreational hunters will not—union grievances, collective bargaining issues, worker's compensation claims, and other significant monetary losses including temporary disability payments, replacement, retraining, inspection, and the costs of § 1983 civil rights violations Thus, pennsylvania asks this Court to withhold final approval of the settlement and consider certifying a subclass consisting of law enforcement agencies to ensure the unique interests of these agencies in minimizing work-related injuries and protecting public safety and the civil rights of citizens are addressed in any proposed settlement.

**\*25** At the Fairness Hearing, class counsel testified though none of the named plaintiffs were institutional owners, their interests were certainly represented, as all shotgun owners, interests were represented. The value of shotguns sold to institutions have the same value as those sold to individuals. The liability issues are the same—the shotgun either has or does not have a defect. Athough some class members may use the shotguns for recreational purposes only,

the possibility exists that these shotguns are also used for subsistence hunting, for home or business defense, or for professional purposes. Regardless of the category of use, the common thread for all class members is ownership of a Remington 12–gauge shotgun with a barrel made from 1140 modified steel.[30] In addition, institutional owners are not the only class members subject to third party litigation. The possibility of suits by third parties in relation to use or ownership of an allegedly defective product applies to all class members including those who own, rent, or loan guns. More importantly, the settlement at issue concerns only economic loss and expressly excludes claims for personal injury.

The Court also recognizes that Pennsylvania is the only institutional or law enforcement owner arguing they are different from other class members and requesting subclass certification. Other than Pennsylvania, only one other institutional owner has objected to the settlement, and only two have sought exclusion. Contrary positions have been expressed by other law enforcement agencies who have either complimented the quality of the shotguns and questioned the need for the lawsuit[31] or have requested inclusion in the settlement.[32] Other agencies have simply written for a copy of the notice of settlement[33] and have not objected or filed for exclusion.

The Court has previously found the named class members and class counsel adequately represent the class in accordance with [Federal Rule of Civil Procedure 23(a)(4)](). Therefore, before an objector can claim inadequate representation, more than mere dissatisfaction with the settlement must be presented. A showing that class representatives were incapable of representing its interests based on antagonism or intra-class conflict, or that its interests were sacrificed for the benefit of other class members may justify rejection of the settlement. However, Pennsylvania has not made such a showing. As long as "all class members are united in asserting a common right, such as achieving the maximum possible recovery for the class, the class interests are not antagonistic for representation purposes." *In re Corrucrated Container Antitrust Litig.,* 643 F.2d 195, 208 (5th Cir.1981). Based on the facts and circumstances of this case, class counsel obtained the maximum possible recovery for the class. Pennsylvania had the opportunity to opt out of the settlement but chose not to do so. Therefore, just because the settlement does not guarantee full recovery of the cost of replacement

Case 4:19-cv-00509 Document 65-9 Filed 07/02/21 in TXSD Page 896 of 1452

Garza v. Sporting Goods Properties, Inc., Not Reported in F.Supp. (1996)
1996 WL 56247

barrels, the Court does not find the need to certify a subclass for institutional shotgun owners [34] or disapprove the settlement based on Pennsylvania's objections.

 **\*26** Accordingly, the settlement is hereby APPROVED as fair, adequate, and reasonable.

C. ATTORNEYS' FEES AND
OTHER FEES AND EXPENSES

In a common fund case, "a litigant or lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from the fund as a whole." *Boeing Co. v. Van Gemert,* 444 U.S. 472, 478 (1980). The underlying justification for reimbursement from a common fund is that "unless the costs of litigation are spread to the beneficiaries of the fund they will be unjustly enriched by the attorney's efforts." *Swedish Hosp. Corp., v. Shalala,* 1 F.3d 1261, 1265 (D.C.Cir.1993). The Court is aware, however, that once class counsel files their petition, their role often changes. This transformation has been described as follows:

> Once an attorney files such a petition [for attorneys' fees from a common fund], his role changes from one of fiduciary for his clients to that of a claimant against the fund created for the clients' benefit. Defendants, having made their contribution to the settlement, are uninterested in the distribution so (as in this case) they typically do not offer any opposition to the fee petition. it is, therefore, incumbent upon the trial court to become the fiduciary for the fund's beneficiaries and to act with 'moderation and a jealous regard to the rights of those who are interested in the fund" in determining what is a reasonable fee to be paid to class counsel for their efforts in settling the litigation and creating the fund.

*Purdy v. Security Savs. & Loan Ass'n,* 727 F.Supp. 1266, 1268–69 (E.D. Wis. 198 9); *see* *Skelton v. General Motors Corp.,* 860 F.2d 250, 2 5 3(7th Cir.1988) (once attorneys secure settlement for class, their role changes from fiduciary for clients to claimant against fund created for clients, benefit; court becomes fiduciary for fund's beneficiaries and must carefully monitor disbursement to attorneys by scrutinizing fee applications); *In re McDonnell Douglas Equip. Leasing Secs. Litig.,* 842 F.Supp. 733, 740 (S.D.N.Y.1994) (court in fiduciary role must recognize even though class

counsel well intentioned, attorney and client stand as adverse claimants to same settlement fund); *see also* *In re Unisys Corp. Retiree Medical Benefits ERISA Litig.,* 886 F. Supp 445, 457 (E.D.Pa.1995) (in common fund case court responsible for applying heightened judicial scrutiny to fee request); *Trief v. Dun & : Bradstreet Corp.,* 840 F.Supp. 277, 282 (S.D.N.Y.1993) (when common fund created, court as guardian of rights of class members not bound by amount of fee award requested by counsel).

The determination of the amount awarded as attorneys' fees is entrusted to the sound discretion of the trial court. *Wolf v. Frank,* 555 F.2d 1213, 1214 (5th Cir.1977). The Manual for Complex Litigation provides the following guidance for awarding attorney's fees:

> In determining awards of attorneys' fees, the guiding principles should be to provide compensation sufficient to stimulate the motive for representation of classes and to ensure that the fees awarded are consistent with the benefits bestowed upon the class, insofar as the bestowing of those benefits can be shown to be the product of the lawyer's work. The numerous exacting standards that have been set down by the court should be strictly applied to ensure that this aspect of the class action is not subject to abuse.

 **\*27** In *Loncrden v. Sunderman,* 979 F.2d 1095, 1099 (5th Cir.1992), the Fifth Circuit determined it would utilize the "lodestar method" to calculate attorneys' fees. [35] The lodestar is computed by multiplying the number of hours reasonably expended by the prevailing hourly rate in the community for similar work. The court then adjusts the lodestar upward or downward depending on the respective weight of the twelve factors set forth in *Johnson v. Georgia Highway Express, Inc.,* 488 F.2d 714, 717–19 (5th Cir.1974), which are:

  1. the time and labor required;

  2. the novelty and difficulty of the questions;

  3. the skill requisite to perform the legal services properly;

Garza v. Sporting Goods Properties, Inc., Not Reported in F.Supp. (1996)

1996 WL 56247

4. the preclusion of other employment by the attorney;

5. the customary fee;

6. whether the fee is fixed or contingent;

7. time limitation imposed by the client or the circumstances;

8. the amount involved and the results obtained;

9. the experience, reputation, and ability of the attorney;

10. the undesirability of the case;

11. the length and nature of the attorney-client relationship; and

12. awards in similar cases.

The adjustment of the lodestar according to a *Johnson* factor may be made only if "that factor is not already taken into account by the lodestar." *In re Fender,* 12 F.3d 480, 487 (5th Cir.1994); *see Shipes v. Trinity Indus.,* 987 F.2d 311, 320 (5th Cir.), *cert. denied,* 114 S.Ct. 548 (1993)(after lodestar determined, district court may adjust lodestar up or down for relevant *Johnson* factors not already included in lodestar being careful not to double count *Johnson* factor). [36] "The district court must explain how each of the *Johnson* factors affects its award, regardless of their specific factual significance; and 'while the subsidiary fact findings are reversible only if clearly erroneous ... review of the total fee is [governed] by the precept that its amount lies in the trial judge's discretion, and is to be recalculated only if that discretion is abused.' " *Longden v. Sunderman,* 979 F.2d 1095, 1099–1100 (5th 1992) (quoting *Copper Liquor, Inc. v. Adolph Coors Co.,* 684 F.2d 1087, 1092, 1094 (5th Cir.1982). In addition, it is permissible to adjust a lodestar by *Johnson* factors considered within the original lodestar calculation if the case is rare and exceptional and if "supported by both specific evidence on the record and detailed findings by the lower courts." *Shipes,* 987 F.2d at 320.

In this case, the Court is presented with applications for attorneys' fees from class counsel and from intervenors, Pennsylvania and Ralph Lopez. Class counsel seeks attorneys' fees and expenses totalling $13.5 million, Pennsylvania seeks attorneys, fees of $67,760 and expenses in the amount of $1,437.87, and Ralph Lopez seeks attorney's fees totalling

$9,176 multiplied times whatever multiplier the Court deems fit.

1. *Attorneys' Fees Sought by Class Counsel*

**\*28** The request by class counsel for attorneys, fees and expenses totalling $13.5 million was set forth in the Notice and was met with opposition from absent class members through letters of objection and by the two intervenors appearing at the Fairness Hearing. Class counsel filed a brief in support of the application for attorneys' fees on December 22, 1995, prior to the Fairness Hearing. Absent class members have objected to the fee request without reviewing the application and brief. one of the intervenors, Ralph Lopez, filed a post-hearing brief on January 19, 1996, withdrawing his objection to class counsel's application for attorney's fees. Mr. Lopez states that after his participation at the Fairness Hearing and after considering the testimony, exhibits, and arguments presented by class counsel at the Hearing, he agrees the fee requested "falls within the range of fees permitted in class action cases like that at bar." [37]

Concurring with Mr. Lopez and class counsel that the fees being requested were within the range of fees permitted in a class action were several expert witnesses on attorneys' fees who testified at the Fairness Hearing. These experts included: David E. Keltner, a former justice on the Texas Court of Appeals in Fort Worth, Texas and board certified in civil appellate law and personal injury law; Thomas R. McDade, a former senior partner in Fulbright & Jaworski with over thirty years of litigation experience and a Fellow of the American College of Trial Lawyers; Michael W. Perrin, a lawyer with over twenty years of litigation experience, board certified in personal injury trial law, and board certified as a civil trial specialist by the National Board of Trial Advocacy, and two experienced trial lawyers from the San Antonio area, Lawrence R. Linnartz and Rob Myers. Especially in light of the results achieved, all of these experts found the attorneys, fees and costs requested reasonable.

In making its determination of the amount of attorneys' fees to be awarded, the Court must first determine the lodestar. The first step in this calculation is to determine the "compensable hours from the attorneys' time records, including only hours reasonably expended." *Shipes v. Trinity Indus.,* 987 F.2d 311, 319 (5th Cir.), *cert. denied,* 114 S.Ct. 548 (1993). [38] Once that task is complete, the Court must then "select

Case 4:19-cv-00509 Document 65-9 Filed 07/02/21 in TXSD Page 898 of 1452
Garza v. Sporting Goods Properties, Inc., Not Reported in F.Supp. (1996)
1996 WL 56247

an appropriate hourly rate based on prevailing community standards for attorneys of similar experience in similar cases." *Id.* [39] These two numbers are then multiplied to produce the lodestar.

Based on the application, affidavits, and testimony of class counsel and attorneys' fees experts, the Court finds the appropriate hourly rate for lead counsel in this case is $350 per hour. The Court also finds the hourly rates of between $200 and $125 per hour for other counsel and associate attorneys reasonable, as are the rates of between $50 to $100 for legal assistants, paralegals, investigators, and non-secretarial support staff. [40]

**\*29** The Court has also reviewed the voluminous billing/time records submitted by each firm. The fee applicants have the burden of proving the number of hours expended in prevailing in this case are reasonable. *Von Clark v. Butler, 916 F.2d 255, 259 (5th Cir.1990).* The burden is not shifted merely because the opposing party does not show the hours to be unreasonable, or that the opposing party fails to make specific objections to the claimed hours. *Id.* The court is required to determine not only that the total hours claimed by class counsel are reasonable but must determine also that the hours were reasonably expended. *Louisiana Power & Light Co. v. Kellstrom, 50 F.3d 319, 325 (5th Cir.1995).* A court may reduce or delete hours when the documentation provided in support is "too vague to permit meaningful

review." *Id. at 326.* When applications provide the Court with little else than words such as "pleadings," "documents," or "correspondence," without stating in greater detail what job was done, the applicants take a chance the court will reject some of the time spent. In addition, some courts do not award fees for time spent in the preparation of attorneys'

Two of the firms, Mullendore, Tawney & Watt and Branton & Hall, P.C. also used law clerks in this litigation. Both firms request an hourly rate of $90 per hour. Based on the information provided to the Court, this rate is also reasonable. fees applications in common fund cases because the action benefits the attorney and not the fund. *Pawlak v. Grennawalt, 713 F.2d 972, 981 (3rd Cir.1983); Purdy v. Security Savs. & Loan Ass'n, 727 F.Supp. 1266, 1270 (E.D.Wis.1989)* (Seventh Circuit states when attorney's right to compensation depends on creation of common fund, time spent collecting fee cannot be included in compensation). [41] The Court, therefore, will reduce the total number of hours expended by lead counsel for time spent in preparing the fee application and time records in support thereof, and for vague entries such as "legal research," "correspondence," and estimations of time without any explanation. The Court has calculated a reduction of 204.25 hours.

Based on the foregoing, the following lodestar calculations are made for services rendered in this case through December 29, 1995:

| | | |
|---|---|---|
| (1) | Lead Counsel: | 5,727.25 hours x $350 per hour = $2,004,537.50 |
| (2) | Other Counsel: | 1,095.00 hours x $200 per hour = $ 219,000.00 |
| (3) | Assoc. Counsel: | 720.00 hours x $125 per hour = $ 90,000.00 |
| (4) | Assoc. Counsel: | 60.50 hours x $150 per hour = $ 9,075.00 |
| (5) | Assoc. Counsel: | 121.70 hours x $175 per hour = $ 21,297.50 |
| (6) | Law Clerks: | 152.30 hours x $90 per hour = $ 13,707.00 |
| (7) | Paralegals/Legal Assistants: | 155.70 hours x $100 per hour = $ 15,570.00 |
| (8) | Paralegals/Legal Assistants: | 1,750.00 hours x $87.50 per hour = $ 153,125.00 |

Case 4:19-cv-00509 Document 65-9 Filed 07/02/21 in TXSD Page 899 of 1452

Garza v. Sporting Goods Properties, Inc., Not Reported in F.Supp. (1996)

1996 WL 56247

(9)     Paralegals/Legal

        Assistants:                    1,983.40 hours x $85 per hour = $ 168,589.00

(10)    Paralegals/Legal

        Assistants:                    1,797.60 hours x $50 per hour = $ 89,880.00

Total Lodestar: $2,784,781.00

a. *Adjustment of the Lodestar using the Johnson Factors*

1. *Services Expended in the Past*

**\*30** Views conflict as to which of the twelve *Johnson* factors are subsumed within the calculation of the lodestar. In *Shipes v. Trinity Indus.,* 987 F.2d 311, 320 (5th Cir.), *cert. denied,* 114 S.Ct. 548 (1993), the court found four of the *Johnson* factors fully reflected in the lodestar.[42] These factors were: (1) the novelty and complexity of the issues, (2) the special skill and experience of counsel; (3) the quality of representation, and (4) the results obtained from the litigation. *Id.* However, in *Purdy v. Security Savs. & Loan Ass'n,* 727 F.Supp. 1266, 1274 (E.D.Wis.1989), the court found the "quality of representation" factors subsumed within the lodestar were: (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the skill requisite to perform the legal services properly; (4) the customary fee; (5) the amount involved and the results obtained; (6) the experience, reputation and ability of the attorneys; and (7) awards in similar cases. Use of these factors have not been foreclosed in making an upward adjustment of the lodestar if the case is rare and exceptional and "supported by both specific evidence on the record and detailed findings by the lower courts." *Shipes,* 987 F.2d at 320. Conflict among the courts also exists concerning whether the Supreme Court decision in *City of Burlington v. Dague,* 112 S.Ct. 2638 (1992), which foreclosed the use of a multiplier based on risk of loss or contingency fee in a fee-shifting case, also applies to common fund cases. In assessing the use of a multiplier/enhancer in this case, only the factors which favor an adjustment in the lodestar will be considered.

1. *Time and Labor Required*

Although the time and labor required in this case is presented in the calculation of the lodestar, there is evidence the amount of time expended was reduced significantly by the experience of counsel, in particular Jon Robinson. Prior to the filing of this suit, Mr. Robinson had been litigating the issue of barrel bursts against Remington for over 15 years. The time spent in previous cases greatly reduced the amount of time for discovery and research in the class action because counsel already had completed much of needed discovery and research. Counsel estimates approximately 10,000 hours of time were saved as a result of the prior litigation. whereas the argument has been made in other cases that the hourly rate of counsel will encompass such expertise, the Court finds the 15 years of prior experience was not a part of the reasonable hourly rate for Jon Robinson and finds his expertise exceptional—his expertise resulted in a reduced lodestar.

2. *The Novelty and Difficulty of the Questions*

From the Court's previous discussion of the case, there is no doubt this case is both novel and difficult. The novelty is found in the fact that recovery is based on warranty claims of uninjured gun owners. The Court has only found one other case in which recovery to uninjured claimants was allowed. Most other attempts in analogous cases resulted in dismissal for failure to state a claim or summary judgment in favor of the defendants. At the Fairness Hearing, Judge Keltner stated that one of the most important factors to consider in this case is the uniqueness of the litigation. Judge Keltner found it an "extraordinary effort to be undertaken by the lawyers." In addition, it was noted by counsel at the Fairness Hearing that unlike many cases involving a product, counsel did not have the benefit of a government investigation, government assistance, or a government agency's involvement in a product study or recall concerning this metal. Indeed, had an agency of the United States undertaken this litigation, the Court suspects far more taxpayer dollars would have been spent than the amount sought by class counsel as reasonable compensation.

**Garza v. Sporting Goods Properties, Inc., Not Reported in F.Supp. (1996)**

1996 WL 56247

The difficulty in plaintiffs' case was in the remedy it sought —a design change after 35 years of production.

### 3. *The Skill Requisite to Perform the Legal Services Properly.*

**\*31** Clearly, the members of class counsel assembled to represent the class are exceptional. Each member brought a special expertise to the litigation: Jon Robinson brought his 15 years of prior knowledge about the product, Jim Branton brought his expertise in products liability, the Mullendore, Tawney & Watt firm brought in their class action expertise, and Oliver Heard brought his negotiation expertise and organizational skills to the table. On the other side, defendants were represented by equally talented and experienced lawyers. Despite the formidable opposition, plaintiffs were able to work together as a team and overcome many obstacles and financial burdens in reaching a settlement. In addition, because of counsel's efforts, plaintiffs, original pleading was filed just days before E.I. DuPont's sale of its interest in Remington firearms, and therefore, the class action was listed in the final sale documents as a claim for which DuPont remained obligated.

### 4. *The Preclusion of Other Employment by the Attorney Due to the Acceptance of the Case*

The four law firms which make up class counsel are all small law firms, and class counsel are all partners of their respective firms. All attorneys have testified, either at the Fairness Hearing or through submitted affidavits, that their involvement in this case has substantially diminished, and in some cases foreclosed, the acceptance of other employment or possible business opportunities. Based on the number of hours expended by counsel and their support staff, no doubt remains that cases were not accepted because of this ongoing litigation, especially cases which demanded immediate attention. In addition, the matter has been a financial burden on class counsel who have been advancing tens of thousands of dollars in necessary costs and expenses with no guarantee those funds would ever be reimbursed.

### 5. *The Customary Fee*

This case was taken on a purely contingency fee basis, and as testified to at the Fairness Hearing, some of the attorneys involved usually base their fees on a contingency fee basis rather than an hourly rate. The contingency fee system "permits a greater recovery for successful cases, thereby rewarding their investment in successes and offsetting the losses from unsuccessful cases." *In re Shell Oil Refinery,* 155 F.R.D. 552, 571 (E.D.La.1993). The customary contingency fee ranges from 33 1/3% to 40%. *Id.* This Court concurs that 33 1/3% to 40% is the customary contingency fee range.

### 6. *Whether the Fee is Fixed or Contingent*

Adjustment of the lodestar to "reflect other factors such as the contingent nature of suit and the quality of representation" was recognized by the Fifth Circuit in *Graves v. Barnes,* 700 F.2d 220, 222 (5th Cir.1983). Since that decision, the Supreme Court decided that enhancement of the lodestar based on the contingent nature of the fee is not permitted in feepshifting statutes. *City of Burlington v. Dague,* 112 S.Ct. 2638 (1992). Some district courts have applied the *Dague* ban on contingency fee enhancers in common fund cases as well. *Nensel v. Peoples Heritage Fin. Group,* 815 F.Supp. 26, 29–30 (D.Me.1993); *In re Bolar Pharmaceutical Co. Secs. Litig.,* 800 F.Supp. 1091, 1095–96 (E.D.N.Y.1992). However, courts of appeal deciding the issue have held *Dague* does not apply to common or class action settlement fund cases. *Florin v. NationsBank,* 34 F.3d 560 (7th Cir.1994); *Rawlings v. Prudential–Bache Props., Inc.,* 9 F.3d 513 (6th Cir.1993); *Swedish Hosp. Corp. v. Shalala,* 1 F.3d 1261 (D.C.Cir.1993) Although the Fifth Circuit did not address *Dague* in a decision rendered after the Supreme Court's decision, the Fifth Circuit did reiterate that adjustment of the lodestar includes the ten *Johnson* factors. *Longden v. Sunderman,* 979 F.2d 1095, 1099 n. 10 (5th Cir.1992) Therefore, this Court will consider the contingency factor.

**\*32** As the Seventh Circuit has recognized:

> [W]hen attorneys, receipt of payment is contingent on the success of the litigation, reasonable compensation may demand more than the hourly rate multiplied by the hours worked, for that is exactly what the attorneys would have earned from clients who

1996 WL 56247

agreed to pay for services regardless of success. Thus to account for the contingent nature of the compensation, a court should assess the riskiness of litigation.

*Skelton v. General Motors Corp.,* 860 F.2d 250, 258 (7th Cir.1988) One court has suggested a standard risk multiplier of 2 should be used in all contingent fee arrangements. *Id.* Another court has set forth a risk-enhancement factor mathematical equation.[43] *In re McDonnell Douglas Equip. Leasing Secs. Litig.,* 842 F.Supp. 733, 741 (S.D.N.Y.1994).

From its inception, class counsel took substantial risk in pursuing the litigation because of the novelty of seeking recovery for a class of uninjured shotgun owners. Not only did counsel seek monetary compensation, they also undertook the challenge of persuading the manufacturer to change the steel in a product which had been manufactured for 35 years. As in all contingency fee cases, counsel for the past two-and-one-half years have received no funds from the class to pay for work performed or expenses incurred. Given the complex legal and factual issues confronting counsel as discussed throughout this opinion, class counsel undertook a considerable risk with no guarantee any fees or expenses would ever be recovered. Under the risk-enhancement factor mathematical equation, a multiplier of two would be applicable.

### 7. *The Amount Involved and the Results Obtained*

Here, the settlement involves not only a monetary fund but most importantly a change in the barrel steel and a notice and warning campaign. It was the extraordinary results obtained by the settlement that stood out the most in the mind of attorney's fees expert Tom McDade. At the Fairness Hearing, Mr. McDade quoted from the *Graves v. Barnes* decision in which Circuit Judge Thornberry wrote:

The result obtained by verdict or settlement, evaluated in terms of (a) the potential money damages available to the class member, i.e. a comparison of the extent of possible recovery with the amount of actual verdict or settlement; (b) the benefit—monetary or non-monetary—conferred on the class, i.e. permitting the court "to recognize and reward

achievements of a particularly resourceful attorney who secures a substantial benefit for his clients with a minimum of time invested.

*Graves,* 700 F.2d at 223. According to Mr. McDade, the key to this class action is the result obtained. This result, when taken together with the economic value of the settlement as testified to by Dr. Kavoussi, shows just how substantial and beneficial the recovery is.

Notwithstanding that plaintiffs initially sought monetary damages to cover the full replacement cost of all barrels and additional exemplary damages, plaintiffs as well as the Court recognize there was little if any likelihood of achieving that goal. Thus, the failure to recover such additional monetary compensation does not detract from the extraordinary success achieved. This finding is based in part on the fact that most barrels have not failed; barrel inspections may identify most barrels which are at risk; production capacity prevents full barrel replacement in less than ten or twelve years; and full replacement is not necessarily the proper measure of damages where: (1) the owner has enjoyed the benefit of use of the product for many years; (2) the product has suffered some depreciation; (3) the product has been subjected to some wear and tear through usage; and (4) the relatively small number of bursts would result in unreasonable economic waste to set damages at replacement cost.

### 8. *The Experience, Reputation, and Ability of the Attorneys*

**\*33** The experience, excellent reputation and abilities of class counsel is without question. Moreover, class counsel was opposed by a formidable defense team. The skill of each team was observed and complimented by this Court. In particular, the Court recognizes the exceptional and invaluable experience brought to class counsel by Jon Robinson. As set forth in Mr. Robinson's affidavit, since 1978, a significant part of his law practice has been spent representing individuals who had suffered personal injuries as a result of a 12–gauge Remington shotgun barrel burst. He has spent more than 10,800 hours working on litigation of personal injury cases involving Remington shotguns and at least 1,440 of these hours were never compensated. Numerous hours were saved in the class action litigation because of the hours previously expended by Mr. Robinson in the litigation of the personal injury cases. Only about 10% of the time spent on the personal injury cases was spent on medical issues. Mr. Robinson has also expended hundreds

Case 4:19-cv-00509   Document 65-9   Filed 07/02/21 in TXSD   Page 902 of 1452

Garza v. Sporting Goods Properties, Inc., Not Reported in F.Supp. (1996)

1996 WL 56247

of hours reviewing and analyzing over 200,000 pages of new discovery material from Remington and DuPont, many of these hours were not recorded. Without question, Mr. Robinson brings to the class counsel team experience in excess of the $350 hourly rate.

### 9. *The "Undesirability" of the Case*

Factors already discussed, such as the financial burden on counsel and the demands of handling a class action of the size and complexity as set forth, may cause a case to be considered "undesirable." *In re Shell Oil Refinery,* 155 F.R.D. 552, 572 (E.D.La.1993) However, one attorney's fee expert, Michael Perrin, suggested to this Court that taking on this type of litigation against major corporations where the prospective relief involves decisions by corporate management at a high level is as intimidating a legal task as someone can take. According to Mr. Perrin, "[i]t is not even on the radar screen of most lawyers, in terms of the commitment they can make."

In view of the task undertaken, he deemed the settlement "remarkable."

### 10. *Awards in Similar Cases*

Although this Court could not find cases "similar" to this action, the average range of multipliers applied to other class actions is from 1.0 to 4.5. The range of multipliers in large and complicated class actions have ranged from 2.26 to 4.5. *In re Unisys Corp. Retiree Med. Benefits ERISA Litig.,* 886 F. Supp 445, 481–82 (E.D.Pa.1995).

Therefore, based on the foregoing discussion and analysis, the Court find a multiplier of 4 shall be applied to hours expended by Jon Robinson and his staff [44], a multiplier of 3.25 shall be applied to the hours expended by the remaining lead counsel, other counsel and support staff. The calculations are as follows:

| | | |
|---|---|---|
| 1. | Jon Robinson: | 2,125 hours x $350 = $743,750 x 4 = $ 2,975,000 |
| 2. | Robinson's Staff: | total lodestar of $238,475 x 4 = $ $953,900 |
| 3. | Remaining Lead Counsel: | 3,602.25 hours x $350 = $1,260,787.5 x 3.25 = $ 4,097,559.38 |
| 4. | All other Staff: | total lodestar of $541,768.50 x 3.25 = $ 1,706,747.63 |

Total Amount for Services Rendered: $9,733,207.01

### 2. *Services to be Expended in the Future*

**\*34** Class counsel has also requested attorneys, fees for time to be expended from December 29, 1995 (the date of the Fairness Hearing) through December 30, 1996. Although a multiplier of at least 4 was requested, this Court finds that because the contingency of the case is no longer at issue, counsel has been compensated for the substantial risk undertaken. Because class counsel will continue to shoulder significant responsibility for class members in the future until the settlement is consummated, a multiplier of 1.742 will be applied to all future hours to be expended. The Court has reviewed the amount of future time requested and finds the hours to be reasonable. Accordingly, the sum of $1,588,146 will be multiplied by 1.742 for a total of $2,766,550.33 to be awarded for future services. The total amount to be awarded to class counsel for services rendered and to be rendered in this litigation is rounded to $12,500,000.

The Court has also considered class counsel Is request for past and future expenses. The total sum expended as of December 29, 1995, is $91,937.77. Counsel has estimated future expenses to total $76,227.86. However, this Court finds the $91,927.77 and the $76,227.86 are underestimations of the amounts incurred and to be incurred. This finding is based in part on the Court's firsthand knowledge of the amount of correspondence and telephonic communications this class action has generated and will continue to generate. Therefore, the Court awards class counsel the sum of $300,000 for past and future expenses. [45]

Garza v. Sporting Goods Properties, Inc., Not Reported in F.Supp. (1996)

1996 WL 56247

#### 2. *Attorney's Fees and Expenses Sought by Intervenor Pennsylvania*

In its application for attorney's fees and expenses, Pennsylvania seeks reimbursement for travel expenses in the amount of $1,437.87 and attorney's fees in the amount of $67,760 (Pennsylvania seeks $16,940 in attorney's fees plus a multiplier of 4). The Court has reviewed the expense summary provided and agrees Pennsylvania should be compensated for its incurred expenses, particularly in light of the institutional representation Pennsylvania brought to this litigation.

The Court has also reviewed Pennsylvania's request for attorney's fees and the attached affidavits of all attorneys and experts involved in Pennsylvania's intervention. The Court finds the amount of time expended reasonable. However, upon review of the credentials of both Sarah B. Vandenbraak

and Syndi L. Guido, the Court finds the reasonable rate of compensation for these attorneys to be the same as lead counsel in this case—$350 per hour. The Court does not find, however, that Pennsylvania should receive the same multiplier as applied to class counsel who have organized and led this effort from its inception.

Recognizing that Pennsylvania intervened shortly before the Fairness Hearing, counsel worked under substantial time limitations imposed by the circumstances to brief fully the issues facing the institutional shotgun owners and provided the Court with insightful and helpful information at the Fairness Hearing. Therefore, a multiplier of 3 will be applied to the lodestar figure with respect to Sarah Vandenbraak and Syndi Guido. The Court also recognizes the abilities, expertise and time constraints imposed on other members of the Pennsylvania staff, and awards a multiplier of 1.75. Accordingly, the Commonwealth of Pennsylvania is awarded the following:

| | | |
|---|---|---|
| 1. | Travel and related expenses: | $ 1,437.87 |
| 2. | Attorney's fees for Sarah Vandenbraak: | $350 per hour x 25.1 hours x 3 = $26,355.00 |
| 3. | Attorney's fees for Syndi L. Guido: | $350 per hour x 6.5 hours x 3 = $ 6,825.00 |
| 4. | Attorney's fees and expert fees: | $7760 x 1.75 = $13,580.00 [46] |

**\*35** Accordingly, Pennsylvania is awarded the rounded total sum of $50,000.

#### 3. *Attorney's Fees Sought by Intervenor Ralph Lolpez*

Also reviewed was the application for attorney's fees submitted by intervenor Ralph Lopez. Mr. Lopez is an attorney licensed to practice before this Court and represented himself in this litigation. Mr. Lopez has requested compensation for 49.6 hours at a rate of $85 per hour.

The Court finds an award of attorney's fees to Mr. Lopez would require an award of attorney's fees to all class members who filed objections to class counsel's request for attorney's fees. Many class members articulated their complaints and provided the Court with legal research as well. Some of these

correspondents are attorneys; many of these class members are not attorneys. Therefore, as guardian of the common fund on behalf of all class members, the Court does not find Mr. Lopez's intervention benefitted the class to the extent that he be awarded attorney's fees. The Court thanks Mr. Lopez for his time and input at the Fairness Hearing. However, his request for attorney's fees is denied.

#### 4. *Request for Compensation for Named Plaintiffs*

The named plaintiffs, who have given depositions, attended mediation sessions, made court appearances, or performed other services for the benefit of the class, have made a request for additional compensation for time spent. These plaintiffs have submitted records of their time to the Court. Upon review, the Court finds the time spent fair and

Case 4:19-cv-00509   Document 65-9   Filed 07/02/21 in TXSD   Page 904 of 1452

Garza v. Sporting Goods Properties, Inc., Not Reported in F.Supp. (1996)
1996 WL 56247

reasonable. In addition to these class members, an additional 105 plaintiffs were named at a later date. These parties did not have to devote as much extra time to the litigation as the original named plaintiffs but have given time and their name to the litigation as well. The Court finds these plaintiffs should receive additional compensation for their efforts. Accordingly, it is hereby ORDERED that the sum of $150,000 is set aside for the named plaintiffs. Should some of the named plaintiffs not want additional remuneration, their portion of the $150,000 shall be returned to the class fund.

### IV. *CONCLUSION*

Based on the foregoing discussion and the Court's Findings of Fact and Conclusions of Law Regarding Fairness of Class Action Settlement rendered therein,

IT IS HEREBY ORDERED that:

A. The settlement as evidenced by the parties' Stipulation of Settlement, dated as of August 21, 1995, (the "Stipulation") is hereby determined to be fair, reasonable and adequate, and the parties are directed to comply with and consummate its terms.

B. Notice of the Settlement to potential Settlement Class members, given in the form and manner provided in this Court's Order of August 31, 1995, is hereby determined to have constituted the most effective and practicable notice under the circumstances of the pendency of the class action, proposed Settlement and Settlement Hearing. This notice fairly and reasonably advised potential class members of their rights under the Settlement and constituted due and sufficient notice for all other purposes to persons entitled to receive notice required by due process and Rule 23 of the Federal Rules of Civil Procedure.

 **\*36** C. The notice of Settlement advised members of Class, *inter alia,* of their right to exclude themselves from the Settlement Class. A total of three hundred fifty-three persons or institutions have submitted valid and timely requests for exclusion pursuant to the terms and procedures of the Notice of Proposed Settlement and Settlement Hearing of Class Action. Those persons are listed on Attachment A hereto and are not bound by this judgment.

D. Defendants and Defendants, present and former officers, directors, agents, consultants, attorneys, accountants, insurers, reinsurers, personal representatives, distributors, resellers, spouses, issues, heirs, executors, successors, assigns, parent corporations, subsidiaries, divisions and affiliates, trusts, or entities controlled by them, and all other persons and entities whether herein named or not (the "Released Parties") are forever discharged and released from any claims, causes of action, damages, and liabilities of any kind, nature and character whatsoever in law, equity, or otherwise, known or unknown, suspected or unsuspected, that now exist, may come to exist, or heretofore existed, arising out of, related to, connected with, or based in whole or in part on the use of 1140M Steel (including, without limitation, claims relating to the design and/or manufacture of barrels, the selection of 1140M Steel and the adequacy of warnings provided) in the barrels of Shotguns owned, used or possessed by Settlement Class members, or on the matters set forth in the Action; and any and all other claims and causes of action that have been or could be asserted by named plaintiffs and or Settlement Class members in this or any other action or forum by reason of, or that relate in any way to, any of these matters; *provided, however,* that any lawsuits or claims, that Settlement Class members have, have had, or may have, whether brought formally, administratively or informally, alleging personal injury and/or wrongful death (as well as claims derivative thereto, including but not limited to, claims for loss of consortium), allegedly arising out of barrel bursts involving Shotguns shall *not* be released or compromised by the Settlement, regardless of whether such claims are based on negligence, warranty, strict products liability, or any other cause of action or theory of recovery, *except,* however, for claims for mental anguish or emotional distress where such claims are made in the absence of actual physical injury, or are based solely on Shotgun ownership.

E. The Court hereby approves the plan for distributing the Payment Pool defined in the Stipulation to Settlement Class members and approves as reasonable fees and reimbursable costs of Class Counsel the amount of $12,800,000.

F. The Court hereby approves as reasonable fees and reimbursable costs of Pennsylvania the amount of $50,000, and approves compensation to the named plaintiffs in the amount of $150,000.

G. The Settlement Agreement is and shall be binding on all members of the Settlement Class, which shall not include persons listed on Attachment A.

Case 4:19-cv-00509 Document 65-9 Filed 07/02/21 in TXSD Page 905 of 1452

**Garza v. Sporting Goods Properties, Inc., Not Reported in F.Supp. (1996)**

1996 WL 56247

**\*37** H. All claims of Plaintiffs and Settlement Class members in this action are dismissed on the merits and with prejudice, except for those persons who timely requested exclusion from the Class, who are listed on Attachment A hereto, without costs to any party except as provided in the Settlement Agreement.

I. If Settlement does not become Final in accordance with the terms of the Stipulation, then this Final Judgment shall be rendered null and void and shall be vacated and, in such event, all orders entered in connection therewith shall be vacated and rendered null and void.

J. This Final Judgment, the Stipulation, or the Settlement, and all documents relating thereto, are not, and shall not be construed as, an admission or indication by Defendants of the validity of any claims in this Action or of any liability or wrongdoing by any of them or of any violation of law; the Final Judgment, Stipulation, and Settlement, and any related documents, are not a concession and shall not in any way be used as an admission or indication with respect to any claim of any wrongdoing, fault, or omission by Defendants or any other person in connection with any transaction or occurrence or any statement, release, or written document issued, filed, or made; and this Final Judgment, the Stipulation, the Settlement, and any related document, proceeding, action, or any reports or accounts thereof, shall not be offered or received in evidence in any civil, criminal, or administrative action or proceeding, *except* as expressly set forth in the Stipulation.

K. The Court expressly retains continuing and exclusive jurisdiction over the parties hereto, including all members of the Settlement Class, and over the matters set forth in this Stipulation, including the administration and enforcement of the Settlement, and any other appropriate or necessary purpose, and the Court reserves the power to protect and effectuate this Order and Final Judgment and to enter such orders as may be necessary in aid of its continuing jurisdiction.

ORDERED, SIGNED AND ENTERED this 6th day of February, 1996.

**ATTACHMENT A**

**Garza Timely Opt Outs**

| Last Name | First Name | Address | Phone # | # Guns | Serial #s |
|---|---|---|---|---|---|
| Aikler | Christopher F. | 256 Washington Boulevard, Unit #13 Stamford, CT 06902 | | 1 | PC398370 |
| Allman | John W. | 341 S. Burns Ave., Apt. #1 Winchester, KY 40391 | (606) 744–9024 | 1 | B025103M |
| Amerson | Tony W. | 6311 Washington | (706) 465–2894 | 1 | V920038V |

1996 WL 56247

| | | Hwy NE Norwood, GA 30821 | | | |
|---|---|---|---|---|---|
| Anderson | Barry Curtis | 6026 Sparrow Street Venture, CA 93003 | (805) 650–0480 | 1 | A906171M |
| Anderson | George H. | Box 34 Crosby, ND 58730 | (701) 965–6164 | 1 | A475353M |
| Anthony | Mel | 11059 St. Mary's Rd Brookville, IN 47017 | | 1 | PC463568 |
| Archer, Jr. | Douglas E. | 116 Hold Rd. Albemarle, NC 28001 | (704) 983–1061 | 1 | X293075M |
| Artner | Marcus M. | 1319 N. Ridge Road McHenry, IL 60050 | (815) 385–4545 | 1 | X090425M |
| Aslakson | Loren J. | 5727 Syers Rd. Holton, MI 49425 | | | |
| Bachman | Richard N. | 5434 Cecelia Court Cincinnati, OH | (513) 661–5583 | 1 | A670490M |
| Baker | William C. | 6505 Mercer St. Houston, TX 77005 | | 2 | PC356607 PC356051 |
| Balogh | Robert G. | 528 Bradley Rd. Bay Village, OH | | 2 | 1040090V W750743M |

**Garza v. Sporting Goods Properties, Inc., Not Reported in F.Supp. (1996)**

1996 WL 56247

| | | | | | |
|---|---|---|---|---|---|
| | | 44140 | | | |
| Barwin | Karl F. | 1792 Rainbow St. Mora, MN 55051–7210 | (612) 679–1886 | 2 | W381457M |
| Bauer | William C. | 23087 Purdue Farmington Hills, Mi 48336 | (810) 471–3034 | 1 | A008949M |
| Beard | Alden G. | P.O. Box 85 Elliston, MT 59728 | (406) 492–6590 | 1 | W777018M |
| Bedel | Jason R. | 419 Market Place Norfolk, NE 68701 | (402) 371–7004 | 1 | A368089M |
| Bell | Allen E. | 263 S. Park St. Ext. Sykesville, PA 15865–1405 | (814) 894–5266 | 2 | P197003M 279368V |
| Benedict | Richard H. | 4 Wentworth Drive Billerica, MA 01821–3744 | (508) 667–2095 | 1 | PC392347 |
| Berdahl | Timothy James | 9400 Oak Drive Bismarck, ND 58501 | (701) 258–5836 | 1 | P076064V |
| Berg | Jeffrey T. | 5868 Bridgeport Lake Way San Jose, CA | (408) 997–8631 (408) 295–5446 | 1 | X06800M |

WESTLAW   © 2021 Thomson Reuters. No claim to original U.S. Government Works.

1996 WL 56247

| | | | | | |
|---|---|---|---|---|---|
| | | 95123 | | | |
| Bickel | Donald W. | 35 Ln. 590 Lk. James Fremont, IN 46737 | (219) 833–2361 | 2 | S715059M PC258908 |
| Biehl | Roger | 6214 Charity Dr. Cincinnati, OH 45248 | | 1 | W155018M |
| Biltz (Kolenic) | Anne M. | 18580 Shaw Rd. Hiram, OH 44234 | (216) 834–8351 | 1 | B068154M |
| Black | Paul E. | 494 County Road 68 Chesapeake, OH 45619 | (614) 867–3889 | 1 | T64864V |
| Black | Theodore A. | 606 16th Ave. N Myrtle Beach, SC 29577–3501 | | 4 | |
| Blackwell | Charles H. | 7579 Hardy Avenue Rancho Cucamonga, CA 91730 | (909) 948–3032 | 1 | PC379046 |
| Boatwright | Joshua T. | 4400 Horizon Hill Blvd. #1505 San Antonio, TX 78229 | (210) 341–3646 | 1 | PC23020 |
| Bodner | Ronald D. | 10400 Silver Spur Dr. Reno, NV 89506 | (702) 677–0551 | 1 | W720713M |

1996 WL 56247

| | | | | | |
|---|---|---|---|---|---|
| Bontrager | Randel G. | 3066 N. 500E<br><br>Kokomo, IN 46901 | (317) 459–5366 | 1 | A108561M |
| Bontrager | Timothy A. | 3066 N. 500E<br><br>Kokomo, IN 46901 | (317) 459–5366 | 1 | A109815M |
| Bootsma | Daniel J. | 220 W. Taylor Rd<br><br>Lombard, IL 60148 | | 1 | W98—5562M |
| Box | Roy A. | Professional Plaza<br><br>Suite A–102<br><br>9309 Glacier Hwy<br><br>Juneau, AK 99801 | | | |
| Boyd | Matthew J. | 3794 W. 50 S<br><br>Kimmell, IN 46760 | (219) 635–2418 | 1 | X062278M |
| Brasier | James E. | 415 Price Lane<br><br>Clinton, MO 64735 | (816) 885–6590 | 2 | PC271836 |
| Brees | Mike | 4883 Baxter Rd.<br><br>Rockford, IL<br><br>61109 | (815) 874–4403 | | |
| Breitenbach | Thomas | 14037 Trick Rd.<br><br>Delton, MI 49046 | (616) 385–1010<br><br>(616) 671–4868 | 2 | A632894M<br><br>V946733V |
| Brewer | Aaron | 1105 Wisconsin<br><br>Pine Bluff, AR<br><br>77601 | (501) 535–5643<br><br>(501) 535–1616 | 2 | W556526M<br><br>M017438M |
| Bright | Dennis C. | Rr. #66 Box 15–A<br><br>Corley, WV 26621 | (304) 765–7747 | 4 | B285615M<br><br>S612885V |

 © 2021 Thomson Reuters. No claim to original U.S. Government Works.

Case 4:19-cv-00509 Document 65-9 Filed 07/02/21 in TXSD Page 910 of 1452
Garza v. Sporting Goods Properties, Inc., Not Reported in F.Supp. (1996)
1996 WL 56247

| | | | | | A042506M |
|---|---|---|---|---|---|
| | | | | | PC335387 |
| Brinson, III | William C. | P.O. Box 585 | (334) 864–9303 | 4 | N111863V |
| | | 16–326 Veterans | (334) 864–8316 | | N226757M |
| | | Memorial Pkwy | | | M88134?V |
| | | LaFayette, AL | | | PC104409 |
| | | 36862 | | | |
| Brooks | K.D. | P.O. Box 110 | (615) 587–3300 | 3 | A375363U |
| | | Morristown, TN | | | N774360V |
| | | 37815–0110 | | | PC414282 |
| Brooks | Joseph E. | 4263 Dorsey Ct. | (770) 921–5312 | 1 | PC070347 |
| | | Lilburn, GA 30247 | | | |
| Brown | Rita Kay | 13215 63rd Ave. | (319) 381–3148 | 2 | W892057M |
| | | and Blue Grass, IA | | | V527346V |
| | Ricky Dean | 52726 | | | |
| Brown | Randy S. | 10779 North Road | | 1 | 53928M |
| | | Perrysburg, NY | | | |
| | | 14129 | | | |
| Brown | Michael S. | 3407 Brown Rd. | (864) 895–5851 | 1 | X233642M |
| | | Greer, SC 29651– | | | |
| | | 8498 | | | |
| Brummett | Teddy W. | P.O. Box 43 | (913) 535–4774 | 1 | P0445112 |
| | | Emmett, KS 66422 | | | |
| Bryant | Randy | 3048 Edgemont Dr. | (615) 889–5188 | 1 | A654759M |
| | | Nashville, TN | | | |

Case 4:19-cv-00509 Document 65-9 Filed 07/02/21 in TXSD Page 911 of 1452

**Garza v. Sporting Goods Properties, Inc., Not Reported in F.Supp. (1996)**

1996 WL 56247

| | | | | | |
|---|---|---|---|---|---|
| | | 37214 | | | |
| Burnett | Karen | P.O. Box 218<br>Palmer, TN 37365 | | 1 | A481406M |
| Cadle, Jr. | Earl B. | 232 E. Walnut St.<br>Sedalia, MO 65301 | (816) 827–2384 | 1 | A692857M |
| Calley | Patrick M. | 5119 Grover St.<br>Boise, ID 83705 | (208) 344–8784 | 1 | A427291M |
| Camp | S. Lowry | 702 N.E. 95th St.<br>Miami, FL 33138 | (305) 751–1841 | 3 | 5818424V<br>T279779V<br>PC256955 |
| Camp | Morris W. | 10203 State Route<br>1241<br>Booz, KY 42027 | (502) 856–3818 | 2 | B233278M<br>A695057M |
| Cantrell | Capt.<br>William A. | General Delivery<br>Malmstrom AFB, MT<br>59402 | (406) 731–6063 | 1 | PC038933 |
| Cantrell | Delano<br>Brown | 171 Golden Pond<br>Drive<br>Lexington, SC<br>29073–7538 | | 1 | W638291M |
| Caparros | Dana J. | 103 Zachary Drive<br>Lockport, LA<br>70374 | (504) 693–4130 | 2 | A5076714<br>P045463M |
| Carpenter | Benford | 746 Lucille Ave.<br>Painesville, OH | | | |

WESTLAW © 2021 Thomson Reuters. No claim to original U.S. Government Works.

**Garza v. Sporting Goods Properties, Inc., Not Reported in F.Supp. (1996)**

1996 WL 56247

| | | | | | |
|---|---|---|---|---|---|
| | | 44077 | | | |
| Carter | Kenneth E. | 308 Barr Ave. Jerseyville, IL 62052 | | 2 | A341304M A806231M |
| Casperson | Tim | 1415 Dolen Place Iowa City, IA 52246 | (319) 338–9131 | 1 | 878280V |
| Cavanagh | Roland R. | 25 Main St. Chico, CA 95928 | (916) 342–7511 | 1 | PC145098 |
| Cave | Rexford D. | 1007 Country Club Court Washington Court House, OH 43160– 1859 | (614) 335–7055 | 2 | A902122M B406450M |
| Chan | Bill S. | 1401 Fallen Leaf Lane Los Altos, CA 94024–5810 | (415) 964–8379 | 1 | A827055M |
| Cheplick, Jr. | Thomas H. | Box 326 2054 Main Street Claridge, PA 15623 | (412) 744–0418 | 2 | A957340M PC003090 |
| Chesney | John T. | 1924 Alcoa Hwy Knoxville, TN 37919 | (615) 544–9220 | 1 | PC052286 |

Case 4:19-cv-00509   Document 65-9   Filed 07/02/21 in TXSD   Page 913 of 1452

**Garza v. Sporting Goods Properties, Inc., Not Reported in F.Supp. (1996)**

1996 WL 56247

| Chesshir | Wm. D. | P.O. Box 193 Saratoga, AR 71859 | (501) 388–9240 | 1 | A632640M |
| Chesson | Stephen J. | Rt. 1 Box 32–H Call, TX 75933 | (409) 423–3357 | 1 | W655384M |
| Clowminzer | Walter E. | 5439 Prescott Road Utica, N.Y. 13502– 2007 | (315) 724–3747 | 1 | W953618M |
| Cockrum | James D. | 3505 Pine Cone Circle Louisville, KY 40241 | (502) 339–7881 | 1 | PC294065 |
| Combs | Terry G. | P.O. Box 842 Proctorville, OH 45669 | (614) 886–7375 | 1 | W191097V |
| Cotoggio | Thomas J. | 41–10 Bowne Street, Apt. 2H Flushing, NY 11355 | (718) 539–6276 | 2 | T908013 PC027374 |
| Cowan | Cy | 1106 Chisum Artesia, NM 88210 | (505) 748–4372 | 1 | W815378M |
| Crafts | Marshall R. | 20 Sias Lane Spencerport, NY 14559 | (716) 352–8014 | 1 | X191137M |
| Cronin | Roy E. | P.O. Box 131 | (812) 925–6730 | 1 | P152820V |

Case 4:19-cv-00509 Document 65-9 Filed 07/02/21 in TXSD Page 914 of 1452
Garza v. Sporting Goods Properties, Inc., Not Reported in F.Supp. (1996)
1996 WL 56247

|  |  |  |  |  |  |
|---|---|---|---|---|---|
|  |  | 432 W. Maple | (812) 925–3571 |  |  |
|  |  | Chandler, IN |  |  |  |
|  |  | 47610 |  |  |  |
| Dalton | Joseph | 551 Epperson Rd. | (423) 261–2324 | 1 | B123172M |
|  |  | Tellico Plains, TN |  |  |  |
|  |  | 37385 |  |  |  |
| Dammon | Robert L. | 3010 So. 27th St. | (608) 788–1499 | 1 | PC127601 |
|  |  | LaCrosse, WI |  |  |  |
|  |  | 54601 |  |  |  |
| Davis | Lawrence E. | Rt. 1, Box 4532 | (706) 846–9139 | 1 | PC263544 |
|  |  | Murrayville, GA |  |  |  |
|  |  | 30564 |  |  |  |
| DeBerry | Brett | RR6 B125 | (901) 925–9436 | 1 | A618936M |
|  |  | Savannah, TN |  |  |  |
|  |  | 38372 |  |  |  |
| Dennison | Jim | 12731 Daily Dr. | (810) 739–9563 | 1 | A211830M |
|  |  | Sterling Hts., MI |  |  |  |
|  |  | 48313 |  |  |  |
| Denton, Jr. | Robert F. | P.O. Box 3206 | (909) 337–5548 | 1 | M609833V |
|  |  | Blue Jay, CA 92317 |  |  |  |
| Doiel | Michael | 706 4th Street | (712) 623–3408 | 1 | V127206 |
|  |  | Red Oak, IA 51566 |  |  |  |
| Dutour | William J. | 8111 Long Shadow | (803) 553–9131 | 1 | A437377M |
|  |  | Lane |  |  |  |
|  |  | N. Charleston, SC |  |  |  |

1996 WL 56247

| | | 29406–9742 | | | |
|---|---|---|---|---|---|
| Ebberts | Steven R. | 428 Topeka Ave. | (913) 828–3653 | 1 | PC419852 |
| | | Box 622 | (816)756–1060 | | |
| | | Lyndon, Kansas | | | |
| | | 66451 | | | |
| Edington | Danny R. | 1834 E 200 Road | (913) 887–6159 | 1 | PC428998 |
| | | Lecompton, KS | (913) 296–2291 | | |
| | | 66050 | | | |
| Eicher | Loren | RR3 Box 324 | | 1 | W585809M |
| | | Loogootee, IN | | | |
| | | 42553 | | | |
| Ellison | Robert O. | P.O. Box 245 | (901) 247–5604 | 1 | X104098M |
| | | Puryear, TN 38251 | | | |
| Erler | Gregg | 1120 McCammon Ave. | (612) 459–5102 | 1 | A995852M |
| | | St. Paul Park, MN | | | |
| | | 55071 | | | |
| Etzkorn | Gary L. | 22715 Elsinore | (713) 392–9470 | 1 | PC402839 |
| | | Katy, TX 77450 | | | |
| Fellers | Mark W. | 126 Tilford Rd. | (412) 793–5398 | 1 | A691481M |
| | | Pittsburgh, PA | | | |
| | | 15235 | | | |
| Fisk | Richard L. | 710 25th St. S.E. | (319) 362–4539 | 1 | V438310M |
| | | Cedar Rapids, IA | | | |
| | | 52403 | | | |
| Floyd | Cheyord | 250 Erbacon Road | (304) 765–2466 | 2 | B133308M |

Case 4:19-cv-00509    Document 65-9    Filed 07/02/21 in TXSD    Page 916 of 1452
**Garza v. Sporting Goods Properties, Inc., Not Reported in F.Supp. (1996)**

1996 WL 56247

| | Darlene | Sutton WV 26601 | | | M618195V |
|---|---|---|---|---|---|
| Fourtner | James R. | 480 Palisade Dr. Roseburg, OR 97470 | (514) 673–1783 | 2 | PC315957 P049587M |
| Fox | Edward | 30228 E. 2800 North Rd. Dwight, IL 60420 | (815) 567–3367 | 4 | N945441V N898716M D4826724 522597V |
| Freels | Charles | 23060 David St. Eastpointe, MI 48021 | (810) 778–5902 | 1 | W911848M |
| Freouf | Duane | 2233 S. 54th St. W. Billings, MT 59106 | | | |
| Frey | E.M. | 4876 Griswold Road Kimball, MI 48074 | (810) 982–7508 | 1 | PC453204 |
| Fullerton, Jr. | Albert E. | 5179 Bethel Rd. Fountain City, IN 47341 | (317) 966–4000 | 1 | A608060M |
| Gales | Larry | E1294 545th Ave. Menomonie, WI 54751 | (715) 235–4433 | 1 | W781131M |
| German | Martin W. | 317 Osborne Ave. Baltimore, MD 21228 | (410) 788–4506 (301) 474–0806 | 1 | PC264083 |

**Garza v. Sporting Goods Properties, Inc., Not Reported in F.Supp. (1996)**

1996 WL 56247

| | | | | | |
|---|---|---|---|---|---|
| Gibson | William R. | 194 Plum Grove Road<br>Roselle, IL 60172 | (708) 893–4888 | 3 | 108252V<br>N071945V<br>OU45356 |
| Gillette | Gary L. | P.O. Box 266<br>Galesburg, MI 49053 | (616) 385–6783 | 1 | PC210573 |
| Gilstrap | James C. | 5067 Shore Dr.<br>Carlsbad, CA 92008 | (619) 431–6900 | 4 | PC052733<br>PC032325<br>[2 model 32; serial nos. not given] |
| Grant | David P. | 1130A Poplar St.<br>West End, WI 53095 | (414) 337–0766 | 1 | A981594M |
| Green | Jeffery P. | 339 W. North St.<br>Smyrna, DE 19977 | (302) 653–5453 | 2 | S166057M<br>[illegible] |
| Grunklee | Norman H. | 3647 Kosec Dr.<br>Red Wing, MN 55066 | (612) 388–7261 | 2 | 352022V<br>A381453M |
| Guion, Sr. | Robert J. | P.O. Box 11<br>Benton, MS 39039 | (601) 673–9711 | 2 | W610788M<br>T159421V |
| Guminski | Timothy J. | 08921 CR689<br>South Haven, MI | (616) 637–9284 | 1 | A283944M |

1996 WL 56247

|  |  | 49090 |  |  |  |
|---|---|---|---|---|---|
| Hagge | Robert B. | 11533 Garfield Way<br>Thornton, CO<br>80233 | (303) 452–4074 | 2 | P253671V<br>PC024988 |
| Hall | C.R. | 6228 E. University<br>Dallas, TX 75214–<br>2138 | (214) 691–5164 | 1 | X105888M |
| Hall | Larry Gail | 133 Westland Est.<br>Winfield, WV<br>25213 | (304) 586–9657 | 1 | L249424V |
| Hall, Sr. | Donald K. | 461 Northwood<br>Drive<br>Guilford, CT 06437 | (203) 288–1671<br>(203) 457–0492 | 1 | PC478589 |
| Hall | N.P. | Rt. 3, Box 225x<br>Roanoke, TX 76262 | (817) 430–4238 | 1 | W935132M |
| Hamblen | Jerry | P.O. Box 823<br>Brooklyn, IN<br>46111 | (317) 831–8576 | 1 | W802420M |
| Hampton | W.H. | 242 Mountain View<br>Place<br>Palm Springs, CA<br>92262 | (619) 323–5000 | 1 | 60571V |
| Haras, Jr. | Robert J. | 184 Lakeside Road<br>Newburgh, NY<br>12550 | (914) 564–2612 | 3 | A5314444<br>A33220317<br>PC408511 |

**Garza v. Sporting Goods Properties, Inc., Not Reported in F.Supp. (1996)**

1996 WL 56247

| | | | | | |
|---|---|---|---|---|---|
| Hardt | Len R. | 14723 S. Kildare Ave. Midlothian, IL 60445 | (708) 385–7967 | 1 | X119218M |
| Hardy | Chris E. | 4B Wooddale Dr. Valoosta, GA 31602 | (912) 245–8946 | 1 | PC057561 |
| Hardy | Mary G. | Rt. 2 Box 986 San Augustine, TX 75972 | (409) 275–9017 | 1 | W915309M |
| Harman, Jr. | Bob | P.O. Box 30295 Savannah, GA 31410 | (912) 236–1144 | 1 | B278360 |
| Harris | Trent L. | 329 Alexander Blvd. Blackfood, ID 83221–5851 | (208) 785–6094 | 1 | A865372M |
| Hartlage | James | 485 Lakeview Dr. Wytheville, VA 23482 | (540) 228–5501 | 1 | |
| Hawkins | Robert E. | 2550 West Garden Drive Greenfield, IN 46140 | (317) 462–4969 | 1 | A437481M |
| Hayward, Jr. | Roy E. | 373 Fruitwood | (412) 833–0172 | several | |

Case 4:19-cv-00509 Document 65-9 Filed 07/02/21 in TXSD Page 920 of 1452

Garza v. Sporting Goods Properties, Inc., Not Reported in F.Supp. (1996)

1996 WL 56247

|  |  | Drive | | | |
|  |  | Bethel Park, PA | | | |
|  |  | 15102 | | | |
| Heathey | Henry | 427 Skylark Way | (803) 753–3722 | 1 | A751109M |
|  |  | Cross, SC 29436 | | | |
| Hiller | Jon C. | RR #1 Box 52 | (507) 324–5853 | 2 | T600959M |
|  |  | Le Roy, MN 55951 | | | W884879M |
| Hochstetler | Devon L. | 6495 W. 200N | | 1 | PC453474 |
|  |  | Shipshewana, IN | | | |
|  |  | 46565 | | | |
| Hofmann | Brian T. | 600 S. Dobson Rd. | (602) 464–5695 | 1 | |
|  |  | #144 | | | |
|  |  | Mesa, AZ 85202 | | | |
| Holowicki | Daniel L. | 24700 Arsenal | (313) 783–2711 | 1 | A936345M |
|  |  | P.O. Box 265 | | | |
|  |  | Flatrock, MI | | | |
|  |  | 48134 | | | |
| Holub | Nadine | 332 W. Lincoln | (913) 877–2835 | 1 | A303142M |
|  |  | Norton, KS 67654 | | | |
| Houston | William G. | 14745 Babcock Road | (210) 641–2125 | 2 | L730139V |
|  |  | #203 | | | L356580V |
|  |  | San Antonio, TX | | | |
|  |  | 78249 | | | |
| Hovanec | Matthew M. | 638 Patriot Drive | (717) 291–6638 | 1 | X000374M |
|  |  | Lancaster, PA | | | |

1996 WL 56247

| | | 17601 | | | |
|---|---|---|---|---|---|
| Hull | Gorden E. | 4477 Hereford Farm Road Evans, GA 30809 | (706) 855–9621 | 3 | OU23384 OU13736 N379837V |
| Hurley | Elzie | 204 Cottage Grove Ave. Pekin, IL 61554– 5332 | (309) 346–0787 | 1 | W623040M |
| Husband | Donald W. | 727 Spruce Ave. Sharon, PA 16146 | (412) 983–0707 | 1 | S750418V |
| Iowa Department of Public Safety | | c/o Jeffrey D. Farrell Assistant Attorney General Hoover State Office Building Des Moines, Iowa 50319 | (515) 281–6658 | | |
| Izold | Richard R. | 1907 Cleveland Ave. Anchorage, AK 99517 | | 2 | X037107M W331738M |
| Jackson | Duane L. | 16540 Cameron Circle Wamego, KS 66547 | (913) 456–9779 | 1 | W397641M |

1996 WL 56247

| | | | | | |
|---|---|---|---|---|---|
| Jackson | James M. | 123 Perriwinkle St. Madison, AL 35758 | (205) 895–9068 | 2 | M254588V P235491V |
| Jacobs | Jeffrey A. | 57 Cross St. Westerly, RI 02891–2332 | (401) 596–2983 | 1 | A897785M |
| Jalas | Ralph H. | Box 15 Sutherland, IA 51058 | (712) 446–3803 | 1 | 177358V |
| James | John P. | 7557 Vinnedge Rd. Hamilton, OH 45011 | | 1 | T264403V |
| Jeffryes | Brett A. | 5664 E. State Highway C Springfield, MO 65803 | (417) 736–2319 | 1 | PC142197 |
| Johnson | David B. | 532 Richmond Drive Chatham, IL 62629 | (217) 483–3643 | 1 | X131262M |
| Jones | Robert P. | RT 2 Box 720K Adkins, Texas 78101 | (210) 947–4147 | 1 | A922883M |
| Kearns, Jr. | Robert D. | 6226 Kaywood Drive Cincinnati, OH 45243 | (513) 271–6882 | 1 | X207132M |
| Keeger | Stephen E. | 512 S. Frees Rd. | | 2 | A672330M |

Case 4:19-cv-00509 Document 65-9 Filed 07/02/21 in TXSD Page 923 of 1452

**Garza v. Sporting Goods Properties, Inc., Not Reported in F.Supp. (1996)**

1996 WL 56247

| | | | | | |
|---|---|---|---|---|---|
| | | Chelsea, MI | | | B392655M |
| | | 48118–9662 | | | |
| Kemstedt | Harry M. | 6408 Oakland Mills Road | (410) 795–4224 | 1 | A466944M |
| | | Sykesville, MD | | | |
| | | 21784–6924 | | | |
| Kernan | Dale | 547 Urquhart St. | (715) 748–0814 | 1 | W545649M |
| | | Francis Apt. 2 | | | |
| | | Medford, WI 54451 | | | |
| Key | Roy | 11 N. 39th St. | ( ) 545–2407 | 1 | A409335M |
| | | Harrisburg, PA | | | |
| | | 17109 | | | |
| Kilbury | Richard K. | 16 Sunflower Drive | | | |
| | | Tijeras, NM 87059 | | | |
| Kilgarlin | William W. | 120 Cantera Circle | (505) 984–1838 | 1 | A547835M |
| | | Santa Fe, NM | | | |
| | | 87501 | | | |
| Kimball | R.E. | 3957 Old Columbus Rd. | (513) 325–1073 | 1 | M663471V |
| | | Springfield, OH | | | |
| | | 45503 | | | |
| Kinsella | Martin W. | 431 Ave. G. | | | |
| | | Hilltop Mobile Homes | | | |
| | | Bloomington, IL | | | |
| | | 61704 | | | |

Garza v. Sporting Goods Properties, Inc., Not Reported in F.Supp. (1996)

1996 WL 56247

| | | | | | |
|---|---|---|---|---|---|
| Kinser | Ray | 5 Meadowbrook Dr. Conway, AR 72032–2623 | (501) 327–8321 | 1 | M170315U |
| Kittrell | James David | 3100 Rosemary Tyler, TX 75701 | (903) 566–3105 | 1 | X107389M |
| Knowles | Keith Howard | P.O. Box 253 820 Center Street Fulton, MO 65251 | (314) 642–6085 | | |
| Koelling | Dennis | 1507 1st Parkway Washington, MO 63090 | ( ) 239–5083 | 1 | PC006088 |
| Kooken | Ronald D. | RR 1 Box 222 Quincy, IL 62301 | | | |
| Koziak, Jr. | Douglas E. | 55 Fairmont Avenue Stamford, CT 06906–2310 | | 2 | PC403906 302984X |
| Kozicki | Robert J. | 2910 River Park Wichita, KS 67203 | | | |
| Krambeer | Stanley N. | 12815 Concord Avenue Luana, IA 52156 | (319) 864–3361 | 1 | A852728M |
| Kremer | Diana M. | 41320 Dunboyne Cir. Clinton Twp., MI | (810) 412–0867 | 1 | A016173M |

1996 WL 56247

| | | | | | |
|---|---|---|---|---|---|
| | | 48038 | | | |
| Kuntz | Daniel L. | 402 Central Ave. South Box #5 Geneva, MN 56035 | (507) 256–4895 | 5 | V326947V T553514V N139626M 73709V OU8625 |
| Kuschel | Fred | 85 Meadowlark Lane Fargo, ND 58102 | (701) 232–6620 | 2 | N075333V X060715M |
| Laessig | Wayne F. | 131 Saybrook Ave. Vacaville, CA 95687 | (707) 447–3548 | 2 | T821414X V205139V |
| Lamphier | Janet I. | R.D. #2, Box 327 Wellsville, NY 14895 | (716) 593–3955 | 1 | |
| Langlois | Joseph C. | 34916 56th Ave. So. Auburn, WA 98001 | (206) 939–4829 | 1 | X013300M |
| Lashbrook | Clair R. | 6546 Wellesby Terrace Clarkston, MI 48346 | (810) 623–7174 | 1 | X136848M |
| Lay | Ralph | 1790 Decatur Pike Winchester, OH 45697 | (513) 373–4102 | 2 | W173284V N171095V |
| Leder | A.C. | Rt. 2, Box 91 | (501) 241–3753 | 1 | W198272V |

1996 WL 56247

| | | | | | |
|---|---|---|---|---|---|
| | | Stuttgart, AR 72160 | | | |
| Lemon | Richard W. | 915 E. Hampton St. Tucson, AZ 85719 | (520) 740–3351 (520) 791–2342 | 4 | PC231518 PC106275 PC203538 S133610V |
| Leone | Rodney E. | 1278 E. CR. 225 S. Greencastle, IN 46135 | (317) 653–2839 | 1 | PC312768 |
| Lette, Sr. | Kenneth O. | 10257 Prouty Road Painesville, OH 44077–2109 | | 1 | PC413639 |
| Levendusky | Troy | 1722 S. Penn #A Mason City, IA 50401 | (515) 424–0628 | 1 | PC324299 |
| Lewis | Robert R. | 1637 Green Acres Wichita, KS 67218 | (316) 683–7434 | 1 | A161054M |
| Lewis | Fletcher C. | 104 Edmonds Box 410 McCrory, AR 72101 | (501) 731–2581 | 2 | X314040M V768496V |
| Lidhall | Maurice | 3112 State Ave. Des Moines, IA 50317–6658 | (515) 263–8399 | 1 | N779123M |
| Lippmann, Jr. | Edwin J. | P.O. Box 764 Muskogee, OK | (918) 683–3478 | 1 | S992017V |

1996 WL 56247

|  |  | 74402–0764 |  |  |  |
|---|---|---|---|---|---|
| Little, Jr. | James W. | 120 Hope Place | (912) 923–2534 | 4 | N370824V |
|  |  | Warner Robins, GA |  |  | P120881V |
|  |  | 31088 |  |  | N579475K |
|  |  |  |  |  | PC323246 |
| Littlefield | Douglas M. | 2222 Settlers Way | (713) 980–9872 | 1 | A315474M |
|  |  | #1323 |  |  |  |
|  |  | Sugar Land, TX |  |  |  |
|  |  | 77478 |  |  |  |
| Lowry | Donna F. | 7194 Mill Valley | (804) 780–0611 | 1 | W747233M |
|  |  | Road |  |  |  |
|  |  | Mechanicsville, VA |  |  |  |
|  |  | 23111 |  |  |  |
| Machemer | Kenneth D. | 317 Greenwood St. | (610) 562–2478 | 1 | PC303505 |
|  |  | Hamburg, PA 19526 |  |  |  |
| Mack | Lee J. | 1519 Richmond | (701) 255–4853 | 4 | N126227M |
|  |  | Drive |  |  | M039939N |
|  |  | Bismarck, ND |  |  | N142155M |
|  |  | 58504 |  |  | W220001M |
| Maggio III | Sam | 2502 Clinton St. | (318) 742–9320 | 2 | V152048M |
|  |  | Bossier City, LA |  |  | X308099M |
|  |  | 71111 |  |  |  |
| Mancha | Johnny | 1829 W. Santa Ana | (209) 486–4537 | 1 | A586764M |
|  |  | Fresno, CA 93705 |  |  |  |
| Mandy | Steve A. | 36 Cheryl Drive | (716) 825–0252 | 1 | PC425167 |

1996 WL 56247

| | | | | | |
|---|---|---|---|---|---|
| | | Lackawanna, NY 14218 | | | |
| Mangum | H. Eugene | One Elm Place 11107 Wurzbach, Bldg. A, Suite 106 San Antonio, TX 78230 | (210) 690–6290 | 1 | |
| Manzolillo | Michael J. | 429 Hubert Road Jeffersonville, NY 12748 | (914) 482–5785 | 1 | A438478M |
| Martin | Dean C. | 908 Golfview Dr. Eureka, IL 61530 | (309) 467–4126 | 1 | W928742M |
| Martin, III | Edgar M. | 988 Centerville Rd. East Earl, PA 17519 | (717) 445–4042 | 1 | W676388M |
| Martin | Vern P. | 5108 Shelbyshire Dr. Shelby Twp., MI 48316 | (810) 739–8955 | 1 | A998805M |
| Massie | James O. | 930 Trego Creek Rd. Chillicothe, OH 45601 | | | |
| Matthews | Roger V. | 4155 Maysville Road | (706) 335–0766 | 1 | A395083M |

WESTLAW   © 2021 Thomson Reuters. No claim to original U.S. Government Works.

Case 4:19-cv-00509   Document 65-9   Filed 07/02/21 in TXSD   Page 929 of 1452

Garza v. Sporting Goods Properties, Inc., Not Reported in F.Supp. (1996)

1996 WL 56247

| | | Commerce, GA 30529–6812 | | | |
|---|---|---|---|---|---|
| Mauzey | Hilary G. | 1353 Santa Barbara Minden, N.Y. 89423 | (402) 267–3428 | 1 | RR45 |
| McCain | Harold | Box 443 Manila, AR 72442–0443 | ( ) 561–4626 | 1 | A236604M |
| McDaniel | Howard W. | 2513 CK–60 Auburn, IN 46706 | (219) 925–2057 | 1 | A859973M |
| McDonald | Daniel E. | 2476 Nadosa Dr. Sarasota, FL 34232–4234 | (941) 346–2164 | 1 | PC174641 |
| McGimsey | Robert G. | 17609 Toakoana Way Eagle River, AK 99577 | (907) 694–8642 | 1 | T868882V |
| McGraw | Lance | 2363 New Milford School Rd. Rockford, IL 61109 | (815) 874–2082 | 1 | X060072M |
| McMillion | David R. | 5219 Cline Rd. Kent, OH 44240 | (216) 678–9445 | 1 | P193327M |
| Meisner | Sherry | Tesmec U.S.A., Inc. 103 Sentry Drive North Mansfield, TX | | | |

1996 WL 56247

| | | | | | |
|---|---|---|---|---|---|
| | | 76063 | | | |
| Mellby | Theodore R. | HC 75 Box 442<br>Hackensack, MN<br>56452 | | 3 | 26911V<br>L587927<br>99869M |
| Merfeld | John R. | 2320 Hwy 14<br>Rockford, IA<br>50468 | | 1 | A870213M |
| Merritt | James Lee | 2275 Hearne<br>Kingman, AZ 86401 | ( ) 692–1318 | 1 | A152289M |
| Miles | Wilfried J. | 1060 Burchmann Rd.<br>Apt. 43<br>Paradise, CA<br>95969–5126 | (916) 877–2165 | 1 | M596245V |
| Miller | Dave A. | 130 Gravel Pond<br>Road<br>Clarks Summit, PA<br>18411 | (717) 586–8051 | 1 | A046301M |
| Minatani | Steven | 13340 McCabe<br>Circle West<br>Anchorage AK 99516 | (907) 345–6585 | 1 | 930667 |
| Mitchell | Mike | 273 Greene 701 Rd.<br>Paragould, AR<br>72458 | (501) 573–6900 | 1 | X264425M |
| Mock, Jr. | Joseph<br>Wilson | 4051 St. Johns<br>Church Rd. | (912) 449–4885 | 1 | P078288M |

Case 4:19-cv-00509   Document 65-9   Filed 07/02/21 in TXSD   Page 931 of 1452

Garza v. Sporting Goods Properties, Inc., Not Reported in F.Supp. (1996)

1996 WL 56247

| | | Blackshear, GA 31516 | | | |
|---|---|---|---|---|---|
| Mollick | Richard H. | 11644 Deercreek Cr. Plymouth, MI 48170 | (313) 453–5592 | 3 | T753147V A550425M B351556M |
| Monks | Dusty | Rt. 3 Box 3760 Myton, UT 84052 | (801) 646–3018 | 1 | A278917M |
| Monroe, III | Walter H. | 2816 Canoe Brook Lane, Birmingham, AL 35243 | (205) 521–8475 (205) 969–0298 | 1 | 902114V |
| Moore | Tony Steven | P.O. Box 489 Anton, TX 79313 | | | |
| Moore | Matthew P. | 1619 167th Ave. NE Bellevue, WA 98008 | (206) 747–4774 | 1 | PC364065 |
| Moore | Sgt. Michael D. | 5595 Hwy 62 West Pocahontas, AR 72455 | (501) 892–4728 | 1 | L054004X |
| Morris | Timothy L. | P.O. Box 93 Sherwood, ND 58782–0093 | (701) 459–2486 1 A420191M | | |
| Morrison | D. Duane | P.O. Box 494117 | (916) 273–6899 | 1 | A441783M |

1996 WL 56247

| | | | | | |
|---|---|---|---|---|---|
| | | Redding, CA 96049 | | | |
| Murphy | Mark | 2710 Melencamp Dodge City, KS 67801 | (316) 225–1117 | 1 | PC011970 |
| Myers | Robert R. | 640 West Drive Seymour, IN 47274 | (812) 522–7838 | 1 | PC021382 |
| Neff | Dennis L. | 3724 Mission Dr. S Lake Havasu City, AZ 86406 | (520) 680–7596 (619) 663–4911 x3530 | 1 | V967986V |
| Nelson | Joseph A. | 1902 Adonis Court Alberquerque, NM 87112 | (505) 293–1745 | 1 | M285070M |
| Newby | Dan | 103 Stutsman Council Bluffs, IA 51503 | (712) 328–7416 | 2 | B169457M B315162M |
| Norton | Andrew H. | 20 Erwin St. Painted Post, NY 14870–9708 | (607) 962–8137 | 1 | PC403319 |
| Noussias | Panagis | 5088 Wainfleet Ct. Columbus, OH 43221–5257 | | 2 | PC172961 A533511M |
| Nye | Ronald C. | 2496 Long Hill Road Guilford, CT 06437 | (203) 265–8813 (203) 457–0316 | 1 | A138548M |
| O'Connell | Kevin E. | 34676 Circle Drive | (303) 838–2191 | 2 | PC274296 |

1996 WL 56247

| | | | | | |
|---|---|---|---|---|---|
| | | Pine, CO 80470 | | | V881288M |
| O'Connor | William | 313 Riversie Dr. Battle Creek, MI 49015 | (616) 963–7888 | 1 | PC016434 |
| O'Connor | Judy | 313 Riversie Dr. Battle Creek, MI 49015 | (616) 963–7888 | 1 | PC013869 |
| O'Hara | William J. | 6113 E. Hannibal Mesa, AZ 85205–4510 | (602) 891–3762 (602) 985–4177 | 2 | A124293M L259794M |
| Obernberger | Michael T. | 2524 Jean Ave. Racine, WI 53404 | (414) 634–7538 | 1 | A771509M |
| Oest | William H. | 166 Tice Lane Lebanon, PA 17042 | (717) 274–6031 | 1 | 215923A |
| Olsen | Wilford L. | 15 Doe Lane Townsend, MT 59644 | (406) 266–5695 | 3 | V974138V W501718M V173597J |
| Ornatowski | Tony | 70280 Fairfield Dr. Edwardsburg, MI 49112 | (616) 663–6605 | 1 | A395619M |
| Osterberg | Walter | 69 Cook St. Billerica, MA 01821–5424 | (508) 663–6351 | 1 | PC222201 |
| Palmer | Donald E. | 1043 Monticello | (601) 894–3164 | 2 | 1031376V |

1996 WL 56247

| | | Rd. | | | X073443M |
| | | Wesson, MS 39191 | | | |
| Parkhurst | Tyler | 501 Tenth St. | (712) 755–5217 | 1 | W806058M |
| | | Harlan, IA 51537 | | | |
| Pasike | John Robert | 5600 Garretson Ln. | (810) 576–6755 | 1 | A849083M |
| | | Oxford, MI 48371 | (810) 628–8462 | | |
| Perez, Esq. | Plinio | 240 Crest Terrace | (203) 265–8631 | 1 | B188712M |
| | | Fairfield, CT 06432 | (203) 372–2220 | | |
| Perszyk | Robert | RR #2 Box 408 | (218) 346–6850 | 3 | 939679V |
| | | Perham, MN 56573 | (218) 346–7500 | | T112303V |
| | | | | | PC071734 |
| Peterson | Glen R. | 321 Weiss Road | (210) 620–4750 | 1 | V470480V |
| | | New Braunfels, Texas 78130 | | | |
| Peterson | Robert Tillman | Rt. 1, Box 122–B | (910) 893–9887 | 1 | A925097M |
| | | Bunnlevel, NC 28323 | | | |
| Pflug | Andrew K. | 180 South 1st East | (801) 946–8773 | 1 | T908598M |
| | | P.O. Box 156 | | | |
| | | Garden City, UT 84028 | | | |
| Phelps | Richard E. | 48 Nob View Circle | (501) 225–3785 | 1 | A457677M |
| | | Little Rock, AR 72205 | | | |

Case 4:19-cv-00509 Document 65-9 Filed 07/02/21 in TXSD Page 935 of 1452

Garza v. Sporting Goods Properties, Inc., Not Reported in F.Supp. (1996)

1996 WL 56247

| | | | | | |
|---|---|---|---|---|---|
| Philbrick | Larry A. | 1330 L St.<br>Ord, NE 68862 | (308) 728–5286 | 2 | W507910M<br>W850523M |
| Plummer | Michael | 3292 Garcia Drive<br>Tallahassee, FL<br>32308 | (904) 893–6727 | 1 | PC379777 |
| Polansky | James F. | 10602 Country<br>Flower<br>San Antonio, TX<br>78240 | | | |
| Possis | Thomas S. | RR 2 Box 332<br>Aitkin, MN 56431 | (218) 678–3414 | 1 | N477386V |
| Pranckus | Robert S. | 5655 West 1375<br>South<br>Canna, IN 46340 | (219) 797–3901 | 2 | 842699V<br>L345107V |
| Preischel | Timothy | 6803–F W.<br>Paintbrush Dr.<br>USAF Academy, CO<br>80840–1708 | (719) 472–6978 | 1 | |
| Price | Charlie W. | 563 Wise Ferry<br>Road<br>Lexington, SC<br>29072 | | 1 | PC166441 |
| Provitz | John D. | 11332 Shilling Dr.<br>Sterling Hts., MI<br>48314–3553 | (810) 731–9548 | 2 | DU829154<br>N007095V |

1996 WL 56247

| | | | | | |
|---|---|---|---|---|---|
| Rapalyea | Eugene L. | 1005 DeTurk Ave. Santa Rosa, CA 95404 | (707) 544–9032 | 1 | A286791M |
| Rassieur | William T. | 1 Rob Roy Road Austin, TX 78746–3137 | (512) 327–5916 | 1 | W478886M |
| Rausch | Jeffery S. | 1512 Clarkson Ct. Naperville, IL 60565 | (708) 983–9305 | 1 | PC107187 |
| Ray | William H. | 2418 Foothill Dr. S.W. Alberquerque, NM 87105–4457 | (505) 877–3367 | 1 | X024193M |
| Recker | Jeffrey L. | 838 S. Coldwater Rd. Weidman, MI 48893 | (517) 644–3958 | 1 | N968004V |
| Reed | Robert E. | P.O. Box 326 Columbus, MS 39703–0326 | (601) 328–6075 | 1 | A361003M |
| Reed | Greg L. | 39311 Rte. 7 Reedsville, OH 45772 | | 1 | A842632 |
| Reed | Wesley W. | 206 Granada Drive San Antonio, TX 78216 | (210) 342–6669 | 2 | M965172V A935095M |

Case 4:19-cv-00509 Document 65-9 Filed 07/02/21 in TXSD Page 937 of 1452

**Garza v. Sporting Goods Properties, Inc., Not Reported in F.Supp. (1996)**

1996 WL 56247

| | | | | | |
|---|---|---|---|---|---|
| Reichel | Robert & Holly | 627 W. 5th St. Mankato, MN 56001 | (507) 625–7045 | | |
| Reid, Jr. | Clayton M. | 255 Kay St. Warrior, AL 35180 | (205) 647–3138 | 1 | PC007447 |
| Reusswig | Kimberly A. | P.O. Box 432 East Stroudsburg, PA 18301 | (717) 629–6648 | 1 | A143351M |
| Rhodes | Joseph A. | 1427 W. 12th St. Owensboro, KY 42301 | (502) 684–8251 | 2 | T398083V A048446M |
| Richart | Michael | 748 Richardson Ave. Galion, OH 44833 | (419) 468–4425 | 1 | PC356653 |
| Riggs | J. Michael | Rt. 1 Box 305 Claxton, GA 30417 | (912) 739–1554 (912) 767–1075 | 2 | L692047V PC354073 |
| Rincker | Thomas A. | P.O. Box 129 Glen Carbon, IL 62034 | (618) 288–0018 | 1 | |
| Rindal | Marcus | 9604 53rd Ave. College Park, MD 20740 | (301) 345–1012 | 1 | M350145V |
| Roades | John W. | P.O. Box 506 Louise, TX 77455–0506 | (409) 648–2806 | 1 | A377524M |

Case 4:19-cv-00509   Document 65-9   Filed 07/02/21 in TXSD   Page 938 of 1452

Garza v. Sporting Goods Properties, Inc., Not Reported in F.Supp. (1996)

1996 WL 56247

| | | | | | |
|---|---|---|---|---|---|
| Robertson | Ryan | RR1<br><br>Elma, IA 50628 | (515) 364–6561 | 1 | PC329849 |
| Robinson | David R. | P.O. Box 135<br><br>Aledo, IL 61231–<br><br>0135 | (309) 582–2857 | 1 | N816998V |
| Rohn | Darrell G. | Rt. 1 Box 141<br><br>Browns Valley, MN<br><br>56219 | (612) 563–4707 | 1 | A626570M |
| Romazon | Russell L. | 120 Cardinal<br><br>Circle<br><br>Lawson, MO 64062 | (816) 296–7830 | 2 | A938502M<br><br>A942839M |
| Rowan | Kenneth W. | Rt. 2 Box 138<br><br>Lowell, OH 45744 | | | |
| Rowe | Gordon E. | 7493 Sheridan Rd.<br><br>Durand, MI 48429 | (517) 288–6621 | 1 | B127037M |
| Sanders | David Alan | 1325 Sudlersville<br><br>Road<br><br>Clayton, DE 19938 | (302) 653–4046 | 1 | A480651M |
| Sauk Office of<br><br>the Corporation<br><br>Counsel | Sauk County<br><br>Courthouse | (608) 356–5581<br><br>(ext. 3267)<br><br>515 Oak Street<br><br>Baraboo, WI 53913<br><br>ATT: Jann B.<br><br>Charette,<br><br>Assistant<br><br>Corporation | | 37 | X203841M<br><br>T916242V<br><br>T978450V<br><br>W983992M<br><br>X198381M<br><br>V866330V<br><br>S729113V<br><br>T111869V |

Case 4:19-cv-00509 Document 65-9 Filed 07/02/21 in TXSD Page 939 of 1452

Garza v. Sporting Goods Properties, Inc., Not Reported in F.Supp. (1996)

1996 WL 56247

Counsel

A118510M

T975427V

W980315M

W983384M

V149499V

S745367V

T981124V

V151376V

T941132V

T758894V

S745367V

W983387M

W287423M

T981125V

T758891V

V866297V

T981099V

X023675M

T758903V

T758889V

T094922V

S745389V

V866129V

V496802V

W287419V

W979490M

T953153V

S705580V

S745198V

1996 WL 56247

| Schade | Richard N. | 5820 Graves Ave. Encino, CA 91316 | (818) 344–2929 | 1 | S030955V |
| Schalla | Gordon | 1660 Hy 143 West Bend, WI 53095 | (414) 675–6622 | 1 | PC271817 |
| Schaupp | Willis C. | 3838 California St., Suite 301 San Francisco, CA 94118 | (415) 221–4300 | 2 | V270456M PC344464 |
| Schieman | Dale P. | 1651 Briarcliffe Blvd., Apt. D Wheaton, IL 60187 | (708) 871–8723 | 1 | X135799M |
| Schum III | Simon P. | 2961 Belle Air Blvd. Theodore, AL 36582 | 1 | W738061M | |
| Schwehr | Gregory D. | 9717 W. Reichert Place Milwaukee, WI 53225 | (414) 463–8685 | 1 | 507131V |
| Schweihofer | Benjamin F. | 7103 Trumble Rd. St. Clair, MI 48079 | (810) 329–4080 | 1 | A163005M |
| Schwendemann | Jon William | P.O. Box 153 Starbuck, MN | (612) 239–2959 | | |

1996 WL 56247

|  |  | 56381 |  |  |  |
|---|---|---|---|---|---|
| Seabolt | Thomas Andrew | 118 Cliffview Dr. Covington, VA 24426 | (540) 962–2325 | 1 | W878718M |
| Seitz | Howard M. | RR1 – Box 281 Millerstown, PA 17062 | (717) 438–3218 | 1 | PC182651 |
| Selvidge | Joe B. | 12747 S. 120th East Avenue Broken Arrow, OK 74011 | (918) 369–5325 | 1 | PC046785 |
| Serna | Oscar R. | HispAmer Corp. 13160 S.W. 20 Street Miami, FL 33175 | (305) 552–5659 | 2 |  |
| Sherry | Henry W. | 381 Lamplighter Dr. Melbourne, FL 32934 |  |  |  |
| Shipman, Jr. | William L. | 1703 West Copeland Road Powell, TN 37849– 3256 | (423) 938–8792 | 2 | PC328625 N007053V |
| Shope | Charles D. | 626 E. Broad St. West Point, MS | (601) 494–1344 | several |  |

1996 WL 56247

| | | 39773 | | | |
|---|---|---|---|---|---|
| Skates, Sr. | James B. | 14323 SE Fair Oaks Ave. Milwaukie, OR 97267–1008 | (503) 652–2765 | 1 | PC305665 |
| Slear | Stephen James | 2166 Newville Road Carlisle, PA 17013–7747 | (717) 245–9595 | 1 | |
| Smith | Kevin M. | 3234 Barkway Sterling Heights MI 48310 | (810) 939–7876 | 1 | X096990M |
| Smith, Jr. | Namon H. | 2546 Emogene Melvindale, MI 48122 | (313) 382–5636 | 1 | PC303936 |
| Smith | Mary | 115 Thompson St. P.O. Box 481 Lewiston, MN 55952 | (507) 523–3550 | 1 | 163010M M832657V PC113888 |
| Snelling | Tom | 717 E. Edison Ave. Des Moines, IA 50315 | | | |
| Sosnowski | Vincent R. | 40 Manners Ave. Naugatuck, CT 06770 | (203) 729–7020 | 1 | A498081M |
| Spangler | Clarence W. | 11220 Lafayette | (717) 328–2262 | 1 | PC158170 |

1996 WL 56247

| | | Road<br>Mercersburg, PA<br>17236 | | | |
|---|---|---|---|---|---|
| Spielman | Robert W. | 250 Riverbend Dr.<br>Reno, NV 89523 | (702) 345–0410 | 2 | M129145<br>N260779V |
| Spiers | Ronald R. | 7802 Fawn Brook<br>Circle, West<br>Jacksonville, FL<br>32256 | (904) 645–0923 | 1 | PC317305 |
| Spryszak | John T. | 16 Third St.<br>Falls Creek, PA<br>15840 | (814) 371–2655 | 1 | W453792M |
| Stallings | Michael R. | 840 Douglas Dam<br>Rd.<br>New Market, TN<br>37820 | (423) 933–3201 | 1 | PC337812 |
| Starnowsky | Tim | 200 W. Wiconisco<br>St.<br>Muir, PA 17957 | (717) 647–2252 | 1 | A6134M |
| Starr | William F. | RR 2 Box 430A<br>Winamac, IN 46996 | (219) 946–7055 | 1 | PC142661 |
| Stinebrink | Jerry | 1409 Miller Rd.<br>Lake Geneva, WI<br>53147 | (414) 248–4557 | 1 | W537837M |
| Stout | Jack L. | 109 Farm Valley | (803) 879–2780 | 1 | A203353M |

**Garza v. Sporting Goods Properties, Inc., Not Reported in F.Supp. (1996)**

1996 WL 56247

| | | | | | |
|---|---|---|---|---|---|
| | | Ct. Greer, SC 29650 | | | |
| Stubblefield, Jr. | John J. | RR 3, Jonquil Lane #10 Taylors, SC 29687–9803 | | | |
| Sullivan | Mark J. | 540 "I" Street Space #1 Penrose, CO 81240 | (719) 372–3620 | 1 | B209163M |
| Sutton | Duane J. | P.O. Box 981 DeQuincy, LA 70633 | (318) 786–2790 | 1 | W750648M |
| Szabla | Steven P. | 9641 Purcell Hill Road Springwater, NY 14560 | (716) 367–8985 | 1 | W701581M |
| Tarzwell | Randy K. | 5201 Nurmi Dr. Midland, MI 48640 | | | |
| Taylor, Sr. | Ronald B. | 543 13th Ave. New Brighton, PA 15066 | (412) 847–3575 | 2 | A541722M 460961W |
| Thompkins | William D. | 8679 Maple Lane Lee Center, NY 13363–9752 | (315) 337–0106 | 2 | L017084V N910306V |
| Thompson | Ronald G. | Rt. 1 Box 48B | (304) 636–8743 | 1 | A784107N |

Case 4:19-cv-00509 Document 65-9 Filed 07/02/21 in TXSD Page 945 of 1452

Garza v. Sporting Goods Properties, Inc., Not Reported in F.Supp. (1996)
1996 WL 56247

| | | | | | |
|---|---|---|---|---|---|
| | | Montrose, WV 26283 | | | |
| Timmerman | Richard | 4807 Sheffield Road Hickory Corners, MI 49060 | (616) 671–5503 | 1 | W961191M |
| Towles | Phillip G. | 506 Reynolds Ave. Dyersburg, TN 38024 | (901) 285–9432 | 1 | A860768N |
| Troyer | Raymond E. | 52924 State Rd. 651 Fresno, OH 43824 | | 1 | PC317853 |
| Van Scyoc | Darrell L. | 9937 McCreary Rd. Shippensburg, PA 17257–9220 | (717) 532–9316 | 2 | 995392V W034630V |
| Vandeberg | John L. | 106 Saddletree Rd. San Antonio, TX 78231 | | 1 | |
| Vest | John P. | 307 W. Florence Ave. #3 Louisville, KY 40214 | (502) 367–9873 | 1 | W872005M |
| Viens | Donald F. | 10 Roberts Court E. Hartford, CT 06108 | | 1 | B072769M |

**Garza v. Sporting Goods Properties, Inc., Not Reported in F.Supp. (1996)**

1996 WL 56247

| | | | | | |
|---|---|---|---|---|---|
| Viers | Eric | RR1 Box 142<br>Maxwell, IA 50161 | (515) 382–5478<br>(515) 387–8812 | 2 | M763039M<br>PC112405 |
| Vinson, Jr. | Laurence D. | P.O. Box 830709<br>Birmingham, AL<br>35283–0709 | (205) 521–8000 | 1 | |
| Wagner | J.R. | 1114 Whitehall<br>Lane<br>Greenville, TX<br>75402 | (903) 457–5277<br>(903) 455–2873 | 3 | L963201M<br>N332505V<br>MAGT68–<br>9445M |
| Wallace | Jack C. | 118 Rio Grande<br>Drive<br>Mission, TX 78572 | (210) 580–3992 | 1 | PC253551 |
| Wallis | Phillip B. | 809 Shelby 62 So.<br>Harpersville, AL<br>35078 | (205) 672–7126 | 1 | PC287375 |
| Walters | Clair H. | HC–50 Box 4055<br>Red Lodge, MT<br>59068 | | | |
| Wang | Leonard W. | 4850 Connecticut<br>Ave., NW #316<br>Washington, DC<br>20008–5902 | (202) 942–4828<br>(202) 363–8597 | 1 | A010058M |
| Warren | Charles S. | 2185 U.S. Route 11<br>La Fayette, NY<br>13084 | (315) 677–3957 | 1 | A624543M |

WESTLAW   © 2021 Thomson Reuters. No claim to original U.S. Government Works.

Case 4:19-cv-00509   Document 65-9   Filed 07/02/21 in TXSD   Page 947 of 1452

Garza v. Sporting Goods Properties, Inc., Not Reported in F.Supp. (1996)

1996 WL 56247

| Watters | Duane C. | 665 Skyward Drive Aptos, CA 95003 | | | |
| Weiss | Mike W. | 753 Walton Lane Grayslake, IL 60030 | (708) 548–7248 (312) 399–5484 | 1 | W694689M |
| Westbrook | Walter B. | 1113 Mockingbird Circle Ennis, TX 75119 | (214) 875–6152 | 1 | T036297V |
| Whalen | James Michael | 1338 Colfax St. Grand Haven, MI 49417 | (616) 846–6968 | 1 | X280010M |
| Whipp | James B. | 100 S. Westside Ave. P.O. Box 292 Funkstown, MD 21734 | (301) 797–6374 | several | |
| White | Bob | 12202 Pacific Ave. Suite E Tacoma, WA 98444 | ( ) 535–2864 | 1 | M849951M |
| Whitworth, | William J. | P.O. Box 229 206 5th St. Farmersville, IL 62533 | (217) 227–3374 | 6 | S617204V M619066V L612921M N931448V DU853398 PC146426 |
| Wickham | Richard L. | 421 Blodgett Road | | 2 | PC233379 |

WESTLAW   © 2021 Thomson Reuters. No claim to original U.S. Government Works.

1996 WL 56247

| | | Ravena, N.Y. 12143 | | | M106779V |
|---|---|---|---|---|---|
| Wilcoxson | William W. | 6898 So. U.S. Hwy. 191 Safford, AZ 85546 | (520) 348–9236 | 1 | M379173V |
| Willaman | Patrick D. | 909 – 21st St., N.E. Canton, Ohio 44714–2168 | (216) 455–3635 | 1 | W948232H |
| Williams | J. Michael | 8137 Glen Cove Way Sacramento CA 95828 | (916) 688–1273 | 1 | N890917M |
| Williams | James S. | P.O. Box 1177 Twin Peaks, CA 92391–1177 | (909) 337–8088 | 1 | B001121M |
| Williams | Mark R. | 9903 Mimosa Path Salinas, CA 93907 | (408) 633–4306 | 1 | A994862M |
| Winzeler | Tom | 13327 Agarita Lane Houston, TX 77083–1903 | (713) 274–4400 (713) 495–6915 | 2 | A525995M A698813M |
| Wodtke | Susan L. | RR1 Box 49 Loogootee, IL 62857 | (618) 349–6284 | 1 | W909569M |
| Wolfe | Raymond R. | 18 West Home Road Bowmansville, NY 14026 | (716) 683–4679 | 1 | N989559M |

1996 WL 56247

| Woodcock | Reathel W. | 2791 Woodville Rd. Kevil, KY 42053 | (502) 224–2523 | 1 | X300829M |
|---|---|---|---|---|---|
| Woodham | James R. | 2741 Kelleytown Rd. Hartsville, SC 29550 | | | |
| Workman | Bruce A. | 3315 E. Ridgeway Rd. Orange, CA 92667 | (714) 974–9507 | 1 | B456173M |
| Yelton | David S. | 136 Wimbish Way Perry, GA 31069 | (912) 987–0394 | 1 | A968926M |
| Yoder | Joshua M. | 7701 E. 71st St. Indianapolis, IN 46256 | (317) 842–6351 | 1 | B024736M |
| Zeibig | Karl | 1883 Rua Branco Sandy, UT 84093 | (801) 942–0376 | 1 | X162252M |
| Ziglar | Oscar J. | RFD 2 Box 389 Westfield, NC 27053 | (910) 593–9551 | 1 | A536449M |
| Zimmerman | Charles | W 2522 De Master Rd. Oostburg, WI 53070–1825 | (414) 564–3962 | 2 | W740043M |
| Zimmerman | John Clair | RD #1 Box 334 | (717) 682–8696 | 2 | A551268M |

**Garza v. Sporting Goods Properties, Inc., Not Reported in F.Supp. (1996)**

1996 WL 56247

| | | Hegins, PA 17938 | | | PC062349 |
|---|---|---|---|---|---|
| Zorne | Stephen T. | 212 Olive Drive | (614) 266–6540 | 1 | W078212M |
| | | Wintersville, OH | | | |
| | | 43952 | | | |

**All Citations**

Not Reported in F.Supp., 1996 WL 56247

## Footnotes

1   When this case was filed in federal court, it was assigned to the docket of Judge Edward C. Prado and referred to United States magistrate Judge Nancy Stein Nowak pursuant to the General Referral Order. On March 17, 1994, the case was reassigned and transferred to the docket of Judge Fred Biery.

2   Although defendants do not believe plaintiffs' federal law claims are meritorious, the assertion of such a claim, whether or not meritorious, gives the Court jurisdiction. DAVID HITTNER ET AL., RUTTER GROUP PRAC. GUIDE: FED. CIV. PRO. BEFORE TRIAL § 2:700—5TH CIR. ED. (The Rutter Group 1995); *see*

   *Sarmiento v. Texas Bd. of Veterinary Medical Examiners,* 939 F.2d 1242, 1245 (5th Cir.1991) (if it appears federal claim without merit, court should dismiss for failure to state claim not jurisdictional grounds).

3   Local Rule CV–23 became effective January 1, 1994, and provides:
   When a class action allegation is made in any pleading, the movant shall file, within thirty (30) days after any defendant's first pleading, a motion for class certification. The motion shall include, but is not limited to, the information set forth in Appendix A. Failure to timely file a motion for class certification shall constitute a waiver of the request for any class action.

4   The motion for leave to file class certification was filed on June 14, 1995. Plaintiffs argued the time limit for filing a class action should not have passed until all of the multiple defendants had answered and were fully joined. A response to this motion was received by this Court on June 23, 1995. Three days later, on June 26, 1995, plaintiffs filed their motion for leave to file a supplemental memorandum of law in support of their motion for class certification in excess of ten pages. on that same date, a premediation conference was held by the court and mediation with Judge Shannon followed. Before the court made a decision on the class certification issue, the parties had worked out the proposed settlement.

5   This case involved production of heart valves of which 50,000 to 100,000 were implanted in patients all over the world. The manufacturer denied any design or manufacturing defects but has settled all litigation where the heart valve fractured. All of the named plaintiffs in this case had properly functioning heart valves. In addressing the commonality issue in that case the court stated:
   We understand that Pfizer–Shiley manufactured the Bjork–Shiley convex/concave heart valve in a similar manner for all the class members. Facts regarding product liability, negligence, breach of warranty, and fraud would be substantially similar for all class members. Thus, the Defendants' conduct with regard to all implantees arises out of a single nucleus of operative facts and law.

   *Bowling,* 143 F.R.D. at 158.

6   In plaintiffs' Motion for Class Certification Pursuant to Local Rule CV–23 received on June 14, 1995, the plaintiffs set forth the following questions of law and fact which they found common to the class:

Case 4:19-cv-00509 Document 65-9 Filed 07/02/21 in TXSD Page 951 of 1452

Garza v. Sporting Goods Properties, Inc., Not Reported in F.Supp. (1996)
1996 WL 56247

1. Whether the Remington shotguns with barrels made out of 1140 steel were sold in a defective condition and unreasonably dangerous to members of the plaintiff class;

2. whether and when the defendants knew of the danger of unobstructed barrel bursts;

3. Whether the defendants adequately warned members of the class of the danger of unobstructed barrel bursts;

4. Whether defendants intentionally or negligently concealed or failed to disclose the danger of unobstructed barrel bursts from members of plaintiff class;

5. whether the defendants expressly or impliedly warranted the Remington shotguns against defects of the type complained of;

6. Whether defendants' commercial advertising or promotion misrepresented the nature, characteristics, or qualities of Remington shotguns, particularly with respect to the durability of the barrels;

7. whether defendants have received notice of the defects in the barrels of the Remington shotguns, and the opportunity to cure such defects and breaches of warranties;

8. Whether the firing of high-pressure reloaded or new factory shells are reasonably foreseeable uses of the Remington shotguns;

9. whether the receipt by the DuPont defendants of $300 million in connection with the purported sale of SGPI's firearms business in December, 1993, constituted a fraudulent transfer of assets intended to protect such assets from the claims of members of the class;

10. Whether the DuPont defendants improperly dominated SGPI with respect to decisions concerning the design, manufacture and sale of the Remington shotguns, so that SGPI was a mere agent or alter ego, and its existence was used as a subterfuge to defeat public convenience, justify a wrong, or perpetuate a fraud; and

11. Whether defendants are liable for punitive damages.

The defendants now involved in this litigation are as follows:

1. Defendant SPORTING GOODS PROPERTIES, INC. (SGPI)—was formerly known as Remington Arms, Inc. it is a foreign corporation incorporated in Delaware. On or about December 1, 1993, SGPI changed its name from Remington Arms Company, Inc. to Sporting Goods Properties, Inc. Beginning in 1960 until December 1, 1993, SGPI manufactured and sold more than lo million of the shotguns. SGPI sold all of its firearms and ammunition manufacturing facilities and business to RACI Acquisition Corporation on or about December 1, 1993, for $300 million.

2. Defendant DuPONT CHEMICAL AND ENERGY OPERATIONS, INC.—also incorporated in Delaware. Since 1990, DuPont Chemical has owned all the outstanding shares of SGPI. After the sale of SGPI's assets to RACI Acquisition corporation in December of 1993, SGPI transferred at least $298.5 million to DuPont Chemical.

3. Defendant E.I. DuPONT de NEMOURS & CO., INC.—a foreign corporation organized under Delaware law. Between 1933 and 1980, it owned the majority of the outstanding shares of SGPI common stock, then known as Remington Arms. In 1980, DuPont became the owner of all the outstanding shares of SGPI common stock. It has owned all outstanding shares of DuPont Chemical (see above) common stock since the formation of DuPont Chemical in 1988. It participated in the design, manufacture, and evaluation of the 12–gauge Remington shotgun barrels. In 1990, this corporation transferred all the common stock of SGPI to DuPont Chemical After the sale of SGPI's firearms manufacturing assets and business to RACI Acquisition Corporation in December of 1993, and with knowledge of the pending lawsuit, DuPont Chemical transferred at least $298.5 million to this corporation.

4. Defendant REMINGTON ARMS COMPANY, INC. is a Delaware Corporation incorporated in October 1993 under the name of RACI Acquisition Corporation. On December 1, 1993, Remington changed its name from RACI Acquisition Corporation to Remington Arms Company, Inc. Effective an or about December 1, 1993, Remington purchased the firearms and ammunition manufacturing facilities and business of SGPI for about $300 million. Since December 1, 1993, Remington has manufactured and sold the shotguns which are the subject of this action.

8 The complaint was amended several times after removal to federal court, and the complaint as now filed is on behalf of the following:

> All persons or entities in the United States, its possessions and territories, including the District of Columbia and the Commonwealth of Puerto Rico, who now own or use or hereafter acquire or use at least one Remington 12–gauge shotgun manufactured after 1959 of the following model numbers: Model 870, model 1100, and Model 11–87; excluding, however, those persons who have already suffered or who may in the future suffer personal injury as a result of a barrel burst of one of the above-described shotguns; and further excluding any entity in which any Defendant has a controlling interest, and the officers[,] directors, affiliates, legal representatives, heirs, successors, subsidiaries, and/or assigns of any such controlled entity or Defendant.

9 Remington supplied class counsel with prototype barrels made of a different steel for testing.

10 At the conference, Judge Biery informed the parties he was a potential class member because he owns a Remington 12–gauge shotgun, but he has no intention of participating in the settlement. Upon disclosure of this information, Judge Biery offered to recuse, but neither side thought recusal necessary.

11 The point system is as follows:

| Model Numbers | | Manufacture Date | |
|---|---|---|---|
| 870 & Sportsman 12: | one point | Before 1980: | one point |
| 1100 & Sportsman 58: | two points | 1980–1989: | two points |
| 11–87 & 3200: | three points | 1990–1995: | three points |

12 From the Court's observations counsel for both sides acted in a professional manner but at times the discussions became quite intense. For example, the court recalls hearing of accusations of nonparticipation at a meeting between the parties because one side accused the other of reading a newspaper during his discussion.

13 Prior to the mediation, Judge Shannon informed the parties that he was a potential member of the class. He owns three of the shotguns and has used one in the recent past. He knows about guns and the kind of testing they undergo.

14 The Fifth Circuit in *Cotton v. Hinton,* 559 F.2d at 1332 expressed concern that many litigators hold the common belief that great amounts of formal discovery must be taken in each case. The court explained:

> We have often seen cases which were "over discovered." In addition to wasting the time of this court, the parties and their attorneys, it often adds unnecessarily to the financial burden of litigation and may often serve as a vehicle to harass a party. Discovery in its most efficient utilization should be totally extra-judicial. The Court should rarely be required to intervene. Being an extra judicial process, informality in the discovery of information is desired. it is too often forgotten that a conference with or telephone call to opposing counsel may often achieve the results sought by formal discovery.

> *Cotton,* 559 F.2d at 1332.

15 According to Mr. Robinson's affidavit, an average of 115 Remington 12–gauge barrel failures occur each year. He estimates that of those bursts 10–15% are chamber bursts, 10–15% are mid-barrel bursts, and 70–80% are cracks, bulges, or bursts at the muzzle end. Based on Mr. Robinson's experience with the burst cases, his communications with class members since October of 1995, the thousands of written responses received in this case, and his review of the Remington records, the typical annual bursts represent:

> 1. Approximately 100 failures with property damage only, where average loss or damage is $500.
> 2. Approximately 9.5 failures with minor injuries such as lacerations and contusions without loss of digits and property damage, where the average total loss or damage is $50,000.
> 3. Approximately 5 failures with serious hand or hand and arm injuries such as fractures, scars, and lost digits and property damage, where the average total loss or damage is $500,000.
> 4. Approximately .5 failures with catastrophic injuries, such as loss of an eye or thumb and other digits, where total loss or damage averages $1,000,000.

Case 4:19-cv-00509 Document 65-9 Filed 07/02/21 in TXSD Page 953 of 1452

Garza v. Sporting Goods Properties, Inc., Not Reported in F.Supp. (1996)

1996 WL 56247

16      Factors that the court considered potentially relevant were "the complexity, expense and likely duration of the litigation ..., the reaction of the class to the settlement; [and] the stage of the proceedings...." 🚩 *In re Corrugated Container Antitrust Litig.,* 643 F.2d at 217(quoting *City of Detroit v. Grinnell Corp.,* 495 F.2d at 453 (2d Cir.1974)).

17      Dr. Kavoussi testified that the higher number used the lower the benefit for the class. He considered the 96% a conservative number.

18      This figure is comprised of the following figures: $31.5 million in monetary recovery, $356.4 million as the value of change in barrel steel, and $27.4 million as the value of injury prevention.

19      The figures comprising this total are: $31.5 million as the monetary recovery, $985.4 million as the value of change in barrel steel, and $53.6 million as the value of injury prevention.

20      After determining the payment per point, Dr. Kavoussi also provided the Court with a chart which reflected the potential payments per type of gun as follows based on 100,000 claims being filed:

        Models 870 and SP12 purchased before 1980 would received $111. These same models purchased between 1980–89 would received $167 per gun, and if purchased between 1990–94, they same models would receive $223 per gun. As to Models 1100 and 58, the models purchased before 1980 would received $167 per gun, $223 per gun if purchased between 1980–89, and $278 per gun if purchased between 1990 and 1994. As to Models 11–87 and 3200, the payment per gun would be $223 per gun if purchased before 1980, $278 per gun if purchased between 1980–89, and $334 per gun if purchased between 1990–94.

21      The Fifth Circuit has agreed with comments by the Second circuit in its confirmation of a settlement which resulted in recovery of only 12% of the potential recovery. in this opinion, 🚩 *City of Detroit v. Grinnell Corp.,* 495 F.2d 448, 455 (5th Cir.1974), the Second Circuit stated:

        The fact that a proposed settlement may only amount to a fraction of the potential recovery does not, in and of itself, mean that the proposed settlement is grossly inadequate and should be disapproved. in fact there is no reason, at least in theory, why a satisfactory settlement could not amount to a hundredth or even a thousandth part of a single percent of the potential recovery.

        *Parker v. Anderson,* 667 F.2d 1204, 1210 n. 6 (5th Cir.), *cert. denied,* 459 U.S. 828 (1982).

22      In fact, the Court has received a letter from Thomas L. Millner, the president and chief operating officer of Remington Arms company, Inc. reiterating the company's support for the settlement. Although the company remains firm that the shotguns are safe when used in accordance with the rules of proper gun-handling, Remington recognizes that any litigation is filled with uncertainties and could take years before final resolution is reached and would consume personnel resources, generate costs, and would distract the company and its valued customers. Mr. Millner closes with a request that the settlement be approved.

23      Four of the seven class representatives attended the Fairness Hearing before the Court but did not voice any objection to the proposed settlement.

24      The notice was published in the following publications which have a total circulation of approximately 11 million. These publications were available to readers or subscribers between October 1 and late November, and the Notice encompassed a full page. The publications were as follows: AMERICAN HUNTER, AMERICAN RIFLEMAN, DUCKS UNLIMITED, FIELD & STREAM, GUN WORLD, GUNS, GUNS & AMMO, HANDLOADER, NORTH AMERICAN HUNTER, NSSF GUN CLUB ADVISORY NEWSLETTER, OUTDOOR LIFE, PETERSON'S HUNTING, RURAL SPORTSMAN, SHOOTING TIMES, SHOT BUSINESS, SHOTGUN SPORTS, SKEET SHOOTING REVIEW, SPORTING CLASSICS, SPORTING CLAYS, SPORTS AFIELD, THE NEW GUN WEEK, TRAP & FIELD, LAW & ORDER, LAW ENFORCEMENT TOOL, POLICE CHIEF, AND POLICE. in addition, this Notice appeared in the October 15, 1995, issues of two Sunday magazine inserts: *USA Weekend* and *Parade.* The circulation of these inserts are 22.5 million and 9 million, respectively. This Notice was also sent to 1,222 gun and shooting clubs and 69 firearms educators with the request the Notice be posted and/or placed in each organization's newsletter.

        In addition to these Notices, Long Form Notices were sent to approximately 263,000 shotgun owners identified from product owner materials and customer lists maintained by Remington. These notices

Case 4:19-cv-00509   Document 65-9   Filed 07/02/21 in TXSD   Page 954 of 1452

Garza v. Sporting Goods Properties, Inc., Not Reported in F.Supp. (1996)

1996 WL 56247

were also sent to approximately 985 agency and institutional owners of shotguns known to Remington. Approximately 18,850 of these notices were sent to class members who requested information as a result of having seen the Notices or had otherwise learned of the matter.

Although not required by the proposed settlement plan, Remington established, at its own expense, a separate choice on its phone menu for persons calling about the settlement. From October 16 through December 27, 1995, the operators of this option handled over 21,750 phone calls.

25   Defendants estimate it would take them 10 to 12 years to replace all of the modified barrels.

26   Dr. Levinson states in his affidavit that the 1140 modified steel contains more manganese sulfide inclusions than the standard grade. These manganese sulfide inclusions become elongated during the hot working of the steel before and during manufacture of the gun barrel. He further opines at pages 11 and 12 of his affidavit: [M]any Remington barrels made from AISI 1140 modified steel probably will not fail, from fatigue or from a higher-than-standard pressure shell. In most Remington shotguns, the inclusions are small enough and distributed well enough so that no crack initiation or crack growth occurs if manufacturing defects are not present which create one or more weak spots. Although the owner of a Remington's high sulfur 12–gauge shotgun barrel has no way of knowing how many sulfide inclusions are in the barrel, there are visual exams which may indicate barrels likely to fail. The visual exams are:

1. inspect end of chamber (breech end) and muzzle end for uneven wall thickness;

2. inspect outside the entire barrel for cracks or bulges;

3. inspect inside of chamber (the first 3 inches) with flashlight for cracks or flaws, especially in area underneath the rib weld;

4. inspect the fit of any choke for uneven edges inside the barrel which would be caused by improperly manufactured choke or non-concentric barrel.

if one or more of the above conditions is found, there is a significant increase in risk of failure. If cracks, bulges or uneven wall thickness are found in the chamber, failure at that location is more likely to occur. If a bulge, ill-fitting choke, cracks or uneven wall thickness is found at the muzzle end, the barrel is more likely to fail at its mid-point or near the muzzle end. *However, there is no guarantee that your barrel will not fail even if you do not find one or more of these conditions.* And, a shooter should always exercise caution so as not to cause or contribute to a failure by using improper ammunition or by obstructing the barrel.

27   Benefits to the class members have been received just by the notification. one member of class counsel received a letter telling of a catastrophic barrel failure occurring on November 19, 1995. "Thanks to the letter ... received from the *Garza* suit in San Antonio, I had warned my son to check the barrel carefully after each shot." The son was not injured.

28   Counsel for Pennsylvania stated its position as follows:

The reality is that there comes a point where there can be a public perception, whether it is true, not true, or whatever, that the weapons are unsafe. And if that is the case—as well as our employees; correctional officers who put their life on the line, as do state police officers, have that kind of perception. You can't very well ask people to put their lives on the line with unsafe weapons.... As a practical matter, a settlement in this case costs us money.... This is not a question about we want money, this is not a question about we want more money or we want less money. This is a question that we basically would like either the status quo, or pretty much to remain that way. If these weapons are not safe, then we do need to replace them. And I don't think this settlement gives us the ability to do it. I mean, frankly, Your Honor, I would like nothing more than for all of the experts here to sit here and tell me that our weapons are completely safe, and I would be going right back to Philadelphia today....

29   The Court also notes that Pennsylvania stated at the Fairness Hearing that if they knew they would be getting enough money from the settlement fund to replace the barrels, that would "be the end of the question. Frankly, Your Honor, I think we would probably withdraw our concerns." The Court also posed the question to Pennsylvania as to their decision not to opt out. Pennsylvania replied that it had discussed the possibility

1996 WL 56247

but "given the resources of the Defendants in this case, what it would cost us in time to try and pursue this, that frankly it would probably be cheaper to replace the barrels, I'm sorry to say."

30    Law enforcement agencies may be better positioned than other members of the class to avoid the risk of malfunction posed by any firearm, including the shotguns involved in this settlement. People who carry or use shotguns as a part of their profession are trained in their safe use, care and cleaning. In addition, almost all institutional owners, without exception, buy shotguns with smooth barrels as opposed to ones with sight ribs which requires welding. The welding creates the potential of overheat spots and weakened barrels. In fact, in Mr. Robinson's years of experience, he has represented a number of people with vented rib barrels which have burst, but he has never seen or heard of a barrel failing in the institutional setting. Remington acknowledges it is aware of only one potential law enforcement chamber burst, but the circumstances of the burst are still being investigated.

31    Letters from Deputy Sheriff Dwight D. Van Horn, Los Angeles County Sheriff's Department and from Robert A. Leasure, Assistant Chief, Wildlife Law Enforcement, State of Colorado Department of Natural Resources, Division of Wildlife.

32    These agencies include: California Department of Fish and Game, State of Connecticut Department of Public Safety, Division of Police, Dakota county Sheriff, Minnesota, and the Texas Department of Public Safety.

33    A few of these agencies include: state of Alabama, Department of Ccnservation and Natural Resources, Outagamie Co. Sheriff Is Department in Wisconsin, Dothan Policy Department in Alabama, Georgia Department of Corrections, City of Gibraltar Public safety Department in Michigan, Hempstead Police Department in New York, City of Hutchinson, Kansas Police Department, city of Johnson City, Tennessee Department of Public Safety, Kansas Department of corrections, Kenosha County Sheriff's Department in Wisconsin, Lafayette Parish Sheriff Department in Louisiana, Town of Newburgh Indiana Police Department, overland Park Police Department in Kansas, Pinellas county Sheriff's Office in Florida, Police Department of the City of St. Petersburg, Seattle Police Department,.

34    Whether subclasses need to be established is a discretionary decision for the trial court. 🚩 *Georgine v. Amchem Prods., Inc.,* 157 F.R.D. 246, 310 (E.D.Pa.1994). Subclasses are appropriate,only when the court believes it will materially improve the litigation." *id.* (quoting *Clark Equip. Co. v. International Union, Allied Indus. Workers,* 803 F.2d 878, 880 (6th Cir.1986)). Establishing subclasses is not encouraged because it tends to compound cost and confusion. *Id.* Subclasses have been found to be less useful by federal courts in opt out class actions "because class members who are dissatisfied with the terms of a proposed settlement may exclude themselves from the class." *Id.*

35    The percentage of recovery approach has been used with more frequency in common fund cases. 🚩 *In re Unisys Corp. Retiree Medical Benefits ERISA Litig.,* 886 F.Supp. 445, 459 (E.D.Pa.1995). The District of Columbia Circuit and the Eleventh Circuit require its use. Four other circuits, the Ninth, sixth, First, and seventh allow the court to use either the lodestar or percentage approach. *Id.* The Fifth Circuit appears to be staying with the lodestar. However, the lodestar method has been criticized as follows:

> The lodestar method makes considerable demands upon judicial resources since it can be exceptionally difficult for a court to review attorney billing information over the life of a complex litigation and make a determination about whether the time devoted to the litigation was necessary or reasonable.... The lodestar procedure requires detailed involvement by the District court, evaluating the reasonableness of expenditure of attorney time and effort, and making comparative inquiries on reasonable rates for those services. Given the complexity of many class action lawsuits, combined with the degree of detailed review required and considering the heavy workload of most district court judges, lodestar calculation is likely to cause significant delay between the creation of a common fund and remuneration of class counsel. In contrast, the application of a percentage-of-the-fund methodology is relatively straightforward and much less time consuming.

> 🚩 *Swedish Hosp. Corp. v. Shalala,* 1 F.3d 1261, 1269–70 (D.C.Cir.1993)

Case 4:19-cv-00509 Document 65-9 Filed 07/02/21 in TXSD Page 956 of 1452

Garza v. Sporting Goods Properties, Inc., Not Reported in F.Supp. (1996)

1996 WL 56247

36 Four of the *Johnson* factors have been "presumed" to be fully reflected in lodestar calculation. These factors are:

> 1. the novelty and complexity of the issues;
> 2. the special skill and experience of counsel;
> 3. the quality of representation; and
> 4. the results obtained from the litigation.

*Shipes,* 987 F.2d at 320.

37 At the Fairness Hearing the Court asked Mr. Lopez if he was opposing the attorney's fees and/or the certification and the settlement agreement. Mr. Lopez responded that he was exclusively opposing the fees. He stated further:

> As a matter of fact, I compliment and applaud both Plaintiffs' counsel and Defense counsel for the settlement.... It reflects the involvement of very, very expert, esteemed, effective lawyers on both sides.

38 Whether the hours being claimed were "reasonably expended" is the first determination to be made. *Louisiana Power & Light Co. v. Kellstrom,* 50 F.3d 319, 324 (5th Cir.1995). The burden is on the fee applicant to establish "entitlement to an award and documenting the appropriate hours expended and hourly rates." *Id.* Customarily, courts require the fee applicant to provide contemporaneous time or billing records or other documentation which is sufficient for the court to examine the application and discern any noncompensable hours. *Id.* If the documentation provided is vague or incomplete, the court may reduce the number of hours claimed by the applicant. However, as long as the evidence produced provides the court with the necessary information to ascertain the total number of hours reasonably expended, the failure to provide contemporaneous billing records will not, per se, preclude an award of attorneys, fees. *Id.*

39 The determination of the reasonable number of hours expended and the reasonable rate to be applied are questions of fact, and the district court's findings are reviewed for clear error. *Louisiana Power & Light Co. v. Kellstram,* 50 F.3d 319, 324 (5th Cir.1995).

40 The reasonable rate of $200 per hour for counsel Clifton Douglass is based on his thirteen years of experience. In his affidavit, Mr. Douglass averred that the reasonable base rate for associate attorneys in the Heard, Goggan, Blair & Williams firm is $125. The reasonable rate for paralegals/legal assistants in the firm is $85.

> The associate attorneys with the law firm of Branton & Hall are billed at $150 to $175 per hour. Attorneys with approximately five years of experience are billed at the rate of $150 per hour while the senior associate with approximately ten years of experience is billed at $175 per hour. The court finds these rates reflective of the prevailing market rates in the community.

> The Court was also provided with the market rate for paralegals in Texas. The razes range from $40 to $125 per hour. The paralegals involved in this litigation are experienced in civil litigation and most have at least a bachelor's college degree. The rates requested in this litigation range from $50 to $100 depending upon experience. The Courts finds these rates reasonable.

41 In a case not reported in the Federal Supplement, the United States District court for the Eastern District of Louisiana stated:

> Work relating to attorneys, fees application is not compensable from a common fund since it only benefits counsel, not the fund. Thus a reduction in Class Counsel's aggregate lodestar to account for the time spent on fee applications must be considered.

> In re *Prudential–Bache Energy Income Partnerships Secs. Litig.,* No. 888, 1994 WL 202394 at *3 (E.D.La. May 18, 1994).

42 In an earlier opinion, the Fifth Circuit explained that the first *Johnson* factor, the time and labor required, and the fifth factor, the customary fee, were included in the lodestar calculation. *Brantly v. Surles,* 804 F.2d 321, 325 (5th Cir.1986). As to the remaining ten factors, the Court stated that they would "rise or fail in importance according to the facts of each case." *Id.*

Garza v. Sporting Goods Properties, Inc., Not Reported in F.Supp. (1996)

1996 WL 56247

43    The computation of the risk-enhancement factor may be made by "dividing 1 by the difference between 1 and that decimal which represents the contingent risk."  *In re McDonnell Douglas,* 842 F. Supp at 741. For example, if a court determine the plaintiff's risk was 20% that they would lose their lawsuit, i.e. plaintiffs would not prevail on the merits or settle, the risk-enhancement factor would equal 1.25. This result was computed as follows:

$$\frac{1.0}{1.0-.02} = \frac{1.0}{.08} = 1.25$$

*Id.*

44    The total number of hours expended and hourly rate for mr. Robinson's staff is 1,750 hours at $87.50 per hour and 1,707 hours at $50 per hour.

45    Although the Court has made individual calculations based on different multiplier/enhancers in this case, class counsel is free to distribute the amounts among themselves in accordance with their agreement.

46    The hours expended and rates for other counsel and experts is as follows:

| | |
|---|---|
| William E. Fairall, Jr. | 6.8 hours at $250 per hour = $1,400 |
| David B. Farney | 2.0 hours at $150 per hour = $ 300 |
| Randall N. Sears | 13.1 hours at $150 per hour = $1,965 |
| Experts—Department Security and Firearms: | |
| Chief Chwasciewski | 15.0 hours at $65 per hour = $ 975 |
| Asst. Chief Schildt | 52.0 hours at $60 per hour = $1,320 |

**End of Document**                    © 2021 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 36

Case 1:20-cv-03590 Document 523-1 Filed 07/02/17 in TXSD Page 959 of 1452

# EXHIBIT A

Case 1:20-cv-03590 Document 523-1 Filed 07/02/17 in TXSD Page 959 of 1452

**EXHIBIT A**

*Glock v. FTS International, Inc., et al.*, No. 4:20-cv-03928
Robbins Geller Rudman & Dowd LLP
Inception through December 18, 2020

| NAME | | HOURS | RATE | LODESTAR |
|---|---|---|---|---|
| Cochran, Brian E. | (P) | 146.30 | 760 | $  111,188.00 |
| Love, Andrew S. | (P) | 115.20 | 1,150 | 132,480.00 |
| O'Mara, Brian O. | (P) | 560.20 | 870 | 487,374.00 |
| Pintar, Theodore J. | (P) | 130.70 | 1,100 | 143,770.00 |
| Robbins, Darren J. | (P) | 32.70 | 1,325 | 43,327.50 |
| Saham, Scott H. | (P) | 625.15 | 995 | 622,024.25 |
| Abel, Lawrence A. | (A) | 18.50 | 630 | 11,655.00 |
| Albert, Michael | (A) | 24.80 | 540 | 13,392.00 |
| Sciarani, Kevin | (A) | 522.00 | 540 | 281,880.00 |
| Worley, Jr., Regis C. | (A) | 42.00 | 600 | 25,200.00 |
| Bays, Lea M. | (OC) | 4.50 | 775 | 3,487.50 |
| Hines, Nicole Y. | (SA) | 794.50 | 415 | 329,717.50 |
| Feldman, James C. | (FA) | 2.50 | 600 | 1,500.00 |
| Sader, Brad C. | (FA) | 4.10 | 600 | 2,460.00 |
| Yurcek, Christopher J. | (FA) | 6.40 | 750 | 4,800.00 |
| Ponce Rivera, Helen | (FAI) | 10.50 | 75 | 787.50 |
| Barhoum, Anthony J. | (EA) | 9.80 | 430 | 4,214.00 |
| Cabusao, Reggie F. | (EA) | 3.70 | 335 | 1,239.50 |
| Villalovas, Frank E. | (EA) | 3.00 | 420 | 1,260.00 |
| Roelen, Scott R. | (RA) | 12.40 | 295 | 3,658.00 |
| Brandon, Kelley T. | (I) | 4.50 | 290 | 1,305.00 |
| Lyons, James L. | (I) | 2.00 | 290 | 580.00 |
| Peitler, Steven J. | (I) | 61.50 | 290 | 17,835.00 |
| Lewis, Bradley P. | (LS) | 69.20 | 150 | 10,380.00 |
| Torres, Michael | (LS) | 25.90 | 375 | 9,712.50 |
| Ulloa, Sergio | (LS) | 27.40 | 290 | 7,946.00 |
| Paralegals | | 428.10 | 275-350 | 121,620.00 |
| Document Clerks | | 2.40 | 150 | 360.00 |
| **TOTAL** | | **3,689.95** | | **$ 2,395,153.25** |

(P) Partner                  (FA) Forensic Accountant          (I) Investigator
(A) Associate                (FAI) Forensic Accounting Intern  (LS) Litigation Support
(OC) Of Counsel              (EA) Economic Analyst
(SA) Staff Attorney          (RA) Research Analyst

# TAB 37

2021 WL 1422714

2021 WL 1422714
Only the Westlaw citation is currently available.
United States District Court,
S.D. Texas, Houston Division.

Carol GLOCK, Individually and on Behalf
of All Others Similarly Situated, Plaintiff,
v.
FTS INTERNATIONAL, INC., et al., Defendants.

Civil Action No. 4:20-cv-03928
|
Signed 04/13/2021

ORDER AWARDING ATTORNEYS' FEES
AND EXPENSES AND AWARD TO LEAD
PLAINTIFF PURSUANT TO 15 U.S.C. § 77z-1(a)(4)

LEE H. ROSENTHAL, UNITED STATES DISTRICT
JUDGE

**\*1** This matter having come before the Court on April
12, 2021, on the motion of Lead Counsel for an award of
attorneys' fees and expenses (the "Fee Motion"), the Court,
having considered all papers filed and proceedings conducted
herein, having found the Settlement of this Litigation to
be fair, reasonable and adequate, and otherwise being fully
informed in the premises and good cause appearing therefore;

IT IS HEREBY ORDERED, ADJUDGED, AND DECREED
that:

1. This Order incorporates by reference the definitions in
the Stipulation of Settlement dated November 19, 2020 (the
"Stipulation"), and all capitalized terms used, but not defined
herein, shall have the same meanings as set forth in the
Stipulation.

2. This Court has jurisdiction over the subject matter of
this application and all matters relating thereto, including all
Members of the Settlement Class who have not timely and
validly requested exclusion.

3. Notice of Lead Counsel's Fee Motion was given to
all Settlement Class Members who could be located with
reasonable effort. The form and method of notifying the
Settlement Class of the Fee Motion met the requirements
of Rule 23 of the Federal Rules of Civil Procedure,
the Private Securities Litigation Reform Act of 1995, due
process, and any other applicable law, constituted the best
notice practicable under the circumstances, and constituted
due and sufficient notice to all persons and entities entitled
thereto.

4. The Court hereby awards Lead Counsel attorneys' fees of
33% of the Settlement Amount, plus expenses in the amount
of $205,170.61, together with the interest earned on both
amounts for the same time period and at the same rate as that
earned on the Settlement Fund until paid. The Court finds that
the amount of fees awarded is appropriate and that the amount
of fees awarded is fair and reasonable under the "percentage-
of-recovery" method.

5. Fifty percent (50%) of the awarded attorneys' fees and
expenses and interest earned thereon shall be paid to Lead
Counsel from the Settlement Fund immediately after entry of
the Order and Final Judgment and this Order, notwithstanding
¶6.2 of the Stipulation. The remaining fifty percent (50%) of
the fee and expense award and interest earned thereon shall
be paid to Lead Counsel from the Settlement Fund after the
initial distribution of the Net Settlement Fund to Authorized
Claimants.

6. In making this award of fees and expenses to Lead Counsel,
the Court has considered and found that:

(a) the Settlement has created a fund of $9,875,000 in cash
that is already on deposit, and numerous Settlement Class
Members who submit, or have submitted, valid Proof of
Claim and Release forms will benefit from the Settlement
created by Lead Counsel;

(b) over 15,900 copies of the Notice were disseminated to
potential Settlement Class Members indicating that Lead
Counsel would move for attorneys' fees in an amount not to
exceed 33% of the Settlement Amount and for expenses in an
amount not to exceed $400,000, and no objections to the fees
or expenses were filed by Settlement Class Members;

**\*2** (c) Lead Counsel have pursued the Litigation and
achieved the Settlement with skill, perseverance, and diligent
advocacy;

(d) Lead Counsel have expended substantial time and effort
pursuing the Litigation on behalf of the Settlement Class;

**Glock v. FTS International, Inc., Slip Copy (2021)**

2021 WL 1422714

(e) Lead Counsel pursued the Litigation on a contingent basis, having received no compensation during the action, and any fee amount has been contingent on the result achieved;

(f) the Litigation involves complex factual and legal issues and, in the absence of settlement, would involve lengthy proceedings whose resolution would be uncertain;

(g) had Lead Counsel not achieved the Settlement, there would remain a significant risk that the Settlement Class may have recovered less or nothing from the Settling Defendants;

(h) Lead Plaintiff's Counsel have devoted over 6,300 hours to achieve the Settlement;

(i) public policy concerns favor the award of reasonable attorneys' fees and expenses in securities class action litigation; and

(j) the attorneys' fees and expenses awarded are fair and reasonable and consistent with awards in similar cases within the Fifth Circuit.

7. Any appeal or any challenge affecting this Court's approval regarding the Fee Motion shall in no way disturb or affect the finality of the Judgment entered with respect to the Settlement.

8. Pursuant to 15 U.S.C. § 77z-1(a)(4), the Court awards $2,500 to Lead Plaintiff Carol Glock for the time she spent directly related to her representation of the Settlement Class.

9. In the event that the Settlement is terminated or does not become Final or the Effective Date does not occur in accordance with the terms of the Stipulation, this Order shall be rendered null and void to the extent provided in the Stipulation and shall be vacated in accordance with the Stipulation.

**All Citations**

Slip Copy, 2021 WL 1422714

---

**End of Document**

© 2021 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 38

2019 WL 2135914

2019 WL 2135914

Editor's Note: Additions are indicated by Text and deletions by ~~Text~~ .

Only the Westlaw citation is currently available.
United States District Court,
N.D. Illinois, Eastern Division.

Sumit GUPTA, Individually and on Behalf of All Others Similarly Situated, Plaintiffs,

v.

POWER SOLUTIONS INTERNATIONAL, INC., Daniel P. Gorey, Jay J. Hansen, Ellen R. Hoffing, Kenneth Landini, Michael P. Lewis, Mary E. Vogt, and Gary S. Winemaster, Defendants.

Case No. 1:16-cv-08253
|
Consolidated with: Case No. 1:16-cv-9599
|
Signed 05/13/2019

**Attorneys and Law Firms**

Jeremy Alan Lieberman, J. Alexander Hood, II, Pomerantz LLP, New York, NY, Louis Carey Ludwig, Patrick Vincent Dahlstrom, Pomerantz LLP, Chicago, IL, for Plaintiff Sumit Gupta.

Joseph D. Cohen, Pro Hac Vice, Leanne H. Solish, Pro Hac Vice, Jason L. Krajcer, Pro Hac Vice, Robert Vincent Prongay, Pro Hac Vice, Glancy Prongay & Murray LLP, Los Angeles, CA, Bryan Glidden Faubus, Pro Hac Vice, Glancy Prongay & Murray LLP, New York, NY, Elizabeth Camper Lyons, Marielise Fraioli, John Scott Monical, Mitchell Benjamin Goldberg, Peter E. Cooper, Lawrence, Kamin, Saunders, & Uhlenhop, LLC, Chicago, IL, for Plaintiff Richard Giunta.

Joseph D. Cohen, Pro Hac Vice, Leanne H. Solish, Pro Hac Vice, Jason L. Krajcer, Glancy Prongay & Murray LLP, Los Angeles, CA, for Plaintiff David Leibowitz.

Junaid A. Zubairi, Rachel T. Copenhaver, Rebecca Lynn Dandy, Thomas P. Cimino, Jr., Vedder Price P.C., Chicago, IL, for Defendants Power Solutions International, Inc., Jay J. Hansen, Ellen R. Hoffing, Kenneth Landini, Mary E. Vogt.

John J. Sikora, Jr., Sean M. Berkowitz, Heather A. Waller, Adam L. Rosenbloom, Latham & Watkins LLP, Chicago, IL, for Defendant Gary S. Winemaster.

James A. Rolfes, Steven Alan Miller, Theresa Lynn Davis, Anthony Robert Todd, Reed Smith LLP, Chicago, IL, for Defendant Michael P. Lewis.

Michael J. Diver, Anna Mikulski, Michael James Lohnes, Katten Muchin Rosenman LLP, Chicago, IL, for Defendant Daniel P. Gorey.

**May 13, 2019 Final Approval Hearing**

**~~[PROPOSED]~~ ORDER AWARDING ATTORNEYS' FEES AND REIMBURSEMENT OF LITIGATION SEXPENSES**

HON. VIRGINIA M. KENDALL, UNITED STATES DISTRICT JUDGE

**\*1** This matter came on for hearing on May 13, 2019 (the "Final Approval Hearing") on Lead Counsel's motion for an award of attorneys' fees and reimbursement of Litigation Expenses. The Court having considered all matters submitted to it at the Final Approval Hearing and otherwise; and it appearing that notice of the Final Approval Hearing substantially in the form approved by the Court was mailed to all Settlement Class Members who or which could be identified with reasonable effort, and that a summary notice of the hearing substantially in the form approved by the Court was published in *Investor's Business Daily* and was transmitted over the *PR Newswire* pursuant to the specifications of the Court; and the Court having considered and determined the fairness and reasonableness of the award of attorneys' fees and Litigation Expenses requested,

NOW, THEREFORE, IT IS HEREBY ORDERED THAT:

1. This Order incorporates by reference the definitions in the Stipulation and Agreement of Settlement dated January 22, 2019 (ECF No. 135-1) (the "Stipulation") and all capitalized terms not otherwise defined herein shall have the same meanings as set forth in the Stipulation.

2. The Court has jurisdiction to enter this Order and over the subject matter of the Action and all parties to the Action, including all Settlement Class Members.

3. Notice of Lead Counsel's motion for an award of attorneys' fees and reimbursement of Litigation Expenses was given to all Settlement Class Members who could be identified with reasonable effort. The form and method of notifying the Settlement Class of the motion for an award of attorneys' fees and expenses satisfied the requirements of Rule 23 of the Federal Rules of Civil Procedure, the Private Securities Litigation Reform Act of 1995 (15 U.S.C. §§ 77z-1(a)(7), 78u-4(a)(7)), due process, and all other applicable law and rules, constituted the best notice practicable under the circumstances, and constituted due and sufficient notice to all persons and entities entitled thereto.

4. Plaintiffs' Counsel are hereby awarded attorneys' fees in the amount of 33 ⅓% of the Settlement Fund and $ 81,867.58 in reimbursement of Plaintiffs' Counsel's litigation expenses (which fees and expenses shall be paid from the Settlement Fund), which sums the Court finds to be fair and reasonable. Lead Counsel shall allocate the attorneys' fees awarded amongst Plaintiffs' Counsel in a manner which they, in good faith, believe reflects the contributions of such counsel to the institution, prosecution and settlement of the consolidated Action.

5. In making this award of attorneys' fees and reimbursement of expenses to be paid from the Settlement Fund, the Court has considered and found that:

(a) The Settlement has created a fund consisting of $ 8,500,000 in cash that has been funded into escrow pursuant to the terms of the Stipulation, and that numerous Settlement Class Members who submit acceptable Claim Forms will benefit from the Settlement that occurred because of the efforts of Plaintiffs' Counsel;

 *2 (b) Copies of the Postcard Notice were mailed to 12,577 potential Settlement Class Members and nominees stating that Lead Counsel would apply for attorneys' fees in an amount not exceed 33.3% of the Settlement Fund and reimbursement of Litigation Expenses in an amount not to exceed $ 175,000. There were no objections to the requested attorneys' fees and Litigation Expenses;

(c) Lead Counsel has conducted the litigation and achieved the Settlement with skill, perseverance and diligent advocacy;

(d) The Action raised a number of complex issues;

(e) Had Lead Counsel not achieved the Settlement there would remain a significant risk that Plaintiffs and the other members of the Settlement Class may have recovered less or nothing from Defendants;

(f) Plaintiffs' Counsel devoted over 3,554 hours, with a lodestar value of approximately $ 1,822,491 to achieve the Settlement; and

(g) The amount of attorneys' fees awarded and expenses to be reimbursed from the Settlement Fund are fair and reasonable and consistent with awards in similar cases.

6. Lead Plaintiff Richard Giunta is hereby awarded $ 5,000, and Plaintiff David Leibowitz is awarded $ 5,000 from the Settlement Fund as reimbursement for their reasonable costs and expenses directly related to their representation of the Settlement Class.

7. Any appeal or any challenge affecting this Court's approval regarding any attorneys' fees and expense application shall in no way disturb or affect the finality of the Judgment.

8. Exclusive jurisdiction is hereby retained over the parties and Settlement Class Members for all matters relating to this Action, including the administration, interpretation, effectuation or enforcement of the Stipulation and this Order.

9. In the event that the Settlement is terminated or the Effective Date of the Settlement otherwise fails to occur, this Order shall be rendered null and void to the extent provided by the Stipulation.

10. There is no just reason for delay in the entry of this Order, and immediate entry by the Clerk of the Court is expressly directed.

**All Citations**

Slip Copy, 2019 WL 2135914

---

**End of Document**

© 2021 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 39

🚩 KeyCite Yellow Flag - Negative Treatment
Report and Recommendation Adopted as Modified by  Johnson v. City of New York,  E.D.N.Y.,  February 11, 2011

2010 WL 5818290
Only the Westlaw citation is currently available.
United States District Court,
E.D. New York.

David R. JOHNSON; Arlene A. Quick,
individually, and as mother and natural
guardian of David S. Johnson; Infinite
Barnett; and Naseem Barnett, Plaintiffs,
v.
CITY OF NEW YORK; Police Officer Albert
Anzalone; Police Officer Fatmir Useini;
and Police Officers "JOHN DOE" whose
identities are currently unknown, Defendants.

No. 08 CV 3673(KAM)(LB).
|
Dec. 13, 2010.

**Attorneys and Law Firms**

Mark L. Lubelsky, Mark L. Lubelsky and Associates, New York, NY, for Plaintiffs.

Max Oliver McCann, Elizabeth M. Daitz, Max Oliver McCann, New York City Law Department, New York, NY, for Defendants.

**REPORT & RECOMMENDATION**

BLOOM, United States Magistrate Judge.

**\*1** Plaintiffs bring this action pursuant to 🚩 42 U.S.C. § 1983, alleging that defendants violated their constitutional rights during the search of plaintiffs' residence without a warrant or consent on July 6, 2007. (*See generally* Amended Complaint. (Document 32.) The parties have agreed to settle the case. Plaintiffs now move for an infant compromise order. [1] (Document 44.) Judge Matsumoto has referred the matter to me for a Report and Recommendation under 🚩 28 U.S.C. § 636(b). (Order dated October 14, 2010.) For the reasons that follow, it is respectfully recommended that plaintiffs' motion should be granted, and that the proposed infant compromise order should be approved with modifications.

**BACKGROUND**

Plaintiffs originally filed this action *pro se* on September 3, 2008. Because three of the plaintiffs were minors, the Court granted only plaintiffs David R. Johnson and Arlene Quick's motion to proceed *in forma pauperis,* as "the Second Circuit does not permit non-attorneys, even parents, to bring claims on behalf of their children without representation of counsel." (Memorandum and Order dated November 7, 2008, document 4, (citing 🚩 *Murphy v. Arlington Cent. School Dist. Bd. of Educ.,* 297 F.3d 195, 201 (2d Cir.2002)). The Court gave Mr. Johnson and Ms. Quick thirty days to find counsel, but when they were unable to do so within that time, the Court dismissed the claims of the minor plaintiffs without prejudice. (Memorandum and Order dated March 5, 2009, document 16.) [2] On October 5, 2009, counsel filed a notice of appearance on behalf of plaintiffs. Plaintiffs moved thereafter to amend the complaint, and reasserted the minor plaintiffs' claims. (Documents 29–30.) With defendants' consent, the Court granted the plaintiffs' motion to amend on October 23, 2009. (Document 31.)

*The Proposed Infant Compromise and Court Settlement Conferences*
Plaintiffs move for the Court to approve the parties' settlement of this action and to issue an infant compromise order. (*See* document 44.) Plaintiff submits a proposed order, an affirmation from plaintiffs' counsel, affidavits from the parents Mr. Johnson and Ms. Quick, and an affidavit from Jennifer Schwam, the social worker who counseled the minor plaintiffs following the events underlying the complaint. (*Id.*) These affidavits amplify some of the claims alleged in the amended complaint, and set forth a basis for the minor plaintiffs' damages. Specifically, plaintiffs state that the officers entered the house "with guns unholstered," "pointed their guns in the line of site" of all three minor plaintiffs, arrested their father, David R. Johnson, in their presence and "use[d] offensive expletives, including the 'n' word in their presence." (*See e.g.,* Affidavit of Arlene Quick ¶ 2, attached to Plaintiffs' motion for Approval of an Infant Compromise ("Ps' Motion"), document 44, as Exhibit A.) As a result, the three children suffered from post-traumatic stress disorder and depression. (Affidavit of Jennifer Schwam, attached to Ps' Motion as Exhibit C.)

**\*2** Although the parties agreed to settle the claims for a total of $20,000, the parties submitted different versions of how the settlement proceeds should be divided between the plaintiffs. The distributions detailed in plaintiffs' counsel's affirmation and the proposed infant compromise order allocate less to the parents and more to the children than is reflected in the parents' affidavits. A subsequent letter from defendants' counsel sets forth a different allocation proposal than the distributions in plaintiffs' proposed order and affidavits. (Document 45.) Defendants' letter states that plaintiff's counsel attributes the discrepancy in the various distributions of the settlement proceeds to "an oversight in [his] office." [3] (*Id.*)

In an attempt to resolve this issue, the Court held two telephone conferences on October 22 and 27, 2010. A new agreement regarding the allocation of the settlement proceeds was proposed. The parties, including all five plaintiffs, appeared before the Court for an infant compromise hearing on November 12, 2010. Mr. Johnson and Ms. Quick initially rejected, but then approved, the proposed settlement allocation. (Transcript of November 12, 2010 Infant Compromise Hearing ("Tr.") at 7, 12, 22.) The Court then questioned the three minor plaintiffs regarding their experience during the alleged events on July 6, 2007, their subsequent counseling, as well as their understanding of the proposed settlement. (Tr. at 14–21.) All three minor plaintiffs stated that they remember the events underlying the complaint, that they saw a counselor for some time, but no longer, and that they understand that the case is being settled on their behalf for a sum of money that will be held for them until they turn eighteen. (*Id.*)

## DISCUSSION

Where a case involves claims by an infant plaintiff, Courts in this District must review any proposed settlement, *see* Local Civil Rule 83.2(a), and determine "whether it is fair, whether the interests of the infant plaintiff are protected, and whether the attorneys' fees sought are reasonable," *Doe v. Mattingly,* No. 06 CV 5761, 2007 U.S. Dist. LEXIS 59541 (E.D.N.Y. Aug. 14, 2007). The Court should compare "the terms of the compromise with the likely rewards of litigation." *Neilson v. Colgate–Palmolive Co.,* 199 F.3d 642, 654 (2d Cir.1999) (quoting *Maywalt v. Parker & Parsley Petroleum Co.,* 67 F.3d 1072, 1078 (2d Cir.1995)). The Court must "form

an educated estimate of the complexity, expense, and likely duration of such litigation," *Martegani v. Cirrus Design Corp.,* 687 F.Supp.2d 373, 377 (S.D.N.Y.2010) (quoting *Newman v. Stein,* 464 F.2d 689, 692 (2d Cir.1972)), and "exercise the most jealous care that no injustice be done to the infant," *Southerland v. City of New York,* No. CV–99–3329, 2006 U.S. Dist. LEXIS 53582, at \*8 (E.D.N.Y. Aug. 2, 2006). Proposed settlements which have been negotiated by the infant's natural guardian carry a presumption that they are fair and in the infant's best interests, and should therefore be afforded some level of deference. *Sch. for Language & Commun. Dev. v. N.Y. State Dep't of Educ.,* No. 02–CV–0269, 2010 U.S. Dist. LEXIS 51320 at \*9 (E.D.N .Y. Apr. 7, 2010) (collecting cases).

**\*3** The Court's proceedings must "conform, as nearly as may be, to the New York State statutes and rules." Local Civil Rule 83.2(a). The New York rules for infant compromise proceedings are set forth in New York Judiciary Law § 474 and the New York Civil Practice Laws and Rules §§ 1205–1208, which require, among other things, an affidavit from the incompetent's representative stating "the terms and proposed distribution of the settlement and [the representative's] approval of both." NY CPLR § 1208(a)(5).

Here, affidavits submitted by the infants' representatives, David R. Johnson and Arlene Quick, pre-date the Court's conferences and thus state that Johnson and Quick will be allocated $7,333.34 jointly, with $2,000 going to each of the children. (Affidavits of Arlene Quick and David R. Johnson, attached to Ps' Motion as Exhibits A and B.) However, the final proposed infant compromise, as detailed on the record on November 12, 2010, contemplates a joint payment to Mr. Johnson and Ms. Quick of $4,333.34, and a distribution of $3,000 to each child. [4] (Tr. at 22.) The Court recommends that plaintiffs' agreement to the settlement on the record be accepted in lieu of the affidavit required by N.Y. CPLR § 1208(a)(5). *See* Local Civil Rule 83.2(a)(1) ("[T]he court, for cause shown, may dispense with any New York State requirement."); *see also Wagner & Wagner, LLP v. Atkinson, Haskins, Nellis, Brittingham, Gladd, & Carwile, P.C.,* 596 F.3d 84, 89 (2d Cir.2010) ("District courts have broad discretion when conducting an infant compromise hearing."). Mr. Johnson and Ms. Quick, with the assistance of counsel, stated their clear and unequivocal acceptance of the settlement agreement and the allocation of the settlement proceeds, including the settlement allocation regarding attorney's fees, on the record at the infant compromise hearing. (Tr. at 22.)

Case 4:19-cv-00509   Document 65-9   Filed 07/02/21 in TXSD   Page 970 of 1452
Johnson v. City of New York, Not Reported in F.Supp.2d (2010)
2010 WL 5818290

The prior proposals were discussed but abandoned by the parties by the time the Court conducted the hearing.

In accepting the oral agreement, the Court finds the proposed infant compromise to be fair, reasonable and in the best interests of the three infant plaintiffs in this case. As stated in his second affirmation, plaintiffs' counsel has practiced in the civil rights area since 1995, and recognizes the risk of litigating this case any further. Settling this case now avoids a costly and protracted period of discovery, particularly because plaintiffs would need expert discovery regarding plaintiffs' claims for damages and municipal liability. Balancing the potential cost and plaintiffs' burden against the prospect of a substantial damage award, the proposed settlement in this case should be approved. *See Allstate Ins. Co. v. Williams,* 2006 U.S. Dist. LEXIS 67849 (E.D.N.Y. Sept. 21, 2006) (listing the risks of establishing liability and damages among the factors to consider in approving an infant settlement) (citing *City of Detroit v. Grinnell Corp.,* 495 F.2d 448, 463 (2d Cir.1974)). The settlement agreement and the distribution of the settlement proceeds fairly compensate the infant plaintiffs. The infants' interests are protected, and a just balance has been reached between the parties regarding the terms of the compromise and the likely reward of this litigation.

### Attorney's Fees

**\*4** The Court must ensure that the allocation of attorney's fees from the settlement proceeds represents "suitable compensation for the attorney for his services," notwithstanding contingency agreements with a party. N.Y. Judiciary Law § 474; Local Civil Rule 83.2(a) (2); *see also Wagner,* 596 F.3d 84 at 90 ("[A] contract between the attorney and the infant guardians providing for a contingency fee is to be considered by the judge, but it is not binding.") (citation omitted). An infant's attorney must submit contemporaneous records "from which the court may determine the nature of the work done, the need for it, and the amount of time reasonably required...." *Martegani v. Cirrus Design Corp.,* 687 F.Supp.2d 373, 378 (S.D.N.Y.2010) (quote omitted).

An appropriate attorney's fee is determined by calculating the "presumptively reasonable fee." *Simmons v. N.Y. City Transit Auth.,* 575 F.3d 170, 172 (2d Cir.2009). "The most useful starting point for determining the amount of a reasonable fee is the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate."

*Arbor Hill Concerned Citizens Neighborhood Ass'n v. County of Albany,* 522 F.3d 182, 186 (2d Cir.2008) (quoting *Hensley v. Eckerhart,* 461 U.S. 424, 433, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983)). A reasonable rate is "the rate a paying client would be willing to pay," based on the "prevailing [hourly rate] in the community ... where the district court sits." *Arbor Hill,* 522 F.3d at 190; *see also Blum v. Stenson,* 465 U.S. 886, 896, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984) ( "[T]he requested rates [must be] in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation."); *McDaniel v. County of Schenectady,* 595 F.3d 411, 420 (2d Cir.2010) (district courts should "approximate the reasonable fee that a competitive market would bear.") "[A] reasonable, paying client wishes to spend the minimum necessary to litigate the case effectively." *Arbor Hill,* 522 F.3d at 190.

The Court should also consider the following factors in determining the reasonable hourly rate, and in deciding whether further adjustment is required:

> "[T]he complexity and difficulty of the case, the available expertise and capacity of the client's other counsel (if any), the resources required to prosecute the case effectively (taking account of the resources being marshaled on the other side but not endorsing scorched earth tactics), the timing demands of the case, whether an attorney might have an interest (independent of that of his client) in achieving the ends of the litigation or might initiate the representation himself, whether an attorney might have initially acted pro bono (such that a client might be aware that the attorney expected low or non-existent remuneration), and other returns (such as reputation, etc.) that an attorney might expect from the representation."

*Id.* at 184; *see also McDaniel,* 595 F.3d at 420 ("[A] district court should assess case-specific considerations at the *outset,*

2010 WL 5818290

factoring them into its determination of a reasonable hourly rate for the attorneys' work.") (emphasis added).

**\*5** Plaintiffs' counsel files an affirmation and attaches a "statement of account" reflecting his contemporaneous billing records. The statement documents over 32 hours of work on this case, [5] amounting to a total of $11,384.50 in fees. The hourly fees charged by Mr. Lubelsky and his associate ($450 and $325 respectively) are high for this district. *See* *Simmons,* 575 F.3d at 175 ("[A] district court must first apply a presumption in favor of application of the forum rule."); *Estrella v. P.R. Painting Corp.,* 596 F.Supp.2d 723, 725 (E.D.N.Y.2009) (outlining a range of reasonable hourly fees for the Eastern District of New York). However, plaintiffs' counsel seeks only a portion of the actual fees he accrued in prosecuting this case. [6] The Court therefore finds that the attorney's fees allocated here, a third of the total settlement ($6,666.66), is a reasonable attorney's fee and represents "suitable compensation" for plaintiffs' counsel's work in this action.

### *Case Under Seal*

Plaintiffs' proposed infant compromise order contains a provision sealing the courtroom and the entire case file. However, plaintiffs have not made an adequate showing that this case should be sealed. *See* *United States v. Amodeo,* 71 F.3d 1044, 1050–52 (2d Cir.1995) (indentifying the factors to consider when a party seeks to seal a document). The Court therefore recommends that the proposed infant compromise order be modified and this case should not be sealed. This recommendation is without prejudice and plaintiffs could file a new motion making the requisite showing to seal this case.

### CONCLUSION

Upon review of plaintiffs' motion for infant compromise, the attached affidavits and affirmations, and the record testimony of David R. Johnson, Arlene Quick, David S. Johnson, Infinite Barnett, and Naseem Barnett, the Court respectfully recommends that the proposed infant compromise be approved.

1. That the $20,000 settlement proceeds should be allocated as follows:

   a. $4,333.34 to David R. Johnson and Arlene Quick jointly

   b. $3,000 to Infinite Barnett (infant plaintiff)

   c. $3,000 to Naseem Barnett (infant plaintiff)

   d. $3,000 to David S. Johnson (infant plaintiff)

   e. $6,666.66 to Mark L. Lubelsky, Esq. for attorney's fees.

2. The proposed order's request to have the case filed under seal should be denied without prejudice.

Accordingly, plaintiffs shall revise and file the proposed infant compromise order by December 17, 2010.

### FILING OF OBJECTIONS TO THIS REPORT AND RECOMMENDATION

Pursuant to Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from service of this Report to file written objections. Such objections (and any responses to objections) shall be filed with the Clerk of the Court. Any request for an extension of time to file objections must be made within the fourteen-day period. Failure to file a timely objection to this Report generally waives any further judicial review. *Marcella v. Capital Dist. Physician's Health Plan, Inc.,* 293 F.3d 42 (2d Cir.2002); *Small v. Sec'y of Health and Human Services,* 892 F.2d 15 (2d Cir.1989); *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985).

**All Citations**

Not Reported in F.Supp.2d, 2010 WL 5818290

### Footnotes

2010 WL 5818290

1    David R. Johnson and Arlene Quick are the parents of the infant plaintiffs David S. Johnson, Infinite Barnett, and Naseem Barnett.

2    The November 7, 2008 and March 5, 2009 Orders were issued by Senior Judge Nina Gershon. The case was later transferred to Judge Matsumoto on March 6, 2009. (Document 17.)

3    The attorney who originally appeared for plaintiffs, and who first brokered the settlement between plaintiffs and defendants, has since left the firm. (*See* document 45.) His recollection of the proposed distribution cannot be reconciled with his clients' recollection of what they say they agreed to.

4    Both versions set aside one-third, or $6,666.66, in attorney's fees.

5    These records include the entries of the prior attorney David Gottlieb, and do not include more than 20 additional hours spent by attorney Mark L. Lubelsky on the infant compromise proceeding. (Affirmation of Mark Lubelsky, document 49, ¶ 4.)

6    Even at the lowest end of the hourly rate scale for partners in this District ($200), *Estrella,* 596 F.Supp.2d at 725, plaintiffs' counsel's 32 hours would amount to $6,400 in fees. However, this low hourly rate would not be appropriate for plaintiffs' counsel herein, based on his experience and the resources required to prosecute the case.

**End of Document**                              © 2021 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 40

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

| | |
|---|---|
| JULIAN KEIPPEL, Individually and On Behalf of All Others Similarly Situated, | CASE NO. 8:19-CV-00421-WFJ-CPT |
| Plaintiff, | CLASS ACTION |
| v. | |
| HEALTH INSURANCE INNOVATIONS, INC. n/k/a BENEFYTT TECHNOLOGIES, INC., GAVIN SOUTHWELL, and MICHAEL D. HERSHBERGER, | |
| Defendants. | |

**ORDER AWARDING ATTORNEYS' FEES AND
LITIGATION EXPENSES**

This matter came on for hearing on March 23, 2021 (the "Settlement Hearing") on Lead Plaintiffs' motion for attorneys' fees and litigation expenses. The Court having considered all matters submitted to it at the Settlement Hearing and otherwise; and it appearing that notice of the Settlement Hearing substantially in the form approved by the Court was mailed to all Settlement Class Members who or which could be identified with reasonable effort, and that a summary notice of the hearing substantially in the form approved by the Court was published in *Investor's Business Daily* and was transmitted over the *PR Newswire* pursuant to the specifications of the

1

Court; and the Court having considered and determined the fairness and reasonableness of the award of attorneys' fees and litigation expenses requested,

NOW, THEREFORE, IT IS HEREBY ORDERED THAT:

1. This Order incorporates by reference the definitions in the Stipulation and Agreement of Settlement dated December 3, 2020 (ECF No. 100-2) (the "Stipulation"), and all terms not otherwise defined herein shall have the same meanings as set forth in the Stipulation.

2. The Court has jurisdiction to enter this Order and over the subject matter of the Action and all parties to the Action, including all Settlement Class Members.

3. Notice of Lead Plaintiffs' motion for an award of attorneys' fees and litigation expenses was given to all Settlement Class Members who could be identified with reasonable effort. The form and method of notifying the Settlement Class of the motion for an award of attorneys' fees and litigation expenses satisfied the requirements of Rule 23 of the Federal Rules of Civil Procedure, the Private Securities Litigation Reform Act of 1995 (15 U.S.C. § 78u-4(a)(7)), due process, and all other applicable laws and rules, constituted the best notice practicable under the circumstances, and constituted due and sufficient notice to all persons and entities entitled thereto.

4. Lead Counsel for the Settlement Class are hereby awarded attorneys' fees in the amount of one-third of the Settlement Fund, or $3,666,666.67, plus accrued interest, and $377,837.59 in reimbursement of litigation expenses (which fees and expenses shall be paid from the Settlement Fund), which sums the Court finds to be

2

fair and reasonable. Lead Counsel shall allocate the attorneys' fees awarded amongst Plaintiffs' Counsel in a manner which it, in good faith, believes reflects the contributions of such counsel to the institution, prosecution, and settlement of the Action.

5.      In making this award of attorneys' fees and litigation expenses to be paid from the Settlement Fund, the Court has considered and found that:

a)      The Settlement has created a fund of $11,000,000 in cash that has been funded into escrow pursuant to the terms of the Stipulation, and that numerous Settlement Class Members who submit acceptable Claim Forms will benefit from the Settlement that occurred because of the efforts of Lead Counsel;

b)      The requested fee has been reviewed and approved as reasonable by Lead Plaintiffs;

c)      Copies of the Notice were mailed to 25,531 potential Settlement Class Members and nominees stating that Lead Counsel would apply for attorneys' fees in an amount not to exceed one-third of the Settlement Fund and for litigation expenses in an amount not to exceed $450,000, and no objections to the requested attorneys' fees and expenses were received;

d)      Lead Counsel conducted the litigation and achieved the Settlement with skill, perseverance, and diligent advocacy;

e)      The Action raised a number of complex issues;

3

f) Had Lead Counsel not achieved the Settlement, there would remain a significant risk that Lead Plaintiffs and the other members of the Settlement Class may have recovered less or nothing from Defendants;

g) Plaintiffs' Counsel devoted over 9,480 hours, with a lodestar value of over $4.8 million, to achieve the Settlement; and

h) The amount of attorneys' fees awarded and expenses to be reimbursed from the Settlement Fund are fair and reasonable and consistent with awards in similar cases.

6. In accordance with 15 U.S.C. § 78u-4(a)(4), Lead Plaintiff City of Birmingham Retirement and Relief System is hereby awarded $7,503.75 from the Settlement Fund, and Lead Plaintiff Oklahoma Municipal Retirement Fund is hereby awarded $7,069.55 from the Settlement Fund, as reimbursement for their reasonable costs and expenses directly related to their representation of the Settlement Class.

7. Any appeal or any challenge affecting this Court's approval regarding any attorneys' fees and expense application shall in no way disturb or affect the finality of the Judgment.

8. Exclusive jurisdiction is hereby retained over the parties and the Settlement Class Members for all matters relating to this Action, including the administration, interpretation, effectuation or enforcement of the Stipulation and this Order.

9.      In the event that the Settlement is terminated or the Effective Date of the Settlement otherwise fails to occur, this Order shall be rendered null and void to the extent provided by the Stipulation.

10.      Lead Plaintiffs' Motion for Attorneys' Fees and Litigation Expenses (Dkt. 106) is granted. There is no just reason for delay in the entry of this Order. The Clerk is directed to enter final judgment for attorneys' fees and expenses consistent with this Order.

**SO ORDERED** this 23rd day of March, 2021.

_____
**WILLIAM F. JUNG**
**UNITED STATES DISTRICT JUDGE**

# TAB 41

# EXHIBIT H

**EXHIBIT H - LODESTAR REPORT**

**KIRBY McINERNEY LLP**
**HOURS BY CATEGORY FROM INCEPTION TO OCTOBER 9, 2019**

*Lazan v. Quantum Corp., et al.* **, No. 18 Civ. 00923-RS (N.D. Cal.)**

Categories:

| | | |
|---|---|---|
| (1) New Case Research | (4) Mediation | (7) Conditional Class Certification/Preliminary Settlement Approval and Notice to Class |
| (2) Motions and Legal Research | (5) Discovery | (8) Final Approval |
| (3) Pleadings and Factual Research | (6) Settlement | (9) Case Management and Litigation Strategy/Analysis |

| | Status | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | Hourly Rate | Total Hours | Total Lodestar |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Attorneys** | | | | | | | | | | | | | |
| Ira Press | (P) | 8.50 | 44.75 | 48.50 | 74.75 | 47.50 | 40.25 | 10.75 | 14.50 | 10.00 | $ 995.00 | 299.50 | $ 298,002.50 |
| Christopher Studebaker | (P) | | 33.50 | 27.50 | 29.00 | 54.75 | 9.25 | 48.00 | 0.75 | 19.25 | $ 900.00 | 222.00 | $ 199,800.00 |
| Henry Telias | (OC) | | | 14.50 | | 233.50 | | | | | $ 950.00 | 248.00 | $ 235,600.00 |
| Beverly Tse Mirza | (OC) | | | | 30.00 | 59.50 | 47.00 | 50.50 | 21.00 | 0.25 | $ 700.00 | 208.25 | $ 145,775.00 |
| Karina Kosharskyy | (OC) | | | | 67.75 | | | | | | $ 650.00 | 67.75 | $ 44,037.50 |
| Emily Finestone | (A) | | | | | 69.75 | | | | | $ 475.00 | 69.75 | $ 33,131.25 |
| Peter Brueggen | (SA) | | | | | 233.40 | | | | | $ 475.00 | 233.40 | $ 110,865.00 |
| | | | | | | | | | | | | | |
| **Total Attorney Time** | | 8.50 | 78.25 | 90.50 | 201.50 | 698.40 | 96.50 | 109.25 | 36.25 | 29.50 | | 1348.65 | $ 1,067,211.25 |
| | | | | | | | | | | | | | |
| **Analysts** | | | | | | | | | | | | | |
| Orie Braun | (SAN) | | | 164.00 | 2.00 | 4.00 | | | | | $ 475.00 | 170.00 | $ 80,750.00 |
| Elaine Mui | (SAN) | | | | | | | 20.50 | 44.50 | | $ 475.00 | 65.00 | $ 30,875.00 |
| Nicholas Topousis | (AN) | 3.00 | 13.50 | | | | | | | | $ 275.00 | 16.50 | $ 4,537.50 |
| | | | | | | | | | | | | | |
| **Paralegals/Admin Clerks** | | | | | | | | | | | | | |
| Sarah Lynch | (PL) | 2.50 | 29.50 | | | | | | | | $ 250.00 | 32.00 | $ 8,000.00 |
| Margaret Carroll | (SPL) | | | | 5.00 | 4.50 | | 10.75 | | 3.25 | $ 300.00 | 23.50 | $ 7,050.00 |
| Robert Familiar | (SPL) | | | | | 1.00 | | | 8.00 | 5.00 | $ 300.00 | 14.00 | $ 4,200.00 |
| Elizabeth Ortiz | (PL) | | | | | 3.00 | | | 6.75 | 0.25 | $ 275.00 | 10.00 | $ 2,750.00 |
| Ricardo Wright | (AC) | | 13.00 | | | | | | | | $ 125.00 | 13.00 | $ 1,625.00 |
| | | | | | | | | | | | | | |
| **Total Professional Staff Time** | | 5.50 | 56.00 | 164.00 | 7.00 | 12.50 | 0.00 | 31.25 | 59.25 | 8.50 | | 344.00 | $ 139,787.50 |
| | | | | | | | | | | | | | |
| **TOTALS:** | | 14.00 | 134.25 | 254.50 | 208.50 | 710.90 | 96.50 | 140.50 | 95.50 | 38.00 | | 1692.65 | $ 1,206,998.75 |

Status:

| | | |
|---|---|---|
| **(P) - Partner** | **(SA) - Staff Attorney** | **(SPL) - Senior Paralegal** |
| **(OC) - Of Counsel** | **(SAN) - Senior Analyst** | **(PL) - Paralegal** |
| **(A) - Associate** | **(AN) - Analyst** | **(AC) - Administrative Clerk** |

Page 1 of 1

**EXHIBIT H - EXPENSES REPORT**

**KIRBY McINERNEY LLP**
**From Inception through October 9, 2019**

*Lazan v. Quantum Corp., et al.* , **No. 18 Civ. 00923-RS (N.D. Cal.)**

| CATEGORY | AMOUNT |
|---|---:|
| Computer Research (Westlaw, Pacer, Lexis) | $4,394.11 |
| Document Management | $39,029.56 |
| Experts | $23,611.00 |
| Filing Fees | $630.00 |
| Investigation | $13,589.75 |
| Mediation | $5,450.00 |
| Postage | $62.89 |
| Travel, Meals, Lodging | $13,826.35 |
|  |  |
| **TOTALS:** | **$100,593.66** |

# TAB 42

Robert V. Prongay (#270796)
Lionel Z. Glancy (#134180)
Lesley F. Portnoy (#304851)
GLANCY PRONGAY & MURRAY LLP
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
Facsimile: (310) 432-1495
rprongay@glancylaw.com
lportnoy@glancylaw.com

*Liaison Counsel for Lead Plaintiff Globis Capital Advisors L.L.C.
and the Proposed Plaintiff Class*

[Additional Counsel on Signature Page]

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| STEVEN LAZAN, <br><br> Plaintiff, <br><br> v. <br><br> QUANTUM CORPORATION, *et. al.*, <br><br> Defendants. | Case No. 3:18-cv-00923-RS <br><br> Hon. Richard Seeborg <br><br> **JUDGMENT AND ORDER GRANTING FINAL APPROVAL OF CLASS ACTION SETTLEMENT** |
| ALEXANDER E. NABHAN, <br><br> Plaintiff, <br> v. <br><br> QUANTUM CORP., *et al.*, <br><br> Defendants. | |

1

[Proposed] Judgment and Order Granting Final Approval of Class Action Settlement
Case No. 3:18-cv-00923-RS

WHEREAS, a consolidated class action is pending in this Court entitled *Lazan, et al. v. Quantum Corp., et al.*, Case No. 3:18-cv-00923-RS (the "Action");

WHEREAS, (a) Lead Plaintiff Globis Capital Advisors L.L.C., on behalf of itself and the putative Settlement Class (defined below), and (b) Defendants Quantum Corporation ("Quantum"), Jon W. Gacek ("Gacek"), and Fuad Ahmad ("Ahmad") (collectively, "Settling Defendants"; and, together with Lead Plaintiff, the "Parties"), have entered into a Stipulation of Settlement dated June 28, 2019 (the "Stipulation") that provides for the complete dismissal with prejudice of the claims, both known and unknown, that have been or could have been asserted against Defendants in the Action on the terms and conditions set forth in the Stipulation, subject to the approval of this Court (the "Settlement");

WHEREAS, unless otherwise defined in this Judgment, the capitalized terms herein shall have the same meaning as they have in the Stipulation;

WHEREAS, by Order dated July 26, 2019 (the "Preliminary Approval Order"), this Court: (a) preliminarily approved the Settlement; (b) certified the Settlement Class solely for purposes of effectuating the Settlement; (c) ordered that notice of the proposed Settlement be provided to potential Settlement Class Members; (d) provided Settlement Class Members with the opportunity either to exclude themselves from the Settlement Class or to object to the proposed Settlement; and (e) scheduled a hearing regarding final approval of the Settlement;

WHEREAS, due and adequate notice has been given to the Settlement Class;

WHEREAS, the Court conducted a hearing on November 14, 2019 (the "Settlement Hearing") to consider, among other things, (a) whether the terms and conditions of the Settlement are fair, reasonable, and adequate to the Settlement Class, and should therefore be approved; and (b) whether a judgment should be entered dismissing the Action with prejudice as against the Defendants; and

WHEREAS, the Court having reviewed and considered the Stipulation, all papers filed and proceedings held herein in connection with the Settlement, all oral and written comments

2

received regarding the Settlement, and the record in the Action, and good cause appearing therefor;

**IT IS HEREBY ORDERED, ADJUDGED AND DECREED:**

1. **Jurisdiction** – The Court has jurisdiction over the subject matter of the Action, and all matters relating to the Settlement, as well as personal jurisdiction over all of the Parties and each of the Settlement Class Members.

2. **Incorporation of Settlement Documents** – This Judgment incorporates and makes a part hereof: (a) the Stipulation filed with the Court on July 2, 2019; and (b) the Notice, the Summary Notice, and the Postcard Notice, all of which were filed with the Court on July 2, 2019.

3. **Class Certification for Settlement Purposes** – The Court hereby affirms its determinations in the Preliminary Approval Order certifying, for the purposes of the Settlement only, the Action as a class action pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure of behalf of the Settlement Class consisting of all Persons[1] who purchased Quantum common stock during the period from April 18, 2016 through February 8, 2018, inclusive (the "Settlement Class Period"), and who were damaged thereby. Excluded from the Settlement Class are: Defendants; the Officers and directors of Quantum at all relevant times, as well as members of their Immediate Families and their legal representatives, heirs, successors, or assigns; and any entity in which Defendants have or had a controlling interest.

4. **Adequacy of Representation** – Pursuant to Rule 23 of the Federal Rules of Civil Procedure, and for the purposes of the Settlement only, the Court hereby affirms its determinations in the Preliminary Approval Order certifying Lead Plaintiff as the Class Representative for the Settlement Class and appointing Lead Counsel as Class Counsel for the

---

[1] "Person" or "Persons" means an individual, corporation, partnership, limited partnership, association, joint stock company, estate, legal representative, trust, unincorporated association, government or any political subdivision or agency thereof, and any business or legal entity and their spouses, heirs, predecessors, successors, representatives, or assigns.

3

Settlement Class. Lead Plaintiff and Lead Counsel have fairly and adequately represented the Settlement Class both in terms of litigating the Action and for purposes of entering into and implementing the Settlement and have satisfied the requirements of Federal Rules of Civil Procedure 23(a)(4) and 23(g), respectively.

5. **Notice** – The Court finds that the dissemination of the Postcard Notice, the online posting of the Notice, and the publication of the Summary Notice complied with the requirements of the Federal Rules of Civil Procedure, satisfied the requirements of due process, as well as the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78-u4(a)(7), and constituted due and sufficient notice of the matters set forth herein. The Court finds that a full opportunity has been afforded to Class Members to object to the Settlement and/or to participate in the Settlement Hearing.  Furthermore, the Court hereby affirms that due and sufficient notice has been given to the appropriate State and Federal officials pursuant to the Class Action Fairness Act, 28 U.S.C § 1715.

a. Pursuant to, and in full compliance with, the Federal Rules of Civil Procedure, this Court hereby finds and concludes that due and adequate notice was directed to all Persons who are Settlement Class Members advising them of the Plan of Allocation and of their right to object thereto, and a full and fair opportunity was accorded to all Persons and entities who are Class Members to be heard with respect to the Plan of Allocation.

b. The Court hereby finds and concludes that the formula for the calculation of the claims of Authorized Claimants, as set forth in the Notice, provides a fair and reasonable basis upon which to allocate the net proceeds of the Settlement among Class Members, with due consideration having been given to administrative convenience and necessity.

6. **Final Settlement Approval and Dismissal of Claims** – Pursuant to, and in accordance with, Rule 23 of the Federal Rules of Civil Procedure, this Court hereby fully and finally approves the Settlement set forth in the Stipulation in all respects (including, without limitation: the amount of the Settlement; the Releases provided for therein; and the dismissal with prejudice of the claims asserted against Defendants in the Action), and finds that the

4

Settlement is, in all respects, fair, reasonable, and adequate to the Settlement Class. The Parties are directed to implement, perform, and consummate the Settlement in accordance with the terms and provisions contained in the Stipulation.

7. The Action and all of the claims asserted against Defendants in the Action by Lead Plaintiff and the other Settlement Class Members are hereby dismissed with prejudice. The Parties shall bear their own costs and expenses, except as otherwise expressly provided in the Stipulation.

8. **Binding Effect** – The terms of the Stipulation and of this Judgment shall be forever binding on Defendants, Lead Plaintiff, and all other Settlement Class Members (regardless of whether or not any individual Settlement Class Member submits a Claim Form or seeks or obtains a distribution from the Net Settlement Fund), as well as their respective successors and assigns.

9. **Releases** – The Releases set forth in paragraphs 5 and 6 of the Stipulation, together with the definitions contained in paragraph 1 of the Stipulation relating thereto, are expressly incorporated herein in all respects. The Releases are effective as of the Effective Date. Accordingly, this Court orders that:

a. Without further action by anyone, and subject to paragraph 10 below, upon the Effective Date of the Settlement, Lead Plaintiff and each of the other Settlement Class Members, on behalf of themselves and all other Plaintiffs' Released Parties, shall be deemed to have, and by operation of law and of this Judgment shall have, fully, finally and forever compromised, settled, released, resolved, relinquished, waived, discharged, and dismissed each and every Released Plaintiffs' Claim against the Defendants and the other Defendants' Released Parties, and shall forever be barred and enjoined from prosecuting any or all of the Released Plaintiffs' Claims against any of the Defendants' Released Parties. This release shall not apply to any Excluded Claims (as that term is defined in paragraph 1(p) of the Stipulation).

b. Without further action by anyone, and subject to paragraph 10 below, upon the Effective Date of the Settlement, Defendants, on behalf of themselves and all other

5

[Proposed] Judgment and Order Granting Final Approval of Class Action Settlement
Case No. 3:18-cv-00923-RS

Defendants' Released Parties, shall be deemed to have, and by operation of law and of this Judgment shall have, fully, finally and forever compromised, settled, released, resolved, relinquished, waived and discharged each and every Released Defendants' Claims against Lead Plaintiff and the other Plaintiffs' Released Parties, and shall forever be barred and enjoined from prosecuting any or all of the Released Defendants' Claims against any of the Plaintiffs' Released Parties.

10. Notwithstanding paragraphs 9(a)–(b) above, nothing in this Judgment shall bar any action by any of the Parties to enforce or effectuate the terms of the Stipulation or this Judgment.

11. **Rule 11 Findings** – The Court finds and concludes that the Parties and their respective counsel have complied in all respects with the requirements of Rule 11 of the Federal Rules of Civil Procedure in connection with the institution, prosecution, defense, and settlement of the Action.

12. **No Admissions** – Neither this Judgment, the Stipulation (whether or not consummated), including the exhibits thereto and the Plan of Allocation contained therein (or any other plan of allocation that may be approved by the Court), nor the negotiations leading to the execution of the Stipulation, nor any proceedings taken pursuant to or in connection with the Stipulation and/or approval of the Settlement (including any arguments proffered in connection therewith):

a. shall be offered against any of the Defendants' Released Parties as evidence of, or construed as or deemed to be evidence of, any presumption, concession, or admission by any of the Defendants' Released Parties with respect to the truth of any fact alleged by Lead Plaintiff or any other of Plaintiffs' Released Parties, or the validity of any claim that was or could have been asserted against any of the Defendants' Released Parties, or the deficiency of any defense that has been or could have been asserted in this Action or in any other litigation, or of any liability, negligence, fault, or other wrongdoing of any kind with respect to any of the Defendants' Released Parties, or in any way referred to for any other reason as against any of the

6

[Proposed] Judgment and Order Granting Final Approval of Class Action Settlement
Case No. 3:18-cv-00923-RS

Defendants' Released Parties, in any civil, criminal, or administrative action or proceeding, other than such proceedings as may be necessary to effectuate the provisions of this Stipulation;

b.      shall be offered against any of the Plaintiffs' Released Parties, as evidence of, or construed as, or deemed to be evidence of any presumption, concession, or admission by any of the Plaintiffs' Released Parties that any of their claims are without merit, that any of the Defendants' Released Parties had meritorious defenses, or that damages recoverable under the Complaint would not have exceeded the Settlement Amount or with respect to any liability, negligence, fault, or wrongdoing of any kind, or in any way referred to for any other reason as against any of the Plaintiffs' Released Parties, in any civil, criminal, or administrative action or proceeding, other than such proceedings as may be necessary to effectuate the provisions of this Stipulation; or

c.      shall be construed against any of the Released Parties as an admission, concession, or presumption that the consideration to be given hereunder represents the amount which could be or would have been recovered after trial; provided, however, that the Parties and the Released Parties and their respective counsel may refer to this Judgment and the Stipulation to effectuate the protections from liability granted hereunder and thereunder or otherwise to enforce the terms of the Settlement.

13.      **Retention of Jurisdiction** – Without affecting the finality of this Judgment in any way, this Court retains continuing and exclusive jurisdiction over: (a) the Parties for purposes of the administration, interpretation, implementation, and enforcement of the Settlement; (b) the disposition of the Settlement Fund; (c) any motion for an award of attorneys' fees and/or Litigation Expenses by Lead Counsel in the Action that will be paid from the Settlement Fund; (d) any motion to approve the Plan of Allocation; (e) any motion to approve the Class Distribution Order; and (f) the Settlement Class Members for all matters relating to the Action.

14.      **Plan of Allocation** – This Court hereby approves the Plan of Allocation as set forth in the Notice as fair and equitable, and overrules all objections to the Plan of Allocation, if any, in their entirety. The Court directs Lead Plaintiff's Counsel and the Claims Administrator to

[Proposed] Judgment and Order Granting Final Approval of Class Action Settlement
Case No. 3:18-cv-00923-RS

proceed with the processing of Claim Forms and the administration of the settlement pursuant to the terms of the Plan of Allocation and, upon completion of the claims processing procedure, to present to this Court a proposed final distribution order for the distribution of the Net Settlement Fund to eligible Settlement Class Members, as provided in the Stipulation and Plan of Allocation.

15. **Lead Counsel's Attorneys' Fees and Reimbursement of Litigation Expenses** – This Court hereby awards Lead Plaintiff's Counsel attorneys' fees equal to 25% of the Settlement Fund net of their out-of- pocket expenses in the amount of $101,324.55, for a total of $2,012,168.86, with interest to accrue on such amount at the same rate and for the same periods as accrued by the Settlement Fund from the date of this Judgment to the date of actual payment of said attorneys' fees and expenses to Lead Plaintiff's Counsel as provided in the Stipulation. The foregoing amount shall be paid to Lead Plaintiff's Counsel from the Settlement Fund pursuant to the terms, conditions and obligations of the Stipulation. Lead Plaintiff's Counsel may make payments of fees and expenses to counsel for other plaintiffs as Lead Plaintiff's Counsel deems appropriate based on their relative contribution to the prosecution and resolution of the Action. Neither the Plan of Allocation submitted by Lead Plaintiffs' Counsel nor the portion of this Judgment regarding the attorneys' fee and litigation expenses application including any modification or change in the award of attorneys' fees and litigation expenses that may hereafter be approved, shall in any way disturb or affect this Judgment or the Releases provided hereunder and shall be considered separate from this Judgment.

16. **Modification of the Agreement of Settlement** – Without further approval from the Court, Lead Plaintiff and Defendants are hereby authorized to agree to and adopt such amendments or modifications of the Stipulation or any exhibits attached thereto to effectuate the Settlement that: (a) are not materially inconsistent with this Judgment; and (b) do not materially limit the rights of Settlement Class Members in connection with the Settlement. Without further order of the Court, Lead Plaintiff and Defendants may agree to reasonable extensions of time to carry out any provisions of the Settlement.

8

17.   **Termination of Settlement** – If the Settlement is terminated as provided in the Stipulation or the Effective Date of the Settlement otherwise fails to occur, this Judgment shall be vacated, rendered null and void, and be of no further force and effect, except as otherwise provided by the Stipulation, and this Judgment shall be without prejudice to the rights of Lead Plaintiff, the other Settlement Class Members and Defendants, and the Parties shall revert to their respective positions in the Action as of February 20, 2019, as provided in the Stipulation.

18.   **Entry of Final Judgment** – There is no just reason to delay the entry of this Judgment as a final judgment in this Action. Accordingly, the Clerk of the Court is expressly directed to immediately enter this final judgment in this Action.

SO ORDERED this 27th day of November, 2019.

_____
The Honorable Richard Seeborg
United States District Judge

9

[Proposed] Judgment and Order Granting Final Approval of Class Action Settlement
Case No. 3:18-cv-00923-RS

# TAB 43

Filed 5/15/15

Clerk, U. S. District Court
Western District of Texas

By

Deputy

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**

| | |
|---|---|
| DON LEE, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED, Plaintiff, vs. ACTIVE POWER, INC., STEVEN R. FIFE, DOUG MILNER, and HUAN WANG, Defendants. | Civil Action No.: **13-cv-797-SS** |



~~[PROPOSED]~~ **ORDER**

Having considered the moving papers on Class Representatives' Motion for an Award of Attorneys' Fees and Reimbursement of Expensesand all other matters presented to this Court, and good cause appearing therefore: **IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:**

1. The Court GRANTS Co-Lead Counsel's request for attorneys' fees in the cash amount of one-third of the Settlement Fund ($500,000), as well as reimbursement of reasonable and necessary expenses incurred in the prosecution of the Action in the amount of $25,485.53, together with the interest earned thereon for the same time period and at the rate earned by the Settlement Fund until paid. Said fees shall be allocated among Plaintiffs' Counsel in a manner which, in their good-faith judgment, reflects each counsel's contribution to the institution, prosecution and resolution of the Action. The Court finds that the amount of fees awarded is fair and reasonable in light of the time and labor required, the novelty and difficulty of the case, the skill required to prosecute the case, the experience and ability of the attorneys, awards in similar cases, the contingent nature of the representation and the result obtained for the Class

2. The Court hereby GRANTS Class Representatives' reimbursement of their reasonable costs and expenses (including lost wages) directly related to their representation of the Settlement Class in the amount of $1,500 each.

SO ORDERED:

Dated: _May 16_____, 2015

_____
HON. SAM SPARKS
UNITED STATES DISTRICT JUDGE

# TAB 44

2021 WL 2220565

2021 WL 2220565
Only the Westlaw citation is currently available.
United States District Court, D. New Jersey.

Bing LI, et al., Plaintiffs,
v.
AETERNA ZENTARIS INC., et al., Defendants.

Case No. 3:14-cv-07081-PGS-TJB
|
Signed 06/01/2021

**Attorneys and Law Firms**

Erica L. Stone, The Rosen Law Firm PA, New York, NY, Lauren M. Rosen, The Rosen Law Firm PA, South Orange, NJ, for Plaintiff Bing Li.

Austin A. Evans, Ryan T. Kearney King & Spalding LLP, Atlanta, GA, for Defendants David A. Dodd, Juerhen Engel, Paul Blake, Nicholas J. Pelliccione.

### ORDER AWARDING ATTORNEYS' FEES AND REIMBURSEMENT OF LITIGATION EXPENSES

Peter G. Sheridan, United States District Judge

**\*1** This matter came on for hearing on May 27, 2021 (the "Settlement Hearing") on Lead Counsel's motion for an award of attorneys' fees and reimbursement of Litigation Expenses. The Court having considered all matters submitted to it at the Settlement Hearing and otherwise; and it appearing that notice of the Settlement Hearing substantially in the form approved by the Court was provided to all Class Members who or which could be identified with reasonable effort; and that a summary notice of the hearing substantially in the form approved by the Court was published in *Investor's Business Daily* and was transmitted over the *PR Newswire* pursuant to the specifications of the Court; and the Court having considered and determined the fairness and reasonableness of the award of attorneys' fees and Litigation Expenses requested,

NOW, THEREFORE, IT IS HEREBY ORDERED THAT:
1. This Order incorporates by reference the definitions in the Stipulation and Agreement of Settlement dated July 22, 2020 (ECF No. 169-1, the "Stipulation") and all capitalized terms not otherwise defined herein shall have the same meanings as set forth in the Stipulation.

2. The Court has jurisdiction to enter this Order and over the subject matter of the Action and all Parties to this Action, including all Class Members.

3. Notice of Lead Counsel's motion for an award of attorneys' fees and reimbursement of Litigation Expenses was given to all Class Members who could be identified with reasonable effort. The form and method of notifying the Class of the motion for an award of attorneys' fees and expenses satisfied the requirements of 🚩 Rule 23 of the Federal Rules of Civil Procedure, the Private Securities Litigation Reform Act of 1995 (15 U.S.C. § 78u-4(a)(7)), due process, and all other applicable law and rules, constituted the best notice practicable under the circumstances, and constituted due and sufficient notice to all persons and entities entitled thereto.

4. Lead Counsel is hereby awarded attorneys' fees in the amount of 33⅓% of the Settlement Fund (including interest earned thereon at the same rate as the Settlement Fund) and $683,161.10 in reimbursement of counsel's out-of-pocket litigation expenses (which fees and expenses shall be paid from the Settlement Fund), which sums the Court finds to be fair and reasonable.

5. In making this award of attorneys' fees and reimbursement of expenses to be paid from the Settlement Fund, the Court has considered statements set forth by Lead Counsel at the hearing on May 27, 2021, and in the briefs and evidence filed in support of the motion for award of attorneys' fees and reimbursement of Litigation Expenses, and found that:

(a) The Settlement has created a fund of $6,500,000 in cash that has been funded into escrow pursuant to the terms of the Stipulation, and that numerous Class Members who submit acceptable Claim Forms will benefit from the Settlement that occurred because of the efforts of Plaintiffs' Counsel;

(b) Approximately 22,098 copies of the Notice were mailed to potential Class Members and nominees stating that Lead Counsel would apply for attorneys' fees in an amount not to exceed 33⅓% of the Settlement Fund and reimbursement of Litigation Expenses in an amount not to exceed $825,000. There were no meritorious objections to the requested attorneys' fees and reimbursement of Litigation Expenses;

**\*2** (c) Plaintiffs' Counsel undertook the Action on a fully contingent basis, have received no compensation during the

pendency of the Action, and any fee and expense award has been contingent on the result achieved;

(d) The percentage fee award is consistent with the market rate in similarly complex litigation conducted on a contingent basis;

(e) The Settlement is solely attributable to the efforts of Lead Plaintiffs and Plaintiff's Counsel;

(f) Plaintiffs' Counsel have conducted the litigation and achieved the Settlement with skill, perseverance and diligent advocacy, and they are highly experienced in the field of securities class action litigation;

(g) The Action involves complex factual and legal issues and, in the absence of settlement, would involve lengthy proceedings whose resolution would be uncertain;

(h) Had Plaintiffs' Counsel not achieved the Settlement there would remain a significant risk that Lead Plaintiffs and the other members of the Settlement Class may have recovered less or nothing from Defendants;

(i) Plaintiffs' Counsel devoted at least 6,584.2 hours through January 7, 2021, with a lodestar value of approximately $4,885,315.50, to achieve the Settlement;

(j) The stakes in the Action were extremely high given, among other things, the amount of money at issue, and the large size of the Settlement Class; and

(k) The amount of attorneys' fees awarded from the Settlement Fund is fair and reasonable and consistent with

fee awards approved in similarly complex cases within the Third Circuit.

6. Lead Plaintiffs Phong Thomas Dinh, Gregory Vizirgianakis, and Jamshid Khodavandi are each hereby awarded $17,000 from the Settlement Fund as reimbursement for their reasonable costs and expenses directly related to their representation of the Class.

7. Any appeal or any challenge affecting this Court's approval regarding any attorneys' fees and expense application shall in no way disturb or affect the finality of the Judgment.

8. Exclusive jurisdiction is hereby retained over the Parties and Class Members for all matters relating to this Action, including the administration, interpretation, effectuation or enforcement of the Stipulation and this Order.

9. In the event that the Settlement is terminated or the Effective Date of the Settlement otherwise fails to occur, this Order shall be rendered null and void to the extent provided by the Settlement.

10. There is no just reason for delay in the entry of this Order, and immediate entry by the Clerk of the Court is expressly directed.

SO ORDERED this 1 day of June, 2021.

**All Citations**

Slip Copy, 2021 WL 2220565

---

**End of Document**

© 2021 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 45

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| DANIEL LILIENFELD, Individually and On Behalf of All Others Similarly Situated, | § § § § | Case No.: 4:19-cv-1064 |
| | § | JURY TRIAL DEMANDED |
| Plaintiff, | § § | |
| v. | § § | |
| BRISTOW GROUP INC., JONATHAN E. BALIFF, and L. DON MILLER, | § § § | |
| Defendants. | § § § | |

## CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

{00316920;2 }

Case 4:19-cv-01064 Document 1 Filed on 03/21/19 in TXSD Page 2 of 20

Plaintiff Daniel Lilienfeld ("Plaintiff"), individually and on behalf of all others similarly situated, by and through his attorneys, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, among other things, his counsel's investigation, which includes without limitation: (a) review and analysis of regulatory filings made by Bristow Group Inc. ("Bristow" or the "Company") with the United States ("U.S.") Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and media reports issued by and disseminated by Bristow; and (c) review of other publicly available information concerning Bristow.

## NATURE OF THE ACTION AND OVERVIEW

1.  This is a class action on behalf of persons and entities that purchased or otherwise acquired Bristow securities between February 8, 2018 and February 12, 2019, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act"), against the Company and certain of its top officials.

2.  Bristow is an industrial aviation services provider with major transportation operations in the North Sea, Nigeria and the Gulf of Mexico, and in most other major offshore energy producing regions of the world.

3.  Throughout the Class Period, Defendants made materially false and/or misleading statements, as well as failed to disclose material adverse facts about Bristow's business, operations, and prospects. Specifically, Defendants failed to disclose to investors that: (i) Bristow lacked adequate monitoring processes related to non-financial covenants within its secured financing and lease agreements; (ii) as a result, Bristow could not reasonably assure compliance with certain non-financial covenants; (iii) as a result, Bristow was reasonably likely to breach certain agreements; (iv) as a result, Bristow had understated its short-term debt; (v) the

{00316920;2 }

2

required corrections would materially impact financial statements; (vi) there was a material weakness in Bristow's internal controls over financial reporting; and (vii) as a result of the foregoing, Defendants' positive statements about Bristow's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

4.      On February 11, 2019, after the market closed, Bristow filed a Form 8-K with the SEC disclosing that it "did not have adequate monitoring control processes in place related to non-financial covenants within certain of its secured financing and lease agreements."

5.      On this news, Bristow's stock price fell $1.22 per share, or nearly 40%, to close at $1.84 per share on February 12, 2019, on unusually heavy trading volume.

6.      On February 12, 2019, Bristow filed a Form 8-K with the SEC to announce that: (i) it had terminated its agreement to purchase Columbia Helicopters, Inc. ("Columbia Helicopters"); and (ii) Jonathan E. Baliff would retire as Chief Executive Officer and would resign from the Board of Directors, effective February 28, 2019.

7.      On this news, Bristow's stock price fell $0.64 per share, or nearly 35%, to close at $1.20 per share on February 13, 2019, on unusually heavy trading volume.

8.      As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

9.      The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

10.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

{00316920;2 }

3

11. Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)). Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District. Many of the acts charged herein, including the dissemination of materially false and/or misleading information, occurred in substantial part in this Judicial District. In addition, the Company's principal executive offices are located in this district.

12. In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

**PARTIES**

13. Plaintiff, as set forth in the accompanying certification, incorporated by reference herein, purchased Bristow securities during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

14. Defendant Bristow is incorporated under the laws of Delaware with its principal executive offices located in Houston, Texas. Bristow's common stock trades on the New York Stock Exchange ("NYSE") under the symbol "BRS."

15. Defendant Jonathan E. Baliff ("Baliff") was the Chief Executive Officer ("CEO") and a Director of Bristow at all relevant times.

16. Defendant L. Don Miller ("Miller") was the Chief Financial Officer of Bristow at all relevant times.

17. Defendants Baliff and Miller, (collectively the "Individual Defendants"), because of their positions with Bristow, possessed the power and authority to control the contents of the

{00316920;2 }

4

Case 4:19-cv-01064 Document 1 Filed 03/21/19 in TXSD Page 5 of 20

Company's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market. The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading. The Individual Defendants are liable for the false statements pleaded herein.

## SUBSTANTIVE ALLEGATIONS

### Background

18. Bristow is an industrial aviation services provider with major transportation operations in the North Sea, Nigeria and the Gulf of Mexico, and in most other major offshore energy producing regions of the world.

### Materially False and Misleading Statements Issued During the Class Period

19. The Class Period begins on February 8, 2018. On that day, Bristow filed its quarterly report on Form 10-Q with the SEC for the period ended December 31, 2017 (the "3Q18 10-Q"). Therein, the Company reported $360.7 million revenue, $9.937 million net loss, $1.102 billion long-term debt, and $93.137 million short-term borrowings.

20. In the 3Q18 10-Q, Bristow reported that management had concluded that its internal controls over financial reporting were effective as of December 31, 2017.

21. On May 23, 2018, Bristow filed its annual report on Form 10-K with the SEC for the period ended March 31, 2018 (the "2018 10-K"). Therein, the Company reported $1.444

billion revenue, $198.08 million net loss, $1.429 billion long-term debt, and $56.7 million short-term borrowings.

22. The 2018 10-K disclosed certain risks relating to Bristow's level of indebtedness that affected its operations. The Company stated, in relevant part:

***Failure to comply with covenants contained in certain of our lease agreements could limit our ability to maintain our leased aircraft fleet and could adversely affect our business.***

We have a significant amount of fixed obligations related to operating leases, including aircraft leases. The terms of our aircraft lease agreements contain covenants that impose certain limitations on us. Such lease agreements limit, among other things, our ability to utilize aircraft in certain jurisdictions and/or to sublease aircraft, and may contain restrictions upon a change of control. A breach of lease covenants could result in an obligation to repay amounts outstanding under the lease, including rent. A breach of lease covenants with respect to the return of aircraft to our lessors could also result in an obligation to pay holdover rent beyond the scheduled lease expiration date for such aircraft and/or increased maintenance and repair costs. If any such event occurs, we may not be able to pay all amounts due under the leases or to refinance such leases on terms satisfactory to us or at all, which could have a material adverse effect on our business, financial condition and results of operations.

23. Moreover, the 2018 10-K stated that management had concluded that Bristow's internal control over financial reporting was effective as of March 31, 2018.

24. On August 2, 2018, Bristow filed its quarterly report on Form 10-Q with the SEC for the period ended June 30, 2018, in which it reported $367.89 million revenue, $32.04 million net loss, $1.410 billion long-term debt, and $53.7 million short-term borrowings.

25. On November 9, 2018, Bristow filed its quarterly report on Form 10-Q with the SEC for the period ended September 30, 2018, in which it reported $350.65 million revenue, $143.67 net loss, $1.399 billion long-term debt, and $50.79 million short-term borrowings.

26. The same day, Bristow announced that it had entered an agreement to combine with privately-held Columbia Helicopters, Inc. for $560 million.

27. The above statements identified in ¶¶ 19-26 were materially false and/or misleading, and failed to disclose material adverse facts about Bristow's business, operations, and prospects. Specifically, Defendants failed to disclose to investors that: (i) Bristow lacked adequate monitoring processes related to non-financial covenants within its secured financing and lease agreements; (ii) as a result, Bristow could not reasonably assure compliance with certain non-financial covenants; (iii) as a result, Bristow was reasonably likely to breach certain agreements; (iv) as a result, Bristow had understated its short-term debt; (v) the required corrections would materially impact financial statements; (vi) there was a material weakness in Bristow's internal controls over financial reporting; and (vii) as a result of the foregoing, Defendants' positive statements about Bristow's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

**Disclosures at the End of the Class Period**

28. On February 11, 2019, after the market closed, Bristow disclosed that management had identified a material weakness in its internal controls over financial reporting. In a Form 8-K filed with the SEC, the Company stated, in relevant part:

> As part of management's assessment of the Company's internal controls over financial reporting as of December 31, 2018, a control deficiency was identified by the Company related to the Company's processes for monitoring compliance with certain non-financial covenants in certain of the Company's secured financing and lease agreements . . . .

> Management has concluded that the Company did not have adequate monitoring control processes in place related to non-financial covenants within certain of its secured financing and lease agreements, and this control deficiency identified represents a "material weakness" in internal controls over financial reporting. Accordingly, the Company's internal control over financial reporting was ineffective at March 31, 2018 and the reporting periods thereafter. As such, both management's assessment and the report of KPMG on internal control over financial reporting as of March 31, 2018 should no longer be relied upon. In addition, because of the material weakness described above, in February 2019, the Company's management has determined that the Company's disclosure controls

{00316920;2 }

7

and procedures were not effective at a reasonable assurance level as of March 31, 2018 and the reporting periods thereafter.

29. Moreover, Bristow stated that it was evaluating whether the material weakness resulted in a misstatement in its financial statements. Specifically, the Company was evaluating "whether certain debt balances should be reclassified from long-term to short-term in those financial statements, whether related waivers can be obtained from lenders, if necessary, and the resulting impact on the assessment of the Company's ability to continue as a going concern."

30. On this news, Bristow's stock price fell $1.22 per share, or nearly 40%, to close at $1.84 per share on February 12, 2019, on unusually heavy trading volume.

31. On February 12, 2019, Bristow filed a Form 8-K with the SEC to announce that it had terminated its agreement to purchase Columbia Helicopters and that it had paid $20 million to Columbia Helicopters in exchange for a release of claims associated with the purchase agreement and/or its termination.

32. In the same filing, Bristow also announced that Defendant Baliff had retired as the Company's CEO and resigned from its Board of Directors, effective February 28, 2019.

33. On this news, Bristow's stock price fell $0.64 per share, or nearly 35%, to close at $1.20 per share on February 13, 2019, on unusually heavy trading volume.

## CLASS ACTION ALLEGATIONS

34. Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all persons and entities that purchased or otherwise acquired Bristow securities between February 8, 2018 and February 12, 2019, inclusive, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their

Case 4:19-cv-01064 Document 1 Filed on 03/21/19 in TXSD Page 9 of 20

immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

35.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Bristow's common shares actively traded on the NYSE.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are at least hundreds or thousands of members in the proposed Class.  Millions of Bristow common stock were traded publicly during the Class Period on the NYSE.  Record owners and other members of the Class may be identified from records maintained by Bristow or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

36.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

37.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

38.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

a.     whether the federal securities laws were violated by Defendants' acts as alleged herein;

b.      whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of Bristow; and

c.      to what extent the members of the Class have sustained damages and the proper measure of damages.

39.      A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## UNDISCLOSED ADVERSE FACTS

40.      The market for Bristow's securities was open, well-developed and efficient at all relevant times.  As a result of these materially false and/or misleading statements, and/or failures to disclose, Bristow's securities traded at artificially inflated prices during the Class Period.  Plaintiff and other members of the Class purchased or otherwise acquired Bristow's securities relying upon the integrity of the market price of the Company's securities and market information relating to Bristow, and have been damaged thereby.

41.      During the Class Period, Defendants materially misled the investing public, thereby inflating the price of Bristow's securities, by publicly issuing false and/or misleading statements and/or omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and/or misleading.  The statements and omissions were materially false and/or misleading because they failed to disclose material adverse information and/or misrepresented the truth about Bristow's business, operations, and prospects as alleged herein.

{00316920;2 }

10

42. At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Bristow's financial well-being and prospects. These material misstatements and/or omissions had the cause and effect of creating in the market an unrealistically positive assessment of the Company and its financial well-being and prospects, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times. Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein when the truth was revealed.

## LOSS CAUSATION

43. Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class.

44. During the Class Period, Plaintiff and the Class purchased Bristow's securities at artificially inflated prices and were damaged thereby. The price of the Company's securities significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

## SCIENTER ALLEGATIONS

45. As alleged herein, Defendants acted with scienter since Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and/or misleading; knew that such statements or documents would be issued or

disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding Bristow, their control over, and/or receipt and/or modification of Bristow's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Bristow, participated in the fraudulent scheme alleged herein.

## APPLICABILITY OF PRESUMPTION OF RELIANCE (FRAUD-ON-THE-MARKET DOCTRINE)

46. The market for Bristow's securities was open, well-developed and efficient at all relevant times. As a result of the materially false and/or misleading statements and/or failures to disclose, Bristow's securities traded at artificially inflated prices during the Class Period. On May 17, 2018, the Company's share price closed at a Class Period high of $18.72 per share. Plaintiff and other members of the Class purchased or otherwise acquired the Company's securities relying upon the integrity of the market price of Bristow's securities and market information relating to Bristow, and have been damaged thereby.

47. During the Class Period, the artificial inflation of Bristow's shares was caused by the material misrepresentations and/or omissions particularized in this Complaint causing the damages sustained by Plaintiff and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Bristow's business, prospects, and operations. These material misstatements and/or omissions created an unrealistically positive assessment of Bristow and its business, operations, and prospects, thus causing the price of the Company's securities to be

{00316920;2 }

artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Company shares. Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at such artificially inflated prices, and each of them has been damaged as a result.

48. At all relevant times, the market for Bristow's securities was an efficient market for the following reasons, among others:

a. Bristow shares met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

b. As a regulated issuer, Bristow filed periodic public reports with the SEC and/or the NYSE;

c. Bristow regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or

d. Bristow was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

49. As a result of the foregoing, the market for Bristow's securities promptly digested current information regarding Bristow from all publicly available sources and reflected such information in Bristow's share price. Under these circumstances, all purchasers of Bristow's securities during the Class Period suffered similar injury through their purchase of Bristow's securities at artificially inflated prices and a presumption of reliance applies.

50.     A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are, in large part, grounded on Defendants' material misstatements and/or omissions. Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business operations and financial prospects—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## NO SAFE HARBOR

51.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Bristow who knew that the statement was false when made.

{00316920;2 }

14

## COUNT I

**(Violations of Section 10(b) of The Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants)**

52. Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

53. During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase Bristow's securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each defendant, took the actions set forth herein.

54. Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Bristow's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

55. Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Bristow's financial well-being and prospects, as specified herein.

56. Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a

course of conduct as alleged herein in an effort to assure investors of Bristow's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Bristow and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

57. Each of the Individual Defendants' primary liability and controlling person liability arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

58. Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such

defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Bristow's financial well-being and prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by Defendants' overstatements and/or misstatements of the Company's business, operations, financial well-being, and prospects throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

59. As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of Bristow's securities was artificially inflated during the Class Period. In ignorance of the fact that market prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class acquired Bristow's securities during the Class Period at artificially high prices and were damaged thereby.

60. At the time of said misrepresentations and/or omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiff and the other members of the Class and the marketplace known the truth regarding the problems that Bristow was experiencing, which were not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their Bristow securities,

or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

61. By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

62. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

## COUNT II

**(Violations of Section 20(a) of The Exchange Act Against the Individual Defendants)**

63. Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

64. The Individual Defendants acted as controlling persons of Bristow within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions and their ownership and contractual rights, participation in, and/or awareness of the Company's operations and intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading. The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

65.    In particular, the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

66.    As set forth above, Bristow and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of their position as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

(a)    Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b)    Awarding compensatory damages in favor of Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)    Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)    Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: March 21, 2019          Respectfully submitted,

*/s/ Willie C. Briscoe*
Texas Bar No.: 24001788
S.D. Tex. Federal Bar Number 25157
Texas Bar No: 24001788
THE BRISCOE LAW FIRM, PLLC
12700 Park Central Drive, Suite 520
Dallas, Texas 75251
Telephone: 972-521-6868
Facsimile: 281-254-7789
wbriscoe@thebriscoelawfirm.com

POMERANTZ LLP
Jeremy A. Lieberman
(S.D. Tex. Federal Bar Number 1466757)
J. Alexander Hood II
(S.D. Tex. Federal Bar Number 3086579)
Jonathan Lindenfeld
(*pro hac vice* application forthcoming)
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (212) 661-8665
Email: jalieberman@pomlaw.com
       ahood@pomlaw.com
       jlindenfeld@pomlaw.com

POMERANTZ LLP
Patrick V. Dahlstrom
(*pro hac vice* application forthcoming)
10 South La Salle Street, Suite 3505
Chicago, Illinois 60603
Telephone: (312) 377-1181
Facsimile: (312) 377-1184
Email: pdahlstrom@pomlaw.com

*Attorneys for Plaintiff*

{00316920;2 }

20

# TAB 46

Case 4:19-cv-00509   Document 65-9   Filed 07/02/21 in TXSD   Page 1021 of 1452

Marcus v. J.C. Penney Company, Inc., Not Reported in Fed. Supp. (2017)

2017 WL 6590976

2017 WL 6590976
Only the Westlaw citation is currently available.
United States District Court,
E.D. Texas, Tyler Division.

Alan B. MARCUS, et al.

v.

J.C. PENNEY COMPANY, INC., et al.

CIVIL ACTION NO. 6:13-CV-736
|
Signed 12/18/2017

**Attorneys and Law Firms**

Danielle Suzanne Myers, Austin P. Brane, Darren Jay Robbins, David J. Harris, Jr., David Conrad Walton, James Albert Caputo, Jonah H. Goldstein, Robert R. Henssler, Jr., Hillary B. Stakem, Rachel A. Cocalis, Theodore J. Pintar, X. Jay Alvarez, Robbins Geller Rudman & Dowd LLP, San Diego, CA, Rocky M. Lawdermilk, Rocky Lawdermilk —Attorney at Law, Beaumont, TX, Samuel H. Rudman, Robbins Geller Rudman & Dowd, Melville, NY, Thomas John Ward, Jr., Jack Wesley Hill, Claire Abernathy Henry, Ward, Smith & Hill, PLLC, Longview, TX, for Alan B. Marcus, et al.

Jason Jacob Mendro, Lissa M. Percopo, Gibson Dunn & Crutcher LLP, Washington, DC, Meryl L. Young, Gibson Dunn & Crutcher LLP, Irvine, CA, Robert C. Walters, Gibson Dunn & Crutcher, Dallas, TX, John Frederick Bufe, Michael E. Jones, Potter Minton, a Professional Corporation, Tyler, TX, for J.C. Penney Company, Inc., et al.

**REPORT AND RECOMMENDATION OF
THE UNITED STATES MAGISTRATE JUDGE**

K. NICOLE MITCHELL, UNITED STATES MAGISTRATE JUDGE

**\*1** Before the Court is Plaintiffs' Motion and Memorandum of Law in Support of Final Approval of Settlement and Approval of Plan of Allocation (ECF 165) and Lead Counsel's Motion and Memorandum of Law in Support of an Award of Attorneys' Fees and Expenses and Awards to Plaintiffs Pursuant to 15 U.S.C. § 78u–4(a)(4) (ECF 166). The Court conducted a fairness hearing on December 5, 2017 and heard arguments on the motions. Having reviewed the motion and the documents submitted with the motion, and heard the arguments of counsel at the hearing, Plaintiffs' Motion and Memorandum of Law in Support of Final Approval of Settlement and Approval of Plan of Allocation (ECF 165) and Lead Counsel's Motion and Memorandum of Law in Support of an Award of Attorneys' Fees and Expenses and Awards to Plaintiffs Pursuant to 15 U.S.C. § 78u–4(a)(4) (ECF 166) should be **GRANTED**.

**Background**

Plaintiffs filed this securities class action lawsuit on behalf of all persons who purchased J.C. Penney Company, Inc. ("JCP") common stock between August 20, 2013 and September 26, 2013. Plaintiffs alleged that Defendants made materially false and misleading statements regarding JCP's financial health. Following a hearing, the Court entered an Order on February 28, 2014 consolidating this case with two other cases that were filed by plaintiffs seeking to pursue class actions against JCP for the same conduct—*Erdem v. J.C. Penney Co., Inc.*, Civil Action No. 6:13cv750 and *Gilbert v. J.C. Penney Co., Inc.*, Civil Action No. 6:13cv810. The Court further considered multiple motions for appointment as lead plaintiff and appointed Plaintiff National Shopmen Pension Fund ("the Fund"), together with the Fund's choice of lead counsel and liaison counsel, Robbins Geller Rudman & Dowd LLP of San Diego, California and Ward & Smith Law Firm of Longview, Texas, respectively.

The Fund alleges that Defendants made misstatements and/ or omissions, beginning on August 20, 2013, regarding the financial condition of JCP that caused JCP stock prices to be artificially inflated. On September 24, 2013, the Fund alleges that the market first learned of JCP's liquidity problem in a Report by Goldman Sachs. Immediately following this disclosure, JCP stock dropped 15%. The Fund alleges that this drop in stock price was due to the disclosure of the previously undisclosed information about JCP's liquidity issue. On September 25, 2013, the Fund alleges that Defendant Ullman told attendees at a Sterne Agee conference that JCP would end the year with sufficient liquidity and that he did not see conditions for the rest of the year where JCP would need to raise liquidity. JCP stock started to recover and the recovery continued the following day. After the market closed on September 26, 2013, JCP announced that it would raise capital with an $800 million offering of its common stock. The following day, JCP's stock declined 13%. The Fund and

2017 WL 6590976

Class members allege violations of § 10(b) and 20(a) of the Securities Exchange Act of 1934 and SEC Rule 10b-5.

**\*2** Following extensive briefing, the Court granted class certification on March 8, 2017. The Class is defined as:

> All persons who, between August 20, 2013 and September 26, 2013 (the "Class Period"), purchased or otherwise acquired J.C. Penney Company, Inc. securities and were damaged thereby. Excluded from the Class are current and former defendants, members of the immediate family of any current or former defendants, directors, officers, subsidiaries and affiliates of J.C. Penney Company, Inc., any person, firm, trust, corporation, officer, director or other individual or entity in which any current or former defendant has a controlling interest, and the legal representatives, affiliates, heirs, successors-in-interest or assigns of any such excluded party.

Defendants filed a Motion for Leave to Appeal under FED.R.CIV.P. 23(f), which was granted by the Fifth Circuit Court of Appeals on April 24, 2017. All deadlines in this case were stayed pending resolution of the interlocutory appeal.

Subsequently, the parties filed a joint motion to dismiss the appeal. On June 14, 2017, the Fund filed a Motion and Memorandum of Law in Support of Plaintiffs' Unopposed Motion for Preliminary Approval of Settlement and Approval of Notice to the Class. The Court granted the motion and preliminarily approved the Settlement Agreement and the form, substance and requirements of the Notice of Pendency and Proposed Settlement of Class Action and Proof of Claim and Release. The Court approved approved the Summary Notice and appointed Gilardi & Co. LLC as the Claims Administrator.

In advance of the fairness hearing, Plaintiffs filed their Motion and Memorandum of Law in Support of Final

Approval of Settlement and Approval of Plan of Allocation and Lead Counsel's Motion and Memorandum of Law in Support of an Award of Attorneys' Fees and Expenses and Awards to Plaintiffs Pursuant to 15 U.S.C. § 78u–4(a)(4) on October 25, 2017, together with over 400 pages of supporting documentation. To date, no objections have been filed to the settlement. The Court conducted a fairness hearing on December 5, 2017. No Settlement Class members or notice recipients appeared for the hearing.

### Analysis

**I. Plaintiffs' Motion and Memorandum of Law in Support of Final Approval of Settlement and Approval of Plan of Allocation (ECF 165)**

**A. Class Certification**

The Court fully considered and resolved the appropriateness of class certification in this case prior to settlement. The Report and Recommendation filed on August 29, 2016 and the Order Adopting Report and Recommendation of the United States Magistrate Judge filed on March 8, 2017 are fully incorporated here by reference. For the reasons previously determined, the Fund satisfies the requirements of FED.R.CIV.P. 23(a) and is an appropriate Class Representative on behalf of the Class. Pursuant to FED.R.CIV.P. 23(a) and (b)(3), the Class consists of:

> All persons who, between August 20, 2013 and September 26, 2013 (the "Class Period"), purchased or otherwise acquired J.C. Penney Company, Inc. securities and were damaged thereby. Excluded from the Class are current and former defendants, members of the immediate family of any current or former defendants, directors, officers, subsidiaries and affiliates of J.C. Penney Company, Inc., any person, firm, trust, corporation, officer, director or other individual or entity in which any current or former defendant has a controlling interest, and the legal representatives, affiliates, heirs,

Marcus v. J.C. Penney Company, Inc., Not Reported in Fed. Supp. (2017)
2017 WL 6590976

successors-in-interest or assigns of any
such excluded party.

**\*3** The Class satisfies the requirements of FED.R.CIV.P. 23(a) in that: (a) the Class is so numerous that joinder of all members thereof is impracticable; (b) there are questions of law or fact common to the Class; (c) the claims of the class representatives are typical of the claims of the other members of the Class; and (d) the class representatives fairly and adequately represent the interests of the Class. Further,

the Class satisfies the requirements of FED.R.CIV.P. 23(b) (3) that: (a) the questions of law or fact common to the Class predominate over any questions affecting only individual members of the Class; and (b) a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

### B. Approval of Settlement Agreement

There is a strong judicial policy in favor of settlements, particularly in the class action context. *See In re PaineWebber Ltd. P'ships Litig.*, 147 F.3d 132, 138 (2nd Cir. 1998). Pursuant to Rule 23(e), a class action settlement must be fair, reasonable and adequate. The Fifth Circuit provides six factors to consider: (1) the existence of fraud or collusion behind the settlement; (2) the probability of plaintiffs' success on the merits; (3) the range of possible recovery; (4) the complexity, expense and likely duration of the litigation; (5) the stage of the proceedings and the amount of discovery completed; and (6) the opinions of class counsel, class representatives, and absent class members. *Reed v. General Motors Corp.*, 703 Fed.2d 170, 172 (5th Cir. 1983). Significant weight is given to the opinion of class counsel concerning whether the settlement is in the best interest of the class and the court is not to substitute its own judgment for that of counsel. *Cotton v. Hinton*, 559 F.2d 1326, 1330 (5th Cir. 1977).

In addition, the Manual for Complex Litigation (Third) provides the following factors to consider when evaluating a class settlement: (1) the advantages of the proposed settlement versus the probable outcome of a trial on the merits of liability and damages as to the claims, issues, or defenses of the class and individual class members; (2) the probable time, duration and cost of trial; (3) the probability that the class claims, issues, or defenses could be maintained through trial on a class basis; (4) the maturity of the underlying substantive issues, as measured by the information and experience gained through adjudicating individual actions, the development of scientific knowledge, and other factors that bear on the probable outcome of a trial on the merits; (5) the extent of participation in the settlement negotiations by class members or class representatives, and by a judge, a magistrate judge, or a special master; (6) the number and force of objections by class members; (7) the probable resources and ability of the parties to pay, collect, or enforce the settlement compared with enforcement of the probable judgment predicted under above paragraph 1 or 4; (8) the effect of the settlement on other pending actions; (9) similar claims by other classes and subclasses and their probable outcome; (10) the comparison of the results achieved for individual class or subclass members by the settlement or compromise and the results achieved or likely to be achieved for other claimants pressing similar claims; (11) whether class or subclass members have the right to request exclusion from the settlement, and, if so, the number exercising that right; (12) the reasonableness of any provisions for attorney fees, including agreements on the division of fees among attorneys and the terms of any agreements affecting the fees to be charged for representing individual claimants or objectors; (13) the fairness and reasonableness of the procedure for processing individual claims under the settlement; (14) whether another court has rejected a substantially similar settlement for a similar class; and (15) the apparent intrinsic fairness of the settlement terms. There is a presumption of fairness, reasonableness, and adequacy when the settlement is the production of arms-length negotiations between experienced, capable counsel after meaningful discovery. *See Manual for Complex Litigation (Third)* § 30.42 (1995).

**\*4** Plaintiffs filed this case alleging that Defendants violated federal securities laws. Discovery included more than 800,000 of pages of documents, more than 20 fact witness depositions, and the engagement of at least 5 expert witnesses. The litigation proceeded through four years of hard fought motion practice that included determination of the lead plaintiff, dispositive motions, class certification and an interlocutory appeal. The parties had two extensive mediation conferences with an experienced mediator, Judge Daniel Weinstein (Ret.), prior to reaching a settlement.

The proposed settlement provides for the payment of $97.5 million in exchange for dismissal of claims against Defendants. The settlement provides for the Settlement Fund (settlement amount plus accrued interest) to pay taxes, notice

Marcus v. J.C. Penney Company, Inc., Not Reported in Fed. Supp. (2017)
2017 WL 6590976

and administrative costs, attorneys' fees and expenses, and awards to named plaintiffs, if awarded, first and then the remainder (Net Settlement Fund) will be distributed to the Class Members. The Settlement Fund has been accruing interest since August 8, 2017. Class members must submit a valid Proof of Claim and Release form to the claims administrator to receive payment.

The total settlement of $97.5 million represents 21% of Plaintiffs' expert witness's estimate of the maximum recovery. Plaintiffs note that their risks in this litigation included overcoming Defendants' defenses to scienter and loss causation, as well as the substantial expenses that would have been incurred related to summary judgment motions and trial. The Fund, in its capacity as lead plaintiff, and the class representative, David O'Connell, have approved the settlement. No class members have filed objections.

Following preliminary approval, notice was mailed to more than 78,000 potential Class Members and nominees. At the hearing, counsel stated that more than 107,000 notice packages were distributed. Notice was also published in the Wall Street Journal, transmitted over the Business Wire and posted on a dedicated website. Plaintiffs now seek the entry of their proposed Final Judgment and Order of Dismissal with Prejudice, an Order Approving Plan of Allocation and an Order Awarding Attorneys' Fees and Expenses.

There is no evidence of fraud or collusion. The settlement was reached with the assistance of an experienced mediator following extensive arm's length negotiations. The case is complex and carries significant financial risks. Settlement was only reached following an extremely large amount of discovery and four years of litigation. Defendants argue in this case that there is no evidence that JC Penney knew they were on the verge of bankruptcy when the statements were made or that they had any motive to make misstatements. Any damage determination would be a battle of the experts even if Plaintiffs successfully establish liability. Plaintiffs assert that the negotiated recovery represents 21% to 100% of the recoverable damages in the case. Lead counsel has extensive experience in complex civil litigation and believes that the settlement represents a fair, reasonable and adequate resolution. Additionally, notice provided to Class Members was sufficient.

In sum, the parties reached this settlement at an advanced stage of litigation after extensive discovery with the assistance of a qualified and experienced mediator. The $97.5 million

settlement falls within the range of reasonableness in light of the risks and costs associated with this litigation. Lead counsel believes the settlement is appropriate in the context of his considerable experience in complex class actions and securities litigation. For all of these reasons, the settlement should be approved.

## II. Plan of Allocation

**\*5** The district court has broad discretion with regard to the allocation of a class action settlement. *See In re Marsh ERISA Litig.*, 265 F.R.D. 128, 145 (S.D. NY Jan. 29, 2010). Where, as here, the plan is formulated by competent and experienced class counsel, the plan need only have a reasonable and rational basis. *Id.* A just allocation necessitates that the class members who lost the most should stand to gain the most from a settlement. *See In re Dell, Inc.*, 2010 WL 2371834, slip op. at \*10 (W.D. Tex. June 11, 2010).

The Plan of Allocation provides for a pro rata distribution of the funds on the basis of recognized loss. The plan is based on the most likely provable damages at trial. It is calculated by looking at inflation per share based on the difference between the price paid and the estimated price if the allegedly omitted information had been disclosed. The plan was prepared in consultation with Plaintiffs' damages expert. The lead plaintiff is not favored in the plan in any way.

Once the Net Settlement Fund amount is determined, the Claims Administrator will calculate the claims of the Authorized Claimants to determine each claimant's pro rata share of the Net Settlement Fund. The Plan of Allocation was fully disclosed in the Notice. No objections have been filed by any class members to the plan of allocation. The proposed plan has a reasonable and rational basis and should be approved.

## III. Plaintiffs' Request for Attorney's Fees and Expenses

Lead Counsel seeks to recover attorneys' fees in the amount of 30% of the $97,500,000 Gross Settlement Fund—$29,250,000. In addition, counsel seeks to recover expenses totaling $868,760.57. The expenses are supported by documentation submitted with the motion and include expenses related to filing, notice, discovery and expert witnesses. Nearly half of the total amount of expenses is related to expert witness expenses. The expenses were borne entirely by lead counsel.

Case 4:19-cv-00509 Document 65-9 Filed 07/02/21 in TXSD Page 1025 of 1452

Marcus v. J.C. Penney Company, Inc., Not Reported in Fed. Supp. (2017)
2017 WL 6590976

Pursuant to Rule 23(h), the Court may award reasonable attorney's fees and nontaxable costs that are authorized by law or by the parties' agreement. It is well established that a common fund can be used to pay attorney's fees in a class action settlement. *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478, 100 S.Ct. 745 (1980). In cases involving a common fund, the Fifth Circuit has expressly approved of the use the percentage method to calculate attorney's fees, so long as it is cross-checked with the *Johnson* factors. *See Union Asset Mgmt Holding A.G. v. Dell, Inc.*, 669 F.3d 632, 644 (5th Cir. 2012). The so-called *Johnson* factors include: (1) the time and labor required; (2) the novelty and difficulty of the issues; (3) the skill required to perform the legal service adequately; (4) the preclusion of other employment by the attorney because he accepted this case; (5) the customary fee for similar work in the community; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the undesirability of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases. *Johnson v. Ga. Highway Express, Inc.*, 488 F.2d 714, 717–19 (5th Cir. 1974), *overruled on other grounds*, *Blanchard v. Bergeron*, 489 U.S. 87, 109 S.Ct. 939 (1989).

Lead Counsel showed that substantial discovery occurred in this case prior to settlement and a lot of time and work was invested in litigation and mediation. In addition to fronting considerable expenses in the case, lead counsel provided more than 18,000 hours of attorney work in the case on a wholly contingent fee basis. The parties expended considerable time and labor over a period of four years since this case was filed and before settlement.

**\*6** Lead Counsel's request for a fee of 30% is not excessive. It is not unusual for attorneys' fees awarded under the percentage method to range between 25% to 30% of the fund or more. *See In re Dell Inc.*, 2010 WL 2371834, at \*13 (W.D. Tex. June 11, 2010) (citing *Klein v. O'Neal*, 705 F.Supp.2d 632 (N.D. Tex. June 14, 2010)). Additionally, applying the *Johnson* factors reveals that the requested percentage is appropriate. This was a time-intensive, complex case that required considerable expertise by the counsel involved. The experienced Lead Counsel obtained a fair and reasonable settlement on behalf of the Class Members and bore a substantial risk by pursuing the litigation. The fees

and expenses requested by Lead Counsel are reasonable and should be awarded.

#### IV. Incentive Award

Finally, the settlement includes an award of $10,200 to National Shopmen Pension Fund for its time in representing the Class and $1,500 to class representative David O'Connell. Incentive awards have been approved in other circuits and by district courts in this district to reward class representatives for their work on behalf of the class. *See Humphrey v. United Way of Texas Gulf Coast*, 802 F.Supp.2d 847 (S.D. Tex. July 28, 2011); *McClain v. Lufkin Indus., Inc.*, 2010 WL 455351, slip op. at \*24 (E.D. Tex Jan. 15, 2010). Considerations may include the amount of work done and any financial or reputational risk in bringing the action. *Rodriguez v. West Publishing Corp.*, 563 F.3d 948, 959 (9th Cir. 2009). In addition, an award may compensate for extra burdens undertaken by named plaintiffs, such as great subjection to discovery. *McClain*, 2010 WL 455351, slip op. at \*25.

Class representative David O'Connell reviewed pleadings and briefs and communicated with Lead Counsel. The Fund complied with discovery requests, reviewed pleadings and motions, participated in a deposition, monitored settlement negotiations and communicated with counsel. The incentive award amounts requested are reasonable.

#### RECOMMENDATION

It is accordingly recommended that Plaintiffs' Motion and Memorandum of Law in Support of Final Approval of Settlement and Approval of Plan of Allocation (ECF 165) and Lead Counsel's Motion and Memorandum of Law in Support of an Award of Attorneys' Fees and Expenses and Awards to Plaintiffs Pursuant to 15 U.S.C. § 78u–4(a)(4) (ECF 166) be **GRANTED.** It is further recommended that the Court enter the proposed Final Judgment and Order of Dismissal with Prejudice, Order Approving Plan of Allocation and Order Awarding Attorneys' Fees and Expenses and Awards to Plaintiffs Pursuant to 15 U.S.C. § 78u-4(a)(4) that were submitted by the Lead Plaintiff.

Within fourteen days after receipt of the magistrate judge's report, any party may serve and file written objections to the

**Marcus v. J.C. Penney Company, Inc., Not Reported in Fed. Supp. (2017)**

2017 WL 6590976

findings and recommendations of the magistrate judge. 28 U.S.C. § 636(b).

A party's failure to file written objections to the findings, conclusions and recommendations contained in this Report shall bar that party from *de novo* review by the district judge of those findings, conclusions and recommendations and, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted and adopted by the district court. *Douglass v. United Servs. Auto. Assn.*, 79 F.3d 1415, 1430

(5th Cir. 1996) (en banc), *superseded by statute on other grounds*, 28 U.S.C. § 636(b)(1) (extending the time to file objections from ten to fourteen days).

**So ORDERED and SIGNED this 18th day of December, 2017.**

**All Citations**

Not Reported in Fed. Supp., 2017 WL 6590976

---

**End of Document**

© 2021 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 47

Case 4:19-cv-00509    Document 65-9    Filed 07/02/21 in TXSD    Page 1028 of 1452

Marcus v. J.C. Penney Company, Inc., Not Reported in Fed. Supp. (2018)
2018 WL 307024

2018 WL 307024
Only the Westlaw citation is currently available.
United States District Court,
E.D. Texas, Tyler Division.

Alan B. MARCUS, et al.

v.

J.C. PENNEY COMPANY, INC., et al.

CIVIL ACTION NO. 6:13cv736
|
Signed 01/04/2018

**Attorneys and Law Firms**

Danielle Suzanne Myers, Austin P. Brane, Darren Jay Robbins, David J. Harris, Jr., David Conrad Walton, James Albert Caputo, Jonah H. Goldstein, Robert R. Henssler, Jr., Hillary B. Stakem, Rachel A. Cocalis, Theodore J. Pintar, X. Jay Alvarez, Robbins Geller Rudman & Dowd LLP, San Diego, CA, Rocky M. Lawdermilk, Rocky Lawdermilk —Attorney at Law, Beaumont, TX, Samuel H. Rudman, Robbins Geller Rudman & Dowd, Melville, NY, Thomas John Ward, Jr., Jack Wesley Hill, Claire Abernathy Henry, Ward, Smith & Hill, PLLC, Longview, TX, for Alan B. Marcus, et al.

Jason Jacob Mendro, Lissa M. Percopo, Gibson Dunn & Crutcher LLP, Washington, DC, Meryl L. Young, Gibson Dunn & Crutcher LLP, Irvine, CA, Robert C. Walters, Gibson Dunn & Crutcher, Dallas, TX, John Frederick Bufe, Michael E. Jones, Potter Minton, Tyler, TX, for J.C. Penney Company, Inc., et al.

## ORDER ADOPTING REPORT AND RECOMMENDATION OF THE UNITED STATES MAGISTRATE JUDGE

ROBERT W. SCHROEDER III, UNITED STATES DISTRICT JUDGE

**\*1** The Report and Recommendation of the Magistrate Judge, which contains her findings, conclusions, and recommendation for the disposition of Plaintiffs' Motion and Memorandum of Law in Support of Final Approval of Settlement and Approval of Plan of Allocation (Docket No. 165) and Lead Counsel's Motion and Memorandum of Law in Support of an Award of Attorneys' Fees and Expenses and Awards to Plaintiffs Pursuant to 15 U.S.C. § 78u-4(a) (4) (Docket No. 166) has been presented for consideration. The Report (Docket No. 176) recommends that the motions be granted and that the Court enter the Final Judgment and Order of Dismissal with Prejudice, the Order Approving Plan of Allocation and the Order Awarding Attorneys' Fees and Expenses and Awards to Plaintiffs Pursuant to 15 U.S.C. § 78u-4(a)(4) submitted by the Lead Plaintiff. No objections have been filed. The Court agrees with the Magistrate Judge that the settlement, plan of allocation and request for attorneys' fees should be approved. Accordingly, the Court hereby **ADOPTS** the Report as the opinion of the Court. It is therefore

**ORDERED** that Plaintiffs' Motion and Memorandum of Law in Support of Final Approval of Settlement and Approval of Plan of Allocation (Docket No. 165) and Lead Counsel's Motion and Memorandum of Law in Support of an Award of Attorneys' Fees and Expenses and Awards to Plaintiffs Pursuant to 15 U.S.C. § 78u-4(a)(4) (Docket No. 166) are **GRANTED**. The Court will enter the Final Judgment and Order of Dismissal with Prejudice, Order Approving Plan of Allocation and Order Awarding Attorneys' Fees and Expenses and Awards to Plaintiffs Pursuant to 15 U.S.C. § 78u-4(a)(4) separately.

**So ORDERED and SIGNED this 4th day of January, 2018.**

**All Citations**

Not Reported in Fed. Supp., 2018 WL 307024

---

**End of Document**                    © 2021 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 48

2016 WL 11645372
Only the Westlaw citation is currently available.
United States District Court,
S.D. Texas, Houston Division.

Britt MILLER and Bret Gould,
on Behalf of Themselves and All
Others Similarly Situated, Plaintiff,
v.
GLOBAL GEOPHYSICAL
SERVICES, INC., et al., Defendants.

Civil Action No.: 14-cv-0708
|
Signed 01/14/2016

**Attorneys and Law Firms**

Laurence M. Rosen, Phillip Kim, Jonathan Horne, The Rosen Law Firm, PA, New York, NY, R. Dean Gresham, Gresham pc, Dallas, TX, for Plaintiff.

Dean D. Hunt, Baker Hostetler LLP, Gerard G. Pecht, Fulbright and Jaworski, Michael Terrell Murphy, K&L Gates, Quentin L. Smith, Vinson and Elkins, Christina Elise Ponig, DLA Piper LLP, Houston, TX, Marc Dennis Powers, Baker Hostetler LLP, New York, NY, Peter Andrew Stokes, Norton Rose Fulbright US LLP, Austin, TX, Michael C. Holmes, Vinson & Elkins, Karl G. Dial, Casey Lee Moore, Greenberg Traurig, LLP, Dallas, TX, Lawrence A. Wojcik, DLA Piper LLP, Chicago, IL, for Defendants.

Yongtong Lan, Arcadia, CA, pro se.

**ORDER**

VANESSA GILMORE, UNITED STATES DISTRICT JUDGE

**CLASS ACTION**

**\*1** Having considered the moving papers on Plaintiffs' Motion for Award of Attorneys' Fes, Reimbursement of Expenses, and Compensatory Award to Plaintiffs and all other matters presented to this Court, and good cause appearing therefore:

IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:

1. The Court GRANTS Lead Counsel's request for attorneys' fees in the cash amount of one-third of the Settlement Fund ($1,766,666.67 in cash), as well as reimbursement of reasonable and necessary expenses incurred in the prosecution of the Action in the amount of $73,432.16, together with the interest earned thereon for the same time period and at the rate earned by the Settlement Fund until paid. Said fees shall be allocated among Plaintiffs' Counsel in a manner which, in their good-faith judgment, reflects each counsel's contribution to the institution, prosecution and resolution of the Action. The Court finds that the amount of fees awarded is fair and reasonable in light of the time and labor required, the novelty and difficulty of the case, the skill required to prosecute the case, the experience and ability of the attorneys, awards in similar cases, the contingent nature of the representation and the result obtained for the Class.

2. The Court hereby GRANTS Plaintiffs' reimbursement of their reasonable costs and expenses (including lost wages) directly related to their representation of the Settlement Class in the total amount of $15,000.

SO ORDERED:

**All Citations**

Slip Copy, 2016 WL 11645372

---

**End of Document**

© 2021 Thomson Reuters. No claim to original U.S. Government Works.

TAB 49

2009 WL 512081, Fed. Sec. L. Rep. P 95,215, 72 Fed.R.Serv.3d 1060

2009 WL 512081
United States District Court,
E.D. Louisiana.

In re OCA, INC. SECURITIES
AND DERIVATIVE LITIGATION.

Civil Action No. 05–2165.
|
March 2, 2009.

West KeySummary

**1**    **Compromise, Settlement, and
Release** 👈 Form, requisites, and sufficiency

A class member's objection to the notice
provided in the settlement of a class action
did not raise problems sufficient to warrant a
rejection of the settlement. The company being
sued in the action met the disclosure requirement
of the Private Securities Litigation Reform Act.
The notice clearly stated the amount of the
settlement, average recovery per damaged share
of stock, the amount of attorney's fees sought,
and the average cost per share. Further, the notice
provided 16 sections set off with bold headings
that explained the settlement and actions a
potential claimant had to take to make a claim,
opt out, or object to the settlement. Fed.Rules
Civ.Proc.Rule 23(c)(3), 28 U.S.C.A.

16 Cases that cite this headnote

*ORDER AND REASONS*

SARAH S. VANCE, District Judge.

**\*1**   Before the Court are Lead Plaintiff's motion for final
approval of the class action settlement and Lead Counsel's
motion for an award of attorneys' fees and costs. The Court
has considered all of the evidence submitted at the fairness
hearing held on February 10, 2009, as well as the objection
and legal memoranda submitted by the parties. For the reasons
stated more fully below, the Court finds the settlement of this

class action to be fair, reasonable, and adequate, and the Court
awards attorneys' fees and costs as provided in this order.

**I. Background**

 **A. Factual Background**
This action is a securities fraud action brought under Sections
10(b) and 20(a) of the Securities Exchange Act of 1934 and
Rule 10b–5, promulgated by the Securities and Exchange
Commission under the statute. Defendant OCA, Inc. is a
Louisiana-based company that provided business services
to orthodontic and pediatric dental practices throughout the
United States. Plaintiffs sued on behalf of purchasers of
OCA's publicly traded common stock and sellers of OCA put
options who engaged in their transactions between May 18,
2004 through June 6, 2005 (the "Class Period").

Specifically, OCA provided affiliated orthodontic practices
with information systems and a range of operational,
purchasing, financial, marketing, administrative and other
business services. It generally provided its services to
affiliated practices under long-term contracts with terms that
typically range from 20 to 25 years. As of December 31, 2004,
OCA had approximately 565 affiliated centers in the United
States and abroad.

On May 18, 2004, OCA announced that it would adopt
Financial Accounting Standards Board Interpretation No.
46R ("FIN 46R"), which requires a company to consolidate
the financial results of variable interest entities under certain
circumstances when the company has an interest in the
entities. OCA stated that its adoption of FIN 46R would
require it to make a number of changes to its financial
statements. Those changes included changes to the way OCA
recorded patient revenue and patient receivables. OCA's chief
executive officer, Bart F. Palmisano, Sr., stated in OCA's May
18, 2004 press release that the accounting changes would
make OCA's accounting simpler and more transparent and
would lead to financial reporting that was more consistent
with the way OCA managed its business.

Plaintiffs allege that over the remainder of 2004 and the early
part of 2005, defendants made a series of false statements
concerning OCA's quarterly financial results and its future
prospects. According to plaintiffs, those statements were
materially false or misleading and had the effect of artificially
inflating OCA's stock price.

2009 WL 512081, Fed. Sec. L. Rep. P 95,215, 72 Fed.R.Serv.3d 1060

On March 17, 2005, OCA announced that it would delay the filing of its Form 10–K for the fiscal year ending December 31, 2004, because it had identified certain accounting errors relating to 2004 and earlier years. OCA stated that it would continue to review its accounting and that it had not made a decision about whether the errors were material or would require it to restate earlier financial results. On June 7, 2005, OCA announced a further delay in the filing of its 2004 Form 10–K and reported that it had identified material errors in its calculation of patient receivables reported during the first three quarters of 2004. It revealed that its audit committee required it to restate its financial results for those periods. OCA also announced that it had organized a special committee of the board of directors to review the origins of certain journal entries in the company's general ledger and their impact on OCA's financial statements. OCA's chief operating officer, Bart. F. Palmisano, Jr., went on administrative leave pending the outcome of the company's internal investigation. After OCA's June 7 announcement, shares of OCA stock fell $1.55, or 38%, to close at $2 .48 per share. The New York Stock Exchange de-listed OCA's stock on November 8, 2005, after which the stock traded on the pink sheets. On March 14, 2006, OCA filed a voluntary petition for relief under Chapter 11 of the United States Bankruptcy Code.

### B. Procedural Background

**\*2** Shortly after OCA's June 7, 2005 announcement, a number of plaintiffs filed securities class actions in this district against OCA and certain of its officers and directors. The Court consolidated twenty of the class actions into the present case against OCA, OCA's insurers National Union Fire Insurance Company of Louisiana and XL Specialty Insurance Company, and OCA officers Bart Palmisano, Sr., David Verret, and Bart Palmisano, Jr. (R. Docs.3, 27, 113). A group of plaintiffs also filed shareholder derivative actions (collectively referred to as the "Derivative Case") against the OCA Board of Directors, the Palmisanos, Verret, and their insurers, and the cases were consolidated with this securities action. (R. Doc. 3, 170). Another related case, the OCAI litigation, was proceeding in the United States Bankruptcy Court for the Eastern District of Louisiana. In that case, OCA sued OCA International, LLC, Gimili Enterprises, LLC, and Palmisano, Sr. over a transaction that transferred ownership of OCA's foreign subsidiaries from OCA to OCA International. *See In re OCA, Inc., et al.,* No. 06–1289 (Bankr.E.D.La.).

On November 18, 2005, the Court appointed Samuel Boodman as Lead Plaintiff pursuant to the Private Securities Litigation Reform Act (PSLRA), 15 U.S.C.A. § 78u–

4(a)(3)(B)(v), and approved Kaplan Fox & Kilsheimer as Lead Counsel and Neblett Beard & Arsenault as liaison counsel. (R. Docs.157, 159). Plaintiffs filed a consolidated class action complaint on February 1, 2006 against OCA, Palmisano, Sr., Palmisano, Jr., and Verret. (R. Doc. 167). The complaint alleged that defendants engaged in securities fraud in violation of Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) and SEC Rule 10b–5, 17 CFR § 240.10b–5, promulgated thereunder. The complaint further alleged that the individual defendants, the Palmisanos and Verret, were controlling persons under Section 20(a) of the Act, 15 U.S.C. § 78t(a), and therefore were derivatively liable for the company's fraudulent acts. On December 14, 2006, the Court denied the Motion to Dismiss of Palmisano, Sr. and Verret, but granted the Motion to Dismiss of Palmisano, Jr. (R. Doc. 208). After discovery, the parties opted to mediate this action, as well as the Derivative Case and the OCAI Litigation, before the Honorable Daniel Weinstein. (Strauss Decl., Exhibit G, Weinstein Decl.). The first mediation session was held on September 25–26, 2007. The session was unsuccessful and the parties remained quite far apart. (Weinstein Decl., ¶ 6). The parties continued to engage in settlement discussions and held a second mediation session on November 26, 2007. (Weinstein Decl., ¶ 7). No settlement resulted from the mediation, but the parties continued to negotiate, often with the assistance of Weinstein. (Weinstein Decl., ¶ 7). The parties eventually reached a global resolution of the Securities Case, the Derivative Case, and the OCAI litigation, memorialized in a Memorandum of Understanding on February 28, 2008. (Weinstein Decl ., ¶ 7).

**\*3** Lead Plaintiff Samuel Boodman filed a motion for preliminary approval of the settlement in the Securities Case and certification of the settlement class on August 25, 2008. (R. Doc. 344). Plaintiff requested that the Court: (1) approve the form of class notice described in the Notice of Pendency and Proposed Settlement of Class Action; (2) approve the form of summary notice,(3) schedule a hearing to determine whether the settlement should be given final approval, and (4) establish dates for submission of proofs of claim, dissemination of the class notice, and other relevant deadlines. (R. Doc. 344). After a status conference, the Court ordered the parties to brief the following issues before the preliminary approval hearing: (1) the propriety of certifying the class under Federal Rule of Civil Procedure 23; (2) the suitability of the proposed class counsel under the requirements of Rule 23(g); (3) the reasonableness of the apportionment plan contained in the settlement agreement;

2009 WL 512081, Fed. Sec. L. Rep. P 95,215, 72 Fed.R.Serv.3d 1060

(4) the substance of any side agreements; (5) the amount of attorneys' fees sought; (6) the identity of the proposed Claims Administrator and his qualifications; (7) the procedure to be followed if the settlement fund is inadequate to pay the claims; and (8) the meaning of paragraph (gg) of the settlement agreement, dealing with the release of unknown claims. (R. Doc. 346).

On October 7, 2008, the Court held a hearing on the motion for preliminary approval of the settlement. (R. Doc. 352). After considering the parties' memoranda, exhibits, and live arguments, the Court issued an order preliminarily approving the settlement and certifying the settlement class on October 17, 2008. (R. Doc. 353). In the Order, the Court certified the settlement class and approved Samuel Boodman as Lead Plaintiff and Kaplan Fox & Kilsheimer as Lead Counsel for purposes of Rule 23. The Court approved Analytics, Inc. as the Claims Administrator. The Court also approved the proposed notice and claim forms, as well as deadlines for submitting claims forms, opting out, and filing objections. The Court scheduled a fairness hearing on February 9, 2009, to determine whether the settlement is fair, whether the securities complaint should be dismissed, whether the proposed allocation plan is fair, and to determine an award of attorneys' fees and expenses.

### C. The Settlement Class

On October 17, 2008, the Court certified a class for purposes of settlement. The class is defined as:

> [A]ll persons who purchased the publicly traded common stock or sold put options of OCA during the period from May 18, 2004 through June 6, 2005, inclusive. Excluded from the Class are the Defendants, former defendant Palmisano, Jr., any members of Defendants' or Palmisano, Jr.'s immediate families, any entity in which any Defendant or former defendant has a controlling interest, and the affiliates, legal representatives, heirs, predecessors, successors, and assigns of any such excluded party.

**\*4** (R. Doc. 344–2 at 7). A "person" includes:

> [A]ny individual, corporation, partnership, association, affiliate, joint stock company, estate, trust, unincorporated association, entity, government and any political subdivision thereof, or any other type of business or legal entity, and their spouses, heirs, predecessors, successors, representatives, agents, or assignees.

(R. Doc. 344–2 at 10). In its October 17, 2008 Order, the Court found that the class met the numerosity, commonality, typicality, adequacy, and predominance requirements of Rule 23. (R. Doc. 353).

### D. The Settlement Agreement

Under the Stipulation and Agreement of Settlement, defendants agreed to have National Union and XL, their insurers, pay $6.5 million in cash into the escrow account established for the settlement fund by Lead Counsel for the benefit of the class members. (R. Doc. 344–2 at ¶ 4). The payment was to be made on or within 30 days after the Court entered the preliminary order approving the settlement. (R. Doc. 344–2 at ¶ 4). Neither National Union nor XL were required to make payment, however, until the insurers received a release from each defendant and any other person or entity that is a defendant in either the Derivative Case or the OCAI litigation, regardless of whether 30 days has elapsed. (R. Doc. 344–2 at ¶ 4).

Under the Agreement, the settlement fund will be used to pay: (1) the notice and administration costs; (2) the attorneys' fees and expense award; and (3) the remaining administrative expenses. (R. Doc. 344–2 at ¶ 5). After these payments, the balance of the settlement fund will be distributed to Authorized Claimants, defined as those "whose claim for recovery has been allowed pursuant to the terms of this Settlement Stipulation." (R. Doc. 344–2 at ¶¶ 1 & 5). In addition, all costs and expenses incurred by the Lead Plaintiff and the class in connection with the settlement are to be paid from the settlement fund. (R. Doc. 344–2 at ¶ 5).

The Agreement required that, within 10 business days after counsel for National Union receives a copy of the

Court's preliminary approval order, National Union will deposit $175,000 of the settlement amount into another escrow account ("the Notice and Administration Fund") to be used for reasonable out-of-pocket costs in connection with providing notice of the settlement to the class members and other administrative expenses. (R. Doc. 344–2 at ¶ 6). The Agreement provides that upon written agreement of the parties or order of the Court, additional amounts may be transferred from the settlement fund to the Notice and Administration Fund. (R. Doc. 344–2 at ¶ 6). The Agreement prohibits the escrow agent from disbursing funds from the Notice and Administration Fund, except as provided in the Agreement, as ordered by the Court or with the written agreement of counsel for all of the parties. (R. Doc. 344–2 at ¶ 7).

Under the Agreement, Lead Counsel or the Claims Administrator, Analytics, Inc., will administer and calculate the claims submitted by class members, oversee distribution of the Settlement Fund, and perform all claims administration procedures. (R. Doc. 344–2 at ¶ 16). In order to be an "Authorized Claimant" under the Agreement: (1) a class member must timely submit a proof of claim to the Claims Administrator, supported by certain documents showing proof of the claimant's loss; (2) the proof of claim must be submitted by the claims bar date of February 14, 2009, unless the Court extends the time period; and (3) the Claims Administrator must determine that the claim should be allowed in accordance with the Settlement Stipulation, subject to the Court's review. The Administrator may reject proofs of claim that do not meet the submission requirements, but before rejection, the Claims Administrator must notify the claimant of his reasons for proposing to reject the claim, and the claimant may contest the rejection within 20 days by serving the Claims Administrator with a notice and statement of reasons and requesting review by the Court. The Agreement requires the administrative determinations of the Claims Administrator to be presented to the Court for approval. (R. Doc. 344–2 at ¶ 18).

**\*5** The Agreement further provides that all class members will be bound by the judgment of the Court concerning the Settlement, unless the person requests exclusion from the class by mail. (R. Doc. 344–2 at ¶ 25). The class notice establishes the opt-out date as January 20, 2009–21 days before the settlement fairness hearing. (R. Doc. 344–4 at § 9).

The Agreement discloses that Lead Counsel and the defendants have executed a Supplemental Agreement, setting forth conditions under which the Settlement Agreement may be withdrawn or terminated at the discretion of the defendants if potential class members who purchased in excess of a certain number of shares exclude themselves from the class. (R. Doc. 344–2 at ¶ 28). Finally, the Agreement provides that it is intended to be a final and complete resolution of all disputes asserted or that could be asserted by the class members against any of the released parties with respect to the released claims. (R. Doc. 344–2 at ¶ 41).

### E. Plan of Allocation

The notice to class members sets forth the plan of allocation ("Plan"). (R. Doc. 344–4 at § 7). The Plan provides that the Net Settlement Fund will be distributed to class members who submit valid, timely proof of claim forms. (R. Doc. 344–4 at § 7). The Plan provides that class members may participate only if they suffered a net loss on all transactions in OCA during the Class Period.

Specifically the Plan provides that, for shares of OCA common stock purchased between May 18, 2004 and March 17, 2005, inclusive: (1) if the share was held as of the close of trading on June 6, 2005, the Authorized Claimant's Recognized Claim shall be the lesser of $1.85 per share; or (b) the difference between the purchase price per share and $1.64 per share; (2) if the share was sold at a loss between March 18, 2005 and June 6, 2005, the Recognized Claim shall be the lesser of $0.31 per share; or (b) the difference between the purchase price per share and the sales price per share; (3) if the share was sold at a loss between June 7, 2005 and September 2, 2005, inclusive, the Recognized Claim shall be the lesser of (a) $1.85 per share or (b) the difference between the purchase price per share and the sales price per share; or (4) if the share was sold prior to the close of trading on March 17, 2005, the Recognized Claim is $0. (R. Doc. 344–4 at § 7).

For shares of OCA common stock purchased between March 18, 2005 and June 6, 2005, inclusive, the Plan provides that: (1) if the share was held as of the close of trading on June 6, 2005, the Authorized Claimant's Recognized Claim shall be the lesser of (a) $1 .54 per share or (b) the difference between the purchase price per share and $1.64 per share; (2) if the share was sold at a loss between June 7, 2005 and September 2, 2005, inclusive, the Recognized Claim shall be the lesser of (a) $1.54 per share or (b) the difference between the purchase price per share and the sales price per share; or (3) if the share was sold prior to the close of trading on June 6, 2005, the Recognized Claim is $0. (R. Doc. 344–4 at § 7).

**\*6** As for put options, the Plan provides that for put options sold between May 18, 2004 and March 17, 2005:(1) no claim will be recognized for OCA put options sold between May 18, 2004 and March 17, 2005 that were not the obligation of the Authorized Claimant as of the close of trading on March 17, 2005; (2) for put options that were the obligation of the Authorized Claimant at the close of trading on March 17, 2005, the Recognized Claim shall be the lesser of (a) the difference, if a loss, between the amount received for writing the put option and the sum for which the put options were repurchased at a loss, (b) $0.31 per share covered by such put options if repurchased at a loss between March 18, 2005 and June 6, 2005, or (c) $1.85 per share covered by such put options if repurchased at a loss after the close of trading on June 6, 2005; (3) for OCA put options that were "put" to the Authorized Claimant, the Authorized Claimant's Recognized Claim shall be calculated as a purchase of common stock as shown above, and as if the sale of the put option were instead a purchase of OCA common stock on the date of the sale of the put option and the "purchase price paid" shall be the strike prices less the proceeds received on the sale of the put option. (R. Doc. 344–4 at § 7).

As for put options sold between March 18, 2005 and June 6, 2005, the Plan provides that: (1) no claim shall be recognized for OCA put options sold that were not the obligation of the Authorized Claimant as of the close of trading on June 6, 2005; (2) for put options sold that were the obligation of the Authorized Claimant at the close of trading on June 6, 2005, the Authorized Claimant's Recognized Claim shall be the lesser of (a) the difference, if a loss, between the amount received for writing the put option and the sum for which the put options were repurchased at a loss after the close of trading on June 6, 2005 or (b) $1.54 per share covered by such put options; or (3) for put options that were "put" to the Authorized Claimant, the Authorized Claimant's Recognized Claim shall be calculated as a purchase of common stock as shown above, and the "purchase price paid" shall be the strike price less the proceeds received on the sale of the put option. (R. Doc. 344–4 at § 7).

The Plan further provides that for put options sold that expired unexercised, an Authorized Claimant's Recognized Claim shall be $0. The Plan provides that no loss shall be recognized for put options sold during the Class Period to offset a long position in the same option that was purchased at any time prior to the sale. (R. Doc. 344–4 at § 7).

To the extent that class members' claims exceed the Net Settlement Fund, each claimant will be compensated on a pro rata basis according to the claimant's calculated loss under the allocation plan. (R. Doc. 351–8 at ¶ 15).

### F. Notice

Federal Rule of Civil Procedure 23(c)(3) governs the notice requirements for class certification. Specifically, the notice must state:

 **\*7** (i) the nature of the action;

(ii) the definition of the class certified;

(iii) the class claims, issues, or defenses;

(iv) that a class member may enter an appearance through an attorney if the member so desires;

(v) that the court will exclude from the class any member who requests exclusion;

(vi) the time and manner for requesting exclusion; and

(vii) the binding effect of a class judgment on members under Rule 23(c)(3).

Fed.R.Civ.P. 23(c)(3)(B). Additionally, in securities class actions, the notice must satisfy the disclosure requirements of the Private Securities Litigation Reform Act (PSLRA). The PSLRA requires a proposed settlement agreement published and disseminated to the class to include: (1) the amount of settlement proposed to be distributed to the parties to the action, determined in the aggregate and on an average per share basis; (2) if the parties do not agree on the average amount of damages per share that would be recoverable if plaintiffs prevailed, a statement from the settling party concerning the average amount of such potential damages per share; (3) a statement indicating which parties or counsel intend to make application for attorneys' fees and costs, including the amount of fees and costs sought; (4) the name, telephone number, and address of one or more representatives of counsel for the plaintiff class who will be reasonably available to answer questions from class members; (5) a brief statement of the reasons the parties propose to settle; and (6) such other information as the Court requires. 15 U.S.C.A. § 78u–4(a)(7)(A)(F). After reviewing the notice here, the Court found in its preliminary approval order that it met the requirements of Rule 23(c)(3) and the PSLRA. The Court

also found that the proposed dissemination of the notice was the best notice practicable in accordance with Rule 23(c)(2)(B) and that it met the requirements of Due Process.

Lead Counsel has provided evidence that the notice was disseminated as planned. (Strauss Decl., Exhibit I, Affidavit of Richard Simmons). Analytics received from Lead Counsel two reports identifying Security Intermediaries identified by the Depository Trust Company and Registered Holders of Equity Interests as evidenced by the Equity Holder List prepared by Computershare. (Simmons Affidavit, ¶ 4). From those reports, Analytics assembled a list of 410 unique names and addresses of potential class members. (Simmons Affidavit, ¶ 4). To provide notice to those shareholders that owned OCA stock in "street name," Analytics looked to its list of 577 brokers and other nominees who regularly purchase and/or hold securities as nominees for beneficial purchasers and to a list of 5,439 brokers registered with the SEC. (Simmons Affidavit, ¶ 5). Analytics then put together the notice package, the mailing envelope of which stated, conspicuously: "Notice to those who purchased common stock or sold put options of OCA, Inc." [or] "Notice to those who purchased common stock or sold put options of OCA, Inc. You could receive a payment from a class action settlement." (Simmons Affidavit, ¶ 6). Analytics then sent the notice package to: (1) security intermediaries; (2) registered holders, and (3) Analytics' focused lists of financial institutions known to hold the securities on behalf of investors. (Simmons Affidavit, ¶ 8). In total, Analytics sent out 6,426 copies of the notice package. (Simmons Affidavit, ¶ 8).

**\*8** Analytics also arranged for the publication of summary notice. On November 19, 2008, summary notice was published in the national edition of *The Wall Street Journal.* (Simmons Affidavit, ¶ 10 and Exhibit D). Summary notice was also distributed by PR Newswire, both internationally and domestically. (Simmons Affidavit, ¶ 11 and Exhibit E). Analytics confirmed that the summary notice was redistributed by online news organizations and financial web sites such as Bloomberg, CBS Marketwatch, Fox Business, The Wall Street Journal, Google Finance, and Yahoo Finance. (Simmons Affidavit, ¶ 12). Analytics also requested that the securities clearing agency, the Depository Trust Company ("DTC"), post the summary notice on its Electronic Legal Notice System. (Simmons Affidavit, ¶ 13).

In addition, Analytics conducted a nominee outreach campaign. Analytics obtained security position reports regarding relevant securities on May 22, 2004, the earliest date available, and June 3, 2005, the end of the class period. (Simmons Affidavit, ¶ 15). The reports identified 191 nominees holding positions in the relevant securities. (Simmons Affidavit, ¶ 15). Analytics then attempted to contact those nominees multiple times, through mail and email. (Simmons Affidavit, ¶ 16). Based on the additional information received from the nominees, Analytics sent an additional 20,751 copies of the notice package by the date of its affidavit. (Simmons Affidavit, ¶ 17). In total, Analytics mailed or caused to be mailed 27,177 copies of the settlement notice and claim form as of the date of the affidavit. (Simmons Affidavit, ¶ 18). Although some of the notice packages were returned, Analytics re-mailed those with forwarding addresses and conducted searches for updated address information for those without forwarding addresses. (Simmons Affidavit, ¶ 19).

To further disseminate notice of the settlement and answer questions about the claims process, Analytics maintained a settlement administration website and a settlement administration call center. (Simmons Affidavit, ¶¶ 20–25). The website, www.ocasecuritieslitigation.com, contained a frequently asked questions section, a case status section, and a case documents section containing links to the notice, proof of claim, consolidated class action complaint, and the Court's Order preliminarily approving the settlement. (Simmons Affidavit, ¶ 21). As of the date of the affidavit, the website had received 1,489 unique visits and 859 downloads of various case documents. (Simmons Affidavit, ¶ 22). The call center was fully operational as of November 6, 2008. When a caller connected with the call center, she heard an Interactive Voice Response system, which provided detailed information regarding the claims filing process and filing objections, and allowed the caller to request a Notice Package by mail. (Simmons Affidavit, ¶ 24). The call center also contained an option to speak to a live operator who was trained on the specifics of the settlement. (Simmons Affidavit, ¶ 25).

**\*9** In sum, after reviewing evidence of the actual dissemination of the notice by the Claims Administrator, the Court confirms that the notice complies with the requirements of Rule 23, the PSLRA, and Due Process.

### G. Opt-outs and objections

Analytics received only one request to be excluded from the settlement before the opt-out deadline of January 20,

Case 4:19-cv-00509 Document 65-9 Filed 07/02/21 in TXSD Page 1038 of 1452

In re OCA, Inc. Securities and Derivative Litigation, Not Reported in F.Supp.2d (2009)
2009 WL 512081, Fed. Sec. L. Rep. P 95,215, 72 Fed.R.Serv.3d 1060

2009. (Simmons Affidavit, ¶ 27, Trans. of Settlement Fairness Hearing). While the request was timely, it was invalid because it failed to include any transaction information. (Simmons Affidavit, ¶ 27).

The Court also received one objection to the settlement. On January 5, 2009, the Court received a letter of objection from Richard & Betsy Jasinski. The Jasinski's objected to the proposed award of attorneys' fees in the settlement, asserting that the proposed fee award was a "windfall" and a "skimming operation." The Jasinski's also objected to the certification of the class because plaintiffs were required to "opt out" rather than "opt in ." The Jasinski's further alleged that counsel presented the information to the class in a manner that made it difficult for the class to understand what was going on in the case. They contended that the class notice was used in an effort to quickly resolve the case before class members could object to the settlement and attorneys' fees. The Jasinski's aver that the limited objection to the settlement simply means that the class has not taken the time to respond, rather than that most of the class favors the proposed settlement.

## II. Class Action Settlement

### A. Legal Standard—Fair, Reasonable, and Adequate
A class action may not be dismissed or compromised without the approval of the Court and notification to all class members. Fed.R.Civ.P. 23(e). Before the Court approves a settlement, the Court must find that the proposed settlement is "fair, reasonable, and adequate." Fed.R.Civ.P. 23(e)(1)(c); *Newby v. Enron Corp.,* 394 F.3d 296, 301 (5th Cir.2004); *Ayers v. Thompson,* 358 F.3d 356, 368 (5th Cir.2004); *In re Educ. Testing Serv. Praxis Principles of Learning and Teaching: Grades 7–12 Litig.,* 447 F.Supp.2d 612, 619 (E.D.La.2006).

The Court must "ensure that the settlement is in the interest of the class, does not unfairly impinge on the rights and interests of dissenters, and does not merely mantle oppression." *Ayers,* 358 F.3d at 368–69 (quoting *Reed v. General Motors Corp.,* 703 F.2d 170, 172 (5th Cir.1983)); *see also Pettway v. American Cast Iron Pipe Co.,* 576 F.2d 1157, 1214 (5th Cir.1978). Because the parties' interests are aligned in favor of a settlement, the Court must take independent steps to ensure fairness in the absence of adversarial proceedings. *Reynolds v. Beneficial Nat'l Bank,* 288 F.3d 277, 279–80

(7th Cir.2002) (noting that the class action context "requires district judges to exercise the highest degree of vigilance in scrutinizing proposed settlements."); *see also* Manual for Complex Litigation (Fourth) § 21.61 (2004). The Court's duty of vigilance does not, however, authorize it to try the case in the settlement hearings. *Cotton v. Hinton,* 559 F.2d 1326, 1330 (5th Cir.1977).

**\*10** The Fifth Circuit has identified six factors that the Court should consider in assessing whether a settlement is fair, adequate, and reasonable: (1) evidence that the settlement was obtained by fraud or collusion; (2) the complexity, expense, and likely duration of the litigation; (3) the stage of the proceedings and the amount of discovery completed; (4) the factual and legal obstacles to plaintiffs prevailing on the merits; (5) the range of possible recovery and certainty of damages; and (6) the opinions of class counsel, class representatives, and absent class members. *See Newby,* 394 F.3d at 301; *Ayers,* 358 F.3d at 369; *Reed,* 703 F.2d at 172; *Parker v. Anderson,* 667 F.2d 1204, 1209 (5th Cir.1982).

### B. Discussion
The Court will now consider the factors for final approval of the settlement.

#### 1. Fraud or collusion

There is no evidence that the settlement involves fraud or collusion. The parties have presented evidence that the settlement was the result of arm's length negotiations after two mediation sessions before the Honorable Daniel Weinstein, an experienced mediator. (R. Doc. 357–3, Strauss Decl., ¶¶ 32–34). The parties submitted a declaration from Judge Weinstein detailing the mediation and negotiation process. (R. Doc. 357, Exhibit G, Weinstein Decl.). Judge Weinstein explained that, because of the bankruptcy of OCA and the limited financial resources of the individual defendants, the bulk of the potential settlement was to come from the two insurance carriers, National Union and XL. (Weinstein Decl., ¶ 6). He explained that the settlement was further complicated by the insurance companies' push for a global resolution of the Securities Case, the Derivative Case and the OCAI Litigation. (Weinstein Decl., ¶ 6). He noted that it was a "long and difficult" mediation in which counsel for all parties worked hard to represent the interests of their clients. Judge Weinstein

stated that there was no evidence of fraud or collusion at any point in the settlement process. (Weinstein Decl., ¶ 9).

The Court has required justification from the parties for certain provisions of the settlement. Specifically, the Court required the parties to demonstrate the reasonableness of the "Released Claims" provision in the settlement agreement, which extended to any claims, known or unknown, arising out of the purchase of OCA stock or sale of put options during the Class Period. The parties demonstrated that the release applied only to class members and that this type of provision was common in class action litigation, citing a number of cases allowing the release of similar provisions.

*See, e.g.,* ⚑*In re DeHoyos v. Allstate Corp.,* 240 F.R.D. 269, 311 (W.D.Tex.2007)(finding that the release of all past, present, and future claims is not overly broad). The Fifth Circuit has explained that courts are required to enforce such broad provisions because they "contribute significantly to the public policy of encouraging the settlement of differences and compromise of disputes in which the execution and exchange of releases is the common and legally accepted means of consummation." ⚑*Ingram Corp. v. J. Ray McDermott & Co.,* 698 F.2d 1295, 1312 (5th Cir.1983). Accordingly, the Court finds the provision to be reasonable. In addition, the Court reviewed the Supplemental Agreement between Lead Counsel and defendants, which allowed defendants to withdraw from the settlement agreement if potential class members who purchased in excess of a certain number of shares opted out of the settlement. Without such an agreement, defendants would have no protection from potentially duplicative liability if class members who purchased a large number of shares opted out of the settlement and sued defendants. The Court finds that the number of shares that triggers defendants' ability to withdraw from the settlement to be neither unreasonable nor unfair.

 **\*11** As noted by the Court in its preliminary approval order, the plan of allocation does not give unfair or preferential treatment to the lead plaintiff or any segment of the class. The allocation plan was developed by Lead Counsel and its damage consultant FMA, and it has a fair and reasonable basis for apportionment of recovery.

The allocation plan compensates class members in relation to the timing of their actual purchases and sales as well as the amount of their actual losses. (R. Doc. 351–3 at ¶ 13). The funds will be distributed based on two purchase periods. For class members who purchased shares (or sold put options)

between May 18, 2004 and March 17, 2005, the agreement essentially recognizes a loss upon purchase of $1.85 per share. (R. Doc. 351–3 at ¶ 13). For class members who purchased shares (or sold put options) between March 18, 2005 and June 6, 2005, the agreement essentially recognizes a loss upon purchase of $1.54 per share. (R. Doc. 351–3 at ¶ 13). The different levels of compensation are due to OCA's March 17, 2005 announcement that it would delay the filing of its Form 10–K because it had identified accounting errors relating to 2004 and earlier years. FMA's analysis shows that this partially curative disclosure caused $0.31 in artificial inflation per share to be removed from the price of OCA stock. (R. Doc. 351–3 at ¶ 13). The differential treatment of these two groups thus has a reasonable basis.

In sum, the Court has received no indication that the settlement is fraudulent, collusive, or that it unfairly discriminates among class members. This factor favors approval of the settlement.

### 2. Complexity, expense, and likely duration of the litigation

This case is a securities class action brought under the PSLRA. Plaintiffs have alleged that defendants committed securities fraud in violation of Section 10(b) of the Securities Exchange Act and SEC Rule 10b–5 and that the individual defendants were controlling persons under Section 20(a) of the Act and thus derivatively liable.

Under this factor, the Court considers whether settling now avoids the risks and burdens of potentially protracted litigation. *Ayers v. Thompson,* 358 F.3d 356, 369 (5th Cir.2004). Here, both parties would incur significant expenses if the case continued in litigation. Although the parties have engaged in some formal discovery, much more would be necessary, including consulting with expert witnesses. The parties would undoubtedly spend large amounts of time and resources filing and contesting motions before trial. The parties would also have to deal with an interlocutory appeal of any class certification order before trial. Trial itself would be lengthy and would require numerous attorneys, paralegals, and witnesses, as well as voluminous amounts of evidence. Prosecution of the case would require extensive expert testimony on accounting rules, loss causation, and damages. After trial, the parties could still expect years of appeals. Such litigation would consume substantial judicial and attorney time and resources, and avoiding such costs weighs in favor

2009 WL 512081, Fed. Sec. L. Rep. P 95,215, 72 Fed.R.Serv.3d 1060

of settlement. *See* *In re Delphi Corp. Sec., Derivative & ERISA Litig.,* 248 F.R.D. 483, 498 (E.D.Mich.2008) (avoiding the unnecessary expenditure of time and resources for the complex trial of a securities actions benefits all parties and the court); *In re Ikon Office Solutions, Inc., Sec. Litig.,* 194 F.R.D. 166, 178 (E.D.Pa.2000) (the "inherently complicated nature of large class actions alleging securities fraud" weighs in favor of settlement); *In re Cendant Corp. Sec. Litig.,* 109 F.Supp.2d 235, 257 (D.N.J.2000) (complex legal and factual issues in securities litigation weigh in favor of settlement).

### 3. Stage of the proceedings

**\*12** This factor asks whether the parties have obtained sufficient information "to evaluate the merits of the competing positions." *Ayers,* 358 F.3d at 369. The question is not whether the parties have completed a particular amount of discovery, but whether the parties have obtained sufficient information about the strengths and weaknesses of their respective cases to make a reasoned judgment about the desirability of settling the case on the terms proposed or continuing to litigate it. *In re Educ. Testing Serv.,* 447 F.Supp.2d at 620–21 (citing *In re Train Derailment Near Amite, La.,* 2006 WL 1561470 at \*22 (E.D.La.2006)). The parties need not undertake extensive formal discovery or build a voluminous record before settlement. *Cotton,* 559 F.2d at 1332; *see also* *In re Corrugated Container Antitrust Litig.,* 643 F.2d 195, 211 (5th Cir.1981). Rather, if the settlement proponents have taken affirmative steps to gather data on the claims at issue and the terms of the settlement are not patently unfair, the Court may rely on counsel's judgment that the information gathered was enough to support a settlement. *In re Corrugated Container,* 643 F.2d at 211.

Because the PSLRA prohibits formal discovery during the pendency of any motion to dismiss, the parties were prohibited from engaging in formal discovery until the Court ruled on defendants' motion to dismiss on December 14, 2006. *See* 15 U.S.C.A. § 78u–4(b)(3)(B). Before then, plaintiffs' counsel performed informal discovery, including identifying, locating and interviewing potential witnesses and identifying and obtaining records from court proceedings involving OCA. (Strauss Decl., ¶ 22). As for formal discovery, Lead Counsel drafted and served extensive document requests

upon the individual defendants and served ten subpoenas to nonparties, including OCA's auditor and former auditor and various former OCA employees and consultants. (Strauss Decl., ¶ 23). Plaintiffs' counsel received and reviewed nearly 250,000 pages of documents, including depositions taken in the SEC investigation of OCA. The protracted mediation led to further understanding of the factual and legal issues involved in the case. Plaintiffs' counsel declared that they were in a position to fully evaluate the strengths and weaknesses of the case. (Strauss Decl., ¶¶ 25–27).

The Court is satisfied that the parties were sufficiently informed to assess the strengths and weaknesses of their positions and to make a reasoned evaluation of whether and on what terms to settle. This factor favors settlement.

### 4. The obstacles to prevailing on the merits

In order to succeed on a claim for securities fraud under Rule 10b–5, a plaintiff must prove: (1) a material misrepresentation or omission by the defendant, (2) scienter on the part of the defendant, (3) a connection with the purchase or sale of security, (4) reliance, often referred to as transaction causation, (5) economic loss, and (6) loss causation. *Oscar Private Equity Invs. v. Allegiance Telecom, Inc.,* 487 F.3d 261, 264 n. 5 (5th Cir.2007) (citing *Dura Pharm. Inc. v. Broudo,* 544 U.S. 336, 341–42, 125 S.Ct. 1627, 161 L.Ed.2d 577 (2005)).

**\*13** Plaintiffs would face significant obstacles to prevailing on the merits of their claim. If the class had not been certified for settlement purposes, defendants would have vigorously contested plaintiffs' class certification motion. To attain class certification, plaintiffs would have had to meet the Fifth Circuit's stringent requirement that plaintiffs prove loss causation at the class certification stage in order to trigger the fraud-on-the-market presumption, such that the court could find that common issues of reliance predominate. *See* *Oscar Private Equity,* 487 F.3d at 271; *cf.* *In re LDK Solar Sec. Litig.,* 255 F.R.D. 519, 2009 WL 196396 at \*10–\*11 (N.D.Cal.2009) ( "[*Oscar* ] essentially injects what is fundamentally a merits inquiry into the class-certification inquiry ... [I]t requires the *plaintiff* to *prove* loss causation in order to avail itself of the benefit of the fraud-on-the-market presumption (without which certification is virtually impossible)."); *Oscar Private Equity,* 487 F.3d at 277

(Dennis, J., dissenting) ("the majority's decision dramatically expands the scope of class certification review in this circuit to effectively require a mini-trial on the merits of plaintiffs' claims at the certification stage."). To prove loss causation, plaintiffs would have had to show that the corrective disclosure—not other negative information released on the same day—caused the stock price movement. *See* Oscar *Private Equity,* 487 F.3d at 271. Plaintiffs would have had to show this for both dates at issue—March 18, 2005 and June 7, 2005. Plaintiffs previously submitted evidence that the decline in stock price on the relevant days was caused by OCA's disclosures that it would delay filing its Form 10–K because it had previously overstated patient receivables in its financial statements and had no effective internal controls, rather than other unrelated negative information or a general business downturn. (*See* R. Doc. 351–3). But plaintiffs' evidence was uncontested, as they submitted it in connection with their motion for preliminary approval of the settlement. Had the case not settled, defendants would have argued that other negative information released on the dates in question actually caused the decline in stock price. Plaintiffs would have had to prove loss causation just to certify the class. If the class were certified, plaintiffs would have had to defeat defendants' interlocutory appeal of the class certification order.

Plaintiffs would also have had to survive defendants' inevitable summary judgment motions. If plaintiffs made it to trial, they would have had the difficult task of proving these complex issues to a jury. Plaintiffs would have had to prove scienter and would thus have had to show that defendants either knew that their statements or omissions were materially false or misleading or were severely reckless in making the statements. *See* Abrams v. Baker Hughes Inc. ., 292 F.3d 424, 430 (5th Cir.2002) (scienter element of a section 10(b) claim is a "mental state embracing intent to deceive, manipulate, or defraud."); Nathenson v. Zonagen Inc., 267 F.3d 400, 408 (5th Cir.2001) (scienter in securities fraud cases includes severe recklessness). Defendants contested whether plaintiffs sufficiently pleaded scienter at the motion to dismiss stage and would certainly have continued to vigorously contest this issue. (R. Doc. 208). Proving each defendant's state of mind would be a difficult task. *See* In re Telik, Inc. Sec. Litig., 576 F.Supp.2d 570, 579 (S.D.N.Y.2008) ("Proving a defendant's state of mind is hard in any circumstances."). Accordingly, proof of this element would have been a significant obstacle to plaintiffs' case. Further, even if plaintiffs succeeded on the merits at trial, they would have had to face years of appeals before they could actually recover any money from the judgment.

**\*14** In sum, considering the risks plaintiffs face in attaining class certification and prevailing at trial and on appeal, the probability of success factor favors approval of the settlement.

### 5. Range of possible recovery

Even if plaintiffs established liability, plaintiffs would have had substantial obstacles in proving damages. Plaintiffs can recover only for the amount of stock price inflation that they can prove resulted from the defendants' alleged misstatements and omissions. *See* In re Rent–Way Sec. Litig., 305 F.Supp.2d 491, 505 (W.D.Pa.2003). Before the mediation, plaintiffs' expert Cynthia Jones attested that OCA's damages were $32 million. (Trans. of Settlement Fairness Hearing & R. Doc. 351–3). Jones's firm, Financial Market Analysis, LLC (FMA), calculated this figure by performing a regression analysis that quantified the relationship of OCA's daily common stock changes to those of the S & P 500 Index and the S & P Small Cap Health Care Services Index. (R. Doc. 351–3 at ¶ 9). FMA then used those results to calculate abnormal OCA common stock price changes and measured those residual price changes for statistical significance. (R. Doc. 351–3 at ¶ 9). FMA determined that the residual price changes on March 18, 2005 and June 7, 2005 did not occur by chance, but were the result of investors' reactions to unexpected negative information and were indicative of previously existing artificial stock price inflation. (R. Doc. 351–3 at ¶¶ 9–10). FMA estimated the artificial stock price inflation per share based on the residual price declines and determined that the March 18, 2005 decline of 6.3% translated to a $0.31 loss per share and the June 7, 2005 decline of 38.3% translated to a loss of $1.54 per share. (R. Doc. 351–3 at ¶ 10). Based on this analysis, FMA concluded that class members who purchased OCA stock during the Class Period and held those shares at the close of trading on March 17, 2005, suffered losses of $1.85 per share. Class members who purchased OCA stock between March 18, 2005 and June 6, 2005 who held those shares at the close of trading on June 6, 2005 lost $1.54 per share. (R. Doc. 351–3 at ¶ 11). FMA used a standard share trading model to reach its $32 million estimate of the aggregate class-wide damages. (R. Doc. 351–3 at ¶ 12). This is the amount of damages plaintiffs would have requested at trial and thus is probably their maximum possible recovery.

2009 WL 512081, Fed. Sec. L. Rep. P 95,215, 72 Fed.R.Serv.3d 1060

To prove those damages, plaintiffs would have had to rely on market data and expert testimony as to the extent the price was artificially inflated. Proving the level of artificial inflation would have been complicated by the fact that plaintiffs alleged multiple misstatements over a prolonged period—over one year. *See In re Rent–Way,* 305 F.Supp.2d at 505. Plaintiffs would also have had to establish the difference in damages between those who purchased OCA stock before and after the partially curative disclosure on March 17, 2005. Defendants would have rebutted plaintiffs' damage assessment with their own expert testimony. Because the jury would have been faced with competing expert opinions, the resulting damage award would have been highly unpredictable. *See In re Rent–Way,* 305 F.Supp.2d at 505; *In re Global Crossing Sec. and ERISA Litig.,* 225 F.R.D. 436, 459 (S.D.N.Y.2004) (calculation of damages in a securities fraud case "is a complicated and uncertain process, typically involving conflicting expert opinion about the difference between the purchase price and the stock's 'true' value absent the alleged fraud"); *In re Indep. Energy Holdings PLC,* 2003 WL 22244676 at *3 ("proof of damages in a securities case is always difficult and invariably requires expert testimony which may, or may not be, accepted by a jury."). Because plaintiffs' damage award could vary widely from $0 to $32 million, settlement would grant relief to plaintiffs without subjecting them to the considerable risks of litigating their claims.

**\*15** Further, OCA's bankruptcy meant there were not many "deep pockets" in the case. *See In re Quintus Sec. Litig.,* 2006 WL 3507936 at *3 (N.D.Cal.2006) (the risk and cost of further litigation is enhanced by defendant's bankruptcy). The money available for recovery primarily comes from two of OCA's insurance policies for director and officer liability, and these policies are worth a total of approximately $20 million. (Trans. Of Class Certification Hearing at 4). [1] Thus even though plaintiffs' damage estimate is $32 million, plaintiffs could not have realistically expected to recover over $20 million. While the $20 million in insurance proceeds is substantially more than the settlement, the $20 million is being used to fund the $5.75 million settlement in the Derivative Case and the $1.2 settlement in the OCAI litigation. Furthermore, the insurance policies are being depleted by the substantial litigation expenses and attorneys' fees incurred in this case, the Derivative Case (which has significantly more defendants), and the OCAI Litigation. Both Lead Counsel and defense counsel stated that, before the mediation, between $2 million and $3 million

of the insurance proceeds available had already been spent on OCA's attorneys' fees. As the case had not yet undergone full discovery and motion practice, counsel estimated that going to trial and completing the appellate process would further deplete the proceeds available from these policies by as much as $5 million. (Trans. of Settlement Fairness Hearing). Because plaintiffs faced considerable risk in litigating the damages element of their claim and are limited in their recovery because of OCA's bankruptcy, this factor weighs in favor of settlement.

### 6. Opinions of class counsel, class representatives, and absent class members

The opinions of the affected parties are generally favorable towards the settlement. Lead Counsel and Lead Plaintiff have both expressed their approval of the settlement. (Strauss Decl. and Boodman Decl.). Further, the Court and counsel have received only one objection, from Richard and Betsy Jasinski, to the settlement and proposed attorneys' fee award (R. Doc. 356), even though 26,000 copies of the Notice were sent to potential class members and summary notice was published in *The Wall Street Journal* and on *PR Newswire.* (Strauss Decl., ¶ 51). The Claims Administrator has also received only one request to opt out of the settlement. (Simmons Affidavit, ¶ 27).

Although the Court is careful not too infer too much from a paucity of objectors and opt-outs, that only one couple objected and only one person attempted to opt out suggests class-wide support for the proposed settlement. *See In re Delphi Corp.,* 248 F.R.D. at 499 (a small number of opt-outs and objections can be viewed as indicative of the adequacy of the settlement); *In re Rent–Way,* 305 F.Supp.2d at 502 ("sole objector to the proposed Settlement comprises an infinitesimal percentage of the total number of class members and of the shares traded during the Class Period" and suggests "overwhelming class-wide support" for the settlement); *In re Excess Value Ins. Coverage Litig.,* 2004 WL 1724980 at *11 (S.D.N.Y.2004) (small number of objectors suggests support for settlement).

**\*16** In addition, Lead Counsel demonstrated additional support for the settlement at the Settlement Fairness Hearing. Pursuant to the Class Action Fairness Act, the defendants sent notice of the settlement to the Attorneys General of all 50 states and the United States Attorney General. (Trans. of Settlement Fairness Hearing). Defendants received no

negative reaction to the settlement in response. (Trans. of Settlement Fairness Hearing). Additionally, 1755 claim forms had been received as of Thursday, February 5, 2009 —well over a week before the February 14 deadline. (Trans. of Settlement Fairness Hearing). Although the number of potential claimants is unascertainable because of the frequency with which some people trade stock, Lead Counsel explained that this was a substantial number of claimants. Lead Counsel also noted that a number of the claimants were sophisticated financial institutions such as state and municipal pension funds. (Trans. of Settlement Fairness Hearing). That those institutions filed claims and voiced no objections further attests to the general support for the settlement.

In sum, because all of the factors weigh in favor of settlement, the Court finds the settlement to be fair, reasonable and adequate under Rule 23(e)(1)(C) of the Federal Rules of Civil Procedure.

### 7. Objection

The Court has considered the arguments raised in the Jasinskis' objection and for the reasons discussed below does not find that the objection raises problems sufficient to warrant rejection of the settlement. The Jasinski's do not object to the amount of the settlement, but rather to the percentage of attorneys' fees proposed to be awarded to counsel. The Court will separately consider the attorneys' fee award in Part III of this Order.

The Jasinski's also object that "counsel for the plaintiffs [ ] presents all this information in a manner which makes it difficult and time consuming for the class to decipher and act upon." The Court interprets this to be an objection to the notice. The Court reviewed the notice sent to potential class members in its preliminary approval order. The Court found that it met the disclosure requirements of the PSLRA and Rule 23(c)(3) because it disclosed: (1) the nature of the action; (2) the definition of the class; (3) the class claims and defenses; (4) the class members' right to be heard; (5) the class members' right to exclusion; (6) the time and manner for requesting exclusion and the binding effect of a class judgment; (7) the amount of settlement; (8) the amount of damages per share; (9) a statement of the attorneys' fees sought; (10) the name and contact information of counsel; and (11) the reasons for settlement. (*See* R. Doc. 344–4). After reviewing the notice again, the Court finds nothing

in the eight-page document that makes it difficult or time consuming to decipher. On the first page, the notice plainly states the amount of the settlement and the average recovery per damaged share of the stock. (R. Doc. 344–4). At the top of the second page, the notice clearly states the amount of attorneys' fees sought and explains that, if the Court approves that amount, the average cost of attorneys' fees per damaged share would be $0.09. After these initial statements, the notice contains 16 sections, each set off with a heading in bold and all capital letters, that explain various aspects of the settlement and the actions potential claimants must take to make a claim, opt out, or object to the settlement. The Court finds that the notice presents the information to potential claimants as clearly as possible given the complex issues involved in securities litigation.

**\*17**  The Jasinskis' other objection largely concerns the class action process itself. The Jasinski's object that they must "opt out" rather than "opt in" to the class and that the Court does not require the class to respond if they favor the settlement of this suit. The Court notes that Rule 23(b)(3) mandates the opt-out procedure used here. Because the objection does not concern the fairness or substance of the settlement, but rather the class action process set forth in Federal Rule of Civil Procedure 23(b)(3), the Court OVERRULES the objection.

### III. Attorneys' Fees and Costs

Class counsel requests attorneys' fees of 30% of the $6.5 million Settlement Fund, or $1,950,000, plus interest accruing thereon at the same rate as earned on the Settlement Fund, until paid. The Court must independently analyze the reasonableness of the attorneys' fees proposed in the settlement agreement. *See Strong v. BellSouth Telecomm., Inc.,* 137 F.3d 844, 849–50 (5th Cir.1998); *see also* Fed.R.Civ.P. 23(e).

#### A. Common Fund Cases

In common fund cases, as here, the attorneys' fees award is taken out of the common fund, lessening the ultimate award for the plaintiffs. *See In re Enron Corp. Sec., Derivatives & "ERISA" Litig.,* 586 F.Supp.2d 732, 745 n. 10 (S.D.Tex.2008). The Court must carefully scrutinize the attorneys' fee award in a common fund settlement because the interests of the attorneys conflict with those of the class. *See id.* at 745. If the attorneys get more, the class gets less.

Case 4:19-cv-00509 Document 65-9 Filed 07/02/21 in TXSD Page 1044 of 1452

In re OCA, Inc. Securities and Derivative Litigation, Not Reported in F.Supp.2d (2009)
2009 WL 512081, Fed. Sec. L. Rep. P 95,215, 72 Fed.R.Serv.3d 1060

In common fund cases, courts typically utilize one of two methods of calculating attorneys' fees. Courts use either (1) the percentage method, under which the Court awards fees as a reasonable percentage of the common fund; or (2) the lodestar method, under which the Court awards fees by multiplying the number of reasonable hours expended by a reasonable hourly rate and applying a lodestar multiplier. *See In re Enron,* 586 F.Supp.2d at 745–46. The Fifth Circuit has established twelve factors to consider in calculating reasonable fees and costs. *Johnson v. Georgia Highway Express, Inc.,* 488 F.2d 714 (5th Cir.1974). The twelve *Johnson* factors are: (1) the time and labor required; (2) the novelty and difficulty of the question; (3) the skill requisite to perform the legal service; (4) the preclusion of other employment by the attorney due to the acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the residuals obtained; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of professional relationship with the client; and (12) awards in similar cases. *Von Clark v. Butler,* 916 F.2d 255, 258 n. 3 (5th Cir.1990). Using the *Johnson* factors, the court should (1) ascertain the nature and extent of the services supplied by the attorney; (2) determine the value of the service according to the customary fee and the quality of the work; and (3) adjust the compensation on the basis of the other *Johnson* factors that may be of significance in that particular case. *Id.* at 258 (citations omitted). The first two tasks compute the "lodestar," which is essentially the reasonable number of hours expended on litigation multiplied by a reasonable hourly rate. *See Strong,* 137 F.3d at 851; *see also* Manual on Complex Litigation (4th) §§ 13.121–14.122. The Court then uses the *Johnson* factors to adjust the lodestar upward or downward using a multiplier. *Strong,* 137 F.3d at 851; *see also Longden v. Sunderman,* 979 F.2d 1095, 1099–1100 (5th Cir.1992).

### B. Percentage vs. Lodestar

**\*18** This Court has previously discussed the pervasive criticism of the lodestar method of calculating attorneys' fees. *See In re Educ. Testing,* 447 F.Supp.2d at 628–69. The method has been called "difficult to apply, time-consuming to administer, inconsistent in result, and capable

of manipulation." *See* Manual on Complex Litigation (4th) § 14.121. The vast majority of Courts of Appeals have approved or mandated the use of the percentage method. *See, e.g., In re Thirteen Appeals Arising out of San Juan Dupont Plaza Hotel Fire Litig.,* 56 F.3d 295, 307 (1st Cir.1995); *Gwozdzinnsky v. Sandler Assocs.,* 159 F.3d 1346 (2d Cir.1998); *In re General Motors Corp. Pick–Up Truck Fuel Tank Products Liability Litig.,* 55 F.3d 768, 821–22 (3d Cir.1995); *Rawlings v. Prudential–Bache Properties, Inc.,* 9 F.3d 513, 515–17 (6th Cir.1993); *Florin v. Nationsbank of Georgia, N.A.,* 34 F.3d 560, 564–65 (7th Cir.1994); *In re Wash. Pub. Power Supply Sys. Sec. Litig.,* 19 F.3d 1291, 1295 (9th Cir.1994); *Gottlieb v. Barry,* 43 F.3d 474, 487 (10th Cir.1994); *Camden I Condominium Ass'n, Inc. v. Dunkle,* 946 F.2d 768, 774 (11th Cir.1991); *Swedish Hosp. Corp. v. Shalala,* 1 F.3d 1261, 1271 (D.C.Cir.1993). The Supreme Court has also approved the percentage method in common fund cases. *See Blum v. Stenson,* 465 U.S. 886, 900 n. 16, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984) ("under the 'common fund doctrine,' a reasonable fee is based on a percentage of the fund bestowed on the class"); *Boeing Co. v. Van Gemert,* 444 U.S. 472, 478, 100 S.Ct. 745, 62 L.Ed.2d 676 (1980) ("[A] lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorneys' fee from the fund as a whole.").

The Fifth Circuit has never explicitly disapproved of the percentage method of calculating fees in common fund cases. For instance, in *Strong,* 137 F.3d at 852, the Fifth Circuit found that the lodestar method applied because the settlement at issue did not involve a traditional common fund. The court distinguished the Supreme Court's decision in *Boeing,* because there, "each member of the class had an undisputed and mathematically ascertainable claim to part of [the] lump sum judgment." *Id.* In contrast, in *Strong,* the value of the settlement was contingent on class members' desire to continue inside wire maintenance service plans with BellSouth. *Id.* The Fifth Circuit has affirmed a court's calculation of fees based on the percentage method when the court also considered the *Johnson* factors, noting the judge's use of the percentage method merely demonstrated his preference "as a matter of policy." *See Longden v. Sunderman,* 979 F.2d 1095, 1100 n. 11 (5th Cir.1992). Numerous district courts in the Fifth Circuit have applied the

percentage fee method to common fund cases. *See In re Enron,* 586 F.Supp.2d at 751; *In re Educ. Testing Serv.,* 447 F.Supp.2d at 630; *In re Lease Oil Antitrust Litig.,* 186 F.R.D. 403, 444 (S.D.Tex.1999); *In re Harrah's Entm't, Inc.,* 1998 WL 832574 at *4 (E.D.La.1998); *In re Combustion, Inc.,* 968 F.Supp. 1116, 1135 (W.D.La.1997); *In re Catfish Antitrust Litig.,* 939 F.Supp. 493, 501 (N.D.Miss.1996).

**\*19** The percentage method of calculating fees is particularly appropriate in the PSLRA context. The PSLRA explicitly authorizes the percentage method in calculating attorneys' fees in securities action. *See* 15 U.S.C.A. § 78u–4(a)(6) ("Total attorneys' fees and expenses awarded by the court to counsel for the plaintiff class shall not exceed a reasonable percentage of the amount of any damages and prejudgment interest actually paid to the class."). A number of courts have held that, based on this statutory language, the percentage method is the preferred method for calculating attorneys' fees in securities actions. *See In re Cendant Corp. Sec. Litig.,* 404 F.3d 173, 188 n. 7 (3d Cir.2005) ("the PSLRA has made percentage-of-recovery the standard for determining whether attorneys' fees are reasonable"); *In re Telik, Inc. Sec. Litig.,* 576 F.Supp.2d 570, 586 (S.D.N.Y.2008) ("Congress plainly contemplated that percentage-of-recovery would be the primary measure of attorneys' fee awards in federal securities class actions"); *In re Xcel Energy, Inc., Sec., Derivative & ERISA Litig.,* 364 F.Supp.2d 980, 992 n. 6 (D.Minn.2005) ("the PSLRA incorporates the common fund percentage method"). But courts often perform the lodestar analysis as a cross-check on the percentage method. *See Gunter v. Ridgewood Energy Corp.,* 223 F.3d 190 (3d Cir.2000) (noting that "it is advisable to cross-check the percentage award counsel asks for against the lodestar method of awarding fees"); *see also In re Enron,* 586 F.Supp.2d at 778; *In re Telik,* 576 F.Supp.2d at 588; *In re Educ. Testing,* 447 F.Supp.2d at 633; *In re Indep. Energy Holdings, PLC,* 2003 WL 22244676 at *9 (S.D.N.Y.2003).

### C. Percentage

The Court first notes that, surprisingly, Lead Counsel and Lead Plaintiff represented to the Court that, while counsel took this case on a contingent basis, the plaintiff did not enter into an *ex ante* fee agreement as to the percentage to be paid counsel in this representation. Such an agreement would be entitled to deference given the lead plaintiff's role in selecting counsel under the PSLRA. *See In re Enron,* 586 F.Supp.2d at 749 ("The PSLRA establishes a model of client control that extends not only to appointment of counsel but also to monitoring of counsel and negotiation of the fee."). Because Lead Plaintiff and Lead Counsel did not enter into such a fee agreement, the Court will begin its analysis by looking at awards in comparable cases to determine a benchmark percentage. The Manual on Complex Litigation states that a fee of 25% of a common fund "represents a typical benchmark." MCL (4th) § 14.121. The Ninth Circuit has adopted a benchmark of 25% in common fund cases. *See Staton v. Boeing Co.,* 327 F.3d 938, 968 (9th Cir.2003). In securities suits, common fee awards generally fall within the 20 to 33 per cent range. *See* 4 Newberg on Class Actions § 14.6 (4th ed.). In order to prevent windfalls to attorneys, the percentage of attorneys' fees awarded typically decreases as the settlement award increases in size. *See In re Ikon Office Solutions, Inc. Sec. Litig.,* 194 F.R.D. 166, 195 (E.D.Pa.2000); *Hicks v. Stanley,* 2005 WL 2757792 at *9 (S.D.N.Y.2005). In reported securities cases involving funds in the $5 million to $10 million range, attorneys' fee awards are generally within the 25 to 33 1/3 per cent range. *See e.g., In re Telik,* 576 F.Supp.2d at 570 (25% of $5 million fund); *In re Veeco Instruments Inc. Sec. Litig.,* 2007 WL 4115808 at *4 (S.D.N.Y.2007) (30% of $5.5 million fund); *In re Immune Response Sec. Litig.,* 497 F.Supp.2d 1166, 1177 (S.D.Cal.2007) (25% of $10 million); *Hicks v. Stanley,* 2005 WL 2757792 at *9 (S.D.N.Y.2005) (30% of $10 million); *Great Neck Capital Appreciation Inv. P'ship, L.P. v. PricewaterhouseCoopers, L.L.P.,* 212 F.R.D. 400, 412 (E.D.Wis.2002) (30% of $10.15 million); *In re Safety Components, Inc. Sec. Litig.,* 166 F.Supp.2d 72, 102 (D.N.J.2001) (33 1/3% of $4.5 million); *In re Eng'g Animation Sec. Litig.,* 203 F.R.D. 417, 423 (S.D.Iowa 2001) (33 1/3 % of $7.5 million); *In re Harrah's Entm't, Inc.,* 1998 WL 832574 at *7 (E.D.La.1998) (26% of $6.8 million).

**\*20** Further, the Court has reviewed data on fee awards in class action settlements in a study involving data sets from 1993–2002. *See* Theodore Eisenberg and Geoffrey P. Miller, *Attorney Fees in Class Action Settlements: An Empirical Study,* 1 Journal of Empirical Legal Studies 27, 28 (2004). The data sets are (1) data based on published decisions from "all state and federal class actions with reported fee decisions between 1993 and 2002, inclusive, in which the fee and class

recovery could be determined with reasonable confidence"; and (2) information reported on more than 600 common fund cases from 1993 and 2002 in *Class Action Reports (CAR)*. *Id.* The study finds a "strong correlation between the fee amount and the client recovery." *Id.* at 52. The authors of the study suggest that the results can assist courts in determining fee awards:

> [B]ecause our study finds an overwhelming correlation between class recovery and attorney fees, the court can conduct a simple initial inquiry that looks only at these two variables in any case where the size of the class recovery can be estimated. The court need only compare the request in a given case with average awards in cases of similar magnitude. If the request is relatively close to average awards in cases with similar characteristics, the court may feel a degree of confidence in approving the award. If the request is significantly higher than amounts awarded in past cases, the court should inquire further.

*Id.* at 72. Eisenberg and Miller divided the cases into ten ranges of recovery (deciles) and then gave the mean and median fee percent, as well as the standard deviation, for each fee percent. *Id.* at 73. The Court finds the study's data on the average percentage fee awarded in the recovery range comparable to this case useful in arriving at a benchmark percentage fee. [2] The $6.5 million recovery in this case falls within the 30–40% decile of client recovery, which includes recoveries between $5.2 million and $9.7 million. *Id.* at 73. Based on the *Class Action Reports (CAR)* data set, the mean fee percent for common fund cases with funds of this size range is 28.7%, with a standard deviation of 5.3%. The data set generated from published decisions shows a mean fee percent for cases in this decile of 25.6%, with a standard deviation of 7.0%. Eisenberg and Miller also found that, in general, the median fee award in securities class actions of all sizes is 25%. *Id.*

Based on the study and the Court's review of similar reported cases, the Court finds that a benchmark of 27% is appropriate. Twenty-seven percent is the average of the mean fee percents

(28.7% and 25.6%) of the two data sets in the Eisenberg and Miller study involving settlements of comparable size and is also roughly the average of the fee awards in the sampling of reported securities cases collected by this Court involving similar-sized settlements. The Court will determine whether this benchmark should be adjusted upward or downward based on the particular circumstances of this case. In doing so, the Court will consider the *Johnson* factors.

### D. *Johnson* Factors

**\*21** The *Johnson* factors are intended to ensure "a reasonable fee ." *Johnson,* 488 F.2d at 720. Because not all of the *Johnson* factors are always applicable, *see In re Harrah's,* 1998 WL 832574 at \*4 (citing *Uselton v. Commercial Lovelace Motor Freight, Inc.,* 9 F.3d 849, 854 (10th Cir.1993)), the Court will only consider the relevant ones.

### 1. Time and labor required

The Court does not find that the amount of time and labor required in this case warrants an adjustment of the benchmark percentage. The case was settled before intensive formal discovery began and well before trial. Although the case was settled in its early stages, the Court is mindful not to "penalize counsel for obtaining an early settlement." *In re Harrah's,* 1998 WL 832574 at \*5. The magnitude of the work required in connection with informal and formal discovery, the motion to dismiss, the monitoring of the bankruptcy, the settlement negotiations and mediation, preliminary approval of the settlement, the fairness hearing, and post-approval administration is adequately reflected in the benchmark percentage fee. This factor does not warrant an increase or decrease in the benchmark fee award.

### 2. Novelty and difficulty of the question and skill required to perform the legal service

Securities actions are generally large and complex cases involving difficult financial and accounting issues. Moreover, Fifth Circuit decisions on causation, pleading and proof at the class certification stage make PSLRA claims particularly difficult in this circuit. *See In re Enron,* 586 F.Supp.2d at 788. This case was further complicated by OCA's bankruptcy, for which Lead Counsel had to retain separate

bankruptcy counsel. *See In re Harrah's,* 1998 WL 832574 at *5 (recognizing that concurrent bankruptcy proceedings add a level of difficulty to a typical securities litigation case). Further, the Court does not doubt that handling this difficult case required considerable skill and experience. Given the inherent difficulty involved in securities class actions, the special difficulty of bringing those cases in the Fifth Circuit, and the further complication of the bankruptcy proceeding, as well as accounting for counsel's skill and expertise, the Court finds that an increase in the percentage is merited.

### 3. The customary fee

The Court has discussed, *supra,* the typical fees in securities cases involving comparable awards. Because the benchmark percentage is about average for cases of this kind the Court finds that this factor does not warrant an adjustment.

### 4. Whether the fee is fixed or contingent

Consideration of this factor is designed to "demonstrat[e] the attorney's fee expectations when he accepted the case." *Johnson,* 488 F.2d at 718. This factor considers the financial risks a contingency fee arrangement places on counsel. *See In re Enron,* 586 F.Supp.2d at 791. Class counsel undertook this case on a contingency basis and has thus far received no payment. Although counsel faces risks in litigating any securities class action post-PSLRA, counsel faces even more challenges in the Fifth Circuit. Early on, counsel faced a significant risk that the case would be dismissed given the Fifth Circuit jurisprudence regarding the pleading of scienter under the PSLRA. *See Ind. Elec. Workers' Pension Trust Fund IBEW v. Shaw Group, Inc.,* 537 F.3d 527, 545 (5th Cir.2008) (reversing the denial of a motion to dismiss because plaintiffs' circumstantial allegations of scienter were insufficient to support a strong inference of scienter); *Goldstein v. MCI WorldCom,* 340 F.3d 238 (5th Cir.2003) (affirming grant of motion to dismiss because circumstantial allegations did not meet "strong inference" requirement); *Abrams v. Baker Hughes Inc.,* 292 F.3d 424, 432 (5th Cir.2002) (affirming grant of motion to dismiss for failure to sufficiently plead scienter).

**\*22** Although the case survived the motion to dismiss, counsel still faced challenges in overcoming the Fifth

Circuit's loss causation hurdle to class certification (as discussed, *supra* ), surviving summary judgment, and then proving liability and damages at trial. In addition, counsel stated at the Settlement Fairness Hearing that, because of OCA's bankruptcy, there was a chance that plaintiffs' claims would be completely wiped out in the reorganization of the company. (Trans. of Settlement Fairness Hearing). That counsel pursued this case against a bankrupt corporation was a substantial risk in itself. Because there were no obvious deep pockets, plaintiffs would be at risk of little or no recovery even if they won a judgment. *See In re Enron,* 586 F.Supp.2d at 791 (noting the risk of no recovery because of Enron's bankruptcy and the "wasting" director's and officer's liability insurance policies). In sum, the risk plaintiffs' counsel undertook in litigating this case on a contingency basis must be considered in its award of attorneys' fees, and thus an upward adjustment is warranted.

### 5. Amount involved and the results obtained

Given the limited pool of recovery for this case, counsel obtained a favorable settlement for plaintiffs. Although counsel estimated that plaintiffs' damages totaled $32 million, only $20 million in insurance proceeds was available for recovery for plaintiffs in this securities action, as well as those in the Derivative Case and OCAI Litigation. As discussed, *supra,* defendants had expended between $2 million and $3 million of the $20 million in attorneys' fees and costs even before the mediation. This depleting resource would likely be lessened by as much as $5 million more if the case were to go through trial and appeal. (*See* Trans. of Settlement Fairness Hearing). Thus if the Court estimates that roughly $12 million of the policy would be available for judgments in all three cases, and that in the settlement context, the insurance companies were pushing for a global resolution of the three cases, the plaintiffs' $6.5 million recovery (notably, $750,000 more than the settlement in the Derivative Case) is not insubstantial under the circumstances. Still, the class members' potential award was depressed because of OCA's bankruptcy, a factor that is independent of the merits of their claims. Class counsel should share the pain and not receive an increase because their clients' settlement was limited because of the bankruptcy. The Court thus finds that this factor does not warrant an increase or decrease in the percentage.

### 6. The experience, reputation, and ability of the attorneys

The Court is satisfied that the experience and reputation of the attorneys involved are of the highest quality. But as the Court has accounted for counsel's experience and skill in the *Johnson* factor considering the skill necessary to litigate the case, a further increase in the percentage is not warranted.

### 7. Undesirability of the case

**\*23** Class counsel asserts that the case was risky and undesirable, particularly, as previously noted, because of the numerous obstacles to bringing securities class actions in the Fifth Circuit and the fact that OCA was in bankruptcy proceedings. The Court agrees that these factors make the case undesirable, but it has already accounted for this in granting an increase for the risks in the litigation.

In sum, most of the *Johnson* factors do not point to an increase in the fee award. The Court finds that, after considering these factors, an increase of 1.5% is warranted. Counsel has also requested interest on their percentage of the settlement. No party has objected to an award of interest. The Court thus awards counsel 28.5% of the interest the settlement fund has accrued.

### E. Lodestar Cross-check

The Court will calculate a rough lodestar for purposes of checking the percentage fee award. Class counsel and Lead Plaintiff request that the attorneys' fees be apportioned among Lead Counsel; local counsel, Neblett Beard & Arsenault; plaintiffs' bankruptcy counsel, Lowenstein Sandler, PC; and counsel for plaintiff Stephen Klein, Pomerantz Haudek Block Grossman & Gross, LLP. [3]

### 1. Non-class counsel

The Court first notes that Lead Counsel requests that the attorneys' fee award be apportioned among four law firms, two of which, Lowenstein Sandler and Pomerantz Haudek, were never appointed class counsel by the Court. In securities cases governed by the PSLRA, courts may give deference to lead counsel and lead plaintiff's allocation of attorneys' fees to non-lead counsel for work done after the appointment of lead

counsel at the direction of lead counsel. *See In re Cendant Corp. Sec. Litig.,* 404 F.3d 173, 197–98 (3d Cir.2005); *In re Tut Systems, Inc. Sec. Litig.,* 2007 WL 1722420 at \*3 (N.D.Cal.2007); *In re NTL, Inc. Sec. Litig.,* 2007 WL 438320 at \*3 (S.D.N.Y.2007). Such deference is warranted because of the PSLRA's structure, which allows the lead plaintiff to choose the class's counsel and direct the litigation. Under the PSLRA, the lead plaintiff is "the decisionmaker for the class, deciding which lawyers will represent the class and how they will be paid." *In re Cendant,* 404 F.3d at 197. Thus lead plaintiff and lead counsel's decision that non-lead counsel is entitled to some compensation is entitled to deference, although the Court must still independently review it.

Here, Lead Counsel requests attorneys' fees for Lowenstein Sandler for its work on behalf of the class and at the direction of Lead Counsel in monitoring the OCA bankruptcy proceedings. (Strauss Declaration, Exhibit E). Lead Counsel request attorneys' fees for Pomerantz Haudek for its work, at the direction of Lead Counsel, in researching and analyzing issues related to the motion for class certification and assisting in the drafting of the plan of allocation. (Strauss Declaration, Exhibit F). Because Lead Counsel and Lead Plaintiff both approve of the allocation of a portion of the attorneys' fee award to non-class counsel for this work completed after the appointment of Lead Plaintiff and Lead Counsel, and because the work was of a nature that substantially benefitted the class, the Court finds that the firms are entitled to a fee award.

**\*24** Lead Counsel also seeks to allocate some attorneys' fees to Pomerantz Haudek for the firm's work in filing the complaint and editing the amended complaint. The Third Circuit has explained that in the securities case context, courts have the paramount role in the fee decision when the fee request is for work performed before the appointment of lead plaintiff. *See In re Cendant,* 404 F.3d at 194. "The court, not the lead plaintiff, must decide for itself what firms deserve compensation for work done on behalf of the class prior to the appointment of lead plaintiff." *Id.* Non-lead counsel may be entitled to compensation if the attorney created a "substantial benefit for the class in this period." *Id.* Still, even at this stage, the Court may place "significant weight" on Lead Plaintiff's decision about what work conferred such benefits.

Because Lead Counsel had not explained the reasons for the award to Pomerantz Haudek for the work it performed before the appointment of Lead Counsel, the Court ordered the parties to submit evidence outlining the specific contributions

of the firm to the class claims. (R. Doc. 363). In response, Pomerantz Haudek submitted a declaration lowering the number of hours in its fee request from 235 .3 to 54.8, which lowered its projected lodestar from $127,898.25 to $25,188.50. (R. Doc. 364). Pomerantz Haudek asserted that its firm's work pre-appointment substantially benefitted the class because the firm drafted and filed a complaint on behalf of a plaintiff who sold OCA put options, whereas the other complaints were on behalf of plaintiffs who were holders of OCA common stock. (R. Doc. 364–1 at ¶ 3).

The Court takes into account Lead Counsel's and Lead Plaintiff's determination that Pomerantz Haudek's work in drafting the complaint and editing the amended complaint entitled the firm to compensation. Further, the Third Circuit has explained that although the filing of a complaint in itself does not merit compensation, attorneys whose complaints contain factual information or legal theories not contained in lead counsel's complaint, upon which lead counsel later rely, may be entitled to compensation. *In re Cendant,* 404 F.3d at 197. Because Pomerantz Haudek included the sellers of put options in the class defined in its complaint, and because such persons were later included in the class certified for settlement purposes, the Court finds that Pomerantz Haudek conferred a substantial benefit on the class. Accordingly, the Court finds that Pomerantz Haudek is entitled to fees for the 54.8 hours it spent on the class claims.

### 2. Cross-check

The attorneys involved reported over 3,905.95 hours of time spent in the prosecution of this litigation. Lead Counsel Kaplan Fox reported 3,006.5 hours, including 989.50 partner hours, 1,315.5 associate hours, 99 law clerk hours, 422.5 investigator hours, and 180 paralegal hours. Kaplan Fox's requested average rate is $447.18 per hour. Liaison counsel Neblett Beard & Arsenault reported 179.75 hours, including 145.5 partner hours and 34.25 paralegal hours. Liaison counsel's requested average rate is $404.97 per hour. Bankruptcy counsel Lowenstein Sandler, PC, reported 664.9 attorney hours, including 189.5 partner hours, 340.10 counsel hours, 6.7 associate hours, 25.3 law clerk hours, 33.6 paralegal hours, and 69.7 project assistant hours. Bankruptcy counsel requested an average hourly rate of $452.26. Finally, counsel for plaintiff Steve Klein, Pomerantz Haudek Block Grossman & Gross, LLP, reported 54.8 hours, including 8.1 partner hours and 46.7 associate hours. Pomerantz Haudek requested an average hourly rate of $459.64. In total,

plaintiffs' counsel calculated a lodestar of $1,743,123.90, for an average hourly rate of $446.27. If counsel received its requested 30% fee, the resulting lodestar multiplier would be 1.12. The lodestar multiplier for a 28.5% fee would be 1.06.

**\*25** In determining the reasonable hourly rate, courts look to the reasonable hourly rate for attorneys of a similar caliber practicing in the community. *See Watkins v. Fordice,* 7 F.3d 453, 458 (5th Cir.1993); *Tollett v. City of Kemah,* 285 F.3d 357, 368 (5th Cir.2002); *In re Enron,* 586 F.Supp.2d at 756. To support a proposed hourly rate, counsel must not only submit an affidavit attesting to her customary rate, but must also address the rates billed and paid in similar lawsuits. *See In re Enron,* 586 F.Supp.2d at 756 (citing *Watkins v. Input/Output, Inc.,* 531 F.Supp.2d 777, 784 (S.D.Tex.2007)).

Here, counsel submitted evidence of the defense attorneys' hourly rates and of a 30% fee award in another securities action in the Eastern District of Louisiana. The Court found that neither were helpful and ordered counsel to submit affidavits from attorneys practicing in the community to assist in computation of the lodestar. (R. Doc. 360). Lead Counsel then submitted an affidavit from the New Orleans firm Kahn Gauthier, a firm specializing in plaintiffs' securities cases, whose rates were comparable to those of Kaplan Fox—$575 per hour for partners and $425–$465 per hour for associates. (R. Doc. 362, Exhibit A). Lead Counsel's affidavit from local counsel Neblett Beard & Arsenault showed rates of $400–$500 per hour for partners engaged in securities work. (R. Doc. 357–4, Exhibit D). While the Court takes note of these affidavits, the Court recognizes that these rates are from firms that typically do not bill by the hour, but rather, work on a contingency fee basis. The Fifth Circuit has noted that a court is itself an expert in attorneys' fees and "may consider its own knowledge and experience concerning reasonable and proper fees and may form an independent judgment with or without the aid of witnesses as to value." *Campbell v. Green,* 112 F.2d 143, 144 (5th Cir.1940). The Court is familiar with the local legal market and finds that partner-level attorneys performing similar securities work bill at a rate between $400 and $450 per hour, and associates bill at a rate between $200 and $250 per hour. The Court will thus utilize a blended rate of $350 per hour to calculate the lodestar. The Court uses a blended rate to reflect that not all of the work was performed by the highest level attorneys. The Court finds that $100 per hour is a reasonable rate for the work by paralegals, law clerks, investigators, and project assistants. Using these hours and rates, the Court calculates a lodestar baseline of

2009 WL 512081, Fed. Sec. L. Rep. P 95,215, 72 Fed.R.Serv.3d 1060

$1,150,995. If counsel received the requested 30% fee, the lodestar multiplier would be 1.69. The lodestar multiplier for a 28.5% fee would be 1.6. Because the Court found that an increase in the fee was merited based on a few of the *Johnson* factors, the Court finds that a multiplier of 1.6 is appropriate. This multiplier adequately accounts for the results obtained and the risks involved.

The Court thus awards a total fee of $1,852,500, or 28.5% of the settlement fund. This fee is further confirmed by the lodestar calculation. The fee award in this case is to be distributed among plaintiffs' counsel in the proportions reflected by agreement of the attorneys, which the Court has already analyzed. *See* *Longden v. Sunderman,* 979 F.2d 1095, 1101 (citation omitted).

### G. Costs

 **\*26** Class counsel requests an award of $179,466.05 in expenses. (Trans. of Settlement Fairness Hearing). Class counsel has submitted a declaration itemizing the expenses. (Strauss Decl., Exhibit B). The Court has reviewed the itemized expenses and finds that the asserted expenses are reasonable. The Court thus awards the full amount in addition to the percentage fee.

### IV. Conclusion

For the foregoing reasons, IT IS ORDERED that the Motion for Final Approval of the Class Action Settlement be GRANTED and the SETTLEMENT be APPROVED. IT IS FURTHER ORDERED that Class Counsel be awarded 28.5% of the common fund and $179,466.05 in expenses.

### All Citations

Not Reported in F.Supp.2d, 2009 WL 512081, Fed. Sec. L. Rep. P 95,215, 72 Fed.R.Serv.3d 1060

---

### Footnotes

1    Counsel for both sides stated at the Settlement Fairness Hearing that the individual defendants remaining in the case could not significantly contribute to the settlement.

2    Eisenberg and Miller suggest that a fee request within one standard deviation of the mean is presumptively reasonable, and that one falling between one and two standard deviations from the mean may require further justification. *Id.* at 74.

3    Each firm submitted declarations outlining the description of the work performed on behalf of the class and the lodestar calculation for that firm's work.

---

**End of Document**

© 2021 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 50

2019 WL 2352837
Only the Westlaw citation is currently available.
United States District Court,
N.D. Texas, Dallas Division.

Cynthia A. PARMELEE, Individually and on
Behalf of All Others Similarly Situated, Plaintiff,
v.
SANTANDER CONSUMER USA
HOLDINGS INC., Thomas G. Dundon, Jason
Kulas, and Jennifer Davis, Defendants.

C.A. No. 3:16-cv-00783-K
|
Signed 06/03/2019

**Attorneys and Law Firms**

Willie Briscoe, The Briscoe Law Firm, Dallas, TX, Jason L. Krajcer, Pro Hac Vice, Joseph D. Cohen, Pro Hac Vice, Kara M. Wolke, Pro Hac Vice, Kevin F. Ruf, Pro Hac Vice, Lesley F. Portnoy, Lionel Z. Glancy, Pro Hac Vice, Glancy Prongay & Murray LLP, Los Angeles, CA, Keith Lorenze, The Rosen Law Firm PA, Jenkintown, PA, for Plaintiff Cynthia A. Parmelee.

R. Dean Gresham, Steckler Gresham Cochran, Willie Briscoe, The Briscoe Law Firm, Dallas, TX, Jason L. Krajcer, Pro Hac Vice, Joseph D. Cohen, Pro Hac Vice, Kara M. Wolke, Pro Hac Vice, Kevin F. Ruf, Pro Hac Vice, Lionel Z. Glancy, Pro Hac Vice, Glancy Prongay & Murray LLP, Los Angeles, CA, Keith Lorenze, The Rosen Law Firm PA, Jenkintown, PA, Laurence Rosen, Phillip Kim, The Rosen Law Firm PA, New York, NY, for Plaintiff Kelly Baxley.

Courtney Barksdale Perez, Carter Arnett PLLC, Dallas, TX, J. Alexander Hood, II, Jeremy Alan Lieberman, Marc Gorrie, Pomerantz LLP, Peretz Bronstein, Bronstein Gewirtz & Grossman LLC, New York, NY, Patrick Dahlstrom, Pomerantz LLP, Chicago, IL, for Plaintiff Stuart A. Benson.

R. Thaddeus Behrens, Daniel H. Gold, Matthew Adams McGee, Haynes & Boone LLP, Dallas, TX, Caitlin A. Donovan, Corey Jared Banks, Pro Hac Vice, David B. Anders, Pro Hac Vice, Nathaniel D. Cullerton, Stephen R. DiPrima, Wachtell Lipton Rosen & Katz, New York, NY, for Defendants.

**ORDER AWARDING ATTORNEYS' FEES AND REIMBURSEMENT OF LITIGATION EXPENSES**

ED KINKEADE, UNITED STATES DISTRICT JUDGE

**\*1** This matter came on for hearing on May 21, 2019 (the "Settlement Hearing") on Lead Counsel's motion for an award of attorneys' fees and reimbursement of Litigation Expenses. The Court having considered all matters submitted to it at the Settlement Hearing and otherwise; and it appearing that notice of the Settlement Hearing substantially in the form approved by the Court was mailed to all Settlement Class Members who or which could be identified with reasonable effort, and that a summary notice of the hearing substantially in the form approved by the Court was published in *Investor's Business Daily* and was transmitted over the *PR Newswire* pursuant to the specifications of the Court; and the Court having considered and determined the fairness and reasonableness of the award of attorneys' fees and Litigation Expenses requested,

NOW, THEREFORE, IT IS HEREBY ORDERED THAT:

1. This Order incorporates by reference the definitions in the Stipulation and Agreement of Settlement dated July 16, 2018 (ECF No. 64; App.004-043) (the "Stipulation") and all capitalized terms not otherwise defined herein shall have the same meanings as set forth in the Stipulation.

2. The Court has jurisdiction to enter this Order and over the subject matter of the Action and all parties to the Action, including all Settlement Class Members.

3. Notice of Lead Counsel's motion for an award of attorneys' fees and reimbursement of Litigation Expenses was given to all Settlement Class Members who could be identified with reasonable effort. The form and method of notifying the Settlement Class of the motion for an award of attorneys' fees and expenses satisfied the requirements of Rule 23 of the Federal Rules of Civil Procedure, the Private Securities Litigation Reform Act of 1995 (15 U.S.C. § 78u-4(a)(7)), due process, and all other applicable law and rules, constituted the best notice practicable under the circumstances, and constituted due and sufficient notice to all persons and entities entitled thereto.

4. Plaintiffs' Counsel are hereby awarded attorneys' fees in the amount of 33 1/3% of the Settlement Fund ($ 3,166,666.67) and $ 74,295.83 in reimbursement of Plaintiffs' Counsel's litigation expenses (which fees and expenses shall be paid from the Settlement Fund), which sums the Court finds to be fair, reasonable, and adequate under applicable Fifth Circuit law. *See* *Union Asset Mgmt. Holding v. Dell, Inc.*, 669 F.3d 632, 642 n.25 (5th Cir. 2012). Lead Counsel shall allocate the attorneys' fees awarded amongst Plaintiffs' Counsel in a manner which it, in good faith, believes reflects the contributions of such counsel to the institution, prosecution, and settlement of the Action.

5. In making this award of attorneys' fees and reimbursement of expenses to be paid from the Settlement Fund, the Court has considered and found that:

(a) The Settlement has created a fund of $ 9.5 million in cash that has been funded into escrow pursuant to the terms of the Stipulation, and that numerous Settlement Class Members who submit acceptable Claim Forms will benefit from the Settlement that occurred because of the efforts of Lead Counsel;

 **\*2** (b) Copies of the Postcard Notice were mailed to over 27,000 potential Settlement Class Members and nominees stating that Lead Counsel would apply for attorneys' fees and expenses, notice and administration costs, and taxes;

(c) The Notice posted on the Settlement Website informed potential Settlement Class Members and nominees that Lead Counsel would apply for attorneys' fees and expenses in an amount not to exceed 33 1/3% of the Settlement Fund and reimbursement of Litigation Expenses in an amount not to exceed $ 140,000. There were no objections to the requested attorneys' fees and expenses;

(d) Lead Counsel has conducted the litigation and achieved the Settlement with skill, perseverance, and diligent advocacy;

(e) The Action raised a number of complex issues;

(f) Had Lead Counsel not achieved the Settlement there would remain a significant risk that Lead Plaintiff and the other members of the Settlement Class may have recovered less or nothing from Defendants;

(g) Plaintiffs' Counsel devoted over 2,845 hours, with a lodestar value of approximately $ 1,558,478.50 to achieve the Settlement; and

(h) The amount of attorneys' fees awarded and expenses to be reimbursed from the Settlement Fund are fair and reasonable and consistent with awards in similar cases.

6. Lead Plaintiff Cynthia Parmelee is hereby awarded $ 12,000 from the Settlement Fund as reimbursement for her reasonable costs directly related to her representation of the Settlement Class.

7. Lead Plaintiff Kelly Baxley is hereby awarded $ 2,500 from the Settlement Fund as reimbursement for her reasonable costs directly related to her representation of the Settlement Class.

8. Any appeal or any challenge affecting this Court's approval regarding any attorneys' fees and expense application shall in no way disturb or affect the finality of the Judgment.

9. Exclusive jurisdiction is hereby retained over the parties and the Settlement Class Members for all matters relating to this Action, including the administration, interpretation, effectuation, or enforcement of the Stipulation and this Order.

10. In the event that the Settlement is terminated or the Effective Date of the Settlement otherwise fails to occur, this Order shall be rendered null and void to the extent provided by the Stipulation.

11. There is no just reason for delay in the entry of this Order, and immediate entry by the Clerk of the Court is expressly directed.

**SO ORDERED.**

**All Citations**

Slip Copy, 2019 WL 2352837

---

**End of Document**

© 2021 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 51

Case 4:19-cv-00509   Document 65-9   Filed 07/02/21 in TXSD   Page 1055 of 1452

Rodriguez v. Stage 3 Separation, LLC, Not Reported in Fed. Supp. (2015)

2015 WL 12866212

2015 WL 12866212
Only the Westlaw citation is currently available.
United States District Court, W.D.
Texas, San Antonio Division.

Robert A. RODRIGUEZ, on behalf of himself and others similarly situated, et al., Plaintiffs,

v.

STAGE 3 SEPARATION, LLC, et al., Defendants.

5:14–CV–00603–RP
|
Signed 12/23/2015

**Attorneys and Law Firms**

Andrew W. Dunlap, Michael A. Josephson, Lindsay R. Itkin, Fibich, Leebron, Copeland, Briggs & Josephson, David Isaac Moulton, Richard J. Burch, Bruckner Burch PLLC, Houston, TX, for Plaintiffs.

Charles J. Muller, III, Mel Ethan Myers, Chamberlain Hrdlicka White Williams & Martin, PC, San Antonio, TX, Annette Idalski, Fletcher Beaumont Howard, Chamberlin Hrdlicka White Williams & Aughtry, Atlanta, GA, Lee Marshall Larkin, Dobrowski, Larkin & Johnson LLP, David B. Jordan, Littler Mendelson, P.C., Houston, TX, for Defendants.

## ORDER

ROBERT L. PITMAN, UNITED STATES DISTRICT JUDGE

 **\*1**  Before the Court is the Parties' Joint Motion to Approve Settlement (Dkt. 111). After reviewing the pleadings, the applicable case law, and the case file, the Court issues the following Order.

## BACKGROUND

This is a putative collective action by current and former employees to recover unpaid overtime compensation under the Fair Labor Standards Act (FLSA), 29 U.S.C. § 201 et seq. On July 5, 2014, Plaintiff Robert Rodriguez filed his original Complaint in the United States District Court for the Western District of Texas. Plaintiff Rodriguez was a "solids control technician" employed by Defendants Stage 3—a "closed loop solids control company that serves the oil and gas industry"—and Insperity—a "Professional Employment Organization ... [that] served as Stage 3's human resources department." (Pl.'s Second Am. Compl., Dkt. 105, ¶¶ 4–6).

Plaintiff's Second Amended Complaint [*hereinafter* "the Complaint"] alleges that Stage 3 and Insperity are enterprises covered under the FLSA, (*id.* ¶¶ 12, 15), that Plaintiff and other class members are "nonexempt employees ... entitled to overtime pay," (*id.* ¶ 23), and that Defendants nonetheless paid Rodriguez and the class members "a flat amount per day" with no overtime premium, (*id.* ¶ 24). The Complaint further alleges Defendants "attempted to conceal their unlawful day-rate payroll," (*id.* ¶ 25), and otherwise willfully violated the FLSA, (*id.* ¶¶ 32–34).

This case was conditionally certified as a collective action under 29 U.S.C. § 216(b). The putative class includes:

> All current and former Stage 3 Separation, LLC employees who worked in any of the following positions at any time during the last three years from [March 16, 2015]: Field Techs, Solid Control Tech, Trainee, Tech 2, Tech 1, Service Tech, Site Leader or Field Leader. (Ord. Grant. Mot. Conditional Cert., Dkt. 57, at 3).

The Court further ordered Defendants to provide Plaintiff with the last known names, addresses, and email addresses of potential class members and ordered Plaintiff's counsel to distribute notice via mail and email. In addition to Plaintiff Rodriguez, 163 additional plaintiffs opted to join the case. (Joint Mot. App. Settle., Dkt. 111, at 1).

Plaintiff Rodriguez, on behalf of himself and the 163 additional plaintiffs (collectively, "Plaintiffs"), and Stage 3 Separation, LLC, Fred Lausen, Jr., and Insperity, Inc. (collectively, "Defendants) have jointly proposed a Settlement Agreement (Dkts. 111, 113).

Case 4:19-cv-00509   Document 65-9   Filed 07/02/21 in TXSD   Page 1056 of 1452

Rodriguez v. Stage 3 Separation, LLC, Not Reported in Fed. Supp. (2015)

2015 WL 12866212

## ANALYSIS

The FLSA provides that a suit may be instituted by "one or more employees for and in behalf of himself or themselves and other employees similarly situated" to recover unpaid minimum wages, overtime compensation, and liquidated damages from employers who violate the statute's provisions. 🚩 29 U.S.C. § 216(b). This type of collective action follows an "opt-in" procedure in which "[n]o employee shall be a party plaintiff to any such action unless he gives his consent in writing to become such a party and such consent is filed in the court in which such action is brought." *Id.*

 **\*2** FLSA claims "may be compromised" after a court reviews and approves a settlement. *See Villeda v. Landry's Restaurants, Inc.*, 2009 WL 3233405, at \*1 (S.D. Tex. Oct. 7, 2009). Courts may approve a settlement if it reflects "a reasonable compromise over issues" that are "actually in dispute." 🚩 *Lynn's Food Stores, Inc. v. U.S. By & Through U.S. Dep't of Labor, Employment Standards Admin., Wage & Hour Div.*, 679 F.2d 1350, 1354 (11th Cir. 1982). "The primary focus of the Court's inquiry in deciding whether to approve the settlement of a FLSA collective action is not on due process concerns as it would be for a Rule 23 class action .... Rather[,] the Court primarily focuses on ensuring that an employer does not take advantage of its employees in settling their claim for wages." *Sims v. Hous. Auth. City of El Paso,* EP:10–CV–109–PRM, 2012 WL 10862119, at \*2 (W.D. Tex. Feb. 29, 2012) (quoting *Liger v. New Orleans Hornets NBA Ltd., P'ship,* 2009 WL 2856246, at \*2 (E.D.La. Aug. 28, 2009)).

Courts thus evaluate proposed settlements on two dimensions. First, courts determine whether there is a "bona fide" dispute; second, courts determine whether a proposed settlement fairly and reasonably resolves that dispute.

### I. A FAIR AND REASONABLE RESOLUTION OF A BONA FIDE DISPUTE

First, courts determine "whether there exists a bona fide dispute" under the FLSA–for example, a dispute regarding "the amount of hours worked or compensation due." *Jones v. JGC Dallas LLC*, No. 3:11–CV–2743–O, 2014 WL 7332551, at \*3 (N.D. Tex. Nov. 12, 2014) (citing *Sims*, 2012 WL 10862119, at \*2–3).

The procedural evolution of cases can demonstrate the existence of a bona fide dispute. *See, e.g.*, *Jones*, 2014 WL 7332551, at \*3. Here, Plaintiffs amended their complaint. (Dkts. 1, 21). Defendants moved to dismiss each complaint. (Dkts. 18, 28, 34). Those motions disputed, among other things, the manner of compensation and the amount due. *See, e.g.*, (Dkt. 28). This Court denied each Motion, finding that Plaintiffs had sufficiently alleged claims upon which relief could be granted. (Dkt. 50). Thereafter, the parties reached a settlement after "months of discovery, investigation, litigation, and negotiation." (Joint Mot. App. Settle., Dkt. 111, at 1). Defendants continue to "deny having engaged in any wrongdoing ...[;] dispute[ ] Plaintiffs' entitlement to recover any damages; and disagree[ ] with Plaintiffs as to, for example ... the number of hours Plaintiffs actually worked." (*Id.*, at 1–2).

There is thus a bona fide dispute. *Cf., e.g.,* 🚩*Martin v. Spring Break '83 Prod., L.L.C.,* 688 F.3d 247, 255–56 (5th Cir. 2012) (finding bona fide dispute where the parties disputed "the number of hours for which [plaintiffs] are owed their set rate of pay.").

If a court finds there is a bona fide dispute, it reviews the settlement agreement to determine whether it is fair and reasonable. *See Jones*, 2014 WL 7332551, at \*3 (citing *Sims*, 2012 WL 10862119, at \*3).

"Although the class-action provisions of 🚩 Federal Rule of Civil Procedure 23 technically do not apply to collective actions under the FLSA, 🚩 Rule 23(e) is similar because it requires court approval to finalize a proposed class action settlement." *Sims*, 2012 WL 10862119, at \*3. "Thus, the 🚩 Rule 23(e) standard encompasses the 'fair and reasonable' settlement standard of the FLSA collective action, and cases interpreting 🚩 Rule 23(e) are analogous and applicable to the instant FLSA action." *Altier v. Worley Catastrophe Resp., LLC*, 2012 WL 161824, at \* 14 (E.D. La. Jan. 18, 2012). The Fifth Circuit propounds six factors for evaluating settlement proposals:

> **\*3** (1) whether the settlement was a product of fraud or collusion; (2) the complexity, expense, and likely duration of the litigation; (3) the stage of the proceedings and the amount of

2015 WL 12866212

discovery completed; (4) the factual and legal obstacles [to] prevailing on the merits; (5) the possible range of recovery and the certainty of damages; and (6) the respective opinions of the participants, including class counsel, class representative, and the absent class members. *Parker v. Anderson*, 667 F.2d 1204, 1209 (5th Cir. 1982).

First, the Court evaluates whether the settlement was the product of fraud or collusion. There is no evidence before this Court of fraud or collusion. Additionally, the parties attest that they "engaged in arm's-length and extended settlement negotiations, including a full-day mediation." (Joint Mot. App. Settle., Dkt. 111, at 1). The Court thus finds that the first factor favors finding a fair and reasonable agreement.

Second, the Court evaluates the offered settlement in light of the complexity, expense, and likely duration of the litigation. This case was filed in July 2014. Though it is more than a year old, it is still in its preliminary stages due to good-faith disagreements at each stage. The live complaint was not filed until July 2015. Defendants maintain that they enter into this agreement as a "compromise of disputed claims," to "avoid the risks, distractions and costs that will result from further litigation." (Joint Mot. App. Settle., Dkt. 111, at 1–2). The Court thus finds that the second factor favors finding a fair and reasonable agreement.

Third, the Court evaluates settlement in light of the stage of the proceedings and the amount of discovery completed. Though this Case is still in preliminary stages, the Parties have litigated significant issues including dispositive motions and collective action certification. They have exchanged significant discovery. And they have participated in mediation. The third factor thus favors finding a fair and reasonable agreement.

Fourth, the Court asks whether there are any obstacles to the merits of the case. "Aside from the contentiousness of the suit," *Jones*, 2014 WL 7332551, at *4, neither party has provided an "obstacle to the merits of the case." The fourth factor thus favors finding a fair and reasonable agreement.

Fifth, the Court evaluates the proposed Settlement Agreement against the possible range of recovery and the certainty of damages. Plaintiffs and Defendants disagree about:

Plaintiffs' entitlement to recover any damages ...[;] the number of hours Plaintiffs actually worked; whether Plaintiffs were paid overtime for any hours worked over forty in a workweek; whether per diem payments to Plaintiffs should have been included in their regular rates for purposes of overtime payment; whether Defendants' alleged FLSA violations were made in good faith ... [or] were willful; and Plaintiffs' status as 'employees' of Insperity. (Joint Mot. App. Settle., Dkt. 111, at 1–2).

Against these disagreements, the Settlement Agreement proposes depositing a settlement amount into a Qualified Settlement Fund ("QSF") within ten days for distribution to Plaintiffs and Plaintiffs' counsel in accordance with the Settlement Agreement. The award received by each Plaintiff is a sum certain to be administered at a time certain. (*See generally* Settlement Agreement, Dkt. 113 (Sealed Docket Entry)). Thus the fifth factor, contrasting the broad and uncertain range of potential damages and recoveries with the definite and certain result of the proposed Settlement Agreement, favors finding a fair and reasonable agreement.

**\*4** Finally, the Court evaluates the respective opinions of the participants, including class counsel, class representative, and the absent class members. When reviewing settlement agreements, courts are "entitled to rely upon the judgment of experienced counsel for the parties." *Cotton v. Hinton*, 559 F. 2d 1326, 1330 (5th Cir. 1977). In this case, "[t]he Parties and their counsel agree the Settlement Agreement is a fair and reasonable compromise of the claims alleged by Plaintiffs in light of the procedural posture of the case, the litigation risks and the costs applicable to all Parties." (Joint Mot. App. Settle., Dkt. 111, at 3). All Parties are represented by experienced counsel. (*Id.*). With regard to "absent class members," potential plaintiffs who have not opted into suit do not waive their individual rights as a result of the Settlement Agreement. Accordingly, the sixth factor favors finding a fair and reasonable agreement.

Applying the six factors laid out by the Fifth Circuit, the Court thus finds that the Settlement Agreement is fair and reasonable.

## II. ATTORNEY'S FEES

The Settlement Agreement requests that Plaintiffs' counsel be paid a percentage of the total Settlement Fund as fees for their work. The parties have agreed that Plaintiffs' counsel may apply to the Court for an award of forty percent of the

2015 WL 12866212

gross settlement amount. The Settlement Agreement adds that forty percent is "pursuant to a contingency arrangement in the Professional Services Agreement between the Plaintiffs and the Plaintiffs' Counsel." (Joint Mot. App. Settle., Dkt. 111, at 4).

"[T]o fully discharge its duty to review and approve class action settlement agreements, a district court must assess the reasonableness of the attorneys' fees." *Strong v. BellSouth Telecomm., Inc.*, 137 F.3d 844, 849 (5th Cir.1998). The Court thus addresses multiple questions—first, the propriety of determining attorney's fees as a percentage of the total award to plaintiffs rather than, for instance, as a function of hours worked at an appropriate rate of pay; second, insofar as fees may be calculated as a percentage of the total Settlement Fund, the Court addresses what percentage is appropriate.

As a preliminary matter, "use of a common fund to pay attorney's fees in class action settlements is well established." *Klein v. O'Neal, Inc.*, 705 F.Supp.2d 632, 673 (N.D.Tex.2010). However, courts must "carefully scrutinize the attorneys' fees award in a common fund settlement because the interests of the attorneys conflict with those of the class[ ]." *Id.* Courts are not "bound by the agreement of the parties as to the amount of attorneys' fees." *Id.*

Plaintiffs request that attorney's fees be calculated as a percentage of the common fund. Specifically, "Plaintiffs believe a fee of forty percent is reasonable." (Joint Mot. App. Settle., Dkt. 111, at 5). The Supreme Court has blessed the percentage method in common fund cases, *Jones*, 2014 WL 7332551 (citing *Blum v. Stenson*, 465 U.S. 886, 900 n. 16 (1984)), and courts in the Fifth Circuit have applied the method, *see id.* (citing *Schwartz v. TXU Corp.*, No. 3:02–cv–2243, 2005 WL 3148350, at *25 (N.D. Tex. Nov. 8, 2005)). The percentage method, however, is appropriate only so long as the "*Johnson*" framework is utilized to ensure the fee is reasonable. *Strong*, 137 F.3d, at 851–2 & n.5. Within the Fifth Circuit, that framework, set forth in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717–19 (5th Cir.1974), is applied to a "benchmark" fee to determine whether deviations from that fee are appropriate and reasonable. *See Klein*, 795 F. Supp. 2d, at 674.

a. The Benchmark Fee

The Settlement Agreement seems to suggest a benchmark fee of 40%. Defendants do not oppose, and Plaintiffs' counsel maintain that their fee arrangement with Plaintiffs suggests, attorney's fees calculated as 40% of the total Settlement Fund.

To support the fee, the parties suggest that 35 to 40% is the "customary contingency" in the Fifth Circuit. The parties additionally cite precedent suggesting that "the most critical factor in determining a fee award is the degree of success obtained," *Singer v. City of Waco, Tex.*, 324 F.3d 813, 829 (5th Cir. 2003), and argue that "[t]he degree of success here is high because Defendants vehemently deny [ ] that the Plaintiffs were improperly paid ... and the Plaintiffs have litigated in excess of one year before the matter could be settled through mediation." (Joint Mot. App. Settle., Dkt. 111, at 5).

**\*5** Though Defendants do not oppose a 40% fee and Plaintiffs allegedly agreed to pay 40%, the Court must "carefully scrutinize the attorneys' fees award in a common fund settlement because the interests of the attorneys conflict with those of the class[ ]." *Klein*, 705 F. Supp. 2d at 673. Defendants have no incentive to police attorney's fees subtracted from the fixed Settlement Fund; and the Fifth Circuit has repeatedly held contingency fee agreements between attorneys and their clients are not beyond judicial control. *See, e.g.*, *Karim v. Finch Shipping Co. Ltd.*, 374 F. 3d 302, 309 (5th Cir. 2004) (noting federal court's "well-recognized power" to reform contingent fee contracts).

A review of Fifth Circuit precedent suggests a benchmark fee of 30%. Contrasted with the parties' proffered 40%, "[t]he *Manual for Complex Litigation* states that '[a]ttorney fees awarded under the percentage method are often between 25% and 30% of the fund.' " *Klein*, 705 F. Supp. 2d at 675 (quoting MANUAL FOR COMPLEX LITIGATION (FOURTH) § 14.121 (2010)). "The majority of common fund fee awards fall between twenty and thirty percent." *In re Harrah's Entm't, Inc.*, No. Civ. A. 95–3925, 1998 WL 832574, at *4 (E.D. La. Nov. 25, 1998). Indeed, the Settlement Agreement's cited appellate case supporting a "customary" fee award between 35% and 40% did not adopt the district court's assertion that such a rate was customary and in fact approved only a 30% award. *Vela*, 276 F.3d at 681.

Because a benchmark fee of 30% is more common and the parties have not proffered exceptional circumstances that

**Rodriguez v. Stage 3 Separation, LLC, Not Reported in Fed. Supp. (2015)**

2015 WL 12866212

justify raising the benchmark and thereby reducing Plaintiffs' recovery, this Court applies a benchmark fee of 30%.

b. The "*Johnson*" Factors

The Court next considers the so-called *Johnson* factors to determine whether a deviation from the benchmark percentage is appropriate. *Klein,* 705 F. Supp. 2d at 676. *Johnson* set out twelve factors:

> (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the skill requisite to perform the legal services properly; (4) the preclusion of other employment by the claimant's attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the claimant or the circumstances; (8) the amount of recovery involved and the results obtained; (9) counsel's experience, reputation, and ability; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the claimant; and (12) awards in similar cases. *Johnson,* 488 F.2d at 717–19.

Not every factor need necessarily be considered, and not every factor is applicable to a case seeking an attorney's fee award out of a common fund. *Jones,* 2014 WL 7332551, at *8. This Court will highlight the factors it considers most relevant to the Settlement Agreement.

With regard to the first factor, the time and labor required, the Court acknowledges that this case has consumed significant time and required significant labor. This case has been pending for over a year. During this time, Plaintiffs' counsel have amended the complaint and dealt with Defendants' Motions to Dismiss. Counsel succeeded in conditionally certifying the class. Counsel participated in mediation on behalf of 164 plaintiffs. These procedural steps suggest that Plaintiffs' counsel diligently represented the plaintiffs and invested significant time and labor on behalf of Plaintiffs. Though Plaintiffs' counsel undoubtedly have expended time and labor, they have not argued that the time and effort expended is extraordinary relative to the time and effort expended by other lawyers in similar FLSA cases. Absent such a showing, the first factor counsels that Plaintiffs' attorneys are adequately compensated by a 30% fee. *Cf. Jones,* 2014 WL 7332551, at *8 (citing *Batchelder v. Kerr–McGee Corp.,* 246 F. Supp. 2d 525, 532 (N.D. Miss. 2003)(finding a 25% fee award to be appropriate)).

**\*6** The second factor analyzes the novelty and difficulty of the issues raised. The issues presented at this stage of the litigation were not so novel or difficult as to differentiate this case from other FLSA actions, and do not counsel deviating upward from the benchmark fee. Nor do the third, fourth, and fifth factors justify deviating from the benchmark fee. The third factor evaluates the special skill required to manage a case of this nature. Though this case requires knowledge of and familiarity with the FLSA, counsel have not argued that the requisite degree of skill is inadequately compensated by the 30% benchmark fee. The fourth factor evaluates whether counsel was precluded from accepting other engagements as a result of managing the present case. Counsel have not argued that they gave up any representations to litigate the present action, and thus this factor does not justify deviating from the benchmark fee. The fifth factor—the customary award—counsels in favor of attorney's fees around 30% of Plaintiffs' recovery.

The sixth and seventh factors do not influence this Court's decision. The parties highlight the eighth factor as the factor that justifies a high recovery. With regard to the eighth factor, counsel argue that a high fee award is justified because of the amount of recovery and the degree of success obtained. In full, the parties state "[t]he degree of success here is high because Defendants vehemently deny [that the] Plaintiffs were improperly paid, underpaid, or that any alleged damages are owed, and the Plaintiffs have litigated in excess of one year before the matter could be settled through mediation." (Joint Mot. App. Settle., Dkt. 111, at 4–5). While the Court agrees that the Settlement Agreement is fair and reasonable in light of a bona fide dispute, the Court is not persuaded that the recovery is so exceptional as to merit significantly heightened recovery for Plaintiffs' counsel at the expense of money that otherwise goes to Plaintiffs. The parties do not show, by anecdotal comparison or empirical analysis, that the recovery attained is exceptional among similarly situated cases. Accordingly, the eighth factor counsels in favor of attorney's fees around 30% of Plaintiffs' recovery.

**Rodriguez v. Stage 3 Separation, LLC, Not Reported in Fed. Supp. (2015)**

2015 WL 12866212

The Court has discussed the twelfth factor at length. Relative to awards in similar cases, a fee award of 30% is customary and appropriate. Finally, the Court has insufficient information to determine whether the ninth, tenth, or eleventh factors justify an additional 10% fee for Plaintiffs' counsel from the total Settlement Fund.

In light of the foregoing, the Court finds that a 30% attorney's fee award from the Settlement Fund is appropriate.

### III. NAMED PLAINTIFF SERVICE AWARD

The Settlement Agreement finally proposes a "Service Award" of $7,500 to named plaintiff Robert Rodriguez. The award "is intended to recognize his initiative and efforts on behalf of the workers and his execution of a broad release." (Joint Mot. App. Settle., Dkt. 111, at 5).

Courts approve service awards for named plaintiffs and class representatives insofar as they are reasonable. *See, e.g.*, *In re Wells Fargo Wage & Hour Emp't Pract. Litig. (No. III), 18 F. Supp. 3d 844, 852 (S.D. Tex., 2014)*. Here, Plaintiff "was subject to extensive written discovery, was deposed, provided information helpful to the case, and otherwise contributed to the overall litigation." (Joint Mot. App. Settle.,

Dkt. 111, at 5). In light of this active participation, an award of $7,500 is reasonable. *Cf. Purdie v. Ace Cash Express, Inc., 2003 WL 22976611, at \*7 (N.D. Tex. Dec. 11, 2003)* (approving "incentive compensation to named plaintiffs" because "Plaintiffs' commitment undoubtedly led to the proposed settlement fund").

### CONCLUSION

**\*7** The Court GRANTS IN PART the Parties' Joint Motion to Approve their Settlement Agreement. The Court approves the Settlement Agreement in all respects except the amounts to be paid in attorney's fees. The Court REDUCES the amount requested in attorney's fees in accordance with this Order.

The Court further DISMISSES this case WITH PREJUDICE.

All relief not expressly granted is hereby DENIED.

**All Citations**

Not Reported in Fed. Supp., 2015 WL 12866212

---

**End of Document**

© 2021 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 52

# Exhibit 5

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| LAWRENCE ROUGIER, *et al.*, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiffs,<br><br>v.<br><br>APPLIED OPTOELECTRONICS, INC., CHIH-HSIANG (THOMPSON) LIN, and STEFAN J. MURRY,<br><br>Defendants. | Case No. 4:17-cv-2399-VDG-CAB |

**DECLARATION OF SHANNON L. HOPKINS ON BEHALF OF**
**LEVI & KORSINSKY, LLP IN SUPPORT OF UNOPPOSED APPLICATION**
**FOR AN AWARD OF ATTORNEYS' FEES AND EXPENSES**

I, SHANNON L. HOPKINS, declare as follows, pursuant to 28 U.S.C. §1746:

1.     I am a partner of the law firm of Levi & Korsinsky, LLP. I am submitting this declaration in support of my firm's application for an award of attorneys' fees and expenses in connection with services rendered in the above-entitled action (the "Action") from inception through August 26, 2020 (the "Time Period").

2.     My firm, which served as lead counsel in the Action, was involved in all aspects of the litigation, such as reviewing: (i) documents filed publicly by Applied Optoelectronics, Inc. ("AOI" or the "Company") with the SEC; (ii) publicly available information, including press releases, news articles, and other public statements issued by or concerning the Company; (iii) research reports issued by financial and industry analysts concerning the Company; (iv) other publicly available information and data concerning the Company and its subsidiaries, including information concerning AOI's customers; (v) interviews conducted with former employees of

AOI; (vi) reports and exhibits prepared by Plaintiffs' expert relating to the Company's securities for class certification purposes; (vii) over 54,000 documents (over 300,000 pages) produced by Defendants in response to eighty-nine (89) Fed. R. Civ. P. 34 requests for production served by Plaintiffs over the course of four sets of requests; (viii) Defendants' responses to Fed. R. Civ. P. 33 interrogatories; (ix) Defendants' responses to Fed. R. Civ. P. 36 requests for admission; (x) Defendants' privilege logs; (xi) over 34,000 documents produced by third parties in response to twenty-six (26) Fed. R. Civ. P. 45 subpoenas; and (xii) the applicable law governing the claims and potential defenses in this Action, and the law as it relates to third party discovery in different jurisdictions (including enforcement proceedings in District Courts in the Northern District of California and the Western District of Washington).

3.      Also, in connection with the litigation, my firm performed substantial legal tasks, including, among other things: (i) drafting the First Amended Complaint ("FAC"); (ii) voluminous briefing related to Defendants' motion to dismiss the FAC and prevailing against the motion to dismiss in its entirety; (iii) preparing a motion for leave to add parties and file a Second Amended Complaint ("SAC") with additional plaintiffs to protect the Class against any potential standing defenses; (iv) opposing Defendants' motion for interlocutory appeal of the Court's decision on the motion to dismiss pursuant to 28 U.S.C. § 1292(b); (v) serving interrogatories, requests for admission, and requests for the production of documents on Defendants; (vi) issuing 26 subpoenas on third parties; (vii) filing two successful motions to transfer motions to compel to this District; (viii) briefing two motions to compel against third parties and successfully arguing one to a full grant; (ix) extensive negotiations with Defendants regarding their compliance with discovery, including numerous meet and confers, voluminous deficiency letters, and scrutiny of lengthy privilege logs; (x) extensive efforts in connection with class certification including preparing and defending Plaintiffs' depositions, consulting with a market efficiency and damages expert, filing

2

a successful opening motion and a reply in connection with class certification proceedings before Judge Bryan, successfully opposing Defendants' objection to Judge Bryan's Memorandum and Recommendation, and opposing Defendants' petition pursuant to Fed. R. Civ. P. 23(f) in the Court of Appeals for the Fifth Circuit; (xi) engaging in hard-fought, and arm's-length settlement negotiations facilitated and supervised by Ms. Yoshida, including extensive pre-mediation briefing, a full day mediation session, and follow-up negotiations; and (xii) negotiating and drafting the Stipulation and related settlement documents, preparing the preliminary approval papers, working with Plaintiffs' damages experts to prepare the proposed Plan of Allocation, and overseeing the Court-approved notice process.

4.      The information in this Declaration regarding my firm's time and expenses is taken from time and expense records prepared and maintained by the firm in the ordinary course of business. These records (and backup documentation where necessary) were reviewed by others at my firm, under my direction, to confirm both the accuracy of the entries as well as the necessity for and reasonableness of the time and expenses incurred in the Action. The review also confirmed the firm's guidelines and policies regarding expenses were followed. As a result of this review, reductions were made to both time and expenses in the exercise of billing judgment.[1] As a result of this review and the adjustments made, I believe that the time reflected in the firm's lodestar calculation and the expenses for which payment is sought are reasonable in amount and were necessary for the effective and efficient prosecution and resolution of the Action. In addition, I believe that the expenses are all of a type that would normally be charged to a fee-paying client in the private legal marketplace.

---

[1] Among other decisions, lead counsel did not claim time for attorneys and professional support staff members who billed less than five hours in this Action.

5. The schedule attached hereto as Exhibit A is a summary indicating the amount of time spent by attorneys and professional support staff members of my firm who were involved in the prosecution of the Action. Exhibit A presents a comparison of lodestar calculations based on: (i) my firm's current hourly rates that are based on the prevailing market rates for practitioners in complex securities litigation; and (ii) adjusted rates to reflect the market rates that were found to be reasonable in this District almost thirteen years ago in *In re Enron Corp. Sec., Deriv., & "ERISA" Litig.*, 586 F. Supp. 2d 732, 780 (S.D. Tex. 2008) ("*Enron*") (Houston/Dallas salary survey in 2007 found highest partner rate was $900 per hour and the highest associate rate was $460 per hour). For personnel who are no longer employed by my firm, the lodestar calculation is based upon the rates for such personnel in his or her final year of employment by my firm. The schedule was prepared from daily time records regularly prepared and maintained by my firm, which are available at the request of the Court. Time expended after the entry of the Order Granting Preliminary Approval of Class Action Settlement, Approving Form and Manner of Notice, and Setting Date for Hearing on Final Approval of Settlement, on August 26, 2020, has been excluded in order to exclude time spent in preparing the application for fees and payment of expenses, the motion for final approval, and associated documents.

6. The total number of hours spent on this Action reported by my firm during the Time Period is 9,547.36. The total lodestar amount for reported attorney/professional staff time based on current market rates is $5,122,159.00, and $4,528,805.75 when adjusted to reflect the rates that were accepted by the *Enron* court. The lodestar figures are based upon hourly rates, which do not include charges for expense items. Expense items are recorded separately and are not duplicated in the hourly rates.

7. As detailed in Exhibit B, my firm has incurred a total of $165,855.33 in expenses in connection with the prosecution of the Action. The expenses are reflected on the books and

5

records of my firm. These books and records are prepared from expense vouchers, check records, and other source materials and are an accurate record of the expenses incurred.

8. With respect to the standing of my firm, attached hereto as Exhibit C is a brief biography of my firm as well as biographies of the firm's partners and of counsels.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 20th day of October, 2020.

/s/ *Shannon L. Hopkins*
Shannon L. Hopkins

*Rougier v. Applied Optoelectronics, Inc., et al.,*
No. 4:17-cv-2399-VDG-CAB (S.D. Tex.)

**EXHIBIT A**

**LODESTAR REPORT**

FIRM: LEVI & KORSINSKY, LLP
REPORTING PERIOD: INCEPTION THROUGH AUGUST 26, 2020

| Professional | Status | Hourly Rate | Hours | | Lodestar | |
|---|---|---|---|---|---|---|
| Ed Korsinsky | P | 8 | $ | 1,050.00 | $ | 8,400.00 |
| Joseph Levi | P | 25 | $ | 1,050.00 | $ | 26,250.00 |
| Gregory Nespole | P | 56.5 | $ | 1,000.00 | $ | 56,500.00 |
| Shannon Hopkins | P | 674.35 | $ | 1,000.00 | $ | 674,350.00 |
| Sebastian Tornatore | OC | 122 | $ | 800.00 | $ | 97,600.00 |
| Alexander Krot | A | 25.25 | $ | 675.00 | $ | 17,043.75 |
| Stephanie Bartone | A | 16.25 | $ | 650.00 | $ | 10,562.50 |
| James Grohsgal | A | 273.5 | $ | 635.00 | $ | 173,672.50 |
| Gregory Potrepka | A | 1353.65 | $ | 600.00 | $ | 812,190.00 |
| Andrew Rocco | A | 1594.75 | $ | 575.00 | $ | 916,981.25 |
| Marion Passmore | A | 346.75 | $ | 550.00 | $ | 190,712.50 |
| Cecille Cargill | A | 36 | $ | 495.00 | $ | 17,820.00 |
| Michael Keating | A | 19.6 | $ | 450.00 | $ | 8,820.00 |
| Briggs Fenwick/Perry | SA | 325.9 | $ | 475.00 | $ | 154,802.50 |
| Christina Chelliah | SA | 379 | $ | 475.00 | $ | 180,025.00 |
| Jennifer Parker | SA | 1158.25 | $ | 475.00 | $ | 550,168.75 |
| Kema Pridgen | SA | 781.5 | $ | 475.00 | $ | 371,212.50 |
| Steven Ekechuku | SA | 47 | $ | 475.00 | $ | 22,325.00 |
| Tatyana Grubnik | SA | 66 | $ | 475.00 | $ | 31,350.00 |
| Darienne Grey | SA | 234.3 | $ | 450.00 | $ | 105,435.00 |
| Veronica Roman | SA | 436.21 | $ | 400.00 | $ | 174,484.00 |
| Jose Suarez | SA | 167.5 | $ | 350.00 | $ | 58,625.00 |
| Karolina Campbell | SA | 694.05 | $ | 350.00 | $ | 242,917.50 |
| Jenn Tash | PL | 44.35 | $ | 325.00 | $ | 14,413.75 |
| Mallory Papp | I | 319.5 | $ | 325.00 | $ | 103,837.50 |
| Samantha Halliday | PL | 182.95 | $ | 325.00 | $ | 59,458.75 |
| Cassidy Mills | I | 63 | $ | 265.00 | $ | 16,695.00 |
| Ettienna Gallaher | PL | 82.25 | $ | 265.00 | $ | 21,796.25 |
| Sean Flanagan | I | 14 | $ | 265.00 | $ | 3,710.00 |
| **Total:** | | | **9547.36** | | **$** | **5,122,159.00** |

**ADJUSTED LODESTAR REPORT**

FIRM: LEVI & KORSINSKY, LLP
REPORTING PERIOD: INCEPTION THROUGH AUGUST 26, 2020

| Professional | Status | Hourly Rate | Hours | Lodestar |
|---|---|---|---|---|
| Ed Korsinsky | P | 8 | $ 900.00 | $ 7,200.00 |
| Joseph Levi | P | 25 | $ 900.00 | $ 22,500.00 |
| Gregory Nespole | P | 56.5 | $ 900.00 | $ 50,850.00 |
| Shannon Hopkins | P | 674.35 | $ 900.00 | $ 606,915.00 |
| Sebastian Tornatore | OC | 122 | $ 700.00 | $ 85,400.00 |
| Alexander Krot | A | 25.25 | $ 460.00 | $ 11,615.00 |
| Stephanie Bartone | A | 16.25 | $ 460.00 | $ 7,475.00 |
| James Grohsgal | A | 273.5 | $ 460.00 | $ 125,810.00 |
| Gregory Potrepka | A | 1353.65 | $ 460.00 | $ 622,679.00 |
| Andrew Rocco | A | 1594.75 | $ 460.00 | $ 733,585.00 |
| Marion Passmore | A | 346.75 | $ 460.00 | $ 159,505.00 |
| Cecille Cargill | A | 36 | $ 460.00 | $ 16,560.00 |
| Michael Keating | A | 19.6 | $ 450.00 | $ 8,820.00 |
| Briggs Fenwick/Perry | SA | 325.9 | $ 460.00 | $ 149,914.00 |
| Christina Chelliah | SA | 379 | $ 460.00 | $ 174,340.00 |
| Jennifer Parker | SA | 1158.25 | $ 460.00 | $ 532,795.00 |
| Kema Pridgen | SA | 781.5 | $ 460.00 | $ 359,490.00 |
| Steven Ekechuku | SA | 47 | $ 460.00 | $ 21,620.00 |
| Tatyana Grubnik | SA | 66 | $ 460.00 | $ 30,360.00 |
| Darienne Grey | SA | 234.3 | $ 450.00 | $ 105,435.00 |
| Veronica Roman | SA | 436.21 | $ 400.00 | $ 174,484.00 |
| Jose Suarez | SA | 167.5 | $ 350.00 | $ 58,625.00 |
| Karolina Campbell | SA | 694.05 | $ 350.00 | $ 242,917.50 |
| Jenn Tash | PL | 44.35 | $ 325.00 | $ 14,413.75 |
| Mallory Papp | I | 319.5 | $ 325.00 | $ 103,837.50 |
| Samantha Halliday | PL | 182.95 | $ 325.00 | $ 59,458.75 |
| Cassidy Mills | I | 63 | $ 265.00 | $ 16,695.00 |
| Ettienna Gallaher | PL | 82.25 | $ 265.00 | $ 21,796.25 |
| Sean Flanagan | I | 14 | $ 265.00 | $ 3,710.00 |
| **Total:** | | | **9,547.36** | **$ 4,528,805.75** |

| | | | |
|---|---|---|---|
| Partner | (P) | Staff Attorney | (SA) |
| Of Counsel | (OC) | Intern | (I) |
| Associate | (A) | Paralegal | (PL) |

*Rougier v. Applied Optoelectronics, Inc., et al.,*
No. 4:17-cv-2399-VDG-CAB (S.D. Tex.)

**EXHIBIT B**

**EXPENSE REPORT**

FIRM: LEVI & KORSINSKY, LLP
REPORTING PERIOD: INCEPTION THROUGH OCTOBER 20, 2020

| CATEGORY | | TOTAL AMOUNT |
|---|---|---|
| Expert Fees | | $ 108,315.00 |
| Investigation Fees | | $ 13,437.50 |
| Travel and Meals | | $ 13,539.72 |
| Mediation Fees | | $ 10,500.00 |
| Court Reporting | | $ 2,907.99 |
| Process Server | | $ 6,604.35 |
| UPS/Fed-ex | | $ 1,200.66 |
| Photocopying | | $ 2,867.25 |
| Filing Fees | | $ 1,894.00 |
| Legal Research | | $ 966.36 |
| Document Hosting & Management | | $ 3,622.50 |
| **TOTAL** | | **$ 165,855.33** |

*Rougier v. Applied Optoelectronics, Inc., et al.,*
No. 4:17-cv-2399-VDG-CAB (S.D. Tex.)

**EXHIBIT C**

**LEVI & KORSINSKY, LLP FIRM RESUME**

# LEVI&KORSINSKY LLP

New York  55 Broadway
10th Floor
New York, NY 10006
T. 212-363-7500
F. 212-363-7171

Washington, D.C.  1101 30th Street NW
Suite 115
Washington, D.C. 20007
T. 202-524-4290
F. 202-333-2121

Connecticut  1111 Summer Street
Suite 401
Stamford, CT 06905
T. 203-992-4523

California  *Los Angeles*
445 South Figueroa Street
31st Floor
Los Angeles, CA 90071
T. 213-985-7290

*San Francisco*
388 Market Street
Suite 1300
San Francisco, CA 94111
T. 415-373-1671
F. 415-484-1294

# LEVI&KORSINSKY LLP

NEW YORK I WASHINGTON, D.C. I CONNECTICUT I CALIFORNIA

## ABOUT THE FIRM

Levi & Korsinsky, LLP is a national law firm with decades of combined experience litigating complex securities, class, and consumer actions in state and federal courts throughout the country. Our main office is located in New York City and we also maintain offices in Connecticut, California, and Washington, D.C.

We represent the interests of aggrieved shareholders in class action and derivative litigation through the vigorous prosecution of corporations that have committed securities fraud and boards of directors who have breached their fiduciary duties. We have served as Lead and Co-Lead Counsel in many precedent–setting litigations, recovered millions of dollars for shareholders via securities fraud lawsuits, and obtained fair value, multi-billion-dollar settlements in merger transactions.

We also represent clients in high-stakes consumer class actions against some of the largest corporations in America. Our legal team has a long and successful track record of litigating high-stakes, resource-intensive cases and consistently achieving results for our clients.

Our attorneys are highly skilled and experienced in the field of securities class action litigation. They bring a vast breadth of knowledge and skill to the table and, as a result, are frequently appointed Lead Counsel in complex shareholder and consumer litigations in various jurisdictions. We are able to allocate substantial resources to each case, reviewing public documents, interviewing witnesses, and consulting with experts concerning issues particular to each case. Our attorneys are supported by exceptionally qualified professionals including financial experts, investigators, and administrative staff, as well as cutting-edge technology and e-discovery systems. Consequently, we are able to quickly mobilize and produce excellent litigation results.  Our ability to try cases, and win them, results in substantially better recoveries than our peers.

We do not shy away from uphill battles – indeed, we routinely take on complex and challenging cases, and we prosecute them with integrity, determination, and professionalism.

*"...a model for how [the] great legal profession should conduct itself."*

Justice Timothy S. Driscoll in *Grossman v. State Bancorp, Inc.*, Index No. 600469/2011 (N.Y. Sup. Ct. Nassau Cnty. Nov. 29, 2011)

# PRACTICE AREAS

## Securities Fraud Class Actions

According to Lex Machina's second annual Securities Litigation Report, Levi & Korsinsky was named the Top Securities Firm for the period of January 2017 and June 30, 2018, with 266 lawsuits filed during that period. Law360.com dubbed the Firm one of the "busiest securities firms" in what is "on track to be one of the busiest [years] for federal securities litigation." Our firm has been appointed Lead Counsel in a significant number of class actions filed in both federal and state courts across the country.

In **Scheller v. Nutanix Inc.,** 19-cv-01651-WHO (N.D. Cal. Jul. 10, 2019) defendants' motion to dismiss was denied, and the case is now in discovery.

In **In re Tesla Inc. Securities Litigation,** 18-cv-04865-EMC (N.D. Cal), the firm is sole Lead Counsel representing the class of Tesla investors who were injured as a result of Elon Musk's "funding secured" tweet of August 7, 2018. The case has survived defendants' motion to dismiss and is now in discovery. It is set for trial in March 2022. Damages are estimated as exceeding $2 billion.

In **In re U.S. Steel Consolidated Cases**, 17-559-CB (W.D. Pa.) the firm is sole Lead Counsel representing U.S. Steel investors who were harmed by U.S. Steel's misrepresentations regarding the maintenance of its manufacturing facilities. Defendants' motion to dismiss has been denied and the class of investors certified by the District Court. The class action case is now in discovery. Damages are estimated as exceeding $1 billion.

In **Ford v. TD Ameritrade Holding Corporation**, 14-cv-396 (D. Neb.), the Firm was appointed Lead Counsel representing customers harmed by securities fraud scheme that has netted TD Ameritrade well over a billion dollars at their expense since the beginning of the class period at the cost of the execution quality of their orders. After defeating a motion to dismiss, we achieved certification of the class using cutting edge data analysis techniques to precisely measure damages incurred by the millions of class members.

In **Rougier v. Applied Optoelectronics, Inc.,** 17-cv-2399 (S.D. Tex.) the Firm is sole Lead Counsel and has prevailed on a Motion to Dismiss and Motion for Class Certification. The court granted preliminary approval of the proposed settlement on August 25, 2020.

In **In re Avon Products Inc. Securities Litigation**, 1:19-cv-01420-MKV (S.D.N.Y.) the Firm is Lead Counsel and prevailed on a motion to dismiss.  A preliminary settlement in this class action case is pending.

In **In re Restoration Robotics, Inc. Sec. Litig.**, 5:18-cv-03712-EJD (N.D. Cal. 2018), the Firm is sole Lead Counsel and has prevailed on a Motion to Dismiss. The class action is in the early stages of discovery and shareholders stand to recover damages in connection with an Initial Public Offering.

In **Stein v. U.S. Xpress Enterprises, Inc., et al.**, 1:19-cv-98-HSM (E.D. Tenn. Jul. 18, 2020) the Firm is Co-Lead Counsel and has prevailed on a Motion to Dismiss. The class action is in the early stages of discovery and shareholders stand to recover damages in connection with an Initial Public Offering.

We have also been appointed Lead or Co-Lead Counsel in the following securities class actions:

- **Snyder v. Baozun Inc.,** 1:19-cv-11290-ALC (S.D.N.Y. Sept. 8, 2020)
- **In re eHealth Inc. Sec. Litig.**, 20-cv-02395-JST (N.D.Cal. Jun. 24, 2020)
- **Mehdi v. Karyopharm Therapeutics Inc.**, 19-cv-11972-NMG (D. Mass. Apr. 29, 2020)
- **Brown v. Opera Ltd.**, 20-cv-00674-JGK (S.D.N.Y. Apr. 17, 2020)
- **In re Dropbox Sec. Litig.**, 19-cv—06348-BLF (N.D.Cal. Jan. 16, 2020)

# LEVI&KORSINSKY LLP

NEW YORK | WASHINGTON, D.C. | CONNECTICUT | CALIFORNIA

- ***Chen v. Yunji Inc.***, 19-cv-6403-LDH-SMG (E.D.N.Y. Feb. 3, 2020)
- ***Zhang v. Valaris plc***, 19-cv-7816-NRB (S.D.N.Y. Dec. 23, 2019)
- ***In re Sundial Growers Inc. Sec. Litig.***, 19-cv-08913-ALC (S.D.N.Y. Dec. 20, 2019)
- ***Costanzo v. DXC Technology Co.***, 19-cv-05794-BLF (N.D.Cal. Nov. 20, 2019)
- ***Ferraro Family Foundation, Inc. et al., v. Corcept Therapeutics Incorporated,*** 19-cv-1372-LHK (N.D.Cal. Oct. 7, 2019)
- ***Roberts v. Bloom Energy Corp.***, 19-cv-02935-HSG (N.D.Cal. Sept. 3, 2019)
- ***Luo v. Sogou Inc.***, 1:19-cv-00230-JPO (S.D.N.Y. Apr. 2, 2019)
- ***Jakobsen v. Aphria Inc.***, 18-cv-11376-GBD (S.D.N.Y. Mar. 27, 2019)
- ***Chew v. MoneyGram International, Inc.***, 1:18-cv-07537 (E.D. Ill. Feb. 12, 2019)
- ***Johnson v. Costco Wholesale Corp.***, 18-cv-01611-TSZ (W.D.Wash. Jan. 30, 2019)
- ***Tung v. Dycom Industries, Inc.***, 9:18-cv-81448-RLR (S.D. Fla. Jan. 11, 2019)
- ***Guyer v. MGT Capital Investments, Inc.***, 1:18-cv-09228-LAP (S.D.N.Y. Jan. 9, 2019)
- ***In re Adient plc Sec. Litig.,*** 1:18-CV-09116 (S.D.N.Y. Dec. 21, 2018)
- ***In re Tesla Inc. Sec. Litig.***, 3:18-cv-04865-EMC (N.D. Cal. Nov. 27, 2018)
- ***In re Helios and Matheson Analytics, Inc. Sec. Litig.,*** 1:18-cv-06965-JGK (S.D.N.Y. Nov. 16, 2018)
- ***In re Prothena Corp. plc Sec. Litig.,*** 1:18-cv-06425 (S.D.N.Y. Oct. 31, 2018)
- ***Pierrelouis v. Gogo Inc.***, 18-cv-04473 (N.D. Ill. Oct. 10, 2018)
- ***Balestra v. Cloud With Me Ltd.***, 2:18-cv-00804-LPL (W.D. Pa. Oct. 18, 2018)
- ***Pierrelouis v. Gogo Inc.,*** 1:18-cv-04473 (N.D. Ill. Oct. 10, 2018)
- ***In re Restoration Robotics, Inc. Sec. Litig.***, 5:18-cv-03712-EJD (N.D. Cal. Oct. 2, 2018)
- ***Richmond v. Mercury Systems, Inc.***, 1:18-cv-11434-IT (D. Mass. Sept. 27, 2018)
- ***Balestra v. Giga Watt, Inc.***, 2:18-cv-00103-SMJ (E.D. Wash. June 28, 2018)
- ***Chandler v. Ulta Beauty, Inc.***, 1:18-cv-01577 (N.D. Ill. June 26, 2018)
- ***In re Longfin Corp. Sec. Litig.***, 1:18-cv-2933 (S.D.N.Y. June 25, 2018)
- ***Chahal v. Credit Suisse Group AG***, 1:18-cv-02268-AT (S.D.N.Y. June 21, 2018)
- ***In re Bitconnect Sec. Litig.***, 9:18-cv-80086-DMM (S.D. Fla. June 19, 2018)
- ***In re Aqua Metals Sec. Litig.***, 4:17-cv-07142-HSG (N.D. Cal. May 23, 2018)
- ***Davy v. Paragon Coin, Inc.***, 4:18-cv-00671-JSW (N.D. Cal. May 10, 2018)
- ***Rensel v. Centra Tech, Inc.***, 17-cv-24500-JLK (S.D. Fla. Apr. 11, 2018)
- ***Cullinan v. Cemtrex, Inc.*** 2:17-cv-01067 (E.D.N.Y. Mar. 3, 2018)
- ***Emerson v. Genocea Biosciences, Inc.***, 1:17-cv-12137 (D. Mass. Feb. 2, 2018)
- ***In re Navient Corporation Sec. Litig.***, 1:17-cv-08373-RBK-AMD (D.N.J. Feb. 2, 2018)
- ***Huang v. Depomed, Inc.***, 3:17-cv-04830-JST (N.D. Cal. Dec. 8, 2017)
- ***In re Regulus Therapeutics Inc. Sec. Litig.,*** 3:17-cv-00182-BTM-RBB (D. Mass. Oct. 26, 2017)
- ***Murphy III v. JBS S.A.,*** 1:17-cv-03084-ILG-RER (E.D.N.Y. Oct. 10, 2017)
- ***Goldsmith v. Weibo Corporation***, 2:17-cv-04728-SRC-CLW (D.N.J. Sept. 28, 2017)
- ***Hinshaw v. Neurotrope, Inc.,*** 1:17-cv-03718-LGS (S.D.N.Y. Aug. 10, 2017)

- ***Ohren v. Amyris, Inc.,*** 3:17-cv-002210-WHO (N.D. Cal. Aug. 8, 2017)
- ***Beezley v. Fenix Parts, Inc.,*** 2:17-cv-00233 (D.N.J. June 28, 2017)
- ***M & M Hart Living Trust v. Global Eagle Entertainment, Inc.,*** 2:17-cv-01479 (C.D. Cal. June 26, 2017)
- ***Maurer v. Argos Therapeutics, Inc.,*** 1:17-cv-00216 (M.D.N.C. June 23, 2017)
- ***Ruedelstei v. U.S. Concrete, Inc.,*** 4:17-cv-266 (N.D. Tex. June 22, 2017)
- ***In re Aratana Therapeutics, Inc. Sec. Litig.,*** 1:17-cv-880 (S.D.N.Y. June 6, 2017)
- ***In re Insys Therapeutics, Inc.,*** 1:17-cv-1954 (S.D.N.Y. May 31, 2017)
- ***Clevlen v. Anthera Pharmaceuticals, Inc.,*** 3:17-cv-00715 (N.D. Cal. May 18, 2017)
- ***In re Agile Therapeutics, Inc. Sec. Litig.***, 3:17-cv-00119-AET-LHG (D.N.J. May 15, 2017)
- ***Roper v. SITO Mobile Ltd.,*** 2:17-cv-01106-ES-MAH (D.N.J. May 8, 2017)
- ***In re Illumina, Inc. Sec. Litig.***, 3:16-cv-03044-L-KSC (S.D. Cal. Mar. 30, 2017)
- ***Michael Gregory v ProNAi,*** 1:16-cv-08703-PAE (Mass. Sup. Ct. Feb. 1, 2017)
- ***In re PTC Therapeutics, Inc.***, 2:16-cv-01224-KM-MAH (D.N.J. Nov. 14, 2016)
- ***Wilbush v. Ambac Financial Group, Inc.,*** Civ. No. 1:16-cv-05076 RMB (S.D.N.Y. Oct. 11, 2016)
- ***The TransEnterix Investor Group v. TransEnterix, Inc.***, 5:16-cv-00313-D (E.D.N.C. Aug. 30, 2016)
- ***Gormley v. magicJack VocalTec Ltd.***, 1:16-cv-01869-VM (S.D.N.Y. July 12, 2016)
- ***Azar v. Blount Int'l Inc.,*** Civ. No. 3:16-cv-00483-SI (D. Or. July 1, 2016)
- ***Plumley v. Sempra Energy***, 3:16-cv-00512-BEN-RBB (S.D. Cal. June 6, 2016)
- ***Francisco v. Abengoa, S.A.,*** 1:15-cv-06279-ER (S.D.N.Y. May 24, 2016)
- ***Harrington v. Tetraphase Pharmaceuticals, Inc.,*** Civ. No. 1:16-cv-10133-LTS (D. Mass. May 13, 2016)
- ***De Vito v. Liquid Holdings Group, Inc.***, 2:15-cv-06969-KM-JBC (D.N.J. Apr. 7, 2016)
- ***In re OvaScience Inc. Stockholder Litig.,*** C.A. No. 15-3087-BLS2 (Mass. Super. Ct. Apr. 2, 2016)
- ***Ford v. Natural Health Trends Corp.,*** 2:16-cv-00255-TJH-AFM (C.D. Cal. Mar. 29, 2016)
- ***Levin v. Resource Capital Corp.,*** 1:15-cv-07081-LLS (S.D.N.Y. Nov. 24, 2015)
- ***Martin v. Altisource Residential Corp.,*** 1:15-cv-00024 (D.V.I. Oct. 7, 2015)
- ***Paggos v. Resonant, Inc.,*** 2:15-cv-01970 SJO (VBKx) (C.D. Cal. Aug. 7, 2015)
- ***Fragala v. 500.com Ltd.,*** 2:15-cv-01463-MMM (C.D. Cal. July 7, 2015)
- ***Stevens v. Quiksilver Inc.***, 8:15-cv-00516-JVS-JCGx. (C.D. Cal. June 26, 2015)
- ***In re Ocean Power Technologies, Inc. Sec. Litig.***, 14-3799 (FLW) (LHG) (D.N.J. Mar. 17, 2015)
- ***In re Energy Recovery Inc. Sec. Litig.***, 3:15-cv-00265 (N.D. Cal. Jan. 20, 2015)
- ***Klein v. TD Ameritrade Holding Corp.***, 3:14-cv-05738 (D. Neb. Dec. 2, 2014)
- ***In re China Commercial Credit Sec. Litig.***, 1:15-cv-00557 (ALC) (D.N.J. Oct. 31, 2014)
- ***In re Violin Memory, Inc. Sec. Litig.,*** 4:13-cv-05486-YGR (N.D. Cal. Feb. 26, 2014)
- ***Berry v. Kior, Inc.***, 4:13-cv-02443 (S.D. Tex. Nov. 25, 2013)
- ***In re OCZ Technology Group, Inc. Sec. Litig.***, 3:12-cv-05265-RS (N.D. Cal. Jan. 4, 2013)
- ***In re Digital Domain Media Group, Inc. Sec. Litig.***, 12-CIV-14333 (JEM) (S.D. Fla. Sept. 20, 2012)

# LEVI&KORSINSKY LLP

NEW YORK I WASHINGTON, D.C. I CONNECTICUT I CALIFORNIA

# Derivative, Corporate Governance & Executive Compensation

We protect shareholders by enforcing the obligations of corporate fiduciaries. We are a leader in achieving important corporate governance reforms for the benefit of shareholders. Our efforts include the prosecution of derivative actions in courts around the country, making pre-litigation demands on corporate boards to investigate misconduct and taking remedial action for the benefit of shareholders. In situations where a company's board responds to a demand by commencing its own investigation, we frequently work with the board's counsel to assist with and monitor the investigation, ensuring that the investigation is thorough and conducted in an appropriate manner.

We also have successfully prosecuted derivative and class action cases to hold corporate executives and board members accountable for various abuses and to help preserve corporate assets through long-lasting and meaningful corporate governance changes, thus ensuring that prior misconduct does not reoccur. We have extensive experience challenging executive compensation, recapturing assets for the benefit of companies and their shareholders. In addition, we have secured corporate governance changes to ensure that executive compensation is consistent with shareholder-approved compensation plans, company performance, and federal securities laws.

In **In re Google Inc. Class C Shareholder Litigation**, C.A. No. 7469-CS (Del. Ch.), we challenged a stock recapitalization transaction to create a new class of nonvoting shares and strengthen the corporate control of the Google founders. We helped achieve an agreement that provided an adjustment payment to existing shareholders harmed by the transaction as well as providing enhanced board scrutiny of the Google founders' ability to transfer stock. Ultimately, Google's shareholders received payments of $522 million and total net benefits estimated as exceeding $3 billion.

In **In re Activision, Inc. Shareholder Derivative Litigation**, No. 06-cv-04771-MRP (JTLX) (C.D. Cal.), we were Co-Lead Counsel and challenged executive compensation related to the dating of options. This effort resulted in the recovery of more than $24 million in excessive compensation and expenses, as well as the implementation of substantial corporate governance changes.

In **Pfeiffer v. Toll** (Toll Brothers Derivative Litigation), C.A. No. 4140-VCL (Del. Ch.), we prevailed in defeating defendants' motion to dismiss in a case seeking disgorgement of profits that company insiders reaped through a pattern of insider-trading. After extensive discovery, we secured a settlement returning $16.25 million in cash to the company, including a significant contribution from the individuals who traded on inside information.

In **Rux v. Meyer**, C.A. No. 11577-CB (Del. Ch.), we challenged the re-purchase by Sirius XM of its stock from its controlling stockholder, Liberty Media, at an inflated, above-market price. After defeating a motion to dismiss and discovery, we obtained a settlement where SiriusXM recovered $8.25 million, a substantial percentage of its over-payment.

In **In re EZCorp Inc. Consulting Agreement Derivative Litig.**, C.A. 9962-VCL, (Del. Ch.), we challenged lucrative consulting agreements between EZCorp and its controlling stockholders. After surviving multiple motions to dismiss, we obtained a settlement where EZCorp was repaid $6.5 million it had paid in consulting fees, or approximately 33% of the total at issue and the consulting agreements were discontinued.

In **Scherer v. Lu**, (Diodes Incorporated), No. 13-358-GMS, 2014 U.S. Dist. LEXIS 196440 (D. Del.), we secured the cancellation of $4.9 million worth of stock options granted to the company's CEO in violation of a shareholder-approved plan, and obtained additional disclosures to enable shareholders to cast a fully-informed vote on the adoption of a new compensation plan at the company's annual meeting.

# LEVI&KORSINSKY LLP

NEW YORK I WASHINGTON, D.C. I CONNECTICUT I CALIFORNIA

---

In **MacCormack v. Groupon, Inc.**, C.A. No. 13-940-GMS (D. Del. ), we caused the cancellation of $2.3 million worth of restricted stock units granted to a company executive in violation of a shareholder-approved plan, as well as the adoption of enhanced corporate governance procedures designed to ensure that the board of directors complies with the terms of the plan; we also obtained additional material disclosures to shareholders in connection with a shareholder vote on amendments to the plan.

In **Edwards v. Benson**, (Headwaters Incorporated)**,** (D. Utah ), we caused the cancellation of $3.2 million worth of stock appreciation rights granted to the company's CEO in violation of a shareholder-approved plan and the adoption of enhanced corporate governance procedures designed to ensure that the board of directors complies with the terms of the plan.

In **Pfeiffer v. Begley**, (DeVry, Inc.)**,** (Cir. Ct. DuPage Cty., Ill.), we secured the cancellation of $2.1 million worth of stock options granted to the company's CEO in 2008-2012 in violation of a shareholder-approved incentive plan.

In **Basch v. Healy** (D. Del. ), we obtained a cash payment to the company to compensate for equity awards issued to officers in violation of the company's compensation plan and caused significant changes in the company's compensation policies and procedures designed to ensure that future compensation decisions are made consistent with the company's plans, charters and policies. We also impacted the board's creation of a new compensation plan and obtained additional disclosures to stockholders concerning the board's administration of the company's plan and the excess compensation.

In **Kleba v. Dees**, C.A. 3-1-13 (Tenn. Cir. Ct. Knox Cty.), we recovered approximately $9 million in excess compensation given to insiders and the cancellation of millions of shares of stock options issued in violation of a shareholder-approved compensation plan. In addition, we obtained the adoption of formal corporate governance procedures designed to ensure that future compensation decisions are made independently and consistent with the plan.

In **Lopez v. Nudelman**, (CTI BioPharma Corp.), 14-2-18941-9 SEA (Wash. Super. Ct. King Cnty.), we recovered approximately $3.5 million in excess compensation given to directors and obtained the adoption of a cap on director compensation, as well as other formal corporate governance procedures designed to implement best practices with regard to director and executive compensation.

In **In re i2 Technologies, Inc. Shareholder Litigation**, C.A. No. 4003-CC (Del. Ch.), as Counsel for the Lead Plaintiff, we challenged the fairness of certain asset sales made by the company and secured a $4 million recovery.

In **In re Corinthian Colleges, Inc. Shareholder Derivative Litigation**, 8:06cv777-AHS (C.D. Cal.), we were Co-Lead Counsel and achieved a $2 million benefit for the company, resulting in the re-pricing of executive stock options and the establishment of extensive corporate governance changes.

In **Pfeiffer v. Alpert (Beazer Homes Derivative Litigation)**, C.A. No. 10-cv-1063-PD (D. Del.), we successfully challenged certain aspects of the company's executive compensation structure, ultimately forcing the company to improve its compensation practices.

In **In re Cincinnati Bell, Inc., Derivative Litigation**, Case No. A1105305 (Ohio, Hamilton Cty.), we achieved significant corporate governance changes and enhancements related to the company's compensation policies and practices in order to better align executive compensation with company performance. Reforms included the formation of an entirely independent compensation committee with staggered terms and term limits for service.

In **Woodford v. Mizel (M.D.C. Holdings, Inc.)**, 1:2011cv00879 (D. Del.), we challenged excessive executive compensation, ultimately obtaining millions of dollars in reductions of that compensation, as well as corporate governance enhancements designed to implement best practices with regard to executive compensation and increased shareholder input.

---

6

# Mergers & Acquisitions

We have achieved an impressive record in obtaining injunctive relief for shareholders and are one of the premier law firms engaged in mergers & acquisitions and takeover litigation, where we strive to maximize shareholder value. In these cases, we regularly fight to obtain settlements that enable the submission of competing buyout bid proposals, thereby increasing consideration for shareholders.

We have litigated landmark cases that have altered the landscape of mergers & acquisitions law and resulted in multi-million dollar awards to aggrieved shareholders.

In *In re Schuff International, Inc. Stockholders Litigation*, Case No. 10323-VCZ, we served as Co-Lead Counsel for the plaintiff class in achieving the largest recovery as a percentage of the underlying transaction consideration in Delaware Chancery Court merger class action history, obtaining an aggregate recovery of more than $22 million -- a gross increase from $31.50 to $67.45 in total consideration per share (a 114% increase) for tendering stockholders.

In *In re CNX Gas Corp. Shareholder Litigation*, 4 A.3d 397 (Del. Ch. 2010), as Plaintiffs' Executive Committee Counsel, we obtained a landmark ruling from the Delaware Chancery Court that set forth a unified standard for assessing the rights of shareholders in the context of freeze-out transactions and ultimately led to a common fund recovery of over $42.7 million for the company's shareholders.

In *Chen v. Howard-Anderson*, C.A. No 5878-VCL (Del. Ch. 2010), we represented shareholders in challenging the merger between Occam Networks, Inc. and Calix, Inc., obtaining a preliminary injunction against the merger after showing that the proxy statement by which the shareholders were solicited to vote for the merger was materially false and misleading. Post-closing, we took the case to trial and recovered an additional $35 million for the shareholders.

In *In re Sauer-Danfoss Stockholder Litig.*, C.A. No. 8396 (Del. Ch.), as one of plaintiffs' co-lead counsel, we recovered a $10 million common fund settlement in connection with a controlling stockholder merger transaction.

In *In re Yongye International, Inc. Shareholders' Litigation*, Consolidated Case No.: A-12-670468-B (District Court, Clark County, Nevada), as one of plaintiffs' co-lead counsel, we recovered a $6 million common fund settlement in connection with a management-led buyout of minority stockholders in a China-based company incorporated under Nevada law.

In *In re Great Wolf Resorts, Inc. Shareholder Litigation*, C.A. No. 7328-VCN (Del. Ch. 2012), we achieved tremendous results for shareholders, including partial responsibility for a $93 million (57%) increase in merger consideration and the waiver of several "don't-ask-don't-waive" standstill agreements that were restricting certain potential bidders from making a topping bid for the company.

In *In re Talecris Biotherapeutics Holdings Shareholder Litigation*, C.A. No. 5614-VCL (Del. Ch. 2010), we served as counsel for one of the Lead Plaintiffs, achieving a settlement that increased the merger consideration to Talecris shareholders by an additional 500,000 shares of the acquiring company's stock and providing shareholders with appraisal rights.

In *In re Minerva Group LP v. Mod-Pac Corp.*, Index No. 800621/2013 (N.Y. Sup. Ct. Erie Cty. 2013), we obtained a settlement in which defendants increased the price of an insider buyout from $8.40 to $9.25 per share, representing a recovery of $2.4 million for shareholders.

In *Stephen J. Dannis v. J.D. Nichols*, C.A. No. 13-CI-00452 (Ky. Cir. Ct. Jefferson Cty. 2014), as Co-Lead Counsel, we obtained a 23% increase in the merger consideration (from $7.50 to $9.25 per unit) for shareholders of NTS Realty Holdings Limited Partnership. The total benefit of $7.4 million was achieved after two years of hard-fought litigation, challenging the fairness of the going-private, squeeze-out merger by NTS's controlling unitholder and Chairman, Defendant Jack Nichols. The unitholders bringing the action

alleged that Nichols' proposed transaction grossly undervalued NTS's units. The 23% increase in consideration was a remarkable result given that on October 18, 2013, the Special Committee appointed by the Board of Directors had terminated the existing merger agreement with Nichols. Through counsel's tenacious efforts the transaction was resurrected and improved.

In **Dias v. Purches**, C.A. No. 7199-VCG (Del. Ch. 2012), Vice Chancellor Sam Glasscock, III of the Delaware Chancery Court partially granted shareholders' motion for preliminary injunction and ordered that defendants correct a material misrepresentation in the proxy statement related to the acquisition of Parlux Fragrances, Inc. by Perfumania Holding, Inc.

In **Forgo v. Health Grades, Inc.**, C.A. No. 5716-VCS (Del. Ch. 2010), as Co-Lead Counsel, our attorneys established that defendants had likely breached their fiduciary duties to Health Grades' shareholders by failing to maximize value as required under *Revlon, Inc. v. MacAndrews & Forbes Holdings, Inc.*, 506 A.2d 173 (Del. 1986). We secured an agreement with defendants to take numerous steps to seek a superior offer for the company, including making key modifications to the merger agreement, creating an independent committee to evaluate potential offers, extending the tender offer period, and issuing a "Fort Howard" release affirmatively stating that the company would participate in good faith discussions with any party making a bona fide acquisition proposal.

In **In re Pamrapo Bancorp Shareholder Litigation**, Docket C-89-09 (N.J. Ch. Hudson Cty. 2011) & HUD-L-3608-12 (N.J. Law Div. Hudson Cty. 2015), we defeated defendants' motion to dismiss shareholders' class action claims for money damages arising from the sale of Pamrapo Bancorp to BCB Bancorp at an allegedly unfair price through an unfair process. We then survived a motion for summary judgment, ultimately securing a settlement recovering $1.95 million for the Class plus the Class's legal fees and expenses up to $1 million (representing an increase in consideration of 15-23% for the members of the Class). The case.

In **In re Complete Genomics, Inc. Shareholder Litigation**, C.A. No. 7888-VCL (Del. Ch. 2012), we obtained preliminary injunctions of corporate merger and acquisition transactions, and Plaintiffs successfully enjoined a "don't-ask-don't-waive" standstill agreement.

In **In re Integrated Silicon Solution, Inc. Stockholder Litigation**, Lead Case No. 115CV279142 (Super. Ct. Santa Clara, CA 2015), we won an injunction requiring corrective disclosures concerning "don't-ask-don't-waive" standstill agreements and certain financial advisor conflicts of interests, and contributed to the integrity of a post-agreement bidding contest that led to an increase in consideration from $19.25 to $23 per share, a bump of almost 25 percent.

In **In re Bluegreen Corp. Shareholder Litigation**, Case No. 502011CA018111 (Cir. Ct. for Palm Beach Cty., FL), as Co-Lead Counsel, we achieved a common fund recovery of $36.5 million for minority shareholders in connection with a management-led buyout, increasing gross consideration to shareholders in connection with the transaction by 25% after three years of intense litigation.

# Consumer Litigation

Levi & Korsinsky works hard to protect consumers by holding corporations accountable for defective products, false and misleading advertising, unfair or deceptive business practices, antitrust violations, and privacy right violations.

Our litigation and class action expertise combined with our in-depth understanding of federal and state laws enable us to fight for consumers who have been aggrieved by deceptive and unfair business practices and who purchased defective products, including automobiles, appliances, electronic goods, and other consumer products. The Firm also represents consumers in cases involving data breaches and privacy right violations. The Firm's attorneys have received a number of leadership appointments in consumer class action cases, including multidistrict litigation ("MDL"). Recently, Law.com identified the Firm as one of the top firms with MDL leadership appointments in the article titled, "There Are New Faces Leading MDLs. And They Aren't All Men" (July 6, 2020). Representative settled and ongoing cases include:

In *NV Security, Inc. v. Fluke Networks*, Case No. CV05-4217 GW (SSx) (C.D. Cal. 2005), we negotiated a settlement on behalf of purchasers of Test Set telephones in an action alleging that the Test Sets contained a defective 3-volt battery. We benefited the consumer class by obtaining the following relief: free repair of the 3-volt battery, reimbursement for certain prior repair, an advisory concerning the 3-volt battery on the outside of packages of new Test Sets, an agreement that defendants would cease to market and/or sell certain Test Sets, and a 42-month warranty on the 3-volt battery contained in certain devices sold in the future.

*In Re: Apple Inc. Device Performance Litig.*, Case No. 5:18-md-02827-EJD (N.D. Cal.): Plaintiffs' Executive Committee Counsel in proposed nationwide class action alleging that Apple purposefully throttled iPhone; Apple has agreed to pay up to $500 million in cash (proposed settlement pending).

*In Re: Intel Corp. CPU Marketing, Sales Practices and Products Liability Litig.*, Case No. 3:18-md-02828 (D. Or.): Co-Lead Interim Class Counsel in proposed nationwide class action alleging that Intel manufactured and sold defective central processing units that allowed unauthorized access to consumer stored confidential information.

*In Re: ZF-TRW Airbag Control Units Products Liability Litig.*, Case No. 2:19-ml-02905-JAK-FFM (C.D. Cal.): Plaintiffs' Steering Committee Counsel in proposed nationwide class action alleging that defendant auto manufacturers sold vehicles with defective airbags.

*In Re: EpiPen (Epinephrine Injection, USP) Marketing, Sales Practices and Antitrust Litig.*, Case No. 17-md-02785 (D. Kan.): Plaintiffs' Executive Committee Counsel in action alleging that Mylan and Pfizer violated antitrust laws and committed other violations relating to the sale of EpiPens. Nationwide class and multi-state classes certified.

*Sung, et al. v. Schurman Retail Group*, Case No. 17-cv-02760-LB (N.D. Cal.): Co-Lead Class Counsel in nationwide class action alleging unauthorized disclosure of employee financial information; obtained final approval of nationwide class action settlement providing credit monitoring and identity theft restoration services through 2022 and cash payments of up to $400.

*Scott, et al. v. JPMorgan Chase Bank, N.A.*, Case No. 1:17-cv-00249 (D.D.C.): Co-Lead Class Counsel in nationwide class action settlement of claims alleging improper fees deducted from payments awarded to jurors; 100% direct refund of improper fees collected.

*In Re: Citrix Data Breach Litig.*, Case No. 19-cv-61350-RKA (S.D. Fla.): Interim Class Counsel in action alleging company failed to implement reasonable security measures to protect employee financial information; common fund settlement of $2.25 million pending.

# LEVI&KORSINSKY LLP

NEW YORK I WASHINGTON, D.C. I CONNECTICUT I CALIFORNIA

***NV Security, Inc. v. Fluke Networks***, Case No. CV05-4217 GW (SSx) (C.D. Cal. 2005): Settlement on behalf of purchasers of Test Set telephones in an action alleging that the Test Sets contained a defective 3-volt battery; benefits included free repair of the 3-volt battery, reimbursement for certain prior repair, an advisory concerning the 3-volt battery on the outside of packages of new Test Sets, an agreement that defendants would cease to market and/or sell certain Test Sets, and a 42-month warranty on the 3-volt battery contained in certain devices sold in the future.

***Bustos v. Vonage America, Inc.***, Case No. 06 Civ. 2308 (HAA) (D.N.J. 2006): Common fund settlement of $1.75 million on behalf of class members who purchased Vonage Fax Service in an action alleging that Vonage made false and misleading statements in the marketing, advertising, and sale of Vonage Fax Service by failing to inform consumers that the protocol defendant used for the Vonage Fax Service was unreliable and unsuitable for facsimile communications.

***Masterson v. Canon U.S.A.***, Case No. BC340740 (Cal. Super. Ct. L.A. Cty. 2006):  Settlement providing refunds to Cannon SD camera purchasers for certain broken LCD repair charges and important changes to the product warranty.

*"The quality of the representation... has been extremely high, not just in terms of the favorable outcome in terms of the substance of the settlement, but in terms of the diligence and the hard work that has gone into producing that outcome."*

The Honorable Joseph F. Bianco, in *Landes v. Sony Mobile Communications*, 17-cv-02264-JFB-SIL (E.D.N.Y. Dec. 1, 2017)

# OUR ATTORNEYS

## *Managing Partners*

### Eduard Korsinsky

For more than 20 years Eduard Korsinsky has represented clients in securities cases, derivative actions, consumer fraud, and complex commercial matters. He has been named a New York "Super Lawyer" by Thomson Reuters and is recognized as one of the country's leading practitioners in class and derivative matters. Mr. Korsinsky also has served as an editor of the American Bar Association's Securities Litigation Section's newsletter and is a member of the American Bar Association's Derivative Suits Subcommittee.

Cases which he has litigated include:

- ***E-Trade Financial Corp. Sec. Litig.***, No. 07-cv-8538 (S.D.N.Y. 2007), $79 million recovery

- ***In re Activision, Inc. S'holder Derivative Litig.***, No. 06-cv-04771-MRP (JTLX)(C.D. Cal. 2006), recovered $24 million in excess compensation

- ***Corinthian Colleges, Inc., S'holder Derivative Litig.***, SACV-06-0777-AHS (C.D. Cal. 2009), obtained re-pricing of executive stock options providing more than $2 million in benefits to the company

- ***Pfeiffer v. Toll,*** C.A. No. 4140-VCL (Del. Ch. 2010), $16.25 million in insider trading profits recovered

- ***In re Net2Phone, Inc. S'holder Litig.***, Case No. 1467-N (Del. Ch. 2005), obtained increase in tender offer price from $1.70 per share to $2.05 per share

- ***In re Pamrapo Bancorp S'holder Litig.***, C-89-09 (N.J. Ch. Hudson Cty. 2011) & HUD-L-3608-12 (N.J. Law Div. Hudson Cty. 2015), obtained supplemental disclosures following the filing of a motion for preliminary injunction, pursued case post-closing, defeated motion for summary judgment, and obtained an increase in consideration of between 15-23% for the members of the Class

- ***In re Google Inc. Class C S'holder Litig.***, C.A. No. 19786 (Del. Ch. 2012), obtained payment ladder indemnifying investors up to $8 billion in losses stemming from trading discounts expected to affect the new stock

- ***Woodford v. M.D.C. Holdings, Inc.***, 1:2011cv00879 (D. Del. 2012), one of a few successful challenges to say on pay voting, recovered millions of dollars in reductions to compensation

- ***i2 Technologies, Inc. S'holder Litig.***, C.A. No. 4003-CC (Del. Ch. 2008), $4 million recovered, challenging fairness of certain asset sales made by the company

- ***Pfeiffer v. Alpert (Beazer Homes)***, C.A. No. 10-cv-1063-PD (D. Del. 2011), obtained substantial revisions to an unlawful executive compensation structure

- ***In re NCS Healthcare, Inc. Sec. Litig.***, C.A. CA 19786, (Del. Ch. 2002), case settled for approximately $100 million

- ***Paraschos v. YBM Magnex Int'l, Inc.***, No. 98-CV-6444 (E.D. Pa.), United States and Canadian cases settled for $85 million Canadian

Education

- New York University School of Law, LL.M. Master of Law(s) Taxation (1997)
- Brooklyn Law School, J.D. (1995)
- Brooklyn College, B.S., Accounting, *summa cum laude* (1992)

Admissions

- New York (1996)
- New Jersey (1996)
- United States District Court for the Southern District of New York (1998)
- United States District Court for the Eastern District of New York (1998)
- United States Court of Appeals for the Second Circuit (2006)
- United States Court of Appeals for the Third Circuit (2010)
- United States District Court for the Northern District of New York (2011)
- United States District Court of New Jersey (2012)
- United States Court of Appeals for the Sixth Circuit (2013)

Publications

- Delaware Court Dismisses Compensation Case Against Goldman Sachs, ABA Section of Securities Litigation News & Developments (Nov. 7, 2011)
- SDNY Questions SEC Settlement Practices in Citigroup Settlement, ABA Section of Securities Litigation News & Developments (Nov. 7, 2011)
- New York Court Dismisses Shareholder Suit Against Goldman Sachs, ABA Section of Securities Litigation News & Developments (Oct. 31, 2011)

## Joseph E. Levi

Joseph E. Levi is a central figure in shaping and managing the Firm's securities litigation practice. Mr. Levi has been lead or co-lead in dozens of cases involving the enforcement of shareholder rights in the context of mergers & acquisitions and securities fraud. In addition to his involvement in class action litigation, he has represented numerous patent holders in enforcing their patent rights in areas including computer hardware, software, communications, and information processing, and has been instrumental in obtaining substantial awards and settlements.

Mr. Levi and the attorneys achieved success on behalf of the former shareholders of Occam Networks, Inc. in litigation challenging the Company's merger with Calix, Inc., obtaining a preliminary injunction against the merger due to material representations and omissions in the proxy statement by which the shareholders were solicited to vote. See **Chen v. Howard-Anderson**, No. 5878-VCL (Del. Ch. Jan. 24, 2011). Vigorous litigation efforts continued to trial, recovering $35 million for the shareholders.

Another victory for Mr. Levi and the attorneys was in litigation challenging the acquisition of Health Grades, Inc. by affiliates of Vestar Capital Partners, L.P., where it was successfully demonstrated to the Delaware Court of Chancery that the defendants had likely breached their fiduciary duties to Health Grades' shareholders by failing to maximize value as required by **Revlon, Inc. v. MacAndrews & Forbes Holdings, Inc.**, 506 A.2d 173 (Del. 1986). See **Weigard v. Hicks**, No. 5732-VCS (Del. Ch. Sept. 3, 2010). This ruling was used to reach a favorable settlement in which defendants agreed to a host of measures designed to increase the likelihood of superior bid. Vice Chancellor Strine "applaud[ed]" the litigation team for their preparation and the extraordinary high-quality of the briefing. He and the attorneys also played a prominent role in the matter of **In re CNX Gas Corp. Shareholders Litigation**, C.A. No. 5377-VCL (Del. Ch. 2010), in which plaintiffs recovered a common fund of over $42.7 million for stockholders.

Education

- Brooklyn Law School, J.D., *magna cum laude* (1995)
- Polytechnic University, B.S., *summa cum laude* (1984); M.S. (1986)

Admissions

- New York (1996)
- New Jersey (1996)
- United States Patent and Trademark Office (1997)
- United States District Court for the Southern District of New York (1997)
- United States District Court for the Eastern District of New York (1997)

*"[The court] appreciated very much the quality of the argument…, the obvious preparation that went into it, and the ability of counsel…"*

Vice Chancellor Sam Glasscock, III in *Dias v. Purches*, C.A. No. 7199-VCG (Del. Ch. Apr. 5, 2012)

LEVI&KORSINSKY LLP

NEW YORK I WASHINGTON, D.C. I CONNECTICUT I CALIFORNIA

## *Partners*

### Nicholas I. Porritt

Nicholas Porritt prosecutes securities class actions, shareholder class actions, derivative actions, and mergers and acquisitions litigation. He has extensive experience representing plaintiffs and defendants in a wide variety of complex commercial litigation, including civil fraud, breach of contract, and professional malpractice, as well as defending SEC investigations and enforcement actions. Mr. Porritt has helped recover hundreds of millions of dollars on behalf of shareholders. He was one of the Lead Counsel in *In re Google Inc. Class C Shareholder Litigation*, C.A. No. 7469-CS (Del. Ch.) that resulted in a payment of $522 million to shareholders and overall benefit of over $3 billion to Google's minority shareholders. He was one of the lead counsel in *Chen v. Howard-Anderson*, No. 5878-VCL (Del. Ch.) that settled during trial resulting in a $35 million payment to the former shareholders of Occam Networks, Inc., one of the largest quasi-appraisal recoveries for shareholders. Amongst other cases, he is currently lead counsel in *In re Tesla, Inc. Securities Litigation*, No. 3:18-cv-04865-EMC (N.D. Cal.), representing Tesla investors who were harmed by Elon Musk's "funding secured" tweet from August 7, 2018 as well as lead counsel in *Ford v. TD Ameritrade Holding Corp.*, No. 14-cv-396 (D. Neb.), representing TD Ameritrade customers harmed by its improper routing of their orders. Both cases involve over $1 billion in estimated damages.

Some of Mr. Porritt's recent cases include:

- *In re Bridgestone Inv. Corp.*, 789 Fed. App'x 13 (9th Cir. 2019)
- *Zaghian v. Farrell,* 675 Fed. Appx. 718, (9th Cir. 2017)
- *SEC v. Cuban*, 620 F.3d 551 (5th Cir. 2010)
- *Cozzarelli v. Inspire Pharmaceuticals, Inc.*, 549 F.3d 618 (4th Cir. 2008)
- *Teachers' Retirement System of Louisiana v. Hunter*, 477 F.3d 162 (4th Cir. 2007)
- *In re Tesla, Inc. Sec. Litig.*, 2020 WL 1873441 (N.D. Cal. Apr. 15, 2020)
- *In re Navient Corp. Sec. Litig.*, 2019 WL 7288881 (D.N.J. Dec. 30, 2019)
- *In re Clovis Oncology, Inc. Deriv. Litig.*, 2019 WL 4850188 (Del. Ch. Oct. 1, 2019)
- *Martin v. Altisource Residential Corp.*, 2019 WL 2762923 (D.V.I. July 2, 2019)
- *Klein v. TD Ameritrade Holding Corp.*, 327 F.R.D. 283 (D. Neb. 2018)
- *Beezley v. Fenix Parts, Inc.*, 2018 WL 3454490 (N.D. Ill. July 13, 2018)
- *In re PTC Therapeutics Sec. Litig.,* 2017 WL 3705801 (D.N.J. Aug. 28, 2017)
- *Gormley v. magicJack VocalTec Ltd.,* 220 F. Supp. 3d 510 (S.D.N.Y. 2016)
- *Carlton v. Cannon*, 184 F. Supp. 3d 428 (S.D. Tex. 2016)
- *Zola v. TD Ameritrade, Inc.*, 172 F. Supp. 3d 1055 (D. Neb. 2016)
- *In re Energy Recovery Sec. Litig.,* 2016 WL 324150 (N.D. Cal. Jan. 27, 2016)
- *In re EZCorp Inc. Consulting Agreement Deriv. Litig.*, 2016 WL 301245 (Del. Ch. Jan. 25, 2016)
- *In re Violin Memory Sec. Litig.*, 2014 WL 5525946 (N.D. Cal. Oct. 31, 2014)
- *Garnitschnig v. Horovitz*, 48 F. Supp. 3d 820 (D. Md. 2014)

Mr. Porritt was selected by Lawdragon as one of the 500 leading plaintiff lawyers in financial litigation and was selected to the 2020 DC Super Lawyers list published by Thomson Reuters.

Mr. Porritt speaks frequently on current topics relating to securities laws and derivative actions, including presentations on behalf of the Council for Institutional Investors, Nasdaq, and the Practising Law Institute. He currently serves as co-chair of the American Bar Association Sub-Committee on Derivative Actions.

Before joining the Firm, Mr. Porritt practiced as a partner at Akin Gump Strauss Hauer & Feld LLP and prior to that was a partner at Wilson Sonsini Goodrich & Rosati PC. Mr. Porritt formerly practiced as a Barrister and Solicitor in Wellington, New Zealand and is a Solicitor of the Senior Courts of England & Wales.

Education

- University of Chicago Law School, J.D., With Honors (1996)
- University of Chicago Law School, LL.M. (1993)
- Victoria University of Wellington, LL.B. (Hons.), With First Class Honors, Senior Scholarship (1990)

Admissions

- New York (1997)
- District of Columbia (1998)
- United States District Court for the District of Columbia (1999)
- United States District Court for the Southern District of New York (2004)
- United States Court of Appeals for the Fourth Circuit (2004)
- United States Court of Appeals for the District of Columbia Circuit (2006)
- United States Supreme Court (2006)
- United States District Court for the District of Maryland (2007)
- United States District Court for the Eastern District of New York (2012)
- United States Court of Appeals for the Second Circuit (2014)
- United States Court of Appeals for the Ninth Circuit (2015)
- United States District Court for the District of Colorado (2015)
- United States Court of Appeals for the Tenth Circuit (2016)
- United States Court of Appeals for the Eleventh Circuit (2017)
- United States Court of Appeals for the Eighth Circuit (2019)
- United States Court of Appeals for the Third Circuit (2019)

Publications

- "Current Trends in Securities Litigation: How Companies and Counsel Should Respond," *Inside the Minds Recent Developments in Securities Law* (Aspatore Press 2010)

## Rosemary M. Rivas

The Firm's Consumer Litigation Group is led by Rosemary M. Rivas, who manages the Firm's San Francisco office. She has dedicated her legal career to representing consumers in complex, class action litigation in various areas including defective products and automobiles, data breach and privacy rights, false and misleading advertising, and unfair business practices, among others. Ms. Rivas has been influential in recovering millions of dollars and changes to corporate practices on behalf of consumers. In a highly competitive application process, Judge Charles R. Breyer appointed Ms. Rivas to the Plaintiffs' Steering Committee in *In re: Volkswagen "Clean Diesel" MDL*, Case No. 15-MDL-2672-CRB (JSC), which resulted in unprecedented settlements exceeding $15 billion dollars.

Currently, Ms. Rivas is Co-Lead Counsel in the action titled *Intel Corp. CPU Marketing, Sales Practices and Products Liability Litig.*, Case No. 3:18-md-02828-SI, involving allegations that Intel sold CPUs that were defective and allowed unauthorized access to confidential information. Ms. Rivas is also currently a member of the Plaintiffs' Steering Committee in the action titled *In re: EpiPen (Epinephrine Injection, USP) Marketing, Sales Practices and Antitrust Litig.*, Case No. 2:17-md-02785 (D. Kan.) involving unlawful monopoly claims in the market for epinephrine injection pens.

Ms. Rivas' work has resulted in important monetary and injunctive settlements in a number of class action cases, such as:

- *Sung v. Schuman Fine Papers*, Case No. 17-cv-02760 (N.D. Cal.) (Co-Lead Class Counsel): nationwide class action settlement of claims for unauthorized disclosure of W2s; eligible class members could recover up to $500 and implementation of training and changes to practices for the protection of employee personal and financial information

- *Scott v. JPMorgan Chase Bank, N.A.*, Case No. 1:17-cv-00249 (D.D.C.) (Co-Lead Class Counsel): nationwide class action settlement of claims alleging improper fees to payments awarded to jurors; 100% direct refund of improper fees collected

- *Lilly v. ConAgra Foods*, 743 F.3d 662 (9th Cir. 2014) (Class Counsel): claims that food manufacturer violated food regulations by failing to list total sodium on salt of sunflower seeds product were not preempted by federal law; class action injunctive relief settlement for change in product labels

- *Petersen v. CJ America, Inc.*, Case No. 3:14-cv-02570 (S.D. Cal.) (Co-Lead Class Counsel): nationwide class action involving false advertising claims; $1.5 million common fund and changes to product labeling

- *Lilly v. Jamba Juice*, Case No. 13-cv-02998 (N.D. Cal.) (Co-Lead Class Counsel): class action injunctive relief settlement; change in product labels

- *In re Carrier IQ, Inc., Consumer Privacy Litig.*, Case No. 3:12-md-02330 (N.D. Cal.) (Executive Committee): nationwide class action settlement involving data privacy; $9 million settlement and changes to corporate practices

- *Pappas v. Naked Juice*, Case No. 2:11-cv-08276 (C.D. Cal.) (Co-Lead Class Counsel): nationwide class action settlement for $9 million and changes to the company's testing procedures and product labels

- *Garcia v. Allergan, Inc.*, Case No. 09-cv-7088 PSG (C.D. Cal.) (Co-Lead Class Counsel): nationwide class action settlement of false advertising and unfair business practice claims; $7.75 million settlement and changes to the company's training procedures

## LEVI&KORSINSKY LLP

NEW YORK I WASHINGTON, D.C. I CONNECTICUT I CALIFORNIA

- ***Rodriguez v. West Publishing Corp.***, 563 F.3d 948 (9th Cir. 2009): nationwide class action settlement of antitrust claims in bar review market; $49 million and dissolution of allegedly illegal market allocation agreement

- ***Lima v. Gateway***, Case No. SACV-09-1366 (C.D. Cal.) (Co-Lead Class Counsel): nationwide class action involving defective monitor; $195 cash refund for each monitor purchased

She has also been instrumental in obtaining favorable appellate decisions on behalf of consumers in the areas of false advertising, federal preemption, and arbitration, such as:

- ***Lilly v. ConAgra Foods, Inc.***, 743 F.3d 662 (9th Cir. 2014)

- ***In re Sony PS3 "Other OS" Litig.***, 551 Fed. App. 916 (9th Cir. 2014)

- ***Probst v. Superior Court (Health Net of California)***, 2012 Cal. LEXIS 4476 (Ct. Appeal, 1st Dist., May 9, 2012)

Ms. Rivas is a recipient of the 2018 California Lawyer Attorney of the Year (CLAY) Award. The CLAY award was presented to her by the Daily Journal for her work in the Volkswagen litigation. The CLAY awards are given annually to outstanding California practitioners "whose extraordinary work and cases had a major impact on the law."

In 2019 Ms. Rivas was selected as a Super Lawyer. From 2009-2011, Ms. Rivas was selected as a Rising Star by Law & Politics Magazine, which recognizes the best lawyers 40 years old or under or in practice for 10 years or less. In 2015, Bay Area Legal Aid presented her with the Guardian of Justice award, for her work achievements in the law and her role in helping direct cy près funds to ensure equal access to the civil justice system. As a recognized leader in consumer class actions, Ms. Rivas is regularly invited to speak at conferences concerning class action litigation, including the following:

- *Class Action Law Forum 2020 – Review of Key Class Action Decisions*, March 2020 (Western Alliance Bank in collaboration with University of San Diego School of Law)

- *Nationwide Settlement Classes – The Impact of the Hyundai/Kia Litigation*, 2018 (National Consumer Law Center's Consumer Rights Litigation Conference and Class Action Symposium)

- *One Class Action Or 50? Choice of Law Considerations as Potential Impediment to Nationwide Class Action Settlements*, 2018 (5th Annual Western Regional CLE Program on Class Actions and Mass Torts)

- *The Right Approach to Effective Claims*, 2018 (Beard Group - Class Action Money & Ethics)

- *False Advertising Class Actions: A Practitioner's Guide to Class Certification, Damages and Trial*, 2017 (The Bar Association of San Francisco)

- *Section 17200: The Fertility of Man's Invention*, 2016 (The Bar Association of San Francisco)

- *Food Labeling and False Advertising Class Actions*, 2015 (The Bar Association of San Francisco)

- *Data Privacy Law 101: U.S. Data Privacy and Security Laws 2015* (The Bar Association of San Francisco)

- *Effective Consumer Privacy Enforcement*, 2011 (Berkeley Law and The Samuelson Law, Technology & Public Policy Clinic)

- *Class Actions: New Developments & Approaches for Strategic Response*, 2013 (American Bar Association)

Previously, Ms. Rivas served as a Board Member and Diversity Director of the Barristers Club of the San Francisco Bar Association. Ms. Rivas is fluent in Spanish.

Education

- University of California, Hastings College of Law, J.D. (2000)
- San Francisco State University, B.A., Political Science (1997)

Admissions

- United States Court of Appeals for the Ninth Circuit (2001)
- United States District Court for the Northern District of California (2001)
- United States District Court for the Central District of California (2002)
- United States District Court for the Eastern District of California (2005)
- United States District Court for the Southern District of California (2005)

## Donald J. Enright

During his 24 years as a litigator and trial lawyer, Mr. Enright has handled matters in the fields of securities, commodities, consumer fraud and commercial litigation, with a particular emphasis on shareholder M&A and securities fraud class action litigation. He has been named as one of the leading financial litigators in the nation by Lawdragon, as a Washington, DC "Super Lawyer" by Thomson Reuters, and as one of the city's "Top Lawyers" by *Washingtonian* magazine.

Mr. Enright has shown a track record of achieving victories in federal trials and appeals, including:

- ***Nathenson v. Zonagen, Inc.***, 267 F. 3d 400, 413 (5th Cir. 2001)
- ***SEC v. Butler***, 2005 U.S. Dist. LEXIS 7194 (W.D. Pa. April 18, 2005)
- ***Belizan v. Hershon***, 434 F. 3d 579 (D.C. Cir. 2006)

Most recently, in ***In re Schuff International, Inc. Stockholders Litigation***, Case No. 10323-VCZ, Mr. Enright served as Co-Lead Counsel for the plaintiff class in achieving the largest recovery as a percentage of the underlying transaction consideration in Delaware Chancery Court merger class action history, obtaining an aggregate recovery of more than $22 million -- a gross increase from $31.50 to $67.45 in total consideration per share (a 114% increase) for tendering stockholders.

Similarly, as Co-Lead Counsel in ***In re Bluegreen Corp. Shareholder Litigation***, Case No. 502011CA018111 (Cir. Ct. for Palm Beach Cnty., Fla.), Mr. Enright achieved a $36.5 million common fund settlement in the wake of a majority shareholder buyout, representing a 25% increase in total consideration to the minority stockholders. Also, in ***In re CNX Gas Corp. Shareholders Litigation***, C.A. No. 53377-VCL (Del. Ch. 2010), in which Levi & Korsinsky served upon plaintiffs' Executive Committee, Mr. Enright helped obtain the recovery of a common fund of over $42.7 million for stockholders.

Mr. Enright has also played a leadership role in numerous securities and shareholder class actions from inception to conclusion. Most recently, he has served as lead counsel in several cryptocurrency-related securities class actions. His leadership has produced multi-million-dollar recoveries in shareholder class actions involving such companies as:

- Allied Irish Banks PLC
- Iridium World Communications, Ltd.
- En Pointe Technologies, Inc.
- PriceSmart, Inc.
- Polk Audio, Inc.
- Meade Instruments Corp.
- Xicor, Inc.
- Streamlogic Corp.
- Interbank Funding Corp.
- Riggs National Corp.
- UTStarcom, Inc.
- Manugistics Group, Inc.

Mr. Enright also has a successful track record of obtaining injunctive relief in connection with shareholder M&A litigation, having won preliminary injunctions or other injunctive relief in the cases of:

- *In re Portec Rail Products, Inc. S'holder Litig.*, G.D. 10-3547 (Ct. Com. Pleas Pa. 2010)
- *In re Craftmade International, Inc. S'holder Litig.*, C.A. No. 6950-VCL (Del. Ch. 2011)
- *Dias v. Purches*, C.A. No. 7199-VCG (Del. Ch. 2012)
- *In re Complete Genomics, Inc. S'holder Litig.*, C.A. No. 7888-VCL (Del. Ch. 2012)
- *In re Integrated Silicon Solution, Inc. Stockholder Litig.*, Lead Case No. 115CV279142 (Sup. Ct. Santa Clara, CA 2015)

Mr. Enright has also demonstrated considerable success in obtaining deal price increases for shareholders in M&A litigation. As Co-Lead Counsel in the matter of *In re Great Wolf Resorts, Inc. Shareholder Litigation*, C.A. No. 7328-VCN (Del. Ch. 2012), Mr. Enright was partially responsible for a $93 million (57%) increase in merger consideration and waiver of several "don't-ask-don't-waive" standstill agreements that were precluding certain potential bidders from making a topping bid for the company.

Similarly, Mr. Enright served as Co-Lead Counsel in the case of *Berger v. Life Sciences Research, Inc.*, No. SOM-C-12006-09 (NJ Sup. Ct. 2009), which caused a significant increase in the transaction price from $7.50 to $8.50 per share, representing additional consideration for shareholders of approximately $11.5 million.

Mr. Enright also served as Co-Lead Counsel in *Minerva Group, LP v. Keane*, Index No. 800621/2013 (NY Sup. Ct. of Erie Cnty.) and obtained a settlement in which Defendants increased the price of an insider buyout from $8.40 to $9.25 per share.

The courts have consistently recognized and praised the quality of Mr. Enright's work. In *In re Interbank Funding Corp. Securities Litigation* (D.D.C. 02-1490)**,** Judge Bates of the United States District Court for the District of Columbia observed that Mr. Enright had "...skillfully, efficiently, and zealously represented the class, and... worked relentlessly throughout the course of the case."

Similarly, in **Freeland v. Iridium World Communications**, LTD, (D.D.C. 99-1002), Judge Nanette Laughrey stated that Mr. Enright had done "an outstanding job" in connection with the recovery of $43.1 million for the shareholder class.

And, in the matter of **Osieczanek v. Thomas Properties Group**, C.A. No. 9029-VCG (Del. Ch. 2013), Vice Chancellor Sam Glasscock of the Chancery Court of Delaware observed that "it's always a pleasure to have counsel [like Mr. Enright] who are articulate and exuberant in presenting their position," and that Mr. Enright's prosecution of a merger case was "wholesome" and served as "a model of . . . plaintiffs' litigation in the merger arena."

<u>Education</u>

- George Washington University School of Law, J.D. (1996), where he was a Member Editor of The George Washington University Journal of International Law and Economics from 1994 to 1996
- Drew University, B.A., Political Science and Economics, *cum laude* (1993)

<u>Admissions</u>

- Maryland (1996)
- New Jersey (1996)
- United States District Court for the District of Maryland (1997)
- United States District Court for the District of New Jersey (1997)
- District of Columbia (1999)
- United States Court of Appeals for the Fourth Circuit (1999)
- United States Court of Appeals for the Fifth Circuit (1999)
- United States District Court for the District of Columbia (1999)
- United States Court of Appeals for the District of Columbia (2004)
- United States Court of Appeals for the Second Circuit (2005)
- United States Court of Appeals for the Third Circuit (2006)
- United States District Court for the District of Colorado (2017)

<u>Publications</u>

- "SEC Enforcement Actions and Investigations in Private and Public Offerings," Securities: Public and Private Offerings, Second Edition, West Publishing 2007
- "Dura Pharmaceuticals: Loss Causation Redefined or Merely Clarified?" J. Tax'n & Reg. Fin. Inst. September/October 2007, Page 5

## Shannon L. Hopkins

Shannon L. Hopkins manages the Firm's Connecticut office. She was selected in 2013 as a New York "Super Lawyer" by Thomson Reuters. For more than a decade Ms. Hopkins has been prosecuting a wide range of complex class action matters in securities fraud, mergers and acquisitions, and consumer fraud litigation on behalf of individuals and large institutional clients. Ms. Hopkins has played a lead role in numerous shareholder securities fraud and merger and acquisition matters and has been involved in recovering multi-million dollar settlements on behalf of shareholders, including:

- *In re Force Protection, Inc. S'holder Litig.*, C.A. No. A-11-651336-B (D. Nev. 2015), $11 million shareholder recovery

- *Craig Telke v. New Frontier Media, Inc.*, C.A. No. 1:12-cv-02941-JLK (D. Co. 2015), $2.25 million shareholder recovery

- *Shona Investments v. Callisto Pharmaceuticals, Inc.*, C.A. No. 652783/2012 (NY Sup. Ct. 2015), shareholder recovery of $2.5 million and increase in exchange ratio from 0.1700 to 0.1799

- *E-Trade Financial Corp. S'holder Litig.*, No. 07-cv-8538 (S.D.N.Y. 2007), $79 million recovery for the shareholder class

- *In re Cogent, Inc. S'holder Litig.*, C.A. No. 5780-VCP (Del. Ch. 2010), $1.9 million shareholder recovery and corrective disclosures relating to the Merger

- *In re CMS Energy Sec. Litig.*, Civil No. 02 CV 72004 (GCS) (E.D. Mich. Sept. 6, 2007), $200 million recovery

- *In re Sears, Roebuck and Co. Sec. Litig.*, No. 02-cv-07527 (N.D. Ill. Jan. 8, 2007), $200 million recovery

- *In re El Paso Electric Co. Sec. Litig.*, C.A. No. 3:03-cv-00004-DB (W.D. Tex. Sept. 15, 2005), $10 million recovery

- *In re Novastar Fin. Sec. Litig.*, 4:04-cv-00330-ODS (W.D. Mo. Apr. 14, 2009), $7.25 million recovery

The quality of Ms. Hopkin's work has been noted by courts. In *In re Health Grades, Inc. Shareholder Litigation*, C.A. No. 5716-VCS (Del. Ch. 2010), where Ms. Hopkins was significantly involved with the briefing of the preliminary injunction motion, then Vice Chancellor Strine "applaud[ed]" Co-Lead Counsel for their preparation and the extraordinary high-quality of the briefing.

In addition to her legal practice, Ms. Hopkins is a Certified Public Accountant (1998 Massachusetts). Prior to becoming an attorney, Ms. Hopkins was a senior auditor with PricewaterhouseCoopers LLP, where she led audit engagements for large publicly held companies in a variety of industries.

Education

- Suffolk University Law School, J.D., *magna cum laude* (2003), where she served on the Journal for High Technology and as Vice Magister of the Phi Delta Phi International Honors Fraternity

- Bryant University, B.S.B.A., Accounting and Finance, *cum laude* (1995), where she was elected to the Beta Gamma Sigma Honor Society

# LEVI&KORSINSKY LLP

NEW YORK I WASHINGTON, D.C. I CONNECTICUT I CALIFORNIA

---

Admissions

- Massachusetts (2003)
- United States District Court for the District of Massachusetts (2004)
- New York (2004)
- United States District Court for the Southern District of New York (2004)
- United States District Court for the Eastern District of New York (2004)
- United States District Court for the District of Colorado (2004)
- United States Court of Appeals for the First Circuit (2008)
- United States Court of Appeals for the Third Circuit (2010)
- Connecticut (2013)

Publications

- "Cybercrime Convention: A Positive Beginning to a Long Road Ahead," 2 J. High Tech. L. 101 (2003)

---

*In appointing the Firm Lead Counsel, the Honorable Gary Allen Feess noted our "significant prior experience in securities litigation and complex class actions."*

*Zaghian v. THQ, Inc.,* 2:12-cv-05227-GAF-JEM (C.D. Cal. Sept. 14, 2012)

---

## Gregory Mark Nespole

Gregory Mark Nespole is a Partner of the Firm, having been previously a member of the management committee of one of the oldest firms in New York, as well as chair of that firm's investor protection practice. He specializes in complex class actions, derivative actions, and transactional litigation representing institutional investors such as public and labor pension funds, labor health and welfare benefit funds, and private institutions. Prior to practicing law, Mr. Nespole was a strategist on an arbitrage desk and an associate in a major international investment bank where he worked on structuring private placements and conducting transactional due diligence.

For over twenty years, Mr. Nespole has played a lead role in numerous shareholder securities fraud and merger and acquisition matters and has been involved in recovering multi-million-dollar settlements on behalf of shareholders, including:

- Served as co-chair of a Madoff Related Litigation Task Force that recovered over several hundred million dollars for wronged investors;
- Obtained a $90 million award on behalf of a publicly listed company against a global bank arising out of fraudulently marketed auction rated securities;
- Successfully obtained multi-million-dollar securities litigation recoveries and/or corporate governance reforms from Cablevision, JP Morgan, American Pharmaceutical Partners, Sepracor, and MBIA, among many others.

---

22

Mr. Nespole's peers have elected him a "Super Lawyer" in the class action field annually since 2009. He is active in his community as a youth sports coach.

Education

- Brooklyn Law School, J.D. (1993)
- Bates College, B.A. (1989)

Admissions

- New York (1994)
- United States District Court for the Southern District of New York (1994)
- United States District Court for the Eastern District of New York (1994)
- United States Court of Appeals for the Second Circuit (1994)
- United States Court of Appeals for the Fourth Circuit (1994)
- United States Court of Appeals for the Fifth Circuit (1994)
- United States District Court for the Northern District of New York (2018)
- United States Court of Appeals for the Eighth Circuit (2019)
- United States Court of Appeals for the Third Circuit (2020)

## Daniel Tepper

Daniel Tepper is a Partner of the Firm with extensive experience in shareholder derivative suits, class actions and complex commercial litigation. Before he joined Levi & Korsinsky, Mr. Tepper was a partner in one of the oldest law firms in New York. He is an active member of the CPLR Committee of the New York State Bar Association and was an early member of its Electronic Discovery Committee. Mr. Tepper was selected as a New York "Super Lawyer" in 2016 – 2019.

Some of the notable matters where Mr. Tepper had a leading role include:

- ***Siegmund v. Bian,*** Case No. 16-62506 (S.D. Fla.), achieving an estimated recovery of $29.93 per share on behalf of a class of public shareholders of Linkwell Corp. who were forced to sell their stock at $0.88 per share.

- ***In re Platinum-Beechwood Litigation,*** Case No. 18-06658 (S.D.N.Y.), achieved dismissal on behalf of an individual investor in Platinum Partners-affiliated investment fund.

- ***Lakatamia Shipping Co. Ltd. v. Nobu Su,*** Index No. 654860/2016 (Sup. Ct., N.Y. Co. 2016), achieved dismissal on suit attempting to domesticate a $40 million UK judgment in New York State.

- ***Zelouf Int'l Corp. v. Zelouf***, 45 Misc.3d 1205(A) (Sup.Ct. N.Y. Co., 2014), representing the plaintiff in an appraisal proceeding triggered by freeze-out merger of closely-held corporation. Achieved a $10 million verdict after eleven day trial, with the Court rejecting a discount for lack of marketability.

- ***Sacher v. Beacon Assocs. Mgmt. Corp.,*** 114 A.D.3d 655 (2d Dep't 2014), affirming denial of defendants' motion to dismiss shareholder derivative suit by Madoff feeder fund against fund's auditor for accounting malpractice.

## LEVI&KORSINSKY LLP

NEW YORK | WASHINGTON, D.C. | CONNECTICUT | CALIFORNIA

- ***In re Belzberg***, 95 A.D.3d 713 (1st Dep't 2012), compelling a non-signatory to arbitrate brokerage agreement dispute arising under doctrine of direct benefits estoppel.

- ***Estate of DeLeo***, Case No. 353758/A (Surrog. Ct., Nassau Co. 2011), achieving a full plaintiff's verdict after a seven day trial which restored a multi-million dollar family business to its rightful owner.

- ***CMIA Partners Equity Ltd. v. O'Neill***, 2010 NY Slip Op 52068(U) (Sup. Ct. N.Y. Co., 2010). Representing the independent directors of a Cayman Islands investment fund, won a dismissal on the pleadings in the first New York state case examining shareholder derivative suits under Cayman Islands law.

- ***Hecht v. Andover Assocs. Mgmt. Corp.,*** 27 Misc 3d 1202(A) (Sup. Ct. Nassau Co., 2010), aff'd, 114 A.D.3d 638 (2d Dep't 2014). Participated in a $213 million global settlement in the first Madoff-related feeder fund in the country to defeat a motion to dismiss.

Education

- New York University School of Law (JD, 2000)
- The University of Texas at Austin (BA with Honors, 1997), National Merit Scholar

Admissions

- Massachusetts (retired)
- New York (2002)
- United States District Court for the Eastern District of New York (2004)
- United States District Court for the Southern District of New York (2010)
- United States District Court for the Western District of New York (2019)

## Elizabeth K. Tripodi

Elizabeth K. Tripodi focuses her practice on shareholder M&A litigation, representing shareholders of public companies impacted by mergers, acquisitions, tender offers, and other change-in-control transactions. Ms. Tripodi has been named as a Washington, DC "Super Lawyer" and was selected as a "Rising Star" by Thomson Reuters for several consecutive years.

Ms. Tripodi has played a lead role in obtaining monetary *recoveries* for shareholders in M&A litigation:

- ***In re Schuff International, Inc. Stockholders Litigation***, Case No. 10323-VCZ, achieving the largest recovery as a percentage of the underlying transaction consideration in Delaware Chancery Court merger class action history, obtaining an aggregate recovery of more than $22 million -- a gross increase from $31.50 to $67.45 in total consideration per share (a 114% increase) for tendering stockholders.

- ***In re Bluegreen Corp. S'holder Litig.,*** Case No. 502011CA018111 (Circuit Ct. for Palm Beach Cty., FL), creation of a $36.5 million common fund settlement in the wake of a majority shareholder buyout, representing a 25% increase in total consideration to the minority stockholders

- ***In re Cybex International S'holder Litig***, Index No. 653794/2012 (N.Y. Sup. Ct. 2014), recovery of $1.8 million common fund, which represented an 8% increase in stockholder consideration in connection with management-led cash-out merger

- ***In re Great Wolf Resorts, Inc. S'holder Litig***, C.A. No. 7328-VCN (Del. Ch. 2012), where there was a

24

$93 million (57%) increase in merger consideration

- ***Minerva Group, LP v. Keane***, Index No. 800621/2013 (N.Y. Sup. Ct. 2013), settlement in which Defendants increased the price of an insider buyout from $8.40 to $9.25 per share

Ms. Tripodi has played a key role in obtaining injunctive relief while representing shareholders in connection with M&A litigation, including obtaining preliminary injunctions or other injunctive relief in the following actions:

- ***In re Portec Rail Products, Inc. S'holder Litig***, G.D. 10-3547 (Ct. Com. Pleas Pa. 2010)
- ***In re Craftmade International, Inc. S'holder Litig***, C.A. No. 6950-VCL (Del. Ch. 2011)
- ***Dias v. Purches***, C.A. No. 7199-VCG (Del. Ch. 2012)
- ***In re Complete Genomics, Inc. S'holder Litig***, C.A. No. 7888-VCL (Del. Ch. 2012)
- ***In re Integrated Silicon Solution, Inc. Stockholder Litig.***, Lead Case No. 115CV279142 (Sup. Ct. Santa Clara, CA 2015)

Prior to joining Levi & Korsinsky, Ms. Tripodi was a member of the litigation team that served as Lead Counsel in, and was responsible for, the successful prosecution of numerous class actions, including: *Rudolph v. UTStarcom* (stock option backdating litigation obtaining a $9.5 million settlement); *Grecian v. Meade Instruments* (stock option backdating litigation obtaining a $3.5 million settlement).

Education

- American University Washington College of Law, *cum laude* (2006), where she served as Editor in Chief of the Business Law Brief, was a member of the National Environmental Moot Court team, and interned for Environmental Enforcement Section at the Department of Justice
- Davidson College, B.A., Art History (2000)

Admissions

- Virginia (2006)
- District of Columbia (2008)
- United States District Court for the Eastern District of Virginia (2006)
- United States District Court for the District of Columbia (2010)

## Adam M. Apton

Adam M. Apton focuses his practice on investor protection. He represents institutional investors and high net worth individuals in securities fraud, corporate governance, and shareholder rights litigation. Prior to joining the firm, Mr. Apton defended corporate clients against complex mass tort, commercial, and products liability lawsuits. Thomson Reuters has selected Mr. Apton to the Super Lawyers Washington, DC "Rising Stars" list every year since 2016, a distinction given to only the top 2.5% of lawyers.

Mr. Apton's past representations and successes include:

- ***In re Tesla, Inc. Securities Litigation,*** No. 3:18-cv-04865-EMC (N.D. Cal.) (lead counsel in class action representing Tesla investors who were harmed by Elon Musk's "funding secured" tweet from August 7, 2018)
- ***In re Navient Corp. Securities Litigation,*** 17-8373 (RBK/AMD) (D.N.J.) (lead counsel in class action against leading provider of student loans for alleged false and misleading statements about

# LEVI&KORSINSKY LLP
NEW YORK I WASHINGTON, D.C. I CONNECTICUT I CALIFORNIA

compliance with consumer protection laws)

- **In re Prothena Corporation Plc Securities Litigation,** 1:18-cv-06425-ALC (S.D.N.Y.) ($15.75 million settlement fund against international drug company for false statements about development of lead biopharmaceutical product)

- **Martin v. Altisource Residential Corporation, et al.,** 15-00024 (AET) (GWC) (D.V.I.) ($15. 5 million settlement fund against residential mortgage company for false statements about compliance with consumer regulations and corporate governance protocols)

- **Levin v. Resource Capital Corp., et al.,** 1:15-cv-07081-LLS (S.D.N.Y.) ($9.5 million settlement in class action over fraudulent statements about toxic mezzanine loan assets)

- **Rux v. Meyer (Sirius XM Holdings Inc.),** No. 11577 (Del. Ch.) (recovery of $8.25 million against SiriusXM's Board of Directors for engaging in harmful related-party transactions with controlling stockholder, John. C. Malone and Liberty Media Corp.)

## Education

- New York Law School, J.D., *cum laude* (2009), where he served as Articles Editor of the *New York Law School Law Review* and interned for the New York State Supreme Court, Commercial Division

- University of Minnesota, B.A., Entrepreneurial Management & Psychology, With Distinction (2006)

## Admissions

- New York (2010)
- United States District Court for the Southern District of New York (2010)
- United States District Court for the Eastern District of New York (2010)
- District of Columbia (2013)
- United States Court of Appeals for the Ninth Circuit (2015)
- United States Court of Appeals for the Second Circuit (2016)
- United States Court of Appeals for the Third Circuit (2016)
- California (2017)
- United States District Court for the Northern District of California (2017)
- United States District Court for the Central District of California (2017)
- United States District Court for the Southern District of California (2017)

## Publications

- "Pleading Section 11 Liability for Secondary Offerings" *American Bar Association: Practice Points* (Jan. 4, 2017)

- "Second Circuit Rules in Indiana Public Retirement System v. SAIC, Inc." *American Bar Association: Practice Points* (Apr. 4, 2016)

- "Second Circuit Applies Omnicare to Statements of Opinion in Sanofi" *American Bar Association: Practice Points* (Mar. 30, 2016)

- "Second Circuit Rules in Acticon AG v. China North" *American Bar Association: Practice Points*

(Sept. 14, 2015)

# *Of Counsel*

## Andrew E. Lencyk

Andrew E. Lencyk is Of Counsel to the Firm.  Prior to joining the Firm, Mr. Lencyk was a partner in an established boutique firm in New York specializing in securities litigation.  He was graduated *magna cum laude* from Fordham College, New York, with a B.A. in Economics and History, where he was a member of the College's Honors Program, and was elected to Phi Beta Kappa. Mr. Lencyk received his J.D. from Fordham University School of Law, where he was a member of the Fordham Urban Law Journal. He was named to the 2013, 2014, 2015, 2016, 2017, 2018 and 2019 Super Lawyers ®, New York Metro Edition.

Mr. Lencyk has co-authored the following articles for the Practicing Law Institute's Accountants' Liability Handbooks:

- *Liability in Forecast and Projection Engagements: Impact of Luce v. Edelstein*

- *An Accountant's Duty to Disclose Internal Control Weaknesses*

- *Whistle-blowing: An Accountants' Duty to Disclose A Client's Illegal Acts*

- *Pleading Motions under the Private Securities Litigation Reform Act of 1995*

- *Discovery Issues in Cases Involving Auditors* (co-authored and appeared in the 2002 PLI Handbook on *Accountants' Liability After Enron*.)

In addition, he co-authored the following article for the Association of the Bar of the City of New York, Corporate & Securities Law Updates:

- *Safe Harbor Provisions for Forward-Looking Statements* (co-authored and published by the Association of the Bar of the City of New York, Corporate & Securities Law Updates, Vol. II, May 12, 2000)

Cases in which Mr. Lencyk actively represented plaintiffs include:

- ***Kirkland et al. v. WideOpenWest, Inc.,*** Index No. 653248/2018 (Sup. Ct, NY County) (substantially denying defendants' motion to dismiss Section 11 and 12(a)(2) claims)

- ***In re Community Psychiatric Centers Securities Litigation,*** SA CV-91-533-AHS (Eex) (C.D. Cal.) and *McGann v. Ernst & Young,* SA CV-93-0814-AHS (Eex) (C.D. Cal.)(recovery of $54.5 million against company and its outside auditors)

- ***In re Danskin Securities Litigation,*** Master File No. 92 CIV. 8753 (JSM) (S.D.N.Y.);

- ***In re JWP Securities Litigation,*** Master File No. 92 Civ. 5815 (WCC) (S.D.N.Y.) (class recovery of approximately $36 million)

- ***In re Porta Systems Securities Litigation,*** Master File No. 93 Civ. 1453 (TCP) (E.D.N.Y.);

- ***In re Leslie Fay Cos. Securities Litigation,*** No. 92 Civ. 8036 (S.D.N.Y.)($35 million recovery)

- ***Berke v. Presstek, Inc.,*** Civ. No. 96-347-M (MDL Docket No. 1140) (D.N.H.) ($22 million recovery)

- ***In re Micro Focus Securities Litigation,*** No. C-01-01352-SBA-WDB (N.D. Cal.)

- ***Dusek v. Mattel, Inc., et al.,*** CV99-10864 MRP (C.D. Cal.) ($122 million global settlement)

- ***In re Sonus Networks, Inc. Securities Litigation-II,*** No. 06-CV-10040 (MLW) (D. Mass.)

- ***In re AIG ERISA Litigation,*** No. 04 Civ. 9387 (JES) (S.D.N.Y.) ($24.2 million recovery)

- ***In re Mutual Funds Investment Litigation,*** MDL No. 1586 (D. Md.)

- ***In re Alger, Columbia, Janus, MFS, One Group, Putnam, Allianz Dresdner,*** MDL No. 15863-JFM - Allianz Dresdner subtrack (D. Md.)

- ***In re Alliance, Franklin/Templeton, Bank of America/Nations Funds and Pilgrim Baxter,*** MDL No. 15862-AMD – Franklin/Templeton subtrack (D. Md.)

- ***In re AIG ERISA Litigation II,*** No. 08 Civ. 5722 (LTS) (S.D.N.Y.) ($40 million recovery); and

- ***Flynn v. Sientra, Inc.,*** CV-15-07548 SJO (RAOx) (C.D. Cal.) ($10.9 million recovery) (co-lead counsel)
  Court decisions in which Mr. Lencyk played an active role on behalf of plaintiffs include:

- ***Pub. Empls' Ret. Sys. of Miss. v. TreeHouse Foods,*** 2018 U.S. Dist. LEXIS 22717 (N.D. Ill. Feb. 12, 2018) (denying defendants' motion to dismiss in its entirety)

- ***Flynn v. Sientra, Inc.,*** 2016 U.S. Dist. LEXIS 83409 (C.D. Cal. June 9, 2016) (denying in substantial part defendants' motions to dismiss Section 10(b), Section 11 and 12(b)(2) claims), *motion for reconsideration denied*, slip op. (C.D. Cal. Aug 12, 2016)

- ***In re Principal U.S. Property Account ERISA Litigation,*** 274 F.R.D. 649 (S.D. Iowa 2011) (denying defendants' motion to dismiss)

- ***In re AIG ERISA Litigation II,*** No. 08 Civ. 5722(LTS), 2011 U.S. Dist. LEXIS 35717 (S.D.N.Y. May 31, 2011) (denying in substantial part defendants' motions to dismiss), *renewed motion to dismiss denied*, slip op. (S.D.N.Y. June 26, 2014)

- ***In re Mutual Funds Investment Litigation,*** 384 F. Supp. 2d 845 (D. Md. 2005) (denying in substantial part defendants' motions to dismiss), *In re Alger, Columbia, Janus, MFS, One Group, Putnam, Allianz Dresdner*, MDL No. 15863-JFM - Allianz Dresdner subtrack (D. Md. Nov. 3, 2005) (denying in substantial part defendants' motions to dismiss), and *In re Alliance, Franklin/Templeton, Bank of America/Nations Funds and Pilgrim Baxter*, MDL No. 15862-AMD – Franklin/Templeton subtrack (D. Md. June 27, 2008) (same)

- ***In re AIG ERISA Litigation,*** No. 04 Civ. 9387 (JES) (S.D.N.Y. Dec. 12, 2006) (denying defendants' motions to dismiss in their entirety)

- ***Dusek v. Mattel, Inc., et al.,*** CV99-10864 MRP (C.D. Cal. Dec. 17, 2001) (denying defendants' motions to dismiss Section 14(a) complaint in their entirety)

- ***In re Micro Focus Sec. Litig.,*** Case No. C-00-20055 SW (N.D. Cal. Dec. 20, 2000) (denying motion to dismiss Section 11 complaint);

- ***Zuckerman v. FoxMeyer Health Corp.,*** 4 F. Supp.2d 618 (N.D. Tex. 1998) (denying defendants' motion to dismiss in its entirety in one of the first cases decided in the Fifth Circuit under the Private Securities Litigation Reform Act of 1995)

- ***In re U.S. Liquids Securities Litigation,*** Master File No. H-99-2785 (S.D. Tex. Jan. 23, 2001) (denying motion to dismiss Section 11 claims)

- ***Sands Point Partners, L.P., et al. v. Pediatrix Medical Group, Inc., et al.,*** Case No. 99-6181-CIV-Zloch (S.D. Fla. June 6, 2000) (denying defendants' motion to dismiss in its entirety)

- ***Berke v. Presstek, Inc.,*** Civ. No. 96-347-M (MDL Docket No. 1140) (D.N.H. Mar. 30, 1999) (denying defendants' motion to dismiss)

- ***Chalverus v. Pegasystems, Inc.,*** 59 F. Supp. 2d 226 (D. Mass. 1999) (denying defendants' motion to dismiss);

- ***Danis v. USN Communications, Inc.,*** 73 F. Supp. 2d 923 (N.D. Ill. 1999) (denying defendants' motion to dismiss)

- ***In re JWP Inc. Securities Litigation,*** 928 F. Supp. 1239 (S.D.N.Y. 1996) (denying defendants' motion for summary judgment);

- ***In re Danskin Securities Litigation,*** Master File No. 92 CIV. 8753 (JSM) (S.D.N.Y. Feb. 23, 1994) (denying corporate and underwriter defendants' motions to dismiss in all respects)

- ***In re UCAR International Inc., Securities Litigation,*** No. 3:98cv600 (JBA) (D. Conn.) (Case settled during pendency of defendants' motion to dismiss).

Education:

- Fordham University School of Law, J.D. (1992)
- Fordham College, B.A. *magna cum laude*, 1988)

Admissions

- New York (1993)
- Connecticut (1992)
- United States District Court for the Southern District of New York (2004)
- United States District Court for the Eastern District of New York (2004)
- United States Court of Appeals for the Second Circuit (2015)

## Kristina Mentone

Kristina Mentone is Of Counsel at the Firm. She is a seasoned litigator with more than 15 years of experience in complex securities litigation. Ms. Mentone previously represented investors in residential mortgage backed securities, helping to recover several billions of dollars of damages for her clients. She has represented both plaintiffs and defendants in complex class actions and has represented major financial institutions in high-stakes regulatory investigations.

Education

- Fordham University School of Law, J.D., *cum laude*, Order of the Coif (2003)
- New York University, B.A., *cum laude* (1999)

Admissions

- New York (2004)
- United States District Court for the Southern District of New York (2005)
- United States District Court for the Eastern District of New York (2009)

## Sebastian Tornatore

Sebastian Tornatore is Of Counsel in the Connecticut office of Levi & Korsinsky, LLP with a focus on representing individual and institutional plaintiffs in federal securities fraud class actions and related shareholder matters.

Since joining the firm in 2013, Sebastian has assisted in the recovery of millions of dollars for the benefit of shareholder classes, including:

- *In re EndoChoice Holdings, Inc. Sec. Litig.,* C.A. No. 2016-cv-277772 (Fulton Cty. Ga.) ($8.5 million settlement in action stemming from defendant corporation's IPO)

- *Forman v. Meridian Bioscience Inc.,* C.A. No. 1:17-cv-00774 (S.D. Ohio) (settlement of $2.1 million in securities fraud action)

- *In re: Comverge Inc. S'holders Litig.,* C.A. No. 7368 (Del. Ch.) (settlement of $5.9 million in action arising from takeover)

Sebastian is currently litigating a variety of class actions throughout the country, including:

- *Ford v. TD Ameritrade,* C.A. No. 8:14-cv-396 (D. Neb.) (defeated motion to dismiss in best execution case stemming from TD Ameritrade's order routing practices)

- *In re Restoration Robotics, Inc. Sec. Litig.,* C.A. No. 5:18-cv-03712-EJD (N.D. Cal.) (defeated defendants' motion to dismiss in part and litigating an action on behalf of a certified class of investors in defendant company's IPO)

- *Kirkland et al. v. WideOpenWest, Inc.,* Index No. 653248/2018 (Sup. Ct, NY County) (defeated defendants' motion to dismiss in part on behalf of a proposed class of investors in defendant company's IPO)

- *Stein v. U.S. Xpress Enterprises, Inc.,* C.A. No. 1:19-cv-00098 (E.D. Tenn.) (defeated defendants' motion to dismiss in part on behalf of a proposed class of investors in defendant company's IPO)

Prior to joining the firm, Sebastian worked for the Connecticut Judicial System, where he gained significant experience assisting various state judges.

Education

- University of Connecticut School of Law, J.D. (2012)
- Boston College, B.A., Political Science  (2008)

Admissions

- Connecticut (2012)
- Massachusetts (2012)
- New York (2014)
- United States District Court for the District of Connecticut (2014)
- United States District Court for the Southern District of New York (2016)
- United States District Court for the District of Massachusetts (2016)
- United States District Court for the Eastern District of New York (2018)

Case 4:17-cv-02399 Document 159-5 Filed 07/02/20 in TXSD Page 1432 of 1452

## LEVI&KORSINSKY LLP
NEW YORK I WASHINGTON, D.C. I CONNECTICUT I CALIFORNIA

# *Associates*

## Stephanie A. Bartone

Stephanie A. Bartone practices in all areas of the firm, with a focus on securities fraud litigation.  Prior to joining the firm, Ms. Bartone worked for the Connecticut Judicial System where she assisted state court judges in civil and family matters. Ms. Bartone also previously worked for a firm specializing in civil litigation and criminal defense at the state and federal level. While attending The University of Connecticut School of Law, Ms. Bartone was the Symposium Editor of the *Connecticut Law Review.*

Education

- The University of Connecticut School of Law, J.D. (2012)
- The University of New Hampshire, B.A. *summa cum laude* (2008) Psychology and Justice Studies

Admissions

- Connecticut (2012)
- Massachusetts (2012)
- United States District Court for the District of Colorado (2013)
- United States District Court for the District of Connecticut (2015)
- United States District Court for the District of Massachusetts (2016)
- United States Court of Appeals for the Third Circuit (2020)

## Jordan A. Cafritz

Jordan Cafritz is an Associate with the Firm's Washington, D.C. office. While attending law school at American University he was an active member of the American University Business Law Review and worked as a Rule 16 attorney in the Criminal Justice Defense Clinic. After graduating from law school, Mr. Cafritz clerked for the Honorable Paul W. Grimm in the U.S. District Court for the District of Maryland.

Education

- American University Washington College of Law, J.D. (2014)
- University of Wisconsin-Madison, B.A., Economics & History (2010)

Admissions

- Maryland (2014)
- District of Columbia (2018)

*"I think you've done a superb job and I really appreciate the way this case was handled."*

The Honorable Ronald B. Rubin in *Teoh v. Ferrantino*, C.A. No. 356627
(Cir. Ct. for Montgomery Cnty., MD 2012)

# LEVI&KORSINSKY LLP

NEW YORK I WASHINGTON, D.C. I CONNECTICUT I CALIFORNIA

## Michael Keating

Michael Keating is an Associate with the Firm's Stamford office focusing on federal securities litigation. Mr. Keating previously interned with the Division of Enforcement for the Securities and Exchange Commission while attending law school.

Education:

- University of Connecticut School of Law, J.D. (2019)
- University of Connecticut, B.A Psychology (2014)

Admissions:

- Connecticut

*Vice Chancellor Sam Glasscock, III said "it's always a pleasure to have counsel who are articulate and exuberant…" and referred to our approach to merger litigation as "wholesome" and "a model of… plaintiffs' litigation in the merger arena."*

*Ocieczanek v. Thomas Properties Group*, C.A. No. 9029-VCG (Del. Ch. May 15, 2014)

## Alexander Krot

Education

- The George Washington University, B.B.A., Finance and International Business (2003)
- American University Washington College of Law, J.D. (2010)
- Georgetown University Law Center, LL.M., Securities and Financial Regulation, With Distinction (2011)
- American University, Kogod School of Business, M.B.A. (2012)

Admissions

- Maryland (2011)
- District of Columbia (2014)
- United States District Court for the District of Colorado (2015)
- United States Court of Appeals for the Tenth Circuit (2016)
- United States District Court for the Eastern District of Wisconsin (2017)
- United States Court of Appeals for the Third Circuit (2018)

*Then Vice Chancellor Leo E. Strine, Jr. praised the Firms' "exceedingly measured and logical" argument*

*Forgo v. Health Grades, Inc.*, C.A. No. 5716-VCS (Del. Ch. Sept. 3, 2010)

## Courtney E. Maccarone

Courtney E. Maccarone focuses her practice on prosecuting consumer class actions. Prior to joining Levi & Korsinsky, Ms. Maccarone was an associate at a boutique firm in New York specializing in class action litigation. While attending Brooklyn Law School, Ms. Maccarone served as the Executive Symposium Editor of the *Brooklyn Journal of International Law* and was a member of the Moot Court Honor Society. Her note, "Crossing Borders: A TRIPS-Like Treaty on Quarantines and Human Rights" was published in the Spring 2011 edition of the *Brooklyn Journal of International Law*.

Ms. Maccarone also gained experience in law school as an intern to the Honorable Martin Glenn of the Southern District of New York Bankruptcy Court and as a law clerk at a New York City-based class action firm. Ms. Maccarone has been recognized as a Super Lawyer "Rising Star" for the New York Metro area for the past seven consecutive years.

Education

- Brooklyn Law School, J.D., *magna cum laude* (2011), where she served as the Executive Symposium Editor of the *Brooklyn Journal of International Law* and was a member of the Moot Court Honor Society
- New York University, B.A., *magna cum laude* (2008)

Admissions

- New Jersey (2011)
- New York (2012)
- United States District Court for the District of New Jersey (2012)
- United States District Court for the Eastern District of New York (2012)
- United States District Court for the Southern District of New York (2012)

Publications

- "Crossing Borders: A TRIPS-Like Treaty on Quarantines and Human Rights," published in the Spring 2011 edition of the *Brooklyn Journal of International Law*

## Rosanne L. Mah

Rosanne L. Mah is an Associate in Levi & Korsinsky, LLP's San Francisco office. She represents consumers in complex class action litigation involving deceptive or misleading practices, false advertising, and data/privacy issues.

Education

- University of San Francisco, School of Law, J.D. (2005)
- University of California at Santa Cruz, B.A., Politics and Environmental Studies (1995)

Admissions

- United States District Court for the Northern District of California (2007)
- United States District Court for the Eastern District of California (2007)
- United States District Court for the Central District of California (2017)

33

## LEVI&KORSINSKY LLP
NEW YORK I WASHINGTON, D.C. I CONNECTICUT I CALIFORNIA

### Adam C. McCall

Adam C. McCall is an Associate with the Firm. Prior to joining Levi & Korsinsky, Mr. McCall was a Summer Analyst at Moelis & Company and an intern at Fortress Investment Group. While attending the Georgetown University Law Center, he was an extern at the Securities and Exchange Commission's Division of Corporate Finance.

Education

- Georgetown University Law Center, LL.M., Securities and Financial Regulation (2015)
- California Western School of Law, J.D., *cum laude* (2013)
- Santa Clara University, Certificate of Advanced Accounting Proficiency (2010)
- University of Southern California, B.A., Economics (2008)

Admissions

- California (2014)
- United States District Court for the Central District of California (2015)
- United States District Court for the Eastern District of California (2015)
- United States District Court for the Northern District of California (2015)
- United States District Court for the Southern District of California (2015)
- United States Court of Appeals for the Ninth Circuit (2016)
- District of Columbia (2017)

### Melissa Muller

Melissa Muller is an Associate with the Firm's New York Office focusing on federal securities litigation. Ms. Muller previously worked as a paralegal for the New York office while attending law school.

Education

- New York Law School, J.D., Dean's Scholar Award, member of the Dean's Leadership Council (2018)
- John Jay College of Criminal Justice, B.A. (2013), *magna cum laude*

Admissions

- New York (2019)
- United States District Court for the Southern District of New York (2020)

### Zachary Ness

Mr. Ness is an Associate with the Firm in the Washington, D.C. office, where he focuses his practice on financial litigation, including class action litigation relating to corporate governance, securities, cryptocurrencies, and initial coin offerings. During law school, he was an honors intern for the Trading and Markets Division of the U.S. Securities and Exchange Commission, where he practiced in the offices of Trading Practices and Market Supervision. In addition, he was a judicial intern for the Superior Court of the District of Columbia, and a research assistant tasked with examining modern constitutional privacy law issues.

## LEVI&KORSINSKY LLP

NEW YORK I WASHINGTON, D.C. I CONNECTICUT I CALIFORNIA

Education

- Georgetown University Law Center, J.D. (2019)
- Rutgers University (New Brunswick) (2016), *summa cum laude*

Admissions

- District of Columbia (2020)

Publications

- "A Fighting Chance: Ensuring Choice of Representation," 31 GEO. J. LEGAL ETHICS 781 (2018)

## Gregory M. Potrepka

Gregory M. Potrepka is an Associate in Levi & Korsinsky's Connecticut office. Mr. Potrepka is an experienced lawyer having litigated cases in State, Federal, and Tribal courts, at both the trial and appellate levels. While in law school, Mr. Potrepka clerked in the Civil Division of the United States Attorney's Office for the District of Columbia.

Education

- University of Connecticut School of Law, J.D. (2015)
- University of Connecticut Department of Public Policy, M.P.A. (2015)
- University of Connecticut, B.A., Political Science (2010)

Admissions

- Connecticut (2015)
- Mashantucket Pequot Tribal Court (2015)
- United States District Court for the District of Connecticut (2016)
- United States District Court for the Southern District of New York (2018)
- United States District Court for the Eastern District of New York (2018)
- United States Court of Appeals for the Third Circuit (2020)

## Andrew Rocco

Andrew Rocco is an Associate with the Firm in the Connecticut office. As a law student, he interned for the Office of the Attorney General for the State of Connecticut in the Employment Rights Department and served as the Editor-in-Chief of the Quinnipiac Probate Law Journal.

Education

- Quinnipiac University School of Law, J.D., *summa cum laude* (2017)
- Champlain College, B.A., Legal Studies, *summa cum laude* (2014)

Admissions

- Connecticut

LEVI&KORSINSKY LLP

NEW YORK I WASHINGTON, D.C. I CONNECTICUT I CALIFORNIA

## Brian Stewart

Brian Stewart is an Associate with the Firm practicing in the Washington, D.C. office. Prior to joining the firm, Mr. Stewart was an associate at a small litigation firm in Washington D.C. and a regulatory analyst at the Financial Industry Regulatory Authority (FINRA).  During law school, he interned for the Enforcement Divisions of the SEC and CFPB.

Education

- American University Washington College of Law, J.D. (2012)
- University of Washington, B.S., Economics and Mathematics (2008)

Admissions

- Maryland (2012)
- District of Columbia (2014)

# TAB 53

Roussel v. Brinker Intern., Inc., Not Reported in F.Supp.2d (2010)
2010 WL 1881898

🟨 KeyCite Yellow Flag - Negative Treatment
Distinguished by Clark v. Centene Corp., W.D.Tex., November 10, 2015

2010 WL 1881898
Only the Westlaw citation is currently available.
United States District Court,
S.D. Texas,
Houston Division.

Jennifer ROUSSELl, on Behalf of Herself
and Others Similarly Situated, Plaintiffs,
v.
BRINKER INTERNATIONAL, INC., Defendant.

Civil Action No. H-05-3733.
|
Jan. 13, 2010.

West KeySummary

1  **Labor and Employment** 🔑 Amount

Hours spent by restaurant employees' counsel interviewing a portion of more than 3,500 opt-in potential claimants in a Fair Labor Standards Act (FLSA) collective action, which alleged that employer failed to pay its servers a minimum wage by coercing them into sharing tips with employees who were not eligible for the mandatory tip pools, were reasonably expended in obtaining judgment for the employees under the FLSA's attorney fee statute. The case began with a complaint brought by only a single plaintiff, who could offer only a limited perspective as to employer's compliance with FLSA. In interviewing a portion of the potential opt-in claimants, counsel were justifiably gathering the information necessary to effectively advocate their position, and to explore the possibility of continued collective action treatment. Fair Labor Standards Act of 1938, § 16(b), 🚩 29 U.S.C.A. § 216(b).

**Attorneys and Law Firms**

Daryl John Sinkule, Martin A. Shellist, Shellist Lazarz LLP, Houston, TX, David A. Borgen, Laura L. Ho, Teresa Demchak, Goldstein, Demchack, Baller, et al., James Kan, Goldstein, Demchak, Baller, Borgen & Dardarian, Oakland, CA, Richard J. Burch, Bruckner Burch PLLC, Houston, TX, for Plaintiffs.

Fraser A. McAlpine, Kevin James White, Hunton & Williams LLP, Houston, TX, Sara Gillian Noel, Akin Gump Strauss Hauer & Feld LLP, Michael Brett Burns, Hunton & Williams, San Francisco, CA, Marcia Nelson Jackson, Wick Phillips LLP, Dallas, TX, for Defendant.

*MEMORANDUM AND ORDER*

KEITH P. ELLISON, District Judge.

**\*1** Pending before the Court is the Motion for an Award of Reasonable Attorneys' Fees, Costs, and Expenses of Plaintiffs (Doc. No. 307). After considering the parties' filings, oral arguments of counsel, and the applicable law, this Court finds and holds that Plaintiffs' Motion should be granted in part.

**I. BACKGROUND**

This case involves a Fair Labor Standards Act ("FLSA") collective action brought on behalf of servers at Chili's Bar and Grill restaurants. Plaintiffs filed the case in November 2005, alleging that Defendant had failed to pay its servers a minimum wage by coercing them into sharing tips with Quality Assurance employees ("QAs"), who were not eligible for the mandatory tip pools. In August 2006, this Court granted Plaintiffs' unopposed motion to distribute notice of this collective action to a national class of potential opt-in plaintiffs. (Doc. No. 22.) Over 3,500 individuals consented to join the collective action in response to the distributed notice. Over the course of discovery, the parties conducted approximately 120 depositions held in 26 states. (Pl. Mot., Doc. No. 307, at 4.) In a status conference held in July 2007, the Court discussed with the parties Plaintiffs' proposed trial witness strategy and issues of representative testimony. Pursuant to the discussions at this conference, Plaintiffs thereafter identified their trial witnesses on a rolling basis. The 55 deposed opt-ins who ultimately became the Plaintiff class were identified as representative proof witnesses for the preliminary class of over 3500 opt-ins.

Following discovery, in an order issued July 9, 2008, this Court denied Defendant's motion for summary judgment, finding that there remained issues of fact as to whether QAs were eligible to participate in mandatory tip pools, and granted Plaintiffs' motion to strike Defendant's tipping expert ("July 2008 Order"). (Doc. No. 162.) In the July 2008 Order, this Court also addressed Defendant's pending motion to decertify the plaintiff class. While noting that certification of the class on the issue of tip pool eligibility would be appropriate, the Court expressed concern as to the propriety of treating the issue of coercive tip-sharing through representative testimony. (July 2008 Order, at 33-39.) However, based on thorough examination of the deposition testimony of 55 opt-in Plaintiffs, the Court concluded that the deposed opt-ins were similarly situated as to both issues. (*Id.,* at 43.) In September 2008, after reviewing Plaintiffs' revised trial plan, the Court granted in part Defendant's motion to decertify by decertifying all opt-ins except the deposed opt-ins and those who worked at the same restaurants as the deposed opt-ins ("September 2008 Order"). (Doc. No. 172, at 5-6.) In January 2009, the Court further limited the collective action by decertifying all opt-ins except those deposed and denying Plaintiffs' motion to intervene on behalf of several hundred dismissed opt-in plaintiffs ("January 2009 Order"). (Doc. No. 197.) The case went to trial in March 2009, and 14 Plaintiffs testified on behalf of the remaining class of 55 deposed opt-in Plaintiffs. Questions concerning QA tip-pool eligibility were submitted to the jury and, after the jury determined that the 14 Plaintiffs who testified at trial were representative of the 55, the jury answered "no" to the question:

> **\*2** Do you find that the Defendant Brinker proved by a preponderance of the evidence that it operated a legal tip pool under the Fair Labor Standards Act, that is, that QAs/Expos work in positions or an occupation that customarily and regularly receives tips?

(Doc. No. 284.) The issue of coercion was decided by this Court in April 2009. The Court found that Defendant's concession that the 14 testifying Plaintiffs were coerced could be extrapolated to cover the remaining 41. (Doc. No. 295, at 6.) On June 18, 2009, the Court entered judgment in favor of Plaintiffs and ruled that they were entitled to an aggregate monetary award of $271,878.04 as well as attorneys' fees and costs. (Doc. No. 298.) As the prevailing party in the Court's final judgment, Plaintiffs file this Motion for an Award of Attorneys' Fees, Costs, and Expenses.

## II. LEGAL STANDARD

FLSA provides that "[t]he court in such action shall, in addition to any judgment awarded to the plaintiff or plaintiffs, allow a reasonable attorney [s'] fee to be paid by the defendant, and costs of the action." 29 U.S.C. § 216(b). A party is a "prevailing party" for the purposes of attorneys' fee awards if the party "succeeded on any significant claim affording it some of the relief sought." *Tex. State Teachers Ass'n v. Garland Indep. School Dist.,* 489 U.S. 782, 791, 109 S.Ct. 1486, 103 L.Ed.2d 866 (1989). For prevailing plaintiffs in FLSA cases, fee awards are mandatory. *Kreager v. Solomon & Flanagan P.A.,* 775 F.2d 1541, 1542 (11th Cir.1985).

In evaluating a fee award, the Court determines the amount of attorneys' fees to which a prevailing party is entitled through a two-step process. *Hopwood v. Texas,* 236 F.3d 256, 277 (5th Cir.2000), *cert. denied,* 533 U.S. 929, 121 S.Ct. 2550, 150 L.Ed.2d 717 (2001). First, the court calculates the "lodestar" by multiplying the reasonable number of hours spent on the case by the reasonable hourly rate. *Id.; see also Saltan v. Delta Concrete Prods., Co.,* 448 F.3d 795, 799 (5th Cir.2006) (noting that courts use the lodestar method to assess attorneys' fees in FLSA suits). A reasonable rate for attorneys' fees awarded under Section 1692k(a)(3) is the prevailing market rate for attorneys of comparable experience employed in cases of similar complexity. *See Cope v. Duggins,* 203 F.Supp.2d 650, 655 (E.D.La.2002) (citing *Blum v. Stenson,* 465 U.S. 886, 895-96 n. 11, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984)). Plaintiffs seeking attorneys' fees "are charged with the burden of showing the reasonableness of the hours billed...." *Saizan v. Delta Concrete Products Company,* 448 F.3d 795, 799 (5th Cir.2006); *see also Hensley v. Eckerhart,* 461 U.S. 424, 437, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983) (stating that "the fee applicant bears the burden of establishing entitlement to an award and documenting the appropriate hours expended and hourly rates"). Plaintiffs' counsel "is not required to record in great detail how each minute of his time was expended," but

*Roussel v. Brinker Intern., Inc., Not Reported in F.Supp.2d (2010)*

2010 WL 1881898

should "at least identify the general subject matter of his time expenditures." *Hensley,* 461 U.S. at 437 n. 12.

**\*3** Second, the court considers whether the lodestar amount should be adjusted upwards or downwards based on the factors set out in *Johnson v. Georgia Highway Express, Inc.,* 488 F.2d 714 (5th Cir.1974).[1] The most important of these factors is the overall degree of success achieved. *Hensely,* 461 U.S. at 434. The Supreme Court has held that there is a "strong presumption" that the lodestar figure, without adjustment, is the reasonable fee award. *Kenny v. Perdue,* 532 F.3d 1209 (11th Cir.2008) (citing *City of Burlington v. Dague,* 505 U.S. 557, 562, 112 S.Ct. 2638, 120 L.Ed.2d 449 (1992); *Pennsylvania v. Del. Valley Citizens' Council for Clean Air,* 478 U.S. 546, 565, 106 S.Ct. 3088, 92 L.Ed.2d 439 (1986)).

In considering the reasonable hours expended, the court must determine "whether the attorneys demonstrated adequate billing judgment by '[w]riting off unproductive, excessive or redundant hours.' " *Jones v. White,* No. H-03-cv-2286, 2007 WL 2427976, at \*2 (S.D.Tex. Aug.22, 2007) (citing *Walker v. U.S. Dep't of Housing & Urban Dev.,* 99 F.3d 761, 769 (5th Cir.1996)); *Watkins v. Fordice,* 7 F.3d 453, 457 (5th Cir.1993).

## III. THE LODESTAR CALCULATION

Plaintiffs' counsel in this case included attorneys from the firms of Goldstein Demchack Bailer Borgen & Dardarian ("Goldstein Demchak"), Bruckner Burch PLLC ("Bruckner Burch"), and Shellist Lazarz LLC ("Shellist Lazarz") ("Plaintiffs' counsel" collectively), along with several other attorneys who assisted with the large number of depositions. Plaintiffs seek a total of $1,813,263.68 in attorneys' fees in accordance with their lodestar calculation. (Proposed Order, Pl. Reply, Doc. No. 358.) This Court will first consider whether to adopt this lodestar amount, and then address any necessary adjustments according to the *Johnson* factors.

### A. Hourly Rates

The parties in this case have stipulated as to the hourly rates to be applied to the attorneys and staff who worked on this case. (Doc. No. 341.) Those rates are as follows:

| TIMEKEEPER | HOURLY RATE |
| --- | --- |
| David Borgen | $500 |
| Laura Ho | $450 |
| Martin A. Shellist | $400 |
| Richard J. Burch | $400 |
| Michael K. Burke | $300 |
| James Kan | $250 |
| All other Associates | $250 |
| Senior Paralegals/Legal Assistants | $125 |
| All other Paralegals/Legal Assistants | $105 |

The Court holds that these stipulated hourly rates are reasonable and consistent with hourly rates charged by comparable attorneys in the relevant legal community. The Court accordingly adopts these stipulated rates in its findings and holdings.

### B. Hours Reasonably Expended

The parties vigorously dispute the number of compensable hours reasonably expended in obtaining a favorable judgment for the 55 Plaintiffs in this collective action. It is the burden of Plaintiffs' counsel to establish that the hours of work for which they seek compensation were reasonably related to

Case 4:19-cv-00509    Document 65-9    Filed 07/02/21 in TXSD    Page 1113 of 1452
**Roussel v. Brinker Intern., Inc., Not Reported in F.Supp.2d (2010)**
2010 WL 1881898

the success they achieved. *Saizan,* 448 F.3d 795, 799 (5th Cir.2006). The party opposing the fee application "has a burden of rebuttal that requires submission of evidence to the district court challenging the accuracy and reasonableness of the hours charged or the facts asserted by the prevailing party in its submitted affidavits." *Gates v. Deukmejian,* 987 F.2d 1392, 1397-98 (9th Cir.1992) (citing *Blum v. Stenson,* 465 U.S. 886, 892 n. 5, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984) (noting that petitioner failed to submit any evidence to the district court challenging the accuracy and reasonableness of the hours charged or facts asserted by respondent's counsel)). In order for a court to properly assess fee applications, objections by fee opponents concerning hours that should be excluded must be "specific and reasonably precise." *American Civil Liberties Union of Georgia v. Barnes,* 168 F.3d 423, 428 (11th Cir.1999).

 **\*4** In their initial Motion, Plaintiffs' provided voluminous evidence in the form of time records, attorney declarations, and exhibits to support their calculation of the appropriate lodestar amount. (Doc. Nos.307-13.) Defendant argues, however, that many of the hours accounted for in Plaintiffs' Motion were not reasonably and necessarily related to the overall results actually achieved in this case, and that Plaintiffs should therefore not be entitled to recover any fees for that time. More specifically, Defendant argues that Plaintiffs' Motion as it pertains to work performed prior to January 26, 2009, or the date of the January 2009 Order, should be denied in its entirety because these fees "were primarily accrued pursuing class discovery, class certification strategy, and unsuccessfully attempting to maintain a 3,556 opt-in collective action." (Def. Resp., Doc. No. 338, at 10.) The Court will consider each of the categories of work the compensability of which Defendant challenges.

### 1. Interviewing the 3,500 opt-ins

Defendant contends that Plaintiffs' counsel have failed to show that it was reasonable and necessary for them to interview more than 3,500 opt-in potential claimants to obtain a favorable judgment on the "idiosyncratic allegations" of the 55 Plaintiffs in this case. (Def. Resp., at 11.) Defendant points out that the vast majority of the original opt-in claimants worked "at different restaurants, under different managers, and during different time periods" than the prevailing Plaintiffs, and thus the lack of necessity in interviewing them should have been obvious. (*Id.*) Plaintiffs point out that counsel did not in fact interview all 3,556 opt-in plaintiffs,

but only a small fraction of this group. They argue that these interviews were necessary to "gather information regarding Chili's tip pooling procedures and practices," to identify the 55 Plaintiffs who ultimately prevailed at trial, and to reveal "critical facts that ultimately shaped the jury's and Court's understanding of class wide issues." (Pl. Reply, at 7.) [2]

The Court finds that these interviews were reasonably expended for the success of the Plaintiffs in this case. This case began with a Complaint brought by only a single Plaintiff, who could offer only a limited perspective as to Defendant's compliance with FLSA. In interviewing a portion of the 3,500 potential opt-in plaintiffs, counsel for Plaintiffs were justifiably gathering the information necessary to effectively advocate their position in this case, and to explore the possibility of continued collective active treatment. Furthermore, at this early stage in the litigation, neither Defendant nor the Court had taken a position as to the appropriate size and scope of the case to be tried. Had Plaintiffs' counsel not conducted these interviews and gathered as much information as possible as to the circumstances of individual servers across the country, counsel could realistically have neither identified nor advocated for the 55 Plaintiffs who ultimately obtained a successful judgment. Although many of the interviewees did not become plaintiffs in this case, Defendant fails to show that the information obtained from interviewing these opt-ins yielded nothing that contributed to the ultimate success of the prevailing Plaintiffs.

 **\*5** Plaintiffs have therefore met their burden of demonstrating that these hours were reasonably necessary to the case, and Defendant has not conclusively rebutted this showing. As such, the Court holds that the hours spent interviewing the initial opt-in plaintiffs in this case were reasonably expended in obtaining judgment for Plaintiffs.

### 2. Discovery and Document Review

Defendant also challenges Plaintiffs' application to recover fees for time spent reviewing written discovery, particularly those documents and records that pertained to non-deposed opt-ins who were not involved in the trial. Plaintiffs, however, maintain that the hours for which they seek compensation clearly relate to work on behalf of the 55 prevailing Plaintiffs, because they were gathering information necessary to the identification and claims of these individuals. (David Borgen Supp. Decl., Doc. No. 359, ¶¶ 12, 21.) Through Mr. Borgen's declaration, Plaintiffs provide a convincing account of how

2010 WL 1881898

the hours logged after the depositions of the 55 Plaintiffs directly related to Plaintiffs' success at trial.

Defendant is notably unspecific as to what portion of the nearly 1,200 hours Plaintiffs claim was spent on written discovery it finds objectionable. However, Defendant does point out that some of the 359.2 hours spent reviewing the personnel files of non-deposed opt-ins *after* the depositions had been taken could not have realistically contributed to Plaintiffs' success. (Def. Resp., at 12.) While the Court understands, and Plaintiffs adequately demonstrate, that much of the time and effort spent combing through the written discovery was necessary both for the identification of the 55 Plaintiffs as well as to prepare for the factually intense depositions, these rationales are significantly less applicable to the time spent reviewing this information *after* the depositions of the Plaintiffs were complete. Plaintiffs contend that these hours were "related to trial preparation" and are "directly related to the issues on which Plaintiffs prevailed at trial." (Borgen Supp. Decl. ¶ 21.) In Mr. Borgen's Declaration, Plaintiffs identify three specific time entries for post-deposition document review, totaling 1.5 hours, the relevance of which they specifically describe. (*Id.*) Plaintiffs have certainly met their burden with respect to these hours.

The Court, however, is of the opinion that more is required of Plaintiffs' counsel than their conclusory statements that all of these hours were spent on work that contributed to the success of their clients. Because the timing of these particular hours of document review suggests that this work was done primarily for the benefit of the entire 3,500-member class, Plaintiffs have not met their burden of showing that all of these hours were, in fact, spent on tasks that directly benefited the 55 Plaintiffs. Plaintiffs offer no suggestion as to what portion of this post-deposition document review identified by Defendant might be reduced should this Court question its compensability. Similarly, Defendant vaguely argues that "some" of these hours are related to review of personnel files of non-deposed opt-ins. After reviewing the entries for this time period, the Court finds that the total number of compensable hours should be reduced by 209.2 hours, or approximately 58 percent of the amount of time spent on reviewing documents after depositions were taken. Because the bulk of this work appears to have been performed by Legal Assistants or Senior Legal Assistants, the Courts finds that 130 Legal Assistant hours, 70 Senior Legal Assistant Hours, and 9.2 associate hours should be subtracted.

### 3. Depositions

**\*6** The parties hotly contest the time spent on the 118 depositions taken in this case. Plaintiffs argue that all depositions taken "were related to the development of the evidentiary record linked to the claims of the 55 prevailing Plaintiffs." (Pl. Mot., at 4.) [3] Defendant argues that the hours spent on these depositions should be discounted to reflect the fact that "Plaintiffs did not need to conduct 118 depositions to succeed on their claims at trial." (Def. Resp., at 12.) According to Defendant, had this case been brought as a 55-plaintiff case from the onset, rather than as a 3,500-member nation-wide collective action, counsel would have deposed only the 14 Plaintiff representatives rather than each and every class member.

The duty of the Court is to evaluate the reasonableness of Plaintiffs' fee request at the time the work was performed. The relevant issue is not "whether hindsight vindicates an attorney's time expenditures, but whether at the time the work was performed, a reasonable attorney would have engaged in similar time expenditures." *Grant v. Martinez,* 973 F.2d 96, 99 (2d Cir.1992) (finding that post-settlement offer hours expended should not be excluded from attorneys' fee award because, at the time, they were reasonably expended to evaluate the appropriateness of the settlement offer); *see also* *Wooldridge v. Marlene Industries Corp.,* 898 F.2d 1169, 1177 (6th Cir.1990) (holding that the standard for awarding attorneys' fees "is whether a reasonable attorney would have believed the work to be reasonably expended in pursuit of success at the point in time when the work was performed"); *In re Enron Corp. Securities, Derivative & ERISA Litigation,* 586 F.Supp.2d 732, 825 (S.D.Tex.2008) (allowing fees for post-settlement work done in the class's interest); *cf. Frazier v. Board of Trustees of Northwest Mississippi Regional Medical Center,* 765 F.2d 1278, 1293-95 (5th Cir.1985) (discouraging the use of "hindsight logic" and holding that the fact that a plaintiff eventually loses on the merits of a Section 1983 claim does not undermine the validity of an interim attorneys' fee award based on successfully obtaining a preliminary injunction). [4]

The Court notes that its ultimate conclusion that the appropriate scope of this case was not the nation-wide class for which Plaintiffs' sought certification was a very close call, an observation of disputed importance. The decertification issue was not apparent from the onset of the litigation, as evident by the fact that the Court arrived at its conclusion incrementally, over the course of three separate orders, and

after much discussion and briefing from the parties. Thus, in the period over which 55 potential class representatives were identified and deposed, Plaintiffs were not proceeding unreasonably or irresponsibly. Plaintiffs' counsel believed that these depositions would lead to a more favorable result for Plaintiffs in the case, a belief that was reasonable at that time and stage in the proceedings. As such, the Court rejects the underlying premise of many of Defendant's objections that this case should have been brought as a 55-plaintiff case from the start of the litigation.

 **\*7** Moreover, in reaching the conclusion that these 55 Plaintiffs were similarly situated and could be tried as a class, the Court heavily referenced the well-developed factual record as to these particular individuals. (July 2008 Order, at 39-43.) That is, the Court explicitly relied on the factual information generated by these depositions in concluding that the 55 deposed opt-in Plaintiffs could proceed as a class. (*Id.,* at 43). Plaintiff is correct that "[i]t was due to this exhaustive evidentiary record that the Court ultimately concluded that the 55 prevailing Plaintiffs should remain certified. (Borgen Supp. Decl. ¶ 5.) Thus, while it might be the case that each and every one of these depositions was not absolutely necessary for the Plaintiffs to prove their case at trial, where they relied on the testimony of only 14 representatives, [5] the Court is persuaded by the record and by its previous holdings that these depositions were vital to the Plaintiffs' success in having the class partially certified. This victory ultimately allowed all 55 Plaintiffs to obtain a favorable judgment. But for the thorough evidentiary support generated from the testimony of the 55 opt-in Plaintiffs, neither the Plaintiffs nor the Court could have determined that each and every one of the 55 Plaintiffs should move forward to trial. Accordingly, because the Court finds that the hours spent deposing the opt-in Plaintiffs was reasonably expended for the ultimate success of these Plaintiffs at trial, we reject Defendant's challenge and hold that Plaintiff is entitled to fees for the time and effort expended in depositions.

### 4. Time Spent on Class Certification

Defendant argues that the Court should award no fees for time Plaintiffs spent briefing the class certification issue. Defendant points out that "the decision on the 55 opt-ins was judicially created, not something Plaintiffs proposed, advocated, or briefed." (Def. Resp., at 14.) Thus, according to Defendant, Plaintiffs were entirely unsuccessful in their effort to get the class of 3,500 certified, and should accordingly be awarded nothing for this effort.

This Court is unpersuaded by Defendant's arguments. First, as explained above, the Court is of the opinion that the efforts of Plaintiffs' counsel to maintain a certified class were neither irresponsible nor unreasonable. Secondly, while it is true that Plaintiffs' attempt to defeat decertification was by no means entirely successful, the Court did in fact find that the 55 deposed opt-in Plaintiffs could proceed as a class. Although this was not based on an explicit proposition advocated by Plaintiffs, the Court certainly relied on Plaintiffs' arguments and briefing as to why this case was subject to collective action treatment in reaching its conclusion.

Moreover, the Court does not give much weight to the position advocated by Defendant at oral argument that, because the Court ultimately decertified roughly 98 percent of the class, Plaintiffs essentially failed completely in their class certification efforts. The amount of work necessary to effectively argue against class decertification, and the degree of persuasiveness and thoroughness necessary to be successful, does not directly vary with the number of people within the subject class. The number of class members that the Court allowed to proceed to trial has little relationship to the efforts that allowed the Court to find that this case was subject to collective action treatment and representative testimony. This case began with only one named Plaintiff, and through the efforts of Plaintiffs' counsel, it was tried as a collective action case of 55 Plaintiffs. This is not, therefore, a case in which Plaintiffs' certification efforts went completely unrewarded, as was the situation in most of the case law cited by Defendant. (Def. Resp., at 14-15.) To the extent that Plaintiffs' counsel did expend energy on decertification matters that were decidedly unsuccessful or unrelated to the Court's decision regarding the Plaintiff class, the Court adopts Plaintiffs' representation that many of these hours have already been removed through billing judgment. (Borgen Decl. ¶ 63(d); Pl. Mot., at 13 (indicating that time spent on Plaintiffs' motion to intervene, unsuccessful revised trial plans, and the brief advocating for inclusion of non-deposed opt-in plaintiffs was eliminated from the lodestar calculation).)

 **\*8** The Court does not, though, wholly ignore the fact that the overall outcome achieved by Plaintiffs' counsel was not that which was originally sought. However, any attempt to disentangle those hours spent on decertification that benefited the certified class of 55 Plaintiffs from those that did not would require far too much speculation and conjecture on the part of this Court. Accordingly, the appropriate stage at which

to consider a fee reduction in light of the limited nature of Plaintiffs' success is in making *Johnson* factor adjustments, and not through reducing the hours reasonably expended to defeat decertification. *See* 🚩 *Louisiana Power & Light Co. v. Kellstrom,* 50 F.3d 319, 327 (5th Cir.1995) (holding that when hours spent on various claims cannot be disentangled, the court's focus should shift to adjustments for results obtained); *Abell v. Potomac Ins. Co.,* 946 F.2d 1160, 1169 (5th Cir.1991) ("[W]here time spent on unsuccessful issues is difficult to segregate, no reduction of fees is required.") As such, the Court makes no adjustment to the hours expended by Plaintiffs in achieving this limited success. Consistent with the above analysis, this Court finds that the unadjusted lodestar amount sought by Plaintiffs should be reduced.

## IV. THE *JOHNSON* FACTORS

The Court now turns to the *Johnson* factors to determine whether the lodestar fees should be adjusted further.

### A. The Degree of Success Obtained

The Supreme Court has emphasized that the degree of success obtained is the "most critical factor" in determining a fee award. *Volk v. Gonzalez,* 262 F.3d 528, 534 (5th Cir.2001); *see also* 🚩 *Farrar v. Hobby,* 506 U.S. 103, 114, 113 S.Ct. 566, 121 L.Ed.2d 494 (1992); 🚩 *Hensley v. Eckerhart,* 461 U.S. 424, 440, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983). The most important consideration is the relief plaintiffs obtained "in comparison to the scope of the litigation as a whole."

🚩 *Hensley,* 461 U.S. at 440. In this case, while the 55 Plaintiffs unambiguously prevailed on their claims at trial and through this Court's final judgment, Plaintiffs' efforts to certify a nation-wide class were, in large part, unsuccessful. This Court must therefore determine whether Plaintiffs' inability to certify a nation-wide class warrants a reduction in the lodestar fee. The Court notes that both parties have taken rather extreme positions on this issue. In oral argument, Defendant suggested that Plaintiffs' entirely failed in their class certification efforts because they did not achieve the 3,500-member class for which they unwaveringly advocated, and because the conditional class was 98 percent decertified. Thus, according to Defendant, Plaintiffs achieved favorable judgment in a case that was almost entirely deflated at the time of trial. Plaintiffs, on the other hand, portray the 55-member Plaintiff class as a notable and rarely accomplished victory in defeating FLSA decertification efforts. (Pl. Mot., at 22.) The Court believes that neither position is entirely accurate.

However because neither side offers a more moderate or specific suggestion as to how the degree of success obtained in this case should be translated into a fee adjustment, the Court is left to make an entirely independent assessment.

### 1. Class decertification

**\*9** Both parties offer numerous and somewhat contradictory case holdings addressing the question of how FLSA fee motions should be adjusted to account for unsuccessful class certification. Defendant points to several cases in which courts have reduced requested fees to account for decertification of a class. *See, e.g.,* 🚩 *Barfield v. New York City Health and Hosp. Corp.,* 537 F.3d 132, 151-53 (2d Cir.2008) (affirming 50 percent reduction in attorneys' fees because recovery was for a single plaintiff rather than for the thousands of workers that plaintiff sought to include in a collective action); Order, *Howe v. Hoffman-Curtis Partners Ltd., LLP,* No. H-03-4298 (S.D.Tex. Aug. 24, 2005) (Ellison, J.) (excluding fees for time spent pursuing the suit as a collective action); *Clarke v. Ford Motor Co.,* No. 01-C-0961, 2006 WL 752902, at \*1 (E.D.Wis. March 21, 2006) (reducing fee award because plaintiff "accomplished nothing on behalf of the class"); 🚩 *Grochowski v. Ajet Const. Corp.,* No. 97-civ-6269(NRB), 2002 WL 465272, at \*4 (S.D.N.Y. March 27, 2002) (reducing fees because only half of the original plaintiffs achieved success at trial).

Plaintiffs, on the other hand, cite to several cases that suggest fees should not be reduced, even though a conditional national class was decertified. *See* 🚩 *Johnson v. Big Lots Stores, Inc.,* 639 F.Supp.2d 696, 706 (E.D.La.2009) (declining to make an adjustment to the lodestar amount for "results obtained" even though class was decertified, and finding that this amount reflected the number of hours spent in furtherance of the claims that succeeded); 🚩 *McElmurry v. U.S. Bank Nat. Ass'n,* No. 04-642-HA, 2008 WL 1925119, at \*2 (D.Or. April 30, 2008) (adopting plaintiff's method of discounting time related to collective action and noting that time spent on the collective action "dovetailed closely" with issues pertinent to prevailing plaintiffs); *Maranon v. Appliance Direct, Inc.,* No. 7-cv-1160-Orl-22DAB, 2008 WL 151891, at \*3 (M.D.Fla. Jan.16, 2008) (declining to reduce plaintiff's attorney fees for work related to an unsuccessful collective action, and finding that Defendant must take the case as he finds it); Order, *Thiebes v. Wal-mart Stores, Inc.,* No. 98-802-KI (D.Or. Jan. 18, 2005) (King, J.) (opining that plaintiffs would be entitled to fees for work they did for unsuccessful plaintiffs if the time

spent was on work also relevant to the plaintiffs who did not receive an award).

Turning to the facts of this case, the Court notes that this is not a case where Plaintiffs were wholly unsuccessful in taking a collective action case to trial. This case did in fact go to trial as a collective action, despite its genesis with only a single Plaintiff named in the Complaint. Moreover, the favorable judgment received by the 55-person class has benefited all members of the original certification to some extent. In response to this litigation, Defendant "sent a notice to all of its managers, instructing them that they should not include QAs in the tip pools." (Pl. Reply, at 11.) Defendant does not refute this fact. It is further likely that the decertified class members will continue to experience positive effects of the judgment received by Plaintiffs, both because Defendant's actions, to the extent that they were unlawful, have been exposed, and because the judgment will have some precedential value in subsequent cases. *See* (January 2009 Order, at 15 (noting that "any decision in [this case] regarding whether QAs are tip eligible may have some *stare decisis* effect" on dismissed class members' subsequent litigation).); *cf. City of Riverside v. Rivera,* 477 U.S. 561, 574, 106 S.Ct. 2686, 91 L.Ed.2d 466 (U.S.1986) (noting that civil rights plaintiffs vindicate important civil and constitutional rights that cannot be valued solely in monetary terms, and that the damages a plaintiff recovers contribute significantly to the deterrence of civil rights violations in the future). Finally, the Court reiterates that Plaintiffs have, through an independent act of their professional judgment, already reduced the hours included in their lodestar calculation to account for the fact that they were not entirely successful in pursuing this case as a class action. The Court does not wish to establish a precedent whereby successful plaintiffs who purportedly discount their billing are automatically subject to a further steep judicial discount.

 **\*10**  In light of these observations, but still keeping in mind this Court's overarching obligation to consider the overall degree of success obtained relative to the scope of the litigation as a whole, the Court holds that a 20 percent reduction in fees is warranted to account for the fact that Plaintiffs were not successful in certifying the national class. This reduction is justified because, although the efforts of Plaintiffs' counsel prior to the January 2009 Order undoubtedly contributed to the Plaintiffs' success at trial, some of this energy was necessarily in excess of that to which the victory can lawfully be attributed. However, any greater reduction would give too little weight to the

circumstances in this case, articulated above, which strongly council against too significant a discount. The Court finds that this reduction, combined with the hourly reductions already implemented through Plaintiffs' billing judgment and by the Court, accurately reflect the degree of success obtained by Plaintiffs in this case.

### 2. *Judgment sought v. judgment obtained*

Defendant points out that, while Plaintiffs in this case sought withheld wages for 3,500 workers, what they ultimately achieved was a judgment of only $271,868.04 for 55 Plaintiffs, a small fraction of the judgment they had set out to obtain. [6] According to Defendant, this fact weighs in favor of additional reductions to Plaintiffs' fee request. *See Hilton v. Executive Self Storage Associates, Inc.,* No. H-06-2744, 2009 WL 1750121, at \*14 (S.D.Tex. June 18, 2009) (reducing the lodestar amount by 67 percent because judgment obtained at trial was only one percent of the amount sought); *Powell v. Carey Intern., Inc.,* 547 F.Supp.2d 1281, 1297 (S.D.Fla.2008) (reducing fee award to reflect that the judgment received was only two percent of the amount demanded and that several plaintiffs received less than defendants' pre-trial settlement offer).

The Court notes, however, that several of the cases to which Defendant points are inapposite. In many of those situations, plaintiffs were unsuccessful in obtaining the full judgment sought *at trial;* that is, plaintiffs' counsel were able to get only a fraction of what they sought from the jury itself. Here, on the other hand, Plaintiffs' counsel was fully successful at trial, as they obtained a favorable judgment and damages for each one of the 55 Plaintiffs. That they did not obtain a judgment in favor of the remaining members of the initial 3,500 opt-ins speaks not to their success at trial, but rather their unsuccessful attempts at national certification. Adjustments for the degree to which Plaintiffs failed to certify a nationwide class have already been discussed and implemented.

Furthermore, Plaintiffs continue to aver, and Defendant does not dispute, that they were never offered a settlement in this case. Therefore, it cannot be said that Plaintiffs were unsuccessful for having obtained a judgment at trial that was less than what Plaintiffs would have otherwise received. As such, the Court finds that no further adjustment is warranted.

### 3. *Attorney fees v. judgment obtained*

Roussel v. Brinker Intern., Inc., Not Reported in F.Supp.2d (2010)
2010 WL 1881898

**\*11** Defendant also points out that the amount sought in attorneys' fees is more than six times the amount of the judgment awarded to Plaintiffs in this case. "While a low damages award is one factor which a district court may consider in setting the amount of attorney's fees, this factor alone should not lead the district court to reduce a fee award." *Singer v. City of Waco, Tex.,* 324 F.3d 813, 830 (5th Cir.2003) (quoting *Hollowell v. Orleans Reg'l Hosp. LLC,* 217 F.3d 379, 392 (5th Cir.2000). The Supreme Court has explicitly rejected the notion that an award of attorneys' fees must be "proportional" to the damages awarded to a successful plaintiff. *See City of Riverside v. Rivera,* 477 U.S. 561, 578, 106 S.Ct. 2686, 91 L.Ed.2d 466 (1986). In fact, the Fifth Circuit has approved attorneys' fee awards that are several times the amount of plaintiffs' recovery. *Lucio-Cantu v. Vela,* 239 Fed. Appx. 866 (5th Cir.2007) (district court did not abuse its discretion in awarding $51,750 in attorneys' fees under FLSA when plaintiffs recovered $3,349.29, $52.50, and $1,296.00 respectively); *Cox v. Brookshire Grocery Co.,* 919 F.2d 354 (5th Cir.1990) (approving an award of $9,250 in attorneys' fees when plaintiff recovered $1,181 under FLSA). Moreover, the unique nature of a claim under FLSA renders attorneys' fee requests that exceed judgment awards by multiples not uncommon. *Howe v. Hoffman-Curtis Partners Ltd., LLP,* 215 Fed. Appx. 341, 342 (5th Cir.2007) (upholding $23,357.30 in damages and $129,805.50 in attorneys' fees.) This Court accordingly finds that the proportion of requested fees to the judgment obtained does not warrant an adjustment to the fee award. The fee amount, as adjusted above, accurately reflects the degree of energy and attention on the part of Plaintiffs' counsel that was necessary to achieve a favorable outcome in this complex FLSA action, although the monetary judgment may not adequately reflect this. *See* (September 2008 Order, at 4 (noting the importance of collection action lawsuits to vindicating rights under FLSA given the likelihood that individual claims will be relatively small).)

### B. Novelty and Difficulty of the Questions Presented

Plaintiffs also point out that they prevailed on a claim that was novel under existing FLSA tip pool precedent, as the Court and jury were asked to resolve the question of QA tip pool eligibility as a matter of first impression. In addition, the Court adopted a coercion standard in the context of FLSA tip pools that clarified otherwise undeveloped case law. [7] The Court acknowledges both the difficulty of this case and the novelty of the questions presented. Counsel for both parties represented their clients in the highest traditions of the bar. This Court does not, however, find that this recognition warrants any upward adjustment to counsel's fees.

### C. Contingency Fee

The Court notes that Plaintiffs' counsel undertook representation of the Plaintiff class on a wholly contingent basis, and advanced all litigation costs and expenses. This factor, while notable, does not in the Court's judgment outweigh the reductions imposed in consideration of the degree of success obtained.

### D. Undesirability of the Case

**\*12** In its Motion, Plaintiffs list several reasons this case was undesirable, including the history of unsuccessful attempts to withstand collective action decertification in the Fifth Circuit, the sizeable costs of litigation, and the formidability of the opponents. (Pl. Mot., at 23.) The Court took these factors into consideration and acknowledges their significance, but concludes that they do not outweigh the lodestar reduction already imposed. Accordingly, the Court finds and holds that the lodestar fees should be discounted by 20 percent to reflect Plaintiffs' failure to obtain final certification of the entire proposed collective action. No other adjustments are called for. [8]

## V. TAXABLE COSTS

In their Amended Bill of Taxable Costs, Plaintiffs seek a total of $63,509.70 pursuant to 28 U.S.C. Section 1920. (Doc. No. 362.) There is a strong presumption under Federal Rule of Civil Procedure 54(d)(1) that the prevailing party will be awarded costs. *Cheatham v. Allstate Ins. Co.,* 465 F.3d 578, 586 (5th Cir.2006). There is disagreement among district courts as to the level of specificity necessary to support an award of costs. *DP Solutions, Inc. v. Rollins, Inc.,* 353 F.3d 421, 434 (5th Cir.2003) (comparing cases). Defendant objects to several of the costs included in Plaintiffs' Bill of Costs, and the Court now considers each of these objections. [9]

### A. Copying Costs

Defendant argues that Plaintiffs have failed to meet their burden of proving that the copy costs listed in their Bill of Costs were necessarily obtained for use in this case. *See Fogleman v. ARAMCO,* 920 F.2d 278, 285-86 (5th Cir.1991). Although it is not necessary for "a prevailing

Case 4:19-cv-00509   Document 65-9   Filed 07/02/21 in TXSD   Page 1119 of 1452
Roussel v. Brinker Intern., Inc., Not Reported in F.Supp.2d (2010)
2010 WL 1881898

party to identify every Xerox copy made for use in the course of legal proceedings, [a court will] require some demonstration that reproduction costs necessarily result from that litigation." *Id.* at 286. Here, Plaintiffs provide an itemized list of the copies for which they seek reimbursement, along with declarations from attorneys at the three firms who worked on the case: Goldstein Demcheck; Bruckner Burch; and Shellist Lazarz. The declarations describe the categories into which these copying costs fall and assert the attorneys' beliefs that each of these costs were reasonably and necessarily incurred. (Borgan Supp. Decl. ¶ 40; Burch Supp. Decl. ¶ 18; Shellist Supp. Decl. ¶ 15.) This Court holds that, in so doing, Plaintiffs' counsel meet their burden in this case. *Compare Kellogg Brown & Root Intern., Inc. v. Altanmia Commercial Marketing Co.,* No. H-07-2684, 2009 WL 1457632, at * 6 (S.D.Tex. May 26, 2009) (noting that movant in that case provided only a spreadsheet showing the number of copies made on each date but no other description of what was copied or why, and noting that "some information of the types or categories of documents copied and the reason for the copies must be furnished").

Defendant incorrectly articulates Plaintiffs' burden as having to prove that "each copy was necessarily obtained for use in the litigation." (Def. Resp., at 19.) In light of the large and complex nature of this case, and the length of the litigation history, the Court finds Defendant's standard to be unreasonable. In providing declarations listing the reasonable categories under which these copies fall, the Court holds that Plaintiffs have discharged their burden.

### B. Costs Incurred for Deposition Transcripts

**\*13** Defendant objects to the costs sought by Plaintiffs for deposition transcripts. To the extent that Defendant's objections are premised on the failure of Plaintiffs' counsel to identify the specific depositions for which it sought transcripts, the Court finds that the Amended Bill of Costs provides sufficient detail to cure these deficiencies. (Doc. No. 382.) As to Defendant's contention that Plaintiffs' have not shown that each of these transcripts was necessarily obtained for use in this case, the Court refers to its previous conclusions as to the integral role that depositions played in providing an exhaustive evidentiary record by which this Court could determine the proper scope of this case. Accordingly, the Court finds that Plaintiffs are entitled to all costs incurred to obtain deposition transcripts.

### C. Witness Fees

Defendant argues that Plaintiffs should not be entitled to recover the costs of travel and accommodation for the testifying Plaintiffs because they are parties to this case, and not just witnesses. In response, Plaintiffs point out that the testifying Plaintiffs testified not only for themselves, but also as witnesses for the other members of the 55-member Plaintiff class. In the Fifth Circuit, the preferred exercise of a district court's discretion in awarding costs is "to exclude from an award of costs those items not specifically mentioned in the statute." *Hodge v. Seiler,* 558 F.2d 284, 287 (5th Cir.1977). While 28 U.S.C. Section 1920, the statute that itemizes the elements that may be included in an award of taxable costs, includes "(f)ees and disbursements for ... witnesses," it does not include corresponding allowances for *parties* to the suit. The Fifth Circuit has noted that " '(t)he expenses of witnesses who are themselves parties normally are not taxable.' " *Hodge,* 558 F.2d at 287 (quoting CHARLES ALAN WRIGHT, ARTHUR R. MILLER & EDWARD H. COOPER, FEDERAL PRACTICE AND PROCEDURE: CIVIL 3d § 2678). As such, the Court cannot award Plaintiffs the $11,539.17 they seek for witness fees as taxable costs. The Bill of Costs should be reduced accordingly. The Court does find, however, that this amount should be added to untaxable litigation expenses reimbursable to Plaintiffs, discussed further below.

## VI. UNTAXABLE LITIGATION EXPENSES

Plaintiffs currently seek $156,293.12 in untaxable litigation expenses pursuant to Federal Rule of Civil Procedure 54(d). (Proposed Order, Pl. Reply.) Defendant concedes that these types of expenses are "sometimes awarded." (Def. Resp., at 22.) However, Defendant argues that Plaintiffs are not entitled to many of these expenses because they failed to meet their burden of showing that the expenses are reasonable and related to the case that was tried. As a preliminary matter, the two expense entries specifically identified by Defendant as unrelated to the case tried were removed by Plaintiffs in their Amended Proposed Order. (Def. Resp., at 22 n. 25; PL Reply, at 22 n. 29.)

**\*14** As to the online research conducted by Plaintiffs, Defendant argues that this research is inadequately documented and should therefore be disallowed. The Court holds that, because Plaintiff includes a list of the research categories that were removed in exercise of billing judgment, and an explanation of the billing code system that allows

them to be reasonably certain that legal research conducted was directly related to this case, they have adequately documented their online research expenses. (Borgen Decl. ¶ 94.) As to Plaintiffs' request for expenses related to in-house faxes, courier services, long distance charges, in-house postage, and travel expenses, the Court holds that Defendant's arguments that Plaintiffs should have provided information demonstrating how "each of these fees was reasonable or necessary to the final judgment" is unreasonable. (Def. Resp., at 23.) The documentation of these expenses, combined with Goldstein Demcheck's list of reasons for which each of these categories of fees was incurred, satisfies the Court that these fees were related to this particular case. Because of the size, scope, and duration of this matter, requiring anything more would be unreasonable. The only expense to which Defendant points that this Court finds inadequately documented, and therefore un-compensable, is the entry for $163.00 for "miscellaneous expense for Theresa Bryant." (Doc. No. 312-1, at 58.) The litigation expenses should accordingly be reduced by $163.00.

Finally, Defendant objects to payment for costs of two mailings to the entire class, the database system Plaintiffs used to track class members, and the search service Plaintiff used to locate class members on the ground. First, Plaintiffs are correct to point out that Defendant did not initially oppose Plaintiffs' original request for class notice, which undermines its objections to the costs incurred in pursuance thereof. Furthermore, and more importantly, the Court has explained above its conclusion that communications with all class members was vitally important to the identification of

the 55 prevailing Plaintiffs and to the Court's determination as to the correct scope of this case. Given that no one, including Defendant, initially objected to the possibility that this case might be given collective action treatment, and that the case was in fact tried as a collective action suit, it is expected that Plaintiffs' counsel would have utilized technological resources to identify, track, and manage the various Plaintiffs who resided in cities all over the country. As such, this Court finds that Plaintiffs are entitled to compensation for these expenses.

The reductions in fees and taxable and non-taxable expenses indicated above should be implemented. The Court asks Plaintiffs to submit a revised Proposed Order reflecting these changes.

## VII. CONCLUSION

For the reasons stated in this Memorandum, Plaintiffs' Motion for an Award of Reasonable Attorneys' Fees, Costs, and Expenses (Doc. No. 307) is hereby **GRANTED IN PART.** The parties are **ORDERED** to submit a Joint Proposed Order reflecting all changes to Plaintiffs' current fee request indicated above, no later than seven (7) days from entry of this Order.

**\*15 IT IS SO ORDERED.**

## All Citations

Not Reported in F.Supp.2d, 2010 WL 1881898

## Footnotes

1 The twelve *Johnson* factors are: (1) the time and labor required; (2) the novelty and difficulty of the question; (3) the skill requisite to perform the legal service; (4) the preclusion of other employment by the attorney due to the acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases. 488 F.2d at 717-19.

2 At oral argument, Defendant also argued that Plaintiffs had not provided sufficient information regarding which individuals were interviewed, rendering it impossible to effectively rebut these claimed hours. The Court finds that it was unnecessary for Plaintiffs to identify each and every individual opt-in whom they interviewed to discharge their burden. *Hensley,* 461 U.S. at 437 n. 12 (holding that plaintiff must identify the general subject matter of time expenditures).

2010 WL 1881898

3    The parties deposed an additional (56th) opt-in plaintiff, Tammy Parsons. However, her claims were dismissed before trial, and time spent on her deposition and those related to it have accordingly been excluded from Plaintiffs' work hours pursuant to their exercise of billing judgment. (David Borgen Decl., Doc. No. 308, ¶¶ 31, 63.)

4    In fleshing out this standard in oral argument, Plaintiffs' counsel pointed out that, while the standard for fee recovery is an *ex post* determination of success, the reasonableness of work performed for purposes of compensability is measured from the *ex ante* perspective of the attorney at the time the work was actually performed.

5    The Court also acknowledges Plaintiffs' averments as to how a number of the non-testifying witness depositions were in fact used to advance arguments at trial. (Borgen Supp. Decl. ¶ 18.) It seems logical that, had these depositions not been taken, Plaintiffs' counsel would have been in a very different position during trial preparation, and that difference may have affected the likelihood of success.

6    The Court is unclear as to the monetary amount actually sought by Plaintiffs during the period of time in which they were proceeding as a 3500-member class. Defendant avers that, at this point, Plaintiff sought $25,000,000. Plaintiffs, however, contend that this figure reflects only Plaintiffs' pre-discovery assessment of the potential value of the case, and that the amount of Plaintiffs' actual demand was redacted from Defendant's submission to this Court. (Pl. Reply, at 13 n. 20.)

7    The coercion standard that the Court ultimately adopted is "free from any coercion whatever." (July 2008 Order, at 36.)

8    The parties do not discuss the remaining eight *Johnson* factors in their briefs. To the extent these factors were applicable, the Court did consider them, but concluded that no other fee adjustments were necessary.

9    A few of Defendant's objections were addressed and cured by Plaintiffs' Amended Bill of Costs (Doc. No. 362), filed with their Reply brief. The Court will not address any such objections.

**End of Document**

© 2021 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 54

# Exhibit 6

**UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
(COLUMBIA DIVISION)**

|  |  |
|---|---|
| *In re SCANA Corporation Securities Litigation* | Civil Action No. 3:17-CV-2616-MBS<br><br>CLASS ACTION |

**DECLARATION OF JAMES W. JOHNSON IN SUPPORT OF LEAD COUNSEL'S
MOTION FOR ATTORNEYS' FEES AND LITIGATION EXPENSES
FILED ON BEHALF OF LABATON SUCHAROW LLP**

I, James W. Johnson, hereby declare under penalty of perjury as follows:

1.      I am a partner of the law firm of Labaton Sucharow LLP ("Labaton Sucharow").[1] My firm serves as Lead Counsel for Lead Plaintiffs and the Settlement Class in the above-captioned action (the "Action").  I submit this declaration in support of Lead Counsel's application for an award of attorneys' fees in connection with services rendered in the Action, as well as for payment of litigation expenses incurred in connection with the Action.  I have personal knowledge of the facts set forth herein and, if called upon, could and would testify thereto.

2.      My firm, as one of the Lead Counsel firms, was involved in all aspects of the prosecution and settlement of the Action, as set forth in the Joint Declaration of John C. Browne and James W. Johnson in Support of (I) Lead Plaintiffs' Motion for Final Approval of Class Action Settlement and Plan of Allocation and (II) Lead Counsel's Motion for Award of Attorneys' Fees and Litigation Expenses, submitted herewith.

---

[1] Unless otherwise defined in this Declaration, all capitalized terms have the meanings set out in the Stipulation and Agreement of Settlement, dated December 20, 2019 (ECF No. 214-2).

3.    The schedule attached hereto as Exhibit A is a detailed summary indicating the amount of time spent by attorneys and professional support staff employees of my firm who, from inception of the Action through and including March 31, 2020, devoted ten or more hours to the Action, and the lodestar calculation for those individuals based on my firm's current hourly rates.  For personnel who are no longer employed by my firm, the lodestar calculation is based upon the hourly rates for such personnel in his or her final year of employment by my firm.  The schedule was prepared from daily time records regularly prepared and maintained by my firm.  No time expended on the application for fees and expenses has been included.

4.    The hourly rates shown in Exhibit A are the current rates set by the firm for each individual.  The hourly rates are comparable to rates accepted by courts for lodestar cross-checks in other securities class action litigation fee applications.

5.    After the deduction noted above, the total number of hours expended on this Action by my firm from its inception through and including March 31, 2020, is 16,697.1.  The total lodestar for my firm for that period is $8,540,972.00.

6.    My firm's lodestar figures are based upon the firm's hourly rates, which do not include expense items.  Expense items are recorded separately, and these amounts are not duplicated in my firm's hourly rates.

7.    As detailed in Exhibit B, my firm is seeking payment for a total of $334,246.34 in expenses incurred from inception of the Action through and including April 15, 2020.

8.    The Litigation Expenses reflected in Exhibit B are the actual expenses or reflect "caps" based on the application of the following criteria:

(a)    Out-of-town travel – airfare is at coach rates; hotel charges per night are capped at $350 for higher-cost cities and $250 for lower-cost cities (the relevant cities and how they are categorized are reflected on Exhibit B); and meals are capped at $25 per

2

person for breakfast, $35 per person for lunch, $75 per person for dinner, and at cost for in-room hotel meals.

(b)    Out-of-Office Working Meals – capped at $25 per person for breakfast, $35 per person for lunch, and $75 per person for dinner.

(c)    In-Office Working Meals – capped at $20 per person for lunch and $30 per person for dinner.

(d)    Internal Copying/Printing – charged at $0.20 per page for black & white copies, and $0.40 per page for color copies.

(e)    On-Line Research – charges reflected are for out-of-pocket payments to the vendors for research done in connection with this Action. On-line research is billed to each case based on a set charge by the vendor. There are no administrative charges by my firm included in these figures.

9.    With respect to the standing of my firm, attached hereto as Exhibit C is a firm résumé, which includes information about my firm and biographical information concerning its partners and of counsel.

I declare, under penalty of perjury, that the foregoing facts are true and correct. Executed on April 22, 2020.

_____
JAMES W. JOHNSON

3

# Exhibit A

**EXHIBIT A**

*In re SCANA Corporation Securities Litigation*
Civil Action No. 3:17-CV-2616-MBS

**LABATON SUCHAROW LLP**

**TIME REPORT**

Inception through and including March 31, 2020

| NAME | HOURS | HOURLY RATE | LODESTAR |
|---|---|---|---|
| **Partners** | | | |
| Keller, C. | 121.0 | $1,100 | $133,100.00 |
| Johnson, J. | 1,017.5 | $1,075 | $1,093,812.50 |
| Zeiss, N. | 54.1 | $950 | $51,395.00 |
| Rogers, M. | 329.5 | $895 | $294,902.50 |
| Vasilchenko, I. | 1,747.7 | $800 | $1,398,160.00 |
| McConville, F. | 171.1 | $775 | $132,602.50 |
| **Of Counsel** | | | |
| Rosenberg, E. | 68.5 | $775 | $53,087.50 |
| McGovern, J. | 50.0 | $775 | $38,750.00 |
| Esmay, J. | 23.8 | $725 | $17,255.00 |
| **Associates** | | | |
| Cividini, D. | 218.6 | $625 | $136,625.00 |
| Schmidt, M. | 215.1 | $500 | $107,550.00 |
| Christie, J. | 964.4 | $475 | $458,090.00 |
| Halloran, J. | 160.9 | $475 | $76,427.50 |
| Hane, C. | 457.6 | $465 | $212,784.00 |
| Leggio, P. | 1,741.0 | $450 | $783,450.00 |
| **Staff Attorneys** | | | |
| Gill, C. | 1,055.7 | $410 | $432,837.00 |
| Pospischil, D. | 882.3 | $410 | $361,743.00 |
| Dolinger, L. | 875.7 | $410 | $359,037.00 |
| Whitfield, L. | 874.7 | $410 | $358,627.00 |
| Davis, O. | 677.1 | $390 | $264,069.00 |

4

| NAME | HOURS | HOURLY RATE | LODESTAR |
|---|---|---|---|
| Kussin, T. | 142.5 | $390 | $55,575.00 |
| Patrikios, P. | 1,166.6 | $360 | $419,976.00 |
| Haque, N. | 2,416.5 | $335 | $809,527.50 |
| **Research Analysts** | | | |
| Ahn, E. | 21.9 | $340 | $7,446.00 |
| Rivera, E. | 21.0 | $290 | $6,090.00 |
| O'Neill, G. | 37.7 | $175 | $6,597.50 |
| **Investigators** | | | |
| Pontrelli, J. | 252.5 | $550 | $138,875.00 |
| Wroblewski, R. | 31.0 | $450 | $13,950.00 |
| Crowley, M. | 171.4 | $435 | $74,559.00 |
| **Paralegals** | | | |
| Mundo, S. | 556.3 | $335 | $186,360.50 |
| Schneider, P. | 51.7 | $335 | $17,319.50 |
| Boria, C. | 33.2 | $335 | $11,122.00 |
| Chan-Lee, E. | 29.0 | $335 | $9,715.00 |
| Rogers, D. | 21.7 | $335 | $7,269.50 |
| Molloy, M. | 26.0 | $325 | $8,450.00 |
| Alayo, J. | 11.8 | $325 | $3,835.00 |
| **TOTALS** | **16,697.1** | | **$8,540,972.00** |

**Exhibit B**

**EXHIBIT B**

*In re SCANA Corporation Securities Litigation*
Civil Action No. 3:17-CV-2616-MBS

**LABATON SUCHAROW LLP**

**EXPENSE REPORT**

Inception through and including April 15, 2020

| CATEGORY | AMOUNT |
|---|---|
| On-Line Legal/Factual Research | $21,676.15 |
| Long Distance Telephone/Conference Calls | $678.48 |
| Postage/Express Mail/Hand Delivery Charges | $1,020.45 |
| Local Work-Related Transportation | $8,593.07 |
| Copying/Printing Costs | $33,746.50 |
| Out of Town Travel* | $30,473.58 |
| Local Work-Related Meals | $5,066.27 |
| Court Reporting & Transcripts | $10,824.65 |
| Experts - Damages/Loss Causation | $139,885.55 |
| Filing Fees | $120.00 |
| Litigation Support | $60,061.64 |
| Mediation | $22,100.00 |
| **TOTAL EXPENSES:** | **$334,246.34** |

\*       Travel includes lodging for Labaton Sucharow employees in the following higher-cost cities capped at $350 per night:  New York, NY; Vancouver, BC; Palm Beach, FL and Arlington, VA and the following lower-cost cities capped at $250 per night: Charleston, WV and Columbia, SC.  It also includes an estimate of $1,790.00 for one attorney to travel to the Settlement Fairness Hearing, in the event in-person attendance is required.  If attendance is not required, these estimated costs will not be paid to Labaton Sucharow.

**Exhibit C**

**EXHIBIT C**

*In re SCANA Corporation Securities Litigation*
Civil Action No. 3:17-CV-2616-MBS

**LABATON SUCHAROW LLP**

**FIRM RESUME**



# Firm Resume

## Securities Class Action Litigation

New York, NY    |    Wilmington, DE    |    Washington, D.C.

www.labaton.com

**Labaton
Sucharow**

# Table of Contents

About the Firm ................................................................................................................................... 1

    Notable Successes ...................................................................................................................... 2

    Lead Counsel Appointments in Ongoing Litigation ........................................................... 6

    Innovative Legal Strategy ......................................................................................................... 7

    Appellate Advocacy and Trial Experience .......................................................................... 8

Our Clients ......................................................................................................................................... 9

Awards and Accolades ................................................................................................................... 10

Community Involvement ............................................................................................................... 11

    Firm Commitments .................................................................................................................. 11

    Individual Attorney Commitments ....................................................................................... 12

Commitment to Diversity .............................................................................................................. 13

Securities Litigation Attorneys .................................................................................................... 14

**Labaton**
**Sucharow**

# About the Firm

Founded in 1963, Labaton Sucharow LLP has earned a reputation as one of the leading plaintiffs' firms in the United States. We have recovered more than $12 billion and secured corporate governance reforms on behalf of the nation's largest institutional investors, including public pension and Taft-Hartley funds, hedge funds, investment banks, and other financial institutions. These recoveries include more than $1 billion in *In re American International Group, Inc. Securities Litigation,* $671 million in *In re HealthSouth Securities Litigation*, $624 million in *In re Countrywide Financial Corporation Securities Litigation*, and $473 million in *In re Schering-Plough/ENHANCE Securities Litigation.*

As a leader in the field of complex litigation, the Firm has successfully conducted class, mass, and derivative actions in the following areas: securities; antitrust; financial products and services; corporate governance and shareholder rights; mergers and acquisitions; derivative; REITs and limited partnerships; consumer protection; and whistleblower representation.

Along with securing newsworthy recoveries, the Firm has a track record for successfully prosecuting complex cases from discovery to trial to verdict. In court, as *Law360* has noted, our attorneys are known for "fighting defendants tooth and nail." Our appellate experience includes winning appeals that increased settlement value for clients, and securing a landmark 2013 U.S. Supreme Court victory benefitting all investors by reducing barriers to the certification of securities class action cases.

Our Firm is equipped to deliver results with a robust infrastructure of more than 60 full-time attorneys, a dynamic professional staff, and innovative technological resources. Labaton Sucharow attorneys are skilled in every stage of business litigation and have challenged corporations from every sector of the financial markets. Our professional staff includes paralegals, financial analysts, e-discovery specialists, a certified public accountant, a certified fraud examiner, and a forensic accountant. With seven investigators, including former members of federal and state law enforcement, we have one of the largest in-house investigative teams in the securities bar. Managed by a law enforcement veteran who spent 12 years with the FBI, our internal investigative group provides us with information that is often key to the success of our cases.

Outside of the courtroom, the Firm is known for its leadership and participation in investor protection organizations, such as the Council for Institutional Investors, World Federation of Investors, National Association of Shareholder and Consumer Attorneys, as well as serving as a patron of the John L. Weinberg Center for Corporate Governance of the University of Delaware. The Firm shares these groups' commitment to a market that operates with greater transparency, fairness, and accountability.

Labaton Sucharow has been consistently ranked as a top-tier firm in leading industry publications such as *Chambers & Partners USA*, *The Legal 500*, and *Benchmark Litigation*. For the past decade, the Firm was listed on *The National Law Journal*'s Plaintiffs' Hot List and was inducted to the Hall of Fame for successive honors. The Firm has also been featured as one of *Law360*'s Most Feared Plaintiffs Firms and Class Action and Securities Law Practice Groups of the Year.

Visit www.labaton.com for more information about our Firm.

**Labaton Sucharow**

# Securities Class Action Litigation

Labaton Sucharow is a leader in securities litigation and a trusted advisor to more than 300 institutional investors. Since the passage of the Private Securities Litigation Reform Act of 1995 (PSLRA), the Firm has recovered more than $9 billion in the aggregate for injured investors through securities class actions prosecuted throughout the United States and against numerous public corporations and other corporate wrongdoers.

These notable recoveries would not be possible without our exhaustive case evaluation process. The Firm has developed a proprietary system for portfolio monitoring and reporting on domestic and international securities litigation, and currently provides these services to more than 300 institutional investors, which manage collective assets of more than $2 trillion. The Firm's in-house licensed investigators also gather crucial details to support our cases, whereas other firms rely on outside vendors, or conduct no confidential investigation at all.

As a result of our thorough case evaluation process, our securities litigators can focus solely on cases with strong merits. The benefits of our selective approach are reflected in the low dismissal rate of the securities cases we pursue, which is well below the industry average. Over the past decade, we have successfully prosecuted headline-making class actions against AIG, Countrywide, Fannie Mae, and Bear Stearns, among others.

## Notable Successes

Labaton Sucharow has achieved notable successes in financial and securities class actions on behalf of investors, including the following:

- *In re American International Group, Inc. Securities Litigation*, No. 04-cv-8141 (S.D.N.Y.)

  In one of the most complex and challenging securities cases in history, Labaton Sucharow secured more than $1 billion in recoveries on behalf of lead plaintiff Ohio Public Employees' Retirement System in a case arising from allegations of bid rigging and accounting fraud. To achieve this remarkable recovery, the Firm took over 100 depositions and briefed 22 motions to dismiss. The settlement entailed a $725 million settlement with American International Group (AIG), $97.5 million settlement with AIG's auditors, $115 million settlement with former AIG officers and related defendants, and an additional $72 million settlement with General Reinsurance Corporation, which was approved by the Second Circuit on September 11, 2013.

- *In re Countrywide Financial Corp. Securities Litigation*, No. 07-cv-05295 (C.D. Cal.)

  Labaton Sucharow, as lead counsel for the New York State Common Retirement Fund and the five New York City public pension funds, sued one of the nation's largest issuers of mortgage loans for credit risk misrepresentations. The Firm's focused investigation and discovery efforts uncovered incriminating evidence that led to a $624 million settlement for investors. On February 25, 2011, the court granted final approval to the settlement, which is one of the top 20 securities class action settlements in the history of the PSLRA.

- *In re HealthSouth Corp. Securities Litigation*, No. 03-cv-01500 (N.D. Ala.)

  Labaton Sucharow served as co-lead counsel to New Mexico State Investment Council in a case stemming from one of the largest frauds ever perpetrated in the healthcare industry. Recovering $671 million for the class, the settlement is one of the top 15 securities class action settlements of all

time. In early 2006, lead plaintiffs negotiated a settlement of $445 million with defendant HealthSouth. On June 12, 2009, the court also granted final approval to a $109 million settlement with defendant Ernst & Young LLP. In addition, on July 26, 2010, the court granted final approval to a $117 million partial settlement with the remaining principal defendants in the case, UBS AG, UBS Warburg LLC, Howard Capek, Benjamin Lorello, and William McGahan.

▪ *In re Schering-Plough/ENHANCE Securities Litigation, No. 08-cv-00397 (D. N.J.)*

As co-lead counsel, Labaton Sucharow obtained a $473 million settlement on behalf of co-lead plaintiff Massachusetts Pension Reserves Investment Management Board. After five years of litigation, and three weeks before trial, the settlement was approved on October 1, 2013. This recovery is one of the largest securities fraud class action settlements against a pharmaceutical company. The Special Masters' Report noted, "**the outstanding result achieved for the class is the direct product of outstanding skill and perseverance by Co-Lead Counsel...no one else...could have produced the result here—no government agency or corporate litigant to lead the charge and the Settlement Fund is the product solely of the efforts of Plaintiffs' Counsel**."

▪ *In re Waste Management, Inc. Securities Litigation, No. H-99-2183 (S.D. Tex.)*

In 2002, the court approved an extraordinary settlement that provided for recovery of $457 million in cash, plus an array of far-reaching corporate governance measures. Labaton Sucharow represented lead plaintiff Connecticut Retirement Plans and Trust Funds. At that time, this settlement was the largest common fund settlement of a securities action achieved in any court within the Fifth Circuit and the third largest achieved in any federal court in the nation. Judge Harmon noted, among other things, that Labaton Sucharow "**obtained an outstanding result by virtue of the quality of the work and vigorous representation of the class.**"

▪ *In re General Motors Corp. Securities Litigation, No. 06-cv-1749 (E.D. Mich.)*

As co-lead counsel in a case against automotive giant, General Motors (GM), and Deloitte & Touche LLP (Deloitte), its auditor, Labaton Sucharow obtained a settlement of $303 million—one of the largest settlements ever secured in the early stages of a securities fraud case. Lead plaintiff Deka Investment GmbH alleged that GM, its officers, and its outside auditor overstated GM's income by billions of dollars, and GM's operating cash flows by tens of billions of dollars, through a series of accounting manipulations. The final settlement, approved on July 21, 2008, consisted of a cash payment of $277 million by GM and $26 million in cash from Deloitte.

▪ *Arkansas Teacher Retirement System v. State Street Corp., No. 11-cv-10230 (D. Mass)*

Labaton Sucharow served as lead counsel for the plaintiff Arkansas Teacher Retirement System (ATRS) in this securities class action against Boston-based financial services company, State Street Corporation (State Street). On November 2, 2016, the court granted final approval of the $300 million settlement with State Street. The plaintiffs claimed that State Street, as custodian bank to a number of public pension funds, including ATRS, was responsible for foreign exchange (FX) trading in connection with its clients global trading. Over a period of many years, State Street systematically overcharged those pension fund clients, including Arkansas, for those FX trades.

▪ *Wyatt v. El Paso Corp., No. H-02-2717 (S.D. Tex.)*

Labaton Sucharow secured a $285 million class action settlement against the El Paso Corporation on behalf of co-lead plaintiff, an individual. The case involved a securities fraud stemming from the company's inflated earnings statements, which cost shareholders hundreds of millions of dollars during a four-year span. On March 6, 2007, the court approved the settlement and also commended the

efficiency with which the case had been prosecuted, particularly in light of the complexity of the allegations and the legal issues.

- ### *In re Bear Stearns Cos., Inc. Securities, Derivative & ERISA Litigation, No. 08-cv-2793 (S.D.N.Y.)*

Labaton Sucharow served as co-lead counsel, representing lead plaintiff, the State of Michigan Retirement Systems, and the class. The action alleged that Bear Stearns and certain officers and directors made misstatements and omissions in connection with Bear Stearns' financial condition, including losses in the value of its mortgage-backed assets and Bear Stearns' risk profile and liquidity. The action further claimed that Bear Stearns' outside auditor, Deloitte & Touche LLP, made misstatements and omissions in connection with its audits of Bear Stearns' financial statements for fiscal years 2006 and 2007. Our prosecution of this action required us to develop a detailed understanding of the arcane world of packaging and selling subprime mortgages. Our complaint has been called a "tutorial" for plaintiffs and defendants alike in this fast-evolving area. After surviving motions to dismiss, on November 9, 2012, the court granted final approval to settlements with the Bear Stearns defendants for $275 million and with Deloitte for $19.9 million.

- ### *In re Massey Energy Co. Securities Litigation, No. 10-CV-00689 (S.D. W.Va.)*

As co-lead counsel representing the Commonwealth of Massachusetts Pension Reserves Investment Trust, Labaton Sucharow achieved a $265 million all-cash settlement in a case arising from one of the most notorious mining disasters in U.S. history. On June 4, 2014, the settlement was reached with Alpha Natural Resources, Massey's parent company. Investors alleged that Massey falsely told investors it had embarked on safety improvement initiatives and presented a new corporate image following a deadly fire at one of its coal mines in 2006. After another devastating explosion which killed 29 miners in 2010, Massey's market capitalization dropped by more than $3 billion. Judge Irene C. Berger noted that "**Class counsel has done an expert job of representing all of the class members to reach an excellent resolution and maximize recovery for the class.**"

- ### *Eastwood Enterprises, LLC v. Farha (WellCare Securities Litigation), No. 07-cv-1940 (M.D. Fla.)*

On behalf of The New Mexico State Investment Council and the Public Employees Retirement Association of New Mexico, Labaton Sucharow served as co-lead counsel and negotiated a $200 million settlement over allegations that WellCare Health Plans, Inc., a Florida-based managed healthcare service provider, disguised its profitability by overcharging state Medicaid programs. Under the terms of the settlement approved by the court on May 4, 2011, WellCare agreed to pay an additional $25 million in cash if, at any time in the next three years, WellCare was acquired or otherwise experienced a change in control at a share price of $30 or more after adjustments for dilution or stock splits.

- ### *In re Bristol-Myers Squibb Securities Litigation, No. 00-cv-1990 (D.N.J.)*

Labaton Sucharow served as lead counsel representing the lead plaintiff, union-owned LongView Collective Investment Fund of the Amalgamated Bank, against drug company Bristol-Myers Squibb (BMS). Lead plaintiff claimed that the company's press release touting its new blood pressure medication, Vanlev, left out critical information, other results from the clinical trials indicated that Vanlev appeared to have life-threatening side effects. The FDA expressed serious concerns about these side effects, and BMS released a statement that it was withdrawing the drug's FDA application, resulting in the company's stock price falling and losing nearly 30 percent of its value in a single day. After a five year battle, we won relief on two critical fronts. First, we secured a $185 million recovery for shareholders, and second, we negotiated major reforms to the company's drug development

process that will have a significant impact on consumers and medical professionals across the globe. Due to our advocacy, BMS must now disclose the results of clinical studies on all of its drugs marketed in any country.

- ***In re Fannie Mae 2008 Securities Litigation*, No. 08-cv-7831 (S.D.N.Y.)**

As co-lead counsel representing co-lead plaintiff Boston Retirement System, Labaton Sucharow secured a $170 million settlement on March 3, 2015 with Fannie Mae. Lead plaintiffs alleged that Fannie Mae and certain of its current and former senior officers violated federal securities laws, by making false and misleading statements concerning the company's internal controls and risk management with respect to Alt-A and subprime mortgages. Lead plaintiffs also alleged that defendants made misstatements with respect to Fannie Mae's core capital, deferred tax assets, other-than-temporary losses, and loss reserves. This settlement is a significant feat, particularly following the unfavorable result in a similar case for investors of Fannie Mae's sibling company, Freddie Mac. Labaton Sucharow successfully argued that investors' losses were caused by Fannie Mae's misrepresentations and poor risk management, rather than by the financial crisis.

- ***In re Broadcom Corp. Class Action Litigation*, No. 06-cv-05036 (C.D. Cal.)**

Labaton Sucharow served as lead counsel on behalf of lead plaintiff New Mexico State Investment Council in a case stemming from Broadcom Corp.'s $2.2 billion restatement of its historic financial statements for 1998 - 2005. In August 2010, the court granted final approval of a $160.5 million settlement with Broadcom and two individual defendants to resolve this matter, the second largest up-front cash settlement ever recovered from a company accused of options backdating. Following a Ninth Circuit ruling confirming that outside auditors are subject to the same pleading standards as all other defendants, the district court denied Broadcom's auditor Ernst & Young's motion to dismiss on the ground of loss causation. This ruling is a major victory for the class and a landmark decision by the court—the first of its kind in a case arising from stock-options backdating. In October 2012, the court approved a $13 million settlement with Ernst & Young.

- ***In re Satyam Computer Services Ltd. Securities Litigation*, No. 09-md-2027 (S.D.N.Y.)**

Satyam, referred to as "India's Enron," engaged in one of the most egregious frauds on record. In a case that rivals the Enron and Bernie Madoff scandals, the Firm represented lead plaintiff UK-based Mineworkers' Pension Scheme, which alleged that Satyam Computer Services Ltd., related entities, its auditors, and certain directors and officers made materially false and misleading statements to the investing public about the company's earnings and assets, artificially inflating the price of Satyam securities. On September 13, 2011, the court granted final approval to a settlement with Satyam of $125 million and a settlement with the company's auditor, PricewaterhouseCoopers, in the amount of $25.5 million. Judge Barbara S. Jones commended lead counsel during the final approval hearing noting that the "**...quality of representation which I found to be very high...**"

- ***In re Mercury Interactive Corp. Securities Litigation*, No. 05-cv-3395 (N.D. Cal.)**

Labaton Sucharow served as co-lead counsel on behalf of co-lead plaintiff Steamship Trade Association/International Longshoremen's Association Pension Fund, which alleged Mercury backdated option grants used to compensate employees and officers of the company. Mercury's former CEO, CFO, and General Counsel actively participated in and benefited from the options backdating scheme, which came at the expense of the company's shareholders and the investing public. On September 25, 2008, the court granted final approval of the $117.5 million settlement.

- ***In re Oppenheimer Champion Fund Securities Fraud Class Actions**, **No. 09-cv-525 (D. Colo.) and *In re Core Bond Fund**, **No. 09-cv-1186 (D. Colo.)**

  Labaton Sucharow served as lead counsel and represented individuals and the proposed class in two related securities class actions brought against OppenheimerFunds, Inc., among others, and certain officers and trustees of two funds—Oppenheimer Core Bond Fund and Oppenheimer Champion Income Fund. The lawsuits alleged that the investment policies followed by the funds resulted in investor losses when the funds suffered drops in net asset value although the funds were presented as safe and conservative investments to consumers. In May 2011, the Firm achieved settlements amounting to $100 million: $52.5 million in *In re Oppenheimer Champion Fund Securities Fraud Class Actions*, and a $47.5 million settlement in *In re Core Bond Fund*.

- ***In re Computer Sciences Corporation Securities Litigation**, **No. 11-cv-610 (E.D. Va.)**

  As lead counsel representing Ontario Teachers' Pension Plan Board, Labaton Sucharow secured a $97.5 million settlement in this "rocket docket" case involving accounting fraud. The settlement was the third largest all cash recovery in a securities class action in the Fourth Circuit and the second largest all cash recovery in such a case in the Eastern District of Virginia. The plaintiffs alleged that IT consulting and outsourcing company Computer Sciences Corporation (CSC) fraudulently inflated its stock price by misrepresenting and omitting the truth about the state of its most visible contract and the state of its internal controls. In particular, the plaintiffs alleged that CSC assured the market that it was performing on a $5.4 billion contract with the UK National Health Services when CSC internally knew that it could not deliver on the contract, departed from the terms of the contract, and as a result, was not properly accounting for the contract. Judge T.S. Ellis, III stated, "**I have no doubt—that the work product I saw was always of the highest quality for both sides.**"

## Lead Counsel Appointments in Ongoing Litigation

Labaton Sucharow's institutional investor clients are regularly chosen by federal judges to serve as lead plaintiffs in prominent securities litigations brought under the PSLRA. Dozens of public pension funds and union funds have selected Labaton Sucharow to represent them in federal securities class actions and advise them as securities litigation/investigation counsel. Our recent notable lead and co-lead counsel appointments include the following:

- ***In re AT&T/DirecTV Now Securities Litigation**, **No. 19-cv-2892 (S.D.N.Y.)**

  Labaton Sucharow represents Steamfitters Local 449 Pension Plan in this securities class action against AT&T and multiple executives and directors of the company alleging wide-ranging fraud, abusive sales tactics, and misleading statements to the market concerning its streaming service, DirecTV Now.

- ***In re PG&E Corporation Securities Litigation**, **No. 18-cv-03509 (N.D. Cal.)**

  Labaton Sucharow represents the Public Employees Retirement Association of New Mexico in a securities class action lawsuit against PG&E related to wildfires that devastated Northern California in 2017.

- ***In re SCANA Corporation Securities Litigation**, **No. 17-cv-2616 (D.S.C.)**

  Labaton Sucharow represents the West Virginia Investment Management Board against SCANA Corporation and certain of the company's senior executives in this securities class action alleging false and misleading statements about the construction of two new nuclear power plants.

- ***Murphy v. Precision Castparts Corp.,*** **No. 16-cv-00521 (D. Or.)**

   Labaton Sucharow represents Oklahoma Firefighters Pension and Retirement System in this securities class action against Precision Castparts Corp., an aviation parts manufacturing conglomerate that produces complex metal parts primarily marketed to industrial and aerospace customers.

- ***In re Goldman Sachs Group, Inc. Securities Litigation,*** **No. 10-cv-03461 (S.D.N.Y.)**

   Labaton Sucharow represents Arkansas Teacher Retirement System in this high-profile litigation based on the scandals involving Goldman Sachs' sales of the Abacus CDO.

## Innovative Legal Strategy

Bringing successful litigation against corporate behemoths during a time of financial turmoil presents many challenges, but Labaton Sucharow has kept pace with the evolving financial markets and with corporate wrongdoer's novel approaches to committing fraud.

Our Firm's innovative litigation strategies on behalf of clients include the following:

- ***Mortgage-Related Litigation***

   In *In re Countrywide Financial Corporation Securities Litigation*, No. 07-cv-5295 (C.D. Cal.), our client's claims involved complex and data-intensive arguments relating to the mortgage securitization process and the market for residential mortgage-backed securities (RMBS) in the United States. To prove that defendants made false and misleading statements concerning Countrywide's business as an issuer of residential mortgages, Labaton Sucharow utilized both in-house and external expert analysis. This included state-of-the-art statistical analysis of loan level data associated with the creditworthiness of individual mortgage loans. The Firm recovered $624 million on behalf of investors.

   Building on its experience in this area, the Firm has pursued claims on behalf of individual purchasers of RMBS against a variety of investment banks for misrepresentations in the offering documents associated with individual RMBS deals.

- ***Options Backdating***

   In 2005, Labaton Sucharow took a pioneering role in identifying options-backdating practices as both damaging to investors and susceptible to securities fraud claims, bringing a case, *In re Mercury Interactive Securities Litigation*, No. 05-cv-3395 (N.D. Cal.), that spawned many other plaintiff recoveries.

   Leveraging its experience, the Firm went on to secure other significant options backdating settlements, in, for example, *In re Broadcom Corp. Class Action Litigation*, No. 06-cv-5036  (C.D. Cal.), and in *In re Take-Two Interactive Securities Litigation*, No. 06-cv-0803 (S.D.N.Y.). Moreover, in *Take-Two*, Labaton Sucharow was able to prompt the SEC to reverse its initial position and agree to distribute a disgorgement fund to investors, including class members. The SEC had originally planned for the fund to be distributed to the U.S. Treasury. As a result, investors received a very significant percentage of their recoverable damages.

- ***Foreign Exchange Transactions Litigation***

   The Firm has pursued or is pursuing claims for state pension funds against BNY Mellon and State Street Bank, the two largest custodian banks in the world. For more than a decade, these banks failed

to disclose that they were overcharging their custodial clients for foreign exchange transactions. Given the number of individual transactions this practice affected, the damages caused to our clients and the class were significant. Our claims, involving complex statistical analysis, as well as qui tam jurisprudence, were filed ahead of major actions by federal and state authorities related to similar allegations commenced in 2011. Our team favorably resolved the BNY Mellon matter in 2012. The case against State Street Bank resulted in a $300 million recovery.

## Appellate Advocacy and Trial Experience

When it is in the best interest of our clients, Labaton Sucharow repeatedly has demonstrated our willingness and ability to litigate these complex cases all the way to trial, a skill unmatched by many firms in the plaintiffs bar.

Labaton Sucharow is one of the few firms in the plaintiffs securities bar to have prevailed in a case before the U.S. Supreme Court. In *Amgen Inc. v. Connecticut Retirement Plans and Trust Funds*, 568 U.S. 455 (2013), the Firm persuaded the court to reject efforts to thwart the certification of a class of investors seeking monetary damages in a securities class action. This represents a significant victory for all plaintiffs in securities class actions.

In *In re Real Estate Associates Limited Partnership Litigation*, Labaton Sucharow's advocacy significantly increased the settlement value for shareholders. The defendants were unwilling to settle for an amount the Firm and its clients viewed as fair, which led to a six-week trial. The Firm and co-counsel ultimately obtained a landmark $184 million jury verdict. The jury supported the plaintiffs' position that the defendants knowingly violated the federal securities laws, and that the general partner had breached his fiduciary duties to shareholders. The $184 million award was one of the largest jury verdicts returned in any PSLRA action and one in which the class, consisting of 18,000 investors, recovered 100 percent of their damages.

**Labaton Sucharow**

# Our Clients

Labaton Sucharow represents and advises the following institutional investor clients, among others:

- Arkansas Teacher Retirement System

- Baltimore County Retirement System

- Boston Retirement System

- California State Teachers' Retirement System

- Chicago Teachers' Pension Fund

- City of New Orleans Employees' Retirement System

- Connecticut Retirement Plans & Trust Funds

- Division of Investment of the New Jersey Department of the Treasury

- Genesee County Employees' Retirement System

- Illinois Municipal Retirement Fund

- Indiana Public Retirement System

- Los Angeles County Employees Retirement Association

- Macomb County Employees Retirement System

- Metropolitan Atlanta Rapid Transit Authority

- Michigan Retirement Systems

- New York State Common Retirement Fund

- Norfolk County Retirement System

- Office of the Ohio Attorney General and several of its Retirement Systems

- Oklahoma Firefighters Pension and Retirement System

- Plymouth County Retirement System

- Office of the New Mexico Attorney General and several of its Retirement Systems

- Public Employees' Retirement System of Mississippi

- Public Employee Retirement System of Idaho

- Rhode Island State Investment Commission

- Santa Barbara County Employees' Retirement System

- State of Oregon Public Employees' Retirement System

- State of Wisconsin Investment Board

- Utah Retirement Systems

- Virginia Retirement System

- West Virginia Investment Management Board

**Labaton Sucharow**

# Awards and Accolades

Industry publications and peer rankings consistently recognize the Firm as a respected leader in securities litigation.

## Chambers & Partners USA

Leading Plaintiffs Securities Litigation Firm (2009-2019)

**"effective and greatly respected…a bench of partners who are highly esteemed by competitors and adversaries alike "**

## The Legal 500

Leading Plaintiffs Securities Litigation Firm and also recognized in Antitrust (2010-2019) and M&A Litigation (2013, 2015-2019)

**" 'Superb' and 'at the top of its game.' The Firm's team of 'hard-working lawyers, who push themselves to thoroughly investigate the facts' and conduct 'very diligent research.' "**

## Benchmark Litigation

Recommended in Securities Litigation Nationwide and in New York State (2012-2020); and Noted for Corporate Governance and Shareholder Rights Litigation in the Delaware Court of Chancery (2016-2020), Top 10 Plaintiffs Firm in the United States (2017-2020)

**"clearly living up to its stated mission 'reputation matters'…consistently earning mention as a respected litigation-focused firm fighting for the rights of institutional investors "**

## Law360

Most Feared Plaintiffs Firm (2013-2015); Class Action Practice Group of the Year (2012 and 2014-2018); and Securities Practice Group of the Year (2018)

**"known for thoroughly investigating claims and conducting due diligence before filing suit, and for fighting defendants tooth and nail in court "**

## The National Law Journal

Winner of the Elite Trial Lawyers Award in Securities Law (2015, 2019), Hall of Fame Honoree, and Top Plaintiffs' Firm on the annual Hot List (2006-2016)

**"definitely at the top of their field on the plaintiffs' side "**

**Labaton Sucharow**

# Community Involvement

To demonstrate our deep commitment to the community, Labaton Sucharow has devoted significant resources to pro bono legal work and public and community service.

## Firm Commitments

### Immigration Justice Campaign

Labaton Sucharow has partnered with the Immigration Justice Campaign to represent immigrants in their asylum proceedings.

### Brooklyn Law School Securities Arbitration Clinic

Labaton Sucharow partnered with Brooklyn Law School to establish a securities arbitration clinic. The program, which ran for five years, assisted defrauded individual investors who could not otherwise afford to pay for legal counsel and provided students with real-world experience in securities arbitration and litigation. Former Partners Mark S. Arisohn and Joel H. Bernstein led the program as adjunct professors.

### Change for Kids

Labaton Sucharow supports Change for Kids (CFK) as a Strategic Partner of P.S. 182 in East Harlem. One school at a time, CFK rallies communities to provide a broad range of essential educational opportunities at under-resourced public elementary schools. By creating inspiring learning environments at our partner schools, CFK enables students to discover their unique strengths and develop the confidence to achieve.

### The Lawyers' Committee for Civil Rights Under Law
### Edward Labaton, Member, Board of Directors

The Firm is a long-time supporter of The Lawyers' Committee for Civil rights Under Law, a nonpartisan, nonprofit organization formed in 1963 at the request of President John F. Kennedy. The Lawyers' Committee involves the private bar in providing legal services to address racial discrimination.

Labaton Sucharow attorneys have contributed on the federal level to U.S. Supreme Court nominee analyses (analyzing nominees for their views on such topics as ethnic equality, corporate diversity, and gender discrimination) and national voters' rights initiatives.

### Sidney Hillman Foundation

Labaton Sucharow supports the Sidney Hillman Foundation. Created in honor of the first president of the Amalgamated Clothing Workers of America, Sidney Hillman, the foundation supports investigative and progressive journalism by awarding monthly and yearly prizes. Partner Thomas A. Dubbs is frequently invited to present these awards.

# Individual Attorney Commitments

Labaton Sucharow attorneys give of themselves in many ways, both by volunteering and in leadership positions in charitable organizations. A few of the awards our attorneys have received or organizations they are involved in are:

- Awarded "Champion of Justice" by the Alliance for Justice, a national nonprofit association of over 100 organizations which represent a broad array of groups "committed to progressive values and the creation of an equitable, just, and free society."

- Pro bono representation of mentally ill tenants facing eviction, appointed as guardian ad litem in several housing court actions.

- Recipient of a Volunteer and Leadership Award from a tenants' advocacy organization for work defending the rights of city residents and preserving their fundamental sense of public safety and home.

- Board Member of the Ovarian Cancer Research Fund—the largest private funding agency of its kind supporting research into a method of early detection and, ultimately, a cure for ovarian cancer.

Our attorneys have also contributed to or continue to volunteer with the following charitable organizations, among others:

- American Heart Association
- Big Brothers/Big Sisters of New York City
- Boys and Girls Club of America
- Carter Burden Center for the Aging
- City Harvest
- City Meals-on-Wheels
- Coalition for the Homeless
- Cycle for Survival
- Cystic Fibrosis Foundation
- Dana Farber Cancer Institute
- Food Bank for New York City
- Fresh Air Fund
- Habitat for Humanity
- Lawyers Committee for Civil Rights

- Legal Aid Society
- Mentoring USA
- National Lung Cancer Partnership
- National MS Society
- National Parkinson Foundation
- New York Cares
- New York Common Pantry
- Peggy Browning Fund
- Sanctuary for Families
- Sandy Hook School Support Fund
- Save the Children
- Special Olympics
- Toys for Tots
- Williams Syndrome Association

**Labaton Sucharow**

# Commitment to Diversity

Recognizing that business does not always offer equal opportunities for advancement and collaboration to women, Labaton Sucharow launched its Women's Networking and Mentoring Initiative in 2007.

Led by Firm partners and co-chairs Serena P. Hallowell and Carol C. Villegas, the Women's Initiative reflects our commitment to the advancement of women professionals. The goal of the Initiative is to bring professional women together to collectively advance women's influence in business. Each event showcases a successful woman role model as a guest speaker. We actively discuss our respective business initiatives and hear the guest speaker's strategies for success. Labaton Sucharow mentors young women inside and outside of the firm and promotes their professional achievements. The Firm also is a member of the National Association of Women Lawyers (NAWL). For more information regarding Labaton Sucharow's Women's Initiative, please visit www.labaton.com/en/about/women/Womens-Initiative.cfm.

Further demonstrating our commitment to diversity in the legal profession and within our Firm, in 2006, we established the Labaton Sucharow Minority Scholarship and Internship. The annual award—a  grant and a summer associate position—is presented to a first-year minority student who is enrolled at a metropolitan New York law school and who has demonstrated academic excellence, community commitment, and personal integrity.

Labaton Sucharow has also instituted a diversity internship which brings two Hunter College students to work at the Firm each summer. These interns rotate through various departments, shadowing Firm partners and getting a feel for the inner workings of the Firm.

**Labaton Sucharow**

# Securities Litigation Attorneys

Our team of securities class action litigators includes:

## Partners

Christopher J. Keller (Chairman)

Lawrence A. Sucharow (Chairman Emeritus)

Eric J. Belfi

Michael P. Canty

Marisa N. DeMato

Thomas A. Dubbs

Christine M. Fox

Jonathan Gardner

David J. Goldsmith

Serena P. Hallowell

Thomas G. Hoffman, Jr.

James W. Johnson

Edward Labaton

Francis P. McConville

Domenico Minerva

Corban S. Rhodes

Michael H. Rogers

Ira A. Schochet

David J. Schwartz

Irina Vasilchenko

Carol C. Villegas

Ned Weinberger

Mark S. Willis

Nicole M. Zeiss

## Of Counsel

Rachel A. Avan

Mark Bogen

Jeffrey A. Dubbin

Joseph H. Einstein

John J. Esmay

Derrick Farrell

Alfred L. Fatale III

Mark Goldman

Lara Goldstone

James McGovern

Mark D. Richardson

Elizabeth Rosenberg

Detailed biographies of the team's qualifications and accomplishments follow.

## Christopher J. Keller, Chairman
ckeller@labaton.com

Christopher J. Keller focuses on complex securities litigation. His clients are institutional investors, including some of the world's largest public and private pension funds with tens of billions of dollars under management.

Described by *The Legal 500* as a "sharp and tenacious advocate" who "has his pulse on the trends," Chris has been instrumental in the Firm's appointments as lead counsel in some of the largest securities matters arising out of the financial crisis, such as actions against Countrywide ($624 million settlement), Bear Stearns ($275 million settlement with Bear Stearns Companies, plus a $19.9 million settlement with Deloitte & Touche LLP, Bear Stearns' outside auditor), Fannie Mae ($170 million settlement), and Goldman Sachs.

Chris has also been integral in the prosecution of traditional fraud cases such as *In re Schering-Plough Corporation / ENHANCE Securities Litigation*; *In re Massey Energy Co. Securities Litigation*, where the Firm obtained a $265 million all-cash settlement with Alpha Natural Resources, Massey's parent company; as well as *In re Satyam Computer Services, Ltd. Securities Litigation*, where the Firm obtained a settlement of more than $150 million. Chris was also a principal litigator on the trial team of *In re Real Estate Associates Limited Partnership Litigation*. The six-week jury trial resulted in a $184 million plaintiffs' verdict, one of the largest jury verdicts since the passage of the Private Securities Litigation Reform Act.

In addition to his active caseload, Chris holds a variety of leadership positions within the Firm, including serving on the Firm's Executive Committee. In response to the evolving needs of clients, Chris also established, and currently leads, the Case Development Group, which is composed of attorneys, in-house investigators, financial analysts, and forensic accountants. The group is responsible for evaluating clients' financial losses and analyzing their potential legal claims both in and outside of the U.S. and tracking trends that are of potential concern to investors.

Educating institutional investors is a significant element of Chris' advocacy efforts for shareholder rights. He is regularly called upon for presentations on developing trends in the law and new case theories at annual meetings and seminars for institutional investors.

He is a member of several professional groups, including the New York State Bar Association and the New York County Lawyers' Association. In 2017, he was elected to the New York City Bar Fund Board of Directors. The City Bar Fund is the nonprofit 501(c)(3) arm of the New York City Bar Association aimed at engaging and supporting the legal profession in advancing social justice."

He is admitted to practice in the States of New York and Ohio, as well as before the Supreme Court of the United States, and the United States District Courts for the Southern and Eastern Districts of New York, the Eastern District of Wisconsin, and the District of Colorado.

## Lawrence A. Sucharow, Chairman Emeritus
lsucharow@labaton.com

With more than four decades of experience, Lawrence A. Sucharow is an internationally recognized trial lawyer and a leader of the class action bar. Under his guidance, the Firm has grown into and earned its position as one of the top plaintiffs securities and antitrust class action firms in the world. As Chairman Emeritus, Larry focuses on counseling the Firm's large institutional clients, developing creative and compelling strategies to advance and protect clients' interests, and the prosecution and resolution of many of the Firm's leading cases.

Over the course of his career, Larry has prosecuted hundreds of cases and the Firm has recovered billions in groundbreaking securities, antitrust, business transaction, product liability, and other class actions. In fact, a landmark case tried in 2002—*In re Real Estate Associates Limited Partnership Litigation*—was the very first securities action successfully tried to a jury verdict following the enactment of the Private Securities Litigation

Reform Act (PSLRA). Experience such as this has made Larry uniquely qualified to evaluate and successfully prosecute class actions.

Other representative matters include: *In re CNL Resorts, Inc. Securities Litigation* ($225 million settlement); *In re Paine Webber Incorporated Limited Partnerships Litigation* ($200 million settlement); *In re Prudential Securities Incorporated Limited Partnerships Litigation* ($110 million partial settlement); *In re Prudential Bache Energy Income Partnerships Securities Litigation* ($91 million settlement) and *Shea v. New York Life Insurance Company* (over $92 million settlement).

Larry's consumer protection experience includes leading the national litigation against the tobacco companies in *Castano v. American Tobacco Co.*, as well as litigating *In re Imprelis Herbicide Marketing, Sales Practices and Products Liability Litigation*. Currently, he plays a key role in *In re Takata Airbag Products Liability Litigation* and a nationwide consumer class action against Volkswagen Group of America, Inc., arising out of the wide-scale fraud concerning Volkswagen's "Clean Diesel" vehicles. Larry further conceptualized the establishment of two Dutch foundations, or "Stichtingen" to pursue settlement of claims against Volkswagen on behalf of injured car owners and investors in Europe.

In recognition of his career accomplishments and standing in the securities bar at the Bar, Larry was selected by *Law360* as one the 10 Most Admired Securities Attorneys in the United States and as a Titan of the Plaintiffs Bar. Further, he is one of a small handful of plaintiffs' securities lawyers in the United States recognized by *Chambers & Partners USA*, *The Legal 500*, *Benchmark Litigation*, and *Lawdragon 500* for his successes in securities litigation. Referred to as a "legend" by his peers in *Benchmark Litigation*, *Chambers* describes him as an "an immensely respected plaintiff advocate" and a "renowned figure in the securities plaintiff world…[that] has handled some of the most high-profile litigation in this field." According to *The Legal 500*, clients characterize Larry as a "a strong and passionate advocate with a desire to win." In addition, Brooklyn Law School honored Larry with the 2012 Alumni of the Year Award for his notable achievements in the field.

In 2018, Larry was appointed to serve on Brooklyn Law School's Board of Trustees. He has served a two-year term as President of the National Association of Shareholder and Consumer Attorneys, a membership organization of approximately 100 law firms that practice complex civil litigation including class actions. A longtime supporter of the Federal Bar Council, Larry serves as a trustee of the Federal Bar Council Foundation. He is a member of the Federal Bar Council's Committee on Second Circuit Courts, and the Federal Courts Committee of the New York County Lawyers' Association. He is also a member of the Securities Law Committee of the New Jersey State Bar Association and was the Founding Chairman of the Class Action Committee of the Commercial and Federal Litigation Section of the New York State Bar Association, a position he held from 1988-1994. In addition, Larry serves on the Advocacy Committee of the World Federation of Investors Corporation, a worldwide umbrella organization of national shareholder associations. In 2019, Larry was honored with the National Law Journal's Elite Trial Lawyers Lifetime Achievement Award. In May 2013, Larry was elected Vice Chair of the International Financial Litigation Network, a network of law firms from 15 countries seeking international solutions to cross-border financial problems.

Larry is admitted to practice in the States of New York, New Jersey, and Arizona as well as before the Supreme Court of the United States, the United States Court of Appeals for the Second Circuit, and the United States District Courts for the Southern and Eastern Districts of New York, and the District of New Jersey.

## Eric J. Belfi, Partner
ebelfi@labaton.com

Representing many of the world's leading pension funds and other institutional investors, Eric J. Belfi is an accomplished litigator with experience in a broad range of commercial matters. Eric focuses on domestic and international securities and shareholder litigation, as well as direct actions on behalf of governmental entities. He serves as a member of the Firm's Executive Committee.

As an integral member of the Firm's Case Development Group, Eric has brought numerous high-profile domestic securities cases that resulted from the credit crisis, including the prosecution against Goldman Sachs. In *In re Goldman Sachs Group, Inc. Securities Litigation*, he played a significant role in the investigation and drafting of the operative complaint. Eric was also actively involved in securing a combined settlement of $18.4 million in *In re Colonial BancGroup, Inc. Securities Litigation*, regarding material misstatements and omissions in SEC filings by Colonial BancGroup and certain underwriters.

Along with his domestic securities litigation practice, Eric leads the Firm's Non-U.S. Securities Litigation Practice, which is dedicated exclusively to analyzing potential claims in non-U.S. jurisdictions and advising on the risk and benefits of litigation in those forums. The practice, one of the first of its kind, also serves as liaison counsel to institutional investors in such cases, where appropriate. Currently, Eric represents nearly 30 institutional investors in over a dozen non-U.S. cases against companies including SNC-Lavalin Group Inc. in Canada, Vivendi Universal, S.A. in France, OZ Minerals Ltd. in Australia, Lloyds Banking Group in the UK, and Olympus Corporation in Japan.

Eric's international experience also includes securing settlements on behalf of non-U.S. clients including the UK-based Mineworkers' Pension Scheme in *In re Satyam Computer Securities Services Ltd. Securities Litigation*, an action related to one of the largest securities fraud in India which resulted in $150.5 million in collective settlements. Representing two of Europe's leading pension funds, Deka Investment GmbH and Deka International S.A., Luxembourg, in *In re General Motors Corp. Securities Litigation*, Eric was integral in securing a $303 million settlement in a case regarding multiple accounting manipulations and overstatements by General Motors.

Additionally, Eric oversees the Financial Products and Services Litigation Practice, focusing on individual actions against malfeasant investment bankers, including cases against custodial banks that allegedly committed deceptive practices relating to certain foreign currency transactions. Most recently, he served as lead counsel to Arkansas Teacher Retirement System in a class action against State Street Corporation and certain affiliated entities alleging misleading actions in connection with foreign currency exchange trades, which resulted in a $300 million recovery. He has also represented the Commonwealth of Virginia in its False Claims Act case against Bank of New York Mellon, Inc.

Eric's M&A and derivative experience includes noteworthy cases such as *In re Medco Health Solutions Inc. Shareholders Litigation*, in which he was integrally involved in the negotiation of the settlement that included a significant reduction in the termination fee.

Eric's prior experience included serving as an Assistant Attorney General for the State of New York and as an Assistant District Attorney for the County of Westchester. As a prosecutor, Eric investigated and prosecuted white-collar criminal cases, including many securities law violations. He presented hundreds of cases to the grand jury and obtained numerous felony convictions after jury trials.

Eric is a member of the National Association of Public Pension Attorneys (NAPPA) Securities Litigation Working Group. He has spoken on the topics of shareholder litigation and U.S.-style class actions in European countries and has discussed socially responsible investments for public pension funds.

Eric is admitted to practice in the State of New York, as well as before the United States Court of Appeals for the Tenth Circuit, and the United States District Courts for the Southern and Eastern Districts of New York, the Eastern District of Michigan, the District of Colorado, the District of Nebraska, and the Eastern District of Wisconsin.

## Michael P. Canty, Partner
mcanty@labaton.com

Michael P. Canty prosecutes complex fraud cases on behalf of institutional investors and consumers. Upon joining Labaton, Michael successfully prosecuted a number of high profile securities matters involving

technology companies including cases against AMD, a multi-national semiconductor company and Ubiquiti Networks, Inc., a global software company. In both cases Michael played a pivotal role in securing favorable settlements for investors.  Recommended by *The Legal 500* in the field of securities litigation, Michael also is an accomplished litigator with more than a decade of trial experience in matters relating to national security, white collar crime, and cybercrime. He currently serves as General Counsel to the Firm.

Prior to joining Labaton Sucharow, Michael was a federal prosecutor in the United States Attorney's Office for the Eastern District of New York, where he served as the Deputy Chief of the Office's General Crimes Section. Michael also served in the Office's National Security and Cybercrimes Section. During his time as lead prosecutor, Michael investigated and prosecuted complex and high-profile white collar, national security, and cybercrime offenses. He also served as an Assistant District Attorney for the Nassau County District Attorney's Office, where he handled complex state criminal offenses and served in the Office's Homicide Unit.

Michael has extensive trial experience both from his days as a prosecutor in New York City for the United States Department of Justice and during his six years as an Assistant District Attorney. He served as trial counsel in more than 35 matters, many of which related to violent crime, white collar and terrorism related offenses. He played a pivotal role in *United States v. Abid Naseer*, where he prosecuted and convicted an al-Qaeda operative who conspired to carry out attacks in the United States and Europe. Michael also led the investigation in *United States v. Marcos Alonso Zea*, a case in which he successfully prosecuted a citizen for attempting to join a terrorist organization in the Arabian Peninsula and for providing material support intended for planned attacks.

Michael also has a depth of experience investigating and prosecuting cases involving the distribution of prescription opioids. In January 2012, Michael was assigned to the U.S. Attorney's Office Prescription Drug Initiative to mount a comprehensive response to what the United States Department of Health and Human Services' Center for Disease Control and Prevention has called an epidemic increase in the abuse of so-called opioid analgesics. As a member of the initiative, in *United States. v. Conway* and *United States v. Deslouches* Michael successfully prosecuted medical professionals who were illegally prescribing opioids. In *United States v. Moss et al.* he was responsible for dismantling one of the largest oxycodone rings operating in the New York metropolitan area at the time. In addition to prosecuting these cases, Michael spoke regularly to the community on the dangers of opioid abuse as part of the Office's community outreach.

Additionally, Michael has extensive experience in investigating and prosecuting data breach cases

Before becoming a prosecutor, Michael worked as a Congressional Staff Member for the United States House of Representatives. He primarily served as a liaison between the Majority Leader's Office and the Government Reform and Oversight Committee. During his time with the House of Representatives, Michael managed congressional oversight of the United States Postal Service and reviewed and analyzed counter-narcotics legislation as it related to national security matters.

Michael is admitted to practice in the State of New York as well as before the United States Courts of Appeals for the Second Circuit, and the United States District Court for the Eastern District of New York.

## Marisa N. DeMato, Partner
mdemato@labaton.com

With more than 15 years of securities litigation experience, Marisa N. DeMato advises leading pension funds and other institutional investors in the United States and Canada on issues related to corporate fraud in the U.S. securities markets and represents them in complex civil actions. Her work focuses on counseling clients on best practices in corporate governance of publicly traded companies and advising institutional investors on monitoring the well-being of their investments. Marisa also advises and counsels municipalities and health plans on issues related to U.S. antitrust law and potential violations.

Recently, Marisa represented Seattle City Employees' Retirement System and helped reach a $90 million derivative settlement and historic corporate governance changes with Twenty-First Century Fox, Inc., regarding allegations surrounding workplace harassment incidents at Fox News. Marisa also represented the Oklahoma Firefighters Pension and Retirement System in securing an $11 million settlement with Rent-A-Center, Inc. to resolve claims that the company made false and misleading statements regarding its point of sale information management system. She also served as legal adviser to the West Palm Beach Police Pension Fund in *In re Walgreen Co. Derivative Litigation*, which secured significant corporate governance reforms and required Walgreens to extend its Drug Enforcement Agency commitments as part of the settlement related to the company's violation of the U.S. Controlled Substances Act.

Prior to joining Labaton Sucharow, Marisa worked for a nationally recognized securities litigation firm and devoted a substantial portion of her time to litigating securities fraud, derivative, mergers and acquisitions, and consumer fraud. Over the course of those eight years she represented numerous pension funds, municipalities, and individual investors throughout the United States and was an integral member of the legal teams that helped secure multimillion dollar settlements, including *In re Managed Care Litigation* ($135 million recovery); *Cornwell v. Credit Suisse Group* ($70 million recovery); *Michael v. SFBC International, Inc.* ($28.5 million recovery); *Ross v. Career Education Corporation* ($27.5 million recovery); and *Village of Dolton v. Taser International Inc.* ($20 million recovery).

Marisa has spoken on shareholder litigation-related matters, frequently lecturing on topics pertaining to securities fraud litigation, fiduciary responsibility, and corporate governance issues. Most recently, she testified before the Texas House of Representatives Pensions Committee to address the changing legal landscape public pensions have faced since the Supreme Court's Morrison decision and highlighted the best practices for non-U.S. investment recovery. During the 2008 financial crisis, Marisa spoke widely on the subprime mortgage crisis and its disastrous effect on the pension fund community at regional and national conferences, and addressed the crisis' global implications and related fraud to institutional investors internationally in Italy, France, and the United Kingdom. Marisa has also presented on issues pertaining to the federal regulatory response to the 2008 crisis, including implications of the Dodd-Frank legislation and the national debate on executive compensation and proxy access for shareholders.

Marisa is an active member of the National Association of Public Pension Attorneys (NAPPA) and the National Association of Securities Professionals (NASP). She is also a member of the Federal Bar Council, an organization of lawyers dedicated to promoting excellence in federal practice and fellowship among federal practitioners.

Marisa has also become one of the leading advocates for institutional investing in women and minority-owned investment firms. In 2018, she served as co-chair of the Firm's first annual Women's Initiative forum focusing on institutional investing in women and minority-owned investment firms. Marisa was instrumental in the development and execution of the programming for the inaugural event, which featured two all-female panels, and was praised by attendees for offering an insightful discussion on how pension funds and other institutional investors can provide opportunities for women and minority-owned firms.

In the spring of 2006, Marisa was selected over 250,000 applicants to appear on the sixth season of The Apprentice, which aired on January 7, 2007, on NBC. As a result of her role on *The Apprentice*, Marisa has appeared in numerous news media outlets, such as *The Wall Street Journal*, *People* magazine, and various national legal journals.

Marisa is admitted to practice in the State of Florida and the District of Columbia as well as before the United States District Courts for the Northern, Middle, and Southern Districts of Florida.

## Thomas A. Dubbs, Partner
tdubbs@labaton.com

Thomas A. Dubbs focuses on the representation of institutional investors in domestic and multinational securities cases. Recognized as a leading securities class action attorney, Tom has been named as a top litigator by *Chambers & Partners* for nine consecutive years.

Tom has served or is currently serving as lead or co-lead counsel in some of the most important federal securities class actions in recent years, including those against American International Group, Goldman Sachs, the Bear Stearns Companies, Facebook, Fannie Mae, Broadcom, and WellCare. Tom has also played an integral role in securing significant settlements in several high-profile cases including: *In re American International Group, Inc. Securities Litigation* (settlements totaling more than $1 billion); *In re Bear Stearns Companies, Inc. Securities Litigation* ($275 million settlement with Bear Stearns Companies, plus a $19.9 million settlement with Deloitte & Touche LLP, Bear Stearns' outside auditor); *In re HealthSouth Securities Litigation* ($671 million settlement); *Eastwood Enterprises LLC v. Farha et al.* (*WellCare Securities Litigation*) (over $200 million settlement); *In re Fannie Mae 2008 Securities Litigation* ($170 million settlement); *In re Broadcom Corp. Securities Litigation* ($160.5 million settlement with Broadcom, plus $13 million settlement with Ernst & Young LLP, Broadcom's outside auditor); *In re St. Paul Travelers Securities Litigation* ($144.5 million settlement); *In re Amgen Inc. Securities Litigation* ($95 million settlement); and *In re Vesta Insurance Group, Inc. Securities Litigation* ($79 million settlement).

Representing an affiliate of the Amalgamated Bank, the largest labor-owned bank in the United States, a team led by Tom successfully litigated a class action against Bristol-Myers Squibb, which resulted in a settlement of $185 million as well as major corporate governance reforms. He has argued before the United States Supreme Court and has argued 10 appeals dealing with securities or commodities issues before the United States Courts of Appeals.

Due to his reputation in securities law, Tom frequently lectures to institutional investors and other groups such as the Government Finance Officers Association, the National Conference on Public Employee Retirement Systems, and the Council of Institutional Investors. He is a prolific author of articles related to his field, and he recently penned "Textualism and Transnational Securities Law: A Reappraisal of Justice Scalia's Analysis in *Morrison v. National Australia Bank*," *Southwestern Journal of International Law* (2014). He has also written several columns in UK-wide publications regarding securities class action and corporate governance.

Prior to joining Labaton Sucharow, Tom was Senior Vice President & Senior Litigation Counsel for Kidder, Peabody & Co. Incorporated, where he represented the company in many class actions, including the First Executive and Orange County litigation and was first chair in many securities trials. Before joining Kidder, Tom was head of the litigation department at Hall, McNicol, Hamilton & Clark, where he was the principal partner representing Thomson McKinnon Securities Inc. in many matters, including the Petro Lewis and Baldwin-United class actions.

In addition to his *Chambers & Partners* recognition, Tom was named a Leading Lawyer by *The Legal 500*, and inducted into its Hall of Fame, an honor presented to only three other plaintiffs securities litigation lawyers "who have received constant praise by their clients for continued excellence." *Law360* also named him an "MVP of the Year" for distinction in class action litigation in 2012 and 2015, and he has been recognized by *The National Law Journal*, *Lawdragon 500*, and *Benchmark Litigation* as a Securities Litigation Star. Tom has received a rating of AV Preeminent from the publishers of the Martindale-Hubbell directory.

Tom serves as a FINRA Arbitrator and is an Advisory Board Member for the Institute for Transnational Arbitration. He is a member of the New York State Bar Association, the Association of the Bar of the City of New York, the American Law Institute, and he is a Patron of the American Society of International Law. He was previously a member of the Members Consultative Group for the Principles of the Law of Aggregate Litigation and the Department of State Advisory Committee on Private International Law. Tom also serves on the Board of Directors for The Sidney Hillman Foundation.

Tom is admitted to practice in the State of New York as well as before the Supreme Court of the United States, the United States Courts of Appeals for the Second, Third, Fourth, Ninth, and Eleventh Circuits, and the United States District Court for the Southern District of New York.

## Christine M. Fox, Partner
cfox@labaton.com

With more than 20 years of securities litigation experience, Christine M. Fox prosecutes complex securities fraud cases on behalf of institutional investors. Christine is actively involved in litigating matters against Molina Healthcare, Hain Celestial, Avon, Adient, AT&T, and Apple.

Christine has played a pivotal role in securing favorable settle for investors in class actions against Barrick Gold Corporation, one of the largest gold mining companies in the world ($140 million recovery); CVS Caremark, the nation's largest pharmacy retail chain ($48 million recovery); Nu Skin Enterprises, a multilevel marketing company ($47 million recovery); and Intuitive Surgical, a manufacturer of robotic-assisted technologies for surgery ($42.5 million recovery).

Prior to joining the Firm, Christine worked at a national litigation firm focusing on securities, antitrust, and consumer litigation in state and federal courts. She played a significant role in securing class action recoveries in a number of high-profile securities cases, including I*n re Merrill Lynch & Co., Inc. Research Reports Securities Litigation* ($475 million recovery); *In re Informix Corp. Securities Litigation* ($136.5 million recovery); *In re Alcatel Alsthom Securities Litigation* ($75 million recovery); and *In re Ambac Financial Group, Inc. Securities Litigation* ($33 million recovery).

Christine received her J.D. from the University of Michigan Law School and her B.A. from Cornell University. She is a member of the American Bar Association, the New York State Bar Association, and the Puerto Rican Bar Association. Christine is actively involved in Labaton Sucharow's pro bono immigration program and recently reunited a father and child separated at the border. She is currently working on their asylum application.

Christine is conversant in Spanish.

Christine is admitted to the practice in the State of New York as well as before the United States District Courts for the Southern and Eastern Districts of New York.

## Jonathan Gardner, Partner
jgardner@labaton.com

Jonathan Gardner serves as Head of Litigation for the Firm. With more than 28 years of experience, Jonathan oversees all of the Firm's litigation matters, including prosecuting complex securities fraud cases on behalf of institutional investors. He has played an integral role in securing some of the largest class action recoveries against corporate offenders since the global financial crisis.

A *Benchmark Litigation* "Star" acknowledged by his peers as "engaged and strategic," Jonathan was also named an MVP by *Law360* for securing hard-earned successes in high-stakes litigation and complex global matters. Recently, he led the Firm's team in the investigation and prosecution of *In re Barrick Gold Securities Litigation*, which resulted in a $140 million recovery. Jonathan has also served as the lead attorney in several cases resulting in significant recoveries for injured class members, including: *In re Hewlett-Packard Company Securities Litigation*, resulting in a $57 million recovery; *Public Employees' Retirement System of Mississippi v. Endo International PLC*, resulting in $50 million recovery; *Medoff v. CVS Caremark Corporation*, resulting in a $48 million recovery; *In re Nu Skin Enterprises, Inc., Securities Litigation*, resulting in a $47 million recovery; *In re Intuitive Surgical Securities Litigation*, resulting in a $42.5 million recovery; *In re Carter's Inc. Securities Litigation*, resulting in a $23.3 million recovery against Carter's and certain of its officers as well as PricewaterhouseCoopers, its auditing firm; *In re Aeropostale Inc. Securities Litigation*, resulting in a $15 million

recovery; *In re Lender Processing Services Inc.*, involving claims of fraudulent mortgage processing which resulted in a $13.1 million recovery; and *In re K-12, Inc. Securities Litigation*, resulting in a $6.75 million recovery.

Recommended and described by *The Legal 500* as having the "ability to master the nuances of securities class actions," Jonathan has led the Firm's representation of investors in many recent high-profile cases including *Rubin v. MF Global Ltd.*, which involved allegations of material misstatements and omissions in a Registration Statement and Prospectus issued in connection with MF Global's IPO in 2007. In November 2011, the case resulted in a recovery of $90 million for investors. Jonathan also represented lead plaintiff City of Edinburgh Council as Administering Authority of the Lothian Pension Fund in *In re Lehman Brothers Equity/Debt Securities Litigation*, which resulted in settlements exceeding $600 million against Lehman Brothers' former officers and directors, Lehman's former public accounting firm as well the banks that underwrote Lehman Brothers' offerings. In representing lead plaintiff Massachusetts Bricklayers and Masons Trust Funds in an action against Deutsche Bank, Jonathan secured a $32.5 million recovery for a class of investors injured by the bank's conduct in connection with certain residential mortgage-backed securities.

Jonathan has also been responsible for prosecuting several of the Firm's options backdating cases, including *In re Monster Worldwide, Inc. Securities Litigation* ($47.5 million settlement); *In re SafeNet, Inc. Securities Litigation* ($25 million settlement); *In re Semtech Securities Litigation* ($20 million settlement); and *In re MRV Communications, Inc. Securities Litigation* ($10 million settlement). He also was instrumental in *In re Mercury Interactive Corp. Securities Litigation*, which settled for $117.5 million, one of the largest settlements or judgments in a securities fraud litigation based on options backdating. Jonathan also represented the Successor Liquidating Trustee of Lipper Convertibles, a convertible bond hedge fund, in actions against the fund's former independent auditor and a member of the fund's general partner as well as numerous former limited partners who received excess distributions. He successfully recovered over $5.2 million for the Successor Liquidating Trustee from the limited partners and $29.9 million from the former auditor.

He is a member of the Federal Bar Council, New York State Bar Association, and the Association of the Bar of the City of New York.

Jonathan is admitted to practice in the State of New York as well as before the United States Court of Appeals for the First, Sixth, Ninth, and Eleventh Circuits, and the United States District Courts for the Southern and Eastern Districts of New York, and the Eastern District of Wisconsin.

## David J. Goldsmith, Partner
dgoldsmith@labaton.com

David J. Goldsmith has nearly 20 years of experience representing public and private institutional investors in a variety of securities and class action litigations. He has twice been recommended by *The Legal 500* as part of the Firm's recognition as a top-tier plaintiffs firm in securities class action litigation.

A principal litigator at the Firm, David is responsible for the Firm's appellate practice, and has briefed and argued multiple appeals in the federal Courts of Appeals. He is presently litigating appeals in the Second and Ninth Circuits in significant securities class actions brought against Petróleo Brasileiro S.A. — Petrobras and Molina Healthcare, Inc.. In the Supreme Court of the United States, David recently acted as co-counsel for AARP and AARP Foundation as *amici curiae* in *China Agritech, Inc. v. Resh*, 138 S. Ct. 1800 (2018), and as co-counsel for a group of federal jurisdiction and securities law scholars as amici curiae in *Cyan, Inc. v. Beaver County Employees Retirement Fund*, 138 S. Ct. 1061 (2018).

As a trial lawyer, David was an integral member of the team representing the Arkansas Teacher Retirement System in a significant action alleging unfair and deceptive practices by State Street Bank in connection with foreign currency exchange trades executed for its custodial clients. The resulting $300 million settlement is the largest class action settlement ever reached under the Massachusetts consumer protection statute, and one of the largest class action settlements reached in the First Circuit. David also represented the New York State

Common Retirement Fund and New York City pension funds as lead plaintiffs in the landmark *In re Countrywide Financial Corp. Securities Litigation*, which settled for $624 million. He has successfully represented state and county pension funds in class actions in California state court arising from the IPOs of technology companies, and recovered tens of millions of dollars for a large German bank and a major Irish special-purpose vehicle in individual actions alleging fraud in connection with the sale of residential mortgage-backed securities. David's representation of a hedge fund and individual investors as lead plaintiffs in an action concerning the well-publicized collapse of four Regions Morgan Keegan mutual funds led to a $62 million settlement.

David regularly advises the Genesee County (Michigan) Employees' Retirement Commission with respect to potential securities, shareholder, and antitrust claims, and represents the System in a major action charging a conspiracy by some of the world's largest banks to manipulate the U.S. Dollar ISDAfix benchmark interest rate. This case was featured in Law360's selection of the Firm as a Class Action Group of the Year for 2017.

In 2016, David participated in a panel moderated by Prof. Arthur Miller at the 22nd Annual Symposium of the Institute for Law and Economic Policy, discussing changes in Rule 23 since the 1966 Amendments. David is an active member of several professional organizations, including The National Association of Shareholder & Consumer Attorneys (NASCAT), a membership organization of approximately 100 law firms that practice complex civil litigation including class actions, the American Association for Justice, New York State Bar Association, and the Association of the Bar of the City of New York.

During law school, David was Managing Editor of the *Cardozo Arts & Entertainment Law Journal* and served as a judicial intern to the Honorable Michael B. Mukasey, then a United States District Judge for the Southern District of New York.

For many years, David has been a member of AmorArtis, a renowned choral organization with a diverse repertoire.

He is admitted to practice in the States of New York and New Jersey as well as before the United States Courts of Appeals for the First, Second, Fourth, Fifth, Eighth, and Ninth Circuits, and the United States District Courts for the Southern and Eastern Districts of New York, the District of New Jersey, the District of Colorado, and the Western District of Michigan.

## Serena P. Hallowell, Partner
shallowell@labaton.com

Serena P. Hallowell leads the Direct Action Litigation Practice and focuses on complex litigation, prosecuting securities fraud cases on behalf of some of the world's largest institutional investors, including pension funds, hedge funds, mutual funds, asset managers, and other large institutional investors. Serena also regularly advises and/or represents institutional investors who are seeking counsel on evaluating recovery opportunities in connection with fraud-related conduct. In addition to her active caseload, Serena serves as Co-Chair of the Firm's Women's Networking and Mentoring Initiative and is actively involved in the Firm's summer associate and lateral hiring programs.

Recently, Serena was recognized as a 2019 MVP in Securities by *Law360*, a "Trailblazer" by *The National Law Journal*, a Future Star by *Benchmark Litigation*, and as one of the leading lawyers in America by *Lawdragon*. She has also been recommended by *The Legal 500* in securities litigation, and named a Rising Star by *Law360*.

Currently she is prosecuting cases against Valeant Pharmaceuticals and Endo International, among others. Recently, in Endo, the parties have announced an agreement in principle to settle the matter. Also, in Valeant, Serena leads a team that won a significant motion in the District of New Jersey, when the court sustained claims arising under the NJ RICO Act in direct actions filed against Valeant.

Serena was part of a highly skilled team that reached a $140 million settlement against one of the world's largest gold mining companies in *In re Barrick Gold Securities Litigation*. Playing a principal role in prosecuting *In re Computer Sciences Corporation Securities Litigation* in a "rocket docket" jurisdiction, she helped secure a settlement of $97.5 million on behalf of lead plaintiff Ontario Teachers' Pension Plan Board, the third largest all cash settlement in the Fourth Circuit at the time. She was also instrumental in securing a $48 million recovery in *Medoff v. CVS Caremark Corporation*, as well as a $41.5 million settlement in *In re NII Holdings, Inc. Securities Litigation*. Serena also has broad appellate and trial experience.

Serena received a J.D. from Boston University School of Law, where she served as the Note Editor for the Journal of Science & Technology Law. She earned a B.A. in Political Science from Occidental College.

Serena is a member of the New York City Bar Association, where she serves on the Securities Litigation Committee, the Federal Bar Council, the South Asian Bar Association, the National Association of Public Pension Attorneys (NAPPA), and the National Association of Women Lawyers (NAWL). Her pro bono work includes representing immigrant detainees in removal proceedings for the American Immigrant Representation Project and devoting time to the Securities Arbitration Clinic at Brooklyn Law School.

She is conversational in Urdu/Hindi.

Serena is admitted to practice in the State of New York, as well as before the United States Courts of Appeals for the First, Ninth, and Eleventh Circuits, and the United States District Courts for the Southern and Eastern Districts of New York.

## Thomas G. Hoffman, Jr., Partner
thoffman@labaton.com

Thomas G. Hoffman, Jr. focuses on representing institutional investors in complex securities actions.

Thomas was instrumental in securing a $1 billion recovery in the eight-year litigation against AIG and related defendants. He also was a key member of the Labaton Sucharow team that recovered $170 million for investors in *In re 2008 Fannie Mae Securities Litigation*. Currently, Thomas is prosecuting cases against BP and Allstate.

Thomas received a J.D. from UCLA School of Law, where he was Editor-in-Chief of the UCLA *Entertainment Law Review*, and he served as a Moot Court Executive Board Member. In addition, he was a judicial extern to the Honorable William J. Rea, United States District Court for the Central District of California. Thomas earned a B.F.A., with honors, from New York University.

Thomas is admitted to practice in the State of New York as well as before the United States District Courts for the Southern and Eastern Districts of New York.

## James W. Johnson, Partner
jjohnson@labaton.com

James W. Johnson focuses on complex securities fraud cases. In representing investors who have been victimized by securities fraud and breaches of fiduciary responsibility, Jim's advocacy has resulted in record recoveries for wronged investors. Currently, he is prosecuting high-profile cases against financial industry leader Goldman Sachs in *In re Goldman Sachs Group, Inc., Securities Litigation,* and SCANA, an energy-based holding company, in *In re SCANA Securities Litigation*. In addition to his active caseload, Jim holds a variety of leadership positions within the Firm, including serving on the Firm's Executive Committee. He also serves as the Firm's Executive Partner overseeing firmwide issues.

A recognized leader in his field, Jim has successfully litigated a number of complex securities and RICO class actions including: *In re Bear Stearns Companies, Inc. Securities Litigation* ($275 million settlement with Bear

Stearns Companies, plus a $19.9 million settlement with Deloitte & Touche LLP, Bear Stearns' outside auditor); *In re HealthSouth Corp. Securities Litigation* ($671 million settlement); *Eastwood Enterprises LLC v. Farha et al.* (WellCare Securities Litigation) ($200 million settlement); *In re Bristol Myers Squibb Co. Securities Litigation* ($185 million settlement), in which the court also approved significant corporate governance reforms and recognized plaintiff's counsel as "extremely skilled and efficient"; *In re Amgen Inc. Securities Litigation* ($95 million settlement); *In re National Health Laboratories, Inc. Securities Litigation*, which resulted in a recovery of $80 million in the federal action and a related state court derivative action; and *In re Vesta Insurance Group, Inc. Securities Litigation* ($79 million settlement).

In *County of Suffolk v. Long Island Lighting Co.*, Jim represented the plaintiff in a RICO class action, securing a jury verdict after a two-month trial that resulted in a $400 million settlement. The Second Circuit quoted the trial judge, Honorable Jack B. Weinstein, as stating "counsel [has] done a superb job [and] tried this case as well as I have ever seen any case tried." On behalf of the Chugach Native Americans, he also assisted in prosecuting environmental damage claims resulting from the Exxon Valdez oil spill.

Jim is a member of the American Bar Association and the Association of the Bar of the City of New York, where he served on the Federal Courts Committee, and he is a Fellow in the Litigation Council of America.

Jim has received a rating of AV Preeminent from the publishers of the Martindale-Hubbell directory.

He is admitted to practice in the States of New York and Illinois as well as before the Supreme Court of the United States, the United States Courts of Appeals for the Second, Third, Fourth, Fifth, Seventh, and Eleventh Circuits, and the United States District Courts for the Southern, Eastern, and Northern Districts of New York, and the Northern District of Illinois.

## Edward Labaton, Partner
elabaton@labaton.com

An accomplished trial lawyer and partner with the Firm, Edward Labaton has devoted 50 years of practice to representing a full range of clients in class action and complex litigation matters in state and federal court. He is the recipient of the Alliance for Justice's 2015 Champion of Justice Award, given to outstanding individuals whose life and work exemplifies the principle of equal justice.

Ed has played a leading role as plaintiffs' class counsel in a number of successfully prosecuted, high-profile cases, involving companies such as PepsiCo, Dun & Bradstreet, Financial Corporation of America, ZZZZ Best, Revlon, GAF Co., American Brands, Petro Lewis and Jim Walter, as well as several Big Eight (now Four) accounting firms. He has also argued appeals in state and federal courts, achieving results with important precedential value.

Ed has been President of the Institute for Law and Economic Policy (ILEP) since its founding in 1996. Each year, ILEP co-sponsors at least one symposium with a major law school dealing with issues relating to the civil justice system. In 2010, he was appointed to the newly formed Advisory Board of George Washington University's Center for Law, Economics, & Finance (C-LEAF), a think tank within the Law School, for the study and debate of major issues in economic and financial law confronting the United States and the globe. Ed is an Honorary Lifetime Member of the Lawyers' Committee for Civil Rights under Law, a member of the American Law Institute, and a life member of the ABA Foundation. In addition, he has served on the Executive Committee and has been an officer of the Ovarian Cancer Research Fund since its inception in 1996.

Ed is the past Chairman of the Federal Courts Committee of the New York County Lawyers Association, and was a member of the Board of Directors of that organization. He is an active member of the Association of the Bar of the City of New York, where he was Chair of the Senior Lawyers' Committee and served on its Task Force on the Role of Lawyers in Corporate Governance. He has also served on its Federal Courts, Federal Legislation, Securities Regulation, International Human Rights, and Corporation Law Committees. He also served as Chair of the Legal Referral Service Committee, a joint committee of the New York County Lawyers'

Association and the Association of the Bar of the City of New York. He has been an active member of the American Bar Association, the Federal Bar Council, and the New York State Bar Association, where he has served as a member of the House of Delegates.

For more than 30 years, he has lectured on many topics including federal civil litigation, securities litigation, and corporate governance.

He is admitted to practice in the State of New York as well as before the Supreme Court of the United States, the United States Courts of Appeals for the Second, Fifth, Sixth, Seventh, Ninth, Tenth, and Eleventh Circuits, and the United States District Courts for the Southern and Eastern Districts of New York, and the Central District of Illinois.

## Francis P. McConville, Partner
fmcconville@labaton.com

Francis P. McConville focuses on prosecuting complex securities fraud cases on behalf of institutional investor clients. As a lead member of the Firm's Case Development Group, he focuses on the identification, investigation, and development of potential actions to recover investment losses resulting from violations of the federal securities laws and various actions to vindicate shareholder rights in response to corporate and fiduciary misconduct.

Most recently, Francis has played a key role in filing several matters on behalf of the Firm including, *In re PG&E Corporation Securities Litigation*; *In re SCANA Corporation Securities Litigation*; *Steamfitters Local 449 Pension Plan v. Skechers U.S.A., Inc.*; and *In re Nielsen Holdings PLC Securities Litigation*.

Prior to joining Labaton Sucharow, Francis was a litigation associate at a national law firm primarily focused on securities and consumer class action litigation. Francis has represented institutional and individual clients in federal and state court across the country in class action securities litigation and shareholder disputes, along with a variety of commercial litigation matters. He assisted in the prosecution of several matters, including *Kiken v. Lumber Liquidators Holdings, Inc.* ($42 million recovery); *Hayes v. MagnaChip Semiconductor Corp.* ($23.5 million recovery); and *In re Galena Biopharma, Inc. Securities Litigation* ($20 million recovery).

Francis received his J.D. from New York Law School, *magna cum laude*, where he served as Associate Managing Editor of the *New York Law School Law Review*, worked in the Urban Law Clinic, named a John Marshall Harlan Scholar, and received a Public Service Certificate. He earned his B.A. from the University of Notre Dame.

He is admitted to practice in the State of New York as well as in the United States District Courts for the Southern and Eastern Districts of New York, the District of Colorado, and the Eastern District of Michigan.

## Domenico Minerva, Partner
dminerva@labaton.com

Domenico "Nico" Minerva advises leading pension funds and other institutional investors on issues related to corporate fraud in the U.S. securities markets. A former financial advisor, his work focuses on securities, antitrust, and consumer class action litigation and shareholder derivative litigation, representing Taft-Hartley and public pension funds across the country.

Nico's extensive experience litigating securities cases includes those against global securities systems company Tyco and co-defendant PricewaterhouseCoopers (*In re Tyco International Ltd., Securities Litigation*), which resulted in a $3.2 billion settlement, achieving the largest single defendant settlement in post-PSLRA history. He also has counseled companies and institutional investors on corporate governance reform.

Nico has also done substantial work in antitrust class actions in pay-for-delay or "product hopping" cases in which pharmaceutical companies allegedly obstructed generic competitors in order to preserve monopoly profits on patented drugs, including *Mylan Pharmaceuticals Inc. v. Warner Chilcott Public Limited Co.*, *In re Lidoderm Antitrust Litigation*, *In re Solodyn (MinocyclineHydrochloride) Antitrust Litigation*, *In re Niaspan Antitrust Litigation*, *In re Aggrenox Antitrust Litigation*, and *Sergeants Benevolent Association Health & Welfare Fund et al. v. Actavis PLC et al.* In an anticompetitive antitrust matter, *The Infirmary LLC vs. National Football League Inc et al.*, Nico played a part in challenging an exclusivity agreement between the NFL and DirectTV over the service's "NFL Sunday Ticket" package, and he litigated on behalf of indirect purchasers of potatoes in a case alleging that growers conspired to control and suppress the nation's potato supply *In re Fresh and Process Potatoes Antitrust Litigation*.

On behalf of consumers, Nico represented a plaintiff in *In Re ConAgra Foods Inc.* over its claims that Wesson-brand vegetable oils are 100 percent natural.

An accomplished speaker, Nico has given numerous presentations to investors on a variety of topics of interest regarding corporate fraud, wrongdoing, and waste. He is also an active member of the National Association of Public Pension Plan Attorneys (NAPPA).

Nico obtained his J.D. from Tulane University Law School, where he also completed a two-year externship with the Honorable Kurt D. Engelhardt of the United States District Court for the Eastern District of Louisiana. He earned his B.S. in Business Administration from the University of Florida.

Nico is admitted to practice in the States of New York and Delaware, as well as the United States District Courts for the Eastern and Southern Districts of New York.

## Corban S. Rhodes, Partner
crhodes@labaton.com

Corban S. Rhodes focuses on prosecuting complex securities fraud cases on behalf of institutional investors, as well as consumer data privacy litigation.

Currently, Corban represents shareholders litigating fraud-based claims against TerraVia (formerly Solazyme) and Alexion Pharmaceuticals. He has successfully litigated dozens of cases against most of the largest Wall Street banks in connection with their underwriting and securitization of mortgage-backed securities leading up to the financial crisis.

Recognized as a "Rising Star" in Consumer Protection Law by *Law360*, Corban is also pursuing a number of matters involving consumer data privacy, including cases of intentional misuse or misappropriation of consumer data, and cases of negligence or other malfeasance leading to data breaches, including *In re Facebook Biometric Information Privacy Litigation* and *Schwartz v. Yahoo Inc*.

Before joining Labaton Sucharow, Corban was an associate at Sidley Austin LLP where he practiced complex commercial litigation and securities regulation and served as the lead associate on behalf of large financial institutions in several investigations by regulatory and enforcement agencies related to the financial crisis.

In 2008, Corban received a Thurgood Marshall Award for his pro bono representation on a habeas petition of a capital punishment sentence. He also later co-authored "Parmalat Judge: Fraud by Former Executives of Bankrupt Company Bars Trustee's Claims Against Auditors," published by the American Bar Association.

Corban received a J.D., *cum laude*, from Fordham University School of Law, where he received the 2007 Lawrence J. McKay Advocacy Award for excellence in oral advocacy and was a board member of the Fordham Moot Court team. He earned his B.A., *magna cum laude*, in History from Boston College.

Corban serves on the Securities Litigation Committee of the New York City Bar Association. Additionally, *Super Lawyers*, a Thomson Reuters publication, recognized Corban as a New York Metro "Rising Star," noting his experience and contribution to the securities litigation field.

Corban is admitted to practice in the State of New York, as well as before the United States Court of Appeals for the Second Circuit and the United States District Courts for Southern District of New York and the Central District of California.

## Michael H. Rogers, Partner
mrogers@labaton.com

Michael H. Rogers focuses on prosecuting complex securities fraud cases on behalf of institutional investors. Currently, Mike is actively involved in prosecuting *In re Goldman Sachs, Inc. Securities Litigation*; *3226701 Canada, Inc. v. Qualcomm, Inc.*; *In re SCANA Securities Litigation, Murphy v. Precision Castparts Corp.*; and *Vancouver Asset Alumni Holdings, Inc. v. Daimler AG.*

Since joining Labaton Sucharow, Mike has been a member of the lead counsel teams in federal class actions against Countrywide Financial Corp. ($624 million settlement), HealthSouth Corp. ($671 million settlement), State Street ($300 million settlement), Mercury Interactive Corp. ($117.5 million settlement), and Computer Sciences Corp. ($97.5 million settlement).

Prior to joining Labaton Sucharow, Mike was an attorney at Kasowitz, Benson, Torres & Friedman LLP, where he practiced securities and antitrust litigation, representing international banking institutions bringing federal securities and other claims against major banks, auditing firms, ratings agencies and individuals in complex multidistrict litigation. He also represented an international chemical shipping firm in arbitration of antitrust and other claims against conspirator ship owners.

Mike began his career as an attorney at Sullivan & Cromwell, where he was part of Microsoft's defense team in the remedies phase of the Department of Justice antitrust action against the company.

Mike received a J.D., *magna cum laude*, from the Benjamin N. Cardozo School of Law, Yeshiva University, where he was a member of the *Cardozo Law Review*. He earned a B.A., *magna cum laude*, in Literature-Writing from Columbia University.

Mike is proficient in Spanish.

He is admitted to practice in the State of New York as well as before the United States Court of Appeals for the Second and Ninth Circuits, and the United States District Courts for the Southern and Eastern Districts of New York.

## Ira A. Schochet, Partner
ischochet@labaton.com

A seasoned litigator with three decades of experience, Ira A. Schochet focuses on class actions involving securities fraud. Ira has played a lead role in securing multimillion dollar recoveries in high-profile cases such as those against Countrywide Financial Corporation ($624 million), Weatherford International Ltd ($120 million), Massey Energy Company ($265 million), Caterpillar Inc. ($23 million), Autoliv Inc. ($22.5 million), and Fifth Street Financial Corp. ($14 million).

A longtime leader in the securities class action bar, Ira represented one of the first institutional investors acting as a lead plaintiff in a post-Private Securities Litigation Reform Act case and ultimately obtained one of the first rulings interpreting the statute's intent provision in a manner favorable to investors in *STI Classic Funds, et al. v. Bollinger Industries, Inc*. His efforts are regularly recognized by the courts, including in *Kamarasy v. Coopers & Lybrand*, where the court remarked on "the superior quality of the representation provided to the class." In

approving the settlement he achieved in *In re InterMune Securities Litigation*, the court complimented Ira's ability to secure a significant recovery for the class in a very efficient manner, shielding the class from prolonged litigation and substantial risk.

Ira has also played a key role in groundbreaking cases in the field of merger and derivative litigation. In In re *Freeport-McMoRan Copper & Gold Inc. Derivative Litigation*, he achieved the second largest derivative settlement in the Delaware Court of Chancery history, a $153.75 million settlement with an unprecedented provision of direct payments to stockholders by means of a special dividend. In another first-of-its-kind case, Ira was featured in *The AmLaw Litigation Daily* as Litigator of the Week for his work in *In re El Paso Corporation Shareholder Litigation*. The action alleged breach of fiduciary duties in connection with a merger transaction, including specific reference to wrongdoing by a conflicted financial advisory consultant, and resulted in a $110 million recovery for a class of shareholders and a waiver by the consultant of its fee.

From 2009-2011, Ira served as President of the National Association of Shareholder and Consumer Attorneys (NASCAT), a membership organization of approximately 100 law firms that practice class action and complex civil litigation. During this time, he represented the plaintiffs' securities bar in meetings with members of Congress, the Administration, and the SEC.

From 1996 through 2012, Ira served as Chairman of the Class Action Committee of the Commercial and Federal Litigation Section of the New York State Bar Association. During his tenure, he has served on the Executive Committee of the Section and authored important papers on issues relating to class action procedure including revisions proposed by both houses of Congress and the Advisory Committee on Civil Procedure of the United States Judicial Conference. Examples include: "Proposed Changes in Federal Class Action Procedure"; "Opting Out On Opting In," and "The Interstate Class Action Jurisdiction Act of 1999."

He also has lectured extensively on securities litigation at continuing legal education seminars. He has also been awarded an AV Preeminent rating, the highest distinction, from the publishers of the Martindale-Hubbell directory.

He is admitted to practice in the State of New York as well as before the United States Court of Appeals for the Second, Fifth, Ninth, and Tenth Circuits, and the United States District Courts for the Southern and Eastern Districts of New York, the Central District of Illinois, the Northern District of Texas, and the Western District of Michigan.

## David J. Schwartz, Partner
dschwartz@labaton.com

David J. Schwartz's practice focuses on event driven and special situation litigation using legal strategies to enhance clients' investment return.

His extensive experience includes prosecuting as well as defending against securities and corporate governance actions for an array of institutional clients including hedge funds, merger arbitrage investors, pension funds, mutual funds, and asset management companies. He played a pivotal role in several securities class action cases, including against real estate service provider Altisource Portfolio Solutions, where he helped achieve a $32 million cash settlement, and investment management firm Virtus Investment Partners, which resulted in a $22 million settlement. David has also done substantial work in mergers and acquisitions appraisal litigation, and direct action/opt-out litigation.

David was recently named a Future Star by *Benchmark Litigation* and to *Benchmark*'s "40 & Under Hot List," which recognizes him as one the nation's most accomplished partners age 40 years and under.

David obtained his J.D. from Fordham University School of Law, where he served on the *Urban Law Journal*. He received his B.A. in economics, with honors, from the University of Chicago.

David is admitted to practice in the State of New York as well as before the United States District Court for the Southern District of New York.

## Irina Vasilchenko, Partner
ivasilchenko@labaton.com

Irina Vasilchenko focuses on prosecuting complex securities fraud cases on behalf of institutional investors.

Currently, Irina is actively involved in prosecuting *In re Goldman Sachs Group, Inc. Securities Litigation*, *In re SCANA Corporation Securities Litigation*, *In re Acuity Brands, Inc. Securities Litigation*, and *Vancouver Alumni Asset Holdings, Inc. v. Daimler AG*. Since joining Labaton Sucharow, she has been part of the Firm's teams in *In re Massey Energy Co. Securities Litigation*, where the Firm obtained a $265 million all-cash settlement with Alpha Natural Resources, Massey's parent company; *In re Fannie Mae 2008 Securities Litigation* ($170 million settlement); *In re Amgen Inc. Securities Litigation* ($95 million settlement); and *In re Hewlett-Packard Company Securities Litigation* ($57 million settlement).

Prior to joining Labaton Sucharow, Irina was an associate in the general litigation practice group at Ropes & Gray LLP, where she focused on securities litigation.

Irina maintains a commitment to pro bono legal service including, most recently, representing an indigent defendant in a criminal appeal case before the New York First Appellate Division, in association with the Office of the Appellate Defender. As part of this representation, she argued the appeal before the First Department panel. Irina is a member of the New York City Bar Association's Women in the Courts Task Force. She also leads Labaton Sucharow's Associate Training Program.

Irina received a J.D., *magna cum laude*, from Boston University School of Law, where she was an editor of the *Boston University Law Review* and was the G. Joseph Tauro Distinguished Scholar (2005), the Paul L. Liacos Distinguished Scholar (2006), and the Edward F. Hennessey Scholar (2007). Irina earned a B.A. in Comparative Literature with Distinction, *summa cum laude* and Phi Beta Kappa, from Yale University.

She is fluent in Russian and proficient in Spanish.

Irina is admitted to practice in the State of New York and the State of Massachusetts as well as before the United States District Courts for the Southern and Eastern Districts of New York.

## Carol C. Villegas, Partner
cvillegas@labaton.com

Carol C. Villegas Carol C. Villegas focuses on prosecuting complex securities fraud cases on behalf of institutional investors. Leading one of the Firm's litigation teams, she currently oversees litigation against AT&T, Marriott, Nielsen Holdings, Skechers, U.S.A., Inc., Shanda Games, and Danske Bank. In addition to her litigation responsibilities, Carol holds a variety of leadership positions within the Firm, including serving on the Firm's Executive Committee and serving as Co-Chair of the Firm's Women's Networking and Mentoring Initiative and as the Firm's Chief Compliance Officer.

Carol's skillful handling of discovery work, her development of innovative case theories in complex cases, and her adept ability during oral argument earned her recent accolades from the New York Law Journal as a Top Woman in Law. She has also been recognized as a Future Star Star by *Benchmark Litigation* and a Next Generation Lawyer by *The Legal 500*, where clients praised her for helping them "better understand the process and how to value a case."

Carol played a pivotal role in securing favorable settlements for investors from AMD, a multi-national semiconductor company, Liquidity Services, an online auction marketplace, Aeropostale, a leader in the international retail apparel industry, ViroPharma Inc., a biopharmaceutical company, and Vocera, a healthcare

communications provider. She also recently helped revive a securities class action against LifeLock after arguing an appeal before the Ninth Circuit. A true advocate for her clients, Carol's argument in the case against Vocera resulted in a ruling from the bench, denying defendants' motion to dismiss in that case.

Prior to joining Labaton Sucharow, Carol served as the Assistant District Attorney in the Supreme Court Bureau for the Richmond County District Attorney's office, where she took several cases to trial. She began her career as an associate at King & Spalding LLP, where she worked as a federal litigator.

Carol received a J.D. from New York University School of Law, and she was the recipient of The Irving H. Jurow Achievement Award for the Study of Law and selected to receive the Association of the Bar of the City of New York Minority Fellowship. Carol served as the Staff Editor, and later the Notes Editor, of the *Environmental Law Journal*. She earned a B.A., with honors, in English and Politics from New York University.

Carol is a member of the National Association of Public Pension Attorneys (NAPPA), the National Association of Women Lawyers (NAWL), the Hispanic National Bar Association, the Association of the Bar of the City of New York, and a member of the Executive Council for the New York State Bar Association's Committee on Women in the Law.

She is fluent in Spanish.

She is admitted to practice in the State of New York, as well as before the United States Court of Appeals for the First, Second, Ninth, Tenth, and Eleventh Circuits, and the United States District Courts for the Southern and Eastern Districts of New York, the District of Colorado, and the Eastern District of Wisconsin.

## Ned Weinberger, Partner
**nweinberger@labaton.com**

Ned Weinberger is Chair of the Firm's Corporate Governance and Shareholder Rights Litigation Practice. An experienced advocate of shareholder rights, Ned focuses on representing investors in corporate governance and transactional matters, including class action and derivative litigation. Ned was recognized by *Chambers & Partners USA* in the Delaware Court of Chancery and was named "Up and Coming," noting his impressive range of practice areas. He was also recently named a "Leading Lawyer" by *The Legal 500* and a Future Star by *Benchmark Litigation*.

Ned is currently prosecuting, among other matters, *In re Straight Path Communications Inc. Consolidated Stockholder Litigation*, which alleges breaches of fiduciary duty by the controlling stockholder of Straight Path Communications, Howard Jonas, in connection with the company's proposed sale to Verizon Communications Inc. He recently led a class and derivative action on behalf of stockholders of Providence Service Corporation—*Haverhill Retirement System v. Kerley*—that challenged an acquisition financing arrangement involving Providence's board chairman and his hedge fund. The case settled for $10 million.

Ned was part of a team that achieved a $12 million recovery on behalf of stockholders of ArthroCare Corporation in a case alleging breaches of fiduciary duty by the ArthroCare board of directors and other defendants in connection with Smith & Nephew, Inc.'s acquisition of ArthroCare. Other recent successes on behalf of stockholders include *In re Vaalco Energy Inc. Consolidated Stockholder Litigation*, which resulted in the invalidation of charter and bylaw provisions that interfered with stockholders' fundamental right to remove directors without cause.

Prior to joining Labaton Sucharow, Ned was a litigation associate at Grant & Eisenhofer P.A. where he gained substantial experience in all aspects of investor protection, including representing shareholders in matters relating to securities fraud, mergers and acquisitions, and alternative entities. Representative of Ned's experience in the Delaware Court of Chancery is *In re Barnes & Noble Stockholders Derivative Litigation*, in which Ned assisted in obtaining approximately $29 million in settlements on behalf of Barnes & Noble investors. Ned was also part of the litigation team in *In re Clear Channel Outdoor Holdings, Inc. Shareholder*

*Litigation*, the settlement of which provided numerous benefits for Clear Channel Outdoor Holdings and its shareholders, including, among other things, a $200 million cash dividend to the company's shareholders.

Ned received his J.D. from the Louis D. Brandeis School of Law at the University of Louisville where he served on the *Journal of Law and Education*. He earned his B.A. in English Literature, *cum laude*, at Miami University.

Ned is admitted to practice in the States of Delaware, Pennsylvania, and New York as well as before the United States District Court for the District of Delaware.

## Mark S. Willis, Partner
mwillis@labaton.com

With nearly three decades of experience, Mark S. Willis' practice focuses on domestic and international securities litigation. Mark advises leading pension funds, investment managers, and other institutional investors from around the world on their legal remedies when impacted by securities fraud and corporate governance breaches. Mark represents clients in U.S. litigation and maintains a significant practice advising clients of their legal rights abroad to pursue securities-related claims.  He has been recognized in securities litigation by *The Legal 500*.

Mark represents institutions from the United Kingdom, Spain, the Netherlands, Denmark, Germany, Belgium, Canada, Japan, and the United States in a novel lawsuit in Texas against BP plc to salvage claims that were dismissed from the U.S. class action because the claimants' BP shares were purchased abroad (thus running afoul of the Supreme Court's *Morrison* rule that precludes a U.S. legal remedy for such shares). These previously dismissed claims have now been sustained and are being pursued under English law in a Texas federal court.

Mark also represents the Utah Retirement Systems in a shareholder action against the DeVry Education Group, and he represented the Arkansas Public Employees Retirement System in a shareholder action against The Bancorp (which settled for $17.5 million), and Caisse de dépôt et placement du Québec, one of Canada's largest institutional investors, in a U.S. shareholder class action against Liquidity Services (which settled for $17 million).

In the *Converium* class action, Mark represented a Greek institution in a nearly four-year battle that eventually became the first U.S. class action settled on two continents. This trans-Atlantic result saw part of the $145 million recovery approved by a federal court in New York, and the rest by the Amsterdam Court of Appeal. The Dutch portion was resolved using the Netherlands then newly enacted Act on Collective Settlement of Mass Claims. In doing so, the Dutch Court issued a landmark decision that substantially broadened its jurisdictional reach, extending jurisdiction for the first time to a scenario in which the claims were not brought under Dutch law, the alleged wrongdoing took place outside the Netherlands, and none of the potentially liable parties were domiciled in the Netherlands.

In the corporate governance arena, Mark has represented both U.S. and overseas investors. In a shareholder derivative action against Abbott Laboratories' directors, he charged the defendants with mismanagement and fiduciary breaches for causing or allowing the company to engage in a 10-year off-label marketing scheme, which had resulted in a $1.6 billion payment pursuant to a Justice Department investigation—at the time the second largest in history for a pharmaceutical company. In the derivative action, the company agreed to implement sweeping corporate governance reforms, including an extensive compensation clawback provision going beyond the requirements under the Dodd-Frank Act, as well as the restructuring of a board committee and enhancing the role of the Lead Director. In the *Parmalat* case, known as the "Enron of Europe" due to the size and scope of the fraud, Mark represented a group of European institutions and eventually recovered nearly $100 million and negotiated governance reforms with two large European banks who, as part of the settlement, agreed to endorse their future adherence to key corporate governance principles designed to advance investor protection and to minimize the likelihood of future deceptive transactions. Securing

governance reforms from a defendant that was not an issuer was a first at that time in a shareholder fraud class action.

Mark has also represented clients in opt-out actions. In one, brought on behalf of the Utah Retirement Systems, Mark negotiated a settlement that was nearly four times more than what its client would have received had it participated in the class action.

On non-U.S. actions Mark has advised clients, and represented their interests as liaison counsel, in more than 30 cases against companies such as Volkswagen, Olympus, the Royal Bank of Scotland, the Lloyds Banking Group, and Petrobras, and in jurisdictions ranging from the UK to Japan to Australia to Brazil to Germany.

Mark has written on corporate, securities, and investor protection issues—often with an international focus—in industry publications such as *International Law News*, *Professional Investor*, *European Lawyer*, and *Investment & Pensions Europe*. He has also authored several chapters in international law treatises on European corporate law and on the listing and subsequent disclosure obligations for issuers listing on European stock exchanges. He also speaks at conferences and at client forums on investor protection through the U.S. federal securities laws, corporate governance measures, and the impact on shareholders of non-U.S. investor remedies.

He is admitted to practice in the State of Massachusetts and the District of Columbia, as well as the U.S. District Court for the District of Columbia.

## Nicole M. Zeiss, Partner
nzeiss@labaton.com

A litigator with nearly two decades of experience, Nicole M. Zeiss leads the Settlement Group at Labaton Sucharow, analyzing the fairness and adequacy of the procedures used in class action settlements. Her practice focuses on negotiating and documenting complex class action settlements and obtaining the required court approval of the settlements, notice procedures, and payments of attorneys' fees.

Over the past decade, Nicole was actively involved in finalizing settlements with Massey Energy Company ($265 million), Fannie Mae ($170 million), and Schering-Plough ($473 million), among many others.

Nicole was part of the Labaton Sucharow team that successfully litigated the $185 million settlement in In re Bristol-Myers Squibb Securities Litigation, and she played a significant role in In re Monster Worldwide, Inc. Securities Litigation ($47.5 million settlement). Nicole also litigated on behalf of investors who have been damaged by fraud in the telecommunications, hedge fund, and banking industries.

Prior to joining Labaton Sucharow, Nicole practiced in the area of poverty law at MFY Legal Services. She also worked at Gaynor & Bass practicing general complex civil litigation, particularly representing the rights of freelance writers seeking copyright enforcement.

Nicole maintains a commitment to pro bono legal services by continuing to assist mentally ill clients in a variety of matters-from eviction proceedings to trust administration.

She received a J.D. from the Benjamin N. Cardozo School of Law, Yeshiva University and earned a B.A. in Philosophy from Barnard College. Nicole is a member of the Association of the Bar of the City of New York.

She is admitted to practice in the State of New York as well as before the United States Court of Appeals for the Second and Ninth Circuits, and the United States District Courts for the Southern and Eastern Districts of New York, and the District of Colorado.

## Rachel A. Avan, Of Counsel
**ravan@labaton.com**

Rachel A. Avan prosecutes complex securities fraud cases on behalf of institutional investors. She focuses on advising institutional investor clients regarding fraud-related losses on securities, and on the investigation and development of U.S. and non-U.S. securities fraud class, group, and individual actions. Rachel manages the Firm's Non-U.S. Securities Litigation Practice, which is dedicated to analyzing the merits, risks, and benefits of potential claims outside the United States. She has played a key role in ensuring that the Firm's clients receive substantial recoveries through non-U.S. securities litigation. In addition to her litigation responsibilities, Rachel serves as the Firm's Compliance Officer.

In evaluating new and potential matters, Rachel draws on her extensive experience as a securities litigator. She was an active member of the team prosecuting the securities fraud class action against Satyam Computer Services, Inc., in *In re Satyam Computer Services Ltd. Securities Litigation*, dubbed "India's Enron." That case achieved a $150.5 million settlement for investors from the company and its auditors. She also had an instrumental part in the pleadings in a number of class actions including, *In re Barrick Gold Securities Litigation* ($140 million settlement); *Freedman v. Nu Skin Enterprises, Inc.* ($47 million recovery); and *Iron Workers District Council of New England Pension Fund v. NII Holdings, Inc.* ($41.5 million recovery).

Rachel has spearheaded the filing of more than 75 motions for lead plaintiff appointment in U.S. securities class actions including, *In re Facebook, Inc. IPO Securities & Derivative Litigation*; *In re Computer Sciences Corporation Securities Litigation*; *In re Petrobras Securities Litigation*; *In re Spectrum Pharmaceuticals, Inc. Securities Litigation*; *Weston v. RCS Capital Corporation*; and *Cummins v. Virtus Investment Partners Inc.*

In addition to her securities class action litigation experience, Rachel also played a role in prosecuting several of the Firm's derivative matters, including *In re Barnes & Noble Stockholder Derivative Litigation*; *In re Coca-Cola Enterprises Inc. Shareholders Litigation*; and *In re The Student Loan Corporation Litigation*.

Rachel brings to the Firm valuable insight into corporate matters, having served as an associate at a corporate law firm, where she counseled domestic and international public companies regarding compliance with federal and state securities laws. Her analysis of corporate securities filings is also informed by her previous work assisting with the preparation of responses to inquiries by the U.S. Securities and Exchange Commission and the Financial Industry Regulatory Authority.

Before attending Benjamin N. Cardozo School of Law, Rachel enjoyed a career in editing for a Boston-based publishing company. She also earned a Master of Arts in English and American Literature from Boston University.

Since 2015, Rachel has been recognized as a New York Metro "Rising Star" in securities litigation by *Super Lawyers*, a Thomson Reuters publication.

She is proficient in Hebrew.

Rachel is admitted to practice in the States of New York and Connecticut as well as before the United States District Court for the Southern District of New York.

## Mark Bogen, Of Counsel
**mbogen@labaton.com**

Mark Bogen advises leading pension funds and other institutional investors on issues related to corporate fraud in domestic and international securities markets. His work focuses on securities, antitrust, and consumer class action litigation, representing Taft-Hartley and public pension funds across the country.

Among his many efforts to protect his clients' interests and maximize shareholder value, Mark recently helped bring claims against and secure a settlement with Abbott Laboratories' directors, whereby the company agreed to implement sweeping corporate governance reforms, including an extensive compensation clawback provision going beyond the requirements under the Dodd-Frank Act.

Mark has written weekly legal columns for the *Sun-Sentinel*, one of the largest daily newspapers circulated in Florida. He has been legal counsel to the American Association of Professional Athletes, an association of over 4,000 retired professional athletes. He has also served as an Assistant State Attorney and as a Special Assistant to the State Attorney's Office in the State of Florida.

Mark obtained his J.D. from Loyola University School of Law. He received his B.A. in Political Science from the University of Illinois.

He is admitted to practice in the States of Illinois and Florida.

## Jeffrey A. Dubbin, Of Counsel
jdubbin@labaton.com

Jeffrey A. Dubbin focuses on prosecuting complex securities fraud cases on behalf of institutional investors.

Jeff joined Labaton Sucharow following clerkships with the Honorable Marilyn L. Huff and the Honorable Larry Alan Burns in the U.S. District Court for the Southern District of California. Prior to that, he worked as legal counsel for the investment management firm Matrix Capital Management.

Jeff received his J.D. from the University of Pennsylvania Law School and received his B.A., *magna cum laude*, from Harvard University.

He is admitted to practice in the States of New York and California.

## Joseph H. Einstein, Of Counsel
jeinstein@labaton.com

A seasoned litigator, Joseph H. Einstein represents clients in complex corporate disputes, employment matters, and general commercial litigation. He has litigated major cases in the state and federal courts and has argued many appeals, including appearing before the United States Supreme Court.

His experience encompasses extensive work in the computer software field including licensing and consulting agreements. Joe also counsels and advises business entities in a broad variety of transactions.

Joe serves as an official mediator for the United States District Court for the Southern District of New York. He is an arbitrator for the American Arbitration Association and FINRA. Joe is a former member of the New York State Bar Association Committee on Civil Practice Law and Rules and the Council on Judicial Administration of the Association of the Bar of the City of New York. He currently is a member of the Arbitration Committee of the Association of the Bar of the City of New York.

During Joe's time at New York University School of Law, he was a Pomeroy and Hirschman Foundation Scholar, and served as an Associate Editor of the *Law Review*.

Joe has been awarded an AV Preeminent rating, the highest distinction, from the publishers of the Martindale-Hubbell directory.

He is admitted to practice in the State of New York as well as before the Supreme Court of the United States, the United States Courts of Appeals for the First and Second Circuits, and the United States District Courts for the Southern and Eastern Districts of New York.

## John J. Esmay, Of Counsel
jesmay@labaton.com

John J. Esmay focuses on prosecuting complex securities fraud cases on behalf of institutional investors.

Prior to joining Labaton Sucharow, John was an associate at a white collar defense firm where he assisted in all aspects of complex litigation including securities fraud, banking regulation violations, and other regulatory matters. John successfully defended a disciplinary hearing brought by the Financial Industry Regulatory Authority's (FINRA) enforcement division for allegations of insider trading and securities fraud. John helped reach a successful conclusion of a criminal prosecution of a trader for one of the nation's largest financial institutions involved in a major bid-rigging scheme. He was also instrumental in clearing charges and settling a regulatory matter against a healthcare provider brought by the New York State Office of the Attorney General.

Prior to his white collar defense experience, John was an associate at Hogan Lovells US LLP and litigated many large complex civil matters including securities fraud cases, antitrust violations, and intellectual property disputes.

John also previously worked as a judicial clerk for the Honorable William H. Pauley III in the Southern District of New York. He received his J.D., *magna cum laude*, from Brooklyn Law School and his B.S. from Pomona College.

John is admitted to practice in the State of New York.

## Derrick Farrell, Of Counsel
dfarrell@labaton.com

Derrick Farrell focuses on representing shareholders in appraisal, class, and derivative actions. He has substantial trial experience as both a petitioner and a respondent on a number of high profile matters, including: *In re Appraisal of Ancestry.com, Inc.*, C.A. No. 8173-VCG, *IQ Holdings, Inc. v. Am. Commercial Lines Inc.*, Case No. 6369-VCL, and *In re Cogent, Inc. S'holder Litig.*, C.A. No. 5780-VCP. He has also argued before the Delaware Supreme Court on multiple occasions.

Prior to joining Labaton Sucharow, Derrick started his career as an associate at Latham & Watkins LLP, where he gained substantial insight into the inner workings of corporate boards and the role of investment bankers in a sale process. He has guest lectured at Harvard University and co-authored numerous articles including articles published by the Harvard Law School Forum on Corporate Governance and Financial Regulation and PLI.

Derrick graduated from Texas A&M University (B.S., Biomedical Science) and the Georgetown University Law Center (J.D. cum laude). At Georgetown Mr. Farrell served as an advocate and coach to the Barrister's Council (Moot Court Team) and was Magister of Phi Delta Phi. Following his graduation Derrick clerked for the Honorable Donald F. Parsons, Jr., Vice Chancellor, Court of Chancery of the State of Delaware.

Derrick is licensed to practice law in the States of Delaware and Massachusetts and is admitted to practice before the U.S. District Court for the District of Delaware.

## Alfred L. Fatale III, Of Counsel
afatale@labaton.com

Alfred L. Fatale III focuses on prosecuting complex securities fraud cases on behalf of institutional and individual investors.

Alfred represents investors in cases related to the protection of the financial markets in trial and appellate courts throughout the country. In particular, he is leading the firm's efforts in litigating securities claims against several companies in state courts following the U.S. Supreme Court's decision in *Cyan, Inc. v. Beaver County Employees Retirement Fund*. This includes prosecuting *In re ADT Inc. Shareholder Litigation*, a case alleging that the offering documents for ADT's $1.47 billion IPO misrepresented the competition the company was facing from do-it-yourself home security products.

He recently secured an $11 million settlement for investors in In re CPI Card Group Inc., Securities Litigation, a class action brought by an individual retail investor against a debit and credit card manufacturer that allegedly misrepresented demand for its products prior to the company's IPO.

Alfred is also actively involved in *Murphy v. Precision Castparts Corp.*, a case against a major aerospace parts manufacturer that allegedly misled investors about its market share and demand for its products, and *Boston Retirement System v. Alexion Pharmaceuticals Inc.*, a class action arising from the company's conduct in connection with sales of Soliris – a drug that costs between $500,000 and $700,000 a year.

Prior to joining Labaton Sucharow, Alfred was an associate at Fried, Frank, Harris, Shriver & Jacobson LLP, where he advised and represented financial institutions, investors, officers, and directors in a broad range of complex disputes and litigations including cases involving violations of federal securities law and business torts.

Alfred earned his J.D. from Cornell Law School, where he was a member of the *Cornell Law Review*, as well as the Moot Court Board. He also served as a judicial extern under the Honorable Robert C. Mulvey. He received his B.A., *summa cum laude*, from Montclair State University.

Alfred is an active member of the American Bar Association, Federal Bar Council, New York State Bar Association, New York County Bar Association, and New York City Bar Association.

Alfred is admitted to practice in the State of New York as well as before the United States Court of Appeals for the Second Circuit, and the United States District Courts for the Southern and Eastern Districts of New York.

## Mark Goldman, Of Counsel
**mgoldman@labaton.com**

Mark S. Goldman has 30 years of experience in commercial litigation, primarily litigating class actions involving securities fraud, consumer fraud, and violations of federal and state antitrust laws.

Mr. Goldman has extensive experience in data protection and consumer litigation, including representing numerous victims of identity theft seeking to hold accountable companies that failed to protect the safety of private data maintained on their networks, including *In re Community Health Systems, Inc. Customer Data Security Breach Litigation*, No. 15-cv-222 (N.D. Ala.), *In re Anthem, Inc. Data Breach Litigation*, No. 15-md-02617 (N.D. Cal.), *In re Intuit Data Litigation*, No. 15-cv-1778 (N.D. Cal.), and *In re Medical Informatics Engineering, Inc. Customer Data Security Breach Litigation,* MDL No. 2667 (N.D. Ind.).

In the antitrust field, Mr. Goldman litigated several cases that led to recoveries exceeding $1 billion each, for the benefit of the consumers and small businesses he represented, including *In re Air Cargo Antitrust Litigation,* No. 06-md-1775 (E.D.N.Y.), *In re Vitamins Antitrust Litigation,* MDL No. 1285 (D.D.C.), *In re NASDAQ Antitrust Litigation,* No. 94-cv-3996 (S.D.N.Y.), and *In re Brand Name Prescription Drugs Antitrust Litigation,* No. 94-c-897 (N.D. Ill.).

In the area of securities litigation, Mr. Goldman played a prominent role in class actions brought under the antifraud provisions of the Securities Exchange Act of 1934, including *In re Nuskin Enterprises, Inc. Securities*

*Litigation,* No. 14-cv-0033 (D. Utah), *In re Spectrum Pharmaceuticals, Inc. Securities Litigation,* No. 13-cv-0433 (D. Nev.), and *In re OmniVision Technologies, Inc. Securities Litigation,* No. 11-cv-05235 (N.D. Cal.).

Mr. Goldman also prosecuted a number of insider trading cases brought against company insiders who, in violation of Section 16(b) of the Securities Exchange Act of 1934, engaged in short swing trading.  Mr. Goldman has also served as co-lead counsel in a number of class actions brought against life insurance companies, challenging the manner in which premiums are charged during the first year of coverage.

Mr. Goldman is a member of the Philadelphia Bar Association.  Mr. Goldman has been awarded an AV Preeminent rating, the highest distinction, from the publishers of the Martindale-Hubbell directory.

## Lara Goldstone, Of Counsel
lgoldstone@labaton.com

Lara Goldstone advises pension funds and other institutional investors on issues related to corporate fraud in the U.S. securities markets. Before joining Labaton Sucharow, Lara worked as a legal intern in the Larimer County District Attorney's Office and the Jefferson County District Attorney's Office.

Prior to her legal career, Lara worked at Industrial Labs where she worked closely with Federal Drug Administration standards and regulations. In addition, she was a teacher in Irvine, California.

Lara received a J.D. from University of Denver Sturm College of Law, where she was a judge of The Providence Foundation of Law & Leadership Mock Trial and a competitor of the Daniel S. Hoffman Trial Advocacy Competition. She earned a B.A. from The George Washington University where she was a recipient of a Presidential Scholarship for academic excellence.

Lara is admitted to practice in the State of Colorado.

## James McGovern, Of Counsel
jmcgovern@labaton.com

James McGovern advises leading pension funds and other institutional investors on issues related to corporate fraud in domestic and international securities markets. His work focuses primarily on securities litigation and corporate governance, representing Taft-Hartley, public pension funds, and other institutional investors across the country in domestic securities actions. He also advises clients as to their potential claims tied to securities-related actions in foreign jurisdictions.

James has worked on a number of large securities class action matters, including *In re Worldcom, Inc. Securities Litigation,* the second-largest securities class action settlement since the passage of the PSLRA ($6.1 billion recovery); *In re Parmalat Securities Litigation* ($90 million recovery); *In re American Home Mortgage Securities Litigation* (amount of the opt-out client's recovery is confidential); *In re The Bancorp Inc. Securities Litigation* ($17.5 million recovery); *In re Pozen Securities Litigation* ($11.2 million recovery); *In re Cabletron Systems, Inc. Securities Litigation* ($10.5 million settlement); and *In re UICI Securities Litigation* ($6.5 million recovery).

In the corporate governance arena, James helped bring claims against Abbott Laboratories' directors, on account of their mismanagement and breach of fiduciary duties for allowing the company to engage in a 10-year off-label marketing scheme. Upon settlement of this action, the company agreed to implement sweeping corporate governance reforms, including an extensive compensation clawback provision going beyond the requirements under the Dodd-Frank Act.

Following the unprecedented takeover of Fannie Mae and Freddie Mac by the federal government in 2008, James was retained by a group of individual and institutional investors to seek recovery of the massive losses

they had incurred when the value of their shares in these companies was essentially destroyed. He brought and continues to litigate a complex takings class action against the federal government for depriving Fannie Mae and Freddie Mac shareholders of their property interests in violation of the Fifth Amendment of the U.S. Constitution, and causing damages in the tens of billions of dollars.

James also has addressed members of several public pension associations, including the Texas Association of Public Employee Retirement Systems and the Michigan Association of Public Employee Retirement Systems, where he discussed how institutional investors could guard their assets against the risks of corporate fraud and poor corporate governance.

Prior to focusing his practice on plaintiffs' securities litigation, James was an attorney at Latham & Watkins where he worked on complex litigation and FIFRA arbitrations, as well as matters relating to corporate bankruptcy and project finance. At that time, he co-authored two articles on issues related to bankruptcy filings: *Special Issues In Partnership and Limited Liability Company Bankruptcies* and *When Things Go Bad: The Ramifications of a Bankruptcy Filing*.

James earned his J.D., *magna cum laude*, from Georgetown University Law Center. He received his B.A. and M.B.A. from American University, where he was awarded a Presidential Scholarship and graduated with high honors.

He is admitted to practice in the State of Vermont and the District of Columbia.

## Mark D. Richardson, Of Counsel
mrichardson@labaton.com

Mark D. Richardson focuses on representing shareholders in derivative litigation and corporate governance matters.

Prior to joining Labaton Sucharow, Mark was an associate at Schulte Roth & Zabel LLP, where he focused on complex commercial litigation within the financial services industry. He advised and represented clients in class action litigation, expedited bankruptcy proceedings and arbitrations, fraudulent transfer actions, proxy fights, internal investigations, employment disputes, breaches of contact, enforcement of non-competes, data theft, and misappropriation of trade secrets.

Mark has contributed to several publications over the years. In 2016, he was the recipient of the Distinguished Legal Writing award by the Burton Awards for Legal Achievement for an article published in the New York Law Journal, "Options When a Competitor Raids the Company."

Mark earned his J.D. from Emory University School of Law, where he served as the President of the Student Bar Association. He now teaches as an Adjunct Professor in Emory's Kessler-Eidson Program for Trial Techniques. He received his B.S. from Cornell University.

Mark is admitted to practice in the States of New York and Pennsylvania, as well as before the United States Court of Appeals for the Second Circuit, and the U.S. District Court of the Southern and Eastern Districts of New York.

## Elizabeth Rosenberg, Of Counsel
erosenberg@labaton.com

Elizabeth Rosenberg focuses on prosecuting complex securities fraud cases on behalf of institutional investors, with a focus on obtaining court approval of class action settlements, notice procedures, and payment of attorneys' fees.

Prior to joining Labaton Sucharow, Elizabeth was an associate at Whatley Drake & Kallas LLP, where she litigated securities and consumer fraud class actions. Elizabeth began her career as an associate at Milberg LLP where she practiced securities litigation and was also involved in the pro bono representation of individuals seeking to obtain relief from the World Trade Center Victims' Compensation Fund.

Elizabeth received her J.D. from Brooklyn Law School. She obtained her B.A. in Psychology from the University of Michigan.

Elizabeth is admitted to practice in the State of New York and the District Courts for the Southern and Eastern Districts of New York.

# TAB 55

Case 4:19-cv-00509 Document 65-9 Filed 07/02/21 in TXSD Page 1177 of 1452
Schwartz v. TXU Corp., Not Reported in F.Supp.2d (2005)
2005 WL 3148350

📁 KeyCite Yellow Flag - Negative Treatment
Remanded by Schwartz v. TXU Corp., 5th Cir.(Tex.), January 13, 2006

2005 WL 3148350
Only the Westlaw citation is currently available.
United States District Court,
N.D. Texas, Dallas Division.

Richard SCHWARTZ, et al., On
Behalf of Themselves and All
Others Similarly Situated Plaintiffs,
v.
TXU CORP., et al., Defendants

Nos. 3:02–CV–2243–K, 3:02–CV–2248, 3:02–
CV–2255, 3:02–CV–2262, 3:02–CV–2270, 3:02–
CV–2279, 3:02–CV–2314, 3:02–CV–2315, 3:02–
CV–2322, 3:02–CV–2328, 3:02–CV–2334, 3:02–
CV–2337, 3:02–CV–2339, 3:02–CV–2343, 3:02–
CV–2346, 3:02–CV–2360, 3:02–CV–2366, 3:02–
CV–2416, 3:02–CV–2438, 3:02–CV–2450, 3:02–
CV–2458, 3:02–CV–2471, 3:02–CV–2525, 3:02–
CV–2586, 3:02–CV–2600, 3:02–CV–2689,
3:02–CV–2739, 3:02–CV–0289, 3:02–CV–0290.
|
Nov. 8, 2005.

**Attorneys and Law Firms**

Joe Kendall, Provost Umphrey Law Firm, Dallas, TX, William S. Lerach, Darren J. Robbins, Lerach Coughlin Stoia Geller Rudman & Robbins, San Diego, CA, Lawrence G. Soicher, Law Office of Lawrence G. Soicher, New York, NY, for Plaintiffs.

David P Poole, TXU Legal Department, Robert K. Wise, Hunton & Williams, Jim L. Flegle, Michael B. Hopkins, Loewinsohn & Flegle, Dallas, TX, Edward J. Fuhr, Stacy M. Colvin, Thomas G. Slater, Jr., Hunton & Williams, Richmond, VA, Richard Gallagher, Robert P. Varian, Clifford Chance Law Firm, San Francisco, CA, Roger B. Greenberg, Schwartz Junell Greenberg & Oathout, Paul T. Warner, Reich & Binstock, Houston, TX, Wayne Schneider, New York State Teacher's Retirement System, Office of the General Counsel, Albany, NY, Brad G. Goodsell, Office of the Attorney General—State of Idaho, Boise, ID, Keith Johnson, State of Wisconsin Investment Board, Madison, WI, David L. Treat, Mark A. Lindow, Lindow & Treat, San Antonio, TX, Gerald Gornish, Pennsylvania Public School Employees' Retirement System, Harrisburg, PA, Brian J. Robbins, Jeffrey P. Fink, Robbins Umeda & Fink, San Diego, CA, David R. Scott, Scott & Scott, Colchester, CT, Jack G. Fruchter, Fruchter & Twersky, New York, NY, for Defendants.

FINDINGS OF FACT AND CONCLUSIONS OF LAW

KINKEADE, J.

**\*1** Plaintiffs and Defendants have submitted for approval a proposed settlement of this class action that is memorialized in a Stipulation and Agreement of Settlement ("Stipulation of Settlement"), filed with the Court on March 31, 2005. For the reasons set out below, the Court has determined that the settlement is fair, reasonable and adequate, and should be approved. The Court makes the following findings of fact and conclusions of law. It has issued a Final Judgment and Order of Dismissal with Prejudice, approving the settlement and dismissing the complaint in this action with prejudice.

I. BACKGROUND

A. Materials Considered by the Court
1. In coming to its decision, this Court has considered the written memoranda and supporting documents submitted by the parties and all other Class members, as well as oral arguments made by the parties and other Class members in connection with the settlement. As discussed below, the parties have fully briefed the request for approval, and they have supported the request with numerous declarations or affidavits of fact, including from expert witnesses and the Court appointed Lead Plaintiffs. Also, both Lead Plaintiffs' counsel and counsel for Defendants made oral presentations at the June 23, 2005 Fairness Hearing.

B. History of Litigation
2. On or about November 15, 2002, pursuant to the provisions of the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 77z-I(a)(3)(B)(ii), this Court consolidated 30 putative class actions complaints against TXU Corp. ("TXU") and certain of its present and former officers and directors of TXU alleging federal securities law violations into the above-captioned case, *Schwartz, et al. v. TXU Corp., et al,* Case No. 3:02–CV–2243–K (the "Litigation").

Schwartz v. TXU Corp., Not Reported in F.Supp.2d (2005)

2005 WL 3148350

3. In December 2002, various class members filed motions and memoranda in support thereof for the appointment of lead plaintiffs and the approval of lead plaintiffs' choice of counsel. During December 2002 and February 2003, opposition and reply memoranda were filed in connection therewith.

4. On May 8, 2003, pursuant to PSLRA, this Court resolved the competing motions for appointment of lead plaintiff appointing the Plumbers & Pipefitters National Pension Fund, Arthur Nielsen, Jr. and Ronald Canada as Lead Plaintiffs in the consolidated class action and approving Lead Plaintiffs' choice of William S. Lerach, Darren J. Robbins, Mark Solomon and Milberg, Weiss, Bershad, Hynes & Lerach, LLP and Joe Kendall of Provost Umphrey Law Firm, LLP as Co–Lead Counsel. [1]

5. On or about July 21, 2003, Lead Plaintiffs filed a Consolidated Complaint (the "Complaint") that named as defendants TXU, Erle Nye, David W. Biegler, Michael J. McNally, Brian N. Dickie, Biggs C. Porter, V.J. Horgan, Derek C. Bonham, J.S. Farrington, William M. Griffin, Kerney Laday, Jack E. Little, Margaret N. Maxey, J.E. Oesterreicher, Charles R. Perry, Herbert H. Richardson (collectively, the "Individual Defendants"), and Merrill Lynch, Pierce, Fenner & Smith, Incorporated, Banc of America Securities LLC, Credit Suisse First Boston Corporation and Salomon Smith Barney Inc ("Underwriter Defendants"). The Complaint pled on behalf of all persons who purchased the publicly traded securities of TXU, between 4/26/01 and 10/11/02 (the "Class Period").

 *2  6. In September 2003, TXU Defendants' Motion to Dismiss ("TXU's Motion to Dismiss") and the Underwrites' Motion to Dismiss the Consolidated Complaint ("Underwriters' Motion to Dismiss") were filed. Lead Plaintiffs file opposition memoranda in November 2003, and in January 2004, defendants filed their reply memoranda. Defendants' motions to dismiss the Complaint were under submission at the time the parties reached a tentative settlement agreement.

7. In January 2005, the parties reached a tentative settlement agreement and executed a Memorandum of Understanding on January 20, 2005. Between January 20, 2005 and March 31, 2005, the parties negotiated a comprehensive Stipulation of Settlement and supporting exhibits. On March 31, 2005, Lead Plaintiffs and Defendants executed a Stipulation of Settlement pursuant to which they agreed to settle the action. Before beginning settlement negotiations, Lead Counsel (with the assistance of a team of private investigators) conducted dozens of interviews of former employees and management of the Company. [See Joint Declaration of Joe Kendall and Mark Solomon in Support of: (1) Final Approval of Settlement and Plan of Allocation of Settlement Proceeds; and (2) Award of Attorneys' Fees and Reimbursement of Expenses ("Joint Declaration of Joe Kendall and Mark Solomon"), at ¶¶ 7, 27, 33.] The proposed settlement was conditioned on, among other things, Lead Counsel's completion of certain additional discovery, including review of relevant Company documents and interviews of TXU witnesses, and Lead Counsel's and Lead Plaintiffs' conclusion at the completion of that additional discovery that the settlement terms were fair, reasonable and adequate. [See Id at ¶ 13.]

8. In connection with the prosecution and the settlement of the litigation, Lead Counsel and their experts have reviewed hundreds of thousands of pages of documents, including TXU's public filings and other public statements and internal TXU documents produced in response to specific requests from Lead Counsel.

9. In addition to the review of documents, Lead Counsel has interviewed more than two dozen witnesses, including nine former or current TXU officers and directors in both the United States and Europe knowledgeable about the issues alleged in the litigation.

   C. The Parties and Their Counsel

10. Lead Plaintiffs—Lead Plaintiffs are the Plumbers & Pipefitters National Pension Fund, Arthur Nielsen, Jr. and Ronald Canada. Each purchased TXU securities during the class period. [See Compl., at ¶ 17.]

11. Lead Counsel—Lead Plaintiffs and the Class are represented by several experienced law firms, including Lerach Coughlin Stoia Geller Rudman & Robbins LLP and Provost & Umphrey LLP. Lead Counsel are knowledgeable about, and experienced in, federal securities fraud class actions.

12. Defendants—Defendant TXU provides electric and natural gas services, merchant energy trading, energy marketing, telecommunications and energy related services. TXU's common stock is traded in an efficient market on the New York Stock Exchange. TXU Europe Ltd. was a wholly-owned subsidiary of TXU, and was a holding company for TXU's European Operations. TXU controlled

2005 WL 3148350

TXU Europe Limited, which issued TOPrS. TOPrS traded on the NASDAQ during the Class Period. The Individual Defendants are: (i) Erle Nye who, at all relevant times, was Chairman of the Board and CEO of TXU; (ii) Michael J. McNally who, at all relevant times, was Executive Vice Chairman and CFO of TXU; (iii) Brian N. Dickie who, at all relevant times, was Executive Vice President of TXU and President of the TXU Energy business segment; (iv) Biggs C. Porter who, at all relevant times, was the Controller and Principal Accounting Officer of TXU; (v) V.J. Horgan who, at all relevant times, was President of Energy Trading at TXU; (vi) Derek C. Bonham, J.S. Farrington, William M. Griffin, Kerney Laday, Jack E. Little, Margaret N. Maxey, J.E. Oesterreicher, Charles R. Perry, Herbert H. Richardson who, at all relevant times, were directors of TXU; and (vii) Merrill Lynch, Pierce, Fenner & Smith, Incorporated, Banc of America Securities LLC, Credit Suisse First Boston Corporation and Salomon Smith Barney Inc. who, during the relevant time period, were underwriters of certain securities offerings for TXU.

**\*3** 13. Defendants' Counsel—Defendant TXU and all of the Individual Defendants are represented by Hunton & Williams, Orrick, Herrington & Sutcliffe LLP and the TXU Legal Department and the Underwriter Defendants are represented by Weil, Gotshal & Manges LLP. These firms and the lawyers involved in this case have extensive experience in the defense of complex securities class action litigation.

### D. Lead Plaintiffs' Allegations

14. The Complaint is brought on behalf of all persons who purchased the publicly traded securities of TXU between 4/26/01 and 10/11/02 (the "Class Period"), including TXU Europe Capital I, 9–3/4% Trust Originated Preferred Securities ("TOPrS"). Plaintiffs allege violations of the federal securities laws arising out of defendants' issuance of false and misleading statements about the health of the Company's business, its operating performance and prospects. [*See* Compl., at ¶ 1.] The definition of the Class, including certain exceptions, is set out in full in the Court's Order Preliminarily Approving Class Action Settlement and in the Final Judgment.

15. The Complaint alleges that defendants violated §§ 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b–5, and under §§ 11, 12(a)(2) and 15 of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. §§ 77k, 77l(a)

(2) and 77o, by, among other things, issuing a series of false and misleading statements during the Class Period. These allegedly false and misleading statements were in the following forms:

- Statements made by defendants during the Class Period in press releases, analyst meetings, conference calls and elsewhere concerning the Company's business, earnings and historical and projected financial results, including TXU's ability to meet earnings guidance; [*see, e.g.,* Compl., at ¶¶ 24–38.]

- SEC filings during the Class Period that omitted or inadequately disclosed serious and identifiable problems being experienced by TXU that affected TXU's financial performance, liquidity and credit ratings; [*see, e.g.,* Compl., at ¶¶ 40–52.]

- Omissions by the individual defendants during the Class Period regarding TXU's severe billing problems that negatively impacted revenues and receivables; [*see, e.g.,* Compl., at ¶¶ 53–64.]

- Omissions by the individual defendants during the Class Period of TXU's use of round-trip trades to falsely inflate trading volume revenues and manipulate the Texas energy markets; [*see, e.g.,* Compl., at ¶ 65.] and

- Failures by the Underwriter Defendants during the Class Period to conduct adequate due diligence to detect and disclose the severity of TXU's financial problems and accounting irregularities. [*see, e.g.,* Compl., at ¶¶ 191–206.]

The Complaint seeks compensatory damages, pre-judgment and post-judgment interest, as well as reasonable attorney's fees, expert witness fees, and extraordinary, equitable or injunctive relief as well as such other relief as the Court may deem just and proper.

### E. Defendants' Response

**\*4** 16. Defendants expressly deny any wrongdoing or liability in connection with any facts or claims that have been or could have been alleged in connection with this litigation. [*See* TXU Defendants' Brief in Support of Motion to Dismiss ("TXU's Motion to Dismiss"), at pgs. 1–2, Underwriters' Memorandum of Law in Support of Its Motion to Dismiss ("Underwriters' Motion to Dismiss"), at pgs. 1– 2]. Defendants contend that they have substantial legal and factual defenses to plaintiffs' claims and believe that they

ultimately would have prevailed on the claims—either on a motion to dismiss, a motion for summary judgment or at trial. Defendants have identified the following issues they contend would defeat plaintiffs' claims:

- Plaintiffs' allegations failed to meet the heightened pleadings standards as required under the Private Securities Litigation Reform Act of 1995 ("PLSRA");

- Plaintiffs' reliance on opinions of former TXU employees does not satisfy the heightened pleading requirements of the PSLRA in that the former employees can not establish a strong inference of scienter, and that the former employees' opinions are contradicted by the Company's "clean audit" opinions;

- Plaintiffs' reliance on statements about the security of the Company's dividend and European subsidiary fails to satisfy the heightened pleadings standards of the PSLRA;

- Plaintiffs' accounting allegations fail to satisfy the heightened pleadings standards of the PSLRA, nor are the accounting allegations plead with specificity;

- Many of Plaintiffs' challenged statements are forward looking and protected from liability;

- Plaintiffs failed to satisfy the pleading requirements of Section 11 and 12 of the Securities Act of 1933, in that Plaintiffs improperly collapsed allegations about the underwriters into allegations that are not actionable; and

- Plaintiffs lack standing to bring certain claims.

[*See passim,* TXU's Motion to Dismiss and Underwriters' Motion to Dismiss.]

17. Defendants have represented to the Court that they nevertheless consider it desirable for the class action to be settled and dismissed to avoid the substantial burden, expense, management distraction and uncertainties that would be involved in protracted litigation, and to settle the Released Claims against them. [*See* Stipulation of Settlement, at pg. 4.]

F. The Settlement

1. Initial Settlement Discussions

18. In early 2004, counsel for the parties met to initiate settlement discussions and the progress of the case. [*See* Joint Declaration of Joe Kendall and Mark Solomon, at ¶ 47.] Subsequent discussions ensued and Counsel for the parties began exploring issues of damages, causation, allegations and defenses. [*See Id.*]

19. In May 2004, Counsel for Lead Plaintiffs and the Defendants engaged in a mediation session before Antonio Piazza. [*See Id.*] Many issues were debated and vigorously contested. [*See Id.*] At that time, Lead Plaintiffs and Defendants could not reach an accord. [*See Id.*] Counsel for Lead Plaintiffs continued to investigate the case, interview fact witnesses and meet with consultants. [*See Id.* at ¶ 27.] Throughout the second and third quarters of 2004, the parties engaged in ongoing discussions. [*See Id.* at ¶ 47.] However, they were unable to reach an amicable agreement, due in part to Lead Plaintiffs' insistence on stringent corporate governance reforms as part of any settlement. [*See Id.*] Ultimately the differences between the parties narrowed, with the assistance of the Honorable Robert M. Parker as Mediator, and a Memorandum of Understanding was signed mid-January 2005. [*See Id.* at ¶ 48.]

 **\*5**  20. Throughout this period, Lead Plaintiffs oversaw the progress of the litigation and instructed Lead Counsel with respect to the ongoing investigation. [*See* Declaration of Arthur Nielsen, Jr., in Support of Application of Settlement and Plan of Allocation of Settlement Proceeds ("Nielsen Declaration"), at ¶¶ 7–9; Declaration of Ronald Canada in Support of Application of Settlement and Plan of Allocation of Settlement Proceeds ("Canada Declaration"), at ¶¶ 4–7; Declaration of Plumbers & Pipefitters National Pension Fund in Support of Application of Settlement and Plan of Allocation of Settlement Proceeds ("Sweeney Declaration"), at ¶¶ 4–5.] Indeed, the Lead Plaintiffs monitored the mediation process and a representative of The Plumbers and Pipefitter National Pension Fund attended the May 2004 mediation before Antonio Piazza. In addition, Lead Plaintiffs reviewed key documents provided by Lead Counsel and reviewed and approved significant pleadings prior to filing. Lead Plaintiffs also participated in numerous meetings with Lead Counsel in which they discussed the merits and settlement value of the various claims, and instructed Lead Counsel with respect to negotiating the terms of settlement. [*See* Nielsen Declaration, at ¶¶ 8–9; Canada Declaration, at ¶ 6; Sweeney Declaration, at ¶¶ 4–5.]

21. Furthermore, Lead Plaintiffs and Defendants each were advised by various consultants and experts, including individuals with expertise in accounting, auditing and/or

governance issues, and in estimating potential damages in cases involving allegations of securities fraud. In addition, Lead Counsel (with the assistance of teams of private investigators) held dozens of interviews with the Company's current and former employees and management personnel. [*See* Joint Declaration of Joe Kendall and Mark Solomon, at ¶¶ 7, 27, 33.]

#### 2. The Stipulation and Agreement of Settlement

22. In January, 2005, Lead Plaintiffs and Defendants reached an agreement on the terms to settle the Litigation. [*See* Joint Declaration of Joe Kendall and Mark Solomon, at ¶ 48.] The proposed settlement was conditioned on, among other things, Lead Counsel's completion of additional discovery, including interviews of Company witnesses, and Lead Counsel's and Lead Plaintiffs' conclusion at the completion of that additional discovery that the settlement terms were fair, reasonable and adequate. [*See Id.* at ¶ 13.] On January 20, 2005, Lead Plaintiffs and the defendants executed a Memorandum of Understanding.

23. The proposed settlement provides, among other things, that TXU would make a cash settlement payment of $149,750,000.00 and would implement and maintain for seven (7) years certain corporate governance reforms and enhancements. The parties also agreed that the settlement was subject to Lead Plaintiffs' Counsel's review of additional non-privileged documents, deposition transcripts, and non-privileged reports, and completion of witness interviews to enable them to further review the evidence relevant to the claims in this action.

#### 3. Discovery

**\*6** 24. In January 2005, Counsel for Lead Plaintiffs continued their review of relevant documents and had their accounting experts begin reviewing relevant Company documents. [*See* Joint Declaration of Joe Kendall and Mark Solomon, at ¶ ¶ 13, 27.] The Company has made available hundreds of thousands of pages of documents. Additional requests were made by Lead Counsel regarding the allegation in the complaint and the Company produced more documents. [*See Id.* at ¶ 13.]

25. Lead Counsel also interviewed a substantial number of former or current Company witnesses knowledgeable about the issues, including two former Chairmen of the Board, former CEO, the former Executive Vice Chairman and Chief Financial Officer, the former Executive Vice President of TXU and President of TXU Energy, the former Chief Operations Officer of TXU Europe, the former Chief Executive Officer of TXU Europe, and the former President of Energy Trading for TXU Europe. [*See Id.*]

26. Throughout this period of discovery, Lead Plaintiffs and Defendants were advised by various consultants and experts, including individuals with expertise in damages and governance issues, and in estimating potential damages in cases involving allegations of securities fraud. [*See Id.* at ¶¶ 13, 47.]

#### G. The April 11, 2005 Order

27. On April 1, 2005, this Court held a hearing to determine whether to grant preliminary approval of the proposed settlement and to authorize the issuance of notice to Class Members.

28. Based upon this Court's review of the Stipulation of Settlement, the parties' joint application and oral presentations, this Court entered its April 11 Order, which, among other things: (i) preliminarily certified the Class for settlement purposes; (ii) found the proposed settlement sufficiently fair, reasonable and adequate to warrant sending notice of the proposal to class members and holding a full hearing on the proposed settlement; and (iii) found that the proposed forms and methods of notice met all of the requirements of the Federal Rules of Civil Procedure, the PSLRA and due process. The Court scheduled a final hearing on the fairness of the proposed settlement for June 23, 2005.

29. As discussed in more detail below, consistent with the court's April 11 Order, the parties provided Notice of proposed settlement to Class Members. The Court approved a class action claims administrator, Gilardi & Co, LLC ("Gilardi" or "Settlement Administrator"), which arranged for the mailing of individual notices. [*See* Declaration of Carole Sylvester Re A) Mailing of the Notice of Pendency and Settlement of Class Action and the Proof of Claim and Release Form; and B) Publication of the Summary Notice ("Sylvester Declaration"), at ¶¶ 5–6.] Gilardi, also had the Notice published in the *Investor's Business Daily* and on its website. [*See Id.* at ¶ 8.]

#### H. The Fairness Hearing

30. The parties filed submissions in support of the settlement on June 13, 2005. These submissions were accompanied by numerous declarations from fact and expert witnesses.

**\*7** 31. Lead Plaintiffs presented declarations from: (1) Authur C. Nielsen, Jr., Ronald Canada and the Plumbers & Pipefitters National Pension, Lead Plaintiffs, supporting the settlement and plan of allocation of settlement proceeds; (2) Robert A.G. Monks, which detailed the benefits conferred upon TXU shareholders due to corporate governance changes as a result of this settlement; (3) Carole K. Sylvester and Robert E. Forrest, concerning the dissemination and publication of Notice to potential class members; (4) Professor Charles Silver, concerning the reasonableness of class counsels' request for attorneys' fees and reimbursement of expenses; (5) The Honorable Craig Enoch, in support of the proposed attorneys' fee award; and (6) Joe Kendall and Mark Solomon, class counsel, in support of final approval of the settlement and plan of allocation, and award of attorneys' fees and reimbursement of expenses.

32. The Court held a hearing regarding the fairness, reasonableness and adequacy of the proposed settlement on June 23, 2005.

33. Both Lead Plaintiffs' counsel and TXU's counsel made presentations in support of the settlement at the June 23, 2005 Fairness Hearing. Parties objecting to the settlement made presentations as well.

## II. THE TERMS OF THE SETTLEMENT

34. The proposed settlement provides the Class with a substantial monetary recovery, which will be allocated among Class Members on the basis of their particular claims, as well as important corporate governance reforms, designed to benefit TXU and its shareholders.

### A. The Settlement Fund

35. Pursuant to the terms of the Stipulation of Settlement, the Defendants paid a total of One Hundred Forty–Nine Million Seven Hundred and Fifty Thousand Dollars ($149,750,000) into a settlement fund from which relief will be provided to Class Members (the "Settlement Fund"). From this settlement fund, $200,000 was used to establish a "Class Notice and Administration Fund." The balance, after deducting the amount of Lead Counsel's attorneys' fee and expenses award, is to be allocated among eligible claimants who submit timely proofs of claim.

### 1. Expenses to be Deducted from the Settlement Fund

36. The Stipulation of Settlement provides that notice and administration expenses, Lead Counsel's fees and expenses, and tax expenses (if any) will be paid from the Settlement Fund. [*See* Stipulation of Settlement, at 3.b., 3.c., and 8.] The balance of the fund after payment of those amounts will be distributed to Class Members.

37. The terms of the Stipulation of Settlement provided that Lead Counsel could apply to the Court for an award of attorneys' fees and expenses. Lead Counsel committed in the Notice mailed to Class Members that they will not seek an award of fees exceeding 22.2% of the Settlement Fund [*See* Notice, at XI.] Lead Plaintiffs and Lead Counsel have also applied for reimbursement of litigation expenses in an amount equal to *$541.203.77.* [*See* Declaration of Ellen Gusikoff filed on Behalf of Lerach Coughlin Stoia Geller Rudman & Robbins LLP in Support of Application for Award of Attorneys' Fees and Reimbursement of Expenses ("Gusikoff Declaration"); Declaration of Willie C. Briscoe filed on Behalf of Provost Umphrey Law Firm LLP in Support of Application for Award of Attorneys' Fees and Reimbursement of Expenses ("Briscoe Declaration"); Declaration of Jack G. Fruchter filed on Behalf of Abraham Fruchter & Twersky LLP in Support of Application for Award of Attorneys' Fees and Reimbursement of Expenses ("Fruchter Declaration"); Declaration of Lawrence G. Soicher, Esq. in Support of Application for Award of Attorneys' Fees and Reimbursement of Expenses (Soicher Declaration).]

### 2. The Plan of Allocation

**\*8** 38. The Stipulation of Settlement provides that eligible Class Members who submit valid and timely proof of claim forms will receive distributions from the balance of the settlement fund in the form of cash. Those distributions are to be calculated pursuant to the Plan of Allocation prepared by Lead Counsel. Neither the defendants nor their counsel have had any role in, or responsibility for, the Plan of Allocation.

39. Pursuant to the Plan of Allocation, the Net Settlement Fund will be distributed to eligible Class Members who submit valid, timely Proof of Claim forms and Release forms ("Authorized Claimants"). The Plan of Allocation clearly identifies the circumstances by which Authorized Claimants may participate in the distribution of the Net Settlement Fund. [*See* Notice, at VII.]

40. Based on the Plan of Allocation, Lead Counsel projects that Class Members will receive an average distribution of: (1) $5.86 per TXU common stock for Authorized Claimants

that purchased TXU stock from April 26, 2001 through October 3, 2002, and sold their stock between October 4 through October 11, 2002; (2) $11.67 per TXU common stock for Authorized Claimants that purchased TXU stock from April 26, 2001 through October 3, 2002, and sold their stock on or after October 12, 2002; (3) $5.81 per TXU common stock for Authorized Claimants that purchased TXU stock from October 4, 2002 October 11, 2002, and sold their stock on or after October 12, 2002; and (4) the difference between the purchase price (not to exceed $50.00) less the sales price per TXU FELINE PRIDES for Authorized Claimants that purchased from May 31, 2002 through October 11, 2002. Additional payment provisions are provided for other Authorized Claimants that purchased all other publicly traded TXU securities during the Class Period. If there are sufficient funds in the Net Settlement Fund, each Authorized Claimant will receive an amount equal to the Authorized Claimant's claim, as defined in the Plan of Allocation. If the amount in the Net Settlement Fund is not sufficient to permit payment of the total claim of each Authorized Claimant, however, then each Authorized Claimant shall be paid the percentage of the Net Settlement Fund that each Authorized Claimant's claim bears to the total of the claims of all Authorized Claimants. [*See* Notice, at VII.]

41. The Plan of Allocation was formulated by Lead Counsel with assistance from its materiality and damages experts. [*See* Joint Declaration of Joe Kendall and Mark Solomon, at ¶ 70.]

### 3. Other Relief

42. In addition to the cash payment of $149.75 million, the Stipulation of Settlement provides that TXU's Board of Directors will adopt resolutions or amendments to the Company's By–Laws and/or Articles of Incorporation to implement a series of corporate governance principles designed to improve the Company's corporate governance and internal controls. The proposed settlement provides for enhancements to the board's composition, compensation, committees and functions in the form of the following, among others:

**\*9** the formation of a Lead Independent Director position;

the replacement of two directors who served on the TXU board during the Class Period with independent directors;

increases in the minimum stock holdings by members of the Company's Board;

increasing the number of independent directors;

enhanced "independence" standards for board members;

rescission of the Company's "shareholders rights plan," also known as "poison pill"; and

the appointment of a corporate Governance Officer;

### B. Release Bar Orders

43. In consideration of the comprehensive relief described above, the Stipulation of Settlement contemplates that this Court will enter an Order approving the settlement that incorporates a release. [*See* Stipulation of Settlement, at pgs. 10–11.]

### III. JURISDICTION

#### A. Subject Matter Jurisdiction

44. This Court has federal question jurisdiction pursuant to § 27 of the Exchange Act, 15 U.S.C. § 78aa, and § 22 of the Securities Act, 15 U.S.C. § 77v, and 28 U.S.C. §§ 1331 and 1337(a).

#### B. Personal Jurisdiction

45. This Court has in personam jurisdiction over Lead Plaintiffs and Class Members. The Court plainly may exercise personal jurisdiction over Class Members from Texas and over objectors as a result of their filing objections with this Court. And the Court has properly obtained personal jurisdiction over other out-of-state class Members by giving them proper notice and a chance to opt out or to be heard. *Phillips Petroleum Co. v. Shutts,* 472 U.S. 797, 811–12, 105 S.Ct. 2965, 86 L.Ed.2d 628 (1985); *Calagaz v. Calhoon,* 309 F.2d 248 (5th Cir.1962); *Robins v. Cli–Claque Co.,* 2003 U.S. Dist. LEXIS 13695, at *15 (N.D.Tex. Aug. 4, 2003).

46. The Court therefore finds that all Class Members who did not request exclusion from the Class are subject to this Court's personal jurisdiction. *See Shutts,* 472 U.S. at 812–13.

## IV. THE CLASS NOTICE SATISFIES ALL APPLICABLE REQUIREMENTS

47. This Court has found "that the publication, mailing, and Internet posting of such notices in the manner and form set forth in the Stipulation ... meet the requirements of the Rule 23 of the Federal Rules of Civil Procedure, due process, and the Rule of this Court, and is the best notice practicable under the circumstances and shall constitute due and sufficient notice to all persons entitled thereto." [*See* April 11 Order at ¶ 3.]

### A. Notice to Class Members

48. Beginning on April 22, 2005, the Settlement Administrator mailed by first-class mail, postage prepaid, more than 289,000 copies of the Court-approved Notice to the last-known address of each reasonably identifiable Class Member and in response to requests from potential Class Members, brokers and/or nominees. [*See* Sylvester Declaration, at ¶ 6.]

49. Consistent with the Court's April 11 Order, the Notice included the text of the proposed Plan of Allocation and a Proof of Claim and Release form, which included instructions and requirements for filing a Proof of Claim. The Notice also included a general description of the dismissal, release and bar order provisions of the Stipulation of Settlement.

**\*10** 50. In addition to mailing individual notices, the Settlement Administrator arranged to have the Court approved Summary Notice run in the national edition of *Investor's Business Daily,* on April 29, 2005. [*See* Sylvester Declaration, at ¶ 8.]

51. The Notice (in its entirety, including the text of the Plan of Allocation and a general description of the release) was published on the Settlement Administrator's Internet website [*See Id.* at ¶ 7.]

### B. Applicable Notice Requirements

52. Where, as here, the parties have sought simultaneously to certify a settlement class and settle a class action, the Court must consider Fed.R.Civ.P. 23(c)(2)'s notice requirements for class certification, as well as Rule 23(e)'s notice requirements for settlement and dismissal. *See, e.g., Newby v. Enron Corp.,* 394 F.3d 296, 306 (5th Cir.2004);

*Moore v. Halliburton Co.,* Fed. Sec. L. Rep. (CCH) P92,916, at \*36 (N.D.Tex. Sep. 9, 2004). For classes certified under Fed.R.Civ.P. 23(b)(3), such as the class in this action, Rule 23(c)(2) requires "the best notice practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." Rule 23(e) is less specific, requiring only that notice of the proposed settlement be given "in such a manner as the court directs," and is considered less stringent than Rule 23(c)(2). *See, e.g., Zimmer Paper Prods., Inc. v. Berger & Montague, P.C.,* 758 F.2d 86, 91 (3d Cir.1985); *In re Cherry's Pet to Intervene,* 164 F.R.D. 630, 636 (E.D.Mich.1996).

53. The Constitution's Due Process Clause also imposes certain minimum notice requirements which are satisfied if the notice conforms to Rule 23(c)(2). *See Eisen v. Carlisle & Jacquilin,* 417 U.S. 156, 173–74, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974) ("the mandatory notice pursuant to subdivision (c)(2) ... is designed to fulfill requirements of due process to which the class action procedure is of course subject") (quotations marks omitted); *see also Doleac v. Michalson,* 264 F.3d 470, 489 (5th Cir.2001); *Bertulli v. Indep. Ass'n of Cont'l Pilots,* 242 F.3d 290, 294 (5th Cir.2001).

54. In addition to the requirements of the Federal Rules and due process, the PSLRA, see 15 U.S.C. § 78u–4(a)(7); 15 U.S.C. § 77z–1(a)(7)(A), imposes certain additional notice requirements:

> [1] the amount of the settlement and proposed distribution to plaintiffs; [2] if the parties to settlement disagree on the average amount of damages per share ..., "a statement from each settling party concerning the issue or issues on which the parties disagree"; [3] a statement of attorneys' fees or costs sought; [4] the name, address and telephone number of plaintiffs' representatives; and [5] "[a] brief statement explaining why the parties are proposing the settlement."

*In re Cendant Corp. Securities Litig.,* 109 F.Supp.2d 235, 254–55 (D.N.J.2000) (quoting the PSLRA), aff'd, 264 F.3d 201 (3d Cir.2001), *cert. denied sub nom. Mark v. California Pub. Employees' Retirement Sys.,* 535 U.S. 929, 122 S.Ct. 1300, 152 L.Ed.2d 212 (2002).

C. The Notice Provided in the Case Clearly Meets all Applicable Requirements

**\*11** 55. First, the dissemination of the notice package —by first-class mail to all Class Members who could be identified by reasonable effort—supplemented by publication on the Settlement Administrator's Internet website, and broad publication notice of the Summary Notice in a national newspaper—more than satisfies Rule 23(c)(2)'s requirement of individual notice "to all members who can be identified through reasonable effort." *See, e.g., Miller v. Republic Nat'l Life Ins. Co.,* 559 F.2d 426, 429–30 (5th Cir.1977); *Grace v. City of Detroit,* 145 F.R.D. 413, 416 (E.D.Mich.1992) (notice by first-class mail and publication meets Rule 23(c)(2) requirements).

56. Notice was also provided to Class Members in a timely manner. As noted, mailing of the individual Notice began on April 22, 2005—62 days before the scheduled Fairness Hearing. The timing of the mailing is thus adequate. *See, e.g., Miller,* 559 F.2d at 429; (period of four weeks between the mailing and the hearing is sufficient); *see also Tanksley v. Gulf Oil Corp.,* 848 F.2d 515, 518 (5th Cir.1988); *Bass v. Phoenix Seadrill/78, Ltd.,* 749 F.2d 1154, 1164 (5th Cir.1985).

57. The content of the notice also complies with Rule 23(c)(2). *See Bowling v. Pfizer, Inc.,* 143 F.R.D. 141, 160 (S.D.Ohio 1992) ("[t]he notice provided to class members must include enough information to allow the class members to make an informed choice of whether to approve or disapprove the settlement"); *see generally, Williams v. Vukovich,* 720 F.2d 909, 921 (6th Cir.1983) (notice must give class members "a full and fair opportunity to consider the proposed [settlement] and develop a response"); *see also, In re Corrugated Container Antitrust Litig.,* 643 F.2d 195, 224 (5th Cir. Apr.1981); *In re Beef Indus. Antitrust Litig.,* 607 F.2d 167, 183 (5th Cir.1979).

58. The Court-approved individual Notice, which was mailed to individual Class Members and posted on the Administrator's website, clearly informed Class Members of the relevant aspects of the class action and the settlement, including:

How the settlement fund will be allocated to the Class Members if the settlement is approved;

The right of Class Members to exclude themselves from the settlement Class, to object to any aspect of the settlement or to appear at the Fairness Hearing and the processes and deadlines for doing so;

The date of the Fairness Hearing; and

The binding effect of any judgment—whether favorable or not—on all persons who do not exclude themselves from the Class, and the impact on Class members if the settlement is approved.

The Notice also provided Class Members with a telephone number that they could call to obtain additional information regarding the settlement. In addition, as described above, a Court-approved Summary Notice—published in a national newspaper—that contained all pertinent information about the class action and settlement required by Rule 23(c)(2), Rule 23(e) and due process. The Summary Notice also provided Class Members with a telephone number and advised them that they could obtain a copy of the individual Notice by calling that number.

**\*12** 59. Consistent with the requirements of the PSLRA, the Notice:

• Sets out the amount of the settlement and the proposed distribution under the heading "Plan of Allocation";

• Informs Class Members of the parties' disagreement regarding the average damages per share;

States the amount of attorneys' fees and costs sought and provides Class Members with the names, addresses and telephone numbers of Lead Counsel; and

• Explains why the parties are proposing the settlement.

60. In these circumstances, all applicable notice requirements have been satisfied, including the requirements of Rule 23(c)(2) and 23(e), and the U.S. Constitution. *See, e.g., In re Nissan Motor Corp. Antitrust Litig.,* 552 F.2d 1088 (5th Cir.1977); *Prieto v. John Hancock Mut. Life Ins. Co.,* 132 F.Supp.2d 506, 517 (N.D.Tex.2001); *Shaw v. Toshiba Am. Info. Sys.,* 2000 U.S. Dist. LEXIS 3592, at \*49 (E.D. Tex Jan. 28, 2000); *In re Corrugated Container Litig.,* 556 F.Supp.

2005 WL 3148350

1117, 1123; *Johnson v. Am. Airlines, Inc.,* 531 F.Supp. 957, 961 (N.D.Tex.1982).

61. The Court thus affirms its findings and conclusions in the April 11 Order that the notice and the notice methodology are the best practicable notice and meet the requirements of the Federal Rules of Civil Procedure (including Fed.R.Civ.P. 23(c)(2) and (e)), the United States Constitution (including the Due Process Clause), the PSLRA, the Rules of this Court and any other applicable law.

## V. CLASS CERTIFICATION

62. In its April 11, 2005 Order Preliminarily Approving Settlement and Approving Form and Manner of Service, the Court preliminarily found the requirements of class certification to be satisfied. [*See* April 11 Order, at ¶¶ 1(a)-(b).] Lead Plaintiffs argue that final certification of this action is both appropriate and warranted. [*See* Lead Plaintiffs' Memorandum of Law in Support of Final Approval of Settlement and Plan of Allocation of Settlement Proceeds ("Lead Plaintiffs' Settlement Memorandum"), at pgs. 28–32.] The Court makes the following findings in support of its decision to grant final certification of the Class for settlement purposes, which are intended to supplement and finalize the certification findings made by the Court in its April 11 Order.

63. In order to certify this settlement class, the court must find that the proposed class meets the four threshold requirements of the Federal Rule of Civil Procedure 23(a)—numerosity, commonality, typicality and adequacy of representation—and, in addition, is maintainable under Rule 23(b)(3). The Rule 23(b)(3) requirements are that common questions "predominate over any questions affecting only individual members" and that class resolution be "superior to other available methods for the fair and efficient adjudication of the controversy."

64. In *Amchem Products,* the Supreme Court expressly acknowledged that cases may be certified for settlement purposes only. *Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, 618–19, 621–22, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997) ( "dominant concern" is "whether a proposed class has sufficient unity so that absent members can fairly be bound by decisions of class representatives"; "settlement is relevant to class certification," and is "a factor in the calculus."); *see also Black v. Chase Bank of Tex. Nat'l Ass'n,* 2001 U.S. Dist.

LEXIS 18134, at *5 (N.D.Tex. Nov. 6, 2001); *In re Beef Indus. Antitrust Litig.,* 607 F.2d 167, 178 (5th Cir.1979) (it is proper and consistent for the court to certify a class for settlement purposes even while it might be difficult to reach that determination in a different context).

### A. Numerosity

**\*13** 65. The numerosity requirement plainly is satisfied in this case. In its April 11 Order, the Court defined the class for settlement purposes as:

> All Persons who purchased the publicly traded securities of TXU Corp. including TXU Europe Limited, ("TXU") between April 26, 2001 to October 11, 2002, inclusive. Excluded from the Settlement Class are Defendants, officers and directors of TXU and its affiliates and subsidiaries and the Underwriter Defendants, as well as their families; members of the immediate family of each of the Individual Defendants; any entity in which any Defendant has or had a controlling interest; the legal representatives, heirs, executor, successors or assigns of any such excluded party; and those members of the Settlement Class that timely and validly exclude themselves from the Settlement Class.

[*See* April 11 Order, at ¶ 1.] The purchasers covered by this Class or those who purchased publicly traded TXU securities during the Class Period. "[T]he prerequisite expressed in Rule 23(a)(1) is generally assumed to have been met in class action suits involving nationally traded securities." *See Zeidman v. J. Ray McDermott & Co.,* 651 F.2d 1030, 1039 (5th Cir. Jul.1981).

### B. Commonality

2005 WL 3148350

66. Rule 23(a)(2) requires that questions of law or fact exist that are common to the class. "The commonality requirement is satisfied where the party opposing the class has engaged in some course of conduct that affects a group of persons. In such instances, the elements of that cause of action will be common to all persons affected." *McNamara v. Bre–X Minerals, Ltd.,* 2003 U.S. Dist. LEXIS 25644, at \*24 (E.D.Tex. Dec. 15, 2003); *see also,*1 CONTE & NEWBERG § 3.10. The Fifth Circuit has observed that "the threshold for commonality is not high." *Bertulli v. Indep. Ass'n of Cont'l Pilots,* 242 F.3d 290, 296–97 (5th Cir.2001). In the instant case, the claims of all Class members rest on the same allegations of false and misleading statements by Defendants. In addition, the claims of all Class Members derive from the same private right of action granted by the federal securities laws, based on the same underlying facts.

67. Allegations of a common course of fraudulent conduct, such as those set forth in the Complaint, generally satisfy the commonality requirement. *See, e.g., In re Fleming Cos. Secs., & Derivative Litig.,* 2004 U.S. Dist. LEXIS 26488, at \*151 (E.D.Tex. Jun. 10, 2004), *citing, In re Saxon Sec. Litig.,* 1984 WL 2399, at \*7 (S.D.N.Y.1984) (holding that "debenture holders have an interest identical to that of the holders of common stock in demonstrating a common course of fraudulent conduct").

68. There is no doubt that questions of law and fact exist that are common to members of the Class in this case.

#### C. Typicality

69. Rule 23(a)(3) requires that the claims of the class representative not differ significantly from the claims of the class as a whole. Rule 23(a)(3) "focuses on the similarity between the named plaintiffs' legal and remedial theories and the theories of those they purport to represent." *Mullen v. Treasure Chest Casino, L.L.C.,* 186 F.3d 620, 625 (5th Cir.1999).

 **\*14** 70. "Typicality does not require a complete identity of claims. Rather, the critical inquiry is whether the class representative's claims have the same essential characteristics as that of the putative class. If the claims arise from a similar course of conduct and share the same legal theory, factual differences will not defeat typicality." *Berger v. Compaq*

*Computer Corp.,* 2000 U.S. Dist. LEXIS 21424, at \*10 (S.D.Tex. Jul. 17, 2000).

71. Here, Lead Plaintiffs' legal and remedial theories are the same as those of the other Class Members. The same allegedly false and misleading statements were directed to Lead Plaintiffs and the other Class Members. Defendants are alleged to have violated the federal securities laws in the same manner with respect to Lead Plaintiffs as to all other Class Members. Moreover, the legal theories and evidence that Lead Plaintiffs would advance to prove its claims would apply to the claims of all other members of the Class.

72. Lead Plaintiffs allege that they were damaged because the Defendants' misrepresentations caused the price of TXU Securities to be artificially inflated. Other Class Members were allegedly harmed by the same artificial price inflation arising from Defendants' alleged misconduct. Because Lead Plaintiffs stand in the same position as other Class Members, Lead Plaintiffs' claims are typical of those asserted by Class Members.

73. Lead Plaintiffs' claims are typical of those of the other members of the Class.

#### D. Adequacy of Representation

74. To meet the adequacy-of-representation requirement of Rule 23(a)(4), Courts consider (1) whether the named representative shares common interest with other class members, and (2) whether the named representative will vigorously prosecute the interests of the class through the class counsel. *Berger v. Compaq Computer Corp.,* 257 F.3d 475, 482 (5th Cir.2001).

##### 1. Qualifications of Lead Counsel

75. Lerach Coughlin Stoia Geller Rudman & Robbins LLP and Provost Umphrey Law Firm, LLP (collectively "Lead Counsel") are two of the nations' preeminent plaintiffs' class action law firms. The lawyers from those firms responsible for the prosecution of this case have taken leading roles in numerous important actions on behalf of investors asserting claims of fraud.

76. Lead Counsel have amply demonstrated their competence through their representation of Lead Plaintiffs in this action to date, including their successful negotiation of a $149.75 million settlement of the claims made by Lead Plaintiffs. This

is the largest cash settlement in a securities class action ever in this District. It is also one of the largest securities class action recoveries ever obtained in the United States in a case not involving a restart of never reported earnings.

### 2. Qualifications of Lead Plaintiffs

77. Lead Plaintiffs are The Plumbers & Pipefitters National Pension Fund (a large institutional investor), Arthur Nielsen, Jr. and Ronald Canada. Each purchased TXU securities during the Class Period. [*See* Compl., at ¶ 17.]

 **\*15** 78. In the Fifth Circuit, two criteria has been articulated for determining adequacy of representation: (1) whether the named representative shares common interest with other class members; and (2) whether the named representative will vigorously prosecute the interests of the class through the class counsel. *Berger,* 257 F.3d at 482.

79. It is plain that the Lead Plaintiffs are united in asserting the common goal of maximizing the total recovery for the Class. Through Lead Plaintiffs' efforts, Defendants have been compelled to pay $149.75 million in cash and implement groundbreaking corporate governance improvements. This settlement amount clearly evidences that Lead Plaintiffs have "vigorously" prosecuted the interests of the Class.

80. Moreover, the Lead Plaintiffs have no interests that conflict with those of other Class Members, and have a major stake in the outcome of this action, having asserted losses in connection with their lead plaintiff motion in the aggregate of nearly $2.6 million from the Class Period purchase of TXU Securities during the Class Period. As such, Lead Plaintiffs are part of the Class and possesses the same interests and suffered the same injury as other Class Members. *See Amchem,* 521 U.S. at 625.

81. As Congress intended in passing the PSLRA, Lead Plaintiffs, are sophisticated class members that have taken an active and participatory role in the prosecution of this litigation. As noted above, Lead Plaintiffs monitored the progress of the litigation, instructed Lead Counsel with respect to ongoing investigation and participated, through Lead Counsel, in settlement negotiations. [*See* Nielsen Declaration, at ¶¶ 7–9; Canada Declaration, at ¶¶ 4–7; and Sweeney Declaration, at ¶¶ 4–5.] Thus, there is no doubt that Lead Plaintiffs are adequate class representatives.

82. Given that Lead Counsel are highly respected, experienced lawyers in this area of practice, and no conflicts exist between the Lead Plaintiffs' interests and those of other Class Members, this Court finds that the adequacy requirement is satisfied.

### E. Predominance of Common Questions

83. Predominance "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem,* 521 U.S. at 623. "In order to predominate common issues must constitute a significant part of the individual cases." *Jenkins v. Raymark Indus.,* 782 F.2d 468, 472 (5th Cir.1986). "The predominance requirement is satisfied unless it is clear that individual issues will overwhelm the common questions and render the class action valueless." *Id.* (Internal quotation marks and citation omitted). The test is " 'readily met in certain cases alleging consumer or securities fraud or violations of the antitrust laws.' " *Jones v. Allercare, Inc.,* 203 F.R.D. 290, 303 (N.D.Ohio 2001) (quoting *Amchem,* 521 U.S. at 625).

84. Lead Plaintiffs have shown above that numerous important questions of law and fact are common to the members of the Class. These questions clearly predominate over any conceivable individual question, because Defendants' alleged misconduct affected the members of the Class in the same manner. The alleged misrepresentations by Defendants involve a series of statements that were uniformly disseminated to the investing public, as well as material non-public information that the Defendants failed to disclose to the investing public. Inasmuch as the claims against Defendants arise out of the same set of operative facts and are based on common legal theories, the predominance of common questions of law and fact is clear. *See In re Eng'g Animation Sec. Litig.,* 203 F.R.D. 417, 422 (S.D.Iowa 2001) (predominance requirement met where class has a common interest in determining whether " 'defendants' course of conduct is in its broad outlines actionable' "; "[d]ifferences between class members—based on when they bought [the] stock, how much they bought, and when they sold it 'cast no doubt on the finding of predominance' ") (quoting *In re Ikon Office Solutions, Inc. Sec. Litig.,* 194 F.R.D. 166, 178 (E.D.Pa.2000)). Indeed, all liability issues are common to each and every Class Member. The Class thus readily satisfies the predominance requirement.

### F. Superiority

**\*16** 85. Class actions are superior when individual actions would be wasteful, duplicative, present managerial difficulty and be adverse to judicial economy. *Mullen v. Treasure Chest Casino, L.L.C.,* 186 F.3d 620, 627 (5th Cir.1999). Here the class members claim the same injury, from the same event, from the same defendant over the same period of time. Individual actions would therefore be duplicative of the same facts and law. *Basic, Inc. v. Levinson,* 485 U.S. 224, 250, 108 S.Ct. 978, 99 L.Ed.2d 194 (1998).

86. Where a settlement class is presented, the trial court need not consider the manageability of the class at trial. *See Amchem,* 521 U.S. at 620 (*citing* Fed.R.Civ.P. 23(b)(3)(D)). The remaining three superiority factors plainly indicate that a class action is the best vehicle for conducting this litigation.

87. Given the identity of legal and factual issues among Class Members, the notion that Class Members should file thousands of individual actions is completely illogical and would constitute an enormous waste of judicial and private resources. *See Shaw v. Toshiba Am. Info. Sys., Inc.,* 91 F.Supp.2d 942, 958 (E.D.Tex.2000). Moreover, it would be economically prohibitive for all but a limited number of Class Members (i.e., those who had the largest losses) to adjudicate their claims individually. *Amchem,* 521 U.S. at 617 ("[t]he policy at the very core of the class mechanism is to overcome the problem that small recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or her rights"); *Amchem* at 615 ("the superiority requirement was to achieve economies of time, effort, and expenses and promote uniformity of decisions"); *Sterling v. Velsicol Chem. Corp.,* 855 F.2d 118, 1196 (6th Cir.1988) ("[t]he procedural device of a Rule 23(b)(3) class action was designed not solely as a means for assuring legal assistance in the vindication of small claims but, rather, to achieve the economies of time, effort, and expense").

88. In addition, this Court is the most desirable forum in which to prosecute this action. TXU's corporate headquarters was located in Dallas, Texas during the Class Period and remains here today. Many of the acts and practices complained of originated in Texas, and much of the evidence and many of the witnesses relevant to Lead Plaintiffs' claims are found in Texas. Any fragmentation or separation of this litigation

into other jurisdictions would increase the costs to the Class and Defendants, and possibly could cause conflicting results, increasing legal costs and delay associated with resolving such conflicts. *See Shaw,* 91 F.Supp.2d at 958. Clearly, there is a strong interest in resolving the litigation in this forum.

89. Based on these factors, the superiority of resolving this litigation by means of a class action is evident.

90. For all of these reasons, as well as those set out in the Court's April 11 Order, the Court finally certifies for settlement purposes the Class described in the Order Approving the Class Action Settlement and in the Final Judgment.

## VI. FAIRNESS OF THE SETTLEMENT

**\*17** 91. Under Federal Rule of Civil Procedure 23(e), a court should approve a proposed class action settlement if it determines that the settlement is "fair, reasonable, and adequate, as well as consistent with the public interest." *Cotton v. Hinton,* 559 F.2d 1326, 1330 (5th Cir.1977). In making this determination, a court should consider the following factors:

- The Plaintiffs' likelihood of success on the merits, weighed against the amount and form of relief offered in the settlement,

- The complexity, expense and likely duration of the litigation,

- The state of proceedings and the amount of discovery completed,

- The nature of the settlement negotiations,

- The judgment of experienced counsel, and

- Objections raised by members of the class.

*Newby,* 394 F.3d at 301; *Reed v. Gen. Motors Corp.,* 703 F.2d 170 (5th Cir.1983); *Parker v. Anderson,* 667 F.2d 1204, 1209 (5th Cir.1982).

92. In addition, a court should consider the "public interest in favor of settlement of class action lawsuits," *Cotton,* 559 F.2d at 1331; *see also Vukovich,* 720 F.2d at 922 ("A

2005 WL 3148350

court may not withhold approval simply because the benefits accrued from the [settlement] are not what a successful plaintiff would have received in a fully litigated case"). Each of these various considerations strongly supports approval of the proposed settlement in this action.

A. Relief Offered in Settlement Compares Favorably to Plaintiffs' Likelihood of Success

93. "The most important factor is the probability of the plaintiff's success on the merits." *Parker,* 667 F.2d at 1209. "Courts judge the fairness of a proposed compromise by weighing the plaintiff's likelihood of success on the merits against the amount and form of settlement [t]hey do not decide the merits of the case or resolve unsettled legal questions." *Carson v. AM. Brands, Inc.,* 450 U.S. 79, 88, n. 14, 101 S.Ct. 993, 67 L.Ed.2d 59 (1981).

94. Review of the circumstances here demonstrates that the concrete monetary and corporate governance benefits of the proposed settlement far outweigh plaintiffs' uncertain prospects of success if this case were to be litigated rather than settled.

1. Relief Offered in Settlement

95. As set forth in detail above, the proposed settlement provides a $149.75 million settlement fund that will, after Lead Counsel's fees and certain other settlement-related expenses are paid, be distributed to eligible Class Members. The proposed settlement also provides for important enhancements to TXU's corporate governance policies and procedures, designed to strengthen the Company's internal controls and corporate governance.

96. The settlement thus offers significant benefits to the shareholder Class. Not only does it provide for one of the largest cash recoveries ever obtained in a non-restatement securities class action, it also includes TXU's adoption of sweeping beneficial corporate governance procedures. [*See* Declaration of Robert A.G. Monks, at ¶¶ 3, 15–22.]

**\*18** 97. The relief provided by the proposed settlement thus clearly falls well within the "range of reasonableness" required for settlement approval. *See, e.g.* *In re Domestic Air Transp. Antitrust Litig.,* 148 F.R.D. 297, 319 (N.D.Ga.1993) ("[i]n assessing the settlement, the Court must determine 'whether it falls within the 'range of

reasonableness,' not whether it is the most favorable possible result in the litigation' ") (internal citations omitted).

2. Plaintiffs' Likelihood of Success Is Uncertain

98. Defendants have demonstrated that Plaintiffs would face substantial factual and legal obstacles if this case were to proceed. Indeed, the allegations of the Complaint are untested by a motion to dismiss for failure to state a claim. Even assuming some parts of the Complaint were found to state a claim, Defendants have identified in their motions to dismiss what they believe are substantial legal and factual defenses that they believe ultimately would prevail—either on a motion for summary judgment or at trial.

99. For example, Defendants contend that notwithstanding allegations by a former TXU executive that he forecasted the adverse events that precipitated this lawsuit, in fact there is no evidence that the statements made by Defendants were false when made. [*See* TXU's Motion to Dismiss, at pgs. 11–12.] Even if there was such evidence, Defendants maintain on a motion to dismiss, Plaintiffs' Exchange Act and Rule 10b–5 claims would be found to lack the requisite scienter element required by the PSLRA. As the Fifth Circuit recently observed, "Under the PSLRA, a plaintiff must now 'state with particularity facts giving rise to a strong inference that defendant acted with the required state of mind.' " *In re El Paso Elec. Co. Sec. Litig.,* 2004 U.S. Dist. LEXIS 2580, at \*9 (W.D. Tex. Feb 23, 2004). The Supreme Court has held that scienter, a mental state embracing intent to deceive, manipulate, or defraud, is an essential element of a § 10(b) or Rule 10–5 claim. *Id.*

100. As noted above, the proposed settlement provides that each eligible Class Member who files a valid Proof of Claim will receive, within a relatively short period of time following approval and final disposition of the case, a distribution from the settlement fund consistent with Lead Counsel's Plan of Allocation. That certainty of recovery clearly outweighs plaintiffs' uncertain prospects of success through continued litigation. This factor therefore favors approval of the settlement.

B. Further Litigation Would Be Complex and Lengthy

101. The Complaint's allegations raise many complex legal and factual issues, including the accuracy and materiality of numerous statements and the scienter of those who made the statements. If litigation were to proceed, the issues would be hotly disputed by the parties. Litigation relating to such

Schwartz v. TXU Corp., Not Reported in F.Supp.2d (2005)

2005 WL 3148350

fact-intensive and difficult-to-prove claims would thus be extraordinarily complicated and time consuming, and require expert testimony. *In re Elec. Data Sys. Corp. Secs. Litig.,* 226 F.R.D. 559, 571 (E.D.Tex.2005) (securities fraud class actions are exceptionally complex) (the PSLRA's scienter requirements are complex); *Oscar Private Equity Invs. v. Holland,* 2005 U.S. Dist. LEXIS 6525, at \*34 (N.D.Tex. Apr. 15, 2005) (causation analysis in securities fraud cases is complex); *Longman v. Physicians Res. Group, Inc.,* 2003 U.S. Dist. LEXIS 17546, at \*8 (N.D.Tex. Sep. 30, 2003) (securities fraud class actions are complex litigation); *Nathenson v. Zonagen Inc.,* 267 F.3d 400, 412 (5th Cir.2001) (recognizing the complexity of securities fraud class action claims brought under the PSLRA); *Boston v. Tesoro Petroleum Corp.,* 871 F.2d 1266, 1278 (5th Cir.1989) (securities fraud trial was long and complex).

**\*19** 102. Ultimately, if Plaintiffs were to succeed at trial, they still could expect a vigorous appeal by Defendants and an accompanying delay in the receipt of any relief. *See, e.g., In re MicroStrategy, Inc. Sec. Litig.,* 148 F.Supp.2d 654, 667 (D.Va.2001) ("a jury verdict for either side would only have ushered in a new round of litigation in the Fourth Circuit and beyond, thus extending the duration of the case and significantly delaying any relief for plaintiffs").

103. In contrast, the proposed settlement grants Class Members relief without subjecting them to the risk, complexity, duration and expense inherent in continuing this litigation. *See Id.* (recognizing that "additional litigation of plaintiffs' claims ... would likely have been protracted and costly, requiring extensive expert testimony concerning the company's accounting practices and significance of the Individual Defendants' decisions in relation to GAAP" and concluding that "the old adage, 'a bird in hand is worth two in the bush' applies with particular force"); *see also In re Cendant Corp. Sec. Litig.,* 109 F.Supp.2d 235, 243 (D.N.J.2000) (finding that the complexity and duration of litigation weighed in favor of settlement).

104. Thus, this factor also supports approval of the settlement.

   C. The State of this Proceeding Strongly Supports
   Approval of the Proposed Settlement
105. Formal discovery is not a prerequisite to settlement. *In re Corrugated Container Antitrust Litig.,* 643 F.2d 195, 211 (5th Cir. Apr.1981) Although "[t]here is no precise

yardstick to measure the amount of litigation that the parties should conduct before settling," *In re Rio Hair Naturalizer Prods. Liab. Litig.,* No. MDL 1055, 1996 WL 780512, at \*13 (E.D.Mich. Dec.20, 1996), "[t]he Court need not find that the parties have engaged in extensive discovery," *In re Austrian & German Bank Holocaust Litig.,* 80 F.Supp.2d 164, 176 (S.D.N.Y.2000), *aff'd sub nom. D'Amato v. Deutsche Bank,* 236 F.3d 78 (2d Cir.2001) (citation omitted); *see also Levell v. Monsanto Research Corp.,* 191 F.R.D. 543, 556–57 (S.D.Ohio 2000) (approving settlement in which counsel relied primarily on informal discovery); *D'Amato,* 236 F.3d at 87 ("although no formal discovery had taken place, the parties had engaged in an extensive exchange of documents and other information ... thus, the 'stage of the proceedings' factor ... weighed in favor of settlement approval") (internal citation omitted); *Linney v. Cellular Alaska Partnership,* 151 F.3d 1234, 1239 (9th Cir.1998) (formal discovery is not necessary "where the parties have sufficient information to make an informed decision about settlement."). Unless Lead Counsel settled while "groping in darkness" the lack of formal discovery will not hinder the settlement. *Id. Cotton,* 559 F.2d at 1332.

106. The Settlement Agreement follows several phases of informal discovery (due to the PSLRA-mandates discovery stay) that provided Lead Counsel and their experts a comprehensive understanding of the facts and issues involved in their claims and defenses that potentially could be raised against them were the case to proceed. Before entering settlement negotiations, Lead Plaintiffs conducted an extensive investigation to assess the merits of the Complaint's allegations. Lead Counsel and private investigators conducted dozens of interviews with the Company's former employees and management personnel. Lead Counsel also examined the Company's public filings, press releases, analyst reports and other documents and employed experts in accounting, damages, materiality, loss causation and corporate governance to aid in Lead Counsel's investigation. [*See* Joint Declaration of Joe Kendall and Mark Solomon, at ¶ 9.]

 **\*20** 107. After initial settlement negotiations failed in May 2004, Lead Counsel continued their investigation. Prior to filing the Consolidated Complaint, Counsel for Lead Plaintiffs had conducted many months of investigation and research into the claims alleged. [*See Id.* at ¶ 7.] In January

**Schwartz v. TXU Corp., Not Reported in F.Supp.2d (2005)**

2005 WL 3148350

2005, the parties preliminarily agreed to settle this action. [*See Id.* at ¶ 48.] Lead Counsel continued its investigation during the parties' settlement negotiations and reviewed hundreds of thousands of pages of relevant information to Lead Plaintiffs. A team of more than ten attorneys representing the two Lead Counsel firms reviewed these documents from current and former TXU officers and directors. Co–Lead Counsel also had access to and have reviewed the transcripts of numerous depositions and related exhibits from the Murray Litigation. Similarly, Co–Lead Counsel had access to and have reviewed the transcripts and related materials pertaining to the English Proceedings. Finally, Co–Lead Counsel have had access to and have reviewed over 100,000 pages of additional documents produced to the SEC in connection with a subpoena served on TXU on March 17, 2005 after his proposed settlement had been announced (the "SEC Investigation"). As a result, Co–Lead Counsel were able to assess the claims and defenses in this case through the investigation, through the exchange of information in settlement talks, and through the negotiation and exercise of broad discovery rights that Co–Lead Counsel insisted that plaintiffs be afforded in the settlement process. [*See Id.* at ¶ 11.]

108. The investigation and discovery that occurred before, during and after settlement negotiations have enabled Lead Counsel and Lead Plaintiffs—as well as Defendants and this Court—to assess the legal and factual merits of the claims set out in the Complaint. *Ayers v. Thompson,* 358 F.3d 356, 369 (5th Cir.2004) (state of the proceedings favored settlement when discovery provided for ample information with which to evaluate the merits of the competing positions). Lead Counsel states that in the discovery process, Co–Lead Counsel became aware of the defendants' defenses which, if accepted, could be sufficient to refute plaintiffs' allegations. [*See* Joint Declaration of Joe Kendall and Mark Solomon, at ¶ 4.]

109. Under these circumstances, there is no doubt that Lead Plaintiffs had "an excellent idea of the merits of [their] case ... [and were] able to form an 'adequate appreciation of the merits of the case before negotiating.' " *See In re Cendant Corp. Litig.,* 264 F.3d 201, 235–36 (3d Cir.2001). The stage of this proceeding thus also weighs heavily in favor of approving the settlement.

**D. The Parties Reached the Settlement After Arm's–Length Negotiations and the Settlement Was Not a Product of Fraud or Collusion**

110. In addition to evaluating the substance of the proposed settlement, the Court examines "the process by which the settlement was arrived at, to make sure that the settlement is not the product of fraud, overreaching, or collusion." *Murillo v. Tex. A & M Univ. Sys.,* 921 F.Supp. 443, 445 (S.D.Tex.1996).

**\*21** 111. The parties have amply demonstrated that the settlement negotiations in this case, which took place over a lengthy period of time and involved two highly regarded mediators, were extensive and undertaken at arm's length by counsel on both sides who have substantial experience and expertise in representing parties in securities class actions. Throughout the negotiation process, the parties employed their own teams of attorneys, consultants and experts to assess the validity of the allegations underlying the Complaint. In addition, Lead Counsel and Lead Plaintiffs diligently prosecuted the action on behalf of the Class. Lead Counsel had already conducted dozens of interviews with former Company employees prior to beginning negotiations. After the parties reached a preliminary settlement agreement, Lead Plaintiffs and Lead Counsel insisted on additional discovery, as described above.

112. The extensive negotiations thus produced a final settlement agreement that is fair to all Class Members and does not unjustly benefit any Class Member. The settlement funds will be distributed on a pro rata basis based on a formula that is tied to liability and damages. The Plan of Allocation developed by experts retained by Lead Counsel, has resulted in a settlement agreement that fairly and rationally allocates the proceeds of the settlement.

113. The gravamen of an approvable proposed settlement is that it be "fair adequate, and reasonable and is not the product of collusion between the parties." *See Cotton,* 559 F.2d at 1330,*citing Young v. Katz,* 447 F.2d 431 (5th Cir.1971)); *see also Amchem,* 521 U.S. at 633 (settlement approved when it is the result of arms-length adversarial negotiations by extraordinarily competent and experienced attorneys). Here the "proposed settlement was the result of intense, arms-length negotiations between the parties" and "the final agreement suggests no bias, collusion or coercion in favor of any party or sub-group of class members," this factor

Schwartz v. TXU Corp., Not Reported in F.Supp.2d (2005)

2005 WL 3148350

weights in favor of approving the settlement. *In re Dun & Bradstreet Credit Servs. Customer Litig.,* 130 F.R.D. at 372; see also *In re Southern Ohio Corr. Facility,* 173 F.R.D. at 214 (approving settlement negotiated at arms' length, with no evidence of collusion and no indication that any party benefited at class's expense).

#### E. The Opinion of Lead Counsel Weighs Strongly in Favor of Settlement

114. When evaluating the fairness, adequacy and reasonableness of a settlement, courts consider the opinions of experienced counsel. See *San Antonio Hispanic Police Officers' Org. Inc. v. City of San Antonio,* 188 F.R.D. 433, 461 (W.D.Tex.1999); *Lelsz v. Kavanagh,* 783 F.Supp. 286, 297 (N.D.Tex.1991); *Neff v. Via Metro. Transit Auth.,* 179 F.R.D. 185, 208 (N.D.Tex.1998); see also *Dun & Bradstreet,* 130 F.R.D. at 372 ("[c]ounsel in this matter have extensive experience in complex class action litigation. The Court pays particular attention to the opinion of all counsel that the proposed settlement agreement is fair, adequate and reasonable"). In a case like this one, where the parties have conducted an extensive investigation, engaged in significant fact-finding and Lead Counsel is experienced in class-action litigation, courts typically "defer to the judgment of experienced trial counsel who has evaluated the strength of his case." *Thompson v. Midwest Found. Ind. Physicians Ass'n,* 124 F.R.D. 154, 159 (S.D.Ohio 1988) (recognizing that because the parties engaged in "extensive discovery" and Plaintiffs' counsel was "experienced in class action matters ... the opinion of Plaintiffs' counsel that the proposed settlement agreement is fair, adequate and reasonable is an important factor in the Court's consideration").

**\*22** 115. Here, the Court-appointed Lead Counsel have extensive experience in class action securities litigation. In addition, as discussed in detail above, Lead Counsel participated in an intensive investigative and discovery process. Lead Counsel reviewed hundreds of thousands of pages of documents, including thousands of documents from TXU's files, and conducted numerous interviews to assess the strengths and weaknesses of their positions. [*See* Joint Declaration of Joe Kendall and Mark Solomon, at ¶¶ 7, 13.] As a result of their thorough investigation, Lead Counsel have concluded that the proposed settlement is fair, reasonable and adequate. [*See* Lead Plaintiffs' Settlement Memorandum, at pgs. 5–8.] Under these circumstances, this Court gives

Lead Counsel's support of the settlement substantial weight in considering whether to approve the settlement.

#### F. Absent Class Members Have Responded Favorably to the Proposed Settlement

116. The Court should consider the reaction of the class to the settlement; however, "a settlement can be fair notwithstanding a large number of class members who oppose it." *Cotton,* 559 F.2d at 1331.

117. As of June 1, 2005, from the over 289,000 notices sent to Class Members, only 122 timely requests for exclusion have been submitted. The shareholders submitting these requests for exclusion indicated that they purchased less than 1.5 million shares of common stock during the class period. Those shares represent a tiny percentage of TXU stock that was traded during that period. The extremely small number of requests for exclusion that have been submitted demonstrates that the vast majority of Class Members support the settlement. Furthermore, a review of the requests for exclusion that were received reveals that the majority do not evidence opposition to the settlement. Many of the shareholders who requested exclusion apparently simply do not wish to participate in the settlement with no apparent reason.

118. Moreover, there have only been eight (8) objections, timely or otherwise, to the proposed settlement filed with the Court. However, only two objectors have contested the benefits received by the Class as a result of the settlement.

a. The New York State Teachers Retirement System, the State of Wisconsin Investment Board, the Public Employees Retirement System of Idaho, and the Pennsylvania Public School Employees Retirement System, objected to the requested attorneys fees. The objections are without merit since the fee structure agreed between Lead Counsel and Lead Plaintiffs is fair and reasonable. It is in the best interests of the class in that it has appropriately incentivized counsel to obtain the maximum recovery possible, and it represents a percentage of the Settlement Fund that is consistent with, if not less than, awards made in similar cases.

b. Irwin Chase has objected to the plan of allocation and to the requested attorneys fees. The objection is without merit with respect to attorneys fees, as set forth above. Irwin Chase's objection to the plan of allocation—that it does not include option traders—is without merit because lead plaintiffs have

confirmed that under the catch-all provisions of the plan of allocation options are included and such claims will be processed.

**\*23** c. Tom Bouressa objected on multiple grounds. However, Mr. Bouressa is not a member of the plaintiff class and, therefore, has no standing. Accordingly, the court rejects Mr. Bouressa's objections.

d. Bruce Girdauskas has objected on the grounds that TXU is contributing too much to the Settlement Fund. Mr. Girdauskas' claims, if he has any, are derivative in nature. Because Mr. Girdauskas has not complied with the demand requirements for derivative claims under the Texas Corporation Act, and because he lacks standing, Mr. Girdauskas' objections are rejected.

e. Rinis Travel Service Inc Profit Sharing Trust ("Rinis") has filed an untimely objection and, in an attempt to avoid the consequences of its untimeliness, has also sought to intervene. Because the notice of settlement was sufficient, including the notice of the time within to file objections, Rinis' objection is rejected and its motion to intervene is denied.

119. Accordingly, the overwhelming response of absent Class Members overall also strongly supports approval of the settlement.

G. Approval of the Proposed Settlement Agreement Is in the Public's Interest

120. Courts in the Fifth Circuit have consistently held that public policy favors the settlement of class actions. *Cotton, 559 F.2d at 1331*.

121. The proposed settlement in this case serves the public interest. The settlement requires Defendant TXU to implement a number of corporate governance improvements as well as compensate Class Members for their contested damages now, rather than prolonging a recovery until after a trial and appeal, if at all. In addition, the proposed settlement would allow the Company to avoid the expense and burden of defending the action and alleviate any further disruption to its operations. A swift resolution of this dispute thus will avoid complex and protracted litigation, provide valuable relief to the Class, and "foster [ ] the goals of certainty, finality and economy, which lie at the heart of our general preference for settlement of class actions." *Berry, 184 F.R.D. at 106*.

122. In these circumstances, the public interest clearly weighs in favor of approving the settlement.

VII. FAIRNESS OF THE PLAN OF ALLOCATION

123. Approval of a plan of allocation of settlement proceeds among the members of the Class under *Federal Rule of Civil Procedure 23* is governed by the same standard of fairness, reasonableness and adequacy applicable to approval of the settlement as a whole. *See In re Chicken Antitrust Litig., 669 F.2d 228, 238 (5th Cir.1982)* (standard of review "applies with as much force to the review of the allocation agreement as it does to the review of the overall settlement between plaintiffs and defendants").

124. "A plan of allocation that reimburses class members based on the extent of their injuries is generally reasonable," *In re Oracle Sec. Litig.,* [1994–1995 Transfer Binder] Fed. Sec. L. Rep. (CCH) 98,355, at 90,446 (N.D. Cal. June 18, 1994). However, "a class action settlement need not necessarily treat all class members equally." *Cohen v. Resolution Trust Corp., 61 F.3d 725, 728 (9th Cir.1995), vacated on other grounds, 72 F.3d 686 (9th Cir.1996); see also Petruzzi's, Inc. v. Darling–Del. Co., 880 F.Supp. 292, 300–01 (M.D.Pa.1995)* ("disparate treatment of class members may be justified by a demonstration that the favored class members have different claims or greater damages").

**\*24** 125. As noted above, in this case Lead Counsel relied on the damages analyses of its expert, in determining the allocation of the Net Settlement Fund among Class Members. [*See* Joint Declaration of Joe Kendall and Mark Solomon, at ¶ 70.]

126. The Court finds that the methodology used by Lead Counsel in preparing the Plan of Allocation was appropriate. That methodology ensures that Class Members' recovery will be based on not only their legal damages, but also on their actual losses recognizing the facts and circumstances of this case, based on an objective analysis of the magnitude of loss based on the timing of purchases and sales. *See, e.g., Microstrategy, 148 F.Supp.2d at 654* (approving plan of allocation that "sensibly makes interclass distinctions based upon, inter alia, the relative strengths and weaknesses of class members' individual claims and the timing of purchases of the securities at issue"); *In re Aetna Sec. Litig.,* No. CIV.A.MDL 1219, 2001 WL 20928, at \*12 (E.D.Pa. Jan.4, 2001) (approving plan of allocation that "acknowledges the

2005 WL 3148350

differing losses suffered by Claimants depending on the dates on which they purchased and sold Aetna stock and the price at which they may have sold the shares").

127. The Court further finds that allocation of the Net Settlement Fund that will be accomplished by the Plan of Allocation is fair, reasonable and adequate. The objective and widely accepted analytical methodology employed by Lead Counsel and its expert in preparing the Plan of Allocation has resulted in a substantively appropriate set of principles for distribution of the settlement fund. Most importantly, there has only been one objection to the Plan of Allocation.

128. For all of the reasons set out above, the Court finds that the Plan of Allocation proposed by Lead Plaintiff in this case is fair, reasonable and adequate.

## VIII. ATTORNEYS' FEES AND EXPENSES SOUGHT BY LEAD COUNSEL

A. Attorneys' Fees Sought by Lead Counsel

129. Lead Counsel seek an award of attorneys' fees of 22.2% of the $149.75 million Settlement Fund (plus interest, if any). (*See* Lead Plaintiffs' Counsel's Memorandum of Law In Support of Application for Attorneys' Fees and Reimbursement of Expenses, at pg. 1.]

130. Lead Counsel for the Class is entitled to a fee paid out of the common fund created for the benefit of the Class. *See Boeing Co. v. Van Gemert,* 444 U.S. 472, 478–79, 100 S.Ct. 745, 62 L.Ed.2d 676 (1980) (Supreme Court has consistently recognized the common fund doctrine to permit attorneys who obtain a recovery for a class to be compensated from the benefits achieved as a result of their efforts); *see also Magana v. Platzer Shipyard, Inc.,* 74 F.R.D. 61, 73 (S.D.Tex.1977).

131. The Fifth Circuit recognizes the propriety of the percentage fee method where each member of a class has an "undisputed and mathematically ascertainable claim to part of [a] judgment." *Strong v. Bellsouth Telecomms., Inc.,* 137 F.3d 844, 852 (5th Cir.1998).

**\*25** 132. In fact, the percentage method is widely used by district courts, including this one, throughout the Fifth Circuit in common fund cases. *See, e.g., Faircloth v. Certified Fin., Inc.,* 2001 U.S. Dist. LEXIS 6793, at \*20–\*23 (E.D.La. May

16, 2001); *Shaw,* 91 F.Supp.2d at 942; *In re Lease Oil Antitrust Litig. (No. II),* 186 F.R.D. 403, 446 (S.D.Tex.1999); *In re Harrah's Entm't, Inc.,* 1998 U.S. Dist. LEXIS 18774 (E.D.La. Nov. 25, 1998); *Orzel v. Gillam,* Civil Action No. 3:90–CV–0044–G (N.D.Tex. May 16, 1995); *Steiner v. Phillips,* Civil Action No. 3:89–1387–X (N.D.Tex.Mar.14, 1994); *Belman v. Warrington,* Civil Action No. H–91–3767 (S.D.Tex. Nov. 16, 1993); *In re Intellicall Sec. Litig.,* Civil Action No. 3:91–CV0703–P (N.D.Tex. Sep. 22, 1993); *In re First Republic Bank Sec. Litig.,* Civil Action No. 3:88 CV–0641–H (N.D. Tex. Feb. 28, 1992 and Mar. 8, 1993).

133. Moreover, the Supreme Court has indicated that the percentage method is proper in common fund cases. *See Blum v. Stenson,* 465 U.S. 886, 900 n. 16, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984). "[S]ince *Blum* was decided [in 1984], there has been no Fifth Circuit decision that would preclude this Court from employing the percentage of the fund approach endorsed in *Blum* and the circuit and district court decisions that followed and applied *Blum."Prudential 1,* 1994 WL 150742, at \*4;*see also Batchelder v. Kerr– McGee Corp.,* 246 F.Supp.2d 525, 531 (N.D.Miss.2003) ("A percentage fee approach, as opposed to a lodestar computation, is the preferred method for determining awards of attorneys' fees in common fund, or class action, cases."); *Shaw,* 91 F.Supp.2d at 967 n. 15 ("the Fifth Circuit has *never* ... reversed a district court judge's decision to award a fee as a percentage") (emphasis in original); *Longden v. Sunderman,* 979 F.2d 1095, 1100 n. 11 (5th Cir.1992) (affirming district court's percentage fee award in securities class action noting that the district court stated its preference for the percentage of recovery approach "as a matter of policy").

134. Numerous courts and commentators have stated that the percentage method is vastly superior to the lodestar method for a variety of reasons, including an incentive for counsel to "run up the bill" and the heavy burden that calculation under the lodestar method places upon the court. *See, e.g. Di Giacomo v. Plains All Am. Pipeline,* 2001 U.S. Dist. LEXIS 25532, at \*36 (S.D.Tex. Sep. 18, 2001), Report of Third Circuit Task Force: Court Awarded Attorney Fees, 108 F.R.D. 237,238 (1985) (The Report identified a number of deficiencies with the lodestar method, including: (1) increasing the workload of the judicial system; (2) lack of objectivity; (3) a sense of mathematical precision unwarranted in terms of the realities of the practice of

**Schwartz v. TXU Corp., Not Reported in F.Supp.2d (2005)**

2005 WL 3148350

law; (4) ease of manipulation by judges who prefer to calculate the fees in terms of percentages of the settlement fund; (5) encouraging duplicative and unjustified work; (6) discouraging early settlement; (7) not providing judges with enough flexibility to award or deter lawyers so that desirable objectives, such as early settlement, will be fostered; (8) providing relatively less monetary reward to the public interest bar; and (9) confusion and unpredictability in administration. Task Force Report, 108 F.R.D. at 246–49).

**\*26** 135. In sum, there is a strong consensus in favor of awarding attorneys' fees in common fund cases as a percentage of the recovery. For all of the reasons previously accepted by this Court as well as other courts in this Circuit, the Court approves the use of the percentage method here.

B. Co–Lead Counsel's Fee Request Made Pursuant to a Fee Schedule Negotiated by the Court–Appointed Lead Plaintiffs is Reasonable

136. The Court appointed Lead Plaintiffs in this case negotiated a fee schedule with counsel prior to their appointment as lead plaintiff. [*See* Lead Plaintiffs' Settlement Memorandum, at pgs. 15–16.] Co–Lead Counsel's fee application is being made pursuant to that fee schedule and is presumptively reasonable and is "precisely the type of bargaining that the PSLRA anticipated and to which a court reasonably may give substantial deference." *In re Global Crossing Sec. and ERISA Litig.,* 225 F.R.D. 436 (S.D.N.Y.2004), *see also In re Cendant Corp., Litig.,* 264 F.3d 201 (3rd Cir.2001). Lead Plaintiffs negotiated a graduated fee arrangement with Co–Lead Counsel at the beginning of the case that results in a 22.2% fee for a recovery of $149,750,000. In fulfillment of their duties as contemplated under the PSLRA, Lead Plaintiffs have worked with Counsel throughout the prosecution of the Litigation and the settlement negotiations, are familiar with the work done by Counsel, and not only negotiated the fee schedule at the beginning of the case but also support the fee request presently before the Court based on the results obtained. [*See* Nielsen Declaration, at ¶ 11; Canada Declaration, at ¶ 6; and Sweeney Declaration, at ¶ 6.]

137. The fee structure utilized by the Lead Plaintiffs here is entitled to some deference for another reason—it was designed to incentivize counsel to achieve the maximum result possible for the Class. *See, e.g., Cendant II,* 404 F.3d 173 at \*42 ("to PSLRA attempts to implement a market approach" by leaving the selection of counsel to sophisticated Lead Plaintiffs who can evaluate counsel "based on both skin and lost and can negotiate fee structures that will keep costs reasonable while providing counsel with initiatives to perform excellent work."). And in retrospect it appears that the Lead Plaintiffs accomplished their goal. It provides that Counsel receive increasing percentages (20, 22 and 24%) of the common fund only on those amounts recovered above the prior tier. It is axiomatic that the "last" dollars of a recovery are more difficult to obtain [*See* Expert Reports of Expert Report of Professor Charles Silver Concerning the Reasonableness of Class Counsel's Request for an Award of Attorneys' Fees and Reimbursement of Expenses ("Silver Declaration"), at pg. 30.] Here, it appears that Co–Lead Counsel were given appropriate incentives and those incentives have yielded a $149.75 million recovery and pervasive corporate governance changes. This recovery is one of the largest SEC class action recoveries obtained in a case of this genre, a substantial result for the class which justifies the requested fee.

C. Co–Lead Counsel's Requested Fee is Consistent with Fee Awards In Comparable Cases From the District

**\*27** 138. The requested fee award of 22.2% of the Settlement Fund is consistent with and, in fact, significantly less than awards made in similar cases. *See, e.g., Shaw,* 91 F.Supp.2d at 972 ("based on the opinions of other courts and the available studies of class action attorneys' fees awards (such as the NERA study), this Court concludes that attorneys' fees in the range from twenty-five percent (25%) to [33–1/3%] have been routinely awarded in class actions"); *Prudential I,* 1994 WL 150742, at \*1 (same) (Lead Plaintiffs' Compendium at 83); *Plains,* 2001 U.S. Dist. LEXIS 25532, at \*28 (approving 30% fee) (Lead Plaintiffs' Compendium at 31); *Waters v. Int'l Precious Metals Corp.,* 190 F.3d 1291 (11th Cir.1999) (approving 30% fee); *In re Warner Communications Sec. Litig.,* 618 F.Supp. 735, 749 (S.D.N.Y.1985) ( "Traditionally, courts in this Circuit and elsewhere have awarded fees in the 20%–50% range in class actions.") (citing numerous cases), *aff'd,* 798 F.2d 35 (2d Cir.1986); *see also* Silver Declaration, at pages 31–33. Indeed, courts throughout this Circuit regularly award fees of 25% and more often 30% or more of the total recovery under the percentage-of-the recovery method. *See Southland Secs. Corp. v. INSpire Ins. Solutions, Inc.,* No. 4:00–CV–355y (N.D.Tex. Mar. 9, 2005) (Judge Means) (approving fee of 30% fee in securities class action); *Scheiner v. i2 Techs.,*

*Inc., et al.,* Civil Action No. 3:01–CV–418–H (N.D.Tex. Oct. 1, 2004) (Judge Sanders) (approving fee of 25% of $80 million settlement in securities class action); *Hoeck v. Compusa, Inc. et al.,* Civil Action No. 3:98–CV–0998–M (N.D.Tex. Oct. 14, 2003) (Judge Lynn) (awarding 30% fee); *In re Firstplus Fin. Group, Inc. Sec. Litig.,* Master File No. 3:98–CV–2551–M (N.D.Tex. Oct. 14, 2003) (Judge Lynn) (awarding 30% fee in securities class action); *Warstadt v. Hastings Entm't, Inc., et al.,* Civil Action No. 2:00–CV–089–J (N.D.Tex. Mar. 10, 2003) (Judge Robinson) (awarding 30% fee in securities class action); *Silver v. UICI, et al.,* No. 3:99CV2860–L (N.D. Tex. Mar 3, 2003) (Judge Lindsay) (awarding 30% fee in securities class action); *In re Unistar Fin. Serv. Corp. Sec. Litig.,* No. 3:99–CV–1857–D (N.D.Tex. Aug. 17, 2001) (approving 30% fee in a securities class action) (Compendium at 96); *Kisilenko v. STB Sys., Inc.,* No. 3:99–CV–2872–M (N.D.Tex. Nov. 3, 2000) (approving 30% fee in a securities class action) (Lead Plaintiffs' Compendium at 111); *In re Landry's Seafood Rests., Inc. Sec. Litig.,* No. H–99–1948 (S.D.Tex. Jun.13, 2002) (Judge Harmon) (approving 30% fee in securities class action) (Compendium at 73); *In re Intellicall Sec. Litig.,* No. 3:91–CV–0730–P (N.D.Tex. Sept. 22, 1993) (Judge Solis) (approving 30% fee in a securities class action) (Lead Plaintiffs' Compendium at 65); *Robertson, et al. v. Strassner, et al.,* No. H–98–0364 (S.D.Tex. Jan. 5, 2000) (Judge Atlas) (approving 30% fee in a securities class action) (Lead Plaintiffs' Compendium at 158); *In re Combustion, Inc.,* 968 F.Supp. 1116, 1156 (W.D.La.1997) (Judge Haik) (approving fee of 36% of $127 million settlement); *Neibert, et al. v. Monarch Dental Corp., et al.,* No. 3:99–CV–762–X (N.D.Tex. Jun. 19, 2000) (Judge Kendall) (approving 30% fee of settlement) (Lead Plaintiffs' Compendium at 123). *In re Olicom Sec. Litig.,* No. 3:94–CV–0511–D (N.D.Tex. Aug. 30, 1996) (Judge Fitzwater) (approving 33–1/3% fee) (Compendium at 77); *Belman, et al. v. Warrington, et al.,* No. H–91–3767 (S.D.Tex. Nov. 16, 1993) (Judge Hoyt) (approving fees representing 33% of the settlement fund in securities case) (Compendium at 5); *Sims v. Shearson Lehman Bros., Inc.,* [1993–1994 Transfer Binder] Fed. Sec. L. Rep. (CCH) ¶ 98, 134, at 98,976 (N.D.Tex. Nov. 29, 1993)Fed. Sec. L. Rep. (CCH) ¶ 98, 134, at 98,976 (N.D.Tex. Nov. 29, 1993) (Judge Kendall) (approving fee of 33–1/3% of $30 million settlement in securities case) (Lead Plaintiffs' Compendium at 16); *In re ProNet, Inc.1933 Act Sec. Litig.,* No. 3:96–CV–1795–P (N.D.Tex. Nov. 19, 1997) (Judge Solis) (awarding 30% fee in securities class action) (Lead Plaintiffs' Compendium at 80); *In re Granada P'ships Sec. Litig.,* No. H–90–0214 (S.D.Tex. Oct. 19, 1992) (Judge Harmon) (approving 30%

fee) (Lead Plaintiffs' Compendium at 55); *Orzel v. Gilliam, et al.,* No. 3:90–CV–0044–G (N.D.Tex. May 16, 1995) (Judge Fish) (awarding 30% fee in securities case) (Lead Plaintiffs' Compendium at 128); *Courtney, et al. v. Am. Airlines, Inc., et al.,* No. 4:97–CV–668–A (N.D.Tex. Sept.3, 1999) (Judge McBryde) (30% fee award) (Lead Plaintiffs' Compendium at 25); *Transamerican Ref. Corp. v. Dravo Corp.,* No. H–88–789 (S.D.Tex. Nov. 16, 1992) (Judge Black) (awarding 30% fee) (Compendium at 164); *Plains,* 2001 U.S. Dist. LEXIS 25532 (Judge Rosenthal) (awarding 30% fee in securities class action) (Compendium at 31).

## D. The Reasonableness of Co–Lead Counsel's Fee Request is Confirmed Under the Johnson Factors

**\*28** 139. As noted above, the percentage-of-recovery method is generally favored in common fund cases. *Shaw, 91 F.Supp.2d at 962.* Some district courts within the Fifth Circuit have applied a hybrid approach in analyzing the fairness and reasonableness of requested fees. These courts have used the percentage method to set an initial percentage fee, and then reviewed that fee based on the "*Johnson* factors." *See In re Harrah's Entm't Sec. Litig.,* No. 95–2935 Section "N," 1998 U.S. Dist. LEXIS 18774, at \*20–\*21 (E.D.La. Nov. 24, 1998); *see also Shaw,* 91 F.Supp.2d at 967–68. As shown below, application of the *Johnson* factors further supports the fairness and reasonableness of the percentage fee requested.

The twelve *Johnson* factors are:

> (1) The time and labor required.... (2) The novelty and difficulty of the questions.... (3) The skill requisite to perform the legal service properly.... (4) The preclusion of other employment by the attorney due to acceptance of the case.... (5) The customary fee [for similar work in the community].... (6) Whether the fee is fixed or contingent.... (7) Time limitations imposed by the client or the circumstances.... (8) The amount involved and the results obtained.... (9) The experience, reputation, and ability of the attorneys.... (10) The "undesirability" of the case.... (11) The

**Schwartz v. TXU Corp., Not Reported in F.Supp.2d (2005)**

2005 WL 3148350

nature and length of the professional relationship with the client .... [and] (12) Awards in similar cases.

*Johnson v. Ga. Highway Express, Inc.,* 488 F.2d 714, 717–19 (5th Cir.1974). The relevance of each of the *Johnson* factors will vary in any particular case, and, rather than requiring a rigid application of each factor, the Fifth Circuit has left it to the lower court's discretion to apply those factors in view of the circumstances of a particular case. *Brantley v. Surles,* 804 F.2d 321, 325–26 (5th Cir.1986); *In re Catfish Antitrust Litig.,* 939 F.Supp. 493 (D.Miss.1996) ("not every [*Johnson* ] factor need be necessarily considered"). *See also Cotton,* 559 F.2d at 1331.

#### 1. Time and Labor Required

140. As set forth in the Joint Declaration, Counsel for Lead Plaintiffs marshaled considerable resources and time in the research, investigation and prosecution of this Litigation. In considering the time and labor expended, several factors should be considered. First, this Litigation was initiated by Lead Plaintiffs' counsel without the assistance of any governmental investigation or litigation whatsoever. *See e.g., Cendant,* 264 F.3d 201, 219 (case involving clear evidence, including admissions of fraud). In fact, it appears that the SEC took an interest in this case and issued a subpoena to TXU only after it was publicly announced that Defendants would pay almost $150 million to settle this case. [*See* Joint Declaration of Joe Kendall and Mark Solomon, at ¶ 32.] Accordingly, Lead Plaintiffs' counsel had to rely on their own diligent investigation to build a framework for a successful securities fraud case. Second, the legal obstacles to recovery were significant, and a recovery was obtained due to the skill and tenacity of Lead Plaintiffs' counsel. Counsel for Lead Plaintiffs' dedicated more than eight lawyers to working on this case. In this regard, for Lead Plaintiffs' counsel reviewed hundreds of thousands of pages of relevant documents and the Company's public filings, press releases and other public statements, interviewed witnesses in the United States and Europe, and consulted with experts in accounting, materiality, loss causation, damages and corporate governance to ensure the viability of the claims asserted. [*See Id.* at ¶ 13.] Co–Lead Counsel researched, drafted and filed a 207–paragraph Complaint, which they believe would have been upheld in response to Defendants' motions to dismiss. [*See Id.* at ¶¶ 7, 13.] The parties' settlement negotiations went on for approximately one year. [*See Id.* at ¶ 47, 48.] Counsel for plaintiffs were required to work with experts in the areas of damages, causation, accounting, and corporate governance. [*See Id.* at ¶ 13.] The history of the Litigation, as set forth in the Joint Declaration, makes clear the services provided by Lead Plaintiffs' counsel were highly successful and directly resulted in an outstanding recovery for the Class without the substantial expense, risk and delay of continued litigation. This factor supports the reasonableness of the percentage fee requested.

**\*29** 141. One of the criticisms of the use of attorney time as a key factor in determining an attorney's fee award, which has led to the substantial abandonment of the lodestar method in common fund cases, is that it encourages delay, inefficiency and recalcitrance towards early settlement.[2] In contrast, the percentage method motivates class counsel to maximize the result because they are paid a straight percentage of what they recover for the class. Thus, where, as here, lead plaintiffs with a substantial financial interest in the relief sought by the Class negotiated a fee structure at the outset of the case, and class counsel obtained an excellent result for the class in less than three years, the fact that the time involved is less than if the cases had unnecessarily dragged on for years should not diminish the percentage to be awarded. To the contrary, such efficiency and effectiveness should be rewarded and the percentage method accomplishes this result. *See In re Harrah's Entm't,* 1998 U.S. Dist. LEXIS 18774, at \*15 (E.D.La. Nov. 25, 1998) ("Because counsel prosecuted this action on a contingent fee basis, the Court would rather focus on results obtained. To unduly emphasize the amount of hours spent on a contingency fee case would penalize counsel for obtaining an early settlement and would distort the value of the attorneys' services."). *See also In re Xcel Energy, Inc. Sec. Litig.,* 364 F.Supp. 980, 983 (D.Minn.2005) (early settlements are consistent with the purposes of the Federal Rules of Civil Procedures, and modest lodestars are the result of efficient case prosecution); *Rite Aid II,* 396 F.3d 294, 303 (3rd Cir.2005).

#### 2. Novelty and Difficulty of the Issues

142. Federal Securities class action litigation is notably difficult and notoriously uncertain. *Dun & Bradstreet,* 840 F.Supp. 277,281 (S.D.N.Y.1993). They involve complex issues of causation and culpability. *Id.* The novelty and difficulty of the issues raised in federal securities class action litigation is a significant factor to be considered in making a fee award. From the outset, this post-PSLRA action

Schwartz v. TXU Corp., Not Reported in F.Supp.2d (2005)

2005 WL 3148350

was an especially difficult and highly uncertain securities case, which did not involve restatement of TXU's previously issued financial statements or any other acknowledgments of wrongdoing. There were no criminal convictions or significant insider trading. *See, e.g., Southland Sec. Corp., v. INSpire Ins. Solutions, Inc.,* 365 F.3d 353, 366 (5th Cir.2004). Thus, there was no assurance that the Litigation would survive Defendants' challenges to the pleadings, motion for summary judgment, trial and appeal. Indeed, courts have recognized that "securities actions have become more difficult from a plaintiff's perspective in the wake of the PSLRA." *Ikon,* 194 F.R.D. at 194;*see also Goldstein v. MCI Worldcom,* 340 F.3d 238 (5th Cir.2003) (affirming dismissal with prejudice of securities fraud class action complaint against Bernard Ebbers and Worldcom involving a massive securities fraud with a $685 million write-off of accounts receivable, for which Ebbers was later convicted). In addition to being factually complex, the case also involved numerous complex and unsettled questions of law under the PSLRA which the Fifth Circuit has yet to decide, and which have caused numerous splits among the circuit courts that have interpreted the statute.

**\*30** 143. To the extent that Defendants could prevail on issues relating to liability or show that any assumptions made by Plaintiffs' experts were incorrect or unreliable or could show that any portion of the market drop was due to factors other than the alleged fraud, Plaintiffs' claimed damages could be significantly reduced. Moreover, the reaction by a jury to such complex testimony is highly unpredictable and a jury could have very well sided with Defendants' experts. Thus, there was a real risk that even if Plaintiffs were successful in proving liability, that a jury could have awarded damages in an amount less than the proposed settlement or none at all. Despite the novelty and difficulty of the issues raised, Counsel secured an excellent result for the Class. As a result, this factor supports the requested award.

### 3. The Skill Required to Perform the Legal Services Properly

144. As noted by the Court in *Di Giacomo,* this factor is evidenced where "[C]ounsel performed diligently and skillfully, achieving a speedy and fair settlement, distinguished by the use of informal discovery and cooperative investigation to provide the information necessary to analyze the case and reach a resolution." *Di Giacomo v. Plains All Am. Pipeline,* 2001 U.S. Dist. LEXIS 25532, at \*36 (S.D.Tex. Sep. 18, 2001). This Litigation

required considerable skill and experience to successfully conclude. This case required a determined investigation, the ability to develop facts and creative legal theories, and the skill to respond to a host of legal and factual defenses. But for Co–Lead Counsel's diligent and tenacious efforts, all of the Class's claims could have been dismissed with prejudice at the pleading stage.

145. Lead Plaintiffs' counsel demonstrated that notwithstanding the barriers erected by the PSLRA, they would develop evidence to support a convincing case. During the settlement negotiations, Lead Plaintiffs' counsel demonstrated a willingness to continue the litigation rather than accept a settlement that they believed was not in the best interests of the Class, refusing to settle this case for about one year after the potential for settlement was first discussed. Based upon Lead Plaintiffs' counsels' diligent efforts on behalf of the Class and their skill and reputations, Lead Plaintiffs' counsels were able to negotiate a very favorable result for the Class under the circumstances.

146. In addition, defendants were represented by highly experienced lawyers from prominent and well-respected law firms: Hunton & Williams, Orrick, Herrington & Sutcliffe LLP, and Weil, Gotshal & Manges LLP. The standing of opposing counsel should be weighed in determining the fee, because such standing reflects the challenge faced by plaintiffs' attorneys. *See In re King Res. Co. Sec. Litig.,* 420 F.Supp. 610, 634 (D.Colo.1976). The ability of plaintiffs' counsel to obtain such a favorable settlement for the Class in the face of such formidable legal opposition confirms the superior quality of their representation. Accordingly, this factor also supports the requested percentage. *Shaw,* 91 F.Supp.2d at 970.

**\*31** 147. The substantial and creative recovery obtained for the Class, short of trial, is just the sort of result the percentage-fee method was designed to reward. The skill and acumen of counsel have produced unprecedented benefits to the Class.

### 4. Preclusion of Other Employment

148. The time spent by Lead Plaintiffs' counsel on this case was at the expense of time that counsel could have devoted to other matters. In fact, nearly 40% of the attorneys in the Dallas office of Provost Umphrey, including Managing Partner Joe Kendall spent a substantial amount of their time over the last two years working on this case. Lead Counsel had more

Schwartz v. TXU Corp., Not Reported in F.Supp.2d (2005)

2005 WL 3148350

than eight lawyers assigned to the prosecution of the case. Accordingly, this factor supports the requested percentage.

### 5. The Customary Fee

149. Co–Lead Counsel's application for a fee award of 22.2% of the Settlement Fund is below the range normally awarded in cases of this nature. In fact, the customary fee awarded in securities cases in this District and across the country is 30% or more. A 2005 NERA statement shows that of the securities class actions settled between 2002–2004, *the attorneys fees in at least 85% of those cases* were a greater percentage of the recovery than the 22.2% fee sought here. In local, regional and national markets, complex commercial cases require a contingent fee between 30 and 40 percent of the gross recovery. The vast majority of Texas federal courts and courts in this District have awarded fees of 25%–33% in securities class actions. As Justices Brennan and Marshall observed in their concurring opinion in *Blum:* "In tort suits, an attorney might receive one-third of whatever amount the plaintiff recovers. In those cases, therefore, the fee is directly proportional to the recovery." *Blum,* 465 U.S. at 903.*See also In re Prudential–Bache Energy Income P'ships Sec. Litig.,* 1994 WL 202394, at \*2 (May 18, 1994) ("Were this not a class action, attorney's fees would range between 30% and 40%, the percentages commonly contracted for in contingency cases.").

### 6. Whether the Fee Is Fixed or Contingent

150. Lead Plaintiffs' counsel undertook this Litigation on a contingent fee basis, assuming a substantial risk that the Litigation would yield no recovery and leave them uncompensated. Courts have consistently recognized that the risk of receiving little or no recovery is a major factor in considering an award of attorneys' fees. For example, in awarding counsel's attorneys' fees in *Prudential,* the court noted the risks that plaintiffs' counsel had taken:

> Although today it might appear that risk was not great based on Prudential Securities' global settlement with the Securities and Exchange Commission, such was not the case when the action was commenced and throughout most of the litigation. Counsel's contingent fee risk is an important factor in determining the fee award. Success

is never guaranteed and counsel faced serious risks since both trial and judicial review are unpredictable. Counsel advanced all of the costs of litigation, a not insubstantial amount, and bore the additional risk of unsuccessful prosecution.

**\*32** *Prudential,* 1994 WL 202394, at \*6 (Compendium at 87).

151. Indeed, the risk of no recovery in complex cases of this type is very real. There are numerous class actions in which plaintiffs' counsel expended thousands of hours and yet received no remuneration whatsoever despite their diligence and expertise. Subsequent to the passage of the PSLRA, many cases in this Circuit have been dismissed at the pleading stage in response to defendants' arguments that the complaints do not meet the PSLRA's pleading standards. For example, 90% of this Circuit's reported PSLRA decisions involving the adequacy of pleadings in securities fraud cases have upheld their dismissal, including the class action arising out of the WorldCom debacle. *See, e.g., Goldstein v. MCI Worldcom,* 340 F.3d 238 (5th Cir.2003). Lead Plaintiffs' counsel were faced with that possibility in this case. Even plaintiffs who get past summary judgment and succeed at trial may find their judgment overturned on appeal or on judgment notwithstanding the verdict. [3]

152. Lead Plaintiffs' counsel have received no compensation during the course of this Litigation and have incurred significant expenses in prosecuting this Litigation for the benefit of the Class. Any fee award or expense reimbursement has always been at risk and completely contingent on the result achieved. Thus, the contingent nature of the Litigation supports the requested percentage.

### 7. Time Limitations Imposed by the Client or Circumstances

153. This factor does not pertain to this case.

### 8. The Amount Involved and Results Achieved

154. The eighth *Johnson* factor—the amount involved and the results achieved—is entitled to particular weight when, as in this case, the efforts of counsel were instrumental in realizing a substantial recovery on behalf of the class. *See*

*In re Terra–Drill P'ships Sec. Litig.,* 733 F.Supp. 1127, 1129 (S.D.Tex.1990) ("[t]he factors enumerated by *Johnson,* ... emphasize 'the results obtained' "). The Supreme Court, recognized that in making a fee award the "most critical factor is the degree of success obtained." *Hensley v. Eckerhart,* 461 U.S. 424, 436, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983). Here, the settlement provides substantial monetary and non-monetary benefits provided to the Class.

155. The Settlement provides for $149,750,000 in cash (the largest securities class action recovery ever obtained in this District and one of the five largest securities class action recoveries ever obtained in the United States in a case not involving a restatement of previously issued earnings) the adoption of groundbreaking corporate governance enhancements, including:

- two new independent directors;

- increasing the number of independent directors

- minimum shareholdings for directors;

- separation of board leadership from management leadership; and

- rescission of TXU's "poison pill";

156. By any measure, the settlement represents an excellent resolution of this Litigation, as it includes significant relief for the vast majority of damaged class members, including cash for those damaged shareholders who suffered out of pocket losses as well as a wide range of corporate governance changes that Lead Plaintiffs' expert has attested have had a favorable impact on the Company's current operations and its existing shareholders.

9. The Experience, Reputations and Ability of the Attorneys

**\*33** 157. Lead Plaintiffs' counsel's efforts in efficiently bringing this litigation to a successful conclusion are the best indicator of the experience and ability of the attorneys involved. That Lead Plaintiffs' counsel have managed the litigation in a disciplined and pragmatic fashion confirms that this litigation was ably prosecuted for the benefit of the Class.

10. The Undesirability of the Case

158. Class Action cases that carry with them elevated risks, such as the present litigation and that also require lengthy investigation through informal discovery, not to mention a possibility of no recovery, certainly speaks to the undesirability of a case. *Di Giacomo v. Plains All Am. Pipeline,* 2001 U.S. Dist. LEXIS 25532, at \*35 (S.D.Tex. Sep. 18, 2001). The issues presented in this litigation rendered the case inherently risky, if not "undesirable" from the start. The case involved a panoply of difficult issues of law and fact, and no restatement of financial statements. Furthermore, the Court's review of the case law shows that approximately 90% of Fifth Circuit PSLRA pleading decisions have upheld the dismissal of complaints. This case was risky when Lead Counsel accepted this retention. The risks Lead Plaintiffs' counsel faced must be assessed as they existed at the time counsel undertook the litigation and not in light of the settlement ultimately achieved. *See, e.g., Harman v. Lyphomed, Inc.,* 945 F.2d 969, 974 (7th Cir.1991) (the riskiness of a case must be judged *ex ante* not *ex post* ). [*See* Silver Declaration, at pgs. 8–18; Declaration of Craig Enoch, Justice (Ret.) in Support of Proposed Award of Attorneys' Fees, at pg. 8.] The "undesirability" of the Litigation supports the requested percentage.

11. Nature and Length of Relationship With the Client

159. As noted above, the Court-appointed Lead Plaintiffs negotiated an attorney fee agreement with Co–Lead Counsel at the beginning of the case. This agreement provided for attorneys' fees on a graduated scale, and the resulting percentage for the recovery obtained there is 22.2%, the percentage sought by this application. With respect to this agreement and support for the requested fee, the Third Circuit Task Force recently concluded:

> The Task Force believes, however, that the deference to the empowered plaintiff's choice of *counsel* in PSLRA cases should extend to the *ex post* review of the fee agreement in those cases. The PSLRA establishes a model of client control that extends not only to appointment of counsel but also to monitoring of counsel and negotiation of the fee. The Task Force concludes, therefore, that strict scrutiny of the fee agreement is inconsistent with the client-driven litigation model

established in the PSLRA. This means that a court should presume that the fee is reasonable when it is the result of an agreement between the "most adequate" plaintiff and chosen counsel.

Third Circuit Task Force Report, *Selection of Class Counsel,* 208 F.R.D. at 425 (emphasis in original); *see also* In re *Cendant Corp. Litig.,* 264 F.3d 201 (3d Cir.2001)(a fee that was negotiated and agreed to at the beginning of the litigation should be given great weight).

### 12. Awards in Similar Cases

**\*34** 160. As demonstrated in Section C. above, a 22.2% fee is consistent with, in fact, 10% less than the percentage that has been repeatedly awarded by courts in this Circuit and District as well as numerous other similar courts throughout the country.

### E. Reimbursement of Expenses Sought by Lead Counsel

161. Lead Counsel also requests reimbursement of $541,203.77 in out-of-pocket expenses incurred by all plaintiffs' counsel in connection with prosecuting this case.

162. Counsel were required to lay out substantial funds for consulting expert fees (Co–Lead Counsel Lerach Coughlin Stoia Geller Rudman & Robbins expended $253,836.96 in expert fees [*See* Gusikoff Declaration, at ¶ 4.] and Co–

Lead Counsel Provost & Umphrey expended $21,170.20 in expert fees [*See* Briscoe Declaration, at ¶ 4.] ), transportation, meals and lodging, in-house and outsourced photocopying, computerized and on-line research, court reporting fees and deposition transcripts; telephone and facsimile; overnight courier service; statutory notice publication; purchase of special materials; postage; messengers; and other services. [*See generally* Gusikoff Declaration; Briscoe Declaration; Fruchter Declaration; and Soicher Declaration.]

163. The Court finds that these expenses were reasonably and necessarily incurred in prosecuting this action and achieving the proposed Settlement. The expenses should therefore be reimbursed.

### IX. CONCLUSION

164. This settlement is comprehensive in its scope, is fair and evenhanded in its application and is of substantial monetary and non-monetary value to the Class. The Court therefore approves the settlement as fair, reasonable and adequate, and certifies the Class as defined in the Final Judgment and Order of Dismissal with Prejudice. The Court also finds reasonable and awards to Counsel for Lead Plaintiff's Counsel the negotiated attorneys' fee of 22.2% of the settlement fund, and the expense amount requested, plus interest.

SO ORDERED.

### All Citations

Not Reported in F.Supp.2d, 2005 WL 3148350

---

### Footnotes

1    Messrs. Lerach, Robbins and Solomon, and the other attorneys from Milberg, Weiss Berchad Hynes & Lerach LLP who were appointed lead counsel, and who have prosecuted this litigation from the onset, formed the firm of Lerach Coughlin Stoia Geller Rudman & Robbins LLP, effective May 1, 2004.

2    *See* Jerold S. Solovy, Laura A. Kaster and James B. Sowerby, *Attorneys' Fees in Common Fund Cases: The Percentage Method is Back, in Securities Class Actions: Abuses and Remedies,* 145, 147 (National Legal Center for the Public Interest 1994).

3    *See, e.g.,* Robbins v. Koger Props., Inc., 116 F.3d 1441 (11th Cir.1997) (jury verdict of $81 million for plaintiffs against an accounting firm reversed on appeal on loss causation grounds and judgment entered for defendant); Anixter v. Home–Stake Prod. Co., 77 F.3d 1215 (10th Cir.1996) (Tenth Circuit overturned

**Schwartz v. TXU Corp., Not Reported in F.Supp.2d (2005)**

2005 WL 3148350

securities fraud class action jury verdict for plaintiffs in case filed in 1973 and tried in 1988 on the basis of 1994 Supreme Court opinion); *In re Apple Computer Sec. Litig.,* No. C–84–20148(A)–JW, 1991 U.S. Dist. LEXIS 15608 (N.D.Cal. Sept. 6, 1991) (class won jury verdict against two individual defendants, but court vacated judgment on motion for judgment notwithstanding the verdict) (Compendium at 51); *Backman v. Polaroid Corp.,* 910 F.2d 10 (1st Cir.1990) (where the class won a substantial jury verdict and motion for judgment n.o.v. was denied, on appeal the judgment was reversed and the case was dismissed—after 11 years of litigation); *Berkey Photo, Inc. v. Eastman Kodak Co.,* 603 F.2d 263 (2d Cir.1979) (multimillion dollar judgment reversed after lengthy trial); *Trans World Airlines, Inc. v. Hughes,* 312 F.Supp. 478 (S.D.N.Y.1970) (judgment for $145 million overturned after years of litigation and appeals), *modified,* 449 F.2d 51 (2d Cir.1971), *rev'd,* 409 U.S. 363, 93 S.Ct. 647, 34 L.Ed.2d 577 (1973).

---

**End of Document**

© 2021 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 56

2018 WL 6427721

2018 WL 6427721
Only the Westlaw citation is currently available.
United States District Court,
E.D. Texas, Marshall Division.

Ranjit SINGH, Individually and on Behalf
of All Others Similarly Situated, Plaintiff,
v.
21VIANET GROUP, INC., Sheng Chen,
Shang-Wen Hsiao, Terry Wang, Steve
Zhenqing Zhang, and Eric Chu, Defendants.

Case No. 2:14-cv-00894-JRG-RSP
|
Signed 12/06/2018
|
Filed 12/07/2018

**Attorneys and Law Firms**

Phillip Kim, Laurence Rosen, The Rosen Law Firm, PA, New York, NY, R. Dean Gresham, Steckler Gresham Cochran LLP, Dallas, TX, Sammy Ford, IV, Ahmad Zavitsanos Anaipakos Alavi & Mensing PC, Houston, TX, Lionel Z. Glancy, Ex Kano S. Sams II, Jason L. Krajcer, and Leanne H. Solish, Glancy Prongay & Murray LLP, Los Angeles, CA, for Plaintiff.

Noelle Marie Reed, Skadden Arps Slate Meagher & Flom LLP, Houston, TX, Scott Musoff, Skadden Arps Slate Meagher & Flom LLP, New York, NY, for Defendants.

### ORDER AWARDING ATTORNEYS' FEES AND REIMBURSEMENT OF LITIGATION EXPENSES

RODNEY GILSTRAP, UNITED STATES DISTRICT JUDGE

**\*1** This matter came on for hearing on October 31, 2018 (the "Settlement Hearing") on Lead Counsel's motion for an award of attorneys' fees and reimbursement of Litigation Expenses. The Court having considered all matters submitted to it at the Settlement Hearing and otherwise; and it appearing that notice of the Settlement Hearing substantially in the form approved by the Court was mailed to all Settlement Class Members who or which could be identified with reasonable effort, and that a summary notice of the hearing substantially in the form approved by the Court was published in *Investor's Business*

*Daily* and was transmitted over the *PR Newswire* pursuant to the specifications of the Court; and the Court having considered and determined the fairness and reasonableness of the award of attorneys' fees and Litigation Expenses requested, the Court HEREBY ORDERS THAT:

1. This Order incorporates by reference the definitions in the Stipulation and Agreement of Settlement dated April 6, 2018 (ECF No. 51-1) (the "Stipulation") and all capitalized terms not otherwise defined herein shall have the same meanings as set forth in the Stipulation.

2. The Court has jurisdiction to enter this Order and over the subject matter of the Action and all parties to the Action, including all Settlement Class Members.

3. Notice of Lead Counsel's motion for an award of attorneys' fees and reimbursement of Litigation Expenses was given to all Settlement Class Members who could be identified with reasonable effort. The form and method of notifying the Settlement Class of the motion for an award of attorneys' fees and expenses satisfied the requirements of Rule 23 of the Federal Rules of Civil Procedure, the Private Securities Litigation Reform Act of 1995 (15 U.S.C. §§ 77z-1(a)(7), 78u-4(a)(7) ), due process, and all other applicable law and rules, constituted the best notice practicable under the circumstances, and constituted due and sufficient notice to all persons and entities entitled thereto.

4. Plaintiff's Counsel are hereby awarded attorneys' fees in the amount of 33.30% of the Settlement Fund and $70,343.38 in reimbursement of Plaintiff's Counsel's litigation expenses (which fees and expenses shall be paid from the Settlement Fund), which sums the Court finds to be fair and reasonable. Lead Counsel shall allocate the attorneys' fees awarded amongst Plaintiff's Counsel in a manner which it, in good faith, believes reflects the contributions of such counsel to the institution, prosecution and settlement of the Action.

5. In making this award of attorneys' fees and reimbursement of expenses to be paid from the Settlement Fund, the Court has considered and found that:

(a) The Settlement has created a fund of $9 million in cash that has been funded into escrow pursuant to the terms of the Stipulation, and numerous Settlement Class Members who submit acceptable Claim Forms will benefit from the Settlement that occurred because of the efforts of Lead Counsel;

2018 WL 6427721

(b) Copies of the Notice were mailed to over 26,000 potential Settlement Class Members and nominees stating that Lead Counsel would apply for attorneys' fees in an amount not exceed 33 1/3% of the Settlement Fund and reimbursement of Litigation Expenses in an amount not to exceed $125,000. There were no objections to the requested attorneys' fees and expenses;

 **\*2**  (c) Lead Counsel has conducted the litigation and achieved the Settlement with skill, perseverance, and diligent advocacy;

(d) The Action raised a number of complex issues;

(e) If Lead Counsel had not achieved the Settlement, then a significant chance would remain that Lead Plaintiff and the other members of the Settlement Class may have recovered less or nothing from Defendants;

(f) Plaintiff's Counsel devoted over 1,900 hours, with a lodestar value of approximately $1,096,535.75 to achieve the Settlement;

(g) The amount of attorneys' fees awarded and expenses to be reimbursed from the Settlement Fund are fair and reasonable and consistent with awards in similar cases; and

6. Lead Plaintiff Emily Wu is hereby awarded $2,500 from the Settlement Fund as reimbursement for her reasonable costs and expenses directly related to her representation of the Settlement Class.

7. Any appeal or any challenge affecting this Court's approval regarding any attorneys' fees and expense application shall in no way disturb or affect the finality of the Judgment.

8. Exclusive jurisdiction is hereby retained over the parties and the Settlement Class Members for all matters relating to this Action, including the administration, interpretation, effectuation or enforcement of the Stipulation and this Order.

9. In the event that the Settlement is terminated or the Effective Date of the Settlement otherwise fails to occur, this Order shall be rendered null and void to the extent provided by the Stipulation.

10. There is no just reason for delay in the entry of this Order, and immediate entry by the Clerk of the Court is expressly directed.

**So Ordered this Dec 6, 2018.**

**All Citations**

Not Reported in Fed. Supp., 2018 WL 6427721

---

**End of Document**

© 2021 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 57

2015 WL 338358
Only the Westlaw citation is currently available.
United States District Court,
S.D. Texas,
Houston Division.

Tamara SLIPCHENKO, David "Cowboy" Boswell, and Valorie Barton, on behalf of all other persons, similarly situated, Plaintiffs,
v.
BRUNEL ENERGY, INC., et al., Defendants.

Civil Action No. H–11–1465.
|
Signed Jan. 23, 2015.

**Attorneys and Law Firms**

Karen Handorf, R. Joseph Barton, Mary J. Bortscheller, Monya M. Bunch, Cohen Milstein et al, Washington, DC, T.H. Waters, III, Kenneth Jason Fair, Justin M. Campbell, III, Campbell Harrison Dagley LLP, Houston, TX, for Plaintiff.

Jay R. Aldis, Bracewell Giuliani LLP, Houston, TX, Robert E. Sheeder, Bracewell Giuliani LLP, Dallas, TX, for Defendant.

**MEMORANDUM OPINION**

LEE H. ROSENTHAL, District Judge.

**\*1** The plaintiffs, Tamara Slipchenko, David R. Boswell, and Valorie Barton,[1] worked for Brunel Energy, Inc., a Houston-based subsidiary of Brunel International N.V. (together, "Brunel"). The plaintiffs sued Brunel on behalf of themselves and similarly situated present and former employees, alleging that it failed to provide required notices of their right to continued health care coverage under the Consolidated Omnibus Budget Reconciliation Act of 1985 ("COBRA") and to premium reduction under the American Recovery and Reinvestment Act of 2009 ("ARRA"). After fact discovery, the court granted the plaintiffs' motion to certify the class under Federal Rule of Civil Procedure 23, granted the plaintiffs' motion for partial summary judgment as to Brunel's liability on various claims, and denied the plaintiffs' motion for summary judgment as to damages and statutory penalties. *See Slipchenko v. Brunel Energy, Inc.,* No. H–11–1465, 2013 WL 4677918 (S.D.Tex. Aug.30, 2013).

Over the next year, class counsel sent notices to the class members and the parties engaged in further discovery. In August 2014, the parties reached a settlement. Brunel agreed to pay $375,000 to settle the COBRA and ARRA claims and $624,999 in attorney's fees and costs. On September 30, 2014, this court preliminarily approved the proposed settlement, form and method of notifying class members, and plan of allocation. (Docket Entry No. 163). No class members filed objections during the 60–day notice period. Class counsel have moved for final approval of the settlement, plan of allocation, and division of fees; for service awards for the named plaintiffs, and for an award of attorneys' fees. (Docket Entry Nos. 166; 171; 176). On January 20, 2015, the court held a final fairness hearing.

Based on the memoranda in support of the proposed settlement, the parties' arguments at the preliminary and final fairness hearings, the remainder of the record, and the relevant law, this court: (1) approves the proposed settlement, plan of allocation, and division of fees; (2) approves the proposed service awards totaling $12,000; and (3) approves attorneys' fees and costs in the amount of $624,999. (Docket Entry Nos. 166; 171; 176). The reasons are explained in detail below.

**I. The Litigation and the Proposed Settlement Agreement**

**A. The Plaintiffs' Claims**

Brunel is in the energy business. Its clients are companies with projects requiring individuals with specialized knowledge for relatively short periods. Brunel places individuals with the necessary knowledge in temporary positions at its client companies to work on specific projects. Brunel enters into short-term employment contracts with the individuals it hires for its clients' projects, but the employees work directly with the clients. When the project is finished, the individual's employment with Brunel is usually terminated. If the same individual is hired to work on another client project, Brunel and the individual enter into a new employment contract. (Docket Entry No. 83, at 9–10). During their employment with Brunel, the named plaintiffs were insured under the Brunel Group Health Plan (the "Plan") and elected coverage under BUPA. (*Id.* at 5). They sued in 2011, alleging that Brunel failed to provide them and other similarly situated employees with notice of their right to elect COBRA coverage when they first began participating in the Plan; failed to provide notice of their right to continue coverage when their employment was terminated, which the plaintiffs argue was

an event qualifying them for continued COBRA coverage; failed to offer a premium reduction to eligible individuals; and failed to notify employees of their eligibility for premium reduction. (*Id.* at 15–19).

 **\*2** COBRA gives workers who lose health coverage due to a qualifying event the opportunity to elect continued coverage from their group health plan for a limited time. *See* 29 U.S.C. §§ 1161, 1166. COBRA requires an employer to notify an eligible employee twice: first, when the employee begins participating in a group health plan; and second, when the employee notifies the employer that a qualifying event has occurred. *Id.* The ARRA provides eligible individuals with a right to reduced premium payments for healthcare coverage they receive through COBRA. *See* Pub.L. No. 111–5, § 3001(a)(1)(A), 123 Stat. 115, 455 (codified as amended at 26 U.S.C. § 6432).[2] The ARRA also requires an employer to notify an eligible employee of this right when he or she is notified of the right to elect continued coverage under COBRA after a qualifying event. *See* Pub.L. No. 111–5, § 3001(a)(7)(A)(I), 123 Stat. 115, 458–59 (codified as amended at 26 U.S.C. § 6432).

### B. The Named Plaintiffs

#### 1. Tamara Slipchenko
Brunel employed Tamara Slipchenko from August 2008 until March 2010. She worked as an Environmental and Regulatory Advisor at Exxon/Mobil Development Company. During her Brunel employment, she received health coverage under the Plan. (Docket Entry No. 83 at 10). When Slipchenko's employment was terminated, she asked Brunel for information about COBRA. In response, Brunel told her that employees who elected coverage under BUPA were not eligible for COBRA coverage. (*Id.* at 11–12).

In December 2010, Slipchenko was diagnosed with Hodgkin's lymphoma and needed treatment. (*Id.* at 12). At some point after her Brunel employment ended, Slipchenko was able to get health coverage from another insurance company, Health Net. (*Id.*). In February 2011, Slipchenko contacted the Department of Labor about her COBRA eligibility and was told that because Brunel had terminated her employment, she was eligible for both continued coverage and for premium reduction under the ARRA. (*Id.* at 12–13). The Department of Labor sent Brunel a letter dated March 3, 2011, directing it to provide Slipchenko with a COBRA package within 10 days. (*Id.* at 13). Brunel initially failed to comply. Approximately

three months later, with one month of eligibility left, Brunel offered Slipchenko COBRA coverage. (*Id.* at 14).

In this lawsuit, Slipchenko alleged that Brunel failed to provide her initial notice of her COBRA rights when she began participating in the Plan in August 2008 and failed to give her notice of her COBRA and ARRA rights when her employment ended in March 2010. (*Id.* at 10–11). During the course of this litigation, she has frequently communicated with class counsel, responded to requests for production and interrogatories, given a deposition, and participated in mediation and settlement negotiations.

#### 2. David R. Boswell
Brunel employed David R. Boswell from March 2007 to July 2010 as an Offshore Installation Technical Foreman. He received health coverage under BUPA. (*Id.* at 14). Boswell was apparently insured under a different plan than the other class members. He was covered by the BUPA Gold Plan, and was the only Brunel-employed American citizen covered by that plan. (Docket Entry No. 60, at 7 (citing Ex. 1, Decl. of Bob Glover, Gen. Mgr.—Am., Brunel Energy, Inc.)). Boswell alleged that Brunel failed to provide him with an initial notice of his COBRA rights and with a notice of his right to continued coverage under COBRA once his employment was terminated. (Docket Entry No. 83, at 14). Boswell's employment was terminated after the May 31, 2010 deadline for ARRA coverage.[3] During this litigation, Boswell has communicated with class counsel, responded to requests for production and interrogatories, given a deposition, and participated in mediation and settlement negotiations.

#### 3. Valorie Barton
 **\*3** Brunel employed Valorie Barton from November 2009 to November 2010 as a Contract Administrator at Exxon/Mobil Global Services Company. She received health coverage under BUPA. (*Id.*). Barton alleged that Brunel failed to provide her with an initial notice of her COBRA rights and with notice of her right to continued coverage once her employment was terminated. (*Id.* at 14–15). She alleged that Brunel did not offer her a COBRA package until over nine months after it terminated her employment. (*Id.* at 15). Her employment ended after the May 31, 2010 deadline for ARRA coverage.[4] Like the other named plaintiffs, she has communicated with class counsel, responded to production requests and interrogatories, given a deposition, and participated in settlement negotiations.

## C. Procedural Background

On August 30, 2014, at the close of fact discovery, the court granted the plaintiffs' motion for class certification under Federal Rule of Civil Procedure 23. *See* *Slipchenko,* 2013 WL 4677918, at *1–2, *14. The court certified the COBRA claims but did not certify the ARRA claims because "it appear[ed] that Slipchenko [was] the only individual among the putative class members with such claims" and "[t]o the extent there are individuals with additional [ARRA] claims, the number of such individuals is so small—far fewer than the 20 to 30 individuals who experienced a qualifying event of any type—that disputed issues about their claims can be resolved on an individual basis." *Id.* at n. 5.[5]

The court also granted Slipchenko and Barton partial summary judgment as to (1) Brunel's liability for failing to provide initial notice of their right to continued health care coverage under COBRA and (2) its liability for failing to provide notice and benefits under COBRA to Barton after a qualifying event. *Id.* at *16–17. The court found that "Brunel is liable as a matter of law for violating [COBRA's] initial notice requirement," but could not grant summary judgment as to damages and penalties (or Brunel's liability to Boswell) on the record at the time. *Id.* Class counsel sent notices to the class members, and the parties engaged in further discovery.

## D. The Proposed Settlement Agreement

On August 25, 2014, the parties reached a settlement for the COBRA class certified by the court (excluding those who elected to opt out and those who were not identified by the defendants):

> All employees of Brunel who elected coverage provided by British United Provident Association Limited ("BUPA"), together with their spouses and other covered dependents who were participants or beneficiaries in the Brunel Group Health Plan at any time from April 15, 2009 until August 25, 2014.

(Docket Entry No. 157, at 9); *see also* *Slipchenko,* 2013 WL 4677918, at *1–2.

The parties conducted negotiations in two phases. First, the parties negotiated the class award without regard to attorney's fees. Brunel agreed to pay $375,000 to settle (a) the COBRA claims and (b) subject to the court's permission for including the ARRA claims on a class-wide basis for settlement purposes, the ARRA claims. (Docket Entry No. 157, ¶ XII.1). Under the proposed settlement, the guaranteed minimum for each class member is $100 and the average class award is $5,000. Class members would not need to make affirmative claims on the fund. Instead, under the proposed plan of allocation, they would be issued award checks based on a formula considering the following factors:

> **\*4** (1) the number of days that the class member did not receive notice; (2) the number of days, if any, that the class member did not have health insurance; (3) whether the class member had health issues or medical expenditures during that period (or otherwise suffered harm); (4) whether the class member inquired about COBRA benefits and/or stated under oath that they would have purchased the COBRA coverage; and (5) whether the class member experienced actual harm as a result of not being provided with COBRA coverage.

(Docket Entry No. 158, at 2–3); *see also* (Docket Entry No. 172 at 6 n. 7); (Docket Entry No. 177, at 15). The parties also agreed that the named plaintiffs would "be entitled to seek a Service Award to be paid out of the Class Settlement Fund in recognition of their service and/or for reimbursement of their time and expenses subject to the approval of, and in an amount to be determined by, the Court." (Docket Entry No. 157, ¶ IX.5). Only after agreeing on the class fund did the parties negotiate attorney's fees and costs. Brunel agreed to pay $624,999 in attorney's fees and costs.

On September 30, 2014, the court preliminarily approved the parties' settlement agreement. (Docket Entry No. 163). On October 13, 2014, the plaintiffs moved for approval of

**Slipchenko v. Brunel Energy, Inc., Not Reported in F.Supp.3d (2015)**

both (1) $12,000 in proposed service awards—$6,000 for Slipchenko, $4,000 for Boswell, and $2,000 for Barton—for representing the class and (2) $624,999 in attorney's fees and costs. (Docket Entry No. 167; 171). On January 5, 2015, the plaintiffs moved for final approval of the settlement, plan of allocation, and division of fees. (Docket Entry No. 176). The court held a final fairness hearing on January 20, 2015. The motions are analyzed below, starting with the motion for final approval.

## II. The Motion for Final Approval of the Proposed Settlement, Plan of Allocation, and Division of Fees

Class counsel seek final approval of the proposed settlement, plan of allocation, and division of fees (subject to this court's approval of their motion for fees, which is discussed below).

Federal Rule of Civil Procedure 23(e) requires court approval of a class settlement and establishes certain procedures:

> (1) The court must direct notice in a reasonable manner to all class members who would be bound by the proposal.

> (2) If the proposal would bind class members, the court may approve it only after a hearing and on finding that it is fair, reasonable, and adequate.

> (3) The parties seeking approval must file a statement identifying any agreement made in connection with the proposal.

> (4) If the class action was previously certified under Rule 23(b)(3), the court may refuse to approve a settlement unless it affords a new opportunity to request exclusion to individual class members who had an earlier opportunity to request exclusion but did not do so.

> (5) Any class member may object to the proposal if it requires court approval under this subdivision (e); the objection may be withdrawn only with the court's approval.

 **\*5**  Fed.R.Civ.P. 23(e). The court addresses each of these five requirements, with the (e)(2) fairness requirement discussed last.

### A. Notice
"There are no rigid rules to determine whether a settlement notice satisfies constitutional or Rule 23(e)

requirements[.]" *Wal–Mart Stores, Inc. v. Visa U.S.A., Inc.,* 396 F.3d 96, 114 (2d Cir.2005). Instead, "a settlement notice need only satisfy the broad reasonableness standards imposed by due process." *In re Katrina Canal Breaches Litig.,* 628 F.3d 185, 197 (5th Cir.2010) (internal quotation marks omitted). Due process is satisfied if the notice provides class members with the "information reasonably necessary for them to make a decision whether to object to the settlement."

*Id.; see also Wal–Mart Stores,* 396 F.3d at 114 (explaining that "the settlement notice must fairly apprise the prospective members of the class of the terms of the proposed settlement and of the options that are open to them in connection with the proceedings" (internal quotation marks omitted)); AGGREGATE LITIGATION § 3.04(a) ("The purpose of a notice of a proposed class settlement is to set forth the major contours of the proposal and to inform class members of their right to attend the fairness hearing and to lodge written objections by a prescribed date should they so desire.").

In moving for preliminary approval of the settlement, class counsel submitted proposed summary and detailed notices. (Docket Entry No. 158–1). The court granted its preliminary approval to the form and manner of providing notice proposed by the parties. (Docket Entry No. 163). The notice sent to class members (1) informs the class members of the nature of the action and the general terms of the settlement; (2) provides the addresses of the settlement website established by the settlement administrator and of the firm website of Cohen Milstein Sellers & Toll, PLLC, where class members can readily access information and documents related to the settlement; (3) provides the street address and location of the court, where class members may obtain additional information about the action; and (4) contains the date, time, and place of the fairness hearing where class members can appear and/or object to the settlement. (Docket Entry No. 165–1). Class counsel submitted the affidavit of Lillian Ewing, who works for Gilardi & Co. LLC ("Gilardi"), the Settlement Administrator. (Docket Entry No. 179). Gilardi used the National Change of Address service to obtain the most recent address for each class member based on the list of names provided by defendants. (Docket Entry No. 179, ¶¶ 2–5). Gilardi sent electronic notice to the 28 names on the class list for whom electronic information was provided and mailed notice to the remaining 41 names for whom no email address information was provided by defendants. (*Id.* ¶¶ 3–4). Four notices were returned as undeliverable, but Gilardi successfully located one updated address and resent the notice to that location. (*Id.* ¶ 4). When Gilardi learned that

19 of the social security numbers provided to Gilardi did not match those on file with the government, Gilardi sent W–9 forms to those class members along with a letter requesting that they complete, sign, and return the form to Gilardi to avoid automatic backup withholding on their settlement disbursement. (*Id.* ¶¶ 79).

**\*6** The form and method of providing notice was the "best notice practicable under the circumstances," and provided the class members with a full opportunity to consider the terms of the settlement agreement and to make an informed decision as to whether to participate, opt-out, or object to the settlement. The notice provided satisfied the reasonableness standards imposed by due process and Rule 23. *See In re Heartland,* 851 F.Supp.2d 1061–62.

### B. Side Agreements

Rule 23(e) requires "[t]he parties seeking approval [to] file a statement identifying any Agreement made in connection with the proposal." FED. R. CIV. P. 23(e)(3). This requirement does not concern disclosure of the basic settlement terms; "[i]t aims instead at related undertakings that, although seemingly separate, may have influenced the terms of the settlement by trading away possible advantages for the class in return for advantages for others." *Id.* Committee Notes (2003). "The spirit of [formerly numbered] Rule 23(e)(2) is to compel identification of any agreement or understanding," written or oral, "that might have affected the interests of class members by altering what they may be receiving or foregoing." MANUAL FOR COMPLEX LITIGATION (FOURTH) § 21.631 (2004) ["MANUAL"].

In addition to agreeing to pay $375,000 into a general settlement fund for the class, Brunel agreed that the named plaintiffs would "be entitled to seek a Service Award to be paid out of the Class Settlement Fund in recognition of their service and/or for reimbursement of their time and expenses subject to the approval of, and in an amount to be determined by, the Court." (Docket Entry No. 157, ¶ IX.5). The agreement does not specify an amount, but, as discussed below, the plaintiffs have moved for service awards totaling $12,000–$6,000 to Tamara Slipchenko, $4,000 to David Boswell, and $2,000 to Valerie Barton. (Docket Entry No. 166). Brunel also agreed to pay class counsel $624,999 in attorneys' fees and costs. (Docket Entry No. 157, ¶¶ IX.1–4). The parties have stated that they did not discuss the specific amounts of attorneys' fees and costs until after negotiating a settlement

for the class. All the amounts are subject to court review and approval. (Docket Entry No. 159, ¶ 8).

### C. An Additional Opt–Out Opportunity

A certifying court may refuse to approve a settlement unless it provides an additional opportunity for class members to opt out. *See* FED. R. CIV. P. 23(e)(4); *Tardiff v. Knox Cnty.,* 567 F.Supp.2d 201, 209 (D.Me.2008). The 2003 amendments to the Federal Rules explain:

> Rule 23(e) (3) [now (e)(4) ] authorizes the court to refuse to approve a settlement unless the settlement affords a new opportunity to elect exclusion in a case that settles after a certification decision if the earlier opportunity to elect exclusion provided with the certification notice has expired by the time of the settlement notice. A decision to remain in the class is likely to be more carefully considered and is better informed when settlement terms are known.

**\*7** FED. R. CIV. P. 23(e)(4) Committee Notes (2003). Rule 23(e) (4) comes into play when the opt-out opportunity expired before the members received notice of a proposed settlement. It is inapplicable here.

### D. Objections

Class members must be provided an opportunity to object to the proposed settlement. FED. R. CIV. P. 23(e)(5). The notice sent to the class members informed them of their right to object and outlined the process for doing so. (Docket Entry No. 165–1). To date, no members of the class objected.

### E. Fair, Reasonable, and Adequate

Finally, "the court may approve [the proposed settlement] only after a hearing and on finding that it is fair, reasonable, and adequate." FED. R. CIV. P. 23(e)(2). This court held

a final fairness hearing on January 20, 2015. No members of the class appeared at the hearing to object.

The Fifth Circuit lists six factors that a district court must consider in determining the fairness, reasonableness, and adequacy of a proposed settlement:

> (1) evidence that the settlement was obtained by fraud or collusion; (2) the complexity, expense, and likely duration of the litigation; (3) the stage of the litigation and available discovery; (4) the probability of plaintiffs' prevailing on the merits; (5) the range of possible recovery and certainty of damages; and (6) the opinions of class counsel, class representatives, and absent class members.

*All Plaintiffs v. All Defendants,* 645 F.3d 329, 334 (5th Cir.2011) (quotations omitted). These six factors are known as the *"Reed* factors," after *Reed v. General Motors Corp.,* 703 F.2d 170 (5th Cir.1983). *See id.* at 172. "A 'presumption of fairness, adequacy, and reasonableness may attach to a class settlement reached in arm's-length negotiations between experienced, capable counsel after meaningful discovery.' " *Wal–Mart Stores,* 396 F.3d at 116 (quoting MANUAL FOR COMPLEX LITIGATION, THIRD § 30.42 (1995)); *accord Nat'l Ass'n of Chain Drug Stores v. New England Carpenters Health Benefits Fund,* 582 F.3d 30, 44 (1st Cir.2009); *Klein v. O'Neal, Inc.,* 705 F.Supp.2d 632, 650 (N.D.Tex.2010) ("When considering the *Reed* factors, the court should keep in mind the strong presumption in favor of finding a settlement fair." (internal quotation marks and alteration omitted)). This presumption notwithstanding, the settlement proponents bear the burden of demonstrating the settlement's fairness. *See Katrina Canal Breaches,* 628 F.3d at 196.

"A proposed settlement need not obtain the largest conceivable recovery for the class to be worthy of approval; it must simply be fair and adequate considering all the relevant circumstances." *Klein,* 705 F.Supp.2d at 649. At the same time, "a proposed settlement in which the class receives an insubstantial payment while the fees requested by counsel are substantial could raise fairness concerns." AGGREGATE LITIGATION § 3.05 cmt. b.

**\*8** The *Reed* factors are examined below.

### 1. Evidence of Fraud or Collusion

"The Court may presume that no fraud or collusion occurred between counsel, in the absence of any evidence to the contrary." *Klein,* 705 F.Supp.2d at 651 (quoting *Liger v. New Orleans Hornets NBA Ltd. P'ship,* Civ. A. No. 05–1969, 2009 WL 2856246, at *3 (E.D.La. Aug.28, 2009)). There has been no suggestion of any fraud or collusion. Nor does the record support such a finding. *See DeHoyos v. Allstate Corp.,* 240 F.R.D. 269, 287 (W.D.Tex.2007) ("[T]here are no allegations or indications of fraud or collusion."). The parties vigorously and extensively litigated this case for more than three years before settling. Class counsel have described the arm's-length negotiations that resulted in this settlement. (*See* Docket Entry No. 159, ¶¶ 3, 5, 7). The negotiations occurred over three months and class counsel rejected several settlement offers before agreeing to the $375,000 settlement agreement. (*Id.* ¶ 5). Given these representations, the lack of evidence showing any fraud or collusion, and the vigorous litigation of this case before the parties settled, this factor supports a finding that the settlement is fair, reasonable, and adequate.

"It is common practice today for class counsel to negotiate a specific fee award after they have successfully negotiated the class's recovery." *Turner v. Murphy Oil USA, Inc.,* 472 F.Supp.2d 830, 844 (E.D.La.2007) (citing cases). Here, as in *Turner,* the parties negotiated and agreed to the proposed settlement before reaching the issue of attorneys' fees. Their agreement on attorneys' fees is subject to court review and approval. This factor supports approval of the settlement.

### 2. Complexity, Expense, and Duration of Litigation

"When the prospect of ongoing litigation threatens to impose high costs of time and money on the parties, the reasonableness of approving a mutually-agreeable settlement is strengthened." *Klein,* 705 F.Supp.2d at 651 (citing *Ayers v. Thompson,* 358 F.3d 356, 369 (5th Cir.2004)). Although this court granted partial summary judgment on liability and the trial would focus on the availability of statutory penalties, proving these damages at trial would have been difficult and complex. The court would have considered a range of evidence, including whether the defendants acted in bad

faith and whether the class members suffered any harm or prejudice. *See* Slipchenko, 2013 WL 4677918, at \*11–12. Litigating this case to trial would also be expensive and time consuming, without any guarantee of success because the court retains discretion whether to award statutory penalties. Without settlement, the parties wold have spent significant time briefing motions in limine, prepping fact witnesses, and preparing for cross-examination. Although few pretrial obstacles remained, the novel issues involving COBRA class certification, statutory penalties, and individual ARRA claims could well have resulted in an appeal, which "would likely prolong the litigation, and any recovery by class members, for years." Rodriguez v. West Pub'g Corp., 563 F.3d 948, 966 (9th Cir.2009); *see also* Wal–Mart Stores, 396 F.3d at 118. Settling now "avoids the risks and burdens of potentially protracted litigation" requiring the plaintiff class to incur further expenses without the guarantee of any recovery. Ayers v. Thompson, 358 F.3d 356, 369 (5th Cir.2004). This second factor supports approving the settlement.

### 3. The Stage of Litigation and the Available Discovery

**\*9** Under the third *Reed* factor, the key issue is whether "the parties and the district court possess ample information with which to evaluate the merits of the competing positions." Ayers, 358 F.3d at 369. "A settlement can be approved under this factor even if the parties have not conducted much formal discovery." Klein, 705 F.Supp.2d at 653 (citing, for example, Cotton v. Hinton, 559 F.2d 1326, 1332 (5th Cir.1977)); *see also* Union Asset Mgmt. Holding A.G. v. Dell, Inc., 669 F.3d 632, 639 (5th Cir.2012) (agreeing with district court's conclusion that "formal discovery is not a prerequisite to approving a settlement as reasonable"). The "[s]ufficiency of information does not depend on the amount of formal discovery which has been taken because other sources of information may be available to show the settlement may be approved even when little or no formal discovery has been completed." San Antonio Hispanic Police Officers' Org., Inc. v. City of San Antonio, 188 F.R.D. 433, 459 (W.D.Tex.1999). "The Court should consider all information which has been available to all parties." DeHoyos, 240 F.R.D. at 292.

The parties have litigated this action for more than three years. During this time, class counsel reviewed numerous documents produced by the defendants, propounded 36 requests for production and 11 interrogatories, 25 requests for admissions, took 6 depositions, and defended depositions noticed by the defendants of the 3 named plaintiffs and 5 absentee class members. (Docket Entry No. 160, ¶ 3). By the time the parties settled, the plaintiffs had already received class certification and a favorable summary judgment determination on liability. They even submitted witness and exhibit lists in preparation for trial. Given the substantial discovery, motion practice, and trial preparation, the parties and the district court possessed ample information with which to evaluate the merits of the competing positions in this case. The parties have shown that they possessed sufficient information to gauge the strengths and weaknesses of the claims and defenses. Class counsel were able to determine the settlement's adequacy in relation to the probability of success on the merits were this litigation to continue. The court is well aware of the parties' positions in this case, the legal issues, and the risks to the class should litigation continue. *See* Stott v. Capital Fin. Servs., Inc. ., 277 F.R.D. 316, 344 (N.D.Tex.2011). This factor favors approval of the proposed settlement.

### 4. The Probability of Success on the Merits

The probability of success on the merits is the most important *Reed* factor. Smith v. Crystian, 91 Fed.Appx. 952, 954 n. 3 (5th Cir.2004) (per curiam) (citing Parker v. Anderson, 667 F.2d 1204, 1209 (5th Cir.1982)); *accord, e.g.,* Poplar Creek Dev. Co. v. Chesapeake Appalachia, L.L.C., 636 F.3d 235, 245 (6th Cir.2011). "In evaluating the likelihood of success, the Court must compare the terms of the settlement with the rewards the class would have been likely to receive following a successful trial." DeHoyos, 240 F.R.D. at 287 (citing Reed, 703 F.2d at 172); *see also* Poplar Creek, 636 F.3d at 245 ("The likelihood of success, in turn, provides a gauge from which the benefits of the settlement must be measured." (quotations omitted)). At the same time, a district court "must not try the case in the settlement hearings because the very purpose of the compromise is to avoid the delay and expense of such a trial." Reed, 703 F.2d at 172 (quotations and alterations omitted). This factor favors approval of the settlement when the class's likelihood of success on the merits is questionable. *See In re Corrugated Container Antitrust Litig.,* 659 F.2d 1322, 1326–27 (5th Cir.1981) (affirming district court's finding that this factor favored approving the settlement when the class faced major obstacles in establishing proof of liability and damages).

**\*10** Despite obtaining partial summary judgment on liability, the plaintiffs faced an uncertain likelihood of obtaining statutory penalties at trial for the defendants' failure to notify class members of their continuing coverage under COBRA. First, the statutory provision at issue, § 1132(c), leaves the decisions whether to impose a penalty and, if so, how much, to the court's discretion. *See* 29 U.S.C. § 1132(c)(1); *Slipchenko,* 2013 WL 4677918, at \*17 ("The penalties sought are *not mandatory.* A court *may* award a statutory penalty of up to $110 per day against an employer who fails to provide adequate COBRA notice." (emphasis added)). Thus, although the plaintiffs could have obtained as much as $110 per day for each notice violation, they also could have received nothing.

Second, it is difficult to obtain such penalties under the prevailing legal standard. Courts consider several factors in making this inquiry, but two important factors are bad faith and prejudice. *See Slipchenko,* 2013 WL 4677918, at \*17 ("In awarding penalties under § 1132(c), district courts in the Fifth Circuit look at the presence or absence of good faith on the part of the employer and the presence or absence of prejudice to the plaintiff."); *see also Kreutzer v. A.O. Smith Corp.,* 951 F.2d 739, 743 (7th Cir.1991); *Moothart v. Bell,* 21 F.3d 1499, 1506 (10th Cir.1994); *Agosto v. Academia Sagrado Corazon,* 739 F.Supp.2d 90, 99 (D.P.R.2010) (citing *Kerkhof v. MCI WorldCom, Inc. .,* 282 F.3d 44, 56 (1st Cir.2002)); *Kascewicz v. Citibank, N.A.,* 837 F.Supp. 1312, 1322 (S.D.N.Y.1993) (although prejudice "is not a prerequisite to an award of civil penalties," it is "one factor, albeit a significant one, out of the factors which district courts may consider in exercising their discretion whether to award penalties."); *see also Rodriguez v. Int'l Coll. of Bus.,* 364 F.Supp.2d 40, 49 (D.P.R.2005) ("A showing of prejudice or bad faith is not a prerequisite to the imposition of statutory penalties for failing to inform an employee of the right to continued coverage, but in the court's discretion, these factors may be given dispositive weight."); *Kelly v. Chase Manhattan Bank,* 717 F.Supp. 227, 233 (S.D.N.Y.1989) ("[P]enalties will not be imposed on a plan administrator absent a showing by the plaintiff that he has suffered some degree of harm ....").

Given the difficulty of proving bad faith and prejudice, and the discretion inherent in even assessing statutory penalties,

the plaintiff class's likelihood of success at trial was uncertain. *See Slipchenko,* 2013 WL 467798, at \*17 *Slipchenko,* 2013 WL 467798, at \*17 ("At bottom, the penalty is discretionary and fact-specific."). The settlement agreement represents a fair, reasonable, and adequate compromise that takes into account the plaintiffs' likelihood of success at trial. Accordingly, this factor supports final approval.

### 5. The Range of Possible Recovery and Certainty of Damages

**\*11** This factor requires the district court to "establish the range of possible damages that could be recovered at trial and, then, by evaluating the likelihood of prevailing at trial and other relevant factors, determine whether the settlement is pegged at a point in the range that is fair to the plaintiff settlors." *Maher v. Zapata Corp.,* 714 F.2d 436, 460 (5th Cir.1983) (internal quotation marks omitted) (quoting *In re Corrugated Container Antitrust Litig.,* 643 F.2d 195, 213 (5th Cir.1981)). The district court's consideration of this factor "can take into account the challenges to recovery at trial that could preclude the class from collecting altogether, or from only obtaining a small amount." *Klein,* 705 F.Supp.2d at 656. The question is not whether the parties have reached "exactly the remedy they would have asked the Court to enter absent the settlement," but instead "whether the settlement's terms fall within a reasonable range of recovery, given the likelihood of the plaintiffs' success on the merits." *Id.* (quotations omitted).

Section 1132(c) allows courts to award up to $110 per day for each COBRA notice violation. Class counsel estimates this could have resulted in a class recovery as high as $3 million. (Docket Entry No. 172 (citing Bunch Decl. ¶ 5)). But as class counsel observes, this award requires a showing of bad faith and prejudice. Even then, the court retains discretion to award no statutory penalties at all. Due to the discretionary nature of awarding statutory penalties under § 1132(c), the class could have received anywhere between $0 and $110 per day of notice violation. *See Cole v. Trinity Health Corp.,* No. 14–1408, 2014 WL 7012371 (8th Cir. Sept.8, 2014) (affirming district court's determination that plan participant was not entitled to statutory penalties, despite administrator's failure to comply with COBRA); *In re Interstate Bakeries Corp.,* 704 F.3d 528 (8th Cir.2013) (same); *Kwan v. Andalex Grp. LLC,* 737 F.3d 834 (2d Cir.2013) (same). Given this wide range of recovery, the difficulty of prevailing on

the merits, and the discretion to award statutory penalties even in meritorious circumstances, the $375,000 settlement reflects a fair, reasonable, and adequate compromise. This settlement, which reflects an average per person recovery of over $5,000 for the 69 class members, is well within the range of what courts have awarded or approved in other COBRA class actions. *See* Pierce v. Visteon Corp., No. 1:05–cv–01325–LJM–DKL, 2013 WL 3225832, at *21–22 (S.D.Ind. June 25, 2013) (surveying awards in COBRA cases, and awarding statutory penalties totaling $2,500 per class members); *Hornsby v. Mason Cnty. Greyhound Park,* No. 3:10–cv–680–MHT, 2013 WL 1747539, at *1 (M.D.Ala. April 23, 2013) (approving settlement of COBRA class action involving 1,600 class members for $350,000, which resulted in an average award of $200 per class member). This factor supports final approval.

### 6. The Opinions of Class Counsel, Class Representatives, and Absent Class Members about the Settlement

**\*12** "The endorsement of class counsel is entitled to deference, especially in light of class counsel's significant experience in complex civil litigation and their lengthy opportunity to evaluate the merits of the claims." *DeHoyos,* 240 F.R.D. at 292; *see also* Stott, 277 F.R.D. at 346 ("As class counsel tends to be the most familiar with the intricacies of a class action lawsuit and settlement, 'the trial court is entitled to rely upon the judgment of experienced counsel for the parties.' " (quoting *Cotton,* 559 F.2d at 1330)). But a court should not blindly defer to class counsel's opinion. "Rather, the Court must give class counsel's recommendations appropriate weight in light of all the factors surrounding the settlement." *Turner,* 472 F.Supp.2d at 852.

Class counsel have significant experience in employment class action litigation and have endorsed the settlement after substantial arm's length negotiations. Each of the class representatives agrees that the settlement is a fair, adequate, and reasonable compromise. (Docket Entry Nos. 168, ¶ 27; 169, ¶ 21; 170, ¶ 21). There is no evidence that any absent class members disagree with the settlement. As discussed above, class counsel and the settlement administrator apprised the absent class members of the settlement's terms and their right to object in the best manner practicable under the circumstances. Yet no class members objected during the notice period or at the final fairness hearing. *See In re*

*Heartland,* 851 F.Supp.2d at 1068 ("Receipt of few or no objections 'can be viewed as indicative of the adequacy of the settlement." (quoting *Newberg on Class Actions* § 1141)). Thus, this sixth *Reed* factor favors approving the settlement.

### 7. Result of the *Reed* Analysis

All six *Reed* factors favor approving the proposed settlement. The court concludes that the settlement is fair, reasonable, and adequate under Rule 23(e). The terms are approved.

### F. The Plan of Allocation

The plan of allocation also merits approval. " 'A plan of allocation that reimburses class members based on the extent of their injuries is generally reasonable.' " *Schwartz v. TXU Corp.,* 2005 WL 3148350, at *23 (N.D.Tex. Nov.8, 2005) (quoting *In re Oracle Sec. Litig.,* No. C–90–0931–VRW, 1994 U.S. Dist. LEXIS 21593, at *3, 1994 WL 502054 (N.D. Cal. June 18, 1994)). " '[A] class action settlement need not necessarily treat all class members equally.' " *Id.* (quoting *Cohen v. Resolution Trust Corp.,* 61 F.3d 725, 728 (9th Cir.1995), *vacated on other grounds,* 72 F.3d 686 (9th Cir.1996)). "[D]isparate treatment of class members may be justified by a demonstration that the favored class members have different claims or greater damages." *Petruzzi's, Inc. v. Darling–Del. Co.,* 880 F.Supp. 292, 300–01 (M.D.Pa.1995). The plan at issue here is based primarily on the number of days that each class member did not receive various notices required under ERISA. It looks to other relevant factors, described above, that seek to allocate the funds based on the extent of the class members' individual injuries. These factors stem from the questionnaire sent to class members and information counsel "would have used at trial as evidence of prejudice" in seeking statutory penalties. (Docket Entry No. 177, at 20). The plan of allocation is a fair and equitable method of allocating the proceeds of the settlement among the class members. [6]

### III. The Motion for Approval of Service Awards

**\*13** Class counsel ask the court to approve service awards totaling $12,000 for the three class representatives. (Docket Entry No. 166). " 'Courts commonly permit payments to class representatives above those received in settlement by class members generally.' " *In re Heartland Payment Sys., Inc. Customer Data Sec. Breach Litig.,* 851 F.Supp.2d 1040, 1089 (S.D.Tex.2012) (quoting *Turner v. Murphy*

*Oil USA, Inc.,* 472 F.Supp.2d 830, 870 (E.D.La.2007)); *see also Smith v. Tower Loan of Miss., Inc.,* 216 F.R.D. 338, 367–68 (S.D.Miss.2003). "That does not mean, however, that incentive awards are always merited." *In re Heartland,* 851 F.Supp.2d at 1089. "In deciding whether an incentive award is warranted, courts look to: (1) the actions the plaintiff has taken to protect the interests of the class; (2) the degree to which the class has benefitted from those actions; and (3) the amount of time and effort the plaintiff expended in pursuing the litigation." *Id.* (quotations omitted); *see also* 🚩*Cook v. Niedert,* 142 F.3d 1004, 1016 (7th Cir.1998); Theodore Eisenberg & Geoffrey P. Miller, *Incentive Awards to Class Action Plaintiffs: An Empirical Study,* 53 UCLA L. REV. 1303, 1310 (2006) (arguing that "incentive awards serve multiple goals": compensating representative plaintiffs for costs and superior service to the class). These factors support approving the plaintiffs' proposed service awards.

First, the actions the class representatives took to protect the class interests were substantial. The class representatives faced risk in acting as the public face of the class. *See* 🚩*Humphrey v. United Way of Tex. Gulf Coast,* 802 F.Supp.2d 847, 868–69 (S.D.Tex.2011) (listing among the factors courts consider in awarding incentive awards "(1) the risk to the class representative in commencing suit, both financial and otherwise; [and] (2) the notoriety and personal difficulties encountered by the class representative"). Future employers may consider them less desirable than other applicants because they previously sued an employer. *See* 🚩*Frank v. Eastman Kodak Co.,* 228 F.R.D. 174, 187 (W.D.N.Y.2005) (noting that service awards are especially appropriate in employment litigation in which "the plaintiff is often a former or current employee of the defendant and thus, by lending his name to the litigation, he has, for the benefit of the class as a whole, undertaken the risk of adverse actions by the employer or co-workers"); *Beesley v. Int'l Paper Co.,* No. 3:06–cv–703–DRH–CJP, 2014 WL 375432, at *4 (S.D.Ill. Jan.31, 2014) (approving incentive awards to each plaintiff in part because "ERISA litigation against an employee's current or former employer carries unique risks and fortitude, including alienation from employers or peers"). Slipchenko and Barton were unemployed and seeking employment at various times during the litigation. They both testified that they believe their active involvement in this litigation negatively affected their employment opportunities. (Docket Entry Nos. 168, ¶ 14; 170, ¶¶ 9–10). The class representatives also risked paying litigation and other costs if their claims failed. *See, e.g., Stoffels v. SBC Communs., Inc.,* No. SA–05–cv–0233–XR,

2012 WL 2122191, at *2 (W.D.Tex. June 11, 2012) (imposing costs against plaintiffs in an ERISA class action even though they were initially successful at a liability trial). Despite the risks, the class representatives each declined offers to settle their individual claims in favor of pursuing class-wide settlement. (Docket Entry Nos. 168, ¶¶ 17; 169, ¶¶ 12, ¶¶ 12).

**\*14** Second, the class has benefitted from the representatives' actions. Those actions contributed to the $375,000 settlement offered to the class, representing an average per person recovery of over $5,000. This appears to be among the largest, if not the largest, average per person recovery in a certified class action asserting COBRA claims. *See Pierce v. Visteon Corp.,* No. 1:05–cv–01325–LJM–DKL, 2013 WL 3225832, at *21 (S.D.Ind. June 25, 2013) (awarding each class member $2,500 in statutory damages and noting that the penalty award is "substantially more" than the per person amount awarded in other COBRA class actions). Because ERISA's statutory penalty provision is subject to the court's decision on the appropriate award, the named plaintiffs had no assurance that there would be any damages awarded, much less a minimum amount. *See* 🚩29 U.S.C. § 1132(c)(1). The defendants made no class settlement offers until the summer of 2014, more than three years after the case was filed. The $375,000 settlement award—all of which will be paid out—is a substantial benefit for the class.

Third, the class representatives expended significant time and effort in pursuing the claims. In *In re Heartland,* this court denied the request for service awards for the representative plaintiffs because there "must be some evidence in the record demonstrating that the representative plaintiffs were involved" and there was "no evidence of such involvement, time or expenses." 851 F.Supp.2d at 1090. Not so here. The named plaintiffs played a significant and active role throughout the litigation, and there is evidence of the time and expense they incurred.

Slipchenko began this lawsuit by retaining counsel after unsuccessfully seeking continuation coverage. (Docket Entry No. 168, ¶¶ 5, 9, 11–12). Slipchenko communicated regularly with counsel before and after suit was filed, providing documents and information. (Docket Entry No. 168, ¶¶ 13–14). The other two named plaintiffs, Boswell and Barton, provided information and documents to help counsel draft the amended and second amended complaints. (Docket Entry Nos. 169, ¶ 9; 170, ¶ 9).

As the litigation proceeded, all three named plaintiffs communicated regularly with counsel, despite the fact that Boswell and Barton were working offshore or overseas. (Docket Entry Nos. 169, ¶¶ 10–11, 13; 170, ¶¶ 11, 14, 16). All three responded to discovery requests and interrogatories. (Docket Entry Nos. 168, ¶ 15; 169, ¶ 14; 170, ¶ 13). They made themselves available for depositions, devoted time to prepare with class counsel, and spent significant time testifying during their depositions. (Docket Entry No. 168, ¶¶ 15, 18, 21–22; 169, ¶ 13; 170, ¶¶ 14–16). Slipchenko traveled from her home in Southern California to Houston for her deposition, which lasted more than ten hours over two days. (Docket Entry No. 168, ¶ 18). Boswell and Barton's depositions each lasted over three hours. (Docket Entry Nos. 169, ¶ 13; 170, ¶ 13). Slipchenko and Boswell participated in three mediation sessions, and all three participated in numerous settlement discussions. (Docket Entry Nos. 168, ¶¶ 15–17, 23; 169, ¶¶ 11–12, 17; 170, ¶¶ 11–12, 17). In the months leading up to the September 2014 trial date, the class representatives assisted with trial preparation through telephone conferences and, in Barton's case, a seven-hour meeting during her leave from a job assignment in Angola. (Docket Entry No. 170, ¶ 16).

**\*15** Finally, the size of the service awards sought—$6,000 for Slipchenko, $4,000 for Boswell, and $2,000 for Barton—is supported by the evidence and well within the range courts have approved in similar cases. *See, e.g.,* *Shaw v. Toshiba Am. Info. Sys., Inc.,* 91 F.Supp.2d 942, 973 (E.D.Tex.2000) (approving $25,000 incentive wards to both named plaintiffs); *In re Catfish Antitrust Litig.,* 939 F.Supp. 493, 504 (N.D.Miss.1996) (approving $10,000 incentive awards to each of the four named plaintiffs); *see also* *In re Sprint Corp. ERISA Litig.,* 443 F.Supp.2d 1249, 1271 (D.Kan.2006) ($5,000 incentive award to named plaintiffs); *In re McKesson HBOC Inc. ERISA Litig.,* 391 F.Supp.2d 844, 851 (N.D.Cal.2005) ($5,000 incentive award to named plaintiffs).

Courts recognize that "[a] differentiation among class representatives based upon the role that each played may be proper in given circumstances." *In re Dun & Bradstreet Credit Servs. Customer Litig.,* 130 F.R.D. 366, 374 (S.D.Ohio 1990). The proposed awards reflect the different levels of time and effort each named plaintiff spent. Slipchenko began the litigation and has spent the most time and energy on it. Boswell, who joined the lawsuit as a named plaintiff after Slipchenko in the amended complaint, has also put forth

significant time over the last three years. Barton became a class representative after Slipchenko and Boswell, but has also invested significant time and effort over the last two years. The service awards for the three named plaintiffs appropriately reflect the amount of time and effort each spent on the case.

In sum, the class representatives spent significant time and effort on the litigation, took steps to protect the class interests, and helped obtain the class benefit. The court grants the plaintiffs' motion for payment of class service awards in the amounts of $6,000 for Slipchenko, $4,000 for Boswell, and $2,000 for Barton. (Docket Entry No. 166).

## IV. The Motion for Approval of Attorney's Fees and Costs

Rule 23(h) authorizes a district court to "award reasonable attorney's fees and nontaxable costs that are authorized by law or by the parties' agreement." Fed.R.Civ.P. 23(h). Courts, including in the Fifth Circuit, "have encouraged litigants to resolve fee issues by agreement, if possible." *DeHoyos v. Allstate Corp.,* 240 F.R.D. 269, 322 (W.D.Tex.2007) (citing cases, including *Johnson v. Ga. Highway Express, Inc.,* 488 F.2d 714, 720 (5th Cir.1974)). But "a district court is not bound by the agreement of the parties as to the amount of attorneys' fees." *Strong v. BellSouth Telecomms., Inc.,* 137 F.3d 844, 849 (5th Cir.1998) (internal quotation marks omitted); *see also* Fed.R.Civ.P. 23, advisory committee's notes to the 2003 Amendments, subdivision (h) ("The agreement by a settling party not to oppose a fee application up to a certain amount, for example, is worthy of consideration, but the court remains responsible to determine a reasonable fee.").

**\*16** "In a class action settlement, the district court has an independent duty under Federal Rule of Civil Procedure 23 to the class and the public to ensure that attorneys' fees are reasonable and divided up fairly among plaintiffs' counsel." *In re High Sulfur Content Gasoline Prods. Liab. Litig.,* 517 F.3d 220, 227 (5th Cir.2008). "In determining a fee for class counsel, the court's objective is to ensure an overall fee that is fair for counsel and equitable within the class." Fed.R.Civ.P. 23, advisory committee's notes to the 2003 Amendments, subdivision (h). "The district court's close scrutiny of fee awards serves to 'protect the nonparty

members of the class from unjust or unfair settlements affecting their rights as well as to minimize conflicts that may arise between the attorney and the class, between the named plaintiffs and the absentees, and between various subclasses.' " *In re High Sulfur Content Gasoline Prods. Liab. Litig.,* 517 F.3d at 228 (quoting *Strong,* 137 F.3d at 849). Such scrutiny also "guards against the public perception that attorneys exploit the class action device to obtain large fees at the expense of the class." *Id.* (quoting *Strong,* 137 F.3d at 849). "To fulfill its duty, the district court must not cursorily approve the attorneys' fee provision of a class settlement or delegate that duty to the parties." *Id.* (quotation omitted). "Although exacting judicial review of fee applications may be burdensome, it is 'necessary to discharge the [court's] obligation to award fees that are reasonable and consistent with governing law.' " *Id.* (quoting MANUAL FOR COMPLEX LITIGATION § 14.231 (4th ed. 2004) ("MANUAL")).

Class counsel seek court approval of $624,999 in fees and costs, and Brunel agrees. (Docket Entry Nos. 157, 171, 172). Class counsel have explained that they arrived at these amounts using a lodestar analysis, cross-checked by the *Johnson* factors. According to the affidavits and billing invoices submitted by R. Joseph Barton of Cohen Milstein, who served as lead counsel, Monya M. Bunch of Cohen Milstein, and Justin M. Campbell, III, of Campbell Harrison & Dagley, class counsel spent 3,600 hours on the case. Under a lodestar approach, the fees would total over $1,705,000. The requested award of $624,999 is roughly 36% of that lodestar.

### A. Methodology

In common-fund cases—in which class counsel is compensated from the general fund used to pay class members' damages and claims—district courts generally award attorneys' fees using one of two methods:

> (1) the percentage method, in which the court awards fees as a reasonable percentage of the common fund; or (2) the lodestar method, in which the court computes fees by multiplying the number of hours reasonably expended on the litigation by a reasonable hourly

rate and, in its discretion, applying an upward or downward multiplier.

*Union Asset Mgmt. Holding A.G. v. Dell, Inc.,* 669 F.3d 632, 642–43 (5th Cir.2012). Under the lodestar method as applied in this circuit, the upward or downward adjustment is based on the court's review of the factors set out in *Johnson v. Georgia Highway Express,* 488 F.2d at 717–19. The twelve Johnson factors are:

> **\*17** (1) the time and labor required; (2) the novelty and difficulty of the issues; (3) the skill required to perform the legal service adequately; (4) the preclusion of other employment by the attorney because he accepted the case; (5) the customary fee for similar work in the community; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the undesirability of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases.

*Dell,* 669 F.3d at 642 n. 25. "The *Johnson* factors are intended to ensure 'a reasonable fee.' " *Id.* (quoting *Johnson* ). In *Dell,* the Fifth Circuit confirmed that district courts have discretion to determine the proper fee award in common-fund cases by using either the percentage or lodestar methods, cross-checked with the *Johnson* factors. *Id.* at 642–44. The district court must show that it "has utilized the *Johnson* framework as the basis of its analysis, has not proceeded in a summary fashion, and has arrived at an amount that can be said to be just compensation." *Dell,* 669 F.3d at 642 (quotation omitted).

Having two funds—one for the claimants, one for the attorneys—is a well-recognized variant of a common-fund arrangement. " 'A variant on the traditional common-fund

case occurs frequently in mass tort litigation—in both class actions and large consolidations—where a separate fund to pay attorney fees is created as a part of the settlement.' " *In re Heartland,* 851 F.Supp.2d at 1072 (quoting MANUAL § 14.11). Such an arrangement is sometimes called a "constructive common fund." *Id.* "If an agreement is reached on the amount of a settlement fund and a separate amount for attorney fees and expenses, ... the sum of the two amounts ordinarily should be treated as a settlement fund for the benefit of the class, with the agreed-on fee amount constituting the upper limit on the fees that can be awarded to counsel." *Id.* (quoting MANUAL § 21.7). Although "[m]any courts and commentators have concluded that the best approach is to use the percentage method in a common-fund or variant case with the lodestar method as a cross-check," the "lodestar method is most appropriate in cases with a statutory provision for fee-shifting." *Id.* at 1072–73 & n. 25.

ERISA provides for fee-shifting in § 502(g), which recognizes that the court has discretion to award "reasonable costs to either party." *Hogan v. Kraft Foods,* 969 F.2d 142, 146 (5th Cir.1992) (quoting 29 U.S.C. § 1132(g)(1)). Courts use a two-step analysis to evaluate the reasonableness of a fee request under § 502(g). *See Humphrey v. United Way of Texas Gulf Coast,* No. H–05–758, 2008 WL 5070057, at *3 (S.D.Tex. Nov.20, 2008); *Johnson v. Prudential Ins. Co. of Am.,* No. H–06–0130, 2008 WL 901526, at *6 (S.D.Tex. Mar.31, 2008).

**\*18**  In the first step, a court determines whether a party is entitled to an award by examining the factors set forth in *Iron Workers Local No. 272 v. Bowen,* 624 F.2d 1255, 1266 (5th Cir.1980). They are:

> (1) the degree of the opposing parties' culpability or bad faith; (2) the ability of the opposing parties to satisfy an award of attorneys' fees; (3) whether an award of attorneys' fees against the opposing parties would deter other persons acting under similar circumstances; (4) whether the parties requesting attorneys' fees sought to benefit all participants and beneficiaries of an ERISA plan or to resolve a significant legal question

regarding ERISA itself; and (5) the relative merits of the parties' positions.

*Id.* at 1266 (footnote omitted). Each of the *Bowen* factors is present here: (1) the court has already determined that the defendants were culpable in failing to provide COBRA coverage, *see Slipchenko,* 2013 WL 4677918, at *18; (2) the defendants are able to pay and in the settlement agreement promised to pay these fees; (3) the award would deter other employers from declining to provide COBRA coverage; (4) the plaintiffs will be benefitting all plan participants; and (5) the plaintiffs' claims had merit, as demonstrated by this court's grant of summary judgment on certain liability issues.

In the second step under § 502(g), a court applies the lodestar method to determine the amount and then adjusts upward or downward based on the applicable *Johnson* factors, including the benefit the litigation provided, and using the percentage of fund approach as a cross-check. *Prudential,* 2008 WL 901526, at *6; *see also Dell,* 669 F.3d at 644.

### B. Calculating the Lodestar

#### 1. The Hours Spent

Class counsel have been litigating this case for over three years. The parties engaged in a significant amount of discovery. Class counsel briefed vigorously opposed motions for class certification and summary judgment. (Docket Entry Nos. 54; 60; 61; 71; 78; 80; 174, ¶¶ 3–4). Class counsel also spent significant time preparing for the September 8, 2014 docket call. (Docket Entry No. 173, ¶ 19). In *Hornsby v. Macon County Greyhound Park, Inc.,* No. 3:10–cv–680–MHT, 2013 WL 1747539, at *3 (M.D.Ala. April 23, 2013), a court found that class counsel's expenditure of 3,400 hours in litigating a COBRA case to settlement *before class certification* was reasonable. *See id.* Here, class counsel not only successfully achieved certification but also partial summary judgment and had to spend significant time conducting discovery and preparing for trial before the parties settled. As a general matter, spending 3,645.60 hours was reasonable.

The specific billing records confirm that the great majority of the time submitted is for a reasonable number of hours, given the issues in the case, the legal tasks performed, and the experience and expertise of the lawyers performing those

tasks. That is, the records show that class counsel have used appropriate staffing and billing judgment. "Billing judgment requires documentation of the hours charged and of the hours written off as unproductive, excessive, or redundant." *Saizan v. Delta Concrete Prods. Co.,* 448 F.3d 795, 799 (5th Cir.2006) (per curiam). When appropriate, out-of-state counsel assigned work to attorneys with lower billing rates, avoided duplication of work, and reduced unnecessary expenditures by relying on Houston counsel and seeking leave to appear in court by telephone. (Docket Entry No. 173, ¶ 29). One associate, Monya Bunch, performed nearly half the work (roughly 1,570 hours), avoiding the higher hourly fee the partners would charge. (Docket Entry No. 173, Ex. E). Class counsel have removed many time entries for administrative tasks. (Docket Entry Nos. 173, Ex. F; 175, ¶ 9). Class counsel has also reduced the billing rate for one of its partners, Ms. Handorf, for time she worked on the case while serving as of counsel to the firm because some of that work could have been performed by an associate at a lower hourly rate. (Docket Entry No. 173, ¶ 31; Ex. E). This last adjustment reduced the lodestar by $200,000. (Docket Entry No. 173, ¶ 31). Additionally, class counsel wrote off roughly 15 hours in travel time for both Ms. Bunch and Ms. Handorf. (*Id.*). Finally, class counsel reduced one paralegal's time entries by 50% to avoid submitting excessive time for certain projects. (*Id.;* Ex. E). The type and amount of legal work required and the evidence of staffing and billing judgment further demonstrates the reasonableness of the number of hours spent.

### 2. The Hourly Rates

**\*19** "An attorney's requested hourly rate is prima facie reasonable when he requests that the lodestar be computed at his or her customary billing rate, the rate is within the range of prevailing market rates, and the rate is not contested." *In re Heartland,* 851 F.Supp.2d at 1087 (citation omitted) (finding reasonable rates ranging from $90/hour for paralegal work to $825/hour for co-lead class counsel). An "accepted method of compensating for a long delay in paying for attorneys' services is to use their current billing rates in calculating the lodestar." *In re Enron Corp. Sec., Derivative & ERISA Litig.,* 586 F.Supp.2d 732, 763 (S.D.Tex.2008).

Class counsel seek reimbursement of attorney's fees at the current hourly rates customarily billed to fee-paying clients. (Docket Entry No. 173, ¶ 28; 175, ¶ 8). Campbell Harrison & Dagley's current rates—ranging from $100 to $600 per hour —are well within the prevailing market rate in the Houston

legal community. Cohen Milstein's billing rates—ranging from $240–$260 for paralegals, $415–$530 for associates, and $635–$775 for partners—are generally comparable to the rates charged by the Texas-based defense counsel in this action. (Docket Entry No. 174, Ex. A) For example, Bracewell & Guiliani rates range from $275–$700 for associates and $575–$1,125 for partners. (*Id.*). Courts have regularly approved Cohen Milstein's associate and partner rates for representing plaintiffs in class action litigation, including litigation less complex than ERISA claims tend to be. *See, e.g., In re The Mills Corp. Sec. Litig.,* 265 F.R.D. 246, 260 (E.D.Va.2009) (approving as reasonable rates ranging from $440 to $775 for partners and $295 to $525 for associates at Cohen Milstein); *Chesemore v. Alliance Holdings, Inc.,* No. 09–cv–413–WMC, 2014 WL 4415919, at \*6 (W.D.Wis. Sept.5, 2014) (finding 2014 "hourly rates ranging from $395 (for lower-level associates) to $895 (for highest-level partners)" to be reasonable). Cohen Milstein's legal assistant hourly rates, which range from $240 to $260, are closer to lower-level associate rates at many national law firms than to legal assistant rates. That said, class counsel's reduction of the lodestar by more than 50% from $1,705,971.25 to $624,999.00 adjusts for the higher rates. And as the table class counsel submitted shows, even if Cohen Milstein used Campbell Harrison & Dagley's lower legal assistant rates, its lodestar would still be $860,200, which is significantly higher than the award sought. (Docket Entry No. 173–9 at 2).

### C. The Applicable *Johnson* Factors

#### 1. Time and Labor Involved

The time and labor reasonably required and actually spent for class counsel to litigate this case were substantial. Since filing suit in 2011, class counsel have engaged in significant discovery, obtained—over vigorous and competent opposition—class certification and partial summary judgment; implemented class notice; prepared for trial; and engaged in what ultimately proved successful settlement negotiations, including mediation. The first *Johnson* factor supports the requested award.

#### 2. Novelty and Difficulty of the Issues

**\*20** Few class claims have been filed under ERISA's COBRA provisions and fewer have been certified over opposition *See* COBRA Handbook § 8.07[A][2] (noting that only a few courts have considered whether to certify COBRA cases as class actions and reporting that most have

denied certification). As noted, this appears to be only the third certified COBRA class action. *See Hornsby v. Macon Cty. Greyhound Park,* No. 3:10–cv–680–MHT, 2013 WL 1747539, at \*2–3 (M.D.Ala. Oct.23, 2013) (certifying similar COBRA class); *Pierce v. Visteon Corp.,* 2006 WL 6667384, at \*2, \*5 (S.D.Ind. Sept.14, 2006) (certifying a class of beneficiaries of group and medical dental plans "who were entitled to be provided notice of their COBRA rights due to a qualifying event" but "were not provided said notice in a timely fashion").

In addition to the certification uncertainty, class counsel faced considerable uncertainty as to whether the court would award statutory penalties under § 1132(c) and, if so, in what amount. *See Slipchenko,* 2013 WL 4677918, at \*11 ("The statutory provision at issue, § 1132(c), leaves the decisions whether to impose a penalty and, if so, how much, to the court's discretion."). Although the plaintiff class could have received as much as $3 million in statutory penalties, they also could have received nothing, given the difficulty in establishing the defendants' bad faith and prejudice to class members. Class counsel took the case on a contingency basis with no assurance "of a paycheck." *Florin v. Nationsbank of Georgia, N.A.,* 60 F.3d 1245, 1247 (7th Cir.1995). The second *Johnson* factor supports the requested award.

### 3. The Skill Required to Perform the Legal Service Properly

As class counsel observe, (Docket Entry No. 172 at 21–22), this factor is related to the novelty and difficulty of the issues as well as the experience and ability of class counsel. Given the complexity of COBRA claims and the small number certified as class actions, representing the plaintiff class required skill. Cohen Milstein and Campbell Harrison & Dagley could, and did, "fairly and adequately represent the class," *Slipchenko,* 2013 WL 4677918, at \*15, demonstrating the necessary skill to conduct the litigation effectively and well. Other courts have reached similar conclusions. (Docket Entry No. 173, ¶¶ 3–8; Ex. A (describing Cohen Milstein's reputation for providing excellent representation to plaintiffs in ERISA class actions)); (Docket Entry No. 174, ¶ ¶ 3–6 (describing Campbell Harrison & Dagley's extensive experience)); *Boos v. AT & T, Inc.,* 704 F.Supp.2d 600, 612 n. 13 (W.D.Tex.2010), *aff'd sub nom. Boos v. AT & T, Inc.,* 643 F.3d 127 (5th Cir.2011) (commenting that Cohen Milstein, in an ERISA case led by

Joseph Barton, "presented a cogent argument, well supported by facts and legal authority, in an area repeatedly referred to as complex and difficult"). The third *Johnson* factor supports the requested award.

### 4. The Preclusion of Other Employment

**\*21** By accepting this case, class counsel necessarily limited their ability to work on other cases. Four of Cohen Milstein's seven-lawyer Employee Benefits Practice Group spent more than 50 hours on this case. This factor supports the fee request.

### 5. A Customary Fee for Similar Work in the Community

Class counsel agreed to advance litigation expenses and take this representation on contingency. (Docket Entry Nos. 173, ¶ 26; 174, ¶ 7). The representative plaintiffs agreed that if they prevailed, class counsel would seek a fee through a common-fund recovery, statutory fee-shifting, or some combination of the two, a customary arrangement in employee-benefit class actions. (Docket Entry No. 173, ¶ 26). A straight lodestar award is more than class counsel seeks under the common-fund approach. Brunel agreed to pay $624,999 to settle the attorney's fees claims, including claims under § 502(g). (Docket Entry No. 173, ¶ 22 ("Class Counsel informed Counsel for Defendants during the settlement negotiations that Plaintiffs were entitled to and would seek an award of attorney's fees under § 502(g) if necessary.")). The parties used class counsel's customary hourly rate in their negotiations. (Docket Entry No. 173, ¶ 22 ("Class Counsel also provided Defendants with an estimate of their fees and costs incurred in the litigation.")). This factor is neutral.

### 6. Whether the Fee is Fixed or Contingent

Class counsel took this case on contingency. The typical contingency fee arrangement would yield a fraction of the fees Brunel has agreed to pay. The fact that defense counsel will pay the fee rather than have it deducted from the amount the plaintiff class receives, plus the ERISA fee-shifting provision, make this difference appropriate. *See Haggart v. United States,* 116 Fed. Cl. 131, 144 (Fed.Cl.2014) (observing that the purpose of statutory fee-shifting provisions is "to directly, not proportionately, relieve the burden on plaintiffs to pay their lawyers out of the compensation received"). This factor is neutral.

### 7. The Time Limitations Imposed by the Client or the Circumstances

This "case did not present any particular time limitations imposed either by the client or the circumstances." (Docket Entry No. 172 at 24). This factor does not apply.

### 8. Amount Involved and the Results Obtained

The "most critical factor in determining the reasonableness of a fee award is the degree of success obtained." *In re Heartland,* 851 F.Supp.2d at 1085 (citing *Farrar v. Hobby,* 506 U.S. 103, 114, 113 S.Ct. 566, 121 L.Ed.2d 494 (1995); *Migis v. Pearle Vision, Inc.,* 135 F.3d 1041, 1047 (5th Cir.1998)). Class counsel negotiated a $375,000 settlement for the plaintiff class, which computes to an average award of $5,000 per class member and a minimum of $100 per class member. As noted above, class members will not need to make affirmative claims on the fund. Instead, they will be issued award checks based on a formula considering the number of days that each did not receive notice along with several additional factors. This case thus presents no issue of having to estimate the value of the money that will be delivered to class members. The class members and their locations are known and the settlement funds can be delivered to them with relative ease. *Cf.* *Pearson v. NBTY, Inc.,* 772 F.3d 778, 781–82 (7th Cir. Nov.19, 2014) (reversing an attorney's fees award under nationwide consumer class action settlement where the class received a fraction of the nominal settlement value because very few opted in and there was "no fund ... no litigated judgment, and there was no reasonable expectation in advance of the deadline for filing claims that more members of the class would submit claims than did"). [7]

**\*22** Although the class could have obtained substantially more in statutory penalties had they proceeded to trial, they also could have received nothing because the penalty provisions require proof of bad faith and prejudice and are subject to the court's discretion, and any payment would have been delayed, potentially for years. *See* *Slipchenko,* 2013 WL 4677918, at *11–12 (observing that "[a] primary factor for statutory penalties is whether the employer acted in bad faith" and that that the inquiry also turns "in part on whether individual class members were prejudiced"); (Docket Entry No. 156, at 6–8 (discussing awards in prior COBRA cases)). Given the difficulty of establishing bad faith and prejudice on a class-wide basis to obtain discretionary relief, and the fact that the payment will be within the next few months as

opposed to sometime in the next few years, the negotiated settlement award presents a positive result for each class member. *See Hornsby,* 2013 WL 1747539, at *3 (approving attorney's fees of over $900,000 when each class member in a similar suit received $1,331.45 in settlement). This factor supports the requested award.

### 9. The Experience, Reputation, and Ability of the Attorneys

As discussed above, this *Johnson* factor supports the requested award.

### 10. The Undesirability of the Case

This factor relates to the novelty and difficulty of the issues. As noted above, when class counsel took on this case, very few COBRA class actions had been certified, and obtaining statutory penalties is both difficult and subject to the court's discretion. Although certain liability issues were relatively clear, other factors made the case risky and therefore undesirable. This factor supports the requested award.

### 11. The Nature and Length of the Professional Relationship with the Client

Class counsel communicated regularly with each class representative throughout the case even though Barton and Boswell were often working offshore or overseas. (Docket Entry No. 174, ¶¶ 12–13). When an inadequate number of class members responded to the first notices sent to the class, counsel attempted to contact every class member. In addition to the extensive and difficult motion practice and other discovery work, class counsel litigated the extent of discovery on the absent class members and prepared and presented the named plaintiffs for their depositions. Finally, class counsel mediated the case and negotiated what ultimately proved to be a settlement agreement. *Cf. In re Heartland,* 851 F.Supp.2d at 1086 (finding this factor to support a negative adjustment where there was no "record evidence showing [communication beyond class notice] between class counsel and [plaintiffs], or any class members"). This factor supports the requested award.

### 12. Awards in Similar Cases

Relatively few COBRA class actions have achieved successful results for plaintiff classes. In *Hornsby,* however, the plaintiffs sued based on failure to provide COBRA notice

and payment of reduced premiums under ARRA. Before class certification or findings of liability, the parties reached a settlement under which the defendants agreed to pay $350,000 to class members and another $950,000 in attorney's fees and costs. *Hornsby,* 3:10–cv–00680–MHT–SRW, ECF No. 188 (M.D.Ala. Oct. 23, 2012). Each class member would receive $1,331.45 with a $2,200 enhancement award for the class representatives. *Hornsby,* 2013 WL 1747539, at \*3. The court found that the requested $917,957.41 award of attorney's fees was "reasonable in light of the successful results achieved ..., the monetary benefits obtained ..., [and] the substantial risk associated" with the case. *Id.* The requested fees here are clearly reasonable compared with the award approved in *Hornsby.* This factor supports the requested fee award.

 **\*23** In sum, the *Johnson* factors support the requested award and the grant of the motion for attorney's fees. (Docket Entry No. 171).

### D. Division of Fees

The court has an "independent duty under Federal Rule of Civil Procedure 23 to the class and the public to ensure that the attorney's fees are ... divided up fairly among plaintiffs' counsel." *In re High Sulfur Content Gasoline Prods.*

*Liab. Litig.,* 517 F.3d at 227. Under class counsel's proposed division of fees, lead counsel Cohen Milstein would receive $480,834.23 in fees and $64,069.21 in costs, whereas liaison counsel Campbell, Harrison & Dagley would receive $75,000 in fees and $5,095.56 in costs. Both counsel agree that this is a fair and reasonable division of fees and costs in light of their respective role and hours expended. The court agrees. The proposed division of fees is "factually supportable and consistent with the *Johnson* factors." *In re High Sulfur Content Gasoline Prods. Liab. Litig.,* 517 F.3d at 230. The proposed division of fees is approved.

### V. Conclusion

The court grants the plaintiffs' motions for final approval of: (1) the proposed settlement, plan of allocation, and division of fees, (Docket Entry No. 176); (2) service awards totaling $12,000, (Docket Entry No. 166); and (3) attorneys' fees and costs in the amount of $624,999 (plus interest accrued), (Docket Entry No. 171). An order granting final approval is separately entered.

### All Citations

Not Reported in F.Supp.3d, 2015 WL 338358

---

## Footnotes

1 The plaintiffs' initial complaint, (Docket Entry No. 1), named Tamara Slipchenko as the representative plaintiff. The plaintiffs later filed an amended complaint, (Docket Entry No. 36), adding David R. Boswell as a representative plaintiff. The plaintiffs filed a motion for leave to amend to add Valorie Barton as a named plaintiff, (Docket Entries No. 50, 51). This court granted the plaintiffs' motion to amend, (Docket Entry No. 82). A second amended complaint names the three plaintiffs as class representatives, (Docket Entry No. 83).

2 Section 3001(a) of the ARRA was amended by § 1010 of the Department of Defense Appropriations Act, Pub.L. No 111–118, § 1010, 123 Stat. 3409, 3472–73 (2009); § 3 of the Temporary Extension Act of 2010, Pub.L. No. 111–144, § 3, 124 Stat. 42, 43–45 (2010); and § 3 of the Continuing Extension Act of 2010, Pub.L. No. 111–157, § 3, 124 Stat. 1116, 1117 (2010), to extend eligibility for the premium reduction program to involuntary terminations that occurred before May 31, 2010.

3 *See supra* n. 2.

4 *See supra* n. 2.

5 The court permitted the members of the class to individually assert ARRA claims as part of this action. *See* *Slipchenko,* 2013 WL 4677918, at \*14. The only person to do so was Tamara Slipchenko. (Docket Entry No. 177, at 3).

6 The court addresses the proposed division of fees below.

**Slipchenko v. Brunel Energy, Inc., Not Reported in F.Supp.3d (2015)**

7      Similarly, the percentage relationship between the fees and the fund—which will be delivered in its entirety —also presents none of the issues in *Pearson.* Unlike the localized employment class action here, *Pearson* dealt with a nationwide "consumer class action[ ], where the percentage of class members who file claims is often quite low (in [that] case it was 30,245 ÷ 12 million = .0025, or one quarter of one percent)," and where it is "especially" important to apply a "presumption ... that attorneys' fees awarded to class counsel should not exceed a third or at most a half of the total amount of money going to class members and their counsel."

*Pearson,* 772 F.3d at 782.

---

**End of Document**                                  © 2021 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 58

2007 WL 4115808
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

In re VEECO INSTRUMENTS
INC. SECURITIES LITIGATION.
This Document Relates to All Actions.

No. 05 MDL 01695(CM).
|
Nov. 7, 2007.

ORDER AWARDING ATTORNEYS' FEES AND
EXPENSES TO PLAINTIFFS' LEAD COUNSEL,
AND REIMBURSEMENT OF REASONABLE
COSTS AND EXPENSES TO LEAD PLAINTIFF
FOR REPRESENTATION OF THE CLASS

McMAHON, District Judge.

**I. INTRODUCTION**

**\*1** Concluding almost two years of litigation, Steelworkers and Plaintiffs' Lead Counsel have obtained a settlement of $5,500,000 in cash, plus interest, for the Class (the "Settlement"). The Settlement was achieved after extensive motion practice and fact and expert discovery, and after the parties participated in two mediation sessions before a highly respected mediator, the Honorable Nicholas H. Politan. Moreover, the Settlement was reached only after extensive and near-complete pre-trial preparations, including submission of trial exhibits and a full-day pre-trial hearing before this Court on June 28, 2007. The parties executed an agreement in principle to settle the litigation on July 5, 2007, only days before trial was scheduled to begin on July 9, 2007.

In light of the risks posed by continued litigation, the $5.5 million Settlement is an excellent result for Plaintiffs. Moreover, published data on securities fraud settlements further confirms the quality of the proposed Settlement. The $5.5 million settlement results in an estimated average recovery of $.87 per share of Veeco common stock for the approximately 6.3 million shares which suffered damages in accordance with this Court's June 28, 2007 opinion, or 23.2% of the estimated maximum $3.75 per share suffered by any Class Member, The 23.2% possible recovery of estimated damages exceeds the median percentage reported by Cornerstone Research for settlements overall, which was 3.6% through year-end 2005 and 2.4% for 2006. [1]

As compensation for the efforts expended to achieve the settlement for the Class. Lead Counsel Berger & Montague applied for counsel fees of $1,650,000-equaling 30% of the Settlement Fund-and for reimbursement of Plaintiffs' Counsel's out-of-pocket expenses in the amount of $774,329,29. The 30% fee requested is well within the range of fees customarily sought by (and awarded to) experienced counsel in similar securities class actions, and the fairness of the percentage fee is underscored by a lodestar crosscheck, which reveals that counsel will not be compensated for a substantial portion of the time they devoted to litigating the Action on behalf of the certified Class. Plaintiffs' Counsel litigated the case to the eve of trial on a wholly contingent basis, incurring $774,329.29 in out-of-pocket expenses, and spent over 12,000 hours incurring over $4.5 million in lodestar. The lodestar crosscheck shows that the fee requested in fact represents a fractional multiplier-only about 35.91%-of the aggregate lodestar accumulated by Plaintiffs' counsel. [2] Berger & Montague alone bore all the risks and out-of-pocket expenses for almost two years during this litigation against an able opponent. The Steelworkers, a sophisticated institutional investor, which was actively engaged in the prosecution of this Action, approved the Settlement and fee percentage sought by Plaintiffs' Counsel.

No Class Member has objected to the fee and expenses requested. A total of 15,528 notices of the settlement were mailed to Class Members advising them of Plaintiffs' Counsel's intent to apply to the Court for an award of attorneys' fees of 30% of the Settlement Fund, reimbursement of out-of-pocket expenses not to exceed $775,000, and reimbursement to the Steelworkers of their costs and expenses for representing the Class of $16,089. Information regarding the settlement, including downloadable copies of the Notice and Claim Form, was made available through the Claim Administrator's website. The lack of any objections further supports the fairness and reasonableness of the fee and expense reimbursement requests. [3]

**\*2** For the foregoing reasons, as explained in greater detail below, the Court awards to Plaintiffs' Counsel the fees and expenses that it seeks, as well as reimbursement of costs and expenses to Lead Plaintiff.

## II. THE REQUESTED FEE IS FAIR AND REASONABLE

### A. A Reasonable Percentage of the Fund Recovered Comports with the Legal Standards Governing Awards of Attorneys' Fees in this Circuit

Pursuant to the " 'equitable' or 'common fund' doctrine established more than a century ago in *Trustees v. Greenough,* 105 U.S. 527, 532-533, 15 Otto 527, 26 L.Ed. 1157 (1881), *Trustees v. Greenough,* 105 U.S. 527, 532-33, 26 L.Ed. 1157 (1881), attorneys who create a common fund to be shared by a class are entitled to an award of fees and expenses from that fund as compensation for their work." *In re American Bank Note Holographies,* 127 F.Supp.2d 418, 430 (S.D.N.Y.2001) (McMahon, J.). *See In re EVCI Career Colleges Holding Corp. Sec. Litig.,* 2007 U.S. Dist. LEXIS 57918, at *43, 2007 WL 2230177 (S.D.N.Y. July 27, 2007) (McMahon, J.) ("The Supreme Court has recognized that 'a lawyer who recovers a common fund for the benefit of persons other than ... his client is entitled to a reasonable attorney's fee from the fund as a whole.' " (citing *Boeing Co. v. Van Gemert,* 444 U.S. 472, 478, 100 S.Ct. 745, 62 L.Ed.2d 676 (1980), and *Savoie v. Merchants Bank,* 84 F.3d 52, 56 (2d Cir.1996))). Fees and expenses are paid from the common fund so that all class members contribute equally towards the costs associated with litigation pursued on their behalf. *Goldberger v. Integrated Resources, Inc.,* 209 F.3d 43, 47 (2d Cir.2000) (the common fund doctrine "prevents unjust enrichment of those benefitting from a lawsuit without contributing to its cost").

Courts have recognized that, in addition to providing just compensation, awards of attorneys' fees from a common fund serve to encourage skilled counsel to represent those who seek redress for damages inflicted on entire classes of persons, and to discourage future misconduct of a similar nature. *See Maley v. Del Global Techs. Corp.,* 186 F.Supp.2d 358, 369 (S.D.N.Y.2002) (McMahon, J.). The Supreme Court has stated that private securities actions, such as the instant action, provide " 'a most effective weapon in the enforcement' of the securities laws and are 'a necessary supplement to [SEC] action.' " *Bateman Eichler, Hill Richards, Inc. v. Berner,* 472 U.S. 299, 310, 105 S.Ct. 2622, 86 L.Ed.2d 215 (1985) (citation omitted); *accord Tellabs, Inc. v. Makor Issues &*

*Rights, Ltd.,* --- U.S. ----, 127 S.Ct. 2499, 168 L.Ed.2d 179, 2007 WL 1773208, at *4 (June 21, 2007).

In *Goldberger,* the Second Circuit emphasized the need for fee awards to plaintiffs' counsel to be fair and reasonable, and described two acceptable fee calculation methodologies. One is the "lodestar" method, under which "the district court scrutinizes the fee petition to ascertain the number of hours reasonably billed to the class and then multiplies that figure by an appropriate hourly rate." *Goldberger,* 209 F.3d at 47. Once the lodestar is calculated, the court "may, in its discretion, increase the lodestar by applying a multiplier based on 'other less objective factors/ such as the risk of the litigation and the performance of the attorneys." *Id.* (citation omitted). The second method for calculating fees is the "percentage of recovery" method. *Id.* "In determining what percentage to award, courts have looked to the same 'less objective' factors that are used to determine the multiplier for the lodestar." *Id.* (citation omitted). Because the percentage of recovery approach does not require courts to "exhaustively scrutinize [ ]" attorneys' time records, that methodology is "simpler" than the lodestar approach. *Id.* at 47. 50.

**\*3** Indeed, the Supreme Court has held that where a common fund has been created for the benefit of a class as a result of counsel's efforts, the award of counsel's fees should be determined by the percentage of recovery method. *See, e.g.,* *Boeing,* 444 U.S. at 478-79; *Blum v. Stenson,* 465 U.S. 886, 900 n. 16, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984). The advantages of this methodology led the Second Circuit in *Goldberger* to reaffirm this Circuit's view that it is an accepted means for calculating attorneys' fees in class actions, *Goldberger,* 209 F.3d at 47-50, a view which was expressed again just recently. *See* *Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.,* 396 F.3d 96, 121 (2d Cir.2005). The Second Circuit in *Wal-Mart* observed that "[t]he trend in this Circuit is toward the percentage method." *Id.* at 122.

Moreover, from a public policy perspective, this Court has noted that "[t]he percentage method is attractive because it directly aligns the interests of the Class and its counsel and provides a powerful incentive for the efficient prosecution and early resolution of litigation, which clearly benefits both litigants and the judicial system." *American Bank Note,* 127 F.Supp.2d at 431-32. The percentage approach "is uniquely the formula that mimics the compensation system actually used by individual clients to compensate their attorneys," often serves as a favorable substitute for more costly judicial

In re Veeco Instruments Inc. Securities Litigation, Not Reported in F.Supp.2d (2007)

2007 WL 4115808

monitoring of the attorney's performance, and "can serve as a proxy for the market in setting counsel fees." *Id.* at 432 (citing *In re Sumitomo Copper Litig.,* 74 F.Supp.2d 393, 397 (S.D.N.Y.1999), and *In re Cont'l Illinois Sec. Litig.,* 962 F.2d 566, 568 (7th Cir.1992)).

This Court has recently stated that the percentage of recovery method continues to be the trend of district courts in this Circuit, and that it "has been expressly adopted in the vast majority of circuits." *EVCI,* 2007 U.S. Dist. LEXIS 57918, at *44-46 & *46, 2007 WL 2230177 n. 3 (collecting cases). This Court observed:

> For many years, courts within this Circuit recognized that "Support for the lodestar/multiplier approach in common fund cases has eroded, and there has been a 'groundswell of support for *mandating* a percentage-of-the-fund approach' in the common fund cases."

*Id.* at ----46-47 n. 3. (citing *In re Sumitomo Copper Litig.,* 74 F.Supp.2d at 397 (citation omitted, emphasis in original)). *See also Taft v. Ackermans,* 2007 U.S. Dist. LEXIS 9144, at *28, 2007 WL 414493 (S.D.N.Y. Jan. 31, 2007). This view is in accord with the dictates of the Private Securities Litigation Reform Act ("PSLRA"), which provides that an award of fees and expenses should constitute "a reasonable percentage of the amount of any damages and prejudgment interest actually paid to the class." 15 U.S.C. § 78u-4(a)(6) (emphasis added). *See EVCI,* 2007 U.S. Dist. LEXIS 57918, at *46, 2007 WL 2230177.

## B. The Requested Fee is Fair and Reasonable as a Percentage of the Settlement Benefit Obtained for the Class

**\*4**  The requested amount of attorneys' fees, $1.65 million-representing 30% of the total all-cash recovery to the Class of $5.5 million-is consistent with fees awarded in other securities class action settlements in this Circuit.[4] "Thirty percent of a larger settlement fund could constitute a windfall; however, a settlement fund of this size does not create such an issue." *Taft,* 2007 U.S. Dist. LEXIS 9144, at *32, 2007 WL 414493; *Hicks,* 2005 WL 2757792, at *9 ("A settlement amount of $10 million does not raise the windfall issue in the same way as would a $100 million settlement, and a 30% fee does not produce such a windfall."). A thirty percent fee, requested here by Plaintiffs' Counsel, is consistent with fees

awarded in similar class action settlements of comparable value.[5]

## C. The Percentage Fee Requested by Plaintiffs is Reasonable Under the Second Circuit's *Goldberger* Factors

The Second Circuit has set forth the following six factors that should be considered by District Courts, regardless of which method is used, in determining the reasonableness of the fee:

> (1) the time and labor expended by counsel; (2) the magnitude and complexities of the litigation; (3) the risk of the litigation; (4) the quality of representation; (5) the requested fee in relation to the settlement; and (6) public policy considerations.

*Goldberger,* 209 F.3d at 50; *Wal-Mart,* 396 F.3d at 122 ("Irrespective of which method is used, the '*Goldberger* factors' ultimately determine the reasonableness of a common fund fee"). The lodestar value then acts as a "cross check," and the hours submitted by the attorneys are reviewed but not exhaustively scrutinized. *Goldberger,* 209 F.3d at 50.

Consideration of the relevant *Goldberger* factors supports an award of a fee of 30% of the settlement fund to Lead Plaintiffs' Counsel in this case.

## 1. The Significant Time and Labor Expended by Plaintiffs' Counsel

The first factor set forth in *Goldberger* for determining an appropriate fee is "the time and labor expended by counsel." 209 F.3d at 50. Plaintiffs' Counsel has devoted over 12,000 hours to the prosecution and settlement of this Action, including the following matters:

- extensive pre-filing investigatory work, including research, review, and analysis of public filings, articles, and analyst reports about Vecco.

- moving for certification of the Class under Fed.R.Civ.P. 23, and, at the same time, opposing Defendants' motion to dismiss. In connection with

the motion for class certification, Lead Plaintiff produced documents in response to Defendants' requests and defended the depositions of the proposed Class Representative-Lead Plaintiff Steelworkers-and its asset manager.

• review of approximately 225,000 pages of documents produced by Defendants, including documents produced as a result of Lead Plaintiff's motion to compel Defendants' production of documents on backup tapes. Lead Plaintiff also subpoenaed documents from twenty-six third-parties, including Veeco's auditor Ernst & Young, and received and reviewed approximately ten thousand pages of documents from Ernst & Young alone.

**\*5** • conducting ten days of depositions, including the depositions of: Individual Defendants Braun, Rein and Kiernan; three Ernst & Young partners involved in Veeco's audit; former TurboDisc controller Bruce Huff, to whom the Company attributed the improprieties leading to the restatement; and Veeco's internal auditors during the Class Period, Gary Reifert and Herman Birnbaum. Lead Plaintiff also served interrogatories and requests for admission upon Defendants.

• during expert discovery, exchanging reports of accounting and damages experts, deposing Defendants' damages expert, and defending depositions of Plaintiffs' accounting and damages experts.

• engaging in extensive motion practice, including a number of contentious discovery motions involving briefing and court appearances, for example: (i) Lead Plaintiffs' motion to compel Defendants to produce documents concerning the internal investigation of TurboDisc by Veeco and Jefferson Wells; and (ii) Lead Plaintiffs' motion to obtain documents on Defendants' backup tapes.

• completing substantial preparation for trial, including submission of pre-trial order and exhibits, and filing responses to motions *in limine.* The parties attended a pre-trial conference on June 28, 2007 and were prepared to select a jury on July 9.2007.

In total, Plaintiffs' Counsel reported spending over 12,000 hours litigating this case up until trial, representing a lodestar of about $4,6 million. Plaintiffs' Counsel also incurred $774,329.29 in out-of-pocket expenses on this matter since its initiation. Plaintiffs' Counsel's efforts were undertaken on a contingent fee basis despite the possibility that Plaintiffs

would not prevail in this litigation (and would therefore receive no compensation). The tasks performed by Plaintiffs' Counsel were necessary in order to achieve the Settlement, and the time and labor expended by counsel in producing this Settlement supports the requested fee. Indeed, Plaintiffs' fee request represents a fractional multiplier of .3591 in this case. As a result, Lead Counsel will receive no compensation for almost two-thirds of its time spent litigating this case.

### 2. The Complexity, Magnitude and Risks of Litigation, and the Contingent Nature of the Fee Supports the Requested Fee

A securities case, "by its very nature, is a complex animal."

*Maley,* 186 F.Supp.2d at 372 (quotation omitted). Berger & Montague, P.C. prosecuted this Action by itself against a team of defense lawyers from the well-known law firm Gibson Dunn & Crutcher, LLP. for almost two years, up until the eve of trial. Plaintiffs' Counsel did not "piggy back" on any prior governmental action related to Veeco.

*Maley,* 186 F.Supp.2d at 371. Prosecution of this Action was heavily dependent on expert testimony, thereby adding substantially to its costs. Plaintiffs have encountered-and would certainly continue to encounter at trial, absent the Settlement-significant litigation risks, including successfully proving all of the necessary elements to establish that Defendants' dissemination of materially false and misleading statements regarding Veeco violated Rule 10b-5, and proving that any or all of the price drop of the stock was attributable to the disclosure of the alleged fraud as opposed to market factors.

**\*6** The complex and difficult issues in this case included the following:

• the difficulty of proving Plaintiffs' case through the testimony of Veeco's employees and former employees, who could be considered hostile witnesses.

• the difficulty of establishing loss causation in light of the Supreme Court's decision in *Dura Pharms., Inc. v. Broudo,* 544 U.S. 336, 125 S.Ct. 1627, 161 L.Ed.2d 577 (2005).

• the complexity of the legal and factual accounting issues involved, including GAAP and the relative novelty of the internal control issues involving the Sarbanes-Oxley Act that had to be presented to substantiate Plaintiffs' allegations of fraud and scienter.

- the difficulty of proving that Defendants' public statements were materially false and misleading.

- the difficulty in proving that any or all of the Defendants acted with scienter where there was no insider selling and no finding of wrongdoing by any governmental or other investigative body.

The Courts of this Circuit, including this District, have expressly recognized that the contingent nature of counsel's fee. with the built-in risk of litigation, is a highly relevant factor in determining the fee to be awarded. As the Second Circuit stated:

> No one expects a lawyer whose compensation is contingent upon his success to charge, when successful, as little as he would charge a client who in advance had agreed to pay for his services, regardless of success. Nor, particularly in complicated cases producing large recoveries, is it just to make a fee depend solely on the reasonable amount of time expended.

*City of Detroit v. Grinnell Corp.,* 495 F.2d 448, 470 (2d Cir.1974); *In re Warner Communications Sec. Litig.,* 618 F.Supp. 735, 747 (S.D.N.Y.1985) ( "Numerous cases have recognized that the attorneys' contingent fee risk is an important factor in determining the fee award.") (citations omitted).

Indeed, the risk of non-payment in complex cases, such as this one, is very real. There are numerous class actions in which counsel expended thousands of hours and yet received no remuneration whatsoever despite their diligence and expertise. There is no guarantee of reaching trial, and even a victory at trial does not guarantee recovery.[6] As the Court stated in *Warner:* "Even a victory at trial is not a guarantee of ultimate success.... An appeal could seriously and adversely affect the scope of an ultimate recovery, if not the recovery itself." 618 F.Supp. at 747-748.

### 3. The Quality of Plaintiffs' Counsel's Representation and Substantial Benefit to the Class Supports the Requested Fee

The result achieved and the quality of the services provided are also important factors to be considered in determining the amount of reasonable attorneys' fees. *See, e.g., Hensley v. Eckerhart,* 461 U.S. 424, 436, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983) ("[T]he most critical factor is the degree of success obtained."); *Behrens v. Wometco Enterprises, Inc.,* 118 F.R.D. 534, 547-48 (S.D.Fla.1988) ("The quality of work performed in a case that settles before trial is best measured by the benefit obtained.").

**\*7** In this case, the quality of the representation of Plaintiffs' Counsel is best evidenced by the result. Despite vigorous opposition by Defendants at every stage up to trial. Plaintiffs obtained a Settlement of $5.5 million in cash. Not only did Plaintiffs' Counsel's "skill and expertise contribute to the favorable settlement for the class, it contributed to the overall efficiency of the case." *Denney v. Jenkens & Gilchrist,* 230 F.R.D. 317, 352 (S.D.N.Y.2005).

Defendants were represented by a well-staffed team of lawyers from the New York office of Gibson, Dunn & Crutcher, LLP, one of the country's largest law firms, who tenaciously challenged Plaintiffs at every stage of the litigation up until the eve of trial. That Plaintiffs' Counsel was able to obtain a substantial settlement from these Defendants confirms the quality of Plaintiffs' Counsel's representation in this matter, and is a factor in determining the reasonableness of the fee request. *See, e.g., Taft,* 2007 U.S. Dist. LEXIS 9144, at \*31, 2007 WL 414493 (noting that, in determining the quality of the representation, courts review, *inter alia,* the recovery obtained and the backgrounds of the lawyers involved in the suit).

### 4. The Requested Fee Award is Reasonable in Relation to the Settlement Amount

As discussed above, a fee of 30% of the $5.5 million settlement fund is consistent with fees awarded in a similar class action settlements of comparable value. Moreover, it does not create a windfall. *See Wal-Mart,* 396 F.3d at 122; *Taft v. Ackermans,* 2007 U.S. Dist. LEXIS 9144, at \*32, 2007 WL 414493; *In re Greenwich Pharm. Sec. Litig.,* 1995 WL 251293, at \* 7 (E.D.Pa. April 26, 1995) (fee award of 33% of $4.3 million settlement does not present danger of windfall

2007 WL 4115808

that would accompany a "megafund" of, for example, $100 million settlement).

### 5. Public Policy Considerations Fully Support the Requested Fee

The Second Circuit has also noted that "public policy considerations" should be considered in determining the fee awarded to plaintiffs' counsel in class actions. *Goldberger, 209 F.3d at 50.*

Private enforcement of the federal securities laws, as is the nature of the action here, is a necessary adjunct to government intervention because neither the SEC nor the Justice Department has sufficient assets to address all forms of securities fraud. *See, e.g., Bateman Eichler, Hill Richards, Inc.,* 472 U.S. at 310 (lawsuits brought by investors provide " 'a most effective weapon in the enforcement' of the securities laws and are 'a necessary supplement to [SEC] action' " (quoting *J.I. Case Co. v. Barak,* 377 U.S. 426, 432, 84 S.Ct. 1555, 12 L.Ed.2d 423 (1964))). As this Court has stated:

> "It is ... imperative that the filing of such contingent lawsuits not be chilled by the imposition of fee awards which fail to adequately compensate counsel for the risks for pursuing such litigation and the benefits which would not otherwise have been achieved but for their persistent and diligent efforts. Private attorneys should be encouraged to take the risks required to represent those who would not otherwise be protected from socially undesirable activities like securities fraud."

**\*8** *Maley,* 186 F.Supp.2d at 374. *See also Goldberger,* 209 F.3d at 51 (noting the "commendable sentiment in favor of providing lawyers with sufficient incentive to bring common fund cases that serve the public interest").

Moreover, public policy considerations support the award in this case because the Lead Plaintiff and Class Representative, Steelworkers Pension Trust-a large public pension fund-

conscientiously supervised the work of lead counsel and has approved the fee request. Since passage of the PSLRA, courts-including this Court have found that in a PSLRA case, a fee request which has been approved and endorsed by a properly-appointed lead plaintiff is "presumptively reasonable," especially where the lead plaintiff is a sophisticated institutional investor. *EVCI,* 2007 U.SDist. LHXIS 57918. at \*49-50 (citing *In re Cendanl Corp. Litig.,* 264 F.3d 201, 282 (3d Cir.2001)). This accords with Congress's belief that institutions would be in the best position to monitor the ongoing prosecution of the litigation and to assess the reasonableness of counsel's fee request. *In re EVCI,* 2007 U.S. Dist. LEXIS 57918, at \*50 n. 4, 2007 WL 2230177.

### D. A "Cross-Check" Of Plaintiffs' Counsel's Lodestar Demonstrates the Reasonableness of the Requested Percentage Fee

The Second Circuit "encourages" an analysis of counsel's lodestar "as a 'cross-check' on the reasonableness of the requested percentage." *Goldberger,* 209 F.3d at 50; *EVCI,* 2007 U.S. Dist. LEXIS 57918, at \*54, 2007 WL 2230177. Where the lodestar is "used as a mere cross-check, the hours documented by counsel need not be exhaustively scrutinized by the district court." *Goldberger,* 209 F.3d at 50.

### 1. The Number of Hours Expended By Plaintiffs' Counsel Was Reasonable

The starting point for a lodestar analysis is the calculation of the lodestar-which is "comprised of the amount of hours devoted by counsel multiplied by the normal, non-contingent hourly billing rate of counsel." *In re Prudential Sec. Ltd. P'shps. Litig.,* 985 F.Supp. 410, 414 (S.D.N.Y.1997); *see EVCI,* 2007 U.S. Dist. LEXIS 57918, at \*54, 2007 WL 2230177. Here, Plaintiffs' Counsel devoted 12,185 hours to this matter, and their lodestar through October 18, 2007, was $4,594,233.40. The requested fee represents only a fractional multiplier of the lodestar. Plaintiffs' Counsel performed substantial work on behalf of the Class, litigating this case to the eve of trial against a formidable opponent.

Berger & Montague bore all the risks and expenses of the litigation, including extensive fact and expert discovery, motion practice, participation in and preparation of submissions for mediations, and preparation for trial. Berger & Montague was efficient in litigating this action, as it is highly experienced in prosecuting securities law claims and shareholder class actions. *Cf. Teachers' Ret. Sys.*

*v. A.C.L.N., Ltd.,* 2004 U.S. Dist. LEXIS 8608, at *20, 2004 WL 1087261 (S.D.N.Y. May 14, 2004) (noting that the skill and prior experience of counsel in the specialized field of shareholder securities litigation is relevant in determining fair compensation).

### 2. The Rates Charged By Plaintiffs' Counsel Are Reasonable

**\*9** The second step in the lodestar cross-check analysis is to evaluate the reasonableness of the current billing rates charged by plaintiffs' counsel. The Second Circuit in *Goldberger* noted that the overall goal of the fee-setting process is to replicate the rate that counsel would be paid in a perfect market. 209 F.3d at 52 ("market rates, where available, are the ideal proxy for their compensation"). The use of current rates to calculate the lodestar figure has been repeatedly endorsed by courts as a means of accounting for the delay in payment inherent in class actions and for inflation. *See, e.g., Missouri v. Jenkins,* 491 U.S. 274, 283-84, 109 S.Ct. 2463, 105 L.Ed.2d 229 (1989) ("an appropriate adjustment for delay in payment" by applying "current" rate is appropriate); *LeBlanc-Sternberg v. Fletcher.,* 143 F.3d 748, 764 (2d Cir.1998) (current rates "should be applied in order to compensate for the delay in payment").

In determining the propriety of the hourly rates charged by plaintiffs' counsel in class actions, courts have held that the standard is the rate charged in the community where the services were performed for the type of service performed by counsel. *See Luciano v. Olsten Corp.,* 109 F.3d 111, 115 (2d Cir.1997) ("[t]he 'lodestar' figure should be 'in line with those [rates] prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation' " (quoting *Blum,* 465 U.S. at 896 n. 11)); *accord In re NASDAQ Market-Makers Antitrust Litig.,* 187 F.R.D. 465, 489 (S.D.N.Y.1998); *see also Sutton v. Bernard,* 504 F.3d 688, 2007 WL 2963940, at *4 (7th Cir. Oct.12, 2007) (in deciding fee award in common fund cases, courts should look to marketplace for legal services as guide to what is reasonable). Viewed in light of a "marketplace" barometer, Plaintiffs' Counsel's rates are reasonable.

In class actions, courts in this district and around the country have consistently found to be reasonable rates comparable to those at issue here, given the nature of plaintiffs' counsel's

work in such cases and the risks associated with financing class actions. [7] Thus, substantial precedent-as well as a market check-demonstrates that the rates utilized by Plaintiffs' Counsel in calculating its lodestar is are reasonable.

### E. The Requested Fee Is Reasonable Because It Implies a Fractional Multiplier, Indicating that Plaintiffs' Counsel Will Not Be Compensated for Much of Their Time Spent Litigating This Case

Courts have continually recognized that, in instances where a lodestar analysis is employed to calculate attorneys' fees or used as a "cross-check" for a percentage of recovery analysis, counsel may be entitled to a "multiplier" of their lodestar rate to compensate them for the risk assumed by them, the quality of their work, and the result achieved for the class. *See, e.g., Goldberger,* 209 F.3d at 54 ("We have historically labeled the risk of success as 'perhaps the foremost' factor to be considered in determining whether to award an enhancement." (citation omitted)); *Prudential,* 985 F.Supp. at 414 ("Because counsel who rendered services were not being compensated for their work as it was being performed and because of the significant risk that they might never receive any compensation if the action was unsuccessful, courts have, when warranted, applied a multiplier to the lodestar to arrive at a fair contingent fee.").

**\*10** Berger & Montague spent over 12,000 hours on this case and their lodestar for the services performed by the firm is approximately $4.6 million. Lodestar multiples of over 4 are routinely awarded by courts, including this Court. *See, e.g., Maley,* 186 F.Supp.2d at 369 (awarding fee equal to 4.65 multiplier, which was "well within the range awarded by courts in this Circuit and courts throughout the country"); *EVCI,* 2007 U.S. Dist. LEXIS 5791S, at *56 & n. 7, 2007 WL 2230177 (2.48 multiplier "is within the range found to be reasonable"; collecting cases and noting that "[l]odestar multipliers of nearly 5 have been deemed 'common' by courts in this District" (citation omitted)). Here, Lead Counsel seeks no multiple of its lodestar. In fact, Plaintiffs' Counsel will recoup less than 36% of their lodestar. Not only is Plaintiffs' Counsel not receiving a premium on their lodestar to compensate them for the contingent risk factor, their fee request amounts to a deep discount from their lodestar. Thus, the lodestar "cross-check" unquestionably supports a percentage fee award of 30%.

**F. The Reaction of the Class Demonstrates The Reasonableness of the Fee Request**

Finally, "[t]he reaction by members of the Class is entitled to great weight by the Court" and confirms the reasonableness of the requested fees. *Maley,* 186 F.Supp.2d at 374. The Notice mailed to members of the Class specifically indicated that Plaintiffs' Counsel would apply for a fee award of 30% of the Gross Settlement Fund, and that any class member could object to the fee application by October 19, 2007. No member of the Class has objected to either the Settlement or to Plaintiffs' Counsel's request for an award of attorneys' fees. This response suggests that the fee request is fair and reasonable. *Id.*

**III. LEAD COUNSEL'S REQUEST FOR REIMBURSEMENT OF EXPENSES IS REASONABLE AND APPROPRIATE**

It is well established that counsel who create a common fund are entitled to the reimbursement of expenses that they advance to a class. *See, e.g., Teachers' Ret. Sys.,* 2004 U.S. Dist. LEXIS 8608, at *17, 2004 WL 1087261 (citations omitted). "Courts in the Second Circuit normally grant expense requests in common fund cases as a matter of course." *EVCI,* 2007 U.S. Dist. LEXIS 57918, at *57, 2007 WL 2230177 (citations omitted); *see American Bank Note,* 127 F.Supp.2d at 433; *Taft,* 2007 U.S. Dist. LEXIS 9144, at *35, 2007 WL 414493; *Miltland Raleigh-Durham v. Myers,* 840 F.Supp. 235, 239 (S.D.N.Y.1993) ("Attorneys may be compensated for reasonable out-of-pocket expenses incurred and customarily charged to their clients, as long as they 'were incidental and necessary to the representation' of those clients" (citation omitted)).

As set forth in the affidavit of Plaintiffs' Counsel, the total unreimbursed out-of-pocket expenses incurred by them to date are $774,329.29. The expenses were incurred on an ongoing basis for such items as consultant and expert fees, photocopying of documents, mediation fees, court filing fees, deposition transcripts, fees for service of subpoenas to witnesses, on-line research, creation of a document database, messenger service, postage and next day delivery, long distance and facsimile expenses, transportation, travel and other expenses directly related to the prosecution of this Action, including preparation for trial. All of these expenses are customary and necessary expenses for a complex

securities action, and were necessary for Plaintiffs' Counsel to successfully prosecute this case to trial. Moreover, Plaintiffs had no co-counsel or local counsel to perform any of these tasks.

**\*11** The largest portion of the $774,329.29 in out-of-pocket expenses incurred by Plaintiffs in litigating this case was for accounting and damages experts retained by Plaintiffs, which comprised over $543,000, or over 70% of the total costs. These expenses reflected the fact that this was a complex case which was litigated until a week before trial.

The prosecution of this Action was heavily dependent on expert assistance and testimony. The case involved a $10.2 million restatement of Veeco's financials and allegations concerning complex accounting, internal financial reporting and disclosure control issues. Plaintiffs alleged that Defendants violated the Securities Exchange Act of 1934 by issuing statements and financial reports for the first, second and third quarters of 2004, by employing improper accounting at the Company's TurboDisc division, including alleged improper revenue recognition, and accounting for inventory, and warranty costs. Plaintiffs requested and received over 225,000 pages of documents from Defendants and another 10,000 pages of documents from Defendants' internal auditor, Ernst & Young.

During the course of discovery, Plaintiffs retained accounting and damages experts to assist Plaintiffs, including analyzing the documents produced. During expert discovery, the parties exchanged expert reports and took and defended expert depositions. Plaintiffs' damages expert Steven P. Feinstein, Ph.D., CFA, opined on damages and loss causation, and their accounting expert, Robert W. Berliner, CPA, CFE, opined on issues of liability, materiality, and scienter with respect to the alleged fraud involving accounting and internal control issues. The non-testifying expert assisted Plaintiffs in the factual investigation and analysis in connection with the amended complaint and during merits discovery, and also assisted Plaintiffs in preparing their submissions for mediation, including the two-day mediation in October 2006. Expert accounting and damages testimony would have been crucial at trial, and Dr. Feinstein and Mr. Berliner were prepared to testify. The expenses for Plaintiffs' accounting and damages experts totaled $543,196.49, as follows:

- Non-testifying forensic accounting expert $218,000.00

- Robert W. Berliner, CPA, CRD (testifying accounting expert)     $252,349.49

- Stephen P. Feinstein,, Ph.D., CFA (testifying damages expert)     $ 72,847.00

This Court and others have reimbursed such expert witness fees where "[t]he expenses incurred were essential to the successful prosecution and resolution of [the] Action." *EVCI,* 2007 U.S. Dist. LEXIS 57918, 2007 WL 2230177. at *57-58. [8]

The Notice to the Class advised Class members that Lead Counsel would seek reimbursement of expenses in addition to attorneys' fees, in an amount not to exceed $775,000, exclusive of costs of notice and claims administration. Lead Counsel received no objections to this request. The requested expenses are well within the amount specified in the notice Accordingly, Berger & Montague are awarded $774,329.29 for out-of-pocket expenses.

## IV. AN AWARD OF REASONABLE COSTS AND EXPENSES FOR THE STEELWORKERS IS APPROPRIATE

 **\*12** The PSLRA states that "[n]othing in this paragraph shall be construed to limit the award of reasonable costs and expenses (including lost wages) directly relating to the representation of the class to any representative party serving on behalf of a class." 15 U.S.C. § 78u-4(a)(4).

The Steelworkers were appointed Lead Plaintiff and, subsequently, Class Representative in this action. The Steelworkers expended over eighty hours valued at a total of $15,964.20, and incurred $125 of out-of-pocket expenses directly relating to the representation of the Class. From the outset of the litigation to settlement, the Steelworkers monitored the litigation and participated in prosecuting the case, including participation in discovery, subjecting itself to deposition, and reviewing significant pleadings and briefs.

"Courts in this Circuit routinely award such costs and expenses both to reimburse the named plaintiffs for expenses incurred through their involvement with the action and lost wages, as well as to provide an incentive for such plaintiffs to remain involved in the litigation and to incur such expenses in the first place." *Hicks,* 2005 WL 2757792, at \*10; *see*

*In re Worldcom, Inc. ERISA Litig.,* 2004 WL 2338151, at \*11 (S.D.N.Y. Oct.18, 2004) (awarding $5,000 to each of the three named plaintiffs who were involved in the litigation, had been deposed, and had "performed an important service to the class").

The Notice to the Class advised Class members that Lead Counsel would seek reimbursement of $16,089 to Steelworkers for their reasonable costs and expenses, including lost wages, directly relating to its representation of the Class. Lead Counsel has received no objections to this request. Accordingly, the Court awards the Steelworkers $16,089.20 as compensation for their reasonable costs and expenses incurred in representing the Class.

## CONCLUSION

For the foregoing reasons, the Court hereby awards; (I) attorneys' fees in the amount of $1,650,000, or 30% of the $5,500,000 settlement fund, together with reimbursement of Plaintiffs' Counsel's expenses in the amount of $774,329.29; and (ii) reimbursement of Lead Plaintiff Steelworkers Pension Trust's reasonable costs and expenses related to their representation of the Class in the amount of $16,089.20.

## All Citations

Not Reported in F.Supp.2d, 2007 WL 4115808

## Footnotes

1     *See* Laura E. Simmons & Ellen M. Ryan, *Cornerstone Research, Securities Class Action Settlements: 2006 Review and Analysis* (Cornerstone Research 2007), at 6, *available at* http://www.cornerstone.com (the "Cornerstone Report").

2 Lead Counsel will reimburse from its fee award the law firm Milberg Weiss LLP for the time it expended in serving as liaison counsel from April 2005 until the time the Court decided to dispense with liaison counsel in view of the ease of electronic filing. (Order of October 12, 2005.) Lead Counsel has included the out-of-pocket expenses incurred by Milberg Weiss as liaison counsel during that period in Lead Counsel's fee and expense petition.

3 Moreover, there has been only one request for exclusion.

4 *See, e.g., Taft v. Ackermans,* 2007 U.S. Dist. LEXIS 9144, at *32, 2007 WL 414493 (S.D.N.Y. Jan. 31, 2007) (awarding 30% of $15.17 million settlement); *Hicks v. Morgan Stanley,* 2005 WL 2757792, at *9 (S.D.N.Y. Oct.24, 2005) (30% of $10 million settlement); *In re Warnaco Group. Inc. Sec. Litig.,* 2004 WL 1574690, at *3 (S.D.N.Y. July 13, 2004) (30% of $12.85 million settlement); *In re Bisys Sec. Litig.,* 2007 U.S. Dist. LEXIS 51087, at * 8 (S.D.N.Y. July 11, 2007) (30% of $65.87 million settlement).

5 *See, e.g., The Takara Trust v. Molex, Inc.,* No. 05-1245 (N.D.Ill. Mar. 1, 2007) (30% of $10.5 million settlement); *In re Amerco Sec. Litig.,* No. 04-2182 (D.Ariz. Nov. 2, 2006) (30% of $7 million settlement); *Davidco Investors, LLC v. Anchor Glass Container Corp.,* No. 04-2561 (M.D.Fla. Mar. 16, 2007) (30% of $5.5 million settlement); *In re Carreker Corp. Sec. Litig.,* No. 03-250 (N.D.Tex. Aug. 16, 2006) (30% of $5.25 million settlement); *Mairah v. Medical Staffing Network Holdings, Inc.,* No. 04-80158 (S.D.Fla. March 6, 2007) (30% of $5 million settlement); *Gulp v. Gainsco, Inc.,* No 04-723 (N.D.Tex. Feb. 13, 2007) (30% of $4 million settlement); *In re Dobson Communications, Inc. Sec. Litig.,* No. 04-1394 (W.D.Okla. Mar. 20, 2007) (30% of $3.4 million settlement).

Indeed, there are numerous other common fund cases in this District alone where fees were awarded in the amount of 33 1/3% of the settlement fund, an amount greater than that requested here. *See, e.g., Strougo v. Bassini,* 258 F.Supp.2d 254, 262 (S.D.N.Y.2003); *Maley,* 186 F.Supp.2d at 370; *Newman v. Caribiner Int'l Inc.,* No. 99 14 Civ. 2271 (S.D.N.Y. Oct. 19, 2001); *In re Net Ease.com, Inc. Sec. Litig.,* C.A. 01-CV-9405 (S.D.N.Y. May 30, 2003); *Meridian Inv. Club v. Delta Financial Corp.,* Master File No. CV-99-7033 (S.D.N.Y. April 14, 2003); *Lemmer v. Golden Books Family Entm't Inc.,* 98 Civ. 5748 (S.D.N.Y. Oct. 12, 1999); *Maywalt v. Parker & Parsley Petroleum Co.,* 963 F.Supp. 310, 313 (S.D.N.Y.1997).

6 *See, e.g., Robbins v. Koger Props.,* 116 F.3d 1441 (11th Cir.1997) (jury verdict of $81 million for plaintiffs against an accounting firm reversed on appeal on loss causation grounds and judgment entered for defendant); *Eisenstadt v. Centel Corp.,* 113 F.3d 738 (7th Cir.1997) (Seventh Circuit affirmed the lower court's granting of summary judgment in favor of defendants); *Anixier v. Home-Stake Prod. Co.,* 77 F.3d 1215 (10th Cir.1996) (Tenth Circuit overturned securities fraud class action jury verdict for plaintiffs in case filed in 1973-and tried in 1988-on the basis of 1994 Supreme Court opinion); *Backman v. Polaroid Corp.,* 910 F.2d 10 (1st Cir.1990) (*en banc* ) (class won a substantial jury verdict and a motion for judgment n.o.v. was denied, but on appeal the judgment was reversed and the case dismissed, after 11 years of litigation); *Winkler v. NRD Mining, Ltd.,* 198 F.R.D. 355 (E.D.N.Y.2000) (granting defendants' motion for judgment as matter of law after jury verdict for plaintiffs); *Krinsk v. Fund Asset Mgmt., Inc.,* 715 F.Supp. 472 (S.D.N.Y.1988), *aff'd,* 875 F.2d 404 (2d Cir.1989) (verdict for defendants after trial); *Landy v. Amsterdam,* 815 F.2d 925 (3d Cir.1987) (directed verdict for defendants after five years of litigation; affirmed on appeal); *Bentley v. Legent Corp.,* 849 F.Supp. 429 (E.D.Va.1994) (directed verdict in favor of defendants after plaintiffs' presentation of its case to jury).

7 *See, e.g., In re Indep. Energy Holdings PLC Sec. Litig.,* 2003 U.S. Dist. LEXIS 17090, at *30 (S.D.N.Y. Sept. 26, 2003) (rates of $650/hour for a partner, and $300-$425/hour for associates, are "not extraordinary for a topflight New York City law firm"); *In re Bankamerica Corp. Secs. Litig.,* 228 F.Supp.2d 1061, 1065 (E.D.Mo.2002) ( "IWJhilc the hourly rates ranging up to S695 are high for the Eastern District of Missouri, they are nonetheless within the range of reasonableness in the realm of nationwide securities class actions.").

In re Veeco Instruments Inc. Securities Litigation, Not Reported in F.Supp.2d (2007)

2007 WL 4115808

8       *See also* *In re Media Vision Technology Sec. Litig.,* 913 F.Supp. 1362, 1366 (N.D.Cal.1995) (courts award consulting and expert expenses where the testimony is "crucial or indispensable" to the litigation al hand); *In re Immune Response Secs. Litig.,* 497 F.Supp.2d 1166, 1178 (S.D.Cal.2007) (reimbursement for experts and consultants was "reasonable" given the "complex factual nature" of case in which experts opined on materiality, loss causation, and damages, which was "crucial or indispensable" to the litigation (internal quotation omitted)); *Uniroyal Goodrich Tire Company v. Mutual Trading Corp.,* 63 F.3d 516, 526 (7th Cir.1995) (court reimbursed counsel for expert expenses where the expert testimony was "reasonably necessary" for plaintiff to prove its case); *In re Greenwhich Pharm. Secs. Litig.,* 1995 WL 251293, at *7 (E.D.Pa. Aug.26, 1995) (awarding expert witness fees, which was "a reimbursable expense since expert testimony would have been crucial at trial"); *Hicks,* 2005 WL 2757792, at *10 (awarding expenses incurred by co-lead counsel including expert witness fees and other expenses "necessary to the litigation and settlement of [the] action").

---

**End of Document**

© 2021 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 59

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

ENTERED
09/11/2019

---------------------------------------------------------------- x
In re:                                                          :    Chapter 11
                                                                :
WEATHERFORD INTERNATIONAL PLC, *et al.*,   :    Case No. 19-33694 (DRJ)
                                                                :
          Debtors. [1]                                          :    (Jointly Administered)
                                                                :
---------------------------------------------------------------- x

## ORDER (I) APPROVING DEBTORS' DISCLOSURE STATEMENT AND (II) CONFIRMING SECOND AMENDED JOINT PREPACKAGED PLAN OF REORGANIZATION FOR WEATHERFORD INTERNATIONAL PLC AND ITS AFFILIATE DEBTORS UNDER CHAPTER 11 OF THE BANKRUPTCY CODE

[Relates to Docket Nos. 16 and 328]

WHEREAS, on July 1, 2019 (the "**Petition Date**"), the above-captioned debtors and debtors-in-possession (collectively, "**Weatherford**", the "**Company**" or the "**Debtors**") commenced their chapter 11 bankruptcy cases (the "**Chapter 11 Cases**") in this United States Bankruptcy Court for the Southern District of Texas, Houston Division (the "**Court**");

WHEREAS, on July 2, 2019, the Debtors filed their *Disclosure Statement for Joint Prepackaged Plan of Reorganization for Weatherford International plc and Its Affiliate Debtors Under Chapter 11 of the Bankruptcy Code* [Docket No. 62] (as may be amended, modified, or supplemented, the "**Disclosure Statement**") and their *Joint Prepackaged Plan of Reorganization for Weatherford International plc and Its Affiliate Debtors Under Chapter 11 of the Bankruptcy Code* [Docket No. 62, Exhibit A] (as was amended, modified, or supplemented, the "**Original Plan**");

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Weatherford International plc (6750); Weatherford International Ltd. (1344); and Weatherford International, LLC (5019). The location of the Debtors' U.S. corporate headquarters and the Debtors' service address is: 2000 St. James Place, Houston, TX 77056.

1

WHEREAS, prior to the Petition Date, the Debtors solicited votes to accept or reject the Original Plan from Holders of Class 7 Prepetition Notes Claims[2] (the "**Prepetition Solicitation**");

WHEREAS, as attested to by Prime Clerk LLC, the Debtors' voting and claims agent (the "**Voting and Claims Agent**"), in the *Affidavit of Service of Solicitation Materials* filed on July 2, 2019 [Docket No. 77] (the "**Prepetition Affidavit of Service**"), the Voting and Claim Agent transmitted copies of the Disclosure Statement and the solicitation package (the "**Prepetition Solicitation Package**") to Holders of Class 7 Prepetition Notes Claims prior to the Petition Date, on or about June 28, 2019;

WHEREAS, on the Petition Date, the Debtors filed their *Emergency Motion for Entry of an Order (I) Conditionally Approving Disclosure Statement, (II) Scheduling Combined Hearing on (A) Adequacy of Disclosure Statement, and (B) Confirmation of Plan, (III) Establishing Deadline to Object to Disclosure Statement and Plan and Form of Notice Thereof, (IV) Approving Solicitation Procedures and Forms of Ballots and Notice of Non-Voting Status, (V) Conditionally Waiving Requirement of Filing Schedules and Statements and of Convening Section 341 Meeting of Creditors, and (VI) Granting Related Relief* [Docket No. 16] (the "**Solicitation Procedures Motion**"). Pursuant to the Solicitation Procedures Motion, the Debtors sought, among other things, Court approval of the process by which the Debtors would solicit votes on the Original Plan from Holders of Existing Common Stock in Class 10 on a postpetition basis (the "**Postpetition Solicitation**");

WHEREAS, on July 2, 2019 the Court entered its *Order (I) Conditionally Approving Disclosure Statement, (II) Scheduling Combined Hearing on (A) Adequacy of Disclosure*

---

[2] Capitalized terms used and not otherwise defined herein have the meanings set forth in the Plan (as defined below), and if not defined in the Plan then as defined in the Disclosure Statement.

2

*Statement, and (B) Confirmation of Plan, (III) Establishing Deadline to Object to Disclosure Statement and Plan and Form of Notice Thereof, (IV) Approving Solicitation Procedures and Forms of Ballots and Notice of Non-Voting Status, (V) Conditionally Waiving Requirement of Filing Schedules and Statements and of Convening Section 341 Meeting of Creditors, and (VI) Granting Related Relief* [Docket No. 89] (the "**Solicitation Procedures Order**") which, among other things, conditionally approved the Disclosure Statement for the Postpetition Solicitation;

WHEREAS, as attested to by the Voting and Claims Agent in the affidavits of service filed with the Court on July 16, 2019 [Docket No. 173], the Voting and Claims Agent (a) served *Notice of (I) Commencement of Chapter 11 Bankruptcy Cases, (II) Combined Hearing on Disclosure Statement, and Confirmation of Joint Prepackaged Chapter 11 Plan, and Related Matters, and (III) Objection Deadlines, and Summary of Debtor's Joint Prepackaged Chapter 11 Plan Filing of Solicitation Version of Disclosure Statement and Plan* [Docket No. 16-1] (the "**Combined Notice**") on July 9, 2019; (b) published the Combined Notice in the *Houston Chronicle* and the national edition of *USA Today* on July 10, 2019 (the "**Publication Notice**"); and (c) served the Postpetition Ballots on Holders of Class 10 Existing Common Stock on July 9, 2019 (the "**Postpetition Solicitation Package**" and together with the Prepetition Solicitation Package, the "**Solicitation Package**");

WHEREAS, in accordance with the Solicitation Procedures Order and as attested by the Voting and Claims Agent in the *Affidavit of Service* [Docket No. 273], the Voting and Claims Agent served (a) the Notice of Non-Voting Status on the Non-Voting Classes on August 5, 2019 and (b) a notice permitting the Holders of Class 12 Unexercised Equity Interests to opt-out of the Third Party Releases (the "**Opt-Out Form**") on the Holders of Class 12 Unexercised Equity

3

Interests on July 22, 2019, who were the only Impaired Non-Voting Class bound by the Third-Party Releases;

WHEREAS, on September 4, 2019, the Voting and Claims Agent filed the *Declaration of Christina Pullo of Prime Clerk LLC Regarding Solicitation of Votes and Tabulation of Ballots Cast on Joint Prepackaged Plan of Reorganization for Weatherford International plc and its Affiliate Debtors Under Chapter 11 of the Bankruptcy Code* [Docket No. 313] (the "**Voting Certification**") attesting to the results of the tabulation of all Ballots received by the Voting and Claims Agent before the Noteholder Voting Deadline and before the Common Stock Voting Deadline (as defined in the Solicitation Procedures Motion). As a result of the Prepetition Solicitation, the Debtors have received votes in favor of the Plan from 99.79% in amount of the Class 7 Prepetition Notes Claims that voted and 97.53% in number of Holders of Prepetition Notes Claims that voted. As a result of the Postpetition Solicitation, the Debtors have received votes in favor of the Plan from 79.38% in amount of the Class 10 Existing Common Stock Claims that voted;

WHEREAS, on September 4, 2019, the Debtors filed with the Court the agreements and other documents set forth in the *Plan Supplement for the Joint Prepackaged Plan of Reorganization for Weatherford International plc and Its Affiliate Debtors Under Chapter 11 of the Bankruptcy Code* [Docket No. 315] (as amended, modified, or supplemented from time to time, the "**Plan Supplement**");

WHEREAS, on September 4, 2019, the Debtors filed with the Court (i) the *First Amended Joint Prepackaged Plan of Reorganization for Weatherford International plc and Its Affiliate Debtors Under Chapter 11 of the Bankruptcy Code* [Docket No. 315, Exhibit A] (the "**First**

4

**Amended Plan**"), and (ii) a redline copy of the Plan showing the modifications to the Original Plan;

WHEREAS, on September 9, 2019, the Debtors filed with the Court (i) the *Second Amended Joint Prepackaged Plan of Reorganization for Weatherford International plc and Its Affiliate Debtors Under Chapter 11 of the Bankruptcy Code* [Docket No. 328, Exhibit B] (as may be amended, modified, or supplemented, the "**Plan**"), a copy of which (without Exhibits or Plan Schedules) is attached hereto as Exhibit 1, and (ii) a redline copy of the Plan showing the modifications to the First Amended Plan (such plan modifications, the "**Subsequent Plan Modifications**");

WHEREAS, on September 9, 2019, the Debtors filed with the Court the agreements and other documents set forth in the *Second Plan Supplement for the Second Amended Joint Prepackaged Plan of Reorganization for Weatherford International plc and Its Affiliate Debtors Under Chapter 11 of the Bankruptcy Code* [Docket No. 332];

WHEREAS, contemporaneously herewith, the Debtors filed the *Memorandum of Law in Support of (I) Approval of Debtors' Disclosure Statement and (II) Confirmation of First Amended Joint Prepackaged Plan Of Reorganization For Weatherford International Plc and its Affiliate Debtors Under Chapter 11 of the Bankruptcy Code* [Docket No. 329] (the "**Confirmation Brief**"); and

WHEREAS, a hearing to consider the Debtors' compliance with the Bankruptcy Code's disclosure requirements and confirmation of the Plan was held before this Court on September 11, 2019 (the "**Combined Hearing**").

NOW, THEREFORE, based upon this Court's review of the Disclosure Statement, Plan, the briefs, affidavits and declarations submitted in support of confirmation of the Plan, including,

5

without limitation, (i) the Confirmation Brief, (ii) the *Declaration of Andrew Yearley in Support of Confirmation of the Second Amended Joint Prepackaged Plan of Reorganization for Weatherford International plc and Its Affiliate Debtors Under Chapter 11 of the Bankruptcy Code,* filed substantially contemporaneously herewith (the "**Yearley Declaration**"), and (iii) the *Declaration of Ryan Omohundro in Support of Confirmation of the Second Amended Joint Prepackaged Plan of Reorganization for Weatherford International plc and Its Affiliate Debtors Under Chapter 11 of the Bankruptcy Code,* filed substantially contemporaneously herewith (the "**Omohundro Declaration**" and together with the Yearley Declaration, the "**Confirmation Declarations**"), and upon all of the evidence proffered or adduced at, and arguments of counsel made at the Combined Hearing, and upon the entire record of these Chapter 11 Cases, and after due deliberation thereon, **THE COURT HEREBY FINDS AND CONCLUDES THAT:**

A. **Findings of Fact; Conclusions of Law**. The findings and conclusions set forth herein and in the record of the Combined Hearing constitute the Court's findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure, as made applicable herein by Bankruptcy Rules 7052 and 9014. To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

B. **Jurisdiction; Venue; Core Proceeding**. The Court has jurisdiction over the Chapter 11 Cases pursuant to Section 1334 of title 28 of the United States Code. Venue is proper before this Court pursuant to Sections 1408 and 1409 of title 28 of the United States Code. Approval of the Disclosure Statement and confirmation of the Plan are core proceedings pursuant to Section 157(b)(2) of title 28 of the United States Code. This Court has jurisdiction to enter a final order determining that the Disclosure Statement and the Plan comply with all of the applicable

provisions of the Bankruptcy Code and should be approved and confirmed, respectively.

C. **Eligibility for Relief; Proper Plan Proponents**. The Debtors were and are eligible for relief under Section 109 of the Bankruptcy Code and the Debtors were and are proper plan proponents under Section 1121(a) of the Bankruptcy Code.

D. **Commencement and Joint Administration of the Chapter 11 Cases**. On the Petition Date, each of the above-captioned Debtors commenced a voluntary case under chapter 11 of the Bankruptcy Code. By prior order of the Court, the Chapter 11 Cases have been consolidated for procedural purposes only and are being jointly administered pursuant to Bankruptcy Rule 1015 [Docket No. 41]. Since the Petition Date, the Debtors have operated their businesses and managed their properties as debtors in possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code. On July 17, 2019, the United States Trustee ("**U.S. Trustee**") appointed an official committee of unsecured creditors pursuant to Section 1102 of the Bankruptcy Code (the "**Creditors' Committee**").

E. **Judicial Notice**. The Court takes judicial notice of the docket of the Chapter 11 Cases maintained by the clerk of the Court, including, without limitation, all pleadings and other documents filed and orders entered thereon. The Court also takes judicial notice of all hearing transcripts, evidence proffered or adduced and all arguments made at the hearings held before the Court during the pendency of these Chapter 11 Cases.

F. **Burden of Proof**. The Debtors, as proponents of the Plan, have met their burden of proving the elements of Sections 1129(a) and 1129(b) of the Bankruptcy Code by a preponderance of the evidence, which is the applicable evidentiary standard for confirmation of the Plan.

G. **Transmittal and Mailing of Materials; Notice**. As evidenced by the affidavits of

7

US-DOCS\110021092

service, due, timely, adequate and sufficient notice of the Disclosure Statement, the Plan, the Plan Supplement, the Combined Hearing, the Notice of Non-Voting Status, the Opt-Out Form, and other dates and deadlines described in the Solicitation Procedures Order, together with all deadlines for voting to accept or reject the Plan as well as objecting to the Disclosure Statement and the Plan, has been given in substantial compliance with the Court's orders, all applicable Bankruptcy Rules, and all other applicable rules, laws, and regulations, and no other or further notice is or shall be required. All parties in interest had the opportunity to appear and be heard at the Combined Hearing, and no other or further notice is required. The Debtors published the Combined Notice in the national edition of *USA Today* and the *Houston Chronicle*, in substantial compliance with the Solicitation Procedures Order and Bankruptcy Rule 2002(*l*), as evidenced by the affidavit of publication.

H. **Solicitation**. Votes for acceptance and rejection of the Plan were solicited in good faith and in compliance with Sections 1125 and 1126 of the Bankruptcy Code, Bankruptcy Rules 3017 and 3018, all other applicable provisions of the Bankruptcy Code and all other applicable rules, laws, and regulations. Specifically, the Disclosure Statement, the Plan, the Combined Notice, the Ballots and other materials constituting the solicitation materials approved by the Court in the Solicitation Procedures Order, were transmitted to and served on all Holders of Claims and Equity Interests in the Voting Classes, and the solicitation materials (not including Ballots) were also provided to the key parties in interest in the Chapter 11 Cases, in compliance with Section 1125 of the Bankruptcy Code, the Bankruptcy Rules and the Solicitation Procedures Order. The Combined Notice and Notice of Non-Voting Status were provided to Holders or potential Holders of Claims and Equity Interests in Non-Voting Classes (as defined in the Solicitation Procedures Motion). In addition, a separate Opt-Out Form was sent to all Holders of Equity Interests in Class

12, which was the only Impaired Class deemed to reject the Plan. Such transmittal and service were adequate and sufficient, and no other or further notice is or shall be required. All procedures used to distribute the solicitation materials and other notices and documents described in the Solicitation Procedures Order were fair and conducted in accordance with the Bankruptcy Code, the Bankruptcy Rules and all other applicable rules, laws, and regulations.

I.      The solicitation of votes on the Plan complied with the Solicitation Procedures (as defined in the Solicitation Procedures Motion), was appropriate and satisfactory based upon the circumstances of the Chapter 11 Cases, and was in compliance with the provisions of the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, the Solicitation Procedures Order, and applicable non-bankruptcy law. To the extent that the Debtors' Prepetition Solicitation was deemed to constitute an offer of new securities, such solicitation is exempt from registration pursuant to section 4(a)(2), Regulation D and/or Regulation S of the Securities Act, as applicable to any recipient deemed an offeree.

J.      **Adequacy of Disclosure Statement**. The Disclosure Statement (i) contains sufficient information of a kind necessary to satisfy the disclosure requirements of all applicable nonbankruptcy rules, laws, and regulations, including the Securities Act, (ii) contains "adequate information" (as such term is defined in Section 1125(a) of the Bankruptcy Code and used in Section 1126(b)(2) of the Bankruptcy Code) with respect to the Debtors, the Plan, and the transactions contemplated therein, and (iii) is hereby approved in all respects.

K.      **Vote Certification**. Before the Combined Hearing, the Debtors filed the Voting Certification. All procedures used to tabulate the Ballots were fair and conducted in accordance with the Bankruptcy Code, the Bankruptcy Rules, the Solicitation Procedures Order, and all other applicable rules, laws and regulations.

US-DOCS\110021092

L.      As evidenced by the Voting Certification, Class 7 (Prepetition Notes Claims) voted as follows:  1,780 claims in the aggregate amount of $6,419,301,330 voted to accept the Plan, and 45 claims in the amount of $13,642,000 voted to reject the Plan.  Accordingly, 97.53% of the voting Class 7 creditors voted to accept the Plan, and those creditors in the aggregate held 99.79% of the total dollar amount of the claims held by such voting Class 7 creditors.  Therefore, Class 7 has accepted the Plan pursuant to Section 1126(c) of the Bankruptcy Code.  Additionally, as evidenced by the Voting Certification, approximately 79.38% in amount of the Class 10 Existing Common Stock voted to accept the Plan.  Therefore, Class 10 has accepted the Plan pursuant to Section 1126(d) of the Bankruptcy Code.

M.      **Modifications to the Plan**.  Pursuant to Section 1127 of the Bankruptcy Code, the modifications to the Plan described or set forth in this Confirmation Order (including the Subsequent Plan Modifications) constitute changes with respect to particular Claims or Equity Interests by agreement with Holders of such Claims or Equity Interests, modifications that do not otherwise materially and adversely affect or change the treatment of any other Claim or Equity Interest, and/or non-substantive technical changes.  Certain of these modifications were the result of a settlement reached by the Debtors, the Ad Hoc Noteholder Group, and the Consenting Equityholders (as defined in the Restructuring Support Agreement).   Certain additional modifications were made in the Plan, including changes to the Reorganized Debtors' post-emergence capital structure to provide additional liquidity and reduce the Reorganized Debtors' debt burden.  These modifications have the support of approximately 81% of the Holders of the Prepetition Notes Claims as reflected in the amended Restructuring Support Agreement.  Additionally, these modifications are consistent with the disclosures previously made pursuant to the Disclosure Statement and solicitation materials served pursuant to the Solicitation Procedures

10

Order or announced in open court, and notice of these modifications was adequate and appropriate under the facts and circumstances of these Chapter 11 Cases.

N.      In accordance with Bankruptcy Rule 3019, these modifications do not require additional disclosure under Section 1125 of the Bankruptcy Code or the resolicitation of votes under Section 1126 of the Bankruptcy Code, and they do not require that Holders of Claims and Equity Interests be afforded an opportunity to change previously cast acceptances or rejections of the Plan.  Accordingly, the Plan, as modified, is properly before this Court and all votes cast with respect to the Plan prior to such modification shall be binding, and shall apply with respect to the Plan.

O.      **Adequate Assurance**.  The Debtors have cured, or provided adequate assurance that the Reorganized Debtors will cure, defaults (if any) under or relating to each of the contracts and leases that are being assumed by the Debtors pursuant to the Plan.  The Debtors also have provided adequate assurance of the Reorganized Debtors' future performance under such contracts and leases.

P.      **Valuation**.  The Debtors' Valuation Analysis included as Exhibit E to the Disclosure Statement (the "**Valuation Analysis**") and the estimated enterprise value, as described therein, is reasonable, proposed in good faith, and supported by the Confirmation Declarations and the evidence presented at or prior to the Combined Hearing.  All parties in interest have been given the opportunity to challenge the Valuation Analysis, and no party has raised any such challenge.  Accordingly, the Valuation Analysis (i) is reasonable, persuasive, and credible as of the date such analysis was prepared, presented, or proffered, and (ii) uses reasonable and appropriate methodologies and assumptions.

Q.      **Plan Compliance with Bankruptcy Code (11 U.S.C. § 1129(a)(1))**.  The Plan

11

complies with the applicable provisions of the Bankruptcy Code, thereby satisfying Section 1129(a)(1) of the Bankruptcy Code, including, without limitation Sections 1122 and 1123 of the Bankruptcy Code.

(1)     Proper Classification and Designation of Classes of Claims and Equity Interests (11 U.S.C. §§ 1122 & 1123(a)(1)).  Other than Administrative Claims, DIP Facility Claims, and Priority Tax Claims, which are addressed in Article II of the Plan and which have not been classified in accordance with Section 1123(a)(1) of the Bankruptcy Code, the Plan designates twelve Classes of Claims and Equity Interests, based on the differences in the legal nature or priority of such Claims and Equity Interests.  The Claims and Equity Interests placed in each Class are substantially similar to the other Claims or Equity Interests, as the case may be, in each such Class.  Rational factual and legal reasons exist for separately classifying the various Classes of Claims and Equity Interests created under the Plan, and such Classes are proper and the creation of such Classes does not unfairly discriminate between or among holders of Claims or Equity Interests.  Thus, the Plan satisfies Sections 1122 and 1123(a)(1) of the Bankruptcy Code.

(2)     Specification of Classes That Are Not Impaired by the Plan (11 U.S.C. § 1123(a)(2)).  The Plan specifies that Class 1 (Other Priority Claims), Class 2 (Other Secured Claims), Class 3 (Secured Tax Claims), Class 4 (Prepetition Revolving Credit Claims), Class 5 (Prepetition Term Loan Claims), Class 6 (Prepetition A&R Claims), Class 8 (General Unsecured Claims), Class 9 (Intercompany Claims) and Class 11 (Intercompany Equity Interests) are Unimpaired under the Plan, thereby satisfying Section 1123(a)(2) of the Bankruptcy Code (collectively, the "**Unimpaired Classes**").

(3)     Treatment of Classes That Are Impaired by the Plan (11 U.S.C. § 1123(a)(3)).  The Plan designates Class 7 (Prepetition Notes Claims), Class 10 (Existing Common Stock), and Class 12 (Unexercised Equity Interests) as Impaired and specifies the treatment of the Claims and the Equity Interests in those Classes, thereby satisfying Section 1123(a)(3) of the Bankruptcy Code.

(4)     Equal Treatment Within Each Class (11 U.S.C. § 1123(a)(4)).  The Plan provides for the same treatment by the Debtors for each Claim or Equity Interest in each respective Class, thereby satisfying Section 1123(a)(4) of the Bankruptcy Code.

(5)     Adequate Means for Implementation of Plan (11 U.S.C. § 1123(a)(5)).  The Plan and the various documents and agreements set forth in the Plan Supplement provide adequate and proper means for implementation of the Plan, thereby satisfying Section 1123(a)(5) of the Bankruptcy Code.

(6)     Amendment of the Reorganized Debtors' Corporate Governance Documents (11 U.S.C. § 1123(a)(6)).  The Plan provides that the corporate governance documents of Weatherford Parent shall prohibit the issuance of non-voting equity securities to the extent required by Section 1123(a)(6) of the Bankruptcy Code, thereby satisfying Section 1123(a)(6) of the Bankruptcy Code.

12

(7) <u>Provisions Regarding Directors and Officers (11 U.S.C. §§ 1123(a)(7) and 1129(a)(5))</u>. The members of the boards of directors of the Reorganized Debtors were identified by the Debtors at or prior to the Confirmation Hearing. Pursuant to Section 1129(a)(5) of the Bankruptcy Code, the Debtors disclosed, at or prior to the Confirmation Hearing, the identity of those Persons proposed to serve on the initial boards of directors or as officers of each of the Reorganized Debtors to the extent such information is available, or, to the extent not available, the means by which such selection will be made has been disclosed, and, to the extent such Person is an insider other than by virtue of being a director or an officer, the nature of any compensation for such Person. The directors and officers of the Reorganized Debtors were selected in a manner consistent with the interests of creditors and with public policy, thereby satisfying Section 1123(a)(7) of the Bankruptcy Code.

(8) <u>Additional Permissive Plan Provisions (11 U.S.C. § 1123(b))</u>. The Plan contains certain provisions that may be construed as permissive, but are not required for Confirmation under the Bankruptcy Code. These discretionary provisions comply with Section 1123(b) of the Bankruptcy Code, are appropriate, in the best interests of the Debtors and their Estates and are not inconsistent with the applicable provisions of the Bankruptcy Code, including, without limitation, provisions for (i) the assumption or rejection of executory contracts and unexpired leases; (ii) the Reorganized Debtors' retention of certain Litigation Claims that the Debtors had or had power to assert immediately prior to the Effective Date, whether directly or derivatively; and (iii) releases, injunctions, and exculpation for the benefit of various Persons and Entities.

(9) <u>Identification of Plan (Bankruptcy Rule 3016(a))</u>. The Plan is dated and identifies the entities submitting it, thereby satisfying Bankruptcy Rule 3016(a). The filing of the Disclosure Statement with the Clerk of this Court satisfied Bankruptcy Rule 3016(a).

R. **<u>The Debtors, as Plan Proponents, Have Complied with Applicable Provisions of the Bankruptcy Code (11 U.S.C. § 1129(a)(2))</u>**. The Debtors have complied with the applicable provisions of the Bankruptcy Code, thereby satisfying Section 1129(a)(2) of the Bankruptcy Code. Specifically:

(1) The Debtors are proper debtors under Section 109 of the Bankruptcy Code and proper proponents of the Plan under Section 1121(a) of the Bankruptcy Code;

(2) The Debtors have complied with the applicable provisions of the Bankruptcy Code, including, without limitation, Sections 1125 and 1126, except as otherwise provided or permitted by orders of this Court; and

(3) The Debtors have complied with the applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, and the Solicitation Procedures Order in transmitting the Plan, the Disclosure Statement, the Ballots and related documents and notices and in soliciting and tabulating votes on the Plan.

13

S.    **The Plan Has Been Proposed in Good Faith and Not by Any Means Forbidden by Law (11 U.S.C. § 1129(a)(3))**.  The Debtors have proposed the Plan in good faith and not by any means forbidden by law, thereby satisfying Section 1129(a)(3) of the Bankruptcy Code.  In determining that the Plan has been proposed in good faith, this Court has examined the totality of the circumstances surrounding the filing of the Chapter 11 Cases, the Plan itself (and the Plan Supplement) and the formulation and Confirmation of the Plan.  The good faith of the Debtors and each of the persons or other entities who negotiated the Plan is evident from the facts and records of the Chapter 11 Cases, the Disclosure Statement and the hearing thereon, the record of the Confirmation Hearing (including the Confirmation Declarations) and other proceedings held in the Chapter 11 Cases.  The Plan is the product of arm's length negotiations among the Debtors, the Creditors' Committee, the DIP Agent, the DIP Lenders, the Consenting Noteholders, and other parties in interest.  The Plan itself, and the process leading to its formulation, provide independent evidence of good faith of the Debtors, the Creditors' Committee, the DIP Agent, the DIP Lenders, and the Consenting Noteholders who negotiated the Plan, serve the public interest, and assure fair treatment of holders of Claims and Equity Interests.  Consistent with the overriding purpose of the Bankruptcy Code, the Chapter 11 Cases were filed, and the Plan was proposed, with the legitimate and honest purpose of reorganizing the Debtors and maximizing the value of the Debtors' assets.

T.    **The Payment for Certain Services or for Certain Costs and Expenses Is Subject to Court Approval (11 U.S.C. § 1129(a)(4))**.  Any payment made or to be made by the Debtors or Reorganized Debtors, as applicable, for services or for costs and expenses in or in connection with the Chapter 11 Cases, or in connection with the Plan and incident to the Chapter 11 Cases requiring approval, has been approved by, or is subject to the approval of, this Court as reasonable, thereby satisfying Section 1129(a)(4) of the Bankruptcy Code.

14

U.      **Necessary Information Regarding Directors and Officers of the Debtors Under the Plan Has Been Disclosed (11 U.S.C. § 1129(a)(5))**.  The Debtors have complied with Section 1129(a)(5) of the Bankruptcy Code.  The identity of the Persons proposed to serve as the initial directors and officers of the Reorganized Debtors after Confirmation of the Plan have been fully disclosed to the extent such information is available, or to the extent not disclosed the means by which such selection will be made has been disclosed.  The appointment to, or continuance in, such offices of such persons is consistent with the interests of Holders of Claims against and Equity Interests in the Debtors and with public policy.  To the extent available, the identity of any insider that will be employed or retained by the Reorganized Debtors and the nature of such insider's compensation have also been fully disclosed.

V.      **No Rate Changes (11 U.S.C. § 1129(a)(6))**.  The Debtors are not subject to any governmental regulatory commission with jurisdiction, after Confirmation of the Plan, over the rates of the Debtors.  Thus, Section 1129(a)(6) of the Bankruptcy Code is not applicable in the Chapter 11 Cases.

W.      **The Plan Satisfies the Best Interests Test (11 U.S.C. § 1129(a)(7))**.  The Plan satisfies Section 1129(a)(7) of the Bankruptcy Code.  The liquidation analysis set forth in Exhibit D to the Disclosure Statement, the Omohundro Declaration, and other evidence proffered or adduced at the Confirmation Hearing (a) are reasonable, persuasive, and credible; (b) utilize reasonable and appropriate methodologies and assumptions; (c) have not been controverted by other evidence; and (d) establish that each Holder of a Claim or Equity Interest in an Impaired Class either (i) has accepted the Plan or (ii) will receive or retain under the Plan, on account of such Claim or Equity Interest, property of a value, as of the Effective Date of the Plan, that is not less than the amount that it would receive if the Debtors were liquidated under Chapter 7 of the

15

Bankruptcy Code on such date.

X.    **Acceptance by Certain Classes (11 U.S.C. § 1129(a)(8))**. Section 1129(a)(8) of the Bankruptcy Code requires that each class of claims or interests must either accept a plan or be unimpaired under a plan. The Holders of Other Priority Claims (Class 1), Other Secured Claims (Class 2), Secured Tax Claims (Class 3), Prepetition Revolving Credit Claims (Class 4), Prepetition Term Loan Claims (Class 5), Prepetition A&R Claims (Class 6), General Unsecured Claims (Class 8), Intercompany Claims (Class 9), and Intercompany Interests (Class 11) are Unimpaired and, thus, under Section 1126(f) of the Bankruptcy Code, are conclusively presumed to have accepted the Plan. The Holders of Prepetition Notes Claims (Class 7) and Existing Common Stock (Class 10) have voted to accept the Plan in accordance with Section 1126(c) and 1126(d) of the Bankruptcy Code. The Holders of Unexercised Equity Interests (Class 12) are deemed to have rejected the Plan pursuant to Section 1126(g) of the Bankruptcy Code. Although Section 1129(a)(8) of the Bankruptcy Code is not satisfied with respect to Rejecting Class 12, the Plan may nevertheless be confirmed because the Plan satisfies Section 1129(b) of the Bankruptcy Code with respect to such rejecting Classes. Article IV.E of the Plan contemplates the non-consensual Confirmation of the Plan.

Y.    **Treatment of Claims Entitled to Priority Pursuant to Section 507(a) of the Bankruptcy Code (11 U.S.C. § 1129(a)(9))**. Unless the holder of a particular claim agrees to a different treatment with respect to such claim, Section 1129(a)(9) of the Bankruptcy Code requires a plan to satisfy administrative claims, priority unsecured claims and priority tax claims in full in cash. The treatment of Administrative Claims (Article II.A), DIP Facility Claims (Article II.B), Other Priority Claims (Article III.B.1), and Priority Tax Claims (Article II.C), under the Plan is, in each case, consistent with Section 1129(a)(9).

US-DOCS\110021092

Z.     **The Plan Has Been Accepted by at Least One Impaired Class of Claims (11 U.S.C. § 1129(a)(10))**.  Class 7 Prepetition Notes Claims is an Impaired Class of Claims that has voted to accept the Plan in accordance with Section 1126(c) of the Bankruptcy Code, determined without including any acceptance of the Plan by "insiders," thereby satisfying Section 1129(a)(10) of the Bankruptcy Code.

AA.     **The Plan Is Feasible (11 U.S.C. § 1129(a)(11))**.   The evidence proffered or adduced at or prior to the Confirmation Hearing, including the financial projections set forth in Exhibit D to the Disclosure Statement, the Confirmation Brief, the Omohundro Declaration, and the Voting Certification, (i) is reasonable, persuasive, and credible, (ii) utilizes reasonable and appropriate methodologies and assumptions, (iii) has not been controverted by other evidence, and (iv) establishes that the Plan is feasible and that there is a reasonable prospect of the Reorganized Debtors being able to meet their financial obligations under the Plan with respect to operating their businesses in the ordinary course, and that Confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Reorganized Debtors or any successor to the Reorganized Debtors, thereby satisfying the requirements of Section 1129(a)(11) of the Bankruptcy Code.

BB.     **Payment of Bankruptcy Fees (11 U.S.C. § 1129(a)(12))**.  All fees payable under 28 U.S.C. § 1930 have been paid or will be paid pursuant to Article XII.B of the Plan, thereby satisfying Section 1129(a)(12) of the Bankruptcy Code.

CC.     **Non-Applicability of Certain Sections (11 U.S.C. §§ 1129(a)(13), (14), (15), and (16))**.  The Debtors do not have obligations to pay retiree benefits and, therefore, Section 1129(a)(13) of the Bankruptcy Code, to the extent such section is applicable to the Debtors, is satisfied.  The Debtors do not owe any domestic support obligations, are not individuals, and are

17

not nonprofit corporations, and thus Sections 1129(a)(14), 1129(a)(15) and 1129(a)(16) of the Bankruptcy Code do not apply to the Chapter 11 Cases.

DD.  **No Unfair Discrimination; Fair and Equitable (11 U.S.C. § 1129(b))**.  The Holders of Unexercised Equity Interests (Class 12) are deemed to have rejected the Plan (the "**Rejecting Class**").  The evidence proffered or adduced at the Confirmation Hearing (i) is reasonable, persuasive, and credible, (ii) utilizes reasonable and appropriate methodologies and assumptions, (iii) has not been controverted by other evidence, and (iv) establishes that the Plan does not discriminate unfairly, and is fair and equitable, with respect to the Rejecting Class, as required by Sections 1129(b)(1) and (b)(2) of the Bankruptcy Code, because (x) there is no Class of Claims or Equity Interests similarly situated to the Rejecting Class and (y) no Holder of any interest that is junior to the Equity Interests represented by the Rejecting Class will receive or retain any property under the Plan on account of such junior interest, and no Holder of a Claim in a Class senior to the Rejecting Class is receiving more than 100% recovery on account of its Claim. Thus, the Plan may be confirmed notwithstanding the rejection of the Plan by the Rejecting Class.

EE.  **Only One Plan (11 U.S.C. § 1129(c))**.  Other than the Plan (including previous versions thereof), no other plan has been filed for the Debtors in the Chapter 11 Cases, and the Plan thereby satisfies the requirements of Section 1129(c) of the Bankruptcy Code.

FF.  **Principal Purpose of Plan (11 U.S.C. § 1129(d))**.  The principal purpose of the Plan is not the avoidance of taxes or the avoidance of the application of Section 5 of the Securities Act of 1933 (15 U.S.C. § 77e).

GG.  **Inapplicable Provisions (11 U.S.C. § 1129(e))**.  The provisions of Section 1129(e) of the Bankruptcy Code apply only to "small business cases" as defined therein.  The Chapter 11 Cases are not "small business cases." Accordingly, Section 1129(e) of the Bankruptcy Code is

18

US-DOCS\110021092

inapplicable in these Chapter 11 Cases.

HH.    **Good Faith Solicitation (11 U.S.C. § 1125(e))**.  The evidence proffered or adduced at the Confirmation Hearing (i) is reasonable, persuasive and credible, (ii) utilizes reasonable and appropriate methodologies and assumptions, (iii) has not been controverted by other evidence, (iv) establishes that the Debtors, the Reorganized Debtors and each of their respective Related Persons have, as applicable, (a) solicited acceptances or rejections of the Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code, including without limitation, Sections 1125 and 1126 of the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, and any applicable non-bankruptcy law, rule or regulation governing the adequacy of disclosure in connection with such solicitation and (b) participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code and any applicable non-bankruptcy law, rule or regulation in the offer and issuance of any securities under the Plan, and (v) establishes that the Debtors, the Reorganized Debtors, the Creditors' Committee, the Ad Hoc Noteholder Committee, the DIP Agent, the DIP Lenders, the Consenting Noteholders, and each of their respective Related Persons will, as applicable, continue to act in good faith if they consummate the Plan and the agreements, settlements, transactions and transfers contemplated thereby, and take all other actions authorized by this Confirmation Order.  Accordingly, each of the foregoing Persons is entitled to and, pursuant to paragraph 52 of this Confirmation Order, granted the full protections afforded by Section 1125(e) of the Bankruptcy Code.

II.    **Satisfaction of Confirmation Requirements**.  Based on the foregoing, all other pleadings, documents, exhibits, statements, declarations, and affidavits filed in connection with Confirmation of the Plan and all evidence and arguments made, proffered or adduced at the Confirmation Hearing, the Plan satisfies the requirements for confirmation set forth in Section

19

1129 of the Bankruptcy Code.

JJ.    **Implementation of Other Necessary Documents and Agreements**.    All documents and agreements necessary or advisable to implement or carry out the Plan, the Restructuring Transactions and the other transactions contemplated by the Restructuring Documents (including the Plan Supplement) are essential elements of the Plan and entry into and consummation of the transactions contemplated by each such document and agreement is in the best interests of the Debtors, their Estates and Holders of Claims and Equity Interests, and shall be valid, binding and enforceable in accordance with their respective terms and conditions.    The Debtors have exercised reasonable business judgment in determining which documents and agreements to enter into and have provided sufficient and adequate notice of such documents and agreements.    The terms and conditions of such documents and agreements have been negotiated in good faith, at arm's length, are fair and reasonable and are reaffirmed and approved.    The Debtors and the Reorganized Debtors, as applicable, are authorized, without any further notice to or action, order or approval of this Court, to finalize, execute and deliver all agreements, documents, instruments and certificates relating thereto and perform their obligations thereunder in accordance with the Plan.

KK.    **Retention of Jurisdiction**.    Upon the Effective Date, this Court shall retain jurisdiction over the matters arising in, and under, and related to, the Chapter 11 Cases, including those set forth in <u>Article XI</u> of the Plan and as contemplated herein.

LL.    **Classification Takes Into Account Subordination Rights**. The classification and manner of satisfying all Claims and Equity Interests under the Plan takes into consideration all contractual, legal and equitable rights, including subordination and turnover rights, whether arising under general principles of equitable subordination, Section 510 of the Bankruptcy Code, or

20

otherwise, that a Holder of a Claim or Equity Interest may have against other Holders of a Claim or Equity Interest with respect to any distribution made pursuant to the Plan.

MM.  **Additional Findings Regarding Releases**.  The releases provided pursuant to Article X.B of the Plan (a) represent a sound exercise of the Debtors' business judgment; (b) were negotiated in good faith and at arms' length; and (c) formed an essential part of the agreement among the Persons participating in the negotiation and formulation of the Plan. The releases are in the best interests of the Debtors and the Chapter 11 Cases and, in the case of the Third Party Release, is fully-consensual, as all impaired creditors and interest holders were given an opportunity to "opt out" of such release.  The Released Parties played an integral role in the formulation of the Plan, have made significant contributions that are essential to the Plan's success, and have expended significant time and resources analyzing and negotiating the Plan and the issues presented by the Debtors' prepetition capital structure.

## ORDER

**NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:**

1.     Confirmation of the Plan.  The Plan and Plan Supplement (as such may be amended by this Confirmation Order or in accordance with the Plan, and which amendments are hereby incorporated into and constitute a part of the Plan) and each of the provisions thereof, as may be modified by this Confirmation Order, are confirmed in each and every respect pursuant to Section 1129 of the Bankruptcy Code.  The documents contained in the Plan Supplement, and any amendments, modifications and supplements thereto, and all documents and agreements related thereto (including all exhibits and attachments thereto), and the execution, delivery and performance thereof by the Debtors or the Reorganized Debtors, as applicable, are authorized and approved.  Without any further notice to or action, order or approval of the Court, the Debtors, the

21

Reorganized Debtors and their successors are authorized and empowered to make all modifications to all documents included as part of the Plan Supplement that are consistent with and subject to the Plan. As set forth in the Plan, once finalized and executed, the documents comprising the Plan Supplement and all other documents contemplated by the Plan shall constitute legal, valid, binding and authorized rights and obligations of the respective parties thereto, enforceable in accordance with their terms and, to the extent applicable, shall create, as of the Effective Date, all Liens and other security interests purported to be created thereby. The Plan, as modified by the Subsequent Plan Modifications, is deemed accepted by all creditors and equity holders who have previously accepted the Plan and such acceptances cannot be withdrawn, and the Debtors are not required to prepare or distribute a new disclosure statement with respect to the Subsequent Plan Modifications.

2. **Disclosure Statement Approved**. The Disclosure Statement (i) contains adequate information of a kind generally consistent with the disclosure requirements of all applicable non-bankruptcy law, including the Securities Act, (ii) contains "adequate information" (as such term is defined in Section 1125(a)(1) and used in Section 1126(b)(2) of the Bankruptcy Code) with respect to the Debtors, the Plan, and the transactions contemplated therein, and (iii) is approved in all respects.

3. **Objections**. Based upon the record of the Combined Hearing and the Chapter 11 Cases, any objections that have not been consensually resolved or withdrawn are overruled on the merits pursuant to this Confirmation Order, including Docket No. 281 filed by GAMCO.

4. **Compromise of Controversies**. For the reasons stated herein, the Plan constitutes a good faith, arm's-length compromise and settlement of all Claims or controversies relating to the rights that a holder of a Claim or Equity Interest, or any assignees thereof, may have with respect to any Allowed Claim or Equity Interest or any distribution to be made or obligation to be incurred

22

pursuant to the Plan, and the entry of this Confirmation Order constitutes approval of all such compromises and settlements.

5.     Binding Effect.  Pursuant to Section 1141 and the other applicable provisions of the Bankruptcy Code, effective as of the Effective Date and without limiting or altering Article X.H of the Plan, the provisions of the Plan (including the exhibits and schedules to, and all documents and agreements executed pursuant to or in connection with, the Plan) and this Confirmation Order shall be binding on (a) the Debtors and the Reorganized Debtors, (b) all Holders of Claims against and Equity Interests in the Debtors, whether or not Impaired under the Plan and whether or not such Holders have accepted or rejected the Plan or affirmatively voted to reject the Plan, (c) each Person or Entity receiving, retaining or otherwise acquiring property under the Plan, and (d) any non-Debtor party to an Executory Contract or Unexpired Lease with the Debtors.  The Debtors are hereby authorized to consummate the Plan immediately upon entry of this Confirmation Order in accordance with the terms and conditions of the Plan.

6.     Board of Directors.  Upon the Effective Date, the New Board shall take office and replace the then-existing board of directors of Weatherford Parent.  All members of the existing board of Weatherford Parent shall cease to hold office in any capacity in regard to the Reorganized Debtors from and after the Effective Date.  The existing board of directors of Weatherford Parent shall be deemed to have resigned on and as of the Effective Date, in each case without further notice to or order of this Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Person or Entity.

7.     Effectuating Documents; Further Transactions.  On and after the Effective Date, the Reorganized Debtors and the officers and members of the New Board are authorized to and may issue, execute, deliver, file or record such contracts, securities, instruments, releases and other

23

agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement and further evidence the terms and conditions of the Plan, the corporate actions and transactions contemplated under the Plan, and the securities issued pursuant to the Plan in the name of and on behalf of the Reorganized Debtors, without the need for any approvals, authorizations or consents except for those expressly required pursuant to the Plan or the Amended/New Corporate Governance Documents.

8.      Findings of Fact and Conclusions of Law.  The findings of fact and the conclusions of law stated in this Confirmation Order shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to the proceeding by Bankruptcy Rule 9014. To the extent any finding of fact shall be determined to be a conclusion of law, it shall be so deemed, and to the extent any conclusion of law shall be determined to be a finding of fact, it shall be so deemed.

9.      Notice of the Combined Hearing.  Notice of the Combined Hearing was appropriate and satisfactory based upon the circumstances of the Chapter 11 Cases, and was in compliance with the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules.

10.      Solicitation.  The solicitation of votes on the Plan complied with the Solicitation Procedures Order, was appropriate and satisfactory based upon the circumstances of the Chapter 11 Cases, and was in compliance with the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, and applicable non-bankruptcy law.

11.      Incorporation by Reference.  The terms of the Plan, the Plan Supplement and the exhibits and schedules thereto are incorporated by reference into, and are an integral part of, this Confirmation Order.  The terms of the Plan, the documents contained in the Plan Supplement, all

24

exhibits thereto, and all other relevant and necessary documents, shall be effective and binding as of the Effective Date.

12. _Plan Classification Controlling_. The classification of Claims and Equity Interests for purposes of the distributions to be made under the Plan shall be governed solely by the terms of the Plan. The classifications and amounts set forth on the Ballots tendered to or returned by the Debtors' creditors in connection with voting on the Plan (a) were set forth on the Ballots solely for purposes of voting to accept or reject the Plan, (b) do not necessarily represent, and in no event shall be deemed to modify or otherwise affect, the actual classification or amounts of such Claims or Equity Interests under the Plan for distribution purposes, (c) may not be relied upon by any creditor or interest holder as representing the actual classification or amounts of such Claims or Equity Interests under the Plan for distribution or any other purpose (other than for evidencing the vote of such party on the Plan), and (d) shall not be binding on the Debtors, the Reorganized Debtors or Holders of Claims or Equity Interests for purposes other than voting on the Plan.

13. _Distributions are Fair_. The distribution of Cash and applicable Plan Securities and Documents to the Holders of Allowed Claims and Allowed Equity Interests are fair and for reasonably equivalent value.

14. _Corporate Existence_. Subject to the Restructuring Transactions permitted by paragraph 23 of this Confirmation Order, after the Effective Date, the Reorganized Debtors will continue to exist as separate legal entities in accordance with the applicable law in the respective jurisdiction in which they are incorporated or formed and pursuant to their respective certificates or articles of incorporation and by-laws, or other applicable organizational documents, in effect immediately prior to the Effective Date, except to the extent such certificates or articles of incorporation and by-laws, or other applicable organizational documents, are amended, restated or

25

US-DOCS\110021092

otherwise modified under the Plan, and to the extent that such documents are amended, such documents are deemed to be amended pursuant to the Plan and require no further action or approval (other than any requisite filings required under applicable state, provincial, federal, or other law). Notwithstanding anything to the contrary herein, the Claims against a particular Debtor or Reorganized Debtor will remain the obligation solely of such Debtor or Reorganized Debtor and will not become obligations of any other Debtor or Reorganized Debtor solely by virtue of the Plan or the Chapter 11 Cases.

15.     Vesting of Assets in the Reorganized Debtors Free and Clear of Liens and Claims. Except as otherwise expressly provided in the Plan, this Confirmation Order, or any Restructuring Document, pursuant to Sections 1123(a)(5), 1123(b)(3), 1141(b) and (c) and other applicable provisions of the Bankruptcy Code, on and after the Effective Date, all property and assets of the Estates of the Debtors, including all claims, rights, and Litigation Claims of the Debtors, and any other assets or property acquired by the Debtors or the Reorganized Debtors during the Chapter 11 Cases or under or in connection with the Plan (other than the Professional Fee Claim Reserve and any rejected Executory Contracts and/or Unexpired Leases), will vest in the Reorganized Debtors free and clear of all Claims, Liens, charges, and other encumbrances, subject to the Restructuring Transactions and Liens which survive the occurrence of the Effective Date as described in Article V.C of the Plan (including, without limitation, the Liens that secure the Exit Facility). On and after the Effective Date, the Reorganized Debtors may (i) operate their respective businesses, (ii) use, acquire, and dispose of their respective property and (iii) compromise or settle any Claims, in each case without notice to, hearing before, supervision of or approval by this Court and free and clear of any restrictions of the Bankruptcy Code, the Bankruptcy Rules, or the Local Rules, other than restrictions expressly imposed by the Plan or this Confirmation Order.

16.     Exit Facility Loan Documents.  On the Effective Date, the Debtors and the Reorganized Debtors, as applicable, are authorized to execute and deliver, and to consummate the transactions contemplated by, the Exit Facility Loan Documents, in each case in form and substance acceptable to the Required Consenting Noteholders in the manner set forth in the Restructuring Support Agreement and without further notice to or order of this Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Person or Entity (other than as expressly required by the Exit Facility Loan Documents).  On the Effective Date, the Exit Facility Loan Documents shall constitute legal, valid, binding and authorized indebtedness and obligations of the Reorganized Debtors, enforceable in accordance with their respective terms and such indebtedness and obligations shall not be, and shall not be deemed to be, enjoined or subject to discharge, impairment, release or avoidance under the Plan, this Confirmation Order or on account of the Confirmation or Consummation of the Plan.

17.     Exit Senior Unsecured Notes Indenture.  On the Effective Date, the Debtors and the Reorganized Debtors, as applicable, are authorized to execute and deliver, and to consummate the transactions contemplated by, the Exit Senior Unsecured Notes Indenture and the other Exit Senior Unsecured Notes Documents, in each case in form and substance acceptable to the Required Consenting Noteholders in the manner set forth in the Restructuring Support Agreement and with respect to the Rights Offering Notes, in form and substance acceptable to the Backstop Parties, and without further notice to or order of this Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Person or Entity (other than as expressly required by the Exit Senior Unsecured Notes Indenture).  On the Effective Date, the Exit Senior Unsecured Notes Documents shall constitute legal, valid, binding and authorized indebtedness and obligations of the Reorganized Debtors, enforceable in accordance with their

27

respective terms and such indebtedness and obligations shall not be, and shall not be deemed to be, enjoined or subject to discharge, impairment, release or avoidance under the Plan, this Confirmation Order or on account of the Confirmation or Consummation of the Plan.

18.    <u>New Common Stock.</u>  On the Effective Date, subject to the terms and conditions of the Plan and the Restructuring Transactions and as described more fully in the Reorganization Steps Overview of the Plan, Reorganized Parent will issue the New Common Stock and the New Warrants pursuant to the Plan and the Amended/New Corporate Governance Documents. Distributions of the New Common Stock and the New Warrants may be made by delivery or book-entry transfer thereof by the applicable Distribution Agent in accordance with the Plan, the Amended/New Corporate Governance Documents, and the New Warrant Agreement.  Upon the Effective Date, after giving effect to the transactions contemplated by the Plan and this Confirmation Order, the authorized share capital or other equity securities of Reorganized Parent will be that number of shares of New Common Stock as may be designated in the Amended/New Corporate Governance Documents.  The New Common Stock will constitute a single class of equity securities in Reorganized Parent on the Effective Date and, other than the New Common Stock issued under the New Management Incentive Plan and the New Warrants, there will exist no other equity securities, warrants, options, or other agreements to acquire any equity interest in Reorganized Parent as of the Effective Date.

19.    <u>New Registration Rights Agreement</u>.  On the Effective Date, Reorganized Parent will enter into the New Registration Rights Agreement, which will become effective and binding in accordance with its terms and conditions upon the parties thereto, in each case without further notice to or order of this Court, act or action under applicable law, regulation, order, or rule or the

28

vote, consent, authorization or approval of any Entity (other than as expressly required by the New Registration Rights Agreement).

20. New Management Incentive Plan. As soon as reasonably practicable after the Effective Date, Reorganized Parent will adopt the New Management Incentive Plan, which will be on the terms and conditions (including any and all awards granted thereunder) determined by the New Board (including with respect to participants, allocation, timing, and the form and structure of the options, warrants, and/or equity compensation thereunder). The New Common Stock issued under the New Management Incentive Plan will dilute all of the New Common Stock equally.

21. New Warrants. On the Effective Date, Reorganized Parent will enter into and consummate the transactions contemplated by the New Warrant Agreement (including issuing the New Warrants), which will become effective and binding in accordance with their respective terms and conditions upon the parties thereto, in each case without further notice to or order of this Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Person or Entity (other than as expressly required by the New Warrant Agreements or New Warrants, as applicable).

22. Release of Liens and Claims. Except as otherwise provided in this Confirmation Order, the Plan, or in any contract, instrument, release or other agreement or document entered into or delivered in connection with the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to Article VII of the Plan, all Liens, Claims, mortgages, deeds of trust, or other security interests against the assets or property of the Debtors or the Estates shall be fully released, canceled, terminated, extinguished and discharged, in each case without further notice to or order of this Court, act or action under applicable law, regulation, order, or rule

29

or the vote, consent, authorization or approval of any Entity. This release, termination, extinguishment and discharge is necessary to implement the Plan and is appropriate, fair, equitable and reasonable and in the best interest of the Debtors, their Estates and Holders of Claims and Equity Interests. The filing of this Confirmation Order with any federal, state, or local agency or department shall constitute good and sufficient evidence of, but shall not be required to effect, the termination of such Liens, Claims and other interests to the extent provided in the immediately preceding sentence. Any Entity holding such Liens, Claims or interests shall, pursuant to Section 1142 of the Bankruptcy Code, promptly execute and deliver to the Reorganized Debtors such instruments of termination, release, satisfaction and/or assignment (in recordable form) as may be reasonably requested by the Reorganized Debtors.

23. <u>Restructuring Transactions</u>. On the Effective Date, the applicable Debtors or Reorganized Debtors are authorized to consummate the Restructuring Transactions described in <u>Article V.A</u> of the Plan, subject to the terms and conditions set forth therein, in this Confirmation Order and in the Restructuring Documents (including the Reorganization Steps Overview).

24. <u>Distributions Exempt from Securities Laws</u>.

(a) On and after the Effective Date, the Debtors and the Reorganized Debtors, as applicable, are authorized to and will provide or issue, as applicable, the Plan Securities and Documents, in each case in form and substance acceptable to the Required Consenting Noteholders in the manner set forth in the Restructuring Support Agreement, and without further notice to or order of this Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Person or Entity.

(b) The offer, distribution, and issuance, as applicable, of the Plan Securities and Documents under the Plan will be exempt or will be effected in a manner that is exempt, from

registration and prospectus delivery requirements under applicable securities laws (including, as applicable, Section 5 of the Securities Act, Article 3(1) of Directive 2003/71/EC of the European Parliament and of the Council (as amended), Article 3(1) of Regulation (EU) 2017/1129 of the European Parliament and of the Council, or any similar state or local law requiring the registration and/or delivery of a prospectus for offer or sale of a security or registration or licensing of an issuer of a security) pursuant to Section 1145(a) of the Bankruptcy Code and/or other applicable exemptions; *provided*, *however*, that Rights Offering Notes issued to the Backstop Parties pursuant to the Backstop Commitment Agreement (but not the Rights Offering Notes issued to Holders of Allowed Prepetition Notes Claims in the Rights Offering pursuant to Article III.B.7(c) of the Plan) will be issued and distributed pursuant to Section 4(a)(2) of the Securities Act and other applicable exemptions.  An offering of Plan Securities provided in reliance on the exemption from registration under the Securities Act pursuant to Section 1145(a) of the Bankruptcy Code may be sold without registration to the extent permitted under Section 1145 of the Bankruptcy Code and is deemed to be a public offering, and such Plan Securities may be resold without registration to the extent permitted under Section 1145 of the Bankruptcy Code and other applicable law.

25. Rights Offering Procedures. The Rights Offering Procedures are hereby approved. The Debtors are authorized to commence and conduct the Rights Offering in accordance with such procedures, the Plan, and the Backstop Commitment Agreement.

26. Discharge of the Debtors.

(a) To the fullest extent provided under Section 1141(d)(1)(A) and other applicable provisions of the Bankruptcy Code, except as otherwise expressly provided by the Plan (including, without limitation, Article II.B.,  V.D, and V.E of the Plan) or this Confirmation Order, effective as of the Effective Date, all consideration distributed under the Plan shall be in exchange

for, and in complete satisfaction, settlement, discharge, and release of, all Claims, Equity Interests and Causes of Action of any kind or nature whatsoever against the Debtors or any of their respective assets or properties, including any interest accrued on such Claims from and after the Petition Date and regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims, Equity Interests or Causes of Action.

(b)     Except as otherwise expressly provided by the Plan (including, without limitation, Article II.B., V.D, and V.E of the Plan) or this Confirmation Order, upon the Effective Date, the Debtors and their Estates shall be deemed discharged and released under and to the fullest extent provided under Sections 524 and 1141(d)(1)(A) and other applicable provisions of the Bankruptcy Code from any and all Claims of any kind or nature whatsoever, including, but not limited to, demands and liabilities that arose before the Confirmation Date, and all debts of the kind specified in Sections 502(g), 502(h), or 502(i) of the Bankruptcy Code.  Such discharge shall void any judgment obtained against the Debtors or the Reorganized Debtors at any time, to the extent that such judgment relates to a discharged Claim.

(c)     Except as otherwise expressly provided by the Plan (including, without limitation, Article II.B., V.D, and V.E of the Plan) or this Confirmation Order, upon the Effective Date: (i) the rights afforded by the Plan and the treatment of all Claims and Equity Interests shall be in exchange for and in complete satisfaction, settlement, discharge, and release of all Claims and Equity Interests of any nature whatsoever, including any interest accrued on such Claims from and after the Petition Date, against the Debtors or any of their respective assets, property, or Estates; (ii) all Claims and Equity Interests shall be satisfied, discharged, and released in full, and each of the Debtors' liability with respect thereto shall be extinguished completely without further notice or action; and (iii) all Entities shall be precluded from asserting against the Debtors, the

Estates, the Reorganized Debtors, each of their respective successors and assigns, and each of their respective assets and properties, any such Claims or Equity Interests, whether based upon any documents, instruments or any act or omission, transaction, or other activity of any kind or nature that occurred prior to the Effective Date or otherwise.

27. Releases and Exculpation. The releases and exculpation provisions contained in the Plan, including, but not limited to, those provided in Article X of the Plan, are hereby authorized, approved and binding on all Persons and Entities described therein. Notwithstanding anything to the contrary in any ballot of a Consenting Noteholder, all Consenting Noteholders shall be and hereby are deemed not to have elected to opt out of any releases under the Plan as required by the Restructuring Support Agreement.

28. Injunctions. The injunctions contained in the Plan, including, but not limited to, those provided in Article X.G of the Plan, are hereby authorized, approved and binding on all Persons and Entities described therein. Except as otherwise expressly provided in the Plan or this Confirmation Order, from and after the Effective Date, all Persons and Entities are, to the fullest extent provided under Section 524 and other applicable provisions of the Bankruptcy Code, permanently enjoined from (i) commencing or continuing, in any manner or in any place, any suit, action or other proceeding; (ii) enforcing, attaching, collecting, or recovering in any manner any judgment, award, decree, or order; (iii) creating, perfecting, or enforcing any Lien or encumbrance; (iv) asserting a setoff or right of subrogation of any kind; or (v) commencing or continuing in any manner any action or other proceeding of any kind, in each case on account of or with respect to any Claim, demand, liability, obligation, debt, right, Cause of Action, Equity Interest, or remedy released or to be released, exculpated or to be exculpated, settled or to be settled or discharged or to be discharged pursuant to the Plan or this Confirmation Order against any Person or Entity so

33

released, discharged, or exculpated (or the property or estate of any Person or Entity so released, discharged, or exculpated). All injunctions or stays provided for in the Chapter 11 Cases under Section 105 or Section 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the Effective Date.

29. <u>Contracts and Leases</u>. The Debtors have exercised reasonable business judgment in determining whether to assume or reject each of the Executory Contracts and Unexpired Leases as set forth within the Plan, the Plan Supplement, this Confirmation Order or otherwise. All of the Executory Contracts and Unexpired Leases of the Debtors (including, without limitation, the D&O Liability Insurance Policies, the Indemnification Provisions, the Employment Plans, and the Insurance Contracts) are hereby assumed by the Debtors in accordance with, and subject to, the provisions and requirements of Sections 365 and 1123 of the Bankruptcy Code, with such assumption effective as of, and subject to the occurrence of, the Effective Date, except for those Executory Contracts and Unexpired Leases that (i) have been assumed or rejected by the Debtors by prior order of this Court; (ii) are the subject of a motion to reject filed by the Debtors pending on the Effective Date; (iii) are identified by the Debtors (with the consent of the Required Consenting Noteholders) as being rejected contracts or leases and Filed in the Plan Supplement; or (iv) are rejected or terminated by the Debtors pursuant to the terms of the Plan (subject to such exclusions, collectively, the "**Assumed Contracts**"). To the extent any provision in any Executory Contract or Unexpired Lease assumed or assumed and assigned (as applicable) pursuant to the Plan (including, without limitation, any "change of control" provision) prohibits, restricts or conditions, or purports to prohibit, restrict or condition, or is modified, breached or terminated, or deemed modified, breached or terminated by, (i) the commencement of these Chapter 11 Cases or the insolvency or financial condition of any Debtor at any time before the closing of its respective

34

Chapter 11 Case, (ii) any Debtor's or any Reorganized Debtor's assumption or assumption and assignment (as applicable) of such Executory Contract or Unexpired Lease or (iii) the Confirmation or Consummation of the Plan, then such provision shall be deemed modified such that the transactions contemplated by the Plan shall not entitle the non-debtor party thereto to modify or terminate such Executory Contract or Unexpired Lease or to exercise any other default-related rights or remedies with respect thereto, and any required consent under any such contract or lease shall be deemed satisfied by the Confirmation of the Plan. The inclusion or exclusion of a contract or lease on any schedule or exhibit shall not constitute an admission by any Debtor that such contract or lease is an Executory Contract or Unexpired Lease or that any Debtor has any liability thereunder. Each Executory Contract and Unexpired Lease assumed and/or assigned pursuant to the Plan shall revest in and be fully enforceable by the applicable Reorganized Debtor or the applicable assignee in accordance with its terms and conditions, except as modified by the provisions of the Plan, any order of this Court approving its assumption and/or assignment, or applicable law.

30. <u>Approval of Assumption of Assumed Contracts</u>.

(a) <u>Court Approval</u>. The Debtors' assumption of the Assumed Contracts is hereby approved pursuant to Sections 365(a) and 1123 of the Bankruptcy Code. The Assumed Contracts shall remain in full force and effect in accordance with their respective terms and conditions for the benefit of the Reorganized Debtors, notwithstanding any provision in such Assumed Contract (including, without limitation, those described in Sections 365(b), (c), (e) and (f) of the Bankruptcy Code) or under applicable non-bankruptcy law that purports to (a) terminate, modify, or restrict, or permit the applicable non-Debtor party to terminate, modify or restrict, such contract or lease or the Debtors' rights, benefits and privileges thereunder; or (b) create or impose,

US-DOCS\110021092

or permit the applicable non-Debtor party to create or impose, any additional duties, obligations, penalties, default rates of interest or payments (monetary and non-monetary) upon any Debtor or Reorganized Debtor, in each case as a result of or in connection with (i) the filing of a petition for relief under Chapter 11 of the Bankruptcy Code by the Debtors; (ii) the Debtors' insolvency or financial condition at any time before the Chapter 11 Cases are closed; or (iii) the Confirmation or Consummation of the Plan.

(b)     Cure Disputes.  Any monetary amounts by which any Executory Contract or Unexpired Lease to be assumed pursuant to the Plan is in default shall be satisfied, pursuant to Section 365(b)(1) of the Bankruptcy Code, by payment of the default amount (if any) in Cash by the Debtors or Reorganized Debtors, as applicable, on the Effective Date or on such other terms as the parties to each such executory contract or unexpired lease may otherwise agree in writing, with the consent of the Majority Noteholders.  In the event of a dispute regarding (a) the amount of any cure payment, (b) the ability of any Debtor or assignee to provide "adequate assurance of future performance" (within the meaning of Section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed, or assumed and assigned or (c) any other matter pertaining to assumption or assignment, the applicable cure payments required by Section 365(b)(1) of the Bankruptcy Code will be made following the entry of a Final Order resolving the dispute in accordance with Article VIII.A.4 of the Plan and approving such assumption or assumption and assignment; provided, however, that following the resolution of any such dispute, the Debtors or the Reorganized Debtors, as applicable, may elect to reject such Executory Contract or Unexpired Lease in lieu of assuming or assigning it.  The Debtors or the Reorganized Debtors, as applicable, will be authorized to effect such rejection by filing a written notice of rejection with

36

the Bankruptcy Court and serving such notice on the applicable counterparty within ten days of the entry of such Final Order.

31.     Approval of Rejection of Rejected Contracts.   All Executory Contracts and Unexpired Leases of the Debtors that are identified on a Plan Schedule as being rejected, or that are otherwise rejected pursuant to the terms of the Plan or this Confirmation Order (collectively, the "**Rejected Contracts**"), are rejected by the applicable Debtors and such rejection is hereby approved by this Court pursuant to Sections 365(a) and 1123 of the Bankruptcy Code, with such rejection effective as of, and subject to the occurrence of, the Effective Date (the "**Rejection Date**").  Rejection of any Rejected Contract pursuant to the Plan or otherwise will not constitute a termination of any preexisting obligations owed to the Debtors or the Reorganized Debtors, as applicable, under such Rejected Contract.  All Proofs of Claim with respect to Claims arising from or in connection with the rejection of the Rejected Contracts, if any, must be filed with this Court within thirty days after service of an order of this Court (including this Confirmation Order) approving such rejection (such Claims, the "**Rejection Claims**").  Any and all Rejection Claims not filed within such time will, without any further notice to or action of any Person, be forever barred from assertion against the Debtors or Reorganized Debtors, their Estates, or property, unless otherwise ordered by this Court or provided for in the Plan.  All Rejection Claims shall, as of the Effective Date, be subject to the permanent injunction set forth in the Plan and this Confirmation Order.  At any time prior to the Effective Date, and without altering or limiting the other provisions of the Plan or this Confirmation Order, the Debtors may seek to (i) reject any contract or lease to which any Debtor is a party and to file a motion requesting authorization for the rejection of any such contract or lease and (ii) remove any contract or lease to which any Debtor is a party from a

37

Plan Schedule and thereafter file a motion requesting authorization to assume any such contract or lease.

32.     Corporate Action

(a)     Each of the Debtors and the Reorganized Debtors may take any and all actions to execute, deliver, File or record such contracts, instruments, releases and other agreements or documents and take such actions as may be necessary or appropriate to effectuate and implement the provisions of the Plan, including, without limitation, the issuance and the distribution of the securities to be issued pursuant thereto, in each case in form and substance acceptable to the Required Consenting Noteholders in the manner set forth in the Restructuring Support Agreement and to the extent permitted by the DIP Financing Documents, and without further notice to or order of this Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote or other approval or authorization by the security holders, officers or directors of the Debtors or the Reorganized Debtors or by any other Person or Entity (subject to such actions being in accordance with the law of the Debtor's jurisdiction of incorporation to the extent such non-bankruptcy law is applicable).

(b)     Prior to, on or after the Effective Date (as appropriate), to the extent permitted by the law of the Debtor's jurisdiction of incorporation to the extent such non-bankruptcy law is applicable, all matters provided for pursuant to the Plan that would otherwise require approval of the stockholders, directors, officers, managers, members or partners of the Debtors (as of prior to the Effective Date) will be deemed to have been so approved and will be in effect prior to, on or after the Effective Date (as appropriate) pursuant to applicable law and without any requirement of further action by such Person or Entity or the need for any approvals, authorizations, actions or consents of or from any such Person or Entity.

38

(c)     As of the Effective Date, all matters provided for in the Plan involving the legal or corporate structure of the Debtors or the Reorganized Debtors (including, without limitation, the adoption of the Amended/New Corporate Governance Documents and similar constituent and organizational documents, and the selection of directors and officers for, each of the Reorganized Debtors), and any legal or corporate action required by the Debtors or the Reorganized Debtors in connection with the Plan, to the extent permitted by the law of the applicable Debtor's jurisdiction of incorporation to the extent such non-bankruptcy law is applicable, will be deemed to have occurred and will be in full force and effect in all respects, in each case without further notice to or order of this Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote or other approval or authorization by any Person or Entity.

(d)     On and after the Effective Date, the appropriate officers of the Debtors and the Reorganized Debtors are authorized to issue, execute, and deliver, and consummate the transactions contemplated by, the contracts, agreements, documents, guarantees, pledges, consents, securities, certificates, resolutions and instruments contemplated by or described in the Plan in the name of and on behalf of the Debtors and the Reorganized Debtors, in each case in form and substance acceptable to the Required Consenting Noteholders in the manner set forth in the Restructuring Support Agreement, and without further notice to or order of this Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote or other approval or authorization by any Person or Entity.  The secretary and any assistant secretary of the Debtors and the Reorganized Debtors will be authorized to certify or attest to any of the foregoing actions.

US-DOCS\110021092

33.  Authority to Act.  Each Debtor and Reorganized Debtor and their respective officers and directors, are authorized and empowered pursuant to Section 303 of the Delaware General Corporation Law and other applicable laws, to take any and all actions necessary or desirable to implement the transactions contemplated by the Plan and this Confirmation Order, in each case without any requirement of further vote, consent, approval, authorization or other action by the stockholders, security holders, officers, directors, partners, managers, members or other applicable owners or notice to, order of, or hearing before this Court.  Each federal, state, and local (domestic or foreign) governmental agency or department is hereby authorized and directed to accept any and all documents and instruments necessary and appropriate to consummate the Plan and the transactions contemplated thereby.

34.  Exemption From Transfer Taxes.  Pursuant to and to the fullest extent permitted by Section 1146(a) of the Bankruptcy Code, any issuance, transfer, or exchange of a security, or the making or delivery of an instrument of transfer of property, pursuant to or in connection with the Plan or the Restructuring Documents will not be subject to any Stamp or Similar Tax or governmental assessment in the United States or by any other Governmental Unit, and this Confirmation Order hereby directs the appropriate federal, state or local (domestic or foreign) governmental officials or agents to forgo the collection of any such Stamp or Similar Tax or governmental assessment and to accept for filing and recordation instruments or other documents evidencing such action or event without the payment of any such Stamp or Similar Tax or governmental assessment.  Such exemption specifically applies, without limitation, to (i) all actions, agreements and documents necessary to evidence and implement the provisions of, transactions contemplated by and the distributions to be made under this Confirmation Order, the Plan or the Restructuring Documents, (ii) the issuance and distribution of the New Common Stock

US-DOCS\110021092

or Plan Securities and Documents, and (iii) the maintenance or creation of security interests or any Lien as contemplated by the Plan or the Restructuring Documents.

35.     Professional Fee Claims.

(a)     Professional Fees.     The Professionals or other Entities asserting a Professional Fee Claim for services rendered after the Petition Date and before the Effective Date must File with this Court and serve on the Reorganized Debtors and such other Entities designed by this Confirmation Order an application for final allowance of such Professional Fee Claim (each a "**Final Fee Application**") by no later than forty-five days after the Effective Date (the "**Professional Fees Bar Date**"); provided that the Reorganized Debtors will pay Professionals in the ordinary course of business for any work performed on and after the Effective Date, including those reasonable and documented fees and expenses incurred by Professionals in connection with the implementation and consummation of the Plan, in each case without further application or notice to this Court.  Each Holder of an Allowed Professional Fee Claim shall be paid in full in Cash by the Reorganized Debtors, including from the Professional Fee Claim Reserve, within five Business Days after entry of the order approving such Allowed Professional Fee Claim.  The Reorganized Debtors shall not commingle any funds contained in the Professional Fee Claim Reserve and shall use such funds to pay only the Professional Fee Claims, as and when allowed by order of this Court.  Notwithstanding anything to the contrary contained in the Plan, the failure of the Professional Fee Claim Reserve to satisfy in full the Professional Fee Claims shall not, in any way, operate or be construed as a cap or limitation on the amount of Professional Fee Claims due and payable by the Reorganized Debtors.

(b)     Service of Final Fee Applications.     All Final Fee Applications of Professionals shall be filed with this Court and actually served on or prior to the Professional Fees

Bar Date upon the following parties (collectively, the "**Notice Parties**"): (i) the Debtors, c/o Weatherford International plc, 2000 St. James Place, Houston, Texas 77056, Attn: Christina M. Ibrahim; (ii) co-counsel to the Debtors, Latham & Watkins LLP, 885 Third Avenue, New York, New York 10022, Attn: Keith A. Simon, Esq. and Lisa K. Lansio, Esq.; (iii) co-counsel to the Debtors, Hunton Andrews Kurth LLP, 600 Travis Street, Suite 4200, Houston, Texas 77002, Attn: Timothy A. ("Tad") Davidson II, Esq. and Ashley L. Harper, Esq.; (iv) counsel to the Ad Hoc Noteholder Committee, Akin Gump Strauss Hauer & Feld LLP, One Bryant Park, Bank of America Tower, New York, New York 10036, Attn: Michael S. Stamer, Esq. and Meredith A. Lahaie, Esq. and 2001 K Street N.W., Washington, DC 20006, Attn: Kate Doorley, Esq.; (v) counsel to the DIP Agent, Shearman & Sterling LLP, 599 Lexington Avenue, New York, New York 10022, Attn: Fredric Sosnick, Esq.; (vi) the U.S. Trustee, 515 Rusk Street, Suite 3516, Houston, TX 77002, Attn: Stephen D. Statham and Hector Duran, Jr.; and (vii) proposed counsel to the Creditors' Committee, (a) Ropes & Gray LLP, 1211 Avenue of the Americas, New York, New York 10036, Attn: Mark R. Somerstein, Esq. and Matthew Roose, Esq. and (b) Norton Rose Fulbright US LLP, 2200 Ross Avenue, Suite 3600, Dallas, Texas 75201, Attn: Louis R. Strubeck, Jr., Esq. and 1301 McKinney Street, Suite 5100, Houston, Texas 77010, Attn: Jason L. Boland, Esq.

(c) Objections to and Hearing to Approve Final Fee Applications. Any objection to any Final Fee Application must be Filed with this Court, together with proof of service thereof, and served upon the applicable Professional and the other Notice Parties, so as to be actually received no later than 4:00 p.m. (prevailing Eastern Time) on the date that is thirty days after the filing of the applicable Final Fee Application (the "**Professional Fees Objection Deadline**"). Only those objections made in writing and timely filed and received by the

US-DOCS\110021092

Professional Fees Objection Deadline will be considered by this Court. If no objection to a Final Fee Application is timely filed and served in accordance with the procedures set forth herein, then this Court may enter a Final Order approving such uncontested Final Fee Application without further notice and the Reorganized Debtors, as applicable shall pay the amounts requested in such uncontested Final Fee Application (or if any Final Fee Application is the subject of an objection, the Debtors or the Reorganized Debtors, as applicable, shall pay the undisputed amounts described in such Final Fee Application). The hearing to consider approval of the Final Fee Applications, if necessary, will be held as soon as reasonably practicable after the expiration of the Professional Fees Objection Deadline and the date of such hearing will be promptly provided to the applicable Professional and Notice Parties and posted on the Debtors' restructuring website.

36. Funding and Use of Professional Fee Claim Reserve.

(a) On or before the Effective Date, the Debtors will fund the Professional Fee Claim Reserve in such amount as determined by the Debtors, with the consent of the Required Consenting Noteholders and in consultation with the Creditors' Committee or as determined by order of this Court, as necessary in order to be able to pay in full in Cash the obligations and liabilities for which such reserve was established.

(b) The Cash contained in the Professional Fee Claim Reserve will be used solely to pay the obligations and liabilities for which such reserve was established, with the Unused Cash Reserve Amount (if any) being returned to the Reorganized Debtors within three (3) Business Days after determining the Unused Cash Reserve Amount. The Debtors and the Reorganized Debtors, as applicable, will maintain detailed records of all payments made from the Professional Fee Claim Reserve, such that all payments and transactions will be adequately and promptly documented in, and readily ascertainable from, their respective books and records.

(c)     The Professional Fee Claim Reserve will be maintained in trust for the Professionals and will not be considered property of the Debtors' Estates; provided that the Reorganized Debtors will have a reversionary interest in the Unused Cash Reserve Amount.  To the extent that funds held in the Professional Fee Claim Reserve do not or are unable to satisfy the full amount of the Allowed Professional Fee Claims, such Professionals will have an Allowed Administrative Claim for any such deficiency, which will be satisfied in full in Cash accordance with Article II.A of the Plan.

(d)     After the Effective Date, neither the Debtors nor the Reorganized Debtors will deposit any other funds or property into the Professional Fee Claim Reserve without further order of this Court or otherwise commingle funds in the Professional Fee Claim Reserve.

37.     Distributions Under the Plan.  All distributions under the Plan shall be made in accordance with Article VII of the Plan.  Notwithstanding any policies, practices or procedures of DTC or any other applicable clearing system, DTC and all other applicable clearing systems shall cooperate with and take all actions reasonably requested by the Voting and Claims Agent or the Prepetition Notes Indenture Trustee to facilitate distributions to Holders of Allowed Claims without requiring that such distributions be characterized as repayments of principal or interest. No Distribution Agent, including the Prepetition Notes Indenture Trustee in any capacity, shall be required to provide indemnification or other security to DTC in connection with any distributions to Holders of Allowed Claims through the facilities of DTC.

38.     DTC shall be required to accept and conclusively rely upon the Plan or this Confirmation Order in lieu of a legal opinion regarding whether the Plan Securities (other than the Rights Offering Notes issued to the Backstop Parties pursuant to the Backstop Commitment

Agreement) are exempt from registration and/or eligible for DTC book-entry delivery, settlement, and depository services.

39.     Notwithstanding anything to the contrary in this Plan or Confirmation Order, no entity (including, for the avoidance of doubt, DTC) shall be entitled to require a legal opinion regarding the validity of any transaction contemplated by the Plan or this Confirmation Order, including, for the avoidance of doubt, whether the Plan Securities (other than the Rights Offering Notes issued to the Backstop Parties pursuant to the Backstop Commitment Agreement) are exempt from registration and/or eligible for DTC book entry delivery, settlement, and depositary services.

40.     Resolution of Contingent, Unliquidated and Disputed Claims.  Except as otherwise ordered by this Court, any Claim that is not an Allowed Claim as of the Confirmation Date shall be determined, resolved, or adjudicated in accordance with the terms of this Confirmation Order and the Plan, including, without limitation, Article VIII of the Plan.

41.     No Distributions Pending Allowance.  Notwithstanding any other provision of the Plan to the contrary, no payments or distributions of any kind or nature will be made with respect to all or any portion of a Disputed Claim or Disputed Equity Interest unless and until all objections to such Disputed Claim or Disputed Equity Interest have been settled or withdrawn or have been determined by Final Order, and the Disputed Claim or Disputed Equity Interest is or becomes Allowed by Final Order; provided, that, notwithstanding the foregoing, payments or distributions under this Plan to Holders of Allowed Prepetition Notes Claims will be made in full on the Initial Distribution Date, regardless of whether such Holders hold any Disputed Claims.

42.     No Postpetition Interest on Claims.  Unless otherwise specifically provided for in the Plan, this Confirmation Order, or Final Order of this Court, or required by applicable

45

bankruptcy law (including, without limitation, as required pursuant to Section 506(b) or Section 511 of the Bankruptcy Code), postpetition interest shall not accrue or be paid on any Claims (except DIP Facility Claims) and no Holder of a Claim (except a DIP Facility Claim) will be entitled to interest accruing on or after the Petition Date on any Claim, provided, that to the extent provided for in the contracts or instruments giving rise to a Class 8 General Unsecured Claim or required to be paid on a Class 8 General Unsecured Claim under applicable non-bankruptcy law, interest shall accrue on Class 8 General Unsecured Claims at the relevant contractual rate or other rate applicable under relevant non-bankruptcy law.

43.     Reserve for Disputed Claims and Disputed Equity Interests.  The Debtors, the Reorganized Debtors, and the Distribution Agent may establish such appropriate reserves for Disputed Claims and Disputed Equity Interests in the applicable Class(es) as it determines necessary and appropriate, in each case with the consent of the Required Consenting Noteholders or as approved by order of this Court.  Without limiting the foregoing, reserves (if any) for Disputed Claims and Disputed Equity Interests will equal, as applicable, an amount of property equal to 100% of distributions to which Holders of Disputed Claims and Disputed Equity Interests in each applicable Class would otherwise be entitled under the Plan as of such date if such Disputed Claims and Disputed Equity Interests were Allowed based on the Debtors' books and records; provided, however, that the Debtors and the Reorganized Debtors, as applicable, will have the right to file a motion seeking to estimate any Disputed Claims or Disputed Equity Interest.

44.     Payment of Statutory Fees; Post-Effective Date Fees and Expenses.  All fees payable pursuant to Section 1930 (a) of the Judicial Code, as determined by this Court at a hearing pursuant to Section 1128 of the Bankruptcy Code to the extent necessary, shall be paid by each of the Debtors or the Reorganized Debtors (or the Distribution Agent on behalf of each of the Debtors

or Reorganized Debtors), as applicable, for each quarter (including any fraction thereof) until the earliest to occur of the entry of (a) a final decree closing such Debtor's Chapter 11 Case, (b) an order dismissing such Debtor's Chapter 11 Case, or (c) an order converting such Debtor's Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code. The Reorganized Debtors will pay the liabilities and charges that they incur on or after the Effective Date for Professionals' fees, disbursements, expenses, or related support services (including reasonable fees, costs and expenses incurred by Professionals relating to the preparation of interim and final fee applications and obtaining this Court's approval thereof) in the ordinary course of business and without application or notice to, or order of, this Court, including, without limitation, the reasonable fees, expenses, and disbursements of the Distribution Agents and the fees, costs and expenses incurred by Professionals in connection with the implementation, enforcement and Consummation of the Plan and the Restructuring Documents.

45. <u>Payment of Fees and Expenses of Certain Creditors</u>. The Debtors will, on and after the Effective Date and to the extent invoiced in accordance with the terms of the applicable engagement letter, pay the Ad Hoc Noteholder Committee Fees and Expenses (whether accrued prepetition or postpetition and to the extent not otherwise paid during the Chapter 11 Cases), without the need for application by any such parties to this Court, and without notice and a hearing pursuant to Section 1129(a)(4) of the Bankruptcy Code or otherwise.

46. <u>Payment of Fees and Expenses of the Prepetition Notes Indenture Trustee</u>. The Debtors and the Reorganized Debtors will, as applicable, on and after the Effective Date, and upon the presentment of invoices in customary form (which may be redacted to preserve any confidential or privileged information), pay the Prepetition Notes Indenture Trustee Fees and Expenses (in each case whether accrued prepetition or postpetition and to the extent not otherwise paid during the

47

Chapter 11 Cases and the fees and expenses of the Prepetition Notes Indenture Trustee solely in its capacity as Distribution Agent under the Plan), without the need for application by any party to this Court, and without notice and a hearing pursuant to Section 1129(a)(4) of the Bankruptcy Code or otherwise.  Nothing herein will be deemed to impair, waive, or discharge the Prepetition Notes Indenture Trustee Charging Lien for any amounts not paid pursuant to the Plan and otherwise claimed by the Prepetition Notes Indenture Trustee pursuant to and in accordance with the Prepetition Notes Indentures.

47.     Payment of Fees and Expenses of Counsel for the Consenting Equityholders.  On the Effective Date, the Debtors shall pay $250,000 to Proskauer Rose LLP, counsel for the Consenting Equityholders (as defined in the Restructuring Support Agreement), in full and final satisfaction of any and all fees, costs, and expenses incurred by the Consenting Equityholders and their advisors, and no additional claims for the reimbursement of fees, costs, and/or expenses shall be asserted against the Debtors or the Reorganized Debtors by or on behalf of the Consenting Equityholders, including, without limitation, pursuant to Section 503 of the Bankruptcy Code.

48.     Existing Equity Interests.  On the Effective Date, the Equity Interests in Weatherford Parent will be terminated and cancelled without further notice to or order of this Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote or other approval or authorization by any Person or Entity.  On the Effective Date, the Intercompany Equity Interests will remain effective and outstanding, except to the extent modified pursuant to the terms of the Reorganization Steps Overview (provided such steps are taken in accordance with applicable law to the extent such non-bankruptcy law is applicable), and will be owned and held by the same applicable Person(s) that held and/or owned such Intercompany Equity Interests immediately prior to the Effective Date.  Each Parent Subsidiary will continue to

48

be governed by the terms and conditions of its applicable corporate governance documents as in effect immediately prior to the Effective Date, except as amended or modified by the Plan, where such amendment or modification is permitted under the law of the Parent Subsidiary's jurisdiction of incorporation to the extent such non-bankruptcy law is applicable.

49.     DIP Facility Claims.  The DIP Facility Claims are Allowed in the full amount due and owing under the DIP Financing Documents, including all principal, accrued and accruing postpetition interest, costs, fees and expenses.  On the Effective Date and as a condition to Consummation, the Allowed DIP Facility Claims will, in full satisfaction, settlement, discharge and release of, and in exchange for such DIP Facility Claims, be indefeasibly paid in full in Cash from the proceeds of the Exit Facility (or, in the case of "Swap Obligations" and "Banking Services Obligations" be treated as the applicable Holder thereof shall otherwise agree), any unused commitments under the Revolving Credit Facility (as defined in the DIP Credit Agreement) shall be deemed terminated, and the DIP Facility Liens will be deemed discharged, released, and terminated for all purposes without further action of or by any Person or Entity; provided that the DIP Contingent Obligations shall survive the Effective Date on an unsecured basis and shall be paid by the Reorganized Debtors as and when due.  All Cash distributions to be made under the Plan to the DIP Agent on account of the DIP Facility Claims shall be made by wire transfer.  Notwithstanding anything to the contrary in the Plan or this Confirmation Order, the Allowed DIP Facility Claims and the Allowed Prepetition Debt Claims and the distributions to be made pursuant to the Plan on account of such Claims will not be subject to set off by the Debtors or the Reorganized Debtors pursuant to section 553 of the Bankruptcy Code or applicable non-bankruptcy law and no proofs of Claim or interest shall be required to be filed in connection with the DIP Facility Claims.  Notwithstanding the entry of this Order, from the Confirmation Date

through the Effective Date, all claims, Liens, interest, rights, priorities, protections, and remedies afforded to the DIP Agents and DIP Lenders in the DIP Financing Documents, including, but not limited to, the obligation of the Debtors to pay the reasonable and documented out-of-pocket prepetition and post-petition fees, charges, and disbursements of legal counsel advising the DIP Agent in accordance with paragraph 3 of the DIP Final Order, shall remain in full force and effect and shall continue to constitute the legal, valid, binding, and enforceable obligations of Debtors, which obligations shall not be impaired, prejudiced, or modified in any way at any time prior to the indefeasible payment in full in Cash of the DIP Facility Claims on the Effective Date.

50.     _Notice of Confirmed Plan_.  In accordance with Bankruptcy Rules 2002(f)(7), 2002(k) and 3020(c), as soon as reasonably practicable after the Confirmation Date, the Debtors shall serve a notice of entry of this Confirmation Order, substantially in the form attached hereto as Exhibit B (the "**Notice of Confirmed Plan**") by first-class mail, postage prepaid on all known creditors, equity security holders, the U.S. Trustee and other parties-in-interest in these Chapter 11 Cases; provided, however, that such notice need not be given or served under or pursuant to the Bankruptcy Code, the Bankruptcy Rules, the Local Rules or this Confirmation Order to any Person or Entity to whom the Debtors mailed a notice of the Confirmation Hearing, but received such notice returned marked "undeliverable as addressed," "moved-left no forwarding address" or "forwarding order expired," or similar reason, unless the Debtors have been informed in writing by such Person or Entity of that Person's or Entity's new mailing address.  The notice described herein is adequate and appropriate under the particular circumstances and no other or further notice is necessary or required.  The Notice of Confirmed Plan shall have the effect of an order of this Court, shall constitute sufficient notice of the entry of the Confirmation Order to such filing and

50

recording officers and shall be a recordable instrument notwithstanding any contrary provision of applicable non-bankruptcy law.

51.     Notice of Effective Date.  In accordance with Bankruptcy Rules 2002(f)(7), 2002(k) and 3020(c), as soon as reasonably practicable after the occurrence of the Effective Date, the Reorganized Debtors shall serve a notice of the Effective Date, substantially in the form attached hereto as Exhibit C (the "**Notice of Effective Date**") by first-class mail, postage prepaid on all known creditors, equity security holders, the U.S. Trustee and other parties-in-interest in these Chapter 11 Cases; provided, however, that such notice need not be given or served under or pursuant to the Bankruptcy Code, the Bankruptcy Rules, the Local Rules or this Confirmation Order to any Person or Entity to whom the Debtors mailed a Notice of the Confirmed Plan, but received such notice returned marked "undeliverable as addressed," "moved-left no forwarding address" or "forwarding order expired," or similar reason, unless the Reorganized Debtors have been informed in writing by such Person or Entity of that Person's or Entity's new mailing address. The notice described herein is adequate and appropriate under the particular circumstances and no other or further notice is necessary or required.  The Notice of Effective Date shall have the effect of an order of this Court, shall constitute sufficient notice of the occurrence of the Effective Date to such filing and recording officers and shall be a recordable instrument notwithstanding any contrary provision of applicable non-bankruptcy law.

52.     No Liability for Solicitation.  Based on the factual findings described in this Confirmation Order, the Debtors, the Reorganized Debtors and each of their respective Related Persons are not, and on account of or with respect to the offer, issuance, sale, or purchase of any security under the Plan, and/or solicitation of votes on the Plan, shall not be, liable at any time for any violation of any applicable law, rule, or regulation governing the solicitation of acceptances

or rejections of the Plan or the distribution, offer, issuance, sale, or purchase of any securities, including, without limitation, the applicable Plan Securities and Documents under the Plan. The Debtors, the Reorganized Debtors and each of their respective Related Persons have solicited votes on the Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, the Local Rules and all other applicable rules, laws, and regulations and are, therefore, entitled to, and are hereby granted, the protections afforded by Section 1125(e) of the Bankruptcy Code.

53. <u>Estimation Proceedings and Other Rights</u>. Any and all rights of the Debtors and Reorganized Debtors under Section 502(c) and Section 502(e) of the Bankruptcy Code are reserved.

54. <u>Failure to Consummate Plan</u>. If the Confirmation or the Consummation of the Plan does not occur with respect to one or more of the Debtors, then the Plan shall, with respect to such applicable Debtor or Debtors, be null and void in all respects and nothing contained in the Plan, the Disclosure Statement or this Confirmation Order shall: (1) constitute a waiver or release of any claims by or Claims against or Equity Interests in the Debtors; (2) prejudice in any manner the rights of the Debtors, any Holders or any other Entity; (3) constitute an Allowance of any Claim or Equity Interest; or (4) constitute an admission, acknowledgment, offer or undertaking by the Debtors, any Holders or any other Entity in any respect.

55. <u>Successors and Assigns</u>. The Plan will be binding upon and inure to the benefit of the Debtors, the Reorganized Debtors, all present and former Holders of Claims and Equity Interests, other parties-in-interest, and their respective heirs, executors, administrators, successors, and assigns. The rights, benefits, and obligations of any Person or Entity named or referred to in

52

the Plan will be binding on, and will inure to the benefit of, any heir, executor, administrator, successor, or assign of such Person or Entity.

56.     No Successors In Interest.  Except as to obligations expressly assumed pursuant to the Plan, the Reorganized Debtors shall not be deemed to be successors to the Debtors and shall not assume, nor be deemed to assume, or in any way be responsible for, any successor liability or similar liability with respect to the Debtors or the Debtors' operations that are not expressly assumed or reinstated in connection with, or expressly provided by, the Plan or this Confirmation Order.

57.     Retention of Jurisdiction.  Pursuant to Sections 105(a) and 1142 of the Bankruptcy Code and notwithstanding the entry of this Confirmation Order or the occurrence of the Effective Date, this Court shall retain exclusive jurisdiction over the Chapter 11 Cases and all Entities with respect to all matters arising under or in, or related to, the Chapter 11 Cases, the Debtors, and the Plan to the fullest extent permitted by law, including, among other things, jurisdiction over the matters set forth in Article XI of the Plan.  This Court shall retain jurisdiction to hear and determine all matters arising from the implementation of this Confirmation Order.  Notwithstanding the foregoing or any provision of this Confirmation Order to the contrary, any dispute arising under or in connection with the Exit Facility shall be dealt with in accordance with the provisions of the applicable Exit Facility Loan Document.

58.     Headings.  The headings contained within this Confirmation Order are used for the convenience of the parties and shall not alter or affect the meaning of the text of this Confirmation Order.

59.     References to Plan Provisions.  The failure specifically to include or reference any particular article, section or provision of the Plan (and the Plan Supplement) or any related

document in this Confirmation Order shall not diminish or impair the effectiveness of such article, section or provision, it being the intent of this Court that the Plan (and the exhibits and schedules thereto) be confirmed in its entirety and any related documents be approved in their entirety and incorporated herein by reference.

60. <u>No Admission or Waiver</u>. None of the filing of the Plan, any statement or provision contained within the Plan or the taking of any action by any Debtor with respect to the Plan (and Plan Supplement), the Disclosure Statement or Confirmation Order shall be or shall be deemed to be an admission or wavier of any rights of any Debtor.

61. <u>Confirmation Order Controlling</u>. The provisions of the Plan and of this Confirmation Order shall be construed in a manner consistent with each other so as to effect the purposes of each; <u>provided</u>, <u>however</u>, that if there is any conflict or inconsistency between the Plan and this Confirmation Order that cannot be so reconciled, then, solely to the extent of such inconsistency, the terms of this Confirmation Order shall control and govern.

62. <u>Modification of Plan</u>. Without need for further order or authorization of this Court, the Debtors or the Reorganized Debtors, subject to the consents required by the Plan, are authorized and empowered to make any and all modifications to any and all documents included as part of the Plan Supplement, and any other documents that are necessary to effectuate the Plan. Subject to the limitations and rights contained in the Plan, after the entry of this Confirmation Order, the Debtors or the Reorganized Debtors, as applicable, may amend or modify the Plan in accordance with Section 1127(b) of the Bankruptcy Code or remedy any defect or omission or reconcile any inconsistency in the Plan in such manner as may be necessary to carry out the purpose and intent of the Plan. A Holder of a Claim or Equity Interest that has accepted the Plan shall be deemed to have accepted the Plan as altered, amended or modified, if the proposed

US-DOCS\110021092

alteration, amendment or modification does not materially and adversely change the treatment of such Claim or Interest of such Holder.

63.     Waiver of Filings.  Any requirement under Section 521 of the Bankruptcy Code or Bankruptcy Rule 1007 obligating the Debtors to file any list, schedule, or statement with this Court or the U.S. Trustee (except for monthly operating reports or any other post-confirmation reporting obligation to the U.S. Trustee) is hereby waived.

64.     Nonseverability of Plan Provisions Upon Confirmation.  Each provision of the Plan is: (a) valid and enforceable in accordance with its terms; (b) integral to the Plan and may not be deleted or modified except as provided for in the Plan or this Confirmation Order; and (c) non-severable and mutually dependent.  The provisions of this Confirmation Order and the provisions of the Plan are hereby deemed mutually non-severable and mutually dependent.

65.     Immediate Effectiveness of this Confirmation Order.  Pursuant to Bankruptcy Rule 3020(e), the fourteen day stay of this Confirmation Order imposed thereby is waived and the Debtors are hereby authorized to consummate the Plan and the transactions contemplated thereby immediately upon the entry of this Confirmation Order upon the Court's docket, subject to the satisfaction or waiver of the conditions set forth in Article IX of the Plan.

66.     Final Order.  This Confirmation Order is a final order and the period in which an appeal thereof must be filed shall commence upon its entry.

67.     Miscellaneous/Reservations of Rights.

(a)     MUFG Claim.    Notwithstanding anything to the contrary in this Confirmation Order or the Plan (including, without limitation, Article X of the Plan):  (a) the Claim of MUFG Americas Capital Leasing & Finance, LLC ("**MUFG**") against Weatherford Parent, as guarantor of the obligations of non-Debtor Weatherford Netherlands, B.V. ("**WIL-Netherlands**")

55

under that certain Master Equipment Lease Agreement, dated as of March 31, 2014, between MUFG and WIL-Netherlands (the "**MUFG Equipment Lease**") shall constitute an Allowed Claim in an amount equal to (1) $19,150,160.07, plus (2) $3,020.10 per day, beginning on September 12, 2019 and ending on the date on which the Allowed MUFG Claim (as defined below) is paid in full in accordance with clause (b) below, plus (3) the reasonable and documented fees and expenses of MUFG's counsel, Dechert LLP, accrued through the Effective Date (the sum of (1) through (3), collectively, the "**Allowed MUFG Claim**"); (b) the Allowed MUFG Claim shall be fully enforceable against Weatherford Parent; (c) as soon as practicable (but no more than five Business Days) after the earlier to occur of (1) the date on which the DIP Facility Claims are paid pursuant to the terms of the Plan and (2) the Effective Date of the Plan, Weatherford Parent shall pay, or cause WIL-Netherlands to pay, the Allowed MUFG Claim in full in cash in full satisfaction of Weatherford Parent's and WIL-Netherlands's accrued and unpaid obligations under the MUFG Equipment Lease; (d) this Court shall retain exclusive jurisdiction over all matters related to the Allowed MUFG Claim; and (e) nothing in the Plan or this Confirmation Order shall alter or affect any rights or remedies of MUFG against WIL-Netherlands, or any rights or defenses of WIL-Netherlands thereto.

(b)     Texas Ad Valorem Tax Authorities.  Notwithstanding anything to the contrary contained within the Plan or this Order, to the extent there are any secured ad valorem tax claims owing to Bexar County, Cypress-Fairbanks Independent School District, Harris County, Jim Wells CAD, Lee County, Nueces County and Victoria County ("**Texas Ad Valorem Tax Authorities**"), the Texas Ad Valorem Tax Authorities shall retain their statutory liens securing their tax claims until such time as the tax claims are paid in full.

56

(c)     Exterran Claimants.  Both the Debtors and Exterran Energy Solutions, L.P. ("**Exterran**"), Archrock Services., L.P. (in its own capacity and as successor-in-interest to Exterran) ("**Archrock**"), and Universal Compression, Inc. (in its capacity as predecessor-in-interest to Exterran) ("**Universal**") have agreed that the parties' disputes should be resolved through the action pending in the 385th District Court of Texas (Midland County, Texas), captioned Weatherford International, LLC and Weatherford U.S., L.P. v. AB-Tex Beverage, Ltd.; Aegis Chemical Solutions, LLC; Aplex Industries, Inc.; Bell Petroleum Services, Inc.; City of Midland; Control Power, Inc.; Corcoat I, LLC; Core Laboratories, LP; Dawson Geophysical Company; Ecological Environmental Services, Inc.; Exterran Energy Solutions, L.P.; HY-Bon Engineering Company, Inc.; KES (USA) Inc.; Logicoat, Inc.; Luna Mesa Ventures, LLC; NCZ I, Inc.; Pentair, Inc.; Spectrum Brand Holdings, Inc.; and Strong Properties, LLC, No. CV-55471 (the "**Exterran Lawsuit**"), rather than in these Chapter 11 Cases.  Accordingly, notwithstanding any provision of the Solicitation Order or the Plan to the contrary, or any other provision in this Confirmation Order, all Claims, Causes of Action, defenses, rights, or remedies of the Debtors and/or Exterran, Archrock, and Universal related to the Exterran Lawsuit, whether arising under contract, at law, in equity, or otherwise, and whether previously asserted in the Exterran Lawsuit or not, are expressly preserved, and none of the Plan, this Confirmation Order, nor any other order of this Court shall be construed as discharging, impairing, limiting or expanding the relief, remedies, or recovery available to the above-listed parties arising out of the Exterran Lawsuit.  For the avoidance of doubt, upon the occurrence of the Effective Date, the automatic stay pursuant to Section 362 of the Bankruptcy Code shall no longer apply with respect to the Exterran Lawsuit.

(d)     AlphaX Contract.  The Debtors have determined and confirm Weatherford International, LLC shall assume the agreement with AlphaX Decision Sciences, LLC ("**AlphaX**"),

to the extent they are executory contracts, comprised of the following: (i) LLC Agreement, (ii) Consulting Agreement, (iii) Services Agreement, and (iv) Intellectual Property License (collectively, the "**AlphaX Contract**").  The assumption shall not be subject to reversal as a result of any later determination of cure amounts.  In the event the contracts are not executory, the Parties confirm any claims arising thereunder shall remain Claims comprising General Unsecured Claims, and allowance to be subject to the terms herein.  The Debtors and AlphaX have disputes regarding the performance of the AlphaX Contract, and the cure required in connection with certain obligations arising under the Debtors' assumption of the AlphaX Contract.  The Debtors and AlphaX agree that any of the parties' disputes that remain following assumption of the AlphaX Contract should be resolved through the dispute resolution terms provided in the AlphaX Contract.  The Parties agreed that no provision of the Solicitation Order or the Plan, or any other provision in this Confirmation Order shall affect or prejudice any Claims, Causes of Action, rights, or remedies of the Debtors and/or AlphaX arising from or related to the AlphaX Contract, whether arising under contract, tort, at law, in equity, or otherwise (the "**AlphaX Claims**").  All such rights are expressly preserved, and neither the Plan, this Confirmation Order, nor any other order of this Court shall be construed as limiting the relief, remedies, or recovery available to either party in any future proceedings arising from or related to the AlphaX Contract.  For the avoidance of doubt, upon the occurrence of the Confirmation Date, the automatic stay pursuant to Section 362 and any discharge or injunction under Section 524 and 1141 of the Bankruptcy Code, and any other injunction or exculpation under the Plan and this Confirmation Order, shall not apply with respect to any future proceedings between the parties regarding disputes arising from or related to the AlphaX Contract including in particular, but not limited to, the ability of AlphaX to receive full and complete payment for any AlphaX Claims or amounts to which it is determined by either the

58

dispute resolution procedures in accordance with the AlphaX Contract or final order of a court of competent jurisdiction to have a right to receive under the AlphaX Contract.  Any notices to AlphaX shall also be concurrently sent to CAMARA & SIBLEY LLP, Attn. Joseph D. Sibley, 4400 Post Oak Pkwy., Suite 2700, Houston, Texas 77027, e-mail: sibley@camarasibley.com, facsimile: (713) 583-1131.

      (e)    GAMCO Opt-Out.  GAMCO Asset Management, Inc. and its affiliates ("**GAMCO**") have elected to opt out of the Third Party Release contained in the Plan.  As a result, GAMCO is not a Releasing Party or a Released Party under the Plan.

      (f)    AIG and Chubb Insurance Contracts.  Notwithstanding anything to the contrary in this Confirmation Order, the Disclosure Statement, the Plan (including, but not limited to Articles VI(E), VI(G) and VI(H) thereof), the Restructuring Documents, any other document related to any of the foregoing, or any other order of the Bankruptcy Court (including, without limitation, any other provision that purports to be preemptory or supervening or grants an injunction or release, confers Bankruptcy Court jurisdiction or requires a party to opt out of any releases), on and after the Effective Date:

    (i) the Reorganized Debtors shall be deemed to have assumed all of the insurance policies that have been issued at any time and for any line of coverage by Federal Insurance Company, ACE American Insurance Company and any of their U.S. based affiliates and successors (collectively, "**Chubb**") or National Union Fire Insurance Company of Pittsburgh, Pa. and/or each of their affiliates and successors (collectively, the "**AIG Companies**" and together with Chubb, collectively, the "**Insurers**") to or provide coverage to any of the Debtors (collectively and together with any agreements related thereto and each as amended, modified, endorsed or supplemented and including any exhibit, schedule or addenda thereto, collectively, the "**Insurance Contracts**") in their entirety pursuant to Sections 105 and 365 of the Bankruptcy Code,

    (ii) the Reorganized Debtors shall be substituted for the Debtors for purposes of responsibility for all of the obligations of the Debtors under the Insurance Contracts, regardless of whether such obligations arise before or after the Effective Date (collectively, and together with any ongoing monthly payments arising thereunder, the "**Obligations**"), and such Obligations shall be paid in full in

59

the ordinary course of business by the Debtors (or the Reorganized Debtors, as applicable) without the need or requirement for Insurers to file or serve any objection to a notice of proposed Cure Claim Amount (or lack of such notice) or file or serve a request, motion, or application for payment of or proof of any Claim or Administrative Claim (and further and for the avoidance of doubt, any Claim bar date or similar deadline or provision of the Plan governing a Cure Claim Amount or Administrative Claim shall not be applicable to the Insurers),

(iii) nothing alters, modifies, affects, impairs, prejudices or otherwise amends the terms and conditions of the Insurance Contracts or prejudices the legal, equitable or contractual rights, obligations, and defenses of the Insurers, the Debtors (or, after the Effective Date, the Reorganized Debtors), or any other individual or entity, as applicable, under the Insurance Contracts, including, but not limited to, (A) any agreement to arbitrate disputes, (B) any provisions regarding the payment of amounts within any deductible by the Insurers (and the obligation of the Debtors to pay or reimburse the Insurers therefor), (C) any provisions regarding the application, provision, maintenance, use, nature and priority of collateral/security and (D) the duty, if any, that the Insurers have to pay claims covered by the Insurance Contracts; any such rights and obligations shall be determined under the applicable Insurance Contract and applicable non-bankruptcy law as if the Chapter 11 Cases had not occurred,

(iv) except as otherwise provided for in this Section 67(f), nothing shall permit or otherwise effect a sale, assignment or any other transfer of the Insurance Contracts and/or any rights, benefits, claims, rights to payments, or recoveries under or relating thereto without the prior express written consent of the applicable Insurer,

(v) nothing herein shall limit, alter, or impair the scope of Bankruptcy Code Section 365(b)(2) or 365(e)(1),

(vi) nothing releases, impairs, modifies, or discharges the Debtors' (or, after the Effective Date, the Reorganized Debtors') Obligations due and owing to the Insurers arising from or pursuant to the Insurance Contracts, and

(vii) the automatic stay of Bankruptcy Code Section 362(a) and the injunction set forth in Article X(G) of the Plan, if and to the extent applicable, shall be deemed lifted without further order of the Bankruptcy Court, solely to permit: (A) claimants with valid direct action claims against the Insurers under applicable non-bankruptcy law to proceed with their claims; (B) Insurers to administer, handle, defend, settle, and/or pay, in the ordinary course of business and without further order of the Bankruptcy Court, (I) all claims where a claimant asserts a direct claim against the Insurers under applicable law or an order has been entered by the Bankruptcy Court granting a claimant relief from the automatic stay or the injunction set forth in Article X(G) of the Plan to proceed with its claim and (II) all fees, costs, and expenses in relation to the foregoing; (C) the Insurers to draw against any or all of the collateral or security provided by or on behalf of the

60

Debtors (or the Reorganized Debtors, as applicable) at any time and to hold the proceeds thereof as security for the obligations of the Debtors (and the Reorganized Debtors, as applicable) under the applicable Insurance Contracts, in such order as the Insurers may determine; and (D) subject to the terms of the Insurance Contacts and to the extent permitted by applicable non-bankruptcy law, the Insurers to (I) cancel any policies under the Insurance Contracts, and (II) take other actions relating thereto.

(f) Chevron Agreements. Notwithstanding anything to the contrary in the Plan, this Confirmation Order, or any other order entered in these Chapter 11 Cases, the Debtors' agreements with Chevron U.S.A. Inc. and its Affiliates (as defined in the Chevron Agreements, collectively, "**Chevron**") (such agreements, the "**Chevron Agreements**") shall be deemed assumed and affirmed upon the occurrence of the Effective Date. The Debtors and Reorganized Debtors shall continue to have and perform the obligations under the Chevron Agreements in accordance with their terms. Subject to Section 365(e) of the Bankruptcy Code in connection with these Chapter 11 Cases, all rights and claims of the parties under the Chevron Agreements are expressly preserved and nothing in, about or related to these Chapter 11 Cases (including but not limited to the confirmation of the Plan and the entry of the Confirmation Order) shall prevent the parties from maintaining, asserting or pursuing any right, claim or defense against the other party arising under the Chevron Agreements. Notwithstanding anything to the contrary in the Plan, this Confirmation Order, or any other order entered in these Chapter 11 Cases, nothing in, about or related to these Chapter 11 Cases (including, but not limited to, the confirmation of the Plan and entry of the Confirmation Order) releases any entity from any claim, defense or Cause of Action of Chevron.

**Signed:  September 11, 2019.**

**DAVID R. JONES**
**UNITED STATES BANKRUPTCY JUDGE**

61

US-DOCS\110021092

# EXHIBIT A

**Plan**

US-DOCS\110021092

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

```
------------------------------------------------------------------------  x
In re:                                                                    : Chapter 11
                                                                          :
WEATHERFORD INTERNATIONAL PLC, et al.,                                    : Case No. 19-33694 (DRJ)
                                                                          :
              Debtors. ¹                                                  : (Jointly Administered)
                                                                          :
------------------------------------------------------------------------  x
```

---

## SECOND AMENDED JOINT PREPACKAGED PLAN OF REORGANIZATION FOR WEATHERFORD INTERNATIONAL PLC AND ITS AFFILIATE DEBTORS UNDER CHAPTER 11 OF THE BANKRUPTCY CODE

---

**HUNTON ANDREWS KURTH LLP**

Timothy A. ("Tad") Davidson II (No. 240112503)
Ashley L. Harper (No. 24065272)
600 Travis Street, Suite 4200
Houston, Texas 77002
Telephone: (713) 220-4200
Facsimile: (713) 220-4285

**LATHAM & WATKINS LLP**

George A. Davis (admitted *pro hac vice*)
Keith A. Simon (admitted *pro hac vice*)
David A. Hammerman (admitted *pro hac vice*)
Annemarie V. Reilly (admitted *pro hac vice*)
Lisa K. Lansio (admitted *pro hac vice*)
885 Third Avenue
New York, New York 10022
Telephone: (212) 906-1200
Facsimile: (212) 751-4864

Counsel for the Debtors and Debtors-in-Possession

Dated: September 9, 2019
       Houston, Texas

---

¹ The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Weatherford International plc (6750); Weatherford International Ltd. (1344); and Weatherford International, LLC (5019). The location of the Debtors' U.S. corporate headquarters and the Debtors' service address is: 2000 St. James Place, Houston, TX 77056.

US-DOCS\110687040

# TABLE OF CONTENTS

ARTICLE I. RULES OF INTERPRETATION, COMPUTATION OF TIME AND DEFINED TERMS ...................1

    A.    *Rules of Interpretation; Computation of Time* ...................................................................1
    B.    *Defined Terms* ...................................................................................................................2

ARTICLE II. ADMINISTRATIVE, DIP FACILITY, AND PRIORITY TAX CLAIMS ........................20

    A.    *Administrative Claims* ......................................................................................................20
        1.    Professional Fee Claims ........................................................................................20
    B.    *DIP Facility Claims* ..........................................................................................................21
    C.    *Priority Tax Claims* ..........................................................................................................21

ARTICLE III. CLASSIFICATION AND TREATMENT OF CLASSIFIED CLAIMS AND EQUITY
    INTERESTS....................................................................................................................................22

    A.    *Summary* ...........................................................................................................................22
    B.    *Classification and Treatment of Claims and Equity Interests* ........................................23
        1.    Class 1 - Other Priority Claims.............................................................................23
        2.    Class 2 - Other Secured Claims.............................................................................24
        3.    Class 3 - Secured Tax Claims................................................................................24
        4.    Class 4 – Prepetition Revolving Credit Claims .....................................................25
        5.    Class 5 – Prepetition Term Loan Claims ...............................................................26
        6.    Class 6 – Prepetition A&R Claims ........................................................................26
        7.    Class 7 - Prepetition Notes Claims ........................................................................27
        8.    Class 8 – General Unsecured Claims.....................................................................28
        9.    Class 9 – Intercompany Claims .............................................................................28
        10.    Class 10 – Existing Common Stock.......................................................................29
        11.    Class 11 – Intercompany Equity Interests..............................................................29
        12.    Class 12 – Unexercised Equity Interests................................................................29
    C.    *Special Provision Governing Unimpaired Claims* ...........................................................30
    D.    *Elimination of Vacant Classes* ........................................................................................30

ARTICLE IV. ACCEPTANCE OR REJECTION OF THE PLAN ...........................................................30

    A.    *Presumed Acceptance of Plan*..........................................................................................30
    B.    *Presumed Rejection of Plan* .............................................................................................31
    C.    *Voting Classes*..................................................................................................................31
    D.    *Acceptance by Impaired Class of Claims*.........................................................................31
    E.    *Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code;*
        *Cram Down* .......................................................................................................................31
    F.    *Votes Solicited in Good Faith* ..........................................................................................31

ARTICLE V. MEANS FOR IMPLEMENTATION OF THE PLAN .........................................................32

    A.    *Restructuring Transactions*..............................................................................................32
    B.    *Continued Corporate Existence* .......................................................................................33
    C.    *Vesting of Assets in the Reorganized Debtors Free and Clear of Liens and Claims* .....33
    D.    *Exit Facility Loan Documents*..........................................................................................33
    E.    *Exit Senior Unsecured Notes Indenture* ..........................................................................34
    F.    *New Common Stock; Book Entry* .....................................................................................34
    G.    *Listing of New Securities and Transfer Restrictions* ......................................................34
    H.    *New Registration Rights Agreement* ................................................................................35

i

| I. | New Management Incentive Plan | 35 |
|---|---|---|
| J. | New Warrants | 35 |
| K. | Plan Securities and Related Documentation; Exemption from Securities Laws | 35 |
| L. | Release of Liens and Claims | 36 |
| M. | Corporate Governance Documents of the Reorganized Debtors | 36 |
| N. | Directors and Officers of the Reorganized Debtors | 37 |
| O. | Corporate Action | 37 |
| P. | Cancellation of Notes, Certificates and Instruments | 38 |
| Q. | Existing Equity Interests | 39 |
| R. | Sources of Cash for Plan Distributions | 39 |
| S. | Funding and Use of Professional Fee Claim Reserve | 40 |
| T. | Payment of Fees and Expenses of Certain Creditors | 40 |
| U. | Payment of Fees and Expenses of the Prepetition Notes Indenture Trustee | 41 |
| V. | Rights Offering | 41 |

**ARTICLE VI. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES** .......... 41

| A. | Assumption of Executory Contracts and Unexpired Leases | 41 |
|---|---|---|
| B. | Cure of Defaults; Assignment of Executory Contracts and Unexpired Leases | 42 |
| C. | Rejection of Executory Contracts and Unexpired Leases | 43 |
| D. | Claims on Account of the Rejection of Executory Contracts or Unexpired Leases | 44 |
| E. | D&O Liability Insurance Policies | 44 |
| F. | Indemnification Provisions | 44 |
| G. | Employment Plans | 45 |
| H. | Insurance Contracts | 45 |
| I. | Extension of Time to Assume or Reject | 45 |
| J. | Modifications, Amendments, Supplements, Restatements, or Other Agreements | 45 |

**ARTICLE VII. PROVISIONS GOVERNING DISTRIBUTIONS** .......... 46

| A. | Distributions for Claims Allowed as of the Effective Date | 46 |
|---|---|---|
| B. | No Postpetition Interest on Claims | 46 |
| C. | Distributions by the Reorganized Debtors or Other Applicable Distribution Agent | 46 |
| D. | Delivery and Distributions; Undeliverable or Unclaimed Distributions | 48 |
| | 1.   Record Date for Distributions | 48 |
| | 2.   Delivery of Distributions in General | 49 |
| | 3.   Minimum Distributions | 49 |
| | 4.   Undeliverable Distributions | 49 |
| E. | Compliance with Tax Requirements | 50 |
| F. | [Intentionally Omitted] | 51 |
| G. | Means of Cash Payment | 51 |
| H. | Timing and Calculation of Amounts to Be Distributed | 51 |
| I. | Setoffs | 51 |

**ARTICLE VIII. PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED, AND DISPUTED CLAIMS AND EQUITY INTERESTS** .......... 52

| A. | Resolution of Disputed Claims and Equity Interests | 52 |
|---|---|---|
| | 1.   Allowance of Claims and Equity Interests | 52 |
| | 2.   Prosecution of Objections to Claims and Equity Interests | 52 |
| | 3.   Claims Estimation | 53 |
| | 4.   No Filings of Proofs of Claim or Equity Interests | 53 |
| B. | No Distributions Pending Allowance | 53 |
| C. | Distributions on Account of Disputed Claims and Disputed Equity Interests Once They Are Allowed and Additional Distributions on Account of Previously Allowed Claims and Allowed Equity Interests | 54 |

ii

US-DOCS\110687040

D.     *Reserve for Disputed Claims and Disputed Equity Interests* .......................................................54

**ARTICLE IX. CONDITIONS PRECEDENT TO CONFIRMATION AND CONSUMMATION OF THE PLAN** ................................................................................................................................55

     A.     *Conditions Precedent to Confirmation* .........................................................................55
     B.     *Conditions Precedent to Consummation* ........................................................................55
     C.     *Waiver of Conditions* ....................................................................................................57
     D.     *Effect of Non-Occurrence of Conditions to Confirmation or Consummation* ................58

**ARTICLE X. RELEASE, DISCHARGE, INJUNCTION AND RELATED PROVISIONS** ....................................58

     A.     *General* ..........................................................................................................................58
     B.     *Release of Claims and Causes of Action* .......................................................................58
     C.     *Waiver of Statutory Limitations on Releases* ................................................................61
     D.     *Discharge of Claims and Equity Interests* ....................................................................61
     E.     *Exculpation* ...................................................................................................................62
     F.     *Preservation of Causes of Action* .................................................................................63
          1.     Maintenance of Causes of Action .......................................................................63
          2.     Preservation of All Causes of Action Not Expressly Settled or Released ..........63
     G.     *Injunction* ......................................................................................................................64
     H.     *Binding Nature of Plan* .................................................................................................64
     I.     *Protection Against Discriminatory Treatment* ..............................................................65
     J.     *Integral Part of Plan* ....................................................................................................65

**ARTICLE XI. RETENTION OF JURISDICTION** ................................................................................65

**ARTICLE XII. MISCELLANEOUS PROVISIONS** ..............................................................................67

     A.     *Substantial Consummation* ...........................................................................................67
     B.     *Payment of Statutory Fees; Post-Effective Date Fees and Expenses* .............................67
     C.     *Statutory Committee* ......................................................................................................67
     D.     *Conflicts* ........................................................................................................................68
     E.     *Modification of Plan* .....................................................................................................68
     F.     *Revocation or Withdrawal of Plan* ...............................................................................68
     G.     *Successors and Assigns* .................................................................................................69
     H.     *Reservation of Rights* ....................................................................................................69
     I.     *Further Assurances* .......................................................................................................69
     J.     *Severability* ...................................................................................................................69
     K.     *Service of Documents* ....................................................................................................70
     L.     *Exemption from Transfer Taxes Pursuant to Section 1146(a) of the Bankruptcy Code*..................71
     M.     *Governing Law*..............................................................................................................71
     N.     *Tax Reporting and Compliance* .....................................................................................72
     O.     *Schedules*.......................................................................................................................72
     P.     *No Strict Construction* ...................................................................................................72
     Q.     *Entire Agreement* ..........................................................................................................72
     R.     *Closing of Chapter 11 Cases*.........................................................................................72
     S.     *2002 Notice Parties*.......................................................................................................72

US-DOCS\110687040

---

**SECOND AMENDED JOINT PREPACKAGED PLAN OF REORGANIZATION FOR WEATHERFORD INTERNATIONAL PLC AND ITS AFFILIATE DEBTORS UNDER CHAPTER 11 OF THE BANKRUPTCY CODE**

---

Weatherford International plc, Weatherford International Ltd., and Weatherford International, LLC (each a "**Debtor**" and, collectively, the "**Debtors**") jointly propose the following amended prepackaged chapter 11 plan of reorganization (the "**Plan**") for the resolution of the outstanding Claims (as defined below) against, and Equity Interests (as defined below) in, each of the Debtors. Although proposed jointly for administrative purposes, this Plan constitutes a separate Plan for each Debtor for the resolution of outstanding Claims against and Equity Interests in each Debtor pursuant to the Bankruptcy Code (as defined below). The Debtors are the proponents of this Plan within the meaning of section 1129 of the Bankruptcy Code. Reference is made to the Disclosure Statement (as such term is defined herein and distributed contemporaneously herewith) for a discussion of the Debtors' history, business, results of operations, historical financial information, and projections, and for a summary and analysis of this Plan, the treatment provided for herein and certain related matters. There also are other agreements and documents, which will be filed with the Bankruptcy Court (as defined below), that are referenced in this Plan or the Disclosure Statement as Exhibits and Plan Schedules. All such Exhibits and Plan Schedules are incorporated into and are a part of this Plan as if set forth in full herein. Subject to certain restrictions and requirements set forth in 11 U.S.C. § 1127, Fed. R. Bankr. P. 3019 and the terms and conditions set forth in this Plan, the Debtors reserve the right to alter, amend, modify, revoke or withdraw this Plan prior to its substantial consummation.

## ARTICLE I.

## RULES OF INTERPRETATION, COMPUTATION OF TIME AND DEFINED TERMS

*A.   Rules of Interpretation; Computation of Time*

For purposes herein: (a) in the appropriate context, each term, whether stated in the singular or the plural, will include both the singular and the plural, and pronouns stated in the masculine, feminine or neuter gender will include the masculine, feminine and the neuter gender; (b) any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced item will be substantially in that form or substantially on those terms and conditions; (c) except as otherwise provided herein, any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document will mean as it may be amended, modified or supplemented from time to time; (d) any reference to an Entity as a Holder of a Claim or an Equity Interest includes that Entity's successors and assigns; (e) unless otherwise specified, all references herein to "Articles", "Sections", "Exhibits" and "Plan Schedules" are references to Articles, Sections, Exhibits and Plan Schedules hereof or hereto; (f) unless otherwise stated, the words ''herein,'' "hereof," "hereunder" and ''hereto'' refer to this Plan in its entirety rather than to a particular portion of this Plan; (g) subject to the provisions of any contract, certificate of incorporation, by-law, instrument, release, indenture, or other agreement or document entered into in connection with this Plan and except as expressly provided in 0 of this Plan, the rights and obligations arising pursuant to this Plan will be governed by, and construed and enforced in accordance with the applicable federal law, including the Bankruptcy Code and Bankruptcy Rules; (h) except as

1

otherwise specifically provided herein, any provision in this Plan, the Exhibits and Plan Schedules hereto, and the Plan Supplement will be in form and substance consistent in all respects with the Restructuring Support Agreement and subject to the consent and consultation rights of the parties thereto (as specified in the Restructuring Support Agreement) in all respects; (i) captions and headings to Articles and Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation hereof; (j) the rules of construction set forth in section 102 of the Bankruptcy Code will apply to this Plan; (k) references to a specific article, section, or subsection of any statute, rule, or regulation expressly referenced herein will, unless otherwise specified, include any amendments to or successor provisions of such article, section, or subsection; (l) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules will have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be; (m) references to "shareholders," "directors," and/or "officers" will also include "members" and/or "managers," as applicable, as such terms are defined under the applicable state limited liability company laws; and (n) all references to statutes, regulations, orders, rules of courts, and the like will mean as amended from time to time, and as applicable to the Chapter 11 Cases, unless otherwise stated. Except as otherwise specifically provided in this Plan to the contrary, references in this Plan to "the Debtors" or to "the Reorganized Debtors" will mean "the Debtors and the Reorganized Debtors", as applicable, to the extent the context requires.

Unless otherwise specifically stated herein, the provisions of Bankruptcy Rule 9006(a) will apply in computing any period of time prescribed or allowed herein. If the date on which a transaction may occur pursuant to this Plan will occur on a day that is not a Business Day, then such transaction will instead occur on the next succeeding Business Day.

B.     *Defined Terms*

Unless the context otherwise requires, the following terms will have the following meanings when used in capitalized form herein:

"*510(b) Equity Claim*" means any Claim subordinated pursuant to section 510(b) of the Bankruptcy Code.

"*Accrued Professional Compensation*" means, with respect to a particular Professional, an Administrative Claim of such Professional for compensation for services rendered or reimbursement of costs, expenses or other charges incurred on or after the Petition Date and prior to and including the Effective Date.

"*Ad Hoc Noteholder Committee*" means that certain ad hoc committee of Holders of the Prepetition Notes represented by Akin Gump Strauss Hauer & Feld LLP and Evercore Group L.L.C.

"*Ad Hoc Noteholder Committee Fees and Expenses*" means all unpaid reasonable and documented fees and out-of-pocket expenses of the Ad Hoc Noteholder Committee Professionals incurred in connection with the Chapter 11 Cases.

"*Ad Hoc Noteholder Committee Professionals*" means, collectively, (i) Akin Gump Strauss Hauer & Feld LLP, Arthur Cox, one local law firm (and, with the consent of the Debtors, more

2

than one local law firm) in each relevant jurisdiction outside of the United States and England & Wales, as legal counsel to the Ad Hoc Noteholder Committee and (ii) Evercore Group L.L.C, as financial advisor to the Ad Hoc Noteholder Committee.

"*Administrative Claim*" means a Claim for costs and expenses of administration of the Chapter 11 Cases that are Allowed under sections 503(b), 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code other than the DIP Facility Claims, including, without limitation: (a) any actual and necessary costs and expenses incurred on or after the Petition Date and through the Effective Date of preserving the Estates and operating the businesses of the Debtors; (b) Professional Fee Claims and any other compensation for legal, financial, advisory, accounting, and other services and reimbursement of expenses Allowed by the Bankruptcy Court under sections 328, 330, 331 or 503(b) of the Bankruptcy Code to the extent incurred on or after the Petition Date and through the Effective Date; (c) all fees and charges assessed against the Estates under section 1930, chapter 123, of title 28, United States Code; and (d) all requests for compensation or expense reimbursement for making a substantial contribution in the Chapter 11 Cases Allowed pursuant to sections 503(b)(3), (4) and (5) of the Bankruptcy Code.

"*Affiliate*" means an "affiliate", as defined in section 101(2) of the Bankruptcy Code.

"*Affiliate Debtor(s)*" means, individually or collectively, any Debtor or Debtors other than Weatherford Parent.

"*Allowed*" means, with respect to a Claim or Equity Interest:  (a) any Claim or Equity Interest as to which no objection to allowance has been interposed (either in the Bankruptcy Court or in the ordinary course of business) on or before the applicable time period fixed by applicable non-bankruptcy law or such other applicable period of limitation fixed by the Bankruptcy Code, the Bankruptcy Rules or the Bankruptcy Court, or as to which any objection has been determined by a Final Order, either before or after the Effective Date, to the extent such objection is determined in favor of the respective Holder; (b) any Claim or Equity Interest as to which the liability of the Debtors and the amount thereof are determined by a Final Order of a court of competent jurisdiction other than the Bankruptcy Court, either before or after the Effective Date; or (c) any Claim or Equity Interest expressly deemed Allowed by this Plan, including, without limitation, the DIP Facility Claims.

"*Amended/New Corporate Governance Documents*" means, as applicable, the amended and restated or new applicable corporate governance documents of the Reorganized Debtors in substantially the form Filed with the Plan Supplement, which documents will be acceptable to the Required Consenting Noteholders in their sole discretion.

"*Avoidance Actions*" means any and all avoidance, recovery, subordination or similar actions or remedies that may be brought by and on behalf of the Debtors or their Estates under the Bankruptcy Code or applicable non-bankruptcy law, including, without limitation, actions or remedies arising under chapter 5 of the Bankruptcy Code.

"*Backstop Commitment Agreement*" means that certain Backstop Commitment Agreement entered into by the Debtors and the Backstop Parties prior to the Petition Date, in the form attached to this Plan or to the Disclosure Statement or Filed with the Plan Supplement, as amended by the

3

First Amended Backstop Commitment Agreement dated September 9, 2019 and otherwise in form and substance acceptable to the Backstop Parties.

"*Backstop Parties*" means those parties that agree to backstop the Rights Offering for the Exit Senior Unsecured Notes pursuant to the Backstop Commitment Agreement, each in its respective capacity as such.

"*Ballots*" means the ballots accompanying the Disclosure Statement upon which Holders of Impaired Claims and Equity Interests entitled to vote will, among other things, indicate their acceptance or rejection of this Plan in accordance with this Plan and the procedures governing the solicitation process, and which must be actually received by the Voting and Claims Agent on or before the Voting Deadline.

"*Bankruptcy Code*" means title 11 of the United States Code, 11 U.S.C. §§ 101-1532, as amended from time to time and as applicable to the Chapter 11 Cases.

"*Bankruptcy Court*" means the United States Bankruptcy Court for the Southern District of Texas, having jurisdiction over the Chapter 11 Cases and, to the extent of the withdrawal of any reference under section 157 of title 28 of the United States Code and/or the Order of the United States District Court for the Southern District of Texas pursuant to section 157(a) of the Judicial Code, the United States District Court for the Southern District of Texas.

"*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure and the Local Rules of the Bankruptcy Court, in each case as amended from time to time and as applicable to the Chapter 11 Cases.

"*Business Day*" means any day, other than a Saturday, Sunday or "legal holiday" (as defined in Bankruptcy Rule 9006(a)).

"*Cash*" means the legal tender of the United States of America or the equivalent thereof.

"*Causes of Action*" means any claims, causes of action (including Avoidance Actions), demands, actions, suits, obligations, liabilities, cross-claims, counterclaims, offsets, or setoffs of any kind or character whatsoever, in each case whether known or unknown, contingent or non-contingent, matured or unmatured, suspected or unsuspected, foreseen or unforeseen, direct or indirect, choate or inchoate, existing or hereafter arising, under statute, in contract, in tort, in law, or in equity, or pursuant to any other theory of law, federal or state, whether asserted or assertable directly or derivatively in law or equity or otherwise by way of claim, counterclaim, cross-claim, third party action, action for indemnity or contribution or otherwise, based in whole or in part upon any act or omission or other event occurring prior to the Petition Date or during the course of the Chapter 11 Cases, including through the Effective Date.

"*Chapter 11 Case(s)*" means (a) when used with reference to a particular Debtor, the case under chapter 11 of the Bankruptcy Code that will be commenced by such Debtor in the Bankruptcy Court, and (b) when used with reference to all Debtors, the cases under chapter 11 of the Bankruptcy Code that will be commenced by the Debtors in the Bankruptcy Court.

4

"*Claim*" means any "claim" (as defined in section 101(5) of the Bankruptcy Code) against any Debtor.

"*Claims Register*" means the official register of Claims and Equity Interests maintained by the Voting and Claims Agent.

"*Class(es)*" means a category of Holders of Claims or Equity Interests as set forth in Article III hereof pursuant to section 1122(a) of the Bankruptcy Code.

"*Collateral*" means any property or interest in property of the Debtors' Estates that is subject to a valid and enforceable Lien to secure a Claim.

"*Committee*" means the official committee of unsecured creditors appointed in the Chapter 11 Cases pursuant to section 1102 of the Bankruptcy Code by the United States Trustee, pursuant to the *Notice of Appointment of Committee of Unsecured Creditors* [Docket No. 182] on July 17, 2019, and as such may be reconstituted from time to time.

"*Confirmation*" means the occurrence of the Confirmation Date, subject to all conditions specified in Article IX of this Plan having been satisfied or waived pursuant to Article IX of this Plan.

"*Confirmation Date*" means the date on which the clerk of the Bankruptcy Court enters the Confirmation Order on the docket of the Bankruptcy Court in the Chapter 11 Cases.

"*Confirmation Hearing*" means the combined hearing held by the Bankruptcy Court pursuant to sections 105(d)(2)(B)(vi) and 1128 of the Bankruptcy Code to consider (i) approval of the Disclosure Statement under sections 1125 and 1126(b) of the Bankruptcy Code and (ii) confirmation of this Plan, as such hearing may be adjourned or continued from time to time.

"*Confirmation Order*" means the order of the Bankruptcy Court (i) approving the Disclosure Statement and (ii) confirming this Plan pursuant to sections 1125, 1126(b) and 1129 of the Bankruptcy Code, which shall, to the extent required by the DIP Credit Agreement, be in form and substance satisfactory or reasonably satisfactory, as applicable, to the DIP Agent and the DIP Required Lenders.

"*Consenting Noteholders*" means those Holders of the Prepetition Notes that are party to the Restructuring Support Agreement as "Consenting Noteholders" thereunder.

"*Consummation*" means the occurrence of the Effective Date.

"*D&O Liability Insurance Policies*" means all insurance policies (including, without limitation, the D&O Tail Policy, any general liability policies, any errors and omissions policies, and, in each case, any agreements, documents, or instruments related thereto) issued at any time and providing coverage for liability of any Debtor's directors, managers, and officers.

"*D&O Tail Policy*" means that certain directors' & officers' liability insurance policy purchased by the Debtors on or about June, 2019.

US-DOCS\110687040

"*Debtor Release*" has the meaning set forth in Article X.B hereof.

"*Debtor Releasing Parties*" has the meaning set forth in Article X.B hereof.

"*DIP Agent*" means Citibank, N.A., or its duly appointed successor, in its capacity as administrative agent and collateral agent under the DIP Credit Agreement.

"*DIP Credit Agreement*" means that certain Senior Secured Superpriority Debtor-in-Possession Credit Agreement, dated as of June, 2019, by and among the Debtors, the DIP Agent, and the DIP Lenders, as amended, amended and restated, supplemented or otherwise modified from time to time in accordance with the terms thereof prior to the Effective Date.

"*DIP Contingent Obligations*" means all contingent obligations not due and payable under the DIP Financing Documents on the Effective Date, including any and all indemnification and expense reimbursement obligations of the Debtors that are contingent as of the Effective Date.

"*DIP Facility*" means the debtor-in-possession financing facility provided by the DIP Lenders consisting of a (i) up to $750,000,000 debtor-in-possession first lien revolving credit facility provided by certain lenders and (ii) a $1,000,000,000 debtor-in-possession term loan facility provided by certain of the Consenting Noteholders and fully backstopped by certain of the Consenting Noteholders.

"*DIP Facility Claims*" means any and all Claims arising from, under, or in connection with the DIP Credit Agreement or any other DIP Financing Documents, including Claims for all principal amounts outstanding, interest, fees, expenses, costs, and other charges and all other "Obligations," "Swap Obligations," and "Banking Services Obligations" as defined in the DIP Credit Agreement.

"*DIP Facility Liens*" means the Liens securing the payment of the DIP Facility Claims.

"*DIP Final Order*" means the "Final Order" as defined in the DIP Credit Agreement.

"*DIP Financing Documents*" means the "Loan Documents" and the "Swap Agreements" as defined in the DIP Credit Agreement, as well as any documents evidencing "Banking Services Obligations" (as defined in the DIP Credit Agreement), and the DIP Orders, in each case as amended, amended and restated, supplemented or otherwise modified from time to time in accordance with the terms thereof prior to the Effective Date.

"*DIP Lenders*" means the banks, financial, institutions, and other lenders party to the DIP Facility from time to time, and each arranger, bookrunner, syndication agent, manager, and documentation agent party to the DIP Credit Agreement from time to time.

"*DIP Orders*" means, collectively, the "Interim Order" as defined in the DIP Credit Agreement and the DIP Final Order.

"*DIP Required Lenders*" shall mean the "Required Lenders" as defined in the DIP Credit Agreement.

US-DOCS\110687040

"*Disclosure Statement*" means that certain *Disclosure Statement for Joint Prepackaged Plan Of Reorganization For Weatherford International plc And Its Affiliate Debtors Under Chapter 11 Of The Bankruptcy Code*, dated as of June 28, 2019 (as amended, supplemented, or modified from time to time).

"*Disputed*" means any Claim or Equity Interest, or any portion thereof, that has not been Allowed, but has not been disallowed pursuant to this Plan or a Final Order of the Bankruptcy Court.

"*Distribution Agent*" means the Reorganized Debtors or any party designated by the Reorganized Debtors to serve as distribution agent under this Plan. For purposes of distributions under this Plan to the Holders of Allowed DIP Facility Claims, Allowed Prepetition Debt Claims and Allowed Prepetition Notes Claims, the DIP Agent, the Prepetition Agents, and the Prepetition Notes Indenture Trustee, respectively, will be and will act as the Distribution Agent.

"*Distribution Record Date*" means the date for determining which Holders of Claims and Equity Interests are eligible to receive distributions under this Plan, which date will be the Effective Date, subject to Article VII.D of this Plan. The Distribution Record Date shall not apply to the Prepetition Notes Claims or any securities of the Debtors deposited with DTC, the holders of which shall receive a distribution in accordance with Article VII of this Plan and, as applicable, the customary procedures of DTC.

"*DTC*" means the Depository Trust Company.

"*Effective Date*" means the first Business Day on which the conditions specified in Article IX of this Plan, have been satisfied or waived in accordance with the terms of Article IX.

"*Election Amount*" has the meaning set forth in Article V.V of this Plan.

"*Employment Plans*" has the meaning set forth in 0 of this Plan.

"*Entity*" means an "entity" as defined in section 101(15) of the Bankruptcy Code.

"*Equity Interest*" means (a) any Equity Security or other ownership interest in any Debtor, including, without limitation, all issued, unissued, authorized or outstanding units, shares of stock and other ownership interests, together with (i) any options, warrants or contractual rights to purchase or acquire any such Equity Securities at any time with respect to any Debtor, and all rights arising with respect thereto and (ii) the rights of any Person or Entity to purchase or demand the issuance of any of the foregoing and will include: (1) conversion, exchange, voting, participation, and dividend rights; (2) liquidation preferences; (3) options, warrants, and call and put rights; (4) share-appreciation rights; and (5) all Unexercised Equity Interests; and (b) any 510(b) Equity Claim, in each case, as in existence immediately prior to the Effective Date.

"*Equity Security*" means an "equity security" as defined in section 101(16) of the Bankruptcy Code.

"*Estate(s)*" means, individually, the estate of each of the Debtors and, collectively, the estates of all of the Debtors created under section 541 of the Bankruptcy Code.

7

"*Exchange Act*" means the Securities Exchange Act of 1934, 15 U.S.C. §§ 78a *et seq.*, as now in effect or hereafter amended, and any rules and regulations promulgated thereunder.

"*Exculpated Parties*" means, collectively: (a) the Debtors; (b) the Reorganized Debtors; (c) the Prepetition Agents; (d) the Prepetition Lenders; (e) the Exit Senior Unsecured Notes Indenture Trustee; (f) the DIP Agent; (g) the DIP Lenders; (h) the Prepetition Notes Indenture Trustee; (i) the Ad Hoc Noteholder Committee and the members thereof in their capacities as such; (j) the Consenting Noteholders; (k) the Backstop Parties; (l) the Distribution Agents; (m) the Exit Facility Lenders; (n) the Exit Facility Agent; (o) the Provisional Liquidator; (p) the Committee and its current and former members in their capacities as such; and (q) with respect to each of the foregoing Entities in clauses (a) through (p), each such Entity's Related Persons, in each case solely in their capacity as such.

"*Exculpation*" means the exculpation provision set forth in Article X.E hereof.

"*Executory Contract*" means a contract to which any Debtor is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

"*Exhibit*" means an exhibit annexed to either this Plan or as an appendix to the Disclosure Statement (as such exhibits are amended, modified or otherwise supplemented from time to time).

"*Existing Common Stock*" means all ordinary shares of $0.0001 each in share capital of Weatherford Parent issued and outstanding immediately prior to the Effective Date.

"*Exit Facility*" means the secured revolving credit facility with availability of at least $600,000,000, including a letter of credit sublimit of $500,000,000, as contemplated under the Exit Facility Credit Agreement.

"*Exit Facility Agent*" means the administrative agent and collateral agent under the Exit Facility Credit Agreement, solely in its capacity as such.

"*Exit Facility Credit Agreement*" means the credit agreement for the Exit Facility, the terms and conditions of which are acceptable to the Debtors and the Consenting Noteholders in the manner set forth in the Restructuring Support Agreement.

"*Exit Facility Lenders*" means each of the lenders under the Exit Facility Credit Agreement, solely in their respective capacities as such.

"*Exit Facility Loan Documents*" means the Exit Facility Credit Agreement, and other documents (including UCC financing statements), contracts, and agreements entered into with respect to, or in connection with, the Exit Facility Credit Agreement.

"*Exit Senior Unsecured Notes*" means, the senior unsecured notes to be issued by Reorganized Weatherford Delaware and/or Reorganized Weatherford Bermuda, or both, on the Effective Date in the amount of up to $2,100,000,000, which Exit Senior Unsecured Notes shall consist of the Rights Offering Notes and the Takeback Notes and shall have the terms set forth in the Exit Senior Unsecured Notes Indenture.

8

"*Exit Senior Unsecured Notes Documents*" means the Exit Senior Unsecured Notes, the Exit Senior Unsecured Notes Indenture, and other documents, contracts, and agreements entered into with respect, or in connection with, the Exit Senior Unsecured Notes Indenture.

"*Exit Senior Unsecured Notes Indenture*" means, the indenture or indentures governing the Exit Senior Unsecured Notes, in substantially the form Filed with the Bankruptcy Court, which indenture or indentures will contain terms and conditions consistent with the Restructuring Support Agreement and otherwise acceptable to the initial holders of the Exit Senior Unsecured Notes and the Debtors, and otherwise reasonably acceptable to the Required Consenting Noteholders.

"*Exit Senior Unsecured Notes Indenture Trustee*" means the indenture trustee under the Exit Senior Unsecured Notes Indenture.

"*File*" or "*Filed*" or "Filing" means file, filed or filing with the Bankruptcy Court or its authorized designee in the Chapter 11 Cases.

"*Final Order*" means an order or judgment of the Bankruptcy Court, or court of competent jurisdiction with respect to the subject matter, as entered on the docket in any Chapter 11 Case or the docket of any court of competent jurisdiction, and as to which the time to appeal, or seek certiorari or move for a new trial, reargument, or rehearing has expired and no appeal or petition for certiorari or other proceedings for a new trial, reargument, or rehearing has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been or may be timely Filed has been withdrawn or resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought or the new trial, reargument, or rehearing will have been denied, resulted in no stay pending appeal of such order, or has otherwise been dismissed with prejudice; *provided*, *however*, that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be filed with respect to such order will not preclude such order from being a Final Order.

"*General Unsecured Claim*" means any Claim that is not a/an: Administrative Claim; DIP Facility Claim; Professional Fee Claim; Priority Tax Claim; Secured Tax Claim; Other Priority Claim; Other Secured Claim; Intercompany Claim; Prepetition Debt Claim; or 510(b) Equity Claim.

"*Governmental Unit*" means a "governmental unit" as defined in section 101(27) of the Bankruptcy Code.

"*Holder*" means either a Prepetition Noteholder or an Entity holding a Claim or Equity Interest, as the context requires.

"*Impaired*" means, when used in reference to a Claim or Equity Interest, a Claim or Equity Interest that is "impaired" within the meaning of section 1124 of the Bankruptcy Code.

"*Indemnification Provisions*" means, collectively, each of the provisions in existence immediately prior to the Effective Date (whether in bylaws, certificates of formation or incorporation, board resolutions, employment contracts or otherwise) whereby any Debtor agrees to indemnify, reimburse, provide contribution or advance fees and expenses to or for the benefit of, defend, exculpate, or limit the liability of, any Indemnified Party.

"*Indemnified Parties*" means each of the Debtors' and their respective subsidiaries' respective current and former directors, officers, and managers in their respective capacities as such.

"*Initial Distribution Date*" means the date that is as soon as practicable after the Effective Date, but no later than five (5) Business Days after the Effective Date, when, subject to the "Treatment" sections in Article III hereof, distributions under this Plan will be made to Holders of Allowed Claims and Allowed Equity Interests; provided that any applicable distributions under this Plan on account of the DIP Facility Claims and the Prepetition Debt Claims will be made to the applicable Distribution Agent on the Effective Date, and each such Distribution Agent will make, transmit or cause to be transmitted its respective distributions as soon as practicable thereafter pursuant to the terms of this Plan.

"*Insurance Contract*" means all insurance policies and all surety bonds and related agreements of indemnity that have been issued at any time to, or provide coverage to, any of the Debtors and all agreements, documents, or instruments relating thereto.  For the avoidance of doubt, each of the D&O Liability Insurance Policies will constitute an Insurance Contract.

"*Intercompany Claim*" means any Claim against any of the Debtors held by another Debtor, other than an Administrative Claim.

"*Intercompany Equity Interest*" means direct and indirect Equity Interests in a Debtor other than Weatherford Parent held by another Debtor or an affiliate of a Debtor.

"*Irish Examinership Proceedings*" means the examinership process under the Companies Act 2014 of Ireland (as amended) with respect to, and commenced by, Weatherford Parent.

"*Irish Scheme of Arrangement*" means the scheme of arrangement with respect to Weatherford Parent submitted by the examiner of Weatherford Parent in the Irish Examinership Proceedings which is in form and substance acceptable to the Required Consenting Noteholders, and, to the extent required by the DIP Credit Agreement, the DIP Agent and the DIP Required Lenders, and on terms consistent with this Plan in all material respects.

"*Lien*" means a "lien" as defined in section 101(37) of the Bankruptcy Code, and, with respect to any property or asset, includes, without limitation, any mortgage, lien, pledge, charge, security interest or other encumbrance of any kind, or any other type of preferential arrangement that has the practical effect of creating a security interest, in respect of such property or asset.

"*Litigation Claims*" means the claims, rights of action, suits or proceedings, whether in law or in equity, whether known or unknown, that any Debtor or any Estate may hold against any Person or Entity, including, without limitation, the Causes of Action of the Debtors or their Estates, in each case solely to the extent of the Debtors' or their Estates' interest therein.  A non-exclusive list of the Litigation Claims held by the Debtors as of the Effective Date will be Filed with the Plan Supplement, which will be deemed to include any derivative actions filed against any Debtor as of the Effective Date.

"*Local Rules*" means the Bankruptcy Local Rules for the Southern District of Texas.

"*New Board*" means the initial board of directors of Reorganized Parent to be put in place on and as of the Effective Date in accordance with the Restructuring Support Agreement.

"*New Common Stock*" means the ordinary shares in the share capital of Reorganized Parent to be issued pursuant to this Plan and the Irish Scheme of Arrangement (and subject to the Restructuring Transactions) and the Amended/New Corporate Governance Documents.

"*New Management Incentive Plan*" means a post-Effective Date equity incentive plan providing for the issuance from time to time, as approved by the New Board, of equity and equity-based awards with respect to New Common Stock in the aggregate and on a fully-diluted basis, of up to five percent (5%) of the New Common Stock issued or to be issued as of the Effective Date.

"*New Registration Rights Agreement*" means the registration rights agreement with respect to the New Common Stock, in substantially the form Filed with the Plan Supplement, which agreement will contain terms and conditions as are acceptable to the Required Consenting Noteholders in their sole discretion.

"*New Warrants*" means the warrants contemplated under the New Warrant Agreement.

"*New Warrant Agreement*" means the documents governing the New Warrants, Filed with the Plan Supplement, which will be consistent in all material respects with the New Warrant Term Sheet and reasonably acceptable to the Required Consenting Noteholders.

"*New Warrant Term Sheet*" means the term sheet filed with the Plan Supplement.

"*Non-Debtor Releasing Parties*" means, collectively: (a) the Prepetition Agents; (b) the Prepetition Lenders; (c) the Exit Senior Unsecured Notes Indenture Trustee; (d) the DIP Agent; (e) the DIP Lenders; (f) the Prepetition Notes Indenture Trustee; (g) the Ad Hoc Noteholder Committee and the members thereof in their capacities as such; (h) the Consenting Noteholders; (i) the Backstop Parties; (j) the Distribution Agents; (k) the Exit Facility Agent; (l) the Exit Facility Lenders; (m) the Provisional Liquidator; (n) the Committee and its current and former members in their capacities as such; (o) the Holders of Existing Common Stock and Unexercised Equity Interests that do not affirmatively opt out of the Release; and (p) the Prepetition Noteholders that are not party to the Restructuring Support Agreement and do not affirmatively opt out of the Release.

"*Notice*" has the meaning set forth in Article XII.K of this Plan.

"*NOL Order*" means the *Final Order Establishing Notification Procedures and Approving Restrictions on Certain Transfers of Stock of, and Claims Against, the Debtors* issued by the Bankruptcy Court and appearing on the docket at number 172.

"*Other Priority Claim*" means any Claim accorded priority in right of payment under section 507(a) of the Bankruptcy Code, other than a Priority Tax Claim or an Administrative Claim or a DIP Facility Claim.

"*Other Secured Claim*" means any Secured Claim other than an Administrative Claim, Secured Tax Claim, DIP Facility Claim, or Prepetition A&R Credit Agreement Claim.

11

"*Overallotment Right*" has the meaning set forth in **Error! Reference source not found.** of this Plan.

"*Participating Holder*" has the meaning set forth in **Error! Reference source not found.** of this Plan.

"*Parent Subsidiary*" means each direct and indirect, wholly-owned subsidiary of Weatherford Parent.

"*Person*" means a "person" as defined in section 101(41) of the Bankruptcy Code and also includes any natural person, corporation, general or limited partnership, limited liability company, firm, trust, association, government, governmental agency or other Entity, whether acting in an individual, fiduciary or other capacity.

"*Petition Date*" means the date on which the Debtors commence the Chapter 11 Cases.

"*Plan Objection Deadline*" means the date and time by which objections to Confirmation and Consummation of this Plan must be Filed with the Bankruptcy Court.

"*Plan Schedule*" means a schedule annexed to this Plan or an appendix to the Disclosure Statement (as amended, modified or otherwise supplemented from time to time), which shall, to the extent required by the DIP Credit Agreement, be in form and substance satisfactory or reasonably satisfactory, as applicable, to the DIP Agent and the DIP Required Lenders.

"*Plan Securities*" has the meaning set forth in <u>Article V.K</u> of this Plan.

"*Plan Securities and Documents*" has the meaning set forth in <u>Article V.K</u> of this Plan.

"*Plan Supplement*" means, collectively, the compilation of documents and forms of documents, and all exhibits, attachments, schedules, agreements, documents and instruments referred to therein, ancillary or otherwise, including, without limitation, the Exhibits and Plan Schedules, all of which shall, to the extent required by the DIP Credit Agreement, be in form and substance satisfactory or reasonably satisfactory, as applicable, to the DIP Agent and the DIP Required Lenders and are incorporated by reference into, and are an integral part of, this Plan, as all of the same may be amended, supplemented, or modified from time to time, in a manner in form and substance consistent in all respects with the Restructuring Support Agreement and to the extent required by the DIP Credit Agreement, in form and substance satisfactory or reasonably satisfactory, as applicable, to the DIP Agent and the DIP Required Lenders.  The Exhibits and Plan Schedules (or substantially final forms thereof) will be Filed with the Bankruptcy Court at least seven (7) days prior to the Confirmation Hearing.

"*Prepetition Agents*" means, collectively, the Prepetition A&R Credit Agreement Agent, the Prepetition Revolving Credit Agreement Agent, the Prepetition Revolving Credit Agreement Collateral Agent, and the Prepetition Term Loan Administrative Agent.

"*Prepetition A&R Claims*" means any and all Claims arising from, under or in connection with the Prepetition A&R Credit Agreement (including, without limitation, any and all

12

"Indebtedness" as defined therein) or any other Prepetition Loan Document relating to the Prepetition A&R Credit Agreement.

"*Prepetition A&R Credit Agreement*" means that certain Amended and Restated Credit Agreement, dated as of May 9, 2016, by and among Weatherford International Ltd., Weatherford International plc, WOFS Assurance Limited, the Prepetition A&R Credit Agreement Agent, the Prepetition A&R Credit Agreement Lenders, and the Prepetition A&R Credit Agreement Issuing Banks party thereto, as amended, supplemented, or modified from time to time prior to the Petition Date.

"*Prepetition A&R Credit Agreement Agent*" means JPMorgan Chase Bank, N.A., in its capacity as administrative agent under the Prepetition A&R Credit Agreement.

"*Prepetition A&R Credit Agreement Issuing Banks*" means the issuing banks party to the Prepetition A&R Credit Agreement from time to time.

"*Prepetition A&R Credit Agreement Lenders*" means the lenders (including the swingline lender) party to the Prepetition A&R Credit Agreement from time to time and the Prepetition A&R Credit Agreement Issuing Banks.

"*Prepetition Debt Claims*" means, collectively, the Prepetition A&R Claims, the Prepetition Revolving Credit Claims, the Prepetition Term Loan Claims, and the Prepetition Notes Claims.

"*Prepetition Debt Documents*" means, collectively, the Prepetition A&R Credit Agreement, the Prepetition Revolving Credit Agreement, the Prepetition Term Loan Agreement, the Prepetition Loan Documents, the Prepetition Notes, and the Prepetition Notes Indentures.

"*Prepetition Lenders*" means, collectively, the Prepetition A&R Credit Agreement Lenders, the Prepetition Revolving Credit Agreement Lenders, and the Prepetition Term Loan Agreement Lenders.

"*Prepetition Loan Documents*" means, as applicable, the "Loan Documents" as defined in the Prepetition A&R Credit Agreement, the Prepetition Revolving Credit Agreement, and the Prepetition Term Loan Agreement, in each case as amended, supplemented, or modified from time to time prior to the Petition Date.

"*Prepetition Noteholders*" means, collectively, the record holders of and owners of beneficial interests in the Prepetition Notes.

"*Prepetition Notes*" means, collectively, (i) those certain 5.125% senior unsecured notes due 2020, issued by Weatherford International Ltd. pursuant to the applicable Prepetition Notes Indenture, in an aggregate principal amount outstanding of $365,107,000 (the "*5.125% Notes*"); (ii) those certain 7.750% senior unsecured notes due 2021, issued by Weatherford International Ltd. pursuant to the applicable Prepetition Notes Indenture, in an aggregate principal amount outstanding of $750,000,000 (the "*7.750% Notes*"); (iii) those certain 5.875% exchangeable senior unsecured notes due 2021, issued by Weatherford International Ltd. pursuant to the applicable Prepetition Notes Indenture, in an aggregate principal amount outstanding of $1,265,000,000 (the

13

"*5.875% Notes*"); (iv) those certain 4.500% senior unsecured notes due 2022, issued by Weatherford International Ltd. pursuant to the applicable Prepetition Notes Indenture, in an aggregate principal amount outstanding of $646,286,000 (the "*4.500% Notes*"); (v) those certain 8.250% senior unsecured notes due 2023, issued by Weatherford International Ltd. pursuant to the applicable Prepetition Notes Indenture, in an aggregate principal amount outstanding of $750,000,000 (the "*8.250% Notes*"); (vi) those certain 9.875% senior unsecured notes due 2024, issued by Weatherford International Ltd. pursuant to the applicable Prepetition Notes Indenture, in an aggregate principal amount outstanding of $790,000,000 (the "*9.875% 2024 Notes*"); (vii) those certain 6.500% senior unsecured notes due 2036, issued by Weatherford International Ltd. pursuant to the applicable Prepetition Notes Indenture, in an aggregate principal amount outstanding of $453,045,000 (the "*6.500% Notes*"); (viii) those certain 7.000% senior unsecured notes due 2038, issued by Weatherford International Ltd. pursuant to the applicable Prepetition Notes Indenture, in an aggregate principal amount outstanding of $461,300,000 (the "*7.000% Notes*"); (ix) those certain 9.875% senior unsecured notes due 2039, issued by Weatherford International Ltd. pursuant to the applicable Prepetition Notes Indenture, in an aggregate principal amount outstanding of $250,000,000 (the "*9.875% 2039 Notes*"); (x) those certain 6.750% senior unsecured notes due 2040, issued by Weatherford International Ltd. pursuant to the applicable Prepetition Notes Indenture, in an aggregate principal amount outstanding of $462,601,000 (the "*6.750% Notes*"); (xi) those certain 5.950% senior unsecured notes due 2042, issued by Weatherford International Ltd. pursuant to the applicable Prepetition Notes Indenture, in an aggregate principal amount outstanding of $374,961,000 (the "*5.950% Notes*"); (xii) those certain 9.875% senior unsecured notes due 2025, issued by Weatherford International LLC pursuant to the applicable Prepetition Notes Indenture, in an aggregate principal amount outstanding of $600,000,000 (the "*9.875% 2025 Notes*"); and (xiii) those certain 6.800% senior unsecured notes due 2037, issued by Weatherford International LLC pursuant to the applicable Prepetition Notes Indenture, in an aggregate principal amount outstanding of $258,767,000 (the "*6.800% Notes*").

"*Prepetition Notes Claims*" means any and all Claims arising from, under, or in connection with the Prepetition Notes, the Prepetition Notes Indentures or any document or agreement related to the Prepetition Notes or the Prepetition Notes Indentures.

"*Prepetition Notes Indentures*" means, collectively, (i) that certain Indenture, dated as of October 1, 2003, by and between Weatherford International Ltd., as issuer, the Prepetition Notes Indenture Trustee, as indenture trustee, and certain of the Debtors, as guarantors, governing the 5.125% Notes, the 7.750% Notes, the 5.875% Notes, the 4.500% Notes, the 8.250% Notes, the 9.875% 2024 Notes, the 6.500% Notes, the 7.00% Notes, the 9.875% 2039 Notes, the 6.750% Notes, and the 5.950% Notes, and (ii) that certain Indenture, dated as of June 18, 2007, by and between Weatherford International LLC, as issuer, the Prepetition Notes Indenture Trustee, as indenture trustee, and certain of the Debtors, as guarantors, governing the 9.875% 2025 Notes and the 6.800% Notes, and with respect to each such Indenture, as amended, restated, modified, supplemented, or replaced from time to time prior to the Petition Date.

"*Prepetition Notes Indenture Trustee*" means Deutsche Bank Trust Company Americas, solely in its capacity as indenture trustee and in each other capacity for which it serves under or in connection with the Prepetition Notes Indentures; provided that if the context requires only certain of the foregoing capacities, then only in such capacity(ies).

US-DOCS\110687040

"*Prepetition Notes Indenture Trustee Charging Lien*" means any Lien or other priority in payment in favor of the Prepetition Notes Indenture Trustee against distributions to be made to Holders of Allowed Prepetition Notes Claims for payment of any Prepetition Notes Indenture Trustee Fees and Expenses, which Lien or other priority in payment arose prior to the Effective Date and pursuant to the Prepetition Notes Indentures.

"*Prepetition Notes Indenture Trustee Fees and Expenses*" means the reasonable and documented compensation, fees, expenses, disbursements and indemnity claims incurred by the Prepetition Notes Indenture Trustee, including without limitation, attorneys' and agents' fees, expenses and disbursements, incurred by the Prepetition Notes Indenture Trustee, whether prior to or after the Petition Date and whether prior to or after consummation of this Plan, in each case to the extent payable or reimbursable under the Prepetition Notes Indentures.  For the avoidance of doubt, the Prepetition Notes Indenture Trustee Fees and Expenses shall also include those fees and expenses incurred in connection with any foreign insolvency proceeding.

"*Prepetition Revolving Credit Agreement*" means that certain 364-Day Revolving Credit Agreement, dated as of August 16, 2018, by and among Weatherford International Ltd., the other borrowers party thereto, Weatherford International plc, the Prepetition Revolving Credit Agreement Agent, the Prepetition Revolving Credit Agreement Lenders, and the Prepetition Revolving Credit Agreement Collateral Agent, as amended, supplemented, or modified from time to time prior to the Petition Date.

"*Prepetition Revolving Credit Agreement Agent*" means JPMorgan Chase Bank, N.A., in its capacity as administrative agent under the Prepetition Revolving Credit Agreement.

"*Prepetition Revolving Credit Agreement Collateral Agent*" means Morgan Stanley Senior Funding, Inc., in its capacity as collateral agent under the Prepetition Revolving Credit Agreement.

"*Prepetition Revolving Credit Claims*" means any and all Claims arising from, under or in connection with the Prepetition Revolving Credit Agreement (including, without limitation, any and all "Indebtedness" as defined therein) or any other Prepetition Loan Document relating to the Prepetition Revolving Credit Agreement.

"*Prepetition Revolving Credit Agreement Lenders*" means the lenders (including the swingline lender) party to the Prepetition Revolving Credit Agreement from time to time.

"*Prepetition Revolving Credit Agreement Liens*" means the Liens securing the payment of the Prepetition Revolving Credit Claims.

"*Prepetition Term Loan Agreement*" means that certain Term Loan Agreement, dated as of May 4, 2016, by and among Weatherford International Ltd., Weatherford International plc, the Prepetition Term Loan Agent and the Prepetition Term Loan Lenders, as amended, supplemented, or modified from time to time prior to the Petition Date.

"*Prepetition Term Loan Administrative Agent*" means JPMorgan Chase Bank, N.A., in its capacity as administrative agent under the Prepetition Term Loan Agreement.

US-DOCS\110687040

"*Prepetition Term Loan Claims*" means any and all Claims arising from, under or in connection with the Prepetition Term Loan Agreement (including, without limitation, any and all "Indebtedness" as defined therein) or any other Prepetition Loan Document relating to the Prepetition Term Loan Agreement.

"*Prepetition Term Loan Agreement Lenders*" means the lenders party to the Prepetition Term Loan Agreement from time to time.

"*Prepetition Term Loan Agreement Liens*" means the Liens securing the payment of the Prepetition Term Loan Claims.

"*Priority Tax Claim*" means any Claim of a Governmental Unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.

"*Pro Rata*" means the proportion that an Allowed Claim or Allowed Equity Interest in a particular class bears to the aggregate amount of Allowed Claims or Allowed Equity Interests in that Class.

"*Professional*" means any Person or Entity retained by the Debtors or the Committee in the Chapter 11 Cases pursuant to section 327, 328, 363, and/or 1103 of the Bankruptcy Code (other than an ordinary course professional).

"*Professional Fee Claim*" means a Claim for Accrued Professional Compensation under sections 327, 328, 329, 330, 331, or 503 of the Bankruptcy Code.

"*Professional Fee Claim Reserve*" means the reserve established and maintained by the Reorganized Debtors from Cash on hand existing immediately prior to the Effective Date to pay in full in Cash the Professional Fee Claims incurred on or prior to the Effective Date, as and when such claims become Allowed.

"*Provisional Liquidator*" means John C. McKenna, as provisional liquidator of Weatherford Bermuda, or any replacement or additional provisional liquidator appointed by the Supreme Court of Bermuda in proceedings 2019: No.270.

"*Related Persons*" means, with respect to any Person, such Person's predecessors, successors, assigns and present and former Affiliates (whether by operation of law or otherwise) and subsidiaries, and each of their respective current and former officers, directors, principals, employees, shareholders, members (including *ex officio* members and managing members), managers, managed accounts or funds, management companies, fund advisors, advisory or subcommittee board members, partners, agents, financial advisors, attorneys, accountants, investment bankers, investment advisors, consultants, representatives, and other professionals, in each case acting in such capacity at any time on or after the date of the Restructuring Support Agreement, and any Person claiming by or through any of them, including such Related Persons' respective heirs, executors, estates, servants, and nominees; *provided*, *however*, that no insurer of any Debtor will constitute a Related Person.

"*Release*" means the release given by the Releasing Parties to the Released Parties as set forth in Article X.B hereof.

16

"*Released Parties*" means, collectively: (a) the Debtors; (b) the Reorganized Debtors; (c) the Prepetition Agents; (d) the Prepetition Lenders; (e) the Exit Senior Unsecured Notes Indenture Trustee; (f) the DIP Agent; (g) the DIP Lenders; (h) the Prepetition Notes Indenture Trustee; (i) the Ad Hoc Noteholder Committee and the members thereof in their capacities as such; (j) the Consenting Noteholders; (k) the Backstop Parties; (l) the Distribution Agents; (m) the Exit Facility Lenders; (n) the Exit Facility Agent; (o) the Provisional Liquidator; (p) the Committee and its current and former members in their capacities as such; and (q) with respect to each of the foregoing Entities in clauses (a) through (p), each such Entity's Related Persons, in each case solely in their capacity as such.

"*Releasing Party*" has the meaning set forth in <u>Article X.B</u> hereof.

"*Reorganization Steps Overview*" means the description of the steps of the Restructuring Transactions, substantially in the form Filed with the Plan Supplement in form and substance reasonably acceptable to the Debtors and the Required Consenting Noteholders and, to the extent required by the DIP Credit Agreement, in form and substance satisfactory or reasonably satisfactory, as applicable, to the DIP Agent and the DIP Required Lenders.

"*Reorganized Debtors*" means, subject to the Restructuring Transactions, the Debtors as reorganized pursuant to this Plan on or after the Effective Date, and their respective successors.

"*Reorganized Parent*" means, subject to the Restructuring Transactions, Weatherford International plc, an Irish public limited company, as reorganized pursuant to this Plan on the Effective Date, its successor, or a newly-formed entity that issues the New Common Stock under this Plan.

"*Reorganized Weatherford Bermuda*" means, subject to the Restructuring Transactions, Weatherford International Ltd., a Bermuda exempted company, as reorganized pursuant to this Plan on the Effective Date, and its successors.

"*Reorganized Weatherford Delaware*" means, subject to the Restructuring Transactions, Weatherford International, LLC, a Delaware limited liability company, as reorganized pursuant to this Plan on the Effective Date, and its successors.

"*Required Consenting Noteholders*" means the "Required Consenting Noteholders" under, and as defined in, the Restructuring Support Agreement.

"*Restructuring Documents*" means, collectively, the documents and agreements (and the exhibits, schedules, annexes and supplements thereto) necessary to implement, or entered into in connection with, this Plan, including, without limitation, the Plan Supplement, the Exhibits, the Plan Schedules, the Amended/New Corporate Governance Documents, the Exit Facility Loan Documents, the Exit Senior Unsecured Notes Documents, the New Warrant Agreement, and the Plan Securities and Documents, which documents and agreements shall, to the extent required by the DIP Credit Agreement, be in form and substance satisfactory or reasonably satisfactory, as applicable, to the DIP Agent and the DIP Required Lenders.

US-DOCS\110687040

"*Restructuring Support Agreement*" means that certain Restructuring Support Agreement, dated as of May 10, 2019, by and among the Debtors and the Consenting Noteholders (as amended, supplemented or modified from time to time).

"*Restructuring Term Sheet*" means the term sheet attached as Exhibit A to the Restructuring Support Agreement, a copy of which is attached to the Disclosure Statement as Exhibit B (as amended, supplemented, or modified from time to time).

"*Restructuring Transaction*" has the meaning ascribed thereto in Article V.A of this Plan.

"*Rights Offering*" means that certain rights offering pursuant to which each holder of Prepetition Notes is entitled to receive Subscription Rights to acquire the Rights Offering Notes on a Pro Rata basis in accordance with the Rights Offering Procedures and which will be backstopped by the Backstop Parties pursuant to the Backstop Commitment Agreement.

"*Rights Offering Notes*" means up to $1,600,000,000 of the Exit Senior Unsecured Notes, which shall be issued for cash pursuant to the Rights Offering and the Backstop Commitment Agreement; *provided* that the principal amount of the Rights Offering Notes will be reduced dollar for dollar based on the amount of the Exit Facility commitments in excess of $650,000,000 as of the Effective Date, but, in any case, to no less than $1,500,000,000.

"*Rights Offering Procedures*" means the procedures for the implementation of the Rights Offering as described in the Disclosure Statement, in form and substance acceptable to the Required Consenting Noteholders (as amended, supplemented, or modified from time to time).

"*Schedules*" means the schedules of assets and liabilities, schedules of Executory Contracts, and statement of financial affairs Filed by the Debtors pursuant to section 521 of the Bankruptcy Code and the applicable Bankruptcy Rules, as such Schedules may be amended, modified, or supplemented from time to time, if any such Schedules are required to be Filed by order of the Bankruptcy Court.

"*SEC*" means the U.S. Securities and Exchange Commission.

"*Secured Claim*" means a Claim that is secured by a Lien on property in which any of the Debtors' Estates have an interest or that is subject to setoff under section 553 of the Bankruptcy Code, to the extent of the value of the Claim holder's interest in such Estate's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code or, in the case of setoff, pursuant to section 553 of the Bankruptcy Code.

"*Secured Tax Claim*" means any Secured Claim which, absent its secured status, would be entitled to priority in right of payment under section 507(a)(8) of the Bankruptcy Code.

"*Securities Act*" means the Securities Act of 1933, 15 U.S.C. §§ 77c-77aa, as now in effect or hereafter amended, and the rules and regulations promulgated thereunder.

"*Stamp or Similar Tax*" means any stamp tax, recording tax, conveyance fee, intangible or similar tax, mortgage tax, personal or real property tax, real estate transfer tax, sales tax, use tax,

transaction privilege tax (including, without limitation, such taxes on prime contracting and owner-builder sales), privilege taxes (including, without limitation, privilege taxes on construction contracting with regard to speculative builders and owner builders), and other similar taxes or fees imposed or assessed by any Governmental Unit.

"*Subscription Rights*" means the subscription rights to acquire Rights Offering Notes in accordance with the Rights Offering Procedures.

"*Subsequent Distribution*" means any distribution of property under this Plan to Holders of Allowed Claims or Allowed Equity Interests other than the initial distribution given to such Holders on the Initial Distribution Date.

"*Subsequent Distribution Date*" means the last Business Day of the month following the end of each calendar quarter after the Effective Date; *provided*, *however*, that if the Effective Date is within thirty (30) days of the end of a calendar quarter, then the first Subsequent Distribution Date will be the last Business Day of the month following the end of the first (1st) calendar quarter after the calendar quarter in which the Effective Date falls.

"*Takeback Notes*" means $500,000,000 of Exit Senior Unsecured Notes which shall be issued to Holders of Allowed Prepetition Notes Claims pursuant to the Plan.

"*Third Party Release*" has the meaning set forth in Article X.B hereof.

"*Unexercised Equity Interests*" means any and all unexercised options, performance, stock units, restricted stock units, restricted stock awards, warrants, calls, rights, puts, awards, commitments, or any other agreements, arrangements, or commitments of any character, kind, or nature to acquire, exchange for, or convert into an Equity Interest, as in existence immediately prior to the Effective Date.

"*Unexpired Lease*" means a lease to which any Debtor is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

"*Unimpaired*" means, with respect to a Class of Claims or Equity Interests, a Claim or an Equity Interest that is "unimpaired" within the meaning of section 1124 of the Bankruptcy Code.

"*Unused Cash Reserve Amount*" means the remaining Cash, if any, in the Professional Fee Claim Reserve after all obligations and liabilities for which such reserve was established are paid, satisfied, and discharged in full in Cash or are disallowed by Final Order in accordance with this Plan.

"*Voting and Claims Agent*" means Prime Clerk LLC, in its capacity as solicitation, notice, claims and balloting agent for the Debtors.

"*Voting Classes*" means Classes 7 and 10.

"*Voting Deadline*" means the date and time by which all Ballots must be received by the Voting and Claims Agent in accordance with the Disclosure Statement.

19

US-DOCS\110687040

"*Voting Record Date*" means the date for determining which Holders of Claims and Equity Interests in the Voting Classes are entitled, as applicable, to receive the Disclosure Statement and to vote to accept or reject this Plan.

"*Weatherford Bermuda*" means Weatherford International Ltd, a Bermuda company, as debtor-in-possession in these Chapter 11 Cases.

"*Weatherford Delaware*" means Weatherford International, LLC, a Delaware limited liability company, as debtor-in-possession in these Chapter 11 Cases.

"*Weatherford Parent*" means Weatherford International plc, an Irish public limited company, as debtor-in-possession in these Chapter 11 Cases.

## ARTICLE II.

## ADMINISTRATIVE, DIP FACILITY, AND PRIORITY TAX CLAIMS

*A.     Administrative Claims*

Subject to sub-paragraph 1 below, on the later of the Effective Date or the date on which an Administrative Claim becomes an Allowed Administrative Claim, or, in each such case, as soon as practicable thereafter, each Holder of an Allowed Administrative Claim (other than an Allowed Professional Fee Claim) will receive, in full satisfaction, settlement, discharge and release of, and in exchange for, such Claim either (i) Cash equal to the amount of such Allowed Administrative Claim; or (ii) such other less favorable treatment as to which the Debtors (with the consent of the Required Consenting Noteholders in the manner set forth in the Restructuring Support Agreement and in consultation with the Committee) or Reorganized Debtors, as applicable, and the Holder of such Allowed Administrative Claim will have agreed upon in writing; *provided*, *however*, Administrative Claims incurred by any Debtor in the ordinary course of business may be paid in the ordinary course of business following the occurrence of the Effective Date by the applicable Reorganized Debtor in accordance with such applicable terms and conditions relating thereto without further notice to or order of the Bankruptcy Court.

1.    Professional Fee Claims

Professionals or other Entities asserting a Professional Fee Claim for services rendered before the Effective Date must File and serve on the Reorganized Debtors and such other Entities who are designated in the Confirmation Order an application for final allowance of such Professional Fee Claim no later than forty-five days after the Effective Date; provided that the Reorganized Debtors will pay Professionals in the ordinary course of business for any work performed after the Effective Date, including those reasonable and documented fees and expenses incurred by Professionals in connection with the implementation and consummation of this Plan, in each case without further application or notice to or order of the Bankruptcy Court.

Objections to any Professional Fee Claim must be Filed and served on the Reorganized Debtors, the Committee, and the requesting party by no later than thirty (30) days after the Filing of the applicable final request for payment of the Professional Fee Claim.  Each Holder of an Allowed Professional Fee Claim will be paid in full in Cash by the Reorganized Debtors, including from the Professional Fee Claim Reserve, within five (5) Business Days after entry of the order

20

approving such Allowed Professional Fee Claim. The Reorganized Debtors will not commingle any funds contained in the Professional Fee Claim Reserve and will use such funds to pay only the Professional Fee Claims, as and when allowed by order of the Bankruptcy Court. Notwithstanding anything to the contrary contained in this Plan, the failure of the Professional Fee Claim Reserve to satisfy in full the Professional Fee Claims will not, in any way, operate or be construed as a cap or limitation on the amount of Professional Fee Claims due and payable by the Reorganized Debtors. The Professional Fee Claim Reserve will be maintained in trust for the Professionals and will not be considered property of the Debtors' Estates; provided that the Reorganized Debtors will have a reversionary interest in the Unused Cash Reserve Amount. To the extent that funds held in the Professional Fee Claim Reserve do not or are unable to satisfy the full amount of the Allowed Professional Fee Claims, such Professionals will have an Allowed Administrative Claim for any such deficiency, which will be satisfied in full in Cash in accordance with Article II.A of this Plan.

B.      *DIP Facility Claims*

The DIP Facility Claims will be Allowed in the full amount due and owing under the DIP Financing Documents, including all principal, accrued and accruing postpetition interest, costs, fees and expenses. On the Effective Date, the Allowed DIP Facility Claims will, in full satisfaction, settlement, discharge and release of, and in exchange for such the DIP Facility Claims, be indefeasibly paid in full in Cash from the proceeds of the Exit Facility (or, in the case of "Swap Obligations" and "Banking Services Obligations" be treated as the applicable Holder thereof shall otherwise agree), any unused commitments under the Revolving Credit Facility (as defined in the DIP Credit Agreement) shall be deemed terminated, and the DIP Facility Liens will be deemed discharged, released, and terminated for all purposes without further action of or by any Person or Entity; provided that the DIP Contingent Obligations shall survive the Effective Date on an unsecured basis and shall be paid by the Reorganized Debtors as and when due.

C.      *Priority Tax Claims*

Subject to Article VIII hereof, on, or as soon as reasonably practicable after, the later of (i) the Initial Distribution Date if such Priority Tax Claim is an Allowed Priority Tax Claim as of the Effective Date or (ii) the next Subsequent Distribution Date after the date on which such Priority Tax Claim becomes an Allowed Priority Tax Claim, each Holder of an Allowed Priority Tax Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Priority Tax Claim, at the election of the Debtors or Reorganized Debtors, as applicable: (A) Cash equal to the amount of such Allowed Priority Tax Claim; (B) such other less favorable treatment as to which the Debtors (with the consent of the Required Consenting Noteholders in the manner set forth in the Restructuring Support Agreement) or Reorganized Debtors, as applicable, and the Holder of such Allowed Priority Tax Claim have agreed upon in writing; (C) such other treatment such that it will not be Impaired pursuant to section 1124 of the Bankruptcy Code; or (D) pursuant to and in accordance with sections 1129(a)(9)(C) and 1129(a)(9)(D) of the Bankruptcy Code, Cash in an aggregate amount of such Allowed Priority Tax Claim payable in regular installment payments over a period ending not more than five (5) years after the Petition Date, plus simple interest at the rate required by applicable non-bankruptcy law on any outstanding balance from the Effective Date, or such lesser rate as is agreed to in writing by a particular taxing authority and the Debtors or Reorganized Debtors, as applicable, pursuant to section 1129(a)(9)(C)

21

of the Bankruptcy Code; *provided*, *however*, Priority Tax Claims incurred by any Debtor in the ordinary course of business may be paid in the ordinary course of business following the occurrence of the Effective Date by the applicable Reorganized Debtor in accordance with such applicable terms and conditions relating thereto without further notice to or order of the Bankruptcy Court. Any installment payments to be made under clause (C) or (D) above will be made in equal quarterly Cash payments beginning on the first applicable Subsequent Distribution Date, and continuing on each Subsequent Distribution Date thereafter until payment in full of the applicable Allowed Priority Tax Claim.

## ARTICLE III.

## CLASSIFICATION AND TREATMENT
## OF CLASSIFIED CLAIMS AND EQUITY INTERESTS

*A.    Summary*

This Plan constitutes a separate plan of reorganization for each Debtor.  All Claims and Equity Interests, except Administrative Claims, DIP Facility Claims, and Priority Tax Claims, are placed in the Classes set forth below. For all purposes under this Plan, each Class will contain sub-Classes for each of the Debtors (*i.e.*, there will be twelve (12) Classes for each Debtor); provided, that any Class that is vacant as to a particular Debtor will be treated in accordance with Article III.D below.

The categories of Claims and Equity Interests listed below classify Claims and Equity Interests for all purposes, including, without limitation, for voting, confirmation and distribution pursuant hereto and pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code.  This Plan deems a Claim or Equity Interest to be classified in a particular Class only to the extent that the Claim or Equity Interest qualifies within the description of that Class and will be deemed classified in a different Class to the extent that any remaining portion of such Claim or Equity Interest qualifies within the description of such different Class.  A Claim or Equity Interest is in a particular Class only to the extent that any such Claim or Equity Interest is Allowed in that Class and has not been paid, released, disallowed or otherwise settled prior to the Effective Date.

Summary of Classification and Treatment of Classified Claims and Equity Interests

| Class | Claim/Equity Interest | Status | Voting Rights |
|-------|----------------------|--------|---------------|
| 1. | Other Priority Claims | Unimpaired | Deemed to Accept |
| 2. | Other Secured Claims | Unimpaired | Deemed to Accept |
| 3. | Secured Tax Claims | Unimpaired | Deemed to Accept |
| 4. | Prepetition Revolving Credit Claims | Unimpaired | Deemed to Accept |
| 5. | Prepetition Term Loan Claims | Unimpaired | Deemed to Accept |

22

| Class | Claim/Equity Interest | Status | Voting Rights |
|-------|----------------------|--------|---------------|
| 6. | Prepetition A&R Claims | Unimpaired | Deemed to Accept |
| 7. | Prepetition Notes Claims | Impaired | Entitled to Vote |
| 8. | General Unsecured Claims | Unimpaired | Deemed to Accept |
| 9. | Intercompany Claims | Unimpaired | Deemed to Accept |
| 10. | Existing Common Stock[2] | Impaired | Entitled to Vote |
| 11. | Intercompany Equity Interests | Unimpaired | Deemed to Accept |
| 12. | Unexercised Equity Interests | Impaired | Deemed to Reject |

B. *Classification and Treatment of Claims and Equity Interests*

1. Class 1 - Other Priority Claims

(a) *Classification*: Class 1 consists of the Other Priority Claims.

(b) *Treatment*: Subject to Article VIII hereof, on, or as soon as reasonably practicable after, the later of (i) the Initial Distribution Date if such Class 1 Claim is an Allowed Class 1 Claim as of the Effective Date or (ii) the next Subsequent Distribution Date after the date on which such Class 1 Claim becomes an Allowed Class 1 Claim, each Holder of an Allowed Class 1 Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Class 1 Claim, at the election of the Debtors or Reorganized Debtors, as applicable (with the consent of the Required Consenting Noteholders in the manner set forth in the Restructuring Support Agreement): (A) Cash equal to the amount of such Allowed Class 1 Claim; (B) such other less favorable treatment as to which the Debtors or Reorganized Debtors, as applicable, and the Holder of such Allowed Class 1 Claim will have agreed upon in writing; or (C) such other treatment such that it will not be impaired pursuant to section 1124 of the Bankruptcy Code; *provided*, *however*, Class 1 Claims incurred by any Debtor in the ordinary course of business may be paid in the ordinary course of business following the occurrence of the Effective Date by the applicable Reorganized Debtor in accordance with the terms and conditions of any agreements relating thereto without further notice to or order of the Bankruptcy Court.

---

[2] This class excludes the Unexercised Equity Interests that are classified in Class 12.

23

US-DOCS\110687040

(c) *Voting*: Class 1 is an Unimpaired Class, and the Holders of Claims in Class 1 are conclusively deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, the Holders of Claims in Class 1 are not entitled to vote to accept or reject this Plan.

2. Class 2 - Other Secured Claims

(a) *Classification*: Class 2 consists of the Other Secured Claims. Class 2 consists of separate subclasses for each Other Secured Claim.

(b) *Treatment*: Subject to <u>Article VIII</u> hereof, on, or as soon as reasonably practicable after, the later of (i) the Initial Distribution Date if such Class 2 Claim is an Allowed Class 2 Claim as of the Effective Date or (ii) the next Subsequent Distribution Date after the date on which such Class 2 Claim becomes an Allowed Class 2 Claim, each Holder of an Allowed Class 2 Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Class 2 Claim, at the election of the Debtors or Reorganized Debtors, as applicable (with the consent of the Required Consenting Noteholders in the manner set forth in the Restructuring Support Agreement): (A) Cash equal to the amount of such Allowed Class 2 Claim; (B) such other less favorable treatment as to which the Debtors or Reorganized Debtors, as applicable, and the Holder of such Allowed Class 2 Claim will have agreed upon in writing; (C) the Collateral securing such Allowed Class 2 Claim; or (D) such other treatment such that it will not be impaired pursuant to section 1124 of the Bankruptcy Code; *provided*, *however*, Class 2 Claims incurred by any Debtor in the ordinary course of business may be paid in the ordinary course of business following the occurrence of the Effective Date by the applicable Reorganized Debtor in accordance with the terms and conditions of any agreements relating thereto without further notice to or order of the Bankruptcy Court.

(c) *Voting*: Class 2 is an Unimpaired Class, and the Holders of Claims in Class 2 are conclusively deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, the Holders of Claims in Class 2 are not entitled to vote to accept or reject this Plan.

3. Class 3 - Secured Tax Claims

(a) *Classification*: Class 3 consists of the Secured Tax Claims.

(b) *Treatment*: Subject to <u>Article VIII</u> hereof, on, or as soon as reasonably practicable after, the later of (i) the Initial Distribution Date if such Class 3 Claim is an Allowed Class 3 Claim as of the Effective Date or (ii) the next Subsequent Distribution Date after the date on which such Class 3 Claim becomes an Allowed Class 3 Claim, each Holder of an Allowed Class 3 Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Class 3 Claim, at the election of the

24

Debtors or Reorganized Debtors, as applicable (with the consent of the Required Consenting Noteholders in the manner set forth in the Restructuring Support Agreement): (A) Cash equal to the amount of such Allowed Class 3 Claim; (B) such other less favorable treatment as to which the Debtors or Reorganized Debtors, as applicable, and the Holder of such Allowed Class 3 Claim will have agreed upon in writing; (C) the Collateral securing such Allowed Class 3 Claim; (D) such other treatment such that it will not be impaired pursuant to section 1124 of the Bankruptcy Code; or (E) pursuant to and in accordance with sections 1129(a)(9)(C) and 1129(a)(9)(D) of the Bankruptcy Code, Cash in an aggregate amount of such Allowed Class 3 Claim payable in regular installment payments over a period ending not more than five (5) years after the Petition Date, plus simple interest at the rate required by applicable non-bankruptcy law on any outstanding balance from the Effective Date, or such lesser rate as is agreed to in writing by a particular taxing authority and the Debtors or Reorganized Debtors, as applicable, pursuant to section 1129(a)(9)(C) of the Bankruptcy Code; *provided*, *however*, Class 3 Claims incurred by any Debtor in the ordinary course of business may be paid in the ordinary course of business following the occurrence of the Effective Date by the applicable Reorganized Debtor in accordance with such applicable terms and conditions relating thereto without further notice to or order of the Bankruptcy Court. Any installment payments to be made under clause (D) or (E) above will be made in equal quarterly Cash payments beginning on the first applicable Subsequent Distribution Date, and continuing on each Subsequent Distribution Date thereafter until payment in full of the applicable Allowed Class 3 Claim.

(c) *Voting:* Class 3 is an Unimpaired Class, and the Holders of Claims in Class 3 will be conclusively deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, Holders of Claims in Class 3 are not entitled to vote to accept or reject this Plan.

4. Class 4 – Prepetition Revolving Credit Claims

(a) *Classification:* Class 4 consists of the Prepetition Revolving Credit Claims.

(b) *Allowance*: The Prepetition Revolving Credit Claims are deemed Allowed in the aggregate principal amount of $316,742,581 plus accrued and unpaid interest thereon.

(c) *Treatment:* To the extent not paid in full in Cash prior to the Effective Date, on the Effective Date, the Allowed Prepetition Revolving Credit Claims will, in full satisfaction, settlement, discharge and release of, and in exchange for, such Claims, be indefeasibly paid in full in Cash and the Prepetition Revolving Credit Agreement Liens will be deemed discharged, released, and terminated for all purposes without further action of or by any Person or Entity.

25

(d) *Voting:* Class 4 is an Unimpaired Class, and the Holders of Claims in Class 4 will be conclusively deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, Holders of Claims in Class 4 are not entitled to vote to accept or reject this Plan.

5. Class 5 – Prepetition Term Loan Claims

(a) *Classification:* Class 5 consists of the Prepetition Term Loan Claims.

(b) *Allowance*: The Prepetition Term Loans Claims are deemed Allowed in the aggregate principal amount of $297,500,000 plus accrued and unpaid interest thereon.

(c) *Treatment:* To the extent not paid in full in Cash prior to the Effective Date, on the Effective Date, the Allowed Prepetition Term Loan Claims will, in full satisfaction, settlement, discharge and release of, and in exchange for, such Claims, be indefeasibly paid in full in Cash and the Prepetition Term Loan Agreement Liens will be deemed discharged, released, and terminated for all purposes without further action of or by any Person or Entity.

(d) *Voting:* Class 5 is an Unimpaired Class, and the Holders of Claims in Class 5 will be conclusively deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, Holders of Claims in Class 5 are not entitled to vote to accept or reject this Plan.

6. Class 6 – Prepetition A&R Claims

(a) *Classification:* Class 6 consists of the Prepetition A&R Claims.

(b) *Allowance*: The Prepetition A&R Claims are deemed Allowed in the aggregate principal amount of $305,000,000 plus accrued and unpaid interest and fees (at the default rate set forth in the Prepetition A&R Credit Agreement or related loan documents) plus outstanding letters of credit in an amount of $166,000,000.

(c) *Treatment:* On the Effective Date, the Allowed Prepetition A&R Claims will, in full satisfaction, settlement, discharge and release of, and in exchange for, such Claims, be indefeasibly paid in full in Cash. Any letters of credit issued and outstanding as of the Effective Date under the Prepetition A&R Credit Agreement will either be cash collateralized, replaced or receive such other treatment as may be acceptable to the Debtors, the Prepetition A&R Credit Agreement Agent, the applicable Prepetition A&R Credit Agreement Issuing Bank, and the Required Consenting Noteholders.

(d) *Voting:* Class 6 is an Unimpaired Class, and the Holders of Claims in Class 6 will be conclusively deemed to have accepted this Plan pursuant to section

26

1126(f) of the Bankruptcy Code. Therefore, Holders of Claims in Class 6 are not entitled to vote to accept or reject this Plan.

7. Class 7 - Prepetition Notes Claims

    (a)    *Classification:* Class 7 consists of the Prepetition Notes Claims.

    (b)    *Allowance*: The Prepetition Notes Claims are deemed Allowed in the aggregate principal amount of $7,427,067,000, plus accrued and unpaid interest thereon, consisting of:

        (i)    $365,107,000 in aggregate principal amount, plus accrued and unpaid interest on account of the 5.125% Notes;

        (ii)    $750,000,000 in aggregate principal amount, plus accrued and unpaid interest on account of the 7.750% Notes;

        (iii)    $1,265,000,000 in aggregate principal amount, plus accrued and unpaid interest on account of the 5.875% Notes;

        (iv)    $646,286,000 in aggregate principal amount, plus accrued and unpaid interest on account of the 4.500% Notes;

        (v)    $750,000,000 in aggregate principal amount, plus accrued and unpaid interest on account of the 8.250% Notes;

        (vi)    $790,000,000 in aggregate principal amount, plus accrued and unpaid interest on account of the 9.875% 2024 Notes;

        (vii)    $453,045,000 in aggregate principal amount, plus accrued and unpaid interest on account of the 6.500% Notes;

        (viii)    $461,300,000 in aggregate principal amount, plus accrued and unpaid interest on account of the 7.000% Notes;

        (ix)    $250,000,000 in aggregate principal amount, plus accrued and unpaid interest on account of the 9.875% 2039 Notes;

        (x)    $462,601,000 in aggregate principal amount, plus accrued and unpaid interest on account of the 6.750% Notes;

        (xi)    $374,961,000 in aggregate principal amount, plus accrued and unpaid interest on account of the 5.950% Notes;

        (xii)    $600,000,000 in aggregate principal amount, plus accrued and unpaid interest on account of the 9.875% 2025 Notes; and

        (xiii)    $258,767,000 in aggregate principal amount, plus accrued and unpaid interest on account of the 6.8000% Notes.

US-DOCS\110687040

(c)   *Treatment:*  On the Initial Distribution Date, each Holder of an Allowed Prepetition Notes Claim will receive, in full satisfaction, settlement, discharge and release of, and in exchange for, such Claim, its Pro Rata share of (i) 99% of the New Common Stock, subject to dilution on account of equity issued pursuant to the New Management Incentive Plan and the New Common Stock issuable pursuant to the New Warrants and (ii) the Takeback Notes.  In addition, each of such Holders will receive Subscription Rights to purchase its Pro Rata share of the Rights Offering Notes pursuant to the Rights Offering and in accordance with the applicable Rights Offerings Procedures.

(d)   *Voting:* Class 7 is Impaired, and Holders of Claims in Class 7 are entitled to vote to accept or reject this Plan.

8.   Class 8 – General Unsecured Claims

(a)   *Classification:* Class 8 consists of the General Unsecured Claims.

(b)   *Treatment:*  The legal, equitable, and contractual rights of the holders of General Unsecured Claims are unaltered by this Plan.  Except to the extent that a holder of a General Unsecured Claim agrees to a different treatment, on the later of (i) the Effective Date or (ii) the date such General Unsecured Claim becomes due and payable, each Holder of an Allowed General Unsecured Claim shall receive Cash in an amount equal to such Allowed General Unsecured Claim, or such other treatment that will render such Claim Unimpaired, including but not limited to, Reinstatement of such Allowed General Unsecured Claim pursuant to section 1124 of the Bankruptcy Code.  For the avoidance of doubt, and notwithstanding anything herein to the contrary, no provision of this Plan shall diminish or modify any applicable non-bankruptcy legal, equitable, and/or contractual rights of any Holder of an Allowed General Unsecured Claim to receive payment on account of such Claims in the ordinary course of business and in accordance with applicable non-bankruptcy law as if the Chapter 11 Cases had not been commenced.

(c)   *Voting:* Class 8 is an Unimpaired Class, and the Holders of Claims in Class 8 are conclusively deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, the Holders of Claims in Class 8 are not entitled to vote to accept or reject this Plan.

9.   Class 9 – Intercompany Claims

(a)   *Classification*: Class 9 consists of the Intercompany Claims.

(b)   *Treatment:*  Subject to the Restructuring Transactions, the Intercompany Claims will be adjusted, reinstated, compromised, or cancelled to the extent determined appropriate by the Debtors, with the consent of the Required Consenting Noteholders.

28

(c)    *Voting:* Class 9 is an Unimpaired Class and the Holders of Claims in Class 9 are conclusively deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, the Holders of Claims in Class 9 are not entitled to vote to accept or reject this Plan.

10. Class 10 – Existing Common Stock

(a)    *Classification*: Class 10 consists of the Existing Common Stock.[3]

(b)    *Treatment*: On the Effective Date, the Existing Common Stock will be cancelled without further notice to, approval of or action by any Entity.  On the Initial Distribution Date, each Holder of Existing Common Stock will receive its Pro Rata share of (i) 1.0% of the New Common Stock, subject to dilution on account of the equity issued pursuant to the New Management Incentive Plan and the New Common Stock issuable pursuant to the New Warrants and (ii) the New Warrants.

The foregoing is offered solely for settlement purposes under Rule 408 of the Federal Rules of Evidence and analogous state law, and such settlement is conditioned on the Bankruptcy Court confirming this Plan and the occurrence of the Effective Date.

(c)    *Voting*: Class 10 is Impaired, and the Holders of Existing Common Stock in Class 10 are entitled to vote to accept or reject this Plan.

11. Class 11 – Intercompany Equity Interests

(a)    *Classification*: Class 11 consists of Intercompany Equity Interests.

(b)    *Treatment*:   Subject to the Restructuring Transactions and the applicable law of the Debtors' jurisdiction of incorporation, the Intercompany Equity Interests will be reinstated for administrative convenience or cancelled as determined by the Debtors, with the reasonable consent of the Required Consenting Noteholders.

(c)    *Voting*: Class 11 is an Unimpaired Class and the Holders of Claims in Class 11 are conclusively deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, the Holders of Claims in Class 11 are not entitled to vote to accept or reject this Plan.

12. Class 12 – Unexercised Equity Interests

(a)    *Classification*: Class 12 consists of Unexercised Equity Interests.

(b)    *Treatment*:   On the Effective Date, the Unexercised Equity Interests will be cancelled, and the Holders of such Unexercised Equity Interests will not

---

[3] This class excludes the Unexercised Equity Interests that are classified in Class 12.

US-DOCS\110687040

receive any distribution or retain any property on account of such Unexercised Equity Interests.

(c)  *Voting*: Class 12 is Impaired, and the Holders of Unexercised Equity Interests in Class 12 will be conclusively deemed to have rejected this Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, Holders of Unexercised Equity Interests in Class 12 will not be entitled to vote to accept or reject this Plan.

C.  *Special Provision Governing Unimpaired Claims*

Except as otherwise provided herein, nothing under this Plan will affect or limit the Debtors' or the Reorganized Debtors' rights and defenses (whether legal or equitable) in respect of any Unimpaired Claims, including, without limitation, all rights in respect of legal and equitable defenses to or setoffs or recoupments against any such Unimpaired Claims. For the avoidance of doubt, notwithstanding anything to the contrary in this Plan, the Confirmation Order or any Restructuring Documents, (a) no Unimpaired Claim shall be deemed settled, satisfied, resolved, released, discharged, barred or enjoined by any provision of this Plan, the Confirmation Order or the Restructuring Documents, and (b) the property of each of the Debtors' Estates that vest in the applicable Reorganized Debtor pursuant to Articles IV.C and VI.E of this Plan shall not be free and clear of such Claims, until an Unimpaired Claim in Class 8 of this Plan has been (x) paid in full in the Allowed amount of such Claim determined in accordance with applicable law, or on terms agreed to between the Holder of such Claim and the Debtors or Reorganized Debtors, as applicable, or in accordance with the terms and conditions of the particular transaction giving rise to such Claim, or (y) otherwise satisfied or disposed of as determined by a court of competent jurisdiction, at which time (in clause (x) or clause (y)) all of the foregoing provisions of this Plan referenced in clause (b) shall apply in all respects as to the applicable Unimpaired Claim. For further avoidance of doubt, Holders of Unimpaired Class 8 Claims shall not be required to file a proof of Claim with the Bankruptcy Court, and, subject to Article X of this Plan, shall retain all their rights under applicable non-bankruptcy law to pursue their claims in any forum with jurisdiction over the parties.

D.  *Elimination of Vacant Classes*

Any Class of Claims that is not occupied as of the commencement of the Confirmation Hearing by an Allowed Claim or a claim temporarily allowed under Bankruptcy Rule 3018, or as to which no vote is cast, will be deemed eliminated from this Plan for purposes of voting to accept or reject this Plan and for purposes of determining acceptance or rejection of this Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

# ARTICLE IV.

# ACCEPTANCE OR REJECTION OF THE PLAN

A.  *Presumed Acceptance of Plan*

Classes 1-6 and 8, 9, and 11 are Unimpaired under this Plan. Therefore, the Holders of Claims or Equity Interests in such Classes are deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code and are not entitled to vote to accept or reject this Plan.

*B.        Presumed Rejection of Plan*

Class 12 is Impaired and Holders of Unexercised Equity Interests in Class 12 are not entitled to receive or retain any property under this Plan. Accordingly, under section 1126(g) of the Bankruptcy Code, the votes of Holders of Unexercised Equity Interests in Class 12 will not be solicited and such Holders are deemed to reject this Plan.

*C.        Voting Classes*

Classes 7 and 10 are Impaired and entitled to vote under this Plan. The Holders of Claims in Class 7 and Existing Common Stock in Class 10 as of the Voting Record Date are entitled to vote to accept or reject this Plan.

*D.        Acceptance by Impaired Class of Claims*

Pursuant to section 1126(c) of the Bankruptcy Code and except as otherwise provided in section 1126(e) of the Bankruptcy Code, an Impaired Class of Claims has accepted this Plan if the Holders of at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of the Allowed Claims in such Class actually voting have voted to accept this Plan.

Pursuant to section 1126(d) of the Bankruptcy Code and except as otherwise provided in section 1126(e) of the Bankruptcy Code, an Impaired Class of Equity Interests has accepted this Plan if the Holders of at least two-thirds (2/3) in amount of the Allowed Equity Interests in such Class actually have voted to accept this Plan.

*E.        Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code; Cram Down*

Section 1129(a)(10) of the Bankruptcy Code will be satisfied for purposes of Confirmation by acceptance of this Plan by Class 7. The Debtors request confirmation of this Plan under section 1129(b) of the Bankruptcy Code with respect to any Impaired Class that does not accept this Plan pursuant to section 1126 of the Bankruptcy Code. The Debtors reserve the right, in accordance with the terms of the Restructuring Support Agreement, to modify this Plan or any Exhibit or Plan Schedule in order to satisfy the requirements of section 1129(b) of the Bankruptcy Code, if necessary.

*F.        Votes Solicited in Good Faith*

The Debtors have, and upon the Confirmation Date will be deemed to have, solicited votes on this Plan from the Voting Classes in good faith and in compliance with the applicable provisions of the Bankruptcy Code, including, without limitation, sections 1125 and 1126 of the Bankruptcy Code, and any applicable non-bankruptcy law, rule, or regulation governing the adequacy of disclosure in connection with the solicitation. Accordingly, the Debtors, the Reorganized Debtors, and each of their respective Related Persons will be entitled to, and upon the Confirmation Date are hereby granted, the protections of section 1125(e) of the Bankruptcy Code.

US-DOCS\110687040

# ARTICLE V.

## MEANS FOR IMPLEMENTATION OF THE PLAN

*A.      Restructuring Transactions*

Without limiting any rights and remedies of the Debtors or Reorganized Debtors under this Plan or applicable law, but in all cases subject to the terms and conditions of the Restructuring Support Agreement (if applicable), the DIP Financing Documents (if applicable), and the Restructuring Documents and any consents or approvals required thereunder, the entry of the Confirmation Order will constitute authorization for the Reorganized Debtors to take, or to cause to be taken, all actions necessary or appropriate to consummate and implement the provisions of this Plan, including but not limited to the actions set forth in the Reorganization Steps Overview, prior to, on and after the Effective Date, including such actions as may be necessary or appropriate to effectuate a corporate restructuring of their respective businesses, to otherwise simplify the overall corporate structure of the Reorganized Debtors, or to reincorporate certain of the Debtors under the laws of jurisdictions other than the laws of which the applicable Debtors are presently formed or incorporated.  Such restructuring may include one or more mergers, amalgamations, consolidations, restructures, dispositions, liquidations, dissolutions, or creations of one or more new Entities, as may be determined by the Debtors or Reorganized Debtors to be necessary or appropriate (with the consent of the Required Consenting Noteholders), including the steps described in the Reorganization Steps Overview, but in all cases subject to the terms and conditions of this Plan, the DIP Financing Documents (if applicable), and the Restructuring Documents and any consents or approvals required hereunder or thereunder (collectively, the "**Restructuring Transactions**").

All such Restructuring Transactions taken, or caused to be taken, will be deemed to have been authorized and approved by the Bankruptcy Court.  The actions to effectuate the Restructuring Transactions may include: (i) the execution and delivery of appropriate agreements or other documents of merger, amalgamation, consolidation, restructuring, disposition, liquidation, or dissolution containing terms that are consistent with the terms of this Plan and that satisfy the applicable requirements of applicable state law and such other terms to which the applicable Entities may agree; (ii) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, duty, or obligation on terms consistent with the terms of this Plan and having such other terms to which the applicable Entities may agree; (iii) the filing of appropriate certificates or articles of merger, amalgamation, consolidation, or dissolution pursuant to applicable state law; (iv) the creation of one or more new Entities; and (v) all other actions that the applicable Entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable state law in connection with such transactions, in each case in form and substance reasonably acceptable to the Required Consenting Noteholders, and in all cases subject to the terms and conditions of this Plan, the DIP Financing Documents (if applicable), and the Restructuring Documents and any consents or approvals required thereunder.

32

Case 19-30504   Document 343-9 Filed in TXSB on 07/23/21   Page 38 of 76
Case 19-33694   Document 523-2   Filed in TXSB on 05/09/19   Page 38 of 76
1337   1452

*B.     Continued Corporate Existence*

Subject to the Restructuring Transactions permitted by <u>Article V.A</u> of this Plan, after the Effective Date, the Reorganized Debtors will continue to exist as separate legal Entities in accordance with the applicable law in the respective jurisdiction in which they are incorporated or formed and pursuant to their respective certificates or articles of incorporation and by-laws, or other applicable corporate governance documents, in effect immediately prior to the Effective Date, except to the extent such certificates or articles of incorporation and by-laws, or other applicable corporate governance documents, are amended, restated or otherwise modified under this Plan (subject to such amendment, restatement, or replacement being in accordance with the law of the Debtor's jurisdiction of incorporation to the extent such non-bankruptcy law is applicable), including pursuant to the Amended/New Corporate Governance Documents. Notwithstanding anything to the contrary herein, the Claims against a particular Debtor or Reorganized Debtor will remain the obligations solely of such Debtor or Reorganized Debtor and will not become obligations of any other Debtor or Reorganized Debtor solely by virtue of this Plan or the Chapter 11 Cases.

*C.     Vesting of Assets in the Reorganized Debtors Free and Clear of Liens and Claims*

Except as otherwise expressly provided in this Plan, the Confirmation Order, or any Restructuring Document, pursuant to sections 1123(a)(5), 1123(b)(3), 1141(b) and (c) and other applicable provisions of the Bankruptcy Code, on and after the Effective Date, all property and assets of the Estates of the Debtors, including all claims, rights, and Litigation Claims of the Debtors, and any other assets or property acquired by the Debtors or the Reorganized Debtors during the Chapter 11 Cases or under or in connection with this Plan (other than the Professional Fee Claim Reserve and any rejected Executory Contracts and/or Unexpired Leases), will vest in the Reorganized Debtors free and clear of all Claims, Liens, charges, and other encumbrances, subject to the applicable law of the Debtor's jurisdiction of incorporation, where such non-bankruptcy law is applicable, Liens which survive the occurrence of the Effective Date as described in <u>Article III</u> of this Plan (including, without limitation, the Liens that secure the Exit Facility). On and after the Effective Date, the Reorganized Debtors may (i) operate their respective businesses, (ii) use, acquire, and dispose of their respective property and (iii) compromise or settle any Claims, in each case without notice to, supervision of or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or the Bankruptcy Rules, other than restrictions expressly imposed by this Plan or the Confirmation Order.

*D.     Exit Facility Loan Documents*

On the Effective Date, the Debtors and the Reorganized Debtors, as applicable, will be authorized to execute and deliver, and to consummate the transactions contemplated by, the Exit Facility Loan Documents, in each case in form and substance acceptable to the Required Consenting Noteholders in the manner set forth in the Restructuring Support Agreement and to the Exit Facility Lenders and without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Person or Entity (other than as expressly required by the Exit Facility Loan Documents). On the Effective Date, the Exit Facility Loan Documents will constitute legal, valid, binding and authorized indebtedness and obligations of the Reorganized Debtors, enforceable in accordance with their respective terms and such indebtedness and obligations will not be, and will not be

33

deemed to be, enjoined or subject to discharge, impairment, release or avoidance under this Plan, the Confirmation Order or on account of the Confirmation or Consummation of this Plan.

E.     *Exit Senior Unsecured Notes Indenture*

On the Effective Date, the Debtors and the Reorganized Debtors, as applicable, will be authorized to execute and deliver, and to consummate the transactions contemplated by, the Exit Senior Unsecured Notes Indenture and other Exit Senior Unsecured Notes Documents in each case in form and substance acceptable to the Required Consenting Noteholders in the manner set forth in the Restructuring Support Agreement, and in form and substance acceptable to the Backstop Parties, and without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Person or Entity (other than as expressly required by the Exit Senior Unsecured Notes Indenture). The Exit Senior Unsecured Notes will consist of the Rights Offering Notes and the Takeback Notes to be issued under the Exit Senior Unsecured Notes Indenture.  On the Effective Date, the Exit Senior Unsecured Notes Indenture will constitute legal, valid, binding and authorized indebtedness and obligations of the Reorganized Debtors, enforceable in accordance with their respective terms and such indebtedness and obligations will not be, and will not be deemed to be, enjoined or subject to discharge, impairment, release or avoidance under this Plan, the Confirmation Order or on account of the Confirmation or Consummation of this Plan.

F.     *New Common Stock; Book Entry*

On the Effective Date, subject to the terms and conditions of this Plan and the Restructuring Transactions and as described more fully in the Reorganization Steps Overview, Reorganized Parent will issue the New Common Stock pursuant to this Plan and the Amended/New Corporate Governance Documents.

Distributions of the New Common Stock and the New Warrants may be made by delivery or book-entry transfer thereof by the applicable Distribution Agent in accordance with this Plan and the Amended/New Corporate Governance Documents.  Upon the Effective Date, after giving effect to the transactions contemplated hereby, the authorized share capital or other equity securities of Reorganized Parent will be that number of shares of New Common Stock as may be designated in the Amended/New Corporate Governance Documents.

G.     *Listing of New Securities and Transfer Restrictions*

Reorganized Parent will use its commercially reasonable efforts to list the New Common Stock for trading on a national securities exchange reasonably acceptable to the Debtors and the Required Consenting Noteholders, with such listing to be effective as soon as practical after the Effective Date.  On the Effective Date, Reorganized Parent will be a registrant under the Exchange Act.  Each share of New Common Stock will have the same rights, including with respect to voting, dividend, capital, redemption, and information rights.  The New Common Stock will constitute a single class of equity securities in Reorganized Parent on the Effective Date and, other than the New Common Stock issued under the New Management Incentive Plan and the New Warrants, there will exist no other equity securities, warrants, options, or other agreements to acquire any equity interest in Reorganized Parent as of the Effective Date.

34

US-DOCS\110687040

*H.     New Registration Rights Agreement*

Subject to the Restructuring Transactions permitted by Article V.A of this Plan, on the Effective Date, Reorganized Parent will enter into the New Registration Rights Agreement, which will become effective and binding in accordance with its terms and conditions upon the parties thereto, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Entity (other than as expressly required by the New Registration Rights Agreement).

*I.     New Management Incentive Plan*

As soon as reasonably practicable after the Effective Date, Reorganized Parent will adopt the New Management Incentive Plan, which will be on the terms and conditions (including any and all awards granted thereunder) determined by the New Board (including with respect to participants, allocation, timing, and the form and structure of the options, warrants, and/or equity compensation thereunder). The New Common Stock issued under the New Management Incentive Plan will dilute all of the New Common Stock equally.

*J.     New Warrants*

On the Effective Date, Reorganized Parent will enter into and consummate the transactions contemplated by the New Warrant Agreement (including issuing the New Warrants), which will become effective and binding in accordance with their respective terms and conditions upon the parties thereto, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Person or Entity (other than as expressly required by the New Warrant Agreement and the New Warrants, as applicable).

*K.     Plan Securities and Related Documentation; Exemption from Securities Laws*

On and after the Effective Date, the Debtors and the Reorganized Debtors, as applicable, are authorized to and will provide or issue, as applicable, the New Common Stock, the New Warrants, and the Exit Senior Unsecured Notes to be distributed and issued under this Plan (collectively, the "**Plan Securities**") and any and all other notes, stock, instruments, certificates, and other documents or agreements required to be distributed, issued, executed or delivered pursuant to or in connection with this Plan (collectively, the "**Plan Securities and Documents**"), in each case in form and substance acceptable to the Required Consenting Noteholders in the manner set forth in the Restructuring Support Agreement, and without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Entity.

The offer, distribution, and issuance, as applicable, of the Plan Securities and Documents under this Plan will be exempt, or will be effected in a manner that is exempt, from registration and prospectus delivery requirements under applicable securities laws (including, as applicable, Section 5 of the Securities Act, Article 3(1) of Directive 2003/71/EC of the European Parliament and of the Council (as amended), Article 3(1) of Regulation (EU) 2017/1129 of the European Parliament and of the Council, or any similar state or local law requiring the registration and/or delivery of a prospectus for offer or sale of a security or registration or licensing of an issuer of a

35

security) pursuant to section 1145(a) of the Bankruptcy Code and/or other applicable exemptions; *provided*, *however*, that Rights Offering Notes issued to the Backstop Parties pursuant to the Backstop Commitment Agreement (but not the Rights Offering Notes issued to Holders of Allowed Prepetition Notes Claims in the Rights Offering pursuant to Article III.B.7(c) of this Plan) will be issued and distributed pursuant to Section 4(a)(2) of the Securities Act and other applicable exemptions. An offering of Plan Securities provided in reliance on the exemption from registration under the Securities Act pursuant to section 1145(a) of the Bankruptcy Code may be sold without registration to the extent permitted under section 1145 of the Bankruptcy Code and is deemed to be a public offering, and such Plan Securities may be resold without registration to the extent permitted under section 1145 of the Bankruptcy Code and other applicable law.

Persons who purchase securities pursuant to the exemption from registration set forth in Section 4(a)(2) of the Securities Act or Regulation D promulgated thereunder will hold "restricted securities." Resales of such restricted securities would not be exempted by section 1145 of the Bankruptcy Code from registration under the Securities Act or other applicable law. Holders of restricted securities would, however, be permitted to resell Plan Securities without registration if they are able to comply with the applicable provisions of Rule 144 under the Securities Act or Rule 144A under the Securities Act or any other applicable registration exemption under the Securities Act, or if such securities are registered with the SEC.

*L.     Release of Liens and Claims*

To the fullest extent provided under section 1141(c) and other applicable provisions of the Bankruptcy Code, except as otherwise provided herein (including, without limitation, Article V.D of this Plan and to the extent any cash collateral is provided to satisfy or cash collateralize the Prepetition A&R Claims) or in any contract, instrument, release or other agreement or document entered into or delivered in connection with this Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to Article VII hereof, all Liens, Claims, mortgages, deeds of trust, or other security interests against the assets or property of the Debtors or the Estates will (subject to the laws of the Debtor's jurisdiction of incorporation where such non-bankruptcy law is applicable) be fully released, canceled, terminated, extinguished and discharged, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Person or Entity. The filing of the Confirmation Order with any federal, state, or local agency or department will constitute good and sufficient evidence of, but will not be required to effect, the termination of such Liens, Claims and other interests to the extent provided in the immediately preceding sentence. Any Person or Entity holding such Liens, Claims or interests will, pursuant to section 1142 of the Bankruptcy Code, and, in the case of any DIP Facility Liens or liens securing the Prepetition A&R Claims, Prepetition Term Loan Claims or the Prepetition Revolving Credit Claims at the sole cost and expense of the Reorganized Debtors, promptly execute and deliver to the Reorganized Debtors such instruments of termination, release, satisfaction and/or assignment (in recordable form) as may be reasonably requested by the Reorganized Debtors.

*M.     Corporate Governance Documents of the Reorganized Debtors*

The respective corporate governance documents of each of the Debtors will be amended and restated or replaced (as applicable) by the Amended/New Corporate Governance Documents

US-DOCS\110687040

(subject to such amendment, restatement, or replacement being in accordance with the law of the Debtor's jurisdiction of incorporation to the extent such non-bankruptcy law is applicable). Such corporate governance documents will (if permissible under the law of the Debtor's jurisdiction of incorporation if such non-bankruptcy law is applicable): (i) to the extent required by section 1123(a)(6) of the Bankruptcy Code, include a provision prohibiting the issuance of non-voting equity securities; (ii) authorize the issuance of New Common Stock in an amount not less than the amount necessary to permit the distributions thereof required or contemplated by this Plan (including as a result of the exercise of New Warrants); and (iii) to the extent necessary or appropriate, include such provisions as may be needed to effectuate and consummate this Plan and the transactions contemplated herein. After the Effective Date, the Reorganized Debtors may, subject to the terms and conditions of the Amended/New Corporate Governance Documents, amend and restate their respective corporate governance documents as permitted thereby and by applicable law.

### N. Directors and Officers of the Reorganized Debtors

The New Board will be composed of seven (7) directors, one of whom will be Mark A. McCollum, the chief executive officer of the Debtors, and six (6) of whom will be designated by the Ad Hoc Noteholder Committee (in consultation with Mark A. McCollum, the chief executive officer of the Debtors and subject to the obligation of the Ad Hoc Noteholder Committee to meet and interview upon reasonable notice any existing members of the Debtors' boards of directors who express interest in serving on the New Board).

Pursuant to and to the extent required by section 1129(a)(5) of the Bankruptcy Code, the Debtors will disclose in the Plan Supplement the identity and affiliations of any Person proposed to serve on the New Board or as an officer of each of the Reorganized Debtors, and, to the extent such Person is an insider other than by virtue of being a director or an officer, the nature of any compensation for such Person. Each such director and officer will serve from and after the Effective Date pursuant to applicable law and the terms of the Amended/New Corporate Governance Documents and the other constituent and corporate governance documents of the applicable Reorganized Debtors. The existing boards of directors and other governing bodies of the Debtors will be deemed to have resigned on and as of the Effective Date, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Person or Entity.

### O. Corporate Action

Each of the Debtors and the Reorganized Debtors may take any and all actions to execute, deliver, File or record such contracts, instruments, releases and other agreements or documents and take such actions as may be necessary or appropriate to effectuate and implement the provisions of this Plan, including, without limitation, the issuance and the distribution of the securities to be issued pursuant hereto, in each case in form and substance acceptable to the Required Consenting Noteholders in the manner set forth in the Restructuring Support Agreement and to the extent permitted by the DIP Financing Documents, and without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote or other approval or authorization by the security holders, officers or directors of the Debtors or the Reorganized Debtors or by any other Person (subject to

US-DOCS\110687040

such actions being in accordance with the law of the Debtor's jurisdiction of incorporation to the extent such non-bankruptcy law is applicable).

Prior to, on or after the Effective Date (as appropriate), to the extent permitted by the law of the Debtor's jurisdiction of incorporation to the extent such non-bankruptcy law is applicable, all matters provided for pursuant to this Plan that would otherwise require approval of the stockholders, directors, officers, managers, members or partners of the Debtors (as of prior to the Effective Date) will be deemed to have been so approved and will be in effect prior to, on or after the Effective Date (as appropriate) pursuant to applicable law and without any requirement of further action by such Person or Entity or the need for any approvals, authorizations, actions or consents of or from any such Person or Entity.

As of the Effective Date, all matters provided for in this Plan involving the legal or corporate structure of the Debtors or the Reorganized Debtors (including, without limitation, the adoption of the Amended/New Corporate Governance Documents and similar constituent and corporate governance documents, and the selection of directors and officers for, each of the Reorganized Debtors), and any legal or corporate action required by the Debtors or the Reorganized Debtors in connection with this Plan, to the extent permitted by the law of the Debtor's jurisdiction of incorporation to the extent such non-bankruptcy law is applicable, will be deemed to have occurred and will be in full force and effect in all respects, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote or other approval or authorization by any Person or Entity.

On and after the Effective Date, the appropriate officers of the Debtors and the Reorganized Debtors are authorized to issue, execute, and deliver, and consummate the transactions contemplated by, the contracts, agreements, documents, guarantees, pledges, consents, securities, certificates, resolutions and instruments contemplated by or described in this Plan in the name of and on behalf of the Debtors and the Reorganized Debtors, in each case in form and substance acceptable to the Required Consenting Noteholders in the manner set forth in the Restructuring Support Agreement, and without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote or other approval or authorization by any Person or Entity. The secretary and any assistant secretary of the Debtors and the Reorganized Debtors will be authorized to certify or attest to any of the foregoing actions.

*P.      Cancellation of Notes, Certificates and Instruments*

On the Effective Date, except to the extent otherwise provided in this Plan (including, without limitation, Article II.B and Article V.B of this Plan), all notes, indentures, instruments, certificates, agreements and other documents evidencing or relating to any Impaired Claim (including, for the avoidance of doubt and without limitation, the Prepetition Notes Indentures and the Prepetition Notes, or any Claim being paid in full in Cash under this Plan), will be fully released, terminated, extinguished and discharged (including, in respect of DIP Financing Documents, any duties or obligations of the DIP Agent thereunder), in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote or other approval or authorization by any Person or Entity and in the case of any Claim being paid in full in Cash upon the indefeasible payment of such Claim in full in Cash as contemplated by this Plan; provided that the Prepetition Debt

38

Documents and the DIP Financing Documents will continue in effect for the limited purpose of (i) allowing Holders of Claims thereunder to receive, and allowing and preserving the rights of the Prepetition Agents, the Prepetition Notes Indenture Trustee or other applicable Distribution Agents thereunder to make, distributions under this Plan; (ii) permitting the Prepetition Notes Indenture Trustee to exercise its Prepetition Notes Indenture Trustee Charging Lien against such distributions for payment of any unpaid portion of the Prepetition Notes Indenture Trustee Fees and Expenses; (iii) preserving any rights of the DIP Agent to payment of fees, expenses, and indemnification obligations and otherwise allowing the DIP Agent to take any actions contemplated by this Plan, and (iv) preserving the DIP Contingent Obligations as contemplated by Article II.B of this Plan; provided further that, upon completion of the distribution with respect to a specific Prepetition Debt Claim, the Prepetition Debt Documents in connection thereto and any and all notes, securities and instruments issued in connection with such Prepetition Debt Claim shall terminate completely without further notice or action and be deemed surrendered; provided, further, that the foregoing provisions shall not apply to any Class 8 General Unsecured Claims. For the avoidance of doubt, nothing in this Plan or the Confirmation Order will affect or impair the Prepetition Notes Indenture Trustee Charging Lien, which will remain in full force and effect as of and after the Effective Date.  For the avoidance of doubt, nothing contained in this Plan or the Confirmation Order shall in any way limit or affect the standing of the Prepetition Notes Indenture Trustee or the DIP Agent to appear and be heard in the Chapter 11 Cases or any other proceeding in which they are or may become party on and after the Effective Date, to enforce any provisions of this Plan or otherwise.

### Q. Existing Equity Interests

On the Effective Date, the Equity Interests in Weatherford Parent will be terminated and cancelled without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote or other approval or authorization by any Person or Entity.

On the Effective Date, the Intercompany Equity Interests will remain effective and outstanding, except to the extent modified pursuant to the terms of the Reorganization Steps Overview (provided such steps are taken in accordance with applicable law to the extent such non-bankruptcy law is applicable), and will be owned and held by the same applicable Person(s) that held and/or owned such Intercompany Equity Interests immediately prior to the Effective Date. Each Parent Subsidiary will continue to be governed by the terms and conditions of its applicable corporate governance documents as in effect immediately prior to the Effective Date, except as amended or modified by this Plan, where such amendment or modification is permitted under the law of the Parent Subsidiary's jurisdiction of incorporation to the extent such non-bankruptcy law is applicable.

### R. Sources of Cash for Plan Distributions

All Cash necessary for the Debtors or the Reorganized Debtors, as applicable, to make payments required pursuant to this Plan will be obtained from their respective Cash balances, including Cash from operations, the Rights Offering, and the Exit Facility Credit Agreement. The Debtors and the Reorganized Debtors, as applicable, may also make such payments using Cash received from their subsidiaries through their respective consolidated cash management systems and the incurrence of intercompany transactions, in all cases subject to the terms and conditions of

US-DOCS\110687040

the Restructuring Documents. For the avoidance of doubt, Weatherford Bermuda and Weatherford Delaware may make payments on behalf of Weatherford Parent that would otherwise be considered prepetition claims of Weatherford Parent in the Irish Scheme of Arrangement so long as such payments are in the ordinary course of business and otherwise in accordance with the terms of this Plan and the DIP Orders.

S.      *Funding and Use of Professional Fee Claim Reserve*

On or before the Effective Date, the Debtors will fund the Professional Fee Claim Reserve in such amount as determined by the Debtors, with the consent of the Required Consenting Noteholders and in consultation with the Committee or as determined by order of the Bankruptcy Court, as necessary in order to be able to pay in full in Cash the obligations and liabilities for which such reserve was established.

The Cash contained in the Professional Fee Claim Reserve will be used solely to pay the obligations and liabilities for which such reserve was established, with the Unused Cash Reserve Amount (if any) being returned to the Reorganized Debtors within three (3) Business Days after determining the Unused Cash Reserve Amount. The Debtors and the Reorganized Debtors, as applicable, will maintain detailed records of all payments made from the Professional Fee Claim Reserve, such that all payments and transactions will be adequately and promptly documented in, and readily ascertainable from, their respective books and records.

The Professional Fee Claim Reserve will be maintained in trust for the Professionals and will not be considered property of the Debtors' Estates; provided that the Reorganized Debtors will have a reversionary interest in the Unused Cash Reserve Amount. To the extent that funds held in the Professional Fee Claim Reserve do not or are unable to satisfy the full amount of the Allowed Professional Fee Claims, such Professionals will have an Allowed Administrative Claim for any such deficiency, which will be satisfied in full in Cash in accordance with Article II.A of this Plan.

After the Effective Date, neither the Debtors nor the Reorganized Debtors will deposit any other funds or property into the Professional Fee Claim Reserve without further order of the Bankruptcy Court or otherwise commingle funds in the Professional Fee Claim Reserve. To the extent the Professional Fee Claim Reserve is insufficient to pay in full in Cash the obligations and liabilities for which such reserve was established, then the Reorganized Debtors will, within five (5) Business Days, pay such obligations and liabilities from either Cash on hand or by drawing under the Exit Facility Credit Agreement to the extent of any availability thereunder.

T.      *Payment of Fees and Expenses of Certain Creditors*

The Debtors will, on and after the Effective Date and to the extent invoiced in accordance with the terms of the applicable engagement letter, pay the Ad Hoc Noteholder Committee Fees and Expenses (whether accrued prepetition or postpetition and to the extent not otherwise paid during the Chapter 11 Cases), without the need for application by any such parties to the Bankruptcy Court, and without notice and a hearing pursuant to section 1129(a)(4) of the Bankruptcy Code or otherwise.

US-DOCS\110687040

*U.     Payment of Fees and Expenses of the Prepetition Notes Indenture Trustee*

The Debtors will, on and after the Effective Date, and upon the presentment of invoices in customary form (which may be redacted to preserve any confidential or privileged information), pay the Prepetition Notes Indenture Trustee Fees and Expenses (in each case whether accrued prepetition or postpetition and to the extent not otherwise paid during the Chapter 11 Cases and the fees and expenses of the Prepetition Notes Indenture Trustee solely in its capacity as Distribution Agent under this Plan), without the need for application by any party to the Bankruptcy Court, and without notice and a hearing pursuant to section 1129(a)(4) of the Bankruptcy Code or otherwise.  Nothing herein will be deemed to impair, waive, or discharge the Prepetition Notes Indenture Trustee Charging Lien for any amounts not paid pursuant to this Plan and otherwise claimed by the Prepetition Notes Indenture Trustee pursuant to and in accordance with the Prepetition Notes Indentures.  From and after the Effective Date, the Reorganized Debtors will pay any Prepetition Notes Indenture Trustee Fees and Expenses in full in Cash without further court approval.

*V.     Rights Offering*

The Debtors will distribute the Subscription Rights for the Rights Offering to the Holders of Prepetition Notes as set forth in this Plan and the Rights Offering Procedures.  Pursuant to the Rights Offering Procedures and this Plan, the Rights Offering will be open to all Holders of Prepetition Notes.  The Rights Offering will commence within three (3) Business Days following entry of the Confirmation Order by the Bankruptcy Court and will conclude on the first Business Day that is not less than 10 days thereafter and prior to the Effective Date.  Upon exercise of the Subscription Rights by the Holders of Prepetition Notes pursuant to the terms of the Rights Offering Procedures and this Plan, the Reorganized Debtors will be authorized to issue the Rights Offering Notes on the Effective Date under the Exit Senior Unsecured Notes Indenture and in accordance with this Plan and the Rights Offering Procedures.  Pursuant to the Backstop Commitment Agreement, the Backstop Parties will purchase any of the Rights Offering Notes not subscribed for by Holders of Prepetition Notes in the Rights Offering at the per note purchase price set forth in the Rights Offering Procedures and the Backstop Commitment Agreement.  On the Effective Date, the rights and obligations of the Debtors under the Backstop Commitment Agreement will vest in the Reorganized Debtors.

**ARTICLE VI.**

**TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES**

*A.     Assumption of Executory Contracts and Unexpired Leases*

On the Effective Date, all Executory Contracts and Unexpired Leases of the Debtors will be assumed by the Debtors in accordance with, and subject to, the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code, except for those Executory Contracts and Unexpired Leases that:

(i)     have been assumed or rejected by the Debtors by prior order of the Bankruptcy Court;

41

(ii)     are the subject of a motion to reject filed by the Debtors pending on the Effective Date;

(iii)    are identified by the Debtors (with the consent of the Required Consenting Noteholders) and Filed in the Plan Supplement; or

(iv)    are rejected or terminated by the Debtors pursuant to the terms of this Plan.

Without amending or altering any prior order of the Bankruptcy Court approving the assumption or rejection of any Executory Contract or Unexpired Lease, entry of the Confirmation Order by the Bankruptcy Court will constitute approval of such assumptions pursuant to sections 365(a) and 1123 of the Bankruptcy Code.

To the extent any provision in any Executory Contract or Unexpired Lease assumed or assumed and assigned (as applicable) pursuant to this Plan or any prior order of the Bankruptcy Court (including, without limitation, any "change of control" provision) (a) prohibits, restricts or conditions (or purports to prohibit, restrict or condition), (b) is modified, breached or terminated (or deemed modified, breached or terminated), (c) increases, accelerates or otherwise alters any obligations or liabilities of the Debtors or Reorganized Debtors (or purports to increase, accelerate or otherwise alter any obligations or liabilities of the Debtors or Reorganized Debtors), or (d) results in the creation or imposition of any Lien upon any property or asset of any of the Debtors or Reorganized Debtors (or purports to result in the creation or imposition of any Lien upon any property or asset or any of the Debtors or Reorganized Debtors), in each case as a result of (i) the commencement of these Chapter 11 Cases or the insolvency or financial condition of any Debtor at any time before the closing of its respective Chapter 11 Case, (ii) any Debtor's or any Reorganized Debtor's assumption or assumption and assignment (as applicable) of such Executory Contract or Unexpired Lease or (iii) the Confirmation or Consummation of this Plan, then such provision will, to the extent provided by section 365 of the Bankruptcy Code, not entitle the non-debtor party thereto to modify, declare a breach, terminate, increase, accelerate or alter any of the obligations or liabilities of the Debtors or the Reorganized Debtors under, or create or impose any Lien upon any property or asset of any of the Debtors or Reorganized Debtors under any such Executory Contract or Unexpired Lease or to exercise any other default-related rights or remedies solely with respect thereto, and any required consent under any such contract or lease will be deemed satisfied by the Confirmation of this Plan, in each case subject to the remaining terms and conditions of this Article VI.

Each Executory Contract and Unexpired Lease assumed and/or assigned pursuant to this Plan will revest in and be fully enforceable by the applicable Reorganized Debtor or the applicable assignee in accordance with its terms and conditions, except as modified by the provisions of this Plan, any order of the Bankruptcy Court approving its assumption and/or assignment, or applicable law.

The inclusion or exclusion of a contract or lease on any schedule or exhibit will not constitute an admission by any Debtor that such contract or lease is an Executory Contract or Unexpired Lease or that any Debtor has any liability thereunder.

B.      *Cure of Defaults; Assignment of Executory Contracts and Unexpired Leases*

Any monetary amounts by which any Executory Contract or Unexpired Lease to be assumed pursuant to this Plan is in default shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the default amount (if any) in Cash by the Debtors or

42

Reorganized Debtors, as applicable, on the Effective Date or on such other terms as the parties to each such executory contract or unexpired lease may otherwise agree in writing, with the consent of the Required Consenting Noteholders.

In the event of a dispute regarding (a) the amount of any cure payment, (b) the ability of any Debtor or assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed, or assumed and assigned or (c) any other matter pertaining to assumption or assignment, the applicable cure payments required by section 365(b)(1) of the Bankruptcy Code will be made following the entry of a Final Order resolving the dispute in accordance with Article VIII.A.4 of this Plan and approving such assumption or assumption and assignment; provided, however, that following the resolution of any such dispute, the Debtors or the Reorganized Debtors, as applicable, may elect to reject such Executory Contract or Unexpired Lease in lieu of assuming or assigning it. The Debtors or the Reorganized Debtors, as applicable, will be authorized to effect such rejection by filing a written notice of rejection with the Bankruptcy Court and serving such notice on the applicable counterparty within ten (10) days of the entry of such Final Order.

Subject to any cure claims Filed with respect thereto, assumption or assumption and assignment of any Executory Contract or Unexpired Lease pursuant to this Plan will result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time prior to the effective date of assumption or assumption and assignment, in each case as provided in section 365 of the Bankruptcy Code, in each case subject to the remaining terms and conditions of this Article VI. Any proofs of Claim filed with respect to an Executory Contract or Unexpired Lease that has been assumed or assumed and assigned by Final Order will be deemed disallowed and expunged (subject to any cure claims Filed with respect thereto), without further notice to or action, order, or approval of the Bankruptcy Court.

With respect to any Executory Contract or Unexpired Lease assumed and assigned pursuant to this Plan, upon and as of the Effective Date, the applicable assignee will be deemed to be substituted as a party thereto for the applicable Debtor party to such assigned Executory Contract or Unexpired Lease and, accordingly, the Debtors and the Reorganized Debtors will be relieved, pursuant to and to the extent set forth in section 365(k) of the Bankruptcy Code, from any further liability under such assigned Executory Contract or Unexpired Lease.

C.      *Rejection of Executory Contracts and Unexpired Leases*

The Debtors reserve the right (with the consent of the Required Consenting Noteholders), at any time prior to the Effective Date, except as otherwise specifically provided herein, to seek to reject any Executory Contract or Unexpired Lease and to file a motion requesting authorization for the rejection of any such contract or lease. All Executory Contracts and Unexpired Leases listed on a Plan Schedule will be deemed rejected as of the Effective Date. The Confirmation Order will constitute an order of the Bankruptcy Court approving the rejections described in this Article VI pursuant to sections 365 and 1123 of the Bankruptcy Code as of the Effective Date. Rejection of any Executory Contract or Unexpired Lease pursuant to this Plan or otherwise will not constitute a termination of any preexisting obligations owed to the Debtors or the Reorganized Debtors, as applicable, under such Executory Contracts or Unexpired Leases.

43

D.      *Claims on Account of the Rejection of Executory Contracts or Unexpired Leases*

All proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, pursuant to this Plan or the Confirmation Order, if any, must be filed with the Bankruptcy Court within thirty (30) days after service of an order of the Bankruptcy Court (including the Confirmation Order) approving such rejection and any such Claims will be paid in full in cash when Allowed.

Any Person or Entity that is required to file a proof of Claim arising from the rejection of an Executory Contract or an Unexpired Lease that fails to timely do so will be forever barred, estopped and enjoined from asserting such Claim, and such Claim will not be enforceable, against the Debtors, the Reorganized Debtors or the Estates, and the Debtors, the Reorganized Debtors and their Estates and their respective assets and property will be forever discharged from any and all indebtedness and liability with respect to such Claim unless otherwise ordered by the Bankruptcy Court or as otherwise provided herein.  All such Claims will, as of the Effective Date, be subject to the permanent injunction set forth in Article X.G hereof.

E.      *D&O Liability Insurance Policies*

On the Effective Date, each D&O Liability Insurance Policy will be deemed and treated as an Executory Contract that is and will be assumed by the Debtors (and assigned to the applicable Reorganized Debtors, if necessary) pursuant to section 365(a) and section 1123 of the Bankruptcy Code as to which no proof of Claim, request for administrative expense, or cure claim need be Filed, and all Claims arising from the D&O Liability Insurance Policies will survive the Effective Date and be Unimpaired. Unless previously effectuated by separate order entered by the Bankruptcy Court, entry of the Confirmation Order will constitute the Bankruptcy Court's approval of the Debtors' assumption of each of the D&O Liability Insurance Policies. In furtherance of the foregoing, the Reorganized Debtors will maintain and continue in full force and effect such D&O Liability Insurance Policies for the benefit of the insured Persons at levels (including with respect to coverage and amount) no less favorable than those existing as of the date of entry of the Confirmation Order for a period of no less than six (6) years following the Effective Date; provided, however, that, after assumption of the D&O Liability Insurance Policies, nothing in this Plan otherwise alters the terms and conditions of the D&O Liability Insurance Policies. Confirmation and Consummation of this Plan will not impair or otherwise modify any available defenses of the Reorganized Debtors under the D&O Liability Insurance Policies. For the avoidance of doubt, the D&O Liability Insurance Policies will continue to apply with respect to actions, or failures to act, that occurred on or prior to the Effective Date, subject to the terms and conditions of the D&O Liability Insurance Policies. The Debtors are further authorized to take such actions, and to execute and deliver such documents, as may be reasonably necessary or appropriate to implement, maintain, cause the binding of, satisfy any terms or conditions of, or otherwise secure for the insureds the benefits of the D&O Tail Policy, without further notice to or order of the Bankruptcy Court or approval or consent of any Person or Entity.

F.      *Indemnification Provisions*

On the Effective Date, all Indemnification Provisions will be deemed and treated as Executory Contracts that are and will be assumed by the Debtors (and assigned to the applicable Reorganized Debtors, if necessary) pursuant to section 365(a) and section 1123 of the Bankruptcy Code as to which no proof of Claim, request for administrative expense, or cure claim need be

44

Filed, and all Claims arising from the Indemnification Provisions will survive the Effective Date and be Unimpaired. Unless previously effectuated by separate order entered by the Bankruptcy Court, entry of the Confirmation Order will constitute the Bankruptcy Court's approval of the Debtors' assumption of each of the Indemnification Provisions. Confirmation and Consummation of this Plan will not impair or otherwise modify any available defenses of the Reorganized Debtors or other applicable parties under the Indemnification Provisions. For the avoidance of doubt, the Indemnification Provisions will continue to apply with respect to actions, or failures to act, that occurred on or prior to the Effective Date, subject to the terms and conditions of the Indemnification Provisions.

G.    *Employment Plans*

All employment agreements and severance policies, and all employment and service provider, compensation, bonus, retention, change of control, equity, benefit, pension and/or welfare plans and similar plans, policies, programs, agreements and arrangements of the Debtors and applicable to any of the Debtors' current or former officers, directors, members, partners, employees, service providers, or retirees (collectively, the "**Employment Plans**") will be maintained, continued in full force and effect and assumed by the applicable Debtors (and assigned to the applicable Reorganized Debtors, if necessary) pursuant to sections 365(a) and 1123 of the Bankruptcy Code as to which no proof of Claim, request for administrative expense, or cure claim need be Filed. All Claims arising from the Employment Plans will be Unimpaired.

H.    *Insurance Contracts*

On the Effective Date, and without limiting the terms or provisions of Paragraph E of this Article VI, each Insurance Contract will be deemed and treated as an Executory Contract that is and will be assumed by the Debtors pursuant to section 365(a) and section 1123 of the Bankruptcy Code as to which no proof of Claim, request for administrative expense, or cure claim need be Filed. Unless previously effectuated by separate order entered by the Bankruptcy Court, entry of the Confirmation Order will constitute the Bankruptcy Court's approval of the Debtors' assumption of each of the Insurance Contracts. Confirmation and Consummation of this Plan will not impair or otherwise modify any available defenses of the Reorganized Debtors or any insurer under the Insurance Contracts.

I.    *Extension of Time to Assume or Reject*

Notwithstanding anything to the contrary set forth in Article VI of this Plan, in the event of a dispute as to whether a contract is executory or a lease is unexpired, the right of the Reorganized Debtors to move to assume or reject such contract or lease will be extended until the date that is ten (10) days after entry of a Final Order by the Bankruptcy Court determining that the contract is executory or the lease is unexpired. The deemed assumption provided for in Article VI.A of this Plan will not apply to any such contract or lease, and any such contract or lease will be assumed or rejected only upon motion of the Reorganized Debtors following the Bankruptcy Court's determination that the contract is executory or the lease is unexpired.

J.    *Modifications, Amendments, Supplements, Restatements, or Other Agreements*

Unless otherwise provided in this Plan, each Executory Contract or Unexpired Lease that is assumed by the Debtors or the Reorganized Debtors will include all modifications, amendments,

45

supplements, restatements, or other agreements that in any manner affect such Executory Contract or Unexpired Lease, and all rights related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing has been previously rejected or repudiated or is rejected or repudiated hereunder. Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases will not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority, or amount of any Claims that may arise in connection therewith.

## ARTICLE VII.

## PROVISIONS GOVERNING DISTRIBUTIONS

*A.      Distributions for Claims Allowed as of the Effective Date*

Except as otherwise provided in the "Treatment" sections in <u>Article III</u> hereof (including in respect of the DIP Facility Claims which shall be indefeasibly paid in full in cash on the Effective Date), initial distributions to be made on account of Claims that are Allowed Claims as of the Effective Date will be made on the Initial Distribution Date or as soon thereafter as is practicable. Any payment or distribution required to be made under this Plan on a day other than a Business Day will be made on the next succeeding Business Day. Distributions on account of Disputed Claims that first become Allowed Claims after the Effective Date will be made pursuant to <u>Article VIII</u> hereof.

*B.      No Postpetition Interest on Claims*

Unless otherwise specifically provided for in this Plan, the Confirmation Order or Final Order of the Bankruptcy Court, or required by applicable bankruptcy law (including, without limitation, as required pursuant to section 506(b) or section 511 of the Bankruptcy Code), postpetition interest will not accrue or be paid on any Claims (except DIP Facility Claims) and no Holder of a Claim (except a DIP Facility Claim) will be entitled to interest accruing on or after the Petition Date on any Claim, provided, that, to the extent provided for in the contracts or instruments giving rise to a Class 8 General Unsecured Claim or required to be paid on a Class 8 General Unsecured Claim under applicable nonbankruptcy law, interest shall accrue on Class 8 General Unsecured Claims at the relevant contractual rate or other rate applicable under relevant nonbankruptcy law.

*C.      Distributions by the Reorganized Debtors or Other Applicable Distribution Agent*

Other than as specifically set forth below or as otherwise provided in this Plan, the Reorganized Debtors or other applicable Distribution Agent will make, or facilitate the making of, all distributions required to be distributed under this Plan. Except as otherwise provided in this Plan, distributions on account of the Allowed Prepetition Debt and Allowed DIP Facility Claims will be made to the Prepetition Agents, the Prepetition Notes Indenture Trustee, and the DIP Agent, respectively, and such agent or trustee will be, and will act as, the Distribution Agent with respect to its respective Class of Claims in accordance with the terms and conditions of this Plan and the applicable debt documents. Except as otherwise provided in this Plan, all distributions to Holders of Prepetition Debt Claims and DIP Facility Claims will be deemed completed when made by the

46

Reorganized Debtors to the Prepetition Agents, the Prepetition Notes Indenture Trustee (or as directed by the Prepetition Notes Indenture Trustee) in its capacity as Distribution Agent, and the DIP Agent, or as otherwise provided in this Plan, as applicable. The Reorganized Debtors may employ or contract with other Entities to assist in or make the distributions required by this Plan and may pay the reasonable fees and expenses of such Entities and the Distribution Agents in the ordinary course of business without any further notice to or action, order or approval of the Bankruptcy Court. No Distribution Agent will be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court. The DIP Agent, the Prepetition Agents and the Prepetition Notes Indenture Trustee shall not have any liability to any person with respect to distributions made, directed to be made by or facilitated by the DIP Agent, the Prepetition Agents or the Prepetition Notes Indenture Trustee, as applicable, pursuant to this Plan regardless of what capacity they are acting in.

The distributions of New Common Stock and Takeback Notes to be made under this Plan to Holders of Allowed Prepetition Notes Claims shall be deemed made by the Debtors or Reorganized Debtors, as applicable, to the Prepetition Notes Indenture Trustee which, subject to the right of the Prepetition Notes Indenture Trustee to assert its Prepetition Notes Indenture Trustee Charging Lien against such distributions, shall transmit (or cause to be transmitted) such distributions to such Holders as set forth below. Notwithstanding anything to the contrary in this Plan, the Prepetition Notes Indenture Trustee, in its capacity as Distribution Agent, may transfer or facilitate the transfer of such distributions through the facilities of DTC in exchange for the relevant Prepetition Notes. If it is necessary to adopt alternate, additional or supplemental distribution procedures for any reason including because such distributions cannot be made through the facilities of DTC, to otherwise effectuate the distributions under this Plan or to give effect to the terms of the NOL Order, the Debtors or Reorganized Debtors, as applicable, shall implement such alternate, additional or supplemental procedures in consultation with the Prepetition Notes Indenture Trustee, in its capacity as Distribution Agent, to make distributions to Holders of the Prepetition Notes and to eliminate such Prepetition Notes, including all book entry positions relating thereto, from DTC's books and records (the "**Alternate/Supplemental Distribution Process**"). The Debtors or Reorganized Debtors (as applicable) shall use their best efforts to make the New Common Stock and Takeback Notes to be distributed to Holders of the Prepetition Notes eligible for distribution through the facilities of DTC. Distributions of Subscription Rights under this Plan to Holders of Allowed Prepetition Notes Claims shall be made by the Voting and Claims Agent as provided in the Rights Offering Procedures. The obligations of the Prepetition Notes Indenture Trustee under the Prepetition Notes Indentures, the Prepetition Notes, and this Plan shall, in its capacity as indenture trustee, be deemed fully satisfied upon the Effective Date. The obligations of the Prepetition Notes Indenture Trustee in its capacity as Distribution Agent shall be deemed fully satisfied upon either: (i) DTC's receipt of the distributions with respect to the Prepetition Notes; or (ii) if the Alternate/Supplemental Distribution Process is utilized, upon the completion (other than for continuing ministerial items) of its role in such process. The Prepetition Notes Indenture Trustee as a Distribution Agent under this Plan will be entitled to recognize and deal with for all purposes the Holders of the Prepetition Notes to the extent necessary to facilitate the distributions with respect to Allowed Prepetition Notes Claims to such Holders. Regardless of which capacity it is acting, the Prepetition Notes Indenture Trustee in any capacity shall not be responsible for, and may conclusively rely on, the Alternate/Supplemental Distribution Process.

.

47

The distributions of New Common Stock and New Warrants to be made under this Plan to Holders of Allowed Existing Common Stock shall be made by the Debtors or Reorganized Debtors, as applicable, and may include the distribution of that New Common Stock and New Warrants through the facilities of DTC.  The Debtors or Reorganized Debtors (as applicable) shall use their best efforts to make the New Common Stock and New Warrants to be distributed to Holders of the Existing Common Stock eligible for distribution through the facilities of DTC.

Notwithstanding any policies, practices or procedures of DTC or any other applicable clearing system, DTC and all other applicable clearing systems shall cooperate with and take all actions reasonably requested by the Voting and Claims Agent or the Prepetition Notes Indenture Trustee to facilitate distributions to Holders of Allowed Claims without requiring that such distributions be characterized as repayments of principal or interest. No Distribution Agent, including the Prepetition Notes Indenture Trustee in any capacity, shall be required to provide indemnification or other security to DTC in connection with any distributions to Holders of Allowed Claims through the facilities of DTC.

DTC shall be required to accept and conclusively rely upon this Plan or Confirmation Order in lieu of a legal opinion regarding whether the Plan Securities (other than the Rights Offering Notes issued to the Backstop Parties pursuant to the Backstop Commitment Agreement) are exempt from registration and/or eligible for DTC book-entry delivery, settlement, and depository services.

Notwithstanding anything to the contrary in this Plan or Confirmation Order, no entity (including, for the avoidance of doubt, DTC) shall be entitled to require a legal opinion regarding the validity of any transaction contemplated by this Plan or Confirmation Order, including, for the avoidance of doubt, whether the Plan Securities (other than the Rights Offering Notes issued to the Backstop Parties pursuant to the Backstop Commitment Agreement) are exempt from registration and/or eligible for DTC book entry delivery, settlement, and depositary services.

D.      *Delivery and Distributions; Undeliverable or Unclaimed Distributions*

1.  Record Date for Distributions

On the Distribution Record Date, the Claims Register (and the Debtors' books and records with respect to the Holders of Equity Interests in Weatherford Parent) will be closed.  Accordingly, the Debtors, the Reorganized Debtors or other applicable Distribution Agent will have no obligation to recognize the assignment, transfer or other disposition of, or the sale of any participation in, any Allowed Claim (other than DIP Facility Claims and Prepetition Debt Claims) or Allowed Equity Interest that occurs after the close of business on the Distribution Record Date, and will be entitled for all purposes herein to recognize and distribute securities, property, notices and other documents only to those Holders of Allowed Claims (other than DIP Facility Claims and Prepetition Debt Claims) or Allowed Equity Interest who are Holders of such Claims or Equity Interests, or participants therein, as of the close of business on the Distribution Record Date.  The Reorganized Debtors or other applicable Distribution Agent will be entitled to recognize and deal for all purposes under this Plan with only those record holders stated on the Claims Register, or their books and records, as of the close of business on the Distribution Record Date; provided, however, that the Distribution Record Date will not apply to the DIP Facility Claims, Prepetition Debt Claims, or any securities of the Debtors deposited with DTC.

US-DOCS\110687040

2. Delivery of Distributions in General

Except as otherwise provided herein, the Debtors, the Reorganized Debtors or other applicable Distribution Agent, as applicable, will make distributions to Holders of Allowed Claims and Allowed Equity Interests, or in care of their authorized agents, as appropriate, at the address for each such Holder or agent as indicated on the Debtors' or other applicable Distribution Agent's books and records as of the date of any such distribution; *provided*, *however*, that the manner of such distributions will be determined in the discretion of the applicable Distribution Agent (subject to the terms and conditions of the DIP Credit Agreement and the relevant Prepetition Debt Documents, if applicable); provided further, that the address for each Holder of an Allowed Claim will be deemed to be the address set forth in the latest proof of Claim, if any, Filed by such Holder pursuant to Bankruptcy Rule 3001 as of the Distribution Record Date and the address for each Holder of an Allowed Equity Interest will be deemed to be the address set forth in the Debtors' books and records, or as may be held by the applicable transfer agent or similar such agency.

3. Minimum Distributions

Notwithstanding anything herein to the contrary, no Distribution Agent will be required to make distributions or payments of less than $100.00 (whether in Cash or otherwise) or to make partial distributions or payments of fractions of dollars, Takeback Notes, or New Common Stock, in each case with respect to Impaired Claims or Impaired Equity Interests. With respect to Impaired Claims and Impaired Equity Interests, whenever any payment or distribution of a fraction of a dollar, a fraction of a Takeback Note in less than the denominational requirement, or a fraction of a share of New Common Stock under this Plan would otherwise be called for, the actual payment or distribution will reflect a rounding of such fraction down to the nearest whole dollar, or minimum denomination of Takeback Notes, or share of New Common Stock (and no Cash will be distributed in lieu of such fractional New Common Stock). For the avoidance of doubt, DTC shall be considered a single holder for purposes of distributions.

No Distribution Agent will have any obligation to make a distribution on account of an Allowed Claim that is Impaired under this Plan if: (a) the aggregate amount of all distributions authorized to be made on the Subsequent Distribution Date in question is or has an economic value less than $25,000, unless such distribution is a final distribution; or (b) the amount to be distributed to the specific Holder of an Allowed Claim on such Subsequent Distribution Date does not constitute a final distribution to such Holder and is or has an economic value less than $25.00, which will be treated as an undeliverable distribution under Article VII.D.4 below.

4. Undeliverable Distributions

(a) Holding of Certain Undeliverable Distributions

If the distribution to any Holder of an Allowed Claim or an Allowed Equity Interest is returned to the Distribution Agent as undeliverable or is otherwise unclaimed, no further distributions will be made to such Holder unless and until the Distribution Agent is notified in writing of such Holder's then current address in accordance with the time frames described in Article VII.D.4(b) hereof, at which time all currently due but missed distributions will be made to such Holder on the next Subsequent Distribution Date (or such earlier date as determined by the applicable Distribution Agent). Undeliverable distributions will remain in the possession of the Reorganized Debtors or in the applicable reserve, subject to Article VII.D.4(b) hereof, until such

49

time as any such distributions become deliverable. Undeliverable distributions will not be entitled to any additional interest, dividends or other accruals of any kind on account of their distribution being undeliverable.

(b)     Failure to Claim Undeliverable Distributions

Any Holder of an Allowed Claim or an Allowed Equity Interest (or any successor or assignee or other Person or Entity claiming by, through, or on behalf of, such Holder) that does not assert a right pursuant to this Plan for an undeliverable or unclaimed distribution within ninety (90) days after the later of the Effective Date or the date such distribution is due will be deemed to have forfeited its rights for such undeliverable or unclaimed distribution and will be forever barred and enjoined from asserting any such rights for an undeliverable or unclaimed distribution against the Debtors or their Estates, the Reorganized Debtors or their respective assets or property, or any Distribution Agent. In such case, any Cash, Plan Securities, or other property reserved for distribution on account of such Claim or Equity Interest will become the property of the Reorganized Debtors, free and clear of any Claims or other rights of such Holder with respect thereto and notwithstanding any federal or state escheat laws to the contrary. Any such Cash, Plan Securities, or other property will thereafter be distributed or allocated in accordance with the applicable terms and conditions of this Plan. Nothing contained in this Plan will require the Debtors, the Reorganized Debtors, or any Distribution Agent to attempt to locate any Holder of an Allowed Claim or an Allowed Equity Interest.

(c)     Failure to Present Checks

Checks issued by the Distribution Agent on account of Allowed Claims or Allowed Equity Interests will be null and void if not negotiated within ninety (90) days after the issuance of such check. Requests for reissuance of any check will be made directly to the Distribution Agent by the Holder of the relevant Allowed Claim or Allowed Equity Interest with respect to which such check originally was issued. Any Holder of an Allowed Claim or Allowed Equity Interest holding an un-negotiated check that does not request reissuance of such un-negotiated check within ninety (90) days after the date of mailing or other delivery of such check will have its rights for such un-negotiated check discharged and be forever barred, estopped and enjoined from asserting any such right against the Debtors, their Estates, the Reorganized Debtors, or their respective assets or property. In such case, any Cash held for payment on account of such Claims or Equity Interests will become the property of the Reorganized Debtors, free and clear of any Claims or other rights of such Holder with respect thereto and notwithstanding any federal or state escheat laws to the contrary. Any such Cash will thereafter be distributed or allocated in accordance with the applicable terms and conditions of this Plan.

E.     *Compliance with Tax Requirements*

In connection with this Plan and all distributions hereunder, the Reorganized Debtors or other applicable Distribution Agent will comply with all withholding and reporting requirements imposed by any federal, state, local, or foreign taxing authority, and all distributions hereunder will be subject to any such withholding and reporting requirements. Notwithstanding any provision in this Plan to the contrary, the Reorganized Debtors or other applicable Distribution Agent will be authorized to take any and all actions that may be necessary or appropriate to comply with such withholding and reporting requirements. All Persons holding Claims or Equity Interests will be required to provide any information necessary to effect information reporting and the

US-DOCS\110687040

withholding of such taxes (or establish eligibility for an exclusion for the withholding of taxes), and each Holder of an Allowed Claim or an Allowed Equity Interest will have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any Governmental Unit, including income, withholding, and other tax obligations, on account of such distribution. Any amounts withheld or reallocated pursuant to this **Error! Reference source not found.** will be treated as if distributed to the Holder of the Allowed Claim.

F.      *[Intentionally Omitted]*

G.      *Means of Cash Payment*

Payments of Cash made pursuant to this Plan will be in U.S. dollars and will be made, at the option of the applicable Distribution Agent, by checks drawn on, or wire transfer from, a domestic bank selected by such Distribution Agent. Cash payments to foreign creditors may be made, at the option of the applicable Distribution Agent, in such funds and by such means as are necessary or customary in a particular foreign jurisdiction. All Cash distributions to be made under this Plan to the DIP Agent on account of the DIP Facility Claims shall be made by wire transfer.

H.      *Timing and Calculation of Amounts to Be Distributed*

Except as otherwise provided in the "Treatment" sections in Article III hereof or as ordered by the Bankruptcy Court, on the Initial Distribution Date (or if a Claim is not an Allowed Claim on the Effective Date, on the Subsequent Distribution Date occurring after such Claim becomes an Allowed Claim, or as soon as reasonably practicable thereafter), each Holder of an Allowed Claim will receive the full amount of the distributions that this Plan provides for Allowed Claims in the applicable Class. If and to the extent that there are Disputed Claims, distributions on account of any such Disputed Claims will be made pursuant to the provisions set forth in the applicable class treatment or in Article VIII hereof. Except as otherwise provided herein, Holders of Claims will not be entitled to interest, dividends or accruals on the distributions provided for herein, regardless of whether such distributions are delivered on or at any time after the Effective Date.

I.      *Setoffs*

Without altering or limiting any of the rights and remedies of the Debtors and the Reorganized Debtors under section 502(d) of the Bankruptcy Code, all of which rights and remedies are hereby reserved, the Debtors and the Reorganized Debtors may, but will not be required to, withhold (but not setoff except as set forth below) from the distributions called for hereunder on account of any Allowed Claim an amount equal to any claims, Causes of Action and Litigation Claims of any nature that the Debtors or the Reorganized Debtors may hold against the Holder of any such Allowed Claim; provided that, at least ten (10) days prior to effectuating such withholding, the Debtors or the Reorganized Debtors, as applicable, will provide written notice thereof to the applicable Holder of such Claim, and all objections and defenses of such Holder to such withholding are preserved. In the event that any such claims, Causes of Action or Litigation Claims are adjudicated by Final Order or otherwise resolved against the applicable Holder, the Debtors and the Reorganized Debtors may, pursuant to section 553 of the Bankruptcy Code or applicable non-bankruptcy law, set off against any Allowed Claim and the distributions to be made pursuant hereto on account of such Allowed Claim (before any distribution is made on account of such Allowed Claim), the amount of such adjudicated or resolved claims, Causes of Action or Litigation Claims. Neither the failure to effect such a setoff nor the allowance of any Claim

51

hereunder will constitute a waiver or release by the Debtors or the Reorganized Debtors of any such claims, Causes of Action or Litigation Claims, all of which are reserved unless expressly released or compromised pursuant to this Plan or the Confirmation Order.  Notwithstanding anything to the contrary herein, the Allowed DIP Facility Claims and the Allowed Prepetition Debt Claims and the distributions to be made pursuant hereto on account of such Claims will not be subject to set off by the Debtors or the Reorganized Debtors pursuant to section 553 of the Bankruptcy Code or applicable non-bankruptcy law and the Debtors and the Reorganized Debtors hereby waive any and all rights of set off against such Claims.

## ARTICLE VIII.

## PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED, AND DISPUTED CLAIMS AND EQUITY INTERESTS

*A.*     *Resolution of Disputed Claims and Equity Interests*

1. Allowance of Claims and Equity Interests

After the Effective Date, and except as otherwise provided in this Plan, the Reorganized Debtors will have and will retain any and all available rights and defenses that the Debtors had with respect to any Claim or Equity Interest, including, without limitation, the right to assert any objection to Claims and Equity Interests based on the limitations imposed by section 502 or section 510 of the Bankruptcy Code.  The Debtors and the Reorganized Debtors may contest the amount and validity of any Disputed Claim or Disputed Equity Interest in the ordinary course of business in the manner and venue in which such Claim or Equity Interest would have been determined, resolved or adjudicated if the Chapter 11 Cases had not been commenced.

2. Prosecution of Objections to Claims and Equity Interests

After the Confirmation Date but before the Effective Date, the Debtors (in consultation with the Ad Hoc Noteholder Committee and the Committee), and after the Effective Date, the Reorganized Debtors, will have the authority to File objections to Claims and Equity Interests (other than those that are Allowed under this Plan, including the DIP Facility Claims) and settle, compromise, withdraw or litigate to judgment objections to any and all such Claims and Equity Interests, regardless of whether such Claims and Equity Interests are in an Unimpaired Class or otherwise; *provided*, *however*, this provision will not apply to Professional Fee Claims, which may be objected to by any party-in-interest in these Chapter 11 Cases.  From and after the Effective Date, the Reorganized Debtors may settle or compromise any Disputed Claim and Disputed Equity Interest without any further notice to or action, order or approval of the Bankruptcy Court.  The Reorganized Debtors will have the sole authority to administer and adjust the Claims Register and their respective books and records to reflect any such settlements or compromises without any further notice to or action, order or approval of the Bankruptcy Court.

52

3.   Claims Estimation

After the Confirmation Date but before the Effective Date, the Debtors (in consultation with the Ad Hoc Noteholder Committee and the Committee), and after the Effective Date, the Reorganized Debtors may at any time request that the Bankruptcy Court estimate any Disputed Claim or contingent or unliquidated Claim pursuant to applicable law, including, without limitation, section 502(c) of the Bankruptcy Code, and the Bankruptcy Court will retain jurisdiction under 28 U.S.C. §§ 157 and 1334 to estimate any such Claim, whether for allowance or to determine the maximum amount of such Claim, including during the litigation concerning any objection to any Claim or during the pendency of any appeal relating to any such objection. All of the aforementioned Claims objection, estimation and resolution procedures are cumulative and not exclusive of one another.  Claims may be estimated and subsequently compromised, settled, withdrawn or resolved by any mechanism approved by the Bankruptcy Court.  The rights and objections of all parties are reserved in connection with any such estimation.

4.   No Filings of Proofs of Claim or Equity Interests

Except as otherwise provided in this Plan, Holders of Claims or Equity Interests, including the Prepetition Notes Indenture Trustee with respect to the Prepetition Notes Indentures and the Prepetition Notes and the DIP Agent with respect to the DIP Facility Claims, will not be required to File a proof of Claim or proof of interest, and no parties should File a proof of Claim or proof of interest.  The Debtors do not intend to object in the Bankruptcy Court to the allowance of Claims Filed or Equity Interests Filed; provided, however, that the Debtors and the Reorganized Debtors, as applicable, reserve the right to object to any Claim or Equity Interest (other than those that are Allowed under this Plan) that is entitled, or deemed to be entitled, to a distribution under this Plan or is rendered Unimpaired under this Plan.  Instead, the Debtors intend to make distributions, as required by this Plan, in accordance with the books and records of the Debtors.  Unless disputed by a Holder of a Claim or an Equity Interest, the amount set forth in the books and records of the Debtors will constitute the amount of the Allowed Claim or Allowed Equity Interest of such Holder.  If any such Holder of a Claim or an Equity Interest disagrees with the Debtors' books and records with respect to the Allowed amount of such Holder's Claim or Equity Interest, such Holder must so advise the Debtors in writing, in which event the Claim or Equity Interest will become a Disputed Claim or a Disputed Equity Interest.  The Debtors intend to attempt to resolve any such disputes consensually or through judicial means outside the Bankruptcy Court subject to the consent of the Required Consenting Noteholders.  Nevertheless, the Debtors may, in their discretion and in consultation with the Ad Hoc Noteholder Committee, File with the Bankruptcy Court (or any other court of competent jurisdiction) an objection to the allowance of any Claim or Equity Interest (other than those that are Allowed under this Plan) or any other appropriate motion or adversary proceeding with respect thereto.  All such objections will be litigated to Final Order; provided, however, that the Debtors may, with the consent of the Required Consenting Noteholders, compromise, settle, withdraw or resolve by any other method approved by the Bankruptcy Court any objections to Claims or Equity Interests.

B.   *No Distributions Pending Allowance*

Notwithstanding any other provision of this Plan to the contrary, no payments or distributions of any kind or nature will be made with respect to all or any portion of a Disputed Claim or Disputed Equity Interest unless and until all objections to such Disputed Claim or

53

US-DOCS\110687040

Disputed Equity Interest have been settled or withdrawn or have been determined by Final Order, and the Disputed Claim or Disputed Equity Interest is or becomes Allowed by Final Order; provided, that, notwithstanding the foregoing, payments or distributions under this Plan to Holders of Allowed Prepetition Notes Claims will be made in full on the Initial Distribution Date, regardless of whether such Holders hold any Disputed Claims.

C. *Distributions on Account of Disputed Claims and Disputed Equity Interests Once They Are Allowed and Additional Distributions on Account of Previously Allowed Claims and Allowed Equity Interests*

On each Subsequent Distribution Date (or such earlier date as determined by the Reorganized Debtors in their sole discretion), the Reorganized Debtors or other applicable Distribution Agent will make distributions (a) on account of any Disputed Claim and Disputed Equity Interest that has become Allowed during the preceding calendar quarter, and (b) on account of previously Allowed Claims and Allowed Equity Interests of property that would have been distributed to the Holders thereof on the dates distributions previously were made to Holders of Allowed Claims and Allowed Equity Interests in such Class had the Disputed Claims and Disputed Equity Interests that have become Allowed or disallowed been Allowed or disallowed, as applicable, on such dates. Such distributions will be made pursuant to the applicable provisions of Article VII of this Plan. For the avoidance of doubt, but without limiting the terms or conditions of Article VII.B or Paragraph B of this Article VIII, any dividends or other distributions arising from property distributed to holders of Allowed Claims and Allowed Equity Interests in a Class and paid to such Holders under this Plan will also be paid, in the applicable amounts, to any Holder of a Disputed Claim and Disputed Equity Interest in such Class that becomes Allowed after the date or dates that such dividends or other distributions were earlier paid to holders of Allowed Claims and Allowed Equity Interests in such Class.

D. *Reserve for Disputed Claims and Disputed Equity Interests*

The Debtors, the Reorganized Debtors, and the Distribution Agent may establish such appropriate reserves for Disputed Claims and Disputed Equity Interests in the applicable Class(es) as it determines necessary and appropriate, in each case with the consent of the Required Consenting Noteholders or as approved by order of the Bankruptcy Court. Without limiting the foregoing, reserves (if any) for Disputed Claims and Disputed Equity Interests will equal, as applicable, an amount of property equal to 100% of distributions to which Holders of Disputed Claims and Disputed Equity Interests in each applicable Class would otherwise be entitled under this Plan as of such date if such Disputed Claims and Disputed Equity Interests were Allowed based on the Debtors' books and records; provided, however, that the Debtors and the Reorganized Debtors, as applicable, will have the right to file a motion seeking to estimate any Disputed Claims or Disputed Equity Interest.

**ARTICLE IX.**

## CONDITIONS PRECEDENT TO CONFIRMATION
## AND CONSUMMATION OF THE PLAN

*A.    Conditions Precedent to Confirmation*

Unless satisfied or waived pursuant to the provisions of Article IX.C hereof, the following are conditions precedent to Confirmation of this Plan.

1.   This Plan and the Restructuring Documents are in form and substance acceptable to the Debtors and the Required Consenting Noteholders in the manner set forth in the Restructuring Support Agreement, and, to the extent required by the DIP Credit Agreement, in form and substance satisfactory or reasonably satisfactory, as applicable, to the DIP Agent and the DIP Required Lenders in the manner set forth in the DIP Financing Documents and otherwise consistent with the Restructuring Term Sheet and the Restructuring Support Agreement;

2.   The Confirmation Order has been entered by the Bankruptcy Court, and such order is in form and substance consistent in all respects with the Restructuring Term Sheet and the Restructuring Support Agreement and otherwise reasonably acceptable to the Debtors and to the Required Consenting Noteholders in the manner set forth in the Restructuring Support Agreement and, to the extent required by the DIP Credit Agreement, in form and substance satisfactory or reasonably satisfactory, as applicable, to the DIP Agent and the DIP Required Lenders in the manner set forth in the DIP Financing Documents, and reasonably acceptable to the Committee with respect to the treatment of General Unsecured Claims; and

3.   The Restructuring Support Agreement is in full force and effect and has not been terminated in accordance with its terms.

*B.    Conditions Precedent to Consummation*

Unless satisfied or waived pursuant to the provisions of Article IX.C hereof, the following are conditions precedent to Consummation of this Plan.

1.   The Confirmation Order has become a Final Order and such order has not been amended, modified, vacated, stayed, or reversed;

2.   The Bankruptcy Court has entered one or more Final Orders (which may include the Confirmation Order), in form and substance acceptable to the Debtors and Required Consenting Noteholders, authorizing the assumption, assumption and assignment and rejection of the Executory Contracts and Unexpired Leases by the Debtors as contemplated in this Plan and the Plan Supplement;

3.   This Plan and the Restructuring Documents have not been amended or modified other than in a manner in form and substance consistent in all respects with the Restructuring Term Sheet, otherwise acceptable to the Debtors and the Required Consenting Noteholders in the manner set forth in the Restructuring Support Agreement and, to the extent required by the DIP Credit Agreement, in form and substance satisfactory or reasonably satisfactory, as applicable, to the DIP Agent and the DIP Required Lenders in the manner set forth in the DIP Financing Documents, and reasonably acceptable to the Committee with respect to the treatment of General Unsecured Claims;

55

4. The Restructuring Documents have been filed, tendered for delivery, and been effectuated or executed by all Entities party thereto (as appropriate), and in each case in full force and effect. All conditions precedent to the effectiveness of such Restructuring Documents, including, without limitation, the Exit Facility Credit Agreement and the Exit Senior Unsecured Notes Indenture, have been satisfied or waived pursuant to the terms of such applicable Restructuring Documents (or will be satisfied concurrently with the occurrence of the Effective Date) and such agreements have closed or will close simultaneously with the effectiveness of this Plan;

5. Any documents governing the Exit Senior Unsecured Notes, which shall be in form and substance acceptable to the Debtors and the Backstop Parties, each in their sole discretion, and otherwise reasonably satisfactory to the Required Consenting Noteholders, have become effective or will become effective concurrently with effectiveness of this Plan and all conditions precedent to issuance of the Exit Senior Unsecured Notes have been satisfied or waived;

6. All DIP Facility Claims have been indefeasibly paid in full in Cash, or will have been paid in full in Cash simultaneously with the effectiveness of this Plan, in accordance with the terms of the DIP Credit Agreement;

7. The Debtors have received, or concurrently with the occurrence of the Effective Date will receive, up to $1,600,000,000, but no less than $1,500,000,000 based on the amount of the Exit Facility commitments in excess of $650,000,000, as contemplated in connection with the Backstop Commitment Agreement and the Rights Offering provided to the Prepetition Noteholders;

8. Any Amended/New Corporate Governance Documents, which shall be in form and substance acceptable to the Required Consenting Noteholders in their sole discretion, have become effective or will become effective concurrently with the effectiveness of this Plan;

9. The Irish Scheme of Arrangement has been approved by the High Court of Ireland, or such other structure as is reasonably acceptable to the Required Consenting Noteholders and, solely to the extent the Irish Scheme of Arrangement has an adverse impact on the treatment of General Unsecured Creditors, the Committee (with such consent not to be unreasonably withheld), and to the extent required by the DIP Credit Agreement, the DIP Agent and the DIP Required Lenders, and has become effective in accordance with its terms or will become effective concurrently with effectiveness of this Plan;

10. The appointment of provisional liquidators has been approved and the implementation of a scheme of arrangement in Bermuda under section 99 of the Companies Act 1981 of Bermuda has been sanctioned by the Bermuda court, or such other structure as is reasonably acceptable to the Required Consenting Noteholders and, solely to the extent the scheme of arrangement has an adverse impact on the treatment of General Unsecured Creditors, the Committee (with such consent not to be unreasonably withheld), and to the extent required by the DIP Credit Agreement, the DIP Agent and the DIP Required Lenders, and has become effective in accordance with its terms or will become effective concurrently with effectiveness of this Plan.

US-DOCS\110687040

11. All consents, actions, documents, certificates and agreements necessary to implement this Plan and the transactions contemplated by this Plan have been, as applicable, obtained and not otherwise subject to unfulfilled conditions, effected or executed and delivered to the required parties and, to the extent required, filed with the applicable governmental units in accordance with applicable laws, and in each case in full force and effect;

12. All governmental approvals and consents, including Bankruptcy Court approval and Irish Takeover Panel approval, that are applicable and legally required for the consummation of this Plan have been obtained, not be subject to unfulfilled conditions and be in full force and effect, and, to the extent applicable, all applicable waiting periods under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, and any foreign jurisdictions has expired;

13. The New Board has been selected in accordance with the Restructuring Support Agreement;

14. The Executive Arrangements, as defined in the Restructuring Support Agreement, relating to change in control and severance matters have been modified in a manner acceptable to the Required Consenting Noteholders;

15. The Restructuring Support Agreement is in full force and effect and has not been terminated in accordance with its terms;

16. The Professional Fee Claim Reserve has been funded in full in Cash by the Debtors in accordance with the terms and conditions of this Plan;

17. The DIP Final Order is in full force and effect and there are no events of default existing and continuing thereunder or under the DIP Financing Documents; and

18. To the extent invoiced, (a) all Ad Hoc Noteholder Committee Fees and Expenses have been paid in full in Cash and (b) all Prepetition Notes Indenture Trustee Fees and Expenses have been paid in full in Cash.

C.    *Waiver of Conditions*

Subject to section 1127 of the Bankruptcy Code, the conditions to Confirmation and Consummation of this Plan set forth in this Article IX may be waived by the Debtors, with the consent of the Required Consenting Noteholders in the manner set forth in the Restructuring Support Agreement and in consultation with the Committee, or, to the extent such waiver adversely impacts the treatment of the General Unsecured Claims, with the reasonable consent of the Committee, or, in the case of Article IX.B.14 and B.18(a), the Required Consenting Noteholders (and solely with respect to the payment of the Prepetition Notes Indenture Trustee Fees and Expenses in Article IX.B.19(b), the Prepetition Notes Indenture Trustee) in their sole discretion, without notice, leave or order of the Bankruptcy Court or any formal action other than proceeding to confirm or consummate this Plan.  The failure of the Debtors or Reorganized Debtors to exercise any of the foregoing rights will not be deemed a waiver of any other rights, and each right will be deemed an ongoing right that may be asserted at any time.

57

*D.*     *Effect of Non-Occurrence of Conditions to Confirmation or Consummation*

If the Confirmation or the Consummation of this Plan does not occur with respect to one or more of the Debtors, then this Plan will, with respect to such applicable Debtor or Debtors, be null and void in all respects and nothing contained in this Plan or the Disclosure Statement will: (1) constitute a waiver or release of any claims by or Claims against or Equity Interests in the Debtors; (2) prejudice in any manner the rights of the Debtors, any Holders or any other Entity; (3) constitute an Allowance of any Claim or Equity Interest; or (4) constitute an admission, acknowledgment, offer or undertaking by the Debtors, any Holders or any other Entity in any respect.

## ARTICLE X.

## RELEASE, DISCHARGE, INJUNCTION AND RELATED PROVISIONS

*A.*     *General*

Pursuant to section 1123 of the Bankruptcy Code, and in consideration for the classification, distributions, releases and other benefits provided under this Plan, upon the Effective Date, the provisions of this Plan shall constitute a good faith compromise and settlement of all Claims and Equity Interests and controversies resolved pursuant to this Plan. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Equity Interests and controversies, as well as a finding by the Bankruptcy Court that any such compromise or settlement is in the best interests of the Debtors, their Estates, and any Holders of Claims and Equity Interests and is fair, equitable and reasonable.

Notwithstanding anything contained herein to the contrary, the allowance, classification and treatment of all Allowed Claims and Equity Interests and their respective distributions (if any) and treatments hereunder, takes into account the relative priority and rights of the Claims and the Equity Interests in each Class in connection with any contractual, legal and equitable subordination rights relating thereto whether arising under general principles of equitable subordination, section 510 of the Bankruptcy Code or otherwise. As of the Effective Date, any and all contractual, legal and equitable subordination rights, whether arising under general principles of equitable subordination, section 510 of the Bankruptcy Code or otherwise, relating to the allowance, classification and treatment of all Allowed Claims and Equity Interests and their respective distributions (if any) and treatments hereunder, are settled, compromised, terminated and released pursuant hereto; *provided*, *however*, that nothing contained herein shall preclude any Person or Entity from exercising their rights pursuant to and consistent with the terms of this Plan and the contracts, instruments, releases, indentures, and other agreements or documents delivered under or in connection with this Plan.

*B.*     *Release of Claims and Causes of Action*

1.     ***Release by the Debtors and their Estates*.** **Pursuant to section 1123(b) and any other applicable provisions of the Bankruptcy Code, and except as otherwise expressly provided in this Plan (including with respect to retained Litigation Claims as provided in Article X.F below), effective as of the Effective Date, for good and valuable consideration provided by each of the Released Parties, the adequacy and sufficiency of which is hereby confirmed, the Debtors and the Reorganized Debtors, in their respective individual**

capacities and as debtors-in-possession, and on behalf of themselves and their respective Estates, including, without limitation, any successor to the Debtors or any Estate representative appointed or selected pursuant to section 1123(b)(3) of the Bankruptcy Code (collectively, the "**Debtor Releasing Parties**") shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever provided a full discharge, waiver and release to each of the Released Parties (and each such Released Party so released shall be deemed forever released, waived and discharged by the Debtor Releasing Parties) and their respective assets and properties (the "**Debtor Release**") from any and all Claims, Causes of Action, Litigation Claims and any other debts, obligations, rights, suits, damages, actions, remedies, and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, whether directly or derivatively held, existing as of the Effective Date or thereafter arising, in law, at equity or otherwise, whether for tort, contract, violations of federal or state securities laws, or otherwise, based in whole or in part upon any act or omission, transaction, or other occurrence or circumstances existing or taking place prior to or on the Effective Date arising from or related in any way in whole or in part to any of the Debtors or their Affiliates, including, without limitation, (i) the Chapter 11 Cases, the Disclosure Statement, this Plan, the Restructuring Support Agreement, the Restructuring Documents, and the DIP Financing Documents, (ii) the subject matter of, or the transactions or events giving rise to, any Claim or Equity Interest that is treated in this Plan, (iii) the business or contractual arrangements between any Debtor and any Released Parties, (iv) the negotiation, formulation or preparation of the Restructuring Support Agreement, this Plan, the Disclosure Statement, the Plan Supplement, the Restructuring Documents, the DIP Financing Documents, or related agreements, instruments or other documents, (v) the restructuring of Claims or Equity Interests prior to or during the Chapter 11 Cases, (vi) the purchase, sale, or rescission of the purchase or sale of any Equity Interest of the Debtors or the Reorganized Debtors, and/or (vii) the Confirmation or Consummation of this Plan or the solicitation of votes on this Plan that such Debtor Releasing Party would have been legally entitled to assert (whether individually or collectively) or that any Holder of a Claim or Equity Interest or other Entity would have been legally entitled to assert for, or on behalf or in the name of, any Debtor, its respective Estate or any Reorganized Debtor (whether directly or derivatively) against any of the Released Parties; _provided_, _however_, that the foregoing provisions of this Debtor Release shall not operate to waive or release: (i) any Causes of Action arising from willful misconduct, actual fraud, or gross negligence of such applicable Released Party as determined by Final Order of the Bankruptcy Court or any other court of competent jurisdiction; and/or (ii) the rights of such Debtor Releasing Party to enforce this Plan and the contracts, instruments, releases, indentures, and other agreements or documents delivered under or in connection with this Plan or assumed pursuant to this Plan or assumed pursuant to Final Order of the Bankruptcy Court.  The foregoing release shall be effective as of the Effective Date without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Person and the Confirmation Order shall permanently enjoin the commencement or prosecution by any Person or Entity, whether directly, derivatively or otherwise, of any claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, or liabilities released pursuant to this Debtor Release. Notwithstanding the foregoing, nothing in this **Article X.B** shall or shall be deemed to (i) prohibit the Debtors or the Reorganized Debtors from asserting and enforcing any claims,

59

obligations, suits, judgments, demands, debts, rights, Causes of Action or liabilities they may have against any Person that is based upon an alleged breach of a confidentiality or non-compete obligation owed to the Debtors or the Reorganized Debtors and/or (ii) operate as a release or waiver of any Intercompany Claims or any obligations of any Entity arising after the Effective Date under the Exit Facility Loan Documents or any document, instrument or agreement set forth in the Plan Supplement, in each case unless otherwise expressly provided for in this Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Debtor Release, which includes by reference each of the related provisions and definitions contained herein, and further, shall constitute the Bankruptcy Court's finding that the Debtor Release is: (i) in exchange for the good and valuable consideration provided by the Released Parties; (ii) a good faith settlement and compromise of the Claims released by the Debtor Release; (iii) in the best interest of the Debtors and their Estates; (iv) fair, equitable and reasonable; and (v) given and made after due notice and opportunity for hearing.

2.      *Release By Third Parties*.  Except as otherwise expressly provided in this Plan, effective as of the Effective Date, to the fullest extent permitted by applicable law, for good and valuable consideration provided by each of the Released Parties, the adequacy and sufficiency of which is hereby confirmed, and without limiting or otherwise modifying the scope of the Debtor Release provided by the Debtor Releasing Parties above, each Non-Debtor Releasing Party (together with the Debtor Releasing Parties, the "Releasing Parties") shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever provided a full discharge, waiver and release to each of the Released Parties (and each such Released Party so released shall be deemed forever released, waived and discharged by the Non-Debtor Releasing Parties) and their respective assets and properties (the "Third Party Release") from any and all Claims, Causes of Action, Litigation Claims and any other debts, obligations, rights, suits, damages, actions, remedies, and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, whether directly or derivatively held, existing as of the Effective Date or thereafter arising, in law, at equity or otherwise, whether for tort, contract, violations of federal or state securities laws, or otherwise, based in whole or in part upon any act or omission, transaction, or other occurrence or circumstances existing or taking place prior to or on the Effective Date arising from or related in any way in whole or in part to any of the Debtors or their Affiliates, including, without limitation, (i) the Chapter 11 Cases, the Disclosure Statement, this Plan, the Restructuring Support Agreement, the Restructuring Documents, and the DIP Financing Documents, (ii) the subject matter of, or the transactions or events giving rise to, any Claim or Equity Interest that is treated in this Plan, (iii) the business or contractual arrangements between any Debtor and any Released Parties, (iv) the negotiation, formulation or preparation of the Restructuring Support Agreement, this Plan, the Disclosure Statement, the Plan Supplement, the Restructuring Documents, the DIP Financing Documents, or related agreements, instruments or other documents, (v) the restructuring of Claims or Equity Interests prior to or during the Chapter 11 Cases, (vi) the purchase, sale or rescission of the purchase or sale of any Equity Interest of the Debtors or the Reorganized Debtors, and/or (vii) the Confirmation or Consummation of this Plan or the solicitation of votes on this Plan that such Non-Debtor Releasing Party would have been legally entitled to assert (whether individually or collectively) against any of the Released Parties; provided, however, that the foregoing provisions of this Third Party

60

**Release shall not operate to waive or release (i) any Causes of Action arising from willful misconduct, actual fraud, or gross negligence of such applicable Released Party as determined by Final Order of the Bankruptcy Court or any other court of competent jurisdiction; (ii) any Unimpaired Class 8 General Unsecured Claims, and/or (iii) the rights of such Non-Debtor Releasing Party to enforce this Plan and the contracts, instruments, releases, indentures, and other agreements and documents delivered under or in connection with this Plan or assumed pursuant to this Plan or Final Order of the Bankruptcy Court; and/or (iv) any obligations of any Entity arising after the Effective Date under the Exit Facility Loan Documents or any document, instrument or agreement set forth in the Plan Supplement. The foregoing release shall be effective as of the Effective Date without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Person and the Confirmation Order shall permanently enjoin the commencement or prosecution by any Person or Entity, whether directly, derivatively or otherwise, of any claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, or liabilities released pursuant to this Third Party Release.**

**Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the Third Party Release, which includes by reference each of the related provisions and definitions contained herein, and further, shall constitute the Bankruptcy Court's finding that the Third Party Release is: (i) in exchange for the good and valuable consideration provided by the Released Parties; (ii) a good faith settlement and compromise of the Claims released by the Third Party Release; (iii) in the best interest of the Debtors and all Holders of Claims and Equity Interests; (iv) fair, equitable and reasonable; and (v) given and made after due notice and opportunity for hearing.**

C.      *Waiver of Statutory Limitations on Releases*

Each of the Releasing Parties in each of the releases contained above expressly acknowledges that although ordinarily a general release may not extend to Claims which the Releasing Party does not know or suspect to exist in its favor, which if known by it may have materially affected its settlement with the party released, they have carefully considered and taken into account in determining to enter into the above releases the possible existence of such unknown losses or claims. Without limiting the generality of the foregoing, each Releasing Party expressly waives any and all rights conferred upon it by any statute or rule of law which provides that a release does not extend to claims which the claimant does not know or suspect to exist in its favor at the time of providing the release, which if known by it may have materially affected its settlement with the released party. The releases contained in this Plan are effective regardless of whether those released matters are presently known, unknown, suspected or unsuspected, foreseen or unforeseen.

D.      *Discharge of Claims and Equity Interests*

To the fullest extent provided under section 1141(d)(1)(A) and other applicable provisions of the Bankruptcy Code, except as otherwise expressly provided by this Plan (including, without limitation, Article V.D and V.E of this Plan) or the Confirmation Order, effective as of the Effective Date, all consideration distributed under this Plan shall be in exchange for, and in complete satisfaction, settlement, discharge, and release of, all Claims, Equity Interests and Causes

61

of Action of any kind or nature whatsoever against the Debtors or any of their respective assets or properties, including any interest accrued on such Claims or Equity Interests from and after the Petition Date, and regardless of whether any property shall have been abandoned by order of the Bankruptcy Court, distributed or retained pursuant to this Plan on account of such Claims, Equity Interests or Causes of Action.

Except as otherwise expressly provided by this Plan (including, without limitation, Article V.D and V.E of this Plan) or the Confirmation Order, upon the Effective Date, the Debtors and their Estates shall be deemed discharged and released under and to the fullest extent provided under sections 524 and 1141(d)(1)(A) and other applicable provisions of the Bankruptcy Code from any and all Claims of any kind or nature whatsoever, including, but not limited to, demands and liabilities that arose before the Confirmation Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code. Such discharge shall void any judgment obtained against the Debtors or the Reorganized Debtors at any time, to the extent that such judgment relates to a discharged Claim.

Except as otherwise expressly provided by this Plan (including, without limitation, Article V.D and V.E of this Plan) or the Confirmation Order, upon the Effective Date: (i) the rights afforded herein and the treatment of all Claims and Equity Interests shall be in exchange for and in complete satisfaction, settlement, discharge, and release of all Claims and Equity Interests of any nature whatsoever, including any interest accrued on such Claims from and after the Petition Date, against the Debtors or any of their respective assets, property, or Estates; (ii) all Claims and Equity Interests shall be satisfied, discharged, and released in full, and each of the Debtor's liability with respect thereto shall be extinguished completely without further notice or action; and (iii) all Entities shall be precluded from asserting against the Debtors, the Estates, the Reorganized Debtors, each of their respective successors and assigns, and each of their respective assets and properties, any such Claims or Equity Interests, whether based upon any documents, instruments or any act or omission, transaction, or other activity of any kind or nature that occurred prior to the Effective Date or otherwise.

*E.      Exculpation*

Effective as of the Effective Date, to the fullest extent permitted by law, the Exculpated Parties shall neither have nor incur any liability to any Person or Entity for any claims or Causes of Action arising prior to or on the Effective Date for any act taken or omitted to be taken in connection with, or related to, formulating, negotiating, preparing, disseminating, implementing, administering, confirming or effecting the Confirmation or Consummation of this Plan, the Disclosure Statement, the Restructuring Documents, the DIP Financing Documents, or any contract, instrument, release or other agreement or document created or entered into in connection with this Plan, including the Restructuring Support Agreement, or any other prepetition or postpetition act taken or omitted to be taken in connection with or in contemplation of the restructuring of the Debtors, the approval of the Disclosure Statement or Confirmation or Consummation of this Plan; *provided*, *however*, that the foregoing provisions of this exculpation shall not operate to waive or release: (i) any Causes of Action arising from willful misconduct, actual fraud, or gross negligence of such applicable Exculpated Party as determined by Final Order of the Bankruptcy Court or any other court of competent jurisdiction; and/or (ii) the rights of any Person or Entity to enforce this Plan and the contracts, instruments, releases, indentures, and other agreements and documents delivered under or in connection with this Plan or assumed pursuant to

62

this Plan or Final Order of the Bankruptcy Court; provided, further, that each Exculpated Party shall be entitled to rely upon the advice of counsel concerning its respective duties pursuant to, or in connection with, the above referenced documents, actions or inactions. The foregoing exculpation shall be effective as of the Effective Date without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Person. Notwithstanding the foregoing, nothing in this Article X.E shall or shall be deemed to prohibit the Debtors or the Reorganized Debtors from asserting and enforcing any claims, obligations, suits, judgments, demands, debts, rights, Causes of Action or liabilities they may have against any Person that is based upon an alleged breach of a confidentiality or non-compete obligation owed to the Debtors or the Reorganized Debtors, in each case unless otherwise expressly provided for in this Plan.

*F.     Preservation of Causes of Action*

### 1.  Maintenance of Causes of Action

Except as otherwise provided in this Article X (including, without limitation, and for the avoidance of doubt, the Releases contained in Article X.B and Exculpation contained in Article X.E hereof) or elsewhere in this Plan or the Confirmation Order, after the Effective Date, the Reorganized Debtors shall retain all rights to commence, pursue, litigate or settle, as appropriate, any and all Litigation Claims, whether existing as of the Petition Date or thereafter arising, in any court or other tribunal including, without limitation, in an adversary proceeding Filed in the Chapter 11 Cases. The Reorganized Debtors, as the successors-in-interest to the Debtors and the Estates, may, and shall have the exclusive right to, enforce, sue on, settle, compromise, transfer or assign (or decline to do any of the foregoing) any or all of such Litigation Claims without notice to or approval from the Bankruptcy Court.

### 2.  Preservation of All Causes of Action Not Expressly Settled or Released

The Debtors expressly reserve all Causes of Action and Litigation Claims for later adjudication by the Debtors or the Reorganized Debtors (including, without limitation, Causes of Action and Litigation Claims not specifically identified or of which the Debtors may presently be unaware or which may arise or exist by reason of additional facts or circumstances unknown to the Debtors at this time or facts or circumstances that may change or be different from those the Debtors now believe to exist) and, therefore, no preclusion doctrine, including, without limitation, the doctrines of *res judicata*, collateral estoppel, issue preclusion, claim preclusion, waiver, estoppel (judicial, equitable or otherwise) or laches shall apply to such Causes of Action or Litigation Claims upon or after the Confirmation or Consummation of this Plan based on the Disclosure Statement, this Plan or the Confirmation Order, except in each case where such Causes of Action or Litigation Claims have been expressly waived, relinquished, released, compromised or settled in this Plan (including, without limitation, and for the avoidance of doubt, the Releases contained in Article X.B and Exculpation contained in Article X.E hereof) or any other Final Order (including, without limitation, the Confirmation Order). In addition, the Debtors and the Reorganized Debtors expressly reserve the right to pursue or adopt any claims alleged in any lawsuit in which any of the Debtors are a plaintiff, defendant or an interested party, against any Person or Entity, including, without limitation, the plaintiffs or co-defendants in such lawsuits.

US-DOCS\110687040

*G.*     *Injunction*

EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THIS PLAN OR THE CONFIRMATION ORDER, INCLUDING SPECIFICALLY WITH RESPECT TO CLASS 8 GENERAL UNSECURED CLAIMS AND FOR THE AVOIDANCE OF DOUBT, SUBJECT TO ARTICLE III.C, FROM AND AFTER THE EFFECTIVE DATE, ALL PERSONS AND ENTITIES ARE, TO THE FULLEST EXTENT PROVIDED UNDER SECTION 524 AND OTHER APPLICABLE PROVISIONS OF THE BANKRUPTCY CODE, PERMANENTLY ENJOINED FROM (I) COMMENCING OR CONTINUING, IN ANY MANNER OR IN ANY PLACE, ANY SUIT, ACTION OR OTHER PROCEEDING; (II) ENFORCING, ATTACHING, COLLECTING, OR RECOVERING IN ANY MANNER ANY JUDGMENT, AWARD, DECREE, OR ORDER; (III) CREATING, PERFECTING, OR ENFORCING ANY LIEN OR ENCUMBRANCE; (IV) ASSERTING A SETOFF OR RIGHT OF SUBROGATION OF ANY KIND; OR (V) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND, IN EACH CASE ON ACCOUNT OF OR WITH RESPECT TO ANY CLAIM, DEMAND, LIABILITY, OBLIGATION, DEBT, RIGHT, CAUSE OF ACTION, EQUITY INTEREST, OR REMEDY RELEASED OR TO BE RELEASED, EXCULPATED OR TO BE EXCULPATED, SETTLED OR TO BE SETTLED OR DISCHARGED OR TO BE DISCHARGED PURSUANT TO THIS PLAN OR THE CONFIRMATION ORDER AGAINST ANY PERSON OR ENTITY SO RELEASED, DISCHARGED, OR EXCULPATED (OR THE PROPERTY OR ESTATE OF ANY PERSON OR ENTITY SO RELEASED, DISCHARGED, OR EXCULPATED). ALL INJUNCTIONS OR STAYS PROVIDED FOR IN THE CHAPTER 11 CASES UNDER SECTION 105 OR SECTION 362 OF THE BANKRUPTCY CODE, OR OTHERWISE, AND IN EXISTENCE ON THE CONFIRMATION DATE, SHALL REMAIN IN FULL FORCE AND EFFECT UNTIL THE EFFECTIVE DATE.

*H.*     *Binding Nature of Plan*

ON THE EFFECTIVE DATE, AND EFFECTIVE AS OF THE EFFECTIVE DATE, THIS PLAN SHALL BIND, AND SHALL BE DEEMED BINDING UPON, THE DEBTORS, THE REORGANIZED DEBTORS, ANY AND ALL HOLDERS OF CLAIMS AGAINST AND EQUITY INTERESTS IN THE DEBTORS, ALL PERSONS AND ENTITIES THAT ARE PARTIES TO OR ARE SUBJECT TO THE SETTLEMENTS, COMPROMISES, RELEASES, DISCHARGES, AND INJUNCTIONS DESCRIBED IN THIS PLAN, EACH PERSON AND ENTITY ACQUIRING PROPERTY UNDER THIS PLAN, ANY AND ALL NON-DEBTOR PARTIES TO EXECUTORY CONTRACTS AND UNEXPIRED LEASES WITH THE DEBTORS AND THE RESPECTIVE SUCCESSORS AND ASSIGNS OF EACH OF THE FOREGOING, TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, AND NOTWITHSTANDING WHETHER OR NOT SUCH PERSON OR ENTITY (I) SHALL RECEIVE OR RETAIN ANY PROPERTY, OR INTEREST IN PROPERTY, UNDER THIS PLAN, (II) HAS FILED A PROOF OF CLAIM OR INTEREST IN THE CHAPTER 11 CASES OR (III) FAILED TO VOTE TO ACCEPT OR REJECT THIS PLAN, AFFIRMATIVELY VOTED TO REJECT THIS PLAN OR IS CONCLUSIVELY PRESUMED TO REJECT THIS PLAN.

US-DOCS\110687040

*I.     Protection Against Discriminatory Treatment*

To the extent provided by section 525 of the Bankruptcy Code and the Supremacy Clause of the United States Constitution, all Persons and Entities, including Governmental Units, shall not discriminate against the Reorganized Debtors or deny, revoke, suspend or refuse to renew a license, permit, charter, franchise or other similar grant to, condition such a grant to, discriminate with respect to such a grant, against the Reorganized Debtors, or another Person or Entity with whom the Reorganized Debtors have been associated, solely because any Debtor has been a debtor under chapter 11 of the Bankruptcy Code, has been insolvent before the commencement of the Chapter 11 Cases (or during the Chapter 11 Cases but before the Debtors are granted or denied a discharge) or has not paid a debt that is dischargeable in the Chapter 11 Cases.

*J.     Integral Part of Plan*

Each of the provisions set forth in this Plan with respect to the settlement, release, discharge, exculpation, injunction, indemnification and insurance of, for or with respect to Claims and/or Causes of Action are an integral part of this Plan and essential to its implementation. Accordingly, each Entity that is a beneficiary of such provision shall have the right to independently seek to enforce such provision and such provision may not be amended, modified, or waived after the Effective Date without the prior written consent of such beneficiary.

## ARTICLE XI.

## RETENTION OF JURISDICTION

Pursuant to sections 105(c) and 1142 of the Bankruptcy Code and notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court will, on and after the Effective Date, retain exclusive jurisdiction over the Chapter 11 Cases and all Entities with respect to all matters related to the Chapter 11 Cases, the Debtors and this Plan as legally permissible, including, without limitation, jurisdiction to:

1.  allow, disallow, determine, liquidate, classify, estimate or establish the priority or secured or unsecured status of any Claim or Equity Interest, including, without limitation, the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the allowance or priority of any such Claim or Equity Interest;

2.  grant or deny any applications for allowance of compensation or reimbursement of expenses authorized pursuant to the Bankruptcy Code or this Plan, for periods ending on or before the Effective Date; *provided*, *however*, that, from and after the Effective Date, the Reorganized Debtors will pay Professionals in the ordinary course of business for any work performed after the Effective Date and such payment will not be subject to the approval of the Bankruptcy Court;

3.  resolve any matters related to the assumption, assignment or rejection of any Executory Contract or Unexpired Lease and to adjudicate and, if necessary, liquidate, any Claims arising therefrom, including, without limitation, those matters related to any amendment to this Plan after the Effective Date to add Executory Contracts or Unexpired Leases to the list of Executory Contracts and Unexpired Leases to be assumed or rejected (as applicable);

4.  resolve any issues related to any matters adjudicated in the Chapter 11 Cases;

65

5. ensure that distributions to Holders of Allowed Claims or Allowed Equity Interests are accomplished pursuant to the provisions of this Plan;

6. decide or resolve any motions, adversary proceedings, contested or litigated matters and any other Causes of Action that are pending as of the Effective Date or that may be commenced in the future, and grant or deny any applications involving the Debtors that may be pending on the Effective Date or instituted by the Reorganized Debtors after the Effective Date, *provided, however* that the Reorganized Debtors will reserve the right to commence actions in all appropriate forums and jurisdictions;

7. enter such orders as may be necessary or appropriate to implement or consummate the provisions of this Plan and all other contracts, instruments, releases, indentures and other agreements or documents adopted in connection with this Plan, the Plan Supplement or the Disclosure Statement;

8. resolve any cases, controversies, suits or disputes that may arise in connection with the Consummation, interpretation or enforcement of this Plan or any Person or Entity's obligations incurred in connection with this Plan;

9. hear and determine all Causes of Action that are pending as of the Effective Date or that may be commenced in the future;

10. issue injunctions and enforce them, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Person or Entity with Consummation or enforcement of this Plan;

11. enforce the terms and conditions of this Plan, the Confirmation Order, and the Restructuring Documents;

12. resolve any cases, controversies, suits or disputes with respect to the Release, the Exculpation, the indemnification and other provisions contained in Article X hereof and enter such orders or take such others actions as may be necessary or appropriate to implement or enforce all such provisions;

13. hear and determine all Litigation Claims;

14. enter and implement such orders or take such other actions as may be necessary or appropriate if the Confirmation Order is modified, stayed, reversed, revoked or vacated;

15. resolve any other matters that may arise in connection with or relate to this Plan, the Disclosure Statement, the Confirmation Order or any release or exculpation adopted in connection with this Plan; and

16. enter an order concluding or closing the Chapter 11 Cases.

Notwithstanding the foregoing, (i) any dispute arising under or in connection with the Exit Loan Facility or the Exit Senior Unsecured Notes Indenture or any other contract or agreement binding on the Reorganized Debtors that contains provisions governing jurisdiction for litigation

US-DOCS\110687040

of disputes thereunder will be addressed in accordance with the provisions of the applicable document and (ii) if the Bankruptcy Court abstains from exercising, or declines to exercise, jurisdiction or is otherwise without jurisdiction over any matter arising in, arising under, or related to the Chapter 11 Cases, including the matters set forth in this Article of this Plan, the provisions of this Article XI will have no effect upon and will not control, prohibit, or limit the exercise of jurisdiction by any other court having jurisdiction with respect to such matter.

## ARTICLE XII.

## MISCELLANEOUS PROVISIONS

### A. Substantial Consummation

"Substantial Consummation" of this Plan, as defined in 11 U.S.C. § 1101(2), will be deemed to occur on the Effective Date.

### B. Payment of Statutory Fees; Post-Effective Date Fees and Expenses

All fees payable pursuant to section 1930 (a) of the Judicial Code, as determined by the Bankruptcy Court at a hearing pursuant to section 1128 of the Bankruptcy Code to the extent necessary, shall be paid by each of the Debtors or the Reorganized Debtors (or the Distribution Agent on behalf of each of the Debtors or Reorganized Debtors), as applicable, for each quarter (including any fraction thereof) until the earliest to occur of the entry of (a) a final decree closing such Debtor's Chapter 11 Case, (b) an order dismissing such Debtor's Chapter 11 Case, or (c) an order converting such Debtor's Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code.

The Reorganized Debtors will pay the liabilities and charges that they incur on or after the Effective Date for Professionals' fees, disbursements, expenses, or related support services (including reasonable fees, costs and expenses incurred by Professionals relating to the preparation of interim and final fee applications and obtaining Bankruptcy Court approval thereof) in the ordinary course of business and without application or notice to, or order of, the Bankruptcy Court, including, without limitation, the reasonable fees, expenses, and disbursements of the Distribution Agents and the fees, costs and expenses incurred by Professionals in connection with the implementation, enforcement and Consummation of this Plan and the Restructuring Documents.

### C. Statutory Committee

On the Effective Date, the current and former members of the Committee, and their respective officers, employees, counsel, advisors and agents, will be released and discharged of and from all further authority, duties, responsibilities and obligations related to and arising from and in connection with the Chapter 11 Cases and the Committee will dissolve; provided, however, that following the Effective Date, the Committee will continue in existence and have standing and a right to be heard for the following limited purposes: (i) pursuing claims and final fee applications filed pursuant to sections 330 and 331 of the Bankruptcy Code in accordance with Article II.A; and (ii) any appeals of the Confirmation Order or other appeal to which the Committee is a party Following the completion of the Committee's remaining duties set forth above, the Committee will be dissolved, and the retention or employment of the Committee's respective attorneys, accountants and other agents will terminate without further notice to, or action by, any Entity.

67

US-DOCS\110687040

### D.      *Conflicts*

In the event that a provision of the Restructuring Documents or the Disclosure Statement (including any and all exhibits and attachments thereto) conflicts with a provision of this Plan or the Confirmation Order, the provision of this Plan and the Confirmation Order (as applicable) will govern and control to the extent of such conflict.  In the event that a provision of this Plan conflicts with a provision of the Confirmation Order, the provision of the Confirmation Order will govern and control to the extent of such conflict.

### E.      *Modification of Plan*

Effective as of the date hereof and subject to the limitations and rights contained in this Plan: (a) the Debtors reserve the right, in accordance with the Bankruptcy Code and the Bankruptcy Rules, to amend or modify this Plan prior to the entry of the Confirmation Order in a way that is in form and substance consistent in all material respects with the Restructuring Term Sheet and otherwise acceptable to the Debtors and the Required Consenting Noteholders in the manner set forth in the Restructuring Support Agreement, and to the extent required by the DIP Credit Agreement, shall be in form and substance satisfactory or reasonably satisfactory, as applicable, to the DIP Agent and the DIP Required Lenders in the manner set forth in the DIP Financing Documents, in accordance with section 1127(a) of the Bankruptcy Code, and in consultation with the Committee, provided that, if such amendment or modification adversely impacts the treatment of General Unsecured Claims, such modification or amendment shall require the consent of the Committee, not to be unreasonably withheld; and (b) after the entry of the Confirmation Order, the Debtors or the Reorganized Debtors, as applicable, may, upon order of the Bankruptcy Court, amend or modify this Plan in a way that is in form and substance consistent in all material respects with the Restructuring Term Sheet and otherwise acceptable to the Debtors and the Required Consenting Noteholders in the manner set forth in the Restructuring Support Agreement, and to the extent required by the DIP Credit Agreement, shall be in form and substance satisfactory or reasonably satisfactory, as applicable, to the DIP Agent and the DIP Required Lenders in the manner set forth in the DIP Financing Documents, in accordance with section 1127(b) of the Bankruptcy Code, and in consultation with the Committee, provided that, if such amendment or modification adversely impacts the treatment of General Unsecured Claims, such modification or amendment shall require the consent of the Committee, not to be unreasonably withheld, or to remedy any defect or omission or reconcile any inconsistency in this Plan in such manner as may be necessary to carry out the purpose and intent of this Plan.  A Holder of a Claim or Equity Interest that has accepted this Plan will be deemed to have accepted this Plan, as altered, amended or modified, if the proposed alteration, amendment or modification does not materially and adversely change the treatment of the Claim or Equity Interest of such Holder.

### F.      *Revocation or Withdrawal of Plan*

The Debtors reserve the right to revoke or withdraw this Plan prior to the Effective Date and/or to File subsequent chapter 11 plans, with respect to one or more of the Debtors.  If the Debtors revoke or withdraw this Plan, or if Confirmation or Consummation of this Plan does not occur with respect to one or more of the Debtors, then with respect to the applicable Debtor or Debtors for which this Plan was revoked or withdrawn or for which Confirmation or Consummation of this Plan did not occur: (1) this Plan will be null and void in all respects; (2) any settlement or compromise embodied in this Plan, assumption or rejection of Executory Contracts

or Unexpired Leases effected by this Plan and any document or agreement executed pursuant hereto will be deemed null and void except as may be set forth in a separate order entered by the Bankruptcy Court; and (3) nothing contained in this Plan will: (a) constitute a waiver or release of any Claims by or against, or any Equity Interests in, the applicable Debtors or any other Entity; (b) prejudice in any manner the rights of the applicable Debtors or any other Entity; or (c) constitute an admission, acknowledgement, offer or undertaking of any sort by the applicable Debtors or any other Entity.

G.      *Successors and Assigns*

This Plan will be binding upon and inure to the benefit of the Debtors, the Reorganized Debtors, all present and former Holders of Claims and Equity Interests, other parties-in-interest, and their respective heirs, executors, administrators, successors, and assigns.  The rights, benefits, and obligations of any Person or Entity named or referred to in this Plan will be binding on, and will inure to the benefit of, any heir, executor, administrator, successor, or assign of such Person or Entity.

H.      *Reservation of Rights*

Except as expressly set forth herein, this Plan will have no force or effect unless and until the Bankruptcy Court enters the Confirmation Order and this Plan is Consummated.  Neither the filing of this Plan, any statement or provision contained herein, nor the taking of any action by the Debtors or any other Entity with respect to this Plan will be or will be deemed to be an admission or waiver of any rights of: (1) the Debtors with respect to the Holders of Claims or Equity Interests or other Entity; or (2) any Holder of a Claim or an Equity Interest or other Entity prior to the Effective Date.

I.      *Further Assurances*

The Debtors or the Reorganized Debtors, as applicable, all Holders of Claims receiving distributions hereunder and all other Entities will, from time to time, prepare, execute and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of this Plan or the Confirmation Order.

J.      *Severability*

If, prior to the Confirmation Date, any term or provision of this Plan is determined by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court will have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision will then be applicable as altered or interpreted. Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of this Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation.  The Confirmation Order will constitute a judicial determination and will provide that each term and provision of this Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

US-DOCS\110687040

*K.*     *Service of Documents*

Any notice, direction or other communication given regarding the matters contemplated by this Plan (each, a "**Notice**") must be in writing, sent by personal delivery, electronic mail, courier or facsimile and addressed as follows:

**If to the Debtors**:

> Weatherford International plc
> 2000 St. James Place
> Houston, Texas 77056
> Fax: (713) 836-5032
> Attn: Christina M. Ibrahim
> Email: christina.ibrahim@weatherford.com

with a copy to:

> Latham & Watkins LLP
> 885 Third Avenue
> New York, NY 10022
> Attn:  George A. Davis and Keith A. Simon
> Direct Dial:  (212) 906-1200
> Fax:  (212) 751-4864
> Email: george.davis@lw.com and keith.simon@lw.com

**If to the Ad Hoc Noteholder Committee**:

> Akin Gump Strauss Hauer & Feld LLP
> One Bryant Park
> Bank of America Tower
> New York, NY 10036-6745
> Attn: Michael S Stamer, Meredith Lahaie
> Direct Dial: (212) 872-1000
> Fax: (212) 872-1002
> Email: mstamer@akingump.com and mlahaie@akingump.com

and -

> 2001 K Street N.W.
> Washington, DC 20006
> Attn: Kate Doorley
> Direct Dial: (202) 887-4592
> Fax: (202) 887-4288
> Email: kdoorley@akingump.com

70

US-DOCS\110687040

**If to the Committee**:

Ropes and Gray LLP
1211 Avenue of the Americas
New York, NY 10036-8704
Attn: Mark R. Somerstein; Matthew M. Roose
Direct Dial: (212) 596-9000
Fax: (212) 596-9090
Email: mark.somerstein@ropesgray.com and matthew.roose@ropesgray.com

A Notice is deemed to be given and received (a) if sent by personal delivery or courier, on the date of delivery if it is a Business Day and the delivery was made prior to 4:00 p.m. (local time in place of receipt) and otherwise on the next Business Day, or (b) if sent by facsimile, on the Business Day following the date of confirmation of transmission by the originating facsimile, or (c) if sent by electronic mail, when the sender receives an email from the recipient acknowledging receipt, provided that an automatic "read receipt" does not constitute acknowledgment of an email for purposes of this Section. Any party may change its address for service from time to time by providing a Notice in accordance with the foregoing. Any element of a party's address that is not specifically changed in a Notice will be assumed not to be changed. Sending a copy of a Notice to a party's legal counsel as contemplated above is for information purposes only and does not constitute delivery of the Notice to that party. The failure to send a copy of a Notice to legal counsel does not invalidate delivery of that Notice to a party.

L.      *Exemption from Transfer Taxes Pursuant to Section 1146(a) of the Bankruptcy Code*

Pursuant to and to the fullest extent permitted by section 1146(a) of the Bankruptcy Code, any issuance, transfer, or exchange of a security, or the making or delivery of an instrument of transfer of property, pursuant to or in connection with this Plan or the Restructuring Documents will not be subject to any Stamp or Similar Tax or governmental assessment in the United States or by any other Governmental Unit, and the Confirmation Order will direct the appropriate federal, state or local (domestic or foreign) governmental officials or agents to forgo the collection of any such Stamp or Similar Tax or governmental assessment and to accept for filing and recordation instruments or other documents evidencing such action or event without the payment of any such Stamp or Similar Tax or governmental assessment. Such exemption specifically applies, without limitation, to (i) all actions, agreements and documents necessary to evidence and implement the provisions of, transactions contemplated by and the distributions to be made under this Plan or the Restructuring Documents, (ii) the issuance and distribution of the New Common Stock or Plan Securities and Documents, and (iii) the maintenance or creation of security interests or any Lien as contemplated by this Plan or the Restructuring Documents.

M.      *Governing Law*

Except to the extent that the Bankruptcy Code, the Bankruptcy Rules or other federal law is applicable, or to the extent that a Restructuring Document or an exhibit or schedule to this Plan provides otherwise, the rights and obligations arising under this Plan will be governed by, and

71

Case 19-33504   Document 328-2   Filed in TXSB on 05/09/19   Page 77 of 78

construed and enforced in accordance with, the laws of New York, without giving effect to the principles of conflicts of law of such jurisdiction.

N.      *Tax Reporting and Compliance*

The Reorganized Debtors are hereby authorized, on behalf of the Debtors, to request an expedited determination under section 505(b) of the Bankruptcy Code of the tax liability of the Debtors for all taxable periods ending after the Petition Date through and including the Effective Date.

O.      *Schedules*

All exhibits and schedules to this Plan, including the Exhibits and Plan Schedules, are incorporated herein and are a part of this Plan as if set forth in full herein.

P.      *No Strict Construction*

This Plan is the product of extensive discussions and negotiations between and among, *inter alia*, the Debtors, the Consenting Noteholders, and their respective professionals.  Each of the foregoing was represented by counsel of its choice who either participated in the formulation and documentation of, or was afforded the opportunity to review and provide comments on, this Plan, the Disclosure Statement, the Exhibits and the Plan Schedules, and the agreements and documents ancillary or related thereto.  Accordingly, unless explicitly indicated otherwise, the general rule of contract construction known as "contra proferentem" or other rule of strict construction will not apply to the construction or interpretation of any provision of this Plan, the Disclosure Statement, the Exhibits or the Plan Schedules, or the documents ancillary and related thereto.

Q.      *Entire Agreement*

Except as otherwise provided herein or therein, this Plan and the Restructuring Documents supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into this Plan and the Restructuring Documents.

R.      *Closing of Chapter 11 Cases*

The Reorganized Debtors will, promptly after the full administration of the Chapter 11 Cases, File with the Bankruptcy Court all documents required by Bankruptcy Rule 3022 and any applicable order of the Bankruptcy Court to close the Chapter 11 Cases.

S.      *2002 Notice Parties*

After the Effective Date, the Debtors and the Reorganized Debtors, as applicable, are authorized to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to those Entities who have Filed a renewed request after the Confirmation Hearing to receive documents pursuant to Bankruptcy Rule 2002.

US-DOCS\110687040

73

Dated:  September 9, 2019

Respectfully submitted,

WEATHERFORD INTERNATIONAL PLC AND
ITS AFFILIATE DEBTORS

By:     /s/ Christoph Bausch
Title:   Executive Vice President and Chief
         Financial Officer

73

US-DOCS\110687040

## EXHIBIT B

## Notice of Confirmation

US-DOCS\110021092

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

```
-------------------------------------------------------------- x
In re:                                            :   Chapter 11
                                                  :
WEATHERFORD INTERNATIONAL PLC, et al.,            :   Case No. 19-33694 (DRJ)
                                                  :
                        Debtors.[1]               :   (Jointly Administered)
                                                  :
-------------------------------------------------------------- x
```

**NOTICE OF ENTRY OF ORDER (I) APPROVING DEBTORS' DISCLOSURE
STATEMENT AND (II) CONFIRMING SECOND AMENDED JOINT PREPACKAGED
PLAN OF REORGANIZATION FOR WEATHERFORD INTERNATIONAL PLC AND
ITS AFFILIATE DEBTORS UNDER CHAPTER 11 OF THE BANKRUPTCY CODE**

**TO CREDITORS, EQUITY INTEREST HOLDERS AND OTHER PARTIES IN INTEREST:**

PLEASE TAKE NOTICE that on **[_____]**, 2019, the United States Bankruptcy Court for the Southern District of Texas (the "**Bankruptcy Court**") entered the *Order (I) Approving Debtors' Disclosure Statement and (II) Confirming Second Amended Joint Prepackaged Plan of Reorganization for Weatherford International plc and its Affiliate Debtors Under Chapter 11 of the Bankruptcy Code* (the "**Confirmation Order**"). Among other things, the Confirmation Order confirmed the *Second Amended Joint Prepackaged Plan of Reorganization for Weatherford International plc and Its Affiliate Debtors Under Chapter 11 of the Bankruptcy Code* dated [ ● ], 2019 (as amended, modified, or supplemented from time to time, the "**Plan**")[2] as satisfying the requirements of the Bankruptcy Code, thereby authorizing Weatherford International plc and its debtor affiliates (collectively, the "**Debtors**") to implement the Plan on the Effective Date.

PLEASE TAKE FURTHER NOTICE that copies of the Confirmation Order may be examined by any party in interest during normal business hours at the Clerk of the United States Bankruptcy Court for the Southern District of Texas, 515 Rusk Street, Houston, Texas 77002. You may also obtain copies of the Confirmation Order or of any pleadings filed in these Chapter 11 Cases for a fee via PACER at: http://www.ecf.txsb.uscourts.gov or free of charge on the case information website of the Debtors' Voting and Claims Agent, Prime Clerk LLC, at https://cases.primeclerk.com/weatherford/.

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Weatherford International plc (6750); Weatherford International Ltd. (1344); and Weatherford International, LLC (5019). The location of the Debtors' U.S. corporate headquarters and the Debtors' service address is: 2000 St. James Place, Houston, TX 77056.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Plan or the Confirmation Order, as applicable.

1

PLEASE TAKE FURTHER NOTICE that the Plan and its provisions are binding on the Debtors, the Reorganized Debtors, any Holder of a Claim or Equity Interest, and such Holder's respective successors and assigns, whether or not the Claim or Equity Interest of such Holder is Impaired under the Plan and whether or not such Holder voted to accept the Plan.

Dated: September [__], 2019
Houston, Texas

BY ORDER OF THE COURT

Timothy A. ("Tad") Davidson II (Texas Bar No. 24012503)
Ashley L. Harper (Texas Bar No. 24065272)
**HUNTON ANDREWS KURTH LLP**
600 Travis Street, Suite 4200
Houston, Texas 77002
Tel:     713-220-4200
Fax:     713-220-4285
Email:  TadDavidson@HuntonAK.com
            AshleyHarper@HuntonAK.com

-and-

George A. Davis (admitted *pro hac vice*)
Keith A. Simon (admitted *pro hac vice*)
David A. Hammerman (admitted *pro hac vice*)
Annemarie V. Reilly (admitted *pro hac vice*)
Lisa K. Lansio (admitted *pro hac vice*)
**LATHAM & WATKINS LLP**
885 Third Avenue
New York, New York 10022
Tel:     212-906-1200
Fax:     212-751-4864
Email:  george.davis@lw.com
            keith.simon@lw.com
            david.hammerman@lw.com
            annemarie.reilly@lw.com
            lisa.lansio@lw.com

*Counsel for the Debtors and Debtors in Possession*

2

US-DOCS\110021092.

## EXHIBIT C

**Notice of Effective Date**

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

---------------------------------------------------------------- x

In re:                              :    Chapter 11

                                      :

WEATHERFORD INTERNATIONAL PLC, *et al.*,   :    Case No. 19-33694 (DRJ)

                                      :

               Debtors.[1]                 :    (Jointly Administered)

                                      :

---------------------------------------------------------------- x

## NOTICE OF: (A) EFFECTIVE DATE AND (B) DEADLINE
## FOR PROFESSIONALS TO FILE FINAL FEE APPLICATIONS

### TO CREDITORS, EQUITY INTEREST HOLDERS, AND OTHER PARTIES IN INTEREST:

         **PLEASE TAKE NOTICE** that on **[_____]**, 2019, the United States Bankruptcy Court for the Southern District of Texas (the "**Bankruptcy Court**") entered the *Order (I) Approving Debtors' Disclosure Statement and (II) Confirming Second Amended Joint Prepackaged Plan of Reorganization for Weatherford International plc and its Affiliate Debtors Under Chapter 11 of the Bankruptcy Code* (the "**Confirmation Order**"). Among other things, the Confirmation Order confirmed the *Second Amended Joint Prepackaged Plan of Reorganization for Weatherford International plc and Its Affiliate Debtors Under Chapter 11 of the Bankruptcy Code* dated September 9, 2019 (as amended, modified, or supplemented from time to time, the "**Plan**")[2] as satisfying the requirements of the Bankruptcy Code, thereby authorizing Weatherford International plc and its debtor affiliates (collectively, the "**Debtors**") to implement the Plan on the Effective Date.

         **PLEASE TAKE FURTHER NOTICE** that on **[_____]**, 2019, the Effective Date under the Plan occurred.

         **PLEASE TAKE FURTHER NOTICE** that copies of the Confirmation Order may be examined by any party in interest during normal business hours at the Clerk of the United States Bankruptcy Court for the Southern District of Texas, 515 Rusk Street, Houston, Texas 77002. You may also obtain copies of the Confirmation Order or of any pleadings filed in these Chapter 11 Cases for a fee via PACER at: http://www.ecf.txsb.uscourts.gov or free of charge on the case

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Weatherford International plc (6750); Weatherford International Ltd. (1344); and Weatherford International, LLC (5019). The location of the Debtors' U.S. corporate headquarters and the Debtors' service address is: 2000 St. James Place, Houston, TX 77056.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Plan or the Confirmation Order, as applicable.

1

information website of the Debtors' Voting and Claims Agent, Prime Clerk LLC, at https://cases.primeclerk.com/weatherford/.

**PLEASE TAKE FURTHER NOTICE** that all final requests for payment of Professional Fee Claims must be filed with the Bankruptcy Court and served on the Reorganized Debtors no later than [_____], 2019, which is the date that is 45 days after the Effective Date.

**PLEASE TAKE FURTHER NOTICE** that the Plan and its provisions are binding on the Debtors, the Reorganized Debtors, any Holder of a Claim or Equity Interest, and such Holder's respective successors and assigns, whether or not the Claim or Equity Interest of such Holder is Impaired under the Plan and whether or not such Holder voted to accept the Plan.

US-DOCS\110021092.

Dated:   [__], 2019                      BY ORDER OF THE COURT
          Houston, Texas

Timothy A. ("Tad") Davidson II (Texas Bar No. 24012503)
Ashley L. Harper (Texas Bar No. 24065272)
**HUNTON ANDREWS KURTH LLP**
600 Travis Street, Suite 4200
Houston, Texas 77002
Tel:    713-220-4200
Fax:   713-220-4285
Email:  TadDavidson@HuntonAK.com
            AshleyHarper@HuntonAK.com

-and-

George A. Davis (admitted *pro hac vice*)
Keith A. Simon (admitted *pro hac vice*)
David A. Hammerman (admitted *pro hac vice*)
Annemarie V. Reilly (admitted *pro hac vice*)
Lisa K. Lansio (admitted *pro hac vice*)
**LATHAM & WATKINS LLP**
885 Third Avenue
New York, New York 10022
Tel:    212-906-1200
Fax:   212-751-4864
Email:  george.davis@lw.com
        keith.simon@lw.com
        david.hammerman@lw.com
        annemarie.reilly@lw.com
        lisa.lansio@lw.com

*Counsel for the Debtors and Debtors in Possession*

3

# TAB 60

# Exhibit 3A

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| | ) |
| IN RE SALIX PHARMACEUTICALS, LTD. | ) Case No. 14 Civ. 8925 (KMW)<br>) CLASS ACTION<br>)<br>) |

**DECLARATION OF SALVATORE J. GRAZIANO IN SUPPORT OF LEAD**
**COUNSEL'S MOTION FOR AN AWARD OF ATTORNEYS' FEES AND**
**REIMBURSEMENT OF LITIGATION EXPENSES FILED ON**
**BEHALF OF BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP**

I, SALVATORE J. GRAZIANO, declare as follows:

1.      I am a partner of the law firm of Bernstein Litowitz Berger & Grossmann LLP, the Court-appointed Lead Counsel in the above-captioned action (the "Action"). I submit this declaration in support of Lead Counsel's application for an award of attorneys' fees and reimbursement of litigation expenses. I have personal knowledge of the facts set forth herein and, if called upon, could and would testify thereto.

2.      My firm, as Lead Counsel, was involved in all aspects of the litigation and its settlement as set forth in my Declaration in Support of: (I) Lead Plaintiff's Motion for Final Approval of Settlement and Plan of Allocation, and (II) Lead Counsel's Motion for an Award of Attorneys' Fees and Reimbursement of Litigation Expenses.

3.      The schedule attached hereto as Exhibit 1 is a detailed summary indicating the amount of time spent by attorneys and professional support staff employees of my firm who, from inception of the Action through May 31, 2017, billed ten or more hours to the Action, and the lodestar calculation for those individuals based on my firm's current billing rates. For personnel who are no longer employed by my firm, the lodestar calculation is based upon the billing rates for such personnel in his or her final year of employment by my firm. The schedule was prepared from contemporaneous daily time records regularly prepared and maintained by

my firm. Time expended on the application for fees and reimbursement of expenses has not been included.

4. The hourly rates for the attorneys and professional support staff in my firm included in Exhibit 1 are the same as the regular rates charged for their services, which have been accepted in other securities or shareholder litigation.

5. The total number of hours reflected in Exhibit 1 from inception through and including May 31, 2017, is 29,758.25. The total lodestar reflected in Exhibit 1 for that period is $12,349,533.75, consisting of $11,718,620.00 for attorneys' time and $630,913.75 for professional support staff time.

6. My firm's lodestar figures are based upon the firm's billing rates, which rates do not include charges for expense items. Expense items are billed separately and such charges are not duplicated in my firm's billing rates.

7. As detailed in Exhibit 2, my firm is seeking reimbursement for a total of $1,924,023.98 in expenses incurred in connection with the prosecution of this Action from its inception through and including May 31, 2017.

8. The expenses reflected in Exhibit 2 are the expenses actually incurred by my firm or reflect "caps" based on the application of the following criteria:

(a) Out-of-town travel - airfare is at coach rates, hotel charges per night are capped at $350 for large cities and $250 for small cities (the relevant cities and how they are categorized are reflected on Exhibit 2); meals are capped at $20 per person for breakfast, $25 per person for lunch, and $50 per person for dinner.

(b) Out-of-Office Meals - Capped at $25 per person for lunch and $50 per person for dinner.

(c)  In-Office Working Meals - Capped at $20 per person for lunch and $30 per person for dinner.

(d)  Internal Copying - Charged at $0.10 per page.

(e)  On-Line Research - Charges reflected are for out-of-pocket payments to the vendors for research done in connection with this litigation.  On-line research is billed to each case based on actual time usage at a set charge by the vendor.  There are no administrative charges included in these figures.

9.      The expenses incurred in this Action are reflected on the books and records of my firm.  These books and records are prepared from expense vouchers, check records and other source materials and are an accurate record of the expenses incurred.

10.     With respect to the standing of my firm, attached hereto as Exhibit 3 is a brief biography of my firm and attorneys in my firm who were involved in this Action.

I declare under penalty of perjury that the foregoing is true and correct.  Executed on June 19, 2017.

_/s Salvatore J. Graziano_
Salvatore J. Graziano

#108924.1

**EXHIBIT 1**

*In re Salix Pharmaceuticals, Ltd.,*
Case No. 14 Civ. 8925 (KMW)

**BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP**

**TIME REPORT**

Inception through May 31, 2017

| NAME | HOURS | HOURLY RATE | LODESTAR |
|---|---|---|---|
| **Partners** | | | |
| Max W. Berger | 196.50 | $995 | $195,517.50 |
| Michael Blatchley | 400.00 | $700 | 280,000.00 |
| Salvatore J. Graziano | 485.75 | $945 | 459,033.75 |
| Avi Josefson | 26.00 | $800 | 20,800.00 |
| Mark Lebovitch | 32.75 | $875 | 28,656.25 |
| John Rizio-Hamilton | 797.50 | $750 | 598,125.00 |
| Gerald H. Silk | 171.50 | $945 | 162,067.50 |
| Katherine M. Sinderson | 817.25 | $700 | 572,075.00 |
| | | | |
| **Associates** | | | |
| David L. Duncan | 113.50 | $600 | 68,100.00 |
| Scott Foglietta | 317.00 | $500 | 158,500.00 |
| Adam Hollander | 660.00 | $600 | 396,000.00 |
| Angus Fei Ni | 568.00 | $450 | 255,600.00 |
| David Schwartz | 232.25 | $575 | 133,543.75 |
| Katherine A. Stefanou | 493.00 | $500 | 246,500.00 |
| | | | |
| **Staff Attorneys** | | | |
| Erwin Abalos | 1,752.50 | $375 | 657,187.50 |
| Sheela Aiyappasamy | 599.75 | $375 | 224,906.25 |
| Pedro Ariston | 1,676.25 | $340 | 569,925.00 |
| Jim Briggs | 1,497.50 | $340 | 509,150.00 |
| Girolamo Brunetto | 87.75 | $340 | 29,835.00 |
| Ryan Candee | 614.00 | $395 | 242,530.00 |
| Brian Chau | 985.50 | $375 | 369,562.50 |
| Anne T. Cirasuolo | 514.00 | $395 | 203,030.00 |
| Chris Clarkin | 719.00 | $375 | 269,625.00 |
| Alex Dickin | 1,874.50 | $340 | 637,330.00 |
| George Doumas | 625.00 | $395 | 246,875.00 |
| Michael Graff | 761.25 | $340 | 258,825.00 |

| NAME | HOURS | HOURLY RATE | LODESTAR |
|---|---|---|---|
| Daniel Gruttadaro | 1,544.00 | $340 | 524,960.00 |
| Keith Guilfoyle | 803.00 | $395 | 317,185.00 |
| Stephen Imundo | 1,699.50 | $395 | 671,302.50 |
| Merlyne Jean-Louis | 738.75 | $340 | 251,175.00 |
| Laura Lefkowitz | 594.75 | $395 | 234,926.25 |
| Danielle Leon | 810.00 | $340 | 275,400.00 |
| Maureen McCarren | 605.50 | $395 | 239,172.50 |
| John Moore | 449.50 | $340 | 152,830.00 |
| Jeff Powell | 635.00 | $395 | 250,825.00 |
| Prashantha Ratnayake | 611.25 | $395 | 241,443.75 |
| Daniel Renehan | 865.75 | $395 | 341,971.25 |
| Madeleine Severin | 564.00 | $375 | 211,500.00 |
| Christina Suarez | 216.25 | $375 | 81,093.75 |
| Catherine Van Kampen | 333.00 | $395 | 131,535.00 |
| | | | |
| **Financial Analysts** | | | |
| Nick DeFilippis | 21.00 | $500 | 10,500.00 |
| Sharon Safran | 91.25 | $325 | 29,656.25 |
| Adam Weinschel | 112.75 | $415 | 46,791.25 |
| | | | |
| **Investigators** | | | |
| Chris Altiery | 114.50 | $245 | 28,052.50 |
| Lisa C. Williams (Burr) | 271.50 | $290 | 78,735.00 |
| | | | |
| **Paralegals** | | | |
| Martin Braxton | 19.50 | $245 | 4,777.50 |
| Jose Echegaray | 704.00 | $245 | 172,480.00 |
| Ellen Jordan | 370.00 | $245 | 90,650.00 |
| Matthew Mahady | 52.00 | $310 | 16,120.00 |
| Gary Weston | 178.75 | $325 | 58,093.75 |
| | | | |
| **Litigation Support** | | | |
| Babatunde Pedro | 142.50 | $275 | 39,187.50 |
| Andrea R. Webster | 18.50 | $310 | 5,735.00 |
| Jessica M. Wilson | 106.50 | $275 | 29,287.50 |
| | | | |
| **Managing Clerk** | | | |
| Errol Hall | 67.25 | $310 | 20,847.50 |
| | | | |
| **TOTALS** | **29,758.25** | | **$12,349,533.75** |

**EXHIBIT 2**

*In re Salix Pharmaceuticals, Ltd.,*
Case No. 14 Civ. 8925 (KMW)

**BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP**

**EXPENSE REPORT**

Inception through May 31, 2017

| CATEGORY | AMOUNT |
|---|---|
| Service of Process | 6,775.40 |
| On-Line Legal Research | 49,720.40 |
| On-Line Factual Research | 14,144.40 |
| Document Management/Litigation Support | 8,723.21 |
| Telephones/Faxes | 333.54 |
| Postage & Express Mail | 3,2014.24 |
| Hand Delivery Charges | 220.00 |
| Local Transportation | 7,389.52 |
| Internal Copying | 10,459.40 |
| Outside Copying | 10,016.51 |
| Out-of-Town Travel* | 18,639.78 |
| Working Meals | 7,833.39 |
| Court Reporting and Transcripts | 6,051.04 |
| Deposition/Meeting Hosting | 1,988.93 |
| Experts | 1,437,077.61 |
| **Total Paid:** | **$1,582,387.37** |
| | |
| **Outstanding Expenses:** | |
| Document Management/Litigation Support | 102,973.68 |
| Court Reporting and Transcripts | 10,122.93 |
| Experts | 228,540.00 |
| | |
| **Total Outstanding:** | **$341,636.61** |
| | |
| **TOTAL EXPENSES:** | **$1,924,023.98** |

* Out of town travel includes hotels in the following "large cities" capped at $350 per night: Columbus, Ohio, Washington, DC, and San Francisco, California; and the following "small" city capped at $250 per night: Costa Mesa, California.

# EXHIBIT 3

FIRM RESUME AND BIOGRAPHIES





**Trusted Advocacy. Proven Results.**

Bernstein Litowitz Berger & Grossmann LLP

Attorneys at Law

# Firm Resume

**New York**
1251 Avenue of the
Americas, 44th Floor
New York, NY 10020
Tel: 212-554-1400
Fax: 212-554-1444

**California**
12481 High Bluff
Drive, Suite 300
San Diego, CA 92130
Tel: 858-793-0070
Fax: 858-793-0323

**Louisiana**
2727 Prytania Street,
Suite 14
New Orleans, LA 70130
Tel: 504-899-2339
Fax: 504-899-2342

**Illinois**
875 North Michigan
Avenue, Suite 3100
Chicago, IL 60611
Tel: 312-373-3880
Fax: 312-794-7801

**www.blbglaw.com**



# TABLE OF CONTENTS

FIRM OVERVIEW ........................................................................................................................................1
    More Top Securities Recoveries..............................................................................................................1
    Giving Shareholders a Voice and Changing Business Practices for the Better ......................................2
    Advocacy for Victims of Corporate Wrongdoing...................................................................................2
PRACTICE AREAS......................................................................................................................................4
  Securities Fraud Litigation........................................................................................................................4
  Corporate Governance and Shareholders' Rights .....................................................................................4
  Employment Discrimination and Civil Rights..........................................................................................4
  General Commercial Litigation and Alternative Dispute Resolution ........................................................5
  Distressed Debt and Bankruptcy Creditor Negotiation.............................................................................5
  Consumer Advocacy..................................................................................................................................5
THE COURTS SPEAK .................................................................................................................................6
RECENT ACTIONS & SIGNIFICANT RECOVERIES...............................................................................7
    Securities Class Actions..........................................................................................................................7
    Corporate Governance and Shareholders' Rights .................................................................................12
    Employment Discrimination and Civil Rights ......................................................................................15
CLIENTS AND FEES.................................................................................................................................16
IN THE PUBLIC INTEREST .....................................................................................................................17
    Bernstein Litowitz Berger & Grossmann Public Interest Law Fellows ................................................17
    Firm sponsorship of Her Justice ...........................................................................................................17
    The Paul M. Bernstein Memorial Scholarship.......................................................................................17
    Firm sponsorship of City Year New York .............................................................................................17
    Max W. Berger Pre-Law Program .........................................................................................................17
    New York Says Thank You Foundation .................................................................................................17
OUR ATTORNEYS.....................................................................................................................................18
  Members ..................................................................................................................................................18
    Max W. Berger .....................................................................................................................................18
    Gerald H. Silk .......................................................................................................................................19
    Salvatore J. Graziano ............................................................................................................................21
    Mark Lebovitch .....................................................................................................................................21
    Avi Josefson .........................................................................................................................................23
    John Rizio-Hamilton.............................................................................................................................23
    Katherine M. Sinderson ........................................................................................................................24
    Michael D. Blatchley ............................................................................................................................25
  Associates ................................................................................................................................................26
    David L. Duncan....................................................................................................................................26
    Scott R. Foglietta ..................................................................................................................................26
    Adam Hollander ....................................................................................................................................26
    Angus Fei Ni..........................................................................................................................................27
    David Schwartz......................................................................................................................................27
    Katherine A. Stefanou ..........................................................................................................................27
  Staff Attorneys.........................................................................................................................................28
    Erwin Abalos ........................................................................................................................................28
    Sheela Aiyappasamy.............................................................................................................................28
    Pedro Ariston ........................................................................................................................................28
    Jim Briggs.............................................................................................................................................28
    Girolamo Brunetto ...............................................................................................................................29
    Ryan Candee.........................................................................................................................................29
    Brian Chau ............................................................................................................................................29
    Anne Cirasuolo .....................................................................................................................................29
    Christopher Clarkin ..............................................................................................................................30
    Alex Dickin...........................................................................................................................................30
    George Doumas ....................................................................................................................................30
    Michael Graff ........................................................................................................................................30



Daniel Gruttadaro ........................................................................................................................31
Keith Guilfoyle ............................................................................................................................31
Stephen Imundo ...........................................................................................................................31
Merlyne Jean-Louis ......................................................................................................................31
Laura Lefkowitz ...........................................................................................................................32
Danielle Leon ...............................................................................................................................32
Maureen McCarren ......................................................................................................................32
John Moore ..................................................................................................................................32
Robert Jeffrey Powell ..................................................................................................................33
Prashantha Ratnayake ..................................................................................................................33
Daniel Renehan ............................................................................................................................33
Madeleine Severin .......................................................................................................................34
Christina Suarez ...........................................................................................................................34
Catherine Van Kampen ................................................................................................................34



Since our founding in 1983, Bernstein Litowitz Berger & Grossmann LLP has obtained many of the largest monetary recoveries in history – over $30 billion on behalf of investors. Unique among our peers, the firm has obtained the largest settlements ever agreed to by public companies related to securities fraud, including four of the ten largest in history. Working with our clients, we have also used the litigation process to achieve precedent-setting reforms which have increased market transparency, held wrongdoers accountable and improved corporate business practices in groundbreaking ways.

## FIRM OVERVIEW

Bernstein Litowitz Berger & Grossmann LLP ("BLB&G"), a national law firm with offices located in New York, California, Louisiana and Illinois, prosecutes class and private actions on behalf of individual and institutional clients. The firm's litigation practice areas include securities class and direct actions in federal and state courts; corporate governance and shareholder rights litigation, including claims for breach of fiduciary duty and proxy violations; mergers and acquisitions and transactional litigation; alternative dispute resolution; distressed debt and bankruptcy; civil rights and employment discrimination; consumer class actions and antitrust. We also handle, on behalf of major institutional clients and lenders, more general complex commercial litigation involving allegations of breach of contract, accountants' liability, breach of fiduciary duty, fraud, and negligence.

We are the nation's leading firm in representing institutional investors in securities fraud class action litigation. The firm's institutional client base includes the New York State Common Retirement Fund; the California Public Employees' Retirement System (CalPERS); the Ontario Teachers' Pension Plan Board (the largest public pension funds in North America); the Los Angeles County Employees Retirement Association (LACERA); the Chicago Municipal, Police and Labor Retirement Systems; the Teacher Retirement System of Texas; the Arkansas Teacher Retirement System; Forsta AP-fonden ("AP1"); Fjarde AP-fonden ("AP4"); the Florida State Board of Administration; the Public Employees' Retirement System of Mississippi; the New York State Teachers' Retirement System; the Ohio Public Employees Retirement System; the State Teachers Retirement System of Ohio; the Oregon Public Employees Retirement System; the Virginia Retirement System; the Louisiana School, State, Teachers and Municipal Police Retirement Systems; the Public School Teachers' Pension and Retirement Fund of Chicago; the New Jersey Division of Investment of the Department of the Treasury; TIAA-CREF and other private institutions; as well as numerous other public and Taft-Hartley pension entities.

### MORE TOP SECURITIES RECOVERIES

Since its founding in 1983, Bernstein Litowitz Berger & Grossmann LLP has litigated some of the most complex cases in history and has obtained over $30 billion on behalf of investors. Unique among its peers, the firm has negotiated the largest settlements ever agreed to by public companies related to securities fraud, and obtained many of the largest securities recoveries in history (including 5 of the top 10):



- *In re WorldCom, Inc. Securities Litigation* – $6.19 billion recovery
- *In re Cendant Corporation Securities Litigation* – $3.3 billion recovery
- *In re Bank of America Corp. Securities, Derivative, and Employee Retirement Income Security Act (ERISA) Litigation* – $2.43 billion recovery
- *In re Nortel Networks Corporation Securities Litigation* ("Nortel II") – $1.07 billion recovery
- *In re Merck & Co., Inc. Securities Litigation* – $1.06 billion recovery
- *In re McKesson HBOC, Inc. Securities Litigation* – $1.05 billion recovery

For over a decade, Securities Class Action Services (SCAS – a division of ISS Governance) has compiled and published data on securities litigation recoveries and the law firms prosecuting the cases. BLB&G has been at or near the top of their rankings every year – often with the highest total recoveries, the highest settlement average, or both.

BLB&G also eclipses all competitors on SCAS's "Top 100 Settlements" report, having recovered 37% of all the settlement dollars represented in the report (nearly $23 billion), and having prosecuted nearly a third of all the cases on the list (29 of 100).

## GIVING SHAREHOLDERS A VOICE AND CHANGING BUSINESS PRACTICES FOR THE BETTER

BLB&G was among the first law firms ever to obtain meaningful corporate governance reforms through litigation. In courts throughout the country, we prosecute shareholder class and derivative actions, asserting claims for breach of fiduciary duty and proxy violations wherever the conduct of corporate officers and/or directors, as well as M&A transactions, seek to deprive shareholders of fair value, undermine shareholder voting rights, or allow management to profit at the expense of shareholders.

We have prosecuted seminal cases establishing precedents which have increased market transparency, held wrongdoers accountable, addressed issues in the boardroom and executive suite, challenged unfair deals, and improved corporate business practices in groundbreaking ways.

From setting new standards of director independence, to restructuring board practices in the wake of persistent illegal conduct; from challenging the improper use of defensive measures and deal protections for management's benefit, to confronting stock options backdating abuses and other self-dealing by executives; we have confronted a variety of questionable, unethical and proliferating corporate practices. Seeking to reform faulty management structures and address breaches of fiduciary duty by corporate officers and directors, we have obtained unprecedented victories on behalf of shareholders seeking to improve governance and protect the shareholder franchise.

## ADVOCACY FOR VICTIMS OF CORPORATE WRONGDOING

While BLB&G is widely recognized as one of the leading law firms worldwide advising institutional investors on issues related to corporate governance, shareholder rights, and securities litigation, we have also prosecuted some of the most significant employment discrimination, civil rights and consumer protection cases on record. Equally important, the firm has advanced novel and socially beneficial principles by developing important new law in the areas in which we litigate.



The firm served as co-lead counsel on behalf of Texaco's African-American employees in *Roberts v. Texaco Inc*., which resulted in a recovery of $176 million, the largest settlement ever in a race discrimination case. The creation of a Task Force to oversee Texaco's human resources activities for five years was unprecedented and served as a model for public companies going forward.

In the consumer field, the firm has gained a nationwide reputation for vigorously protecting the rights of individuals and for achieving exceptional settlements. In several instances, the firm has obtained recoveries for consumer classes that represented the entirety of the class's losses – an extraordinary result in consumer class cases.



# PRACTICE AREAS

## SECURITIES FRAUD LITIGATION

Securities fraud litigation is the cornerstone of the firm's litigation practice. Since its founding, the firm has had the distinction of having tried and prosecuted many of the most high-profile securities fraud class actions in history, recovering billions of dollars and obtaining unprecedented corporate governance reforms on behalf of our clients. BLB&G continues to play a leading role in major securities litigation pending in federal and state courts, and the firm remains one of the nation's leaders in representing institutional investors in securities fraud class and derivative litigation.

The firm also pursues direct actions in securities fraud cases when appropriate. By selectively opting out of certain securities class actions, we seek to resolve our clients' claims efficiently and for substantial multiples of what they might otherwise recover from related class action settlements.

The attorneys in the securities fraud litigation practice group have extensive experience in the laws that regulate the securities markets and in the disclosure requirements of corporations that issue publicly traded securities. Many of the attorneys in this practice group also have accounting backgrounds. The group has access to state-of-the-art, online financial wire services and databases, which enable it to instantaneously investigate any potential securities fraud action involving a public company's debt and equity securities.

## CORPORATE GOVERNANCE AND SHAREHOLDERS' RIGHTS

The Corporate Governance and Shareholders' Rights Practice Group prosecutes derivative actions, claims for breach of fiduciary duty, and proxy violations on behalf of individual and institutional investors in state and federal courts throughout the country. The group has obtained unprecedented victories on behalf of shareholders seeking to improve corporate governance and protect the shareholder franchise, prosecuting actions challenging numerous highly publicized corporate transactions which violated fair process and fair price, and the applicability of the business judgment rule. We have also addressed issues of corporate waste, shareholder voting rights claims, and executive compensation. As a result of the firm's high-profile and widely recognized capabilities, the corporate governance practice group is increasingly in demand by institutional investors who are exercising a more assertive voice with corporate boards regarding corporate governance issues and the board's accountability to shareholders.

The firm is actively involved in litigating numerous cases in this area of law, an area that has become increasingly important in light of efforts by various market participants to buy companies from their public shareholders "on the cheap."

## EMPLOYMENT DISCRIMINATION AND CIVIL RIGHTS

The Employment Discrimination and Civil Rights Practice Group prosecutes class and multi-plaintiff actions, and other high-impact litigation against employers and other societal institutions that violate federal or state employment, anti-discrimination, and civil rights laws. The practice group represents diverse clients on a wide range of issues including Title VII actions: race, gender, sexual orientation and age discrimination suits; sexual harassment, and "glass ceiling" cases in which otherwise qualified employees are passed over for promotions to managerial or executive positions.

4



Bernstein Litowitz Berger & Grossmann LLP is committed to effecting positive social change in the workplace and in society. The practice group has the necessary financial and human resources to ensure that the class action approach to discrimination and civil rights issues is successful. This litigation method serves to empower employees and other civil rights victims, who are usually discouraged from pursuing litigation because of personal financial limitations, and offers the potential for effecting the greatest positive change for the greatest number of people affected by discriminatory practice in the workplace.

## GENERAL COMMERCIAL LITIGATION AND ALTERNATIVE DISPUTE RESOLUTION

The General Commercial Litigation practice group provides contingency fee representation in complex business litigation and has obtained substantial recoveries on behalf of investors, corporations, bankruptcy trustees, creditor committees and other business entities. We have faced down powerful and well-funded law firms and defendants – and consistently prevailed. However, not every dispute is best resolved through the courts. In such cases, BLB&G Alternative Dispute practitioners offer clients an accomplished team and a creative venue in which to resolve conflicts outside of the litigation process. BLB&G has extensive experience – and a marked record of successes – in ADR practice. For example, in the wake of the credit crisis, we successfully represented numerous former executives of a major financial institution in arbitrations relating to claims for compensation. Our attorneys have led complex business-to-business arbitrations and mediations domestically and abroad representing clients before all the major arbitration tribunals, including the American Arbitration Association (AAA), FINRA, JAMS, International Chamber of Commerce (ICC) and the London Court of International Arbitration.

## DISTRESSED DEBT AND BANKRUPTCY CREDITOR NEGOTIATION

The BLB&G Distressed Debt and Bankruptcy Creditor Negotiation Group has obtained billions of dollars through litigation on behalf of bondholders and creditors of distressed and bankrupt companies, as well as through third-party litigation brought by bankruptcy trustees and creditors' committees against auditors, appraisers, lawyers, officers and directors, and other defendants who may have contributed to client losses. As counsel, we advise institutions and individuals nationwide in developing strategies and tactics to recover assets presumed lost as a result of bankruptcy. Our record in this practice area is characterized by extensive trial experience in addition to completion of successful settlements.

## CONSUMER ADVOCACY

The Consumer Advocacy Practice Group at Bernstein Litowitz Berger & Grossmann LLP prosecutes cases across the entire spectrum of consumer rights, consumer fraud, and consumer protection issues. The firm represents victimized consumers in state and federal courts nationwide in individual and class action lawsuits that seek to provide consumers and purchasers of defective products with a means to recover their damages. The attorneys in this group are well versed in the vast array of laws and regulations that govern consumer interests and are aggressive, effective, court-tested litigators. The Consumer Practice Advocacy Group has recovered hundreds of millions of dollars for millions of consumers throughout the country. Most notably, in a number of cases, the firm has obtained recoveries for the class that were the entirety of the potential damages suffered by the consumer. For example, in actions against MCI and Empire Blue Cross, the firm recovered all of the damages suffered by the class. The group achieved its successes by advancing innovative claims and theories of liabilities, such as obtaining decisions in Pennsylvania and Illinois appellate courts that adopted a new theory of consumer damages in mass marketing cases. Bernstein Litowitz Berger & Grossmann LLP is, thus, able to lead the way in protecting the rights of consumers.



**Bernstein Litowitz**
**Berger & Grossmann** LLP

## THE COURTS SPEAK

Throughout the firm's history, many courts have recognized the professional excellence and diligence of the firm and its members. A few examples are set forth below.

### IN RE WORLDCOM, INC. SECURITIES LITIGATION

**THE HONORABLE DENISE COTE OF THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

*"I have the utmost confidence in plaintiffs' counsel…they have been doing a superb job…. The Class is extraordinarily well represented in this litigation."*

*"The magnitude of this settlement is attributable in significant part to Lead Counsel's advocacy and energy…. The quality of the representation given by Lead Counsel…has been superb…and is unsurpassed in this Court's experience with plaintiffs' counsel in securities litigation."*

*"Lead Counsel has been energetic and creative. . . . Its negotiations with the Citigroup Defendants have resulted in a settlement of historic proportions."*

### IN RE CLARENT CORPORATION SECURITIES LITIGATION

**THE HONORABLE CHARLES R. BREYER OF THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA**

*"It was the best tried case I've witnessed in my years on the bench . . ."*

*"[A]n extraordinarily civilized way of presenting the issues to you [the jury]. . . . We've all been treated to great civility and the highest professional ethics in the presentation of the case…."*

*"These trial lawyers are some of the best I've ever seen."*

### LANDRY'S RESTAURANTS, INC. SHAREHOLDER LITIGATION

**VICE CHANCELLOR J. TRAVIS LASTER OF THE DELAWARE COURT OF CHANCERY**

*"I do want to make a comment again about the excellent efforts . . . put into this case. . . . This case, I think, shows precisely the type of benefits that you can achieve for stockholders and how representative litigation can be a very important part of our corporate governance system . . . you hold up this case as an example of what to do."*

### McCALL V. SCOTT (COLUMBIA/HCA DERIVATIVE LITIGATION)

**THE HONORABLE THOMAS A. HIGGINS OF THE UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF TENNESSEE**

*"Counsel's excellent qualifications and reputations are well documented in the record, and they have litigated this complex case adeptly and tenaciously throughout the six years it has been pending. They assumed an enormous risk and have shown great patience by taking this case on a contingent basis, and despite an early setback they have persevered and brought about not only a large cash settlement but sweeping corporate reforms that may be invaluable to the beneficiaries."*

6



# RECENT ACTIONS & SIGNIFICANT RECOVERIES

Bernstein Litowitz Berger & Grossmann LLP is counsel in many diverse nationwide class and individual actions and has obtained many of the largest and most significant recoveries in history. Some examples from our practice groups include:

## SECURITIES CLASS ACTIONS

**CASE:** *IN RE WORLDCOM, INC. SECURITIES LITIGATION*

**COURT:** **United States District Court for the Southern District of New York**

**HIGHLIGHTS:** $6.19 billion securities fraud class action recovery – the second largest in history; unprecedented recoveries from Director Defendants.

**CASE SUMMARY:** Investors suffered massive losses in the wake of the financial fraud and subsequent bankruptcy of former telecom giant WorldCom, Inc. This litigation alleged that WorldCom and others disseminated false and misleading statements to the investing public regarding its earnings and financial condition in violation of the federal securities and other laws. It further alleged a nefarious relationship between Citigroup subsidiary Salomon Smith Barney and WorldCom, carried out primarily by Salomon employees involved in providing investment banking services to WorldCom, and by WorldCom's former CEO and CFO. As Court-appointed Co-Lead Counsel representing Lead Plaintiff the **New York State Common Retirement Fund**, we obtained unprecedented settlements totaling more than $6 billion from the Investment Bank Defendants who underwrote WorldCom bonds, including a $2.575 billion cash settlement to settle all claims against the Citigroup Defendants. On the eve of trial, the 13 remaining "Underwriter Defendants," including J.P. Morgan Chase, Deutsche Bank and Bank of America, agreed to pay settlements totaling nearly $3.5 billion to resolve all claims against them. Additionally, the day before trial was scheduled to begin, all of the former WorldCom Director Defendants had agreed to pay over $60 million to settle the claims against them. An unprecedented first for outside directors, $24.75 million of that amount came out of the pockets of the individuals – 20% of their collective net worth. *The Wall Street Journal*, in its coverage, profiled the settlement as literally having "shaken Wall Street, the audit profession and corporate boardrooms." After four weeks of trial, Arthur Andersen, WorldCom's former auditor, settled for $65 million. Subsequent settlements were reached with the former executives of WorldCom, and then with Andersen, bringing the total obtained for the Class to over $6.19 billion.

**CASE:** *IN RE CENDANT CORPORATION SECURITIES LITIGATION*

**COURT:** **United States District Court for the District of New Jersey**

**HIGHLIGHTS:** $3.3 billion securities fraud class action recovery – the third largest in history; significant corporate governance reforms obtained.

**CASE SUMMARY:** The firm was Co-Lead Counsel in this class action against Cendant Corporation, its officers and directors and Ernst & Young (E&Y), its auditors, for their role in disseminating materially false and misleading financial statements concerning the company's revenues, earnings and expenses for its 1997 fiscal year. As a result of company-wide accounting irregularities, Cendant restated its financial results for its 1995, 1996 and 1997 fiscal years and all fiscal quarters therein. Cendant agreed to settle the action for $2.8 billion to adopt some of the most extensive corporate governance changes in history. E&Y settled for $335 million. These settlements remain the largest sums ever recovered from a public company and a public accounting firm through securities class action litigation. BLB&G represented Lead Plaintiffs **CalPERS – the California Public Employees' Retirement System**, the **New York State Common Retirement Fund** and the **New York City Pension Funds**, the three largest public pension funds in America, in this action.



| CASE: | *IN RE BANK OF AMERICA CORP. SECURITIES, DERIVATIVE, AND EMPLOYEE RETIREMENT INCOME SECURITY ACT (ERISA) LITIGATION* |
|---|---|
| COURT: | **United States District Court for the Southern District of New York** |
| HIGHLIGHTS: | $2.425 billion in cash; significant corporate governance reforms to resolve all claims. This recovery is by far the largest shareholder recovery related to the subprime meltdown and credit crisis; the single largest securities class action settlement ever resolving a Section 14(a) claim – the federal securities provision designed to protect investors against misstatements in connection with a proxy solicitation; the largest ever funded by a single corporate defendant for violations of the federal securities laws; the single largest settlement of a securities class action in which there was neither a financial restatement involved nor a criminal conviction related to the alleged misconduct; and one of the 10 largest securities class action recoveries in history. |
| DESCRIPTION: | The firm represented Co-Lead Plaintiffs the **State Teachers Retirement System of Ohio**, the **Ohio Public Employees Retirement System**, and the **Teacher Retirement System of Texas** in this securities class action filed on behalf of shareholders of Bank of America Corporation ("BAC") arising from BAC's 2009 acquisition of Merrill Lynch & Co., Inc. The action alleges that BAC, Merrill Lynch, and certain of the companies' current and former officers and directors violated the federal securities laws by making a series of materially false statements and omissions in connection with the acquisition. These violations included the alleged failure to disclose information regarding billions of dollars of losses which Merrill had suffered before the BAC shareholder vote on the proposed acquisition, as well as an undisclosed agreement allowing Merrill to pay billions in bonuses before the acquisition closed despite these losses. Not privy to these material facts, BAC shareholders voted to approve the acquisition. |

| CASE: | *IN RE NORTEL NETWORKS CORPORATION SECURITIES LITIGATION ("NORTEL II")* |
|---|---|
| COURT: | **United States District Court for the Southern District of New York** |
| HIGHLIGHTS: | Over $1.07 billion in cash and common stock recovered for the class. |
| DESCRIPTION: | This securities fraud class action charged Nortel Networks Corporation and certain of its officers and directors with violations of the Securities Exchange Act of 1934, alleging that the Defendants knowingly or recklessly made false and misleading statements with respect to Nortel's financial results during the relevant period. BLB&G clients the **Ontario Teachers' Pension Plan Board** and the **Treasury of the State of New Jersey and its Division of Investment** were appointed as Co-Lead Plaintiffs for the Class in one of two related actions (Nortel II), and BLB&G was appointed Lead Counsel for the Class. In a historic settlement, Nortel agreed to pay $2.4 billion in cash and Nortel common stock (all figures in US dollars) to resolve both matters. Nortel later announced that its insurers had agreed to pay $228.5 million toward the settlement, bringing the total amount of the global settlement to approximately $2.7 billion, and the total amount of the Nortel II settlement to over $1.07 billion. |

| CASE: | *IN RE MERCK & CO., INC. SECURITIES LITIGATION* |
|---|---|
| COURT: | **United States District Court, District of New Jersey** |
| HIGHLIGHTS: | $1.06 billion recovery for the class. |
| DESCRIPTION: | This case arises out of misrepresentations and omissions concerning life-threatening risks posed by the "blockbuster" Cox-2 painkiller Vioxx, which Merck withdrew from the market in 2004. In January 2016, BLB&G achieved a $1.062 billion settlement on the eve of trial after more than 12 years of hard-fought litigation that included a successful decision at the United States Supreme Court. This settlement is the second largest recovery ever obtained in the Third Circuit, one of the top 10 securities recoveries of all time, and the largest securities recovery ever achieved against a pharmaceutical company. BLB&G represented Lead Plaintiff the **Public Employees' Retirement System of Mississippi.** |


Bernstein Litowitz
Berger & Grossmann LLP

| | |
|---|---|
| **CASE:** | *IN RE MCKESSON HBOC, INC. SECURITIES LITIGATION* |
| **COURT:** | **United States District Court for the Northern District of California** |
| **HIGHLIGHTS:** | $1.05 billion recovery for the class. |
| **DESCRIPTION:** | This securities fraud litigation was filed on behalf of purchasers of HBOC, McKesson and McKesson HBOC securities, alleging that Defendants misled the investing public concerning HBOC's and McKesson HBOC's financial results.  On behalf of Lead Plaintiff the **New York State Common Retirement Fund**, BLB&G obtained a $960 million settlement from the company; $72.5 million in cash from Arthur Andersen; and, on the eve of trial, a $10 million settlement from Bear Stearns & Co. Inc., with total recoveries reaching more than $1 billion. |

| | |
|---|---|
| **CASE:** | *IN RE LEHMAN BROTHERS EQUITY/DEBT SECURITIES LITIGATION* |
| **COURT:** | **United States District Court for the Southern District of New York** |
| **HIGHLIGHTS:** | $735 million in total recoveries. |
| **DESCRIPTION:** | Representing the **Government of Guam Retirement Fund**, BLB&G successfully prosecuted this securities class action arising from Lehman Brothers Holdings Inc.'s issuance of billions of dollars in offerings of debt and equity securities that were sold using offering materials that contained untrue statements and missing material information. |

After four years of intense litigation, Lead Plaintiffs achieved a total of $735 million in recoveries consisting of: a $426 million settlement with underwriters of Lehman securities offerings; a $90 million settlement with former Lehman directors and officers; a $99 million settlement that resolves claims against Ernst & Young, Lehman's former auditor (considered one of the top 10 auditor settlements ever achieved); and a $120 million settlement that resolves claims against UBS Financial Services, Inc.  This recovery is truly remarkable not only because of the difficulty in recovering assets when the issuer defendant is bankrupt, but also because no financial results were restated, and that the auditors never disavowed the statements.

| | |
|---|---|
| **CASE:** | *HEALTHSOUTH CORPORATION BONDHOLDER LITIGATION* |
| **COURT:** | **United States District Court for the Northern District of Alabama** |
| **HIGHLIGHTS:** | $804.5 million in total recoveries. |
| **DESCRIPTION:** | In this litigation, BLB&G was the appointed Co-Lead Counsel for the bond holder class, representing Lead Plaintiff the **Retirement Systems of Alabama**.  This action arose from allegations that Birmingham, Alabama based HealthSouth Corporation overstated its earnings at the direction of its founder and former CEO Richard Scrushy.  Subsequent revelations disclosed that the overstatement actually exceeded over $2.4 billion, virtually wiping out all of HealthSouth's reported profits for the prior five years.  A total recovery of $804.5 million was obtained in this litigation through a series of settlements, including an approximately $445 million settlement for shareholders and bondholders, a $100 million in cash settlement from UBS AG, UBS Warburg LLC, and individual UBS Defendants (collectively, "UBS"), and $33.5 million in cash from the company's auditor.  The total settlement for injured HealthSouth bond purchasers exceeded $230 million, recouping over a third of bond purchaser damages. |

| | |
|---|---|
| **CASE:** | *IN RE CITIGROUP, INC. BOND ACTION LITIGATION* |
| **COURT:** | **United States District Court for the Southern District of New York** |
| **HIGHLIGHTS:** | $730 million cash recovery; second largest recovery in a litigation arising from the financial crisis. |
| **DESCRIPTION:** | In the years prior to the collapse of the subprime mortgage market, Citigroup issued 48 offerings of preferred stock and bonds. This securities fraud class action was filed on behalf of purchasers of |

9



Citigroup bonds and preferred stock alleging that these offerings contained material misrepresentations and omissions regarding Citigroup's exposure to billions of dollars in mortgage-related assets, the loss reserves for its portfolio of high-risk residential mortgage loans, and the credit quality of the risky assets it held in off-balance sheet entities known as "structured investment vehicles." After protracted litigation lasting four years, we obtained a $730 million cash recovery – the second largest securities class action recovery in a litigation arising from the financial crisis, and the second largest recovery ever in a securities class action brought on behalf of purchasers of debt securities. As Lead Bond Counsel for the Class, BLB&G represented Lead Bond Plaintiffs Minneapolis Firefighters' Relief Association, Louisiana Municipal Police Employees' Retirement System, and Louisiana Sheriffs' Pension and Relief Fund.

| | |
|---|---|
| *CASE:* | *IN RE WASHINGTON PUBLIC POWER SUPPLY SYSTEM LITIGATION* |
| *COURT:* | **United States District Court for the District of Arizona** |
| *HIGHLIGHTS:* | Over $750 million – the largest securities fraud settlement ever achieved at the time. |
| *DESCRIPTION:* | BLB&G was appointed Chair of the Executive Committee responsible for litigating the action on behalf of the class in this action. The case was litigated for over seven years, and involved an estimated 200 million pages of documents produced in discovery; the depositions of 285 fact witnesses and 34 expert witnesses; more than 25,000 introduced exhibits; six published district court opinions; seven appeals or attempted appeals to the Ninth Circuit; and a three-month jury trial, which resulted in a settlement of over $750 million – then the largest securities fraud settlement ever achieved. |

| | |
|---|---|
| *CASE:* | *IN RE SCHERING-PLOUGH CORPORATION/ENHANCE SECURITIES LITIGATION; IN RE MERCK & CO., INC. VYTORIN/ZETIA SECURITIES LITIGATION* |
| *COURT:* | **United States District Court for the District of New Jersey** |
| *HIGHLIGHTS:* | $688 million in combined settlements (Schering-Plough settled for $473 million; Merck settled for $215 million) in this coordinated securities fraud litigations filed on behalf of investors in Merck and Schering-Plough. |
| *DESCRIPTION:* | After nearly five years of intense litigation, just days before trial, BLB&G resolved the two actions against Merck and Schering-Plough, which stemmed from claims that Merck and Schering artificially inflated their market value by concealing material information and making false and misleading statements regarding their blockbuster anti-cholesterol drugs Zetia and Vytorin. Specifically, we alleged that the companies knew that their "ENHANCE" clinical trial of Vytorin (a combination of Zetia and a generic) demonstrated that Vytorin was no more effective than the cheaper generic at reducing artery thickness. The companies nonetheless championed the "benefits" of their drugs, attracting billions of dollars of capital. When public pressure to release the results of the ENHANCE trial became too great, the companies reluctantly announced these negative results, which we alleged led to sharp declines in the value of the companies' securities, resulting in significant losses to investors. The combined $688 million in settlements (Schering-Plough settled for $473 million; Merck settled for $215 million) is the second largest securities recovery ever in the Third Circuit, among the top 25 settlements of all time, and among the ten largest recoveries ever in a case where there was no financial restatement. BLB&G represented Lead Plaintiffs **Arkansas Teacher Retirement System,** the **Public Employees' Retirement System of Mississippi,** and the **Louisiana Municipal Police Employees' Retirement System**. |

| | |
|---|---|
| *CASE:* | *IN RE LUCENT TECHNOLOGIES, INC. SECURITIES LITIGATION* |
| *COURT:* | **United States District Court for the District of New Jersey** |

10



**BLB&G** Bernstein Litowitz
Berger & Grossmann LLP

**HIGHLIGHTS:** $667 million in total recoveries; the appointment of BLB&G as Co-Lead Counsel is especially noteworthy as it marked the first time since the 1995 passage of the Private Securities Litigation Reform Act that a court reopened the lead plaintiff or lead counsel selection process to account for changed circumstances, new issues and possible conflicts between new and old allegations.

**DESCRIPTION:** BLB&G served as Co-Lead Counsel in this securities class action, representing Lead Plaintiffs the **Parnassus Fund**, **Teamsters Locals 175 & 505 D&P Pension Trust**, **Anchorage Police and Fire Retirement System** and the **Louisiana School Employees' Retirement System.** The complaint accused Lucent of making false and misleading statements to the investing public concerning its publicly reported financial results and failing to disclose the serious problems in its optical networking business. When the truth was disclosed, Lucent admitted that it had improperly recognized revenue of nearly $679 million in fiscal 2000. The settlement obtained in this case is valued at approximately $667 million, and is composed of cash, stock and warrants.

**CASE:** *IN RE WACHOVIA PREFERRED SECURITIES AND BOND/NOTES LITIGATION*

**COURT:** **United States District Court for the Southern District of New York**

**HIGHLIGHTS:** $627 million recovery – among the 20 largest securities class action recoveries in history; third largest recovery obtained in an action arising from the subprime mortgage crisis.

**DESCRIPTION:** This securities class action was filed on behalf of investors in certain Wachovia bonds and preferred securities against Wachovia Corp., certain former officers and directors, various underwriters, and its auditor, KPMG LLP. The case alleges that Wachovia provided offering materials that misrepresented and omitted material facts concerning the nature and quality of Wachovia's multi-billion dollar option-ARM (adjustable rate mortgage) "Pick-A-Pay" mortgage loan portfolio, and that Wachovia's loan loss reserves were materially inadequate. According to the Complaint, these undisclosed problems threatened the viability of the financial institution, requiring it to be "bailed out" during the financial crisis before it was acquired by Wells Fargo. The combined $627 million recovery obtained in the action is among the 20 largest securities class action recoveries in history, the largest settlement ever in a class action case asserting only claims under the Securities Act of 1933, and one of a handful of securities class action recoveries obtained where there were no parallel civil or criminal actions brought by government authorities. The firm represented Co-Lead Plaintiffs **Orange County Employees Retirement System** and **Louisiana Sheriffs' Pension and Relief Fund** in this action.

**CASE:** *OHIO PUBLIC EMPLOYEES RETIREMENT SYSTEM V. FREDDIE MAC*

**COURT:** **United States District Court for the Southern District of Ohio**

**HIGHLIGHTS:** $410 million settlement.

**DESCRIPTION:** This securities fraud class action was filed on behalf of the **Ohio Public Employees Retirement System** and the **State Teachers Retirement System of Ohio** alleging that Federal Home Loan Mortgage Corporation ("Freddie Mac") and certain of its current and former officers issued false and misleading statements in connection with the company's previously reported financial results. Specifically, the Complaint alleged that the Defendants misrepresented the company's operations and financial results by having engaged in numerous improper transactions and accounting machinations that violated fundamental GAAP precepts in order to artificially smooth the company's earnings and to hide earnings volatility. In connection with these improprieties, Freddie Mac restated more than $5 billion in earnings. A settlement of $410 million was reached in the case just as deposition discovery had begun and document review was complete.

**CASE:** *IN RE REFCO, INC. SECURITIES LITIGATION*

**COURT:** **United States District Court for the Southern District of New York**

11


BLB&G Bernstein Litowitz
Berger & Grossmann LLP

**HIGHLIGHTS:** Over $407 million in total recoveries.

**DESCRIPTION:** The lawsuit arises from the revelation that Refco, a once prominent brokerage, had for years secreted hundreds of millions of dollars of uncollectible receivables with a related entity controlled by Phillip Bennett, the company's Chairman and Chief Executive Officer. This revelation caused the stunning collapse of the company a mere two months after its initial public offering of common stock. As a result, Refco filed one of the largest bankruptcies in U.S. history. Settlements have been obtained from multiple company and individual defendants, resulting in a total recovery for the class of over $407 million. BLB&G represented Co-Lead Plaintiff **RH Capital Associates LLC**.

# CORPORATE GOVERNANCE AND SHAREHOLDERS' RIGHTS

**CASE:** *UNITEDHEALTH GROUP, INC. SHAREHOLDER DERIVATIVE LITIGATION*

**COURT:** **United States District Court for the District of Minnesota**

**HIGHLIGHTS:** Litigation recovered over $920 million in ill-gotten compensation directly from former officers for their roles in illegally backdating stock options, while the company agreed to far-reaching reforms aimed at curbing future executive compensation abuses.

**DESCRIPTION:** This shareholder derivative action filed against certain current and former executive officers and members of the Board of Directors of UnitedHealth Group, Inc. alleged that the Defendants obtained, approved and/or acquiesced in the issuance of stock options to senior executives that were unlawfully backdated to provide the recipients with windfall compensation at the direct expense of UnitedHealth and its shareholders. The firm recovered over $920 million in ill-gotten compensation directly from the former officer Defendants – the largest derivative recovery in history. As feature coverage in *The New York Times* indicated, "investors everywhere should applaud [the UnitedHealth settlement]…. [T]he recovery sets a standard of behavior for other companies and boards when performance pay is later shown to have been based on ephemeral earnings." The Plaintiffs in this action were the **St. Paul Teachers' Retirement Fund Association**, the **Public Employees' Retirement System of Mississippi**, the **Jacksonville Police & Fire Pension Fund**, the **Louisiana Sheriffs' Pension & Relief Fund**, the **Louisiana Municipal Police Employees' Retirement System** and **Fire & Police Pension Association of Colorado**.

**CASE:** *CAREMARK MERGER LITIGATION*

**COURT:** **Delaware Court of Chancery – New Castle County**

**HIGHLIGHTS:** Landmark Court ruling orders Caremark's board to disclose previously withheld information, enjoins shareholder vote on CVS merger offer, and grants statutory appraisal rights to Caremark shareholders. The litigation ultimately forced CVS to raise offer by $7.50 per share, equal to more than $3.3 billion in additional consideration to Caremark shareholders.

**DESCRIPTION:** Commenced on behalf of the **Louisiana Municipal Police Employees' Retirement System** and other shareholders of Caremark RX, Inc. ("Caremark"), this shareholder class action accused the company's directors of violating their fiduciary duties by approving and endorsing a proposed merger with CVS Corporation ("CVS"), all the while refusing to fairly consider an alternative transaction proposed by another bidder. In a landmark decision, the Court ordered the Defendants to disclose material information that had previously been withheld, enjoined the shareholder vote on the CVS transaction until the additional disclosures occurred, and granted statutory appraisal rights to Caremark's shareholders—forcing CVS to increase the consideration offered to shareholders by $7.50 per share in cash (over $3 billion in total).

12


Bernstein Litowitz
Berger & Grossmann LLP

**CASE:** *IN RE PFIZER INC. SHAREHOLDER DERIVATIVE LITIGATION*

**COURT:** **United States District Court for the Southern District of New York**

**HIGHLIGHTS:** Landmark settlement in which Defendants agreed to create a new Regulatory and Compliance Committee of the Pfizer Board that will be supported by a dedicated $75 million fund.

**DESCRIPTION:** In the wake of Pfizer's agreement to pay $2.3 billion as part of a settlement with the U.S. Department of Justice to resolve civil and criminal charges relating to the illegal marketing of at least 13 of the company's most important drugs (the largest such fine ever imposed), this shareholder derivative action was filed against Pfizer's senior management and Board alleging they breached their fiduciary duties to Pfizer by, among other things, allowing unlawful promotion of drugs to continue after receiving numerous "red flags" that Pfizer's improper drug marketing was systemic and widespread. The suit was brought by Court-appointed Lead Plaintiffs **Louisiana Sheriffs' Pension and Relief Fund** and **Skandia Life Insurance Company, Ltd.** In an unprecedented settlement reached by the parties, the Defendants agreed to create a new Regulatory and Compliance Committee of the Pfizer Board of Directors (the "Regulatory Committee") to oversee and monitor Pfizer's compliance and drug marketing practices and to review the compensation policies for Pfizer's drug sales related employees.

**CASE:** *IN RE EL PASO CORP. SHAREHOLDER LITIGATION*

**COURT:** **Delaware Court of Chancery – New Castle County**

**HIGHLIGHTS:** Landmark Delaware ruling chastises Goldman Sachs for M&A conflicts of interest.

**DESCRIPTION:** This case aimed a spotlight on ways that financial insiders – in this instance, Wall Street titan Goldman Sachs – game the system. The Delaware Chancery Court harshly rebuked Goldman for ignoring blatant conflicts of interest while advising their corporate clients on Kinder Morgan's high-profile acquisition of El Paso Corporation. As a result of the lawsuit, Goldman was forced to relinquish a $20 million advisory fee, and BLB&G obtained a $110 million cash settlement for El Paso shareholders – one of the highest merger litigation damage recoveries in Delaware history.

**CASE:** *IN RE DELPHI FINANCIAL GROUP SHAREHOLDER LITIGATION*

**COURT:** **Delaware Court of Chancery – New Castle County**

**HIGHLIGHTS:** Dominant shareholder is blocked from collecting a payoff at the expense of minority investors.

**DESCRIPTION:** As the Delphi Financial Group prepared to be acquired by Tokio Marine Holdings Inc., the conduct of Delphi's founder and controlling shareholder drew the scrutiny of BLB&G and its institutional investor clients for improperly using the transaction to expropriate at least $55 million at the expense of the public shareholders. BLB&G aggressively litigated this action and obtained a settlement of $49 million for Delphi's public shareholders. The settlement fund is equal to about 90% of recoverable Class damages – a virtually unprecedented recovery.

**CASE:** *QUALCOMM BOOKS & RECORDS LITIGATION*

**COURT:** **Delaware Court of Chancery – New Castle County**

**HIGHLIGHTS:** Novel use of "books and records" litigation enhances disclosure of political spending and transparency.

**DESCRIPTION:** The U.S. Supreme Court's controversial 2010 opinion in *Citizens United v. FEC* made it easier for corporate directors and executives to secretly use company funds – shareholder assets – to support personally favored political candidates or causes. BLB&G prosecuted the first-ever "books and records" litigation to obtain disclosure of corporate political spending at our client's portfolio

13



BLB&G Bernstein Litowitz
Berger & Grossmann LLP

company – technology giant Qualcomm Inc. – in response to Qualcomm's refusal to share the information. As a result of the lawsuit, Qualcomm adopted a policy that provides its shareholders with comprehensive disclosures regarding the company's political activities and places Qualcomm as a standard-bearer for other companies.

| | |
|---|---|
| **CASE:** | *IN RE NEWS CORP. SHAREHOLDER DERIVATIVE LITIGATION* |
| **COURT:** | **Delaware Court of Chancery – Kent County** |
| **HIGHLIGHTS:** | An unprecedented settlement in which News Corp. recoups $139 million and enacts significant corporate governance reforms that combat self-dealing in the boardroom. |
| **DESCRIPTION:** | Following News Corp.'s 2011 acquisition of a company owned by News Corp. Chairman and CEO Rupert Murdoch's daughter, and the phone-hacking scandal within its British newspaper division, we filed a derivative litigation on behalf of the company because of institutional shareholder concern with the conduct of News Corp.'s management. We ultimately obtained an unprecedented settlement in which News Corp. recouped $139 million for the company coffers, and agreed to enact corporate governance enhancements to strengthen its compliance structure, the independence and functioning of its board, and the compensation and clawback policies for management. |

| | |
|---|---|
| **CASE:** | *IN RE ACS SHAREHOLDER LITIGATION (XEROX)* |
| **COURT:** | **Delaware Court of Chancery – New Castle County** |
| **HIGHLIGHTS:** | BLB&G challenged an attempt by ACS CEO to extract a premium on his stock not shared with the company's public shareholders in a sale of ACS to Xerox. On the eve of trial, BLB&G obtained a $69 million recovery, with a substantial portion of the settlement personally funded by the CEO. |
| **DESCRIPTION:** | Filed on behalf of the **New Orleans Employees' Retirement System** and similarly situated shareholders of Affiliated Computer Service, Inc., this action alleged that members of the Board of Directors of ACS breached their fiduciary duties by approving a merger with Xerox Corporation which would allow Darwin Deason, ACS's founder and Chairman and largest stockholder, to extract hundreds of millions of dollars of value that rightfully belongs to ACS's public shareholders for himself. Per the agreement, Deason's consideration amounted to over a 50% premium when compared to the consideration paid to ACS's public stockholders. The ACS Board further breached its fiduciary duties by agreeing to certain deal protections in the merger agreement that essentially locked up the transaction between ACS and Xerox. After seeking a preliminary injunction to enjoin the deal and engaging in intense discovery and litigation in preparation for a looming trial date, Plaintiffs reached a global settlement with Defendants for $69 million. In the settlement, Deason agreed to pay $12.8 million, while ACS agreed to pay the remaining $56.1 million. |

| | |
|---|---|
| **CASE:** | *IN RE DOLLAR GENERAL CORPORATION SHAREHOLDER LITIGATION* |
| **COURT:** | **Sixth Circuit Court for Davidson County, Tennessee; Twentieth Judicial District, Nashville** |
| **HIGHLIGHTS:** | Holding Board accountable for accepting below-value "going private" offer. |
| **DESCRIPTION:** | A Nashville, Tennessee corporation that operates retail stores selling discounted household goods, in early March 2007, Dollar General announced that its Board of Directors had approved the acquisition of the company by the private equity firm Kohlberg Kravis Roberts & Co. ("KKR"). BLB&G, as Co-Lead Counsel for the **City of Miami General Employees' & Sanitation Employees' Retirement Trust**, filed a class action complaint alleging that the "going private" offer was approved as a result of breaches of fiduciary duty by the board and that the price offered by KKR did not reflect the fair value of Dollar General's publicly-held shares. On the eve of the summary judgment hearing, KKR agreed to pay a $40 million settlement in favor of the shareholders, with a potential for $17 million more for the Class. |

14



| | |
|---|---|
| **CASE:** | *LANDRY'S RESTAURANTS, INC. SHAREHOLDER LITIGATION* |
| **COURT:** | **Delaware Court of Chancery – New Castle County** |
| **HIGHLIGHTS:** | Protecting shareholders from predatory CEO's multiple attempts to take control of Landry's Restaurants through improper means. Our litigation forced the CEO to increase his buyout offer by four times the price offered and obtained an additional $14.5 million cash payment for the class. |
| **DESCRIPTION:** | In this derivative and shareholder class action, shareholders alleged that Tilman J. Fertitta – chairman, CEO and largest shareholder of Landry's Restaurants, Inc. – and its Board of Directors stripped public shareholders of their controlling interest in the company for no premium and severely devalued remaining public shares in breach of their fiduciary duties. BLB&G's prosecution of the action on behalf of Plaintiff **Louisiana Municipal Police Employees' Retirement System** resulted in recoveries that included the creation of a settlement fund composed of $14.5 million in cash, as well as significant corporate governance reforms and an increase in consideration to shareholders of the purchase price valued at $65 million. |

# EMPLOYMENT DISCRIMINATION AND CIVIL RIGHTS

| | |
|---|---|
| **CASE:** | *ROBERTS V. TEXACO, INC.* |
| **COURT:** | **United States District Court for the Southern District of New York** |
| **HIGHLIGHTS:** | BLB&G recovered $170 million on behalf of Texaco's African-American employees and engineered the creation of an independent "Equality and Tolerance Task Force" at the company. |
| **DESCRIPTION:** | Six highly qualified African-American employees filed a class action complaint against Texaco Inc. alleging that the company failed to promote African-American employees to upper level jobs and failed to compensate them fairly in relation to Caucasian employees in similar positions. BLB&G's prosecution of the action revealed that African-Americans were significantly under-represented in high level management jobs and that Caucasian employees were promoted more frequently and at far higher rates for comparable positions within the company. The case settled for over $170 million, and Texaco agreed to a Task Force to monitor its diversity programs for five years – a settlement described as the most significant race discrimination settlement in history. |

| | |
|---|---|
| **CASE:** | *ECOA - GMAC/NMAC/FORD/TOYOTA/CHRYSLER - CONSUMER FINANCE DISCRIMINATION LITIGATION* |
| **COURT:** | **Multiple jurisdictions** |
| **HIGHLIGHTS:** | Landmark litigation in which financing arms of major auto manufacturers are compelled to cease discriminatory "kick-back" arrangements with dealers, leading to historic changes to auto financing practices nationwide. |
| **DESCRIPTION:** | The cases involve allegations that the lending practices of General Motors Acceptance Corporation, Nissan Motor Acceptance Corporation, Ford Motor Credit, Toyota Motor Credit and DaimlerChrysler Financial cause African-American and Hispanic car buyers to pay millions of dollars more for car loans than similarly situated white buyers. At issue is a discriminatory kickback system under which minorities typically pay about 50% more in dealer mark-up which is shared by auto dealers with the Defendants. |
| | *NMAC:* The United States District Court for the Middle District of Tennessee granted final approval of the settlement of the class action against Nissan Motor Acceptance Corporation ("NMAC") in which NMAC agreed to offer pre-approved loans to hundreds of thousands of current and potential African-American and Hispanic NMAC customers, and limit how much it raises the interest charged to car buyers above the company's minimum acceptable rate. |

15



**BLB&G** Bernstein Litowitz
Berger & Grossmann LLP

**GMAC:** The United States District Court for the Middle District of Tennessee granted final approval of a settlement of the litigation against General Motors Acceptance Corporation ("GMAC") in which GMAC agreed to take the historic step of imposing a 2.5% markup cap on loans with terms up to 60 months, and a cap of 2% on extended term loans. GMAC also agreed to institute a substantial credit pre-approval program designed to provide special financing rates to minority car buyers with special rate financing.

**DAIMLERCHRYSLER:** The United States District Court for the District of New Jersey granted final approval of the settlement in which DaimlerChrysler agreed to implement substantial changes to the company's practices, including limiting the maximum amount of mark-up dealers may charge customers to between 1.25% and 2.5% depending upon the length of the customer's loan. In addition, the company agreed to send out pre-approved credit offers of no-markup loans to African-American and Hispanic consumers, and contribute $1.8 million to provide consumer education and assistance programs on credit financing.

**FORD MOTOR CREDIT**: The United States District Court for the Southern District of New York granted final approval of a settlement in which Ford Credit agreed to make contract disclosures informing consumers that the customer's Annual Percentage Rate ("APR") may be negotiated and that sellers may assign their contracts and retain rights to receive a portion of the finance charge.

## CLIENTS AND FEES

We are firm believers in the contingency fee as a socially useful, productive and satisfying basis of compensation for legal services, particularly in litigation. Wherever appropriate, even with our corporate clients, we will encourage retention where our fee is contingent on the outcome of the litigation. This way, it is not the number of hours worked that will determine our fee, but rather the result achieved for our client.

Our clients include many large and well known financial and lending institutions and pension funds, as well as privately-held companies that are attracted to our firm because of our reputation, expertise and fee structure. Most of the firm's clients are referred by other clients, law firms and lawyers, bankers, investors and accountants. A considerable number of clients have been referred to the firm by former adversaries. We have always maintained a high level of independence and discretion in the cases we decide to prosecute. As a result, the level of personal satisfaction and commitment to our work is high.

16



# IN THE PUBLIC INTEREST

Bernstein Litowitz Berger & Grossmann LLP is guided by two principles: excellence in legal work and a belief that the law should serve a socially useful and dynamic purpose. Attorneys at the firm are active in academic, community and *pro bono* activities, as well as participating as speakers and contributors to professional organizations. In addition, the firm endows a public interest law fellowship and sponsors an academic scholarship at Columbia Law School.

### BERNSTEIN LITOWITZ BERGER & GROSSMANN PUBLIC INTEREST LAW FELLOWS

COLUMBIA LAW SCHOOL – BLB&G is committed to fighting discrimination and effecting positive social change. In support of this commitment, the firm donated funds to Columbia Law School to create the Bernstein Litowitz Berger & Grossmann Public Interest Law Fellowship. This newly endowed fund at Columbia Law School will provide Fellows with 100% of the funding needed to make payments on their law school tuition loans so long as such graduates remain in the public interest law field. The BLB&G Fellows are able to begin their careers free of any school debt if they make a long-term commitment to public interest law.

### FIRM SPONSORSHIP OF HER JUSTICE

NEW YORK, NY – BLB&G is a sponsor of Her Justice, a non-profit organization in New York City dedicated to providing *pro bono* legal representation to indigent women, principally battered women, in connection with the myriad legal problems they face. The organization trains and supports the efforts of New York lawyers who provide *pro bono* counsel to these women. Several members and associates of the firm volunteer their time to help women who need divorces from abusive spouses, or representation on issues such as child support, custody and visitation. To read more about Her Justice, visit the organization's website at www.herjustice.org.

### THE PAUL M. BERNSTEIN MEMORIAL SCHOLARSHIP

COLUMBIA LAW SCHOOL – Paul M. Bernstein was the founding senior partner of the firm. Mr. Bernstein led a distinguished career as a lawyer and teacher and was deeply committed to the professional and personal development of young lawyers. The Paul M. Bernstein Memorial Scholarship Fund is a gift of the firm and the family and friends of Paul M. Bernstein, and is awarded annually to one or more second-year students selected for their academic excellence in their first year, professional responsibility, financial need and contributions to the community.

### FIRM SPONSORSHIP OF CITY YEAR NEW YORK

NEW YORK, NY – BLB&G is also an active supporter of City Year New York, a division of AmeriCorps. The program was founded in 1988 as a means of encouraging young people to devote time to public service and unites a diverse group of volunteers for a demanding year of full-time community service, leadership development and civic engagement. Through their service, corps members experience a rite of passage that can inspire a lifetime of citizenship and build a stronger democracy.

### MAX W. BERGER PRE-LAW PROGRAM

BARUCH COLLEGE – In order to encourage outstanding minority undergraduates to pursue a meaningful career in the legal profession, the Max W. Berger Pre-Law Program was established at Baruch College. Providing workshops, seminars, counseling and mentoring to Baruch students, the program facilitates and guides them through the law school research and application process, as well as placing them in appropriate internships and other pre-law working environments.

### NEW YORK SAYS THANK YOU FOUNDATION

NEW YORK, NY – Founded in response to the outpouring of love shown to New York City by volunteers from all over the country in the wake of the 9/11 attacks, The New York Says Thank You Foundation sends volunteers from New York City to help rebuild communities around the country affected by disasters. BLB&G is a corporate sponsor of NYSTY and its goals are a heartfelt reflection of the firm's focus on community and activism.



Bernstein Litowitz
Berger & Grossmann LLP

# OUR ATTORNEYS

## MEMBERS

**MAX W. BERGER**, the firm's senior founding partner, supervises BLB&G's litigation practice and prosecutes class and individual actions on behalf of the firm's clients.

He has litigated many of the firm's most high-profile and significant cases, and has negotiated seven of the largest securities fraud settlements in history, each in excess of a billion dollars: *Cendant* ($3.3 billion); *Citigroup–WorldCom* ($2.575 billion); *Bank of America/Merrill Lynch* ($2.4 billion); *JPMorgan Chase–WorldCom* ($2 billion); *Nortel* ($1.07 billion); *Merck* ($1.06 billion); and *McKesson* ($1.05 billion).

Mr. Berger's work has garnered him extensive media attention, and he has been the subject of feature articles in a variety of major media publications. Unique among his peers, *The New York Times* highlighted his remarkable track record in an October 2012 profile entitled "Investors' Billion-Dollar Fraud Fighter," which also discussed his role in the Bank of America/Merrill Lynch *Merger* litigation. In 2011, Mr. Berger was twice profiled by *The American Lawyer* for his role in negotiating a $627 million recovery on behalf of investors in the *In re Wachovia Corp. Securities Litigation,* and a $516 million recovery in *In re Lehman Brothers Equity/Debt Securities Litigation*. Previously, Mr. Berger's role in the *WorldCom* case generated extensive media coverage including feature articles in *BusinessWeek* and *The American Lawyer*. For his outstanding efforts on behalf of WorldCom investors, *The National Law Journal* profiled Mr. Berger (one of only eleven attorneys selected nationwide) in its annual 2005 "Winning Attorneys" section. He was subsequently featured in a 2006 *New York Times* article, "A Class-Action Shuffle," which assessed the evolving landscape of the securities litigation arena.

**One of the "100 Most Influential Lawyers in America"**

Widely recognized for his professional excellence and achievements, Mr. Berger was named one of the "100 Most Influential Lawyers in America" by *The National Law Journal* for being "front and center" in holding Wall Street banks accountable and obtaining over $5 billion in cases arising from the subprime meltdown, and for his work as a "master negotiator" in obtaining numerous multi-billion dollar recoveries for investors.

Described as a "standard-bearer" for the profession in a career spanning over 40 years, he is the 2014 recipient of *Chambers USA's* award for Outstanding Contribution to the Legal Profession. In presenting this prestigious honor, *Chambers* recognized Mr. Berger's "numerous headline-grabbing successes," as well as his unique stature among colleagues – "warmly lauded by his peers, who are nevertheless loath to find him on the other side of the table."

*Law360* published a special feature discussing his life and career as a "Titan of the Plaintiffs Bar," and also named him one of only six litigators selected nationally as a "Legal MVP" for his work in securities litigation.

For the past ten years in a row, Mr. Berger has received the top attorney ranking in plaintiff securities litigation by *Chambers* and is consistently recognized as one of New York's "local litigation stars" by *Benchmark Litigation* (published by *Institutional Investor* and *Euromoney*). *Law360* also named him one of only six litigators selected nationally as a "Legal MVP" for his work in securities litigation.

Since their various inceptions, he has also been named a "leading lawyer" by the *Legal 500 US* guide, one of "10 Legal Superstars" by *Securities Law360*, and one of the "500 Leading Lawyers

18



in America" and "100 Securities Litigators You Need to Know" by *Lawdragon* magazine. Further, *The Best Lawyers in America* guide has named Mr. Berger a leading lawyer in his field.

Mr. Berger also serves the academic community in numerous capacities as a member of the Dean's Council to Columbia Law School, and as a member of the Board of Trustees of Baruch College. He has taught Profession of Law, an ethics course at Columbia Law School, and currently serves on the Advisory Board of Columbia Law School's Center on Corporate Governance. In May 2006, he was presented with the Distinguished Alumnus Award for his contributions to Baruch College, and in February 2011, Mr. Berger received Columbia Law School's most prestigious and highest honor, "The Medal for Excellence." This award is presented annually to Columbia Law School alumni who exemplify the qualities of character, intellect, and social and professional responsibility that the Law School seeks to instill in its students. As a recipient of this award, Mr. Berger was profiled in the Fall 2011 issue of *Columbia Law School Magazine.*

Mr. Berger is currently a member of the New York State, New York City and American Bar Associations, and is a member of the Federal Bar Council. He is also a member of the American Law Institute and an Advisor to its Restatement Third: Economic Torts project. In addition, Mr. Berger is a member of the Board of Trustees of The Supreme Court Historical Society.

Mr. Berger lectures extensively for many professional organizations. In 1997, Mr. Berger was honored for his outstanding contribution to the public interest by Trial Lawyers for Public Justice, where he was a "Trial Lawyer of the Year" Finalist for his work in *Roberts, et al. v. Texaco*, the celebrated race discrimination case, on behalf of Texaco's African-American employees.

Among numerous charitable and volunteer works, Mr. Berger is an active supporter of City Year New York, a division of AmeriCorps, dedicated to encouraging young people to devote time to public service. In July 2005, he was named City Year New York's "Idealist of the Year," for his long-time service and work in the community. He and his wife, Dale, have also established the Dale and Max Berger Public Interest Law Fellowship at Columbia Law School and the Max Berger Pre-Law Program at Baruch College.

EDUCATION: Baruch College-City University of New York, B.B.A., Accounting, 1968; President of the student body and recipient of numerous awards. Columbia Law School, J.D., 1971, Editor of the *Columbia Survey of Human Rights Law*.

BAR ADMISSIONS: New York; U.S. District Courts for the Eastern and Southern Districts of New York; U.S. Court of Appeals for the Second Circuit; U.S. Supreme Court.

**GERALD H. SILK'S** practice focuses on representing institutional investors on matters involving federal and state securities laws, accountants' liability, and the fiduciary duties of corporate officials, as well as general commercial and corporate litigation. He also advises creditors on their rights with respect to pursuing affirmative claims against officers and directors, as well as professionals both inside and outside the bankruptcy context.

Mr. Silk is a managing partner of the firm and oversees its New Matter department in which he, along with a group of attorneys, financial analysts and investigators, counsels institutional clients on potential legal claims. He was the subject of "Picking Winning Securities Cases," a feature article in the June 2005 issue of *Bloomberg Markets* magazine, which detailed his work for the firm in this capacity. A decade later, in December 2014, Mr. Silk was recognized by *The National Law Journal* in its inaugural list of "Litigation Trailblazers & Pioneers" — one of 50 lawyers in the country who have changed the practice of litigation through the use of innovative legal strategies — in no small part for the critical role he has played in helping the firm's investor clients recover billions of dollars in litigation arising from the financial crisis, among other matters.

19


Bernstein Litowitz
Berger & Grossmann LLP

In addition, *Lawdragon* magazine, which has named Mr. Silk one of the "100 Securities Litigators You Need to Know," one of the "500 Leading Lawyers in America" and one of America's top 500 "rising stars" in the legal profession, also recently profiled him as part of its "Lawyer Limelight" special series, discussing subprime litigation, his passion for plaintiffs' work and the trends he expects to see in the market. Recognized as one of an elite group of notable practitioners by *Chambers USA*, he is also named as a "Litigation Star" by *Benchmark,* is recommended by the *Legal 500 USA* guide in the field of plaintiffs' securities litigation, and has been selected by *New York Super Lawyers* every year since 2006.

In the wake of the financial crisis, he advised the firm's institutional investor clients on their rights with respect to claims involving transactions in residential mortgage-backed securities (RMBS) and collateralized debt obligations (CDOs). His work representing Cambridge Place Investment Management Inc. on claims under Massachusetts state law against numerous investment banks arising from the purchase of billions of dollars of RMBS was featured in a 2010 *New York Times* article by Gretchen Morgenson titled, "Mortgage Investors Turn to State Courts for Relief."

Mr. Silk also represented the New York State Teachers' Retirement System in a securities litigation against the General Motors Company arising from a series of misrepresentations concerning the quality, safety, and reliability of the Company's cars which resulted in a $300 million settlement. In addition, he is actively involved in the firm's prosecution of highly successful M&A litigation, representing shareholders in widely publicized lawsuits, including the litigation arising from the proposed acquisition of Caremark Rx, Inc. by CVS Corporation — which led to an increase of approximately $3.5 billion in the consideration offered to shareholders.

Mr. Silk was one of the principal attorneys responsible for prosecuting the *In re Independent Energy Holdings Securities Litigation.* A case against the officers and directors of Independent Energy as well as several investment banking firms which underwrote a $200 million secondary offering of ADRs by the U.K.-based Independent Energy, the litigation was resolved for $48 million. Mr. Silk has also prosecuted and successfully resolved several other securities class actions, which resulted in substantial cash recoveries for investors, including *In re Sykes Enterprises, Inc. Securities Litigation* in the Middle District of Florida, and *In re OM Group, Inc. Securities Litigation* in the Northern District of Ohio. He was also a member of the litigation team responsible for the successful prosecution of *In re Cendant Corporation Securities Litigation* in the District of New Jersey, which was resolved for $3.2 billion.

A graduate of the Wharton School of Business, University of Pennsylvania and Brooklyn Law School, in 1995-96, Mr. Silk served as a law clerk to the Hon. Steven M. Gold, U.S.M.J., in the United States District Court for the Eastern District of New York.

Mr. Silk lectures to institutional investors at conferences throughout the country, and has written or substantially contributed to several articles on developments in securities and corporate law, including "Improving Multi-Jurisdictional, Merger-Related Litigation," American Bar Association (February 2011); "The Compensation Game," *Lawdragon*, Fall 2006; "Institutional Investors as Lead Plaintiffs: Is There A New And Changing Landscape?," 75 *St. John's Law Review* 31 (Winter 2001); "The Duty To Supervise, Poser, Broker-Dealer Law and Regulation," 3rd Ed. 2000, Chapter 15; "Derivative Litigation In New York after Marx v. Akers," *New York Business Law Journal*, Vol. 1, No. 1 (Fall 1997).

He is a frequent commentator for the business media on television and in print. Among other outlets, he has appeared on NBC's *Today,* and CNBC's *Power Lunch, Morning Call,* and *Squawkbox* programs, as well as being featured in *The New York Times*, *Financial Times, Bloomberg*, *The National Law Journal,* and the *New York Law Journal*.

EDUCATION: Wharton School of the University of Pennsylvania, B.S., Economics, 1991. Brooklyn Law School, J.D., *cum laude,* 1995.


BLB&G Bernstein Litowitz
Berger & Grossmann LLP

BAR ADMISSIONS: New York; U.S. District Courts for the Southern and Eastern Districts of New York.

**SALVATORE J. GRAZIANO** is widely recognized as one of the top securities litigators in the country. He has served as lead trial counsel in a wide variety of major securities fraud class actions, recovering billions of dollars on behalf of institutional investors and hedge fund clients.

Over the course of his distinguished career, Mr. Graziano has successfully litigated many high-profile cases, including: *Merck & Co., Inc. (Vioxx) Sec. Litig.* (D.N.J.); *In re Schering-Plough Corp./ENHANCE Sec. Litig.* (D.N.J.); *New York State Teachers' Retirement System v. General Motors Co.* (E.D. Mich.); *In re MF Global Holdings Limited Sec. Litig.* (S.D.N.Y); *In re Raytheon Sec. Litig.* (D. Mass.); *In re Refco Sec. Litig.* (S.D.N.Y.); *In re MicroStrategy, Inc. Sec. Litig.* (E.D. Va.); *In re Bristol Myers Squibb Co. Sec. Litig.* (S.D.N.Y.); and *In re New Century Sec. Litig.* (C.D. Cal.).

Industry observers, peers and adversaries routinely honor Mr. Graziano for his accomplishments. He is one of the "Top 100 Trial Lawyers" in the nation according to *Benchmark Litigation*, which credits him for performing *"top quality work." Chambers USA* describes Mr. Graziano as "wonderfully talented…a smart, aggressive lawyer who works hard for his clients," while *Legal 500* praises him as a "highly effective litigator." Heralded as one of a handful of Class Action MVPs in the nation by *Law360*, he is also one of *Lawdragon's* 500 Leading Lawyers in America, named as a leading mass tort and plaintiff class action litigator by *Best Lawyers®*, and as a *New York Super Lawyer*.

 A managing partner of the firm, Mr. Graziano has previously served as the President of the National Association of Shareholder & Consumer Attorneys, and has served as a member of the Financial Reporting Committee and the Securities Regulation Committee of the Association of the Bar of the City of New York. He regularly lectures on securities fraud litigation and shareholder rights.

Prior to entering private practice, Mr. Graziano served as an Assistant District Attorney in the Manhattan District Attorney's Office.

EDUCATION: New York University College of Arts and Science, B.A., psychology, *cum laude,* 1988. New York University School of Law, J.D., *cum laude,* 1991.

BAR ADMISSIONS: New York; U.S. District Courts for the Southern and Eastern Districts of New York; U.S. Courts of Appeals for the First, Second, Third, Ninth and Eleventh Circuits.

**MARK LEBOVITCH** heads the firm's corporate governance litigation practice, focusing on derivative suits and transactional litigation. Working with his institutional investor clients, he has helped develop critical new law in the fight to hold management accountable by aggressively pursuing meaningful and novel challenges to alleged corporate governance related misconduct and anti-shareholder practices.

Selected current and past representations include:

- *In re DISH Corp. Shareholder Litigation:* derivative suit challenging misappropriation and front-running by a controlling shareholder, costing investors over $800 million;

- *Insys Derivative Litigation*: challenging a board-approved illegal marketing scheme that actively encouraged off-label marketing of a deadly opioid fentanyl drug;

- *In re TIBCO Software Stockholder Litigation:* pursued novel and precedent-setting merger agreement reformation claims and received 33% of potential damages shortly before trial;



**BLB&G** Bernstein Litowitz
Berger & Grossmann LLP

- *In re Freeport-McMoRan Derivative Litigation:* settled for a cash recovery of nearly $154 million, plus corporate governance reforms;

- *In re Jefferies, Inc. Stockholder Litigation:* settled for a $75 million net payment paid entirely to a class of former Jefferies investor through a first-of-its-kind dividend;

- *Safeway Appraisal Litigation*: provided clients with a nearly 30% increase in value above the negotiated merger consideration;

- *In re News Corp. Shareholder Derivative Litigation*: settled for a $139 million cash recovery, and an unprecedented package of corporate governance and oversight enhancements;

- *In re El Paso Corp. Shareholder Litigation*: resulted in a $110 million post-closing settlement and a ruling that materially improved the way M&A financial advisors address conflicts of interest;

- *In re Delphi Financial Group Shareholder Litigation*: challenged the controlling shareholder's unlawful demand for an additional $55 million in connection with the sale of the company, resulting in the recovery of $49 million;

- *In re Pfizer Derivative Litigation*: resulted in a $75 million payment and creation of a new Healthcare Law Regulatory Committee, which sets an improved standard for regulatory compliance oversight by a public company board of directors; and

- *In re ACS Shareholder Litigation:* settled on the eve of trial for a $69 million cash payment to ACS shareholders.

Mr. Lebovitch pioneered challenges to the improper but widespread practice of using "Proxy Put" provisions in corporate debt agreements, obtaining pro-shareholder rulings in cases like *In re Amylin Shareholders Litigation*, *In re SandRidge Energy, Inc. Shareholder Litigation*, and *In re Healthways, Inc. Shareholder Litigation*, which have caused the industry to materially change its use of such provisions. He also prosecutes securities litigations, and in that capacity, was the lead litigation attorney in *In re Merrill Lynch Bondholders Litigation*, which settled for $150 million; and a member of the team prosecuting *In re Bank of America Securities Litigation*, which settled for $2.425 billion. Currently, he is the lead attorney prosecuting *In re Allergan Proxy Securities Litigation.*

Mr. Lebovitch has received national recognition for his work in securities and M&A litigation. He was selected 2016 national "Plaintiff Attorney of the Year" by *Benchmark Litigation* and is regularly honored as a New York "Litigation Star" by *Benchmark* in its exclusive annual list of top practitioners. Named a leading lawyer in M&A litigation by *Best Lawyers®,* Mr. Lebovitch was selected as its 2016 M&A Litigation "Lawyer of the Year" for New York City. He is one of *Lawdragon's* "500 Leading Lawyers in America," a *New York Super Lawyer,* and is recognized by *Chambers USA* and *Legal 500 as* one of an elite group of notable practitioners in securities and M&A litigation. In 2013, *Law360* named him as one of its five "Rising Stars" nationally in the area of securities litigation – the only plaintiff-side attorney so selected. In 2012, *The Deal* magazine prominently profiled Mr. Lebovitch as one of the top three lawyers nationally representing shareholder plaintiffs in M&A litigation in its feature article, "The Troika Atop the M&A Plaintiffs' Bar."

Mr. Lebovitch is a member of the Board of Advisors for both the Institute for Law and Economics and the NYU Institute for Corporate Governance and Finance, and is an author and a frequent speaker and commentator at industry events on a wide range of corporate governance and securities related issues. His publications include "Of Babies and Bathwater: Deterring Frivolous Stockholder Suits Without Closing the Courthouse Doors to Legitimate Claims," "Making Order Out of Chaos: A Proposal To Improve Organization and Coordination in Multi-Jurisdictional Merger-Related Litigation," "'Novel Issues' or a Return to Core Principles? Analyzing the Common Link Between the Delaware Chancery Court's Recent Rulings in Option Backdating and Transactional Cases" (*NYU Journal of Law & Business*, Volume 4, Number 2), "Calling a Duck a Duck: Determining the Validity of Deal Protection Provisions in Merger of Equals Transactions"

22



**BLB&G** Bernstein Litowitz
Berger & Grossmann LLP

(2001 *Columbia Business Law Review* 1) and "Practical Refinement" (*The Daily Deal*, January 2002), each of which discussed evolving developments in the law of directors' fiduciary duties.

Mr. Lebovitch clerked for Vice Chancellor Stephen P. Lamb on the Court of Chancery of the State of Delaware, and was a litigation associate at Skadden, Arps, Slate, Meagher & Flom in New York, where he represented clients in a variety of corporate governance, commercial and federal securities matters.

EDUCATION: Binghamton University – State University of New York, B.A., *cum laude*, 1996. New York University School of Law, J.D., *cum laude,* 1999.

BAR ADMISSIONS: New York; U. S. District Courts for the Southern and Eastern Districts of New York.

**AVI JOSEFSON** prosecutes securities fraud litigation for the firm's institutional investor clients, and has participated in many of the firm's significant representations, including *In re SCOR Holding (Switzerland) AG Securities Litigation*, which resulted in a recovery worth in excess of $143 million for investors. He was also a member of the team that litigated the *In re OM Group, Inc. Securities Litigation*, which resulted in a settlement of $92.4 million.

As a member of the firm's New Matter department, Mr. Josefson counsels institutional clients on potential legal claims. He has presented argument in several federal and state courts, including an appeal he argued before the Delaware Supreme Court.

Mr. Josefson is also actively involved in the M&A litigation practice, and represented shareholders in the litigation arising from the proposed acquisitions of Ceridian Corporation and Anheuser-Busch. A member of the firm's subprime litigation team, he has participated in securities fraud actions arising from the collapse of subprime mortgage lender American Home Mortgage and the actions against Lehman Brothers, Citigroup and Merrill Lynch, arising from those banks' multi-billion dollar loss from mortgage-backed investments. Mr. Josefson has prosecuted actions against Deutsche Bank and Morgan Stanley arising from their sale of mortgage-backed securities, and is advising U.S. and foreign institutions concerning similar claims arising from investments in mortgage-backed securities.

Mr. Josefson practices in the firm's Chicago and New York Offices.

EDUCATION: Brandeis University, B.A., *cum laude,* 1997. Northwestern University, J.D., 2000; *Dean's List*; Justice Stevens Public Interest Fellowship (1999); Public Interest Law Initiative Fellowship (2000).

BAR ADMISSIONS: Illinois, New York; U.S. District Courts for the Southern District of New York and the Northern District of Illinois.

**JOHN RIZIO-HAMILTON** is involved in a variety of the firm's litigation practice areas, focusing specifically on securities fraud, corporate governance, and shareholder rights. He currently represents the firm's institutional investor clients as counsel in a number of major pending actions, including the securities class action arising from Facebook's IPO, captioned *In re Facebook, Inc. IPO Securities Litigation*.

Mr. Rizio-Hamilton was a member of the trial team prosecuting *In re Bank of America Securities Litigation*, which settled for $2.425 billion, the single largest securities class action recovery ever resolving violations of Sections 14(a) and 10(b) of the Securities Exchange Act, and one of the top securities litigation settlements obtained of all time. He also served as counsel on behalf of the institutional investor plaintiffs in *In re Citigroup, Inc. Bond Action Litigation*, which settled for $730 million, the second largest recovery ever in a securities class action brought on behalf of



purchasers of debt securities. In addition, Mr. Rizio-Hamilton was a member of the team that prosecuted the *In re Wachovia Corp. Bond/Notes Litigation*, in which the firm recovered a total of $627 million on behalf of investors, one of the 15 largest securities class action recoveries in history. Most recently, he served as a key member of the team that recovered $150 million for investors in *In re JPMorgan Chase & Co. Securities Litigation*, a securities fraud class action arising out of misrepresentations and omissions concerning JPMorgan's Chief Investment Office, the company's risk management systems, and the trading activities of the so-called "London Whale."

Mr. Rizio-Hamilton has also been a member of the trial teams in several additional securities litigations through which the firm has successfully recovered hundreds of millions of dollars on behalf of injured investors. Among other matters, he was part of the trial teams that prosecuted *Eastwood Enterprises LLC v. WellCare*, *In re MBIA, Inc. Securities Litigation*, and *In re RAIT Financial Trust Securities Litigation*.

For his remarkable accomplishments, Mr. Rizio-Hamilton was recognized by *Law360* as one of the country's "Top Attorneys Under 40," and a national "Rising Star" in the area of class action litigation.

Before joining BLB&G, Mr. Rizio-Hamilton clerked for the Honorable Chester J. Straub of the United States Court of Appeals for the Second Circuit, and the Honorable Sidney H. Stein of the United States District Court for the Southern District of New York.

EDUCATION: The Johns Hopkins University, B.A., *with honors*, 1997. Brooklyn Law School, J.D., *summa cum laude;* Editor-in-Chief of the *Brooklyn Law Review;* first-place winner of the J. Braxton Craven Memorial Constitutional Law Moot Court Competition.

BAR ADMISSIONS: New York; U.S. District for the Southern District of New York.


**KATHERINE M. SINDERSON** is involved in a variety of the firm's practice areas, including securities fraud, corporate governance, and advisory services. She is currently a member of the teams prosecuting securities class actions against GNC and SunEdison, and litigation arising from the failure of the major mid-Atlantic bank, Wilmington Trust.

Ms. Sinderson played a key role in two of the firm's largest cases in its history, both of which settled near trial for billions of dollars on behalf of investors. In *In re Merck Securities Litigation*, she was a member of the small trial team that achieved a $1.062 billion settlement. This settlement is the second largest recovery ever obtained in the Third Circuit, one of the top 10 recoveries of all time, and the largest recovery ever achieved against a pharmaceutical company. She was also a member of the trial team prosecuting *In re Bank of America Securities Litigation*, which resulted in a recovery of $2.425 billion, the single largest securities class action recovery ever resolving violations of Sections 14(a) and 10(b) of the Securities Exchange Act and one of the largest shareholder recoveries in history.

Ms. Sinderson has also been part of the trial teams in numerous other securities litigations that have successfully recovered hundreds of millions of dollars on behalf of injured investors. Most recently, she served as a senior member of the teams that recently recovered $210 million in *In re Salix Pharmaceuticals, Ltd. Securities Litigation*, and $74 million in the take-private merger litigation *San Antonio Fire and Police Pension Fund et al v. Dole Food Co et al.*, both of which are currently pending court approval. She was also a member of the trial team that prosecuted the action against Washington Mutual, Inc. and certain of its former officers and directors for alleged fraudulent conduct in the thrift's home lending operations. The action resulted in a recovery of $208.5 million, the largest recovery ever achieved in a securities class action in the Western District of Washington. Some of her other prominent prosecutions include the *In re Bristol-Myers Squibb Co. Securities Litigation*, which resulted in a recovery of $125 million; and *In re Biovail Corporation Securities Litigation*, which resulted in a recovery of $138 million for defrauded

24



BLB&G Bernstein Litowitz
Berger & Grossmann LLP

investors and represents the second largest recovery in any securities case involving a Canadian issuer.

In 2016, Ms. Sinderson was recognized as a national "Rising Star" by *Law360* for her work in securities litigation and was named to *Benchmark Litigation's* "Under 40 Hot List," which recognizes her as one the nation's most accomplished legal partners under the age of 40. She is also regularly selected as a New York "Rising Star" by *Super Lawyers*.

EDUCATION: Baylor University, B.A., *cum laude,* 2002. Georgetown University, J.D., *cum laude*, 2006; Dean's Scholar; Articles Editor for *The Georgetown Journal of Gender and the Law*.

BAR ADMISSIONS: New York; U.S. District Court for the Southern District of New York; U.S. Court of Appeals for the Second Circuit.

**MICHAEL D. BLATCHLEY**'s practice focuses on securities fraud litigation. He is currently a member of the firm's New Matter department in which he, along with a team of attorneys, financial analysts, forensic accountants, and investigators, counsels the firm's clients on their legal claims.

Mr. Blatchley has also served as a member of the litigation teams responsible for prosecuting a number of the firm's significant cases. For example, Mr. Blatchley was a key member of the team that recovered $150 million for investors in *In re JPMorgan Chase & Co. Securities Litigation*, a securities fraud class action arising out of misrepresentations and omissions concerning JPMorgan's Chief Investment Office, the company's risk management systems, and the trading activities of the so-called "London Whale." He was also a member of the litigation team in *In re Medtronic, Inc. Securities Litigation*, an action arising out of allegations that Medtronic promoted the Infuse bone graft for dangerous "off-label" uses, which resulted in an $85 million recovery for investors. In addition, Mr. Blatchley prosecuted a number of cases related to the financial crisis, including several actions arising out of wrongdoing related to the issuance of residential mortgage-backed securities and other complex financial products. Currently, Mr. Blatchley is a member of the team prosecuting *In re Allergan, Inc. Proxy Violation Securities Litigation*.

Mr. Blatchley was recently named to *Benchmark Litigation's* "Under 40 Hot List," which recognizes him as one the nation's most accomplished legal partners under the age of 40.

While attending Brooklyn Law School, Mr. Blatchley held a judicial internship position for the Honorable David G. Trager, United States District Judge for the Eastern District of New York. In addition, he worked as an intern at The Legal Aid Society's Harlem Community Law Office, as well as at Brooklyn Law School's Second Look and Workers' Rights Clinics, and provided legal assistance to victims of Hurricane Katrina in New Orleans, Louisiana.

EDUCATION: University of Wisconsin, B.A., 2000. Brooklyn Law School, J.D., *cum laude,* 2007; Edward V. Sparer Public Interest Law Fellowship, William Payson Richardson Memorial Prize, Richard Elliott Blyn Memorial Prize, Editor for the *Brooklyn Law Review,* Moot Court Honor Society.

BAR ADMISSIONS: New York, New Jersey; U.S. District Courts for the Southern District of New York and the District of New Jersey.



## ASSOCIATES

**DAVID L. DUNCAN**'s practice concentrates on the settlement of class actions and other complex litigation and the administration of class action settlements.

Prior to joining BLB&G, Mr. Duncan worked as a litigation associate at Debevoise & Plimpton, where he represented clients in a wide variety of commercial litigation, including contract disputes, antitrust and products liability litigation, and in international arbitration. In addition, he has represented criminal defendants on appeal in New York State courts and has successfully litigated on behalf of victims of torture and political persecution from Sudan, Côte d'Ivoire and Serbia in seeking asylum in the United States.

While in law school, Mr. Duncan served as an editor of the *Harvard Law Review*. After law school, he clerked for Judge Amalya L. Kearse of the U.S. Court of Appeals for the Second Circuit.

EDUCATION: Harvard College, A.B., Social Studies, *magna cum laude*, 1993. Harvard Law School, J.D., *magna cum laude*, 1997.

BAR ADMISSIONS: New York; Connecticut; U.S. District Court for the Southern District of New York.

**SCOTT R. FOGLIETTA** focuses his practice on securities litigation and is a member of the firm's New Matter group, in which he, as part of a team of attorneys, financial analysts, and investigators, counsels institutional investors on potential legal claims.

Mr. Foglietta also serves as a member of the litigation team responsible for prosecuting *In re Lumber Liquidators Holdings, Inc. Securities Litigation*. For his accomplishments, Mr. Foglietta was recently named a New York "Rising Star" in the area of securities litigation.

Before joining the firm, Mr. Foglietta represented institutional and individual clients in a wide variety of complex litigation matters, including securities class actions, commercial litigation, and ERISA litigation. While in law school, Mr. Foglietta served as a legal intern in the Financial Industry Regulatory Authority's (FINRA) Enforcement Division, and in the general counsel's office of NYSE Euronext. Prior to law school, Mr. Foglietta earned his M.B.A. in finance from Clark University and worked as a capital markets analyst for a boutique investment banking firm.

EDUCATION: Clark University, B.A., Management, *cum laude*, 2006. Clark University, Graduate School of Management, M.B.A., Finance, 2007. Brooklyn Law School, J.D., 2010.

BAR ADMISSIONS: New York; New Jersey.

**ADAM HOLLANDER** prosecutes securities fraud, corporate governance, and shareholder rights litigation on behalf of the firm's institutional investor clients.

Mr. Hollander has represented institutional investors and corporations in state and federal trial and appellate courts throughout the country. Currently, he represents clients in a number of disputes relating to corporate governance and transactions, including a derivative action on behalf of Dish Network Corporation in the Nevada Business Court, a class and derivative action on behalf of Kinder Morgan Energy Partners, L.P. and its limited partners, and a class action on behalf of the public shareholders of KKR Financial Holdings LLC. In addition, Mr. Hollander has drafted numerous briefs in matters before the federal courts of appeals.



Prior to joining BLB&G, Mr. Hollander clerked for the Honorable Barrington D. Parker, Jr. of the United States Court of Appeals for the Second Circuit, and for the Honorable Stefan R. Underhill of the United States District Court for the District of Connecticut. He has also been associated with two New York defense firms, where he gained significant experience representing clients in various civil, criminal, and regulatory matters, including white collar and complex commercial litigation.

Mr. Hollander is currently a member of the teams prosecuting *Bach v. Amedisys, Inc.*, *The Department of the Treasury of the State of New Jersey and its Division of Investment v. Cliffs Natural Resources Inc.*, *In re Fairway Group Holdings Corp. Securities Litigation*, *In re Dish Network Corp. Shareholder Litigation, In re Kinder Morgan Energy Partnership, L.P. Derivative Litigation, In re Nu Skin Enterprises, Inc. Derivative Litigation, In re KKR Financial Holdings LLC Shareholder Litigation, Central Laborers' Pension Fund v. Portnoy, Slotoroff v. Kinder Morgan, Inc., City of Cambridge Retirement System v. Devitre, International Union of Operating Engineers Local 478 v. Hsu, Teamsters Local 443 Health Services & Insurance Plan v. Otis,* and *In re Sanchez Energy Derivative Litigation.*

EDUCATION:  Brown University, A.B., *magna cum laude*, 2001, Urban Studies.  Yale Law School, J.D., 2006; Editor, *Yale Law and Policy Review.*

BAR ADMISSIONS:  New York; Connecticut; U.S. District Courts for the Southern District of New York and the District of Connecticut; U.S. Court of Appeals for the Second Circuit.


**ANGUS FEI NI** practices out of the New York office, where he prosecutes securities fraud, corporate governance and shareholder rights litigation for the firm's institutional investor clients.

Prior to joining the firm, he was a litigation associate at a top New York law firm, where he drafted briefs, conducted internal investigations, and managed discovery.  Mr. Ni has also represented corporate clients in international arbitrations before ICC and ICSID tribunals. Mr. Ni is currently a member of the teams prosecuting securities class actions against *Salix Pharmaceuticals, Ltd.* and the *Cardiovascular Systems, Inc.*

EDUCATION: University of Toronto, Trinity College, B.A., *Dean's List*; College Scholar, 2009. University of Chicago Law School, J.D., *with honors,* 2013.

BAR ADMISSIONS: New York; U.S. District Court for the Southern District of New York.


**DAVID SCHWARTZ** (former associate) practiced out of the New York office, where he prosecuted securities fraud, corporate governance and shareholder rights litigation on behalf of the firm's institutional investor clients.

Prior to joining the firm, Mr. Schwartz was an associate at a major international law firm, where he represented clients in business and complex commercial litigation, contract disputes, securities class actions, shareholder derivative suits, and SEC and other governmental inquiries and investigations.

EDUCATION:  University of Chicago, B.A., Economics, 2003; *Dean's List*.  Fordham University School of Law, J.D., 2008; Editor of *Urban Law Journal*.

BAR ADMISSIONS:  New York; U.S. District Court for the Southern District of New York.


**KATHERINE A. STEFANOU** (former associate) practiced out of the New York office, where she prosecuted securities fraud, corporate governance and shareholder rights litigation on behalf of the firm's institutional investor clients.

27



EDUCATION: University of Michigan, B.A., History and Modern Greek, *with distinction*, 2007. Brooklyn Law School, J.D., *cum laude*, 2011.

BAR ADMISSIONS: New York; U.S. District Courts for the Eastern and Southern Districts of New York.

## STAFF ATTORNEYS

**ERWIN ABALOS** has worked on numerous matters at BLB&G, including *In re Salix Pharmaceuticals, Ltd. Securities Litigation, In re Facebook, Inc., IPO Securities and Derivative Litigation, In re Merck & Co., Inc. Securities Litigation (VIOXX-related)* and *Minneapolis Firefighters' Relief Association v. Medtronic, Inc. et al*.

Prior to joining the firm in 2012, Mr. Abalos was an associate at Jacoby & Meyers and Associates LLP. Prior to attending law school, Mr. Abalos was a Senior Scientist at F. Hoffmann-LaRoche Ltd.

EDUCATION: Georgetown University, B.S., 2000. Rutgers University School of Law, J.D., 2006.

BAR ADMISSIONS: New Jersey, New York.

**SHEELA AIYAPPASAMY** focuses on discovery matters, from the initial stages of electronic discovery through depositions. Among other cases, Ms. Aiyappasamy has worked on *Medina, et al v. Clovis Oncology, Inc., et al* and *In re Salix Pharmaceuticals, Ltd. Securities Litigation.*

Prior to joining the firm in 2016, Ms. Aiyappasamy was a staff attorney at Simpson Thacher & Bartlett, and a law clerk at the U.S. Attorney's Office for the Eastern District of New York.

EDUCATION: Boston University, B.A., 2001. University of Miami School of Law, J.D., 2004. Florida International University, M.B.A., 2008.

BAR ADMISSIONS: Florida.

**PEDRO ARISTON** has worked on numerous matters at BLB&G, including *In re Salix Pharmaceuticals, Ltd. Securities Litigation, Kohut v. KBR, Inc. et al., In re Genworth Financial Inc. Securities Litigation* and *In re Wilmington Trust Securities Litigation.*

Prior to joining the firm in 2014, Mr. Ariston was a senior associate at Zambrano & Gruba Law Offices, Philippines, and a staff attorney at Labaton Sucharow LLP.

EDUCATION: Ateneo de Manila University School of Arts and Sciences, B.A., *cum laude*, 1990. Ateneo de Manila University School of Law, J.D., 2002. Georgetown University Law Center, LL.M., 2007.

BAR ADMISSIONS: New York.

**JIM BRIGGS** has worked on numerous matters at BLB&G, including *Medina, et al v. Clovis Oncology, Inc., et al, In re Salix Pharmaceuticals, Ltd. Securities Litigation, In re JPMorgan Chase & Co. Securities Litigation* and *In re Merck & Co., Inc. Securities Litigation (VIOXX-related)*.

28



Prior to joining the firm in 2013, Mr. Briggs was a contract attorney at Paul, Weiss, Rifkind, Wharton & Garrison LLP and Stull, Stull & Brody.

EDUCATION: Cornell University, College of Agriculture and Life Sciences, B.S. in Biological Science, *cum laude*, May 2007. Fordham University School of Law, J.D., 2010.

BAR ADMISSIONS: New York.

**GIROLAMO BRUNETTO** has worked on numerous matters at BLB&G, including *In re Altisource Portfolio Solutions, S.A., Securities Litigation, In re Genworth Financial Inc. Securities Litigation, In re Facebook, Inc., IPO Securities and Derivative Litigation* and *In re JPMorgan Chase & Co. Securities Litigation*.

Prior to joining the firm in 2014, Mr. Brunetto was a volunteer assistant attorney general in the Investor Protection Bureau at the New York State Office of the Attorney General.

EDUCATION: University of Florida, B.S.B.A. and B.A., *cum laude*, May 2007. New York Law School, J.D., *cum laude*, 2011.

BAR ADMISSIONS: New York.

**RYAN CANDEE** has worked on numerous matters at BLB&G, including *In re Salix Pharmaceuticals, Ltd. Securities Litigation, In re Allergan, Inc. Proxy Violation Securities Litigation, West Palm Beach Police Pension Fund v. DFC Global Corp., General Motors Securities Litigation, In re Bank of New York Mellon Corp. Forex Transactions Litigation, In re State Street Corporation Securities Litigation, SMART Technologies, Inc. Shareholder Litigation* and *In re Citigroup Inc. Bond Litigation*.

Prior to joining the firm in 2011, Mr. Candee was an associate at Dorsey & Whitney and a staff attorney at Kaplan Fox & Kilsheimer LLP.

EDUCATION: University of Minnesota, B.A., 1994. New York University School of Law, J.D., 2002.

BAR ADMISSIONS: New York.

**BRIAN CHAU** has worked on numerous matters at BLB&G, including *In re Salix Pharmaceuticals, Ltd. Securities Litigation, In re Genworth Financial Inc. Securities Litigation, In re Facebook, Inc., IPO Securities and Derivative Litigation, In re MF Global Holdings Limited Securities Litigation, SMART Technologies, Inc. Shareholder Litigation* and *In re Bank of America Securities Litigation*.

Prior to joining the firm in 2010, Mr. Chau was an associate at Conway & Conway.

EDUCATION: New York University, Stern School of Business, B.S., 2003. Fordham University School of Law, J.D., 2006.

BAR ADMISSIONS: New York.

**ANNE CIRASUOLO** (former staff attorney) focused on discovery matters, from the initial stages of electronic discovery through depositions. Among other cases, Ms. Cirasuolo worked on *In re Salix Pharmaceuticals, Ltd. Securities Litigation, In re Wilmington Trust Securities Litigation* and *In re Bankrate, Inc. Securities Litigation*.

29



Prior to joining the firm in 2014, Ms. Cirasuolo was a discovery attorney at Willkie Farr & Gallagher, LLP and an associate at Hughes, Hubbard & Reed, LLP.

EDUCATION: Barnard College, B.S., 1991. Brooklyn Law School, J.D., 1994.

BAR ADMISSIONS: New York.

**CHRISTOPHER CLARKIN** has worked on numerous matters at BLB&G, including *In re Wilmington Trust Securities Litigation, In re Salix Pharmaceuticals, Ltd. Securities Litigation, West Palm Beach Police Pension Fund v. DFC Global Corp., In re NII Holdings, Inc. Securities Litigation, In re Facebook, Inc., IPO Securities and Derivative Litigation, In re Bank of New York Mellon Corp. Forex Transactions Litigation, SMART Technologies, Inc. Shareholder Litigation, In re Citigroup Inc. Bond Litigation* and *In re Pfizer Inc. Shareholder Derivative Litigation*.

Prior to joining the firm in 2010, Mr. Clarkin worked as a contract attorney for several law firms in New York City.

EDUCATION: Trinity College, B.A., 2000. New York Law School, J.D., 2006.

BAR ADMISSIONS: Connecticut, New York.

**ALEX DICKIN** has worked on numerous matters at BLB&G, including *In re Salix Pharmaceuticals, Ltd. Securities Litigation* and *In re Wilmington Trust Securities Litigation.*

Prior to joining the firm in 2014, Mr. Dickin was a staff attorney at Labaton Sucharow and an associate at Herbert Smith Freehills.

EDUCATION: Macquarie University, B.B.A. 2005; L.L.B. 2008, with *Honors*.

BAR ADMISSIONS: New York.

**GEORGE DOUMAS** has worked on numerous matters at BLB&G, including *In re Salix Pharmaceuticals, Ltd. Securities Litigation, In re Green Mountain Coffee Roasters, Inc. Securities Litigation, In re NII Holdings, Inc. Securities Litigation, General Motors Securities Litigation, In re Bank of New York Mellon Corp. Forex Transactions Litigation, JPMorgan Mortgage Pass-Through Litigation, In re Citigroup Inc. Bond Litigation, In re Huron Consulting Group, Inc. Securities Litigation* and *In re Bristol-Myers Squibb Co. Securities Litigation*.

Prior to joining the firm in 2008, Mr. Doumas worked as a contract attorney for several major law firms in New York City.

EDUCATION: St. John's University, B.S., Accounting, 1994. Southern New England School of Law, J.D., 1997.

BAR ADMISSIONS: Maryland, Massachusetts.

**MICHAEL GRAFF** (former staff attorney) focused on discovery matters, from the initial stages of electronic discovery through depositions. Among other cases, Mr. Graff worked on *In re Salix Pharmaceuticals, Ltd. Securities Litigation* and *Bear Stearns Mortgage Pass-Through Litigation.*

30



Prior to joining the firm in 2014, Mr. Graff was a contract attorney at Quinn Emmanuel Urquhart & Sullivan, LLP.

EDUCATION:  The George Washington University, B.A., 2001.  Touro College, Jacob D. Fuchsberg Law Center, J.D., 2011.

BAR ADMISSIONS:  New York.

**DANIEL GRUTTADARO** has worked on numerous matters at BLB&G, including *Medina, et al v. Clovis Oncology, Inc., et al, In re Salix Pharmaceuticals, Ltd. Securities Litigation, General Motors Securities Litigation, In re Bank of New York Mellon Corp. Forex Transactions Litigation* and *In re Merck & Co., Inc. Securities Litigation (VIOXX-related)*.

Prior to joining the firm in 2014, Mr. Gruttadaro was a staff attorney at Stull, Stull & Brody.

EDUCATION:  State University of New York at Geneseo, B.S., 2005.   State University of New York at Buffalo Law School, J.D., *cum laude*, 2009.

BAR ADMISSIONS:  New York.

**KEITH GUILFOYLE** (former staff attorney) focused on discovery matters, from the initial stages of electronic discovery through depositions.  Among other matters, Mr. Guilfoyle worked on *In re Salix Pharmaceuticals, Ltd. Securities Litigation*.

Prior to joining the firm in 2016, Mr. Guilfoyle was Assistant Vice President & Counsel at Mass Mutual Financial Group.

EDUCATION:  State University of New York at Plattsburgh, B.S.  New York Law School, J.D.

BAR ADMISSIONS:  New York.

**STEPHEN IMUNDO** has worked on numerous matters at BLB&G, including *In re Salix Pharmaceuticals, Ltd. Securities Litigation, Kohut v. KBR, Inc. et al., In re Bank of New York Mellon Corp. Forex Transactions Litigation, Dexia Holdings, Inc. v. JP Morgan, In re Citigroup Inc. Bond Litigation* and *In re Huron Consulting Group, Inc. Securities Litigation*.

Prior to joining the firm in 2010, Mr. Imundo worked as a contract attorney at Labaton Sucharow LLP and Constantine & Cannon, LLP.

EDUCATION:  Mercy College, B.S., *summa cum laude*, 1994.  Fordham University School of Law, J.D., 2002.

BAR ADMISSIONS:  Connecticut, New York.

**MERLYNE JEAN-LOUIS** (former staff attorney) focused on discovery matters, from the initial stages of electronic discovery through depositions.  Among other matters, Ms. Jean-Louis worked on *In re Salix Pharmaceuticals, Ltd. Securities Litigation* and *Bear Stearns Mortgage Pass-Through Litigation*.

Prior to joining the firm in 2014, Ms. Jean-Louis was a contract attorney at Quinn Emmanuel Urquhart & Sullivan, LLP.

31



EDUCATION:  New York University, B.A., *cum laude*, 2006.  Duke University School of Law, J.D., 2012.

BAR ADMISSIONS:  New York.

**LAURA LEFKOWITZ** has worked on numerous matters at BLB&G, including *Town of Davie Police Pension Plan v. CommVault Systems, Inc., et al, In re Salix Pharmaceuticals, Ltd. Securities Litigation, In re NII Holdings, Inc. Securities Litigation, West Palm Beach Police Pension Fund v. DFC Global Corp., In re Bank of New York Mellon Corp. Forex Transactions Litigation, JPMorgan Mortgage Pass-Through Litigation, SMART Technologies, Inc. Shareholder Litigation, In re Citigroup Inc. Bond Litigation* and *In re Pfizer Inc. Shareholder Derivative Litigation.*

Prior to joining the firm in 2010, Ms. Lefkowitz worked as a litigation associate at Morgenstern Fisher & Blue, LLC.

EDUCATION:  University of Michigan, B.A., 1998.  American University, Washington College of Law, J.D., *cum laude*, 2001.

BAR ADMISSIONS:  New York.

**DANIELLE LEON** (former staff attorney) worked on numerous matters at BLB&G, including *In re Salix Pharmaceuticals, Ltd. Securities Litigation, In re MF Global Holdings Limited Securities Litigation* and *In re Merck & Co., Inc. Securities Litigation (VIOXX-related)*.

Prior to joining the firm in 2013, Ms. Leon was a staff attorney at Brower Piven.

EDUCATION:  University of Florida, B.A., *magna cum laude*, 2007.  The George Washington University Law School, J.D., 2010.

BAR ADMISSIONS:  New York.

**MAUREEN MCCARREN** focuses on discovery matters, from the initial stages of electronic discovery through depositions.  Among other cases, Ms. McCarren has worked on *In re Salix Pharmaceuticals, Ltd. Securities Litigation* and *In re Bank of New York Mellon Corp. Forex Transactions Litigation.*

Prior to joining the firm in 2014, Ms. McCarren was a contract attorney at Kaye Scholer LLP and Skadden, Arps, Slate, Meagher & Flom LLP.

EDUCATION:  Adelphi University, B.A., 1978.  St. John's University School of Law, J.D., 1987.

BAR ADMISSIONS:  New York.

**JOHN MOORE** focuses on discovery matters, from the initial stages of electronic discovery through depositions.  Among other matters, Mr. Moore has worked on *California Public Employees' Retirement System v. IAC/InterActiveCorp, et al*, and *In re Salix Pharmaceuticals, Ltd. Securities Litigation.*

Prior to joining the firm in 2016, Mr. Moore was engaged in a general law practice, and also provided pro bono assistance to pro se litigants in consumer credit and bankruptcy actions.

32



**Bernstein Litowitz Berger & Grossmann LLP**

EDUCATION:  Colorado University, Bachelor of Music, 1986.  Northeastern University School of Law, J.D., 2007.

BAR ADMISSIONS:  New York.

**ROBERT JEFFREY POWELL** has worked on numerous matters at BLB&G, including *Fernandez, et al v. UBS AG, et al ("UBS Puerto Rico Bonds"), In re Salix Pharmaceuticals, Ltd. Securities Litigation, In re Green Mountain Coffee Roasters, Inc. Securities Litigation, In re Genworth Financial Inc. Securities Litigation, In re Bank of New York Mellon Corp. Forex Transactions Litigation, Bear Stearns Mortgage Pass-Through Litigation, Cambridge Place Investment Management Inc. v. Morgan Stanley & Co., Inc., et al., SMART Technologies, Inc. Shareholder Litigation* and *In re Citigroup Inc. Bond Litigation.*

Prior to joining the firm in 2011, Mr. Powell was a litigation associate at Pillsbury Winthrop LLP and Constantine Cannon LLP.

EDUCATION:  University of the South, B.A., *magna cum laude*, 1992; Phi Beta Kappa.  Harvard Law School, J.D., 2001.

BAR ADMISSIONS:  New York.

**PRASHANTHA RATNAYAKE** (former staff attorney) focused on discovery matters, from the initial stages of electronic discovery through depositions.  Among other cases, Mr. Ratnayake worked on *In re Salix Pharmaceuticals, Ltd. Securities Litigation, In re Kinder Morgan Energy Partnership, L.P. Derivative Litigation* and *In re Wilmington Trust Securities Litigation*.

Prior to joining the firm in 2014, Mr. Ratnayake was a contract attorney at Quinn Emmanuel Urquhart & Sullivan, LLP and Cohen Milstein Sellers & Toll PLLC.

EDUCATION:  Sri Lanka Law College (School of Law) Attorneys-at-Law, December 1993.  Benjamin N. Cardozo School of Law, LL.M., January 2002.

BAR ADMISSIONS:  New York.

**DANIEL RENEHAN** (former staff attorney) worked on numerous matters at BLB&G, including *In re Salix Pharmaceuticals, Ltd. Securities Litigation, General Motors Securities Litigation, In re Bank of New York Mellon Corp. Forex Transactions Litigation, Cambridge Place Investment Management Inc. v. Morgan Stanley & Co., Inc., et al., In re MF Global Holdings Limited Securities Litigation, In re Citigroup Inc. Bond Litigation, In re Pfizer Inc. Shareholder Derivative Litigation, In re WellCare Securities Litigation, In re Merrill Lynch & Co., Inc. Securities, Derivative and ERISA Litigation (Bond Action), In re RAIT Financial Trust Securities Litigation, In re Refco, Inc. Securities Litigation, In re Converium Holding AG Securities Litigation, Affiliated Computer Services, Inc. Shareholder Derivative Litigation, Ohio Public Employees Retirement System, et al. v. Freddie Mac, et al.* and *In re Symbol Technologies, Inc. Securities Litigation*.

Prior to joining the firm in 2004, Mr. Renehan worked as an associate at Gibbons, Del Deo, Dolan Griffinger & Vecchione, P.C.

EDUCATION:  State University of New York, College at Oswego, B.A, 1987.  New York University, Graduate School of Arts & Science, M.A., 1991.  Brooklyn Law School, J.D., 2000.

BAR ADMISSIONS:  New York.



**MADELEINE SEVERIN** focuses on discovery matters, from the initial stages of electronic discovery through depositions. Among other cases, Ms. Severin has worked on *Medina, et al v. Clovis Oncology, Inc., et al* and *In re Salix Pharmaceuticals, Ltd. Securities Litigation.*

Prior to joining the firm in 2016, Ms. Severin was a staff attorney at Dewey & LeBoeuf LLP and a contract attorney at several firms in New York City.

EDUCATION: Sarah Lawrence College, B.A., 1997. Benjamin N. Cardozo School of Law, J.D., 2004.

BAR ADMISSIONS: New York.

**CHRISTINA SUAREZ** has worked on numerous matters at BLB&G, including *Town of Davie Police Pension Plan v. CommVault Systems, Inc., et al, In re Salix Pharmaceuticals, Ltd. Securities Litigation, Kohut v. KBR, Inc. et al., In re NII Holdings, Inc. Securities Litigation* and *In re JPMorgan Chase & Co. Securities Litigation.*

Prior to joining the firm in 2014, Ms. Suarez was a litigation associate at Schulte Roth & Zabel LLP.

EDUCATION: Barnard College, Columbia University, B.A., *magna cum laude*, 2002. George Washington University Law School, J.D., 2006.

BAR ADMISSIONS: New York.

**CATHERINE VAN KAMPEN** has worked on numerous matters at BLB&G, including *In re Wilmington Trust Securities Litigation, Kohut v. KBR, Inc. et al., In re Bank of New York Mellon Corp. Forex Transactions Litigation, In re Merck & Co., Inc. Securities Litigation (VIOXX-related), Dexia Holdings, Inc. v. JP Morgan, In re Citigroup Inc. Bond Litigation, In re Pfizer Inc. Shareholder Derivative Litigation, In re WellCare Securities Litigation, In re Merrill Lynch & Co., Inc. Securities, Derivative and ERISA Litigation (Bond Action), In re State Street Bank and Trust Co. ERISA Litigation, In re Converium Holding AG Securities Litigation, In re Monster Worldwide, Inc. Derivative Litigation* and *Stonington Partners, Inc. v. Dexia Bank Belgium.*

Prior to joining the firm in 2005, Ms. van Kampen was corporate counsel at Centric Communications Worldwide.

EDUCATION: Indiana University, B.A, 1988. Seton Hall University, School of Law, J.D., 1998.

BAR ADMISSIONS: New Jersey.

# TAB 61

Case 4:19-cv-00509 Document 65-9 Filed 07/02/21 in TXSD Page 1432 of 1452

Woburn Retirement System v. Salix Pharmaceuticals, Ltd., Not Reported in Fed. Supp....

2017 WL 3579892

2017 WL 3579892
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

WOBURN RETIREMENT SYSTEM, Plaintiff,

v.

SALIX PHARMACEUTICALS,
LTD., et al., Defendants.

14-CV-8925 (KMW)
|
Signed 08/18/2017

**Attorneys and Law Firms**

Christopher J. Keller, Rachel Ann Avan, Michael Walter Stocker, Labaton & Sucharow LLP, New York, NY, for Plaintiff.

Charles Alan Gilman, Adam Shawn Mintz, Bradley Joseph Bondi, Sarah Penny Windle, Cahill Gordon & Reindel LLP, Martin L. Seidel, Heather Elyse Murray, Jared Jon Stanisci, Nathan Marshall Bull, Cadwalader, Wickersham & Taft LLP, Brian Jeffrey Wegrzyn, Buckley Sandler LLP, New York, NY, Frederick Whitten Peters, Anne M. Rucker, George Anthony Borden, Matthew Danzer, Stephen D. Andrews, Williams & Connolly LLP, Andrew L. Sandler, Stephen Michael LeBlanc, Buckley Sandler LLP, Caitlin M. Kasmar, BuckleySandler LLP, Washington, DC, Scott T. Sakiyama, Sean B. Karunaratne, BuckleySandler LLP, Chicago, IL, for Defendants.

**OPINION & ORDER**

KIMBA M. WOOD, United States District Judge

 **\*1** This Opinion considers the Motion for Final Approval of the Settlement and Plan of Allocation ("Approval Motion"), filed by Lead Plaintiff Pentwater Funds, and the Motion for an Award of Attorneys' Fees and Reimbursement of Litigation Expenses ("Attorneys' Fees Motion"), filed by Lead Counsel Bernstein Litowitz Berger & Grossman LLP ("Lead Counsel" or "Bernstein Litowitz"). For the reasons stated below and stated at the Settlement Fairness Hearing held on July 28, 2017, the Court GRANTS both motions.

**I. Introduction and Procedural History**

On March 23, 2015, this Court consolidated two putative securities fraud class actions against Salix Pharmaceuticals and two of its officers and directors. Both alleged that Salix materially misled the public by deliberately making false or misrepresentative statements, or by failing to correct such statements, between November 8, 2013 and November 6, 2014 (the "Class Period"). Plaintiffs claim that Salix's fraudulent actions artificially increased the price of Salix securities. This Court appointed Pentwater Funds as Lead Plaintiff, and Bernstein Litowitz as Lead Counsel for the consolidated action. (Doc. No. 64.)

Defendants subsequently filed a Motion to Dismiss the Consolidated Class Action Complaint, which this Court denied in its entirety on March 31, 2016. (Doc. Nos. 123, 127.) The parties then proceeded with discovery, with Defendants producing millions of documents and Plaintiffs' counsel taking several depositions. (Approval Motion at 2, 5.)

Following the Court's resolution of a discovery dispute on January 24, 2017, the parties informed the Court that they had reached an agreement to settle. The Court preliminarily approved the settlement and appointed a claims administrator on April 5, 2017. (Doc. No. 220.)

The proposed settlement resolves all claims in this action, in exchange for a cash payment of $210 million payment to class members. The Court granted final approval of the settlement, the plan of allocation, and the application for attorneys' fees and reimbursement of litigation expenses at the July 28, 2017 Settlement Fairness Hearing, for the reasons that follow.

**II. Final Approval of the Settlement**

Under Federal Rule of Civil Procedure 23(e), this Court must approve a class action settlement before it is executed. To do so, adequate notice of the proposed settlement must be provided to potential class members, and the Court must hold a hearing to determine the fairness of the settlement. Fed. R. Civ. P. 23(e).

"A court may approve a class action settlement if it is 'fair, adequate, and reasonable, and not a product of collusion.' " Wal-Mart Stores, Inc. v. Visa U.S.A., Inc., 396 F.3d 96, 116 (2d Cir. 2005) (quoting Joel A v. Giuliani, 218 F.3d 132, 138 (2d Cir. 2000)). To evaluate the settlement's fairness, a court should consider "both the settlement's terms and the negotiating process leading to settlement." Id. (quoting

Case 4:19-cv-00509 Document 65-9 Filed 07/02/21 in TXSD Page 1433 of 1452

Woburn Retirement System v. Salix Pharmaceuticals, Ltd., Not Reported in Fed. Supp....

2017 WL 3579892

*D'Amato v. Deutsche Bank,* 236 F.3d 78, 85 (2d Cir. 2001)).

### A. Adequacy of Notice

Under both the Due Process Clause and Rule 23, the adequacy of notice in a class action is determined by its reasonableness. There are no rigid standards to determine the reasonableness of notice; if the average class member understands "the terms of the proposed settlement and of the options that are open to them in connection with [the] proceedings," then the notice is adequate. *Weinberger v. Kendrick,* 698 F.2d 61, 70 (2d Cir. 1982).

**\*2** A Court-approved Claims Administrator, Epiq, sent notice packets to approximately 73,000 potential class members—everyone who could be identified with reasonable effort—covering information required by the Private Securities Litigation Reform Act ("PSLRA") and Federal Rule of Civil Procedure 23(c)(2)(B). The notice was also published in the Wall Street Journal, was transmitted over the PR Newswire, and was published on Lead Counsel's website. The notice provided: (i) an explanation of the Action; (ii) the definition of the settlement class; (iii) the amount of the settlement and the reasons for it; (iv) the plan of allocation; (v) an approximation of the attorneys' fees and costs to be requested; (vii) the right to opt-out or object; and (viii) the binding effect of this Court's judgment on Class members.

The Court finds that the notice given in this case was reasonable and adequate.

### B. Procedural Fairness

When settlement is achieved through arm's-length negotiations, between experienced and capable counsel, after meaningful discovery, "a presumption of fairness, adequacy, and reasonableness" will apply to the class settlement. *Wal-Mart,* 396 F.3d at 116.

The parties engaged in protracted, arm's-length negotiations between counsel, who were well-versed in the strengths and weaknesses of the case, after months of intensive fact discovery. Thus, the Court finds the settlement to have been achieved through a fair and reasonable process.

### C. Substantive Fairness

In *City of Detroit v. Grinnell Corp.,* the Second Circuit set forth nine factors to determine whether a settlement is substantively fair and reasonable, pursuant to Rule 23(e). The factors are:

> (1) the complexity, expense and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through the trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; [and] (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

*City of Detroit v. Grinnell Corp.,* 495 F.2d 448, 463 (2d Cir. 1974) ("*Grinnell*"), *abrogated on other grounds by Goldberger v. Integrated Reserves, Inc.,* 209 F.3d 43 (2d Cir. 2000). A court may consider the totality of the factors "in light of the particular circumstances." *In re Merrill Lynch & Co., Inc.,* 2007 WL 313474, at \*9 (S.D.N.Y Feb. 1, 2007) (Keenan, J).

#### 1. Complexity, Expense, and Likely Duration of the Litigation

Lead Plaintiff states that although the case settled toward the end of discovery, it would have required substantially more time and expense to conclude discovery, litigate to a verdict, and potentially await appeal of the decision—which would have delayed recovery for class members. (Approval Motion at 3, 8.)

Thus, this factor supports the approval of the settlement.

### 2. Reaction of the Class to Settlement

The Claims Administrator distributed notice widely, to several thousands of potential Class members. Neither the parties nor the Court received any objections to the settlement or to the Plan of Allocation. No institutional investors —sophisticated class members constituting the majority of common stockholders during the Class Period—have objected, either. There were only two requests for exclusion from the Class.

The Class members' favorable reaction to the settlement "is perhaps the most significant factor in [the] *Grinnell* inquiry." *Wal-Mart,* 396 F.3d at 119. This constitutes strong evidence that the proposed settlement is fair. *See In re Citigroup Inc. Sec. Litig.,* 965 F. Supp. 2d 369, 382 (S.D.N.Y. 2013) (Stein, J.) (quoting *Grinnell,* 495 F.2d at 462).

 **\*3**  The Court concludes that the lack of objections to the settlement and minimal requests for exclusion are indicative of the adequacy of the settlement.

### 3. Stage of the Proceedings and Amount of Discovery Completed

At the time that the parties agreed to settle, Plaintiffs' counsel had conducted substantial discovery, and Plaintiffs had "a thorough understanding of their case" before entering into the settlement. *Wal-Mart,* 396 F.3d at 118.

Lead Plaintiff states that Lead Counsel thoroughly investigated the legal and factual issues in this action, and the parties had the benefit of an extensive discovery process, including millions of pages of documents and ten fact witness depositions. (Approval Motion at 5, 9.) The fact investigation enabled Lead Counsel to be well-informed to "gauge the strengths and weaknesses of their claims and the adequacy of settlement." *In re AOL Time Warner, Inc.,* 2006 WL 903236, at \*10 (S.D.N.Y. Apr. 6, 2006) (Kram, J.). This *Grinnell* factor weighs in favor of approval.

### 4. The Risks of Continued Litigation

A court must also consider the likelihood that the class would prevail, at trial, when determining the reasonableness, fairness, and adequacy of settlement. The fourth, fifth, and sixth *Grinnell* factors concern risks: the plaintiff's risks of establishing liability and damages, and the risk that the Court might deny class certification.

### i. Liability

Although Lead Plaintiff successfully challenged the Defendants' Motion to Dismiss, the class risked being unable to prove, at trial, that Defendants' alleged misstatements were materially false, and that Defendants acted with scienter in making these statements. Salix had a host of defenses—for example, that the supposed misstatements were forward-looking estimates, and thus not actionable, and that Defendants lacked any motive to engage in fraud. Lead Plaintiff acknowledged the difficulty of overcoming Salix's defenses.

### ii. Damages/Loss Causation

Proving loss causation would have been an additional challenge for Lead Plaintiff. (*See* Approval Motion at 18-19.) Lead Plaintiff bore the burden of disaggregating negative information about Salix from the alleged misstatements in the company's November 6, 2014 corrective disclosure, to prove that the Class's losses were caused by Defendants' alleged misrepresentations, and not by other market forces.

Additionally, Salix was acquired by Valeant after the end of the Class Period. This caused the common stock to rise to a price significantly higher than the share price after the company's corrective disclosure. *Id.* at 19. Lead Plaintiff would have had to demonstrate at trial that in spite of this price increase, shareholders sustained damages. Warring experts, Lead Plaintiff contends, would have confused the jury. *Id.*

In light of the significant possibility that plaintiffs may not have prevailed at trial, this Court finds that the risk of establishing causation, liability, and damages at trial heavily supports the reasonableness of the settlement.

### iii. Maintaining a Class Through Trial

Defendants contested class certification on the ground that Lead Plaintiff was atypical of the class. This would have subjected Plaintiffs to considerably more risk. *In re AOL Time Warner, Inc.,* 2006 WL 903236, at *12.

**\*4** In summary, the *Grinnell* "risk factors" also favor the settlement.

### 5. *The Ability of the Defendants to Withstand a Greater Judgment*

Defendants could have satisfied a greater judgment than the settlement amount; however, this factor alone does not render the settlement unfair, given the force of the other *Grinnell* factors in determining the settlement to be reasonable. *D'Amato,* 236 F.3d at 86; *see also Shapiro v. JPMorgan Chase & Co.,* 2014 WL 1224666, at *11 (S.D.N.Y. Mar. 24, 2014) (McMahon, J.).

### 6. *Range of Reasonableness in Light of Best Possible Recovery and All the Attendant Risks of Litigation*

"[T]he question for the Court is not whether the settlement represents the highest recovery possible ... but whether it represents a reasonable one in light of the many uncertainties the class faces." *In re Citigroup,* 965 F. Supp. 2d at 384.

Lead Plaintiff's expert estimated that the total damages, if the class succeeded at trial, would be $600 million. (Approval Motion at 17.) This Court finds that a settlement of $210 million—approximately a third of that estimate—is highly favorable to Plaintiffs, who risked recovering a much smaller sum, given the risks attendant to continued litigation.

In sum, all of the *Grinnell* factors support the Court's approval of this settlement as fair, reasonable, and adequate.

### D. Plan of Allocation

The Court approves the parties' plan to apportion the settlement proceeds based on each claimant's respective market loss (the "Plan of Allocation"). The Plan of Allocation

was developed by Lead Counsel and Lead Plaintiff's damages expert. Each claimant who has documented proof of a purchase or other acquisition of Salix common stock or Salix Call Option, or sale of a Salix Put Option during the Class Period and 90 days after the Class Period, will be assigned a "Recognized Loss Amount":

(1) For those who purchased Salix stock, the Recognized Loss Amount will be "the difference between the estimated artificial inflation on the date of purchase and the estimated artificial inflation on the date of sale, or the difference between the actual purchase price and sales price of the stock, whichever is less." (Approval Motion at 19.)

(2) For those who sold Salix common stock or for whom Salix Options closed during the 90 days after the Class Period, the Recognized Loss Amount is limited to "the difference between the purchase price and the average closing price of the security during that period." *Id.* at 20.

(3) For those claimants who still held Salix securities at the end of the 90-day period, the Recognized Loss Amount will be "50% of the lesser of (a) the amount of artificial inflation (or deflation) in the security at the time of purchase or (b) the difference between the purchase price and the average closing price for the security during that 90-day period." *Id.*

(4) Finally, claimants who bought and sold Salix securities before the alleged misstatements were made at 4:30 p.m. on November 6, 2014, have no Recognized Loss Amount. *Id.* at 19.

There have been no objections to the Plan. The Court deems the Plan of Allocation to be fair, reasonable, and adequate, and approves the payment of the net settlement fund proportional to each claimant's Recognized Loss Amount.

### III. Approval of Attorneys' Fees and Reimbursements

**\*5** Lead Counsel request a fee award of 21.24% of the Settlement Fund of $210 million, after deducting expenses. This amounts to a sum of $44,609,218, plus interest. Counsel also request reimbursement of litigation expenses in the amount of $1,983,708.41. (Lead Plaintiff's Reply at 2, 6.)

"[W]here an attorney succeeds in creating a common fund from which members of a class are compensated for a common injury inflicted on the class, ... the attorneys whose efforts created the fund are entitled to a reasonable fee—set

Case 4:19-cv-00509 Document 65-9 Filed 07/02/21 in TXSD Page 1436 of 1452

Woburn Retirement System v. Salix Pharmaceuticals, Ltd., Not Reported in Fed. Supp....

2017 WL 3579892

by the court—to be taken from the fund." *Goldberger,* 209 F.3d at 47. In the Second Circuit, district courts traditionally award plaintiffs' counsel fees in class actions in one of two ways: either the percentage of the fund method, or the lodestar method. The former calculates a reasonable percentage of the settlement fund, and the latter is an assessment of the market value of the work performed by plaintiffs' attorneys. *See In re Merrill Lynch,* 2007 WL 313474, at \*12.

The trend in the Second Circuit is to award attorneys' fees based on the percentage of the fund method; however, courts cross-check this value with the lodestar amount, to ensure that the fees awarded do not exceed what is reasonable under the circumstances. A cross-check is crucial here because of the high amount of this settlement, to avoid awarding plaintiffs' counsel a "windfall." *In re Citigroup Inc. Bond Litig.,* 988 F. Supp. 2d 371, 373 (S.D.N.Y. 2013) (Stein, J.).

### A. *Goldberger* Factors to Assess the Reasonableness of Attorneys' Fees

Pursuant to the factors set forth in *Goldberger v. Integrated Resources,* district courts in this Circuit weigh the following factors to determine the reasonableness of attorneys' fees: "(1) the time and labor expended by counsel; (2) the magnitude and complexities of the litigation; (3) the risk of the litigation; (4) the quality of representation; (5) the requested fee in relation to the settlement; and (6) public policy considerations." *Wal-Mart,* 396 F.3d at 121 (citing *Goldberger,* 209 F.3d at 50).

### 1. Time and Labor Expended by Counsel: The Lodestar Cross-Check

The lodestar amount is calculated by multiplying the number of hours counsel spent throughout this action by reasonable hourly rates; this allows the Court to evaluate the extent of the time and labor expended in comparison to the percentage of the fund requested as attorneys' fees.

Lead Counsel Bernstein Litowitz, as well as co-counsel Robbins Geller Rudman & Dowd LLP ("Robbins Geller"), and Hach Rose Schirripa & Cheverie, LLP ("Hach Rose"), have submitted detailed time records demonstrating a great deal of work on this case over the last three years— over 34,000 hours of work done by the three firms.

Counsel investigated the facts, moved to be appointed Lead Plaintiff and Lead Counsel, submitted amended pleadings, successfully defended the Motion to Dismiss, conducted discovery, took ten fact witness depositions, consulted experts, moved for class certification, and ultimately negotiated a favorable settlement for their clients. (Attorneys' Fees Motion at 2.)

The Court agrees that counsel should be compensated for their extensive work on this case. The lodestar value of counsel's work, not including expenses, is $14,185,499.25. This reflects the various hourly billing rates for partners, which ranged from $700 to $995 at Bernstein Litowitz, $715 to $980 at Robbins Geller, and $550 to $695 at Hach Rose, as well as for associates, staff and project attorneys, financial and economic analysts, investigators, paralegals, and other support staff. Lead Counsel billed approximately 87% of the total lodestar.

**\*6** Lead Counsel request a fee equivalent to 21.24% of the net settlement fund, or $44,609,218, which reflects a lodestar multiplier of approximately 3.14. Lead Counsel contend that this percentage and this multiplier are within the range of reasonable percentages and multipliers approved in this Circuit, and cite decisions in support. (Attorneys' Fees Motion at 10-11.)

A 3.14 multiplier for a case that settled for $210 million is significant. *See In re Citigroup Inc. Sec. Litig.,* 965 F. Supp. 2d 369, 401 (S.D.N.Y. 2013) (Stein, J.) ("Courts in this Circuit have trended toward awarding lower percentages and lower multipliers for awards from extremely large common funds such as this one."); *In re Merrill Lynch,* 2007 WL 313474, at \*23 (recognizing that courts since *Goldberger* question multipliers exceeding 2.03).

Lead Counsel have cited decisions approving awards of attorneys' fees in comparable cases that constitute different lodestar multipliers. *E.g., In re Bank of New York Mellon Corp. Forex Transactions Litig.,* 148 F. Supp. 3d 303, 305 (S.D.N.Y. 2015) (Kaplan, J.) (awarding 25% of $180 million settlement) (**lodestar multiplier of 0.96**); *Bd. of Trustees of the AFTRA Ret. Fund v. JPMorgan Chase Bank, N.A.,* 2012 WL 2064907, at \*3 (S.D.N.Y. June 7, 2012) (Scheindlin, J.) (awarding 25% of $150 million settlement) (**lodestar multiplier of 2.86**); *In re Comverse Tech., Inc. Sec. Litig.,* 2010 WL 2653354, at \*6 (E.D.N.Y. June 24, 2010) (Garaufis, J.) (awarding 25% of $225 million settlement) (**lodestar multiplier of 2.78**); *In re Deutsche Telekom AG*

Case 4:19-cv-00509 Document 65-9 Filed 07/02/21 in TXSD Page 1437 of 1452

Woburn Retirement System v. Salix Pharmaceuticals, Ltd., Not Reported in Fed. Supp....

2017 WL 3579892

*Sec. Litig.,* 2005 WL 7984326, at \*4 (S.D.N.Y. June 9, 2005) (Buchwald, J.) (awarding 28% of $120 million settlement) (**lodestar multiplier of 3.96**).

Although a lodestar multiplier of 3.14 for a settlement of $210 million is high, it is still within the range of lodestar multipliers approved in this Circuit. Thus, this *Goldberger* factor favors approval of the requested attorneys' fees.

### 2. Magnitude and Complexities of the Litigation

The remaining *Goldberger* factors bolster Lead Counsel's requested amount of attorneys' fees. Securities class action litigation is "notably difficult and notoriously uncertain." *In re Milken & Assocs. Sec. Litig.,* 150 F.R.D. 46, 53 (S.D.N.Y. 1993) (Pollack, J.). Investigating and litigating this action was undoubtedly complex and required expert consultation; this factor reinforces the reasonableness of the requested fees.

### 3. Risk of the Litigation

The Second Circuit held that the risk of the litigation is one of the most important factors, if not the foremost factor, to consider when determining the reasonableness of fees. *Goldberger,* 209 F.3d at 54; *Merrill Lynch,* 2007 WL 313474, at \*16.

Particularly when lawyers undertake a case on a contingency fee basis, and thus assume a great deal of risk, the Second Circuit has held that it is appropriate to award fees that exceed the lodestar amount. *See* *Grinnell,* 495 F.2d at 470 ("No one expects a lawyer whose compensation is contingent upon his success to charge, when successful, as little as he would charge a client who in advance had agreed to pay for his services, regardless of success.").

As discussed *supra,* Lead Plaintiff faced substantial hurdles to recovery, as they needed to prove scienter, loss causation, and damages. Success at trial was not certain. In spite of these risks, Lead Counsel agreed to litigate on a contingency basis. *Flag Telecom,* 2010 WL 4537550, at \*27.

 **\*7** Thus, the Court finds that Lead Counsel's assumption of the risk of litigating this case supports the reasonableness of the requested fee.

### 4. Quality of Representation

The Court has reviewed the backgrounds of the attorneys working for the class, and of opposing counsel. Lead Counsel successfully challenged the Motion to Dismiss, vigorously prosecuted the action through a highly contested discovery process, and achieved a favorable settlement against a well-represented opponent. Counsel all have ample experience in class action litigation. Altogether, the high quality of representation warrants the requested fee award.

### 5. Requested Fee in Relation to Settlement

The PSLRA expressly contemplates that attorneys' fees should be calculated using the percentage method. 15 U.S.C. § 78u-4(a)(6). Lead Counsel requests $44,609,218, or approximately 21.24% of the Settlement Fund of $210 million, after expenses are deducted. Lead Counsel cites several decisions in this Circuit, in which courts awarded attorneys' fees that amounted to similar percentages of the settlement amount. (*See* Attorneys' Fees Motion at 7-8). For a settlement in the hundreds of millions of dollars, a request of over 20% is substantial; however, because the percentage is within the range of what is reasonably granted in this Circuit, and the lodestar multiplier is reasonable, the Court approves Lead Counsel's fee request.

The fee agreement is pursuant to a written retainer agreement between Lead Plaintiff, a sophisticated entity, and Lead Counsel, entered into at the outset of the litigation. (*See* Attorneys' Fees Motion at 11-13.) Courts have found that *ex ante* fee agreements between lead counsel and lead plaintiffs enjoy a presumption of reasonableness under the PSLRA. *See In re WorldCom, Inc. Sec. Litig.,* 388 F. Supp. 2d 319, 356 (S.D.N.Y. 2005) (Cote, J.); *In re Cendant Corp. Litig.,* 264 F.3d 201, 282 (3d Cir. 2001).

Thus, the Court finds the requested fee of 21.24% of the net settlement fund to be reasonable.

### 6. Public Policy Considerations

To provide financial incentives for class action securities litigation, "[p]ublic policy concerns favor the award of reasonable attorneys' fees." *In re Merrill Lynch*, at \*21; *see*

Case 4:19-cv-00509 Document 65-9 Filed 07/02/21 in TXSD Page 1438 of 1452

Woburn Retirement System v. Salix Pharmaceuticals, Ltd., Not Reported in Fed. Supp....

2017 WL 3579892

*also* *In re Citigroup,* 965 F. Supp.2d at 400. The work done by Lead Counsel on a contingency basis inures to the benefit of the entire Class. Thus, the award of 21.24% of the settlement fund is appropriate, and not excessive, to encourage future securities class actions.

### B. Fairness Hearing & *Flanagan*

In the Settlement Fairness Hearing, the Court noted its concern that two secondary law firms, Robbins Geller and Hach Rose, were heavily involved in this action, even after the Court appointed Bernstein Litowitz, a very well-staffed law firm, as Lead Counsel in March of 2015. The Court expressed concern with the inefficiency of that distribution of work, which may impose needless fees on the class.

Lead Counsel indicated their desire to engage the other firms and other plaintiffs as insurance against the attacks that Lead Plaintiff was an ineffective class representative. Because that "insurance" should have been obtainable with far less work by secondary law firms, the Court, in its capacity "as a guardian of the rights of absent class members," *Goldberger,* 209 F. 3d at 52, requested that in the future, before Lead Counsel chooses additional firms to represent the Class, and decides how much work they will perform, that Lead Counsel explain to the Court the need for work allocation, so that the Court can ensure that the class's resources will not be wasted. (Settlement Fairness Hearing Tr. at 9:21-10:16).

**\*8** The Court acknowledges that the Second Circuit's decision in *Flanagan* controls. *See Flanagan, Lieberman, Hoffman & Swaim v. Ohio Pub. Employees Ret. Sys.,* 814 F.3d 652 (2d Cir. 2016). In that case, the district court had denied attorneys' fees, to be paid from a securities class action settlement fund, to non-lead counsel, finding that its work did not benefit the class. The Second Circuit overturned that decision, holding instead that a rebuttable presumption of correctness applies to a lead plaintiff's decision to apportion

attorneys' fees from the settlement fund to non-lead counsel. *Flanagan* was also a case with a capped percentage-of-the-fund recovery on attorneys' fees. *Id.* at 658.

Given the similarity of the fee arrangements in this case to those in *Flanagan* (in both cases, the percentage fee cap was negotiated *ex ante*), this Court finds no reason to deny the presumption of correctness to the fee agreement between Lead Counsel and Lead Plaintiff. *See In re Credit Default Swaps Antitrust Litig.,* 2016 WL 2731524, at \*16 (S.D.N.Y. Apr. 26, 2016) (Cote, J.).

### C. Reimbursement of Litigation Expenses

The Court finds that the request to reimburse litigation expenses of $1,953,908.41 is reasonable. The significant bulk of expenses went toward Lead Plaintiff's experts, as well as online legal research, and an electronic discovery vendor, among other expenses and costs. The Notice to the Class stated that expense reimbursement request would not exceed $2.5 million, and it has not. (Attorneys' Fees Motion at 20.)

There have been no objections to this request. The Court thus approves the requested reimbursement of litigation expenses.

### IV. Conclusion

For the foregoing reasons, the Court GRANTS the Motions for Final Approval of the Settlement and Plan of Allocation, Motion for Attorneys' Fees in the amount of $44,609,218, and Motion for the Reimbursement of Litigation Expenses of $1,953,908.41. This resolves docket nos. 221 and 223. All other pending motions are moot.

SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2017 WL 3579892

---

**End of Document**

© 2021 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 62

**Paragraph (4).** By incorporating Rule 54(d)(2), this provision gives the court broad authority to obtain assistance in determining the appropriate amount to award. In deciding whether to direct submission of such questions to a special master or magistrate judge, the court should give appropriate consideration to the cost and delay that such a process might entail.

2007 Amendment

The language of Rule 23 has been amended as part of the general restyling of the Civil Rules to make them more easily understood and to make style and terminology consistent throughout the rules. These changes are intended to be stylistic only.

Amended Rule 23(d)(2) carries forward the provisions of former Rule 23(d) that recognize two separate propositions. First, a Rule 23(d) order may be combined with a pretrial order under Rule 16. Second, the standard for amending the Rule 23(d) order continues to be the more open-ended standard for amending Rule 23(d) orders, not the more exacting standard for amending Rule 16 orders.

As part of the general restyling, intensifiers that provide emphasis but add no meaning are consistently deleted. Amended Rule 23(f) omits as redundant the explicit reference to court of appeals discretion in deciding whether to permit an interlocutory appeal. The omission does not in any way limit the unfettered discretion established by the original rule.

2009 Amendment

The time set in the former rule at 10 days has been revised to 14 days. See the Note to Rule 6.

**2018 Amendments**

Rule 23 is amended mainly to address issues related to settlement, and also to take account of issues that have emerged since the rule was last amended in 2003.

**Subdivision (c)(2).** As amended, Rule 23(e)(1) provides that the court must direct notice to the class regarding a proposed class-action settlement only after determining that the prospect of class certification and approval of the proposed settlement justifies giving notice. This decision has been called "preliminary approval" of the proposed class certification in Rule 23(b)(3) actions. It is common to send notice to the class simultaneously under both Rule 23(e)(1) and Rule 23(c)(2)(B), including a provision for class members to decide by a certain date whether to opt out. This amendment recognizes the propriety of this combined notice practice.

Subdivision (c)(2) is also amended to recognize contemporary methods of giving notice to class members. Since *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156 (1974), interpreted the individual notice requirement for class members in Rule 23(b)(3) class actions, many courts have read the rule to require notice by first class mail in every case. But technological change since 1974 has introduced other means of communication that may sometimes provide a reliable additional or alternative method for giving notice. Although first class mail may often be the preferred primary method of giving notice, courts and counsel have begun to employ new technology to make notice more effective. Because there is no reason to expect that technological change will cease, when selecting a method or methods of giving notice courts should consider the capacity and limits of current technology, including class members' likely access to such technology.

Rule 23(c)(2)(B) is amended to take account of these changes. The rule continues to call for giving class members "the best notice that is practicable." It does not specify any particular means as preferred. Although it may sometimes be true that electronic methods of notice, for example email, are the most promising, it is important to keep in mind that a significant portion of class members in certain cases may have limited or no access to email or the Internet.

Case 4:19-cv-00509 Document 65-9 Filed 07/02/21 in TXSD Page 1441 of 1452

Instead of preferring any one means of notice, therefore, the amended rule relies on courts and counsel to focus on the means or combination of means most likely to be effective in the case before the court. The court should exercise its discretion to select appropriate means of giving notice. In providing the court with sufficient information to enable it to decide whether to give notice to the class of a proposed class-action settlement under Rule 23(e)(1), it would ordinarily be important to include details about the proposed method of giving notice and to provide the court with a copy of each notice the parties propose to use.

In determining whether the proposed means of giving notice is appropriate, the court should also give careful attention to the content and format of the notice and, if notice is given under both Rule 23(e)(1) and Rule 23(c)(2)(B), any claim form class members must submit to obtain relief.

Counsel should consider which method or methods of giving notice will be most effective; simply assuming that the "traditional" methods are best may disregard contemporary communication realities. The ultimate goal of giving notice is to enable class members to make informed decisions about whether to opt out or, in instances where a proposed settlement is involved, to object or to make claims. Rule 23(c)(2)(B) directs that the notice be "in plain, easily understood language." Means, format, and content that would be appropriate for class members likely to be sophisticated, for example in a securities fraud class action, might not be appropriate for a class having many members likely to be less sophisticated. The court and counsel may wish to consider the use of class notice experts or professional claims administrators.

Attention should focus also on the method of opting out provided in the notice. The proposed method should be as convenient as possible, while protecting against unauthorized opt-out notices.

**Subdivision (e).** The introductory paragraph of Rule 23(e) is amended to make explicit that its procedural requirements apply in instances in which the court has not certified a class at the time that a proposed settlement is presented to the court. The notice required under Rule 23(e)(1) then should also satisfy the notice requirements of amended Rule 23(c)(2)(B) for a class to be certified under Rule 23(b)(3), and trigger the class members' time to request exclusion. Information about the opt-out rate could then be available to the court when it considers final approval of the proposed settlement.

**Subdivision (e)(1).** The decision to give notice of a proposed settlement to the class is an important event. It should be based on a solid record supporting the conclusion that the proposed settlement will likely earn final approval after notice and an opportunity to object. The parties must provide the court with information sufficient to determine whether notice should be sent. At the time they seek notice to the class, the proponents of the settlement should ordinarily provide the court with all available materials they intend to submit to support approval under Rule 23(e)(2) and that they intend to make available to class members. The amended rule also specifies the standard the court should use in deciding whether to send notice--that it likely will be able both to approve the settlement proposal under Rule 23(e)(2) and, if it has not previously certified a class, to certify the class for purposes of judgment on the proposal.

The subjects to be addressed depend on the specifics of the particular class action and proposed settlement. But some general observations can be made.

One key element is class certification. If the court has already certified a class, the only information ordinarily necessary is whether the proposed settlement calls for any change in the class certified, or of the claims, defenses, or issues regarding which certification was granted. But if a class has not been certified, the parties must ensure that the court has a basis for concluding that it likely will be able, after the final hearing, to certify the class. Although the standards for certification differ for settlement and litigation purposes, the court cannot make the decision regarding the prospects for certification without a suitable basis in the record. The ultimate decision to certify the class for purposes of settlement cannot be made until the hearing on final approval of the proposed settlement. If the settlement is not approved, the parties' positions regarding certification for settlement should not be considered if certification is later sought for purposes of litigation.

Regarding the proposed settlement, many types of information might appropriately be provided to the court. A basic focus is the extent and type of benefits that the settlement will confer on the members of the class. Depending on the nature of the proposed relief, that showing may include details of the contemplated claims process and the anticipated rate of claims by class members. Because some funds are frequently left unclaimed, the settlement agreement ordinarily should address the distribution of those funds.

The parties should also supply the court with information about the likely range of litigated outcomes, and about the risks that might attend full litigation. Information about the extent of discovery completed in the litigation or in parallel actions may often be important. In addition, as suggested by Rule 23(b)(3)(B), the parties should provide information about the existence of other pending or anticipated litigation on behalf of class members involving claims that would be released under the proposal.

The proposed handling of an award of attorney's fees under Rule 23(h) ordinarily should be addressed in the parties' submission to the court. In some cases, it will be important to relate the amount of an award of attorney's fees to the expected benefits to the class. One way to address this issue is to defer some or all of the award of attorney's fees until the court is advised of the actual claims rate and results.

Another topic that normally should be considered is any agreement that must be identified under Rule 23(e)(3).

The parties may supply information to the court on any other topic that they regard as pertinent to the determination whether the proposal is fair, reasonable, and adequate. The court may direct the parties to supply further information about the topics they do address, or to supply information on topics they do not address. The court should not direct notice to the class until the parties' submissions show it is likely that the court will be able to approve the proposal after notice to the class and a final approval hearing.

**Subdivision (e)(2).** The central concern in reviewing a proposed class-action settlement is that it be fair, reasonable, and adequate. Courts have generated lists of factors to shed light on this concern. Overall, these factors focus on comparable considerations, but each circuit has developed its own vocabulary for expressing these concerns. In some circuits, these lists have remained essentially unchanged for thirty or forty years. The goal of this amendment is not to displace any factor, but rather to focus the court and the lawyers on the core concerns of procedure and substance that should guide the decision whether to approve the proposal.

A lengthy list of factors can take on an independent life, potentially distracting attention from the central concerns that inform the settlement-review process. A circuit's list might include a dozen or more separately articulated factors. Some of those factors--perhaps many--may not be relevant to a particular case or settlement proposal. Those that are relevant may be more or less important to the particular case. Yet counsel and courts may feel it necessary to address every factor on a given circuit's list in every case. The sheer number of factors can distract both the court and the parties from the central concerns that bear on review under Rule 23(e)(2).

This amendment therefore directs the parties to present the settlement to the court in terms of a shorter list of core concerns, by focusing on the primary procedural considerations and substantive qualities that should always matter to the decision whether to approve the proposal.

Approval under Rule 23(e)(2) is required only when class members would be bound under Rule 23(c)(3). Accordingly, in addition to evaluating the proposal itself, the court must determine whether it can certify the class under the standards of Rule 23(a) and (b) for purposes of judgment based on the proposal.

**Paragraphs (A) and (B).** These paragraphs identify matters that might be described as "procedural" concerns, looking to the conduct of the litigation and of the negotiations leading up to the proposed settlement. Attention to these matters is an important foundation for scrutinizing the substance of the proposed settlement. If the court has appointed class counsel or interim class

counsel, it will have made an initial evaluation of counsel's capacities and experience. But the focus at this point is on the actual performance of counsel acting on behalf of the class.

The information submitted under Rule 23(e)(1) may provide a useful starting point in assessing these topics. For example, the nature and amount of discovery in this or other cases, or the actual outcomes of other cases, may indicate whether counsel negotiating on behalf of the class had an adequate information base. The pendency of other litigation about the same general subject on behalf of class members may also be pertinent. The conduct of the negotiations may be important as well. For example, the involvement of a neutral or court-affiliated mediator or facilitator in those negotiations may bear on whether they were conducted in a manner that would protect and further the class interests. Particular attention might focus on the treatment of any award of attorney's fees, with respect to both the manner of negotiating the fee award and its terms.

**Paragraphs (C) and (D).** These paragraphs focus on what might be called a "substantive" review of the terms of the proposed settlement. The relief that the settlement is expected to provide to class members is a central concern. Measuring the proposed relief may require evaluation of any proposed claims process; directing that the parties report back to the court about actual claims experience may be important. The contents of any agreement identified under Rule 23(e)(3) may also bear on the adequacy of the proposed relief, particularly regarding the equitable treatment of all members of the class.

Another central concern will relate to the cost and risk involved in pursuing a litigated outcome. Often, courts may need to forecast the likely range of possible classwide recoveries and the likelihood of success in obtaining such results. That forecast cannot be done with arithmetic accuracy, but it can provide a benchmark for comparison with the settlement figure.

If the class has not yet been certified for trial, the court may consider whether certification for litigation would be granted were the settlement not approved.

Examination of the attorney-fee provisions may also be valuable in assessing the fairness of the proposed settlement. Ultimately, any award of attorney's fees must be evaluated under Rule 23(h), and no rigid limits exist for such awards. Nonetheless, the relief actually delivered to the class can be a significant factor in determining the appropriate fee award.

Often it will be important for the court to scrutinize the method of claims processing to ensure that it facilitates filing legitimate claims. A claims processing method should deter or defeat unjustified claims, but the court should be alert to whether the claims process is unduly demanding.

Paragraph (D) calls attention to a concern that may apply to some class action settlements--inequitable treatment of some class members vis-a-vis others. Matters of concern could include whether the apportionment of relief among class members takes appropriate account of differences among their claims, and whether the scope of the release may affect class members in different ways that bear on the apportionment of relief.

**Subdivisions (e)(3) and (e)(4).** Headings are added to subdivisions (e)(3) and (e)(4) in accord with style conventions. These additions are intended to be stylistic only.

**Subdivision (e)(5).** The submissions required by Rule 23(e)(1) may provide information critical to decisions whether to object or opt out. Objections by class members can provide the court with important information bearing on its determination under Rule 23(e)(2) whether to approve the proposal.

**Subdivision (e)(5)(A).** The rule is amended to remove the requirement of court approval for every withdrawal of an objection. An objector should be free to withdraw on concluding that an objection is not justified. But Rule 23(e)(5)(B)(i) requires court approval of any payment or other consideration in connection with withdrawing the objection.

The rule is also amended to clarify that objections must provide sufficient specifics to enable the parties to respond to them and the court to evaluate them. One feature required of objections is specification whether the objection asserts interests of only the objector, or of some subset of the class, or of all class members. Beyond that, the rule directs that the objection state its grounds "with specificity." Failure to provide needed specificity may be a basis for rejecting an objection. Courts should take care, however, to avoid unduly burdening class members who wish to object, and to recognize that a class member who is not represented by counsel may present objections that do not adhere to technical legal standards.

**Subdivision (e)(5)(B).** Good-faith objections can assist the court in evaluating a proposal under Rule 23(e)(2). It is legitimate for an objector to seek payment for providing such assistance under Rule 23(h).

But some objectors may be seeking only personal gain, and using objections to obtain benefits for themselves rather than assisting in the settlement-review process. At least in some instances, it seems that objectors--or their counsel--have sought to obtain consideration for withdrawing their objections or dismissing appeals from judgments approving class settlements. And class counsel sometimes may feel that avoiding the delay produced by an appeal justifies providing payment or other consideration to these objectors. Although the payment may advance class interests in a particular case, allowing payment perpetuates a system that can encourage objections advanced for improper purposes.

The court-approval requirement currently in Rule 23(e)(5) partly addresses this concern. Because the concern only applies when consideration is given in connection with withdrawal of an objection, however, the amendment requires approval under Rule 23(e)(5)(B)(i) only when consideration is involved. Although such payment is usually made to objectors or their counsel, the rule also requires court approval if a payment in connection with forgoing or withdrawing an objection or appeal is instead to another recipient. The term "consideration" should be broadly interpreted, particularly when the withdrawal includes some arrangements beneficial to objector counsel. If the consideration involves a payment to counsel for an objector, the proper procedure is by motion under Rule 23(h) for an award of fees.

Rule 23(e)(5)(B)(ii) applies to consideration in connection with forgoing, dismissing, or abandoning an appeal from a judgment approving the proposal. Because an appeal by a class-action objector may produce much longer delay than an objection before the district court, it is important to extend the court-approval requirement to apply in the appellate context. The district court is best positioned to determine whether to approve such arrangements; hence, the rule requires that the motion seeking approval be made to the district court.

Until the appeal is docketed by the circuit clerk, the district court may dismiss the appeal on stipulation of the parties or on the appellant's motion. See Fed. R. App. P. 42(a). Thereafter, the court of appeals has authority to decide whether to dismiss the appeal. This rule's requirement of district court approval of any consideration in connection with such dismissal by the court of appeals has no effect on the authority of the court of appeals to decide whether to dismiss the appeal. It is, instead, a requirement that applies only to providing consideration in connection with forgoing, dismissing, or abandoning an appeal.

**Subdivision (e)(5)(C).** Because the court of appeals has jurisdiction over an objector's appeal from the time that it is docketed in the court of appeals, the procedure of Rule 62.1 applies. That procedure does not apply after the court of appeals' mandate returns the case to the district court.

**Subdivision (f).** As amended, Rule 23(e)(1) provides that the court must direct notice to the class regarding a proposed class-action settlement only after determining that the prospect of eventual class certification justifies giving notice. But this decision does not grant or deny class certification, and review under Rule 23(f) would be premature. This amendment makes it clear that an appeal under this rule is not permitted until the district court decides whether to certify the class.

The rule is also amended to extend the time to file a petition for review of a class-action certification order to 45 days whenever a party is the United States, one of its agencies, or a United States officer or employee sued for an act or omission occurring in connection with duties performed on the United States' behalf. In such a case, the extension applies to a petition for permission

to appeal by any party. The extension recognizes--as under Rules 4(i) and 12(a) and Appellate Rules 4(a)(1)(B) and 40(a)(1)-- that the United States has a special need for additional time in regard to these matters. It applies whether the officer or employee is sued in an official capacity or an individual capacity. An action against a former officer or employee of the United States is covered by this provision in the same way as an action against a present officer or employee. Termination of the relationship between the individual defendant and the United States does not reduce the need for additional time.

Notes of Decisions (4496)

Fed. Rules Civ. Proc. Rule 23, 28 U.S.C.A., FRCP Rule 23
Including Amendments Received Through 6-1-21

---

**End of Document**

© 2021 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 63

# Manual for Complex Litigation, Fourth

Federal Judicial Center 2004

# Manual for Complex Litigation,
# Fourth

*Board of Editors*

Judge Stanley Marcus (Ct. of App., 11th Cir.), *chair*

| | |
|---|---|
| Judge John G. Koeltl (S.D.N.Y.) | Judge Barefoot Sanders (N.D. Tex.) |
| Judge J. Frederick Motz (D. Md.) | Sheila Birnbaum, Esq. (N.Y., N.Y.) |
| Judge Lee H. Rosenthal (S.D. Tex.) | Frank A. Ray, Esq. (Columbus, Ohio) |

Judge Fern M. Smith (N.D. Cal.),
*director, Federal Judicial Center 1999–2003*

Federal Judicial Center 2004

The *Manual for Complex Litigation, Fourth* has been produced under the auspices of the Federal Judicial Center. The analyses and recommendations are those of the *Manual*'s Board of Editors.

a class against it may be prejudicial[902] and may even deprive it of First Amendment rights.[903] It is important to balance any efficiencies that might be gained by this approach against the burden such mailings can impose. Before requiring a defendant to use its own mailings to provide certification notice, the court should require class counsel to show the absence of feasible alternatives.

## 21.312 Settlement Notice

Rule 23(e)(1)(B) requires the court to "direct notice in a reasonable manner to all class members who would be bound by a proposed settlement, voluntary dismissal, or compromise" regardless of whether the class was certified under Rule 23(b)(1), (b)(2), or (b)(3). Certification and settlement notices are subject to many of the same considerations.[904]

*When is a settlement notice required?* Rule 23(e) requires notice of a settlement only if it would bind the class. If individual members settle individual claims before class certification, notice to the class is not required even if the class claims have been dismissed without prejudice or withdrawn. When a proposed class has not been certified, however, special circumstances might lead a court to impose terms to prevent abuse of the class action procedure. Section 21.61 discusses potential abuses, especially the filing and voluntary dismissal of class allegations for strategic purposes; section 21.62 discusses criteria for reviewing proposed settlements, especially when named plaintiffs receive relief that is disproportionately large. The judge might also require notice directed to the absent members of the proposed class under Rule 23(d)(2).[905] However, requiring such notice is unusual. The court should

---

902. Katz v. Carte Blanche Corp., 496 F.2d 747, 757 (3d Cir. 1974) (en banc) (noting that credit card customers might refuse to pay their regular bills as a result of a notice including information about statutory damages).

903. *See* Pac. Gas & Elec. Co. v. Public Util. Comm'n, 475 U.S. 1 (1986) (plurality opinion in nonclass action context).

904. *See supra* note 880. *See, e.g.*, *In re* Nissan Motor Corp. Antitrust Litig., 552 F.2d 1088, 1105 (5th Cir. 1977).

905. The cases cited in this note were all decided under the pre-2003 version of Rule 23(e). *See, e.g.*, Diaz v. Trust Territory of Pac. Islands, 876 F.2d 1401, 1409 (9th Cir. 1989) (notice of a precertification voluntary dismissal of a complaint with class action allegations should be given to protect members of the proposed class from "prejudice [they] would otherwise suffer if class members have refrained from filing suit because of knowledge of the pending class action"; notice not required in Diaz case); *see also* Glidden v. Chromalloy Am. Corp., 808 F.2d 621, 627 (7th Cir. 1986) (dicta that notice of a settlement or summary judgment dismissal of a case before deciding on certification should be given because the settlement or dismissal "creates obvious dangers; the representative may have been a poor negotiator or may even be in cahoots with the defendant"); *In re* Nazi Era Cases Against German Defendants Litig., 198 F.R.D. 429, 439 (D.N.J.

weigh the costs and consequences of such notices against the need for the protection it may provide in a given case.[906]

*Who is to receive settlement notice and how is notice to be delivered?* Rule 23(e)(1)(B) requires notice in a reasonable manner to "all class members who would be bound by a proposed settlement, voluntary dismissal, or compromise." Even if a class member has opted out after receiving a certification notice, the parties might direct notice to such opt outs to give them an opportunity to opt back into the class and participate in the proposed settlement.

In general, settlement notices should be delivered or communicated to class members in the same manner as certification notices (see section 21.311). As with certification notices, individual notice is required, where practicable, in Rule 23(b)(3) actions. Posting notices and other information on the Internet, publishing short, attention-getting notices in newspapers and magazines, and issuing public service announcements may be viable substitutes for, or more often supplements to, individual notice if that is not reasonably practicable.

*When should the notice be given?* In an order preliminarily approving the settlement under Rule 23(e), the judge sets the date for providing notice of the proposed settlement. This order, as well as the notice, should establish the time and place of a public hearing on the proposed settlement and specify the procedure and timetable for opting out, filing objections, and appearing at the settlement hearing. If problems or questions concerning the terms of the settlement are identified at the preliminary approval stage, notice to the class ordinarily is deferred until there has been an opportunity to resolve those issues.

*What must the notice include?* The notice should announce the terms of a proposed settlement and state that, if approved, it will bind all class members. If the class has been certified only for settlement purposes, that fact should be disclosed. Even though a settlement is proposed, the notice should outline the original claims, relief sought, and defenses so class members can make an informed decision about whether to opt out.[907]

---

2000) (stating that "a district court should make a 'proper inquiry' to determine whether a proposed settlement and dismissal are tainted by collusion or will prejudice absent members of the putative class"); Gassie v. SMH, Ltd., Civ. A. No. 97-1786, 1997 U.S. Dist. LEXIS 13687, at *4–*5 (E.D. La. Sept. 9, 1997) (same).

906. *Diaz*, 876 F.2d at 1411.

907. If the class had been certified previously under Rule 23(b)(3), and if the parties propose a class settlement after expiration of the opportunity for class members to opt out, Rule 23(e)(3) authorizes the court, in its discretion, to refuse to approve a settlement unless the parties provide a second opportunity to opt out. *See infra* section 21.611.

The notice should

- define the class and any subclasses;
- describe clearly the options open to the class members and the deadlines for taking action;
- describe the essential terms of the proposed settlement;
- disclose any special benefits provided to the class representatives;
- provide information regarding attorney fees (see section 14);
- indicate the time and place of the hearing to consider approval of the settlement;
- describe the method for objecting to (or, if permitted, for opting out of) the settlement;
- explain the procedures for allocating and distributing settlement funds, and, if the settlement provides different kinds of relief for different categories of class members, clearly set forth those variations;
- explain the basis for valuation of nonmonetary benefits if the settlement includes them;
- provide information that will enable class members to calculate or at least estimate their individual recoveries, including estimates of the size of the class and any subclasses;[908] and
- prominently display the address and phone number of class counsel and how to make inquiries.

In a Rule 23(b)(3) class, the notice and any Internet Web site should include opt-out forms. The notice must clearly explain the options available to a class member and the difference between opting out and claiming benefits.[909] If the details of a claims procedure have been determined, and there is little

908. *See, e.g.*, Grunin v. Int'l House of Pancakes, 513 F.2d 114, 122 (8th Cir. 1975) (stating "the notice may consist of a very general description of the proposed settlement, including a summary of the monetary and other benefits that the class would receive and an estimation of attorneys' fees and other expenses"); Boggess v. Hogan, 410 F. Supp. 433, 442 (N.D. Ill. 1975) (stating "the notice should . . . include . . . an estimated range of unitary recovery"). *Cf.* 3 Alba Conte & Herbert B. Newberg, Newberg on Class Actions § 8:32, at 265 (4th ed. 2002) (indicating that "[i]t is unnecessary for the settlement distribution formula to specify precisely the amount that each individual class member may expect to recover").

909. *But see In re* Domestic Air Transp. Antitrust Litig., 141 F.R.D. 534, 554 (N.D. Ga. 1992) (refusing to include opt-out form with notice to class because of "possible confusion resulting from inclusion of such a form" (citing Roberts v. Heim, 130 F.R.D. 416, 423 (N.D. Cal. 1988) (disallowing opt-out form with class notice on the basis that "on balance, such a separate form will engender confusion and encourage investors to unwittingly opt out of the class"))); *see also* 3 Conte & Newberg, *supra* note 908, § 8:31, at 257–59 (describing use of forms for class members to notify court of desire to be excluded).

indication of any serious challenge to or problems with the settlement, claims forms might be included with the settlement notice. Often, however, the outcome of objections to or concerns over the settlement terms and the details of allocation and distribution are not established until after the settlement is approved. In that situation, claims forms are distributed after the approval.[910] The court can direct class counsel or their agents (such as settlement claims administrators) to communicate with class members whose intentions are unclear in order to help ensure that they make an informed election or exclusion of class membership and that the outcome (claimant status or opt-out status) is what they intended. Rule 23(d)(2) permits the court to revoke inadvertent opt outs to protect class members' interests and advance "the fair conduct of the action."

In most instances, the notice does not include the full text of the proposed settlement. If the agreement itself is not distributed, however, the notice must contain a clear, accurate description of the key terms of the settlement and inform class members where they can examine or obtain a copy, such as from the Internet, the clerk's office, class counsel, or another readily accessible source. For example, in an employment discrimination case, the agreement may be obtained from a defendant's employer's office.

*Who pays for the notice?* The parties generally use the settlement agreement to allocate the cost of settlement notices. The costs are often assessed against a fund created by the defendants or to the defendant, in addition to any funds paid to the class.

## 21.313 Other Court Notices

Rule 23(d)(2) authorizes the court to require that notice be given

> for the protection of the members of the class . . . of any step in the action, or of the proposed extent of the judgment, or of the opportunity of members to signify whether they consider the representation fair and adequate, to intervene and present claims or defenses, or otherwise to come into the action.

---

910. For example, in *In re Holocaust Victim Assets Litigation ("Swiss Banks")*, the pre-fairness hearing on worldwide notice did not include a detailed plan of allocation; instead, the notice program was actively used to solicit allocation proposals and preferences from the class members themselves. These were submitted to a court-appointed special master, who in turn considered the suggestions and prepared a detailed plan of allocation, after final settlement approval, that the court ultimately approved and implemented. *See In re* Holocaust Victim Assets Litig., No. CV 96-4849, 2000 U.S. Dist. LEXIS 20817, at *13 (E.D.N.Y. Nov. 22, 2000).